# **<u>EXHIBIT A</u>**

David J. Burman (admitted *pro hac vice*)
DBurman@perkinscoie.com
Cori G. Moore (admitted *pro hac vice*)
CGMoore@perkinscoie.com
Eric J. Weiss (admitted *pro hac vice*)
EWeiss@perkinscoie.com
Nicholas H. Hesterberg (admitted *pro hac vice*)
NHesterberg@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Joren S. Bass, Bar No. 208143
JBass@perkinscoie.com
**PERKINS COIE LLP**
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:  415.344.7120
Facsimilie:  415.344.7320

Attorneys for Plaintiff
COSTCO WHOLESALE CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COSTCO WHOLESALE CORPORATION, | Master File No. 3:07-cv-05944-SC |
| Plaintiff, | MDL No. 1917 |
| v. | Individual Case No. 3:11-cv-06397 |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA | FIRST AMENDED COMPLAINT AND JURY DEMAND |

1  AMAZONIA INDUSTRIA ELECTRONICA
   LTDA.; SAMSUNG ELECTRONICS CO.,
2  LTD.; SAMSUNG ELECTRONICS AMERICA,
   INC.; SAMSUNG SDI CO., LTD.; SAMSUNG
3  SDI AMERICA, INC.; SAMSUNG SDI
   MEXICO S.A. DE C.V.;  SAMSUNG SDI
4  BRASIL LTDA.; SHENZHEN SAMSUNG SDI
   CO., LTD.; TIANJIN SAMSUNG SDI CO.,
5  LTD.; SAMSUNG SDI (MALAYSIA) SDN.
   BHD.; SAMTEL COLOR LTD.; THAI CRT
6  CO., LTD.; TOSHIBA CORPORATION;
   TOSHIBA AMERICA, INC.; TOSHIBA
7  AMERICA CONSUMER PRODUCTS, LLC;
   TOSHIBA AMERICA ELECTRONIC
8  COMPONENTS, INC.; TOSHIBA AMERICA
   INFORMATION SYSTEMS, INC.;
9  CHUNGHWA PICTURE TUBES, LTD.;
   CHUNGHWA PICTURE TUBES
10 (MALAYSIA); TECHNICOLOR SA;
   TECHNICOLOR USA, INC.; MITSUBISHI
11 ELECTRIC CORPORATION; MITSUBISHI
   DIGITAL ELECTRONICS AMERICA, INC.;
12 MITSUBISHI ELECTRIC & ELECTRONICS,
   USA, INC.
13
                    Defendants.
14

15        Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive
16
   relief under the antitrust laws of the United States and of the states of California, Arizona,
17
   Florida, Illinois, and Washington.  Costco alleges as follows based on information including the
18
   pleas and prosecutions of certain Defendants and their executives as well as allegations in the
19
   complaints of the direct and indirect purchaser classes and of other direct action plaintiffs,
20
   allegations that were in some cases tested by motions to dismiss in MDL No. 1917.
21
                                      **INTRODUCTION**
22
          1.      Defendants and their co-conspirators formed an international cartel that conducted a
23
   conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the
24
   "Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or
25
   maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs").  The effects
26
   of the conspiracy on prices lasted into at least 2008.
27

28
                                            2

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them are referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.      Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.  The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.      Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.      Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

6.      The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in

3

1   greater detail below.  There were at least 500 conspiracy meetings and communications during

2   the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia,

3   Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from

4   the highest levels of the companies, as well as regional managers and others.

5        7.      The conspiracy affected billions of dollars of commerce throughout the United

6   States.

7        8.      This conspiracy is being investigated by the United States Department of Justice

8   ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ

9   was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who

10  had a two-count indictment issued against him by a federal grand jury in San Francisco on

11  February 10, 2009.  Since then, five more individuals have been indicted in connection with

12  Defendants' CRT price-fixing conspiracy.

13       9.      Throughout the Relevant Period, the conspiracy moderated the normal downward

14  pressure on prices caused by periods of oversupply, process and other efficiency gains, and

15  technological change.  The prices of producers who were not members of the conspiracy were

16  also higher as a result of the conspiracy than they otherwise would have been.  Defendants'

17  conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when

18  prices declined, they declined from supra-competitive levels, rather than levels set by free and

19  open competition, and prices declined less than they would have in a competitive market.  As a

20  result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any

21  source than it would have paid in a competitive market.

22       10.     During the Relevant Period, Costco purchased CRT Products in the United States

23  directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants'

24  conspiracy, and brings this action to recover the overcharges paid for the CRT Products

25  containing price-fixed CRTs it purchased during the Relevant Period.

26

27

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

1

**PARTIES**

2

**A.      Plaintiff**

3          11.      Plaintiff Costco Wholesale Corporation is now a Washington corporation with its

4  principal place of business in Issaquah, Washington.  Costco operates throughout the United

5  States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

6          12.      Costco Wholesale Corporation is the result of the combination of two companies:

7  Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to

8  76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in

9  Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993,

10  Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware.

11  As the new name suggested, the two companies were not fully integrated for many years, and the

12  company had two principal executive offices, in San Diego, California, and Kirkland,

13  Washington.  Many headquarters functions continued in California during the Relevant Period.

14  In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in

15  Washington.

16          13.      During the Relevant Period, Costco purchased in the United States large numbers

17  of CRT Products whose prices were inflated by the conspiracy.  Costco purchased and sold more

18  such CRT Products in California than in any other state during the Relevant Period.  Costco's

19  negotiations for the purchase of CRT Products took place primarily in the United States, and the

20  basic choice of vendors was made from the company's headquarters.  Decisions among approved

21  vendors and as to volumes to purchase were made in, and Costco purchase orders were created in

22  and issued from, regional offices located in multiple states including California, Washington,

23  Texas, Virginia, and Georgia.  Costco issued more purchase orders for CRT Products from

24  California than from any other state.  The purchase orders reflected the volumes affected by and

25  incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to

26  Costco in Washington, with the invoices reflecting volumes and prices specified in purchase

27  orders issued from the regional offices.

28

5

14. Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida. Costco received far more CRT Products in California than in any other state.

15. Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16. Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business. There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations. Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B. Defendants**

    **1. Hitachi Entities**

17. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi,

6

Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

19.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

20.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

21.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

22.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001

7

1    Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

2    least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the

3    time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen

4    was a member of the Hitachi corporate group for all but the last two weeks of the Relevant

5    Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and

6    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7    United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

8    finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in

9    this complaint.

10          23.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

11   HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

12          **2.     IRICO Entities**

13          24.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its

14   principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

15   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

16   distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed,

17   sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates,

18   throughout the United States.

19          25.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

20   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

21   712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT

22   manufacturer in China and one of the leading global manufacturers of CRTs.  The website also

23   claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and

24   sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE

25   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

26   subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

27   the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this

28   complaint.

8

26.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.     Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.     LG Electronics Entities**

28.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

29.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

9

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

**4.     LP Displays**

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     BMCC**

33.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  BMCC is the second

10

largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.   Philips Entities

34.   Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Breitner Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.   Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips America relating to the antitrust violations alleged in this complaint.

36.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11

1    Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips

2    Taiwan relating to the antitrust violations alleged in this complaint.

3          37.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

4    Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

5    andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

6    controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

7    manufactured, marketed, sold, and distributed CRT Products, either directly or through its

8    subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

9    controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations

10   alleged in this complaint.

11         38.    Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are

12   collectively referred to as "Philips."

13         **7.    Samsung Entities**

14         39.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company

15   with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

16   dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.

17   During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products,

18   either directly or through subsidiaries or affiliates, throughout the United States.

19         40.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

20   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

21   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

22   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed

23   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

24   States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung

25   SEAI relating to the antitrust violations alleged in this complaint.

26         41.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

27   ("Samsung SDI") is a South Korean company with its principal place of business located at 575

28   Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a

                                          12

1   major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims

2   to be the world's leading company in the display and energy business, with 28,000 employees and

3   facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the

4   market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San

5   Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or

6   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

8   Samsung SDI relating to the antitrust violations alleged in this complaint.

9          42.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

10  corporation with its principal place of business located at 3333 Michelson Drive, Suite 700,

11  Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

12  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

13  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

14  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

15  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

16  violations alleged in this complaint.

17         43.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a

18  Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

19  Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned

20  and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

21  Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through

22  its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

23  dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to

24  the antitrust violations alleged in this complaint.

25         44.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

26  company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

27  Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and

28  controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

13

1   Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through

2   its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

3   dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

4   antitrust violations alleged in this complaint.

5           45.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

6   Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

7   Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

8   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

9   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

10  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

11  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

12  violations alleged in this complaint.

13          46.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

14  company with its principal place of business located at Developing Zone of Yi-Xian Park,

15  Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

16  subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

17  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

18  subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

19  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

20  antitrust violations alleged in this complaint.

21          47.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

22  Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

23  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

24  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

25  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

26  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27  United States.  Defendants SEC and Samsung SDI dominated and controlled the finances,

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

1    policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

2    complaint.

3         48.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

4    Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI

5    Malaysia and their subsidiaries and affiliates are collectively referred to as "Samsung."

6         **8.    Samtel**

7         49.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal

8    place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

9    Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's

10   largest exporter of CRT Products.  Samtel has gained safety approvals from the United States,

11   Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

12   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

13   subsidiaries and affiliates, throughout the United States.

14        **9.    Thai CRT**

15        50.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

16   Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

17   Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

18   televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and distributed

19   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

20   States.

21        **10.   Toshiba Entities**

22        51.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

23   place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

24   TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

25   monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-

26   defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

27   TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In

28   2002, TC consolidated its CRT business into MTPD, a joint venture with co-conspirator

15

1   Panasonic Corporation.  During the Relevant Period, TC manufactured, marketed, sold, and

2   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

3   United States.

4        52.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

5   with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

6   York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of

7   Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant TC dominated and controlled the finances, policies, and affairs of

10   Toshiba America relating to the antitrust violations alleged in this complaint.

11        53.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

12   liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.

13   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

14   During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products,

15   either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

16   TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust

17   violations alleged in this complaint.

18        54.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

19   California corporation with its principal place of business located at 19900 MacArthur Boulevard,

20   Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

21   Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

22   marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

24   policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

25        55.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

26   corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

27   92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

28   Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and

16

1   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

2   United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAIS

3   relating to the antitrust violations alleged in this complaint.

4          56.     Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively

5   referred to as "Toshiba."

6          **11.    Chunghwa Entities**

7          57.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

8   company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

9   Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

10  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

11  that market.  Chunghwa PT's Board of Directors includes representatives from Tatung Company,

12  and its Chairman is also the Chairman and General Manager of Tatung Company.  Throughout

13  the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the

14  Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly

15  or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United

16  States.

17         58.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

18  Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

19  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

20  owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

21  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

22  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

23  Products either directly or through its subsidiaries or affiliates throughout the United States.

24  Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of

25  Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

26         59.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as

27  "Chunghwa."

28

                                                 17

1

### 12.     Thomson Entities

2       60.      Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French

3 corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

4 Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

5 Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

6 plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs

7 internally to its television-manufacturing division, which had plants in the United States and

8 Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's

9 television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

10 televisions were sold in the United States to consumers under the RCA brand.  In November

11 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company,

12 TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-

13 Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by

14 TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

15 brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT

16 business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured,

17 marketed, sold and/or distributed CRT Products, either directly or indirectly through its

18 subsidiaries or affiliates, to customers throughout the United States.

19       61.      Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

20 ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business

21 located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer

22 Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a

23 major manufacturer of CRTs for the United States market, with plants located in Scranton,

24 Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were

25 closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-

26 manufacturing division, which had plants in the United States and Mexico, and to other television

27 manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the

28 United States to United States consumers under the RCA brand.  Thomson Consumer

18

1    Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was

2    sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics

3    manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

4    through its subsidiaries or affiliates, to customers throughout the United States.

5          62.    Thomson SA and Thomson Consumer Electronics are collectively referred to

6    herein as "Thomson."

7          **13.    Mitsubishi Entities**

8          63.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a

9    Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

10   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

11   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

12   internally to Mitsubishi's television and monitor manufacturing division and to other television

13   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

14   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

15   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

16   United States.

17         64.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric

18   USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.

19   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

20   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

21   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

22   and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

23   and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

24   CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

25   marketed, sold and distributed CRT Products in the United States.

26         65.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

27   United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi

28   Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period,

19

1   Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and

2   monitors in the United States.

3          66.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

4   collectively referred to herein as "Mitsubishi."

5   **C.     Agents and Co-Conspirators**

6          67.     The acts alleged against Defendants in this Complaint were authorized, ordered, or

7   done by their officers, agents, employees, or representatives while actively engaged in the

8   management and operation of Defendants' businesses or affairs.

9          68.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other

10  Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

11         69.     When Plaintiff refers to a corporate family or companies by a single name in

12  allegations of participation in the conspiracy, it is to be understood that one or more employees or

13  agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

14  every company in that family.  In fact, the individual participants in the conspiratorial meetings

15  and discussions did not always know the corporate affiliation of their counterparts, nor did they

16  distinguish between the entities within a corporate family.

17         70.     Individual participants entered into agreements on behalf of, and reported these

18  meetings and discussions to, their respective corporate families.  As a result, the entire corporate

19  families were represented in meetings and discussions by their agents and were parties to the

20  agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

21  families distributed CRT Products, these subsidiaries played a significant role in the conspiracy

22  because Defendants wished to ensure that the prices for such products would not undercut the

23  pricing agreements reached at these various meetings.  Thus, all entities within the corporate

24  families were active, knowing participants in the alleged conspiracy.

25         71.     Various persons or firms not named as Defendants participated as co-conspirators

26  in the alleged violations, performed acts, and made statements in furtherance of the conspiracy,

27  and manufactured, sold, and distributed CRT Products to customers in the United States.  These

28  co-conspirators include, but are not limited to: Panasonic Corporation (f/k/a Matsushita Electric

20

Industrial Co., Ltd.), Panasonic Corporation of North America ("PCNA"), MT Picture Display Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co., Ltd.) ("MTPD"), Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia"), Videocon Industries, Ltd., , Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, PT.MT Picture Display Indonesia, P.T. Tosummit Electronic Devices Indonesia ("TEDI"), and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

## JURISDICTION AND VENUE

72.     Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California, Washington, Arizona, Florida, and Illinois.

73.     This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331, which provides this Court with original jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C. § 1332 or, alternatively, 28 U.S.C. § 1367.

74.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this district and a substantial portion of affected interstate commerce was carried out in this district.

75.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of Washington.

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

76.     Related cases are pending in MDL No. 1917 in the Northern District of California, and this matter should be consolidated there for pretrial purposes but returned to this district for trial.

**FACTS AND BACKGROUND**

**A.     CRT Technology**

77.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue, and black.

78.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

79.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

80.     Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

81.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors

22

1    and similar devices.  The primary difference is that CDTs typically yield a higher resolution

2    image requiring more pixels than do CPTs.

3           82.    CRTs have no independent utility, and have value only as components of other

4    products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from

5    the demand for such products.  The market for CRTs and the market for the products into which

6    they are placed are inextricably intertwined because the CRT market exists to serve the CRT

7    Products markets.  The markets for CRTs and CRT Products are effectively inseparable.

8    Defendants are well aware of this intimate relationship.

9           83.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it

10   moves through the distribution system.  CRTs are identifiable, discrete physical objects that do

11   not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a

12   physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

13          84.    Throughout the Relevant Period, Defendants controlled the market for CRTs.

14   Consequently, during the Relevant Period, non-defendant original equipment manufacturers

15   ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were

16   artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful

17   conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has

18   suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants'

19   conspiracy.

20   **B.    Structure of the CRT Industry**

21          85.    The CRT industry has several characteristics that facilitated a conspiracy,

22   including market concentration, ease of information sharing, the consolidation of manufacturers,

23   multiple interrelated business relationships, significant barriers to entry, heightened price

24   sensitivity to supply and demand forces, and homogeneity of products.

25          **1.    Market Concentration**

26          86.    During the Relevant Period, the CRT industry was dominated by relatively few

27   companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high

28   concentration of market share facilitates coordination because there are fewer cartel members

23

among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2. Information Sharing

87.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

88.     Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

89.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

### 4. Multiple Interrelated Business Relationships

90.     The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

91.     Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

24

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003.

d.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

e.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

f.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

g.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips.

h.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

25

i.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

j.    Defendant Samtel claims to have supplied CRTs to Defendants including LG Electronics, Samsung, and Philips.

**5.    High Costs of Entry Into the Industry**

92.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources, and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

93.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.    Maturity of the CRT Product Market**

94.    Newer industries typically are characterized by rapid growth, innovation, and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

95.    Demand for CRT Products was declining through most or all of the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

96.    In addition, conventional CRT televisions and computer monitors were being replaced by LCD and plasma displays.  This was one of the factors which led Defendants to engage in price-fixing to slow the decline of CRT Product prices.  Between 2000 and 2006,

26

1    revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were

2    predicted to decline by an additional 84.5 percent between 2006 and 2010.

3            97.     Although demand was declining as a result of the popularity of flat-panel LCD and

4    plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant

5    display technology during most of the Relevant Period, making Defendants' collusion and the

6    international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

7    plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

8    cheaper alternative to these new technologies.

9            98.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for

10   computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

11   substantial share of the market.

12           99.     As for CRT televisions, they accounted for 73 percent of the North American

13   television market in 2004, and by the end of 2006, still held a 46 percent market share.

14           **7.     Homogeneity of CRT Products**

15           100.    CRT Products are commodity-like products manufactured in standardized sizes.

16   One Defendant's CRT Product for a particular application, such as a particular size television set

17   or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT

18   Products primarily on the basis of price.

19           101.    It is easier to form and sustain a cartel when the product in question is commodity-

20   like because it is easier to agree on prices to charge and to monitor those prices once an

21   agreement is formed.

22   **C.     Pre-Conspiracy Market**

23           102.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products

24   business became more international and Defendants began serving customers that were also being

25   served by other international companies.  During this period, the employees of Defendants would

26   encounter employees from their competitors when visiting their customers.  A culture of

27   cooperation developed over the years, and these Defendant employees would exchange market

28   information on production, capacity, and customers.

27

103.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

104.    To control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least March, 1995, through at least November 25, 2007.

105.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings and other communications and activities.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

106.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

107.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

108.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.    "Glass Meetings"**

109.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three levels of Defendants' corporations.

110.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

111.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

112.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

113.   The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

114.   Glass meetings also occurred occasionally in European countries.  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays,

1   Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo),

2   IRICO, and Thomson.  Chunghwa also attended these meetings.

3          115.    Representatives of Defendants also attended what were known in the conspiracy as

4   "green meetings."  These were meetings held on golf courses.  The green meetings were generally

5   attended by top and management level employees of Defendants.

6          116.    During the Relevant Period, glass meetings took place in Taiwan, South Korea,

7   Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

8          117.    Participants would often exchange competitively sensitive information prior to a

9   glass meeting.  This included information on inventories, production, sales, and exports.  For

10  some such meetings, where information could not be gathered in advance of the meeting, it was

11  brought to the meeting and shared.

12         118.    The glass meetings at all levels followed a fairly typical agenda.  First, the

13  participants exchanged competitive information such as proposed future CRT pricing, sales

14  volume, inventory levels, production capacity, exports, customer orders, price trends and

15  forecasts of sales volumes for coming months.  The participants also updated the information they

16  had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who

17  would write the information on a white board.  The meeting participants then used this

18  information to discuss and agree upon what price each would charge for CRTs to be sold in the

19  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

20  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of

21  CRTs that were sold to specific customers, and agreed upon target prices to be used in

22  negotiations with large customers.  Having analyzed the supply and demand, the participants

23  would also discuss and agree upon production cutbacks.

24         119.    During periods of oversupply, the focus of the meeting participants turned to

25  making controlled and coordinated price reductions.  This was referred to as setting a "bottom

26  price."

27         120.    Defendants' conspiracy included agreements on the prices at which certain

28  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

30

1   end products, such as televisions and computer monitors.  Defendants realized the importance of

2   keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

3   pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser

4   OEMs paid supracompetitive prices for CRTs.

5          121.    Each of the participants in these meetings knew, and in fact discussed, the

6   significant impact that the price of CRTs had on the cost of the finished products into which they

7   were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

8   were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

9   increases stick, they needed to make the increase high enough that their direct customers (CRT

10  TV and monitor makers) would be able to justify a corresponding price increase to their

11  customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

12         122.    The agreements reached at the glass meetings included:

13                 a.      agreements on CRT prices, including establishing target prices, "bottom"

14                         prices, price ranges, and price guidelines;

15                 b.      placing agreed-upon price differentials on various attributes of CRTs, such
16                         as quality or certain technical specifications;
17

18                 c.      agreements on pricing for intra-company CRTs sales to vertically

19                         integrated customers;

20                 d.      agreements as to what to tell customers about the reason for a price

21                         increase;

22
23                 e.      agreements to coordinate with competitors that did not attend the group

24                         meetings and agreements with them to abide by the agreed-upon pricing;

25                 f.      agreements to coordinate pricing with CRT manufacturers in other

26                         geographic markets such as Brazil, Europe, and India;

27

28

g.      agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demands;

h.      agreements to coordinate uniform public statements regarding available capacity and supply;

i.      agreements to allocate both overall market shares and share of a particular customer's purchases;

j.      agreements to allocate customers;

k.      agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.      agreements to keep their meetings secret.

123.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

124.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns about antitrust liability.

**2.      Bilateral Discussions**

125.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal

32

than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

126.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

127.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

128.   To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States. These CRT manufacturers were particularly important because they served the North American market for CRT Products.  North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained, and stabilized at supracompetitive levels.

129.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

130.   Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements

33

to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

131.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

132.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

133.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

34

134.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

135.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

136.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

137.    Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with the Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

138.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants and their co-conspirators wished

35

1    to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

2    pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing

3    participant in the alleged conspiracy.

4         139.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

5    glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

6    These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

7    bilateral discussions with the Defendants.  Through these discussions, MTPD agreed on prices

8    and supply levels for CRTs.

9         140.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

10   meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

11   engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese

12   CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for

13   CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the

14   Chinese government.  BMCC was acting to further its own independent private interests in

15   participating in the alleged conspiracy.

16        141.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

17   Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

18   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

19   LP Displays).  A substantial number of these meetings were attended by high level executives

20   from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

21   Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

22   effectively withdrew from this conspiracy.

23        142.    Defendants Philips America and Philips Brazil were represented at those meetings

24   and were a party to the agreements entered at them.  To the extent Philips America and Philips

25   Brazil sold or distributed CRT Products to direct purchasers, they played a significant role in the

26   conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct

27   purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus,

28   Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

36

143.     Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

144.     Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

145.     Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

146.     Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

147.     Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this

37

1    conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July

2    2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

3    148.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

4    bilateral meetings with its competitors.  These meetings were attended by high level sales

5    managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices,

6    production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

7    allocation, and new product development, and agreed on prices and supply levels for CRTs.

8    Mitsubishi never effectively withdrew from this conspiracy.

9    149.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT, and

10   TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

11   conspiracy through MTPD.  These meetings were attended by high level sales managers from

12   Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

13   Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and

14   supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

15   150.    Defendants Toshiba America, TACP, TAEC, and TAIS were represented at those

16   meetings and were a party to the agreements entered at them.  To the extent Toshiba America,

17   TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they played a

18   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

19   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

20   glass meetings.  Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing

21   participants in the alleged conspiracy.

22   151.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

23   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

24   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

25   were attended by the highest ranking executives from Chunghwa, including the former Chairman

26   and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each

27   of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on

28   prices and supply levels for CRTs.

38

152.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

153.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

## E.    The CRT Market During the Conspiracy

154.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

155.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.

## F.    International Government Antitrust Investigations

156.    Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

39

157.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

158.     In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

159.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

160.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

161.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states

40

that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

162.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

163.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

164.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.  The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

165.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the

41

CRT market.  The companies fined by the European Commission included Chunghwa, LG
Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly
Thomson).  The Commission Vice President in charge of competition policy said, "These cartels
for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive
behavior that are strictly forbidden to companies doing business in Europe."  The press release
accompanying the fines further notes that the CRT cartels were "among the most organised
cartels that the Commission has investigated."

166.    Several Defendants also have a history of "cooperation" and anticompetitive
conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of
Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random
Access Memory ("DRAM").

167.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.
Department of Justice as part of an ongoing investigation for fixing prices of Static Random
Access Memory ("SRAM") and NAND Flash Memory.

168.    In December 2006, government authorities in Japan, Korea, the European Union
and the United States revealed a comprehensive investigation into anticompetitive conduct in the
closely-related TFT-LCD market.

169.    On November 12, 2008, the DOJ announced that it had reached agreements with
three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America,
Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of the
Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a
conspiracy to fix prices of TFT-LCD panels.

170.    On March 10, 2009, the DOJ announced that it had reached an agreement with
Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations
of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a
conspiracy to fix the prices of LCD panels.

**G.     The Role of Trade Associations During the Relevant Period**

171.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

172.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

173.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

174.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

175.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of the Conspiracy**

176.     The conspiracy has had the following effects, among others:

a.     Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

b.     Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.     Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

177.     During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.

178.     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**FRAUDULENT CONCEALMENT**

179.     Costco had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Costco did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least late November 2007, when investigations by the United States and other antitrust authorities became widely reported.  Defendants' secret conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

44

180.     Because Defendants' conspiracy was kept secret, Plaintiff was unaware of Defendants' unlawful conduct and did not know that it was paying artificially high prices for CRT Products.

181.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

182.     Defendants' price-fixing conspiracy was inherently self-concealing.

183.     Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.  The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

184.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at

45

1    such meetings to avoid being seen in public with each other and with the express purpose and

2    effect of keeping them secret.

3         185.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual

4    reasons for price increases and output reductions to their customers.

5         186.    Despite the ever-increasing popularity of, and intensifying competition from, flat

6    panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout

7    1995 according to a CNET News.com article.  This price stabilization was purportedly due

8    exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal

9    the conspiracy.

10        187.    In early 1999, despite declining production costs and the rapid entry of flat panel

11   display products, the price of large-sized color CRTs actually rose.  The price increase was

12   allegedly based on increasing global demand for the products.  In fact, this price rise was the

13   result of collusive conduct amongst Defendants.

14        188.    As alleged above, despite increased competition from flat panel monitors, prices

15   for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

16   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

17   This was a pretext used to cover up the conspiracy.

18        189.    In addition, when several CRT manufacturers, including Defendants Samsung,

19   Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a

20   shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a

21   Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of

22   glass shells] is a global phenomena and every company has to increase the prices of CRT

23   monitors in due course of time."

24        190.    Manufacturers such as LG Electronics periodically issued press statements falsely

25   asserting that CRT prices were being driven lower by intense competition.

26        191.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported

27   reasons for the price increases of CRTs were materially false and misleading and made for the

28   purpose of concealing Defendants' anti-competitive scheme as alleged herein.

46

192.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

### *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

193.    As discussed at length in Paragraphs 158-72 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Costco's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

194.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

195.    As shown by Costco's allegations in Paragraphs 1 and 10 and the following causes of action, Costco was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

### FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

196.    Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

197.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

47

198.    In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

199.    As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

200.    The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

201.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

202.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

**SECOND CAUSE OF ACTION**
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

203.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

204.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

48

1    205.    As a result of Defendants' unlawful conduct, Costco was injured in its business

2    and property in that it paid more for CRT Products than it otherwise would have paid in the

3    absence of Defendants' unlawful conduct, and lost sales of CRT Products.

4    206.    Even CRT Product manufacturers who were not part of the conspiracy charged

5    higher prices than they otherwise would have when they were forced to pay supra-competitive

6    prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers,

7    including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

8    Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.

9    Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made

10   by Defendants and their co-conspirators.

11                          **THIRD CAUSE OF ACTION**
                **(Violation of the Washington Consumer Protection Act, RCW 19.86.030)**
12

13   207.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the

14   allegations in paragraphs 1 through 184 above.

15   208.    Defendants and their co-conspirators entered into a continuing contract,

16   combination, or conspiracy to unreasonably restrain trade and commerce in violation of the

17   Washington Consumer Protection Act, RCW 19.86.030.

18   209.    As a result of Defendants' unlawful conduct, Costco was injured in its business

19   and property in that it paid more for CRT Products than it otherwise would have paid in the

20   absence of Defendants' unlawful conduct, and lost sales of CRT Products.

21   210.    Even CRT Product manufacturers who were not part of the conspiracy charged

22   higher prices than they otherwise would have when they were forced to pay supra-competitive

23   prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers,

24   including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

25   Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.

26   Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made

27   by Defendants and their co-conspirators.

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

**FOURTH CAUSE OF ACTION**
**(Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)**

211.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

212.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

213.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

214.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**FIFTH CAUSE OF ACTION**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat.**
**§ 501.201, *et seq.*)**

215.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

216.    Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

217.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

50

218.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently of whether they constitute a violation of the Sherman Act.

219.    Defendants' and their co-conspirators' acts are fraudulent or deceptive.

220.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

221.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## SIXTH CAUSE OF ACTION
### (Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)

222.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 209 above.

223.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

224.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

225.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

51

Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D.      Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E.      Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

1        F.      Costco shall recover such other and further relief as the Court deems just.

2   DATED:                       By: _____

David J. Burman (admitted *pro hac vice*)
Cori G. Moore (admitted *pro hac vice*)
Eric J. Weiss (admitted *pro hac vice*)
Nicholas H. Hesterberg (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email:   DBurman@perkinscoie.com
          CGMoore@perkinscoie.com
          EWeiss@perkinscoie.com
          NHesterberg@perkinscoie.com

Joren S. Bass, Bar No. 208143
**PERKINS COIE** LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:  415.344.7120
Facsimilie:  415.344.7320
Email:  JBass@perkinscoie.com

Attorneys for Plaintiff
COSTCO WHOLESALE CORPORATION

LEGAL25416835.5

53

# **EXHIBIT B**

1    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
     Roman M. Silberfeld, Bar No. 62783
2    RMSilberfeld@rkmc.com
     David Martinez, Bar No. 193183
3    DMartinez@rkmc.com
     2049 Century Park East, Suite 3400
4    Los Angeles, CA  90067-3208
     Telephone:     310-552-0130
5    Facsimile:      310-229-5800

6    Attorneys for Plaintiffs
     BEST BUY CO., INC.; BEST BUY PURCHASING
7    LLC; BEST BUY ENTERPRISE SERVICES, INC.;
     BEST BUY STORES, L.P.; BESTBUY.COM,
8    L.L.C.; and MAGNOLIA HI-FI, INC.

9

10                  **UNITED STATES DISTRICT COURT**

11                **NORTHERN DISTRICT OF CALIFORNIA**

12

13   BEST BUY CO., INC.; BEST BUY            Case No.  Master File No. 3:07-cv-05944-SC
     PURCHASING LLC; BEST BUY
14   ENTERPRISE SERVICES, INC.; BEST         MDL No. 1917
     BUY STORES, L.P.; BESTBUY.COM,
15   L.L.C.; and MAGNOLIA HI-FI, LLC,        Individual Case No. 3:11-cv-05513-SC

16                  Plaintiffs,             **FIRST AMENDED COMPLAINT**

17          v.                              **JURY TRIAL DEMANDED**

18   HITACHI, LTD.; HITACHI DISPLAYS,
     LTD.; HITACHI AMERICA, LTD.;
19   HITACHI ASIA, LTD.; HITACHI
     ELECTRONIC DEVICES (USA), INC.;
20   SHENZHEN SEG HITACHI COLOR
     DISPLAY DEVICES, LTD.; IRICO
21   GROUP CORPORATION; IRICO
     GROUP ELECTRONICS CO., LTD.;
22   IRICO DISPLAY DEVICES CO., LTD.;
     LG ELECTRONICS, INC.; LG
23   ELECTRONICS USA, INC.; LG
     ELECTRONICS TAIWAN TAIPEI CO.,
24   LTD.; LP DISPLAYS INTERNATIONAL
     LTD.; PANASONIC CORPORATION;
25   PANASONIC CORPORATION OF
     NORTH AMERICA; MT PICTURE
26   DISPLAY CO., LTD.; BEIJING
     MATSUSHITA COLOR CRT CO., LTD.;
27   KONINKLIJKE PHILIPS
     ELECTRONICS N.V.; PHILIPS
28   ELECTRONICS NORTH AMERICA

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

_____
                              FIRST AMENDED COMPLAINT

1  | CORPORATION; PHILIPS
2  | ELECTRONICS INDUSTRIES
3  | (TAIWAN), LTD.; PHILIPS DA
   | AMAZONIA INDUSTRIA
3  | ELECTRONICA LTDA.; SAMTEL
   | COLOR LTD.; THAI CRT CO., LTD.;
4  | TOSHIBA CORPORATION; TOSHIBA
   | AMERICA, INC.; TOSHIBA AMERICA
5  | CONSUMER PRODUCTS, LLC;
   | TOSHIBA AMERICA ELECTRONIC
6  | COMPONENTS, INC.; TOSHIBA
   | AMERICA INFORMATION SYSTEMS,
7  | INC.; CHUNGHWA PICTURE TUBES,
   | LTD.; CHUNGHWA PICTURE TUBES
8  | (MALAYSIA); THOMSON SA;
   | TECHNICOLOR USA, INC.;
9  | MITSUBISHI ELECTRIC
   | CORPORATION; MITSUBISHI
10 | DIGITAL ELECTRONICS AMERICA,
   | INC.; MITSUBISHI ELECTRIC &
11 | ELECTRONICS, USA, INC. Defendants.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Plaintiffs, Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, LLC (collectively "Plaintiffs" or "Best Buy"), for their Complaint against all Defendants named herein, hereby allege as follows:

## I.  **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be

1    referred to collectively herein as "CRT Products."

2          3.      Defendants control the majority of the CRT industry, a multibillion dollar market,

3    which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant

4    Period, virtually every household in the United States owned at least one CRT Product.

5          4.      Since the mid-1990s, the CRT industry faced significant economic pressures as

6    customer preferences for other emerging technologies shrank profits and threatened the

7    sustainability of the industry.  In order to maintain price stability, increase profitability, and

8    decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

9    contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

10   States.

11         5.      With respect to CRTs, Defendants or their agents agreed, *inter alia*, to:  (a) fix

12   target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments,

13   prices, production and customer demand; (c) coordinate public statements regarding available

14   capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

15   of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

16   agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;

17   (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit

18   competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of

19   certain key customers' sales; and (k) restrict output.

20         6.      The conspiracy concerning CRTs commenced with bilateral meetings that began

21   in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995,

22   the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings

23   had become more formalized, as described in greater detail below.  There were at least 500

24   conspiracy meetings during the Relevant Period, including hundreds of group meetings and

25   hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

26   South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

27   meetings included representatives from the highest levels of the respective companies, as well as

28   regional managers and others.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

- 3 -                                FIRST AMENDED COMPLAINT

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.    **JURISDICTION AND VENUE**

10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiffs also bring this action pursuant to the Minnesota Antitrust Act of 1971 because Plaintiffs purchased in Minnesota CRT Products from both Defendants and non-Defendant vendors containing price-fixed CRTs manufactured by Defendants.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiffs.

14.     This court has jurisdiction over each Defendant named in this action.  Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

### III.   PARTIES

#### A.     Plaintiffs

16.     Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated retail stores throughout the United States and sold CRT Products in those stores.

17.     Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and principal places of business in Richfield, Minnesota.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

18.     Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its headquarters and principal place of business in Richfield, Minnesota.  Best Buy Stores, L.P. operates retail stores throughout the United States and sells CRT Products in those stores.

19.     Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its headquarters and principal place of business in Richfield, Minnesota.  BestBuy.com, L.L.C. is a wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

20.     During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for CRT Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C.  These negotiations, purchasing and payments took place out of Best Buy's principal place of business and headquarters in Richfield, Minnesota.

21.     Plaintiff Magnolia Hi-Fi, LLC ("MHF") is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video.  MHF is a specialty consumer electronic retailer that operates several Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and several Magnolia Home Theater stores located within Best Buy stores.  During the Relevant Time Period, MHF's purchasing of CRT Products took place in its headquarters in Kent Washington.

22.     During the Relevant Period, Best Buy purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Best Buy suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

23.     Those products were kept as inventory and sold in Minnesota and every other state where Best Buy retail stores were located, and over the internet throughout the United States.

24.     As a result of the Best Buy Plaintiffs' presence, purchases, and sales in Minnesota, and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled to the protection of the Sherman Act and the antitrust laws of Minnesota.

FIRST AMENDED COMPLAINT

B.    **Defendants**

    1.    **Hitachi Entities**

25.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

27.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

FIRST AMENDED COMPLAINT

During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.     IRICO Entities

32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed,

2  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

3  throughout the United States.

4      33.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

5  its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

6  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer

7  in China and one of the leading global manufacturers of CRTs.  Their website also claims that in

8  2003, they were the largest CRT manufacturer in China in terms of production and sales volume,

9  sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured,

10  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11  affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances,

12  policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

13      34.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with

14  its principal place of business located at No. 16, Fenghui South Road West, District High-tech

15  Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.

16  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured,

17  marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or

18  affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances,

19  policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

20      35.    Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

21          **3.    LG Electronics Entities**

22      36.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the

23  laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20

24  Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global

25  force in consumer electronics, home appliances and mobile communications, which established its

26  first overseas branch office in New York in 1968.  The company's name was changed from Gold

27  Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United

28  States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

37.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

38.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

39.    Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.    LP Displays**

40.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI

would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     Panasonic Entities**

41.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this Complaint.

43.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

46.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York  10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2   affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the

3   finances, policies and affairs of Philips America relating to the antitrust violations alleged in this

4   Complaint.

5         48.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

6   Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,

7   Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.

8   During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT

9   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

10  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

11  Taiwan relating to the antitrust violations alleged in this Complaint.

12        49.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

13  Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

14  andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

15  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

16  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

17  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

18  controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations

19  alleged in this Complaint.

20        50.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

21  collectively referred to herein as "Philips."

22          **7.**    **Samtel**

23        51.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal

24  place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

25  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest

26  exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada,

27  Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

28  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

FIRST AMENDED COMPLAINT

subsidiaries and affiliates, throughout the United States.

### 8.   Thai CRT

52.      Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 9.   Toshiba Entities

53.      Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

54.      Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York  10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

55.      Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey  07470-3114.

- 14 -                           FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

2  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT

3  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

4  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the

5  antitrust violations alleged in this Complaint.

6       56.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

7  California corporation with its principal place of business located at 19900 MacArthur Boulevard,

8  Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

9  Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

10  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

12  policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

13      57.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

14  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

15  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

16  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or

17  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

18  United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS

19  relating to the antitrust violations alleged in this Complaint.

20      58.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively

21  referred to herein as "Toshiba."

22              **10.    Chunghwa Entities**

23      59.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

24  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

25  Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

26  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

27  that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

28  manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed

- 15 -                                              FIRST AMENDED COMPLAINT

1   CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou

2   subsidiary) throughout the United States.

3        60.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

4   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

5   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

6   owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

7   production, and it has established itself as one of the leading worldwide suppliers of CRTs.

8   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

9   Products either directly or through its subsidiaries or affiliates throughout the United States.

10  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa

11  Malaysia relating to the antitrust violations alleged in this Complaint.  Defendants Chunghwa PT

12  and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

13       **12.    Thomson Entities**

14       61.     Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

15  corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

16  Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

17  Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

18  plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs

19  internally to its television-manufacturing division, which had plants in the United States and

20  Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's

21  television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

22  televisions were sold in the United States to consumers under the RCA brand.  In November 2003,

23  Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL

24  Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-

25  Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by

26  TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

27  brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT

28  business to Videocon.  During the Relevant Period, Thomson SA manufactured, marketed, sold

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

2   to customers throughout the United States.

3          62.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

4   ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business

5   located at 10330 N Meridian St., Indianapolis, IN 46290-1024.  Thomson Consumer Electronics is

6   a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major

7   manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania,

8   Marion, Indiana and Mexicali, Mexico.  The United States-based plants were closed in 2004.

9   Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing

10  division, which had plants in the United States and Mexico, and to other television manufacturers

11  in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to

12  United States consumers under the RCA brand.  Thomson Consumer Electronics' television

13  business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.

14  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or

15  distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

16  customers throughout the United States.

17         63.     Thomson SA and Thomson Consumer Electronics are collectively referred to

18  herein as "Thomson."

19         **12.    Mitsubishi Entities**

20         64.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a

21  Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

22  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

23  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally

24  to Mitsubishi's television and monitor manufacturing division and to other television and monitor

25  manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also

26  purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric

27  Japan manufactured, marketed, sold and distributed CRT Products in the United States.

28

1      65.      Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric

2  USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.

3  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

4  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

5  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

6  and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

7  and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

8  CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

9  marketed, sold and distributed CRT Products in the United States.

10      66.      Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

11  United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.  Mitsubishi Digital is

12  a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi

13  Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in

14  the United States.

15      67.      Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

16  collectively referred to herein as "Mitsubishi."

17

18  **IV.    AGENTS AND CO-CONSPIRATORS**

19      68.      The acts alleged against Defendants in this Complaint were authorized, ordered, or

20  done by their officers, agents, employees, or representatives, while actively engaged in the

21  management and operation of Defendants' businesses or affairs.

22      69.      Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of,

23  or for, other Defendants and co-conspirators with respect to the acts, violations, and common

24  course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of

25  a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent

26  company.

27      70.      Various persons and/or firms not named as Defendants in this Complaint

28  participated as co-conspirators in the violations alleged herein and may have performed acts and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company, Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Videocon Industries, Ltd., and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

71.     Co-conspirator Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

72.     Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey  07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this Complaint.

73.     Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San

1   Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or

2   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

3   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

4   Samsung SDI relating to the antitrust violations alleged in this Complaint.

5          74.     Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a

6   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

7   700, Irvine, California  92612.  Samsung America is a wholly-owned and controlled subsidiary of

8   Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

9   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

10  affiliates, throughout the United States.  Co-conspirators SEC and Samsung SDI dominated and

11  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

12  violations alleged in this Complaint.

13         75.     Co-conspirator Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a

14  Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

15  Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and

16  controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI

17  Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through

18  its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung

19  SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating

20  to the antitrust violations alleged in this Complaint.

21         76.     Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

22  company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

23  Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and

24  controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI

25  Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

26  subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI

27  dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

28  antitrust violations alleged in this Complaint.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1     77.     Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

2   Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

3   Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Co-

4   Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

5   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

6   affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and

7   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

8   violations alleged in this Complaint.

9     78.     Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

10  Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park,

11  Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

12  subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

13  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

14  subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI

15  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

16  antitrust violations alleged in this Complaint.

17    79.     Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is

18  a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

19  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

20  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung

21  SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

22  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

23  United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances,

24  policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

25  Complaint.

26    80.     Co-conspirators SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

27  Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI

28  Malaysia are collectively referred to herein as "Samsung."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   81.   During the Relevant Period, Orion Electronic Co. ("Orion") was a major

2   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

3   2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.

4   Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries

5   all over the world, including South Africa, France, Indonesia, Mexico, and the United States.

6   Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The

7   Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom

8   Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was

9   dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in

10  an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately

11  1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or

12  around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

13  marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their

14  subsidiaries or affiliates, throughout the United States.

15  82.   Daewoo Electronics, Orion, and DOSA are collectively referred to herein as

16  "Daewoo."

17  83.   Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia")

18  was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku

19  Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia

20  was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic

21  Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT

22  joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia)

23  Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During

24  the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT

25  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of

27  Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

28  84.   P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

- 22 -                          FIRST AMENDED COMPLAINT

formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

85.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

86.     The acts charged in this Complaint have been done by Defendants and their Co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendants' or Co-conspirators' business or affairs.

## V.     TRADE AND COMMERCE

87.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

FIRST AMENDED COMPLAINT

89.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in Minnesota and caused antitrust injuries in Minnesota.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

90.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.     CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.     The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.     CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors

FIRST AMENDED COMPLAINT

1   and similar devices.  The primary difference is that CDTs typically yield a higher resolution image

2   requiring more pixels than do CPTs.

3       95.     CRTs have no independent utility, and have value only as components of other

4   products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from

5   the demand for such products.

6       96.     The market for CRTs and the market for the products into which they are placed

7   are inextricably linked and intertwined because the CRT market exists to serve the CRT Products

8   markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in

9   that one would not exist without the other.

10      97.     Plaintiffs have participated in the market for CRTs through their direct purchases

11  from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT

12  Products containing price-fixed CRTs indirectly from non-Defendant original equipment

13  manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at

14  which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-

15  competitive prices for CRT Products.

16      98.     Plaintiffs have participated in the market for products containing CRTs.  To the

17  extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-

18  conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in

19  these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

20      99.     Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

21      **B.**     **Structure of the CRT Industry**

22      100.    The CRT industry has several characteristics that facilitated a conspiracy,

23  including market concentration, ease of information sharing, the consolidation of manufacturers,

24  multiple interrelated business relationships, significant barriers to entry, heightened price

25  sensitivity to supply and demand forces and homogeneity of products.

26          **1.     Market Concentration**

27      101.    During the Relevant Period, the CRT industry was dominated by relatively few

28  companies.  In 2004, Co-Conspirators Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

- 25 -                    FIRST AMENDED COMPLAINT

1    Chunghwa, together held a collective 78% share of the global CRT market.  The high

2    concentration of market share facilitates coordination because there are fewer cartel members

3    among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

4    production of other cartel members.

5                        **2.    Information Sharing**

6              102.    Because of common membership in trade associations, interrelated business

7    arrangements such as joint ventures, allegiances between companies in certain countries and

8    relationships between the executives of certain companies, there were many opportunities for

9    Defendants to discuss and exchange competitive information.  The ease of communication was

10   facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took

11   advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged

12   below.

13             103.    Defendants Hitachi, and Chunghwa and Co-conspirator Samsung are all members

14   of the Society for Information Display.  Samsung and LG Electronics are two of the co-founders

15   of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics,

16   LP Displays, and Co-conspirator Samsung are members of the Electronic Display Industrial

17   Research Association.  Upon information and belief, Defendants and their Co-Conspirators used

18   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

19   the meetings of these trade associations, Defendants exchanged proprietary and competitively

20   sensitive information which they used to implement and monitor the conspiracy.

21                        **3.    Consolidation**

22             104.    The CRT industry also had significant consolidation during the Relevant Period,

23   including but not limited to:  (a) the creation of LGPD in 2001, which was a joint venture

24   involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and

25   Panasonic's CRT businesses into MTPD.

26                    **4.    Multiple Interrelated Business Relationships**

27             105.    The industry is marked by a web of cross-licensing agreements, joint ventures and

28   other cooperative arrangements that can facilitate collusion.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

106.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Co-conspirator Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Co-conspirator Samsung and non-Defendant Corning Inc., USA for the production

FIRST AMENDED COMPLAINT

1    and supply of picture tube glass.

2        k.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

3              Philips, Panasonic, and Co-conspirator Samsung.

4            **5.      High Costs of Entry Into the Industry**

5        107.    There are significant manufacturing and technological barriers to entry into the

6    CRT industry.  It would require substantial time, resources and industry knowledge to overcome

7    these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in

8    light of the declining demand for CRT Products.

9        108.    During the Relevant Period, the costs of the assembly components, both as a whole

10   and individually, have been generally declining, and, in some periods, declining at a substantial

11   rate.  A combination of price discussions and manipulation of the output of CRTs allowed

12   Defendants to keep prices above where they would have been but for the conspiracy.

13           **6.      The Maturity of the CRT Product Market**

14       109.    Newer industries typically are characterized by rapid growth, innovation and high

15   profits.  The CRT Product market is a mature one, and like many mature industries, is

16   characterized by slim profit margins, creating a motivation to collude.

17       110.    Demand for CRT Products was declining throughout the Relevant Period.  Static

18   declining demand is another factor which makes the formation of a collusive arrangement more

19   likely because it provides a greater incentive to firms to avoid price competition.

20

21       111.    In addition, conventional CRT televisions and computer monitors were being

22   rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

23   Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT

24   Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

25   States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

26   between 2006 and 2010.

27       112.    Although demand was declining as a result of the popularity of flat-panel LCD and

28   plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

115.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia. During this period, these producers began to include discussions about price in their meetings.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    **D.    Defendants' and Co-Conspirators' Illegal Agreements**

2        119.    In order to control and maintain profitability during declining demand for CRT

3   Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or

4   conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which

5   they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

6   November 25, 2007.

7        120.    The CRT conspiracy was effectuated through a combination of group and bilateral

8   meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the

9   primary method of communication and took place on an informal, ad hoc basis.  During this

10  period, representatives from Daewoo and Defendants LG Electronics and Co-conspirator Samsung

11  visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi,

12  Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.

13  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

14  Singapore.

15       121.    Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended

16  several ad hoc group meetings during this period.  The participants at these group meetings also

17  discussed increasing prices for CRTs.

18       122.    As more manufacturers formally entered the conspiracy, group meetings became

19  more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic

20  fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants'

21  representatives attended hundreds of these meetings during the Relevant Period.

22       123.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

23  Defendants charged for CRTs.

24       **1.    "Glass Meetings"**

25       124.    The group meetings among the participants in the CRT price-fixing conspiracy

26  were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at

27  three general levels of Defendants' and Co-conspirator' corporations.

28       125.    The first level meetings were attended by high level company executives including

- 30 -                      FIRST AMENDED COMPLAINT

CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.   The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants and Co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

129.   Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and Co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of

2   Daewoo)IRICO, and Thomson.  Chunghwa also attended these meetings.

3       130.    Representatives of Defendants also attended what were known amongst members

4   of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green

5   meetings were generally attended by top and management level employees of Defendants.

6       131.    During the Relevant Period, glass meetings took place in Taiwan, South Korea,

7   Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

8       132.    Participants would often exchange competitively sensitive information prior to a

9   glass meeting.  This included information on inventories, production, sales and exports.  For some

10  such meetings, where information could not be gathered in advance of the meeting, it was brought

11  to the meeting and shared.

12      133.    The glass meetings at all levels followed a fairly typical agenda.  First, the

13  participants exchanged competitive information such as proposed future CRT pricing, sales

14  volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts

15  of sales volumes for coming months.  The participants also updated the information they had

16  provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who

17  would write the information on a white board.  The meeting participants then used this

18  information to discuss and agree upon what price each would charge for CRTs to be sold in the

19  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

20  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of

21  CRTs that were sold to specific customers, and agreed upon target prices to be used in

22  negotiations with large customers.  Having analyzed the supply and demand, the participants

23  would also discuss and agree upon production cutbacks.

24      134.    During periods of oversupply, the focus of the meeting participants turned to

25  making controlled and coordinated price reductions.  This was referred to as setting a "bottom

26  price."

27      135.    Defendants' conspiracy included agreements on the prices at which certain

28  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

- 32 -                                        FIRST AMENDED COMPLAINT

CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

137.    The agreements reached at the glass meetings included:

   a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

   b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

   c.   agreements on pricing for intra-company CRTs sales to vertically integrated customers;

   d.   agreements as to what to tell customers about the reason for a price increase;

   e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

   f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

   g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

   h.   agreements to coordinate uniform public statements regarding available capacity and supply;

FIRST AMENDED COMPLAINT

1        i. agreements to allocate both overall market shares and share of a particular

2         customer's purchases;

3        j. agreements to allocate customers;

4        k. agreements regarding capacity, including agreements to restrict output and to audit

5         compliance with such agreements; and

6        l. agreements to keep their meetings secret.

7       138. Efforts were made to monitor each Defendant's adherence to these agreements in a

8    number of ways, including seeking confirmation of pricing both from customers and from

9    employees of Defendants themselves.  When cheating did occur, it was addressed in at least four

10   ways:  1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live

11   up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a

12   recognition of a mutual interest in living up to the target price and living up to the agreements that

13   had been made.

14   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by

15   TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again

16   became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to

17   manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about

18   antitrust issues.

19       **2.**  **Bilateral Discussions**

20      139. Throughout the Relevant Period, the glass meetings were supplemented by

21   bilateral discussions between various Defendants.  The bilateral discussions were more informal

22   than the group meetings and occurred on a frequent, ad hoc basis, often between the group

23   meetings. These discussions, usually between sales and marketing employees, took the form of in-

24   person meetings, telephone contacts and emails.

25      140. During the Relevant Period, in-person bilateral meetings took place in Malaysia,

26   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

27   Brazil,Mexico, and the United States.

28      141. The purpose of the bilateral discussions was to exchange information about past

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico,  Europe, and the United States. .

142.     In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

143.     Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

144.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had

a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

145. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Co-conspirator Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

146. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

147. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

148. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

2   Displays).  A substantial number of these meetings were attended by the highest ranking

3   executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of

4   the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

5   supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

6        149.    Defendant LGEUSA was represented at those meetings and was a party to the

7   agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it

8   played a significant role in the conspiracy because Defendants wished to ensure that the prices for

9   CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

10  at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

11  conspiracy.

12       150.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated

13  in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended

14  by the highest ranking executives from LP Displays.  Certain of these high level executives from

15  LP Displays had previously attended meetings on behalf of Defendants LG Electronics and

16  Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these

17  discussions, LP Displays agreed on prices and supply levels for CRTs.

18       151.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

19  Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

20  Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

21  These meetings were attended by high level sales managers from Panasonic and MTPD.

22  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

23  discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

24  withdrew from this conspiracy.

25       152.    PCNA was represented at those meetings and was a party to the agreements

26  entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it

27  played a significant role in the conspiracy because Defendants wished to ensure that the prices for

28  CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

153.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

154.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

155.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

156.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

157.    Between at least 1995 and 2007, Co-conspirator Samsung, through SEC, Samsung

SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

158.    Co-conspirators SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

159.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

160.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

161.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this

FIRST AMENDED COMPLAINT

1    conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July

2    2005.

3         162.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

4    bilateral meetings with its competitors.  These meetings were attended by high level sales

5    managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices,

6    production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

7    allocation, and new product development, and agreed on prices and supply levels for CRTs.

8    Mitsubishi never effectively withdrew from this conspiracy.

9

10        163.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and

11   TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

12   conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

13   high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

14   discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

15   agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

16   conspiracy.

17        164.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

18   meetings and were a party to the agreements entered at them.  To the extent Toshiba America,

19   TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a

20   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

21   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

22   glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing

23   participants in the alleged conspiracy.

24        165.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

25   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

26   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

27   were attended by the highest ranking executives from Chunghwa, including the former Chairman

28   and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each

1   of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on

2   prices and supply levels for CRTs.

3          166.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

4   DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these

5   meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in

6   bilateral discussions with other Defendants on a regular basis.  Through these discussions,

7   Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo

8   continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo

9   never effectively withdrew from this conspiracy.

10         167.    When Plaintiffs refers to a corporate family or companies by a single name in their

11  allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or

12  agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

13  every company in that family.  In fact, the individual participants in the conspiratorial meetings

14  and discussions did not always know the corporate affiliation of their counterparts, nor did they

15  distinguish between the entities within a corporate family.  The individual participants entered into

16  agreements on behalf of, and reported these meetings and discussions to, their respective corporate

17  families.  As a result, the entire corporate family was represented in meetings and discussions by

18  their agents and were parties to the agreements reached in them.

19         **E.      The CRT Market During the Conspiracy**

20         168.    Until the last few years of the CRT conspiracy, CRTs were the dominant

21  technology used in displays, including televisions and computer monitors.  During the Relevant

22  Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

23  annual profits.

24         169.    The following data was reported by Stanford Resources, Inc., a market research

25  firm focused on the global electronic display industry:

26
| Year | Units Sold (millions) | Revenue(billion US dollars)[1] | Average Selling Price Per Unit |
| --- | --- | --- | --- |

27

28  _____
    [1] Estimated market value of CRT units sold.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

| 1998 | 90.5 | $18.9 | $208 |
|------|------|-------|------|
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

171.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

172.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

173.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

174.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

175.    A BNET Business Network news article from August 1998 reported that "key

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

176.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

177.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

178.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

179.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

180.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

1   substitutable technology.

2        181.    These price increases and price stability in the market for CRT Products during the

3   Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing

4   demand caused by a new, substitutable technology.

5        **F.    International Government Antitrust Investigations**

6        182.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and

7   restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by

8   a multinational investigation commenced by the Antitrust Division of the United States

9   Department of Justice ("DOJ").

10       183.    Separately, the European Commission and Japan and South Korea's Fair Trade

11  Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in

12  Europe and Asia.

13       184.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also

14  being investigated by the [European] Commission and/or the U.S. Department of Justice for

15  potential violations of competition laws with respect to semiconductors, LCD products, cathode

16  ray tubes (CRT) and heavy electrical equipment."

17       185.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

18  own investigation into the CRT cartel.  The HCA described the cartel as follows:

19           The Hungarian Competition Authority (Gazdasági Versenyhivatal –
             GVH) initiated a competition supervision proceeding against the
20           following undertakings: Samsung SDI Co., Ltd., Samsung SDI
             Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP
21           sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays,
             Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes
22           Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo
             Electronics European HQ, MT Picture Display Germany GmbH,
23           Matsushita Global HQ, Matsushita European HQ.

24           Based on the data available the undertakings mentioned above
             concerted their practice regarding the manufacturing and
25           distribution of cathode-ray tubes (including coloured pictures tubes
             and coloured screen tubes) on the European market between 1995
26           and 2007.  The anti-competitive behaviour may have concerned the
             exchange of sensitive market information (about prices, volumes
27           sold, demand and the extent to which capacities were exploited),
             price-fixing, the allocation of market shares, consumers and
28           volumes to be sold, the limitation of output and coordination

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

concerning the production.  The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007.  The coordination concerning the Hungarian market allegedly formed part of the European coordination.  Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

186.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

187.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

188.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director

- 45 -                              FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

189.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

191.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

192.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market. The companies fined by the European Commission included Chunghwa, LG Electronics,

Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

194.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

195.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Co-conspirator Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

196.    Defendant Toshiba and Co-conspirator Samsung have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

197.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

198.    On December 12, 2006, news reports indicated that Co-conspirator Samsung and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

199.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

- 47 -                                    FIRST AMENDED COMPLAINT

200.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

201.     The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.     The Role of Trade Associations During the Relevant Period

202.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

203.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

204.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

FIRST AMENDED COMPLAINT

205.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

206.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

207.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

208.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

209.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

210.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

211.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

212.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRTs

213.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

214.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

215.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

216.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

217.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

218.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was

---

FIRST AMENDED COMPLAINT

allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

219.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

220.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

221.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

222.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.**    **Summary Of Effects Of The Conspiracy Involving CRTs**

223.    The above combination and conspiracy has had the following effects, among others:

    a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

FIRST AMENDED COMPLAINT

d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

224.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

225.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their Co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

226.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

227.   The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

228.   Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

229.   As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

230.   Plaintiffs had neither actual nor constructive knowledge of the facts supporting

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not

discover, and could not have discovered through the exercise of reasonable diligence, the

existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not

give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the

prices of CRTs.

231. Because Defendants' agreement, understanding and conspiracy were kept secret,

Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that

they were paying artificially high prices for CRT Products.

232. The affirmative acts of Defendants alleged herein, including acts in furtherance of

the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral

meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for

their pricing actions and output restrictions. Defendants would coordinate and exchange in

advance the texts of the proposed communications with customers containing these pretextual

statements and would coordinate which co-conspirator would first communicate these pretextual

statements to customers.

233. By its very nature, Defendants' price-fixing conspiracy was inherently self-

concealing.

234. Plaintiffs could not have discovered the alleged contract, conspiracy or

combination at an earlier date by the exercise of reasonable diligence because of the deceptive

practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract,

conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various

means and methods, including, but not limited to, secret meetings, surreptitious communications

between Defendants by the use of the telephone or in-person meetings in order to prevent the

existence of written records, discussion on how to evade antitrust laws and concealing the

existence and nature of their competitor pricing discussions from non-conspirators (including

customers).

FIRST AMENDED COMPLAINT

235.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

236.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

237.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

238.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

239.    In addition, when several CRT manufacturers, including Defendant Philips and LG Electronics and Co-Conspirator Samsung, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

240.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

FIRST AMENDED COMPLAINT

241.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

242.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this Complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

243.    As discussed at length in Paragraphs 182-201 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present.  Best Buy's direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

244.    As shown by Best Buy's allegations in Paragraphs 20, 21 & 22 above and 252 and 259 below, Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007)

- Direct Purchaser Plaintiffs' Consolidated Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

245.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Best Buy opted out on November 14, 2011. [2]

---

[2] *See, e.g., Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at 54 (C.D. Cal. May 5, 2011); *Jenson v. Allison-Williams Co.*, 1999 U.S. Dist. LEXIS 22170, at 18-19 (S.D.Cal. Aug. 23, 1999); *Cullen v. Margiotta*, 811 F.2d 698, 718-721 (2d Cir. 1987); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 341 (E.D. Pa. 2004); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528-29 (M.D. Fla. 1989); *Bartlett v. Miller and Schroder Municipals, Inc.*, 355 N.W.2d 435, 439 (Minn. Ct. App. 1984); *Carson v. Independent School Dist. No.* 623, 392 N.W.2d 216, 223 (Minn. 1986).

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

2 **X.    CLAIM FOR VIOLATIONS**

3 **First Claim for Relief**

4 **(Violation of Section 1 of the Sherman Act)**

5    246.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

6 herein.

7    247.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs

8 and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered

9 into a continuing contract, combination or conspiracy to unreasonably restrain trade and

10 commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or

11 eliminating competition in the United States.

12    248.    In particular, Defendants and their co-conspirators combined and conspired to

13 raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

14    249.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed,

15 maintained and stabilized in the United States.

16    250.    The contract, combination or conspiracy among Defendants consisted of a

17 continuing agreement, understanding, and concerted action among Defendants and their co-

18 conspirators.

19    251.    For purposes of formulating and effectuating their contract, combination or

20 conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

21 conspired to do, including:

22        a.   participating in meetings and conversations to discuss the prices and supply of

23           CRTs;

24        b.   communicating in writing and orally to fix target prices, floor prices and price

25           ranges for CRTs;

26        c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a

27           manner that deprived direct purchasers of free and open competition;

28        d.   issuing price announcements and price quotations in accordance with the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    agreements reached;

2         e.   selling CRTs to customers in the United States at noncompetitive prices;

3         f.   exchanging competitively sensitive information in order to facilitate their

4              conspiracy;

5         g.   agreeing to maintain or lower production capacity; and

6         h.   providing false statements to the public to explain increased prices for CRTs.

7         252.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their

8    businesses and property in that they paid more for CRT Products than they otherwise would have

9    paid in the absence of Defendants' unlawful conduct.

10                              **Second Claim for Relief**

11    **(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq*.)**

12        253.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

13    allegation set forth in the preceding paragraphs of this Complaint.

14        254.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March

15    1, 1995, and continuing thereafter at least up to and including at least November 25, 2007,

16    Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy

17    to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971,

18    Minn. Stat. § 326D.52, *et seq*.  Defendants conspired to and did fix, raise, stabilize and maintain

19    prices of, and allocate markets for, CRTs at supra-competitive levels.

20        255.    The aforesaid violations of the Minnesota Antitrust Act of 1971, Minn. Stat. §

21    326D.52, *et seq*., consisted, without limitation, of a continuing unlawful trust and concert of action

22    among Defendants and their co-conspirators, the substantial terms of which were to fix, raise,

23    maintain and stabilize the prices of, and to allocate markets for, CRTs.

24        256.    For the purpose of forming and effectuating the unlawful trust, Defendants and

25    their co-conspirators have done those things which they combined and conspired to do, including

26    but in no way limited to the acts, practices and course of conduct set forth above and the

27    following:

28         a.   to fix, raise, maintain and stabilize the price of CRTs;

- 57 -                    FIRST AMENDED COMPLAINT

b.   to allocate markets for CRTs amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

d.   to allocate among themselves the production of CRTs.

257.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

258.   As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

259.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees.

**XI.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

B.      Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D.      Plaintiffs shall recover damages sustained by them, as provided by Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.   **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

FIRST AMENDED COMPLAINT

DATED:                              **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

                                    By: _____
                                         Roman M. Silberfeld
                                         David Martinez

                                    Attorneys for Plaintiffs
                                    BEST BUY CO., INC.; BEST BUY PURCHASING
                                    LLC; BEST BUY ENTERPRISE SERVICES, INC.;
                                    BEST BUY STORES, L.P.; BESTBUY.COM,
                                    L.L.C.; and MAGNOLIA HI-FI, LLC

FIRST AMENDED COMPLAINT

# **<u>EXHIBIT C</u>**

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Interbond Corporation of America*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06275 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06275 | MDL No. 1917 |
| INTERBOND CORPORATION OF AMERICA., d/b/a BrandsMart USA | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; | |

1  SHENZHEN SEG HITACHI COLOR
   DISPLAY DEVICES, LTD.; IRICO GROUP
2  CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO
3  DISPLAY DEVICES CO., LTD.; LG
   ELECTRONICS, INC.; LG ELECTRONICS
4  USA, INC.; LG ELECTRONICS TAIWAN
   TAIPEI CO., LTD.; LP DISPLAYS
5  INTERNATIONAL LTD.; PANASONIC
   CORPORATION; PANASONIC
6  CORPORATION OF NORTH AMERICA;
   MT PICTURE DISPLAY CO., LTD.;
7  BEIJING MATSUSHITA COLOR CRT CO.,
   LTD.; KONINKLIJKE PHILIPS
8  ELECTRONICS N.V.; PHILIPS
   ELECTRONICS NORTH AMERICA
9  CORPORATION; PHILIPS ELECTRONICS
   INDUSTRIES (TAIWAN), LTD.; PHILIPS
10 DA AMAZONIA INDUSTRIA
   ELECTRONICA LTDA.; SAMSUNG
11 ELECTRONICS CO., LTD.; SAMSUNG
   ELECTRONICS AMERICA, INC.;
12 SAMSUNG SDI CO., LTD.; SAMSUNG
   SDI AMERICA, INC.; SAMSUNG SDI
13 MEXICO S.A. DE C.V.;  SAMSUNG SDI
   BRASIL LTDA.; SHENZHEN SAMSUNG
14 SDI CO., LTD.; TIANJIN SAMSUNG SDI
   CO., LTD.; SAMSUNG SDI (MALAYSIA)
15 SDN. BHD.; SAMTEL COLOR LTD.; THAI
   CRT CO., LTD.; TOSHIBA
16 CORPORATION; TOSHIBA AMERICA,
   INC.; TOSHIBA AMERICA CONSUMER
17 PRODUCTS, LLC; TOSHIBA AMERICA
   ELECTRONIC COMPONENTS, INC.;
18 TOSHIBA AMERICA INFORMATION
   SYSTEMS, INC.; CHUNGHWA PICTURE
19 TUBES, LTD.; CHUNGHWA PICTURE
   TUBES (MALAYSIA); TECHNICOLOR
20 SA; TECHNICOLOR USA, INC.;
   MITSUBISHI ELECTRIC CORPORATION;
21 MITSUBISHI DIGITAL ELECTRONICS
   AMERICA, INC.; MITSUBISHI ELECTRIC
22 & ELECTRONICS, USA, INC.,

23      Defendants.

24
25          Plaintiff   Interbond   Corporation   of   America,   d/b/a   BrandsMart   USA

26 ("BrandsMart") for its Complaint against all Defendants named herein, hereby alleges as

27 follows:

28

BRANDSMART'S AMENDED COMPLAINT          1          Case No. 11-cv-06275
                                                   Master File No. 3:07-cv-05944-SC

1    I.    **<u>INTRODUCTION</u>**

2         1.    Defendants and their co-conspirators formed an international cartel which

3    conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

4    through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

5    conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

6         2.    Defendants are or were among the leading manufacturers of: (a) color

7    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

8    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

9    devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

10   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

11   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

12   and the products containing them shall be referred to as "CDT Products."  CDT Products and

13   CPT Products shall be referred to collectively herein as "CRT Products."

14        3.    Defendants control the majority of the CRT industry, a multibillion dollar

15   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

16   Relevant Period, virtually every household in the United States owned at least one CRT Product.

17        4.    Since the mid-1990s, the CRT industry faced significant economic

18   pressures as customer preferences for other emerging technologies shrank profits and threatened

19   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

20   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

21   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

22   States.

23        5.    With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

24   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

25   shipments, prices, production and customer demand; (c) coordinate public statements regarding

26   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

27   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

28   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of

the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to Section 501.211 of the Florida Statutes, for declaratory relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA").

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's FDUTPA claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claim under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Florida.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

1   corporation, transacts business in this District, or is otherwise found within this District.   In

2   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

3   events or omissions giving rise to this claim occurred in this District.   Defendants and their co-

4   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

5   into this District.

6   **III.**   **PARTIES**

7   **A.**   **Plaintiff**

8   16.   Plaintiff BrandsMart is a Florida corporation with its corporate

9   headquarters in Hollywood, Florida.   BrandsMart was incorporated in 1977 with the opening of

10   its first retail location in Miami, Florida.   Through the conclusion of Defendants' and the co-

11   conspirators' conspiracy, BrandsMart was a supplier of consumer electronics products and

12   services with 11 stores in Florida and Georgia.   In fiscal year 2010, BrandsMart sold $725

13   million of products and services.

14   17.   During the Relevant Period, BrandsMart purchased CRT Products directly

15   and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any

16   agents the Defendants or Defendants' subsidiaries and affiliates controlled.   As such, BrandsMart

17   suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.   Throughout the

18   Relevant Period, BrandsMart conducted a substantial amount of business in Florida.

19   18.   During the Relevant Period, BrandsMart's negotiations for the purchase

20   of CRT Products took place in the United States and were controlled by a department based at

21   the company's headquarters in Florida.   In addition, BrandsMart's purchase orders for CRT

22   Products were issued from Florida, all invoices for CRT Products were sent to BrandsMart in

23   Florida, and all payments for CRT Products were made by BrandsMart from Florida.

24   BrandsMart employees based in Florida were also responsible for selecting vendors and product

25   lines with respect to CRT Products.

26   **B.**   **Defendants**

27   **1.**   **Hitachi Entities**

28   19.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of

1    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

2    parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

3    market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

4    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

5    subsidiaries or affiliates, throughout the United States.

6            20.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

7    company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

8    297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

9    in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

10   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

11   create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

12   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

13   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

14   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

15   antitrust violations alleged in this complaint.

16           21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

17   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

18   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

19   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

20   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

21   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

22   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

23           22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

24   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

25   Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

26   Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

27   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

28   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

23.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

24.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.     IRICO Entities**

26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries or affiliates, throughout the United States.

2              27.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

3    company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

4    Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

5    CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

6    also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

7    and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

8    IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

9    subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

10   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

11   complaint.

12             28.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

13   company with its principal place of business located at No. 16, Fenghui South Road West,

14   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

15   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

16   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

17   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

18   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

19   alleged in this complaint.

20             29.    Defendants IGC, IGE and IDDC are collectively referred to herein as

21   "IRICO."

22             **3.    LG Electronics Entities**

23             30.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

24   the laws of the Republic of Korea with its principal place of business located at LG Twin

25   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

26   billion global force in consumer electronics, home appliances and mobile communications,

27   which established its first overseas branch office in New York in 1968.  The company's name

28   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

1   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

2   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

3   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

4   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

5   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

6   throughout the United States.

7          31.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

8   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

9   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

10  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

11  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

12  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

13  to the antitrust violations alleged in this complaint.

14         32.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

15  Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

16  NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

17  Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

18  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

19  throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

20  and affairs of LGETT relating to the antitrust violations alleged in this complaint.

21         33.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

22  herein as "LG Electronics."

23         **4.    LP Displays**

24         34.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

25  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

26  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

27  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

28  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.   Panasonic Entities**

35.   Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

36.   Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

37.   Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

38.   Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

1   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

2   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

3   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

4   subsidiaries or affiliates, throughout the United States.

5          39.   Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

6   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

7   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

8   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

9   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

10  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

11  China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

12  manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

13  China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

14  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

15  States.

16              **6.     Philips Entities**

17         40.   Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

18  Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

19  Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

20  of the world's largest electronics companies, with 160,900 employees located in over 60

21  countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

22  Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

23  Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

24  demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

25  million Euros of its investment and said it would not inject further capital into the venture.

26  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

27  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

28         41.   Defendant Philips Electronics North America Corporation ("Philips

BRANDSMART'S AMENDED COMPLAINT                11                    Case No. 11-cv-06275
                                                                   Master File No. 3:07-cv-05944-SC

America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

43.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

44.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

45.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

47.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

48.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

1    violations alleged in this complaint.

2          49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

3    is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

4    21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

5    owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

6    Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

7    directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

8    and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

9    Mexico relating to the antitrust violations alleged in this complaint.

10          50.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

11    Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

12    Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

13    owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

14    Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

15    directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

16    and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

17    Brazil relating to the antitrust violations alleged in this complaint.

18          51.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

19    is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

20    Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

21    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

22    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

24    controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

25    violations alleged in this complaint.

26          52.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

27    Chinese company with its principal place of business located at Developing Zone of Yi-Xian

28    Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

1    subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

2    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

3    subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

4    dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

5    the antitrust violations alleged in this complaint.

6              53.      Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

7    is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

8    Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

9    Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

10   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

11   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

13   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

14   in this complaint.

15             54.      Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

16   SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

17   SDI Malaysia are collectively referred to herein as "Samsung."

18             **8.      Samtel**

19             55.      Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

20   principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

21   110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

22   country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

23   States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

24   Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

25   its subsidiaries and affiliates, throughout the United States.

26             **9.      Thai CRT**

27             56.      Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

28   1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

57.   Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

58.   Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

59.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

16

1    States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP

2    relating to the antitrust violations alleged in this complaint.

3              60.      Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

4    California corporation with its principal place of business located at 19900 MacArthur

5    Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

6    subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC

7    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

8    subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled

9    the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

10   complaint.

11             61.      Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

12   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

13   California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC

14   through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold

15   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.   Defendant TC dominated and controlled the finances, policies and

17   affairs of TAIS relating to the antitrust violations alleged in this complaint.

18             62.      Defendants TC, Toshiba America, TACP, TAEC and TAIS are

19   collectively referred to herein as "Toshiba."

20             **11.**   **Chunghwa Entities**

21             63.      Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

22   Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

23   Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In

24   1974, Chunghwa PT's CRTs received certification by the United States, giving the company

25   entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major

26   global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and

27   distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

28   Fuzhou subsidiary) throughout the United States.

64.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

### 12.    Thomson Entities

65.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.   In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

1    through its subsidiaries or affiliates, to customers throughout the United States.

2            66.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

3    Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

4    business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson

5    Consumer Electronics is a wholly-owned subsidiary of Thomson SA.   Thomson Consumer

6    Electronics was a major manufacturer of CRTs for the United States market, with plants located

7    in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.   The United States-based

8    plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own

9    television-manufacturing division, which had plants in the United States and Mexico, and to

10   other television manufacturers in the United States and elsewhere.   Thomson's CRT televisions

11   were sold in the United States to United States consumers under the RCA brand.   Thomson

12   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

13   business was sold to Videocon in 2005.   During the Relevant Period, Thomson Consumer

14   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

15   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

16           67.     Thomson SA and Thomson Consumer Electronics are collectively referred

17   to herein as "Thomson."

18           **13.    <u>Mitsubishi Entities</u>**

19           68.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

20   is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

21   Japan.   Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

22   Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold

23   internally to Mitsubishi's television and monitor manufacturing division and to other television

24   and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor

25   division also purchased CRTs from other CRT manufacturers.   During the Relevant Period,

26   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

27   United States.

28           69.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

BRANDSMART'S AMENDED COMPLAINT            19              Case No. 11-cv-06275
                                                         Master File No. 3:07-cv-05944-SC

1    Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

2    Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

3    Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

4    Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

5    and monitor manufacturing division and to other television and monitor manufacturers in the

6    U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

7    other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

8    marketed, sold and distributed CRT Products in the United States.

9           70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

10   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

11   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

12   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

13   CRT televisions and monitors in the United States.

14          71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

15   are collectively referred to herein as "Mitsubishi."

16   **IV.    AGENTS AND CO-CONSPIRATORS**

17          72.    The acts alleged against Defendants in this Complaint were authorized,

18   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

19   in the management and operation of Defendants' businesses or affairs.

20          73.    Each Defendant or co-conspirator acted as the principal, agent, or joint

21   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

22   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

23   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

24   made by its parent company.

25          74.    Various persons and/or firms not named as Defendants in this Complaint

26   participated as co-conspirators in the violations alleged herein and may have performed acts and

27   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

28   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

1   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

2   Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

3   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

4   conspirators as Defendants at a later date.

5          75.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major

6   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

7   2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

8   Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

9   subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

10   United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

11   Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

12   Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

13   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

14   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

15   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

16   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

17   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

18   directly or through their subsidiaries or affiliates, throughout the United States.

19          76.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein

20   as "Daewoo."

21          77.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

22   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

23   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

24   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

25   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

26   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

27   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

28   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

1   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

3   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

4   this complaint.

5      78. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

6   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

7   principal place of business was located in Indonesia.  TEDI was projected to have an annual

8   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

9   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

10  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

11  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

13  affairs of TEDI relating to the antitrust violations alleged in this complaint.

14     79. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

15  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

16  Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

17  subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

18  venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

19  Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

20  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

21  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

22  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

23  the antitrust violations alleged in this complaint.

24     80. The acts charged in this Complaint have been done by Defendants and

25  their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

26  employees or representatives while actively engaged in the management of each Defendant's or

27  co-conspirator's business or affairs.

28

V.      **TRADE AND COMMERCE**

81.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

82.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

83.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Florida and caused antitrust injuries in Florida.

VI.     **FACTUAL ALLEGATIONS**

A.      **CRT Technology**

84.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

85.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

86.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

1    the whole CRT product so that the product is often simply referred to as "the CRT."

2          87.    Although there have been refinements and incremental advancements

3    along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

4    the CRT technology used today is similar to that RCA unveiled in 1939.

5          88.    CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

6    used primarily in televisions and related devices and CDTs are primarily used in computer

7    monitors and similar devices.  The primary difference is that CDTs typically yield a higher

8    resolution image requiring more pixels than do CPTs.

9          89.    CRTs have no independent utility, and have value only as components of

10   other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

11   from the demand for such products.

12         90.    The market for CRTs and the market for the products into which they are

13   placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

14   Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

15   inseparable in that one would not exist without the other.

16         91.    Plaintiff has participated in the market for CRTs through its direct

17   purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of

18   CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment

19   manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at

20   which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-

21   competitive prices for CRT Products.

22         92.    Plaintiff has participated in the market for products containing CRTs. To

23   the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their

24   co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs

25   in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

26         93.    Plaintiff has been injured by paying supra-competitive prices for CRT

27   Products.

28

1    **B.**     **Structure of the CRT Industry**

2          94.     The CRT industry has several characteristics that facilitated a conspiracy,

3    including market concentration, ease of information sharing, the consolidation of manufacturers,

4    multiple interrelated business relationships, significant barriers to entry, heightened price

5    sensitivity to supply and demand forces and homogeneity of products.

6          **1.     Market Concentration**

7          95.     During the Relevant Period, the CRT industry was dominated by relatively

8    few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

9    Chunghwa, together held a collective 78% share of the global CRT market.   The high

10   concentration of market share facilitates coordination because there are fewer cartel members

11   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

12   production of other cartel members.

13         **2.     Information Sharing**

14         96.     Because of common membership in trade associations, interrelated

15   business arrangements such as joint ventures, allegiances between companies in certain countries

16   and relationships between the executives of certain companies, there were many opportunities

17   for Defendants to discuss and exchange competitive information.  The ease of communication

18   was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

19   took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

20   alleged below.

21         97.     Defendants Hitachi, Samsung and Chunghwa are all members of the

22   Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

23   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

24   Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

25   Research Association.  Upon information and belief, Defendants and their co-conspirators used

26   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

27   the meetings of these trade associations, Defendants exchanged proprietary and competitively

28   sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

98.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

99.     The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

100.     Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.   Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.   <u>High Costs of Entry Into the Industry</u>**

101.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

102.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.   <u>The Maturity of the CRT Product Market</u>**

103.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

104.   Demand for CRT Products was declining throughout the Relevant Period.

BRANDSMART'S AMENDED COMPLAINT                    27                    Case No. 11-cv-06275
Master File No. 3:07-cv-05944-SC

1    Static declining demand is another factor which makes the formation of a collusive arrangement

2    more likely because it provides a greater incentive to firms to avoid price competition.

3           105.    In addition, conventional CRT televisions and computer monitors were

4    being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

5    Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT

6    Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

7    States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

8    between 2006 and 2010.

9           106.    Although demand was declining as a result of the popularity of flat-panel

10   LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

11   dominant display technology during the Relevant Period, making Defendants' collusion and the

12   international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

13   plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

14   cheaper alternative to these new technologies.

15          107.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for

16   computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

17   substantial share of the market.

18          108.    As for CRT televisions, they accounted for 73 percent of the North

19   American television market in 2004, and by the end of 2006, still held a 46 percent market share.

20          **7.    Homogeneity of CRT Products**

21          109.    CRT Products are commodity-like products which are manufactured in

22   standardized sizes.  One Defendant's CRT Product for a particular application, such as a

23   particular size television set or computer monitor, is substitutable for another's.  Defendants sold

24   and Plaintiff purchased CRT Products primarily on the basis of price.

25          110.    It is easier to form and sustain a cartel when the product in question is

26   commodity-like because it is easier to agree on prices to charge and to monitor those prices once

27   an agreement is formed.

28

C.     **Pre-Conspiracy Market**

111.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

112.   In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

D.     **Defendants' and Co-Conspirators' Illegal Agreements**

113.   In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

114.   The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

115.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

116.   As more manufacturers formally entered the conspiracy, group meetings

1   became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized,

2   systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

3   Defendants' representatives attended hundreds of these meetings during the Relevant Period.

4        117.   The overall CRT conspiracy raised and stabilized worldwide and U.S.

5   prices that Defendants charged for CRTs.

6        **1.**   **"Glass Meetings"**

7        118.   The group meetings among the participants in the CRT price-fixing

8   conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by

9   employees at three general levels of Defendants' corporations.

10        119.   The first level meetings were attended by high level company executives

11   including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top

12   meetings occurred less frequently, typically quarterly, and were focused on longer term

13   agreements and forcing compliance with price-fixing agreements.  Because attendees at top

14   meetings had authority as well as more reliable information, these meetings resulted in

15   agreements.  Attendees at top meetings were also able to resolve disputes because they were

16   decision makers who could make agreements.

17        120.   The second level meetings were attended by Defendants' high level sales

18   managers and were known as "management" meetings.  These meetings occurred more

19   frequently, typically monthly, and handled implementation of the agreements made at top

20   meetings.

21        121.   Finally, the third level meetings were known as "working level" meetings

22   and were attended by lower level sales and marketing employees.  These meetings generally

23   occurred on a weekly or monthly basis and were mostly limited to the exchange of information

24   and discussing pricing since the lower level employees did not have the authority to enter into

25   agreements.  These lower level employees would then transmit the competitive information up

26   the corporate reporting chain to those individuals with pricing authority.  The working level

27   meetings also tended to be more regional and often took place near Defendants' factories.  In

28   other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

1    manufacturers' employees met in Korea, the Chinese in China, and so on.

2            122.    The Chinese glass meetings began in 1998 and generally occurred on a
3    monthly basis following a top or management level meeting.  The China meetings had the
4    principal purpose of reporting what had been decided at the most recent glass meetings to the
5    Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located
6    in China, such as IRICO and BMCC, as well as the China-based branches of the other
7    Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung
8    SDI Tianjin, and Chunghwa.

9            123.    Glass meetings also occurred occasionally in various European countries.
10   Attendees at these meetings included those Defendants and co-conspirators which had
11   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,
12   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf
13   of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

14           124.    Representatives of Defendants also attended what were known amongst
15   members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The
16   green meetings were generally attended by top and management level employees of Defendants.

17           125.    During the Relevant Period, glass meetings took place in Taiwan, South
18   Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

19           126.    Participants would often exchange competitively sensitive information
20   prior to a glass meeting.  This included information on inventories, production, sales and exports.
21   For some such meetings, where information could not be gathered in advance of the meeting, it
22   was brought to the meeting and shared.

23           127.    The glass meetings at all levels followed a fairly typical agenda.  First, the
24   participants exchanged competitive information such as proposed future CRT pricing, sales
25   volume, inventory levels, production capacity, exports, customer orders, price trends and
26   forecasts of sales volumes for coming months.  The participants also updated the information
27   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"
28   who would write the information on a white board.  The meeting participants then used this

1    information to discuss and agree upon what price each would charge for CRTs to be sold in the

2    following month or quarter.  They discussed and agreed upon target prices, price increases, so-

3    called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

4    of CRTs that were sold to specific customers, and agreed upon target prices to be used in

5    negotiations with large customers.  Having analyzed the supply and demand, the participants

6    would also discuss and agree upon production cutbacks.

7            128.    During periods of oversupply, the focus of the meeting participants turned

8    to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

9    price."

10           129.    Defendants' conspiracy included agreements on the prices at which certain

11   Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

12   CRT Products, such as televisions and computer monitors.  Defendants realized the importance

13   of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

14   pricing in the market to other OEMs.   In this way, Defendants ensured that all OEMs paid

15   supracompetitive prices for CRTs.

16           130.    The agreements reached at the glass meetings included:

17                 a.    agreements on CRT prices, including establishing target prices,

18                      "bottom" prices, price ranges and price guidelines;

19                 b.    placing agreed-upon price differentials on various attributes of CRTs,

20                      such as quality or certain technical specifications;

21                 c.    agreements on pricing for intra-company CRTs sales to vertically

22                      integrated customers;

23                 d.    agreements as to what to tell customers about the reason for a price

24                      increase;

25                 e.    agreements to coordinate with competitors that did not attend the

26                      group meetings and agreements with them to abide by the agreed-

27                      upon pricing;

28                 f.    agreements to coordinate pricing with CRT manufacturers in other

geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

131.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

132.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.   **Bilateral Discussions**

133.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of

1   in-person meetings, telephone contacts and emails.

2          134.    During the Relevant Period, in-person bilateral meetings took place in

3   Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

4   Brazil, Mexico, and the United States.

5          135.    The purpose of the bilateral discussions was to exchange information

6   about past and future pricing, confirm production levels, share sales order information, confirm

7   pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

8   including Brazil, Mexico, Europe, and the United States.

9          136.    In order to ensure the efficacy of their global conspiracy, Defendants also

10   used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the

11   United States.  These CRT manufacturers were particularly important because they served the

12   North American market for CRT Products.  As further alleged herein, North America was the

13   largest market for CRT televisions and computer monitors during the Relevant Period.  Because

14   these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they

15   adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of

16   all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at

17   supracompetitive levels.

18          137.    Defendants also used bilateral discussions with each other during price

19   negotiations with customers to avoid being persuaded by customers to cut prices.  The

20   information gained in these communications was then shared with supervisors and taken into

21   account in determining the price to be offered.

22          138.    Bilateral discussions were also used to coordinate prices with CRT

23   manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

24   Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

25   management meeting, the attendees at these group meetings would meet bilaterally with the

26   other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

27   output agreements had been reached during the meeting.  For example, Samsung had a

28   relationship with Hitachi and was responsible for communicating CRT pricing agreements to

1    Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

2    CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

3    with Thomson in Europe and the United States, and Samsung SDI had regular communications

4    with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for

5    communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented

6    the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes

7    Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel

8    participated in the conspiracy to fix prices of CRTs.

9                      **3.      Defendants' and Co-Conspirators' Participation in Group and**

10                              **Bilateral Discussions**

11            139.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

12   Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

13   These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

14   in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

15   these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

16   withdrew from this conspiracy.

17            140.    Defendants Hitachi America and HEDUS were represented at those

18   meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

19   HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

20   in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

21   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

22   Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

23            141.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

24   IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

25   ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

26   Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

27   agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

28   connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

1    its own independent private interests in participating in the alleged conspiracy.

2            142.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

3    and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

4    participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

5    Displays).   A substantial number of these meetings were attended by the highest ranking

6    executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each

7    of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

8    supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

9            143.    Defendant LGEUSA was represented at those meetings and was a party to

10   the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it

11   played a significant role in the conspiracy because Defendants wished to ensure that the prices

12   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

13   reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

14   conspiracy.

15           144.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

16   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

17   were attended by the highest ranking executives from LP Displays.  Certain of these high level

18   executives from LP Displays had previously attended meetings on behalf of Defendants LG

19   Electronics and Philips.   LP Displays also engaged in bilateral discussions with other

20   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

21   CRTs.

22           145.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

23   Corporation and Matsushita Malaysia, participated in several glass meetings.   After 2003,

24   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

25   These meetings were attended by high level sales managers from Panasonic and MTPD.

26   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

27   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

28   withdrew from this conspiracy.

146.   PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

147.   Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

148.   Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

149.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

150.   Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

1   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

2   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

3   the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

4   in the alleged conspiracy.

5          151.   Between at least 1995 and 2007, Defendant Samsung, through SEC,

6   Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

7   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

8   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

9   bilateral discussions with each of the other Defendants on a regular basis.  Through these

10  discussions, Samsung agreed on prices and supply levels for CRTs.

11         152.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

12  Samsung SDI Mexico were represented at those meetings and were a party to the agreements

13  entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

14  a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

15  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

16  the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

17  Mexico were active, knowing participants in the alleged conspiracy.

18         153.   Between at least 1998 and 2006, Defendant Samtel participated in

19  multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

20  meetings were attended by high level executives from Samtel.  Through these discussions,

21  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

22  this conspiracy.

23         154.   Between at least 1997 and 2006, Defendant Thai CRT participated in

24  multiple glass meetings.  These meetings were attended by the highest ranking executives from

25  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

26  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

27  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

28         155.   Between at least 1996 and 2005, Defendant Thomson participated in

dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005. Thomson has admitted to the European Commission that it played a role in the conspiracy.

156. Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

157. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

158. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

159.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

160.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

161.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

E.    **The CRT Market During the Conspiracy**

162.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

1    annual profits.

2    163.    The following data was reported by Stanford Resources, Inc., a market

3    research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

---

[1]    Estimated market value of CRT units sold.

1  September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

2      168.    Defendants also conspired to limit production of CRTs by shutting down

3  production lines for days at a time, and closing or consolidating their manufacturing facilities.

4      169.    For example, Defendants' CRT factory utilization percentage fell from

5  90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

6  example of a drop in factory utilization in the CRT industry.   There were sudden drops

7  throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

8  these sudden, coordinated drops in factory utilization by Defendants were the result of

9  Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

10      170.    During the Relevant Period, while demand in the United States for CRT

11  Products continued to decline, Defendants' conspiracy was effective in moderating the normal

12  downward pressures on prices for CRT Products caused by the entry and popularity of the new

13  generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

14  Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

15  CRT technology is very mature; prices and technology have become stable."

16      171.    During the Relevant Period, there were not only periods of unnatural and

17  sustained price stability, but there were also increases in prices of CRTs and CRT Products.

18  These price increases were despite the declining demand due to the approaching obsolescence of

19  CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

20  substitutable technology.

21      172.    These price increases and price stability in the market for CRT Products

22  during the Relevant Period are inconsistent with a competitive market for a product facing

23  rapidly decreasing demand caused by a new, substitutable technology.

24      **F.      International Government Antitrust Investigations**

25      173.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of,

26  and restrict output for, CRTs sold in the United States during the Relevant Period, is

27  demonstrated by a multinational investigation commenced by the Antitrust Division of the

28  United States Department of Justice.

174.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

175.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

176.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.   On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.   On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used

44

in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried out in California.

183.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

184.    On December 5, 2012 the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

185.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

186.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

191.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

192.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.**     **The Role of Trade Associations During the Relevant Period**

193.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

194.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

195.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

196.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

197.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.    This exchange of information was used to implement and monitor the conspiracy.

**H.**    **Effects of Defendants' Antitrust Violations**

**1.**    **Examples of Reductions in Manufacturing Capacity by Defendants**

198.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

199.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.    Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."    The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.    Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

202.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

203.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.    The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

1

**2.      Examples of Collusive Pricing for CRTs**

2          204.    Defendants' collusion is evidenced by unusual price movements in the

3   CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation

4   predicted that "[e]conomies of scale, in conjunction with technological improvements and

5   advances in manufacturing techniques, will produce a drop in the price of the average electronic

6   display to about $50 in 1997."

7          205.    In 1996, another industry source noted that "the price of the 14" tube is at

8   a sustainable USD50 and has been for some years . . . ."

9          206.    In reality, prices for CRTs never approached $50 in 1997, and were

10   consistently more than double this price.

11          207.    Despite the ever-increasing popularity of, and intensifying competition

12   from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels"

13   throughout 1995 according to a *CNET News.com* article.  This price stabilization was

14   purportedly due exclusively to a shortage of critical components such as glass.  This was a

15   pretext used to conceal the conspiracy.

16          208.    Prices for CRT monitors did fall sharply as a result of the Asian economic

17   crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at

18   Asia Display 1998, an annual conference for the display industry, to state:

19
20
21

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

22
23
24
25

          209.    In early 1999, despite declining production costs and the rapid entry of flat

panel display products, the price of large-sized color CRTs actually rose.  The price increase was

allegedly based on increasing global demand for the products.  In fact, this price rise was the

result of collusive conduct amongst Defendants.

26
27
28

210.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.    Summary Of Effects Of The Conspiracy Involving CRTs**

213.    The above combination and conspiracy has had the following effects, among others:

a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.    PLAINTIFF'S INJURIES**

214.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

215.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

216.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

217.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

218.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

219.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

1    220.    As a result, Plaintiff was injured in connection with its purchases of CRT

2    Products during the Relevant Period.

3    **VIII.   FRAUDULENT CONCEALMENT**

4    221.    Plaintiff had neither actual nor constructive knowledge of the facts

5    supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff

6    did not discover, and could not have discovered through the exercise of reasonable diligence, the

7    existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did

8    not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix

9    the prices of CRTs.

10    222.    Because Defendants' agreement, understanding and conspiracy were kept

11    secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know

12    that it was paying artificially high prices for CRT Products.

13    223.    The affirmative acts of Defendants alleged herein, including acts in

14    furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

15    precluded detection.  As noted above, Defendants organized glass meetings to avoid detection,

16    conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

17    pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

18    and exchange in advance the texts of the proposed communications with customers containing

19    these pretextual statements and would coordinate which co-conspirator would first communicate

20    these pretextual statements to customers.

21    224.    By its very nature, Defendants' price-fixing conspiracy was inherently

22    self-concealing.

23    225.    Plaintiff could not have discovered the alleged contract, conspiracy or

24    combination at an earlier date by the exercise of reasonable diligence because of the deceptive

25    practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

26    detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

27    conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

28    various means and methods, including, but not limited to, secret meetings, surreptitious

1    communications between Defendants by the use of the telephone or in-person meetings in order

2    to prevent the existence of written records, discussion on how to evade antitrust laws and

3    concealing the existence and nature of their competitor pricing discussions from non-

4    conspirators (including customers).

5              226.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT

6    meetings at separate venues in order to avoid detection.  Participants at glass meetings were also

7    told not to take minutes.   Attending companies also reduced the number of their respective

8    attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

9    nature of their agreement.   During these meetings, top executives and other officials attending

10   these meetings were instructed on more than once occasion not to disclose the fact of these

11   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

12   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

13   arrivals and departures at such meetings to avoid being seen in public with each other and with

14   the express purpose and effect of keeping them secret.

15             227.    Defendants also agreed at glass meetings and bilateral meetings to give

16   pretextual reasons for price increases and output reductions to their customers.

17             228.    As alleged above, in early 1999, despite declining production costs and the

18   rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The

19   price increase was allegedly based on increasing global demand for the products.  In fact, this

20   price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the

21   time.

22             229.    As alleged above, despite increased competition from flat panel monitors,

23   prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

24   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

25   This was a pretext used to cover up the conspiracy.

26             230.    In addition, when several CRT manufacturers, including Defendants

27   Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

28   blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this

price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

231.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

232.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

233.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.    As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

237.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

238.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

239.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

240.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

241.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

242.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

   a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

   b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

   c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

243.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

244.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.   During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

246.   Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

247.   During the Relevant Period, Plaintiff maintained its principal place of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities. As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

248. In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff. These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

249. The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." Fla. Stat. § 501.202(2). FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

250. Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

251. As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the FDUTPA, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.   Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.   Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.   Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.   Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.   Plaintiff shall receive such other or further relief as may be just and proper.

1    **XII.**        <u>**JURY TRIAL DEMAND**</u>

2              Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

3    jury of all the claims asserted in this Complaint so triable.

4

5

6

7

8

9

10   Dated:                              Respectfully Submitted,

11                                       _____

12                                       STUART H. SINGER (*Pro hac vice*)
                                         BOIES, SCHILLER, & FLEXNER LLP

13                                       401 East Las Olas Boulevard, Suite 1200
                                         Fort Lauderdale, Florida 33301

14                                       Telephone: (954) 356-0011
                                         Facsimile: (954) 356-0022

15                                       Email: ssinger@bsfllp.com

16                                       WILLIAM A. ISAACSON (*Pro hac vice*)

17                                       BOIES, SCHILLER & FLEXNER LLP
                                         5301 Wisconsin Ave. NW, Suite 800

18                                       Washington, DC 20015
                                         Telephone:  (202) 237-2727

19                                       Facsimile:   (202) 237-6131
                                         Email:  wisaacson@bsfllp.com

20

21                                       PHILIP J. IOVIENO (*Pro hac vice*)
                                         ANNE M. NARDACCI (*Pro hac vice*)

22                                       LUKE NIKAS (*Pro hac vice*)
                                         CHRISTOPHER V. FENLON (*Pro hac vice*)

23                                       BOIES, SCHILLER & FLEXNER LLP

24                                       10 North Pearl Street, 4th Floor
                                         Albany, NY 12207

25                                       Telephone:  (518) 434-0600
                                         Facsimile:   (518) 434-0665

26                                       Email: piovieno@bsfllp.com

27                                       *Counsel for Plaintiff*

28                                       *Interbond Corporation of America*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT D**

Attorneys for Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust
[additional counsel listed on signature page]

H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Jonathan J. Ross (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com
jross@susmangodfrey.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST, | Master File No. 3:07-cv-05944-SC |
| | MDL No. 1917 |
| Plaintiff, | Individual Case No. 11-cv-05502 |
| v. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; | FIRST AMENDED COMPLAINT

JURY TRIAL DEMANDED |

1

TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG
SDI (MALAYSIA) SDN. BHD.; SAMTEL
COLOR CRT CO., LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA); TATUNG
COMPANY OF AMERICA, INC., .
TECHNICOLOR SA; TECHNICOLOR USA,
INC.; MITSUBISHI ELECTRIC
CORPORATION; MITSUBISHI DIGITAL
ELECTRONICS AMERICA, INC.; MITSUBISHI
ELECTRIC & ELECTRONICS, USA, INC.

                              Defendants.

Plaintiff, Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc. Liquidating Trust (the "Circuit City Trust"), submits this Complaint against all Defendants named herein, and hereby alleges as follows:

## I.   INTRODUCTION

1.      Plaintiff Circuit City Trust brings this action to recover those damages to Circuit City Stores, Inc., and its affiliated companies ("Circuit City") caused by a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"), conducted by an international cartel formed by Defendants and their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT

Products shall be referred to collectively herein as "CRT Products."

3.       Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.       Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.       With respect to CRTs, Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.       The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., Europe, and the United States.   These meetings included representatives from the highest levels of the respective

companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.      Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States.  Throughout the period of the conspiracy alleged herein, Circuit City purchased CRT Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors.  These purchases took place throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received CRT Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

10.     On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1]  On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the

---

[1] *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

4

Circuit City Trust. The Plan became effective on November 1, 2010.

11. During the Relevant Period, Circuit City purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Circuit City thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.   JURISDICTION AND VENUE

12. Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13. Plaintiff also brings this action pursuant to various state laws listed herein because Circuit City purchased CRT Products from both defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

14. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiff's state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

15. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiff's antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially

5

affected the price of CRT Products purchased by Circuit City in the states identified herein.

16.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

17.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III.     PARTIES

### A.     Plaintiff

18.     Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

19.     Circuit City was headquartered in Richmond, Virginia.   During the Relevant Period, Circuit City purchased in the United States CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Circuit City suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.  Circuit City's negotiations for the purchase of CRT Products took place in the United States; purchase orders for CRT Products were issued from the United States; and invoices for CRT Products were

6

received by Circuit City in the United States.

20.     Upon information and belief, Circuit City purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California and Illinois

21.     Upon information and belief, during the Relevant Period, Circuit City received shipments of and took title to CRT Products at its distribution centers in Walnut, California; Livermore, California, and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution centers in California.  From its distribution centers in California and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution centers in California through online sales.

22.     During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois law invoked in this Complaint. Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution center in Illinois.  From its distribution center in Illinois and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution center in Illinois through online sales.

B.     **Defendants**

1.     **Hitachi Entities**

23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7

parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

25.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.   During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).   Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.     IRICO Entities**

30.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGE is owned by Defendant IGC.   According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.   Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.   During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.   In 2006, IDDC was China's top CRT maker.   During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.     LG Electronics Entities

34.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.   LGEI is a $48.5 billion

global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.     LP Displays**

38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.      Panasonic Entities

39.      Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.      Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41.      Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

42.      Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).   Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and

13

prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

48.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

49.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

15

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.   Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

16

Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     Samtel**

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

17

principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.   Thai CRT

60.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

61.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.   During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

18

subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.   Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.   Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

COMPLAINT

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

69.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death,

20

her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

### 13. Thomson Entities

70.  Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.  Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton,

COMPLAINT

2625971v1/012325

Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**14.     Mitsubishi Entities**

73.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

74.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers

in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

75.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

76.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

IV.        **AGENTS AND CO-CONSPIRATORS**

77.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

78.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

79.    Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd. Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

COMPLAINT

80.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

81.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

82.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

24

this complaint.

83.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

84.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

85.     Defendant Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

86.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

V.      **TRADE AND COMMERCE**

25

87.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

89.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Illinois and caused antitrust injuries in California and Illinois.

## VII.     FACTUAL ALLEGATIONS

### A.     CRT Technology

90.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

93.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

96.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

97.     Circuit City has participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Circuit City bought CRT Products, and Circuit City has been injured thereby and paid supra-competitive prices for CRT Products.

98.     Circuit City has participated in the market for products containing CRTs. To the extent Circuit City indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.

99.     Circuit City has been injured by paying supra-competitive prices for CRT Products.

COMPLAINT

2625971v1/012325

**B.**     **Structure of the CRT Industry**

100.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

101.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

102.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

103.    Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

28

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

104.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

105.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

106.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

  a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

  b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

  c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

  d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

  e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

  f.  Defendant Toshiba and Orion also signed a cooperative agreement

relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

107.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

108.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.    A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

30

**6.**      **The Maturity of the CRT Product Market**

109.      Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

110.      Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

111.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

112.      Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.      As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.**      **Homogeneity of CRT Products**

115.      CRT Products are commodity-like products which are manufactured in

31

standardized sizes.   One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Circuit City purchased CRT Products primarily on the basis of price.

116.   It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.   Pre-Conspiracy Market

117.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.   During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.   In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.   Defendants' and Co-Conspirators' Illegal Agreements

119.   In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.   The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the

other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

122.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1.   **"Glass Meetings"**

124.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

125.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more

33

frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

129.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

130.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

131.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

132.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.   The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

134.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

135.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser

35

2625971v1/012325

OEMs paid supracompetitive prices for CRTs.

136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

137.    The agreements reached at the glass meetings included:

a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

36

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

138.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

139.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.   Bilateral Discussions**

140.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

141.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

37

142.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

143.     In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

144.     Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

145.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Phillips had regular bilateral communications with Thomson in

Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

146.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

147.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

148.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

COMPLAINT

149.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

150.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

151.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

152.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

153.    PCNA was represented at those meetings and was a party to the agreements

40

entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

154.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

155.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

156.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

157.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant

41

role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

158.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.   A substantial number of these meetings were attended by the highest ranking executives from Samsung.   Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, Samsung agreed on prices and supply levels for CRTs.

159.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.   To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.   Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

160.   Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These meetings were attended by high level executives from Samtel.   Through these discussions, Samtel agreed on prices and supply levels for CRTs.   Samtel never effectively withdrew from this conspiracy.

161.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.   These meetings were attended by the highest ranking executives from Thai CRT.   Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.   Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.   Thai CRT never effectively withdrew from this conspiracy.

162.   Between at least 1996 and 2005, Defendant Thomson participated in

42

dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005. Thomson has admitted to the European Commission that it played a role in the conspiracy.

163. Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

164. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

165. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

43

166.    Between at least 1995 and 2006, defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

167.    Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

168.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

169.    When Circuit City Trust refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and

discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.      The CRT Market During the Conspiracy

170.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

171.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

172.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

173.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence

---

[2]      Estimated market value of CRT units sold.

45

of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

174.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

179.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

180.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

181.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

182.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

183.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

184.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

185.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

186.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is

47

also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

187.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

188.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the

48

former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

189.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives

49

from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market. The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson). The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe." The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

194.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

195.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

196.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

197.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

198.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

199.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

200.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

201.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

202.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

COMPLAINT

203.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

G.    **The Role of Trade Associations During the Relevant Period**

204.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."   Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").   In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

205.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

206.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

207.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition

COMPLAINT

(the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

208.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

### H.    Effects of Defendants' Antitrust Violations

#### 1.    Examples of Reductions in Manufacturing Capacity by Defendants

209.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

210.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

211.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

212.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

213.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

214.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.      Examples of Collusive Pricing for CRTs**

215.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

216.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

217.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

218.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

219.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in
>
> his tough environment and also to prepare for the coming years.  This means that
>
> we have to deviate from the traditional approach of the simple scale up of
>
> production volume.

54

220.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

221.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

222.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

223.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

224.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**H.    Summary Of Effects Of The Conspiracy Involving CRTs**

225.    The above combination and conspiracy has had the following effects, among others:

> a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b. Prices for CRTs in CRT Products sold by Defendants to Circuit City directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c. Circuit City was deprived of the benefit of free and open competition in the purchase of CRT Products.

d. As a direct and proximate result of the unlawful conduct of Defendants, Circuit City was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VIII.   PLAINTIFF'S INJURIES

226.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Circuit City suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Circuit City to pay higher prices than they would have in the absence of Defendants' conspiracy.

227.    Circuit City also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

228.    The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy.  Circuit City was not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Circuit City suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

229.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

COMPLAINT

230.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

231.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

232.    As a result, Circuit City was injured in connection with their purchases of CRT Products during the Relevant Period.

## IX.    FRAUDULENT CONCEALMENT

233.    Neither Circuit City Trust nor Circuit City had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.   Neither Circuit City Trust nor Circuit City discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Circuit City Trust or Circuit City on inquiry notice that there was a conspiracy to fix the prices of CRTs.

234.    Because Defendants' agreement, understanding and conspiracy were kept secret, Circuit City Trust and Circuit City were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

235.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.   As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing

COMPLAINT

2625971v1/012325

these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

236.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

237.    Neither Circuit City nor Circuit City Trust could have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

238.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

239.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

COMPLAINT

240.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

241.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

242.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

243.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

244.     Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

245.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

**X.     *American Pipe*, GOVERNMENT ACTION,
AND CROSS-JURISDICTIONAL TOLLING**

246.     As discussed at length in Paragraphs 184-203 above, the United States Department of Justice instituted criminal proceedings and investigations against several

COMPLAINT

Defendants and co-conspirators commencing on at least February 10, 2009.  Circuit City's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

247.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

248.    As shown by Circuit City Trust's allegations in Paragraphs 1 and 10 and the following causes of action, Circuit City was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

249.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

250.    Beginning no later than March 1, 1995, the exact date being unknown to Circuit City and Circuit City Trust and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

251.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

252.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

2625971v1/012325

253.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

254.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

255.     As a result of Defendants' unlawful conduct, Circuit City was injured in its businesses and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

## (Violation of the California Cartwright Act)

61

256.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

257.     During the Relevant Period, Circuit City conducted a substantial volume of business in California.  In particular, Circuit City purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Circuit City also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Circuit City maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Circuit City also sold CRT Products to customers in California.  Finally, Circuit City maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Circuit City's business operations in California, it was registered to do business in the State and paid taxes to the State of California during the Relevant Period.   As a result of Circuit City's substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

258.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

259.     Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of

COMPLAINT

Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

260.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

261.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.   to fix, raise, maintain and stabilize the price of CRTs;

    b.   to allocate markets for CRTs amongst themselves;

    c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.   to allocate among themselves the production of CRTs.

262.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

    b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

263.    As a result of the alleged conduct of Defendants, Circuit City paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

COMPLAINT

2625971v1/012325

264.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

265.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

267.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

268.    The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Circuit City and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.    Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

64

b.     Defendants' Unfair Business Practices: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.     Defendants' Fraudulent Business Practices: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Circuit City and Circuit City Trust were in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

269.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

270.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

271.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

272.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

COMPLAINT

2625971v1/012325

**Fourth Claim for Relief**

**(Restitution and Unjust Enrichment Under California Law)**

273.   Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

274.   During the Relevant Period, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

**Fifth Claim for Relief**

**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

275.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

276.   During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Illinois. Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of CRT Products in Illinois and fixing, raising, maintaining and stabilizing CRT Product prices in Illinois at artificially high, noncompetitive levels.  Defendants' conduct and fraudulent concealment caused injury to Circuit City, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Circuit City as a purchaser.

277.   Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

278.   During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois at artificially-inflated prices because of defendants' price fixing

conspiracy.  Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its Marion Illinois Distribution Center.

279.     During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois.  Circuit City sold CRT Products and other products in retail stores in Illinois and on the Internet to Illinois customers.  In addition, Circuit City maintained in Illinois inventories of CRT Products manufactured and sold by defendants, their co-conspirators, and others.  As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and

280.     As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for CRT Products purchased in Illinois from defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the Illinois Antitrust Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations, and that defendants unjustly retained substantial benefits received due to such conspiracy;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

COMPLAINT

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*., and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.      Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq*., and Plaintiff was injured in its business as a result of Defendants' violations;

F.      Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

G.      Defendants engaged in a contract, combination, and conspiracy in violation of the Illinois Antitrust Act, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.      Plaintiff shall recover damages sustained by it, as provided by the Illinois Antitrust Act, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.      Defendants received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a result of their conspiracy, and have unjustly retained these substantial benefits, at the expense of Circuit City;

J.      Defendants shall disgorge all ill-gotten gains and Plaintiff shall be entitled to restitution;

K.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

68

L. Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

M. Plaintiff shall receive such other or further relief as may be just and proper.

## XIII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                         SUSMAN GODFREY L.L.P.


By: _____

H. Lee Godfrey
(*pro hac vice*)
Kenneth S. Marks
(*pro hac vice*)
Jonathan J. Ross
(*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email: lgodfrey@sumangodfrey.com
        kmarks@susmangodfrey.com


Parker C. Folse III
(*pro hac vice to be submitted*)
Rachel S. Black
(*pro hac vice to be submitted*)
Jordan Connors
(*pro hac vice to be submitted*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com

69

rblack@susmangodfrey.com
jconnors@susmangodfrey.com

Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust

COMPLAINT

# **EXHIBIT E**

1    WILLIAM A. ISAACSON (*Pro hac vice*)
     BOIES, SCHILLER & FLEXNER LLP
2    5301 Wisconsin Ave. NW, Suite 800
     Washington, DC 20015
3    Telephone:  (202) 237-2727
     Facsimile:   (202) 237-6131
4    Email:  wisaacson@bsfllp.com

5
     PHILIP J. IOVIENO (*Pro hac vice*)
6    ANNE M. NARDACCI (*Pro hac vice*)
     LUKE NIKAS (*Pro hac vice*)
7    CHRISTOPHER V. FENLON (*Pro hac vice*)
     BOIES, SCHILLER & FLEXNER LLP
8    10 North Pearl Street, 4th Floor
     Albany, NY 12207
9    Telephone:  (518) 434-0600
     Facsimile:   (518) 434-0665
10   Email: piovieno@bsfllp.com

11
     MIKE MCKOOL, JR. (*Pro hac vice*)
12   LEWIS T. LECLAIR (*Pro hac vice*)
     SCOTT R. JACOBS (*Pro hac vice*)
13   MCKOOL SMITH, P.C
     300 Crescent Court, Suite 1500
14   Dallas, TX 75201
     Telephone: (214) 978-4000
15   Facsimile: (214) 978-4044
     Email: mmckool@mckoolsmith.com
16

17   *Counsel for Plaintiff CompuCom Systems, Inc.*

18
                    **UNITED STATES DISTRICT COURT**
19                  **NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
20

21   IN RE CATHODE RAY TUBE (CRT)          Case No. 11-cv-06396
     ANTITRUST LITIGATION
                                           Master File No. 3:07-cv-05944-SC
22
     _____      MDL No. 1917
23   This Document Relates To Individual Case
     No. 11-cv-06396

24   COMPUCOM SYSTEMS, INC.,               **AMENDED COMPLAINT**

25            Plaintiff,                   **JURY TRIAL DEMANDED**

26       vs.

27   HITACHI, LTD.; HITACHI DISPLAYS,
     LTD.; HITACHI AMERICA, LTD.;
28   HITACHI ASIA, LTD.; HITACHI

1  ELECTRONIC DEVICES (USA), INC.;
   SHENZHEN SEG HITACHI COLOR
   DISPLAY DEVICES, LTD.; IRICO GROUP
2  CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO
3  DISPLAY DEVICES CO., LTD.; LG
   ELECTRONICS, INC.; LG ELECTRONICS
4  USA, INC.; LG ELECTRONICS TAIWAN
   TAIPEI CO., LTD.; LP DISPLAYS
5  INTERNATIONAL LTD.; PANASONIC
   CORPORATION; PANASONIC
6  CORPORATION OF NORTH AMERICA;
   MT PICTURE DISPLAY CO., LTD.;
7  BEIJING MATSUSHITA COLOR CRT CO.,
   LTD.; KONINKLIJKE PHILIPS
8  ELECTRONICS N.V.; PHILIPS
   ELECTRONICS NORTH AMERICA
9  CORPORATION; PHILIPS ELECTRONICS
   INDUSTRIES (TAIWAN), LTD.; PHILIPS
10 DA AMAZONIA INDUSTRIA
   ELECTRONICA LTDA.; SAMSUNG
11 ELECTRONICS CO., LTD.; SAMSUNG
   ELECTRONICS AMERICA, INC.;
12 SAMSUNG SDI CO., LTD.; SAMSUNG
   SDI AMERICA, INC.; SAMSUNG SDI
13 MEXICO S.A. DE C.V.;  SAMSUNG SDI
   BRASIL LTDA.; SHENZHEN SAMSUNG
14 SDI CO., LTD.; TIANJIN SAMSUNG SDI
   CO., LTD.; SAMSUNG SDI (MALAYSIA)
15 SDN. BHD.; SAMTEL COLOR LTD.; THAI
   CRT CO., LTD.; TOSHIBA
16 CORPORATION; TOSHIBA AMERICA,
   INC.; TOSHIBA AMERICA CONSUMER
17 PRODUCTS, LLC; TOSHIBA AMERICA
   ELECTRONIC COMPONENTS, INC.;
18 TOSHIBA AMERICA INFORMATION
   SYSTEMS, INC.; CHUNGHWA PICTURE
19 TUBES, LTD.; CHUNGHWA PICTURE
   TUBES (MALAYSIA).; TECHNICOLOR
20 SA; TECHNICOLOR USA, INC.;
   MITSUBISHI ELECTRIC CORPORATION;
21 MITSUBISHI DIGITAL ELECTRONICS
   AMERICA, INC.; MITSUBISHI ELECTRIC
22 & ELECTRONICS, USA, INC.,

23      Defendants.

24         Plaintiff, CompuCom Systems, Inc. ("CompuCom") for its Complaint against all

25 Defendants named herein, hereby alleges as follows:

26 **I.    <u>INTRODUCTION</u>**

27         1.      Defendants and their co-conspirators formed an international cartel which

28 conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

1   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

2   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3        2.   Defendants are or were among the leading manufacturers of: (a) color

4   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

7   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

9   and the products containing them shall be referred to as "CDT Products."  CDT Products and

10  CPT Products shall be referred to collectively herein as "CRT Products."

11       3.   Defendants control the majority of the CRT industry, a multibillion dollar

12  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

13  Relevant Period, virtually every household in the United States owned at least one CRT Product.

14       4.   Since the mid-1990s, the CRT industry faced significant economic

15  pressures as customer preferences for other emerging technologies shrank profits and threatened

16  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

17  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19  States.

20       5.   With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

22  shipments, prices, production and customer demand; (c) coordinate public statements regarding

23  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28  producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein, because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in New York and California.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Northern District of Texas under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

1    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

2    into this District.

3    **III.    PARTIES**

4        **A.    Plaintiff**

5            16.    Plaintiff CompuCom is a Delaware corporation with its corporate

6    headquarters in Dallas, Texas.  Founded in 1987, CompuCom is a leading IT outsourcing

7    company providing infrastructure management services, application services, systems integration

8    and consulting services, as well as the procurement and management of hardware and software.

9    In 2010, CompuCom had $1.4 billion in revenue.  Through the conclusion of Defendants' and

10   the co-conspirators' conspiracy, CompuCom maintained operations in several states including

11   Texas, California, New York, and Massachusetts.

12           17.    During the Relevant Period, CompuCom purchased CRT Products directly

13   from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the

14   Defendants or Defendants' subsidiaries and affiliates controlled.  CompuCom also purchased

15   CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers,

16   which contained CRTs that had been purchased from Defendants and their co-conspirators.  As

17   such, CompuCom suffered injury as a result of Defendants' and their co-conspirators' unlawful

18   conduct.

19           18.    During the Relevant Period, CompuCom purchased CRT Products in,

20   *inter alia*, California and New York containing CRTs manufactured and sold by Defendants and

21   their co-conspirators.  Plaintiff sent purchase orders to various CRT Product manufacturers in

22   each of these states and sent payment to these manufacturers in each of these states.  In addition,

23   Plaintiff supplied its offices in California and New York with CRT Products and maintained

24   corporate offices and inventories in these states and provided information technology services to

25   its customers in these states.

26       **B.    Defendants**

27           **1.    Hitachi Entities**

28           19.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

21.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

22.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

23.   Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

24.   Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.   Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.   IRICO Entities

26.   Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries or affiliates, throughout the United States.

2           27.      Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

3 company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

4 Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first

5 CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website

6 also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

7 and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period,

8 IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

9 subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled

10 the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

11 complaint.

12           28.      Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

13 company with its principal place of business located at No. 16, Fenghui South Road West,

14 District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned

15 subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant

16 Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

17 through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated

18 and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

19 alleged in this complaint.

20           29.      Defendants IGC, IGE and IDDC are collectively referred to herein as

21 "IRICO."

22          **3.**      **LG Electronics Entities**

23           30.      Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

24 the laws of the Republic of Korea with its principal place of business located at LG Twin

25 Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5

26 billion global force in consumer electronics, home appliances and mobile communications,

27 which established its first overseas branch office in New York in 1968. The company's name

28 was changed from Gold Star Communications to LGEI in 1995, the year in which it also

1  acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

2  venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

3  ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

4  LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

5  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

6  throughout the United States.

7         31.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

8  corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

9  New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

10  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

11  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

12  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

13  to the antitrust violations alleged in this complaint.

14         32.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

15  Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

16  NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

17  Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

18  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

19  throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

20  and affairs of LGETT relating to the antitrust violations alleged in this complaint.

21         33.     Defendants LGEI, LGEUSA and LGETT are collectively referred to

22  herein as "LG Electronics."

23         **4.     LP Displays**

24         34.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

25  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

26  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

27  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

28  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

1   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

2   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

3   and LGEI would cede control over the company and the shares would be owned by financial

4   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

5   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

6   affiliates, throughout the United States.

7                      **5.     Panasonic Entities**

8          35.    Defendant Panasonic Corporation, which was at all times during the

9   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

10  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

11  Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

12  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13  affiliates, throughout the United States.

14         36.    Defendant Panasonic Corporation of North America ("PCNA") is a

15  Delaware corporation with its principal place of business located at One Panasonic Way,

16  Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

17  Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

18  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

19  United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

20  and affairs of PCNA relating to the antitrust violations alleged in this complaint.

21         37.    Defendants Panasonic Corporation and PCNA are collectively referred to

22  herein as "Panasonic."

23         38.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

24  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

25  Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

26  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

27  manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.   On

28  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

39.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     **Philips Entities**

40.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41.     Defendant Philips Electronics North America Corporation ("Philips

America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

43.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

44.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

45.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

1   company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

2   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

3   States.

4          46.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

5   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

6   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

7   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

10  Samsung SEAI relating to the antitrust violations alleged in this complaint.

11         47.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

12  Company ("Samsung SDI") is a South Korean company with its principal place of business

13  located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

14  company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

15  Samsung SDI claims to be the world's leading company in the display and energy business, with

16  28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

17  market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

18  Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

19  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20  throughout the United States.  Defendant SEC dominated and controlled the finances, policies

21  and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

22         48.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

23  California corporation with its principal place of business located at 3333 Michelson Drive, Suite

24  700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

25  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

26  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

27  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

28  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

1   violations alleged in this complaint.

2           49.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

3   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

4   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

5   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

6   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

7   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

8   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

9   Mexico relating to the antitrust violations alleged in this complaint.

10          50.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

11  Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

12  Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

13  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

14  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

15  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

16  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

17  Brazil relating to the antitrust violations alleged in this complaint.

18          51.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

19  is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

20  Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

21  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

22  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

24  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

25  violations alleged in this complaint.

26          52.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

27  Chinese company with its principal place of business located at Developing Zone of Yi-Xian

28  Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

54.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     Samtel**

55.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.     Thai CRT**

56.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

1  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

2  televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

3  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

4  United States.

5         **10.**    **Toshiba Entities**

6         57.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

7  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

8  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

9  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

10  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

11  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

12  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

13  in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

14  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15  subsidiaries or affiliates, throughout the United States.

16         58.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

17  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

18  4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

19  subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured,

20  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

21  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

22  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

23  complaint.

24         59.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

25  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

26  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

27  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

28  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

1    States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP

2    relating to the antitrust violations alleged in this complaint.

3            60.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

4    California corporation with its principal place of business located at 19900 MacArthur

5    Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

6    subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC

7    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

8    subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled

9    the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

10   complaint.

11           61.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

12   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

13   California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC

14   through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold

15   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.   Defendant TC dominated and controlled the finances, policies and

17   affairs of TAIS relating to the antitrust violations alleged in this complaint.

18           62.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

19   collectively referred to herein as "Toshiba."

20           **11.    Chunghwa Entities**

21           63.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

22   Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

23   Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In

24   1974, Chunghwa PT's CRTs received certification by the United States, giving the company

25   entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major

26   global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and

27   distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

28   Fuzhou subsidiary) throughout the United States.

64.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

### 12.     **Thomson Entities**

65.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or

1   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2   66.   Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

3   Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

4   business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson

5   Consumer Electronics is a wholly-owned subsidiary of Thomson SA.   Thomson Consumer

6   Electronics was a major manufacturer of CRTs for the United States market, with plants located

7   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.   The United States-based

8   plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own

9   television-manufacturing division, which had plants in the United States and Mexico, and to

10  other television manufacturers in the United States and elsewhere.   Thomson's CRT televisions

11  were sold in the United States to United States consumers under the RCA brand.   Thomson

12  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

13  business was sold to Videocon in 2005.   During the Relevant Period, Thomson Consumer

14  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

15  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

16  67.   Thomson SA and Thomson Consumer Electronics are collectively referred

17  to herein as "Thomson."

18  **13.   <u>Mitsubishi Entities</u>**

19  68.   Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

20  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

21  Japan.   Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

22  Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold

23  internally to Mitsubishi's television and monitor manufacturing division and to other television

24  and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor

25  division also purchased CRTs from other CRT manufacturers.   During the Relevant Period,

26  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

27  United States.

28  69.   Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

70.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

71.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.     AGENTS AND CO-CONSPIRATORS**

72.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

73.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

74.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

1    Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

2    Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

3    Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

4    conspirators as Defendants at a later date.

5            75.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major

6    manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

7    2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

8    Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

9    subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

10   United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

11   Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

12   Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The

13   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

14   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

15   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

16   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

17   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

18   directly or through their subsidiaries or affiliates, throughout the United States.

19           76.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein

20   as "Daewoo."

21           77.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

22   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

23   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

24   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

25   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

26   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

27   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

28   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

1    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2    throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

3    finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

4    this complaint.

5                78.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

6    venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

7    principal place of business was located in Indonesia.  TEDI was projected to have an annual

8    production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

9    MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

10   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

11   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

13   affairs of TEDI relating to the antitrust violations alleged in this complaint.

14               79.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai

15   company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

16   Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

17   subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

18   venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

19   Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

20   During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

21   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

22   Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

23   the antitrust violations alleged in this complaint.

24               80.    The acts charged in this Complaint have been done by Defendants and

25   their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

26   employees or representatives while actively engaged in the management of each Defendant's or

27   co-conspirator's business or affairs.

28

1    V.    **TRADE AND COMMERCE**

2            81.    During the Relevant Period, each Defendant, or one or more of its

3    subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

4    interstate commerce and foreign commerce, including through and into this judicial district.

5            82.    During the Relevant Period, Defendants collectively controlled a vast

6    majority of the market for CRT Products, both globally and in the United States.

7            83.    The business activities of Defendants substantially affected interstate trade

8    and commerce in the United States and caused antitrust injury in the United States.  The business

9    activities of Defendants also substantially affected trade and commerce in New York and

10   California and caused antitrust injuries in New York and California.

11   VI.   **FACTUAL ALLEGATIONS**

12        A.    **CRT Technology**

13           84.    A CRT has three components: (a) one or more electron guns, each of

14   which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

15   other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

16   that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

17   faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

18   coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

19   shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

20   produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

21   narrow lines of red, green, blue and black.

22           85.    CRT technology was first developed more than a century ago.  The first

23   commercially practical CRT television was made in 1931.  However, it was not until RCA

24   Corporation introduced the product at the 1939 World's Fair that it became widely available to

25   consumers.  After that, CRTs became the heart of most display products, including televisions,

26   computer monitors, oscilloscopes, air traffic control monitors and ATMs.

27           86.    The quality of a CRT itself determines the quality of the CRT display.  No

28   external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

87.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

88.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

92.     Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

93.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.     Structure of the CRT Industry**

94.     The CRT industry has several characteristics that facilitated a conspiracy,

including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1. **Market Concentration**

95.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.   The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2. **Information Sharing**

96.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

97.     Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. **Consolidation**

98.     The CRT industry also had significant consolidation during the Relevant

1  Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

2  involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

3  and Panasonic's CRT businesses into MTPD.

4  **4.    Multiple Interrelated Business Relationships**

5  99.    The industry is marked by a web of cross-licensing agreements, joint

6  ventures and other cooperative arrangements that can facilitate collusion.

7  100.    Examples of the high degree of cooperation among Defendants in both the

8  CRT Product market and other closely related markets include the following:

9  a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

10  LG Electronics and Philips.

11  b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

12  Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

13  purpose of manufacturing TFT-LCD panels.

14  c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

15  Toshiba and Panasonic.

16  d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita

17  Display Technology Co., Ltd. as a joint venture for the purpose of

18  manufacturing TFT-LCD panels.

19  e.   In December 1995, Defendant Toshiba partnered with Orion and two

20  other non-defendant entities to form TEDI, which manufactured CRTs

21  in Indonesia.

22  f.   Defendant Toshiba and Orion also signed a cooperative agreement

23  relating to LCDs in 1995.  Pursuant to the agreement, Daewoo

24  produced STN-LCDs, and Toshiba, which had substituted its STN-

25  LCD production with TFT-LCD production, marketed Daewoo's

26  STN-LCDs globally through its network.

27  g.   Also in 1995, Defendant Toshiba entered into a technology transfer

28  agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.  High Costs of Entry Into the Industry**

101.  There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

102.  During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.  The Maturity of the CRT Product Market**

103.  Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

104.  Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

105.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

106.   Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

107.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

108.   As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.   Homogeneity of CRT Products**

109.   CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

110.   It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.   Pre-Conspiracy Market**

111.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were

1    also being served by other international companies. During this period, the employees of

2    Defendants would encounter employees from their competitors when visiting their customers. A

3    culture of cooperation developed over the years and these Defendant employees would exchange

4    market information on production, capacity and customers.

5            112. In the early 1990s, representatives from Samsung, Daewoo, Chunghwa,

6    and Orion visited each other's factories in Southeast Asia. During this period, these producers

7    began to include discussions about price in their meetings.

8         **D.**     **Defendants' and Co-Conspirators' Illegal Agreements**

9            113. In order to control and maintain profitability during declining demand for

10    CRT Products, Defendants and their co-conspirators have engaged in a contract, combination,

11    trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices

12    at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

13    November 25, 2007.

14            114. The CRT conspiracy was effectuated through a combination of group and

15    bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions

16    were the primary method of communication and took place on an informal, ad hoc basis. During

17    this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

18    the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

19    and Panasonic, to discuss increasing prices for CRTs in general and to specific customers. These

20    meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

21    Singapore.

22            115. Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

23    Daewoo, also attended several ad hoc group meetings during this period. The participants at

24    these group meetings also discussed increasing prices for CRTs.

25            116. As more manufacturers formally entered the conspiracy, group meetings

26    became more prevalent. Beginning in 1997, Defendants began to meet in a more organized,

27    systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

28    Defendants' representatives attended hundreds of these meetings during the Relevant Period.

117.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.   "Glass Meetings"

118.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."   Glass meetings were attended by employees at three general levels of Defendants' corporations.

119.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.   Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.   Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.   Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.   These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.   These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.   These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.   The working level meetings also tended to be more regional and often took place near Defendants' factories.   In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122.   The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.   The China meetings had the

principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

123.     Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson. Chunghwa also attended these meetings.

124.     Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

125.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

126.     Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

127.     The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices

of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

128.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

129.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

130.    The agreements reached at the glass meetings included:

      a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

      b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

      c.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

      d.   agreements as to what to tell customers about the reason for a price increase;

      e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

      f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

      g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

131.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

132.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.   Bilateral Discussions**

133.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

134.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

Brazil, Mexico, and the United States.

135.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

136.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

137.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

138.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications

35

with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

139.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

140.   Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

141.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

142.   Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

143.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

144.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

145.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

146.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

1    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

2    agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

3    the alleged conspiracy.

4           147.   Between at least 2003 and 2006, Defendant MTPD participated in

5    multiple glass meetings and in fact led many of these meetings during the latter years of the

6    conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

7    also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

8    agreed on prices and supply levels for CRTs.

9           148.   Between at least 1998 and 2007, Defendant BMCC participated in

10   multiple glass meetings.  These meetings were attended by high level sales managers from

11   BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants,

12   particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

13   prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

14   CRTs was mandated by the Chinese government.   BMCC was acting to further its own

15   independent private interests in participating in the alleged conspiracy.

16          149.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips

17   and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

18   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

19   LP Displays).  A substantial number of these meetings were attended by high level executives

20   from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

21   Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

22   effectively withdrew from this conspiracy.

23          150.   Defendants Philips America and Philips Brazil were represented at those

24   meetings and were a party to the agreements entered at them.  To the extent Philips America and

25   Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

26   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

27   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

28   the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

1   in the alleged conspiracy.

2          151.   Between at least 1995 and 2007, Defendant Samsung, through SEC,

3   Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

4   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

5   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

6   bilateral discussions with each of the other Defendants on a regular basis.  Through these

7   discussions, Samsung agreed on prices and supply levels for CRTs.

8          152.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

9   Samsung SDI Mexico were represented at those meetings and were a party to the agreements

10  entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

11  a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

12  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

13  the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

14  Mexico were active, knowing participants in the alleged conspiracy.

15         153.   Between at least 1998 and 2006, Defendant Samtel participated in

16  multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

17  meetings were attended by high level executives from Samtel.  Through these discussions,

18  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

19  this conspiracy.

20         154.   Between at least 1997 and 2006, Defendant Thai CRT participated in

21  multiple glass meetings.  These meetings were attended by the highest ranking executives from

22  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

23  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

24  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

25         155.   Between at least 1996 and 2005, Defendant Thomson participated in

26  dozens of meetings with its competitors, including several glass meetings and multiple bilateral

27  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

28  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

1    demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

2    development and agreed on prices and supply levels for CRTs.  Thomson never effectively

3    withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

4    Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

5    a role in the conspiracy.

6            156.    Between at least 1995 and 2005, Defendant Mitsubishi participated in

7    multiple bilateral and some multilateral meetings with its competitors.  These meetings were

8    attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

9    such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

10   plant shutdowns, customer allocation, and new product development, and agreed on prices and

11   supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

12           157.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

13   and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

14   conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

15   high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

16   discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

17   agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

18   conspiracy.

19           158.    Defendants Toshiba America, TACP, TAEC and TAIS were represented

20   at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

21   America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers,

22   they played a significant role in the conspiracy because Defendants wished to ensure that the

23   prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

24   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

25   were active, knowing participants in the alleged conspiracy.

26           159.    Between at least 1995 and 2006, Defendant Chunghwa, through

27   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

28   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

1    these meetings were attended by the highest ranking executives from Chunghwa, including the

2    former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

3    discussions with each of the other Defendants on a regular basis.  Through these discussions,

4    Chunghwa agreed on prices and supply levels for CRTs.

5         160.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

6    Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

7    of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

8    engaged in bilateral discussions with other Defendants on a regular basis.  Through these

9    discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

10   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

11   Daewoo never effectively withdrew from this conspiracy.

12        161.    When Plaintiff refers to a corporate family or companies by a single name

13   in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

14   employees or agents of entities within the corporate family engaged in conspiratorial meetings

15   on behalf of every company in that family.  In fact, the individual participants in the

16   conspiratorial meetings and discussions did not always know the corporate affiliation of their

17   counterparts, nor did they distinguish between the entities within a corporate family.  The

18   individual participants entered into agreements on behalf of, and reported these meetings and

19   discussions to, their respective corporate families.  As a result, the entire corporate family was

20   represented in meetings and discussions by their agents and were parties to the agreements

21   reached in them.

22        **E.      The CRT Market During the Conspiracy**

23        162.    Until the last few years of the CRT conspiracy, CRTs were the dominant

24   technology used in displays, including televisions and computer monitors.  During the Relevant

25   Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

26   annual profits.

27        163.    The following data was reported by Stanford Resources, Inc., a market

28   research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

168.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

---

[1]        Estimated market value of CRT units sold.

169.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.   There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

170.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

171.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

172.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

## F.    International Government Antitrust Investigations

173.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

174.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

175.     In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

176.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in

computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.    On March 18, 2011, the DOJ issued a press release announcing that it had

1    reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a

2    $32 million fine for its role in a conspiracy to fix prices of CDTs.

3            182.    Samsung SDI admitted that from at least as early as January 1997 until at

4    least as late as March 2006, participated in a conspiracy among major CDT producers to fix

5    prices, reduce output, and allocate market shares of CDTs sold in the United States and

6    elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

7    and employees, engaged in discussions and attended meetings with representatives of other

8    major CDT producers.  During these discussions and meetings, agreements were reached to fix

9    prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

10   elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

11   in California.

12           183.    The plea agreement of Samsung SDI requires that it cooperate with the

13   DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

14   manufacture or sale of CDTs and CPTs.

15           184.    On December 5, 2012, the European Commission announced that it had

16   fined seven international corporate families a total of over €1.4 billion for their two-decade-long

17   effort to fix prices, share markets, restrict output, and allocate customers between themselves in

18   the CRT market.  The companies fined by the European Commission included Chunghwa, LG

19   Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

20   Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

21   for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

22   behavior that are strictly forbidden to companies doing business in Europe."  The press release

23   accompanying the fines further notes that the CRT cartels were "among the most organised

24   cartels that the Commission has investigated."

25           185.    As outlined above, Defendants have a history of competitor contacts

26   resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

27   businesses in the electronics industry.

28           186.    Several  Defendants  also  have  a  history  of  "cooperation"  and

anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188.   In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189.   On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190.   On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

191.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

192.   The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.   The Role of Trade Associations During the Relevant Period

193.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

194.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

195.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

196.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

197.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

48

H.     **Effects of Defendants' Antitrust Violations**

1.     **Examples of Reductions in Manufacturing Capacity by Defendants**

198.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

199.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

202.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

203.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

2.     **Examples of Collusive Pricing for CRTs**

204.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

205.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

206.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

207.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.   This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.   This was a pretext used to conceal the conspiracy.

208.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

210.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.   This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have

absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.** **Summary Of Effects Of The Conspiracy Involving CRTs**

213.   The above combination and conspiracy has had the following effects, among others:

> a. Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;
>
> b. Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and
>
> c. Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.
>
> d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.   PLAINTIFF'S INJURIES**

214.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

215.   Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

216.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

217.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

218.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

219.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

220.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

**VIII.    FRAUDULENT CONCEALMENT**

221.    Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

222.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

223.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

224.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

225.    Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

226.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

1   these meetings were instructed on more than once occasion not to disclose the fact of these

2   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

3   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

4   arrivals and departures at such meetings to avoid being seen in public with each other and with

5   the express purpose and effect of keeping them secret.

6           227.    Defendants also agreed at glass meetings and bilateral meetings to give

7   pretextual reasons for price increases and output reductions to their customers.

8           228.    As alleged above, in early 1999, despite declining production costs and the

9   rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The

10  price increase was allegedly based on increasing global demand for the products.  In fact, this

11  price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the

12  time.

13          229.    As alleged above, despite increased competition from flat panel monitors,

14  prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

15  stabilization was purportedly due exclusively to a shortage of critical components such as glass.

16  This was a pretext used to cover up the conspiracy.

17          230.    In addition, when several CRT manufacturers, including Defendants

18  Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

19  blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this

20  price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

21  "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

22  prices of CRT monitors in due course of time."

23          231.    Manufacturers such as LG Electronics periodically issued press statements

24  falsely asserting that CRT prices were being driven lower by intense competition.

25          232.    Plaintiff is informed and believes, and thereon alleges, that Defendants'

26  purported reasons for the price increases of CRTs were materially false and misleading and made

27  for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

28

233.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.    As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

XI.    CLAIM FOR VIOLATIONS

First Claim for Relief

(Violation of Section 1 of the Sherman Act)

237.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

238.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

239.   In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

240.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

241.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

242.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.   issuing price announcements and price quotations in accordance with the agreements reached;

    e.   selling CRTs to customers in the United States at noncompetitive prices;

    f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

243.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

## (Violation of the California Cartwright Act)

244.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.   During the Relevant Period, Plaintiff conducted a substantial volume of business in California.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in California.  Plaintiff also sent payment for CRT Products to these manufacturers in California.   In addition, Plaintiff sold CRT Products in California containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices and inventories in California of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

246.   In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

247.     Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.   Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.   Defendants' conduct substantially affected California commerce.

248.     The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

249.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.  to fix, raise, maintain and stabilize the price of CRTs;

b.  to allocate markets for CRTs amongst themselves;

c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

d.  to allocate among themselves the production of CRTs.

250.     The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at

1      artificially high, non-competitive levels in the State of California;

2      and

3          c.   those who purchased CRT Products containing price-fixed CRTs

4              from Defendants, their co-conspirators, and others have been

5              deprived of the benefit of free and open competition.

6          251.   As a result of the alleged conduct of Defendants, Plaintiff paid supra-

7   competitive, artificially inflated prices for the CRT Products they purchased during the Relevant

8   Period.

9          252.   As a direct and proximate result of Defendants' conduct, Plaintiff has been

10   injured in its business and property by paying more for CRT Products containing price-fixed

11   CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence

12   of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section

13   16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages

14   and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the

15   California Business and Professions Code.

16                        **Third Claim for Relief**

17              **(Violation of California Unfair Competition Law)**

18          253.   Plaintiff incorporates and realleges, as though fully set forth herein, each

19   and every allegation set forth in the preceding paragraphs of this Complaint.

20          254.   Defendants have engaged in unfair competition in violation of California's

21   Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

22          255.   This Complaint is filed, and these proceedings are pursuant to Sections

23   17203 and 17204 of the California Business & Professions Code, to obtain restitution from

24   Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a

25   result of their unlawful, unfair, and fraudulent conduct.

26          256.   The unlawful, unfair, and fraudulent business practices of Defendants, as

27   alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained

28

competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

a. **Defendants' Unlawful Business Practices**: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b. **Defendants' Unfair Business Practices**: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c. **Defendants' Fraudulent Business Practices**: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

257.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

258.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

259.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

260.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Violation of the New York Donnelly Act)**

261.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.     During the Relevant Period, Plaintiff conducted a substantial volume of business in New York.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing Conspiracy, in New York.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in New York.  Plaintiff also sent payment for CRT Products to these manufacturers in New York.  In addition, Plaintiff sold CRT Products in New York containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices, and inventories in New York of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York.  As a result of its substantial contacts with New York, Plaintiff is entitled to the protection of the laws of New York.

263.     Beginning at a time presently unknown to Plaintiff, but at least as early as December 23, 1998, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq*.

264.     Defendants' Conspiracy restrained, suppressed, and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained, and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

265.     As a result, Defendants' Conspiracy substantially affected New York commerce.

266.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages and the costs of suit, including attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

1          F.      Plaintiff shall receive such other or further relief as may be just and
2   proper.

3   **XII.          JURY TRIAL DEMAND**

4          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by
5   jury of all the claims asserted in this Complaint so triable.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated:                                  Respectfully Submitted,

2

3                                       _____

4                                    William A. Isaacson (*Pro hac vice*)

5                                    **BOIES, SCHILLER & FLEXNER LLP**

                                      5301 Wisconsin Ave. NW, Suite 800

6                                    Washington, D.C.  20015

                                      Telephone:  (202) 237-2727

7                                    Facsimile:   (202) 237-6131

                                      Email:  wisaacson@bsfllp.com

8

9                                    Philip J. Iovieno (*Pro hac vice*)

                                      Anne M. Nardacci (*Pro hac vice*)

10                                   Luke Nikas (*Pro hac vice*)

                                    Christopher V. Fenlon (*Pro hac vice*)

11                                  **BOIES, SCHILLER & FLEXNER LLP**

                                    10 North Pearl Street, 4th Floor

12                                  Albany, NY  12207

                                    Telephone:  (518) 434-0600

13                                  Facsimile:   (518) 434-0665

                                    Email: piovieno@bsfllp.com

14                                  Email: anardacci@bsfllp.com

                                    Email: lnikas@bsfllp.com

15                                  Email: cfenlon@bsfllp.com

16

17                                  Mike McKool, Jr. (*Pro hac vice*)

                                    Email: mmckool@mckoolsmith.com

18                                  Lewis T. LeClair (*Pro hac vice*)

                                    Email: lleclair@mckoolsmith.com

19                                  Scott R. Jacobs (*Pro hac vice*)

20                                  Email: srjacobs@mckoolsmith.com

                                  **MCKOOL SMITH, P.C.**

21                                  300 Crescent Court, Suite 1500

22                                  Dallas, TX 75201

                                  Telephone: (214) 978-4000

23                                  Facsimile: (214) 978-4044

24

25                                  *Counsel For Plaintiff*

                                  *Compucom Systems, Inc.*

26

27

28

# **<u>EXHIBIT F</u>**

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc.
and Electrograph Technologies Corp.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-01656-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-01656-SC | MDL No. 1917 |
| ELECTROGRAPH SYSTEMS, INC.; ELECTROGRAPH TECHNOLOGIES CORP., | **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS | |

USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA,
INC.; MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.,

        Defendants.

        Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for

their Complaint against all Defendants named herein, hereby allege as follows:

# I.        **INTRODUCTION**

        1.        Defendants and their co-conspirators formed an international cartel which

conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs") and

products containing CRTs.

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRT Products were sold in the United States.

5.      With respect to CRT Products, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.

1   Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By

2   1997, these group meetings had become more formalized, as described in greater detail below.

3   There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of

4   group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales,

5   including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and

6   Europe.  These meetings included representatives from the highest levels of the respective

7   companies, as well as regional managers and others.

8           7.      During the Relevant Period, the conspiracy affected billions of dollars of

9   commerce throughout the United States.

10          8.      This conspiracy is being investigated by the United States Department of

11  Justice ("DOJ") and by multiple foreign competition authorities.  Since February 10, 2009,

12  federal indictments have been issued against six individuals in connection with Defendants' CRT

13  price-fixing conspiracy.

14          9.      During the Relevant Period, Plaintiffs purchased CRT Products, both

15  CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly

16  from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or

17  Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of

18  Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT

19  Products they purchased during the Relevant Period.

20  **II.    JURISDICTION AND VENUE**

21          10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of

22  the Clayton Act; and to recover damages, including treble damages under Section 4 of the

23  Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

24  Section 1 of the Sherman Act (15 U.S.C. § 1).

25          11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the

26  California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs

27  sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the

28  California Business and Professions Code (the "Cartwright Act").  Plaintiffs' claims are also

1    brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code,

2    to obtain restitution from and an injunction against Defendants due to their violations of Section

3    17200 *et seq.* of the California Business and Professions Code (the "California Unfair

4    Competition Act").

5           12.    Plaintiffs also bring this action pursuant to Section 340 of the New York

6    General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to

7    Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General

8    Business Law (the "Donnelly Act").  Plaintiffs' claims are also brought pursuant to Section 349

9    of the New York General Business Law, to obtain restitution from and an injunction against

10   Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law

11   (the "New York Unfair Competition Act").

12          13.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

13   the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

14   supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair

15   Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C.

16   § 1367.  Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman

17   Act and they form part of the same case or controversy.

18          14.    The activities of Defendants and their co-conspirators, as described herein,

19   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

20   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

21   import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the

22   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

23   United States.

24          15.    The activities of Defendants and their co-conspirators, as described herein,

25   were within the flow of, were intended to, and did have a direct and substantial effect on

26   commerce in California and New York.  In particular Defendants' and their co-conspirators'

27   conspiracy directly and substantially affected the price of CRT Products purchased in these

28   states.  These effects also give rise to Plaintiffs' antitrust claims.  Plaintiffs maintained operations

1    in these states during the Relevant Period.

2            16.    This court has jurisdiction over each Defendant named in this action under

3    both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR.

4    Each Defendant conducts substantial business in New York as well as California.  In addition,

5    Defendants and their co-conspirators purposely availed themselves of the laws of the United

6    States and the identified states insofar as they manufactured CRTs for sale in the United States,

7    including New York and California, or which were incorporated into CRT Products Defendants

8    and their co-conspirators knew would be sold to customers in the United States, including New

9    York and California.  Defendants' and their co-conspirators' conspiracy affected this commerce

10   in CRT Products in the United States, including in New York and California.

11           17.    Venue is proper in the Eastern District of New York under Section 12 of

12   the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is

13   either an alien corporation, transacts business in this District, or is otherwise found within this

14   District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a

15   substantial part of the events or omissions giving rise to this claim occurred in this District.

16   Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed

17   CRTs would be sold and shipped into this District.

18   **III.    PARTIES**

19       **A.     Plaintiffs**

20           18.    Plaintiff Electrograph Systems, Inc. is a New York corporation with its

21   principal place of business in New York.  Through May 2009, Electrograph Systems, Inc.

22   conducted business as a value-added wholesale distributor of display technology solutions,

23   including CRT displays and components, rear screen projection TVs, projectors, and digital

24   electronic products, primarily to resellers and system integrators.  Electrograph Systems, Inc.

25   specialized in display, audio, connectivity, and other complementary technologies for sale to

26   commercial, retail and government customers.

27           19.    Plaintiff Electrograph Technologies Corp. is a New York corporation,

28   with its principal place of business in New York.  Electrograph Technologies Corp. owns 100%

1    of the outstanding capital stock of Electrograph Systems, Inc.    In addition to its ownership of

2    Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph

3    Technologies Corp. conducted business as an information technology solutions provider that

4    specialized in hardware and software procurement, display technology, custom networking,

5    security, IP telephony, remote management, application development/e-commerce, storage, and

6    enterprise and Internet solutions.  Electrograph Technologies Corp. offered its customers single-

7    source solutions customized to their information systems needs by integrating its analysis, design

8    and implementation services with hardware, software, networking products and peripherals from

9    leading vendors.

10           20.      During the Relevant Period, the Plaintiffs, and their predecessor entities

11   described below, purchased CRT Products directly and indirectly from Defendants, and/or

12   Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries

13   and affiliates controlled.   As such, the Plaintiffs suffered injury as a result of Defendants'

14   unlawful conduct.   Throughout the Relevant Period, Plaintiffs, and their predecessor entities

15   described below, conducted a substantial amount of business in New York and California.

16           **B.       Plaintiffs' Corporate History**

17           21.      Electrograph Technologies Corp. was incorporated under the name

18   Manchester Equipment Co., Inc. on August 21, 1973.  The company's name was changed to

19   Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to

20   Electrograph Technologies Corp. on August 1, 2005.  On August 1, 2005, upon consummation

21   of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE

22   Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc.,

23   the merger sub was merged with and into Manchester Technologies, Inc., and Manchester

24   Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and

25   concurrently changed its name to Electrograph Technologies Corp.  During the Relevant Period,

26   Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in

27   the United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

28   subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

7

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

affiliates controlled.  As such, Electrograph Technologies Corp. suffered injury as a result of Defendants' unlawful conduct.

22.     Electrograph Systems, Inc. was incorporated under the name Electrograph Acquisitions, Inc. on April 10, 1997.  On April 28, 1997, Manchester Equipment Co., Inc.—the predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph Acquisitions, Inc. from Bitwise Designs, Inc.  On April 29, 1997, Electrograph Acquisitions, Inc. changed its name to Electrograph Systems, Inc.  During the Relevant Period, Electrograph Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

23.     ActiveLight, Inc. was formed on April 16, 1998, as a Washington company with its principal place of business in the State of Washington.  ActiveLight, Inc. was a value-added wholesale distributor of display technology solutions and projectors to the professional, commercial and high-end consumer markets.  During the Relevant Period, ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, ActiveLight, Inc. suffered injury as a result of Defendants' unlawful conduct.

24.     On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired 100% of the outstanding stock of ActiveLight, Inc.  From the acquisition date through March 2, 2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

25.     CineLight Corporation was formed on June 11, 2001, as a Washington company with its principal place of business in the State of Washington.  CineLight Corporation was a value-added wholesale distributor of advanced display technology products and accessories to home theater designers and resellers.  During the Relevant Period, CineLight Corporation purchased CRT Products directly and indirectly from Defendants, and/or

1   Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

2   subsidiaries and affiliates controlled.  As such, CineLight Corporation suffered injury as a result

3   of Defendants' unlawful conduct.

4              26.     On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the

5   outstanding stock of CineLight Corporation.  From the date of the acquisition until July 2006,

6   CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  In

7   July 2006, CineLight Corporation was merged into ActiveLight, Inc.

8              27.     International Computer Graphics, Inc. was formed on April 18, 1985, as a

9   California company with its principal place of business in California.  International Computer

10  Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and

11  desktop displays, digital imaging peripherals and AV presentation products.  During the Relevant

12  Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly

13  from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants

14  or Defendants' subsidiaries and affiliates controlled.  As such, International Computer Graphics,

15  Inc. suffered injury as a result of Defendants' unlawful conduct.

16             28.     On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the

17  outstanding stock of International Computer Graphics, Inc.  From the date of the acquisition

18  through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned

19  subsidiary of Electrograph Systems, Inc.  On March 3, 2008, International Computer Graphics,

20  Inc. was merged into Electrograph Systems, Inc.

21             29.     Champion Vision, Inc. was formed on June 19, 2003, as a New York

22  company with its principal place of business in New York.  During the Relevant Period,

23  Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or

24  Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

25  subsidiaries and affiliates controlled.  As such, Champion Vision, Inc. suffered injury as a result

26  of Defendants' unlawful conduct.

27             30.     On September 15, 2008, Champion Vision, Inc. was merged into

28  Electrograph Systems, Inc.

31.     Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland.  On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp.  Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area.  During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct.  In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32.     In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

33.     During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary.  In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc.  As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities."  By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' conspiracy, these predecessor entities were injured in their business and property because the prices they paid for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any

1   reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any

2   of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems,

3   Inc. or Electrograph Technologies Corp.

4       **C.    Defendants**

5           **1.    Hitachi Entities**

6           34.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

7   business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

8   parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

9   market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

10  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11  subsidiaries or affiliates, throughout the United States.

12          35.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

13  company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

14  297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

15  in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

16  manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

17  create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

18  Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

19  through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

20  dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

21  antitrust violations alleged in this complaint.

22          36.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

23  company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

24  York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

25  Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

26  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

28  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

37.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

38.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

39.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

40.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

1

## 2.   **IRICO Entities**

2      41.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with

3 its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

4 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

5 marketing, distribution and sale of CRT Products.    During the Relevant Period, IGC

6 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7 subsidiaries or affiliates, throughout the United States.

8      42.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

9 company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

10 Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

11 CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

12 also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

13 and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

14 IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15 subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

16 the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17 complaint.

18      43.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

19 company with its principal place of business located at No. 16, Fenghui South Road West,

20 District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

21 subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

22 Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

23 through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

24 and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

25 alleged in this complaint.

26      44.     Defendants IGC, IGE and IDDC are collectively referred to herein as

27 "IRICO."

28      ## 3.   **LG Electronics Entities**

45.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

47.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

48.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

1

### 4.      LP Displays

2          49.      Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

3    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

4    Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

5    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

6    In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

7    of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

8    billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

9    and LGEI would cede control over the company and the shares would be owned by financial

10   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

11   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

12   affiliates, throughout the United States.

13

### 5.      Panasonic Entities

14         50.      Defendant Panasonic Corporation, which was at all times during the

15   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

16   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

17   Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

18   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

19   affiliates, throughout the United States.

20         51.      Defendant Panasonic Corporation of North America ("PCNA") is a

21   Delaware corporation with its principal place of business located at One Panasonic Way,

22   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

23   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

24   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

25   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

26   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

27         52.      Defendants Panasonic Corporation and PCNA are collectively referred to

28   herein as "Panasonic."

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

15

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

53.      Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

54.      Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.      Philips Entities

55.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

56.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

57.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

58.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

1    59.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

2    Brazil are collectively referred to herein as "Philips."

3    **7.    Samsung Entities**

4    60.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

5    company with its principal place of business located at Samsung Electronics Building, 1320-10,

6    Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

7    company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

8    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

9    States.

10    61.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

11    corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

12    Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

13    Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

14    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15    United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

16    Samsung SEAI relating to the antitrust violations alleged in this complaint.

17    62.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

18    Company ("Samsung SDI") is a South Korean company with its principal place of business

19    located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

20    company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

21    Samsung SDI claims to be the world's leading company in the display and energy business, with

22    28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

23    market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

24    Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

25    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26    throughout the United States.  Defendant SEC dominated and controlled the finances, policies

27    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

28    63.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

1   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

2   700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

3   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

4   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

5   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

6   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

7   violations alleged in this complaint.

8          64.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

9   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

10  21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

11  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

12  Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

13  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

14  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

15  Mexico relating to the antitrust violations alleged in this complaint.

16         65.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

17  Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

18  Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

19  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

20  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

21  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

22  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

23  Brazil relating to the antitrust violations alleged in this complaint.

24         66.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

25  is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

26  Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

27  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

28  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

1   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and
2   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust
3   violations alleged in this complaint.

4          67.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a
5   Chinese company with its principal place of business located at Developing Zone of Yi-Xian
6   Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled
7   subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin
8   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
9   subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI
10  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to
11  the antitrust violations alleged in this complaint.

12         68.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")
13  is a Malaysian corporation with its principal place of business located at Lots 635 & 660,
14  Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,
15  Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant
16  Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,
17  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
18  throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the
19  finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged
20  in this complaint.

21         69.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung
22  SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung
23  SDI Malaysia are collectively referred to herein as "Samsung."

24         **8.**    <u>**Samtel**</u>

25         70.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its
26  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-
27  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that
28  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.    Thai CRT

71.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.    Toshiba Entities

72.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

73.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this

1    complaint.

2          74.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a

3    limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

4    3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

5    America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

6    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

7    States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

8    relating to the antitrust violations alleged in this complaint.

9          75.   Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

10   California corporation with its principal place of business located at 19900 MacArthur

11   Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled

12   subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

13   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

14   subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

15   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

16   complaint.

17         76.   Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

18   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

19   California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC

20   through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold

21   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

22   throughout the United States.  Defendant TC dominated and controlled the finances, policies and

23   affairs of TAIS relating to the antitrust violations alleged in this complaint.

24         77.   Defendants TC, Toshiba America, TACP, TAEC and TAIS are

25   collectively referred to herein as "Toshiba."

26         **11.   Thomson Entities**

27         78.   Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

28   French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-

ELECTROGRAPH'S SECOND AMENDED                    22                    Case No. 11-cv-01656-SC
COMPLAINT                                                              Master File No. 3:07-cv-05944-SC

les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

79.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

23

1    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2            80.    Thomson SA and Thomson Consumer Electronics are collectively referred

3    to herein as "Thomson."

4            **12.    Mitsubishi Entities**

5            81.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6    is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8    Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

9    internally to Mitsubishi's television and monitor manufacturing division and to other television

10   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

11   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

12   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13   United States.

14           82.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19   and monitor manufacturing division and to other television and monitor manufacturers in the

20   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22   marketed, sold and distributed CRT Products in the United States.

23           83.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

26   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27   CRT televisions and monitors in the United States.

28           84.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

---

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT                                    24                    Case No. 11-cv-01656-SC
                                                                  Master File No. 3:07-cv-05944-SC

1  are collectively referred to herein as "Mitsubishi."

2  **IV.        AGENTS AND CO-CONSPIRATORS**

3         85.     The acts alleged against Defendants in this Complaint were authorized,

4  ordered, or done by their officers, agents, employees, or representatives, while actively engaged

5  in the management and operation of Defendants' businesses or affairs.

6         86.     Each Defendant acted as the principal, agent, or joint venturer of, or for,

7  other Defendants with respect to the acts, violations, and common course of conduct alleged by

8  Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent

9  for CRTs or CRT Products made by its parent company.

10         87.     Various persons and/or firms not named as Defendants in this Complaint

11  participated as co-conspirators in the violations alleged herein and may have performed acts and

12  made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

13  include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

14  Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

15  Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

16  Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-

17  conspirators as Defendants at a later date.

18         88.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major

19  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

20  2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

21  Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

22  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

23  United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

24  Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

25  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

26  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

27  joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

28  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

ELECTROGRAPH'S SECOND AMENDED                    25                    Case No. 11-cv-01656-SC
COMPLAINT                                                              Master File No. 3:07-cv-05944-SC

1   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

2   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

3   directly or through their subsidiaries or affiliates, throughout the United States.

4          89.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein

5   as "Daewoo."

6          90.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

7   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

8   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

9   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

10  Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

11  Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

12  Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

13  its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

14  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

15  throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

16  finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

17  this complaint.

18         91.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

19  venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's

20  principal place of business was located in Indonesia.  TEDI was projected to have an annual

21  production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

22  MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

23  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

24  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

25  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

26  affairs of TEDI relating to the antitrust violations alleged in this complaint.

27         92.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

28  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

1   Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

2   subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

3   venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

4   Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

5   During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

6   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7   Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

8   the antitrust violations alleged in this complaint.

9          93.    The acts charged in this Complaint have been done by Defendants and

10  their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

11  employees or representatives while actively engaged in the management of each Defendant's or

12  co-conspirator's business or affairs.

13  **V.     TRADE AND COMMERCE**

14         94.    During the Relevant Period, each Defendant, or one or more of its

15  subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

16  interstate commerce and foreign commerce, including through and into this judicial district.

17         95.    During the Relevant Period, Defendants collectively controlled a vast

18  majority of the market for CRT Products, both globally and in the United States.

19         96.    The business activities of Defendants substantially affected interstate trade

20  and commerce in the United States and caused antitrust injury in the United States.  The business

21  activities of Defendants also substantially affected trade and commerce in California and New

22  York and caused antitrust injuries in California and New York.

23  **VI.    FACTUAL ALLEGATIONS**

24      **A.     CRT Technology**

25         97.    A CRT has three components: (a) one or more electron guns, each of

26  which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

27  other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

28  that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.   An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

98.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

99.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

100.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

101.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

102.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

103.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

104.     Plaintiffs have participated in the market for CRTs through their direct

1   purchases from Defendants of CRTs and CRT Products and their purchases of CRT Products

2   indirectly from non-Defendant original equipment manufacturers ("OEM") and others.

3   Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs

4   and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices

5   for CRTs and CRT Products.

6          105.   Plaintiffs have participated in the market for products containing CRTs.

7   To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and

8   their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold

9   CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

10         106.   Plaintiffs have been injured by paying supra-competitive prices for CRTs

11   and CRT Products.

12         **B.    Structure of the CRT Industry**

13         107.   The CRT industry has several characteristics that facilitated a conspiracy,

14   including market concentration, ease of information sharing, the consolidation of manufacturers,

15   multiple interrelated business relationships, significant barriers to entry, heightened price

16   sensitivity to supply and demand forces and homogeneity of products.

17                **1.    Market Concentration**

18         108.   During the Relevant Period, the CRT industry was dominated by relatively

19   few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well

20   as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78% share of the

21   global CRT market.  The high concentration of market share facilitates coordination because

22   there are fewer cartel members among which to coordinate pricing or allocate markets, and it is

23   easier to monitor the pricing and production of other cartel members.

24                **2.    Information Sharing**

25         109.   Because of common membership in trade associations, interrelated

26   business arrangements such as joint ventures, allegiances between companies in certain countries

27   and relationships between the executives of certain companies, there were many opportunities

28   for Defendants to discuss and exchange competitive information.  The ease of communication

1    was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

2    took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products

3    as alleged below.

4          110.    Defendants Hitachi and Samsung, as well as Chunghwa, are all members

5    of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the

6    co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

7    Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

8    Research Association.  Upon information and belief, Defendants and their co-conspirators used

9    these trade associations as vehicles for discussing and agreeing upon their pricing for CRT

10   Products.  At the meetings of these trade associations, Defendants exchanged proprietary and

11   competitively sensitive information which they used to implement and monitor the conspiracy.

12         **3.      Consolidation**

13         111.    The CRT industry also had significant consolidation during the Relevant

14   Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

15   involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

16   and Panasonic's CRT businesses into MTPD.

17         **4.      Multiple Interrelated Business Relationships**

18         112.    The industry is marked by a web of cross-licensing agreements, joint

19   ventures and other cooperative arrangements that can facilitate collusion.

20         113.    Examples of the high degree of cooperation among Defendants in both the

21   CRT Product market and other closely related markets include the following:

22               a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

23                    LG Electronics and Philips.

24               b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

25                    Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

26                    purpose of manufacturing TFT-LCD panels.

27               c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

28                    Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

h. Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

## 5. High Costs of Entry Into the Industry

114. There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to

1   overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter

2   the market in light of the declining demand for CRT Products.

3          115.    During the Relevant Period, the costs of the assembly components, both as

4   a whole and individually, have been generally declining, and, in some periods, declining at a

5   substantial rate.   A combination of price discussions and manipulation of the output of CRT

6   Products allowed Defendants to keep prices above where they would have been but for the

7   conspiracy.

8                 **6.      The Maturity of the CRT Product Market**

9          116.    Newer industries typically are characterized by rapid growth, innovation

10  and high profits.  The CRT Product market is a mature one, and like many mature industries, is

11  characterized by slim profit margins, creating a motivation to collude.

12         117.    Demand for CRT Products was declining throughout the Relevant Period.

13  Static declining demand is another factor which makes the formation of a collusive arrangement

14  more likely because it provides a greater incentive to firms to avoid price competition.

15         118.    In addition, conventional CRT televisions and computer monitors were

16  being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

17  Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT

18  Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

19  States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

20  between 2006 and 2010.

21         119.    Although demand was declining as a result of the popularity of flat-panel

22  LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

23  dominant display technology during the Relevant Period, making Defendants' collusion and the

24  international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

25  plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

26  cheaper alternative to these new technologies.

27         120.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for

28  computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

substantial share of the market.

121.   As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.   Homogeneity of CRT Products**

122.   CRT Products are commodity-like products which are manufactured in standardized sizes.   One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.   Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

123.   It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.   Pre-Conspiracy Market**

124.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.   During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.   A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

125.   In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.   During this period, these producers began to include discussions about price in their meetings.

**D.   Defendants' and Co-Conspirators' Illegal Agreements**

126.   In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

127. The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis. During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRT Products in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

128. Defendants Samsung, LG, and Mitsubishi, along with Chunghwa and Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRT Products.

129. As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

130. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

### 1. "Glass Meetings"

131. The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

132. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

133.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.    These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

134.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.    These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.    These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.    The working level meetings also tended to be more regional and often took place near Defendants' factories.    In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

135.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.    The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.    Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

136.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) IRICO, and Thomson.    Chunghwa also attended these meetings.

137.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."    These were meetings held on golf courses.    The green meetings were generally attended by top and management level employees of Defendants.

138.   During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

139.   Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

140.   The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

141.   During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

142.   Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

143.   The agreements reached at the glass meetings included:

36

a.  agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

b.  placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

c.  agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

144.  Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

1    customers; and 4) a recognition of a mutual interest in living up to the target price and living up

2    to the agreements that had been made.

3         145.    As market conditions worsened in 2005-2007, and the rate of replacement

4    of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and

5    bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

6    subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have

7    concerns about antitrust issues.

8              **2.    Bilateral Discussions**

9         146.    Throughout the Relevant Period, the glass meetings were supplemented by

10   bilateral discussions between various Defendants.  The bilateral discussions were more informal

11   than the group meetings and occurred on a frequent, ad hoc basis, often between the group

12   meetings. These discussions, usually between sales and marketing employees, took the form of

13   in-person meetings, telephone contacts and emails.

14        147.    During the Relevant Period, in-person bilateral meetings took place in

15   Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

16   Brazil, Mexico, and the United States.

17        148.    The purpose of the bilateral discussions was to exchange information

18   about past and future pricing, confirm production levels, share sales order information, confirm

19   pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

20   including Brazil, Mexico, Europe, and the United States.

21        149.    In order to ensure the efficacy of their global conspiracy, Defendants also

22   used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil, Mexico,

23   and the United States.  These CRT manufacturers were particularly important because they

24   served the North American market for CRT Products.  As further alleged herein, North America

25   was the largest market for CRT televisions and computer monitors during the Relevant Period.

26   Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of

27   Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants

28   ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or

ELECTROGRAPH'S SECOND AMENDED                    38                    Case No. 11-cv-01656-SC
COMPLAINT                                                              Master File No. 3:07-cv-05944-SC

1   stabilized at supracompetitive levels.

2          150.    Defendants also used bilateral discussions with each other during price

3 negotiations with customers to avoid being persuaded by customers to cut prices. The

4 information gained in these communications was then shared with supervisors and taken into

5 account in determining the price to be offered.

6          151.    Bilateral discussions were also used to coordinate prices with CRT

7 Product manufacturers that did not ordinarily attend the group meetings, such as Defendants

8 Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a

9 top or management meeting, the attendees at these group meetings would meet bilaterally with

10 the other Defendant manufacturers for the purpose of communicating whatever CRT Product

11 pricing and/or output agreements had been reached during the meeting. For example, Samsung

12 had a relationship with Hitachi and was responsible for communicating CRT Product pricing

13 agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for

14 communicating CRT Product pricing agreements to Toshiba. Similarly, Philips had regular

15 bilateral communications with Thomson in Europe and the United States, and Samsung SDI had

16 regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was

17 responsible for communicating CRT Product pricing agreements to Samtel. Hitachi, Toshiba

18 and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and

19 Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way,

20 Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

21
22       **3.**      **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

23          152.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

24 Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

25 These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged

26 in multiple bilateral discussions with other Defendants, particularly with Samsung. Through

27 these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never

28 effectively withdrew from this conspiracy.

153. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

154. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRT Products. None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

155. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRT Products. LG Electronics never effectively withdrew from this conspiracy.

156. Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

157. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

1   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

2   were attended by the highest ranking executives from LP Displays.  Certain of these high level

3   executives from LP Displays had previously attended meetings on behalf of Defendants LG

4   Electronics and Philips.  LP Displays also engaged in bilateral discussions with other

5   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRT

6   Products.

7        158.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

8   Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

9   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

10  These meetings were attended by high level sales managers from Panasonic and MTPD.

11  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

12  discussions, Panasonic agreed on prices and supply levels for CRT Products.  Panasonic never

13  effectively withdrew from this conspiracy.

14       159.   PCNA was represented at those meetings and was a party to the

15  agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

16  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

17  that the prices for CRT Products paid by direct purchasers would not undercut the pricing

18  agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

19  the alleged conspiracy.

20       160.   Between at least 2003 and 2006, Defendant MTPD participated in

21  multiple glass meetings and in fact led many of these meetings during the latter years of the

22  conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

23  also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

24  agreed on prices and supply levels for CRT Products.

25       161.   Between at least 1998 and 2007, Defendant BMCC participated in

26  multiple glass meetings.  These meetings were attended by high level sales managers from

27  BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

28  particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

1   prices and supply levels for CRT Products.   None of BMCC's conspiratorial conduct in

2   connection with CRT Products was mandated by the Chinese government.   BMCC was acting to

3   further its own independent private interests in participating in the alleged conspiracy.

4         162.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips

5   and Philips Taiwan, participated in at least 100 glass meetings at all levels.   After 2001, Philips

6   participated in the CRT Product conspiracy through its joint venture with LG Electronics, LGPD

7   (n/k/a LP Displays).   A substantial number of these meetings were attended by high level

8   executives from Philips.   Philips also engaged in numerous bilateral discussions with other

9   Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRT

10   Products.  Philips never effectively withdrew from this conspiracy.

11         163.   Defendants Philips America and Philips Brazil were represented at those

12   meetings and were a party to the agreements entered at them.  To the extent Philips America and

13   Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

14   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

15   Products paid by direct purchasers would not undercut the pricing agreements reached at the

16   glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in

17   the alleged conspiracy.

18         164.   Between at least 1995 and 2007, Defendant Samsung, through SEC,

19   Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

20   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

21   were attended by the highest ranking executives from Samsung.   Samsung also engaged in

22   bilateral discussions with each of the other Defendants on a regular basis.   Through these

23   discussions, Samsung agreed on prices and supply levels for CRT Products.

24         165.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

25   Samsung SDI Mexico were represented at those meetings and were a party to the agreements

26   entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

27   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

28   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

1   the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

2   Mexico were active, knowing participants in the alleged conspiracy.

3           166.    Between at least 1998 and 2006, Defendant Samtel participated in

4   multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

5   meetings were attended by high level executives from Samtel.  Through these discussions,

6   Samtel agreed on prices and supply levels for CRT Products.  Samtel never effectively withdrew

7   from this conspiracy.

8           167.    Between at least 1997 and 2006, Defendant Thai CRT participated in

9   multiple glass meetings.  These meetings were attended by the highest ranking executives from

10  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

11  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

12  levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

13          168.    Between at least 1996 and 2005, Defendant Thomson participated in

14  dozens of meetings with its competitors, including several glass meetings and multiple bilateral

15  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

16  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

17  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

18  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

19  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

20  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

21  a role in the conspiracy.

22          169.    Between at least 1995 and 2005, Defendant Mitsubishi participated in

23  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

24  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

25  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

26  plant shutdowns, customer allocation, and new product development, and agreed on prices and

27  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

28          170.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never effectively withdrew from this conspiracy.

171.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

172.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRT Products.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

173.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was

1   represented in meetings and discussions by their agents and were parties to the agreements

2   reached in them.

3       **E.      The CRT Market During the Conspiracy**

4           174.    Until the last few years, CRTs were the dominant technology used in

5   displays, including televisions and computer monitors.   During the Relevant Period, this

6   translated into the sale of millions of CRT Products, generating billions of dollars in annual

7   profits.

8           175.    The following data was reported by Stanford Resources, Inc., a market

9   research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

15          176.    During the Relevant Period, North America was the largest market for

16  CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research,

17  the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

18  percent) were consumed in North America.  By 2002, North America still consumed around 35

19  percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related*

20  *Display Materials,* Fuji Chimera Research, 1997, p.12.

21          177.    Defendants' collusion is evidenced by unusual price movements in the

22  CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly

23  predicted declines in consumer prices for CRT Products that did not fully materialize.  For

24  example, in 1992, an analyst for Market Intelligent Research Corporation predicted that

25  "[e]conomies of scale, in conjunction with technological improvements and advances in

26  manufacturing techniques, will produce a drop in the price of the average electronic display to

27  about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence

28

---

[1]       Estimated market value of CRT units sold.

1    of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained

2    stable.

3            178.    In 1996, another industry source noted that "the price of the 14" tube is at

4    a sustainable USD50 and has been for some years . . . ."

5            179.    In early 1999, despite declining production costs and the rapid entry of flat

6    panel display products, the price of large sized color CRTs actually rose.  The price increase was

7    allegedly based on increasing global demand.  In fact, this price increase was a result of the

8    collusive conduct as herein alleged.

9            180.    After experiencing oversupply of 17" CRTs in the second half of 1999, the

10   average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech*

11   *Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-

12   related products."

13           181.    A BNET Business Network news article from August 1998 reported that

14   "key components (cathode ray tubes) in computer monitors have risen in price.  'Although

15   several manufacturers raised their CRT prices in the beginning of August, additional CRT price

16   increases are expected for the beginning of October . . . . While computer monitor price increases

17   may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

18   foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

19           182.    A 2004 article from Techtree.com reports that various computer monitor

20   manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

21   monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

22   used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

23   September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

24           183.    Defendants also conspired to limit production of CRTs by shutting down

25   production lines for days at a time, and closing or consolidating their manufacturing facilities.

26           184.    For example, Defendants' CRT factory utilization percentage fell from

27   90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

28   example of a drop in factory utilization.  There were sudden drops throughout the Relevant

Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

185.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

186.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

187.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

188.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

189.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

190.    Defendant MTPD, now the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

191.    *Kyodo News* reported on November 8, 2007, upon information and belief,

that MTPD fixed prices for CRTs with manufacturers in three Asian countries, including South

Korea's Samsung SDI.  *Kyodo News* further reported that "[o]fficials of these three companies

are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate

target prices when delivering their products to TV manufacturers in Japan and South Korea, the

sources said."

192.    Defendant Samsung SDI was raided by South Korea's Fair Trade

Commission, which has started an investigation into Samsung's CRT business.

193.    The *Asian Shimbun* further reported on November 10, 2007, that "[t]he

representatives held meetings in Southeast Asia where the companies operate CRT factories, the

sources said.  The European Commission, the European Union's executive branch, and the U.S.

Justice Department have been investigating four companies' [referring to the four Asian-based

manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are

closely consulting with the Fair Trade Commission by sharing information."

194.    On November 21, 2007, Defendant Royal Philips publicly disclosed that it

too is subject to one or more investigations into anticompetitive conduct in the CRT industry.

Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started

investigations.  Royal Philips stated that it intended to assist the regulators.

195.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is

also being investigated by the [European] Commission and/or the U.S. Department of Justice for

potential violations of competition laws with respect to semiconductors, LCD products, cathode

ray tubes (CRT) and heavy electrical equipment."

196.    On May 6, 2008, the Hungarian Competition Authority ("HCA")

announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)
> initiated a competition supervision proceeding against the following
> undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,
> Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips
> Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes
> (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo
> Electronics Global HQ, Daewoo Electronics European HQ, MT Picture
> Display Germany GmbH, Matsushita Global HQ, Matsushita European

HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

197.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

198.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-

LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

199.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

200.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

201.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

202.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

1    203.   The plea agreement of Samsung SDI requires that it cooperate with the

2    DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

3    manufacture or sale of CDTs and CPTs.

4    204.   On December 5, 2012, the European Commission announced that it had

5    fined seven international corporate families a total of over €1.4 billion for their two-decade-long

6    effort to fix prices, share markets, restrict output, and allocate customers between themselves in

7    the CRT market.  The companies fined by the European Commission included Chunghwa, LG

8    Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

9    Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

10   for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

11   behavior that are strictly forbidden to companies doing business in Europe."  The press release

12   accompanying the fines further notes that the CRT cartels were "among the most organised

13   cartels that the Commission has investigated."

14   205.   As outlined above, Defendants have a history of competitor contacts

15   resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

16   businesses in the electronics industry.

17   206.   Several Defendants also have a history of "cooperation" and

18   anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S.

19   Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

20   Dynamic Random Access Memory ("DRAM").

21   207.   Defendants Samsung and Toshiba have acknowledged being contacted by

22   the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static

23   Random Access Memory ("SRAM") and NAND Flash Memory.

24   208.   In December 2006, government authorities in Japan, Korea, the European

25   Union and the United States revealed a comprehensive investigation into anticompetitive

26   conduct in the closely-related TFT-LCD market.

27   209.   On December 12, 2006, news reports indicated that Defendant Samsung

28   and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG

1  Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

2  210.  On November 12, 2008, the DOJ announced that it had reached

3  agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary,

4  LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

5  Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

6  their roles in a conspiracy to fix prices of TFT-LCD panels.

7  211.  On March 10, 2009, the DOJ announced that it had reached an agreement

8  with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

9  violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role

10  in a conspiracy to fix the prices of TFT-LCD panels.

11  212.  The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa

12  and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-

13  LCDs was carried out, in part, in California.

14  **G.**  **The Role of Trade Associations During the Relevant Period**

15  213.  Defendants' collusive activities have been furthered by trade associations

16  and trade events that provided opportunities to conspire and share information.  One example is

17  the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

18  by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a

19  national trade organization representing about 80 member companies in the Korean display

20  industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had

21  been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.

22  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to

23  display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display

24  Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of

25  USDC's governing board, said "[e]ven competitors should cooperate on common issues."

26  214.  Samsung and LG Electronics were members of both KODEMIA and

27  EDIRAK, and have participated extensively in the KDCs.

28

215.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

216.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

217.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.    Effects of Defendants' Antitrust Violations**

**1.    Examples of Reductions in Manufacturing Capacity by Defendants**

218.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

219.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

220.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

221.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

222.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

223.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRT Products

224.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

225.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

226.    In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

227.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

228.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

229.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

230.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

231.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

232.     Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

233.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**H.     Summary Of Effects Of The Conspiracy Involving CRT Products**

234.   The above combination and conspiracy has had the following effects, among others:

a.  Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.  Prices for CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.  Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

235.   As purchasers of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRT Products causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

236.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

237.    The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

238.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

239.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

240.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

241.    As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

**VIII.    FRAUDULENT CONCEALMENT**

242.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 2007, when investigations by the DOJ and other antitrust regulators became public.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

243. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

244. The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

245. By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

246. Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

247. As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at glass meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy.

58

248.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

249.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

250.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

251.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

252.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

253.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRT Products were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

254.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

255.    As discussed at length in Paragraphs 188-212 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

256.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

257.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## X.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

258.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

259.    Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

260.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

261.   As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

262.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

263.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRT Products;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRT Products;

    c.   agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.   issuing price announcements and price quotations in accordance with the agreements reached;

    e.   selling CRT Products to customers in the United States at noncompetitive prices;

    f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.   agreeing to maintain or lower production capacity; and

    h.   providing false statements to the public to explain increased prices for CRT Products.

264.   As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

265.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266.    During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

267.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT Products.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

268.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRT Products at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

269.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

270.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.  to fix, raise, maintain and stabilize the price of CRT Products;

    b.  to allocate markets for CRT Products amongst themselves;

    c.  to submit rigged bids for the award and performance of certain CRT Products contracts; and

    d.  to allocate among themselves the production of CRT Products.

271.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.  price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California;

    b.  prices for CRT Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.  those who purchased CRT Products from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

63

272.     As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

273.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**

**(Violation of California Unfair Competition Law)**

274.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

275.     During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California and elsewhere. As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

276.     Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

277.     Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRT Products as described above.

278.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

279.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

280.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

281.    Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

282.    By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Violation of the New York Donnelly Act)**

283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284.    Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere.  As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

285.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq*.

286.     Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

287.     As a result, Defendants' conspiracy substantially affected New York commerce

288.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq*.

289.     As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief**

**(Violation of New York Unfair Competition Law)**

290.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

291.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

292.     The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349, which

1 resulted in consumer injury and broad adverse impact on the public at large, and harmed the

2 public interest of New York State in an honest marketplace in which economic activity is

3 conducted in a competitive manner.

4       293.    Defendants' unlawful conduct had the following effects:  (1) CRT price

5 competition was restrained, suppressed and eliminated throughout New York; (2) CRT Products

6 prices were raised, fixed, maintained and stabilized at artificially high levels throughout New

7 York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-

8 competitive, artificially inflated prices for CRT Products.

9       294.    During the Relevant Period, Defendants' illegal conduct substantially

10 affected New York commerce and consumers.

11       295.    During the Relevant Period, each of Defendants named herein, directly, or

12 indirectly and through affiliates or subsidiaries or agents they dominated and controlled,

13 manufactured, sold and/or distributed CRT Products in New York.

14       296.    Plaintiffs seek treble damages for their injuries caused by these violations

15 in an amount to be determined at trial and are threatened with further injury.  Without prejudice

16 to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs do not

17 seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

18 **XI.**    **PRAYER FOR RELIEF**

19       WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf,

20 adjudging and decreeing that:

21       A.    Defendants engaged in a contract, combination, and conspiracy in

22 violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the

23 New York Donnelly Act and the unfair competition laws of California and New York and

24 Plaintiffs were injured in their business and property as a result of Defendants' violations;

25       B.    Plaintiffs shall recover damages sustained by them, as provided by the

26 federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

27 entered against Defendants in an amount to be trebled in accordance with such laws, including

28 Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.    JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                                  Respectfully Submitted,

_____
Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com
               anardacci@bsfllp.com

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems,
Inc. and Electrograph Technologies Corp.*

# **<u>EXHIBIT G</u>**

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06276-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06276-SC | MDL No. 1917 |
| OFFICE DEPOT, INC., | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR | |

1   DISPLAY DEVICES, LTD.; IRICO GROUP
    CORPORATION; IRICO GROUP
2   ELECTRONICS CO., LTD.; IRICO
    DISPLAY DEVICES CO., LTD.; LG
3   ELECTRONICS, INC.; LG ELECTRONICS
    USA, INC.; LG ELECTRONICS TAIWAN
4   TAIPEI CO., LTD.; LP DISPLAYS
    INTERNATIONAL LTD.; PANASONIC
5   CORPORATION; PANASONIC
    CORPORATION OF NORTH AMERICA;
6   MT PICTURE DISPLAY CO., LTD.;
    BEIJING MATSUSHITA COLOR CRT CO.,
7   LTD.; KONINKLIJKE PHILIPS
    ELECTRONICS N.V.; PHILIPS
8   ELECTRONICS NORTH AMERICA
    CORPORATION; PHILIPS ELECTRONICS
9   INDUSTRIES (TAIWAN), LTD.; PHILIPS
    DA AMAZONIA INDUSTRIA
10  ELECTRONICA LTDA.; SAMSUNG
    ELECTRONICS CO., LTD.; SAMSUNG
11  ELECTRONICS AMERICA, INC.;
    SAMSUNG SDI CO., LTD.; SAMSUNG
12  SDI AMERICA, INC.; SAMSUNG SDI
    MEXICO S.A. DE C.V.;  SAMSUNG SDI
13  BRASIL LTDA.; SHENZHEN SAMSUNG
    SDI CO., LTD.; TIANJIN SAMSUNG SDI
14  CO., LTD.; SAMSUNG SDI (MALAYSIA)
    SDN. BHD.; SAMTEL COLOR LTD.; THAI
15  CRT CO., LTD.; TOSHIBA
    CORPORATION; TOSHIBA AMERICA,
16  INC.; TOSHIBA AMERICA CONSUMER
    PRODUCTS, LLC; TOSHIBA AMERICA
17  ELECTRONIC COMPONENTS, INC.;
    TOSHIBA AMERICA INFORMATION
18  SYSTEMS, INC.; CHUNGHWA PICTURE
    TUBES, LTD.; CHUNGHWA PICTURE
19  TUBES (MALAYSIA); TECHNICOLOR
    SA; TECHNICOLOR USA, INC.;
20  MITSUBISHI ELECTRIC CORPORATION;
    MITSUBISHI DIGITAL ELECTRONICS
21  AMERICA, INC.; MITSUBISHI ELECTRIC
    & ELECTRONICS, USA, INC.,
22
            Defendants.
23
24      Plaintiff, Office Depot, Inc. ("Office Depot"), for its Complaint against all Defendants

25  named herein, hereby alleges as follows:

    **I.      INTRODUCTION**
26
27          1.      Defendants and their co-conspirators formed an international cartel which

28  conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

---

OFFICE DEPOT'S AMENDED COMPLAINT                    2                    Case No. 11-cv-06276-SC
                                                                         Master File No. 3:07-cv-05944-SC

1   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

2   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3           2.      Defendants are or were among the leading manufacturers of: (a) color

4   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

7   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

9   and the products containing them shall be referred to as "CDT Products."  CDT Products and

10  CPT Products shall be referred to collectively herein as "CRT Products."

11          3.      Defendants control the majority of the CRT industry, a multibillion dollar

12  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

13  Relevant Period, virtually every household in the United States owned at least one CRT Product.

14          4.      Since the mid-1990s, the CRT industry faced significant economic

15  pressures as customer preferences for other emerging technologies shrank profits and threatened

16  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

17  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19  States.

20          5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

22  shipments, prices, production and customer demand; (c) coordinate public statements regarding

23  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28  producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

**II.      JURISDICTION AND VENUE**

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein because Plaintiff purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

1    events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

2    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

3    into this District.

4    **III.    PARTIES**

5        **A.    Plaintiff**

6            16.    Plaintiff Office Depot is a Delaware corporation with its corporate

7    headquarters in Delray Beach, Florida. Office Depot was incorporated in 1986 with the opening

8    of its first retail location in Fort Lauderdale, Florida. Through the conclusion of Defendants' and

9    the co-conspirators' conspiracy, Office Depot was a global supplier of office products and

10   services. In fiscal year 2010, Office Depot sold $11.6 billion of products and services to

11   consumers and businesses of all sizes.  Upon information and belief, Office Depot owns all

12   claims and rights under federal law and state law to recover any overcharges suffered by Office

13   Depot and the following subsidiaries: (1) Viking Office Products, Inc.; (2) Solutions4sure.com,

14   Inc., d/b/a Tech Depot; and (3) Computers4sure.com, Inc., (collectively, the "Office Depot

15   Subsidiaries").

16           17.    During the Relevant Period, Office Depot and the Office Depot

17   Subsidiaries purchased CRT Products directly and indirectly from the Defendants, and/or the

18   Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants'

19   subsidiaries and affiliates controlled.  As such, Office Depot and the Office Depot Subsidiaries

20   suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

21   Throughout the Relevant Period, Office Depot conducted a substantial amount of business in

22   Florida and California.

23           18.    Upon information and belief, during the Relevant Period, Office Depot

24   and the Office Depot Subsidiaries purchased CRT Products in, *inter alia*, California and Florida

25   containing CRTs manufactured and sold by Defendants and their co-conspirators.  In addition,

26   upon information and belief, Plaintiff supplied its offices in California and Florida with CRT

27   Products and maintained corporate offices and inventories in these states.

28           19.    Upon information and belief, Plaintiff purchased CRT Products, which

OFFICE DEPOT'S AMENDED COMPLAINT                6                Case No. 11-cv-06276-SC
                                                                 Master File No. 3:07-cv-05944-SC

1   contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially

2   inflated prices because of the price-fixing conspiracy, in California and Florida.

3   **B.**   **Defendants**

4   **1.**   **Hitachi Entities**

5          20.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

6   business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7   parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

8   market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

9   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

10  subsidiaries or affiliates, throughout the United States.

11         21.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

12  company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

13  297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

14  in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

15  manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

16  create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

17  Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

18  through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

19  dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

20  antitrust violations alleged in this complaint.

21         22.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

22  company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

23  York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

24  Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

25  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

27  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28         23.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

1    with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

2    Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

3    Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

4    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

6    affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

7            24.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

8    Delaware corporation with its principal place of business located at 208 Fairforest Way,

9    Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

10   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

11   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

13   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

14   complaint.

15           25.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

16   Shenzhen") was a Chinese company with its principal place of business located at 5001

17   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

18   least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

19   around the time that the government investigations into the CRT industry began).  Thus, Hitachi

20   Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

21   Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

22   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23   throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

24   controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

25   violations alleged in this complaint.

26           26.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

27   HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

28

1

## 2.   IRICO Entities

2          27.   Defendant IRICO Group Corporation ("IGC") is a Chinese company with

3   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

4   712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

5   marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

6   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7   subsidiaries or affiliates, throughout the United States.

8          28.   Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

9   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

10   Province 712021.   IGE is owned by Defendant IGC.   According to its website, IGE was the first

11   CRT manufacturer in China and one of the leading global manufacturers of CRTs.   Their website

12   also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

13   and sales volume, sales revenue and aggregated profit, and taxation.   During the Relevant Period,

14   IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States.   Defendant IGC dominated and controlled

16   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17   complaint.

18          29.   Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

19   company with its principal place of business located at No. 16, Fenghui South Road West,

20   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

21   subsidiary of Defendant IGC.   In 2006, IDDC was China's top CRT maker.   During the Relevant

22   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

23   through its subsidiaries or affiliates, throughout the United States.   Defendant IGC dominated

24   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

25   alleged in this complaint.

26          30.   Defendants IGC, IGE and IDDC are collectively referred to herein as

27   "IRICO."

28

1

### 3.   LG Electronics Entities

2        31.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

3   the laws of the Republic of Korea with its principal place of business located at LG Twin

4   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

5   billion global force in consumer electronics, home appliances and mobile communications,

6   which established its first overseas branch office in New York in 1968.  The company's name

7   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

8   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

9   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

10   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

11   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

12   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

13   throughout the United States.

14        32.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

15   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

16   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

17   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

18   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

19   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

20   to the antitrust violations alleged in this complaint.

21        33.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

22   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

23   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

24   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

25   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

27   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

28        34.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

1  herein as "LG Electronics."

2       **4.      LP Displays**

3       35.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10 and LGEI would cede control over the company and the shares would be owned by financial

11 institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13 affiliates, throughout the United States.

14      **5.      Panasonic Entities**

15      36.     Defendant Panasonic Corporation, which was at all times during the

16 Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17 Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18 Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

19 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20 affiliates, throughout the United States.

21      37.     Defendant Panasonic Corporation of North America ("PCNA") is a

22 Delaware corporation with its principal place of business located at One Panasonic Way,

23 Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24 Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26 United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27 and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28      38.     Defendants Panasonic Corporation and PCNA are collectively referred to

1    herein as "Panasonic."

2         39.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

4    Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

5    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

6    manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On

7    March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

8    venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

9    Corporation, and renaming it MT Picture Display Co., Ltd.   During the Relevant Period, MTPD

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12        40.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

13   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

14   Dashanzi Chaoyang District, Beijing, China.   BMCC is a joint venture company, 50% of which

15   is held by Defendant MTPD.   The other 50% is held by Beijing Orient Electronics (Group) Co.,

16   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

17   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

18   China state-owned enterprise).   Formed in 1987, BMCC was Panasonic Corporation's first CRT

19   manufacturing facility in China.   BMCC is the second largest producer of CRTs for televisions in

20   China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

21   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22   States.

23        **6.    Philips Entities**

24        41.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

25   Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

26   Amstelplein 2, 1070 MX Amsterdam, The Netherlands.   Royal Philips, founded in 1891, is one

27   of the world's largest electronics companies, with 160,900 employees located in over 60

28   countries.   Royal Philips had sole ownership of its CRT business until 2001.   In 2001, Royal

1    Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

2    Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

3    demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

4    million Euros of its investment and said it would not inject further capital into the venture.

5    During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

6    Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7            42.    Defendant Philips Electronics North America Corporation ("Philips

8    America") is a Delaware corporation with its principal place of business located at 1251 Avenue

9    of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and

10   controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America

11   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12   subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

13   controlled the finances, policies and affairs of Philips America relating to the antitrust violations

14   alleged in this complaint.

15           43.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

16   Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

17   Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

18   Philips.   During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

19   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20   United States.  Defendant Royal Philips dominated and controlled the finances, policies and

21   affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

22           44.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

23   Brazil") is a Brazilian company with its principal place of business located at Av Torquato

24   Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

25   wholly-owned and controlled subsidiary of Defendant Royal Philips.   During the Relevant

26   Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

27   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

28   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

the antitrust violations alleged in this complaint.

45.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

46.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

48.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

49.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

52.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

53.   Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

54.   Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

55.   Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

## 8.   **Samtel**

56.   Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

1   country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

2   States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

3   Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

4   its subsidiaries and affiliates, throughout the United States.

5   **9.    Thai CRT**

6   57.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

7   1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

8   Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

9   televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

10  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

11  United States.

12  **10.    Toshiba Entities**

13  58.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

14  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

15  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

16  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

17  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

18  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

19  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

20  in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

21  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22  subsidiaries or affiliates, throughout the United States.

23  59.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

24  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

25  4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

26  subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

27  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

28  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

1  policies and affairs of Toshiba America relating to the antitrust violations alleged in this
2  complaint.

3         60.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a
4  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-
5  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba
6  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed
7  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United
8  States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP
9  relating to the antitrust violations alleged in this complaint.

10         61.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a
11  California corporation with its principal place of business located at 19900 MacArthur
12  Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled
13  subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC
14  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
15  subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled
16  the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this
17  complaint.

18         62.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a
19  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,
20  California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC
21  through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold
22  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
23  throughout the United States.  Defendant TC dominated and controlled the finances, policies and
24  affairs of TAIS relating to the antitrust violations alleged in this complaint.

25         63.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are
26  collectively referred to herein as "Toshiba."

27         **11.**    **Chunghwa Entities**

28         64.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

1    Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

2    Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In

3    1974, Chunghwa PT's CRTs received certification by the United States, giving the company

4    entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major

5    global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and

6    distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

7    Fuzhou subsidiary) throughout the United States.

8            65.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

9    Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

10    Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

11    owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

12    production, and it has established itself as one of the leading worldwide suppliers of CRTs.

13    During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

14    Products either directly or through its subsidiaries or affiliates throughout the United States.

15    Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

16    Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

17            66.    Defendants Chunghwa PT and Chunghwa Malaysia are collectively

18    referred to herein as "Chunghwa."

19              **12.**    **Thomson Entities**

20            67.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

21    French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-

22    les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson

23    Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States

24    market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold

25    its CRTs internally to its television-manufacturing division, which had plants in the United States

26    and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson

27    SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's

28    CRT televisions were sold in the United States to consumers under the RCA brand.  In

1  November 2003, Thomson SA sold its television division to a joint venture it formed with

2  Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics

3  Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

4  televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

5  Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

6  SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA

7  manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

8  through its subsidiaries or affiliates, to customers throughout the United States.

9          68.      Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

10  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

11  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

12  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

13  Electronics was a major manufacturer of CRTs for the United States market, with plants located

14  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

15  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

16  television-manufacturing division, which had plants in the United States and Mexico, and to

17  other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

18  were sold in the United States to United States consumers under the RCA brand.  Thomson

19  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

20  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

21  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

22  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

23          69.      Thomson SA and Thomson Consumer Electronics are collectively referred

24  to herein as "Thomson."

25          **13.    Mitsubishi Entities**

26          70.      Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

27  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

28  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

1    Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

2    internally to Mitsubishi's television and monitor manufacturing division and to other television

3    and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

4    division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

5    Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

6    United States.

7            71.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

8    Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

9    Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

10   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

11   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

12   and monitor manufacturing division and to other television and monitor manufacturers in the

13   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

14   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

15   marketed, sold and distributed CRT Products in the United States.

16           72.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

17   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

18   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.     During the

19   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

20   CRT televisions and monitors in the United States.

21           73.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

22   are collectively referred to herein as "Mitsubishi."

23   **IV.    AGENTS AND CO-CONSPIRATORS**

24           74.    The acts alleged against Defendants in this Complaint were authorized,

25   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

26   in the management and operation of Defendants' businesses or affairs.

27           75.    Each Defendant or co-conspirator acted as the principal, agent, or joint

28   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

1    common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

2    subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

3    made by its parent company.

4         76.    Various persons and/or firms not named as Defendants in this Complaint

5    participated as co-conspirators in the violations alleged herein and may have performed acts and

6    made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

7    include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

8    Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

9    Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

10   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

11   conspirators as Defendants at a later date.

12        77.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major

13   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

14   2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

15   Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

16   subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

17   United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

18   Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

19   Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

20   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

21   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

22   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

23   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

24   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

25   directly or through their subsidiaries or affiliates, throughout the United States.

26        78.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein

27   as "Daewoo."

28        79.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

1   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

2   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

3   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

4   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

5   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

6   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

7   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

8   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

9   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

10  finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

11  this complaint.

12          80.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

13  venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

14  principal place of business was located in Indonesia.  TEDI was projected to have an annual

15  production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

16  MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

17  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

18  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

19  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

20  affairs of TEDI relating to the antitrust violations alleged in this complaint.

21          81.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

22  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

23  Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

24  subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

25  venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

26  Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

27  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

28  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

1    Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

2    the antitrust violations alleged in this complaint.

3           82.    The acts charged in this Complaint have been done by Defendants and

4    their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

5    employees or representatives while actively engaged in the management of each Defendant's or

6    co-conspirator's business or affairs.

7    **V.    TRADE AND COMMERCE**

8           83.    During the Relevant Period, each Defendant, or one or more of its

9    subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

10   interstate commerce and foreign commerce, including through and into this judicial district.

11          84.    During the Relevant Period, Defendants collectively controlled a vast

12   majority of the market for CRT Products, both globally and in the United States.

13          85.    The business activities of Defendants substantially affected interstate trade

14   and commerce in the United States and caused antitrust injury in the United States.  The business

15   activities of Defendants also substantially affected trade and commerce in California and Florida

16   and caused antitrust injuries in California and Florida.

17   **VI.   FACTUAL ALLEGATIONS**

18        **A.    CRT Technology**

19          86.    A CRT has three components: (a) one or more electron guns, each of

20   which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

21   other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

22   that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

23   faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

24   coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

25   shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

26   produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

27   narrow lines of red, green, blue and black.

28          87.    CRT technology was first developed more than a century ago.  The first

commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

88.   The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

89.   Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

90.   CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

91.   CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

92.   The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

93.   Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

94.   Plaintiff has participated in the market for products containing CRTs. To

1    the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their

2    co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs

3    in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

4          95.    Plaintiff has been injured by paying supra-competitive prices for CRT

5    Products.

6          **B.**    **Structure of the CRT Industry**

7          96.    The CRT industry has several characteristics that facilitated a conspiracy,

8    including market concentration, ease of information sharing, the consolidation of manufacturers,

9    multiple interrelated business relationships, significant barriers to entry, heightened price

10   sensitivity to supply and demand forces and homogeneity of products.

11         **1.**    **Market Concentration**

12         97.    During the Relevant Period, the CRT industry was dominated by relatively

13   few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

14   Chunghwa, together held a collective 78% share of the global CRT market.  The high

15   concentration of market share facilitates coordination because there are fewer cartel members

16   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

17   production of other cartel members.

18         **2.**    **Information Sharing**

19         98.    Because of common membership in trade associations, interrelated

20   business arrangements such as joint ventures, allegiances between companies in certain countries

21   and relationships between the executives of certain companies, there were many opportunities

22   for Defendants to discuss and exchange competitive information.  The ease of communication

23   was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

24   took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

25   alleged below.

26         99.    Defendants Hitachi, Samsung and Chunghwa are all members of the

27   Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

28   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

1  Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

2  Research Association.  Upon information and belief, Defendants and their co-conspirators used

3  these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

4  the meetings of these trade associations, Defendants exchanged proprietary and competitively

5  sensitive information which they used to implement and monitor the conspiracy.

6  **3.**   **Consolidation**

7  100.   The CRT industry also had significant consolidation during the Relevant

8  Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

9  involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

10  and Panasonic's CRT businesses into MTPD.

11  **4.**   **Multiple Interrelated Business Relationships**

12  101.   The industry is marked by a web of cross-licensing agreements, joint

13  ventures and other cooperative arrangements that can facilitate collusion.

14  102.   Examples of the high degree of cooperation among Defendants in both the

15  CRT Product market and other closely related markets include the following:

16  a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

17  LG Electronics and Philips.

18  b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

19  Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

20  purpose of manufacturing TFT-LCD panels.

21  c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

22  Toshiba and Panasonic.

23  d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita

24  Display Technology Co., Ltd. as a joint venture for the purpose of

25  manufacturing TFT-LCD panels.

26  e.   In December 1995, Defendant Toshiba partnered with Orion and two

27  other non-defendant entities to form TEDI, which manufactured CRTs

28  in Indonesia.

OFFICE DEPOT'S AMENDED COMPLAINT   27   Case No. 11-cv-06276-SC
Master File No. 3:07-cv-05944-SC

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.   Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.   Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.   High Costs of Entry Into the Industry**

103.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

104.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

6.     **The Maturity of the CRT Product Market**

105.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

106.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

107.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

108.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

109.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

110.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

7.     **Homogeneity of CRT Products**

111.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold

1   and Plaintiff purchased CRT Products primarily on the basis of price.

2          112.    It is easier to form and sustain a cartel when the product in question is

3   commodity-like because it is easier to agree on prices to charge and to monitor those prices once

4   an agreement is formed.

5          C.     **Pre-Conspiracy Market**

6          113.    The genesis of the CRT conspiracy was in the late 1980s as the CRT

7   Products business became more international and Defendants began serving customers that were

8   also being served by other international companies.  During this period, the employees of

9   Defendants would encounter employees from their competitors when visiting their customers.  A

10  culture of cooperation developed over the years and these Defendant employees would exchange

11  market information on production, capacity and customers.

12         114.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa,

13  and Orion visited each other's factories in Southeast Asia.  During this period, these producers

14  began to include discussions about price in their meetings.

15         D.     **Defendants' and Co-Conspirators' Illegal Agreements**

16         115.    In order to control and maintain profitability during declining demand for

17  CRT Products, Defendants and their co-conspirators have engaged in a contract, combination,

18  trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices

19  at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

20  November 25, 2007.

21         116.    The CRT conspiracy was effectuated through a combination of group and

22  bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

23  were the primary method of communication and took place on an informal, ad hoc basis.  During

24  this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

25  the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

26  and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These

27  meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

28  Singapore.

117. Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

118. As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

119. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.    "Glass Meetings"**

120. The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

121. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

122. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

123. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into

agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

124.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

125.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

126.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

127.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

128.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

129.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales

1  volume, inventory levels, production capacity, exports, customer orders, price trends and

2  forecasts of sales volumes for coming months.  The participants also updated the information

3  they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

4  who would write the information on a white board.  The meeting participants then used this

5  information to discuss and agree upon what price each would charge for CRTs to be sold in the

6  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

7  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

8  of CRTs that were sold to specific customers, and agreed upon target prices to be used in

9  negotiations with large customers.  Having analyzed the supply and demand, the participants

10  would also discuss and agree upon production cutbacks.

11        130.    During periods of oversupply, the focus of the meeting participants turned

12  to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

13  price."

14        131.    Defendants' conspiracy included agreements on the prices at which certain

15  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

16  CRT Products, such as televisions and computer monitors.  Defendants realized the importance

17  of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

18  pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

19  supracompetitive prices for CRTs.

20        132.    The agreements reached at the glass meetings included:

21        l.  agreements on CRT prices, including establishing target prices,

22            "bottom" prices, price ranges and price guidelines;

23        m.  placing agreed-upon price differentials on various attributes of CRTs,

24            such as quality or certain technical specifications;

25        n.  agreements on pricing for intra-company CRT sales to vertically

26            integrated customers;

27        o.  agreements as to what to tell customers about the reason for a price

28            increase;

p.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

q.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

r.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

s.  agreements to coordinate uniform public statements regarding available capacity and supply;

t.  agreements to allocate both overall market shares and share of a particular customer's purchases;

u.  agreements to allocate customers;

v.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

w.  agreements to keep their meetings secret.

133.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

134.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

2. **Bilateral Discussions**

135.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

136.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

137.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

138.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants , they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

139.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

140.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

1    Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

2    management meeting, the attendees at these group meetings would meet bilaterally with the

3    other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

4    output agreements had been reached during the meeting.  For example, Samsung had a

5    relationship with Hitachi and was responsible for communicating CRT pricing agreements to

6    Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

7    CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

8    with Thomson in Europe and the United States, and Samsung SDI had regular communications

9    with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for

10   communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented

11   the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes

12   Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel

13   participated in the conspiracy to fix prices of CRTs.

14

15        **3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

16            141.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

17   Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

18   These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

19   in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

20   these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

21   withdrew from this conspiracy.

22            142.    Defendants Hitachi America and HEDUS were represented at those

23   meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

24   HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

25   in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

26   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

27   Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

28            143.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

144.   Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

145.   Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

146.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.   LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

147.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

37

1    Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

2    These meetings were attended by high level sales managers from Panasonic and MTPD.

3    Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

4    discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

5    withdrew from this conspiracy.

6          148.    PCNA was represented at those meetings and was a party to the

7    agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

8    purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

9    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

10   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

11   the alleged conspiracy.

12         149.    Between at least 2003 and 2006, Defendant MTPD participated in

13   multiple glass meetings and in fact led many of these meetings during the latter years of the

14   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

15   also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

16   agreed on prices and supply levels for CRTs.

17         150.    Between at least 1998 and 2007, Defendant BMCC participated in

18   multiple glass meetings.  These meetings were attended by high level sales managers from

19   BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

20   particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

21   prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

22   CRTs was mandated by the Chinese government.  BMCC was acting to further its own

23   independent private interests in participating in the alleged conspiracy.

24         151.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips

25   and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

26   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

27   LP Displays).  A substantial number of these meetings were attended by high level executives

28   from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

1  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

2  effectively withdrew from this conspiracy.

3         152.    Defendants Philips America and Philips Brazil were represented at those

4  meetings and were a party to the agreements entered at them.  To the extent Philips America and

5  Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

6  significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

7  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

8  the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

9  in the alleged conspiracy.

10         153.    Between at least 1995 and 2007, Defendant Samsung, through SEC,

11  Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

12  participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

13  were attended by the highest ranking executives from Samsung.  Samsung also engaged in

14  bilateral discussions with each of the other Defendants on a regular basis.  Through these

15  discussions, Samsung agreed on prices and supply levels for CRTs.

16         154.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

17  Samsung SDI Mexico were represented at those meetings and were a party to the agreements

18  entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

19  a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

20  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

21  the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22  Mexico were active, knowing participants in the alleged conspiracy.

23         155.    Between at least 1998 and 2006, Defendant Samtel participated in

24  multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

25  meetings were attended by high level executives from Samtel.  Through these discussions,

26  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

27  this conspiracy.

28         156.    Between at least 1997 and 2006, Defendant Thai CRT participated in

1    multiple glass meetings.  These meetings were attended by the highest ranking executives from

2    Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

3    particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

4    levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

5            157.    Between at least 1996 and 2005, Defendant Thomson participated in

6    dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral

7    meetings.  These meetings were attended by high level sales managers from Thomson.  At these

8    meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

9    demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

10   development and agreed on prices and supply levels for CRTs.  Thomson never effectively

11   withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

12   Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

13   a role in the conspiracy.

14           158.    Between at least 1995 and 2005, Defendant Mitsubishi participated in

15   multiple bilateral and some multilateral meetings with its competitors.  These meetings were

16   attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

17   such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

18   plant shutdowns, customer allocation, and new product development, and agreed on prices and

19   supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

20           159.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

21   and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

22   conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

23   high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

24   discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

25   agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

26   conspiracy.

27           160.    Defendants Toshiba America, TACP, TAEC and TAIS were represented

28   at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

161.   Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

162.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

163.   When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements

reached in them.

**E.     The CRT Market During the Conspiracy**

164.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

165.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars)[1] | Average Selling Price Per Unit |
|------|------------------------|----------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

166.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

167.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

168.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price

---

[1] Estimated market value of CRT units sold.

increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

169.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

170.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

171.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

172.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

173.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

174.    These price increases and price stability in the market for CRT Products

1    during the Relevant Period are inconsistent with a competitive market for a product facing

2    rapidly decreasing demand caused by a new, substitutable technology.

3        **F.    International Government Antitrust Investigations**

4        175.   Defendants' conspiracy to fix, raise, maintain and stabilize the prices of,

5    and restrict output for, CRTs sold in the United States during the Relevant Period, is

6    demonstrated by a multinational investigation commenced by the Antitrust Division of the

7    United States Department of Justice.

8        176.   Separately, the European Commission and Japan and South Korea's Fair

9    Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being

10   sold in Europe and Asia.

11       177.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group

12   is also being investigated by the [European] Commission and/or the U.S. Department of Justice

13   for potential violations of competition laws with respect to semiconductors, LCD products,

14   cathode ray tubes (CRT) and heavy electrical equipment."

15       178.   On May 6, 2008, the Hungarian Competition Authority ("HCA")

16   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

17
18           The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)
             initiated a competition supervision proceeding against the following
19           undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,
             Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips
20           Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes
             (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo
21           Electronics Global HQ, Daewoo Electronics European HQ, MT Picture
             Display Germany GmbH, Matsushita Global HQ, Matsushita European
22           HQ.

23           Based on the data available the undertakings mentioned above concerted
             their practice regarding the manufacturing and distribution of cathode-ray
24           tubes (including coloured pictures tubes and coloured screen tubes) on the
             European market between 1995 and 2007. The anti-competitive behaviour
25           may have concerned the exchange of sensitive market information (about
             prices, volumes sold, demand and the extent to which capacities were
26           exploited), price-fixing, the allocation of market shares, consumers and
             volumes to be sold, the limitation of output and coordination concerning
27           the production. The undertakings evolved a structural system and
             functional mechanism of cooperation.
28

OFFICE DEPOT'S AMENDED COMPLAINT          44          Case No. 11-cv-06276-SC
                                                      Master File No. 3:07-cv-05944-SC

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

179.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

184.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

185.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

186.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG

Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

187.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

188.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

189.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

190.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

191.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

192.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

193.    On March 10, 2009, the DOJ announced that it had reached an agreement

1    with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

2    violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role

3    in a conspiracy to fix the prices of TFT-LCD panels.

4           194.   The plea agreements of LG Display Co., Ltd., Sharp Corporation,

5    Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

6    TFT-LCDs was carried out, in part, in California.

7           **G.    The Role of Trade Associations During the Relevant Period**

8           195.   Defendants' collusive activities have been furthered by trade associations

9    and trade events that provided opportunities to conspire and share information.  One example is

10   the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

11   by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a

12   national trade organization representing about 80 member companies in the Korean display

13   industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had

14   been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.

15   EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to

16   display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display

17   Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of

18   USDC's governing board, said "[e]ven competitors should cooperate on common issues."

19          196.   Samsung and LG Electronics were members of both KODEMIA and

20   EDIRAK, and have participated extensively in the KDCs.

21          197.   The KDC has taken place in Seoul, Korea or other Korean venues on:

22   December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

23   2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

24   and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

25   Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

26   Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated,

27   such as Zenzou Tashima of Hitachi.

28

198.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

199.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.    This exchange of information was used to implement and monitor the conspiracy.

H.    **Effects of Defendants' Antitrust Violations**

1.    **Examples of Reductions in Manufacturing Capacity by Defendants**

200.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

201.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

202.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

203.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

204.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

205.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

2.    **Examples of Collusive Pricing for CRTs**

206.    Defendants' collusion is evidenced by unusual price movements in the CRT market.   For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

207.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.   This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.   This was a pretext used to conceal the conspiracy.

210.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.   This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.   This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.   The price increase was

allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

212.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

214.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.    Summary Of Effects Of The Conspiracy Involving CRTs**

215.    The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

1    **VII.    PLAINTIFF'S INJURIES**

2         216.    As a purchaser of computer monitors, TVs and other devices that

3    contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

4    result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

5    competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing

6    Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

7         217.    Plaintiff also purchased CRT Products containing CRTs from OEMs as

8    well as others, which in turn purchased CRTs from Defendants and their co-conspirators.

9    Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

10   OEMs and others, which paid higher prices for CRTs than they would have absent the

11   conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

12        218.    The OEMs and others passed on to their customers, including Plaintiff, the

13   overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers

14   the overcharges caused by Defendants' conspiracy.   Thus, Plaintiff suffered injury when it

15   purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

16        219.    Once a CRT leaves its place of manufacture, it remains essentially

17   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

18   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

19   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

20   Plaintiff.

21        220.    The market for CRTs and the market for CRT Products are inextricably

22   linked and cannot be considered separately.   Defendants are well aware of this intimate

23   relationship.

24        221.    Throughout the Relevant Period, Defendants controlled the market for

25   CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

26   CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

27   Defendants' conspiracy.

28

1    222.    As a result, Plaintiff was injured in connection with its purchases of CRT

2    Products during the Relevant Period.

3    **VIII.   FRAUDULENT CONCEALMENT**

4    223.    Plaintiff had neither actual nor constructive knowledge of the facts

5    supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff

6    did not discover, and could not have discovered through the exercise of reasonable diligence, the

7    existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did

8    not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix

9    the prices of CRTs.

10    224.    Because Defendants' agreement, understanding and conspiracy were kept

11    secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know

12    that it was paying artificially high prices for CRT Products.

13    225.    The affirmative acts of Defendants alleged herein, including acts in

14    furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

15    precluded detection.  As noted above, Defendants organized glass meetings to avoid detection,

16    conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

17    pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

18    and exchange in advance the texts of the proposed communications with customers containing

19    these pretextual statements and would coordinate which co-conspirator would first communicate

20    these pretextual statements to customers.

21    226.    By its very nature, Defendants' price-fixing conspiracy was inherently

22    self-concealing.

23    227.    Plaintiff could not have discovered the alleged contract, conspiracy or

24    combination at an earlier date by the exercise of reasonable diligence because of the deceptive

25    practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

26    detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

27    conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

28    various means and methods, including, but not limited to, secret meetings, surreptitious

1    communications between Defendants by the use of the telephone or in-person meetings in order

2    to prevent the existence of written records, discussion on how to evade antitrust laws and

3    concealing the existence and nature of their competitor pricing discussions from non-

4    conspirators (including customers).

5         228.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT

6    meetings at separate venues in order to avoid detection.  Participants at glass meetings were also

7    told not to take minutes.  Attending companies also reduced the number of their respective

8    attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

9    nature of their agreement.  During these meetings, top executives and other officials attending

10   these meetings were instructed on more than once occasion not to disclose the fact of these

11   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

12   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

13   arrivals and departures at such meetings to avoid being seen in public with each other and with

14   the express purpose and effect of keeping them secret.

15        229.    Defendants also agreed at glass meetings and bilateral meetings to give

16   pretextual reasons for price increases and output reductions to their customers.

17        230.    As alleged above, in early 1999, despite declining production costs and the

18   rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The

19   price increase was allegedly based on increasing global demand for the products.  In fact, this

20   price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the

21   time.

22        231.    As alleged above, despite increased competition from flat panel monitors,

23   prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

24   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

25   This was a pretext used to cover up the conspiracy.

26        232.    In addition, when several CRT manufacturers, including Defendants

27   Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

28   blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this

1    price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

2    "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

3    prices of CRT monitors in due course of time."

4         233.    Manufacturers such as LG Electronics periodically issued press statements

5    falsely asserting that CRT prices were being driven lower by intense competition.

6         234.    Plaintiff is informed and believes, and thereon alleges, that Defendants'

7    purported reasons for the price increases of CRTs were materially false and misleading and made

8    for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

9         235.    As a result of Defendants' fraudulent concealment of their conspiracy, the

10   running of any statute of limitations has been tolled with respect to any claims that Plaintiff has

11   as a result of the anticompetitive conduct alleged in this complaint.

12   **IX.    _AMERICAN PIPE_, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL
          TOLLING**

13        236.    As discussed at length in Paragraphs 175-194 above, the United States

14   Department of Justice instituted criminal proceedings and investigations against several

15   Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims

16   were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

17        237.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the

18   following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted

19   against Defendants, including, but not limited to, the following Complaints:

20   - *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-

21     SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

22   - Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-

23     cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

24        238.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v.

25   Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during

26   the pendency of the Direct Purchaser Class actions asserted against Defendants, and

27   commencing on at least November 26, 2007.

28

# XI. CLAIM FOR VIOLATIONS

## First Claim for Relief

## (Violation of Section 1 of the Sherman Act)

239.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

240.   Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

241.   In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

242.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

243.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

244.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

  a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

  b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

  c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

1             d.  issuing price announcements and price quotations in accordance

2                 with the agreements reached;

3             e.  selling CRTs to customers in the United States at noncompetitive

4                 prices;

5             f.  exchanging competitively sensitive information in order to facilitate

6                 their conspiracy;

7             g.  agreeing to maintain or lower production capacity; and

8             h.  providing false statements to the public to explain increased prices

9                 for CRTs.

10      245.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its

11 business and property in that it paid more for CRT Products than it otherwise would have paid in

12 the absence of Defendants' unlawful conduct.

13                             **<u>Second Claim for Relief</u>**

14              **<u>(Violation of the Florida Deceptive and Unfair Trade Practices Act)</u>**

15      246.   Plaintiff incorporates and realleges, as though fully set forth herein, each

16 and every allegation set forth in the preceding paragraphs of this Complaint.

17      247.   During the Relevant Period, each of the Defendants named herein,

18 directly, and through affiliates or subsidiaries or agents they dominated and controlled,

19 manufactured, sold, and/or distributed CRT Products in commerce in the United States,

20 including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as

21 both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to

22 Plaintiff as a purchaser.

23      248.   Based on the foregoing, Defendants engaged in unfair and deceptive acts

24 in violation of Fla. Stat. §§ 501.201 *et seq.*

25      249.   During the Relevant Period, Plaintiff maintained its principal place of

26 business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT

27 Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders

28 and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

250.   In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

251.   The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202(3).

252.   Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

253.   As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

**Third Claim for Relief**

**(Violation of the California Cartwright Act)**

254.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255.     During the Relevant Period, Plaintiff conducted a substantial volume of business in California.   In particular, upon information and belief, Plaintiff purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Plaintiff also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Plaintiff maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Plaintiff also sold CRT Products to customers in California.  Finally, Plaintiff maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Plaintiff's business operations in California, it was registered to do business in the State and, upon information and belief, paid taxes to the State of California during the Relevant Period.   As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

256.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

257.     Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for,

1    CRTs at supra-competitive levels.    Defendants' conduct substantially affected California

2    commerce.

3           258.    The aforesaid violations of Section 16720, California Business and

4    Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of

5    action among Defendants and their co-conspirators, the substantial terms of which were to fix,

6    raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

7           259.    For the purpose of forming and effectuating the unlawful trust, Defendants

8    and their co-conspirators have done those things which they combined and conspired to do,

9    including but in no way limited to the acts, practices and course of conduct set forth above and

10    the following:

11              a.   to fix, raise, maintain and stabilize the price of CRTs;

12              b.   to allocate markets for CRTs amongst themselves;

13              c.   to submit rigged bids for the award and performance of certain

14                   CRTs contracts; and

15              d.   to allocate among themselves the production of CRTs.

16           260.    The combination and conspiracy alleged herein has had, inter alia, the

17    following effects:

18              a.   price competition in the sale of CRTs has been restrained,

19                   suppressed and/or eliminated in the State of California;

20              b.   prices for CRTs sold by Defendants, their co-conspirators, and

21                   others have been fixed, raised, maintained and stabilized at

22                   artificially high, non-competitive levels in the State of California;

23                   and

24              c.   those who purchased CRT Products containing price-fixed CRTs

25                   from Defendants, their co-conspirators, and others have been

26                   deprived of the benefit of free and open competition.

27

28

261.    As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

262.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Fourth Claim for Relief

### (Violation of California Unfair Competition Law)

263.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

265.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

266.    The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

    a.    Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce.

1    Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or

2    stabilize prices, and to restrict the output of CRTs.

3              b.     <u>Defendants' Unfair Business Practices</u>: As alleged above,

4    Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by

5    entering into and engaging in a continuing unlawful trust in restraint of trade and

6    commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain,

7    and/or stabilize prices, and to restrict the output of CRTs.

8              c.     <u>Defendants' Fraudulent Business Practices</u>: As alleged above,

9    Defendants took affirmative actions to conceal their collusive activity by keeping

10    meetings with coconspirators secret and making false public statements about the reasons

11    for artificially inflated prices of CRTs. Members of the public were likely to be deceived,

12    and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of

13    Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or

14    property.

15        267.    The acts, omissions, misrepresentations, practices, and non-disclosures of

16    Defendants, as described above, constitute a common, continuous, and continuing course of

17    conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or

18    practices with the meaning of Section 17200 *et seq.*

19        268.    Defendants' acts, omissions, misrepresentations, practices, and non-

20    disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether

21    they constitute a violation of the Sherman Act or the Cartwright Act.

22        269.    Defendants' acts or practices are fraudulent or deceptive within the

23    meaning of Section 17200 *et seq.*

24        270.    By reason of the foregoing, Plaintiff is entitled to full restitution and/or

25    disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been

26    obtained by Defendants as result of such business acts and practices described above.

27

28

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the FDUTPA, the California Cartwright Act, and the California Unfair Competition Law, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.    Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.    Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.    Defendants shall be enjoined from engaging in further acts or practices in violation of and Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

G.    Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

1           H.     Plaintiff shall recover damages sustained by it, as provided by Florida

2    Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several

3    judgment in favor of Plaintiff shall be entered against the Defendants;

4           I.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

5    and the respective officers, directors, partners, agents, and employees thereof, and all other

6    persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

7    from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

8           J.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and

9    such interest shall be awarded at the highest legal rate from and after the date of service of the

10   initial complaint in this action;

11          K.     Plaintiff shall recover its costs of this suit, including reasonable attorneys'

12   fees as provided by law; and

13          L.     Plaintiff shall receive such other or further relief as may be just and

14   proper.

15   **XII.**        **<u>JURY TRIAL DEMAND</u>**

16          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

17   jury of all the claims asserted in this Complaint so triable.

18

19

20

21

22

23

24

25

26

27

28

Dated:                                   Respectfully Submitted,

_____

STUART H. SINGER (P*ro Hac Vice)*
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email:  ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT H**

1
2
3
4
5
6
7
8

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida  33131
Tel:     (305) 373-1000
Fax:     (305) 372-1861
Email:  rarnold@knpa.com
           wblechman@knpa.com
           kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck
and Co. and Kmart Corp.*

9

10

11

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SEARS, ROEBUCK AND CO. and KMART CORP.,

Plaintiffs

v.

CHUNGHWA PICTURE TUBES, LTD.;
CHUNGHWA PICTURE TUBES
(MALAYSIA); IRICO GROUP
CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO DISPLAY
DEVICES CO., LTD.; LG ELECTRONICS,
INC.; LG ELECTRONICS USA, INC.; LG
ELECTRONICS TAIWAN TAIPEI CO., LTD.;
LP DISPLAYS INTERNATIONAL LTD.;
HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES
(USA), INC.; SHENZHEN SEG HITACHI
COLOR DISPLAY DEVICES, LTD.;
PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS

Master File No. 3:07-cv-05944-SC

MDL No. 1917

Individual Case No. CV 11-5514

**SECOND AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC., TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
and MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.

                                    Defendants

Plaintiffs Sears, Roebuck and Co. ("Sears") and Kmart Corp. ("Kmart") (hereafter "Plaintiffs")

for their Second Amended Complaint for Damages and Injunctive Relief against all Defendants named

herein, hereby allege as follows:

## I.     INTRODUCTION

1.      Defendants and their co-conspirators formed an international cartel which conducted a

long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise,

stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading

manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;

(b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c)

electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

7.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.      During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.      Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.      This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair

competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.    The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.    This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

15.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

III.    **THE PARTIES**

   A.    **Plaintiffs**

16.    Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com. During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for internal use during the Relevant Period.

17. On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned by a common corporate parent, Sears Holdings Corporation. During and after the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants, their co-conspirators, and others. As a result of Defendants' and their co-conspirators' conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

18. During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's negotiations for the purchase of CRTs took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan. In addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan respectively and all invoices were sent to those companies in Illinois and Michigan respectively. The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to CRTs.

19. During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers. Kmart Corporation likewise purchased CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota, Nebraska, Nevada, and North Carolina.

20.

**B.** **The Defendants**

    **1.** **IRICO Entities**

21.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

22.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

23.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

24.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

    **2.** **LG Electronics Entities**

25.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer

electronics, home appliances and mobile communications, which established its first overseas branch

office in New York in 1968.  The company's name was changed from Gold Star Communications to

LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred

its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called

LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and

changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured,

marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

throughout the United States.

26.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period,

LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the

finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

27.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

alleged in this complaint.

28.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

Electronics."

### 3.     LP Displays

29.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong

company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 4.   Hitachi Entities

30.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

31.   Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

32.   Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or

1   through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated

2   and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations

3   alleged in this complaint.

4          33.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

5   principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.

6   Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the

7   Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or

8   through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated

9   and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

10  in this complaint.

11         34.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

12  with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.

13  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period,

14  HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its

15  subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays

16  dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations

17  alleged in this complaint.

18         35.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was

19  a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

20  District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

21  Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

22  investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi

23  corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period,

24  Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

25  subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays

26  dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

27  violations alleged in this complaint.

28

36.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**5.     Panasonic Entities**

37.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

38.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

39.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

40.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

41.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

42.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

44.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

45.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

46.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.     Samsung Entities

47.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

48.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1    Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

2    subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

3    finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

4    complaint.

5            49.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung

6    SDI") is a South Korean company with its principal place of business located at 575 Shin-dong,

7    Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder

8    holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading

9    company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

10   2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

11   producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

12   SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

13   affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

14   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

15           50.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

16   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

17   California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

18   Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

19   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

20   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

21   Samsung SDI America relating to the antitrust violations alleged in this complaint.

22           51.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican

23   company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial

24   El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of

25   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

26   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

27

28

1    United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

2    affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

3           52.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

4    with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

5    Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

6    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed,

7    sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

8    United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

9    affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

10          53.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese

11   company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.

12   Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

13   During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed

14   CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants

15   SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

16   Shenzhen relating to the antitrust violations alleged in this complaint.

17          54.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

18   company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing

19   County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of

20   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed,

21   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

22   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

23   affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

24          55.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

25   Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

26   Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung

27   SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

56.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.    Samtel

57.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.    Thai CRT

58.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.    Toshiba Entities

59.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint

16

1    venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.

2    During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or

3    through its subsidiaries or affiliates, throughout the United States.

4            60.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its

5    principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York

6    10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the

7    Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly

8    or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

9    controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations

10   alleged in this complaint.

11           61.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability

12   company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-

13   owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant

14   Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its

15   subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the

16   finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

17           62.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California

18   corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400,

19   Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through

20   Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

21   CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

22   TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust

23   violations alleged in this complaint.

24           63.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

25   corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-

26   1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

27   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly

28

1   or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

2   controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this

3   complaint.

4       64.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to

5   herein as "Toshiba."

6                   **11.   Chunghwa Entities**

7       65.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company

8   with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was

9   established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs

10  received certification by the United States, giving the company entry into that market.  Throughout the

11  Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant

12  Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its

13  subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

14      66.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a

15  Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu

16  Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary

17  of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of

18  the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia

19  manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates

20  throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies

21  and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

22      67.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

23  "Chunghwa."

24

25                  **12.   Thomson Entities**

26      68.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation

27  with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

28

                                18
                    **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
                                                    **Case No. CV 11-5514**

Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.   Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.   Thomson SA's television division also purchased CRTs from other CRT manufacturers.   Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.   In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").   As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.   In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.   During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a United States corporation with its principal place of business located at 10330 N. Meridian Street, Indianapolis, Indiana 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.   Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.   The United States-based plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.   Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.   Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.   During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

1       70.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as

2  "Thomson."

3       **13.    Mitsubishi Entities**

4       71.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese

5  corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi

6  Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and

7  Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and

8  monitor manufacturing division and to other television and monitor manufacturers in the United States

9  and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT

10 manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and

11 distributed CRT Products in the United States.

12      72.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a

13 United States corporation located at 5665 Plaza Drive, Cypress, California  90630.  Mitsubishi Electric

14 USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured

15 CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.

16 Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division

17 and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's

18 television and monitor division also purchased CRTs from other CRT manufacturers.  During the

19 Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products

20 in the United States.

21      73.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United

22 States corporation located at 9351 Jeronimo Road, Irvine, California  92618.  Mitsubishi Digital is a

23 wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital

24 manufactured, marketed, sold and distributed CRT Products in the United States.

25      74.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

26 collectively referred to herein as "Mitsubishi."

27

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

IV.   **AGENTS AND CO-CONSPIRATORS**

75.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

76.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

77.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., Videocon Industries, Ltd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

78.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

79.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

80.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

81.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

82.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

83.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

84.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

85.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

86.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce and caused antitrust injuries in California, Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

87.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a

polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

88.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

89.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

90.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

91.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

92.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

93.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets. The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

94.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment

manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

95.    Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

96.    Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.    Structure of the CRT Industry**

97.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.    Market Concentration**

98.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.    Information Sharing**

99.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

100.    Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

101.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

102.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

103.    Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

  i. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

  ii. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

  iii. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

iv.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.    In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.    Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.    Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

104.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers

to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

105.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Market

106.    Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

107.    Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

108.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

109.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

110.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

1    111.    As for CRT televisions, they accounted for 73 percent of the North American television

2    market in 2004, and by the end of 2006, still held a 46 percent market share.

3        **7.    Homogeneity of CRTs**

4    112.    CRTs are commodity-like products which are manufactured in standardized sizes.  One

5    Defendant's CRT for a particular application, such as a particular size television set or computer

6    monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the

7    basis of price.

8    113.    It is easier to form and sustain a cartel when the product in question is commodity-like

9    because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

10    **C.    Pre-Conspiracy Market**

11    114.    The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became

12    more international and Defendants began serving customers that were also being served by other

13    international companies.  During this period, the employees of Defendants would encounter employees

14    from their competitors when visiting their customers.  A culture of cooperation developed over the years

15    and these Defendant employees would exchange market information on production, capacity and

16    customers.

17    115.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each

18    other's factories in S.E. Asia.  During this period, these producers began to include discussions about

19    price in their meetings.

20    **D.    Defendants' and Co-Conspirators' Illegal Agreements**

21    116.    In order to control and maintain profitability during declining demand for CRTs,

22    Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the

23    effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

24    artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

25    117.    The CRT conspiracy was effectuated through a combination of group and bilateral

26    meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary

27    method of communication and took place on an informal, ad hoc basis.  During this period,

28

1    representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

2    manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

3    increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

4    South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

5            118.    Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also attended

6    several ad hoc group meetings during this period.  The participants at these group meetings also

7    discussed increasing prices for CRTs.

8            119.    As more manufacturers formally entered the conspiracy, group meetings became more

9    prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a

10    formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

11    attended hundreds of these meetings during the Relevant Period.

12            120.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

13    Defendants charged for CRTs.

14           **1.**      **"Glass Meetings"**

15            121.    The group meetings among the participants in the CRT price-fixing conspiracy were

16    referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general

17    levels of Defendants' corporations.

18            122.    The first level meetings were attended by high level company executives including

19    CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less

20    frequently, typically quarterly, and were focused on longer term agreements and forcing compliance

21    with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable

22    information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve

23    disputes because they were decision makers who could make agreements.

24            123.    The second level meetings were attended by Defendants' high level sales managers and

25    were known as "management" meetings.  These meetings occurred more frequently, typically monthly,

26    and handled implementation of the agreements made at top meetings.

27

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

124.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

125.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

126.     Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.

127.     Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

128.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia and the United States.

129.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

130.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

131.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

132.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

133.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

134.    The agreements reached at the glass meetings included:

i.      agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

ii.     placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

iv.    agreements as to what to tell customers about the reason for a price increase;

v.     agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

vii.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

viii.  agreements to coordinate uniform public statements regarding available capacity and supply;

ix.    agreements to allocate both overall market shares and share of a particular customer's purchases;

x.     agreements to allocate customers;

xi.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xii.   agreements to keep their meetings secret.

135.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

136.     As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.     Bilateral Discussions

137.     Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

138.     During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

139.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

140.     In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT manufacturers were particularly important because they served the North American market for CRTs.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because the CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

141.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

142.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

143.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

144.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or

distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

145.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

146.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

147.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

148.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also

1   engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed

2   on prices and supply levels for CRTs.

3       149.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation

4   and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in

5   the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by

6   high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral

7   discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply

8   levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

9       150.    PCNA was represented at those meetings and was a party to the agreements entered at

10  them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role

11  in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct

12  purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was

13  an active, knowing participant in the alleged conspiracy.

14      151.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass

15  meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

16  meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral

17  discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply

18  levels for CRTs.

19      152.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

20  meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

21  engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT

22  manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None

23  of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

24  BMCC was acting to further its own independent private interests in participating in the alleged

25  conspiracy.

26      153.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips

27  Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the

28

37

CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

154.   Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

155.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

156.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

157.   Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

158.     Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

159.     Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

160.     Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

161.     Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

162.     Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

163.   Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

164.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

165.   When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

E.       **The CRT Market During the Conspiracy**

166.     Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

167.     The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

168.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

169.     Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

---

[1]       Estimated market value of CRT units sold.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

170. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

171. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

172. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

173. A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

174. A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

175. Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

176. For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by

Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

177.     During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

178.     During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

179.     These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.     International Government Antitrust Investigations**

180.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and

volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

181.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan

based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185.    On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in furtherance of this conspiracy were carried out within the Northern District of California.  The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

186.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The

1    companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung

2    SDI, Panasonic, Toshiba, MTPD and Technicolor (formerly Thomson).  The Commission Vice

3    President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

4    cartels'; they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

5    companies doing business in Europe."  The press release accompanying the fines further notes that the

6    CRT cartels were "among the most organized cartels that the Commission has investidated."

7         187.   As outlined above, Defendants have a history of competitor contacts resulting from joint

8    ventures, numerous cross-licensing agreements, and other alliances in related businesses in the

9    electronics industry.

10        188.   Several Defendants also have a history of "cooperation" and anticompetitive conduct.

11   For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October

12   2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

13        189.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.

14   Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access

15   Memory ("SRAM") and NAND Flash Memory.

16        190.   In December 2006, government authorities in Japan, Korea, the European Union and the

17   United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related

18   TFT-LCD market.

19        191.   On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa,

20   as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co.,

21   Ltd.—were all under investigation for price fixing TFT-LCDs.

22        192.   On November 12, 2008, the DOJ announced that it had reached agreements with three

23   TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.),

24   Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15

25   U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of

26   TFT-LCD Products.

27

28

193.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

194.   The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

G.   **The Role of Trade Associations During the Relevant Period**

195.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

196.   Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

197.   The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

198.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

199.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

200.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

201.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

202.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

203.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

204.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

205.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.    Examples of Collusive Pricing for CRTs

206.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

207.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.    In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

210.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on

1    increasing global demand for the products.  In fact, this price rise was the result of collusive conduct

2    amongst Defendants.

3         212.   After experiencing an oversupply of 17" CRTs in the second half of 1999, the average

4    selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as

5    saying that this price increase was "unlike most other PC-related products."

6         213.   On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in

7    India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture

8    CRTs.

9         214.   Over the course of the Relevant Period, the price of CRTs remained stable, and in some

10   instances went up in an unexplained manner, despite the natural trend in most technology products to go

11   down over time.  CRT technology was mature, and the costs of production were relatively low compared

12   to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore

13   Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very

14   mature; prices and technology have become stable."

15        215.   CRT prices resisted downward price pressures and remained stable over a period of many

16   years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis,

17   the prices of CRTs did not decline as much as they would have absent the conspiracy.  The stability of

18   the price of CRTs was accomplished by the collusive activities alleged above.

19   **I.     <u>Summary Of Effects Of The Conspiracy Involving CRTs</u>**

20        216.   The above combination and conspiracy has had the following effects, among others:

21             a.     Price competition in the sale of CRTs by Defendants and their co-conspirators has

22                    been restrained, suppressed and eliminated throughout the United States;

23             b.     Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been

24                    raised, fixed, maintained and stabilized at artificially high and noncompetitive

25                    levels throughout the United States; and

26             c.     Plaintiffs have been deprived of the benefit of free and open competition in the

27                    purchase of CRTs.

28
                                            50
                     **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
                                                              **Case No. CV 11-5514**

d.     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

217.    As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

218.    Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

219.    The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs containing such price-fixed CRTs from the OEMs and others.

220.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

221.    The market for CRTs and the market for products containing CRTs are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

222.    Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1    223.    As a result, Plaintiffs were injured in connection with their purchases of CRTs during the

2    Relevant Period.

3    **VIII.   <u>FRAUDULENT CONCEALMENT</u>**

4    224.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their

5    claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a

6    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was

7    a conspiracy to fix the prices of CRTs.

8    225.    Because Defendants' agreement, understanding and conspiracy were kept secret,

9    Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were

10   paying artificially high prices for CRTs.

11   226.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the

12   conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted

13   above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret

14   and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and

15   output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed

16   communications with customers containing these pretextual statements and would coordinate which co-

17   conspirator would first communicate these pretextual statements to customers.

18   227.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

19   228.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an

20   earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of

21   secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently

22   conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein

23   alleged was fraudulently concealed by Defendants by various means and methods, including, but not

24   limited to, secret meetings, surreptitious communications between Defendants by the use of the

25   telephone or in-person meetings in order to prevent the existence of written records, discussion on how

26   to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions

27   from non-conspirators (including customers).

28   **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
     **Case No. CV 11-5514**

229.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

230.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

231.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

232.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

233.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

234.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

235.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

236.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

IX. *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

237.    As discussed at length in Paragraphs 183 through 187 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

238.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

239.    As shown by Plaintiffs' allegations in Paragraphs 1 through 9, and the following causes of action, Plaintiffs were members of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 3:07-cv-05944 SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

X. CLAIM FOR VIOLATIONS

First Claim for Relief

(Violation of Section 1 of the Sherman Act)

240.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

241.    Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

242.   In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

243.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

244.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

245.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

246.   As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

247.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

248.   During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

249.   In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

250.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

251.   The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

252.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.     to fix, raise, maintain and stabilize the price of CRTs;

    b.     to allocate markets for CRTs amongst themselves;

    c.     to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.     to allocate among themselves the production of CRTs.

253.     The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.     price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

    b.     prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.     those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

254.     As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

255.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**

**(Violation of State Antitrust and Unfair Competition Laws)**

256.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

257.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

258.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

259.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

       a.    to fix, raise, maintain and stabilize the price of CRTs;

       b.    to allocate markets for CRTs amongst themselves;

       c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

       d.    to allocate among themselves the production of CRTs.

260.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

       a.    price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c.    those who purchased CRTs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

261.    As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

262.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

a.    Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa,

59
**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1        Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the

2        conspiracy to fix the price of CRTs were carried out in California;

3      f.     During the Relevant Period, Plaintiffs purchased CRTs in California.  As a result,

4        each is entitled to the protection of the laws of California; and

5      g.     By reason of the foregoing, each of those Plaintiffs is entitled to full restitution

6        and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

7        that may have been obtained by Defendants or their co-conspirators as result of

8        such business acts and practices.

9    263.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

10 an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

11      a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

12        eliminated competition in the sale of CRTs in Arizona and fixed, raised,

13        maintained and stabilized CRT prices in Arizona at artificially high, non-

14        competitive levels;

15      b.     As a result, Defendants and their co-conspirators' conspiracy substantially

16        affected Arizona commerce;

17      c.     During the Relevant Period, Sears purchased CRTs in Arizona.  As a result, Sears

18        is entitled to the protection of the laws of Arizona; and

19      d.     As a direct and proximate result of Defendants' and their co-conspirators'

20        conduct, Sears has been injured in its business and property by paying more for

21        CRTs manufactured by Defendants, their co-conspirators, and others than it

22        would have paid in the absence of Defendants and their co-conspirators'

23        combination and conspiracy, and is therefore entitled to relief under Ariz. Rev.

24        Stat. §§ 44-1401, *et seq*.

25    264.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in

26 unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

27

28

a.      Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.      Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.      Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

f.      During the Relevant Period, Plaintiffs purchased CRTs in Florida.  As a result, each is entitled to the protection of the laws of Florida.

265.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.      During the Relevant Period, Plaintiffs purchased CRTs in Illinois.  As a result, each is entitled to the protection of the laws of Illinois; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

a.

266.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

a.      Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.      Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.      Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1           f.       During the Relevant Period, Sears purchased CRTs in Massachusetts.  As a result,

2                  Sears is entitled to the protection of the laws of Massachusetts.

3      267.     By reason of the foregoing, Defendants and their co-conspirators also have entered into

4 an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

5           a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6                  eliminated competition in the sale of CRTs in Michigan and fixed, raised,

7                  maintained and stabilized CRT prices in Michigan at artificially high, non-

8                  competitive levels;

9           b.      As a result, Defendants and their co-conspirators' conspiracy substantially

10                  affected Michigan commerce;

11           c.      During the Relevant Period, Plaintiffs purchased CRTs in Michigan.  As a result,

12                  each is entitled to the protection of the laws of Michigan; and

13           d.      As a direct and proximate result of Defendants' and their co-conspirators'

14                  conduct, each of those Plaintiffs has been injured in its business and property by

15                  paying more for CRTs manufactured by Defendants, their co-conspirators, and

16                  others than it would have paid in the absence of Defendants and their co-

17                  conspirators' combination and conspiracy, and is therefore entitled to relief under

18                  Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

19      268.     By reason of the foregoing, Defendants and their co-conspirators also have entered into

20 an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

21           a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

22                  eliminated competition in the sale of CRTs in Minnesota and fixed, raised,

23                  maintained and stabilized CRT prices in Minnesota at artificially high, non-

24                  competitive levels;

25           b.      As a result, Defendants and their co-conspirators' conspiracy substantially

26                  affected Minnesota commerce;

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

c.   During the Relevant Period, Plaintiffs purchased CRTs in Minnesota.  As a result, each is entitled to the protection of the laws of Minnesota; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their coconspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Minnesota Stat. §§ 325D.50, *et seq.*

269.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Mississippi and fixed, raised, maintained and stabilized CRT prices in Mississippi at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

c.   During the Relevant Period, Sears purchased CRTs in Mississippi.  As a result, Sears is entitled to the protection of the laws of Mississippi; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

270.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

1      a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

2                eliminated competition in the sale of CRTs in Nebraska and fixed, raised,

3                maintained and stabilized CRT prices in Nebraska at artificially high, non-

4                competitive levels;

5      b.    As a result, Defendants and their co-conspirators' conspiracy substantially

6                affected Nebraska commerce;

7      c.    During the Relevant Period, Plaintiffs purchased CRTs in Nebraska.  As a result,

8                each is entitled to the protection of the laws of Nebraska; and

9      d.    As a direct and proximate result of Defendants' and their co-conspirators'

10               conduct, each of those Plaintiffs has been injured in its business and property by

11               paying more for CRTs manufactured by Defendants, their co-conspirators, and

12               others than it would have paid in the absence of Defendants and their co-

13               conspirators' combination and conspiracy, and is therefore entitled to relief under

14               Nebraska Stat. §§ 59-801, *et seq.*

15     271.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

16 an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

17     a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

18               eliminated competition in the sale of CRTs in Nevada and fixed, raised,

19               maintained and stabilized CRT prices in Nevada at artificially high, non-

20               competitive levels;

21     b.    As a result, Defendants and their co-conspirators' conspiracy substantially

22               affected Nevada commerce;

23     c.    During the Relevant Period, Plaintiffs purchased CRTs in Nevada.  As a result,

24               each is entitled to the protection of the laws of Nevada; and

25     d.    As a direct and proximate result of Defendants' and their co-conspirators'

26               conduct, each of those Plaintiffs has been injured in its business and property by

27               paying more for CRTs manufactured by Defendants, their co-conspirators, and

28

1    others than it would have paid in the absence of Defendants and their co-

2    conspirators' combination and conspiracy, and is therefore entitled to relief under

3    Nevada Rev. Stat. Ann. §§ 598A, *et seq*.

4    272.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

5    an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

6        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

7            eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

8            maintained and stabilized CRT prices in New Mexico at artificially high, non-

9            competitive levels;

10       b.    As a result, Defendants and their co-conspirators' conspiracy substantially

11           affected New Mexico commerce;

12       c.    During the Relevant Period, Sears purchased CRTs in New Mexico.  As a result,

13           Sears is entitled to the protection of the laws of New Mexico; and

14       d.    As a direct and proximate result of Defendants' and their co-conspirators'

15           conduct, each of those Plaintiffs has been injured in its business and property by

16           paying more for CRTs manufactured by Defendants, their co-conspirators, and

17           others than it would have paid in the absence of Defendants and their co-

18           conspirators' combination and conspiracy, and is therefore entitled to relief under

19           New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

20   273.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

21   an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq*.

22       a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23           eliminated competition in the sale of CRTs in New York and fixed, raised,

24           maintained and stabilized CRT prices in New York at artificially high, non-

25           competitive levels;

26       b.    As a result, Defendants and their co-conspirators' conspiracy substantially

27           affected New York commerce;

28

66

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

c.      During the Relevant Period, Sears purchased CRTs in New York.  As a result, Sears is entitled to the protection of the laws of New York; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

274.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised, maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

c.      During the Relevant Period, Plaintiffs purchased CRTs in North Carolina.  As a result, each is entitled to the protection of the laws of North Carolina; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

275.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.   During the Relevant Period, Sears purchased CRTs in Wisconsin.  As a result, Sears is entitled to the protection of the laws of Wisconsin; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of California, Arizona, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.   Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or

claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

       D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

       E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

       F.     Plaintiffs shall receive such other or further relief as may be just and proper.

/ / /

/ / /

/ / /

/ / /

## XII.   JURY TRIAL DEMAND

       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                           Respectfully submitted

_____

Richard Alan Arnold, Esquire (pro hac vice)
William J. Blechman, Esquire (pro hac vice)
Kevin J. Murray, Esquire (pro hac vice)
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida  33131
Tel:    (305) 373-1000
Fax:   (305) 372-1861
Email:  rarnold@knpa.com
         wblechman@knpa.com
         kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck and Co. and Kmart Corp.*

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

# **<u>EXHIBIT I</u>**

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiffs P.C. Richard & Son Long Island Corporation;*
*MARTA Cooperative of America, Inc; and  ABC Appliance, Inc*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 12-cv-02648 |
| | Master File No. 3:07-cv-05944-SC |
| | MDL No. 1917 |
| This Document Relates To Individual Case No. 12-cv-02648 | |
| | **AMENDED COMPLAINT** |
| P.C. RICHARD & SON LONG ISLAND CORPORATION; MARTA COOPERATIVE OF AMERICA, INC; and  ABC APPLIANCE, INC., | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG | |

ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiffs, P.C. Richard & Son Long Island Corporation ("P.C. Richard"), MARTA Cooperative of America, Inc. ("MARTA"), and ABC Appliance, Inc. d/b/a ABC Warehouse ("ABC Warehouse"), for their Complaint against all Defendants named herein, hereby allege as follows:

1    I.    **INTRODUCTION**

2            1.      Defendants and their co-conspirators formed an international cartel which

3    conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

4    through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

5    conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

6            2.      Defendants are or were among the leading manufacturers of: (a) color

7    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

8    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

9    devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

10   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

11   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

12   and the products containing them shall be referred to as "CDT Products."  CDT Products and

13   CPT Products shall be referred to collectively herein as "CRT Products."

14           3.      Defendants control the majority of the CRT industry, a multibillion dollar

15   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

16   Relevant Period, virtually every household in the United States owned at least one CRT Product.

17           4.      Since the mid-1990s, the CRT industry faced significant economic

18   pressures as customer preferences for other emerging technologies shrank profits and threatened

19   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

20   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

21   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

22   States.

23           5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

24   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

25   shipments, prices, production and customer demand; (c) coordinate public statements regarding

26   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

27   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

28   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.   The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.   During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.   This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.   During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs they purchased during the Relevant Period.

## II.   JURISDICTION AND VENUE

10.   Plaintiffs bring this action to obtain injunctive relief under Section 16 of

the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.    Plaintiffs also bring this action pursuant to various state laws listed herein because Plaintiffs purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiffs' state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.    The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiffs in the states identified herein.

14.    This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.    Venue is proper in the Eastern District of New York under Section 12 of

1   the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

2   corporation, transacts business in this District, or is otherwise found within this District.   In

3   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

4   events or omissions giving rise to this claim occurred in this District.   Defendants and their co-

5   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

6   into this District.

7   **III.   PARTIES**

8        **A.   Plaintiff**

9             **1.   P.C. Richard**

10            16.   Plaintiff P.C. Richard is a New York corporation with its corporate

11   headquarters in Farmingdale, New York.   P.C. Richard is the largest chain of private, family-

12   owned electronics and appliances stores in the United States with 65 stores in Connecticut, New

13   York, New Jersey, and Pennsylvania, as well as an online retail store.   Through the conclusion of

14   Defendants' and the co-conspirators' conspiracy, P.C. Richard was a supplier of consumer

15   electronics and appliances.

16            17.   During the Relevant Period, P.C. Richard purchased CRT Products

17   directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents

18   the Defendants or Defendants' subsidiaries and affiliates controlled.   P.C. Richard also

19   purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other

20   suppliers, which contained CRTs that had been purchased from Defendants and their co-

21   conspirators.   As such, P.C. Richard suffered injury as a result of Defendants' and co-

22   conspirators' unlawful conduct.

23            18.   During the Relevant Period, P.C. Richard's negotiations for the purchase

24   of CRT Products took place in the United States and were controlled by a department based at

25   the company's headquarters in New York.   In addition, P.C. Richard's purchase orders for CRT

26   Products were issued from New York, invoices for these CRT Products were sent to P.C.

27   Richard in New York, and payments for these CRT Products were issued from New York.   P.C.

28   Richard employees based in New York were also responsible for selecting vendors and product

lines with respect to CRT Products.

## 2.   **MARTA**

19.     Plaintiff MARTA is a Michigan corporation and has its corporate headquarters in Scottsdale, Arizona.   MARTA was initially formed in 1965 by twelve independent appliance and electronics retailers as a member-owned, not-for-profit, buying cooperative serving a select group of retailers in the appliance and electronics industry. Through the conclusion of Defendants' and the co-conspirators' conspiracy, MARTA was a buying group comprised of larger, independent retailers selling appliances, electronics and furniture.

20.     During the Relevant Period, MARTA purchased CRT Products directly from the Conspirators, including Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.   MARTA also purchased CRT Products from OEMs, as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.   As such, MARTA suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

21.     During the Relevant Period, MARTA's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Arizona.  In addition, MARTA's purchase orders for CRT Products were issued from Arizona, invoices for these CRT Products were sent to MARTA in Arizona, and payments for these CRT Products were issued from Arizona and Illinois.   From its headquarters in Arizona, MARTA selected vendors and product lines with respect to CRT Products.

## 3.   **ABC Warehouse**

22.     Plaintiff ABC Warehouse is a Michigan corporation with its corporate headquarters in Pontiac, Michigan.  ABC Warehouse was founded in 1963 as a family-owned appliance and electronics retailer.   Through the conclusion of Defendants' and the co-conspirators' conspiracy, ABC Warehouse was a supplier of consumer electronics and appliances with approximately 60 stores in Michigan, Ohio, and Indiana, as well as an online retail store.

23.     During the Relevant Period, ABC Warehouse purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, ABC Warehouse suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

24.     During the Relevant Period, ABC Warehouse's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Michigan.  In addition, all ABC Warehouse purchase orders for CRT Products were issued from Michigan, invoices for these products were sent to ABC Warehouse in Michigan, and payments for these CRT Products were issued from ABC Warehouse in Michigan.  ABC Warehouse employees based in Michigan were also responsible for selecting vendors and product lines with respect to CRT Products.

**B.     Defendants**

**1.     Hitachi Entities**

25.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

1    antitrust violations alleged in this complaint.

2              27.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

3    company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

4    York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

5    Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

6    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

8    affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

9              28.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

10   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

11   Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

12   Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

13   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

14   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

15   affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

16             29.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

17   Delaware corporation with its principal place of business located at 208 Fairforest Way,

18   Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

19   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

20   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

21   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

22   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

23   complaint.

24             30.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

25   Shenzhen") was a Chinese company with its principal place of business located at 5001

26   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

27   least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

28   around the time that the government investigations into the CRT industry began).  Thus, Hitachi

1    Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

2    Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

3    and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

4    throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

5    controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

6    violations alleged in this complaint.

7          31.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

8    HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

9                       **2.   IRICO Entities**

10          32.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with

11   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

12   712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

13   marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC

14   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States.

16          33.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

17   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

18   Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

19   CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

20   also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

21   and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

22   IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

23   subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

24   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

25   complaint.

26          34.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

27   company with its principal place of business located at No. 16, Fenghui South Road West,

28   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC  is  a  partially-owned

1   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

2   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

3   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

4   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

5   alleged in this complaint.

6          35.     Defendants IGC, IGE and IDDC are collectively referred to herein as

7   "IRICO."

8          **3.      LG Electronics Entities**

9          36.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

10  the laws of the Republic of Korea with its principal place of business located at LG Twin

11  Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

12  billion global force in consumer electronics, home appliances and mobile communications,

13  which established its first overseas branch office in New York in 1968.  The company's name

14  was changed from Gold Star Communications to LGEI in 1995, the year in which it also

15  acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

16  venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

17  ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

18  LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

19  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20  throughout the United States.

21         37.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

22  corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

23  New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

24  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

25  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

27  to the antitrust violations alleged in this complaint.

28         38.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

1   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

2   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

3   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

4   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

5   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

6   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

7         39.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

8   herein as "LG Electronics."

9         **4.    LP Displays**

10        40.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

11  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

12  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

13  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

14  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

15  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

16  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

17  and LGEI would cede control over the company and the shares would be owned by financial

18  institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

19  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20  affiliates, throughout the United States.

21        **5.    Panasonic Entities**

22        41.    Defendant Panasonic Corporation, which was at all times during the

23  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

24  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

25  Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

26  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

27  affiliates, throughout the United States.

28        42.    Defendant Panasonic Corporation of North America ("PCNA")  is a

1   Delaware corporation with its principal place of business located at One Panasonic Way,

2   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

3   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

4   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

6   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

7          43.    Defendants Panasonic Corporation and PCNA are collectively referred to

8   herein as "Panasonic."

9          44.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

10  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

11  Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

12  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

13  manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

14  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

15  venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

16  Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

17  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

18  subsidiaries or affiliates, throughout the United States.

19         45.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

20  Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

21  Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

22  is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

23  Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

24  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

25  China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

26  manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

27  China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

28  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

States.

### 6.     Philips Entities

46.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

48.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

49.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

50.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

51.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

52.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

54. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

55. Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

56. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

1    directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

2    and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

3    Brazil relating to the antitrust violations alleged in this complaint.

4              57.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

5    is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

6    Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

7    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

10   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

11   violations alleged in this complaint.

12             58.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

13   Chinese company with its principal place of business located at Developing Zone of Yi-Xian

14   Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

15   subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

16   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

17   subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

18   dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

19   the antitrust violations alleged in this complaint.

20             59.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

21   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

22   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

23   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

24   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

25   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

27   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

28   in this complaint.

60. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.** **Samtel**

61. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.** **Thai CRT**

62. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**10.** **Toshiba Entities**

63. Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1   subsidiaries or affiliates, throughout the United States.

2          64.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

3   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4   4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

5   subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured,

6   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

7   affiliates, throughout the United States.   Defendant TC dominated and controlled the finances,

8   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

9   complaint.

10          65.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a

11   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

12   3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

13   America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

14   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

15   States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP

16   relating to the antitrust violations alleged in this complaint.

17          66.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

18   California corporation with its principal place of business located at 19900 MacArthur

19   Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

20   subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC

21   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22   subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled

23   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

24   complaint.

25          67.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

26   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

27   California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC

28   through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

68. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.** **Chunghwa Entities**

69. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

70. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.** **Thomson Entities**

71. Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-

les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2           73.    Thomson SA and Thomson Consumer Electronics are collectively referred

3    to herein as "Thomson."

4           **13.    Mitsubishi Entities**

5           74.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6    is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8    Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold

9    internally to Mitsubishi's television and monitor manufacturing division and to other television

10   and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor

11   division also purchased CRTs from other CRT manufacturers.   During the Relevant Period,

12   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13   United States.

14          75.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19   and monitor manufacturing division and to other television and monitor manufacturers in the

20   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22   marketed, sold and distributed CRT Products in the United States.

23          76.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.     During the

26   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27   CRT televisions and monitors in the United States.

28          77.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

1    are collectively referred to herein as "Mitsubishi."

2    IV.    **AGENTS AND CO-CONSPIRATORS**

3            78.    The acts alleged against Defendants in this Complaint were authorized,

4    ordered, or done by their officers, agents, employees, or representatives, while actively engaged

5    in the management and operation of Defendants' businesses or affairs.

6            79.    Each Defendant or co-conspirator acted as the principal, agent, or joint

7    venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

8    common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a

9    subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

10   made by its parent company.

11           80.    Various persons and/or firms not named as Defendants in this Complaint

12   participated as co-conspirators in the violations alleged herein and may have performed acts and

13   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

14   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

15   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

16   Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

17   Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-

18   conspirators as Defendants at a later date.

19           81.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major

20   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

21   2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

22   Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

23   subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

24   United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

25   Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

26   Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

27   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

28   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

1    As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

2    CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

3    DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

4    directly or through their subsidiaries or affiliates, throughout the United States.

5              82.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein

6    as "Daewoo."

7              83.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

8    Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

9    Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

10   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

11   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

12   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

13   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

14   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

15   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

17   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

18   this complaint.

19             84.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

20   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

21   principal place of business was located in Indonesia.  TEDI was projected to have an annual

22   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

23   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

24   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

25   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

27   affairs of TEDI relating to the antitrust violations alleged in this complaint.

28             85.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

86.    The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

87.    During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.    During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

89.    The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  Defendants' business activities substantially affected trade and commerce within each of the 50 states, as the conspiracy artificially inflated the prices of CRT Products sold in all 50 states, and therefore caused antitrust injury in every state including the states identified herein.  Moreover, Plaintiffs purchased price-fixed goods directly and indirectly from Defendants for sale across the United States.

1    **VI.      FACTUAL ALLEGATIONS**

2           **A.      CRT Technology**

3           90.      A CRT has three components: (a) one or more electron guns, each of

4    which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

5    other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

6    that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

7    faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

8    coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

9    shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

10   produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

11   narrow lines of red, green, blue and black.

12          91.      CRT technology was first developed more than a century ago.  The first

13   commercially practical CRT television was made in 1931.  However, it was not until RCA

14   Corporation introduced the product at the 1939 World's Fair that it became widely available to

15   consumers.  After that, CRTs became the heart of most display products, including televisions,

16   computer monitors, oscilloscopes, air traffic control monitors and ATMs.

17          92.      The quality of a CRT itself determines the quality of the CRT display.  No

18   external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

19   the whole CRT product so that the product is often simply referred to as "the CRT."

20          93.      Although there have been refinements and incremental advancements

21   along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

22   the CRT technology used today is similar to that RCA unveiled in 1939.

23          94.      CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

24   used primarily in televisions and related devices and CDTs are primarily used in computer

25   monitors and similar devices.  The primary difference is that CDTs typically yield a higher

26   resolution image requiring more pixels than do CPTs.

27          95.      CRTs have no independent utility, and have value only as components of

28   other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

1    from the demand for such products.

2          96.    The market for CRTs and the market for the products into which they are

3    placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

4    Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

5    inseparable in that one would not exist without the other.

6          97.    Plaintiffs have participated in the market for CRTs through their direct

7    purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of

8    CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.

9    Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT

10   Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT

11   Products.

12         98.    Plaintiffs have participated in the market for products containing CRTs.

13   To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and

14   their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold

15   CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

16         99.    Plaintiffs have been injured by paying supra-competitive prices for CRT

17   Products.

18         **B.**    **Structure of the CRT Industry**

19         100.   The CRT industry has several characteristics that facilitated a conspiracy,

20   including market concentration, ease of information sharing, the consolidation of manufacturers,

21   multiple interrelated business relationships, significant barriers to entry, heightened price

22   sensitivity to supply and demand forces and homogeneity of products.

23              **1.**    **Market Concentration**

24         101.   During the Relevant Period, the CRT industry was dominated by relatively

25   few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

26   Chunghwa, together held a collective 78% share of the global CRT market.  The high

27   concentration of market share facilitates coordination because there are fewer cartel members

28   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

1    production of other cartel members.

2                          **2.**      **Information Sharing**

3              102.    Because of common membership in trade associations, interrelated

4    business arrangements such as joint ventures, allegiances between companies in certain countries

5    and relationships between the executives of certain companies, there were many opportunities

6    for Defendants to discuss and exchange competitive information.  The ease of communication

7    was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

8    took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

9    alleged below.

10             103.    Defendants Hitachi, Samsung and Chunghwa are all members of the

11   Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

12   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

13   Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

14   Research Association.  Upon information and belief, Defendants and their co-conspirators used

15   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

16   the meetings of these trade associations, Defendants exchanged proprietary and competitively

17   sensitive information which they used to implement and monitor the conspiracy.

18                         **3.**      **Consolidation**

19             104.     The CRT industry also had significant consolidation during the Relevant

20   Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

21   involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

22   and Panasonic's CRT businesses into MTPD.

23                         **4.**      **Multiple Interrelated Business Relationships**

24             105.     The industry is marked by a web of cross-licensing agreements, joint

25   ventures and other cooperative arrangements that can facilitate collusion.

26             106.     Examples of the high degree of cooperation among Defendants in both the

27   CRT Product market and other closely related markets include the following:

28                         a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

LG Electronics and Philips.

b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc.,

1    USA for the production and supply of picture tube glass.

2        k.   Defendant Samtel claims to have supplied CRTs to Defendants LG

3            Electronics, Samsung, Philips, and Panasonic.

4        **5.    High Costs of Entry Into the Industry**

5        107.    There are significant manufacturing and technological barriers to entry

6    into the CRT industry.  It would require substantial time, resources and industry knowledge to

7    overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter

8    the market in light of the declining demand for CRT Products.

9        108.    During the Relevant Period, the costs of the assembly components, both as

10   a whole and individually, have been generally declining, and, in some periods, declining at a

11   substantial rate.   A combination of price discussions and manipulation of the output of CRTs

12   allowed Defendants to keep prices above where they would have been but for the conspiracy.

13       **6.    The Maturity of the CRT Product Market**

14       109.    Newer industries typically are characterized by rapid growth, innovation

15   and high profits.  The CRT Product market is a mature one, and like many mature industries, is

16   characterized by slim profit margins, creating a motivation to collude.

17       110.    Demand for CRT Products was declining throughout the Relevant Period.

18   Static declining demand is another factor which makes the formation of a collusive arrangement

19   more likely because it provides a greater incentive to firms to avoid price competition.

20       111.    In addition, conventional CRT televisions and computer monitors were

21   being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

22   Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT

23   Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

24   States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

25   between 2006 and 2010.

26       112.    Although demand was declining as a result of the popularity of flat-panel

27   LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

28   dominant display technology during the Relevant Period, making Defendants' collusion and the

international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.   Homogeneity of CRT Products

115.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.   Pre-Conspiracy Market

117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.   Defendants' and Co-Conspirators' Illegal Agreements

119.    In order to control and maintain profitability during declining demand for

1   CRT Products, Defendants and their co-conspirators have engaged in a contract, combination,

2   trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices

3   at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

4   November 25, 2007.

5          120.   The CRT conspiracy was effectuated through a combination of group and

6   bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

7   were the primary method of communication and took place on an informal, ad hoc basis.  During

8   this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

9   the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

10  and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These

11  meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

12  Singapore.

13         121.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

14  Daewoo, also attended several ad hoc group meetings during this period.  The participants at

15  these group meetings also discussed increasing prices for CRTs.

16         122.   As more manufacturers formally entered the conspiracy, group meetings

17  became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized,

18  systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

19  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

20         123.   The overall CRT conspiracy raised and stabilized worldwide and U.S.

21  prices that Defendants charged for CRTs.

22         **1.      "Glass Meetings"**

23         124.   The group meetings among the participants in the CRT price-fixing

24  conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by

25  employees at three general levels of Defendants' corporations.

26         125.   The first level meetings were attended by high level company executives

27  including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top

28  meetings occurred less frequently, typically quarterly, and were focused on longer term

agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

129.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

1   of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

2        130.    Representatives of Defendants also attended what were known amongst

3   members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The

4   green meetings were generally attended by top and management level employees of Defendants.

5        131.    During the Relevant Period, glass meetings took place in Taiwan, South

6   Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

7        132.    Participants would often exchange competitively sensitive information

8   prior to a glass meeting.  This included information on inventories, production, sales and exports.

9   For some such meetings, where information could not be gathered in advance of the meeting, it

10  was brought to the meeting and shared.

11       133.    The glass meetings at all levels followed a fairly typical agenda.  First, the

12  participants exchanged competitive information such as proposed future CRT pricing, sales

13  volume, inventory levels, production capacity, exports, customer orders, price trends and

14  forecasts of sales volumes for coming months.  The participants also updated the information

15  they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

16  who would write the information on a white board.  The meeting participants then used this

17  information to discuss and agree upon what price each would charge for CRTs to be sold in the

18  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

19  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

20  of CRTs that were sold to specific customers, and agreed upon target prices to be used in

21  negotiations with large customers.  Having analyzed the supply and demand, the participants

22  would also discuss and agree upon production cutbacks.

23       134.    During periods of oversupply, the focus of the meeting participants turned

24  to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

25  price."

26       135.    Defendants' conspiracy included agreements on the prices at which certain

27  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

28  CRT Products, such as televisions and computer monitors.  Defendants realized the importance

of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

supracompetitive prices for CRTs.

136.    The agreements reached at the glass meetings included:

a.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

b.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

c.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

d.    agreements as to what to tell customers about the reason for a price increase;

e.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.    agreements to coordinate uniform public statements regarding available capacity and supply;

i.    agreements to allocate both overall market shares and share of a particular customer's purchases;

j.    agreements to allocate customers;

k.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.    agreements to keep their meetings secret.

137.    Efforts were made to monitor each Defendant's adherence to these

agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

138.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    Bilateral Discussions

139.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

140.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

141.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

142.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the

largest market for CRT televisions and computer monitors during the Relevant Period. Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

143. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

144. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

145. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

1   These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

2   in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

3   these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

4   withdrew from this conspiracy.

5           146.    Defendants Hitachi America and HEDUS were represented at those

6   meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

7   HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

8   in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

9   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

10  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

11          147.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

12  IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

13  ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

14  Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

15  agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

16  connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

17  its own independent private interests in participating in the alleged conspiracy.

18          148.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

19  and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

20  participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

21  Displays).   A substantial number of these meetings were attended by the highest ranking

22  executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each

23  of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

24  supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

25          149.    Defendant LGEUSA was represented at those meetings and was a party to

26  the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it

27  played a significant role in the conspiracy because Defendants wished to ensure that the prices

28  for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

1    reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

2    conspiracy.

3          150.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

4    participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

5    were attended by the highest ranking executives from LP Displays.  Certain of these high level

6    executives from LP Displays had previously attended meetings on behalf of Defendants LG

7    Electronics and Philips.    LP Displays also engaged in bilateral discussions with other

8    Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

9    CRTs.

10         151.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

11   Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

12   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

13   These meetings were attended by high level sales managers from Panasonic and MTPD.

14   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

15   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

16   withdrew from this conspiracy.

17         152.    PCNA was represented at those meetings and was a party to the

18   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

19   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

20   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

21   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

22   the alleged conspiracy.

23         153.    Between at least 2003 and 2006, Defendant MTPD participated in

24   multiple glass meetings and in fact led many of these meetings during the latter years of the

25   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

26   also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

27   agreed on prices and supply levels for CRTs.

28         154.    Between at least 1998 and 2007, Defendant BMCC participated in

1   multiple glass meetings.  These meetings were attended by high level sales managers from

2   BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants,

3   particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

4   prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

5   CRTs was mandated by the Chinese government.   BMCC was acting to further its own

6   independent private interests in participating in the alleged conspiracy.

7          155.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips

8   and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

9   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

10  LP Displays).  A substantial number of these meetings were attended by high level executives

11  from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

12  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

13  effectively withdrew from this conspiracy.

14         156.   Defendants Philips America and Philips Brazil were represented at those

15  meetings and were a party to the agreements entered at them.  To the extent Philips America and

16  Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

17  significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

18  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

19  the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

20  in the alleged conspiracy.

21         157.   Between at least 1995 and 2007, Defendant Samsung, through SEC,

22  Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

23  participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

24  were attended by the highest ranking executives from Samsung.  Samsung also engaged in

25  bilateral discussions with each of the other Defendants on a regular basis.  Through these

26  discussions, Samsung agreed on prices and supply levels for CRTs.

27         158.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

28  Samsung SDI Mexico were represented at those meetings and were a party to the agreements

entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

159.   Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

160.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

161.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

162.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

163.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

164.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

165.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

166.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

167.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.   In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.   The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.   As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

168.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.   During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

169.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.   According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

---

[1]    Estimated market value of CRT units sold.

1  percent) were consumed in North America.  By 2002, North America still consumed around 35

2  percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related*

3  *Display Materials,* Fuji Chimera Research, 1997, p.12.

4        171.    In the 1990s, industry analysts repeatedly predicted declines in consumer

5  prices for CRT Products.  Despite such predictions, and the existence of economic conditions

6  warranting a drop in prices, CRT Product prices nonetheless remained stable.

7        172.    A BNET Business Network news article from August 1998 reported that

8  "key components (cathode ray tubes) in computer monitors have risen in price.  'Although

9  several manufacturers raised their CRT prices in the beginning of August, additional CRT price

10  increases are expected for the beginning of October . . . . While computer monitor price increases

11  may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

12  foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

13        173.    A 2004 article from Techtree.com reports that various computer monitor

14  manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

15  monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

16  used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

17  September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

18        174.    Defendants also conspired to limit production of CRTs by shutting down

19  production lines for days at a time, and closing or consolidating their manufacturing facilities.

20        175.    For example, Defendants' CRT factory utilization percentage fell from

21  90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

22  example of a drop in factory utilization in the CRT industry.  There were sudden drops

23  throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that

24  these sudden, coordinated drops in factory utilization by Defendants were the result of

25  Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

26        176.    During the Relevant Period, while demand in the United States for CRT

27  Products continued to decline, Defendants' conspiracy was effective in moderating the normal

28  downward pressures on prices for CRT Products caused by the entry and popularity of the new

1   generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

2   Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

3   CRT technology is very mature; prices and technology have become stable."

4          177.   During the Relevant Period, there were not only periods of unnatural and

5   sustained price stability, but there were also increases in prices of CRTs and CRT Products.

6   These price increases were despite the declining demand due to the approaching obsolescence of

7   CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

8   substitutable technology.

9          178.   These price increases and price stability in the market for CRT Products

10   during the Relevant Period are inconsistent with a competitive market for a product facing

11   rapidly decreasing demand caused by a new, substitutable technology.

12        **F.**   **International Government Antitrust Investigations**

13          179.   Defendants' conspiracy to fix, raise, maintain and stabilize the prices of,

14   and restrict output for, CRTs sold in the United States during the Relevant Period, is

15   demonstrated by a multinational investigation commenced by the Antitrust Division of the

16   United States Department of Justice in November 2007.

17          180.   Separately, the European Commission and Japan and South Korea's Fair

18   Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being

19   sold in Europe and Asia.

20          181.   In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group

21   is also being investigated by the [European] Commission and/or the U.S. Department of Justice

22   for potential violations of competition laws with respect to semiconductors, LCD products,

23   cathode ray tubes (CRT) and heavy electrical equipment."

24          182.   On May 6, 2008, the Hungarian Competition Authority ("HCA")

25   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

26             The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)

27             initiated a competition supervision proceeding against the following
          undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,

28             Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips

Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

183.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an

assistant Vice President of Sales and Marketing at Chunghwa.   The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.   The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

186.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

187.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

188.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

in California.

189.    The plea agreement of Samsung SDI requires that it cooperate with the

DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

manufacture or sale of CDTs and CPTs.

190.    On December 5, 2012, the European Commission announced that it had

fined seven international corporate families a total of over €1.4 billion for their two-decade-long

effort to fix prices, share markets, restrict output, and allocate customers between themselves in

the CRT market.  The companies fined by the European Commission included Chunghwa, LG

Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

behavior that are strictly forbidden to companies doing business in Europe."  The press release

accompanying the fines further notes that the CRT cartels were "among the most organised

cartels that the Commission has investigated."

191.    As outlined above, Defendants have a history of competitor contacts

resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

businesses in the electronics industry.

192.    Several Defendants also have a history of "cooperation" and

anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S.

Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

Dynamic Random Access Memory ("DRAM").

193.    Defendants Samsung and Toshiba have acknowledged being contacted by

the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static

Random Access Memory ("SRAM") and NAND Flash Memory.

194.    In December 2006, government authorities in Japan, Korea, the European

Union and the United States revealed a comprehensive investigation into anticompetitive

conduct in the closely-related TFT-LCD market.

195.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

196.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

197.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

198.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.      The Role of Trade Associations During the Relevant Period**

199.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

1    200.   Samsung and LG Electronics were members of both KODEMIA and

2    EDIRAK, and have participated extensively in the KDCs.

3    201.   The KDC has taken place in Seoul, Korea or other Korean venues on:

4    December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

5    2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

6    and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

7    Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

8    Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated,

9    such as Zenzou Tashima of Hitachi.

10   202.   Other opportunities to collude among Defendants were provided by events

11   sponsored by the Society for Information Display, such as the annual Asian Symposiums on

12   Information Display, the annual International Display Manufacturing Conference and Exhibition

13   (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on

14   Information Displays (held each August in Daegu, Korea) and the annual International Display

15   Workshops (the most recent ones of which have been held in Japan).

16   203.   Through these trade association and trade events, and in meetings related

17   to these trade associations and trade events, on information and belief, Defendants shared what

18   would normally be considered proprietary and competitively sensitive information.   This

19   exchange of information was used to implement and monitor the conspiracy.

20   **H.**    **Effects of Defendants' Antitrust Violations**

21          **1.**    **Examples of Reductions in Manufacturing Capacity by Defendants**

22   204.   As explained above, during the Relevant Period, Defendants consolidated

23   their manufacturing facilities in lower-cost venues such as China and reduced manufacturing

24   capacity to prop up prices.

25   205.   In December of 2004, MTPD closed its American subsidiary's operations

26   in Horseheads, New York, citing price and market erosion.   Panasonic announced that the

27   closing was part of the company's "global restructuring initiatives in the CRT business."   The

28   company further stated that in the future, "CRTs for the North American market will be supplied

1    by other manufacturing locations in order to establish an optimum CRT manufacturing

2    structure."

3             206.    In July of 2005, LGPD ceased CRT production at its Durham, England

4    facility, citing a shift in demand from Europe to Asia.

5             207.    In December of 2005, MTPD announced that it would close its American

6    subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG

7    Philips, the company explained that it was shifting its CRT operations to Asian and Chinese

8    markets.

9             208.    In late 2005, Samsung SDI followed the lead of other manufacturers,

10   closing its CRT factory in Germany.

11            209.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton,

12   Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in

13   Malaysia and liquidating its joint venture with Toshiba.

14            **2.      Examples of Collusive Pricing for CRTs**

15            210.    Defendants' collusion is evidenced by unusual price movements in the

16   CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation

17   predicted that "[e]conomies of scale, in conjunction with technological improvements and

18   advances in manufacturing techniques, will produce a drop in the price of the average electronic

19   display to about $50 in 1997."

20            211.    In 1996, another industry source noted that "the price of the 14" tube is at

21   a sustainable USD50 and has been for some years . . . ."

22            212.    In reality, prices for CRTs never approached $50 in 1997, and were

23   consistently more than double this price.

24            213.    Despite the ever-increasing popularity of, and intensifying competition

25   from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels"

26   throughout 1995 according to a *CNET News.com* article.   This price stabilization was

27   purportedly due exclusively to a shortage of critical components such as glass.  This was a

28   pretext used to conceal the conspiracy.

214.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

215.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

216.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

217.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

218.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

   3.    **Summary Of Effects Of The Conspiracy Involving CRTs**

219.    The above combination and conspiracy has had the following effects, among others:

   a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b. Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c. Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

220.    As purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

221.    Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

222.    The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

223.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

224.   The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

225.   Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

226.   As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

227.   Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

228.   Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

229.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection,

1   conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

2   pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

3   and exchange in advance the texts of the proposed communications with customers containing

4   these pretextual statements and would coordinate which co-conspirator would first communicate

5   these pretextual statements to customers.

6          230.    By its very nature, Defendants' price-fixing conspiracy was inherently

7   self-concealing.

8          231.    Plaintiffs could not have discovered the alleged contract, conspiracy or

9   combination at an earlier date by the exercise of reasonable diligence because of the deceptive

10  practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

11  detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

12  conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

13  various means and methods, including, but not limited to, secret meetings, surreptitious

14  communications between Defendants by the use of the telephone or in-person meetings in order

15  to prevent the existence of written records, discussion on how to evade antitrust laws and

16  concealing the existence and nature of their competitor pricing discussions from non-

17  conspirators (including customers).

18         232.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT

19  meetings at separate venues in order to avoid detection.  Participants at glass meetings were also

20  told not to take minutes.  Attending companies also reduced the number of their respective

21  attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

22  nature of their agreement.  During these meetings, top executives and other officials attending

23  these meetings were instructed on more than once occasion not to disclose the fact of these

24  meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

25  production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

26  arrivals and departures at such meetings to avoid being seen in public with each other and with

27  the express purpose and effect of keeping them secret.

28

233.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

234.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

235.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

236.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

237.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

238.     Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

239.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

IX.    *AMERICAN PIPE*, **GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

240.     As discussed at length in Paragraphs 179-198 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

241.     As shown by Plaintiffs' allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiffs were members of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

242.     Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.     CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

243.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

244.     Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

245.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

246.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

247.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

248.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

249.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of State Antitrust Laws)**

250.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.    During the Relevant Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, subsidize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

252.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

253.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

a.   to fix, raise, maintain and stabilize the price of CRTs;

b.   to allocate the market for CRTs amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRT contracts; and

d.   to allocate among themselves the production of CRTs.

254.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.   price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

1         c.  those who purchased CRTs from Defendants, their co- conspirators

2           and others and CRT Products containing price-fixed CRTs from

3           Defendants, their co-conspirators and others have been deprived of the

4           benefits of free and open competition.

5       255.   As a result of the alleged conduct Defendants and their co-conspirators,

6  Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products they purchased

7  during the Relevant Period.

8       256.   By reason of the foregoing, Defendants and their co-conspirators,  have

9  entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*:

10         a.  Defendants and their co-conspirators' conspiracy restrained,

11           suppressed and/or eliminated competition in the sale of CRTs in

12           Arizona and fixed, raised, maintained and stabilized CRT prices in

13           Arizona at artificially high, non-competitive levels;

14         b.  As a result, Defendants' and their co-conspirators' conspiracy

15           substantially affected Arizona commerce;

16         c.  During the Relevant Period, MARTA purchased CRT Products

17           containing priced fixed CRTs in Arizona, and, as a result, MARTA is

18           entitled to the protection of the laws of Arizona; and

19         d.  As a direct and proximate result of Defendants' and their co-

20           conspirators' conduct, MARTA has been injured in its business and

21           property by paying more for CRT Products containing CRTs

22           manufactured by Defendants, their co-conspirators, and others than it

23           would have paid in the absence of Defendants' and their co-

24           conspirators' combination and conspiracy, and is therefore entitled to

25           damages and the costs of suit, including reasonable attorneys' fees,

26           pursuant to Ariz. Rev. Stat §§ 44-1408(B).

27

28

257.    By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Code 10/1, *et seq.*:

       a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

       b.  As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

       c.  During the Relevant Period, MARTA purchased CRT Products containing price-fixed CRTs in Illinois, and, as a result, MARTA is entitled to the protection of the laws of Illinois; and

       d.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to the Illinois Antitrust Act, 740 Ill. Code 10/7(2).

258.    By reason of the foregoing, Defendants and their co-conspirators also have entered into a restraint of trade in violation of Mich. Comp. Laws §§ 445.771, et seq.:

       a.  Defendants' and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained, and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

       b.  As a result, Defendants' and their co-conspirators' conspiracy substantially affected Michigan commerce;

1           c. During the Relevant Period, ABC Warehouse purchased CRT

2              Products containing price-fixed CRTs in Michigan, and, as a result,

3              ABC Warehouse is entitled to the protection of the laws of Michigan;

4              and

5           d. As a direct and proximate result of Defendants' and their co-

6              conspirators' conduct, ABC Warehouse has been injured in its

7              business and property by paying more for CRT Products containing

8              CRTs manufactured by Defendants, their co-conspirators, and others

9              than it would have paid in the absence of Defendants' and their co-

10             conspirators' conspiracy, and is therefore entitled to damages and the

11             costs of suit, including reasonable attorneys' fees, pursuant to Mich.

12             Comp. Laws § 445.778(2).

13      259. By reason of the foregoing, Defendants and their co- conspirators also

14 have entered into an agreement in restraint of trade in violation of New York's Donnelly Act,

15 N.Y. Gen. Bus. Law §§ 340, et seq.:

16           a. Defendants' and their co-conspirators' conspiracy restrained,

17             suppressed and/or eliminated competition in the sale of CRTs in New

18             York and fixed, raised, maintained and stabilized  CRT prices in New

19             York at artificially high, non-competitive levels;

20           b. As a result, Defendants' and their co-conspirators' conspiracy

21             substantially affected New York  commerce;

22           c. Beginning on December 23, 1998, P.C. Richard purchased CRT

23             Products containing price-fixed CRT panels in New York, and, as a

24             result, P.C. Richard is entitled to the protection of the laws of New

25             York; and

26           d. As a direct and proximate result of Defendants' and their co-

27             conspirators' conduct, P.C. Richard has been injured in its business

28             and property by paying more for CRT Products containing CRT panels

manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Ariz. Rev. Stat. §§ 44-1401, *et seq.*, and the Illinois Antitrust Act, and that Plaintiffs were injured in their businesses and property as a result of Defendants' violations;

B.     Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     Plaintiffs shall recover **its** costs of this suit, including reasonable attorneys' fees as provided by law; and

F.     Plaintiffs shall receive such other or further relief as may be just and proper.

1    **XII.**          <u>**JURY TRIAL DEMAND**</u>

2                   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by

3    jury of all the claims asserted in this Complaint so triable.

1    Dated:                              Respectfully Submitted,

2

3                                        _____
                                         PHILIP J. IOVIENO (*Pro Hac Vice*)
4                                        ANNE M. NARDACCI (*Pro Hac Vice*)
                                         LUKE NIKAS (*Pro Hac Vice*)
5                                        CHRISTOPHER V. FENLON (*Pro Hac Vice*)
                                         BOIES, SCHILLER & FLEXNER LLP
6                                        10 North Pearl Street, 4th Floor
                                         Albany, NY 12207
7                                        Telephone:  (518) 434-0600
                                         Facsimile:  (518) 434-0665
8                                        Email: piovieno@bsfllp.com
9                                        Email: anardacci@bsfllp.com
                                         Email: lnikas@bsfllp.com
10                                       Email: cfenlon@bsfllp.com

11                                       WILLIAM A. ISAACSON (*Pro Hac Vice*)
                                         BOIES, SCHILLER & FLEXNER LLP
12                                       5301 Wisconsin Ave. NW, Suite 800
                                         Washington, DC 20015
13                                       Telephone:  (202) 237-2727
                                         Facsimile:  (202) 237-6131
14                                       Email:  wisaacson@bsfllp.com

15
                                         *Counsel for Plaintiffs P.C. Richard & Son Long*
16                                       *Island Corporation, MARTA Cooperative of America,*
                                         *Inc., and ABC Appliance, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT J

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Schultze Agency Services, LLC*
*on behalf of Tweeter Opco, LLC and Tweeter Newco, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 12-cv-02649 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 12-cv-02649 | MDL No. 1917 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS | |

1   USA, INC.; LG ELECTRONICS TAIWAN
    TAIPEI CO., LTD.; LP DISPLAYS
2   INTERNATIONAL LTD.; PANASONIC
    CORPORATION; PANASONIC
3   CORPORATION OF NORTH AMERICA;
    MT PICTURE DISPLAY CO., LTD.;
4   BEIJING MATSUSHITA COLOR CRT CO.,
    LTD.; KONINKLIJKE PHILIPS
5   ELECTRONICS N.V.; PHILIPS
    ELECTRONICS NORTH AMERICA
6   CORPORATION; PHILIPS ELECTRONICS
    INDUSTRIES (TAIWAN), LTD.; PHILIPS
7   DA AMAZONIA INDUSTRIA
    ELECTRONICA LTDA.; SAMSUNG
8   ELECTRONICS CO., LTD.; SAMSUNG
    ELECTRONICS AMERICA, INC.;
9   SAMSUNG SDI CO., LTD.; SAMSUNG
    SDI AMERICA, INC.; SAMSUNG SDI
10  MEXICO S.A. DE C.V.;  SAMSUNG SDI
    BRASIL LTDA.; SHENZHEN SAMSUNG
11  SDI CO., LTD.; TIANJIN SAMSUNG SDI
    CO., LTD.; SAMSUNG SDI (MALAYSIA)
12  SDN. BHD.; SAMTEL COLOR LTD.; THAI
    CRT CO., LTD.; TOSHIBA
13  CORPORATION; TOSHIBA AMERICA,
    INC.; TOSHIBA AMERICA CONSUMER
14  PRODUCTS, LLC; TOSHIBA AMERICA
    ELECTRONIC COMPONENTS, INC.;
15  TOSHIBA AMERICA INFORMATION
    SYSTEMS, INC.; CHUNGHWA PICTURE
16  TUBES, LTD.; CHUNGHWA PICTURE
    TUBES (MALAYSIA); TECHNICOLOR
17  SA; TECHNICOLOR USA, INC.;
    MITSUBISHI ELECTRIC CORPORATION;
18  MITSUBISHI DIGITAL ELECTRONICS
    AMERICA, INC.; MITSUBISHI ELECTRIC
19  & ELECTRONICS, USA, INC.,

20          Defendants.

21

22

23          Plaintiff, Schultze Agency Services, LLC ("Schultze Agency Services") on behalf

24  of Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Newco, LLC ("Tweeter Newco")

25  (collectively "Plaintiff"), for its Complaint against all Defendants named herein, hereby alleges

26  as follows:

27

28

1

**I.      INTRODUCTION**

2            1.      Plaintiff brings this action to recover those damages to Tweeter Home

3   Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long-running

4   conspiracy among suppliers of cathode ray tubes ("CRTs") and related products.  Defendants and

5   their co-conspirators formed an international cartel which conducted a long-running conspiracy

6   extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the

7   "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and

8   maintain prices for CRTs.

9            2.      Defendants are or were among the leading manufacturers of: (a) color

10   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

11   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

12   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

13   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

14   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

15   and the products containing them shall be referred to as "CDT Products."  CDT Products and

16   CPT Products shall be referred to collectively herein as "CRT Products."

17            3.      Defendants control the majority of the CRT industry, a multibillion dollar

18   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

19   Relevant Period, virtually every household in the United States owned at least one CRT Product.

20            4.      Since the mid-1990s, the CRT industry faced significant economic

21   pressures as customer preferences for other emerging technologies shrank profits and threatened

22   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

23   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

24   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

25   States.

26            5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

27   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*

28   shipments, prices, production and customer demand; (c) coordinate public statements regarding

available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it

1   purchased during the Relevant Period.

2   **II.     JURISDICTION AND VENUE**

3          10.    Plaintiff brings this action to obtain injunctive relief under Section 16 of

4   the Clayton Act; and to recover damages, including treble damages under Section 4 of the

5   Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

6   Section 1 of the Sherman Act (15 U.S.C. § 1).

7          11.    Plaintiff also brings this action pursuant to Massachusetts General Laws,

8   chapter 93A. for injunctive relief and damages that Plaintiff sustained due to Defendants' and

9   their co-conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, because Plaintiff

10  purchased CRT Products from non-defendant vendors which contained price-fixed CRTs

11  manufactured by Defendants and their co-conspirators in Massachusetts.

12         12.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

13  the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

14  supplemental jurisdiction over Plaintiff's Massachusetts state law claims under 28 U.S.C. § 1367

15  because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's

16  state law claims are so related to its claims under Section 1 of the Sherman Act that they form

17  part of the same case or controversy.

18         13.    The activities of Defendants and their co-conspirators, as described herein,

19  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

20  did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

21  import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the

22  Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

23  United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

24  substantially affected the price of CRT Products purchased by Plaintiff in Massachusetts.

25         14.    This court has jurisdiction over each Defendant named in this action under

26  Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

27  availed themselves of the laws of the United States as they manufactured CRT Products for sale

28  in the United States, or CRTs which were incorporated into CRT Products Defendants and their

co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.   PARTIES**

    **A.     Plaintiff**

16.     Through the conclusion of Defendants' and the co-conspirators' conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of consumer electronics and operated dozens of stores in several states under the names Tweeter, Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east coast and in Texas, Arizona, and Illinois.

17.     On June 11, 2007, Tweeter commenced cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code. *In re Tweeter Home Entertainment Group, Inc. et al.*, Case No. 07-10787 (PJW) (Jointly Administered). On July 13, 2007, the Court entered an Order (1) Approving Sale of Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its assignees (the "Sale"). The Sale was closed on or about July 13, 2007.

18.     Tweeter Newco is the sole member and owner of Tweeter Opco. Both were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the

"APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or causes of action of Sellers against third parties relating to the Purchased Assets arising out of events occurring prior to the Closing Date."

19.     On November 5, 2008, Tweeter Opco and Tweeter Newco commenced cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re Tweeter Opco, LLC, et al.*, Case No. 08-12646 (MFW) (Jointly Administered).  On December 5, 2008, the Court issued an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

20.     Schultze Agency Services is the agent bank for certain lenders which provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and Schultze Agency Services as agent for the lenders.  On March 23, 2009, the Court in the Tweeter Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint.  Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc. and its subsidiaries, affiliates and predecessors, including, but not limited to:  NEA Delaware, Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems; Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

21.     During the Relevant Period, Tweeter purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  Tweeter also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRT panels that had been purchased from Defendants and their co-conspirators.  As

1    such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

2            22.     During the Relevant Period, Tweeter's negotiations for the purchase of

3    CRT Products took place in the United States and were controlled by a department based at the

4    company's headquarters in Massachusetts.   In addition, Tweeter's purchase orders for CRT

5    Products were issued from Massachusetts, invoices for these CRT Products were sent to Tweeter

6    in Massachusetts, and payments for these CRT Products were issued from Massachusetts.

7    Tweeter employees based in Massachusetts were also responsible for selecting vendors and

8    product lines with respect to CRT Products.

9        B.    **Defendants**

10            1.    **Hitachi Entities**

11            23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of

12    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

13    parent company for the Hitachi brand of CRT Products.   In 1996, Hitachi, Ltd.'s worldwide

14    market share for color CRTs was 20 percent.   During the Relevant Period, Hitachi, Ltd.

15    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

16    subsidiaries or affiliates, throughout the United States.

17            24.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

18    company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

19    297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

20    in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

21    manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

22    create a separate company called Hitachi Displays.   During the Relevant Period, Hitachi

23    Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

24    through its subsidiaries or affiliates, throughout the United States.   Defendant Hitachi, Ltd.

25    dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

26    antitrust violations alleged in this complaint.

27            25.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

28    company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

1  throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

2  controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

3  violations alleged in this complaint.

4      29.  Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

5  HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

6      **2.   IRICO Entities**

7      30.  Defendant IRICO Group Corporation ("IGC") is a Chinese company with

8  its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

9  712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

10 marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC

11 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12 subsidiaries or affiliates, throughout the United States.

13     31.  Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

14 company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

15 Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

16 CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

17 also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

18 and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

19 IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

20 subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

21 the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

22 complaint.

23     32.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

24 company with its principal place of business located at No. 16, Fenghui South Road West,

25 District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned

26 subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

27 Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

28 through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

1    and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

2    alleged in this complaint.

3        33.    Defendants IGC, IGE and IDDC are collectively referred to herein as

4    "IRICO."

5        **3.    LG Electronics Entities**

6        34.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

7    the laws of the Republic of Korea with its principal place of business located at LG Twin

8    Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

9    billion global force in consumer electronics, home appliances and mobile communications,

10   which established its first overseas branch office in New York in 1968.  The company's name

11   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

12   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

13   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

14   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

15   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

16   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

17   throughout the United States.

18       35.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

19   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

20   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

21   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

22   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

23   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

24   to the antitrust violations alleged in this complaint.

25       36.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

26   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

27   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

28   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

1   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

3   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

4           37.     Defendants LGEI, LGEUSA and LGETT are collectively referred to

5   herein as "LG Electronics."

6           **4.     LP Displays**

7           38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

8   Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

9   Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

10  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

11  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

12  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

13  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

14  and LGEI would cede control over the company and the shares would be owned by financial

15  institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

16  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

17  affiliates, throughout the United States.

18          **5.     Panasonic Entities**

19          39.     Defendant Panasonic Corporation, which was at all times during the

20  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

21  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

22  Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

23  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

24  affiliates, throughout the United States.

25          40.     Defendant Panasonic Corporation of North America ("PCNA") is a

26  Delaware corporation with its principal place of business located at One Panasonic Way,

27  Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

28  Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

1    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

2    United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

3    and affairs of PCNA relating to the antitrust violations alleged in this complaint.

4          41.    Defendants Panasonic Corporation and PCNA are collectively referred to

5    herein as "Panasonic."

6          42.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

7    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

8    Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

9    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

10   manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.   On

11   March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

12   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

13   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

14   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States.

16         43.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

17   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

18   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

19   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

20   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

21   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

22   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

23   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

24   China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

25   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

26   States.

27         **6.    Philips Entities**

28         44.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

1    wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

2    Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

3    directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

4    Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

5    the antitrust violations alleged in this complaint.

6         48.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips

7    Brazil are collectively referred to herein as "Philips."

8              **7.     <u>Samsung Entities</u>**

9         49.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

10   company with its principal place of business located at Samsung Electronics Building, 1320-10,

11   Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

12   company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

13   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

14   States.

15        50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

16   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

17   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

18   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

19   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

21   Samsung SEAI relating to the antitrust violations alleged in this complaint.

22        51.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

23   Company ("Samsung SDI") is a South Korean company with its principal place of business

24   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

25   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

26   Samsung SDI claims to be the world's leading company in the display and energy business, with

27   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

28   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

1   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

2   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

3   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

4   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

5        52.   Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

6   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

7   700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

8   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

9   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

10  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

11  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

12  violations alleged in this complaint.

13       53.   Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

14  is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

15  21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

16  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

17  Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

18  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

19  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

20  Mexico relating to the antitrust violations alleged in this complaint.

21       54.   Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

22  Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

23  Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

24  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

25  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

26  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

27  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

28  Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

1

### 8.     Samtel

2     59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

3     principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

4     110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

5     country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

6     States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

7     Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

8     its subsidiaries and affiliates, throughout the United States.

9

### 9.     Thai CRT

10    60.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

11    1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

12    Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

13    televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

14    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15    United States.

16

### 10.     Toshiba Entities

17    61.     Defendant Toshiba Corporation ("TC") is a Japanese company with its

18    principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

19    Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

20    and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

21    other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

22    Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

23    1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

24    in which the entities consolidated their CRT businesses.   During the Relevant Period, TC

25    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

26    subsidiaries or affiliates, throughout the United States.

27    62.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

28    corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.   Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.   Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Thomson Entities**

69.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold

its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand. In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation. The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson"). As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively. In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd. During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

70.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024. Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA. Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico. The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand. Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

21

13.    **Mitsubishi Entities**

72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

IV.    **AGENTS AND CO-CONSPIRATORS**

76.    The acts alleged against Defendants in this Complaint were authorized,

1   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

2   in the management and operation of Defendants' businesses or affairs.

3   77.   Each Defendant or co-conspirator acted as the principal, agent, or joint

4   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

5   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

6   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

7   made by its parent company.

8   78.   Various persons and/or firms not named as Defendants in this Complaint

9   participated as co-conspirators in the violations alleged herein and may have performed acts and

10  made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

11  include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

12  Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

13  Tosummit Electronic Devices Indonesia , Toshiba Display Devices (Thailand) Co., Ltd., and

14  Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

15  conspirators as Defendants at a later date.

16  79.   During the Relevant Period, Orion Electronic Co. ("Orion") was a major

17  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

18  2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

19  Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

20  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

21  United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

22  Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

23  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

24  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

25  joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

26  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

27  CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

28  DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

1   directly or through their subsidiaries or affiliates, throughout the United States.

2           80.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein

3   as "Daewoo."

4           81.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

5   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

6   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

7   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

8   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

9   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

10   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

11   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

12   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

13   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

14   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

15   this complaint.

16           82.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

17   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

18   principal place of business was located in Indonesia.  TEDI was projected to have an annual

19   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

20   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

21   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

22   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

24   affairs of TEDI relating to the antitrust violations alleged in this complaint.

25           83.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

26   company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

27   Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

28   subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

84.    The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

85.    During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

86.    During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

87.    The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Massachusetts and caused antitrust injuries in Massachusetts.

## VI.    FACTUAL ALLEGATIONS

### A.    CRT Technology

88.    A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

1    shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

2    produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

3    narrow lines of red, green, blue and black.

4           89.    CRT technology was first developed more than a century ago.  The first

5    commercially practical CRT television was made in 1931.  However, it was not until RCA

6    Corporation introduced the product at the 1939 World's Fair that it became widely available to

7    consumers.  After that, CRTs became the heart of most display products, including televisions,

8    computer monitors, oscilloscopes, air traffic control monitors and ATMs.

9           90.    The quality of a CRT itself determines the quality of the CRT display.  No

10   external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

11   the whole CRT product so that the product is often simply referred to as "the CRT."

12          91.    Although there have been refinements and incremental advancements

13   along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

14   the CRT technology used today is similar to that RCA unveiled in 1939.

15          92.    CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

16   used primarily in televisions and related devices and CDTs are primarily used in computer

17   monitors and similar devices.  The primary difference is that CDTs typically yield a higher

18   resolution image requiring more pixels than do CPTs.

19          93.    CRTs have no independent utility, and have value only as components of

20   other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

21   from the demand for such products.

22          94.    The market for CRTs and the market for the products into which they are

23   placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

24   Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

25   inseparable in that one would not exist without the other.

26          95.    Plaintiff has participated in the market for CRTs through its direct

27   purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of

28   CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.

1    Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products,

2    and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

3          96.    Plaintiff has participated in the market for products containing CRTs. To

4    the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their

5    co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs

6    in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

7          97.    Plaintiff has been injured by paying supra-competitive prices for CRT

8    Products.

9      **B.    Structure of the CRT Industry**

10         98.    The CRT industry has several characteristics that facilitated a conspiracy,

11   including market concentration, ease of information sharing, the consolidation of manufacturers,

12   multiple interrelated business relationships, significant barriers to entry, heightened price

13   sensitivity to supply and demand forces and homogeneity of products.

14         **1.    Market Concentration**

15         99.    During the Relevant Period, the CRT industry was dominated by relatively

16   few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

17   Chunghwa, together held a collective 78% share of the global CRT market.  The high

18   concentration of market share facilitates coordination because there are fewer cartel members

19   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

20   production of other cartel members.

21         **2.    Information Sharing**

22         100.   Because of common membership in trade associations, interrelated

23   business arrangements such as joint ventures, allegiances between companies in certain countries

24   and relationships between the executives of certain companies, there were many opportunities

25   for Defendants to discuss and exchange competitive information.  The ease of communication

26   was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

27   took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

28   alleged below.

101.    Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

102.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

103.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.     High Costs of Entry Into the Industry**

105.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

106.   During the Relevant Period, the costs of the assembly components, both as

a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Product Market

107.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

108.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

109.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

110.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

111.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

112.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

7.      **Homogeneity of CRT Products**

113.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

114.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

C.      **Pre-Conspiracy Market**

115.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

D.      **Defendants' and Co-Conspirators' Illegal Agreements**

117.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

118.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

1   the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

2   and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These

3   meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

4   Singapore.

5          119.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

6   Daewoo, also attended several ad hoc group meetings during this period.  The participants at

7   these group meetings also discussed increasing prices for CRTs.

8          120.   As more manufacturers formally entered the conspiracy, group meetings

9   became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized,

10  systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

11  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

12         121.   The overall CRT conspiracy raised and stabilized worldwide and U.S.

13  prices that Defendants charged for CRTs.

14         **1.**     **"Glass Meetings"**

15         122.   The group meetings among the participants in the CRT price-fixing

16  conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by

17  employees at three general levels of Defendants' corporations.

18         123.   The first level meetings were attended by high level company executives

19  including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top

20  meetings occurred less frequently, typically quarterly, and were focused on longer term

21  agreements and forcing compliance with price-fixing agreements.  Because attendees at top

22  meetings had authority as well as more reliable information, these meetings resulted in

23  agreements.  Attendees at top meetings were also able to resolve disputes because they were

24  decision makers who could make agreements.

25         124.   The second level meetings were attended by Defendants' high level sales

26  managers and were known as "management" meetings.   These meetings occurred more

27  frequently, typically monthly, and handled implementation of the agreements made at top

28  meetings.

125. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127. Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson. Chunghwa also attended these meetings.

128. Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

129. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

130. Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports.

1  For some such meetings, where information could not be gathered in advance of the meeting, it

2  was brought to the meeting and shared.

3          131.    The glass meetings at all levels followed a fairly typical agenda.  First, the

4  participants exchanged competitive information such as proposed future CRT pricing, sales

5  volume, inventory levels, production capacity, exports, customer orders, price trends and

6  forecasts of sales volumes for coming months.  The participants also updated the information

7  they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

8  who would write the information on a white board.  The meeting participants then used this

9  information to discuss and agree upon what price each would charge for CRTs to be sold in the

10  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

11  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

12  of CRTs that were sold to specific customers, and agreed upon target prices to be used in

13  negotiations with large customers.  Having analyzed the supply and demand, the participants

14  would also discuss and agree upon production cutbacks.

15          132.    During periods of oversupply, the focus of the meeting participants turned

16  to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

17  price."

18          133.    Defendants' conspiracy included agreements on the prices at which certain

19  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

20  CRT Products, such as televisions and computer monitors.  Defendants realized the importance

21  of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

22  pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

23  supracompetitive prices for CRTs.

24          134.    The agreements reached at the glass meetings included:

25                  a.  agreements on CRT prices, including establishing target prices,

26                      "bottom" prices, price ranges and price guidelines;

27                  b.  placing agreed-upon price differentials on various attributes of CRTs,

28                      such as quality or certain technical specifications;

  c. agreements on pricing for intra-company CRT sales to vertically integrated customers;

  d. agreements as to what to tell customers about the reason for a price increase;

  e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

  f. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

  g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

  h. agreements to coordinate uniform public statements regarding available capacity and supply;

  i. agreements to allocate both overall market shares and share of a particular customer's purchases;

  j. agreements to allocate customers;

  k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

  l. agreements to keep their meetings secret.

135. Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

136. As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and

1    bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

2    subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have

3    concerns about antitrust issues.

4              **2.     Bilateral Discussions**

5              137.    Throughout the Relevant Period, the glass meetings were supplemented by

6    bilateral discussions between various Defendants.  The bilateral discussions were more informal

7    than the group meetings and occurred on a frequent, ad hoc basis, often between the group

8    meetings. These discussions, usually between sales and marketing employees, took the form of

9    in-person meetings, telephone contacts and emails.

10             138.    During the Relevant Period, in-person bilateral meetings took place in

11   Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

12   Brazil, Mexico, and the United States.

13             139.    The purpose of the bilateral discussions was to exchange information

14   about past and future pricing, confirm production levels, share sales order information, confirm

15   pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

16   including Brazil, Mexico, Europe, and the United States.

17             140.    In order to ensure the efficacy of their global conspiracy, Defendants also

18   used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the

19   United States.  These CRT manufacturers were particularly important because they served the

20   North American market for CRT Products.  As further alleged herein, North America was the

21   largest market for CRT televisions and computer monitors during the Relevant Period.  Because

22   these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they

23   adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of

24   all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at

25   supracompetitive levels.

26             141.    Defendants also used bilateral discussions with each other during price

27   negotiations with customers to avoid being persuaded by customers to cut prices.  The

28   information gained in these communications was then shared with supervisors and taken into

1    account in determining the price to be offered.

2             142.    Bilateral discussions were also used to coordinate prices with CRT

3    manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

4    Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

5    management meeting, the attendees at these group meetings would meet bilaterally with the

6    other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

7    output agreements had been reached during the meeting.   For example, Samsung had a

8    relationship with Hitachi and was responsible for communicating CRT pricing agreements to

9    Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

10   CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

11   with Thomson in Europe and the United States, and Samsung SDI had regular communications

12   with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for

13   communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented

14   the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes

15   Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel

     participated in the conspiracy to fix prices of CRTs.

              **3.     Defendants' and Co-Conspirators' Participation in Group and
                       Bilateral Discussions**

              143.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

     Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

     These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

     in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

     these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

     withdrew from this conspiracy.

              144.    Defendants Hitachi America and HEDUS were represented at those

     meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

     HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

     in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

1    direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

2    Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

3           145.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

4    IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

5    ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

6    Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

7    agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

8    connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

9    its own independent private interests in participating in the alleged conspiracy.

10          146.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

11   and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

12   participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

13   Displays).  A substantial number of these meetings were attended by the highest ranking

14   executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each

15   of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

16   supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

17          147.    Defendant LGEUSA was represented at those meetings and was a party to

18   the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it

19   played a significant role in the conspiracy because Defendants wished to ensure that the prices

20   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

21   reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

22   conspiracy.

23          148.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

24   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

25   were attended by the highest ranking executives from LP Displays.  Certain of these high level

26   executives from LP Displays had previously attended meetings on behalf of Defendants LG

27   Electronics and Philips.   LP Displays also engaged in bilateral discussions with other

28   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

1    CRTs.

2         149.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

3    Corporation and Matsushita Malaysia, participated in several glass meetings.   After 2003,

4    Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

5    These meetings were attended by high level sales managers from Panasonic and MTPD.

6    Panasonic also engaged in multiple bilateral discussions with other Defendants.   Through these

7    discussions, Panasonic agreed on prices and supply levels for CRTs.   Panasonic never effectively

8    withdrew from this conspiracy.

9         150.    PCNA was represented at those meetings and was a party to the

10   agreements entered at them.   To the extent PCNA sold and/or distributed CRT Products to direct

11   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

12   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

13   agreements reached at the glass meetings.   Thus, PCNA was an active, knowing participant in

14   the alleged conspiracy.

15        151.    Between at least 2003 and 2006, Defendant MTPD participated in

16   multiple glass meetings and in fact led many of these meetings during the latter years of the

17   conspiracy.   These meetings were attended by high level sales managers from MTPD.   MTPD

18   also engaged in bilateral discussions with other Defendants.   Through these discussions, MTPD

19   agreed on prices and supply levels for CRTs.

20        152.    Between at least 1998 and 2007, Defendant BMCC participated in

21   multiple glass meetings.   These meetings were attended by high level sales managers from

22   BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants,

23   particularly the other Chinese CRT manufacturers.   Through these discussions, BMCC agreed on

24   prices and supply levels for CRTs.   None of BMCC's conspiratorial conduct in connection with

25   CRTs was mandated by the Chinese government.   BMCC was acting to further its own

26   independent private interests in participating in the alleged conspiracy.

27        153.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips

28   and Philips Taiwan, participated in at least 100 glass meetings at all levels.   After 2001, Philips

1    participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

2    LP Displays).  A substantial number of these meetings were attended by high level executives

3    from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

4    Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

5    effectively withdrew from this conspiracy.

6            154.    Defendants Philips America and Philips Brazil were represented at those

7    meetings and were a party to the agreements entered at them.  To the extent Philips America and

8    Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

9    significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

10   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

11   the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

12   in the alleged conspiracy.

13           155.    Between at least 1995 and 2007, Defendant Samsung, through SEC,

14   Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

15   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

16   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

17   bilateral discussions with each of the other Defendants on a regular basis.  Through these

18   discussions, Samsung agreed on prices and supply levels for CRTs.

19           156.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

20   Samsung SDI Mexico were represented at those meetings and were a party to the agreements

21   entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

22   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

23   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

24   the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

25   Mexico were active, knowing participants in the alleged conspiracy.

26           157.    Between at least 1998 and 2006, Defendant Samtel participated in

27   multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

28   meetings were attended by high level executives from Samtel.  Through these discussions,

1    Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

2    this conspiracy.

3           158.   Between at least 1997 and 2006, Defendant Thai CRT participated in

4    multiple glass meetings.  These meetings were attended by the highest ranking executives from

5    Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

6    particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

7    levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

8           159.   Between at least 1996 and 2005, Defendant Thomson participated in

9    dozens of meetings with its competitors, including several glass meetings and multiple bilateral

10   meetings.  These meetings were attended by high level sales managers from Thomson.  At these

11   meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

12   demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

13   development and agreed on prices and supply levels for CRTs.  Thomson never effectively

14   withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

15   Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

16   a role in the conspiracy.

17          160.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

18   multiple bilateral and some multilateral meetings with its competitors.  These meetings were

19   attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

20   such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

21   plant shutdowns, customer allocation, and new product development, and agreed on prices and

22   supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

23          161.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

24   and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

25   conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

26   high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

27   discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

28   agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

conspiracy.

162.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

163.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

164.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

165.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The

1    individual participants entered into agreements on behalf of, and reported these meetings and

2    discussions to, their respective corporate families.  As a result, the entire corporate family was

3    represented in meetings and discussions by their agents and were parties to the agreements

4    reached in them.

5         **E.     The CRT Market During the Conspiracy**

6         166.    Until the last few years of the CRT conspiracy, CRTs were the dominant

7    technology used in displays, including televisions and computer monitors.  During the Relevant

8    Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

9    annual profits.

10        167.    The following data was reported by Stanford Resources, Inc., a market

11   research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

16

17        168.    During the Relevant Period, North America was the largest market for

18   CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research,

19   the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

20   percent) were consumed in North America.  By 2002, North America still consumed around 35

21   percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related*

22   *Display Materials,* Fuji Chimera Research, 1997, p.12.

23        169.    In the 1990s, industry analysts repeatedly predicted declines in consumer

24   prices for CRT Products.  Despite such predictions, and the existence of economic conditions

25   warranting a drop in prices, CRT Product prices nonetheless remained stable.

26        170.    A BNET Business Network news article from August 1998 reported that

27   "key components (cathode ray tubes) in computer monitors have risen in price.  'Although

---

[1]      Estimated market value of CRT units sold.

1    several manufacturers raised their CRT prices in the beginning of August, additional CRT price

2    increases are expected for the beginning of October . . . . While computer monitor price increases

3    may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

4    foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

5          171.   A 2004 article from Techtree.com reports that various computer monitor

6    manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

7    monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

8    used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

9    September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

10         172.   Defendants also conspired to limit production of CRTs by shutting down

11   production lines for days at a time, and closing or consolidating their manufacturing facilities.

12         173.   For example, Defendants' CRT factory utilization percentage fell from

13   90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

14   example of a drop in factory utilization in the CRT industry.   There were sudden drops

15   throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

16   these sudden, coordinated drops in factory utilization by Defendants were the result of

17   Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

18         174.   During the Relevant Period, while demand in the United States for CRT

19   Products continued to decline, Defendants' conspiracy was effective in moderating the normal

20   downward pressures on prices for CRT Products caused by the entry and popularity of the new

21   generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

22   Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

23   CRT technology is very mature; prices and technology have become stable."

24         175.   During the Relevant Period, there were not only periods of unnatural and

25   sustained price stability, but there were also increases in prices of CRTs and CRT Products.

26   These price increases were despite the declining demand due to the approaching obsolescence of

27   CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

28   substitutable technology.

176.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

177.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

178.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

179.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

180.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning

the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

181. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a

1   "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

2   The indictment states that the combination and conspiracy to fix the prices of CRTs was carried

3   out, in part, in California.

4      184. On November 9, 2010, the DOJ issued a press release announcing that a

5   federal grand jury in San Francisco had that same day returned a one-count indictment against

6   Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S.

7   Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used

8   in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives

9   from two color display tube (CDT) manufacturing companies."  The indictment states that the

10  combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

11     185. On March 18, 2011, the DOJ issued a press release announcing that it had

12  reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a

13  $32 million fine for its role in a conspiracy to fix prices of CDTs.

14     186. Samsung SDI admitted that from at least as early as January 1997 until at

15  least as late as March 2006, participated in a conspiracy among major CDT producers to fix

16  prices, reduce output, and allocate market shares of CDTs sold in the United States and

17  elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

18  and employees, engaged in discussions and attended meetings with representatives of other

19  major CDT producers.  During these discussions and meetings, agreements were reached to fix

20  prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

21  elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

22  in California.

23     187. The plea agreement of Samsung SDI requires that it cooperate with the

24  DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

25  manufacture or sale of CDTs and CPTs.

26     188. On December 5, 2012, the European Commission announced that it had

27  fined seven international corporate families a total of over €1.4 billion for their two-decade-long

28  effort to fix prices, share markets, restrict output, and allocate customers between themselves in

the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

189.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

190.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

191.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

192.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

193.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

194.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

195.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

196.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.    The Role of Trade Associations During the Relevant Period

197.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

198.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

199.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

200.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

201.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.     This exchange of information was used to implement and monitor the conspiracy.

### H.     Effects of Defendants' Antitrust Violations

#### 1.     Examples of Reductions in Manufacturing Capacity by Defendants

202.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

203.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

204.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

205.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

206.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

207.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.    Examples of Collusive Pricing for CRTs**

208.    Defendants' collusion is evidenced by unusual price movements in the CRT market.   For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

209.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

210.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

211.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.   This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.   This was a pretext used to conceal the conspiracy.

212.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.   This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.   This means that we have to deviate from the traditional approach of the simple scale up of production volume.

213.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.   The price increase was

1   allegedly based on increasing global demand for the products.  In fact, this price rise was the

2   result of collusive conduct amongst Defendants.

3          214.   After experiencing an oversupply of 17" CRTs in the second half of 1999,

4   the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an

5   industry analyst as saying that this price increase was "unlike most other PC-related products."

6          215.   On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT

7   monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass

8   needed to manufacture CRTs.

9          216.   CRT prices resisted downward price pressures and remained stable over a

10  period of many years.  Even in periods of decreasing prices caused by outside factors, such as the

11  Asian currency crisis, the prices of CRT Products did not decline as much as they would have

12  absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive

13  activities alleged above.

14          **3.**      **Summary Of Effects Of The Conspiracy Involving CRTs**

15          217.   The above combination and conspiracy has had the following effects,

16  among others:

17                     a.   Price competition in the sale of CRTs by Defendants and their co-

18                          conspirators  has  been  restrained,  suppressed  and  eliminated

19                          throughout the United States;

20                     b.   Prices for CRTs sold by Defendants to Plaintiff directly and indirectly

21                          have been raised, fixed, maintained and stabilized at artificially high

22                          and noncompetitive levels throughout the United States; and

23                     c.   Plaintiff has been deprived of the benefit of free and open competition

24                          in the purchase of CRT Products.

25                     d.   As  a  direct  and  proximate  result  of  the  unlawful  conduct  of

26                          Defendants, Plaintiff has been injured in its business and property in

27                          that it paid more for CRT Products than it otherwise would have paid

28                          in the absence of the unlawful conduct of Defendants.

1

**VII.    PLAINTIFF'S INJURIES**

2      218.    As a purchaser of computer monitors, TVs and other devices that

3   contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

4   result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

5   competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing

6   Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

7      219.    Plaintiff also purchased CRT Products containing CRTs from OEMs as

8   well as others, which in turn purchased CRTs from Defendants and their co-conspirators.

9   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

10   OEMs and others, which paid higher prices for CRTs than they would have absent the

11   conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

12      220.    The OEMs and others passed on to their customers, including Plaintiff, the

13   overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers

14   the overcharges caused by Defendants' conspiracy.   Thus, Plaintiff suffered injury when it

15   purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

16      221.    Once a CRT leaves its place of manufacture, it remains essentially

17   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

18   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

19   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

20   Plaintiff.

21      222.    The market for CRTs and the market for CRT Products are inextricably

22   linked and cannot be considered separately.   Defendants are well aware of this intimate

23   relationship.

24      223.    Throughout the Relevant Period, Defendants controlled the market for

25   CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

26   CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

27   Defendants' conspiracy.

28

224.     As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.    FRAUDULENT CONCEALMENT

225.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

226.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

227.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

228.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

229.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

1    various means and methods, including, but not limited to, secret meetings, surreptitious

2    communications between Defendants by the use of the telephone or in-person meetings in order

3    to prevent the existence of written records, discussion on how to evade antitrust laws and

4    concealing the existence and nature of their competitor pricing discussions from non-

5    conspirators (including customers).

6         230.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT

7    meetings at separate venues in order to avoid detection.  Participants at glass meetings were also

8    told not to take minutes.  Attending companies also reduced the number of their respective

9    attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

10   nature of their agreement.  During these meetings, top executives and other officials attending

11   these meetings were instructed on more than once occasion not to disclose the fact of these

12   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

13   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

14   arrivals and departures at such meetings to avoid being seen in public with each other and with

15   the express purpose and effect of keeping them secret.

16        231.    Defendants also agreed at glass meetings and bilateral meetings to give

17   pretextual reasons for price increases and output reductions to their customers.

18        232.    As alleged above, in early 1999, despite declining production costs and the

19   rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The

20   price increase was allegedly based on increasing global demand for the products.  In fact, this

21   price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the

22   time.

23        233.    As alleged above, despite increased competition from flat panel monitors,

24   prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

25   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

26   This was a pretext used to cover up the conspiracy.

27        234.    In addition, when several CRT manufacturers, including Defendants

28   Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

blamed on a shortage of glass shells use for manufacturing CRT monitors.   In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

235.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

236.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

238.    As discussed at length in Paragraphs 177-196 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.   Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

240.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during

1    the pendency of the Direct Purchaser Class actions asserted against Defendants, and

2    commencing on at least November 26, 2007.

3    **XI.**    **CLAIM FOR VIOLATIONS**

4    **First Claim for Relief**

5    **(Violation of Section 1 of the Sherman Act)**

6    241.    Plaintiff incorporates by reference all the above allegations as if fully set

7    forth herein.

8    242.    Beginning no later than March 1, 1995, the exact date being unknown to

9    Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

10    conspirators entered into a continuing contract, combination or conspiracy to unreasonably

11    restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

12    artificially reducing or eliminating competition in the United States.

13    243.    In particular, Defendants and their co-conspirators combined and

14    conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

15    244.    As a result of Defendants' unlawful conduct, prices for CRTs were raised,

16    fixed, maintained and stabilized in the United States.

17    245.    The contract, combination or conspiracy among Defendants consisted of a

18    continuing agreement, understanding, and concerted action among Defendants and their co-

19    conspirators.

20    246.    For purposes of formulating and effectuating their contract, combination

21    or conspiracy, Defendants and their co-conspirators did those things they contracted, combined,

22    or conspired to do, including:

23          a.   participating in meetings and conversations to discuss the prices and

24             supply of CRTs;

25          b.   communicating in writing and orally to fix target prices, floor prices

26             and price ranges for CRTs;

27

28

1       c.  agreeing to manipulate prices and supply of CRTs sold in the United

2            States in a manner that deprived direct purchasers of free and open

3            competition;

4       d.  issuing price announcements and price quotations in accordance

5            with the agreements reached;

6       e.  selling CRTs to customers in the United States at noncompetitive

7            prices;

8       f.  exchanging competitively sensitive information in order to facilitate

9            their conspiracy;

10       g.  agreeing to maintain or lower production capacity; and

11       h.  providing false statements to the public to explain increased prices

12            for CRTs.

13       247.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its

14 business and property in that it paid more for CRT Products than it otherwise would have paid in

15 the absence of Defendants' unlawful conduct.

16                         **Second Claim for Relief**

17       **(Violation of Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*)**

18       248.   Plaintiff incorporates and realleges, as though fully set forth herein, each

19 and every allegation set forth in the preceding paragraphs of this Complaint.

20       249.   Tweeter was a corporation organized and existing under the laws of the

21 State of Massachusetts and during the Relevant Period, conducted a substantial volume of

22 business in Massachusetts.  In particular, Tweeter purchased CRT Products from Defendants and

23 their co-conspirators in Massachusetts; maintained warehouses in Massachusetts containing CRT

24 Products manufactured and sold by Defendants and co-conspirators; and maintained agents and

25 representatives in Massachusetts who sold CRT Products to consumers in Massachusetts and

26 elsewhere.  As a result of its presence in Massachusetts and the substantial business it conducted

27 in Massachusetts, Plaintiff is entitled to the protection of the laws of Massachusetts.

28

250.     Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*

251.     The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

252.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

        a.  to fix, raise, maintain and stabilize the price of CRTs;

        b.  to allocate the market for CRTs amongst themselves;

        c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

        d.  to allocate among themselves the production of CRTs.

253.     The combination and conspiracy alleged herein has had, *inter alia,* the following effects:

        a.  price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

        b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

        c.  those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

254.   As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff paid supra-competitive, artificially inflated prices for CRT Products it purchased during the Relevant Period.

*255.*   By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*:

    a.   Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

    b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

    c.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

    d.   Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

    e.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

    f.   During the Relevant Period, Tweeter purchased CRT Products containing price-fixed CRTs in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

## XI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants engaged in a contract, combination, and conspiracy in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.    Plaintiff shall recover damages sustained by it, as provided by Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.    Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.    Plaintiff shall receive such other or further relief as may be just and proper.

XII.    **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

1

2   Dated:                                  Respectfully Submitted,

3

4                                           _____
                                            PHILIP J. IOVIENO (*Pro Hac Vice*)
                                            ANNE M. NARDACCI (*Pro Hac Vice*)
5                                           LUKE NIKAS (*Pro Hac Vice*)
                                            CHRISTOPHER V. FENLON (*Pro Hac Vice*)
6                                           BOIES, SCHILLER & FLEXNER LLP
                                            10 North Pearl Street, 4th Floor
7                                           Albany, NY 12207
                                            Telephone:  (518) 434-0600
8                                           Facsimile:  (518) 434-0665
                                            Email: piovieno@bsfllp.com
9                                           Email: anardacci@bsfllp.com
                                            Email: lnikas@bsfllp.com
10                                          Email: cfenlon@bsfllp.com

11

12                                          WILLIAM A. ISAACSON (*Pro Hac Vice*)
                                            BOIES, SCHILLER & FLEXNER LLP
13                                          5301 Wisconsin Ave. NW, Suite 800
                                            Washington, DC 20015
14                                          Telephone:  (202) 237-2727
                                            Facsimile:   (202) 237-6131
15                                          Email:  wisaacson@bsfllp.com

16

17                                          *Counsel for Schultze Agency Services, LLC*

18

19

20

21

22

23

24

25

26

27

28

# **<u>EXHIBIT K</u>**

1  Jason C. Murray (CA Bar No. 169806)
2  CROWELL & MORING LLP
   515 South Flower St., 40th Floor
3  Los Angeles, CA 90071
   Telephone:  213-443-5582
4  Facsimile:  213-622-2690
   Email:  jmurray@crowell.com

5  Jerome A. Murphy (*pro hac vice*)
   Astor H.L. Heaven (*pro hac vice*)
6  CROWELL & MORING LLP
   1001 Pennsylvania Avenue, N.W.
7  Washington, D.C. 20004
   Telephone:  202-624-2500
8  Facsimile:  202-628-5116
   E-mail:  jmurphy@crowell.com
9           aheaven@crowell.com

10  *Counsel for Plaintiffs Target Corp.and RadioShack Corp*

11  [Additional counsel listed on signature page]

12           **UNITED STATES DISTRICT COURT**

13      **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

14

15  TARGET CORP.; RADIOSHACK CORP.          Master File No. 3:07-cv-05944-SC

16                      Plaintiffs             MDL No. 1917

17                   v.                        Individual Case No. 3:11-cv-05514

18  CHUNGHWA PICTURE TUBES, LTD.;
    CHUNGHWA PICTURE TUBES
19  (MALAYSIA); IRICO GROUP              **SECOND AMENDED COMPLAINT FOR**
    CORPORATION; IRICO GROUP             **DAMAGES AND INJUNCTIVE RELIEF**
20  ELECTRONICS CO., LTD.; IRICO DISPLAY
    DEVICES CO., LTD.; LG ELECTRONICS,
21  INC.; LG ELECTRONICS USA, INC.; LG   **DEMAND FOR JURY TRIAL**
    ELECTRONICS TAIWAN TAIPEI CO., LTD.;
22  LP DISPLAYS INTERNATIONAL LTD.;
    HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
23  HITACHI AMERICA, LTD.; HITACHI ASIA,
    LTD.; HITACHI ELECTRONIC DEVICES
24  (USA), INC.; SHENZHEN SEG HITACHI
    COLOR DISPLAY DEVICES, LTD.;
25  PANASONIC CORPORATION; PANASONIC
    CORPORATION OF NORTH AMERICA; MT
26  PICTURE DISPLAY CO., LTD.; BEIJING
27

1 | MATSUSHITA COLOR CRT CO., LTD.;
2 | KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
3 | AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
4 | LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
5 | ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
6 | SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
7 | SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
8 | SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
9 | LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
10 | TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
11 | ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
12 | SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
13 | ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
14 | MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

Defendants

Plaintiffs Target Corp. and RadioShack Corp. (hereafter "Plaintiffs") for their Complaint against all Defendants named herein, hereby allege as follows:

I.   **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c)

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

1   electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

2   purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

3        2.      Defendants control the majority of the CRT industry, a multibillion dollar market, which

4   in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually

5   every household in the United States owned at least one product containing CRTs.

6        3.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer

7   preferences for other emerging technologies shrank profits and threatened the sustainability of the

8   industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing

9   in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize

10  the price at which CRTs were sold in the United States.

11       4.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target

12  prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices,

13  production and customer demand; (c) coordinate public statements regarding available capacity and

14  supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-

15  conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to

16  discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at

17  times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key

18  customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and

19  (k) restrict output.

20       5.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at

21  least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-

22  conspirators began to engage in informal group meetings.  By 1997, these group meetings had become

23  more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings

24  during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.

25  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand,

26  Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the

27  highest levels of the respective companies, as well as regional managers and others.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

6.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.      During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.      Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.      This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1    Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair

2    competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their

3    claims under the federal antitrust laws that they form part of the same case or controversy.

4        13.    The activities of Defendants and their co-conspirators, as described herein, involved U.S.

5    import trade or commerce and/or were within the flow of, were intended to, and did have a direct,

6    substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce,

7    as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs'

8    antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected

9    the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or

10   used in each of the states identified herein.

11       14.    This court has jurisdiction over each Defendant named in this action under both Section

12   12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts

13   substantial business in the state of California, and a number of Defendants maintain their headquarters in

14   this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of

15   the laws of the United States and California insofar as they manufactured CRTs and products containing

16   CRTs for sale in the United States and California. Samsung SDI has also admitted that conduct in

17   furtherance of the conspiracy occurred in the Northern District of California.

18       15.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and

19   28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this

20   District, or is otherwise found within this District.  In addition, venue is proper in this District under 28

21   U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in

22   this district.

23   **III.    THE PARTIES**

24       **A.    Plaintiffs**

25           **1.    Target**

26       16.    Plaintiff Target Corporation is a Minnesota corporation with its headquarters in

27   Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and

1   food discount stores throughout the United States, as well as an online retail store, Target.com.  During

2   the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their

3   co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal

4   use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target

5   was injured in its business and property because the prices it paid for such CRTs were artificially

6   inflated by that conspiracy.

7        17.   During the Relevant Period, Target's negotiations for the purchase of CRTs took place in

8   the United States and were controlled by a merchandising department based at the company's

9   headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from

10  Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in

11  Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

12       18.   During the Relevant Period, Target also purchased CRTs at distribution centers located in

13  multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota,

14  New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution

15  centers.

16                          **2.   RadioShack**

17       19.   Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort

18  Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700

19  wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com.

20  During the Relevant Period, RadioShack purchased and then resold from its facilities substantial

21  amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for

22  resale there.  RadioShack also purchased CRTs for internal use during the Relevant Period.  As a result

23  of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and

24  property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

25       20.   During the Relevant Period, all of RadioShack's negotiations for the purchase of CRTs

26  took place in the United States and were controlled by a merchandising department based at the

27  company's Texas headquarters.  In addition, all RadioShack purchase orders for CRTs were issued from

1   Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising

2   department was also responsible for selecting vendors and product lines with respect to CRTs.

3          21.     During the Relevant Period, RadioShack also purchased CRTs at distribution centers

4   located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs

5   shipped to those distribution centers.

6   **B.     The Defendants**

7          **1.     IRICO Entities**

8          22.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal

9   place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent

10  company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of

11  CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either

12  directly or through its subsidiaries or affiliates, throughout the United States.

13         23.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its

14  principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is

15  owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and

16  one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the

17  largest CRT manufacturer in China in terms of production and sales volume, sales revenue and

18  aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or

19  distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

20  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the

21  antitrust violations alleged in this complaint.

22         24.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its

23  principal place of business located at No. 16, Fenghui South Road West, District High-tech

24  Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In

25  2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed,

26  distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

27

United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

25.    Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**2.    LG Electronics Entities**

26.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

27.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

28.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

1   dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

2   alleged in this complaint.

3       29.    Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

4   Electronics."

5          **3.**      **LP Displays**

6       30.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong

7   company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

8   Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a

9   50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became

10  an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and

11  computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP

12  Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company

13  and the shares would be owned by financial institutions and private equity firms.  During the Relevant

14  Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its

15  subsidiaries or affiliates, throughout the United States.

16         **4.**      **Hitachi Entities**

17      31.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6,

18  Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the

19  Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.

20  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either

21  directly or through its subsidiaries or affiliates, throughout the United States.

22      32.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its

23  principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi

24  Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.

25  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with

26  the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.

27  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs,

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

33.   Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

34.   Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

35.   Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

36.   Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

1    Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

2    investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi

3    corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period,

4    Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

6    dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

7    violations alleged in this complaint.

8         37.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and

9    Hitachi Shenzhen are collectively referred to herein as "Hitachi."

10                        **5.    Panasonic Entities**

11        38.    Defendant Panasonic Corporation, which was at all times during the Relevant Period

12   known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1,

13   2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During

14   the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs,

15   either directly or through its subsidiaries or affiliates, throughout the United States.

16        39.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation

17   with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA

18   is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant

19   Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

20   subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and

21   controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this

22   complaint.

23        40.    Defendants Panasonic Corporation and PCNA are collectively referred to herein as

24   "Panasonic."

25        41.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co.,

26   Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.

27   In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called

1   Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the

2   majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining

3   35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned

4   subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant

5   Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its

6   subsidiaries or affiliates, throughout the United States.

7          42.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company

8   with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District,

9   Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The

10  other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import &

11  Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the

12  Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC

13  was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest

14  producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured,

15  marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

16  throughout the United States.

17              **6.     Philips Entities**

18         43.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal

19  Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX

20  Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics

21  companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of

22  its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint

23  venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a

24  result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book

25  value of 126 million Euros of its investment and said it would not inject further capital into the venture.

26  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either

27  directly or through its subsidiaries or affiliates, throughout the United States.

1   44.    Defendant Philips Electronics North America Corporation ("Philips America") is a

2   Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New

3   York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of

4   Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold

5   and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

6   States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

7   America relating to the antitrust violations alleged in this complaint.

8   45.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

9   Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang

10  District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the

11  Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly

12  or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips

13  dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust

14  violations alleged in this complaint.

15  46.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

16  Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar

17  (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled

18  subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured,

19  marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

20  throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies

21  and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

22  47.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

23  collectively referred to herein as "Philips."

24          **7.    Samsung Entities**

25  48.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its

26  principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-

27  gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant

1    Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its

2    subsidiaries or affiliates, throughout the United States.

3        49.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with

4    its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey

5    07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant

6    Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

7    subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

8    finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

9    complaint.

10       50.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung

11   SDI") is a South Korean company with its principal place of business located at 575 Shin-dong,

12   Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder

13   holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading

14   company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

15   2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

16   producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

17   SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

18   affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

19   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

20       51.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

21   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

22   California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

23   Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

24   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

25   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

26   Samsung SDI America relating to the antitrust violations alleged in this complaint.

27

52.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

54.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

55.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

56. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

57. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8. Samtel

58. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9. Thai CRT

59. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

## 10. Toshiba Entities

60.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

61.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

62.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

63.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

1    CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

2    TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust

3    violations alleged in this complaint.

4            64.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

5    corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-

6    1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

7    During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly

8    or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

9    controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this

10   complaint.

11           65.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to

12   herein as "Toshiba."

13                   **11.     Chunghwa Entities**

14           66.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company

15   with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was

16   established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs

17   received certification by the United States, giving the company entry into that market.  Throughout the

18   Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant

19   Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its

20   subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

21           67.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a

22   Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu

23   Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary

24   of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of

25   the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia

26   manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates

27

1   throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies

2   and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

3        68.    Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

4   "Chunghwa."

5            **12.    Thomson Entities**

6        69.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation

7   with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

8   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a

9   major manufacturer of CRTs for the United States market, with plants located in the United States,

10  Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing

11  division, which had plants in the United States and Mexico, and to other television manufacturers in the

12  United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT

13  manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the

14  RCA brand.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the

15  Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRTs, either directly or

16  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

17       70.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

18  ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at

19  10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-

20  owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs

21  for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and

22  Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer

23  Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in

24  the United States and Mexico, and to other television manufacturers in the United States and elsewhere.

25  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA

26  brand.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold

27

1    and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers

2    throughout the United States.

3        71.    Thomson SA and Thomson Consumer Electronics are collectively referred to herein as

4    "Thomson."

5            **13.    Mitsubishi Entities**

6        72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese

7    corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi

8    Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and

9    Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and

10   monitor manufacturing division and to other television and monitor manufacturers in the U.S. and

11   elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT

12   manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and

13   distributed CRTs in the United States.

14       73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a

15   United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric

16   USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured

17   CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.

18   Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division

19   and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television

20   and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

21   Mitsubishi Electric USA manufactured, marketed, sold and distributed CRTs in the United States.

22       74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United

23   States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi Digital is a

24   wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital

25   manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United

26   States.

27

1    75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

2  collectively referred to herein as "Mitsubishi."

3  **IV.    AGENTS AND CO-CONSPIRATORS**

4    76.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done

5  by their officers, agents, employees, or representatives, while actively engaged in the management and

6  operation of Defendants' businesses or affairs.

7    77.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants

8  with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each

9  Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs

10  made by its parent company.

11    78.    Various persons and/or firms not named as Defendants in this Complaint participated as

12  co-conspirators in the violations alleged herein and may have performed acts and made statements in

13  furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not

14  limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme,

15  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia,

16  Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right

17  to name some or all of these and other co-conspirators as Defendants at a later date.

18    79.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of

19  CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately

20  85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and

21  manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France,

22  Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly

23  owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo

24  Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The

25  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint

26  venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of

27  approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business

1    in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

2    marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates,

3    throughout the United States.

4         80.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

5         81.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a

6    Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan

7    Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-

8    owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation

9    transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with

10   Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

11   as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period,

12   Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

13   its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated

14   and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

15   violations alleged in this complaint.

16        82.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

17   by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of

18   business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3

19   million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

20   Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the

21   Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

22   through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

23   controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

24   complaint.

25        83.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

26   principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

27   Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

22

2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

84.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

85.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

86.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

87.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce and caused antitrust injuries in Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, and Wisconsin.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

88.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor

produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

89.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

90.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

91.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

92.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

93.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

94.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets. The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

95.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

96.     Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

97.     Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.      Structure of the CRT Industry**

98.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.      Market Concentration

99.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.      Information Sharing

100.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was

facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

101.    Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

102.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

103.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104.    Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

    i.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    ii.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

    iii.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

iv.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.    In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.    Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.    Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

105.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers

to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

106.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Market

107.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT market is a mature one, where there is greater motivation to collude.

108.    Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

109.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

110.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

111.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

112.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

### 7.     Homogeneity of CRTs

113.     CRTs are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

114.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.     Pre-Conspiracy Market

115.     The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116.     In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.     Defendants' and Co-Conspirators' Illegal Agreements

117.     In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

118.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

29

1    increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

2    South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

3        119.    Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also attended

4    several ad hoc group meetings during this period.  The participants at these group meetings also

5    discussed increasing prices for CRTs.

6        120.    As more manufacturers formally entered the conspiracy, group meetings became more

7    prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a

8    formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

9    attended hundreds of these meetings during the Relevant Period.

10       121.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

11   Defendants charged for CRTs.

12           **1.    "Glass Meetings"**

13       122.    The group meetings among the participants in the CRT price-fixing conspiracy were

14   referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general

15   levels of Defendants' corporations.

16       123.    The first level meetings were attended by high level company executives including

17   CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less

18   frequently, typically quarterly, and were focused on longer term agreements and forcing compliance

19   with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable

20   information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve

21   disputes because they were decision makers who could make agreements.

22       124.    The second level meetings were attended by Defendants' high level sales managers and

23   were known as "management" meetings.  These meetings occurred more frequently, typically monthly,

24   and handled implementation of the agreements made at top meetings.

25       125.    Finally, the third level meetings were known as "working level" meetings and were

26   attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly

27   or monthly basis and were mostly limited to the exchange of information and discussing pricing since

the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) IRICO, and Thomson.

128.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

129.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

130.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

131.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1    coming months.  The participants also updated the information they had provided in the previous

2    meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a

3    white board.  The meeting participants then used this information to discuss and agree upon what price

4    each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed

5    upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also

6    discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target

7    prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the

8    participants would also discuss and agree upon production cutbacks.

9            132.    During periods of oversupply, the focus of the meeting participants turned to making

10   controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

11           133.    Defendants' conspiracy included agreements on the prices at which certain Defendants

12   would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such

13   as televisions and computer monitors.  Defendants realized the importance of keeping the internal

14   pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other

15   OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for

16   CRTs.

17           134.    Each of the participants in these meetings knew, and in fact discussed, the significant

18   impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like

19   CRTs themselves, the market for CRTs was a mature one.  Defendants therefore concluded that in order

20   to make their CRT price increases stick, they needed to make the increase high enough that their direct

21   customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their

22   customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect

23   purchasers of CRTs.

24           135.    The agreements reached at the glass meetings included:

25                   i.      agreements on CRT prices, including establishing target prices, "bottom" prices,

26                           price ranges and price guidelines;

27

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

ii. placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

iii. agreements on pricing for intra-company CRT sales to vertically integrated customers;

iv. agreements as to what to tell customers about the reason for a price increase;

v. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

vii. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

viii. agreements to coordinate uniform public statements regarding available capacity and supply;

ix. agreements to allocate both overall market shares and share of a particular customer's purchases;

x. agreements to allocate customers;

xi. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xii. agreements to keep their meetings secret.

136. Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

137. As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**Case No. CV 11-05514**

became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    Bilateral Discussions

138.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

139.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

140.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

141.    To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRTs. North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained, and stabilized at supracompetitive levels.

142.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

143.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.

### 3.     Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

144.     Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

145.     Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

146.     Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-05514

from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

147.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

148.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

149.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

150.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-05514

discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

151.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

152.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

153.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

154.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

155.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**Case No. CV 11-05514**

and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

156.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

157.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

158.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

159.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

160.     Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

161.     Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.     Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

163.     Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

164.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

165.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

166.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

E.    **The CRT Market During the Conspiracy**

167.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

40

168.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

169.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

170.    Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

171.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

172.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on

---

[1]    Estimated market value of CRT units sold.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

173.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

174.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

175.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

176.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

177.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

178.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.

1    As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was

2    quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become

3    stable."

4         179.    During the Relevant Period, there were not only periods of unnatural and sustained price

5    stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite

6    the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new,

7    potentially superior and clearly more popular, substitutable technology.

8         180.    These price increases and price stability in the market for CRTs during the Relevant

9    Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused

10   by a new, substitutable technology.

11        F.    **International Government Antitrust Investigations**

12        181.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

13   investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)
> initiated a competition supervision proceeding against the following
> undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,
> Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips
> Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes
> (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo
> Electronics Global HQ, Daewoo Electronics European HQ, MT Picture
> Display Germany GmbH, Matsushita Global HQ, Matsushita European
> HQ.
>
> Based on the data available the undertakings mentioned above concerted
> their practice regarding the manufacturing and distribution of cathode-ray
> tubes (including coloured pictures tubes and coloured screen tubes) on the
> European market between 1995 and 2007. The anti-competitive behaviour
> may have concerned the exchange of sensitive market information (about
> prices, volumes sold, demand and the extent to which capacities were
> exploited), price-fixing, the allocation of market shares, consumers and
> volumes to be sold, the limitation of output and coordination concerning
> the production. The undertakings evolved a structural system and
> functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination
> of European and Asian undertakings regarding to the European market
> also included Hungary from 1995 to 2007. The coordination concerning
> the Hungarian market allegedly formed part of the European coordination.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

182.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

186.     On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in furtherance of this conspiracy were carried out within the Northern District of California.  The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

187.     On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1   companies doing business in Europe."  The press release accompanying the fines further notes that the

2   CRT cartels were "among the most organised cartels that the Commission has investigated."

3       188.    As outlined above, Defendants have a history of competitor contacts resulting from joint

4   ventures, numerous cross-licensing agreements, and other alliances in related businesses in the

5   electronics industry.

6       189.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.

7   For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October

8   2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

9       190.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.

10  Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access

11  Memory ("SRAM") and NAND Flash Memory.

12      191.    In December 2006, government authorities in Japan, Korea, the European Union and the

13  United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related

14  TFT-LCD market.

15      192.    On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa,

16  as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co.,

17  Ltd.—were all under investigation for price fixing TFT-LCDs.

18      193.    On November 12, 2008, the DOJ announced that it had reached agreements with three

19  TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.),

20  Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15

21  U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of

22  TFT-LCD Products.

23      194.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant

24  Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the

25  Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of

26  TFT-LCD Products.

27

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

1    195.   The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state

2    that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in

3    California.

4        **G.**     **The Role of Trade Associations During the Relevant Period**

5        196.   Defendants' collusive activities have been furthered by trade associations and trade

6    events that provided opportunities to conspire and share information.  One example is the Korea Display

7    Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the

8    Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization

9    representing about 80 member companies in the Korean display industry, including manufacturers and

10   suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display

11   Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with

12   foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with

13   the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

14   Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

15       197.   Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have

16   participated extensively in the KDCs.

17       198.   The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002;

18   June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005;

19   July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT

20   operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han,

21   Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.

22   Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

23       199.   Other opportunities to collude among Defendants were provided by events sponsored by

24   the Society for Information Display, such as the annual Asian Symposiums on Information Display, the

25   annual International Display Manufacturing Conference and Exhibition (the most recent one of which

26   was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each

27

August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

200.   Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

H.   **Effects of Defendants' Antitrust Violations**

1.   **Examples of Reductions in Manufacturing Capacity by Defendants**

201.   As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

202.   In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

203.   In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

204.   In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

205.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

206.   In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

### 2.      Examples of Collusive Pricing for CRTs

207.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

208.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

209.     In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

210.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

211.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to
> survive in his tough environment and also to prepare for the coming years.
> This means that we have to deviate from the traditional approach of the
> simple scale up of production volume.

212.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

213.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

214.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

215.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

216.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.    <u>Summary Of Effects Of The Conspiracy Involving CRTs</u>**

217.    The above combination and conspiracy has had the following effects, among others:

a.      Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.      Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.      Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

d.      As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs

50

1    than they otherwise would have paid in the absence of the unlawful conduct of

2    Defendants.

3    **VII.   PLAINTIFFS' INJURIES**

4    218.   As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably

5    foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at

6    supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing

7    Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

8    219.   Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased

9    CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially

10   inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than

11   they would have absent the conspiracy.

12   220.   The OEMs and others passed on to their customers, including Plaintiffs, the overcharges

13   caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges

14   caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs

15   containing such price-fixed CRTs from the OEMs and others.

16   221.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves

17   through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form

18   or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from

19   Defendants through manufacturers of CRTs sold to Plaintiffs.

20   222.   The market for CRTs and the market for products containing CRTs are inextricably

21   linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

22   223.   Throughout the Relevant Period, Defendants controlled the market for CRTs.

23   Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from

24   Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants'

25   conspiracy.

26   224.   As a result, Plaintiffs were injured in connection with their purchases of CRTs during the

27   Relevant Period.

VIII.   **FRAUDULENT CONCEALMENT**

225.   Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

226.   Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs.

227.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

228.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

229.   Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

230.   As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take

52

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

1    minutes.  Attending companies also reduced the number of their respective attendees to maintain

2    secrecy.

3           231.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons

4    for price increases and output reductions to their customers.

5           232.    As alleged above, in early 1999, despite declining production costs and the rapid entry of

6    flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was

7    allegedly based on increasing global demand for the products.  In fact, this price rise was the result of

8    collusive conduct amongst Defendants, which was undisclosed at the time.

9           233.    As alleged above, despite increased competition from flat panel monitors, prices for CRT

10   monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was

11   purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used

12   to cover up the conspiracy.

13          234.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips

14   and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of

15   glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General

16   Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global

17   phenomena and every company has to increase the prices of CRT monitors in due course of time."

18          235.    Manufacturers such as LG Electronics periodically issued press statements falsely

19   asserting that CRT prices were being driven lower by intense competition.

20          236.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported

21   reasons for the price increases of CRTs were materially false and misleading and made for the purpose

22   of concealing Defendants' anti-competitive scheme as alleged herein.

23          237.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any

24   statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the

25   anticompetitive conduct alleged in this complaint.

26

27

IX.   *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL
TOLLING

238.   As discussed at length in paragraphs 181-195 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present.  Plaintiffs' direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Plaintiffs opted out on November 14, 2011.

240.   Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes Ltd., et al.*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

X.   CLAIM FOR VIOLATIONS

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

241.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

242.   Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

243.   In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

244.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

245.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

246.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

        b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

        c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

        d.    issuing price announcements and price quotations in accordance with the agreements reached;

        e.    selling CRTs to customers in the United States at noncompetitive prices;

        f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

        g.    agreeing to maintain or lower production capacity; and

        h.    providing false statements to the public to explain increased prices for CRTs.

247.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### Second Claim for Relief

### (Violation of the California Cartwright Act)

248.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

249.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

250.    In addition, Defendants Mitsubishi, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

251.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

252.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

253.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.      to fix, raise, maintain and stabilize the price of CRTs;

56

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

b.      to allocate markets for CRTs amongst themselves;

c.      to submit rigged bids for the award and performance of certain CRTs contracts;
and

d.      to allocate among themselves the production of CRTs.

254.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.      price competition in the sale of CRTs has been restrained, suppressed and/or
eliminated in the State of California;

b.      prices for CRTs sold by Defendants, their co-conspirators, and others have been
fixed, raised, maintained and stabilized at artificially high, non-competitive levels
in the State of California; and

c.      those who purchased CRTs from Defendants, their co-conspirators, and others
and CRTs containing price-fixed CRTs from Defendants, their co-conspirators,
and others have been deprived of the benefit of free and open competition.

255.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive,
artificially inflated prices for the CRTs they purchased during the Relevant Period.

256.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in
their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants,
their co-conspirators and others than they would have paid in the absence of Defendants' combination
and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and
Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable
attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

257.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
allegation set forth in the preceding paragraphs of this Complaint.

258.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1,
1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1   their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and

2   commerce described above in violation of the state antitrust and unfair competition laws referenced

3   below.  Defendants and their co-conspirators have each acted in violation of these state laws in their

4   efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive

5   levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

6          259.   The aforesaid violations consisted, without limitation, of a continuing unlawful trust and

7   concert of action among Defendants and their co-conspirators, the substantial terms of which were to

8   fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

9          260.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-

10  conspirators have done those things which they combined and conspired to do, including but in no way

11  limited to the acts, practices and course of conduct set forth above and the following:

12          a.      to fix, raise, maintain and stabilize the price of CRTs;

13          b.      to allocate markets for CRTs amongst themselves;

14          c.      to submit rigged bids for the award and performance of certain CRTs contracts;

15                  and

16          d.      to allocate among themselves the production of CRTs.

17         261.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

18          a.      price competition in the sale of CRTs has been restrained, suppressed, and/or

19                  eliminated in the states listed below;

20          b.      prices for CRTs sold by Defendants, their co-conspirators, and others have been

21                  fixed, raised, maintained and stabilized at artificially high, non-competitive levels

22                  in the states listed below; and

23          c.      those who purchased CRTs from Defendants, their co-conspirators, and others

24                  have been deprived of the benefits of free and open competition.

25         262.   As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid

26  supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

27

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

263.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

      a.    Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

      b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

      c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

      d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

      e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendant Samsung SDI admitted that acts in furtherance of the conspiracy to fix the price of CRTs were carried out in California;

      f.    During the Relevant Period, the following Plaintiffs purchased CRTs in California:  Target and RadioShack.  As a result, each is entitled to the protection of the laws of California; and

      g.    By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that

may have been obtained by Defendants or their co-conspirators as result of such business acts and practices.

264.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised, maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Arizona commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Arizona: Target.  As a result, Target is entitled to the protection of the laws of Arizona; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

265.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

    a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

    b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of

unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.       Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.       Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.       Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

f.       During the Relevant Period, the following Plaintiffs purchased CRTs in Florida: Target.  As a result, Target is entitled to the protection of the laws of Florida.

266.     By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a.       Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.       As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.       During the Relevant Period, the following Plaintiffs purchased CRTs in Illinois: Target.  As a result, Target is entitled to the protection of the laws of Illinois; and

d.       As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators'

1    combination and conspiracy, and is therefore entitled to relief under the Illinois

2    Antitrust Act, 740 Illinois Code 10/1, *et seq*.

3         267.   By reason of the foregoing, Defendants and their co-conspirators also have entered into

4    an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.

5         a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6              eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained

7              and stabilized CRT prices in Iowa at artificially high, non-competitive levels;

8         b.   As a result, Defendants and their co-conspirators' conspiracy substantially

9              affected Iowa commerce;

10        c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa:

11             Target.  As a result, Target is entitled to the protection of the laws of Iowa; and

12        d.   As a direct and proximate result of Defendants' and their co-conspirators'

13             conduct, Target has been injured in its business and property by paying more for

14             CRTs manufactured by Defendants, their co-conspirators, and others than it

15             would have paid in the absence of Defendants and their co-conspirators'

16             combination and conspiracy, and is therefore entitled to relief under Iowa Code

17             §§ 553.1, *et seq*.

18        268.   By reason of the foregoing, Defendants and their co-conspirators also have entered into

19    an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.

20        a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

21             eliminated competition in the sale of CRTs in Kansas and fixed, raised,

22             maintained and stabilized CRT prices in Kansas at artificially high, non-

23             competitive levels;

24        b.   As a result, Defendants and their co-conspirators' conspiracy substantially

25             affected Kansas commerce;

26        c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:

27             Target.  As a result, Target is entitled to the protection of the laws of Kansas; and

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Kansas Stat. Ann. §§ 50-101, *et seq.*

269.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Massachusetts:  RadioShack.  As a result, RadioShack is entitled to the protection of the laws of Massachusetts.

270.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Michigan commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Michigan:  Target.  As a result, Target is entitled to the protection of the laws of Michigan; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

271.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

c.     During the Relevant Period, the following Plaintiffs purchased CRTs in Minnesota:  Target.  As a result, Target is entitled to the protection of the laws of Minnesota; and

d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their coconspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Minnesota Stat. §§ 325D.50, *et seq.*

272.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Mississippi and fixed, raised, maintained and stabilized CRT prices in Mississippi at artificially high, non-competitive levels;

b.     As a result, Defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

c.     During the Relevant Period, the following Plaintiffs purchased CRTs in Mississippi:  RadioShack.  As a result, RadioShack is entitled to the protection of the laws of Mississippi; and

d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, RadioShack has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

273. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected New York commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in New York:  Target.  As a result, Target is entitled to the protection of the laws of New York; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

274. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised, maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

1        c.      During the Relevant Period, the following Plaintiffs purchased CRTs in North

2                 Carolina:  Target.  As a result, Target is entitled to the protection of the laws of

3                 North Carolina; and

4        d.      As a direct and proximate result of Defendants' and their co-conspirators'

5                 conduct, Target has been injured in its business and property by paying more for

6                 CRTs manufactured by Defendants, their co-conspirators, and others than it

7                 would have paid in the absence of Defendants and their co-conspirators'

8                 combination and conspiracy, and is therefore entitled to relief under North

9                 Carolina Gen. Stat. §§ 75-1, *et seq*.

10     275.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

11  an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.

12        a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

13                 eliminated competition in the sale of CRTs in Wisconsin and fixed, raised,

14                 maintained and stabilized CRT prices in Wisconsin at artificially high, non-

15                 competitive levels;

16        b.      As a result, Defendants and their co-conspirators' conspiracy substantially

17                 affected Wisconsin commerce;

18        c.      During the Relevant Period, the following Plaintiffs purchased CRTs in

19                 Wisconsin:  Target.  As a result, Target is entitled to the protection of the laws of

20                 Wisconsin; and

21        d.      As a direct and proximate result of Defendants' and their co-conspirators'

22                 conduct, Target has been injured in its business and property by paying more for

23                 CRTs manufactured by Defendants, their co-conspirators, and others than it

24                 would have paid in the absence of Defendants and their co-conspirators'

25                 combination and conspiracy, and is therefore entitled to relief under Wisconsin

26                 Stat. §§ 133.01, *et seq*.

27

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1
**XI.     PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and

3    decreeing that:

4          A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1

5    of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of

6    Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi,

7    New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as

8    a result of Defendants' violations;

9          B.     Plaintiffs shall recover damages sustained by them, as provided by the federal and state

10   antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants

11   in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

12         C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the

13   respective officers, directors, partners, agents and employees thereof, and all other persons acting or

14   claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and

15   maintaining the combination, conspiracy or agreement alleged herein;

16         D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest

17   shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this

18   action;

19         E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

20   provided by law; and

21         F.     Plaintiffs shall receive such other or further relief as may be just and proper.

22   **XII.    JURY TRIAL DEMAND**

23         Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

24   claims asserted in this Complaint so triable.

25

26

27

1

Dated:                                            Respectfully submitted

2                                                  Jason C. Murray (CA Bar No. 169806)
                                                   CROWELL & MORING LLP
3                                                  515 South Flower St., 40th Floor
                                                   Los Angeles, CA  90071
4                                                  Telephone:  213-443-5582
                                                   Facsimile:  213-622-2690
5                                                  Email: jmurray@crowell.com

6                                                  Jerome A. Murphy (*pro hac vice*)
                                                   Astor H.L. Heaven (*pro hac vice*)
7                                                  CROWELL & MORING LLP
                                                   1001 Pennsylvania Avenue, N.W.
8                                                  Washington, D.C. 20004
                                                   Telephone:  202-624-2500
9                                                  Facsimile:  202-628-5116
                                                   E-mail:  jmurphy@crowell.com
10                                                           aheaven@crowell.com

11                                                 *Counsel for Target Corp.and RadioShack Corp.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**