# **<u>EXHIBIT A</u>**



**EUROPEAN COMMISSION**

**PRESS RELEASE**

Brussels, 5 December 2012

# Antitrust: Commission fines producers of TV and computer monitor tubes € 1.47 billion for two decade-long cartels

The European Commission has fined seven international groups of companies a total of € 1 470 515 000 for participating in either one or both of two distinct cartels in the sector of cathode ray tubes ("CRT"). For almost ten years, between 1996 and 2006, these companies fixed prices, shared markets, allocated customers between themselves and restricted their output. One cartel concerned colour picture tubes used for televisions and the other one colour display tubes used in computer monitors. The cartels operated worldwide. The infringements found by the Commission therefore cover the entire European Economic Area (EEA). Chunghwa, LG Electronics, Philips and Samsung SDI participated in both cartels, while Panasonic, Toshiba, MTPD (currently a Panasonic subsidiary) and Technicolor (formerly Thomson) participated only in the cartel for television tubes. Chunghwa received full immunity from fines under the Commission's 2006 Leniency Notice for the two cartels, as it was the first to reveal their existence to the Commission. Other companies received reductions of their fines for their cooperation in the investigation under the Commission's leniency programme.

Commission Vice President in charge of competition policy Joaquín Almunia said: *"These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behaviour that are strictly forbidden to companies doing business in Europe. Cathode ray tubes were a very important component in the making of television and computer screens. They accounted for 50 to 70% of the price of a screen. This gives an indication of the serious harm this illegal behaviour has caused both to television and computer screen producers in the EEA, and ultimately the harm it caused to the European consumers over the years".*

The two CRT cartels are among the most organised cartels that the Commission has investigated. For almost 10 years, the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information. The cartelists also monitored the implementation, including auditing compliance with the capacity restrictions by plant visits in the case of the computer monitor tubes cartel.

Top management level meetings, dubbed "green(s) meetings" by the cartelists themselves because they were often followed by a golf game, designed the orientations for the two cartels. Preparation and implementation were carried out through lower level meetings, often referred to as "glass meetings", on a quarterly, monthly, sometimes even weekly basis. Meetings were held in various locations in Asia (Taiwan, Korea, Japan, Malaysia, Indonesia, Thailand, Hong Kong, etc.) and Europe (Amsterdam, Budapest, Glasgow, Paris, Rome). The cartels operated worldwide.

Multilateral meetings usually started with a review of demand, production, sales and capacity in the main sales areas, including Europe; then prices were discussed, including for individual customers, i.e. TV and computer manufacturers. They had therefore a direct impact on customers in the European Economic Area (EEA), ultimately harming final consumers. The cartelists were trying to address the decline of the CRT market in a collusive way, to the detriment of consumers. For example, one document recording the cartel discussions spells out clearly: *"producers need to avoid price competition through controlling their production capacity"*.

The investigation also revealed that the companies were well aware they were breaking the law. For instance, in a document found during the Commission's inspections, a warning goes as follows: *"Everybody is requested to keep it as secret as it would be serious damage if it is open to customers or European Commission"*. The participants were therefore taking precautions to avoid being in possession of anticompetitive documents. Some documents spelled out, for example: *"Please dispose the following document after reading it"*.

## Fines

The fines were set on the basis of the [Commission's 2006 Guidelines on fines](#) (see [IP/06/857](#) and [MEMO/06/256](#)).

In setting the level of fines, the Commission took into account the companies' sales of the products concerned in the EEA, the very serious nature of the infringement, its geographic scope, its implementation and its duration. If Chunghwa had not received full immunity, its fines would have been € 8 385 000 for the TV tubes cartel and € 8 594 000 for the computer monitor tubes cartel. Samsung SDI, Philips and Technicolor received reductions of fines ranging from 10 to 40% for their cooperation under the Commission's leniency programme. The reductions reflect the timing of their cooperation and the extent to which the evidence they provided helped the Commission to prove the respective cartels. One of the companies invoked its inability to pay the fine. The Commission assessed this claim under point 35 of the 2006 fines Guidelines and granted a reduction of the fine.

The fines imposed are as follows:

| Name of undertaking | Reduction under the Leniency Notice (%) | Fine for the TV tubes cartel[1] (€) | Fine for the computer monitor tubes cartel[1] (€) | Total fine[1] (€) |
|---|---|---|---|---|
| Chunghwa[2] | 100% | 0 | 0 | 0 |
| Samsung SDI | 40% | 81 424 000 | 69 418 000 | 150 842 000 |
| Philips | 30% | 240 171 000 | 73 185 000 | 313 356 000 |
| LG Electronics | 0% | 179 061 000 | 116 536 000 | 295 597 000 |
| Philips and LG Electronics[2] | 30% (reduction only for Philips) | 322 892 000 | 69 048 000 | 391 940 000 |
| Technicolor | 10% | 38 631 000 | | 38 631 000 |
| Panasonic | 0% | 157 478 000 | | 157 478 000 |
| Toshiba | 0% | 28 048 000 | | 28 048 000 |
| Panasonic, Toshiba and MTPD[2] | 0% | 86 738 000 | | 86 738 000 |
| Panasonic and MTPD[2] | 0% | 7 885 000 | | 7 885 000 |
| **TOTAL** | | 1 142 328 000 | 328 187 000 | **1 470 515 000** |

[1] *Legal entities within the undertaking may be held jointly and severally liable for the whole or part of the fine imposed.*

[2] *Jointly and severally liable for that whole fine imposed.*

## Background

A Cathode Ray Tube ("CRT") is an evacuated glass envelope containing an electron gun and a fluorescent screen. Two distinct types of CRTs are relevant for the cartels sanctioned in today's decisions: (i) colour display tubes (CDT) used in computer monitors and (ii) colour picture tubes (CPT) used for colour televisions. The CRT was gradually replaced by alternative techniques such as LCD and plasma displays.

The Commission's investigation started with unannounced inspections in November 2007 (see MEMO/07/453). A statement of objections was issued in November 2009 (see MEMO/09/525) on which the companies had the opportunity to comment and to be heard. A supplementary statement of objections concerning corporate liability was issued in June 2012 against two companies.

More information on this case will be available under the case number 39437 in the Commission's public case register on the competition website, once confidentiality issues have been dealt with. For more information on the Commission's action against cartels, see its cartels website.

## Action for damages

Any person or firm affected by anti-competitive behaviour as described in this case may bring the matter before the courts of the Member States and seek damages. The case law of the European Court of Justice (ECJ) and the Antitrust Regulation (Council Regulation 1/2003) both confirm that in cases before national courts, a Commission decision is binding proof that the behaviour took place and was illegal. Even though the Commission has fined the companies concerned, damages may be awarded without these being reduced on account of the Commission fine.

The Commission considers that meritorious claims for damages should be aimed at compensating, in a fair way, the victims of an infringement for the harm done. More information on antitrust damages actions, including the public consultation and a citizens' summary, is available at:

http://ec.europa.eu/comm/competition/antitrust/actionsdamages/documents.html

---

Contacts :
Antoine Colombani  (+32 2 297 45 13)
Marisa Gonzalez Iglesias  (+32 2 295 19 25)

---

# **<u>EXHIBIT B</u>**



ANNUAL REPORT **2011**
including the Annual Financial Report

ANNUAL REPORT 2011 ......................................................... 1

## 1 PRESENTATION OF THE GROUP AND ITS ACTIVITIES ........................................ 5

1.1 Selected Financial Data ................................................. 6
1.2 History and Strategy of the Company .................... 9
1.3 Business Overview .......................................................13

## 2 OPERATING AND FINANCIAL REVIEW AND PROSPECTS ...................................... 21

2.1 Overview ............................................................................ 22
2.2 Trends in the Media & Entertainment industry ........... 22
2.3 Summary of results ........................................................ 23
2.4 Seasonality ....................................................................... 24
2.5 Geographic breakdown of revenues & Effect of exchange rate fluctuations ........................................................ 24
2.6 Events subsequent to December 31, 2011 ................ 25
2.7 Notification of interests acquired in the share capital of French companies in 2011 ................................ 26
2.8 Notification of interests acquired in the share capital of French companies in 2010 ................................ 26
2.9 Results of operations for 2011 and 2010 ................. 26
2.10 Liquidity and capital resources ................................ 33
2.11 Priorities and objectives for 2012 ............................41

## 3 RISK FACTORS ........................................ 43

3.1 Risk related to the debt restructuring ......................44
3.2 Market Risk .......................................................................46
3.3 Risks related to the business ...................................... 47
3.4 Other risks ........................................................................ 53
3.5 Insurance .......................................................................... 55

## 4 CORPORATE GOVERNANCE AND INTERNAL CONTROL PROCEDURES ................ 57

4.1 Board of Directors ..........................................................58
4.2 Chairman's report on corporate governance, internal control and risk management ................................64
4.3 Statutory Auditors' report on the Chairman's report on internal control procedures ........................... 76
4.4 Compensation and benefits of Directors .................77
4.5 Executive Committee ....................................................84

## 5 TECHNICOLOR AND ITS SHAREHOLDERS .................... 87

5.1 Share capital ....................................................................88
5.2 Listing information .........................................................95

## 6 SOCIAL INFORMATION AND SUSTAINABILITY ........... 97

6.1 Employees and workforce ...........................................98
6.2 Environmental matters ...............................................107
6.3 Technicolor Foundation for Cinema Heritage .......117

## 7 ADDITIONAL INFORMATION ........................................... 119

7.1 Property, Plant and Equipment ................................120
7.2 Memorandum and bylaws ......................................... 124
7.3 Material contracts ........................................................ 125
7.4 Additional tax information ........................................ 126
7.5 Organization of the Group ....................................... 127
7.6 Documents on display .................................................130
7.7 Information on accounting services .........................130
7.8 Accounting fees and services ....................................131
7.9 Persons responsible for the Registration Document and the Annual Financial Report ............................... 132

## 8 FINANCIAL STATEMENTS ................................................. 133

8.1 Technicolor 2011 consolidated financial statements ........................134
8.2 Notes to the consolidated financial statements .................................... 141
8.3 Statutory Auditors' report on the Consolidated Financial Statements ........................................................... 231
8.4 Technicolor sa parent company financial statements .................................233
8.5 Notes to the Parent Company Financial Statements ...... 236
8.6 Parent company financial data over the five last years (under article R.225-102 of the French Commercial code) ...........257
8.7 Statutory auditors' report on the financial statements for the year ended December 31, 2011 .................................. 258
8.8 Statutory Auditor's Special report on regulated agreements and commitments ...........................................260

## 9 REGISTRATION DOCUMENT CROSS REFERENCE TABLE ................................................................ 261



*Société anonyme* with a share capital of €223,759,083
Registered Office: 1-5, rue Jeanne d'Arc
92130 Issy-Les-Moulineaux
Nanterre Register of Commerce and companies No. 333 773 174

# ANNUAL REPORT **2011**



This Registration document *(Document de Référence)* was filed with the *Autorité des Marchés Financiers* (AMF) on March 27, 2012 in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note *(note d'opération)* approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

This registration document can be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA, Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson/Technicolor sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC should render its decision in 2012, but the Company considers that the timetable for the remainder of this proceeding cannot be accurately determined.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998.

In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway.

It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, TCETVT has incurred approximately U.S.$11 million in remediation costs. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$6.3 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate.

In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

# **EXHIBIT C**

1   David J. Burman (admitted *pro hac vice*)
    DBurman@perkinscoie.com
2   Cori G. Moore (admitted *pro hac vice*)
    CGMoore@perkinscoie.com
3   Eric J. Weiss (admitted *pro hac vice*)
    EWeiss@perkinscoie.com
4   Nicholas H. Hesterberg (admitted *pro hac vice*)
    NHesterberg@perkinscoie.com
5   **PERKINS COIE LLP**
    1201 Third Avenue, Suite 4900
6   Seattle, WA  98101-3099
    Telephone:  206.359.8000
7   Facsimile:  206.359.9000

8   Joren S. Bass, Bar No. 208143
    JBass@perkinscoie.com
9   **PERKINS COIE LLP**
    Four Embarcadero Center, Suite 2400
10  San Francisco, CA  94111-4131
    Telephone:  415.344.7120
11  Facsimilie:  415.344.7320

12  Attorneys for Plaintiff
    COSTCO WHOLESALE CORPORATION

13

14              ~~UNITED STATES DISTRICT COURT~~

15              ~~WESTERN DISTRICT OF WASHINGTON~~

16      ~~AT SEATTLE~~ UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18

19  COSTCO WHOLESALE CORPORATION,          Master File No. 3:07-cv-05944-SC

20              Plaintiff,                 MDL No. 1917

21      v.                                 Individual Case No. 3:11-cv-06397

22  HITACHI, LTD.; HITACHI DISPLAYS, LTD.;  FIRST AMENDED COMPLAINT
    HITACHI AMERICA, LTD.; HITACHI ASIA,    AND JURY DEMAND
23  LTD.; HITACHI ELECTRONIC DEVICES
    (USA), INC.; SHENZHEN SEG HITACHI
24  COLOR DISPLAY DEVICES, LTD.; IRICO
    GROUP CORPORATION; IRICO GROUP
25  ELECTRONICS CO., LTD.; IRICO DISPLAY
    DEVICES CO., LTD.; LG ELECTRONICS,
26  INC.; LG ELECTRONICS USA, INC.; LG
    ELECTRONICS TAIWAN TAIPEI CO., LTD.;
27  LP DISPLAYS INTERNATIONAL LTD.;
    BEIJING MATSUSHITA COLOR CRT CO.,
28  LTD.; KONINKLIJKE PHILIPS

1  ELECTRONICS N.V.; PHILIPS
   ELECTRONICS NORTH AMERICA
2  CORPORATION; PHILIPS ELECTRONICS
   INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
3  AMAZONIA INDUSTRIA ELECTRONICA
   LTDA.; SAMSUNG ELECTRONICS CO.,
4  LTD.; SAMSUNG ELECTRONICS AMERICA,
   INC.; SAMSUNG SDI CO., LTD.; SAMSUNG
5  SDI AMERICA, INC.; SAMSUNG SDI
   MEXICO S.A. DE C.V.;  SAMSUNG SDI
6  BRASIL LTDA.; SHENZHEN SAMSUNG SDI
   CO., LTD.; TIANJIN SAMSUNG SDI CO.,
7  LTD.; SAMSUNG SDI (MALAYSIA) SDN.
   BHD.; SAMTEL COLOR LTD.; THAI CRT
8  CO., LTD.; TOSHIBA CORPORATION;
   TOSHIBA AMERICA, INC.; TOSHIBA
9  AMERICA CONSUMER PRODUCTS, LLC;
   TOSHIBA AMERICA ELECTRONIC
10 COMPONENTS, INC.; TOSHIBA AMERICA
   INFORMATION SYSTEMS, INC.;
11 CHUNGHWA PICTURE TUBES, LTD.;
   CHUNGHWA PICTURE TUBES
12 (MALAYSIA); TATUNG COMPANY OF
   AMERICA, INC. TECHNICOLOR SA;
13 TECHNICOLOR USA, INC.; MITSUBISHI
   ELECTRIC CORPORATION; MITSUBISHI
14 DIGITAL ELECTRONICS AMERICA, INC.;
   MITSUBISHI ELECTRIC & ELECTRONICS,
15 USA, INC.

16                    Defendants.

17

18         Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive

19 relief under the antitrust laws of the United States and of the states of California, Arizona,

20 Florida, Illinois, and Washington.  Costco alleges as follows based on information including the

21 pleas and prosecutions of certain Defendants and their executives as well as allegations in the

22 complaints of the direct and indirect purchaser classes and of other direct action plaintiffs,

23 allegations that were in some cases tested by motions to dismiss in MDL No. 1917.

24                              **INTRODUCTION**

25         1.      Defendants and their co-conspirators formed an international cartel that conducted a

26 conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the

27 "Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or

28

                                        2

maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs").  The effects of the conspiracy on prices lasted into at least 2008.

2.       Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them are referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.       Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.  The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.       Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.       Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

3

6.      The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings and communications during the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from the highest levels of the companies, as well as regional managers and others.

7.      The conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      Throughout the Relevant Period, the conspiracy moderated the normal downward pressure on prices caused by periods of oversupply, process and other efficiency gains, and technological change.  The prices of producers who were not members of the conspiracy were also higher as a result of the conspiracy than they otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when prices declined, they declined from supra-competitive levels, rather than levels set by free and open competition, and prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any source than it would have paid in a competitive market.

10.      During the Relevant Period, Costco purchased CRT Products in the United States directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

4

1

**PARTIES**

2

**A.      Plaintiff**

3        11.      Plaintiff Costco Wholesale Corporation is now a Washington corporation with its

4    principal place of business in Issaquah, Washington.  Costco operates throughout the United

5    States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

6        12.      Costco Wholesale Corporation is the result of the combination of two companies:

7    Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to

8    76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in

9    Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993,

10   Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware.

11   As the new name suggested, the two companies were not fully integrated for many years, and the

12   company had two principal executive offices, in San Diego, California, and Kirkland,

13   Washington.  Many headquarters functions continued in California during the Relevant Period.

14   In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in

15   Washington.

16       13.      During the Relevant Period, Costco purchased in the United States large numbers

17   of CRT Products whose prices were inflated by the conspiracy.  Costco purchased and sold more

18   such CRT Products in California than in any other state during the Relevant Period.  Costco's

19   negotiations for the purchase of CRT Products took place primarily in the United States, and the

20   basic choice of vendors was made from the company's headquarters.  Decisions among approved

21   vendors and as to volumes to purchase were made in, and Costco purchase orders were created in

22   and issued from, regional offices located in multiple states including California, Washington,

23   Texas, Virginia, and Georgia.  Costco issued more purchase orders for CRT Products from

24   California than from any other state.  The purchase orders reflected the volumes affected by and

25   incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to

26   Costco in Washington, with the invoices reflecting volumes and prices specified in purchase

27   orders issued from the regional offices.

28

5

14.     Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida.  Costco received far more CRT Products in California than in any other state.

15.     Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16.     Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business.  There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations.  Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B.     Defendants**

**1.     Hitachi Entities**

17.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi,

6

1   Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant

2   Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either

3   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi,

4   Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to

5   the antitrust violations alleged in this complaint.

6        19.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

7   with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.

8   Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During

9   the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT

10  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

12  America relating to the antitrust violations alleged in this complaint.

13       20.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

14  principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

15  528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

16  During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT

17  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

19  Asia relating to the antitrust violations alleged in this complaint.

20       21.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

21  corporation with its principal place of business located at 208 Fairforest Way, Greenville, South

22  Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During

23  the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either

24  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi,

25  Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS

26  relating to the antitrust violations alleged in this complaint.

27       22.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

28  Shenzhen") was a Chinese company with its principal place of business located at 5001

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

23. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

**2.    IRICO Entities**

24. Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

25. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. The website also claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this complaint.

8

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

26.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.     Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.     LG Electronics Entities**

28.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

29.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

9

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

**4.     LP Displays**

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     BMCC**

33.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  BMCC is the second

10

1   largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC

2   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

3   subsidiaries or affiliates, throughout the United States.

4   **6.      Philips Entities**

5   34.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics

6   ("Royal Philips") is a Dutch company with its principal place of business located at Breitner

7   Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands.  Royal Philips, founded in 1891,

8   is one of the world's largest electronics companies, with 160,900 employees located in over 60

9   countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

10  Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

11  Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

12  demand and prices for CRT Products, Royal Philips wrote off the remaining book value of

13  126 million Euros of its investment and said it would not inject further capital into the venture.

14  During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT

15  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

16  35.      Defendant Philips Electronics North America Corporation ("Philips America") is a

17  Delaware corporation with its principal place of business located at 1251 Avenue of the

18  Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled

19  subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America

20  manufactured, marketed, sold, and distributed CRT Products, either directly or through its

21  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

22  controlled the finances, policies, and affairs of Philips America relating to the antitrust violations

23  alleged in this complaint.

24  36.      Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

25  Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,

26  Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.

27  During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT

28  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

1   Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips

2   Taiwan relating to the antitrust violations alleged in this complaint.

3         37.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

4   Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

5   andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

6   controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

7   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

8   subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

9   controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations

10  alleged in this complaint.

11        38.     Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are

12  collectively referred to as "Philips."

13        **7.     Samsung Entities**

14        39.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company

15  with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

16  dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.

17  During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products,

18  either directly or through subsidiaries or affiliates, throughout the United States.

19        40.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

20  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

21  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

22  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed

23  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

24  States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung

25  SEAI relating to the antitrust violations alleged in this complaint.

26        41.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

27  ("Samsung SDI") is a South Korean company with its principal place of business located at 575

28  Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a

12

major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

42.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

43.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

44.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

13

1    Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through

2    its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

3    dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

4    antitrust violations alleged in this complaint.

5         45.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

6    Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

7    Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

8    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

9    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

10   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

11   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

12   violations alleged in this complaint.

13        46.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

14   company with its principal place of business located at Developing Zone of Yi-Xian Park,

15   Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

16   subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

17   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

18   subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

19   dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

20   antitrust violations alleged in this complaint.

21        47.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

22   Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

23   Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

24   Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

25   During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

26   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances,

28

14

1    policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

2    complaint.

3         48.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

4    Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI

5    Malaysia and their subsidiaries and affiliates are collectively referred to as "Samsung."

6         **8.      Samtel**

7         42.49.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal

8    place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

9    Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's

10   largest exporter of CRT Products.  Samtel has gained safety approvals from the United States,

11   Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

12   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

13   subsidiaries and affiliates, throughout the United States.

14        **9.      Thai CRT**

15        43.50.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

16   Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

17   Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

18   televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and distributed

19   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

20   States.

21        **10.     Toshiba Entities**

22        44.51.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

23   place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

24   TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

25   monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-

26   defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

27   TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In

28   2002, TC consolidated its CRT business into MTPD, a joint venture with co-conspirator

15

1   Panasonic Corporation.  During the Relevant Period, TC manufactured, marketed, sold, and
2   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
3   United States.

4       45.52.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation
5   with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New
6   York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of
7   Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and
8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
9   United States.  Defendant TC dominated and controlled the finances, policies, and affairs of
10  Toshiba America relating to the antitrust violations alleged in this complaint.

11      46.53.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited
12  liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.
13  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.
14  During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products,
15  either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant
16  TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust
17  violations alleged in this complaint.

18      47.54.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a
19  California corporation with its principal place of business located at 19900 MacArthur Boulevard,
20  Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of
21  Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,
22  marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or
23  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,
24  policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

25      48.55.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California
26  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California
27  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through
28  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and

1    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

2    United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAIS

3    relating to the antitrust violations alleged in this complaint.

4        49.56.  Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively

5    referred to as "Toshiba."

6        **11.    Chunghwa Entities**

7        50.57.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

8    company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

9    Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

10   Chunghwa PT's CRTs received certification by the United States, giving the company entry into

11   that market.  Chunghwa PT's Board of Directors includes representatives from Tatung Company,

12   and its Chairman is also the Chairman and General Manager of Tatung Company.  Throughout

13   the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the

14   Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly

15   or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United

16   States.

17       51.58.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

18   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

19   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

20   owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

21   production, and it has established itself as one of the leading worldwide suppliers of CRTs.

22   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

23   Products either directly or through its subsidiaries or affiliates throughout the United States.

24   Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of

25   Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

26       52.59.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as

27   "Chunghwa."

28

---

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**12. Tatung Company of America, Inc.**

**53. Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold, and distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.**

**12.     Thomson Entities**

60.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

18

61.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

62.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

63.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

64.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.

19

1  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

2  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

3  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

4  and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

5  and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

6  CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

7  marketed, sold and distributed CRT Products in the United States.

8       65.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

9  United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi

10  Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period,

11  Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and

12  monitors in the United States.

13       66.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

14  collectively referred to herein as "Mitsubishi."

15  **C.**     **Agents and Co-Conspirators**

16       ~~54.~~67.  The acts alleged against Defendants in this Complaint were authorized, ordered, or

17  done by their officers, agents, employees, or representatives while actively engaged in the

18  management and operation of Defendants' businesses or affairs.

19       ~~55.~~68.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other

20  Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

21       ~~56.~~69.  When Plaintiff refers to a corporate family or companies by a single name in

22  allegations of participation in the conspiracy, it is to be understood that one or more employees or

23  agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

24  every company in that family.  In fact, the individual participants in the conspiratorial meetings

25  and discussions did not always know the corporate affiliation of their counterparts, nor did they

26  distinguish between the entities within a corporate family.

27       ~~57.~~70.  Individual participants entered into agreements on behalf of, and reported these

28  meetings and discussions to, their respective corporate families.  As a result, the entire corporate

1    families were represented in meetings and discussions by their agents and were parties to the

2    agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

3    families distributed CRT Products, these subsidiaries played a significant role in the conspiracy

4    because Defendants wished to ensure that the prices for such products would not undercut the

5    pricing agreements reached at these various meetings.  Thus, all entities within the corporate

6    families were active, knowing participants in the alleged conspiracy.

7          58.71.  Various persons or firms not named as Defendants participated as co-conspirators

8    in the alleged violations, performed acts, and made statements in furtherance of the conspiracy,

9    and manufactured, sold, and distributed CRT Products to customers in the United States.  These

10   co-conspirators include, but are not limited to: Panasonic Corporation (f/k/a Matsushita Electric

11   Industrial Co., Ltd.), Panasonic Corporation of North America ("PCNA"), MT Picture Display

12   Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co., Ltd.) ("MTPD"), Matsushita Electronic

13   Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia"), Videocon Industries, Ltd., Mitsubishi

14   Electric Corporation, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société

15   Anonyme, PT.MT Picture Display Indonesia, P.T. Tosummit Electronic Devices Indonesia

16   ("TEDI"), and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiff reserves the right to name

17   some or all of these and other co-conspirators as Defendants at a later date.

18                                     **JURISDICTION AND VENUE**

19          59.72.  Plaintiff brings this action to obtain injunctive relief and to recover damages,

20   including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants'

21   violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California,

22   Washington, Arizona, Florida, and Illinois.

23          60.73.  This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and

24   26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman

25   Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C.

26   § 1331, which provides this Court with original jurisdiction over actions arising under the laws of

27   the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over

28   any action arising under federal laws regulating commerce or protecting commerce against

                                                     21

1    restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C.

2    § 1332 or, alternatively, 28 U.S.C. § 1367.

3         ~~61.~~74.  Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28

4    U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in

5    this district and a substantial portion of affected interstate commerce was carried out in this

6    district.

7         ~~62.~~75.  Defendants are subject to the jurisdiction of this Court by virtue of their

8    nationwide contacts and other activities, as well as their contacts with the State of Washington.

9         ~~63.~~76.  Related cases are pending in MDL No. 1917 in the Northern District of California,

10   and this matter should be consolidated there for pretrial purposes but returned to this district for

11   trial.

12                                **FACTS AND BACKGROUND**

13   **A.    CRT Technology**

14        ~~64.~~77.  A CRT has three components: (a) one or more electron guns, each of which is a

15   series of metallic structures used to generate a beam of electrons; (b) a magnetic or other

16   deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that

17   phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

18   faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

19   coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow

20   mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color

21   image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red,

22   green, blue, and black.

23        ~~65.~~78.  CRT technology was first developed more than a century ago.  The first

24   commercially practical CRT television was made in 1931.  However, it was not until RCA

25   Corporation introduced the product at the 1939 World's Fair that it became widely available to

26   consumers.  After that, CRTs became the heart of most display products, including televisions,

27   computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

28

66.79.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

67.80.  Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

68.81.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

69.82.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.  The market for CRTs and the market for the products into which they are placed are inextricably intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are effectively inseparable.  Defendants are well aware of this intimate relationship.

70.83.  Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

71.84.  Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, non-defendant original equipment manufacturers ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' conspiracy.

**B.     Structure of the CRT Industry**

72.85.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.     Market Concentration**

73.86.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

74.87.  Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

75.88.  Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

24

3.      **Consolidation**

76.89.  The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

4.      **Multiple Interrelated Business Relationships**

77.90.  The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

78.91.  Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.      The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.      Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.      The formation of the CRT joint venture MTPD in 2003.

d.      In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

e.      Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

f.      Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

25

g.      Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips.

h.      Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

i.      Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

j.      Defendant Samtel claims to have supplied CRTs to Defendants including LG Electronics, Samsung, and Philips.

**5.      High Costs of Entry Into the Industry**

79.92.  There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources, and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

80.93.  During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      Maturity of the CRT Product Market**

81.94.  Newer industries typically are characterized by rapid growth, innovation, and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

82.95.  Demand for CRT Products was declining through most or all of the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive

26

1    arrangement more likely because it provides a greater incentive to firms to avoid price

2    competition.

3    83.96.  In addition, conventional CRT televisions and computer monitors were being

4    replaced by LCD and plasma displays.  This was one of the factors which led Defendants to

5    engage in price-fixing to slow the decline of CRT Product prices.  Between 2000 and 2006,

6    revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were

7    predicted to decline by an additional 84.5 percent between 2006 and 2010.

8    84.97.  Although demand was declining as a result of the popularity of flat-panel LCD and

9    plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant

10    display technology during most of the Relevant Period, making Defendants' collusion and the

11    international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

12    plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

13    cheaper alternative to these new technologies.

14    85.98.  In 1999, CRT monitors accounted for 94.5 percent of the retail market for

15    computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

16    substantial share of the market.

17    86.99.  As for CRT televisions, they accounted for 73 percent of the North American

18    television market in 2004, and by the end of 2006, still held a 46 percent market share.

19    **7.**      **Homogeneity of CRT Products**

20    87.100. CRT Products are commodity-like products manufactured in standardized sizes.

21    One Defendant's CRT Product for a particular application, such as a particular size television set

22    or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT

23    Products primarily on the basis of price.

24    88.101. It is easier to form and sustain a cartel when the product in question is commodity-

25    like because it is easier to agree on prices to charge and to monitor those prices once an

26    agreement is formed.

27

28

**C.      Pre-Conspiracy Market**

89.102. The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years, and these Defendant employees would exchange market information on production, capacity, and customers.

90.103. In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.      Defendants' and Co-Conspirators' Illegal Agreements**

91.104. To control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least March, 1995, through at least November 25, 2007.

92.105. The CRT conspiracy was effectuated through a combination of group and bilateral meetings and other communications and activities.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

93.106. Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

94.107. As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic

28

fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants'
representatives attended hundreds of these meetings during the Relevant Period.

95.108.The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that
Defendants charged for CRTs.

**1.      "Glass Meetings"**

96.109.The group meetings among the participants in the CRT price-fixing conspiracy
were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at
three levels of Defendants' corporations.

97.110.The first level meetings were attended by high level company executives including
CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings
occurred less frequently, typically quarterly, and were focused on longer term agreements and
forcing compliance with price-fixing agreements.  Because attendees at top meetings had
authority as well as more reliable information, these meetings resulted in agreements.  Attendees
at top meetings were also able to resolve disputes because they were decision makers who could
make agreements.

98.111.The second level meetings were attended by Defendants' high level sales
managers and were known as "management" meetings.  These meetings occurred more
frequently, typically monthly, and handled implementation of the agreements made at top
meetings.

99.112.Finally, the third level meetings were known as "working level" meetings and
were attended by lower level sales and marketing employees.  These meetings generally occurred
on a weekly or monthly basis and were mostly limited to the exchange of information and
discussing pricing since the lower level employees did not have the authority to enter into
agreements.  These lower level employees would then transmit the competitive information up
the corporate reporting chain to those individuals with pricing authority.  The working level
meetings also tended to be more regional and often took place near Defendants' factories.  In
other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers'
employees met in Korea, the Chinese in China, and so on.

100.113.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

101.114.     Glass meetings also occurred occasionally in European countries.  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson.  Chunghwa also attended these meetings.

102.115.     Representatives of Defendants also attended what were known in the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

103.116.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

104.117.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales, and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

105.118.     The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the

30

following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

106.119.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

107.120.     Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

108.121.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

109.122.     The agreements reached at the glass meetings included:

a.     agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

b.     placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

31

c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

110.123.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

32

1  customers; and 4) a recognition of a mutual interest in living up to the target price and living up to

2  the agreements that had been made.

3  ~~111.~~124.        As market conditions worsened in 2005-2007, and the rate of replacement

4  of CRT Products by LCDs increased, the group glass meetings became less frequent and bilateral

5  meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

6  subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns

7  about antitrust liability.

8       **2.       Bilateral Discussions**

9  ~~112.~~125.        Throughout the Relevant Period, the glass meetings were supplemented by

10  bilateral discussions between various Defendants.  The bilateral discussions were more informal

11  than the group meetings and occurred on a frequent, ad hoc basis, often between the group

12  meetings. These discussions, usually between sales and marketing employees, took the form of

13  in-person meetings, telephone contacts and emails.

14  ~~113.~~126.        During the Relevant Period, in-person bilateral meetings took place in

15  Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

16  Brazil, ~~and~~ Mexico, and the United States.

17  ~~114.~~127.        The purpose of the bilateral discussions was to exchange information about

18  past and future pricing, confirm production levels, share sales order information, confirm pricing

19  rumors, and coordinate pricing with manufacturers in other geographic locations, including

20  Brazil, Mexico, ~~and~~ Europe, and the United States.

21  ~~115.~~128.        To ensure the efficacy of their global conspiracy, Defendants also used

22  bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, ~~and~~ Mexico, and the

23  United States.  These ~~Brazilian and Mexican~~ CRT manufacturers were particularly important

24  because they served the North American market for CRT Products.  North America was the

25  largest market for CRT televisions and computer monitors during the Relevant Period.  Because

26  these ~~Brazilian and Mexican~~ manufacturers are all wholly-owned and controlled subsidiaries of

27  Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants

28

33

1    ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised,

2    maintained, and stabilized at supracompetitive levels.

3        ~~116.~~129.        Defendants also used bilateral discussions with each other during price

4    negotiations with customers to avoid being persuaded by customers to cut prices.  The

5    information gained in these communications was then shared with supervisors and taken into

6    account in determining the price to be offered.

7        ~~117.~~130.        Bilateral discussions were also used to coordinate prices with CRT

8    manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the

9    few days following a top or management meeting, the attendees at these group meetings would

10   meet bilaterally with the other Defendant manufacturers for the purpose of communicating

11   whatever CRT pricing and output agreements had been reached during the meeting.  For example,

12   Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing

13   agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for

14   communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral

15   communications with Thomson in Europe and the United States, and Samsung SDI had regular

16   communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was

17   responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel

18   implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.

19   Sometimes Hitachi and Toshiba also attended the glass meetings.

20       **3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral
              Discussions**

21

22       ~~118.~~131.        Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

23   Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings.

24   These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

25   in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

26   these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

27   withdrew from this conspiracy.

28

                                            34

119.132.        Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

120.133.        Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

121.134.        Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

122.135.        Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

123.136.        Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

35

1    were attended by the highest ranking executives from LP Displays.  Certain of these high level

2    executives from LP Displays had previously attended meetings on behalf of Defendants LG

3    Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

4    Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

5              137.    Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic

6    Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

7    Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

8    These meetings were attended by high level sales managers from Panasonic and MTPD.

9    Panasonic also engaged in multiple bilateral discussions with the Defendants.  Through these

10   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

11   withdrew from this conspiracy.

12             138.    PCNA was represented at those meetings and was a party to the agreements

13   entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers,

14   it played a significant role in the conspiracy because Defendants and their co-conspirators wished

15   to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

16   pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing

17   participant in the alleged conspiracy.

18             139.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

19   glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

20   These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

21   bilateral discussions with the Defendants.  Through these discussions, MTPD agreed on prices

22   and supply levels for CRTs.

23             124.140.         Between at least 1998 and 2007, Defendant BMCC participated in multiple

24   glass meetings.  These meetings were attended by high level sales managers from BMCC.

25   BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other

26   Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

27   levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

1    mandated by the Chinese government.  BMCC was acting to further its own independent private

2    interests in participating in the alleged conspiracy.

3    125.141.         Between at least 1996 and 2001, Defendant Philips, through Royal Philips

4    and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

5    participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

6    LP Displays).  A substantial number of these meetings were attended by high level executives

7    from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

8    Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

9    effectively withdrew from this conspiracy.

10   126.142.         Defendants Philips America and Philips Brazil were represented at those

11   meetings and were a party to the agreements entered at them.  To the extent Philips America and

12   Philips Brazil sold or distributed CRT Products to direct purchasers, they played a significant role

13   in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

14   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

15   Thus, Philips America and Philips Brazil were active, knowing participants in the alleged

16   conspiracy.

17   143.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

18   SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in

19   at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by

20   the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions

21   with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed

22   on prices and supply levels for CRTs.

23   125.144.         Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and

24   Samsung SDI Mexico wereas represented at those meetings and wereas a party to the agreements

25   entered at them.  To the extent SEC and SEAI sold or distributed CRT Products, they played a

26   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

27   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

28

37

1  glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI

2  Mexico were active, knowing participants in the alleged conspiracy.

3  128.145.      Between at least 1998 and 2006, Defendant Samtel participated in multiple

4  bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were

5  attended by high level executives from Samtel.  Through these discussions, Samtel agreed on

6  prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

7  129.146.      Between at least 1997 and 2006, Defendant Thai CRT participated in

8  multiple glass meetings.  These meetings were attended by the highest ranking executives from

9  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

10  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

11  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

12  147.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of

13  meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.

14  These meetings were attended by high level sales managers from Thomson.  At these meetings,

15  Thomson discussed such things as CRT prices, production, revenues, volumes, demand,

16  inventories, estimated sales, plant shutdowns, customer allocation, and new product development

17  and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this

18  conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July

19  2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

20  148.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

21  bilateral meetings with its competitors.  These meetings were attended by high level sales

22  managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices,

23  production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

24  allocation, and new product development, and agreed on prices and supply levels for CRTs.

25  Mitsubishi never effectively withdrew from this conspiracy.

26  130.149.      Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT,

27  and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

28  conspiracy through MTPD.  These meetings were attended by high level sales managers from

38

1   Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

2   Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and

3   supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

4       131.150.     Defendants Toshiba America, TACP, TAEC, and TAIS were represented

5   at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

6   America, TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they

7   played a significant role in the conspiracy because Defendants wished to ensure that the prices for

8   CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

9   at the glass meetings.  Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing

10  participants in the alleged conspiracy.

11      132.151.     Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

12  PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and

13  Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these

14  meetings were attended by the highest ranking executives from Chunghwa, including the former

15  Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions

16  with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa

17  agreed on prices and supply levels for CRTs.

18      133.Defendant Tatung America was represented at those meetings and was a party to the

19  agreements entered at them.  To the extent Tatung America sold or distributed CRT Products to

20  direct purchasers, it played a significant role in the conspiracy because Defendants wished to

21  ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

22  pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing

23  participant in the alleged conspiracy.

24      134.152.     Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

25  Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

26  of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

27  engaged in bilateral discussions with other Defendants on a regular basis.  Through these

28  discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

39

1    Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

2    Daewoo never effectively withdrew from this conspiracy.

3        135.153.        When Plaintiff refers to a corporate family or companies by a single name

4    in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

5    employees or agents of entities within the corporate family engaged in conspiratorial meetings on

6    behalf of every company in that family.  In fact, the individual participants in the conspiratorial

7    meetings and discussions did not always know the corporate affiliation of their counterparts, nor

8    did they distinguish between the entities within a corporate family.  The individual participants

9    entered into agreements on behalf of, and reported these meetings and discussions to, their

10   respective corporate families.  As a result, the entire corporate family was represented in meetings

11   and discussions by their agents and was a party to the agreements reached in them.

12   **E.       The CRT Market During the Conspiracy**

13       136.154.        Until the last few years of the CRT conspiracy, CRTs were the dominant

14   technology used in displays, including televisions and computer monitors.  During the Relevant

15   Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

16   annual profits.

17       137.155.        During the Relevant Period, North America was the largest market for

18   CRT TVs and computer monitors.

19   **F.       International Government Antitrust Investigations**

20       138.156.        Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of,

21   and restrict output for, CRTs sold in the United States during the Relevant Period, is

22   demonstrated by a multinational investigation commenced by the Antitrust Division of the United

23   States Department of Justice ("DOJ").

24       139.157.        Separately, the European Commission and Japan and South Korea's Fair

25   Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being

26   sold in Europe and Asia.

27       140.158.        In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is

28   also being investigated by the [European] Commission and/or the U.S. Department of Justice for

40

1   potential violations of competition laws with respect to semiconductors, LCD products, cathode

2   ray tubes (CRT) and heavy electrical equipment."

3   ~~141.~~159.          On May 6, 2008, the Hungarian Competition Authority ("HCA")

4   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

5           The anti-competitive behaviour may have concerned the exchange
        of sensitive market information (about prices, volumes sold,
6        demand and the extent to which capacities were exploited), price-
        fixing, the allocation of market shares, consumers and volumes to
7        be sold, the limitation of output and coordination concerning the
        production. The undertakings evolved a structural system and
8        functional mechanism of cooperation.

9   ~~142.~~160.          On February 10, 2009, the DOJ issued a press release announcing that a

10   federal grand jury in San Francisco had that same day returned a two-count indictment against the

11   former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for

12   his participation in global conspiracies to fix the prices of two types of CRTs used in computer

13   monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the

14   Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release

15   further notes that Lin had previously been indicted for his participation in a conspiracy to fix the

16   prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the

17   prices of CRTs was carried out, in part, in California.

18   ~~143.~~161.          On August 19, 2009, the DOJ issued a press release announcing that a

19   federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng

20   a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

21   of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of

22   Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been

23   indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's

24   indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in

25   part, in California.

26   ~~144.~~162.          On March 30, 2010, the DOJ issued a press release announcing that a

27   federal grand jury in San Francisco had that same day returned a one-count indictment against

28   Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of

41

CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

145.163.      On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

146.164.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.  The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

165.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release

42

accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

146.

147.166.      Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

148.167.      Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

149.168.      In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

150.169.      On November 12, 2008, the DOJ announced that it had reached agreements with three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

151.170.      On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of LCD panels.

151.

## H.G.   The Role of Trade Associations During the Relevant Period

152.171.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

43

by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

153.172.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

154.173.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

155.174.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

156.175.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

44

1    ~~I.~~**H.**    **Effects of the Conspiracy**

2        ~~157.~~176.        The conspiracy has had the following effects, among others:

3            a.        Price competition in the sale of CRTs by Defendants and their co-
conspirators has been restrained, suppressed, and eliminated throughout the
4                United States;

5            b.        Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have
been raised, fixed, maintained, and stabilized at artificially high and
6                noncompetitive levels throughout the United States; and

7            c.        Plaintiff has been deprived of the benefit of free and open competition in
the purchase of CRT Products.

8

9        ~~158.~~177.        During the Relevant Period, while demand in the United States for CRT

10   Products continued to decline, Defendants' conspiracy was effective in moderating the normal

11   downward pressures on prices for CRT Products caused by the entry and popularity of the new

12   generation LCD panels and plasma display products.

13       ~~159.~~178.        As a direct and proximate result of the unlawful conduct of Defendants,

14   Plaintiff has been injured in its business and property in that they paid more for CRT Products

15   than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

16                              **FRAUDULENT CONCEALMENT**

17       ~~160.~~179.        Costco had neither actual nor constructive knowledge of the facts

18   supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Costco

19   did not discover, and could not have discovered through the exercise of reasonable diligence, the

20   existence of the conspiracy alleged herein until at least late November 2007, when investigations

21   by the United States and other antitrust authorities became widely reported.  Defendants' secret

22   conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a

23   conspiracy to fix the prices of CRT Products.

24       ~~161.~~180.        Because Defendants' conspiracy was kept secret, Plaintiff was unaware of

25   Defendants' unlawful conduct and did not know that it was paying artificially high prices for

26   CRT Products.

27       ~~162.~~181.        The affirmative acts of Defendants alleged herein, including acts in

28   furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

                                        45

precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

163.182.          Defendants' price-fixing conspiracy was inherently self-concealing.

164.183.          Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.  The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

165.184.          As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

166.185.          Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

46

167.186.        Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a CNET News.com article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

168.187.        In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

169.188.        As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

170.189.        In addition, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

171.190.        Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

172.191.        Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

173.192.        As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

*AMERICAN PIPE*, GOVERNMENT ACTION,
AND CROSS-JURISDICTIONAL TOLLING

193.    As discussed at length in Paragraphs 158-72 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Costco's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

194.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

195.    As shown by Costco's allegations in Paragraphs 1 and 10 and the following causes of action, Costco was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

173.

**FIRST CAUSE OF ACTION**
**(Violation of Section 1 of the Sherman Act)**

174.196.      Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

175.197.      Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

176.198.      In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

48

177.199.      As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

178.200.      The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

179.201.      For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

180.202.      As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

### SECOND CAUSE OF ACTION
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

181.203.      Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

182.204.      Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

183.205.      As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

184.206.      Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### THIRD CAUSE OF ACTION
### (Violation of the Washington Consumer Protection Act, RCW 19.86.030)

185.207.      Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 184 above.

186.208.      Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

187.209.      As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

188.210.      Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**FOURTH CAUSE OF ACTION**
**(Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)**

~~189.~~211.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

~~190.~~212.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

~~191.~~213.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

~~192.~~214.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**FIFTH CAUSE OF ACTION**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat.**
**§ 501.201, *et seq.*)**

~~193.~~215.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

~~194.~~216.    Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

~~195.~~217.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

196.218.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently of whether they constitute a violation of the Sherman Act.

197.219.     Defendants' and their co-conspirators' acts are fraudulent or deceptive.

198.220.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

199.221.     Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### SIXTH CAUSE OF ACTION
**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

200.222.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 209 above.

201.223.     Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the the of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

202.224.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

203.225.     Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators'

conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D.    Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E.    Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

1        F.      Costco shall recover such other and further relief as the Court deems just.

2    DATED:                                    By: _____

3                                              David J. Burman #10611(admitted *pro hac*
                                               *vice*)
4                                              Cori G. Moore (admitted *pro hac vice*)#28649
                                               Noah G. Purcell #43492Eric J. Weiss (admitted
5                                              *pro hac vice*)
                                               Nicholas H. Hesterberg (admitted *pro hac*
6                                              *vice*)#41970
                                               **PERKINS COIE LLP**
7                                              **Perkins Coie LLP**
                                               1201 Third Avenue, Suite 4800
8                                              Seattle, WA  98101-3099
                                               Telephone:  206.359.8000
9                                              Facsimile:  206.359.9000
                                               Email:  DBurman@perkinscoie.com
10                                                     CGMoore@perkinscoie.com
                                                       NPurcellEWeiss@perkinscoie.com
11                                                     NHesterberg@perkinscoie.com

12                                             Joren S. Bass, Bar No. 208143
                                               **PERKINS COIE LLP**
13                                             Four Embarcadero Center, Suite 2400
                                               San Francisco, CA  94111-4131
14                                             Telephone:  415.344.7120
                                               Facsimilie:  415.344.7320
15                                             Email:  JBass@perkinscoie.com

16                                             Attorneys for Plaintiff
                                               COSTCO WHOLESALE CORPORATION

17

18

19   LEGAL25416835.5

20

21

22

23

24

25

26

27

28

54

# **EXHIBIT D**

1   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
    Roman M. Silberfeld, Bar No. 62783
2   RMSilberfeld@rkmc.com
    David Martinez, Bar No. 193183
3   DMartinez@rkmc.com
    2049 Century Park East, Suite 3400
4   Los Angeles, CA  90067-3208
    Telephone:     310-552-0130
5   Facsimile:     310-229-5800

6   Attorneys for Plaintiffs
    BEST BUY CO., INC.; BEST BUY PURCHASING
7   LLC; BEST BUY ENTERPRISE SERVICES, INC.;
    BEST BUY STORES, L.P.; BESTBUY.COM,
8   L.L.C.; and MAGNOLIA HI-FI, INC.

9

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13   BEST BUY CO., INC.; BEST BUY          Case No.  Master File No. 3:07-cv-05944-SC
     PURCHASING LLC; BEST BUY
14   ENTERPRISE SERVICES, INC.; BEST       MDL No. 1917
     BUY STORES, L.P.; BESTBUY.COM,
15   L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC,   Individual Case No. 3:11-cv-05513-SC

16              Plaintiffs,               **FIRST AMENDED COMPLAINT**

17        v.                              **JURY TRIAL DEMANDED**

18   HITACHI, LTD.; HITACHI DISPLAYS,
     LTD.; HITACHI AMERICA, LTD.;
19   HITACHI ASIA, LTD.; HITACHI
     ELECTRONIC DEVICES (USA), INC.;
20   SHENZHEN SEG HITACHI COLOR
     DISPLAY DEVICES, LTD.; IRICO
21   GROUP CORPORATION; IRICO
     GROUP ELECTRONICS CO., LTD.;
22   IRICO DISPLAY DEVICES CO., LTD.;
     LG ELECTRONICS, INC.; LG
23   ELECTRONICS USA, INC.; LG
     ELECTRONICS TAIWAN TAIPEI CO.,
24   LTD.; LP DISPLAYS INTERNATIONAL
     LTD.; PANASONIC CORPORATION;
25   PANASONIC CORPORATION OF
     NORTH AMERICA; MT PICTURE
26   DISPLAY CO., LTD.; BEIJING
     MATSUSHITA COLOR CRT CO., LTD.;
27   KONINKLIJKE PHILIPS
     ELECTRONICS N.V.; PHILIPS
28   ELECTRONICS NORTH AMERICA

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.; THOMSON SA; TECHNICOLOR USA, INC.; MITSUBISHI ELECTRIC CORPORATION; MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC.; MITSUBISHI ELECTRIC & ELECTRONICS, USA, INC.,

Defendants.

Plaintiffs, Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, Inc.LLC (collectively "Plaintiffs" or "Best Buy"), for their Complaint against all Defendants named herein, hereby allege as follows:

**I.    INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.      With respect to CRTs, Defendants or their agents agreed, *inter alia*, to:  (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as

1    regional managers and others.

2          7.     During the Relevant Period, the conspiracy affected billions of dollars of

3    commerce throughout the United States.

4          8.     This conspiracy is being investigated by the United States Department of Justice

5    ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by

6    the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes,

7    Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco

8    on February 10, 2009.  Since then, five more individuals have been indicted in connection with

9    Defendants' CRT price-fixing conspiracy.

10         9.     During the Relevant Period, Plaintiffs purchased CRT Products in the United

11   States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and

12   affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.

13   Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to

14   recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased

15   during the Relevant Period.

16   **II.     JURISDICTION AND VENUE**

17         10.    Plaintiffs bring this action to obtain injunctive relief under Section 16 of the

18   Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton

19   Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1

20   of the Sherman Act (15 U.S.C. § 1).

21         11.    Plaintiffs also bring this action pursuant to the Minnesota Antitrust Act of 1971

22   because Plaintiffs purchased in Minnesota CRT Products from both Defendants and non-

23   Defendant vendors containing price-fixed CRTs manufactured by Defendants.

24         12.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the

25   Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

26   supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367 because they

27   arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs' state law

28   claims are so related to their claims under Section 1 of the Sherman Act that they form part of the

1    same case or controversy.

2          13.     The activities of Defendants and their co-conspirators, as described herein,

3    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did

4    have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import

5    trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant

6    Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

7    In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected

8    the price of CRT Products purchased by Plaintiffs.

9          14.     This court has jurisdiction over each Defendant named in this action.  Defendants

10   and their co-conspirators purposely availed themselves of the laws of the United States as they

11   manufactured CRT Products for sale in the United States, or CRTs which were incorporated into

12   CRT Products Defendants and their co-conspirators knew would be sold to customers in the

13   United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT

14   Products in the United States.

15         15.     Venue is proper in the Northern District of California under Section 12 of the

16   Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

17   corporation, transacts business in this District, or is otherwise found within this District.  In

18   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

19   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

20   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into

21   this District.

22   **III.   PARTIES**

23        **A.    Plaintiffs**

24         16.     Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and

25   principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated

26   retail stores throughout the United States and sold CRT Products in those stores.

27         17.     Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and

28   Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

principal places of business in Richfield, Minnesota.

18.     Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its headquarters and principal place of business in Richfield, Minnesota.  Best Buy Stores, L.P. operates retail stores throughout the United States and sells CRT Products in those stores.

19.     Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its headquarters and principal place of business in Richfield, Minnesota.  BestBuy.com, L.L.C. is a wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

20.     During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for CRT Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C.  These negotiations, purchasing and payments took place out of Best Buy's principal place of business and headquarters in Richfield, Minnesota.

21.     Plaintiff Magnolia Hi-Fi, ~~Inc.~~ LLC ("MHF") is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video.  MHF is a specialty consumer electronic retailer that operates several Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and several Magnolia Home Theater stores located within Best Buy stores.  During the Relevant Time Period, MHF's purchasing of CRT Products took place in its headquarters in Kent Washington.

22.     During the Relevant Period, Best Buy purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Best Buy suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

23.     Those products were kept as inventory and sold in Minnesota and every other state where Best Buy retail stores were located, and over the internet throughout the United States.

24.     As a result of the Best Buy Plaintiffs' presence, purchases, and sales in Minnesota, and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled to the protection of the Sherman Act and the antitrust laws of Minnesota.

- 6 -                                     FIRST AMENDED COMPLAINT

1

2          B.      **Defendants**

3                  1.      **Hitachi Entities**

4          25.      Defendant Hitachi, Ltd. is a Japanese company with its principal place of business

5  at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent

6  company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share

7  for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured,

8  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9  affiliates, throughout the United States.

10         26.      Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with

11 its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.

12 Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City,

13 Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and

14 sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate

15 company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured,

16 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

17 affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the

18 finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this

19 Complaint.

20         27.      Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

21 with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.

22 Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During

23 the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT

24 Products, either directly or through its subsidiaries or affiliates, throughout the United States.

25 Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi

26 America relating to the antitrust violations alleged in this complaint.

27         28.      Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

28 principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     IRICO Entities

32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

33. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

34. Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

35. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.    LG Electronics Entities

36. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

37.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

38.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

39.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 4.     LP Displays

40.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and

FIRST AMENDED COMPLAINT

a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI

would cede control over the company and the shares would be owned by financial institutions and

private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

the United States.

### 5.   <u>Panasonic Entities</u>

41.     Defendant Panasonic Corporation, which was at all times during the Relevant

Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation

on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-

8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

the United States.

42.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware

corporation with its principal place of business located at One Panasonic Way, Secaucus, New

Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic

Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed

CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of

PCNA relating to the antitrust violations alleged in this Complaint.

43.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as

"Panasonic."

44.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display

Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-

8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba

Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic

Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic

Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita

Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold

2  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

3  the United States.

4        45.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese

5  company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi

6  Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by

7  Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China

8  National Electronics Import & Export Beijing Company (a China state-owned enterprise), and

9  Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned

10  enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing

11  facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During

12  the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either

13  directly or through its subsidiaries or affiliates, throughout the United States.

14                  **6.**     **Philips Entities**

15        46.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics

16  ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2,

17  1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's

18  largest electronics companies, with 160,900 employees located in over 60 countries.  Royal

19  Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its

20  CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP

21  Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT

22  Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment

23  and said it would not inject further capital into the venture.  During the Relevant Period, Royal

24  Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through

25  its subsidiaries or affiliates, throughout the United States.

26        47.     Defendant Philips Electronics North America Corporation ("Philips America") is a

27  Delaware corporation with its principal place of business located at 1251 Avenue of the Americas,

28  New York, New York  10020-1104.  Philips America is a wholly-owned and controlled subsidiary

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured,

2   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

3   affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the

4   finances, policies and affairs of Philips America relating to the antitrust violations alleged in this

5   Complaint.

6          48.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

7   Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,

8   Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.

9   During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT

10  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

12  Taiwan relating to the antitrust violations alleged in this Complaint.

13         49.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

14  Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

15  andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

16  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

17  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

18  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

19  controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations

20  alleged in this Complaint.

21         50.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

22  collectively referred to herein as "Philips."

23                      **7.**     **Samtel**

24         51.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal

25  place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

26  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest

27  exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada,

28  Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

1  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

2  subsidiaries and affiliates, throughout the United States.

3  **8.  Thai CRT**

4  52.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

5  Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

6  Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

7  televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

8  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9  United States.

10  **9.  Toshiba Entities**

11  53.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

12  place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

13  TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

14  monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-

15  Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

16  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002,

17  TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the

18  entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured,

19  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20  affiliates, throughout the United States.

21  54.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

22  with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

23  York, New York  10020.  Toshiba America is a wholly-owned and controlled subsidiary of

24  Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold

25  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

26  the United States.  Defendant TC dominated and controlled the finances, policies and affairs of

27  Toshiba America relating to the antitrust violations alleged in this Complaint.

28  55.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this Complaint.

56.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

57.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this Complaint.

58.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 10.   Chunghwa Entities

59.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

1  manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed

2  CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou

3  subsidiary) throughout the United States.

4          60.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

5  Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

6  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

7  owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

8  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

9  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

10  Products either directly or through its subsidiaries or affiliates throughout the United States.

11  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa

12  Malaysia relating to the antitrust violations alleged in this Complaint.  Defendants Chunghwa PT

13  and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

14          ~~11.     Tatung Company of America, Inc.~~

15  ~~Tatung Company of America, Inc. ("Tatung America") is a California corporation with its~~

16  ~~principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung~~

17  ~~America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately~~

18  ~~half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of~~

19  ~~Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share~~

20  ~~passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed,~~

21  ~~sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes,~~

22  ~~Ltd., either directly or through its subsidiaries or affiliates throughout the United States.~~

23          **12.     Thomson Entities**

24          61.     Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

25  corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

26  Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

27  Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

28  plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

62.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, IN 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania, Marion, Indiana and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

63.    Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

**12.      Mitsubishi Entities**

2

64.      Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a

3   Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

4   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

5   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally

6   to Mitsubishi's television and monitor manufacturing division and to other television and monitor

7   manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also

8   purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric

9   Japan manufactured, marketed, sold and distributed CRT Products in the United States.

10

65.      Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric

11   USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CAalifornia, 90630.

12   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

13   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

14   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

15   and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

16   and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

17   CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

18   marketed, sold and distributed CRT Products in the United States.

19

66.      Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

20   United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.  Mitsubishi Digital is

21   a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi

22   Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in

23   the United States.

24

67.      Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

25   collectively referred to herein as "Mitsubishi."

26

61.

27

**IV.      AGENTS AND CO-CONSPIRATORS**

28

62.68.   The acts alleged against Defendants in this Complaint were authorized, ordered, or

1   done by their officers, agents, employees, or representatives, while actively engaged in the

2   management and operation of Defendants' businesses or affairs.

3   63.69.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of,

4   or for, other Defendants and co-conspirators with respect to the acts, violations, and common

5   course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of

6   a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent

7   company.

8   64.70.  Various persons and/or firms not named as Defendants in this Complaint

9   participated as co-conspirators in the violations alleged herein and may have performed acts and

10  made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

11  include, but are not limited to, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

12  Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company, Samsung SDI America, Inc.,

13  Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd.,

14  Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Orion Electronic Co.,

15  Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic

16  Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Videocon

17  Industries, Ltd., and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to

18  name some or all of these and other co-conspirators as Defendants at a later date.

19  65.71.  Co-conspirator Samsung Electronics Co., Ltd. ("SEC") is a South Korean

20  company with its principal place of business located at Samsung Electronics Building, 1320-10,

21  Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

22  company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT

23  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24  66.72.  Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York

25  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

26  Ridgefield Park, New Jersey  07660.  SEAI is a wholly-owned and controlled subsidiary of

27  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

28  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this Complaint.

67.73. Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

68.74. Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

69.75. Co-conspirator Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

to the antitrust violations alleged in this Complaint.

70.76.  Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

71.77.  Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

72.78.  Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

73.79.  Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

74.80.  Co-conspirators SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

75.81.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

76.82.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

77.83.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia

- 22 -

was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic

Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT

joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia)

Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During

the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT

Products, either directly or through its subsidiaries or affiliates, throughout the United States.

Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of

Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

78.84.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal

place of business was located in Indonesia.  TEDI was projected to have an annual production

capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's

joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display

Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed

CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the

antitrust violations alleged in this Complaint.

79.85.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with

its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road,

Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of

Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with

Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated

as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the

Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either

directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC

dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust

violations alleged in this Complaint.

80.86.  The acts charged in this Complaint have been done by Defendants and their Co-

conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendants' or Co-conspirators' business or affairs.

**V.     TRADE AND COMMERCE**

~~81.~~87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

~~82.~~88.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

~~83.~~89.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Minnesota and caused antitrust injuries in Minnesota.

**VI.     FACTUAL ALLEGATIONS**

**A.     CRT Technology**

~~84.~~90.  A CRT has three components:  (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

~~85.~~91.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    computer monitors, oscilloscopes, air traffic control monitors and ATMs.

2

3

4    86.92.  The quality of a CRT itself determines the quality of the CRT display.  No external

5    control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole

6    CRT product so that the product is often simply referred to as "the CRT."

7    87.93.  Although there have been refinements and incremental advancements along the

8    way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT

9    technology used today is similar to that RCA unveiled in 1939.

10    88.94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used

11    primarily in televisions and related devices and CDTs are primarily used in computer monitors

12    and similar devices.  The primary difference is that CDTs typically yield a higher resolution image

13    requiring more pixels than do CPTs.

14    89.95.  CRTs have no independent utility, and have value only as components of other

15    products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from

16    the demand for such products.

17    90.96.  The market for CRTs and the market for the products into which they are placed

18    are inextricably linked and intertwined because the CRT market exists to serve the CRT Products

19    markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in

20    that one would not exist without the other.

21    91.97.  Plaintiffs have participated in the market for CRTs through their direct purchases

22    from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT

23    Products containing price-fixed CRTs indirectly from non-Defendant original equipment

24    manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at

25    which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-

26    competitive prices for CRT Products.

27    92.98.  Plaintiffs have participated in the market for products containing CRTs.  To the

28    extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-

1    conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in

2    these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

3    93.99.  Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.    Structure of the CRT Industry**

5    94.100.        The CRT industry has several characteristics that facilitated a conspiracy,

6    including market concentration, ease of information sharing, the consolidation of manufacturers,

7    multiple interrelated business relationships, significant barriers to entry, heightened price

8    sensitivity to supply and demand forces and homogeneity of products.

**1.    Market Concentration**

10   95.101.        During the Relevant Period, the CRT industry was dominated by relatively

11   few companies.  In 2004, Co-Conspirators Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

12   Chunghwa, together held a collective 78% share of the global CRT market.  The high

13   concentration of market share facilitates coordination because there are fewer cartel members

14   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

15   production of other cartel members.

**2.    Information Sharing**

17   96.102.        Because of common membership in trade associations, interrelated

18   business arrangements such as joint ventures, allegiances between companies in certain countries

19   and relationships between the executives of certain companies, there were many opportunities for

20   Defendants to discuss and exchange competitive information.  The ease of communication was

21   facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took

22   advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged

23   below.

24   97.103.        Defendants Hitachi, and Chunghwa and Co-conspirator Samsung are all

25   members of the Society for Information Display.  Samsung and LG Electronics are two of the co-

26   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

27   Electronics, LP Displays, and Co-conspirator Samsung are members of the Electronic Display

28   Industrial Research Association.  Upon information and belief, Defendants and their Co-

1   Conspirators used these trade associations as vehicles for discussing and agreeing upon their

2   pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary

3   and competitively sensitive information which they used to implement and monitor the

4   conspiracy.

### 3.   Consolidation

6   98.104.          The CRT industry also had significant consolidation during the Relevant

7   Period, including but not limited to:  (a) the creation of LGPD in 2001, which was a joint venture

8   involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and

9   Panasonic's CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

11   99.105.          The industry is marked by a web of cross-licensing agreements, joint

12   ventures and other cooperative arrangements that can facilitate collusion.

13   100.106.          Examples of the high degree of cooperation among Defendants in both the

14   CRT Product market and other closely related markets include the following:

15          a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG

16               Electronics and Philips.

17          b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd.

18               n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of

19               manufacturing TFT-LCD panels.

20          c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba

21               and Panasonic.

22          d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display

23               Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-

24               LCD panels.

25          e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-

26               Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

27          f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to

28               LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    Toshiba, which had substituted its STN-LCD production with TFT-LCD

2    production, marketed Daewoo's STN-LCDs globally through its network.

3    g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement

4    with Defendant Chunghwa for large CPTs.

5    h.   Defendant Chunghwa has a joint venture with Co-conspirator Samsung for the

6    production of LCD panels.  Chunghwa now licenses the technology from

7    Defendant Philips, a recent development that helped resolve a patent infringement

8    suit filed in 2002.

9    i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the

10   manufacture, sale and distribution of optical storage products such as DVD drives.

11   j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Co-

12   conspirator Samsung and non-Defendant Corning Inc., USA for the production

13   and supply of picture tube glass.

14   k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

15   Philips, Panasonic, and Co-conspirator Samsung.

16       **5.    High Costs of Entry Into the Industry**

17   ~~101.~~107.     There are significant manufacturing and technological barriers to entry into

18   the CRT industry.  It would require substantial time, resources and industry knowledge to

19   overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the

20   market in light of the declining demand for CRT Products.

21   ~~102.~~108.     During the Relevant Period, the costs of the assembly components, both as

22   a whole and individually, have been generally declining, and, in some periods, declining at a

23   substantial rate.  A combination of price discussions and manipulation of the output of CRTs

24   allowed Defendants to keep prices above where they would have been but for the conspiracy.

25       **6.    The Maturity of the CRT Product Market**

26   ~~103.~~109.     Newer industries typically are characterized by rapid growth, innovation

27   and high profits.  The CRT Product market is a mature one, and like many mature industries, is

28   characterized by slim profit margins, creating a motivation to collude.

1   104.110.      Demand for CRT Products was declining throughout the Relevant Period.

2   Static declining demand is another factor which makes the formation of a collusive arrangement

3   more likely because it provides a greater incentive to firms to avoid price competition.

4

5   105.111.      In addition, conventional CRT televisions and computer monitors were

6   being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

7   Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT

8   Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

9   States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

10   between 2006 and 2010.

11   106.112.      Although demand was declining as a result of the popularity of flat-panel

12   LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

13   dominant display technology during the Relevant Period, making Defendants' collusion and the

14   international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma

15   displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper

16   alternative to these new technologies.

17   107.113.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for

18   computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

19   substantial share of the market.

20   108.114.      As for CRT televisions, they accounted for 73 percent of the North

21   American television market in 2004, and by the end of 2006, still held a 46 percent market share.

22          **7.     Homogeneity of CRT Products**

23   109.115.      CRT Products are commodity-like products which are manufactured in

24   standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular

25   size television set or computer monitor, is substitutable for another's.  Defendants sold and

26   Plaintiffs purchased CRT Products primarily on the basis of price.

27   110.116.      It is easier to form and sustain a cartel when the product in question is

28   commodity-like because it is easier to agree on prices to charge and to monitor those prices once

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    an agreement is formed.

2        **C.    Pre-Conspiracy Market**

3        111.117.        The genesis of the CRT conspiracy was in the late 1980s as the CRT

4    Products business became more international and Defendants began serving customers that were

5    also being served by other international companies.  During this period, the employees of

6    Defendants would encounter employees from their competitors when visiting their customers.  A

7    culture of cooperation developed over the years and these Defendant employees would exchange

8    market information on production, capacity and customers.

9        112.118.        In the early 1990s, representatives from Samsung, Daewoo, Chunghwa,

10   and Orion visited each other's factories in Southeast Asia.  During this period, these producers

11   began to include discussions about price in their meetings.

12       **D.    Defendants' and Co-Conspirators' Illegal Agreements**

13       113.119.        In order to control and maintain profitability during declining demand for

14   CRT Products, Defendants and their co-conspirators have engaged in a contract, combination,

15   trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at

16   which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

17   November 25, 2007.

18       114.120.        The CRT conspiracy was effectuated through a combination of group and

19   bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

20   were the primary method of communication and took place on an informal, ad hoc basis.  During

21   this period, representatives from Daewoo and Defendants LG Electronics and Co-conspirator

22   Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT,

23   Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific

24   customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia,

25   Indonesia and Singapore.

26       115.121.        Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also

27   attended several ad hoc group meetings during this period.  The participants at these group

28   meetings also discussed increasing prices for CRTs.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

116.122.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

117.123.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1. **"Glass Meetings"**

118.124.      The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' and Co-conspirator' corporations.

119.125.      The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.      The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.      Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   met in Korea, the Chinese in China, and so on.

2   ~~122.~~128.        The Chinese glass meetings began in 1998 and generally occurred on a

3   monthly basis following a top or management level meeting.  The China meetings had the

4   principal purpose of reporting what had been decided at the most recent glass meetings to the

5   Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

6   in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants

7   and Co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen,

8   Samsung SDI Tianjin, and Chunghwa.

9   ~~123.~~129.        Glass meetings also occurred occasionally in various European countries.

10  Attendees at these meetings included those Defendants and Co-conspirators which had

11  subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

12  LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of

13  Daewoo) ~~and~~ IRICO, and Thomson.  Chunghwa also attended these meetings.

14  ~~124.~~130.        Representatives of Defendants also attended what were known amongst

15  members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The

16  green meetings were generally attended by top and management level employees of Defendants.

17  ~~125.~~131.        During the Relevant Period, glass meetings took place in Taiwan, South

18  Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, ~~and~~ Malaysia, and the United

19  States.

20  ~~126.~~132.        Participants would often exchange competitively sensitive information

21  prior to a glass meeting.  This included information on inventories, production, sales and exports.

22  For some such meetings, where information could not be gathered in advance of the meeting, it

23  was brought to the meeting and shared.

24  ~~127.~~133.        The glass meetings at all levels followed a fairly typical agenda.  First, the

25  participants exchanged competitive information such as proposed future CRT pricing, sales

26  volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts

27  of sales volumes for coming months.  The participants also updated the information they had

28  provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

1   would write the information on a white board.  The meeting participants then used this

2   information to discuss and agree upon what price each would charge for CRTs to be sold in the

3   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

4   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of

5   CRTs that were sold to specific customers, and agreed upon target prices to be used in

6   negotiations with large customers.  Having analyzed the supply and demand, the participants

7   would also discuss and agree upon production cutbacks.

8        ~~128.~~134.    During periods of oversupply, the focus of the meeting participants turned

9   to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

10  price."

11       ~~129.~~135.    Defendants' conspiracy included agreements on the prices at which certain

12  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

13  CRT Products, such as televisions and computer monitors.  Defendants realized the importance of

14  keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

15  pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

16  supracompetitive prices for CRTs.

17       ~~130.~~136.    Each of the participants in these meetings knew, and in fact discussed, the

18  significant impact that the price of CRTs had on the cost of the finished products into which they

19  were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

20  were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

21  increases stick, they needed to make the increase high enough that their direct customers (CRT TV

22  and monitor makers) would be able to justify a corresponding price increase to their customers.  In

23  this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers

24  of CRT Products.

25       ~~131.~~137.    The agreements reached at the glass meetings included:

26           a.   agreements on CRT prices, including establishing target prices, "bottom" prices,

27                price ranges and price guidelines;

28           b.   placing agreed-upon price differentials on various attributes of CRTs, such as

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    quality or certain technical specifications;

2    c.   agreements on pricing for intra-company CRTs sales to vertically integrated

3         customers;

4    d.   agreements as to what to tell customers about the reason for a price increase;

5

6    e.   agreements to coordinate with competitors that did not attend the group meetings

7         and agreements with them to abide by the agreed-upon pricing;

8    f.   agreements to coordinate pricing with CRT manufacturers in other geographic

9         markets such as Brazil, Europe and India;

10   g.   agreements to exchange pertinent information regarding shipments, capacity,

11        production, prices and customers demands;

12   h.   agreements to coordinate uniform public statements regarding available capacity

13        and supply;

14   i.   agreements to allocate both overall market shares and share of a particular

15        customer's purchases;

16   j.   agreements to allocate customers;

17   k.   agreements regarding capacity, including agreements to restrict output and to audit

18        compliance with such agreements; and

19   l.   agreements to keep their meetings secret.

20   ~~132.~~138.    Efforts were made to monitor each Defendant's adherence to these

21   agreements in a number of ways, including seeking confirmation of pricing both from customers

22   and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

23   least four ways:  1) monitoring; 2) attendees at the meetings challenging other attendees if they did

24   not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers;

25   and 4) a recognition of a mutual interest in living up to the target price and living up to the

26   agreements that had been made.

27   ~~133.~~   As market conditions worsened in 2005-2007, and the rate of replacement of CRT

28   Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral

- 34 -

meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.     Bilateral Discussions

134.139.         Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

135.140.         During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico, and the United States.

136.141.         The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe, and the United States. .

137.142.         In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and MexicanCRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs imported intosold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

138.143.         Defendants also used bilateral discussions with each other during price

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

139.144.        Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

> **3.**      **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

140.145.        Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Co-conspirator Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

141.146.        Defendants Hitachi America and HEDUS were represented at those

meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

142.147.        Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

143.148.        Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

144.149.        Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

145.150.        Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

executives from LP Displays had previously attended meetings on behalf of Defendants LG

Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

146.151.        Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

These meetings were attended by high level sales managers from Panasonic and MTPD.

Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

withdrew from this conspiracy.

147.152.        PCNA was represented at those meetings and was a party to the

agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that

the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the

alleged conspiracy.

148.153.        Between at least 2003 and 2006, Defendant MTPD participated in multiple

glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices

and supply levels for CRTs.

149.154.        Between at least 1998 and 2007, Defendant BMCC participated in multiple

glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC

also engaged in multiple bilateral discussions with other Defendants, particularly the other

Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated

by the Chinese government.  BMCC was acting to further its own independent private interests in

participating in the alleged conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

150.155.         Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

151.156.         Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

152.157.         Between at least 1995 and 2007, Co-conspirator Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

153.158.         Co-conspirators SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

154.159.         Between at least 1998 and 2006, Defendant Samtel participated in multiple

- 39 -

bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

160. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

161. Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

162. Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

~~155.~~

~~156.~~163. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

2    conspiracy.

3    ~~157.~~164.          Defendants Toshiba America, TACP, TAEC and TAIS were represented at

4    those meetings and were a party to the agreements entered at them.  To the extent Toshiba

5    America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they

6    played a significant role in the conspiracy because Defendants wished to ensure that the prices for

7    CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

8    at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing

9    participants in the alleged conspiracy.

10   ~~158.~~165.          Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

11   PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

12   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

13   were attended by the highest ranking executives from Chunghwa, including the former Chairman

14   and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each

15   of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on

16   prices and supply levels for CRTs.

17   ~~159.   Defendant Tatung America was represented at those meetings and was a party to~~

18   ~~the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT~~

19   ~~Products to direct purchasers, it played a significant role in the conspiracy because Defendants~~

20   ~~wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut~~

21   ~~the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active,~~

22   ~~knowing participant in the alleged conspiracy.~~

23   ~~160.~~166.          Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

24   Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of

25   these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

26   engaged in bilateral discussions with other Defendants on a regular basis.  Through these

27   discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

28   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Daewoo never effectively withdrew from this conspiracy.

161.167.    When Plaintiffs refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

162.168.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue(billion US dollars)[1] | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

164.170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

---

[1] Estimated market value of CRT units sold.

FIRST AMENDED COMPLAINT

165.171.       Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.172.       In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

167.173.       In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

168.174.       After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

169.175.       A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

170.176.       A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used

to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

171.177.        Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

172.178.        For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

173.179.        During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

174.180.        During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

175.181.        These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.       International Government Antitrust Investigations**

176.182.        Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Department of Justice ("DOJ").

177.183.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

178.184.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

179.185.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.  The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007.  The coordination concerning the Hungarian market allegedly formed part of the European coordination.  Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

180.186.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187.      On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.188.      On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.189.      On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.190.        On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

185.191.        Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

192.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

186.

187.194.        As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

FIRST AMENDED COMPLAINT

1  businesses in the electronics industry.

2  188.195.    Several Defendants also have a history of "cooperation" and

3  anticompetitive conduct.  For example, Co-conspirator Samsung was fined $300 million by the

4  U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

5  Dynamic Random Access Memory ("DRAM").

6  189.196.    Defendant Toshiba and Co-conspirator Samsung have acknowledged being

7  contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of

8  Static Random Access Memory ("SRAM") and NAND Flash Memory.

9  190.197.    In December 2006, government authorities in Japan, Korea, the European

10  Union and the United States revealed a comprehensive investigation into anticompetitive conduct

11  in the closely-related TFT-LCD market.

12  191.198.    On December 12, 2006, news reports indicated that Co-conspirator

13  Samsung and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips

14  and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-

15  LCDs.

16  192.199.    On November 12, 2008, the DOJ announced that it had reached agreements

17  with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display

18  America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of

19  the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in

20  a conspiracy to fix prices of TFT-LCD panels.

21  193.200.    On March 10, 2009, the DOJ announced that it had reached an agreement

22  with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

23  violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in

24  a conspiracy to fix the prices of TFT-LCD panels.

25  194.201.    The plea agreements of LG Display Co., Ltd., Sharp Corporation,

26  Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

27  TFT-LCDs was carried out, in part, in California.

28

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

### G.      The Role of Trade Associations During the Relevant Period

195.202.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

196.203.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

197.204.      The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

198.205.      Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

199.206.      Through these trade association and trade events, and in meetings related to

1   these trade associations and trade events, on information and belief, Defendants shared what

2   would normally be considered proprietary and competitively sensitive information.  This exchange

3   of information was used to implement and monitor the conspiracy.

4   **H.     Effects of Defendants' Antitrust Violations**

5           **1.     Examples of Reductions in Manufacturing Capacity by Defendants**

6   ~~200.~~207.        As explained above, during the Relevant Period, Defendants consolidated

7   their manufacturing facilities in lower-cost venues such as China and reduced manufacturing

8   capacity to prop up prices.

9   ~~201.~~208.        In December of 2004, MTPD closed its American subsidiary's operations

10  in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing

11  was part of the company's "global restructuring initiatives in the CRT business."  The company

12  further stated that in the future, "CRTs for the North American market will be supplied by other

13  manufacturing locations in order to establish an optimum CRT manufacturing structure."

14  ~~202.~~209.        In July of 2005, LGPD ceased CRT production at its Durham, England

15  facility, citing a shift in demand from Europe to Asia.

16  ~~203.~~210.        In December of 2005, MTPD announced that it would close its American

17  subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG

18  Philips, the company explained that it was shifting its CRT operations to Asian and Chinese

19  markets.

20  ~~204.~~211.        In late 2005, Samsung SDI followed the lead of other manufacturers,

21  closing its CRT factory in Germany.

22  ~~205.~~212.        In July of 2006, Orion shut down a CRT manufacturing plant in Princeton,

23  Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia

24  and liquidating its joint venture with Toshiba.

25          **2.     Examples of Collusive Pricing for CRTs**

26  ~~206.~~213.        Defendants' collusion is evidenced by unusual price movements in the

27  CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for

28  CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

207.214.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.215.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.216.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

210.217.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211.218.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

212.219.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.220.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

to manufacture CRTs.

214.221.     Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

215.222.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.     Summary Of Effects Of The Conspiracy Involving CRTs**

216.223.     The above combination and conspiracy has had the following effects, among others:

    a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.     PLAINTIFFS' INJURIES**

217.224.     As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

218.225.     Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their Co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

219.226.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

220.227.     The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

221.228.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

222.229.     As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

223.230.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

conspiracy to fix the prices of CRTs.

224.231.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

225.232.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

226.233.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

227.234.     Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

228.235.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

229.236.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

230.237.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

231.238.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

232.239.     In addition, when several CRT manufacturers, including Defendant Philips and LG Electronics and Co-Conspirator Samsung, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

233.240.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

234.241.     Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

242.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this Complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

243.    As discussed at length in Paragraphs 182-201 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present.  Best Buy's direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

244.    As shown by Best Buy's allegations in Paragraphs 20, 21 & 22 above and 252 and 259 below, Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007)

- Direct Purchaser Plaintiffs' Consolidated Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

245.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Best Buy opted out on November 14, 2011. [2]

235.

## IX.X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

---

[2] *See, e.g., Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at 54 (C.D. Cal. May 5, 2011); *Jenson v. Allison-Williams Co.*, 1999 U.S. Dist. LEXIS 22170, at 18-19 (S.D.Cal. Aug. 23, 1999); *Cullen v. Margiotta*,  811 F.2d 698, 718-721 (2d Cir. 1987); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 341 (E.D. Pa. 2004); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528-29 (M.D. Fla. 1989); *Bartlett v. Miller and Schroder Municipals, Inc.*, 355 N.W.2d 435, 439 (Minn. Ct. App. 1984); *Carson v. Independent School Dist. No.* 623, 392 N.W.2d 216, 223 (Minn. 1986).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**(Violation of Section 1 of the Sherman Act)**

~~236.~~246.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~237.~~247.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~238.~~248.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~239.~~249.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~240.~~250.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~241.~~251.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.   issuing price announcements and price quotations in accordance with the agreements reached;

    e.   selling CRTs to customers in the United States at noncompetitive prices;

    f.   exchanging competitively sensitive information in order to facilitate their

conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

242.252.       As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**<u>Second Claim for Relief</u>**

**(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq*.)**

243.253.       Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.254.       Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*  Defendants conspired to and did fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.

245.255.       The aforesaid violations of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

246.256.       For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.   to fix, raise, maintain and stabilize the price of CRTs;

b.   to allocate markets for CRTs amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

d.   to allocate among themselves the production of CRTs.

247.257.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

248.258.      As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

249.259.      As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees.

## X.XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.      Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against

the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D.      Plaintiffs shall recover damages sustained by them, as provided by Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiffs shall receive such other or further relief as may be just and proper.

## ~~XI.~~XII.        JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

1    DATED:                                    **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

2

3                                             By: _____
                                                     Roman M. Silberfeld
4                                                    David Martinez

5                                             Attorneys for Plaintiffs
                                             BEST BUY CO., INC.; BEST BUY PURCHASING
6                                             LLC; BEST BUY ENTERPRISE SERVICES, INC.;
                                             BEST BUY STORES, L.P.; BESTBUY.COM,
                                             L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 61 -

# **<u>EXHIBIT E</u>**

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

2

3    INTERBOND CORPORATION OF AMERICA,
     _____

4          Plaintiff,                              CASE NO. _____

5    _____
     v.                                           COMPLAINT

6    HITACHI, LTD.; HITACHI DISPLAYS, LTD.;        JURY TRIAL DEMANDED
     HITACHI AMERICA, LTD.; HITACHI ASIA,

7    LTD.; HITACHI ELECTRONIC DEVICES (USA),
     INC.; SHENZHEN SEG HITACHI COLOR

8    DISPLAY DEVICES, LTD.; IRICO GROUP
     CORPORATION; IRICO GROUP ELECTRONICS

9    CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.;
     LG ELECTRONICS, INC.; LG ELECTRONICS

10   USA, INC.; LG ELECTRONICS TAIWAN TAIPEI
     CO., LTD.; LP DISPLAYS INTERNATIONAL

11   LTD.; PANASONIC CORPORATION;
     PANASONIC CORPORATION OF NORTH

12   AMERICA; MT PICTURE DISPLAY CO., LTD.;
     BEIJING MATSUSHITA COLOR CRT CO., LTD.;

13   KONINKLIJKE PHILIPS ELECTRONICS N.V.;
     PHILIPS ELECTRONICS NORTH AMERICA

14   CORPORATION; PHILIPS ELECTRONICS
     INDUSTRIES (TAIWAN), LTD.; PHILIPS DA

15   AMAZONIA INDUSTRIA ELECTRONICA
     LTDA.; SAMSUNG ELECTRONICS CO., LTD.;

16   SAMSUNG ELECTRONICS AMERICA, INC.;
     SAMSUNG SDI CO., LTD.; SAMSUNG SDI

17   AMERICA, INC.; SAMSUNG SDI MEXICO S.A.
     DE C.V.;  SAMSUNG SDI BRASIL LTDA.;

18   SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN
     SAMSUNG SDI CO., LTD.; SAMSUNG SDI

19   (MALAYSIA) SDN. BHD.; SAMTEL COLOR
     LTD.; THAI CRT CO., LTD.; TOSHIBA

20   CORPORATION; TOSHIBA AMERICA, INC.;
     TOSHIBA AMERICA CONSUMER PRODUCTS,

21   LLC; TOSHIBA AMERICA ELECTRONIC
     COMPONENTS, INC.; TOSHIBA AMERICA

22   INFORMATION SYSTEMS, INC.; CHUNGHWA
     PICTURE TUBES, LTD.; CHUNGHWA PICTURE

23   TUBES (MALAYSIA); TATUNG COMPANY OF
     AMERICA, INC.
     _____

24         Defendants._____

25

26   STUART H. SINGER (*Pro hac vice*)
     BOIES, SCHILLER, & FLEXNER LLP

27   401 East Las Olas Boulevard, Suite 1200
     Fort Lauderdale, Florida 33301

28   Telephone: (954) 356-0011

Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com
_____

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Interbond Corporation of America*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06275 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06275 | MDL No. 1917 |
| INTERBOND CORPORATION OF AMERICA., d/b/a BrandsMart USA | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS | |

1  USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
2  INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
3  CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
4  BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
5  ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
6  CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
7  DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
8  ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
9  SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
10  MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
11  SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
12  SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
13  CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
14  PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
15  TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
16  TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
17  SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
18  MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
19  & ELECTRONICS, USA, INC.,

20          Defendants.

21

22          Plaintiff   Interbond   Corporation   of   America,   d/b/a   BrandsMart   USA

23  ("BrandsMart") for its Complaint against all Defendants named herein, hereby alleges as

24  follows:

25  I.    **INTRODUCTION**

26          1.      Defendants and their co-conspirators formed an international cartel which

27  conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

28  through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

1  conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2          2.      Defendants are or were among the leading manufacturers of: (a) color

3  picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

4  tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

5  devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

6  purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

7  to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

8  and the products containing them shall be referred to as "CDT Products."  CDT Products and

9  CPT Products shall be referred to collectively herein as "CRT Products."

10         3.      Defendants control the majority of the CRT industry, a multibillion dollar

11  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

12  Relevant Period, virtually every household in the United States owned at least one CRT Product.

13         4.      Since the mid-1990s, the CRT industry faced significant economic

14  pressures as customer preferences for other emerging technologies shrank profits and threatened

15  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

16  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

17  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

18  States.

19         5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

20  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

21  shipments, prices, production and customer demand; (c) coordinate public statements regarding

22  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

23  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

24  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

25  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

26  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

27  producer's share of certain key customers' sales; and (k) restrict output.

28         6.      The conspiracy concerning CRTs commenced with bilateral meetings that

began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.     During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     <u>JURISDICTION AND VENUE</u>

10.     Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to Section 501.211 of the Florida

1    Statutes, for declaratory relief and damages that Plaintiff sustained due to Defendants' and their

2    co-conspirators violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§

3    501.201, *et seq.* ("FDUTPA").

4         12.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

5    the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

6    supplemental jurisdiction over Plaintiff's FDUTPA claims under 28 U.S.C. § 1367 because they

7    arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law

8    claims are so related to its claim under Section 1 of the Sherman Act that they form part of the

9    same case or controversy.

10        13.    The activities of Defendants and their co-conspirators, as described herein,

11   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

12   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

13   import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the

14   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

15   United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

16   substantially affected the price of CRT Products purchased by Plaintiff in Florida.

17        14.    This court has jurisdiction over each Defendant named in this action under

18   Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

19   availed themselves of the laws of the United States as they manufactured CRT Products for sale

20   in the United States, or CRTs which were incorporated into CRT Products Defendants and their

21   co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

22   conspirators' conspiracy affected this commerce in CRT Products in the United States.

23        15.    Venue is proper in the Southern District of Florida under Section 12 of the

24   Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

25   corporation, transacts business in this District, or is otherwise found within this District.   In

26   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

27   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

28   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

1     into this District.

2     **III.**     **PARTIES**

3         **A.**     **Plaintiff**

4         16.     Plaintiff BrandsMart is a Florida corporation with its corporate

5 headquarters in Hollywood, Florida.  BrandsMart was incorporated in 1977 with the opening of

6 its first retail location in Miami, Florida.  Through the conclusion of Defendants' and the co-

7 conspirators' conspiracy, BrandsMart was a supplier of consumer electronics products and

8 services with 11 stores in Florida and Georgia.  In fiscal year 2010, BrandsMart sold $725

9 million of products and services.

10         17.     During the Relevant Period, BrandsMart purchased CRT Products directly

11 and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any

12 agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, BrandsMart

13 suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.  Throughout the

14 Relevant Period, BrandsMart conducted a substantial amount of business in Florida.

15         18.     During the Relevant Period, BrandsMart's negotiations for the purchase

16 of CRT Products took place in the United States and were controlled by a department based at

17 the company's headquarters in Florida.  In addition, BrandsMart's purchase orders for CRT

18 Products were issued from Florida, all invoices for CRT Products were sent to BrandsMart in

19 Florida, and all payments for CRT Products were made by BrandsMart from Florida.

20 BrandsMart employees based in Florida were also responsible for selecting vendors and product

21 lines with respect to CRT Products.

22         **B.**     **Defendants**

23         **1.**     **Hitachi Entities**

24         19.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of

25 business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

26 parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

27 market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

28 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1  subsidiaries or affiliates, throughout the United States.

2          20.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese
3  company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,
4  297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.
5  in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,
6  manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to
7  create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi
8  Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or
9  through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.
10  dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the
11  antitrust violations alleged in this complaint.

12          21.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York
13  company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New
14  York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant
15  Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or
16  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
17  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and
18  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

19          22.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company
20  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,
21  Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant
22  Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or
23  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
24  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and
25  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

26          23.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a
27  Delaware corporation with its principal place of business located at 208 Fairforest Way,
28  Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

1  Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

2  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

3  United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

4  finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

5  complaint.

6        24.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

7  Shenzhen") was a Chinese company with its principal place of business located at 5001

8  Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

9  least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

10  around the time that the government investigations into the CRT industry began).  Thus, Hitachi

11  Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

12  Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

13  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

14  throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

15  controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

16  violations alleged in this complaint.

17        25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

18  HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

19           **2.    IRICO Entities**

20        26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with

21  its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

22  712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

23  marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

24  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

25  subsidiaries or affiliates, throughout the United States.

26        27.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

27  company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

28  Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

1    CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

2    also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

3    and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

4    IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

6    the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

7    complaint.

8            28.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

9    company with its principal place of business located at No. 16, Fenghui South Road West,

10   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

11   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

12   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

13   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

14   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

15   alleged in this complaint.

16           29.    Defendants IGC, IGE and IDDC are collectively referred to herein as

17   "IRICO."

18           **3.    LG Electronics Entities**

19           30.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

20   the laws of the Republic of Korea with its principal place of business located at LG Twin

21   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

22   billion global force in consumer electronics, home appliances and mobile communications,

23   which established its first overseas branch office in New York in 1968.  The company's name

24   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

25   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

26   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

27   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

28   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

1    and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2    throughout the United States.

3           31.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

4    corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

5    New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

6    During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

7    Products, either directly or through its subsidiaries or affiliates, throughout the United States.

8    Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

9    to the antitrust violations alleged in this complaint.

10          32.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

11   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

12   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

13   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

14   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

15   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

16   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

17          33.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

18   herein as "LG Electronics."

19          **4.    LP Displays**

20          34.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

21   Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

22   Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

23   which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

24   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

25   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

26   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

27   and LGEI would cede control over the company and the shares would be owned by financial

28   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

1    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2    affiliates, throughout the United States.

3                                **5.        Panasonic Entities**

4            35.     Defendant Panasonic Corporation, which was at all times during the

5    Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

6    Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

7    Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States.

10           36.     Defendant Panasonic Corporation of North America ("PCNA") is a

11   Delaware corporation with its principal place of business located at One Panasonic Way,

12   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

13   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

14   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

16   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

17           37.     Defendants Panasonic Corporation and PCNA are collectively referred to

18   herein as "Panasonic."

19           38.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

20   Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

21   Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

22   Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

23   manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.   On

24   March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

25   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

26   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

27   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

28   subsidiaries or affiliates, throughout the United States.

39.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

40.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1   subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

2   controlled the finances, policies and affairs of Philips America relating to the antitrust violations

3   alleged in this complaint.

4        42.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

5   Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

6   Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

7   Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant Royal Philips dominated and controlled the finances, policies and

10  affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

11       43.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

12  Brazil") is a Brazilian company with its principal place of business located at Av Torquato

13  Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

14  wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

15  Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

16  directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

17  Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

18  the antitrust violations alleged in this complaint.

19       44.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

20  Brazil are collectively referred to herein as "Philips."

21       **7.    <u>Samsung Entities</u>**

22       45.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

23  company with its principal place of business located at Samsung Electronics Building, 1320-10,

24  Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

25  company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

26  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

27  States.

28       46.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

47.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

48.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

51.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

52.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

1  the antitrust violations alleged in this complaint.

2  53.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

3  is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

4  Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

5  Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

6  Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

7  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

8  throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

9  finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

10  in this complaint.

11  54.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

12  SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

13  SDI Malaysia are collectively referred to herein as "Samsung."

14  **8.    Samsung**

15  55.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

16  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

17  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

18  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

19  States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

20  Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

21  its subsidiaries and affiliates, throughout the United States.

22  **9.    Thai CRT**

23  56.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

24  1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

25  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

26  televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

27  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

28  United States.

10.    **Toshiba Entities**

57.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

58.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

59.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

60.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur

1    Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

2    subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC

3    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

4    subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled

5    the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

6    complaint.

7            61.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

8    California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

9    California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC

10   through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold

11   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12   throughout the United States.   Defendant TC dominated and controlled the finances, policies and

13   affairs of TAIS relating to the antitrust violations alleged in this complaint.

14           62.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

15   collectively referred to herein as "Toshiba."

16           **11.    Chunghwa Entities**

17           63.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

18   Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

19   Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In

20   1974, Chunghwa PT's CRTs received certification by the United States, giving the company

21   entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major

22   global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and

23   distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

24   Fuzhou subsidiary) throughout the United States.

25           64.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

26   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

27   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.   It is a wholly-

28   owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT

production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

Tatung Company of America, Inc. ("Tatung America**12.     Thomson Entities**

65.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a CaliforniaFrench corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half usedThomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passedits television-manufacturing division, which had plants in the United States and Mexico, and to her two childrenother television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Tatung

1  ~~America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products
2  ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~, either directly or indirectly
3  through its subsidiaries or affiliates, to customers throughout the United States.

4        66.   Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,
5  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of
6  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson
7  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.   Thomson Consumer
8  Electronics was a major manufacturer of CRTs for the United States market, with plants located
9  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.   The United States-based
10 plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own
11 television-manufacturing division, which had plants in the United States and Mexico, and to
12 other television manufacturers in the United States and elsewhere.   Thomson's CRT televisions
13 were sold in the United States to United States consumers under the RCA brand.   Thomson
14 Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT
15 business was sold to Videocon in 2005.   During the Relevant Period, Thomson Consumer
16 Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or
17 indirectly through its subsidiaries or affiliates, to customers throughout the United States.

18       67.   Thomson SA and Thomson Consumer Electronics are collectively referred
19 to herein as "Thomson."

20       **13.**   **Mitsubishi Entities**

21       ~~66.~~

22       ~~67.~~

23       68.   Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")
24 is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,
25 Japan.   Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in
26 Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold
27 internally to Mitsubishi's television and monitor manufacturing division and to other television
28 and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor

division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

69.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.    AGENTS AND CO-CONSPIRATORS

68.72.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

69.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

70.74.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

71.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

72.76.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

73.77.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

1    Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

2    Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

3    Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

4    its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

5    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

6    throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

7    finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

8    this complaint.

9            74.78.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

10   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

11   principal place of business was located in Indonesia.  TEDI was projected to have an annual

12   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

13   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

14   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

15   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

17   affairs of TEDI relating to the antitrust violations alleged in this complaint.

18           75.79.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

19   company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

20   Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

21   subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

22   venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

23   Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

24   During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

25   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26   Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

27   the antitrust violations alleged in this complaint.

28           76.80.  The acts charged in this Complaint have been done by Defendants and

BRANDSMART'S AMENDED COMPLAINT                    61                    Case No. 11-cv-06275
                                                                       Master File No. 3:07-cv-05944-SC

1   their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

2   employees or representatives while actively engaged in the management of each Defendant's or

3   co-conspirator's business or affairs.

4   **V.     TRADE AND COMMERCE**

5   ~~77.~~81.  During the Relevant Period, each Defendant, or one or more of its

6   subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

7   interstate commerce and foreign commerce, including through and into this judicial district.

8   ~~78.~~82.  During the Relevant Period, Defendants collectively controlled a vast

9   majority of the market for CRT Products, both globally and in the United States.

10   ~~79.~~83.  The business activities of Defendants substantially affected interstate trade

11   and commerce in the United States and caused antitrust injury in the United States.  The business

12   activities of Defendants also substantially affected trade and commerce in Florida and caused

13   antitrust injuries in Florida.

14   **VI.    FACTUAL ALLEGATIONS**

15          **A.     CRT Technology**

16   ~~80.~~84.  A CRT has three components: (a) one or more electron guns, each of

17   which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

18   other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

19   that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

20   faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

21   coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

22   shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

23   produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

24   narrow lines of red, green, blue and black.

25   ~~81.~~85.  CRT technology was first developed more than a century ago.  The first

26   commercially practical CRT television was made in 1931.  However, it was not until RCA

27   Corporation introduced the product at the 1939 World's Fair that it became widely available to

28   consumers.  After that, CRTs became the heart of most display products, including televisions,

1  computer monitors, oscilloscopes, air traffic control monitors and ATMs.

2  ~~82.~~86.  The quality of a CRT itself determines the quality of the CRT display.  No

3  external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

4  the whole CRT product so that the product is often simply referred to as "the CRT."

5  ~~83.~~87.  Although there have been refinements and incremental advancements

6  along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

7  the CRT technology used today is similar to that RCA unveiled in 1939.

8  ~~84.~~88.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

9  used primarily in televisions and related devices and CDTs are primarily used in computer

10  monitors and similar devices.  The primary difference is that CDTs typically yield a higher

11  resolution image requiring more pixels than do CPTs.

12  ~~85.~~89.  CRTs have no independent utility, and have value only as components of

13  other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

14  from the demand for such products.

15  ~~86.~~90.  The market for CRTs and the market for the products into which they are

16  placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

17  Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

18  inseparable in that one would not exist without the other.

19  ~~87.~~91.  Plaintiff has participated in the market for CRTs through its direct

20  purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of

21  CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment

22  manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at

23  which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-

24  competitive prices for CRT Products.

25  ~~88.~~92.  Plaintiff has participated in the market for products containing CRTs. To

26  the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their

27  co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs

28  in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

89.93.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.     Structure of the CRT Industry**

90.94.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

91.95.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

92.96.  Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

93.97.  Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

**3.**     **Consolidation**

~~94.~~98.   The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

**4.**     **Multiple Interrelated Business Relationships**

~~95.~~99. The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

~~96.~~100.       Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-

1      LCD production with TFT-LCD production, marketed Daewoo's

2      STN-LCDs globally through its network.

3      g.   Also in 1995, Defendant Toshiba entered into a technology transfer

4      agreement with Defendant Chunghwa for large CPTs.

5      h.   Defendant Chunghwa has a joint venture with Defendant Samsung for

6      the production of LCD panels.   Chunghwa now licenses the

7      technology from Defendant Philips, a recent development that helped

8      resolve a patent infringement suit filed in 2002.

9      i.   Defendants LG Electronics and Hitachi entered into a joint venture in

10      2000 for the manufacture, sale and distribution of optical storage

11      products such as DVD drives.

12      j.   Defendant Samtel participates in a joint venture, Samcor Glass

13      Limited, with Defendant Samsung and non-defendant Corning Inc.,

14      USA for the production and supply of picture tube glass.

15      k.   Defendant Samtel claims to have supplied CRTs to Defendants LG

16      Electronics, Samsung, Philips, and Panasonic.

17      **5.      High Costs of Entry Into the Industry**

18      97.101.      There are significant manufacturing and technological barriers to

19   entry into the CRT industry.  It would require substantial time, resources and industry knowledge

20   to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter

21   the market in light of the declining demand for CRT Products.

22      98.102.      During the Relevant Period, the costs of the assembly components,

23   both as a whole and individually, have been generally declining, and, in some periods, declining

24   at a substantial rate.   A combination of price discussions and manipulation of the output of

25   CRTs allowed Defendants to keep prices above where they would have been but for the

26   conspiracy.

27      **6.      The Maturity of the CRT Product Market**

28      99.103.      Newer industries typically are characterized by rapid growth,

BRANDSMART'S AMENDED COMPLAINT          61          Case No. 11-cv-06275
                                                    Master File No. 3:07-cv-05944-SC

innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~100.~~104.        Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~101.~~105.        In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~102.~~106.        Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

~~103.~~107.        In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

~~104.~~108.        As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    **Homogeneity of CRT Products**

~~105.~~109.        CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

1    ~~106.~~110.          It is easier to form and sustain a cartel when the product in

2    question is commodity-like because it is easier to agree on prices to charge and to monitor those

3    prices once an agreement is formed.

4         **C.      Pre-Conspiracy Market**

5    ~~107.~~111.          The genesis of the CRT conspiracy was in the late 1980s as the

6    CRT Products business became more international and Defendants began serving customers that

7    were also being served by other international companies.  During this period, the employees of

8    Defendants would encounter employees from their competitors when visiting their customers.  A

9    culture of cooperation developed over the years and these Defendant employees would exchange

10   market information on production, capacity and customers.

11   ~~108.~~112.          In the early 1990s, representatives from Samsung, Daewoo,

12   Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these

13   producers began to include discussions about price in their meetings.

14        **D.      Defendants' and Co-Conspirators' Illegal Agreements**

15   ~~109.~~113.          In order to control and maintain profitability during declining

16   demand for CRT Products, Defendants and their co-conspirators have engaged in a contract,

17   combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or

18   stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1,

19   1995 through at least November 25, 2007.

20   ~~110.~~114.          The CRT conspiracy was effectuated through a combination of

21   group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral

22   discussions were the primary method of communication and took place on an informal, ad hoc

23   basis.  During this period, representatives from Daewoo and Defendants LG Electronics and

24   Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT,

25   Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific

26   customers.   These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia,

27   Indonesia and Singapore.

28   ~~111.~~115.          Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

1    ~~and~~ Daewoo, also attended several ad hoc group meetings during this period.  The participants at

2    these group meetings also discussed increasing prices for CRTs.

3         ~~112.~~116.      As more manufacturers formally entered the conspiracy, group

4    meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more

5    organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put

6    in place. Defendants' representatives attended hundreds of these meetings during the Relevant

7    Period.

8         ~~113.~~117.      The overall CRT conspiracy raised and stabilized worldwide and

9    U.S. prices that Defendants charged for CRTs.

10         **1.**     **"Glass Meetings"**

11         ~~114.~~118.      The group meetings among the participants in the CRT price-

12    fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended

13    by employees at three general levels of Defendants' corporations.

14         ~~115.~~119.      The first level meetings were attended by high level company

15    executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.

16    Top meetings occurred less frequently, typically quarterly, and were focused on longer term

17    agreements and forcing compliance with price-fixing agreements.  Because attendees at top

18    meetings had authority as well as more reliable information, these meetings resulted in

19    agreements.  Attendees at top meetings were also able to resolve disputes because they were

20    decision makers who could make agreements.

21         ~~116.~~120.      The second level meetings were attended by Defendants' high

22    level sales managers and were known as "management" meetings.  These meetings occurred

23    more frequently, typically monthly, and handled implementation of the agreements made at top

24    meetings.

25         ~~117.~~121.      Finally, the third level meetings were known as "working level"

26    meetings and were attended by lower level sales and marketing employees.  These meetings

27    generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

28    information and discussing pricing since the lower level employees did not have the authority to

enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

118.122.      The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

119.123.      Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

120.124.      Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

121.125.      During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

122.126.      Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

123. 127.     The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

124. 128.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

125. 129.     Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

126.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

1    ~~indirect purchasers of CRT Products.~~

2              ~~127.~~130.        The agreements reached at the glass meetings included:

3                    a.   agreements on CRT prices, including establishing target prices,

4                         "bottom" prices, price ranges and price guidelines;

5                    b.   placing agreed-upon price differentials on various attributes of CRTs,

6                         such as quality or certain technical specifications;

7                    c.   agreements on pricing for intra-company CRTs sales to vertically

8                         integrated customers;

9                    d.   agreements as to what to tell customers about the reason for a price

10                        increase;

11                   e.   agreements to coordinate with competitors that did not attend the

12                        group meetings and agreements with them to abide by the agreed-

13                        upon pricing;

14                   f.   agreements to coordinate pricing with CRT manufacturers in other

15                        geographic markets such as Brazil, Europe and India;

16                   g.   agreements to exchange pertinent information regarding shipments,

17                        capacity, production, prices and customer demands;

18                   h.   agreements to coordinate uniform public statements regarding

19                        available capacity and supply;

20                   i.   agreements to allocate both overall market shares and share of a

21                        particular customer's purchases;

22                   j.   agreements to allocate customers;

23                   k.   agreements regarding capacity, including agreements to restrict output

24                        and to audit compliance with such agreements; and

25                   l.   agreements to keep their meetings secret.

26              ~~128.~~131.        Efforts were made to monitor each Defendant's adherence to these

27   agreements in a number of ways, including seeking confirmation of pricing both from customers

28   and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

1    least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they

2    did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

3    customers; and 4) a recognition of a mutual interest in living up to the target price and living up

4    to the agreements that had been made.

5    ~~129.~~132.      As market conditions worsened in 2005-2007, and the rate of

6    replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less

7    frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the

8    DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to

9    have concerns about antitrust issues.

10                    **2.      Bilateral Discussions**

11                   ~~130.~~133.      Throughout the Relevant Period, the glass meetings were

12   supplemented by bilateral discussions between various Defendants.  The bilateral discussions

13   were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

14   between the group meetings. These discussions, usually between sales and marketing employees,

15   took the form of in-person meetings, telephone contacts and emails.

16                   ~~131.~~134.      During the Relevant Period, in-person bilateral meetings took

17   place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

18   Thailand, Brazil ~~and~~, Mexico, and the United States.

19                   ~~132.~~135.      The purpose of the bilateral discussions was to exchange

20   information about past and future pricing, confirm production levels, share sales order

21   information, confirm pricing rumors, and coordinate pricing with manufacturers in other

22   geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

23                   ~~133.~~136.      In order to ensure the efficacy of their global conspiracy,

24   Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

25   ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the

26   United States.   These ~~Brazilian and Mexican~~CRT manufacturers were particularly important

27   because they served the North American market for CRT Products.  As further alleged herein,

28   North America was the largest market for CRT televisions and computer monitors during the

1  Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned

2  and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the

3  unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

4  ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at

5  supracompetitive levels.

6          ~~134.~~137.          Defendants also used bilateral discussions with each other during

7  price negotiations with customers to avoid being persuaded by customers to cut prices.  The

8  information gained in these communications was then shared with supervisors and taken into

9  account in determining the price to be offered.

10         ~~135.~~138.          Bilateral discussions were also used to coordinate prices with CRT

11 manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

12 Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

13 management meeting, the attendees at these group meetings would meet bilaterally with the

14 other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

15 output agreements had been reached during the meeting.  For example, Samsung had a

16 relationship with Hitachi and was responsible for communicating CRT pricing agreements to

17 Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

18 CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

19 with Thomson in Europe and the United States, and Samsung SDI had regular communications

20 with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for

21 communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented

22 the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes

23 Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel

24 participated in the conspiracy to fix prices of CRTs.

25         **3.          Defendants' and Co-Conspirators' Participation in Group and**

26                **Bilateral Discussions**

27         ~~136.~~139.          Between at least 1996 and 2001, Defendant Hitachi, through

28 Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass

1   meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also

2   engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

3   Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never

4   effectively withdrew from this conspiracy.

5   137.140.    Defendants Hitachi America and HEDUS were represented at

6   those meetings and were a party to the agreements entered at them.  To the extent Hitachi

7   America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a

8   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

9   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

10  the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the

11  alleged conspiracy.

12  138.141.    Between at least 1998 and 2007, Defendant IRICO, through IGC,

13  IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the

14  highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

15  with other Defendants, particularly with other Chinese manufacturers.  Through these

16  discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's

17  conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

18  IRICO was acting to further its own independent private interests in participating in the alleged

19  conspiracy.

20  139.142.    Between at least 1995 and 2001, Defendant LG Electronics,

21  through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001,

22  LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

23  (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest

24  ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

25  with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on

26  prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this

27  conspiracy.

28  140.143.    Defendant LGEUSA was represented at those meetings and was a

1    party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

2    Products, it played a significant role in the conspiracy because Defendants wished to ensure that

3    the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

4    agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in

5    the alleged conspiracy.

6         141.144.        Between at least 2001 and 2006, Defendant LP Displays (f/k/a

7    LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these

8    meetings were attended by the highest ranking executives from LP Displays.  Certain of these

9    high level executives from LP Displays had previously attended meetings on behalf of

10   Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with

11   other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

12   CRTs.

13        142.145.        Between at least 1996 and 2003, Defendant Panasonic, through

14   Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After

15   2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with

16   Toshiba.   These meetings were attended by high level sales managers from Panasonic and

17   MTPD.   Panasonic also engaged in multiple bilateral discussions with other Defendants.

18   Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic

19   never effectively withdrew from this conspiracy.

20        143.146.        PCNA was represented at those meetings and was a party to the

21   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

22   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

23   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

24   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

25   the alleged conspiracy.

26        144.147.        Between at least 2003 and 2006, Defendant MTPD participated in

27   multiple glass meetings and in fact led many of these meetings during the latter years of the

28   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

1    also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

2    agreed on prices and supply levels for CRTs.

3        145.148.        Between at least 1998 and 2007, Defendant BMCC participated in

4    multiple glass meetings.  These meetings were attended by high level sales managers from

5    BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

6    particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

7    prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

8    CRTs was mandated by the Chinese government.  BMCC was acting to further its own

9    independent private interests in participating in the alleged conspiracy.

10        146.149.        Between at least 1996 and 2001, Defendant Philips, through Royal

11   Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

12   Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

13   (n/k/a LP Displays).  A substantial number of these meetings were attended by high level

14   executives from Philips.  Philips also engaged in numerous bilateral discussions with other

15   Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.

16   Philips never effectively withdrew from this conspiracy.

17        147.150.        Defendants Philips America and Philips Brazil were represented at

18   those meetings and were a party to the agreements entered at them.  To the extent Philips

19   America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

20   played a significant role in the conspiracy because Defendants wished to ensure that the prices

21   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

22   reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing

23   participants in the alleged conspiracy.

24        148.151.        Between at least 1995 and 2007, Defendant Samsung, through

25   SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

26   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

27   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

28   bilateral discussions with each of the other Defendants on a regular basis.  Through these

discussions, Samsung agreed on prices and supply levels for CRTs.

149.152.      Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

153.   Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These meetings were attended by high level executives from Samtel.   Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

154.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

155.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

156.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

150.157.        Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

151.158.        Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

152.159.        Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

153.   Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

154.160.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

155.161.   When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.   The CRT Market During the Conspiracy

156.162.   Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

157.163.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

158.164.　　　During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

159.165.　　　In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

160.166.　　　A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

161.167.　　　A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

162.168.　　　Defendants also conspired to limit production of CRTs by shutting

---

[1]　　　Estimated market value of CRT units sold.

1   down production lines for days at a time, and closing or consolidating their manufacturing

2   facilities.

3   ~~163.~~169.       For example, Defendants' CRT factory utilization percentage fell

4   from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most

5   dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops

6   throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

7   these sudden, coordinated drops in factory utilization by Defendants were the result of

8   Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

9   ~~164.~~170.       During the Relevant Period, while demand in the United States for

10  CRT Products continued to decline, Defendants' conspiracy was effective in moderating the

11  normal downward pressures on prices for CRT Products caused by the entry and popularity of

12  the new generation LCD panels and plasma display products.  As Finsen Yu, President of

13  Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of

14  2007: "[t]he CRT technology is very mature; prices and technology have become stable."

15  ~~165.~~171.       During the Relevant Period, there were not only periods of

16  unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT

17  Products.  These price increases were despite the declining demand due to the approaching

18  obsolescence of CRT Products caused by the emergence of a new, potentially superior and

19  clearly more popular, substitutable technology.

20  ~~166.~~172.       These price increases and price stability in the market for CRT

21  Products during the Relevant Period are inconsistent with a competitive market for a product

22  facing rapidly decreasing demand caused by a new, substitutable technology.

23       **F.**     **International Government Antitrust Investigations**

24  ~~167.~~173.       Defendants' conspiracy to fix, raise, maintain and stabilize the

25  prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is

26  demonstrated by a multinational investigation commenced by the Antitrust Division of the

27  United States Department of Justice.

28  ~~168.~~174.       Separately, the European Commission and Japan and South

BRANDSMART'S AMENDED COMPLAINT          61          Case No. 11-cv-06275
                                                    Master File No. 3:07-cv-05944-SC

1   Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs

2   that were being sold in Europe and Asia.

3   169.175.         In its 2008 Annual Report, Defendant Toshiba reports that "[t]he

4   Group is also being investigated by the [European] Commission and/or the U.S. Department of

5   Justice for potential violations of competition laws with respect to semiconductors, LCD

6   products, cathode ray tubes (CRT) and heavy electrical equipment."

7   170.176.         On May 6, 2008, the Hungarian Competition Authority ("HCA")

8   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

9   The Hungarian Competition Authority (Gazdasági Versenyhivatal –

10  GVH) initiated a competition supervision proceeding against the
    following undertakings: Samsung SDI Co., Ltd., Samsung SDI

11  Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP
    sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays,

12  Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd,
    Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo

13  Electronics European HQ, MT Picture Display Germany GmbH,
    Matsushita Global HQ, Matsushita European HQ.

14

15  Based on the data available the undertakings mentioned above
    concerted their practice regarding the manufacturing and distribution

16  of cathode-ray tubes (including coloured pictures tubes and coloured
    screen tubes) on the European market between 1995 and 2007. The

17  anti-competitive behaviour may have concerned the exchange of
    sensitive market information (about prices, volumes sold, demand

18  and the extent to which capacities were exploited), price-fixing, the
    allocation of market shares, consumers and volumes to be sold, the

19  limitation of output and coordination concerning the production. The
    undertakings evolved a structural system and functional mechanism

20  of cooperation.

21

22  According to the available evidences it is presumable that the
    coordination of European and Asian undertakings regarding to the

23  European market also included Hungary from 1995 to 2007. The
    coordination concerning the Hungarian market allegedly formed part

24  of the European coordination. Samsung SDI Magyarország. was
    called into the proceeding since it manufactured and sold cathode-

25  ray tubes in Hungary in the examined period, and it allegedly
    participated in the coordination between its parent companies.

26

27  171.177.         On February 10, 2009, the DOJ issued a press release announcing

28

that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

172.178.      On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.   The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

173.179.      On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.180.      On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former

executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

175.181.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

176.182.      Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried out in California.

177.183.      The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

184.   On December 5, 2012 the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

178.185.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

179.186.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

180.187.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

181.188.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

182.189.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

183.190.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

184.191.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

185.192.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

G.       The Role of Trade Associations During the Relevant Period

186.193.       Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

187.194.       Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

188.195.       The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

189.196.       Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and

the annual International Display Workshops (the most recent ones of which have been held in Japan).

190.197.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

191.198.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

192.199.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

193.200.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

194.201.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

195.202.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

196.203.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.      Examples of Collusive Pricing for CRTs

197.204.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

198.205.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

199.206.      In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

200.207.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

201.208.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

202.209.      In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

203.210.      After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article

quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

204.211.      On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

205.212.      CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.      Summary Of Effects Of The Conspiracy Involving CRTs**

206.213.      The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.      PLAINTIFF'S INJURIES**

207.214.      As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

208.215.      Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

209.216.      The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

210.217.      Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

211.218.      The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

212.219.      Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

213.220.      As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

214.221.      Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

215.222.      Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

216.223.      The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

217.224.      By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

218.225.      Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and

concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

219.226.        As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

220.227.        Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

221.228.        As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

222.229.        As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

223.230.        In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

"[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

~~224.~~231.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

~~225.~~232.     Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

~~226.~~233.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

~~IX.~~

**IX.     *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

234.     As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.     As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236.     Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

227.237.        Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

228.238.        Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

229.239.        In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

230.240.        As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

231.241.        The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

232.242.        For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

  a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

  b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

  c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

1    d.  issuing price announcements and price quotations in accordance

2        with the agreements reached;

3    e.  selling CRTs to customers in the United States at noncompetitive

4        prices;

5    f.  exchanging competitively sensitive information in order to facilitate

6        their conspiracy;

7    g.  agreeing to maintain or lower production capacity; and

8    h.  providing false statements to the public to explain increased prices

9        for CRTs.

10    233.243.    As a result of Defendants' unlawful conduct, Plaintiff was injured

11   in its business and property in that it paid more for CRT Products than it otherwise would have

12   paid in the absence of Defendants' unlawful conduct.

13                              **Second Claim for Relief**

14          **(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

15    234.244.    Plaintiff incorporates and realleges, as though fully set forth

16   herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

17    235.245.    During the Relevant Period, each of the Defendants named herein,

18   directly, and through affiliates or subsidiaries or agents they dominated and controlled,

19   manufactured, sold, and/or distributed CRT Products in commerce in the United States,

20   including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as

21   both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to

22   Plaintiff as a purchaser.

23    236.246.    Based on the foregoing, Defendants engaged in unfair and

24   deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

25    237.247.    During the Relevant Period, Plaintiff maintained its principal place

26   of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT

27   Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders

28   and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

238.248.    In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

239.249.    The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202(3).

240.250.    Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

241.251.    As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

1    **XI.    PRAYER FOR RELIEF**

2            WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf,

3    adjudging and decreeing that:

4            A.      Defendants engaged in a contract, combination, and conspiracy in

5    violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the FDUTPA, and that Plaintiff

6    was injured in its business and property as a result of Defendants' violations;

7            B.      Plaintiff shall recover damages sustained by it, as provided by the federal

8    and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered

9    against the Defendants in an amount to be trebled in accordance with such laws, including

10   Section 4 of the Clayton Act;

11           C.      Defendants engaged in a contract, combination, and conspiracy in

12   violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and

13   Plaintiff was injured in its business and property as a result of Defendants' violations;

14           D.      Plaintiff shall recover damages sustained by it, as provided by Florida

15   Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several

16   judgment in favor of Plaintiff shall be entered against the Defendants;

17           E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

18   and the respective officers, directors, partners, agents, and employees thereof, and all other

19   persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

20   from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

21           F.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and

22   such interest shall be awarded at the highest legal rate from and after the date of service of the

23   initial complaint in this action;

24           G.      Plaintiff shall recover its costs of this suit, including reasonable attorneys'

25   fees as provided by law; and

26           H.      Plaintiff shall receive such other or further relief as may be just and

27   proper.

28

XII.        **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                Respectfully Submitted,

_____

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice to be filed*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice to be filed*)
ANNE M. NARDACCI (*Pro hac vice to be filed*)
LUKE NIKAS (*Pro hac vice to be filed*)
CHRISTIOPHERCHRISTOPHER V. FENLON (*Pro hac vice to be filed*)

BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Interbond Corporation of America*

# **<u>EXHIBIT F</u>**

1
~~David H. Orozco (220732)~~
2
~~SUSMAN GODFREY LLP~~
~~1901 Avenue of the Stars, Suite 950~~
3
~~Los Angeles, California 90067-6029~~
~~Telephone: (310) 789-3100~~
4
~~Facsimile: (310) 789-3150~~
~~dorozco@susmangodfrey.com~~
5
6   Attorneys for Alfred H. Siegel, as Trustee of
    the Circuit City Stores, Inc. Liquidating Trust
    [additional counsel listed on signature page]
7

H. Lee Godfrey (*pro hac vice* ~~to be submitted~~)
Kenneth S. Marks (*pro hac vice* ~~to be submitted~~)
Jonathan J. Ross (pro hac vice)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com
jross@susmangodfrey.com

8

9

10

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

11

12

13   ALFRED H. SIEGEL, AS TRUSTEE OF THE
     CIRCUIT CITY STORES, INC. LIQUIDATING
     TRUST,

14                                          Plaintiff,

15   v.

16   HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
     HITACHI AMERICA, LTD.; HITACHI ASIA,
17   LTD.; HITACHI ELECTRONIC DEVICES
     (USA), INC.; SHENZHEN SEG HITACHI
18   COLOR DISPLAY DEVICES, LTD.; IRICO
     GROUP CORPORATION; IRICO GROUP
19   ELECTRONICS CO., LTD.; IRICO DISPLAY
     DEVICES CO., LTD.; LG ELECTRONICS, INC.;
20   LG ELECTRONICS USA, INC.; LG
     ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP
21   DISPLAYS INTERNATIONAL LTD.;
     PANASONIC CORPORATION; PANASONIC
22   CORPORATION OF NORTH AMERICA; MT
     PICTURE DISPLAY CO., LTD.; BEIJING
23   MATSUSHITA COLOR CRT CO., LTD.;
     KONINKLIJKE PHILIPS ELECTRONICS N.V.;
24   PHILIPS ELECTRONICS NORTH AMERICA
     CORPORATION; PHILIPS ELECTRONICS
25   INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
     AMAZONIA INDUSTRIA ELECTRONICA
26   LTDA.; SAMSUNG ELECTRONICS CO., LTD.;
     SAMSUNG ELECTRONICS AMERICA, INC.;
27   SAMSUNG SDI CO., LTD.; SAMSUNG SDI
     AMERICA, INC.; SAMSUNG SDI MEXICO S.A.
28   DE C.V.;  SAMSUNG SDI BRASIL LTDA.;

Master File No. 3:07-cv-05944-SC

MDL No. 1917

Individual Case No. 11-cv-05502 ~~CASE NO.~~

FIRST AMENDED COMPLAINT

JURY TRIAL DEMANDED

1

SHENZHEN SAMSUNG SDI CO., LTD.;
TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG
SDI (MALAYSIA) SDN. BHD.; SAMTEL
COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA); TATUNG
COMPANY OF AMERICA, INC., ;
TECHNICOLOR SA; TECHNICOLOR USA,
INC.; MITSUBISHI ELECTRIC
CORPORATION; MITSUBISHI DIGITAL
ELECTRONICS AMERICA, INC.; MITSUBISHI
ELECTRIC & ELECTRONICS, USA, INC.

                    Defendants.

Plaintiff, Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc. Liquidating Trust (the "Circuit City Trust"), submits this Complaint against all Defendants named herein, and hereby alleges as follows:

## I.    **INTRODUCTION**

1.      Plaintiff Circuit City Trust brings this action to recover those damages to Circuit City Stores, Inc., and its affiliated companies ("Circuit City") caused by a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"), conducted by an international cartel formed by Defendants and their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT

2

Products shall be referred to collectively herein as "CRT Products."

3.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., ~~and~~ Europe, and the United States.  These meetings included representatives from the highest levels of the respective

companies, as well as regional managers and others.

7. During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9. Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States. Throughout the period of the conspiracy alleged herein, Circuit City purchased CRT Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors. These purchases took place throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received CRT Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

10. On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1] On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the

---

[1] *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

4

Circuit City Trust. The Plan became effective on November 1, 2010.

11.     During the Relevant Period, Circuit City purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Circuit City thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

12.     Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13.     Plaintiff also brings this action pursuant to various state laws listed herein because Circuit City purchased CRT Products from both defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

14.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

15.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially

5

affected the price of CRT Products purchased by Circuit City in the states identified herein.

16.      This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

17.      Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III.      **PARTIES**

### A.      **Plaintiff**

18.      Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

19.      Circuit City was headquartered in Richmond, Virginia.   During the Relevant Period, Circuit City purchased in the United States CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Circuit City suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.  Circuit City's negotiations for the purchase of CRT Products took place in the United States; purchase orders for CRT Products were issued from the United States; and invoices for CRT Products were

received by Circuit City in the United States.

20.    Upon information and belief, Circuit City purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California and Illinois

21.    Upon information and belief, during the Relevant Period, Circuit City received shipments of and took title to CRT Products at its distribution centers in Walnut, California; Livermore, California, and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution centers in California.  From its distribution centers in California and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution centers in California through online sales.

22.    During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois law invoked in this Complaint. Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution center in Illinois.  From its distribution center in Illinois and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution center in Illinois through online sales.

## B.    Defendants

### 1.    Hitachi Entities

23.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7

parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

25.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.   During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.   Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.   Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).   Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.   Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.   <u>IRICO Entities</u>**

30.   Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32. Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3. LG Electronics Entities

34. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion

COMPLAINT

global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37. Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.    LP Displays**

38. Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

2625971v1/012325

Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5. Panasonic Entities

39. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

42. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

COMPLAINT

Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and

13

prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.   Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.   Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

COMPLAINT

48.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

49.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

15

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.   Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     <u>Samtel</u>**

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

17

principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.    Thai CRT

60.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.    Toshiba Entities

61.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.   During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

COMPLAINT

subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

COMPLAINT

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.   It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.   Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

69.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.   Tatung America is a subsidiary of Tatung Company.   Currently, Tatung Company owns approximately half of Tatung America.   The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.   Following Lun Kuan Lin's death,

20

her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

**13.     Thomson Entities**

70.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton,

21

Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**14.     Mitsubishi Entities**

73.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

74.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers

22

in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

75.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

69.76.  Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.          AGENTS AND CO-CONSPIRATORS

70.77.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

71.78.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

72.79.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd. Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

2625971v1/012325

~~73.~~80.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

~~74.~~81.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

~~75.~~82.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

24

this complaint.

76.83.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

84.   Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

77.85.  Defendant Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

78.86.  The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.   TRADE AND COMMERCE

79.87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

80.88.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

81.89.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Illinois and caused antitrust injuries in California and Illinois.

## VII.  FACTUAL ALLEGATIONS

### A.  CRT Technology

82.90.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83.91.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84.92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

85.93.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86.94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

88.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89.97.  Circuit City has participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Circuit City bought CRT Products, and Circuit City has been injured thereby and paid supra-competitive prices for CRT Products.

90.98.  Circuit City has participated in the market for products containing CRTs. To the extent Circuit City indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.

91.99.  Circuit City has been injured by paying supra-competitive prices for CRT Products.

COMPLAINT

### B.      Structure of the CRT Industry

92.100.      The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

#### 1.      Market Concentration

93.101.      During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

#### 2.      Information Sharing

94.102.      Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

95.103.      Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

28

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

96.104.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

97.105.     The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

98.106.     Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.  Defendant Toshiba and Orion also signed a cooperative agreement

relating to LCDs in 1995.   Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5. High Costs of Entry Into the Industry

99.107.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

100.108.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

30

**6.     The Maturity of the CRT Product Market**

101.109.       Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

102.110.       Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

103.111.       In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

104.112.       Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

105.113.       In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

106.114.       As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.     Homogeneity of CRT Products**

31

2625971v1/012325

107.115.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Circuit City purchased CRT Products primarily on the basis of price.

108.116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.    Pre-Conspiracy Market**

109.117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

110.118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

111.119.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

112.120.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc

32

basis.   During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.   These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.121.      Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

114.122.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent.   Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.123.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1.      **"Glass Meetings"**

116.124.      The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."   Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.125.      The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.   Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.   Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

33

118.126.      The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

119.127.      Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

120.128.      The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

121.129.      Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson.  Chunghwa also attended these meetings.

122.130.      Representatives of Defendants also attended what were known

34

COMPLAINT

amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

123.131.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

124.132.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

125.133.     The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.   The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

126.134.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

127.135.     Defendants' conspiracy included agreements on the prices at which

35

certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

128.136.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins. Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

129.137.     The agreements reached at the glass meetings included:

    a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.  agreements as to what to tell customers about the reason for a price increase;

    e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

36

g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h. agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

~~130.~~138.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~131.~~139.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2. Bilateral Discussions

~~132.~~140.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

37

took the form of in-person meetings, telephone contacts and emails.

133.141. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico, and the United States.

134.142. The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe, and the United States.

135.143. In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs soldimported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

136.144. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

137.145. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output

38

agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Phillips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

138.146. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

139.147. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

140.148. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions

with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

141.149.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

142.150.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

143.151.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

144.152.     Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After

40

2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

145.153.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

146.154.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

147.155.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

148.156.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level

executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

149.157.	Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

150.158.	Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

151.159.	Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

152.160.	Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

42

161.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

162.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

153.163.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

154.164.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

155.165.   Defendants Toshiba America, TACP, TAEC and TAIS were

43

represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

156.166.        Between at least 1995 and 2006, defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

157.167.        Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.   To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

158.168.        Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

159.169.        When Circuit City Trust refers to a corporate family or companies

44

by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

     **E.**       **The CRT Market During the Conspiracy**

160.170.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

161.171.     The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

162.172.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

163.173.     Defendants' collusion is evidenced by unusual price movements in

---

[2]     Estimated market value of CRT units sold.

45

the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

164.174.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

165.175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

166.176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

167.177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

168.178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

169.179.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

170.180.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

171.181.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

172.182.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

173.183.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

174.184.    Defendants' conspiracy to fix, raise, maintain and stabilize the

47

prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

175.185.      Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

176.186.      In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

177.187.      On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the

48

coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

178.188.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.189.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.190.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."   The

49

indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.191.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

183.194.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and

50

employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

184.195.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

185.196.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

186.197.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187.198.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188.199.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189.200.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190.201.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

COMPLAINT

Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

191.202.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

192.203.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

G.    **The Role of Trade Associations During the Relevant Period**

193.204.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."   Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

194.205.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

195.206.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

52

Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

196.207.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

197.208.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

### H.    Effects of Defendants' Antitrust Violations

#### 1.    Examples of Reductions in Manufacturing Capacity by Defendants

198.209.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

199.210.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.211.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.212.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like

LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

202.213.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

203.214.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.      Examples of Collusive Pricing for CRTs

204.215.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

205.216.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

206.217.      In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

207.218.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

208.219.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

COMPLAINT

We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209.220.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

210.221.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.222.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.223.    Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

213.224.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### H.     Summary Of Effects Of The Conspiracy Involving CRTs

214.225.     The above combination and conspiracy has had the following effects, among others:

    a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.   Prices for CRTs in CRT Products sold by Defendants to Circuit City directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.   Circuit City was deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.   As a direct and proximate result of the unlawful conduct of Defendants, Circuit City was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VIII.   PLAINTIFF'S INJURIES

215.226.     As a purchaser of computer monitors, TVs and other devices that contained CRTs, Circuit City suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Circuit City to pay higher prices than they would have in the absence of Defendants' conspiracy.

216.227.     Circuit City also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.228.     The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy.  Circuit City was not able to pass

on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Circuit City suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.229.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

219.230.     The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

220.231.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.232.     As a result, Circuit City was injured in connection with their purchases of CRT Products during the Relevant Period.

## IX.     FRAUDULENT CONCEALMENT

222.233.     Neither Circuit City Trust nor Circuit City had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.  Neither Circuit City Trust nor Circuit City discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Circuit City Trust or Circuit City on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.234.     Because Defendants' agreement, understanding and conspiracy were kept secret, Circuit City Trust and Circuit City were unaware of Defendants' unlawful

COMPLAINT

conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.235.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.236.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.237.    Neither Circuit City nor Circuit City Trust could have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.238.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

58

these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.239.      Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.240.      As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.241.      As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

231.242.      In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.243.      Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.244.      Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and

misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

245.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## X.   *American Pipe*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

246.   As discussed at length in Paragraphs 184-203 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Circuit City's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

247.   Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

248.   As shown by Circuit City Trust's allegations in Paragraphs 1 and 10 and the following causes of action, Circuit City was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- 234. Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## X.XI.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

235.249.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

60

2625971v1/012325

236.250.      Beginning no later than March 1, 1995, the exact date being unknown to Circuit City and Circuit City Trust and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

237.251.      In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

238.252.      As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

239.253.      The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

240.254.      For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for CRTs.

241.255.    As a result of Defendants' unlawful conduct, Circuit City was injured in its businesses and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

242.256.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243.257.    During the Relevant Period, Circuit City conducted a substantial volume of business in California.  In particular, Circuit City purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Circuit City also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Circuit City maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Circuit City also sold CRT Products to customers in California.  Finally, Circuit City maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Circuit City's business operations in California, it was registered to do business in the State and paid taxes to the State of California during the Relevant Period.   As a result of Circuit City's substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

244.258.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and

intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

245.259.      Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.    Defendants' conduct substantially affected California commerce.

246.260.      The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

247.261.      For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.   to fix, raise, maintain and stabilize the price of CRTs;

      b.   to allocate markets for CRTs amongst themselves;

      c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.   to allocate among themselves the production of CRTs.

248.262.      The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

~~249.~~263.     As a result of the alleged conduct of Defendants, Circuit City paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

~~250.~~264.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

~~251.~~265.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~252.~~266.     Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

~~253.~~267.     This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

254.268.	The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Circuit City and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.	<u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b.	<u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.	<u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Circuit City and Circuit City Trust were in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

255.269.	The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

65

256.270.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

257.271.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

258.272.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### Fourth Claim for Relief

### (Restitution and Unjust Enrichment Under California Law)

259.273.     Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

260.274.     During the Relevant Period, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

### Fifth Claim for Relief

### (Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)

261.275.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.276.     During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Illinois.  Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of CRT Products in Illinois and fixing, raising, maintaining and stabilizing CRT Product prices in Illinois at

artificially high, noncompetitive levels.  Defendants' conduct and fraudulent concealment caused injury to Circuit City, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Circuit City as a purchaser.

263.277.    Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

264.278.    During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois at artificially-inflated prices because of defendants' price fixing conspiracy.  Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its Marion Illinois Distribution Center.

265.279.    During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois.  Circuit City sold CRT Products and other products in retail stores in Illinois and on the Internet to Illinois customers.  In addition, Circuit City maintained in Illinois inventories of CRT Products manufactured and sold by defendants, their co-conspirators, and others.  As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and

266.280.    As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for CRT Products purchased in Illinois from defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

## XI.XII.        PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California

Unfair Competition Law, and the Illinois Antitrust Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations, and that defendants unjustly retained substantial benefits received due to such conspiracy;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.     Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.     Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.     Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

G.     Defendants engaged in a contract, combination, and conspiracy in violation of the Illinois Antitrust Act, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.     Plaintiff shall recover damages sustained by it, as provided by the Illinois Antitrust Act, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

68

I.      Defendants received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a result of their conspiracy, and have unjustly retained these substantial benefits, at the expense of Circuit City;

J.      Defendants shall disgorge all ill-gotten gains and Plaintiff shall be entitled to restitution;

K.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

L.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

M.      Plaintiff shall receive such other or further relief as may be just and proper.

## ~~XII.~~XIII.      JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                                          SUSMAN GODFREY L.L.P.


By: _____

~~David Orozco (220732)~~
~~SUSMAN GODFREY L.L.P.~~
~~1901 Avenue of the Stars, Suite 950~~
~~Los Angeles, California 90067-6029~~
~~Telephone:  (310) 789-3100~~
~~Facsimile:  (310) 789-3150~~
~~Email: dorozco@susmangodfrey.com~~

H. Lee Godfrey
(*pro hac vice ~~to be submitted~~*)
Kenneth S. Marks
(*pro hac vice ~~to be submitted~~*)
Jonathan J. Ross
(*pro hac vice)*
SUSMAN GODFREY L.L.P.

69

1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email: lgodfrey@sumangodfrey.com
        kmarks@susmangodfrey.com

Parker C. Folse III
(*pro hac vice to be submitted*)
Rachel S. Black
(*pro hac vice to be submitted*)
Jordan Connors
(*pro hac vice to be submitted*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
        rblack@susmangodfrey.com
        jconnors@susmangodfrey.com

Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust

COMPLAINT

2625971v1/012325

# **<u>EXHIBIT G</u>**

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2

3  WILLIAM A. ISAACSON (*Pro hac vice*)
   BOIES, SCHILLER & FLEXNER LLP
4  5301 Wisconsin Ave. NW, Suite 800
   Washington, DC 20015
5  Telephone:  (202) 237-2727
   Facsimile:   (202) 237-6131
6  Email:  wisaacson@bsfllp.com

7

8  PHILIP J. IOVIENO (*Pro hac vice*)
   ANNE M. NARDACCI (*Pro hac vice*)
   LUKE NIKAS (*Pro hac vice*)
9  CHRISTOPHER V. FENLON (*Pro hac vice*)
   BOIES, SCHILLER & FLEXNER LLP
10 10 North Pearl Street, 4th Floor
   Albany, NY 12207
11 Telephone:  (518) 434-0600
   Facsimile:   (518) 434-0665
12 Email: piovieno@bsfllp.com

13

14 MIKE MCKOOL, JR. (*Pro hac vice*)
   LEWIS T. LECLAIR (*Pro hac vice*)
15 SCOTT R. JACOBS (*Pro hac vice*)
   MCKOOL SMITH, P.C
16 300 Crescent Court, Suite 1500
   Dallas, TX 75201
17 Telephone: (214) 978-4000
   Facsimile: (214) 978-4044
18 Email: mmckool@mckoolsmith.com

19

20 *Counsel for Plaintiff CompuCom Systems, Inc.*

21  COMPUCOM SYSTEMS, INC.,

22        Plaintiff,

23  v.

24  HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA,
    LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR
25  DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP
    ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS,
26  INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP
    DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC
27  CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING
    MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.;
28  PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS

1  INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA
   LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA,
2  INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI
   MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO.,
3  LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.;
   SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA
4  AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA
   AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION
5  SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES
   (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,

6                    Defendants.  **UNITED STATES DISTRICT COURT**
                              **NORTHERN DISTRICT OF CALIFORNIA**
7                             **SAN FRANCISCO DIVISION**

8   IN RE CATHODE RAY TUBE (CRT)          Case No. 11-cv-06396
    ANTITRUST LITIGATION
9                                         Master File No. 3:07-cv-05944-SC

10  This Document Relates To Individual Case   MDL No. 1917
    No. 11-cv-06396
11
                                          **AMENDED COMPLAINT**
12  COMPUCOM SYSTEMS, INC.,
                                          **JURY TRIAL DEMANDED**
13          Plaintiff,

14      vs.

15  HITACHI, LTD.; HITACHI DISPLAYS,
    LTD.; HITACHI AMERICA, LTD.;
16  HITACHI ASIA, LTD.; HITACHI
    ELECTRONIC DEVICES (USA), INC.;
17  SHENZHEN SEG HITACHI COLOR
    DISPLAY DEVICES, LTD.; IRICO GROUP
18  CORPORATION; IRICO GROUP
    ELECTRONICS CO., LTD.; IRICO
19  DISPLAY DEVICES CO., LTD.; LG
    ELECTRONICS, INC.; LG ELECTRONICS
20  USA, INC.; LG ELECTRONICS TAIWAN
    TAIPEI CO., LTD.; LP DISPLAYS
21  INTERNATIONAL LTD.; PANASONIC
    CORPORATION; PANASONIC
22  CORPORATION OF NORTH AMERICA;
    MT PICTURE DISPLAY CO., LTD.;
23  BEIJING MATSUSHITA COLOR CRT CO.,
    LTD.; KONINKLIJKE PHILIPS
24  ELECTRONICS N.V.; PHILIPS
    ELECTRONICS NORTH AMERICA
25  CORPORATION; PHILIPS ELECTRONICS
    INDUSTRIES (TAIWAN), LTD.; PHILIPS
26  DA AMAZONIA INDUSTRIA
    ELECTRONICA LTDA.; SAMSUNG
27  ELECTRONICS CO., LTD.; SAMSUNG
    ELECTRONICS AMERICA, INC.;
28  SAMSUNG SDI CO., LTD.; SAMSUNG
    SDI AMERICA, INC.; SAMSUNG SDI

1  MEXICO S.A. DE C.V.;  SAMSUNG SDI
2  BRASIL LTDA.; SHENZHEN SAMSUNG
   SDI CO., LTD.; TIANJIN SAMSUNG SDI
3  CO., LTD.; SAMSUNG SDI (MALAYSIA)
   SDN. BHD.; SAMTEL COLOR LTD.; THAI
4  CRT CO., LTD.; TOSHIBA
   CORPORATION; TOSHIBA AMERICA,
5  INC.; TOSHIBA AMERICA CONSUMER
   PRODUCTS, LLC; TOSHIBA AMERICA
6  ELECTRONIC COMPONENTS, INC.;
   TOSHIBA AMERICA INFORMATION
7  SYSTEMS, INC.; CHUNGHWA PICTURE
   TUBES, LTD.; CHUNGHWA PICTURE
8  TUBES (MALAYSIA).; TECHNICOLOR
   SA; TECHNICOLOR USA, INC.;
9  MITSUBISHI ELECTRIC CORPORATION;
   MITSUBISHI DIGITAL ELECTRONICS
10 AMERICA, INC.; MITSUBISHI ELECTRIC
   & ELECTRONICS, USA, INC.,

11         Defendants.

12         Plaintiff, CompuCom Systems, Inc. ("CompuCom") for its Complaint against all

13 Defendants named herein, hereby alleges as follows:

14 **I.    INTRODUCTION**

15         1.      Defendants and their co-conspirators formed an international cartel which

16 conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

17 through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

18 conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

19         2.      Defendants are or were among the leading manufacturers of: (a) color

20 picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

21 tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

22 devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

23 purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

24 to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

25 and the products containing them shall be referred to as "CDT Products."  CDT Products and

26 CPT Products shall be referred to collectively herein as "CRT Products."

27         3.      Defendants control the majority of the CRT industry, a multibillion dollar

28 market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

COMPUCOM'S AMENDED COMPLAINT                    3                    Case No. 11-cv-06396
                                                                    Master File No. 3:07-cv-05944-SC

Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of

Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.     During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.     Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein, because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in New York and California.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Northern District of Texas under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.    PARTIES**

**A.    Plaintiff**

16.     Plaintiff CompuCom is a Delaware corporation with its corporate headquarters in Dallas, Texas.  Founded in 1987, CompuCom is a leading IT outsourcing company providing infrastructure management services, application services, systems integration and consulting services, as well as the procurement and management of hardware and software.  In 2010, CompuCom had $1.4 billion in revenue.  Through the conclusion of Defendants' and the co-conspirators' conspiracy, CompuCom maintained operations in several states including Texas, California, New York, and Massachusetts.

17.     During the Relevant Period, CompuCom purchased CRT Products directly

from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  CompuCom also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.  As such, CompuCom suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

18.     During the Relevant Period, CompuCom purchased CRT Products in, *inter alia*, California and New York containing CRTs manufactured and sold by Defendants and their co-conspirators.  Plaintiff sent purchase orders to various CRT Product manufacturers in each of these states and sent payment to these manufacturers in each of these states.  In addition, Plaintiff supplied its offices in California and New York with CRT Products and maintained corporate offices and inventories in these states and provided information technology services to its customers in these states.

B.     **Defendants**

1.     **Hitachi Entities**

19.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

2    dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

3    antitrust violations alleged in this complaint.

4            21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

5    company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

6    York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

7    Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

8    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

10   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

11           22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

12   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

13   Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

14   Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

15   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

17   affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

18           23.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

19   Delaware corporation with its principal place of business located at 208 Fairforest Way,

20   Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

21   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

22   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

23   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

24   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

25   complaint.

26           24.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

27   Shenzhen") was a Chinese company with its principal place of business located at 5001

28   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     IRICO Entities

26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

27.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

28.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

29.    Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.    LG Electronics Entities

30.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

1  to the antitrust violations alleged in this complaint.

2        32.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

3  Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

4  NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

5  Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

6  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

7  throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

8  and affairs of LGETT relating to the antitrust violations alleged in this complaint.

9        33.     Defendants LGEI, LGEUSA and LGETT are collectively referred to

10  herein as "LG Electronics."

11        **4.     LP Displays**

12        34.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

13  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

14  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

15  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

16  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

17  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

18  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

19  and LGEI would cede control over the company and the shares would be owned by financial

20  institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

21  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

22  affiliates, throughout the United States.

23        **5.     Panasonic Entities**

24        35.     Defendant Panasonic Corporation, which was at all times during the

25  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

26  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

27  Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

28  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

1   affiliates, throughout the United States.

2          36.    Defendant Panasonic Corporation of North America ("PCNA") is a

3   Delaware corporation with its principal place of business located at One Panasonic Way,

4   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

5   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

6   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

8   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

9          37.    Defendants Panasonic Corporation and PCNA are collectively referred to

10  herein as "Panasonic."

11         38.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

12  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

13  Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

14  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

15  manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

16  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

17  venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

18  Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

19  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

20  subsidiaries or affiliates, throughout the United States.

21         39.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

22  Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

23  Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

24  is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

25  Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

26  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

27  China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

28  manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.    Philips Entities

40.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

43.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

44.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

45.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

47.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business

located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.   Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

48.   Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

49.   Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

50.   Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

51.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

52.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

54.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.     Samtel

55.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.     Thai CRT

56.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.     Toshiba Entities

57.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

1    in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

2    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

3    subsidiaries or affiliates, throughout the United States.

4           58.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

5    corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

6    4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

7    subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

10   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

11   complaint.

12          59.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

13   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

14   3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

15   America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

16   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

17   States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

18   relating to the antitrust violations alleged in this complaint.

19          60.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

20   California corporation with its principal place of business located at 19900 MacArthur

21   Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

22   subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

23   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

24   subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

25   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

26   complaint.

27          61.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

28   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

62.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     <u>Chunghwa Entities</u>**

63.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

64.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

1    **12.    Tatung Company of America, Inc.**

2    Tatung Company of America, Inc. ("Tatung America**12.    Thomson Entities**

3        65.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

4    CaliforniaFrench corporation with its principal place of business located at 2850 El Presidio

5    Street, Long Beach, California.  Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-

6    Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary of Tatung Company.

7    Currently, Tatung Company owns approximately half of Tatung America.  The other half

8    usedThomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the

9    United States market, with plants located in the United States, Mexico, China and Europe.

10   Thomson SA sold its CRTs  internally to be owned by Lun Kuan Lin, the daughter of Tatung

11   Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passedits

12   television-manufacturing division, which had plants in the United States and Mexico, and to her

13   two childrenother television manufacturers in the United States and elsewhere.  Thomson SA's

14   television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

15   televisions were sold in the United States to consumers under the RCA brand.  In November

16   2003, Thomson SA sold its television division to a joint venture it formed with Chinese

17   company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics

18   Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

19   televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

20   Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

21   SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Tatung

22   AmericaThomson SA manufactured, marketed, sold and/or distributed CRT Products

23   manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or indirectly

24   through its subsidiaries or affiliates, to customers throughout the United States.

25        66.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

26   Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

27   business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

28   Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

1   Electronics was a major manufacturer of CRTs for the United States market, with plants located

2   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

3   plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

4   television-manufacturing division, which had plants in the United States and Mexico, and to

5   other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

6   were sold in the United States to United States consumers under the RCA brand.  Thomson

7   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

8   business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

9   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

10   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

11         67.     Thomson SA and Thomson Consumer Electronics are collectively referred

12   to herein as "Thomson."

13         **13.     Mitsubishi Entities**

14         68.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

15   is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

16   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

17   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

18   internally to Mitsubishi's television and monitor manufacturing division and to other television

19   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

20   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

21   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

22   United States.

23         69.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

24   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

25   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

26   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

27   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

28   and monitor manufacturing division and to other television and monitor manufacturers in the

1    U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

2    other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

3    marketed, sold and distributed CRT Products in the United States.

4           70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

5    Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

6    Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

7    Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

8    CRT televisions and monitors in the United States.

9           71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

10   are collectively referred to herein as "Mitsubishi."

11   **IV.    AGENTS AND CO-CONSPIRATORS**

12          66.72.  The acts alleged against Defendants in this Complaint were authorized,

13   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

14   in the management and operation of Defendants' businesses or affairs.

15          67.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint

16   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

17   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

18   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

19   made by its parent company.

20          68.74.  Various persons and/or firms not named as Defendants in this Complaint

21   participated as co-conspirators in the violations alleged herein and may have performed acts and

22   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

23   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

24   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

25   Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

26   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

27   conspirators as Defendants at a later date.

28          69.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

70.76.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

71.77.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

72.78.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

73.79. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

74.80. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

75.81. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

76.82. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

77.83.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in New York and California and caused antitrust injuries in New York and California.

## VI.   FACTUAL ALLEGATIONS

### A.   CRT Technology

78.84.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

79.85.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

80.86.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

81.87.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

82.88.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer

1   monitors and similar devices.   The primary difference is that CDTs typically yield a higher

2   resolution image requiring more pixels than do CPTs.

3   ~~83.~~89.   CRTs have no independent utility, and have value only as components of

4   other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

5   from the demand for such products.

6   ~~84.~~90.   The market for CRTs and the market for the products into which they are

7   placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

8   Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

9   inseparable in that one would not exist without the other.

10   ~~85.~~91.  Plaintiff has participated in the market for CRTs through its direct

11   purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of

12   CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.

13   Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products,

14   and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

15   ~~86.~~92.   Plaintiff has participated in the market for products containing CRTs. To

16   the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their

17   co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs

18   in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

19   ~~87.~~93.   Plaintiff has been injured by paying supra-competitive prices for CRT

20   Products.

21   **B.**   **Structure of the CRT Industry**

22   ~~88.~~94.   The CRT industry has several characteristics that facilitated a conspiracy,

23   including market concentration, ease of information sharing, the consolidation of manufacturers,

24   multiple interrelated business relationships, significant barriers to entry, heightened price

25   sensitivity to supply and demand forces and homogeneity of products.

26   **1.**   **Market Concentration**

27   ~~89.~~95.   During the Relevant Period, the CRT industry was dominated by relatively

28   few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.    Information Sharing

~~90.~~96.  Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~91.~~97.  Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

~~92.~~98.   The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

~~93.~~99.  The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

94.100.      Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

    g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

    h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

    i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage

products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

~~95.~~101.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~96.~~102.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      The Maturity of the CRT Product Market**

~~97.~~103.      Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~98.~~104.      Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~99.~~105.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT

televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

100.106.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

101.107.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

102.108.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

103.109.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

104.110.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

105.111.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

1    106.112.    In the early 1990s, representatives from Samsung, Daewoo,

2    Chunghwa, and Orion visited each other's factories in Southeast Asia. During this period, these

3    producers began to include discussions about price in their meetings.

4        **D.    Defendants' and Co-Conspirators' Illegal Agreements**

5        107.113.    In order to control and maintain profitability during declining

6    demand for CRT Products, Defendants and their co-conspirators have engaged in a contract,

7    combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or

8    stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1,

9    1995 through at least November 25, 2007.

10       108.114.    The CRT conspiracy was effectuated through a combination of

11   group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral

12   discussions were the primary method of communication and took place on an informal, ad hoc

13   basis. During this period, representatives from Daewoo and Defendants LG Electronics and

14   Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT,

15   Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific

16   customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia,

17   Indonesia and Singapore.

18       109.115.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

19   and Daewoo, also attended several ad hoc group meetings during this period. The participants at

20   these group meetings also discussed increasing prices for CRTs.

21       110.116.    As more manufacturers formally entered the conspiracy, group

22   meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more

23   organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put

24   in place. Defendants' representatives attended hundreds of these meetings during the Relevant

25   Period.

26       111.117.    The overall CRT conspiracy raised and stabilized worldwide and

27   U.S. prices that Defendants charged for CRTs.

28

1   **1.   "Glass Meetings"**

2   ~~112.~~118.     The group meetings among the participants in the CRT price-

3   fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended

4   by employees at three general levels of Defendants' corporations.

5   ~~113.~~119.     The first level meetings were attended by high level company

6   executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.

7   Top meetings occurred less frequently, typically quarterly, and were focused on longer term

8   agreements and forcing compliance with price-fixing agreements.  Because attendees at top

9   meetings had authority as well as more reliable information, these meetings resulted in

10  agreements.  Attendees at top meetings were also able to resolve disputes because they were

11  decision makers who could make agreements.

12  ~~114.~~120.     The second level meetings were attended by Defendants' high

13  level sales managers and were known as "management" meetings.  These meetings occurred

14  more frequently, typically monthly, and handled implementation of the agreements made at top

15  meetings.

16  ~~115.~~121.     Finally, the third level meetings were known as "working level"

17  meetings and were attended by lower level sales and marketing employees.  These meetings

18  generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

19  information and discussing pricing since the lower level employees did not have the authority to

20  enter into agreements.  These lower level employees would then transmit the competitive

21  information up the corporate reporting chain to those individuals with pricing authority.  The

22  working level meetings also tended to be more regional and often took place near Defendants'

23  factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

24  manufacturers' employees met in Korea, the Chinese in China, and so on.

25  ~~116.~~122.     The Chinese glass meetings began in 1998 and generally occurred

26  on a monthly basis following a top or management level meeting.  The China meetings had the

27  principal purpose of reporting what had been decided at the most recent glass meetings to the

28  Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

117.123.       Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

118.124.       Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

119.125.       During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

120.126.       Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

121.127.       The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

122.128.	During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

123.129.	Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

124.	Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

125.130.	The agreements reached at the glass meetings included:

> a.	agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;
>
> b.	placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;
>
> c.	agreements on pricing for intra-company CRT sales to vertically integrated customers;
>
> d.	agreements as to what to tell customers about the reason for a price

increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

126.131.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

127.132.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

1

       **2.**     **Bilateral Discussions**

2

128.133.     Throughout the Relevant Period, the glass meetings were

3

supplemented by bilateral discussions between various Defendants.  The bilateral discussions

4

were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

5

between the group meetings. These discussions, usually between sales and marketing employees,

6

took the form of in-person meetings, telephone contacts and emails.

7

129.134.     During the Relevant Period, in-person bilateral meetings took

8

place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

9

Thailand, Brazil and, Mexico, and the United States.

10

130.135.     The purpose of the bilateral discussions was to exchange

11

information about past and future pricing, confirm production levels, share sales order

12

information, confirm pricing rumors, and coordinate pricing with manufacturers in other

13

geographic locations, including Brazil, Mexico and, Europe, and the United States.

14

131.136.     In order to ensure the efficacy of their global conspiracy,

15

Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

16

and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the

17

United States.  These Brazilian and MexicanCRT manufacturers were particularly important

18

because they served the North American market for CRT Products.  As further alleged herein,

19

North America was the largest market for CRT televisions and computer monitors during the

20

Relevant Period.  Because these Brazilian and MexicanCRT manufacturers are all wholly-owned

21

and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the

22

unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

23

imported intosold in the United States were fixed, raised, maintained and/or stabilized at

24

supracompetitive levels.

25

132.137.     Defendants also used bilateral discussions with each other during

26

price negotiations with customers to avoid being persuaded by customers to cut prices.  The

27

information gained in these communications was then shared with supervisors and taken into

28

account in determining the price to be offered.

133.138.        Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.    **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

134.139.        Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

135.140.        Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

1   the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the

2   alleged conspiracy.

3          136.141.          Between at least 1998 and 2007, Defendant IRICO, through IGC,

4   IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the

5   highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

6   with other Defendants, particularly with other Chinese manufacturers.  Through these

7   discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's

8   conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

9   IRICO was acting to further its own independent private interests in participating in the alleged

10  conspiracy.

11         137.142.          Between at least 1995 and 2001, Defendant LG Electronics,

12  through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001,

13  LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD

14  (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest

15  ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions

16  with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on

17  prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this

18  conspiracy.

19         138.143.          Defendant LGEUSA was represented at those meetings and was a

20  party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT

21  Products, it played a significant role in the conspiracy because Defendants wished to ensure that

22  the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

23  agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in

24  the alleged conspiracy.

25         139.144.          Between at least 2001 and 2006, Defendant LP Displays (f/k/a

26  LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these

27  meetings were attended by the highest ranking executives from LP Displays.  Certain of these

28  high level executives from LP Displays had previously attended meetings on behalf of

1   Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with
2   other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for
3   CRTs.

4           ~~140.~~145.         Between at least 1996 and 2003, Defendant Panasonic, through
5   Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After
6   2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with
7   Toshiba.   These meetings were attended by high level sales managers from Panasonic and
8   MTPD.   Panasonic also engaged in multiple bilateral discussions with other Defendants.
9   Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic
10  never effectively withdrew from this conspiracy.

11          ~~141.~~146.         PCNA was represented at those meetings and was a party to the
12  agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct
13  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure
14  that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing
15  agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in
16  the alleged conspiracy.

17          ~~142.~~147.         Between at least 2003 and 2006, Defendant MTPD participated in
18  multiple glass meetings and in fact led many of these meetings during the latter years of the
19  conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD
20  also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD
21  agreed on prices and supply levels for CRTs.

22          ~~143.~~148.         Between at least 1998 and 2007, Defendant BMCC participated in
23  multiple glass meetings.  These meetings were attended by high level sales managers from
24  BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants,
25  particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on
26  prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with
27  CRTs was mandated by the Chinese government.   BMCC was acting to further its own
28  independent private interests in participating in the alleged conspiracy.

144.149.        Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by high level executives from Philips.   Philips also engaged in numerous bilateral discussions with other Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

145.150.        Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.   To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

146.151.        Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.   Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, Samsung agreed on prices and supply levels for CRTs.

147.152.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

153.        Between at least 1998 and 2006, Defendant Samtel participated in

multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These meetings were attended by high level executives from Samtel.   Through these discussions, Samtel agreed on prices and supply levels for CRTs.   Samtel never effectively withdrew from this conspiracy.

148.154.      Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.   These meetings were attended by the highest ranking executives from Thai CRT.   Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.   Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.   Thai CRT never effectively withdrew from this conspiracy.

155.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.   These meetings were attended by high level sales managers from Thomson.   At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.   Thomson never effectively withdrew from this conspiracy.   Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.   Thomson has admitted to the European Commission that it played a role in the conspiracy.

156.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.   These meetings were attended by high level sales managers from Mitsubishi.   At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.   Mitsubishi never effectively withdrew from this conspiracy.

149.157.      Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.   After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.   These meetings were attended by high level sales managers from Toshiba and MTPD.   Toshiba also engaged in multiple

1    bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

2    Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

3    this conspiracy.

4            ~~150.~~158.        Defendants Toshiba America, TACP, TAEC and TAIS were

5    represented at those meetings and were a party to the agreements entered at them.  To the extent

6    Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

7    purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

8    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

9    agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

10   were active, knowing participants in the alleged conspiracy.

11           ~~151.~~159.        Between at least 1995 and 2006, Defendant Chunghwa, through

12   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

13   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

14   these meetings were attended by the highest ranking executives from Chunghwa, including the

15   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

16   discussions with each of the other Defendants on a regular basis.  Through these discussions,

17   Chunghwa agreed on prices and supply levels for CRTs.

18           ~~152.   Defendant Tatung America was represented at those meetings and was a~~

19   ~~party to the agreements entered at them.  To the extent Tatung America sold and/or distributed~~

20   ~~CRT Products to direct purchasers, it played a significant role in the conspiracy because~~

21   ~~Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would~~

22   ~~not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America~~

23   ~~was an active, knowing participant in the alleged conspiracy.~~

24           ~~153.~~160.        Between at least 1995 and 2004, Daewoo, through Daewoo

25   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

26   substantial number of these meetings were attended by the highest ranking executives from

27   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

28   Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

154.161.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

155.162.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

156.163.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

157.164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of

---

[1]    Estimated market value of CRT units sold.

which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

158.165.     In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

159.166.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

160.167.     A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

161.168.     Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

162.169.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

163.170.     During the Relevant Period, while demand in the United States for

CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

164.171.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

165.172.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

166.173.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

167.174.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

168.175.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

169.176.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)

initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

170.177.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

171.178.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment

against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

172.179.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

173.180.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.181.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

175.182.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

176.183.      The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

184.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

177.185.      As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

178.186.      Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

179.187.      Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

180.188.        In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

181.189.        On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

182.190.        On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

183.191.        On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

184.192.        The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.        The Role of Trade Associations During the Relevant Period**

185.193.        Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

186.194.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

187.195.      The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

188.196.      Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

189.197.      Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.**      **Effects of Defendants' Antitrust Violations**

**1.**      **Examples of Reductions in Manufacturing Capacity by Defendants**

190.198.      As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

191.199.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

192.200.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

193.201.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

194.202.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

195.203.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.    Examples of Collusive Pricing for CRTs**

196.204.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

197.205.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

198.206.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

199.207.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

200.208.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

201.209.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

202.210.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

203.211.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

204.212.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3. Summary Of Effects Of The Conspiracy Involving CRTs

205.213.    The above combination and conspiracy has had the following effects, among others:

      a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

      b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

      c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

      d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

206.214.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

207.215.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

208.216.        The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

209.217.        Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

210.218.        The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

211.219.        Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

212.220.        As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

213.221.        Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

214.222.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

215.223.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

216.224.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

217.225.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

218.226.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

1    these meetings were instructed on more than once occasion not to disclose the fact of these

2    meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

3    production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

4    arrivals and departures at such meetings to avoid being seen in public with each other and with

5    the express purpose and effect of keeping them secret.

6    219.227.     Defendants also agreed at glass meetings and bilateral meetings to

7    give pretextual reasons for price increases and output reductions to their customers.

8    220.228.     As alleged above, in early 1999, despite declining production costs

9    and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

10    rose.  The price increase was allegedly based on increasing global demand for the products.  In

11    fact, this price rise was the result of collusive conduct amongst Defendants, which was

12    undisclosed at the time.

13    221.229.     As alleged above, despite increased competition from flat panel

14    monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

15    This price stabilization was purportedly due exclusively to a shortage of critical components

16    such as glass.  This was a pretext used to cover up the conspiracy.

17    222.230.     In addition, when several CRT manufacturers, including

18    Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price

19    hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying

20    this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

21    "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

22    prices of CRT monitors in due course of time."

23    223.231.     Manufacturers such as LG Electronics periodically issued press

24    statements falsely asserting that CRT prices were being driven lower by intense competition.

25    224.232.     Plaintiff is informed and believes, and thereon alleges, that

26    Defendants' purported reasons for the price increases of CRTs were materially false and

27    misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

28    alleged herein.

225.233.      As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

IX.

IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.   As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

226.236.      Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

XI.    CLAIM FOR VIOLATIONS

First Claim for Relief

(Violation of Section 1 of the Sherman Act)

227.237.      Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

228.238.     Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

229.239.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

230.240.     As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

231.241.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

232.242.     For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.   issuing price announcements and price quotations in accordance with the agreements reached;

    e.   selling CRTs to customers in the United States at noncompetitive prices;

    f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

233.243.     As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

234.244.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235.245.     During the Relevant Period, Plaintiff conducted a substantial volume of business in California.   In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California.   Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in California.   Plaintiff also sent payment for CRT Products to these manufacturers in California.  In addition, Plaintiff sold CRT Products in California containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices and inventories in California of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California.   As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

236.246.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

237.248.    Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.   Defendants' conduct substantially affected California commerce.

238.248.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

239.249.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.   to fix, raise, maintain and stabilize the price of CRTs;

      b.   to allocate markets for CRTs amongst themselves;

      c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.   to allocate among themselves the production of CRTs.

240.250.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b. prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c. those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

241.251. As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

242.252. As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy. As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**

**(Violation of California Unfair Competition Law)**

243.253. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.254. Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

245.255. This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

246.256.      The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.      <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b.      <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.      <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

247.257.      The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

248.258.      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

249.259.      Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

250.260.      By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Violation of the New York Donnelly Act)**

251.261.      Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.262.      During the Relevant Period, Plaintiff conducted a substantial volume of business in New York.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing Conspiracy, in New York.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in New York.  Plaintiff also sent payment for CRT Products to these manufacturers in New York.  In addition, Plaintiff sold CRT Products in New York containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices, and inventories in New York of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York.  As a result of its substantial contacts with New York, Plaintiff is entitled to the protection of the laws of New York.

253.263.      Beginning at a time presently unknown to Plaintiff, but at least as early as December 23, 1998, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

254.264.      Defendants' Conspiracy restrained, suppressed, and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained, and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

255.265.      As a result, Defendants' Conspiracy substantially affected New York commerce.

256.266.      As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages and the costs of suit, including attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1       E.      Plaintiff shall recover its costs of this suit, including reasonable attorneys'

2   fees as provided by law; and

3       F.      Plaintiff shall receive such other or further relief as may be just and

4   proper.

5   **XII.**        **JURY TRIAL DEMAND**

6               Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

7   jury of all the claims asserted in this Complaint so triable.

1    Dated:                                    Respectfully Submitted,

2

3                                              _____

4                                              ~~Mike McKool, Jr.~~
                                               ~~State Bar No. 13732100~~
                                               ~~Email: mmckool@mckoolsmith.com~~

5                                              ~~Lewis T. LeClair~~

6                                              ~~State Bar No. 12072500~~
                                               ~~Email: lleclair@mckoolsmith.com~~

7                                              ~~Scott R. Jacobs~~
                                               ~~State Bar No. 10521550~~

8                                              ~~Email: srjacobs@mckoolsmith.com~~
                                               ~~**MCKOOL SMITH, P.C.**~~

9                                              ~~300 Crescent Court, Suite 1500~~

10                                             ~~Dallas, TX 75201~~
                                               ~~Telephone: (214) 978-4000~~

11                                             ~~Facsimile: (214) 978-4044~~

12                                             ~~*Counsel For Plaintiff Compucom Systems,*~~
                                               ~~*Inc.*~~

13   ~~**OF COUNSEL:**~~

14                                             William A. Isaacson *(Pro hac vice)*

15                                             **BOIES, SCHILLER & FLEXNER LLP**
                                               5301 Wisconsin Ave. NW, Suite 800

16                                             Washington, D.C.  20015
                                               Telephone:  (202) 237-2727

17                                             Facsimile:   (202) 237-6131

18                                             Email:  wisaacson@bsfllp.com

19                                             Philip J. Iovieno *(Pro hac vice)*

20                                             Anne M. Nardacci *(Pro hac vice)*
                                               Luke Nikas *(Pro hac vice)*

21                                             Christopher V. Fenlon *(Pro hac vice)*

22                                             **BOIES, SCHILLER & FLEXNER LLP**
                                               10 North Pearl Street, 4th Floor

23                                             Albany, NY  12207
                                               Telephone:  (518) 434-0600

24                                             Facsimile:   (518) 434-0665
                                               Email: piovieno@bsfllp.com

25

26

27

28

COMPUCOM'S AMENDED COMPLAINT            66           Case No. 11-cv-06396
                                                     Master File No. 3:07-cv-05944-SC

Email: anardacci@bsfllp.com
Email: lnikas@bsfllp.com
Email: cfenlon@bsfllp.com


Mike McKool, Jr. (*Pro hac vice*)
Email: mmckool@mckoolsmith.com
Lewis T. LeClair (*Pro hac vice*)
Email: lleclair@mckoolsmith.com
Scott R. Jacobs (*Pro hac vice*)
Email: srjacobs@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044


*Counsel For Plaintiff*
*Compucom Systems, Inc.*

# **EXHIBIT H**

1
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

2

3
WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

4

5

6

7
PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

8

9

10

11

12

13
*Counsel for Plaintiffs Electrograph Systems, Inc.*
*and Electrograph Technologies Corp.*

14

15

16
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

17

18
IN RE CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

**Case No. 11-cv-01656-SC**

Master File No. 3:07-cv-05944-SC

19

20
This Document Relates To Individual Case
No. 11-cv-01656-SC

MDL No. 1917

21

22
ELECTROGRAPH SYSTEMS, INC.;
ELECTROGRAPH TECHNOLOGIES
CORP.,

~~FIRST~~SECOND **AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

23
Plaintiffs,

24
vs.

25
HITACHI, LTD.; HITACHI DISPLAYS,
LTD.; HITACHI AMERICA, LTD.;
HITACHI ASIA, LTD.; HITACHI
ELECTRONIC DEVICES (USA), INC.;
SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP

26

27

28

ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA,
INC.; MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.,

       Defendants.

Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for

their Complaint against all Defendants named herein, hereby allege as follows:

I.           **<u>INTRODUCTION</u>**

        1.        Defendants and their co-conspirators formed an international cartel which

conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs") and products containing CRTs.

2.     Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRT Products were sold in the United States.

5.     With respect to CRT Products, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  Since February 10, 2009, federal indictments have been issued against six individuals in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products, both CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.      Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs

1   sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the

2   California Business and Professions Code (the "Cartwright Act").  Plaintiffs' claims are also

3   brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code,

4   to obtain restitution from and an injunction against Defendants due to their violations of Section

5   17200 *et seq.* of the California Business and Professions Code (the "California Unfair

6   Competition Act").

7          12.    Plaintiffs also bring this action pursuant to Section 340 of the New York

8   General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to

9   Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General

10  Business Law (the "Donnelly Act").  Plaintiffs' claims are also brought pursuant to Section 349

11  of the New York General Business Law, to obtain restitution from and an injunction against

12  Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law

13  (the "New York Unfair Competition Act").

14         13.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

15  the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

16  supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair

17  Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C.

18  § 1367.  Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman

19  Act and they form part of the same case or controversy.

20         14.    The activities of Defendants and their co-conspirators, as described herein,

21  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

22  did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

23  import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the

24  Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

25  United States.

26         15.    The activities of Defendants and their co-conspirators, as described herein,

27  were within the flow of, were intended to, and did have a direct and substantial effect on

28  commerce in California and New York.  In particular Defendants' and their co-conspirators'

conspiracy directly and substantially affected the price of CRT Products purchased in these states. These effects also give rise to Plaintiffs' antitrust claims. Plaintiffs maintained operations in these states during the Relevant Period.

16. This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR. Each Defendant conducts substantial business in New York as well as California. In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured CRTs for sale in the United States, including New York and California, or which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States, including New York and California. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States, including in New York and California.

17. Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.   PARTIES**

**A.   Plaintiffs**

18. Plaintiff Electrograph Systems, Inc. is a New York corporation with its principal place of business in New York. Through May 2009, Electrograph Systems, Inc. conducted business as a value-added wholesale distributor of display technology solutions, including CRT displays and components, rear screen projection TVs, projectors, and digital electronic products, primarily to resellers and system integrators. Electrograph Systems, Inc. specialized in display, audio, connectivity, and other complementary technologies for sale to commercial, retail and government customers.

19.     Plaintiff Electrograph Technologies Corp. is a New York corporation, with its principal place of business in New York.  Electrograph Technologies Corp. owns 100% of the outstanding capital stock of Electrograph Systems, Inc.   In addition to its ownership of Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph Technologies Corp. conducted business as an information technology solutions provider that specialized in hardware and software procurement, display technology, custom networking, security, IP telephony, remote management, application development/e-commerce, storage, and enterprise and Internet solutions.  Electrograph Technologies Corp. offered its customers single-source solutions customized to their information systems needs by integrating its analysis, design and implementation services with hardware, software, networking products and peripherals from leading vendors.

20.     During the Relevant Period, the Plaintiffs, and their predecessor entities described below, purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.   As such, the Plaintiffs suffered injury as a result of Defendants' unlawful conduct.  Throughout the Relevant Period, Plaintiffs, and their predecessor entities described below, conducted a substantial amount of business in New York and California.

### B.   **Plaintiffs' Corporate History**

21.     Electrograph Technologies Corp. was incorporated under the name Manchester Equipment Co., Inc. on August 21, 1973.  The company's name was changed to Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to Electrograph Technologies Corp. on August 1, 2005.  On August 1, 2005, upon consummation of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc., the merger sub was merged with and into Manchester Technologies, Inc., and Manchester Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and concurrently changed its name to Electrograph Technologies Corp.  During the Relevant Period, Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in

the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Electrograph Technologies Corp. suffered injury as a result of Defendants' unlawful conduct.

22.   Electrograph Systems, Inc. was incorporated under the name Electrograph Acquisitions, Inc. on April 10, 1997.  On April 28, 1997, Manchester Equipment Co., Inc.—the predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph Acquisitions, Inc. from Bitwise Designs, Inc.  On April 29, 1997, Electrograph Acquisitions, Inc. changed its name to Electrograph Systems, Inc.  During the Relevant Period, Electrograph Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

23.   ActiveLight, Inc. was formed on April 16, 1998, as a Washington company with its principal place of business in the State of Washington.  ActiveLight, Inc. was a value-added wholesale distributor of display technology solutions and projectors to the professional, commercial and high-end consumer markets.   During the Relevant Period, ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, ActiveLight, Inc. suffered injury as a result of Defendants' unlawful conduct.

24.   On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired 100% of the outstanding stock of ActiveLight, Inc.  From the acquisition date through March 2, 2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

25.   CineLight Corporation was formed on June 11, 2001, as a Washington company with its principal place of business in the State of Washington.  CineLight Corporation was a value-added wholesale distributor of advanced display technology products and

1   accessories to home theater designers and resellers.  During the Relevant Period, CineLight

2   Corporation purchased CRT Products directly and indirectly from Defendants, and/or

3   Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

4   subsidiaries and affiliates controlled.  As such, CineLight Corporation suffered injury as a result

5   of Defendants' unlawful conduct.

6           26.     On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the

7   outstanding stock of CineLight Corporation.  From the date of the acquisition until July 2006,

8   CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  In

9   July 2006, CineLight Corporation was merged into ActiveLight, Inc.

10          27.     International Computer Graphics, Inc. was formed on April 18, 1985, as a

11  California company with its principal place of business in California.  International Computer

12  Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and

13  desktop displays, digital imaging peripherals and AV presentation products.  During the Relevant

14  Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly

15  from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants

16  or Defendants' subsidiaries and affiliates controlled.  As such, International Computer Graphics,

17  Inc. suffered injury as a result of Defendants' unlawful conduct.

18          28.     On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the

19  outstanding stock of International Computer Graphics, Inc.  From the date of the acquisition

20  through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned

21  subsidiary of Electrograph Systems, Inc.  On March 3, 2008, International Computer Graphics,

22  Inc. was merged into Electrograph Systems, Inc.

23          29.     Champion Vision, Inc. was formed on June 19, 2003, as a New York

24  company with its principal place of business in New York.  During the Relevant Period,

25  Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or

26  Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

27  subsidiaries and affiliates controlled.  As such, Champion Vision, Inc. suffered injury as a result

28  of Defendants' unlawful conduct.

30.     On September 15, 2008, Champion Vision, Inc. was merged into Electrograph Systems, Inc.

31.     Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland.  On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp.  Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area.  During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct.  In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32.     In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

33.     During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary.  In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc.  As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities."  By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' conspiracy,

1   these predecessor entities were injured in their business and property because the prices they paid

2   for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any

3   reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any

4   of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems,

5   Inc. or Electrograph Technologies Corp.

6   **C.** **Defendants**

7   **1.** **Hitachi Entities**

8   34.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of

9   business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

10   parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

11   market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

12   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

13   subsidiaries or affiliates, throughout the United States.

14   35.   Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

15   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

16   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

17   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

18   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

19   create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

20   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

21   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

22   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

23   antitrust violations alleged in this complaint.

24   36.   Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

25   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

26   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

27   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

28   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

2    affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

3                    37.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

4    with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

5    Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

6    Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

7    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

9    affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

10                   38.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

11   Delaware corporation with its principal place of business located at 208 Fairforest Way,

12   Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

13   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

14   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

16   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

17   complaint.

18                   39.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

19   Shenzhen") was a Chinese company with its principal place of business located at 5001

20   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

21   least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

22   around the time that the government investigations into the CRT industry began).  Thus, Hitachi

23   Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

24   Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

25   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26   throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

27   controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

28   violations alleged in this complaint.

40.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     IRICO Entities

41.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

43.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

44.     Defendants IGC, IGE and IDDC are collectively referred to herein as

"IRICO."

### 3. LG Electronics Entities

45. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

47. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

48.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.     LP Displays**

49.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     Panasonic Entities**

50.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

52. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

53. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

54. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.** **Philips Entities**

55. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60

countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

56. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

57. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

58. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal

1    Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

2    the antitrust violations alleged in this complaint.

3            59.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

4    Brazil are collectively referred to herein as "Philips."

5            **7.    Samsung Entities**

6            60.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

7    company with its principal place of business located at Samsung Electronics Building, 1320-10,

8    Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

9    company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

10   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

11   States.

12           61.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

13   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

14   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

15   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

16   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

17   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

18   Samsung SEAI relating to the antitrust violations alleged in this complaint.

19           62.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

20   Company ("Samsung SDI") is a South Korean company with its principal place of business

21   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

22   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

23   Samsung SDI claims to be the world's leading company in the display and energy business, with

24   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

25   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

26   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

27   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

28   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

1    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

2          63.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

3    California corporation with its principal place of business located at 3333 Michelson Drive, Suite

4    700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

5    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

6    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

7    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

8    controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

9    violations alleged in this complaint.

10          64.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

11   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

12   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

13   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

14   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

15   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

16   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

17   Mexico relating to the antitrust violations alleged in this complaint.

18          65.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

19   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

20   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

21   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

22   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

23   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

24   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

25   Brazil relating to the antitrust violations alleged in this complaint.

26          66.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

27   is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

28   Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

67. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

68. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

69. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.** **Samtel**

70. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

1  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

2  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

3  States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

4  Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

5  its subsidiaries and affiliates, throughout the United States.

6  **9.**   **Thai CRT**

7  71.   Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

8  1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

9  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

10  televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

11  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12  United States.

13  **10.**   **Toshiba Entities**

14  72.   Defendant Toshiba Corporation ("TC") is a Japanese company with its

15  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

16  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

17  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

18  other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

19  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

20  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

21  in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

22  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

23  subsidiaries or affiliates, throughout the United States.

24  73.   Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

25  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

26  4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

27  subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

28  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

74.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

75.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

76.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

77.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Thomson Entities**

78.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

79.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

1  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

2  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

3  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

4          80.     Thomson SA and Thomson Consumer Electronics are collectively referred

5  to herein as "Thomson."

6          **12.    Mitsubishi Entities**

7          81.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

8  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

9  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

10  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

11  internally to Mitsubishi's television and monitor manufacturing division and to other television

12  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

13  division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

14  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

15  United States.

16          82.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

17  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

18  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

19  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

20  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

21  and monitor manufacturing division and to other television and monitor manufacturers in the

22  U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

23  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

24  marketed, sold and distributed CRT Products in the United States.

25          83.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

26  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

27  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the

28  Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

CRT televisions and monitors in the United States.

84.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.      AGENTS AND CO-CONSPIRATORS**

78.85.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

79.86.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRT Products made by its parent company.

80.87.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

81.88.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

82.89. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

83.90. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

84.91. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

85.92. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

86.93. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.      TRADE AND COMMERCE

87.94. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.95. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

89.96. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in California and New York and caused antitrust injuries in California and New York.

## VI.      FACTUAL ALLEGATIONS

### A.      CRT Technology

90.97. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.98.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.99.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.100.        Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.101.        CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.102.        CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

96.103.        The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and

purposes, inseparable in that one would not exist without the other.

97.104.         Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and CRT Products and their purchases of CRT Products indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs and CRT Products.

98.105.         Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

99.106.         Plaintiffs have been injured by paying supra-competitive prices for CRTs and CRT Products.

**B.      Structure of the CRT Industry**

100.107.         The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.      Market Concentration**

101.108.         During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.      Information Sharing**

102.109.         Because of common membership in trade associations, interrelated

business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.   The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.   Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products as alleged below.

103.110.   Defendants Hitachi and Samsung, as well as Chunghwa, are all members of the Society for Information Display.   Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.   Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.   Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products.   At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.   Consolidation

104.111.   The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

105.112.   The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

106.113.   Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

> a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.
>
> b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

h.   Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG

Electronics, Samsung, Philips, and Panasonic.

**5.** **High Costs of Entry Into the Industry**

~~107.~~114.     There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~108.~~115.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRT Products allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.** **The Maturity of the CRT Product Market**

~~109.~~116.     Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~110.~~117.     Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~111.~~118.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~112.~~119.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion

and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.120.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.121.      As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.      Homogeneity of CRT Products

115.122.      CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

116.123.      It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.      Pre-Conspiracy Market

117.124.      The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.125.      In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.      Defendants' and Co-Conspirators' Illegal Agreements

119.126.     In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.127.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRT Products in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.128.     Defendants Samsung, LG, and LGMitsubishi, along with Chunghwa and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRT Products.

122.129.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.130.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

### 1.     "Glass Meetings"

124.131.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

125.132.     The first level meetings were attended by high level company

executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.133.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.134.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.135.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

129.136.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had

subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Thomson.  Chunghwa also attended these meetings.

130.137.      Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

131.138.      During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

132.139.      Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133.140.      The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

134.141.      During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a

"bottom price."

135.142.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

137.143.    The agreements reached at the glass meetings included:

    a.   agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.   placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

    c.   agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

    d.   agreements as to what to tell customers about the reason for a price increase;

    e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.   agreements to coordinate pricing with CRT manufacturers in other

geographic markets such as Brazil, Europe and India;

g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h. agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

138.144.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

139.145.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2. **Bilateral Discussions**

140.146.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

took the form of in-person meetings, telephone contacts and emails.

141.147.     During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

142.148.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and, Europe, and the United States.

143.149.     In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the United States.   These Brazilian and MexicanCRT manufacturers were particularly important because they served the North American market for CRT Products.   As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.   Because these Brazilian and MexicanCRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.   In this way, Defendants ensured that prices of all CRT Products imported intoCRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

144.150.     Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.   The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

145.151.     Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.   It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product

pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

146.152.       Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

147.153.       Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

148.154.       Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

1   with other Defendants, particularly with other Chinese manufacturers.   Through these

2   discussions, IRICO agreed on prices and supply levels for CRT Products.   None of IRICO's

3   conspiratorial conduct in connection with CRT Products was mandated by the Chinese

4   government.   IRICO was acting to further its own independent private interests in participating

5   in the alleged conspiracy.

6   149.155.      Between at least 1995 and 2001, Defendant LG Electronics,

7   through LGEI and LGETT, participated in at least 100 glass meetings at all levels.   After 2001,

8   LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips,

9   LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by the highest

10   ranking executives from LG Electronics.   LG Electronics also engaged in bilateral discussions

11   with each of the other Defendants on a regular basis.   Through these discussions, LG agreed on

12   prices and supply levels for CRT Products.   LG Electronics never effectively withdrew from this

13   conspiracy.

14   150.156.      Defendant LGEUSA was represented at those meetings and was a

15   party to the agreements entered at them.   To the extent LGEUSA sold and/or distributed CRT

16   Products, it played a significant role in the conspiracy because Defendants wished to ensure that

17   the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements

18   reached at the glass meetings.   Thus, LGEUSA was an active, knowing participant in the alleged

19   conspiracy.

20   151.157.      Between at least 2001 and 2006, Defendant LP Displays (f/k/a

21   LGPD) participated in at least 100 glass meetings at all levels.   A substantial number of these

22   meetings were attended by the highest ranking executives from LP Displays.   Certain of these

23   high level executives from LP Displays had previously attended meetings on behalf of

24   Defendants LG Electronics and Philips.   LP Displays also engaged in bilateral discussions with

25   other Defendants.   Through these discussions, LP Displays agreed on prices and supply levels for

26   CRT Products.

27   152.158.      Between at least 1996 and 2003, Defendant Panasonic, through

28   Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.   After

2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.   These meetings were attended by high level sales managers from Panasonic and MTPD.   Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRT Products. Panasonic never effectively withdrew from this conspiracy.

153.159.      PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

154.160.      Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

155.161.      Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.   These meetings were attended by high level sales managers from BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRT Products.   None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

156.162.      Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.   Philips also engaged in numerous bilateral discussions with other

Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRT Products.  Philips never effectively withdrew from this conspiracy.

157.163.        Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.    Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

158.164.        Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.   Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

159.165.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

160.166.        Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These meetings were attended by high level executives from Samtel.   Through these discussions, Samtel agreed on prices and supply levels for CRT Products.  Samtel never effectively withdrew from this conspiracy.

161.167.        Between at least 1997 and 2006, Defendant Thai CRT participated

in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

168.  Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

169.  Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.170.  Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never effectively withdrew from this conspiracy.

163.171.  Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent

1    Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

2    purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

3    that the prices for CRT Products paid by direct purchasers would not undercut the pricing

4    agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

5    were active, knowing participants in the alleged conspiracy.

6        164.172.       Between at least 1995 and 2004, Daewoo, through Daewoo

7    Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

8    substantial number of these meetings were attended by the highest ranking executives from

9    Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

10   Through these discussions, Daewoo agreed on prices and supply levels for CRT Products.

11   Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary,

12   filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

13       165.173.       When Plaintiffs refer to a corporate family or companies by a

14   single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one

15   or more employees or agents of entities within the corporate family engaged in conspiratorial

16   meetings on behalf of every company in that family.  In fact, the individual participants in the

17   conspiratorial meetings and discussions did not always know the corporate affiliation of their

18   counterparts, nor did they distinguish between the entities within a corporate family.  The

19   individual participants entered into agreements on behalf of, and reported these meetings and

20   discussions to, their respective corporate families.  As a result, the entire corporate family was

21   represented in meetings and discussions by their agents and were parties to the agreements

22   reached in them.

23       **E.    The CRT Market During the Conspiracy**

24       166.174.       Until the last few years, CRTs were the dominant technology used

25   in displays, including televisions and computer monitors.  During the Relevant Period, this

26   translated into the sale of millions of CRT Products, generating billions of dollars in annual

27   profits.

28       167.175.       The following data was reported by Stanford Resources, Inc., a

market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

168.176.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

169.177.     Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

170.178.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

171.179.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

---

[1]     Estimated market value of CRT units sold.

172.180.      After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

173.181.      A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

174.182.      A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

175.183.      Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

176.184.      For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

177.185.      During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

178.186.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

179.187.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

180.188.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

181.189.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

182.190.    Defendant MTPD, now the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

183.191.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MTPD fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI.  *Kyodo News* further reported that "[o]fficials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

184.192.    Defendant Samsung SDI was raided by South Korea's Fair Trade

Commission, which has started an investigation into Samsung's CRT business.

185.193.    The *Asian Shimbun* further reported on November 10, 2007, that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

186.194.    On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.   Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.   Royal Philips stated that it intended to assist the regulators.

187.195.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

188.196.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were

exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

189.197.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.198.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.199.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the

prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.200.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

193.201.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

194.202.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

195.203.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

204.    On December 5, 2012, the European Commission announced that it had

fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

196.205.      As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

197.206.      Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

198.207.      Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

199.208.      In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

200.209.      On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

201.210.      On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

1  Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

2  their roles in a conspiracy to fix prices of TFT-LCD panels.

3  ~~202.~~211.        On March 10, 2009, the DOJ announced that it had reached an

4  agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead

5  guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine

6  for its role in a conspiracy to fix the prices of TFT-LCD panels.

7  ~~203.~~212.        The indictments of LG Display Co., Ltd., Sharp Corporation,

8  Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

9  TFT-LCDs was carried out, in part, in California.

10        **G.        The Role of Trade Associations During the Relevant Period**

11  ~~204.~~213.        Defendants' collusive activities have been furthered by trade

12  associations and trade events that provided opportunities to conspire and share information.  One

13  example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the

14  summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.

15  KODEMIA is a national trade organization representing about 80 member companies in the

16  Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004,

17  the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association

18  of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations

19  related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

20  States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

21  Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common

22  issues."

23  ~~205.~~214.        Samsung and LG Electronics were members of both KODEMIA

24  and EDIRAK, and have participated extensively in the KDCs.

25  ~~206.~~215.        The KDC has taken place in Seoul, Korea or other Korean venues

26  on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

27  2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

28  and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

1    Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

2    Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated,

3    such as Zenzou Tashima of Hitachi.

4                 207.216.      Other opportunities to collude among Defendants were provided

5    by events sponsored by the Society for Information Display, such as the annual Asian

6    Symposiums on Information Display, the annual International Display Manufacturing

7    Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the

8    annual International Meeting on Information Displays (held each August in Daegu, Korea) and

9    the annual International Display Workshops (the most recent ones of which have been held in

10   Japan).

11                208.217.      Through these trade association and trade events, and in meetings

12   related to these trade associations and trade events, on information and belief, Defendants shared

13   what would normally be considered proprietary and competitively sensitive information.  This

14   exchange of information was used to implement and monitor the conspiracy.

15      **H.      Effects of Defendants' Antitrust Violations**

16             **1.      Examples of Reductions in Manufacturing Capacity by Defendants**

17                209.218.      As explained above, during the Relevant Period, Defendants

18   consolidated their manufacturing facilities in lower-cost venues such as China and reduced

19   manufacturing capacity to prop up prices.

20                210.219.      In December of 2004, MTPD closed its American subsidiary's

21   operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that

22   the closing was part of the company's "global restructuring initiatives in the CRT business."  The

23   company further stated that in the future, "CRTs for the North American market will be supplied

24   by other manufacturing locations in order to establish an optimum CRT manufacturing

25   structure."

26                211.220.      In July of 2005, LGPD ceased CRT production at its Durham,

27   England facility, citing a shift in demand from Europe to Asia.

28

212.221.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

213.222.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

214.223.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.     Examples of Collusive Pricing for CRT Products

215.224.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

216.225.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

217.226.     In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

218.227.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

219.228.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

220.229.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

221.230.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

222.231.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

223.232.     Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

224.233.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

H.     **Summary Of Effects Of The Conspiracy Involving CRT Products**

~~225.~~234.     The above combination and conspiracy has had the following effects, among others:

      a.  Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

      b.  Prices for CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

      c.  Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

      d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.     PLAINTIFFS' INJURIES**

~~226.~~235.     As purchasers of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRT Products causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

~~227.~~236.     Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have

absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

228.237.     The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

229.238.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

230.239.     The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

231.240.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

232.241.     As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

**VIII.   FRAUDULENT CONCEALMENT**

233.242.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 2007, when investigations by the DOJ and other antitrust regulators became public.  Defendants engaged in a

secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

234.243.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

235.244.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

236.245.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

237.246.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

238.247.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were

1  also told not to take minutes.  Attending companies also reduced the number of their respective

2  attendees to maintain secrecy.

3       239.248.     Defendants also agreed at glass meetings and bilateral meetings to

4  give pretextual reasons for price increases and output reductions to their customers.

5       240.249.     As alleged above, in early 1999, despite declining production costs

6  and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

7  rose.  The price increase was allegedly based on increasing global demand for the products.  In

8  fact, this price rise was the result of collusive conduct amongst Defendants, which was

9  undisclosed at the time.

10       241.250.     As alleged above, despite increased competition from flat panel

11  monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

12  This price stabilization was purportedly due exclusively to a shortage of critical components

13  such as glass.  This was a pretext used to cover up the conspiracy.

14       242.251.     In addition, when several CRT manufacturers, including

15  Defendants Samsung, Philips and LG Electronics, increased the price of CRT Products in 2004,

16  the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In

17  justifying this price increase, a Deputy General Manager for an LG Electronics distributor in

18  India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to

19  increase the prices of CRT monitors in due course of time."

20       243.252.     Manufacturers such as LG Electronics periodically issued press

21  statements falsely asserting that CRT prices were being driven lower by intense competition.

22       244.253.     Plaintiffs are informed and believe, and thereon allege, that

23  Defendants' purported reasons for the price increases of CRT Products were materially false and

24  misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

25  alleged herein.

26       245.254.     As a result of Defendants' fraudulent concealment of their

27  conspiracy, the running of any statute of limitations has been tolled with respect to any claims

28  that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

**IX.** ***AMERICAN PIPE*****, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

255.   As discussed at length in Paragraphs 188-212 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

256.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

257.   Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

~~IX.~~X.   **CLAIM FOR VIOLATIONS**

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

~~246.~~258.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~247.~~259.   Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

248.260.      In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

249.261.      As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

250.262.      The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

251.263.      For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

     a.  participating in meetings and conversations to discuss the prices and supply of CRT Products;

     b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRT Products;

     c.  agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

     d.  issuing price announcements and price quotations in accordance with the agreements reached;

     e.  selling CRT Products to customers in the United States at noncompetitive prices;

     f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

     g.  agreeing to maintain or lower production capacity; and

     h.  providing false statements to the public to explain increased prices for CRT Products.

252.264.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

253.265.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

254.266.    During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

255.267.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT Products.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

256.268.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have

each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRT Products at supra-competitive levels.   Defendants' conduct substantially affected California commerce.

257.269.   The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

258.270.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

   a.   to fix, raise, maintain and stabilize the price of CRT Products;

   b.   to allocate markets for CRT Products amongst themselves;

   c.   to submit rigged bids for the award and performance of certain CRT Products contracts; and

   d.   to allocate among themselves the production of CRT Products.

259.271.   The combination and conspiracy alleged herein has had, inter alia, the following effects:

   a.   price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California;

   b.   prices for CRT Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

   c.   those who purchased CRT Products from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

1

2   ~~260.~~272.       As a result of the alleged conduct of Defendants, Plaintiffs paid

3   supra-competitive, artificially inflated prices for the CRT Products they purchased during the

4   Relevant Period.

5       ~~261.~~273.       As a direct and proximate result of Defendants' conduct, Plaintiffs

6   have been injured in their business and property by paying more for CRT Products containing

7   price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid

8   in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation

9   of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to

10  treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section

11  16750(a) of the California Business and Professions Code.

12                          **Third Claim for Relief**

13              **(Violation of California Unfair Competition Law)**

14      ~~262.~~274.       Plaintiffs incorporate and reallege, as though fully set forth herein,

15  each and every allegation set forth in the preceding paragraphs of this Complaint.

16      ~~263.~~275.       During the Relevant Period, Plaintiffs, and their predecessor

17  entities, including International Computer Graphics, Inc., conducted a substantial volume of

18  business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and

19  their co-conspirators in California; maintained warehouses in California containing CRT

20  Products manufactured and sold by Defendants and co-conspirators; and maintained agents and

21  representatives in California who sold CRT Products to consumers in California and elsewhere.

22  As a result of their presence in California and the substantial business they conducted in

23  California, Plaintiffs are entitled to the protection of the laws of California.

24      ~~264.~~276.       Defendants have engaged in unfair competition in violation of

25  California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

26      ~~265.~~277.       Defendants committed acts of unfair competition, as defined by

27  Section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of CRT Products

28  as described above.

266.278.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

267.279.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

268.280.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

269.281.    Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

270.282.    By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### Fourth Claim for Relief

### (Violation of the New York Donnelly Act)

271.283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272.284.    Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere.  As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

273.285.      Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq*.

274.286.      Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

275.287.      As a result, Defendants' conspiracy substantially affected New York commerce

276.288.      As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq*.

277.289.      As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief**

**(Violation of New York Unfair Competition Law)**

278.290.      Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

279.291.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

280.292.      The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349,

which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

281.293.    Defendants' unlawful conduct had the following effects:  (1) CRT price competition was restrained, suppressed and eliminated throughout New York; (2) CRT Products prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products.

282.294.    During the Relevant Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

283.295.    During the Relevant Period, each of Defendants named herein, directly, or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

284.296.    Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

## X.XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the New York Donnelly Act and the unfair competition laws of California and New York and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

1    entered against Defendants in an amount to be trebled in accordance with such laws, including

2    Section 4 of the Clayton Act;

3              C.      Defendants,   their   subsidiaries,   affiliates,   successors,   transferees,

4    assignees and the respective officers, directors, partners, agents and employees thereof, and all

5    other persons acting or claiming to act on their behalf, shall be permanently enjoined and

6    restrained from continuing and maintaining the combination, conspiracy or agreement alleged

7    herein;

8              D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and

9    such interest shall be awarded at the highest legal rate from and after the date of service of the

10   initial complaint in this action;

11             E.      Plaintiffs shall recover their costs of this suit, including reasonable

12   attorneys' fees as provided by law; and

13   Plaintiffs shall receive such other or further relief as may be just and proper.

14   **~~XI.~~XII.**      **JURY TRIAL DEMAND**

15             Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

16   jury of all the claims asserted in this Complaint so triable.

17

18

19

20   Dated:                        Respectfully Submitted,

21

22                           _____

23                           Philip J. Iovieno
                        Anne M. Nardacci
                        ~~Benjamin D. Battles~~

24                           BOIES, SCHILLER & FLEXNER LLP
                        10 North Pearl Street, 4th Floor

25                           Albany, NY  12207
                        Telephone:  (518) 434-0600

26                           Facsimile:  (518) 434-0665
                        Email: piovieno@bsfllp.com

27                                   anardacci@bsfllp.com
                        ~~bbattles@bsfllp.com~~

28

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems,
Inc. and Electrograph Technologies Corp.*

# **EXHIBIT I**

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

2

3     OFFICE DEPOT, INC.,
      _____

4            Plaintiff,                                    CASE NO. _____
      _____

5     v.                                                   **COMPLAINT**

6     HITACHI, LTD.; HITACHI DISPLAYS, LTD.;              **JURY TRIAL DEMANDED**
      HITACHI AMERICA, LTD.; HITACHI ASIA,

7     LTD.; HITACHI ELECTRONIC DEVICES (USA),
      INC.; SHENZHEN SEG HITACHI COLOR

8     DISPLAY DEVICES, LTD.; IRICO GROUP
      CORPORATION; IRICO GROUP ELECTRONICS

9     CO., LTD.; IRICO DISPLAY DEVICES CO.,
      LTD.; LG ELECTRONICS, INC.; LG

10    ELECTRONICS USA, INC.; LG ELECTRONICS
      TAIWAN TAIPEI CO., LTD.; LP DISPLAYS

11    INTERNATIONAL LTD.; PANASONIC
      CORPORATION; PANASONIC CORPORATION

12    OF NORTH AMERICA; MT PICTURE DISPLAY
      CO., LTD.; BEIJING MATSUSHITA COLOR

13    CRT CO., LTD.; KONINKLIJKE PHILIPS
      ELECTRONICS N.V.; PHILIPS ELECTRONICS

14    NORTH AMERICA CORPORATION; PHILIPS
      ELECTRONICS INDUSTRIES (TAIWAN), LTD.;

15    PHILIPS DA AMAZONIA INDUSTRIA
      ELECTRONICA LTDA.; SAMSUNG

16    ELECTRONICS CO., LTD.; SAMSUNG
      ELECTRONICS AMERICA, INC.; SAMSUNG

17    SDI CO., LTD.; SAMSUNG SDI AMERICA,
      INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;

18    SAMSUNG SDI BRASIL LTDA.; SHENZHEN
      SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG

19    SDI CO., LTD.; SAMSUNG SDI (MALAYSIA)
      SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT

20    CO., LTD.; TOSHIBA CORPORATION;
      TOSHIBA AMERICA, INC.; TOSHIBA

21    AMERICA CONSUMER PRODUCTS, LLC;
      TOSHIBA AMERICA ELECTRONIC

22    COMPONENTS, INC.; TOSHIBA AMERICA
      INFORMATION SYSTEMS, INC.; CHUNGHWA

23    PICTURE TUBES, LTD.; CHUNGHWA
      PICTURE TUBES (MALAYSIA); TATUNG

24    COMPANY OF AMERICA, INC.,
      _____

25            Defendants.
      _____

26

27

28

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06276-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06276-SC | MDL No. 1917 |
| OFFICE DEPOT, INC., | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; | |

SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff, Office Depot, Inc. ("Office Depot"), for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.    **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

1   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

2   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3          2.      Defendants are or were among the leading manufacturers of: (a) color

4   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

7   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

9   and the products containing them shall be referred to as "CDT Products."  CDT Products and

10   CPT Products shall be referred to collectively herein as "CRT Products."

11          3.      Defendants control the majority of the CRT industry, a multibillion dollar

12   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

13   Relevant Period, virtually every household in the United States owned at least one CRT Product.

14          4.      Since the mid-1990s, the CRT industry faced significant economic

15   pressures as customer preferences for other emerging technologies shrank profits and threatened

16   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

17   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19   States.

20          5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

22   shipments, prices, production and customer demand; (c) coordinate public statements regarding

23   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28   producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein because Plaintiff purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

1   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

2   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

3   into this District.

4   **III.    PARTIES**

5         **A.    Plaintiff**

6         16.    Plaintiff Office Depot is a Delaware corporation with its corporate

7   headquarters in Delray Beach, Florida. Office Depot was incorporated in 1986 with the opening

8   of its first retail location in Fort Lauderdale, Florida. Through the conclusion of Defendants' and

9   the co-conspirators' conspiracy, Office Depot was a global supplier of office products and

10   services. In fiscal year 2010, Office Depot sold $11.6 billion of products and services to

11   consumers and businesses of all sizes.  Upon information and belief, Office Depot owns all

12   claims and rights under federal law and state law to recover any overcharges suffered by Office

13   Depot and the following subsidiaries: (1) Viking Office Products, Inc.; (2) Solutions4sure.com,

14   Inc., d/b/a Tech Depot; and (3) Computers4sure.com, Inc., (collectively, the "Office Depot

15   Subsidiaries").

16         17.    During the Relevant Period, Office Depot and the Office Depot

17   Subsidiaries purchased CRT Products directly and indirectly from the Defendants, and/or the

18   Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants'

19   subsidiaries and affiliates controlled.  As such, Office Depot and the Office Depot Subsidiaries

20   suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

21   Throughout the Relevant Period, Office Depot conducted a substantial amount of business in

22   Florida and California.

23         18.    Upon information and belief, during the Relevant Period, Office Depot

24   and the Office Depot Subsidiaries purchased CRT Products in, *inter alia*, California and Florida

25   containing CRTs manufactured and sold by Defendants and their co-conspirators.  In addition,

26   upon information and belief, Plaintiff supplied its offices in California and Florida with CRT

27   Products and maintained corporate offices and inventories in these states.

28         19.    Upon information and belief, Plaintiff purchased CRT Products, which

OFFICE DEPOT'S AMENDED COMPLAINT                    7

1    contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially

2    inflated prices because of the price-fixing conspiracy, in California and Florida.

3        **B.**    **Defendants**

4            **1.**    **Hitachi Entities**

5            20.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

6    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7    parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

8    market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

9    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

10   subsidiaries or affiliates, throughout the United States.

11           21.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

12   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

13   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

14   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

15   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

16   create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

17   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

18   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

19   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

20   antitrust violations alleged in this complaint.

21           22.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

22   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

23   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

24   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

25   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

27   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28           23.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

1  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

2  Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

3  Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

4  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

6  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

7          24.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

8  Delaware corporation with its principal place of business located at 208 Fairforest Way,

9  Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

10  Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

11  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12  United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

13  finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

14  complaint.

15          25.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

16  Shenzhen") was a Chinese company with its principal place of business located at 5001

17  Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

18  least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

19  around the time that the government investigations into the CRT industry began).  Thus, Hitachi

20  Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

21  Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

22  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23  throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

24  controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

25  violations alleged in this complaint.

26          26.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

27  HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

28

1

### 2.   IRICO Entities

2          27.      Defendant IRICO Group Corporation ("IGC") is a Chinese company with

3    its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

4    712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

5    marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

6    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7    subsidiaries or affiliates, throughout the United States.

8          28.      Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

9    company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

10   Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

11   CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

12   also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

13   and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

14   IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

16   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17   complaint.

18         29.      Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

19   company with its principal place of business located at No. 16, Fenghui South Road West,

20   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

21   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

22   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

23   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

24   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

25   alleged in this complaint.

26         30.      Defendants IGC, IGE and IDDC are collectively referred to herein as

27   "IRICO."

28

### 3.      LG Electronics Entities

31.      Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

32.      Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

33.      Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

34.      Defendants LGEI, LGEUSA and LGETT are collectively referred to

11

1    herein as "LG Electronics."

2         **4.    LP Displays**

3         35.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5    Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7    In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8    of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9    billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10   and LGEI would cede control over the company and the shares would be owned by financial

11   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13   affiliates, throughout the United States.

14        **5.    Panasonic Entities**

15        36.    Defendant Panasonic Corporation, which was at all times during the

16   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18   Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

19   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20   affiliates, throughout the United States.

21        37.    Defendant Panasonic Corporation of North America ("PCNA") is a

22   Delaware corporation with its principal place of business located at One Panasonic Way,

23   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28        38.    Defendants Panasonic Corporation and PCNA are collectively referred to

herein as "Panasonic."

39.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.   On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

41.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

1   Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

2   Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

3   demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

4   million Euros of its investment and said it would not inject further capital into the venture.

5   During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

6   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7          42.    Defendant Philips Electronics North America Corporation ("Philips

8   America") is a Delaware corporation with its principal place of business located at 1251 Avenue

9   of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and

10  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America

11  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

13  controlled the finances, policies and affairs of Philips America relating to the antitrust violations

14  alleged in this complaint.

15         43.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

16  Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

17  Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

18  Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

19  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20  United States.  Defendant Royal Philips dominated and controlled the finances, policies and

21  affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

22         44.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

23  Brazil") is a Brazilian company with its principal place of business located at Av Torquato

24  Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

25  wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

26  Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

27  directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

28  Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

the antitrust violations alleged in this complaint.

45.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

46.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.   It is South Korea's top electronics company.   During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.   SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.   During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

48.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.   Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

1         49.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

2  California corporation with its principal place of business located at 3333 Michelson Drive, Suite

3  700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

4  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

5  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

6  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

7  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

8  violations alleged in this complaint.

9         50.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

10  is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

11  21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

12  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

13  Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

14  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

15  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

16  Mexico relating to the antitrust violations alleged in this complaint.

17         51.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

18  Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

19  Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

20  owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

21  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

22  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

23  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

24  Brazil relating to the antitrust violations alleged in this complaint.

25         52.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

26  is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

27  Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

28  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

53.   Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

54.   Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

55.   Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.   Samtel

56.   Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

1   country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

2   States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

3   Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

4   its subsidiaries and affiliates, throughout the United States.

5              **9.       Thai CRT**

6              57.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

7   1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

8   Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

9   televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

10  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

11  United States.

12             **10.      Toshiba Entities**

13             58.     Defendant Toshiba Corporation ("TC") is a Japanese company with its

14  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

15  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

16  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

17  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

18  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

19  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

20  in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

21  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22  subsidiaries or affiliates, throughout the United States.

23             59.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

24  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

25  4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

26  subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

27  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

28  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

1  policies and affairs of Toshiba America relating to the antitrust violations alleged in this

2  complaint.

3         60.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a

4  limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

5  3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

6  America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

7  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

8  States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

9  relating to the antitrust violations alleged in this complaint.

10         61.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

11  California corporation with its principal place of business located at 19900 MacArthur

12  Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled

13  subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

14  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15  subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

16  the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

17  complaint.

18         62.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

19  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

20  California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC

21  through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold

22  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23  throughout the United States.  Defendant TC dominated and controlled the finances, policies and

24  affairs of TAIS relating to the antitrust violations alleged in this complaint.

25         63.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are

26  collectively referred to herein as "Toshiba."

27         **11.**    **Chunghwa Entities**

28         64.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

65. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.~~Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."~~

**~~12.     Tatung Company of America, Inc.~~**

66.     ~~Tatung Company of America, Inc. ("Tatung America") is a California~~Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Thomson Entities**

67.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California.  Tatung America is a~~5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located

1   in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its

2   television-manufacturing division, which had plants in the United States and Mexico, and to

3   other television manufacturers in the United States and elsewhere.  Thomson SA's television

4   division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions

5   were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson

6   SA sold its television division to a joint venture it formed with Chinese company, TCL

7   Corporation.    The other half used to joint venture was called TCL-Thomson Electronics

8   Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

9   televisions made by TCL-Thomson would be owned by Lun Kuan Lin, the daughter of Tatung

10  Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to

11  her two children marketed under the TCL brand in Asia and the Thomson and RCA brands in

12  Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to

13  Videocon Industries, Ltd.     During the Relevant Period, Tatung America Thomson SA

14  manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others,

15  Chunghwa Picture Tubes, Ltd., either directly or indirectly through its subsidiaries or affiliates,

16  to customers throughout the United States.

17         68.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

18  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

19  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

20  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

21  Electronics was a major manufacturer of CRTs for the United States market, with plants located

22  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

23  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

24  television-manufacturing division, which had plants in the United States and Mexico, and to

25  other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

26  were sold in the United States to United States consumers under the RCA brand.  Thomson

27  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

28  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.      Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.      Mitsubishi Entities**

70.      Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

71.      Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

72.      Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

73.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.     AGENTS AND CO-CONSPIRATORS**

74.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

75.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

76.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

77.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

78.   Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

79.   Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

80.   P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

81.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

82.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

**V.      TRADE AND COMMERCE**

83.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

84.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

85.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Florida and caused antitrust injuries in California and Florida.

**VI.     FACTUAL ALLEGATIONS**

**A.      CRT Technology**

86.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

87.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

88.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

89.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

90.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

91.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

92.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

inseparable in that one would not exist without the other.

93.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

94.     Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

95.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.     Structure of the CRT Industry**

96.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

97.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.   The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

98.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries

and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

99.     Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

**3.     Consolidation**

100.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

**4.     Multiple Interrelated Business Relationships**

101.     The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

102.     Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.   Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.   Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

1

### 5.    High Costs of Entry Into the Industry

2       103.    There are significant manufacturing and technological barriers to entry

3  into the CRT industry.  It would require substantial time, resources and industry knowledge to

4  overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter

5  the market in light of the declining demand for CRT Products.

6       104.    During the Relevant Period, the costs of the assembly components, both as

7  a whole and individually, have been generally declining, and, in some periods, declining at a

8  substantial rate.   A combination of price discussions and manipulation of the output of CRTs

9  allowed Defendants to keep prices above where they would have been but for the conspiracy.

10

### 6.    The Maturity of the CRT Product Market

11      105.    Newer industries typically are characterized by rapid growth, innovation

12  and high profits.  The CRT Product market is a mature one, and like many mature industries, is

13  characterized by slim profit margins, creating a motivation to collude.

14      106.    Demand for CRT Products was declining throughout the Relevant Period.

15  Static declining demand is another factor which makes the formation of a collusive arrangement

16  more likely because it provides a greater incentive to firms to avoid price competition.

17      107.    In addition, conventional CRT televisions and computer monitors were

18  being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

19  Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT

20  Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

21  States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

22  between 2006 and 2010.

23      108.    Although demand was declining as a result of the popularity of flat-panel

24  LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

25  dominant display technology during the Relevant Period, making Defendants' collusion and the

26  international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

27  plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

28  cheaper alternative to these new technologies.

109.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

110.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

111.    CRT Products are commodity-like products which are manufactured in standardized sizes.   One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

112.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

113.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.   During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

114.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

115.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

November 25, 2007.

116.   The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

117.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

118.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

119.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1.   **"Glass Meetings"**

120.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

121.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were

1     decision makers who could make agreements.

2           122.    The second level meetings were attended by Defendants' high level sales

3     managers and were known as "management" meetings.  These meetings occurred more

4     frequently, typically monthly, and handled implementation of the agreements made at top

5     meetings.

6           123.    Finally, the third level meetings were known as "working level" meetings

7     and were attended by lower level sales and marketing employees.  These meetings generally

8     occurred on a weekly or monthly basis and were mostly limited to the exchange of information

9     and discussing pricing since the lower level employees did not have the authority to enter into

10    agreements.  These lower level employees would then transmit the competitive information up

11    the corporate reporting chain to those individuals with pricing authority.  The working level

12    meetings also tended to be more regional and often took place near Defendants' factories.  In

13    other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14    manufacturers' employees met in Korea, the Chinese in China, and so on.

15          124.    The Chinese glass meetings began in 1998 and generally occurred on a

16    monthly basis following a top or management level meeting.  The China meetings had the

17    principal purpose of reporting what had been decided at the most recent glass meetings to the

18    Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

19    in China, such as IRICO and BMCC, as well as the China-based branches of the other

20    Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21    SDI Tianjin, and Chunghwa.

22          125.    Glass meetings also occurred occasionally in various European countries.

23    Attendees at these meetings included those Defendants and co-conspirators which had

24    subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25    LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26    of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

27          126.    Representatives of Defendants also attended what were known amongst

28    members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The

green meetings were generally attended by top and management level employees of Defendants.

127.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

128.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

129.     The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

130.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

131.     Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

1    supracompetitive prices for CRTs.

2    ~~132.   Each of the participants in these meetings knew, and in fact discussed, the~~

3    ~~significant impact that the price of CRTs had on the cost of the finished products into which they~~

4    ~~were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there~~

5    ~~were slim profit margins.  Defendants therefore concluded that in order to make their CRT price~~

6    ~~increases stick, they needed to make the increase high enough that their direct customers (CRT~~

7    ~~TV and monitor makers) would be able to justify a corresponding price increase to their~~

8    ~~customers.  In this way, Defendants ensured that price increases for CRTs were passed on to~~

9    ~~indirect purchasers of CRT Products.~~

10    ~~133.~~132.        The agreements reached at the glass meetings included:

11               l.   agreements on CRT prices, including establishing target prices,

12                    "bottom" prices, price ranges and price guidelines;

13               m.   placing agreed-upon price differentials on various attributes of CRTs,

14                    such as quality or certain technical specifications;

15               n.   agreements on pricing for intra-company CRT sales to vertically

16                    integrated customers;

17               o.   agreements as to what to tell customers about the reason for a price

18                    increase;

19               p.   agreements to coordinate with competitors that did not attend the

20                    group meetings and agreements with them to abide by the agreed-

21                    upon pricing;

22               q.   agreements to coordinate pricing with CRT manufacturers in other

23                    geographic markets such as Brazil, Europe and India;

24               r.   agreements to exchange pertinent information regarding shipments,

25                    capacity, production, prices and customer demands;

26               s.   agreements to coordinate uniform public statements regarding

27                    available capacity and supply;

28               t.   agreements to allocate both overall market shares and share of a

1                          particular customer's purchases;

2                  u.   agreements to allocate customers;

3                  v.   agreements regarding capacity, including agreements to restrict output

4                        and to audit compliance with such agreements; and

5                  w.  agreements to keep their meetings secret.

6        ~~134.~~133.     Efforts were made to monitor each Defendant's adherence to these

7   agreements in a number of ways, including seeking confirmation of pricing both from customers

8   and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

9   least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they

10  did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

11  customers; and 4) a recognition of a mutual interest in living up to the target price and living up

12  to the agreements that had been made.

13        ~~135.~~134.     As market conditions worsened in 2005-2007, and the rate of

14  replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less

15  frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the

16  DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to

17  have concerns about antitrust issues.

18                  **2.**     **Bilateral Discussions**

19        ~~136.~~135.     Throughout the Relevant Period, the glass meetings were

20  supplemented by bilateral discussions between various Defendants.  The bilateral discussions

21  were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

22  between the group meetings. These discussions, usually between sales and marketing employees,

23  took the form of in-person meetings, telephone contacts and emails.

24        ~~137.~~136.     During the Relevant Period, in-person bilateral meetings took

25  place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

26  Thailand, Brazil ~~and~~, Mexico, and the United States.

27        ~~138.~~137.     The purpose of the bilateral discussions was to exchange

28  information about past and future pricing, confirm production levels, share sales order

information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

139.138.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the United States.  These ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

140.139.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

141.140.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for

communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

142.141.      Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

143.142.      Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

144.143.      Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.   Through these discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

145.144.      Between at least 1995 and 2001, Defendant LG Electronics,

through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

146. 145.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

147. 146.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

148. 147.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

149. 148.    PCNA was represented at those meetings and was a party to the

1   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

2   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

3   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

4   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

5   the alleged conspiracy.

6         150.149.       Between at least 2003 and 2006, Defendant MTPD participated in

7   multiple glass meetings and in fact led many of these meetings during the latter years of the

8   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

9   also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

10  agreed on prices and supply levels for CRTs.

11        151.150.       Between at least 1998 and 2007, Defendant BMCC participated in

12  multiple glass meetings.  These meetings were attended by high level sales managers from

13  BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

14  particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

15  prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

16  CRTs was mandated by the Chinese government.  BMCC was acting to further its own

17  independent private interests in participating in the alleged conspiracy.

18        152.151.       Between at least 1996 and 2001, Defendant Philips, through Royal

19  Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

20  Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

21  (n/k/a LP Displays).  A substantial number of these meetings were attended by high level

22  executives from Philips.  Philips also engaged in numerous bilateral discussions with other

23  Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.

24  Philips never effectively withdrew from this conspiracy.

25        153.152.       Defendants Philips America and Philips Brazil were represented at

26  those meetings and were a party to the agreements entered at them.  To the extent Philips

27  America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

28  played a significant role in the conspiracy because Defendants wished to ensure that the prices

for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

154.153.        Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

155.154.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

156.155.        Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

157.156.        Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

157.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral

meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

158.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

158.159.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

159.160.   Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

160.161.   Between at least 1995 and 2006, Defendant Chunghwa, through

Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

161. Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them. To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

162. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

163. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements

reached in them.

### E.     The CRT Market During the Conspiracy

164.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

165.     The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars)[1] | Average Selling Price Per Unit |
|------|------------------------|----------------------------------|--------------------------------|
| 1998 | 90.5  | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

166.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

167.     In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

168.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price

---

[1]  Estimated market value of CRT units sold.

increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

169.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

170.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

171.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

172.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

173.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

174.    These price increases and price stability in the market for CRT Products

during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

## F.      International Government Antitrust Investigations

175.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

176.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

177.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

178.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

179.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.   On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.   The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.   On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

1    The indictment states that the combination and conspiracy to fix the prices of CRTs was carried

2    out, in part, in California.

3              182.    On November 9, 2010, the DOJ issued a press release announcing that a

4    federal grand jury in San Francisco had that same day returned a one-count indictment against

5    Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S.

6    Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used

7    in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives

8    from two color display tube (CDT) manufacturing companies."  The indictment states that the

9    combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

10             183.    On March 18, 2011, the DOJ issued a press release announcing that it had

11   reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a

12   $32 million fine for its role in a conspiracy to fix prices of CDTs.

13             184.    Samsung SDI admitted that from at least as early as January 1997 until at

14   least as late as March 2006, participated in a conspiracy among major CDT producers to fix

15   prices, reduce output, and allocate market shares of CDTs sold in the United States and

16   elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

17   and employees, engaged in discussions and attended meetings with representatives of other

18   major CDT producers.  During these discussions and meetings, agreements were reached to fix

19   prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

20   elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

21   in California.

22             185.    The plea agreement of Samsung SDI requires that it cooperate with the

23   DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

24   manufacture or sale of CDTs and CPTs.

25             186.    On December 5, 2012, the European Commission announced that it had

26   fined seven international corporate families a total of over €1.4 billion for their two-decade-long

27   effort to fix prices, share markets, restrict output, and allocate customers between themselves in

28   the CRT market.  The companies fined by the European Commission included Chunghwa, LG

Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

186.187.       As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

187.188.       Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

188.189.       Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

189.190.       In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

190.191.       On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

191.192.       On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

192.193.       On March 10, 2009, the DOJ announced that it had reached an

agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

193.194.       The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

G.       **The Role of Trade Associations During the Relevant Period**

194.195.       Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

195.196.       Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

196.197.       The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

197.198.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

198.199.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

199.200.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

200.201.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

201.202.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

202.203.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

203.204.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

204.205.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.      Examples of Collusive Pricing for CRTs

205.206.      Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

206.207.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

207.208.      In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

208.209.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

209.210.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

210.211.      In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price

increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

211.212.        After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

212.213.        On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

213.214.        CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.**        **Summary Of Effects Of The Conspiracy Involving CRTs**

214.215.        The above combination and conspiracy has had the following effects, among others:

a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in

that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

215.216.      As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

216.217.      Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.   The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.218.      The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.   Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.   Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.219.      Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.   CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.   Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

219.220.      The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

220.221.      Throughout the Relevant Period, Defendants controlled the market for CRTs.   Consequently, during the Relevant Period, the OEMs had no choice but to purchase

1    CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

2    Defendants' conspiracy.

3          221.222.          As a result, Plaintiff was injured in connection with its purchases

4    of CRT Products during the Relevant Period.

5    **VIII.   FRAUDULENT CONCEALMENT**

6          222.223.          Plaintiff had neither actual nor constructive knowledge of the facts

7    supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff

8    did not discover, and could not have discovered through the exercise of reasonable diligence, the

9    existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did

10   not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix

11   the prices of CRTs.

12         223.224.          Because Defendants' agreement, understanding and conspiracy

13   were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did

14   not know that it was paying artificially high prices for CRT Products.

15         224.225.          The affirmative acts of Defendants alleged herein, including acts in

16   furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

17   precluded detection.  As noted above, Defendants organized glass meetings to avoid detection,

18   conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

19   pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

20   and exchange in advance the texts of the proposed communications with customers containing

21   these pretextual statements and would coordinate which co-conspirator would first communicate

22   these pretextual statements to customers.

23         225.226.          By its very nature, Defendants' price-fixing conspiracy was

24   inherently self-concealing.

25         226.227.          Plaintiff could not have discovered the alleged contract, conspiracy

26   or combination at an earlier date by the exercise of reasonable diligence because of the deceptive

27   practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

28   detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.228.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.229.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.230.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.231.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

231.232.      In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.233.      Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.234.      Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

235.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.IX.

IX.      *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

236.   As discussed at length in Paragraphs 175-194 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

237.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

238.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

234.239.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

235.240.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

236.241.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

237.242.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

238.243.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

239.244.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

240.245.      As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

241.246.      Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242.247.      During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

1    243.248.    Based on the foregoing, Defendants engaged in unfair and

2    deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

3    244.249.    During the Relevant Period, Plaintiff maintained its principal place

4    of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT

5    Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders

6    and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

7    Florida; and resold CRT Products in Florida through its retail locations in Florida, among other

8    Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida,

9    the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is

10   entitled to the protection of the laws of Florida.

11   245.250.    In violation of Section 501.204, Defendants agreed to act, and did

12   in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining

13   at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or

14   obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts

15   constitute a common and continuous course of conduct of unfair competition by means of unfair,

16   unlawful and/or fraudulent business acts or practices.

17   246.251.    The conduct of the Defendants described herein constitutes unfair

18   and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the

19   consuming public and legitimate business enterprises from those who engage in unfair methods

20   of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any

21   trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer

22   protection and enforcement consistent with established policies of federal law relating to

23   consumer protection."  Fla. Stat. § 501.202(3).

24   247.252.    Defendants' unlawful conduct had the following effects: (1) CRT

25   price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices

26   were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3)

27   Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive,

28   artificially inflated prices for CRT Products that it purchased both directly and indirectly. During

1  the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected

2  Florida commerce, and injured Plaintiff in Florida, causing financial losses.

3  ~~248.~~253.       As a result of Defendants' violation of the FDUTPA, Plaintiff is

4  entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. §

5  501.211.

6                               **Third Claim for Relief**

7                    **(Violation of the California Cartwright Act)**

8  ~~249.~~254.       Plaintiff incorporates and realleges, as though fully set forth

9  herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

10  ~~250.~~255.       During the Relevant Period, Plaintiff conducted a substantial

11  volume of business in California.  In particular, upon information and belief, Plaintiff purchased

12  CRT Products by sending purchase orders to California and sent payments to for CRT Products

13  California.  Plaintiff also received shipments of CRT Products at its warehouses in California.  In

14  addition, upon information and belief, Plaintiff maintained California inventories of CRT

15  Products manufactured and sold by Defendants, their co-conspirators, and others, and operated

16  warehouses in California.  Plaintiff also sold CRT Products to customers in California.  Finally,

17  Plaintiff maintained offices and inventories in California of CRT Products and maintained agents

18  and representatives in California who sold CRT Products to consumers in California.  As a result

19  of Plaintiff's business operations in California, it was registered to do business in the State and,

20  upon information and belief, paid taxes to the State of California during the Relevant Period.   As

21  a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws

22  of California**.**

23  ~~251.~~256.       In addition, Defendants LG Display, Samsung and Toshiba all

24  maintained offices in California during the Relevant Period.  Employees at Defendants' locations

25  in California participated in meetings and engaged in bilateral communications in California and

26  intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.

27  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

28

were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

252.257.	Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

253.258.	The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

254.259.	For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.	to fix, raise, maintain and stabilize the price of CRTs;

    b.	to allocate markets for CRTs amongst themselves;

    c.	to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.	to allocate among themselves the production of CRTs.

255.260.	The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.	price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

256.261.    As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

257.262.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Fourth Claim for Relief**

**(Violation of California Unfair Competition Law)**

258.263.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

259.264.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

260.265.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

261.266.     The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

      a.     <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

      b.     <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

      c.     <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

262.267.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

263.268.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

264.269.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

265.270.     By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

## XI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the FDUTPA, the California Cartwright Act, and the California Unfair Competition Law, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.     Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.     Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.      Defendants shall be enjoined from engaging in further acts or practices in violation of and Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

G.      Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.      Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

J.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

K.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

L.      Plaintiff shall receive such other or further relief as may be just and proper.

## XII.      <u>**JURY TRIAL DEMAND**</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

1

Dated:                              Respectfully Submitted,

2

3                                   _____
                                    STUART H. SINGER
                                    (Florida Bar No.: 377325 (*Pro Hac Vice*)
4                                   BOIES, SCHILLER, & FLEXNER LLP
                                    401 East Las Olas Boulevard, Suite 1200
5                                   Fort Lauderdale, Florida 33301
                                    Telephone: (954) 356-0011
6                                   Facsimile: (954) 356-0022
                                    Email: ssinger@bsfllp.com
7

8                                   WILLIAM A. ISAACSON (*Pro Hac Vice to be filed*)
                                    BOIES, SCHILLER & FLEXNER LLP
9                                   5301 Wisconsin Ave. NW, Suite 800
                                    Washington, DC 20015
10                                  Telephone:  (202) 237-2727
                                    Facsimile:   (202) 237-6131
11                                  Email:  wisaacson@bsfllp.com

12
                                    PHILIP J. IOVIENO (*Pro Hac Vice to be filed*)
13                                  BOIES, SCHILLER & FLEXNER LLP
                                    10 North Pearl Street, 4th Floor
14                                  Albany, NY 12207
                                    Telephone:  (518) 434-0600
15                                  Facsimile:   (518) 434-0665
                                    Email: piovieno@bsfllp.com
16

17                                  *Counsel for Plaintiff Office Depot, Inc.*

18

19

20

21

22

23

24

25

26

27

28

OFFICE DEPOT'S AMENDED COMPLAINT            67

# **EXHIBIT J**

1

**~~UNITED STATES DISTRICT COURT~~**
**~~EASTERN DISTRICT OF NEW YORK~~**

2

3 ~~P.C.~~WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
4 5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
5 Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
6 Email:  wisaacson@bsfllp.com

7

PHILIP J. IOVIENO (*Pro hac vice*)
8 ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
9 CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 10 North Pearl Street, 4th Floor
Albany, NY 12207
11 Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
12 Email: piovieno@bsfllp.com

13

14 *Counsel for Plaintiffs P.C.* Richard & ~~SON LONG ISLAND CORPORATION~~*Son Long Island Corporation*;
~~MARTA COOPERATIVE~~*MARTA Cooperative* of ~~AMERICA, INC~~*America, Inc*; and  *ABC Appliance, Inc*
15 ~~ABC APPLIANCE, INC.,~~

16

~~          Plaintiffs,~~
17 ~~─────────────────────────────~~

~~v.~~
18

19 ~~HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,~~

20

21

22

23

24

25

26

27

~~─────────────────────────────~~
28

1   ~~Defendants.~~

2   **UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
3   SAN FRANCISCO DIVISION**

4   IN RE CATHODE RAY TUBE (CRT)      | Case No. 12-cv-02648
    ANTITRUST LITIGATION
5                                      | Master File No. 3:07-cv-05944-SC

6   _____        | MDL No. 1917

7   This Document Relates To Individual Case
    No. 12-cv-02648

8   P.C. RICHARD & SON LONG ISLAND     **AMENDED COMPLAINT**
    CORPORATION; MARTA COOPERATIVE
9   OF AMERICA, INC; and  ABC          **JURY TRIAL DEMANDED**
    APPLIANCE, INC.,

10         Plaintiffs,

11      vs.

12  HITACHI, LTD.; HITACHI DISPLAYS,
    LTD.; HITACHI AMERICA, LTD.;
13  HITACHI ASIA, LTD.; HITACHI
    ELECTRONIC DEVICES (USA), INC.;
14  SHENZHEN SEG HITACHI COLOR
    DISPLAY DEVICES, LTD.; IRICO GROUP
15  CORPORATION; IRICO GROUP
    ELECTRONICS CO., LTD.; IRICO
16  DISPLAY DEVICES CO., LTD.; LG
    ELECTRONICS, INC.; LG ELECTRONICS
17  USA, INC.; LG ELECTRONICS TAIWAN
    TAIPEI CO., LTD.; LP DISPLAYS
18  INTERNATIONAL LTD.; PANASONIC
    CORPORATION; PANASONIC
19  CORPORATION OF NORTH AMERICA;
    MT PICTURE DISPLAY CO., LTD.;
20  BEIJING MATSUSHITA COLOR CRT CO.,
    LTD.; KONINKLIJKE PHILIPS
21  ELECTRONICS N.V.; PHILIPS
    ELECTRONICS NORTH AMERICA
22  CORPORATION; PHILIPS ELECTRONICS
    INDUSTRIES (TAIWAN), LTD.; PHILIPS
23  DA AMAZONIA INDUSTRIA
    ELECTRONICA LTDA.; SAMSUNG
24  ELECTRONICS CO., LTD.; SAMSUNG
    ELECTRONICS AMERICA, INC.;
25  SAMSUNG SDI CO., LTD.; SAMSUNG
    SDI AMERICA, INC.; SAMSUNG SDI
26  MEXICO S.A. DE C.V.;  SAMSUNG SDI
    BRASIL LTDA.; SHENZHEN SAMSUNG
27  SDI CO., LTD.; TIANJIN SAMSUNG SDI
    CO., LTD.; SAMSUNG SDI (MALAYSIA)
28

1  SDN. BHD.; SAMTEL COLOR LTD.; THAI
   CRT CO., LTD.; TOSHIBA
2  CORPORATION; TOSHIBA AMERICA,
   INC.; TOSHIBA AMERICA CONSUMER
3  PRODUCTS, LLC; TOSHIBA AMERICA
   ELECTRONIC COMPONENTS, INC.;
4  TOSHIBA AMERICA INFORMATION
   SYSTEMS, INC.; CHUNGHWA PICTURE
5  TUBES, LTD.; CHUNGHWA PICTURE
   TUBES (MALAYSIA); TECHNICOLOR
6  SA; TECHNICOLOR USA, INC.;
   MITSUBISHI ELECTRIC CORPORATION;
7  MITSUBISHI DIGITAL ELECTRONICS
   AMERICA, INC.; MITSUBISHI ELECTRIC
8  & ELECTRONICS, USA, INC.,

9         Defendants.

10

11

12

13

14

15

16

17

18

19

20

21        Plaintiffs, P.C. Richard & Son Long Island Corporation ("P.C. Richard"), MARTA

22  Cooperative of America, Inc. ("MARTA"), and ABC Appliance, Inc. d/b/a ABC Warehouse

23  ("ABC Warehouse"), for their Complaint against all Defendants named herein, hereby allege as

24  follows:

25  **I.    INTRODUCTION**

26        1.       Defendants and their co-conspirators formed an international cartel which

27  conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

28  through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.     Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.     The conspiracy concerning CRTs commenced with bilateral meetings that

began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs they purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiffs also bring this action pursuant to various state laws listed herein

1   because Plaintiffs purchased CRT Products from both Defendants and non-defendant vendors

2   which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in

3   those states.

4       12.   The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

5   the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

6   supplemental jurisdiction over Plaintiffs' state law claims listed herein under 28 U.S.C. § 1367

7   because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs'

8   state law claims are so related to their claims under Section 1 of the Sherman Act that they form

9   part of the same case or controversy.

10      13.   The activities of Defendants and their co-conspirators, as described herein,

11  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

12  did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

13  import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the

14  Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

15  United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

16  substantially affected the price of CRT Products purchased by Plaintiffs in the states identified

17  herein.

18      14.   This court has jurisdiction over each Defendant named in this action under

19  Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

20  availed themselves of the laws of the United States as they manufactured CRT Products for sale

21  in the United States, or CRTs which were incorporated into CRT Products Defendants and their

22  co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

23  conspirators' conspiracy affected this commerce in CRT Products in the United States.

24      15.   Venue is proper in the Eastern District of New York under Section 12 of

25  the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

26  corporation, transacts business in this District, or is otherwise found within this District.  In

27  addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

28  events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

### III.   PARTIES

#### A.   Plaintiff

##### 1.   P.C. Richard

16.     Plaintiff P.C. Richard is a New York corporation with its corporate headquarters in Farmingdale, New York.  P.C. Richard is the largest chain of private, family-owned electronics and appliances stores in the United States with 65 stores in Connecticut, New York, New Jersey, and Pennsylvania, as well as an online retail store.  Through the conclusion of Defendants' and the co-conspirators' conspiracy, P.C. Richard was a supplier of consumer electronics and appliances.

17.     During the Relevant Period, P.C. Richard purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  P.C. Richard also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.  As such, P.C. Richard suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

18.     During the Relevant Period, P.C. Richard's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in New York.  In addition, P.C. Richard's purchase orders for CRT Products were issued from New York, invoices for these CRT Products were sent to P.C. Richard in New York, and payments for these CRT Products were issued from New York.  P.C. Richard employees based in New York were also responsible for selecting vendors and product lines with respect to CRT Products.

##### 2.   MARTA

19.     Plaintiff MARTA is a Michigan corporation and has its corporate headquarters in Scottsdale, Arizona.   MARTA was initially formed in 1965 by twelve

independent appliance and electronics retailers as a member-owned, not-for-profit, buying cooperative serving a select group of retailers in the appliance and electronics industry. Through the conclusion of Defendants' and the co-conspirators' conspiracy, MARTA was a buying group comprised of larger, independent retailers selling appliances, electronics and furniture.

20.     During the Relevant Period, MARTA purchased CRT Products directly from the Conspirators, including Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  MARTA also purchased CRT Products from OEMs, as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.  As such, MARTA suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

21.     During the Relevant Period, MARTA's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Arizona.  In addition, MARTA's purchase orders for CRT Products were issued from Arizona, invoices for these CRT Products were sent to MARTA in Arizona, and payments for these CRT Products were issued from Arizona and Illinois.  From its headquarters in Arizona, MARTA selected vendors and product lines with respect to CRT Products.

### 3.     ABC Warehouse

22.     Plaintiff ABC Warehouse is a Michigan corporation with its corporate headquarters in Pontiac, Michigan.  ABC Warehouse was founded in 1963 as a family-owned appliance and electronics retailer.  Through the conclusion of Defendants' and the co-conspirators' conspiracy, ABC Warehouse was a supplier of consumer electronics and appliances with approximately 60 stores in Michigan, Ohio, and Indiana, as well as an online retail store.

23.     During the Relevant Period, ABC Warehouse purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, ABC Warehouse suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

24.     During the Relevant Period, ABC Warehouse's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Michigan.  In addition, all ABC Warehouse purchase orders for CRT Products were issued from Michigan, invoices for these products were sent to ABC Warehouse in Michigan, and payments for these CRT Products were issued from ABC Warehouse in Michigan.  ABC Warehouse employees based in Michigan were also responsible for selecting vendors and product lines with respect to CRT Products.

B.     **Defendants**

1.     **Hitachi Entities**

25.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     **IRICO Entities**

32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

33.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

34.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

alleged in this complaint.

35.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**3.     LG Electronics Entities**

36.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

37.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

38.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

1    throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

2    and affairs of LGETT relating to the antitrust violations alleged in this complaint.

3            39.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

4    herein as "LG Electronics."

5            **4.    LP Displays**

6            40.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

7    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

8    Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

9    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

10   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

11   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

12   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

13   and LGEI would cede control over the company and the shares would be owned by financial

14   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

15   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

16   affiliates, throughout the United States.

17           **5.    Panasonic Entities**

18           41.    Defendant Panasonic Corporation, which was at all times during the

19   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

20   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

21   Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

22   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.

24           42.    Defendant Panasonic Corporation of North America ("PCNA") is a

25   Delaware corporation with its principal place of business located at One Panasonic Way,

26   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

27   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

28   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1    United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

2    and affairs of PCNA relating to the antitrust violations alleged in this complaint.

3          43.    Defendants Panasonic Corporation and PCNA are collectively referred to

4    herein as "Panasonic."

5          44.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

6    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

7    Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

8    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

9    manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

10   March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

11   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

12   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

13   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

14   subsidiaries or affiliates, throughout the United States.

15         45.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

16   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

17   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

18   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

19   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

20   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

21   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

22   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

23   China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

24   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

25   States.

26       **6.**    **Philips Entities**

27         46.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

28   Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.   Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

48.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.   During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

49.   Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

1   Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

2   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

3   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

4   the antitrust violations alleged in this complaint.

5           50.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips

6   Brazil are collectively referred to herein as "Philips."

7           **7.     Samsung Entities**

8           51.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

9   company with its principal place of business located at Samsung Electronics Building, 1320-10,

10  Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

11  company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

12  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

13  States.

14          52.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

15  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

16  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

17  Defendant SEC.   During the Relevant Period, SEAI manufactured, marketed, sold and/or

18  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

19  United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

20  Samsung SEAI relating to the antitrust violations alleged in this complaint.

21          53.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

22  Company ("Samsung SDI") is a South Korean company with its principal place of business

23  located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.   Samsung SDI is a public

24  company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

25  Samsung SDI claims to be the world's leading company in the display and energy business, with

26  28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

27  market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

28  Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

55.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

56.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

57.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

58.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

59.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

60.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

1          **8.     Samtel**

2          61.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

3    principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

4    110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

5    country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

6    States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

7    Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

8    its subsidiaries and affiliates, throughout the United States.

9          **9.     Thai CRT**

10         62.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

11   1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

12   Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

13   televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

14   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15   United States.

16         **10.    Toshiba Entities**

17         63.     Defendant Toshiba Corporation ("TC") is a Japanese company with its

18   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

19   Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

20   and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

21   other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

22   Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

23   1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

24   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

25   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

26   subsidiaries or affiliates, throughout the United States.

27         64.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

28   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

65.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

66.   Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

67.   Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

68.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

69.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

70.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

~~12.     Tatung Company of America, Inc.~~

~~Tatung Company of America, Inc. ("Tatung America~~**12.     Thomson Entities**

71.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a ~~California~~French corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California.  Tatung America is a~~ 5 Rue Jeanne d'Arc 92130 Issy-les-

Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs  internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed~~its television-manufacturing division, which had plants in the United States and Mexico, and to ~~her two children~~other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

1   were sold in the United States to United States consumers under the RCA brand.   Thomson

2   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

3   business was sold to Videocon in 2005.   During the Relevant Period, Thomson Consumer

4   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

5   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

6          73.     Thomson SA and Thomson Consumer Electronics are collectively referred

7   to herein as "Thomson."

8          **13.     Mitsubishi Entities**

9          74.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

10  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

11  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

12  Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold

13  internally to Mitsubishi's television and monitor manufacturing division and to other television

14  and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor

15  division also purchased CRTs from other CRT manufacturers.   During the Relevant Period,

16  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

17  United States.

18         75.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

19  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

20  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

21  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

22  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

23  and monitor manufacturing division and to other television and monitor manufacturers in the

24  U.S. and elsewhere.   Mitsubishi's television and monitor division also purchased CRTs from

25  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

26  marketed, sold and distributed CRT Products in the United States.

27         76.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

28  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

77.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.    AGENTS AND CO-CONSPIRATORS

72.78.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

73.79.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

74.80.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

75.81.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

Group."   The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),
Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The
Daewoo Group was dismantled in or around 1999.   Daewoo Electronics and Orion were 50/50
joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.
As of approximately 1996, DOSA produced 1.2 million CRTs annually.   Daewoo sold DOSA's
CRT business in or around 2004.   During the Relevant Period, Orion, Daewoo Electronics and
DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either
directly or through their subsidiaries or affiliates, throughout the United States.

76.82.   Daewoo Electronics, Orion, and DOSA are collectively referred to herein
as "Daewoo."

77.83.   Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita
Malaysia") was a Malaysian company with its principal place of business located at Lot 1,
Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.
Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic
Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,
Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.   It was re-named MT
Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until
its closure in 2006.   During the Relevant Period, Matsushita Malaysia manufactured, marketed,
sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
throughout the United States.   Defendant Panasonic Corporation dominated and controlled the
finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in
this complaint.

78.84.   P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint
venture formed by TC, Orion and two other non-defendant entities in December 1995.   TEDI's
principal place of business was located in Indonesia.   TEDI was projected to have an annual
production capacity of 2.3 million CRTs by 1999.   In 2003, TEDI was transferred to Defendant
MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT
Picture Display Indonesia.   During the Relevant Period, TEDI manufactured, marketed, sold,

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

79.85.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

80.86.  The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

81.87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

82.88.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

83.89.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  Defendants' business activities substantially affected trade and commerce within each of the 50 states, as the conspiracy artificially inflated the prices of CRT Products sold in all 50 states, and therefore caused antitrust injury in every state including the states identified herein.  Moreover, Plaintiffs

1    purchased price-fixed goods directly and indirectly from Defendants for sale across the United

2    States.

3    **VI.     FACTUAL ALLEGATIONS**

4         **A.     CRT Technology**

5         84.90.  A CRT has three components: (a) one or more electron guns, each of

6    which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

7    other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

8    that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

9    faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

10   coated with multiple colors of phosphor produces a polychromatic image.   An aperture or

11   shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

12   produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

13   narrow lines of red, green, blue and black.

14        85.91.  CRT technology was first developed more than a century ago.  The first

15   commercially practical CRT television was made in 1931.  However, it was not until RCA

16   Corporation introduced the product at the 1939 World's Fair that it became widely available to

17   consumers.  After that, CRTs became the heart of most display products, including televisions,

18   computer monitors, oscilloscopes, air traffic control monitors and ATMs.

19        86.92.  The quality of a CRT itself determines the quality of the CRT display.  No

20   external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

21   the whole CRT product so that the product is often simply referred to as "the CRT."

22        87.93.  Although there have been refinements and incremental advancements

23   along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

24   the CRT technology used today is similar to that RCA unveiled in 1939.

25        88.94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

26   used primarily in televisions and related devices and CDTs are primarily used in computer

27   monitors and similar devices.  The primary difference is that CDTs typically yield a higher

28   resolution image requiring more pixels than do CPTs.

89.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.97.  Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92.98.  Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

93.99.  Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.**     **Structure of the CRT Industry**

94.100.        The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.**     **Market Concentration**

95.101.        During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The

1   high concentration of market share facilitates coordination because there are fewer cartel

2   members among which to coordinate pricing or allocate markets, and it is easier to monitor the

3   pricing and production of other cartel members.

### 2.   Information Sharing

5   96.102.   Because of common membership in trade associations, interrelated

6   business arrangements such as joint ventures, allegiances between companies in certain countries

7   and relationships between the executives of certain companies, there were many opportunities

8   for Defendants to discuss and exchange competitive information.  The ease of communication

9   was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

10  took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

11  alleged below.

12  97.103.   Defendants Hitachi, Samsung and Chunghwa are all members of

13  the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

14  founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

15  Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

16  Research Association.  Upon information and belief, Defendants and their co-conspirators used

17  these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

18  the meetings of these trade associations, Defendants exchanged proprietary and competitively

19  sensitive information which they used to implement and monitor the conspiracy.

### 3.   Consolidation

21  98.104.   The CRT industry also had significant consolidation during the

22  Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a

23  joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of

24  Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

26  99.105.   The industry is marked by a web of cross-licensing agreements,

27  joint ventures and other cooperative arrangements that can facilitate collusion.

28  100.106.   Examples of the high degree of cooperation among Defendants in

both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

    g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

    h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

    i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

~~101.~~107.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~102.~~108.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.    A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.    The Maturity of the CRT Product Market**

~~103.~~109.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~104.~~110.    Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~105.~~111.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an

1   additional 84.5 percent between 2006 and 2010.

2   ~~106.~~112.        Although demand was declining as a result of the popularity of

3   flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were

4   still the dominant display technology during the Relevant Period, making Defendants' collusion

5   and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels

6   and plasma displays during the Relevant Period, a substantial market for CRT Products existed

7   as a cheaper alternative to these new technologies.

8   ~~107.~~113.        In 1999, CRT monitors accounted for 94.5 percent of the retail

9   market for computer monitors in North America.  By 2002, that figure had dropped to 73

10  percent; still a substantial share of the market.

11  ~~108.~~114.        As for CRT televisions, they accounted for 73 percent of the North

12  American television market in 2004, and by the end of 2006, still held a 46 percent market share.

13  **7.    Homogeneity of CRT Products**

14  ~~109.~~115.        CRT   Products   are   commodity-like   products   which   are

15  manufactured in standardized sizes.  One Defendant's CRT Product for a particular application,

16  such as a particular size television set or computer monitor, is substitutable for another's.

17  Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

18  ~~110.~~116.        It is easier to form and sustain a cartel when the product in

19  question is commodity-like because it is easier to agree on prices to charge and to monitor those

20  prices once an agreement is formed.

21  **C.    Pre-Conspiracy Market**

22  ~~111.~~117.        The genesis of the CRT conspiracy was in the late 1980s as the

23  CRT Products business became more international and Defendants began serving customers that

24  were also being served by other international companies.  During this period, the employees of

25  Defendants would encounter employees from their competitors when visiting their customers.  A

26  culture of cooperation developed over the years and these Defendant employees would exchange

27  market information on production, capacity and customers.

28  ~~112.~~118.        In   the   early   1990s,   representatives   from   Samsung,   Daewoo,

Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.      Defendants' and Co-Conspirators' Illegal Agreements**

~~113.~~119.      In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

~~114.~~120.      The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

~~115.~~121.      Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with ~~and~~ Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

~~116.~~122.      As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

~~117.~~123.      The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.      "Glass Meetings"**

~~118.~~124.      The group meetings among the participants in the CRT price-

fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

119.125.      The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.      The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.      Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122.128.      The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

1    SDI Tianjin, and Chunghwa.

2    123.129.    Glass meetings also occurred occasionally in various European

3    countries.  Attendees at these meetings included those Defendants and co-conspirators which had

4    subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

5    LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

6    of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

7    124.130.    Representatives of Defendants also attended what were known

8    amongst members of the conspiracy as "green meetings."  These were meetings held on golf

9    courses.  The green meetings were generally attended by top and management level employees

10   of Defendants.

11   125.131.    During the Relevant Period, glass meetings took place in Taiwan,

12   South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the

13   United States.

14   126.132.    Participants would often exchange competitively sensitive

15   information prior to a glass meeting.  This included information on inventories, production, sales

16   and exports.  For some such meetings, where information could not be gathered in advance of the

17   meeting, it was brought to the meeting and shared.

18   127.133.    The glass meetings at all levels followed a fairly typical agenda.

19   First, the participants exchanged competitive information such as proposed future CRT pricing,

20   sales volume, inventory levels, production capacity, exports, customer orders, price trends and

21   forecasts of sales volumes for coming months.  The participants also updated the information

22   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

23   who would write the information on a white board.  The meeting participants then used this

24   information to discuss and agree upon what price each would charge for CRTs to be sold in the

25   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

26   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

27   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

28   negotiations with large customers.  Having analyzed the supply and demand, the participants

would also discuss and agree upon production cutbacks.

128.134.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

129.135.     Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

130.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

131.136.     The agreements reached at the glass meetings included:

        a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

        b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

        c.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

        d.   agreements as to what to tell customers about the reason for a price increase;

        e.   agreements to coordinate with competitors that did not attend the

group meetings and agreements with them to abide by the agreed-upon pricing;

f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

132.137.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

133.138.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    Bilateral Discussions

134.139.    Throughout the Relevant Period, the glass meetings were

1  supplemented by bilateral discussions between various Defendants.  The bilateral discussions

2  were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

3  between the group meetings. These discussions, usually between sales and marketing employees,

4  took the form of in-person meetings, telephone contacts and emails.

5  ~~135.~~140.     During the Relevant Period, in-person bilateral meetings took

6  place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

7  Thailand, Brazil ~~and~~, Mexico, and the United States.

8  ~~136.~~141.     The purpose of the bilateral discussions was to exchange

9  information about past and future pricing, confirm production levels, share sales order

10 information, confirm pricing rumors, and coordinate pricing with manufacturers in other

11 geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

12 ~~137.~~142.     In order to ensure the efficacy of their global conspiracy,

13 Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

14 ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the

15 United States.   These ~~Brazilian and Mexican~~CRT manufacturers were particularly important

16 because they served the North American market for CRT Products.  As further alleged herein,

17 North America was the largest market for CRT televisions and computer monitors during the

18 Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned

19 and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the

20 unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

21 ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at

22 supracompetitive levels.

23 ~~138.~~143.     Defendants also used bilateral discussions with each other during

24 price negotiations with customers to avoid being persuaded by customers to cut prices.  The

25 information gained in these communications was then shared with supervisors and taken into

26 account in determining the price to be offered.

27 ~~139.~~144.     Bilateral discussions were also used to coordinate prices with CRT

28 manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

> **3.**      **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

140.145.        Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

141.146.        Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

142.147.     Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

143.148.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

144.149.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

145.150.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

CRTs.

146.151.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

147.152.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

148.153.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

149.154.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

150.155.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

1   Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

2   (n/k/a LP Displays).   A substantial number of these meetings were attended by high level

3   executives from Philips.   Philips also engaged in numerous bilateral discussions with other

4   Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRTs.

5   Philips never effectively withdrew from this conspiracy.

6   151.156.      Defendants Philips America and Philips Brazil were represented at

7   those meetings and were a party to the agreements entered at them.   To the extent Philips

8   America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

9   played a significant role in the conspiracy because Defendants wished to ensure that the prices

10  for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

11  reached at the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing

12  participants in the alleged conspiracy.

13  152.157.      Between at least 1995 and 2007, Defendant Samsung, through

14  SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

15  participated in at least 200 glass meetings at all levels.   A substantial number of these meetings

16  were attended by the highest ranking executives from Samsung.   Samsung also engaged in

17  bilateral discussions with each of the other Defendants on a regular basis.   Through these

18  discussions, Samsung agreed on prices and supply levels for CRTs.

19  153.158.      Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

20  and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

21  entered at them.   To the extent SEC and SEAI sold and/or distributed CRT Products, they played

22  a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

23  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

24  the glass meetings.   Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

25  Mexico were active, knowing participants in the alleged conspiracy.

26  154.159.      Between at least 1998 and 2006, Defendant Samtel participated in

27  multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These

28  meetings were attended by high level executives from Samtel.   Through these discussions,

1   Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

2   this conspiracy.

3       155.160.      Between at least 1997 and 2006, Defendant Thai CRT participated

4   in multiple glass meetings.  These meetings were attended by the highest ranking executives

5   from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

6   particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

7   levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

8       161.    Between at least 1996 and 2005, Defendant Thomson participated in

9   dozens of meetings with its competitors, including several glass meetings and multiple bilateral

10  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

11  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

12  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

13  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

14  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

15  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

16  a role in the conspiracy.

17      162.    Between at least 1995 and 2005, Defendant Mitsubishi participated in

18  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

19  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

20  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

21  plant shutdowns, customer allocation, and new product development, and agreed on prices and

22  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

23      156.163.      Between at least 1995 and 2003, Defendant Toshiba, through TC,

24  TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the

25  CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended

26  by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple

27  bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

28  Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

1   this conspiracy.

2          157.164.        Defendants Toshiba America, TACP, TAEC and TAIS were

3   represented at those meetings and were a party to the agreements entered at them.  To the extent

4   Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

5   purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

6   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

7   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

8   were active, knowing participants in the alleged conspiracy.

9          158.165.        Between at least 1995 and 2006, Defendant Chunghwa, through

10  Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

11  and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

12  these meetings were attended by the highest ranking executives from Chunghwa, including the

13  former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

14  discussions with each of the other Defendants on a regular basis.  Through these discussions,

15  Chunghwa agreed on prices and supply levels for CRTs.

16         159.   Defendant Tatung America was represented at those meetings and was a

17  party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

18  CRT Products to direct purchasers, it played a significant role in the conspiracy because

19  Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would

20  not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America

21  was an active, knowing participant in the alleged conspiracy.

22         160.166.        Between at least 1995 and 2004, Daewoo, through Daewoo

23  Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

24  substantial number of these meetings were attended by the highest ranking executives from

25  Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

26  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

27  discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

28  bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

161.167.      When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.      The CRT Market During the Conspiracy**

162.168.      Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.      The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.170.      During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and*

---

[1]      Estimated market value of CRT units sold.

*Related Display Materials,* Fuji Chimera Research, 1997, p.12.

165.171.      In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.172.      A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

167.173.      A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

168.174.      Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

169.175.      For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

170.176.      During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

171.177.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

172.178.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.    International Government Antitrust Investigations

173.179.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

174.180.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

175.181.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

176.182.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips

Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.183.      On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.184.      On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an

assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.185.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.186.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.188.     Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix

1   prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

2   elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

3   in California.

4           183.189.        The plea agreement of Samsung SDI requires that it cooperate with

5   the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

6   manufacture or sale of CDTs and CPTs.

7           190.    On December 5, 2012, the European Commission announced that it had

8   fined seven international corporate families a total of over €1.4 billion for their two-decade-long

9   effort to fix prices, share markets, restrict output, and allocate customers between themselves in

10  the CRT market.  The companies fined by the European Commission included Chunghwa, LG

11  Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

12  Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

13  for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

14  behavior that are strictly forbidden to companies doing business in Europe."  The press release

15  accompanying the fines further notes that the CRT cartels were "among the most organised

16  cartels that the Commission has investigated."

17          184.191.        As outlined above, Defendants have a history of competitor

18  contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances

19  in related businesses in the electronics industry.

20          185.192.        Several Defendants also have a history of "cooperation" and

21  anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S.

22  Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

23  Dynamic Random Access Memory ("DRAM").

24          186.193.        Defendants Samsung and Toshiba have acknowledged being

25  contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices

26  of Static Random Access Memory ("SRAM") and NAND Flash Memory.

27          187.194.        In December 2006, government authorities in Japan, Korea, the

28  European Union and the United States revealed a comprehensive investigation into

anticompetitive conduct in the closely-related TFT-LCD market.

188.195.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

189.196.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

190.197.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

191.198.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

192.199.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

1  Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common

2  issues."

3  193.200.      Samsung and LG Electronics were members of both KODEMIA

4  and EDIRAK, and have participated extensively in the KDCs.

5  194.201.      The KDC has taken place in Seoul, Korea or other Korean venues

6  on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

7  2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

8  and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

9  Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

10  Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated,

11  such as Zenzou Tashima of Hitachi.

12  195.202.      Other opportunities to collude among Defendants were provided

13  by events sponsored by the Society for Information Display, such as the annual Asian

14  Symposiums on Information Display, the annual International Display Manufacturing

15  Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the

16  annual International Meeting on Information Displays (held each August in Daegu, Korea) and

17  the annual International Display Workshops (the most recent ones of which have been held in

18  Japan).

19  196.203.      Through these trade association and trade events, and in meetings

20  related to these trade associations and trade events, on information and belief, Defendants shared

21  what would normally be considered proprietary and competitively sensitive information.  This

22  exchange of information was used to implement and monitor the conspiracy.

23  **H.    Effects of Defendants' Antitrust Violations**

24  **1.    Examples of Reductions in Manufacturing Capacity by Defendants**

25  197.204.      As explained above, during the Relevant Period, Defendants

26  consolidated their manufacturing facilities in lower-cost venues such as China and reduced

27  manufacturing capacity to prop up prices.

28

198.205.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

199.206.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

200.207.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

201.208.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

202.209.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.     Examples of Collusive Pricing for CRTs**

203.210.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

204.211.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

205.212.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

206.213.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

207.214.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

208.215.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

209.216.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

210.217.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

211.218.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### 3. Summary Of Effects Of The Conspiracy Involving CRTs

212.219.    The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

213.220.    As purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

214.221.    Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have

absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

215.222.    The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

216.223.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

217.224.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

218.225.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

219.226.    As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

220.227.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United

States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

221.228.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

222.229.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

223.230.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

224.231.     Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

225.232.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective

1    attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

2    nature of their agreement.  During these meetings, top executives and other officials attending

3    these meetings were instructed on more than one occasion not to disclose the fact of these

4    meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

5    production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

6    arrivals and departures at such meetings to avoid being seen in public with each other and with

7    the express purpose and effect of keeping them secret.

8         226.233.        Defendants also agreed at glass meetings and bilateral meetings to

9    give pretextual reasons for price increases and output reductions to their customers.

10        227.234.        As alleged above, in early 1999, despite declining production costs

11   and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

12   rose.  The price increase was allegedly based on increasing global demand for the products.  In

13   fact, this price rise was the result of collusive conduct amongst Defendants, which was

14   undisclosed at the time.

15        228.235.        As alleged above, despite increased competition from flat panel

16   monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

17   This price stabilization was purportedly due exclusively to a shortage of critical components

18   such as glass.  This was a pretext used to cover up the conspiracy.

19        229.236.        In  addition,  when  several  CRT  manufacturers,  including

20   Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price

21   hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying

22   this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

23   "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

24   prices of CRT monitors in due course of time."

25        230.237.        Manufacturers such as LG Electronics periodically issued press

26   statements falsely asserting that CRT prices were being driven lower by intense competition.

27        231.238.        Plaintiffs are informed and believe, and thereon allege, that

28   Defendants' purported reasons for the price increases of CRTs were materially false and

misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

239.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.~~IX.~~

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

240.    As discussed at length in Paragraphs 179-198 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

241.    As shown by Plaintiffs' allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiffs were members of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

242.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

1 **XI.     CLAIM FOR VIOLATIONS**

2                              **First Claim for Relief**

3                    **(Violation of Section 1 of the Sherman Act)**

4          ~~232.~~243.        Plaintiffs incorporate by reference all the above allegations as if

5 fully set forth herein.

6          ~~233.~~244.        Beginning no later than March 1, 1995, the exact date being

7 unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their

8 co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably

9 restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

10 artificially reducing or eliminating competition in the United States.

11         ~~234.~~245.        In particular, Defendants and their co-conspirators combined and

12 conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

13         ~~235.~~246.        As a result of Defendants' unlawful conduct, prices for CRTs were

14 raised, fixed, maintained and stabilized in the United States.

15         ~~236.~~247.        The contract, combination or conspiracy among Defendants

16 consisted of a continuing agreement, understanding, and concerted action among Defendants and

17 their co-conspirators.

18         ~~237.~~248.        For purposes of formulating and effectuating their contract,

19 combination or conspiracy, Defendants and their co-conspirators did those things they

20 contracted, combined, or conspired to do, including:

21                    a.  participating in meetings and conversations to discuss the prices and

22                        supply of CRTs;

23                    b.  communicating in writing and orally to fix target prices, floor prices

24                        and price ranges for CRTs;

25                    c.  agreeing to manipulate prices and supply of CRTs sold in the United

26                        States in a manner that deprived direct purchasers of free and open

27                        competition;

28

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

238.249.     As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of State Antitrust Laws)**

239.250.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.251.     During the Relevant Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, subsidize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

241.252.     The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

242.253.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired

1  to do, including, but in no way limited to, the actions, practices and course of conduct set forth

2  above and the following:

      a.   to fix, raise, maintain and stabilize the price of CRTs;

      b.   to allocate the market for CRTs amongst themselves;

      c.   to submit rigged bids for the award and performance of certain CRT contracts; and

      d.   to allocate among themselves the production of CRTs.

8  ~~243.~~254.   The combination and conspiracy alleged herein has had, inter alia,

9  the following effects:

      a.   price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

      b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

      c.   those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

19  ~~244.~~255.   As a result of the alleged conduct Defendants and their co-

20  conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products they

21  purchased during the Relevant Period.

22  ~~245.~~256.   By reason of the foregoing, Defendants and their co-conspirators,

23  have entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et*

24  *seq.*:

      a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised, maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

1        b.   As a result, Defendants' and their co-conspirators' conspiracy

2           substantially affected Arizona commerce;

3        c.   During the Relevant Period, MARTA purchased CRT Products

4           containing priced fixed CRTs in Arizona, and, as a result, MARTA is

5           entitled to the protection of the laws of Arizona; and

6        d.   As a direct and proximate result of Defendants' and their co-

7           conspirators' conduct, MARTA has been injured in its business and

8           property by paying more for CRT Products containing CRTs

9           manufactured by Defendants, their co-conspirators, and others than it

10          would have paid in the absence of Defendants' and their co-

11          conspirators' combination and conspiracy, and is therefore entitled to

12          damages and the costs of suit, including reasonable attorneys' fees,

13          pursuant to Ariz. Rev. Stat §§ 44-1408(B).

14     ~~246.~~257.     By reason of the foregoing, Defendants and their co-conspirators

15 have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740

16 Ill. Code 10/1, *et seq.*:

17       a.   Defendants and their co-conspirators' conspiracy restrained,

18          suppressed and/or eliminated competition in the sale of CRTs in

19          Illinois and fixed, raised, maintained and stabilized CRT prices in

20          Illinois at artificially high, non-competitive levels;

21       b.   As a result, Defendants and their co-conspirators' conspiracy

22          substantially affected Illinois commerce;

23       c.   During the Relevant Period, MARTA purchased CRT Products

24          containing price-fixed CRTs in Illinois, and, as a result, MARTA is

25          entitled to the protection of the laws of Illinois; and

26       d.   As a direct and proximate result of Defendants' and their co-

27          conspirators' conduct, MARTA has been injured in its business and

28          property by paying more for CRT Products containing CRTs

1   manufactured by Defendants, their co-conspirators, and others than it

2   would have paid in the absence of Defendants and their co-

3   conspirators' combination and conspiracy, and is therefore entitled to

4   treble damages and costs of suit, including reasonable attorneys' fees,

5   pursuant to the Illinois Antitrust Act, 740 Ill. Code 10/7(2).

6   247.258.        By reason of the foregoing, Defendants and their co-conspirators

7   also have entered into a restraint of trade in violation of Mich. Comp. Laws §§ 445.771, et seq.:

8   a.  Defendants' and their co-conspirators' conspiracy restrained,

9   suppressed and/or eliminated competition in the sale of CRTs in

10   Michigan and fixed, raised, maintained, and stabilized CRT prices in

11   Michigan at artificially high, non-competitive levels;

12   b.  As a result, Defendants' and their co-conspirators' conspiracy

13   substantially affected Michigan commerce;

14   c.  During the Relevant Period, ABC Warehouse purchased CRT

15   Products containing price-fixed CRTs in Michigan, and, as a result,

16   ABC Warehouse is entitled to the protection of the laws of Michigan;

17   and

18   d.  As a direct and proximate result of Defendants' and their co-

19   conspirators' conduct, ABC Warehouse has been injured in its

20   business and property by paying more for CRT Products containing

21   CRTs manufactured by Defendants, their co-conspirators, and others

22   than it would have paid in the absence of Defendants' and their co-

23   conspirators' conspiracy, and is therefore entitled to damages and the

24   costs of suit, including reasonable attorneys' fees, pursuant to Mich.

25   Comp. Laws § 445.778(2).

26   248.259.        By reason of the foregoing, Defendants and their co- conspirators

27   also have entered into an agreement in restraint of trade in violation of New York's Donnelly

28   Act, N.Y. Gen. Bus. Law §§ 340, et seq.:

a.   Defendants' and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b.   As a result, Defendants' and their co-conspirators' conspiracy substantially affected New York commerce;

c.   Beginning on December 23, 1998, P.C. Richard purchased CRT Products containing price-fixed CRT panels in New York, and, as a result, P.C. Richard is entitled to the protection of the laws of New York; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, P.C. Richard has been injured in its business and property by paying more for CRT Products containing CRT panels manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Ariz. Rev. Stat. §§ 44-1401, *et seq.*, and the Illinois Antitrust Act, and that Plaintiffs were injured in their businesses and property as a result of Defendants' violations;

B.   Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

1  entered against the Defendants in an amount to be trebled in accordance with such laws,

2  including Section 4 of the Clayton Act;

3          C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

4  and the respective officers, directors, partners, agents, and employees thereof, and all other

5  persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

6  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

7          D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and

8  such interest shall be awarded at the highest legal rate from and after the date of service of the

9  initial complaint in this action;

10         E.      Plaintiffs shall recover **its** costs of this suit, including reasonable

11  attorneys' fees as provided by law; and

12         F.      Plaintiffs shall receive such other or further relief as may be just and

13  proper.

14  **XII.**         **JURY TRIAL DEMAND**

15          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by

16  jury of all the claims asserted in this Complaint so triable.

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated:                                    Respectfully Submitted,

2

3                                             _____
                                              PHILIP J. IOVIENO *(Pro Hac Vice)*
4                                             ANNE M. NARDACCI *(Pro Hac Vice to be filed)*
                                              LUKE NIKAS *(Pro Hac Vice to be filed)*
5                                             CHRISTOPHER V. FENLON *(Pro Hac Vice to be*
6        *filed)*

                                              BOIES, SCHILLER & FLEXNER LLP
7                                             10 North Pearl Street, 4th Floor
                                              Albany, NY 12207
8                                             Telephone:  (518) 434-0600
                                              Facsimile:  (518) 434-0665
9                                             Email: piovieno@bsfllp.com
                                              Email: anardacci@bsfllp.com
10                                            Email: lnikas@bsfllp.com
                                              Email: cfenlon@bsfllp.com
11

12                                            WILLIAM A. ISAACSON *(Pro Hac Vice to be filed)*
                                              BOIES, SCHILLER & FLEXNER LLP
13                                            5301 Wisconsin Ave. NW, Suite 800
                                              Washington, DC 20015
14                                            Telephone:  (202) 237-2727
                                              Facsimile:  (202) 237-6131
15                                            Email:  wisaacson@bsfllp.com

16                                            *Counsel for Plaintiffs P.C. Richard & Son Long*
                                              *Island Corporation, MARTA Cooperative of America,*
17                                            *Inc., and ABC Appliance, Inc.*

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida 33131
Tel:     (305) 373-1000
Fax:     (305) 372-1861
Email: rarnold@knpa.com
          wblechman@knpa.com
          kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck
and Co. and Kmart Corp.*

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213-443-5582
Facsimile: 213-622-2690
Email: jmurray@crowell.com

*Counsel for Plaintiffs*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

| | |
|---|---|
| TARGET CORP.; SEARS, ROEBUCK AND CO. and KMART CORP.; OLD COMP INC.; GOOD GUYS, INC.; RADIOSHACK CORP., <br><br> Plaintiffs <br><br> v. <br><br> CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; | **Master File No. 3:07-cv-05944-SC** <br><br> **MDL No. 1917** <br><br> Individual Case No.CASE NO. CV 11-5514 <br><br> **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES
(USA), INC.; SHENZHEN SEG HITACHI
COLOR DISPLAY DEVICES, LTD.;
PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC., TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
and MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.

Defendants

Plaintiffs ~~Target Corp.;~~ Sears, Roebuck and Co. ("Sears") and; Kmart Corp. ("Kmart"); ~~Old
Comp Inc.; Good Guys, Inc.; and RadioShack Corp.~~ (hereafter "Plaintiffs") for their Second Amended
Complaint for Damages and Injunctive Relief against all Defendants named herein, hereby allege as
follows:

2
SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1    I.    **<u>INTRODUCTION</u>**

2           1.      Defendants and their co-conspirators formed an international cartel which conducted a

3    long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

4    November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise,

5    stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading

6    manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;

7    (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c)

8    electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

9    purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

10          2.      Defendants control the majority of the CRT industry, a multibillion dollar market, which

11   in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually

12   every household in the United States owned at least one product containing CRTs.

13          3.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer

14   preferences for other emerging technologies shrank profits and threatened the sustainability of the

15   industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing

16   in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize

17   the price at which CRTs were sold in the United States.

18          4.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target

19   prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices,

20   production and customer demand; (c) coordinate public statements regarding available capacity and

21   supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-

22   conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to

23   discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at

24   times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key

25   customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and

26   (k) restrict output.

27

28

3

<span style="color:blue">SECOND </span>AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**Case No. CV 11-5514**

5.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

6.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.      During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

II.     **JURISDICTION AND VENUE**

10.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

## III.     THE PARTIES

### A.     Plaintiffs

#### 1.     Target

16.     Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com.  During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.     During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

**2.    Sears**

18.16.  Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for internal use during the Relevant Period.

19.17.  On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

20.18.  During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's negotiations for the purchase of CRTs took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan. In addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to CRTs.

21.19.  During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

1   CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,

2   Nebraska, Nevada, and North Carolina.

3   ~~3.      Old Comp~~

4   ~~22.     Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas.~~

5   ~~During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was~~

6   ~~headquartered in Dallas, Texas.~~

7   ~~23.     Old Comp owns all claims and rights under federal and state law to recover any~~

8   ~~overcharges suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings~~

9   ~~Company; (2) CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico~~

10  ~~Inc.; (5) CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.;~~

11  ~~and (9) BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA~~

12  ~~Subsidiaries").~~

13  ~~24.     During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries,~~

14  ~~purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others~~

15  ~~in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs~~

16  ~~for internal use during the Relevant Period.  As a result of Defendants' their co-conspirators'~~

17  ~~conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property~~

18  ~~because the prices they paid for such CRTs were artificially inflated by that conspiracy.~~

19  ~~25.     During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs~~

20  ~~took place in the United States and were controlled by the company's merchandising department at its~~

21  ~~Texas headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and~~

22  ~~received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was~~

23  ~~also responsible for selecting vendors and product lines with respect to CRTs.~~

24  ~~26.     During the Relevant Period, CompUSA also purchased CRTs at distribution centers~~

25  ~~located in multiple states, including California and Illinois, where it received CRTs shipped to those~~

26  ~~distribution centers.~~

27

28

1    27.    CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service

2   marks, and trademarks to an unrelated third party in 2008.

3            4.    Good Guys

4    28.    Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving,

5   Texas.  During the Relevant Period, The Good Guys maintained its headquarters in California and then

6   in Texas.

7    29.    The Good Guys owns all claims and rights under federal and state laws to recover any

8   overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc.

9   and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

10   30.    During the Relevant Period, The Good Guys, by itself or through the Good Guys

11   Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs

12   manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  The

13   Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant

14   Period.  As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good

15   Guys Subsidiaries were injured in their business and property because the prices they paid for such

16   CRTs were artificially inflated by that conspiracy.

17   31.    During the Relevant Period, all of The Good Guys' negotiations for the purchase of

18   CRTs took place in the United States and were controlled by the company's merchandising department

19   at its California, and then Texas headquarters.  In addition, The Good Guys issued all of its purchase

20   orders for CRTs from California, and then Texas, and received invoices for those orders in California,

21   and then Texas.  The Good Guys' California and then Texas-based merchandising department was also

22   responsible for selecting vendors and product lines with respect to CRTs.

23   32.    During the Relevant Period, The Good Guys also purchased CRTs at a distribution center

24   located in California, where it received CRTs shipped to that distribution center.

25   33.    The Good Guys no longer operates any stores.

26

27

28

**5.    RadioShack**

34.    Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com. During the Relevant Period, RadioShack purchased and then resold from its facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  RadioShack also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

35.    During the Relevant Period, all of RadioShack's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters.  In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

36.20.   During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

**B.    The Defendants**

**1.    IRICO Entities**

37.21.   Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

38.22.   Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and

10

1   one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the

2   largest CRT manufacturer in China in terms of production and sales volume, sales revenue and

3   aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or

4   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

5   Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the

6   antitrust violations alleged in this complaint.

7         39.23.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its

8   principal place of business located at No. 16, Fenghui South Road West, District High-tech

9   Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In

10  2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed,

11  distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

12  United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC

13  relating to the antitrust violations alleged in this complaint.

14        40.24.  Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

15             **2.     LG Electronics Entities**

16        41.25.  Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the

17  Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

18  Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer

19  electronics, home appliances and mobile communications, which established its first overseas branch

20  office in New York in 1968.  The company's name was changed from Gold Star Communications to

21  LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred

22  its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called

23  LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and

24  changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured,

25  marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

26  throughout the United States.

27

28

1    42.26.  Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

2    principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

3    LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period,

4    LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the

6    finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

7    43.27.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

8    with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

9    Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

10   During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

11   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

12   dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

13   alleged in this complaint.

14   44.28.  Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

15   Electronics."

16       **3.    LP Displays**

17   45.29.  Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong

18   company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

19   Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a

20   50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became

21   an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and

22   computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP

23   Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company

24   and the shares would be owned by financial institutions and private equity firms.  During the Relevant

25   Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its

26   subsidiaries or affiliates, throughout the United States.

27

28

**4.      Hitachi Entities**

46.30.  Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

47.31.  Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

48.32.  Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

49.33.  Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated

1    and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

2    in this complaint.

3        50.34.  Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

4    with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.

5    HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period,

6    HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its

7    subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

8    dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations

9    alleged in this complaint.

10       51.35.  Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was

11   a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

12   District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

13   Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

14   investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi

15   corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period,

16   Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

17   subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

18   dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

19   violations alleged in this complaint.

20       52.36.  Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and

21   Hitachi Shenzhen are collectively referred to herein as "Hitachi."

22       **5.    Panasonic Entities**

23       53.37.  Defendant Panasonic Corporation, which was at all times during the Relevant Period

24   known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1,

25   2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During

26   the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs,

27   either directly or through its subsidiaries or affiliates, throughout the United States.

28

1    54.38.  Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation

2    with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA

3    is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant

4    Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and

6    controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this

7    complaint.

8    55.39.  Defendants Panasonic Corporation and PCNA are collectively referred to herein as

9    "Panasonic."

10   56.40.  Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co.,

11   Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.

12   In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called

13   Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the

14   majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining

15   35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned

16   subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant

17   Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its

18   subsidiaries or affiliates, throughout the United States.

19   57.41.  Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company

20   with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District,

21   Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The

22   other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import &

23   Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the

24   Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC

25   was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest

26   producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured,

27

28

1   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

2   throughout the United States.

3         **6.**     **Philips Entities**

4       58.42.  Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal

5   Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX

6   Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics

7   companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of

8   its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint

9   venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a

10   result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book

11   value of 126 million Euros of its investment and said it would not inject further capital into the venture.

12   During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either

13   directly or through its subsidiaries or affiliates, throughout the United States.

14       59.43.  Defendant Philips Electronics North America Corporation ("Philips America") is a

15   Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New

16   York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of

17   Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold

18   and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

19   States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

20   America relating to the antitrust violations alleged in this complaint.

21       60.44.  Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

22   Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang

23   District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the

24   Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly

25   or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips

26   dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust

27   violations alleged in this complaint.

28

61.45.  Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

62.46.  Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.    Samsung Entities

63.47.  Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

64.48.  Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

65.49.  Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

1    2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

2    producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

3    SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

4    affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

5    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

6        66.50.  Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

7    corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

8    California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

9    Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

10   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

11   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

12   Samsung SDI America relating to the antitrust violations alleged in this complaint.

13       67.51.  Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican

14   company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial

15   El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of

16   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

17   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

18   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

19   affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

20       68.52.  Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

21   with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

22   Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

23   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed,

24   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

25   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

26   affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

27

28

1      69.53.  Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese

2      company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.

3      Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

4      During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed

5      CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants

6      SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

7      Shenzhen relating to the antitrust violations alleged in this complaint.

8      70.54.  Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

9      company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing

10     County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of

11     Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed,

12     sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

13     United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

14     affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

15     71.55.  Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

16     Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

17     Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung

18     SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

19     Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

20     directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and

21     Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

22     relating to the antitrust violations alleged in this complaint.

23     72.56.  Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

24     Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are

25     collectively referred to herein as "Samsung."

26

27

28

**8. Samtel**

~~73.~~57.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

**9. Thai CRT**

~~74.~~58.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

**10. Toshiba Entities**

~~75.~~59.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

~~76.~~60.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly

20

1    or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

2    controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations

3    alleged in this complaint.

4        77.61.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability

5    company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-

6    owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant

7    Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its

8    subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the

9    finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

10       78.62.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California

11   corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400,

12   Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through

13   Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

14   CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

15   TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust

16   violations alleged in this complaint.

17       79.63.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

18   corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-

19   1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

20   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly

21   or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

22   controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this

23   complaint.

24       80.64.  Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to

25   herein as "Toshiba."

26

27

28

**11.    Chunghwa Entities**

~~81~~65.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

~~82~~66.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

~~83~~67.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

~~**12.    Tatung Company of America, Inc.**~~

~~Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRTs manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.~~

Formatted: Indent: Left:  0.5", No bullets or numbering

1        **12.     Thomson Entities**

2        68.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation

3    with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

4    Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a

5    major manufacturer of CRTs for the United States market, with plants located in the United States,

6    Mexico, China and Europe.   Thomson SA sold its CRTs internally to its television-manufacturing

7    division, which had plants in the United States and Mexico, and to other television manufacturers in the

8    United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT

9    manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the

10   RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed

11   with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics

12   Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

13   televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson

14   and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT

15   business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured,

16   marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or

17   affiliates, to customers throughout the United States.

18       69.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

19   ("Thomson Consumer Electronics") is a United States corporation with its principal place of business

20   located at 10330 N. Meridian Street, Indianapolis, Indiana 46290-1024.  Thomson Consumer Electronics

21   is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major

22   manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania;

23   Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson

24   Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had

25   plants in the United States and Mexico, and to other television manufacturers in the United States and

26   elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under

27   the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in

28
                                        23

1  2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson
2  Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or
3  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

4      70.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as
5  "Thomson."

6  **13.    Mitsubishi Entities**

7      71.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese
8  corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi
9  Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and
10 Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and
11 monitor manufacturing division and to other television and monitor manufacturers in the United States
12 and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT
13 manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and
14 distributed CRT Products in the United States.

15      72.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a
16 United States corporation located at 5665 Plaza Drive, Cypress, California  90630.  Mitsubishi Electric
17 USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured
18 CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.
19 Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division
20 and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's
21 television and monitor division also purchased CRTs from other CRT manufacturers.  During the
22 Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products
23 in the United States.

24      73.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United
25 States corporation located at 9351 Jeronimo Road, Irvine, California  92618.  Mitsubishi Digital is a
26 wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital
27 manufactured, marketed, sold and distributed CRT Products in the United States.

28

74.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.   AGENTS AND CO-CONSPIRATORS**

84.75.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

85.76.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

86.77.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., Videocon Industries, Ltd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

87.78.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of

25

1    approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business

2    in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

3    marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates,

4    throughout the United States.

5        88.79.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

6        89.80.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a

7    Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan

8    Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-

9    owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation

10   transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with

11   Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

12   as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period,

13   Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

14   its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated

15   and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

16   violations alleged in this complaint.

17       90.81.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

18   by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of

19   business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3

20   million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

21   Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the

22   Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

23   through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

24   controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

25   complaint.

26       91.82.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

27   principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

28

1   Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

2   2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

3   re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

4   subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured,

5   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

6   throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs

7   of TDDT relating to the antitrust violations alleged in this complaint.

8   92. 83.  The acts charged in this Complaint have been done by Defendants and their co-

9   conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

10  representatives while actively engaged in the management of each Defendant's or co-conspirator's

11  business or affairs.

12  **V.    TRADE AND COMMERCE**

13  93. 84.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

14  CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

15  commerce, including through and into this judicial district.

16  94. 85.  During the Relevant Period, Defendants collectively controlled a vast majority of the

17  market for CRTs, both globally and in the United States.

18  95. 86.  The business activities of Defendants substantially affected interstate trade and commerce

19  in the United States and caused antitrust injury in the United States.  The business activities of

20  Defendants also substantially affected trade and commerce and caused antitrust injuries in California,

21  Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska,

22  Nevada, New Mexico, New York, North Carolina, and Wisconsin.

23  **VI.   FACTUAL ALLEGATIONS**

24  **A.    CRT Technology**

25  96. 87.  A CRT has three components: (a) one or more electron guns, each of which is a series of

26  metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used

27  to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by

28

27

1  an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor

2  produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a

3  polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the

4  faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of

5  thousands of narrow lines of red, green, blue and black.

6  ~~97.~~88.  CRT technology was first developed more than a century ago.  The first commercially

7  practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the

8  product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs

9  became the heart of most display products, including televisions, computer monitors, oscilloscopes, air

10  traffic control monitors and ATMs.

11  ~~98.~~89.  The quality of a CRT itself determines the quality of the CRT display.  No external

12  control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT

13  product so that the product is often simply referred to as "the CRT."

14  ~~99.~~90.  Although there have been refinements and incremental advancements along the way

15  since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology

16  used today is similar to that RCA unveiled in 1939.

17  ~~100.~~91.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used

18  primarily in televisions and related devices and CDTs are primarily used in computer monitors and

19  similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring

20  more pixels than do CPTs.

21  ~~101.~~92.  CRTs have no independent utility, and have value only as components of other

22  products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the

23  demand for such products.

24  ~~102.~~93.  The market for CRTs and the market for the products into which they are placed

25  are inextricably linked and intertwined because the CRT market exists to serve the CRTs products

26  markets.  The markets for CRTs and products containing CRTs are, for all intents and purposes,

27  inseparable in that one would not exist without the other.

28

1       ~~103.~~94.     Plaintiffs have participated in the market for CRTs through their direct purchases

2 from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original

3 equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices

4 at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-

5 competitive prices for CRTs.

6       ~~104.~~95.     Plaintiffs have participated in the market for products containing CRTs.  To the

7 extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-

8 conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these

9 products.  Plaintiffs were not able to pass the inflated prices on to their customers.

10       ~~105.~~96.     Plaintiffs have been injured by paying supra-competitive prices for CRTs.

11     **B.**     **Structure of the CRT Industry**

12       ~~106.~~97.     The CRT industry has several characteristics that facilitated a conspiracy,

13 including market concentration, ease of information sharing, the consolidation of manufacturers,

14 multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to

15 supply and demand forces and homogeneity of products.

16         **1.**    **Market Concentration**

17       ~~107.~~98.     During the Relevant Period, the CRT industry was dominated by relatively few

18 companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as

19 Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of

20 market share facilitates coordination because there are fewer cartel members among which to coordinate

21 pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel

22 members.

23         **2.**    **Information Sharing**

24       ~~108.~~99.     Because of common membership in trade associations, interrelated business

25 arrangements such as joint ventures, allegiances between companies in certain countries and

26 relationships between the executives of certain companies, there were many opportunities for

27 Defendants to discuss and exchange competitive information.  The ease of communication was

28

1  facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took

2  advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

3  ~~109.~~100.    Defendants Hitachi, Samsung and Chunghwa are members of the Society for

4  Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea

5  Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and

6  Samsung are members of the Electronic Display Industrial Research Association.  Upon information and

7  belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and

8  agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants

9  exchanged proprietary and competitively sensitive information which they used to implement and

10  monitor the conspiracy.

11  **3.     Consolidation**

12  ~~110.~~101.    The CRT industry also had significant consolidation during the Relevant Period,

13  including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving

14  Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's

15  CRT businesses into MTPD.

16  **4.     Multiple Interrelated Business Relationships**

17  ~~111.~~102.    The industry is marked by a web of cross-licensing agreements, joint ventures and

18  other cooperative arrangements that can facilitate collusion.

19  ~~112.~~103.    Examples of the high degree of cooperation among Defendants in both the CRT

20  market and other closely related markets include the following:

21       i.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG

22            Electronics and Philips.

23      ii.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd.

24            n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of

25            manufacturing TFT-LCDs.

26     iii.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba

27            and Panasonic.

28

1    iv.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display

2           Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-

3           LCDs.

4    v.     In December 1995, Defendant Toshiba partnered with Orion and two other non-

5           Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

6    vi.    Defendant Toshiba and Orion also signed a cooperative agreement relating to

7           LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and

8           Toshiba, which had substituted its STN-LCD production with TFT-LCD

9           production, marketed Daewoo's STN-LCDs globally through its network.

10   vii.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement

11          with Chunghwa for large CPTs.

12   viii.  Defendant Chunghwa has a joint venture with Defendant Samsung for the

13          production of CRTs.  Chunghwa now licenses the technology from Defendant

14          Philips, a recent development that helped resolve a patent infringement suit filed

15          in 2002.

16   ix.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the

17          manufacture, sale and distribution of optical storage products such as DVD

18          drives.

19   x.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with

20          Defendant Samsung and non-Defendant Corning Inc., USA for the production and

21          supply of picture tube glass.

22   xi.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

23          Samsung, Philips, and Panasonic.

24        **5.    High Costs of Entry Into the Industry**

25        ~~113.~~104.    There are significant manufacturing and technological barriers to entry into the

26   CRT industry.  It would require substantial time, resources and industry knowledge to overcome these

27

28
                                    31

1    barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the

2    declining demand for CRTs.

3          114.105.     During the Relevant Period, the costs of the assembly components, both as a

4    whole and individually, have been generally declining, and, in some periods, declining at a substantial

5    rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants

6    to keep prices above where they would have been but for the conspiracy.

7          **6.**      **The Maturity of the CRT Market**

8          115.106.     Newer industries typically are characterized by rapid growth, innovation and high

9    profits.  The CRT market is a mature one, and like many mature industries, is characterized by slim

10   profit margins, creating a motivation to collude.

11         116.107.     Demand for CRTs was declining throughout the Relevant Period.  Static declining

12   demand is another factor which makes the formation of a collusive arrangement more likely because it

13   provides a greater incentive to firms to avoid price competition.

14         117.108.     In addition, conventional CRT televisions and computer monitors were being

15   rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to

16   engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000

17   and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and

18   were predicted to decline by an additional 84.5 percent between 2006 and 2010.

19         118.109.     Although demand was declining as a result of the popularity of flat-panel LCD

20   and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display

21   technology during the Relevant Period, making Defendants' collusion and the international price fixing

22   conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period,

23   a substantial market for CRTs existed as a cheaper alternative to these new technologies.

24         119.110.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for

25   computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial

26   share of the market.

27

28

1    ~~120.~~111.      As for CRT televisions, they accounted for 73 percent of the North American

2    television market in 2004, and by the end of 2006, still held a 46 percent market share.

3          **7.      Homogeneity of CRTs**

4    ~~121.~~112.      CRTs are commodity-like products which are manufactured in standardized sizes.

5    One Defendant's CRT for a particular application, such as a particular size television set or computer

6    monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the

7    basis of price.

8    ~~122.~~113.      It is easier to form and sustain a cartel when the product in question is

9    commodity-like because it is easier to agree on prices to charge and to monitor those prices once an

10   agreement is formed.

11         **C.      Pre-Conspiracy Market**

12   ~~123.~~114.      The genesis of the CRT conspiracy was in the late 1980s as the CRTs business

13   became more international and Defendants began serving customers that were also being served by other

14   international companies.  During this period, the employees of Defendants would encounter employees

15   from their competitors when visiting their customers.  A culture of cooperation developed over the years

16   and these Defendant employees would exchange market information on production, capacity and

17   customers.

18   ~~124.~~115.      In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa

19   visited each other's factories in S.E. Asia.  During this period, these producers began to include

20   discussions about price in their meetings.

21         **D.      Defendants' and Co-Conspirators' Illegal Agreements**

22   ~~125.~~116.      In order to control and maintain profitability during declining demand for CRTs,

23   Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the

24   effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

25   artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

26   ~~126.~~117.      The CRT conspiracy was effectuated through a combination of group and

27   bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the

28

1    primary method of communication and took place on an informal, ad hoc basis.  During this period,

2    representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

3    manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

4    increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

5    South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

6            127.118.        Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also

7    attended several ad hoc group meetings during this period.  The participants at these group meetings also

8    discussed increasing prices for CRTs.

9            128.119.        As more manufacturers formally entered the conspiracy, group meetings became

10   more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion,

11   and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

12   attended hundreds of these meetings during the Relevant Period.

13           129.120.        The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

14   Defendants charged for CRTs.

15           **1.    "Glass Meetings"**

16           130.121.        The group meetings among the participants in the CRT price-fixing conspiracy

17   were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three

18   general levels of Defendants' corporations.

19           131.122.        The first level meetings were attended by high level company executives

20   including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings

21   occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing

22   compliance with price fixing agreements.  Because attendees at top meetings had authority as well as

23   more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also

24   able to resolve disputes because they were decision makers who could make agreements.

25           132.123.        The second level meetings were attended by Defendants' high level sales

26   managers and were known as "management" meetings.  These meetings occurred more frequently,

27   typically monthly, and handled implementation of the agreements made at top meetings.

28
                                                      34
                                    SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
                                                Case No. CV 11-5514

1    133.124.        Finally, the third level meetings were known as "working level" meetings and

2    were attended by lower level sales and marketing employees.  These meetings generally occurred on a

3    weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing

4    since the lower level employees did not have the authority to enter into agreements.  These lower level

5    employees would then transmit the competitive information up the corporate reporting chain to those

6    individuals with pricing authority.  The working level meetings also tended to be more regional and

7    often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees

8    met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

9    134.125.        The Chinese glass meetings began in 1998 and generally occurred on a monthly

10   basis following a top or management level meeting.  The China meetings had the principal purpose of

11   reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.

12   Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and

13   BMCC, as well as the China-based branches of the other Defendants, including but not limited to

14   Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

15   135.126.        Glass meetings also occurred occasionally in various European countries.

16   Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries

17   and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays,

18   Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and

19   IRICO.

20   136.127.        Representatives of Defendants also attended what were known amongst members

21   of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings

22   were generally attended by top and management level employees of Defendants.

23   137.128.        During the Relevant Period, glass meetings took place in Taiwan, South Korea,

24   Europe, China, Singapore, Japan, Indonesia, Thailand,  and Malaysia and the United States.

25   138.129.        Participants would often exchange competitively sensitive information prior to a

26   glass meeting.  This included information on inventories, production, sales and exports.  For some such

27

28

1   meetings, where information could not be gathered in advance of the meeting, it was brought to the

2   meeting and shared.

3        139.130.      The glass meetings at all levels followed a fairly typical agenda.  First, the

4   participants exchanged competitive information such as proposed future CRT pricing, sales volume,

5   inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales

6   volumes for coming months.  The participants also updated the information they had provided in the

7   previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the

8   information on a white board.  The meeting participants then used this information to discuss and agree

9   upon what price each would charge for CRTs to be sold in the following month or quarter.  They

10   discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for

11   CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and

12   agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply

13   and demand, the participants would also discuss and agree upon production cutbacks.

14        140.131.      During periods of oversupply, the focus of the meeting participants turned to

15   making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

16        141.132.      Defendants' conspiracy included agreements on the prices at which certain

17   Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end

18   products, such as televisions and computer monitors.  Defendants realized the importance of keeping the

19   internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market

20   to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive

21   prices for CRTs.

22        142.133.      Each of the participants in these meetings knew, and in fact discussed, the

23   significant impact that the price of CRTs had on the cost of the finished products into which they were

24   placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit

25   margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they

26   needed to make the increase high enough that their direct customers (CRT TV and monitor makers)

27

28

1  would be able to justify a corresponding price increase to their customers.  In this way, Defendants

2  ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

3  ~~143.~~134.      The agreements reached at the glass meetings included:

    i.      agreements on CRT prices, including establishing target prices, "bottom" prices,
            price ranges and price guidelines;

    ii.     placing agreed-upon price differentials on various attributes of CRTs, such as
            quality or certain technical specifications;

    iii.    agreements on pricing for intra-company CRT sales to vertically integrated
            customers;

    iv.     agreements as to what to tell customers about the reason for a price increase;

    v.      agreements to coordinate with competitors that did not attend the group meetings
            and agreements with them to abide by the agreed-upon pricing;

    vi.     agreements to coordinate pricing with CRT manufacturers in other geographic
            markets such as Brazil, Europe and India;

    vii.    agreements to exchange pertinent information regarding shipments, capacity,
            production, prices and customers demands;

    viii.   agreements to coordinate uniform public statements regarding available capacity
            and supply;

    ix.     agreements to allocate both overall market shares and share of a particular
            customer's purchases;

    x.      agreements to allocate customers;

    xi.     agreements regarding capacity, including agreements to restrict output and to
            audit compliance with such agreements; and

    xii.    agreements to keep their meetings secret.

4  ~~144.~~135.      Efforts were made to monitor each Defendant's adherence to these agreements in

5  a number of ways, including seeking confirmation of pricing both from customers and from employees

6  of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1)

37

1    monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an

2    agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of

3    a mutual interest in living up to the target price and living up to the agreements that had been made.

4         145.136.      As market conditions worsened in 2005-2007, and the rate of replacement of

5    CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings

6    again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to

7    manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust

8    issues.

9                   **2.       Bilateral Discussions**

10        146.137.      Throughout the Relevant Period, the glass meetings were supplemented by

11   bilateral discussions between various Defendants.  The bilateral discussions were more informal than the

12   group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These

13   discussions, usually between sales and marketing employees, took the form of in-person meetings,

14   telephone contacts and emails.

15        147.138.      During the Relevant Period, in-person bilateral meetings took place in Malaysia,

16   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and

17   Mexico.

18        148.139.      The purpose of the bilateral discussions was to exchange information about past

19   and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

20   coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and

21   Europe.

22        149.140.      In order to ensure the efficacy of their global conspiracy, Defendants also used

23   bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico and the United

24   States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT Brazilian and

25   Mexican manufacturers were particularly important because they served the North American market for

26   CRTs.  As further alleged herein, North America was the largest market for CRT televisions and

27   computer monitors during the Relevant Period.  Because the CRT se Brazilian and Mexican

28

1    manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung

2    SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices

3    of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at

4    supracompetitive levels.

5         150.141.       Defendants also used bilateral discussions with each other during price

6    negotiations with customers to avoid being persuaded by customers to cut prices.  The information

7    gained in these communications was then shared with supervisors and taken into account in determining

8    the price to be offered.

9         151.142.       Bilateral discussions were also used to coordinate prices with CRT manufacturers

10   that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and

11   Samtel.  It was often the case that in the few days following a top or management meeting, the attendees

12   at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose

13   of communicating whatever CRT pricing and/or output agreements had been reached during the

14   meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating

15   CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was

16   responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular

17   bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular

18   communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible

19   for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the

20   agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and

21   Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the

22   conspiracy to fix prices of CRTs.

23         **3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral**
               **Discussions**

24
25         152.143.       Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi

26   Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings

27   were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral

28

                                             39

1    discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi

2    agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

3        153.144.      Defendants Hitachi America and HEDUS were represented at those meetings and

4    were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or

5    distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

6    Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the

7    pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active,

8    knowing participants in the alleged conspiracy.

9        154.145.      Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

10   participated in multiple glass meetings.  These meetings were attended by the highest ranking executives

11   from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly

12   with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply

13   levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by

14   the Chinese government.  IRICO was acting to further its own independent private interests in

15   participating in the alleged conspiracy.

16       155.146.      Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and

17   LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated

18   in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial

19   number of these meetings were attended by the highest ranking executives from LG Electronics.  LG

20   Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.

21   Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never

22   effectively withdrew from this conspiracy.

23       156.147.      Defendant LGEUSA was represented at those meetings and was a party to the

24   agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a

25   significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

26   direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

27   LGEUSA was an active, knowing participant in the alleged conspiracy.

28

1   157.148.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

2   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

3   attended by the highest ranking executives from LP Displays.  Certain of these high level executives

4   from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.

5   LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP

6   Displays agreed on prices and supply levels for CRTs.

7   158.149.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

8   Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic

9   participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were

10   attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple

11   bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and

12   supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

13   159.150.   PCNA was represented at those meetings and was a party to the agreements

14   entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a

15   significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

16   direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

17   PCNA was an active, knowing participant in the alleged conspiracy.

18   160.151.   Between at least 2003 and 2006, Defendant MTPD participated in multiple glass

19   meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

20   meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral

21   discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply

22   levels for CRTs.

23   161.152.   Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

24   meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

25   engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT

26   manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None

27   of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

28

1    BMCC was acting to further its own independent private interests in participating in the alleged

2    conspiracy.

3         162.153.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4    Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5    in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6    substantial number of these meetings were attended by high level executives from Philips.  Philips also

7    engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8    agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9         163.154.     Defendants Philips America and Philips Brazil were represented at those meetings

10   and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11   sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13   undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14   were active, knowing participants in the alleged conspiracy.

15        164.155.     Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

16   SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least

17   200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18   ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19   Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20   for CRTs.

21        165.156.     Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22   Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23   extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25   undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26   America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27   alleged conspiracy.

28

1    166.157.    Between at least 1998 and 2006, Defendant Samtel participated in multiple

2    bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended

3    by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply

4    levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

5    158.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass

6    meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT

7    also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through

8    these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively

9    withdrew from this conspiracy.

10   159.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings

11   with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings

12   were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such

13   things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant

14   shutdowns, customer allocation, and new product development and agreed on prices and supply levels

15   for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business

16   to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European

17   Commission that it played a role in the conspiracy.

18   167.160.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

19   bilateral meetings with its competitors.  These meetings were attended by high level sales managers

20   from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production,

21   revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new

22   product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively

23   withdrew from this conspiracy.

24   168.161.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and

25   TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy

26   through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales

27   managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

28

43

1   Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply

2   levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

3        169.162.      Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4   meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5   TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6   conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7   would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8   TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9        170.163.      Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10  Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11  participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12  attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13  Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14  Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15  for CRTs.

16        171.   Defendant Tatung America was represented at those meetings and was a party to the

17  agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct

18  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the

19  prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at

20  the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

21        172.164.      Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion

22  and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these

23  meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in

24  bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo

25  agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion,

26  its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew

27  from this conspiracy.

28
                                         44

173.165.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.     The CRT Market During the Conspiracy**

174.166.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

175.167.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|---------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

176.168.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor

---

[1]    Estimated market value of CRT units sold.

1   supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997,

2   p.12.

3       ~~177.~~169.       Defendants' collusion is evidenced by unusual price movements in the CRT

4   market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in

5   consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market

6   Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological

7   improvements and advances in manufacturing techniques, will produce a drop in the price of the average

8   electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and

9   the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained

10  stable.

11      ~~178.~~170.       In 1996, another industry source noted that "the price of the 14" tube is at a

12  sustainable USD50 and has been for some years . . . ."

13      ~~179.~~171.       In early 1999, despite declining production costs and the rapid entry of flat panel

14  display products, the price of large sized color CRTs actually rose.  The price increase was allegedly

15  based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as

16  herein alleged.

17      ~~180.~~172.       After experiencing oversupply of 17" CRTs in the second half of 1999, the

18  average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly*

19  quoted an industry analyst as saying that this price increase was "unlike most other PC-related

20  products."

21      ~~181.~~173.       A BNET Business Network news article from August 1998 reported that "key

22  components (cathode ray tubes) in computer monitors have risen in price.  'Although several

23  manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are

24  expected for the beginning of October . . . . While computer monitor price increases may be a necessary

25  course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand

26  if we have to raise our prices relative to CRT price increases.'"

27

28

182.174.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

183.175.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

184.176.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

185.177.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

186.178.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

187.179.    These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.   **International Government Antitrust Investigations**

~~188.~~181.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

~~189.~~181.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

1   Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried

2   out, in part, in California.

3   ~~190.~~182.   On August 19, 2009, the DOJ issued a press release announcing that a federal

4   grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen

5   Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

6   of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and

7   Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his

8   participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the

9   combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

10   ~~191.~~183.   On March 30, 2010, the DOJ issued a press release announcing that a federal

11   grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng

12   Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of

13   CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a

14   large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination

15   and conspiracy to fix the prices of CRTs was carried out, in part, in California.

16   ~~192.~~184.   On November 9, 2010, the DOJ issued a press release announcing that a federal

17   grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee

18   a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their

19   participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer

20   monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display

21   tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to

22   fix the prices of CRTs was carried out, in part, in California.

23   185.   On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung

24   SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce

25   the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an

26   amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine

27   and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January

28

1    1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI,

2    through its officers and employees, participated in a conspiracy among major CDT producers, the

3    primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in

4    the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers

5    and employees, engaged in discussions and attended meetings with representatives of other major CDT

6    producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

7    output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in

8    furtherance of this conspiracy were carried out within the Northern District of California.  The plea

9    agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal

10   antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

11   ~~193.~~186.      On December 5, 2012, the European Commission announced that it had fined

12   seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix

13   prices, share markets, restrict output, and allocate customers between themselves in the CRT market.

14   The companies fined by the European Commission included Chunghwa, LG Electronics, Philips,

15   Samsung SDI, Panasonic, Toshiba, MTPD and Technicolor (formerly Thomson).  The Commission

16   Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

17   cartels'; they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

18   companies doing business in Europe."  The press release accompanying the fines further notes that the

19   CRT cartels were "among the most organized cartels that the Commission has investigated."

20   ~~194.~~187.      As outlined above, Defendants have a history of competitor contacts resulting

21   from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in

22   the electronics industry.

23   ~~195.~~188.      Several Defendants also have a history of "cooperation" and anticompetitive

24   conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in

25   October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory

26   ("DRAM").

27

28

196.189.     Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

197.190.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

198.191.     On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

199.192.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

200.193.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

201.194.     The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.     The Role of Trade Associations During the Relevant Period**

202.195.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including

1   manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the

2   Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting

3   co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a

4   cooperation pact with the United States Display Consortium ("USDC").  In describing that pact,

5   Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should

6   cooperate on common issues."

7       203.196.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK,

8   and have participated extensively in the KDCs.

9       204.197.      The KDC has taken place in Seoul, Korea or other Korean venues on: December

10   4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4,

11   2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT

12   operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han,

13   Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.

14   Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

15       205.198.      Other opportunities to collude among Defendants were provided by events

16   sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information

17   Display, the annual International Display Manufacturing Conference and Exhibition (the most recent

18   one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays

19   (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent

20   ones of which have been held in Japan).

21       206.199.      Through these trade association and trade events, and in meetings related to these

22   trade associations and trade events, on information and belief, Defendants shared what would normally

23   be considered proprietary and competitively sensitive information.  This exchange of information was

24   used to implement and monitor the conspiracy.

25

26

27

28

**H.     Effects of Defendants' Antitrust Violations**

      **1.     Examples of Reductions in Manufacturing Capacity by Defendants**

~~207.~~200.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

~~208.~~201.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

~~209.~~202.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

~~210.~~203.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

~~211.~~204.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

~~212.~~205.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

      **2.     Examples of Collusive Pricing for CRTs**

~~213.~~206.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50

1   in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in

2   prices, CRT prices nonetheless remained stable.

3      214.207.      In 1996, another industry source noted that "the price of the 14" tube is at a

4   sustainable USD50 and has been for some years . . . ."

5      215.208.      In reality, consumer prices for CRTs never approached $50 in 1997, and were

6   consistently more than double this price.

7      216.209.      Despite the ever-increasing popularity of, and intensifying competition from, flat

8   panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995

9   according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a

10  shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

11     217.210.      Prices for CRT monitors did fall sharply as a result of the Asian economic crisis

12  of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display

13  1998, an annual conference for the display industry, to state:

14          We believe that now is the time to revise our strategic plan in order to
            survive in his tough environment and also to prepare for the coming years.
15          This means that we have to deviate from the traditional approach of the
            simple scale up of production volume.
16

17     218.211.      In early 1999, despite declining production costs and the rapid entry of flat panel

18  display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly

19  based on increasing global demand for the products.  In fact, this price rise was the result of collusive

20  conduct amongst Defendants.

21     219.212.      After experiencing an oversupply of 17" CRTs in the second half of 1999, the

22  average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry

23  analyst as saying that this price increase was "unlike most other PC-related products."

24     220.213.      On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT

25  monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to

26  manufacture CRTs.

27

28

1    ~~221.~~214.    Over the course of the Relevant Period, the price of CRTs remained stable, and in

2    some instances went up in an unexplained manner, despite the natural trend in most technology products

3    to go down over time.  CRT technology was mature, and the costs of production were relatively low

4    compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial

5    Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology

6    is very mature; prices and technology have become stable."

7    ~~222.~~215.    CRT prices resisted downward price pressures and remained stable over a period

8    of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian

9    currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.

10   The stability of the price of CRTs was accomplished by the collusive activities alleged above.

11   **I.    Summary Of Effects Of The Conspiracy Involving CRTs**

12   ~~223.~~216.    The above combination and conspiracy has had the following effects, among

13   others:

14        a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has

15              been restrained, suppressed and eliminated throughout the United States;

16        b.    Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been

17              raised, fixed, maintained and stabilized at artificially high and noncompetitive

18              levels throughout the United States; and

19        c.    Plaintiffs have been deprived of the benefit of free and open competition in the

20              purchase of CRTs.

21        d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs

22              have been injured in their business and property in that they paid more for CRTs

23              than they otherwise would have paid in the absence of the unlawful conduct of

24              Defendants.

25   **VII.   PLAINTIFFS' INJURIES**

26   ~~224.~~217.    As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and

27   reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain

28

1  CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs,

2  causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

3      225.218.    Plaintiffs also purchased CRTs from OEMs as well as others, which in turn

4  purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and

5  artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for

6  CRTs than they would have absent the conspiracy.

7      226.219.    The OEMs and others passed on to their customers, including Plaintiffs, the

8  overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the

9  overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased

10  CRTs containing such price-fixed CRTs from the OEMs and others.

11      227.220.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as

12  it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not

13  change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain

14  from Defendants through manufacturers of CRTs sold to Plaintiffs.

15      228.221.    The market for CRTs and the market for products containing CRTs are

16  inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate

17  relationship.

18      229.222.    Throughout the Relevant Period, Defendants controlled the market for CRTs.

19  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from

20  Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants'

21  conspiracy.

22      230.223.    As a result, Plaintiffs were injured in connection with their purchases of CRTs

23  during the Relevant Period.

24  **VIII.  FRAUDULENT CONCEALMENT**

25      231.224.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting

26  their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a

27

28

1    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was

2    a conspiracy to fix the prices of CRTs.

3        232.225.    Because Defendants' agreement, understanding and conspiracy were kept secret,

4    Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were

5    paying artificially high prices for CRTs.

6        233.226.    The affirmative acts of Defendants alleged herein, including acts in furtherance of

7    the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As

8    noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in

9    secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing

10   actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the

11   proposed communications with customers containing these pretextual statements and would coordinate

12   which co-conspirator would first communicate these pretextual statements to customers.

13       234.227.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

14   concealing.

15       235.228.    Plaintiffs could not have discovered the alleged contract, conspiracy or

16   combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices

17   and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and

18   fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or

19   combination as herein alleged was fraudulently concealed by Defendants by various means and

20   methods, including, but not limited to, secret meetings, surreptitious communications between

21   Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written

22   records, discussion on how to evade antitrust laws and concealing the existence and nature of their

23   competitor pricing discussions from non-conspirators (including customers).

24       236.229.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings

25   at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take

26   minutes.  Attending companies also reduced the number of their respective attendees to maintain

27   secrecy.

28

1   237.230.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual

2   reasons for price increases and output reductions to their customers.

3   238.231.    As alleged above, in early 1999, despite declining production costs and the rapid

4   entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase

5   was allegedly based on increasing global demand for the products.  In fact, this price rise was the result

6   of collusive conduct amongst Defendants, which was undisclosed at the time.

7   239.232.    As alleged above, despite increased competition from flat panel monitors, prices

8   for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization

9   was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext

10  used to cover up the conspiracy.

11  240.233.    In addition, when several CRT manufacturers, including Defendants Samsung,

12  Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a

13  shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy

14  General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a

15  global phenomena and every company has to increase the prices of CRT monitors in due course of

16  time."

17  241.234.    Manufacturers such as LG Electronics periodically issued press statements falsely

18  asserting that CRT prices were being driven lower by intense competition.

19  242.235.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported

20  reasons for the price increases of CRTs were materially false and misleading and made for the purpose

21  of concealing Defendants' anti-competitive scheme as alleged herein.

22  236.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any

23  statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the

24  anticompetitive conduct alleged in this complaint.

25

26

27

28

**IX.** *AMERICAN PIPE,* **GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

237. As discussed at length in Paragraphs 183 through 187 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009. Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

238. Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

239. As shown by Plaintiffs' allegations in Paragraphs 1 through 9, and the following causes of action, Plaintiffs were members of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 3:07-cv-05944 SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- 243. *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

**IX.X. CLAIM FOR VIOLATIONS**

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

244.240. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

245.241. Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

59

Formatted: Indent: Hanging: 0.5", Line spacing: single, Bulleted + Level: 1 + Aligned at: 0.75" + Indent at: 1"

246.242.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

247.243.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

248.244.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

249.245.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    issuing price announcements and price quotations in accordance with the agreements reached;

    e.    selling CRTs to customers in the United States at noncompetitive prices;

    f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.    agreeing to maintain or lower production capacity; and

    h.    providing false statements to the public to explain increased prices for CRTs.

250.246.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

251.247.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.248.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

253.249.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

254.250.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

255.251.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

61

256.252.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.   to fix, raise, maintain and stabilize the price of CRTs;

      b.   to allocate markets for CRTs amongst themselves;

      c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.   to allocate among themselves the production of CRTs.

257.253.   The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c.   those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

258.254.   As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

259.255.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**

**(Violation of State Antitrust and Unfair Competition Laws)**

260.256.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

261.257.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

262.258.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

263.259.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    to fix, raise, maintain and stabilize the price of CRTs;

    b.    to allocate markets for CRTs amongst themselves;

    c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.    to allocate among themselves the production of CRTs.

264.260.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a.    price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

63

b.      prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c.      those who purchased CRTs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

265.261.      As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

266.262.      By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

a.      Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.      Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

1    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

2         perfected within the state of California.  Defendants LG Display, Chunghwa,

3         Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the

4         conspiracy to fix the price of CRTs were carried out in California;

5    f.    During the Relevant Period, the following Plaintiffs purchased CRTs in

6         California: Target, Sears, Kmart, Old Comp, Good Guys, and RadioShack.  As a

7         result, each is entitled to the protection of the laws of California; and

8    g.    By reason of the foregoing, each of those Plaintiffs is entitled to full restitution

9         and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

10        that may have been obtained by Defendants or their co-conspirators as result of

11        such business acts and practices.

12   267.263.    By reason of the foregoing, Defendants and their co-conspirators also have

13  entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

14   a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

15        eliminated competition in the sale of CRTs in Arizona and fixed, raised,

16        maintained and stabilized CRT prices in Arizona at artificially high, non-

17        competitive levels;

18   b.    As a result, Defendants and their co-conspirators' conspiracy substantially

19        affected Arizona commerce;

20   c.    During the Relevant Period, the following Sears Plaintiffs purchased CRTs in

21        Arizona: Target and Sears.  As a result, Sears each is entitled to the protection of

22        the laws of Arizona; and

23   d.    As a direct and proximate result of Defendants' and their co-conspirators'

24        conduct, Sears each of those Plaintiffs has been injured in its business and

25        property by paying more for CRTs manufactured by Defendants, their co-

26        conspirators, and others than it would have paid in the absence of Defendants and

27

28

1        their co-conspirators' combination and conspiracy, and is therefore entitled to

2        relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

3        268.264.        By reason of the foregoing, Defendants and their co-conspirators also have

4   engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*

5        a.    Defendants and their co-conspirators committed acts of unfair competition by

6              engaging in a conspiracy to fix and stabilize the price of CRTs as described

7              above;

8        b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

9              practices and non-disclosures, as described above, constitute a common,

10             continuous and continuing course of conduct of unfair competition by means of

11             unfair, unlawful and/or fraudulent business acts or practices, including, but not

12             limited to violation of Section 1 of the Sherman Act;

13       c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

14             practices and non-disclosures are unfair, unconscionable, unlawful and/or

15             fraudulent independently of whether they constitute a violation of the Sherman

16             Act;

17       d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

18             deceptive;

19       e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

20             perfected within Florida; and

21       f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Florida:

22             Target, Sears and Kmart.  As a result, each is entitled to the protection of the laws

23             of Florida.

24       269.265.        By reason of the foregoing, Defendants and their co-conspirators also have

25   entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code

26   10/1, *et seq.*

27

28

a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.  As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.  During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Illinois~~:~~ ~~Target, Sears, Kmart and Old Comp~~.  As a result, each is entitled to the protection of the laws of Illinois; and

d.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

~~270.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*~~

~~a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;~~

~~b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Iowa commerce;~~

~~c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa: Target.  As a result, each is entitled to the protection of the laws of Iowa; and~~

~~d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and~~

67
SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1    others than it would have paid in the absence of Defendants and their co-
2    conspirators' combination and conspiracy, and is therefore entitled to relief under
3    Iowa Code §§ 553.1, *et seq*.

4    271.   By reason of the foregoing, Defendants and their co-conspirators also have entered into
5    an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.

6    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
7    eliminated competition in the sale of CRTs in Kansas and fixed, raised,
8    maintained and stabilized CRT prices in Kansas at artificially high, non-
9    competitive levels;

10   b.    As a result, Defendants and their co-conspirators' conspiracy substantially
11   affected Kansas commerce;

12   c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:
13   Target.  As a result, each is entitled to the protection of the laws of Kansas; and

14   a.    As a direct and proximate result of Defendants' and their co-conspirators'
15   conduct, each of those Plaintiffs has been injured in its business and property by
16   paying more for CRTs manufactured by Defendants, their co-conspirators, and
17   others than it would have paid in the absence of Defendants and their co-
18   conspirators' combination and conspiracy, and is therefore entitled to relief under
19   Kansas Stat. Ann. §§ 50-101, *et seq*.

20   272.266.   By reason of the foregoing, Defendants and their co-conspirators also have
21   engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq*.

22   a.    Defendants and their co-conspirators committed acts of unfair competition by
23   engaging in a conspiracy to fix and stabilize the price of CRTs as described
24   above;

25   b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,
26   practices and non-disclosures, as described above, constitute a common,
27   continuous and continuing course of conduct of unfair competition by means of

28

1    unfair, unlawful and/or fraudulent business acts or practices, including, but not

2    limited to violation of Section 1 of the Sherman Act;

3    c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

4    practices and non-disclosures are unfair, unconscionable, unlawful and/or

5    fraudulent independently of whether they constitute a violation of the Sherman

6    Act;

7    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

8    deceptive;

9    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

10    perfected within Massachusetts; and

11    f.    During the Relevant Period, Sears the following Plaintiffs purchased CRTs in

12    Massachusetts: Sears and RadioShack.  As a result, Sears each is entitled to the

13    protection of the laws of Massachusetts.

14    273.267.    By reason of the foregoing, Defendants and their co-conspirators also have

15    entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771,

16    *et seq.*

17    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

18    eliminated competition in the sale of CRTs in Michigan and fixed, raised,

19    maintained and stabilized CRT prices in Michigan at artificially high, non-

20    competitive levels;

21    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

22    affected Michigan commerce;

23    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in

24    Michigan: Target, Sears and Kmart.  As a result, each is entitled to the protection

25    of the laws of Michigan; and

26    d.    As a direct and proximate result of Defendants' and their co-conspirators'

27    conduct, each of those Plaintiffs has been injured in its business and property by

28

69

1           paying more for CRTs manufactured by Defendants, their co-conspirators, and

2           others than it would have paid in the absence of Defendants and their co-

3           conspirators' combination and conspiracy, and is therefore entitled to relief under

4           Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

5   ~~274.~~268.    By reason of the foregoing, Defendants and their co-conspirators also have

6   entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

7       a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

8           eliminated competition in the sale of CRTs in Minnesota and fixed, raised,

9           maintained and stabilized CRT prices in Minnesota at artificially high, non-

10          competitive levels;

11      b.    As a result, Defendants and their co-conspirators' conspiracy substantially

12          affected Minnesota commerce;

13      c.    During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in

14          Minnesota~~: Target, Sears and Kmart~~.  As a result, each is entitled to the

15          protection of the laws of Minnesota; and

16      d.    As a direct and proximate result of Defendants' and their co-conspirators'

17          conduct, each of those Plaintiffs has been injured in its business and property by

18          paying more for CRTs manufactured by Defendants, their coconspirators and

19          others than it would have paid in the absence of Defendants and their co-

20          conspirators' combination and conspiracy, and is therefore entitled to relief under

21          Minnesota Stat. §§ 325D.50, *et seq.*

22  ~~275.~~269.    By reason of the foregoing, Defendants and their co-conspirators also have

23  entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

24      a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

25          eliminated competition in the sale of CRTs in Mississippi and fixed, raised,

26          maintained and stabilized CRT prices in Mississippi at artificially high, non-

27          competitive levels;

28

1        b.      As a result, Defendants and their co-conspirators' conspiracy substantially

2                affected Mississippi commerce;

3        c.      During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in

4                Mississippi~~: Sears and RadioShack~~.  As a result, Sears ~~each Plaintiff~~ is entitled to

5                the protection of the laws of Mississippi; and

6        d.      As a direct and proximate result of Defendants' and their co-conspirators'

7                conduct, each of those Plaintiffs has been injured in its business and property by

8                paying more for CRTs manufactured by Defendants, their co-conspirators, and

9                others than it would have paid in the absence of Defendants and their co-

10               conspirators' combination and conspiracy, and is therefore entitled to relief under

11               Mississippi Code Ann. §§ 75-21-1, *et seq.*

12    ~~276.~~270.      By reason of the foregoing, Defendants and their co-conspirators also have

13    entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

14        a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

15               eliminated competition in the sale of CRTs in Nebraska and fixed, raised,

16               maintained and stabilized CRT prices in Nebraska at artificially high, non-

17               competitive levels;

18        b.      As a result, Defendants and their co-conspirators' conspiracy substantially

19               affected Nebraska commerce;

20        c.      During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nebraska~~:~~

21               ~~Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of

22               Nebraska; and

23        d.      As a direct and proximate result of Defendants' and their co-conspirators'

24               conduct, each of those Plaintiffs has been injured in its business and property by

25               paying more for CRTs manufactured by Defendants, their co-conspirators, and

26               others than it would have paid in the absence of Defendants and their co-

27

28

1  conspirators' combination and conspiracy, and is therefore entitled to relief under

2  Nebraska Stat. §§ 59-801, *et seq.*

3  ~~277.~~271.  By reason of the foregoing, Defendants and their co-conspirators also have

4  entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

5  a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6  eliminated competition in the sale of CRTs in Nevada and fixed, raised,

7  maintained and stabilized CRT prices in Nevada at artificially high, non-

8  competitive levels;

9  b.  As a result, Defendants and their co-conspirators' conspiracy substantially

10  affected Nevada commerce;

11  c.  During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nevada~~:~~

12  ~~Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of

13  Nevada; and

14  d.  As a direct and proximate result of Defendants' and their co-conspirators'

15  conduct, each of those Plaintiffs has been injured in its business and property by

16  paying more for CRTs manufactured by Defendants, their co-conspirators, and

17  others than it would have paid in the absence of Defendants and their co-

18  conspirators' combination and conspiracy, and is therefore entitled to relief under

19  Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

20  ~~278.~~272.  By reason of the foregoing, Defendants and their co-conspirators also have

21  entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

22  a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23  eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

24  maintained and stabilized CRT prices in New Mexico at artificially high, non-

25  competitive levels;

26  b.  As a result, Defendants and their co-conspirators' conspiracy substantially

27  affected New Mexico commerce;

28

1        c.    During the Relevant Period, Sears the following Plaintiffs purchased CRTs in

2        New Mexico: Sears. As a result, Sears each is entitled to the protection of the

3        laws of New Mexico; and

4        d.    As a direct and proximate result of Defendants' and their co-conspirators'

5        conduct, each of those Plaintiffs has been injured in its business and property by

6        paying more for CRTs manufactured by Defendants, their co-conspirators, and

7        others than it would have paid in the absence of Defendants and their co-

8        conspirators' combination and conspiracy, and is therefore entitled to relief under

9        New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

10   279.273.    By reason of the foregoing, Defendants and their co-conspirators also have

11   entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340,

12   *et seq.*

13       a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

14       eliminated competition in the sale of CRTs in New York and fixed, raised,

15       maintained and stabilized CRT prices in New York at artificially high, non-

16       competitive levels;

17       b.    As a result, Defendants and their co-conspirators' conspiracy substantially

18       affected New York commerce;

19       c.    During the Relevant Period, Sears the following Plaintiffs purchased CRTs in

20       New York: Target and Sears. As a result, Sears each is entitled to the protection

21       of the laws of New York; and

22       d.    As a direct and proximate result of Defendants' and their co-conspirators'

23       conduct, each of those Plaintiffs has been injured in their business and property by

24       paying more for CRTs manufactured by Defendants, their co-conspirators, and

25       others than it would have paid in the absence of Defendants and their co-

26       conspirators' combination and conspiracy, and is therefore entitled to relief under

27       New York General Business Law §§ 340, *et seq.*

28

1    280.274.    By reason of the foregoing, Defendants and their co-conspirators also have

2  entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

3        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

4              eliminated competition in the sale of CRTs in North Carolina and fixed, raised,

5              maintained and stabilized CRT prices in North Carolina at artificially high, non-

6              competitive levels;

7        b.    As a result, Defendants and their co-conspirators' conspiracy substantially

8              affected North Carolina commerce;

9        c.    During the Relevant Period, the following Plaintiffs purchased CRTs in North

10             Carolina: Target, Sears and Kmart.  As a result, each is entitled to the protection

11             of the laws of North Carolina; and

12       d.    As a direct and proximate result of Defendants' and their co-conspirators'

13             conduct, each of those Plaintiffs has been injured in its business and property by

14             paying more for CRTs manufactured by Defendants, their co-conspirators, and

15             others than it would have paid in the absence of Defendants and their co-

16             conspirators' combination and conspiracy, and is therefore entitled to relief under

17             North Carolina Gen. Stat. §§ 75-1, *et seq.*

18   281.275.    By reason of the foregoing, Defendants and their co-conspirators also have

19  entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

20       a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

21             eliminated competition in the sale of CRTs in Wisconsin and fixed, raised,

22             maintained and stabilized CRT prices in Wisconsin at artificially high, non-

23             competitive levels;

24       b.    As a result, Defendants and their co-conspirators' conspiracy substantially

25             affected Wisconsin commerce;

26

27

28

c.   During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in Wisconsin~~: Target and Sears~~.  As a result, Sears ~~each~~ is entitled to the protection of the laws of Wisconsin; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## ~~X.~~XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of California, Arizona, Florida, Illinois, ~~Iowa, Kansas,~~ Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.   Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.   Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1          E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

2    provided by law; and

3          F.     Plaintiffs shall receive such other or further relief as may be just and proper.

4    / / /

5    / / /

6    / / /

7    / / /

8    ~~/ / /~~

9    ~~/ / /~~

10   ~~XI.~~**XII.**      **JURY TRIAL DEMAND**

11         Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

12   claims asserted in this Complaint so triable.

13   Dated:                      Respectfully submitted

14

15   ~~Jason C. Murray (CA Bar No. 169806)~~

     ~~CROWELL & MORING LLP~~

16   ~~515 South Flower St., 40th Floor~~

17   ~~Los Angeles, CA  90071~~

     ~~Telephone:  213-443-5582~~

18   ~~Facsimile:  213-622-2690~~

19   ~~Email:                  jmurray@crowell.com~~

20

21   ~~Jeffrey H. Howard (*pro hac vice*)~~

     ~~Jerome A. Murphy (*pro hac vice*)~~

22   ~~CROWELL & MORING LLP~~

23   ~~1001 Pennsylvania Avenue, N.W.~~

     ~~Washington, D.C. 20004~~

24   ~~Telephone:  202-624-2500~~

25   ~~Facsimile:  202-628-5116~~

     ~~E-mail:  jhoward@crowell.com~~

26   ~~jmurphy@crowell.com~~

27

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

*Counsel for Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.; RadioShack Corp.*

Richard Alan Arnold, Esquire (pro hac vice)
William J. Blechman, Esquire (pro hac vice)
Kevin J. Murray, Esquire (pro hac vice)
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida  33131
Tel:     (305) 373-1000
Fax:     (305) 372-1861
Email:  rarnold@knpa.com
            wblechman@knpa.com
            kmurray@knpa.com

**Field Code Changed**

**Field Code Changed**

**Field Code Changed**

*Counsel for Plaintiffs Sears Roebuck and Co. and Kmart Corp.*

77
SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

# **EXHIBIT L**

1

~~UNITED STATES DISTRICT COURT~~
~~EASTERN DISTRICT OF NEW YORK~~

2

3

~~SCHULTZE AGENCY SERVICES~~WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP

4

5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015

5

Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131

6

Email:  wisaacson@bsfllp.com

7

8

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)

9

CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP

10

10 North Pearl Street, 4th Floor
Albany, NY 12207

11

Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665

12

Email: piovieno@bsfllp.com

13

*Counsel for Plaintiff Schultze Agency Services*, LLC

14

*on behalf of* ~~TWEETER OPCO~~*Tweeter Opco*, LLC *and* ~~TWEETER NEWCO~~*Tweeter Newco*,

15

*LLC*~~,~~

—————————————————

16

—————————————————
~~Plaintiff,~~

17

—————————————————

~~v.~~

18

~~HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA,~~
~~LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR~~

19

~~DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS~~
~~CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG~~

20

~~ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS~~
~~INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF~~

21

~~NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR~~
~~CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS~~

22

~~NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN),~~
~~LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG~~

23

~~ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI~~
~~CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;~~

24

~~SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN~~
~~SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR~~

25

~~LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.;~~
~~TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC~~

26

~~COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.;~~
~~CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA);~~

27

~~TATUNG COMPANY OF AMERICA, INC.,~~ —————————————————————

~~Defendants.~~

28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 12-cv-02649 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 12-cv-02649 | MDL No. 1917 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC | **AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
|       Plaintiff, | |
|   vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA | |

1   ELECTRONIC COMPONENTS, INC.;
    TOSHIBA AMERICA INFORMATION
2   SYSTEMS, INC.; CHUNGHWA PICTURE
    TUBES, LTD.; CHUNGHWA PICTURE
3   TUBES (MALAYSIA); TECHNICOLOR
    SA; TECHNICOLOR USA, INC.;
4   MITSUBISHI ELECTRIC CORPORATION;
    MITSUBISHI DIGITAL ELECTRONICS
5   AMERICA, INC.; MITSUBISHI ELECTRIC
    & ELECTRONICS, USA, INC.,

6           Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20          Plaintiff, Schultze Agency Services, LLC ("Schultze Agency Services") on behalf

21   of Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Newco, LLC ("Tweeter Newco")

22   (collectively "Plaintiff"), for its Complaint against all Defendants named herein, hereby alleges

23   as follows:

24   **I.      INTRODUCTION**

25          1.      Plaintiff brings this action to recover those damages to Tweeter Home

26   Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long-running

27   conspiracy among suppliers of cathode ray tubes ("CRTs") and related products.  Defendants and

28   their co-conspirators formed an international cartel which conducted a long-running conspiracy

1    extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the

2    "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and

3    maintain prices for CRTs.

4            2.      Defendants are or were among the leading manufacturers of: (a) color

5    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

6    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

7    devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

8    purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

9    to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

10   and the products containing them shall be referred to as "CDT Products."  CDT Products and

11   CPT Products shall be referred to collectively herein as "CRT Products."

12           3.      Defendants control the majority of the CRT industry, a multibillion dollar

13   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

14   Relevant Period, virtually every household in the United States owned at least one CRT Product.

15           4.      Since the mid-1990s, the CRT industry faced significant economic

16   pressures as customer preferences for other emerging technologies shrank profits and threatened

17   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

18   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

19   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

20   States.

21           5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

22   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*

23   shipments, prices, production and customer demand; (c) coordinate public statements regarding

24   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

25   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

26   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

27   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

28   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to Massachusetts General Laws, chapter 93A. for injunctive relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq*., because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in Massachusetts.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's Massachusetts state law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Massachusetts.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In

1    addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

2    events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

3    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

4    into this District.

5    **III.**    **PARTIES**

6         **A.**    **Plaintiff**

7         16.    Through the conclusion of Defendants' and the co-conspirators'

8    conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of

9    consumer electronics and operated dozens of stores in several states under the names Tweeter,

10   Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east

11   coast and in Texas, Arizona, and Illinois.

12        17.    On June 11, 2007, Tweeter commenced cases in the United States

13   Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re*

14   *Tweeter Home Entertainment Group, Inc. et al.*, Case No. 07-10787 (PJW) (Jointly

15   Administered).   On July 13, 2007, the Court entered an Order (1) Approving Sale of

16   Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and

17   Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and

18   (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the

19   assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its

20   assignees (the "Sale").  The Sale was closed on or about July 13, 2007.

21        18.    Tweeter Newco is the sole member and owner of Tweeter Opco.  Both

22   were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of

23   Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the

24   "APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or

25   causes of action of Sellers against third parties relating to the Purchased Assets arising out of

26   events occurring prior to the Closing Date."

27        19.    On November 5, 2008, Tweeter Opco and Tweeter Newco commenced

28   cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the

Bankruptcy Code.  *In re Tweeter Opco, LLC, et al.*, Case No. 08-12646 (MFW) (Jointly Administered).   On December 5, 2008, the Court issued an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

20.   Schultze Agency Services is the agent bank for certain lenders which provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and Schultze Agency Services as agent for the lenders.  On March 23, 2009, the Court in the Tweeter Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint. Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc. and its subsidiaries, affiliates and predecessors, including, but not limited to:  NEA Delaware, Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems; Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

21.   During the Relevant Period, Tweeter purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  Tweeter also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRT panels that had been purchased from Defendants and their co-conspirators.  As such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

22.   During the Relevant Period, Tweeter's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Massachusetts.  In addition, Tweeter's purchase orders for CRT Products were issued from Massachusetts, invoices for these CRT Products were sent to Tweeter

8

1    in Massachusetts, and payments for these CRT Products were issued from Massachusetts.

2    Tweeter employees based in Massachusetts were also responsible for selecting vendors and

3    product lines with respect to CRT Products.

4        B.      **Defendants**

5             1.      **Hitachi Entities**

6             23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of

7    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

8    parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

9    market share for color CRTs was 20 percent.   During the Relevant Period, Hitachi, Ltd.

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12            24.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

13   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

14   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

15   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

16   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

17   create a separate company called Hitachi Displays.   During the Relevant Period, Hitachi

18   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

19   through its subsidiaries or affiliates, throughout the United States.   Defendant Hitachi, Ltd.

20   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

21   antitrust violations alleged in this complaint.

22            25.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

23   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

24   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

25   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

26   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27   United States.   Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

28   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

1

## 2.     **IRICO Entities**

2      30.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with

3      its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

4      712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

5      marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

6      manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7      subsidiaries or affiliates, throughout the United States.

8      31.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

9      company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

10     Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

11     CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

12     also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

13     and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

14     IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15     subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

16     the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17     complaint.

18     32.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

19     company with its principal place of business located at No. 16, Fenghui South Road West,

20     District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

21     subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

22     Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

23     through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

24     and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

25     alleged in this complaint.

26     33.     Defendants IGC, IGE and IDDC are collectively referred to herein as

27     "IRICO."

28

TWEETER'S AMENDED COMPLAINT                           11                    Case No. 12-cv-02649
                                                                            Master File No. 3:07-cv-05944-SC

### 3.      LG Electronics Entities

34.      Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.      Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36.      Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.      Defendants LGEI, LGEUSA and LGETT are collectively referred to

herein as "LG Electronics."

### 4.   **LP Displays**

38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.   **Panasonic Entities**

39.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41.     Defendants Panasonic Corporation and PCNA are collectively referred to

herein as "Panasonic."

42.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.   During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

1    the antitrust violations alleged in this complaint.

2            48.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

3    Brazil are collectively referred to herein as "Philips."

4            **7.    Samsung Entities**

5            49.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

6    company with its principal place of business located at Samsung Electronics Building, 1320-10,

7    Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

8    company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

9    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

10   States.

11           50.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

12   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

13   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

14   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

15   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

17   Samsung SEAI relating to the antitrust violations alleged in this complaint.

18           51.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

19   Company ("Samsung SDI") is a South Korean company with its principal place of business

20   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

21   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

22   Samsung SDI claims to be the world's leading company in the display and energy business, with

23   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

24   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

25   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

26   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

28   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

1       52.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

2 California corporation with its principal place of business located at 3333 Michelson Drive, Suite

3 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

4 Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

5 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

6 affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

7 controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

8 violations alleged in this complaint.

9       53.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

10 is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

11 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

12 owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

13 Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

14 directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

15 and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

16 Mexico relating to the antitrust violations alleged in this complaint.

17      54.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

18 Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

19 Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

20 owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

21 Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

22 directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

23 and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

24 Brazil relating to the antitrust violations alleged in this complaint.

25      55.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

26 is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

27 Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

28 Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.     Samtel

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

1    country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

2    States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

3    Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

4    its subsidiaries and affiliates, throughout the United States.

5                                    **9.      Thai CRT**

6              60.      Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

7    1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

8    Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

9    televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

10   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

11   United States.

12                                   **10.     Toshiba Entities**

13             61.      Defendant Toshiba Corporation ("TC") is a Japanese company with its

14   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

15   Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

16   and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

17   other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

18   Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

19   1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

20   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

21   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22   subsidiaries or affiliates, throughout the United States.

23             62.      Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

24   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

25   4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

26   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

27   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

28   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

1    policies and affairs of Toshiba America relating to the antitrust violations alleged in this

2    complaint.

3             63.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a

4    limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

5    3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

6    America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

7    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

8    States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

9    relating to the antitrust violations alleged in this complaint.

10            64.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

11   California corporation with its principal place of business located at 19900 MacArthur

12   Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled

13   subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

14   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

16   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

17   complaint.

18            65.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

19   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

20   California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC

21   through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold

22   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23   throughout the United States.  Defendant TC dominated and controlled the finances, policies and

24   affairs of TAIS relating to the antitrust violations alleged in this complaint.

25            66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are

26   collectively referred to herein as "Toshiba."

27            **11.     Chunghwa Entities**

28            67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

**Tatung Company of America, Inc. ("Tatung America12.     Thomson Entities**

69.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a CaliforniaFrench corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half usedThomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.

1  Thomson SA sold its CRTs  internally to be owned by Lun Kuan Lin, the daughter of Tatung

2  Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed its

3  television-manufacturing division, which had plants in the United States and Mexico, and to her

4  two children other television manufacturers in the United States and elsewhere.  Thomson SA's

5  television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

6  televisions were sold in the United States to consumers under the RCA brand.  In November

7  2003, Thomson SA sold its television division to a joint venture it formed with Chinese

8  company, TCL Corporation.    The joint venture was called TCL-Thomson Electronics

9  Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

10  televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

11  Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

12  SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Tatung

13  America Thomson SA manufactured, marketed, sold and/or distributed CRT Products

14  manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or indirectly

15  through its subsidiaries or affiliates, to customers throughout the United States.

16        70.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

17  Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

18  business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

19  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

20  Electronics was a major manufacturer of CRTs for the United States market, with plants located

21  in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

22  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

23  television-manufacturing division, which had plants in the United States and Mexico, and to

24  other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

25  were sold in the United States to United States consumers under the RCA brand.  Thomson

26  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

27  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

28  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2    71.    Thomson SA and Thomson Consumer Electronics are collectively referred

3    to herein as "Thomson."

4    **13.    Mitsubishi Entities**

5    72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6    is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8    Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

9    internally to Mitsubishi's television and monitor manufacturing division and to other television

10   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

11   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

12   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13   United States.

14   73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19   and monitor manufacturing division and to other television and monitor manufacturers in the

20   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22   marketed, sold and distributed CRT Products in the United States.

23   74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the

26   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27   CRT televisions and monitors in the United States.

28   75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

1   are collectively referred to herein as "Mitsubishi."

2   **IV.**   **AGENTS AND CO-CONSPIRATORS**

3   70.76.  The acts alleged against Defendants in this Complaint were authorized,

4   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

5   in the management and operation of Defendants' businesses or affairs.

6   71.77.  Each Defendant or co-conspirator acted as the principal, agent, or joint

7   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

8   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

9   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

10  made by its parent company.

11  72.78.  Various persons and/or firms not named as Defendants in this Complaint

12  participated as co-conspirators in the violations alleged herein and may have performed acts and

13  made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

14  include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

15  Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

16  Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

17  Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

18  conspirators as Defendants at a later date.

19  73.79.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

20  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

21  2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

22  Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

23  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

24  United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

25  Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

26  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

27  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

28  joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

1    As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

2    CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

3    DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

4    directly or through their subsidiaries or affiliates, throughout the United States.

5            74.80.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein

6    as "Daewoo."

7            75.81.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

8    Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

9    Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

10   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

11   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

12   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

13   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

14   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

15   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

17   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

18   this complaint.

19           76.82.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

20   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

21   principal place of business was located in Indonesia.  TEDI was projected to have an annual

22   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

23   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

24   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

25   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

27   affairs of TEDI relating to the antitrust violations alleged in this complaint.

28           77.83.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

78.84.  The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

79.85.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

80.86.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

81.87.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Massachusetts and caused antitrust injuries in Massachusetts.

## VI.    FACTUAL ALLEGATIONS

### A.    CRT Technology

82.88.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83.89.  CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84.90.  The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

85.91.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86.92.  CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87.93.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

88.94.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89.95.  Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

90.96.  Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

91.97.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.**     **Structure of the CRT Industry**

92.98.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.**     **Market Concentration**

93.99.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.   The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.**     **Information Sharing**

94.100.          Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication

1  was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

2  took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

3  alleged below.

4         95.101.      Defendants Hitachi, Samsung and Chunghwa are all members of

5  the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

6  founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

7  Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

8  Research Association.  Upon information and belief, Defendants and their co-conspirators used

9  these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

10  the meetings of these trade associations, Defendants exchanged proprietary and competitively

11  sensitive information which they used to implement and monitor the conspiracy.

12  **3.**      **Consolidation**

13         96.102.      The CRT industry also had significant consolidation during the

14  Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a

15  joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of

16  Toshiba's and Panasonic's CRT businesses into MTPD.

17  **4.**      **Multiple Interrelated Business Relationships**

18         97.103.      The industry is marked by a web of cross-licensing agreements,

19  joint ventures and other cooperative arrangements that can facilitate collusion.

20         98.104.      Examples of the high degree of cooperation among Defendants in

21  both the CRT Product market and other closely related markets include the following:

22        a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

23            LG Electronics and Philips.

24        b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

25            Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

26            purpose of manufacturing TFT-LCD panels.

27        c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

28            Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.   Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.   Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

99.105.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge

1  to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter

2  the market in light of the declining demand for CRT Products.

3      ~~100.~~106.        During the Relevant Period, the costs of the assembly components,

4  both as a whole and individually, have been generally declining, and, in some periods, declining

5  at a substantial rate.    A combination of price discussions and manipulation of the output of

6  CRTs allowed Defendants to keep prices above where they would have been but for the

7  conspiracy.

8           **6.        The Maturity of the CRT Product Market**

9      ~~101.~~107.        Newer industries typically are characterized by rapid growth,

10  innovation and high profits.  The CRT Product market is a mature one, and like many mature

11  industries, is characterized by slim profit margins, creating a motivation to collude.

12     ~~102.~~108.        Demand for CRT Products was declining throughout the Relevant

13  Period.  Static declining demand is another factor which makes the formation of a collusive

14  arrangement more likely because it provides a greater incentive to firms to avoid price

15  competition.

16     ~~103.~~109.        In addition, conventional CRT televisions and computer monitors

17  were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors

18  which led Defendants to engage in this alleged price-fixing scheme in order to slow down

19  declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT

20  televisions in the United States declined by 50.7 percent and were predicted to decline by an

21  additional 84.5 percent between 2006 and 2010.

22     ~~104.~~110.        Although demand was declining as a result of the popularity of

23  flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were

24  still the dominant display technology during the Relevant Period, making Defendants' collusion

25  and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels

26  and plasma displays during the Relevant Period, a substantial market for CRT Products existed

27  as a cheaper alternative to these new technologies.

28     ~~105.~~111.        In 1999, CRT monitors accounted for 94.5 percent of the retail

1   market for computer monitors in North America.  By 2002, that figure had dropped to 73

2   percent; still a substantial share of the market.

3       ~~106.~~112.        As for CRT televisions, they accounted for 73 percent of the North

4   American television market in 2004, and by the end of 2006, still held a 46 percent market share.

5           **7.      Homogeneity of CRT Products**

6       ~~107.~~113.        CRT   Products   are   commodity-like   products   which   are

7   manufactured in standardized sizes.  One Defendant's CRT Product for a particular application,

8   such as a particular size television set or computer monitor, is substitutable for another's.

9   Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

10      ~~108.~~114.        It is easier to form and sustain a cartel when the product in

11  question is commodity-like because it is easier to agree on prices to charge and to monitor those

12  prices once an agreement is formed.

13      **C.      Pre-Conspiracy Market**

14      ~~109.~~115.        The genesis of the CRT conspiracy was in the late 1980s as the

15  CRT Products business became more international and Defendants began serving customers that

16  were also being served by other international companies.  During this period, the employees of

17  Defendants would encounter employees from their competitors when visiting their customers.  A

18  culture of cooperation developed over the years and these Defendant employees would exchange

19  market information on production, capacity and customers.

20      ~~110.~~116.        In   the   early   1990s,   representatives   from   Samsung,   Daewoo,

21  Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these

22  producers began to include discussions about price in their meetings.

23      **D.      Defendants' and Co-Conspirators' Illegal Agreements**

24      ~~111.~~117.        In order to control and maintain profitability during declining

25  demand for CRT Products, Defendants and their co-conspirators have engaged in a contract,

26  combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or

27  stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1,

28  1995 through at least November 25, 2007.

112.118.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.119.     Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

114.120.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.121.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.     "Glass Meetings"

116.122.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.123.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were

1    decision makers who could make agreements.

2    ~~118.~~124.      The second level meetings were attended by Defendants' high

3    level sales managers and were known as "management" meetings.  These meetings occurred

4    more frequently, typically monthly, and handled implementation of the agreements made at top

5    meetings.

6    ~~119.~~125.      Finally, the third level meetings were known as "working level"

7    meetings and were attended by lower level sales and marketing employees.  These meetings

8    generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

9    information and discussing pricing since the lower level employees did not have the authority to

10   enter into agreements.   These lower level employees would then transmit the competitive

11   information up the corporate reporting chain to those individuals with pricing authority.   The

12   working level meetings also tended to be more regional and often took place near Defendants'

13   factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14   manufacturers' employees met in Korea, the Chinese in China, and so on.

15   ~~120.~~126.      The Chinese glass meetings began in 1998 and generally occurred

16   on a monthly basis following a top or management level meeting.  The China meetings had the

17   principal purpose of reporting what had been decided at the most recent glass meetings to the

18   Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

19   in China, such as IRICO and BMCC, as well as the China-based branches of the other

20   Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21   SDI Tianjin, and Chunghwa.

22   ~~121.~~127.      Glass meetings also occurred occasionally in various European

23   countries.  Attendees at these meetings included those Defendants and co-conspirators which had

24   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26   of Daewoo~~)~~), IRICO, and ~~IRICO~~Thomson.  Chunghwa also attended these meetings.

27   ~~122.~~128.      Representatives of Defendants also attended what were known

28   amongst members of the conspiracy as "green meetings."  These were meetings held on golf

1   courses.  The green meetings were generally attended by top and management level employees

2   of Defendants.

3   123.129.   During the Relevant Period, glass meetings took place in Taiwan,

4   South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the

5   United States.

6   124.130.   Participants would often exchange competitively sensitive

7   information prior to a glass meeting.  This included information on inventories, production, sales

8   and exports.  For some such meetings, where information could not be gathered in advance of the

9   meeting, it was brought to the meeting and shared.

10   125.131.   The glass meetings at all levels followed a fairly typical agenda.

11   First, the participants exchanged competitive information such as proposed future CRT pricing,

12   sales volume, inventory levels, production capacity, exports, customer orders, price trends and

13   forecasts of sales volumes for coming months.  The participants also updated the information

14   they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

15   who would write the information on a white board.  The meeting participants then used this

16   information to discuss and agree upon what price each would charge for CRTs to be sold in the

17   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

18   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

19   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

20   negotiations with large customers.  Having analyzed the supply and demand, the participants

21   would also discuss and agree upon production cutbacks.

22   126.132.   During periods of oversupply, the focus of the meeting participants

23   turned to making controlled and coordinated price reductions.  This was referred to as setting a

24   "bottom price."

25   127.133.   Defendants' conspiracy included agreements on the prices at which

26   certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

27   manufactured CRT Products, such as televisions and computer monitors.  Defendants realized

28   the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

128.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

129.134.        The agreements reached at the glass meetings included:

        a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

        b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

        c.  agreements on pricing for intra-company CRT sales to vertically integrated customers;

        d.  agreements as to what to tell customers about the reason for a price increase;

        e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

        f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

        g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

        h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.    agreements to allocate both overall market shares and share of a particular customer's purchases;

j.    agreements to allocate customers;

k.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.    agreements to keep their meetings secret.

130.135.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

131.136.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.    Bilateral Discussions**

132.137.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

133.138.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

134.139.    The purpose of the bilateral discussions was to exchange

information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

~~135.~~140.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the United States.  These ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~136.~~141.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

~~137.~~142.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications

38

1   with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for

2   communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented

3   the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes

4   Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel

5   participated in the conspiracy to fix prices of CRTs.

6         **3.    Defendants' and Co-Conspirators' Participation in Group and**

7              **Bilateral Discussions**

8         138.143.    Between at least 1996 and 2001, Defendant Hitachi, through

9   Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass

10  meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also

11  engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

12  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never

13  effectively withdrew from this conspiracy.

14        139.144.    Defendants Hitachi America and HEDUS were represented at

15  those meetings and were a party to the agreements entered at them.  To the extent Hitachi

16  America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a

17  significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

18  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

19  the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the

20  alleged conspiracy.

21        140.145.    Between at least 1998 and 2007, Defendant IRICO, through IGC,

22  IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the

23  highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

24  with other Defendants, particularly with other Chinese manufacturers.   Through these

25  discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's

26  conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

27  IRICO was acting to further its own independent private interests in participating in the alleged

28  conspiracy.

141.146.　　Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

142.147.　　Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

143.148.　　Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

144.149.　　Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

145.150.     PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

146.151.     Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

147.152.     Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

148.153.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

149.154.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

150.155.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

151.156.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

157.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

152.158.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

159.    Between at least 1996 and 2005, Defendant Thomson participated in

1  dozens of meetings with its competitors, including several glass meetings and multiple bilateral

2  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

3  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

4  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

5  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

6  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

7  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

8  a role in the conspiracy.

9          160.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

10  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

11  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

12  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

13  plant shutdowns, customer allocation, and new product development, and agreed on prices and

14  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

15          153.161.      Between at least 1995 and 2003, Defendant Toshiba, through TC,

16  TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the

17  CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended

18  by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple

19  bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

20  Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

21  this conspiracy.

22          154.162.      Defendants Toshiba America, TACP, TAEC and TAIS were

23  represented at those meetings and were a party to the agreements entered at them.  To the extent

24  Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

25  purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

26  that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

27  agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

28  were active, knowing participants in the alleged conspiracy.

1    155.163.       Between at least 1995 and 2006, Defendant Chunghwa, through

2    Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

3    and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

4    these meetings were attended by the highest ranking executives from Chunghwa, including the

5    former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

6    discussions with each of the other Defendants on a regular basis.  Through these discussions,

7    Chunghwa agreed on prices and supply levels for CRTs.

8    156.   Defendant Tatung America was represented at those meetings and was a

9    party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

10   CRT Products to direct purchasers, it played a significant role in the conspiracy because

11   Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would

12   not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America

13   was an active, knowing participant in the alleged conspiracy.

14   157.164.       Between at least 1995 and 2004, Daewoo, through Daewoo

15   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

16   substantial number of these meetings were attended by the highest ranking executives from

17   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

18   Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

19   discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

20   bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

21   158.165.       When Plaintiff refers to a corporate family or companies by a

22   single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or

23   more employees or agents of entities within the corporate family engaged in conspiratorial

24   meetings on behalf of every company in that family.  In fact, the individual participants in the

25   conspiratorial meetings and discussions did not always know the corporate affiliation of their

26   counterparts, nor did they distinguish between the entities within a corporate family.  The

27   individual participants entered into agreements on behalf of, and reported these meetings and

28   discussions to, their respective corporate families.  As a result, the entire corporate family was

represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.    The CRT Market During the Conspiracy

159.166.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

160.167.     The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

161.168.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

162.169.     In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

163.170.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor

---

[1]    Estimated market value of CRT units sold.

price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

164.171.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

165.172.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

166.173.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

167.174.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

168.175.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

1    169.176.      These price increases and price stability in the market for CRT

2    Products during the Relevant Period are inconsistent with a competitive market for a product

3    facing rapidly decreasing demand caused by a new, substitutable technology.

4    **F.      International Government Antitrust Investigations**

5    170.177.      Defendants' conspiracy to fix, raise, maintain and stabilize the

6    prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is

7    demonstrated by a multinational investigation commenced by the Antitrust Division of the

8    United States Department of Justice in November 2007.

9    171.178.      Separately, the European Commission and Japan and South

10   Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs

11   that were being sold in Europe and Asia.

12   172.179.      In its 2008 Annual Report, Defendant Toshiba reports that "[t]he

13   Group is also being investigated by the [European] Commission and/or the U.S. Department of

14   Justice for potential violations of competition laws with respect to semiconductors, LCD

15   products, cathode ray tubes (CRT) and heavy electrical equipment."

16   173.180.      On May 6, 2008, the Hungarian Competition Authority ("HCA")

17   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

18
19           The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)
             initiated a competition supervision proceeding against the following
20           undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,
             Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips
21           Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes
             (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo
22           Electronics Global HQ, Daewoo Electronics European HQ, MT Picture
             Display Germany GmbH, Matsushita Global HQ, Matsushita European
23           HQ.

24           Based on the data available the undertakings mentioned above concerted
             their practice regarding the manufacturing and distribution of cathode-ray
25           tubes (including coloured pictures tubes and coloured screen tubes) on the
             European market between 1995 and 2007. The anti-competitive behaviour
26           may have concerned the exchange of sensitive market information (about
             prices, volumes sold, demand and the extent to which capacities were
27           exploited), price-fixing, the allocation of market shares, consumers and
             volumes to be sold, the limitation of output and coordination concerning

28

the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

174.181.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

175.182.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

176.183.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as

a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

177.184.　　　On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.185.　　　On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

179.186.　　　Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

180.187.　　　The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

188.　　On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long

effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

181.189.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

182.190.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

183.191.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

184.192.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

185.193.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

186.194.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

1    their roles in a conspiracy to fix prices of TFT-LCD panels.

2    ~~187.~~195.    On March 10, 2009, the DOJ announced that it had reached an

3    agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead

4    guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine

5    for its role in a conspiracy to fix the prices of TFT-LCD panels.

6    ~~188.~~196.    The plea agreements of LG Display Co., Ltd., Sharp Corporation,

7    Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

8    TFT-LCDs was carried out, in part, in California.

9    **G.    The Role of Trade Associations During the Relevant Period**

10   ~~189.~~197.    Defendants' collusive activities have been furthered by trade

11   associations and trade events that provided opportunities to conspire and share information.  One

12   example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the

13   summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.

14   KODEMIA is a national trade organization representing about 80 member companies in the

15   Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004,

16   the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association

17   of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations

18   related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

19   States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

20   Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common

21   issues."

22   ~~190.~~198.    Samsung and LG Electronics were members of both KODEMIA

23   and EDIRAK, and have participated extensively in the KDCs.

24   ~~191.~~199.    The KDC has taken place in Seoul, Korea or other Korean venues

25   on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

26   2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

27   and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

28   Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

1   Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated,

2   such as Zenzou Tashima of Hitachi.

3   192.200.        Other opportunities to collude among Defendants were provided

4   by events sponsored by the Society for Information Display, such as the annual Asian

5   Symposiums on Information Display, the annual International Display Manufacturing

6   Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the

7   annual International Meeting on Information Displays (held each August in Daegu, Korea) and

8   the annual International Display Workshops (the most recent ones of which have been held in

9   Japan).

10   193.201.        Through these trade association and trade events, and in meetings

11   related to these trade associations and trade events, on information and belief, Defendants shared

12   what would normally be considered proprietary and competitively sensitive information.  This

13   exchange of information was used to implement and monitor the conspiracy.

14   **H.**        **Effects of Defendants' Antitrust Violations**

15        **1.**        **Examples of Reductions in Manufacturing Capacity by Defendants**

16   194.202.        As explained above, during the Relevant Period, Defendants

17   consolidated their manufacturing facilities in lower-cost venues such as China and reduced

18   manufacturing capacity to prop up prices.

19   195.203.        In December of 2004, MTPD closed its American subsidiary's

20   operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that

21   the closing was part of the company's "global restructuring initiatives in the CRT business."  The

22   company further stated that in the future, "CRTs for the North American market will be supplied

23   by other manufacturing locations in order to establish an optimum CRT manufacturing

24   structure."

25   196.204.        In July of 2005, LGPD ceased CRT production at its Durham,

26   England facility, citing a shift in demand from Europe to Asia.

27   197.205.        In December of 2005, MTPD announced that it would close its

28   American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.

Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

~~198.~~206.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

~~199.~~207.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.     Examples of Collusive Pricing for CRTs**

~~200.~~208.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

~~201.~~209.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

~~202.~~210.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

~~203.~~211.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

~~204.~~212.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

205.213.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

206.214.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

207.215.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

208.216.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.    Summary Of Effects Of The Conspiracy Involving CRTs**

209.217.    The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   **PLAINTIFF'S INJURIES**

210.218.      As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

211.219.      Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.   The conspiracy artificially inflated the prices of CRTs included in CRT Products.

212.220.      The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.   Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.   Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

213.221.      Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.   CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.   Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

214.222.      The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

215.223.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

216.224.     As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

217.225.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

218.226.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

219.227.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

220.228.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

221.229.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

222.230.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

223.231.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

224.232.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

225.233.      As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

226.234.      In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

227.235.      Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

228.236.      Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237.      As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.IX.

**IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

238.    As discussed at length in Paragraphs 177-196 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

1  • *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC

2     (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

3  • Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-

4     05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

5     240.   Plaintiff's claims were tolled under *American Pipe & Construction Co. v.*

6  *Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during

7  the pendency of the Direct Purchaser Class actions asserted against Defendants, and

8  commencing on at least November 26, 2007.

9  **XI.   CLAIM FOR VIOLATIONS**

10  **First Claim for Relief**

11  **(Violation of Section 1 of the Sherman Act)**

12     ~~229.~~241.     Plaintiff incorporates by reference all the above allegations as if

13  fully set forth herein.

14     ~~230.~~242.     Beginning no later than March 1, 1995, the exact date being

15  unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their

16  co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably

17  restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

18  artificially reducing or eliminating competition in the United States.

19     ~~231.~~243.     In particular, Defendants and their co-conspirators combined and

20  conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

21     ~~232.~~244.     As a result of Defendants' unlawful conduct, prices for CRTs were

22  raised, fixed, maintained and stabilized in the United States.

23     ~~233.~~245.     The contract, combination or conspiracy among Defendants

24  consisted of a continuing agreement, understanding, and concerted action among Defendants and

25  their co-conspirators.

26     ~~234.~~246.     For purposes of formulating and effectuating their contract,

27  combination or conspiracy, Defendants and their co-conspirators did those things they

28  contracted, combined, or conspired to do, including:

a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

~~235.~~247.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

## **Second Claim for Relief**

### **(Violation of Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*)**

~~236.~~248.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~237.~~249.   Tweeter was a corporation organized and existing under the laws of the State of Massachusetts and during the Relevant Period, conducted a substantial volume of business in Massachusetts.  In particular, Tweeter purchased CRT Products from Defendants and their co-conspirators in Massachusetts; maintained warehouses in Massachusetts containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and

representatives in Massachusetts who sold CRT Products to consumers in Massachusetts and elsewhere.  As a result of its presence in Massachusetts and the substantial business it conducted in Massachusetts, Plaintiff is entitled to the protection of the laws of Massachusetts.

238.250.    Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*

239.251.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

240.252.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

  a.  to fix, raise, maintain and stabilize the price of CRTs;

  b.  to allocate the market for CRTs amongst themselves;

  c.  to submit rigged bids for the award and performance of certain
   CRTs contracts; and

  d.  to allocate among themselves the production of CRTs.

241.253.    The combination and conspiracy alleged herein has had, *inter alia,* the following effects:

  a.  price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

  b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c. those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

242.254. As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff paid supra-competitive, artificially inflated prices for CRT Products it purchased during the Relevant Period.

243.255. By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*:

a. Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d. Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e. Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

f.    During the Relevant Period, Tweeter purchased CRT Products containing price-fixed CRTs in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

## XI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants engaged in a contract, combination, and conspiracy in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.    Plaintiff shall recover damages sustained by it, as provided by Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.    Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiff shall receive such other or further relief as may be just and proper.

## XII.        **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

1

Dated:                                    Respectfully Submitted,

2

_____
3        PHILIP J. IOVIENO (*Pro Hac Vice*)
         ANNE M. NARDACCI (*Pro Hac Vice to be filed*)
4        LUKE NIKAS (*Pro Hac Vice to be filed*)
         CHRISTOPHER V. FENLON (*Pro Hac Vice to be*
5        *filed*)

6        BOIES, SCHILLER & FLEXNER LLP
         10 North Pearl Street, 4th Floor
7        Albany, NY 12207
         Telephone:  (518) 434-0600
8        Facsimile:   (518) 434-0665
         Email: piovieno@bsfllp.com
9        Email: anardacci@bsfllp.com
         Email: lnikas@bsfllp.com
10       Email: cfenlon@bsfllp.com

11       WILLIAM A. ISAACSON (*Pro Hac Vice to be filed*)
12       BOIES, SCHILLER & FLEXNER LLP
         5301 Wisconsin Ave. NW, Suite 800
13       Washington, DC 20015
         Telephone:  (202) 237-2727
14       Facsimile:   (202) 237-6131
         Email:  wisaacson@bsfllp.com
15

16       *Counsel for Schultze Agency Services, LLC*

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT M

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-443-5582
Facsimile:  213-622-2690
Email: jmurray@crowell.com

Jerome A. Murphy (*pro hac vice*)
Astor H.L. Heaven (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
E-mail:  jmurphy@crowell.com
          aheaven@crowell.com

*Counsel for Plaintiffs Target Corp.and RadioShack Corp*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| TARGET CORP.; SEARS, ROEBUCK AND CO.; KMART CORP.; OLD COMP INC.; GOOD GUYS, INC.; RADIOSHACK CORP.; | Master File No. 3:07-cv-05944-SC |
| | MDL No. 1917 |
| Plaintiffs | CASE NO Individual Case No. CV 3:11-5514 cv-05514 |
| v. | |
| CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; | **SECOND** AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**DEMAND FOR JURY TRIAL** |

PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.~~.~~; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

                            Defendants

       Plaintiffs Target Corp.~~.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;~~

and RadioShack Corp. (hereafter "Plaintiffs") for their Complaint against all Defendants named herein,

hereby allege as follows:

**I.**     **INTRODUCTION**

       1.    Defendants and their co-conspirators formed an international cartel which conducted a

long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

November 25, 2007 (the "Relevant Period"). The purpose and effect of this conspiracy was to fix, raise,

stabilize and maintain prices for cathode ray tubes ("CRTs"). Defendants are or were among the leading

manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;

(b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the

highest levels of the respective companies, as well as regional managers and others.

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.     During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims

arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have. Samsung SDI has also admitted that they engaged in conduct in furtherance of the conspiracy occurred in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

III.     **THE PARTIES**

    A.       **Plaintiffs**

        1.       **Target**

16.      Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com.  During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.      During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

18.      During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

        2. Sears

19. Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased

1  substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the

2  United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for

3  internal use during the Relevant Period.

4  20. On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned

5  by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant Period,

6  Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants,

7  their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, both

8  Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the

9  prices they paid for such CRTs were artificially inflated by that conspiracy.

10  21. During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's

11  negotiations for the purchase of CRTs took place in the United States and were controlled by

12  merchandising departments based at the companies' respective headquarters in Illinois and Michigan.  In

13  addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan

14  respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The

15  merchandising departments in Illinois and Michigan were also responsible for selecting vendors and

16  product lines with respect to CRTs.

17  22. During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution

18  centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts,

19  Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin,

20  where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

21  CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,

22  Nebraska, Nevada, and North Carolina.

23  **3. Old Comp**

24  23. Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas.

25  During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was

26  headquartered in Dallas, Texas.

27  24. Old Comp owns all claims and rights under federal and state law to recover any overcharges

28

1  suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings Company; (2)

2  CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico Inc.; (5)

3  CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.; and (9)

4  BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA Subsidiaries").

5      25. During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries,

6  purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others

7  in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs

8  for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators'

9  conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property

10  because the prices they paid for such CRTs were artificially inflated by that conspiracy.

11      26. During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs took

12  place in the United States and were controlled by the company's merchandising department at its Texas

13  headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and

14  received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was

15  also responsible for selecting vendors and product lines with respect to CRTs.

16      27. During the Relevant Period, CompUSA also purchased CRTs at distribution centers located

17  in multiple states, including California and Illinois, where it received CRTs shipped to those distribution

18  centers.

19      28. CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service

20  marks, and trademarks to an unrelated third party in 2008.

21      **4. Good Guys**

22      29. Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving, Texas.

23  During the Relevant Period, The Good Guys maintained its headquarters in California and then in

24  Texas.

25      30. The Good Guys owns all claims and rights under federal and state laws to recover any

26  overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc.

27  and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

28

1    31. During the Relevant Period, The Good Guys, by itself or through the Good Guys

2    Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs

3    manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  The

4    Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant

5    Period.  As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good

6    Guys Subsidiaries were injured in their business and property because the prices they paid for such

7    CRTs were artificially inflated by that conspiracy.

8    32. During the Relevant Period, all of The Good Guys' negotiations for the purchase of CRTs

9    took place in the United States and were controlled by the company's merchandising department at its

10   California, and then Texas headquarters.  In addition, The Good Guys issued all of its purchase orders

11   for CRTs from California, and then Texas, and received invoices for those orders in California, and then

12   Texas.  The Good Guys' California and then Texas-based merchandising department was also

13   responsible for selecting vendors and product lines with respect to CRTs.

14   33. During the Relevant Period, The Good Guys also purchased CRTs at a distribution center

15   located in California, where it received CRTs shipped to that distribution center.

16   34. The Good Guys no longer operates any stores.

17   **2.**   5. **RadioShack**

18   19.   35. Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in

19   Fort Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly

20   700 wireless phone kiosks throughout the United States, as well as an online retail store,

21   Radioshack.com.  During the Relevant Period, RadioShack purchased and then resold from its facilities

22   substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the

23   United States for resale there.  RadioShack also purchased CRTs for internal use during the Relevant

24   Period.  As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its

25   business and property because the prices it paid for such CRTs were artificially inflated by that

26   conspiracy.

27   20.   36. During the Relevant Period, all of RadioShack's negotiations for the purchase of

28

CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters.  In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

21.   37.  During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

**B.**   **The Defendants**

**1.**   **IRICO Entities**

22.   38.  Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

23.   39.  Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

24.   40.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed,

1   distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

2   United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC

3   relating to the antitrust violations alleged in this complaint.

4       25.   41. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

5           2.       **LG Electronics Entities**

6       26.   42. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of

7   the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-

8   dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in

9   consumer electronics, home appliances and mobile communications, which established its first overseas

10  branch office in New York in 1968.  The company's name was changed from Gold Star

11  Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In

12  2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips

13  Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an

14  independent company and changed its name to LP Displays International Ltd.  During the Relevant

15  Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

16  subsidiaries or affiliates, throughout the United States.

17      27.   43. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

18  principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

19  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period,

20  LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

21  subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the

22  finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

23      28.   44. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

24  with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

25  Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

26  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

27  directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

28

1    dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

2    alleged in this complaint.

3         29.   45. Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

4    Electronics."

5              **3.   LP Displays**

6         30.   46. Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong

7    Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road

8    Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in

9    2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP

10   Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in

11   television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share

12   of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over

13   the company and the shares would be owned by financial institutions and private equity firms.  During

14   the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly

15   or through its subsidiaries or affiliates, throughout the United States.

16             **4.   Hitachi Entities**

17        31.   47. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at

18   6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company

19   for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20

20   percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed

21   CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

22        32.   48. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its

23   principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi

24   Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.

25   In 2002, all the departments of planning, development, design, manufacturing and sales concerned with

26   the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.

27   During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs,

28

1   either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi,

2   Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

3   antitrust violations alleged in this complaint.

4   33. 49. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with

5   its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi

6   America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant

7   Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or

8   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated

9   and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations

10   alleged in this complaint.

11   34. 50. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

12   principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.

13   Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the

14   Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or

15   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated

16   and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

17   in this complaint.

18   35. 51. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

19   corporation with its principal place of business located at 208 Fairforest Way, Greenville, South

20   Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the

21   Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or

22   through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi

23   Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust

24   violations alleged in this complaint.

25   36. 52. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen")

26   was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

27   District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

28

1   Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

2   investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi

3   corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period,

4   Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

5   subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

6   dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

7   violations alleged in this complaint.

8        37.    ~~53.~~ Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS

9   and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**5.    Panasonic Entities**

11        38.    ~~54.~~ Defendant Panasonic Corporation, which was at all times during the Relevant Period

12   known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1,

13   2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During

14   the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs,

15   either directly or through its subsidiaries or affiliates, throughout the United States.

16        39.    ~~55.~~ Defendant Panasonic Corporation of North America ("PCNA") is a Delaware

17   corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey

18   07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.

19   During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either

20   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic

21   Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust

22   violations alleged in this complaint.

23        40.    ~~56.~~ Defendants Panasonic Corporation and PCNA are collectively referred to herein as

24   "Panasonic."

25        41.    ~~57.~~ Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display

26   Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504,

27   Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation

28

called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

42. 58. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6. Philips Entities

43. 59. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

44. 60. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

45. 61. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

46. 62. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

47. 63. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.    Samsung Entities

48. 64. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the

1    Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through

2    its subsidiaries or affiliates, throughout the United States.

3         49.   65.  Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation

4    with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New

5    Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the

6    Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through

7    its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

8    finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

9    complaint.

10        50.   66.  Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

11   ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-

12   dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major

13   shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the

14   world's leading company in the display and energy business, with 28,000 employees and facilities in 18

15   countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more

16   than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant

17   Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through

18   its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

19   finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this

20   complaint.

21        51.   67.  Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

22   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

23   California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

24   Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

25   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

26   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

27   Samsung SDI America relating to the antitrust violations alleged in this complaint.

28

52. 68. Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

53. 69. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

54. 70. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

55. 71. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

1  United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

2  affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

3      56.   72. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

4  Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

5  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung

6  SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

7  Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

8  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and

9  Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

10  relating to the antitrust violations alleged in this complaint.

11      57.   73. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

12  Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI

13  Malaysia are collectively referred to herein as "Samsung."

14          **8.    Samtel**

15      58.   74. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place

16  of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's

17  market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of

18  CRTs.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain

19  for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed

20  CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

21          **9.    Thai CRT**

22      59.   75. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

23  Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

24  Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.

25  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either

26  directly or through its subsidiaries or affiliates, throughout the United States.

27

28

**10.  Toshiba Entities**

60.  76. Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

61.  77. Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

62.  78. Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

63.  79. Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

20

CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

64. 80. Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

65. 81. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11.     Chunghwa Entities

66. 82. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

67. 83. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies

1    and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

2        68.   84. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein

3    as "Chunghwa."

4            12. Tatung Company of America, Inc.

5            12.      Thomson Entities

6        69.   Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation

7    with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

8    Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a

9    major manufacturer of CRTs for the United States market, with plants located in the United States,

10   Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing

11   division, which had plants in the United States and Mexico, and to other television manufacturers in the

12   United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT

13   manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the

14   RCA brand.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the

15   Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRTs, either directly or

16   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

17       70.   85. Tatung Company of AmericaDefendant Technicolor USA, Inc. ("Tatung America")

18   is a Californiaf/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S.

19   corporation with its principal place of business located at 2850 El Presidio Street, Long Beach,

20   California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns

21   approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter

22   of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to

23   her two children10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer

24   Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major

25   manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania;

26   Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson

27   Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had

28

plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  During the Relevant Period, ~~Tatung America~~Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRTs ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.~~, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.    Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

### 13.    Mitsubishi Entities

72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRTs in the United States.

73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRTs in the United States.

74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi Digital is a

23

wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

75.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.     AGENTS AND CO-CONSPIRATORS**

76.     86. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

77.     87. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

78.     88. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

79.     89. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components

Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

80. 90. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

81. 91. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

82. 92. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

1    complaint.

2        83.   93. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

3    principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

4    Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

5    2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

6    re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

7    subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured,

8    marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

9    throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs

10   of TDDT relating to the antitrust violations alleged in this complaint.

11       84.   94. The acts charged in this Complaint have been done by Defendants and their co-

12   conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

13   representatives while actively engaged in the management of each Defendant's or co-conspirator's

14   business or affairs.

15   **V.   TRADE AND COMMERCE**

16       85.   95. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

17   CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

18   commerce, including through and into this judicial district.

19       86.   96. During the Relevant Period, Defendants collectively controlled a vast majority of the

20   market for CRTs, both globally and in the United States.

21       87.   97. The business activities of Defendants substantially affected interstate trade and

22   commerce in the United States and caused antitrust injury in the United States.  The business activities

23   of Defendants also substantially affected trade and commerce and caused antitrust injuries in California,

24   Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi,

25   Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin.

26

27

28

## VI.   FACTUAL ALLEGATIONS

### A.   CRT Technology

88.   98. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

89.   99. CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

90.   100. The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

91.   101. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

92.   102. CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

93.   103. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the

demand for such products.

94. 104. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets. The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

95. 105. Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

96. 106. Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

97. 107. Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.** **Structure of the CRT Industry**

98. 108. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.    Market Concentration

99. 109. During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.    Information Sharing

100. ~~110.~~ Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

101. ~~111.~~ Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

102. ~~112.~~  The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

103. ~~113.~~ The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104. ~~114.~~ Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

   i.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

ii.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

iii.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

iv.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

1    Samsung, Philips, and Panasonic.

2    **5.    High Costs of Entry Into the Industry**

3    105.   115. There are significant manufacturing and technological barriers to entry into the CRT

4    industry.  It would require substantial time, resources and industry knowledge to overcome these barriers

5    to entry.  It is also extremely unlikely that a new producer would enter the market in light of the

6    declining demand for CRTs.

7    106.   116. During the Relevant Period, the costs of the assembly components, both as a whole

8    and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A

9    combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep

10   prices above where they would have been but for the conspiracy.

11   **6.    The Maturity of the CRT Market**

12   107.   117. Newer industries typically are characterized by rapid growth, innovation and high

13   profits.  The CRT market is a mature one, and like many mature industries, is characterized by slim

14   profit margins, creating a where there is greater motivation to collude.

15   108.   118. Demand for CRTs was declining throughout the Relevant Period.  Static declining

16   demand is another factor which makes the formation of a collusive arrangement more likely because it

17   provides a greater incentive to firms to avoid price competition.

18   109.   119. In addition, conventional CRT televisions and computer monitors were being

19   rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to

20   engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000

21   and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and

22   were predicted to decline by an additional 84.5 percent between 2006 and 2010.

23   110.   120. Although demand was declining as a result of the popularity of flat-panel LCD and

24   plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display

25   technology during the Relevant Period, making Defendants' collusion and the international price fixing

26   conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period,

27   a substantial market for CRTs existed as a cheaper alternative to these new technologies.

28

31

111. ~~121.~~ In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

112. ~~122.~~ As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.   Homogeneity of CRTs

113. ~~123.~~ CRTs are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

114. ~~124.~~ It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.   **Pre-Conspiracy Market**

115. ~~125.~~ The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116. ~~126.~~ In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.   **Defendants' and Co-Conspirators' Illegal Agreements**

117. ~~127.~~ In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

1   artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

2   118.   128. The CRT conspiracy was effectuated through a combination of group and bilateral

3   meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary

4   method of communication and took place on an informal, ad hoc basis.  During this period,

5   representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

6   manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

7   increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

8   South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

9   119.   129. Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also

10   attended several ad hoc group meetings during this period.  The participants at these group meetings also

11   discussed increasing prices for CRTs.

12   120.   130. As more manufacturers formally entered the conspiracy, group meetings became

13   more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion,

14   and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

15   attended hundreds of these meetings during the Relevant Period.

16   121.   131. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

17   Defendants charged for CRTs.

18       **1.   "Glass Meetings"**

19   122.   132. The group meetings among the participants in the CRT price-fixing conspiracy were

20   referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general

21   levels of Defendants' corporations.

22   123.   133. The first level meetings were attended by high level company executives including

23   CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less

24   frequently, typically quarterly, and were focused on longer term agreements and forcing compliance

25   with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable

26   information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve

27   disputes because they were decision makers who could make agreements.

28

124. 134. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

125. 135. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126. 136. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127. 137. Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Thomson.

128. 138. Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

129. 139. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

130. 140. Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

131. 141. The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

132. 142. During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

133. 143. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

134. 144. Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they

needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

135. 145. The agreements reached at the glass meetings included:

    i.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

    iv.    agreements as to what to tell customers about the reason for a price increase;

    v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    vi.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    vii.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    viii.    agreements to coordinate uniform public statements regarding available capacity and supply;

    ix.    agreements to allocate both overall market shares and share of a particular customer's purchases;

    x.    agreements to allocate customers;

    xi.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    xii.    agreements to keep their meetings secret.

136. 146. Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of

Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring;

2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3)

threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual

interest in living up to the target price and living up to the agreements that had been made.

137.  147. As market conditions worsened in 2005-2007, and the rate of replacement of CRTs

by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again

became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of

TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.    Bilateral Discussions

138.  148. Throughout the Relevant Period, the glass meetings were supplemented by bilateral

discussions between various Defendants.  The bilateral discussions were more informal than the group

meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions,

usually between sales and marketing employees, took the form of in-person meetings, telephone

contacts and emails.

139.  149. During the Relevant Period, in-person bilateral meetings took place in Malaysia,

Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and,

Mexico, and the United States.

140.  150. The purpose of the bilateral discussions was to exchange information about past and

future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and,

Europe, and the United States.

141.  151. In order to To ensure the efficacy of their global conspiracy, Defendants also used

bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and, Mexico, such as Philips

Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican and the United

States.  These CRT manufacturers were particularly important because they served the North American

market for CRTs.  As further alleged herein, North America was the largest market for CRT televisions

and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers

are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs ~~imported into~~ sold in the United States were fixed, raised, maintained, and ~~/or~~ stabilized at supracompetitive levels.

142. ~~152.~~ Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

143. ~~153.~~ Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings ~~, such as Defendants Hitachi, Toshiba, Panasonic and Samtel~~. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and ~~/or~~ output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. ~~In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.~~

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

144. ~~154.~~ Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral

discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi

agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

145.   155. Defendants Hitachi America and HEDUS were represented at those meetings and

were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or

distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the

pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active,

knowing participants in the alleged conspiracy.

146.   156. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

participated in multiple glass meetings.  These meetings were attended by the highest ranking executives

from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly

with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply

levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by

the Chinese government.  IRICO was acting to further its own independent private interests in

participating in the alleged conspiracy.

147.   157. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and

LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated

in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial

number of these meetings were attended by the highest ranking executives from LG Electronics.  LG

Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.

Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never

effectively withdrew from this conspiracy.

148.   158. Defendant LGEUSA was represented at those meetings and was a party to the

agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a

significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

LGEUSA was an active, knowing participant in the alleged conspiracy.

149.   159. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

150.   160. Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

151.   161. PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

152.   162. Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

153.   163. Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

1   BMCC was acting to further its own independent private interests in participating in the alleged

2   conspiracy.

3       154.  164. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4   Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5   in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6   substantial number of these meetings were attended by high level executives from Philips.  Philips also

7   engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8   agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9       155.  165. Defendants Philips America and Philips Brazil were represented at those meetings

10  and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11  sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12  because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13  undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14  were active, knowing participants in the alleged conspiracy.

15      156.  166. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI,

16  Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200

17  glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18  ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19  Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20  for CRTs.

21      157.  167. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22  Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23  extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24  because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25  undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26  America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27  alleged conspiracy.

28

158.   168. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

159.   169. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

160.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

161.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.   170. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants,

1  particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.

2  Toshiba never effectively withdrew from this conspiracy.

3      163.  171. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4  meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5  TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6  conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7  would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8  TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9      164.  172. Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10  Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11  participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12  attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13  Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14  Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15  for CRTs.

16      173. Defendant Tatung America was represented at those meetings and was a party to the

17  agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct

18  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the

19  prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at

20  the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

21      165.  174. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

22  DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

23  were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral

24  discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on

25  prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-

26  owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this

27  conspiracy.

28

166. ~~175.~~When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.   The CRT Market During the Conspiracy**

167. ~~176.~~Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

168. ~~177.~~The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

169. ~~178.~~During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

---

[1]     Estimated market value of CRT units sold.

170. 179. Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

171. 180. In 1996 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

172. 181. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged alleged.

173. 182. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

174. 183. A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

175. 184. A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004]

1   there will be [a] 20% hike in the price of our CRT monitors."

2   **176.** ~~185.~~ Defendants also conspired to limit production of CRTs by shutting down production

3   lines for days at a time, and closing or consolidating their manufacturing facilities.

4   **177.** ~~186.~~ For example, Defendants' CRT factory utilization percentage fell from 90% in the

5   third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in

6   factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.

7   Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by

8   Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices

9   of CRTs.

10   **178.** ~~187.~~ During the Relevant Period, while demand in the United States for CRTs continued

11   to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on

12   prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display

13   products.  As Finsen Yu, President of Skyworth Macao ~~Commerical~~ Commercial Offshore Co., Ltd., a

14   television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and

15   technology have become stable."

16   **179.** ~~188.~~ During the Relevant Period, there were not only periods of unnatural and sustained

17   price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were

18   despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of

19   a new, potentially superior and clearly more popular, substitutable technology.

20   **180.** ~~189.~~ These price increases and price stability in the market for CRTs during the Relevant

21   Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused

22   by a new, substitutable technology.

23       **F.**    **International Government Antitrust Investigations**

24   **181.** ~~190.~~ On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

25   investigation into the CRT cartel.  The HCA described the cartel as follows:

26       The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)
27       initiated a competition supervision proceeding against the following
    undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,

28

1
2
3

Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

4
5
6
7
8
9

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

10
11
12
13

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

14
15
16
17
18
19
20
21
22
23

182. 191. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

24
25
26
27

183. 192. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and

28

Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184. 193. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185. 194. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

186. 195. On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

1  output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in

2  furtherance of this conspiracy were carried out within the Northern District of California.  The plea

3  agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal

4  antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

5       187.  On December 5, 2012, the European Commission announced that it had fined seven

6  international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices,

7  share markets, restrict output, and allocate customers between themselves in the CRT market.  The

8  companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung

9  SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice

10  President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

11  cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

12  companies doing business in Europe."  The press release accompanying the fines further notes that the

13  CRT cartels were "among the most organised cartels that the Commission has investigated."

14       188.  196. As outlined above, Defendants have a history of competitor contacts resulting from

15  joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the

16  electronics industry.

17       189.  197. Several Defendants also have a history of "cooperation" and anticompetitive

18  conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in

19  October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory

20  ("DRAM").

21       190.  198. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.

22  Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access

23  Memory ("SRAM") and NAND Flash Memory.

24       191.  199. In December 2006, government authorities in Japan, Korea, the European Union and

25  the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-

26  related TFT-LCD market.

27       192.  200. On December 12, 2006, news reports indicated that Defendants Samsung and

28

Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

193. 201. On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

194. 202. On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

195. 203. The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.   The Role of Trade Associations During the Relevant Period

196. 204. Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

197. 205. Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

198. 206. The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

199. 207. Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

200. 208. Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

## H. Effects of Defendants' Antitrust Violations

### 1. Examples of Reductions in Manufacturing Capacity by Defendants

201. 209. As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

202. 210. In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

203. 211. In July of 2005, LGPD ceased CRT production at its Durham, England facility,

citing a shift in demand from Europe to Asia.

204. 212. In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

205. 213. In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

206. 214. In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.   Examples of Collusive Pricing for CRTs

207. 215. Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

208. 216. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

209. 217. In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

210. 218. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

211. 219. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display

1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

212. 220. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

213. 221. After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

214. 222. On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

215. 223. Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

216. 224. CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

I.   **Summary Of Effects Of The Conspiracy Involving CRTs**

217. 225. The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has

been restrained, suppressed and eliminated throughout the United States;

b.    Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.    Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFFS' INJURIES

218. 226. As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

219. 227. Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

220. 228. The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs containing such price-fixed CRTs from the OEMs and others.

221. 229. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

222.   230. The market for CRTs and the market for products containing CRTs are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

223.   231. Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

224.   232. As a result, Plaintiffs were injured in connection with their purchases of CRTs during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

225.   233. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

226.   234. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs.

227.   235. The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

228.   236. By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

229.   237. Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and

1    techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and

2    fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or

3    combination as herein alleged was fraudulently concealed by Defendants by various means and

4    methods, including, but not limited to, secret meetings, surreptitious communications between

5    Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written

6    records, discussion on how to evade antitrust laws and concealing the existence and nature of their

7    competitor pricing discussions from non-conspirators (including customers).

8        230.    238. As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at

9    separate venues in order to avoid detection.  Participants at glass meetings were also told not to take

10   minutes.  Attending companies also reduced the number of their respective attendees to maintain

11   secrecy.

12       231.    239. Defendants also agreed at glass meetings and bilateral meetings to give pretextual

13   reasons for price increases and output reductions to their customers.

14       232.    240. As alleged above, in early 1999, despite declining production costs and the rapid

15   entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase

16   was allegedly based on increasing global demand for the products.  In fact, this price rise was the result

17   of collusive conduct amongst Defendants, which was undisclosed at the time.

18       233.    241. As alleged above, despite increased competition from flat panel monitors, prices for

19   CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was

20   purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used

21   to cover up the conspiracy.

22       234.    242. In addition, when several CRT manufacturers, including Defendants Samsung,

23   Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a

24   shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy

25   General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a

26   global phenomena and every company has to increase the prices of CRT monitors in due course of

27   time."

28

235. 243. Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

236. 244. Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237. 245. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

238.    As discussed at length in paragraphs 181-195 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present.  Plaintiffs' direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.    Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Plaintiffs opted out on November 14, 2011.

240.    Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes Ltd., et al.*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

**X.** ~~IX.~~ **CLAIM FOR VIOLATIONS**

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

241. ~~246.~~ Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

242. ~~247.~~ Beginning no later than March 1, 1995, the exact date being unknown to ~~plaintiffs~~Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

243. ~~248.~~ In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

244. ~~249.~~ As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

245. ~~250.~~ The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

246. ~~251.~~ For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

     a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

     b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

     c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

     d.    issuing price announcements and price quotations in accordance with the agreements reached;

1    e.    selling CRTs to customers in the United States at noncompetitive prices;

2    f.    exchanging competitively sensitive information in order to facilitate their

3          conspiracy;

4    g.    agreeing to maintain or lower production capacity; and

5    h.    providing false statements to the public to explain increased prices for CRTs.

6    247. 252. As a result of Defendants' unlawful conduct, Plaintiffs were injured in their

7  businesses and property in that they paid more for CRTs than they otherwise would have paid in the

8  absence of Defendants' unlawful conduct.

9    **Second Claim for Relief**

10    **(Violation of the California Cartwright Act)**

11    248. 253. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

12  allegation set forth in the preceding paragraphs of this Complaint.

13    249. 254. During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a

14  substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants

15  and their co-conspirators in California; maintained warehouses in California containing CRTs

16  manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in

17  California who sold CRTs to customers in California and elsewhere.  As a result of their presence in

18  California and the substantial business they conducted in California, Plaintiffs are entitled to the

19  protection of the laws of California.

20    250. 255. In addition, Defendants LG Display Mitsubishi, Samsung and Toshiba all maintained

21  offices in California during the Relevant Period.  Employees at Defendants' locations in California

22  participated in meetings and engaged in bilateral communications in California and intended and did

23  carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within

24  California thus injured Plaintiffs and their predecessor entities, both in California and throughout the

25  United States.

26    251. 256. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1,

27  1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and

28

their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

252. 257. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

253. 258. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.    to fix, raise, maintain and stabilize the price of CRTs;

      b.    to allocate markets for CRTs amongst themselves;

      c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.    to allocate among themselves the production of CRTs.

254. 259. The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c.    those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

255. 260. As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

256. 261. As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

257. 262. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258. 263. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

259. 264. The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

260. 265. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.      to fix, raise, maintain and stabilize the price of CRTs;

1    b.    to allocate markets for CRTs amongst themselves;

2    c.    to submit rigged bids for the award and performance of certain CRTs contracts;

3    and

4    d.    to allocate among themselves the production of CRTs.

5    261.    266. The combination and conspiracy alleged herein has had, *inter alia*, the following

6 effects:

7    a.    price competition in the sale of CRTs has been restrained, suppressed, and/or

8    eliminated in the states listed below;

9    b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been

10    fixed, raised, maintained and stabilized at artificially high, non-competitive levels

11    in the states listed below; and

12    c.    those who purchased CRTs from Defendants, their co-conspirators, and others

13    have been deprived of the benefits of free and open competition.

14    262.    267. As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs

15 paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant

16 Period.

17    263.    268. By reason of the foregoing, Defendants and their co-conspirators also have engaged

18 in unfair competition in violation of California's Unfair Competition Law, California Business and

19 Professional Code § 17200, *et seq.*

20    a.    Defendants and their co-conspirators committed acts of unfair competition, as

21    defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize

22    the price of CRTs as described above;

23    b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

24    practices and non-disclosures, as described above, constitute a common,

25    continuous and continuing course of conduct of unfair competition by means of

26    unfair, unlawful and/or fraudulent business acts or practices with the meaning of

27    Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of

28

1   the Sherman Act; and (2) violation of the Cartwright Act;

2   c.   Defendants' and their co-conspirators' acts, omissions, misrepresentations,

3        practices and non-disclosures are unfair, unconscionable, unlawful and/or

4        fraudulent independently of whether they constitute a violation of the Sherman

5        Act or the Cartwright Act;

6   d.   Defendants' and their co-conspirators' acts or practices are fraudulent or

7        deceptive within the meaning of Section 17200, *et seq.*;

8   e.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and

9        perfected within the state of California.  ~~Defendants LG Display, Chunghwa,~~

10       ~~Sharp, Chi Mei, HannStar, and Epson all~~<u>Defendant Samsung SDI</u> admitted that

11       acts in furtherance of the conspiracy to fix the price of CRTs were carried out in

12       California;

13  f.   During the Relevant Period, the following Plaintiffs purchased CRTs in

14       California:  Target~~, Sears, Kmart, Old Comp, Good Guys,~~ and RadioShack.  As a

15       result, each is entitled to the protection of the laws of California; and

16  g.   By reason of the foregoing, ~~each of those~~ Plaintiffs ~~is~~<u>are</u> entitled to full restitution

17       and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

18       that may have been obtained by Defendants or their co-conspirators as result of

19       such business acts and practices.

20  <u>264.</u> ~~269.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

21  into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

22  a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23       eliminated competition in the sale of CRTs in Arizona and fixed, raised,

24       maintained and stabilized CRT prices in Arizona at artificially high, non-

25       competitive levels;

26  b.   As a result, Defendants and their co-conspirators' conspiracy substantially

27       affected Arizona commerce;

~~28~~

1      c.     During the Relevant Period, the following Plaintiffs purchased CRTs in Arizona:

2            Target and Sears.  As a result, eachTarget is entitled to the protection of the laws

3            of Arizona; and

4      d.     As a direct and proximate result of Defendants' and their co-conspirators'

5            conduct, each of those PlaintiffsTarget has been injured in its business and

6            property by paying more for CRTs manufactured by Defendants, their co-

7            conspirators, and others than it would have paid in the absence of Defendants and

8            their co-conspirators' combination and conspiracy, and is therefore entitled to

9            relief under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

10     265.    270. By reason of the foregoing, Defendants and their co-conspirators also have engaged

11  in unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

12      a.     Defendants and their co-conspirators committed acts of unfair competition by

13            engaging in a conspiracy to fix and stabilize the price of CRTs as described

14            above;

15      b.     Defendants' and their co-conspirators' acts, omissions, misrepresentations,

16            practices and non-disclosures, as described above, constitute a common,

17            continuous and continuing course of conduct of unfair competition by means of

18            unfair, unlawful and/or fraudulent business acts or practices, including, but not

19            limited to violation of Section 1 of the Sherman Act;

20      c.     Defendants' and their co-conspirators' acts, omissions, misrepresentations,

21            practices and non-disclosures are unfair, unconscionable, unlawful and/or

22            fraudulent independently of whether they constitute a violation of the Sherman

23            Act;

24      d.     Defendants' and their co-conspirators' acts or practices are fraudulent or

25            deceptive;

26      e.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and

27            perfected within Florida; and

28

1          f.       During the Relevant Period, the following Plaintiffs purchased CRTs in Florida:

2                   Target, Sears and Kmart.  As a result, eachTarget is entitled to the protection of

3                   the laws of Florida.

4    266. 271. By reason of the foregoing, Defendants and their co-conspirators also have entered

5    into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et*

6    *seq*.

7          a.       Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

8                   eliminated competition in the sale of CRTs in Illinois and fixed, raised,

9                   maintained and stabilized CRT prices in Illinois at artificially high, non-

10                  competitive levels;

11         b.       As a result, Defendants and their co-conspirators' conspiracy substantially

12                  affected Illinois commerce;

13         c.       During the Relevant Period, the following Plaintiffs purchased CRTs in Illinois:

14                  Target, Sears, Kmart and Old Comp.  As a result, eachTarget is entitled to the

15                  protection of the laws of Illinois; and

16         d.       As a direct and proximate result of Defendants' and their co-conspirators'

17                  conduct, each of those PlaintiffsTarget has been injured in its business and

18                  property by paying more for CRTs manufactured by Defendants, their co-

19                  conspirators, and others than it would have paid in the absence of Defendants and

20                  their co-conspirators' combination and conspiracy, and is therefore entitled to

21                  relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

22   267. 272. By reason of the foregoing, Defendants and their co-conspirators also have entered

23   into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*.

24         a.       Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

25                  eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained

26                  and stabilized CRT prices in Iowa at artificially high, non-competitive levels;

27         b.       As a result, Defendants and their co-conspirators' conspiracy substantially

28

1    affected Iowa commerce;

2    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa:

3    Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Iowa;

4    and

5    d.    As a direct and proximate result of Defendants' and their co-conspirators'

6    conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

7    property by paying more for CRTs manufactured by Defendants, their co-

8    conspirators, and others than it would have paid in the absence of Defendants and

9    their co-conspirators' combination and conspiracy, and is therefore entitled to

10    relief under Iowa Code §§ 553.1, *et seq*.

11    268. ~~273.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

12    into an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.

13    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

14    eliminated competition in the sale of CRTs in Kansas and fixed, raised,

15    maintained and stabilized CRT prices in Kansas at artificially high, non-

16    competitive levels;

17    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

18    affected Kansas commerce;

19    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:

20    Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Kansas;

21    and

22    d.    As a direct and proximate result of Defendants' and their co-conspirators'

23    conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

24    property by paying more for CRTs manufactured by Defendants, their co-

25    conspirators, and others than it would have paid in the absence of Defendants and

26    their co-conspirators' combination and conspiracy, and is therefore entitled to

27    relief under Kansas Stat. Ann. §§ 50-101, *et seq*.

28

1    269.   274. By reason of the foregoing, Defendants and their co-conspirators also have engaged

2    in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

3         a.    Defendants and their co-conspirators committed acts of unfair competition by

4               engaging in a conspiracy to fix and stabilize the price of CRTs as described

5               above;

6         b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

7               practices and non-disclosures, as described above, constitute a common,

8               continuous and continuing course of conduct of unfair competition by means of

9               unfair, unlawful and/or fraudulent business acts or practices, including, but not

10              limited to violation of Section 1 of the Sherman Act;

11        c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

12              practices and non-disclosures are unfair, unconscionable, unlawful and/or

13              fraudulent independently of whether they constitute a violation of the Sherman

14              Act;

15        d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

16              deceptive;

17        e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

18              perfected within Massachusetts; and

19        f.    During the Relevant Period, the following Plaintiffs purchased CRTs in

20              Massachusetts: Sears and RadioShack.  As a result, eachRadioShack is entitled to

21              the protection of the laws of Massachusetts.

22    270.   275. By reason of the foregoing, Defendants and their co-conspirators also have entered

23    into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

24        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

25              eliminated competition in the sale of CRTs in Michigan and fixed, raised,

26              maintained and stabilized CRT prices in Michigan at artificially high, non-

27              competitive levels;

28

67

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Michigan commerce;

c.      During the Relevant Period, the following Plaintiffs purchased CRTs in Michigan:  Target~~, Sears and Kmart~~.  As a result, ~~each~~Target is entitled to the protection of the laws of Michigan; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, ~~each of those Plaintiffs~~Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

271. ~~276.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

c.      During the Relevant Period, the following Plaintiffs purchased CRTs in Minnesota:  Target~~, Sears and Kmart~~.  As a result, ~~each~~Target is entitled to the protection of the laws of Minnesota; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, ~~each of those Plaintiffs~~Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to

1   relief under Minnesota Stat. §§ 325D.50, *et seq.*

2   272. ~~277.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

3   into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

4       a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

5           eliminated competition in the sale of CRTs in Mississippi and fixed, raised,

6           maintained and stabilized CRT prices in Mississippi at artificially high, non-

7           competitive levels;

8       b.    As a result, Defendants and their co-conspirators' conspiracy substantially

9           affected Mississippi commerce;

10      c.    During the Relevant Period, the following Plaintiffs purchased CRTs in

11          Mississippi: ~~Sears and~~ RadioShack.  As a result, ~~each Plaintiff~~ RadioShack is

12          entitled to the protection of the laws of Mississippi; and

13      d.    As a direct and proximate result of Defendants' and their co-conspirators'

14          conduct, ~~each of those Plaintiffs~~ RadioShack has been injured in its business and

15          property by paying more for CRTs manufactured by Defendants, their co-

16          conspirators, and others than it would have paid in the absence of Defendants and

17          their co-conspirators' combination and conspiracy, and is therefore entitled to

18          relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

19  ~~278. By reason of the foregoing, Defendants and their co-conspirators also have entered into an~~

20  ~~agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*~~

21  ~~a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or~~

22  ~~eliminated competition in the sale of CRTs in Nebraska and fixed, raised,~~

23  ~~maintained and stabilized CRT prices in Nebraska at artificially high, non-~~

24  ~~competitive levels;~~

25  ~~b. As a result, Defendants and their co-conspirators' conspiracy substantially affected~~

26  ~~Nebraska commerce;~~

27  ~~c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nebraska:~~

28

**SECOND** AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-~~5514~~05514

1    Sears and Kmart.  As a result, each is entitled to the protection of the laws of

2    Nebraska; and

3    d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

4    each of those Plaintiffs has been injured in its business and property by paying

5    more for CRTs manufactured by Defendants, their co-conspirators, and others

6    than it would have paid in the absence of Defendants and their co-conspirators'

7    combination and conspiracy, and is therefore entitled to relief under Nebraska

8    Stat. §§ 59-801, *et seq.*

9    279. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

10   agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

11   a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

12   eliminated competition in the sale of CRTs in Nevada and fixed, raised,

13   maintained and stabilized CRT prices in Nevada at artificially high, non-

14   competitive levels;

15   b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

16   Nevada commerce;

17   c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nevada:  Sears

18   and Kmart.  As a result, each is entitled to the protection of the laws of Nevada;

19   and

20   d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

21   each of those Plaintiffs has been injured in its business and property by paying

22   more for CRTs manufactured by Defendants, their co-conspirators, and others

23   than it would have paid in the absence of Defendants and their co-conspirators'

24   combination and conspiracy, and is therefore entitled to relief under Nevada Rev.

25   Stat. Ann. §§ 598A, *et seq.*

26   280. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

27   agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

28

1          a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

2                  eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

3                  maintained and stabilized CRT prices in New Mexico at artificially high, non-

4                  competitive levels;

5          b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

6                  New Mexico commerce;

7          c. During the Relevant Period, the following Plaintiffs purchased CRTs in New Mexico:

8                  Sears.  As a result, each is entitled to the protection of the laws of New Mexico;

9                  and

10         d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

11                 each of those Plaintiffs has been injured in its business and property by paying

12                 more for CRTs manufactured by Defendants, their co-conspirators, and others

13                 than it would have paid in the absence of Defendants and their co-conspirators'

14                 combination and conspiracy, and is therefore entitled to relief under New Mexico

15                 Stat. Ann. §§ 57-1-1, *et seq.*

16       273. 281. By reason of the foregoing, Defendants and their co-conspirators also have entered

17 into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

18         a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

19                 eliminated competition in the sale of CRTs in New York and fixed, raised,

20                 maintained and stabilized CRT prices in New York at artificially high, non-

21                 competitive levels;

22         b.     As a result, Defendants and their co-conspirators' conspiracy substantially

23                 affected New York commerce;

24         c.     During the Relevant Period, the following Plaintiffs purchased CRTs in New

25                 York:  Target and Sears.  As a result, each Target is entitled to the protection of

26                 the laws of New York; and

27         d.     As a direct and proximate result of Defendants' and their co-conspirators'

28

1    conduct, ~~each of those Plaintiffs~~Target has been injured in their business and

2    property by paying more for CRTs manufactured by Defendants, their co-

3    conspirators, and others than it would have paid in the absence of Defendants and

4    their co-conspirators' combination and conspiracy, and is therefore entitled to

5    relief under New York General Business Law §§ 340, *et seq.*

6    274. ~~282.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

7    into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

8    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

9    eliminated competition in the sale of CRTs in North Carolina and fixed, raised,

10   maintained and stabilized CRT prices in North Carolina at artificially high, non-

11   competitive levels;

12   b.    As a result, Defendants and their co-conspirators' conspiracy substantially

13   affected North Carolina commerce;

14   c.    During the Relevant Period, the following Plaintiffs purchased CRTs in North

15   Carolina:  Target~~, Sears and Kmart~~.  As a result, ~~each~~Target is entitled to the

16   protection of the laws of North Carolina; and

17   d.    As a direct and proximate result of Defendants' and their co-conspirators'

18   conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

19   property by paying more for CRTs manufactured by Defendants, their co-

20   conspirators, and others than it would have paid in the absence of Defendants and

21   their co-conspirators' combination and conspiracy, and is therefore entitled to

22   relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

23   275. ~~283.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

24   into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

25   a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

26   eliminated competition in the sale of CRTs in Wisconsin and fixed, raised,

27   maintained and stabilized CRT prices in Wisconsin at artificially high, non-

28

1    competitive levels;

2    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

3          affected Wisconsin commerce;

4    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in

5          Wisconsin:  Target ~~and Sears~~.  As a result, ~~each~~Target is entitled to the protection

6          of the laws of Wisconsin; and

7    d.    As a direct and proximate result of Defendants' and their co-conspirators'

8          conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

9          property by paying more for CRTs manufactured by Defendants, their co-

10         conspirators, and others than it would have paid in the absence of Defendants and

11         their co-conspirators' combination and conspiracy, and is therefore entitled to

12         relief under Wisconsin Stat. §§ 133.01, *et seq.*

13   **XI.**   ~~X.~~**PRAYER FOR RELIEF**

14         WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and

15   decreeing that:

16         A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1

17   of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of

18   ~~California,~~ Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota,

19   Mississippi ~~, Nebraska, Nevada, New Mexico~~, New York, North Carolina, and Wisconsin, and Plaintiffs

20   were injured in their business and property as a result of Defendants' violations;

21         B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state

22   antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants

23   in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

24         C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the

25   respective officers, directors, partners, agents and employees thereof, and all other persons acting or

26   claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and

27   maintaining the combination, conspiracy or agreement alleged herein;

28

1   D.   Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest

2   shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this

3   action;

4   E.   Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

5   provided by law; and

6   F.   Plaintiffs shall receive such other or further relief as may be just and proper.

7   ///

8   ///

9   ///

10   ///

11   ///

12   ///

13   **XII.** ~~XI.~~ **JURY TRIAL DEMAND**

14   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

15   claims asserted in this Complaint so triable.

16   Dated:                                          Respectfully submitted

17   _____

18   Jason C. Murray (CA Bar No. 169806)
     CROWELL & MORING LLP

19   515 South Flower St., 40th Floor
     Los Angeles, CA  90071

20   Telephone:  213-443-5582
     Facsimile:  213-622-2690

21   Email: jmurray@crowell.com

22   ~~Jeffrey H. Howard~~ *(pro hac vice)*
     Jerome A. Murphy *(pro hac vice)*

23   Astor H.L. Heaven *(pro hac vice)*
     CROWELL & MORING LLP

24   1001 Pennsylvania Avenue, N.W.
     Washington, D.C. 20004

25   Telephone:  202-624-2500
     Facsimile:  202-628-5116

26   E-mail:  ~~jhoward~~jmurphy@crowell.com
              ~~jmurphy~~  _aheaven@crowell.com

27   *Counsel for Target Corp.~~, Sears, Roebuck and Co.;~~*

28

*Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;*and
*RadioShack Corp.*

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-55140 5514