# **<u>EXHIBIT A</u>**

1   David J. Burman (admitted *pro hac vice*)
    DBurman@perkinscoie.com
2   Cori G. Moore (admitted *pro hac vice*)
    CGMoore@perkinscoie.com
3   Eric J. Weiss (admitted *pro hac vice*)
    EWeiss@perkinscoie.com
4   Nicholas H. Hesterberg (admitted *pro hac vice*)
    NHesterberg@perkinscoie.com
5   **PERKINS COIE LLP**
    1201 Third Avenue, Suite 4900
6   Seattle, WA  98101-3099
    Telephone:  206.359.8000
7   Facsimile:  206.359.9000

8   Joren S. Bass, Bar No. 208143
    JBass@perkinscoie.com
9   **PERKINS COIE LLP**
    Four Embarcadero Center, Suite 2400
10  San Francisco, CA  94111-4131
    Telephone:  415.344.7120
11  Facsimilie:  415.344.7320

12  Attorneys for Plaintiff
    COSTCO WHOLESALE CORPORATION
13

14                  UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17  COSTCO WHOLESALE CORPORATION, | Master File No. 3:07-cv-05944-SC |
| 18                    Plaintiff, | MDL No. 1917 |
| 19          v. | Individual Case No. 3:11-cv-06397 |
| 20  HITACHI, LTD.; HITACHI DISPLAYS, LTD.; | FIRST AMENDED COMPLAINT AND JURY DEMAND |
| 21  HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES | |
| 22  (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO | |
| 23  GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY | |
| 24  DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG | |
| 25  ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; | |
| 26  BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS | |
| 27  ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA | |
| 28  CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA | |

1  AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO.,
2  LTD.; SAMSUNG ELECTRONICS AMERICA,
INC.; SAMSUNG SDI CO., LTD.; SAMSUNG
3  SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
4  BRASIL LTDA.; SHENZHEN SAMSUNG SDI
CO., LTD.; TIANJIN SAMSUNG SDI CO.,
5  LTD.; SAMSUNG SDI (MALAYSIA) SDN.
BHD.; SAMTEL COLOR LTD.; THAI CRT
6  CO., LTD.; TOSHIBA CORPORATION;
TOSHIBA AMERICA, INC.; TOSHIBA
7  AMERICA CONSUMER PRODUCTS, LLC;
TOSHIBA AMERICA ELECTRONIC
8  COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.;
9  CHUNGHWA PICTURE TUBES, LTD.;
CHUNGHWA PICTURE TUBES
10  (MALAYSIA); TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
11  ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
12  MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.
13
                              Defendants.
14

15        Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive

16  relief under the antitrust laws of the United States and of the states of California, Arizona,

17  Florida, Illinois, and Washington.  Costco alleges as follows based on information including the

18  pleas and prosecutions of certain Defendants and their executives as well as allegations in the

19  complaints of the direct and indirect purchaser classes and of other direct action plaintiffs,

20  allegations that were in some cases tested by motions to dismiss in MDL No. 1917.

21                                **INTRODUCTION**

22        1.        Defendants and their co-conspirators formed an international cartel that conducted a

23  conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the

24  "Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or

25  maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs").  The effects

26  of the conspiracy on prices lasted into at least 2008.

27

28

2

2.    Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them are referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.    Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.  The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.    Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.    Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

6.    The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in

3

greater detail below.  There were at least 500 conspiracy meetings and communications during the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from the highest levels of the companies, as well as regional managers and others.

7.      The conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      Throughout the Relevant Period, the conspiracy moderated the normal downward pressure on prices caused by periods of oversupply, process and other efficiency gains, and technological change.  The prices of producers who were not members of the conspiracy were also higher as a result of the conspiracy than they otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when prices declined, they declined from supra-competitive levels, rather than levels set by free and open competition, and prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any source than it would have paid in a competitive market.

10.     During the Relevant Period, Costco purchased CRT Products in the United States directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

4

**PARTIES**

**A.     Plaintiff**

11.     Plaintiff Costco Wholesale Corporation is now a Washington corporation with its principal place of business in Issaquah, Washington.  Costco operates throughout the United States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

12.     Costco Wholesale Corporation is the result of the combination of two companies: Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to 76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993, Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware.  As the new name suggested, the two companies were not fully integrated for many years, and the company had two principal executive offices, in San Diego, California, and Kirkland, Washington.  Many headquarters functions continued in California during the Relevant Period.  In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in Washington.

13.     During the Relevant Period, Costco purchased in the United States large numbers of CRT Products whose prices were inflated by the conspiracy.  Costco purchased and sold more such CRT Products in California than in any other state during the Relevant Period.  Costco's negotiations for the purchase of CRT Products took place primarily in the United States, and the basic choice of vendors was made from the company's headquarters.  Decisions among approved vendors and as to volumes to purchase were made in, and Costco purchase orders were created in and issued from, regional offices located in multiple states including California, Washington, Texas, Virginia, and Georgia.  Costco issued more purchase orders for CRT Products from California than from any other state.  The purchase orders reflected the volumes affected by and incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to Costco in Washington, with the invoices reflecting volumes and prices specified in purchase orders issued from the regional offices.

14.     Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida.  Costco received far more CRT Products in California than in any other state.

15.     Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16.     Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business.  There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations.  Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B.     Defendants**

     **1.     Hitachi Entities**

17.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi,

6

1    Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant

2    Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either

3    directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi,

4    Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to

5    the antitrust violations alleged in this complaint.

6              19.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

7    with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.

8    Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During

9    the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT

10   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11   Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

12   America relating to the antitrust violations alleged in this complaint.

13             20.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

14   principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

15   528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

16   During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT

17   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18   Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

19   Asia relating to the antitrust violations alleged in this complaint.

20             21.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

21   corporation with its principal place of business located at 208 Fairforest Way, Greenville, South

22   Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During

23   the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either

24   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi,

25   Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS

26   relating to the antitrust violations alleged in this complaint.

27             22.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

28   Shenzhen") was a Chinese company with its principal place of business located at 5001

7

Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

23.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

**2.     IRICO Entities**

24.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

25.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  The website also claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this complaint.

8

26.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.     Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.      LG Electronics Entities**

28.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

29.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

9

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

### 4.     LP Displays

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.     BMCC

33.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  BMCC is the second

10

largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.      Philips Entities**

34.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Breitner Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.      Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips America relating to the antitrust violations alleged in this complaint.

36.      Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11

1    Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips

2    Taiwan relating to the antitrust violations alleged in this complaint.

3         37.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

4    Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

5    andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

6    controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

7    manufactured, marketed, sold, and distributed CRT Products, either directly or through its

8    subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

9    controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations

10   alleged in this complaint.

11        38.    Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are

12   collectively referred to as "Philips."

13        **7.    Samsung Entities**

14        39.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company

15   with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

16   dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.

17   During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products,

18   either directly or through subsidiaries or affiliates, throughout the United States.

19        40.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

20   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

21   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

22   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed

23   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

24   States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung

25   SEAI relating to the antitrust violations alleged in this complaint.

26        41.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

27   ("Samsung SDI") is a South Korean company with its principal place of business located at 575

28   Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

1  major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims

2  to be the world's leading company in the display and energy business, with 28,000 employees and

3  facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the

4  market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San

5  Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or

6  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7  United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

8  Samsung SDI relating to the antitrust violations alleged in this complaint.

9        42.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

10  corporation with its principal place of business located at 3333 Michelson Drive, Suite 700,

11  Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

12  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

13  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

14  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

15  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

16  violations alleged in this complaint.

17        43.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a

18  Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

19  Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned

20  and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

21  Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through

22  its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

23  dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to

24  the antitrust violations alleged in this complaint.

25        44.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

26  company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

27  Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and

28  controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

13

1  Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through

2  its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

3  dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

4  antitrust violations alleged in this complaint.

5          45.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

6  Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

7  Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

8  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

9  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

10  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

11  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

12  violations alleged in this complaint.

13          46.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

14  company with its principal place of business located at Developing Zone of Yi-Xian Park,

15  Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

16  subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

17  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

18  subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

19  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

20  antitrust violations alleged in this complaint.

21          47.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

22  Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

23  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

24  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

25  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

26  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27  United States.  Defendants SEC and Samsung SDI dominated and controlled the finances,

28

14

policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

48.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia and their subsidiaries and affiliates are collectively referred to as "Samsung."

### 8.     Samtel

49.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.     Thai CRT

50.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.     Toshiba Entities

51.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC consolidated its CRT business into MTPD, a joint venture with co-conspirator

15

1   Panasonic Corporation.  During the Relevant Period, TC manufactured, marketed, sold, and

2   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

3   United States.

4          52.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

5   with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

6   York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of

7   Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant TC dominated and controlled the finances, policies, and affairs of

10  Toshiba America relating to the antitrust violations alleged in this complaint.

11         53.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

12  liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.

13  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

14  During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products,

15  either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

16  TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust

17  violations alleged in this complaint.

18         54.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

19  California corporation with its principal place of business located at 19900 MacArthur Boulevard,

20  Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

21  Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

22  marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or

23  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

24  policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

25         55.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

26  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

27  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

28  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and

16

1    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

2    United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAIS

3    relating to the antitrust violations alleged in this complaint.

4          56.     Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively

5    referred to as "Toshiba."

6          **11.     Chunghwa Entities**

7          57.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

8    company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

9    Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

10   Chunghwa PT's CRTs received certification by the United States, giving the company entry into

11   that market.  Chunghwa PT's Board of Directors includes representatives from Tatung Company,

12   and its Chairman is also the Chairman and General Manager of Tatung Company.  Throughout

13   the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the

14   Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly

15   or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United

16   States.

17         58.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

18   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

19   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

20   owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

21   production, and it has established itself as one of the leading worldwide suppliers of CRTs.

22   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

23   Products either directly or through its subsidiaries or affiliates throughout the United States.

24   Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of

25   Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

26         59.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as

27   "Chunghwa."

28

17

### 12.     Thomson Entities

60.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

61.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer

18

1    Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was

2    sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics

3    manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

4    through its subsidiaries or affiliates, to customers throughout the United States.

5            62.     Thomson SA and Thomson Consumer Electronics are collectively referred to

6    herein as "Thomson."

7        **13.    Mitsubishi Entities**

8            63.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a

9    Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

10   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

11   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

12   internally to Mitsubishi's television and monitor manufacturing division and to other television

13   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

14   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

15   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

16   United States.

17           64.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric

18   USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.

19   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

20   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

21   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

22   and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

23   and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

24   CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

25   marketed, sold and distributed CRT Products in the United States.

26           65.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

27   United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi

28   Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period,

19

1    Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and

2    monitors in the United States.

3         66.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

4    collectively referred to herein as "Mitsubishi."

5    **C.    Agents and Co-Conspirators**

6         67.    The acts alleged against Defendants in this Complaint were authorized, ordered, or

7    done by their officers, agents, employees, or representatives while actively engaged in the

8    management and operation of Defendants' businesses or affairs.

9         68.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other

10   Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

11        69.    When Plaintiff refers to a corporate family or companies by a single name in

12   allegations of participation in the conspiracy, it is to be understood that one or more employees or

13   agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

14   every company in that family.  In fact, the individual participants in the conspiratorial meetings

15   and discussions did not always know the corporate affiliation of their counterparts, nor did they

16   distinguish between the entities within a corporate family.

17        70.    Individual participants entered into agreements on behalf of, and reported these

18   meetings and discussions to, their respective corporate families.  As a result, the entire corporate

19   families were represented in meetings and discussions by their agents and were parties to the

20   agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate

21   families distributed CRT Products, these subsidiaries played a significant role in the conspiracy

22   because Defendants wished to ensure that the prices for such products would not undercut the

23   pricing agreements reached at these various meetings.  Thus, all entities within the corporate

24   families were active, knowing participants in the alleged conspiracy.

25        71.    Various persons or firms not named as Defendants participated as co-conspirators

26   in the alleged violations, performed acts, and made statements in furtherance of the conspiracy,

27   and manufactured, sold, and distributed CRT Products to customers in the United States.  These

28   co-conspirators include, but are not limited to: Panasonic Corporation (f/k/a Matsushita Electric

20

1   Industrial Co., Ltd.), Panasonic Corporation of North America ("PCNA"), MT Picture Display

2   Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co., Ltd.) ("MTPD"), Matsushita Electronic

3   Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia"), Videocon Industries, Ltd., , Orion

4   Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, PT.MT Picture

5   Display Indonesia, P.T. Tosummit Electronic Devices Indonesia ("TEDI"), and Toshiba Display

6   Devices (Thailand) Co., Ltd.  Plaintiff reserves the right to name some or all of these and other

7   co-conspirators as Defendants at a later date.

8   **JURISDICTION AND VENUE**

9   72.     Plaintiff brings this action to obtain injunctive relief and to recover damages,

10   including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants'

11   violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California,

12   Washington, Arizona, Florida, and Illinois.

13   73.     This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and

14   26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman

15   Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C.

16   § 1331, which provides this Court with original jurisdiction over actions arising under the laws of

17   the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over

18   any action arising under federal laws regulating commerce or protecting commerce against

19   restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C.

20   § 1332 or, alternatively, 28 U.S.C. § 1367.

21   74.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28

22   U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in

23   this district and a substantial portion of affected interstate commerce was carried out in this

24   district.

25   75.     Defendants are subject to the jurisdiction of this Court by virtue of their

26   nationwide contacts and other activities, as well as their contacts with the State of Washington.

27

28

21

76.     Related cases are pending in MDL No. 1917 in the Northern District of California, and this matter should be consolidated there for pretrial purposes but returned to this district for trial.

## FACTS AND BACKGROUND

A.     **CRT Technology**

77.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue, and black.

78.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

79.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

80.     Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

81.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors

22

and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

82.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.  The market for CRTs and the market for the products into which they are placed are inextricably intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are effectively inseparable. Defendants are well aware of this intimate relationship.

83.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

84.     Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, non-defendant original equipment manufacturers ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' conspiracy.

**B.      Structure of the CRT Industry**

85.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.      Market Concentration**

86.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members

23

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2. Information Sharing

87. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

88. Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

89. The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

### 4. Multiple Interrelated Business Relationships

90. The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

91. Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

24

a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.  The formation of the CRT joint venture MTPD in 2003.

d.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

e.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

f.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

g.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips.

h.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

25

i.      Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

j.      Defendant Samtel claims to have supplied CRTs to Defendants including LG Electronics, Samsung, and Philips.

**5.      High Costs of Entry Into the Industry**

92.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources, and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

93.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      Maturity of the CRT Product Market**

94.      Newer industries typically are characterized by rapid growth, innovation, and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

95.      Demand for CRT Products was declining through most or all of the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

96.      In addition, conventional CRT televisions and computer monitors were being replaced by LCD and plasma displays.  This was one of the factors which led Defendants to engage in price-fixing to slow the decline of CRT Product prices.  Between 2000 and 2006,

26

revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

97.     Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during most of the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

98.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

99.     As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.     Homogeneity of CRT Products**

100.     CRT Products are commodity-like products manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

101.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.     Pre-Conspiracy Market**

102.     The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years, and these Defendant employees would exchange market information on production, capacity, and customers.

27

103.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

104.     To control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least March, 1995, through at least November 25, 2007.

105.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings and other communications and activities.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

106.     Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

107.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

108.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.     "Glass Meetings"**

109.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three levels of Defendants' corporations.

28

110.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

111.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

112.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

113.   The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

114.   Glass meetings also occurred occasionally in European countries.  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays,

29

1   Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo),

2   IRICO, and Thomson.  Chunghwa also attended these meetings.

3        115.    Representatives of Defendants also attended what were known in the conspiracy as

4   "green meetings."  These were meetings held on golf courses.  The green meetings were generally

5   attended by top and management level employees of Defendants.

6        116.    During the Relevant Period, glass meetings took place in Taiwan, South Korea,

7   Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

8        117.    Participants would often exchange competitively sensitive information prior to a

9   glass meeting.  This included information on inventories, production, sales, and exports.  For

10  some such meetings, where information could not be gathered in advance of the meeting, it was

11  brought to the meeting and shared.

12       118.    The glass meetings at all levels followed a fairly typical agenda.  First, the

13  participants exchanged competitive information such as proposed future CRT pricing, sales

14  volume, inventory levels, production capacity, exports, customer orders, price trends and

15  forecasts of sales volumes for coming months.  The participants also updated the information they

16  had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who

17  would write the information on a white board.  The meeting participants then used this

18  information to discuss and agree upon what price each would charge for CRTs to be sold in the

19  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

20  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of

21  CRTs that were sold to specific customers, and agreed upon target prices to be used in

22  negotiations with large customers.  Having analyzed the supply and demand, the participants

23  would also discuss and agree upon production cutbacks.

24       119.    During periods of oversupply, the focus of the meeting participants turned to

25  making controlled and coordinated price reductions.  This was referred to as setting a "bottom

26  price."

27       120.    Defendants' conspiracy included agreements on the prices at which certain

28  Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

1   end products, such as televisions and computer monitors.  Defendants realized the importance of

2   keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

3   pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser

4   OEMs paid supracompetitive prices for CRTs.

5        121.    Each of the participants in these meetings knew, and in fact discussed, the

6   significant impact that the price of CRTs had on the cost of the finished products into which they

7   were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

8   were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

9   increases stick, they needed to make the increase high enough that their direct customers (CRT

10   TV and monitor makers) would be able to justify a corresponding price increase to their

11   customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

12        122.    The agreements reached at the glass meetings included:

13          a.    agreements on CRT prices, including establishing target prices, "bottom"

14              prices, price ranges, and price guidelines;

15

16          b.    placing agreed-upon price differentials on various attributes of CRTs, such

17              as quality or certain technical specifications;

18          c.    agreements on pricing for intra-company CRTs sales to vertically

19              integrated customers;

20          d.    agreements as to what to tell customers about the reason for a price

21              increase;

22

23          e.    agreements to coordinate with competitors that did not attend the group

24              meetings and agreements with them to abide by the agreed-upon pricing;

25          f.    agreements to coordinate pricing with CRT manufacturers in other

26              geographic markets such as Brazil, Europe, and India;

27

28

g.     agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demands;

h.     agreements to coordinate uniform public statements regarding available capacity and supply;

i.     agreements to allocate both overall market shares and share of a particular customer's purchases;

j.     agreements to allocate customers;

k.     agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.     agreements to keep their meetings secret.

123.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

124.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns about antitrust liability.

### 2.    Bilateral Discussions

125.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal

32

than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

126.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

127.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

128.    To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States. These CRT manufacturers were particularly important because they served the North American market for CRT Products.  North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained, and stabilized at supracompetitive levels.

129.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

130.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements

33

to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

131.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

132.   Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

133.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

34

134.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

135.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

136.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

137.     Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with the Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

138.     PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants and their co-conspirators wished

35

1    to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

2    pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing

3    participant in the alleged conspiracy.

4         139.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

5    glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

6    These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

7    bilateral discussions with the Defendants.  Through these discussions, MTPD agreed on prices

8    and supply levels for CRTs.

9         140.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

10   meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

11   engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese

12   CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for

13   CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the

14   Chinese government.  BMCC was acting to further its own independent private interests in

15   participating in the alleged conspiracy.

16        141.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

17   Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

18   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

19   LP Displays).  A substantial number of these meetings were attended by high level executives

20   from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

21   Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

22   effectively withdrew from this conspiracy.

23        142.    Defendants Philips America and Philips Brazil were represented at those meetings

24   and were a party to the agreements entered at them.  To the extent Philips America and Philips

25   Brazil sold or distributed CRT Products to direct purchasers, they played a significant role in the

26   conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct

27   purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus,

28   Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

36

143.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

144.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

145.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

146.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

147.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this

37

1    conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July

2    2005. Thomson has admitted to the European Commission that it played a role in the conspiracy.

3            148.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

4    bilateral meetings with its competitors. These meetings were attended by high level sales

5    managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices,

6    production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

7    allocation, and new product development, and agreed on prices and supply levels for CRTs.

8    Mitsubishi never effectively withdrew from this conspiracy.

9            149.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT, and

10   TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT

11   conspiracy through MTPD. These meetings were attended by high level sales managers from

12   Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other

13   Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and

14   supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

15           150.    Defendants Toshiba America, TACP, TAEC, and TAIS were represented at those

16   meetings and were a party to the agreements entered at them. To the extent Toshiba America,

17   TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they played a

18   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

19   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

20   glass meetings. Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing

21   participants in the alleged conspiracy.

22           151.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

23   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

24   participated in at least 100 glass meetings at all levels. A substantial number of these meetings

25   were attended by the highest ranking executives from Chunghwa, including the former Chairman

26   and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each

27   of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on

28   prices and supply levels for CRTs.

152.     Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

153.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

**E.     The CRT Market During the Conspiracy**

154.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

155.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.

**F.     International Government Antitrust Investigations**

156.     Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

39

157.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

158.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

159.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

160.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

161.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states

40

that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

162.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

163.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

164.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.  The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

165.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the

1  CRT market.  The companies fined by the European Commission included Chunghwa, LG

2  Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

3  Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

4  for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

5  behavior that are strictly forbidden to companies doing business in Europe."  The press release

6  accompanying the fines further notes that the CRT cartels were "among the most organised

7  cartels that the Commission has investigated."

8      166.    Several Defendants also have a history of "cooperation" and anticompetitive

9  conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of

10 Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random

11 Access Memory ("DRAM").

12     167.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.

13 Department of Justice as part of an ongoing investigation for fixing prices of Static Random

14 Access Memory ("SRAM") and NAND Flash Memory.

15     168.    In December 2006, government authorities in Japan, Korea, the European Union

16 and the United States revealed a comprehensive investigation into anticompetitive conduct in the

17 closely-related TFT-LCD market.

18     169.    On November 12, 2008, the DOJ announced that it had reached agreements with

19 three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America,

20 Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of the

21 Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a

22 conspiracy to fix prices of TFT-LCD panels.

23     170.    On March 10, 2009, the DOJ announced that it had reached an agreement with

24 Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations

25 of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a

26 conspiracy to fix the prices of LCD panels.

27

28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

### G.     The Role of Trade Associations During the Relevant Period

171.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

172.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

173.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

174.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

43

175.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.    Effects of the Conspiracy**

176.    The conspiracy has had the following effects, among others:

a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

b.    Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.    Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

177.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.

178.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## FRAUDULENT CONCEALMENT

179.    Costco had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Costco did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least late November 2007, when investigations by the United States and other antitrust authorities became widely reported.  Defendants' secret conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

44

180.    Because Defendants' conspiracy was kept secret, Plaintiff was unaware of Defendants' unlawful conduct and did not know that it was paying artificially high prices for CRT Products.

181.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

182.    Defendants' price-fixing conspiracy was inherently self-concealing.

183.    Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.  The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

184.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at

45

1    such meetings to avoid being seen in public with each other and with the express purpose and

2    effect of keeping them secret.

3        185.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual

4    reasons for price increases and output reductions to their customers.

5        186.    Despite the ever-increasing popularity of, and intensifying competition from, flat

6    panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout

7    1995 according to a CNET News.com article.  This price stabilization was purportedly due

8    exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal

9    the conspiracy.

10       187.    In early 1999, despite declining production costs and the rapid entry of flat panel

11   display products, the price of large-sized color CRTs actually rose.  The price increase was

12   allegedly based on increasing global demand for the products.  In fact, this price rise was the

13   result of collusive conduct amongst Defendants.

14       188.    As alleged above, despite increased competition from flat panel monitors, prices

15   for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

16   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

17   This was a pretext used to cover up the conspiracy.

18       189.    In addition, when several CRT manufacturers, including Defendants Samsung,

19   Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a

20   shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a

21   Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of

22   glass shells] is a global phenomena and every company has to increase the prices of CRT

23   monitors in due course of time."

24       190.    Manufacturers such as LG Electronics periodically issued press statements falsely

25   asserting that CRT prices were being driven lower by intense competition.

26       191.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported

27   reasons for the price increases of CRTs were materially false and misleading and made for the

28   purpose of concealing Defendants' anti-competitive scheme as alleged herein.

46

192. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

193. As discussed at length in Paragraphs 158-72 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009. Costco's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

194. Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

195. As shown by Costco's allegations in Paragraphs 1 and 10 and the following causes of action, Costco was a member of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

196. Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

197. Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

47

198. In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

199. As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

200. The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

201. For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

202. As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

**SECOND CAUSE OF ACTION**
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

203. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

204. Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

48

205.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

206.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**THIRD CAUSE OF ACTION**
**(Violation of the Washington Consumer Protection Act, RCW 19.86.030)**

207.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 184 above.

208.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

209.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

210.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

49

1

2

**FOURTH CAUSE OF ACTION**
**(Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)**

3

4

211.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

5

6

7

212.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

8

9

10

213.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

11

12

13

14

15

16

17

214.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

18

19

**FIFTH CAUSE OF ACTION**
**(Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat.**
**§ 501.201, *et seq.*)**

20

21

215.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

22

23

216.    Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

24

25

217.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

26

27

28

50

218.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently of whether they constitute a violation of the Sherman Act.

219.    Defendants' and their co-conspirators' acts are fraudulent or deceptive.

220.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

221.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**SIXTH CAUSE OF ACTION**
**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

222.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 209 above.

223.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

224.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

225.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.

51

Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D.      Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E.      Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

1      F.      Costco shall recover such other and further relief as the Court deems just.

2    DATED:                              By: _____
                                         David J. Burman (admitted *pro hac vice*)
3                                        Cori G. Moore (admitted *pro hac vice*)
                                         Eric J. Weiss (admitted *pro hac vice*)
4                                        Nicholas H. Hesterberg (admitted *pro hac vice*)
                                         **PERKINS COIE** LLP
5                                        1201 Third Avenue, Suite 4800
                                         Seattle, WA  98101-3099
6                                        Telephone:  206.359.8000
                                         Facsimile:  206.359.9000
7                                        Email:   DBurman@perkinscoie.com
                                                  CGMoore@perkinscoie.com
8                                                 EWeiss@perkinscoie.com
                                                  NHesterberg@perkinscoie.com
9
                                         Joren S. Bass, Bar No. 208143
10                                       **PERKINS COIE** LLP
                                         Four Embarcadero Center, Suite 2400
11                                       San Francisco, CA  94111-4131
                                         Telephone:  415.344.7120
12                                       Facsimilie:  415.344.7320
                                         Email:  JBass@perkinscoie.com
13
                                         Attorneys for Plaintiff
14                                       COSTCO WHOLESALE CORPORATION

15

16

17   LEGAL25416835.5

18

19

20

21

22

23

24

25

26

27

28

53

# **EXHIBIT B**

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Roman M. Silberfeld, Bar No. 62783
RMSilberfeld@rkmc.com
David Martinez, Bar No. 193183
DMartinez@rkmc.com
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone:     310-552-0130
Facsimile:     310-229-5800

Attorneys for Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING
LLC; BEST BUY ENTERPRISE SERVICES, INC.;
BEST BUY STORES, L.P.; BESTBUY.COM,
L.L.C.; and MAGNOLIA HI-FI, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEST BUY CO., INC.; BEST BUY PURCHASING LLC; BEST BUY ENTERPRISE SERVICES, INC.; BEST BUY STORES, L.P.; BESTBUY.COM, L.L.C.; and MAGNOLIA HI-FI, LLC, | Case No.  Master File No. 3:07-cv-05944-SC<br><br>MDL No. 1917<br><br>Individual Case No. 3:11-cv-05513-SC |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA | |

CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES
(TAIWAN), LTD.; PHILIPS DA
AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMTEL
COLOR LTD.; THAI CRT CO., LTD.;
TOSHIBA CORPORATION; TOSHIBA
AMERICA, INC.; TOSHIBA AMERICA
CONSUMER PRODUCTS, LLC;
TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA
AMERICA INFORMATION SYSTEMS,
INC.; CHUNGHWA PICTURE TUBES,
LTD.; CHUNGHWA PICTURE TUBES
(MALAYSIA); THOMSON SA;
TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC
CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA,
INC.; MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC. Defendants.

Plaintiffs, Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, LLC (collectively "Plaintiffs" or "Best Buy"), for their Complaint against all Defendants named herein, hereby allege as follows:

I.  **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    referred to collectively herein as "CRT Products."

2         3.      Defendants control the majority of the CRT industry, a multibillion dollar market,

3    which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant

4    Period, virtually every household in the United States owned at least one CRT Product.

5         4.      Since the mid-1990s, the CRT industry faced significant economic pressures as

6    customer preferences for other emerging technologies shrank profits and threatened the

7    sustainability of the industry.  In order to maintain price stability, increase profitability, and

8    decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

9    contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

10   States.

11        5.      With respect to CRTs, Defendants or their agents agreed, *inter alia*, to:  (a) fix

12   target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments,

13   prices, production and customer demand; (c) coordinate public statements regarding available

14   capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

15   of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

16   agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;

17   (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit

18   competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of

19   certain key customers' sales; and (k) restrict output.

20        6.      The conspiracy concerning CRTs commenced with bilateral meetings that began

21   in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995,

22   the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings

23   had become more formalized, as described in greater detail below.  There were at least 500

24   conspiracy meetings during the Relevant Period, including hundreds of group meetings and

25   hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

26   South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

27   meetings included representatives from the highest levels of the respective companies, as well as

28   regional managers and others.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiffs also bring this action pursuant to the Minnesota Antitrust Act of 1971 because Plaintiffs purchased in Minnesota CRT Products from both Defendants and non-Defendant vendors containing price-fixed CRTs manufactured by Defendants.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiffs' antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiffs.

14. This court has jurisdiction over each Defendant named in this action. Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15. Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.** **PARTIES**

    **A.** **Plaintiffs**

16. Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and principal place of business in Richfield, Minnesota. Prior to 2004, Best Buy Co., Inc. operated retail stores throughout the United States and sold CRT Products in those stores.

17. Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and principal places of business in Richfield, Minnesota.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

18.     Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its headquarters and principal place of business in Richfield, Minnesota.  Best Buy Stores, L.P. operates retail stores throughout the United States and sells CRT Products in those stores.

19.     Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its headquarters and principal place of business in Richfield, Minnesota.  BestBuy.com, L.L.C. is a wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

20.     During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for CRT Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C.  These negotiations, purchasing and payments took place out of Best Buy's principal place of business and headquarters in Richfield, Minnesota.

21.     Plaintiff Magnolia Hi-Fi, LLC ("MHF") is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video.  MHF is a specialty consumer electronic retailer that operates several Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and several Magnolia Home Theater stores located within Best Buy stores.  During the Relevant Time Period, MHF's purchasing of CRT Products took place in its headquarters in Kent Washington.

22.     During the Relevant Period, Best Buy purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Best Buy suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

23.     Those products were kept as inventory and sold in Minnesota and every other state where Best Buy retail stores were located, and over the internet throughout the United States.

24.     As a result of the Best Buy Plaintiffs' presence, purchases, and sales in Minnesota, and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled to the protection of the Sherman Act and the antitrust laws of Minnesota.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

B.      **Defendants**

1.      **Hitachi Entities**

25.      Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.      Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

27.      Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28.      Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

- 7 -                          FIRST AMENDED COMPLAINT

During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.      IRICO Entities

32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

33.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

34.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

35.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**3.     LG Electronics Entities**

36.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant

Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

37.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

38.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

39.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.     LP Displays**

40.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

## 5.   **Panasonic Entities**

41.    Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this Complaint.

43.    Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

46.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York  10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured,

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2  affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the

3  finances, policies and affairs of Philips America relating to the antitrust violations alleged in this

4  Complaint.

5      48.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a

6  Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,

7  Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.

8  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT

9  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

10 Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips

11 Taiwan relating to the antitrust violations alleged in this Complaint.

12     49.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

13 Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

14 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

15 controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

16 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

17 subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

18 controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations

19 alleged in this Complaint.

20     50.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

21 collectively referred to herein as "Philips."

22          **7.    Samtel**

23     51.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal

24 place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

25 Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest

26 exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada,

27 Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

28 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries and affiliates, throughout the United States.

2            **8.      Thai CRT**

3            52.      Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

4    Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

5    Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

6    televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

7    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8    United States.

9            **9.      Toshiba Entities**

10           53.      Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

11   place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

12   TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

13   monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-

14   Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

15   TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002,

16   TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the

17   entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured,

18   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

19   affiliates, throughout the United States.

20           54.      Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

21   with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

22   York, New York  10020.  Toshiba America is a wholly-owned and controlled subsidiary of

23   Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold

24   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

25   the United States.  Defendant TC dominated and controlled the finances, policies and affairs of

26   Toshiba America relating to the antitrust violations alleged in this Complaint.

27           55.      Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

28   liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey  07470-3114.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

2   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT

3   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

4   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the

5   antitrust violations alleged in this Complaint.

6        56.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

7   California corporation with its principal place of business located at 19900 MacArthur Boulevard,

8   Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

9   Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

10  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11  affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

12  policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

13       57.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

14  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

15  92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

16  Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or

17  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

18  United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS

19  relating to the antitrust violations alleged in this Complaint.

20       58.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively

21  referred to herein as "Toshiba."

22       **10.    Chunghwa Entities**

23       59.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

24  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

25  Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

26  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

27  that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

28  manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed

FIRST AMENDED COMPLAINT

1    CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou

2    subsidiary) throughout the United States.

3          60.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

4    Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

5    Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

6    owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

7    production, and it has established itself as one of the leading worldwide suppliers of CRTs.

8    During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

9    Products either directly or through its subsidiaries or affiliates throughout the United States.

10   Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa

11   Malaysia relating to the antitrust violations alleged in this Complaint.  Defendants Chunghwa PT

12   and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

13         **12.     Thomson Entities**

14         61.      Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

15   corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

16   Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

17   Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

18   plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs

19   internally to its television-manufacturing division, which had plants in the United States and

20   Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's

21   television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

22   televisions were sold in the United States to consumers under the RCA brand.  In November 2003,

23   Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL

24   Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-

25   Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by

26   TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

27   brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT

28   business to Videocon.  During the Relevant Period, Thomson SA manufactured, marketed, sold

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

62.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, IN 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania, Marion, Indiana and Mexicali, Mexico.  The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

63.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**12.    Mitsubishi Entities**

64.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

FIRST AMENDED COMPLAINT

65.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

66.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

67.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.     AGENTS AND CO-CONSPIRATORS

68.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

69.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

70.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company, Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Videocon Industries, Ltd., and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

71.    Co-conspirator Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

72.    Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey  07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this Complaint.

73.    Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

74.     Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California  92612.  Samsung America is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

75.     Co-conspirator Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

76.     Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

77.     Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

78.     Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

79.     Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

80.     Co-conspirators SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

81. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products. Orion was a Korean corporation which filed for bankruptcy in 2004. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States. Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

82. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

83. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

84. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

formed by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

85.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

86.     The acts charged in this Complaint have been done by Defendants and their Co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendants' or Co-conspirators' business or affairs.

## V.     <u>TRADE AND COMMERCE</u>

87.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

FIRST AMENDED COMPLAINT

89.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Minnesota and caused antitrust injuries in Minnesota.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

90.     A CRT has three components:  (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors

1  and similar devices.  The primary difference is that CDTs typically yield a higher resolution image

2  requiring more pixels than do CPTs.

3      95.    CRTs have no independent utility, and have value only as components of other

4  products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from

5  the demand for such products.

6      96.    The market for CRTs and the market for the products into which they are placed

7  are inextricably linked and intertwined because the CRT market exists to serve the CRT Products

8  markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in

9  that one would not exist without the other.

10      97.    Plaintiffs have participated in the market for CRTs through their direct purchases

11  from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT

12  Products containing price-fixed CRTs indirectly from non-Defendant original equipment

13  manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at

14  which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-

15  competitive prices for CRT Products.

16      98.    Plaintiffs have participated in the market for products containing CRTs.  To the

17  extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-

18  conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in

19  these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

20      99.    Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

21      **B.**    **Structure of the CRT Industry**

22      100.    The CRT industry has several characteristics that facilitated a conspiracy,

23  including market concentration, ease of information sharing, the consolidation of manufacturers,

24  multiple interrelated business relationships, significant barriers to entry, heightened price

25  sensitivity to supply and demand forces and homogeneity of products.

26      **1.**    **Market Concentration**

27      101.    During the Relevant Period, the CRT industry was dominated by relatively few

28  companies.  In 2004, Co-Conspirators Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.   Information Sharing

102.   Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

103.   Defendants Hitachi, and Chunghwa and Co-conspirator Samsung are all members of the Society for Information Display. Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Co-conspirator Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their Co-Conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.   Consolidation

104.   The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

105.   The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

106.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.    In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.    Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.    Defendant Chunghwa has a joint venture with Co-conspirator Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Co-conspirator Samsung and non-Defendant Corning Inc., USA for the production

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Philips, Panasonic, and Co-conspirator Samsung.

**5.   High Costs of Entry Into the Industry**

107.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

108.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.   The Maturity of the CRT Product Market**

109.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

110.   Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

111.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

112.   Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

1    display technology during the Relevant Period, making Defendants' collusion and the

2    international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma

3    displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper

4    alternative to these new technologies.

5           113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for

6    computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

7    substantial share of the market.

8           114.    As for CRT televisions, they accounted for 73 percent of the North American

9    television market in 2004, and by the end of 2006, still held a 46 percent market share.

10                **7.      Homogeneity of CRT Products**

11          115.    CRT Products are commodity-like products which are manufactured in

12   standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular

13   size television set or computer monitor, is substitutable for another's.  Defendants sold and

14   Plaintiffs purchased CRT Products primarily on the basis of price.

15          116.    It is easier to form and sustain a cartel when the product in question is commodity-

16   like because it is easier to agree on prices to charge and to monitor those prices once an agreement

17   is formed.

18        **C.     Pre-Conspiracy Market**

19          117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products

20   business became more international and Defendants began serving customers that were also being

21   served by other international companies.  During this period, the employees of Defendants would

22   encounter employees from their competitors when visiting their customers.  A culture of

23   cooperation developed over the years and these Defendant employees would exchange market

24   information on production, capacity and customers.

25          118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion

26   visited each other's factories in Southeast Asia.  During this period, these producers began to

27   include discussions about price in their meetings.

28

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.   Defendants' and Co-Conspirators' Illegal Agreements

119.   In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.   The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Co-conspirator Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.   Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

122.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

#### 1.   "Glass Meetings"

124.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' and Co-conspirator' corporations.

125.   The first level meetings were attended by high level company executives including

CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants and Co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

129. Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and Co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

FIRST AMENDED COMPLAINT

LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)IRICO, and Thomson.  Chunghwa also attended these meetings.

130.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

131.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

132.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

134.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

135.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

FIRST AMENDED COMPLAINT

CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

137.    The agreements reached at the glass meetings included:

a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

FIRST AMENDED COMPLAINT

i. agreements to allocate both overall market shares and share of a particular

customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit

compliance with such agreements; and

l. agreements to keep their meetings secret.

138. Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.     Bilateral Discussions**

139. Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

140. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil,Mexico, and the United States.

141. The purpose of the bilateral discussions was to exchange information about past

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico,  Europe, and the United States. .

142.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

143.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

144.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had

FIRST AMENDED COMPLAINT

a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.  Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

145.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Co-conspirator Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

146.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

147.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

148.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

149.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

150.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

151.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

152.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

1    at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

2           153.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass

3    meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

4    meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

5    bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices

6    and supply levels for CRTs.

7           154.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

8    meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

9    engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese

10   CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for

11   CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the

12   Chinese government.  BMCC was acting to further its own independent private interests in

13   participating in the alleged conspiracy.

14          155.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

15   Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

16   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP

17   Displays).  A substantial number of these meetings were attended by high level executives from

18   Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through

19   these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively

20   withdrew from this conspiracy.

21          156.    Defendants Philips America and Philips Brazil were represented at those meetings

22   and were a party to the agreements entered at them.  To the extent Philips America and Philips

23   Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in

24   the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

25   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

26   Thus, Philips America and Philips Brazil were active, knowing participants in the alleged

27   conspiracy.

28          157.    Between at least 1995 and 2007, Co-conspirator Samsung, through SEC, Samsung

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

158.    Co-conspirators SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

159.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

160.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

161.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July

2   2005.

3       162.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

4   bilateral meetings with its competitors.  These meetings were attended by high level sales

5   managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices,

6   production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

7   allocation, and new product development, and agreed on prices and supply levels for CRTs.

8   Mitsubishi never effectively withdrew from this conspiracy.

9

10      163.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and

11  TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

12  conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

13  high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

14  discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

15  agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

16  conspiracy.

17      164.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

18  meetings and were a party to the agreements entered at them.  To the extent Toshiba America,

19  TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a

20  significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

21  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

22  glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing

23  participants in the alleged conspiracy.

24      165.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

25  Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

26  participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

27  were attended by the highest ranking executives from Chunghwa, including the former Chairman

28  and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each

of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

166.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

167.    When Plaintiffs refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

168.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

169.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue(billion US dollars)[1] | Average Selling Price Per Unit |
|---|---|---|---|

---

[1] Estimated market value of CRT units sold.

FIRST AMENDED COMPLAINT

| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

171.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

172.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

173.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

174.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

175.    A BNET Business Network news article from August 1998 reported that "key

FIRST AMENDED COMPLAINT

components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

176.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

177.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

178.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

179.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

180.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

substitutable technology.

181.   These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.   International Government Antitrust Investigations**

182.   Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

183.   Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

184.   In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

185.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination

concerning the production.  The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007.  The coordination concerning the Hungarian market allegedly formed part of the European coordination.  Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

186.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

187.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

188.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director

of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

189.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

191.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

192.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics,

- 46 -          FIRST AMENDED COMPLAINT

Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

194.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

195.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Co-conspirator Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

196.    Defendant Toshiba and Co-conspirator Samsung have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

197.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

198.    On December 12, 2006, news reports indicated that Co-conspirator Samsung and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

199.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

FIRST AMENDED COMPLAINT

200.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

201.     The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.     The Role of Trade Associations During the Relevant Period**

202.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

203.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

204.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

205.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

206.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.**     **Effects of Defendants' Antitrust Violations**

**1.**     **Examples of Reductions in Manufacturing Capacity by Defendants**

207.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

208.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

209.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

210.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

211.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

212.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.      Examples of Collusive Pricing for CRTs**

213.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

214.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

215.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

216.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

217.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

218.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was

allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

219. After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

220. On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

221. Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

222. CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.** **Summary Of Effects Of The Conspiracy Involving CRTs**

223. The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

         FIRST AMENDED COMPLAINT

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

224.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

225.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their Co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

226.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

227.   The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

228.   Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

229.   As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

230.   Plaintiffs had neither actual nor constructive knowledge of the facts supporting

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

231.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

232.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

233.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

234.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

FIRST AMENDED COMPLAINT

235.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

236.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

237.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

238.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

239.    In addition, when several CRT manufacturers, including Defendant Philips and LG Electronics and Co-Conspirator Samsung, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

240.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  241.   Plaintiffs are informed and believe, and thereon allege, that Defendants' purported

2  reasons for the price increases of CRTs were materially false and misleading and made for the

3  purpose of concealing Defendants' anti-competitive scheme as alleged herein.

4  242.   As a result of Defendants' fraudulent concealment of their conspiracy, the running

5  of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a

6  result of the anticompetitive conduct alleged in this Complaint.

7  **IX.  *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-**

8  **JURISDICTIONAL TOLLING**

9  243.   As discussed at length in Paragraphs 182-201 above, the United States Department

10  of Justice instituted criminal proceedings and investigations against several Defendants and co-

11  conspirators commencing on at least February 10, 2009 through the present.  Best Buy's direct

12  claims for violation of the Sherman Act have been tolled during these criminal proceedings

13  pursuant to 15 U.S.C. § 16.

14  244.   As shown by Best Buy's allegations in Paragraphs 20, 21 & 22 above and 252 and

15  259 below, Plaintiffs were members of Class Actions asserted against Defendants, including, but

16  not limited to, the following Complaints:

17  • *Crago Inc. v. Chunghwa Picture Tubes*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D.

18  Cal. Nov. 26, 2007)

19  • Direct Purchaser Plaintiffs' Consolidated Complaint, No. 3:07-cv-05944-SC (Dkt.

20  No. 436) (N.D. Cal. Mar. 16, 2009)

21  245.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*,

22  414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the

23  pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing

24  on at least November 26, 2007 until Best Buy opted out on November 14, 2011. [2]

25

26  [2] *See, e.g., Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at 54 (C.D. Cal. May 5, 2011); *Jenson v. Allison-Williams Co.*, 1999 U.S.

27  Dist. LEXIS 22170, at 18-19 (S.D.Cal. Aug. 23, 1999); *Cullen v. Margiotta*,  811 F.2d 698, 718-721 (2d Cir. 1987); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 341 (E.D. Pa. 2004); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp.

28  1512, 1528-29 (M.D. Fla. 1989); *Bartlett v. Miller and Schroder Municipals, Inc.*, 355 N.W.2d 435, 439 (Minn. Ct. App. 1984); *Carson v. Independent School Dist. No.* 623, 392 N.W.2d 216, 223 (Minn. 1986).

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

## X.     CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

246.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

247.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

248.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

249.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

250.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

251.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.   issuing price announcements and price quotations in accordance with the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    agreements reached;

2        e.  selling CRTs to customers in the United States at noncompetitive prices;

3        f.  exchanging competitively sensitive information in order to facilitate their

4            conspiracy;

5        g.  agreeing to maintain or lower production capacity; and

6        h.  providing false statements to the public to explain increased prices for CRTs.

7        252.  As a result of Defendants' unlawful conduct, Plaintiffs were injured in their

8    businesses and property in that they paid more for CRT Products than they otherwise would have

9    paid in the absence of Defendants' unlawful conduct.

10                              **Second Claim for Relief**

11      **(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq*.)**

12        253.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

13   allegation set forth in the preceding paragraphs of this Complaint.

14        254.  Beginning at a time presently unknown to Plaintiffs, but at least as early as March

15   1, 1995, and continuing thereafter at least up to and including at least November 25, 2007,

16   Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy

17   to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971,

18   Minn. Stat. § 326D.52, *et seq*.  Defendants conspired to and did fix, raise, stabilize and maintain

19   prices of, and allocate markets for, CRTs at supra-competitive levels.

20        255.  The aforesaid violations of the Minnesota Antitrust Act of 1971, Minn. Stat. §

21   326D.52, *et seq*., consisted, without limitation, of a continuing unlawful trust and concert of action

22   among Defendants and their co-conspirators, the substantial terms of which were to fix, raise,

23   maintain and stabilize the prices of, and to allocate markets for, CRTs.

24        256.  For the purpose of forming and effectuating the unlawful trust, Defendants and

25   their co-conspirators have done those things which they combined and conspired to do, including

26   but in no way limited to the acts, practices and course of conduct set forth above and the

27   following:

28        a.  to fix, raise, maintain and stabilize the price of CRTs;

---

- 57 -                                    FIRST AMENDED COMPLAINT

b.   to allocate markets for CRTs amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

d.   to allocate among themselves the production of CRTs.

257.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

258.   As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

259.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees.

## XI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

B.      Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D.      Plaintiffs shall recover damages sustained by them, as provided by Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.   **<u>JURY TRIAL DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

FIRST AMENDED COMPLAINT

DATED:                                  **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
        Roman M. Silberfeld
        David Martinez

Attorneys for Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING
LLC; BEST BUY ENTERPRISE SERVICES, INC.;
BEST BUY STORES, L.P.; BESTBUY.COM,
L.L.C.; and MAGNOLIA HI-FI, LLC

FIRST AMENDED COMPLAINT

# **EXHIBIT C**

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Interbond Corporation of America*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06275 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06275 | MDL No. 1917 |
| INTERBOND CORPORATION OF AMERICA., d/b/a BrandsMart USA | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; | |

1   SHENZHEN SEG HITACHI COLOR
    DISPLAY DEVICES, LTD.; IRICO GROUP
2   CORPORATION; IRICO GROUP
    ELECTRONICS CO., LTD.; IRICO
3   DISPLAY DEVICES CO., LTD.; LG
    ELECTRONICS, INC.; LG ELECTRONICS
4   USA, INC.; LG ELECTRONICS TAIWAN
    TAIPEI CO., LTD.; LP DISPLAYS
5   INTERNATIONAL LTD.; PANASONIC
    CORPORATION; PANASONIC
6   CORPORATION OF NORTH AMERICA;
    MT PICTURE DISPLAY CO., LTD.;
7   BEIJING MATSUSHITA COLOR CRT CO.,
    LTD.; KONINKLIJKE PHILIPS
8   ELECTRONICS N.V.; PHILIPS
    ELECTRONICS NORTH AMERICA
9   CORPORATION; PHILIPS ELECTRONICS
    INDUSTRIES (TAIWAN), LTD.; PHILIPS
10  DA AMAZONIA INDUSTRIA
    ELECTRONICA LTDA.; SAMSUNG
11  ELECTRONICS CO., LTD.; SAMSUNG
    ELECTRONICS AMERICA, INC.;
12  SAMSUNG SDI CO., LTD.; SAMSUNG
    SDI AMERICA, INC.; SAMSUNG SDI
13  MEXICO S.A. DE C.V.;  SAMSUNG SDI
    BRASIL LTDA.; SHENZHEN SAMSUNG
14  SDI CO., LTD.; TIANJIN SAMSUNG SDI
    CO., LTD.; SAMSUNG SDI (MALAYSIA)
15  SDN. BHD.; SAMTEL COLOR LTD.; THAI
    CRT CO., LTD.; TOSHIBA
16  CORPORATION; TOSHIBA AMERICA,
    INC.; TOSHIBA AMERICA CONSUMER
17  PRODUCTS, LLC; TOSHIBA AMERICA
    ELECTRONIC COMPONENTS, INC.;
18  TOSHIBA AMERICA INFORMATION
    SYSTEMS, INC.; CHUNGHWA PICTURE
19  TUBES, LTD.; CHUNGHWA PICTURE
    TUBES (MALAYSIA); TECHNICOLOR
20  SA; TECHNICOLOR USA, INC.;
    MITSUBISHI ELECTRIC CORPORATION;
21  MITSUBISHI DIGITAL ELECTRONICS
    AMERICA, INC.; MITSUBISHI ELECTRIC
22  & ELECTRONICS, USA, INC.,

23         Defendants.

24  _____

25         Plaintiff   Interbond   Corporation   of   America,   d/b/a   BrandsMart   USA

26  ("BrandsMart") for its Complaint against all Defendants named herein, hereby alleges as

27  follows:

28

BRANDSMART'S AMENDED COMPLAINT          1          Case No. 11-cv-06275
                                                   Master File No. 3:07-cv-05944-SC

1   **I.   <u>INTRODUCTION</u>**

2   1.   Defendants and their co-conspirators formed an international cartel which

3   conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

4   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

5   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

6   2.   Defendants are or were among the leading manufacturers of: (a) color

7   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

8   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

9   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

10   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

11   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

12   and the products containing them shall be referred to as "CDT Products."  CDT Products and

13   CPT Products shall be referred to collectively herein as "CRT Products."

14   3.   Defendants control the majority of the CRT industry, a multibillion dollar

15   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

16   Relevant Period, virtually every household in the United States owned at least one CRT Product.

17   4.   Since the mid-1990s, the CRT industry faced significant economic

18   pressures as customer preferences for other emerging technologies shrank profits and threatened

19   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

20   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

21   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

22   States.

23   5.   With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

24   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

25   shipments, prices, production and customer demand; (c) coordinate public statements regarding

26   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

27   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

28   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of

the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11. Plaintiff also brings this action pursuant to Section 501.211 of the Florida Statutes, for declaratory relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA").

12. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's FDUTPA claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiff's state law claims are so related to its claim under Section 1 of the Sherman Act that they form part of the same case or controversy.

13. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiff's antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Florida.

14. This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15. Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.   Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.   PARTIES**

**A.   Plaintiff**

16.   Plaintiff BrandsMart is a Florida corporation with its corporate headquarters in Hollywood, Florida.   BrandsMart was incorporated in 1977 with the opening of its first retail location in Miami, Florida.   Through the conclusion of Defendants' and the co-conspirators' conspiracy, BrandsMart was a supplier of consumer electronics products and services with 11 stores in Florida and Georgia.   In fiscal year 2010, BrandsMart sold $725 million of products and services.

17.   During the Relevant Period, BrandsMart purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.   As such, BrandsMart suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.   Throughout the Relevant Period, BrandsMart conducted a substantial amount of business in Florida.

18.   During the Relevant Period, BrandsMart's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Florida.   In addition, BrandsMart's purchase orders for CRT Products were issued from Florida, all invoices for CRT Products were sent to BrandsMart in Florida, and all payments for CRT Products were made by BrandsMart from Florida. BrandsMart employees based in Florida were also responsible for selecting vendors and product lines with respect to CRT Products.

**B.   Defendants**

**1.   Hitachi Entities**

19.   Defendant Hitachi, Ltd. is a Japanese company with its principal place of

business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

21.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

22.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

23.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

24.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.     IRICO Entities

26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1   subsidiaries or affiliates, throughout the United States.

2           27.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

3   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

4   Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

5   CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

6   also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

7   and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

8   IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

9   subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

10  the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

11  complaint.

12          28.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

13  company with its principal place of business located at No. 16, Fenghui South Road West,

14  District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

15  subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

16  Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

17  through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

18  and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

19  alleged in this complaint.

20          29.    Defendants IGC, IGE and IDDC are collectively referred to herein as

21  "IRICO."

22          **3.     LG Electronics Entities**

23          30.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

24  the laws of the Republic of Korea with its principal place of business located at LG Twin

25  Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

26  billion global force in consumer electronics, home appliances and mobile communications,

27  which established its first overseas branch office in New York in 1968.  The company's name

28  was changed from Gold Star Communications to LGEI in 1995, the year in which it also

1    acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

2    venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

3    ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

4    LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

5    and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

6    throughout the United States.

7           31.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

8    corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

9    New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

10   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

11   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

12   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

13   to the antitrust violations alleged in this complaint.

14          32.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

15   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

16   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

17   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

18   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

19   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

20   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

21          33.     Defendants LGEI, LGEUSA and LGETT are collectively referred to

22   herein as "LG Electronics."

23          **4.     LP Displays**

24          34.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

25   Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

26   Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

27   which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

28   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.    Panasonic Entities

35.    Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

36.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

37.    Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

38.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

39.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

40.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41.     Defendant Philips Electronics North America Corporation ("Philips

America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

43.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

44.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.     **Samsung Entities**

45.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

1  company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

2  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

3  States.

4          46.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

5  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

6  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

7  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

8  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9  United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

10  Samsung SEAI relating to the antitrust violations alleged in this complaint.

11          47.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

12  Company ("Samsung SDI") is a South Korean company with its principal place of business

13  located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

14  company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

15  Samsung SDI claims to be the world's leading company in the display and energy business, with

16  28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

17  market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

18  Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

19  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20  throughout the United States.  Defendant SEC dominated and controlled the finances, policies

21  and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

22          48.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

23  California corporation with its principal place of business located at 3333 Michelson Drive, Suite

24  700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

25  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

26  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

27  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

28  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

1    violations alleged in this complaint.

2                49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

3    is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

4    21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

5    owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

6    Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

7    directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

8    and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

9    Mexico relating to the antitrust violations alleged in this complaint.

10               50.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

11   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

12   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

13   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

14   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

15   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

16   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

17   Brazil relating to the antitrust violations alleged in this complaint.

18               51.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

19   is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

20   Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

21   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

22   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

24   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

25   violations alleged in this complaint.

26               52.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

27   Chinese company with its principal place of business located at Developing Zone of Yi-Xian

28   Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

54.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     Samsung**

55.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.     Thai CRT**

56.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

57.   Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

58.   Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

59.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

60.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

61.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

62.  Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.  <u>Chunghwa Entities</u>**

63.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

64.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

### 12.     **Thomson Entities**

65.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.   In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

1    through its subsidiaries or affiliates, to customers throughout the United States.

2         66.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

3    Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

4    business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson

5    Consumer Electronics is a wholly-owned subsidiary of Thomson SA.   Thomson Consumer

6    Electronics was a major manufacturer of CRTs for the United States market, with plants located

7    in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.   The United States-based

8    plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own

9    television-manufacturing division, which had plants in the United States and Mexico, and to

10   other television manufacturers in the United States and elsewhere.   Thomson's CRT televisions

11   were sold in the United States to United States consumers under the RCA brand.   Thomson

12   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

13   business was sold to Videocon in 2005.   During the Relevant Period, Thomson Consumer

14   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

15   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

16        67.    Thomson SA and Thomson Consumer Electronics are collectively referred

17   to herein as "Thomson."

18        **13.    Mitsubishi Entities**

19        68.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

20   is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

21   Japan.   Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

22   Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold

23   internally to Mitsubishi's television and monitor manufacturing division and to other television

24   and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor

25   division also purchased CRTs from other CRT manufacturers.   During the Relevant Period,

26   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

27   United States.

28        69.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

72. Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

71. Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.   AGENTS AND CO-CONSPIRATORS

72. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

73. Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

74. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

1  Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

2  Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

3  Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

4  conspirators as Defendants at a later date.

5        75.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major

6  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

7  2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

8  Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

9  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

10  United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

11  Group."   The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

12  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

13  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

14  joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

15  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

16  CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

17  DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

18  directly or through their subsidiaries or affiliates, throughout the United States.

19        76.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein

20  as "Daewoo."

21        77.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

22  Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

23  Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

24  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

25  Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

26  Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

27  Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

28  its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

1   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

3   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

4   this complaint.

5           78.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

6   venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

7   principal place of business was located in Indonesia.  TEDI was projected to have an annual

8   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

9   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

10  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

11  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

13  affairs of TEDI relating to the antitrust violations alleged in this complaint.

14          79.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai

15  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

16  Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

17  subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

18  venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

19  Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

20  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

21  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

22  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

23  the antitrust violations alleged in this complaint.

24          80.    The acts charged in this Complaint have been done by Defendants and

25  their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

26  employees or representatives while actively engaged in the management of each Defendant's or

27  co-conspirator's business or affairs.

28

1    V.    **TRADE AND COMMERCE**

2         81.    During the Relevant Period, each Defendant, or one or more of its

3    subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

4    interstate commerce and foreign commerce, including through and into this judicial district.

5         82.    During the Relevant Period, Defendants collectively controlled a vast

6    majority of the market for CRT Products, both globally and in the United States.

7         83.    The business activities of Defendants substantially affected interstate trade

8    and commerce in the United States and caused antitrust injury in the United States.  The business

9    activities of Defendants also substantially affected trade and commerce in Florida and caused

10   antitrust injuries in Florida.

11   VI.   **FACTUAL ALLEGATIONS**

12        A.    **CRT Technology**

13        84.    A CRT has three components: (a) one or more electron guns, each of

14   which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

15   other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

16   that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

17   faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

18   coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

19   shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

20   produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

21   narrow lines of red, green, blue and black.

22        85.    CRT technology was first developed more than a century ago.  The first

23   commercially practical CRT television was made in 1931.  However, it was not until RCA

24   Corporation introduced the product at the 1939 World's Fair that it became widely available to

25   consumers.  After that, CRTs became the heart of most display products, including televisions,

26   computer monitors, oscilloscopes, air traffic control monitors and ATMs.

27        86.    The quality of a CRT itself determines the quality of the CRT display.  No

28   external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

87.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

88.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

92.     Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

93.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

B.       **Structure of the CRT Industry**

94.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.       Market Concentration

95.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.   The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.       Information Sharing

96.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

97.     Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.     Consolidation

98.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.     Multiple Interrelated Business Relationships

99.     The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

100.     Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.     <u>High Costs of Entry Into the Industry</u>**

101.    There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

102.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.     <u>The Maturity of the CRT Product Market</u>**

103.    Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

104.    Demand for CRT Products was declining throughout the Relevant Period.

1    Static declining demand is another factor which makes the formation of a collusive arrangement

2    more likely because it provides a greater incentive to firms to avoid price competition.

3         105.    In addition, conventional CRT televisions and computer monitors were

4    being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

5    Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT

6    Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

7    States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

8    between 2006 and 2010.

9         106.    Although demand was declining as a result of the popularity of flat-panel

10   LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

11   dominant display technology during the Relevant Period, making Defendants' collusion and the

12   international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and

13   plasma displays during the Relevant Period, a substantial market for CRT Products existed as a

14   cheaper alternative to these new technologies.

15        107.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for

16   computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

17   substantial share of the market.

18        108.    As for CRT televisions, they accounted for 73 percent of the North

19   American television market in 2004, and by the end of 2006, still held a 46 percent market share.

20        **7.    Homogeneity of CRT Products**

21        109.    CRT Products are commodity-like products which are manufactured in

22   standardized sizes.  One Defendant's CRT Product for a particular application, such as a

23   particular size television set or computer monitor, is substitutable for another's.  Defendants sold

24   and Plaintiff purchased CRT Products primarily on the basis of price.

25        110.    It is easier to form and sustain a cartel when the product in question is

26   commodity-like because it is easier to agree on prices to charge and to monitor those prices once

27   an agreement is formed.

28

C.     **Pre-Conspiracy Market**

111.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.   During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.   A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

112.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.   During this period, these producers began to include discussions about price in their meetings.

D.     **Defendants' and Co-Conspirators' Illegal Agreements**

113.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

114.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.   In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.   During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.   These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

115.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.   The participants at these group meetings also discussed increasing prices for CRTs.

116.    As more manufacturers formally entered the conspiracy, group meetings

became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

117. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1. "Glass Meetings"

118. The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

119. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

manufacturers' employees met in Korea, the Chinese in China, and so on.

122.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

123.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

124.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

125.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

126.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

127.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this

information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

128.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

129.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

130.    The agreements reached at the glass meetings included:

    a.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.    agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.    agreements as to what to tell customers about the reason for a price increase;

    e.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.    agreements to coordinate pricing with CRT manufacturers in other

geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

131.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

132.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.  Bilateral Discussions**

133.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of

1    in-person meetings, telephone contacts and emails.

2            134.    During the Relevant Period, in-person bilateral meetings took place in

3    Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

4    Brazil, Mexico, and the United States.

5            135.    The purpose of the bilateral discussions was to exchange information

6    about past and future pricing, confirm production levels, share sales order information, confirm

7    pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

8    including Brazil, Mexico, Europe, and the United States.

9            136.    In order to ensure the efficacy of their global conspiracy, Defendants also

10   used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the

11   United States.  These CRT manufacturers were particularly important because they served the

12   North American market for CRT Products.  As further alleged herein, North America was the

13   largest market for CRT televisions and computer monitors during the Relevant Period.  Because

14   these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they

15   adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of

16   all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at

17   supracompetitive levels.

18           137.    Defendants also used bilateral discussions with each other during price

19   negotiations with customers to avoid being persuaded by customers to cut prices.  The

20   information gained in these communications was then shared with supervisors and taken into

21   account in determining the price to be offered.

22           138.    Bilateral discussions were also used to coordinate prices with CRT

23   manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

24   Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

25   management meeting, the attendees at these group meetings would meet bilaterally with the

26   other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

27   output agreements had been reached during the meeting.  For example, Samsung had a

28   relationship with Hitachi and was responsible for communicating CRT pricing agreements to

1  Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

2  CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

3  with Thomson in Europe and the United States, and Samsung SDI had regular communications

4  with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for

5  communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented

6  the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes

7  Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel

8  participated in the conspiracy to fix prices of CRTs.

9          **3.      Defendants' and Co-Conspirators' Participation in Group and**

10                  **Bilateral Discussions**

11          139.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

12  Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

13  These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

14  in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

15  these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

16  withdrew from this conspiracy.

17          140.    Defendants Hitachi America and HEDUS were represented at those

18  meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

19  HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

20  in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

21  direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

22  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

23          141.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

24  IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

25  ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

26  Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

27  agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

28  connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

1    its own independent private interests in participating in the alleged conspiracy.

2            142.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI
3    and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics
4    participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP
5    Displays).   A substantial number of these meetings were attended by the highest ranking
6    executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each
7    of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and
8    supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

9            143.    Defendant LGEUSA was represented at those meetings and was a party to
10   the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it
11   played a significant role in the conspiracy because Defendants wished to ensure that the prices
12   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements
13   reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged
14   conspiracy.

15           144.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)
16   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings
17   were attended by the highest ranking executives from LP Displays.  Certain of these high level
18   executives from LP Displays had previously attended meetings on behalf of Defendants LG
19   Electronics and Philips.   LP Displays also engaged in bilateral discussions with other
20   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for
21   CRTs.

22           145.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic
23   Corporation and Matsushita Malaysia, participated in several glass meetings.   After 2003,
24   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.
25   These meetings were attended by high level sales managers from Panasonic and MTPD.
26   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these
27   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively
28   withdrew from this conspiracy.

146.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

147.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

148.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

149.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

150.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

151.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

152.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

153.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

154.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

155.    Between at least 1996 and 2005, Defendant Thomson participated in

1   dozens of meetings with its competitors, including several glass meetings and multiple bilateral

2   meetings.  These meetings were attended by high level sales managers from Thomson.  At these

3   meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

4   demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

5   development and agreed on prices and supply levels for CRTs.  Thomson never effectively

6   withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

7   Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

8   a role in the conspiracy.

9        156.  Between at least 1995 and 2005, Defendant Mitsubishi participated in

10  multiple bilateral meetings with its competitors.  These meetings were attended by high level

11  sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT

12  prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns,

13  customer allocation, and new product development, and agreed on prices and supply levels for

14  CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

15       157.  Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

16  and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

17  conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

18  high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

19  discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

20  agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

21  conspiracy.

22       158.  Defendants Toshiba America, TACP, TAEC and TAIS were represented

23  at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

24  America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers,

25  they played a significant role in the conspiracy because Defendants wished to ensure that the

26  prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

27  agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

28  were active, knowing participants in the alleged conspiracy.

159.   Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

160.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

161.   When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

## E.   The CRT Market During the Conspiracy

162.   Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

annual profits.

163.    The following data was reported by Stanford Resources, Inc., a market

research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5  | $18.9    | $208 |
| 1999 | 106.3 | $19.2    | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.    During the Relevant Period, North America was the largest market for

CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research,

the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

percent) were consumed in North America.  By 2002, North America still consumed around 35

percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related

Display Materials,* Fuji Chimera Research, 1997, p.12.

165.    In the 1990s, industry analysts repeatedly predicted declines in consumer

prices for CRT Products.  Despite such predictions, and the existence of economic conditions

warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.    A BNET Business Network news article from August 1998 reported that

"key components (cathode ray tubes) in computer monitors have risen in price.  'Although

several manufacturers raised their CRT prices in the beginning of August, additional CRT price

increases are expected for the beginning of October . . . . While computer monitor price increases

may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

167.    A 2004 article from Techtree.com reports that various computer monitor

manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

---

[1]      Estimated market value of CRT units sold.

September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

168.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

169.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

170.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

171.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

172.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

173.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

174.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

175.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

176.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used

in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.   On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.   Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried out in California.

183.   The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

184.   On December 5, 2012 the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

185.     As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

186.     Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187.     Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189.     On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

191.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

192.     The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.       The Role of Trade Associations During the Relevant Period

193.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

194.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

195.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

196.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

197.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

**H.**    **Effects of Defendants' Antitrust Violations**

**1.**    **Examples of Reductions in Manufacturing Capacity by Defendants**

198.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

199.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

202.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

203.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2. Examples of Collusive Pricing for CRTs

204. Defendants' collusion is evidenced by unusual price movements in the CRT market. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

205. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

206. In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

207. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

208. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

210.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.**     <u>**Summary Of Effects Of The Conspiracy Involving CRTs**</u>

213.     The above combination and conspiracy has had the following effects, among others:

        a.     Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

        b.     Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

        c.     Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

        d.     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFF'S INJURIES

214.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

215.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

216.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

217.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

218.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

219.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

220.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

221.    Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

222.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

223.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

224.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

225.    Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious

1    communications between Defendants by the use of the telephone or in-person meetings in order

2    to prevent the existence of written records, discussion on how to evade antitrust laws and

3    concealing the existence and nature of their competitor pricing discussions from non-

4    conspirators (including customers).

5          226.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT

6    meetings at separate venues in order to avoid detection.  Participants at glass meetings were also

7    told not to take minutes.   Attending companies also reduced the number of their respective

8    attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

9    nature of their agreement.  During these meetings, top executives and other officials attending

10   these meetings were instructed on more than once occasion not to disclose the fact of these

11   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

12   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

13   arrivals and departures at such meetings to avoid being seen in public with each other and with

14   the express purpose and effect of keeping them secret.

15         227.    Defendants also agreed at glass meetings and bilateral meetings to give

16   pretextual reasons for price increases and output reductions to their customers.

17         228.    As alleged above, in early 1999, despite declining production costs and the

18   rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The

19   price increase was allegedly based on increasing global demand for the products.  In fact, this

20   price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the

21   time.

22         229.    As alleged above, despite increased competition from flat panel monitors,

23   prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

24   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

25   This was a pretext used to cover up the conspiracy.

26         230.    In addition, when several CRT manufacturers, including Defendants

27   Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

28   blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this

price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

231.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

232.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

233.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.    As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

# XI.    CLAIM FOR VIOLATIONS

## First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

237.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

238.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

239.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

240.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

241.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

242.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

      b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

      c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

243.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**<u>Second Claim for Relief</u>**

**<u>(Violation of the Florida Deceptive and Unfair Trade Practices Act)</u>**

244.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.   During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

246.   Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

247.   During the Relevant Period, Plaintiff maintained its principal place of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities. As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

248. In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff. These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

249. The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." Fla. Stat. § 501.202(2). FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

250. Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

251. As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.   Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the FDUTPA, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.   Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.   Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.   Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.   Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.   Plaintiff shall receive such other or further relief as may be just and proper.

1

XII.         **JURY TRIAL DEMAND**

2

           Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

3

jury of all the claims asserted in this Complaint so triable.

4

5

6

7

8

9

Dated:                                      Respectfully Submitted,

10

11

                 _____

12

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP

13

401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301

14

Telephone: (954) 356-0011
Facsimile: (954) 356-0022

15

Email: ssinger@bsfllp.com

16

WILLIAM A. ISAACSON (*Pro hac vice*)

17

BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800

18

Washington, DC 20015
Telephone: (202) 237-2727

19

Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

20

21

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)

22

LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)

23

BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor

24

Albany, NY 12207
Telephone: (518) 434-0600

25

Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

26

27

*Counsel for Plaintiff*

28

*Interbond Corporation of America*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **EXHIBIT D**

H. Lee Godfrey (*pro hac vice*)
Kenneth S. Marks (*pro hac vice*)
Jonathan J. Ross (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com
jross@susmangodfrey.com

Attorneys for Alfred H. Siegel, as Trustee of
the Circuit City Stores, Inc. Liquidating Trust
[additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST,

Plaintiff,

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.;

Master File No. 3:07-cv-05944-SC

MDL No. 1917

Individual Case No. 11-cv-05502

FIRST AMENDED COMPLAINT

JURY TRIAL DEMANDED

1

2625971v1/012325

TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR CRT CO., LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC., . TECHNICOLOR SA; TECHNICOLOR USA, INC.; MITSUBISHI ELECTRIC CORPORATION; MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC.; MITSUBISHI ELECTRIC & ELECTRONICS, USA, INC.

Defendants.

Plaintiff, Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc. Liquidating Trust (the "Circuit City Trust"), submits this Complaint against all Defendants named herein, and hereby alleges as follows:

## I.    INTRODUCTION

1.    Plaintiff Circuit City Trust brings this action to recover those damages to Circuit City Stores, Inc., and its affiliated companies ("Circuit City") caused by a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"), conducted by an international cartel formed by Defendants and their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.    Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT

Products shall be referred to collectively herein as "CRT Products."

3.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., Europe, and the United States.  These meetings included representatives from the highest levels of the respective

COMPLAINT

companies, as well as regional managers and others.

7. During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9. Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States. Throughout the period of the conspiracy alleged herein, Circuit City purchased CRT Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors. These purchases took place throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received CRT Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

10. On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1] On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the

---

[1] *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

4

Circuit City Trust. The Plan became effective on November 1, 2010.

11.     During the Relevant Period, Circuit City purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Circuit City thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

12.     Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13.     Plaintiff also brings this action pursuant to various state laws listed herein because Circuit City purchased CRT Products from both defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

14.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

15.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially

COMPLAINT

affected the price of CRT Products purchased by Circuit City in the states identified herein.

16.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

17.     Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III.   <u>PARTIES</u>

### A.   <u>Plaintiff</u>

18.     Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

19.     Circuit City was headquartered in Richmond, Virginia.   During the Relevant Period, Circuit City purchased in the United States CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.   As such, Circuit City suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.   Circuit City's negotiations for the purchase of CRT Products took place in the United States; purchase orders for CRT Products were issued from the United States; and invoices for CRT Products were

received by Circuit City in the United States.

20.     Upon information and belief, Circuit City purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California and Illinois

21.     Upon information and belief, during the Relevant Period, Circuit City received shipments of and took title to CRT Products at its distribution centers in Walnut, California; Livermore, California, and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution centers in California.  From its distribution centers in California and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution centers in California through online sales.

22.     During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois law invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution center in Illinois.  From its distribution center in Illinois and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution center in Illinois through online sales.

**B.**     **Defendants**

**1.**     **Hitachi Entities**

23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7

parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

25.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8

United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).   Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.     IRICO Entities

30.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGC is the parent company for multiple subsidiaries engaged in the manufacture,

9

marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.   IGE is owned by Defendant IGC.   According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.   Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.   During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.   In 2006, IDDC was China's top CRT maker.   During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.     LG Electronics Entities

34.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.   LGEI is a $48.5 billion

global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37. Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4. LP Displays**

38. Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

COMPLAINT

Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     Panasonic Entities**

39.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

42.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and

13

prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

48.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

49.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

15

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.   Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     Samtel**

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

17

principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.   Thai CRT

60.   Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

61.   Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62.   Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled

subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

COMPLAINT

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.   It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.   Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

69.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.   Tatung America is a subsidiary of Tatung Company.   Currently, Tatung Company owns approximately half of Tatung America.   The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.   Following Lun Kuan Lin's death,

20

her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

### 13.   Thomson Entities

70.   Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.   Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton,

21

Pennsylvania; Marion, Indiana; and Mexicali, Mexico. The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand. Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**14.     Mitsubishi Entities**

73.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States. These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

74.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers

in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

75.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

76.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.        AGENTS AND CO-CONSPIRATORS

77.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

78.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

79.    Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd. Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

80.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

81.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

82.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

COMPLAINT

this complaint.

83.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

84.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

85.     Defendant Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

86.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

V.     **TRADE AND COMMERCE**

25

87.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

89.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Illinois and caused antitrust injuries in California and Illinois.

## VII.     FACTUAL ALLEGATIONS

### A.     CRT Technology

90.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

93.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

96.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

97.     Circuit City has participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Circuit City bought CRT Products, and Circuit City has been injured thereby and paid supra-competitive prices for CRT Products.

98.     Circuit City has participated in the market for products containing CRTs. To the extent Circuit City indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.

99.     Circuit City has been injured by paying supra-competitive prices for CRT Products.

COMPLAINT

2625971v1/012325

### B.     Structure of the CRT Industry

100.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.     Market Concentration

101.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.     Information Sharing

102.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

103.    Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

28

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

104.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

105.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

106.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

   a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

   b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

   c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

   d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

   e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

   f.  Defendant Toshiba and Orion also signed a cooperative agreement

29

relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5.  High Costs of Entry Into the Industry

107.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

108.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

30

### 6.     The Maturity of the CRT Product Market

109.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

110.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

111.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

112.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.     Homogeneity of CRT Products

115.    CRT Products are commodity-like products which are manufactured in

31

standardized sizes.   One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Circuit City purchased CRT Products primarily on the basis of price.

116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

119.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the

32

other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

122.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1.    **"Glass Meetings"**

124.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

125.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more

33

frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

129.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

130.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

131.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

132.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.   The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

134.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

135.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser

OEMs paid supracompetitive prices for CRTs.

136.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

137.    The agreements reached at the glass meetings included:

    a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.  agreements as to what to tell customers about the reason for a price increase;

    e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

138. Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

139. As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2. **Bilateral Discussions**

140. Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

141. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

37

142.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

143.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

144.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

145.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Phillips had regular bilateral communications with Thomson in

38

Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

146.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

147.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

148.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

39

149.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

150.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.   Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

151.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

152.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.   After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

153.    PCNA was represented at those meetings and was a party to the agreements

40

entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

154.  Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

155.  Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

156.  Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

157.  Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant

41

role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

158. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

159. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

160. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

161. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

162. Between at least 1996 and 2005, Defendant Thomson participated in

dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings. These meetings were attended by high level sales managers from Thomson. At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005. Thomson has admitted to the European Commission that it played a role in the conspiracy.

163.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

164.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

165.   Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

166.    Between at least 1995 and 2006, defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

167.    Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

168.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

169.    When Circuit City Trust refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and

discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.    The CRT Market During the Conspiracy

170.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

171.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

172.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

173.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence

---

[2]    Estimated market value of CRT units sold.

of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

174.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

179.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

180.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

181.   During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

182.   During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

183.   These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

184.   Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

185.   Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

186.   In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is

47

also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

187.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

188.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the

former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

189.   On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.   On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives

49

from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

193.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

194.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

195.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

50

196. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

197. Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

198. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

199. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

200. On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

201. On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

202. On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

203.   The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

## G.   The Role of Trade Associations During the Relevant Period

204.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."   Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").   In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

205.   Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

206.   The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

207.   Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition

(the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

208.   Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

**H.   Effects of Defendants' Antitrust Violations**

**1.   Examples of Reductions in Manufacturing Capacity by Defendants**

209.   As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

210.   In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

211.   In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

212.   In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

213.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

214. In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**2.      Examples of Collusive Pricing for CRTs**

215. Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

216. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

217. In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

218. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

219. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in
>
> his tough environment and also to prepare for the coming years. This means that
>
> we have to deviate from the traditional approach of the simple scale up of
>
> production volume.

COMPLAINT

2625971v1/012325

220.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

221.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

222.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

223.     Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

224.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### H.     Summary Of Effects Of The Conspiracy Involving CRTs

225.     The above combination and conspiracy has had the following effects, among others:

        a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b. Prices for CRTs in CRT Products sold by Defendants to Circuit City directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c. Circuit City was deprived of the benefit of free and open competition in the purchase of CRT Products.

d. As a direct and proximate result of the unlawful conduct of Defendants, Circuit City was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VIII.   PLAINTIFF'S INJURIES

226.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Circuit City suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Circuit City to pay higher prices than they would have in the absence of Defendants' conspiracy.

227.    Circuit City also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

228.    The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy.  Circuit City was not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Circuit City suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

229.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

COMPLAINT

230.   The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

231.   Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

232.   As a result, Circuit City was injured in connection with their purchases of CRT Products during the Relevant Period.

## IX.   FRAUDULENT CONCEALMENT

233.   Neither Circuit City Trust nor Circuit City had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.   Neither Circuit City Trust nor Circuit City discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.   Defendants engaged in a secret conspiracy that did not give rise to facts that would put Circuit City Trust or Circuit City on inquiry notice that there was a conspiracy to fix the prices of CRTs.

234.   Because Defendants' agreement, understanding and conspiracy were kept secret, Circuit City Trust and Circuit City were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

235.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.   As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.   Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing

these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

236.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

237.   Neither Circuit City nor Circuit City Trust could have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.   The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

238.   As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.   Participants at glass meetings were also told not to take minutes.   Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.   During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.   In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

239.   Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

COMPLAINT

2625971v1/012325

240.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

241.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

242.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

243.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

244.     Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

245.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

X.     ***American Pipe*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

246.     As discussed at length in Paragraphs 184-203 above, the United States Department of Justice instituted criminal proceedings and investigations against several

COMPLAINT

Defendants and co-conspirators commencing on at least February 10, 2009.  Circuit City's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

247.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

248.    As shown by Circuit City Trust's allegations in Paragraphs 1 and 10 and the following causes of action, Circuit City was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## XI.    <u>CLAIM FOR VIOLATIONS</u>

### <u>First Claim for Relief</u>

### <u>(Violation of Section 1 of the Sherman Act)</u>

249.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

250.    Beginning no later than March 1, 1995, the exact date being unknown to Circuit City and Circuit City Trust and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

251.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

252.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

60

253.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

254.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

255.    As a result of Defendants' unlawful conduct, Circuit City was injured in its businesses and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**<u>Second Claim for Relief</u>**

**<u>(Violation of the California Cartwright Act)</u>**

256.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

257.     During the Relevant Period, Circuit City conducted a substantial volume of business in California.  In particular, Circuit City purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Circuit City also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Circuit City maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Circuit City also sold CRT Products to customers in California.  Finally, Circuit City maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Circuit City's business operations in California, it was registered to do business in the State and paid taxes to the State of California during the Relevant Period.    As a result of Circuit City's substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

258.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

259.     Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of

Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

260.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

261.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.   to fix, raise, maintain and stabilize the price of CRTs;

    b.   to allocate markets for CRTs amongst themselves;

    c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.   to allocate among themselves the production of CRTs.

262.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

    b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

263.    As a result of the alleged conduct of Defendants, Circuit City paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

63

264.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

265.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266.     Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

267.     This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

268.     The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Circuit City and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.     Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

64

b.      <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.      <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Circuit City and Circuit City Trust were in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

269.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

270.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

271.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

272.    By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

COMPLAINT

**Fourth Claim for Relief**

**(Restitution and Unjust Enrichment Under California Law)**

273.    Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

274.    During the Relevant Period, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

**Fifth Claim for Relief**

**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

275.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

276.    During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Illinois. Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of CRT Products in Illinois and fixing, raising, maintaining and stabilizing CRT Product prices in Illinois at artificially high, noncompetitive levels.  Defendants' conduct and fraudulent concealment caused injury to Circuit City, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Circuit City as a purchaser.

277.    Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

278.    During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois at artificially-inflated prices because of defendants' price fixing

conspiracy.  Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its Marion Illinois Distribution Center.

279.    During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois.  Circuit City sold CRT Products and other products in retail stores in Illinois and on the Internet to Illinois customers.  In addition, Circuit City maintained in Illinois inventories of CRT Products manufactured and sold by defendants, their co-conspirators, and others.  As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and

280.    As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for CRT Products purchased in Illinois from defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the Illinois Antitrust Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations, and that defendants unjustly retained substantial benefits received due to such conspiracy;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*., and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.      Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq*., and Plaintiff was injured in its business as a result of Defendants' violations;

F.      Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

G.      Defendants engaged in a contract, combination, and conspiracy in violation of the Illinois Antitrust Act, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.      Plaintiff shall recover damages sustained by it, as provided by the Illinois Antitrust Act, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.      Defendants received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a result of their conspiracy, and have unjustly retained these substantial benefits, at the expense of Circuit City;

J.      Defendants shall disgorge all ill-gotten gains and Plaintiff shall be entitled to restitution;

K.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

COMPLAINT

L.    Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

M.    Plaintiff shall receive such other or further relief as may be just and proper.

## XIII.  <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                              SUSMAN GODFREY L.L.P.

By: _____

H. Lee Godfrey
(*pro hac vice*)
Kenneth S. Marks
(*pro hac vice*)
Jonathan J. Ross
(*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email: lgodfrey@sumangodfrey.com
             kmarks@susmangodfrey.com

Parker C. Folse III
(*pro hac vice to be submitted*)
Rachel S. Black
(*pro hac vice to be submitted*)
Jordan Connors
(*pro hac vice to be submitted*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com

69

rblack@susmangodfrey.com
jconnors@susmangodfrey.com

Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust

70

COMPLAINT

# **EXHIBIT E**

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

MIKE MCKOOL, JR. (*Pro hac vice*)
LEWIS T. LECLAIR (*Pro hac vice*)
SCOTT R. JACOBS (*Pro hac vice*)
MCKOOL SMITH, P.C
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
Email: mmckool@mckoolsmith.com

*Counsel for Plaintiff CompuCom Systems, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06396 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06396 | MDL No. 1917 |
| COMPUCOM SYSTEMS, INC., | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI | |

1  ELECTRONIC DEVICES (USA), INC.;
   SHENZHEN SEG HITACHI COLOR
   DISPLAY DEVICES, LTD.; IRICO GROUP
2  CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO
3  DISPLAY DEVICES CO., LTD.; LG
   ELECTRONICS, INC.; LG ELECTRONICS
4  USA, INC.; LG ELECTRONICS TAIWAN
   TAIPEI CO., LTD.; LP DISPLAYS
5  INTERNATIONAL LTD.; PANASONIC
   CORPORATION; PANASONIC
6  CORPORATION OF NORTH AMERICA;
   MT PICTURE DISPLAY CO., LTD.;
7  BEIJING MATSUSHITA COLOR CRT CO.,
   LTD.; KONINKLIJKE PHILIPS
8  ELECTRONICS N.V.; PHILIPS
   ELECTRONICS NORTH AMERICA
9  CORPORATION; PHILIPS ELECTRONICS
   INDUSTRIES (TAIWAN), LTD.; PHILIPS
10 DA AMAZONIA INDUSTRIA
   ELECTRONICA LTDA.; SAMSUNG
11 ELECTRONICS CO., LTD.; SAMSUNG
   ELECTRONICS AMERICA, INC.;
12 SAMSUNG SDI CO., LTD.; SAMSUNG
   SDI AMERICA, INC.; SAMSUNG SDI
13 MEXICO S.A. DE C.V.;  SAMSUNG SDI
   BRASIL LTDA.; SHENZHEN SAMSUNG
14 SDI CO., LTD.; TIANJIN SAMSUNG SDI
   CO., LTD.; SAMSUNG SDI (MALAYSIA)
15 SDN. BHD.; SAMTEL COLOR LTD.; THAI
   CRT CO., LTD.; TOSHIBA
16 CORPORATION; TOSHIBA AMERICA,
   INC.; TOSHIBA AMERICA CONSUMER
17 PRODUCTS, LLC; TOSHIBA AMERICA
   ELECTRONIC COMPONENTS, INC.;
18 TOSHIBA AMERICA INFORMATION
   SYSTEMS, INC.; CHUNGHWA PICTURE
19 TUBES, LTD.; CHUNGHWA PICTURE
   TUBES (MALAYSIA).; TECHNICOLOR
20 SA; TECHNICOLOR USA, INC.;
   MITSUBISHI ELECTRIC CORPORATION;
21 MITSUBISHI DIGITAL ELECTRONICS
   AMERICA, INC.; MITSUBISHI ELECTRIC
22 & ELECTRONICS, USA, INC.,

23      Defendants.

24      Plaintiff, CompuCom Systems, Inc. ("CompuCom") for its Complaint against all

25 Defendants named herein, hereby alleges as follows:

26 **I.    <u>INTRODUCTION</u>**

27      1.      Defendants and their co-conspirators formed an international cartel which

28 conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

1   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

2   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3            2.        Defendants are or were among the leading manufacturers of: (a) color

4   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

7   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

9   and the products containing them shall be referred to as "CDT Products."  CDT Products and

10   CPT Products shall be referred to collectively herein as "CRT Products."

11            3.        Defendants control the majority of the CRT industry, a multibillion dollar

12   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

13   Relevant Period, virtually every household in the United States owned at least one CRT Product.

14            4.        Since the mid-1990s, the CRT industry faced significant economic

15   pressures as customer preferences for other emerging technologies shrank profits and threatened

16   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

17   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19   States.

20            5.        With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

22   shipments, prices, production and customer demand; (c) coordinate public statements regarding

23   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28   producer's share of certain key customers' sales; and (k) restrict output.

6.  The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.  During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.  This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.  During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.  Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein, because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in New York and California.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Northern District of Texas under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

1    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

2    into this District.

3    **III.    PARTIES**

4          **A.    Plaintiff**

5          16.    Plaintiff CompuCom is a Delaware corporation with its corporate

6    headquarters in Dallas, Texas.   Founded in 1987, CompuCom is a leading IT outsourcing

7    company providing infrastructure management services, application services, systems integration

8    and consulting services, as well as the procurement and management of hardware and software.

9    In 2010, CompuCom had $1.4 billion in revenue.   Through the conclusion of Defendants' and

10   the co-conspirators' conspiracy, CompuCom maintained operations in several states including

11   Texas, California, New York, and Massachusetts.

12         17.    During the Relevant Period, CompuCom purchased CRT Products directly

13   from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the

14   Defendants or Defendants' subsidiaries and affiliates controlled.   CompuCom also purchased

15   CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers,

16   which contained CRTs that had been purchased from Defendants and their co-conspirators.   As

17   such, CompuCom suffered injury as a result of Defendants' and their co-conspirators' unlawful

18   conduct.

19         18.    During the Relevant Period, CompuCom purchased CRT Products in,

20   *inter alia*, California and New York containing CRTs manufactured and sold by Defendants and

21   their co-conspirators.   Plaintiff sent purchase orders to various CRT Product manufacturers in

22   each of these states and sent payment to these manufacturers in each of these states.   In addition,

23   Plaintiff supplied its offices in California and New York with CRT Products and maintained

24   corporate offices and inventories in these states and provided information technology services to

25   its customers in these states.

26         **B.    Defendants**

27               **1.    Hitachi Entities**

28         19.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

20.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

21.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

22.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

23.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.   HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

24.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     **IRICO Entities**

26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries or affiliates, throughout the United States.

2           27.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

3    company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

4    Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

5    CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

6    also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

7    and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

8    IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

9    subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

10   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

11   complaint.

12          28.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

13   company with its principal place of business located at No. 16, Fenghui South Road West,

14   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

15   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

16   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

17   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

18   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

19   alleged in this complaint.

20          29.    Defendants IGC, IGE and IDDC are collectively referred to herein as

21   "IRICO."

22          **3.    LG Electronics Entities**

23          30.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

24   the laws of the Republic of Korea with its principal place of business located at LG Twin

25   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

26   billion global force in consumer electronics, home appliances and mobile communications,

27   which established its first overseas branch office in New York in 1968.  The company's name

28   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

1   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

2   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

3   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

4   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

5   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

6   throughout the United States.

7       31.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

8   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

9   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

10  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

11  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

12  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

13  to the antitrust violations alleged in this complaint.

14      32.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

15  Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

16  NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

17  Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

18  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

19  throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

20  and affairs of LGETT relating to the antitrust violations alleged in this complaint.

21      33.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

22  herein as "LG Electronics."

23      **4.    LP Displays**

24      34.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

25  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

26  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

27  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

28  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

1   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

2   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

3   and LGEI would cede control over the company and the shares would be owned by financial

4   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

5   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

6   affiliates, throughout the United States.

7   **5.    Panasonic Entities**

8   35.    Defendant Panasonic Corporation, which was at all times during the

9   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

10  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

11  Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

12  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13  affiliates, throughout the United States.

14  36.    Defendant Panasonic Corporation of North America ("PCNA") is a

15  Delaware corporation with its principal place of business located at One Panasonic Way,

16  Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

17  Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

18  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

19  United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

20  and affairs of PCNA relating to the antitrust violations alleged in this complaint.

21  37.    Defendants Panasonic Corporation and PCNA are collectively referred to

22  herein as "Panasonic."

23  38.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

24  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

25  Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

26  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

27  manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.   On

28  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

1   venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

2   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

3   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

4   subsidiaries or affiliates, throughout the United States.

5            39.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

6   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

7   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

8   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

9   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

10  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

11  China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

12  manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

13  China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

14  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

15  States.

16            **6.    Philips Entities**

17            40.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

18  Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

19  Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

20  of the world's largest electronics companies, with 160,900 employees located in over 60

21  countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

22  Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

23  Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

24  demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

25  million Euros of its investment and said it would not inject further capital into the venture.

26  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

27  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

28            41.    Defendant Philips Electronics North America Corporation ("Philips

America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

43. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

44. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7. **Samsung Entities**

45. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

1   company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

2   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

3   States.

4            46.      Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

5   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

6   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

7   Defendant SEC.   During the Relevant Period, SEAI manufactured, marketed, sold and/or

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

10  Samsung SEAI relating to the antitrust violations alleged in this complaint.

11           47.      Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

12  Company ("Samsung SDI") is a South Korean company with its principal place of business

13  located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.   Samsung SDI is a public

14  company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

15  Samsung SDI claims to be the world's leading company in the display and energy business, with

16  28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

17  market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

18  Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

19  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20  throughout the United States.  Defendant SEC dominated and controlled the finances, policies

21  and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

22           48.      Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

23  California corporation with its principal place of business located at 3333 Michelson Drive, Suite

24  700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

25  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

26  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

27  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

28  controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

1    violations alleged in this complaint.

2             49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

3    is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

4    21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

5    owned and controlled subsidiary of Defendant Samsung SDI.   During the Relevant Period,

6    Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

7    directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

8    and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

9    Mexico relating to the antitrust violations alleged in this complaint.

10            50.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

11   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

12   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

13   owned and controlled subsidiary of Defendant Samsung SDI.   During the Relevant Period,

14   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

15   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

16   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

17   Brazil relating to the antitrust violations alleged in this complaint.

18            51.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

19   is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

20   Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

21   Defendant Samsung SDI.   During the Relevant Period, Samsung SDI Shenzhen manufactured,

22   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.   Defendants SEC and Samsung SDI dominated and

24   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

25   violations alleged in this complaint.

26            52.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

27   Chinese company with its principal place of business located at Developing Zone of Yi-Xian

28   Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

53.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

54.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.    Samtel

55.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.    Thai CRT

56.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.   Toshiba Entities

57.   Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

58.   Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

59.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

60.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

61.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

62.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

63.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

64.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

### 12.     **Thomson Entities**

65.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or

indirectly through its subsidiaries or affiliates, to customers throughout the United States.

66.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.   Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.   The United States-based plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.   Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.   Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.   During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

67.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

68.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.   Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

69.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

70.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

71.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.     AGENTS AND CO-CONSPIRATORS

72.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

73.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

74.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

75.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

76.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

77.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

78.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

79.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

80.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

1  **V.     TRADE AND COMMERCE**

2          81.     During the Relevant Period, each Defendant, or one or more of its

3  subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

4  interstate commerce and foreign commerce, including through and into this judicial district.

5          82.     During the Relevant Period, Defendants collectively controlled a vast

6  majority of the market for CRT Products, both globally and in the United States.

7          83.     The business activities of Defendants substantially affected interstate trade

8  and commerce in the United States and caused antitrust injury in the United States.  The business

9  activities of Defendants also substantially affected trade and commerce in New York and

10  California and caused antitrust injuries in New York and California.

11  **VI.     FACTUAL ALLEGATIONS**

12      **A.     CRT Technology**

13          84.     A CRT has three components: (a) one or more electron guns, each of

14  which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

15  other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

16  that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

17  faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

18  coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

19  shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

20  produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

21  narrow lines of red, green, blue and black.

22          85.     CRT technology was first developed more than a century ago.  The first

23  commercially practical CRT television was made in 1931.  However, it was not until RCA

24  Corporation introduced the product at the 1939 World's Fair that it became widely available to

25  consumers.  After that, CRTs became the heart of most display products, including televisions,

26  computer monitors, oscilloscopes, air traffic control monitors and ATMs.

27          86.     The quality of a CRT itself determines the quality of the CRT display.  No

28  external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

87.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

88.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

92.     Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

93.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.     Structure of the CRT Industry**

94.     The CRT industry has several characteristics that facilitated a conspiracy,

including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1. Market Concentration

95.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2. Information Sharing

96.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

97.     Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

98.      The CRT industry also had significant consolidation during the Relevant

1   Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

2   involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

3   and Panasonic's CRT businesses into MTPD.

4                    **4.        Multiple Interrelated Business Relationships**

5          99.     The industry is marked by a web of cross-licensing agreements, joint

6   ventures and other cooperative arrangements that can facilitate collusion.

7          100.    Examples of the high degree of cooperation among Defendants in both the

8   CRT Product market and other closely related markets include the following:

9                    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

10                        LG Electronics and Philips.

11                  b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

12                        Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

13                        purpose of manufacturing TFT-LCD panels.

14                  c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

15                        Toshiba and Panasonic.

16                  d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita

17                        Display Technology Co., Ltd. as a joint venture for the purpose of

18                        manufacturing TFT-LCD panels.

19                  e.   In December 1995, Defendant Toshiba partnered with Orion and two

20                        other non-defendant entities to form TEDI, which manufactured CRTs

21                        in Indonesia.

22                  f.   Defendant Toshiba and Orion also signed a cooperative agreement

23                        relating to LCDs in 1995.  Pursuant to the agreement, Daewoo

24                        produced STN-LCDs, and Toshiba, which had substituted its STN-

25                        LCD production with TFT-LCD production, marketed Daewoo's

26                        STN-LCDs globally through its network.

27                  g.   Also in 1995, Defendant Toshiba entered into a technology transfer

28                        agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

101.    There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

102.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.    The Maturity of the CRT Product Market**

103.    Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

104.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

105.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

106.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

107.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

108.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

109.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

110.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

111.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were

1  also being served by other international companies. During this period, the employees of

2  Defendants would encounter employees from their competitors when visiting their customers. A

3  culture of cooperation developed over the years and these Defendant employees would exchange

4  market information on production, capacity and customers.

5      112. In the early 1990s, representatives from Samsung, Daewoo, Chunghwa,

6  and Orion visited each other's factories in Southeast Asia. During this period, these producers

7  began to include discussions about price in their meetings.

8      **D.**    **Defendants' and Co-Conspirators' Illegal Agreements**

9      113. In order to control and maintain profitability during declining demand for

10  CRT Products, Defendants and their co-conspirators have engaged in a contract, combination,

11  trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices

12  at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

13  November 25, 2007.

14      114. The CRT conspiracy was effectuated through a combination of group and

15  bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions

16  were the primary method of communication and took place on an informal, ad hoc basis. During

17  this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

18  the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

19  and Panasonic, to discuss increasing prices for CRTs in general and to specific customers. These

20  meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

21  Singapore.

22      115. Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

23  Daewoo, also attended several ad hoc group meetings during this period. The participants at

24  these group meetings also discussed increasing prices for CRTs.

25      116. As more manufacturers formally entered the conspiracy, group meetings

26  became more prevalent. Beginning in 1997, Defendants began to meet in a more organized,

27  systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

28  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

117. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1. "Glass Meetings"

118. The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

119. The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120. The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121. Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the

principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

123.   Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

124.   Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

125.   During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

126.   Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

127.   The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

128. During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

129. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

130. The agreements reached at the glass meetings included:

    a. agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b. placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c. agreements on pricing for intra-company CRT sales to vertically integrated customers;

    d. agreements as to what to tell customers about the reason for a price increase;

    e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

131.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

132.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.   Bilateral Discussions

133.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

134.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

1  Brazil, Mexico, and the United States.

2  135.   The purpose of the bilateral discussions was to exchange information

3  about past and future pricing, confirm production levels, share sales order information, confirm

4  pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

5  including Brazil, Mexico, Europe, and the United States.

6  136.   In order to ensure the efficacy of their global conspiracy, Defendants also

7  used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the

8  United States.  These CRT manufacturers were particularly important because they served the

9  North American market for CRT Products.  As further alleged herein, North America was the

10  largest market for CRT televisions and computer monitors during the Relevant Period.  Because

11  these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they

12  adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of

13  all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at

14  supracompetitive levels.

15  137.   Defendants also used bilateral discussions with each other during price

16  negotiations with customers to avoid being persuaded by customers to cut prices.  The

17  information gained in these communications was then shared with supervisors and taken into

18  account in determining the price to be offered.

19  138.   Bilateral discussions were also used to coordinate prices with CRT

20  manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

21  Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

22  management meeting, the attendees at these group meetings would meet bilaterally with the

23  other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

24  output agreements had been reached during the meeting.  For example, Samsung had a

25  relationship with Hitachi and was responsible for communicating CRT pricing agreements to

26  Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

27  CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

28  with Thomson in Europe and the United States, and Samsung SDI had regular communications

with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

139.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

140.   Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

141.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

142.   Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

143.   Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

144.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.   LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

145.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.   After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

146.   PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

147.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

148.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

149.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

150.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

1    in the alleged conspiracy.

2         151.   Between at least 1995 and 2007, Defendant Samsung, through SEC,

3    Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

4    participated in at least 200 glass meetings at all levels.   A substantial number of these meetings

5    were attended by the highest ranking executives from Samsung.   Samsung also engaged in

6    bilateral discussions with each of the other Defendants on a regular basis.   Through these

7    discussions, Samsung agreed on prices and supply levels for CRTs.

8         152.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

9    Samsung SDI Mexico were represented at those meetings and were a party to the agreements

10   entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

11   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

12   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

13   the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

14   Mexico were active, knowing participants in the alleged conspiracy.

15        153.   Between at least 1998 and 2006, Defendant Samtel participated in

16   multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These

17   meetings were attended by high level executives from Samtel.   Through these discussions,

18   Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

19   this conspiracy.

20        154.   Between at least 1997 and 2006, Defendant Thai CRT participated in

21   multiple glass meetings.  These meetings were attended by the highest ranking executives from

22   Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

23   particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

24   levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

25        155.   Between at least 1996 and 2005, Defendant Thomson participated in

26   dozens of meetings with its competitors, including several glass meetings and multiple bilateral

27   meetings.  These meetings were attended by high level sales managers from Thomson.  At these

28   meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

156.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

157.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

158.   Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

159.   Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

160.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

161.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.**    **The CRT Market During the Conspiracy**

162.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

168.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

[1]    Estimated market value of CRT units sold.

169.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

170.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

171.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

172.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

173.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

174.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

175.     In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

176.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in

computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.    On March 18, 2011, the DOJ issued a press release announcing that it had

1   reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a

2   $32 million fine for its role in a conspiracy to fix prices of CDTs.

3          182.    Samsung SDI admitted that from at least as early as January 1997 until at

4   least as late as March 2006, participated in a conspiracy among major CDT producers to fix

5   prices, reduce output, and allocate market shares of CDTs sold in the United States and

6   elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

7   and employees, engaged in discussions and attended meetings with representatives of other

8   major CDT producers.  During these discussions and meetings, agreements were reached to fix

9   prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

10  elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

11  in California.

12         183.    The plea agreement of Samsung SDI requires that it cooperate with the

13  DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

14  manufacture or sale of CDTs and CPTs.

15         184.    On December 5, 2012, the European Commission announced that it had

16  fined seven international corporate families a total of over €1.4 billion for their two-decade-long

17  effort to fix prices, share markets, restrict output, and allocate customers between themselves in

18  the CRT market.  The companies fined by the European Commission included Chunghwa, LG

19  Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

20  Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

21  for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

22  behavior that are strictly forbidden to companies doing business in Europe."  The press release

23  accompanying the fines further notes that the CRT cartels were "among the most organised

24  cartels that the Commission has investigated."

25         185.    As outlined above, Defendants have a history of competitor contacts

26  resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

27  businesses in the electronics industry.

28         186.    Several  Defendants  also  have  a  history  of  "cooperation"  and

anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

191.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

192.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

193.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

194.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

195.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

196.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

197.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

**H.**     **Effects of Defendants' Antitrust Violations**

     **1.**     **Examples of Reductions in Manufacturing Capacity by Defendants**

198.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

199.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

200.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

201.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

202.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

203.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.   The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

     **2.**     **Examples of Collusive Pricing for CRTs**

204.     Defendants' collusion is evidenced by unusual price movements in the CRT market.   For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

205.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

206.   In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

207.   Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.   This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.   This was a pretext used to conceal the conspiracy.

208.   Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.   This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.   This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.   The price increase was allegedly based on increasing global demand for the products.   In fact, this price rise was the result of collusive conduct amongst Defendants.

210.   After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.   A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.   On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.   This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.   CRT prices resisted downward price pressures and remained stable over a period of many years.   Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have

1    absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive

2    activities alleged above.

3                   **3.      Summary Of Effects Of The Conspiracy Involving CRTs**

4         213.   The above combination and conspiracy has had the following effects,

5    among others:

6              a.  Price competition in the sale of CRTs by Defendants and their co-

7                  conspirators has been restrained, suppressed and eliminated

8                  throughout the United States;

9              b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly

10                 have been raised, fixed, maintained and stabilized at artificially high

11                 and noncompetitive levels throughout the United States; and

12             c.  Plaintiff has been deprived of the benefit of free and open competition

13                 in the purchase of CRT Products.

14             d.  As a direct and proximate result of the unlawful conduct of

15                 Defendants, Plaintiff has been injured in its business and property in

16                 that it paid more for CRT Products than it otherwise would have paid

17                 in the absence of the unlawful conduct of Defendants.

18   **VII.    PLAINTIFF'S INJURIES**

19        214.   As a purchaser of computer monitors, TVs and other devices that

20   contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

21   result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

22   competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing

23   Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

24        215.   Plaintiff also purchased CRT Products containing CRTs from OEMs as

25   well as others, which in turn purchased CRTs from Defendants and their co-conspirators.

26   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

27   OEMs and others, which paid higher prices for CRTs than they would have absent the

28   conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

216.     The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

217.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

218.     The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

219.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

220.     As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

221.     Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

222.   Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

223.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

224.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

225.   Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

226.   As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

227.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

228.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

229.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

230.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

231.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

232.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

233.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## IX.     *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.     As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.     As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236.     Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.     CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

237.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

238.     Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

239. In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

240. As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

241. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

242. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a. participating in meetings and conversations to discuss the prices and supply of CRTs;

    b. communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c. agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d. issuing price announcements and price quotations in accordance with the agreements reached;

    e. selling CRTs to customers in the United States at noncompetitive prices;

    f. exchanging competitively sensitive information in order to facilitate their conspiracy;

    g. agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

243.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

244.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.   During the Relevant Period, Plaintiff conducted a substantial volume of business in California.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in California.  Plaintiff also sent payment for CRT Products to these manufacturers in California.  In addition, Plaintiff sold CRT Products in California containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices and inventories in California of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

246.   In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

247.   Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.   Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.   Defendants' conduct substantially affected California commerce.

248.   The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

249.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.   to fix, raise, maintain and stabilize the price of CRTs;

      b.   to allocate markets for CRTs amongst themselves;

      c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.   to allocate among themselves the production of CRTs.

250.   The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at

1     artificially high, non-competitive levels in the State of California;

2     and

3         c.   those who purchased CRT Products containing price-fixed CRTs

4              from Defendants, their co-conspirators, and others have been

5              deprived of the benefit of free and open competition.

6     251.   As a result of the alleged conduct of Defendants, Plaintiff paid supra-

7 competitive, artificially inflated prices for the CRT Products they purchased during the Relevant

8 Period.

9     252.   As a direct and proximate result of Defendants' conduct, Plaintiff has been

10 injured in its business and property by paying more for CRT Products containing price-fixed

11 CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence

12 of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section

13 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages

14 and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the

15 California Business and Professions Code.

16                          **Third Claim for Relief**

17              **(Violation of California Unfair Competition Law)**

18     253.   Plaintiff incorporates and realleges, as though fully set forth herein, each

19 and every allegation set forth in the preceding paragraphs of this Complaint.

20     254.   Defendants have engaged in unfair competition in violation of California's

21 Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

22     255.   This Complaint is filed, and these proceedings are pursuant to Sections

23 17203 and 17204 of the California Business & Professions Code, to obtain restitution from

24 Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a

25 result of their unlawful, unfair, and fraudulent conduct.

26     256.   The unlawful, unfair, and fraudulent business practices of Defendants, as

27 alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained

28

COMPUCOM'S AMENDED COMPLAINT          59          Case No. 11-cv-06396
                                                  Master File No. 3:07-cv-05944-SC

competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.      **Defendants' Unlawful Business Practices**: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b.      **Defendants' Unfair Business Practices**: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.      **Defendants' Fraudulent Business Practices**: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

257.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

258.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

259.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

260.    By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

#### Fourth Claim for Relief

#### (Violation of the New York Donnelly Act)

261.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.    During the Relevant Period, Plaintiff conducted a substantial volume of business in New York.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing Conspiracy, in New York.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in New York.  Plaintiff also sent payment for CRT Products to these manufacturers in New York.  In addition, Plaintiff sold CRT Products in New York containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices, and inventories in New York of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York.  As a result of its substantial contacts with New York, Plaintiff is entitled to the protection of the laws of New York.

263.    Beginning at a time presently unknown to Plaintiff, but at least as early as December 23, 1998, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

264.    Defendants' Conspiracy restrained, suppressed, and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained, and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

265.     As a result, Defendants' Conspiracy substantially affected New York commerce.

266.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages and the costs of suit, including attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Plaintiff shall receive such other or further relief as may be just and proper.

## XII.      **<u>JURY TRIAL DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

1    Dated:                                    Respectfully Submitted,

2

3                                              _____

4                                              William A. Isaacson (*Pro hac vice*)
                                               **BOIES, SCHILLER & FLEXNER LLP**
5                                              5301 Wisconsin Ave. NW, Suite 800
                                               Washington, D.C.  20015
6                                              Telephone:  (202) 237-2727
                                               Facsimile:   (202) 237-6131
7                                              Email:  wisaacson@bsfllp.com

8
                                               Philip J. Iovieno (*Pro hac vice*)
9                                              Anne M. Nardacci (*Pro hac vice*)
                                               Luke Nikas (*Pro hac vice*)
10                                             Christopher V. Fenlon (*Pro hac vice*)
                                               **BOIES, SCHILLER & FLEXNER LLP**
11                                             10 North Pearl Street, 4th Floor
                                               Albany, NY  12207
12                                             Telephone:  (518) 434-0600
                                               Facsimile:   (518) 434-0665
13                                             Email: piovieno@bsfllp.com
                                               Email: anardacci@bsfllp.com
14                                             Email: lnikas@bsfllp.com
                                               Email: cfenlon@bsfllp.com
15

16

17                                             Mike McKool, Jr. (*Pro hac vice*)
                                               Email: mmckool@mckoolsmith.com
18                                             Lewis T. LeClair (*Pro hac vice*)
                                               Email: lleclair@mckoolsmith.com
19                                             Scott R. Jacobs (*Pro hac vice*)
                                               Email: srjacobs@mckoolsmith.com
20                                             **MCKOOL SMITH, P.C.**
21                                             300 Crescent Court, Suite 1500
                                               Dallas, TX 75201
22                                             Telephone: (214) 978-4000
                                               Facsimile: (214) 978-4044
23

24                                             *Counsel For Plaintiff*
25                                             *Compucom Systems, Inc.*

26

27

28

# **EXHIBIT F**

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc.*
*and Electrograph Technologies Corp.*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-01656-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-01656-SC | MDL No. 1917 |
| ELECTROGRAPH SYSTEMS, INC.; ELECTROGRAPH TECHNOLOGIES CORP., | **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS | |

USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA,
INC.; MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.,

Defendants.

Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for their Complaint against all Defendants named herein, hereby allege as follows:

I.        **INTRODUCTION**

1.        Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs") and products containing CRTs.

2.     Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRT Products were sold in the United States.

5.     With respect to CRT Products, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.     The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.

1    Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By

2    1997, these group meetings had become more formalized, as described in greater detail below.

3    There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of

4    group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales,

5    including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and

6    Europe.  These meetings included representatives from the highest levels of the respective

7    companies, as well as regional managers and others.

8        7.    During the Relevant Period, the conspiracy affected billions of dollars of

9    commerce throughout the United States.

10       8.    This conspiracy is being investigated by the United States Department of

11   Justice ("DOJ") and by multiple foreign competition authorities.  Since February 10, 2009,

12   federal indictments have been issued against six individuals in connection with Defendants' CRT

13   price-fixing conspiracy.

14       9.    During the Relevant Period, Plaintiffs purchased CRT Products, both

15   CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly

16   from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or

17   Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of

18   Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT

19   Products they purchased during the Relevant Period.

20   **II.    <u>JURISDICTION AND VENUE</u>**

21       10.   Plaintiffs bring this action to obtain injunctive relief under Section 16 of

22   the Clayton Act; and to recover damages, including treble damages under Section 4 of the

23   Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

24   Section 1 of the Sherman Act (15 U.S.C. § 1).

25       11.   Plaintiffs also bring this action pursuant to Section 16750(a) of the

26   California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs

27   sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the

28   California Business and Professions Code (the "Cartwright Act").  Plaintiffs' claims are also

1    brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code,

2    to obtain restitution from and an injunction against Defendants due to their violations of Section

3    17200 *et seq.* of the California Business and Professions Code (the "California Unfair

4    Competition Act").

5           12.    Plaintiffs also bring this action pursuant to Section 340 of the New York

6    General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to

7    Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General

8    Business Law (the "Donnelly Act").  Plaintiffs' claims are also brought pursuant to Section 349

9    of the New York General Business Law, to obtain restitution from and an injunction against

10   Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law

11   (the "New York Unfair Competition Act").

12          13.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

13   the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

14   supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair

15   Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C.

16   § 1367.  Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman

17   Act and they form part of the same case or controversy.

18          14.    The activities of Defendants and their co-conspirators, as described herein,

19   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

20   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

21   import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the

22   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

23   United States.

24          15.    The activities of Defendants and their co-conspirators, as described herein,

25   were within the flow of, were intended to, and did have a direct and substantial effect on

26   commerce in California and New York.  In particular Defendants' and their co-conspirators'

27   conspiracy directly and substantially affected the price of CRT Products purchased in these

28   states.  These effects also give rise to Plaintiffs' antitrust claims.  Plaintiffs maintained operations

1  in these states during the Relevant Period.

2        16.    This court has jurisdiction over each Defendant named in this action under

3  both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR.

4  Each Defendant conducts substantial business in New York as well as California.  In addition,

5  Defendants and their co-conspirators purposely availed themselves of the laws of the United

6  States and the identified states insofar as they manufactured CRTs for sale in the United States,

7  including New York and California, or which were incorporated into CRT Products Defendants

8  and their co-conspirators knew would be sold to customers in the United States, including New

9  York and California.  Defendants' and their co-conspirators' conspiracy affected this commerce

10  in CRT Products in the United States, including in New York and California.

11        17.    Venue is proper in the Eastern District of New York under Section 12 of

12  the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is

13  either an alien corporation, transacts business in this District, or is otherwise found within this

14  District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a

15  substantial part of the events or omissions giving rise to this claim occurred in this District.

16  Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed

17  CRTs would be sold and shipped into this District.

18  **III.**    <u>**PARTIES**</u>

19      **A.**    <u>**Plaintiffs**</u>

20        18.    Plaintiff Electrograph Systems, Inc. is a New York corporation with its

21  principal place of business in New York.  Through May 2009, Electrograph Systems, Inc.

22  conducted business as a value-added wholesale distributor of display technology solutions,

23  including CRT displays and components, rear screen projection TVs, projectors, and digital

24  electronic products, primarily to resellers and system integrators.  Electrograph Systems, Inc.

25  specialized in display, audio, connectivity, and other complementary technologies for sale to

26  commercial, retail and government customers.

27        19.    Plaintiff Electrograph Technologies Corp. is a New York corporation,

28  with its principal place of business in New York.  Electrograph Technologies Corp. owns 100%

1    of the outstanding capital stock of Electrograph Systems, Inc.   In addition to its ownership of

2    Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph

3    Technologies Corp. conducted business as an information technology solutions provider that

4    specialized in hardware and software procurement, display technology, custom networking,

5    security, IP telephony, remote management, application development/e-commerce, storage, and

6    enterprise and Internet solutions.  Electrograph Technologies Corp. offered its customers single-

7    source solutions customized to their information systems needs by integrating its analysis, design

8    and implementation services with hardware, software, networking products and peripherals from

9    leading vendors.

10             20.      During the Relevant Period, the Plaintiffs, and their predecessor entities

11   described below, purchased CRT Products directly and indirectly from Defendants, and/or

12   Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries

13   and affiliates controlled.   As such, the Plaintiffs suffered injury as a result of Defendants'

14   unlawful conduct.   Throughout the Relevant Period, Plaintiffs, and their predecessor entities

15   described below, conducted a substantial amount of business in New York and California.

16           **B.**       **Plaintiffs' Corporate History**

17             21.      Electrograph Technologies Corp. was incorporated under the name

18   Manchester Equipment Co., Inc. on August 21, 1973.  The company's name was changed to

19   Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to

20   Electrograph Technologies Corp. on August 1, 2005.  On August 1, 2005, upon consummation

21   of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE

22   Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc.,

23   the merger sub was merged with and into Manchester Technologies, Inc., and Manchester

24   Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and

25   concurrently changed its name to Electrograph Technologies Corp.  During the Relevant Period,

26   Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in

27   the United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

28   subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and

affiliates controlled.  As such, Electrograph Technologies Corp. suffered injury as a result of Defendants' unlawful conduct.

22.     Electrograph Systems, Inc. was incorporated under the name Electrograph Acquisitions, Inc. on April 10, 1997.  On April 28, 1997, Manchester Equipment Co., Inc.—the predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph Acquisitions, Inc. from Bitwise Designs, Inc.  On April 29, 1997, Electrograph Acquisitions, Inc. changed its name to Electrograph Systems, Inc.  During the Relevant Period, Electrograph Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

23.     ActiveLight, Inc. was formed on April 16, 1998, as a Washington company with its principal place of business in the State of Washington.  ActiveLight, Inc. was a value-added wholesale distributor of display technology solutions and projectors to the professional, commercial and high-end consumer markets.  During the Relevant Period, ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, ActiveLight, Inc. suffered injury as a result of Defendants' unlawful conduct.

24.     On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired 100% of the outstanding stock of ActiveLight, Inc.  From the acquisition date through March 2, 2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

25.     CineLight Corporation was formed on June 11, 2001, as a Washington company with its principal place of business in the State of Washington.  CineLight Corporation was a value-added wholesale distributor of advanced display technology products and accessories to home theater designers and resellers.  During the Relevant Period, CineLight Corporation purchased CRT Products directly and indirectly from Defendants, and/or

1  Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

2  subsidiaries and affiliates controlled.  As such, CineLight Corporation suffered injury as a result

3  of Defendants' unlawful conduct.

4      26.     On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the

5  outstanding stock of CineLight Corporation.  From the date of the acquisition until July 2006,

6  CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  In

7  July 2006, CineLight Corporation was merged into ActiveLight, Inc.

8      27.     International Computer Graphics, Inc. was formed on April 18, 1985, as a

9  California company with its principal place of business in California.  International Computer

10 Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and

11 desktop displays, digital imaging peripherals and AV presentation products.  During the Relevant

12 Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly

13 from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants

14 or Defendants' subsidiaries and affiliates controlled.  As such, International Computer Graphics,

15 Inc. suffered injury as a result of Defendants' unlawful conduct.

16     28.     On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the

17 outstanding stock of International Computer Graphics, Inc.  From the date of the acquisition

18 through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned

19 subsidiary of Electrograph Systems, Inc.  On March 3, 2008, International Computer Graphics,

20 Inc. was merged into Electrograph Systems, Inc.

21     29.     Champion Vision, Inc. was formed on June 19, 2003, as a New York

22 company with its principal place of business in New York.  During the Relevant Period,

23 Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or

24 Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'

25 subsidiaries and affiliates controlled.  As such, Champion Vision, Inc. suffered injury as a result

26 of Defendants' unlawful conduct.

27     30.     On September 15, 2008, Champion Vision, Inc. was merged into

28 Electrograph Systems, Inc.

31.     Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland.  On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp.  Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area.  During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct.  In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32.     In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

33.     During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary.  In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc.  As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities."  By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' conspiracy, these predecessor entities were injured in their business and property because the prices they paid for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any

1  reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any

2  of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems,

3  Inc. or Electrograph Technologies Corp.

4  **C.**     **Defendants**

5       **1.**     **Hitachi Entities**

6       34.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

7  business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

8  parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

9  market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

10 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11 subsidiaries or affiliates, throughout the United States.

12      35.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

13 company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

14 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

15 in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

16 manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

17 create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

18 Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

19 through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

20 dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

21 antitrust violations alleged in this complaint.

22      36.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

23 company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

24 York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

25 Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

26 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27 United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

28 affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

37.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

38.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

39.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

40.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

1

### 2.   IRICO Entities

2

41.   Defendant IRICO Group Corporation ("IGC") is a Chinese company with

3 its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

4 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

5 marketing, distribution and sale of CRT Products.   During the Relevant Period, IGC

6 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

7 subsidiaries or affiliates, throughout the United States.

8

42.   Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

9 company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

10 Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

11 CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

12 also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

13 and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

14 IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15 subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

16 the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17 complaint.

18

43.   Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

19 company with its principal place of business located at No. 16, Fenghui South Road West,

20 District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

21 subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

22 Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

23 through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

24 and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

25 alleged in this complaint.

26

44.   Defendants IGC, IGE and IDDC are collectively referred to herein as

27 "IRICO."

28

### 3.   LG Electronics Entities

45.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

47.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

48.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 4.   **LP Displays**

49.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.   **Panasonic Entities**

50.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

52.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

53.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

54.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

55.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

56. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

57. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

58. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

1    59.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

2    Brazil are collectively referred to herein as "Philips."

3        **7.    Samsung Entities**

4    60.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

5    company with its principal place of business located at Samsung Electronics Building, 1320-10,

6    Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.    It is South Korea's top electronics

7    company.    During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

8    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

9    States.

10    61.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

11    corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

12    Ridgefield Park, New Jersey 07660.    SEAI is a wholly-owned and controlled subsidiary of

13    Defendant SEC.    During the Relevant Period, SEAI manufactured, marketed, sold and/or

14    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15    United States.    Defendant SEC dominated and controlled the finances, policies and affairs of

16    Samsung SEAI relating to the antitrust violations alleged in this complaint.

17    62.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

18    Company ("Samsung SDI") is a South Korean company with its principal place of business

19    located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.    Samsung SDI is a public

20    company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

21    Samsung SDI claims to be the world's leading company in the display and energy business, with

22    28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

23    market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

24    Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

25    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26    throughout the United States.  Defendant SEC dominated and controlled the finances, policies

27    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

28    63.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

1   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

2   700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

3   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

4   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

5   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

6   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

7   violations alleged in this complaint.

8          64.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

9   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

10  21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

11  owned and controlled subsidiary of Defendant Samsung SDI.   During the Relevant Period,

12  Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

13  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

14  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

15  Mexico relating to the antitrust violations alleged in this complaint.

16         65.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

17  Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

18  Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

19  owned and controlled subsidiary of Defendant Samsung SDI.   During the Relevant Period,

20  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

21  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

22  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

23  Brazil relating to the antitrust violations alleged in this complaint.

24         66.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

25  is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

26  Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

27  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

28  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

67.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

68.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

69.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.     Samtel

70.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

1    States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

2    Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

3    its subsidiaries and affiliates, throughout the United States.

4               **9.**     **Thai CRT**

5               71.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

6    1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

7    Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

8    televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

9    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

10   United States.

11              **10.**    **Toshiba Entities**

12              72.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

13   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

14   Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

15   and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

16   other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

17   Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

18   1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

19   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

20   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

21   subsidiaries or affiliates, throughout the United States.

22              73.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

23   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

24   4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled

25   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

26   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

27   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

28   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

1    complaint.

2        74.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

3    limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

4    3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

5    America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

6    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

7    States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

8    relating to the antitrust violations alleged in this complaint.

9        75.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

10   California corporation with its principal place of business located at 19900 MacArthur

11   Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

12   subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC

13   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

14   subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled

15   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

16   complaint.

17       76.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

18   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

19   California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC

20   through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold

21   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

22   throughout the United States.  Defendant TC dominated and controlled the finances, policies and

23   affairs of TAIS relating to the antitrust violations alleged in this complaint.

24       77.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

25   collectively referred to herein as "Toshiba."

26       **11.    Thomson Entities**

27       78.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

28   French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-

1    les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson

2    Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States

3    market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold

4    its CRTs  internally to its television-manufacturing division, which had plants in the United

5    States and Mexico, and to other television manufacturers in the United States and elsewhere.

6    Thomson SA's television division also purchased CRTs from other CRT manufacturers.

7    Thomson SA's CRT televisions were sold in the United States to consumers under the RCA

8    brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed

9    with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson

10   Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties

11   agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia

12   and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005,

13   Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period,

14   Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or

15   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

16          79.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

17   Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

18   business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson

19   Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

20   Electronics was a major manufacturer of CRTs for the United States market, with plants located

21   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

22   plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

23   television-manufacturing division, which had plants in the United States and Mexico, and to

24   other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

25   were sold in the United States to United States consumers under the RCA brand.  Thomson

26   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

27   business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

28   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2         80.    Thomson SA and Thomson Consumer Electronics are collectively referred

3    to herein as "Thomson."

4         **12.    Mitsubishi Entities**

5         81.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6    is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8    Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

9    internally to Mitsubishi's television and monitor manufacturing division and to other television

10   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

11   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

12   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13   United States.

14        82.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19   and monitor manufacturing division and to other television and monitor manufacturers in the

20   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22   marketed, sold and distributed CRT Products in the United States.

23        83.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

26   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27   CRT televisions and monitors in the United States.

28        84.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

1  are collectively referred to herein as "Mitsubishi."

2  **IV.**          **AGENTS AND CO-CONSPIRATORS**

3           85.     The acts alleged against Defendants in this Complaint were authorized,

4  ordered, or done by their officers, agents, employees, or representatives, while actively engaged

5  in the management and operation of Defendants' businesses or affairs.

6           86.     Each Defendant acted as the principal, agent, or joint venturer of, or for,

7  other Defendants with respect to the acts, violations, and common course of conduct alleged by

8  Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent

9  for CRTs or CRT Products made by its parent company.

10          87.     Various persons and/or firms not named as Defendants in this Complaint

11 participated as co-conspirators in the violations alleged herein and may have performed acts and

12 made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

13 include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

14 Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

15 Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

16 Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-

17 conspirators as Defendants at a later date.

18          88.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major

19 manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

20 2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

21 Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

22 subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

23 United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

24 Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

25 Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

26 Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

27 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

28 As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

89.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

90.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

91.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

92.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

1   Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled

2   subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint

3   venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co.,

4   Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

5   During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

6   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7   Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

8   the antitrust violations alleged in this complaint.

9           93.     The acts charged in this Complaint have been done by Defendants and

10   their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

11   employees or representatives while actively engaged in the management of each Defendant's or

12   co-conspirator's business or affairs.

13   **V.      TRADE AND COMMERCE**

14          94.     During the Relevant Period, each Defendant, or one or more of its

15   subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

16   interstate commerce and foreign commerce, including through and into this judicial district.

17          95.     During the Relevant Period, Defendants collectively controlled a vast

18   majority of the market for CRT Products, both globally and in the United States.

19          96.     The business activities of Defendants substantially affected interstate trade

20   and commerce in the United States and caused antitrust injury in the United States.  The business

21   activities of Defendants also substantially affected trade and commerce in California and New

22   York and caused antitrust injuries in California and New York.

23   **VI.     FACTUAL ALLEGATIONS**

24          **A.      CRT Technology**

25          97.     A CRT has three components: (a) one or more electron guns, each of

26   which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

27   other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

28   that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

98.     CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

99.     The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

100.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

101.     CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

102.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

103.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

104.     Plaintiffs have participated in the market for CRTs through their direct

1  purchases from Defendants of CRTs and CRT Products and their purchases of CRT Products

2  indirectly from non-Defendant original equipment manufacturers ("OEM") and others.

3  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs

4  and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices

5  for CRTs and CRT Products.

6       105.    Plaintiffs have participated in the market for products containing CRTs.

7  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and

8  their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold

9  CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

10       106.    Plaintiffs have been injured by paying supra-competitive prices for CRTs

11  and CRT Products.

12      **B.**      **Structure of the CRT Industry**

13       107.    The CRT industry has several characteristics that facilitated a conspiracy,

14  including market concentration, ease of information sharing, the consolidation of manufacturers,

15  multiple interrelated business relationships, significant barriers to entry, heightened price

16  sensitivity to supply and demand forces and homogeneity of products.

17         **1.**     **Market Concentration**

18       108.    During the Relevant Period, the CRT industry was dominated by relatively

19  few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well

20  as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78% share of the

21  global CRT market.  The high concentration of market share facilitates coordination because

22  there are fewer cartel members among which to coordinate pricing or allocate markets, and it is

23  easier to monitor the pricing and production of other cartel members.

24         **2.**     **Information Sharing**

25       109.    Because of common membership in trade associations, interrelated

26  business arrangements such as joint ventures, allegiances between companies in certain countries

27  and relationships between the executives of certain companies, there were many opportunities

28  for Defendants to discuss and exchange competitive information.  The ease of communication

was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products as alleged below.

110.   Defendants Hitachi and Samsung, as well as Chunghwa, are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.   Consolidation

111.   The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

112.   The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

113.   Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

1

2

3

    d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

4

5

6

    e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

7

8

9

10

11

    f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

12

13

    g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

14

15

16

17

    h.   Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

18

19

20

    i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

21

22

23

    j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

24

25

    k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

26

    **5.**    **High Costs of Entry Into the Industry**

27

28

    114.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to

overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

115.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRT Products allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.   The Maturity of the CRT Product Market

116.   Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

117.   Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

118.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

119.   Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

120.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a

substantial share of the market.

121.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

122.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

123.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

124.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

125.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

126.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

127.   The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRT Products in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

128.   Defendants Samsung, LG, and Mitsubishi, along with Chunghwa and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRT Products.

129.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

130.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

### 1.   "Glass Meetings"

131.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

132.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

133.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.   These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

134.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.   These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.   These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.   The working level meetings also tended to be more regional and often took place near Defendants' factories.   In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

135.   The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.   The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.   Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

136.   Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) IRICO, and Thomson.   Chunghwa also attended these meetings.

137.   Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

138.  During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

139.  Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

140.  The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

141.  During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

142.  Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

143.  The agreements reached at the glass meetings included:

a.  agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

b.  placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

c.  agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

144.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

1   customers; and 4) a recognition of a mutual interest in living up to the target price and living up

2   to the agreements that had been made.

3           145.    As market conditions worsened in 2005-2007, and the rate of replacement

4   of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and

5   bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

6   subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have

7   concerns about antitrust issues.

8                   **2.      Bilateral Discussions**

9           146.    Throughout the Relevant Period, the glass meetings were supplemented by

10  bilateral discussions between various Defendants.  The bilateral discussions were more informal

11  than the group meetings and occurred on a frequent, ad hoc basis, often between the group

12  meetings. These discussions, usually between sales and marketing employees, took the form of

13  in-person meetings, telephone contacts and emails.

14          147.    During the Relevant Period, in-person bilateral meetings took place in

15  Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

16  Brazil, Mexico, and the United States.

17          148.    The purpose of the bilateral discussions was to exchange information

18  about past and future pricing, confirm production levels, share sales order information, confirm

19  pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

20  including Brazil, Mexico, Europe, and the United States.

21          149.    In order to ensure the efficacy of their global conspiracy, Defendants also

22  used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil, Mexico,

23  and the United States.  These CRT manufacturers were particularly important because they

24  served the North American market for CRT Products.  As further alleged herein, North America

25  was the largest market for CRT televisions and computer monitors during the Relevant Period.

26  Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of

27  Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants

28  ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or

ELECTROGRAPH'S SECOND AMENDED                              38                    Case No. 11-cv-01656-SC
COMPLAINT                                                                        Master File No. 3:07-cv-05944-SC

1  stabilized at supracompetitive levels.

2      150.   Defendants also used bilateral discussions with each other during price

3  negotiations with customers to avoid being persuaded by customers to cut prices.   The

4  information gained in these communications was then shared with supervisors and taken into

5  account in determining the price to be offered.

6      151.   Bilateral discussions were also used to coordinate prices with CRT

7  Product manufacturers that did not ordinarily attend the group meetings, such as Defendants

8  Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a

9  top or management meeting, the attendees at these group meetings would meet bilaterally with

10  the other Defendant manufacturers for the purpose of communicating whatever CRT Product

11  pricing and/or output agreements had been reached during the meeting.  For example, Samsung

12  had a relationship with Hitachi and was responsible for communicating CRT Product pricing

13  agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for

14  communicating CRT Product pricing agreements to Toshiba.  Similarly, Philips had regular

15  bilateral communications with Thomson in Europe and the United States, and Samsung SDI had

16  regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was

17  responsible for communicating CRT Product pricing agreements to Samtel.  Hitachi, Toshiba

18  and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and

19  Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way,

20  Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

21
22  **3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

23      152.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

24  Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

25  These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

26  in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

27  these discussions, Hitachi agreed on prices and supply levels for CRT Products.  Hitachi never

28  effectively withdrew from this conspiracy.

153.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

154.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRT Products.  None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

155.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRT Products.  LG Electronics never effectively withdrew from this conspiracy.

156.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

157.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

40

1    participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

2    were attended by the highest ranking executives from LP Displays.  Certain of these high level

3    executives from LP Displays had previously attended meetings on behalf of Defendants LG

4    Electronics and Philips.   LP Displays also engaged in bilateral discussions with other

5    Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRT

6    Products.

7              158.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

8    Corporation and Matsushita Malaysia, participated in several glass meetings.   After 2003,

9    Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

10   These meetings were attended by high level sales managers from Panasonic and MTPD.

11   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

12   discussions, Panasonic agreed on prices and supply levels for CRT Products.  Panasonic never

13   effectively withdrew from this conspiracy.

14             159.   PCNA was represented at those meetings and was a party to the

15   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

16   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

17   that the prices for CRT Products paid by direct purchasers would not undercut the pricing

18   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

19   the alleged conspiracy.

20             160.   Between at least 2003 and 2006, Defendant MTPD participated in

21   multiple glass meetings and in fact led many of these meetings during the latter years of the

22   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

23   also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

24   agreed on prices and supply levels for CRT Products.

25             161.   Between at least 1998 and 2007, Defendant BMCC participated in

26   multiple glass meetings.  These meetings were attended by high level sales managers from

27   BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants,

28   particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

prices and supply levels for CRT Products.   None of BMCC's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

162.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by high level executives from Philips.   Philips also engaged in numerous bilateral discussions with other Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRT Products.  Philips never effectively withdrew from this conspiracy.

163.   Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

164.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.   Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

165.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

42

1  the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

2  Mexico were active, knowing participants in the alleged conspiracy.

3       166.   Between at least 1998 and 2006, Defendant Samtel participated in

4  multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These

5  meetings were attended by high level executives from Samtel.   Through these discussions,

6  Samtel agreed on prices and supply levels for CRT Products.  Samtel never effectively withdrew

7  from this conspiracy.

8       167.   Between at least 1997 and 2006, Defendant Thai CRT participated in

9  multiple glass meetings.  These meetings were attended by the highest ranking executives from

10  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

11  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

12  levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

13       168.   Between at least 1996 and 2005, Defendant Thomson participated in

14  dozens of meetings with its competitors, including several glass meetings and multiple bilateral

15  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

16  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

17  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

18  development and agreed on prices and supply levels for CRTs.   Thomson never effectively

19  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

20  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

21  a role in the conspiracy.

22       169.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

23  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

24  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

25  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

26  plant shutdowns, customer allocation, and new product development, and agreed on prices and

27  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

28       170.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

1  and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT

2  conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by

3  high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral

4  discussions with other Defendants, particularly with LG. Through these discussions, Toshiba

5  agreed on prices and supply levels for CRT Products. Toshiba never effectively withdrew from

6  this conspiracy.

7      171. Defendants Toshiba America, TACP, TAEC and TAIS were represented

8  at those meetings and were a party to the agreements entered at them. To the extent Toshiba

9  America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers,

10  they played a significant role in the conspiracy because Defendants wished to ensure that the

11  prices for CRT Products paid by direct purchasers would not undercut the pricing agreements

12  reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active,

13  knowing participants in the alleged conspiracy.

14      172. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

15  Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number

16  of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also

17  engaged in bilateral discussions with other Defendants on a regular basis. Through these

18  discussions, Daewoo agreed on prices and supply levels for CRT Products. Bilateral discussions

19  with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in

20  2004. Daewoo never effectively withdrew from this conspiracy.

21      173. When Plaintiffs refer to a corporate family or companies by a single name

22  in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more

23  employees or agents of entities within the corporate family engaged in conspiratorial meetings

24  on behalf of every company in that family. In fact, the individual participants in the

25  conspiratorial meetings and discussions did not always know the corporate affiliation of their

26  counterparts, nor did they distinguish between the entities within a corporate family. The

27  individual participants entered into agreements on behalf of, and reported these meetings and

28  discussions to, their respective corporate families. As a result, the entire corporate family was

1    represented in meetings and discussions by their agents and were parties to the agreements

2    reached in them.

3        **E.        The CRT Market During the Conspiracy**

4        174.    Until the last few years, CRTs were the dominant technology used in

5    displays, including televisions and computer monitors.  During the Relevant Period, this

6    translated into the sale of millions of CRT Products, generating billions of dollars in annual

7    profits.

8        175.    The following data was reported by Stanford Resources, Inc., a market

9    research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

15       176.    During the Relevant Period, North America was the largest market for

16   CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research,

17   the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

18   percent) were consumed in North America.  By 2002, North America still consumed around 35

19   percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related*

20   *Display Materials,* Fuji Chimera Research, 1997, p.12.

21       177.    Defendants' collusion is evidenced by unusual price movements in the

22   CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly

23   predicted declines in consumer prices for CRT Products that did not fully materialize.  For

24   example, in 1992, an analyst for Market Intelligent Research Corporation predicted that

25   "[e]conomies of scale, in conjunction with technological improvements and advances in

26   manufacturing techniques, will produce a drop in the price of the average electronic display to

27   about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence

28

---

[1]        Estimated market value of CRT units sold.

1   of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained

2   stable.

3   178.   In 1996, another industry source noted that "the price of the 14" tube is at

4   a sustainable USD50 and has been for some years . . . ."

5   179.   In early 1999, despite declining production costs and the rapid entry of flat

6   panel display products, the price of large sized color CRTs actually rose.  The price increase was

7   allegedly based on increasing global demand.  In fact, this price increase was a result of the

8   collusive conduct as herein alleged.

9   180.   After experiencing oversupply of 17" CRTs in the second half of 1999, the

10  average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech*

11  *Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-

12  related products."

13  181.   A BNET Business Network news article from August 1998 reported that

14  "key components (cathode ray tubes) in computer monitors have risen in price.  'Although

15  several manufacturers raised their CRT prices in the beginning of August, additional CRT price

16  increases are expected for the beginning of October . . . . While computer monitor price increases

17  may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

18  foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

19  182.   A 2004 article from Techtree.com reports that various computer monitor

20  manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

21  monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

22  used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

23  September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

24  183.   Defendants also conspired to limit production of CRTs by shutting down

25  production lines for days at a time, and closing or consolidating their manufacturing facilities.

26  184.   For example, Defendants' CRT factory utilization percentage fell from

27  90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

28  example of a drop in factory utilization.  There were sudden drops throughout the Relevant

1    Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated

2    drops in factory utilization by Defendants were the result of Defendants' agreements to decrease

3    output in order to stabilize the prices of CRT Products.

4            185.    During the Relevant Period, while demand in the United States for CRT

5    Products continued to decline, Defendants' conspiracy was effective in moderating the normal

6    downward pressures on prices for CRT Products caused by the entry and popularity of the new

7    generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

8    Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

9    CRT technology is very mature; prices and technology have become stable."

10           186.    During the Relevant Period, there were not only periods of unnatural and

11   sustained price stability, but there were also increases in prices of CRT Products.  These price

12   increases were despite the declining demand due to the approaching obsolescence of CRT

13   Products caused by the emergence of a new, potentially superior and clearly more popular,

14   substitutable technology.

15           187.    These price increases and price stability in the market for CRT Products

16   during the Relevant Period are inconsistent with a competitive market for a product facing

17   rapidly decreasing demand caused by a new, substitutable technology.

18       **F.    International Government Antitrust Investigations**

19           188.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of,

20   and restrict output for, CRT Products sold in the United States during the Relevant Period, is

21   demonstrated by a multinational investigation commenced by the Antitrust Division of the

22   United States Department of Justice ("DOJ") and others in November 2007.

23           189.    On November 8, 2007, antitrust authorities in Europe, Japan and South

24   Korea raided the offices of manufacturers of CRTs as part of an international investigation of

25   alleged price fixing.

26           190.    Defendant MTPD, now the CRT unit of Defendant Panasonic, has

27   confirmed that it was raided by Japan's Fair Trade Commission.

28           191.    *Kyodo News* reported on November 8, 2007, upon information and belief,

ELECTROGRAPH'S SECOND AMENDED                       47                    Case No. 11-cv-01656-SC
COMPLAINT                                                                 Master File No. 3:07-cv-05944-SC

that MTPD fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI.  *Kyodo News* further reported that "[o]fficials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

192.     Defendant Samsung SDI was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

193.     The *Asian Shimbun* further reported on November 10, 2007, that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

194.     On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry. Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.  Royal Philips stated that it intended to assist the regulators.

195.     In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

196.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European

48

HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

197.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

198.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-

LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

199.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

200.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

201.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

202.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

203.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

204.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

205.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

206.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

207.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

208.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

209.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG

51

Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

210.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

211.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

212.    The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.      The Role of Trade Associations During the Relevant Period

213.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

214.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

215.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

216.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

217.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.    Effects of Defendants' Antitrust Violations**

**1.    Examples of Reductions in Manufacturing Capacity by Defendants**

218.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

219.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

220.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

221.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

222.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

223.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRT Products

224.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

225.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

226.    In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

227.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

228.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

229.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

230.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

231.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

232.    Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

233.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**H.     Summary Of Effects Of The Conspiracy Involving CRT Products**

234.    The above combination and conspiracy has had the following effects, among others:

    a.    Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.    Prices for CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.    Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFFS' INJURIES

235.    As purchasers of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRT Products causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

236.    Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

56

1       237.   The OEMs and others passed on to their customers, including Plaintiffs,

2   the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their

3   customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury

4   when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

5       238.   Once a CRT leaves its place of manufacture, it remains essentially

6   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

7   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

8   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

9   Plaintiffs.

10      239.   The market for CRTs and the market for CRT Products are inextricably

11  linked and cannot be considered separately.  Defendants are well aware of this intimate

12  relationship.

13      240.   Throughout the Relevant Period, Defendants controlled the market for

14  CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

15  CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

16  Defendants' conspiracy.

17      241.   As a result, Plaintiffs were injured in connection with their purchases of

18  CRT Products during the Relevant Period.

19  **VIII.**   **FRAUDULENT CONCEALMENT**

20      242.   Plaintiffs had neither actual nor constructive knowledge of the facts

21  supporting their claims for relief despite diligence in trying to discover the pertinent facts.

22  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable

23  diligence, the existence of the conspiracy alleged herein until November 2007, when

24  investigations by the DOJ and other antitrust regulators became public.  Defendants engaged in a

25  secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that

26  there was a conspiracy to fix the prices of CRT Products.

27

28

243.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

244.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

245.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

246.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

247.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

248.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

249.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

250.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

251.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

252.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

253.     Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRT Products were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

254.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX.     *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

255.     As discussed at length in Paragraphs 188-212 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

256.     As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

257.     Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## X.     CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

258.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

259.     Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

260.     In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

261.    As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

262.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

263.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      a.  participating in meetings and conversations to discuss the prices and supply of CRT Products;

      b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRT Products;

      c.  agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

      d.  issuing price announcements and price quotations in accordance with the agreements reached;

      e.  selling CRT Products to customers in the United States at noncompetitive prices;

      f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

      g.  agreeing to maintain or lower production capacity; and

      h.  providing false statements to the public to explain increased prices for CRT Products.

264.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

265.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266.     During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

267.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT Products.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

268.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRT Products at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

269.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

270.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.  to fix, raise, maintain and stabilize the price of CRT Products;

b.  to allocate markets for CRT Products amongst themselves;

c.  to submit rigged bids for the award and performance of certain CRT Products contracts; and

d.  to allocate among themselves the production of CRT Products.

271.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.  price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California;

b.  prices for CRT Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.  those who purchased CRT Products from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

272.     As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

273.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

274.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

275.     During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California and elsewhere. As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

276.     Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

277.     Defendants committed acts of unfair competition, as defined by Section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of CRT Products as described above.

278.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

279.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

280.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

281.     Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

282.     By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**Fourth Claim for Relief**

**(Violation of the New York Donnelly Act)**

283.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284.     Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere.  As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

285.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

286.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

287.    As a result, Defendants' conspiracy substantially affected New York commerce

288.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq.*

289.    As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief**

**(Violation of New York Unfair Competition Law)**

290.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

291.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

292.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349, which

1    resulted in consumer injury and broad adverse impact on the public at large, and harmed the

2    public interest of New York State in an honest marketplace in which economic activity is

3    conducted in a competitive manner.

4              293.   Defendants' unlawful conduct had the following effects:  (1) CRT price

5    competition was restrained, suppressed and eliminated throughout New York; (2) CRT Products

6    prices were raised, fixed, maintained and stabilized at artificially high levels throughout New

7    York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-

8    competitive, artificially inflated prices for CRT Products.

9              294.   During the Relevant Period, Defendants' illegal conduct substantially

10   affected New York commerce and consumers.

11             295.   During the Relevant Period, each of Defendants named herein, directly, or

12   indirectly and through affiliates or subsidiaries or agents they dominated and controlled,

13   manufactured, sold and/or distributed CRT Products in New York.

14             296.   Plaintiffs seek treble damages for their injuries caused by these violations

15   in an amount to be determined at trial and are threatened with further injury.  Without prejudice

16   to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs do not

17   seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

18   **XI.    PRAYER FOR RELIEF**

19             WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf,

20   adjudging and decreeing that:

21             A.   Defendants engaged in a contract, combination, and conspiracy in

22   violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the

23   New York Donnelly Act and the unfair competition laws of California and New York and

24   Plaintiffs were injured in their business and property as a result of Defendants' violations;

25             B.   Plaintiffs shall recover damages sustained by them, as provided by the

26   federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

27   entered against Defendants in an amount to be trebled in accordance with such laws, including

28   Section 4 of the Clayton Act;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.   <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                 Respectfully Submitted,

_____
Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com
            anardacci@bsfllp.com

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems,*
*Inc. and Electrograph Technologies Corp.*

# **<u>EXHIBIT G</u>**

STUART H. SINGER (*Pro hac vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 11-cv-06276-SC |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 11-cv-06276-SC | MDL No. 1917 |
| OFFICE DEPOT, INC., | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR | |

DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff, Office Depot, Inc. ("Office Depot"), for its Complaint against all Defendants named herein, hereby alleges as follows:

**I.**     **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

1   through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

2   conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3        2.       Defendants are or were among the leading manufacturers of: (a) color

4   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

7   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

9   and the products containing them shall be referred to as "CDT Products."  CDT Products and

10  CPT Products shall be referred to collectively herein as "CRT Products."

11       3.       Defendants control the majority of the CRT industry, a multibillion dollar

12  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

13  Relevant Period, virtually every household in the United States owned at least one CRT Product.

14       4.       Since the mid-1990s, the CRT industry faced significant economic

15  pressures as customer preferences for other emerging technologies shrank profits and threatened

16  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

17  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19  States.

20       5.       With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

22  shipments, prices, production and customer demand; (c) coordinate public statements regarding

23  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28  producer's share of certain key customers' sales; and (k) restrict output.

OFFICE DEPOT'S AMENDED COMPLAINT            3            Case No. 11-cv-06276-SC
                                                         Master File No. 3:07-cv-05944-SC

6.  The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.  During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.  This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.  During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II. <u>JURISDICTION AND VENUE</u>

10.  Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein because Plaintiff purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

1    events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

2    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

3    into this District.

4    **III.    PARTIES**

5         **A.    Plaintiff**

6         16.    Plaintiff Office Depot is a Delaware corporation with its corporate

7    headquarters in Delray Beach, Florida. Office Depot was incorporated in 1986 with the opening

8    of its first retail location in Fort Lauderdale, Florida. Through the conclusion of Defendants' and

9    the co-conspirators' conspiracy, Office Depot was a global supplier of office products and

10   services. In fiscal year 2010, Office Depot sold $11.6 billion of products and services to

11   consumers and businesses of all sizes.  Upon information and belief, Office Depot owns all

12   claims and rights under federal law and state law to recover any overcharges suffered by Office

13   Depot and the following subsidiaries: (1) Viking Office Products, Inc.; (2) Solutions4sure.com,

14   Inc., d/b/a Tech Depot; and (3) Computers4sure.com, Inc., (collectively, the "Office Depot

15   Subsidiaries").

16        17.    During the Relevant Period, Office Depot and the Office Depot

17   Subsidiaries purchased CRT Products directly and indirectly from the Defendants, and/or the

18   Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants'

19   subsidiaries and affiliates controlled.  As such, Office Depot and the Office Depot Subsidiaries

20   suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

21   Throughout the Relevant Period, Office Depot conducted a substantial amount of business in

22   Florida and California.

23        18.     Upon information and belief, during the Relevant Period, Office Depot

24   and the Office Depot Subsidiaries purchased CRT Products in, *inter alia*, California and Florida

25   containing CRTs manufactured and sold by Defendants and their co-conspirators.  In addition,

26   upon information and belief, Plaintiff supplied its offices in California and Florida with CRT

27   Products and maintained corporate offices and inventories in these states.

28        19.     Upon information and belief, Plaintiff purchased CRT Products, which

1    contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially

2    inflated prices because of the price-fixing conspiracy, in California and Florida.

3        **B.    Defendants**

4            **1.    Hitachi Entities**

5            20.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

6    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

7    parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

8    market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

9    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

10   subsidiaries or affiliates, throughout the United States.

11           21.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

12   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

13   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

14   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

15   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

16   create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

17   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

18   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

19   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

20   antitrust violations alleged in this complaint.

21           22.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

22   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

23   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

24   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

25   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

27   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28           23.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

1  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

2  Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

3  Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

4  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

6  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

7        24.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

8  Delaware corporation with its principal place of business located at 208 Fairforest Way,

9  Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

10  Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

11  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12  United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

13  finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

14  complaint.

15        25.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

16  Shenzhen") was a Chinese company with its principal place of business located at 5001

17  Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

18  least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

19  around the time that the government investigations into the CRT industry began).  Thus, Hitachi

20  Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

21  Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

22  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23  throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

24  controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

25  violations alleged in this complaint.

26        26.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

27  HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

28

## 2. **IRICO Entities**

27.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

28.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

29.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

30.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.      LG Electronics Entities

31.      Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

32.      Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

33.      Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

34.      Defendants LGEI, LGEUSA and LGETT are collectively referred to

1   herein as "LG Electronics."

2       **4.      LP Displays**

3       35.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4   Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5   Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6   which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10  and LGEI would cede control over the company and the shares would be owned by financial

11  institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13  affiliates, throughout the United States.

14      **5.      Panasonic Entities**

15      36.     Defendant Panasonic Corporation, which was at all times during the

16  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18  Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

19  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20  affiliates, throughout the United States.

21      37.     Defendant Panasonic Corporation of North America ("PCNA") is a

22  Delaware corporation with its principal place of business located at One Panasonic Way,

23  Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24  Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26  United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27  and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28      38.     Defendants Panasonic Corporation and PCNA are collectively referred to

herein as "Panasonic."

39.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

41.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

43. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

44. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

the antitrust violations alleged in this complaint.

45.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

46.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

48.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

49.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

52.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

53.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

55.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

## 8.     Samtel

56.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

1    country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

2    States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

3    Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

4    its subsidiaries and affiliates, throughout the United States.

5              **9.      Thai CRT**

6              57.      Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

7    1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

8    Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

9    televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

10   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

11   United States.

12             **10.     Toshiba Entities**

13             58.      Defendant Toshiba Corporation ("TC") is a Japanese company with its

14   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

15   Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

16   and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

17   other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

18   Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

19   1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

20   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

21   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22   subsidiaries or affiliates, throughout the United States.

23             59.      Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

24   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

25   4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled

26   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

27   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

28   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

60.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

61.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

62.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

63.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.    Chunghwa Entities**

64.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

1    Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

2    Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In

3    1974, Chunghwa PT's CRTs received certification by the United States, giving the company

4    entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major

5    global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and

6    distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

7    Fuzhou subsidiary) throughout the United States.

8            65.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

9    Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

10   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

11   owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

12   production, and it has established itself as one of the leading worldwide suppliers of CRTs.

13   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

14   Products either directly or through its subsidiaries or affiliates throughout the United States.

15   Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

16   Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

17           66.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively

18   referred to herein as "Chunghwa."

19           **12.    Thomson Entities**

20           67.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

21   French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-

22   les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson

23   Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States

24   market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold

25   its CRTs internally to its television-manufacturing division, which had plants in the United States

26   and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson

27   SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's

28   CRT televisions were sold in the United States to consumers under the RCA brand.  In

1    November 2003, Thomson SA sold its television division to a joint venture it formed with

2    Chinese company, TCL Corporation. The joint venture was called TCL-Thomson Electronics

3    Corporation ("TCL-Thomson"). As part of the joint venture agreement, the parties agreed that

4    televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

5    Thomson and RCA brands in Europe and North America, respectively. In July 2005, Thomson

6    SA sold its CRT business to Videocon Industries, Ltd. During the Relevant Period, Thomson SA

7    manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

8    through its subsidiaries or affiliates, to customers throughout the United States.

9         68.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

10   Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

11   business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024. Thomson

12   Consumer Electronics is a wholly-owned subsidiary of Thomson SA. Thomson Consumer

13   Electronics was a major manufacturer of CRTs for the United States market, with plants located

14   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico. The United States-based

15   plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own

16   television-manufacturing division, which had plants in the United States and Mexico, and to

17   other television manufacturers in the United States and elsewhere. Thomson's CRT televisions

18   were sold in the United States to United States consumers under the RCA brand. Thomson

19   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

20   business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer

21   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

22   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

23        69.    Thomson SA and Thomson Consumer Electronics are collectively referred

24   to herein as "Thomson."

25        **13.    Mitsubishi Entities**

26        70.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

27   is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

28   Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

71.   Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.   Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.   During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

72.   Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.     During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

73.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

IV.   <u>AGENTS AND CO-CONSPIRATORS</u>

74.   The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

75.   Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

1    common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

2    subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

3    made by its parent company.

4         76.    Various persons and/or firms not named as Defendants in this Complaint

5    participated as co-conspirators in the violations alleged herein and may have performed acts and

6    made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

7    include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

8    Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

9    Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

10   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

11   conspirators as Defendants at a later date.

12        77.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major

13   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

14   2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

15   Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

16   subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

17   United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

18   Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

19   Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

20   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

21   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

22   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

23   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

24   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

25   directly or through their subsidiaries or affiliates, throughout the United States.

26        78.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein

27   as "Daewoo."

28        79.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

80.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

81.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

1   Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

2   the antitrust violations alleged in this complaint.

3         82.    The acts charged in this Complaint have been done by Defendants and

4   their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

5   employees or representatives while actively engaged in the management of each Defendant's or

6   co-conspirator's business or affairs.

7   **V.    TRADE AND COMMERCE**

8         83.    During the Relevant Period, each Defendant, or one or more of its

9   subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

10  interstate commerce and foreign commerce, including through and into this judicial district.

11        84.    During the Relevant Period, Defendants collectively controlled a vast

12  majority of the market for CRT Products, both globally and in the United States.

13        85.    The business activities of Defendants substantially affected interstate trade

14  and commerce in the United States and caused antitrust injury in the United States.  The business

15  activities of Defendants also substantially affected trade and commerce in California and Florida

16  and caused antitrust injuries in California and Florida.

17  **VI.    FACTUAL ALLEGATIONS**

18      **A.    CRT Technology**

19        86.    A CRT has three components: (a) one or more electron guns, each of

20  which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

21  other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

22  that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

23  faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

24  coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

25  shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

26  produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

27  narrow lines of red, green, blue and black.

28        87.    CRT technology was first developed more than a century ago.  The first

1   commercially practical CRT television was made in 1931.  However, it was not until RCA

2   Corporation introduced the product at the 1939 World's Fair that it became widely available to

3   consumers.  After that, CRTs became the heart of most display products, including televisions,

4   computer monitors, oscilloscopes, air traffic control monitors and ATMs.

5          88.    The quality of a CRT itself determines the quality of the CRT display.  No

6   external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

7   the whole CRT product so that the product is often simply referred to as "the CRT."

8          89.    Although there have been refinements and incremental advancements

9   along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

10  the CRT technology used today is similar to that RCA unveiled in 1939.

11         90.    CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

12  used primarily in televisions and related devices and CDTs are primarily used in computer

13  monitors and similar devices.  The primary difference is that CDTs typically yield a higher

14  resolution image requiring more pixels than do CPTs.

15         91.    CRTs have no independent utility, and have value only as components of

16  other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

17  from the demand for such products.

18         92.    The market for CRTs and the market for the products into which they are

19  placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

20  Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes,

21  inseparable in that one would not exist without the other.

22         93.    Plaintiff has participated in the market for CRTs through its direct

23  purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of

24  CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment

25  manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at

26  which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-

27  competitive prices for CRT Products.

28         94.    Plaintiff has participated in the market for products containing CRTs. To

the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiff was not able to pass the inflated prices on to its customers.

95.    Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.    Structure of the CRT Industry**

96.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.    Market Concentration**

97.    During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.    Information Sharing**

98.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

99.    Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG

Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. <u>Consolidation</u>

100.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. <u>Multiple Interrelated Business Relationships</u>

101.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

102.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.   High Costs of Entry Into the Industry**

103.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

104.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.      The Maturity of the CRT Product Market

105.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

106.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

107.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

108.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

109.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

110.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.      Homogeneity of CRT Products

111.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold

and Plaintiff purchased CRT Products primarily on the basis of price.

112.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

113.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

114.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

115.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

116.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

117.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

118.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

119.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.   "Glass Meetings"

120.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

121.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

122.   The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.   These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

123.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into

agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

124.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

125.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

126.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

127.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

128.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

129.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales

volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

130.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

131.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

132.    The agreements reached at the glass meetings included:

        l.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

        m. placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

        n. agreements on pricing for intra-company CRT sales to vertically integrated customers;

        o. agreements as to what to tell customers about the reason for a price increase;

p.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

q.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

r.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

s.  agreements to coordinate uniform public statements regarding available capacity and supply;

t.  agreements to allocate both overall market shares and share of a particular customer's purchases;

u.  agreements to allocate customers;

v.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

w.  agreements to keep their meetings secret.

133.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

134.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.      **Bilateral Discussions**

135.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

136.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

137.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

138.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants , they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

139.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

140.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

141.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.  These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

142.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

143.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

144.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

145.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

146.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

147.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

1    Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

2    These meetings were attended by high level sales managers from Panasonic and MTPD.

3    Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

4    discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

5    withdrew from this conspiracy.

6           148.    PCNA was represented at those meetings and was a party to the

7    agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

8    purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

9    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

10   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

11   the alleged conspiracy.

12          149.    Between at least 2003 and 2006, Defendant MTPD participated in

13   multiple glass meetings and in fact led many of these meetings during the latter years of the

14   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

15   also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

16   agreed on prices and supply levels for CRTs.

17          150.    Between at least 1998 and 2007, Defendant BMCC participated in

18   multiple glass meetings.  These meetings were attended by high level sales managers from

19   BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

20   particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

21   prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

22   CRTs was mandated by the Chinese government.  BMCC was acting to further its own

23   independent private interests in participating in the alleged conspiracy.

24          151.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips

25   and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

26   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

27   LP Displays).  A substantial number of these meetings were attended by high level executives

28   from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

1    Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

2    effectively withdrew from this conspiracy.

3         152.    Defendants Philips America and Philips Brazil were represented at those

4    meetings and were a party to the agreements entered at them.  To the extent Philips America and

5    Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

6    significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

7    Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

8    the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants

9    in the alleged conspiracy.

10        153.    Between at least 1995 and 2007, Defendant Samsung, through SEC,

11   Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

12   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

13   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

14   bilateral discussions with each of the other Defendants on a regular basis.  Through these

15   discussions, Samsung agreed on prices and supply levels for CRTs.

16        154.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

17   Samsung SDI Mexico were represented at those meetings and were a party to the agreements

18   entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

19   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

20   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

21   the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22   Mexico were active, knowing participants in the alleged conspiracy.

23        155.    Between at least 1998 and 2006, Defendant Samtel participated in

24   multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

25   meetings were attended by high level executives from Samtel.  Through these discussions,

26   Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

27   this conspiracy.

28        156.    Between at least 1997 and 2006, Defendant Thai CRT participated in

1   multiple glass meetings.  These meetings were attended by the highest ranking executives from
2   Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,
3   particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply
4   levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

5               157.   Between at least 1996 and 2005, Defendant Thomson participated in
6   dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral
7   meetings.  These meetings were attended by high level sales managers from Thomson.  At these
8   meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,
9   demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product
10  development and agreed on prices and supply levels for CRTs.  Thomson never effectively
11  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon
12  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played
13  a role in the conspiracy.

14              158.   Between at least 1995 and 2005, Defendant Mitsubishi participated in
15  multiple bilateral and some multilateral meetings with its competitors.  These meetings were
16  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed
17  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,
18  plant shutdowns, customer allocation, and new product development, and agreed on prices and
19  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

20              159.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT
21  and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT
22  conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by
23  high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral
24  discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba
25  agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this
26  conspiracy.

27              160.   Defendants Toshiba America, TACP, TAEC and TAIS were represented
28  at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

1    America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers,

2    they played a significant role in the conspiracy because Defendants wished to ensure that the

3    prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

4    agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

5    were active, knowing participants in the alleged conspiracy.

6          161.   Between at least 1995 and 2006, Defendant Chunghwa, through

7    Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

8    and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

9    these meetings were attended by the highest ranking executives from Chunghwa, including the

10   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

11   discussions with each of the other Defendants on a regular basis.  Through these discussions,

12   Chunghwa agreed on prices and supply levels for CRTs.

13         162.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

14   Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

15   of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

16   engaged in bilateral discussions with other Defendants on a regular basis.  Through these

17   discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

18   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

19   Daewoo never effectively withdrew from this conspiracy.

20         163.   When Plaintiff refers to a corporate family or companies by a single name

21   in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

22   employees or agents of entities within the corporate family engaged in conspiratorial meetings

23   on behalf of every company in that family.  In fact, the individual participants in the

24   conspiratorial meetings and discussions did not always know the corporate affiliation of their

25   counterparts, nor did they distinguish between the entities within a corporate family.  The

26   individual participants entered into agreements on behalf of, and reported these meetings and

27   discussions to, their respective corporate families.  As a result, the entire corporate family was

28   represented in meetings and discussions by their agents and were parties to the agreements

reached in them.

E.      **The CRT Market During the Conspiracy**

164.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

165.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars)[1] | Average Selling Price Per Unit |
|------|----------------------|--------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

166.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

167.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

168.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price

---

[1]  Estimated market value of CRT units sold.

increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

169.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

170.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

171.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

172.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

173.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

174.    These price increases and price stability in the market for CRT Products

during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.   **International Government Antitrust Investigations**

175.   Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

176.   Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

177.   In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

178.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

179.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.   On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

184.   Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

185.   The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

186.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG

Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

187.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

188.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

189.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

190.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

191.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

192.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

193.    On March 10, 2009, the DOJ announced that it had reached an agreement

with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

194.   The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.   The Role of Trade Associations During the Relevant Period

195.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

196.   Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

197.   The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

198.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

199.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

H.    **Effects of Defendants' Antitrust Violations**

1.    **Examples of Reductions in Manufacturing Capacity by Defendants**

200.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

201.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

202.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

203.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

204. In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

205. In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.   Examples of Collusive Pricing for CRTs

206. Defendants' collusion is evidenced by unusual price movements in the CRT market. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

207. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208. In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

210. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was

allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

212.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

214.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

     **3.**    **Summary Of Effects Of The Conspiracy Involving CRTs**

215.    The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

1    **VII.    PLAINTIFF'S INJURIES**

2              216.    As a purchaser of computer monitors, TVs and other devices that

3    contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

4    result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-

5    competitive levels.    Defendants' conspiracy artificially inflated the price of CRTs causing

6    Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

7              217.    Plaintiff also purchased CRT Products containing CRTs from OEMs as

8    well as others, which in turn purchased CRTs from Defendants and their co-conspirators.

9    Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

10   OEMs and others, which paid higher prices for CRTs than they would have absent the

11   conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

12             218.    The OEMs and others passed on to their customers, including Plaintiff, the

13   overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers

14   the overcharges caused by Defendants' conspiracy.    Thus, Plaintiff suffered injury when it

15   purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

16             219.    Once a CRT leaves its place of manufacture, it remains essentially

17   unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

18   objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

19   CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

20   Plaintiff.

21             220.    The market for CRTs and the market for CRT Products are inextricably

22   linked and cannot be considered separately.    Defendants are well aware of this intimate

23   relationship.

24             221.    Throughout the Relevant Period, Defendants controlled the market for

25   CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

26   CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

27   Defendants' conspiracy.

28

222.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.    FRAUDULENT CONCEALMENT

223.    Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

224.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

225.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

226.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

227.    Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious

1    communications between Defendants by the use of the telephone or in-person meetings in order

2    to prevent the existence of written records, discussion on how to evade antitrust laws and

3    concealing the existence and nature of their competitor pricing discussions from non-

4    conspirators (including customers).

5        228.   As alleged above, Defendants in mid-2000 began to hold CDT and CPT

6    meetings at separate venues in order to avoid detection.  Participants at glass meetings were also

7    told not to take minutes.  Attending companies also reduced the number of their respective

8    attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

9    nature of their agreement.  During these meetings, top executives and other officials attending

10   these meetings were instructed on more than once occasion not to disclose the fact of these

11   meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

12   production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

13   arrivals and departures at such meetings to avoid being seen in public with each other and with

14   the express purpose and effect of keeping them secret.

15       229.   Defendants also agreed at glass meetings and bilateral meetings to give

16   pretextual reasons for price increases and output reductions to their customers.

17       230.   As alleged above, in early 1999, despite declining production costs and the

18   rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The

19   price increase was allegedly based on increasing global demand for the products.  In fact, this

20   price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the

21   time.

22       231.   As alleged above, despite increased competition from flat panel monitors,

23   prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

24   stabilization was purportedly due exclusively to a shortage of critical components such as glass.

25   This was a pretext used to cover up the conspiracy.

26       232.   In addition, when several CRT manufacturers, including Defendants

27   Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

28   blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this

price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

233.   Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

234.   Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

235.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

IX.   *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

236.   As discussed at length in Paragraphs 175-194 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

237.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

238.   Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

239.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

240.   Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

241.   In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

242.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

243.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

244.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance
with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive
prices;

f.  exchanging competitively sensitive information in order to facilitate
their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices
for CRTs.

245.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

## (Violation of the Florida Deceptive and Unfair Trade Practices Act)

246.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

247.   During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

248.   Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

249.   During the Relevant Period, Plaintiff maintained its principal place of business in Florida.   Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

250.   In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

251.   The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202(3).

252.   Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

253.   As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

**Third Claim for Relief**

**(Violation of the California Cartwright Act)**

254.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255.     During the Relevant Period, Plaintiff conducted a substantial volume of business in California.   In particular, upon information and belief, Plaintiff purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Plaintiff also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Plaintiff maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Plaintiff also sold CRT Products to customers in California.  Finally, Plaintiff maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Plaintiff's business operations in California, it was registered to do business in the State and, upon information and belief, paid taxes to the State of California during the Relevant Period.   As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California**.**

256.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

257.     Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for,

1    CRTs at supra-competitive levels. Defendants' conduct substantially affected California

2    commerce.

3         258.   The aforesaid violations of Section 16720, California Business and

4    Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of

5    action among Defendants and their co-conspirators, the substantial terms of which were to fix,

6    raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

7         259.   For the purpose of forming and effectuating the unlawful trust, Defendants

8    and their co-conspirators have done those things which they combined and conspired to do,

9    including but in no way limited to the acts, practices and course of conduct set forth above and

10   the following:

11            a.  to fix, raise, maintain and stabilize the price of CRTs;

12            b.  to allocate markets for CRTs amongst themselves;

13            c.  to submit rigged bids for the award and performance of certain

14               CRTs contracts; and

15            d.  to allocate among themselves the production of CRTs.

16        260.   The combination and conspiracy alleged herein has had, inter alia, the

17   following effects:

18            a.  price competition in the sale of CRTs has been restrained,

19               suppressed and/or eliminated in the State of California;

20            b.  prices for CRTs sold by Defendants, their co-conspirators, and

21               others have been fixed, raised, maintained and stabilized at

22               artificially high, non-competitive levels in the State of California;

23               and

24            c.  those who purchased CRT Products containing price-fixed CRTs

25               from Defendants, their co-conspirators, and others have been

26               deprived of the benefit of free and open competition.

27

28

261.   As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

262.   As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Fourth Claim for Relief**

**(Violation of California Unfair Competition Law)**

263.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.   Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

265.   This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

266.   The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.   Defendants' Unlawful Business Practices: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce.

Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b. <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c. <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

267. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

268. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

269. Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

270. By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

XI.     **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.     Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the FDUTPA, the California Cartwright Act, and the California Unfair Competition Law, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.     Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.     Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.     Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.     Defendants shall be enjoined from engaging in further acts or practices in violation of and Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

G.     Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.      Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

J.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

K.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

L.      Plaintiff shall receive such other or further relief as may be just and proper.

## XII.      **<u>JURY TRIAL DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                  Respectfully Submitted,

_____

STUART H. SINGER (P*ro Hac Vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

# **<u>EXHIBIT H</u>**

1  Richard Alan Arnold, Esquire
   William J. Blechman, Esquire
2  Kevin J. Murray, Esquire
   KENNY NACHWALTER, P.A.
3  201 S. Biscayne Boulevard, Suite 1100
   Miami, Florida 33131
4  Tel:   (305) 373-1000
   Fax:   (305) 372-1861
5  Email: rarnold@knpa.com
          wblechman@knpa.com
6          kmurray@knpa.com

7
   *Counsel for Plaintiffs Sears Roebuck*
8  *and Co. and Kmart Corp.*

9

                    **UNITED STATES DISTRICT COURT**
10
          **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**
11

12 SEARS, ROEBUCK AND CO. and KMART          **Master File No. 3:07-cv-05944-SC**
   CORP.,
13                                            **MDL No. 1917**
                       Plaintiffs
14
                                             Individual Case No. CV 11-5514
       v.
15
16 CHUNGHWA PICTURE TUBES, LTD.;
   CHUNGHWA PICTURE TUBES
17 (MALAYSIA); IRICO GROUP                    **SECOND AMENDED COMPLAINT FOR**
   CORPORATION; IRICO GROUP                   **DAMAGES AND INJUNCTIVE RELIEF**
18 ELECTRONICS CO., LTD.; IRICO DISPLAY
   DEVICES CO., LTD.; LG ELECTRONICS,
19 INC.; LG ELECTRONICS USA, INC.; LG         **DEMAND FOR JURY TRIAL**
   ELECTRONICS TAIWAN TAIPEI CO., LTD.;
20 LP DISPLAYS INTERNATIONAL LTD.;
   HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
21 HITACHI AMERICA, LTD.; HITACHI ASIA,
   LTD.; HITACHI ELECTRONIC DEVICES
22 (USA), INC.; SHENZHEN SEG HITACHI
   COLOR DISPLAY DEVICES, LTD.;
23 PANASONIC CORPORATION; PANASONIC
   CORPORATION OF NORTH AMERICA; MT
24 PICTURE DISPLAY CO., LTD.; BEIJING
   MATSUSHITA COLOR CRT CO., LTD.;
25 KONINKLIJKE PHILIPS ELECTRONICS
   N.V.; PHILIPS ELECTRONICS NORTH
26 AMERICA CORPORATION; PHILIPS
27

28

ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC., TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
and MITSUBISHI ELECTRIC &
ELECTRONICS, USA, INC.

Defendants

Plaintiffs Sears, Roebuck and Co. ("Sears") and Kmart Corp. ("Kmart") (hereafter "Plaintiffs")

for their Second Amended Complaint for Damages and Injunctive Relief against all Defendants named

herein, hereby allege as follows:

## I.    INTRODUCTION

1.      Defendants and their co-conspirators formed an international cartel which conducted a

long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise,

stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading

manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;

(b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c)

electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.     The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.      During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

II.      **JURISDICTION AND VENUE**

10.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.      Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.      This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair

1   competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their

2   claims under the federal antitrust laws that they form part of the same case or controversy.

3       13.    The activities of Defendants and their co-conspirators, as described herein, involved U.S.

4   import trade or commerce and/or were within the flow of, were intended to, and did have a direct,

5   substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce,

6   as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs'

7   antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected

8   the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or

9   used in each of the states identified herein.

10      14.    This court has jurisdiction over each Defendant named in this action under both Section

11  12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts

12  substantial business in the state of California, and a number of Defendants maintain their headquarters in

13  this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of

14  the laws of the United States and California insofar as they manufactured CRTs and products containing

15  CRTs for sale in the United States and California and several Defendants have admitted that they

16  engaged in conduct in furtherance of the conspiracy in the Northern District of California.

17      15.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and

18  28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this

19  District, or is otherwise found within this District.  In addition, venue is proper in this District under 28

20  U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in

21  this district.

22  **III.   THE PARTIES**

23      **A.   Plaintiffs**

24

25      16.    Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in

26  Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters

27  in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's

28

largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com. During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for internal use during the Relevant Period.

17.     On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned by a common corporate parent, Sears Holdings Corporation. During and after the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants, their co-conspirators, and others. As a result of Defendants' and their co-conspirators' conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

18.     During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's negotiations for the purchase of CRTs took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan. In addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan respectively and all invoices were sent to those companies in Illinois and Michigan respectively. The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to CRTs.

19.     During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers. Kmart Corporation likewise purchased CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota, Nebraska, Nevada, and North Carolina.

20.

### B. The Defendants

#### 1. IRICO Entities

21.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

22.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

23.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

24.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

#### 2. LG Electronics Entities

25.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

26.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

27.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

28.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 3.     LP Displays

29.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 4.    Hitachi Entities

30.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

31.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

32.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or

through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

33.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

34.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

35.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

36.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**5.     Panasonic Entities**

37.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

38.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

39.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

40.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

41.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

42.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United

States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

44.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

45.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

46.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.     Samsung Entities

47.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

48.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant

Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

49.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

50.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

51.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

52.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

53.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

54.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

55.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

1   Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

2   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and

3   Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

4   relating to the antitrust violations alleged in this complaint.

5      56.   Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

6   Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are

7   collectively referred to herein as "Samsung."

8                    **8.      Samtel**

9      57.   Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of

10   business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market

11   share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.

12   Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its

13   CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs,

14   either directly or through its subsidiaries and affiliates, throughout the United States.

15                    **9.      Thai CRT**

16      58.   Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam

17   Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and

18   it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the

19   Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or

20   through its subsidiaries or affiliates, throughout the United States.

21                    **10.     Toshiba Entities**

22      59.   Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of

23   business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to

24   10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In

25   December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form

26   P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an

27   annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

60.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

61.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

62.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

63.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly

or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

64.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11.   Chunghwa Entities

65.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

66.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

67.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

### 12.   Thomson Entities

68.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.   Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.      Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a United States corporation with its principal place of business located at 10330 N. Meridian Street, Indianapolis, Indiana 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-5514

70.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**13.     Mitsubishi Entities**

71.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

72.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California  90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

73.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California  92618.  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRT Products in the United States.

74.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.    AGENTS AND CO-CONSPIRATORS

75.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

76.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

77.    Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., Videocon Industries, Ltd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

78.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

1    marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates,

2    throughout the United States.

3          79.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

4          80.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a

5    Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan

6    Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-

7    owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation

8    transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with

9    Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

10   as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period,

11   Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

12   its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated

13   and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

14   violations alleged in this complaint.

15         81.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

16   by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of

17   business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3

18   million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

19   Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the

20   Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

21   through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

22   controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

23   complaint.

24         82.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

25   principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

26   Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

27   2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

28

22

re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured,

marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs

of TDDT relating to the antitrust violations alleged in this complaint.

83.    The acts charged in this Complaint have been done by Defendants and their co-

conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

representatives while actively engaged in the management of each Defendant's or co-conspirator's

business or affairs.

## V.    **TRADE AND COMMERCE**

84.    During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

commerce, including through and into this judicial district.

85.    During the Relevant Period, Defendants collectively controlled a vast majority of the

market for CRTs, both globally and in the United States.

86.    The business activities of Defendants substantially affected interstate trade and commerce

in the United States and caused antitrust injury in the United States.  The business activities of

Defendants also substantially affected trade and commerce and caused antitrust injuries in California,

Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska,

Nevada, New Mexico, New York, North Carolina, and Wisconsin.

## VI.   **FACTUAL ALLEGATIONS**

### A.    **CRT Technology**

87.    A CRT has three components: (a) one or more electron guns, each of which is a series of

metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used

to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by

an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor

produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a

polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

88.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

89.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

90.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

91.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

92.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

93.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets.  The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

94.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment

manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

95.    Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

96.    Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.    Structure of the CRT Industry**

97.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.    Market Concentration

98.    During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.    Information Sharing

99.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

100.     Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.     Consolidation

101.      The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.     Multiple Interrelated Business Relationships

102.     The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

103.     Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

     i.     The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

     ii.     Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

     iii.     The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

iv.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.    In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.    High Costs of Entry Into the Industry**

104.   There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers

to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

105.   During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.   The Maturity of the CRT Market

106.   Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

107.   Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

108.   In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

109.   Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

110.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

111.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRTs

112.    CRTs are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

113.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

114.    The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

115.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

116.    In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

117.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period,

1  representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

2  manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

3  increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

4  South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

5          118.    Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also attended

6  several ad hoc group meetings during this period.  The participants at these group meetings also

7  discussed increasing prices for CRTs.

8          119.    As more manufacturers formally entered the conspiracy, group meetings became more

9  prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a

10 formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

11 attended hundreds of these meetings during the Relevant Period.

12         120.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

13 Defendants charged for CRTs.

14              **1.      "Glass Meetings"**

15         121.    The group meetings among the participants in the CRT price-fixing conspiracy were

16 referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general

17 levels of Defendants' corporations.

18         122.    The first level meetings were attended by high level company executives including

19 CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less

20 frequently, typically quarterly, and were focused on longer term agreements and forcing compliance

21 with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable

22 information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve

23 disputes because they were decision makers who could make agreements.

24         123.    The second level meetings were attended by Defendants' high level sales managers and

25 were known as "management" meetings.  These meetings occurred more frequently, typically monthly,

26 and handled implementation of the agreements made at top meetings.

27

28

124.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

125.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

126.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.

127.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

128.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia and the United States.

129.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

130.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

131.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

132.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

133.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

134.    The agreements reached at the glass meetings included:

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

i.     agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

iii.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

iv.   agreements as to what to tell customers about the reason for a price increase;

v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

vii.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

viii. agreements to coordinate uniform public statements regarding available capacity and supply;

ix.   agreements to allocate both overall market shares and share of a particular customer's purchases;

x.    agreements to allocate customers;

xi.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xii.  agreements to keep their meetings secret.

135.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

136.     As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    Bilateral Discussions

137.     Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

138.     During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

139.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and Europe.

140.     In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT manufacturers were particularly important because they served the North American market for CRTs.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because the CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

141.     Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

142.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.     Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

143.     Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

144.     Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

145.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

146.   Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

147.   Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

148.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also

engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

149. Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

150. PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

151. Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

152. Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

153. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the

CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

154. Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

155. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

156. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

157. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

158.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

159.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

160.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

161.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

162.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

163.   Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

164.   Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

165.   When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E.   The CRT Market During the Conspiracy

166.   Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

167.   The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

168.   During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

169.   Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

---

[1]   Estimated market value of CRT units sold.

170.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

171.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

172.     After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

173.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

174.     A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

175.     Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

176.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by

1    Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices

2    of CRTs.

3        177.    During the Relevant Period, while demand in the United States for CRTs continued to

4    decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices

5    for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.

6    As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was

7    quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become

8    stable."

9        178.    During the Relevant Period, there were not only periods of unnatural and sustained price

10   stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite

11   the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new,

12   potentially superior and clearly more popular, substitutable technology.

13       179.    These price increases and price stability in the market for CRTs during the Relevant

14   Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused

15   by a new, substitutable technology.

16       **F.    International Government Antitrust Investigations**

17       180.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

18   investigation into the CRT cartel.  The HCA described the cartel as follows:

19           The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)
             initiated a competition supervision proceeding against the following
20           undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,
             Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips
21           Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes
             (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo
22           Electronics Global HQ, Daewoo Electronics European HQ, MT Picture
             Display Germany GmbH, Matsushita Global HQ, Matsushita European
23           HQ.

24           Based on the data available the undertakings mentioned above concerted
             their practice regarding the manufacturing and distribution of cathode-ray
25           tubes (including coloured pictures tubes and coloured screen tubes) on the
             European market between 1995 and 2007. The anti-competitive behaviour
26           may have concerned the exchange of sensitive market information (about
             prices, volumes sold, demand and the extent to which capacities were
27           exploited), price-fixing, the allocation of market shares, consumers and

28

volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

181.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.   On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.   On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan

based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185.     On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs. The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006. The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Acts in furtherance of this conspiracy were carried out within the Northern District of California. The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

186.     On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market. The

1   companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung

2   SDI, Panasonic, Toshiba, MTPD and Technicolor (formerly Thomson).  The Commission Vice

3   President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

4   cartels'; they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

5   companies doing business in Europe."  The press release accompanying the fines further notes that the

6   CRT cartels were "among the most organized cartels that the Commission has investidated."

7       187.    As outlined above, Defendants have a history of competitor contacts resulting from joint

8   ventures, numerous cross-licensing agreements, and other alliances in related businesses in the

9   electronics industry.

10       188.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.

11   For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October

12   2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

13       189.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.

14   Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access

15   Memory ("SRAM") and NAND Flash Memory.

16       190.    In December 2006, government authorities in Japan, Korea, the European Union and the

17   United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related

18   TFT-LCD market.

19       191.    On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa,

20   as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co.,

21   Ltd.—were all under investigation for price fixing TFT-LCDs.

22       192.    On November 12, 2008, the DOJ announced that it had reached agreements with three

23   TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.),

24   Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15

25   U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of

26   TFT-LCD Products.

27

28

193.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

194.    The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

195.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

196.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

197.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

198.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

199.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

### H.    Effects of Defendants' Antitrust Violations

#### 1.    Examples of Reductions in Manufacturing Capacity by Defendants

200.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

201.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

202.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

203.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

204.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

205.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.    Examples of Collusive Pricing for CRTs

206.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

207.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.    In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

210.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on

increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

212.   After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.   On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

214.   Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

215.   CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.**   **Summary Of Effects Of The Conspiracy Involving CRTs**

216.   The above combination and conspiracy has had the following effects, among others:

a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

d.      As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFFS' INJURIES

217.     As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

218.     Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

219.     The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs containing such price-fixed CRTs from the OEMs and others.

220.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

221.     The market for CRTs and the market for products containing CRTs are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

222.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

223.     As a result, Plaintiffs were injured in connection with their purchases of CRTs during the Relevant Period.

**VIII.   FRAUDULENT CONCEALMENT**

224.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

225.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs.

226.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

227.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

228.     Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

229.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

230.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

231.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

232.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

233.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

234.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

235.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

236.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

IX.   *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

237.   As discussed at length in Paragraphs 183 through 187 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

238.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

239.   As shown by Plaintiffs' allegations in Paragraphs 1 through 9, and the following causes of action, Plaintiffs were members of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 3:07-cv-05944 SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

X.   CLAIM FOR VIOLATIONS

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

240.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

241.   Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

242.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

243.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

244.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

245.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    issuing price announcements and price quotations in accordance with the agreements reached;

    e.    selling CRTs to customers in the United States at noncompetitive prices;

    f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.    agreeing to maintain or lower production capacity; and

    h.    providing false statements to the public to explain increased prices for CRTs.

246.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

247.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

248.   During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

249.   In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

250.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

251.   The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

252. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a. to fix, raise, maintain and stabilize the price of CRTs;

      b. to allocate markets for CRTs amongst themselves;

      c. to submit rigged bids for the award and performance of certain CRTs contracts; and

      d. to allocate among themselves the production of CRTs.

253. The combination and conspiracy alleged herein has had, inter alia, the following effects:

      a. price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b. prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c. those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

254. As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

255. As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy. As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

256.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

257.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

258.   The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

259.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.     to fix, raise, maintain and stabilize the price of CRTs;

    b.     to allocate markets for CRTs amongst themselves;

    c.     to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.     to allocate among themselves the production of CRTs.

260.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a.     price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c.    those who purchased CRTs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

261.    As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

262.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

a.    Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa,

Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the conspiracy to fix the price of CRTs were carried out in California;

      f.    During the Relevant Period, Plaintiffs purchased CRTs in California.  As a result, each is entitled to the protection of the laws of California; and

      g.    By reason of the foregoing, each of those Plaintiffs is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants or their co-conspirators as result of such business acts and practices.

263.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

      a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised, maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

      b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Arizona commerce;

      c.    During the Relevant Period, Sears purchased CRTs in Arizona.  As a result, Sears is entitled to the protection of the laws of Arizona; and

      d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Sears has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

264.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

a.      Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.      Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.      Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.      Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

f.      During the Relevant Period, Plaintiffs purchased CRTs in Florida.  As a result, each is entitled to the protection of the laws of Florida.

265.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

c.   During the Relevant Period, Plaintiffs purchased CRTs in Illinois.  As a result, each is entitled to the protection of the laws of Illinois; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

a.

266.   By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

a.   Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.   Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**Case No. CV 11-5514**

1     f.  During the Relevant Period, Sears purchased CRTs in Massachusetts.  As a result,

2         Sears is entitled to the protection of the laws of Massachusetts.

3   267.  By reason of the foregoing, Defendants and their co-conspirators also have entered into

4 an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

5     a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6         eliminated competition in the sale of CRTs in Michigan and fixed, raised,

7         maintained and stabilized CRT prices in Michigan at artificially high, non-

8         competitive levels;

9     b.  As a result, Defendants and their co-conspirators' conspiracy substantially

10        affected Michigan commerce;

11     c.  During the Relevant Period, Plaintiffs purchased CRTs in Michigan.  As a result,

12        each is entitled to the protection of the laws of Michigan; and

13     d.  As a direct and proximate result of Defendants' and their co-conspirators'

14        conduct, each of those Plaintiffs has been injured in its business and property by

15        paying more for CRTs manufactured by Defendants, their co-conspirators, and

16        others than it would have paid in the absence of Defendants and their co-

17        conspirators' combination and conspiracy, and is therefore entitled to relief under

18        Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

19   268.  By reason of the foregoing, Defendants and their co-conspirators also have entered into

20 an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

21     a.  Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

22        eliminated competition in the sale of CRTs in Minnesota and fixed, raised,

23        maintained and stabilized CRT prices in Minnesota at artificially high, non-

24        competitive levels;

25     b.  As a result, Defendants and their co-conspirators' conspiracy substantially

26        affected Minnesota commerce;

27

28

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1        c.     During the Relevant Period, Plaintiffs purchased CRTs in Minnesota.  As a result,

2            each is entitled to the protection of the laws of Minnesota; and

3        d.     As a direct and proximate result of Defendants' and their co-conspirators'

4            conduct, each of those Plaintiffs has been injured in its business and property by

5            paying more for CRTs manufactured by Defendants, their coconspirators and

6            others than it would have paid in the absence of Defendants and their co-

7            conspirators' combination and conspiracy, and is therefore entitled to relief under

8            Minnesota Stat. §§ 325D.50, *et seq.*

9     269.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

10 an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

11       a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

12           eliminated competition in the sale of CRTs in Mississippi and fixed, raised,

13           maintained and stabilized CRT prices in Mississippi at artificially high, non-

14           competitive levels;

15       b.     As a result, Defendants and their co-conspirators' conspiracy substantially

16           affected Mississippi commerce;

17       c.     During the Relevant Period, Sears purchased CRTs in Mississippi.  As a result,

18           Sears is entitled to the protection of the laws of Mississippi; and

19       d.     As a direct and proximate result of Defendants' and their co-conspirators'

20           conduct, each of those Plaintiffs has been injured in its business and property by

21           paying more for CRTs manufactured by Defendants, their co-conspirators, and

22           others than it would have paid in the absence of Defendants and their co-

23           conspirators' combination and conspiracy, and is therefore entitled to relief under

24           Mississippi Code Ann. §§ 75-21-1, *et seq.*

25     270.    By reason of the foregoing, Defendants and their co-conspirators also have entered into

26 an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nebraska and fixed, raised, maintained and stabilized CRT prices in Nebraska at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Nebraska commerce;

c.   During the Relevant Period, Plaintiffs purchased CRTs in Nebraska.  As a result, each is entitled to the protection of the laws of Nebraska; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Nebraska Stat. §§ 59-801, *et seq.*

271.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nevada and fixed, raised, maintained and stabilized CRT prices in Nevada at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Nevada commerce;

c.   During the Relevant Period, Plaintiffs purchased CRTs in Nevada.  As a result, each is entitled to the protection of the laws of Nevada; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

1    others than it would have paid in the absence of Defendants and their co-

2    conspirators' combination and conspiracy, and is therefore entitled to relief under

3    Nevada Rev. Stat. Ann. §§ 598A, *et seq*.

4    272.   By reason of the foregoing, Defendants and their co-conspirators also have entered into

5    an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

6        a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

7             eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

8             maintained and stabilized CRT prices in New Mexico at artificially high, non-

9             competitive levels;

10       b.   As a result, Defendants and their co-conspirators' conspiracy substantially

11            affected New Mexico commerce;

12       c.   During the Relevant Period, Sears purchased CRTs in New Mexico.  As a result,

13            Sears is entitled to the protection of the laws of New Mexico; and

14       d.   As a direct and proximate result of Defendants' and their co-conspirators'

15            conduct, each of those Plaintiffs has been injured in its business and property by

16            paying more for CRTs manufactured by Defendants, their co-conspirators, and

17            others than it would have paid in the absence of Defendants and their co-

18            conspirators' combination and conspiracy, and is therefore entitled to relief under

19            New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

20   273.   By reason of the foregoing, Defendants and their co-conspirators also have entered into

21   an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq*.

22       a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23            eliminated competition in the sale of CRTs in New York and fixed, raised,

24            maintained and stabilized CRT prices in New York at artificially high, non-

25            competitive levels;

26       b.   As a result, Defendants and their co-conspirators' conspiracy substantially

27            affected New York commerce;

28

c.      During the Relevant Period, Sears purchased CRTs in New York.  As a result, Sears is entitled to the protection of the laws of New York; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

274.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised, maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

c.      During the Relevant Period, Plaintiffs purchased CRTs in North Carolina.  As a result, each is entitled to the protection of the laws of North Carolina; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

275.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

67

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**

a.      Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

b.      As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.      During the Relevant Period, Sears purchased CRTs in Wisconsin.  As a result, Sears is entitled to the protection of the laws of Wisconsin; and

d.      As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of California, Arizona, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.      Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or

claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.     Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.     Plaintiffs shall receive such other or further relief as may be just and proper.

///

///

///

///

## XII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                              Respectfully submitted

_____

Richard Alan Arnold, Esquire (pro hac vice)
William J. Blechman, Esquire (pro hac vice)
Kevin J. Murray, Esquire (pro hac vice)
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida  33131
Tel:     (305) 373-1000
Fax:     (305) 372-1861
Email:  rarnold@knpa.com
             wblechman@knpa.com
             kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck and Co. and Kmart Corp.*

# **<u>EXHIBIT I</u>**

1  WILLIAM A. ISAACSON (*Pro hac vice*)
   BOIES, SCHILLER & FLEXNER LLP
2  5301 Wisconsin Ave. NW, Suite 800
   Washington, DC 20015
3  Telephone:  (202) 237-2727
   Facsimile:   (202) 237-6131
4  Email:  wisaacson@bsfllp.com

5
   PHILIP J. IOVIENO (*Pro hac vice*)
6  ANNE M. NARDACCI (*Pro hac vice*)
   LUKE NIKAS (*Pro hac vice*)
7  CHRISTOPHER V. FENLON (*Pro hac vice*)
   BOIES, SCHILLER & FLEXNER LLP
8  10 North Pearl Street, 4th Floor
   Albany, NY 12207
9  Telephone:  (518) 434-0600
   Facsimile:   (518) 434-0665
10 Email: piovieno@bsfllp.com

11
   *Counsel for Plaintiffs P.C. Richard & Son Long Island Corporation;*
12 *MARTA Cooperative of America, Inc; and  ABC Appliance, Inc*

13

14                  **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
15                     **SAN FRANCISCO DIVISION**

16  IN RE CATHODE RAY TUBE (CRT)          Case No. 12-cv-02648
    ANTITRUST LITIGATION
17                                        Master File No. 3:07-cv-05944-SC

18  _____   MDL No. 1917

19  This Document Relates To Individual Case
    No. 12-cv-02648
20                                        **AMENDED COMPLAINT**
    P.C. RICHARD & SON LONG ISLAND
21  CORPORATION; MARTA COOPERATIVE       **JURY TRIAL DEMANDED**
    OF AMERICA, INC; and  ABC
22  APPLIANCE, INC.,

23           Plaintiffs,

24       vs.

25  HITACHI, LTD.; HITACHI DISPLAYS,
    LTD.; HITACHI AMERICA, LTD.;
26  HITACHI ASIA, LTD.; HITACHI
    ELECTRONIC DEVICES (USA), INC.;
27  SHENZHEN SEG HITACHI COLOR
    DISPLAY DEVICES, LTD.; IRICO GROUP
28  CORPORATION; IRICO GROUP
    ELECTRONICS CO., LTD.; IRICO
    DISPLAY DEVICES CO., LTD.; LG

ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

　　　　Defendants.

Plaintiffs, P.C. Richard & Son Long Island Corporation ("P.C. Richard"), MARTA

Cooperative of America, Inc. ("MARTA"), and ABC Appliance, Inc. d/b/a ABC Warehouse

("ABC Warehouse"), for their Complaint against all Defendants named herein, hereby allege as

follows:

I.      **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs they purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

10.      Plaintiffs bring this action to obtain injunctive relief under Section 16 of

the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiffs also bring this action pursuant to various state laws listed herein because Plaintiffs purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiffs' state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiffs in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Eastern District of New York under Section 12 of

the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.   Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

**III.   PARTIES**

     **A.   Plaintiff**

          **1.   P.C. Richard**

16.   Plaintiff P.C. Richard is a New York corporation with its corporate headquarters in Farmingdale, New York.   P.C. Richard is the largest chain of private, family-owned electronics and appliances stores in the United States with 65 stores in Connecticut, New York, New Jersey, and Pennsylvania, as well as an online retail store.   Through the conclusion of Defendants' and the co-conspirators' conspiracy, P.C. Richard was a supplier of consumer electronics and appliances.

17.   During the Relevant Period, P.C. Richard purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.   P.C. Richard also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.   As such, P.C. Richard suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

18.   During the Relevant Period, P.C. Richard's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in New York.   In addition, P.C. Richard's purchase orders for CRT Products were issued from New York, invoices for these CRT Products were sent to P.C. Richard in New York, and payments for these CRT Products were issued from New York.   P.C. Richard employees based in New York were also responsible for selecting vendors and product

lines with respect to CRT Products.

### 2.   <u>MARTA</u>

19.   Plaintiff MARTA is a Michigan corporation and has its corporate headquarters in Scottsdale, Arizona.   MARTA was initially formed in 1965 by twelve independent appliance and electronics retailers as a member-owned, not-for-profit, buying cooperative serving a select group of retailers in the appliance and electronics industry. Through the conclusion of Defendants' and the co-conspirators' conspiracy, MARTA was a buying group comprised of larger, independent retailers selling appliances, electronics and furniture.

20.   During the Relevant Period, MARTA purchased CRT Products directly from the Conspirators, including Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  MARTA also purchased CRT Products from OEMs, as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.   As such, MARTA suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

21.   During the Relevant Period, MARTA's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Arizona.  In addition, MARTA's purchase orders for CRT Products were issued from Arizona, invoices for these CRT Products were sent to MARTA in Arizona, and payments for these CRT Products were issued from Arizona and Illinois.   From its headquarters in Arizona, MARTA selected vendors and product lines with respect to CRT Products.

### 3.   <u>ABC Warehouse</u>

22.   Plaintiff ABC Warehouse is a Michigan corporation with its corporate headquarters in Pontiac, Michigan.  ABC Warehouse was founded in 1963 as a family-owned appliance and electronics retailer.   Through the conclusion of Defendants' and the co-conspirators' conspiracy, ABC Warehouse was a supplier of consumer electronics and appliances with approximately 60 stores in Michigan, Ohio, and Indiana, as well as an online retail store.

23.     During the Relevant Period, ABC Warehouse purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, ABC Warehouse suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

24.     During the Relevant Period, ABC Warehouse's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Michigan.  In addition, all ABC Warehouse purchase orders for CRT Products were issued from Michigan, invoices for these products were sent to ABC Warehouse in Michigan, and payments for these CRT Products were issued from ABC Warehouse in Michigan.  ABC Warehouse employees based in Michigan were also responsible for selecting vendors and product lines with respect to CRT Products.

**B.**     **Defendants**

**1.**     **Hitachi Entities**

25.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

1    antitrust violations alleged in this complaint.

2              27.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

3    company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

4    York 10591.   Hitachi America is a wholly-owned and controlled subsidiary of Defendant

5    Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

6    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

8    affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

9              28.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

10   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

11   Singapore 528736.   Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

12   Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

13   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

14   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

15   affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

16             29.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

17   Delaware corporation with its principal place of business located at 208 Fairforest Way,

18   Greenville, South Carolina 29607.   HEDUS is a subsidiary of Defendant Hitachi, Ltd and

19   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

20   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

21   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

22   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

23   complaint.

24             30.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

25   Shenzhen") was a Chinese company with its principal place of business located at 5001

26   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

27   least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

28   around the time that the government investigations into the CRT industry began).  Thus, Hitachi

1    Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

2    Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

3    and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

4    throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

5    controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

6    violations alleged in this complaint.

7            31.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

8    HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

9            **2.    IRICO Entities**

10           32.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with

11   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

12   712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

13   marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC

14   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States.

16           33.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

17   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

18   Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

19   CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

20   also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

21   and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

22   IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

23   subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

24   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

25   complaint.

26           34.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

27   company with its principal place of business located at No. 16, Fenghui South Road West,

28   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC  is  a  partially-owned

1    subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

2    Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

3    through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

4    and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

5    alleged in this complaint.

6           35.    Defendants IGC, IGE and IDDC are collectively referred to herein as

7    "IRICO."

8           **3.    LG Electronics Entities**

9           36.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

10   the laws of the Republic of Korea with its principal place of business located at LG Twin

11   Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

12   billion global force in consumer electronics, home appliances and mobile communications,

13   which established its first overseas branch office in New York in 1968.  The company's name

14   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

15   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

16   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

17   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

18   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

19   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20   throughout the United States.

21          37.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

22   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

23   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

24   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

25   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

27   to the antitrust violations alleged in this complaint.

28          38.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

1   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

2   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

3   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

4   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

5   throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

6   and affairs of LGETT relating to the antitrust violations alleged in this complaint.

7       39.   Defendants LGEI, LGEUSA and LGETT are collectively referred to

8   herein as "LG Electronics."

9               **4.    LP Displays**

10      40.   Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

11  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

12  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

13  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

14  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

15  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

16  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

17  and LGEI would cede control over the company and the shares would be owned by financial

18  institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

19  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20  affiliates, throughout the United States.

21              **5.    Panasonic Entities**

22      41.   Defendant Panasonic Corporation, which was at all times during the

23  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

24  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

25  Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

26  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

27  affiliates, throughout the United States.

28      42.   Defendant Panasonic Corporation of North America ("PCNA") is a

Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

43.  Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44.  Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.  Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

States.

### 6. Philips Entities

46. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

48. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

49.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

50.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.     Samsung Entities

51.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

52.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

55.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

56.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

1    directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC

2    and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

3    Brazil relating to the antitrust violations alleged in this complaint.

4          57.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

5    is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

6    Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

7    Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and

10   controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

11   violations alleged in this complaint.

12         58.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

13   Chinese company with its principal place of business located at Developing Zone of Yi-Xian

14   Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled

15   subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin

16   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

17   subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI

18   dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

19   the antitrust violations alleged in this complaint.

20         59.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

21   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

22   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

23   Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

24   Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

25   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26   throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the

27   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

28   in this complaint.

1    60.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

2  SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

3  SDI Malaysia are collectively referred to herein as "Samsung."

4    **8.    Samtel**

5    61.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

6  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

7  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

8  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

9  States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

10  Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

11  its subsidiaries and affiliates, throughout the United States.

12    **9.    Thai CRT**

13    62.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

14  1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

15  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

16  televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

17  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

18  United States.

19    **10.    Toshiba Entities**

20    63.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

21  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

22  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

23  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

24  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

25  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

26  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

27  in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

28  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries or affiliates, throughout the United States.

2                64.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

3    corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4    4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

5    subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured,

6    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

7    affiliates, throughout the United States.   Defendant TC dominated and controlled the finances,

8    policies and affairs of Toshiba America relating to the antitrust violations alleged in this

9    complaint.

10               65.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

11   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

12   3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

13   America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

14   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

15   States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP

16   relating to the antitrust violations alleged in this complaint.

17               66.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

18   California corporation with its principal place of business located at 19900 MacArthur

19   Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

20   subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC

21   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22   subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled

23   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

24   complaint.

25               67.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

26   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

27   California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC

28   through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold

1    and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2    throughout the United States.  Defendant TC dominated and controlled the finances, policies and

3    affairs of TAIS relating to the antitrust violations alleged in this complaint.

4           68.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

5    collectively referred to herein as "Toshiba."

6          **11.**   **Chunghwa Entities**

7           69.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

8    Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

9    Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In

10   1974, Chunghwa PT's CRTs received certification by the United States, giving the company

11   entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major

12   global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and

13   distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

14   Fuzhou subsidiary) throughout the United States.

15          70.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

16   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

17   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

18   owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

19   production, and it has established itself as one of the leading worldwide suppliers of CRTs.

20   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

21   Products either directly or through its subsidiaries or affiliates throughout the United States.

22   Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

23   Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

24   Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

25   "Chunghwa."

26         **12.**   **Thomson Entities**

27          71.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

28   French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-

les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.   Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").   As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.   In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.    Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2    73.    Thomson SA and Thomson Consumer Electronics are collectively referred

3    to herein as "Thomson."

4    **13.    Mitsubishi Entities**

5    74.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6    is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8    Japan, Taiwan, Mexico and Canada for sale in the United States.   These CRTs were sold

9    internally to Mitsubishi's television and monitor manufacturing division and to other television

10   and monitor manufacturers in the U.S. and elsewhere.   Mitsubishi's television and monitor

11   division also purchased CRTs from other CRT manufacturers.   During the Relevant Period,

12   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13   United States.

14   75.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19   and monitor manufacturing division and to other television and monitor manufacturers in the

20   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22   marketed, sold and distributed CRT Products in the United States.

23   76.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

26   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27   CRT televisions and monitors in the United States.

28   77.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

1   are collectively referred to herein as "Mitsubishi."

2   **IV.   AGENTS AND CO-CONSPIRATORS**

3   78.   The acts alleged against Defendants in this Complaint were authorized,

4   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

5   in the management and operation of Defendants' businesses or affairs.

6   79.   Each Defendant or co-conspirator acted as the principal, agent, or joint

7   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

8   common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a

9   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

10  made by its parent company.

11  80.   Various persons and/or firms not named as Defendants in this Complaint

12  participated as co-conspirators in the violations alleged herein and may have performed acts and

13  made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

14  include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

15  Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

16  Tosummit Electronic Devices Indonesia, Toshiba Display Devices (Thailand) Co., Ltd., and

17  Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-

18  conspirators as Defendants at a later date.

19  81.   During the Relevant Period, Orion Electronic Co. ("Orion") was a major

20  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

21  2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

22  Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

23  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

24  United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

25  Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

26  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

27  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

28  joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

1   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

2   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

3   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

4   directly or through their subsidiaries or affiliates, throughout the United States.

5          82.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein

6   as "Daewoo."

7          83.    Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

8   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

9   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

10  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

11  Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

12  Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

13  Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

14  its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

15  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16  throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

17  finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

18  this complaint.

19         84.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

20  venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

21  principal place of business was located in Indonesia.  TEDI was projected to have an annual

22  production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

23  MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

24  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

25  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

26  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

27  affairs of TEDI relating to the antitrust violations alleged in this complaint.

28         85.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

1  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,

2  Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled

3  subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint

4  venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co.,

5  Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.

6  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT

7  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

8  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to

9  the antitrust violations alleged in this complaint.

10       86. The acts charged in this Complaint have been done by Defendants and

11  their co-conspirators, or were authorized, ordered or done by their respective officers, agents,

12  employees or representatives while actively engaged in the management of each Defendant's or

13  co-conspirator's business or affairs.

14  **V.**  **TRADE AND COMMERCE**

15       87. During the Relevant Period, each Defendant, or one or more of its

16  subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of

17  interstate commerce and foreign commerce, including through and into this judicial district.

18       88. During the Relevant Period, Defendants collectively controlled a vast

19  majority of the market for CRT Products, both globally and in the United States.

20       89. The business activities of Defendants substantially affected interstate trade

21  and commerce in the United States and caused antitrust injury in the United States. Defendants'

22  business activities substantially affected trade and commerce within each of the 50 states, as the

23  conspiracy artificially inflated the prices of CRT Products sold in all 50 states, and therefore

24  caused antitrust injury in every state including the states identified herein. Moreover, Plaintiffs

25  purchased price-fixed goods directly and indirectly from Defendants for sale across the United

26  States.

27

28

**VI.     FACTUAL ALLEGATIONS**

**A.     CRT Technology**

90.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives

1    from the demand for such products.

2         96.    The market for CRTs and the market for the products into which they are

3    placed are inextricably linked and intertwined because the CRT market exists to serve the CRT

4    Products markets. The markets for CRTs and CRT Products are, for all intents and purposes,

5    inseparable in that one would not exist without the other.

6         97.    Plaintiffs have participated in the market for CRTs through their direct

7    purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of

8    CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.

9    Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT

10   Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT

11   Products.

12        98.    Plaintiffs have participated in the market for products containing CRTs.

13   To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and

14   their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold

15   CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

16        99.    Plaintiffs have been injured by paying supra-competitive prices for CRT

17   Products.

18        **B.**    **Structure of the CRT Industry**

19        100.    The CRT industry has several characteristics that facilitated a conspiracy,

20   including market concentration, ease of information sharing, the consolidation of manufacturers,

21   multiple interrelated business relationships, significant barriers to entry, heightened price

22   sensitivity to supply and demand forces and homogeneity of products.

23        **1.**    **Market Concentration**

24        101.    During the Relevant Period, the CRT industry was dominated by relatively

25   few companies. In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

26   Chunghwa, together held a collective 78% share of the global CRT market. The high

27   concentration of market share facilitates coordination because there are fewer cartel members

28   among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

1    production of other cartel members.

2              **2.    Information Sharing**

3              102.   Because of common membership in trade associations, interrelated

4    business arrangements such as joint ventures, allegiances between companies in certain countries

5    and relationships between the executives of certain companies, there were many opportunities

6    for Defendants to discuss and exchange competitive information.  The ease of communication

7    was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

8    took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

9    alleged below.

10             103.   Defendants Hitachi, Samsung and Chunghwa are all members of the

11   Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

12   founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

13   Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

14   Research Association.  Upon information and belief, Defendants and their co-conspirators used

15   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

16   the meetings of these trade associations, Defendants exchanged proprietary and competitively

17   sensitive information which they used to implement and monitor the conspiracy.

18             **3.    Consolidation**

19             104.   The CRT industry also had significant consolidation during the Relevant

20   Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

21   involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

22   and Panasonic's CRT businesses into MTPD.

23             **4.    Multiple Interrelated Business Relationships**

24             105.   The industry is marked by a web of cross-licensing agreements, joint

25   ventures and other cooperative arrangements that can facilitate collusion.

26             106.   Examples of the high degree of cooperation among Defendants in both the

27   CRT Product market and other closely related markets include the following:

28                    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

1  LG Electronics and Philips.

2  b. Defendants LG Electronics and Philips also formed LG.Philips LCD

3  Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

4  purpose of manufacturing TFT-LCD panels.

5  c. The formation of the CRT joint venture MTPD in 2003 by Defendants

6  Toshiba and Panasonic.

7  d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita

8  Display Technology Co., Ltd. as a joint venture for the purpose of

9  manufacturing TFT-LCD panels.

10  e. In December 1995, Defendant Toshiba partnered with Orion and two

11  other non-defendant entities to form TEDI, which manufactured CRTs

12  in Indonesia.

13  f. Defendant Toshiba and Orion also signed a cooperative agreement

14  relating to LCDs in 1995.  Pursuant to the agreement, Daewoo

15  produced STN-LCDs, and Toshiba, which had substituted its STN-

16  LCD production with TFT-LCD production, marketed Daewoo's

17  STN-LCDs globally through its network.

18  g. Also in 1995, Defendant Toshiba entered into a technology transfer

19  agreement with Defendant Chunghwa for large CPTs.

20  h. Defendant Chunghwa has a joint venture with Defendant Samsung for

21  the production of LCD panels.  Chunghwa now licenses the

22  technology from Defendant Philips, a recent development that helped

23  resolve a patent infringement suit filed in 2002.

24  i. Defendants LG Electronics and Hitachi entered into a joint venture in

25  2000 for the manufacture, sale and distribution of optical storage

26  products such as DVD drives.

27  j. Defendant Samtel participates in a joint venture, Samcor Glass

28  Limited, with Defendant Samsung and non-defendant Corning Inc.,

1    USA for the production and supply of picture tube glass.

2         k.   Defendant Samtel claims to have supplied CRTs to Defendants LG

3    Electronics, Samsung, Philips, and Panasonic.

4         **5.    High Costs of Entry Into the Industry**

5         107.   There are significant manufacturing and technological barriers to entry

6    into the CRT industry.  It would require substantial time, resources and industry knowledge to

7    overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter

8    the market in light of the declining demand for CRT Products.

9         108.   During the Relevant Period, the costs of the assembly components, both as

10   a whole and individually, have been generally declining, and, in some periods, declining at a

11   substantial rate.   A combination of price discussions and manipulation of the output of CRTs

12   allowed Defendants to keep prices above where they would have been but for the conspiracy.

13        **6.    The Maturity of the CRT Product Market**

14        109.   Newer industries typically are characterized by rapid growth, innovation

15   and high profits.  The CRT Product market is a mature one, and like many mature industries, is

16   characterized by slim profit margins, creating a motivation to collude.

17        110.   Demand for CRT Products was declining throughout the Relevant Period.

18   Static declining demand is another factor which makes the formation of a collusive arrangement

19   more likely because it provides a greater incentive to firms to avoid price competition.

20        111.   In addition, conventional CRT televisions and computer monitors were

21   being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led

22   Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT

23   Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United

24   States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent

25   between 2006 and 2010.

26        112.   Although demand was declining as a result of the popularity of flat-panel

27   LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the

28   dominant display technology during the Relevant Period, making Defendants' collusion and the

international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.   In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.   As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.   Homogeneity of CRT Products

115.   CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

116.   It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.   Pre-Conspiracy Market

117.   The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.   In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.   Defendants' and Co-Conspirators' Illegal Agreements

119.   In order to control and maintain profitability during declining demand for

CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

122.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.    "Glass Meetings"

124.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

125.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term

agreements and forcing compliance with price-fixing agreements.   Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.   Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.   These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.   These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.   These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.   The working level meetings also tended to be more regional and often took place near Defendants' factories.   In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.   The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.   Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

129.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

1  of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

2          130.    Representatives of Defendants also attended what were known amongst

3  members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The

4  green meetings were generally attended by top and management level employees of Defendants.

5          131.    During the Relevant Period, glass meetings took place in Taiwan, South

6  Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

7          132.    Participants would often exchange competitively sensitive information

8  prior to a glass meeting.  This included information on inventories, production, sales and exports.

9  For some such meetings, where information could not be gathered in advance of the meeting, it

10 was brought to the meeting and shared.

11         133.    The glass meetings at all levels followed a fairly typical agenda.  First, the

12 participants exchanged competitive information such as proposed future CRT pricing, sales

13 volume, inventory levels, production capacity, exports, customer orders, price trends and

14 forecasts of sales volumes for coming months.  The participants also updated the information

15 they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

16 who would write the information on a white board.  The meeting participants then used this

17 information to discuss and agree upon what price each would charge for CRTs to be sold in the

18 following month or quarter.  They discussed and agreed upon target prices, price increases, so-

19 called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

20 of CRTs that were sold to specific customers, and agreed upon target prices to be used in

21 negotiations with large customers.  Having analyzed the supply and demand, the participants

22 would also discuss and agree upon production cutbacks.

23         134.    During periods of oversupply, the focus of the meeting participants turned

24 to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

25 price."

26         135.    Defendants' conspiracy included agreements on the prices at which certain

27 Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

28 CRT Products, such as televisions and computer monitors.  Defendants realized the importance

of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

136.    The agreements reached at the glass meetings included:

    a.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    b.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

    d.    agreements as to what to tell customers about the reason for a price increase;

    e.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

    h.    agreements to coordinate uniform public statements regarding available capacity and supply;

    i.    agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.    agreements to allocate customers;

    k.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.    agreements to keep their meetings secret.

137.    Efforts were made to monitor each Defendant's adherence to these

agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

138.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.    Bilateral Discussions

139.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

140.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

141.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

142.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the

largest market for CRT televisions and computer monitors during the Relevant Period. Because these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

143.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

144.   Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.     Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

145.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings.

1   These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

2   in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

3   these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

4   withdrew from this conspiracy.

5           146.    Defendants Hitachi America and HEDUS were represented at those

6   meetings and were a party to the agreements entered at them.  To the extent Hitachi America and

7   HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role

8   in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

9   direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

10  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

11          147.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

12  IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

13  ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

14  Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

15  agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

16  connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

17  its own independent private interests in participating in the alleged conspiracy.

18          148.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

19  and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

20  participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

21  Displays).  A substantial number of these meetings were attended by the highest ranking

22  executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each

23  of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

24  supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

25          149.    Defendant LGEUSA was represented at those meetings and was a party to

26  the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it

27  played a significant role in the conspiracy because Defendants wished to ensure that the prices

28  for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

1    reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

2    conspiracy.

3              150.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

4    participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

5    were attended by the highest ranking executives from LP Displays.  Certain of these high level

6    executives from LP Displays had previously attended meetings on behalf of Defendants LG

7    Electronics and Philips.  LP Displays also engaged in bilateral discussions with other

8    Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

9    CRTs.

10             151.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

11   Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

12   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

13   These meetings were attended by high level sales managers from Panasonic and MTPD.

14   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

15   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

16   withdrew from this conspiracy.

17             152.    PCNA was represented at those meetings and was a party to the

18   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

19   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

20   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

21   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in

22   the alleged conspiracy.

23             153.    Between at least 2003 and 2006, Defendant MTPD participated in

24   multiple glass meetings and in fact led many of these meetings during the latter years of the

25   conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

26   also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

27   agreed on prices and supply levels for CRTs.

28             154.    Between at least 1998 and 2007, Defendant BMCC participated in

1    multiple glass meetings.   These meetings were attended by high level sales managers from

2    BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants,

3    particularly the other Chinese CRT manufacturers.   Through these discussions, BMCC agreed on

4    prices and supply levels for CRTs.   None of BMCC's conspiratorial conduct in connection with

5    CRTs was mandated by the Chinese government.   BMCC was acting to further its own

6    independent private interests in participating in the alleged conspiracy.

7           155.   Between at least 1996 and 2001, Defendant Philips, through Royal Philips

8    and Philips Taiwan, participated in at least 100 glass meetings at all levels.   After 2001, Philips

9    participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

10   LP Displays).   A substantial number of these meetings were attended by high level executives

11   from Philips.   Philips also engaged in numerous bilateral discussions with other Defendants.

12   Through these discussions, Philips agreed on prices and supply levels for CRTs.   Philips never

13   effectively withdrew from this conspiracy.

14          156.   Defendants Philips America and Philips Brazil were represented at those

15   meetings and were a party to the agreements entered at them.   To the extent Philips America and

16   Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a

17   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

18   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

19   the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing participants

20   in the alleged conspiracy.

21          157.   Between at least 1995 and 2007, Defendant Samsung, through SEC,

22   Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

23   participated in at least 200 glass meetings at all levels.   A substantial number of these meetings

24   were attended by the highest ranking executives from Samsung.   Samsung also engaged in

25   bilateral discussions with each of the other Defendants on a regular basis.   Through these

26   discussions, Samsung agreed on prices and supply levels for CRTs.

27          158.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and

28   Samsung SDI Mexico were represented at those meetings and were a party to the agreements

1   entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

2   a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

3   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

4   the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

5   Mexico were active, knowing participants in the alleged conspiracy.

6          159.   Between at least 1998 and 2006, Defendant Samtel participated in

7   multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

8   meetings were attended by high level executives from Samtel.  Through these discussions,

9   Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

10  this conspiracy.

11         160.   Between at least 1997 and 2006, Defendant Thai CRT participated in

12  multiple glass meetings.  These meetings were attended by the highest ranking executives from

13  Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

14  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

15  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

16         161.   Between at least 1996 and 2005, Defendant Thomson participated in

17  dozens of meetings with its competitors, including several glass meetings and multiple bilateral

18  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

19  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

20  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

21  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

22  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

23  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

24  a role in the conspiracy.

25         162.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

26  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

27  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

28  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

1    plant shutdowns, customer allocation, and new product development, and agreed on prices and

2    supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

3            163.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

4    and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

5    conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

6    high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

7    discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

8    agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

9    conspiracy.

10           164.    Defendants Toshiba America, TACP, TAEC and TAIS were represented

11   at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

12   America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers,

13   they played a significant role in the conspiracy because Defendants wished to ensure that the

14   prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

15   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

16   were active, knowing participants in the alleged conspiracy.

17           165.    Between at least 1995 and 2006, Defendant Chunghwa, through

18   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

19   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

20   these meetings were attended by the highest ranking executives from Chunghwa, including the

21   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

22   discussions with each of the other Defendants on a regular basis.  Through these discussions,

23   Chunghwa agreed on prices and supply levels for CRTs.

24           166.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

25   Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

26   of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

27   engaged in bilateral discussions with other Defendants on a regular basis.  Through these

28   discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

167.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.   In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.   The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.   As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

168.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.   During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

169.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.   According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

---

[1]    Estimated market value of CRT units sold.

1   percent) were consumed in North America.  By 2002, North America still consumed around 35

2   percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related*

3   *Display Materials,* Fuji Chimera Research, 1997, p.12.

4         171.   In the 1990s, industry analysts repeatedly predicted declines in consumer

5   prices for CRT Products.  Despite such predictions, and the existence of economic conditions

6   warranting a drop in prices, CRT Product prices nonetheless remained stable.

7         172.   A BNET Business Network news article from August 1998 reported that

8   "key components (cathode ray tubes) in computer monitors have risen in price.  'Although

9   several manufacturers raised their CRT prices in the beginning of August, additional CRT price

10   increases are expected for the beginning of October . . . . While computer monitor price increases

11   may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

12   foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

13         173.   A 2004 article from Techtree.com reports that various computer monitor

14   manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

15   monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

16   used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

17   September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

18         174.   Defendants also conspired to limit production of CRTs by shutting down

19   production lines for days at a time, and closing or consolidating their manufacturing facilities.

20         175.   For example, Defendants' CRT factory utilization percentage fell from

21   90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

22   example of a drop in factory utilization in the CRT industry.  There were sudden drops

23   throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that

24   these sudden, coordinated drops in factory utilization by Defendants were the result of

25   Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

26         176.   During the Relevant Period, while demand in the United States for CRT

27   Products continued to decline, Defendants' conspiracy was effective in moderating the normal

28   downward pressures on prices for CRT Products caused by the entry and popularity of the new

generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

177.  During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

178.  These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.  International Government Antitrust Investigations**

179.  Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

180.  Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

181.  In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

182.  On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips

Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

183.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.   On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an

1   assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that

2   Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-

3   LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of

4   CRTs was carried out, in part, in California.

5          185.   On March 30, 2010, the DOJ issued a press release announcing that a

6   federal grand jury in San Francisco had that same day returned a one-count indictment against

7   Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of

8   CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a

9   "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

10  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried

11  out, in part, in California.

12         186.   On November 9, 2010, the DOJ issued a press release announcing that a

13  federal grand jury in San Francisco had that same day returned a one-count indictment against

14  Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S.

15  Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used

16  in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives

17  from two color display tube (CDT) manufacturing companies."  The indictment states that the

18  combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

19         187.   On March 18, 2011, the DOJ issued a press release announcing that it had

20  reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a

21  $32 million fine for its role in a conspiracy to fix prices of CDTs.

22         188.   Samsung SDI admitted that from at least as early as January 1997 until at

23  least as late as March 2006, participated in a conspiracy among major CDT producers to fix

24  prices, reduce output, and allocate market shares of CDTs sold in the United States and

25  elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

26  and employees, engaged in discussions and attended meetings with representatives of other

27  major CDT producers.  During these discussions and meetings, agreements were reached to fix

28  prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

189.   The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

190.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

191.   As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

192.   Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

193.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

194.   In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

195.   On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

196.   On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

197.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

198.   The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.**    **The Role of Trade Associations During the Relevant Period**

199.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

200.   Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

201.   The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

202.   Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

203.   Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.   This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

204.   As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

205.   In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied

1    by other manufacturing locations in order to establish an optimum CRT manufacturing
2    structure."

3            206.    In July of 2005, LGPD ceased CRT production at its Durham, England
4    facility, citing a shift in demand from Europe to Asia.

5            207.    In December of 2005, MTPD announced that it would close its American
6    subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG
7    Philips, the company explained that it was shifting its CRT operations to Asian and Chinese
8    markets.

9            208.    In late 2005, Samsung SDI followed the lead of other manufacturers,
10   closing its CRT factory in Germany.

11           209.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton,
12   Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in
13   Malaysia and liquidating its joint venture with Toshiba.

14           **2.**      **Examples of Collusive Pricing for CRTs**

15           210.    Defendants' collusion is evidenced by unusual price movements in the
16   CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation
17   predicted that "[e]conomies of scale, in conjunction with technological improvements and
18   advances in manufacturing techniques, will produce a drop in the price of the average electronic
19   display to about $50 in 1997."

20           211.    In 1996, another industry source noted that "the price of the 14" tube is at
21   a sustainable USD50 and has been for some years . . . ."

22           212.    In reality, prices for CRTs never approached $50 in 1997, and were
23   consistently more than double this price.

24           213.    Despite the ever-increasing popularity of, and intensifying competition
25   from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels"
26   throughout 1995 according to a *CNET News.com* article.  This price stabilization was
27   purportedly due exclusively to a shortage of critical components such as glass.  This was a
28   pretext used to conceal the conspiracy.

214.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

215.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

216.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

217.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

218.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.    Summary Of Effects Of The Conspiracy Involving CRTs**

219.    The above combination and conspiracy has had the following effects, among others:

a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

52

b. Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c. Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFF'S INJURIES

220.    As purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

221.    Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

222.    The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

223. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

224. The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

225. Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

226. As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

227. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

228. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

229. The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection,

1   conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

2   pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

3   and exchange in advance the texts of the proposed communications with customers containing

4   these pretextual statements and would coordinate which co-conspirator would first communicate

5   these pretextual statements to customers.

6          230.    By its very nature, Defendants' price-fixing conspiracy was inherently

7   self-concealing.

8          231.    Plaintiffs could not have discovered the alleged contract, conspiracy or

9   combination at an earlier date by the exercise of reasonable diligence because of the deceptive

10  practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

11  detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

12  conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

13  various means and methods, including, but not limited to, secret meetings, surreptitious

14  communications between Defendants by the use of the telephone or in-person meetings in order

15  to prevent the existence of written records, discussion on how to evade antitrust laws and

16  concealing the existence and nature of their competitor pricing discussions from non-

17  conspirators (including customers).

18         232.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT

19  meetings at separate venues in order to avoid detection.  Participants at glass meetings were also

20  told not to take minutes.  Attending companies also reduced the number of their respective

21  attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

22  nature of their agreement.  During these meetings, top executives and other officials attending

23  these meetings were instructed on more than once occasion not to disclose the fact of these

24  meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

25  production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

26  arrivals and departures at such meetings to avoid being seen in public with each other and with

27  the express purpose and effect of keeping them secret.

28

233.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

234.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

235.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

236.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

237.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

238.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

239.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

IX.    *AMERICAN PIPE*, **GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

240.     As discussed at length in Paragraphs 179-198 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

241.     As shown by Plaintiffs' allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiffs were members of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

242.     Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

243.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

244.     Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

245.     In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

1          246.    As a result of Defendants' unlawful conduct, prices for CRTs were raised,

2  fixed, maintained and stabilized in the United States.

3          247.    The contract, combination or conspiracy among Defendants consisted of a

4  continuing agreement, understanding, and concerted action among Defendants and their co-

5  conspirators.

6          248.    For purposes of formulating and effectuating their contract, combination

7  or conspiracy, Defendants and their co-conspirators did those things they contracted, combined,

8  or conspired to do, including:

9              a.  participating in meetings and conversations to discuss the prices and

10                 supply of CRTs;

11              b.  communicating in writing and orally to fix target prices, floor prices

12                 and price ranges for CRTs;

13              c.  agreeing to manipulate prices and supply of CRTs sold in the United

14                 States in a manner that deprived direct purchasers of free and open

15                 competition;

16              d.  issuing price announcements and price quotations in accordance

17                 with the agreements reached;

18               e.  selling CRTs to customers in the United States at noncompetitive

19                 prices;

20              f.  exchanging competitively sensitive information in order to facilitate

21                 their conspiracy;

22              g.  agreeing to maintain or lower production capacity; and

23              h.  providing false statements to the public to explain increased prices

24                 for CRTs.

25          249.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in

26  their businesses and property in that they paid more for CRT Products than they otherwise would

27  have paid in the absence of Defendants' unlawful conduct.

28                            **<u>Second Claim for Relief</u>**

**(Violation of State Antitrust Laws)**

250.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.  During the Relevant Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, subsidize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

252.  The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

253.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

a.  to fix, raise, maintain and stabilize the price of CRTs;

b.  to allocate the market for CRTs amongst themselves;

c.  to submit rigged bids for the award and performance of certain CRT contracts; and

d.  to allocate among themselves the production of CRTs.

254.  The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.  price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c. those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

255. As a result of the alleged conduct Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products they purchased during the Relevant Period.

256. By reason of the foregoing, Defendants and their co-conspirators, have entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*:

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised, maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

b. As a result, Defendants' and their co-conspirators' conspiracy substantially affected Arizona commerce;

c. During the Relevant Period, MARTA purchased CRT Products containing priced fixed CRTs in Arizona, and, as a result, MARTA is entitled to the protection of the laws of Arizona; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to damages and the costs of suit, including reasonable attorneys' fees, pursuant to Ariz. Rev. Stat §§ 44-1408(B).

257.   By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Code 10/1, *et seq.*:

      a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

      b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

      c.   During the Relevant Period, MARTA purchased CRT Products containing price-fixed CRTs in Illinois, and, as a result, MARTA is entitled to the protection of the laws of Illinois; and

      d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to the Illinois Antitrust Act, 740 Ill. Code 10/7(2).

258.   By reason of the foregoing, Defendants and their co-conspirators also have entered into a restraint of trade in violation of Mich. Comp. Laws §§ 445.771, et seq.:

      a.   Defendants' and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained, and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

      b.   As a result, Defendants' and their co-conspirators' conspiracy substantially affected Michigan commerce;

c. During the Relevant Period, ABC Warehouse purchased CRT Products containing price-fixed CRTs in Michigan, and, as a result, ABC Warehouse is entitled to the protection of the laws of Michigan; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, ABC Warehouse has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' conspiracy, and is therefore entitled to damages and the costs of suit, including reasonable attorneys' fees, pursuant to Mich. Comp. Laws § 445.778(2).

259. By reason of the foregoing, Defendants and their co- conspirators also have entered into an agreement in restraint of trade in violation of New York's Donnelly Act, N.Y. Gen. Bus. Law §§ 340, et seq.:

a. Defendants' and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b. As a result, Defendants' and their co-conspirators' conspiracy substantially affected New York commerce;

c. Beginning on December 23, 1998, P.C. Richard purchased CRT Products containing price-fixed CRT panels in New York, and, as a result, P.C. Richard is entitled to the protection of the laws of New York; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, P.C. Richard has been injured in its business and property by paying more for CRT Products containing CRT panels

1           manufactured by Defendants, their co-conspirators, and others than it

2           would have paid in the absence of Defendants' and their co-

3           conspirators' combination and conspiracy, and is therefore entitled to

4           treble damages and costs of suit, including reasonable attorneys' fees,

5           pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Ariz. Rev. Stat. §§ 44-1401, *et seq.*, and the Illinois Antitrust Act, and that Plaintiffs were injured in their businesses and property as a result of Defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.    Plaintiffs shall recover **its** costs of this suit, including reasonable attorneys' fees as provided by law; and

F.    Plaintiffs shall receive such other or further relief as may be just and proper.

XII.      **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of all the claims asserted in this Complaint so triable.

1    Dated:                                    Respectfully Submitted,

2

3                                              _____
                                               PHILIP J. IOVIENO (*Pro Hac Vice*)
4                                              ANNE M. NARDACCI (*Pro Hac Vice*)
                                               LUKE NIKAS (*Pro Hac Vice*)
5                                              CHRISTOPHER V. FENLON (*Pro Hac Vice*)
                                               BOIES, SCHILLER & FLEXNER LLP
6                                              10 North Pearl Street, 4th Floor
                                               Albany, NY 12207
7                                              Telephone:  (518) 434-0600
                                               Facsimile:  (518) 434-0665
8                                              Email: piovieno@bsfllp.com
9                                              Email: anardacci@bsfllp.com
                                               Email: lnikas@bsfllp.com
10                                             Email: cfenlon@bsfllp.com

11                                             WILLIAM A. ISAACSON (*Pro Hac Vice*)
12                                             BOIES, SCHILLER & FLEXNER LLP
                                               5301 Wisconsin Ave. NW, Suite 800
13                                             Washington, DC 20015
                                               Telephone:  (202) 237-2727
14                                             Facsimile:  (202) 237-6131
                                               Email:  wisaacson@bsfllp.com
15
                                               *Counsel for Plaintiffs P.C. Richard & Son Long*
16                                             *Island Corporation, MARTA Cooperative of America,*
                                               *Inc., and ABC Appliance, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28

P.C. RICHARD'S AMENDED COMPLAINT                    65                    Case No. 12-cv-02648
                                                                         Master File No. 3:07-cv-05944-SC

# **EXHIBIT J**

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Schultze Agency Services, LLC*
*on behalf of Tweeter Opco, LLC and Tweeter Newco, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 12-cv-02649 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 12-cv-02649 | MDL No. 1917 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS | |

USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

   Defendants.

Plaintiff, Schultze Agency Services, LLC ("Schultze Agency Services") on behalf of Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Newco, LLC ("Tweeter Newco") (collectively "Plaintiff"), for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.    <u>INTRODUCTION</u>

1.     Plaintiff brings this action to recover those damages to Tweeter Home Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long-running conspiracy among suppliers of cathode ray tubes ("CRTs") and related products.  Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for CRTs.

2.     Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.     Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.     Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.     With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding

available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it

1    purchased during the Relevant Period.

2    **II.    JURISDICTION AND VENUE**

3            10.     Plaintiff brings this action to obtain injunctive relief under Section 16 of

4    the Clayton Act; and to recover damages, including treble damages under Section 4 of the

5    Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

6    Section 1 of the Sherman Act (15 U.S.C. § 1).

7            11.     Plaintiff also brings this action pursuant to Massachusetts General Laws,

8    chapter 93A. for injunctive relief and damages that Plaintiff sustained due to Defendants' and

9    their co-conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, because Plaintiff

10   purchased CRT Products from non-defendant vendors which contained price-fixed CRTs

11   manufactured by Defendants and their co-conspirators in Massachusetts.

12           12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

13   the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

14   supplemental jurisdiction over Plaintiff's Massachusetts state law claims under 28 U.S.C. § 1367

15   because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's

16   state law claims are so related to its claims under Section 1 of the Sherman Act that they form

17   part of the same case or controversy.

18           13.     The activities of Defendants and their co-conspirators, as described herein,

19   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

20   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

21   import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the

22   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

23   United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

24   substantially affected the price of CRT Products purchased by Plaintiff in Massachusetts.

25           14.     This court has jurisdiction over each Defendant named in this action under

26   Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

27   availed themselves of the laws of the United States as they manufactured CRT Products for sale

28   in the United States, or CRTs which were incorporated into CRT Products Defendants and their

1   co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

2   conspirators' conspiracy affected this commerce in CRT Products in the United States.

3           15.     Venue is proper in the Eastern District of New York under Section 12 of

4   the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

5   corporation, transacts business in this District, or is otherwise found within this District.   In

6   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

7   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

8   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

9   into this District.

10   **III.     PARTIES**

11        **A.     Plaintiff**

12           16.     Through   the   conclusion   of   Defendants'   and   the   co-conspirators'

13   conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of

14   consumer electronics and operated dozens of stores in several states under the names Tweeter,

15   Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east

16   coast and in Texas, Arizona, and Illinois.

17           17.     On June 11, 2007, Tweeter commenced cases in the United States

18   Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re*

19   *Tweeter Home Entertainment Group, Inc. et al.*, Case No. 07-10787 (PJW) (Jointly

20   Administered).   On July 13, 2007, the Court entered an Order (1) Approving Sale of

21   Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and

22   Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and

23   (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the

24   assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its

25   assignees (the "Sale").  The Sale was closed on or about July13, 2007.

26           18.     Tweeter Newco is the sole member and owner of Tweeter Opco.  Both

27   were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of

28   Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the

"APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or causes of action of Sellers against third parties relating to the Purchased Assets arising out of events occurring prior to the Closing Date."

19.     On November 5, 2008, Tweeter Opco and Tweeter Newco commenced cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re Tweeter Opco, LLC, et al.*, Case No. 08-12646 (MFW) (Jointly Administered).  On December 5, 2008, the Court issued an Order Converting the Debtors' Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

20.     Schultze Agency Services is the agent bank for certain lenders which provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and Schultze Agency Services as agent for the lenders.  On March 23, 2009, the Court in the Tweeter Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint.  Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc. and its subsidiaries, affiliates and predecessors, including, but not limited to:  NEA Delaware, Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems; Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

21.     During the Relevant Period, Tweeter purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  Tweeter also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRT panels that had been purchased from Defendants and their co-conspirators.  As

1    such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

2          22.    During the Relevant Period, Tweeter's negotiations for the purchase of

3    CRT Products took place in the United States and were controlled by a department based at the

4    company's headquarters in Massachusetts.   In addition, Tweeter's purchase orders for CRT

5    Products were issued from Massachusetts, invoices for these CRT Products were sent to Tweeter

6    in Massachusetts, and payments for these CRT Products were issued from Massachusetts.

7    Tweeter employees based in Massachusetts were also responsible for selecting vendors and

8    product lines with respect to CRT Products.

9      **B.**    **Defendants**

10            **1.**    **Hitachi Entities**

11          23.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

12   business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

13   parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

14   market share for color CRTs was 20 percent.   During the Relevant Period, Hitachi, Ltd.

15   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

16   subsidiaries or affiliates, throughout the United States.

17          24.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

18   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

19   297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

20   in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

21   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

22   create a separate company called Hitachi Displays.   During the Relevant Period, Hitachi

23   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

24   through its subsidiaries or affiliates, throughout the United States.   Defendant Hitachi, Ltd.

25   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

26   antitrust violations alleged in this complaint.

27          25.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

28   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

TWEETER'S AMENDED COMPLAINT                    8                    Case No. 12-cv-02649
                                                                   Master File No. 3:07-cv-05944-SC

York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 2.    **IRICO Entities**

30.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

1  and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

2  alleged in this complaint.

3          33.      Defendants IGC, IGE and IDDC are collectively referred to herein as

4  "IRICO."

5          **3.     LG Electronics Entities**

6          34.      Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

7  the laws of the Republic of Korea with its principal place of business located at LG Twin

8  Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

9  billion global force in consumer electronics, home appliances and mobile communications,

10  which established its first overseas branch office in New York in 1968.  The company's name

11  was changed from Gold Star Communications to LGEI in 1995, the year in which it also

12  acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

13  venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

14  ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

15  LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

16  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

17  throughout the United States.

18          35.      Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

19  corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

20  New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

21  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

22  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

23  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

24  to the antitrust violations alleged in this complaint.

25          36.      Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

26  Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

27  NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

28  Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 4.     LP Displays

38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.     Panasonic Entities

39.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41.     Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

42.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

1   wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

2   Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

3   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

4   Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

5   the antitrust violations alleged in this complaint.

6       48.   Defendants Royal Philips, Philips America, Philips Taiwan and Philips

7   Brazil are collectively referred to herein as "Philips."

8       **7.** **Samsung Entities**

9       49.   Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

10   company with its principal place of business located at Samsung Electronics Building, 1320-10,

11   Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

12   company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

13   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

14   States.

15       50.   Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

16   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

17   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

18   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

19   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

21   Samsung SEAI relating to the antitrust violations alleged in this complaint.

22       51.   Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

23   Company ("Samsung SDI") is a South Korean company with its principal place of business

24   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

25   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

26   Samsung SDI claims to be the world's leading company in the display and energy business, with

27   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

28   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

52.  Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.  Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.  Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.      Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.      Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.      Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.      Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

1

### 8.     Samtel

2      59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

3  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

4  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

5  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

6  States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

7  Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

8  its subsidiaries and affiliates, throughout the United States.

9

### 9.     Thai CRT

10     60.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

11  1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

12  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

13  televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

14  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15  United States.

16

### 10.     Toshiba Entities

17     61.     Defendant Toshiba Corporation ("TC") is a Japanese company with its

18  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

19  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

20  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

21  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

22  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

23  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

24  in which the entities consolidated their CRT businesses.   During the Relevant Period, TC

25  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

26  subsidiaries or affiliates, throughout the United States.

27     62.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

28  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.   During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.   Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.   Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.   Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Thomson Entities**

69.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.   Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold

its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

70.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

13.    **Mitsubishi Entities**

72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

IV.    **AGENTS AND CO-CONSPIRATORS**

76.    The acts alleged against Defendants in this Complaint were authorized,

1    ordered, or done by their officers, agents, employees, or representatives, while actively engaged

2    in the management and operation of Defendants' businesses or affairs.

3            77.     Each Defendant or co-conspirator acted as the principal, agent, or joint

4    venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

5    common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

6    subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

7    made by its parent company.

8            78.     Various persons and/or firms not named as Defendants in this Complaint

9    participated as co-conspirators in the violations alleged herein and may have performed acts and

10   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

11   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

12   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

13   Tosummit Electronic Devices Indonesia , Toshiba Display Devices (Thailand) Co., Ltd., and

14   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

15   conspirators as Defendants at a later date.

16           79.     During the Relevant Period, Orion Electronic Co. ("Orion") was a major

17   manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

18   2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

19   Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

20   subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

21   United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

22   Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

23   Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

24   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

25   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

26   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

27   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

28   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

directly or through their subsidiaries or affiliates, throughout the United States.

80.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

81.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

82.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

83.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint

venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

84.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

85.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

86.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

87.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Massachusetts and caused antitrust injuries in Massachusetts.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

88.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or

shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

89.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

90.     The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

91.     Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

92.     CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

93.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

94.     The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

95.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.

1    Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products,

2    and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

3          96.      Plaintiff has participated in the market for products containing CRTs. To

4    the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their

5    co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs

6    in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

7          97.      Plaintiff has been injured by paying supra-competitive prices for CRT

8    Products.

9        **B.**       **Structure of the CRT Industry**

10          98.      The CRT industry has several characteristics that facilitated a conspiracy,

11    including market concentration, ease of information sharing, the consolidation of manufacturers,

12    multiple interrelated business relationships, significant barriers to entry, heightened price

13    sensitivity to supply and demand forces and homogeneity of products.

14          **1.**       **Market Concentration**

15          99.      During the Relevant Period, the CRT industry was dominated by relatively

16    few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

17    Chunghwa, together held a collective 78% share of the global CRT market.  The high

18    concentration of market share facilitates coordination because there are fewer cartel members

19    among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and

20    production of other cartel members.

21          **2.**       **Information Sharing**

22          100.     Because of common membership in trade associations, interrelated

23    business arrangements such as joint ventures, allegiances between companies in certain countries

24    and relationships between the executives of certain companies, there were many opportunities

25    for Defendants to discuss and exchange competitive information.  The ease of communication

26    was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

27    took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

28    alleged below.

101.   Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.   Consolidation

102.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

103.   The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104.   Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.   Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.   Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.**      **High Costs of Entry Into the Industry**

105.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

106.      During the Relevant Period, the costs of the assembly components, both as

a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.    A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Product Market

107.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

108.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

109.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

110.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

111.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

112.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

7. **Homogeneity of CRT Products**

113.    CRT Products are commodity-like products which are manufactured in standardized sizes.   One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

114.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

C.    **Pre-Conspiracy Market**

115.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.   During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

D.    **Defendants' and Co-Conspirators' Illegal Agreements**

117.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

118.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

1   the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

2   and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These

3   meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

4   Singapore.

5          119.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

6   Daewoo, also attended several ad hoc group meetings during this period.  The participants at

7   these group meetings also discussed increasing prices for CRTs.

8          120.    As more manufacturers formally entered the conspiracy, group meetings

9   became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized,

10  systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

11  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

12         121.    The overall CRT conspiracy raised and stabilized worldwide and U.S.

13  prices that Defendants charged for CRTs.

14         **1.      "Glass Meetings"**

15         122.    The group meetings among the participants in the CRT price-fixing

16  conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by

17  employees at three general levels of Defendants' corporations.

18         123.    The first level meetings were attended by high level company executives

19  including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top

20  meetings occurred less frequently, typically quarterly, and were focused on longer term

21  agreements and forcing compliance with price-fixing agreements.  Because attendees at top

22  meetings had authority as well as more reliable information, these meetings resulted in

23  agreements.  Attendees at top meetings were also able to resolve disputes because they were

24  decision makers who could make agreements.

25         124.    The second level meetings were attended by Defendants' high level sales

26  managers and were known as "management" meetings.  These meetings occurred more

27  frequently, typically monthly, and handled implementation of the agreements made at top

28  meetings.

125.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127.     Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.  Chunghwa also attended these meetings.

128.     Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

129.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

130.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.

1    For some such meetings, where information could not be gathered in advance of the meeting, it

2    was brought to the meeting and shared.

3          131.    The glass meetings at all levels followed a fairly typical agenda.  First, the

4    participants exchanged competitive information such as proposed future CRT pricing, sales

5    volume, inventory levels, production capacity, exports, customer orders, price trends and

6    forecasts of sales volumes for coming months.  The participants also updated the information

7    they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

8    who would write the information on a white board.  The meeting participants then used this

9    information to discuss and agree upon what price each would charge for CRTs to be sold in the

10   following month or quarter.  They discussed and agreed upon target prices, price increases, so-

11   called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

12   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

13   negotiations with large customers.  Having analyzed the supply and demand, the participants

14   would also discuss and agree upon production cutbacks.

15         132.    During periods of oversupply, the focus of the meeting participants turned

16   to making controlled and coordinated price reductions.  This was referred to as setting a "bottom

17   price."

18         133.    Defendants' conspiracy included agreements on the prices at which certain

19   Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

20   CRT Products, such as televisions and computer monitors.  Defendants realized the importance

21   of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

22   pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

23   supracompetitive prices for CRTs.

24         134.    The agreements reached at the glass meetings included:

25                 a.    agreements on CRT prices, including establishing target prices,

26                       "bottom" prices, price ranges and price guidelines;

27                 b.    placing agreed-upon price differentials on various attributes of CRTs,

28                       such as quality or certain technical specifications;

     c.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

     d.   agreements as to what to tell customers about the reason for a price increase;

     e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

     f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

     g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

     h.   agreements to coordinate uniform public statements regarding available capacity and supply;

     i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

     j.   agreements to allocate customers;

     k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

     l.   agreements to keep their meetings secret.

135.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

136.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and

1   bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

2   subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have

3   concerns about antitrust issues.

### 2.   **Bilateral Discussions**

5       137.   Throughout the Relevant Period, the glass meetings were supplemented by

6   bilateral discussions between various Defendants.  The bilateral discussions were more informal

7   than the group meetings and occurred on a frequent, ad hoc basis, often between the group

8   meetings. These discussions, usually between sales and marketing employees, took the form of

9   in-person meetings, telephone contacts and emails.

10      138.   During the Relevant Period, in-person bilateral meetings took place in

11  Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

12  Brazil, Mexico, and the United States.

13      139.   The purpose of the bilateral discussions was to exchange information

14  about past and future pricing, confirm production levels, share sales order information, confirm

15  pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

16  including Brazil, Mexico, Europe, and the United States.

17      140.   In order to ensure the efficacy of their global conspiracy, Defendants also

18  used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the

19  United States.  These CRT manufacturers were particularly important because they served the

20  North American market for CRT Products.  As further alleged herein, North America was the

21  largest market for CRT televisions and computer monitors during the Relevant Period.  Because

22  these CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they

23  adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of

24  all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at

25  supracompetitive levels.

26      141.   Defendants also used bilateral discussions with each other during price

27  negotiations with customers to avoid being persuaded by customers to cut prices.  The

28  information gained in these communications was then shared with supervisors and taken into

account in determining the price to be offered.

142.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

143.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

144.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

1    direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

2    Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

3           145.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and

4    IDDC, participated in multiple glass meetings.  These meetings were attended by the highest

5    ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other

6    Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO

7    agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

8    connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

9    its own independent private interests in participating in the alleged conspiracy.

10          146.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI

11   and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics

12   participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

13   Displays).   A substantial number of these meetings were attended by the highest ranking

14   executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each

15   of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and

16   supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

17          147.    Defendant LGEUSA was represented at those meetings and was a party to

18   the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it

19   played a significant role in the conspiracy because Defendants wished to ensure that the prices

20   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

21   reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged

22   conspiracy.

23          148.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

24   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

25   were attended by the highest ranking executives from LP Displays.  Certain of these high level

26   executives from LP Displays had previously attended meetings on behalf of Defendants LG

27   Electronics and Philips.   LP Displays also engaged in bilateral discussions with other

28   Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

CRTs.

149.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.    After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants.    Through these discussions, Panasonic agreed on prices and supply levels for CRTs.    Panasonic never effectively withdrew from this conspiracy.

150.    PCNA was represented at those meetings and was a party to the agreements entered at them.    To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.    Thus, PCNA was an active, knowing participant in the alleged conspiracy.

151.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.    These meetings were attended by high level sales managers from MTPD.    MTPD also engaged in bilateral discussions with other Defendants.    Through these discussions, MTPD agreed on prices and supply levels for CRTs.

152.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.    These meetings were attended by high level sales managers from BMCC.    BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.    Through these discussions, BMCC agreed on prices and supply levels for CRTs.    None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.    BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

153.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.    After 2001, Philips

participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

154.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

155.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

156.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

157.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions,

1   Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

2   this conspiracy.

3          158.    Between at least 1997 and 2006, Defendant Thai CRT participated in

4   multiple glass meetings.  These meetings were attended by the highest ranking executives from

5   Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

6   particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

7   levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

8          159.    Between at least 1996 and 2005, Defendant Thomson participated in

9   dozens of meetings with its competitors, including several glass meetings and multiple bilateral

10  meetings.  These meetings were attended by high level sales managers from Thomson.  At these

11  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

12  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

13  development and agreed on prices and supply levels for CRTs.  Thomson never effectively

14  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

15  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

16  a role in the conspiracy.

17         160.    Between at least 1995 and 2005, Defendant Mitsubishi participated in

18  multiple bilateral and some multilateral meetings with its competitors.  These meetings were

19  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed

20  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

21  plant shutdowns, customer allocation, and new product development, and agreed on prices and

22  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

23         161.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT

24  and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

25  conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by

26  high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral

27  discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

28  agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

1   conspiracy.

2         162.    Defendants Toshiba America, TACP, TAEC and TAIS were represented

3   at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

4   America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers,

5   they played a significant role in the conspiracy because Defendants wished to ensure that the

6   prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

7   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

8   were active, knowing participants in the alleged conspiracy.

9         163.    Between at least 1995 and 2006, Defendant Chunghwa, through

10   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

11   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

12   these meetings were attended by the highest ranking executives from Chunghwa, including the

13   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

14   discussions with each of the other Defendants on a regular basis.  Through these discussions,

15   Chunghwa agreed on prices and supply levels for CRTs.

16         164.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

17   Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

18   of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

19   engaged in bilateral discussions with other Defendants on a regular basis.  Through these

20   discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

21   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

22   Daewoo never effectively withdrew from this conspiracy.

23         165.    When Plaintiff refers to a corporate family or companies by a single name

24   in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

25   employees or agents of entities within the corporate family engaged in conspiratorial meetings

26   on behalf of every company in that family.  In fact, the individual participants in the

27   conspiratorial meetings and discussions did not always know the corporate affiliation of their

28   counterparts, nor did they distinguish between the entities within a corporate family.  The

1  individual participants entered into agreements on behalf of, and reported these meetings and

2  discussions to, their respective corporate families. As a result, the entire corporate family was

3  represented in meetings and discussions by their agents and were parties to the agreements

4  reached in them.

5       **E.**       **The CRT Market During the Conspiracy**

6       166.    Until the last few years of the CRT conspiracy, CRTs were the dominant

7  technology used in displays, including televisions and computer monitors. During the Relevant

8  Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

9  annual profits.

10       167.    The following data was reported by Stanford Resources, Inc., a market

11  research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

17       168.    During the Relevant Period, North America was the largest market for

18  CRT TVs and computer monitors. According to a report published by Fuji Chimera Research,

19  the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5

20  percent) were consumed in North America. By 2002, North America still consumed around 35

21  percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related*

22  *Display Materials,* Fuji Chimera Research, 1997, p.12.

23       169.    In the 1990s, industry analysts repeatedly predicted declines in consumer

24  prices for CRT Products. Despite such predictions, and the existence of economic conditions

25  warranting a drop in prices, CRT Product prices nonetheless remained stable.

26       170.    A BNET Business Network news article from August 1998 reported that

27  "key components (cathode ray tubes) in computer monitors have risen in price. 'Although

28

---

[1]     Estimated market value of CRT units sold.

1  several manufacturers raised their CRT prices in the beginning of August, additional CRT price

2  increases are expected for the beginning of October . . . . While computer monitor price increases

3  may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

4  foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

5      171.   A 2004 article from Techtree.com reports that various computer monitor

6  manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

7  monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

8  used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

9  September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

10      172.   Defendants also conspired to limit production of CRTs by shutting down

11  production lines for days at a time, and closing or consolidating their manufacturing facilities.

12      173.   For example, Defendants' CRT factory utilization percentage fell from

13  90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

14  example of a drop in factory utilization in the CRT industry.   There were sudden drops

15  throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

16  these sudden, coordinated drops in factory utilization by Defendants were the result of

17  Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

18      174.   During the Relevant Period, while demand in the United States for CRT

19  Products continued to decline, Defendants' conspiracy was effective in moderating the normal

20  downward pressures on prices for CRT Products caused by the entry and popularity of the new

21  generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

22  Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

23  CRT technology is very mature; prices and technology have become stable."

24      175.   During the Relevant Period, there were not only periods of unnatural and

25  sustained price stability, but there were also increases in prices of CRTs and CRT Products.

26  These price increases were despite the declining demand due to the approaching obsolescence of

27  CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

28  substitutable technology.

176.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

177.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

178.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

179.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

180.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning

the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

181.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a

"former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185.   On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

186.   Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

187.   The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

188.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in

the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

189.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

190.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

191.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

192.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

193.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

194.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

195.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

196.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.    The Role of Trade Associations During the Relevant Period

197.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

198.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

199.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

200.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

201.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.    This exchange of information was used to implement and monitor the conspiracy.

**H.**     **Effects of Defendants' Antitrust Violations**

**1.**     **Examples of Reductions in Manufacturing Capacity by Defendants**

202.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

203.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.   Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."   The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

204.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

205.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

206.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

207.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRTs

208.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

209.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

210.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

211.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

212.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

213.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was

allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

214.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

215.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

216.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.    <u>Summary Of Effects Of The Conspiracy Involving CRTs</u>**

217.    The above combination and conspiracy has had the following effects, among others:

a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFF'S INJURIES

218.   As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.   Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

219.   Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

220.   The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

221.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

222.   The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.   Defendants are well aware of this intimate relationship.

223.   Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

1  224.   As a result, Plaintiff was injured in connection with its purchases of CRT

2  Products during the Relevant Period.

3  **VIII.   FRAUDULENT CONCEALMENT**

4  225.   Plaintiff had neither actual nor constructive knowledge of the facts

5  supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff

6  did not discover, and could not have discovered through the exercise of reasonable diligence, the

7  existence of the conspiracy alleged herein that affected it until November 2007, when the

8  investigation by the DOJ became public and class action complaints in the United States were

9  filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put

10  Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

11  226.   Because Defendants' agreement, understanding and conspiracy were kept

12  secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know

13  that it was paying artificially high prices for CRT Products.

14  227.   The affirmative acts of Defendants alleged herein, including acts in

15  furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

16  precluded detection.  As noted above, Defendants organized glass meetings to avoid detection,

17  conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

18  pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

19  and exchange in advance the texts of the proposed communications with customers containing

20  these pretextual statements and would coordinate which co-conspirator would first communicate

21  these pretextual statements to customers.

22  228.   By its very nature, Defendants' price-fixing conspiracy was inherently

23  self-concealing.

24  229.   Plaintiff could not have discovered the alleged contract, conspiracy or

25  combination at an earlier date by the exercise of reasonable diligence because of the deceptive

26  practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

27  detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

28  conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

230.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

231.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

232.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

233.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

234.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was

blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

235.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

236.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

238.    As discussed at length in Paragraphs 177-196 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

240.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during

1    the pendency of the Direct Purchaser Class actions asserted against Defendants, and

2    commencing on at least November 26, 2007.

3    **XI.    CLAIM FOR VIOLATIONS**

4                    **First Claim for Relief**

5              **(Violation of Section 1 of the Sherman Act)**

6            241.    Plaintiff incorporates by reference all the above allegations as if fully set

7    forth herein.

8            242.    Beginning no later than March 1, 1995, the exact date being unknown to

9    Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-

10   conspirators entered into a continuing contract, combination or conspiracy to unreasonably

11   restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

12   artificially reducing or eliminating competition in the United States.

13           243.    In particular, Defendants and their co-conspirators combined and

14   conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

15           244.    As a result of Defendants' unlawful conduct, prices for CRTs were raised,

16   fixed, maintained and stabilized in the United States.

17           245.    The contract, combination or conspiracy among Defendants consisted of a

18   continuing agreement, understanding, and concerted action among Defendants and their co-

19   conspirators.

20           246.    For purposes of formulating and effectuating their contract, combination

21   or conspiracy, Defendants and their co-conspirators did those things they contracted, combined,

22   or conspired to do, including:

23                    a.   participating in meetings and conversations to discuss the prices and

24                         supply of CRTs;

25                    b.   communicating in writing and orally to fix target prices, floor prices

26                         and price ranges for CRTs;

27

28

c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.   issuing price announcements and price quotations in accordance with the agreements reached;

e.   selling CRTs to customers in the United States at noncompetitive prices;

f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.   agreeing to maintain or lower production capacity; and

h.   providing false statements to the public to explain increased prices for CRTs.

247.   As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**<u>Second Claim for Relief</u>**

**<u>(Violation of Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*)</u>**

248.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

249.   Tweeter was a corporation organized and existing under the laws of the State of Massachusetts and during the Relevant Period, conducted a substantial volume of business in Massachusetts.  In particular, Tweeter purchased CRT Products from Defendants and their co-conspirators in Massachusetts; maintained warehouses in Massachusetts containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in Massachusetts who sold CRT Products to consumers in Massachusetts and elsewhere.  As a result of its presence in Massachusetts and the substantial business it conducted in Massachusetts, Plaintiff is entitled to the protection of the laws of Massachusetts.

250.     Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*

251.     The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

252.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

        a.  to fix, raise, maintain and stabilize the price of CRTs;

        b.  to allocate the market for CRTs amongst themselves;

        c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

        d.  to allocate among themselves the production of CRTs.

253.     The combination and conspiracy alleged herein has had, *inter alia,* the following effects:

        a.  price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

        b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

        c.  those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

254.    As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff paid supra-competitive, artificially inflated prices for CRT Products it purchased during the Relevant Period.

*255.*    By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*:

    a.  Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

    b.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

    c.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

    d.  Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

    e.  Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

    f.  During the Relevant Period, Tweeter purchased CRT Products containing price-fixed CRTs in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

## XI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.      Plaintiff shall recover damages sustained by it, as provided by Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiff shall receive such other or further relief as may be just and proper.

## XII.      <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

1

2          Dated:                              Respectfully Submitted,

3

4                                              _____
                                               PHILIP J. IOVIENO (*Pro Hac Vice*)
                                               ANNE M. NARDACCI (*Pro Hac Vice*)
5                                              LUKE NIKAS (*Pro Hac Vice*)
                                               CHRISTOPHER V. FENLON (*Pro Hac Vice*)
6                                              BOIES, SCHILLER & FLEXNER LLP
                                               10 North Pearl Street, 4th Floor
7                                              Albany, NY 12207
                                               Telephone:  (518) 434-0600
8                                              Facsimile:  (518) 434-0665
                                               Email: piovieno@bsfllp.com
9                                              Email: anardacci@bsfllp.com
                                               Email: lnikas@bsfllp.com
10                                             Email: cfenlon@bsfllp.com

11

12                                             WILLIAM A. ISAACSON (*Pro Hac Vice*)
                                               BOIES, SCHILLER & FLEXNER LLP
13                                             5301 Wisconsin Ave. NW, Suite 800
                                               Washington, DC 20015
14                                             Telephone:  (202) 237-2727
                                               Facsimile:   (202) 237-6131
15                                             Email:  wisaacson@bsfllp.com

16

17                                             *Counsel for Schultze Agency Services, LLC*

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT K**

1
2
3
4

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  213-443-5582
Facsimile:  213-622-2690
Email:  jmurray@crowell.com

5
6
7
8
9

Jerome A. Murphy (*pro hac vice*)
Astor H.L. Heaven *(pro hac vice)*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:  202-624-2500
Facsimile:  202-628-5116
E-mail:  jmurphy@crowell.com
            aheaven@crowell.com

10

*Counsel for Plaintiffs Target Corp.and RadioShack Corp*

11

[Additional counsel listed on signature page]

12

### UNITED STATES DISTRICT COURT

13

### NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

14
15
16
17

TARGET CORP.; RADIOSHACK CORP.

                        Plaintiffs

            v.

18
19
20
21
22
23
24
25
26
27

CHUNGHWA PICTURE TUBES, LTD.;
CHUNGHWA PICTURE TUBES
(MALAYSIA); IRICO GROUP
CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO DISPLAY
DEVICES CO., LTD.; LG ELECTRONICS,
INC.; LG ELECTRONICS USA, INC.; LG
ELECTRONICS TAIWAN TAIPEI CO., LTD.;
LP DISPLAYS INTERNATIONAL LTD.;
HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES
(USA), INC.; SHENZHEN SEG HITACHI
COLOR DISPLAY DEVICES, LTD.;
PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING

Master File No. 3:07-cv-05944-SC

MDL No. 1917

Individual Case No. 3:11-cv-05514


**SECOND AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF**


**DEMAND FOR JURY TRIAL**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

                                  Defendants

17
18
19
20
21
22
23
24
25
26
27

Plaintiffs Target Corp. and RadioShack Corp. (hereafter "Plaintiffs") for their Complaint against all Defendants named herein, hereby allege as follows:

**I.    INTRODUCTION**

1.     Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c)

2
**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.     During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

## II.     <u>JURISDICTION AND VENUE</u>

10.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California. Samsung SDI has also admitted that conduct in furtherance of the conspiracy occurred in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

## III.   **THE PARTIES**

### A.   **Plaintiffs**

#### 1.   **Target**

16.     Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and

food discount stores throughout the United States, as well as an online retail store, Target.com. During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. Target also purchased CRTs for internal use during the Relevant Period. As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.     During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota. In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota. Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

18.     During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

## 2.   RadioShack

19.     Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort Worth, Texas. RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com. During the Relevant Period, RadioShack purchased and then resold from its facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. RadioShack also purchased CRTs for internal use during the Relevant Period. As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

20.     During the Relevant Period, all of RadioShack's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters. In addition, all RadioShack purchase orders for CRTs were issued from

Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

21.     During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

**B.     The Defendants**

**1.     IRICO Entities**

22.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

23.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

24.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1    United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC

2    relating to the antitrust violations alleged in this complaint.

3        25.    Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

4            **2.    LG Electronics Entities**

5        26.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the

6    Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

7    Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer

8    electronics, home appliances and mobile communications, which established its first overseas branch

9    office in New York in 1968. The company's name was changed from Gold Star Communications to

10   LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred

11   its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called

12   LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and

13   changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured,

14   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

15   throughout the United States.

16       27.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

17   principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

18   LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period,

19   LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

20   subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the

21   finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

22       28.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

23   with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

24   Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

25   During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

26   directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI

27

1    dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

2    alleged in this complaint.

3          29.    Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

4    Electronics."

5          **3.    LP Displays**

6          30.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong

7    company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

8    Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a

9    50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became

10   an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and

11   computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP

12   Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company

13   and the shares would be owned by financial institutions and private equity firms.  During the Relevant

14   Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its

15   subsidiaries or affiliates, throughout the United States.

16         **4.    Hitachi Entities**

17         31.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6,

18   Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the

19   Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.

20   During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either

21   directly or through its subsidiaries or affiliates, throughout the United States.

22         32.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its

23   principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi

24   Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.

25   In 2002, all the departments of planning, development, design, manufacturing and sales concerned with

26   the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.

27   During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs,

either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

33.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

34.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

35.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

36.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

37. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 5. Panasonic Entities

38. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

39. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

40. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

41. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called

1    Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the

2    majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining

3    35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned

4    subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant

5    Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its

6    subsidiaries or affiliates, throughout the United States.

7          42.      Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company

8    with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District,

9    Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The

10   other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import &

11   Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the

12   Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC

13   was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest

14   producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured,

15   marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

16   throughout the United States.

17         **6.**      **Philips Entities**

18         43.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal

19   Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX

20   Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics

21   companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of

22   its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint

23   venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a

24   result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book

25   value of 126 million Euros of its investment and said it would not inject further capital into the venture.

26   During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either

27   directly or through its subsidiaries or affiliates, throughout the United States.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**Case No. CV 11-05514**

44.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

45.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

46.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

47.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.     Samsung Entities

48.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant

1   Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its

2   subsidiaries or affiliates, throughout the United States.

3       49.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with

4   its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey

5   07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant

6   Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

7   subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

8   finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

9   complaint.

10      50.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung

11  SDI") is a South Korean company with its principal place of business located at 575 Shin-dong,

12  Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder

13  holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading

14  company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

15  2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

16  producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

17  SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

18  affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

19  and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

20      51.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

21  corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

22  California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

23  Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

24  distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

25  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

26  Samsung SDI America relating to the antitrust violations alleged in this complaint.

27

52. Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

53. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

54. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

55. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

1    United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

2    affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

3          56.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

4    Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

5    Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung

6    SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

7    Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

8    directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and

9    Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

10   relating to the antitrust violations alleged in this complaint.

11         57.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

12   Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are

13   collectively referred to herein as "Samsung."

14        **8.**     **Samtel**

15         58.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of

16   business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market

17   share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs.

18   Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its

19   CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs,

20   either directly or through its subsidiaries and affiliates, throughout the United States.

21        **9.**     **Thai CRT**

22         59.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam

23   Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and

24   it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the

25   Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or

26   through its subsidiaries or affiliates, throughout the United States.

27

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

### 10.    Toshiba Entities

60.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

61.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

62.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

63.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

64.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

65.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11.     Chunghwa Entities

66.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

67.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates

1    throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies

2    and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

3        68.    Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

4    "Chunghwa."

5                **12.    Thomson Entities**

6        69.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation

7    with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

8    Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a

9    major manufacturer of CRTs for the United States market, with plants located in the United States,

10   Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing

11   division, which had plants in the United States and Mexico, and to other television manufacturers in the

12   United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT

13   manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the

14   RCA brand.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the

15   Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRTs, either directly or

16   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

17       70.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

18   ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at

19   10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-

20   owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs

21   for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and

22   Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer

23   Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in

24   the United States and Mexico, and to other television manufacturers in the United States and elsewhere.

25   Thomson's CRT televisions were sold in the United States to United States consumers under the RCA

26   brand.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold

27

1    and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers

2    throughout the United States.

3        71.    Thomson SA and Thomson Consumer Electronics are collectively referred to herein as

4    "Thomson."

5            **13.    Mitsubishi Entities**

6        72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese

7    corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi

8    Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and

9    Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and

10   monitor manufacturing division and to other television and monitor manufacturers in the U.S. and

11   elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT

12   manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and

13   distributed CRTs in the United States.

14       73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a

15   United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric

16   USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured

17   CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.

18   Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division

19   and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television

20   and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

21   Mitsubishi Electric USA manufactured, marketed, sold and distributed CRTs in the United States.

22       74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United

23   States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi Digital is a

24   wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital

25   manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United

26   States.

27

1    75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

2    collectively referred to herein as "Mitsubishi."

3    **IV.    AGENTS AND CO-CONSPIRATORS**

4    76.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done

5    by their officers, agents, employees, or representatives, while actively engaged in the management and

6    operation of Defendants' businesses or affairs.

7    77.    Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants

8    with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each

9    Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs

10   made by its parent company.

11   78.    Various persons and/or firms not named as Defendants in this Complaint participated as

12   co-conspirators in the violations alleged herein and may have performed acts and made statements in

13   furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not

14   limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme,

15   Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia,

16   Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right

17   to name some or all of these and other co-conspirators as Defendants at a later date.

18   79.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of

19   CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately

20   85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and

21   manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France,

22   Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly

23   owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo

24   Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The

25   Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint

26   venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of

27   approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business

in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

80.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

81.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

82.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

83.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

84.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

85.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

86.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

87.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce and caused antitrust injuries in Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, and Wisconsin.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

88.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor

produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

89. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

90. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

91. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

92. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

93. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

94. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets. The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

95.     Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs.

96.     Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

97.     Plaintiffs have been injured by paying supra-competitive prices for CRTs.

**B.     Structure of the CRT Industry**

98.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.     Market Concentration**

99.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.     Information Sharing**

100.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was

facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

101.    Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

102.    The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

103.    The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104.    Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

   i.    The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

   ii.    Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

   iii.    The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-05514

iv.    Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.     In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.    Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.    Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.     Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.     High Costs of Entry Into the Industry**

105.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers

1    to entry.  It is also extremely unlikely that a new producer would enter the market in light of the

2    declining demand for CRTs.

3        106.    During the Relevant Period, the costs of the assembly components, both as a whole and

4    individually, have been generally declining, and, in some periods, declining at a substantial rate.  A

5    combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep

6    prices above where they would have been but for the conspiracy.

7                   **6.     The Maturity of the CRT Market**

8        107.    Newer industries typically are characterized by rapid growth, innovation and high profits.

9    The CRT market is a mature one, where there is greater motivation to collude.

10       108.    Demand for CRTs was declining throughout the Relevant Period.  Static declining

11   demand is another factor which makes the formation of a collusive arrangement more likely because it

12   provides a greater incentive to firms to avoid price competition.

13       109.    In addition, conventional CRT televisions and computer monitors were being rapidly

14   replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage

15   in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and

16   2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were

17   predicted to decline by an additional 84.5 percent between 2006 and 2010.

18       110.    Although demand was declining as a result of the popularity of flat-panel LCD and

19   plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display

20   technology during the Relevant Period, making Defendants' collusion and the international price fixing

21   conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period,

22   a substantial market for CRTs existed as a cheaper alternative to these new technologies.

23       111.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer

24   monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of

25   the market.

26       112.    As for CRT televisions, they accounted for 73 percent of the North American television

27   market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.     Homogeneity of CRTs

113.     CRTs are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

114.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.     Pre-Conspiracy Market

115.     The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116.     In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.     Defendants' and Co-Conspirators' Illegal Agreements

117.     In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

118.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

119.    Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

120.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

121.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.    "Glass Meetings"

122.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

123.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

124.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

125.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since

the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126. The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127. Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) IRICO, and Thomson.

128. Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

129. During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

130. Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

131. The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for

coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

132.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

133.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

134.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

135.    The agreements reached at the glass meetings included:

> i.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

ii.     placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

iv.     agreements as to what to tell customers about the reason for a price increase;

v.      agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi.     agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

vii.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

viii.   agreements to coordinate uniform public statements regarding available capacity and supply;

ix.     agreements to allocate both overall market shares and share of a particular customer's purchases;

x.      agreements to allocate customers;

xi.     agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xii.    agreements to keep their meetings secret.

136.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

137.    As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again

became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.   Bilateral Discussions

138.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

139.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

140.   The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

141.   To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRTs.  North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs sold in the United States were fixed, raised, maintained, and stabilized at supracompetitive levels.

142.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

143.   Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

144.   Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

145.   Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

146.   Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives

from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

147.   Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

148.   Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

149.   Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

150.   Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

151.    PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

152.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

153.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

154.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

155.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1   and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

2   Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the

3   pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active,

4   knowing participants in the alleged conspiracy.

5         156.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI,

6   Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200

7   glass meetings at all levels.  A substantial number of these meetings were attended by the highest

8   ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

9   Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

10   for CRTs.

11         157.   Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

12   Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

13   extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

14   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

15   undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

16   America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

17   alleged conspiracy.

18         158.   Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral

19   discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high

20   level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for

21   CRTs.  Samtel never effectively withdrew from this conspiracy.

22         159.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass

23   meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT

24   also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through

25   these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively

26   withdrew from this conspiracy.

27

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

160.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

161.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

163.    Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

164.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

165.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

166.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

E.    **The CRT Market During the Conspiracy**

167.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

168.    The following data was reported by Stanford Resources, Inc., a market research firm

focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------------------------|-------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

169.    During the Relevant Period, North America was the largest market for CRT TVs and

computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide

market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in

North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor

supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997,

p.12.

170.    Defendants' collusion is evidenced by unusual price movements in the CRT market

during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer

prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent

Research Corporation predicted that "[e]conomies of scale, in conjunction with technological

improvements and advances in manufacturing techniques, will produce a drop in the price of the average

electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and

the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained

stable.

171.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable

USD50 and has been for some years . . . ."

172.    In early 1999, despite declining production costs and the rapid entry of flat panel display

products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on

---

[1]    Estimated market value of CRT units sold.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**Case No. CV 11-05514**

increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

173.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

174.   A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

175.   A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

176.   Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

177.   For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

178.   During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.

As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

179.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

180.    These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

181.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination.

Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

182.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a

44

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Case No. CV 11-05514

Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

186.    On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in furtherance of this conspiracy were carried out within the Northern District of California.  The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

187.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

1   companies doing business in Europe."  The press release accompanying the fines further notes that the

2   CRT cartels were "among the most organised cartels that the Commission has investigated."

3   188.   As outlined above, Defendants have a history of competitor contacts resulting from joint

4   ventures, numerous cross-licensing agreements, and other alliances in related businesses in the

5   electronics industry.

6   189.   Several Defendants also have a history of "cooperation" and anticompetitive conduct.

7   For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October

8   2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

9   190.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S.

10  Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access

11  Memory ("SRAM") and NAND Flash Memory.

12  191.   In December 2006, government authorities in Japan, Korea, the European Union and the

13  United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related

14  TFT-LCD market.

15  192.   On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa,

16  as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co.,

17  Ltd.—were all under investigation for price fixing TFT-LCDs.

18  193.   On November 12, 2008, the DOJ announced that it had reached agreements with three

19  TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.),

20  Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15

21  U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of

22  TFT-LCD Products.

23  194.   On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant

24  Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the

25  Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of

26  TFT-LCD Products.

27

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

195.     The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.     The Role of Trade Associations During the Relevant Period

196.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

197.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

198.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

199.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each

August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

200.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

  **H.**  <u>**Effects of Defendants' Antitrust Violations**</u>

    **1.**  **Examples of Reductions in Manufacturing Capacity by Defendants**

201.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

202.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

203.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

204.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

205.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

206.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**Case No. CV 11-05514**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## 2.   Examples of Collusive Pricing for CRTs

207.   Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

208.   In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

209.   In reality, consumer prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

210.   Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

211.   Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

212.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

213.   After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

214.   On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

215.   Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time.  CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

216.   CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**I.      Summary Of Effects Of The Conspiracy Involving CRTs**

217.   The above combination and conspiracy has had the following effects, among others:

a.      Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.      Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.      Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

d.      As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs

1     than they otherwise would have paid in the absence of the unlawful conduct of

2     Defendants.

3  **VII.   PLAINTIFFS' INJURIES**

4        218.   As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably

5  foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at

6  supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing

7  Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

8        219.   Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased

9  CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially

10  inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than

11  they would have absent the conspiracy.

12        220.   The OEMs and others passed on to their customers, including Plaintiffs, the overcharges

13  caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges

14  caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs

15  containing such price-fixed CRTs from the OEMs and others.

16        221.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves

17  through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form

18  or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from

19  Defendants through manufacturers of CRTs sold to Plaintiffs.

20        222.   The market for CRTs and the market for products containing CRTs are inextricably

21  linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

22        223.   Throughout the Relevant Period, Defendants controlled the market for CRTs.

23  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from

24  Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants'

25  conspiracy.

26        224.   As a result, Plaintiffs were injured in connection with their purchases of CRTs during the

27  Relevant Period.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

## VIII.   FRAUDULENT CONCEALMENT

225.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

226.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs.

227.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

228.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

229.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

230.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take

minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.

231.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

232.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

233.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

234.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

235.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

236.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

1     **IX.**     *AMERICAN PIPE*, **GOVERNMENT ACTION AND CROSS-JURISDICTIONAL**

2         **TOLLING**

3         238.     As discussed at length in paragraphs 181-195 above, the United States Department of

4 Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators

5 commencing on at least February 10, 2009 through the present. Plaintiffs' direct claims for violation of

6 the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

7         239.     Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S.

8 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these

9 Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26,

10 2007 until Plaintiffs opted out on November 14, 2011.

11         240.     Plaintiffs were members of Class Actions asserted against Defendants, including, but not

12 limited to, the following Complaints:

13             •    *Crago Inc. v. Chunghwa Picture Tubes Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1)

14                 (N.D. Cal. Nov. 26, 2007); and

15             •    *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC

16                 (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

17    **X.**     **CLAIM FOR VIOLATIONS**

18                                **First Claim for Relief**

19                      **(Violation of Section 1 of the Sherman Act)**

20         241.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

21         242.     Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and

22 exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a

23 continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation

24 of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in

25 the United States.

26         243.     In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the

27 prices of CRTs sold in the United States.

244.   As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

245.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

246.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.   issuing price announcements and price quotations in accordance with the agreements reached;

    e.   selling CRTs to customers in the United States at noncompetitive prices;

    f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.   agreeing to maintain or lower production capacity; and

    h.   providing false statements to the public to explain increased prices for CRTs.

247.   As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

## (Violation of the California Cartwright Act)

248.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

249.     During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

250.     In addition, Defendants Mitsubishi, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

251.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

252.     The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

253.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

       a.     to fix, raise, maintain and stabilize the price of CRTs;

b.    to allocate markets for CRTs amongst themselves;

c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

d.    to allocate among themselves the production of CRTs.

254.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.    those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

255.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

256.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

257.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and

their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

259.   The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

260.   For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.     to fix, raise, maintain and stabilize the price of CRTs;

      b.     to allocate markets for CRTs amongst themselves;

      c.     to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.     to allocate among themselves the production of CRTs.

261.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

      a.     price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

      b.     prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

      c.     those who purchased CRTs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

262.   As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-05514

263.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

    a.    Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

    b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; and (2) violation of the Cartwright Act;

    c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendant Samsung SDI admitted that acts in furtherance of the conspiracy to fix the price of CRTs were carried out in California;

    f.    During the Relevant Period, the following Plaintiffs purchased CRTs in California:  Target and RadioShack.  As a result, each is entitled to the protection of the laws of California; and

    g.    By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that

1     may have been obtained by Defendants or their co-conspirators as result of such

2     business acts and practices.

3     264.   By reason of the foregoing, Defendants and their co-conspirators also have entered into

4     an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

5          a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6               eliminated competition in the sale of CRTs in Arizona and fixed, raised,

7               maintained and stabilized CRT prices in Arizona at artificially high, non-

8               competitive levels;

9          b.   As a result, Defendants and their co-conspirators' conspiracy substantially

10              affected Arizona commerce;

11         c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Arizona:

12              Target.  As a result, Target is entitled to the protection of the laws of Arizona; and

13         d.   As a direct and proximate result of Defendants' and their co-conspirators'

14              conduct, Target has been injured in its business and property by paying more for

15              CRTs manufactured by Defendants, their co-conspirators, and others than it

16              would have paid in the absence of Defendants and their co-conspirators'

17              combination and conspiracy, and is therefore entitled to relief under Ariz. Rev.

18              Stat. §§ 44-1401, *et seq*.

19    265.   By reason of the foregoing, Defendants and their co-conspirators also have engaged in

20    unfair competition in violation of Florida Stat. §§ 501.201, *et seq*.

21         a.   Defendants and their co-conspirators committed acts of unfair competition by

22              engaging in a conspiracy to fix and stabilize the price of CRTs as described

23              above;

24         b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations,

25              practices and non-disclosures, as described above, constitute a common,

26              continuous and continuing course of conduct of unfair competition by means of

27

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d. Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e. Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

f. During the Relevant Period, the following Plaintiffs purchased CRTs in Florida: Target.  As a result, Target is entitled to the protection of the laws of Florida.

266.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq*.

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c. During the Relevant Period, the following Plaintiffs purchased CRTs in Illinois: Target.  As a result, Target is entitled to the protection of the laws of Illinois; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators'

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

1   combination and conspiracy, and is therefore entitled to relief under the Illinois

2   Antitrust Act, 740 Illinois Code 10/1, *et seq.*

3   267.   By reason of the foregoing, Defendants and their co-conspirators also have entered into

4   an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*

5   a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6   eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained

7   and stabilized CRT prices in Iowa at artificially high, non-competitive levels;

8   b.   As a result, Defendants and their co-conspirators' conspiracy substantially

9   affected Iowa commerce;

10   c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa:

11   Target.  As a result, Target is entitled to the protection of the laws of Iowa; and

12   d.   As a direct and proximate result of Defendants' and their co-conspirators'

13   conduct, Target has been injured in its business and property by paying more for

14   CRTs manufactured by Defendants, their co-conspirators, and others than it

15   would have paid in the absence of Defendants and their co-conspirators'

16   combination and conspiracy, and is therefore entitled to relief under Iowa Code

17   §§ 553.1, *et seq.*

18   268.   By reason of the foregoing, Defendants and their co-conspirators also have entered into

19   an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*

20   a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

21   eliminated competition in the sale of CRTs in Kansas and fixed, raised,

22   maintained and stabilized CRT prices in Kansas at artificially high, non-

23   competitive levels;

24   b.   As a result, Defendants and their co-conspirators' conspiracy substantially

25   affected Kansas commerce;

26   c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:

27   Target.  As a result, Target is entitled to the protection of the laws of Kansas; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Kansas Stat. Ann. §§ 50-101, *et seq.*

269.    By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Massachusetts:  RadioShack.  As a result, RadioShack is entitled to the protection of the laws of Massachusetts.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

270.     By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Michigan commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Michigan:  Target.  As a result, Target is entitled to the protection of the laws of Michigan; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

271.     By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Minnesota:  Target.  As a result, Target is entitled to the protection of the laws of Minnesota; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their coconspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Minnesota Stat. §§ 325D.50, *et seq.*

272.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Mississippi and fixed, raised, maintained and stabilized CRT prices in Mississippi at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Mississippi:  RadioShack.  As a result, RadioShack is entitled to the protection of the laws of Mississippi; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, RadioShack has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

273.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

    a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

    b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected New York commerce;

    c.   During the Relevant Period, the following Plaintiffs purchased CRTs in New York:  Target.  As a result, Target is entitled to the protection of the laws of New York; and

    d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

274.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

    a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised, maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

    b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

c.    During the Relevant Period, the following Plaintiffs purchased CRTs in North Carolina:  Target.  As a result, Target is entitled to the protection of the laws of North Carolina; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq*.

275.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Wisconsin:  Target.  As a result, Target is entitled to the protection of the laws of Wisconsin; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq*.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-05514**

XI.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.      Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Plaintiffs shall receive such other or further relief as may be just and proper.

XII.    **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

1   Dated:                                    Respectfully submitted

2                                             Jason C. Murray (CA Bar No. 169806)
                                              CROWELL & MORING LLP
3                                             515 South Flower St., 40th Floor
                                              Los Angeles, CA  90071
4                                             Telephone:  213-443-5582
                                              Facsimile:  213-622-2690
5                                             Email:  jmurray@crowell.com

6                                             Jerome A. Murphy (*pro hac vice*)
                                              Astor H.L. Heaven (*pro hac vice*)
7                                             CROWELL & MORING LLP
                                              1001 Pennsylvania Avenue, N.W.
8                                             Washington, D.C. 20004
                                              Telephone:  202-624-2500
9                                             Facsimile:  202-628-5116
                                              E-mail:  jmurphy@crowell.com
10                                                        aheaven@crowell.com

11                                            *Counsel for Target Corp.and RadioShack Corp.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27