ALDO A. BADINI (257086)
JEFFREY L. KESSLER (*pro hac vice*)
A. PAUL VICTOR (*pro hac vice*)
EVA W. COLE (*pro hac vice*)
MOLLY M. DONOVAN (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: jkessler@winston.com

STEVEN A. REISS (*pro hac vice*)
DAVID L. YOHAI (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: steven.reiss@weil.com

*Attorneys for Defendants Panasonic Corporation of North America, MT Picture Display Co., Ltd., and Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.)*

Additional Moving Defendants and Counsel Listed on Signature Pages

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>INDIRECT-PURCHASER ACTIONS | Case No. 07-5944 SC<br>MDL No. 1917<br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ**<br><br>Date:  To be heard on same date<br>        as class certification.<br>Place: JAMS Resolution Center<br>Special Master: Hon. Charles A. Legge |

**DOCUMENT SUBMITTED PARTIALLY UNDER SEAL**

**AND CHAMBERS COPY**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT ........................................................................................................7

I.    PLAINTIFFS MISSTATE THE CONTROLLING STANDARDS ............................................7

II.   PLAINTIFFS OFFER NO SUBSTANTIVE RESPONSE TO THE MANY
      POINTS DEMONSTRATING THAT DR. NETZ'S OPINIONS CONSTITUTE
      INADMISSIBLE "JUNK SCIENCE" ...................................................................9

      A.   Dr. Netz's Unreliable Assumption of Universal Pass-On by Manufacturers and
           Distributors of Finished CRT Products ........................................................10

      B.   Dr. Netz's Unreliable Assumption of Universal Pass-On at the Retail Level ................14

      C.   Dr. Netz's Continued Reliance on Improper Averaging and Aggregation ...................17

      D.   Dr. Netz's Unsupported Assumption That Alleged Cartel Target Prices for
           CRTs Sold Abroad Were Also Applicable to the Sale of CRTs in North
           America ......................................................................................................23

      E.   Dr. Netz's Use of "One-Size-Fits-All" Economic Theory Instead of Actual
           Analysis ......................................................................................................25

      F.   Dr. Netz's Unreliable Assumptions About the Product, Geographic and
           Participant Scope of the Alleged Cartel ........................................................27

III.  PLAINTIFFS CANNOT SAVE DR. NETZ'S TESTIMONY BY CLAIMING THAT
      IT IS SUBSTANTIALLY SIMILAR TO THE TESTIMONY HELD TO BE
      ADMISSIBLE IN THE *LCD* LITIGATION ..................................................................29

CONCLUSION ....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,*
    247 F.R.D. 156 (C.D. Cal. 2007) ...................................................22

*Argus Inc. v. Eastman Kodak Co.,*
    612 F. Supp. 904 (S.D.N.Y. 1985) ...............................................28

*Bigelow v. RKO Radio Pictures, Inc.,*
    327 U.S. 251 (1946) .....................................................................21

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ..........................................................8

*Blades v. Monsanto Co.,*
    400 F.3d 562 (8th Cir. 2005) ....................................................7, 27

*Bazemore v. Friday,*
    478 U.S. 385 (1986) .....................................................................26

*Cascade Yarns, Inc. v. Knitting Fever, Inc.,*
    No. C10-861RSM, 2012 WL 5194085 (W.D. Wash. Oct. 18, 2012) ............................1

*Daubert v. Merrell Dow Pharm.,*
    509 U.S. 579 (1993) .......................................................... *passim*

*Daubert v. Merrell Dow Pharm., Inc. (Daubert II),*
    43 F.3d 1311 (1995) .....................................................................30

*Domingo v. T.K., M.D.,*
    289 F.3d 600 (9th Cir. 2002) ........................................................10

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) ..........................................................9

*Finestone v. Florida Power & Light Co.,*
    No. 03-14040, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006) ............................13

*Gen. Elec. Co v. Joiner.,*
    522 U.S. 136 (1997) .......................................................................9

*Gordon v. Microsoft Corp.,*
    No. MC 00-5994, 2003 WL 23105550 (Minn. Dist. Ct. Dec. 15, 2003) ...................20

*Hendrix v. Evenflo Co.,*
    609 F.3d 1183 (11th Cir. 2010) ....................................................30

*In re Commercial Tissue Prods.*,
  183 F.R.D. 589 (N.D. Fla. 1998) ..................................................................................21

*In re Flash Memory Antitrust Litig.*,
  C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ....................................8, 16, 20

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) ........................................................................ *passim*

*In re Lake States Commodities, Inc.*,
  271 B.R. 575 (Bankr. N.D. Ill. 2002) ............................................................................29

*In re Leap Wireless Int'l, Inc.*,
  301 B.R. 80 (Bankr. S.D. Cal. 2003) .............................................................................29

*In re Live Concert Antitrust Litig.*,
  247 F.R.D 98 (C.D. Cal. 2007) .......................................................................................8

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................8, 22, 26

*In re Nasdaq Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ...............................................................................8, 21

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ...............................................................................................7

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) .........................................................................26

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ..................................................................................26

*In re Scrap Metal Antitrust Litig.*,
  No. 1:02 CV 0844, 2006 WL 2850453 (N.D. Ohio Sept. 30, 2006) ...........................21

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ..................................................................................26

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) .............................................................................26, 29

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) .....................................29

*In re W. Liquid Asphalt Cases*,
  487 F.2d 191 (9th Cir. 1973) ...........................................................................................8

*In re Wireless Tel. Serv. Antitrust Litig.*,
  385 F. Supp. 2d 403 (S.D.N.Y. 2005) ...........................................................................26

iii

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ....................................................................................................21

*Kottaras v. Whole Foods Market, Inc.*,
    281 F.R.D. 16 (D.D.C. 2012) ........................................................................................7

*LeClercq v. Lockformer Co.*,
    No. 00 C 7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005).......................................13

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) .......................................................................................11

*Pecover v. Elec. Arts Inc.*,
    No. C 08-2820, 2010 WL 8742757 (N.D. Cal Dec. 21, 2010).......................................9

*Perez v. State Farm Mut. Auto. Ins. Co.*,
    No. C 06-01962, 2012 WL 3116355 (N.D. Cal. July 31, 2012).....................................10

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009).........................................................................1, 8, 20, 22

*Rojas v. Marko Zaninovich, Inc.*,
    No. CIV-F-09-0705, 2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) .............................13

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
    No. 98 CIV, 8272, 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)......................13, 28

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010)........................................22

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
    No. 95 CIV. 8136, 2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001)...............................28

*Target Corp. v. Chunghwa Picture Tubes, Ltd.*,
    No. 11-cv-05514 (N.D. Cal.) .......................................................................................17

*Utah v. Evans*,
    536 U.S. 452 (2002).....................................................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)...................................................................................................9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969).....................................................................................................21

**STATUTES**

Clayton Act Section 4 ...........................................................................................................7

1

**RULES**

Fed. R. Civ. P. 23 .................................................................................................7, 8, 16

Fed. R. Civ. P. 30(b)(6)................................................................................................16

Fed. R. Evid. 702 .......................................................................................................1, 9

**OTHER AUTHORITIES**

2A Phillip Areeda *et al.*, *Antitrust Law* ¶ 331d (3d ed. 2007) ........................................7, 8

ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues 220
     (ABA Publishing 2005) ........................................................................................22

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON ESTIMATION OF
     ECONOMIC DAMAGES (3d ed. 2011)........................................................................14

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON STATISTICS (3d ed.
     2011) .........................................................................................................13, 14, 15

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE       Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                              MDL NO. 1917

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition to Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz ("Opposition" or "Opp'n") is based on the false premise that this Court can abdicate its responsibility to scrutinize the reliability and admissibility of Dr. Netz's testimony simply because an undisclosed analysis submitted by Dr. Netz regarding totally different products, competitive forces, and time periods was admitted by Judge Illston in *In re TFT-LCD (Flat Panel) Antitrust Litigation* ("*LCD*").  The issue before this Court is not whether Dr. Netz's testimony in support of class certification was admitted in *a different litigation involving different facts*, or even whether her techniques and methodologies would be proper in a different context; rather, the issue here is whether the expert testimony offered by Dr. Netz is reliable as applied to the specific data and facts *in this case.  See, e.g.*, *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10-861RSM, 2012 WL 5194085, at *3 (W.D. Wash. Oct. 18, 2012) (FRE 702 calls for a "fact-specific inquiry"); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 594 (N.D. Ill. 2009) (the relevant inquiry "is not whether [plaintiffs' expert's] techniques are generally accepted; it is whether they are appropriate when applied to the facts and data *in this case*").

Moreover, Plaintiffs are precluded from even advancing the claim that Dr. Netz's expert analysis here is substantially similar to her reports admitted in the *LCD* litigation, as Plaintiffs and Dr. Netz have refused to produce unredacted versions of those reports and their underlying details.[1] Plaintiffs cannot use Dr. Netz's undisclosed work as both a sword and a shield by claiming, on the one hand, that her *LCD* reports support the admissibility of her work here, yet refusing, on the other hand, to produce that work to allow Defendants and the Court to test the veracity of that assertion. As a matter of law and fundamental fairness, this Court must disregard Plaintiffs' arguments about

---

[1] Netz Tr. 296:1-5 ("Q. You're not able to produce in this case to us your work from the LCD case; is that correct?  A. I believe that's correct."); *id.* at 297:3-299:7, 318:6-320:15, attached in its entirety as Exhibit 1 to the concurrently filed Reply Declaration of Eva W. Cole in Support of Defendants' Reply Memorandum of Law in Support of Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz ("Cole Reply Decl."), March 25, 2013; *see also* Cole Reply Decl. Exs. 2 & 3 (DVDs of Dr. Netz's deposition testimony).  Indeed, it is precisely because Defendants were denied access to Dr. Netz's *LCD* reports that they were not addressed in Defendants' opening brief.

1    Dr. Netz's testimony in *LCD* and decide on the record here whether Dr. Netz's testimony meets the

2    *Daubert*[2] test.

3            As shown in Defendants' moving brief, and as further demonstrated below, Dr. Netz's

4    testimony in this litigation does not come close to satisfying the rigorous standard Plaintiffs must

5    meet.[3]   To the contrary, Dr. Netz's new declarations and deposition testimony only serve to

6    underscore and confirm that her pervasive reliance on unsupportable factual assumptions and

7    unreliable methodologies requires that her testimony be excluded from this case.

8            For example, Dr. Netz's new testimony starkly illustrates that her opinion that cartel

9    overcharges were uniformly passed through to each and every class member – an opinion critical to

10   plaintiffs' ability to meet their burden at class certification of presenting a common method of proof

11   of impact – rests on pure speculation and unsupported factual assumptions.[4]  Dr. Netz unequivocally

12   asserts that "all" putative indirect purchaser class members suffered pass-on injury, premised on

13   three factual assumptions about the alleged cartel price increases – that such cost increases caused by

14   the cartel were:  (a) "industry wide;" (b) "significant" in magnitude; and (c) "permanent."[5]  She

15   further opines that the competitive nature of the CRT distribution chain would "preclude" any pass-

16   on of a cartel price increase if even one of these three factual assumptions were not correct.[6]  But Dr.

17   Netz admits that she has done no analysis to determine that any of these assumptions about pass-on

18   are valid *in this case*.  To the contrary, not one of these assumptions can be supported by the record

---

[2] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) ("*Daubert*").

[3] For a further explanation of the defects in the Netz analyses that render them economically unreliable, see the Rebuttal Declaration of Robert D. Willig filed in support of this motion ("Willig Rebuttal Decl.").

[4] Willig Rebuttal Decl. ¶¶ 15-17.

[5] *See* Decl. of Janet S. Netz, Ph.D., in Support of Indirect-Purchaser Plaintiffs' Opp'n to Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz (N.D. Cal.) No. CV-07-5944-SC (Feb. 15, 2013) ("Netz MTS Decl.") 5; Rebuttal Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification (N.D. Cal.) No. CV-07-5944-SC (Feb. 15, 2013) ("Netz Rebuttal Decl.") 62; Netz Tr. 272:24-273:13.

[6] Netz MTS Decl. 5; Netz Tr. 273:9-13.

here.[7]

- ***No Support for "Significant" Overcharges.***  Dr. Netz readily concedes that she has done no analysis to determine whether the alleged cartel overcharges – the difference between the actual price and the but-for price that would have prevailed absent the alleged cartel – were "significant."  This is hardly surprising given that Dr. Netz has not calculated the but-for price of any CRT, let alone all of them during the class period, leaving her with no basis to determine or opine on whether the alleged cartel price increases – whose magnitude she has not even attempted to measure – were "significant:"[8]

  > Q. And as we're sitting here today, you can't testify that any of them were significant? *Throughout the entire cartel period, you haven't yet measured them, so you can't give an opinion as to whether even a single one is significant or not?*
  >
  > A. *Well, here – I guess, yes, that is true.*"[9]

  There is thus no record basis at all to support Dr. Netz's critical assumption that all of the alleged CRT cartel price increases were "significant" and, consequently, no record basis to support her testimony of uniform 100% pass-on of any overcharge.  This undisputed and gaping hole in one of Dr. Netz's three self-defined essential factual assumptions is by itself a sufficient basis to exclude her pass-on opinion.

- ***No Support for Industry-wide Price Increases.***  Similarly, Dr. Netz asserts that the alleged CRT cartel caused "industry-wide" price increases—meaning that the alleged cartel caused prices to increase for all industry participants at each level of the distribution chain.  But she offers no evidence for this critical factual assumption, only pure *ipse dixit*.[10]  Indeed, Dr. Netz admitted that "there's no evidence in this case" that "when the price of a CRT was

---

[7] Willig Rebuttal Decl. ¶ 16 ("[T]he evidence indicates that not all CRTs' prices were elevated significantly and permanently by the actions of the alleged cartel as Dr. Netz claims."); *see also id.* ¶¶ 112-113.

[8] *See id.* ¶ 113 ("[S]ince Dr. Netz has not estimated but-for prices, none of her analyses is capable of establishing that the putative cartel succeeded in elevating CRT prices significantly, and Dr. Netz acknowledged in her deposition that she has not established that all putative CRT price increases by the alleged cartel were significant.").

[9] Netz Tr. 326:19-24 (emphasis added).

[10] *Id.* at 281:13-285:11, 285:23-287:5, 300:1-12.

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                MDL NO. 1917

increased . . . that the price of any component of a plasma television was increased."[11]  She further conceded that she has not done any comparison of CRT prices with LCD or plasma prices, that she has not done any analysis of the CRT prices of a company like Sony, which made its own unique CRTs that it did not purchaser from Defendants and is not alleged to have been a conspirator, and that she cannot even identify alleged cartel target prices for 74% of Defendants' CRT sales.[12]   On this undisputed record, Dr. Netz's assumption that the alleged cartel cause "industry-wide" price increases is simply frivolous at the product manufacturer level.   Moreover, there is also no basis in the record to support Dr. Netz's "industry wide" cost increase assumption at the retailer level.  Dr. Netz failed to study the CRT product pricing data for the vast majority of the finished CRT product retailers in the industry; instead, she relied on nothing other than her "subjective judgment" to conclude that the very limited retailer pricing data she did study was representative of an entire retailer population that she could not identify in either total or type.[13]  Dr. Netz also admitted that retailer "power buyers" could have the ability to negotiate better terms with finished CRT product suppliers than other retailers, but she never examined whether such "power buyers" existed in this case or whether they were able to resist any cost increases.[14]  For all of these reasons, it is clear that Dr. Netz's assumption that the alleged cartel resulted in "industry-wide" price increases to all retailers is unsupported by the record evidence and cannot

---

[11]  Netz Tr. at 300:7-12 ("A.   Yes, I agree with that."); *see also* Willig Rebuttal Decl. ¶ 113 ("[C]ompetition from flat screen technologies would have constrained the ability of the putative cartel to elevate prices of some CRTs during certain periods, especially since Dr. Netz does not claim that the alleged CRT cartel coordinated LCD or plasma prices in addition to CRT prices.").

[12]  *Id.* at 287:2-5, 288:19-22 (Q. "[Y]our conclusions here are based without doing any reliance on anything – any study of LCD prices; right?  A. Any price study, that's correct."); *id*. at 300:7-12 ("Q. So am I correct that there's no evidence in this case . . . that when the price of a CRT was increased . . . that the price of any component of a plasma television was increased?  A. Yes, I agree with that."); *id.* at 281:21-285:11 ("Q. Have you done any comparison of Sony's CRT prices with the prices of . . . the defendants?  A. No, I have not."); *id.* at 321:5-9 ("Q. Okay.  So . . . you concede that you don't have any target prices you've been able to identify to cover, so far, approximately 74 percent of the CRT sales at issue? A. That would be the right implication, yes.").

[13]  *Id.* at 357:22-358:3, 360:1-361:3.

[14]  *Id.* at 314:1-316:20.

4

provide an admissible basis for her testimony in this case.[15]

- ***No Support for Permanent Price Increases.***  To complete the trilogy of failures, Dr. Netz was forced to admit that she has not conducted any analysis of the third leg of her "pass-on" stool – the assumption that each of the alleged CRT price increases was "permanent."  Dr. Netz testified that she has not done any study of how often Defendants changed their CRT prices during the class period[16] or the duration of any alleged CRT cartel target prices, many of which were in effect for only three months.[17]  In fact, when asked how long the alleged cartel price increase has to be in effect to be considered "permanent" for purposes of her universal pass-on conclusion, Dr. Netz candidly replied:  "I have not studied that issue at this point."[18]  It is simply not proper for Dr. Netz to use her unsupported assumption that the alleged cartel was "effective" as the sole support for her assumption that all of the alleged cartel price increases were "permanent."  This is especially true in the face of what even Dr. Netz conceded to be increasing competition and market share increases from LCD and plasma products during the alleged cartel period that were, by definition, not the subject of any CRT price increases.[19]

For all these reasons, Dr. Netz's three critical factual assumptions regarding pass-on are demonstrably without any basis in the record and her pass-on testimony must be excluded from this case.

Likewise, Dr. Netz's most recent testimony confirms numerous other fatal defects in her methodologies and assumptions that require her testimony to be held inadmissible.  For example, she

---

[15]  *See* Willig Rebuttal Decl. ¶ 113 ("Dr. Netz's claim of an across-the-board, significant, and permanent increase in CRT prices and a minimum pass-through rate of 100% is inconsistent with the evidence [which] show[s] that the alleged cartel was not uniformly or consistently effective (if at all) in elevating CRT prices.").

[16]  Netz Tr. 336:20-337:10.

[17]  *Id*. at 333:19-334:3, 401:11-14.

[18]  *Id*. at 328:11-25.

[19]  *Id*. at 56:13-16, 226:6-9, 382:18-25; *see also* Willig Rebuttal Decl. ¶ 113 ("[C]ompetition from flat screen technologies would have constrained the ability of the putative cartel to elevate prices of some CRTs during certain periods.")

now admits that:

(i)    She relied solely on her "subjective judgment" to decide that her non-random "samples" of manufacturer, distributor and retailer pricing data were "representative" of the entire industry, and used no objective criteria;[20]

(ii)   There could be an "unknown" number of transactions in her pricing data reflecting a complete absence of pass-on to various class members, yet she did not try to identify or quantify these transactions or report anything but "average" pass-on results from her regression analyses.  Instead, she simply dismissed those transactions as "anomalies" without knowing what or how many there are;[21] and

(iii)  In contrast to her testimony that *all* class members were impacted, she admitted that there could "very well" be numerous instances of "economically meaningless" pricing transaction data in her regression analyses as a result of CRT transfers between vertically-related, but commonly-owned, CRT businesses, but she did not study this issue.[22]

Indeed, Dr. Netz now admits that outside the litigation context, she cannot identify any peer-reviewed publication that talks about or supports the type of methodology she used to conclude that there was a "price structure" for CRT models and sizes.[23]  Further, she concedes that she could not conclude from her target price analysis that the alleged CRT cartel was effective for the many sales of CRTs that she calculated to be 25% or more below the alleged cartel target prices, and that it would be "borderline" to offer any effectiveness opinion from such a study for those that were 15%

---

[20] Netz Tr. 360:15-361:3, 364:18-21, 366:11-20, 370:22-371:9.

[21] *Id*. at 338:3-343:25, 346:13-18.

[22] *Id*. at 381:18-23; 375:12-22.

[23] *Id*. at 389:9-13; *see also* Willig Rebuttal Decl. ¶69 ("As [Professor Willig] noted in [his] report, Dr. Netz's concept of a 'price structure' is not a standard concept found in the economics literature, and the establishment of a 'price structure,' however defined, as evidence that a class should be certified is not an approach generally accepted by economists.  Indeed, Dr. Netz admitted at her deposition that she is unaware of any peer-reviewed article that uses the term price structure in the context of an unregulated industry (i.e., an industry in which prices/fares are not determined by an external government authority).").

1    or more below the purported cartel target prices.[24]

2        In sum, there is no admissible foundation for Dr. Netz's testimony that there is a reliable

3    economic methodology to prove, through common economic evidence, that all members of the

4    purported class suffered injury from the alleged CRT cartel.[25]  Instead, the undisputed facts show

5    that there were tens of millions of individualized transactions experienced by putative class

6    members, at different prices under different factual circumstances through different distribution

7    channels, all of which Dr. Netz simply tries to assume away.  It is the responsibility of this Court

8    under the Federal Rules of Evidence and the principles of *Daubert* to exclude such "junk science"

9    from this case.

10   ## ARGUMENT

11   ## I.    PLAINTIFFS MISSTATE THE CONTROLLING STANDARDS

12       Defendants' Motion to Strike ("Mot." or "Motion") is *not* an attempt to apply some

13   heightened standard for class certification under Federal Rule 23.  The rule is straightforward:  In an

14   antitrust class action like the instant case, plaintiffs bear the burden of establishing, through

15   admissible and reliable expert testimony, a common methodology that is capable of proving that

16   each class member sustained individual injury as a result of the alleged antitrust violation; in the

17   absence of such evidence, injury under Section 4 of the Clayton Act would have to be established on

18   an individual basis and class certification would not be possible.  *See, e.g.*, *In re New Motor Vehicles*

19   *Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 n.18, 28 (1st Cir. 2008) (vacating class certification

20   where plaintiffs' evidence did not "include some means of determining that each member of the

21   class was in fact injured"); *Blades v. Monsanto Co.*, 400 F.3d 562, 570, 573-74 (8th Cir. 2005)

22   (denying class certification where plaintiffs' expert could not exclude uninjured class members

23   without engaging in "a fact-intensive inquiry unique to each potential class member"); *Kottaras v.*

24   *Whole Foods Market, Inc.*, 281 F.R.D. 16, 24 (D.D.C. 2012) (denying class certification where

25   plaintiffs' expert could not account for instances where class members did not pay higher prices); 2A

26

27   [24] Netz Tr. 354:12-355:19.

28   [25] Willig Rebuttal Decl. ¶ 19.

Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 331d (3d ed. 2007) ("[T]he fact that some class members may not have been damaged at all generally defeats class certification, because the fact of injury, or 'impact,' must be established by common proof.").[26]

In this case, as in *GPU*,[27] and *Flash Memory*:[28]

> [T]here are thousands of differentiated products with diverse price points that have been purchased by putative class members over the course of the last decade. Such products are sold to class members by hundreds of different retailer suppliers. The price of any given product can vary across retailers, and differ even for a single retailer at a given point in time. Further, different retailers respond to cost changes in different ways, with some choosing not to pass-through cost changes in the form of higher prices for the end-user.

*Flash Memory*, 2010 WL 2332081, at *10. Under these circumstances, an indirect purchaser class cannot be certified absent reliable and admissible expert testimony that there is a common method capable of proving fact of injury to all class members. *GPU*, 253 F.R.D. at 503, 505 ("the only way to fully assess pass-through" with respect to non-fungible products sold at varying price points "would be to conduct a wholesaler-by-wholesaler and re-seller-by-re-seller investigation"). Plaintiffs have not come close to providing admissible expert testimony from Dr. Netz to satisfy this burden.[29]

Contrary to what Plaintiffs would have this Court believe, it is not the jury's role to "assess the weight" of Dr. Netz's testimony (Opp'n 4) *unless and until* the Court first determines that it is reliable and admissible. *See, e.g.*, *Reed*, 268 F.R.D. at 593-94 ("[w]hen it comes to the reliability of

---

[26] Even Dr. Netz thus recognizes that she must provide economic evidence that "all" class members were harmed. *See* Netz MTS Decl. 5.

[27] *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*").

[28] *In re Flash Memory Antitrust Litig.*, C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ("*Flash Memory*").

[29] Plaintiffs continue to rely upon pre-*Dukes* authorities that do not correctly state the current Rule 23 standard, or inapposite cases that either involve the measure of damages, as opposed to classwide impact, or do not otherwise discuss the "common impact" requirement. *See, e.g.*, Opp'n 24 n.51 citing *In re Nasdaq Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) (involving measure of damages); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) (inferring causation as to each class member in the unique 10b-5 context on the basis of the materiality of the misrepresentation); *In re W. Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973) (no discussion of common impact test). Particularly misplaced is Plaintiffs' reliance upon *In re Live Concert Antitrust Litig.*, 247 F.R.D 98, 141 (C.D. Cal. 2007); Opp'n 24 n.51, where the court granted certification only to later de-certify the class in light of *Dukes* and hold that the prior order had "little to no precedential value." *In re Live Concert Antitrust Litig.* 863 F. Supp. 2d 966, 970 (C.D. Cal. 2012).

1    an expert's methods," the argument that the "battle of experts" is strictly for the jury "is incorrect").

2    As the gatekeeper under the Federal Rules of Evidence, the Court is required to scrutinize proposed

3    expert testimony pursuant to Rule 702 and *Daubert*, 509 U.S. at 589-90, 592-93, including at the

4    class certification stage. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.

5    2011) (holding that the district court correctly applied the *Daubert* standard during the class

6    certification process in ruling upon a motion to strike); *Pecover v. Elec. Arts Inc.*, No. C 08-2820,

7    2010 WL 8742757, at *2-3 (N.D. Cal Dec. 21, 2010) (conducting a full *Daubert* analysis at the class

8    certification phase); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2553-54 (2011)

9    (indicating that *Daubert* fully applies to expert testimony at class certification). Indeed, certifying a

10   class on the basis of inadmissible and unreliable expert testimony – such as Dr. Netz's here – would

11   result in irreparable harm, damage which could not be undone even if the Court were to strike Dr.

12   Netz's evidence at a later stage of the case. *See Pecover*, 2010 WL 8742757, at *3 (such a ruling

13   would "consume vast judicial resources" and expose defendants to "substantial settlement

14   pressures").

15   **II.    PLAINTIFFS OFFER NO SUBSTANTIVE RESPONSE TO THE MANY
16          POINTS DEMONSTRATING THAT DR. NETZ'S OPINIONS CONSTITUTE
             INADMISSIBLE "JUNK SCIENCE"**

17           Defendants' Motion describes in great detail the many specific defects and false factual

18   assumptions in Dr. Netz's expert testimony. These are not mere "technicalities," but rather go to the

19   heart of whether Dr. Netz's testimony is admissible or not. Plaintiffs' response does nothing to

20   refute Defendants' showing, merely regurgitating what Dr. Netz did and characterizing it as

21   "professional," "careful," "widely accepted" and "impeccable." Opp'n 2, 17. Both Plaintiffs and

22   Dr. Netz fail to address substantively the many dispositive flaws in her study, simply glossing over

23   each error with the assertion that Dr. Netz's assumptions and analyses were based on her "subjective

24   judgment." *See, e.g.*, Netz Tr. 360:15-361:3, 366:11-20, 370:22-371:4. But "subjective judgment"

25   is nothing more than expert *ipse dixit*, and the law is clear that such testimony does not meet the

26   *Daubert* test. *See, e.g.*, *Gen. Elec. Co v. Joiner.*, 522 U.S. 136, 146 (1997) ("[N]othing in either

27   *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

28

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                  MDL NO. 1917

connected to existing data only by the *ipse dixit* of the expert."); *Domingo v. T.K., M.D.*, 289 F.3d 600, 606-07 (9th Cir. 2002) (excluding expert testimony under *Daubert* on the grounds that the conclusion was not "probable" from the studies cited and there was nothing but the expert's "*ipse dixit* linking" the data to the conclusion); *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962, 2012 WL 3116355, at *2 (N.D. Cal. July 31, 2012) (explaining that an expert's opinion may be excluded "on the ground that an expert's purported methodology fails to explain his final conclusion").

### A.  Dr. Netz's Unreliable Assumption of Universal Pass-On by Manufacturers and Distributors of Finished CRT Products

As discussed above, Dr. Netz concedes that her "universal" pass-through opinions that form the linchpin of her testimony are based on her economic "theory" that sellers of CRT products would have been compelled by competitive forces to pass on each of the alleged CRT cartel cost changes due to the competitive CRT distribution structure so long as each of the purported cartel cost increases were "industry-wide," "significant," and "permanent."  Netz MTS Decl. 5.  Significantly, Dr. Netz further concedes that, under the economic theory on which she relies, a firm in a competitive market *cannot* pass through cost increases if *any one of the three* conditions are not satisfied.  *Id.*  Thus, putting aside her admission that one cannot determine injury from the alleged cartel on the basis of economic theory alone (Netz Tr. 371:24-372:10), Dr. Net'z opinion falters on its own terms unless the record evidence supports each of her three critical assumptions that the alleged cartel prices were industry-wide, significant, and permanent.[30]  However, there is not a shred of evidence in this record to support any one – let alone all three – of Dr. Netz's critical assumptions.

First, Dr. Netz readily conceded that because she has done no estimate of "but-for" prices, she cannot opine, at this time, whether even a single price increase by the alleged cartel was "significant" under her pass-on theory.  Netz Tr. 326:19-24; *see also* Willig Rebuttal Decl. ¶ 10. Likewise, she admits that she has done nothing to determine how long a CRT cartel price increase would have to exist in this industry to be considered "permanent" for purposes of her pass-on

---

[30] *See* Willig Rebuttal Decl. ¶ 112.

1    analysis. Netz Tr. 328:11-25. Without any evidence or opinions to support either of these two

2    critical factual assumptions, Dr. Netz's entire pass-on testimony is rendered inadmissible. *See, e.g.*,

3    *Daubert*, 509 U.S. at 590; *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988)

4    (affirming the exclusion of expert reports with "no basis in the record" that "rest[ed] on unsupported

5    assumptions and ignore[d] distinctions crucial to arriving at a valid conclusion").

6          Similarly, there is no record basis for Dr. Netz to assume an industry-wide CRT price

7    increase to competitive finished CRT product manufacturers like Sony, who Plaintiffs do not claim

8    was a part of the alleged CRT cartel, or competitors that sold products that use non-CRT technology,

9    such as LCD and plasma products. Such industry members did not purchase any CRTs from the

10   alleged cartel and thus would not have incurred any cost increase in their components. Netz Tr.

11   56:13-16, 226:6-9, 284:13-285:11, 300:1-12. Further, Dr. Netz has now admitted that she has been

12   unable to identify an alleged cartel target price in the record for 74% of Defendants' CRT sales

13   during the class period. *Id.* at 321:5-9. There is thus no record support for any "industry-wide"

14   cartel cost increase assumption.[31]

15         The only supposition Dr. Netz was able to advance for why Sony, LCD and plasma product

16   competitors would experience a cost increase even though they did not purchase any CRTs from

17   alleged cartel members, and were not part of any alleged CRT conspiracy, is that, as a matter of

18   economic theory, they could have used the CRT cartel price increases as an opportunity to raise their

19   own finished product prices. *Id*. at 279:23-283:18, 285:23-287:5. However, Dr. Netz has no

20   evidence of that. Nor does she have any way to discount the more plausible possibility, fully

21   consistent with economic theory, that these companies, who operate in a "highly competitive"

22   distribution market and who would not experience a component cost increase as they did not

23   purchase CRTs from the alleged cartel, would not increase their finished product prices in favor of

24   trying to increase their market shares at the expense of those companies participating in the CRT

25   cartel. *Id.* at 283:19-287:5. This possibility, which Dr. Netz did not study, is especially likely to

26

27   ───────────────
     [31] Willig Rebuttal Decl. ¶ 113 ("Dr. Netz has provided no sound basis to conclude that the alleged
     cartel was able to elevate prices in an industry-wide, significant and permanent manner, which
     undermines her claim of universal pass-through.").

28

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                  MDL NO. 1917

have been the case because, as Dr. Netz conceded, LCD and Plasma producers substantially increased their market shares at the expense of members of the alleged CRT cartel throughout the class period.  *Id.* at 292:11-15; Netz Rebuttal Decl. 2.  Moreover, Dr. Netz has never compared Sony's CRT prices to changes in CRT cartel target prices to determine if there was any correlation. Netz Tr. at 285:6-11.  Dr. Netz's assumption of industry-wide cost increases caused by the alleged cartel is thus pure speculation which cannot be supported by the record.

In addition, Dr. Netz's assumption of industry-wide pass-on at the manufacturer and distributor levels is defective and inadmissible because she concedes that she used nothing more than her "subjective judgment" to conclude that her non-random sample of only one tube manufacturer, three monitor makers and two television makers, accounting for less than 3% of global monitor manufacturing and less than 9% of TV manufacturing, were representative of the entire industry population, which she could not even define.[32]  Mot. 21-22; Netz Tr. 137:9-23, 366:5-371:9.  As explained by Dr. Netz in the most candid manner:

> Q. Okay, I understand you used your judgment.  What I'm trying to understand is other than looking at it and subjectively saying these look representative, did you apply any particular objective criteria to decide why I want these [retailer data] as opposed to others?
>
> A. As I said, there is no objective criteria.  There is no statistical law, rule, guideline that says if you're doing an analysis, you want a firm that has the – whatever same number of employees, same number of sales, et cetera.  There simply is no such criteria.  The only criteria are subjective criteria."

Netz Tr. 360:15-361:3.  On this point, Dr. Netz is wrong as a matter of law.

Regardless of who selects the data, it must be representative to provide a basis for admissible

---

[32] *See id.* Willig Rebuttal Decl. ¶ 147



REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917

1  expert testimony.  *See, e.g.*, *Rojas v. Marko Zaninovich, Inc.*, No. CIV-F-09-0705, 2011 WL

2  6671737, at *4-5 (E.D. Cal. Dec. 21, 2011) (concluding that expert report was "marred by serious

3  methodological flaws" including its failure to factor in all data); *LeClercq v. Lockformer Co.*, No. 00

4  C 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert's opinion which relied

5  on only some of the sampling data); *Finestone v. Florida Power & Light Co.*, No. 03-14040, 2006

6  WL 267330, at *12 (S.D. Fla. Jan. 6, 2006) (finding the expert's methodology unreliable as he did

7  not "adequately explain why he chose only the thirty-two samples" and "not the remaining

8  samples").[33]

9         Plaintiffs claim that Dr. Netz's data should be considered representative because she looked

10  "to see if several different analyses converge to the same conclusion" and she looked "to the

11  standard errors and the resulting confidence intervals for each dataset."[34]   Opp'n 21.  Neither of

12  these assertions does anything to address the fundamental defect in using a non-random sample

13  without any objective test or criteria to determine representativeness.  *See* Willig Rebuttal Decl. ¶

14  148 ("Dr. Netz has provided no sound reasons to conclude that her limited sample of CRT finished

15  product manufacturers provides a reliable basis to opine about pass-through rates at the many

16  manufacturers she has not analyzed."); *id.* ¶ 149 ("[E]ven among the retailers in her sample, the

17  average pass-through rate she estimates is not necessarily representative of pass-through rates

18

19

20  [33] Plaintiffs' only response to these cases is that they involve experts who are not economists.  Opp'n 15.  But Plaintiffs cite nothing for the strange and unsupportable proposition that economists are

21  somehow not required to use a sound methodology for selecting data, but other experts are.  This, of course, is not the law.  *See, e.g.*, *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 CIV,

22  8272, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) (excluding expert testimony of an economist that was based on non-random data without any showing that the sample used was

23  representative of the population as a whole).

24  [34] Dr. Netz's admission that she used a non-random "subjective" sample for her pass-on analyses underscores the reliability problem.  *See Utah v. Evans*, 536 U.S. 452, 466-67 (2002) (representative

25  or probability sampling is "[t]he . . . methodology . . . typically used by statisticians seeking to find a subset that will resemble a whole through the use of artificial, *random* selection processes . . . .")

26  (emphasis added); *see also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON STATISTICS 230 (3d ed. 2011) ("Probability methods are designed to avoid selection bias. . . .  [T]he

27  units to be measured are selected by a lottery that gives each unit in the sampling frame a known, nonzero probability of being chosen.  Random numbers leave no room for selection bias.").  Her

28  stubborn refusal to employ any such objective test renders her testimony inadmissible.

1   associated with specific finished products in specific periods.").[35]  Without any objective standard

2   for a non-random data selection, Dr. Netz's pass-on analysis should be excluded for this reason

3   alone.[36]

4   **B.      Dr. Netz's Unreliable Assumption of Universal Pass-On at the Retail Level**

5          Dr. Netz likewise has no admissible basis to support her opinion that the alleged overcharges

6   on CRTs were passed through at a rate approximating 100% by every retailer to every consumer

7   regardless of the product purchased, the relevant distribution channel, or even the price paid.  Netz

8   Rebuttal Decl. 74-75; Netz Tr. 90:14-92:25.  It is undisputed, for example, that Dr. Netz did not

9   trace even one cost increase on CRTs through the retail level for finished CRT products to see if

10  there was actual "pass-through" to an individual consumer in an individual transaction.  Netz Tr.

11  240:19-242:23, 340:23-343:25.  Further, she admits that she did not study the pricing data for the

12  vast majority of such retailers in the industry, including many of those who are parties to this MDL,

13  such as Circuit City and Target.  *See, e.g.*, *id.* at 69:19-71:8, 80:24-82:5, 84:19-22.

14         Most profoundly, the same false factual assumptions and defective methodologies that Dr.

15  Netz relied upon at the manufacturer level for her universal pass on assumption also render

16  _____

17  [35] *see also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON ESTIMATION OF
    ECONOMIC DAMAGES 483 (3d ed. 2011) ("If the expert elects to study a sample of the data, the expert
18  needs to have carefully considered how the information will be used to ensure that the data sample is
    large enough and contains sufficient information."); REFERENCE MANUAL ON SCIENTIFIC EVIDENCE,
19  REFERENCE GUIDE ON STATISTICS 217 (3d ed. 2011) ("The population is the whole class of units that
    are of interest; the sample is the set of units chosen for detailed study.  Inferences from the part to
20  the whole are justified when the sample is *representative*.") (emphasis added).

21  [36] *See* Willig Rebuttal Decl. ¶ 150 ("Dr. Netz has conducted no objective analysis of whether the
    samples of CRT TV and monitor sales she examines are representative of the relevant population of
22  finished product sales.  For example, she could have compared data from her sample of
    manufacturers with data from her sample of retailers to determine if the data are consistent.
23  [Professor Willig] ha[s] examined them and found them to be substantially inconsistent in their
    coverage of finished products.

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Similar mismatches are
    apparent in other years and for other size groups of monitors and TVs, which indicate that the data
25  are not likely to be representative.  Even if Dr. Netz's sample of retailers and manufacturers were
    consistent in terms of the size distributions of TVs and monitors sold by such entities, the entities in
26  her sample may not be representative of the overall population of retailers and manufacturers along
    other dimensions (such as business models employed) that potentially matter for pass-through rates.
27  Dr. Netz has conducted no objective analysis of the representativeness of her sample along these
    dimensions.").

28
                                                    14

inadmissible her universal pass on assumption at the retailer level.  Specifically, it remains the case that Dr. Netz cannot, and does not, offer any opinions about the "significance" or the "permanence" of any cartel-inflicted cost increases that allegedly made their way to the retail level.  *See* Section II.A, *supra*.  Further, she cannot support her assumption of an "industry-wide" cost increase at the retailer level, when she has no basis to assume any cost increase by Sony televisions, LCD or plasma products sold at the retail level given the undisputed fact that such products do not contain CRTs sold by the alleged cartel members.  Netz Tr. 56:13-16, 226:6-9, 279:14-18, 284:13-285:11, 300:1-12.

Dr. Netz also cannot support her assumption about "industry-wide" retailer cost increases in finished CRT products as a result of the alleged cartel on the basis of what she concedes to be an examination of only a non-random sample of pricing data for a handful of retailers, out of thousands, without any objective criteria to determine that such non-random data is representative of the entire relevant retailer population.  Dr. Netz has thus admitted that she used only her "subjective judgment" – and nothing more – to select her small non-random sample of pricing data for just six internet retailers and nine brick and mortar retailers out of the thousands of retailers who sold finished CRT products during the class period.  *Id.* at 78:14-80:23, 360:15-361:6, 364:18-21.[37]  There is simply no reliable basis for this Court to admit such non-representative data as a basis for Dr. Netz's assumption that there was universal pass-on of the alleged CRT cartel cost increase at the retailer level.  This is especially so given that Dr. Netz has not even studied the possibility that "power buyers" among the retailers may have been able to resist all or some of the alleged CRT cost increases (*id.* at 314:1-316:20), and the fact that Dr. Netz has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[37]  Indeed, even the scholarly sources cited by Dr. Netz as purported support for her use of "subjective judgment" to make a sample selection in fact stated that an objective test, such as a "large probability sample," was required to use such non-random data.  Netz MTS Decl. 7 n.24 (citing REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON STATISTICS 211-302 (3d ed. 2011).  As Dr. Netz admitted, she did not employ any such objective test.  Netz Tr. 360:15-361:3.

15

1   ███████████████████████████████████████████████████████████

2   ██████████████████████████████████

3       Having had a full opportunity to pursue discovery, it is no excuse for Dr. Netz to claim that

4 she used the only suitable data that Plaintiffs obtained for her.  *GPU*, 253 F.R.D. at 505-06 (Netz

5 study rejected despite claim that better data had not been obtained when full discovery was available

6 to plaintiffs, who had the burden of gathering the evidence necessary to satisfy the prerequisites for

7 class certification under Rule 23).  As in *Flash Memory* and *GPU*, Dr. Netz has simply not done the

8 economic analysis required to account for all of the various factors that affected pricing for different

9 products purchased by different class members from different retailers in the distribution chain.  *See,*

10 *e.g.*, *Flash Memory*, 2010 WL 2332081, at *8, 11-12 (rejecting Dr. Netz's analysis because it did not

11 account for the factual differences associated with the "various links in the distribution channel;"

12 explaining that Dr. Netz made "no attempt to assess whether pass-through rates vary by product or

13 by customer," while claiming that all products are in the same market and subject to the same pass-

14 through rate without distinction); *GPU*, 253 F.R.D. at 504-506 (same).

15       Finally, Dr. Netz's testimony on retailer pass-on is inadmissible for the additional reason that

16 it simply dismisses the only testimony in the record from actual retailers on the pass-on issue – ████

17 ███████████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████████

19 ███████████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████

25 ████████████████████████  Further, there is no contradictory retailer testimony in the record,

26 and therefore there is no basis for Dr. Netz to dismiss these record facts simply because they refute

27 her unsupported assumptions and conclusions. ████████████████████████

28

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE       Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ       MDL NO. 1917

1 [REDACTED]

2 [REDACTED]

3 [REDACTED]

4 [REDACTED]

5 [REDACTED]

6      Indeed, as Dr. Netz now knows – but still chooses to ignore – numerous major retailers have

7 specifically denied in this very MDL that they passed on to their customers all of the specific CRT

8 cartel price increases alleged in this case.  *See, e.g.*, *Target Corp. v. Chunghwa Picture Tubes, Ltd.*,

9 No. 11-cv-05514, ¶¶ 106, 228 (N.D. Cal.) [Dkt. No. 9] (Jan. 6, 2012) (alleging that Target was "not

10 able to pass the inflated prices on to their customers").[39]  Plaintiffs claim that such "[p]leading

11 allegations" can be ignored by Dr. Netz because they are not record evidence.  Opp'n 20.  But even

12 Dr. Netz has conceded that she should have studied these retailer claims because they are clearly

13 relevant to her analyses.  Netz Tr. 60:5-16, 89:20-90:5.  Her continued failure to examine the vast

14 majority of this data is just one more basis to find her testimony to be unreliable, divorced from the

15 record, and thus inadmissible.

16     **C.**    **Dr. Netz's Continued Reliance on Improper Averaging and Aggregation**

17      As even Dr. Netz concedes, the use of averaging would not be proper in all economic studies

18 and analyses.  Netz Tr. 347:6-11.  Here, Defendants' Motion provides detailed reasons why Dr.

19 Netz's pervasive use of aggregation, averages and groups renders her specific testimony in this case

20 unreliable and inadmissible because it conceals, rather than identifies, the very price differences

21 among individual transactions and class members that are the subject of Dr. Netz's "common

22 impact" testimony:

23     • In her purported comparison of cartel target prices to "actual prices," Dr. Netz "groups" the

24 [REDACTED]

25 [REDACTED]

26 [REDACTED]

27 [REDACTED]

[39] *See also* Mot. 20 n.10.

28

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE    Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ    MDL NO. 1917

target prices by certain characteristics, aggregates those groups, and then averages the transactional-level data to calculate "average sales prices."  In doing so, she obscures the fact that many of the CRT prices she studied were either significantly below or significantly above the alleged cartel target prices.  *See* Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification (N.D. Cal.) (No. CV-07-5944-SC (Oct. 1, 2012) ("Netz Decl.") 61-64; *see also* Willig Rebuttal Decl. ¶ 22-26.

Thus, Dr. Netz's use of averaging conceals hundreds of thousands of transactions as to which, even according to her own analysis, the cartel was not effective.

- To support her opinion that the alleged cartel target prices and Defendants' CRT sales prices exhibit a "price structure," Dr. Netz uses hedonic regressions which rely upon the "average" effect of product characteristics on either "group" target prices or "average" monthly sales prices.  Netz Decl. 68-71.  Such averaging covers up the significant pricing differences that appear in individual transactions, which exhibited substantial variation, and even Dr. Netz has now been forced to concede that outside the litigation context, she cannot identify any peer-reviewed literature discussing or supporting her hedonic regression methodology for concluding that there was a "price structure."  Netz Tr. 389:9-13; *see also* Willig Rebuttal Decl. ¶ 69.  Nor does Dr. Netz have any explanation for her failure to perform any pricing correlation analysis to determine whether there was a constant price relationship between different CRT sizes, even though she performed just such a price correlation study between different sized products in the *LCD* case.  Netz Tr. 106:1-108:20.  The only inference one can draw is that such a correlation study would not support the existence of any price structure with respect to CRTs – a conclusion demonstrated by the analyses of Dr. Willig. *See* Willig

1    Rebuttal Decl. ¶ 107.

2    • In all of her purported analyses of pass-through rates at both the retail and manufacturer-

3      distributor levels, Dr. Netz estimates and reports only an "average" pass-through rate across

4      all finished CRT products, and across all individual customers of finished CRT products at

5      the retailer customer level. Netz Decl. 98-104, 113-17. Such averaging, of course, fails to

6      account for all of the extensive variations in price that exist at the transactional level of

7      individual sales. *See* Willig Rebuttal Decl. ¶¶ 109-112. Indeed, at her recent deposition, Dr.

8      Netz conceded that she has no idea how many individual transactions showing zero pass-

9      through exist in her data. Netz Tr. 343:15-25; Willig Rebuttal Decl. ¶¶ 117-119 ("[F]or some

10     entities, the pass-through rates were not positive in a significant number of instances. This

11     heterogeneity in pass-through rates is masked by Dr. Netz's estimates of average pass-

12     through rates."). Dr. Netz believes such transactions are "anomalies" (Netz Tr. 344:1-3), but

13     each such "anomaly" represents a real life individual class member who would not have

14     experienced any pass-through on his individual transaction—and Dr. Netz has no idea how

15     many such uninjured class member "anomalies" there are in her data set. Netz Tr. 344:4-6,

16     346:13-18.

17   In short, Dr. Netz's pervasive use of averages conceals individualized pricing and pass-on

18   variations in the underlying, transaction-by-transaction data,[40] and fails to account for precisely the

19   individual factors that would have had an impact on price and pass-on in specific transactions. *See,*

20   *e.g.*, Netz Decl. 63 (admitting "grouping" target and actual prices fails to account for many product

21   characteristics "relevant to pricing, such as aspect ratio, the type of shadow mask a CRT has, dot

22   pitch, frequency, and coating"). Whatever justification there may be for using such averaging in

23   other contexts, it is inexcusable in a case like this where the very purpose of the pricing analyses is

24   to determine whether impact and injury can be proven for "all" class members from common

25   evidence or whether the variations hidden by averaging requires a case-by-case examination,

26   precluding class certification. Dr. Netz's use of averaging makes it impossible to account for the

27   ─────────────────────────

28   [40] Willig Tr. 160-162, attached in its entirety as Exhibit 7 to Cole Reply Decl.

1  countless individual pricing differences in the markets for CRTs and finished CRT products, and

2  therefore renders her testimony inherently unreliable in the class certification context.  *See GPU*, 253

3  F.R.D. at 495-96 ("Notably absent from [Dr. Netz's GPU] analysis are other factors that would

4  likely have an impact on prices . . . .  Without incorporating such variables, it is impossible to

5  account for the diversity in products and purchasers here."); *Flash Memory*, 2010 WL 2332081, at

6  *10 ("Dr. Netz's regression analysis does not take into account individual variances in price trends

7  based on a particular chip or a particular chip purchased by a specific Direct-Purchaser – or even

8  more generally, by *category* of chip or *category* of customer.  By looking only at an *average price*

9  *trend*, Dr. Netz's model obscures individual variations over time among the prices that different

10  customers pay for the same or different products that appear in the data.").

11      Plaintiffs claim that "other district courts consistently hold that the use of averages" is

12  "appropriate when estimating damages."  Opp'n 25.  This argument, however, misses the "critical

13  issue," which "is not whether [the expert's] techniques are generally accepted; it is whether they are

14  appropriate when applied to the facts and data *in this case*."  *Reed*, 268 F.R.D. at 594.  Indeed,

15  "[w]hile averaging may be tolerable in some situations," such as in estimating damages, the record

16  here, just as in *GPU*, shows that it is inherently unreliable for class certification purposes as it

17  "mask[s] important differences between products and purchasers" in pricing which must be

18  examined in order to determine whether there is a common method of proving class-wide fact of

19  injury."  *GPU*, 253 F.R.D. at 489, 494.  None of Plaintiffs' cited authorities support the proposition

20  that averages are "widely accepted" to prove common class-wide impact where (as here) they fail to

21  account for individual variances in price trends.  In fact, even the cases cited by plaintiffs indicate

22  otherwise, *i.e.*, that a class should not be certified where averages obscure pass-through rates that are

23  different for particular products or customers.  *See Gordon v. Microsoft Corp.*, No. MC 00-5994,

24  2003 WL 23105550, at *2 (Minn. Dist. Ct. Dec. 15, 2003) (noting that if Microsoft had "offered

25  [any] evidence or [an] expert to establish that the pass-through rate is different or unique for any

26  particular product, any distribution channel, any time frame, or any subset of class members,"

27

28

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE      Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ      MDL NO. 1917

decertification would have been necessary).[41]   There is simply no reliable basis for Dr. Netz to have

employed her averaging methodology here, where the CRT distribution structure was filled with

price variations by products, customers, distribution channels, individual retailer philosophies, and

terms and circumstances of sale.  *See* Willig Rebuttal Decl. ¶ 76-77.[42]

Plaintiffs try to argue against preclusion under *Daubert* by asserting that the use of averaging

was a mere "technical" decision based on Dr. Netz's judgment regarding which data was useable.[43]

But the decision to employ "averages" to obscure transactional difference was a major substantive

flaw in an analysis purportedly designed to determine whether it can be shown through common

proof that all members of the putative class were injured or not; it was "key" to examining the issue

of common impact; and, by itself, provides ample ground for determining Dr. Netz's analyses are

inherently unreliable.  *See, e.g.*, *GPU*, 253 F.R.D. at 504 (Dr. Netz's analysis found to be "overly

reliant on averages [which] would thus sweep in an unacceptable number of uninjured plaintiffs");

*id.* at 493 ("[A]verages can hide substantial variation across individual cases, which may be key to

---

[41]  The other cases cited by Plaintiffs rely on legal standards that either have no application in the Ninth Circuit; are pre-*Daubert* or pre-*Dukes*; have nothing to do with the use of averaging by experts; and/or deal with the issue of measuring of damages, which is completely different from the issue of using common proof to demonstrate class-wide  impact and injury.  *See, e.g.*, *Nasdaq*, 169 F.R.D. at 523 (involving measure of damages); *In re Commercial Tissue Prods.*, 183 F.R.D. 589 (N.D. Fla. 1998) (declining to consider challenges to expert's methodology because the court, pre-*Dukes*,  held that it was precluded from engaging in a "battle of the experts"); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) (pre-*Daubert*; not involving expert use of averaging or aggregation); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) (same); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) (same).

[42]  Plaintiffs also cite part of a single sentence from *In re Scrap Metal Antitrust Litigation*, No. 1:02 CV 0844, 2006 WL 2850453, at *16 (N.D. Ohio Sept. 30, 2006), stating that a defendant's challenge to averaging of the price spreads can only be relevant "if 'averaging' is not a generally accepted or legally acceptable economic tool for identifying uniform impacts."  Opp'n 25.  Conveniently, Plaintiffs omit the first part of that sentence, which makes it clear that the court's statement in that case would apply only when there is an "unrebutted view that the market operated in a manner that would yield a uniform impact from an anti-competitive conspiracy."  *Scrap Metal*, 2006 WL 2850453, at *16.  Obviously, that is not the situation here and, in any event, the *Scrap Metal* court was addressing how to quantify or estimate damages *only after* uniform impact had already been determined.

[43]  Dr. Netz's claim that she had no choice but to aggregate data or "discard entire data sets" is not an excuse for inappropriately using averages to conceal pricing differences.  If there were gaps in the data produced that precluded a proper and reliable analysis, Dr. Netz had the ability to ask Plaintiffs' counsel to seek further data from Defendants or third parties if it was necessary to do so.  The failure of Plaintiffs to obtain such data for Dr. Netz is not a justification for doing an unreliable analysis. *GPU*, 253 F.R.D. at 495-96, 505-06.

---

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE                    Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                           MDL NO. 1917

1    determining whether there is common impact;" by resorting to averaging, plaintiffs' expert "evaded

2    the very burden that he was supposed to shoulder" and masked significant variation between

3    products and purchasers); *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975-76

4    (C.D. Cal. 2012) (finding that use of averaging and failure to account for important "differences in

5    artist quality/popularity" "render[ed] [the expert's] analysis 'so incomplete as to be inadmissible as

6    irrelevant'") (quotation omitted); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,

7    247 F.R.D. 156, 166-67 (C.D. Cal. 2007) ("proof of fact of injury requires much more than a simple

8    showing that the plaintiffs purchased an item in a world where average prices were inflated"); *Sheet

9    Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL

10   3855552, *30 (E.D. Pa. Sept. 30, 2010) (finding that use of averaging was inappropriate where the

11   evidence presented substantial variations in the prices paid by individual class members but

12   "plaintiffs' use of average prices mask[ed] these individual variations"); *Reed*, 268 F.R.D. at 592

13   (finding that plaintiffs' use of averages, when applied to the facts, "unacceptably mask[ed] []

14   significant variation" in base wages during the class period); ABA Section of Antitrust Law,

15   Econometrics: Legal, Practical, and Technical Issues 220 (ABA Publishing 2005) ("averages can

16   hide substantial variation across individual cases, which may be key to determining whether there is

17   common impact").[44]

18        In the end, neither Dr. Netz nor Plaintiffs can escape the inherent fallacy in her averaging

19   approach.  Dr. Netz's own testimony underscores the lack of reliability of using averages in the

20   context of trying to determine whether a common method exists for proving injury from the alleged

21   cartel target prices to all class members:

22

23   _____

     [44] The fact that Professor Willig uses some averages in his work in this litigation for a very different
24   purpose than Dr. Netz, (Opp'n 27), is of no moment to determining whether Dr. Netz's use of
     averages is admissible. ████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████████████
     ████████████████████████████████████████████████████████████████████████████
26   ███████████████  This is a very different purpose than the Netz analyses, which were required to
     examine, not obscure, the many differences in transaction pricing of CRTs and finished CRT
27   products to determine whether such variations precluded common proof of fact or injury for all
     putative class members.

28

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                  MDL NO. 1917

Q. Let's assume that the transaction data for one of your averages revealed that half the transactions were 25 percent below the target price and half were 25 percent above the target price.  You would use an average and calculate that the transactions were all at the target price, correct, in that hypothetical?

A. Yes.

Netz Tr. 158:14-22.  There can be no question that such an averaging approach is completely unsuitable and inadmissible for opining on whether a common method of proof can be utilized to prove impact to all class members in the highly variable pricing that existed for different finished CRT products sold to different putative class members throughout different retail channels in this case.

D.      **Dr. Netz's Unsupported Assumption That Alleged Cartel Target Prices for CRTs Sold Abroad Were Also Applicable to the Sale of CRTs in North America**

████████████████████████████████████████████████████████ Mot. 27.  Dr. Netz simply did not study this geographic market issue as part of her original Declaration and, ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

There is no basis to admit expert testimony which simply assumes, without any record support, that such target prices for overseas sales applied to the sale of CRTs in the United States.  This is especially so, given the fact that Dr. Netz has not even tried to define the relevant geographic market or to conduct a correlation analysis to show a price connection between CRTs sold in the United States and those sold in overseas markets.  Netz Tr. 38:16-23, 40:25-41:3.  In fact, Dr. Netz admits that she still has not done any comparison of CRT prices in North America with CRT prices sold overseas, so she has no basis to opine on the existence of or absence of a price correlation (if any) between such sales.  *Id.* at 391:12-17; *see also* Willig Rebuttal Decl. ¶¶ 60-61.

Dr. Netz tries to justify this unsupported geographic pricing assumption in her testimony by now performing what she claims to be a comparison of the alleged CRT target prices to sales by Defendants of CRTs or finished CRT products sold in the United States.  Netz Rebuttal Decl. 56, Ex. 26; Netz Tr. 302:1-14. ████████████████████████████████████████████

23

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ███████████████████████████████████████████

4 ███████████████████████████████████████████

5 ███████████████████████████████████████████

6 ███████████████████████████████████████████

7 ███████████████████████████████████████████

8 ███████████████████████████████████████████

9 ███████████████████████████████████████████

10 ██████████████████████████████████████████

11 ██████████████████████████████████████████

12 ██████████████████████████████████████████

13 ████████████████████

14    Further, Plaintiffs cannot save Dr. Netz's unsupported assumption about the ████

15 ██████████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████████████

18 ██████████████████████████████████████████

19 ██████████████████████████████████████████

20 ████████████████████████████

21    Finally, even assuming, *arguendo*, that the ████████████████████

22 ████████████████████████████████████████ their

23

24 ██ ██████████████████████████████████████

25 ██████████████████████████████████████████

26 ██████████████████████████████████████████

27 ██████████████████████████████████████████

28 ████████████████████████████████

24

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ██████████████████████████████████████████

### E.  Dr. Netz's Use of "One-Size-Fits-All" Economic Theory Instead of Actual Analysis

Dr. Netz continues to opine that the alleged CRT cartel charged a supra-competitive price for every product, every time, based on the "theory" that cartels continue to operate for a long period of time only if universally successful.  Mot. 29-31; Netz Rebuttal Decl. 4.  Theory alone cannot save Dr. Netz's testimony, which must be excluded because she simply did not study whether the alleged CRT cartel in this case was in fact, not theory, successful with respect to all of the alleged transactions at issue during the entire class period with respect to all putative class members.  *See* Netz MTS Decl. 13.[46]  Dr. Netz simply ignores and does not take into account the vast and very specific record evidence cited by Defendants that demonstrates that (i) actual prices of tubes varied widely based on individual negotiations with customers that differed on a case-by-case basis at any given time; (ii) CRT tubes were highly specialized making it difficult to switch to another manufacturer's tubes; (iii) CRT prices were based on those special features; (iv) some CRT customers were captive and subject to special transfer prices based on their common ownership; and (v) CRT prices were based on a number of factors that were constantly in flux.  Mot. 29-31.  Neither

---

[46] Dr. Netz conceded at her deposition, however, that economic theory, by itself, cannot prove impact in this case (Netz Tr. 371:24-372:10), and that it would be rational for the alleged CRT cartel to exist for a long period of time even if it was effective only with respect to some products, some customers or some geographic markets.  Mot. 13 citing Netz Tr. 153:17-154:9.

Plaintiffs nor Dr. Netz has offered any basis for ignoring this record evidence that fundamentally undermines the Netz testimony.  For example, Dr. Netz recently conceded that she chose not to include any variable in her pass-through regressions to account for the undisputed record fact that LCD and plasma television competition with CRT products significantly increased during the class period, simply because it was her "subjective" decision not to do so.  Netz Tr. 382:18-383:5.[47]  This deliberate exclusion of a relevant variable to account for undisputed record facts which would have a material effect on CRT prices is by itself a basis to exclude the Netz analyses.  *See, e.g.*, *Live Concert*, 863 F. Supp. 2d at 976 (citing *Bazemore*, 478 U.S. at 400 n. 10) (excluding plaintiffs' analysis where the expert "impermissibly" failed to account for important variables that impacted prices); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010) (excluding a regression analysis where plaintiffs' expert assumed there was only one relevant factor and made no attempt to account for other "key" variables, rendering his methodology fatally flawed); *In re Wireless Tel. Serv. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005) (excluding a regression where plaintiffs' expert failed to control for significant factors that affected prices, rendering his analysis "essentially worthless").  Indeed, the "importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation," where flawed regression analysis can result in erroneous conclusions.  *Live Concert*, 863 F. Supp. 2d at 973-74.

There is no basis for Plaintiffs' claim that Dr. Netz "did not need to calculate the 'but-for' price of the CRTs" to study whether real world prices were actually supra-competitive or not.  Opp'n 31 ("[a]t the class certification stage, proposing sound methodologies for calculating the but-for price is sufficient").  To support this proposition, Plaintiffs cite *LCD*, *SRAM* and *Rubber Chemicals*, but those cases merely state that experts need not supply a "precise damage formula" at class certification.[48]  Dr. Netz's failure here is not the absence of a "precise damages formula;"[49] rather,

---

[47] *See* Willig Rebuttal Decl. ¶¶ 124-125.

[48] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 606 (N.D. Cal. 2010); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) (same); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005) (same).

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE                    Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                           MDL NO. 1917

1    her failure in not estimating the "but-for" price is that it has deprived her of the ability to provide any

2    support for her critical factual assumptions that each of the alleged CRT cartel cost increases were

3    both "significant" and "permanent."  Netz Tr. 325:14-326:24, 328:11-329:5.  Without any basis to

4    support these critical assumptions, Dr. Netz's pass-through testimony does not meet its own self-

5    defined requirements and collapses of its own weight.

6    **F.    Dr. Netz's Unreliable Assumptions About the Product, Geographic and
            Participant Scope of the Alleged Cartel**

7

8    Finally, Dr. Netz admitted in her deposition that based on the allegations in Plaintiffs'

9    complaint, she assumed a single, integrated, global conspiracy that covered both CDTs and CPTs in

10   which all Defendants participated uniformly.  Netz Tr. 29:8-30:1.  She did not try to determine the

11   relevant geographic and product markets.  *Id*. at 40:25-41:3.  And, she did not try to determine which

12   Defendants attended which alleged cartel meetings involving which CRTs or whether, at any

13   particular time, any given defendant was in the CDT or CPT business with respect to any particular

14   CRT tube types or sizes.  *Id.* at 28:17-29:7, 47:1-48:2.

15   Plaintiffs now claim that Dr. Netz *did* review record evidence, such as meeting minutes and

16   deposition testimony, to determine the conduct of the alleged cartel.  Opp'n 31-32 ("it is *conduct* that

17   matters to Dr. Netz's conclusions"); Netz MTS Decl. 14.  None of this changes Dr. Netz's sworn

18   testimony on this subject, which specifically sets forth her extensive reliance on unsupported

19   complaint allegations to assume the scope and shape of the alleged cartel:  "It's my testimony that

20   my report takes as its foundation the *conduct* alleged in the complaint."  Netz Tr. 29:24-30:1

21   (emphasis added); *see also id*. at 29:12-15 ("I don't recall what is alleged in the complaint, and I

22   never undertook any analysis dependent on whether there were multiple conspiracies or a single

23   conspiracy."); *id*. at 32:23-33:2 ("I've not assumed a geographic market beyond the discussion in the

24   complaint about how the conspiracy worked.  And to the best of my recollection, the complaint does

25   not specify a geographic region."); *id*. at 47:9-14 (confirming that if the defendants were in the

26   ───────────────

27   [49]  Notably, not only has Dr. Netz failed to determine any "but-for" prices, she has not shown any
      common methodology to determine individual but-for prices using common proof.  *See, e.g.*, *Blades*,
28   400 F.3d at 574-75 (expert opinion could not overcome need to determine individual but-for prices).

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                  MDL NO. 1917

business during the relevant period, she assumed they were part of the conspiracy).   This is indefensible for expert testimony when the conduct and marketplace facts being assumed are critical to the analysis and unsupported by the record.  *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 CIV, 8272, 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) (expert testimony excluded for relying upon the unsupported assumptions supplied by plaintiffs' counsel); *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 CIV 8136, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001) (expert testimony excluded for, among other reasons, relying upon client's conclusory and unsupportable statements that were contradicted by the record); *Argus Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985) (same).

Equally important, ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████

Indeed, Dr. Netz does not dispute that the scope of the alleged conspiracy could have varied with respect to particular defendants and that this issue, if studied, could affect her conclusions about proving common impact. Netz Tr. 47:16-48:2 (agreeing that if "some defendants had no role in any discussions or agreements about CDTs," that "could very well" affect her analysis and conclusions). Despite this concession, Dr. Netz chose not to study any of these record facts and relied instead upon the unsupported allegations about the scope of the conspiracy that are set forth in the complaint.

### III.   PLAINTIFFS CANNOT SAVE DR. NETZ'S TESTIMONY BY CLAIMING THAT IT IS SUBSTANTIALLY SIMILAR TO THE TESTIMONY HELD TO BE ADMISSIBLE IN THE *LCD* LITIGATION

Recognizing that Dr. Netz's analyses cannot withstand the independent scrutiny of this Court, Plaintiffs attempt to hide behind Judge Illston's ruling in the *LCD* antitrust litigation that Dr. Netz's purportedly similar expert testimony was admissible in that case. *See* Opp'n 5-9.[50]  This argument should be rejected out of hand.

First, Plaintiffs are precluded from trying to meet their *Daubert* burden here by relying on the admissibility ruling in *LCD* given their refusal to produce the testimony and expert materials submitted by Dr. Netz in the *LCD* litigation.   Netz Tr. 296:1-5; 297:3-299:7; 318:6-320:15. Plaintiffs claim that the protective order in *LCD* prevents them from revealing the confidential contents of Dr. Netz's expert work in that case, but Plaintiffs cannot use the *LCD* protective order as a sword and shield.  *Id.*  If Plaintiffs are unable to produce Dr. Netz's confidential expert work from *LCD*, they cannot claim that the alleged similarity of that work to her work here supports the admissibility of her opinions in this case.  Neither Defendants nor this Court should be forced to merely accept Plaintiffs' assertions in this regard without any ability to verify them.[51]  *See In re Leap Wireless Int'l, Inc.*, 301 B.R. 80, 84-85 (Bankr. S.D. Cal. 2003) (striking expert testimony under *Daubert* where expert's refusal to disclose the underlying facts or data upon which he relied on left the court "with the bare option of . . . to trust but not to verify"); *In re Lake States Commodities, Inc.*, 271 B.R. 575, 587-88 (Bankr. N.D. Ill. 2002) (holding that "the [report] carries no weight due to the lack of meaningful testing of the information upon which it is based and the insufficient validation of the underlying sources").

---

[50] Plaintiffs rely primarily on Judge Illston's February 21, 2012 decision denying defendants' motion to strike; however, that decision is largely a regurgitation of the court's decision on class certification and defendants' original motion to strike, which barely applied any scrutiny to the Netz testimony, apparently under the mistaken belief that it was inappropriate to do so at class certification.  *See LCD*, 267 F.R.D. 583, 606 (N.D. Cal. 2010); *LCD*, No. M 07-1827, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012).

[51] While Dr. Netz's heavily redacted expert report in support of the indirect purchasers' motion for class certification was filed publicly, the bases for Dr. Netz's analyses cannot be discerned from these redacted versions.  Declaration of Janet S. Netz, Ph.D., in Support of Indirect-Purchaser Plaintiffs' Motion for Class Certification, *LCD*, 07-md-1827 (N.D. Cal.) [Dkt. No. 1023-5-10] (June 2, 2009).  Moreover, Dr. Netz's merits and damages reports in *LCD* were filed under seal in their entirety.  *LCD*, 07-md-1827 (N.D. Cal.) [Dkt. No. 3944] (Oct. 19, 2011).

1        That is particularly so given the fact that even the limited information available regarding Dr.

2   Netz's expert testimony in *LCD* shows that her analyses in that case – involving different products,

3   different defendant groups and different time periods – were not substantially similar to her analyses

4   or methodologies here.  For example, Dr. Netz has admitted that she conducted a price correlation

5   analysis between different sizes of LCD to support her conclusion of a prices structure in the *LCD*

6   litigation, but chose not to do such an analysis here, for her own "subjective" reasons.  Netz Tr.

7   106:1-108:20.  Without having access to Dr. Netz's analyses and their underlying support in the

8   *LCD* litigation, neither Defendants nor this Court can make any determination about whether the

9   decision by Judge Illston to admit Dr. Netz's testimony in the *LCD* litigation has any relevance to

10  her very different methodologies and analyses in this case, which presents a very different factual

11  record.

12       In any event, regardless of Plaintiffs' unsupported and unverifiable claims that the CRT and

13  LCD markets are "comparable" and that Dr. Netz's analyses and opinions were "nearly identical" in

14  both cases, this Court must review the facts in this record and Dr. Netz's analyses in this case alone

15  to fulfill its role as gatekeeper of admissible expert testimony under *Daubert*.  *See, e.g.*, *Hendrix v.*

16  *Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010) (recognizing that the reliability of an expert's

17  methodology must be judged by considering the reasonableness of applying the methodology to the

18  specific facts of the case); *see also Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (1995)

19  (court must "analyze not what the experts say, but what basis they have for saying it").  Neither

20  *LCD*, nor any of the other inapposite cases cited by Plaintiffs in which expert testimony has been

21  held to be admissible, is of any help to Plaintiffs in staving off a *Daubert* exclusion of Dr. Netz's

22  unreliable testimony in this litigation.  In this case, the record is clear that Dr. Netz has relied upon

23  unsupported factual assumptions and defective methodologies which render her testimony the very

24  type of junk science which the courts are required to exclude under *Daubert* and its progeny.

## CONCLUSION

26       For each reason stated above and in Defendants' Motion, Defendants' Motion to Strike the

27  Expert Testimony of Dr. Netz should be granted.

28

REPLY MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                 MDL NO. 1917

Dated:  March 25, 2013                  WINSTON & STRAWN LLP

                                        By: /s/ Jeffrey L. Kessler
                                        JEFFREY L. KESSLER (*pro hac vice*)
                                        E-mail: jkessler@winston.com
                                        ALDO A. BADINI (257086)
                                        E-mail: abadini@winston.com
                                        A. PAUL VICTOR (*pro hac vice*)
                                        E-mail: pvictor@winston.com
                                        EVA COLE (*pro hac vice*)
                                        E-mail: EWCole@winston.com
                                        MOLLY M. DONOVAN (*pro hac vice*)
                                        Email: MMdonovan@winston.com
                                        **WINSTON & STRAWN LLP**
                                        200 Park Avenue
                                        New York, NY 10166-4193
                                        Telephone: (212) 294-4692
                                        Facsimile: (212) 294-4700

                                        STEVEN A. REISS (*pro hac vice*)
                                        E-mail: steven.reiss@weil.com
                                        DAVID L. YOHAI (*pro hac vice*)
                                        E-mail: david.yohai@weil.com
                                        ADAM C. HEMLOCK (*pro hac vice*)
                                        E-mail: adam.hemlock@weil.com
                                        DAVID E. YOLKUT (*pro hac vice*)
                                        E-mail: david.yolkut@weil.com
                                        **WEIL, GOTSHAL & MANGES LLP**
                                        767 Fifth Avenue
                                        New York, New York 10153-0119
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        GREGORY D. HULL (57367)
                                        E-mail: greg.hull@weil.com
                                        **WEIL, GOTSHAL & MANGES LLP**
                                        201 Redwood Shores Parkway
                                        Redwood Shores, California 94065-1175
                                        Telephone: (650) 802-3000
                                        Facsimile: (650) 802-3100

                                        *Attorneys for Defendants Panasonic*
                                        *Corporation of North America, MT Picture*
                                        *Display Co., Ltd. and Panasonic Corporation*
                                        *(f/k/a Matsushita Electric Industrial Co.)*

                                        FRESHFIELDS BRUCKHAUS
                                        DERINGER US LLP

                                        By: /s/ Richard Snyder
                                        TERRY CALVANI (SBN 53260)
                                        E-mail: terry.calvani@freshfields.com
                                        CHRISTINE LACIAK(*pro hac vice*)
                                        E-mail: christine.laciak@freshfields.com

                                        31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RICHARD SNYDER (*pro hac vice*)
E-mail: richard.snyder@freshfields.com
**FRESHFIELDS BRUCKHAUS**
**DERINGER US LLP**
701 Pennsylvania Avenue NW, Suite 600
Washington, DC  20004
Telephone: (202) 777-4565
Facsimile: (202) 777-4555

*Attorneys for Beijing-Matsushita Color CRT*
*Company, Ltd.*

MORGAN, LEWIS & BOCKIUS LLP

By:  /s/ Kent M. Roger
KENT M. ROGER (SBN 95987)
E-mail: kroger@morganlewis.com
MICHELLE PARK CHIU (SBN 248421)
E-mail: mchiu@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, California 94105-1126
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

J. CLAYTON EVERETT, JR. (*pro hac vice*)
E-mail: jeverett@morganlewis.com
SCOTT A. STEMPEL (*pro hac vice*)
E-mail: sstempel@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

*Attorneys for Defendants Hitachi, Ltd., Hitachi*
*Displays, Ltd., Hitachi Asia, Ltd., Hitachi*
*America, Ltd., and Hitachi Electronic Devices*
*(USA), Inc.*

MUNGER, TOLLES & OLSON LLP

By:  /s/ Hojoon Hwang
HOJOON HWANG
E-mail: Hojoon.Hwang@mto.com
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

WILLIAM D. TEMKO
E-mail: William.Temko@mto.com
JONATHAN E. ALTMAN
E-mail: Jonathan.Altman@mto.com
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue, Thirty-Fifth Floor

32

1

Los Angeles, California  90071
Telephone: (213) 683-9100

2

3

*Attorneys for Defendants LG Electronics, Inc.;
LG, LG Electronics USA, Inc.,; and LG
Electronics Taiwan Taipei Co., Ltd.*

4

5

SHEPPARD MULLIN RICHTER &
HAMPTON

6

By: /s/ Gary L. Halling
GARY L. HALLING (SBN 66087)
E-mail: ghalling@sheppardmullin.com
JAMES L. MCGINNIS (SBN 95788)
E-mail: jmcginnis@sheppardmullin.com
MICHAEL W. SCARBOROUGH (SBN 203524)
E-mail: mscarborough@sheppardmullin.com
**SHEPPARD MULLIN RICHTER &
HAMPTON**
Four Embarcadero Center, 17th Floor
San Francisco, California  94111
Telephone:  (415) 434-9100
Facsimile:  (415) 434-3947

7

8

9

10

11

12

*Attorneys for Defendants Samsung SDI America,
Inc. Samsung SDI Co., Ltd.; Samsung SDI
(Malaysia) SDN. BHD.; Samsung SDI Mexico
S.A. DE C.V.; Samsung SDI Brasil Ltda.;
Shenzen Samsung SDI Co., Ltd. And Tianjin
Samsung SDI Co., Ltd.*

13

14

15

16

BAKER BOTTS LLP

17

By: /s/ Jon V. Swenson
JON V. SWENSON (SBN 233054)
E-mail: jon.swenson@bakerbotts.com
**BAKER BOTTS LLP**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699

18

19

20

21

22

John M. Taladay (*pro hac vice*)
E-mail: john.taladay@bakerbotts.com
Joseph Ostoyich (*pro hac vice*)
E-mail: joseph.ostoyich@bakerbotts.com
**BAKER BOTTS LLP**
1299 Pennsylvania Avenue N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

23

24

25

26

27

*Attorneys for Defendants Koninklijke Philips
Electronics N.V. and Philips Electronics North*

28

33

*America Corporation*

WHITE & CASE LLP

By: /s/ Lucius B. Lau
CHRISTOPHER M. CURRAN (*pro hac vice*)
E-mail: ccurran@whitecase.com
GEORGE L. PAUL (*pro hac vice*)
E-mail: gpaul@whitecase.com
LUCIUS B. LAU (*pro hac vice*)
E-mail: alau@whitecase.com
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, DC  20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

*Attorneys for Defendants Toshiba Corporation,*
*Toshiba America Information Systems, Inc.,*
*Toshiba America Consumer Products, L.L.C.,*
*and Toshiba America Electronic Components,*
*Inc.*

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from each of the above signatories.