# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Document Relates to:

ALL INDIRECT-PURCHASER ACTIONS

Master File No. CV-07-5944-SC
MDL No. 1917

**REBUTTAL DECLARATION OF PROFESSOR ROBERT D. WILLIG IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ**

<u>DOCUMENT SUBMITTED PARTIALLY UNDER SEAL AND CHAMBERS COPY</u>

Document Submitted Partially Under Seal

## TABLE OF CONTENTS

I.      **Assignment** .................................................................................................... 1

II.     **Summary of Opinions** ................................................................................... 2

III.    **The Methodologies Used by Dr. Netz to Establish Common Impact on Direct Purchasers Are Unreliable and Based on Unsupported Assumptions** ..................... 8

    A.   Dr. Netz's Assumptions and Methodologies Used to Claim Uniform, Effective, and Sustained Collusion .................................................................. 8

        *Dr. Netz Does Not Contest That Her Comparison of Actual and Target Prices is Fundamentally Biased. This Bias and Other Flaws Make Dr. Netz's Target Price Methodology Unreliable.* ....................................................... 9

        *Dr. Netz's Target Price Dataset Has Significant Shortcomings.* .................................. 10

        *Dr. Netz's Own Target Price Data Show Little or No Connection between Changes in Target CRT Prices and Changes in Actual CRT Prices.* ............................................ 14

        *Dr. Netz's Explanation for Why Target Price Changes Need Not Predict Actual Price Changes Undermines Her Methodologies Used to Attempt to Establish that the Alleged Cartel Had Classwide Impact* .................................................................... 15

        *My Target Price Compliance Analysis Was Based on a Proper Measure of Actual Price Changes.* .................................................................................................... 18

        *The Relationship between Actual and Target Price Changes Was Weaker for Transfer Sales than Merchant Sales.* .............................................................................. 24

        *Dr. Netz's New Comparisons of Actual Prices of CRTs Manufactured or Sold in North America to the Alleged Target Prices Do Not Remedy the Unreliability of Her Methodologies for Assessing Whether the Alleged Cartel Elevated Price for Any or All CRTs Sold in North America.* ................................................................. 27

        *Dr. Netz's Failure to Perform any Analysis of But-For Prices, at a Minimum, Leaves Open the Possibility that a Substantial Number of Class Members Were Not Injured.* .......................................................................................................... 29

    B.   Dr. Netz's Assumptions and Methodologies to Claim a "Price Structure" in CRT and CRT Finished Product Markets ........................................................................ 31

        *Dr. Netz Has Failed to Provide Even Rudimentary Evidence to Establish That a "Price Structure" Exists.* ............................................................................................ 31

        *CRTs Were Highly Differentiated.* ............................................................................. 36

        *There Was Substantial Heterogeneity in Price Movements across CRTs.* ................... 39

        *Dr. Netz Does Not Contest the Substantial Heterogeneity in Price Movements across CRT Finished Products.* ................................................................................... 41

        *Dr. Netz's Own Sales Price Hedonic Analyses Undermine Her Claim of a Price Structure.* ................................................................................................................. 42

*A Material Amount of CRT Price Variation Is Left Unexplained by the Factors Identified in Dr. Netz's Sales Price Hedonic Regressions.* ............................................ 46

**IV.    Class-wide Impact on Indirect Purchasers Cannot Be Established using Common Evidence.** ...................................................................................... **50**

A.   Dr. Netz Estimates Only Average Pass-Through Rates, and She Provides No Method for Reliably Estimating the Pass-Through Rate for a Particular Product, Finished Product Manufacturer, or Time Period. ......................................... 50

B.   Dr. Netz's Methodology for Estimating Pass-Through Is Unreliable because It Does Not Control for Changes in Market Conditions and Does Not Properly Control for Differences across Products. ......................................................... 60

*Dr. Netz Makes No Effort to Control for Changes in Market Conditions during the Class Period, thereby Rendering Her Average Pass-Through Estimates Unreliable.* ... 60

*Dr. Netz's Method for Estimating Pass-Through Fails to Control Appropriately for Differences in Products.* ................................................................................. 65

*Dr. Netz Has Not Demonstrated that She Has Examined a Representative Sample.* ...... 72

**V.    Conclusion** ....................................................................................... **74**

Document Submitted Partially Under Seal

# I. Assignment

1.      I am a Professor of Economics and Public Affairs at the Woodrow Wilson School and the Economics Department of Princeton University, USA. I am also a Senior Consultant at Compass Lexecon, an economics consulting firm based in the U.S.

2.      I have been retained by the Defendants[1] to address whether Plaintiffs are likely to be able to demonstrate through common proof on a class-wide basis, that all of the members of the proposed indirect purchaser class ("the IPP class") suffered economic injury from the alleged conspiracy.  I was also asked to review the expert report filed by Dr. Janet Netz, the economic expert for the IPP class, on October 1, 2012 ("Netz Initial Report"[2]) and opine on the analyses and views presented therein.  Pursuant to this assignment, I filed an expert report on December 17, 2012 ("Willig Report" or "my report").[3]

3.      Since then, Dr. Netz has filed a declaration in support of Indirect Purchaser Plaintiffs' response to the Defendants' motion to strike her proposed testimony ("Netz Declaration")[4] and a rebuttal report ("Netz Rebuttal Report").[5] Counsel for Defendants have asked me to review and respond to the opinions and analyses contained in the new Netz Declaration and Netz Rebuttal Report with respect to all issues relevant to Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz.

4.      A list of matters in which I have given sworn testimony as an expert during the past four years, at trial or in deposition, is contained in Attachment 1. A list of the

---

[1] I have been retained by LG, SDI, Philips, Hitachi, Toshiba, Panasonic, and MTPD.  I was also retained by SEA and SEC until March 12, 2013, the date the IPP class voluntarily dismissed those companies from their case.

[2] Declaration of Janet S. Netz, Ph.D. in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification, October 1, 2012.

[3] Expert Report of Robert D. Willig, December 17, 2012.

[4] Declaration of Janet S. Netz, Ph.D., in Support of Indirect-Purchaser Plaintiffs' Opposition to Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz, February 15, 2013.

[5] Rebuttal Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification, February 15, 2013.

Document Submitted Partially Under Seal

information and data I relied upon in forming the opinions expressed herein is contained in Attachment 2. My opinions expressed herein are based on those materials and data, my knowledge and experience in industrial organization economics and antitrust economics, my experience in antitrust enforcement at the U.S. Department of Justice, and my experience in advising and consulting with clients on competition matters over the past 30 years, both here and abroad.

5.      The opinions expressed in this declaration reflect the information and facts I believe to be true at the time this declaration is filed. I reserve the right to revise my opinions if additional information and facts supplied in discovery or through subsequent expert reports and depositions make such revisions appropriate.

6.      Compass Lexecon is being compensated for my work at my usual hourly rate of $1,350, which is the same rate for research and testimony. This compensation is in no way connected to the outcome of this litigation.

## II.      Summary of Opinions

7.      Dr. Netz's conclusions are not "based on sound judgments that combine the facts and data of the case with widely accepted methods of economics," as she claims.[6] Further, her opinions are not "consistent with generally-accepted economic theories and principles found in textbooks," nor are her "methods [for] evaluat[ing] the facts and data of the case consistent with the research implementing and testing these theories and principles on real world data published in peer-reviewed scholarly journals," as she herself admitted in her deposition.[7] In this section, I briefly summarize the key points that demonstrate the lack of support for Dr. Netz's opinions.  I provide a more detailed analysis in the body of this declaration.

---

[6] Netz Declaration, p. 3.

[7] Netz Declaration, p. 3. Specifically, Dr. Netz admitted during her deposition that she was unaware of her use of the term "price structure" being employed in a published peer-reviewed journal in the context of an unregulated industry. (Deposition of Dr. Janet Netz, March 15, 2013 ("Netz Deposition Vol. 2"), pp. 386-389.)

Document Submitted Partially Under Seal

8.      Dr. Netz's opinion that classwide impact can be established using common methods and evidence rests on three claims: (a) Defendants' actual CRT prices were close to the alleged applicable target prices set by the alleged cartel; (b) a so-called "price structure" existed for CRTs; and (c) pass-through rates were uniformly positive across all CRT finished products sold by a given entity (*i.e.,* that there was universal pass-through by retailers and manufacturers).  If any one of these three claims is incorrect, then her entire methodology for establishing common impact on indirect purchasers collapses.  In fact, all three claims are fundamentally incorrect, thereby rendering her conclusions unreliable, as I discuss below.

9.      Dr. Netz claims that the alleged target prices were always above the but-for (*i.e.,* competitive) level and that actual CRT prices were close to the alleged target prices.  However, Dr. Netz offers no basis for her claim that the alleged target CRT prices were always above the competitive level, and in fact Dr. Netz contradicts this assumption herself in her Rebuttal Report.  Specifically, she acknowledges that market conditions can change after a target price is set, potentially causing competitive prices to be above or below the alleged target price.  It thus follows that even if the alleged cartel set a target price above what it expected to be the competitive level, unexpected changes in market conditions could propel the competitive price above the target price, likely resulting in no impact on direct purchasers and consequently no impact indirect purchasers.

10.      Even accepting Dr. Netz's assumption that the alleged target CRT prices were always above the but-for CRT price, she nonetheless fails to demonstrate that any actual CRT price was higher than the corresponding target price, much less the corresponding but-for price.  In particular, Dr. Netz is not able to explain how her comparison of actual and alleged target prices is reliable despite its bias towards mistakenly finding that actual prices are close to or above the alleged applicable target prices.[8]  Dr. Netz also does not contest my finding that, even ignoring the inherent bias in her comparison, the majority

---

[8] Willig Report, ¶ 103-104.  As I explain in my report, her analysis is biased because, as Dr. Netz acknowledges (Netz Initial Report, p. 63), she is often comparing a target price for more basic CRT models in a group of CRTs with the average actual price for that group.

Document Submitted Partially Under Seal

of CRT sales were priced below the alleged applicable target price. Since I filed my report, Dr. Netz has identified additional alleged target prices, and I still find that – even with the inherent bias in her comparison – more than half of Defendant's CRT sales were priced below the alleged target price.  Even assuming that all target prices were above the competitive level, it does not follow that an actual price that was below the alleged target price must have been above the but-for price.  Dr. Netz has not estimated but-for prices, and she presents no methodology that reliably could be used to assess which, if any, of the actual prices that were below the alleged target prices were nevertheless above the corresponding but-for prices.  Instead, she offers fragments of evidence that at most attempt to indicate that the alleged cartel was effective at elevating prices for *some* products or during *some* time periods, but this would not constitute proof of *classwide* impact.  As a result, her assertion that all CRT prices were elevated above the competitive level amounts to an unsupported assumption rendering her entire actual and alleged target price analysis unreliable.

11.     Dr. Netz's opinion that a "price structure" existed for CRTs is essentially a claim that the relative prices of different types of CRTs would be about the same in the but-for world as in the actual world.  Put differently, she is claiming that the cartel increased prices for all CRT products by about the same percentage.  However, this claim is baseless. The central piece of evidence that Dr. Netz puts forth to support her claim that such a price structure exists is a set of hedonic regressions.  However, those hedonic regressions only use actual and target price data from the claimed cartel period.  As such, they are fundamentally incapable of telling us anything about the prices that would have existed but-for the putative cartel and, therefore, they fundamentally cannot provide any basis for Dr. Netz's price structure claim.

12.     The only other evidence offered by Dr. Netz is a set of documents that she claims demonstrates that the alleged cartel set differentials in the target CRT prices. Even if Dr. Netz were correct that the alleged cartel set target price differentials between different categories of CRTs, it would at most establish that the cartel hoped to achieve certain relative prices between pairs of CRT categories *in the actual world*.  It would not provide any evidence whatsoever that the relative prices between CRT categories in the but-for world would have been the same as the allegedly targeted relative prices in the actual

Document Submitted Partially Under Seal

world – even if those target prices were uniformly adhered to by the alleged cartel members.  As a result, Dr. Netz's approach is fundamentally incapable of establishing the existence of a price structure of the kind that she defines and relies upon.

13.     The above itself is sufficient to prove that Dr. Netz's proposed methodology is unreliable because, without any basis, her conclusions become strictly assumptions.  And, from an economic perspective, it is inappropriate to claim that a common approach is valid based on an unsupported assumption.

14.     In fact, there is evidence indicating that Dr. Netz's assumed price structure does not exist, evidence that Dr. Netz herself acknowledges.  A "price structure" of the sort claimed by Dr. Netz cannot exist if prices in different segments of CRTs were affected by materially different market forces such that the ability and incentive of the alleged cartel to affect CRT prices differed across CRT segments. For example, if the alleged cartel substantially elevated the prices of some CRTs but failed to elevate prices of other CRTs (or elevated them less) because the latter had better substitutes and faced greater competition from alternative technologies, then relative prices in the actual and but-for worlds would be quite different – precisely the opposite of what Dr. Netz's price structure would require.  This is, in fact, exactly the situation surrounding the competition between CRTs and flat screens (LCD and plasma).  As I explain in my report, ███████  ████████████████████████████████████████████████████████████  ████████████████████████████████████████  As such, the alleged cartel's ability to elevate prices was not uniform across those segments.  Dr. Netz does not contest this possibility, nor does she contest ███████████████████  ████████████████████████████████████████████████  ██████████████  It thus follows as a matter of basic economic logic and common sense that Dr. Netz's purported price structure could not exist.

15.     Turning next to Dr. Netz's claim that pass-through rates were uniformly positive across all CRT finished products, Dr. Netz's methodology is unreliable because it

---

[9] Willig Report, ¶¶ 56-63.

calculates only the *average* pass-through rate for all TVs or monitors at each finished product manufacturer or reseller in the distribution chain – averaged across time periods, products, and transactions.   Dr. Netz provides no empirical support for a claim that pass-through rates were uniformly positive across these myriad dimensions.  Indeed, she provides no explanation of how her methodology could be used to assess pass-through rates for individual TV or monitor products or segments of TVs or monitors sold by a re-seller or manufacturer, for different time periods, or any other disaggregated dimension. In fact, she makes no claim that her approach could be employed in any disaggregated manner, and instead she just proposes that her approach be used to estimate pass-through rates at highly aggregated levels (*e.g.,* all TVs sold by a retailer over all time periods). Given that Dr. Netz does not contest that various segments of the CRT and CRT finished product marketplace were subject to differentiated market forces, uniformly positive pass-through rates cannot be reliably assumed.

16.     Having failed to provide any empirical evidence that pass-through rates were uniformly positive for all products, transactions and time periods, Dr. Netz relies entirely and mistakenly on economic theory to conclude that pass-through rates were uniformly positive.  However, she greatly over-simplifies the relevant economic theory and assumes rather than establishes that the conditions necessary to apply the theory are satisfied in the CRT marketplace.  In particular, Dr. Netz's claim that pass-through rates would be uniformly positive because the alleged cartel was able to achieve an across-the-board, significant, and permanent increase in CRT prices is inconsistent with record evidence showing that the alleged cartel was not uniformly or consistently effective (if at all) in elevating CRT prices.  For example, competition from flat screen technologies likely constrained the ability of the putative cartel to elevate prices of some CRTs during certain periods.  Moreover, as I have explained above and in my report, vertically integrated firms that manufactured CRTs and also finished products had the ability and incentive to deviate from alleged cartel prices, and I have provided evidence that the putative cartel was especially ineffective in elevating transfer prices of CRTs. Thus, the evidence indicates that not all CRTs' prices were elevated significantly and permanently by the actions of the alleged cartel as Dr. Netz claims.  Indeed, since Dr. Netz has not estimated but-for prices, none of her analyses is capable of establishing that the putative cartel

Document Submitted Partially Under Seal

succeeded in elevating CRT prices significantly, and Dr. Netz acknowledged in her deposition that she has not established that all putative CRT price increases by the alleged cartel were significant.

17.     Thus, in effect, Dr. Netz makes the unsupported assumption that pass-through rates were uniformly positive, *i.e.,* she assumes that there was universal pass-through by retailers and manufacturers.

18.     As is also the case with the other two claims on which Dr. Netz's opinion is based, the evidence indicates that her fundamental assumption of uniformly positive pass-through is incorrect. As I show in my report, the evidence indicates that pass-through rates were heterogeneous across multiple dimensions and that many of them were not positive – indicating the absence of pass-through due to market conditions.[10]  (Dr. Netz's criticism of the pass-through analyses I used to demonstrate the unreliability of her aggregated pass-through estimates is unfounded, as I discuss below.)

19.     In sum, Dr. Netz has failed to provide any valid support in her declaration for any of the three claims that underlie her proposed generalized approach for establishing classwide impact, which renders her approach essentially a series of inappropriately applied methodologies and unsupported assumptions leading to unreliable conclusions. From an economic perspective, that itself is a fatal flaw.  But, compounding the failure, the evidence indicates that Dr. Netz's assumptions are not just unsupported – they are simply wrong.

20.     The remainder of this declaration provides further details on the above findings and conclusions.

---

[10] See, *e.g.*, Willig Report, ¶¶ 123-125, 134-137.

Document Submitted Partially Under Seal

## III. The Methodologies Used by Dr. Netz to Establish Common Impact on Direct Purchasers Are Unreliable and Based on Unsupported Assumptions.

21.     Dr. Netz claims that common methods and evidence can be used to reliably establish that the alleged CRT price-fixing conspiracy impacted all members of the proposed IPP class.  With regard to alleged overcharges paid by direct purchasers, Dr. Netz's underlying assertion rests on two claims:

  a)     The first claim is Dr. Netz's contention that the Defendants actually did set CRT sales prices that matched "target prices" established by the alleged cartel.

  b)     The second is Dr. Netz's claim that prices of CRTs exhibited a "price structure" that in her view implies that relative prices would have been the same in the actual and but-for world, which is equivalent to saying that the alleged cartel was successful in elevating prices of all CRTs by about the same percentage amount.

### A. Dr. Netz's Assumptions and Methodologies Used to Claim Uniform, Effective, and Sustained Collusion

22.     Dr. Netz contends that her analysis comparing target CRT prices identified by her with actual CRT prices shows that the alleged cartel was effective in elevating CRT prices. For example, in her declaration, she states that "[w]hat I do conclude from the target price analysis is the effectiveness of the cartel in fixing prices."[11] However, in my report, I explain why Dr. Netz's target vs. actual price comparisons do not support her opinion that the putative cartel was consistently effective in elevating CRT prices, and that, in fact, her own data contradict her.  In her declaration, Dr. Netz does not contest my analysis that her approach is fundamentally biased.  I expand on this topic and related issues in this section.

---

[11] Netz Declaration, p. 11.  In her rebuttal report, Dr. Netz claim ████████████████████
████████████

Document Submitted Partially Under Seal

*Dr. Netz Does Not Contest That Her Comparison of Actual and Target Prices is Fundamentally Biased.  This Bias and Other Flaws Make Dr. Netz's Target Price Methodology Unreliable.*

23.      I explain in my report that Dr. Netz's comparisons of actual and target price levels at a given point in time are fundamentally flawed.  Dr. Netz does not contest or address most of my criticisms of her comparison between actual and target price levels.  In particular, Dr. Netz does not contest my opinion that her comparison of actual and target prices "is biased in the sense that her test would tend mistakenly to indicate that actual sales prices were at or above target prices regardless of whether manufacturers set their actual prices below target prices."[12] This bias almost surely causes her to overstate the share of the Defendants' CRT sales for which actual prices were above the alleged target price and to understate the magnitude by which actual CRT prices were below the alleged target prices.

24.      Dr. Netz also does not contest  my point that she presents actual-to-target price comparisons that are either averaged across all CRT products sold in a given month or aggregated across the entire class period, and that as a result, her analysis masks considerable differences between the actual and target prices for individual CRT models as well as variations over time.[13]  Dr. Netz's new comparisons between actual and target prices are presented in an identical fashion and therefore suffer from the same flaw.[14]

25.      Lastly, Dr. Netz does not contest my finding that comparisons between the actual price for a given CRT (defined in terms of a model, customer, and month) and the putative target price that Dr. Netz alleges is applicable to that CRT reveal tha ███ █████████████████████████████████████████████████████ Dr. Netz

---

[12] Willig Report, ¶ 103.  As explained in my report, her analysis is biased because, as Dr. Netz acknowledges (Netz Initial Report, p. 63), she is often comparing a target price for more basic CRT models in a product group with the average actual price for that product group (Willig Report, ¶ 104).

[13] Willig Report, ¶ 106 (referencing Netz Initial Report, Exhibits 14-17).

[14] Netz Rebuttal Report, Exhibits RR-15, 26, and 27.

[15] Willig Report, ¶¶ 107-108 and Exhibit 18.

Document Submitted Partially Under Seal

has since identified additional alleged target prices in her rebuttal report.  I have updated my comparisons of actual and target prices using her updated alleged target price data and find that



26.     The aforementioned flaws in Dr. Netz's methodology, which Dr. Netz does not contest, are by themselves sufficient to render Dr. Netz's target price analysis unreliable for the purposes of establishing her conclusion regarding "the effectiveness of the cartel in fixing prices."[17] Nevertheless, below I address Dr. Netz's responses to the finding of additional flaws in her target price analysis.

*Dr. Netz's Target Price Dataset Has Significant Shortcomings.*

27.     As a robustness check on my comparison of actual and target prices, I considered whether the substantiality of the share of actual prices that fell below the allegedly applicable target price could result from Dr. Netz being unable to identify precisely the target price applicable to a given model in a particular month.  Although Dr. Netz does not contest my finding that the majority of CRT sales were priced below the allegedly applicable target prices, she does criticize this one robustness check.  As explained below, Dr. Netz's criticism is misplaced since the issues she raises stem from limitations in target price data she compiled and her averaging of those data.

---



[17] Netz Declaration, p. 11.

Document Submitted Partially Under Seal

28.     Dr. Netz often identifies more than one alleged target price that might have applied to a given CRT sale.  Because she does not know which alleged target price (if any) actually applied to the given sale, Dr. Netz averages the potentially applicable target prices together and compares the average to the actual price.  Thus, as a robustness check on my (uncontested) finding that the majority of actual CRT prices were below the average of the alleged applicable target prices identified by Dr. Netz, I considered whether actual CRT prices were at least close to *any* of the potentially applicable target prices.  As I describe in my report, ███████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████ ██ █ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████

29.     Dr. Netz criticizes my analysis because ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████.  Netz proceeds to highlight some examples in which the range

---

[18] Willig Report, ¶ 110 and Exhibit 19.  I have updated my analysis to include any additional alleged target prices that Dr. Netz has identified since I filed my report.  ████████████████████ ███████████████████████████████████████████████████████

[19] This analysis is conservative because, as Dr. Netz acknowledges, "target prices are generally for basic models" (Netz Initial Report, p. 63), whereas actual prices include prices for premium CRTs, which likely causes my analysis to understate the share of CRT sales volume priced below the minimum potentially applicable target price.

[20] One potential explanation for actual prices that were well above the highest potentially applicable alleged target price is that, as discussed later, unexpected changes in market conditions following the alleged setting of a target price could have resulted in the competitive price being higher than the alleged target price.  If that occurred, the Defendants would have had an economic incentive to adjust their prices upward, at least to the competitive level.  However, if Defendants did not increase their prices beyond the competitive level, the alleged cartel would have had no impact on CRT customers for those sales.



- 11 -

Document Submitted Partially Under Seal

consisted of a single alleged target price and asserts that the cartel likely agreed upon other potentially applicable target prices, which, if observed, would have resulted in a larger range of potentially applicable target prices to which actual prices could have been compared.[22]  However, Dr. Netz appears to have misunderstood the objective of my analysis.  It was not my intention to speculate about the possible existence of unobserved target prices that could reconcile the frequent disparities between actual prices and the target prices identified by Dr. Netz with Dr. Netz's unsupported allegation that "prices paid by [CRT customers] were approximately equal to the cartel's target prices."[23]  Rather, my objective was to assess whether it is plausible that Defendants uniformly adhered to the alleged target prices that Dr. Netz actually identified.  Put differently, my analysis shows that Dr. Netz has provided no evidence that the substantial share of actual prices that were significantly below the lowest potentially applicable alleged target price were consistent with adherence to the alleged agreement to price at supracompetitive levels.  Dr. Netz's criticism of my analysis therefore amounts to a claim that the cartel may have adhered to such an agreement even though it cannot be reliably demonstrated using the data she has collected.

30.     I also wish to address the examples that Dr. Netz presents in her rebuttal report of

███████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████ ███████████
██████████████████████████████████████
███████████████████████████████
█████████████████████████████████
████████████████████████████████████
██████████████████████████████

---

[22] Netz Rebuttal Report, pp. 34-35.

[23] Netz Initial Report, p. 33.

[24] Netz Rebuttal Report, pp. 35.

Document Submitted Partially Under Seal

[REDACTED]

32.     As noted above, this extension is based on actual and target prices that Dr. Netz matched based on manufacturer, application, finish, size, and shape.  This list includes all of the attributes that Dr. Netz describes as major price differentiators.[27] If Dr. Netz's assertion is correct, [REDACTED]

[26] These figures include any additional alleged target prices that Dr. Netz has identified since I filed my report.

[27] Netz Rebuttal Report, pp. 12-13.

Document Submitted Partially Under Seal

other attributes, which Dr. Netz describes as "minor price differentiators."[28]  That is, █████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

*Dr. Netz's Own Target Price Data Show Little or No Connection between Changes in Target CRT Prices and Changes in Actual CRT Prices.*

33.     In my report, I present an econometric analysis showing that █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

34.     In her rebuttal report, Dr. Netz criticizes my analysis in three ways. █████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

_____

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████

[30] Willig Report, ¶¶ 92-101.

Document Submitted Partially Under Seal

██████████████████████████████████ For reasons I explain below, Dr. Netz's criticisms are without merit and, in fact, her arguments further undermine her own methodologies for establishing that the alleged cartel was highly effective in elevating CRT prices.

*Dr. Netz's Explanation for Why Target Price Changes Need Not Predict Actual Price Changes Undermines Her  Methodologies Used to Attempt to Establish that the Alleged Cartel Had Classwide Impact.*

35.   ████████████████████████████████

████████████████████

█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████

████████████████████████████████████
███████████████████████████████████
████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

---

[31] Netz Rebuttal Report, p. 36.

[32] Netz Rebuttal Report, p. 36.

Document Submitted Partially Under Seal



36.    Additionally, if market conditions were substantially variable and unpredictable and target prices were not adjusted frequently enough to respond to such changes – as Dr. Netz implies in the above quote – it would have been difficult for the alleged cartel members to effectively detect and punish cheating on the alleged agreement.  For example, it would be difficult for cartel members to know when it would be viewed as acceptable to deviate from the target price as a result of changing market conditions and when such conduct would or should be punished.

37.    Thus, the fact that unexpected changes in market conditions could override the alleged cartel's efforts to enforce target prices, which Dr. Netz acknowledges, undermines Dr. Netz's opinion ████████████████████████████████████████ ████

38.    Dr. Netz mistakenly claims that I should have controlled for these changes in market conditions in my econometric analysis of changes in actual prices and alleged target prices. ████████████████



---

[33] Although this scenario contemplated the impact of unexpected changes in market conditions for a specific CRT, the same logic applies to unexpected changes in market conditions that could have caused the but-for price to be higher than the target price for some CRT segments and not others, or in some regions and not others.

[34] Netz Rebuttal Report, p. 37.

Document Submitted Partially Under Seal

Dr. Netz's criticism is without merit and flies in the face of basic economics.  As an initial matter, Dr. Netz is just mistaken when she says that my model ████████████ ████████████████████████████████████████  On the contrary, my model just measures the extent to which changes in actual CRT prices can be predicted by changes in the allegedly applicable target prices, and finds that changes in the alleged target prices do not predict changes in actual CRT prices well at all.[35]

39.     Moreover, as I explained in my report, the fact that I did not "[control] for the effect of market forces on sales prices," causes my model to be a conservative test of cartel effectiveness because the model attributes any co-movement between actual and alleged target prices to adherence by the alleged cartel when the co-movement may instead have been caused by changes in market forces that had a common impact on actual and target prices.[36]  Put differently, because market forces are likely to have the same directional effect on actual and target prices – *e.g.,* a decline in demand for CRTs is likely to result in lower actual and target prices – controlling for changes in market conditions is likely to lower the estimated ability of alleged target price changes to predict actual price changes.

40.     Nevertheless, to further confirm the conservatism of my original model, I re-estimate my regression with ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[35] Willig Report, ¶¶ 92-93.

[36] Willig Report, ¶ 93 ("Moreover, even this slight correlation does not imply causation (*i.e.,* the change in actual price may not be due to the change in target price) since actual and target price changes are both likely to have been affected in the same direction by common market factors, generating some positive correlation between the two series. ████████████████████████████████████ ██ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

Document Submitted Partially Under Seal

████████████████████████████████████████████

41.     Thus, consistent with economic theory, the empirical evidence shows that controlling for changes in CRT market conditions leads to the conclusion that changes in the alleged target prices predict changes in actual CRT prices even more poorly than when these market conditions are ignored.

*My Target Price Compliance Analysis Was Based on a Proper Measure of Actual Price Changes.*

42.     The results of my regression analysis comparing actual and target price changes to assess whether the alleged cartel was uniformly effective (if at all) in elevating prices supports the conclusion that Dr. Netz's methodologies for assessing the cartel's effectiveness are unreliable.  Dr. Netz mistakenly criticizes my reliance on changes in actual U.S. dollar prices in my regressions. ████████████████████



Document Submitted Partially Under Seal



43.     However, adherence to target prices is most logically measured using U.S. dollars. This conclusion follows naturally from Dr. Netz's allegation that the alleged cartel was orchestrated through the use of target prices that were denominated in U.S. dollars.[41]  In fact, she assumes that there was only a single global target price (expressed in U.S. dollars) for any given product (or set of products) at a particular point in time – not different target prices depending on the region of sale or the currency in which a particular price was negotiated.  If there was only a single U.S. dollar-denominated ("USD") target price for any given product (or set of products) at a point in time, then economic logic implies that in order for the alleged cartel to be effective, cartel members would be expected to adjust their negotiated prices (*i.e.,* prices expressed in the currency in which they were negotiated) in order to maintain adherence to the alleged USD target price, thus offsetting any exchange rate movements.

44.     To see why, consider the following example.

---

[40] Netz Rebuttal Report, p. 38.

[41] Netz Rebuttal Report, fn. 55.

(footnote continued …)

Document Submitted Partially Under Seal



45.     The above example illustrates why the alleged cartel members would have had an economic incentive to adjust their negotiated prices even when those prices were denominated in a currency other than U.S. dollars to offset exchange rate movements in order to maintain cartel stability.[44] ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ███████████████████████ Because cartel members would be expected to adhere to the USD target prices, if cartel members closely adhered to the putative target prices, then changes in USD target prices should reliably predict changes in USD actual prices.

(… footnote continued)

[44] Dr. Netz does not offer any opinion to the contrary.

[45] Netz Initial Report, fn. 181-183.

Document Submitted Partially Under Seal



---

[46] Specifically, I include the change in the exchange rate between the currency prices were negotiated in and the U.S. dollar and also interactions between this variable and a series of indicator variables that correspond to each of the currencies in which CRT actual prices represented in the Defendants' CRT sales data were negotiated.



Document Submitted Partially Under Seal



If Dr. Netz is correct that size and shape are the only major price differentiators, then the fact that the average target prices she compiles by product group may be comprised of target prices for different sets of "minor" characteristics from one period to the next should not significantly distort the calculation of target price changes in the version of my analysis in which actual and target prices could be matched based on attributes that include size and shape. That is, if size and shape are the only characteristics that have a material influence on CRT prices, then a failure of changes in target prices to explain changes in actual prices once size and shape are taken into account cannot be attributable

---

[49] Netz Rebuttal Report, p. 37.

[50] As noted in footnote 82, althoug █████████████████████████████████████████

[51] Netz Rebuttal Report, p. 12.

[52] Netz Rebuttal Report, p. 12. Dr. Netz also refers to application, size, and shape as the only "meaningful price differentiators." *Id.*, p. 13.

Document Submitted Partially Under Seal

to the gaps in the target price data Dr. Netz compiled.  It can only be due to the alleged conspiracy being far from uniformly effective.



---

[53] Willig Report, fn. 94.  The programs for recreating this analysis were produced to Plaintiffs along with the backup to the other analyses in my report.



[55] Conversely, if other product attributes besides size and shape – such as resolution, frequency, safety standards, mask type, neck diameter, and shipping terms – represent significant price differentiators, either individually or in combination, then, by minimizing the importance of these other attributes, Dr. Netz dramatically understates the extent of CRT product differentiation.  Moreover, if these other attributes are significant price differentiators, Dr. Netz also would have failed to explain how the alleged cartel effectively coordinated on prices despite the fact that target prices were rarely differentiated along these other product dimensions.  Even if one were to posit that the cartel members reached some sort of understanding regarding pricing along these other important product dimensions that was not reflected in the meeting minutes cited by Dr. Netz, Dr. Netz has not presented any methodology that could be used to assess whether the cartel adhered to pricing agreements not reflected in the target prices that she identified.  As such, there would be no basis for concluding that classwide impact could be demonstrated through common proof.

Document Submitted Partially Under Seal

*The Relationship between Actual and Target Price Changes Was Weaker for Transfer Sales than Merchant Sales.*

52.     In my report, I cite to what Dr. Netz refers to as "a widely used Industrial Organization economics textbook"[56] for the proposition that economists have identified the presence of varying degrees of vertical integration in an industry as a contributor to cartel instability.[57] Dr. Netz does not agree with this proposition and argues that cartelization is possible even in the presence of vertical integration.[58]  However, what is relevant in the present context is whether the varying degrees of vertical integration in the CRT industry affect the likelihood that classwide impact could be demonstrated through common proof.  Unlike Dr. Netz, in my report, I examine data related to this issue and show that changes in prices between vertically affiliated entities ("transfer prices") exhibited an even weaker relationship with target price changes than did changes in prices between vertically unaffiliated entities ("merchant prices").

53.     Specifically, I examined whether there was any difference between (a) the ability of target price changes to predict changes in transfer prices, and (b) the ability of target price changes to predict changes in merchant prices ████████████████████ ████████████████████████████ ██████████████████████████████ ███████████████████████████ ██████████████████████████████ ███████████  As I note in my report, this finding "supports the hypothesis that the alleged

---

[56] Netz Initial Report, p. 43 and fn. 151.

[57] Willig Report, ¶¶ 85-86, fn. 82.

[58] Netz Rebuttal Report, pp. 25-26.

[59] Willig Report, ¶¶ 97-100.  I have incorporated into my analysis the additional alleged target prices identified by Dr. Netz since I filed my report ████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████

(footnote continued …)

target price-setting process was even less effective in the context of sales to downstream affiliates than in the context of sales to unaffiliated finished product manufacturers."[60]

54.     Dr. Netz concedes that she has not performed any specific comparisons of merchant and transfer prices.[61]  Dr. Netz also does not contest my finding that the changes in the alleged target prices are an even worse predictor of changes in transfer prices than changes in merchant prices.  She does assert that the manner in which I calculated actual price changes and target price changes introduces spurious variation into both series.  For the reasons described above, these assertions are without merit.  However, even if one were to accept her assertion that some spurious variation was introduced into the actual and target prices, it would imply only that I understated the ability of target price changes to predict actual price changes, but it would not explain my finding that target price changes are demonstrably worse predictors of actual transfer price changes than of actual merchant price changes.

55.     As discussed in my report, █████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████   █ her rebuttal report, Dr. Netz responds,

---

(… footnote continued)

these regressions and find that the R-squared and estimated coefficient on the change in the alleged target price are substantially lower when I implement the model for transfer CRT sales. *Id.*

[60] Willig Report, ¶ 100.

[61] Netz Deposition Vol. 2, pp. 375-376 (**Q.** Okay. And have you examined -- have you done any separate analysis of transfers of CRTs to affiliated finished goods manufacturers to see if the pricing was any different than it was for sales to other affiliated companies? Have you done any comparisons like that of prices? **A.** Not specifically comparisons as we discussed in my first deposition.)

[62] Willig Report, ¶ 97.

Document Submitted Partially Under Seal

> "The vertically integrated firm has no incentive to 'cheat' on the cartel agreement by setting a low transfer price because the process is analogous to an individual moving money from one pocket to another pocket."[63]

56.     However, by the same logic, the vertically integrated firm has no incentive to elevate the price that the CRT manufacturer charges an affiliated finished product manufacturer in the first place.  Dr. Netz appears to agree and states that

> "[O]ther cartel members have no incentive to monitor the internal transfer prices of a vertically integrated firm."[64]

However, if transfer prices are not particularly important to the alleged cartel members, then the only way they could try to ensure vertically integrated CRT manufacturers adhered to the alleged agreement would be to monitor the affiliated downstream finished product manufacturers' prices to ensure that they remained above an agreed upon benchmark.  However, I understand that Plaintiffs are not alleging a conspiracy to elevate finished product prices, and I am not aware of any evidence indicating that the alleged cartel either agreed to or attempted to enforce an agreement on finished product prices.  Similarly, I am not aware of – and Dr. Netz does not present – any evidence indicating

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████.  As a result, the evidence indicates that the alleged cartel would not have had the same impact on transfer CRT prices as merchant CRT prices.  Moreover, Dr. Netz provides no evidence or even a coherent explanation of her implicit assumption that evidence that the cartel elevated prices for merchant CRT sales would necessarily imply that it also elevated prices for transfer CRT sales.

---

[63] Netz Rebuttal Report, pp. 26-27.

[64] Netz Rebuttal Report, p. 27. Dr. Netz also states that when a CRT manufacturer sells a CRT to an affiliated finished products manufacturer, "there is no economically meaningful sale." *Id*., p. 26. See, also, Netz Deposition Vol. 2, p. 375.

Document Submitted Partially Under Seal

*Dr. Netz's New Comparisons of Actual Prices of CRTs Manufactured or Sold in North America to the Alleged Target Prices Do Not Remedy the Unreliability of Her Methodologies for Assessing Whether the Alleged Cartel Elevated Price for Any or All CRTs Sold in North America.*

57.     In her initial report, Dr. Netz performed no analysis to establish that target CRT prices ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████ █

58.     In her declaration, Dr. Netz contends that the target CRT prices she identified applied to North America. █████████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████

59.     However, the results of Dr. Netz's comparison have no bearing on the reliability of her methodology for assessing whether the cartel elevated prices for CRTs sold in North America because the "results" could just as easily be attributable to the undisputed bias in her actual-to-target price comparisons.  As noted above, Dr. Netz does not contest

---

[65] Willig Report, ¶¶ 65-66.

[66] In her rebuttal report, Dr. Netz acknowledges that CRTs were constrained geographically, *i.e.,* the same CRT could not be used in any and all regions of the world because of factors such as differences in broadcast standards across countries, differences in shielding, and differences in the Earth's magnetic field. (Netz Rebuttal Report, pp. 52-53.)

[67] Netz Declaration, p. 12.

Document Submitted Partially Under Seal

my opinion that █████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████ ████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████

60.     The most direct test of differentiated price dynamics consists of comparing changes over time in CRT prices in North America with changes in CRT prices in other regions.  If changes in North American CRT prices were not highly correlated with changes in CRT prices in other regions such that when CRT prices increased in North America, CRT prices elsewhere frequently decreased, then that is strong evidence that market forces in North America were differentiated from the rest of the world.

61.     In my report, I provide such a test and █████████████████████████

████████████████████████████████████████████████████████████████

████████████████ n her rebuttal report, Dr. Netz claims that this analysis is flawed because it measures CPT prices in U.S. dollars, and it is thus affected by fluctuations in exchange rates.[70] For reasons I explain in paragraphs 84 to 87 below, the heterogeneity in CRT price changes is appropriately analyzed using U.S. dollars.   Nonetheless, to further confirm my results, I also examined the extent of divergence in CPT price movements in North America and the rest of the world when those prices are expressed in the currency in which they were negotiated. █████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[68] See ¶ 23 above and also Willig Report, ¶¶ 103-104.

[69] Willig Report, Exhibit 9.

[70] Netz Rebuttal Report, p. 54.

Document Submitted Partially Under Seal



*Dr. Netz's Failure to Perform any Analysis of But-For Prices, at a Minimum, Leaves Open the Possibility that a Substantial Number of Class Members Were Not Injured.*

62.     I previously concluded that, because Dr. Netz has not estimated any but-for (*i.e.,* competitive) prices, she has not provided any information that would allow a fact-finder to determine which, if any, CRT sales were priced above the competitive level and thus has not demonstrated that the alleged cartel's conduct resulted in classwide impact.[72] Because she has not estimated but-for prices, her analysis is incapable of ruling out the possibility that some CRT prices were elevated above the competitive level, while others were not.

63.     Dr. Netz responds that it is not necessary to estimate a but-for price to determine whether the cartel had common impact.  In particular, she asserts in her declaration that "[j]ust as it is possible to infer whether one car is going faster than another car without knowing the precise speed of either car, evaluation of whether the but-for price is likely to have been lower than the actual price does not require providing a measurement of the but-for price."[73] However, Dr. Netz's analogy makes no sense in the present context; neither the economist nor the fact-finder can observe the "other car," which in this case is the but-for price.

64.     Inapt analogies aside, Dr. Netz has not demonstrated that all (or even most) CRT prices were above the corresponding but-for prices, nor has she demonstrated that such a showing would be possible using common (or even individualized) evidence (as I explain

---

[71] See Exhibit 9-R.

[72] Willig Report, ¶109.

[73] Netz Declaration, p. 14. See also, Netz Rebuttal Report, p. 57.

Document Submitted Partially Under Seal

in my report[74]).  She presents no empirical analysis that would even be capable of supporting such a claim.  The most seemingly germane analysis she presents is her comparison of actual and target prices.  However, this comparison fails to demonstrate that actual prices were above the competitive level for the three reasons documented at length above: (i) she has not established that the preponderance of alleged target prices were above the corresponding but-for prices;[75] (ii) she does not contest my finding that her comparison of actual and alleged target prices is biased towards mistakenly finding that actual prices were above the allegedly applicable target prices; and (iii) ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████████ As a result, her comparison of actual prices and alleged target prices is incapable of demonstrating that any, much less most or all, actual CRT prices were above the corresponding but-for prices.[76]

65.     The other evidence and arguments that Dr. Netz presents to support her claim that "CRT prices would therefore have been lower in the but-for world than they were in the actual world" also fail to demonstrate that classwide impact could be demonstrated with common proof.  For example, Dr. Netz states that, because participating in an illicit cartel entails taking on risks, rational cartel members would not have participated in the alleged cartel for as long as they allegedly did unless they were successful in elevating the price of CRTs.  However, at best, this rationale implies that the alleged cartel was effective at elevating prices for *some* products or during *some* time periods.  In fact, Dr. Netz conceded at her deposition that it could be rational for firms to participate in a cartel even if the cartel were only effective at increasing prices for some product sizes, in some

---

[74] Willig Report, ¶¶145-160

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Document Submitted Partially Under Seal

regions, or for some customers.[77] ██████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ As a

result, this putative evidence is incapable of serving as a common basis from which to

establish that the alleged cartel elevated all (or most) CRT prices above the competitive

level.

66.     In sum, Dr. Netz has not estimated but-for prices, and she presents no

methodology that reliably could be used to assess which, if any, of the actual prices that

were below the alleged target prices were nevertheless above the corresponding but-for

prices.  Instead, she offers fragments of evidence that at most indicate that the alleged

cartel was effective at elevating prices for *some* products or during *some* time periods, but

provide no basis to infer *classwide* impact.  As a result, her assertion that all CRT prices

were elevated above the competitive level amounts to an unsupported assumption.

**B. Dr. Netz's Assumptions and Methodologies to Claim a "Price Structure" in CRT and CRT Finished Product Markets**

*Dr. Netz Has Failed to Provide Even Rudimentary Evidence to Establish That a "Price Structure" Exists.*

67.     In her declaration, Dr. Netz claims that she "… applied textbook economic logic

to the record evidence to show that the cartel had the incentive to cause all prices to be

supracompetitive, that a market mechanism provided the means for the cartel to cause

impact to the entire price structure without setting target prices for all CRTs, and that the

cartel meeting notes indicate Defendants explicitly created structure in its target prices by

setting price differentials."[78]

---

[77] Deposition of Janet S. Netz, November 15, 2012 ("Netz Deposition Vol. 1"), pp. 153-154.

[78] Netz Declaration, p. 14.

Document Submitted Partially Under Seal

68.     Dr. Netz defines a "price structure" such that it implies that the relative prices across CRTs would be approximately the same in the actual and but-for worlds at a given point in time.[79]  In other words, the existence of a price structure implies that if the average price of CRT A is twice the average price of CRT B in the actual world in a given month, then the average price of CRT A would also have been about twice the price of CRT B in the but- for world in the same month (although both CRTs allegedly would have been priced lower in the but-for world than in the actual world).  According to Dr. Netz, one implication of the alleged existence of a price structure is that, if the cartel successfully elevated the price of CRT A, then CRT B's price must have been elevated by approximately the same percentage even if the cartel did not explicitly target the price of CRT B.  In effect, Dr. Netz's concept of a price structure implies that the alleged cartel had about the same impact on all CRTs, *i.e.,* prices of all CRTs were elevated by approximately the same percentage.

69.     As noted in my report, Dr. Netz's concept of a "price structure" is not a standard concept found in the economics literature, and the establishment of a "price structure," however defined, as evidence that a class should be certified is not an approach generally accepted by economists.[80]  Indeed, Dr. Netz admitted at her deposition that she is unaware of any peer-reviewed article that uses the term "price structure" in the context of an unregulated industry (*i.e.,* an industry in which prices/fares are not determined by an external government authority).[81]

70.     Nonetheless, the purported existence of a "price structure" is clearly central to her opinion that the alleged cartel had a classwide impact.  That is, although Dr. Netz readily

---

[79] Netz Rebuttal Report, p. 39. ("The relative prices that are reflected in the price structure are substantially the same in the actual world as in the but-for world. Relative prices are ratios of prices at a point in time; if both prices change by the same percentage, the relative price is unchanged.")

[80] See, *e.g.*, Johnson, J. H., & Leonard, G. K. (2008). In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings. *Antitrust*, volume 22 (no 3). pp. 108-112.

[81] Netz Deposition Vol. 2, pp. 386-389.

Document Submitted Partially Under Seal

acknowledges that she is able to identify target prices for only a fraction of CRT sales,[82] she claims that prices of *all* CRTs – including CRTs not mentioned in the documents Dr.



Netz relies on to identify target CRT prices allegedly set by Defendants – were elevated because the alleged "price structure" links prices of all (or nearly all) CRTs.[83]

71.     The primary evidence that Dr. Netz provides in her initial and rebuttal reports for the existence of such a "price structure" is a set of hedonic price regressions. In her declaration, Dr. Netz claims that "Defendants wrongly criticize me for using a hedonic regression analysis instead of a correlation analysis to evaluate the price data in forming my conclusion. This is misguided. … In my expert judgment, I determined that the hedonic regression analysis was the most appropriate method given the question of interest and data available."[84]

72.     Simply put, these hedonic regressions purport to show that sales prices (in the actual world) of most CRTs can be reliably predicted by a small set of product features (size, aspect ratio, and finish),[85] a time trend and the identities of customers and sellers. From this claimed fact, Dr. Netz concludes that there exists a price structure.[86] The only other evidence Dr. Netz offers in support of a price structure is a set of documents that she uses



73.     The fundamental flaw in Dr. Netz's argument is that even if she were correct in her view that her sales price hedonic regressions show that a small set of product features,

---

[83] Netz Initial Report, p.71.

[84] Netz Declaration, p. 14. See also Netz Initial Report, p.66-71.

[85] "Finish" refers to whether or not the CRT contains a deflection yoke when it is sold to a customer.  A "bare" CRT is one that does not contain the deflection yoke and an "ITC" CRT is one that does contain the yoke.

[86] Netz Initial Report, p.71; Netz Rebuttal Report, pp. 42-43.

[87] Netz Rebuttal Report, p. 42.

[88] Netz Initial Report, pp. 68-9

Document Submitted Partially Under Seal

a time trend, and the identities of customers and sellers explain most of the variation in CRT sales prices, it would not establish the "price structure" of the sort claimed by Dr. Netz. All that her sales price hedonic regressions would establish is that the relative price of CRT A to CRT B was likely similar to the relative price of CRT A to CRT C in the actual world if CRT B and CRT C had similar characteristics.  It would provide no indication whatsoever that the relative sales price of CRT A to CRT B or CRT A to CRT C would be the same in the but-for world as in the actual world, which is what Dr. Netz would need to show to establish her claim that "[t]he relative prices that are reflected in the price structure are substantially the same in the actual world as in the but-for world."[89]

74. 

However, Dr. Netz has not done anything to show that relative but-for prices are in any way similar to actual relative prices. As such, Dr. Netz's sales price hedonic analysis provides no support for her claim that there was a price structure for CRTs, *i.e.,* that relative prices would have been the same in the but-for world as in the actual world.

75.     Similarly, even if Dr. Netz were correct that the alleged cartel set target price differentials between different categories of CRTs, that would at most establish that the cartel hoped to achieve certain relative prices between pairs of CRT categories *in the actual world*.  It would not provide any evidence whatsoever that the relative prices

---

[89] Netz Rebuttal Report, p. 39.

[90] Calculated based on Netz Initial Report, Exhibit 22.

between CRT categories in the but-for world would have been the same as the allegedly targeted relative prices in the actual world – even if those target prices were uniformly adhered to by the alleged cartel members.  As a result, Dr. Netz's approach is fundamentally incapable of establishing that a price structure exists.

*CRTs Were Highly Differentiated.*

76.     A price structure of the sort claimed by Dr. Netz is highly unlikely in part because CRTs were widely differentiated by features such as application (TVs or computer monitors), size, shape, resolution, the inclusion or exclusion of deflection yokes, type of mask, electrical properties, and the extent and type of customization. CRT prices also often varied based on the region in which the CRT was manufactured and the region in which it was sold.  In my report.

77.     I also document the large degree of variation in CRT finished product pricing within and across retailers.[92] CRT finished product prices varied widely based on the aforementioned characteristics of the CRT, as well as on the type of sound system, HDTV capability, picture-in-picture capability, whether the product included a built-in VCR and/or DVD player or was bundled with a desktop PC, the retailer, and the time period.[93]

78.     In her declaration, Dr. Netz does not contest my showing that there was substantial heterogeneity in prices across CRT finished products sold in the U.S.  She does, however, argue in her rebuttal report that

---

[91] Willig Report, ¶¶ 15, 18, 68, Exhibits 1A and 9.

[92] Willig Report, ¶¶ 20, 44 and Errata Exhibit ER-1B.

[93] Willig Report, ¶ 39.

Document Submitted Partially Under Seal



79.     However, weighting prices by sales volume does not alter my conclusion that CRT prices in any given month exhibited substantial heterogeneity.

80.     Dr. Netz attempts to downplay the degree of price variation by claiming that, among CRT product characteristics, "only application, size, and shape were meaningful price differentiators," and thus CRT prices primarily differ only along three dimensions.[97]

---

[94] Netz Rebuttal Report, pp. 7-8.



[97] Netz Rebuttal Report, pp. 12-13.

Document Submitted Partially Under Seal

This response is irrelevant as a matter of economic logic, as market conditions can vary widely even for products that only vary along three dimensions, particularly if differences along those dimensions have a significant impact on cost or demand.

81.     Dr. Netz's claim is also incorrect as an empirical matter.  Although Dr. Netz states that a CRT's finish (whether a CRT is shipped with a deflection yoke ("ITC") or without it ("bare")) should be thought of differently from size and shape, a CRT's finish clearly has a significant effect on its price.[98]  Moreover, the remaining characteristics of a CRT transaction, including the alleged "minor" product attributes and also the identity of the buyer and seller, account for a substantial amount of heterogeneity in CRT pricing. For example, suppose a "product group" is defined as a unique combination of application, finish, size, and shape. ███████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
████████████████

82.     In sum, the evidence is clear that there was a substantial amount of dispersion in CRT prices at any given point in time during the class period. This evidence, together with the evidence of heterogeneous CRT price movements described below, makes the existence of Dr. Netz's so-called price structure highly unlikely.



Document Submitted Partially Under Seal

*There Was Substantial Heterogeneity in Price Movements across CRTs.*

83.     If there were substantial heterogeneity in price movements across CRTs (*i.e.,* relative prices across CRTs changed materially over time), then it is highly likely that different CRTs were affected by different market forces or were affected by the same market forces differently. Under these conditions, a price structure of the sort claimed by Dr. Netz is highly unlikely.

84.     Clearly, relative prices must be measured in a common currency in order to achieve an apples-to-apples comparison, and the same is true of a comparison of price changes across products.  In my report, I use U.S. dollars in my analysis of price changes because Dr. Netz alleges that the putative cartel was orchestrated through the use of target prices that were denominated in U.S. dollars.[100] U.S. dollars are the natural choice also because members of the proposed class of indirect purchasers are located in the U.S., and they paid for their finished products in U.S. dollars.  (Nonetheless, my results are identical regardless of which common currency is used.)

---

[100] Netz Rebuttal Report, fn. 55.

[101] Netz Rebuttal Report, p. 46.

[102] Netz Rebuttal Report, p. 17.

Document Submitted Partially Under Seal



Document Submitted Partially Under Seal



89.     These results reinforce my conclusion described in my report that CRT price movements varied widely within and across different segments of the CRT marketplace, including by CRT application (CPT or CDT), size, shape, and the geographic region in which it was sold.[103]  As noted above and in my report, the observed heterogeneity in price movements indicates that different CRTs were affected by different market forces (or by the same market forces differently), which is inconsistent with the alleged existence of a price structure for CRTs.[104]

*Dr. Netz Does Not Contest the Substantial Heterogeneity in Price Movements across CRT Finished Products.*

90.     In my report, I documented the highly differentiated price dynamics for CRT finished products.   In particular, ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████ As I discussed in my report, ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████ It is therefore important to note that in her declaration and her rebuttal report Dr. Netz does not contest the accuracy and relevance of my showing that there was

---

[103] Willig Report, ¶¶ 17-18.

[104] Willig Report, ¶¶ 14, 21-23, 53.

[105] See, *e.g.*, Willig Report, ¶ 20.

[106] Willig Report, ¶¶ 47-48.

substantial heterogeneity in price movements across CRT finished products sold in the U.S.

*Dr. Netz's Own Sales Price Hedonic Analyses Undermine Her Claim of a Price Structure.*

91.     A "price structure" of the sort claimed by Dr. Netz in her declaration and in her rebuttal report cannot exist if prices in different segments of CRTs were affected by materially different market forces such that the ability and incentive of the alleged cartel to affect CRT prices differed across CRT segments. For example, if the alleged cartel substantially elevated the prices of some CRTs but failed to elevate prices of other CRTs (or elevated them less) because the latter had better substitutes and faced greater competition from alternative technologies, then relative prices in the actual and but-for worlds would be quite different – precisely the opposite of what Dr. Netz's price structure would require.

92.     As I describe in my report, Dr. Netz's own sales price hedonic regressions provide evidence that relative price premiums commanded by larger CPTs over smaller CPTs varied considerably over time, which is strong evidence that market conditions differed materially between large and small CPTs. For example, ██████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████ ▮Clearly, the relative prices of CPTs of different sizes varied substantially even during short time periods.

---

[107] Willig Report, ¶ 75 and Exhibit 11A. In her Rebuttal Report, Dr. Netz claims that some of the relative CPT price variation over time may be due to exchange rate fluctuations. (Netz Rebuttal Report, p. 46.) However, as I explain below, there exist substantial and statistically significant changes in CRT relative prices over time even when controlling for exchange rate variation. Controlling for the shape of the CPT (curved or flat) also does not affect this conclusion.

Document Submitted Partially Under Seal

93.     Although Dr. Netz attributes some of the changes in relative CRT prices over time to exchange rate fluctuations,[108] Dr. Netz does not dispute that ████████████ ███████████████████████████████████ and she acknowledges that CRT price changes were caused by changes in market conditions.[110]  Nonetheless, she contends ████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████ █████████████████████████████████

94.     For example, although Dr. Netz acknowledges that competition from flat screens (*i.e.,* LCD and plasma) impacted CRT prices, and ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

---

[108] I have extended the annualized versions of Dr. Netz's sales price hedonic analysis to control for exchange rate movements, and I continue to find that relative CRT prices typically changed across years by a statistically significantly amount. ███████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████

██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████

[110] Netz Rebuttal Report, p. 46.

██████████████████████████████████████████████████████████ ████████████████████████

[112] Netz Rebuttal Report, p. 46 ("For example, if the cartel had not fixed prices and restricted output, CRT prices in the but-for world would have changed over time due to the emergence of flat panel displays, just as CRT prices changed in the actual world due to the emergence of flat panel displays. Any differential impact on prices of CDTs and CPTs in the actual world due to the emergence of flat panel displays would also have occurred in the but-for world. Because this differential impact in CDTs and CPTs would have occurred in both the actual and but-for worlds, it is part of the price structure.")

Document Submitted Partially Under Seal



---

[113] For example, Dr. Netz  does not contest the evidence I present in my report describing ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[114] Dr. Netz claims that "rational cartelization" requires that if a cartel increased prices of 15-inch CDTs (for example), the cartel would also have to increase the prices of 14-inch CDTs or else customers that otherwise would have purchased a 15-inch CDT would substitute to the 14-inch CDT and avoid paying the overcharge.  (Netz Rebuttal Report, p. 41.) Dr. Netz is correct that a rational cartel may not want to elevate the price of one CRT by a substantial amount while leaving unchanged the price of a very similar CRT.  However, it is entirely plausible that a rational cartel that sought to elevate the price of 16-inch CPTs by 10%, for example, might target a smaller overcharge for 21-inch CPTs, an even smaller overcharge for 25-inch CPTs, and no overcharge for 29-inch or larger CPTs due to the more intense

(footnote continued …)

- 44 -

Document Submitted Partially Under Seal

97.      More generally, the undisputed fact that relative prices changed substantially over time and that changing market conditions contributed to these relative price changes is inconsistent with the existence of a price structure, as defined by Dr. Netz. Substantial changes in relative CRT prices over time clearly indicate that different segments of CRTs were affected by materially different market forces. However, once this fact is acknowledged, it should also be clear that there is no reason to assume that relative prices would be about the same in the actual and but-for worlds at any given point in time. Put differently, if different segments of CRTs were subject to different market forces, then it would be incorrect to assume with no support (as Dr. Netz does) that the alleged cartel had the incentive or ability to elevate prices for all segments of CRTs at all times by similar amounts during the class period. Certainly, Dr. Netz has failed to provide any reason to conclude that the alleged cartel had a similar impact on all segments of CRTs despite the presence of quite different market forces in various CRT segments. The bottom line is that Dr. Netz is just assuming a common percentage price elevation across myriad product dimensions, which is a baseless assumption and, in fact, makes no sense given observed pricing behavior.

98.      Thus, contrary to Dr. Netz, changes over time in relative prices of CRTs are extremely relevant for assessing price structure and classwide impact, and analyses of relative price changes over time show that actual pricing data are wholly inconsistent with the type of price structure claimed by Dr. Netz. Individualized inquiries regarding the heterogeneous market forces at work in different CRT segments would be required to assess the impact of the alleged conduct on various categories of CRTs.

---

(… footnote continued)

competitive constraint that flat screens imposed on larger CPTs.  In this example, if the overcharge on 25-inch CPTs were sufficiently small, few customers that otherwise would have purchased a 25-inch CPT would substitute to a 29-inch CPT just to avoid the (very small) overcharge.  Customers that otherwise would have purchased a 16-inch CPT could avoid a more substantial overcharge by substituting from the 16-inch CPT to a 29-inch CPT, but given the substantial cost difference between 29-inch and 16-inch CPTs ($120 compared to $44 in this example), most customers would be unlikely to consider them to be close substitutes.

99.     In addition to the variability of relative prices across different categories of CRTs, the relative prices of CRTs also were quite different across manufacturers at the same point in time, as I explain in my report.[115]  These variations make it less likely that the alleged cartel was uniformly effective in raising prices of CRTs.  Based on the putative target prices identified by Dr. Netz, the alleged cartel did not set target prices for the vast majority of every type or even category of CRT.  Dr. Netz provides no explanation of how the alleged cartel members, in the face of relative prices that varied widely across manufacturers and over time, would have reached a common understanding about what price to charge for each CRT absent a complete set of explicit target prices.  Absent such a common understanding or a complete set of explicit target prices, it is unlikely that the cartel would have been uniformly effective in elevating CRT prices.

*A Material Amount of CRT Price Variation Is Left Unexplained by the Factors Identified in Dr. Netz's Sales Price Hedonic Regressions.*

100.     In her declaration, Dr. Netz claims that her "hedonic regression analysis … allowed [her] to evaluate important features like size, application and finish in regard to CRT prices."[116] Dr. Netz claims in both her reports that her sales price hedonic regressions show that certain CRT product features, time trends, and customer-seller



[116] Netz Declaration, p. 14.

- 46 -

Document Submitted Partially Under Seal

identities explain the majority of CRT price variation.[117] However, I explain in my report that a material amount of price variation is left unexplained by the common factors that are identified by Dr. Netz.[118] Specifically, ███████████████████████████████

████████████████████████████████████████████

████████████████████████████ ███████████████

█████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

██████████████████████████████ ████████

███████████████████████████████████████

█████████████████████████

101.     In her rebuttal report, Dr. Netz articulates several responses to my analysis, but they are without any merit.

102.     ████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

███████ █████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

█████████████████████

████ █████████████████████████████████

████████████████████████████████████████

---

[117] Netz Initial Report, p.70; Netz Rebuttal p. 42.

[118] Willig Report, ¶¶ 77-79.

[119] Willig Report, fn. 66 and ¶ 79.

[120] Willig Report, Exhibits 14A and 15A.

[121] Netz Rebuttal Report, p. 50.

[122] Netz Initial Report, pp. 69-70.

Document Submitted Partially Under Seal

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

104.     Second, she claims that I used an "impaired version" of her sales price hedonic regressions in my analysis when I dropped buyer-seller dummies from the regressions. However, she ignores the extensions and robustness checks that I performed and noted in my report.[123] Specifically, she ignores the fact that I explain that even using the fuller version of her sales price hedonic regressions with buyer-seller dummies produces a qualitatively similar result: a material amount of variation in CRT prices remains unexplained by her analysis.[124]

███   ████████████████████████████████

████████████████████████████████

██████ █ ████████████████████████████████

████████████████████████████

---

[123] The backup computer programs to all the extensions and robustness checks identified in my report were produced to Plaintiffs shortly after my report was filed.

[124] Willig Report, fn. 62, fn. 65.  As explained in my report, I focused on the hedonic regressions analysis without the individualized buyer-seller dummies because Dr. Netz discounts the importance of these dummies and contends that observed product characteristics alone are sufficient to reliably determine CRT price.  (*Id.*)  See ¶ 106 below for details on the magnitude of unexplained CRT price variation even when buyer-seller identities are included in the hedonic regressions.

[125] Netz Rebuttal Report, p. 50.

Document Submitted Partially Under Seal



---

[126] Willig Report, fn. 66.



[128] Netz Rebuttal Report, p. 48.

[129] These results are based on extending the hedonic analyses described in my report (Willig Report, ¶ 75) as described in *supra* note 108. The residuals are weighted by sales volume.

(footnote continued …)

Document Submitted Partially Under Seal

107.    In sum, while Dr. Netz claims to have used well-accepted principles of economics and undertaken peer-reviewed methodologies to establish the existence of a price structure in CRTs, her price structure conclusions are not supported by record evidence and reliable methodologies.  In addition, as I have explained in my report, there is ample evidence that such a price structure does not exist.[131]  Moreover, Dr. Netz's responses related to data and regression specifications fail to rebut the conclusion that her sales price hedonic regressions leave a material amount of unexplained CRT price variation.

## IV.    Class-wide Impact on Indirect Purchasers Cannot Be Established using Common Evidence.

### A.  Dr. Netz Estimates Only Average Pass-Through Rates, and She Provides No Method for Reliably Estimating the Pass-Through Rate for a Particular Product, Finished Product Manufacturer, or Time Period.

108.    In her declaration, Dr. Netz claims that she has established rather than assumed universal pass-through by retailers and manufacturers.[132] As support for this opinion,

(… footnote continued)

---

[131] Willig Report, Section III A.

[132] Netz Declaration, pp. 4-10.

[133] Netz Declaration, pp. 6-7.

[134] Netz Rebuttal Report, pp. 64-65.

[135] *Id.*



109.    The "common" methodology proposed by Dr. Netz is comprised of a regression analysis that compares the costs and prices of CRT finished products with each other, both at a point in time and over time, to estimate the pass-through rate.[137]  However, Dr. Netz's pass-through analysis is fundamentally inapposite for assessment of the proposed class because it estimates only the *average* pass-through rate for all CRT TVs or monitors at each finished product manufacturer or reseller in the distribution chain – averaged across time periods, products, and transactions. For example,

110.    Nowhere in her declaration or other filings in the instant matter does Dr. Netz propose any means of applying her methodology to estimate pass-through rates for individual products (or groups of products), or for specific time periods. Nor does Dr. Netz contend that she has verified that the average pass-through rates generated by her methodology accurately reflect pass-through rates for individual products (or groups of products), or for specific time periods. This is a remarkable omission considering that Dr.



---

[137] Netz Initial Report, pp. 115-116.

Document Submitted Partially Under Seal

Netz acknowledges that market conditions changed over time,[139] and she does not contest my finding that different segments of CRTs were subject to different market conditions, as explained above.[140] Given these significant differences in market conditions across products and over time, one would expect significantly heterogeneous (and not always positive) pass-through rates. The evidence supports this view, as I explain below.

111.   In her declaration, Dr. Netz states that she used transactions-level data whenever possible in order to estimate pass-through rates, and she only relied on aggregated data when using transactions-level data was not feasible.[141]  However, this merely speaks to her data handling and the granularity of the data used; it does not refute the fact that Dr. Netz estimated only average pass-through rates. Similarly, her assertion that I used monthly average price and cost data even when transactions-level data were available[142] is irrelevant in this context; the relevant fact is that I calculated disaggregated pass-through rates by entity, product, and month,[143] whereas Dr. Netz did not.

112.   Having provided a methodology designed only to estimate *average* pass-through rates, Dr. Netz then cites to economic theory to support her view that pass-through rates were uniformly positive and high.[144] Specifically, she contends that there is widespread agreement among economists that significant, permanent, and industry-wide cost changes

---

[139] Netz Rebuttal Report, p. 46.

[140] See Section III.B above.

[141] Netz Declaration, p. 11.

[142] Netz Declaration, p. 10.

[143] Willig Report, Exhibits 24 and 27.



would be passed through at a one-for-one rate in highly competitive industries.[145] However, Dr. Netz's view that one-for-one (or even higher) pass-through rates must have prevailed for all CRT finished products at all times and all entities in the distribution chain is inconsistent both with industry facts that she has acknowledged, and with basic economic theory.

113.     First, it is important to recognize the inconsistency of Dr. Netz's view with industry facts.  Dr. Netz's opinion is based on the false premise that the alleged cartel was able to elevate prices of all or most CRTs in a significant and permanent manner. However, Dr. Netz's claim of an across-the-board, significant, and permanent increase in CRT prices and a minimum pass-through rate of 100% is inconsistent with the evidence presented in Section III A of this declaration and in my report[146] showing that the alleged cartel was not uniformly or consistently effective (if at all) in elevating CRT prices.

---

[145] Netz Declaration, p. 5. In her deposition, Dr. Netz defines an "industry-wide" cost change to mean a change in the cost of all sellers of CRT TVs and monitors. (Netz Deposition, Vol. 2, p. 279)

[146] Willig Report, Section III B.

[147] Willig Report, ¶¶ 55-63.

[148] Willig Report, ¶¶ 97-100.

Document Submitted Partially Under Seal

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ Thus, Dr. Netz has

provided no sound basis to conclude that the alleged cartel was able to elevate prices in an industry-wide, significant and permanent manner, which undermines her claim of universal pass-through.

114.    Dr. Netz's argument for a 100% average pass-through rate also fails because she greatly over-simplifies the relevant economic theory.  Even if the markets for the manufacture and re-sale of CRT TVs and monitors were perfectly competitive, that fact alone would not be sufficient to ensure 100% pass-through rates. Standard economic theory demonstrates that pass-through rates of industry-wide cost changes in perfectly competitive markets can diverge from 100%, and depend on factors such as supply and demand elasticities.[151] Indeed, Dr. Netz herself acknowledges that other market conditions are necessary to have a 100% pass-through rate.  For example, she states in her initial report that in a perfectly competitive industry one-for-one pass-through occurs when marginal costs are constant (*i.e.,* the incremental cost of making and selling a product does not change with the volume of production and sales).[152] However, she has not made any attempt to establish that this constant-cost condition is satisfied along the

---

██ ████████████████████████████████████████████████████████
████████████████████████████████████

[150] Netz Deposition, Vol. 2, p. 326.

[151] van Dijk, T. and F. Verboven (2008). Quantification of Damages. In Issues in Competition Law and Policy, ABA Section of Antitrust Law, pp.2331-2348; Weyl G.E. and M. Fabinger. "Pass-through as an Economic Tool." (2012), pp. 1-42.

[152] Netz Initial Report, p. 77.

Document Submitted Partially Under Seal

long and complex CRT finished product distribution chain. ████ ████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

115.    A finding that pass-through rates are zero or even negative for some finished products at certain periods of time is entirely consistent with economic logic and theory.[155]  First, if, as is likely, the alleged cartel was able to elevate the prices of only some CRTs or only in a transitory manner, or the increase was not significant, then by Dr. Netz's own admission, pass-through rates could have been zero.[156] As I have demonstrated, there are ample reasons to conclude that the alleged cartel was not universally effective in elevating all CRT prices.

116.    Second, even if the alleged cartel were able to elevate prices of all CRTs in a permanent and significant manner, economic theory shows that not all finished product prices would have necessarily been elevated and prices of some may have even fallen.

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

---

████

██████████████████████████████████████████████

██████████████████████████████████

[154] Netz Initial Report, pp. 75-76.

[155] Economists have found empirical evidence of negative pass-through rates. See, *e.g.*, Michael M. Knetter, "International Comparisons of Pricing-to-Market Behavior," *The American Economic Review*, Volume 83, No. 3 (Jun., 1993), pp. 473-486.

[156] Netz Deposition Vol. 2, pp. 273-4, 323, 325.

Document Submitted Partially Under Seal



117.    The evidence indicates that pass-through rates were often not positive. In my report, I examine the distribution of pass-through rates for the entities analyzed by Dr. Netz in her initial report, and I find that each of them responded to cost shocks in widely divergent ways, depending on the time period and product.[158] Moreover, for some entities, the pass-through rates were not positive in a significant number of instances. This heterogeneity in pass-through rates is masked by Dr. Netz's estimates of average pass-through rates.

---

[157] See, *e.g.,* Bulow, J. I., J. D. Geanakoplos, and P. D. Klemperer. "Multimarket Oligopoly: Strategic Substitutes and Complements." Journal of Political Economy, Vol. 93, No. 3. (1985) ("Multimarket Oligopoly: Strategic Substitutes and Complements"), pp. 488-511. An increase in the transfer price of CRTs sold within a vertically integrated finished product manufacturer need not represent an actual cost increase since it is a transfer between integrated entities, which makes it all the more likely that an integrated firm would not necessarily increase finished product prices in response to an elevation in CRT transfer prices.

[158] Willig Report, ¶¶ 123-124 and Exhibit 24.

[159] Willig Report, Exhibit 24.

Document Submitted Partially Under Seal

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████

119.    The incidence of zero or negative pass-through rates is inconsistent with Dr.
Netz's view that CRT TV and monitor manufacturers and resellers uniformly passed-
through cost changes, and did so at a high rate. ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

---

[160] Netz Rebuttal Report, p. 63.

██ ████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████

██ ████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████

Document Submitted Partially Under Seal

120.    To further analyze the pass-through rates of widespread cost changes, I have identified quarters in which most retailers on record experienced significant and lasting changes in the costs of a large fraction of the CRT monitors they sold, and then calculated the incidence of zero or negative pass-through rates. I find that even during such instances of widespread, significant, and lasting cost changes, there was a high incidence of zero or negative pass-through rates.





(footnote continued …)

Document Submitted Partially Under Seal



(… footnote continued)



[167] Netz Rebuttal Report, pp. 89-90.

[168] Willig Report, fn. 119.



(footnote continued …)

123.     In sum, Dr. Netz's "common" methodology amounts to estimating only average pass-through rates, and it masks substantial variation in pass-through rates across products and over time. Dr. Netz provides no method for reliably estimating the pass-through rate for a particular product, finished product manufacturer or reseller, or time period.

**B.  Dr. Netz's Methodology for Estimating Pass-Through Is Unreliable because It Does Not Control for Changes in Market Conditions and Does Not Properly Control for Differences across Products.**

*Dr. Netz Makes No Effort to Control for Changes in Market Conditions during the Class Period, thereby Rendering Her Average Pass-Through Estimates Unreliable.*

124.     As I explain in my report, CRT TV and monitor prices typically declined during the class period, and some of this decline was likely caused by reductions in manufacturing costs of CRT TVs and monitors. However, it is very likely that some of the decline in retail prices of CRT finished products was also caused by changes in consumer preferences in favor of newly emergent LCD and plasma technologies, whose prices dropped considerably and whose quality improved during the class period.[172] A proper estimate of pass-through rates would separate these two sources of pricing pressure (*i.e.*, cost reduction and demand reduction) on CRT TVs and monitors. Conflating and aggregating the two would exaggerate pass-through rates and attribute the entire decrease in prices of CRT finished products to the decline in costs when, in fact,

(… footnote continued)

negative pass-through rates in at least 10% of those events when cost change events are defined as ███



the decrease in prices was at least partly due to changes in consumer preferences and to LCD and plasma competition.

125.    In her initial report, Dr. Netz acknowledges that market conditions (such as the relative quality of products) changed over the course of the class period, and that it is necessary to address these changes in order to properly estimate pass-through rates: "[W]hen observing changes in prices and costs over time, not only is the cost changing, but other factors are changing too, such as the quality of the product relative to other available products"[173] and "[i]f one uses time-series data, one can include variables to control for changes that take place over time."[174] Nevertheless, as noted in my report, Dr. Netz fails in her pass-through analyses to control for changes in market demand for CRT finished products that occurred during the class period.[175]  Dr. Netz does not contest or even address this critique of potential bias in her declaration or her rebuttal report, and her pass-through analyses continue to suffer from this critical flaw. In her deposition, Dr. Netz acknowledged that she did not control for increasing LCD and plasma competition in her pass-through analyses.[176]

126.    Given the enormous changes in market conditions during the 1995-2007 class period, Dr. Netz's failure to control for changes in market conditions is a serious omission that potentially inflates her estimates of average pass-through rates. As explained in my report,[177] making just one change to Dr. Netz's pass-through method, *i.e.,* including a control for time trends (in a manner that is standard in empirical economics to control for market changes, and is very similar to the one that Dr. Netz herself uses in her hedonic regressions), leads to very different results from hers.

████████████████████████████████████████████████████████████

---

[173] Netz Initial Report, p. 116.

[174] *Id*.

██ ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

[176] Netz Deposition, Vol. 2, pp. 382-383.

[177] Willig Report, fn. 134.

Document Submitted Partially Under Seal



127.    Although Dr. Netz fails to control for changes in market conditions when estimating average pass-through rates, despite stating that such controls are necessary, she does raise several concerns about the manner in which I control for market trends.[181] I have reviewed each of her criticisms and found them all to be without merit, as explained in the remainder of this section.

128.    First, Dr. Netz contends that the time trend variable in my pass-through regressions may not control for general market-wide trends because it is simultaneously attempting to control for "general marketplace trends" and "individual product cycles."[182] She appears to believe that the trend variable "captures how long a product has been sold



[181] Netz Rebuttal Report, pp. 80-81.

[182] Netz Rebuttal Report, p. 80.

Document Submitted Partially Under Seal

by each firm."[183] Thus, she interprets the trend variable as an imperfect metric of how long a product has been on the market (the product's "age"). She then proceeds to criticize this variable for its imperfections in measuring a product's age, and for attempting to function doubly as a control for a product's age and as a control for market trends.

129.     Dr. Netz is mistaken in her incorrect assumption that the trend variable I rely on is a product-specific age metric. It is not. Instead, it is a metric that captures overall market trends (which includes the tendency for CRT finished products' prices to decrease over time). This should have been evident from the plain fact that the trend variable takes on the same value (before scaling for the lifetime average price of a product) for all products in a given month. For example, if product A had been sold by a retailer for 6 months, and product B for 12 months as of June 2000, and they happen to have the same lifetime average price, then the two products would have identical time trend values. Thus, my metric of time trends is not a measure of a product's age, and it appropriately captures market trends.

130.     Dr. Netz's second critique is that my market trend variable is "linear," which amounts to an assumption that prices fall over time at a linear rate.[184]  However, as I described in my report, I have conducted multiple robustness tests that control for market trends in various ways, including standard non-linear methods of controlling for changes in relevant conditions over time, such as the use of quarter fixed effects and a scaled log of time trend.[185] Dr. Netz just ignores these extensions in her declaration and rebuttal report.

131.     Third, Dr. Netz claims that I mistakenly treat identical products differently. ■

---

[183] Id.

[184] Netz Rebuttal Report, p. 81.

[185] Willig Report, ¶ 173(e).

Document Submitted Partially Under Seal

██████████████████████████████████████████████████████

██████████████████████████████████████ ██ ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ ██ ██████████████

██████████████████████████████████████████████

█████████████████████████████████

132.     Fourth, Dr. Netz contends that including a time trend variable in my pass-through regressions reduces the precision of the estimated average pass-through rates because the time trend variable is correlated with CRT cost trends.[188] This objection ignores the manifest benefit of including such a control, *i.e.,* the ability to produce reliable (unbiased) estimates of average pass-through rates. By not controlling for market trends, Dr. Netz's approach produces average pass-through estimates that are likely biased upwards, *i.e.,* she over-estimates average pass-through rates.  Moreover, contrary to Dr. Netz's assertion, my estimates of average pass-through rates are extremely precise. If the problem alleged by Dr. Netz were material, I would expect that my approach would often be unable to reject the possibility that the average pass-through rate is zero (*i.e.,* the confidence intervals associated with pass-through rates would be so wide that they would include zero).



████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ██ ██████████████████

██████████████████████████████████████████████████

█████████████████

---

[186] Netz Rebuttal Report, p.80.

██ ████████████████████████████████████████████████

[188] Netz Rebuttal Report, p. 81.

[189] Ramanathan, R. (1995). Introductory Econometrics with Applications, Third Edition, Harcourt Brace College Publishers ("Introductory Econometrics with Applications"), p. 50.

Document Submitted Partially Under Seal

133.   Finally, ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████ █ ████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████ █
███████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████

*Dr. Netz's Method for Estimating Pass-Through Fails to Control Appropriately for Differences in Products.*

134.   As I explained in my report, Dr. Netz does not properly control for differences across products in her pass-through analyses.[193]  Dr. Netz's estimation of average pass-through rates relies in large part on comparing the prices and costs of different CRT finished products.  For example, █████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

---

[190] Netz Rebuttal Report, p. 81.



[192] Willig Report, ¶173.

[193] Willig Report, ¶¶ 128-130.

Document Submitted Partially Under Seal



---

[194] This example is discussed in Willig Report, ¶¶ 128-130.

[195] *Id.*



[197] Netz Initial Report, p. 116 ("….when observing multiple products or a product sold at multiple outlets at a single point in time, there may be differences across products and/or across outlets that may have an impact on price as well as on cost.")

Document Submitted Partially Under Seal



More generally, Dr. Netz does not have consistent data on product features across

---

[198] Netz Rebuttal Report, p. 76 ("The fundamental difference between his approach and mine is that I control for those product differences that are economically meaningful, whereas Prof. Willig controls for any and all differences between two products, regardless of whether or not those criteria are likely to have an impact on price.")

[199] Netz Rebuttal Report, p. 12.

[200] Netz Rebuttal Report, Exhibit RR-35.

resellers and manufacturers, and hence she relies on incomplete data on product features. These gaps make Dr. Netz's estimates of average pass-through rates unreliable.

138.    In my report, I implemented a standard solution – product fixed effects – for addressing the problem of incomplete information on product features that fully controls for differences between products.[202] Economists have known for a long time that this type of data limitation can lead to biased and unreliable estimates, and have also long recognized that the use of fixed effects estimation can alleviate this problem.[203]

139.    Dr. Netz objects to this approach on the grounds that I have treated identical products as if they were separate and distinct, thus making distinctions between products based on features that may not have any economic meaning.[204] She provides anecdotal support for this claim by citing to several CRT finished products that she concludes are identical (based on her review of their product features as described on various web sites). ███████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ Clearly, there were economically meaningful differences between these two models. The same conclusion applies to the other anecdotal examples of putatively identical products that Dr. Netz provides.[205]

---

[202] Willig Report, fn. 133, fn. 141, ¶ 163d, ¶ 174d.

[203] An early reference to the potential for incomplete information on control variables to introduce biased estimates and the use of fixed effects as a solution can be found in Mundlak, Y. "Empirical Production Function Free of Management Bias." *Journal of Farm Economics,* Vol. 43, No. 1 (Feb., 1961), pp. 44-56. A later discussion can be found in Wooldridge, J. (2002). *Econometric Analysis of Cross Section and Panel Data,* The MIT Press, pp. 247-251.

[204] Netz Rebuttal Report, pp. 77-78.

█ ███████████████████████████████████████████████ ███████████████████████████████████████████████████ █

(footnote continued …)

Document Submitted Partially Under Seal

140.     More generally, even if my approach were to treat two products that were identical in every way as separate and distinct products, this would not introduce any bias into the estimated product fixed effects or the estimated average pass-through rate.

141.     Additionally, statistical evidence shows that my method better controls for product differences than Dr. Netz's method.  In particular, my method explains substantially more of the variability in CRT finished product prices.[206]  Moreover, the increase in explanatory power is highly statistically significant, which is inconsistent with and refutes Dr. Netz's claim that the features she fails to control for are not economically important.

142.     Finally, Dr. Netz claims that my methodology is suspect because it produces implausible estimates of pass-through rates.[207] For example, she claims that my method produces different pass-through rates for products that she considers to be nearly identical (based on information provided in various web sites about the products' features).



(… footnote continued)

models were sold by Circuit City, the CTSGT-2799C was consistently priced higher than CTSGT-2799T, and the difference in their monthly average prices was as high as 53%.

[206] Specifically, my staff, under my supervision, estimated Dr. Netz's regression model with one modification: product fixed effects were added to her model. (Where there was perfect collinearity between Dr. Netz's product characteristics and certain product fixed effects, the relevant product fixed effects were dropped.) If the product fixed effects explain economically significant product features beyond those explained by Dr. Netz's variables, then model fit should improve substantially as a result of this modification.

[207] Netz Rebuttal Report, p. 79.

[208] *Id.*

Document Submitted Partially Under Seal



---

[209] Willig Report, ¶¶ 122, 136-137 and Exhibit 27.

[210] Netz Rebuttal Report, p.78

██████████████████████████████████████████████████

████████████  █  ███████████████████████████████████

████████████████████████████████████

████████████████████████  It is well known among economists that parameter estimates based on small samples are more likely to be less precise.[212]

145.    In fact, Dr. Netz's own approach to estimating pass-through rates – when applied to disaggregated data sets and specific product categories – generates extreme and implausible pass-through rates.  For example, I have applied Dr. Netz's model to the data that she uses in her top-and-bottom pass-through analysis to estimate pass-through rates for products with various product features that she deems are important drivers of TV prices.[213] This analysis produces estimated pass-through rates for specific product categories based on Dr. Netz's model. ███████████████████████████

█████████████████████████  █  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

---

█ ██████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

[212] See, *e.g.*, Introductory Econometrics with Applications Chapter 3.4.

█ ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

[214] Netz Rebuttal Report, Exhibit RR-34.

Document Submitted Partially Under Seal

██████████████████████  ██████████████████████
█████████████████████████████████████████
███████████████████████████████████

146.    Thus, Dr. Netz's mis-application of my approach to small data samples leads her to erroneous conclusions.  My conclusions in my report hold: pass-through rates for various products sold by retailers are likely to be heterogeneous; and this heterogeneity is likely caused by differences in market conditions across different product categories, time-varying practices, and limitations in available data. Consequently, contrary to Dr. Netz's claim, disaggregated pass-through rates for CRT finished products cannot be reliably estimated using a regression-based formulaic approach.

*Dr. Netz Has Not Demonstrated that She Has Examined a Representative Sample.*

147.    In her declaration and in her deposition, Dr. Netz contends that she attempted to generate a representative sample of CRT TV manufacturers for her pass-through analysis.[217] ██████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████

████  ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
████  ███████████████████████████████████████████
███████████████████████████████████████████████

[217] Netz Declaration, p. 9 and Netz Deposition, Vol. 2, p. 366

Document Submitted Partially Under Seal

████████████████████████████████████████████████████

████████████ Thus, not only does Dr. Netz have a very small sample of finished

product manufacturers that includes just one major manufacturer, the entities in her

sample passed through cost changes at widely divergent rates.

148.    Dr. Netz claims that this small and diverse sample of manufacturers is nonetheless

representative of the larger universe of manufacturers because "even 'tiny' samples are

likely to be representative" since cost changes are likely to be passed through in a

competitive environment.[219]  However, she acknowledges that even in competitive

industries, firms may not pass through changes in costs that affect only some products,

are not significant, or are transitory,[220] and ████████████████████

████████████████████████████████████████████████████

████████████████████ Thus, Dr. Netz has provided no sound reasons

to conclude that her limited sample of CRT finished product manufacturers provides a

reliable basis to opine about pass-through rates at the many manufacturers she has not

analyzed.[221]

149.    Similarly, Dr. Netz contends that her retailer sample is representative of the larger

population of retailers.[222]  However, even among the retailers in her sample, ████████

████████████████████████████████████████████

████████████████████████ As I have explained above

in paragraphs 117-118, the pass-through rates associated with specific models of finished

---

█████████████████████████████████████████████████████████
████████████████████████████████████

[219] Netz Declaration, p. 9.

[220] Netz Deposition Vol. 2, pp. 273-4, 323, 325.

[221] Dr. Netz contends that the small confidence interval associated with each pass-through rate estimate
she generates is also evidence that her data are representative of the larger population of relevant entities.
(Netz Declaration, p. 8)  However, these confidence intervals are irrelevant for the issue of
representativeness. It is possible to obtain small confidence intervals for pass-through rates for a sample
that is not representative of the larger population of entities.

[222] Netz Declaration, pp. 7-8.

Document Submitted Partially Under Seal

products in certain months were substantially different from average pass-through rates estimated by Dr. Netz.

150.    More generally, Dr. Netz has conducted no objective analysis of whether the samples of CRT TV and monitor sales she examines are representative of the relevant population of finished product sales.  For example, she could have compared data from her sample of manufacturers with data from her sample of retailers to determine if the data are consistent.  I have examined them and found them to be substantially inconsistent in their coverage of finished products. ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████  Similar mismatches are apparent in other years and for other size groups of monitors and TVs, which indicate that the data are not likely to be representative. Even if Dr. Netz's sample of retailers and manufacturers were consistent in terms of the size distributions of TVs and monitors sold by such entities, the entities in her sample may not be representative of the overall population of retailers and manufacturers along other dimensions (such as business models employed) that potentially matter for pass-through rates.  Dr. Netz has conducted no objective analysis of the representativeness of her sample along these dimensions.

## V.    Conclusion

151.    While Dr. Netz claims to have used well-accepted principles of economics and undertaken peer-reviewed methodologies to establish the existence of a price structure in CRTs, her price structure conclusions are not supported by record evidence and reliable methodologies.  More generally, Dr. Netz has failed to provide any valid support in her declaration for any of the three claims that underlie her proposed generalized approach for establishing classwide impact, which renders her approach essentially a series of inappropriately applied methodologies and unsupported assumptions leading to unreliable conclusions.

152.    First, Dr. Netz has failed to demonstrate that any actual CRT price was higher than the corresponding target price, much less the corresponding but-for price. Indeed,

she does not contest the point that her own data demonstrate that the majority of actual CRT sales prices were below the target prices that she identifies. Second, she has failed to demonstrate that a price structure exists since the evidence she offers as support for a price structure demonstrably does not, in fact, support her claimed existence of a price structure.  Third, she has failed to establish her claim that pass-through rates were uniformly positive.  She does not claim that the regression methodology can be used to test her view of uniform positive pass-through rates and she provides no empirical support for her claim of universal pass-through.

153.    Overall, it is my conclusion that the fact of impact on all of the members of the proposed IPP class from the alleged collusion among the defendant CRT producers cannot be established by means of common evidence and methods.  It is also my conclusion that Dr. Netz's proposed methodologies to establish common impact are unreliable and unsupported by record facts and economic theory.

Document Submitted Partially Under Seal

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration was executed on the 25th day of March 2013 in Princeton, New Jersey.

Robert D. Willig

**Attachment 1:**
**Expert Testimony Provided by Robert D. Willig in the Last Four Years**

1. In the Matter of Verizon New Jersey, Inc. – Resolution for Assistance Resolving Interconnection Negotiations with US Cable of Paramus/Hillsdale, Time Warner Cable, Cablevision, and Comcast; Before the State of New Jersey Office of Board of Public Utilities, Docket No. CO07070524; expert report 4/21/2008, testimony 5/12/2008.

2. In the Matter of Verizon New Jersey, Inc. – Resolution for Assistance Resolving Interconnection Negotiations with US Cable of Paramus/Hillsdale, Time Warner Cable, Cablevision, and Comcast; Before the State of New Jersey Office of Board of Public Utilities, Docket No. CO07070524; expert report 4/21/2008, testimony 5/12/2008.

3. New England Carpenters Health Benefits Fund et al. v. First Databank, Inc., and McKesson Corp. In the United States District Court for the District of Massachusetts, Civil Action: 1:05-CV-11148-PBS, expert report 1/24/2007; rebuttal expert declaration 5/07/2007; expert declaration 10/15/2007; rebuttal expert declaration 11/08/2007; expert declaration 11/28/2007, expert declaration 5/21/08, expert report 10/1/08.

4. AT&T and Centennial; Before the Federal Communications Commission; WT Docket No. 08-246; expert report 11/20/2008.

5. In the Matter of Lisa Reed and Cindy Digiannantonio v. Advocate Health Care, et al. In the Northern District of Illinois Eastern Division, Civil Action No. 06 C 3337; expert report 1/20/2009; Supplemental 2/27/2009; deposition testimony 3/23/2009-3/24/2009.

6. In the matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market    Conditions with Respect to Mobile Wireless Including Commercial Mobile Services; Before the Federal Communications Commission; WT Docket No. 09-66; declaration, 9/30/09.

7. Cindy Cullen, Wendy Fleishman, on Behalf of Themselves and All Others Similarly Situated v. Albany Medical Center, Ellis Hospital, Northeast Health, Seton Health System, and St. Peter's Health Care Service,    In the United States District Court for the Northern District of New York, Civil Action No. 06-CV-0765/ TJM/ DRH; expert report 2/29/2008; deposition 3/27-28/2008; expert report 9/4/2009; deposition 11/19-20/2009, declaration 12/28/2009.

8. In the Australian Competition Tribunal: Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 23 May 2006 under Section 44H(9) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Mount Newman

Railway Line, By: Fortescue Metals Group Limited; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Robe RailwayBy: Robe River Mining Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Hamersley Rail Network, By: Hamersley Iron Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Goldsworthy Railway, By: BHP Billiton Iron Ore PTY LTD and BHP Billiton Minerals PTY LTD; expert report 6/30/2009 and 9/18/2009, trial testimony 11/2/2009-11/6/2009.

9.  Stagecoach Group PLC and Coach USA, Inc., et al, Acquisition of Control, Twin America, LLC, Before the Surface Transportation Board, Verified Statement of Professor Robert D. Willig, Submitted November 17, 2009.

10. In re: Rail Freight Fuel Surcharge Antitrust Litigation,  In the United States District Court for the District of Columbia, MDL Docket No. 1869, Misc. No. 07-489 (PLF), expert report 8/1/2010, deposition 8/4/2010.

11. Before the Federal Reserve Bank: Docket Number R-1404: Proposed Rule on Debit Card Interchange Fees and Routing, written statement 2/22/2011.

12. Before the Surface Transportation Board:  Docket Number EP 704: Review of Commodity, Boxcar, and TOFC/COFC Exemptions; written statement 1/31/2011; testimony at hearing 2/23, 24/2011.

13. New Zealand Commerce Commission vs. Malaysian Airline Systems Berhad, Ltd. and et. al.; High Court of New Zealand: CV 2008-404-8350, Brief of Evidence 4/28/2011, trial testimony 5/20/11 and 5/23-27/2011.

14. Before the Federal Communications Commission: Docket Number 11-65:  For Consent to Assign or Transfer Control Licenses and Authorization, written reply statement 6/9/2011.

15. In Re: Checking Account Overdraft Litigation, MDL No. 2036 In the United States District Court for the Southern District of Florida, Miami Division, Case No. 09-MD-02036-JLK, Luquetta v. JPMorgan Chase Bank, Declaration In Support of JP Morgan Chase Bank, N.A.'s Opposition to Class Certification, June 16, 2011.

16. Before the Surface Transportation Board: Docket Number EP 705: Competition in the Rail Industry, written statement 4/12/2011, written reply statement 5/27/2011, testimony at hearing 6/22, 23/2011.

17. In the Matter of Rambus Inc. v. Micron Technology, Inc., et al. In the Superior Court of the State of California County of San Francisco, Civil Action No. 04-431105; expert report 11/08/2008; supplemental expert report 12/19/2008, deposition testimony 5/7/2009-5/8/2009, trial testimony 9/1,6,7/2011.

18. In Re McKesson Governmental Entities Average Wholesale Price Litigation, Master File No.: 1:08-CV-10843-PBS; The Board of County Commissioners of Douglas County, Kansas et al. v. McKesson Corp., expert report, April 14, 2010, Response Report, June 28, 2010; Related to Connecticut v. McKesson Corp., expert report, April 14, 2010; Related to Montana v. McKesson Corporation, expert report, November 8, 2010; Related to Oklahoma v. McKesson Corporation, expert report, November 8, 2010; San Francisco Health Plan, et al. v. McKesson Corporation, rebuttal expert report, 9/19/2011.

19. Before the Public Service Commission of Maryland, Case No.: 9271, In the Matter of the Merger of Exelon Corp. and Constellation Energy Group, Inc., written market power rebuttal testimony, 10/17/2011, written surrebuttal testimony 10/26/2011, hearing testimony, 11/2011.

20. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  DELL Inc., *et. al.*, v. SHARP Corporation, *et al.*, Case No. 3:10-cv-01064 SI MDL No. 3:07-md-1827-SI, expert report 2/23/2012, deposition 4/18/2012.

21. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  Motorola Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 3:09-cv-05840SI MDL No. 3:07-md-1827-SI, expert report  2/23/2012, deposition 4/18/2012.

22. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  AT&T Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 09-cv-4997 SI MDL No. 07-m-1827-SI, expert report  2/27/2012, deposition 4/18/2012.

23. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division,  BEST BUY CO., Inc., *et. al.*, v. AU OPTRONICS CORP., *et al.*, Case No. 10-cv-4572 SI MDL No. 07-md-1827-SI, expert report 3/5/2012, deposition 4/18/2012.

24. Clark R. Huffman and Brandi K. Winters, individually and on behalf of all others similarly situated vs. PRUDENTIAL INSURANCE COMPANY of AMERICA, In the United States District Court for the Eastern District of Pennsylvania, Civ. No. 2:10-cv-05135-EL, declaration 4/10/2012.

25. In re Prudential Insurance Company of America SGLI/VGLI Contract Litigation, CLASS ACTION, Master Case No. 3:11-md-02208-MAP, In the

United States District Court for the District of Massachusetts, declaration 5/10/2012.

26. Australian Competition and Consumer Commission v. Singapore Airlines Cargo PTE LTD et. al., Before the Federal Court of Australia, District Registry: New South Wales, Division: General, No. NSD 1980 of 2008, NSD 363 of 2009, NSD 876 of 2009 and NSD 1213 of 2009, affidavit and expert report 7/12/2012.

27. Bandspeed, Inc. v. Sony Electronics, Inc. et al. and Cambridge Silicon Radio Limited, Cause No. A-11-CV-771-LY, In the United States District Court for the Western District of Texas, Austin Division, expert report, 9/21/2012.

28. National Collegiate Athletic Association et al., Plaintiffs, v. Christopher J. Christie et al., Defendants, In the United States District Court for the District of New Jersey, Civil Action No. 3:12-cv-04947 (MAS) (LHG), expert report  11/21/2012, deposition 11/30/2012.

29. In Re Cathode Ray Tube (CRT) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division, Master File No. CV-07-5944-SC MDL No. 1917, expert report 12/17/12, deposition 01/24/12.

30. In Re Titanium Dioxide Antitrust Litigation, In the United States District Court of Maryland Northern Division, Case No. 1:10-cv-00318-RDB, expert report 12/21/2012, deposition testimony 02/07/2013, 02/08/2013.

31. PPL EnergyPlus, LLC, et al., v. Douglas R.M. Nazarian, in his official capacity as Chairman of the Maryland Public Service Commission, et al., In the United States District Court of Maryland Northern Division, Case No. 1:12-cv-01286-MJG, expert report 12/21/2012, supplemental expert report 02/01/2013, deposition testimony 02/14/2013, trial testimony 03/08/2013.

32. PPL EnergyPlus, LLC, et al., v. Lee A. Solomon, in his official capacity as President of the New Jersey Board of Public Utilities, et al., In the United States District Court for the District of New Jersey, Case No. 3:11-cv-00745-PGS-DEA, expert report 02/06/2013, deposition 02/14/2013 and 02/21/2013.

Document Submitted Partially Under Seal

## Attachment 2: Materials Relied Upon by Robert D. Willig

**Academic Citations**

Bulow, J. I., J. D. Geanakoplos, and P. D. Klemperer. "Multimarket Oligopoly: Strategic Substitutes and Complements." Journal of Political Economy, Vol. 93, No. 3. (1985).

Knetter, M., "International Comparisons of Pricing-to-Market Behavior," The American Economic Review, Volume 83, No. 3 (Jun., 1993).

Mundlak, Y. "Empirical Production Function Free of Management Bias." Journal of Farm Economics, Vol. 43, No. 1 (Feb., 1961).

Ramanathan, R. (1995). Introductory Econometrics with Applications, Third Edition, Harcourt Brace College Publishers.

van Dijk, T. and F. Verboven (2008). Quantification of Damages. In Issues in Competition Law and Policy, ABA Section of Antitrust Law.

Weyl G.E. and M. Fabinger. "Pass-through as an Economic Tool." (2012).

Wooldridge, J. (2002). Econometric Analysis of Cross Section and Panel Data, The MIT Press.

**Declarations**

Declaration of Janet S. Netz, Ph.D., in Support of Indirect-Purchaser Plaintiffs' Opposition to Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz, February 15, 2013.

Expert Report of Robert D. Willig, December 17, 2012 and all materials cited in Attachment 3 of the report.

Rebuttal Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification, February 15, 2013.

**Depositions and Exhibits**

Deposition of Janet S. Netz, November 15, 2012

Deposition of Janet S. Netz, March 15, 2013

**Data**

Board of Governors of the Federal Reserve System, "Exchange Rates.xlsx"

Bureau of Labor Statistics, "microprocessor_ppi.xls"

World Bank, "energy_prices.xlsx"

World Bank, "crude_oil.xlsx"

OECD, "total_production.xlsx"

Document Submitted Partially Under Seal

OECD "unemployment.xlsx"

Best Buy, "BBYCRT000081_Highly Confidential û AttorneysÆ Eyes

Document Submitted Partially Under Seal