# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: TFT-LCD (FLAT PANEL) ANTITRUST
LITIGATION
_____/

This Order Relates to:

ALL CASES


_____/

No. M 07-1827 SI

MDL. No. 1827

**ORDER RE: INDIRECT PURCHASER
PLAINTIFFS' MOTION TO FILE A
THIRD AMENDED CONSOLIDATED
COMPLAINT**

Now before the Court is the indirect purchaser plaintiffs' motion for leave to file a third amended complaint. The indirect purchaser plaintiffs seek to amend the complaint to add new defendants and co-conspirators, and to add additional state law claims.

With regard to the proposed new defendants and co-conspirators, the Court finds that as to certain proposed new defendants, plaintiffs have demonstrated that leave to amend should be granted and that there is no prejudice or delay caused by amendment. Specifically, plaintiffs may amend the complaint to add (1) Unipac, Acer Display and Quanta Display as defendants in order to clarify the liability of AU Optronics Corporation; (2) Chimei Innolux, which was formed by a three-way merger by current defendants; and (3) Epson Imaging Devices Corporation.

However, the Court finds that the indirect purchaser plaintiffs have not shown that it is appropriate to amend the complaint to name three additional proposed defendants, Hydis Technologies Co., Mitsubishi Electric Corporation, and Mitsubishi Electric & Electronics USA, Inc. The Court finds that adding these entities as defendants will cause delay due to service, new discovery, and motion practice. In addition, adding these entities as defendants might require revisiting class certification to

1    address issues specific to these entities. The indirect purchaser plaintiffs may, however, amend the

2    complaint to name these entities as co-conspirators.

3        The Court GRANTS plaintiffs' motion to amend to add the following entities as named co-

4    conspirators: Fujitsu Display Technologies Corporation, NEC Corporation, NEC LCD Technologies

5    Ltd., NEC Electronics America, Inc., Panasonic Corporation, Panasonic Corporation of America, Sony

6    Corporation, and S-LCD Corporation.

7        The indirect purchaser plaintiffs also seek to add four new state law claims. The Court GRANTS

8    plaintiffs leave to amend to add claims under the New York antitrust statute and the Missouri

9    Merchandising Practices Act.[1] The Court DENIES plaintiffs' motion to the extent that plaintiffs seek

10   to add claims under Illinois and Oregon law. The States of Illinois and Oregon have opposed the

11   proposed amendments on numerous grounds.[2] The Court finds that the States' objections are well taken

12   in light of the issues raised in the pending proceedings related to the indirect purchaser plaintiffs' motion

13   for approval of the class settlements with certain defendants.[3]

14        The indirect purchaser plaintiffs' amended complaint must be filed by **April 29, 2011**. This

15   order resolves Docket Nos. 1948 and 2016.

16        **IT IS SO ORDERED.**

17

18   Dated: April 12, 2011

                                    _____

19                                      SUSAN ILLSTON
                                     United States District Judge

20

21

---

22    [1] In an order filed April 11, 2011, the Court granted in part and denied in part defendants' motion to dismiss Missouri's claim under the MMPA in Missouri's *parens patriae* complaint. Docket

23    No. 2632. When preparing the amended complaint, plaintiffs should review the Court's April 11, 2011 order for guidance regarding the MMPA claim.

24    [2] In contrast, the State of Missouri filed a statement in support of the indirect purchaser plaintiffs' motion to amend the complaint to add the MMPA claim.

25

26    [3] Those proposed settlements include, *inter alia*, damages settlements for Oregon and Illinois classes, although the operative complaint does not allege claims under Oregon and Illinois law, and the

27    Court did not certify statewide classes under Oregon and Illinois law. Oregon and Illinois have intervened and filed objections to the proposed settlements. In December 2010, the Court appointed

28    retired Judge Weinstein to review the indirect purchaser plaintiffs' proposed settlements, and to make a recommendation to the Court regarding approval of those settlements.

2

# EXHIBIT B

```
                                        Pages 1 - 62

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

                 BEFORE THE HONORABLE SUSAN ILLSTON

IN RE:  TFT-LCD (FLAT PANEL)          )
ANTITRUST LITIGATION,                 )
                                      )MDL 07-1827 SI
                                      )San Francisco, California
                                      ) September 22, 2010
_____ )  3:30 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

```
For Direct Purchaser       LIEFF, CABRASER, HEIMANN
Plaintiffs:                     & BERNSTEIN
                           275 Battery Street, 30th Fl.
                           San Francisco, California  94111
                    BY:  RICHARD M. HEIMANN, ESQ.
                         JORDAN ELIAS, ESQ.
                         ERIC FASTIFF, ESQ.
                         BRENDAN GLACKIN, ESQ.



                           PEARSON, SIMON, WARSHAW & PENNY
                           44 Montgomery
                           Suite 2450
                           San Francisco, California 94104
                    BY:  BRUCE SIMON, ESQ.
                         JESSICA GRANT, ESQ.



            (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 4

1  to you.

2          And then the other issues are wording and --

3          **THE COURT:**  And that I will deal with.  I've got an

4  order.  I just haven't done it yet.

5          All right.  Now, let's talk about the indirect

6  purchasers.  The motion to file the third amended complaint,

7  who wants to talk about that?

8          **MR. CORBITT:**  Good afternoon, your Honor.  Craig

9  Corbitt.

10          **THE COURT:**  Okay.  The indirect purchasers want to

11  file a third amended complaint to add new defendants,

12  Unipack -- I'll give you my view start to finish and then you

13  can tell me briefly what you want to argue about, okay?

14          I'm inclined to grant leave to amend to add Unipack,

15  Acer Display and Quanta Display.

16          I have a question for you about Chimei Innolux.  I'm

17  inclined to grant this.  Who is the defendant who is going to

18  be responding on these issues?

19          **MR. CHERRY:**  Well --

20          **THE CLERK:**  Is this Epson's?  No, this isn't Epson's

21  motion.

22          **MR. CHERRY:**  Yeah, this is the motion for leave to

23  amend.

24          **THE CLERK:**  Oh, wait, but that's what Mr. Johnson,

25  Brady Johnson was really, really wanting to --

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 5

```
 1          MR. CHERRY:  The state AG's are objecting.

 2          THE CLERK:  Right.  I have a phone number.  I can

 3   call him on the old-fashioned phone.  But he's really, like, in

 4   a panic that he's not able to -- and I don't know how important

 5   it is.

 6          THE COURT:  Why don't you phone him and see if you

 7   can get him?

 8          THE CLERK:  Okay.  Well, I just wanted to make sure

 9   it's okay that I do all that stuff.

10          (Brief pause.)

11          MR. CHERRY:  Your Honor, if you wanted to know who is

12   going to address it, I wasn't planning to address the motion in

13   particular, but you asked about the Chi Mei and the Innolux,

14   and I would like to speak to that when you are ready.

15          THE COURT:  And then you are going to do the --

16          MR. LAZERWITZ:  Mike Lazerwitz for LG Display.

17          We wrote the papers, but the -- our position is

18   straightforward and I don't think you need to hear more from

19   us.

20          Mitsubishi also filed its own papers and I thought

21   that the Mitsubishi lawyer was going to be here and raise that

22   with you.

23          MR. TRUAX:  Good morning, your Honor.  It's Terry

24   Truax, T-r-u-a-x, on behalf of Mitsubishi Electric Corporation.

25          THE CLERK:  Can you guys make sure you speak loud so
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 6

```
 1   that the person on the phone can -- Mr. Brady, if you could

 2   quickly state your appearance?

 3             MR. JOHNSON:  My name is Brady Johnson for the State

 4   of Washington.

 5             MR. HARROP:  This is Blake Harrop for the State of

 6   Illinois.

 7             THE COURT:  Are the two of you all that are on the

 8   phone now?

 9             THE CLERK:  I have other numbers.  I can --

10             THE COURT:  Welcome.  That's fine.

11             MR. JOHNSON:  We're not hearing you.

12             THE CLERK:  Okay.  Well, you're on our old phone

13   system, so this is all you get.  Hopefully, you can hear it.

14             MR. JOHNSON:  Okay.  There you go.

15             THE COURT:  All right.  The indirect purchasers want

16   to add Chimei Innolux as a defendant.  As I understand it, it

17   was formed in March of this year by a three-way merger of

18   current defendant Chi Mei Optoelectronics Corp. and two other

19   defendants.

20             I wanted to know what the real problem with this was.

21   It didn't sound like a big deal to me.

22             MR. CHERRY:  Well, two things.  I mean, we don't

23   believe there has been any showing of any involvement of

24   Innolux or Topoly.  I mean, they've never been mentioned.  They

25   just happened to enter into a three-way merger in March of this
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 7

1   year.

2            And the complaint just throws them in there with a

3   single sentence that says they should -- you know, they should

4   be defendants and they participated in the conspiracy.  One

5   sentence.  That's it.  And that can't be enough to bring them

6   into the case.  You know, they have to allege some facts to

7   show they should be in the case.

8            If it's just a name change, you know, for the -- to

9   say we're now the legal entity responsible for what CMO might

10  have done, that's one thing; but they're saying Innolux and

11  Topoly should be in the case and that they -- and in a single

12  sentence just saying they participated in the conspiracy.

13            **THE COURT:**  Mr. Corbitt?

14            **MR. CORBITT:**  I think that's kind of an over-reading

15  of the complaint, at least what we had in mind.

16            Chimei Innolux is, as we understand it, a new

17  entity -- and this is very similar to the AUO issue, is a new

18  entity that combined the former Chi Mei Corporation with

19  Innolux and TPO Display Corporation.  So it is appropriate for

20  us to substitute Chimei Innolux in place of the former Chi Mei.

21  I don't believe there is any dispute about that.

22            And we are -- to the extent that there is any

23  subsidiary liability from Innolux or TPO Display Corporation,

24  certainly Chimei Innolux would be liable for that we believe

25  under the law, and under Taiwanese law in particular, but we

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 8

1  have not named them as additional defendants.  We are simply

2  pointing out that Chi Mei and Innolux Display Corporation and

3  TPO Display Corporation are the predecessor entities, along

4  with Chi Mei, that now form the new defendant Chimei Innolux.

5          **MR. CHERRY:**  Your Honor, I don't believe that's what

6  the complaint says.

7          **THE COURT:**  What paragraph is it?

8          **MR. CHERRY:**  Do you have your complaint?

9          **MR. CORBITT:**  Yes.  I think it's Paragraph 66.

10         **MR. CHERRY:**  Can I see?

11         (Brief pause.)

12         **THE COURT:**  He's right.  It says more than that.

13         **MR. CHERRY:**  I'm looking for the paragraph, but there

14  is -- I know there's a paragraph in here that says that they

15  participated -- here.  It's Paragraph 160.  It just says:

16         "The three predecessor companies of

17      Chimei Innolux -- Chi Mei Optoelectronics,

18      Innolux and TPO -- participated as

19      co-conspirators in the conspiracy."

20         There is no basis for that.

21         **THE COURT:**  I will give you leave to amend the

22  complaint to say -- if it's a new name because of the merger to

23  say what it is, but not to bring in the other two entities

24  unless there are specific factual allegations about them.

25         **MR. CHERRY:**  Okay.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 9

1          MR. CORBITT:  Okay.

2          MR. BLUMENSTEIN:  Your Honor, Carl Blumenstein of

3   Nossaman for AU Optronics.

4          If we could go back to your Honor's first comment

5   regarding Quanta, Acer Display and Unipack, in their reply

6   papers what the plaintiff said, to make clear, was we just want

7   to add these allegations.  We are not naming them as party

8   defendants.

9          I think the complaint and the motion may have been a

10  little bit ambiguous with that, with regard to that

11  clarification, that the allegations will just come in.  We'll

12  deal with the allegations, but just to be clear, they are not

13  going to be named as party defendants, which I think we all

14  agree is --

15          THE COURT:  It's not possible.

16          MR. BLUMENSTEIN:  Right.

17          THE COURT:  I understood that.

18          MR. CORBITT:  That's correct, your Honor.  However,

19  in contrast to the issue we were just talking about with

20  Chi Mei, we think it's very clear that these predecessor

21  entities, while they were independent, were participants in the

22  conspiracy and that AUO is not liable for them.  We think

23  that's clearly alleged in here.

24          THE COURT:  But they are not named as defendants.

25          MR. CORBITT:  They can't be.  They don't exist any

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 10

1    more.

2             **THE COURT:**  Okay.  Hydis, I'm inclined to deny that.

3    I just think it's too late to do that.  I think it's going to

4    just take too much time and there's no good reason not to do

5    this -- not to have done it before.

6             I think it's -- I would give leave to name them as a

7    co-conspirator, but not to bring them in as a defendant.

8             The same thing about Mitsubishi, frankly.  I think

9    it's too late to bring them in.

10            We can talk about Epson in a minute.  You want to add

11   co-conspirators.  You want to add Fujitsu, right, as a

12   co-conspirator?

13            **MR. CORBITT:**  Yes.

14            **THE COURT:**  Is it named as a co-conspirator in any of

15   the other complaints?

16            **MR. CORBITT:**  I don't know that it is, your Honor,

17   but we have alleged and we have evidence that they participated

18   in bilateral conspiracy meetings.  I'm not sure whether any

19   other plaintiff named them or not.

20            **THE COURT:**  What about Sony?

21            **MR. CORBITT:**  Sony has a joint venture with Samsung,

22   SCL -- SLCD, excuse me -- which is, we think, through that

23   joint venture, through Samsung's joint ownership and control of

24   that with Sony is a participant in the conspiracy and is a

25   co-conspirator.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 11

```
 1          THE COURT:  Were they named as a co-conspirator in
 2   any of the other cases?
 3          MR. CORBITT:  Again, I don't know the answer.
 4          THE COURT:  Well, I am inclined at this time to grant
 5   that.
 6          With respect to the adding of any state claims, I
 7   will tell you that I'm inclined to deny your request to add
 8   Illinois.  I'm inclined to deny your request to add Oregon.
 9   I'm inclined to deny your request to add Missouri.
10          I wanted to ask you about New York.  You have already
11   got a claim, an indirect claim under New York state law.  And
12   you want to add the antitrust claim, the antitrust state law
13   claim, right?
14          MR. CORBITT:  Correct.
15          THE COURT:  The defendants suggest that that's going
16   to require a whole lot more briefing and decision making.  Do
17   you agree with that?
18          MR. CORBITT:  No, I don't, your Honor.  I think it's
19   a straightforward claim under state antitrust law, just like
20   the other states that you have that your Honor certified.  It's
21   the same class.  It's just a different relief that is now
22   available in light of the Supreme Court's Shady Grove decision.
23          Apparently, there are no new class reps there --
24          THE COURT:  Right because --
25          MR. CORBITT:  (Continuing) -- or anything like that.
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 12

```
 1          THE COURT:  Does anyone, any defendant want to talk
 2   about that?
 3          MR. LAZERWITZ:  Michael Lazerwitz for LG Display.
 4          Your Honor, all I would say is what we put on our
 5   papers, what -- our position is it's a little bit late in the
 6   day, but if your Honor is inclined to disagree with us, we will
 7   analyze the new claim and if we think we have a motion, we will
 8   file it.  If we don't, we won't.
 9          THE COURT:  I'm inclined to allow you to add the New
10   York antitrust claim on account of things you set out in your
11   papers, but, as I say, I'm inclined to deny Illinois, Missouri
12   and Oregon.
13          And then we get to the new class settlements.
14          MR. CORBITT:  I think Mr. Scarpulla may address the
15   settlements, so can I, if I may, your Honor, respond to your --
16          THE COURT:  You may briefly?
17          MR. CORBITT:  (Continuing) -- your inclination to
18   deny on the other points, which I -- I gather it all comes down
19   to the timeliness issue.
20          THE COURT:  I really does, yes.
21          MR. CORBITT:  And I guess --
22          THE COURT:  Timeliness and the timing.  We are now
23   however many months downstream from having certified your
24   class.  We are at least 12 months downstream from Mr. Scarpulla
25   having said, "We're ready to try this case next month," or
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 13

1  Mr. Alioto or somebody.  Somebody said they were really ready,

2  and now we are amending the complaint.  So now all those things

3  go together to make me think it's not right.

4          **MR. CORBITT:**  I guess I would say, your Honor, a lot

5  has happened in the meantime, including a great deal of

6  discovery that has been taken.  And this goes to the point of

7  adding the new defendants, is that we, in fact, have testimony,

8  have documents that there simply wasn't time to review a year

9  ago when they were at the class cert stage that indicate the

10  involvement of these companies.

11          And we really didn't get underway with merits

12  depositions at all until, I think, right around the time the

13  class cert motions were argued, and there are now several dozen

14  of them.  There are several dozen more, I think, left to be

15  completed.

16          And many, many documents that -- out of millions that

17  were produced had not been finally reviewed at that stage,

18  which now have been.

19          So we now have evidence of participation by these

20  companies in the conspiracy.  We think that they are part of

21  it.

22          Moreover, we recognize that this case has been going

23  on for several years now, but by the same token, the discovery

24  cut-off that your Honor set is next May, which is eight months

25  from now.  And the trial date is nearly a year and a half from

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 14

1   now, in February 2012.  And we think in light of that, that

2   there is ample time to get whatever additional discovery may be

3   necessary from these companies.

4          There is no prejudice that we can see to the

5   defendants to the trial schedule.  We are obviously still

6   committed to that.  And, you know, we will do what it takes to

7   get the work done.

8          But you know, obviously, it's within your Honor's

9   discretion, but I think this is not the kind of situation, as

10  you've seen in some of the cases, where denial of leave to

11  amend was upheld by the Ninth Circuit, where there was just

12  extreme dilatoriness to the point of discovery would have to be

13  reopened or, you know, it was two weeks before trial or

14  anything like that.  We are not anywhere close to that.  We are

15  a long way away.

16         In terms of the states that we propose to add, in

17  particular Oregon and Illinois, that is a direct result of the

18  Supreme Court's decision last spring, I think in April -- I

19  don't remember the exact month -- in the *Shady Grove* case.

20         Prior to that, it was pretty clear under state law

21  that a class claim could only be brought by -- if it could be

22  brought, could only be brought by the Attorney Generals of

23  those states.  That was the precise issue that went up to the

24  Supreme Court in the context of New York law and the Supreme

25  Court said, no, that's wrong.  Rule 23 trumps the state laws,

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 15

 1  or the state in that regard.  And as long as you can allege a

 2  class under Rule 23 -- you can bring a case under Rule 23 even

 3  if -- even despite the fact that if your case were in state

 4  court, you could not do that.  Only the Attorney General could

 5  do that.  So that is a clear change in the law, or at least an

 6  explication of the law by the Supreme Court that is relatively

 7  recent that simply did not exist at the time of the class cert.

 8          And, again, we think that the burden to the

 9  defendants would be minimal.  There are some new class reps,

10  but we would make them available right away.  We don't think

11  that the analysis of the issues in terms of the methodology for

12  class certification in terms of all the arguments the

13  defendants have made and presumably would make again about the

14  complexity of the distribution chain and all the difficulties

15  that pass through and so forth, these are the same issues that

16  your Honor has already ruled on and they are really no

17  different with respect to these new states.

18          So we think that that is a clear changed circumstance

19  and a recent changed circumstance that justifies adding those

20  states to the case, although they weren't in there previously.

21          Likewise, for Missouri.  Unfortunately, the Missouri

22  Attorney General, I think, was -- the woman from that office,

23  Ms. Schneider, was one of the people who intended to be on the

24  conference call, who is not present or tied in, but I would

25  respectfully request that since she supports the amendment and

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 16

1  would like to see the Missouri state claim added to this case,

2  that your Honor would allow her to participate or at least

3  defer a ruling on that until she has an opportunity to address

4  the Court.

5          THE COURT:  Did she file something to that effect?

6          MR. CORBITT:  I'm pretty sure she contacted --

7          THE COURT:  No, no, no.  I mean, saying she supported

8  your motion?  Did she file something?

9          MR. CORBITT:  I don't recall that she filed it.  I

10  have had a number of conversations with her.

11          You know, frankly, since there was no opposition to

12  the concept of a Missouri claim per se, other than the general

13  points the defendants made in opposing the motion that

14  Mr. Lazerwitz had in his briefs and the other defendants and so

15  forth, she was prepared to come in and say something, but there

16  were no -- no questions raised about the substantive issues

17  under Missouri law or changes in the Missouri law that we

18  thought was necessary.

19          THE COURT:  Did she just file a lawsuit?

20          MR. CORBITT:  I'm sorry?

21          THE COURT:  Did she just file a lawsuit?

22          MR. CORBITT:  She filed a lawsuit, yes, I think about

23  a month ago, around the same time at the time rest of the

24  states filed a case.

25          THE COURT:  All right.  Well, she -- I'm sorry for

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter -  U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 17

1   the telephone awkwardness.  If she wants to file something,

2   I'll be happy to take a look at it.

3          **MR. CORBITT:**  I appreciate that.

4          **THE COURT:**  I had not understood her to be supporting

5   your motion.

6          Okay.  What else?

7          **MR. CORBITT:**  There are only a couple of states that

8   don't like this, your Honor.  The rest of them are in favor

9   enough of it.

10         Well, I think those are the main points that I would

11   make, your Honor.  The rest of it is in our papers.

12         But, again, I would urge you that the timeliness

13   issue is -- I understand, obviously, your Honor's desire to get

14   this case moving, to not have a delay, to keep the discovery

15   cut-off, to keep the trial date.  We fully support that.  No

16   one wants that more in any case than plaintiffs do.  In

17   particularly, we do.  And we would not have tried to do this

18   had we not thought that there was really more than sufficient

19   time in order to get this done.

20         And, also, respectfully we think that the Supreme

21   Court's *Shady Grove* decision is ample grounds to permit an

22   amendment to add these additional states when we could have

23   done it before.

24         **THE COURT:**  All right.  Thank you.

25         **MR. HAGLUND:**  Mike Haglund representing the State of

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 18

1    Oregon.

2           One of the points we did not make in our papers is

3    this, your Honor.  We filed our case in the District of Oregon

4    on August 10th.  It's now been transferred and is in your

5    court.

6           The scope of the amendment that the plaintiffs -- the

7    indirect plaintiffs seek in their amended complaint excludes

8    governmental entities.  It's a much more practical approach to

9    let the superior -- the lawyers with the superior ability to

10   represent Oregon governments and Oregon consumers, the Attorney

11   General, to proceed with Oregon's case.

12          If the amendment were granted, we have this situation

13   where the indirect purchaser plaintiffs here are representing

14   Oregon consumers, yet, we stay in the case as the Attorney

15   General representing State of Oregon interests on behalf of the

16   state government and all of the local governments, some 2,000

17   estimated total governmental entities in the state.

18          The other point I would like to make --

19          **THE COURT:**  You oppose his motion?

20          **MR. HAGLUND:**  Absolutely.

21          **THE COURT:**  That would be a bad thing, you think.

22          **MR. HAGLUND:**  It's a very, I think, awkward and

23   impractical approach to the State of Oregon's claims, which

24   have not heretofore been in the case because of the way the

25   class was defined.  To have, in effect, Oregon claimants

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 19

1  bifurcated, governments represented by the AG and consumers

2  represented by the independent -- or by the indirect purchaser

3  plaintiffs.

4       The other point I think that's worth making is that

5  their reading of *Shady Grove* is incorrect.  Justice Stevens was

6  quite clear in the opinion that his -- the applicable opinion

7  in that case; that even where a state procedural statute may

8  be, as he put it, procedural in the ordinary sense, it may be

9  so bound up with the substantive rights given -- applicable to

10  a particular claim that it still must give way or the federal

11  rule must still give way to that combination of procedure and

12  substance.  That's exactly what we have here.

13       Oregon adopted it's own repealer, *Illinois Brick*.

14  It's abundantly clear that the AG, both under that state

15  statute as well as under Section 16 of the *Clayton Act*, is the

16  right law firm to represent Oregon consumer as well as

17  governmental interests.  Their reading of *Shady Grove*, as if

18  Rule 23 simply trumps everything associated with these state

19  repealers is just an incorrect analysis of *Shady Grove*.

20       Thank you.

21       **THE COURT:**  All right.  Thank you.

22       **MR. HARROP:**  Your Honor, this is Blake Harrop on

23  behalf of the State of Illinois.

24       We are finding that as long as we stay on mute here,

25  we can hear you; but as soon as I take you off mute, I cannot

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 20

```
1   hear anybody in the courtroom.  So I'm going to sort of do this

2   like a walkie-talkie and try to be short with what I say.

3            I support everything that Mr. Haglund just said and

4   want to emphasize as well that the Illinois statute is clearly

5   a substantive statute that would under the readings of both the

6   assent and the current -- that is, five justices of the Supreme

7   Court -- be one that should be honored ahead of a private

8   action under class certification.

9            THE COURT:  Thank you.

10           MR. CORBITT:  May I respond briefly, your Honor?

11           THE COURT:  Briefly.

12           MR. CORBITT:  Shady Grove, we think, they are just

13  wrong, but your Honor can read the case and obviously decide

14  for yourself.

15           But the whole point of Shady Grove is that when you

16  are in Federal Court, Rule 23 applies.  If you meet the

17  requirements of Rule 23, you can have a class.

18           With respect to the comments by the gentleman from

19  Oregon, Oregon does not purport to represent businesses, only

20  natural persons as we understand it.  And so, therefore, the

21  same gap that he alleges would be present if we don't represent

22  governmental entities is present, I think, in his complaint.

23           Moreover, your Honor, we already represent consumers

24  and businesses in Oregon and Illinois and all the other states

25  to this extent.  Your Honor certified a nationwide injunctive
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 21

1   class, which is, obviously, everybody in the country.

2          You know, we've been doing this case for three years.

3   We've put a tremendous amount of effort into it, as your Honor

4   knows.  We've these classes certified.  We've taken dozens and

5   dozens of depositions and reviewed millions of documents.  And

6   so the notion that Attorney Generals, with all due respect,

7   three years later can come in and file a case and therefore it

8   should be presumed that what they do is superior to what we can

9   do, we think is just wrong and is also contrary to the

10  principle enunciated in the State of Hawaii case from many

11  years ago by the Supreme Court, which is that an antitrust case

12  as class actions are superior to parents claims.

13          **THE COURT:**  Now, I wanted to talk about the Epson and

14  Chung Hwa settlements.

15          **MR. SCARPULLA:**  Good afternoon, your Honor.  Francis

16  Scarpulla appearing on behalf of the indirect purchasers on

17  that issue, your Honor.

18          **THE COURT:**  Good afternoon.

19          I'm very concerned that because the -- well, we have

20  objections by Oregon, Washington and Illinois.  We have an

21  attorney for Oregon in the courtroom, right?

22          Do we have Illinois or Washington on the phone?

23          **UNIDENTIFIED VOICE:**  Yes, your Honor.  We are here.

24          **THE COURT:**  Okay.  My concern is that I now realize

25  because of the issues raised in Epson, and thinking back on

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 22

# EXHIBIT C



ANNUAL REPORT **2011**
including the Annual Financial Report



*Société anonyme* with a share capital of €223,759,083
Registered Office: 1-5, rue Jeanne d'Arc
92130 Issy-Les-Moulineaux
Nanterre Register of Commerce and companies No. 333 773 174

# ANNUAL REPORT **2011**



This Registration document *(Document de Référence)* was filed with the *Autorité des Marchés Financiers* (AMF) on March 27, 2012 in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note *(note d'opération)* approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

This registration document can be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

Exhibit C, Page 24

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA, Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson/Technicolor sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC should render its decision in 2012, but the Company considers that the timetable for the remainder of this proceeding cannot be accurately determined.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998.

In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway.

It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, TCETVT has incurred approximately U.S.\$11 million in remediation costs. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.\$6.3 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate.

In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

Exhibit C, Page 25

# EXHIBIT D



**2010**
ANNUAL
REPORT

# 2010 Annual Report



Société anonyme with a share capital of €174,846,625

Registered Office: 1-5, rue Jeanne d'Arc

92130 Issy-Les-Moulineaux

Nanterre Register of Commerce and Companies No. 333 773 174



This Registration document (Document de Référence) was filed with the Autorité des Marchés Financiers (AMF) on March 30, 2011, in accordance with Article 212-13 of the AMF General Regulations.  It may be used in connection with a financial transaction provided it is accompanied by a transaction note (note d'opération) approved by the AMF . This document was prepared by the issuer and is the responsibility of the signatories thereof.

Copies of this registration document are available free of charge from Technicolor.

This registration document can also be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

Exhibit D, Page 27

of the Company's revenue. Pegasus has not yet definitively set forth in the litigation the per unit royalty figure or damages sum they seek in the case.

Pegasus also seeks an injunction to prohibit further sales of IRD's which allegedly infringe the patents in suit. If Pegasus were successful in the litigation and able to convince the Court to enter a permanent injunction, the Company's IRD sales could be disrupted. The Company notes, however, that all of the patents asserted against the Company have already expired, with the exception of one which is set to expire in August 2011. (In October, 2010, the Board of Patent Appeals reversed its initial decision ruling the patent in question unpatentable). The Company believes the court is unlikely to issue an injunction prior to the expiration of the last patent. Upon expiration of the last patent, the Company would be free to pursue IRD sales with no risk of an injunction; therefore the risk of this litigation relates primarily to the damages claimed by Pegasus, which amount, as indicated above, Pegasus has not yet claimed.

The stay of proceedings entered by the Delaware District Court in May 2003 remains in effect. The USPTO has now confirmed as patentable four claims of three patents asserted against the Company in the Delaware District Court litigation. However, a third request for re-examination of one of those patents has been tendered to the USPTO and Pegasus and PMC have appealed the rejection of certain asserted claims, all of which could affect the actual claims ultimately confirmed as patentable.

## IP Innovation and Technology Licensing Corp.

On June 20, 2003, Technology Licensing Corp. ("TLC") filed a lawsuit in the US District Court for the Eastern District of California alleging that certain Grass Valley Group products infringe four of TLC's US patents. Thereafter, TLC placed two of the patents into re-issue proceedings before the United States Patent and Trademark Office.

As a result, this lawsuit was stayed as to those patents pending reissue. Both patents have now reissued, and on October 2, 2009, the trial court formally lifted the stay of proceedings. A case management plan has been put in place with a projected September 2011 trial date. Because of the stay, the case is still in the early stages of development. The Company has received a favourable ruling in early claim construction proceedings. The purchaser of the Grass Valley Broadcast Business has contractually agreed to indemnify and hold the Company harmless in connection with this lawsuit, which is being vigorously defended.

In June and July 2005, the District Court granted summary judgment in favour of Technicolor on the remaining two patents. TLC appealed that ruling to the US Federal Circuit Court of Appeals.

In July 2006, the parties entered into a Settlement and License Agreement resolving all issues pertaining to the Appeal.

## Rembrandt Technologies v. Fox Entertainment and NBC

In December of 2006, Rembrandt Technologies filed separate lawsuits against Fox and NBC in the US District Court for the District of Delaware. Each suit alleges that defendants Fox and NBC infringe US Patent 5,243,627 entitled "Signal Point Interleaving Technique" (the "'627 patent") by transmission, or receipt and retransmission, over Fox and NBC television systems, of digital terrestrial broadcast signals that comply with the ATSC digital television standard. Both Fox and NBC have subsequently demanded that Technicolor defend and indemnify them in each case,

alleging that Rembrandt's infringement allegations are in essence based upon digital television transmission equipment sold to Fox and NBC by Thales Broadcast and Multimedia, which the Company acquired in December 2005.

While Technicolor has made no commitment with respect to Fox and NBC's demands for indemnity in the event of a settlement or judgment against them, Technicolor has agreed, subject to certain conditions and restrictions, to fund a portion of the defense costs in each case.

On November 8, 2008, the District Court issued an order construing the claims of the '627 patent. Rembrandt has conceded that it cannot prove infringement of the patent under the Court's claim construction, and in March of 2009 the parties reached an agreement in principle which has allowed for the early filing of a motion for summary judgment of non-infringement. Upon entry of a judgment in favour of defendants, Rembrandt has indicated its intention to appeal the judgment to the Federal Circuit Court of Appeals.

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC decision is expected sometime in 2011, but with no certainty.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability

that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998. In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway. It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, in order to comply with the Environmental Protection Bureau's order, TCETVT has incurred approximately U.S.$7.2 million for the groundwater remediation. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$5.7 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate. In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

Exhibit D, Page 29

# EXHIBIT E

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 6–K

**Report of foreign Private Issuer**
**Pursuant to Rule 13a – 16 or 15d – 16 of**
**the Securities Exchange Act of 1934**

For the month of February, 2008

Commission File Number: 0–3003

# THOMSON

**46 quai A. Le Gallo**
**92648 Boulogne Cedex**

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20–F or Form 40–F.

Form 20–F ☒   Form 40–F ☐

Indicate by check mark if the registrant is submitting the Form 6–K in paper as permitted by Regulation S–T Rule 101 (b) (1): ☐

Note: Regulation S–T Rule 101 (b) (1) only permits the submission in paper of a Form 6–K if submitted solely to provide an attached annual report to security holders.

Indicate by check mark if the registrant is submitting the Form 6–K in paper as permitted by Regulation S–T Rule 101 (b) (7): ☐

Note: Regulation S–T Rule 101 (b) (7) only permits the submission in paper of a Form 6–K if submitted to furnish a report or other document that the registrant foreign private issuer must furnish and make public under the laws of the jurisdiction in which the registrant is incorporated, domiciled or legally organized (the registrant's "home country"), or under the rule of the home country exchange on which the registrant's securities are traded, as long as the report or other document is not a press release, is not required to be and has not been distributed to the registrant's security holders, and, if discussing a material event, has already been subject of a Form 6–K submission or other Commission filing on EDGAR.

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3–2(b) under the Securities Exchange Act of 1934.

Yes ☐   No ☒

If "yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3–2(b) : 82– _____

– Thomson Group –
**NOTES TO THE UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**STV Asia, LTD v. Premier Retail Network**

On March 2, 2006 STV Asia, LTD ("STV") filed suit in the U.S. District Court for the Northern District of California against Premier Retail Networks ("PRN"), Thomson subsidiary since August 2005, alleging that PRN's "in store media network" infringes two U.S. patents allegedly owned by STV. On May 15, 2007, the parties, including the Securityholder Agent for the former PRN shareholders, entered into agreements fully resolving all claims which were the subject of the lawsuit without any material impact for the group.

**Rembrandt Technologies v. Fox Entertainment and NBC**

In December of 2006, Rembrandt Technologies filed separate lawsuits against Fox and NBC in the U.S. District Court for the District of Delaware. Each suit alleges that defendants Fox and NBC infringe U.S. Patent 5,243,627 entitled "Signal Point Interleaving Technique" (the "'627 patent") by its transmission, or receipt and retransmission, over Fox and NBC television systems, of digital terrestrial broadcast signals that comply with the ATSC digital television standard. Both Fox and NBC have subsequently demanded that Thomson defends and indemnifies them in each case, alleging that Rembrandt's infringement allegations are in essence based upon digital television transmission equipment sold to Fox and NBC by Thales Broadcast and Multimedia, a business which Thomson acquired in December 2005 from Thales (a French group, listed on the Euronext market). While Thomson has made no commitment with respect to Fox and NBC's demands for indemnity in the event of a settlement or judgment against them, Thomson has agreed, subject to certain conditions and restrictions, to fund a portion of the defense costs in each case. The cases are scheduled for trial in October 2009 and are being vigorously defended.

**Cathode Ray Tubes Investigations**

On November 28, 2007, Thomson Inc. received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.  On January 9, 2008 Thomson received a request under art 18(2) of Council Regulation n°1/2003 from the European Commission (the "EU") also relating to the CRT industry.  In addition, class action law suits asserting private antitrust claims against Thomson (and other companies currently or formerly in the CRT industry) have been filed on January 28, 2008 in the United States in the District of New Jersey. Thomson sold its "CPT" business in 2005 and never had activity in the CDT business. It is Thomson's policy to conduct business in full compliance with all applicable competition laws.  The Company is taking appropriate measures to respond to the subpoena and the EU request.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 15, 2008

|  |  |
|---|---|
| By: | **/s/ Julian Waldron** |
| Name: | Julian Waldron |
| Title: | Senior Executive Vice President, Chief Financial Officer |