1  Mario N. Alioto (56433)
   Lauren C. Capurro (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
   2280 Union Street
3  San Francisco, CA 94123
   Telephone: (415) 563-7200
4  Facsimile: (415) 346-0679
   Email: malioto@tatp.com
5  Email: laurenrussell@tatp.com

6  *Interim Lead Counsel for Indirect-Purchaser Plaintiffs*

7  [Additional Counsel Listed on Signature Page]

8

9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12               **SAN FRANCISCO DIVISION**

13  IN RE: CATHODE RAY TUBE (CRT)          Master File No. CV-07-5944-SC
    ANTITRUST LITIGATION
14                                          MDL No. 1917

15  _____     **REPLY BRIEF IN SUPPORT OF INDIRECT-**
                                            **PURCHASER PLAINTIFFS' MOTION FOR**
16  This Document Relates to:               **CLASS CERTIFICATION**

17  ALL INDIRECT-PURCHASER ACTIONS          Date:       TBD
                                            Time:       TBD
18                                          Courtroom:  Hon. Charles A. Legge (Ret.)
                                                        Special Master
19
                                            The Honorable Samuel Conti
20

21

22

23              **REDACTED PER COURT ORDER (D.E. 1577)**

24

25

26

27

28

---

1

**TABLE OF CONTENTS**

2    I.      INTRODUCTION ...........................................................................................................1

3    II.     OVERVIEW OF COMMON PROOF OF IMPACT AND DAMAGES ...........................3

4            A.     Predominant Common Proof of Impact and Damages To Direct Purchasers. ........4

5            B.     Predominantly Common Proof of Impact and Damages To Indirect End-
                    Purchaser Class Members. ......................................................................................6

6    III.    ARGUMENT.................................................................................................................10

7            A.     The Applicable Legal Standard. ...........................................................................10

8            B.     The *LCDs* Case Provides a Blueprint for Certification Here.................................11

9                   1.     This Case Is Factually Similar To *LCDs*. ..................................................12

10                  2.     Dr. Netz's Opinions in *LCDs* and Defendants' Challenges Thereto
                           Are Extremely Similar To Those Presented Here.......................................13

11

12                  3.     The *LCDs* Court Approved Dr. Netz's Methodologies and
                           Opinions.....................................................................................................15

13                  4.     The *LCDs* Court Evaluated and Rejected Defendants' Arguments
                           Again on a Motion to Decertify the Classes. .............................................17
14

15                  5.     The *LCDs* Court Also Rejected Defendants' Argument That
                           Plaintiffs Must Trace The Overcharge on Each CRT Through the
16                         Distribution Chain To the Ultimate Purchaser...........................................17

17           C.     The *SRAM* Decision Also Supports Class Certification Here. ..............................19

18           D.     *GPUs* and *Flash* Are Distinguishable.....................................................................21

19           E.     Defendants Do Not Dispute That Common Proof Will Be Used to Prove
                    Defendants' Conspiracy. .......................................................................................23
20

21           F.     Plaintiffs Have Met Their Burden of Proof in Establishing That Impact and
                    Damages Can Be Shown Using Predominantly Common Proof...........................24

22                  1.     Plaintiffs' Burden on Predominance.........................................................24

23                  2.     Defendants' Challenges To Dr. Netz's Methods and Proof Are
                           Unavailing..................................................................................................26
24

25                         a.     Dr. Netz Has Demonstrated That Predominantly Common
                                  Proof Will Be Used to Show Impact on Direct Purchasers. ..........26

26                         b.     Dr. Netz Has Demonstrated That Predominantly Common
                                  Proof Will Be Used to Show Pass-Through to Class
27                                Members. .......................................................................................31

28

i

      G.    State Substantive Laws Regarding the Inference Of Impact Support Class
            Certification. ....................................................................................................36

      H.    The Proposed Classes Are Ascertainable Under Rule 23. .....................................37

      I.     The Proposed Plaintiffs Are Adequate And Typical Class Representatives. ........42

IV.     CONCLUSION................................................................................................................44

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

1

# TABLE OF AUTHORITIES

2

**Federal Cases**

3  *Blackie v. Barrack,*
      524 F.2d 891 (9th Cir. 1975) ................................................................................................. 12
4
   *Chamberlan v. Ford Motor Co.,*
5      402 F.3d 952 (9th Cir. 2005) ............................................................................................... 12

6  *Computer Econ., Inc. v. Gartner Grp., Inc.,*
      50 F. Supp. 2d 980 (S.D. Cal. 1999)..................................................................................... 36
7
   *Conwood Co., L.P. v. United States Tobacco Co.,*
8      290 F.3d 768 (6th Cir. 2002) ................................................................................................. 6

9  *Cross v. 21st Century Holding Co.,*
      No. 00 Civ. 4333 (MBM), 2004 WL 307306 (S.D.N.Y. Feb. 18, 2004).................................. 43
10
   *Cruz v. Dollar Tree Stores, Inc.,*
11     Nos. 07-2050 SC, 07-4012 SC, 2009 WL 1458032 (N.D. Cal. May 26, 2009).......................... 11

12 *Daubert v. Merrell Dow Pharms., Inc.,*
      509 U.S. 579 (1993)............................................................................................................. 17
13
   *DG v. Devaughn,*
14     594 F.3d 1188 (10th Cir. 2010) ........................................................................................... 25

15 *Dick v. New York Life Ins. Co.,*
      359 U.S. 437 (1959)............................................................................................................. 36
16
   *Dunnigan v. Metro. Life Ins. Co.,*
17     214 F.R.D. 125 (S.D.N.Y. 2003) .......................................................................................... 41

18 *Ellis v. Costco Wholesale Corp.,*
      657 F.3d 970 (9th Cir. 2011) ............................................................................................... 10
19
   *In re Adobe Systems, Inc.,*
20     139 F.R.D. 150 (N.D. Cal. 1991)........................................................................................... 42

21 *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.,*
      No. Civ. 02-6030 (WHW), 2006 WL 891362 (D.N.J. Apr. 4, 2006)......................................... 6
22
   *In re Cardizem CD Antitrust Litig.,*
23     200 F.R.D. 326 (E.D. Mich. 2001) ....................................................................................... 24

24 *In re Cathode Ray Tube (CRT) Litigation Antitrust Litig.,*
      No. C-07-5944-SC, --- F. Supp. 2d ----, 2012 WL 5987861 (N.D. Cal. Nov. 29, 2012) ........... 12
25
   *In re Chocolate Confectionary Antitrust Litig.,*
26     No. 1:08-MDL-1935, --- F.R.D. ----, 2012 WL 6652501 (M.D. Pa. Dec. 7, 2012) ................. 4, 5

27 *In re Citric Acid Antitrust Litig.,*
      No. 95-1092, C-95-2963 FMS, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996)............................... 24
28

*In re Commercial Tissue Prods.*,
183 F.R.D. 589 (N.D. Fla. 1998) ........................................................................................ 16

*In re Copper Antitrust Litig.*,
196 F.R.D. 348 (W.D. Wis. 2000) ........................................................................................ 42

*In re Flash Memory Antitrust Litig.*,
No. 07–0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ................................................ *passim*

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D 478 (N.D. Cal. 2008) ........................................................................... 2, 21, 22

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) ........................................................................................ 6

*In re Lorazepam & Clorazepate Antitrust Litig.*,
202 F.R.D. 12 (D.D.C. 2001) ........................................................................................ 41

*In re Methionine Antitrust Litig.*,
204 F.R.D. 161 (N.D. Cal. 2001) ........................................................................................ 11

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................................ 16

*In re OSB Antitrust Litig.*,
No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ............................................ 40

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
No. 07-489 (PLF), 2012 WL 2870207 (D.D.C. June 21, 2012) ............................................ *passim*

*In re Rubber Chem. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ........................................................................... 10, 24, 25, 30

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. C 07-01819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ................................ *passim*

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ........................................................................................ *passim*

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
2011-1 Trade Cases ¶77,335, No. 07-md-01819 CW,
2010 WL 5071694 (N.D. Cal. Dec. 7, 2010) ........................................................................ 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010)
*amended in part*, 2011 WL 3268649 (N.D. Cal. July 28, 2011) ............................................ *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2011 WL 4345446 (N.D. Cal. Sept. 15, 2011) ............................................ 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2011 WL 6148677 (N.D. Cal. Dec. 7, 2011) ............................................ 19

iv

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
820 F. Supp. 2d 1055 (N.D. Cal. 2011) .................................................................................... 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827 SI, 2012 WL 253298 (N.D. Cal. Jan. 26, 2012) ................................................ 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
No. M 07-1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ........................................ 17, 35

*In re Vitamins Antitrust Litig.,*
209 F.R.D. 251 (D.D.C. 2002) ........................................................................................... 10, 24

*In re Worlds of Wonder Sec. Litig.,*
No. C 87 5491 SC, 1990 WL 61951 (N.D. Cal. Mar. 23, 1990) ................................................ 11

*Kirkman v. North Carolina R. Co.,*
220 F.R.D. 49 (M.D.N.C. 2004) .............................................................................................. 42

*Kohen v. Pac. Inv. Mgmt. Co.,*
571 F.3d 672 (7th Cir. 2009),
*cert. denied sub nom. Pacific Inv. Mgmt. Co. LLC v. Hershey,* 130 S. Ct. 1504 (2010) ....... 25, 40

*Marcus v. BMW of N. Am., LLC,*
687 F.3d 583 (3d Cir. 2012) .................................................................................................. 41

*Messner v. Northshore Univ. HealthSystem,*
669 F.3d 802 (7th Cir. 2012) ................................................................................................. 11

*Mims v. Stewart Title Guar. Co.,*
590 F.3d 298 (5th Cir. 2009) ................................................................................................. 25

*O'Connor v. Boeing N. Am., Inc.,*
184 F.R.D. 311 (C.D. Cal. 1998) ............................................................................................ 40

*Pacific Inv. Mgmt. Co. LLC v. Hershey,*
130 S. Ct. 1504 (2010) ......................................................................................................... 25

*Peoples v. Wendover Funding, Inc.,*
179 F.R.D. 492 (D. Md. 1998) ............................................................................................... 41

*Ries v. Arizona Beverages USA LLC,*
No. 10-01139 RS, --- F.R.D. ----, 2012 WL 5975247 (N.D. Cal. Nov. 27, 2012) ...................... 40

*Sadler v. Midland Credit Management, Inc.,*
No. 06 C 5045, 2009 WL 901479 (N.D. Ill. Mar. 31, 2009) ...................................................... 41

*Stoffels v. SBC Communications, Inc.,*
238 F.R.D. 446 (W.D. Tex. 2006) ........................................................................................... 41

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,*
546 F.3d 196 (2d Cir. 2008) ................................................................................................... 11

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
209 F.R.D. 159 (C.D. Cal. 2002) ............................................................................................ 24

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)..........................................................................................................10

*Whiteway v. FedEx Kinko's Office and Print Servs., Inc.*,
  No. C 05-2320 SBA, 2006 WL 2642528 (N.D. Cal. Sept. 14, 2006)..........................................38

*Xavier v. Philip Morris USA Inc.*,
  787 F. Supp. 2d 1075 (N.D. Cal. 2011) ...................................................................................41

**State Cases**

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
  191 Cal. App. 3d 1341 (1987) ..........................................................................................36, 37

*Gordon v. Microsoft Corp.*,
  No. MC 00-5994, 2001 WL 366432 (Minn. D. Ct. Mar. 30, 2001) .....................................16, 37

*Gordon v. Microsoft Corp.*,
  No. MC 00-5994, 2003 WL 23105550 (Minn. D. Ct. Dec. 15, 2003) ........................................16

*In re Cipro Cases I and II*,
  121 Cal. App. 4th 402 (2004) ...........................................................................................36, 37

*In re Florida Microsoft Antitrust Litig.*,
  No. 99-27340, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002).......................................16, 37

*Microsoft I-V Cases*,
  2002–2 Trade Cas. (CCH) ¶ 73,013, No. J.C.C.P. 4106,
  2000 WL 35568182 (Cal. Sup. Ct. Aug. 29, 2000) ..................................................................16

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

I.    **INTRODUCTION**

The Indirect-Purchaser Plaintiffs' ("Plaintiffs") opening papers and expert and other declarations easily meet the requirements for class certification in this straightforward horizontal price-fixing case.  Defendants' opposition memorandum ("Opp.") and the expert declaration of Robert D. Willig ("Willig Decl.") exaggerate purported market complexities, misrepresent the work of Plaintiffs' expert, ignore closely analogous cases and otherwise misdirect the Court. Ultimately, Defendants fail to rebut Plaintiffs' showing that class certification is appropriate here.

Notably, Defendants do not dispute that they participated in a global conspiracy to fix prices, limit production and allocate markets and customers for cathode ray tubes ("CRTs").[1] They also do not dispute that the CRT conspiracy is related to the conspiracy to fix prices of liquid crystal display panels ("*LCDs*"), and that many of the Defendants here participated in the *LCDs* conspiracy.  Finally, Defendants do not dispute that defendant and convicted-felon Samsung SDI Co., Ltd. ("Samsung SDI") escaped greater criminal fines by representing to the district judge presiding over the criminal case and to the U.S. Department of Justice ("DOJ") that *this proceeding* is the appropriate forum for compensating victims of the CRT cartel.  Rather, in an effort to sidestep judgment and retain their ill-gotten gains, Defendants trot out predictable arguments regarding the purportedly insurmountably "complex" and "differentiated" CRTs market in an effort to dispute Plaintiffs' showing that conspiracy, impact and damages can and will be addressed through predominantly common proof.

Plaintiffs' expert, Dr. Janet Netz, has presented extensive qualitative analyses of evidence related to Defendants' conspiracy and to the CRT market and distribution channels that indisputably present common evidence and economic opinions that would be presented at trial on behalf of all class members.  Similarly, Dr. Netz's extensive quantitative analyses—including regression analyses examining CRT pricing to direct purchasers and 47 pass-through studies

---

[1] In fact, multiple Defendants were recently fined €1.47 billion by the European Commission ("EC") for their unlawful CRTs cartel that, according to the EC, had a "direct impact on customers in the European Economic Area (EEA), *ultimately harming final consumers*."  Alioto Reply Decl. Ex. 18 (EC Press Release); emphasis added.

1

1  covering every stage in the CRT distribution chain—utilize well-accepted methodologies designed

2  to assess impact and damages through common proof, and that have been repeatedly upheld in this

3  District Court and others throughout the country.  Defendants and their expert attack Dr. Netz's

4  conclusions and opinions by mischaracterizing them as "assumptions," or by quibbling with her

5  chosen data pools or methodological details, but these characterizations and arguments reflect

6  nothing more than an expert critique of Dr. Netz's opinions that go to the weight of the evidence.

7  The question of which expert is right is one for the jury.

8          Defendants also virtually ignore Judge Illston's order granting class certification to the

9  indirect-purchaser plaintiffs in the closely analogous *LCDs* case.  *See In re TFT-LCD (Flat Panel)*

10  *Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010), *amended in part*, 2011 WL 3268649 (N.D. Cal.

11  July 28, 2011) ("*LCDs*").  This is not surprising given that Judge Illston's order considers and

12  rejects the very arguments made by Defendants in a case involving very similar facts. These

13  similarities include:  (1) *LCDs* involves price-fixed components serving the same function in the

14  same finished products that traveled through the same market channels to the same end-

15  purchasers; (2) many of the *LCDs* defendants are Defendants here; and, (3) *LCDs* involved the

16  same expert for Plaintiffs—Dr. Janet Netz—who presented the same or similar methodologies as

17  those presented here and established that proof of impact and damages may be addressed through

18  predominantly common proof.  Thus, while the Defendants may ignore Judge Illston's order, the

19  Court should not.

20          Rather than address the case that is "on all fours" with this case, Defendants rely nearly

21  entirely on *GPUs* and *Flash Memory*,[2] which are easily distinguished from this case (and *LCDs*).

22  First, there were no guilty pleas or ongoing criminal investigations as there are here.  Second, the

23  products involved were customized and found not to be fungible.  Third, elements of the

24  distribution channels were markedly different, such as highly concentrated direct-purchaser

25  markets not present here.  Finally, the indirect-purchaser plaintiffs in those cases presented no

26

27  [2] *In re Flash Memory Antitrust Litig.*, No. 07–0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010);
    *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008).

28

2

1  quantitative analyses supporting impact to direct purchasers, or presented less extensive

2  quantitative proof of pass-through than Dr. Netz presents here.

3        Defendants' arguments regarding ascertainability fare no better.  Ascertainability is

4  satisfied here because the class definition is based on objective criteria, which will allow a

5  determination as to whether a member of the class purchased a product containing one of the

6  Defendants' CRTs.  Although the class need not be ascertained at this stage of the case, it can be

7  done using a variety of simple, objective methods.  These methods include reviewing model

8  numbers on product exteriors, or reviewing manufacturer names or product numbers printed on

9  tubes themselves.  Because these objective methods allow identification of the class members, the

10  class is ascertainable.

11        Finally, Defendants' opposition does not dispute that Plaintiffs have met the Rule 23(a)

12  requirements that the class is numerous, that joinder of all class members is impracticable, or that

13  there are issues of law and fact common to the class.  Nor do they dispute that Plaintiffs have met

14  the Rule 23(b) requirement that this class action is the superior method to vindicate consumers'

15  rights to seek relief for overcharges they paid as a result of Defendants' price-fixing.  As further

16  described herein, Defendants' challenges to the 23(b)(3) predominance requirement, to the 23(a)

17  requirements of typicality and adequacy, and to ascertainability are unavailing, and certification is

18  warranted.

19  **II.    OVERVIEW OF COMMON PROOF OF IMPACT AND DAMAGES**

20        In opposing class certification, Defendants represent that Dr. Netz made innumerable

21  "assumptions" in her work "without any factual support," "without any analysis" or "completely

22  divorced from the record evidence."  *See, e.g.*, Opp. at 4, 21, 22, 24, 28, 31.  These representations

23  are false.  As detailed below, Dr. Netz's opinions and conclusions are based on sound economic

24  judgments that combine a comprehensive review of facts and data from Defendants, third parties,

25  and public reports with widely accepted qualitative and quantitative methods of economic analysis.

26  *See generally* Rebuttal Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect-

27  Purchaser Plaintiffs for Class Certification ("Netz Rebuttal Decl.") §IV (summarizing testimony

28

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

1   and bases therefor); *see also* Netz Motion to Strike Response Declaration ("Netz MTS Decl.") §II

2   (reviewing and refuting the mischaracterizations made in Defendants' motion to strike).

3        **A.    Predominant Common Proof of Impact and Damages To Direct Purchasers.**

4        Dr. Netz first performed a qualitative analysis of the economic characteristics of the CRT

5   industry and the CRT cartel in order to determine whether "those economic characteristics support

6   the ability of the cartel to increase prices above competitive levels." Declaration of Janet S. Netz,

7   Ph.D., in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification ("Netz Decl.")

8   at 5. Dr. Netz examined the "lack of an alternative source of supply of CRT[s] . . .; the existence

9   of barriers to entry; and regular meetings and interactions that allowed the Defendants to exchange

10  information, come to agreements, and monitor cheating." Netz Decl. at 5, 6-32. It is well

11  accepted that economists rely upon the conceptual and foundational bases for Dr. Netz's

12  qualitative analyses of the CRTs market when assessing whether features of a particular industry

13  create an environment that is conducive to price-fixing. *See, e.g., In re Chocolate Confectionary*

14  *Antitrust Litig.*, No. 1:08-MDL-1935, --- F.R.D. ----, 2012 WL 6652501, at *17 (M.D. Pa. Dec. 7,

15  2012) (holding that expert economist's analysis of the chocolate confectionary market, including

16  market concentration, product interchangeability, inelastic demand, high barriers to entry and

17  opportunities to collude was common evidence that supported 23(b)(3) predominance).

18       Dr. Netz next analyzed whether the CRT "cartel was successful at raising CRT prices

19  above the competitive level." Netz Decl. at 33. To evaluate this issue, Dr. Netz performed both

20  qualitative and quantitative analyses. For example, she analyzed whether—and showed that—

21  Defendants possessed sufficient market power to raise prices; that the cartel set prices above the

22  competitive level and that prices paid by direct purchasers were about equal to the cartel's target

23  prices; that the cartel followed operating practices known to have brought success to other cartels;

24  and, that cartel members expressed their views, in the normal course of business, that the cartel

25  had raised prices. *See* Netz Decl. at 33, 34-65. Importantly, all of this evidence would be

26  presented on behalf of each class member if his or her claim were tried separately to a jury. It is

27  indisputably common evidence supporting proof of impact and damages.

28

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1     Dr. Netz also assessed whether impact to direct purchasers could be addressed using proof

2   that is common to all class members.  She determined that it could, and "███████████████

3   ███████████████████████████████." Netz Decl. at 65.  In reaching the latter conclusions, Dr.

4   Netz first analyzed economic theory which posits that all CRT prices must be raised for a cartel to

5   be effective or, for example, purchasers will substitute away from price-fixed CRTs towards those

6   that are not.  *Id*. at 65-66.  Dr. Netz also examined ████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████. *Id*. at 66-68.

9     Dr. Netz properly relied on economic theory as applied to the CRT product and market

10   facts in rendering her opinions on impact to the class.[3]  Indeed, Dr. Willig does not dispute the

11   economic theories regarding cartel behavior and practices Dr. Netz describes, and does not

12   challenge her application of the facts of this case to the theories posited.  Rather, he sets out his

13   own economic theories, applies those theories to his version of the facts, and opines that "██████

14   ████████████████████████████████████████████████████████." Willig

15   Decl. at 35 (emphasis added).  This equivocal opinion that the CRT cartel *possibly* was ineffective

16   at raising prices clearly fails to rebut Dr. Netz's unequivocal opinions here.  *See* Netz Decl. at 33

17   ("███████████████████████████████████████████████"); *see also id.*

18   §VIII.A (██████████████████████████████████████████████████████████

19   ██████████████████████).

20     Dr. Netz then performed quantitative analyses, conducting two hedonic regression analyses

21   of *target prices*, one for CPTs and one for CDTs.  ████████████████████████████████████

22   _____

23   [3] *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, --- F.R.D. ----, 2012 WL 2870207, at *64,
     *66 (D.D.C. June 21, 2012) (holding that expert economist's application of economic theory to

24   freight industry characteristics (similar to those relied on here by Dr. Netz) "provide[d] strong
     support for plaintiffs' contention that [impact] is capable of proof at trial with evidence common to

25   the class"); *see also Chocolate Confectionary*, 2012 WL 6652501 at *6, *17 (holding that expert
     economist's application of economic theory to chocolate product and market characteristics

26   supported (b)(3) predominance on the issue of direct purchaser impact and overcharge); *In re
     Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613 (N.D. Cal. 2009)

27   (holding that expert economist's application of economic theory to SRAM product and market
     characteristics supported (b)(3) predominance on the issue of indirect purchaser impact and pass-

28   through of overcharge).

1 ███████████████████████████████████████████████████████

2 █████████████████████████████." Netz Decl. at 69; *see also* Netz Rebuttal Decl. Exs.

3 RR-19, RR-20.  Dr. Netz then performed similar hedonic regression analyses using Defendants'

4 *actual, transactional sales prices* (not those targeted in cartel discussions).  Based on the above

5 analyses, Dr. Netz concluded as follows regarding impact to direct purchasers:

6

7

8

9

10

11

12

13

14

15     The regression analysis methodology employed by Dr. Netz has long been accepted by

16 courts as a valid scientific method for estimating overcharges in price-fixing cases.  Courts

17 routinely recognize that econometrics is useful and reliable for assessing impact and damages to

18 class members.[4]

19         **B.**    **Predominantly Common Proof of Impact and Damages To Indirect End-Purchaser Class Members.**

20

21     Having addressed common impact to direct purchasers, Dr. Netz then analyzed whether

22 pass-through to class members down the chain of distribution could be addressed through common

23 proof.  She concluded not only that common proof could be used to address the issue (which is all

24 _____

25 [4] *See, e.g., In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. Civ. 02-6030 (WHW), 2006 WL 891362, at *15 (D.N.J. Apr. 4, 2006) (recognizing multiple regression analysis as "widely

26 accepted" and "recognized by the Third Circuit as a means of proving impact and estimating damages.") (*citing In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-54 (3d Cir. 2002));

27 *Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (rejecting a Daubert challenge to the plaintiff's antitrust expert, noting that regression analysis is a "generally

28 accepted method[] for proving antitrust damages.").

1   that is required of her at this stage), but also that qualitative and quantitative economic analyses

2   showed that pass-through did in fact occur.  *See* Netz Decl. at 72-83, 97-107.

3          In her qualitative analyses, Dr. Netz first reviewed the economic theory of pass-through as

4   applied to highly competitive markets, which recognizes that the more competitive the distribution

5   channels are in an industry, the closer the pass-through rate is to 100% in those channels.  Netz

6   Decl. at 72-77 (citing extensive supporting economic publications and studies).  Dr. Netz next

7   assessed the competitiveness of the channels of distribution here, reviewing the large number of

8   firms involved in the production and distribution of CRT products, the low profit rates of firms in

9   that channel, trade press reports regarding the high degree of competition, and Defendants' own

10  documents describing intense competition in the downstream distribution channel.  Netz Decl. at

11  77-78, Exs. 25-28.  Neither Defendants nor Dr. Willig disputed the highly competitive nature of

12  the CRT distribution channel nor Dr. Netz's application of those facts to economic theory to

13  support pass-through.

14         Dr. Netz also presented documentary evidence showing that ███████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  █████████████████████████████████████████████████████████████

18  ████████████████████████████████████.  Netz Decl. at 78-80.  Based on her review of

19  the well-accepted economic principles and evidence—all of which is common to and would be

20  presented on behalf of all class members—Dr. Netz concluded that at least some portion of the

21  cartel overcharge was passed through to class members, and that class members were harmed by

22  the cartel.  Netz Decl. at 83.  Defendants and their expert ignore this evidence, which supports a

23  finding that common issues predominate here.  *See SRAM*, 264 F.R.D. at 613 (highly competitive

24  SRAM market and other market facts, as applied to economic theories related to pass-through,

25  supported class-wide proof of impact to indirect-purchaser class members).

26         Dr. Netz bolstered her opinions regarding pass-through to class members with extensive

27  econometric and formulaic analyses of pass-through.  Netz Decl. at 97-107.  ██████████████

28

7

1

2

3

4

5

6

7

8

9

10

11      Dr. Netz cites numerous peer-reviewed economic publications and studies supporting the

12  propriety of her pass-through methodologies (*id.* at 98 nn.303-304; *id.* at 102 n.314).  Defendants

13  do not question her cited academic support.  Both of these methodologies use the same data for the

14  top of the channel (*i.e.*, CRT prices), but the top-and-bottom method uses retail or "street" prices

15  for products being sold to end-users as the downstream price, and the top-to-bottom approach

16  incorporates data from intermediate resellers to trace specific products through the entire

17  distribution chain from the CRT manufacturer to the end customer.  Netz Decl. at 102.  As

18  discussed below, both of these methods were reviewed and approved by the court in the *LCDs*

19  litigation.  *See* §III.B.2-B.3, *infra.*

20      In addition to the above studies covering the full-length of the CRT distribution channel,

21  Dr. Netz also performed studies that calculated pass-through for a single level in the distribution

22  channel, estimating a single pass-through rate for each level in the distribution channel.  Dr. Netz

23  performed these studies for multiple entities in each of the intermediate levels of the CRT

24  distribution channel, including tube distributors, CRT product makers, CRT product distributors

25  and CRT product resellers.[5]

26  _____

27  [5]

28

1    All told, ████████████████████████████████████████

2    █████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████████

4    ██████████████████████████████████████    *See* Netz Decl. at 104,

5    Exs. 34, 36, 40-43; Netz Rebuttal Decl. §XI.A.2, Ex. RR-34.

6         Based on all of the above documentary evidence and econometric studies, Dr. Netz

7    concluded that any overcharges were passed through to consumers at a common rate of at least

8    100%; that the results verified that the pass-through rate can be quantified by common evidence;

9    and that "█████████████████████████████████████████████

10   █████████████████████████████████████." Netz Decl. at 104; *see*

11   *also* Netz Rebuttal Decl. §X.A.2.

12        In light of the foregoing, it is highly misleading for Defendants to assert that Dr. Netz

13   "assumes that all manufacturers, wholesalers and retailers of CRT finished products passed on

14   100% or more of the alleged cartel price increases based on a tiny sliver of incomplete data" (Opp.

15   at 24); or that her pass-through analysis "is completely divorced from the record" (Opp. at 21).

16   ████████████████████████████████████████████████████

17   ████████████ hardly a "tiny sliver" that is "divorced from the record."  Defendants' expert

18   quibbles with Dr. Netz's methodologies and claims that his methods are better, but he never

19   questions the academic support for her methods or provides peer-reviewed academic support for

20   his methods; he merely attempts to substitute his judgment for hers.  This debate is not for the

21   Court to decide now; it is for the jury at trial.

22

23

24

25   ─────────────────

26   ████████████████████████████████████████████████

27   ████████████████████████████████████████████████

28   ██████

1   **III.   ARGUMENT**

2        **A.   The Applicable Legal Standard.**

3        Plaintiffs' supporting memorandum established that "antitrust class actions play an

4   important role in enforcement of the antitrust laws;" that any doubts should be resolved "in favor

5   of certifying the class;" that a "rigorous" review does not necessarily require "a lengthy

6   explanation or in-depth review of the record;" and that "Rule 23 authorizes a limited inquiry into

7   the merits only for the purpose of determining if certification is proper." *See* Memo. at 13-14

8   (citing cases). Defendants respond that the so-called "rigorous analysis" requirement precludes

9   this Court from resolving any doubts in favor of certification, and posit standards and arguments

10  that instead seek to advance a decision on the merits of Plaintiffs' claims. Opp. at 18-19.

11  Defendants' arguments miss the mark.

12       First, it is well-settled that "[b]ecause of the important role that class actions play in the

13  private enforcement of antitrust actions, courts resolve doubts in favor of certifying the class." *In*

14  *re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 258 (D.D.C. 2002); *see also* Memo. at 13 n.19 (citing

15  cases). Defendants cite no authority contravening this rule.[6] "'[P]rice-fixing cases are appropriate

16  for class certification because a class-action lawsuit is the most fair and efficient means of

17  enforcing the law where antitrust violations have been continuous, widespread, and detrimental to

18  as yet unidentified consumers.'" *LCDs*, 267 F.R.D. at 592 (*quoting In re Rubber Chem. Antitrust*

19  *Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)). Having acknowledged that these civil proceedings

20  are the appropriate forum for compensating purchasers of price-fixed CRTs, Samsung SDI (and its

21  co-conspirator Defendants) cannot credibly dispute the importance of *this class action* to the

22  enforcement of the antitrust laws it admits violating.

23       Second, any "rigorous" analysis standard is tempered by the fact that this case involves a

24  price-fixing conspiracy, the existence of which is not disputed, and by the fact that the Court need

25  _____

26  [6] Defendants' citations to *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) and *Ellis v.*
    *Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) are misplaced. Neither case addressed

27  policies related to class certification in antitrust cases; they were employment matters that did not
    involve admitted price-fixers. Also, both cases analyzed the commonality requirement under Rule

28  23(a), which is not at issue here.

1   only "form a 'reasonable judgment' on each certification requirement" based on the complaint

2   allegations and parties' evidentiary submissions. *See In re Methionine Antitrust Litig.*, 204 F.R.D.

3   161, 163 (N.D. Cal. 2001). Although the Court must resolve factual disputes necessary to class

4   certification, it "should not turn the class certification proceedings into a dress rehearsal for the

5   trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

6   Moreover, Plaintiffs need not make a showing of predominance to a degree of absolute certainty.

7   It is sufficient if each disputed requirement has been proven by a preponderance of evidence.

8   *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir.

9   2008).

10      Finally, Defendants' opposition focuses almost exclusively on the question of

11   predominance under Rule 23(b)(3). More specifically, Defendants argue that Plaintiffs cannot

12   show impact and damages using predominantly common proof. But the predominance

13   requirement is satisfied when "common questions present a significant aspect of the case and . . .

14   can be resolved for all members of the class in a single adjudication." *Cruz v. Dollar Tree Stores,*

15   *Inc.*, Nos. 07-2050 SC, 07-4012 SC, 2009 WL 1458032, at *7 (N.D. Cal. May 26, 2009). "The

16   mere presence of potential individual issues does not defeat the predominance of common

17   questions." *In re Worlds of Wonder Sec. Litig.*, No. C 87 5491 SC, 1990 WL 61951, at *3 (N.D.

18   Cal. Mar. 23, 1990) (quotations omitted); *see also Messner*, 669 F.3d at 815 ("[t]he text of Rule

19   23(b)(3) itself contemplates that such individual questions will be present"). In sum, the mere

20   presence of some individual questions does not preclude certification.

21      **B.      The *LCDs* Case Provides a Blueprint for Certification Here.**

22      Plaintiffs' supporting memorandum relied on Judge Illston's class certification decision in

23   *LCDs* to support class certification here. *See* Memo. at 1, 14, 21, 27. Defendants essentially

24   ignore that decision.[7] But there is no more analogous case for this Court to look to in assessing the

25

26   [7] Defendants discuss *LCDs* only in footnote 46 of their opposition, asserting that Judge Illston
     "deferred consideration of the validity of Dr. Netz's analysis until trial." This is false. The court
27   in *LCDs* acknowledged that "[s]ufficient information must be provided to form a reasonable and
     informed judgment on each of the requirements of Rule 23" and that its analysis should be "as
28   rigorous as necessary to determine whether class certification is appropriate." 267 F.R.D. at 591

                                              11

1  propriety of class certification here, and Defendants' unwillingness (or inability) to address it
2  speaks volumes.

3            **1.     This Case Is Factually Similar To *LCDs*.**

4         Like this case, *LCDs* involved price-fixed components (*i.e.*, LCD panels) serving the same
5  function as CRTs (*i.e.*, display) in the same finished products (*i.e.*, computer monitors and
6  televisions), that traveled through the same distribution channels as did CRTs to the same or
7  similar end-consumers (*i.e.*, businesses and consumers). *See* 267 F.R.D. at 587-89.  Additionally,
8  LCD panels and CRTs are both a significant cost of the finished products in which there are/were
9  used.  *Compare id.* at 588 (LCD panel cost is 33%-80% of monitor or television finished product
10  cost) and Memo. at 4 (██████████████████████████).

11         Many of the defendants in *LCDs* are Defendants here or are related to a Defendant (*e.g.*,
12  ███████████████████).  *See* Memo. at 9 n.16.  Both cases involve one or
13  more defendants that pled guilty to violating U.S. antitrust laws.  *Id.* at 9.  Many of the same
14  personnel at each Defendant were involved in both the LCD conspiracy and the CRT conspiracy.
15  *Id.* at 9-10.  The conspiratorial methods used by Defendants in both conspiracies are strikingly
16  similar.  *Compare id.* at 10 (██████████████████████████
17  ███████████████████) *with LCDs*, 267 F.R.D. at 588 (describing "Crystal
18  Meetings" at which defendants agreed to, *inter alia*, "target prices, floor prices, and price ranges
19  for TFT-LCD panels and products").

20         In sum, these cases are factually "on all fours," making *LCDs* a virtual blueprint for class
21  certification here.  Indeed, Judge Conti has expressly recognized that this case and *LCDs* are
22  "closely related."  *In re Cathode Ray Tube (CRT) Litigation Antitrust Litig.*, No. C-07-5944-SC, --
23  - F. Supp. 2d ----, 2012 WL 5987861, at *2 (N.D. Cal. Nov. 29, 2012).

24

25

26  (*citing Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) and *Blackie v. Barrack*,
   524 F.2d 891, 901 n.17 (9th Cir. 1975)).  As detailed below, Judge Illston engaged in a rigorous
27  analysis of Dr. Netz's opinions and methodologies and upheld them at class certification, on a
   subsequent motion for decertification, and on a *Daubert* motion in advance of trial.
28

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1

2

**2.    Dr. Netz's Opinions in *LCDs* and Defendants' Challenges Thereto Are Extremely Similar To Those Presented Here.**

3    These cases are extremely similar in terms of the expert opinions presented by the indirect-

4    purchaser plaintiffs and arguments raised by the defendants and their expert in opposition to class

5    certification.  In *LCDs*, as in this case, Plaintiffs submitted the opinions of Dr. Janet Netz, who

6    opined that proof of impact and damages may be addressed through predominantly common proof.

7    In *LCDs*, Dr. Netz first opined that, based upon her review of the market structure and defendants'

8    conduct, the cartel was successful in increasing prices.  Her opinion was premised on a review of

9    the structure and characteristics of the LCD panel market, namely, lack of alternative sources of

10    supply, barriers to entry, regular meetings and interactions among defendants facilitating

11    information exchange, agreements and policing, and difficulty in cheating due to Most-Favored

12    Customer clauses.  *See LCDs*, 267 F.R.D. at 601.  As detailed above, Dr. Netz engaged in the same

13    qualitative analysis here.  *See* p. 4, *supra*.

14    In *LCDs*, Dr. Netz "used regression analysis to examine the determinants of panel prices,

15    and found that 77% of price variation is determined by five variables that describe the panel

16    characteristics (panel size, resolution, volume, application, and time-period)."  267 F.R.D. at 601.

17    Here, Dr. Netz did the same analysis, and found that over 71% and 89% of price variation of CDT

18    and CPT prices, respectively, is determined by several tube characteristics (tube size, finish, aspect

19    ratio and time period).  Netz Decl. at 70-71.  In both *LCDs* and here, Dr. Netz concluded, based on

20    these and other analyses, that common product characteristics explain a majority of variation in

21    prices, that proof of harm to direct purchasers does not require individual inquiry, and that these

22    common influences on price are susceptible to being estimated using a formula.  *Compare* 267

23    F.R.D. at 601 *with* Netz Decl. at 71.

24    In *LCDs*, Dr. Netz proposed three types of regression models to establish that antitrust

25    impact to direct purchasers can be shown on a class-wide basis using common proof:  the before-

26    and-after approach, the structural model of supply approach, and the conjectural variations

27    approach.  267 F.R.D. at 602.  Here, Dr. Netz proposed similar regression models to address

28

1   whether impact to direct purchasers can be shown on a class-wide basis, including "a before and

2   after method" (*id.* at 85 n.264, 85-90), a "benchmark comparisons method" (*id.* at 90-92), a

3   "merger simulation" model (*id.* at 92-96), and a "market power method" (*id.* at 96-97). Like here,

4   Dr. Netz did not perform a "but for" calculation of the overcharge to direct purchasers of LCD

5   panels. *See LCDs*, 267 F.R.D. at 602 (noting that Dr. Netz "describes" the methods).

6       On the issue of pass-through, in *LCDs* Dr. Netz first analyzed the economic theory of pass-

7   through, and opined that because the distribution levels for monitors, notebooks and TVs are

8   highly competitive, the closer the pass-through rate at each level will be to 100 percent. 267

9   F.R.D. at 601-02. Here, the distribution channels are virtually identical and, not surprisingly, Dr.

10  Netz engaged in the same analysis and reached the same conclusion. *See* p. 7, *supra*; Netz Decl. at

11  77-78.

12      In *LCDs*, Dr. Netz proposed two different regression approaches to measuring pass-through

13  over the entire distribution channel: the "top and bottom" approach and the "top to bottom"

14  approach. 267 F.R.D. at 602. As detailed above, Dr. Netz proposes the same methodologies here.

15  *See* p. 8, *supra*; *see also* Netz Decl. at 102-104.

16      In *LCDs*, Dr. Netz conducted 53 pass-through studies: 5 complete pass-through studies

17  that measure pass-through from defendants down the distribution channels to the end user, and 48

18  partial pass-through studies that measure pass-through in different segments of the distribution

19  channel. She also ran separate regression analyses for each of the three LCD products at issue,

20  which took into account panel size, panel manufacturer and resolution, when that data was

21  available. To conduct these analyses, Dr. Netz used transaction data produced by some

22  defendants, as well as data from a third-party market research firm. *See LCDs*, 267 F.R.D. at 603.

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28

1   ████████████████████████████████████████.  *Id.* at 99.  In sum, Dr. Netz closely

2   followed the pass-through methodologies and proof the court found acceptable in *LCDs*.

3          The *LCDs* defendants argued that plaintiffs could not show class-wide impact due to

4   "complex distribution channels, wide variations in purchasers' market power and negotiation

5   abilities, changes in the TFT-LCD market over time, variation in panel specifications, and the

6   value added to TFT-LCD products as they move through the supply chain." 267 F.R.D. at 597-98.

7   The *LCDs* defendants' expert also contended "that the complexity and heterogeneity of the TFT-

8   LCD market makes common proof of impact impossible" due to "industry growth during the class

9   period, the customized nature of some TFT-LCD panels, the significant competition with non-

10  LCD technologies in particular applications, and the recent history of major entry and substantial

11  shifts in shares among manufacturers." *Id.* at 603.  The *LCDs* defendants' expert further asserted

12  that:

13          "[P]ass-through decisions differ by customer, model, stage of
             distribution, and over time, and he emphasizes that '[t]he
14          distribution chains that move LCD panels from the defendant
             manufacturers to products that are purchased by individual end
15          users are extraordinarily complex and varied.  While some simple
             distribution chains may involve only one pass-on decision, more
16          complex chains … may involve six pass-on decisions by
             intermediaries." *Id.*

17

18         These market and product "complexity" arguments are virtually identical to those raised by

19  Defendants here.  *See* Opp. at 5-9, 12-18.

20              **3.      The *LCDs* Court Approved Dr. Netz's Methodologies and Opinions.**

21         In deciding class certification in *LCDs*, Judge Illston meticulously analyzed the defendants'

22  assertions and rejected the argument that purported market and product complexities prevented

23  plaintiffs and Dr. Netz from addressing impact and damages with predominantly common proof.

24  *See* 267 F.R.D. at 603-06.  On pass-through, the *LCDs* court concluded that "plaintiffs have put

25  forth a feasible methodology to show that the channel-length pass-through rate can be measured,

26  regardless of the path or the number of steps the panel went through from defendants to class

27  members." *Id.* at 604.  In so doing, the court cited multiple cases that "have held that variations in

28
                                            15

1  products and complexities in a distribution chain do not preclude an estimation of whether an

2  overcharge impacted end purchasers."[8]  The *LCDs* court also distinguished key cases cited by

3  Defendants here, including *GPUs*:

4              In that case, "[h]undreds if not thousands of GPU products were
            sold during the limitations period [and] each graphics product
5            varied not only as to performance level but also as to its ultimate
            application.  Many of the graphics products sold were particularly
6            customized to the needs of a specific purchaser, meaning they
            could not be interchanged with any other GPU product sold by
7            defendants....  In short, these products were not fungible
            commodities." ...  Here, plaintiffs have submitted considerable
8            evidence—disputed by defendants—that TFT–LCD panels are
            fungible, interchangeable, and largely homogenous.  The *GPU*
9            court also distinguished the *Microsoft* cases, noting that while in
            *Microsoft*, the prior government litigation against Microsoft
10           consisted "extrinsic evidence of harm," in *GPU* the DOJ had ended
            its criminal investigation without returning any indictments. . . . .
11           Here, seven defendants have pled guilty to Sherman Act violations,
            there is an amnesty applicant, and the DOJ's investigation is
12           ongoing.  (*id.* at 605; citations omitted.)

13  The *LCDs* court also rejected defendants' criticism of Dr. Netz's use of averaged price data,

14  reasoning that defendants' expert used averaged data in his analysis, and that "a number of courts

15  have held that averaged and aggregated data may be used to demonstrate pass-through."[9]

16       Defendants here claim that market complexities make it impossible to address impact on a

17  class-wide basis, criticize Dr. Netz's use of averages in her econometric analyses, and argue that

18  *GPUs* precludes certification.  *See, e.g.*, Opp. at 1-4.  All of these arguments were raised by

19  _____

20  [8] *Id.* at 603 (*citing SRAM*, 264 F.R.D. at 605-06, 614 (certifying IP classes in a case involving a
    similarly complex distribution chain and arguments by defendants that the distribution chain was
21  too complex to discern evidence of pass-through)); s*ee also Microsoft I-V Cases*, 2002–2 Trade
    Cas. (CCH) ¶ 73,013 at 88,561, No. J.C.C.P. 4106, 2000 WL 35568182 (Cal. Sup. Ct. Aug. 29,
22  2000); *In re Florida Microsoft Antitrust Litig.*, No. 99–27340, 2002 WL 31423620, at *13-15 (Fla.
    Cir. Ct. Aug. 26, 2002); *Gordon v. Microsoft Corp.*, No. MC 00–5994, 2001 WL 366432, at *12
23  (Minn. D. Ct. Mar. 30, 2001).

    [9] *Id.* (*citing Gordon*, No. MC 00-5994, 2003 WL 23105550, at *3 (Minn. D. Ct. Dec. 15, 2003);
24  *SRAM*, 264 F.R.D. at 614 (rejecting the defendants' criticism that the indirect-purchaser plaintiffs'
    use of average and aggregated data in their structural model could yield "false-positive pass-
25  through"); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996);
    *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998) ("[E]ven if there is
26  considerable individual variety in pricing because of individual price negotiations, class plaintiffs
    may succeed in proving classwide impact by showing that the minimum baseline for beginning
27  negotiations, or the range of prices which resulted from negotiation, was artificially raised (or
    slowed in its descent) by the collusive actions of the defendants.")).

28                    16

1  defendants and rejected by the court in *LCDs*. Given the overwhelming similarities between this

2  case and *LCDs*, this Court should do the same.

3          **4.    The *LCDs* Court Evaluated and Rejected Defendants' Arguments**
                   **Again on a Motion to Decertify the Classes.**

4

5       Nearly two years after the court certified the IP classes in *LCDs*, defendants moved to

6  decertify the classes, arguing that Dr. Netz's economic model "fails to show classwide impact"

7  because it "establishes that some plaintiffs were not subjected to any overcharge during the class

8  period." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07–1827 SI, MDL No. 1827, 2012

9  WL 253298, at \*4 (N.D. Cal. Jan. 26, 2012) ("*LCDs II*"). The court rejected this argument,

10 reasoning that defendants' challenge goes not to the reasonableness of Dr. Netz's methodology for

11 proving classwide impact, but to its application, and is not a proper basis for challenging class

12 certification. *Id.* at \*4-5.

13         **5.    The *LCDs* Court Also Rejected Defendants' Argument That Plaintiffs**
                   **Must Trace The Overcharge on Each CRT Through the Distribution**
                   **Chain To the Ultimate Purchaser.**

14

15      Defendants' assertion that *GPUs* and *Flash Memory* require Plaintiffs to meticulously trace

16 Defendants' price-fixing overcharge on a product-by-product basis through each level of the chain

17 of distribution and establish the overcharge to each end consumer (Opp. at 1, 26-27) is wrong.

18 Neither antitrust law nor well-accepted economic methodologies require such a showing. Indeed,

19 this argument was raised by defendants and rejected by the court in the *LCDs* litigation just prior

20 to trial. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090 (N.D. Cal. Feb. 21,

21 2012) ("*LCDs III*") (denying motion to exclude Dr. Netz's opinions under *Daubert v. Merrell Dow*

22 *Pharms., Inc.*, 509 U.S. 579 (1993)).

23      The *LCDs III* court expressly rejected defendants' argument that "plaintiffs must identify

24 the overcharge that was placed on every LCD panel sold during the conspiracy period and trace

25 that overcharge through the manufacturing and retail distribution chains until plaintiffs can identify

26 the overcharge paid by a particular class member for a particular LCD product." 2012 WL

27 555090, at \*3. Rather, the court held that "plaintiffs need not be able to articulate the precise

28

1   degree to which every individual class member was injured; it suffices to show that it was more

2   likely than not that classwide impact occurred." *Id.*  The court reasoned that impact, like the other

3   elements of plaintiffs' claims, need only be "established by a preponderance of the evidence"; that

4   the Ninth Circuit recognizes that "antitrust plaintiffs benefit from an especially lenient burden

5   when it comes to proof of impact"; and that, because the LCD panels were fungible, "plaintiffs

6   may resort to generalized methods of proof." *Id.* at *3-4.

7        In sum, the *LCDs III* court concluded that "Plaintiffs need not identify the overcharge on

8   each and every panel sold to direct purchasers, and they need not trace that specific overcharge

9   through the manufacturing and retail chains to the ultimate purchaser.  The fact that plaintiffs lack

10   perfect proof does not mean that plaintiffs lack any proof at all." *Id.* at *4.

11        Relying on Judge Armstrong's opinion in *Flash Memory*, the *LCDs III* defendants also

12   contended that there are thousands of different products that contain LCD panels, that many of

13   these products contain thousands of different configurations, and that it is therefore impossible to

14   determine the effect an increase in panel prices had upon the price of a finished product.  *Id.*  The

15   court in *LCDs III* rejected this argument, reasoning that

16        Plaintiffs need not reconstruct each LCD product sold to a class
     member and determine the price of its constituent parts to establish

17        that the class member paid an overcharge attributable to the
     conspiracy.  Rather, . . . plaintiffs . . . may establish pass-through

18        by showing that companies in the manufacturing and distribution
     chains passed along cost increases in general.  Dr. Netz's report

19        does exactly that.  Plaintiffs' proof need not rise to the level of
     establishing how every intermediary treated every LCD panel or

20        product. (*id.* at *9.)

21        Given the highly analogous facts here, there is no reason for this Court to depart from the

22   *LCDs III* court's analysis and conclusion.

23        Moreover, neither Defendants nor their expert cite a single economic publication, study or

24   other academic source articulating a requirement that pass-through of an overcharge must be

25   meticulously traced to an end consumer in this fashion.  *See, e.g.*, Willig Decl. at 51-67 (criticizing

26   Dr. Netz's "top and bottom" and "top to bottom" methodologies, but citing no economic

27   publications or studies supporting his critiques).  Dr. Netz, in contrast, cites multiple economic

28   

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1  publications and studies supporting her pass-through methodologies. *See* Netz Decl. at 98-99

2  nn.303-304, 102, n.314. In sum, Defendants seek to impose a standard on Plaintiffs that is not

3  applied by economists and econometricians who examine price effects and pass-through in non-

4  litigation contexts. As such, it is improper and unwarranted to apply it here.

5      Thus, the analyses and methodologies used by Dr. Netz in *LCDs* to show that impact and

6  damages may be addressed through predominantly common proof—which are essentially the same

7  analyses and methods she posits here—were challenged, vetted and upheld on multiple occasions

8  in the *LCDs* court.[10] Defendants' efforts to challenge her opinions here should fare no better.

9      **C.**     **The *SRAM* Decision Also Supports Class Certification Here.**

10      Another decision from this district, *In re Static Random Access Memory (SRAM) Antitrust*

11  *Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009) (which Defendants also ignore) also supports class

12  certification here. In *SRAM*, now-Chief Judge Claudia Wilken certified 27 state classes of indirect

13  purchasers of Static Random Access Memory or "SRAM," a small memory chip used in a vast

14  array of electronics products. 264 F.R.D. at 605-06, 617-22. The market and product

15  characteristics of the SRAM market were significantly more complex than those the Defendants

16  claim preclude certification here. As such, certification in *SRAM* strongly supports certification

17  here.

18      For example, in support of their argument that the CRT market is complex, Defendants

19  point to the fact that there are two different types of CRT products—CPTs and CDTs. *SRAM*

20  involved three distinct SRAM products, each with unique technical standards and functions.[11] The

21

22  _____

23  [10] The *LCDs* court also upheld Dr. Netz's methodologies and opinions in connection with decisions on multiple substantive issues. *See LCDs*, 2011 WL 4345446, at *4 (N.D. Cal. Sept. 15, 2011) (denying defendants' summary judgment motion based, in part, on Dr. Netz's methodology

24  for calculating damages); *LCDs*, 820 F. Supp. 2d 1055, 1061 (N.D. Cal. 2011) (denying summary judgment motion on grounds that Dr. Netz's pricing study created a triable issue of fact regarding

25  LG's purported conspiracy withdrawal); *LCDs*, 2011 WL 6148677, at *1 (N.D. Cal. Dec. 7, 2011) (denying summary judgment vis-à-vis 14 states, finding that Dr. Netz's testimony supported

26  plaintiffs' antitrust standing).

27  [11] Class members purchased "(1) asynchronous SRAM . . ., which is used in mobile phones and other hand-held devices that contain a central processor, (2) synchronous SRAM . . ., which is

28  generally found in computers and networking equipment and (3) pseudo SRAM (PSRAM), which

19

*SRAM* court upheld certification even though "the number of SRAM products at issue is multitudinous," and notwithstanding the fact that, "even when categorized according to similar characteristics, there are *228 [SRAM] product groups*." *SRAM*, 2011-1 Trade Cases ¶77,335, No. 07-md-01819 CW, 2010 WL 5071694, at *5 (N.D. Cal. Dec. 7, 2010) (upholding expert opinion regarding overcharge to direct purchasers and denying decertification motion) (emphasis and bracketed language added).

Additionally, while CRTs are used in two categories of finished products (monitors and televisions), the SRAM products at issue were used in 15 different categories of finished products.[12] As such, the certified classes in *SRAM* covered a vastly broader array of end products with a necessarily more complex distribution chain. Nevertheless, the court in *SRAM* found that "these complexities do not preclude an estimation of whether an . . . overcharge impacted end purchasers of SRAM-containing products." *SRAM*, 264 F.R.D. at 614. The same is true here.

Indeed, class certification is even more compelling here because in *SRAM*, the defendants possessed a far smaller SRAM market share (60-70 percent) (*see* 264 F.R.D. at 605) than the 90 percent share defendants and their co-conspirators possess here; and, the SRAM percentage of the total cost of the finished products in which it was used was very small compared to that of CRTs (50-70%). *See SRAM*, 264 F.R.D at 614 (rejecting defendants' argument that certification should be denied "because SRAM is a relatively small portion of the price of an overall product"). In addition, Defendants here acknowledge that manufacturers and resellers of CRT finished products pass through cost changes throughout the distribution channel. *See* Memo. at 13. No such evidence was presented in *SRAM* (*see* 264 F.R.D. 603-22). Finally, in *SRAM*, the DOJ discontinued its price-fixing investigation in advance of the court's addressing class certification;

---

is found in smart phones and other devices that require low power consumption and fast memory." 264 F.R.D. at 606.

[12] These included cell phones, Voice Over Internet Protocol (VOIP) technology, servers, mainframes, high-end computer workstations, personal digital assistants (PDAs), smart phones, routers, switches, proxy and gateway devices, modems, storage area networks and firewalls. *SRAM*, 264 F.R.D. at 606.

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1 │ here, there are indictments, significant fines and a guilty plea (*see* Memo. at 5-8).  In sum, there

2 │ are even more compelling reasons to certify here than there were in *SRAM.*

3 │        **D.**    *GPUs* **and** *Flash* **Are Distinguishable.**

4 │       Defendants rely heavily on *GPUs* and *Flash* to argue that Dr. Netz's methods here have

5 │ been rejected by "this Court," that econometricians evaluating antitrust impact should not be

6 │ permitted to use aggregated or average data, and that proof of pass-through requires a meticulous

7 │ tracing of the each overcharge on each product through all levels of the distribution channel.  None

8 │ of these arguments have merit.

9 │       *GPUs* is distinguishable because, as noted by Judge Illston, the DOJ had ended its criminal

10 │ investigation without returning indictments.  253 F.R.D. at 500.  Here, Samsung SDI has pled

11 │ guilty, there is an amnesty applicant and the DOJ investigation continues.

12 │       *GPUs* is also distinguishable because the court found that "the vast majority of sales were

13 │ primarily executed after customized negotiations between wholesalers and either defendant [and] .

14 │ . . without regard to a price list;" and, "many of the graphics products sold were particularly

15 │ customized to the needs of a specific purchaser [and] could not be interchanged with any other

16 │ GPU product sold by defendants."  *Id.* at 490-91.  Here, in contrast, "CRTs were generally not

17 │ designed for a specific customer nor heavily customized for each purchaser."  Netz Rebuttal Decl.

18 │ at 9.  Rather, each Defendant had a small number of major designs with minor variations that were

19 │ frequently sold to multiple customers.  *See id.* at 9-10.  Moreover, the minor variations were of

20 │ minimal economic importance, involving very small price differences relative to the substantially

21 │ larger price differences seen across the major CRT product attributes that drove pricing (*i.e.*,

22 │ application, size, shape).  *Id.* at 10-11.  Finally, at the design-in stage, where the Defendants

23 │ purportedly compete to win supply contracts, CRTs were effectively commodities and

24 │ interchangeable because finished-goods makers could readily substitute between CRTs that

25 │ required only financially and economically inconsequential modifications prior to production and

26 │ sale.  *Id.* at 13.  In light of the above, Defendants' assertion that Dr. Netz admits that CRTs are

27 │ "heavily customized" (Opp. at 6) is untrue.

28 │

1  In addition, in *GPUs*, Dr. Netz did not address proof of the overcharge to direct purchasers;

2  Dr. Anna Meyendorff addressed that issue.  Dr. Netz presumed the overcharge to direct

3  purchasers, and only addressed pass-through to indirect purchasers.  The *GPUs* court rejected Dr.

4  Meyendorff's opinion on proving an overcharge to direct purchasers on the grounds that she

5  provided no econometric or other quantitative, formulaic proof of impact to the direct purchasers.

6  *See id.* at 503 ("Meyendorff essentially asks this Court to presume impact to direct purchasers

7  based on the characteristics of the market").  Having rejected Meyendorff's conclusions, the court

8  "necessarily [found] Netz's dependent analysis unsuccessful as well."  *Id.* at 502.  Here, in

9  contrast, Dr. Netz presented extensive quantitative, formulaic proof of impact on direct purchasers

10 of CRTs:  "I use regression analysis to examine the determinants of CRT prices.  I find that over

11 91% of the variation in prices is determined by common factors. . . . rather than individual ones,

12 and these common influences on price are susceptible to being estimated using a formula."[13]

13  Thus, Dr. Netz's work here is more like that which she performed in *LCDs*, wherein she

14 performed similar regression analyses and "found that 77% of price variation is determined by . . .

15 common factors rather than individual ones, and that these common influences on price are

16 susceptible to being estimated using a formula."  267 F.R.D. at 601.

17  With regard to pass-through, *GPUs* is distinguishable because the court refused to admit

18 Dr. Netz's "top-to-bottom" pass-through analysis because it was not timely submitted by plaintiffs.

19 *See* 253 F.R.D. at 501.  In addition, Dr. Netz's "reseller-specific regressions" only addressed

20 "stand-alone" graphics cards, and did not address graphics cards bundled with computers (*id.* at

21 504, 506).  Here, Dr. Netz has submitted a "top-to-bottom" regression analysis, a "top-and-

22 bottom" regression analysis and her reseller specific regressions covered CRTs as used in TVs,

23

24

25 [13]

26

27

28

22

1  monitors and stand-alone tubes.  *See* Netz Decl. at 102-104, Exs. 37-39.  For all of the above

2  reasons, the *GPUs* decision is distinguishable and should not be followed here.

3      *Flash Memory* is similarly distinguishable.  First, the *Flash Memory* court expressly noted

4  and relied upon the fact that "the Department of Justice investigated claims of price fixing in the

5  flash memory industry and made no findings of wrongdoing."  *Flash Memory*, 2010 WL 2332081,

6  at *6.  Second, "the bulk of Defendants' sales to direct purchasers were made pursuant to

7  negotiated transactions which resulted in substantial variations in the prices paid by direct

8  purchasers for NAND flash memory."  *Id.* at *8.  Indeed, unlike here, the direct purchasers "had

9  significant negotiating power by virtue of the fact that . . . [t]he bulk of NAND flash memory

10 purchases—82%—were made by only three direct purchasers (Apple, Lexar and Kingston)."  *Id.*

11 at *9.  These market characteristics, none of which are present here, weighed heavily in the Flash

12 Memory court's decision that the overcharge to direct purchasers could not be shown on a

13 common, formulaic basis.  In addition, here, Dr. Netz empirically analyzed over 4200 cartel target

14 prices generated from years of Glass Meeting notes among Defendants.  No such analysis was

15 possible in *Flash Memory* (or *GPUs*) because similar highly incriminating conspiracy evidence

16 was not present.  Finally, in terms of pass-through, Dr. Netz did not submit a "top-to-bottom" pass-

17 through analysis that examined each level of the distribution channel.  *Id.* at *11-12.  For these

18 reasons, *Flash Memory* is distinguishable and should not be followed here.

19      **E.    Defendants Do Not Dispute That Common Proof Will Be Used to Prove**
           **Defendants' Conspiracy.**
20

21      Plaintiffs have presented overwhelming common evidence demonstrating the existence and

22 effectiveness of Defendants' CRT conspiracy.  *See* Memo. §III.B.  Specifically, the ▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮.  This evidence, which has generated multiple governmental investigations, indictments, a

25 guilty plea, and substantial fines, is all common to each class member and is essentially dispositive

26 of the conspiracy issue.

27

28
                                    23

1       "[B]ecause plaintiffs' allegations of price fixing indisputably 'will focus on the actions of

2  the defendants, and, as such, proof for these issues will not vary among class members'" (*In re*

3  *Rail Freight Fuel Surcharge Antitrust Litig.*, No. 07-489 (PLF), 2012 WL 2870207, at *31 (D.D.C.

4  June 21, 2012), (quoting *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002))),

5  common questions clearly predominate on proof of Defendants' violation of federal and state

6  antitrust laws.

7       Contrary to Defendants' suggestion, multiple courts have recognized that common proof of

8  conspiracy alone may satisfy Rule 23(b)(3).[14]  Thus, the overriding need to prove an antitrust

9  conspiracy and that prices were fixed in the CRT market satisfies the predominance requirement.

10  At the very least, this indisputably common issue—when viewed in conjunction with Plaintiffs'

11  common proof of impact and damages—strongly supports class certification here.

        **F.**       **Plaintiffs Have Met Their Burden of Proof in Establishing That Impact and**
12                 **Damages Can Be Shown Using Predominantly Common Proof.**

13          **1.**      **Plaintiffs' Burden on Predominance.**

14

15       "On a motion for class certification, the Court only evaluates whether the method by which

16  plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in

17  fact can prove class-wide impact." *SRAM*, 264 F.R.D. at 612 (quotations omitted); *see also In re*

18  *Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 340 (E.D. Mich. 2001) ("To show impact is

19  susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually

20  exists for each class member.").  Thus, Plaintiffs need only make a "threshold" showing that

21  predominantly common proof will be used to show that class members were injured, and "it is not

22  necessary for Plaintiffs to show that every single class member was injured . . .." *Rubber*

23

---

24  [14] *See Rubber Chemicals*, 232 F.R.D. at 352-53 (recognizing that conspiracy is the overriding predominant question); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites,*

25  *Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002) ("In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where

26  significant individual issues are present."); *In re Citric Acid Antitrust Litig.*, No. 95-1092, C-95-2963 FMS, 1996 WL 655791, at *8 (N.D. Cal. Oct. 2, 1996) ("Even if common impact cannot be

27  proven, the Court may certify the class.  The great weight of authority suggests that the dominant issues in cases like this are whether the charged conspiracy existed and whether price-fixing

28  occurred.").

1  *Chemicals*, 232 F.R.D. at 353.  Indeed, it is well-settled that "[c]lass certification is not precluded

2  simply because a class may include persons who have not been injured by the defendants'

3  conduct."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2012 WL 2870207, at *36 (*quoting*

4  *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009)).  *See also Kohen v. Pac. Inv.*

5  *Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("What is true is that a class will often include

6  persons who have not been injured by the defendant's conduct .... Such a possibility or indeed

7  inevitability does not preclude class certification ...") (citations omitted), *cert. denied sub nom.*

8  *Pacific Inv. Mgmt. Co. LLC v. Hershey*, 130 S. Ct. 1504 (2010); *DG v. Devaughn*, 594 F.3d 1188,

9  1201 (10th Cir. 2010) ("That a class possibly or even likely includes persons unharmed by a

10 defendant's conduct should not preclude certification.") (citation omitted).  Finally, "Plaintiffs

11 need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a

12 class-wide basis."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2008 WL

13 4447592, at *5 (N.D. Cal. Sept. 29, 2008) (quotations omitted).

14      As demonstrated in Plaintiffs' supporting papers and above, the generalized evidence that

15 will be presented on the issue of class-wide impact includes qualitative economic evidence and

16 opinions regarding Defendants' successful cartel activities; CRT pricing; and the CRT industry,

17 market structure and competitive distribution channels.[15]  Plaintiffs have also presented numerous

18 plausible methodologies that may be used to perform quantitative expert statistical analysis to

19 demonstrate class-wide injury.[16]

20      The key point here is that this economic evidence would be offered by the proposed class

21 representatives and by every single individual class member if their claims were separately tried to

22 a jury to prove impact and the amount of damages suffered.  The evidence is the same for all class

23 members.  Thus, this evidence is common to all of them for class certification purposes.  This does

24 not mean that at trial the jury will find for Plaintiffs, but that is for another day.

25

26

27 [15] *See* Netz Decl. at 15-32 (analyzing CRT products, industry and distribution), 33-61 (analyzing the CRT cartel's market power and practices), 72-83 (analyzing distribution channel and pass-through economics).

28

1    In addition to repeatedly mischaracterizing Dr. Netz's economic opinions as

2    "assumptions," Defendants argue that the CRT products and markets are uniquely complicated,

3    which make common proof of impact impossible (*see* Opp. at 5-18), and that Plaintiffs' expert's

4    economic analysis is flawed and therefore insufficient to prove impact and damages (*id.* at 20-36).

5    As set forth above in the discussions of *LCDs* and *SRAM*, and as set out below, neither argument

6    has merit.

7        **2.  Defendants' Challenges To Dr. Netz's Methods and Proof Are**

       **Unavailing.**

8

9       Defendants set forth a number of challenges to Dr. Netz's opinions that impact and

10   damages may be addressed through predominantly common proof.  *See* Opp. at 21-40.  Dr. Netz's

11   Rebuttal Declaration provides a detailed response to each and every criticism that Defendants and

12   Dr. Willig have leveled at her work.  Dr. Netz's conclusions are based on sound economic

13   judgments that combine the record facts and data with widely accepted economic methods.  Her

14   conclusions are consistent with generally-accepted economic theories and principles found in

15   textbooks, and the methods she employs are consistent with the research implementing and testing

16   these theories and principles on real world data in peer-reviewed scholarly journals.  *See* Netz

17   Rebuttal Decl. §IV; Netz MTS Decl. §I.B.  Plaintiffs will not attempt a lengthy summary of Dr.

18   Netz's Rebuttal Declaration, or a lengthy critique of Dr. Willig's contrary opinions.  The Court is

19   respectfully referred to Dr. Netz's Rebuttal Declaration for this discussion.  Below, Plaintiffs

20   address Defendants' principal criticisms of Dr. Netz's work.

21        **a.  Dr. Netz Has Demonstrated That Predominantly Common**

       **Proof Will Be Used to Show Impact on Direct Purchasers.**

22

23      Defendants raise a number of challenges to Dr. Netz's conclusion that impact and damages

24   to direct purchasers may be addressed through predominantly common proof.  None of their

25   arguments have merit.

26

27   ---

[16] *See* Netz Decl. at 61-72 (quantitative pricing analyses), 83-97 (describing methods of estimating
"but for" price and overcharge), 97-108 (quantitative pass-through analyses).

28

1     ***"Target" Pricing Analysis.*** █████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6 ████████████████████████████████████████

7    █████████████████████████████████████

8 ████████████████████████████████████████

9 ██████████████████████████████████

10 ██████████████████████████████████

11 ██████████████████████████████████████

12 ██████████████████████████████████████

13 ████████████████████████████████████

14 █████████

15    ████████████████████████████████████████

16 ████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████

20 ██████████████████████

21      Further, as the courts in *LCDs*, *SRAM*, the *Microsoft* cases and innumerable others cited

22 above have found, the use of aggregated or average data in antitrust economics is commonplace

23 and accepted. *See* §III.B.3, *supra.* Indeed, numerous of Dr. Willig's pricing analyses use similar

24 ————————————————

25 [17] ████████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████████████████████████

28 █████████████████████████████████

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1    levels of aggregation and averaging. *See, e.g.,* Willig Decl. ¶¶44, 49, 52, 59, 74-75, Exs. 1A, 3A,

2    3B, 6, 10A, 11A. *See also* Netz MTS Decl. at §II.4 (explaining that Netz used transactional data

3    whenever possible and reviewing Willig's extensive use of averaging).[18]



23   [19]

25   *Rail Freight Fuel Surcharge Antitrust Litig.*, 2012 WL 2870207, at *71 (rejecting similar

26   "snapshot in time" criticism posited by Dr. Willig in his challenge to a similar "common factor"
     pricing analysis). Indeed, in response to this criticism, Dr. Netz re-ran her price matching analysis

27   with a broader set of CDT target pricing, and these updated results fully supported her conclusion
     that Defendants successfully raised actual prices towards target prices. *See* Netz Rebuttal Decl.

28   §VII.D.1.

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1    ***Price Structure Analysis.***  As described above, Dr. Netz performed hedonic regression

2    analyses to identify the extent to which Defendants' actual CRT prices were determined by

3    common product characteristics. ██████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████████████████  Netz Decl. at 71.  Defendants argue that Dr. Netz's CRT "price structure"

6    analysis is not reliable because it uses averaging, did not include a pricing correlation analysis and

7    does not control for all potential tube characteristics that it should.  Opp. at 33-36.  These and

8    Defendants' other arguments challenging Dr. Netz's price structure analyses have no merit.  *See*

9    Netz Rebuttal Decl. §VII.E. (addressing Dr. Willig's criticisms of price structure analysis).

10        First, Dr. Willig does not dispute that CRT size and shape are important determinants of

11   CRT pricing.  Willig Decl. at 17 ████████████████████████████████████

12   Second, Dr. Netz's use of aggregated data and averaging is widely accepted by economists,

13   supported by the case law, and Defendants' expert uses aggregated data and averages—when

14   doing so suits his purposes.  *See* §III.B.3 and "Target Pricing" discussion, *supra.*  Finally, as Dr.

15   Netz testified, ████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ██████████████████████████████████████████████

19   ██████████████████████████████████████

20        Dr. Willig criticizes Dr. Netz's price structure hedonic regression analysis as flawed.  *See*

21   Willig Decl. ¶¶75-77.  His critiques are specious because ████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████

27

28

1  ██████████████████████████████████████████████████████

2  ████████ (*id.* §VII.E.1.).

3        Notably, the failure of Dr. Willig to account for the impact of monetary exchange rate

4  differences and fluctuations infects vast portions of his analyses purporting to show CRT price

5  heterogeneity.  *See* Netz Rebuttal Decl. §VI.B.  For example, as Dr. Netz shows, Dr. Willig's

6  Exhibit 2A, ████████████████████████████████████████████████████ is (1)

7  inconsistent with industry characteristics and record evidence; and (2) flawed due to Dr. Willig's

8  failure ████████████████████████████████████████████ Netz Rebuttal Decl.

9  §VI.B.1.  When Dr. Netz re-calibrates elements of Dr. Willig's analyses, taking exchange rate

10 fluctuations into account, prices are "completely stable over time" or "unchanged."  *Id.*  This is but

11 one example of this error that is repeated throughout Dr. Willig's analyses, and which undermines

12 his challenges to Dr. Netz's opinions.[20]

13        ***Calculation of a "But For" Price and Damages.***  Dr. Netz has provided four detailed and

14 widely-accepted methodologies that she will use to calculate the "but for price" that consumers

15 would have paid absent a conspiracy.  Netz Decl. at 83-97.  In response, Defendants improperly

16 criticize Dr. Netz because she has not yet calculated the actual "but-for" prices paid by consumers.

17 *See* Opp. at 32-33, 36-39.  The law is clear, however, that an expert need only advance an

18 acceptable method for calculating damages, and need not actually perform the damages

19 calculations at the class certification stage.  Specifically, "Plaintiffs do not need to supply a precise

20 damage formula at the certification stage of an antitrust action. . . . [Rather, Plaintiffs need only] . .

21 . have proffered a method that is not so insubstantial or unreasonable as to amount to no method at

22 all."  *Rubber Chemicals*, 232 F.R.D. at 354.

23 ────────────────────

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1    Here, Dr. Netz has substantively described four widely-accepted economic models for

2  measuring the direct overcharge; identified the types of data required for each method; explained

3  how the required data for implementing the method was common to all class members; and

4  demonstrated that each model has been estimated using real-world data similar to the data

5  available or likely to become available here.  Dr. Netz's judgments regarding the likely availability

6  of data are based on her review of the types of evidence Defendants and other firms in the CRT

7  industry regularly collect, as well as her experience in conducting related empirical research in the

8  academic field and the antitrust litigation context.  *See* Netz Rebuttal Decl. §IX.A.  Defendants'

9  efforts to challenge Dr. Netz's planned use of these methodologies fall woefully short (*see id.*

10  §IX.B.-F (Dr. Netz responding to Defendants' criticisms of her proposed methodologies)), and her

11  descriptions of her proposed methods satisfy the standard for class certification.  *See LCDs*, 267

12  F.R.D. at 602, 606 (holding that Dr. Netz's proposed damage calculation methods, including her

13  description of her "before and after" method to calculate the overcharge, satisfied Rule 23); *SRAM*,

14  264 F.R.D. at 615 (same ruling regarding similar methodologies proposed by other experts).

15              **b.    Dr. Netz Has Demonstrated That Predominantly Common Proof**
                      **Will Be Used to Show Pass-Through to Class Members.**

16

17    Defendants challenge Dr. Netz's conclusions regarding pass-through on the grounds that

18  she improperly used averages or aggregated data; her data samples used are too small and

19  unrepresentative; and she did not consider anecdotal evidence purportedly showing that pass-

20  through was not uniform.  None of these arguments have merit.

21    *Use of Averages or Aggregated Data.*  Defendants' argument regarding the purported

22  impropriety of using average or aggregated data in econometric analysis has been refuted above in

23  the prior section addressing Plaintiffs' proof of the direct overcharge.  *See* §III.F.2.A, *supra.*

24  Those arguments apply with equal force in the pass-through context.  For example, as the *LCDs*

25  court reasoned, "a number of courts have held that averaged and aggregated data *may be used to*

26  *demonstrate pass-through.*"  267 F.R.D. at 605 (emphasis added).  In rejecting arguments similar

27

28

1  to those made by Defendants here, the *LCDs* court found the following analysis of the court in

2  *Gordon v. Microsoft* applicable:

> The damages question for trial is presumably not about whether a
> specific Microsoft price increase found its way through the
> distribution chain and resulted in an increase in the price paid by a
> specific class member. Rather, the question is how a series of
> Microsoft price increases, and/or a series of Microsoft failures to
> reduce prices, impacted the price each consumer paid. The
> question of what would have happened but for Microsoft's
> monopoly overcharge is a hypothetical, and a hypothetical
> question generally cannot be answered by historical data about
> what actually happened, but must often be answered by general
> principles about what generally tends to happen. Thus, average
> pass through rates appear reasonable and even necessary to prove
> damages here.

10  *LCDs*, 267 F.R.D. at 605 (quoting Gordon, 2003 WL 23105550, at *3).  The same reasoning

11  applies here.

12       Defendants' reliance on ████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████

16  ████████████████████████████.[21]  Dr. Willig simply substitutes his

17  methodologies using averaging for those of Dr. Netz and claims his methods are better.  But they

18  are not.  *See* Netz Rebuttal Decl. §X.A., §X.A.3. and §X.B. (describing multiple, broad

19  methodological flaws in the pass-through regression and other analyses performed by Dr. Willig).

20  Second, ███████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████

24

25  _____

26  [21] ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████.  *See id.*  At best, Dr. Willig's opinions are

4 mere methodological criticisms that go to the weight of the evidence; at worst, they are fatally

5 flawed and should be disregarded.

6      Defendants also repeatedly assert that Dr. Netz's pass-through methodologies "disregard

7 actual prices." *See* Opp. at 22.  This is false.  Dr. Netz's pass-through analyses use actual,

8 transactional cost and pricing data for nearly all of the third parties she analyzed.[23]  Similarly,

9 Defendants' claim that Dr. Netz testified in her deposition that every class member would

10 experience an identical pass-through rate is also inaccurate; ████████████████████

11 ████████████████████████████████.  *See* Alioto Reply Decl.

12 Ex. 19 (Netz Depo. at 91:15-24).  For purposes of class certification, determining the actual pass-

13 through rate is not required: As long as it can be measured using common formulaic methods and

14 is consistently above zero, then class members have been harmed.  *See* Netz Rebuttal Decl.

15 §VIII.E.  Based on the results of Dr. Netz's pass-through studies, which employ common methods

16 applicable to all class members, the pass-through rate is uniformly positive and, therefore, class

17 members have suffered common harm.  *See id.*

18      ***Representative Data Samples.***  As detailed above, Dr. Netz performed studies covering the

19 full-length of the CRT distribution channel, studies that calculated pass-through for each level in

20 the distribution channel, and studies for all firms in the distribution channel that produced usable

---

22 [22] For example, if costs increase in late February but corresponding prices do not increase until
March, his analysis would conclude that Zones did not change prices in response to this change,
23 when in fact the opposite is true.  *See* Netz Rebuttal Decl. §XIII.B.1.

[23] ████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████

1    data. *See* Netz Decl. at 97-98; Netz Rebuttal Decl. §X.A.2.  Dr. Netz utilized data from multiple

2    entities at each level of the CRT distribution channel, including tube distributors, CRT product

3    makers, CRT product distributors and CRT product resellers. *See* §II.6, *supra*. ████████████

4    ███████████████████████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████████████████████████████████████████

6    █████████████████████████████████████████████████████████ *See* Netz Decl. at 104,

7    Exs. 34, 36, 40-43, Netz Rebuttal Decl. §X.A.2, Ex. RR-34.  There is no basis for claiming these

8    data are "tiny" or "unrepresentative." *See id.*

9         Defendants attempt to mislead the Court by claiming that Dr. Netz's "study at the retail

10   level . . . analyzed the pricing data of only two retailer-plaintiffs (Costco and Best Buy), while

11   ignoring the price data for most of the major retailer-plaintiffs in this MDL." Opp. at 24.  This is

12   false. █████████████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████████████████████████

16   ████████████

17        Defendants also assert that direct action plaintiffs' ("DAPs") data in this case should have

18   been examined because those plaintiffs allege in their complaints that "they did not pass on any

19   increases in CRT costs to their customers." Opp. at 25.  In so arguing, however, Defendants rely

20   only on complaint allegations, not facts or evidence.  Moreover, ████████████████████████

21   ████████████. *See* Netz Decl. Exs. 34, 35.  Also, in response to these criticisms, ██████████

22   ███████████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████████████████████████████████

24   ███████████████████████████████████████████████████████████████████████████████████

25   █████████████████████████████████████████████████████ Clearly, Dr. Netz's

26   empirical analyses trump DAPs' unsupported complaint allegations.

27

28

1    ***Consideration of anecdotal evidence.***  Finally, Defendants assert that the entirety of Dr.

2    Netz's qualitative and quantitative analyses of pass-through should be disregarded because of

3    testimony by two witnesses, ██████████████████████████████████████████

4    ████████████████████████████████.  These same arguments were raised and

5    rejected in *LCDs III.  See* 2012 WL 555090 at *8 (anecdotal evidence from Dell, Best Buy, Target,

6    Radio Shack and HP that increases in component or product costs were not always passed on to

7    customers provided no basis for exclusion of Dr. Netz's testimony; such arguments are appropriate

8    for cross-examination at trial).

9        In addition, the testimony of these witnesses was equivocal at best. █████████████

10   ██████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████

17   ██████.

18       Finally, such anecdotal, self-serving testimony regarding two companies' purported

19   practices provides no basis for ████████████████████████████████████

20   ██████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████████.

23   *See SRAM*, 2010 WL 5071694, at *5 (rejecting *Daubert* challenge to pass-through testimony

24   where defendants cited one company's practices in support of claim that overcharges were not

25   passed through).[24]

26   _____

27   [24] Defendants' further reliance on the self-serving testimony of Defendant witnesses or those of
     their wholly-owned subsidiaries (Opp. at 27 n.51) fares no better. ██████████████████

28

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

**G.    State Substantive Laws Regarding the Inference Of Impact Support Class Certification.**

Defendants argue that no inference of common impact is appropriate because the inference is procedural, not substantive, and therefore governed by federal rather than state law.  Defendants are wrong and, not surprisingly, cite no authority supporting their position.[25]

Defendants also erroneously assert that the inference of class-wide impact under California law applies only if "the product reaches the end-user unchanged from its original sale."  Opp. at 41, n.60.  Defendants' assertion is not supported by the two cases they cite:  *Cipro* and *B.W.I. B.W.I.*'s holding that the inference of common impact applied to Cartwright Act indirect-purchaser cases was not limited to cases where the product was unchanged.  "[W]hen a conspiracy to fix prices has been proven and plaintiffs have established they purchased the price-fixed goods or services, the jury can infer plaintiffs were damaged."  *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1350 (1987).  In fact, the inference has been broadly applied in antitrust cases with markets "characterized by individually negotiated prices, varying profit margins, and intense competition."  *Id.* at 1351.

Similarly, *Cipro* recognized that "injury to the class may be assumed when a horizontal market-wide restraint of trade is alleged;" and that the inference "is ordinarily a permissible assumption in cases where consumers have purchased products in an anticompetitive market, even if some consumers did not actually have to pay the overcharge because of their individual circumstances."  *In re Cipro Cases I and II*, 121 Cal. App. 4th 402, 413 (2004).  *Cipro* also distinguished two cases declining to apply the inference of common impact that are cited by

---

. *See* Netz Decl. at 103-104, Ex. 34.  Generalized testimony of a few witnesses does not outweigh Dr. Netz's empirical analysis of millions of marketplace transactions.  *See Rail Freight Fuel Surcharge Antitrust Litig.*, 2012 WL 2870207, at *60 (rejecting defendant witness declarations regarding claimed discounting in favor of, *inter alia*, plaintiffs' expert's analysis of transactional data).

[25] *See Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446-47 (1959) ("Under the Erie rule, presumptions (and their effects) and burden of proof are 'substantive'"); *Computer Econ., Inc. v. Gartner Grp., Inc.*, 50 F. Supp. 2d 980, 990 (S.D. Cal. 1999) ("State rules that define . . . presumptions . . . are so obviously substantive that their application in diversity actions is required.").

1  Defendants here (Opp. at 41):  "*Global Minerals* and *J.P. Morgan* declined to apply this

2  assumption to the particular facts of those cases, because of the unique peculiarities of the copper

3  market and the dual roles played by members of the class as both buyers and sellers." 121 Cal.

4  App. 4th at 416.  The inference did not apply in *Global Minerals* and *J.P. Morgan* because those

5  cases were brought on behalf of copper purchasers and "there was no showing that changes in

6  COMEX [copper future] prices necessarily caused changes in the physical or cash copper

7  markets."  *Id.* at 415.

8      Here, as in *B.W.I.* and *Cipro*, class members purchased CRTs, which are the "the price-

9  fixed goods or services," as discrete physical objects that are unchanged and distinguishable parts

10  of the monitor and televisions into which they were incorporated.  *B.W.I.*, 191 Cal. App. 3d at

11  1350-51.  Moreover, as in *Cipro*, the extensive evidence and comprehensive expert testimony

12  clearly establishes that Defendants' horizontal restraints caused higher prices to end-users.  The

13  foregoing substantive principles of California state antitrust law, when viewed in conjunction with

14  both California's substantive public policy favoring the class action device and the extensive

15  qualitative and quantitative proof of impact to end-purchaser class members outlined above,

16  strongly support class certification here.[26]

17      **H.      The Proposed Classes Are Ascertainable Under Rule 23.**

18      Defendants and their co-conspirators ███████████████████████████████████████

19  ██████████████████████████████.  *See* Netz Decl. Exs. 1, 5 and 6.  Thus, approximately

20  nine out of every ten finished CRT products sold in the U.S. contained a CRT made by one of the

21  Defendants or their co-conspirators.  Defendants, however, argue that the class is not ascertainable

22  because there is no way to determine whether a Defendant actually manufactured the CRT inside a

23  _____

24  [26] Defendants' argument that Minnesota does not recognize the inference of impact (Opp. at 41-
42) is also incorrect.  In applying the inference, *Gordon* relied on expert testimony—similar to that

25  of Plaintiffs' expert here and undisputed by Defendants—that the highly competitive CRT market
structure was such that overcharges normally would be passed on to indirect purchasers.  2001 WL

26  366432, at *8-10.  In addition, contrary to Defendants' assertions, the inference of impact was
applied in *Florida Microsoft* because—as is the case here—it was supported by expert testimony

27  setting forth "reasonable methods, based on standard economic principles, for establishing with
common evidence that each class member was impacted to some extent by Microsoft's alleged

28  behavior."  2002 WL 31423620, at *8.

1    particular television or computer monitor.  *See* Opp. at 42-45.  Defendants' arguments are both

2    legally and factually incorrect.

3         A class is ascertainable where the class definition is based on objective criteria that allow a

4    determination of whether a particular individual is a member.  *Whiteway v. FedEx Kinko's Office*

5    *and Print Servs., Inc.*, No. C 05-2320 SBA, 2006 WL 2642528, at *3 (N.D. Cal. Sept. 14, 2006)

6    ("An identifiable class exists if its members can be ascertained by reference to objective criteria.");

7    5 James W. Moore, *Moore's Federal Practice*, § 23.21[1] (2001) ("The identity of class members

8    must be ascertainable by reference to objective criteria.").

9         The class definition here is based on objective criteria: Class members must reside in one

10   of the 22 states, must have made a purchase during the class period, the purchase must have been

11   for the class member's own use and not for resale, and the product must contain a CRT made by

12   one of the Defendants, their affiliates, or alleged co-conspirators.  These objective criteria render

13   the class definition both objective and ascertainable.  *See LCDs*, 267 F.R.D. at 592 (similar class

14   definition was objective and ascertainable).  Indeed, Defendants have not identified any portion of

15   the class definition that they believe to be subjective, imprecise, or indefinite.

16        Likewise, the identity of the class members can easily be determined by objective criteria.

17   Although Defendants point to several class representatives who did not know the manufacturer of

18   the tubes in their products *at the time they were deposed earlier* in the case, there are two objective

19   methods to determine whether their tubes were made by a Defendant.

20        First, the tube manufacturer can be identified by using the product model number printed

21   on the outside of the unit.  The model number can be matched with the corresponding service

22   guides, service manuals or other publically available information to reveal the tube number, which

23   is unique to a specific manufacturer.  *See* Alioto Reply Decl. at ¶5; *see also* Alioto Reply Decl. Ex.

24   14 (Kimura Depo. at 95:1-97:2) (█████████████████████████████████████████████

25   █████████████████████████████████████████████████████████████████████).

26   Moreover, because model numbers are printed on the exteriors of the televisions and monitors, this

27   can be done without removing the back of the unit.  This method can be used even where class

28

1    members no longer own their CRT products, and refutes Defendants' argument that tubes cannot

2    be identified in such instances. *See, e.g.*, Alioto Reply Decl. at ¶5(a), (b), and (d) (model numbers

3    obtained from receipts).

4         Second, the tube maker can be identified by removing the screws from the back of the

5    product and viewing the name of the tube maker or the tube number, which is typically printed in

6    large, bold letters on the tube itself. *See, e.g.*, Alioto Reply Decl. at ¶¶3-4. Contrary to

7    Defendants' assertions, this is a simple process that can be accomplished in a few moments with

8    the use of a screwdriver. *See* Alioto Reply Decl. Ex. 15 (Stephenson Depo. at 78:10-79:2, 80:5-7);

9    Alioto Reply Decl. Exs. 1, 7.

10        Plaintiffs have used these objective methods to confirm that each of the purportedly

11   uncertain class representatives identified in Defendants' brief did actually purchase a product

12   containing a tube manufactured by a Defendant. *See* Alioto Reply Decl. at ¶¶3-5.[27] Thus, the

13   class is unquestionably ascertainable because the definition is based on objective criteria that will

14   allow a determination of whether a particular individual is a member. *See* 7A Wright & Miller,

15   *Federal Practice and Procedure*, § 1760 (3d ed. 2004); *see also LCDs*, 267 F.R.D. at 592 (class

16   was ascertainable where plaintiffs could identify television and computer panel makers by using

17   model or serial numbers);[28] *SRAM*, 264 F.R.D. at 608 (class was ascertainable where plaintiffs

18   could objectively determine class membership with information and evidence gathered from

19   defendants, third parties and public sources).

20        Moreover, Defendants' arguments are premature at the class certification stage where a

21   class need only be objectively ascertainable, but need not be actually ascertained. There is no

22   _____

23   [27] Contrary to the argument made at pp. 43-44 of Defendants' brief, Gary Hanson testified that he
     opened the back of two of his five CRT products and determined that Chunghwa made one of the
24   tubes. *See* Alioto Reply Decl. Ex. 16 (Hanson Depo. at 60:23-65:22). Also, Samuel Nastro is no
     longer a class representative for Nevada because he purchased a product that was not a part of the
25   conspiracy (a rear-projection television). Thus, he was replaced with proposed Nevada class
     representative Gloria Comeaux. Ms. Comeaux purchased a product with a Philips tube. *See*
26   Alioto Reply Decl. at ¶4(a).

27   [28] The *LCDs* court also found it significant that, like here, the defendants typically made 90% or
     more of the panels used in television and computer monitors and thus, the universe of products not
     containing defendants' products was small. *See id.*
28

1   requirement that "the identity of the class members . . . be known at the time of certification." *Ries*

2   *v. Arizona Beverages USA LLC*, No. 10–01139 RS, --- F.R.D. ----, 2012 WL 5975247, at *11

3   (N.D. Cal. Nov. 27, 2012). *See also NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 506

4   (certifying antitrust class where class membership determination would require subsequent

5   evidentiary submissions).

6       As Judge Posner stated:

7           What is true is that a class will often include persons who have not
            been injured by the defendant's conduct; indeed this is almost
8           inevitable because at the outset of the case many of the members of
            the class may be unknown, or if they are known still the facts
9           bearing on their claims may be unknown. Such a possibility or
            indeed inevitability does not preclude class certification, despite
10          statements in some cases that it must be reasonably clear at the
            outset that all class members were injured by the defendant's
11          conduct.

12  *Kohen*, 571 F.3d at 677 (internal citations omitted). *See also In re OSB Antitrust Litig.*, No. 06-

13  826, 2007 WL 2253418, at *9 (E.D. Pa. Aug. 3, 2007) ("Because the proposed class *need only be*

14  *ascertainable by some objective criteria, not actually ascertained, challenges to individual claims*

15  *based on class membership may be resolved at the claims phase of the litigation.*") (emphasis

16  added); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) ("As long as the

17  general outlines of the membership of the class are determinable at the outset of the litigation, a

18  class will be deemed to exist.") (internal quotation mark omitted).

19      Defendants also incorrectly argue that it will be administratively difficult to ultimately

20  identify the class members. *See* Opp. at 44-45. Defendants, however, ignore the fact that the

21  brand of tube in a CRT product can be identified by using the model number. *See* Alioto Reply

22  Decl. at ¶5. Thus, CRT purchasers can simply submit their model numbers as part of any potential

23  claims process. Alternatively, as discussed above, it is not difficult for a class member to remove

24  the back of a product and identify the tube maker. Although it will be relatively simple to

25  determine class membership at the appropriate time, an objectively defined class is ascertainable

26

27

28

1   even if the Court determines that the subsequent identification of class members will be

2   burdensome or require individual proof.[29]

3        Finally, the cases Defendants cite are distinguishable. In *Marcus v. BMW of N. Am., LLC*,

4   687 F.3d 583 (3d Cir. 2012), the plaintiffs sought to certify a class of owners and lessees of certain

5   BMW vehicles equipped with Bridgestone Run-Flat Tires which had gone flat and been replaced.

6   The *Marcus* court cautioned against approving a method to determine class members "that would

7   amount to no more than ascertaining by potential class members' say so." *Id.* at 594. The court in

8   Xavier likewise rejected a class definition which depended on each putative class member's

9   subjective beliefs, because there was no reliable way to ascertain class membership. *Xavier v.*

10  *Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (class membership turns on

11  each individual's *subjective estimate* of his or her long-term smoking habit).

12       Unlike situations in which a class fails for lack of ascertainability because there is no

13  "reliable, administratively feasible" means to determine class membership (*Marcus*, 687 F.3d at

14  594), here Plaintiffs have demonstrated feasible (and objective) methods to identify the class

15  members.

16       *Flash Memory*, another case Defendants cite, is also distinguishable. In *Flash Memory*,

17  close to 2,000 different NAND flash memory chips were produced during the class period and

18  were incorporated into a garden variety of consumer electronic products. *Flash Memory*, 2010

19  WL 2332081, at *1-2. Once the chips were incorporated into finished products, it was not possible

20

---

21  [29] *See, e.g., Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003) (the fact that
22  identification of class members "may be slow and burdensome cannot defeat the ascertainability
    requirement."); *see also Sadler v. Midland Credit Management, Inc.*, No. 06 C 5045, 2009 WL
23  901479, at *2 (N.D. Ill. Mar. 31, 2009) (ascertainability requirement met where class was
    objectively defined although identification of class members would require "administratively
24  burdensome" review of records); *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 496 (D. Md.
    1998) ("Defendant argues the class is not 'administratively ascertainable' because the Court would
25  have to undertake an individualized inquiry as to the existence of each member's forbearance
    agreement. These arguments fail to justify denial of class certification."); *Stoffels v. SBC*
26  *Communications, Inc.*, 238 F.R.D. 446, 451 (W.D. Tex. 2006) (class defined based on objective
    criteria ascertainable although class members would need to be identified in part through data
27  obtained from third party); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 22-25
    (D.D.C. 2001) (the complexities of the pharmaceutical market did not make purchasers of drugs in
28  antitrust case unascertainable).

1   to determine the chip's manufacturer simply by examining the finished product or disassembling

2   it. *Id.* Here, in contrast, the tube can be identified by the model number or by simply removing

3   the back of the product and looking at the tube. *See* Alioto Reply Decl. at ¶¶3-5.[30]

4        **I.**     **The Proposed Plaintiffs Are Adequate And Typical Class Representatives.**

5        Defendants challenge the adequacy of the proposed class representatives.  According to

6   Defendants, Plaintiffs did not provide any evidence that the proposed class representatives have

7   adequate knowledge of the case. *See* Opp. at 45-46.  Defendants, however, previously deposed

8   each of the proposed class representatives.  During those depositions, each class representative

9   specifically testified about their knowledge of the case. *See* Alioto Reply Decl. at ¶15, Appendix

10  A.  Thus, the Defendants have long been aware that the proposed class representatives understand

11  the nature of the case, are actively participating in discovery and are committed to enforcing the

12  interests of putative classes. *See id.*  In this instance, the class representatives are unquestionably

13  adequate. *See In re Adobe Systems, Inc.*, 139 F.R.D. 150, 156 (N.D. Cal. 1991) (class

14  representatives are adequate where they have basic knowledge of the claims, willingness to

15  prosecute the action and have no disabling conflicts).

16       Defendants also argue that the proposed class representatives are not adequate or typical

17  because several of them have not identified the manufacturers of their CRTs. *See* Opp. at 47.  As

18  mentioned above, Plaintiffs have now confirmed that these individuals purchased a television or

19  computer monitor containing one of Defendants' CRTs. *See* Alioto Reply Decl. at ¶¶3-5.  Put

20  simply, Defendants' argument on this point is now moot.

21       Finally, Defendants argue that two class representatives "failed to establish that they made

22  their purchases in the relevant state or while a resident of the state at issue. . . . ." Opp. at 47-48.

23  Defendants assert that the proposed class representative for the District of Columbia, Lawyer's

24

25  _____

    [30] Defendants' reliance on *Kirkman* and *Copper* is similarly misplaced.  Unlike this case, both
    cases involved a class with a speculative, amorphous, or fact-intensive definition. *Kirkman v.*

26  *North Carolina R. Co.*, 220 F.R.D. 49, 53 (M.D.N.C. 2004) (ascertaining class members would
    require "detailed title searches . . . across more than 300 miles of land"); *In re Copper Antitrust*

27  *Litig.*, 196 F.R.D. 348, 359 (W.D. Wis. 2000) (proposed definitions do not "convey[ ] sufficient
    meaning to enable persons hearing it to determine whether they are members of the class plaintiffs

28  wish to represent").

1   Choice Suites, Inc., may have made its purchase in Florida, not in the District of Columbia. *See*

2   Opp. at 47-48.  The proposed District of Columbia representative, however, *repeatedly* testified

3   that the company is located only in the District of Columbia, and that the purchase was likewise

4   made there. *See* Alioto Reply Decl. Ex. 17 (Guttman Depo. at 19:5:18, 65:16-22, 66:19-24,

5   113:10-20, 114:5-17, 114:23-25).  Although he did once indicate that it was "conceivable" that he

6   made the purchase in Florida, this statement was made in the context of him explaining why it

7   would not have made sense for him to purchase the monitor in Florida and providing several

8   reasons why he "really" believed that he purchased it while in the District of Columbia. *Id.* at

9   114:23-118:10.  Moreover, he further testified that the purchase was shipped to the District of

10  Columbia, and not to Florida. *Id.* at 117:5-7, 122:22-123:2.  Accordingly, the proposed District of

11  Columbia representative consistently testified that he purchased the CRT monitor in the District of

12  Columbia, and Defendants' arguments to the contrary should be disregarded as pure speculation.

13  *See Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333 (MBM), 2004 WL 307306, at *3

14  (S.D.N.Y. Feb. 18, 2004) (finding that speculative concerns about the plaintiff's suitability as a

15  class representative were not sufficient to defeat class certification).[31]

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24

---

25  [31] Defendants also argue that Mr. Warner, one of the two proposed Tennessee class
    representatives, cannot establish residency in Tennessee at the time he made any of his CRT
26  purchases.  Opp. at 48.  This will not impact class certification in Tennessee, however, because
    there is a second adequate proposed class representative for Tennessee. *See* Alioto Reply Decl. at
27  ¶4(b) (discussing Albert Sidney Crigler's CRT purchase); ¶15 (referencing Mr. Crigler's testimony
    regarding his adequacy as a class representative).

28

1    IV.    **CONCLUSION**

2          For the forgoing reasons, and for the reasons stated in Plaintiffs' opening brief, Plaintiffs

3    respectfully request that the Court grant their motion for class certification, certify the 22 Indirect-

4    Purchaser Statewide Classes pursuant to 23(b)(3), and appoint Trump, Alioto, Trump & Prescott

5    LLP as Class Counsel under Rule 23(g).

6

7    DATED: February 15, 2013                    Respectfully submitted,

8                                                _____/s/ Mario N. Alioto_____
                                                        Mario N. Alioto

9
                                                Mario N. Alioto (56433)
10                                              Lauren C. Capurro (241151)
                                                TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
11                                              2280 Union Street
                                                San Francisco, CA 94123
12                                              Telephone:  (415) 563-7200
                                                Facsimile:  (415) 346-0679
13                                              Email: malioto@tatp.com
                                                Email: laurenrussell@tatp.com
14
                                                *Interim Lead Counsel for*
15                                              *Indirect-Purchaser Plaintiffs*

16                                              Francis O. Scarpulla (41059)
                                                Craig C. Corbitt (83251)
17                                              Judith A. Zahid (215418)
                                                Michael S. Christian (212716)
18                                              Qianwei Fu (242669)
                                                Demetrius X. Lambrinos (246027)
19                                              ZELLE HOFMANN VOELBEL & MASON LLP
                                                44 Montgomery Street, Suite 3400
20                                              San Francisco, CA 94104
                                                Telephone: (415) 693-0700
21                                              Facsimile:  (415) 693-0770
                                                Email: fscarpulla@zelle.com
22                                              Email: ccorbitt@zelle.com

23

24

25

26

27

28
                                                44
     REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
                    MOTION FOR CLASS CERTIFICATION
                                                                        MDL No. 1917

| | |
|---|---|
| Joseph M. Patane | Lawrence G. Papale |
| **LAW OFFICES OF JOSEPH M.** | **LAW OFFICES OF LAWRENCE G.** |
| **PATANE** | **PAPALE** |
| 2280 Union Street | 1308 Main Street #117 |
| San Francisco, CA 94123 | St. Helena, CA 94574 |
| Telephone: (415) 563-7200 | Telephone: (707) 963-1704 |
| Facsimile: (415) 346-0679 | Facsimile: (707) 963-0706 |
| jpatane@tatp.com | lgpapale@papalelaw.com |

| | |
|---|---|
| Christopher Lovell | Daniel E. Birkhaeuser |
| Craig Essenmacher | Jennifer S. Rosenberg |
| Keith Essenmacher | **BRAMSON, PLUTZIK, MAHLER &** |
| Merrick S. Rayle | **BIRKHAEUSER, LLP** |
| **LOVELL STEWART HALEBIAN** | 2125 Oak Grove Road, Suite 120 |
| **JACOBSON LLP** | Walnut Creek, CA 94598 |
| 61 Broadway Suite 501 | dbirkhaeuser@bramsonplutzik.com |
| New York, NY 10006 | jrosenberg@bramsonplutzik.com |
| clovell@lshllp.com | |
| cessenmacher@lshllp.com | |

| | |
|---|---|
| Marvin A. Miller | Paul Novak |
| Lori A. Fanning | Peter Safirstein |
| Matthew E. Van Tine | Elizabeth McKenna |
| **MILLER LAW LLC** | **MILBERG LLP** |
| 115 South LaSalle Street, Suite 2910 | One Pennsylvania Plaza |
| Chicago, IL 60603 | 49th Floor |
| mmiller@millerlawllc.com | New York, NY 10119 |
| lfanning@millerlawllc.com | Telephone: (212) 594-5300 |
| | Facsimile: (212) 868-1229 |
| | pnovak@milberg.com |

| | |
|---|---|
| Sherman Kassof | Jennie Lee Anderson |
| **LAW OFFICES OF SHERMAN** | **ANDRUS ANDERSON LLP** |
| **KASSOF** | 155 Montgomery Street, 9th Floor |
| 954 Risa Road, Suite B | San Francisco, CA 94104 |
| Lafayette, CA 94549 | Telephone: (415) 986-1400 |
| Telephone: (510) 652 2554 | Facsimile: (415) 986-1474 |
| Facsimile: (510) 652 9308 | jennie@andrusanderson.com |
| heevay@att.net | |

| | |
|---|---|
| Daniel Hume | David Boies |
| Robert Gralewski | Timothy Battin |
| **KIRBY McINERNEY LLP** | Nathan Cihlar |
| 825 Third Avenue, 16th Floor | **STRAUS & BOIES, LLP** |
| New York, NY 10022 | 4041 University Drive, Fifth Floor |
| Telephone: (212) 317-2300 | Fairfax, VA 22030 |
| dhume@kmllp.com | dboies@straus-boies.com |
| | tbattin@straus-boies.com |
| | ncihlar@straus-boies.com |

45

| | | |
|---|---|---|
| 1 | Seymour J. Mansfield | Robert Gerard |
| | Jean B. Roth | **GERARD & OSUCH, LLP** |
| 2 | Charles Horowitz | 2840 South Jones Blvd. |
| | **MANSFIELD, TANICK & COHEN,** | Building D, Unit 4 |
| 3 | **P.A.** | Las Vegas, NV 89146 |
| | 1700 U.S. Bank Plaza | Telephone: (702) 251-0093 |
| 4 | 220 South Sixth Street | rgerard@gerardlaw.com |

Seymour J. Mansfield
Jean B. Roth
Charles Horowitz
**MANSFIELD, TANICK & COHEN, P.A.**
1700 U.S. Bank Plaza
220 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 339-4295
Facsimile: (612) 339-3161
smansfield@mansfieldtanick.com

Robert Gerard
**GERARD & OSUCH, LLP**
2840 South Jones Blvd.
Building D, Unit 4
Las Vegas, NV 89146
Telephone: (702) 251-0093
rgerard@gerardlaw.com

Michael G. Simon
M. Eric Frankovitch
**FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON**
337 Penco Road
Weirton, WV 26062
Telephone: (304) 723-4400
Facsimile: (304) 723-5892
msimon@facslaw.com

Rodney Ray
**FORD & RAY**
301 Fifth Street South, Suite C
P.O. Box 1018
Columbus, MS 39703
Telephone: (662) 329-0110
Facsimile: (662) 329-3522
rray@fordraylaw.com

Robert G. Methvin, Jr.
Philip W. McCallum
Matt Stephens
**McCALLUM, METHVIN & TERRELL, P.C.**
2201 Arlington Avenue South
Birmingham, AL 35305
Telephone: (205) 939-0199
Facsimile: (205) 939-0399
Rgm@mmlaw.net
pwm@mmlaw.net
rem@mmlaw.net

Joel Smith
**WILLIAMS, POTTHOFF, WILLIAMS & SMITH**
125 South Orange Avenue
Eufaula, AL 36027
Telephone: (334) 687-5834
Facsimile: (334) 687-5722
joelpsmith@bellsouth.net

Christy Crow
**JINKS, CROW & DICKSON, P.C.**
P.O. Box 350
219 Prairie Street N.
Union Springs, AL 36089
Telephone: (334) 738-4225
Facsimile: (334) 738-4229
cdc@jinkslaw.com

Brent Irby
Eric Hoagland
**McCALLUM, HOAGLAND, COOK & IRBY, LLP**
905 Montgomery Street, Suite 201
Vestavia Hills, AL 35216
birby@mhcilaw.com
ehoagland@mhcilaw.com

Chris Cantrell
Kit Belt
**BELT LAW FIRM PC**
Lakeshore Park Plaza, Suite 208
2204 Lakeshore Drive
Birmingham, AL 35209
keithb@beltlawfirm.com
chris@beltlawfirm.com

Jeff Crabtree
**LAW OFFICES OF JEFF CRABTREE**
820 Mililani Street, Suite 701
Honolulu, HI 96813
lawyer@consumerlaw.com

46

| | |
|---|---|
| 1 | Richard F. Horsley |
| 2 | 1 Metroplex Drive, Suite 280<br>Birmingham, AL 35209-6895 |
| 3 | rfhala@cs.com |

Richard F. Horsley
1 Metroplex Drive, Suite 280
Birmingham, AL 35209-6895
rfhala@cs.com

S. Randall Hood
William A. McKinnon
**McGOWAN HOOD & FELDER, LLC**
1659 Healthcare Drive
Rock Hill, SC 29732

Daniel R. Karon
Mark S. Goldman
Brian D. Penny
**GOLDMAN SCARLATO & KARON, P.C.**
55 Public Square, Suite 1500
Cleveland, OH 44113
karon@gsk-law.com

Krishna B. Narine
**LAW OFFICE OF KRISHNA B. NARINE**
7839 Montgomery Avenue
Elkins Park, PA 19027
knarine@kbnlaw.com

John G. Felder, Jr.
**McGOWAN HOOD & FELDER, LLC**
1405 Calhoun Street
Columbia, SC 29201

Donna F. Solen
**THE MASON LAW FIRM, LLP**
1225 19th Street, N.W., Suite 500
Washington, DC 20036
dsolen@masonlawdc.com

Isaac L. Diel
**SHARP McQUEEN**
135 Oak Street
Bonner Springs, KS 66012
dslawkc@aol.com

Robert J. Pohlman
**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417
rpohlman@rcalaw.com

Mary G. Kirkpatrick
**KIRKPATRICK & GOLDSBOROUGH, PLLC**
Lakewood Commons
1233 Shelburne Road, Suite E-1
South Burlington, VT 05401
mkirk@vtlawfirm.com

Bruce Mulkey
**THE MULKEY ATTORNEYS GROUP, P.A.**
1039 W. Walnut, Suite 3
Rogers, AR 72756
bruce@mulkeylaw.com

Charles M. Kester
**THE KESTER LAW FIRM**
P.O. Box 184
Fayetteville, AR 72702-0184
cmkester@nwark.com

Terry R. Saunders
Thomas A. Doyle
**SAUNDERS & DOYLE**
20 South Clark Street, Suite 1720
Chicago, IL 60603
trsaunders@saundersdoyle.com
tadoyle@saundersdoyle.com

Joel Flom
**JEFFRIES, OLSON & FLOM, P.A.**
1202 27th Street South
Fargo, ND 58103
Telephone: (701) 280-2300
Facsimile: (701) 280-1800
joel@jeffrieslaw.com

James H. McManis
Marwa Elzankaly
**McMANIS FAULKNER & MORGAN**
A Professional Corporation
50 W. Fernando Street, 10th Floor
San Jose, CA 95113
jmcmanis@mfmlaw.com
melzankaly@mfmlaw.com

47

REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

MDL No. 1917

1  Susan G. Kupfer
   (skupfer@glancylaw.com)
2  Kathleen S. Rogers
   **GLANCY BINKOW & GOLDBERG,**
3  **LLP**
   One Embarcadero Center, Suite 760
4  San Francisco, CA 94111
   Telephone: (415) 972-8160
5  Facsimile: (415) 972-8166

6  Kenneth L. Valinoti
   **VALINOTI & DITO LLP**
7  180 Montgomery Street, Suite 940
   San Francisco, CA 94104
8  Telephone: (415) 986-1338
   Facsimile: (415) 986-1231
9  kvalinoti@valinoti-dito.com

10

11 Eric J. Pickar
   **BANGS, McCULLEN, BUTLER,**
12 **FOYE & SIMMONS, LLP**
   333 West Boulevard, Suite 400
13 P.O. Box 2670
   Rapid City, SD 57709-2670
14 Telephone: (605) 343-1040
   epickar@bangsmccullen.com
15

16 Jeffrey Bartos
   **GUERRIERI, EDMOND, CLAYMAN**
   **& BARTOS PC**
17 1625 Massachusetts Ave., N.W.
   Suite 700
18 Washington, DC 20036
   Telephone: (202) 624-7400
19 jbartos@geclaw.com

20 Josef D. Cooper
   Tracy D. Kirkham
21 **COOPER & KIRKHAM, P.C.**
   357 Tehama Street, Second Floor
22 San Francisco, CA 94103
   Telephone: (415) 788-3030
23 Facsimile: (415) 882-7040
   jdc@coopkirk.com
24

25

26

27

28

Christopher P. Welsh
**WELSH & WELSH, PC, LLO**
9290 West Dodge Road
100 The Mark
Omaha, NE 68114
Telephone: (402) 384-8160
Facsimile: (402) 384-8211
cwelsh@welsh-law.com

David Freedman
Joseph Goldberg
**FREEDMAN, BOYD, HOLLANDER,**
**GOLDBERG & IVES, PA**
20 First Plaza, Suite 700
Albuquerque, NM 87102
Telephone: (505) 842-9960
Facsimile: (505) 842-0761
daf@fbdlaw.com

Frank Balint
**BONNETT, FAIRBOURN, FRIEDMAN**
**& BALINT, P.C.**
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
fbalint@bffb.com

Guri Ademi
Shpetim Ademi
**ADEMI & O'REILLY, LLP**
3620 East Layton Ave.
Cudahy, WI 53110
Telephone: (414) 482-8000
Facsimile: (414) 482-8001
gademi@ademilaw.com

James Wyatt
**WYATT & BLAKE, LLP**
435 East Morehead Street
Charlotte, NC 28202-2609
Telephone: (704) 331-0767
Facsimile: (704) 331-0773
JWyatt@wyattlaw.net

48
REPLY BRIEF IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
MDL No. 1917

1   Robert Bonsignore
**BONSIGNORE AND BREWER**
2   193 Plummer Hill Road
Belmont, NH 03220
3   Telephone: (781) 350-0000
rbonsignore@class-actions.us
4

5

6   Sylvie Kern
**KAG LAW GROUP**
7   P.O. Box 210135
San Francisco, CA 94121
8   Telephone: (415) 221-5763
skern@antitrustglobal.com
9

10  W. Timothy Neddham
**JANSSEN, MALLOY & NEEDHAM**
11  **LLP**
730 5th Street
12  Eureka, CA 95501
Telephone: (707) 445-2071
13  Facsimile; (707) 445-8305
tneedham@janssenlaw.com
14

Christopher P. Welsh
**WELSH & WELSH, PC, LLO**
9290 West Dodge Road
100 The Mark
Omaha, NE 68114
Telephone: (402) 384-8160
Facsimile: (402) 384-8211
cwelsh@welsh-law.com

Robert Green
**GREEN & NOBLIN P.C.**
700 Larkspur Landing Circle
Suite 275
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
rsg@classcounsel.com

Brian Barry
**LAW OFFICE OF BRIAN BARRY**
1801 Avenue of the Stars, Suite 307
Los Angeles, CA 90067
Telephone: (323) 522-5584
Bribarry@yahoo.com

15

16

17

18

19

20

21

22  3242931v3

23

24

25

26

27

28

49