Mario N. Alioto (56433)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
Email: malioto@tatp.com
Email: laurenrussell@tatp.com

*Interim Lead Counsel for Indirect-Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>ALL INDIRECT-PURCHASER ACTIONS | **REBUTTAL DECLARATION OF JANET S. NETZ, PH.D., IN SUPPORT OF MOTION OF INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION**<br><br>Date: TBD<br>Time: TBD<br>Courtroom: Hon. Charles A. Legge (Ret.) Special Master<br><br>The Honorable Samuel Conti |

**<u>REDACTED PER COURT ORDER (D.E. 1577)</u>**

1

REBUTTAL DECLARATION OF JANET S. NETZ, PH.D., IN SUPPORT OF MOTION OF INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION

MDL No 1917

I. Qualifications ..... 1

II. Assignment ..... 1

III. The relevant economic questions for class certification ..... 2

IV. Summary of my testimony ..... 3

A. Conclusion: The cartel charged higher prices to direct purchasers than would have occurred in the but-for world ..... 3

B. Conclusion: The cartel impact was common across direct purchasers in the form of higher prices ..... 4

C. Conclusion: The overcharge was passed on to indirect purchasers, causing common impact on class members in the form of higher prices ..... 5

D. Conclusion: The overcharge can be calculated using a common method based on common evidence ..... 5

E. Conclusion: The pass-through rate can be calculated using a common method based on common evidence ..... 6

V. Summary of Prof. Willig's claims ..... 6

VI. Prof. Willig's analyses provide unreliable evidence for assessing commonality ..... 6

A. Prof. Willig's evidence on price diversity is unreliable for assessing commonality ..... 7

*1. Prof. Willig exaggerates CRT price dispersion by ignoring quantities ..... 7*

*2. Prof. Willig exaggerates product differentiation by failing to consider the economic significance of product characteristics ..... 9*

B. Prof. Willig's evidence of different price changes is substantially driven by irrelevant foreign exchange rate changes ..... 15

*1. Prof. Willig relies on data that comingle foreign exchange rates and CRT prices ..... 16*

*2. Comingling foreign exchange rate and CRT price data makes it less likely to find commonality ..... 18*

*3. Prof. Willig's transformations of the data result in unreliable measures of the relevant CRT prices ..... 18*

*4. The oversights and methodological flaws underlying Prof. Willig's Exhibits 2A, 3A, 9, 16, and 17A are repeated throughout his rebuttal report ..... 20*

VII. The cartel had a common impact on direct purchasers in the form of higher prices ..... 20

A. Overview ..... 20

*1. Summary of my findings ..... 20*

*2. Summary of Prof. Willig's criticisms ..... 21*

B. Economic theory as applied to the facts of the case is consistent with the cartel's success in increasing prices ..... 21

*1. The cartel had market power ..... 21*

*2. Vertical integration is consistent with a successful cartel ..... 24*

a) The net effect of facilitating factors is ambiguous ..... 24

b) Vertical integration and cartel cheating ..... 24

(1) Prof. Willig presents only one side of the story when describing the effects of vertical integration on the likelihood of cartel success ... 24

(2) Many vertically integrated firms have been part of successful cartels. ... 25

(3) Vertical integration can facilitate collusion ... 25

(4) Prof. Willig's argument that vertically integrated firms are more likely to cheat on the cartel agreement is inconsistent with standard economic theory ... 26

(5) The CRT cartel developed sophisticated strategies for sharing information and developing trust ... 27

*3. Changing market shares are consistent with an effective cartel ... 28*

a) Shifting market shares are consistent with successful and stable collusion ... 28

b) Successful cartels may have significant changes in market shares ... 29

C. The operation of the cartel is consistent with an effective cartel ... 30

D. The relationship between actual and target prices shows that the cartel was effective ... 32

*1. The existence of a price structure leads to common impact ... 32*

*2. Grouping of Defendants' data is appropriate given target prices set by the cartel ... 33*

*3. Matching global target prices to global actual prices is appropriate ... 33*

*4. Prof. Willig's price-matching criticisms are flawed ... 33*

*5. Prof. Willig's regression analysis is not a useful analysis to determine whether the cartel was effective ... 35*

a) Prof. Willig's regression is nonsensical ... 36

b) Prof. Willig's regression is based on unreliable data ... 37

E. The existence of a price structure is evidence that direct purchasers suffered common impact in the form of higher prices ... 39

*1. A price structure causes the cartel to have a common impact on direct purchasers ... 39*

a) What a price structure is ... 39

b) A price structure can exist even if price relationships change over time ... 40

c) The cartel raised the entire price structure ... 41

d) A price structure exists ... 42

(1) Documentary evidence of a price structure ... 42

(2) Statistical evidence of a price structure ... 42

*2. Prof. Willig's evidence regarding heterogeneity is consistent with the existence of a price structure ... 43*

a) Summary of Prof. Willig's assertion that a price structure does not exist ... 43

b) Prof. Willig exaggerates the degree of price variation ... 44

c) Price heterogeneity is consistent with the existence of a price structure ... 44

(1) Price heterogeneity at a point in time ... 45

(a) Different prices for different CRTs ... 45

(b) Buyer-seller relationships ... 45

(2) Prices differences over time are consistent with the existence of a price structure 46

*3. The price-fixing process accommodated changes in relative prices over time ............ 47*

*4. Prices of CRTs are primarily determined by common factors .................................... 48*

*5. I continue to conclude the cartel raised the prices of all CRTs at issue over the damages period............................................................................................................ 50*

*6. Prof. Willig's inconsequential conclusions.................................................................. 51*

F. The cartel caused higher prices in North America........................................................ 52

G. It is not necessary to estimate a but-for price to determine whether the cartel had common impact.................................................................................................................. 57

H. Conclusion: The cartel had a common impact on direct purchasers in the form of higher prices ................................................................................................................ 57

VIII. The cartel had a common impact on indirect purchasers................................................ 59

A. Overview of the issues ................................................................................................. 59

*1. Summary of my conclusions......................................................................................... 59*

*2. Summary of Prof. Willig's criticisms ........................................................................... 60*

B. Distribution chain.......................................................................................................... 61

*1. Different business models ............................................................................................ 61*

*2. Number of steps in distribution..................................................................................... 61*

C. Prof. Willig ignores economic theory and market conditions in his evaluation of pass-through ........................................................................................................................ 62

D. Prof. Willig's analyses and evidence are premised on the incorrect experiment ............ 63

E. Prof. Willig confuses common impact versus "uniform" pass-through .......................... 64

F. Prof. Willig's analyses are irrelevant.............................................................................. 65

G. Direct Action Plaintiff (DAP) complaints ..................................................................... 66

IX. The overcharge imposed on direct purchasers can be measured using common methods based on common evidence ......................................................................................... 67

A. Overview of the issues ................................................................................................... 67

*1. Summary of my conclusions......................................................................................... 67*

*2. Summary of Prof. Willig's criticisms ........................................................................... 68*

B. The economic determinants method controls for non-cartel related factors.................... 68

C. VHS recorder and portable CD player manufacturers faced similar market conditions as Defendants ................................................................................................................... 69

D. The market power method provides a reasonable measure of the overcharge ................ 70

E. The merger simulation method provides a reasonable measure of the direct overcharge 72

F. Measurement of the antitrust overcharges to direct purchasers is susceptible to common proof............................................................................................................................ 73

X. The pass-through rate to class members can be measured using common methods based on common evidence ....................................................................................................... 73

A. Overview of the issues ........ 73

*1. Summary of my conclusions* ........ *73*

*2. Updated results* ........ *74*

*3. Summary of Prof. Willig's methods and criticisms* ........ *75*

B. Prof. Willig's own results undermine his method ........ 76

*1. Prof. Willig controls for "differences" between identical products* ........ *76*

*2. Prof. Willig's product specific regressions* ........ *78*

a) Prof. Willig's reported results are limited and misleading ........ 78

b) Prof. Willig's results are implausible ........ 79

C. Prof. Willig's time trend variable is inappropriate ........ 80

D. Summary ........ 81

XI. My conclusions are unchanged: the cartel had a common impact on class members and that impact can be quantified using common methods based on common evidence ........ 82

XII. Appendix A: My pass-through results are qualitatively unchanged ........ 83

A. Dell ........ 83

B. TACP ........ 83

C. Ingram Micro ........ 84

D. Best Buy ........ 84

E. Circuit City ........ 84

F. Top-to-bottom study ........ 85

XIII. Appendix B: Prof. Willig's pass-through analyses and evidence premised on the incorrect experiment ........ 86

A. Testimonial evidence cited does not contradict my finding of pass-through at 100% or more ........ 87

B. Examples of "de-linked" prices and costs ........ 89

*1. Zones* ........ *89*

*2. TACP* ........ *90*

XIV. Appendix C: Analyses by Prof. Willig that do not contain the requisite information to measure pass-through ........ 91

A. Prof. Willig's finished goods price graphs are misleading ........ 91

B. Prof. Willig's finished goods price graphs are not relevant ........ 91

C. Plaintiff Steve Ganz's purchase ........ 92

# I. Qualifications

I, Janet S. Netz, am a founding partner of applEcon, LLC. Plaintiffs' counsel asked me to determine whether the Defendants' alleged conduct had common or class-wide impact on the members of the proposed class and whether computation of the damages suffered by the class members as a result of Defendants' alleged conduct is susceptible to common proof on a formulaic basis. My education, skill, and experience qualify me to undertake the necessary economic research into the facts and data of the case to provide reliable answers to the proposed questions.

I have been a tenured Associate Professor of Economics at Purdue University and a Visiting Associate Professor at the University of Michigan. I received a B.A. (1986) from the University of California, Berkeley, *cum laude*, and an M.A. (1990) and Ph.D. (1992) from the University of Michigan, all in the field of economics. My doctoral fields were Industrial Organization, which is the study of firms and markets, the economic field most closely related to the issues in this case specifically and in antitrust generally, and International Trade, which includes the study of firms and markets in a global environment.

Among the courses that I have taught, those that are most closely related to the issues of this case include Industrial Organization at the undergraduate and doctoral level; Antitrust and Regulation at the undergraduate level; Microeconomic Theory at the undergraduate and master's level; and International Trade at the undergraduate and master's levels. I have guest lectured on the role of an economic expert in an Alternative Dispute Resolution class at the University of Michigan Law School. I have spoken on the role of economists and economics in class action antitrust cases at several American Bar Association conference programs. My research has focused on competitive interactions of firms and strategies firms can use to increase profits. I have published in peer-reviewed, scholarly journals and have presented my research at many conferences and seminars. A detailed account of my academic employment and publication histories is provided in my curriculum vitae, which is attached as Exhibit A.

I have consulted on numerous antitrust cases and have testified on class certification or class decertification issues. I have also testified in trial or by affidavit or declaration, especially with regard to the determination of the impact of anti-competitive conduct on consumers and quantifying the magnitude of the impact, for over ten years. A list of the cases on which I have testified and consulted is provided in my curriculum vitae, which is attached as Exhibit A.

# II. Assignment

I have been asked by Plaintiffs' counsel to reconsider my conclusions regarding the economic effects of Defendants' allegedly illegal conduct in light of Defendants' expert Prof. Willig's report. The relevant economic questions remain whether Defendants' conduct had common or class-wide impact on the members of the proposed class and whether computation of the damages suffered by the class members as a result of Defendants' alleged conduct is susceptible to common proof on a formulaic basis.

Again, I undertake my analysis on the assumption that liability will be proven. That is, I assume that Plaintiffs will prove that Defendants conspired to jointly set the price of CRT tubes, as Plaintiffs allege. While I assume that the allegations in the Complaint are true, I also investigate evidence regarding the operation of the cartel in order to evaluate whether such an alleged cartel

would be effective. I did not come across evidence that was broadly contradictory to the allegations in the Complaint.

My staff, under my guidance, and I have reviewed numerous materials on which I base my conclusions. To the best of my ability, I have kept track of the confidential and public materials reviewed since my initial report was filed 1 October 2012 in Exhibits B and C, respectively. I reserve the right to revise my conclusions and opinions as more information comes to light.

## III.    The relevant economic questions for class certification

The relevant economic questions for class certification derive from Federal Rule 23(b)(3): inter alia, a class action can be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members". To provide information to the court regarding the predominance of common factors, I investigate whether the CRT cartel's anticompetitive conduct caused harm to all members of the putative class and whether damages can be calculated using a common, formulaic method. The harm alleged by Plaintiffs consists of overcharges; that is, prices that were higher than they would have been absent the cartel's challenged conduct; in a word, that prices were "supracompetitive".[1]

Thus, to evaluate the existence or magnitude of harm caused by a price-fixing cartel, the appropriate comparison is between the actual price – that is, the price that we observe in the presence of the cartel – and the but-for price – that is, the price that we do not observe that would have occurred in the absence of the cartel.[2]

Care must be taken to avoid confusion between two different concepts regarding prices that are often described using similar language; one of the concepts is central to class certification, but the other is not. The notion central to class certification is whether the price that is observed (which I often refer to as the actual price) is higher than the price that would have occurred had the cartel not engaged in the price-fixing conduct. The seemingly similar concept is how prices that are observed change over time. The actual price can be above the but-for price at the same time that the actual price increases, decreases, or remains stable over time. The words "increase in price" could mean "the cartel increased the actual price relative to the but-for price" or it could mean "the price in February was greater than the price in January." I attempt to be precise in the exposition to avoid confusing the court.

Prices change over time for many reasons, including (but not exclusively) the exercise of market power, and multiple influences can occur at the same time. For example, the observation that competition from LCD and plasma flat panel displays caused CRT prices to decline over time is, on its own, uninformative as to the existence and magnitude of impact caused by the exercise of market power; it does not mean that prices are not supracompetitive. Prof. Willig agrees that a

---

[1] Netz, Janet S., 01 October 2012, Declaration of Janet S. Netz, PH.D., In Support of Motion of Indirect-Purchaser Plaintiffs For Class Certification, In re: Cathode Ray Tube (CRT) Antitrust Litigation (United States District Court Northern District of California San Francisco Division) (Hereinafter "Original Report"), Section IV.

[2] Throughout the rebuttal report, and in my original report, I use the term "actual" to specify the outcome in the cartelized world that we observed. It is the counterpart to the term "but-for".

cartel can be operating effectively even if prices are observed to fall over time.[3] However, some of his statements must be read carefully to avoid confusing mere changes in price over time with evidence regarding whether prices are supracompetitive.[4]

## IV.   Summary of my testimony

Prof. Willig and Defendants' counsel routinely mischaracterize my testimony in his expert report and their Memorandum in Opposition to Class Certification, respectively.[5] I therefore summarize my testimony thus far so that the reader understands the conclusions to which I have actually testified, as well as the foundation for those conclusions.

### A.   Conclusion: The cartel charged higher prices to direct purchasers than would have occurred in the but-for world

I first evaluated whether the alleged cartel operated in the CRT industry and in such a way that it would successfully raise prices above their competitive level. I conclude that the cartel charged higher prices to direct purchasers than would have occurred in the but-for world.  I based my conclusion on the following analyses:

- I examined the characteristics of the CRT industry that are relevant to successful price-fixing. The relevant facts include Defendants' dominant share of the capacity to make CRTs; limited alternative display technologies available for monitors and TVs for much of the damages period; and barriers to entry.[6]

  - Based on this evidence, I find that the cartel possessed the ability to jointly increase the price of CRTs above the competitive level.



- I examined the documentary and testimonial evidence related to the operation of the cartel, including types, attendees, and frequencies of cartel meetings and the topics that were discussed at cartel meetings and other forms of communications among Defendants.
  - Based on this review of the evidence, I find that the CRT cartel engaged in practices that have enabled other cartels to successfully raise price, including restricting capacity, sharing information, and monitoring prices.
- I evaluated direct evidence of the cartel's success, including contemporaneous statements by cartel members describing the cartel's success.
- I evaluated the impacts of the cartel's conduct on the firm. Any firm that participates in a cartel risks substantial monetary costs and incarceration of firm executives, since cartels are illegal in most of the developed world. A firm will therefore not participate in a cartel unless it expects to sufficiently increase profits that it would more than cover the expected costs of participation, including fines, damages, and incarceration. The participation of Defendants for up to thirteen years is indirect evidence that the cartel was successful in increasing the price of CRTs.[7]

Based on the evidence and analyses just summarized, I found that the cartel activities led to a price to direct purchasers that was higher than it would have been but for the cartel.

### B. Conclusion: The cartel impact was common across direct purchasers in the form of higher prices

I next evaluated whether the impact of the alleged cartel was the same for all direct purchasers. I conclude that the cartel charged higher prices to all direct purchasers; in other words, that the impact was common. Common impact can be inferred from the existence of a price structure, by which I mean that when a price structure exists, a cartel can cause all prices to be supracompetitive by setting a subset of prices.[8]

I based my conclusion on the following analyses:

[7] Not all Defendants were in operation for the entire damages period.

[8] See Section VII.E.1.

[9] Original Report, p. 67.

- 

Based on these analyses, I conclude that the impact of the cartel on direct purchasers was common: all direct purchasers faced higher prices because of the cartel.

### C. Conclusion: The overcharge was passed on to indirect purchasers, causing common impact on class members in the form of higher prices

I next considered whether the common impact imposed on direct purchasers would be passed through to all class members, causing common impact to class members.

- I examined evidence relating to how CRTs make their way from Defendants' factories to class members' hands, including the steps of distribution and the degree of competitiveness of the distribution channel.

- I examined the economic literature on pass-through and applied it to the facts of the case, including the intense competition in the distribution channel, pricing diversity, and various pricing strategies.

  - Intense competition means that resellers will pass-through the overcharge. Pass-through is consistent with the existence of price differences and different price strategies.

- I examined the documentary evidence, which showed that market participants, including Defendants, recognize that CRT price changes are passed through to retail CRT product prices.

Based on these analyses, I conclude that the overcharge was passed through to class members.

### D. Conclusion: The overcharge can be calculated using a common method based on common evidence

I next considered whether the overcharge imposed on direct purchasers could be measured using a common method and common evidence. I understand that it is not necessary that the overcharge be actually measured at this stage of the proceedings, but rather to provide the judge with evidence regarding whether common issues predominate over individual issues.

- I evaluated a variety of methods that have been used to calculate the impact on price of price-fixing in other settings to determine whether the facts of the price-fixing allegations and the industry characteristics in this case would allow different methods to be appropriately implemented.

- I investigated whether the data would be available for the implementation of various overcharge models. I looked at data available from Defendants, market research firms, the government, and other third parties.

Based on these analyses, I conclude that there are several methods that are applicable to the facts of the case and for which the necessary data are available. These methods would be implemented in the same way, regardless of whether the plaintiff were an individual or a class.

### E. Conclusion: The pass-through rate can be calculated using a common method based on common evidence

Finally I considered whether the pass-through rate could be calculated using a common method based on common evidence.

- I worked with lawyers to obtain sales data from all levels of the distribution channel and from all types of resellers that contained the requisite information needed to calculate pass-through rates for each reseller and for each CRT application.
- I conducted 40 studies of pass-through for different firms involved in the distribution of CRTs and CRT products and for CDTs and CPTs separately. The results of all of these pass-through studies give pass-through rates of at least 100%. If pass-through is at least 100% at each stage of the distribution channel then the entire overcharge was passed through to class members.

I conclude that the pass-through rate can be calculated using a common method and common evidence.

## V.

[14]

## VI. Prof. Willig's analyses provide unreliable evidence for assessing commonality

I have reviewed Defendants' expert Prof. Willig's report. I find the conclusions offered by Prof. Willig to be largely irrelevant and unreliable for addressing whether Defendants' conduct had common or class-wide impact on the members of the proposed class. I also find the conclusions offered by Prof. Willig to be unreliable for evaluating whether computation of the damages suffered by the class members as a result of Defendants' conduct is susceptible to common proof on a formulaic basis. In particular, I find that Prof. Willig has relied upon analyses that ignore important aspects of the data, and that these oversights yield findings that are biased in a direction favorable to Defendants and that are inconsistent with record evidence. Moreover,

---

[10] Willig Report, ¶14.

[11] Willig Report, ¶26.

[12] Willig Report, ¶33.

[13] Willig Report, ¶34.

[14] Willig Report, ¶160.

many of Prof. Willig's analyses, even if they had been implemented correctly, fail to provide a sufficient basis for his conclusions. The recurrent oversights and methodological flaws in Prof. Willig's analyses also extend to his attempts to rebut the conclusions I offered in my class certification declaration.

Two lines of analyses are central to Prof. Willig's conclusion that commonality is implausible – his analyses of price differences across CRTs and his analyses of CRT price changes.[15] I now detail the ways in which the evidence Prof. Willig presents regarding CRT price diversity and CRT price changes rely on methodological flaws that bias the results in ways that grossly exaggerate the degree of price diversity and yield unreliable measures of CRT price changes. I also explain why, even if Prof. Willig had implemented the analyses correctly, his findings do not preclude common impact and thus provide an unreliable basis for his conclusion.

### A. Prof. Willig's evidence on price diversity is unreliable for assessing commonality

In my class certification declaration, my analysis of the Defendants' data showed that the same small number of common factors – application, size, date, aspect ratio (widescreen), and finish – explain the majority of the variation in prices.[16] This indicates a large degree of commonality across purchasers of CRTs: most of the price difference between two purchasers of CRTs at a given point in time is explained by these common product characteristics.

My finding on this point – that the majority of price variation is explained by common factors – is not rebutted by Prof. Willig. Rather, Prof. Willig argues that there is a vast range of products at issue with a vast range of prices and price variation.[17] Prof. Willig's evidence is unreliable, and when properly examined reveals a relatively small degree of diversity.

1.

15

16

17 Willig Report, ¶15.

18

19

20

### 2. Prof. Willig exaggerates product differentiation by failing to consider the economic significance of product characteristics

[21] Willig Report Exhibit 11B, note (7).

[22]

[23] I grouped 20" and 21" CPTs on the same exhibit because the Defendants consistently discuss them together. From the pricing and the treatment of the tubes in Defendant documents, they appear to be very close substitutes.

[24]

[25] Willig Report, ¶44.

[26] Willig Report, ¶15.

[redacted]

Prof. Willig overstates the importance of differentiation across CRTs to issues of commonality. CRTs were generally *not* designed for a specific customer nor heavily customized for each purchaser. Rather, CRT manufacturers each had a limited number of major product designs, which they could alter in various minor ways. A given minor alteration was typically sold to multiple customers. Furthermore, the minor variations generally have quite limited price differentials across them. This is readily seen by examining the Defendants' sales data.

[redacted] By model family, I refer to groups of CRTs which share the same major characteristics. Following industry practice, I identify families of CRTs based on the first six characters of the Worldwide Type Designation System ("WTDS") model numbers assigned to CRTs. These characters denote the application, aspect ratio, screen size, and major design classification of the CRT.[29] To determine whether some product families are more economically relevant than others, I calculated the share of identifiable unit sales accounted for by each product family for each year and Defendant.[30] I then aggregated these shares for the top five product families in each year and for each Defendant. The results can be found in Exhibit 14. Over 20% of the time, the five top-selling product families account for 100% of total units sold in that year for that Defendant for that application. About 60% of the time, the five top-selling product families for a Defendant in a particular year accounted for 95% or more of total units sold in that year. From this result, it is clear that a relatively small number of product families were of major economic significance.

With this sort of sales dominance by a small number of product families, it is apparent a few product families – the few dominant major design classifications – were marketed widely across customers. That is, a single CRT design was sold to many customers. The WTDS codes in the sales data reveal that even at the finest level of granularity tracked by the system, many tubes, possibly most, were sold to multiple customers.[31,32] [redacted]

---

[27] Willig Report, ¶¶39-42.

[28] Willig Report, ¶42.

[29] The first character of the WTDS code indicates the application and aspect ratio (wide-screen vs. normal) of the model. The second and third characters indicate the diagonal length of the screen in centimeters. The fourth, fifth, and sixth characters give the major design classification, which includes characteristics such as deflection angle, neck diameter, shape, mask pitch, and electron gun information. Industry sources refer to these as delineating the product family. [redacted]

[30] [redacted]

[31] [redacted]

[32] The following evidence is anecdotal, rather than a quantitative analysis of the degree to which individual product variations are sold to multiple customers. A full quantitative analysis is precluded because the Defendants' sales data, even within a single manufacturer, are rarely perfectly consistent in terms of customer names. If I merely



reported the count of distinct customer names for specific products, it is likely I would substantially overstate the number of distinct customers, which is anticonservative. I therefore draw my conclusions from the anecdotal evidence.

[33] This is not a randomly selected example.  Rather, it is the most popular product family in the defendant data.

[34] Although I do not have decoders that allow me to tell the exact specifications of this product, the WTDS system makes it clear that products with the same major and minor design classification are the same design down to mask type, glass type, tint, and coatings.

[35]

If I look even more closely, down to having the same deflection yoke installed, four different deflection yokes each had sales in excess of 3 million units and each was sold to many customers.

[36]

- [redacted]

These examples demonstrate that many CRTs are neither designed for a specific customer nor heavily customized for each sale: a basic design is sold to multiple customers, frequently with multiple customers sharing the identical minor variations as well. Not only are major design families, and even specific minor variations, sold to many customers, but the differentiators among minor variations tend to carry small price differences as well, as I explain in the next paragraph.

Many of the characteristics asserted by Prof. Willig, and some witnesses, as leading to the great degree of price variation are economically very minor differences.[37] This is apparent in the incremental charges described in meeting notes for various attributes. The product characteristics can be roughly grouped into three categories: finish, major price differentiators, and minor price differentiators. Finish – whether the tube shipped without or with the deflection yoke and related components installed; the former are referred to as bare and the latter as ITC – is different from the other two categories because it does not reflect differences in the CRT as acquired by potential class members. *All* tubes require ITC components, so finish is merely a matter of which entity is paid for the ITC components and their installation, the tube manufacturer or some other party, not a matter of whether this particular option is purchased.[38] The major price differentiators are size and shape.[39] These typically involve price premiums substantially larger than 10%, often several times that level. Minor price differentiators discussed in meeting notes include resolution,[40] frequency,[41] safety standards,[42] mask type,[43] and neck diameter.[44] The fact

[37] Willig Report, ¶15, 41 - 42.

[38] Original Report, p. 18.

[39] [redacted]

[40] [redacted]

[41] [redacted]

[42] [redacted]

- [redacted]

that only application, size, and shape were meaningful price differentiators inherently limits the number of economically meaningfully different products at issue to a relatively small number.

This focus on a

•

•

•

[43]

[44]

[45]

•

•

•

•

•

•

•

[46]

•

•

•

small number of attributes is consistent with both my hedonic regression analyses that showed that target prices and actual prices were predominantly determined by a small number of product attributes and the evidence in Exhibit 14 that there are a few archetype products with a number of minor variations.

[47]

As I described in my original report,[48] "competition" among CRT manufacturers is for design wins: tube manufacturers compete by convincing CRT finished goods manufacturers to use their tube in a given finished product design. Once the finished good design is *finalized*, the finished good manufacturer cannot readily switch to an alternative CRT *for that specific finished good model*.

When a finished good manufacturer is in the design stage, the various CRTs available for the application and size desired are almost completely interchangeable – differences in electrical components, mounting points, the curvature where the tube and the bezel mate – are all open to change. Alternatively, after a finished product design has been finalized and a specific tube has been chosen, the finished product manufacturer can cut back on production of one design in favor of a different design for the same size product. In this way, the finished good manufacturer can readily substitute between two incompatible CRTs from different manufacturers, simply by having two different designs of, for example, TVs using 21" CPTs from two different tube manufacturers. See Exhibit 15.

[49] Gaining share by price discounting only works if finished goods manufacturers can respond to below-cartel pricing by *switching to the "cheating" supplier*

---

[47] Willig Report, ¶¶41-42.

[48] Original Report, pp. 18-20

[49] Willig Report, ¶88.

Chunghwa explicitly blamed a short-term reduction in its order volume on Samsung undercutting them by $1 to $2. Again, this only makes sense if customers were able to reduce production of Chunghwa-based monitors and increase production of Samsung-based monitors. Chunghwa Picture Tubes and LTD, 18 December 1996, Customer Contact Report, Main Content Market Information/Pricing Opinion Discussion, CHU00028773 - CHU00028774 at 8773E.

– that is, only if the finished goods manufacturer can readily substitute at the design-in stage or, post-design-in, by switching production from one finished good model to another.

To the extent consumers view different finished goods of the same size from the same manufacturer as very close substitutes, the finished goods manufacturer can view the different tubes embodied in its finished goods as very close substitutes.

### B. Prof. Willig's evidence of different price changes is substantially driven by irrelevant foreign exchange rate changes

[redacted] In this section, I show that, due to his inattention to detail, the data he presents in many of his exhibits conflate the effects of changes in exchange rates with changes in CRT prices, and therefore exaggerate the volatility and heterogeneity in CRT prices.

Prof. Willig presents and draws conclusions from analyses that are unreliable; in particular, Prof. Willig's Exhibits 2A, 3A, 9, 16, and 17A are all fatally flawed. Consider his claim, [redacted][50] When assessing the validity of this claim, I first turn to my knowledge of the CRT industry and basic economic theory. This case involves a mature industry characterized by highly developed products. Long-term, stable relationships between manufacturers and customers prevail in the industry, in part because finished products are tailored around particular CRT models. Given these relationships, stable prices that are not renegotiated on an order-to-order basis are expected; in such a situation, price changes would have neither a large variance nor a high frequency, contrary to Prof. Willig's analyses.

Documentary and testimonial evidence conforms to these instincts. [redacted]

---

[50] Willig Report, ¶46.

[51] See, e.g.,

- [redacted]
- [redacted]

[52] [redacted]

- [redacted]
- [redacted]



### 1. Prof. Willig relies on data that comingle foreign exchange rates and CRT prices

Examination of the data reveals that Prof. Willig has not accounted for the impact of foreign exchange rates on his analyses. Because he has conflated changes in exchange rates with changes in the negotiated price of CRTs, Prof. Willig substantially exaggerates the volatility in CRT prices.

Frequently, and perhaps in the majority of cases, sales were negotiated in a currency other than the U.S. dollar.[55]

[53]

[54]

[55] For each transaction in this case, there are three potentially relevant currencies. First, the cartel established target prices in U.S. dollars, as can be seen in the cartel meeting notes. Second, most of the data produced by Defendants was produced at the plant or division level and typically is reported in a single currency for all transactions; call this the currency of record or the accounting currency for the transaction. Finally, there is a currency in which the price was specified when agreed between the buyer and seller; call this the contract currency. In some cases, for example,



As such, any change in the U.S. dollar price of a product over time reflects a change in the negotiated price, a fluctuation in the exchange rate, or both. Since exchange rates varied on a daily basis for most of the currencies in question during the class period, at times quite volatilely, noise in U.S. dollar prices due to exchange rate variation is significant and pervasive.

56

57

58





### 2. Comingling foreign exchange rate and CRT price data makes it less likely to find commonality

Before I conducted the analyses underlying my initial report, I carefully considered the impact that exchange rates would have on my ability to draw conclusions about the CRT industry and alleged cartel. After weighing several options, I decided to conduct my analyses using prices in U.S. dollars. This decision was based on a number of factors, including the following two. First, examining prices in a common currency allowed me to make direct comparisons between prices, greatly simplifying the execution and interpretation of my analyses. Second, the effect of exchange rate volatility on analyses conducted using prices in U.S. dollars is easily interpreted. In my hedonic analyses, for example, exchange rate noise accounts for a share of the unexplained variation in the model. In my price matching analyses, on the other hand, it increases the variance of the distribution of the ratio of actual to target prices around the mean. Both of these effects are conservative to my analysis. That is, this noise increases the likelihood that I will find that individual factors outweigh the influence of common factors.

### 3. Prof. Willig's transformations of the data result in unreliable measures of the relevant CRT prices

be due to exchange rate volatility as well, possibly things like a $U.S. price being paid in a given currency on one day and being credited at a slightly different exchange rate on a slightly later day.

[59] Willig Dep., p. 89.

[60] Willig Dep., pp. 90-91.



[61] Willig Report, ¶18 and Exhibit 9.

[62] Specifically, Willig Report Exhibits 2A, 3A, 9, 16, and 17.



[redacted]

#### 4. The oversights and methodological flaws underlying Prof. Willig's Exhibits 2A, 3A, 9, 16, and 17A are repeated throughout his rebuttal report

I have provided this extended example to demonstrate how one simple oversight calls into questions the validity of at least five exhibits from Prof. Willig's report. Throughout this rebuttal, I will demonstrate that similar oversights and methodological flaws are recurrent in Prof. Willig's report. Prof. Willig has based his conclusions on flawed analyses; they are therefore untenable.

## VII. The cartel had a common impact on direct purchasers in the form of higher prices

### A. Overview

#### 1. Summary of my findings

Having reviewed Prof. Willig's analyses, I find that my conclusions are unchanged. Applying standard economic principles to the facts of the case lead to the conclusion that the cartel had market power to increase prices above the competitive level. The cartel engaged in conduct that has been used by successful cartels. An examination of the documentary evidence and a statistical analysis of cartel target prices relative to actual prices further supports my conclusion of a successful cartel. [redacted] In fact, these two industry characteristics are equally consistent with the

[63] Willig Report, ¶49.

existence of a successful cartel, as I explain in Sections VII.B.2 and VII.B.3, and hence are uninformative.

To determine whether the cartel's impact was common across direct purchasers, I examined whether a price structure existed. Price structure is simply a shorthand way of referring to price patterns between related products.[64] For the impact of a cartel to be common – that is, to have raised price above the but-for competitive price for all direct purchasers – is in no way related to changes in the price structure over time. The relationship between prices at a point in time is dependent on the market forces prevailing at that time. As those market forces change over time (e.g., as larger CRTs became available), so do the actual and but-for prices. The impact remains common so long as the entire price structure at that point in time is higher than it would have been in a competitive world, at that same point in time.

#### 2. Summary of Prof. Willig's criticisms

### B. Economic theory as applied to the facts of the case is consistent with the cartel's success in increasing prices

#### 1. The cartel had market power

---

[64] Section VII.E.1.a).

[65] Willig Report, ¶81-89 and Memo in Opp., pp. 9-10.

[66] Willig Report, ¶103-114 and Memo in Opp., pp. 28-33.

[67] Willig Report, ¶¶38-79 and Memo in Opp., pp. 33-36.

[68] Willig Report, ¶¶64-68 and Memo in Opp., pp. 31-32.

[69]

[70] Original Report Exhibit 12.



[71] Original Report, Section VIII.A.1.b).(2).

[72] Original Report, Section VIII.A.1.c).

[73] 

[74] Willig Report, ¶87.

[75] Willig Report, ¶88.

[76] Original Report, footnotes 176 and 177.

[77] Original Report, footnotes 178, 179, and 180.

[78] Willig Dep., p. 63:16 - 23.

[79] 

80

### 2. Vertical integration is consistent with a successful cartel

#### a) The net effect of facilitating factors is ambiguous

Economists have identified – theoretically and empirically – a number of industry characteristics which may facilitate or hinder the ability of firms to successfully collude to raise prices. For example, it may be easier for firms to collude if they interact in multiple markets, or it may be more difficult to collude if the number of firms is large and each has a relatively small market share.

Analysis of such industry characteristics may be useful when assessing the relative likelihood of collusion in a large cross-section of industries. However, they are of limited use in determining whether collusion has actually occurred in a particular industry, or whether a cartel has successfully raised prices above the competitive level.

Both cartelized and competitive industries are likely to exhibit one or more characteristics that facilitate collusion and one or more characteristics that hinder collusion. Economic theory has very little to say about the relative magnitude of each effect. Furthermore, some industry characteristics, such as the presence of vertical integration, may facilitate collusion in one theoretical model, but hinder collusion in another model.

Accordingly, the net effect of one or more industry characteristics on the ability of firms to collude is ambiguous, and whether or not a cartel can successfully raise prices in a specific industry is an empirical question. For these reasons, the success of the CRT cartel is an empirical question and cannot be determined solely by economic theory.[81]

#### b) Vertical integration and cartel cheating

Vertical integration refers to a situation where a firm that operates at one stage in the distribution channel (e.g., CRT manufacturers) also operate at another stage in the distribution channel (e.g., manufacturers of CRT monitors and/or TVs).

[81] Willig Report, p. 38.

[82] Original Report, Section VI.C.3.

[83] Willig Report, pp. 35-38.

[84] Carlton, Dennis W. and Jeffrey M. Perloff, 2005, Modern Industrial Organization, Fourth Edition, Person Addison Wesley, p. 139.



(2) Many vertically integrated firms have been part of successful cartels.

One paper notes that "many famous cases of collusion have involved intermediate goods industries. Further, a significant fraction of those cases involved industries where one or more firms were vertically integrated."[87] Examples of successful cartels in which at least one firm was vertically integrated include an early 20th century German steel cartel, the bromine cartel, railways, timber-cutting, and joint bidding for oil and gas tracts.[88]

The LCD cartel was comprised of many of the same firms, both vertically integrated (LG, Samsung, Sharp, and Toshiba) and unintegrated (Chunghwa) as the CRT cartel. The varying levels of vertical integration did not prevent them from successfully raising prices and, as found by the jury in the AUO trial, causing at least $500 million in overcharges.[89]

(3) Vertical integration can facilitate collusion

One reason why many successful cartels feature one or more vertically integrated firms could be that vertical integration can facilitate collusion, leading to a more successful and stable cartel than in an industry with unintegrated firms. A survey of the competitive effects of vertical integration concludes that, "generally, successful express or tacit collusion requires reaching an

---

85

86 In my original report, I explained how both vertically integrated and non-integrated cartel members benefit from raising prices above the competitive level. See Original Report, Section V.B.3.

87 Nocke, Volker, and Lucy White, September 2007, Do Vertical Mergers Facilitate Upstream Collusion?, American Economic Review, Vol. 97, No.4, 1321-1339, p. 1321.

88 Nocke, Volker, and Lucy White, September 2007, Do Vertical Mergers Facilitate Upstream Collusion?, American Economic Review, Vol. 97, No.4, 1321-1339, p. 1321.

89 United States Department of Justice, 13 March 2012, Taiwan-Based AU Optronics Corporation, Its Houston-Based Subsidiary and Former Top Executives Convicted for Role in LCD Price-Fixing Conspiracy, http://www.justice.gov/atr/public/press_releases/2012/281032.htm, accessed 20 September 2012.

agreement, monitoring compliance, and punishing defections. Vertical integration might facilitate collusion by aiding any of these activities."[90]

Nocke and White (2007) show that vertical integration can affect the incentive to cheat on a collusive agreement in the upstream industry in at least two ways.[91] First, vertical integration reduces non-integrated firms' incentive to cheat because they cannot profitably sell to the downstream affiliate of a vertically integrated cartel member. This effect is called the "outlets effect" because it reduces the number of outlets through which a cheating firm can sell, reducing the ability to cheat and thus facilitating collusion. On the other hand, it may be more difficult to punish a vertically integrated firm for cheating on the collusive agreement.[92] This "punishment effect" tends to make collusion more difficult to sustain. The authors demonstrate that under very general assumptions the outlets effect dominates the punishment effect. That is, some degree of vertical integration tends to make collusion easier.[93]

The 1984 Merger Guidelines described at least two other ways in which vertical integration could facilitate collusion.[94] First, vertical integration could create a barrier to entry by forcing potential entrants in one market to enter both the upstream and downstream markets. Second, vertical integration may make it easier for cartel members to monitor prices if the price of the downstream product is more visible than price of the upstream product, as is the case in the CRT industry.[95]

[redacted]

[redacted] In such a transaction, there is no economically meaningful sale at a market price. Instead, the upstream affiliate charges a "transfer price" to the downstream affiliate, which, regardless of its size, has no effect whatsoever on the profit of the vertically integrated organization. The vertically integrated firm has no incentive to "cheat" on the cartel agreement by setting a low transfer price because the process is analogous to an individual moving money

[90] Riordan, Michael H., 2008, Competitive Effects of Vertical Integration, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 145-182.

[91] Nocke, Volker, and Lucy White, September 2007, Do Vertical Mergers Facilitate Upstream Collusion?, American Economic Review, Vol. 97, No.4, 1321-1339 and Original Report, pp. 12-14.

[92] Specifically, the downstream affiliate of the vertically integrated firm may make positive profits during the punishment phase, which softens the impact of the cartel's punishment strategy.

[93] In a similar paper, Norman (2009) also finds that vertical integration facilitates collusion. Normann, Hans-Theo, 2009, Vertical Integration, Raising Rivals' Costs and Upstream Collusion, European Economic Review, Vol. 53, 461-480.

[94] The 1984 Merger Guidelines included a section on the horizontal (i.e., competitive) effects of non-horizontal mergers. A sub-section described how vertical mergers can facilitate collusion. My understanding is that the non-horizontal merger guidelines are still in effect. U.S. Department of Justice and Federal Trade Commission, 1984, 1984 Merger Guidelines, Section 4.22.

[95] [redacted]

from one pocket to another pocket.[96] Similarly, other cartel members have no incentive to monitor the internal transfer prices of a vertically integrated firm.

(5) The CRT cartel developed sophisticated strategies for sharing information and developing trust

Because limits to the ability to monitor other cartel members can make enforcement of a cartel agreement difficult, cartels often develop sophisticated organizational structures and institutions to share information and develop trust among members.[99] These strategies are intended to discourage cheating and enhance detection, particularly when prices are otherwise difficult to observe.

[96] The transfer price could matter for tax purposes if, for example, the upstream and downstream affiliates are located in different tax jurisdictions. For this reason there is broad consensus among national tax authorities for the use of the arm's length principle when determining transfer prices between related entities. Loosely stated, the arm's length principle requires related firms to treat each other as separate entities for the purpose of transfer price accounting. See Organisation for Economic Co-Operation and Development, 22 July 2010, Review of Comparability and of Profit Methods: Revision of Chapters I-III of The Transfer Pricing Guidelines.

[97]

[98] The standard economic theory of vertical integration assumes that the upstream and downstream affiliates behave as if they are managed as a single profit-maximizing entity. To such a perfectly-integrated entity, transfer prices are irrelevant. In reality vertically integrated subsidiary firms may have some degree of independence such that managers care about the profit their units make, rather than caring only about the vertically-integrated parent firm's total profits. To the extent that this is the case, cartel members may have an interest in the level of transfer prices.

[99] "Successful cartels overcome this fragility through the development of sophisticated and flexible organizations. Cartels must identify a collusive equilibrium, coordinate on it, and then continuously update as demand and costs fluctuate. Cartels develop these organizations over time as a result of organizational learning. When cartels 'learn,' what are they learning? They learn how to monitor output and prices of individual cartel members in order to detect cheating. They learn how to structure incentives so that collusion is more profitable in the long run than cheating. Successful cartels fashion self-imposed penalties or other compensation schemes for firms that exceed cartel quotas. They learn how to structure cartel-imposed punishments and other disciplinary actions in response to cartel violations. They develop and implement exclusionary practices to prevent entry or expansion by nonmembers. Finally, they develop an elaborate internal hierarchy that allows communication on various levels (executive and middle-management) not only to provide flexibility in the details of the agreement, but to build trust as well." Levenstein, Margaret C., and Valerie Y. Suslow, 2006, What Determines Cartel Success?, Journal of Economic Literature, Vol. XLIV, 43-95, p. 67.





Both papers focus on the identification of characteristics common to industries known to have been cartelized. They both suggest that antitrust authorities could use analysis of market shares over time as a screening tool to determine whether further investigation into collusion is warranted. One author cautions that "At best, collusive markers [such as market shares over time] can serve to screen industries to determine whether they are worthy of more intense

[100] Original Report, Section VIII.A.2.a.

[101]

[102] Original Report, Section VIII.A.2.b.

[103] Original Report, Section VIII.A.2.f.

[104] Willig Report, footnote 87, citing to

- Grout, Paul A. and Silvia Sonderegger, 2005, Predicting Cartels, Office of Fair Trading.
- Harrington, Jr., Joseph E., 2008, Detecting Cartels, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 213-258.

[105]

investigation."[106] Neither paper states that cartels with shifting market shares are ineffective at raising prices or otherwise unstable.

[107] In these models, "the best collusive equilibrium may have market shares moving over time as firms achieve a more efficient mechanism in which a firm with lower cost has a higher market share. … Thus, market shares are predicted to change over time (with firms' costs) and furthermore, a firm's market share is negatively correlated over time."[108]

There is a multiplicity of economic models of collusion, and even for a single model of collusion, there are often a number of potential collusive equilibria. Many collusive equilibria are perfectly consistent with fluctuating market shares, while others may depend, at least in part, on cartel members maintaining relatively stable market shares.[111] That is, firms can collude successfully in a number of ways. Some of these methods of collusion may involve stable market shares, while others may not. Shifting market shares are not necessarily a sign that a cartel has failed to consistently raise prices above the competitive level.

b) Successful cartels may have significant changes in market shares

The market shares of members of successful cartels often vary over time. For example, three recent, high profile cartels – the citric acid, graphite electrodes, and vitamins cartels – exhibited

---

[106] Harrington, Jr., Joseph E., 2008, Detecting Cartels, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 213-258, pp. 236-237.

[107] Harrington, Jr., Joseph E., 2008, Detecting Cartels, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 213-258, pp. 244-246. Athey, Susan and Kyle Bagwell, 2001, Optimal Collusion with Private Information, The RAND Journal of Economics, Vol. 32(3), 428-465, which is the source of the underlying model.

[108] Harrington, Jr., Joseph E., 2008, Detecting Cartels, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 213-258, pp. 244-246. Athey, Susan and Kyle Bagwell, 2001, Optimal Collusion with Private Information, The RAND Journal of Economics, Vol. 32(3), 428-465, which is the source of the underlying model.

[109] Grout, Paul A. and Silvia Sonderegger, 2005, Predicting Cartels, Office of Fair Trading, pp. 37-56 and Annexe B.

[110] Grout, Paul A. and Silvia Sonderegger, 2005, Predicting Cartels, Office of Fair Trading , pp. 37-56 and Annexe B.

[111] "Allowing for a sophisticated cartel design, we find here that optimal collusion is complex, with considerable market-share instability." Athey, Susan and Kyle Bagwell, 2001, Optimal Collusion with Private Information, The RAND Journal of Economics, Vol. 32(3), 428-465, p. 460.

market share instability.[112] The market shares of members of the Florida school milk bid rigging cartel of the 1980s fluctuated substantially.[113] Despite the European paperboard cartel's focus on maintaining stable market shares, the European Commission found that, "the share of some large individual producers did creep up from year to year. … No doubt producers in a position to negotiate from strength would expect an increased share in the market. … The understanding between the producers on market share was thus not static but was subject to periodic adjustment and re-negotiation."[114]

### C. The operation of the cartel is consistent with an effective cartel

[redacted]

[redacted]

[redacted]

---

[112] "Several recent price-fixing cartels engaged in various forms of intertemporal market sharing including the citric acid cartel of 1991-95 (Connor, 2001), the graphite electrodes cartel of 1992-97 (Levenstein, Suslow, and Oswald, 2004), and the vitamins cartel, in particular vitamins A and E over 1989-99 (European Commission, 2003)." Harrington, Jr., Joseph E., 2008, Detecting Cartels, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 213-258, pp. 245-246.

[113] Pesendorfer, Martin, 2000, A Study of Collusion in First-Price Auctions, The Review of Economic Studies, Vol. 67(3), 381-411.

[114] European Commission, 1994, Decision No. 94/601/EC (Cartonboard), Official Journal of the European Communities.

[115] Willig Report, ¶¶88-91.

[116] [redacted]

[117] Willig Report, ¶¶88-91.



[redacted]

[redacted]

> [redacted]

[redacted]

---

118 [redacted]

119 Willig Report, ¶90.

120 Willig Report, ¶¶92-100.

121 See my Original Report, Section VIII.A.2 for a detailed discussion of the operating practices of successful cartels that the CRT cartel adopted.

122 "Cartels do face challenges… But successful cartels have operated in a wide variety of industries by developing organizations that can overcome these challenges." Levenstein, Margaret and Valerie Suslow, March 2006, What Determines Cartel Success?, Journal of Economic Literature, Vol. 44., p. 44.

123 Willig Report, ¶88.

124 [redacted]



[125] "In each of these cases, successful collusion required the development of alternative organizational responses both to actual violations of the collusive agreement and to events that were, absent further investigation by the cartel, observationally equivalent to violations. As repeatedly discovered by these cartel members, the threat of Cournot reversion [i.e., price war] is an inefficient way to sustain collusion." Levenstein, Margaret C. and Valerie Y. Suslow, 2006, What Determines Cartel Success?, Journal of Economic Literature, Vol. XLIV, 43-95, p. 78.

[126] For a detailed description of the price matching analysis, see Section VIII.A.3 of my Original Report.

[127] Memo in Opp., pp. 31:10-32:13.

[128]



129 See Section VI.A for more information on how product characteristics were inferred from model numbers.

130 Willig Report, ¶18.

131 Willig Report, ¶110.



Case 4:07-cv-05944-JST Document 1654-21 Filed 04/25/13 Page 39 of 123

132 Willig Report, ¶110.

133 Willig Report, ¶110.

134 Section VII.D.1 and Original Report Exhibit 15.

135

136

137

138

139

140

[141] Willig Report, ¶91.

[142] Willig Report, ¶¶92-10.

[143] Willig Report, ¶92.

[144] Willig Report, ¶58.

[145] Willig Dep., pp. 41:14 - 42:23.

146

147

[148] I addressed Prof. Willig's mishandling for foreign currency denominated transactions in greater detail in Section VI.B.

### E. The existence of a price structure is evidence that direct purchasers suffered common impact in the form of higher prices

I begin by re-stating what I mean by "price structure", and why the existence of a price structure is evidence that the cartel caused all prices to be supracompetitive. Next, I show that Prof. Willig's evidence is consistent with the existence of a price structure. Finally, I review Prof. Willig's conclusions, and show that virtually all of them are inconsequential statements that are entirely consistent with the existence of a price structure.

#### 1. A price structure causes the cartel to have a common impact on direct purchasers

In my Original Report, I showed that CRT prices have what I call a price structure, and explained that the existence of a price structure forms part of the basis for my conclusion that all direct purchasers of CRTs paid supracompetitive prices.[149] In Section VII.E below, I restate the basis for my conclusion that the existence of a price structure is evidence that the CRT cartel's anticompetitive conduct caused all CRT prices to be above their levels in the but-for world.

##### a) What a price structure is

I begin by restating what I mean by the term "price structure". As I discussed in my original report (Section VIII.B.1.) and in this report in Section VI.A.2, CRTs are differentiated products, with the most important differentiating product characteristics being application (for monitors or for TVs), size, shape, and finish. Prices of CRTs follow certain regularities with respect to these characteristics that differentiate them: for example, at any point in time, all other characteristics equal, larger CRTs are priced higher than smaller CRTs and flat CRTs are priced higher than round CRTs.

The but-for world differs from the actual world only with respect to the challenged conduct. Therefore, CRT products in the but-for world would be differentiated, just as in the actual world, and product differentiators (such as flat screens or larger screens) would have received price differentials in the but-for world, just as in the actual world. Similarly, in the but-for world CRT manufacturers would have had relationships with certain buyers, just as they did in the actual world; CRT manufacturers would have offered special price concessions to these buyers in the but-for as well as the actual world. I use the term price structure as a shorthand to refer to all of these qualitative and categorical characteristics of CRT prices that are the same in the actual and but-for worlds. The price structure therefore includes price differentials at a point in time associated with product differentiation and price differentials at a point in time due to buyer-seller relationships.

The relative prices that are reflected in the price structure are substantially the same in the actual world as in the but-for world. Relative prices are ratios of prices at a point in time; if both prices change by the same percentage, the relative price is unchanged. Relative prices are substantially the same in the but-for world as in the actual world because they are largely determined, in both the competitive but-for world and the cartelized actual world, by the underlying characteristics of CRT demand and supply, including consumers' willingness to pay for product differentiation in the CRTs of the finished products and CRT manufacturers' costs of producing product

[149] Original Report, Section VIII.B.

differentiators. The difference between actual and but-for CRT prices is due solely to the exercise of market power by the cartel. The exercise of market power may cause relative prices to change, but its primary effect is on price levels, not the relationship between prices; a cartel would choose relative prices similar to the relative prices that would prevail in the but-for world.

[150] Willig Report, ¶14.

[151] I do not claim this is true; the assumption simply makes the illustration easier to understand.



[152]

c) The cartel raised the entire price structure

In this section, I show that the cartel had the incentive to cause all prices to be supracompetitive, and that a market mechanism provided the means for the cartel to cause the entire price structure without setting target prices of all CRTs.

Rational cartelization requires that all or most CRT prices be raised above the competitive level. Suppose the cartel raised the price of 15" CDTs above the competitive level, but left the price of 14" CDTs at the competitive level. Some consumers would substitute away from the 15" model towards the 14" model, thereby escaping the price increase. Rational cartelization (that is, operating the cartel in such a way that firms increase their profits relative to the competitive outcome by as much as possible) requires that the cartel set prices that eliminate such opportunities for buyers to escape overcharges. Thus, in this hypothetical example, the cartel would earn higher profits by raising the prices of 14" and 15" CDTs. In that way, consumers cannot substitute to 14" CDTs to avoid the overcharge. This same logic applies to 17" CDTs, flat versus round CDTs, bare and ITC CDTs, etc. More generally, the cartel's choice of prices seeks to maximize profit; doing so requires applying the cartel overcharge over products in such a way that substitution by consumers has the least impact on profits. It is unlikely that the cartel would choose an overcharge of zero on any CRT, for the reason illustrated above.

The cartel need not explicitly fix the price of the 14" CDT in this example in order to cause its price to be above the competitive level; setting the price of the 15" CDT causes the price of substitutes for it (the 14" CDT among them) to rise, due solely to market forces, without any explicitly-set target price for the 14" CDT model. This is because buyers' willingness to pay for any good depends in part on the prices of substitute goods, so when the cartel raises the price of the 15" CDT, buyers of the 14" CDT become willing to pay more for it than they would be willing to pay if the price of the 15" CDT were at the competitive level; this greater willingness to pay will be reaped, at least in part, by CRT manufacturers in the form of higher prices for the 14" CDT and any other substitutes for the 15" CDT. By this market mechanism, the cartel can achieve its goal of causing all CRT prices to be supracompetitive without setting target prices for all of them.

The cartel therefore had the incentive to raise all CRT prices, and a market mechanism by which the cartel could cause all prices to be supracompetitive by setting prices for only a subset of CRT

152

models.[153] [154] I conclude that the cartel's anticompetitive price fixing and output restriction caused all CRT prices to be above but-for levels.

d) A price structure exists

In my Original Report, I presented the documentary and statistical evidence that a price structure exists.

(1) Documentary evidence of a price structure

(2) Statistical evidence of a price structure

Cartel target prices exhibit a structure: my hedonic regression analysis of target prices[156] shows that CRT prices are well-explained by a function of the characteristics of the CRTs subject to price fixing, whether the purchase is made by a major buyer, and a time trend. This function is manifestly a price structure, and the fact that it fits the cartel's target prices so well demonstrates that most of the dispersion in the cartel's target prices is due to objective characteristics of transactions. Since I submitted my Original Report, I have found additional target prices set by the cartel; I have augmented my target price dataset with these new target prices and re-estimated my hedonics regressions. The results are virtually unchanged from those in my Original Report:

 [157]

The cartel's CRT sales prices also exhibit a price structure: they are well-explained by a function of the characteristics of the CRT sold, the buyer-seller pair involved in the transaction, and a time trend.[158]

---

[153] The "subset" of models for which we observe target prices is generally quite broad, covering a substantial range of sizes but at times lacking details about specific variations along non-size attributes.

[154]

[155] See Original Report, p. 67 (footnotes omitted).

[156] See Original Report, p. 68.

[157] See Exhibits RR-19 and RR-20.

[158] See Original Report, Section VIII.B.1.e).

Notably, the two price structures – actual and target – are very similar. The cartel chose precisely the factors that are the primary market price determinants as the focus of its target price structure.

#### 2. Prof. Willig's evidence regarding heterogeneity is consistent with the existence of a price structure

[redacted]

A price structure describes the relationships between prices at a point in time.[161] The textbook economic logic by which I show that the cartel's conduct caused common impact is also about prices at a point in time.[162] Price differentials at a point in time, such as higher prices for larger CRTs than for otherwise-identical smaller CRTs in the same month, are not only consistent with the existence of the price structure, they are integral to it. In Section VII.E.2.c)(1) below, I show that price heterogeneity at a point in time is explained by common factors, and that this evidence therefore supports the existence of a price structure.

[redacted]

---

159 [redacted]

160 See my discussion of the flaws in Prof. Willig's evidence above at Section VI.

161 See Section VII.E.1.a).

162 See Section VII.E.1.c).



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

163 [redacted]

164 [redacted]

165 [redacted]

166 Willig Report, ¶¶78-79 and Exhibits 14 and 15.

167 See footnote 152.

Price heterogeneity falls into two broad categories: differences in prices at a point in time and differences in prices over time. In the next sub-section, I explain that price differences at a point in time are actually part of the price structure. In the following sub-section, I show that differences in prices over time are consistent with the existence of a price structure.

(1) Price heterogeneity at a point in time

(a) Different prices for different CRTs

(b) Buyer-seller relationships

The existence of a price structure is also consistent with the existence of different prices to different customers. Among the characteristics of CRT prices that are the same in the actual and but-for worlds are price adjustments CRT manufacturers confer upon certain of their customers relative to other buyers. Buyers that received a relatively lower price than other buyers in the actual world, for example because they are very large buyers, would have received a relatively lower price than other buyers in the but-for world; both types of buyers would pay lower prices in the but-for world than they did in the actual world. Price variation that is explained by buyer-seller relationships is part of the price structure.

The hedonics regressions applied to Defendants' data in my first declaration show that, while most variation in price is explained by common CRT characteristics such as size and shape, some variation in price is explained by buyer-seller pairs. Variation in price that is explained by buyer-seller pairs is further evidence of the existence of a price structure.[169] Discounts given by a particular seller to a particular direct purchaser are common to all class members who purchase finished products made using the discounted CRTs.

168

169



(2) Prices differences over time are consistent with the existence of a price structure

In this section, I show that evidence that prices change over time is consistent with the existence of a price structure, and with my conclusion that the cartel caused all CRT prices to be supracompetitive. First, I show that my conclusions do not rely in any way on price stability over time; prices that change over time therefore cannot be inconsistent with my conclusions. Second, I show that the price structure and my conclusion that impact was common naturally coexist with prices that change over time.

The price structure describes relationships among prices at a point in time, as I explained above.[170] And, as I showed above, the cartel has the incentive to cause all prices to be above the competitive level and market forces alone cause all prices to be above the competitive level when target prices are explicitly set for only a subset of CRTs. Both the incentive and the market mechanism discuss only prices as they exist at a point in time.[171] Prices that change over time are immaterial to, and therefore consistent with, the existence of a price structure, and my conclusion that the cartel raised the entire price structure.

Changes in CRT prices over time are caused by changes in market conditions, such as changes in consumer demand for CRT products or changes in the cost of manufacturing CRTs. The but-for world differs from the actual world only in the absence of the challenged conduct. Therefore, the same changes in market conditions over time, and consequently the same changes in CRT prices over time, that occurred in the actual world would also have occurred in the but-for world. For example, if the cartel had not fixed prices and restricted output, CRT prices in the but-for world would have changed over time due to the emergence of flat panel displays, just as CRT prices changed in the actual world due to the emergence of flat panel displays. Any differential impact on prices of CDTs and CPTs in the actual world due to the emergence of flat panel displays would also have occurred in the but-for world. Because this differential impact in CDTs and CPTs would have occurred in both the actual and but-for worlds, it is part of the price structure.[172] While these changes in market conditions caused CRT prices to change over time, all CRT prices were lower in the but-for world than in the actual world at each point in time, according to the logic underlying my conclusion that harm was common.[173] There is therefore no inconsistency between my conclusion of common impact based on evidence of the existence of a price structure and any evidence of changes in price over time, or of changes in relative prices over time, or "different dynamics" affecting different models of CRTs.

[redacted]

---

[170] See Sections VII.E.1.a) and VII.E.1.b).

[171] See Section VII.E.1.c).

[172] The price structure includes the characteristics of CRT prices that are the result of circumstances that are the same in the actual and but-for worlds, at a point in time, as I explained above in Section VII.E.1.a).

[173] See Section VII.E.1.c).

[174] In footnote 163 I show that most of the evidence presented by Prof. Willig regarding the existence of a price structure is related exclusively to changes in prices over time.



[175] See above at Section VI.B.

[176] Willig Report, ¶14.

[177]





### 4. Prices of CRTs are primarily determined by common factors

In my original report, I used regression analysis to assess whether or not CRT prices were primarily determined by common factors. By definition, regression analysis divides the variation in a variable into two parts: that which is explained by the regression model (the "explained variation") and that which is not (the "residual variation"). The $R^2$ statistic, which is the standard measure of how well a model fits the data, reports the ratio of explained variation to total variation in the dependent variable. The $R^2$ from a regression analysis of CRT prices using a model which includes only common factors therefore yields a precise measure of the minimum extent to which CRT prices are determined by common factors.

[178] Regression analysis that examines the impact of product characteristics on prices are referred to as hedonic regressions in the economic literature.

[179]



Prof. Willig criticized my model for restricting the effect of product characteristics on price to be same for all years.[180] I have already explained that changes in relative prices over time are consistent with my conclusions regarding the existence of a price structure (see Section VII.E.2.c)(2)) and that I imposed the restriction to simplify the model and comparisons between my hedonics on target and actual prices (see footnote 177). To assess the impact of Prof. Willig's criticism on my hedonic analysis, I estimated an alternate version of my hedonics model which included interaction terms between size and year using the actual price data. By doing so, I allow for the size of a CRT to affect the CRT's price differently in different years. This alteration slightly increased the explanatory power of the model, reinforcing my conclusion that CRT prices are primarily determined by common factors.

[180] Willig Report, ¶75 and Exhibits 10-11.

[181] Willig Report, ¶76 and Exhibits 12-13.

[182]

[183]





Prof. Willig's criticisms of my hedonic analysis are either immaterial, derived from faulty analysis, or both. None of his criticisms contradicts my conclusion that CRT prices are primarily determined by common factors.

[184] Willig Report, ¶¶78-79 and Exhibits 14-15.

[185]



Case 4:07-cv-05944-JST Document 1654-21 Filed 04/25/13 Page 56 of 123

I conclude there are relatively few important products in terms of the products actually bought by consumers and the cartel set prices based on exactly those attributes that underlie most of the price differentiation in the industry. There is no vast morass of inexplicable prices for an incredible range of products – rather, a limited range of archetypes are sold at prices the cartel controlled by focusing on the key product attributes.

### 6. Prof. Willig's inconsequential conclusions

186

187 See the discussion in Section III.

188 Willig Report, ¶48, emphasis added.

189 Original Report, p. 33, emphasis added.



CPTs have a further geographic limitation. Different areas of the world used different broadcast standards that were incompatible. North America, Japan, Taiwan, Philippines and some other

190 Willig Report, ¶74.

191 Original Report, p. 89.

192 Memo in Opp., p. 7:9-10.

193 Original Report, p. 16.

194 17 July 2012, Deposition of Hitachi Displays, Ltd. 30(b)(6) Witness Nobuhiko Kobayashi, Volume I (Hereinafter "Hitachi 30(b)(6) Nobuhiko Kobayashi Volume I Deposition, 17 July 2012"), pp. 49:17 - 51:8.

195 Hitachi 30(b)(6) Nobuhiko Kobayashi Volume I Deposition, 17 July 2012, pp. 36:12 – 37:23.

Northern Hemisphere countries used the NTSC standard.[196] Most of Europe used the PAL standard. Other countries used the SECAM standard. The most relevant difference for present purposes is that the standards have different numbers of horizontal and vertical lines of resolution. A tube manufactured for NTSC won't work with a PAL broadcast and vice versa. While the need for broadcast standard compatibility constrains the geographic marketability of CPTs, it does not constrain any to strictly North America.[197]

196 CountryCode.org, Undated, World Television Signal Guide, http://countrycode.org/tv-standards, accessed 13 February 2013.

197

198

199

200

201 Willig Report, ¶65, emphasis added.

202 Willig Report, ¶18 and Exhibits 4A, 4B, 5A, 5B.



Even if I assume Prof. Willig's assertion quoted above is directed solely at CPTs, the evidence on which he bases his conclusion *cannot* support it. I first address his analysis of different pricing in North America compared to the rest of the world, then I address his evidence regarding different market conditions in North America compared to the rest of the world.

203 Willig Report Exhibit 9.

204 Willig Report, ¶¶18 and 64.

205 Willig Report, ¶67.

206 Willig Report, ¶66.



[207] See, e.g.,

- 
- 
- 
- 
- 
- 
- 

[208]

[209] See, e.g.,

- 
-



[redacted]

[redacted]

[redacted]

[redacted]

---

210 [redacted]

211 Willig Report, ¶67 and footnote 55

212 07 June 2012, Deposition of Samsung SDI 30(b)(6) Witness Jaein Lee, Volume II (Hereinafter "Samsung SDI 30(b)(6) Jaein Lee Volume II Deposition, 07 June 2012"), pp. 186:10 – 186:17.

213 Samsung SDI 30(b)(6) Jaein Lee Volume II Deposition, 07 June 2012, pp. 186 and 189.

214 Samsung SDI 30(b)(6) Jaein Lee Volume II Deposition, 07 June 2012, 07 June 2012, pp. 188:24 - 189:8.

215 Willig Report, footnote 55.

216 [redacted]

### G. It is not necessary to estimate a but-for price to determine whether the cartel had common impact

Prof. Willig claims that because I did not estimate but-for CRT prices, "there is no basis in [my] report from which to conclude which CRT prices – if any – were above the competitive level."[217] Prof. Willig's logic is invalid. Whether CRT prices were above but-for prices is a question about relative prices, not price levels per se, and as such the answer to this question does not require a measurement of but-for prices. Just as determining whether one car is going faster, slower, or the same speed as another car does not require knowing either car's speed, determining whether CRT prices were above the but-for prices does not require estimating the but-for prices.

[217] Willig Report, p. 68, ¶145.

[218] Original Report, Section VIII.A.1.

[219] Original Report, Section VIII.B.1.a).

[220] Original Report, Section VIII.B.1.b).

[221] Willig Report, ¶21.

[222] Willig Report, ¶14 and Willig Dep., p. 126:13-23.

[223] Section VII.E.1.a) above.

[224] Footnote 159.



Prof. Willig's empirical analyses of cartel effectiveness are so deeply flawed, both conceptually and in their implementation, that they cannot be relied upon as evidence of the effectiveness of the cartel. His regression of actual price changes on target price changes uses data that conflate

225 Section VI.B.

226 Original Report, Section VIII.B.1.e) and Section VII.E.4.

227 Willig Report, ¶69.

228 Willig Report, ¶79, footnote 65, and Exhibits 14A and 15A; see also Section VII.E.4 above.

229 Exhibits 31 and 32.

230 Sections VII.B.2, VII.B.3 above, and Original Report, Section V.B.2.c).

231 Willig Report ¶¶81-87.

232 Original Report, Section V.B.2, V.B.3, VIII.A.2, and Sections VII.B.2, VII.B.3, VII.C above.

233 Original Report, Section VIII.A.2, and Section VII.C above.

234 Original Report, Section V.B.2.c).

changes in exchange rates with changes in CRT prices, and conflates changes in price over time with differences in price across models.[235] His regression fails to control for all influences on CRT prices except changes in target prices, thereby attributing (in error) all changes in actual prices, including the downward pressure on CRT prices due to competition from LCD panels, to changes in target prices.[236] His price-matching analysis cannot show that the cartel was ineffective, because even if actual prices were generally below target levels, it would not show that actual prices were at competitive levels.[237] His price matching study was poorly implemented, and when I corrected its flaws, it showed, as my price matching study does, that actual CRT prices charged by cartel members were broadly consistent with the cartel's target prices.[238]

# VIII. The cartel had a common impact on indirect purchasers

## A. Overview of the issues

### 1. Summary of my conclusions

After reviewing Prof. Willig's report, my conclusions regarding impact on indirect purchaser class members remain unchanged: based on common methods and evidence, the cartel overcharge was passed through to class members. My conclusions are based upon the application of economic theory to the facts of the case, documentary evidence, and testimonial evidence.

[235] Section VII.D.5.b).

[236] Section VII.D.5.a).

[237] Original Report, Section VIII.B.2.

[238] Section VII.D.4.

[239] Original Report, Section VIII.A.1. and Section VII.B.1 above.

[240] Willig Dep., pp. 63:16-63:23.

[241] Original Report, Section VIII.A.3.d).

[242] Original Report, Section VIII.A.3.a).(2).

In my original report, I explained that economic theory shows firms increase price when faced with a significant, non-transitory, industry-wide increase in cost.[243] This is true regardless of the market structure of the industry facing the cost increase; that is, economic theory shows that such an increase in cost leads to an increase in price whether the industry is monopolistic, oligopolistic, or competitive. The incentives to increase price in response to a cost increase are particularly strong when the following conditions are true: the cost increase affects all firms without changing their relative competitive position and the cost increase is perceived to be non-transitory. In the context of this case, economic theory predicts that CRT product prices increase when CRT prices increase.

[246]

2. **Summary of Prof. Willig's criticisms**

Prof. Willig does not contest any of these conclusions. In fact, Prof. Willig provides no discussion of the economic theory of pass-through nor does he present any documentary evidence suggesting that pass-through does not occur. Prof. Willig's conclusions regarding common impact to indirect purchasers fall into three general categories:

- Analyses and anecdotes that are premised upon the incorrect experiment.
- Straw-man arguments that conflate "uniform" pass-through rates and common impact.
- Analyses that present information that is either not pertinent to pass-through or is otherwise insufficient to determine how cost changes result in price changes. Specifically, Prof. Willig discusses price levels, price dispersion, and changes in price levels; these analyses all lack the requisite information to make conclusions about pass-through. These analyses are misleading because they incorrectly make the relationship between CRT costs and CRT finished goods prices appear overly complicated and confusing. More problematic, though, is the fact that these analyses simply do not address the issue of pass-through because they contain no information on costs; I discuss this latter deficiency in Section XIII below.

I discuss each of Prof. Willig's conclusions in turn below.

---

[243] While some economic models predict that not all cost changes will be passed through, those models are not applicable to the type of cost increased caused by a cartel. I provide a more complete discussion of the economic theory related to pass-through in Section VIII.C.1 of my original report.

[244] See Section VIII.C.2 and Exhibits 29-32 of my original report.

[245] See Section VIII.C.3 of my original report.

[246] See Section VIII.C.4 of my original report.

### B. Distribution chain

Prof. Willig's description of the distribution chain is overly complex and based on two false assumptions:

- Different business models constitute a different channel of distribution, and
- The number of steps in the distribution channel is relevant for assessing whether cost changes are passed-through to the end-users.[247]

#### 1. Different business models

#### 2. Number of steps in distribution

The false distinctions that Prof. Willig creates give the appearance that the distribution channel is more complex than it actually is; regardless, the number of steps in the distribution channel is not relevant for assessing the degree of pass-through. That is, the pass-through rate over the entire distribution channel is the relevant measure in order to determine whether the cartel had a common impact on class members: if at least some portion of the overcharge is passed-through at each level of the distribution chain—regardless of the number of steps in the distribution chain or the pass-through rate at each step—then end users have been harmed.

Furthermore, I expect the channel-length pass-through rate to be relatively consistent regardless of the number of intermediary resellers for one fundamental reason: consumers at the end of the

[247] Willig Report, ¶121.

distribution chain have a choice where to buy CRT products and resellers are competing for their business. Intense competition among resellers will lead to prices that reflect the cost of providing the CRT product plus the cost of other services the reseller is providing, such as customer service. Now suppose that the price of CRTs rises. If the resellers do not pass through the cost increase, they will not be covering their full costs of providing the CRT product and other customer services. Firms facing intense competition cannot absorb significant, permanent, and industry-wide cost increases.

### C. Prof. Willig ignores economic theory and market conditions in his evaluation of pass-through

[redacted]

- [redacted][250]
- [redacted][251]
- [redacted]

Prof. Willig does not contest the economic theory I present, nor does he offer documentary evidence to the contrary. Specifically, in my Original Report I present economic theory establishing that pass-through is positive in both perfectly competitive and imperfectly competitive markets; similarly, I explain why the pass-through rate is closer to 100% for more

---

248 Original Report, Section VIII.C.1.c.

249 Original Report, Section XII.A.

250 [redacted]

251 [redacted]

252 Costco 30(b)(6) Geoffrey Shavey Deposition, 07 December 2012, pp. 122:15 - 124:5.

competitive the industries. Furthermore, he provides no explanation for why his anecdotal evidence is inconsistent with economic theory, market conditions, and the evidentiary record.

### D. Prof. Willig's analyses and evidence are premised on the incorrect experiment

In an effort to establish that there is not common impact to class members, Prof. Willig presents several analyses that highlight specific instances in which pass-through may not have occurred. These analyses are flawed and merely illustrate anecdotes from which one cannot draw any meaningful conclusions regarding pass-through.

An appropriate experiment from which to infer the pass-through rate in this matter assesses how resellers respond when faced with cost changes that are comparable to the alleged overcharge. Specifically, how do resellers react to cost increases that are significant, permanent, and affect all firms without changing their relative competitive positions? Many of Prof. Willig's analyses do not correspond to this experiment; rather, he is asking whether there are any instances in which a cost change does not result in a price change. In so doing, he merely identifies isolated instances in which specific cost changes may not have been passed-through; based on this information he concludes that the alleged cartel overcharges were not passed-through in a common manner. This approach is inapposite, though, because he provides no evidence that the cost changes he examines are, in fact, comparable to the cartel overcharges.

The difference between my approach and Prof. Willig's approach is that I am asking whether cost changes comparable to the cartel overcharges were passed-through, whereas Prof. Willig is asking whether every single cost change was passed-through. These are fundamentally different questions, which will result in different answers; however, only the former is relevant and applicable in this matter. In my data analyses, I examine all types of cost changes from which I infer the pass-through rate for the cartel overcharges, which is conservative because these data

253 254



include some cost changes that are less likely to be passed-through than the cartel overcharges. In contrast, many of Prof. Willig's conclusions depend on cherry-picked anecdotes that are not informative to the pertinent question.

I discuss each of these in more detail in Appendix B (Section XIII).

### E. Prof. Willig confuses common impact versus "uniform" pass-through

[255] Because small, temporary, and firm-specific cost changes are less likely to be passed- through, including these observations in the pass-through studies will yield conservative estimates of the pass-through coefficient.

[256] See, e.g.,

- Willig Report, ¶30.
- Prof. Willig also stated during his deposition that I use the word "uniform" to describe my pass-through results. He insists I use this word, despite being advised that I do not. Prof. Willig is simply incorrect: the word "uniform" does not show up in either my Original Report or in my deposition in any context whatsoever.

[257]



### F. Prof. Willig's analyses are irrelevant

Prof. Willig's conclusion is divorced from any foundation. First, the evidence he presents is misleading and exaggerates the degree to which products are sold at disparate prices or have disparate price changes. Second, one can infer nothing about pass-through (the relationship between changes in costs and changes in prices) from prices alone.

[258]

[259] Willig Report, ¶¶118-121 (updated in Errata) and Exhibits ER-1B and ER-2B.

[260] Prof. Willig offers no support from economic theory and literature for his claim that price dispersion makes it unlikely that pass-through is common.

[261] Prof. Willig acknowledges this fact during deposition. Willig Dep., pp. 36:18-37:21.

[262] If a price-to-cost ratio changes, it could be that only price changed, or only cost changed, or both of them changed.

[263]

[264] Willig Report, ¶119 (updated in Errata).

In Section XIV, I discuss the specific flaws with each of Prof. Willig's analyses. I first explain why each analysis is misleading; then I show why, even if these analyses were accurate, they cannot support Prof. Willig's conclusions because they lack essential information.

### G. Direct Action Plaintiff (DAP) complaints

[265]

[266] See, e.g.,

- Willig Report, ¶122 and footnote 115.
- Defendants make the same point in their memo in opposition. Memo in Opp., p. 25.

[267] Prof. Willig cites to the Costco complaint at ¶184. Willig Report, footnote 115.

[268] See, e.g.,

[269]





# IX.   The overcharge imposed on direct purchasers can be measured using common methods based on common evidence

### A. Overview of the issues

#### 1. Summary of my conclusions

As discussed in my Original Report, because class members purchased CRT products such as TVs and monitors that incorporated Defendants' CRTs and did not purchase CRTs directly from Defendants, one method for measuring overcharges to these indirect purchasers is to first measure the overcharge Defendants imposed on their direct customers and to then measure the portion of that direct overcharge that was passed down the distribution chain to the members of the class.



I have described four widely-accepted economic models useful for providing a reasonable measure of the direct overcharge.[270] These are not "my" methods; rather these are four widely-accepted and implemented economic models that I have identified from the field of economics as useful for the purpose of measuring the direct overcharge in this case. In addition to explaining how the model was relevant for estimating the direct overcharge, I also demonstrated that each approach is widely accepted and used in the field of economics; identified the types of data required for each method; explained how the required data for implementing the method was common to all class members; and demonstrated that each model has been estimated using real-world data similar to the data available or likely to become available in the present case.

My judgments in identifying capable models, understanding the necessary data, and determining appropriate estimation techniques are based on my experience in conducting related empirical research in the academic field and the antitrust litigation context. Similarly, my judgments regarding the likely availability of data are based on my review of the types of evidence Defendants and other firms in the CRT industry regularly collect as well as my experience in conducting related empirical research in the academic field and the antitrust litigation context.



[270] Original Report, Section IX.A.

#### 2. Summary of Prof. Willig's criticisms

Prof. Willig does not contest that the models I have described are standard models from field of economics or that these models are regularly applied to the type of data available or likely to be available in the present case. Prof. Willig also does not contest that the requisite data is common to all class members. Instead, Prof. Willig opines on his assessment of the completeness of my description of the model and the assumptions underlying the use of the models I have described. Indeed, a number of what Prof. Willig offers as criticisms of the models I proposed are merely statements that do little more than point out that models require thought and that the results from models depend on the underlying assumptions.[271] These statements are not criticisms of my model but simply truisms about any model.[272] Moreover, Prof. Willig's conclusions are based on his understatements regarding the amount of detail I actually provided as well as ignoring the usefulness of models that are tied directly to the conduct at issue so that the predicted overcharge is restricted to be no higher than that which would occur if the cartel was fully effective (and can be appropriately scaled in a straightforward manner if the cartel is found to have been less than fully effective).

In the remainder of this section I review the economic models for estimating the overcharge to direct purchasers described in my Original Report in light of Defendants' criticisms of these models.

### B. The economic determinants method controls for non-cartel related factors[273]

Defendants' expert acknowledges that the economic determinants method I proposed "could produce a reasonable estimate of but-for prices" but argues that in order to do so it must account for important differences in market conditions between the cartel period and the non-cartel period.[274] I agree. However, contrary to Prof. Willig's claim that I am "silent on the issue" of taking into account potential changes in market conditions, I explained in my Original Report how a multiple regression model would be able to control for changes in demand, cost, and market structure variables unaffected by the conspiracy.[275] Indeed, both Prof. Willig himself and Defendants' counsel contradict Prof. Willig's claim that I am silent on this issue.[276]

---

[271] See, e.g., Willig Report, ¶¶152 and 157.

[272] "Like any formal modeling, merger simulation forces assumptions to be made explicit. That, in turn, adds focus to the analysis by identifying what really matters, why it matters, and how much it matters… At the same time the evidence gathered indicates what modeling assumptions are appropriate." Werden, Gregory J. and Luke M. Froeb, 2008, Unilateral Competitive Effects of Horizontal Mergers, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 43-104, pp. 65-66.

[273] This method is often called a before-and-after method. Original Report, footnote 264.

[274] Willig Report, ¶148.

[275] Original Report, Section IX.A.1.

[276] See, e.g.,

- [redacted]

In addition to describing how multiple regression analysis could account for any such changes, I identified the cartel period and detailed explicit variables that could be used in the model as well as demonstrated existing sources for such variables.[277] Moreover, I documented empirical studies in the economic literature that have implemented multiple regression using real-world data of the type I have described and provided references that this particular model is commonly implemented in antitrust litigation involving cartels.[278]



The economic determinants method I described in my Original Report is a widely-accepted methodology that controls for non-cartel related price factors and that is capable of providing a reasonable basis for the direct overcharge using evidence that is common to the class.

### C. VHS recorder and portable CD player manufacturers faced similar market conditions as Defendants

Another widely-accepted economic model useful for measuring the direct overcharge that I described in my Original Report uses economic outcomes in related industries as proxies for economic outcomes in the but-for world.[281] Defendants' claim that the closest I come to comparing the CRT industry to the VHS recorder and CD player industries that I proposed as potential benchmark markets was to assert that "because both CRT and the proposed benchmark products were eventually replaced by 'alternative technologies,' consumer considerations such as whether to buy a new version of the current technology or wait and purchase the emerging

- Defendants' counsel directly acknowledge that I explicitly recognize in my Original Report "that any before and after prices would need to be adjusted for variables that affected supply and demand of CRTs." Motion In Opp., p. 37:11-13.

[277] See Original Report, pp. 85-89 and accompanying footnotes.

[278] Original Report, footnotes 264-279.

[279] Willig Report, ¶149.

[280] See, e.g.,

- 
- 
- 

[281] Original Report, Section IX.A.2.

technology were likely to have been similar between the CRT industry and the benchmark industries."[282] Defendants' claim is false.

Prof. Willig also points out that the benchmark comparison would be sensitive to how well the market outcomes in the benchmark product markets are matched with the CRT market.[286] This is a mere truism for any comparison method. There are various ways in which the data could be matched to allow comparisons across markets. For example, a straightforward implementation would be to match outcomes in each industry by date and use a multiple regression analysis to control for differences between markets.

Characteristics common across the industries support the conclusion that the VHS recorder and portable CD player industries may be reasonable proxies for the but-for CRT industry. The benchmark comparison method I described in my Original Report is a widely-accepted and widely-implemented formulaic method for providing a reasonable basis to measure direct overcharges using common evidence.

### D. The market power method provides a reasonable measure of the overcharge

[282] Motion in Opp., p. 38:20-24.

[283] Original Report, Section IX.A.2.a).

[284] Original Report, Section IX.A.2.b).

[285] Willig Report, ¶151.

[286] Willig Report, ¶152.



Prof. Willig does not dispute that the market power method provides a widely-accepted and widely-implemented formulaic method for measuring direct overcharges based on common evidence. In fact, the implication of Prof. Willig's criticism is that the market power method restricts the predicted overcharge to be no higher than that which would occur if the cartel was fully effective; this is an advantage, not a flaw.

The market power method I described in my Original Report is a widely-accepted and widely-implemented formulaic method based directly on the conduct at issue for providing a reasonable basis to measure direct overcharges using common evidence.[291]

[287] Willig Report, ¶154.

[288] Willig Report, ¶155.

[289] See,

- Section VII.D.4.
- Original Report, pp. 61-62.
- Willig Report, ¶¶105 - 114

[290] See,

- Original Report, Section VIII.A.3.b.
- Section VII.D.

[291] Original Report, Section IX.A.4.

### E.  The merger simulation method provides a reasonable measure of the direct overcharge

Prof. Willig's criticism of the merger simulation approach – that it assumes the cartel acted as a single entity[292] – is no more persuasive than this same criticism was for the market power method. It merely states that the basis for the overcharge would be limited to be no more than that which would occur if the cartel were effective.

Similarly, Prof. Willig's criticism about the merger simulation approach being sensitive to the underlying assumptions is no more than a truism about any model.[293,294] In my Original Report I described the necessary components of the merger simulation model (consumer demand, cost conditions, and firm interaction)[295] as well as the data from the case that would inform the required assumptions so that the implemented merger simulation model would reflect the facts and data of the case at hand.[296] Prof. Willig specifically mentions the need to control for entry and exit from the market.[297] Entry and exit are issues for the merger simulation approach in the merger context because there the issue is to forecast into a future economic environment that may include entry or exit. In the current case, however, the issue is to apply the simulation methodology to the economic environment (demand, cost conditions, and type of firm interaction) that actually existed to see what the estimated outcome would have been in that environment if the type of firm interaction is altered from one in which Defendants set prices jointly to one in which Defendants competed independently. Prof. Willig's speculation that entry

---

[292] Willig Report, ¶156.

[293] Willig Report, ¶¶157-158.

[294] "Like any formal modeling, merger simulation forces assumptions to be made explicit. That, in turn, adds focus to the analysis by identifying what really matters, why it matters, and how much it matters… At the same time the evidence gathered indicates what modeling assumptions are appropriate." Werden, Gregory J. and Luke M. Froeb, 2008, Unilateral Competitive Effects of Horizontal Mergers, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 43-104, pp. 65-66.

[295] Economists regularly estimate consumer demand, costs, and firm interactions using the type of real-world data available in the present case. See, e.g.,

- "Nearly all the literature considers differentiated consumer products, and much of it focuses primarily on demand estimation of a variety of models." Werden, Gregory J. and Luke M. Froeb, 2008, Unilateral Competitive Effects of Horizontal Mergers, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 43-104, p. 75.

- "Generally, if the business is an ongoing concern, then the costs can be determined from existing data. Often this is done either by directly modeling the costs needed for the additional revenues or using regression analysis that captures how costs have varied with revenues." Allen Mark A., Hall, Robert E, et al., 2011, Reference Guide on Estimation of Economic Damages, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 425-502, p. 499.

- "The key strategic variables can usually be inferred from company documents since, for example, those who compete on prices may well actively study their rivals' prices and analyze whether they in turn are pricing at the right level in light of that analysis." Davis, Peter and Eliana Garces, 2010, Quantitative Techniques for Competition and Antitrust Analysis, Princeton University Press: Princeton, p. 403.

[296] Original Report, Section IX.A.3.

[297] Willig Report, ¶158.

or exit would have been different in the but-for world goes beyond altering the conduct of Defendants.

The merger simulation method I described in my Original Report is a widely-accepted and widely-implemented formulaic method for providing a reasonable basis to measure direct overcharges using common evidence.

### F.  Measurement of the antitrust overcharges to direct purchasers is susceptible to common proof

In my Original Report I detailed the necessary elements of four widely-accepted economic models useful for obtaining an economically reasonable measure of the direct overcharge that have been implemented in the academic field and in antitrust litigation using real-world data of the type available or likely to be available in the present case. In addition, based on the available evidence as well as my experience in conducting empirical research in the academic field and the antitrust litigation context, I concluded that the necessary data to implement these approaches are likely to be available in the present case. These required data are common across the proposed class members.

After reviewing the Defendants' expert's report and Defendants' counsels' memo in opposition to class certification, my conclusions remain unchanged. There exist multiple methods to measure overcharges to direct purchasers that are susceptible to common proof.

## X. The pass-through rate to class members can be measured using common methods based on common evidence

In Section VIII I establish that, based on common methods and evidence, at least some portion of the cartel overcharge was passed through to class members, which establishes impact to class members. To calculate damages to class members based on the overcharge imposed on direct purchasers, I need to measure what share of the overcharges was passed-through to class members. After reviewing Prof. Willig's report, my conclusion remains that both the evidence and the method I employ to estimate the pass-through rate are susceptible to common proof.

### A.  Overview of the issues

#### 1.  Summary of my conclusions

To estimate pass-through rates, I regressed the price of CRTs or CRT products on cost; this approach can be implemented for any portion of the distribution channel or over the entire channel. In either case, the coefficient on the upstream cost variable gives the pass-through rate. Price and cost data are required to calculate the pass-through rate, but there may be some product characteristics (e.g., screen size) that also impact the price level. To the extent possible, I included variables to control for different product characteristics; the composition of each dataset determines those characteristics for which I can control in each study. I ran separate regressions for monitors and TVs and, whenever possible, I controlled for the economically meaningful

product attributes including screen size, CRT manufacturer, resolution, high definition, and flat screen.[298]

Including additional regressors in the pass-through analyses does not affect the interpretation of the coefficient on the cost variable as the pass-through rate, nor does it constitute the use of a different method in any respect; rather, the inclusion of these regressors is a variation on the same method of regressing downstream price on an upstream cost. The purpose of adding additional regressors is to account for the unique characteristics inherent in each dataset.

2. **Updated results**

Using the method described above, I have now performed 47 total pass-through studies including the 7 new studies described above. I have updated the Exhibits that summarize the findings of all the studies I have completed at this point. Exhibit RR-34 lists the calculated pass-through rates and other statistical results for each of the studies I have conducted to date; new and updated

298 

299 Memo in Opp., p. 24.

300 The data for these new studies was made available to me too late to include the results in my Original Report. I completed these new studies to respond to the assertions made both by Prof. Willig as well as by Defendants in their Opp. memo.

studies are highlighted in this exhibit.[301] Exhibit RR-35 provides information about the firms, the data they provided, and the specification for each of the studies I have conducted to date. Exhibit RR-36 lists the files relied upon for each pass-through study.

### 3. Summary of Prof. Willig's methods and criticisms

Prof. Willig and I both use regression analysis to estimate pass-through rates; his method is a variation on the approach I employ. Prof. Willig's regression model assumes that there is unobserved product-level heterogeneity that affects the estimated pass-through rate. If there is unobserved product-level heterogeneity that is correlated with the cost variable and it is not properly controlled for, the estimated pass-through rate will be biased and inconsistent. To control for this heterogeneity, he includes in his regression fixed effects (i.e., dummy or indicator variables) for individual products which he claims "fully controls" for differences between

[301] Updated studies are any study that was included in my Original Report, but that I have made some changes based on information that has become available since submitting that report. These are explained in Section XII below.

[302] A 95% confidence interval is a range that is expected to contain the actual value of interest (in this case, the pass-through rate) 95% of the time the range is estimated. Wooldridge, Jeffrey M., 2000, Introductory Econometrics: A Modern Approach, South-Western College Publishing, p. 134.

products. He also includes a time variable, which he argues captures trend changes in market conditions.[303]

Prof. Willig claims that my regression method does not properly control for differences across products because it does not perfectly explain differences in demand.[304] The fundamental difference between his approach and mine is that I control for those product differences that are economically meaningful, whereas Prof. Willig controls for any and all differences between two products, regardless of whether or not those criteria are likely to have an impact on price. Controlling for every single difference between products is both unnecessary and inappropriate given the data available, which is evidenced by the results of his studies; see Section X.B.1 and X.B.2 below. Prof. Willig provides no explanation for why nearly identical products would have significantly different prices. Below I present examples of products that Prof. Willig treats differently, although they are fundamentally the same product; in fact, in many instances, they are identical.

**B. Prof. Willig's own results undermine his method**

**1. Prof. Willig controls for "differences" between identical products**

[303] Willig Report, ¶133.

[304] Willig Report, ¶¶127-130 and footnote 128.

[305] Willig Report, ¶138.



- [308]
- [309]

These are not isolated examples; this problem is pervasive in the data Prof. Willig uses for his studies. He claims to "fully control for differences between products";[310] however, his approach

[306] "Amazon Standard Identification Numbers (ASINs) are unique blocks of 10 letters and/or numbers that identify items. [...] For books, the ASIN is the same as the ISBN number, but for all other products a new ASIN is created when the item is uploaded to our catalogue." Amazon.com, Undated, What are UPCs, EANs, ISBNs. and ASINs?, http://www.amazon.com/gp/seller/asin-upc-isbn-info.html, accessed 28 January 2013, p. 2.

[307] See, e.g.,

- Amazon.com, Undated, NEC AccuSync AS700 17" CRT Monitor (White), http://www.amazon.com/NEC-AccuSync-AS700-Monitor-White/dp/B00019OBS2, accessed 29 January 2013.
- Amazon.com, Undated, NEC AccuSync AS700-BK 17" CRT Monitor (Black), http://www.amazon.com/NEC-AccuSync-AS700-BK-Monitor-Black/dp/B00019OCRW/, accessed 29 January 2013.

[308] This product accounts for approximately 15,000 units sold. See, e.g.,

- Sony, Undated, Sony HMD-A100 Marketing Specifications, http://www.docs.Sony.com/release/specs/HMDA100_mksp.pdf, accessed 08 January 2013, p. 2.
- Sony, Undated, Sony HMD-A100/L Marketing Specifications, http://www.docs.Sony.com/release/specs/HMDA100L_mksp.pdf, accessed 08 January 2013, p. 2.

[309] Broksonic CTSGT-2799C and CTSGT-2799T are identical 9-inch televisions with a built-in VCR. These account for approximately 154,000 units sold.

- Broksonic, Undated, Broksonic CTSGT-2799C, http://www.broksonic.com/MainCTSGT-2799CA.htm, accessed 08 January 2013, p. 1 - 4.
- Broksonic, Undated, Broksonic CTSGT-2799T, http://www.broksonic.com/MainCTSGT-2799T.htm, accessed 08 January 2013, p. 1 - 4.

[310] Willig Report, ¶133.

implicitly assumes there are economically meaningful differences between items simply because they have different identification numbers. The examples above show why the product numbers he uses are often not meaningful determinants of unique product.

### 2. Prof. Willig's product specific regressions

Prof. Willig runs different regressions to measure pass-through. In this section I discuss the flaws in how he conceptualizes the regression.

#### a) Prof. Willig's reported results are limited and misleading

[redacted]

- [redacted][314]
- [redacted]

The arbitrarily limited results Prof. Willig presents in Exhibit 27A are misleading in that they obscure the true range of pass-through rates he calculates for each product.[315]

---

311 [redacted]

312 Willig Exhibit 27B, note 3.

313 [redacted]

314 [redacted]

315 [redacted]

b) Prof. Willig's results are implausible

These product-specific pass-through rates include meaningless figures which simply do not make any economic sense: they are neither believable (e.g., very large and/or negative pass-through rates) nor are they consistent (e.g., considerably different rates for similar products). Nonetheless, Prof. Willig uses the results of these regressions to support his claim that pass-through cannot be estimated without controlling for even the most trivial difference in products;

316

317



in fact, he even argues that further disaggregation beyond the product level is likely necessary.[318] On the contrary, examining his full results undermine his proposed method, showing why it is unnecessary and inappropriate to control for product differences at the level he proposes; in other words, his product-level regression results expose the false assumptions upon which his firm level analyses are predicated.

### C. Prof. Willig's time trend variable is inappropriate

Prof. Willig includes a time variable that he claims accounts for general marketplace trends; he adjusts this variable by the lifetime average price for each product.[319] There are several problems with this approach, which I discuss below.

The "time trend" purportedly controls for general marketplace trends as well as product lifecycle (i.e., the tendency to reduce prices of older products). The variable Prof. Willig includes, though, does not necessarily capture how long a given product has been on the market, but rather captures how long a product has been sold by each firm.[320] Furthermore, general marketplace conditions and individual product lifecycles are two distinct trends, which cannot be controlled for with the same variable.

Prof. Willig's time trend is also problematical because, as explained in Section X.B.1, he treats identical products differently based on whatever product identifier is available in the data. Often, however, a new product number is created although the new product is identical to the old one; as such, the time trend for the supposedly "new" version is reset.

[318] See, e.g.,

- 
- Additional disaggregation would only further exacerbate his already implausible results.

[319] Willig Report, footnotes 165 and 175.

[320] For example, a product could be at the end of its lifecycle in the first period the data is available, but would nonetheless be treated the same as a new product that introduced in the first period.

[321] These product have identical specifications. See, e.g.,

- The eMachines eView 17f2 is a 17-inch CRT monitor with a resolution of 1280x1024 and a dot pitch of 0.25 mm. CNET, Undated, eMachines eView 17f2 Specs, http://reviews.cnet.com/crt-monitors/emachines-eview-17f2-crt/4507-3175_7-30469667.html, accessed 08 January 2013 at 1.
- The eMachines eView 17f3 is a 17-inch CRT monitor with a resolution of 1280x1024 and a dot pitch of 0.25 mm. CNET, Undated, eMachines eView 17f3 Specs, http://reviews.cnet.com/crt-monitors/emachines-eview-17f3-display/4507-3175_7-31278691.html, accessed 08 January 2013 at 1.

Prof. Willig's treatment of products that are sold during the first period of each dataset is also problematic. Specifically, in the first period for each dataset, all products are treated as new products despite the fact that some are at the end of their lifespan, while other products are brand new.

Prof. Willig multiplies the time variable by each product's lifetime average price because he claims that prices of more expensive products decline more rapidly. This assumption is misguided. Whereas it may be correct that more expensive products tend to decline in price more rapidly, that is because the most expensive products also tend to be the most cutting edge and innovative products; however, there are many cutting edge and innovative products that are not the most expensive. In other words, it is innovative products that decrease in price more rapidly, not just expensive products.[322] For example, at one point DVD/VCR combos were cutting edge additions to CRT TVs of all sizes for which less price elastic customers were willing to pay a premium. Over time, though, the prices for these products dropped and the more price elastic customers also began purchasing these products. What is important, though, is that this innovation impacted the prices of all sizes of CRT TVs, not just the largest and most expensive, which is the inherent, and flawed, assumption in Prof. Willig's approach.

Additionally, Prof. Willig's time trend is linear which assumes that the price-cost margin for all products decreases at a linear rate over time. If the time trend for a particular product covers a long enough period of time, then Prof. Willig's model will necessarily predict a period where the reseller's margin becomes negative and, eventually, where the reseller is predicted to charge negative prices for the product.[323]

Finally, the time trend offered by Prof. Willig is collinear with the cost trend; that is, as time passes, advances in technology lead to cost reductions. Thus, even if the passage of time itself has no impact on the price charged, one is likely to measure a statistically significant coefficient on the time trend simply because it is correlated with the trend of the cost variable. The estimated statistical significance of the collinear time trend will come at the cost of a less precise estimate of the coefficient on the cost variable.[324]

### D. Summary

After reviewing Prof. Willig's report, my conclusion remains that pass-through can be calculated on a common, formulaic basis for the class of indirect purchasers of CRT products. I have presented a common, formulaic approach that uses common evidence.

---

322 One reason that innovative products of all price levels tend to decrease at a more rapid rate is that early adopters are less sensitive to price (in economic terminology, their demand is inelastic).

323

324



# XI. Summary

After reviewing Prof. Willig's criticisms of my analyses, my conclusions are unchanged. I find that his arguments are misguided, flawed, and otherwise uninformative. I conclude that the cartel had a common impact on class members and that impact can be quantified using common methods based on common evidence.

# XII. Appendix A: My pass-through results are qualitatively unchanged

Case 4:07-cv-05944-JST Document 1654-21 Filed 04/25/13 Page 92 of 123

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. This declaration was executed on the 15th day of February 2013, at Ann Arbor, Michigan.

______________________

JANET S. NETZ

Subscribed and sworn to before me this 15th day of February 2013.

______________________

Notary Public

BRIAN PAUL ROSEWARNE
Notary Public, State of Michigan
County of Washtenaw
My Commission Expires May. 20, 2014
Acting in the County of ___________

My commission expires: ______________________



# Dr. Janet S. Netz

## Contact Information

applEcon LLC
617 E. Huron Street
Ann Arbor, MI 48104

Office:  (734) 214-2213 (direct)
Fax:     (734) 213-1935
E-mail:  netz@applEcon.com
Web:     www.applEcon.com

## Education

Ph.D. economics, University of Michigan, 1992
M.A. economics, University of Michigan, 1990
B.A. economics, University of California at Berkeley, 1986, *cum laude*

## Employment

Founder and Partner, applEcon, May 2001 to present
Visiting Associate Professor, University of Michigan, Fall 2001, Fall 2002, Fall 2003
Associate Professor, Purdue University, Fall 2001 to January 2003
Visiting Assistant Professor, University of Michigan, Winter 2001
Assistant Professor, Purdue University, Fall 1994 to Spring 2001
Assistant Professor, University of Delaware, Fall 1992 to Summer 1994

## Courses Taught

Industrial Organization (undergraduate and doctoral)
Antitrust and Regulation (undergraduate)
Intermediate Microeconomics (undergraduate and master's)
Microeconomic Principles (undergraduate)
International Economics (undergraduate and master's)

## Publications

"Are All Men's College Basketball Players Exploited?", with Erin Lane and Juan Nagel, *Journal of Sports Economics*, 2012 (forthcoming).

"Price Regulation: Theory and Performance", in *Regulation and Economics*, Roger J. Van den Bergh and Alessio M. Pacces, eds., Edward Elgar Publishing, 2011.

"Sports Trivia: A Review of The Economics of Intercollegiate Sports by Randy R. Grant, John Leadley, and Zenon Zygmont", *Journal of Economic Literature*, 47(2), June 2009, 485-489.

"One-Way Standards as an Anti-Competitive Strategy", with Jeffrey K. MacKie-Mason, in *Standards and Public Policy*, Shane Greenstein and Victor Stango, eds., Cambridge Press, 2007.

"International Integration and Growth: A Further Investigation on Developing Countries", with Claire Economidou and Vivian Lei, *International Advances in Economic Research*, 12(4), November 2006, 435-448.

"Maximum or Minimum Differentiation? An Empirical Investigation into the Location of Firms", with Beck A. Taylor, *Review of Economics and Statistics*, February 2002.

"International Integration and Growth: A Survey and Empirical Investigation", with Vivian Lei and Jon D. Haveman, *Review of Development Economics*, 5(2), June 2001.

"Price Regulation: A (Non-Technical) Overview", in *Encyclopedia of Law and Economics*, Boudewijn Bouckaert and Gerrit De Geest, eds, Edward Elgar and University of Ghent, 2000.

"Exercising Market Power in Proprietary Aftermarkets," with Severin Borenstein and Jeffrey K. MacKie-Mason, *Journal of Economic and Management Strategy*, 9(2), Summer 2000, 157-188.

"All in the Family: Family, Income, and Labor Force Attachment", with Jon D. Haveman, *Feminist Economics*, 5(3), November 1999, 85-106.

"Why Do All Flights Leave at 8am?: Competition and Departure-Time Differentiation in Airline Markets", with Severin Borenstein, *International Journal of Industrial Organization*, 17(5), July 1999, 611-640.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", *Journal of Futures Markets*, 16(3), 289-312, May 1996.

"The Effect of Futures Markets and Corners on Storage and Spot Price Variability", *American Journal of Agricultural Economics*, 77(1), 182-193, February 1995.

"Antitrust Policy in Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, *Antitrust Law Journal*, 63(2), 455-482, Winter 1995.

"The Economics of Customer Lock-In and Market Power in Services", with Severin Borenstein and Jeffrey K. MacKie-Mason, in *The Service Productivity and Quality Challenge*, Patrick T. Harker, ed., Kluwer Academic, 1994.

**Working Papers and Work in Progress**

"Fantasy Football Points as a Measure of Performance", with Erin Lane and Juan Nagel

"Non-Profits and Price-Fixing: The Case of the Ivy League"

"The End of Collusion? Competition after Justice and the Ivy League and MIT Settle"

"Basis and Exchange Rate Risks and their Impact on Storage and Exports"

**Research Grants and Awards**

"Cooperation and Competition Among Nonprofits", Nonprofit Sector Research Fund, Aspen Institute, 2000.

"Product Customization and Product-Space Positioning", Dauch Center for the Management of Manufacturing Enterprises, Summer 2000.

"Outstanding Economics Professor of the Year", Economics Club, Purdue University, 1999.

"Trade Barriers, Trade Blocs, Growth, and Convergence", Purdue Research Foundation, 1998-1999.

"Effects of Informational Asymmetry on Competition in the Residential Long Distance Calling Market", Purdue Research Foundation, 1997-1998.

"Basis and Exchange Rate Risks and their Impact on Storage and Exports", Center for International Business and Economic Research, Summer 1997.

Global Initiative Faculty Grant (Course Development), "Industrial Organization in an International Marketplace", Purdue University, Summer 1997.

"Trade, Not Aid", Purdue Research Foundation, Summer 1996.

"Trade, Not Aid", Center for International Business and Economic Research, Summer 1996.

"The Effect of Price-Fixing by Institutions of Higher Education", Purdue Research Foundation, Summer 1995.

"Applied Microeconomics/International Workshop", Purdue University, Spring 1995.

"The Market Structure of Higher Education", University of Delaware, Summer 1993.

Research Associate, Center for the Study of Futures Markets, Columbia University, 1991.

Rackham Merit Fellowship, University of Michigan, 1987-1989.

Chancellor's Scholar, University of California at Berkeley, 1983-1986.

**Referee**

American Economic Review
Feminist Economics
International Journal of the Economics of Business
International Journal of Industrial Organization
Journal of Economic Education
Journal of Economic and Management Strategy
Journal of Family and Economic Issues
Journal of Futures Markets
Journal of Industrial Economics
Journal of Law and Economics
Journal of Law, Economics, and Organization
Management Science
Review of Economics and Statistics
Scandinavian Journal of Economics
Telecommunications Systems

**Conference and Workshop Presentations**

Panel participant, "Preparing Early and Often", State-of-the-Art Strategies for Managing Class Action Experts, American Bar Association, 16th Annual National Institute on Class Actions, Chicago, IL, October 2012.

Panel participant, "Hot Topics Involving Experts in Antitrust Litigation", New York State Bar Association, Antitrust Law Section, Annual Meeting, New York, NY, January 2011.

Guest lecturer, Alternative Dispute Resolution Practicum, University of Michigan Law School, April 2008.

“The Economics of Indirect Purchaser Cases”, State Bar of Arizona Annual Conference, Phoenix, AZ, June 2004.

“Manipulating Interface Standards as an Anti-Competitive Strategy”, Standards and Public Policy Conference, Federal Reserve Bank of Chicago, Chicago, Il, May 2004.

“One-Way Standards as an Anti-Competitive Strategy”, Telecommunications Policy Research Conference, Alexandria, VA, September 2002.

“Product Proliferation and Product Space Location”, Econometric Society Meetings, New Orleans, January 2001.

“The End of Collusion? Competition after Justice and the Ivy League and MIT Settle”, American Economics Association Meetings, New Orleans, January 2001.

“The End of Collusion? Competition after Justice and the Ivy League and MIT Settle”, Indiana University-Purdue University Indianapolis, November 2000.

“Maximum or Minimum Differentiation? An Empirical Investigation into the Location of Firms”, University of British Columbia, March 2000.

“Non-Profits and Price-Fixing: The Case of the Ivy League”, University of Illinois, October 1999.

“The End of Collusion? Competition after Justice and the Ivy League and MIT Settle”, Baylor University, September 1999.

“The End of Collusion? Competition after Justice and the Ivy League and MIT Settle”, Western Economic Association Meetings, San Diego, July 1999.

“Non-Profits and Price-Fixing: The Case of the Ivy League”, University of Chicago, April 1999.

“Non-Profits and Price-Fixing: The Case of the Ivy League”, Indiana University, December 1998.

“International Integration and Growth: A Survey and Empirical Investigation”, Dynamics, Economic Growth, and International Trade, III, Taiwan, August 1998.

Discussant (“Fiscal Policy and International Demand Spillovers”), Dynamics, Economic Growth, and International Trade, III, An International Conference, Taiwan, August 1998.

“International Integration and Growth”, Workshop on Empirical Research in International Trade and Investment, Copenhagen, June 1998.

Discussant (“Factor Endowments and the Pattern of Affiliate Production by Multinational Enterprises,” by Karolina Ekholm), Workshop on Empirical Research in International Trade and Investment, Copenhagen, June 1998.

“Non-Profits and Price-Fixing: The Case of the Ivy League”, Department of Justice Antitrust Division, April 1998.

“Non-Profits and Price-Fixing: The Case of the Ivy League”, American Economics Association Meetings, Chicago, January 1998.

Discussant (“Equilibrium under Satisficing,” by Ralph W. Pfouts), International Atlantic Economics Society, ASSA Meetings, Chicago, January 1998.

Discussant ("Overseas Investments and Firm Exports," by Keith Head and John Ries), Fourth Annual Empirical Investigations in International Trade conference, Purdue University, November 1997.

"Maximum or Minimum Differentiation? An Empirical Investigation into the Location of Firms", International Atlantic Economic Association Conference, Philadelphia, October 1997.

Discussant ("Antidumping Enforcement in a Reciprocal Model of Dumping: Theory and Evidence," Taiji Furusawa and Thomas J. Prusa) and session chair, Third Annual Empirical Investigations in International Trade conference, Purdue University, November 1996.

"The Effect of Price-Fixing by Institutions of Higher Education", Indiana University-Purdue University Indianapolis, April 1996.

"Exercising Market Power in Proprietary Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, Indiana University - Purdue University - IUPUI First Tri-School Conference, March 1996.

"All in the Family: Family, Income, and Labor Force Attachment", with Jon D. Haveman, American Economic Association Meetings, San Francisco, January 1996.

"Family Matters: Unemployment, Wage Changes, and Mobility", with Jon D. Haveman, Southern Economics Association Meetings, New Orleans, November 1995.

Discussant and session chair, Second Annual Empirical Investigations in International Trade conference, Purdue University, November 1995.

"Competition and Anti-Competitive Behavior", ICLE (The State Bar of Michigan) Conference on Antitrust and Intellectual Property, July 1995.

"Price-Fixing, Tuition, and Financial Aid", Midwest Economics Association Meetings, Cincinnati, April 1995.

"Family Matters: Unemployment, Wage Changes, and Mobility," Midwest Economics Association Meetings, Cincinnati, April 1995.

Discussant and session chair, "Customer Discrimination, Entrepreneurial Decisions, and Investment", Midwest Economics Association Meetings, April 1995.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", University of Illinois, Urbana-Champaign, February 1995.

Discussant and session chair, First Annual Empirical Investigations in International Trade conference, Purdue University, November 1994.

"Antitrust Policy in Aftermarkets", with Severin Borenstein and Jeffrey K. MacKie-Mason, FTC/DOJ/ABA Conference on Post-Chicago Economics, Washington, D.C., May 1994.

"The Effect of Price-Fixing by Institutions of Higher Education, University of Delaware, May 1994.

"The Effect of Futures Markets and Corners on Storage and Spot Price Variability", Purdue University, February 1994.

"An Empirical Test of the Effect of Basis Risk on Cash Market Positions", University of California at Davis, February 1993.

Discussant, Econometrics Association, Anaheim, 1992 Annual Meetings.

"Testing the Principle of Minimum Differentiation: Airline Departure-Time Crowding", Econometrics Association, Washington, D.C., 1990 Annual Meetings.

**Consulting and Testifying**

In re Cathode Ray Tube (CRT) Antitrust Litigation
*United States District Court, Northern District of California, San Francisco Division,* No. CV-07-5944-SC
Testifying expert for plaintiffs
Deposed November 2012

In re Photochromic Lens Antitrust Litigation, 2010-2012
*United States District Court Middle District of Florida, Tampa Division*, No. 8:10-md-02173-JDW-EAJ
Testifying expert for plaintiffs
Deposed August 2012

Datel Holdings and Datel Design and Development v. Microsoft, 2010-2011
*United States District Court, Northern District of California, San Francisco Division,* No. 09-cv-05535
Testifying expert for plaintiffs
Deposed October 2011

In re Prefilled Propane Tank Marketing and Sales Practices Litigation, 2010-2011
*United States District Court, Western District of Missouri, Western Division*, No. 4:09-cv-00465
Testifying expert for plaintiffs

In re Florida Cement and Concrete Antitrust Litigation, 2010
*United States District Court, Southern District of Florida, Miami Division*, No. 1:09-cv-23493-CMA
Consulting expert for plaintiffs

Altair Engineering v. MSC Software, 2009-2010
*United States District Court, Eastern District of Michigan, Southern Division,* No. 2:07-cv-12807
Testifying expert for plaintiffs
Deposed May 2010

In re Optical Disk Drive products Antitrust Litigation, 2009-2010
*United States District Court, Northern District of California, San Francisco Division,* No. M:2010-cv-02143
Consulting expert for plaintiffs

In re Flash Memory Antitrust Litigation, 2008-2011
*United States District Court, Northern District of California, Oakland Division,* No. C-07-0086-SBA
Testifying expert for plaintiffs
Deposed August 2009

Valassis Communications, Inc. v. News America, Inc., 2008-2009
*United States District Court, Eastern District of Michigan, Southern Division*, No. 2:06-cv-10240
*Circuit Court of the State of Michigan, County of Wayne*, No. 07-0706645-CZ
Consulting expert for plaintiffs

In re TFT-LCD (Flat Panel) Antitrust Litigation, 2008-present
*United States District Court, Northern District of California, San Francisco Division, No.* M:07-cv-01827
Testifying expert for plaintiffs
Deposed July 2009, June 2010, June 2011, August 2011

Houston Baptist University v. NCAA, 2008-2009
*United States District Court in and for the Southern District of Texas, Houston Division*
Testifying expert for plaintiffs

Seoul Semiconductor Co. v. Nichia Corp., 2008
*United States District Court, Northern District of California, No. 3:08-cv-04932-PJH*
Testifying expert for plaintiffs

Albert Andy Cohn v. Office Depot, 2008
*Superior Court of the State of California, County of Los Angeles, Central District, No. BC 372449*
Testifying expert for defendants

In re Graphics Processing Units Antitrust Litigation, 2007-2008
*United States District Court Northern District of California, No. M:07-CV-01826-WHA*
Testifying expert for plaintiffs
Deposed June 2008

Pro-Sys Consultants Ltd. and Neil Godfrey v. Microsoft, 2007-present
*Supreme Court of British Columbia, No. L043175, Vancouver Registry*
Testifying expert for plaintiffs
Deposed December 2008

In re Dynamic Random Access Memory (DRAM) Antitrust Litigation, 2007
*United States District Court, Northern District of California,* No. 02-cv-01486
Consulting expert for plaintiffs

Jason White et al. v. NCAA, 2006-2008
*United States District Court Central District of California, No. CV 06-0999 RGK (MANx)*
Testifying expert for plaintiffs
Deposed October 2007

Kleppner et al. v. Unocal, 2004-2008
In re Reformulated Gasoline (RFG) Antitrust and Patent Litigation
*United States District Court Central District of California, No. 05-1671 CAS*
Testifying expert for plaintiffs
Deposed December 2006

Carlisle, settlement negotiations with Crompton, EPDM price-fixing cartel, 2005-2007
Consulting expert

Caterpillar and Carlisle, settlement negotiations with DuPont-Dow Elastomers, PCP (or CR) and
EPDM price-fixing cartels, 2004-2005
Consulting expert

City and County of San Francisco et al. v. Microsoft, 2004-present
*United States District Court for the District of Maryland, No. 1332*
Testifying expert for plaintiffs

The Service Source v. Office Depot, 2004-2005
*United States District Court Eastern District of Michigan Southern Division, No. 02-73361*
Project director

Joe Comes et al. v. Microsoft, 2002-2008
*Iowa District Court for Polk County, No. CL82311*
Testifying expert for plaintiffs
Deposed July 2006, November 2006

Charles Cox et al. v. Microsoft, 2002-2006
*Supreme Court of the State of New York County of New York, No. 105193/00*
Testifying expert for plaintiffs

Daniel Gordon et al. v. Microsoft, 2002-2004
*State of Minnesota District Court County of Hennepin Fourth Judicial District, No. 00-5994*
Testifying expert for plaintiffs
Deposed September 2003
Morelock Enterprises, Inc. v. Weyerhaeuser Co., 2004-2008
*United States District Court District of Oregon, No. 3:04-cv-00583-PA*
Testifying expert for plaintiffs
Deposed October 2004, April 2005, October 2007
Testified in trial April 2008

Compuware v. IBM, 2002-2005
*United States District Court for the Eastern District of Michigan, No. 02-70906*
Project director

Lingo et al. v. Microsoft, 1999-2004
*Superior Court of the State of California City and County of San Francisco, J.C.C.P. No. 4106*
Project director
In re New Mexico Indirect Purchaser Microsoft Corp. Antitrust Litigation, 2002-2004
*State of New Mexico First Judicial District, No. D-0101-CV-2000-1697*
Testifying expert for plaintiffs

Charles Friedman et al. v. Microsoft, 2002-2004
*Superior Court of the State of Arizona in and for the County of Maricopa, No. CV2000-000722 / CV2000-005872*
Testifying expert for plaintiffs
Deposed September 2003

In re Massachusetts Consumer Protection Litigation, 2003-2004
*Commonwealth of Massachusetts, Superior Court Department of the Trial Court Middlesex Division, No. 00-2456*
Consulting expert

Olson v. Microsoft, 2002
*Montana First Judicial District Court Lewis & Clark County, No. CDV-2000-219*
Consulting expert

Covad v. Bell Atlantic (Verizon), 2001-2004
*United District Court for the District of Columbia, No. 99-1046*
Project director

AMD, 2000-2004
Project director

Gravity et al. v. Microsoft, 1999-2003
*United States District Court for the District of Columbia, No. 1:99CV00363*
Staff economist

Leckrone, et al. v. Premark International, Inc., et al., 2001
Testifying expert for plaintiffs

Ren, et al. v. EMI Music Distribution, Inc., 2001
*State of Michigan in the Circuit Court of the County of Macomb, No. 00-2383-CZ*
Testifying expert for plaintiffs

SBC, 2000
Staff economist

City and County of San Francisco, 1999
Staff economist

Intergraph v. Intel, 1998-2001
*United States District Court Appeals for the Federal District, No. 98-1308*
Staff economist

Comm-Tract v. Northern Telecom, 1991-1997
*United States District Court District of Massachusetts, No. 90-13088-WF*
Project director

Systemcare, Inc. v. Wang Computer, 1991-1993
*United States District Court for the District of Colorado, No. 89-B-1778*
Staff economist

International Travel Arrangers v. Northwest Airlines, 1988-1989
Staff economist











# Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

07 December 2012, Memorandum, In re: Chocolate Confectionary Antitrust Litigation (United States District court For the Middle District of Pennsylvania).

2011, Reference Manual on Scientific Evidence, Third Edition, The National Academies Press: Washington, D.C..

21 December 2012, Memorandum and Order, In re: Urethane Antitrust Litigation (United States District Court for the District of Kansas).

21 December 2012, Memorandum Decision and Order, In re: Vitamin C Antitrust Litigation (United States District Court Eastern District of New York).

21 February 2012, Order Denying Defendants' Motion to Exclude Expert Testimony of Janet S. Netz and William S. Comanor, In re: TFT-LCD (Flat Panel) Antitrust Litigation (United States District Court Northern District of California San Francisco Division).

Acer, Undated, Aspire Product Series, http://us.Acer.com/ac/en/US/content/series/aspire, accessed 29 January 2013.

Akai, Undated, Akai 32" LCD HD TV LCT32Z5TAP, https://www.inspireawards.com/oms/data/1333_LCT32Z5TAP.pdf, accessed 30 January 2013.

Allen Mark A., Hall, Robert E, et al., 2011, Reference Guide on Estimation of Economic Damages, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 425-502.

Amazon, 02 October 2001, Polaroid FDM-0700A 7" Under-The-Cabinet TV/DVD Combo, http://www.amazon.com/Polaroid-FDM-0700A-Under-The-Cabinet-LCD-Combo/dp/B00024L6P2, accessed 30 January 2013.

Amazon, 04 September 1973, Compaq FS640 Flat Screen Multmedia 19" CRT monitor, http://www.amazon.com/Compaq-FS940-Screen-Multimedia-Monitor/dp/B00005JG4D/ref=cm_cr_pr_product_top, accessed 29 January 2013.

Amazon, 05 December 2007, Toshiba Satellite A205-S5804 15.4-inch Laptop (Intel Pentium Dual Core T2330 Processor, 1 GB RAM, 120 GB Hard Drive, Vista Premium), http://www.amazon.com/Toshiba-Satellite-A205-S5804-15-4-inch-Processor/dp/B0010TVLP8, accessed 30 January 2013.

Amazon, 06 November 2007, Compaq Presario F750US 15.4-inch Laptop (AMD Athlon 64 X 2 Dual Core TK-57 Processor, 1 GB RAM, 120 GB Hard Drive, Vista Premium), http://www.amazon.com/Compaq-Presario-F750US-15-4-inch-Processor/dp/B00111NUM2, accessed 29 January 2013.

Amazon, 14 August 2002, Fujifilm FinePix 2650 2MP Digital Camera w/ 3x Optical Zoom, http://www.amazon.com/Fujifilm-FinePix-Digital-Camera-Optical/dp/B00006IR39, accessed 29 January 2013.

Amazon, 15 November 2001, RCA 27" Stereo TV with PIP (F27668), http://www.amazon.com/RCA-27-Stereo-PIP-F27668/dp/B00005T3DM/ref=cm_cr_pr_product_top, accessed 30 January 2013.

Amazon, 28 October 2003, Samsung SyncMaster 173S 17" LCD Monitor, http://www.amazon.com/Samsung-SyncMaster-173S-Monitor-Black/dp/B0000DH8M7, accessed 30 January 2013.

Amazon, Undated, Compaq FS7550 CRT Monitor 17 Black, http://www.amazon.com/Compaq-FS7550-CRT-Monitor-Black/dp/B000066AX0, accessed 29 January 2013.

Amazon.com, Undated, Amazon Overview, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-mediaKit, accessed 22 October 2012.

Amazon.com, Undated, Casio EV-660 3 Portable LCD Screen TV, http://www.amazon.com/Casio-EV-660-Portable-LCD-Screen/dp/B00005EBGM/ref=cm_cr_pr_product_top, accessed 12 February 2013.

Amazon.com, Undated, NEC AccuSync AS700 17" CRT Monitor (White), http://www.amazon.com/NEC-AccuSync-AS700-Monitor-White/dp/B00019OBS2, accessed 29 January 2013.

Amazon.com, Undated, NEC AccuSync AS700-BK 17" CRT Monitor (Black), http://www.amazon.com/NEC-AccuSync-AS700-BK-Monitor-Black/dp/B00019OCRW/, accessed 29 January 2013.

Amazon.com, Undated, Sony CDP-E200 17" CRT Monitor, http://www.amazon.com/Sony-CDP-E200-17-CRT-Monitor/dp/B00004YNSI/ref=cm_cr_pr_product_top, accessed 28 January 2013.

# Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

Amazon.com, Undated, Sony CDP-E210 17" CRT Monitor, http://www.amazon.com/Sony-CDP-E210-17-CRT-Monitor/dp/B00004YNSH/ref=cm_cr_pr_product_top, accessed 28 January 2013.

Amazon.com, Undated, Sony FDL-PT2 LCD Portable TV, http://www.amazon.com/Sony-FDL-PT22-2-2-LCD-Portable/dp/B00001XDZQ, accessed 12 February 2013.

Amazon, Undated, ViewSonic P95F+B 19" CRT Monitor (P95F+B-2, Black), http://www.amazon.com/ViewSonic-P95F-Monitor-B-2-Black/dp/B0000CD0DS/ref=cm_cr_pr_product_top, accessed 13 February 2013.

Amazon, Undated, ViewSonic P95F+B PerfectFlat 19" CRT Monitor (Black), http://www.amazon.com/ViewSonic-P95F-PerfectFlat-Monitor-Black/dp/B00006B6XE/ref=cm_cr_pr_product_top, accessed 13 February 2013.

Amazon.com, Undated, What are UPCs, EANs, ISBNs. and ASINs?, http://www.amazon.com/gp/seller/asin-upc-isbn-info.html, accessed 28 January 2013.

annenutio.net, Undated, NTSC, PAL, SECAM countries, www.annenuotio.net/dvd/ntsc_pal.pdf, accessed 13 February 2013.

Arrow Electronics, Undated, About Arrow, http://www.arrow.com/about_arrow/, accessed 22 October 2012.

Athey, Susan, and Kyle Bagwell, 2001, Optimal Collusion with Private Information, The RAND Journal of Economics, Vol. 32, No. 3, 428-465.

Benq Corporation, Undated, Benq Corporate Introduction, http://www.Benq.us/about/corporate, accessed 22 October 2012.

Best Buy, Undated, About BBY, http://pr.bby.com/phoenix.zhtml?c=244152&p=irol-factSheet, accessed 22 October 2012.

Bing, Undated, RCA MM36100 - 36" CRT TV, http://www.bing.com/shopping/rca-mm36100-36-crt-tv/specs/8B32127CEC574E1E7F56?q=rca+mm36100+36+crt+tv, accessed 30 January 2013.

Board of Governors of the Federal Reserve System, 01 December 2012, Monthly Average TWD to USD Exchange Rates, http://research.stlouisfed.org/fred2/data/EXTAUS.txt, accessed 17 January 2013.

Board of Governors of the Federal Reserve System, 11 January 2013, BZU to USD Exchange Rates to 20130111, http://research.stlouisfed.org/fred2/data/DEXBZUS.txt, accessed 16 January 2013.

Broksonic, Undated, Broksonic CTSGT-2799C, http://www.broksonic.com/MainCTSGT-2799CA.htm, accessed 08 January 2013.

Broksonic, Undated, Broksonic CTSGT-2799T, http://www.broksonic.com/MainCTSGT-2799T.htm, accessed 08 January 2013.

Buy.com, Undated, Buy.com Company Info, http://www.buy.com/ct/stores/tocfeature.aspx?loc=13189, accessed 22 October 2012.

Buzzillions, Undated, HP dv6306 Notebook, Camera and Printer Bundle, http://www.buzzillions.com/reviews/hp-dv6306-notebook-camera-printer-bundle-reviews, accessed 29 January 2013.

Buzzillions, Undated, HP Pavilion s3242x-b PC Bundle Reviews, http://www.buzzillions.com/reviews/hp-pavilion-s3242x-b-pc-bundle-reviews, accessed 30 January 2013.

CDW, Undated, About CDW, http://www.aboutcdw.com/?cm_sp=Footer-_-WhoWeAre-_-About+Us, accessed 22 October 2012.

Census Bureau, 29 December 1999, 1990 to 1999 State Population Estimates, http://www.census.gov/popest/archives/1990s/ST-99-03.txt, accessed 22 May 2009.

Census Bureau, December 2009, Population, population change and estimated components of population change: April 1, 2000 to July 1, 2009 (NST-EST2009-alldata), http://www.census.gov/popest/national/files/NST_EST2009_ALLDATA.csv, accessed 19 May 2011.

Chen, Youngmin, and Michael H. Riordan, 2007, Vertical Integration, Exclusive Dealing, and Ex Post Cartelization, The RAND Journal of Economics, Vol. 38, No. 1, 1-21.

## Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

Chiang, Alpha C., Kevin Wainwright, 2005, Fundamental Methods of Mathematical Economics, Fourth Edition, McGraw-Hill: Singapore.

Clark, Tom, 27 September 2004, TV/VCR/Stereo Troubleshooting/ Magnavox Projection Tv, AllExperts, http://en.allexperts.com/q/TV-VCR-Stereo-1749/Magnavox-Projection-Tv-problems.htm, accessed 28 January 2013.

CNET, Undated, Compaq fs7550 Review, http://reviews.cnet.com/crt-monitors/compaq-fs7550/4505-3175_7-30079935.html, accessed 29 January 2013.

CNET, Undated, Compaq Presario 1800 XL-190, http://www.cnet.com/laptops/compaq-presario-1800-xl/4505-3121_7-2174468.html, accessed 30 January 2013.

CNET, Undated, Compaq Presario 18XL280, http://www.cnet.com/laptops/compaq-presario-18xl280-15/4505-3121_7-30002777.html, accessed 30 January 2013.

CNET, Undated, Compaq Presario 2720US, http://www.cnet.com/laptops/compaq-presario-2720us-15/4505-3121_7-30009486.html, accessed 30 January 2013.

CNET, Undated, eMachines eView 17f2 Specs, http://reviews.cnet.com/crt-monitors/emachines-eview-17f2-crt/4507-3175_7-30469667.html, accessed 08 January 2013.

CNET, Undated, eMachines eView 17f3 Specs, http://reviews.cnet.com/crt-monitors/emachines-eview-17f3-display/4507-3175_7-31278691.html, accessed 08 January 2013.

CNET, Undated, Emerson EWF2004, http://reviews.cnet.com/direct-view-tvs-crt/emerson-ewf2004-20-crt/4505-6481_7-31221836.html, accessed 29 January 2013.

CNET, Undated, Envision AOC L26W861, http://reviews.cnet.com/flat-panel-tvs/envision-aoc-l26w861/4505-6482_7-33623550.html, accessed 29 January 2013.

CNET, Undated, Envision L19W761, http://reviews.cnet.com/flat-panel-tvs/envision-l19w761/4505-6482_7-32909530.html, accessed 29 January 2013.

CNET, Undated, HP Pavilion 544n-b Desktop PC Bundle, http://reviews.cnet.com/desktops/hp-pavilion-544n-b/4505-3118_7-31492013.html, accessed 29 January 2013.

CNET, Undated, HP Pavilion mx70, http://reviews.cnet.com/crt-monitors/hp-pavilion-mx70/4505-3175_7-6148943.html, accessed 29 January 2013.

CNET, Undated, RCA E13332BC, http://reviews.cnet.com/direct-view-tvs-crt/rca-e13332bc-13-crt/4505-6481_7-30432933.html, accessed 29 January 2013.

CNET, Undated, RCA E13342, http://reviews.cnet.com/direct-view-tvs-crt/rca-e13342-13-crt/4505-6481_7-30434041.html, accessed 29 January 2013.

CNET, Undated, RCA F27669, http://reviews.cnet.com/direct-view-tvs-crt/rca-f27669-27-crt/4505-6481_7-30439852.html, accessed 29 January 2013.

CNET, Undated, RCA F32689, http://reviews.cnet.com/direct-view-tvs-crt/rca-f32689-32-crt/4505-6481_7-31294649.html, accessed 29 January 2013.

CNET, Undated, SYLVANIA CW702, http://reviews.cnet.com/crt-monitors/sylvania-cw702-crt-monitor/4505-3175_7-31005003.html, accessed 29 January 2013.

CNET, Undated, Sylvania LD200SL8, http://reviews.cnet.com/flat-panel-tvs/sylvania-ld200sl8/4505-6482_7-32465620.html, accessed 29 January 2013.

CNET, Undated, Toshiba Satellite A105-S2011, http://www.cnet.com/laptops/toshiba-satellite-a105-s2011/4505-3121_7-32428428.html, accessed 30 January 2013.

CNET, Undated, Toshiba Satellite M115-S1064, http://www.cnet.com/laptops/toshiba-satellite-m115-s1064/4505-3121_7-32422477.html, accessed 30 January 2013.

## Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

CNET, Undated, Toshiba Satellite P205-S6307, http://www.cnet.com/laptops/toshiba-satellite-p205-s6307/4505-3121_7-32509535.html, accessed 30 January 2013.

CNET, Undated, ViewSonic VA1721 wmb, http://reviews.cnet.com/lcd-monitors/viewsonic-va1721wmb/4505-3174_7-32509929.html, accessed 29 January 2013.

Costco, Undated, Why Become a Member, http://www.costco.com/membership-information.html, accessed 22 October 2012.

CountryCode.org, Undated, World Television Signal Guide, http://countrycode.org/tv-standards, accessed 13 February 2013.

Dell, Undated, Dell Opens Silicon Valley Executive Briefing and Solution Center, http://content.Dell.com/us/en/corp/d/secure/2012-10-18-dell-executive-briefing-solutions-center.aspx, accessed 22 October 2012.

European Union, 13 July 1994, Commission Decision of 13 July 1994 (IV/C/33.833) -- Cartonboard, Official Journal of the European Communities.

EveryMac.com, Undated, Apple Performa Plus Display Specs, http://www.everymac.com/monitors/apple/classic_monitors/specs/apple_performa_plus_disp.html, accessed 28 January 2013.

Federal Reserve, 31 December 1998, DEM to USD Exchange Rates to 19981231, http://www.federalreserve.gov/releases/h10/hist/dat96_ge.htm, accessed 18 January 2013.

Funai Corporation, Undated, Funai - About Us, http://www.funai.us/about/index.html, accessed 22 October 2012.

Gateway, Undated, Gateway Debuts NE Series Notebook Line in Canada for Students, Families, http://gateway.mwnewsroom.com/press-releases/gateway-debuts-ne-series-notebook-line-in-canada-f-0916930, accessed 22 October 2012.

Gateway, Undated, Product Models for Notebook / M Series, http://support.Gateway.com/product/model.aspx?pid=2071&sid=4419, accessed 29 January 2013.

Goodstein, David, 2011, How Science Works, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 37-54.

Google, Undated, Google Search Sharp LC 31", https://www.google.com/search?q=sharp+lc&oq=sharp+lc&sugexp=chrome,mod=2&sourceid=chrome&ie=UTF-8#hl=en&tbo=d&sclient=psy-ab&q=sharp+lc+32%22&oq=sharp+lc+32%22&gs_l=serp.3..0i10j0j0i10j0.9495.10325.0.11000.4.4.0.0.0.0.120.377.3j1.4.0.les%3B..0.0...1c.1.U5OK6JOQods&pbx=1&bav=on.2,or.r_gc.r_pw.r_cp.r_qf.&bvm=bv.1357316858,d.dmQ&fp=d9ea568ae06747ab&biw=1183&bih=785, accessed 30 January 2013.

Grout, Paul A., and Silvia Sonderegger, 2005, Predicting Cartels, Office of Fair Trading.

Harrington, Jr., Joseph E., 2008, Detecting Cartels, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts,.

Heckman, James J., August 2005, The Scientific Model of Causality, Sociological Methodology, Vol. 35, Issue 1, 1-97.

Hewlett-Packard, 27 June 2003, HP Pavilion 576x-b Desktop PC Bundle Datasheet, http://support.radioshack.com/support_computer/doc71/71279.pdf, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq FP5017 15 inch Flat Panel Monitor, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=1120541, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 12XL125 Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95040, accessed 29 January 2013.

## Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

Hewlett-Packard, Undated, Compaq Presario 12XL127 Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95042, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 12XL327 Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95075, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 12XL427 Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95097, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 12XL527 Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95117, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 17XL260 Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95334, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 17XL360 Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95342, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 2186RS Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=374013, accessed 28 January 2013.

Hewlett-Packard, Undated, Compaq Presario 717RSH Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95574, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 717RSH Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95574, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 720US Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95584, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 722US Notebook PC, https://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95594, accessed 30 January 2013.

Hewlett-Packard, Undated, Compaq Presario 723RSH Notebook PC - Product Specifications, http://bizsupport1.austin.hp.com/bizsupport/TechSupport/Document.jsp?objectID=c00009674&lang=en&cc=us&taskId=135&prodSeriesId=96403&prodTypeId=321957, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 730US Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95617, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario 734RSH Notebook PC-Product Specifications, http://bizsupport1.austin.hp.com/bizsupport/TechSupport/Document.jsp?objectID=c00009699&lang=en&cc=us&taskId=101&prodSeriesId=96403&prodTypeId=321957, accessed 28 January 2013.

Hewlett-Packard, Undated, Compaq Presario 904RSH Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=95677, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario SR1319RS Desktop PC Product Specification, http://h10025.www1.hp.com/ewfrf/wc/document?lc=en&cc=us&dlc=en&product=450176&docname=c00280722, accessed 29 January 2013.

Hewlett-Packard, Undated, Compaq Presario SR1500 Desktop PC Product Specifications, http://h20000.www2.hp.com/bizsupport/TechSupport/Document.jsp?objectID=c00404356&lang=en&cc=us&taskId=101&prodSeriesId=470574&p, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion 545x Desktop PC Product Specifications, https://h10025.www1.hp.com/ewfrf/wc/document?cc=us&lc=en&docname=c00005728, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion a1116x Desktop PC Product Specifications, http://h10025.www1.hp.com/ewfrf/wc/document?cc=us&lc=en&dlc=en&docname=c00402426, accessed 29 January 2013.

# Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

Hewlett-Packard, Undated, HP Pavilion a1229x Desktop PC Product Specifications, http://h20000.www2.hp.com/bizsupport/TechSupport/Document.jsp?objectID=c00503716&lang=en&cc=us&taskId=135&contentType=SupportF, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion a418x Desktop PC Product Specifications, http://h20000.www2.hp.com/bizsupport/TechSupport/Document.jsp?objectID=c00057156&lang=en&cc=us&contentType=SupportFAQ&prodSeries, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion a809rs Desktop PC Product Specifications, http://h10025.www1.hp.com/ewfrf/wc/document?docname=c00305792&lc=en&cc=us&dlc=en&product=464113, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion dv2110rs Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=3289478, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion f50 15 inch Flat Panel Monitor, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=81807, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion Media Center a1329x Desktop PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=1817031, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion tx1410us Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=3647228, accessed 29 January 2013.

Hewlett-Packard, Undated, HP Pavilion zv5348rs Notebook PC, http://h10025.www1.hp.com/ewfrf/wc/product?cc=us&lc=en&dlc=en&product=434894, accessed 29 January 2013.

Hewlett-Packard, Undated, Maintenance & Service Guide Presario 1200 Series Model: 1245, http://h10025.www1.hp.com/ewfrf-JAVA/Doc/pdf/c00000588.pdf, accessed 29 January 2013.

Hewlett-Packard, Undated, Product Specifications Compaq Presario SR1221RS Desktop PC, http://h10025.www1.hp.com/ewfrf/wc/document?dlc=en&lc=en&product=439485&lang=en&cc=us&docname=c00247511, accessed 29 January 2013.

Hewlett-Packard, Undated, Product Specifications HP Pavilion f70 17 inch Flat Panel Monitor, http://h10025.www1.hp.com/ewfrf/wc/document?docname=bph07543&lc=en&cc=us&dlc=&product=81810, accessed 29 January 2013.

Hewlett-Packard, Undated, Comparison Chart Between HP Pavilion and Compaq Presario Flat Panel Monitors, https://h10025.www1.hp.com/ewfrf/wc/document?docname=c00284464&tmp_task=useCategory&cc=us&dlc=el&lc=en&os=-1&product=57763&sw_lang=#c00284464_FX50, accessed 08 January 2013.

Hoover's, Undated, Fry's Electronics, Inc. Company Information, http://www.hoovers.com/company-information/cs/company-profile.Frys_Electronics_Inc.9d1dc6e77862d800.html, accessed 22 October 2012.

Imaging-Resource.com, 23 December 2009, Sanyo Becomes A Panasonic Company, http://www.imaging-resource.com/NEWS/1261603656.html, accessed 22 October 2012.

Ingram Micro, Undated, About Ingram Micro, http://phx.corporate-ir.net/phoenix.zhtml?c=98566&p=irol-aboutIMOverview, accessed 22 October 2012.

JVC, Undated, JVC AV-27D302 Features, http://support.JVC.com/consumer/product.jsp?modelId=MODL026180&pathId=74&page=2&archive=true, accessed 08 January 2013.

JVC, Undated, JVC AV-27D303 Features, http://support.JVC.com/consumer/product.jsp?modelId=MODL026900&pathId=74&page=2&archive=true, accessed 08 January 2013.

# Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

JVC, Undated, JVC AV-32D302 Features, http://support.JVC.com/consumer/product.jsp?modelId=MODL026175&pathId=76&page=2&archive=true, accessed 08 January 2013.

JVC, Undated, JVC AV-32D303 Features, http://support.JVC.com/consumer/product.jsp?modelId=MODL026907&pathId=76&page=2&archive=true, accessed 08 January 2013.

Kaye, David H., David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302.

LCDs 4 Less, Undated, HP Pavilion ZV6000 Series ZV6009US-B Laptop Screen, http://www.lcds4less.com/HPLaptop__HP_Pavilion_ZV6000_Series_ZV6009US-B__laptop-screens.html, accessed 30 January 2013.

Levenstein, Margaret C., and Valerie Y. Suslow, 2006, What Determines Cartel Success?, Journal of Economic Literature, Vol. XLIV, 43-95.

Levenstein, Margaret, and Valerie Y. Suslow, 2004, Contemporary International Cartels and Developing Countries: Economic Effects and Implications for Competition Policy, Antitrust Law Journal Vol. 71, No. 3, 801-852.

LG, Undated, Product Support: LG 32LC7D, http://www.LG.com/us/support-product/lg-32LC7D, accessed 30 January 2013.

Manualslib, Undated, RCA F36688 BROCHURE, http://www.manualslib.com/manual/138781/Rca-F36688.html, accessed 30 January 2013.

Motta, Massimo, 2004, Competition Policy Theory and Practice, Cambridge University Press: Cambridge.

NEC Display, Undated, NEC FE700+ User's Manual, http://www.NECDisplay.com/documents/UserManuals/MSFE700_Manual.pdf, accessed 08 January 2013.

NEC Display, Undated, NEC MultiSync FE700 User's Manual, http://www.NECDisplay.com/documents/UserManuals/fe700e.pdf, accessed 08 January 2013.

NewEgg, Undated, AOC Envision 32 16:9 8ms 720p LCD HDTV L32W761, http://www.newegg.com/Product/Product.aspx?Item=N82E16889197003, accessed 30 January 2013.

NewEgg, Undated, LG 37 720p LCD HDTV 37LC7D, http://www.newegg.com/Product/Product.aspx?Item=N82E16889005009, accessed 30 January 2013.

NewEgg, Undated, ViewSonic DiamaniDuo NX2232w 22" 5ms LCD W/fully integrated HDTV/NTSC/QAM TV

Tuner 300 nits (typ) 2400:1 DCR, http://www.newegg.com/Product/Product.aspx?Item=N82E16889107035, accessed 30 January 2013.

NewEgg, Undated, ViewSonic Value Series VA1930wm Black 19" 5ms Widescreen LCD Monitor with height adjustment 300 cd/m2 700:1 Built-in Speakers, http://www.newegg.com/Product/Product.aspx?Item=N82E16824116067, accessed January 3013.

NewEgg, Undated, ViewSonic Value Series VA703b Black 17" 8ms LCD Monitor 280 cd/m2 600:1, http://www.newegg.com/Product/Product.aspx?Item=N82E16824116016, accessed 30 January 2013.

Normann, Hans-Theo, 2009, Vertical Integration, Raising Rivals' Costs and Upstream Collusion, European Economic Review, Vol. 53, 461-480.

OECD.StatExtracts, 01 October 2012, OECD North American GDP, http://stats.oecd.org/#, accessed 01 October 2012.

OfficeMax, Undated, OfficeMax - Who We Are, http://about.officemax.com/html/officemax_who_we_are.shtml, accessed 22 October 2012.

Organisation for Economic Co-Operation and Development, 22 July 2010, Review of Comparability and of Profit Methods: Revision of Chapters I-III of The Transfer Pricing Guidelines.

## Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.

PC Connection, Undated, Company Overview - PC Connection, http://www.pcconnection.com/IPA/Content/About/PCCB2B/CompanyOverview.htm, accessed 22 October 2012.

PC Mall, Inc., Undated, About PC Mall, Inc., http://www.pcmall.com/n/About-Us/navLinks-151, accessed 22 October 2012.

PCMag.com, 2013, NTSC, http://www.pcmag.com/encyclopedia_term/0,1237,t=NTSC&i=48147,00.ASP, accessed 13 February 2013.

Pesendorfer, Martin, 2000, A Study of Collusion in First-Price Auctions, The Review of Economic Studies, Vol. 67, No. 3, 381-411.

RCA, 1999, 20" TV/VCR Combination (T20064), http://support.radioshack.com/support_video/doc59/59862.pdf, accessed 29 January 2013.

RCA, 1999, 32/36" Stereo Monitor-Receiver (F32685, F36685), http://support.radioshack.com/support_video/doc59/59877.pdf, accessed 29 January 2013.

RCA, 1999, 36"Stereo Digital High-Resolution Monitor-Receiver (MM36100), http://support.radioshack.com/support_video/doc59/59865.pdf, accessed 29 January 2013.

Retrevo, Undated, HP DV6707 review - Pavilion Laptops, http://www.retrevo.com/s/HP-DV6707-Laptops-review-manual/id/8669bh028/t/1-2/, accessed 29 January 2013.

Retrevo, Undated, HP Pavilion ZV6209 laptop, http://www.retrevo.com/support/HP-ZV6209-Laptops-manual/id/610ag317/t/2/, accessed 30 January 2013.

Riordan, Michael H., 2008, Competitive Effects of Vertical Integration, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 145-182.

Rubinfeld, Daniel L., 2011, Reference Guide on Multiple Regression, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 303-357.

Samsung SDI Germany, February 2001, Samsung A68QCP891X430.

Sam's Club, Undated, Sam's Club History, http://www3.samsclub.com/NewsRoom/AboutUs/History, accessed 22 October 2012.

Sears, Undated, Sony Model KP-41EXR96, http://www.searspartsdirect.com/partsdirect/part-model/Sony-Parts/All-Products-Parts/Model-KP41EXR96/0996/0333200, accessed 28 January 2013.

Shopping.com, Undated, RCA F20TF10 20 inch TV, http://www.shopping.com/RCA-F20TF10/info?sb=1, accessed 30 January 2013.

Sony, Undated, Compare VAIO Series, http://store.Sony.com/c/Sony-VAIO-Laptops-Computers-PCs/en/c/S_Notebooks, accessed 29 January 2013.

Sony, Undated, Sony HMD-A100 Marketing Specifications, http://www.docs.Sony.com/release/specs/HMDA100_mksp.pdf, accessed 08 January 2013.

Sony, Undated, Sony HMD-A100/L Marketing Specifications, http://www.docs.Sony.com/release/specs/HMDA100L_mksp.pdf, accessed 08 January 2013.

Tatung, Undated, Tatung USA - Company, http://www.tatungusa.com/eng/corporate_info.aspx, accessed 22 October 2012.

Tech Data Corporation, Undated, Tech Data, http://www.techdata.com/content/visitor/abouttd/default.aspx, accessed 22 October 2012.

Torres, Matthew, Undated, Review of Accurian 7" Portable Handheld LCD TV, Model 16-454, About.com, http://tv.about.com/od/productreviews/gr/Accurian_7inTV.htm?p=1, accessed 29 January 2013.

Toshiba, Undated, Companies & Businesses - Toshiba America, http://www.Toshiba.com/tai/about_us_companies.jsp, accessed 22 October 2012.

U.S. Department of Justice and Federal Trade Commission, 1984, 1984 Merger Guidelines.

**Exhibit C: Documents Considered in the Expert Report of Rebuttal Declaration of Janet S. Netz, Ph. D.**

Walmart, Undated, Walmart Corporate - Our Story, http://corporate.walmart.com/our-story/, accessed 22 October 2012.

Werden, Gregory J. and Luke M. Froeb, 2008, Unilateral Competitive Effects of Hortizontal Mergers, in Buccirossi, Paolo (Eds.), Handbook of Antitrust Economics, MIT Press: Massachusetts, 43-104.

Zones, Undated, About Zones, http://www.zones.com/site/statics/static_page.html?name=corporate/about-us/corporate-info-main, accessed 22 October 2012.

EXHIBITS 1–36

HAVE BEEN REDACTED IN FULL