Mario N. Alioto (56433)
Lauren C. Russell (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA  94123
Telephone:     (415) 563-7200
Facsimile:      (415) 346-0679
Email: malioto@tatp.com
Email:  laurenrussell@tatp.com

*Interim Lead Counsel for Indirect-Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC<br><br>MDL No. 1917<br><br>**DECLARATION OF JANET S. NETZ, PH.D., IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ**<br><br>Date:    TBD<br>Time:    TBD<br>Before: Hon. Charles A. Legge (Ret.)<br>             Special Master<br><br>The Honorable Samuel Conti |
| This Document Relates to:<br><br>ALL INDIRECT PURCHASER ACTIONS | |

## REDACTED PER COURT ORDER (D.E. 1577)

---

1

DECLARATION OF JANET S. NETZ, PH.D., IN SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ — MASTER FILE NO. CV-07-5944-SC, MDL NO. 1917

Confidential    DECLARATION OF JANET S. NETZ, PH.D. IN OPP. TO MOTION TO STRIKE    Page i of i

I. Overview of my qualifications and methodology ................................................................. 1
   A. I am qualified to conduct economic research ................................................................ 1
   B. The conclusions in my Original Report are based on sound judgments that combine the facts and data of the case with widely accepted methods of economics ................................. 2

II. Defendants' Motion to Strike is built on mischaracterizations ............................................. 4
   1. I did not assume that there was universal pass-through by retailers ..................................... 4
      *a.)* *Economic theory and industry facts imply pass-through of overcharges to all class members* ................................................................................................................. 5
      *b.)* *Testimonial evidence is insufficient on its own for determining pass-through of overcharges* ................................................................................................................. 5
      *c.) Statistical estimates of CRT product retailers' data indicate that retailers passed through at least 100% of cost changes* ............................................................................. 6
   2. I did not fail to examine representative retailer pricing data ................................................. 7
   3. I did not assume that there was universal pass-through by manufacturers of finished CRT products ................................................................................................................................. 8
   4. I did not use average prices as opposed to actual prices improperly ................................... 10
   5. The factual record supports my conclusion that the target prices applied to the tubes integrated into the finished CRT products purchased by proposed class members ............. 12
   6. I did not rely on "abstract economic theories untethered to the record facts" ................... 13
   7. My conclusions about the impact of Defendants' conduct are based on the record evidence ................................................................................................................................. 14

III. The conclusions in my Original Report are based on sound judgments that combine the facts and data of the case with widely accepted methods of economics ............................. 15

# I. Overview of my qualifications and methodology

### A. I am qualified to conduct economic research

I, Janet S. Netz, am a founding partner of applEcon, LLC. Plaintiffs' counsel asked me to determine whether the Defendants' alleged conduct had common or class-wide impact on the members of the proposed class and whether computation of the damages suffered by the class members as a result of Defendants' alleged conduct is susceptible to common proof on a formulaic basis. My education, skill, and experience qualify me to undertake the necessary economic research into the facts and data of the case to provide reliable answers to the proposed questions.

I have been a tenured Associate Professor of Economics at Purdue University and a Visiting Associate Professor at the University of Michigan. I received a B.A. (1986) from the University of California, Berkeley, *cum laude*, and an M.A. (1990) and Ph.D. (1992) from the University of Michigan, all in the field of economics. My doctoral fields were Industrial Organization, which is the study of firms and markets, the economic field most closely related to the issues in this case specifically and in antitrust generally, and International Trade, which includes the study of firms and markets in a global environment.

Among the courses that I have taught, those that are most closely related to the issues of this case include Industrial Organization at the undergraduate and doctoral level; Antitrust and Regulation at the undergraduate level; Microeconomic Theory at the undergraduate and master's level; and International Trade at the undergraduate and master's level. I have guest lectured on the role of an economic expert in an Alternative Dispute Resolution class at the University of Michigan Law School. I have spoken on the role of economists and economics in class action antitrust cases at several American Bar Association conference programs. My research has focused on competitive interactions of firms and strategies firms can use to increase profits. I have published in peer-reviewed, scholarly journals and have presented my research at many conferences and seminars.[1]

I have consulted on numerous antitrust cases and have testified on class certification or class decertification issues. I have previously faced only one motion to strike my testimony. Of particular note, this Court denied a motion to strike my testimony in *LCDs*, a case involving similar economic questions and in which I employed the same general economic methodology as I do in the present case – using sound judgment to apply widely-accepted economic theory to the facts and data of the case.[2] I have also testified in trial or by affidavit or declaration, especially

---

[1] A detailed account of my academic employment, guest lecturer, and publication histories is provided in my curriculum vitae, which is attached as Exhibit A to Netz, Janet S., 01 October 2012, Declaration of Janet S. Netz, Ph.D., In Support of Motion of Indirect-Purchaser Plaintiffs For Class Certification, In re: Cathode Ray Tube (CRT) Antitrust Litigation (United States District Court Northern District of California San Francisco Division) (hereinafter "Original Report").

[2] 21 February 2012, Order Denying Defendants' Motion to Exclude Expert Testimony of Janet S. Netz and William S. Comanor, In re: TFT-LCD (Flat Panel) Antitrust Litigation (United States District Court Northern District of California San Francisco Division).

with regard to the determination of the impact of anti-competitive conduct on consumers and quantifying the magnitude of the impact, for over ten years.[3]

### B. The conclusions in my Original Report are based on sound judgments that combine the facts and data of the case with widely accepted methods of economics

End-purchasers of CRT products were injured by Defendants' conduct if the price that end-purchasers paid for a CRT product was higher than it would have been in a world that differed only in regard to Defendants' conduct. Consequently, my conclusions require consideration of what happened in the actual world, in which Defendants did engage in the allegedly illegal conduct, as well as what is likely to have occurred in the hypothetical but-for world, a world that does not and did not exist, in which Defendants did not engage in the allegedly illegal conduct. In conducting analyses of what happened in the actual world in order to answer the questions of interest, it is important to keep in mind the following.

1. A reliable economic analysis of the facts and data of the actual world must be based on economic theory.[4]

2. Economists engaging in empirical research must combine theory and judgment to:[5]

   - Create a mathematical model that is limited to the real-world variables that are most relevant for the question at hand[6]
   - Select the facts and data to which the model can be applied
   - Discard data of insufficient quality[7]

---

[3] A list of the cases on which I have testified and consulted is provided in my curriculum vitae, which is attached as Exhibit A of my original report.

[4] See, e.g.,

- "The role of theory extends beyond the development of the [econometric] specification; it is crucial to the interpretation of the results and to identification of predictions from the empirical results that should be tested." Kennedy, Peter, 26 February 2008, A Guide to Econometrics, 6th Edition, Wiley-Blackwell: Malden, p. 375, attached as Ex. 1 to Appendix A of the concurrently-filed Indirect-Purchaser Plaintiffs' Opposition to Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz ("Appendix A").

- "Specifically, economic theory allows us to define the assumptions required for a given piece of empirical work to be meaningful. Indeed, no solid empirical analysis is entirely disconnected from economic theory and thus theory usually has a very important role in providing guidance and discipline in the design of empirical work." Davis, Peter and Eliana Garces, 2010, Quantitative Techniques for Competition and Antitrust Analysis, Princeton University Press: Princeton, pp. ix-x, attached as Ex. 2 to Appendix A.

[5] "It remains a fact, though, that in practice good results depend as much on the input of sound and imaginative economic theory as on the application of correct statistical methods. The skill of the econometrician lies in judiciously mixing these two essential ingredients". Kennedy, Peter, 26 February 2008, A Guide to Econometrics, 6th Edition, Wiley-Blackwell: Malden, p. 2, attached as Ex. 1 to Appendix A.

[6] "For one thing, the immense complexity of the real economy makes it impossible for us to understand all the interrelationships at once; nor, for that matter, are all these interrelationships of equal importance for the understanding of the particular economic phenomenon under study. The sensible procedure is, therefore, to pick out what appeals to our reason to be the primary factors and relationships relevant to our problem and to focus our attention on these alone." Chiang, Alpha C. and Kevin Wainwright, 2005, Fundamental Methods of Mathematical Economics, Fourth Edition, McGraw-Hill: Singapore, p. 5, attached as Ex. 3 to Appendix A.

- Draw conclusions from the findings

Similarly, in considering the likely economic outcomes in the but-for world, it is important to have in mind the following.

1. Because the but-for world does not and did not exist, but-for CRT and CRT product prices cannot be directly measured.
2. Since but-for CRT and CRT product prices cannot be directly measured, only inferences about but-for CRT and CRT product prices can be made.[8]
3. Economic principles provide a basis for using findings based on economic analyses of the actual world to make inferences about the likely economic outcomes in the but-for world.[9]

Simply put, economic theory and judgment are necessary for engaging in meaningful economic analyses of the actual world as well as for coming to conclusions about the but-for world. While the process is standard, the particular decisions on variables and data, and the conclusions drawn from the analyses, may vary among economists since judgments must be made at each step.[10]

The conclusions in my Original Report are based on sound economic judgments that combine the facts and data of the case with widely accepted methods of economics. In particular, my conclusions about the facts and data are consistent with generally-accepted economic theories and principles found in textbooks and the methods I use to evaluate the facts and data of the case are consistent with the research implementing and testing these theories and principles on real world data published in peer-reviewed scholarly journals.[11]

---

[7] "The validity of data is ultimately a matter of judgment." Allen Mark A., Hall, Robert E, et al., 2011, Reference Guide on Estimation of Economic Damages, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 425-502, p. 484, attached as Ex. 4 to Appendix A.

[8] See, e.g.,

- "Causality cannot be inferred by data analysis alone; rather, one must infer that a causal relationship exists on the basis of an underlying theory that explains the relationship between the two variables." Rubinfeld, Daniel L., 2011, Reference Guide on Multiple Regression, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 303-357, p. 310, attached as Ex. 4 to Appendix A.
- "There is no assumption-free method of causal inference." Heckman, James J., August 2005, The Scientific Model of Causality, Sociological Methodology, Vol. 35, Issue 1, 1-97, p. 55, attached as Ex. 5 to Appendix A. Professor Heckman won the Nobel Prize in Economics in 2000.

[9] As pointed out by a widely used economics textbook, the evaluation of the relationship between an industry's structure, the conduct of firms in the industry, and market outcomes is one of the "major approaches to the study of industrial organization" and empirical researchers using this approach "ask, for example, if industries with certain structural features (for example, few firms) have high prices". Carlton, Dennis W. and Jeffrey M. Perloff, 2005, Modern Industrial Organization, Fourth Edition, Person Addison Wesley, p. 3, attached as Ex. 6 to Appendix A.

[10] "Observational studies can produce legitimate disagreement among experts, and there is no mechanical procedure for resolving such differences of opinion." Kaye, David H. and David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302, p. 222, attached as Ex. 4 to Appendix A.

[11] As the Reference Manual on Scientific Evidence – one of the Authorities listed in Defendants' Motion to Strike – points out, "Peer review works superbly to separate valid science from nonsense…peer review is one of the venerated pillars of the scientific edifice." Goodstein, David, 2011, How Science Works, Reference Manual on

## II. Defendants' Motion to Strike is built on mischaracterizations

I have reviewed Defendants' lawyers memorandum in support of Defendants' Motion to Strike (hereinafter "Mot.") my testimony.[12] In their Mot., Defendants present a mischaracterization of my assumptions, opinions, and methodology. In particular, Defendants ignore the facts and data on which my conclusions are based to give the impression that my conclusions are based solely on economic theory, without regard for the facts of the case. Defendants attempt to justify ignoring the facts on which my conclusions are based by mischaracterizing the data and methods I used in my analyses. Having inappropriately divorced my conclusions from the facts and data on which they were based, Defendants proceed to reword my empirical findings as "false assumptions" and mischaracterize my method as one in which I arrived at "false assumptions" based "solely" on "abstract economic theory".

Defendants also rely on an imprecise use of the terminology "assumption." It fails to appropriately distinguish between conclusions built on a basis that integrates the facts and data of the case with widely accepted methods of economics, as opposed to conclusions that reflect mere assertions. Economic research proceeds by formulating conclusions based on applying sound economic judgment to the analyzed facts and data. My conclusions are based on sound economic judgments that integrate the facts and data of the case with widely accepted methods of economics. My conclusions are not mere assertions.

After mischaracterizing my method, Defendants then criticize the reliability of this mischaracterized methodology. However, since the method Defendants claim to be inadmissible is not the method I used, but rather a mischaracterization of my method, their Mot. does not address the reliability of the method I actually used. In fact, I follow the appropriate steps to arrive at economically reasonable and reliable conclusions regarding the impact of the cartel and the methods available to quantify the harm imposed on class members by the cartel.

Despite the mischaracterizations in Defendants' Mot., my conclusions integrate the facts and data of the case with widely accepted methods of economics. When Defendants' criticisms are applied to the method I actually used, their criticisms are directed only at my economic judgments and conclusions and not my methodology.

I now take the opportunity to clarify a number of Defendants' mischaracterizations of my assumptions, opinions, and methodology.

### 1. I did not assume that there was universal pass-through by retailers

Defendants claim that my conclusions rely in part on a "false assumption that there was universal pass-on by retailers" and that I arrived at this "assumption" "[w]ithout studying the record facts relating to individual retailers' and distributors' actual pricing data or distribution philosophies."[13] This assertion is false. I studied facts and data from this case in regard to the distribution chain, including its competitiveness; deposition testimony in regard to the

---

Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 37-54, pp. 44-45, attached as Ex. 4 to Appendix A.

[12] 17 December 2012, Memorandum of Law in Support of Defendants' Motion to Strike The Proposed Expert Testimony of Dr. Janet S. Netz, In re: Cathode Ray Tube (CRT) Antitrust Litigation (United States District Court Northern District of California San Francisco Division)(hereinafter "Ds' Mot.").

[13] Ds' Mot., p. 3:7-9.

distribution, pricing, and pass-through of CRTs and CRT products; and cost and sales data from retailers.[14] My *conclusions* regarding pass-through are based on analyzing the record evidence using widely accepted economic methods and applying economic theory to the findings from these analyses of the facts and data. For example, the record evidence indicates that the distribution channel for CRTs was competitive.[15] Widely-accepted economic principles establish that the more competitive the market, the more closely changes in cost are reflected one-for-one in changes in prices.[16] Additionally, the record evidence establishes that CRTs account for a large portion of finished CRT product prices.[17]

My *conclusion* that the overcharge was passed through to all class members is supported by the record evidence on the structural characteristics of the CRT distribution chain.

### a.) Economic theory and industry facts imply pass-through of overcharges to all class members

The question at issue is how would the prices of finished CRT products in the but-for world, in which the CRT product industry faced significantly lower costs, compare to finished CRT product prices in the actual world, in which the cost of CRTs included an artificial overcharge as a result of Defendants' conduct. The record evidence that the CRT product distribution chain is competitive implies that resellers would have been forced to pass-through *industry-wide*, *significant*, and *permanent* cost changes. Additionally, competition also precludes firms from passing-through cost changes that do not satisfy all three criteria. No pass-through is consistent with economic theory when all three criteria are not met. For example, if only a single firm facing significant competition is experiencing a significant and permanent cost increase, it will be unlikely to be able to pass the cost increase through. Defendants' anecdotal evidence is ambiguous as Defendants failed to appropriately characterize the types of cost changes of interest – industry-wide, significant, and permanent cost changes – and instead asked about the ability to pass-through generic "cost increases".[18] ████████████████████████████
████████████████████████████████████████████████████████████████

### b.) Testimonial evidence is insufficient on its own for determining pass-through of overcharges

Deposition testimony provides a sample of evidence regarding how costs and prices are related in the CRT distribution chain. However, because deposition testimony is based on a particular individual's understanding of the appropriate question at hand, as well as being limited to his or her own knowledge and memory of the details, the reliability of this anecdotal evidence must be considered. Consequently, an individual deponent's testimony may not be representative. Indeed, in the present case, there is testimonial evidence that supports the existence of pass-through as

---

[14] Original Report, Section VIII.C and Section IX.B.

[15] Original Report, Section VIII.C.1.d.

[16] Original Report, Section VIII.C.1.c.

[17] Original Report, Section XII.A.

[18] See Rebuttal Report, Section VIII.D, Section VIII.G, and Section XIII.A.

well as testimonial evidence that does not appear to support pass-through.[19] Deposition testimony on its own is insufficient for determining pass-through; I consider the entire body of evidence in forming my conclusions, including deposition testimony.

In addition to being contradicted by documentary evidence suggesting that industry-wide, significant, and permanent cost changes were passed on, the reliability of the anecdotal evidence Defendants have presented is questionable for a number of other reasons. For one, the cited deposition testimony is often in response to broad questions about cost increases, which may be small, temporary, and/or firm-specific cost changes. However, these types of cost changes are not comparable to the alleged overcharges and whether such cost changes are passed through is not the relevant question. Again, the relevant question is how prices would respond to significant, permanent, and industry-wide cost changes. Further, the anecdotal evidence offered by Defendants that increases in CRT costs would not have resulted in increases in the prices of CRT products is inconsistent with the regression analyses of the data. The regression analyses of sales data show that, to the extent that such instances of no price changes occur, they are anomalies, not the dominant pattern in the data. For example, Defendants argue from anecdotal deposition testimony that K-Mart and Sears cannot pass-through cost changes, but the cost and price data provided by these and other firms directly contradict this testimony.[20]

The limitations of the anecdotal pass-through testimony offered in the present case point to the importance of conducting empirical analyses to understand how cost changes are passed through the CRT distribution chain.[21]

### c.) Statistical estimates of CRT product retailers' data indicate that retailers passed through at least 100% of cost changes

My empirical analyses of retailer data cover a range of distribution paths and customer bases. I have analyzed cost and CRT product price data from online retailers such as Amazon.com, office supply stores like OfficeMax, electronic stores like Fry's, brick and mortar retailers such as Walmart, and other types of retailers. The regression models I implemented are based on a widely-accepted empirical methodology to measure by how much a product's price would be expected to change if that product's costs changed. I have analyzed data that contain the information necessary to measure pass-through and that I deemed to be of sufficient quality for

---

[19] See, e.g.,

- Original Report, Section VIII.C.2.
- Ds' Mot., 22:15.

[20] See,

- Original Report, Section IX.B.2.b and Exhibit 34.
- Netz, Janet S., 15 February 2013, Rebuttal Declaration of Janet S. Netz, PH.D., In Support of Motion of Indirect-Purchaser Plaintiffs For Class Certification, In re: Cathode Ray Tube (CRT) Antitrust Litigation (United States District Court Northern District of California San Francisco Division) (hereinafter "Rebuttal Report"), Section X.A.2 and Exhibit RR-34.

[21] "The reality that statistical analysis generates probabilities concerning relationships rather than certainty should not be seen in itself as an argument against the use of statistical evidence, or worse, as a reason to not admit that there is uncertainty at all. The only alternative might be to use less reliable anecdotal evidence." Rubinfeld, Daniel L., 2011, Reference Guide on Multiple Regression, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 303-357, p. 310, attached as Ex. 4 to Appendix A.

answering the question of interest given the regression models I estimated. The empirical models I estimated were flexible enough to accommodate any level of the impact of costs on prices, including a finding of no impact. My models also allowed for findings that varied by firm and by product type. The econometric design and relevant academic literature are documented in my Original Report.[22] The findings from the 27 retailer empirical analyses I performed in my Original Report consistently indicate that cost changes result in price changes that are at least as large as the cost changes regardless of firm type or CRT product type.

### 2. I did not fail to examine representative retailer pricing data

Defendants further mischaracterize my method by claiming that my conclusions are based on a "failure to examine representative retailer pricing data."[23] In the Reference Manual, the term representative sample is described as follows: "Not a well-defined technical term. A sample judged to fairly represent the population, or a sample drawn by a process likely to give samples that fairly represent the population, for example, a large probability sample."[24] Defendants' mischaracterization appears to be based on Defendants' misunderstanding about the various ways in which the representativeness of empirical data can be evaluated. Indeed, the standard Defendants have used to characterize the sample of over 40 million observations used in my pass-through analyses of retailers as a "tiny sample" is at odds with how the term is used in the manual they referred to as an authoritative source. It also ignores the fact that this same authoritative source demonstrates that even "tiny" samples have been found admissible.[25]

Contrary to Defendants' apparent belief that evaluating the representativeness of a sample of data hinges on some particular "statistical test", there are in fact a number of widely accepted ways in which the representativeness of the data can be evaluated.[26] First, when different analyses converge to the same conclusion, that convergence provides evidence that the data used in the different analyses were representative.[27] In the present case, the record evidence regarding

---

[22] Original Report, pp. 98-99.

[23] Ds' Mot., p. 3:19.

[24] Kaye, David H. and David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302, p. 295, attached as Ex. 4 to Appendix A.

[25] "Samples presented in the courtroom have ranged from 5 (tiny) to 1.7 million (huge)." Kaye, David H. and David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302, p. 223, attached as Ex. 4 to Appendix A.

[26] See, e.g.,

- "The validity of data is ultimately a matter of judgment." Allen Mark A., Hall, Robert E, et al., 2011, Reference Guide on Estimation of Economic Damages, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 425-502, p. 484, attached as Ex. 4 to Appendix A.

- "How big should the sample be? There is no easy answer to this sensible question. Much depends on the level of error that is tolerable and the nature of the material being sampled." Kaye, David H. and David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302, p. 243, attached as Ex. 4 to Appendix A.

[27] "Sometimes, several studies, each having different limitations, all point in the same direction…Convergent results support the validity of generalizations." Kaye, David H. and David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302, p. 223, attached as Ex. 4 to Appendix A.

the structure of the CRT product distribution chain indicates that input costs and product prices should be closely related. Similarly, the retailer data indicate that prices respond at least one-to-one with cost changes. Moreover, documentary and testimonial evidence on the issue of pass-through of large, permanent, industry-wide cost increases supports the conclusion of at least full pass-through. That these analyses, based on different types of data, yield the same conclusion is support from the record evidence that the retailer data are representative.

The retailer data include 14 different retailers. I analyzed the data separately by CRT application type. For example, if the retailer sold both CPT finished products and CDT finished products, then I conducted separate pass-through studies for each product type. This method allowed for 27 different pass-through studies from the retailer data.[28] ███████████████████████████████████████████████████████████ That finding is inconsistent with Defendants' assertion that the data were not representative.[29] This is particularly true given that the data I used covered the range of major retailer types.

Finally, the record evidence that the CRT product channel was competitive implies that the relationship between changes in costs and changes in prices was likely to have been the same across firms. The reason is that retailers were unlikely to be able to avoid price changes in the face of significant, permanent, industry-wide cost changes. That is, the record evidence suggests that there is likely to be little heterogeneity in pass-through between firms. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[31]

### 3. I did not assume that there was universal pass-through by manufacturers of finished CRT products

---

[28] Not all 14 retailers provided data on both CPT and CDT finished products, consequently the number of retailer studies, 27, is fewer than twice the number of retailers, 2*14=28, for which data are available.

[29] See, e.g.,

- "Experts should also perform cross checks with other data, to the extent possible, to demonstrate completeness and reliability." Allen Mark A., Hall, Robert E, et al., 2011, Reference Guide on Estimation of Economic Damages, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 425-502, p. 484, attached as Ex. 4 to Appendix A.

- "Sometimes, several studies, each having different limitations, all point in the same direction…Convergent results support the validity of generalizations." Kaye, David H. and David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302, p. 223, attached as Ex. 4 to Appendix A.

[30] See Original Report Exhibit 37 and Exhibit 38.

[31] "The standard deviation of the sample comes into play by measuring heterogeneity. The less heterogeneity in the values, the smaller the standard error. For example, if all the values were about the same, a tiny sample would give an accurate estimate." Kaye, David H. and David A. Freeman, 2011, Reference Guide on Statistics, Reference Manual on Scientific Evidence, Third Edition, National Academies Press: Washington, D.C., 211-302, p. 243, attached as Ex. 4 to Appendix A.

Equally false is Defendants' assertion that I *assumed* universal pass-through by manufacturers of finished products.[32] I made no assumption about any pass-through rates. Again, my conclusion is that at least 100% of a significant, long-lasting, industry-wide CRT cost increase would be passed through to end-purchasers. The basis for this conclusion is a combination of findings from the facts and data of the case and widely-accepted economic theory and methods.

As with the retailer data I analyzed, Defendants claim that the data I used in my pass-through analyses of manufacturers of finished CRT products make my conclusions unreliable. Defendants claim that I did not do any "statistical or other analysis" to determine whether the data were representative and that I did not evaluate all available data.[33] This claim is based on the same incorrect understanding of the ways in which to evaluate the representativeness of a sample of data, as well as a failure to recognize the difference between data availability and data usability.

Like the retailer data, the findings from the manufacturer data in regard to the relationship between cost changes and price changes are consistent with the findings from an analysis of the data on the competitiveness of the distribution channel. Indeed, Defendants themselves again argue that "the record evidence demonstrates that manufacturers of finished CRT products" faced "intense competition".[34] As explained above, competition forces resellers to pass-through industry-wide, significant, and permanent cost changes; however, competition also precludes resellers from passing-through cost changes that do not satisfy all three criteria.

As discussed above, the record evidence of the competitiveness of the finished CRT product distribution chain implies that changes in costs will affect prices. Because the competitive environment means this relationship is not likely to vary between firms, even "tiny" samples are likely to be representative. That is, the same record evidence regarding the structure of the CRT distribution chain indicating that the retailer data I used was representative also supports the representativeness of the manufacturer data I used in my pass-through analysis.

Further strengthening the argument that the retailer and CRT product manufacturer data that I used are representative is the convergence of the findings with the both the record facts on the competitiveness of the CRT finished product distribution chain and each of the retailer datasets. The record evidence, combined with economic and statistical principles, provides direct support for the conclusion that the findings from the data I did use are representative of the relationship between costs and CRT finished product prices for other CRT finished product manufacturers.

Defendants' claim that my analysis is somehow fatally flawed because I did not use all available manufacturer-level price data in my analysis is also wrong.[35] Not all available data are usable data. Some of the data Defendants describe were not received in time to adequately process to ensure that they were of sufficient quality to be useful. For example, LG, Philips, and Samsung data were not received with sufficient time to validate the contents and internal validity of the data – part of the process known as "data cleaning" – a necessary step in empirical analyses. Additionally, the Panasonic and Hitachi data were not usable for the estimation of pass-through

---

[32] Ds' Mot., p. 4:8-9.

[33] Ds' Mot., p. 4:10-15.

[34] Ds' Mot., p. 4:15-18.

[35] Ds' Mot., p. 4:10-15.

rates. I used all available data I judged to be of sufficient quality for use in analyzing the question of interest and that I received early enough before the deadline for my Original Report to analyze carefully.

Moreover, even if I had been able to use data from Panasonic, Samsung, Hitachi, Philips, and LG, the *method* for determining the representativeness of the data would remain unchanged. The body of available data would still comprise only a subset of the "much larger universe of manufacturer-level price data" Defendants reference.[36] That is, it would remain true that there would be no single statistical test for representativeness; the complete population of data would be required to establish representativeness. Defendants have not claimed the existence of data for the population that would be required to establish representativeness with certainty. They have merely argued that particular datasets may affect the weight of the conclusion that the analyzed CRT product manufacturer data are representative. My judgment that the data I analyzed for pass-through are representative is based on my review of the body of the record evidence.

### 4. I did not use average prices as opposed to actual prices improperly

Defendants claim that "*all* aspects of Dr. Netz's analysis are fatally infected by [my] improper reliance upon distorted price 'averages.'"[37] Defendants are wrong. My conclusions do not improperly rely on distorted price averages. First, aggregating and averaging are widely accepted practices for understanding economic data. Defendants' expert witness himself relies extensively on averages to draw conclusions, including in instances in which my own analyses were based on transaction level data. Specifically, although I analyzed transaction level data in instance in which they were available in my pass-through analysis, Prof. Willig averages datasets up to the monthly level even when all requisite data were available at the transaction level.[38] In a separate analysis, ████████████████████████████████████████████████████████████████████████ – Fisher Indices of Global CPT and CDT Prices. Lastly, in some instances, Defendants only provided aggregate data so that empirical analysis across multiple Defendant data sets required aggregating data to be at the same level.[39]

As the following passage from Defendants' Mot. shows, not only are Defendants' conclusions about the need for and reliability of my data aggregations incorrect, they are based on mischaracterizations of what aggregation I actually did.

> "Similarly, the 'actual prices' used by Dr. Netz in her purported comparison [of target and actual tube prices] are, in truth, 'average' sales prices, which she calculated by aggregating sales data produced by six defendants, some of which was [sic] at the transactional level and some of which contained monthly results only. Dr. Netz aggregated that data by month; subsequently categorized it by

---

[36] Ds' Mot., p. 4:12-13.

[37] Ds' Mot., p. 4:20-21, emphasis added.

[38] Willig, Robert D., 14 December 2012, Expert Report of Robert D. Willig, In re: Cathode Ray Tube (CRT) Antitrust Litigation (United States District Court Northern District of California San Francisco Division) (hereinafter "Willig Report"), Exhibit 28A.

[39] Panasonic and Samsung provided monthly data aggregated by model and customer. Chunghwa, Hitachi, Philips, and Toshiba provided transactional data that I aggregated to the model-month-customer level.

> 'group' based on application, size and finish; and then created an average group sales price by dividing the monthly revenue within each group by the total number of units sold within each group."[40]

First, I did not aggregate across Defendants for that analysis. Second, as Defendants note, some of the data were produced at the monthly level, so empirical analyses of the various datasets required standardizing them to the same level of aggregation. Third, I did not average prices by group – the price observations in the Defendants' data were already average prices.[41]

Similarly, in their criticism of my use of average prices in my pass-through, Defendants ignore the fact that when usable transaction prices were available, I used them. I aggregated only to the extent required to have datasets at a consistent level of aggregation, where the alternative was to throw out the datasets and the information contained within them. That is, my pass-through analyses use both average and actual prices, depending on what level of aggregation was possible given the data produced and the analyses to be performed. The use of averages is standard in empirical research on pass-through in the economic literature.[42]

In addition to mischaracterizing what aggregations I did, Defendants also mischaracterize what conclusions I would draw from the data. For example, Defendants claim that my methodology would lead me to conclude that if the actual price of half the tubes were 25% below the target price and that the other half were 25% above the target price, I would conclude that "all class members were injured when, under the hypothetical, at least half were not injured at all."[43] In fact, I would conclude no such thing. I do not use, or propose to use, target prices as a benchmark for injury. I base my conclusions regarding injury on the relationship between but-for prices and actual prices, not actual prices and target prices. What I do conclude from the target price analysis is the effectiveness of the cartel in fixing prices. Furthermore, this conclusion is based not only on whether a difference exists between the target and actual prices, but also on the degree to which actual prices are below target prices.

In fact, Defendants go on to falsely claim "Dr. Netz was forced to concede at her deposition that if one-half of all tubes were priced 25% below the alleged cartel 'target price,' and the other half of tubes were priced 25% above the alleged cartel 'target price,' Dr. Netz would conclude that all class members were injured when, under the hypothetical, at least half were not injured at all."[44] I was not forced to concede any such thing. I freely acknowledged what is a mechanical property of any average. Further, I did not conclude that Defendants' hypothetical about target prices would bear on my conclusion regarding injury. Again, the relevant question for injury is whether prices were above but-for prices, not whether prices achieved target prices. Defendants themselves extended my acknowledgment about the way averages work into a conclusion that I did not and would not make regarding injury from their own hypothetical about target prices. This mischaracterizes my deposition testimony and mischaracterizes the way in which I use target prices.

---

[40] Ds' Mot., p. 11:17-22. (Internal cites omitted.)

[41] The groups were used for matching actual and target prices and were not used for constructing an average price.

[42] Original Report, pp. 98-99, fn. 304.

[43] Ds' Mot., p. 5:8-9.

[44] Ds' Mot. p.5:4-9.

Defendants' arguments regarding my use of aggregated data rely on mischaracterizations of the usefulness of aggregated or averaged data; mischaracterizations of when I aggregate or average data; and mischaracterizations of what I conclude from aggregated or averaged data. The data on which I base my conclusions are reliable for answering the questions of interest.

### 5. The factual record supports my conclusion that the target prices applied to the tubes integrated into the finished CRT products purchased by proposed class members

Defendants wrongly assert that "undisputed record evidence establishes that virtually all of the alleged 'target' prices used by Dr. Netz applied only to tubes sold in Southeast Asia or other foreign locations, and not the United States"[45] and that there is "nothing in the factual record" to support my "baseless *assumption*" that the cartel target prices applied to CRTs sold to the proposed class members.[46] This is false. As a starting point, ███████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
Indeed, the proposed class members are indirect purchasers of Defendants' tubes. Therefore, the relevant question for members of the proposed class is whether the cartel target prices applied to the tubes integrated into the finished CRT products purchased by members of the proposed class. Instead, Defendants argue as though the initial sale of the CRT determined where purchase of the finished product occurred. ███████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
████████████████████[51]
Given Defendants' understanding of the global nature of the CRT and CRT products markets as indicated in the record evidence, ███████████████████████████████████████████
███████████████████████████████████████Yet, Defendants conclude that the absence of a U.S. designation is somehow evidence that the target price must apply only for

---

[45] Ds' Mot., p. 5:14.

[46] Ds' Mot., p. 26:14-17, emphasis added.

[47] Rebuttal Report, Section VII.F.

[48] Rebuttal Report, Section VII.F.

[49] Prof. Willig asserts that "few CDTs were produced in North America (most of the major production was in Asia)". Willig Report, p. 28.

[50] Rebuttal Report, Section VII.F.

[51] Rebuttal Report, Section VII.F.

tubes intended for locations outside the U.S. That conclusion is invalid. This is particularly true in light of the flaws in the reasoning and data analysis underlying the evidence presented by Prof. Willig in his attempt to show that CRT tube prices were regional.[52] Defendants have not presented a persuasive argument, or conclusive evidence, that target prices that did not explicitly mention the U.S. (or any other geographic location) did not apply to tubes sold in the U.S.

My conclusion that the target prices applied to the tubes integrated into the finished CRT products purchased by proposed class members is based on the record evidence.

### 6. I did not rely on "abstract economic theories untethered to the record facts"

Yet again, Defendants mischaracterize my testimony when they assert that "[b]ased *only* on 'economic theory,' Dr. Netz opines that the alleged CRT cartel must have been effective with respect to *all* CRTs sold by defendants from 1995-2007 because she presumes that 'rational' firms would continue only under such circumstances."[53] This is false. I applied economic theory to the facts of the case. For example, evaluation of the characteristics of the CRT industry revealed industry features indicating that manufacturers of CRTs operated in an environment that made collusion effective.[54] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[55] In light of Defendants' criticisms that the target prices did not cover enough of the class period,[56] I have identified and reviewed additional cartel meeting notes which contained target prices and added these new data to the pool of target prices I used in my original analysis, including over 2,246 target prices for CDTs with observations spanning the years 1995-2005.[57] Moreover, I reviewed the details of hundreds of Glass Meeting and other notes and e-mails related to communications and agreements between Defendants as well as evaluated deposition testimony of various Defendant officers and employees. Additionally, my conclusions are further informed by the facts of the case through my review of Defendants' data, including sales data for tubes shipped by the cartel members when such data were available.[58] Exhibits B and C of my Original Report detail the record evidence reviewed by me – or my staff under my direction – in forming my conclusions.[59]

Again ignoring the record evidence I reviewed as documented in my Original Report, Defendants begin with a mischaracterization. They argue that I "assumed, without any record analysis, that the cartel was effective in charging prices for all CRTs above the 'but-for' competitive market price without studying the record to estimate what that 'but-for' price would have been."[60] Aside from misrepresenting my conclusions as an "assumption," the implication in

---

[52] Rebuttal Report, Section VII.F.

[53] Ds' Mot., p. 5:23-25, first emphasis added, second emphasis in original.

[54] Original Report, Section VIII.A.

[55] Original Report, Section VIII.A.3.

[56] Ds' Mot., p. 9:11-16.

[57] Rebuttal Report, Section VII.D.1.

[58] Exhibit 13 of my Original Report describes in more detail the available tube sales data I reviewed.

[59] See also Exhibits B and C of Rebuttal Report for additional documents reviewed since my Original Report.

[60] Ds' Mot., p. 6:4-6.

Defendants' claim that one must quantify the but-for price in order to conclude that the actual prices are likely to have been above the but-for prices is invalid. Just as it is possible to infer whether one car is going faster than another car without knowing the precise speed of either car, evaluation of whether the but-for price is likely to have been lower than the actual price does not require providing a measurement of the but-for price.

The record evidence indicates that Defendants would have operated in a more competitive market in the but-for world. CRT prices would therefore have been lower in the but-for world than they were in the actual world.

### 7. My conclusions about the impact of Defendants' conduct are based on the record evidence

In another attempt to support their claim that my conclusions are "divorced from the record evidence," Defendants claim that I "assume[] – based solely on representations by plaintiffs' counsel and the complaint – the existence of one integrated conspiracy involving all CDTs (color display tubes for monitors) and CPTs (color tubes for televisions) without considering any of the undisputed record evidence showing different levels of competition and competitors for these diverse products."[61] This assertion mischaracterizes the basis of my understanding of the cartel. While I did assume that the allegations in the complaint are true, my understanding of the conduct engaged in by the cartel is based directly on the hundreds of Glass Meeting and other notes as well as deposition testimony and documentary evidence.

More importantly, Defendants' argument about what I assumed regarding the *existence* of the cartel is irrelevant to my conclusions about the economic impact of Defendants' *conduct*. My conclusions are based on the record evidence regarding Defendants' *conduct*. They are further informed by the record evidence on the structure of the CRT industry and the sales data from Defendants and other firms throughout the CRT products distribution chain. I have applied textbook economic logic to the record evidence to show that the cartel had the incentive to cause all prices to be supracompetitive, that a market mechanism provided the means for the cartel to cause impact the entire price structure without setting target prices for all CRTs, and that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[62] Defendants wrongly criticize me for using a hedonic regression analysis instead of a correlation analysis to evaluate the price data in forming my conclusion.[63] This is misguided. Correlation analysis can provide input to support conclusions regarding relationships between variables in some instances, but, in this instance the hedonic regression analysis I ran allowed me to evaluate important features like size, application, and finish in regard to CRT prices. In my expert judgment, I determined that the hedonic regression analysis was the most appropriate method given the question of interest and data available.

My conclusions on the likely impact of Defendants' conduct do not depend on Plaintiffs' representations of the existence of the cartel.

---

[61] Ds' Mot., p. 6:9-13.

[62] Original Report, Section VIII.B and Rebuttal Report, Section VII.E.

[63] Ds' Mot., p. 10:10-17.

## III. The conclusions in my Original Report are based on sound judgments that combine the facts and data of the case with widely accepted methods of economics

In their Mot., Defendants repeatedly make invalid arguments about the appropriateness of the facts and data on which I base my conclusions and then ignore my use of the facts and data of the case when forming my conclusions. Defendants then mischaracterize my *findings* (in other words, my *conclusions and opinions* derived from my analyses of the facts and data of the case) as "assumptions." They proceed to mischaracterize my methodology as "based upon a host of unsupported assumptions and methodological defects."[64] Because Defendants present a mischaracterized version of my methodology, Defendants' criticisms do not apply to my actual method but rather to their mischaracterized version of the method they claim I used.

Defendants' Mot. notwithstanding, the conclusions in my Original Report combine the facts and data of the case with widely accepted methods of economics.

---

[64] Ds' Mot., p. 3:2-3.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. This declaration was executed on the 15TH day of February 2013, at Ann Arbor, Michigan.


_____
JANET S. NETZ


Subscribed and sworn to before me this 15TH day of February 2013.

_____
Notary Public

BRIAN PAUL ROSEWARNE
Notary Public, State of Michigan
County of Washtenaw
My Commission Expires May. 20, 2014
Acting in the County of

My commission expires: _____