ALDO A. BADINI (257086)
JEFFREY L. KESSLER (*pro hac vice*)
A. PAUL VICTOR (*pro hac vice*)
EVA W. COLE (*pro hac vice*)
MOLLY M. DONOVAN (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: jkessler@winston.com

STEVEN A. REISS (*pro hac vice*)
DAVID L. YOHAI (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: steven.reiss@weil.com

*Attorneys for Defendants Panasonic Corporation of North America, MT Picture Display Co., Ltd., and Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.)*

Additional Moving Defendants and Counsel Listed on Signature Pages

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-5944 SC<br>MDL No. 1917 |
| This Document Relates to: | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ** |
| INDIRECT-PURCHASER ACTIONS | |
| | Date:  To be heard on same date<br>          as class certification.<br>Place: JAMS Resolution Center<br>Special Master: Hon. Charles A. Legge |

**DOCUMENT SUBMITTED PARTIALLY UNDER SEAL**

**AND CHAMBERS COPY**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................................1

SUMMARY OF DR. NETZ'S ASSUMPTIONS, OPINIONS AND METHODOLOGY ...................7

    I.   DR. NETZ'S OPINION THAT THE ALLEGED CARTEL CAUSED UNIFORM
        IMPACT AND INJURY TO ALL DIRECT PURCHASERS OF CRTs................................7

        A.   Dr. Netz's Assumptions About the Operation of the Alleged Cartel ...............................7

        B.   ████████████████████████████████..........................................8

        C.   ████████████████████████████████.............................9

        D.   ████████████████████████████████.......................11

        E.   ████████████████████████████████.................12

   II.  DR. NETZ'S OPINION ████████████████████████████
        ████████████████████████████████.........................13

        A.   Dr. Netz's Analysis of Pass-On at the Manufacturer and Distributor Levels
           of the Distribution Chain ...............................................................................................14

        B.   Dr. Netz's Analysis of Pass-On at the Retail Level of the Distribution
           Chain ...............................................................................................................................14

ISSUE TO BE DECIDED ...............................................................................................................15

ARGUMENT....................................................................................................................................16

I.   DR. NETZ'S OPINIONS ARE INADMISSIBLE PURSUANT TO THE
    STANDARDS ESTABLISHED BY THE FEDERAL RULES OF EVIDENCE 702,
    DAUBERT, AND ITS PROGENY .........................................................................................16

        A.   Expert Opinions That Are Based on False Assumptions Unsupported by the
           Record Are Inadmissible..................................................................................................17

        B.   Expert Testimony is Also Inadmissible When Based on Unreliable Methods or
           Incomplete Data ..............................................................................................................18

i

II.  DR. NETZ'S OPINION THAT THERE WAS ███████████ ████████ IS INADMISSIBLE "JUNK SCIENCE" FOUNDED ON A HOST OF FALSE ASSUMPTIONS, INCOMPLETE DATA, AND UNTRUSTWORTHY METHODS ...........................................................................19

    A.  ███████████................................................................19

    B.  ███████████...........................................................21

III.  DR. NETZ'S EXTENSIVE RELIANCE ON AVERAGING IS UNRELIABLE BECAUSE IT OBSCURES THE VERY PRICE VARIATIONS HER ANALYSIS IS SUPPOSED TO ADDRESS ..........................................................................24

IV.  THERE IS NOTHING IN THE FACTUAL RECORD TO SUPPORT DR. NETZ'S BASELESS ASSUMPTION ███████████.............................26

V.  DR. NETZ CANNOT RELY UPON NAKED ECONOMIC *IPSE DIXIT* AS A SUBSTITUTE FOR ACTUAL ANALYSIS.............................................................29

VI.  DR. NETZ'S SOLE RELIANCE UPON PLAINTIFFS TO ASSUME THE PRODUCT, GEOGRAPHIC AND PARTICIPANT SCOPE OF THE ALLEGED CARTEL IS ANOTHER GROUND FOR EXCLUSION..........................................32

CONCLUSION...............................................................................................33

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917

1

## TABLE OF AUTHORITIES

2

Page(s)

**CASES**

3

*Boucher v. U.S. Suzuki Motor Corp.*,
4    73 F.3d 18 (2d Cir. 1996) ............................................................................17

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
5    509 U.S. 209 (1993)....................................................................................17

6    *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
7    141 F.R.D. 144 (N.D. Cal. 1991)................................................................32

*Claar v. Burlington N. R.R. Co.*,
8    29 F.3d 499 (9th Cir. 1994) ........................................................................18

9    *Daubert v. Merrell Dow Pharms.*,
     509 U.S. 579 (1993) ("*Daubert*") ..................................................... *passim*

10
     *Domingo v. T.K., M.D.*,
11    289 F.3d 600 (9th Cir. 2002) ......................................................................20

12    *Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*,
      No. CV 07-06, 2012 WL 761950 (D. Mont. Mar. 8, 2012)........................17

13    *Ellis v. Costco Wholesale Corp.*,
14    657 F.3d 970 (9th Cir. 2011) ......................................................................16

*Finestone v. Florida Power & Light Co.*,
15    No. 03-14040, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006)...........................18

16    *General Electric Co. v Joiner*,
      522 U.S. 136 (1997)....................................................................................18
17
      *In re Flash Memory Antitrust Litig.*,
18    C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ("*Flash Memory*") ................ *passim*

19    *In re Graphics Processing Units Antitrust Litig.*,
      253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*") ....................................... *passim*
20
      *Kumho Tire Co. v. Carmichael*,
21    526 U.S. 137 (1999)....................................................................................16

22    *LeClercq v. The Lockformer Co.*,
      No. 00 C 7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005).....................18

23    *McGlinchy v. Shell Chemical Co.*,
      845 F.2d 802 (9th Cir. 1988) ......................................................................17
24
      *Ollier v. Sweetwater Union High School Dist.*,
25    267 F.R.D. 339 (S.D. Cal. 2010) ................................................................17

26    *Pecover v. Elec. Arts Inc.*,
      No. C 08–2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010)...................16

27    *Perez v. State Farm Mut. Auto. Ins. Co.*,
      No. C 06-01962, 2012 WL 3116355 (N.D. Cal. July 31, 2012)............................20
28

iii

*Rojas v. Marko Zaninovich, Inc.,*
  No. CIV-F-09-0705, 2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) ......................................18

*Rowe Entm't, Inc. v. William Morris Agency, Inc.,*
  No. 98 CIV, 8272(RPP), 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) ............................18

*Shatkin v. McDonnell Douglas Corp.,*
  727 F.2d 202 (2d Cir. 1984)..............................................................................................17

*Szabo v. Bridgeport Machs., Inc.,*
  249 F.3d 672 (7th Cir. 2001) ............................................................................................32

*United States v. Hankey,*
  203 F.3d 1160 (9th Cir. 2000) ..........................................................................................16

*Wal-Mart Stores Inc. v. Dukes,*
  131 S. Ct. 2541 (2011).......................................................................................................16

*Wright v. United States,*
  No. CV 06-01788-PHX-NVW, 2008 WL 820557 (D. Ariz. Mar. 25, 2008) ........................17

**RULES**

Fed. R. Evid. 702 ............................................................................................. *passim*

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, Econometrics:  Legal, Practical, and Technical Issues 220
  (ABA Publishing 2005) .....................................................................................................26

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3RD ed. 2011) ................................................4, 26

**PRELIMINARY STATEMENT**

To certify a class of indirect purchasers, plaintiffs must demonstrate, among other things, that there is common proof that each of the millions of consumers in the putative class paid an overcharge on the CRT included in their television or computer monitor. Plaintiffs rely entirely on the opinions of Dr. Janet S. Netz to supply such proof but her testimony must be stricken. Indeed, the Declaration of Janet S. Netz, Ph.D., In Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification (N.D. Cal.) No. CV-07-5944-SC (Oct. 1, 2012) (the "Declaration" or "Netz Decl.") is a classic example of "junk science" that does not meet the admissibility requirements of either Federal Rule of Evidence 702 or the standards established by the Supreme Court in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ("*Daubert*"), and its progeny. This is not the typical case where the defects in an expert's opinions go just to weight, as opposed to admissibility. The unreliable methods and false factual assumptions used by Dr. Netz are pervasive and fundamental to her analyses so that her opinions must be excluded in their entirety.

Inexplicably, Dr. Netz has elected to repeat the same unsound and biased methodologies for opining on the issues of common impact and pass-through that have already been twice rejected by this Court as inherently unreliable. *See In re Flash Memory Antitrust Litig.*, C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ("*Flash Memory*") (holding that Dr. Netz did not produce a "reliable and meaningful method of calculating pass-through rates on a class-wide basis" or common impact at the direct purchaser level); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*") ("Dr. Netz has demonstrated no class-wide formulae that would be reliable in assessing impact on each consumer."). In both prior cases, Dr. Netz proffered a fundamentally flawed "averaging" methodology, similar to that presented here, to support the conclusion that the alleged cartel overcharge – in an industry involving numerous differentiated products sold at different prices through an array of distribution channels – was passed on to all end-users at a rate approximating 100%. *Flash Memory*, 2010 WL 2332081, at *11-12; *GPU*, 253 F.R.D. at 504. In both cases, this Court held that Dr. Netz's common impact opinions were unreliable because she:

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE                    Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                      MDL NO. 1917

- "Ignore[d] the realities of the market" by failing to acknowledge changing price patterns over time among different direct purchasers. *Flash Memory*, 2010 WL 2332081, at *9.

- "Obscure[d] individual variations over time among the prices that different [direct] customers pay for the same or different products that appear in the data" by utilizing "average price trend[s]" as opposed to actual transaction price data. *Flash Memory*, 2010 WL 2332081, at *10; *see also GPU*, 253 F.R.D. at 504.

- Relied upon a purported "economic theory of pass through," while ignoring the "various links in the distribution channel" and other complex "anomalies" presented by the actual record facts of the industry at issue. *Flash Memory*, 2010 WL 2332081, at *11; *see also GPU*, 253 F.R.D. at 504.

- Made "no attempt to assess whether pass-through rates vary by product or by customer," while claiming that all products are in the same market and subject to the same pass-through rate without distinction. *Flash Memory*, 2010 WL 2332081, at *12; *GPU*, 253 F.R.D. at 506.

Once again here, Dr. Netz uses a "one-size-fits-all" approach that is overly reliant on false factual assumptions and "averages," while ignoring undisputed industry facts to opine that ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

████████████████████████████████████

████████████████████

1 ██████████████████ [1]

2     As set forth in detail below, Dr. Netz's Declaration is based upon a host of unsupported

3 assumptions and methodological defects, any one of which would warrant the exclusion of her

4 testimony under *Daubert*. The combination of these defects leaves no doubt that this Court should

5 declare all of Dr. Netz's opinions inadmissible under Rule 702. The following examples tell the

6 story:

7 ████████████████████████████████████████████ Without

8 studying the record facts relating to individual retailers' and distributors' actual pricing data or

9 distribution philosophies, Dr. Netz falsely asserts that ████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████ She insists on this untrue conclusion in the face of evidence to the contrary

13 supplied by every major retailer participating in this MDL, including representations by behemoths

14 such as Target, Circuit City, K-Mart and Sears that there was no pass-through to consumers, ████

15 ████████████████████████████████████████████████

16 ████████████████████████████████ The result is that Dr.

17 Netz assumes universal pass-on, without any basis, to numerous putative class members who, in

18 reality, experienced no pass-on or injury at all. *See infra* at II.A.

19     ***Dr. Netz's Failure to Examine Representative Retailer Pricing Data***: In formulating the

20 unreliable conclusion described above regarding retailer pass-through, Dr. Netz did not examine the

21 actual customer pricing data for most of the retail industry, including data representing most of the

22 major retailers who are parties to this MDL. Nor did she conduct any statistical test to determine

23 whether the tiny sample of retailer customer pricing data she did examine was representative of the

24 prices to customers for the vast majority of retailers for whom she did not review data at all. Netz

25

26 [1] The entire transcript of the deposition of Dr. Janet S. Netz is attached as Exhibit 2 to the
concurrently filed Declaration of Eva W. Cole in Support of Defendants' Opposition to Indirect-
27 Purchaser Plaintiffs' Motion for Class Certification and Motion to Strike ("Cole Decl."), Dec. 17,
2012.

28

1  Tr. 74:15-76:18, 72:2-73:21.  This failure, by itself, renders the Netz analysis inadmissible.  *See*

2  Reference Manual on Scientific Evidence, Reference Guide on Estimation of Economic

3  Damages at 483 (3RD ed. 2011) ("If the expert elects to study a sample of the data, the expert needs

4  to have carefully considered how the information will be used to ensure that the data sample is large

5  enough and contains sufficient information.  Usually, this requires that the expert has constructed a

6  model of damages and a related sampling plan that includes an estimate of the sampling error.").

7  *See infra* at II.A.

8  █████████████████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████████████████

10  █████████████████████████████████   Any such conclusion is unreliable because

11  Dr. Netz did no statistical or other analysis to determine if the tiny sample of manufacturer-level

12  price data she analyzed was in any way representative of the much larger universe of manufacturer-

13  level price data that she did not review, despite having readily available pricing data from defendants

14  for such major brands as Panasonic, Samsung Electronics, Hitachi, Phillips, and LG.  Netz Tr.

15  138:2-139:18.  This failure is once again fatal to the reliability of Dr. Netz's analysis, ██████████

16  █████████████████████████████████████████████████████████████████

17  █████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████   *See infra* at II.B.

19  ***Dr. Netz's Improper and Pervasive Reliance Upon "Average" as Opposed to Actual Prices***:

20  All aspects of Dr. Netz's analysis are fatally infected by her improper reliance upon distorted price

21  "averages."  ████████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████   In choosing

26  repeatedly to rely upon these misleading "averages," Dr. Netz defies this Court's prior

27  determinations that such price "averaging" is completely unreliable in an industry, like this, in which

28

4

1  actual transaction pricing is diverse.  *See, e.g.*, *GPU*, 253 F.R.D. at 504 (Dr. Netz's analysis was

2  "overly reliant on averages [which] would thus sweep in an unacceptable number of uninjured

3  plaintiffs"); *Flash Memory*, 2010 WL 2332081, at *10 (same).  As one illustration of  this fatal

4  defect, Dr. Netz was forced to concede at her deposition that if one-half of all tubes were priced 25%

5  below the alleged cartel "target price," and the other half of tubes were priced 25% above the alleged

6  cartel "target price," Dr. Netz would conclude that 100% of all tube sales were made at target levels

7  (when, in fact, none of them would have been within 25% of the target level).  Netz Tr. 158:14-22.

8  Put differently, Dr. Netz would conclude that all class members were injured when, under the

9  hypothetical, at least half were not injured at all.  Such unreliable and unrealistic averaging obscures,

10  rather than accounts for, the individualized variations in the actual pricing data and is therefore

11  unreliable.  *See GPU*, 253 F.R.D. at 494 ("[A]verages can hide substantial variation across

12  individual cases, which may be key to determining whether there is common impact.").

13  ██████████████████████████████████████████████

14  ████████████████  To further compound the unreliability of her analysis, ████████

15  ██████████████████████████████████████████████

16  ██████████████████████████████████████████████

17  ██████████████████████████████████████████████

18  ██████████████████████████████████████████████

19  ██████████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ████████████████████████  *See infra* at IV.

22  ***Dr. Netz's Improper Reliance Upon Abstract Economic Theories Untethered to the Record***

23  ***Facts***:  Based only on "economic theory," Dr. Netz opines that the alleged CRT cartel must have

24  been effective with respect to ***all*** CRTs sold by defendants from 1995-2007 because she presumes

25  that "rational" firms would continue a cartel only under such circumstances.  Netz Tr. 151:18-21.

26  But, Dr. Netz conceded at her deposition that it would have been equally rational for defendants to

27  have continued in the alleged cartel even if it were successful only with respect to ***certain*** CRTs,

28

5

1    customers or geographic markets. *Id.* at 152:19-154:9. ████████████████████

2    ████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ██████  *Daubert* does not permit such unsupported and fanciful factual assumptions based on abstract

8    economic theory to take the place of reliable expert analysis of the record facts. *See infra* at V.

9         ***Dr. Netz's False Assumption That There Was a Single, Integrated Global Conspiracy***: Dr.

10   Netz assumes – based solely on representations by plaintiffs' counsel and the complaint – the

11   existence of one integrated conspiracy involving all CDTs (color display tubes for monitors) and

12   CPTs (color picture tubes for televisions) ████████████████████████████████

13   ██████████████████████████████████████████████████[2] She also makes

14   this assumption without defining any product market. ████████████████████

15   ████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ██████████████  *See infra* at V.

25         For each of the above reasons, Dr. Netz's unreliable opinions are divorced from the record

26   [2] ████████████████████████████████████████████████  Declaration of
     Janet S. Netz, Ph.D. in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification, 16-
27   17 (N.D. Cal.) No. CV-07-5944-SC (Oct. 1, 2012) (hereinafter "Netz Decl.").

28                                                    6

1   evidence and should be held inadmissible under Federal Rule 702 and the controlling principles of

2   *Daubert*.

3   **SUMMARY OF DR. NETZ'S ASSUMPTIONS, OPINIONS AND METHODOLOGY**

4   **I.    DR. NETZ'S OPINION THAT THE ALLEGED CARTEL CAUSED UNIFORM**

5   **IMPACT AND INJURY TO ALL DIRECT PURCHASERS OF CRTs**

6        Dr. Netz opines that there is common proof that the alleged cartel injured all direct

7   purchasers of CRTs during the twelve-year period at issue by ███████████████████████████

8   ████████████████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████ Such analysis contains countless flaws.

15       **A.    Dr. Netz's Assumptions About the Operation of the Alleged Cartel**

16       Dr. Netz relied solely upon the allegations in the complaint to construct her factual

17  assumptions concerning the operation of the alleged cartel. Netz Tr. 29:24-30:1 ("It's my testimony

18  that my report takes·as its foundation the conduct alleged in the complaint."). She assumes, for

19  example, that there was one global cartel in which all defendants participated, regardless of whether

20  each defendant was in the CDT business, the CPT business, or neither business at any given time.

21  *Id*. at 29:12-15 ("I don't recall what is alleged in the complaint, and I never undertook any analysis

22  dependent on whether there were multiple conspiracies or a single conspiracy."). ██████████████

23  ████████████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████████████

26  █████████████████████████████████████

27

28

These assumptions by Dr. Netz are not supported by any study concerning the relevant product or geographic market, nor any analysis concerning which defendants were involved in which business (CDT or CPT) at various times during the twelve-year putative period, let alone the particular periods when each defendant attended any alleged meetings. *See, e.g.*, Netz Tr. 40:25-41:3 ("At this point, the analysis that I've been asked to undertake does not in any way rely on having to find a relevant product market or a relevant geographic market."); *see also id.* at 32:23-33:2 ("I've not assumed a geographic market beyond the discussion in the complaint about how the conspiracy worked. And to the best of my recollection, the complaint does not specify a geographic region."), 47:9-14 (confirming that if the defendants were in the business during the relevant period, she assumed they were part of the conspiracy). Dr. Netz agreed that such analyses of the record facts would be relevant to her conclusions, but she nevertheless chose not to do them. *Id.* at 47:16-48:2 (agreeing that if some defendants had no role in any discussions or agreements about CDTs, that "could very well" affect her analysis and conclusions).

**B.**



MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917



Dr. Netz stated her belief that it is an "economic fact" that "prices in North America are related to prices globally." *Id.* at 38:8-23.  She admitted, however, that she has not "done an empirical analysis at this point to verify that economic principal [sic]." *Id.*  She conceded that an analysis of whether prices charged for tubes in other countries moved in the same direction as tubes manufactured within the United States would be relevant to determining whether U.S. prices were affected by the alleged cartel or not. *Id.* at 46:10-25.  She nevertheless did no such analysis.

**C.**

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15   However, that analysis – which also improperly relies upon "average," as

16  opposed to actual pricing – fails to measure whether there was in fact any correlation between the

17  price movement of different sized or different featured CRTs.  Netz Tr. 106:1-10.  This omission is

18  devastating, as Dr. Netz admitted that she did perform just such a price correlation analysis in *In re*

19  *TFT-LCD (Flat Panel) Antitrust Litigation*, No. 3:07-md-01827, at 58 (N.D. Cal.) [Dkt. No. 1023-6]

20  (June 2, 2009), in order to support certification of an indirect purchaser class in that case.  Her

21  failure to do so here strongly suggests that such an analysis would not have shown any such price

22  correlation, thus confirming the absence of any price structure among CRTs.

23   Further, and equally fatal, Dr. Netz admitted that she never did any "analysis of what the

24  neighbors are" so she has no idea which target prices cover which "neighboring" CRT models, or if

25  they cover none at all.  *Id.* at 215:4-217:11.  Indeed, without knowing which CRTs are "neighbors,"

26  Dr. Netz does not know how broadly her own analysis could be applied to the thousands of CRTs

27  that were not subject to her supposed "target prices."  And, her entire "price structure" claim makes

28

1  no sense when she cannot even identify which CRTs are "neighbors" and thus in or out of her

2  "structure."

3      Nor did Dr. Netz analyze competition among LCD and CRT products during the class period

4  by screen size, or how plasma products competed with finished CRT products at all. *Id.* at 49:52-

5  52:23, 57:11-19.  Without this, there is no basis for Dr. Netz to opine about a purported CRT "price

6  structure" because she did not study the disparate effects of LCD and plasma competition on the

7  prices of different-sized tubes at different points of the class period.

8      **D.**



23

24      Because she used "average" pricing in her analyses, Dr. Netz cannot (and does not) claim

25  that her comparisons measured actual pricing by defendants in the market, which precludes her from

26  showing that any particular direct purchaser actually paid the "target price," a price above the "target

27  price," or a price below the "target price."  Dr. Netz explained, for example, that if actual prices

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ            MDL NO. 1917

1   charged by defendants were set both above and below the alleged target prices in equal amounts, her

2   "averaging" methodology would cause her to conclude that all prices were at target levels:

3       Q:  Let's assume that the transaction data for one of your averages revealed that half the
            transactions were 25 percent below the target price and half were 25 percent above

4           the target price.  You would use an average and calculate that the transactions were

5           all at the target price, correct, in that hypothetical?

6       A:  Yes.

7   Netz Tr. 158:14-159:8.  Of course, in the example above, *none* of the actual transactions would have

8   been at the "target price."

9       Dr. Netz never did any correlation analysis of purported "target prices" and "actual prices" to

10  determine the extent to which changes in the alleged cartel target prices corresponded, if at all, to

11  changes in the prices that actually prevailed.  *Id.* at 104:1-5, 105:17-22 ("Q:  Did you ever do any

12  analysis to compare how the changes in target prices that you use compared to the changes in actual

13  prices month by month or – you know, or over time?  A:  No . . . . Q:  Did you ask your counsel to

14  try to get additional data so you could do such an analysis?  A:  I asked my counsel for – to try to get

15  additional data, and that is ongoing to the best of their ability.  Were any of my requests specifically

16  so that I could do that specific analysis?  No.").



23      **E.**

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE     Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ         MDL NO. 1917

1

2

3

4  *Id.* at

5  145:17-146:6.  As Dr. Netz conceded, however, these simplistic assumptions could be applied to any

6  cartel of an extended duration, and were not based in any way on the actual facts of this case.  *Id.* at

7  146:7-15.

8       Indeed, Dr. Netz admitted at her deposition that there were facts in the record, for which her

9  general economic theories do not account, including facts relating to variations in pricing by region,

10  customers and product type, which she did not study.  *Id.* at 154:10-15.  She also conceded that she

11  did not do anything to estimate or calculate any "but-for" prices, so her assumptions about alleged

12  "target" and "actual" prices being higher than competitive levels were based solely on economic

13  theory and not any comparison of "but-for" prices either to actual prices charged by defendants in

14  the market or the alleged "target prices" of the purported cartel.  Netz Decl. 83-97; Netz Tr. 96:19-

15  97:11 ("Q: [Y]ou have not calculated the but-for price or competitive price for any of the products at

16  issue in this case?  A: At this point, that is correct.").

17       When further pressed, Dr. Netz conceded that even under her view of economic theory, it

18  could be rational for defendants to participate in a cartel which was only effective in fixing the prices

19  of particular products in particular regions, but she did not study the record to consider that

20  possibility so she has no idea if that occurred here.  Netz Tr. 153:17-154:9.

21  **II.**    **DR. NETZ'S OPINION THAT THE**

22

23

24

25

26

27

28

1

2

3

4

5

**A.** **Dr. Netz's Analysis of Pass-On at the Manufacturer and Distributor Levels of**
6        **the Distribution Chain**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    **B.** **Dr. Netz's Analysis of Pass-On at the Retail Level of the Distribution Chain**

23         Nor did Dr. Netz perform any product-by-product or customer-by-customer analysis of pass-

24    on to customers at the retail level, and she did not examine the retail customer pricing data for the

25    vast majority of retailers who sold finished CRT products, including most of the major retailers, such

26    as K-Mart, Sears, Circuit City, and Target, who are parties to this MDL. *See, e.g.*, Netz Tr. 69:19-

27    71:8, 80:24-82:5, 84:19-22. Instead,

28

14



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19       Finally, Dr. Netz's retailer analyses, like her other analyses, rely again on mere "averages" –

20  not customer-by-customer, or even product-by-product transaction prices.  Netz Decl. 98-104, 113-

21  14.[6]

22  **ISSUE TO BE DECIDED**

23       Whether the opinions of Dr. Netz are so inherently unreliable and unsupported by the factual

24  record as to be inadmissible under the Federal Rules of Evidence and the standard set forth in

25

26  [6]

27

28

15

1   *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).

2                                 **ARGUMENT**

3   **I.     DR. NETZ'S OPINIONS ARE INADMISSIBLE PURSUANT TO THE STANDARDS
4           ESTABLISHED BY THE FEDERAL RULES OF EVIDENCE 702, *DAUBERT*, AND
            ITS PROGENY**

5           Expert testimony is inadmissible under Rule 702 and *Daubert* unless "it is both relevant and
6   reliable."[7] Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589-90, 592-93.  A purported expert opinion is
7   reliable only if it is (i) "based on sufficient facts or data" *and* (ii) "the product of reliable principles
8   and methods" that the expert properly applies to the facts of the case. Fed. R. Evid. 702 (b)-(d).

9           Federal Rule of Evidence 702 requires the trial court to perform a robust gatekeeping
10  function to exclude any expert opinion that fails to meet either prong of this standard, including at
11  class certification.  *Daubert*, 509 U.S. at 589-90, 592-93; *Kumho Tire Co. v. Carmichael*, 526 U.S.
12  137, 141 (1999) (applying the gatekeeping function not just to scientific, but to all proffered expert
13  testimony); *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2553-54 (2011) (indicating that *Daubert*
14  fully applies to expert testimony at class certification); *Ellis v. Costco Wholesale Corp.*, 657 F.3d
15  970, 982 (9th Cir. 2011) (holding that the district court correctly applied the *Daubert* standard at
16  class certification in assessing motion to strike).[8]

17

18  [7] In addition to relevance and reliability, the Ninth Circuit identifies five non-exclusive factors as
19  guidelines for the trial court's assessment of proposed expert testimony:  (1) whether the opinion is
    based on scientific, technical, or other specialized knowledge; (2) whether the expert's opinion
20  would assist the trier of fact in understanding the evidence or determining a fact in issue; (3) whether
    the expert has appropriate qualifications—*i.e.* some special knowledge, skill, experience, training or
21  education on the subject matter; (4) whether the methodology or technique the expert uses "fits" the
    conclusions; and (5) whether the probative value is substantially outweighed by the risk of unfair
22  prejudice, confusion of issues, or undue consumption of time.  *United States v. Hankey*, 203 F.3d
    1160, 1168 (9th Cir. 2000).

23  [8] Indeed, this Court recognizes that "an adequate Daubert analysis of every challenged expert
24  opinion seems prudent in fulfilling the court's obligation to ensure actual conformance with FRCP
    23."  *Pecover v. Elec. Arts Inc.*, No. C 08–2820 VRW, 2010 WL 8742757, at *2-3 (N.D. Cal. Dec.
25  21, 2010) (Conducting a full *Daubert* analysis and holding that "undertaking a full-blown *Daubert*
    analysis at the class certification stage makes a great deal of practical sense . . . .  Given that class
26  actions consume vast judicial resources and that many defendants face substantial settlement
    pressures as a result of class certification, [] it hardly seems appropriate to allow flimsy expert
27  opinions to buttress plaintiffs' FRCP 23 arguments.").

28                                          16

1   The burden is on Plaintiffs as the proponent of the proffered testimony to establish its

2   admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10.

3   **A.    Expert Opinions That Are Based on False Assumptions Unsupported by the
         Record Are Inadmissible**

4

5   An expert opinion cannot be based on "subjective belief" and is inadmissible if it lacks a

6   sufficient basis in the relevant facts or relies upon assumptions unsupported by the record. *Daubert*,

7   509 U.S. at 590; *see also McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988)

8   (affirming the exclusion of expert reports with "no basis in the record" that "rest[ed] on unsupported

9   assumptions and ignore[d] distinctions crucial to arriving at a valid conclusion").   Courts in the

10  Ninth Circuit have held that a purported expert opinion that is based on assumptions contrary to the

11  record evidence is inadmissible as speculative and unreliable. *Wright v. United States*, No. CV 06-

12  01788-PHX-NVW, 2008 WL 820557, at *8 (D. Ariz. Mar. 25, 2008) (finding "expert opinion

13  testimony inadmissible under Fed.R.Evid. 702 because it fails to address facts in the record contrary

14  to her opinion, speculates, and does not provide a sound scientific basis for her opinions"); *Ollier v.

15  Sweetwater Union High School Dist.*, 267 F.R.D. 339, 342 (S.D. Cal. 2010) (excluding testimony

16  and holding that "because [expert's] testimony is based upon insufficient facts and data, the minimal

17  methodology used is vague and lacking in reliable principles and methods"); *Educ. Logistics, Inc. v.

18  Laidlaw Transit, Inc.*, No. CV 07-06, 2012 WL 761950, at *8 (D. Mont. Mar. 8, 2012) (excluding

19  the expert's testimony as it was "speculative, not supported by the facts, contradictory, and

20  troublingly misleading").[9]  Indeed, it is well-established that an expert report is inadmissible if it is

21  "not supported by sufficient facts to validate it in the eyes of the law" or if "indisputable record facts

22  contradict or otherwise render the opinion unreasonable."   *Brooke Group Ltd. v. Brown &

23  Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (noting that "[e]xpert testimony is useful as a

24  ───────────────────

25  [9] *See also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (excluding expert
    testimony under Rule 702 because it was not "accompanied by a sufficient factual foundation" and
    the "expert's projection thus was based on assumptions about Boucher's employment prospects that

26  represent a complete break with his work history"); *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d

27  202, 208 (2d Cir. 1984) (noting that the trial court must "determine whether the expert acted
    reasonably in making assumptions of fact upon which he would base his testimony").

28

17

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE                    Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ                     MDL NO. 1917

1   guide to interpreting market facts, but it is not a substitute for them").

2   **B.    Expert Testimony is Also Inadmissible When Based on Unreliable Methods or
3           Incomplete Data**

4       Courts are "both authorized and obligated to scrutinize carefully" the methodology behind a

5   proffered expert opinion. *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994).

6   "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

7   opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," *General*

8   *Electric Co. v Joiner*, 522 U.S. 136, 146 (1997), and testimony must be excluded where it fails to

9   reply upon "facts or data" "of a type reasonably relied upon by experts in the field." Fed. R. Evid.

10  702.

11      Following these principles, courts routinely reject proffered opinions that are based on

12  "averaged" or incomplete data that is not shown to be representative or is otherwise skewed. *See,*

13  *e.g.*, *GPU*, 253 F.R.D. at 504 (criticizing Dr. Netz's analysis for being "overly reliant on averages

14  [which] would thus sweep in an unacceptable number of uninjured plaintiffs"); *Rojas v. Marko*

15  *Zaninovich, Inc.*, No. CIV-F-09-0705, 2011 WL 6671737, at *4-5 (E.D. Cal. Dec. 21, 2011)

16  (concluding that expert report was "marred by serious methodological flaws" including its failure to

17  factor in all the data that defendant provided); *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005

18  WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert's opinion which relied on only some

19  of the existing sampling data as this "amount[ed] to cherry-pick[ing] the facts he considered to

20  render his opinion, and such selective use of facts fail[s] to satisfy the scientific method and

21  *Daubert*") (internal quotations omitted); *Finestone v. Florida Power & Light Co.*, No. 03-14040,

22  2006 WL 267330, at *12 (S.D. Fla. Jan. 6, 2006) (finding the expert's methodology unreliable as he

23  did not "adequately explain why he chose only the thirty-two samples with Co60 and not the

24  remaining samples that had no Co60 to compute the average amount of Co60"); *Rowe Entm't, Inc. v.*

25  *William Morris Agency, Inc.*, No. 98 CIV, 8272(RPP), 2003 WL 22124991, at *3 (S.D.N.Y. Sept.

26  15, 2003) (excluding expert whose study of 1,561 contracts was neither "random nor

27  representative").

28

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE            Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ             MDL NO. 1917

1    The false factual assumptions and unreliable methodologies that underlie Dr. Netz's expert

2   testimony are pervasive and require that it be excluded.

3   II.    **DR. NETZ'S OPINION THAT** ███████████████████████████████████

4   ███████████████████ **IS INADMISSIBLE "JUNK SCIENCE" FOUNDED ON A HOST OF**

5   **FALSE ASSUMPTIONS, INCOMPLETE DATA, AND UNTRUSTWORTHY**
    **METHODS**

6   Plaintiffs proffer Dr. Netz's opinions as support for their assertion that there is common

7   proof that each member of the putative class experienced impact and injury.  Under *Daubert*, the

8   Court must determine whether Dr. Netz's proposed common methods to prove injury to all class

9   members is based on sufficiently reliable data and methods such that they may be admitted and

10  relied upon for class certification.  Her opinions utterly fail that test.

11  With respect to pass-through, Dr. Netz premises each of her opinions upon a combination of

12  unsupported factual assumptions that ignore the record evidence and unreliable methodologies that

13  have already been rejected by this Court.

14  A.    ████████████████████████████████████████████

15

16  ███████████████████████████████████████████████████

17  ███████████████████████████████████████████████████

18  ███████████████████████████████████████████████████

19  ███████████████████████████████████████████████████

20  ███████████████████████████████████████████████████

21  ██████████████████████

22  *First*, Dr. Netz agreed at her deposition that, under her assumptions, ████████████

23  ███████████████████████████████████████████████████

24  ███████████████████████████████████████████████████

25  ███████████████████████████████████████████████████

26  ███████████████████████████████████████████████████

27  ███████████████████████████████████████████████████

28

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE          Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ            MDL NO. 1917

1

2

3      Dr. Netz's assumptions in this respect defy logic and cannot pass muster under *Daubert*. *See*

4   *Domingo v. T.K., M.D.*, 289 F.3d 600, 606-07 (9th Cir. 2002) (purported conclusion must be

5   "probable," not just an expert's "*ipse dixit* linking" the study to the conclusion); *Perez v. State Farm*

6   *Mut. Auto. Ins. Co.*, No. C 06-01962, 2012 WL 3116355, at *2 (N.D. Cal. July 31, 2012) (explaining

7   that an expert's opinion may be excluded "on the ground that an expert's purported methodology

8   fails to explain his final conclusion").

9      *Second*, Dr. Netz's assumptions concerning pass-through at the retailer level are further

10  belied by the record contentions of ten major retailer groups in this MDL, all of whom assert that

11  alleged CRT price overcharges were *not* passed through to their customers. *See, e.g.*, *Target Corp.*

12  *v. Chunghwa Picture Tubes, Ltd.*, No. 11-cv-05514, ¶¶ 106, 228 (N.D. Cal.) [Dkt. No. 9] (Jan. 6,

13  2012) (alleging that Target was "not able to pass the inflated prices on to their customers"); *Office*

14  *Depot, Inc. v. Hitachi, Ltd.*, No. 11-cv-06276, ¶¶ 87, 210 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011)

15  (same).[10] Remarkably, Dr. Netz testified that she was not even aware of such factual assertions until

16  her deposition, even though she agreed that she should have studied this because it is relevant to her

17  analyses. Netz Tr. 60:5-16, 89:20-90:5.

18      Further,

19

20

21

22

23

---

24  [10] *CompuCom Systems, Inc. v. Hitachi, Ltd.*, No. 11-cv-06396, ¶¶ 88, 211 (N.D. Cal.) [Dkt. No. 1]

25  (Nov. 14, 2011); *Electrograph Systems, Inc. v. Hitachi, Ltd.*, No. 11-cv-01656, ¶¶ 98, 225 (N.D. Cal.) [Dkt. No. 5] (Mar. 10, 2011); *P.C. Richard & Son Long Island Corp. v. Hitachi, Ltd.*, No. 12-cv-02648, ¶¶ 92, 215 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *Schultze Agency Servs., LLC v.*

26  *Hitachi, Ltd.*, No. 12-cv-02649, ¶¶ 90, 213 (N.D. Cal. ) [Dkt. No. 1] (Nov. 14, 2011); *Siegel v.*

27  *Hitachi, Ltd.*, No. 11-cv-05502, ¶ 217 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *Interbond Corp. of Am. v. Hitachi, Ltd.*, No. 11-cv-06275, ¶¶ 86, 209 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011).

28

20

1

2

3

4

5

6

7

8

9

10

11       Nor did Dr. Netz analyze whether the small sample of retailer pricing

12 data she did analyze is representative of the large amount of retailer pricing data she did not review.

13 This is fatal, especially given that this Court has already rejected Dr. Netz's analyses in the past for

14 relying on pricing data from only two defendants in a multi-party case, *Flash Memory*, 2010 WL

15 2332081 at *10 n.9, and for failing to make use of all existing data given "how much time

16 [plaintiffs] have already had for discovery," *GPU*, 253 F.R.D. at 506 ("[P]laintiffs should be able to

17 provide more than promises at this late stage of the litigation.").

18    **B.**

19

20       At the manufacturer-wholesaler level, Dr. Netz similarly relies upon "economic theory"

21

22

23

24       As a result, her testimony is inadmissible.

25    *First,*

26

27

28



MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE      Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ      MDL NO. 1917

1    ██████████████████████████████ Dr. Netz testified that she made no

2    attempt to do any statistical analysis to determine whether such pricing data is representative of the

3    enormous amount of manufacturer pricing data that she chose not to review.  *Id.* at 139:6-18.

4    Remarkably, some of the pricing not studied by Dr. Netz for this purpose included the pricing data

5    produced in this case for Samsung Electronics, Panasonic, Hitachi, LG, Phillips and other major

6    CRT product brands. *See, e.g.*, Netz Tr. 131:25-132:5 (Dr. Netz did not do a pass-on analysis for the

7    pricing data produced by any of the defendant-manufacturers of finished CRT products except for

8    Toshiba); *but see id.* at 72:19-73:1 (Dr. Netz is familiar with the principle that "to make inferences

9    about a population from a sample, the sample should be of a sufficient size and representative of the

10   population.").  Nor did she review any pricing data for such major CRT product brands as Apple,

11   Sony, Sharp, Sanyo, or Visio. *Id.* at 124:24-125:17.

12       *Second*, the failure of Dr. Netz to do any statistical analysis to determine if the scant data she

13   utilized in her purported analyses is representative or not is particularly egregious given the

14   undisputed record evidence from manufacturers and wholesalers of finished CRT products, whose

15   pricing data she did not study, █████████████████████████████████



27   _____
     [11] Only for the purposes of the 30(b)(6) testimony cited herein, "Panasonic" refers collectively to

28   Panasonic Corporation, Panasonic Corporation of North America, and MT Picture Display Co., Ltd.



This Court has already held that an "economic theory" of pass-through is unreliable where, as here, it fails to account for such real world variables. *Flash Memory*, 2010 WL 2332081, at *8 (rejecting

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917

the "economic theory of pass through" because it did not account for the factual anomalies associated with the "various links in the distribution channel").

## III.   DR. NETZ'S EXTENSIVE RELIANCE ON AVERAGING IS UNRELIABLE BECAUSE IT OBSCURES THE VERY PRICE VARIATIONS HER ANALYSIS IS SUPPOSED TO ADDRESS

Throughout Dr. Netz's analyses, she aggregates, averages and groups pricing data at all distribution levels, which conceals, rather than examines, the thousands of price points that exist throughout the industry.   This problem infects her entire Declaration, and renders it wholly unreliable for the purpose for which plaintiffs put it forward:



This pervasive use of "averaging" to eliminate pricing differences is indefensible.

As previously found by this Court in *Flash Memory*, in terms that are equally applicable here substituting "CRTs" for "chips":

> Dr. Netz's regression analysis does not take into account individual variances in price trends based on a particular chip or a particular chip purchased by a specific Direct-Purchaser-or even more generally, by category of chip or category of customer.  By looking only at an *average price trend*, Dr. Netz's model obscures individual variations over time among the prices that different customers pay for the same or different products that appear in the data.

*Flash Memory*, 2010 WL 2332081, at *10 (N.D. Cal. 2010); *see also GPU*, 253 F.R.D. at 504 (similarly dismissing Dr. Netz's analysis for being "overly reliant on averages [which] would thus sweep in an unacceptable number of uninjured plaintiffs").  Similarly, the ABA Section of Antitrust

24

1   Law has explained:

2       Sometimes the prices used by economists are averages of a number of different prices
3       charged to different customers or for somewhat different products.  Using such averages can
        lead to serious analytical problems.  For example, averages can hide substantial variation
4       across individual cases, which may be key to determining whether there is common impact.

5   ABA Section of Antitrust Law, Econometrics:  Legal, Practical, and Technical Issues at 220 (ABA

6   Publishing 2005).

7       This is precisely the problem with Dr. Netz's analysis here.  For example, Dr. Netz admitted

8   at her deposition that her use of averaging of sales prices of CRT tubes would lead her to conclude

9   that 100% of prices were set at the alleged cartel "target price" even in the situation where one-half

10  of real world prices were 25% below the "target price," and the other half of real world prices were

11  25% above the "target price."  Netz Tr. 158:14-22.  There can be no question that such an expert

12  opinion is neither reliable nor admissible because it fails to account for the significant pricing

13  variations in the underlying data.



18

products.[19]  *See* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON MULTIPLE REGRESSION at 308-09 (3RD ed. 2011) ("[C]ourts have rejected regression studies that did not have an adequate foundation or research design with respect to the issues at hand.").

Dr. Netz's failure to account for any of the factors that caused the countless individual pricing differences that permeated the markets for CRTs and finished CRT products renders her analysis inherently unreliable.  *See GPU*, 253 F.R.D. at 495-96 ("Notably absent from Dr. Teece's analysis are other factors that would likely have an impact on prices, including GPU performance, product features, supply and demand factors, the customization of the product, and product deadlines associated with the sale.  Without incorporating such variables, it is impossible to account for the diversity in products and purchasers here."); *see also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON MULTIPLE REGRESSION at 314 (3RD ed. 2011) ("Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable.").

IV.   **THERE IS NOTHING IN THE FACTUAL RECORD TO SUPPORT DR. NETZ'S BASELESS ASSUMPTION THAT**

[REDACTED]

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917



27



Further, ███████████████████████████████████ there still would be no basis for Dr. Netz to use a "target price" that, on its face, applied only for a limited time period to make far-reaching conclusions about the large portion of the alleged class period in which she did not study target prices at all. ██████████████████████████

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE   Case No. 07-5944 SC
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ        MDL NO. 1917

1    Given the above, there is no basis for Dr. Netz to testify based on the unsupported

2 assumption that the alleged "target prices" applied to every CRT sale in the United States during the

3 twelve years at issue.

## V.    DR. NETZ CANNOT RELY UPON NAKED ECONOMIC *IPSE DIXIT* AS A SUBSTITUTE FOR ACTUAL ANALYSIS

6    In her Declaration, Dr. Netz relies on generic "economic theories" that all cartels are

7 "rational" and continue to operate only if they charge prices that are always supra-competitive for

8 every product, every time. Netz Decl. 65-66. At her deposition, Dr. Netz was forced to retreat from

9 this "one-size-fits-all" assumption. Specifically, Dr. Netz testified that the alleged cartel would be

10 rational even if it was effective only with respect to some products or some geographic markets:

11    • It may, in fact, be rational for firms to participate in a cartel even if it only could be

12    effective for some screen sizes but not others. Netz Tr. 153:17-21.

13    • It may be rational for firms to participate in a cartel even if they thought it would be

14    effective for some geographic markets but not others. *Id.* at 153:22-154:2.

15    • It would be rational for firms to participate in a cartel despite it being effective only for

16    some customers, but not others. *Id.* at 154:3-9.

17 Similarly, Dr. Netz conceded at her deposition that a cartel's duration, which she claims in her

18 Declaration is proof of a cartel's success, "doesn't really tell you whether or not the cartel was

19 effective for any particular geographic region, any particular customer, or any particular screen size

20 . . . ." *Id.* at 154:10-15.

21    Despite her admission that a cartel could continue if it was successful only with respect to

22 some customers or products but not others, Dr. Netz did not study whether the alleged cartel in this

23 case was successful with respect to all, some, or *any* particular products or customers. ████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████ ████

---

26 [23] Cole Decl. Ex. 18, Nishiyama (Panasonic) Tr. 103:4-11 (MTPD set up a special sales department

27 to respond to request from Philips global purchasing department), 113:1-116:19 (global large-sized customers had different pricing from local customers and from each other); Cole Decl. Ex. 9,

28 Heinecke (TAEC) Tr. 108:8-110:14 (discussion of how Toshiba America Electronic Components,



MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917

1

2

3      Nor can Dr. Netz properly rely on a so-called "price structure" as a substitute for actual

4   analysis of the record facts concerning direct purchaser impact.  As discussed above, Dr. Netz never

5   performed any correlation analysis studying prices of different-sized or different-featured CRTs,

6   Netz Tr. 216:24-217:11, and does not even know what "neighbors" do or do not exist under her own

7   purported "price structure."  *Id.* at 214:24-217:11.  Thus, all of Dr. Netz's opinions about such a

8   structure are inadmissible speculation lacking any sufficient basis in the record facts.

9      Further, because Dr. Netz cannot reasonably assume that defendants would always charge

10   CRT prices above the competitive level to all customers for all products in all markets and

11   circumstances, she was required to at least estimate the "but-for" competitive prices and compare

12   them to actual prices charged in the United States to direct purchasers.  Given that any such analysis

13   is missing, Dr. Netz has no reliable basis to testify on that subject.  *Id.* at 97:4-7 ("Q: [Y]ou have not

14   calculated the but-for price or competitive price for any of the products at issue in this case?  A: At

15   this point, that is correct.").

16

17

18

19

20

21                              Cole Decl. Ex. 4, Tae Kwon (LG Electronics) Tr.

22   53:7-19 (prices of CRTs sold to a related subsidiary or affiliate of LGE were set at around 95% of
the CRT price charged externally during the prior three month period); Cole Decl. Ex. 89, PTC-

23   00006718-6750, Slide 7 (Philips Electronics purchased 67% by volume and 75% by value of tubes
from Philips Display Components and had a pricing agreement of 2.5% below market conditions);

24

25   28

26

27

28                                       31

1

**VI.    DR. NETZ'S SOLE RELIANCE UPON PLAINTIFFS TO ASSUME THE PRODUCT, GEOGRAPHIC AND PARTICIPANT SCOPE OF THE ALLEGED CARTEL IS ANOTHER GROUND FOR EXCLUSION**

2

3          Finally, Dr. Netz compounds the many defects in her testimony by basing her analysis on the

4    assumption of a single, integrated, global conspiracy that covered both CDTs and CPTs in which all

5    defendants participated uniformly.  *Id.* at 29:12-30:1.  She made this assumption without doing

6    anything more than rely upon the allegations in the plaintiffs' complaint and without even trying to

7    determine the relevant geographic and product markets.  *Id.* at 40:25-41:3.  Nor did she try to

8    determine which defendants attended which alleged cartel meetings involving which CRTs or

9    whether, at any particular time, any given defendant was in the CDT or CPT business or not with

10   respect to any particular types or sizes of CRTs.  *Id.* at 28:17-29:7, 47:1-48:2; *see Burkhalter Travel*

11   *Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 152 (N.D. Cal. 1991) (courts need not accept a

12   plaintiff's "conclusory or generic allegations regarding the suitability of the litigation for resolution

13   through class action"); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675, 677-78 (7th Cir. 2001)

14   (courts are "free to pierce the allegations of the complaint to determine if certification is proper").

15

16

17

18                      

19

20

21

22

23    [29]  ███████████████████████████████████████████████████████ Evidentiary
      Proffer of Defendants Hitachi, Ltd, Hitachi Displays, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd.,
24    and Hitachi Electronic Devices (USA), Inc., Dec. 7, 2010 [Dkt. Nos. 817-25] (the Hitachi entities
      did not manufacture or sell CRTs after early 2003); Second Supplemental Responses and Objections
25    of Panasonic Corp. of N. Am., MT Picture Display Co., Ltd. and Panasonic Corp. to Direct
      Purchaser Plaintiffs' First Set of Interrogatories, Nov. 3, 2011, at 4 [Dkt. No. 1393-8] (Panasonic
26    Corporation ceased the manufacture of CDTs for computer monitors no later than 2001).

27    [30] ████████████████████████████████████████████████████████

28
                                              32

Dr. Netz does not dispute that the scope of the alleged conspiracy could have varied with respect to particular defendants and that this issue, if studied, could affect her conclusions about common impact. Netz Tr. 47:16-48:2. She nevertheless decided not to examine the relevant record to reach her own conclusions about whether the alleged conspiracy only affected some products sold by some defendants in some geographic markets or how such facts would impact her "common impact" analysis. *See id.* at 47:16-48:2 (agreeing that if "some defendants had no role in any discussions or agreements about CDTs," that "could very well" affect her analysis and conclusions), *id.* (Netz simply did not study the record to consider these points). Reliance upon the plaintiffs' allegations, as opposed to the record facts, does not provide a basis for admissible expert testimony.

## CONCLUSION

For each independent reason stated above, as well as the cumulative effect of all of the defects in Dr. Netz's analyses, Defendants' Motion to Strike the Expert Testimony of Dr. Netz should be granted.

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917

Dated:  December 17, 2012

WINSTON & STRAWN LLP

By: /s/ Jeffrey L. Kessler
JEFFREY L. KESSLER (*pro hac vice*)
E-mail: jkessler@winston.com
ALDO A. BADINI (257086)
E-mail: abadini@winston.com
A. PAUL VICTOR (*pro hac vice*)
E-mail: pvictor@winston.com
EVA COLE (*pro hac vice*)
E-mail: EWCole@winston.com
MOLLY M. DONOVAN (*pro hac vice*)
Email: MMdonovan@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4692
Facsimile: (212) 294-4700

STEVEN A. REISS (*pro hac vice*)
E-mail: steven.reiss@weil.com
DAVID L. YOHAI (*pro hac vice*)
E-mail: david.yohai@weil.com
ADAM C. HEMLOCK (*pro hac vice*)
E-mail: adam.hemlock@weil.com
DAVID E. YOLKUT (*pro hac vice*)
E-mail: david.yolkut@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

GREGORY D. HULL (57367)
E-mail: greg.hull@weil.com
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, California 94065-1175
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendants Panasonic*
*Corporation of North America, MT Picture*
*Display Co., Ltd. and Panasonic Corporation*
*(f/k/a Matsushita Electric Industrial Co.)*

FRESHFIELDS BRUCKHAUS
DERINGER US LLP

By: /s/ Richard Snyder
TERRY CALVANI (SBN 53260)
E-mail: terry.calvani@freshfields.com
CHRISTINE LACIAK (*pro hac vice*)
E-mail: christine.laciak@freshfields.com

34

1

RICHARD SNYDER (*pro hac vice*)
E-mail: richard.snyder@freshfields.com
**FRESHFIELDS BRUCKHAUS**
**DERINGER US LLP**
701 Pennsylvania Avenue NW, Suite 600
Washington, DC  20004
Telephone: (202) 777-4565
Facsimile: (202) 777-4555

2

3

4

5

*Attorneys for Beijing-Matsushita Color CRT*
*Company, Ltd.*

6

7

MORGAN, LEWIS & BOCKIUS LLP

8

By:  /s/ Kent M. Roger
KENT M. ROGER (SBN 95987)
E-mail: kroger@morganlewis.com
MICHELLE PARK CHIU (SBN 248421)
E-mail: mchiu@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, California 94105-1126
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

9

10

11

12

13

J. CLAYTON EVERETT, JR. (*pro hac vice*)
E-mail: jeverett@morganlewis.com
SCOTT A. STEMPEL (*pro hac vice*)
E-mail: sstempel@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

14

15

16

17

18

*Attorneys for Defendants Hitachi, Ltd., Hitachi*
*Displays, Ltd., Hitachi Asia, Ltd., Hitachi*
*America, Ltd., and Hitachi Electronic Devices*
*(USA), Inc.*

19

20

MUNGER, TOLLES & OLSON LLP

21

By:  /s/ Hojoon Hwang
HOJOON HWANG
E-mail: Hojoon.Hwang@mto.com
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

22

23

24

25

WILLIAM D. TEMKO
E-mail: William.Temko@mto.com
JONATHAN E. ALTMAN
E-mail: Jonathan.Altman@mto.com
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue, Thirty-Fifth Floor

26

27

28

35

1

Los Angeles, California  90071
Telephone: (213) 683-9100

2

*Attorneys for Defendants LG Electronics, Inc.;*
*LG, LG Electronics USA, Inc.,; and LG*
*Electronics Taiwan Taipei Co., Ltd.*

3

4

SHEPPARD MULLIN RICHTER &
HAMPTON

5

6

By: /s/ Gary L. Halling
GARY L. HALLING (SBN 66087)
E-mail: ghalling@sheppardmullin.com
JAMES L. MCGINNIS (SBN 95788)
E-mail: jmcginnis@sheppardmullin.com
MICHAEL W. SCARBOROUGH (SBN 203524)
E-mail: mscarborough@sheppardmullin.com
**SHEPPARD MULLIN RICHTER &
HAMPTON**
Four Embarcadero Center, 17th Floor
San Francisco, California  94111
Telephone:  (415) 434-9100
Facsimile:  (415) 434-3947

7

8

9

10

11

12

*Attorneys for Defendants Samsung SDI America,*
*Inc. Samsung SDI Co., Ltd.; Samsung SDI*
*(Malaysia) SDN. BHD.; Samsung SDI Mexico*
*S.A. DE C.V.; Samsung SDI Brasil Ltda.;*
*Shenzen Samsung SDI Co., Ltd. And Tianjin*
*Samsung SDI Co., Ltd.*

13

14

15

16

O'MELVENY & MYERS LLP

17

By: /s/ Ian Simmons
IAN SIMMONS (*pro hac vice*)
E-mail: isimmons@omm.com
BENJAMIN G. BRADSHAW (SBN 189925)
E-mail: bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

18

19

20

21

22

*Attorneys for Defendants Samsung Electronics*
*Co., Ltd. and Samsung Electronics America, Inc.*

23

24

BAKER BOTTS LLP

25

By: /s/ Jon V. Swenson
JON V. SWENSON (SBN 233054)
E-mail: jon.swenson@bakerbotts.com
**BAKER BOTTS LLP**
1001 Page Mill Road
Building One, Suite 200

26

27

28

36

MEMORANDUM OF LAW I/S/O DEFENDANTS' MOTION TO STRIKE
THE PROPOSED EXPERT TESTIMONY OF DR. JANET S. NETZ

Case No. 07-5944 SC
MDL NO. 1917

Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699

John M. Taladay (*pro hac vice*)
E-mail: john.taladay@bakerbotts.com
Joseph Ostoyich (*pro hac vice*)
E-mail: joseph.ostoyich@bakerbotts.com
**BAKER BOTTS LLP**
1299 Pennsylvania Avenue N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

*Attorneys for Defendants Koninklijke Philips
Electronics N.V. and Philips Electronics North
America Corporation*

WHITE & CASE LLP

By: /s/ Lucius B. Lau
CHRISTOPHER M. CURRAN (*pro hac vice*)
E-mail: ccurran@whitecase.com
GEORGE L. PAUL (*pro hac vice*)
E-mail: gpaul@whitecase.com
LUCIUS B. LAU (*pro hac vice*)
E-mail: alau@whitecase.com
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, DC  20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

*Attorneys for Defendants Toshiba Corporation,
Toshiba America Information Systems, Inc.,
Toshiba America Consumer Products, L.L.C.,
and Toshiba America Electronic Components,
Inc.*

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from each of the above signatories.

37