1  JEFFREY L. KESSLER (*pro hac vice*)
   E:mail: JKessler@winston.com
2  A. PAUL VICTOR (*pro hac vice*)
   E:mail: PVictor@winston.com
3  ALDO A. BADINI (SBN 257086)
   E:mail: ABadini@winston.com
4  EVA W. COLE (*pro hac vice*)
   E:mail: EWCole@winston.com
5  MOLLY M. DONOVAN
   E:mail: MMDonovan@winston.com
6  **WINSTON & STRAWN LLP**
   200 Park Avenue
7  New York, NY 10166
   Telephone: (212) 294-6700
8  Facsimile: (212) 294-4700

9  STEVEN A. REISS (*pro hac vice*)
   E-mail: steven.reiss@weil.com
10 DAVID L. YOHAI (*pro hac vice*)
   E-mail: david.yohai@weil.com
11 ADAM C. HEMLOCK (*pro hac vice*)
   E-mail: adam.hemlock@weil.com
12 **WEIL, GOTSHAL & MANGES LLP**
   767 Fifth Avenue
13 New York, New York 10153-0119
   Telephone: (212) 310-8000
14 Facsimile: (212) 310-8007

15 *Attorneys for Defendants Panasonic Corporation (f/k/a Matsushita Electric*
   *Industrial Co., Ltd.), Panasonic Corporation of North America, MT Picture*
16 *Display Co., Ltd.*

17 Additional Defendants and Counsel Listed on Signature Pages

18              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
19               **SAN FRANCISCO DIVISION**

20

21 **In re: CATHODE RAY TUBE (CRT)**      **Case No. 07-5944 SC**
   **ANTITRUST LITIGATION**
22                                         **MDL No. 1917**

23 This Document Relates to:               **DEFENDANTS' MEMORANDUM OF**
                                           **POINTS AND AUTHORITIES IN**
24                                         **OPPOSITION TO MOTION OF**
                                           **INDIRECT-PURCHASER PLAINTIFFS**
25 ALL INDIRECT-PURCHASER ACTIONS          **FOR CLASS CERTIFICATION**

26 **DOCUMENT SUBMITTED PARTIALLY**        Date: To Be Determined
   **UNDER SEAL AND CHAMBERS COPY**        Place: JAMS Resolution Center
27                                         Special Master: Hon. Charles A. Legge

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT OF THE ISSUES TO BE DECIDED ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................. 1

STATEMENT OF FACTS ............................................................................................. 5

I.   THE CRT INDUSTRY WAS COMPRISED OF DIVERSE PRODUCTS SUBJECT TO DIFFERENT COSTS AND DIFFERENT FORCES OF SUPPLY AND DEMAND .............................................................................................................. 5

     A.  CPTs And CDTs Were Distinct Products ........................................................ 5

     B.  Within The Distinct Product Categories Of CDTs And CPTs, There Was Extensive Diversity Of Products .................................................................... 6

II.  NORTH AMERICAN PRICING DYNAMICS WERE DISTINCT FROM OVERSEAS PRICING DYNAMICS .............................................................................. 7

III. FINISHED CRT PRODUCTS (TVS AND MONITORS) DIFFERED WIDELY ................... 8

IV.  CRT MANUFACTURERS HAD DIVERGENT BUSINESS MODELS AND MARKET SHARES OVER TIME ................................................................................. 9

V.   DURING THE PUTATIVE CLASS PERIOD, CRTs AND FINISHED CRT PRODUCTS WERE A DYING TECHNOLOGY, AND DEMAND, PRICES, AND PROFITS RAPIDLY DECLINED, NEGATING ANY INFERENCE OF COMMON PROOF OF CLASSWIDE IMPACT ........................................................................... 10

VI.  THE WIDE VARIETY OF DISTRIBUTION AND MANUFACTURING CHANNELS FOR CRTs AND CRT PRODUCTS FURTHER CONTRIBUTED TO WIDE VARIATIONS IN PRICING ............................................................................ 12

VII. PRICING PRACTICES DIFFERED WIDELY FOR BOTH CRTs AND CRT FINISHED PRODUCTS ............................................................................................ 13

VIII. NEITHER MANUFACTURERS NOR RETAILERS OF FINISHED CRT PRODUCTS WERE ABLE TO ACHIEVE UNIFORM PASS-ON TO ALL CUSTOMERS ............................................................................................................ 16

ARGUMENT .................................................................................................................. 18

I.   RULE 23 REQUIRES A "RIGOROUS ANALYSIS" OF ALL THE EVIDENCE ................ 18

     A.  Rule 23(b)(3) Imposes Stringent Demands Of Common Proof Of Impact And Injury Even In Price-Fixing Cases ........................................................... 19

     B.  Plaintiffs Have Not Offered a Methodology Capable of Demonstrating Classwide Impact Or Injury With Common Proof ........................................ 20

i

1.      Dr. Netz Has Not Offered Reliable Common Proof of "Pass-On" to All Members of the Putative Class, Who Paid Vastly Different Prices.............................21

       a.    Dr. Netz's Pass-On Analyses Improperly Use Price "Averages" That Obscure Real World Price Differences .................................................................22

       b.    Dr. Netz's Pass-Through Analyses Are Based on Tiny, Unrepresentative Samples of Pricing Data.............................................................24

       c.    Dr. Netz Ignored The Record Evidence That ███████████████ .........26

2.      Plaintiffs Offer No Reliable Common Method for Proving that All Direct Purchasers Paid Supra-Competitive Prices For Every CRT As a Result of the Alleged Cartel ..................................................................................................28

       a.    Dr. Netz's "Target Price" Analysis Suffers Several Fatal Deficiencies That Render It Incapable Of Demonstrating Classwide Impact to Direct Purchasers...........................................................................................28

       b.    ██████████████████████████████████████████████.........31

       c.    Dr. Netz's Opinions About Common Impact at the Direct Purchaser Level Also Fail Because of Her Refusal to Even Try to Calculate Any "But-For" Price.....................................................................................32

       d.    There Is Also No Reliable Evidence of a Common CRT "Price Structure," Further Undermining The Premise for Dr. Netz's Common Injury Opinions at the Direct Purchaser Level ....................................................33

3.      Dr. Netz Has Offered No Reliable Methodology to Assess Class-Wide Damages Using Common Proof .......................................................................36

4.      Common Impact and Injury Cannot Be Inferred ........................................40

       (a)   California...........................................................................................41

       (b)   Minnesota .........................................................................................41

       (c)   Florida ..............................................................................................42

II.    THE PROPOSED CLASSES ARE NOT ASCERTAINABLE ................................................42

III.   THE PROPOSED CLASS REPRESENTATIVES ARE NEITHER ADEQUATE NOR TYPICAL ...............................................................................................................45

CONCLUSION................................................................................................................48

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

CASES

4
*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007)............................................................36

5

6
*Am. Seed Co. v. Monsanto Co.*,
   238 F.R.D. 394 (D. Del. 2006), *aff'd*, 271 Fed. App'x 138 (3d Cir. 2008)...................39

7
*Arrendondo v. Delano Farms Co.*,
   2011 WL 1486612 (E.D. Cal. Apr. 19, 2011)....................................................46

8

9
*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
   191 Cal. App. 3d 1341 (1987)..............................................................41

10
*Blades v. Monsanto Co.*,
   400 F.3d (8th Cir. 2005) ..............................................................2, 19, 32

11

12
*Bogosian v. Gulf Oil Corp.*,
   561 F.2d 434 (3d Cir. 1977)..............................................................20

13
*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
   141 F.R.D. 144 (N.D. Cal. 1991)..............................................................36

14

15
*Butt v. Allegheny*,
   116 F.R.D. 486 (E.D. Va. 1987) ..............................................................20, 36

16
*California v. Infineon Technologies AG*,
   2008 WL 4155665 (N.D. Cal. Sep. 05, 2008) ..............................................................41

17

18
*City of St. Paul v. FMC Corp.*,
   1990 WL 259683 (D. Minn. Nov. 14, 1990) ..............................................................42

19
*Dowis v. Watson*,
   289 S.E.2d 558 (Ga. App. 1982)..............................................................48

20

21
*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*,
   213 F.3d 198 (5th Cir. 2000) ..............................................................38

22
*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ..............................................................18, 19

23

24
*Execu-Tech Business Sys., Inc. v. Appleton Papers, Inc.*,
   743 So. 2d 19 (Fla. Dist. Ct. App. 1999) ..............................................................42

25
*Finestone v. Florida Power & Light Co.*,
   2006 WL 267330 (S.D. Fla. 2006) ..............................................................25

26

27
*General Telephone Co. of Southwest v. Falcon*,
   457 U.S. 147 (1982)..............................................................5, 45, 46, 47

28

iii

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

*Global Minerals & Metals Corp. v. Superior Court,*
   113 Cal. App. 4th 836 (Cal. Ct. App. 2003) ...................................................................41

*Gordon v. Microsoft Corp.,*
   No. 00-5994, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001)............................. 41-42

*In re Abbott Labs. Norvir Antitrust Litig.,*
   No. C 04-1511, 2007 WL 1689899 (N.D. Cal. June 11, 2007) ....................................19

*In re Brand Name Prescription Drugs Antitrust Litig.,*
   Nos. 94 C 897, MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) .......................24

*In re Cipro Cases I & II,*
   121 Cal. App. 4th 402 (2004) ........................................................................................41

*In re Copper Antitrust Litig.,*
   196 F.R.D. 348 (W.D.Wis. 2000)...................................................................................45

*In re Flash Memory Antitrust Litig.,*
   C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ("*Flash Memory*") ......................*passim*

*In re Florida Cement and Concrete Antitrust Litig.,*
   No. 09-23187-CIV, 2012 WL 27668 (S.D. Fla. Jan 3, 2012)........................................33

*In re Florida Microsoft Antitrust Litig.,*
   No. 99-27340, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002)................................42

*In re Graphics Processing Units Antitrust Litig.,*
   253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*") .......................................................*passim*

*In re Hydrogen Peroxide Antitrust Litig.,*
   552 F.3d 305 (3d Cir. 2008).................................................................................18, 20

*In re IPO Sec. Litig.,*
   471 F.3d 24 (2d Cir. 2006).............................................................................................18

*In re Live Concert Antitrust Litig.,*
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ...........................................................................38

*In re Methionine Antitrust Litig.,*
   2003 WL 22048232 (N.D. Cal. Aug 26, 2003) .......................................................20, 24

*In re Napster Copyright Litigation,*
   No. C MDL-00-1369, 2005 WL 1287611 (N.D. Cal. June 1, 2005).............................19

*In re New Motor Vehicle Canadian Export Antitrust Litig.,*
   522 F.3d 6 (1st Cir. 2008)..............................................................................................19

*In re OSB Antitrust Litig.,*
   2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) .......................................................37, 40, 41

iv

*In re Plastic Additives Antitrust Litig.*,
   No. 03-CV-2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) ....................................................33

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004)..........................................................................................19, 42

*In re Sugar Indus. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976)..............................................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   257 F.R.D. 583 (N.D. Cal. 2010)..........................................................................................19

*J.P. Morgan & Co., Inc. v. Superior Court*,
   113 Cal. App. 4th 195 (Cal. Ct. App. 2003) ..........................................................................41

*Keating v. Phillip Morris, Inc.*,
   417 N.W.2d 132 (Minn. Ct. App. 1987)................................................................................42

*Kirkman v. North Carolina R. Co.*,
   220 F.R.D. 49 (M.D.N.C. 2004)........................................................................................43, 45

*Kottaras v. Whole Foods Market, Inc.*,
   No. 08-cv-1832, 2012 WL 259862 (D.D.C. Jan. 30, 2012).........................................................20

*LeClercq v. The Lockformer Co.*,
   2005 WL 1162979 (N.D. Ill. 2005) ........................................................................................25

*Marcus v BMW of North America, LLC*,
   687 F.3d 583 (3d Cir. 2012)..............................................................................................42, 43

*Marlo v. UPS, Inc.*,
   639 F.3d 942 (9th Cir. 2011) ................................................................................................40

*Melnick v. Microsoft Corp.*,
   2001 WL 1012261 (Aug. 24, 2001).......................................................................................40

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 Fed. App'x 296 (5th Cir. 2004) ......................................................................................37

*Ren v. Philip Morris Inc.*,
   No. 00-004035-CZ, 2002 WL 1839983 (Mich. Cir. Ct. June 11, 2002) ........................................40

*Rojas v. Marko Zaninovich, Inc.*,
   2011 WL 6671737 (E.D. Cal. 2011)...................................................................................24-25

*Rosack v. Volvo of Am. Corp.*,
   131 Cal. App. 3d 741 (1982) ................................................................................................41

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
   2003 WL 22124991 (S.D.N.Y. 2003)......................................................................................25

v

*Sherwood v. Microsoft Corp.*,
  No. M2000-0185-COA-R9-CV, 2003 WL 21780975 (Tenn. Ct. App. July 31, 2003)...............40

*Somers v. Apple, Inc.*,
  258 F.R.D. 354 (N.D. Cal. 2009) .........................................................................20, 40

*Sosna v. Iowa*,
  419 U.S. 393 (1975).........................................................................................47

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008)...............................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ...............................................................................2, 18, 19

*Windham v. American Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977) ...............................................................................18

*Xavier v. Philip Morris USA Inc.*,
  787 F. Supp. 2d 1075 (N.D. Cal. 2011) ..........................................................5, 44, 45

**RULES**

Fed. R. Civ. P. Rule 23 .............................................................................. *passim*

**OTHER AUTHORITIES**

2A Phillip Areeda *et al.*, *Antitrust Law* ¶ 331d (3d ed. 2007) ...........................................20

7A Wright, Miller & Kane, Federal Practice and Procedure ........................................40, 42

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON ESTIMATION OF
  ECONOMIC DAMAGES (3rd ed. 2011)......................................................................25

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON MULTIPLE
  REGRESSION (3rd ed. 2011)...........................................................................29, 36

vi

1     Defendants respectfully submit this brief in opposition to the Indirect Purchaser Plaintiffs'

2     ("Plaintiffs'") Motion for Class Certification (the "Motion").

3     **STATEMENT OF THE ISSUES TO BE DECIDED**

4     Have the Plaintiffs met their burden to establish each of the requirements of Rule 23 to

5     certify the proposed indirect purchaser class?

6     **INTRODUCTION AND SUMMARY OF ARGUMENT**

7     This is not, as Plaintiffs claim in their brief, the type of "straightforward" price-fixing case

8     that is purportedly "routinely certified" as a class action. Motion at 1. It is exactly the opposite – an

9     indirect purchaser case in which the price-fixing allegations at issue involve a multitude of diverse

10    products, incorporated as components into a multitude of differentiated and competitively-priced

11    finished products, sold at different prices, at different times, to different customers, and under

12    various competitive circumstances at each level of distribution. As this Court's recent decisions in

13    *In re Flash Memory Antitrust Litig.*, No. 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010)

14    ("*Flash Memory*") and *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal.

15    2008) ("*GPU*") demonstrate, a class action in these circumstances is inconceivable because it is not

16    possible to establish with common proof that there was classwide impact to each member of the

17    indirect consumer class. Countless mini-trials would be required instead to determine if individual

18    class members suffered any injury at all. *See Flash Memory*, 2010 WL 2332081, at *10-11 (denying

19    motion to certify indirect purchaser class based on the expert testimony of Dr. Netz, the same expert

20    used here by Plaintiffs); *GPU*, 253 F.R.D. at 503-07 (same).

21     Put simply, this case presents the worst possible set of circumstances for indirect purchaser

22    class certification as is evident both from undisputed facts in the record and from Dr. Netz's tortured

23    approach that two different Northern District judges have rejected and is now conclusively debunked

24    once again by Dr. Robert Willig, the former Deputy Assistant Attorney General for economics in the

25    Antitrust Division of the United States Department of Justice. *See* Declaration of Robert D. Willig,

26    Ph.D., In Opposition to Motion of Indirect-Purchaser Plaintiffs for Class Certification (N.D. Cal.)

27    No. CV-07-5944-SC (Dec. 17, 2012) (hereinafter, the "Willig Decl.").

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1    There is no short-cut for Plaintiffs to avoid their burden of establishing that each

2    requirement of class certification has been satisfied.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

3    2541, 251-52 (2011) (district courts must conduct a "rigorous analysis" of the evidence to determine

4    if plaintiffs have met their Rule 23 burden).  Although Plaintiffs take the remarkable position that

5    they are "not required" to demonstrate common impact (Motion at 23-24, 26), they are wrong as a

6    matter of law:  under Rule 23(b)(3), Plaintiffs bear the burden of showing, through common proof,

7    not just that there are common issues with respect to the existence of the alleged conspiracy, but that

8    common issues "predominate" over individualized issues of fact concerning injury and damages

9    with respect to each class member.  *Blades v. Monsanto Co.*, 400 F.3d at 562, 566 (8th Cir. 2005).

10   Plaintiffs cannot do so under the facts of this case because, among other things, they have offered no

11   reliable methodology capable of demonstrating classwide impact or injury with common proof.

12    Plaintiffs' ***only*** support for their claim of "common" proof to establish classwide impact,

13   injury, and pass-on to all class members is the expert declaration of Dr. Janet Netz.  Declaration of

14   Janet S. Netz, Ph.D., In Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification

15   (N.D. Cal.) No. CV-07-5944-SC (Oct. 1, 2012) (hereinafter, the "Netz Decl.").   Dr. Netz's

16   Declaration, however, is based on false factual assumptions that are divorced from the record

17   evidence as well as flawed methodologies that have already been twice rejected by this Court.  It is

18   thus incapable of satisfying Plaintiffs' burden of proof to establish common proof of classwide

19   injury.  For example:

20    •   Dr. Netz has elected to present the very same defective and unreliable approaches to opining

21        on issues of claimed classwide impact, injury, and pass-on that she knows have ***twice been***

22        ***rejected by this Court*** as being wholly unreliable and insufficient to certify indirect purchaser

23        classes in *Flash Memory* and *GPU*. *See Flash Memory*, 2010 WL 2332081, at \*9-13; *GPU*,

24        253 F.R.D. at 503-07.

25    •   This defective approach includes Dr. Netz's improper reliance on "aggregating" and

26        "averaging" of selected pricing data – instead of actual pricing data – which obscures, rather

27        than addresses, transaction-level variations in pricing.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For

---

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

example, Dr. Netz conceded at her deposition that if half of all tubes were sold at prices 25% below the alleged cartel "target prices" and the other half of tubes were sold at prices 25% percent above the alleged cartel "target prices," she would conclude, using her averaging, that all prices charged equaled the alleged "target prices," ████████████████

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████ This type of selective use of non-representative data has been rejected by numerous courts.

More specifically, at the direct purchaser level, Dr. Netz's analysis suffers several fundamental deficiencies that render it incapable of demonstrating common proof of classwide impact. As in *Flash Memory* and *GPU*, the allegedly price-fixed products – CRTs, which include both CDTs (color display tubes for monitors) and CPTs (color picture tubes for televisions) – are diverse, highly customized products sold in numerous different sizes, with different features, at numerous individually negotiated prices to manufacturers of finished CRT products. CRTs of different sizes faced dynamic competition from LCD and plasma at different times over the course of the twelve-year class period alleged in the complaint. Yet, Dr. Netz's analysis accounts for none of these facts. In addition, Dr. Netz makes false assumptions about geographic and product connections without any analysis of the relevant market facts and repeatedly relies upon "theories" and unsupported assumptions, rather than the record evidence, as the basis for her "opinions." For all of these reasons, as well as those set forth in defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S. Netz (hereinafter, the "Motion to Strike"), the proffered analysis of Dr. Netz should be rejected out of hand as it does not provide any reasonable, non-speculative basis for satisfying the Rule 23(b)(3) predominance test.

Just as critically, Dr. Netz's pass-on analysis fails at the indirect purchaser level. The undisputed evidence establishes that the diverse CRTs at issue were used to produce differentiated CRT televisions and CRT monitors – with numerous price points, features and brand reputations –

3

1   and then sold through a varied group of distributors, brick-and-mortar retailers, internet retailers,

2   discounters, department stores, and every other conceivable type of retailer.  In addition, the record

3   establishes that █████████████████████████████████████████████████████████

4   █████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████   The result is that there is no

6   common means of proving pass-through, as different consumers purchased their CRT finished

7   products at divergent price points depending on numerous factors, including whether they purchased

8   the product on sale, what size and type of model they purchased, what type of retailer they

9   patronized, whether they purchased the product in combination with other items, like a VCR,

10  computer or service plan, and when they purchased the product during the alleged twelve-year

11  period.

12  █████████████████████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████████████████

14  █████████████████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████████████████

16  ████████████   *see Flash,* 2010 WL 2332081, at *13; *GPU,* 253 F.R.D. at 505 ("the only way to

17  fully assess pass-through in this action would be to conduct a ***wholesaler-by-wholesaler and re-***

18  ***seller-by-re-seller investigation***" requiring "***thousands of mini-trials***") (emphasis added).

19         Once again, Dr. Netz's pass-on analysis accounts for none of this.  Dr. Netz failed to analyze

20  actual prices; used only a tiny, unrepresentative sample of the data; and completely ignored the

21  record evidence from retailers that pass-through frequently did not occur, and if it did, was not

22  uniform.  As in her "target price" analysis at the direct purchaser level, Dr. Netz's pass-on analysis

23  simply assumes its conclusion with no reliable analysis of the record facts.  For all of these reasons,

24  it provides no basis for demonstrating common proof of classwide impact and should be rejected.

25         Plaintiffs have also failed to meet their Rule 23 burden to establish that their proposed class

26  is ascertainable.  The undisputed evidence instead confirms that there is no manageable way to

27  determine who is and is not a member of the proposed class as many putative class members do not

28  have the means to determine whether or not the finished CRT products they purchased contain a tube

4

1   manufactured by one of the defendants or their alleged co-conspirators. This is fatal. *See, e.g.,*

2   *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011); *Flash Memory*,

3   2010 WL 2332081, at *14-15.

4   Finally, Plaintiffs have failed to meet their burden to prove that the proposed class

5   representatives can meet the adequacy and typicality requirements of Rule 23(a), precluding

6   certification. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982). The undisputed evidence

7   demonstrates that a large number of the proposed class representatives, for a large number of the

8   affected states, cannot meet this test because, among other things, they cannot show that they

9   purchased one of the relevant products in the relevant states.

10                        **STATEMENT OF FACTS**

11  **I.    THE CRT INDUSTRY WAS COMPRISED OF DIVERSE PRODUCTS SUBJECT TO
12          DIFFERENT COSTS AND DIFFERENT FORCES OF SUPPLY AND DEMAND**

13       **A.    CPTs And CDTs Were Distinct Products**

14       At the broadest level, cathode ray tubes ("CRTs") were divided into two distinct types of

15  products: (1) CDTs, which were the tubes used in color computer monitors, and (2) CPTs, which

16  were the tubes used in color televisions. *See* IPPs' Third Consolidated Amended Complaint ("Third

17  CAC") at ¶ 14. CPTs and CDTs were not interchangeable and Plaintiffs have presented no evidence

18  to suggest that they were in the same relevant product market. *See* Netz Decl. 17 ("[A] TV

19  manufacturer would not use a CDT and a monitor manufacturer would not use a CPT."); Cole Decl.

20  Ex. 2, Netz Tr. 49:17-22 (Dr. Netz did not study the relevant product market); *id.* at 57:11-15 (Dr.

21  Netz did not study the extent to which plasma television sets were competitive with CRT sets).[1]

22  Indeed, CPTs and CDTs each had unique technical standards, different components, and dissimilar

23  size ranges. Willig Decl. ¶¶ 39-41.[2] Further, since CPTs and CDTs were designed for different

24  █████████████████████████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████████████████████████

26  ███████████████████████████████████████████████████████████ Cole Decl. Ex.

27  4, Tae Kwon (LG Electronics) Tr. 71:21-24 (same).

    [2] ███████████████████████████████████████████████████████████████████

28  █████████████████████████████████████████████████████████████████████████

1    finished products, there typically were different customers who purchased CPTs and CDTs.[3]

2    **B.    Within The Distinct Product Categories Of CDTs And CPTs, There Was**
3    **Extensive Diversity Of Products**

4        The broad categories of CDTs and CPTs contain many products that differed in "application,

5    size, shape, finish, and mask type" as well as "different resolutions and the use of various coatings."

6    Netz Decl. 16; *see* Willig Decl. ¶¶ 39-41 (additional differentiation of CRTs affecting price by

7    shadow mask material, dot pitch, safety and performance standards, tube curvature, and electrical

8    specs).[4]

9        As Dr. Netz admits, CRTs are not "off-the-shelf" products, but are heavily customized to

10   each purchaser's specifications.  Netz Decl. 20.[5]  CRTs manufactured by one company, designed for

11   and selected by a particular television manufacturer, for example, could not readily be substituted for

12   a CRT from a different manufacturer.  As a result, the price for even the same type and size of CRT

13   would vary substantially based on customization, and it is very difficult to compare prices for

14   different CRTs.[6]



1    Further, different sizes and types of CRTs faced different competitive forces during the
2    alleged class period.  CRT monitors, for example, faced stronger competition from LCDs earlier
3    than CRT televisions did.[7]  As a result, CDTs faced stronger competition from LCDs earlier than
4    CPTs.[8]  When LCD and plasma competition did emerge for CPTs, it was most strongly felt, at first,
5    with respect to larger-sized CPTs.  Willig Decl. ¶ 57.

## II.    NORTH AMERICAN PRICING DYNAMICS WERE DISTINCT FROM OVERSEAS PRICING DYNAMICS

8    While CRTs were manufactured and sold in various countries, pricing dynamics in North
9    America were different from other parts of the world.  Willig Decl. ¶¶ 64-68.  Because of technical
10   issues, certain types of CRTs could only be sold in North America, while others could *not* be sold in
11   North America.[9]

12   The mix of CRT products sold in North America differed from other regions.[10]  Cole Decl.
13   Ex. 2, Netz Tr. 203:5-9.  Moreover, most CRTs sold in the North American market were generally



DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1   manufactured in North American tube factories because of their fragile nature and high shipping

2   costs.[11]   For example, larger CPTs for CRT televisions sold in the U.S. were nearly all manufactured

3   in North America.[12]   These market differences resulted in price movements that were very different

4   for CRTs sold into North America than for CRTs sold elsewhere.   Willig Decl. ¶¶ 64-68, Ex. 9.[13]

5   Hence, there is no basis for Dr. Netz to rely on "global" price assumptions to reach opinions about

6   U.S. prices.   Cole Decl. Ex. 2, Netz Tr. 94:14-15.

7   **III.   FINISHED CRT PRODUCTS (TVS AND MONITORS) DIFFERED WIDELY**

8   Like CRTs, finished CRT products (*i.e.*, televisions and monitors) were not interchangeable

9   and were subject to disparate market forces.[14]   Indeed, CRT televisions and monitors had different

10  distribution and sales chains, internal sales teams, brand reputations, and customers.[15]



Within each size category of televisions and monitors, CRT products were highly differentiated.[16]   In general, there were tiers of finished products, which had dissimilar technological and user features and competed on different terms.[17]   For example, larger or premium CRT televisions had added features beyond simply having a larger tube (*e.g.*, picture-in-picture, advanced stereo sound, built-in VCRs or DVDs, etc.), for which consumers buying a CRT television would pay different and higher prices.[18]

## IV.   CRT MANUFACTURERS HAD DIVERGENT BUSINESS MODELS AND MARKET SHARES OVER TIME

During the alleged class period, numerous companies manufactured CRTs.   These CRT manufacturers included many non-defendants, who were significant competitors.[19]   Worldwide revenue shares also shifted among CRT manufacturers. *See, e.g.,*



Cole Decl. Ex. 29, Wood (IPP) Tr. 49:17-50:21 (discussing IPP's opinion of tier-one versus tier-two quality brands).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

██████████████████████████████████████████.[20]   And, during the class period, different CRT manufacturers entered and exited the business for various CRT products.[21]

Further, contrary to the assertion by Dr. Netz, vertical integration was not uniform in the CRT industry. *See* Netz Decl. 29 & Appx. A. Rather, some CRT manufacturers (like Chunghwa and LG.Philips Displays, post-July 2001) were not vertically integrated with a manufacturer of CRT products.[22] Moreover, even vertically integrated manufacturers of CRT products purchased CRTs from unaffiliated CRT suppliers.[23]

## V. DURING THE PUTATIVE CLASS PERIOD, CRTs AND FINISHED CRT PRODUCTS WERE A DYING TECHNOLOGY, AND DEMAND, PRICES, AND PROFITS RAPIDLY DECLINED, NEGATING ANY INFERENCE OF COMMON PROOF OF CLASSWIDE INJURY

Demand for CRTs and CRT products plummeted rapidly during the alleged class period due to competition from newer, more advanced LCD and plasma display technologies.[24]   Cole Decl. Ex.

[24] *See, e.g.*, Third CAC, ¶ 193 (CRT products were "approaching obsolescence" during the alleged class period "caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology."); *id.* at ¶ 125 ("Demand for CRT products was declining."); *id.* at ¶126 ("conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays"); ████████████████████████████████████████████

1  2, Netz Tr. 115:15-116:2.   This decreased demand caused a corresponding drop in prices and

2  profits.[25]  CRT manufacturers were left with excess capacity[26] and accumulating inventories of soon-

3  to-be obsolete products, leading Dr. Netz to describe CRTs as a "sick" industry during the putative

4  class period.[27]  *Id.* at 120:7-8.

5          The ascendance of LCD and plasma occurred earlier and more rapidly than many in the CRT

6  industry expected.[28]  By 2003, the CRT industry had ██████████████████████████

7  ████████[29]  By the end of the alleged class period, most major suppliers of CRTs and CRT finished

8  products (TVs and monitors) had exited the market or substantially shifted their production to LCD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    and plasma.[30]

2    **VI.    THE WIDE VARIETY OF DISTRIBUTION AND MANUFACTURING CHANNELS
3          FOR CRTs AND FINISHED CRT PRODUCTS FURTHER CONTRIBUTED TO
          WIDE VARIATIONS IN PRICING**

4            CRTs travelled long and varied chains from factory to finished product to consumers' homes

5    and offices, with numerous and different stops in between.  Netz Decl. 29-33; Willig Decl. ¶¶ 120-

6    21.[31]  Tube manufacturers first sold CRTs to either a manufacturer of a finished CRT product or to a

7    distributor (who would resell to the finished CRT product manufacturer).   Netz Decl. 29-30.[32]

8    Finished product manufacturers sometimes sold directly to consumers, sometimes to another layer of

9    distributors, or to retailers.  *Id.* at 32.  If the sale was to an intermediary, they, in turn, resold the

10   finished products to end-users.  *Id.* at 32-33; Willig Decl. ¶¶ 120-21.   There were also huge

11   variations in the type of retailers who sold finished CRT products, ranging from brick-and-mortar

12   specialty stores (like Best Buy, Circuit City or Office Depot), to internet sites (like Amazon.com), to

13   department stores (like Sears or Macy's), to big discounters (like Walmart, Target or Costco), and

14   everything in between.  Netz Decl. 32; Willig Decl. ¶¶ 117, 120-21.  The diagram below illustrates

15   the many different paths a CRT could take to an end-user, which varied depending on the



16
17
18
19
20
21           Cole Decl. Ex. 50, HDP-CRT00049107-108 ("Hitachi Ltd., Japan's biggest
22   electronics maker, on Thursday said it will exit the conventional desktop computer display tube
     business, citing sluggish PC demand and a shift to new displays. . . .  Hitachi Ltd. added that it
23   expected future demand for computer screens to shift to [LCD] monitors and that as a result 'there
     are no prospects for growth of the monitor CRT market.'").
24
25
26
27

28   [32] There are at least four different types of finished CRT product manufacturers, each of which
     "operate under a variety of business models."  Netz Decl. 30-32.

                                                    12

1 manufacturer, time period, CRT-type, finished product type, and business models of the intermediate

2 purchasers and retailers, among other factors:

See Willig Decl. Ex. 23.

The prices of CRT products varied widely depending on the distribution channel used,[33]

among many other factors.

## VII. PRICING PRACTICES DIFFERED WIDELY FOR BOTH CRTs AND CRT FINISHED PRODUCTS

The pricing of both CRTs and CRT finished products varied from supplier to supplier,

product to product, type of retailer, within retailers, and customer to customer over time.

[34] *See, e.g.*, Cole Decl. Ex. 52,  Comeaux (IPP) Tr. 30:14-18 (plaintiff purchased TV on sale); Cole Decl. Ex. 53, Lawyer's Choice Suites, Inc. (IPP) Tr. 75:23-76:9 (stating that he received a discount because he purchased his computer items together as a package);

13



Retailers also had different pricing practices and strategies, resulting in different prices to consumers.[37]

[35] *See, e.g.,* Cole Decl. Ex. 55, Lee (LG Electronics) Tr. 44:4-8 (sales VP could provide volume discounts to particular customers);

[37] *See, e.g.,* Cole Decl. Ex. 29, Wood (IPP) Tr. 74:15-77:22 (discussing Costco's membership model); Cole Decl. Ex. 57, Riebow (IPP) Tr. 71:14-18 (purchased TV at Sears due to favorable return policies);

14



Other retailers employed their own varied pricing philosophies.

The pricing of same-sized CRT televisions and monitors varied considerably based on the quality and feature set of each model.[39]

*see also* Cole Decl. Ex. 29, Wood (IPP) Tr. 76:23-77:22 (plaintiff who purchased television at Costco explained that her membership fees are worth the value because being a member allows her to obtain products at lower prices than at other stores).



Among CRT tubes of the same size, pricing often varied based on each product's quality and features,[41] as well as the reputation and technological aptitude of the manufacturer.[42]  The result was that different consumers purchased different finished CRT products through different distribution channels at thousands of price points.  *See* Willig Decl. ¶¶ 17, 44-45.

**VIII.   NEITHER MANUFACTURERS NOR RETAILERS OF FINISHED CRT PRODUCTS WERE ABLE TO ACHIEVE UNIFORM PASS-ON TO ALL CUSTOMERS**

16

Further, numerous major retailers, including Circuit City, Office Depot, K-Mart and Target, have asserted in this MDL that they were unable to pass on the alleged increase in the prices charged to them for finished CRT products.[45]

[45] *See, e.g., See, e.g., Siegel v. Hitachi, Ltd.*, No. 11-cv-05502, ¶ 217 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *CompuCom Systems, Inc. v. Hitachi, Ltd.*, No. 11-cv-06396, ¶¶ 88, 211 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *Electrograph Systems, Inc. v. Hitachi, Ltd.*, No. 11-cv-01656, ¶¶ 98, 225 (N.D. Cal.) [Dkt. No. 5] (Mar. 10, 2011); *Interbond Corp. of Am. v. Hitachi, Ltd.*, No. 11-cv-06275, ¶¶ 86, 209 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *Office Depot, Inc. v. Hitachi, Ltd.*, No. 11-cv-06276, ¶¶ 87, 210 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *P.C. Richard & Son Long Island Corp. v. Hitachi, Ltd.*, No. 12-cv-02648, ¶¶ 92, 215 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *Schultze Agency Servs., LLC v. Hitachi, Ltd.*, No. 12-cv-02649, ¶¶ 90, 213 (N.D. Cal. ) [Dkt No. 1] (Nov. 14, 2011); *Target Corp. v. Chunghwa Picture Tubes, Ltd.*, No. 11-cv-05514, ¶¶ 106, 228 (N.D. Cal.) [Dkt. No. 9] (Jan. 6, 2012).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 ███████████████████████████████████████████████

5 ██████████████████████████████████████  There is no contrary evidence in

6 the record facts.

7       Based on this, there is no plausible basis for Plaintiffs or Dr. Netz to claim that there is any

8 common method for Plaintiffs to prove that any alleged overcharges on CRTs were uniformly passed

9 through all distribution channels to all consumers. ████████████████████████████

10 ███████████████████████████████████████████████

11 ████████████████████████████████████

12 **ARGUMENT**

13 **I.    RULE 23 REQUIRES A "RIGOROUS ANALYSIS" OF ALL THE EVIDENCE**

14       Class certification is not permissible unless Plaintiffs meet their burden to satisfy all Rule 23

15 prerequisites by a preponderance of the evidence. *See, e.g., In re Hydrogen Peroxide Antitrust*

16 *Litig.*, 552 F.3d 305, 320 (3d Cir. 2008); *Teamsters Local 445 Freight Div. Pension Fund v.*

17 *Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). Plaintiffs' claim that a lower burden applies in a

18 price-fixing case and that doubts about whether Rule 23 has been satisfied must be resolved in

19 Plaintiff's favor (Motion at 13-14) is wrong and flatly contrary to the Supreme Court's requirement

20 of a "rigorous analysis." *Dukes*, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 160-61); *see also*

21 *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011). Indeed, the Supreme Court has

22 made it clear that "actual, not presumed, conformance" with Rule 23 is "indispensable" (*Dukes*, 131

23 S. Ct. at 2551) and it has long been the rule that "the issues of injury and damage remain the critical

24 issues" in a price-fixing case (as opposed to the violation itself) and "are always strictly

25 individualized." *Windham v. American Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977).

26       Given the above, district courts must "resolve[] factual disputes relevant to each Rule 23

27 requirement and find[] that whatever underlying facts are relevant to a particular Rule 23

28 requirement have been established." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir.

18

1    2006).  If necessary in doing so, "district court[s] *must* consider the merits if they overlap" with class

2    certification issues.  *Ellis*, 657 F.3d at 981.[46]

3         In the sections that follow, defendants establish that Dr. Netz has not offered a reliable

4    methodology to prove (i) "pass-on" to all members of the putative indirect purchaser class, most of

5    whom paid vastly different prices even for identical products or (ii)  a common method to prove that

6    the alleged cartel successfully imposed overcharges on all direct purchasers of CRTs.  Finally,

7    defendants confirm that Dr. Netz has offered no reliable, common methodology to assess class-wide

8    damages.

9         **A.      Rule 23(b)(3) Imposes Stringent Demands Of Common Proof Of Impact**
            **And Injury Even In Price-Fixing Cases**

10

11        Plaintiffs take the remarkable position that they are "not required" to establish a viable

12   method for common proof of impact.  Motion at 23-24, 26.  None of Plaintiffs' citations support this

13   assertion, and no such authorities exist.[47]  To the contrary, the governing rule is straightforward:

14   Plaintiffs bear the burden of showing, through common proof, that every class member paid a higher

15   price than he would have absent the alleged conspiracy.  *See, e.g., In re New Motor Vehicles*

16   *Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008); *Blades*, 400 F.3d at 570, 573-

17

18   [46] *Dukes* and *Ellis* highlight the deficiencies of the indirect purchaser class certification decision in
     the TFT-LCD litigation.  Among other things, Judge Illston deferred consideration of the validity of
19   Dr. Netz's analysis until trial.  *See In re TFT-LCD (Flat Panel) Antitrust Litigation*, 257 F.R.D. 583,
     606 (N.D. Cal. 2010) ("Defendants' challenges to plaintiffs' evidence and Dr. Netz's analyses go to
20   the merits of plaintiffs' claims, and will be resolved by the trier of fact.").  Such deferral is no longer
21   permitted.

22   [47] Plaintiffs cite *In re Napster Copyright Litigation*, No. C MDL-00-1369, 2005 WL 1287611 (N.D.
     Cal. June 1, 2005), *see* Motion at 23, but that case is an inapposite copyright litigation lacking the
23   separate conspiracy and individual impact liability elements present in price-fixing cases.  The other
     three cases Plaintiffs cite, *see* Motion at 24, are similarly inapposite because they ***assess whether***,
24   and do not ***presume that***, individual class member impact could be shown using common proof.  *See*
     *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 275, 280-87 (D. Mass. 2004) (dismissing state
25   monopolization class claims based on lack of common evidence of individual impact); *In re Sugar*
     *Indus. Antitrust Litig.*, 73 F.R.D. 322, 346-48 (E.D. Pa. 1976) (granting class certification only after
26   finding that plaintiffs could show impact through common evidence); *In re Abbott Labs. Norvir*
     *Anti-trust Litig.*, No. C 04-1511, 2007 WL 1689899, at *9 (N.D. Cal. June 11, 2007) (granting class
27   certification only after finding that plaintiffs demonstrated that impact and damages could be shown
28   with common proof).

                                                    19

74; *accord* 2A Phillip Areeda *et al.*, *Antitrust Law* ¶ 331d (3d ed. 2007) ("[T]he fact that some class members may not have been damaged at all generally defeats class certification, because the fact of injury, or 'impact,' must be established by common proof.").[48] This requirement is especially rigorous in indirect purchaser cases because indirect plaintiffs must demonstrate common proof to establish both that "defendants overcharged their direct purchasers" and that "those direct purchasers passed on the overcharges to plaintiffs." *GPU*, 253 F.R.D. at 499; *see also Somers v. Apple, Inc.*, 258 F.R.D. 354, 358 (N.D. Cal. 2009); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001); *Flash Memory*, 2010 WL 2332081, at *7. Plaintiffs have failed to satisfy either of these critical elements here.

### B.  Plaintiffs Have Not Offered a Methodology Capable of Demonstrating Classwide Impact Or Injury With Common Proof

Plaintiffs' attempt to offer common proof of impact, injury and pass-on begins and ends with the opinion and testimony of Dr. Netz.  This Court, however, has already twice held that the same methodologies employed by Dr. Netz here are "unreliable" and "insufficient" to prove class-wide impact and pass-on. *See Flash Memory*, 2010 WL 2332081, at *9-13; *GPU*, 253 F.R.D. at 503-07. The undisputed evidence, recounted above, establishes that, in this case, as in the previous cases:

> [T]here are thousands of differentiated products with diverse price points that have been purchased by putative class members over the course of the last decade. Such products are sold to class members by hundreds of different retailer suppliers.  The price of any given product can vary across retailers, and differ even for a single retailer at a given point in time.  Further, different retailers respond to cost changes in different ways, with some choosing   not to pass-

---

[48] *See also Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 24 (D.D.C. 2012) (denying certification where plaintiffs' expert could not account for instances where class members did not pay higher prices); *Butt v. Allegheny*, 116 F.R.D. 486, 490-92 (E.D. Va. 1987) (denying certification due to the "***risk*** of non-injury" because any uninjured class members were identifiable only through individualized inquiry) (emphasis added). In fact, the authorities cited by Plaintiffs fully recognize this rule. *See* Motion at 31 (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977) for the proposition that "proof of impact [may] be made on a common basis so long as the common proof adequately demonstrates some damage to each individual"). The *Bogosian* decision also articulated what has been termed the "*Bogosian* concept of presumed impact," but the Third Circuit has since recognized that "[a]pplying a presumption of impact based solely on an unadorned allegation of price-fixing would appear to conflict with the 2003 amendments to Rule 23, which emphasize the need for a careful, fact-based approach, informed, if necessary, by discovery." *Hydrogen Peroxide*, 552 F.3d at 326.

20

through cost changes in the form of higher prices for the end-user.

*Flash Memory*, 2010 WL 2332081, at *10. Under these circumstances, there is no common method of establishing classwide impact or injury. *GPU*, 253 F.R.D. at 503, 505. ("the only way to fully assess pass-through" with respect to a non-fungible product sold at varying price points "would be to conduct a wholesaler-by-wholesaler and re-seller-by-re-seller investigation.").

Indeed, Dr. Netz employs the same "junk science" masquerading as economics here that she did in *Flash Memory* and *GPU*. As in those cases, Dr. Netz has failed to acknowledge real world differences among the prices paid by direct and indirect purchasers and makes "no attempt to assess whether pass-through rates vary by product or by customer;" instead, she simply assumes that all CRTs (including CPTs and CDTs) are in the same market and subject to the same pass-through rates. *Flash Memory*, 2010 WL 2332081, at *8, *11-12. This failure to account for marketplace differences and realities precludes certification of an indirect purchaser class. *See, e.g.*, *GPU*, 253 F.R.D. at 491 (plaintiffs could not demonstrate class-wide impact in an industry involving non-fungible products, widely divergent distribution chains and other market variables that caused different customers to pay different prices).

In fact, Dr. Netz's analysis is even more deficient here than it was in *Flash Memory* or *GPU* because it is based on false factual assumptions that are contradicted by the undisputed record evidence as well as methodologies so unreliable as to render them inadmissible. *See* Motion to Strike at 7-11. Whether admissible or not, Dr. Netz's analysis is so deficient that it does not come close to satisfying Plaintiffs' burden to prove a reliable common means of establishing impact and pass-on to all members of the putative class. Absent such proof, Plaintiffs cannot meet the predominance test of Rule 23(b)(3).

        1.    **Dr. Netz Has Not Offered Reliable Common Proof of "Pass-On" to All Members of the Putative Class Who Paid Vastly Different Prices**

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1   ███████████████████████████████   As this Court has made clear, the pass-

2   through of any alleged cartel price increase cannot simply be assumed, particularly in an industry

3   like this, in which price variation is the rule, rather than the exception. *See Flash Memory*, 2010 WL

4   2332081, at *10-13; *GPU*, 253 F.R.D. at 503-07.

                     a.     Dr. Netz's Pass-On Analyses Improperly Use Price
                           "Averages" That Obscure Real World Price Differences

7       As a threshold matter, Dr. Netz's purported pass-on analyses are inherently unreliable

8   because they calculate "average" as opposed to actual pricing data. Netz Decl. 103-04, Exs. 34-39.

9   It is undisputed (and even Dr. Netz was forced to concede) that different customers could pay

10   different prices for the same CRT product depending on the time of purchase, individualized

11   discounts, product bundling, and a wide variety of other reasons. *See* Cole Decl. Ex. 2, Netz Tr.

12   92:25-93:2; ████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ███████████████████████████████████████████

20       Despite this acknowledged variation in transaction-level pricing, Dr. Netz did not calculate

21   the actual pass-on rate charged to class members for finished CRT products and looked instead only

22   at their "averages." ████████████████████████████████

23   ████████████████████████████████████████████████████

24   ██████████████████████

25   ████████████████████████████████████████████████████

26   ██████████████████████████████████████████████████

27   ████████████

28   ████████████████████████

As another example of this fatal "averaging" flaw in all of Dr. Netz's pass-on analyses, ▮

Because pass-through rates varied so much within and among individual members of the supply chain, to determine if a particular indirect purchaser was harmed by the alleged cartel, it would be necessary to conduct an individualized inquiry into the pass-through rate for the product at issue at each relevant step. Calculating "averages" is not acceptable to solve this insurmountable

---

[49] Numerous factors would lead to these marked differences in pricing and pass through, including differences in competitive conditions across different product categories (*e.g.*, larger CRT TVs facing greater competition from LCD TVs than smaller CRT TVs) and the use of different discounts and –temporary sales promotions (such as a retailer using certain models of televisions as loss leaders). *See* Willig Decl. ¶ 122.

1    problem.    *Flash Memory*, 2010 WL 2332081, at *10 (N.D. Cal. 2010) ("By looking only at an

2    average price trend, Dr. Netz's model obscures individual variations over time among the prices that

3    different customers pay for the same or different products that appear in the data"); *GPU*, 253 F.R.D.

4    at 504 (dismissing Dr. Netz's analysis for being "overly reliant on averages [which] would thus

5    sweep in an unacceptable number of uninjured plaintiffs").

6    ██████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████      This

9    industry reality alone mandates the denial of Plaintiffs' Motion. *See Flash*, 2010 WL 2332081, at

10   *13 (rejecting certification of an indirect purchaser class based on Dr. Netz analysis where "[t]he

11   products, channels and markets are sufficiently numerous and diverse to preclude application of a

12   reliable and meaningful method of calculating pass-through rates on a class-wide basis"); *GPU*, 253

13   F.R.D. at 505 (same); *In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897, MDL

14   997, 1994 WL 663590, at *7 (N.D. Ill. Nov. 18, 1994) ("tracing the alleged overcharges from

15   manufacturers, to wholesalers, to retailers, to consumers presents individualized issues which would

16   dominate this litigation and preclude certification under Rule 23(b)(3)").

                        **b.**      Dr. Netz's Pass-Through Analyses Are Based on Tiny,
                                    Unrepresentative Samples of Pricing Data

19       A second fatal flaw in Dr. Netz's pass-on analyses is that she simply assumes ████████

20   ██████████████████████████████████████████████████████████████

21   ████████████████████ based on a tiny sliver of incomplete data.  For example, in a purported

22   study at the retail level, Dr. Netz analyzed the pricing data of only two retailer-plaintiffs (████████

23   ████████), while ignoring the price data for most of the major retailer-plaintiffs in this MDL.  Dr.

24   Netz did ***not*** test whether this tiny sample is statistically representative or appropriate, Cole Decl.

25   Ex. 2, Netz. Tr. 72:2-73:23; 74:15-76:18; 129:22-132:8, which clearly contravenes the governing

26   case law. *See, e.g., In re Methionine Antitrust Litig.*, No. 00-1311, 2003 WL 22048232, at *5 (N.D.

27   Cal. Aug. 26, 2003) (decertifying indirect purchaser class where plaintiffs' expert's regressions were

28   not representative samples of the end-user market); *Rojas v. Marko Zaninovich, Inc.*, No. 09-0705,

24

1   2011 WL 6671737, at *4 (E.D. Cal. Dec. 21, 2011) (concluding that expert report was "marred by

2   serious methodological flaws" including its failure to factor in all the available data); *LeClercq v.*

3   *The Lockformer Co.*, No. 00-7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding

4   expert's opinion which relied on only some of the existing sampling data as this "amount[ed] to

5   cherry-pick[ing] the facts he considered to render his opinion, and such selective use of facts fail[s]

6   to satisfy the scientific method and Daubert") (internal quotations omitted); *Finestone v. Florida*

7   *Power & Light Co.*, No. 03-14040, 2006 WL 267330 (S.D. Fla. Jan. 6, 2006) (finding the expert's

8   methodology unreliable as he did not "adequately explain why he chose only the thirty-two samples

9   with Co60 and not the remaining samples that had no Co60 to compute the average amount of

10  Co60"); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98-8272, 2003 WL 22124991, at *3

11  (S.D.N.Y. Sept. 15, 2003) (excluding expert whose study of 1,561 contracts was neither "random

12  nor representative"); *see also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON

13  ESTIMATION OF ECONOMIC DAMAGES at 483 (3rd ed. 2011) ("If the expert elects to study a sample of

14  the data, the expert needs to have carefully considered how the information will be used to ensure

15  that the data sample is large enough and contains sufficient information. Usually, this requires that

16  the expert has constructed a model of damages and a related sampling plan that includes an estimate

17  of the sampling error.").

18      The problem in using incomplete pricing data and leaving large portions of pricing data

19  unstudied is underscored by the fact that eight major retailer-plaintiff groups whose data Dr. Netz

20  did not review (*e.g.*, Circuit City, Office Depot, K-Mart and Target), have asserted the opposite of

21  Dr. Netz's assumption regarding pass-on, *i.e.*, that they did ***not*** pass on any increases in CRT costs to

22  their customers.[50] ███████████████████

23  ─────────────────
    [50] *See, e.g., Siegel v. Hitachi, Ltd.*, No. 11-cv-05502, ¶ 217 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011);
24  *CompuCom Systems, Inc. v. Hitachi, Ltd.*, No. 11-cv-06396, ¶¶ 88, 211 (N.D. Cal.) [Dkt. No. 1]
    (Nov. 14, 2011); *Electrograph Systems, Inc. v. Hitachi, Ltd.*, No. 11-cv-01656, ¶¶ 98, 225 (N.D.
25  Cal.) [Dkt. No. 5] (Mar. 10, 2011); *Interbond Corp. of Am. v. Hitachi, Ltd.*, No. 11-cv-06275, ¶¶ 86,
    209 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *Office Depot, Inc. v. Hitachi, Ltd.*, No. 11-cv-06276,
26  ¶¶ 87, 210 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *P.C. Richard & Son Long Island Corp. v.*
    *Hitachi, Ltd.*, No. 12-cv-02648, ¶¶ 92, 215 (N.D. Cal.) [Dkt. No. 1] (Nov. 14, 2011); *Schultze*
27  *Agency Servs., LLC v. Hitachi, Ltd.*, No. 12-cv-02649, ¶¶ 90, 213 (N.D. Cal. ) [Dkt. No. 1] (Nov. 14,
28  2011); *Target Corp. v. Chunghwa Picture Tubes, Ltd.*, No. 11-cv-05514, ¶¶ 106, 228 (N.D. Cal.)
    [Dkt. No. 9] (Jan. 6, 2012).

25

1

2

3

4

5

6

7      In doing so, she again did nothing to

8  establish that her sample was at all representative and she did not use the pricing data that was

9  available from defendants for such major brands of CRT televisions as Samsung Electronics,

10  Panasonic, Philips, LG and Hitachi to conduct any pass-through analysis. *Id.* at 139:6-18.

11

12

13

14

15

16

17

18

19          c.      Dr. Netz Ignored The Record Evidence That

20

21          Dr. Netz's pass-through analyses are flawed not only from a methodological perspective, but

22  they also ignore the unrebutted record evidence that not all manufacturers, wholesalers, and retailers

23  of finished CRT products

24

25

26

27

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917



This is also consistent with the testimony at the distributor and manufacturer level for finished CRT products that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

The failure of Dr. Netz to address these market realities is yet another fatal flaw in her pass-through studies. *See Flash Memory*, 2010 WL 2332081, at *12 ("Dr. Netz makes no attempt to assess whether pass-through rates vary by product or by customer").  Indeed, Dr. Netz did not and cannot trace an alleged conspiratorial increase in the price of a tube to determine if the consumer price of the relevant finished product experienced any comparable change in price. ▮▮▮▮▮

1

2

     **2.**    **Plaintiffs Offer No Reliable Common Method for Proving that All Direct Purchasers Paid Supra-Competitive Prices For Every CRT As a Result of the Alleged Cartel**

Beyond failing to provide any reliable common proof of pass-through, Dr. Netz's analysis fails at its threshold point because she also does not provide any reliable common proof that all direct purchasers of CRTs paid supra-competitive prices as a result of the alleged cartel. As this Court knows, such common proof of injury at the direct purchaser level is a prerequisite for indirect purchaser class certification as there must first be a common impact to be passed on. *Flash Memory*, 2010 WL 2332081, at *10-11; *GPU*, 253 F.R.D. at 503.

     **a.**    Dr. Netz's "Target Price" Analysis Suffers Several Fatal Deficiencies That Render It Incapable Of Demonstrating Classwide Impact to Direct Purchasers

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████ *Flash Memory*, 2010 WL 2332081, at \*11; *see* Willig Decl. ¶

4 104; Reference Manual on Scientific Evidence, Reference Guide on Multiple Regression at

5 308-09 (3rd ed. 2011) ("[C]ourts have rejected regression studies that did not have an adequate

6 foundation or research design with respect to the issues at hand.").

7 ████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ███████████ Cole Decl. Ex. 2, Netz Tr. 158:5-159:24. Because she used average instead of

10 transaction-level prices, Dr. Netz never examined the actual prices for CRTs that were charged by

11 defendants in the market, nor the numerous price differences that existed for such sales. Instead, as

12 previously discussed, Dr. Netz's use of averages serves to obscure price differences, rather than

13 demonstrating a common method of accounting for them, and for that reason alone, must be rejected

14 by this Court. *See Flash Memory*, 2010 WL 2332081, at \*10-13; *GPU*, 253 F.R.D. at 503-07.[52]

15 Because Dr. Netz only calculates average sales prices for groups of tubes that do not account

16 for the many differences in actual prices charged by defendants for different CRTs and different

17 customers, there is no way for her to reliably opine whether all direct CRT purchasers suffered

18 common impact. To the contrary, she conceded at her deposition that if half of direct purchasers

19 bought CRTs at 25% percent above the alleged cartel "target price," and the other half purchased

20 CRTs at 25% below the alleged cartel "target price," her "averaging" analysis would cause her to

21 conclude that all actual prices equaled the alleged "target price," when, in fact, none of them came

22 within even 25%. Cole Decl. Ex. 2, Netz Tr. 158:14-22. Such an absurd analysis cannot be relied

23 upon by this Court. *See Flash Memory*, 2010 WL 2332081, at \*10 (rejecting analysis for

24 "obscur[ing] individual variations over time among the prices that different customers pay for the

25 same or different products"); *GPU*, 253 F.R.D. at 494-95 (same).

26 ─────────────

27 ■ ███████████████████████████████████████████

28 ██████████████████████████████████████████████

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1    The failure of Dr. Netz's analysis is further demonstrated by the extensive record evidence

2  that she ignores, revealing that significant variations in CRT pricing were a fact of the industry. █

3  ███████████████████████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████████████████

8  ████████████████████████████████

9    It is likewise undisputed that a large number of CRTs were custom-designed and thus subject

10  to individual price negotiations by customer, as opposed to off-the-shelf pricing. *See supra* at 6-7.

11  These negotiated transactions necessarily resulted in substantial price variations, for which Dr. Netz

12  does not attempt to account.  Willig Decl. ¶¶ 77, 83.

13    Instead of relying on average prices like Dr. Netz did, Dr. Willig recognized these market

14  realities and compared actual transaction-level sales prices of CRTs with the group "target prices"

15  used by Dr. Netz.  Willig Decl. ¶¶ 107-08, Ex. 18.  ██████████████████████████

16  ███████████████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████████████████████

22  ████████████████████████████████

23    ███████████████████████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████████████████████

26  ███████████████████████████████████████████████████████████████████████

27  ███████████████████████████████████████████████

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917



b. ████████████████████████

In fact, neither of these assumptions is consistent with the record.

This is not surprising given the fact that pricing dynamics for CRTs sold in North America were different from those for CRTs sold in other parts of the world. *See* Willig Decl. ¶¶ 64-68.

Compounding this problem,

Dr. Netz did nothing to determine if this geographic assumption had any validity. *See id.* at 37:6-14. She did not examine, for example, whether U.S. prices of tubes moved in the same direction as prices charged abroad or not. *Id.* Nor did she do anything to determine the scope of the relevant geographic market. *Id.* at 189:8-12. Accordingly, Dr. Netz had no basis to draw any conclusions about the prices paid by direct purchasers of CRTs in the United States.

31

Similarly, Dr. Netz's target price comparison is fundamentally unreliable ████████

[black redaction bars across lines 2–10]

        c.      Dr. Netz's Opinions About Common Impact at the Direct Purchaser Level Also Fail Because of Her Refusal to Try to Calculate Any "But-For" Price

Despite bearing the burden to offer a methodology capable of demonstrating classwide impact through common proof, *Blades*, 400 F.3d at 570, 573-74, Dr. Netz admits that she made no attempt to calculate the "but-for" (competitive) price of CRTs. Cole Decl. Ex. 2, Netz Tr. 97:4-11, 98:1-3. In other words, Dr. Netz never compared the transactional sales data for a particular tube sold by defendants in the United States with an estimate of the competitive price for that same tube. Instead, she simply assumed, without any factual support or analysis, that each of the "target prices" was set at a supra-competitive level because it would not make sense for the alleged cartel members to do anything else. *Id.* at 154:18-156:2. ████████

[black redaction bars across lines 22–25]

Nor can Dr. Netz rely upon economic theory to fill this gap in her analysis. While she contends in her Declaration that economic theory supports her assumption that all of the defendants would only charge cartel prices above competitive levels for all of their CRT sales to all of their

32

1   customers, at her deposition, Dr. Netz was forced to concede that it would make just as much

2   economic sense for defendants to participate in an alleged cartel that was only effective in raising

3   prices above competitive levels for some CRT products or some, but not all, geographic markets.

4   Cole Decl. Ex. 2, Netz Tr. 153:22-154:9. Despite acknowledging this possibility, Dr. Netz admitted

5   that she did not study this issue and therefore could not opine on it. *Id.* This admission is fatal to

6   Dr. Netz's purported common proof of impact as she had no basis to opine that all direct purchasers

7   in the United States suffered injury by paying a supra-competitive price.

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████          In such circumstances, it is simply impossible for Dr. Netz to reliably

11  opine that all direct purchasers of CRTs experienced a common injury. *See In re Florida Cement*

12  *and Concrete Antitrust Litig.*, No. 09-23187, 2012 WL 27668, at *9 (S.D. Fla. Jan 3, 2012) (no

13  common impact when some customers' prices decreased, while other customers' prices increased);

14  *In re Plastic Additives Antitrust Litig.*, No. 03-CV-2038, 2010 WL 3431837, at *12 (E.D. Pa. Aug.

15  31, 2010) (same).

16            d.   There Is Also No Reliable Evidence of a Common CRT
                   "Price Structure," Further Undermining The Premise
17                 for Dr. Netz's Common Injury Opinions at the Direct
                   Purchaser Level
18

19            Finally, there is no reasonable basis for Dr. Netz's conclusion that there was a common price

20  structure for CRTs that caused all CRT prices to move in tandem and thus enabled the alleged cartel

21  to cause a common impact on all direct purchasers. This failure dooms Plaintiffs' ability to meet the

22  predominance test. Evidence that there was an agreement to set some target prices for some types

23  and sizes of tubes cannot provide *class-wide* proof of impact without further evidence that this

24  agreement affected the pricing of all other tubes. In other words, if impact must be proven

25  separately for each of the numerous types and sizes of tubes, and at different times during the alleged

26  class period, such individualized proof would overwhelm any common questions concerning the

27  existence of the alleged cartel. This failure is particularly significant here because Dr. Netz's price

28  analyses are based on tiny subsets of target price and transaction data that do not account for most

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1   types and sizes of tubes for most of the putative class period.  Without demonstrating that prices of
2   other (unexamined) types and sizes of tubes were correlated to the prices of the tubes she analyzed,
3   *i.e.*, that there was a "price structure" that permits one to conclude that a change in the price of one
4   type of tube leads to a similar, corresponding change in the price of other types of tubes, Dr. Netz's
5   analysis is wholly incapable of proving common impact to direct purchasers, even setting aside all of
6   the other fatal flaws in her analysis discussed above.

7
8
9
10

11      ***First***, Dr. Netz's hedonic regressions, like her other price studies, improperly rely upon
12   "average prices" – this time monthly averages – that distort and cover up price differences and
13   movements.  *Id.* at 69-71.  Such regressions using average price data are simply not a basis for
14   opining on the issue of common impact in a class action context where pricing variations, not
15   averages, are critical to the analysis.  *Flash Memory*, 2010 WL 2332081, at *10-11; *GPU*, 253
16   F.R.D. at 503-04.

17      ***Second***, Dr. Netz's hedonic regressions do not test whether average prices of CRTs of
18   different sizes are correlated in a lock-step price structure. Dr. Netz admitted that she has not
19   conducted the type of price correlation analysis that she conducted in the TFT-LCD litigation, which
20   would actually measure whether there was any such correlation between the price movement of
21   different sizes of different featured products.  Cole Decl. Ex. 2, Netz Tr. 105:1-10.

22
23
24
25
26
27
28



███████████████████████████████████████████████████████

████████████████████

***Third,*** a minor modification of Dr. Netz's hedonic analysis demonstrates the opposite of her "price structure" opinion, *i.e.*, that large and small CRT prices did ***not*** move in lock step, but varied over time and across manufacturers. *Id.* at ¶¶ 75-77.  Consider the following example: suppose that in Month 1, a 32" tube sells for $180 and a 17" tube sells for $100.  In Month 2, the price of the 32" tube goes down by $20 because of increased competition from LCDs, but the price of the 17" tube goes up by $20 because of an alleged cartel target price for that screen size.

| Size of Tube | Month 1 Price | Month 2 Price |
|---|---|---|
| 32 inch | $180 | $160 (-$20) |
| 17 inch | $100 | $120 (+$20) |

In this example, Dr. Netz would conclude, using her regression, that there is a "price structure" between different sized CRTs because the larger sized CRT had a higher price than the smaller sized CRT in both months, and the average of the two months shows that the price of the larger size CRT was consistently higher.  This analysis would do nothing, however, to account for the fact that the prices of the two sizes were actually moving in opposite directions, demonstrating the complete absence of any "price structure."

***Fourth***, Dr. Netz's regressions concededly control only for a limited set of tube characteristics that affect price, while excluding other important tube features that are relevant to price, such as resolution, masks, dot pitch, MPRII/TCO, and frequency. Netz Decl. Exs. 19-24. The omission of such important price variables is yet another reason why the Netz regressions are completely unreliable.  *See Flash Memory*, 2010 WL 2332081, at *10 (rejecting Dr. Netz's regressions because, among other things, they failed "to take into account . . . the wide range of different types of products with equally varied attributes (other than capacity and architecture) and prices."); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) ("there are significant differences between the markets for macadamia nuts on Hawaii and on the

1    mainland, between large and small purchasers, and between bulk and retail purchasers"); *GPU*, 253

2    F.R.D. at 491 (identifying significant differences between the markets for graphics products based

3    on what device the product was designed for (i.e., a desktop, notebook, or handheld application) and

4    performance level); *see also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, REFERENCE GUIDE ON

5    MULTIPLE REGRESSION at 314 (3rd ed. 2011) ("Failure to include a major explanatory variable that is

6    correlated with the variable of interest in a regression model may cause an included variable to be

7    credited with an effect that actually is caused by the excluded variable.").

8         ***Finally***, Dr. Netz admitted at her deposition that she does not know what models qualify as

9    "neighbors" under her "price structure" opinion.  Cole Decl. Ex. 2, Netz Tr. 106:1-10.  Accordingly,

10   she has no basis to offer an opinion that all CRT tubes would suffer any common impact as she does

11   not even know which CRT tubes would be "neighbors" under her own analysis.

12             **3.    Dr.   Netz   Has   Offered   No   Reliable   Methodology   to   Assess**
               **Class-Wide Damages Using Common Proof**
13

14        In addition to its many other defects, Dr. Netz's declaration is insufficient to support

15   Plaintiffs' class allegations because its discussion of various possible methods for proving class

16   damages is purely theoretical (*see* Motion at 26-28; Netz Decl. 83-97) and does not satisfy Rule

17   23(b)(3)'s requirement that Plaintiffs "demonstrate a reliable mathematical or formulaic method for

18   adequately calculating Plaintiffs' damages class-wide." *Allied Orthopedic Appliances, Inc. v. Tyco*

19   *Healthcare Group L.P.*, 247 F.R.D. 156, 176 (C.D. Cal. 2007).  Plaintiffs argue that their "burden to

20   qualify the damages proof as yet another common question is a modest one." Motion at 26.  But to

21   support class certification, a plaintiff's expert must do more than provide a general explanation of

22   the available methods that he or she might use to try to measure class damages.  Instead, the expert

23   must "conduct [a] meaningful economic analysis" of proposed benchmarks to show that "a workable

24   damage formula" exists.  *Allied Orthopedic*, 247 F.R.D. at 177; *Butt v. Allegheny Pepsi-Cola*

25   *Bottling Co.*, 116 F.R.D. 486, 492 (E.D. Va. 1987) (denying class certification where "Plaintiff's

26   expert states, in very general terms, that statistical methods exist by which individual damages may

27   be calculated, and plaintiff asserts that a workable formula can be developed").[54]  Dr. Netz has failed

28   ───────────────────────────
     [54] *See also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. App'x 296, 300 (5th

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1  to meet this burden.

2      Specifically, as noted above (*see supra* at 32-33), Dr. Netz declines to perform any "but-for"

3  analysis in her report, instead opting to merely "describe four formulaic approaches to estimating the

4  but-for price." Netz Decl. 83-97; Cole Decl. Ex. 2, Netz Tr. 97:4-7. However, Dr. Netz failed to

5  establish that any of the "formulaic approaches" are viable given the factual record.

6      For example, Dr. Netz asserts that she could use the "before and after" method, in which she

7  would compare the prices during the alleged conspiracy period to those either before March 1995 or

8  after November 2007. Netz Decl. 86-87. But Dr. Netz fails to identify a before or after time period

9  for which the requisite data is available.[55]  Additionally, while Dr. Netz recognizes that any before

10  and after prices would need to be adjusted for variables that affected supply and demand of CRTs

11  (*see id.* at 87-90) she has not attempted to identify and define these variables, much less construct a

12  model that accounts for them. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974

13  (C.D. Cal. 2012) ("[t]he determination of the 'but for' prices, however, must take into account

14  nonconspiratorial factors that would have caused prices to be different in the conspiracy period even

15  if there had been no conspiracy"). Importantly, Dr. Netz does nothing to explain how she would

16  ─────────────────────────────────────────────

17  Cir. 2004) (denying certification where plaintiffs did not prove that "a reliable formula for damages
   can be devised which will yield statistically significant results, that the data that would have to be
   plugged into such a formula can be assembled, that the relevant variables like negotiating skill can

18  be quantified, and that all of this can be used to reliably measure antitrust damages for each of the
   many thousands of members of the proposed class").

19

   [55]

20  ███████████████████████████████████████████████████

21  ███████████████████████████████████████████████████

    ███████████████████████████████████████ Dr. Netz's assertion that she "expect[s] to receive additional data from

22  Defendants" is insufficient. Netz Decl. 87. In *GPU*, the Court rejected plaintiffs' "promises that
    they will be able to formulate the appropriate analysis and prove both impact and damages once they

23  obtain the necessary data," holding that "[a]fter eight months of discovery, plaintiffs should have the
    data to formulate their regression analyses with more precision." 253 F.R.D. at 505-06. *See also*

24  *Piggly Wiggly*, 100 Fed. App'x at 300 ("[w]hatever theoretical appeal this approach has, plaintiffs do
    not persuade us that data for such periods is readily available for all class members"); *In re OSB*

25  *Antitrust Litig.*, No. 06-826, 2007 WL 2253425, at *6-12 (E.D. Pa. Aug. 3, 2007) (denying class
    certification where plaintiffs' expert had not demonstrated that he could obtain the data necessary to

26  complete his regression analyses). Moreover, Dr. Netz has also conceded that the record
    demonstrates that most defendants were no longer in the CRT business after the conclusion of the

27  putative class period, thus the data required for Dr. Netz's "before and after" method does not exist.
    *See* Cole Decl. Ex. 2, Netz Tr. 247:10-14.

28

                                          37

1  account for the overall decline in the CRT industry as a result of emerging technologies, such as

2  LCD or plasma, or the varied rates of decline by screen size.  Cole Decl. Ex. 2, Netz Tr. 52:18-25

3  ("Q. Do you [] know that LCD penetrated much more quickly against small size screens as opposed

4  to large size screens?  A. I believe, yes, I'm familiar with that at least in terms of TV products but

5  it's not – doing a specific study of penetration rates is not necessary for me to answer the questions I

6  was asked to answer.  Q. You didn't do such a study?  A. That's correct.").  Yet, Dr. Netz concedes

7  that such emerging technologies had a "very significant impact," making her proposed damages

8  method a non-starter. *Id.* at 115:12-22.  *See GPU*, 253 F.R.D. at 495-96 ("Notably absent are other

9  factors that would likely have an impact on prices, including GPU performance, product features,

10  supply and demand factors, the customization of the product, and product deadlines associated with

11  the sale.  Without incorporating such variables, it is impossible to account for the diversity in

12  products and purchasers here.").[56]

13       Dr. Netz's proposed benchmark method of estimating the "but-for" prices of CRTs is

14  likewise deficient.  Dr. Netz identifies "[t]wo electronic products that do possess characteristics that

15  make them *potentially reasonable* benchmarks for the but-for world," but she fails to present any

16  evidence that the markets for those products – VHS recorders and portable CD players – are similar

17  to the market at issue here.  *See* Netz Decl. 90-92 (emphasis added).  The closest Dr. Netz comes to a

18  comparison is her assertion that because both CRT and the proposed benchmark products were

19  eventually replaced by "alternative technologies," "consumer considerations such as whether to buy

20  a new version of the current technology or wait and purchase the emerging technology *were likely to*

21  *have been similar* between the CRT industry and the benchmark industries." *Id.* (emphasis added).

22  This conclusory assertion is insufficient. *See, e.g., Eleven Line, Inc. v. N. Tex. State Soccer Ass'n,*

23  213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of

24  determining lost profit bears the burden to demonstrate the reasonable similarity of the business

25

26  _____

[56] *See also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 980 (rejecting "before and after"

27  approach where it failed to account for "major factors," such as the emergence of digital music on

the concert industry:  "[t]his fundamental change in marketplace dynamics clearly qualifies as a

28  'major factor,' which should have been accounted for—in some fashion—in Dr. Phillips' analysis").

1    whose earning experience he would borrow.").[57]

2        Indeed, each of Dr. Netz's proposed damage methodologies fails to take into account the

3    realities of the CRT market during the alleged class period, and instead are simply general

4    explanations of the available methods that she could try to use to estimate classwide damages in any

5    antitrust matter. Cole Decl. Ex. 2, Netz Tr. 246:12-15 ("Q: Is it correct that these four methods

6    would apply to any cartel case in which there is data available to – to satisfy the method? A: I guess

7    the answer is largely yes."). She has performed no analysis for any one of her four methods to

8    analyze whether the data, if available, will support her economic theories in the specific context of

9    the record in this case and she concedes that "it is within the realm of possibility that when I or

10   somebody else goes to implement one of these methods that they discover that it can't be

11   implemented." Cole Decl. Ex. 2, Netz Tr. 249:13-17; 248:9-17 ("Q: Have you run any tests of any

12   of these methods you identified to -- to see how a damage analysis would work and whether or not

13   there's sufficient data? Like have you actually run anything? A: I have not done any calculations . .

14   . . I have not begun the implementation of any of these methods."). This is insufficient. *See Am.*

15   *Seed Co. v. Monsanto Co.*, 238 F.R.D. 394, 402 (D. Del. 2006) (denying class certification where

16   plaintiff's expert did not know if the data would support his theory, and thus had not "sufficiently

17   grounded his theory of injury in the factual setting of the case to justify class certification"), *aff'd*,

18   271 Fed. App'x 138 (3d Cir. 2008).

19       Dr. Netz's certify-it-now-and-figure-it-out-later approach is not a proper basis to certify a

20   class. Courts have repeatedly rejected class certification motions where, as here, the proposed

21   method to determine class-wide damages consists only of "general, untried economic theory,"

22   without any demonstration that "their proposed methods are workable with real world facts."[58]

---

[57] Dr. Netz's remaining two proposed methods for estimating classwide damages, the simulation and market power methods, face similar problems and amount to nothing more than the type of generalized discussion one could find in a textbook on damage models with no link to the facts of this case. *See* Netz. Decl. 92-97; *see also Flash*, 2010 WL 2332081, at *11 ("more than the one-size-fits-all theoretical construct proposed by Dr. Netz" is needed).

[58] *Melnick v. Microsoft Corp.*, Nos. CV-99-709, CV-99-752, 2001 WL 1012261, at *16 (Me. Super. Ct. Aug. 24, 2001); *OSB*, 2007 WL 2253425, at *11 ("[Plaintiffs' expert's] opinion . . . has little probative value because he has not conducted any analysis of the 'real economic world' . . . [,] [h]e has relied almost entirely on economic theory and generalizations about market competitiveness and

39

1          **4.    Common Impact and Injury Cannot Be Inferred**

2          In a final attempt to establish common impact and injury, Plaintiffs assert that "California

3    and other repealer states' laws permit an inference of classwide injury or classwide proof of

4    damages." Motion at 28.[59] This is not the law.

5          As an initial matter, Rule 23 governs the predominance inquiry, not state law. *See Marlo v.*

6    *UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) ("Federal Rule of Civil Procedure Rule 23 governs the

7    class-certification issue even if the underlying claim arises under state law."); *accord* 7A Wright,

8    Miller & Kane, Federal Practice and Procedure § 1758, *Flash Memory*, 2010 WL 1332081, at *13

9    n.11 ("The existence of a presumption of impact would not obviate the requirement that a plaintiff

10   seeking class certification demonstrate that there is a reasonable method for determining on a class-

11   wide basis whether and to what extent that overcharge was passed on to each of the indirect

12   purchasers at all levels of the distribution chain.") (quotations and alterations omitted).

13         Consistent with this principle, federal courts have repeatedly denied or limited certification

14   of indirect purchaser classes without reference to any state-law "inference" of class-wide injury.

15   *See, e.g.*, *GPU*, 253 F.R.D. at 479, 503-07 (rejecting certification of indirect purchaser classes under

16   California and other state laws due to lack proof of impact through common evidence); *California v.*

17   *Infineon Techs. AG*, No. 06-4333, 2008 WL 4155665, at *3, *5-12 (N.D. Cal. Sept. 5, 2008) (same);

18

19   'elasticities' of supply and demand, without analyzing the competitiveness or elasticities of actual
     housing markets"); *Somers v. Apple, Inc.*, 258 F.R.D. 354, 361 (N.D. Cal. 2009) (denying class
20   certification and "find[ing] it significant that Plaintiff has done nothing more than make a vague
     five-paragraph long collection of proposals for accomplishing what the Court sees as a daunting
21   task").

22   [59] Notably, courts in many states under whose laws Plaintiffs claim relief—including Maine,
23   Michigan, and Tennessee—have explicitly rejected any such inference of class-wide impact. *See,*
     *e.g.*, *Melnick*, 2001 WL 1012261, at *6 (holding that each plaintiff must prove that the antitrust
24   violation "did in fact cause him injury"); *Ren v. Philip Morris Inc.*, No. 00-004035-CZ, 2002 WL
     1839983, at *5 (Mich. Cir. Ct. June 11, 2002) (injury in fact cannot be established through the use of
25   presumptions or inferences); *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003
     WL 21780975, at *30 (Tenn. Ct. App. July 31, 2003) ("plaintiffs will be required to prove they were
26   actually damaged by the alleged monopolistic conduct"). With respect to Kansas, Plaintiffs assert
27   that state law "obviate[es] the need for common proof of damages." Motion at 37. Rule 23(b)(3),
     however, requires common proof of the fact of damages separately from common proof of their
28   amount. *See supra* at 19-20.

                                              40

1    *OSB*, 2007 WL 2253425, at *6-12 (rejecting claimed state law inferences of impact).

2                              (a)      California

3          In addition, the California Supreme Court has never endorsed the supposed inference of

4    impact principle claimed by Plaintiffs; nor has any California appellate court relied on such a

5    purported "inference" with respect to pass-through to indirect purchasers.[60]  Indeed, a number of

6    California decisions have outright declined to apply any presumption of impact in antitrust cases at

7    the class certification stage.  *See, e.g.*, *Global Minerals & Metals Corp. v. Superior Court*, 113 Cal.

8    App. 4th 836, 852 (Cal. Ct. App. 2003); *J.P. Morgan & Co., Inc. v. Superior Court*, 113 Cal. App.

9    4th 195 (Cal. Ct. App. 2003).

10                            (b)      Minnesota

11         Similarly, Plaintiffs are wrong when they claim that *Gordon v. Microsoft Corp.*, No. 00-

12   5994, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001), permits an inference of impact under

13   Minnesota law.  Motion at 39-40.  In reality, *Gordon* only discusses inferring the particular amount

14   of individual damages, *see Gordon*, 2001 WL 366432, at *11, not the fact of injury.  With respect to

15   the fact of injury, the *Gordon* court held that the determination of whether each class member was

16   ────────────────

17   [60] The California cases Plaintiffs cite are not to the contrary.  *See In re Cipro Cases I & II*, 121 Cal.
     App. 4th 402, 411 (2004) (finding substantial evidence of common proof of classwide impact from

18   brand name drug monopoly); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341,
     1352 n.8 (Cal. Ct. App. 1987) (depositions of middlemen established that they pass on overcharges);

19   *Rosack v. Volvo of Am. Corp.*, 131 Cal. App. 3d 741, 745-46 (Cal. Ct. App. 1982) (vertical price-
     fixing cases where there was no issue of pass-on); *accord OSB*, 2007 WL 2253425, at *6-12

20   (refusing to apply inference of classwide impact to a California state antitrust law claim).  Moreover,
     any inference of impact could only even arguably apply to California claims when "the effects of the

21   price-fixing were not obscured by substantially altering or adding to the item received from the

22   manufacturer." *B.W.I.*, 191 Cal. App. 3d at 1352.  In other words, even California courts referring in
     *dicta* to such an inference have indicated it only would be applicable where the product reaches end-

23   users unchanged from its original state.  *In re Cipro Cases I & II*, 121 Cal. App. 4th at 415-16;
     *accord Flash Memory*, 2010 WL 2332081, at *13-14 (describing *B.W.I.* as "fundamentally

24   distinguishable" because "[i]n reaching its decision, the court in *B.W.I.* was careful to distinguish

25   between situations in which the product received by an indirect purchaser from the distributor was in
     the same form that it was originally sold by the defendant manufacturer—and those cases in which

26   the product purchased by the indirect purchaser was altered in some manner").  Here, it is undisputed
     that CRTs, like flash memories, are incorporated into a wide variety of different end-use products

27   and are changed as they move through the supply chain, rendering any arguable inference of impact
     under California law inapplicable. *See supra* at 5-7, 12-13.

28

                                              41
     DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
     INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

1  injured to begin with, "is an element of liability and must be shown with some certainty." *Id.* at *7;

2  *see also City of St. Paul v. FMC Corp.*, No. 89-0466, 1990 WL 259683, at *2 (D. Minn. Nov. 14,

3  1990); *Keating v. Phillip Morris, Inc.*, 417 N.W.2d 132, 137 (Minn. Ct. App. 1987).

(c)     Florida

5  Finally, Plaintiffs assert that an inference of impact can apply under Florida antitrust law

6  despite pricing diversity among individual class members. *See* Motion at 34-35. But, in the sole

7  decision Plaintiffs cite to support this assertion, the court certified the class only upon finding that

8  plaintiffs had demonstrated a reasonable method of proving impact and damages using common

9  proof (as opposed to a presumption). *See In re Florida Microsoft Antitrust Litig.*, No. 99-27340,

10  2002 WL 31423620, at *14-15 (Fla. Cir. Ct. Aug. 26, 2002). Indeed, a Florida appellate court has

11  expressly held that any "presumption [of impact] should not arise in indirect purchaser cases."

12  *Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.*, 743 So. 2d 19, 22 (Fla. Dist. Ct. App. 1999); *see*

13  *also In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 280-82 (D. Mass. 2004) (relying on *Execu-Tech*

14  to deny certification of a Florida state class due to lack of a "precise showing of individual impact").

15  In short, Plaintiffs must meet their burden of proving common impact and pass-on with a

16  preponderance of the evidence and they cannot use any purported state law "inference" as a short-cut

17  to satisfying the predominance test.

18  **II.     THE PROPOSED CLASSES ARE NOT ASCERTAINABLE**

19  Rule 23 further requires Plaintiffs to demonstrate that the class is ascertainable – *i.e.*, that

20  class membership can be determined in an "administratively feasible" manner. *Marcus v BMW of N.*

21  *Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012); *Flash*, 2010 WL 2332091 at *14; *see also* 7A Wright,

22  Miller & Kane, Federal Practice and Procedure § 760 (Rule 23 requires class definition to be

23  "sufficiently definite so that it is administratively feasible for the court to determine whether a

24  particular individual is a member"). A proposed class that requires significant fact-based inquiries to

25  determine class membership is "incongruous with the efficiencies expected in a class action."

26  *Marcus*, 687 F.3d at 593; *see also Flash*, 2010 WL 2332081, at *15 (class not objectively

27  ascertainable when determining membership required factually-intensive efforts to disassemble

28  products); *Kirkman v. North Carolina R.R. Co.*, 220 F.R.D. 49, 53 (M.D.N.C. 2004) (class not

42

1   objectively ascertainable when determining membership required complicated title searches).

2   Plaintiffs' proposed state-law-based classes fail this requirement.

3        Plaintiffs seek to certify classes of individuals located in 22 different states who "purchased

4   Cathode Ray Tubes" for their own use from defendants, their affiliates and alleged co-conspirators.

5   *See* Motion at 2.  None of the proposed class members bought CRTs directly; rather, they bought

6   televisions or computer monitors that allegedly contain a CRT.  This is fatal because few, if any,

7   class members will readily know if their televisions or computers contain a CRT manufactured by

8   one of the defendants or their alleged co-conspirators.  A person who bought a Sony or RCA

9   television, for example, likely will not know who made the CRT inside.  Nor will a person who

10  bought an Apple or Hewlett-Packard computer.

11       The testimony of numerous named Plaintiffs underscores this defect.  Named plaintiff Barry

12  Kushner does not know which company manufactured the CRT in either of the two televisions that

13  serve as the basis for his claim. Cole Decl. Ex. 61, Kushner (IPP) Tr. 22:10-17, 55:22-56:2.  The

14  same is true of Frank Warner, Gary Hanson, Lisa Reynolds, Margaret Slagle, Gloria Comeaux,

15  Lawyer's Choice, Kerry Lee Hall, Janet Ackerman, Albert Crigler, Jeffrey Figone, Samuel Nasto,

16  Brian Luscher, Steven Ganz, Louise Wood, and David Rooks:  None of them know who made the

17  CRT in their televisions or computers.[61]  Named Plaintiffs Jeffrey Figone and Albert Crigler do not

18  know if their products contain CRTs *at all*. Cole Decl. Ex. 68, Figone (IPP) Tr. 68:6-69:16; Cole

19  Decl. Ex. 67, Crigler (IPP) Tr. 88:11-19.  And various named Plaintiffs conceded that if the CRT

20  was made by a non-defendant, they have no claim. Cole Decl. Ex. 64, Slagle (IPP) 86:9-18; Cole

21  ─────────────
[61] Whether each representative knew who manufactured the CRT in question: ▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Cole Decl. Ex. 62, Hanson (IPP) Tr.
    68:9-11 ("No, I do not."); *id*. at 69:16-24 ("I do not know."); Cole Decl. Ex. 63, Reynolds (IPP) Tr.

23  37:18-20 ("No"); *id*. at 47:25-48:2 ("No"); Cole Decl. Ex. 64, Slagle (IPP) Tr. 27:12-14 ("No"); *id*.
    at 50:16-18 ("Do I know who manufactured, no."); *id*. at 81:8-10 ("I don't."); *id*. at 83:7-9 ("No");

24  Cole Decl. Ex. 52,  Comeaux (IPP) Tr. 41:10-12 ("No"); Cole Decl. Ex. 53, Lawyer's Choice Suites,
    Inc. (IPP) Tr. 78:13-15 ("No"); *id*. at 125:12-14 ("No"); Cole Decl. Ex. 65, Hall (IPP) Tr. 113:14-17

25  ("No"); Cole Decl. Ex. 66, Ackerman (IPP) Tr. 32:18-23 ("I don't know."); Cole Decl. Ex. 67,
    Crigler (IPP) Tr. 64:8-11 ("[N]o, I don't know."); *id*. at 89:13-16 ("I don't."); Cole Decl. Ex. 68,

26  Figone (IPP) Tr. 70:3-5 ("No"); *id*. at 96:5-8 ("No"); Cole Decl. Ex. 69, Nasto (IPP) Tr. 83:21-23 ("I
    do not."); Cole Decl. Ex. 70, Luscher (IPP) Tr. 49:11-13 ("No"); Cole Decl. Ex. 71, Ganz (IPP) Tr.

27  59:11-13 ("I do not know."); *id*. at 75:17-19 ("No"); Cole Decl. Ex. 29, Wood (IPP) Tr. 52:20-53:11
    ("I do not."); Cole Decl. Ex. 72, Rooks (IPP) Tr. 82:23-25 ("No").

28
    ──────────────────────
                                         43

1  Decl. Ex. 65, Hall (IPP) Tr. 113:18-114:1; Cole Decl. Ex. 52,  Comeaux (IPP) Tr. 52:18-53:19; Cole

2  Decl. Ex. 29, Wood (IPP) Tr. 53:8-54:13; Cole Decl. Ex. 67, Crigler (IPP) Tr. 69:3-11.

3        The problem is not theoretical as the CRTs incorporated into televisions and computer

4  monitors sold in the United States were made by both defendant and non-defendant manufacturers.

5  ████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████  ████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████████████

13 ████████  This mandates the denial of Plaintiffs' Motion.  *See Flash*, 2010 WL 2332081, at *15

14 (ascertainability not met when there is no objective way to determine if class members bought from

15 defendants rather than non-defendants); *Xavier*, 787 F. Supp. 2d at 1089 (ascertainability not met

16 when records could not determine class membership).

17        Recognizing this problem, class counsel began to provide some of the named Plaintiffs with

18 specialized assistance with opening their televisions and monitors to examine the CRTs inside.[63]

19 That option is not available to many potential class members because, among other things, the

20 alleged class period runs from 1995 to 2007 (from 5 to 17 years ago) and many consumers no longer

21 have the televisions or computers at issue.[64]  There is no way for such individuals to determine who

22 ████████████████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████████████████

24 [63] See, e.g., Cole Decl. Ex. 73, Andrews (IPP) Tr.43:17-44:2 (counsel sent someone to open Ms.
   Andrews' television); Cole Decl. Ex. 74, Jenkins (IPP) Tr. 44:21-45:9 (associate of Mr. Jenkins'

25 counsel sent to open the television); Cole Decl. Ex. 75, Terry (IPP) Tr. 46:11-47:4 (legal assistant
   informed Ms. Terry on how to examine her television); Cole Decl. Ex. 62, Hanson (IPP) Tr. 63:13-

26 65:8 (television brought to counsel's office to be opened); Cole Decl. Ex. 76, Southern Office

27 Supply (IPP) Tr. 140:16-25 (counsel assisted 30(b)(6) deponent in removing covers of CRT
   products).

28 [64] Named plaintiff Jeffrey Figone, for example, claims to have bought three televisions during the

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

made the CRTs inside their products, and thus no way to determine if they are in the class.  *See Xavier*, 787 F. Supp. 2d at 1089 (class unascertainable where class members were required to consult their memories to determine how long they smoked, as there were no records that could be looked at to determine class membership).[65]

## III.   THE PROPOSED CLASS REPRESENTATIVES ARE NEITHER ADEQUATE NOR TYPICAL

Finally, Plaintiffs' motion must be denied because they have not met their burden of establishing that the putative class representatives have claims that are "typical" of the absent class members and that they are able to "adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3), (4); *see also Falcon*, 457 U.S. at 158 n. 13.  These requirements are intended to ensure that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n. 13.

To be adequate and typical, a class representative must (1) be a member of the class; (2) not be subject to unique defenses; and (3) demonstrate a basic awareness of the facts and a willingness to participate sufficient to assure the Court that the class representative will not simply abdicate

---

putative class period, but has failed to preserve them.  Cole Decl. Ex. 68, Figone (IPP) Tr. 113:4-10, 124:11-13, 129:11-14.  *See also* Cole Decl. Ex. 70, Luscher (IPP) Tr. 46:18-20 (no longer owns television); Cole Decl. Ex. 69, Nasto (IPP) Tr. 69:17-19 (same); Cole Decl. Ex. 29, Wood (IPP) Tr. 32:22-24 (same); Cole Decl. Ex. 53, Lawyer's Choice Suites, Inc. (IPP) Tr. 86:13-87:25 (believe monitors at issue were recycled); Cole Decl. Ex. 72, Rooks (IPP) Tr. 49:10-11 (no longer has television).

[65] Moreover, even if a putative class member still owns the relevant computer or television, Rule 23 is still not satisfied because individuals would have to disassemble—and risk damaging—their televisions or computer monitors (or risk electrocuting themselves) to determine if they are in the class. *See, e.g.,* ███████████ Cole Decl. Ex. 77, Kushner Ex. 18 at CRT000382 ("This 'bolt of lightning' . . . may cause an electrical shock.  For the safety of everyone in your household, please do not remove product covering.").  This is not allowed.  *Flash*, 2010 WL 2332081, at *15 (class not ascertainable when "factually-intensive" inquiry of taking apart computer products required to determine who manufactured chips); *Kirkman*, 220 F.R.D. at 53 (class not ascertainable when burdensome title search needed to determine class membership); *see also In re Copper Antitrust Litig.*, 196 F.R.D. 348, 359 (W.D. Wis. 2000) (class not ascertainable when individuals could not determine class membership through class definition itself); *see, e.g.,* Cole Decl. Ex. 66, Ackerman (IPP) Tr. 33:8-15 (testifying that she would not "even know how to open" her television).

45

1   responsibility to class counsel. *See generally Falcon*, 457 U.S. at 156. Plaintiffs have not met this

2   burden. They seek certification of "22 separate Indirect-Purchaser Statewide Classes" (Motion at 2),

3   but have failed to show that *each* proposed class is represented by an adequate and typical

4   representative. *See Arrendondo v. Delano Farms Co.*, No. 09-1247, 2011 WL 1486612 at *17-18

5   (E.D. Cal. Apr. 19, 2011).

6        Plaintiffs have submitted literally no evidence from which the Court could conclude that any

7   of the proffered individuals are typical of, and adequate to represent, the class. They have provided

8   no declarations or deposition testimony from the putative representatives attesting to their ability and

9   willingness to represent consumers from their respective states. Instead, Plaintiffs devote fewer than

10  two pages of their 50-page brief (Motion at 16-17) to a discussion of the adequacy and typicality of

11  the named plaintiffs (and their counsel), which discussion consists entirely of conclusory statements.

12  They submit a chart that sets forth only each proposed represenative's name, state, and product(s)

13  they claim to have purchased, which is obviously insufficient to carry their burden. *Id.*; *see also id.*

14  at A-1. Moreover, at least one of Plaintiffs' conclusory statements – that "all members of the

15  Classes, including Plaintiffs, purchased CRT finished products containing Defendants' CRTs" (*id.* at

16  16) – is wholly unsubstantiated, as discussed below. Plaintiffs' failure to make an adequacy

17  showing is by itself a sufficient basis for the Court to deny certification as to all 22 classes. *Cf.*

18  *Falcon*, 457 U.S. at 158-61.[66]

19       Membership in the class is a threshold requirement for adequacy and typicality. *Falcon*, 457

20  U.S. at 156 ("[w]e have repeatedly held that a class representative must be part of the class")

21  (internal quotations omitted); *Sosna v. Iowa*, 419 U.S. 393, 403 ("A litigant must be a member of the

22  class which he or she seeks to represent at the time the class action is certified by the district

23  court."). On this threshold qualification, many of Plaintiffs' putative representatives do not even

24  make it out of the gate.

25  ─────────────────
    [66] Attached to this Memorandum as Appendix A is a table listing the Plaintiffs whose testimony
26  demonstrates their inadequacy or atypicality and a summary of the relevant testimony. Neither the
    table nor the discussion that follows is intended to suggest that the proposed representatives who are
27  not specifically addressed herein are adequate representatives for the proposed classes. Because
    Plaintiffs bear the burden of establishing adequacy and have not done so with respect to *any*
28  proposed representative, certification must be denied as to all 22 proposed classes.

Each state-specific class includes "[a]ll persons and entities in [indirect purchaser states] who, from March 1, 1995 to November 25, 2007, as residents of [the state], purchased Cathode Ray Tubes" "indirectly *from any defendant or subsidiary thereof*, or any named affiliate or any named co-conspirator." Motion at 2 (emphasis added). Although some proposed representatives testified that they were able to determine who manufactured their CRT, ███ class representatives testified that they did not know whether they purchased a product containing a CRT manufactured or sold by a Defendant or one of the alleged co-conspirators.[67] Some proposed class representatives apparently did not even *attempt* to identify the manufacturer of their CRTs.[68]

In addition to failing to establish who manufactured their CRTs, several putative representatives failed to establish that they made their purchases in the relevant state or while a resident of the state at issue, each of which is a requirement for membership in the proposed classes. Lawyer's Choice, the putative representative for the District of Columbia, testified that it was possible that the purchases were made in Florida. Cole Decl. Ex. 53, Lawyer's Choice Suites, Inc. (IPP) Tr. 114:5-115:23. ████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

---

[67] The 13 individuals are Janet Ackerman (NY), Gloria Comeaux (NV), Albert Crigler (TN), Jeffrey Figone (CA), Steven Ganz (CA), Kerry Lee Hall (ME), Barry Kushner (MN), Lawyer's Choice Suite, Inc. (DC), Brian Luscher (AZ), Lisa Reynolds (MI), Margaret Slagle (VT), ██████ ███ Louise Wood (NY). For example, Jeffrey Figone and Steven Ganz, both of California, testified that they had no idea whether a Defendant manufactured their CRTs. Cole Decl. Ex. 68, Figone (IPP) Tr. 70:3-11 ("Q. [D]o you know who manufactured the CRT inside the Sharp television? A. No. Q. Is it possible that the CRT was manufactured by [non-Defendant] Sharp? . . . A. I don't know."), *id.* at 95:24-96:2 ("Q. [D]o you know who manufactured the CRT [in your Panasonic television]? A. No."); Cole Decl. Ex. 71, Ganz (IPP) Tr. 53:11-15, 59:11-20, 75:17-19, 80:6-81:1, 105:9-20 (testifying that he does not know and is not sure whether a Defendant manufactured the CRT inside his televisions and monitors and that it is possible that a non-Defendant manufactured the CRT).

[68] *See e.g.*, Cole Decl. Ex. 61, Kushner (IPP) Tr. 46:20-25; ████████████████ ██████████ These individuals have not established that they are members of the class.

47

1    Cole Decl. Ex. 78, Warner Ex. 4 (interrogatory responses identifying all purchases that form the

2    basis of Mr. Warner's claim as being post-1997 or un-dateable).[69]

3        Without establishing that they are members of the proposed class, these 13 individuals are

4    necessarily inadequate and atypical class representatives.  At a minimum, therefore, the proposed

5    classes for Arizona, California, District of Columbia, Maine, Michigan, Nevada, New York,

6    Tennessee, and Vermont must be rejected for want of an adequate or typical class representative.

7                                         **CONCLUSION**

8        For all of the foregoing reasons, Plaintiffs' Motion must be denied.

9

10

11   DATED:  DECEMBER 17, 2012                WINSTON & STRAWN LLP
                                             By: /s/ Jeffrey L. Kessler
12                                           JEFFREY L. KESSLER (*pro hac vice*)
                                             E:mail: JKessler@winston.com
13                                           A. PAUL VICTOR (*pro hac vice*)
                                             E:mail: PVictor@winston.com
14                                           ALDO A. BADINI (SBN 257086)
                                             E:mail: ABadini@winston.com
15                                           EVA W. COLE (*pro hac vice*)
                                             E:mail: EWCole@winston.com
16                                           MOLLY M. DONOVAN
                                             E:mail: MMDonovan@winston.com
17                                           **WINSTON & STRAWN LLP**
                                             200 Park Avenue
18                                           New York, NY 10166
                                             Telephone: (212) 294-6700
19                                           Facsimile: (212) 294-4700

20                                           STEVEN A. REISS (*pro hac vice*)
                                             E-mail: steven.reiss@weil.com
21

22   69

23

24

25

26

27

28
                                          48
     DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
     INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917

DAVID L. YOHAI (*pro hac vice*)
E-mail: david.yohai@weil.com
ADAM C. HEMLOCK (*pro hac vice*)
E-mail: adam.hemlock@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Defendants Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of North America, MT Picture Display Co., Ltd.*

FRESHFIELDS BRUCKHAUS
DERINGER US LLP

By: /s/ Richard Snyder
TERRY CALVANI (SBN 53260)
E-mail: terry.calvani@freshfields.com
CHRISTINE LACIAK (*pro hac vice*)
E-mail: christine.laciak@freshfields.com
RICHARD SNYDER (*pro hac vice*)
E-mail: richard.snyder@freshfields.com
**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
701 Pennsylvania Avenue NW, Suite 600
Washington, DC  20004
Telephone: (202) 777-4565
Facsimile: (202) 777-4555

*Attorneys for Beijing-Matsushita Color CRT Company, Ltd.*

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Kent M. Roger
KENT M. ROGER (SBN 95987)
E-mail: kroger@morganlewis.com
MICHELLE PARK CHIU (SBN 248421)
E-mail: mchiu@morganlewis.com
One Market, Spear Street Tower
San Francisco, California 94105-1126
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

J. CLAYTON EVERETT, JR. (*pro hac vice*)
E-mail: jeverett@morganlewis.com
SCOTT A. STEMPEL (*pro hac vice*)
E-mail: sstempel@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 739-3000

49

Facsimile: (202) 739-3001

*Attorneys for Defendants Hitachi, Ltd., Hitachi Displays, Ltd. (n/k/a Japan Display East, Inc.), Hitachi Asia, Ltd., Hitachi America, Ltd., and Hitachi Electronic Devices (USA), Inc.*

By: /s/ Hojoon Hwang
HOJOON HWANG (SBN 184950)
Hojoon.Hwang@mto.com
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

WILLIAM D. TEMKO (SBN 098858)
William.Temko@mto.com
JONATHAN E. ALTMAN (SBN 170607)
Jonathan.Altman@mto.com
BETHANY W. KRISTOVICH (SBN 241891)
Bethany.Kristovich@mto.com
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendants LG Electronics, Inc.; LG, LG Electronics USA, Inc.; and LG Electronics Taiwan Taipei Co., Ltd.*

SHEPPARD MULLIN RICHTER & HAMPTON

By: /s/ Gary L. Halling
GARY L. HALLING (SBN 66087)
E-mail: ghalling@sheppardmullin.com
JAMES L. MCGINNIS (SBN 95788)
E-mail: jmcginnis@sheppardmullin.com
MICHAEL W. SCARBOROUGH, (SBN 203524)
E-mail: mscarborough@sheppardmullin.com
**SHEPPARD MULLIN RICHTER & HAMPTON**
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone: (415) 434-9100
Facsimile: (415) 434-3947

*Attorneys for Defendants Samsung SDI America, Inc.; Samsung SDI Co., Ltd.; Samsung SDI (Malaysia) SDN. BHD.; Samsung SDI Mexico S.A. DE C.V.; Samsung SDI Brasil Ltda.; Shenzen Samsung SDI Co., Ltd. and Tianjin Samsung SDI Co., Ltd.*

O'MELVENY & MYERS LLP

By: /s/ Ian Simmons

50

IAN SIMMONS (*pro hac vice*)
Email: isimmons@omm.com
BENJAMIN G. BRADSHAW (SBN 189925)
Email: bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendants Samsung Electronics Co., Ltd.
and Samsung Electronics America, Inc.*

WHITE & CASE LLP

By: /s/ Lucius B. Lau
CHRISTOPHER M. CURRAN (*pro hac vice*)
E-mail: ccurran@whitecase.com
GEORGE L. PAUL (*pro hac vice*)
E-mail: gpaul@whitecase.com
LUCIUS B. LAU (*pro hac vice*)
E-mail: alau@whitecase.com
**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

*Attorneys for Defendants Toshiba Corporation,
Toshiba America Information Systems, Inc., Toshiba
America Consumer Products, L.L.C., and Toshiba
America Electronic Components, Inc.*

BAKER BOTTS LLP

By: /s/ Jon V. Swenson
JON V. SWENSON (SBN 233054)
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
Email: jon.swenson@bakerbotts.com

JOHN M. TALADAY (*pro hac vice*)
JOSEPH OSTOYICH (*pro hac vice*)
**BAKER BOTTS LLP**
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: joseph.ostoyich@bakerbotts.com

51

*Attorneys for Defendants Koninklijke Philips Electronics N.V. and Philips Electronics North America Corporation*

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from each of the above signatories.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
INDIRECT-PURCHASER PLAINTIFFS FOR CLASS CERTIFICATION – Case No. 07-5944, MDL NO. 1917