Highly Confidential

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC MDL No. 1917 |

**EXPERT REPORT OF ROBERT D. WILLIG**

12/17/12

Highly Confidential

**TABLE OF CONTENTS**

I.      **Introduction** ............................................................................................... 1

A.    Qualifications ........................................................................................... 1

B.    Assignment .............................................................................................. 2

II.     **Summary of Conclusions** ............................................................................ 3

A.    Widespread Impact on Direct Purchasers Cannot Be Established using Common Evidence ................................................................................................ 4

*Actual Pricing Data Are Wholly Inconsistent with the Existence of a Structure in Prices of CRTs and CRT Finished Products.* ................................................. 5

*The Observed Variation in CRT Price Movements Precludes the Use of a Price Structure Theory as the Basis for Establishing Antitrust Impact to All Direct and Indirect Purchasers.* ............................................................................... 8

*There Is No Evidence of Sustained and Effective Collusion across All CRTs Ultimately Purchased by the Proposed Class.* ............................................ 10

B.    Class-Wide Impact on Indirect Purchasers Cannot Be Established using Common Evidence ................................................................................................ 12

III.    **Widespread Impact on Direct Purchasers Cannot Be Established using Common Evidence** ................................................................................................ 14

A.    No Evidence of a "Structure" to Prices of CRTs and CRT Finished Products ............. 15

*Widely Differentiated CRTs and CRT Finished Products Resulted in Widely Different Dynamics for Their Prices.* ......................................................... 16

*Substantially Different Market Forces, Such as Competition from LCD and Plasma Technologies, Influenced CRT and CRT Finished Product Prices Differently during the Alleged Class Period.* ...................................................................... 23

*Conduct Directed at CRT Prices Outside the United States Need Not Have Elevated CRT Market Prices in the United States.* ...................................... 27

*Dr. Netz's Hedonic Regressions Mask the True Changes in Prices.* .................... 29

B.    No Uniform, Effective and Sustained Collusion ......................................... 35

*Economic Theory Suggests that, Contrary to Dr. Netz's View, the CRT Cartel Was Potentially Ineffective at Raising Prices of CRTs across the Proposed Class.* ............. 35

*Documentary Evidence Suggests that, Contrary to Dr. Netz's View, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮* ..... 39

*A Properly Specified Econometric Model Shows Little or No Connection between the Alleged Cartel Target Prices and Actual Prices.* ...................................... 41

*Dr. Netz's Target Price Analysis Is Biased towards ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮* ..................... 46

Highly Confidential

*Dr. Netz's Target Price Analysis Inherently Masks Differences between Actual and Target Prices.* ........................................................................................................ 47

*Dr. Netz's Failure to Perform any Analysis of But-For Prices, at a Minimum, Leaves Open the Possibility that a Substantial Number of Class Members Were Not Injured.* ........................................................................................................ 49

**IV.   Class-Wide Impact on Indirect Purchasers Cannot Be Established using Common Evidence** ........................................................................................ **51**

*Differentiated Pass-Through Rates along Complex Distribution Chains.* ................... 51

*Both Price Levels and Changes in Price Levels Were Highly Differentiated* ............... 52

*The CRT Distribution Channels Were Long and Complex* ........................................ 53

*Dr. Netz's Flawed Pass-Through Regression Model Only Estimates Average Pass-Through Rates* ........................................................................................................ 54

*Dr. Netz's Flawed Pass-Through Regression Model Fails to Control for Differences across Products and Market Changes.* ...................................................... 58

*A Properly Specified Pass-Through Regression Model Demonstrates That Pass-Through Rates Vary and Are Often below 100%.* ...................................................... 62

*Dr. Netz's "Top-and-Bottom" Analysis of U.S. Pass-Through Rates Is Inherently Flawed for, among Other Reasons, Using Global CRT Prices.* ................................... 64

*Dr. Netz's "Top-to-Bottom" Analysis Is Also Flawed, as a Proper Regression Analysis Demonstrates.* ............................................................................................ 66

**V.   Establishing Impact and Estimating Damages** ........................................... **68**

*Dr. Netz's Proposed Methodology for Estimating the But-For Price for CRTs.* ........... 68

*Dr. Netz's Proposed "Economic Determinants" Approach Fails Because Market Conditions Were Dramatically Different before and after the Proposed Class Period.* .................................................................................................................. 68

*Dr. Netz Has Not Established that Her "Benchmark Products" Are Appropriate Benchmarks.* ............................................................................................................ 70

*Dr. Netz's "Market Power" Approach Fails Because the Critical Assumption, that the Defendants Acted as a Single Firm, Cannot Be Made for the CRT Market.* ............ 71

*Dr. Netz's "Simulated Merger" Approach Fails Because the Critical Assumption, that the Defendants Acted as a Single Firm, Cannot Be Made for the CRT Market and Because Dr. Netz Has Not Explained How She Would Construct Such a Model.* ... 73

**VI.   Conclusion** ........................................................................................ **75**

**VII.   Appendix: Data and Methods Used in Pass-Through Analyses** ..................... **76**

Highly Confidential

# I.    Introduction

## A. Qualifications

1.  I am a Professor of Economics and Public Affairs at the Woodrow Wilson School and the Economics Department of Princeton University, USA. I am also a Senior Consultant at Compass Lexecon, an economics consulting firm based in the U.S. Previously, I was a Supervisor in the Economics Research Department of Bell Laboratories. My teaching and research have specialized in the fields of industrial organization, government-business relations, and welfare theory.

2.  I have extensive experience analyzing economic issues arising under the law. From 1989 to 1991, I served as Chief Economist in the Antitrust Division of the U.S. Department of Justice, where I led the development of the 1992 *Horizontal Merger Guidelines*. I met with outsiders, weighed evidence, and participated in decisions on when to use enforcement power. Core to my work were issues pertaining to alleged conspiracies and market competition. I am the author of *Welfare Analysis of Policies Affecting Prices and Products* and *Contestable Markets and the Theory of Industry Structure* (with William Baumol and John Panzar) as well as numerous articles. I have served on the editorial boards of *The American Economic Review*, *The Journal of Industrial Economics*, and the *MIT Press Series on Regulation*. Also, I have served as a consultant and advisor to the Federal Trade Commission, the Department of Justice, the OECD, the Inter-American Development Bank, the World Bank, and the governments of many nations.

3.  I was invited by the Pennsylvania Bar Institute, Antitrust Law Committee CLE and the PLI Annual Antitrust Law Institute in 2007 to give talks on class certification matters, and I have prepared expert reports on class certification matters.

4.  My curriculum vitae, which includes a list of my publications, is at Attachment 1. A list of matters in which I have given sworn testimony as an expert during the past four years, at trial or in deposition, is at Attachment 2.

Highly Confidential

## B. Assignment

5.   The allegations in this case involve a conspiracy to elevate the prices of cathode ray tubes ("CRTs"). Plaintiffs allege that Defendants successfully colluded to elevate the prices of CRTs sold in the U.S. between March 1995 and November 2007 (the class period).[1]  Plaintiffs have asked the Court to certify a class of indirect purchasers ("IPP class") comprised of "[a]ll persons and or entities who or which indirectly purchased [CRTs] in the United States for their own use and not for resale [during the class period]…"[2]

6.   I understand that it is incumbent on Plaintiffs to show that injury and damages to the IPP class as a result of the alleged cartel of CRT manufacturers during the class period can be established using common evidence and common methods, i.e., that the conduct at issue had a "common impact" on members of the proposed class of indirect purchasers.

7.   I have been retained by a subset of the Defendants[3] to:

    a)    Address whether Plaintiffs are likely to be able to demonstrate, at a single trial, through common proof on a class-wide basis, that all or virtually all of the members of the proposed class suffered economic injury from the alleged conspiracy;

    b)    Review the expert report filed by Dr. Janet Netz, the economic expert for the IPP class, and opine on the analyses and views presented therein.

8.   As a starting point for my analysis, I assume that the IPP class is correct in its allegation that the group of defendant CRT manufacturers conspired to elevate prices of

---

[1] Named Defendants are: Chunghwa, Daewoo/Orion, Hitachi, IRICO, Philips, LG, LG.Philips Displays ("LPD") (an independent joint venture that combined LG's and Philips' CRT manufacturing businesses), SDI, SEAI, SEC, Samtel, Thai CRT and MTPD (a new entity formed by Panasonic and Toshiba with these two entities being named as separate defendants prior to the formation of MTPD in 2003). (Indirect Purchaser Plaintiffs' Consolidated Amended Complaint, 16 March 2009, pp.1, 9-29.) I understand that Plaintiffs' seek to add six additional defendants (two Thomson entities, three Mitsubishi entities, and Videocon). (Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification (hereafter "Netz Report"), p. 3.)

[2] Indirect Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009, p.55.

[3] I have been retained by LG, SDI, SEA, SEC, Philips, Hitachi, Toshiba, Panasonic, and MTPD.

Highly Confidential

some CRTs to direct purchasers during the relevant period. However, I do not assume that the alleged cartel was effective in its attempts to elevate prices to any or all direct purchasers of CRTs during the twelve-year class period. I also do not assume that any elevations in prices of CRTs to direct purchasers during the class period by the alleged cartel were passed along to indirect purchasers. Instead, I investigate whether, as an empirical matter, the impact – if any – on all indirect purchasers can be assessed using common evidence and methods.

9. A list of the information and data I relied upon in forming the opinions expressed herein is attached at Attachment 3. My opinions expressed herein are based on those materials and data, my knowledge and experience in industrial organization economics and antitrust economics, my experience in antitrust enforcement at the Department of Justice, and my experience in advising and consulting with clients on competition matters over the past 30 years, both here and abroad.

10. The opinions expressed in this report reflect the information and facts I believe to be true at the time this report is filed. I reserve the right to revise my opinions if additional information and facts supplied in discovery or through subsequent expert reports and depositions make such revisions appropriate.

11. Compass Lexecon is being compensated for my work at my usual hourly rate of $1300, which is the same rate for research and testimony. This compensation is in no way connected to the outcome of this litigation.

## II.    Summary of Conclusions

12. Given the complexities of the CRT marketplace during the class period, my overall conclusion is that common methods and evidence cannot be used to assess the impact of the alleged cartel on members of the proposed IPP class, and instead an individualized examination is required to determine whether any particular direct or indirect purchaser actually paid a cartel overcharge when purchasing a given CRT or CRT finished product. I also conclude that the methods of common proof proposed by Plaintiffs' economist Dr. Netz are unreliable as a matter of economics and cannot in this case substitute for

Highly Confidential

individualized inquiries.   I briefly summarize my more detailed conclusions below, and provide my analyses in the body of this report.

### A.  Widespread Impact on Direct Purchasers Cannot Be Established using Common Evidence

13. Dr. Netz claims that common methods and evidence can be used to establish that the alleged CRT price-fixing conspiracy impacted all or nearly all the members of the proposed IPP class.  With regard to overcharges paid by direct purchasers, this assertion rests on two claims. The first is Dr. Netz's claim that prices of CRTs exhibited a "price structure" which in her view implies that "prices for CRTs with different product configurations and sold to different customers would respond in similar ways to a price-fixing conspiracy."[4]  (The concept of such a "price structure" is not generally recognized in the economic literature.  See discussion in footnote 4.) The second claim is Dr. Netz's contention that the Defendants were successful in setting sales prices to match "target prices" established by the alleged cartel, and that the alleged cartel successfully elevated the prices for *all* CRTs sold during the twelve-year proposed class period.  Both of these contentions are untenable in light of economic analysis of the relevant evidence.

---

[4] Netz Report, p. 5. Dr. Netz offers various vague definitions for the term "price structure."  At different points in her report, she states that a price structure means that "prices are related by market forces" (*Id.*); "A price structure describes relative prices" (*Id.*, p. 65); and "I call the relationships between prices for CRTs the price structure." (*Id.*)  If by "price structure," Dr. Netz means only that there is some relationship among CRT prices or that one can calculate the relative prices between two CRT products, then the existence of a price structure for CRTs clearly would not be sufficient to demonstrate that "prices for CRTs with different product configurations and sold to different customers would respond in similar ways to a price-fixing conspiracy." (Netz Report, p. 5) More generally, the notion of such a "price structure" is not a standard concept found in the economics literature, and the establishment of a "price structure," however defined, as evidence that a class should be certified is not an approach generally accepted by economists. (Johnson, J. H., & Leonard, G. K. (2008). In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings. *Antitrust, volume 22* (no 3). pp. 108-112.) Nevertheless, for the purposes of my analysis, I assume that Dr. Netz uses the term "price structure" to mean that she believes there is some sort of inherent relationship among prices for different CRTs that would imply that "prices for CRTs with different product configurations and sold to different customers would respond in similar ways to a price-fixing conspiracy." (Netz Report, p. 5)

Highly Confidential

*Actual Pricing Data Are Wholly Inconsistent with the Existence of a Structure in Prices of CRTs and CRT Finished Products.*

14. <u>Dr. Netz's Alleged Price Structure Is Inconsistent with the Widespread CRT Price Dispersion Observed in the Data.</u>

Dr. Netz's "price structure" theory is inconsistent with the heterogeneity and diversity observed in the CRT pricing data during the class period. Specifically, an examination of the underlying price data shows that prices of CRTs did not move together. Instead, prices of CRTs moved disparately, with some prices increasing, others decreasing, and the rest remaining relatively constant. The same is also true of the prices of CRT finished products.

15. <u>CRT Price Disparity Is Attributable to Various CRT Product Features and the Various Geographic Regions in which CRTs Were Manufactured and Sold.</u>

CRTs' prices show such disparity because CRTs are widely differentiated by features such as application (TVs or computer monitors), brand, size, shape, resolution, the inclusion or exclusion of deflection yokes,[5] type of mask, electrical properties, and the extent and type of customization. CRT prices can also depend on the region in which a CRT is manufactured and the region in which it is sold. Exhibit 1A illustrates █

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████.

As explained in detail in Section III.A below, I observe substantial price variation of this kind in other months as well.

---

[5] "Deflection yoke" and other industry terms are explained later in the report.

Highly Confidential

16. Various Market Forces, Such as Competition from LCD and Plasma Technologies, Impacted Different CRT Prices Differently at Various Points during the Proposed Class Period.

Substantially different market forces influenced the prices of different CRT segments at various points during the class period.  From 2000 onward, fierce competition from LCD and plasma display technologies rapidly shrank the CRT share of the display marketplace.  This development affected color display tubes ("CDTs"), which are used in computer monitors, earlier and more strongly than color picture tubes ("CPTs"), which are used in TVs.  Thus, ███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

█████████  The growth in sales of LCD and plasma screens also affected some types of CPTs (large and flat screen CPTs) more than others.

17. Different CRT Models Experienced Significantly Different Price Movements over Time Due to the Various Powerful Market Forces

The differential impacts of various market forces on different segments of the CRT marketplace are reflected in the substantial heterogeneity in pricing movements across CRTs. For example:

 a)   In nearly every month during the class period, ████████████████████

 ████████████ (See Exhibit 2A.)

 b)   In roughly half the months during the class period, ██████████████████

 █████████████████████████████

 c)   For every CRT category, in those months during the class period in which its average prices changed the most, ████████████████████████

---

6 ████████████████████████████████████

████████████████████████████████████

████████████████████████████████

Highly Confidential

████████████████████████████████████ (See
Exhibit 3A.)

     d)     For every CRT category, in those months during the class period in which its
average prices changed the most ████████████████ *(Id.)*

18. <u>There Is Substantial Evidence of Differing CRT Price Movements across Geographic
Regions.</u>

In addition to the differentiated CRT price dynamics across and within product
categories, there is substantial evidence of diverse CRT price dynamics across geographic
regions. Marketplace conditions were different for CPTs sold in North America than for
CPTs sold in other parts of the world. LCD and plasma technologies penetrated the U.S.
marketplace earlier and faster than many other parts of the world. Greater competition
from LCDs in the U.S. would likely have reduced the impact of the putative cartel in the
U.S. relative to the rest of the world. Given these facts, it would not be surprising if
prices for CPTs sold in the U.S./North America moved differently from prices for CPTs
sold in other parts of the world. Indeed, ██████████████████████████
████████████████████████████████████████
███████████████████ (See Exhibit 9.)

19. <u>CRT Finished Products Varied in Price.</u>

CRT finished products such as TVs, monitors, and desktop PC/monitor bundles also
varied substantially in their price levels and price changes. The dispersion in price levels
can be illustrated using prices reported by named IPP class members. For example,
Plaintiff Steve Ganz purchased a 27" Toshiba CRT TV from Best Buy in May 2005 for
$329.99.  In the same month, ████████████████████████████
████████████████████████████████████████
███████████████████████[7]

---

[7] The variation in price was likely due to factors such as whether or not a TV was sold in
combination with a VCR.

Highly Confidential

20. <u>Prices of CRT Finished Products Exhibited Highly Differentiated Price Dynamics.</u>

    a)    Month-to-month changes in retail prices of individual TVs and monitors varied greatly across retailers. ███████████



                    (See Exhibit 2B.)

    b)    In a large majority of months in the class period, ███████████

    c)    For each category of finished CRT products, in those months during the class period in which its average prices changed the most, ███████████ (See Exhibit 3B.)

*The Observed Variation in CRT Price Movements Precludes the Use of a Price Structure Theory as the Basis for Establishing Antitrust Impact to All Direct and Indirect Purchasers.*

21. <u>Common Evidence Cannot Be Used to Establish that the Alleged Collusion Affected All Prices When Some Prices Increased While Others Decreased.</u>

This kind of variation in price movements makes it implausible that antitrust impact to all direct and indirect purchasers in the U.S. could be proven on the basis of a "price structure" theory. For example, between September 2003 and October 2003, 24% of retail CRT finished product prices declined by at least 5%, while about 44% of retail finished product prices increased during the same month. Suppose, hypothetically, that evidence indicated that the alleged collusion affected the pricing of those CRT finished products whose prices remained the same or increased from September 2003 to October 2003. There is no sound economic basis to assume that this same hypothesized evidence could show that the alleged collusion affected the prices of CRT finished products whose prices declined by 5% or more during this same period.

---

8 ███████████████████████████████

Highly Confidential

22. <u>Market Forces Unrelated to the Alleged Collusion Likely Affected the Pricing of CRTs whose Prices Declined.</u>

Significantly different market forces other than the hypothesized collusion must have affected the pricing of those CRTs and finished products whose prices declined during this period. None of the analyses in Dr. Netz's report demonstrate that proof that the alleged cartel impacted prices of CRT finished products whose prices increased from September 2003 to October 2003 can somehow also serve as common proof of antitrust impact with regard to CRT finished products whose prices actually *declined* during the same period. Rather, when, as here, prices of some CRTs and CRT-based products increased, some decreased, and some stayed the same over the course of the same time period, individualized inquiries and individualized evidence would be necessary to assess whether the observed prices were higher than they would have been absent the alleged collusion.[9] In particular, evidence specific to the products that experienced price declines would have to be assembled to show that their prices would have declined by even more absent the alleged collusion. Thus, individualized inquiries rather than common evidence would be needed to show class-wide impact of the alleged collusion.

23. <u>Dr. Netz's Hedonic Regression Models and Their "Results" Do Not Support the Existence of a Price Structure.</u>

Although Dr. Netz asserts that her hedonic regression analysis supports her claim that CRT prices exhibited a "structure," her hedonic regressions rely, improperly for this purpose, on the average relationships across categories of CRT products, thereby masking the differences in pricing patterns among different types of CRTs. As a result, her regressions do not demonstrate that CRT prices exhibited a "structure." On the

---

[9] See ABA Section of Antitrust Law. (2005). *Econometrics: Legal, Practical, and Technical Issues.* pp. 209-11. ("[W]hen the prices for some customers are going up while the prices of other customers are not, there is reason to doubt that the different customers (class members) are experiencing a common impact."); Godek, P. E., & Ordover, J. A. (2009). Economic Analysis in Antitrust Class Certification: Hydrogen Peroxide. *Antitrust, Fall 2009.* p. 64 (It "is not plausible to assert that one customer  was harmed by a price increase while another was harmed by a price decrease over the same period.").

Highly Confidential

contrary, in Section III.A below, I demonstrate that a properly constructed hedonic regression shows that CRT prices exhibit no such "structure," a finding that is consistent with a simple examination of the variation in CRT price changes at any given point in time during the class period. As a result, Dr. Netz presents no reliable evidence that "prices for CRTs with different product configurations and sold to different customers would respond in similar ways to a price-fixing conspiracy."[10]

*There Is No Evidence of Sustained and Effective Collusion across All CRTs Ultimately Purchased by the Proposed Class.*

███████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
███████████

25. Economic Theory Predicts that Cartels in Industries with Features Similar to those of the CRT Industry May Potentially Not Be Effective at Generally Raising Prices.

Economic theory has established that cartels in industries with certain features and conduct are less likely to be effective than cartels in industries without those features. Such characteristics include: opaque pricing (i.e., suppliers' prices are not entirely transparent to competitors) and differing degrees of vertical integration among Defendants. These features were found in the CRT industry during the relevant period.

26. The Documentary Evidence on which Dr. Netz Relies to Establish the Alleged Cartel's Success Actually Indicates that the Cartel Was Not Uniformly Successful.

The evidence strongly indicates that the alleged cartel was not uniformly effective in elevating prices. For example, ████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████
████████████████████████

---

[10] Netz Report, p. 5.

Highly Confidential

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

The documentary evidence ████████████████████████████████████

███████████████ In particular, ███████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████ [11] It is impossible validly to justify this conclusion based on her analysis. As she herself acknowledges, ██████████████████

██████████████████████████████████████████████████████

████████████████████████ [12] As a result, █████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

---

[11] ████████████████████████

[12] ████████████████████████

Highly Confidential



**B. Class-Wide Impact on Indirect Purchasers Cannot Be Established using Common Evidence**

30.

31. <u>CRT Industry Characteristics Make Uniform Pass-Through Highly Unlikely.</u>

Industry characteristics suggest such uniform pass-through is highly unlikely. As an initial matter, there is no dispute in this case that the proposed IPP class bought thousands of highly differentiated models of CRT televisions and computer monitors, with components that included thousands of different CRTs, from hundreds of different retailers, during a period of more than twelve years. Data produced by re-sellers in the instant matter indicate that re-sellers often charged different prices to different customers for the same product based on the store, date of sale, region, and promotions in place.

---

13

Highly Confidential

32. <u>Finished Product Price Levels and Price Changes Varied Greatly across Retailers,</u>
<u>Products, and Time Due to (1) the Complex and Lengthy CRT Distribution Chains and</u>
<u>(2) Various Strong Market Forces that Impacted CRT Models Differently.</u>

Not only were the price *levels* of CRT finished products differentiated across retailers,
products and time, *changes* in prices of CRT finished products were also highly
differentiated. In any given time period, the prices of most finished CRT products, like
the prices of CRTs themselves, changed substantially and very differently over the
twelve-year class period (although generally trending down). Different CRT products
were affected by different market forces and were affected by the same market forces
differently. Compounding the elements of heterogeneous dynamics, distribution chains
for CRTs were diverse and could be long and complex.  Many CRTs were sold up to five
times (including when embedded in a finished product) before reaching the end user. The
distribution chains included various types of re-sellers (bricks-and-mortar retailers,
internet retailers, commercial distributors, etc.) with varying business models.

33. <u>Dr. Netz Ignores Relevant Industry Characteristics and Uses a Flawed Regression</u>
<u>Model to Conclude Invalidly that Average Pass-Through Rates Were Uniformly Greater</u>
<u>than 100%.</u>

Despite these industry features, Dr. Netz concludes, based on a regression analysis of
prices and costs, that average pass-through rates were uniformly 100% or higher among
the varied intermediaries in the CRT distribution chains that she examined. There are
several substantial flaws in Dr. Netz's regression model, and correcting (or mitigating)
these flaws leads to a very different conclusion: that average pass-through rates were
often below the rates estimated by Dr. Netz and varied substantially across re-sellers and
manufacturers.

Highly Confidential

34. <u>Additionally, Dr. Netz's Regression Model Is Misleadingly Inapposite for Analysis of the Validity of the Proposed Class Because It Estimates an Average Pass-Through Rate for Each Firm, Rather than the Pass-Through Rates for Particular Transactions, Thus Ignoring the Substantial Variations in Pass-Through Rates across Different Products, Time Periods, and Customers.</u>

Even setting aside the flaws in her regression model, Dr. Netz's pass-through analysis is not on-point for analysis of the validity of the proposed class because it generates estimates of only the *average* pass-through rate (across all products, time periods, and customers) for each finished product manufacturer or reseller in the distribution chain. Dr. Netz's analysis provides no information about the pass-through rate for particular transactions or for the transactions that lead up to a sale to an end-user.  This is a critical shortcoming of her analysis because the data reveal that pass-through rates varied widely by manufacturer or re-seller, product, and time period, among other factors. In particular, pass-through rates were often well below the average pass-through rates estimated by Dr. Netz, and in a significant number of cases re-sellers did not pass-through cost changes at all.  As a result, estimates of the average pass-through rate provide no indication of whether the alleged overcharge on a particular product was passed-through to a particular customer, and thus do not constitute a reliable methodology for demonstrating that the alleged conspiracy had class-wide impact.

## III.   Widespread Impact on Direct Purchasers Cannot Be Established using Common Evidence



35. ███████████████████████████████████████

████████████████████████████████████████[14] This assertion rests in turn on two basic claimed propositions:

▮  ████████████████████████████████████████
████████████████████████████████████████

---

[14] ████████████

- 14 -

Highly Confidential



36. In this section,



37. Overall, it is my conclusion that a finding of impact of the alleged collusion on all (or almost all) of the members of the proposed IPP class cannot validly be established by means of common evidence and common methods.

**A. No Evidence of a "Structure" to Prices of CRTs and CRT Finished Products**

38. Dr. Netz's conclusion of common impact rests heavily on her claim that █████████ ██████████████████████████████████████████████████████████████████████████ █████████████ [18] To support this claim, Dr. Netz presents what she refers to as a "hedonic pricing analysis." Below, I demonstrate that her claim that █████████████████████ ████████ is unsupported by her hedonic price analyses or the data. First, however, I describe the salient features of the CRT marketplace, the enormous heterogeneity in

---

15 ████████

16 ███████ .

17 ████████

18 ████████████

- 15 -

Highly Confidential

CRTs and CRT finished products, and the differentiation in the market forces to which various CRTs and CRT finished products were subjected. In view of this diversity, ███

███████████████████████████████████████████████████████

███████████████   Instead, CRT and CRT finished-product price dynamics were highly differentiated during the class period.

*Widely Differentiated CRTs and CRT Finished Products Resulted in Widely Different Dynamics for Their Prices.*

39. CRTs were widely differentiated by features such as application (TVs or computer monitors), size, shape, resolution, the inclusion or exclusion of deflection yokes, type of mask, electrical properties, and the extent and type of customization. CRT prices also often varied based on the region in which the CRT was manufactured and the region in which it was sold. Finished-product prices varied widely based on the aforementioned characteristics of the CRT, as well on the type of sound system, HDTV capability, picture-in-picture capability, whether the product included a built-in VCR and/or DVD player or was bundled with a desktop PC, the retailer, the time period and a variety of other factors.

40. For example, CDTs were used solely in desktop computer monitors and CPTs were used solely in televisions. ██████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████[20]



———————————

[19] ███████████████████████████████████

[20] ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

(footnote continued …)

Highly Confidential

41. CDTs and CPTs were further differentiated along a variety of dimensions. For example, CPT pricing depended on CPT size, shape (curved or flat), and the type of "mask"[21] included in the CPT. Similarly, ███████████████████ ████████. [23]

42. A particular CRT model was not easily interchangeable with other CRT models, even those that may have shared similar basic features. Each CRT model was designed to fit the specific technical requirements of a particular finished product requested by a customer. For example, the connection points between the CRT and the external casing were specific to a given customer's finished product design. ██████████



(… footnote continued)

[21] The "shadow mask" is a finely perforated screen that ensures that an electron beam strikes the correct phosphor dot. "In a colour picture tube, it is absolutely necessary to ensure that each of the three electron beams strikes only one phosphor in each triad. For this purpose, a mask, called a shadow mask or an aperture mask, is inserted between the neck of the picture tube and the phosphor dot screen." (Bali, S. P. (1994). *Colour Television: Theory and Practice*. Delhi: Tata McGraw-Hill Publishing Company Limited. p. 83)

[22] The "frequency," also called the refresh rate, is the number of times per second the image on a display device is refreshed or restroked on the screen. (Graf, R. F. (1999). *Modern Dictionary of Electronics, 7th Edition*. Woburn, MA: Butterworth-Heinemann.)

[23] ████████████████████████████

[24] ████████████████████████████

Highly Confidential



43. ████████████████████

44. Exhibit 1A illustrates ████████████

████████ [29] Similarly, Exhibit 1B shows that ████████ ████████ The exhibit shows ████████



Highly Confidential



As seen in the exhibit,

45. The resulting dispersion in prices can be illustrated using prices reported by named IPP class member, Steve Ganz. Mr. Ganz purchased a 27-inch Toshiba CRT TV from Best Buy in May 2005 for $329.99.[31]  In the same month,

46. Prices of the various CRTs and CRT finished products also *changed* in heterogeneous ways. As illustrated in Exhibit 2A,



[31] Indirect Purchaser Plaintiffs' Consolidated Amended Complaint, 16 March 2009, p. 5.

(footnote continued ...)

Highly Confidential

47. Similarly, Exhibit 2B shows █████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████[35]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████.

49. Further evidence of ███████████████████████ in Exhibit 3A, which

shows that ██████████████████████████████████████

████████████████████████████████. For example, ██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ as illustrated in Exhibit 6.)

[34] █████████████████████████████████████████

█████████████████████████████

[35] █████████████████████████████████████████

██████████████████████████████ Exhibit 3B.)

Highly Confidential

[36] (See Exhibit 3A.)



Exhibit 3A.

Exhibit 3A.

(footnote continued …)

Highly Confidential



50.

.[39] (See Exhibit 3A.)

51.

(See Exhibit 3A.)

52. as shown in Exhibit 3B.

53. This kind of variation in price movements makes proving antitrust impact to all direct and indirect purchasers in the U.S. based on a "price structure" theory implausible. By way of an example

(… footnote continued)

[39] "Small" CPTs are defined as CPTs that are smaller than 20 inches in diameter. "Medium" CPTs are defined as CPTs between 21 and 29 inches in diameter. Large CPTs are defined as CPTs that are at least 30 inches in diameter.

Highly Confidential

None of the analyses in Dr. Netz's report demonstrate that proof of cartel impact on CRT finished products whose prices increased from September 2003 to October 2003 can somehow also serve as common proof of antitrust impact with regard to CRT finished products whose prices actually declined during the same period.

54. The heterogeneous price dynamics of CRTs and CRT finished products likely were the result of differentiated features of these products and more importantly the result of substantially different market forces that influenced the prices of different CRT product segments at various points during the class period.  From 2000 onward, fierce competition from LCD and plasma display technologies rapidly shrank the CRT share of the display market. This development affected certain types of CRTs more than others. I turn to this next.

*Substantially Different Market Forces, Such as Competition from LCD and Plasma Technologies, Influenced CRT and CRT Finished Product Prices Differently during the Alleged Class Period.*

55. ████████████████████████████████████████████████████████████
████████████████████.  Exhibit 4A shows ████████████████████████
████████████████████████████████████████████████████████████
█████████[40]████████████████████████████████████████████████
█████ Exhibit 4A shows ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ (Exhibits 4A and 4B)

_____

[40] I exclude rear-projection CRT TVs from my analyses since I understand that they are not part of the instant litigation.

Highly Confidential

56. ███████████████████████████████████████████████
██████████████████████████████████ [4] ████████████ evident in
Exhibit 4A and  Exhibit 4B show ████████████████████████████████
████████████████████████ [42].

57. ████████████████████████████████████████████
███████████████████████████████. As evident in Exhibit 5A, ███
████████████████████ [43] ████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████ (See Exhibit 5B)

58. ████████████████████████████████████████████
████, it would not be surprising to find very different dynamic price patterns for various





[43] For the purpose of my analyses, "large" CRT TVs are defined to be TVs that are at least 30" in viewable size.

Highly Confidential

segments of CRTs. Consistent with this view, my analyses of CRT pricing data demonstrate that global prices of CDTs typically fell more and earlier than prices of CPTs. Moreover,



59. █████████████████████████ illustrated in Exhibit 6. ██████
███████████████ (measured using chained Fisher Indices[46,47]) ███████████
████████████████ . As illustrated in Exhibit 6, █████████████



---

[44] See, e.g., ████████████████████████████████████

[45] ████████████████████████████████████████████████

[46] The month-to-month change in the Fisher Price Index for CPTs (for example) represents an average of the price changes for CPT models sold in both months. The price changes across months 1 and 2 are averaged in two ways – once using the month 1 sales volumes and once using the month 2 sales volumes. The change in the Fisher Price Index represents the geometric mean of the two average price changes.

[47] Fisher Indices (or more precisely, chained Fisher Indices of the type I employ) are an accurate way to track changes in average prices of CRTs over time because they remove the effect of changes in product mixes from price trends. (Diewert, W. E. (1993). The Early History of Price Index Research & Fisher Ideal Output, Input and Productivity Indexes Revisited. In W.E. Diewert and A.O. Nakamura (Eds.), *Essays in Index Number Theory, Volume I*, Elsevier Science Publishers. pp. 58, 320-330; International Labour Organization. (2004). *Consumer Price Index Manual: Theory and Practice*. International Labour Organization. pp. 6-32.)This is important because the mix of CRTs changed substantially during the class period, with the advent of higher-quality flat, wide-screened, high resolution CRTs that were introduced in response to LCD and plasma competition. Since these high-quality CRTs were priced higher than lower quality CRTs, ignoring the improvement in product quality over time would mask declines in prices for CRTs of similar quality, and hence I remove the effects of changes in product mix by using Fisher Indices.

Highly Confidential

more than the average price of CPTs.  This is consistent with the view that CDTs faced greater competition from LCDs than did CPTs.

60. Although prices of CPTs and CDTs generally trended downward during the relevant period, the month-to-month changes in CPT prices frequently differed from changes in CDT prices. As explained above in the context of Exhibit 3A,



61.

(See Exhibit 3A.)

62.

.[49] Exhibit 8 shows



Highly Confidential

███████████████████████████████████████

████████████████████████████████

██████████████████████████████████ (See

Exhibit 3A.)

███████████████████████████████████████

████████████████████████████████████████

████████████████████

*Conduct Directed at CRT Prices Outside the United States Need Not Have Elevated CRT Market Prices in the United States.*

64. In addition to ███████████████████████████████, there is

substantial evidence of ███████████████████████. ████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████

65. ████████████████████████████████████████

███████████████████████████████████[50]. ████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

(… footnote continued)

███████████████████████████████████████

[50] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Highly Confidential



66. Market conditions for CPTs in North America were indeed different from those in the rest of the world. For example,

67. A significant difference between CDTs and CPTs is that, while few CDTs were produced in North America (most of the monitor production was in Asia), a substantial volume of CPTs used in TVs sold in the U.S. was manufactured in North America. [54]

---



51

52

53

[54] See the following reports by Fuji Chimera, an analyst firm that tracks CRT sales: *Forecasts and Trends for Flat Panel Displays and Their Applications.* (2000). p. 142. Fuji Chimera Research Institute, translated by InterLingua; *Flat Panel Display Applications: Trends and Forecasts.* (2001). p. 180. Fuji Chimera Research Institute, translated by InterLingua; *Trends and Forecasts: Flat Panel Display Applications* (2002). p. 203. Fuji Chimera Research Institute, translated by InterLingua; *Flat Panel Display Applications: Trends and Forecasts.* (2004). p. 236. Fuji Chimera Research Institute, translated by InterLingua; *Flat Panel Display Applications: Trends and Forecasts.* (2005). p. 231. Fuji Chimera Research Institute, translated by InterLingua; *Trends and Forecasts: Flat Panel Display Applications.* (2006). p. 253. Fuji

(footnote continued …)

Highly Confidential



68. Given these facts, ███████████████████████████

(See Exhibit 9.)

*Dr. Netz's Hedonic Regressions Mask the True Changes in Prices.*

69. In light of the diverse patterns of price movements among different CRTs, CRT finished products, and regions, it is highly implausible that evidence that is common across the class could prove that most of the members of the proposed class were impacted by the alleged collusion over the pricing of CRTs. Rather, many individualized inquiries would be necessary to assess whether the observed prices are higher than they would have been absent the alleged collusion for the many different CRT finished products with diverse patterns of price movements over time.

70. Despite the substantial variation in product and other characteristics affecting CRT prices and the clarity of the data regarding the wide dispersion in CRT price levels and changes, Dr. Netz claims that CRT prices exhibited a "structure." Although she eschews

---

(… footnote continued)

Chimera Research Institute, translated by InterLingua; *Flat Panel Display Applications: Trends and Forecasts.* (2007). p. 226. Fuji Chimera Research Institute, translated by InterLingua."

[55] For example, ███████████████████████████

Highly Confidential

a direct test of price co-movements and structure, Dr. Netz does perform what she regards as an indirect test of price structure to support her assertion that such a structure exists. Specifically, she presents the results from a "hedonic regression" that she contends supports her view. However, her hedonic regression analysis does not support the view that CRT prices exhibit a price structure. In fact, a properly designed hedonic regression analysis demonstrates the opposite, i.e., that price movements were differentiated across various categories of CRTs.

71. Dr. Netz estimates a series of hedonic regressions using CDT and (separately) CPT data. These regressions attempt to predict CDT and CPT prices based on (i) a few product characteristics[56] of these CRTs, (ii) variables to capture time trends in prices,[57] and (iii) customer-manufacturer fixed effects ("buyer-seller dummy" variables) to reflect the impact of interactions between individual customers and manufacturers. She finds that ███

██████████████████████████████████████████████████

██████████████████████████████████████[58] which she concludes shows that "[T]here is a common pricing structure; CRT prices are largely determined by a formula based on the characteristics of the product and the period in which the transaction took place."[59]

---

[56] These characteristics are: size, aspect ratio, whether the CRT was sold with or without a deflection yoke, whether the deflection yoke (if any) was calibrated, and, in a subset of the regressions, whether the CRT was curved or flat.

[57] By including a linear time trend variable and a time squared variable in her regressions, Dr. Netz implicitly assumes that time trends affected all CDTs or CPTs in an identical fashion.

[58] ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

[59] Netz Report, p. 71.

- 30 -

Highly Confidential

72. A critical question when assessing whether impact can be established through common proof is whether a cartel-induced elevation in the price of one type of CRT would necessarily increase the price of similar CRTs. For example, if the alleged cartel were to increase the prices of 14-inch CPTs, would the prices of 21-inch CPTs (that are otherwise identical) also increase – even if the cartel did not target 21-inch CPTs? If "yes," then that would be consistent with the existence of a price structure (at least between these two types of CPTs) along the lines of what Dr. Netz appears to propose.

73. However, this question is not directly answered by Dr. Netz's hedonic regressions.[60] They report the average differential in price between various sizes of CPTs (and CDTs) during the relevant period. Consider the following hypothetical example, in which there are only two periods and two products: the price of all 14-inch CPTs increased from $50 in period 1 to $70 in period 2, whereas the price of all otherwise identical 21-inch CPTs declined from $200 in period 1 to $180 in period 2. Assuming that unit sales of each product were the same across both periods, a hedonic approach of the type used by Dr. Netz would report that 21-inch CPTs had an average premium of $130 in the two periods. This method fails to reflect the fact that the prices of the two types of CPTs moved in opposite directions between period 1 and period 2. Clearly, the fact pattern in this hypothetical would not support the claim that an increase in 14-inch CPT prices must necessarily result in an increase in 21-inch CPT prices.

74. A more direct approach to testing whether the existence of a cartel-induced elevation in the price of 14-inch CPTs would necessarily increase the price of 21-inch CPTs would examine whether the average premium commanded by 21-inch CPTs over 14-inch CPTs actually changed over time. If it did, as in the above hypothetical example, it would indicate that increases in 14-inch CPT prices do not necessarily lead to increases in 21-inch CPT prices.

---

[60] Dr. Netz relies on the proposition that her hedonic regressions explain much of the variation in CRT prices to support the notion that her hedonic regressions imply a price structure. However, as I explain later in this section, Dr. Netz's hedonic regressions are unable to explain a material amount of CRT price variation.

Highly Confidential

75. To analyze whether the average price difference between two different CRT sizes vary over time, I implemented Dr. Netz's regression (without buyer-seller dummy variables) separately for each year for which data were available and recorded the coefficients in each year for the most popular CDT and CPT sizes.[61, 62] The results, presented in Exhibit 10A and Exhibit 11A, ██████████████████████████

████████████████████████████████████████████ For example, in ███████ Exhibit 11A, ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

76. Moreover, Dr. Netz's hedonic regressions provide no support for the existence of a price structure even within a given year. If CRT prices exhibit a price structure, these regressions should show that within a given year, the price premiums for larger CRTs relative to smaller ones should be fairly similar across manufacturers. The results of this analysis are presented in the tables in Exhibit 12 and Exhibit 13. These exhibits clearly show that ██████████████████████████████████████████████████████.

---

[61] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[62] In Exhibit 10A, Exhibit 11A, Exhibit 12 and Exhibit 13, I rely on hedonic regressions without buyer-seller dummies that Dr. Netz includes in her regressions because she contends that buyer-seller interactions (captured by the buyer-seller dummies) do not have a material influence on CRT prices. ("If transaction prices were driven primarily by individual factors such as the nature of the class member or the outcome of a specific negotiating procedure between each Defendant and each direct purchaser, then I would not find a common pricing structure determined by common CRT characteristics that would explain a majority of the variation in prices." Netz Report, p. 71.) ████████████████████████████████████████████████████
████████████████████████████████████████████

Highly Confidential

 For example, 

77. Dr. Netz cites to the high R-squared statistic in her hedonic regressions (i.e., the fact that observed product characteristics included in her regressions explain a substantial portion of the variation in CRT prices) as evidence of a price structure determined mostly by a few observable product characteristics and time trends.[63] However, a relatively high R-squared in hedonic regressions is entirely consistent with individual factors such as customers' bargaining power and the process of negotiations as well as product characteristics omitted from her analysis having an important role in determining prices.

78. 

---

[63] Netz Report, pp. 68-69.

[64] 

- 33 -

Highly Confidential



79.

as seen in Exhibit 14A.

(See Exhibit 15A.)[67]

---

[65] I did this analysis without the individualized buyer-seller dummies since Dr. Netz discounts the importance of these dummies and contends that observed product characteristics alone are sufficient to reliably determine CRT price. However, including them does not qualitatively alter results.

[66] See, e.g.,



[67]

Highly Confidential

## B. No Uniform, Effective and Sustained Collusion

80.



*Economic Theory Suggests that, Contrary to Dr. Netz's View, the CRT Cartel Was Potentially Ineffective at Raising Prices of CRTs across the Proposed Class.*

81. Economic theory has established that cartels in industries with certain features and conduct are less likely to be effective than cartels in industries without those features.

---

[68] Specifically, Dr. Netz explains that "[b]ecause cartel members must be compensated for the expense and risk they incur by participation in a cartel, a cartel will set target prices above the competitive level." (Netz Report, p. 61.) However, in her deposition, Dr. Netz conceded ▮

[69] ▮

[70] ▮

[71] ▮

[72] ▮

[73] ▮

Highly Confidential

Such characteristics include opaque pricing (i.e., prices are not entirely transparent to suppliers)[74] and differing degrees of vertical integration across Defendants.[75]  These features are found in the CRT industry during the relevant period.

82. Transparency of pricing matters for cartel stability because a cartel cannot succeed if cartel members can readily gain sales by cheating on the agreement and undercutting cartel prices without inviting retaliation. Cheating is more likely to be detected and deterred if each member of the alleged cartel were able to observe prices other cartel members charged their customers. If so, members would be able to detect whether cartel participants are, in fact, complying with the agreed-upon target prices. Conversely, if prices are opaque, then cartel members are unlikely to be able to detect cheating in a timely manner. Opaque pricing is especially likely to destabilize a cartel if the market experiences frequent changes in demand, cost and technology because it would be difficult for cartel members to separate price changes and shifts in market shares due to such changes in market conditions from price changes and shifts in market shares due to cheating.[76]

83. As noted above, CRTs are extremely heterogeneous products, and CRT prices depend materially on a variety of CRT features. ████████████████████████████████

████████████████████████████████████████████████████ [77] ████████

██████████████████████████████████████████████████████ .

---

[74] See, e.g., Church, J., & Ware, R. (2000). Industrial Organization: A Strategic Approach. McGraw-Hill. p. 340.

[75] See, e.g., Carlton, D.W., & Perloff, J. M. (1999). Modern Industrial Organization, 3rd edition. Addison-Wesley. p.138.

[76] Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p. 137; Motta, M. (2004). *Competition Policy: Theory and Practice.* Cambridge University Press, p. 150; Scherer, F.M. (1980). *Industrial Market Structure and Economic Performance, 2nd edition.* Houghton Mifflin. pp. 205-206; Church, J., & Ware, R. (2000). *Industrial Organization: A Strategic Approach.* McGraw-Hill. p. 341.

[77] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Highly Confidential



84. Opaque and complex pricing are all the more likely to have eroded the effectiveness of the alleged cartel because there were major changes in the industry during the class period such as the growing competitive presence of LCD and plasma technologies.[79] Shifts in CRT market shares and price changes due to technology disruptions would be difficult to separate from share shifts due to cheating when prices are hard to know.

85. In addition to complex and opaque prices, the differing degrees of vertical integration by CRT suppliers also make it unlikely that the alleged cartel was uniformly and consistently effective in elevating prices. 



Specifically,

---



[79] The shift from analog TV to digital TV in the U.S. was another notable change in the CRT marketplace during the class period. In particular, widescreen and high definition digital CPTs differed from analog CPTs and from CPTs used to display standard definition digital broadcasts. (United States International Trade Commission. (2000). *Color Picture Tubes from Canada, Japan, Korea, and Singapore, Investigations Nos. 731-TA-367-370 (Review), Determinations and Views of the Commission.* USITC Publication No 3291. pp. 21-22.)

(footnote continued ...)

- 37 -

Highly Confidential

███████████████████████████████████

█████████████████████████████████

██████████████████

86. Economists have identified such asymmetries in vertical integration as a contributor to cartel instability.[82] The price paid by a finished product manufacturer to an affiliated CRT manufacturer (the "transfer" price) is likely to be hard to detect by other firms, and the output incentives of a vertically integrated supplier of finished products are apt to differ significantly from those of non-integrated upstream and downstream producers.[83]

87. Although the CRT industry contains features that likely eroded the effectiveness of the alleged cartel, it is also true that the CRT industry is characterized by other factors that economists have identified as facilitating collusion (for example, high entry barriers due to substantial sunk costs of setting up CRT plants[84]). Thus, whether or not the CRT cartel alleged by the IPP class was uniformly effective in elevating prices of all (or most) products and customers during the twelve-year class period is ultimately an empirical question that needs to be resolved by examining the evidence on record.

(… footnote continued)

███████████████████████████████████

[82] Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley. p.138.
[83] In particular, whereas unaffiliated finished-product manufacturers could be expected to use favorable pricing offered by one CRT manufacturer to try to convince other CRT manufacturers to offer even lower prices, an integrated finished-product manufacturer would not reveal that its upstream affiliate had cheated on the cartel agreement by lowering its transfer price.
[84] The construction of a CRT manufacturing plant required an extensive amount of time, and a high initial capital investment, and, once built, could not readily be used for uses other than CRT manufacturing. ████████████████████████████████████████████████████████████
██████████████████████████; and United States International Trade Commission *in the Matter of: Color Picture Tube from Canada, Japan, Korea, and Singapore*, supra note 79, p. 18.

Highly Confidential

*Documentary Evidence Suggests that, Contrary to Dr. Netz's View,* ███████████

███████████████████████████████████

88. In fact, the evidence strongly indicates ████████████████████

████████████████ For example, ██████████████████████



████████████████████████[85] Consistent with this, ██████████████

███████████[87]

---



[86] See Fuji Chimera reports cited in supra note 54

[87] Economists have recognized that shifting shares among alleged cartel members is a symptom of an unstable cartel. See, e.g., Grout, P., & Sonderegger, S. (2005). Predicting Cartels. *Office of Fair Trading*; Harrington, J. E. (2007). Detecting Cartels. In P. Buccirossi (Eds.), *Advances in the Economics of Competition Law*. MIT Press.

Highly Confidential

89. ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████[88]

90. This documentary evidence ███████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████

91. For example, ███████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████ ██████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████



---

[88] See, e.g., ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[89] ███████████████████████████████████████████████████████████████████████████████████████████████

Highly Confidential



*A Properly Specified Econometric Model Shows Little or No Connection between the Alleged Cartel Target Prices and Actual Prices.*



(footnote continued …)

- 41 -

Highly Confidential



(See Exhibit 16.) The R-squared statistic is a standard metric ranging from 0 to 1 that measures the share of variation in the dependent variable in the model ███████ ████████████ ) that is explained by the independent variable(s) (████████ ████████ ).[93] In the context of this analysis, ██████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████ [94, 95]

93. Moreover, target price changes do an extremely poor job of predicting changes in actual prices even on average. Specifically, as noted in Exhibit 16, ████████

(… footnote continued)

[93] Gujarati, D. N. (1995). *Basic Econometrics, 3rd edition.* McGraw Hill. pp. 74-78.
[94] See Exhibit 16 for ████

[95] ██████████

(see Exhibit 16),

Highly Confidential



. Moreover, even this slight correlation does not imply causation (i.e., the change in actual price may not be due to the change in target price) since actual and target price changes are both likely to have been affected in the same direction by common market factors, generating some positive correlation between the two series,

94.

Highly Confidential



95. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮ .[99]

▮▮▮ If actual prices followed target prices closely, I would expect most observations to be located close to the 45-degree line ▮▮▮▮▮▮▮▮▮▮▮▮▮ indicating that an actual price change was equal to the alleged applicable target price change. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮

97. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

As explained above, varying degrees of vertical integration among alleged cartel members can potentially erode the effectiveness of price cartels. The transfer price paid by an affiliated downstream finished-product manufacturer to an upstream CRT manufacturer is likely to be opaque to other CRT manufacturers, thus enabling integrated firms to deviate from cartel agreements with a relatively lower risk of detection and penalties for such cheating.

98. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ Specifically, I implemented the same econometric model as the one described above (i.e., where I assess how well month-to-

---

[99] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Highly Confidential

month changes in actual prices are predicted by target price changes), but now I do so separately for merchant and transfer CRT prices. Put differently, I inquire whether there is any difference between (a) the extent to which changes in *transfer* CRT prices are correlated with target price changes and (b) the extent to which changes in *merchant* CRT prices are correlated with target price changes.

99. If vertically integrated firms deviated more from the target prices identified by Dr. Netz when they sold CRTs to downstream affiliates than when they sold to unaffiliated customers, then we would observe a smaller correlation between transfer prices and target prices than between merchant prices and target prices.

101.    In sum, I conclude that the evidence indicates that the cartel was either ineffective or at least was not uniformly effective. Consequently, an individualized inquiry would be

---

[100] I test for significance using a two-tailed t-test at the 95% level.

Highly Confidential

required to establish whether the cartel was effective at elevating prices for specific CRT models to specific customers at specific times.

102. ████████████████████████████
████████████████████████████████████
████████████████████ I turn next to my assessment of these conclusions of Dr. Netz.

*Dr. Netz's Target Price Analysis Is Biased towards* ████████████████
████████████████████████

103. 

104.    Dr. Netz's methodology thus leads her to compare a *target* price for more basic models in a group with an average *actual* price that includes both basic and premium CRTs in that group. Because premium CRTs are likely to be priced higher than basic models, this is not an apples-to-apples comparison. Instead, it biases her average actual prices up relative to the alleged target price. As a result, even if manufacturers always set actual prices below target prices, her test could indicate that actual sales prices were close to or above target prices. Her test is therefore biased toward finding a successful cartel

---

101 ████████████████████████

102 ████████████████

Highly Confidential

simply by its construction, regardless of the extent of the alleged cartel's actual effectiveness.

*Dr. Netz's Target Price Analysis Inherently Masks Differences between Actual and Target Prices.*

105.    Moreover, the relevant question for class certification is not whether the cartel was effective in elevating prices on *average*. Instead, the pertinent issue is whether the alleged cartel succeeded in elevating prices to all or most members of the class in the U.S. during most of the relevant period for most products and whether that widespread impact across direct purchasers can be established using common evidence. Dr. Netz's target price analysis does not and cannot establish the existence of such widespread injury due to her focus on average prices.

106.



By focusing on *average* prices across all CRT models, her analysis masks considerable differences between the actual and target prices for individual CRT models.[104]



---

103

104

105

Highly Confidential



Instead of comparing *average* prices across all CRT models, I compared the actual price at which each *individual* CRT model was sold to each customer in a given month to the putative target price that Dr. Netz identified as applicable to that model, customer, and month.

108.

Highly Confidential



*Dr. Netz's Failure to Perform any Analysis of But-For Prices, at a Minimum, Leaves Open the Possibility that a Substantial Number of Class Members Were Not Injured.*

109.

110.

Highly Confidential



111.

. In fact, nothing in Dr. Netz's analyses permits the fact-finder to determine whether a particular transaction price was consistent with the target price allegedly set by the alleged cartel. There are two reasons for this.

112.   First,

113.   Second,

- 50 -

Highly Confidential



## IV.   Class-Wide Impact on Indirect Purchasers Cannot Be Established using Common Evidence

*Differentiated Pass-Through Rates along Complex Distribution Chains.*

115.   Even assuming *arguendo* that the alleged cartel had a uniform impact on the prices paid by direct purchasers of most or all CRTs during the class period, it likely would have had a uniform impact on the prices paid by end users only if the increase in CRT prices flowed through the various stages of the manufacturing and distribution chain to end users in a uniform manner. However, if pass-through rates differed across various stages of the distribution chain, various entities within the same stage of the distribution chain, and/or sales by the same entity, then end users would not have been impacted in a uniform fashion. Moreover, if some of the various entities periodically did not pass-through cost changes for some products and customers, then some (and perhaps many) end users may not have been impacted at all. As a result, individualized inquiries specific to the distribution channel, product, and time would have to be made in order to assess impact.

Highly Confidential

116. ██████████████████████████████████████
██████████████████████████████████████
████████████████████████[110]

117. ██████████████████████████████████████
████████ As an initial matter, there is no dispute in this case that the proposed IPP class
bought thousands of highly differentiated models of CRT televisions and computer
monitors, with components that included thousands of different CRTs, from hundreds of
different retailers, during a period of more than twelve years. ████████████████████
████ ████████████████████████████████████████████
████████████████████████████████████████████
█████████████

*Both Price Levels and Changes in Price Levels Were Highly Differentiated*

118. ██████████████████████████████████████


---

[110] ████████████████

[111] "Re-sellers" include not just retailers such as Costco, Best Buy, and PC Connection (an internet retailer) but also distributors such as Ingram Micro that sold primarily to business customers.

Highly Confidential

███████████████████████████████████████████████

████████████████████████

119.    Not only were the price *levels* of CRT finished products differentiated across retailers, products and time, *changes* in prices of CRT finished products were also highly differentiated.  The prices of most finished CRT products, like the prices of CRTs themselves, changed substantially and very differently over the twelve-year class period (although generally trending down). ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████    These disparate pricing patterns for CRT finished products make it unlikely that pass-through rates were uniform across all CRT finished products, retailers, customers, and time, which in turn makes it highly problematic to prove that all indirect purchasers paid an overcharge for a CRT television or monitor using class-wide rather than individualized evidence.

*The CRT Distribution Channels Were Long and Complex*

120.    Compounding the challenge, distribution chains for CRTs were diverse and could be long and complex.  Many CRTs could be sold up to five times (including when embedded in a finished product) before reaching the end user.[113] ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[112] ████████████████████████████████████████████████
████████████████████████████

[113] It is important to note that because a CRT can be sold numerous times, even if some portion of a cost change is passed-through at each stage of the distribution chain, the total pass-through from the original CRT sale to the end user may be negligible. For example, if cost changes are passed-through at a rate of 30% at each level of the distribution chain for a CRT that passes through four levels, the total pass-through rate would be $30\% \times 30\% \times 30\% \times 30\% = 0.81\%$, which is so small that concluding there was pass-through for any given transaction would be purely speculative, and detecting pass-through to end users would be unreliable.

Highly Confidential

██████████████████████ ████████████████████████

████████████████████████████████████

██████████████████████████████████████████ The complexity of distribution

channels is illustrated in Exhibit 23.

121.    Additionally, as discussed above, the distribution chains include various types of

re-sellers (bricks-and-mortar retailers, internet retailers, commercial distributors, etc.)

with varying business models. ███████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████ Given the substantial differences between the various resellers

in the CRT distribution chain, one would expect pass-through rates to be far from

uniform across CRTs and finished products, retailers, customers, and time.

*Dr. Netz's Flawed Pass-Through Regression Model Only Estimates Average Pass-Through Rates*

122.    ████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

███████████████████, Dr. Netz's pass-through analysis is fundamentally inapposite for

██████████████████████████████████████████
████████████

Highly Confidential

assessment of the proposed class since she generates estimates of only the *average* pass-through rate for each finished product manufacturer or reseller in the distribution chain – averaged across time periods, products and transactions. Dr. Netz assumes without discussion or support that the average pass-through rate that she estimates applies to all time periods, products and transactions. However, market conditions changed over time and different segments of CRTs were subject to different market conditions, as explained above. One would expect these significant variations in market conditions to have led to significantly heterogeneous pass-through rates. Indeed, as noted in pleadings by several retailers, pass-through rates may sometimes have been zero.[115]

123.    I have examined the distribution of pass-through rates for the entities analyzed by Dr. Netz, and I find that each of them responded to cost shocks in widely divergent ways, depending on the time period and product, so that the rate at which a particular entity passed-through CRT or finished product cost changes was far from uniform across products and across time. Moreover, for some entities, the pass-through rates were not positive in a significant number of instances.

124.



---

[115] Best Buy Co. Inc. et al. Complaint, ¶92, 14 November 2011; see also Trustee of the Circuit City Stores, Inc. Liquidating Trust Complaint, ¶217, 14 November 2011; Compucom Systems, Inc. et al. Complaint, ¶88, 14 November 2011; Costco Wholesale Corporation Complaint, ¶184, 14 November 2011; Electrograph Systems, Inc. et al. Complaint, ¶98, 10 March 2011; Interbond Corporation of America Complaint, ¶86, 14 November 2011; Office Depot, Inc. Complaint, ¶87, 14 November 2011; P.C. Richard & Son Long Island Corporation et al. Complaint, ¶92, 14 November 2011; Schultze Agency Services, LLC Complaint, ¶90, 14 November 2011; Target Corp. et al. Complaint, ¶106, 6 January 2012.

[116]



Highly Confidential





[120] It is possible that some of the heterogeneity in pass-through rates stems from limitations in available data ███████████████████████████. However, even if this is the case, it would imply only that it is impossible to determine from the available data whether pass-through rates are highly variable, or whether the available data are insufficient to accurately estimate pass-through rates for particular manufacturers/resellers, products, customers, and time, or both.

(footnote continued …)

- 56 -

Highly Confidential

125.  An investigation of the particular marketplace conditions that determined the pricing of this specific product would be necessary to determine whether any alleged overcharge due to the putative cartel would have been passed through to customers.

---

(… footnote continued)

This, in turn, would imply that the impact of the alleged cartel on a particular member of the proposed class cannot be determined using common evidence of the sort proposed by Dr. Netz (i.e., a regression model implemented using data produced by retailers and manufacturers).



Highly Confidential

126.     As the results presented above prove, the average pass-through rates estimated by Dr. Netz mask considerable variation in pass-through rates for a given re-seller or finished product manufacturer – including many cases in which cost changes do not appear to have been passed-through at all. As a result, it would be impossible to determine whether any alleged CRT overcharges were passed-through to a particular member of the proposed indirect purchaser class without an individualized inquiry into the pass-through rate, if any, for that particular product at each link in the distribution chain.

*Dr. Netz's Flawed Pass-Through Regression Model Fails to Control for Differences across Products and Market Changes.*

127.     Even as an estimate of the *average* pass-through rate at each re-seller, Dr. Netz's approach is flawed because she does not properly control for differences across CRT finished products and for changes in market conditions over time (factors that she acknowledges are important to address).[123] Once these flaws in her approach are addressed, the data reveal that (a) Dr. Netz over-estimates average pass-through rates, and (b) average pass-through rates significantly differed across manufacturers and resellers and across CRT finished products. I explain these issues in the rest of this section.

128.     The first flaw in Dr. Netz's approach is that she does not properly control for differences across products.  Dr. Netz' estimates of average pass-through rates rely in large part on comparing the prices and costs of different CRT finished products. ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

---

[123] In order to estimate pass-through rates, Dr. Netz relies on a regression where the dependent variable is the sales price of a particular CRT finished product at a particular point in time and the independent variables are: a small group of finished product characteristics and the cost of that product.

Highly Confidential



129.

130.

124 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

125 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

126 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, see http://jcvinc.com/ctxpl9crt19i-.html and http://www.superwarehouse.com/CTX_PR960FL_19_CRT_Monitor/PR960FL/p/-14753.

127 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Highly Confidential

█████████████████████████████████████████

████████████████ In such cases, Dr. Netz's regression analysis would over-estimate average pass-through rates because it assumes that all price differences between products that share a few characteristics are entirely attributable to the products' cost differences.[128]

131. Not only does Dr. Netz compare very different products, but she also compares CRT finished products at very different points in time. This leads to a second problem with Dr. Netz's approach to pass-through. For example, her analysis compares the prices of 27-inch CRT TVs in 1996 with their prices in 2007. CRT TV prices typically declined during the class period. Some of this decline was likely due to the fact that wholesale prices and manufacturing costs of CRT TVs declined, and such cost declines were passed on in the resale prices of the TVs. However, it is likely that some of the decline in retail prices of CRT TVs was also due to changes in consumer preferences in favor of newly emergent LCD TVs (as explained earlier), ████████████████████████████████
███████████.[129] Additionally, the decline in retail demand for CRT TVs and monitors

---

[128] In principle, it appears Dr. Netz agrees that it is important to control for differences in characteristics across CRT finished-product models: "….when observing multiple products or a product sold at multiple outlets at a single point in time, there may be differences across products and/or across outlets that may have an impact on price as well as on cost." (Netz Report, p. 116) The solution she suggests is to "include variables to control for different product characteristics to the extent possible given the data." (Netz Report, p. 115) However, her solution will not be sufficient unless the identifiable product characteristics are able to perfectly explain differences in demand between products. This is surely not the case for the data on which Dr. Netz relies because they contain only limited information on product characteristics. ███████████████
████████████████████████████████████████████
████████████████████████████

[129] ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Highly Confidential

likely would have exerted pressure on upstream suppliers to reduce the wholesale prices they charged for CRTs and CRT finished products.[130]

132.     A proper estimate of pass-through rates would separate these two sources of pricing pressure (i.e., cost reduction and demand reduction) on CRT TVs. Conflating and aggregating the two would exaggerate pass-through rates and attribute the entire decrease in retail prices to the decline in cost when, in fact, the decline in price was at least partly due to changes in consumer preferences and LCD competition. Although Dr. Netz acknowledges this issue and the need to address it,[131] she does not, in fact, attempt to control for market trends in her pass-through estimates.[132]

---

130 

131 Netz Report, p. 116. ("when observing changes in prices and costs over time, not only is the cost changing, but other factors are changing too, such as the quality of the product relative to other available products" and "if one uses time series data, one can include variables to control for changes that take place over time.")

132 

Highly Confidential

*A Properly Specified Pass-Through Regression Model Demonstrates That Pass-Through Rates Vary and Are Often below 100%.*

133.    In sum, Dr. Netz's approach has at least the potential to over-estimate pass-through rates because she compares widely different products and because she does not account for trend changes in market conditions.  I mitigate both these deficiencies and re-estimate pass-through rates. Specifically, I fully control for differences between products,[133] and I also control for the decline in the prices of products over time due to declining industry demand and the general tendency of suppliers to reduce the price of older models.[134]

134.    When additional variables to control for differences in product characteristics across CRT finished product models and differences in market conditions over time are added to Dr. Netz's pass-through regressions, the resulting estimates of average pass-through rates are often below 100% and reveal substantial heterogeneity in pass-through rates across manufacturers and re-sellers of CRT finished products.

135.    Exhibit 25A presents the estimated average pass-through rate for each manufacturer and re-seller in my analysis.[135] Evident in this table is the fact that the

---

[133] A standard econometrics methodology used when unobserved differences between products need to be controlled for in a "panel data" setting (i.e., in a dataset that has multiple products for multiple periods) is to include in the regression fixed effects (or "dummy variables") for individual products, as I do in my pass-through regressions (described in more detail in the Appendix). This does not require any additional data and ensures that demand differences between products are appropriately controlled for. See, Davis, P., & Garcés, E. (2010). *Quantitative Techniques for Competition and Antitrust Analysis*. Princeton University Press. Section 2.2.3.1.

[134] I include a time trend variable in my pass-through regressions (described in more detail in the Appendix). In her hedonic price analyses, Dr. Netz includes similar time trend variables in order to control for conditions that change over time.  (Netz Report, pp. 68-9, footnote 222.) Simply controlling for time trends in Dr. Netz's regressions and making no other change to Dr. Netz's specification (and hence not fully controlling for product characteristics) produces pass-through estimates that are qualitatively similar to those in Exhibit 25A.

[135] Exhibit 25A lists 21 entities: ███████████████████████████████████
███████████████████████████████████████████████████████████████████

(footnote continued ...)

Highly Confidential

average pass-through rate differs considerably across individual retailers and manufacturers. As further illustrated in Exhibit 26, ███████████████

███████████████████████████████

████████████ [136] The differences in the estimated average pass-through rates across manufacturers and re-sellers likely reflect differences in their business models and strategies.

136.   Uniformity in pass-through rates is even less likely if individual resellers/manufacturers do not uniformly pass-through cost increases to all (or most) of their customers, for all (or most) products and at all (or most) times. The regression results presented in Exhibit 25A only describe *average* pass-through rates for individual entities. As noted earlier, regressions such as these can mask considerable heterogeneity in pass-through decisions made by resellers and manufacturers.

137.   An example of this heterogeneity can be seen in the context of ████████ in Exhibit 27A. ██████████████████████████████████████

████████ ████████████████████████████████████

████████████████████████████████

██████████████████████████████████

(… footnote continued)

████████████        The entities I include in my pass-through analysis are nearly the same ones that were included in Dr. Netz's analysis, which makes it possible to compare the pass-through rates estimated by our respective approaches. ████████████████████████████

████████████████████████████████████

██████████

[136] Statistical significance was assessed at the 5% level.

[137] ████████████████████████████████████

████████████████████████████████████



Highly Confidential



█ Other retailers' data also indicate non-uniform pass-through rates across models.

138.    Some of the heterogeneity in pass-through rates for the various products of a given retailer or manufacturer likely stems from differences in market conditions across different product categories and from time-varying practices (such as using certain models of TVs as loss leaders at a retailer). The heterogeneity may also be due to limitations in available data (e.g., lack of information about the rebates paid or received by a retailer). In either case, pass-through rates cannot reliably be estimated using a regression-based formulaic approach that pools together all products and time periods, and further disaggregation beyond the product-level disaggregation shown in Exhibit 27A is likely necessary. Individualized inquiries would be required to determine whether a particular purchase on a particular day from a particular retailer was impacted by the alleged cartel.

*Dr. Netz's "Top-and-Bottom" Analysis of U.S. Pass-Through Rates Is Inherently Flawed for, among Other Reasons, Using Global CRT Prices.*

139.    In addition to attempting to estimate pass-through rates at a particular level of the vertical distribution chain for CRTs, Dr. Netz also attempts to estimate the overall pass-through rate from the top of the chain to the bottom. Specifically, in what she refers to as her "top-and-bottom" analysis, Dr. Netz examines the relationship between (i) a sample of U.S. online retail CRT TV prices █████████████████████████████, and (ii) the average global price of CRTs sold in the same period to TV manufacturers

---

138 ████████████████████████████████████████████
████████████████████████████████████████████.

Highly Confidential

located throughout the world. 

140.     However, Dr. Netz has no way of knowing which CRTs sold globally are used in
TVs sold in the U.S.[140] As explained in Section III.A, prices of CPTs sold to U.S.-based
customers did not move in tandem with global prices for CPTs.  Dr. Netz finds that there
is a relationship between global CPT prices and the sample of U.S. online CRT TV prices
only because of the two errors in her approach explained above.  Correcting or at least
mitigating these errors using my approach to estimating pass-through (as described
above) leads to the conclusion that there is, on average, no discernible response in U.S.
online CRT TV prices to Dr. Netz's measure of average global CPT prices.[141]  This is

---

[139]

[140] Dr. Netz also presents no evidence that the sample of online prices
is representative of all U.S. online CRT TV prices, much less all U.S. retail
CRT TV prices.

[141] The dependent variable in my regression (and in Dr. Netz's top-and-bottom regression) is the
U.S. online price for a sample of CRT TV models                    and the
independent variables are the contemporaneous average global price for CPTs of the same size,
product fixed effects, and a time trend

When compiling the dataset for her top-and-bottom regression, Dr. Netz mistakenly matches
CPTs of a given size from the Defendants' sales data with CRT TVs of the same size from the
DisplaySearch data.

(footnote continued ...)

Highly Confidential

likely due to the lack of correlation between global CPT prices and North American CPT prices, on average, and/or due to the lack of pass-through at some point in the distribution chain.

*Dr. Netz's "Top-to-Bottom" Analysis Is Also Flawed, as a Proper Regression Analysis Demonstrates.*

141.    In addition to her "top-and-bottom" pass-through estimate, Dr. Netz also provides what she terms a "top-to-bottom" pass-through estimate,



142.    Dr. Netz's top-to-bottom analysis suffers from the same flaws as the rest of her pass-through analyses. For instance, they over-estimate average pass-through rates.

(… footnote continued)



Highly Confidential

Correcting for flaws in Dr. Netz's approach to estimating average pass-through rates (described above) produces lower estimates of average pass-through rates along the distribution chain than the rates estimated by Dr. Netz.



143.

144.

---

[145]  In her top-to-bottom analysis, Dr. Netz uses somewhat different datasets than in her analysis of pass-through rates more generally.

[146]

[147]

Highly Confidential

## V.   Establishing Impact and Estimating Damages

*Dr. Netz's Proposed Methodology for Estimating the But-For Price for CRTs.*

145.    As discussed in Section III.B above, Dr. Netz does not estimate but-for CRT prices.  Consequently, there is no basis in her report from which to conclude which CRT prices – if any – were above the competitive level.  As discussed above, this is particularly true for CRT prices that were below the alleged target price, which is the case for the majority of transactions in Dr. Netz's target price analysis.



[148]

146.    Although she does not estimate but-for prices, Dr. Netz nonetheless asserts that it is possible to do so using common evidence and methods.[149]  To support this view, Dr. Netz identifies four different methods that she describes as reasonable and feasible approaches to estimating but-for CRT prices.[150]  However, Dr. Netz describes these approaches at a very general level and fails to establish that any of them are, in fact, feasible or that they could be used to obtain reliable estimates of but-for CRT prices.

*Dr. Netz's Proposed "Economic Determinants" Approach Fails Because Market Conditions Were Dramatically Different before and after the Proposed Class Period.*

147.    The first damages approach proposed by Dr. Netz (which she refers to as the "economic determinants method") uses the period prior to the class period and the period after the class period as benchmark time periods to estimate the relationship between CRT prices and their economic determinants (such as personal income and prices of related goods, raw materials, and labor costs) under competitive conditions.[151]  The

---

[148] █████████████

[149] Netz Report, p. 84.

[150] *Id.*

[151] Netz Report, pp. 85-88.

Highly Confidential

estimated relationship would be used to estimate but-for CRT prices in the class period based on economic conditions during that time.

148.    Such an approach could produce a reasonable estimate of but-for CRT prices only if CRT market conditions before the beginning of the class period (i.e., before March 1995) and after the class period (i.e., after November 2007) were similar to CRT market conditions during the class period or if any important differences in market conditions could be reflected in measurable and identifiable variables with quantified variations. Otherwise, if conditions were materially different in ways that could not be accurately reflected in the analysis, then the years before and after the class period would provide no guidance to estimating but-for prices during the class period. Despite the importance of demonstrating that this condition is satisfied before employing the "economic determinants method," Dr. Netz's report is silent on this issue.

149.    In fact, conditions were materially different between these time periods. Prior to 1995, LCD and plasma technologies were costly niche technologies, but during the class period their prices dropped dramatically and they mostly displaced CRTs. ████████████

████████████████████████████████████████████████

████████████████████████████████████████[152]   As explained earlier in this report, CRT prices sharply declined in part as a result of this competitive pressure during the class period. Given the dramatic differences in the competitive conditions in the pre-1995 period, pricing in that period does not provide a basis for estimating but-for prices in the class period, and the same is true for the period after 2007.[153]

---

[152] ████████████

[153] Dr. Netz proposes to control for changes in marketplace conditions that could affect demand for CRTs, but none of the data that she propose to use for this purpose – U.S. personal income, U.S. GDP, U.S. employment data, and a data series on "global economic activity" (Netz Report, p. 87) – would account for changes in the impact that competition from LCD and plasma technologies had on demand for CRTs.

Highly Confidential

*Dr. Netz Has Not Established that Her "Benchmark Products" Are Appropriate Benchmarks.*

150.    The second approach proposed by Dr. Netz to estimate putative antitrust overcharges relies on using benchmark *products* instead of benchmark *periods*. Specifically, Dr. Netz proposes to use VHS recorders and portable CD players as benchmarks because they "exhibit scale sensitive manufacturing, are precision electronics devices, and were replaced by alternative technologies..."[154] and because certain firms that manufactured these devices also manufactured CRTs.[155] Dr. Netz proposes to compare the profit margins that vendors earned from the sale of portable CD players and VHS recorders with the profit margins Defendants earned from the sale of CRTs; any difference in profit margins would be attributed to the impact of the alleged CRT cartel.

151.    As a threshold matter, Dr. Netz's benchmark approach assumes that Defendants' CRT operations earned higher profit margins than manufacturers of VHS recorders and portable CD players. If Defendants' CRT profit margins were, in fact, lower than the profit margins earned by most manufacturers of VHS recorders and portable CD players, then the benchmark products proposed by Dr. Netz would imply that the alleged cartel was ineffective.  Since Dr. Netz has not offered even an initial comparison of profit margins across these industries, she has failed to provide any evidence that her proposed benchmark products' profits satisfy this threshold requirement.

152.    Even if Defendants' CRT profit margins were higher than profit margins earned by most manufacturers of VHS recorders and portable CD players, the difference may have been due to many factors other than the alleged cartel. For example, empirical studies have demonstrated that the magnitude of scale economies and market structure in an industry typically influence profits in that industry.[156] In order to establish that VHS

---

[154] Netz Report, p. 90

[155] Id.

[156] "Measures of scale economies or capital requirements tend to be positively correlated with industry-level accounting profitability." Schmalensee, R. (1989). Inter-Industry Studies of

(footnote continued ...)

Highly Confidential

recorders or portable CD players could serve as a proper benchmark for CRTs, Dr. Netz would need to establish that economies of scale (among other factors) were comparable in magnitude across VHS recorders or portable CD players and CRTs.  She has not even attempted to do so.  Moreover, because Dr. Netz proposes to compare CRTs to other products that were in decline, her comparison would be highly sensitive to the precise point of each product's decline phase that she would compare as well as the rate of decline.  Comparing CRT manufacturers' profits to a point too late in the decline of VHS recorders or portable CD players could lead to an underestimate of but-for CRT profit margins.  Yet Dr. Netz offers no explanation as to how she would determine the proper comparison point. In sum, Dr. Netz has not established that VHS recorders and portable CD players, nor any other products, can serve as appropriate benchmarks.

*Dr. Netz's "Market Power" Approach Fails Because the Critical Assumption, that the Defendants Acted as a Single Firm, Cannot Be Made for the CRT Market.*

153.    The third approach proposed by Dr. Netz assumes that the Defendants obtained additional market power through the alleged collusion and involves estimating the reduction in market power each Defendant would face in the absence of such collusion. In particular, Dr. Netz proposes to measure how much lower each firm's market power would have been absent the alleged collusion by estimating how much higher its demand elasticity would have been in the but-for world. She would then translate the estimated difference in demand elasticity into a but-for price using theoretical Lerner Index relationships that by equations relate a firm's profit margin to its demand elasticity.[157]

154.    This approach hinges on the assumption that the Defendants acted as a single firm. In particular, Dr. Netz proposes to estimate the elasticity of demand facing the

---

(... footnote continued)

Structure and Performance. In R. Schmalensee and R. Willig (Eds.), *Handbook of Industrial Organization*, Elsevier. p. 978.

[157] Netz Report, p. 96.

Highly Confidential

alleged cartel based on the collective market of its alleged members.[158,159]  If the alleged cartel did not function equivalently to a single firm, the approach proposed by Dr. Netz would overstate its market power (and hence distort estimates of but-for prices).  This was explained in the very article that Dr. Netz cites in discussing her approach.

> If the cartel is able to enforce its cartel price and output allocation scheme among its members, it will behave as if it were a single large firm and the Lerner index will measure its market power. If, as is more likely, the cartel agreement is imperfectly enforced, output will tend to be greater and price lower, and the Lerner index will overstate the cartel's market power.[160]

155.    Even if the alleged cartel managed to elevate prices of some CRTs, it does not follow that it elevated prices of all CRTs to the level that a single firm controlling all of the alleged cartel members' production and prices would charge. The economics literature on coordination among competitors recognizes that even successful cartels may not achieve the joint profit maximization that Dr. Netz's proposed model assumes, for example, due to firms having imperfect or asymmetric information.[161] █████████

████████████████████████████

---

[158] *Id.* Dr. Netz also proposes to measure the Defendants' actual and but-for demand elasticities using their price-cost margins (*Id.*, p. 96-97), but the logic of this approach is completely circular. In particular, the whole purpose of estimating each Defendant's but-for demand elasticity would be to estimate its but-for price. Thus, if Dr. Netz already knew each Defendant's but-for price and cost, there would be no need to estimate its but-for demand elasticity.

[159] It is worth noting that Dr. Netz refers to the use of "market shares," but she has not offered an opinion on the relevant antitrust market(s).  To the extent that the relevant markets are narrower than a single worldwide market including all CRTs – which is highly likely given the evidence presented in Section III.A above – Dr. Netz would need to conduct her analysis separately for each relevant market.

[160] Landes, W. M., & Posner, R. A. (1981). Market Power in Antitrust Cases. *Harvard Law Review, volume 9(5)*. p. 951.

[161] See, *e.g.*, Green, E. J., & Porter, R. H. (1984). Noncooperative Collusion under Imperfect Price Information. *Econometrica*. Vol. 52, No. 1. pp. 87-100. See also Athey, S., & Bagwell, K. (2001). Optimal Collusion with Private Information. *The RAND Journal of Economics*, Vol. 32, No.3. pp. 428-465. ██████

███████████████████████

Highly Confidential

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████  Because this assumption is required for Dr. Netz's proposed approach, the approach would systematically overstate the market power of the alleged cartel and consequently would also overstate the alleged overcharge.

*Dr. Netz's "Simulated Merger" Approach Fails Because the Critical Assumption, that the Defendants Acted as a Single Firm, Cannot Be Made for the CRT Market and Because Dr. Netz Has Not Explained How She Would Construct Such a Model.*

156.     The fourth approach proposed by Dr. Netz for estimating the alleged antitrust overcharges is to construct a model of the CRT industry and then simulate the price effects of the alleged cartel by simulating a merger among all Defendants.[162] More precisely, since the IPP class alleges that Defendants acted to maximize joint profits during the class period, Dr. Netz would use her proposed approach to simulate the impact of having the Defendants act independently. As an initial matter, Dr. Netz's proposed simulation approach suffers from the same flaws as the previous approach, namely that it assumes that the alleged cartel members acted as a single, merged firm despite overwhelming evidence that Defendants more often than not deviated from the allegedly agreed upon prices.

157.     Additionally, Dr. Netz has not established that her proposed simulation approach can be implemented in the CRT context because she has not described how she would construct a model that would be consistent with material features of the CRT marketplace.  The economics literature on simulation methods has long recognized that results from these models are highly sensitive to the particulars of a marketplace, and

---

[162] Netz Report, pp. 92-96.

Highly Confidential

such models have to be carefully customized to the realities of the marketplace. These challenges are described by one economics textbook as follows:

> Merger simulation exercises rely heavily on structural assumptions about the nature of consumer demand, the nature of costs, firms' objectives and behavior, and the nature of equilibrium – the latter in the sense that differing firm objectives must be reconciled. Ensuring that their assumptions are sufficiently consistent with reality is an essential component of a well-done piece of simulation work. In particular, the choice of strategic variables and the importance of static versus dynamic effects must be evaluated so that the model incorporates the actual drivers of market outcomes. The promise of merger simulation models is not easy to deliver on within statutory time limits.[163]

158.    To take just one example of such complexity, merger simulation models are highly sensitive to assumptions about entry, exit, and product repositioning by sellers.[164] During the class period, many CRT manufacturers exited the industry because of declining demand for CRT TVs and monitors. This process of exit would likely have been accelerated if, as Plaintiffs allege, CRT prices would have had declined even faster in the but-for world than they did in the actual world. A merger simulation model would be highly sensitive to the assumptions that Dr. Netz would make about which CRT companies would have exited (or how they would have re-positioned their products), and yet she provides no discussion of how she would determine the industry structure and the timing of exit and product repositioning in the CRT but-for world. At least of equal importance to the modeling would be the treatment of the entry and expansion of the new

---

[163] Davis, P., & Garcés, E. (2010). *Quantitative Techniques for Competition and Antitrust Analysis*. Princeton University Press. pp. 434-435.

[164] The sensitivity of merger simulations to the composition of suppliers has been noted by economists. See, e.g., Leonard, G. K., & Zona, D. J. (2008). Simulation in Competitive Analysis. *Competition Law and Policy*, ABA Section of Antitrust Law, (Issue 2).  pp. 1420-1421. "Merger simulations are typically performed assuming that the products and the products' characteristics are fixed. Yet, repositioning of existing products or entry by new firms, in response to a post-merger price increase, may in part eliminate any such increase at least in the long run. In this sense, the typical merger simulation predicts the upper bound on long-run competitive effects. On the other hand, the merger may affect the entry and expansion strategies of competitors post-merger. In principle, repositioning or entry could be built into the merger simulation by specifying a more complex model, although this normally has not been done in practice to date."

Highly Confidential

LCD and plasma technologies and the firms marketing them during the pertinent time-frame. The model would have to specify when the relevant market(s) expanded to include the new technologies and what were the own-price and cross-price elasticities of demand for the different stages of competition between TVs and monitors using the old and new technologies.

159.    Despite the sensitivity of merger simulations to the model's many assumptions, Dr. Netz has not laid out any of the assumptions she would make if she were to attempt to implement such an approach.  As a result, Dr. Netz has not provided any support for the view that she would be able to construct a simulation model to reliably predict but-for prices.

160.    In sum, Dr. Netz describes her methods for estimating but-for prices at a very general level and fails to establish that any of them are, in fact, feasible or that they could be used to obtain reliable estimates of but-for CRT prices.

## VI.    Conclusion

161.    Overall, it is my conclusion that the fact of impact on all (or almost all) of the members of the proposed IPP class from the alleged collusion among the defendant CRT producers cannot be established by means of common evidence. Prices of the different CRT finished products and CRTs changed very differently from each other from month to month, quarter to quarter and over the span of the class period, and this heterogeneity was due to substantially different market forces that applied to various CRT product segments at various points during the class period. Moreover, pass-through rates were not uniform across various stages of the long and complex distribution channels and a significant fraction of cost changes may not have been passed on to end-users at all by some manufacturers and re-sellers. The substantial variation in the rate at which costs were passed through (if at all) is another reason why the substantial diversity of pricing levels and movements that is apparent from the pricing data shows that individualized inquiries would be necessary to assess whether most of the members of the proposed class were impacted by the alleged collusion.

Highly Confidential

# VII. Appendix: Data and Methods Used in Pass-Through Analyses

## A. Introduction

162.    This appendix describes the regression specifications and underlying data construction for Exhibits 25-27. Sections VII.B and VII.C describe the baseline regression model and data construction for all pass-through regression analyses. Sections VII.D through VII.G discuss the regression results, robustness checks, the regression specification used in Exhibit 27, and entities excluded from the analysis, respectively.

## B. The Baseline Regression Model

163.    In order to generate the pass-through estimates listed in Exhibit 25, a separate regression analysis was performed for each entity (retailer and manufacturer). The baseline regression specification for each entity is:

$$(1) \qquad price_{it} = \propto + \beta \; cost_{it} + \gamma \; trend_{it} + \sum_{j=2}^{N} \delta_j \; D_j + \varepsilon_{it},$$

where

a)   $price_{it}$ represents the average sale price of product $i$ in month $t$ at a given entity (e.g., a particular model of TV's average retail price ▮▮▮▮▮ in a month),

b)   $cost_{it}$ represents the average cost of product $i$ in month $t$ (either wholesale procurement price for retailers, or a measure of unit production cost for manufacturers),

c)   $trend_{it}$ is a linear time trend variable that increase by 1 each calendar month, adjusted for the product's overall price level,[165] and

---

[165] The trend variable acts as a control for general marketplace trends and the tendency of suppliers of CRT finished products to reduce the price of older models. I adjust (multiply) the trend variable for each product by the product's lifetime average price (for that retailer) because prices of more expensive products tended to decline more rapidly over time (in dollar terms) than prices of cheaper products. Thus, for example, in month 1 when the trend variable equals 1, the adjusted trend variable for a product equals the average lifetime price of that product times 1. In month 2, this variable equals twice the average lifetime price and so on. As discussed below, the results are robust to different formulations of the trend variable.

Highly Confidential

   d)   $D_j$ for $j = 2, \ldots, N$ are a series of $N$-1 dummy variables, where $D_j$ equals 1 for
        product $j = i$ and zero otherwise (product fixed effects).

   e)   Robust standard errors were used in the estimation to account for
        heteroskedasticity.

164.   The regressions are weighted by sales quantity using analytical weights (except

███████████████████████████████████████████████████████).

Specifically, product-month pairs that had higher sale quantities were given more weight
in the regression. By contrast, Dr. Netz uses frequency weights. Frequency weights are an
alternative method of assigning more weight to observations that have higher sales
quantities (by creating a duplicate observation for each unit sold in a transaction).
Frequency weights and analytical weights produce identical coefficient estimates, but
frequency weights lead to artificially lower estimates of standard errors. As a result, tests
of statistical significance are more conservative when using analytical weights.

## C. Data Construction

165.   The entities used in Exhibit 25 ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

*Overview*

████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████

█   ███████████████████████████████████████

Highly Confidential



*Data Filters*

167.    The same data preparation and filters Dr. Netz used to compile the datasets used in the analyses reported in Exhibit 34 of her report were used in my analyses reported in Exhibits 25-27.[168]

*Identifying CRT Products and Product Characteristics in the Sales Data*

168.    Most entities provided data limited mostly to products identified as CRTs and sold in the United States. Remaining non-CRT products were identified and removed based on the presence of certain keywords (e.g., LCD, Plasma, TFT) in the product description or classification fields in the data. Non-U.S. sales were identified and removed based on ship-to or bill-to address, where possible.



Highly Confidential

169.    Characteristics associated with a given product (e.g., flat screen, HDTV, VCR/TV combo) were identified based on the product description fields included in the data. When the description field is inconsistent across different records for the same model number, the most prevalent classification was used to classify the product's attributes.

*Granularity and Frequency of the Data*

170.    Exhibit 28A details the level of aggregation (e.g., transaction level, weekly or monthly average) associated with each entity's produced sales data. Prior to estimating pass-through rates, the data for each entity were aggregated by product and month; weighted average prices and costs for each product and month were calculated using the quantity sold (or procured) as weights. A product was uniquely identified by a model or item number.[169, 170]

171.    Exhibit 28A also distinguishes between what I refer to as "synchronized" and "unsynchronized" datasets. For synchronized datasets, each record in the sales data includes the (i) transaction (or monthly) price (or revenue) and quantity, and (ii) some measure of the procurement or manufacturing cost associated with the product. For unsynchronized datasets, the procurement cost data and sales data were produced in separate files. In my analysis, these files were separately aggregated by product and month and then combined.[171, 172]

---

[169] ████████████████████████████████████████████████

[170] If a particular model or item number reappeared in the data a year or more after it had been last sold, it was classified as a new product.

[171] Sales data for a particular product and month were excluded if there was no cost data for that product and month and vice versa.

[172] For unsynchronized data, the level to which Dr. Netz aggregated the procurement cost data before combining it with the sales data varied by entity. Exhibit 28A identifies the level of aggregation she employed for each unsynchronized dataset.

Highly Confidential

## D. Regression Results and Pass-through Estimates

172.    The regression coefficients, R-squared and number of observations are presented in Exhibit 25A. ███████████████████████████████████████ ████████████ ████ █████████ [174]

## E. Robustness Checks

173.    I have performed a number of robustness checks on the model specifications used for the results reported in Exhibit 25A. In each case, using the alternative specification produces qualitatively similar results:

  a)    The baseline results use monthly frequency data. I have also used data at the product-quarter (rather than product-month) level.

  b)    Data at the transactions level (rather than product-month level).

  c)    Regressions without using weights.

  d)    Regressions with frequency weights (the same weights used in Exhibit 34 of Dr. Netz's report).

  e)    In addition, the regressions were estimated with (a) a linear time trend (unadjusted for each product's average price level), (b) time (quarterly) fixed effects, and (c) scaled log of time trend.

## F. Specification for Exhibit 27

174.    A separate regression analysis was performed for each entity. The regression specification is given by:

$$(2) \qquad price_{it} = \propto \ + \ \sum_{j=1}^{N} \beta_j D_j cost_{jt} + \gamma \, trend_{it} + \sum_{j=2}^{N} \delta_j D_j + \varepsilon_{it},$$

Where

  a)    $price_{it}$ represents the average sale price of product $i$ in month $t$ (e.g., the retail price of a TV ███████ ),

---

[173] For convenience, unless otherwise noted, I use the term "statistically different from X" in this appendix to indicate that an estimate is statistically significantly different from X at the 5% confidence level.

[174] ██████████████████████████████████████████████████████ ████████████████████████████████████

Highly Confidential

b)  $cost_{it}$ represents the average cost of product $j$ in month $t$ (either wholesale price for retailers, or a measure of unit production cost for manufacturers) when $j=i$,

c)  $trend_{it}$ represents the number of calendar months since the first month for which there are observations in the data, adjusted for the product's overall price level,[175] and

d)  $D_j$ for $j = 2, …, N$ are a series of $N$-1 dummy variables, where $D_j$ equals 1 for product $j=i$ and zero otherwise (product fixed effects).

e)  Robust standard errors were used in the estimation, to account for heteroskedasticity.

175. The regressions were weighted by sales quantity using analytical weights. Specifically, product-month pairs that had larger sale quantities were given more weight in the regression. As noted in Section VII.B above, Dr. Netz uses frequency weights, which artificially lead to lower estimates of the standard errors and thus produce less conservative tests of statistical significance.

### G. Entities Excluded from Pass-Through Analyses Reported in Exhibits 24-26

176. The following entities were excluded from the analyses reported in Exhibit 24-26 for the reasons detailed below:

a)



b)

---

[175] The trend variable acts as a control for general marketplace trends and the tendency of suppliers of CRT finished products to reduce the price of older models. I multiply the trend variable for each product by the product's general price level because prices of more expensive products tended to decline more rapidly over time (in dollar terms) than prices of cheaper products. As discussed above, the results are robust to different formulations of the trend variable.

Highly Confidential

c)



---

Highly Confidential

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration was executed on the 17th day of December 2012 in Princeton, New Jersey.

Robert D. Willig

## Appendix A

## Curriculum Vitae

**Name:**          **Robert D. Willig**

**Address:**          220 Ridgeview Road, Princeton, New Jersey  08540

**Birth:**          1/16/47; Brooklyn, New York

**Marital Status:**          Married, four children

**Education:**      Ph.D.   Economics, Stanford University, 1973
                    Dissertation:  Welfare Analysis of Policies
                                        Affecting Prices and Products.
                    Advisor:  James Rosse

                    M.S.    Operations Research, Stanford University, 1968.

                    A.B.    Mathematics, Harvard University, 1967.

**Professional Positions:**

Professor of Economics and Public Affairs, Princeton University, 1978-.

Principal External Advisor, Infrastructure Program, Inter-American Development Bank, 6/97-8/98.

Deputy Assistant Attorney General, U.S. Department of Justice, 1989-1991.

Supervisor, Economics Research Department, Bell Laboratories, 1977-1978.

Visiting Lecturer (with rank of Associate Professor), Department of Economics and Woodrow Wilson School, Princeton University, 1977-78 (part time).

Economics Research Department, Bell Laboratories, 1973-77.

Lecturer, Economics Department, Stanford University, 1971-73.

**Other Professional Activities:**

ABA Section of Antitrust Law Economics Task Force, 2010-2012

Advisory Committee, Compass Lexecon 2010 -,

OECD Advisory Council for Mexican Economic Reform, 2008 -2009,

Senior Consultant, Compass Lexecon, 2008 -,

Director, Competition Policy Associates, Inc., 2003-2005

Advisory Board,  Electronic Journal of Industrial Organization and Regulation Abstracts, 1996-.

Advisory Board, Journal of Network Industries, 2004-.

Visiting Faculty Member (occasional), International Program on Privatization and Regulatory Reform, Harvard Institute for International Development, 1996-2000.

Member, National Research Council Highway Cost Allocation Study
Review Committee, 1995-98.

Member, Defense Science Board Task Force on the Antitrust Aspects of Defense Industry Consolidation, 1993-94.

Editorial Board, Utilities Policy, 1990-2001

Leif Johanson Lecturer, University of Oslo, November 1988.

Member, New Jersey Governor's Task Force on Market-Based Pricing of Electricity, 1987-89.

Co-editor, Handbook of Industrial Organization, 1984-89.

Associate Editor, Journal of Industrial Economics, 1984-89.

Director, Consultants in Industry Economics, Inc., 1983-89, 1991-94.

Fellow, Econometric Society, 1981-.

Organizing Committee, Carnegie-Mellon-N.S.F. Conference on Regulation, 1985.

Board of Editors, American Economic Review, 1980-83.

Nominating Committee, American Economic Association, 1980-1981.

- A2 -

Research Advisory Committee, American Enterprise Institute, 1980-1986.

Editorial Board, M.I.T. Press Series on Government Regulation of Economic Activity, 1979-93.
Program Committee, 1980 World Congress of the Econometric Society.

Program Committee, Econometric Society, 1979, 1981, 1985.

Organizer, American Economic Association Meetings: 1980, 1982.

American Bar Association Section 7 Clayton Act Committee, 1981.

Principal Investigator, NSF grant SOC79-0327, 1979-80; NSF grant 285-6041, 1980-82; NSF grant SES-8038866, 1983-84, 1985-86.

Aspen Task Force on the Future of the Postal Service, 1978-80.

Organizing Committee of Sixth Annual Telecommunications Policy Research Conference, 1977-78.

Visiting Fellow, University of Warwick, July 1977.

Institute for Mathematical Studies in the Social Sciences, Stanford University, 1975.


**Published Articles and Book Chapters**:

"Competition and innovation-driven inclusive growth" (with Mark Dutz, Ioannis Kessides and Stephen O'Connell), in Promoting Inclusive Growth: Challenges and Policies,  Luiz de Mello and Mark Dutz (eds.),  OECD, 2011.

"Unilateral Competitive Effects of Mergers: Upward Pricing Pressure, Product Quality, and Other Extensions," Review of Industrial Organization  (2011) 39:19–38.

"Antitrust and Patent Settlements: The Pharmaceutical Cases," (with John Bigelow) in The Antitrust Revolution (Fifth Edition), John Kwoka and Lawrence White (eds.), 2009.

 "The 1982 Department of Justice Merger Guidelines: An Economic Assessment," (with J. Ordover) reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro)  reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

 "Consumer's Surplus Without Apology," reprinted in Applied Welfare Economics, Richard Just, Darrel Hueth and Andrew Schmitz (eds.), Edward Elgar, 2008; reprinted in  Readings in

- A3 -

Social Welfare: Theory and Policy, Robert E. Kuenne (ed.), Blackwell, 2000, pp. 86-97; reprinted in Readings in Microeconomic Theory, M. M. La Manna (ed.), Dryden Press, 1997, pp. 201-212.

"The Risk of Contagion from Multi-Market Contact," (with Charles Thomas), The International Journal of Industrial Organization, Vol. 24, Issue 6 (Nov. 2006), pp 1157 – 1184.

"Pareto-Superior Nonlinear Outlay Schedules," reprinted in The Economics of Public Utilities, Ray Rees (ed.), Edward Elgar, 2006; reprinted in The Economics of Price Discrimination, G. Norman, (ed.), Edward Elgar, 1999.

"Economic Effects of Antidumping Policy," reprinted in The WTO and Anti-Dumping, Douglas Nelson (ed.), Edward Elgar, 2005.

"Merger Analysis, Industrial Organization Theory and the Merger Guidelines," reprinted in Antitrust and Competition Policy, Andrew Kleit (ed.) Edward Elgar, 2005

"Antitrust Policy Towards Agreements That Settle Patent Litigation," (with John Bigelow), Antitrust Bulletin, Fall 2004, pp. 655-698.

"Economies of Scope," (with John Panzar), reprinted in The Economics of Business Strategy, John Kay (ed.), Edward Elgar, 2003.

"Panel on Substantive Standards for Mergers and the Role of Efficiencies," in International Antitrust Law & Policy, Barry E. Hawk (ed.), Juris Publishing, 2003.

"Practical Rules for Pricing Access in Telecommunications," (with J. Ordover) in Second Generation Reforms in Infrastructure Services , F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

"Comments on Antitrust Policy in the Clinton Administration," in American Economic Policy in the 1990s, J. Frankel and P. Orszag (eds.), MIT Press, 2002.

"Entrepreneurship, Access Policy and Economic Development: Lessons from Industrial Organization," (with M. Dutz and J. Ordover), European Economic Review, (44)4-6 (2000), pp. 739-747.

"Public Versus Regulated Private Enterprise," reprinted in Privatization in Developing Countries, P. Cook and C. Kirkpatrick (eds.), Edward Elgar, 2000.

"Deregulation v. the Legal Culture: Panel Discussion," in Is the Telecommunications Act of 1996 Broken?, G. Sidak (ed.), AEI Press, 1999.

"Economic Principles to Guide Post-Privatization Governance," in <u>Can Privatization Deliver?</u> <u>Infrastructure for Latin America</u>, R. Willig co-editor, Johns Hopkins Press, 1999.

"Access and Bundling in High-Technology Markets," (with J. A. Ordover), in <u>Competition,</u> <u>Innovation and the Microsoft Monopoly: Antitrust in the Digital Marketplace</u>, J. A. Eisenach and T. Lenard (eds.), Kluwer, 1999.

"Competitive Rail Regulation Rules: Should Price Ceilings Constrain Final Products or Inputs?," (With W. J. Baumol),  <u>Journal of Transport Economics and Policy</u>, Vol. 33, Part 1, pp. 1-11.

"Economic Effects of Antidumping Policy," <u>Brookings Trade Forum: 1998</u>, 19-41.

"Interview With Economist Robert D. Willig," <u>Antitrust</u> , Vol. 11, No. 2, Spring 1997, pp.11-15.

"Parity Pricing and its Critics: A Necessary Condition for Efficiency in Provision of Bottleneck Services to Competitors," (with W. J. Baumol and J. A. Ordover), <u>Yale Journal on Regulation,</u> Vol. 14, No. 1, Winter 1997, pp. 145-164.

"Restructuring Regulation of the Rail Industry,"  (with Ioannis Kessides), in <u>Private Sector,</u> Quarterly No. 4, September 1995, pp. 5 - 8.  Reprinted in  <u>Viewpoint,</u> October, 1995, The World Bank.  Reprinted in <u>Private Sector, *special edition*: Infrastructure</u>, June 1996.

"Competition and Regulation in the Railroad Industry," (with Ioannis Kessides), in <u>Regulatory</u> <u>Policies and Reform: A Comparative Perspective,</u> C. Frischtak (ed.), World Bank, 1996.

"Economic Rationales for the Scope of Privatization," (with Carl Shapiro), reprinted in <u>The</u> <u>Political Economy of Privatization and Deregulation</u>, E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 95-130.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), reprinted in <u>The Political Economy of Privatization and</u> <u>Deregulation,</u> E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 245-260.

"Economists' View: The Department of Justice Draft Guidelines for the Licensing and Acquisition of Intellectual Property," (with J. Ordover), <u>Antitrust</u>, V. 9, No. 2 (spring 1995), 29-36.

"Public Versus Regulated Private Enterprise," in <u>Proceedings of the World Bank Annual</u> <u>Conference on Development Economics 1993</u>, L. Summers (ed.), The World Bank, 1994.

"Economics and the 1992 Merger Guidelines: A Brief Survey," (with J. Ordover), <u>Review of</u> <u>Industrial Organization</u>, V. 8, No. 2, (1993), pp. 139-150.

- A5 -

"The Role of Sunk Costs in the 1992 Guidelines' Entry Analysis," Antitrust, V. 6, No. 3 (summer 1992).

"Antitrust Lessons from the Airlines Industry:  The DOJ Experience," Antitrust Law Journal, V. 60, No. 2 (1992).

"William J. Baumol," (with E. E. Bailey), in New Horizons in Economic Thought:  Appraisals of Leading Economists, W. J. Samuels (ed.), Edward Elgar, 1992.

"Anti-Monopoly Policies and Institutions," in The Emergence of Market Economies in Eastern Europe, Christopher Clague and Gordon Rausser (eds.), Basil Blackwell, 1992.

"Economics and the 1992 Merger Guidelines," (with Janusz Ordover), in Collaborations Among Competitors:  Antitrust Policy and Economics, Eleanor Fox and James Halverson (eds.), American Bar Association, 1992.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro), reprinted in Collaborations Among Competitors:  Antitrust Policy and Economics, Eleanor Fox and James Halverson (eds), American Bar Association, 1992.

"Merger Analysis, Industrial Organization Theory, and Merger Guidelines," Brookings Papers on Economic Activity -- Microeconomics 1991, pp. 281-332.

"On the Antitrust Treatment of Production Joint Ventures," (with C. Shapiro), Journal of Economic Perspectives, Vol. 4, No. 3, Summer 1990, pp. 113-130.

 "Economic Rationales for the Scope of Privatization," (with Carl Shapiro), in The Political Economy of Public Sector Reform and Privatization, E.N. Suleiman and J. Waterbury (eds.), Westview Press, Inc., 1990, pp. 55-87.

"Contestable Market Theory and Regulatory Reform," in Telecommunications Deregulation: Market Power and Cost Allocation, J.R. Allison and D.L. Thomas (eds.), Ballinger, 1990.

"Address To The Section," Antitrust Law Section Symposium, New York State Bar Association, 1990.

"Price Caps:  A Rational Means to Protect Telecommunications Consumers and Competition," (with W. Baumol), Review of Business, Vol. 10, No. 4, Spring 1989, pp. 3-8.

"U.S.-Japanese VER:  A Case Study from a Competition Policy Perspective," (with M. Dutz) in The Costs of Restricting Imports, The Automobile Industry.  OECD, 1988.

"Contestable Markets," in The New Palgrave:  A Dictionary of Economics, J. Eatwell, M. Milgate, and P. Newman (eds.), 1987.

"Do Entry Conditions Vary Across Markets:  Comments," <u>Brookings Papers on Economic Activity</u>, 3 - 1987, pp. 872-877.

"Railroad Deregulation:  Using Competition as a Guide," (with W. Baumol), <u>Regulation</u>, January/February 1987, Vol. 11, No. 1, pp. 28-36.

"How Arbitrary is 'Arbitrary'? - or, Toward the Deserved Demise of Full Cost Allocation," (with W. Baumol and M. Koehn), <u>Public Utilities Fortnightly</u>, September 1987, Vol. 120, No. 5, pp. 16-22.

"Contestability:  Developments Since the Book," (with W. Baumol), <u>Oxford Economic Papers</u>, December 1986, pp. 9-36.

"The Changing Economic Environment in Telecommunications:  Technological Change and Deregulation," in <u>Proceedings from the Telecommunications Deregulation Forum</u>; Karl Eller Center; 1986.

"Perspectives on Mergers and World Competition," (with J. Ordover), in  <u>Antitrust and Regulation</u>, R.E. Grieson (ed.), Lexington, 1986.

"On the Theory of Perfectly Contestable Markets," (with J. Panzar and W. Baumol), in <u>New Developments in The Analysis of Market Structure</u>, J. Stiglitz and F. Mathewson (eds.), MIT Press, 1986.

"InterLATA Capacity Growth and Market Competition," (with C. Shapiro), in <u>Telecommunications and Equity:  Policy Research Issues</u>, J. Miller (ed.), North Holland, 1986.

"Corporate Governance and Market Structure," in <u>Economic Policy in Theory and Practice</u>, A. Razin and E. Sadka (eds.), Macmillan Press, 1986.

"Antitrust for High-Technology Industries:  Assessing Research Joint Ventures and Mergers," (with J. Ordover), <u>Journal of Law and Economics</u>, Vol 28(2), May 1985, pp. 311-334.

"Non-Price Anticompetitive Behavior by Dominant Firms Toward the Producers of Complementary Products," (with J. Ordover and A. Sykes), in <u>Antitrust and Regulation</u>, F.M. Fisher (ed.), MIT Press, 1985.

"Telephones and Computers:  The Costs of Artificial Separation," (with W. Baumol), <u>Regulation</u>, March/April 1985.

"Transfer Principles in Income Redistribution," (with P. Fishburn), <u>Journal of Public Economics</u>, 25 (1984), pp. 1-6.

"Market Structure and Government Intervention in Access Markets," in <u>Telecommunications Access and Public Policy</u>, A. Baughcam and G. Faulhaber (eds.), 1984.

"Pricing Issues in the Deregulation of Railroad Rates," (with W. Baumol), in <u>Economic Analysis of Regulated Markets: European and U. S. Perspectives,</u> J. Finsinger (ed.), 1983.

"Local Telephone Pricing in a Competitive Environment," (with J. Ordover), in <u>Telecommunications Regulation Today and Tomorrow</u>, E. Noam (ed.), Harcourt Brace Jovanovich, 1983.

"Economics and Postal Pricing Policy," (with B. Owen), in <u>The Future of the Postal Service</u>, J. Fleishman (ed.), Praeger, 1983.

"Selected Aspects of the Welfare Economics of Postal Pricing," in <u>Telecommunications Policy Annual</u>, Praeger, 1987.

"The Case for Freeing AT&T" (with M. Katz), <u>Regulation</u>, July-Aug. 1983, pp. 43-52.

"Predatory Systems Rivalry: A Reply" (with J. Ordover and A. Sykes), <u>Columbia Law Review</u>, Vol. 83, June 1983, pp. 1150-1166.  Reprinted in <u>Corporate Counsel's Handbook - 1984</u>.

"Sector Differentiated Capital Taxation with Imperfect Competition and Interindustry Flows," <u>Journal of Public Economics</u>, Vol. 21, 1983.

"Contestable Markets: An Uprising in the Theory of Industry Structure: Reply," (with W.J. Baumol and J.C. Panzar), <u>American Economic Review</u>, Vol. 73, No. 3, June 1983, pp. 491-496.

"The 1982 Department of Justice Merger Guidelines: An Economic Assessment," (with J. Ordover), <u>California Law Review</u>, Vol. 71, No. 2, March 1983, pp. 535-574.  Reprinted in <u>Antitrust Policy in Transition: The Convergence of Law and Economics</u>, E.M. Fox and J.T. Halverson (eds.), 1984.

"Intertemporal Failures of the Invisible Hand: Theory and Implications for International Market Dominance," (with W.J. Baumol), <u>Indian Economic Review</u>, Vol. XVI, Nos. 1 and 2, January-June 1981, pp. 1-12.

"Unfair International Trade Practices," (with J. Ordover and A. Sykes), <u>Journal of International Law and Politics</u>, Vol. 15, No. 2, winter 1983, pp. 323-337.

"Journals as Shared Goods: Reply," (with J. Ordover), <u>American Economic Review</u>, V. 72, No. 3, June 1982, pp. 603-607.

"Herfindahl Concentration, Rivalry, and Mergers," (with J. Ordover and A. Sykes), <u>Harvard Law Review</u>, V. 95, No. 8, June 1982, pp. 1857-1875.

"An Economic Definition of Predation: Pricing and Product Innovation," (with J. Ordover), <u>Yale Law Journal</u>, Vol. 90: 473, December 1981, pp. 1-44.

"Fixed Costs, Sunk Costs, Entry Barriers, and the Sustainability of Monopoly," (with W. Baumol), Quarterly Journal of Economics, Vol. 96, No. 3, August 1981, pp. 405-432.

"Social Welfare Dominance," American Economic Review, Vol. 71, No. 2, May 1981, pp. 200-204.

"Economies of Scope," (with J. Panzar), American Economic Review, Vol. 72, No. 2, May 1981, pp. 268-272.

"Income-Distribution Concerns in Regulatory Policymaking," (with E.E. Bailey) in Studies in Public Regulation (G. Fromm, ed.), MIT Press, Cambridge, 1981, pp. 79-118.

"An Economic Definition of Predatory Product Innovation," (with J. Ordover), in Strategic Predation and Antitrust Analysis, S. Salop (ed.), 1981.

"What Can Markets Control?" in Perspectives on Postal Service Issues, R. Sherman (ed.), American Enterprise Institute, 1980.

"Pricing Decisions and the Regulatory Process," in Proceedings of the 1979 Rate Symposium on Problems of Regulated Industries, University of Missouri-Columbia Extension Publications, 1980, pp. 379-388.

"The Theory of Network Access Pricing," in Issues in Public Utility Regulation, H.M. Trebing (ed.), MSU Public Utilities Papers, 1979.

"Customer Equity and Local Measured Service," in Perspectives on Local Measured Service, J. Baude, etal. (ed.), 1979, pp. 71-80.

"The Role of Information in Designing Social Policy Towards Externalities," (with J. Ordover), Journal of Public Economics, V. 12, 1979, pp. 271-299.

"Economies of Scale and the Profitability of Marginal-Cost Pricing: Reply," (with J. Panzar), Quarterly Journal of Economics, Vol. 93, No. 4, Novmber 1979, pp. 743-4.

"Theoretical Determinants of the Industrial Demand for Electricity by Time of Day," (with J. Panzar) Journal of Econometrics, V. 9, 1979, pp. 193-207.

"Industry Performance Gradient Indexes," (with R. Dansby), American Economic Review, V. 69, No. 3, June 1979, pp. 249-260.

"The Economic Gradient Method," (with E. Bailey), American Economic Review, Vol. 69, No. 2, May 1979, pp. 96-101.

"Multiproduct Technology and Market Structure," American Economic Review, Vol. 69, No. 2,

May 1979, pp. 346-351.

"Consumer's Surplus Without Apology: Reply," American Economic Review, Vol.     69, No. 3, June 1979, pp. 469-474.

"Decisions with Estimation Uncertainty," (with R. Klein, D. Sibley, and L. Rafsky), Econometrica, V. 46, No. 6, November 1978, pp. 1363-1388.

"Incremental Consumer's Surplus and Hedonic Price Adjustment," Journal of Economic Theory, V. 17, No. 2, April 1978, pp. 227-253.

"Recent Theoretical Developments in Financial Theory: Discussion, "The Journal of Finance, V. 33, No. 3, June 1978, pp. 792-794.

"The Optimal Provision of Journals Qua Sometimes Shared Goods," (with J. Ordover), American Economic Review, V. 68, No. 3, June 1978, pp. 324-338.

"On the Comparative Statics of a Competitive Industry With Infra-marginal Firms," (with J. Panzar), American Economic Review, V. 68, No. 3, June 1978, pp. 474-478.

"Pareto Superior Nonlinear Outlay Schedules," Bell Journal of Economics, Vol. 9, No. 1, Spring 1978, pp. 56-69.

"Predatoriness and Discriminatory Pricing," in The Economics of Anti-Trust: Course of Study Materials, American Law Institute-American Bar Association, 1978.

"Economies of Scale in Multi-Output Production," (with J. Panzar), Quarterly Journal of Economics, V. 91, No. 3, August 1977, pp. 481-494.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), American Economic Review, V. 67, No. 3, June 1977, pp. 350-365.

"Free Entry and the Sustainability of Natural Monopoly," (with J. Panzar), Bell Journal of Economics, Spring 1977, pp. 1-22.

"Risk Invariance and Ordinally Additive Utility Functions," Econometrica, V. 45, No. 3, April 1977, pp. 621-640.

"Ramsey-Optimal Pricing of Long Distance Telephone Services," (with E. Bailey), in Pricing in Regulated Industries, Theory and Application, J. Wenders (ed.), Mountain State Telephone and Telegraph Co., 1977, pp. 68-97.

"Network Externalities and Optimal Telecommunications Pricing: A Preliminary Sketch," (with R. Klein), in Proceedings of Fifth Annual Telecommunications Policy Research Conference,

Volume II, NTIS, 1977, pp. 475-505.

"Otsenka ekonomicheskoi effektivnosti proizvodstvennoi informatsii" ["The Evaluation of the Economic Benefits of Productive Information"] in Doklady Sovetskikh i Amerikanskikh Spetsialistov Predstavlennye na Pervyi Sovetsko-Amerikanskii Simpozium po Ekonomicheskoi Effektivnosti Informat sionnogo Obsluzhivaniia [Papers of Soviet and American Specialists Presented at the First Soviet- American Symposium on Costs and Benefits of Information Services], All Soviet Scientific Technical Information Center, Moscow, 1976.

"Vindication of a 'Common Mistake' in Welfare Economics," (with J. Panzar), Journal of Political Economy, V. 84, No. 6, December 1976, pp. 1361-1364.

"Consumer's Surplus Without Apology," American Economic Review, V. 66, No. 4, September 1976, pp. 589-597.


**Books**

Second Generation Reforms in Infrastructure Services, F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

Can Privatization Deliver? Infrastructure for Latin America, R. Willig co-editor, Johns Hopkins Press, 1999.

Handbook of Industrial Organization, (edited with R. Schmalensee), North Holland Press, Volumes 1 and 2, 1989.

Contestable Markets and the Theory of Industry Structure, (with W.J. Baumol and J.C. Panzar), Harcourt Brace Jovanovich, 1982. Second Edition, 1989.

Welfare Analysis of Policies Affecting Prices and Products, Garland Press, 1980.


**Unpublished Papers and Reports**:

"Airline Network Effects, Competition and Consumer Welfare" (with Bryan Keating, Mark Israel and Daniel Rubinfeld), working paper, 2011.

"Public Comments on the 2010 Draft Horizontal Merger Guidelines," paper posted to Federal Trade Commission website, 6/4/2010

"The Consumer Benefits from Broadband Connectivity to U.S. Households," (with Mark Dutz and Jon Orszag), submitted for publication.

"An Econometric Analysis of the Matching Between Football Student-Athletes and Colleges,"

(with Yair Eilat, Bryan Keating and Jon Orszag), submitted for publication.

Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington, (co-authored), AEI-Brookings Joint Center Brief No. 07-02, 12/2/07

"(Allegedly) Monopolizing Tying Via Product Innovation," statement before the Department of Justice/Federal Trade Commission Section 2 Hearings, November 1, 2006.

 "Assessment of U.S. Merger Enforcement Policy," statement before the Antitrust Modernization Commission, 11/17/05.

"Investment is Appropriately Stimulated by TELRIC," in Pricing Based on Economic Cost, 12/2003.

"Brief of Amici Curiae Economics Professors, re Verizon v. Trinko, In the Supreme Court of the U.S.," (with W.J. Baumol, J.O. Ordover and F.R. Warren-Boulton), 7/25/2003.

"Stimulating Investment and the Telecommunications Act of 1996," (with J. Bigelow, W. Lehr and S. Levinson), 2002.

 "An Economic Analysis of Spectrum Allocation and Advanced Wireless Services," (with Martin N. Baily, Peter R. Orszag, and Jonathan M. Orszag), 2002

 "Effective Deregulation of Residential Electric Service," 2001

"Anticompetitive Forced Rail Access," (with W. J. Baumol), 2000

"The Scope of Competition in Telecommunications" (with B. Douglas Bernheim), 1998

"Why Do Christie and Schultz Infer Collusion From Their Data? (with Alan Kleidon), 1995.

"Demonopolization," (with Sally Van Siclen), OECD Vienna Seminar Paper, 1993.

"Economic Analysis of Section 337: The Balance Between Intellectual Property Protection and Protectionism," (with J. Ordover) 1990.

"The Effects of Capped NTS Charges on Long Distance Competition," (with  M. Katz).

"Discussion of Regulatory Mechanism Design in the Presence of Research Innovation, and Spillover Effects," 1987.

"Industry Economic Analysis in the Legal Arena," 1987.

"Deregulation of Long Distance Telephone Services: A Public Interest Assessment," (with

M. Katz).

"Competition-Related Trade Issues," report prepared for OECD.

"Herfindahl Concentration Index," (with J. Ordover), Memorandum for ABA Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, March 1981.

"Market Power and Market Definition," (with J. Ordover), Memorandum for ABA  Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, May 1981.

"The Continuing Need for and National Benefits Derived from the REA Telephone Loan Programs - An Economic Assessment," 1981.

"The Economics of Equipment Leasing:  Costing and Pricing," 1980.

"Rail Deregulation and the Financial Problems of the U.S. Railroad Industry," (with W.J. Baumol), report prepared under contract to Conrail, 1979.

"Price Indexes and Intertemporal Welfare," Bell Laboratories Economics Discussion Paper, 1974.

"Consumer's Surplus:  A Rigorous Cookbook," Technical Report #98, Economics Series, I.M.S.S.S., Stanford University, l973.

"An Economic-Demographic Model of the Housing Sector," (with B. Hickman and M. Hinz), Center for Research in Economic Growth, Stanford University, 1973.


**Invited Conference Presentations**:

Georgetown Center for Business and Public Policy, Conference on the Evolution of Regulation
                    "Reflections on Regulation"                                        2011

Antitrust Forum, New York State Bar Association
                    "Upward Price Pressure, Market Definition and Supply Mobility"      2011

American  Bar Association, Antitrust Section, Annual Convention
                    "The New Merger Guidelines' Analytic Highlights"                    2011

OECD and World Bank Conference on Challenges and Policies for Promoting Inclusive Growth
                    "Inclusive Growth From Competition and Innovation"                  2011

Villanova School of Business Executive MBA Conference
                    "Airline Network Effects, Competition and Consumer Welfare"          2011


- A13 -

NYU School of Law Conference on Critical Directions in Antitrust
      "Unilateral Competitive Effects"                                2010

Conf. on the State of European Competition Law and Enforcement in a Transatlantic Context
      "Recent Developments in Merger Control"               2010

Center on Regulation and Competition, Universidad de Chile Law School
      "Economic Regulation and the Limits of Antitrust Law"     2010

Center on Regulation and Competition, Universidad de Chile Law School
      "Merger Policy and Guidelines Revision"                2010

Faculty of Economics, Universidad de Chile
      "Network Effects in Airlines Markets"                 2010

Georgetown Law Global Antitrust Enforcement Symposium
      "New US Merger Guidelines"                         2010

FTI London Financial Services Conference
      "Competition and Regulatory Reform"                 2010

NY State Bar Association Annual Antitrust Conference
      "New Media Competition Policy"                    2009

Antitrust Law Spring Meeting of the ABA
      "Antitrust and the Failing Economy Defense"         2009

Georgetown Law Global Antitrust Enforcement Symposium
      "Mergers: New Enforcement Attitudes in a Time of Economic Challenge"  2009

Phoenix Center US Telecoms Symposium
      "Assessment of Competition in the Wireless Industry"     2009

FTC and DOJ Horizontal Merger Guidelines Workshop
      "Direct Evidence is No Magic Bullet"                 2009

Northwestern Law Research Symposium: Antitrust Economics and Competition Policy
      "Discussion of Antitrust Evaluation of Horizontal Mergers"    2008

Inside Counsel Super-Conference
      "Navigating Mixed Signals under Section 2 of the Sherman Act"   2008

Federal Trade Commission Workshop on Unilateral Effects in Mergers
      "Best Evidence and Market Definition"                2008

European Policy Forum, Rules for Growth: Telecommunications Regulatory Reform
          "What Kind of Regulation For Business Services?"        2007

Japanese Competition Policy Research Center, Symposium on M&A and Competition Policy
          "Merger Policy Going Forward With Economics and the Economy"    2007

Federal Trade Commission and Department of Justice Section 2 Hearings
          "Section 2 Policy and Economic Analytic Methodologies"      2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE
          "The Economics of Resale Price Maintenance and Class Certification"   2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE
          "Antitrust Class Certification – An Economist's Perspective"     2007

Fordham Competition Law Institute, International  Competition Economics Training Seminar
          "Monopolization and Abuse of Dominance"          2007

Canadian Bar Association Annual Fall Conference on Competition Law
          "Economic Tools for the Competition Lawyer"        2007

Conference on Managing Litigation and Business Risk in Multi-jurisdiction Antitrust Matters
          "Economic Analysis in Multi-jurisdictional Merger Control"    2007

World Bank Conference on Structuring Regulatory Frameworks for Dynamic and Competitive
South Eastern European Markets
          "The Roles of Government Regulation in a Dynamic Economy"   2006

Department of Justice/Federal Trade Commission Section 2 Hearings
          "(Allegedly) Monopolizing Tying Via Product Innovation"     2006

Fordham Competition Law Institute,  Competition Law Seminar
          "Monopolization and Abuse of Dominance"          2006

Practicing Law Institute on Intellectual Property Antitrust
          "Relevant Markets for Intellectual Property Antitrust"      2006

PLI Annual Antitrust Law Institute
          "Cutting Edge Issues in Economics"           2006

World Bank's Knowledge Economy Forum V
          "Innovation, Growth and Competition"          2006

Charles University Seminar Series
          "The Dangers of Over-Ambitious Antitrust Regulation"      2006

NY State Bar Association Antitrust Law Section Annual Meeting
    "Efficient Integration or Illegal Monopolization?"       2006

World Bank Seminar
    "The Dangers of Over-Ambitious Regulation"       2005

ABA Section of Antitrust Law 2005 Fall Forum
    "Is There a Gap Between the Guidelines and Agency Practice?"       2005

Hearing of Antitrust Modernization Commission
    "Assessment of U.S. Merger Enforcement Policy"       2005

LEAR Conference on Advances in the Economics of Competition Law
    "Exclusionary Pricing Practices"       2005

Annual Antitrust Law Institute
    "Cutting Edge Issues in Economics"       2005

PRIOR Symposium on States and Stem Cells
    "Assessing the Economics of State Stem Cell Programs"       2005

ABA Section of Antitrust Law – AALS Scholars Showcase
    "Distinguishing Anticompetitive Conduct"       2005

Allied Social Science Associations National Convention
    "Antitrust in the New Economy"       2005

ABA Section of Antitrust Law 2004 Fall Forum
    "Advances in Economic Analysis of Antitrust"       2004

Phoenix Center State Regulator Retreat
    "Regulatory Policy for the Telecommunications Revolution"       2004

OECD Competition Committee
    "Use of Economic Evidence in Merger Control"       2004

Justice Department/Federal Trade Commission Joint Workshop
    "Merger Enforcement"       2004

Phoenix Center Annual U.S. Telecoms Symposium
    "Incumbent Market Power"       2003

Center for Economic Policy Studies Symposium on Troubled Industries
    "What Role for Government in Telecommunications?"       2003

Princeton Workshop on Price Risk and the Future of the Electric Markets
      "The Structure of the Electricity Markets"                    2003

2003 Antitrust Conference
      "International Competition Policy and Trade Policy"      2003

International Industrial Organization Conference
      "Intellectual Property System Reform"             2003

ABA Section of Antitrust Law 2002 Fall Forum
      "Competition, Regulation and Pharmaceuticals"        2002

Fordham Conference on International Antitrust Law and Policy
      "Substantive Standards for Mergers and the Role of Efficiencies"      2002

Department of Justice Telecom Workshop
      "Stimulating Investment and the Telecommunications Act of 1996"      2002

Department of Commerce Conference on the State of the Telecom Sector
      "Stimulating Investment and the Telecommunications Act of 1996"      2002

Law and Public Affairs Conference on the Future of Internet Regulation
      "Open Access and Competition Policy Principles"       2002
Center for Economic Policy Studies Symposium on Energy Policy
      "The Future of Power Supply"                  2002

The Conference Board: Antitrust Issues in Today's Economy
      "The 1982 Merger Guidelines at 20"            2002

Federal Energy Regulatory Commission Workshop
      "Effective Deregulation of Residential Electric Service"      2001

IPEA International Seminar on Regulation and Competition
      "Electricity Markets: Deregulation of Residential Service"      2001
      "Lessons for Brazil from Abroad"                2001

ABA Antitrust Law Section Task Force Conference
      "Time, Change, and Materiality for Monopolization Analyses"      2001

Harvard University Conference on American Economic Policy in the 1990s
      "Comments on Antitrust Policy in the Clinton Administration"      2001

Tel-Aviv Workshop on Industrial Organization and Anti-Trust
      "The Risk of Contagion from Multimarket Contact"      2001

2001 Antitrust Conference
      "Collusion Cases: Cutting Edge or Over the Edge?"      2001
      "Dys-regulation of California Electricity"      2001

FTC Public Workshop on Competition Policy for E-Commerce
      "Necessary Conditions for Cooperation to be Problematic"      2001

HIID International Workshop on Infrastructure Policy
      "Infrastructure Privatization and Regulation"      2000

Villa Mondragone International Economic Seminar
      "Competition Policy for Network and Internet Markets"      2000

New Developments in Railroad Economics: Infrastructure Investment and Access Policies
      "Railroad Access, Regulation, and Market Structure"      2000

The Multilateral Trading System at the Millennium
      "Efficiency Gains From Further Liberalization"      2000

Singapore – World Bank Symposium on Competition Law and Policy
      "Policy Towards Cartels and Collusion"      2000

CEPS: Is It a New World?: Economic Surprises of the Last Decade
      "The Internet and E-Commerce"      2000

Cutting Edge Antitrust: Issues and Enforcement Policies
      "The Direction of Antitrust Entering the New Millennium"      2000

The Conference Board: Antitrust Issues in Today's Economy
      "Antitrust Analysis of Industries With Network Effects"      1999

CEPS: New Directions in Antitrust
      "Antitrust in a High-Tech World"      1999

World Bank Meeting on Competition and Regulatory Policies for Development
      "Economic Principles to Guide Post-Privatization Governance"      1999

1999 Antitrust Conference
      "Antitrust and the Pace of Technological Development"      1999
      "Restructuring the Electric Utility Industry"      1999

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
      "Privatization and Post-Privatization Regulation of Natural Monopolies"      1999

The Federalist Society: Telecommunications Deregulation: Promises Made,
Potential Lost?
      "Grading the Regulators"                                                   1999

Inter-American Development Bank: Second Generation Issues In the Reform
Of Public Services
      "Post-Privatization Governance"                         1999
      "Issues Surrounding Access Arrangements"          1999

Economic Development Institute of the World Bank -- Program on Competition Policy
      "Policy Towards Horizontal Mergers"                 1998

Twenty-fifth Anniversary Seminar for the Economic Analysis Group of the Department of
Justice
      "Market Definition in Antitrust Analysis"            1998

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
      "Infrastructure Architecture and Regulation: Railroads"   1998

EU Committee Competition Conference – Market Power
      "US/EC Perspective on Market Definition"          1998

Federal Trade Commission Roundtable
      "Antitrust Policy for Joint Ventures"               1998

1998 Antitrust Conference
      "Communications Mergers"                      1998

The Progress and Freedom Foundation Conference on Competition, Convergence, and the
Microsoft Monopoly
      Access and Bundling in High-Technology Markets      1998

FTC Program on The Effective Integration of Economic Analysis into Antitrust Litigation
      The Role of Economic Evidence and Testimony        1997

FTC Hearings on Classical Market Power in Joint Ventures
      Microeconomic Analysis and Guideline               1997

World Bank Economists --Week IV Keynote
      Making Markets More Effective With Competition Policy    1997

Brookings Trade Policy Forum
      Competition Policy and Antidumping: The Economic Effects   1997

University of Malaya and Harvard University Conference on The Impact of Globalisation and
Privatisation on Malaysia and Asia in the Year 2020
> Microeconomics, Privatization, and Vertical Integration      1997

ABA Section of Antitrust Law Conference on The Telecommunications Industry
> Current Economic Issues in Telecommunications      1997

Antitrust 1998: The Annual Briefing
> The Re-Emergence of Distribution Issues      1997

Inter-American Development Bank Conference on Private Investment, Infrastructure Reform and
Governance in Latin America & the Caribbean
> Economic Principles to Guide Post-Privatization Governance      1997

Harvard Forum on Regulatory Reform and Privatization of Telecommunications in the Middle
East
> Privatization: Methods and Pricing Issues      1997

American Enterprise Institute for Public Policy Research Conference
> Discussion of Local Competition and Legal Culture      1997

Harvard Program on Global Reform and Privatization of Public Enterprises
> "Infrastructure Privatization and Regulation: Freight"      1997

World Bank Competition Policy Workshop
> "Competition Policy for Entrepreneurship and Growth"      1997

Eastern Economics Association Paul Samuelson Lecture
> "Bottleneck Access in Regulation and Competition Policy"      1997

ABA Annual Meeting, Section of Antitrust Law
> "Antitrust in the 21st Century: The Efficiencies Guidelines"      1997

Peruvian Ministry of Energy and Mines Conference on Regulation of Public Utilities
> "Regulation: Theoretical Context and Advantages vs. Disadvantages"      1997

The FCC: New Priorities and Future Directions
> "Competition in the Telecommunications Industry"      1997

American Enterprise Institute Studies in Telecommunications Deregulation
> "The Scope of Competition in Telecommunications"      1996

George Mason Law Review Symposium on Antitrust in the Information Revolution
> "Introduction to the Economic Theory of Antitrust and Information"      1996

Korean Telecommunications Public Lecture
        "Market Opening and Fair Competition"                                    1996

Korea Telecommunications Forum
        "Desirable Interconnection Policy in a Competitive Market"               1996

European Association for Research in Industrial Economics Annual Conference
        "Bottleneck Access: Regulation and Competition Policy"                   1996

Harvard Program on Global Reform and Privatization of Public Enterprises
        "Railroad and Other Infrastructure Privatization"                       1996

FCC Forum on Antitrust and Economic Issues Involved with InterLATA Entry
        "The Scope of Telecommunications Competition"                           1996

Citizens for a Sound Economy Policy Watch on Telecommunications Interconnection
        "The Economics of Interconnection"                                      1996


World Bank Seminar on Experiences with Corporatization
        "Strategic Directions of Privatization"                                 1996

FCC Economic Forum on the Economics of Interconnection
        Lessons from Other Industries                                           1996

ABA Annual Meeting, Section of Antitrust Law
        The Integration, Disintegration, and Reintegration
        of the Entertainment Industry                                           1996

Conference Board: 1996 Antitrust Conference
        How Economics Influences Antitrust and Vice Versa                       1996

Antitrust 1996: A Special Briefing
        Joint Ventures and Strategic Alliances                                  1996

New York State Bar Association Section of Antitrust Law Winter Meeting
        Commentary on Horizontal Effects Issues                                 1996

FTC Hearings on the Changing Nature of Competition in a Global and Innovation-Driven Age
        Vertical Issues for Networks and Standards                             1995

Wharton Seminar on Applied Microeconomics
        Access Policies with Imperfect Regulation                               1995

Antitrust 1996, Washington D.C.
    Assessing Joint Ventures for Diminution of Competition                1995

ABA Annual Meeting, Section of Antitrust Law
    Refusals to Deal -- Economic Tests for Competitive Harm          1995

FTC Seminar on Antitrust Enforcement Analysis
    Diagnosing Collusion Possibilities                        1995

Philadelphia Bar Education Center: Antitrust Fundamentals
    Antitrust--The Underlying Economics                     1995

Vanderbilt University Conference on Financial Markets
    Why Do Christie and Schultz Infer Collusion From Their Data?     1995

ABA Section of Antitrust Law Chair=s Showcase Program
    Discussion of Telecommunications Competition Policy         1995

Conference Board: 1995 Antitrust Conference
    Analysis of Mergers and Joint Ventures                   1995

ABA Conference on The New Antitrust: Policy of the '90s
    Antitrust on the Super Highways/Super Airways            1994

ITC Hearings on The Economic Effects of Outstanding Title VII Orders
    "The Economic Impacts of Antidumping Policies"            1994

OECD Working Conference on Trade and Competition Policy
    "Empirical Evidence on The Nature of Anti-dumping Actions"      1994

Antitrust 1995, Washington D.C.
    "Rigorous Antitrust Standards for Distribution Arrangements"     1994

ABA -- Georgetown Law Center: Post Chicago-Economics: New Theories
- New Cases?
    "Economic Foundations for Vertical Merger Guidelines"        1994

Conference Board: Antitrust Issues in Today's Economy
    "New Democrats, Old Agencies: Competition Law and Policy"     1994

Federal Reserve Board Distinguished Economist Series
    "Regulated Private Enterprise Versus Public Enterprise"       1994

Institut d'Etudes Politiques de Paris
    "Lectures on Competition Policy and Privatization"         1993

Canadian Bureau of Competition Policy Academic Seminar Series, Toronto.
    "Public Versus Regulated Private Enterprise"           1993

CEPS Symposium on The Clinton Administration: A Preliminary Report Card
    "Policy Towards Business"           1993

Columbia Institute for Tele-Information Conference on Competition in Network Industries, New York, NY
    "Discussion of Deregulation of Networks: What Has Worked and What Hasn't"
           1993

World Bank Annual Conference on Development Economics
    "Public Versus Regulated Private Enterprise"           1993

Center for Public Utilities Conference on Current Issues Challenging the Regulatory Process
    "The Economics of Current Issues in Telecommunications Regulation"    1992
    "The Role of Markets in Presently Regulated Industries"    1992

The Conference Board's Conference on Antitrust Issues in Today's Economy, New York, NY
    "Antitrust in the Global Economy"    1992
    "Monopoly Issues for the '90s"    1993

Columbia University Seminar on Applied Economic Theory, New York, NY
    "Economic Rationales for the Scope of Privatization"    1992

Howrey & Simon Conference on Antitrust Developments, Washington, DC
    "Competitive Effects of Concern in the Merger Guidelines"    1992

Arnold & Porter Colloquium on Merger Enforcement, Washington, DC
    "The Economic Foundations of the Merger Guidelines"    1992

American Bar Association, Section on Antitrust Law Leadership Council Conference, Monterey, CA
    "Applying the 1992 Merger Guidelines"    1992

OECD Competition Policy Meeting, Paris, France
    "The Economic Impacts of Antidumping Policy"    1992

Center for Public Choice Lecture Series, George Mason University Arlington, VA
    "The Economic Impacts of Antidumping Policy"    1992

Brookings Institution Microeconomics Panel, Washington, DC,
    "Discussion of the Evolution of Industry Structure"    1992

AT&T Conference on Antitrust Essentials

"Antitrust Standards for Mergers and Joint Ventures"                          1991

ABA Institute on The Cutting Edge of Antitrust: Market Power
    "Assessing and Proving Market Power: Barriers to Entry"                 1991

Second Annual Workshop of the Competition Law and Policy Institute of New Zealand
    "Merger Analysis, Industrial Organization Theory, and Merger Guidelines"  1991
    "Exclusive Dealing and the Fisher & Paykel Case"                        1991

Special Seminar of the New Zealand Treasury
    "Strategic Behavior, Antitrust, and The Regulation of Natural Monopoly"   1991

Public Seminar of the Australian Trade Practices Commission
    "Antitrust Issues of the 1990's"                                        1991

National Association of Attorneys General Antitrust Seminar
    "Antitrust Economics"                                                   1991

District of Columbia Bar's 1991 Annual Convention
    "Administrative and Judicial Trends in Federal Antitrust Enforcement"      1991

ABA Spring Meeting
    "Antitrust Lessons From the Airline Industry"                           1991

Conference on The Transition to a Market Economy - Institutional Aspects
    "Anti-Monopoly Policies and Institutions"                               1991

Conference Board's Thirtieth Antitrust Conference
    "Antitrust Issues in Today's Economy"                                   1991

American Association for the Advancement of Science Annual Meeting
    "Methodologies for Economic Analysis of Mergers"                         1991

General Seminar, Johns Hopkins University
    "Economic Rationales for the Scope of Privatization"                     1991

Capitol Economics Speakers Series
    "Economics of Merger Guidelines"                                        1991

CRA Conference on Antitrust Issues in Regulated Industries
    "Enforcement Priorities and Economic Principles"                         1990

Pepper Hamilton & Scheetz Anniversary Colloquium
    "New Developments in Antitrust Economics"                               1990

PLI Program on Federal Antitrust Enforcement in the 90's
    "The Antitrust Agenda of the 90's"                      1990

FTC Distinguished Speakers Seminar
    "The Evolving Merger Guidelines"                     1990

The World Bank Speakers Series
    "The Role of Antitrust Policy in an Open Economy"    1990

Seminar of the Secretary of Commerce and Industrial Development of Mexico
    "Transitions to a Market Economy"                    1990

Southern Economics Association
    "Entry in Antitrust Analysis of Mergers"             1990
    "Discussion of Strategic Investment and Timing of Entry"   1990

American Enterprise Institute Conference on Policy Approaches to the
Deregulation of Network Industries
    "Discussion of Network Problems and Solutions"       1990

American Enterprise Institute Conference on Innovation, Intellectual Property, and World
Competition
    "Law and Economics Framework for Analysis"         1990

Banco Nacional de Desenvolvimento Economico Social Lecture
    "Competition Policy:  Harnessing Private Interests for the Public Interest"   1990

Western Economics Association Annual Meetings
    "New Directions in Antitrust from a New Administration"    1990
    "New Directions in Merger Enforcement: The View from Washington"   1990

Woodrow Wilson School Alumni Colloquium
    "Microeconomic Policy Analysis and Antitrust--Washington 1990"   1990

Arnold & Porter Lecture Series
    "Advocating Competition"                        1991
    "Antitrust Enforcement"                        1990

ABA Antitrust Section Convention
    "Recent Developments in Market Definition and Merger Analysis"   1990

Federal Bar Association
    "Joint Production Legislation: Competitive Necessity or Cartel Shield?"   1990

Pew Charitable Trusts Conference

"Economics and National Security"                                                    1990

ABA Antitrust Section Midwinter Council Meeting
    "Fine-tuning the Merger Guidelines"                              1990
    "The State of the Antitrust Division"                            1991

International Telecommunications Society Conference
    "Discussion of the Impact of Telecommunications in the UK"       1989

The Economists of New Jersey Conference
    "Recent Perspectives on Regulation"                              1989

Conference on Current Issues Challenging the Regulatory Process
    "Innovative Pricing and Regulatory Reform"                       1989
    "Competitive Wheeling"                                           1989

Conference Board: Antitrust Issues in Today's Economy
    "Foreign Trade Issues and Antitrust"                             1989

McKinsey & Co. Mini-MBA Conference
    "Economic Analysis of Pricing, Costing, and Strategic Business Behavior"   1989
                                                                     1994

Olin Conference on Regulatory Mechanism Design
    "Revolutions in Regulatory Theory and Practice: Exploring The Gap"   1989

University of Dundee Conference on Industrial Organization and Strategic Behavior
    "Mergers in Differentiated Product Industries"                   1988

Leif Johanson Lectures at the University of Oslo
    "Normative Issues in Industrial Organization"                    1988

Mergers and Competitiveness: Spain Facing the EEC
    "Merger Policy"                                                  1988
    "R&D Joint Ventures"                                             1988

New Dimensions in Pricing Electricity
    "Competitive Pricing and Regulatory Reform"                      1988

Program for Integrating Economics and National Security: Second Annual Colloquium
    "Arming Decisions Under Asymmetric Information"                   1988

European Association for Research in Industrial Economics
    "U.S. Railroad Deregulation and the Public Interest"             1987
    "Economic Rationales for the Scope of Privatization"             1989

"Discussion of Licensing of Innovations"                                                    1990

Annenberg Conference on Rate of Return Regulation in the Presence of Rapid Technical Change
    "Discussion of Regulatory Mechanism Design in the Presence
    of Research, Innovation, and Spillover Effects"                            1987

Special Brookings Papers Meeting
    "Discussion of Empirical Approaches to Strategic Behavior"                 1987
    "New Merger Guidelines"                                                     1990

Deregulation or Regulation for Telecommunications in the 1990's
    "How Effective are State and Federal Regulations?"                         1987

Conference Board Roundtable on Antitrust
    "Research and Production Joint Ventures"                                    1990
    "Intellectual Property and Antitrust"                                       1987

Current Issues in Telephone Regulation
    "Economic Approaches to Market Dominance:  Applicability of
    Contestable Markets"                                                        1987

Harvard Business School Forum on Telecommunications
    "Regulation of Information Services"                                         1987

The Fowler Challenge:   Deregulation and Competition in The Local Telecommunications
Market
    "Why Reinvent the Wheel?"                                                    1986

World Bank Seminar on Frontiers of Economics
    "What Every Economist Should Know About Contestable Markets"                 1986
Bell Communications Research Conference on Regulation and Information
    "Fuzzy Regulatory Rules"                                                     1986

Karl Eller Center Forum on Telecommunications
    "The Changing Economic Environment in Telecommunications:
    Technological Change and Deregulation"                                       1986

Railroad Accounting Principles Board Colloquium
    "Contestable Market Theory and ICC Regulation                                1986

Canadian Embassy Conference on Current Issues in Canadian -- U.S. Trade and Investment
    "Regulatory Revolution in the Infrastructure Industries"                     1985

Eagleton Institute Conference on Telecommunications in Transition
    "Industry in Transition:  Economic and Public Policy Overview"               1985

Brown University Citicorp Lecture
    "Logic of Regulation and Deregulation"            1985

Columbia University Communications Research Forum
    "Long Distance Competition Policy"            1985

American Enterprise Institute Public Policy Week
    "The Political Economy of Regulatory Reform"            1984

MIT Communications Forum
    "Deregulation of AT&T Communications"            1984

Bureau of Census Longitudinal Establishment Data File and Diversification Study Conference
    "Potential Uses of The File"            1984

Federal Bar Association Symposium on Joint Ventures
    "The Economics of Joint Venture Assessment"            1984

Hoover Institute Conference on Antitrust
    "Antitrust for High-Technology Industries"            1984

NSF Workshop on Predation and Industrial Targeting
    "Current Economic Analysis of Predatory Practices"            1983

The Institute for Study of Regulation Symposium: Pricing Electric, Gas, and Telecommunications Services Today and for the Future
    "Contestability As A Guide for Regulation and Deregulation"            1984

University of Pennsylvania Economics Day Symposium
    "Contestability and Competition: Guides for Regulation and Deregulation"            1984

Pinhas Sapir Conference on Economic Policy in Theory and Practice
    "Corporate Governance and Market Structure"            1984

Centre of Planning and Economic Research of Greece
    "Issues About Industrial Deregulation"            1984
    "Contestability: New Research Agenda"            1984

Hebrew and Tel Aviv Universities Conference on Public Economics
    "Social Welfare Dominance Extended and Applied to Excise Taxation"            1983

NBER Conference on Industrial Organization and International Trade
    "Perspectives on Horizontal Mergers in World Markets"            1983

Workshop on Local Access:  Strategies for Public Policy
    "Market Structure and Government Intervention in Access Markets"    1982

NBER Conference on Strategic Behavior and International Trade
    "Industrial Strategy with Committed Firms:  Discussion"    1982

Columbia University Graduate School of Business, Conference on Regulation and New Telecommunication Networks
    "Local Pricing in a Competitive Environment"    1982

International Economic Association Roundtable Conference on New Developments in the Theory of Market Structure
    "Theory of Contestability"    1982
    "Product Dev., Investment, and the Evolution of Market Structures"    1982

N.Y.U. Conference on Competition and World Markets: Law and Economics
    "Competition and Trade Policy--International Predation"    1982

CNRS-ISPE-NBER Conference on the Taxation of Capital
    "Welfare Effects of Investment Under Imperfect Competition"    1982

Internationales Institut fur Management und Verwaltung Regulation Conference
    "Welfare, Regulatory Boundaries, and the Sustainability of Oligopolies"    1981
NBER-Kellogg Graduate School of Management Conference on the
Econometrics of Market Models with Imperfect Competition
    "Discussion of Measurement of Monopoly Behavior:  An
    Application to the Cigarette Industry"    1981

The Peterkin Lecture at Rice University
    "Deregulation:  Ideology or Logic?"    1981

FTC Seminar on Antitrust Analysis
    "Viewpoints on Horizontal Mergers    1982
    "Predation as a Tactical Inducement for Exit"    1980

NBER Conference on Industrial Organization and Public Policy
    "An Economic Definition of Predation"    1980

The Center for Advanced Studies in Managerial Economics Conference on The Economics of Telecommunication
    "Pricing Local Service as an Input"    1980

Aspen Institute Conference on the Future of the Postal Service
    "Welfare Economics of Postal Pricing"    1979

Department of Justice Antitrust Seminar
    "The Industry Performance Gradient Index"           1979

Eastern Economic Association Convention
    "The Social Performance of Deregulated Markets for Telecom Services"
    1979

Industry Workshop Association Convention
    "Customer Equity and Local Measured Service"           1979

Symposium on Ratemaking Problems of Regulated Industries
    "Pricing Decisions and the Regulatory Process"           1979

Woodrow Wilson School Alumni Conference
    "The Push for Deregulation"           1979

NBER Conference on Industrial Organization
    "Intertemporal Sustainability"           1979

World Congress of the Econometric Society
    "Theoretical Industrial Organization"           1980
Institute of Public Utilities Conference on Current Issues in Public Utilities Regulation
    "Network Access Pricing"           1978

ALI-ABA Conference on the Economics of Antitrust
    "Predatoriness and Discriminatory Pricing"           1978

AEI Conference on Postal Service Issues
    "What Can Markets Control?"           1978

University of Virginia Conference on the Economics of Regulation
    "Public Interest Pricing"           1978

DRI Utility Conference
    "Marginal Cost Pricing in the Utility Industry: Impact and Analysis"           1978

International Meeting of the Institute of Management Sciences
    "The Envelope Theorem"           1977

University of Warwick Workshop on Oligopoly
    "Industry Performance Gradient Indexes"           1977

North American Econometric Society Convention
    "Intertemporal Sustainability"           1979
    "Social Welfare Dominance"           1978

"Economies of Scope, DAIC, and Markets with Joint Production"                1977

Telecommunications Policy Research Conference
    "Transition to Competitive Markets"                                       1986
    "InterLATA Capacity Growth, Capped NTS Charges and Long
     Distance Competition"                                                 1985
    "Market Power in The Telecommunications Industry"                          1984
    "FCC Policy on Local Access Pricing"                                       1983
    "Do We Need a Regulatory Safety Net in Telecommunications?"                1982
    "Anticompetitive Vertical Conduct"                                         1981
    "Electronic Mail and Postal Pricing"                                       1980
    "Monopoly, Competition and Efficiency":  Chairman                          1979
    "A Common Carrier Research Agenda"                                         1978
    "Empirical Views of Ramsey Optimal Telephone Pricing"                      1977
    "Recent Research on Regulated Market Structure"                            1976
    "Some General Equilibrium Views of Optimal Pricing"                        1975

National Bureau of Economic Research Conference on Theoretical Industrial Organization
    "Compensating Variation as a Measure of Welfare Change"                    1976
Conference on Pricing in Regulated Industries: Theory & Application
    "Ramsey Optimal Pricing of Long Distance Telephone Services"               1977

NBER Conference on Public Regulation
    "Income Distributional Concerns in Regulatory Policy-Making"               1977

Allied Social Science Associations National Convention
    "Merger Guidelines and Economic Theory"                                    1990
    Discussion of "Competitive Rules for Joint Ventures"                       1989
    "New Schools in Industrial Organization"                                   1988
    "Industry Economic Analysis in the Legal Arena"                            1987
    "Transportation Deregulation"                                              1984
    Discussion of "Pricing and Costing of Telecommunications Services"         1983
    Discussion of "An Exact Welfare Measure"                                   1982
    "Optimal Deregulation of Telephone Services"                               1982
    "Sector Differentiated Capital Taxes"                                      1981
    "Economies of Scope"                                                       1980
    "Social Welfare Dominance"                                                 1980
    "The Economic Definition of Predation"                                     1979
    Discussion of "Lifeline Rates, Succor or Snare?"                           1979
    "Multiproduct Technology and Market Structure"                             1978
    "The Economic Gradient Method"                                             1978
    "Methods for Public Interest Pricing"                                      1977
    Discussion of "The Welfare Implications of New Financial Instruments"      1976
    "Welfare Theory of Concentration Indices"                                  1976
    Discussion of "Developments in Monopolistic Competition Theory"            1976

| | |
|---|---|
| "Hedonic Price Adjustments" | 1975 |
| "Public Good Attributes of Information and its Optimal Pricing" | 1975 |
| "Risk Invariance and Ordinally Additive Utility Functions" | 1974 |
| "Consumer's Surplus:  A Rigorous Cookbook" | 1974 |

University of Chicago Symposium on the Economics of Regulated Public Utilities
    "Optimal Prices for Public Purposes"      1976

American Society for Information Science
    "The Social Value of Information:  An Economist's View"      1975

Institute for Mathematical Studies in the Social Sciences Summer Seminar
    "The Sustainability of Natural Monopoly"      1975

U.S.-U.S.S.R. Symposium on Estimating Costs and Benefits of Information Services
    "The Evaluation of the Economic Benefits of Productive Information"      1975

NYU-Columbia Symposium on Regulated Industries
    "Ramsey Optimal Public Utility Pricing"      1975

**Research Seminars:**

| | |
|---|---|
| Bell Communications Research (2) | University of California, San Diego |
| Bell Laboratories (numerous) | University of Chicago |
| Department of Justice (3) | University of Delaware |
| Electric Power Research Institute | University of Florida |
| Federal Reserve Board | University of Illinois |
| Federal Trade Commission (4) | University of Iowa (2) |
| Mathematica | Universite Laval |
| Rand | University of Maryland |
| World Bank (3) | University of Michigan |
| Carleton University | University of Minnesota |
| Carnegie-Mellon University | University of Oslo |
| Columbia University (4) | University of Pennsylvania (3) |
| Cornell University (2) | University of Toronto |
| Georgetown University | University of Virginia |
| Harvard University (2) | University of Wisconsin |

- A32 -

| | |
|---|---|
| Hebrew University | University of Wyoming |
| Johns Hopkins University (2) | Vanderbilt University |
| M. I. T. (4) | Yale University (2) |
| New York University (4) | Princeton University (many) |
| Northwestern University (2) | Rice University |
| Norwegian School of Economics and | Stanford University (5) |
| Business Administration | S.U.N.Y. Albany |

**Attachment 2:**
**Robert Willig Expert Testimony Provided in the Last Four Years**

1. In the Matter of Verizon New Jersey, Inc. – Resolution for Assistance Resolving Interconnection Negotiations with US Cable of Paramus/Hillsdale, Time Warner Cable, Cablevision, and Comcast; Before the State of New Jersey Office of Board of Public Utilities, Docket No. CO07007524; Expert Report 4/21/2008; Testimony 5/12/2008.

2. New England Carpenters Health Benefits Fund et al.v. First Databank, Inc., and McKesson Corp. In the United States District Court for the District of Massachusetts, Civil Action: 1:05-CV-11148-PBS, Expert Report 1/24/2007; Rebuttal Expert Declaration 5/07/2007; Expert Declaration 10/15/2007; Rebuttal Expert Declaration 11/08/2007; Expert Declaration 11/28/2007. Expert Declaration 5/21/08. Expert Report 10/1/08.

3. AT&T and Centennial;  Before the Federal Communications Commission; WT Docket No. 08-246; Expert Report 11/20/2008.

4. In the Matter of Lisa Reed and Cindy Digiannantonio v. Advocate Health Care, et al. In the Northern District of Illinois Eastern Division, Civil Action No. 06 C 3337; Expert Report 1/20/2009; Supplemental 2/27/2009; Deposition Testimony 3/23/2009-3/24/2009.

5. In the matter of Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market      Conditions with Respect to Mobile Wireless Including Commercial Mobile Services; Before the Federal Communications Commission; WT Docket No. 09-66; Declaration, 9/30/09.

6. Cindy Cullen, Wendy Fleishman, on Behalf of Themselves and All Others Similarly Situated v. Albany Medical Center, Ellis Hospital, Northeast Health, Seton Health System, and St. Peter's Health Care Service,      In the United States District Court for the Northern District of New York, Civil Action No. 06-CV-0765/ TJM/ DRH; Expert Report 2/29/2008; Deposition 3/27-28/2008; Expert Report 9/4/2009; Deposition 11/19-20/2009, Declaration 12/28/2009.

7. In the Australian Competition Tribunal: Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 23 May 2006 under Section 44H(9) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Mount Newman Railway Line, By: Fortescue Metals Group Limited; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Robe RailwayBy: Robe River Mining Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27

October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Hamersley Rail Network, By: Hamersley Iron Co PTY LTD & ORS; Re: Application for Review of the Deemed Decision by the Commonwealth Treasurer of 27 October 2008 under Section 44H(1) of the Trade Practices Act 1974 (CTH) in Relation to the Application for Declaration of Services Provided by the Goldsworthy Railway, By: BHP Billiton Iron Ore PTY LTD and BHP Billiton Minerals PTY LTD; Expert Report 6/30/2009 and 9/18/2009, Trial Testimony 11/2/2009-11/6/2009.

8. Stagecoach Group PLC and Coach USA, Inc., et al, Acquisition of Control, Twin America, LLC, Before the Surface Transportation Board, Verified Statement of Professor Robert D. Willig, Submitted November 17, 2009.

9. In re: Rail Freight Fuel Surcharge Antitrust Litigation, In the United States District Court for the District of Columbia, MDL Docket No. 1869, Misc. No. 07-489 (PLF), Expert Report, 8/1/2010, deposition 8/4/2010

10. Before the Federal Reserve Bank: Docket Number R-1404: Proposed Rule on Debit Card Interchange Fees and Routing, written statement 2/22/2011.

11. Before the Surface Transportation Board: Docket Number EP 704: Review of Commodity, Boxcar, and TOFC/COFC Exemptions; written statement 1/31/2011; testimony at hearing 2/23, 24/2011.

12. New Zealand Commerce Commission vs. Malaysian Airline Systems Berhad, Ltd. and et. al.; High Court of New Zealand: CV 2008-404-8350, Brief of Evidence 4/28/2011, Trial testimony 5/20/11 and 5/23-27/2011.

13. Before the Federal Communications Commission: Docket Number 11-65: For Consent to Assign or Transfer Control Licenses and Authorization, written reply statement 6/9/2011.

14. In Re: Checking Account Overdraft Litigation, MDL No. 2036 In the United States District Court for the Southern District of Florida, Miami Division, Case No. 09-MD-02036-JLK, Luquetta v. JPMorgan Chase Bank, Declaration In Support of JP Morgan Chase Bank, N.A.'s Opposition to Class Certification, June 16, 2011.

15. Before the Surface Transportation Board: Docket Number EP 705: Competition in the Rail Industry, written statement 4/12/2011, written reply statement 5/27/2011, testimony at hearing 6/22, 23/2011.

16. In the Matter of Rambus Inc. v. Micron Technology, Inc., et al. In the Superior Court of the State of California County of San Francisco, Civil Action No. 04-431105; Expert Report 11/08/2008; Supplemental Expert Report 12/19/2008, Deposition Testimony 5/7/2009-5/8/2009, Trial testimony 9/1,6,7/2011.

17. In Re McKesson Governmental Entities Average Wholesale Price Litigation, Master File No.: 1:08-CV-10843-PBS; The Board of County Commissioners of Douglas County, Kansas et al. v. McKesson Corp., Expert Report, April 14, 2010, Response Report, June 28, 2010; Related to Connecticut v. McKesson Corp., Expert Report, April 14, 2010; Related to Montana v. McKesson Corporation, Expert Report, November 8, 2010; Related to Oklahoma v. McKesson Corporation, Expert Report, November 8, 2010; San Francisco Health Plan, et al. v. McKesson Corporation, Rebuttal Expert Report, September 19, 2011.

18. Before the Public Service Commission of Maryland, Case No.: 9271, In the Matter of the Merger of Exelon Corp. and Constellation Energy Group, Inc., written Market Power Rebuttal Testimony, 10/17/2011, written Surrebuttal Testimony, 10/26/2011, Hearing testimony, 11/2011.

19. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division, DELL Inc., *et. al.*, v. SHARP Corporation, *et al.*, Case No. 3:10-cv-01064 SI MDL No. 3:07-md-1827-SI, expert report, 2/23/2012, deposition, 4/18/2012.

20. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division, Motorola Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 3:09-cv-05840SI MDL No. 3:07-md-1827-SI, expert report, 2/23/2012, deposition, 4/18/2012.

21. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division, AT&T Mobility Inc. v. SHARP Corporation, *et al.*,Case No. 09-cv-4997 SI MDL No. 07-m-1827-SI, expert report, 2/27/2012, deposition, 4/18/2012.

22. In Re TFT-LCD (Flat Panel) Antitrust Litigation, In the United States District Court Northern District of California San Francisco Division, BEST BUY CO., Inc., *et. al.*, v. AU OPTRONICS CORP., *et al.*, Case No. 10-cv-4572 SI MDL No. 07-md-1827-SI, expert report, 3/5/2012, deposition, 4/18/2012.

23. Clark R. Huffman and Brandi K. Winters, individually and on behalf of all others similarly situated vs. PRUDENTIAL INSURANCE COMPANY of AMERICA, In the United States District Court for the Eastern District of Pennsylvania, Civ. No. 2:10-cv-05135-EL, declaration, 4/10/2012.

24. In re Prudential Insurance Company of America SGLI/VGLI Contract Litigation, CLASS ACTION, Master Case No. 3:11-md-02208-MAP, In the United States District Court for the District of Massachusetts, declaration, 5/10/2012.

25. Australian Competition and Consumer Commission v. Singapore Airlines Cargo PTE LTD et. al., Before the Federal Court of Australia, District

Registry: New South Wales, Division: General, No. NSD 1980 of 2008, NSD 363 of 2009, NSD 876 of 2009 and NSD 1213 of 2009, Affidavit and expert report, 7/12/2012.

26. Bandspeed, Inc. v. Sony Electronics, Inc. et al. and Cambridge Silicon Radio Limited, Cause No. A-11-CV-771-LY, in the United States District Court for the Western District of Texas, Austin Division, expert report, 9/21/2012.

27. National Collegiate Athletic Association et al., Plaintiffs, v. Christopher J. Christie et al., Defendants, in the United States District Court for the District of New Jersey, Civil Action No. 3:12-cv-04947 (MAS) (LHG), Expert Report 11/21/2012, Deposition 11/30/2012.

Highly Confidential

## Attachment 3: Materials Relied Upon by Robert D. Willig

**Legal Filings**

Best Buy Co. Inc. et al. Complaint, November 14, 2011

Compucom Systems, Inc. et al. Complaint, November 14, 2011

Costco Wholesale Corporation Complaint, November 14, 2011

Electrograph Systems, Inc. et al. Complaint, March 10, 2011

Indirect Purchaser Plaintiffs' Consolidated Amended Complaint, March 16, 2009

Interbond Corporation of America Complaint, November 14, 2011

Office Depot, Inc. Complaint, November 14, 2011

P.C. Richard & Son Long Island Corporation et al. Complaint, November 14, 2011

Schultze Agency Services, LLC Complaint, November 14, 2011

Target Corp. et al. Complaint, January 6, 2012

Trustee of the Circuit City Stores, Inc. Liquidating Trust Complaint, November 14, 2011

**Academic Citations**

ABA Section of Antitrust Law. (2005). *Econometrics: Legal, Practical, and Technical Issues*

Athey, S., & Bagwell, K. (2001). Optimal Collusion with Private Information. *The RAND Journal of Economics*, Vol. 32, No.3

Bali, S. P. (1994). *Colour Television: Theory and Practice*. Delhi: Tata McGraw-Hill Publishing Company Limited

Carlton, D.W., & Perloff, J. M. (1999). *Modern Industrial Organization, 3rd edition.* Addison-Wesley

Church, J., & Ware, R. (2000). *Industrial Organization: A Strategic Approach.* McGraw-Hill

Davis, P., & Garcés, E. (2010). *Quantitative Techniques for Competition and Antitrust Analysis.* Princeton University Press

Diewert, W. E. (1993). The Early History of Price Index Research & Fisher Ideal Output, Input and Productivity Indexes Revisited. In W.E. Diewert and A.O. Nakamura (Eds.), *Essays in Index Number Theory, Volume I*, Elsevier Science Publishers

Godek, P. E., & Ordover, J. A. (2009). Economic Analysis in Antitrust Class Certification: Hydrogen Peroxide. *Antitrust, Fall 2009*

Graf, R. F. (1999). *Modern Dictionary of Electronics, 7th Edition.* Woburn, MA: Butterworth-Heinemann

- A38 -

Highly Confidential

Green, E. J., & Porter, R. H. (1984). Noncooperative Collusion under Imperfect Price Information. *Econometrica.* Vol. 52, No. 1

Grout, P., & Sonderegger, S. (2005). Predicting Cartels. *Office of Fair Trading*

Gujarati, D. N. (1995). *Basic Econometrics, 3rd edition.* McGraw Hill

Harrington, J. E. (2007). Detecting Cartels. In P. Buccirossi (Eds.), *Advances in the Economics of Competition Law.* MIT Press

International Labour Organization. (2004). *Consumer Price Index Manual: Theory and Practice.* International Labour Organization

Johnson, J. H., & Leonard, G. K. (2008). In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings. *Antitrust, volume 22* (no. 3)

Landes, W. M., & Posner, R. A. (1981). Market Power in Antitrust Cases. *Harvard Law Review, volume 9(5)*

Leonard, G. K., & Zona, D. J. (2008). Simulation in Competitive Analysis. *Competition Law and Policy*, ABA Section of Antitrust Law, (Issue 2)

Motta, M. (2004). *Competition Policy: Theory and Practice.* Cambridge University Press

Scherer, F.M. (1980). *Industrial Market Structure and Economic Performance, 2nd edition.* Houghton Mifflin

Schmalensee, R. (1989). Inter-Industry Studies of Structure and Performance. In R. Schmalensee and R. Willig (Eds.), *Handbook of Industrial Organization*, Elsevier

United States International Trade Commission. (2000). *Color Picture Tubes from Canada, Japan, Korea, and Singapore, Investigations Nos. 731-TA-367-370 (Review), Determinations and Views of the Commission.* USITC Publication No. 3291

**Declarations**

Declaration of Janet S. Netz, Ph.D., in Support of Motion of Indirect-Purchaser Plaintiffs for Class Certification

**Staff Communication**

██████████████████████████

█████████████████████

████████████████████

**Information Received**

███████████████████

███████████████████

Highly Confidential



**Depositions and Exhibits**

**Analyst Reports**

Fuji Chimera Research Institute. (2000). *Forecasts and Trends for Flat Panel Displays and Their Applications.* (InterLingua, Trans.)

Fuji Chimera Research Institute. (2001). *Flat Panel Display Applications: Trends and Forecasts.* (InterLingua, Trans.)

Highly Confidential

Fuji Chimera Research Institute. (2002). *Trends and Forecasts: Flat Panel Display Applications*. (InterLingua, Trans.)

Fuji Chimera Research Institute. (2004). *Flat Panel Display Applications: Trends and Forecasts*. (InterLingua, Trans.)

Fuji Chimera Research Institute. (2005). *Flat Panel Display Applications: Trends and Forecasts*. (InterLingua, Trans.)

Fuji Chimera Research Institute. (2006). *Trends and Forecasts: Flat Panel Display Applications*. (InterLingua, Trans.)

Fuji Chimera Research Institute. (2007). *Flat Panel Display Applications: Trends and Forecasts*. (InterLingua, Trans.)

**Data**



Highly Confidential



Highly Confidential



Highly Confidential



Highly Confidential



Highly Confidential



Highly Confidential



**Other Materials**

IHS iSuppli, March 23, 2009, "Original Design Manufacturer (ODM) Definition, Analysis, Competitors, Research". Accessed December 14, 2012. Retrieved from

Highly Confidential

http://www.isuppli.com/Manufacturing-and-Pricing/News/Pages/Adam-Pick-Principal-Analyst-EMS-ODM.aspx

JVC.com. CTX PL9 CRT 19 Inch (.26 Dot Pitch). Accessed December 11, 2012. Retrieved from http://jcv-inc.com/ctxpl9crt19i.html

Super Warehouse.com. CTX PR960FL 19'' CRT Monitor. Accessed December 11, 2012. Retrieved from http://www.superwarehouse.com/CTX_PR960FL_19_CRT_Monitor/PR960FL/p/14753

Weber, A. (February 1, 2003), Outsourcing's Alphabet Soup. *Assembly Magazine*. Accessed December 14, 2012. Retrieved from http://www.assemblymag.com/articles/82852-outsourcing-s-alphabet-soup

Highly Confidential

Highly Confidential



Highly Confidential



