# DOCUMENT 5

1  William A. Isaacson
   Jennifer Milici
2  BOIES, SCHILLER & FLEXNER LLP
   5301 Wisconsin Ave. NW, Suite 800
3  Washington, D.C. 20015
   Telephone: (202) 237-2727
4  Facsimile: (202) 237-6131
   Email: wisaacson@bsfllp.com
5  Email: jmilici@bsfllp.com

6  *Liaison Counsel for Direct Action Plaintiffs*
   *Additional Counsel Listed on Signature Page*

7

8

                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**

9

10  In re: CATHODE RAY TUBE (CRT)            Master File No. 3:07-cv-05944-SC (N.D. Cal.)
    ANTITRUST LITIGATION                     MDL No. 1917

11  This Document Relates to:               Case No. 11-cv-01656 SC
                                            Case No. 11-cv-05381 SC
12  *Electrograph Systems, Inc., et al. v. Hitachi,*   Case No. 11-cv-05502 SC
    *Ltd., et al.*, No. 11-cv-01656         Case No. 11-cv-05513 SC
13                                          Case No. 11-cv-05514 SC
    *Stoebner, et al. v. LG Electronics, et al.*, No.   Case No. 11-cv-06275 SC
14  11-cv-05381                             Case No. 11-cv-06276 SC
                                            Case No. 11-cv-06396 SC
15  *Siegel v. Hitachi, Ltd., et al.*, No. 11-cv-05502   Case No. 11-cv-06397 SC
                                            Case No. 12-cv-02648 SC
16  *Best Buy Co., et al. v. Hitachi, Ltd., et al.*, No.   Case No. 12-cv-02649 SC
    11-cv-05513

17  *Target Corp., et al. v. Chunghwa Picture*
    *Tubes, Ltd.*, No. 11-cv-05514          **DIRECT ACTION PLAINTIFFS'**
18                                          **OPPOSITION TO DEFENDANTS' JOINT**
    *Interbond Corporation of America v. Hitachi,*   **MOTION TO DISMISS AND FOR**
19  *et al.*, No. 11-cv-06275               **JUDGMENT ON THE PLEADINGS AS**
                                            **TO CERTAIN DIRECT ACTION**
    *Office Depot, Inc. v. Hitachi Ltd., et al.*, No.   **PLAINTIFFS' CLAIMS**
20  11-cv-06276

21  *CompuCom Systems, Inc. v. Hitachi, Ltd., et*   **Date: November 30, 2012 (tentative)**
    *al.*, No. 11-cv-06396                  **Time: 10:00 a.m. (tentative)**
22                                          **Place: JAMS Resolution Center**
    *Costco Wholesale Corp. v. Hitachi, Ltd., et al.*,   **Special Master: The Hon. Charles A.**
23  No. 11-cv-06397                         **Legge (Ret.)**

    *P.C. Richard and Son Long Island Corp., et al.*
24  *v. Hitachi, Ltd., et al.*, No. 12-cv-02648

25  *Schultze Agency Services, LLC, et al. v.*
    *Hitachi, Ltd., et al.*, No. 12-cv-02649

26

27

28

## **TABLE OF CONTENTS**

STATEMENT OF ISSUES ............................................................................................. x

PRELIMINARY STATEMENT........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

    A.      Background ....................................................................................... 3

    B.      Government Investigations Into Defendants' Conspiracy ................................ 4

    C.      DAP Complaints ............................................................................... 5

STANDARD OF REVIEW ............................................................................................... 5

ARGUMENT .................................................................................................................... 6

    I.    The DAPs Have Standing to Pursue Their Federal Claims................................... 6

         A.      *ATM Fee* Compels the Denial of Defendants' Motion .............................. 8

    II.    The DAPs' State Law Claims Are Timely ......................................................... 9

         A.      The DAPs Have Alleged Fraudulent Concealment .................................. 11

         B.      The DAPs Did Not Have Actual or Constructive Knowledge of the Facts Underlying Their Claims Until Less Than Four Years Before Filing Suit........................................................................................ 13

         C.      The DAPs' Claims Were Further Tolled Under the Doctrines of Cross-Jurisdictional, Government Action, and *American Pipe* Tolling.............. 18

    III.    The DAPs' State Law Claims Comport With Due Process................................. 21

    IV.    The DAPs Have Standing to Pursue Their State Law Claims............................. 26

         A.      *Associated General Contractors* Does Not Apply to Claims Under the Laws of Arizona, Illinois or Michigan ................................................ 26

         B.      The DAPs' Claims Satisfy *Associated General Contractors* .................. 27

             1.    The DAPs Have Adequately Alleged Antitrust Injury ...................... 29

                 a.    Defendants Have Construed the Relevant Market Too Narrowly ....................................................................... 30

2.   The DAPs' Allegations Demonstrate the Directness of Their
Injuries ............................................................................................. 31

3.   The DAPs' Allegations Demonstrate That Their Injuries are Not
Speculative ........................................................................................ 33

4.   Defendants' Arguments Regarding Duplicative Recovery and the
Complexity of Apportioning Damages Do Not Warrant Dismissal
of State Law Indirect Purchaser Claims ............................................ 34

V.   The DAPs Have Stated Claims Under the Massachusetts and Washington
Consumer Protection Laws ....................................................................... 34

     A.   Massachusetts .......................................................................... 34

     B.   Washington .............................................................................. 35

VI.  The Polaroid Plaintiffs Have Sufficiently Identified That Their Common Law
Claim for Unjust Enrichment Arises Under Minnesota and California Law ..... 36

VII. The DAPs Have Stated Claims Under California Law ................................. 37

     A.   Circuit City Has Stated Claims for Unjust Enrichment and Restitution ... 37

     B.   Circuit City, CompuCom, and the Polaroid Plaintiffs Have Stated
Claims Under California's Unfair Competition Law ................................. 38

VIII. The DAPs Have Standing to Bring Antitrust Claims Based on Indirect
Purchases of CRT Products that Occurred Prior to the Enactment of *Illinois
Brick* Repealer Statutes in Nevada and Nebraska ............................................. 39

     A.   Plaintiffs Have Standing to Bring Claims Under Nevada Law for
Indirect Purchases Made Prior to October 1, 1999 ................................... 39

     B.   Plaintiffs Have Standing to Bring Claims Under Nebraska Law for
Indirect Purchases Made Prior to July 20, 2002 ....................................... 40

CONCLUSION ................................................................................................. 40

## TABLE OF AUTHORITIES

### CASES

*Allstate Ins. Co. v. Hague*,
   449 U.S. 302 (1981) ......................................................................................... 22, 23

*American Ad Mgmt., Inc. v. General Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999)................................................................ 29, 30, 31, 33

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974)............................. 2, 18, 20, 21

*Arivella v. Lucent Techs., Inc.*,
   623 F. Supp. 2d 164 (D. Mass. 2009) ............................................................... 19

*Arpin v. Santa Clara Valley Transp. Agency*,
   261 F.3d 912 (9th Cir. 2001).................................................................................. 6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ 6

*Associated General Contractors v. California State Council of Carpenters*,
   459 U.S. 519 (1983) ..................................................................................*passim*

*Baker v. Jewel Food Stores, Inc.*,
   823 N.E.2d 93 (Ill. App. Ct. 2005) ...................................................................... 27

*Barker v. Riverside County Office of Ed.*,
   584 F.3d 821 (9th Cir. 2009).................................................................................. 6

*Barneby v. E.F. Hutton & Co.*,
   715 F. Supp. 1512 (M.D. Fla. 1989) .................................................................... 19

*Bartlett v. Miller and Schroder Municipals, Inc.*,
   355 N.W.2d 435 (Minn. Ct. App. 1984) .............................................................. 19

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 5, 6, 17

*Blewett v. Abbott Labs.*,
   86 Wash. App. 782, 938 P.2d 842 (Wash. App. Div. 1 1997)............................... 35

*Broam v. Bogan*,
   320 F.3d 1023 (9th Cir. 2003)................................................................................ 5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) .............................................................................................. 29

*Burns v. Hale & Dorr LLP*,
   445 F. Supp. 2d 94 (D. Mass. 2006) .................................................................. 34

*Butler v. Los Angeles County*,
   617 F. Supp. 2d 994 (C.D. Cal. 2008) ................................................................. 6

*Carson v. Independent School Dist. No. 623*,
   392 N.W.2d 216 (Minn. 1986) ............................................................................ 19

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*,
   973 P.2d 527 (Cal. 1999) .................................................................................... 38

*Centro America, S.A. v. Latin American Agribusiness Develop Corp., S.A.*,
   711 F.2d 989 (11th Cir. 1983) ............................................................................. 5

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
   858 F.2d 499 (9th Cir. 1988) ..................................................................... *passim*

*Dean Foods Co. v. Brancel*,
   187 F.3d 609 (7th Cir. 1999) ............................................................................. 24

*Doe I v. Wal-Mart Stores, Inc.*,
   572 F.3d 677 (9th Cir. 2009) ............................................................................. 37

*Douchette v. Bethel Sch. Dist. No. 403*,
   117 Wash. 2d 805, 818 P.2d 1362 (1991) .......................................................... 20

*E.W. French & Sons, Inc. v. General Portland Inc.*,
   885 F.2d 1392 (9th Cir. 1989) ............................................................... 10, 14, 17

*Erickson v. Pardus*,
   551 U.S. 89 (2007) .............................................................................................. 5

*First Nationwide Sav. v. Perry*,
   11 Cal. App. 4th 1657 (1992) ............................................................................ 37

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) ............................................................................. 7

*Galicia v. Country Coach, Inc.*,
   324 Fed. App'x. 687, 2009 WL 1144224 (9th Cir. Apr. 29, 2009) ...................... 24

*Ghirardo v. Antonioli.*,
   14 Cal. 4th 39 (Cal. 1996) ................................................................................. 37

*Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*,
   642 N.E.2d 470 (Ill. 1994) ................................................................................. 27

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
719 P.2d 531 (Wash. 1986) .................................................................................. 19

*Hatfield v. Halifax PLC*,
564 F.3d 1177 (9th Cir. 2009) ............................................................................. 19

*In re ATM Fee Antitrust Litigation*,
686 F.3d 741 (9th Cir. 2012) ......................................................................... *passim*

*In re Beef Industry Antitrust Litigation*,
600 F.2d 1148 (5th Cir. 1979) ............................................................................. 17

*In re Bulk Extruded Graphite Prods. Antitrust Litig.*,
No. 02-6030, 2007 WL 1062979 (D. N.J. Apr. 4, 2007) ...................................... 15

*In re CRT Antitrust Litig.*,
738 F. Supp. 2d, 1011 ................................................................................... *passim*

*In re Dynamic Random Access Memory (Dram) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ......................................................... *passim*

*In Re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................... 30, 33, 34

*In Re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................... 23, 26, 30

*In re Graphics Processing Units Antitrust Litig.*,
540 F. Supp. 2d 1085 (N.D. Cal. 2007) ............................................... 26, 27, 30, 31

*In re Linerboard Antitrust Litig.*,
223 F.R.D. 335 (E.D. Pa. 2004) ..................................................................... 18, 19

*In re Mattel, Inc.*,
588 F. Supp. 2d 1111 (C.D. Cal. 2008) ............................................................... 25

*In re Mercedes-Benz Antitrust Litig.*,
157 F. Supp. 2d 355 (D. N.J. 2001) .................................................................... 16

*In re Optical Disk Drive (ODD) Antitrust Litigation*,
No. 3:10–md–2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) .................. 9

*In re Processed Egg Prods. Antitrust Litig.*,
No. 08-md-02002, 2011 WL 5980001 (E.D. Pa. Nov. 30, 2011) .......................... 15

*In re Rubber Chemicals Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) ...................................................... 11, 13, 18

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) .............................................................. 23, 24

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  Case No. 07-md-01819, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010).................................... 39

*In re Sugar Indus. Antitrust Litig.*,
  579 F.2d 13 (3d Cir. 1978) ........................................................................... 8

*In re Sumitomo Copper Litig.*,
  120 F. Supp. 2d 328 (S.D.N.Y. 2000) ................................................................ 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) .......................................................... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2009 WL 533130 (N.D. Cal. Mar. 3, 2009).......................................................... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2010 WL 1264230 (N.D. Cal. Mar. 28, 2010)....................................................... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2010 WL 2609434 (N.D. Cal. June 28, 2010) ...................................................... 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2010 WL 2836955 (N.D. Cal. Jul. 19, 2010) ....................................................... 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 3738985 (N.D. Cal. Aug. 24, 2011) ..................................................... 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 4345435  (N.D. Cal., Sept. 15, 2011) ............................................... 37, 38

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 5357906 (N.D. Cal. Nov. 7, 2011)........................................................ 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2011 WL 5922966 (N.D. Cal. Nov. 28, 2011) .................................................. 23, 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 149528 n. 5 (N.D. Cal. Jan. 18, 2012) .................................................. 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 149632 (N.D. Cal. Jan. 18, 2012) ...................................................... 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 3727221 (N.D. Cal. Aug. 27, 2012)..................................................... 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  822 F. Supp. 2d 953 (N.D. Cal. 2011) ................................................................. 17

*Joseph v. Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ........................................................................... 18

*Kanne v. Visa U.S.A., Inc.*,
  723 N.W.2d 293 (Neb. 2006) .............................................................................. 40

*Keilholtz v. Lennox Health Products, Inc.*,
  268 F.R.D. 330 (N.D. Cal. 2010) ....................................................................... 23

*Keilholtz v. Superior Fireplace Co.*,
  2009 WL 839076 –5 (N.D. Cal Mar. 30, 2009) ............................................ 37, 38

*Leh v. Gen. Petroleum Corp.*,
  382 U.S. 54 (1965) ............................................................................................. 21

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................................ 5

*McBride v. Boughton*,
  123 Cal. App. 4th 379 (Ct. App. 2004) ............................................................... 37

*McKensi v. Bank of Am., N.A.*,
  No. 09-cv-11940, 2010 WL 3781841 (D. Mass. Sept. 22, 2010) ....................... 34

*Munoz v. MacMillan*,
  195 Cal. App. 4th 648 (Ct. App. 2011) ............................................................... 37

*Nordberg v. Trilegiant Corp.*,
  445 F. Supp. 2d 1082 (N.D. Cal. 2006) .............................................................. 37

*Pecover v. Elec. Arts Inc., C*,
  08-2820, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ..................................... 22

*People v. Liberty Mutual Ins. Co.*,
  52 A.D.3d 378 (1st Dep't 2008) .......................................................................... 21

*Peterson v. Cellco P'ship*,
  164 Cal. App. 4th 1583 (Ct. App. 2008) ............................................................. 38

*Petroleum Products Antitrust Litig.*,
  782 F. Supp. 487 (C.D. Cal. 1991) ................................................... 10, 13, 14, 17

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ........................................................................................... 22

*Pooler v. R.J. Reynolds Tobacco Co.*,
    Case No. 00-cv-02674, 2001 WL 403167 (Nev. Dist. Ct. Apr. 4, 2001) ............................... 39

*Richards v. Mileski*,
    662 F.2d 65 (D.C. Cir. 1981) ............................................................................................... 11

*Royal Printing Co. v. Kimberly Clark Corp.*,
    621 F.2d 323 (9th Cir. 1990) .......................................................................................... 1, 7, 8

*Seaboard Corp. v. Marsh Inc.*,
    284 P.3d 314 (Kan. 2012) ................................................................................................... 19

*Sound Appraisal v. Wells Fargo Bank, NA*,
    717 F. Supp. 2d 940 (N.D. Cal. 2010) ............................................................................... 22

*State Ret. Sys. v. Countrywide Fin. Corp.*,
    722 F. Supp. 2d 1157 (C.D. Cal. 2010) ............................................................................. 18

*Sullivan v. Oracle Corp.*,
    662 F.3d 1265 (9th Cir. 2011) ....................................................................................... 21, 25

*Sutcliffe v. Wells Fargo Bank, N.A.*,
    No. C-11-06595, 2012 WL 1622665 (N.D. Cal. May 9, 2012) ........................................... 24

*Volk v. D.A. Davidson & Co.*,
    816 F.2d 1406 (9th Cir. 1987) ....................................................................................... 10, 13

*Wang v. OCZ Technology Group, Inc.*,
    276 F.R.D. 618 (N.D. Cal. 2011). ........................................................................... 22, 23, 25

*Wiggins v. Cosmopolitan Casino of Las Vegas*,
    No. 11-cv-01815, 2012 WL 3561979 (D. Nev. Aug. 15, 2012) ........................................... 10

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*,
    561 F.3d 1004 (9th Cir. 2009) ............................................................................................... 6

*Williams v. Dow Chem. Co.*,
    No. 01-cv-4307, 2004 WL 1348932 (S.D.N.Y. June 16, 2004) ........................................... 19

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
    951 F.2d 1158 (9th Cir. 1991) ............................................................................................. 31

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971) ............................................................................................................ 21

1

## STATUTES

2     15 U.S.C. § 16 ........................................................................................................... 20

3     California Commercial Code Section 2401(2) ....................................................... 24

4     Mass. Gen. Laws ch. 93A § 2 .......................................................................... 2, 34

5     Mass. Gen. Laws ch. 93A § 9(3) ..................................................................... 2, 34

6

7     Neb. Rev. Stat. § 59-821 ....................................................................................... 40

8     Neb. Rev. Stat. §§ 59-1601 ................................................................................... 40

9     Nev. Rev. Stat. § 598A.210 ................................................................................... 39

10    Nev. Rev. Stat. §§ 598A.010 ................................................................................. 39

11    RCW 19.86.080(3) ................................................................................................ 35

12

## RULES

13

14    Fed. R. Civ. P. 12(e) ............................................................................................. 36

15    Fed. R. Civ. P. 6(a)(1) .......................................................................................... 10

16    Fed. R. Civ. P. 8(a)(2) ...................................................................................... 5, 36

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF ISSUES

1. Do the Direct Action Plaintiffs (DAPs) have standing to sue under the Sherman Act where they have alleged that they purchased finished products containing price-fixed CRTs from the Defendants and from companies owned or controlled by the Defendants?

2. Are the DAPs' state law claims timely where (i) the Defendants fraudulently concealed their conspiracy; (ii) the DAPs did not have actual or constructive knowledge of the conspiracy until less than four years before filing their claims; and (iii) the statutes of limitations on certain of the DAPs' claims were further tolled under the doctrines of cross-jurisdictional, government action, and *American Pipe* tolling?

3. Can the DAPs bring indirect claims under the laws of certain states, consistently with due process, where the DAPs have alleged a significant aggregation of contacts between their claims and those states?

4. Should this Court apply the federal standing test established in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), to determine whether the DAPs have standing to bring their claims under Illinois, Michigan, and Arizona law where neither the legislatures nor highest courts of those states have adopted the *AGC* test?

5. Do the DAPs have standing to bring their California and Washington claims under the *AGC* test where the DAPs have alleged that (i) they have participated in the market for CRTs by purchasing finished products containing CRTs; (ii) a CRT is a discrete physical object and its price is traceable through the distribution chain from Defendants to the DAPs; and (iii) the overcharges on CRTs paid by original equipment manufacturers were passed on to the DAPs in the prices they paid for CRT Products?

6. Does Costco have a viable claim under the Washington Consumer Protection Act where Costco (i) has plausibly alleged a violation of the statute; (ii) can recover under the Act at least for purchases from entities owned or controlled by the conspirators; and (iii) may also recover damages under the statute based on the Washington Attorney

General's pending claim?

7.  Do certain DAPs have viable claims under the Massachusetts Consumer Protection Law, Mass. Gen. Laws ch. 93A § 2, where the DAPs have plausibly alleged a violation of the statute and sent demand letters to Defendants pursuant to Mass. Gen. Laws ch. 93A § 9(3)?

8.  Have the Polaroid Plaintiffs sufficiently identified California and Minnesota law as the basis for their unjust enrichment claims where they specifically allege that (i) the Defendants purposefully availed themselves of California and Minnesota law; (ii) the Defendants caused injury in California and Minnesota; and (iii) the Polaroid Plaintiffs' claims arise under California and Minnesota law?

9.  Does California permit recovery under a theory of unjust enrichment or restitution?

10. Have the DAPs stated claims under California's Unfair Competition Act where they properly invoked California law and pleaded violations of federal and state antitrust statutes?

11. Can the DAPs' claims under Nebraska and Nevada law be based on purchases made before those states enacted *Illinois Brick* "repealer" statutes where the courts of both states have indicated that such statutes apply retroactively?

The Direct Action Plaintiffs ("DAPs") respectfully submit this memorandum of law in opposition to Defendants' joint motion to dismiss under Rule 12(b)(6) and for judgment on the pleadings under Rule 12(c).

## **PRELIMINARY STATEMENT**

For nearly twelve years, the Defendants, who are leading manufacturers of CRTs and CRT Products, engaged in one of the most well documented price-fixing conspiracies known to date. They concealed their illegal conduct throughout this entire period, and in the process inflicted billions of dollars in damages on the DAPs, who paid the Defendants supracompetitive prices for CRT Products. The DAPs filed their complaints against the Defendants within four years of learning about the conspiracy. The Defendants now move to dismiss on several grounds, each of which is meritless and should be rejected.

*First*, Defendants argue that the DAPs lack standing to assert their Sherman Act claims because the DAPs purchased finished products containing CRTs rather than the price-fixed CRTs themselves—even though the DAPs bought these products from companies owned or controlled by Defendants. Defendants' argument is directly contrary to the Ninth Circuit's decisions in *In re ATM Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012), and *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1990), which permitted plaintiffs to recover when, as here, "a conspiring seller owns or controls the direct purchaser." *ATM Fee*, 686 F.3d at 749. *ATM Fee* and *Royal Printing* control here and compel the rejection of Defendants' argument, which, if accepted, would immunize Defendants from liability under the Sherman Act and create a gaping loophole in the antitrust laws.

*Second*, Defendants argue that the DAPs' state law claims are time-barred because on November 8, 2007, a foreign governmental agency issued a press release in Belgium about its "preliminary" investigation of a group of unnamed companies who may (or may not) have engaged in some kind of undefined conduct in the CRT industry that may (or may) not have violated foreign law. This press release in no way provided the DAPs with actual or constructive knowledge that the Defendants here engaged in an illegal price-fixing conspiracy that impacted the United States, violated federal and state antitrust laws, impacted the CRT Products purchased by

1   the DAPs, and caused the DAPs damages. Defendants also point to the fact that the first class

2   action complaint was filed in the United States on November 13, 2007. The law is clear that the

3   filing of such a complaint could not, as a matter of law, have given the DAPs actual or constructive

4   notice of their claims. Moreover, even if it had, the DAPs filed their complaints within four years

5   of that time. Separately, many of the DAPs' claims are also timely under *American Pipe &*

6   *Construction Co. v. Utah*, 414 U.S. 538 (1974), and the doctrines of cross-jurisdictional and

7   government action tolling because of the early class complaints that were filed and the DOJ's

8   ongoing criminal actions.

9       *Third*, Defendants argue that the DAPs' indirect claims violate the Due Process Clause,

10  because the DAPs have not alleged that they purchased CRT Products in the states whose laws

11  they invoke. Defendants have misstated the applicable law and ignored the relevant facts. The

12  DAPs have alleged substantial contacts between their claims and the states at issue, including that

13  the DAPs and the Defendants had business operations in those states, the Defendants committed

14  acts in furtherance of the conspiracy in those states, and that the DAPs purchased CRT Products in

15  the relevant states. These allegations are more than sufficient to satisfy due process.

16      *Fourth*, the Defendants argue that the standing test set forth in *Associated General*

17  *Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), should

18  apply to the DAPs' Illinois, Michigan, Arizona, California, and Washington claims. This

19  argument is both wrong and irrelevant. It is wrong because none of the courts or legislatures in

20  Illinois, Michigan, or Arizona have definitively stated that the *AGC* test applies to claims asserted

21  under those states' laws—as they must for *AGC* to apply. *In re TFT-LCD (Flat Panel) Antitrust*

22  *Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008). It is irrelevant because even though

23  California and Washington may apply the *AGC* test, the DAPs have easily satisfied it by pleading

24  that they participated in the market for CRTs, that CRTs are discrete physical objects whose prices

25  are traceable through the distribution chain from Defendants to the DAPs, and that the overcharges

26  on the CRTs were passed on to the DAPs in the prices they paid for CRT Products.

27      Defendants have also made a variety of other DAP-specific arguments with respect to

28  claims under particular states' laws, for example, that (i) Costco cannot assert a Washington

Consumer Protection Act claim; (ii) certain DAPs cannot assert a Massachusetts Consumer Protection Law claim because they failed to satisfy a statutory requirement that they send a pre-complaint demand letter to the Defendants; (iii) Polaroid has not identified the particular state laws it is invoking for its indirect claims; (iv) certain DAPs have failed to plead claims under the California Unfair Competition Act; and (v) certain DAPs' claims under Nebraska and Nevada law cannot be based on purchases made before the repealer statutes in those states were enacted. As set forth in detail below, Defendants' arguments contradict the settled law in each of these states and, in certain instances, they also misstate the relevant facts.

The Defendants cannot legitimately deny their participation in a 12-year CRT conspiracy that caused the DAPs billions of dollars in damages, and the arguments they make in support of their motion to dismiss have no merit. Defendants' motion should be denied.

## STATEMENT OF FACTS

### A. Background

The Defendants engaged in a long-running and well-documented conspiracy to fix the prices of CRTs—the core components in various CRT Products, including televisions and computer monitors. *See, e.g.*, Best Buy Compl. (No. 11-cv-05513-SC (N.D. Cal.), Dkt No. 1); Circuit City Compl. (No. 11-cv-05502-SC (N.D. Cal.), Dkt No. 1); Costco Compl. (No. 11-cv-06397-SC (N.D. Cal.), Dkt. No. 1); Office Depot Compl. (No. 11-cv-06276-SC (N.D. Cal.), Dkt No. 1); Target Compl. (No. 11-cv-05514-EDL (N.D. Cal.), Dkt. No. 1) at ¶¶ 1-2. Defendants' conspiracy spanned over 12 years, from at least March 1995 to November 2007, and included at least 500 conspiracy meetings. *See, e.g., id.* at ¶¶ 1, 6. The United States Department of Justice ("DOJ") and multiple foreign governments are investigating the conspiracy. Thus far, Defendant Samsung SDI Company, Ltd. has pled guilty and paid a $32 million criminal fine, and six executives of Defendants' companies have been indicted by the DOJ. *See, e.g., id.* at ¶ 8.

Defendants were among the leading manufacturers of CRTs and CRT Products and control the majority of the multibillion-dollar CRT industry. *See, e.g., id.* at ¶¶ 2-3. Many of them are "vertically integrated" manufacturers, meaning they manufactured CRTs and they (or their subsidiaries and affiliates) also manufactured CRT Products. The vast majority of the CRTs the

1    Defendants manufactured were sold to their subsidiaries, affiliates, and co-conspirators for

2    incorporation into finished CRT Products.

3           The DAPs are leading U.S. retailers, distributors, and businesses, including Best Buy,

4    Costco, Office Depot, Sears, and Target.[1]  The DAPs purchased CRTs and/or CRT Products from

5    Defendants' U.S.-based marketing and sales subsidiaries and affiliates, which were owned or

6    controlled by Defendants.  As a result of the conspiracy, the DAPs paid substantial overcharges on

7    the billions of dollars of CRTs and CRT Products they purchased.  *See, e.g.,* Best Buy Compl.;

8    Circuit City Compl.; Costco Compl.; Office Depot Compl.; Target Compl. at ¶ 9.

9           **B.  Government Investigations Into Defendants' Conspiracy**

10          On November 8, 2007, the European Commission ("EC") issued a press release in Belgium

11   stating that EC officials had "carried out unannounced inspections" at the premises of several

12   unnamed CRT manufacturers.  Decl. of Benjamin G. Bradshaw in Support of Defs.' Request for

13   Judicial Notice, Exh. 1.  The release noted that the EC conducted these inspections because it "has

14   reason to believe that the companies concerned may have violated EC Treaty rules."  *Id.*  The

15   release in no way mentioned or suggested that the targets of the investigation violated U.S. law or

16   engaged in conduct that impacted the U.S.  The release also noted that the investigation had just

17   begun and that the EC had not yet determined whether a conspiracy actually existed:  "Surprise

18   inspections are a preliminary step in investigations into suspected cartels.  The fact that the [EC]

19   carries out such inspections does not mean that the companies are guilty of anti-competitive

20   behaviour; nor does it prejudge the outcome of the investigation itself."  *Id.*

21          Despite the preliminary and foreign nature of the EC's CRT investigation, Andrew Kindt—

22   an individual in Michigan "who purchased a computer monitor with a CRT" for his own personal

23   use sometime between January 2003 and November 2007—filed a putative class action lawsuit

24   against six CRT manufacturers in U.S. District Court on November 13, 2007.  Bradshaw Decl.

25   Exh. 2.  The next lawsuit alleging a price-fixing conspiracy in the CRT industry was not filed until

26   November 26, 2007.  *See* Dkt. No. 1 (Class Action Compl. in *Crago, Inc. v. Chunghwa Picture*

27
     ───────────────
28   [1] The DAPs are Target, Sears, Kmart, Comp USA, the Good Guys, Radio Shack, Best Buy, Circuit
     City, Costco, Polaroid, Office Depot, PC Richards, Tweeter, Electrograph, CompuCom,
     BrandsMart, Marta Cooperative, and ABC Appliance.

*Tubes, Ltd.*, No. 07-cv-5944).

The DOJ did not announce its own investigation into Defendants' conspiracy until February 10, 2009, when it issued a press release announcing that a federal grand jury had indicted the former Chairman and Chief Executive Officer of Chunghwa Picture Tubes.  The press release noted that the indictment represented "the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  *See, e.g.,* Best Buy Compl.; Circuit City Compl.; Costco Compl.; Office Depot Compl.; Target Compl. at ¶ 182.

### C. **DAP Complaints**

The DAPs opted out of the putative direct purchaser plaintiff ("DPP") and indirect purchaser plaintiff ("IPP") class actions and seek relief for both their direct and indirect claims individually.  The majority of the DAPs filed their lawsuits on November 14, 2011.[2]

### **STANDARD OF REVIEW**

To survive a motion to dismiss, the DAPs are only required to plead facts that plausibly suggest the existence of a conspiracy.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007).  "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests."  *In re CRT Antitrust Litig.,* 738 F. Supp. 2d, 1011, 1017 (N.D. Cal.) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quotation omitted)).  Indeed, motions to dismiss for failure to state a claim "rarely" will be granted "in an antitrust suit where proof and details of the alleged conspiracy are largely in the hands of the co-conspirators."  *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Develop Corp*., S.A., 711 F.2d 989, 995 (11th Cir. 1983).  Courts view Rule 12(b)(6) motions with "disfavor" because of the lesser role pleadings play in federal practice and the liberal policy regarding amendment.  *See*, *e.g.,* *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (Rule 12(b)(6) dismissal with prejudice proper only in "extraordinary" cases); *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009) (Rule 12(b)(6) motion "viewed with disfavor and rarely granted").

---

[2] Electrograph filed its initial complaint on February 18, 2011, and the Polaroid plaintiffs filed their complaint on November 7, 2011.

1    Thus, "[t]o successfully state a claim under §1 of the Sherman Act, a plaintiff need only

2    meet the notice pleading standard articulated in Fed. R. Civ. P. 8(a)(2). Rule 8(a)(2) requires Rule

3    8(a)(2) requires 'a short and plain statement of the claim showing that the pleader is entitled to

4    relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon

5    which it rests.'" *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.,* 561 F.3d 1004, 1009 (9th

6    Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). Rule 8 does not require detailed factual

7    allegations. *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009). Under *Twombly's* construction of

8    Rule 8, a plaintiff merely has to "nudge[] [its] claims…'across the line from conceivable to

9    plausible.'" *Id.* at 680 (quoting *Twombly*, 550 U.S. at 570).

10    Subject to the requirement that the complaint show a "plausible" claim for relief, the court

11    must accept as true all material factual allegations in the complaint, draw inferences from those

12    allegations in the light most favorable to plaintiff, and construe the complaint liberally. *Barker v.*

13    *Riverside County Office of Ed.,* 584 F.3d 821, 824 (9th Cir. 2009).

14    Moreover, the defects of a complaint must appear on its face; courts cannot consider

15    material outside the complaint such as facts presented in briefs, affidavits, or discovery materials.

16    *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001); *Butler v. Los*

17    *Angeles County*, 617 F. Supp. 2d 994, 999 (C.D. Cal. 2008). "Rule 12(b)(6) does not countenance

18    . . . dismissals based on a judge's disbelief of a complaint's factual allegations. . . . A well-pleaded

19    complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

20    improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556.

21    **ARGUMENT**

22    **I.    THE DAPS HAVE STANDING TO PURSUE THEIR FEDERAL CLAIMS**

23    Defendants argue that the DAPs lack standing under *Illinois Brick* to pursue their federal

24    claims because those claims are based on purchases of finished products containing price-fixed

25    CRTs ("CRT Products") and not stand-alone CRTs. Defs.' Joint Mot. to Dismiss ("Mot.") at 5. In

26    particular, Defendants contend that the Special Master's previous Report and Recommendation

27    ("R&R") concerning Defendants' motion for partial summary judgment in the Direct Purchaser

28    Plaintiff ("DPP") action compels dismissal of the DAPs' claims. *See, e.g., id.* This argument is

utterly without merit. The Ninth Circuit's decision in *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012), which was handed down after the R&R, directly applies here and compels the denial of Defendants' motion. Under *ATM Fee*, the DAPs may pursue their federal claims based on their purchases of CRT Products from Defendants and companies they own or control.

In addressing Defendants' motion for partial summary judgment in the DPP action before the Special Master, the DPPs and the DAPs advanced two principal arguments. First, Plaintiffs argued that they were direct purchasers under federal law because they directly purchased CRTs as part of finished products from Defendants and co-conspirators or their controlled affiliates. The Special Master disagreed with this contention on the ground that Plaintiffs bought finished products containing CRTs and not CRTs on a stand-alone basis. R&R at 3. Second, Plaintiffs argued that, even if they were indirect purchasers, they had standing under Section 4 of the Clayton Act under the Ninth Circuit's decisions in *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1990), and *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003), which permit indirect purchasers to sue for the full amount of an overcharge "when a conspiring seller owns or controls the direct purchaser." *ATM Fee*, 686 F.3d at 749. In that situation, no other party is available to vindicate federal law because "[t]he co-conspirator parent will forbid its subsidiary or division to bring a lawsuit." *Royal Printing*, 621 F.2d at 326. The Special Master found the *Royal Printing* line of cases inapplicable to this situation. R&R at 10.[3]

While *ATM Fee* is consistent with the R&R's conclusion that plaintiffs who purchase finished products containing price-fixed components are indirect purchasers,[4] *ATM Fee* undermines the R&R's conclusion with respect to whether an exception to *Illinois Brick* grants such plaintiffs standing under federal law as indirect purchasers. Under *ATM Fee*, it is clear that the *Royal Printing* ownership or control exception applies to the DAPs' purchases of finished

---

[3] Both the DPPs and the DAPs filed Objections to the R&R. (Dkt. 1271 and 1273.) The DAPs hereby incorporate all arguments made in their Objections to the R&R into this Opposition. Judge Conti has scheduled oral argument on the Objections for December 7, 2012.
[4] The DAPs respectfully disagree with this part of the Ninth Circuit's decision. The DAPs purchased price-fixed CRTs as components in CRT Products from Defendants and companies they own or control. The DAPs' purchases were the first purchases of the price-fixed CRTs outside Defendants' corporate groups. Plaintiffs thus purchased CRTs when they purchased CRT Products and have standing to bring their antitrust claims directly under *Illinois Brick*.

products containing price-fixed CRTs from Defendants and companies they own or control.  Thus, the DAPs have standing.

**A. *ATM Fee* Compels the Denial of Defendants' Motion**

In *ATM Fee* the plaintiffs alleged that the defendants had fixed the prices of "interchange fees" that ATM owners paid to banks.  686 F.3d at 746.  The plaintiff consumers in that case did *not* pay the price-fixed interchange fees, but *were* charged a "foreign ATM fee" when they withdrew money from ATMs.  *Id.* at 749-50.  The plaintiffs argued that the price-fixed interchange fee was "passed on to Plaintiffs [by the ATM owner] as part of the foreign ATM fee."  *Id.* at 746.  Under these circumstances, the Ninth Circuit found that the plaintiffs *would* have standing if they paid the foreign ATM fee to an entity owned or controlled by a conspirator, *id.* at 756-58, because "indirect purchasers may sue when a conspiring seller owns or controls the direct purchaser," *id.* at 749 (citing *Royal Printing*, 621 F.2d at 326).  *ATM Fee* thus left no doubt that the ownership or control exception applies regardless of whether a plaintiff has paid the price-fixed fee directly or the overcharge was passed on to them.[5]

Further, *ATM Fee* agreed with the result in *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978), and stated that *Sugar* "exemplifies the exception allowed when an upstream violator controls or owns the direct purchaser."  686 F.3d at 755, n.7.  The plaintiff in *Sugar* purchased a finished product (candy) containing a price-fixed component (sugar) from a subsidiary of a conspirator.  Regardless, the Third Circuit found that the plaintiff had standing under the ownership or control exception to *Illinois Brick*.  579 F.2d at 18-19.  The Ninth Circuit's approval of *Sugar* confirms that this exception applies to the purchase of a finished product containing a price-fixed component.

*ATM Fee* also approvingly cited Areeda's endorsement of *Sugar's* application of the ownership or control exception.  686 F.3d at 755 n.7 (citing 2A Phillip E. Areeda, et al., *Antitrust Law* ¶ 346f & n.41).  Following *Sugar*, Areeda declared that, although the Supreme Court had not

---

[5] The Court also drew a clear distinction between the ownership or control exception and the co-conspirator exception.  Though *ATM Fee* held that the co-conspirator exception applies only where a plaintiff directly pays the price-fixed price, the Court held that not to be the case under the ownership or control exception.  *Compare ATM Fee*, 686 F.3d at 755-56 *with id.* at 756-58.

1   spoken on the ownership or control exception, "most courts considering the question correctly

2   allow the indirect purchaser to recover."  Areeda ¶ 346f.  Under those circumstances, "[t]he

3   indirect purchaser has obviously borne all of the loss; denying relief would insulate the violator

4   from suit."  *Id.*  Areeda identified *Sugar* as one of the decisions that had *correctly* allowed an

5   indirect purchaser to recover under the ownership or control exception.  *Id.* at n.41.

6       Furthermore, in discussing *Freeman*, *ATM Fee* confirmed that the ownership or control

7   exception applies where plaintiffs do not directly pay the price-fixed fee.  686 F.3d at 756-57.  In

8   *Freeman*, despite finding that plaintiffs did not pay the price-fixed fee (which was passed on to

9   them in another fee), the Court nevertheless applied the ownership or control exception.  *Id.* at 754

10  ("Standing existed in *Freeman,* not because the associations fixed the support fees for the purpose

11  and effect of raising MLS fees, but because of the associations' ownership and control of Sandicor

12  (the direct purchaser).").  Thus, *ATM Fee*'s discussion of *Freeman* confirms that whether a

13  purchaser paid the price-fixed is irrelevant to application of the ownership or control exception.

14      *ATM Fee* is also consistent with the application of the ownership or control exception by

15  Judge Seeborg in the *ODD* antitrust action and by Judge Illston in the *LCD* antitrust action (where

16  the plaintiffs purchased finished products containing price-fixed components) and thus confirms

17  that Judges Seeborg and Illston applied *Royal Printing* correctly.[6]  The facts of *ODD* and *LCD* are

18  nearly identical to those here and thus Plaintiffs respectfully submit that the *Royal Printing*

19  ownership or control exception upheld by the Ninth Circuit in *ATM Fee* must be applied here, too.

20      Thus, Defendants' argument that Plaintiffs do not have standing under the federal antitrust

21  laws for their purchases of CRT Products from Defendants and companies they own or control is

22  wholly incorrect.  *ATM Fee* has provided clear guidance on this issue and, as such, there can be no

23  doubt that these purchases fall squarely within the ownership or control exception to *Illinois Brick*.

24  Thus, Plaintiffs have standing and Defendants' Motion should be denied.

25  _____

26  [6] *See In re Optical Disk Drive (ODD) Antitrust Litigation*, No. 3:10–md–2143 RS, 2012 WL
    1366718 (N.D. Cal. Apr. 19, 2012) (denying motion to dismiss); *TFT-LCD*, 2011 WL 5357906

27  (N.D. Cal. Nov. 7, 2011) (denying Toshiba's motion for summary judgment); *TFT-LCD*, 2009 WL
    533130, at *1-2 (N.D. Cal. Mar. 3, 2009) (denying Tatung's motion to dismiss in class actions);

28  *TFT-LCD*, 2010 WL 1264230, at *1-2 (N.D. Cal. Mar. 28, 2010) at *1 (denying Tatung's motion
    for reconsideration of its motion to dismiss in class actions); *TFT-LCD*, 2010 WL 2836955, at *3
    (N.D. Cal. Jul. 19, 2010) (denying Tatung's motion to dismiss in DAP actions).

1    ## II.     THE DAPs' STATE LAW CLAIMS ARE TIMELY

2              The DAPs' claims are subject to a four-year statute of limitations, and the DAPs filed well

3    within that period.[7]  Specifically, the last DAP complaints were filed on November 14, 2011.

4    Even if the limitations period began to run on November 11, 2007, it would expire on November

5    14, 2011, because November 11, 2011 was Veterans Day (a legal holiday) and the next two days

6    fell on the weekend.[8]  *See* Fed. R. Civ. P. 6(a)(1).  And DAPs have more than adequately alleged

7    that Defendants fraudulently concealed their conspiracy such that the limitations period was tolled

8    until well after DAPs filed their complaints.

9              "Under the doctrine of fraudulent concealment, the applicable statute of limitations is

10   tolled 'if the plaintiff proves the defendant fraudulently concealed the existence of the cause of

11   action so that plaintiff, acting as a reasonable person, did not know of its existence."  *E.W. French*

12   *& Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392 (9th Cir. 1989) (quotation omitted).  A

13   plaintiff must allege that (1) defendant actively concealed the conspiracy; (2) plaintiff did not

14   have actual or constructive notice of the facts constituting its claim for relief; and (3) plaintiff

15   exercised due diligence in trying to uncover its claim.  *See id.* at 1399; *Conmar Corp. v. Mitsui &*

16   *Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).  Due diligence is required only "when facts

17   exist that would excite the inquiry of a reasonable person."  *Conmar*, 858 F.2d at 504.

18             "Ordinarily, a defendant has an extremely difficult burden to show [fraudulent

19   concealment allegations] are barred as a matter of law," *In re Coordinated Pretrial Proceedings*

20   *in Petroleum Products Antitrust Litig.*, 782 F. Supp. 487, 489 (C.D. Cal. 1991) (Tashima, J.)

21   (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987)).  As Judge Conti has

22   noted, "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent

23

24   _____

     [7] While Target's claim under the Kansas Restraint of Trade Act, Radio Shack's claim under the

25   Mississippi Antitrust Act, and Electrograph's claim under the New York Unfair Business Practices
     Act are subject to three-year statutes of limitations, the doctrines of fraudulent concealment and

26   class action tolling discussed below apply equally to those claims such that the limitations period
     did not begin to run until long after November 11, 2008.
     [8] The Court may take judicial notice of calendar dates.  *See* Fed. R. Evidence 201; *Wiggins v.*

27   *Cosmopolitan Casino of Las Vegas*, No. 11-cv-01815, 2012 WL 3561979, at *3 (D. Nev. Aug. 15,
     2012) ("[W]e therefore take judicial notice of the 2011 calendar, and, using . . . the method

28   prescribed by Rule 6, find that Plaintiff's deadline to file suit fell on November 14, 2011 because
     the ninetieth day, November 11, was a Friday and a Veterans Day, a federal legal holiday.").

concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010) (quoting *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)); *see also Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981) (stating that using a motion to dismiss to raise a statute of limitations defense "often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit"). In fact, a district court cannot even grant *summary judgment* on statute of limitations grounds unless "uncontroverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered the cause of action but failed to file a timely complaint." *Conmar*, 858 F.2d at 502 (quotation omitted).

The DAPs have alleged that Defendants fraudulently concealed the conspiracy's existence until at least November 11, 2007, and that they could not have discovered the conspiracy before that with the exercise of due diligence. Defendants' motion should therefore be denied.

### A. The DAPs Have Alleged Fraudulent Concealment

To establish that a defendant fraudulently concealed an antitrust conspiracy, a plaintiff must plead that "its failure to have notice of its claim was the result of affirmative conduct by the defendant." *Conmar*, 858 F.2d at 505. Applying this standard, Judge Conti has already held that the DPPs' and IPPs' class complaints sufficiently pleaded fraudulent concealment by alleging, *inter alia*, that Defendants:

> gave pretextual reasons for price increases, [] coordinated their misleading announcements[,] . . . took steps to keep their meetings secret, such as varying meeting locations, limiting meeting attendees, avoiding note-taking, and agreeing to maintain the secrecy of meetings[, and] . . . blamed price increases in 2004 on a shortage of glass shells . . . .

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d at 1024 (N.D. Cal. 2010).[9] The DAPs have made precisely the same allegations:

| DPP and IPP Allegations | Materially Indistinguishable DAP Allegations |
|---|---|
| | |

---

[9] Judge Illston reached the same conclusion with respect to similar allegations of fraudulent concealment made by the plaintiffs in the LCD litigation. *E.g., TFT-LCD*, 586 F. Supp. 2d 1109, 1132 (N.D. Cal. 2008).

| | | |
|---|---|---|
| Defendants gave pretextual reasons for price increases | • Best Buy Compl. ¶¶ 209, 211, 213, 225, 229-34<br>• Brandsmart Compl. ¶¶ 200, 202, 204, 216, 220-25<br>• Circuit City Compl. ¶¶ 207, 209, 211, 224, 228-33<br>• CompuCom Compl. ¶¶ 202, 204, 206, 218, 222-27<br>• Costco Compl. ¶¶ 162, 166-72<br>• Electrograph FAC ¶¶ 215, 217, 219, 232, 236-41 | • Office Depot Compl. ¶¶ 201, 203, 205, 217, 221-26<br>• P.C. Richard Compl. ¶¶ 206, 208, 210, 222, 226-31<br>• Polaroid Compl. ¶ 176<br>• Target Compl. ¶¶ 208, 210, 212, 225, 229-34<br>• Tweeter Compl. ¶¶ 204, 206, 208, 220, 224-29 |
| Defendants coordinated their misleading announcements | • Best Buy Compl. ¶¶ 5, 225<br>• Brandsmart Compl. ¶¶ 5, 216<br>• Circuit City Compl. ¶¶ 5, 224;<br>• CompuCom Compl. ¶¶ 5, 218<br>• Costco Compl. ¶¶ 5, 162<br>• Electrograph FAC ¶¶ 5, 232 | • Office Depot Compl. ¶¶ 5, 217<br>• P.C. Richard Compl. ¶¶ 5, 222<br>• Polaroid Compl. ¶¶ 121, 176<br>• Target Compl. ¶¶ 4, 225<br>• Tweeter Compl. ¶¶ 5, 220 |
| Defendants took steps to conceal their meetings, such as varying meeting locations, limiting meeting attendees, avoiding note-taking, and agreeing to maintain secrecy | • Best Buy Compl. ¶¶ 227-28<br>• Brandsmart Compl. ¶¶ 218-19<br>• Circuit City Compl. ¶¶ 226-27<br>• CompuCom Compl. ¶¶ 220-21<br>• Costco Compl. ¶¶ 164-65<br>• Electrograph FAC ¶ 234-35 | • Office Depot Compl. ¶¶ 219-20<br>• P.C. Richard Compl. ¶¶ 224-25<br>• Polaroid Compl. ¶ 176<br>• Target Compl. ¶¶ 227-28<br>• Tweeter Compl. ¶¶ 222-23 |
| Defendants blamed price increases on a shortage of glass shells | • Best Buy Compl. ¶¶ 209, 213, 231-32<br>• Brandsmart Compl. ¶¶ 200, 204, 222-23<br>• Circuit City Compl. ¶¶ 207, 211, 230-31<br>• CompuCom Compl. ¶¶ 202, 206, 224-25<br>• Costco Compl. ¶¶ 167, 169-72<br>• Electrograph FAC ¶¶ 215, 238-39 | • Office Depot Compl. ¶¶ 201, 205, 223-24<br>• P.C. Richard Compl. ¶¶ 206, 210, 229-29<br>• Polaroid Compl. ¶ 160<br>• Target Compl. ¶¶ 208, 212, 231-32<br>• Tweeter Compl. ¶¶ 204, 208, 226-27 |

Thus, the DAPs' claims are timely unless Defendants can show as a matter of law that the

DAPs had actual or constructive knowledge of their claims before November 11, 2007.  As demonstrated below, they cannot.

### B.  The DAPs Did Not Have Actual or Constructive Knowledge of the Facts Underlying Their Claims Until Less Than Four Years Before Filing Suit

The DAPs have sufficiently alleged that they did not have actual or constructive knowledge of the Defendants' conspiracy before November 11, 2007.[10]  Defendants' meritless arguments to the contrary should be rejected.

To establish fraudulent concealment, a plaintiff must allege "that [it] had neither actual nor constructive knowledge of the facts constituting [its] claim for relief."  *In re Rubber Chemicals*, 504 F. Supp. 2d at 787.  Thus, even if a plaintiff had knowledge that should have prompted an investigation into a defendant's wrongdoing, the plaintiff does not have constructive knowledge unless that investigation, had it been conducted, would have uncovered the facts establishing the plaintiff's claims.  *Petroleum Products*, 782 F. Supp. at 493 ("Constructive knowledge exists when a plaintiff should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim.").  In other words, facts in a plaintiff's possession

> will not amount to constructive knowledge if those facts were not of a type to prompt investigation.  Nor is there constructive knowledge if, even upon investigating, plaintiffs might reasonably be unable to uncover their claims. Further, public access to information does not incontrovertibly establish constructive knowledge of one's claims.  Even where a plaintiff actually knows of public speculation, constructive knowledge cannot be established absent awareness of some evidence tending to support it.

*Id.* (citations and quotation marks omitted).

This inquiry is fact-intensive and should rarely be resolved at the pleading stage.  *Id.* at 491 ("Ordinarily . . . whether a plaintiff knew or should have known of a cause of action presents a question for the trier of fact.") (quoting *Volk*, 816 F.2d at 1417).  As this Court observed when denying Defendants' motions to dismiss the DPP and IPP class complaints, "lack of due diligence and constructive knowledge are *factual* issues not appropriate for a motion to dismiss."  Dkt. 597

---

[10] Defendants do not argue (and the DAPs dispute) that the DAPs had actual knowledge of their claims before November 11, 2007.  Thus, the DAPs' (lack of) actual knowledge of the conspiracy is not at issue here.  *Petroleum* Products, 782 F. Supp. at 491 (Where a plaintiff claims not to have actual knowledge of the conspiracy, that denial typically is "sufficient to raise a factual dispute for jury determination" regarding actual knowledge).

at 24 (emphasis in original).

Courts in the Ninth Circuit repeatedly have refused to impute constructive knowledge, as a matter of law, even when some facts relevant to the plaintiff's claims were publicly disclosed on numerous occasions. For example, in *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F. 2d 499 (9th Cir. 1988), the plaintiff alleged that defendants had conspired to import steel products at below-market value. Notwithstanding widespread news coverage of a criminal investigation into this conduct, publicly filed criminal court documents, guilty pleas by some of the named defendants, and a prior related lawsuit, the Ninth Circuit refused to grant summary judgment to the defendants, noting that "[c]ases refusing to toll the statute of limitations for fraudulent concealment have required more to find as a matter of law that sufficient facts were available to put the plaintiff on notice of his or her claims." *Id.* at 503. The court so ruled even though the plaintiff had mentioned some of these disclosures in its own complaint. *Id.* at 502 ("[Plaintiff's] mention of the pleas in its complaint does not constitute an admission that these pleas put it on constructive notice of its claim.").

Similarly, in *Petroleum Products*, Judge Tashima (then a district judge) held that a lawsuit alleging price-fixing in the oil industry that had been reported in newspapers and trade journals did not provide constructive notice to plaintiffs who later filed similar claims. The court explained that "a chain of inferences" would be required to find constructive knowledge on these facts:

> First, the lawsuit must have been sufficiently similar such that, if meritorious, plaintiffs should suspect that they too had a claim for relief. Second, the lawsuit must have had a legal and factual basis since constructive knowledge cannot be premised on a frivolous claim. Next, plaintiffs must have had reason to know about the lawsuit since . . . the availability of information in the public domain does not compel finding constructive knowledge. Finally, plaintiffs must have been able to determine the suit had merit.

782 F. Supp. at 493 (citing *E.W. French,* 885 F.2d at 1400; *Conmar,* 858 F.2d at 503–04). The court refused to make these inferences and held that this statute of limitations issue could not be resolved because the prior lawsuit did "not irrefutably demonstrate" that the plaintiffs "discovered or should have discovered the cause of action but failed to file a timely complaint." *Id.* at 494 (quoting *Conmar*, 858 F.2d at 502) (alterations omitted).

The court also held that media coverage of the earlier-filed lawsuit failed to establish constructive knowledge as a matter of law because "[t]he small handful of articles here pales in comparison to the preeminence of the major, nationally-distributed magazine and newspapers involved in the *Conmar* case," where the court had refused to find constructive knowledge. *Id.* at 495 ("In *Conmar,* the Ninth Circuit refused to impute constructive knowledge as a matter of law where an indictment covering the same subject matter as the plaintiffs' complaint was covered by 'two articles in the San Francisco Chronicle . . . [,] The Los Angeles Times . . . [,] The New York Times . . . Business Week and the San Jose Mercury–News.' Further, a pre-indictment investigation identifying the exact violations complained of by the Plaintiffs were mentioned in 'one San Francisco Chronicle article . . . [and] one Wall Street Journal article.'") (quoting *Conmar,* 858 F.2d at 500–01).

Moreover, the court concluded that a long-running federal investigation into the oil industry also failed to provide constructive notice to the plaintiffs, even after the *San Francisco Examiner* reported that both the DOJ and the FTC were investigating price-fixing allegations in the industry in at least seven states. *Id.* at 497. The court explained, "[w]hether plaintiffs should have realized that an investigation of their own was warranted, following up on 10 years of multiple federal grand jury investigations without a single indictment being returned, and whether they should have uncovered wrongdoing of the type they currently are complaining about is an issue for the jury." *Id.*

Other federal courts around the country likewise have found that isolated public disclosures of facts relevant to a plaintiff's claims—including media reports, press releases by government agencies, criminal prosecutions, or civil lawsuits—generally fail to establish constructive knowledge as a matter of law. *E.g.*, *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-02002, 2011 WL 5980001, at *8 (E.D. Pa. Nov. 30, 2011) ("Whether a reasonable plaintiff would be expected to read regional newspapers or egg industry publications . . . is simply not a question that can be resolved at this stage of the case because the answer would require looking to matters extraneous to the [complaint]"); *In re Bulk Extruded Graphite Prods. Antitrust Litig.*, No. 02-6030, 2007 WL 1062979, at *4 (D. N.J. Apr. 4, 2007) (denying summary judgment because although

"Defendants point to numerous industry and government press releases, wire service stories, and

newspaper articles that discuss an ongoing Department of Justice investigation into pricing

practices in the graphite industry and litigation brought by the government and private parties

against corporations in that industry (including certain of the defendants) . . . Only one wire service

story and two SEC filings state that [a defendant] had been served subpoenas for documents

relating to . . . bulk graphite"); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 373-74

(D. N.J. 2001) ("Even assuming the Court could take notice of the *Coast Automotive* action to

assess the adequacy of plaintiffs' complaint, only by operation of a legal fiction could the filing of

a private lawsuit by an unrelated party in a different vicinage put consumers on notice as a matter

of law that a price-fixing conspiracy was afoot.  No authority appears in defendants' briefs to

support so harsh a rule, and the Court declines to adopt one."); *In re Sumitomo Copper Litig.*, 120

F. Supp. 2d 328, 345-47 (S.D.N.Y. 2000) (plaintiffs alleging manipulation of copper prices

sufficiently pleaded fraudulent concealment notwithstanding that the London Metal Exchange

"took public action and various news reports appeared discussing manipulation of the copper

market" before the date when plaintiffs alleged that the concealment stopped).  *Accord* Antitrust

Laws and Trade Regulation, Ch. 162 § 162.04[2] (Matthew Bender).  *Id.* at 346.

Despite these authorities, Defendants argue that the DAPs had constructive notice of their

claims when the Eureopean Commission, a foreign prosecutor, issued a terse statement on

November 8, 2007, announcing that it had conducted "[s]urprise inspections" of several unnamed

CRT manufacturers as a "preliminary step" in an investigation into suspected violations of "EC

Treaty rules on cartels and restrictive business practices (Article 81)."[11]  Defendants are wrong.

Unlike the DAPs' claims, which arise under the federal laws of the United States and

various individual state laws, Article 81 of the EC Treaty prohibits anticompetitive and collusive

conduct that occurs outside of the United States.  *See* Consolidated Version of the Treaty

Establishing the European Community art. 81, 2006 O.J. C 321 E/37, at E/73-74.  Moreover,

---

[11] As Defendants concede (Mot. at 10, n.16), their argument that the DAPs' claims are time-barred because the November 8, 2007, EC statement created a statute of limitations deadline of November 8, 2011, cannot possibly apply to the Electrograph and Polaroid plaintiffs' claims, which were filed on February 18, 2011 and November 7, 2011, respectively.

although Article 81 prohibits a multitude of activities, including price-fixing, capacity restraints, market allocation, price discrimination, and tying, the EC press release does not identify which category of illegal conduct the EC was investigating. In other words, the press release concerned (i) a "preliminary step," (ii) in a foreign investigation, (iii) into unspecified violations, (iv) of foreign law, (v) against unnamed companies, (vi) whom the press release expressly stated should not be presumed to have engaged in anti-competitive conduct.

This bare-bones press release provided *no knowledge*—let alone constructive knowledge to the DAPs—of the facts underpinning the elements of their claims, because the press release did not inform the reader of:

- Whether a conspiracy, combination, or contract even existed. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (In order to state a claim under Section 1 of the Sherman Act, a plaintiff must plausibly allege "that an agreement was made.").

- The identities of the companies that were being investigated. *See In re CRT Antitrust Litig.*, 738 F. Supp. 2d at 1019 ("Courts in this district . . . require plaintiffs to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.") (quotation omitted).

- Whether the conduct impacted United States commerce. *See TFT-LCD*, 822 F. Supp. 2d 953, 956 (N.D. Cal. 2011) (The Foreign Trade Antitrust Improvement Act ("FTAIA") bars Sherman Act claims based on foreign anticompetitive conduct unless that conduct "has a direct, substantial, and reasonably foreseeable effect on domestic commerce.") (quotation omitted); *see also id.* at 958 ("[T]he FTAIA delineates the elements of a successful antitrust claim.") (quotation and alteration omitted).

- Whether the conduct related to or affected products that the DAPs purchased. *See In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1084 (N.D. Cal. 2007) (a plaintiff seeking money damages for a violation of the Sherman Act "must demonstrate injury-or the fact of damage-to his or her business or property interests, which injury is causally linked to [defendants'] antitrust violation").

Not surprisingly, Defendants cannot cite a single case that explains how such a press release "irrefutably demonstrate[s]" as a matter of law that the DAPs discovered or should have discovered their claims by November 11, 2007. *See Petroleum Products*, 782 F. Supp. at 494 (quoting *Conmar*, 858 F.2d at 502). Nor can Defendants cite any authority to support their argument that the complaint filed by another plaintiff on November 13 suffices to show that the DAPs had constructive knowledge of their claims before that complaint was even filed.[12]

_____

[12] For the reasons discussed above, the complaint filed in *Kindt v. Matsushita Electrical Industrial Co.* did not provide the DAPs actual or constructive knowledge of their claims on November 13, 2007. In fact, it is horn book law that the filing of such a complaint cannot, as a matter of law, give a plaintiff actual or constructive notice of its claim. Antitrust Laws and Trade Regulation, Ch. 162 § 162.04[2] (Matthew Bender) ("Defendants often argue that the second element of a

Defendants' arguments are flatly contradicted by *Conmar*, *Petroleum Products*, and decisions from federal courts around the country.[13]

### C. The DAPs' Claims Were Further Tolled under the Doctrines of Cross-Jurisdictional, Government Action, and *American Pipe* Tolling

The doctrines of cross-jurisdictional, government action, and *American Pipe* tolling also tolled the statute of limitations on many of the DAPs' claims. These doctrines apply regardless of whether the DAPs had actual or constructive notice of their claims. *Me. State Ret. Sys. v. Countrywide Fin. Corp.,* 722 F. Supp. 2d 1157, 1166 (C.D. Cal. 2010) ("Other courts have already recognized the distinction between the fraudulent concealment tolling doctrine, which was incorporated into the one-year/three-year structure of the statute of limitations, and *American Pipe* tolling, which is sometimes referred to as "legal tolling.""); *Joseph v. Wiles*, 223 F.3d 1155, 1166-67 (10th Cir. 2000) (recognizing the difference between *American Pipe* tolling and other equitable tolling doctrines such as fraudulent concealment).

The leading decision to address cross-jurisdictional tolling, *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335 (E.D. Pa. 2004), held that the doctrine applies when: (i) there is a strong federal interest in recognizing cross-jurisdictional tolling—which there is "[i]n the antitrust

---

fraudulent concealment claim – successful concealment from the plaintiff – cannot be satisfied because of existence of similar lawsuits gave the plaintiff actual or constructive knowledge of its claim. Courts have generally found this claim to be inadequate to defeat – prior to trial – a fraudulent concealment claim."); *see also E.W. French & Sons, Inc. v. General Portland, Inc.*, 885 F.2d 1392, 1399-1400 (9th Cir. 1989) (citing *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1171 (5th Cir. 1979) (footnotes omitted), *cert. denied*, 449 U.S. 905 (1980) ("The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so as a *matter of law* is to compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights . . . . The mere filing of a similar lawsuit, without more, does not necessarily give 'good ground' because that suit might well be frivolous or baseless." (emphasis added)). In any event, the DAPs' claims would still be timely even if it did. *See supra* at pp. 9-10.

[13] Contrary to Defendants' assertions, the DAPs need not have diligently pursued their claims, having had neither actual nor constructive knowledge of them. "[T]he requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person." *Conmar*, 858 F.2d at 504. This is because "[p]laintiffs are not under a duty to continually scout around to uncover claims which they have no reason to suspect they might have." *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 788 (N.D. Cal. 2007) (quotation omitted). In any event, the sufficiency of a plaintiff's due diligence is not an appropriate subject for a motion to dismiss. *Id.* ("It is impossible to declare at this [motion to dismiss] stage that plaintiffs failed to exercise due diligence to follow up on that which may or may not have been sufficient to excite their suspicions.") (alterations in original); *see also* (Dkt. 597 at 24) (noting that "lack of due diligence" is a "factual issue[…] not appropriate for a motion to dismiss"). In any event, the DAPs have diligently pursued their claims.

context, [because] declining to adopt cross-jurisdictional class action tolling will invite the filing of

numerous protective, duplicative and in many cases, unnecessary, suits by class members that want

to consider filing claims under state antitrust law not included in a federal class action complaint,"

*id.* at 346; (ii) "independent of the federal interest involved, each of the states in question would

adopt cross-jurisdictional class action tolling in antitrust class actions filed in federal court," *id.* at

346; and (iii) the tolling would not prejudice Defendants because they "were put on notice of the

factual predicate for all of the potential antitrust claims," *id.* at 352.

Each of these factors is satisfied here with respect to the DAPs' claims under California,

Florida, Kansas, Massachusetts, Minnesota, New York, and Washington law, because (1) there is a

strong federal interest in recognizing cross-jurisdictional tolling; (2) California,[14] Florida,[15]

Kansas,[16] Massachusetts,[17] New York,[18] Minnesota,[19] and Washington[20] would each adopt cross-

---

[14] *See Hatfield v. Halifax PLC*, 564 F.3d 1177 (9th Cir. 2009) (applying California doctrine of equitable tolling based on class action filed in other jurisdiction). Judge Illston read the Ninth Circuit's decision in *Hatfield* to mean that non-residents could not take advantage of California's equitable tolling doctrine. *TFT-LCD*, 2012 WL 149632, at *3 (N.D. Cal. Jan. 18, 2012). The DAPs respectfully disagree. *Hatfield* refused to extend California's equitable tolling doctrine to the non-residents because their claims accrued outside of California and would have been barred by the statute of limitations of the law that governed their claims (there, English law). *Hatfield*, 564 F.3d at 1189. As *Hatfield* explained, "California's borrowing statute [] prevents non-residents from prosecuting an action in a California court where such action would be barred under the statute of limitations of the jurisdiction whose law would otherwise govern." *Id.* Thus, a non-resident can take advantage of equitable tolling under California law if that plaintiff's claim arose in California.

[15] *See Barneby v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528-29 (M.D. Fla. 1989) ("*American Pipe* tolling is properly extended" where Florida state law claims "involve the same 'evidence, memories, and witnesses' as are involved in the putative class action [in Indiana federal court].").

[16] *See Seaboard Corp. v. Marsh Inc.*, 2012 WL 3807681, at *16, *25-*27 (Kan. August 31, 2012) (applying Kansas savings statute on a cross-jurisdictional basis and holding that plaintiff's claim was timely filed because it was a putative plaintiff in a federal class action based on claims arising out of the same conduct, transaction, or occurrence).

[17] *See Arivella v. Lucent Techs., Inc.*, 623 F. Supp. 2d 164, 180 (D. Mass. 2009) (class action tolling should be interpreted liberally with the goal of reducing multiplicity of actions, even if the individual plaintiff's claims are not identical to those asserted in the class complaint).

[18] *Williams v. Dow Chem. Co.*, No. 01-cv-4307, 2004 WL 1348932, at *12 (S.D.N.Y. June 16, 2004) ("New York would likely apply *American Pipe*" in a cross-jurisdictional context).

[19] Cross-jurisdictional tolling applies to Minnesota claims because "[Minnesota] courts would apply the American Pipe class-action tolling rule in a 'cross-jurisdictional' context." *Jenson v. Allison-Williams Co.*, 1999 U.S. Dist. LEXIS 22170, 18-19 (S.D. Cal. Aug. 23, 1999) (holding that federal class action tolled state law claim under Minnesota Securities Act, and citing to *Carson v. Independent School Dist. No. 623*, 392 N.W.2d 216, 223 (Minn. 1986) and *Bartlett v. Miller and Schroder Municipals, Inc.*, 355 N.W.2d 435, 439-440 (Minn. Ct. App. 1984)).

[20] Although Washington courts have not explicitly decided whether to allow cross-jurisdictional tolling, there is every reason to think that they would. In Washington, "[e]quitable tolling is appropriate when it would effectuate: 1) the policies underlying the statute, and 2) the purposes

---

jurisdictional tolling in the circumstances here; and (3) the Defendants were on notice that they

could be sued under each of these states' laws when the first DPP class action complaint was filed

against them in which the DAPs were members of the class, because that complaint (*Crago, Inc. v.

Chunghwa Picture Tubes* (Dkt. 1)) asserted substantially the same claims as the DAPs based on

substantially the same allegations of wrongdoing. *See Crago, Inc. v. Chunghwa Picture Tubes*

(Dkt. 1 ¶ 37) (asserting claims on behalf of "[a]ll persons and entities who purchased CRT

Products in the United States directly from one or more defendants").[21] The statute of limitations

was therefore tolled under the doctrine of cross-jurisdictional tolling from November 26, 2007—

the date *Crago, Inc. v. Chunghwa Picture Tubes* (Dkt. 1) was filed—until the DAPs filed their

complaints.

Separately, to the extent that the Defendants challenge the timeliness of the DAPs' federal

claims, the statute of limitations with respect to those claims was tolled under the doctrine of

*American Pipe* and pursuant to Section 5(i) of the Clayton Act. As described above, the DAPs

plainly fell within the definition of the early class complaints, which were filed in November 2007

and asserted claims under Section 1 of the Sherman Act. Accordingly, under *American Pipe*, the

statute of limitations on the DAPs' federal claims were tolled from November 26, 2007—the date

the first direct purchaser class complaint was filed—until the dates that the DAPs opted out of the

DPP class. The statutes of limitations on those claims were also tolled under Section 5(i) of the

Clayton Act beginning February 10, 2009, when the DOJ obtained its first indictments in its CRT

---

underlying the statute of limitations." *Douchette v. Bethel Sch. Dist. No. 403*, 117 Wash. 2d 805,
812, 818 P.2d 1362, 1365 (1991). Here, applying cross-jurisdictional tolling would do both. "The
purpose of the Washington [Consumer Protection Act]" is "'to protect the public and foster fair
and honest competition.'" *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719
P.2d 531, 534 (Wash. 1986) (quoting RCW 19.86.920). Meanwhile, "[t]he policy behind statutes
of limitation is protection of the defendant, and the courts, from litigation of stale claims where
plaintiffs have slept on their rights and evidence may have been lost or witnesses' memories
faded." *Douchette v. Bethel Sch. Dist. No. 403*, 117 Wash. 2d 805, 813, 818 P.2d 1362, 1365-66
(1991) (internal quotation marks omitted). Here, plaintiffs have clearly not slept on their rights
and there is no risk of lost evidence or faded memories, as the class actions have been proceeding
for several years. And the statutory goal of "fostering fair and honest competition" would in no
way be furthered by allowing Defendants to escape claims under Washington law.
[21] Plaintiffs were still members of this putative class when the direct purchaser plaintiffs filed their
first consolidated amended complaint on March 16, 2009, asserting direct purchaser claims on
behalf of "[a]ll persons and entities who, between March 1, 1995 and November 25, 2007, directly
purchased a CRT Product in the United States from any defendant or any subsidiary or affiliate
thereof, or any co-conspirator." Dkt. 436 ¶ 85.

investigation, because (i) the DAPs' Sherman Act claims are based on substantially the same facts

as the DOJ's criminal charges; and (ii) the DOJ's criminal case is ongoing. *See* 15 U.S.C. § 16;

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971); *Leh v. Gen. Petroleum

Corp.*, 382 U.S. 54 (1965).

Finally, New York law provides that claims under New York's Donnelly Act are tolled

"during the pendency . . . and one year thereafter" of any civil or criminal antitrust proceeding

brought by the federal government, if the Donnelly Act claims are "based in whole or in part on

any matter complained of in the federal proceeding." N.Y. Gen. Bus. L. § 342-c. Accordingly, for

the same reasons discussed above with respect to Section 5(i) of the Clayton Act, the statute of

limitations on the DAPs' Donnelly Act claims was also tolled beginning February 10, 2009. *See

People v. Liberty Mutual Ins. Co.*, 52 A.D.3d 378, 379 (1st Dep't 2008) ("[T]he Donnelly Act . . .

should generally be construed in light of Federal [antitrust] precedent.") (quotation omitted).

\*     \*     \*     \*

In sum, the DAPs have alleged that the Defendants fraudulently concealed the existence of

the conspiracy and they had neither actual nor constructive knowledge of their claims until less

than four years before filing suit. Further, the limitations period on many of the DAPs' claims

were also tolled under the doctrines of cross-jurisdictional, *American Pipe*, and government action

tolling. Defendants' motion to dismiss on statute of limitations grounds should therefore be

denied.

## III.    THE DAPS' STATE LAW CLAIMS COMPORT WITH DUE PROCESS

Defendants argue that several of the DAPs' state law claims should be dismissed on due

process grounds because they have not adequately alleged that they purchased CRTs or CRT

Products in the states whose laws they invoke. But Defendants' standard is not the exclusive

standard for establishing compliance with due process, and even if it were, the DAPs have alleged

that they purchased CRT Products in each of the states at issue.

Courts apply a flexible standard to determine whether sufficient contacts exist to justify

application of a particular state's law. The Due Process Clause is not offended by the application

of a state's law as long as there is "a significant contact or significant aggregation of contacts

[between the claim and the state], creating state interests, such that choice of its law is neither

arbitrary nor fundamentally unfair." *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011)

(quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985)).  Specifically, in determining

whether the requirements of due process are met, a court must examine "the contacts of the State,

whose law [is to be] applied, with the parties *and* with the occurrence or transaction giving rise to

the litigation." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981) (emphasis added).  In other

words, the question is not *which* state's law applies—as if the due process analysis is a zero-sum

game in which one state wins and the rest lose—but whether a "significant aggregation of

contacts" exists between the claim and the state such that application of that state's law is not

unfair.  As this Court has explained, a single claim can arise under several states' laws consistently

with the Due Process Clause and regardless of the place of purchase:

> Because most of the video games at issue were sold outside California,
> [defendant] argues that California does not have significant contacts to the claims
> asserted by plaintiffs. . . .  Courts, however, have moved away from the view that
> the location of the event is controlling.  Moreover, the relative interests of other
> states generally is not a matter of *constitutional* concern.  Thus California could
> have a smaller actual interest in the claims than that of other states yet still have
> significant contacts to satisfy due process.  Courts therefore consider several
> different factors in addition to the location of the sale in determining whether due
> process is satisfied [including] . . .  the location of the wrongful conduct[,] . . .
> [t]he location of the defendant's headquarters[,] . . . [and the location where the
> relevant] agreements originated . . . .

*Pecover v. Elec. Arts Inc.*, C 08-2820, 2010 WL 8742757, at *18 (N.D. Cal. Dec. 21, 2010); *see

also Hague*, 449 U.S. at 308 n. 11 (noting the move away from a "choice-of-law methodology

focused on the jurisdiction where a particular event occurred" to one based on "interest analysis").

In particular, Defendants' contacts with the relevant states, including their commitment of

acts in furtherance of the conspiracy and their business operations in those states, are sufficient to

justify application of those states' law.[22]  *See, e.g., Wang v. OCZ Technology Group, Inc.*, 276

F.R.D. 618, 629 (N.D. Cal. 2011); *Pecover*, 2010 WL 8742757, at *18; *Sound Appraisal v. Wells

Fargo Bank, NA*, 717 F. Supp. 2d 940, 945 (N.D. Cal. 2010) (even though plaintiffs were injured

---

[22] Judge Illston rejected this argument in the LCD litigation.  *E.g., TFT-LCD*, 2010 WL 2609434,
at *3 (N.D. Cal. June 28, 2010).  Certain plaintiffs in the LCD litigation have appealed this issue to
the Ninth Circuit and the appeal is fully briefed and ready for oral argument.

in other states, sufficient contacts existed to apply California law where plaintiffs alleged that conspiracy was "planned and implemented in California and that many of the wrongful acts emanated from" offices in California); *Keilholtz v. Lennox Health Products, Inc.*, 268 F.R.D. 330, 340 (N.D. Cal. 2010) (applying California law to nationwide class action satisfied due process although most of the defendant's fireplaces were sold outside California because "[p]laintiffs have shown that a significant portion of [d]efendants' alleged harmful conduct emanated from California); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 905 (N.D. Cal. 2008) ("If Plaintiffs can allege specific California conduct underlying out-of-state Plaintiff's claims, they may continue to assert California state law claims on behalf of those Plaintiffs.").

In antitrust cases involving individuals purchasing consumer products, courts often focus their analysis on where the purchase was made, *i.e.*, "where the injury took place, based on the local nature of the individual consumer transaction at issue." *Wang v. OCZ Technology Group, Inc.*, 276 F.R.D. at 629; *see also In Re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007) ("*GPU I*") (agreeing that with respect to "transactions that, for individual consumers, are local in nature" "the more significant factor [is] . . . . where the plaintiff was located when the injury occurred from purchasing the products"). Even in these circumstances, however, "whether the injury occurred in [the forum] is not solely determinative in evaluating the application of [that forum's] law," particularly "where there are significant allegations of the defendant's conduct having taken place in the forum state." *Wang*, 276 F.R.D. at 629 (applying California's Unfair Competition Law to purchases that individual plaintiff made in Washington); *see also Allstate*, 449 U.S. at 314 n. 19 ("Numerous cases have applied the law of a jurisdiction other than the situs of the injury where there existed some other link between that jurisdiction and the occurrence.").

This expanded inquiry is particularly appropriate when business-to-business transactions are at issue, as they are here, because the parties' commercial relationship and the purchasing process often touch several states. In the LCD litigation, for example, Judge Illston considered several factors to determine where a plaintiff's purchases were made, including: (i) where the

1  plaintiff was headquartered, *TFT-LCD*, 2012 WL 149632, at *4 (N.D. Cal. Jan. 18, 2012); (ii)

2  where the plaintiff selected the LCD products, *TFT-LCD*, 2011 WL 5922966, at *2 (N.D. Cal.

3  Nov. 28, 2011); (iii) where the negotiations over the terms of purchase took place, *id.*; (iv) where

4  the plaintiff agreed to pay the inflated prices, *TFT-LCD*, 2012 WL 3727221, at *4 (N.D. Cal. Aug.

5  27, 2012); (v) where the plaintiff executed purchase agreements, *id.*; (vi) where the plaintiff

6  received invoices, *TFT-LCD*, 2011 WL 5922966, at *2; and (vii) where the plaintiff's purchase

7  orders and payments issued from, *id.*; *TFT-LCD*, 2012 WL 3727221, at *4.

8        The Uniform Commercial Code ("UCC") suggests that where the DAPs took title of

9  Defendants' products—*i.e.*, the locations to which those products were shipped by the

10  Defendants—is also relevant.[23] *See* U.C.C. § 1-201(29) (defining a "purchase" as "taking by

11  sale"); *Dean Foods Co. v. Brancel*, 187 F.3d 609, 617 (7th Cir. 1999) (stating that "[u]nder the

12  UCC, a sale occurs upon the passing of title to the goods from the buyer to the seller" and that

13  "[t]itle passes from the seller to the buyer 'at the time and place at which the seller completes his

14  performance with reference to the physical delivery of the goods'") (quoting U.C.C. § 2-401(2)).[24]

15        As described below, the DAPs' allegations, which detail Defendants' and the DAPs'

16  contacts with the relevant states, are more than sufficient to defeat Defendants' motion to

17  dismiss.[25] *See, e.g.*, *TFT-LCD*, 2012 WL 149528, at *4 n. 5 (N.D. Cal. Jan. 18, 2012) (denying

18  motion to dismiss on due process grounds where plaintiff alleged that it made purchases in relevant

19  states); *Sutcliffe v. Wells Fargo Bank, N.A.*, No. C-11-06595, 2012 WL 1622665, at *16 (N.D. Cal.

20

---

21  [23] Judge Illston rejected this argument in the LCD litigation. *E.g.*, *TFT-LCD*, 2012 WL 3727221, at *4 (N.D. Cal. Aug. 27, 2012). Although the DAPs have alleged sufficient contacts with the

22  relevant states to satisfy due process under the standard applied by Judge Illston, it is the DAPs' position that Judge Illston erred by holding that a plaintiff's purchasing activities (but not the act of

23  taking title) are the only relevant contacts for due process purposes.
[24] *See also, e.g.*, *See Galicia v. Country Coach, Inc.*, 324 Fed. App'x. 687, 688-89, 2009 WL

24  1144224, at *1 (9th Cir. Apr. 29, 2009) ("A 'sale' occurs under California law at the time title to the goods passes from the seller to the buyer. California Commercial Code Section 2401(2)

25  provides the default rules for passage of title—'[u]nless otherwise explicitly agreed[,] title passes to the buyer at the time and place at which the seller completes his performance with reference to

26  the physical delivery of the goods. . . .'") (citation omitted).
[25] These allegations likewise suffice to defeat Defendants' arguments (Mot. at 21-22) regarding

27  prudential standing. *See, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 905 (N.D. Cal. 2008) ("If Plaintiffs can allege specific California conduct

28  underlying out-of-state Plaintiffs' claims, they may continue to assert California state law claims on behalf of those Plaintiffs.").

May 9, 2012) (where plaintiffs alleged that defendant had operations in California, sent correspondence from California, and collected payment in California, plaintiffs' allegations were "sufficient to support the application of California law, at least at the pleading stage"); *Wang*, 276 F.R.D. at 630 ("Though [plaintiff's] allegations of [defendant's] California-based conduct are general . . . for the purposes of a motion to dismiss, these allegations are more than sufficient to sustain [plaintiff's] California-based claims."); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) (allegation that "many of [defendant's] executives, including its Vice President of Consumer Products, are located in California" established sufficient "California connections" for purposes of motion to dismiss).

*First*, the DAPs' allegations satisfy the Due Process Clause because the DAPs have alleged a significant aggregation of contacts between their claims and the states at issue.[26] Moreover, with respect to California, the DAPs specifically have alleged that Defendants had business operations there and committed acts in furtherance of the conspiracy there.[27]  *Second*, the DAPs' allegations satisfy the standard applied by Judge Illston in the LCD litigation because the DAPs have alleged that they purchased Defendants' products in the forum states.[28]  These allegations satisfy the requirement under the Due Process Clause that the application of these states' laws "is neither arbitrary nor fundamentally unfair."  *Sullivan*, 662 F.3d at 1271.  The

---

[26]  CompuCom Compl. ¶¶ 11, 16, 18, 21, 31, 42, 47, 49, 59, 61-62, 67, 79, 173-76, 178, 187, 237-39, 242, 254, 256-67; Costco Compl. ¶¶ 12-14, 47-48, 53, 142-46; Electrograph FAC ¶¶ 16, 18-20, 27, 29, 36, 56, 61, 63, 73, 75, 77, 89, 189-92, 200, 251-53, 256, 260, 266, 269, 271-72, 276-77, 280; Office Depot Compl. ¶¶ 11, 18, 19, 49, 61-62, 66, 78, 172-75, 177, 186, 244-46, 249; Polaroid Compl. ¶¶ 4, 8, 9, 11, 18, 21, 189-91, 36, 46, 47, 60, 64, 166, 168, 194; Target Compl. ¶¶ 14, 16-19, 21, 22, 27, 29, 32-33, 37, 42, 49, 60, 64, 67, 77, 79-80, 85, 191-195, 203; Tweeter Compl. ¶¶ 11, 13, 16, 22, 25, 27, 35, 40, 45, 50, 52, 62-65, 69, 79, 171, 175-78, 180, 189; Best Buy Compl. ¶¶ 11, 13-16, 20-21, 27, 29, 37, 42, 47, 54-57, 61, 81, 176, 180-185, 194, 238; P.C. Richard Compl. ¶¶ 11, 14-15, 17-18, 21, 24, 27, 29, 37, 42, 47, 52, 54, 64-67, 71, 81, 173, 177-80, 182, 191, 238, 246, 247, 248, 249.
[27]  CompuCom Compl. ¶¶ 49, 61, 62, 67, 173-76, 178, 187, 238; Costco Compl. ¶¶ 47-48, 53, 142-46; Polaroid Compl. ¶¶ 4, 8, 9, 36, 46, 47, 60, 64, 166, 168; Target Compl. ¶¶ 14, 18, 21, 22, 27, 29, 32-33, 37, 193, 244, 245, 258; Office Depot Compl. ¶¶ 18, 19, 49, 61-62, 66, 78, 172-75, 177, 186, 244-46, 249; Electrograph FAC. ¶¶ 16, 20, 27, 63, 75, 89, 189-92, 200, 251-3, 256, 260, 266; Tweeter Compl. ¶¶ 52, 64-65, 69, 175-80, 189, 233, 234, 236, 239, 245; Best Buy Compl. ¶¶ 55-57, 61, 180-85, 194; P.C. Richard Compl. ¶¶ 54, 66-67, 71, 177-80, 182, 191.
[28]  CompuCom Compl. ¶¶ 11, 18, 237, 254; Costco Compl. ¶¶ 12-14; Electrograph FAC ¶¶ 251, 269; Office Depot Compl. ¶¶ 11, 18-19, 244; Polaroid Compl. ¶¶ 18, 21, 189; Target Compl. ¶¶ 16-19, 21, 22, 27, 29, 32-33, 37; Tweeter Compl. ¶¶ 11, 22; Best Buy Compl. ¶¶ 11, 20-21; P.C. Richard Compl. ¶¶ 11, 17-18, 21, 24, 246-49.

Court should thus reject Defendants' attempt to dismiss the DAPs' state law claims on due process grounds.

## IV. THE DAPS HAVE STANDING TO PURSUE THEIR STATE LAW CLAIMS

Defendants argue that the DAPs lack standing to bring their state law claims under Arizona, California, Illinois, Michigan, and Washington law because *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983), purportedly applies to those claims, and the DAPs have not alleged standing under the *AGC* test.[29] Defendants are wrong. First, *AGC* does not even apply to claims made under those states' laws, save California and Washington. Second, all of the DAPs' claims satisfy the *AGC* test.

### A. *Associated General Contractors* Does Not Apply to Claims Under the Laws of Arizona, Illinois or Michigan

Defendants argue that this Court should apply the *AGC* standing test under the laws of Arizona, Illinois, and Michigan based on (a) lower court decisions from Illinois and Michigan, and (b) "harmonization" statutes enacted by Arizona, Illinois, and Michigan. But "it is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts," and no such "clear directive" exists here. *E.g.*, *TFT-LCD*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008); *see also GPU I*, 527 F. Supp. 2d at 1026 ("Standing under each state's antitrust statute is a matter of that state's law. It would be wrong for a district judge, in *ipse dixit* style, to bypass all state legislatures and all state appellate courts and to pronounce a blanket and nationwide revision of all state antitrust laws.").

This Court has already determined that the *AGC* factors should not apply to determine standing under Arizona and Michigan law. *CRT*, 738 F. Supp. 2d at 1023. Defendants give the Court no reason to depart from this determination. *Accord TFT-LCD*, 586 F. Supp. 2d at 1122 (indicating that the law of these states on *AGC* is not "clearcut"); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (*GPU II*) (although "some intermediate appellate courts have used the *AGC* test" and harmonization statutes are on the books,

---

[29] Defendants move to dismiss Plaintiffs Costco, CompuCom, Electrograph, Circuit City, Office Depot and Polaroid's California law claims; Costco, Circuit City, and P.C. Richard's Illinois law claims; P.C. Richard's Michigan law claims; Costco and P.C. Richard's Arizona law claims; and Costco's Washington law claims.

1  "[t]his is not the same as showing that *AGC* has been adopted as the law of those states").

2  Nor should the Court apply *AGC* to determine standing under Illinois law.  Although

3  Illinois has a harmonization provision, Illinois courts have held that "federal decisions are not

4  binding on our courts" with respect to antitrust claims.  *Baker v. Jewel Food Stores, Inc.*, 823

5  N.E.2d 93, 101 (Ill. App. Ct. 2005) (quoting *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*,

6  642 N.E.2d 470, 472 (Ill. 1994)).  Thus, Illinois courts "are not required to follow federal antitrust

7  decisions, although [they] may do so if [they] find them persuasive."  *Id.* (citation omitted).

8  In sum, Defendants have failed to demonstrate that there is a "clear directive" in each of

9  these states that requires the Court "to undertake the back-breaking labor involved in deciphering

10  the state of antitrust standing in each of those states on this motion—particularly since, as shown

11  below, indirect purchasers have shown standing under *AGC* for consumers who bought finished

12  [CRT Products]."  *See GPU II,* 540 F. Supp. 2d at 1097.  Thus, as courts in this district have

13  already held, it is inappropriate to apply *AGC* factors to claims under Arizona, Michigan, and

14  Illinois law because these states have not given a clear directive to do so.  *E.g., TFT-LCD*, 586 F.

15  Supp. 2d at 1123; *GPU II*, 540 F. Supp. 2d at 1097.[30]

16  **B. The DAPs' Claims Satisfy *Associated General Contractors***

17  In any event, all of the DAPs' claims satisfy the *AGC* standard.[31]  This Court has already

18  rejected Defendants' arguments that the IPPs' allegations failed to establish standing under *AGC*.

19  Specifically, the Court found that the following IPP allegations were "sufficient to find the injury

20  alleged in the Indirect Complaint is the kind the antitrust laws were designed to rectify":

21  • Indirect "Plaintiffs paid 'higher prices for CRT Products than they would have paid
     in the absence of Defendants' conspiracy.'"

22

23  _____

24  [30] Judge Hamilton's decision in *In re Dynamic Access Memory (DRAM) Antitrust Litig.*, 516 F.
    Supp. 2d 1072 (N.D. Cal. 2007), does not compel a different result.  In that case, Judge Hamilton
    found that *AGC* applied to claims brought under the laws of California, Kansas, Maine, Michigan,

25  Minnesota, North Carolina, North Dakota, South Dakota, and Wisconsin.  *Id.* at 1088-89, 1093-94.
    Only California and Michigan are at issue here, and this Court has already determined that, while

26  the *AGC* test may be applied as a matter of California law, it may not be applied as a matter of
    Michigan law.  *CRT*, 738 F. Supp. 2d at 1023.

27  [31] Defendants have conceded that they do *not* seek dismissal on antitrust standing grounds of Best
    Buy's Minnesota state law claims, Tweeter's Massachusetts consumer protection law claims,

28  Interbond's Florida Deceptive and Unfair Trade Practices Act, or Target's claims.  Mot. at 26,
    n.28.

- The "'price of CRT Products is directly correlated to the price of CRTs.'"

- The "'market for CRTs and the market for CRT Products are…inextricably linked and cannot be considered separately.'"

- "Defendants monitored the prices of televisions and computer monitors in order to police their price fixing agreement related to CRTs."

- "CRTs account for approximately sixty percent of the cost of manufacturing a computer monitor, and a slightly smaller percentage of the cost of manufacturing a television, and as such it is easier to determine how much money was being passed through to purchasers of the finished products."

- "CRTs are discrete components that can easily be traced."

*CRT*, 738 F. Supp. 2d at 1024. Plaintiffs have made essentially the same allegations.[32]

Defendants nonetheless argue that a different outcome is warranted here because the Court's decision in the IPP case relied on allegations that Defendants conspired to fix the prices of both CRTs *and* CRT Products, whereas the DAPs do not allege a conspiracy to fix the prices of CRT Products. Mot. at 26, n.30. The Court's analysis, however, did not rely on allegations that the CRT products the IPPs purchased were themselves price-fixed. Rather, the Court's antitrust standing analysis was based on allegations that the markets for CRTs and CRT products were intertwined. *CRT*, 738 F. Supp. 2d at 1023-24. Likewise, Defendants' argument that the DAPs' purchases of CRT Products – as opposed to CRTs standing alone – cannot satisfy *AGC*'s standing requirements must fail. In support of this argument, Defendants claim that "[l]ike the DPPs in the MDL against whom summary judgment has been granted because they lack standing *as direct purchasers* . . . any DAPs who have not specifically pleaded that they purchased CRTs themselves cannot prove antitrust standing *under the laws of those states* that apply *AGC*." Mot. at 26 (emphasis added). This is nonsense. Defendants are moving against certain DAPs' *indirect state law claims*. The DPP Summary Judgment R&R held that purchases of CRT Products are not direct purchases under *Illinois Brick* and made no mention of *AGC*. R&R at 4-9, 12. The R&R thus is irrelevant to whether the DAPs have standing to bring *indirect claims under state Illinois Brick repealer statutes. See id.* at 11 ("Further, the purchasers of FPs [finished products] are

---

[32] *Compare CRT*, 738 F. Supp. 2d at 1023-24 *with* Electrograph Compl. ¶¶ 95-99, 136, 222-229; CompuCom Compl. ¶¶ 85-89, 126, 208-215; Costco Compl. ¶¶ 69-70, 108, 157-158; Office Depot Compl. ¶¶ 84-88, 125, 207-214; P.C. Richard Compl. ¶¶ 89-93, 130, 212-219; Circuit City Compl. ¶¶ 87-91, 128, 214-221; Polaroid Compl. ¶¶ 101, 120, 184-185, 199.

1  probably indirect purchasers who can maintain causes of action, although under state law and not

2  federal, for any economic harm to them.").

3      In *AGC*, the Supreme Court identified five factors for determining whether a plaintiff has

4  antitrust standing: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type

5  the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative

6  measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning

7  damages." *American Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir.

8  1999) (citing *AGC*, 459 U.S. at 535). "To conclude that there is antitrust standing, a court need not

9  find in favor of the plaintiff on each factor." *Id.* at 1055. Rather, courts are to balance the factors,

10  "giving great weight to the nature of the plaintiff's alleged injury." *Id.*

11      **1. The DAPs Have Adequately Alleged Antitrust Injury**

12      Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that

13  flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-*

14  *Mat, Inc.*, 429 U.S. 477, 489 (1977). The Ninth Circuit has parsed this into four requirements:

15  "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes

16  the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am.*

17  *Ad Mgmt.*, 190 F.3d at 1055. Here, the DAPs have alleged a *per se* antitrust violation – horizontal

18  price-fixing of CRTs[33] – and that "[a]s a direct and proximate result of the unlawful conduct of

19  Defendants, [the DAPs] have been injured in their business and property in that they paid more for

20  CRT Products than they otherwise would have paid in the absence of the unlawful conduct of

21  Defendants."[34] The DAPs' injuries are precisely the type of harm the state antitrust laws were

22  intended to remedy.

23      **a. Defendants Have Construed the Relevant Market Too Narrowly**

24      Defendants argue that the DAPs "have not demonstrated 'antitrust injury' because they are

25

26  [33] *E.g.* Electrograph Compl. ¶ 222; CompuCom Compl. ¶ 208; Costco Compl. ¶ 157; Office Depot
    Compl. ¶ 207; P.C. Richard Compl. ¶ 212; Circuit City Compl. ¶ 214; and Polaroid Compl. ¶¶

27  183-185.
    [34] *E.g.*, Electrograph Compl. ¶ 222; *see also* CompuCom Compl. ¶ 208; Costco Compl. ¶ 159;

28  Office Depot Compl. ¶ 207; P.C. Richard Compl. ¶ 212; Circuit City Compl. ¶ 214; Polaroid
    Compl. ¶ 185.

DIRECT ACTION PLAINTIFFS' OPPOSITION TO                    - 29 -                Master File No. 3:07-5944-SC
DEFENDANTS' JOINT MOTION TO DISMISS                                             MDL No. 1917

not participants in the allegedly restrained market for CRTs." Mot. at 27. Defendants thus attempt

to separate the market for CRTs from the finished products that contain CRTs. *Id*. Other courts in

this district have already rejected such an overly narrow and wooden definition of the relevant

market.[35] In *GPU II*, the court rejected defendants' argument that "Plaintiffs who bought finished

computers participated in the market for finished computers, not for GPUs [graphics processing

units]" to find that "this [*AGC*] factor slightly favors standing." *GPU II*, 540 F. Supp. 2d at 1098.

Likewise, in *Flash Memory*, the court rejected defendants' argument "that the alleged

anticompetitive conduct occurred only in the market for *direct* purchasers of NAND flash

memory, which is different than for *indirect* purchasers where the relevant market ostensibly is

defined by where the particular product containing flash memory is sold." *In Re Flash Memory*

*Antitrust Litig.*, 643 F. Supp. 2d 1133, 1153 (N.D. Cal. 2009). The court was persuaded by the

indirect purchasers' allegations that regardless of whether flash memory was purchased as "a

stand-alone item or incorporated as a central component of finished products" it "provides

essentially the same functionally," and that "while the markets for NAND flash memory and

products that contain NAND flash memory technically may be different, in practice, both markets

are inextricably intertwined and there is inherent cross-elasticity of demand between the two." *Id*.

at 1154. Based on those allegations, the court found that plaintiffs "alleged sufficient facts to

show that they are market participants for purposes of AGC." *Id*.

Finally, in *In Re TFT-LCD*, the court found that the plaintiffs participated in the relevant

market where they alleged that the "market for LCD panels and the market for the products into

---

[35] Defendants rely heavily on *In Re DRAM* to support their separate market argument; however, *DRAM* is an outlier in this district, as demonstrated by other courts' refusal to follow it out of recognition of the impropriety of a district court ignoring state legislatures and state courts to broadly apply federal law to state repealer laws. *See GPU I*, 527 F. Supp. 2d at 1026; *In Re TFT-LCD*, 586 F. Supp. 2d at 1122-23; *Flash Memory*, 643 F. Supp. 2d at 1153. Moreover, the products at issue in *DRAM* make it distinguishable from CRTs and CRT televisions and monitors. DRAM memory chips are just one of "numerous other components" found in the wide variety of electronic products that contain DRAM. *DRAM I*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007). Here, Plaintiffs have alleged that CRTs are the primary component of CRT televisions and monitors. *E.g.* Electrograph Compl. ¶92 ("The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as 'the CRT.'"); CompuCom Compl. ¶82; Costco Compl. ¶66; Office Depot Compl. ¶81; P.C. Richard Compl. ¶86; Circuit City Compl. ¶84; Polaroid Compl. ¶84.

which they are placed are inextricably linked and intertwined because the LCD panel market exists

to serve the LCD products market"; that LCD panels "have no independent utility, and have value

only as components of other products, such as TVs, computer monitors, and laptops"; and that the

"demand for LCD panels thus directly derives from the demand for such products." *TFT-LCD*,

586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008).

Here, the DAPs's allegations are sufficient to demonstrate that their purchases of CRT

Products resulted in antitrust injury:

- "CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products."[36]

- "The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other."[37]

- "Plaintiffs have participated in the market for CRTs through . . . their purchases of CRT Products indirectly from non-Defendant original equipment manufacturers ("OEM") and others."[38]

The allegations weigh in favor of finding that the DAPs have suffered antitrust injury.

### 2. The DAPs' Allegations Demonstrate the Directness of Their Injuries

The DAPs' allegations demonstrate that their injuries are sufficiently direct under the

second *AGC* factor. The directness factor looks to whether a plaintiff's injury was the direct result

of the defendants' anticompetitive activity. *Am. Ad Mgmt.*, 190 F.3d at 1058. Directness is

assessed by "look[ing] to the chain of causation between [Plaintiffs'] injury" and Defendants'

unlawful conduct. *Id.* (citing *AGC*, 459 U.S. at 540; *Yellow Pages Cost Consultants, Inc. v. GTE

Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1991) ("Directness in the antitrust context means

close in the chain of causation.")).

At the pleading stage, allegations that the CRT is a discrete component and its price is

traceable through the distribution chain are sufficient. *See GPU II*, 540 F. Supp. 2d at 1098

---

[36] Electrograph Compl. ¶95; CompuCom Compl. ¶85; Costco Compl. ¶69; Office Depot Compl. ¶84; P.C. Richard Compl. ¶89; Circuit City Compl. ¶87.
[37] Electrograph Compl. ¶96; CompuCom Compl. ¶86; Costco Compl. ¶69; Office Depot Compl. ¶85; P.C. Richard Compl. ¶90; Circuit City Compl. ¶88.
[38] Electrograph Compl. ¶97; CompuCom Compl. ¶87; Office Depot Compl. ¶86; P.C. Richard Compl. ¶91; Circuit City Compl. ¶89.

1   ("plaintiffs have pleaded that the price of the GPU is traceable, so this factor favors standing"); *In*

2   *Re TFT-LCD*, 586 F. Supp. 2d at 1123-24 (finding the second *AGC* factor met because "plaintiffs

3   have sufficiently alleged that the price of LCD panels is traceable").[39]  Here, the DAPs have

4   alleged that:

5
          • "CRTs are identifiable, discrete physical objects that do not change form or become
6             an indistinguishable part of a CRT Product."[40]

7         • CRTs remain "essentially unchanged as [they] move through the distribution
8             system" and "follow a physical chain from Defendants through manufacturers of
              CRT Products sold to Plaintiffs."[41]
9
          • Defendants and their co-conspirators knew of and discussed "the significant impact
10            that the price of CRTs had on the cost of the finished products into which they were
              placed," and that Defendants "concluded that in order to make their CRT price
11            increases stick, they needed to make the increase high enough that their direct
              customers (CRT TV and monitor makes) would be able to justify a corresponding
12            price increases to their customers."[42]

13        • "In this way, Defendants ensured that price increases for CRTs were passed on to
14            indirect purchasers of CRT Products."[43]

15         These allegations weigh in favor of standing because they demonstrate the traceability of

16  CRTs and their prices through the distribution chain where Plaintiffs purchased CRT Products.

17         **3.  The DAPs' Allegations Demonstrate That Their Injuries Are Not Speculative**

18         The third *AGC* factor – whether damages are speculative – simply serves the purpose of

19  ensuring that a reasonable basis exists for determining damages.  "Complex antitrust cases . . .

20  invariably involve complicated questions of causation and damages."  *Am. Ad Mgmt.*, 190 F.3d at

21  1059 (finding that while ascertaining the amount of plaintiff's damages is complicated, "this

22  ─────────────────────
23  [39] *Cf. DRAM I*, 516 F. Supp. 2d at 1092 (directness factor weighed against standing where
    plaintiffs "set[] forth no allegations that demonstrate, that within the final purchase price of a given
    product purchased by plaintiffs for 'end use,' the ultimate costs of the DRAM component is
24  somehow directly traceable and/or distinguishable").
    [40] Electrograph Compl. ¶226; CompuCom Compl. ¶212; Costco Compl. ¶70; Office Depot Compl.
25  ¶211; P.C. Richard Compl. ¶216; Circuit City Compl. ¶218; *see also* Polaroid Compl. ¶120
    ("Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT
26  Products.").
    [41] *Id.*
27  [42] Electrograph Compl. ¶ 136; CompuCom Compl. ¶136; Costco Compl. ¶108; Office Depot
    Compl. ¶125; P.C. Richard Compl. ¶130; Circuit City Compl. ¶128; Polaroid Compl. ¶120.
28  [43] Electrograph Compl. ¶ 136; CompuCom Compl. ¶136; Costco Compl. ¶108; Office Depot
    Compl. ¶125; P.C. Richard Compl. ¶130; Circuit City Compl. ¶128; Polaroid Compl. ¶120.

complexity is not so unusual as to distinguish this case from other complex business disputes").

Defendants argue that Plaintiffs' allegations "only emphasize the complexity of any pass-on analysis that might be required." Mot. at 30. That argument should be rejected for a fundamental reason: Defendants have only moved on *AGC* grounds against the DAPs' *indirect state law claims*. Such claims exist only because state legislatures decided to allow suits for damages based on overcharges passed-on by middlemen, despite the Supreme Court's concerns about the complexity of analyzing pass-on.

The DAPs have sufficiently alleged that the overcharges on CRTs paid by OEMs were passed on to them in the prices they paid for CRT Products.[44] Moreover, as discussed above, Plaintiffs have alleged that CRTs are identifiable, discrete physical objects that "follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs," which is sufficient to avoid dismissal.[45] *Flash Memory*, 643 F. Supp. 2d at 1155; *see also TFT-LCD*, 586 F. Supp. 2d at 1124 (finding that "plaintiffs have sufficiently alleged that overcharges are passed on to consumers and that such overcharges can be traced through the relatively short distribution chain").

### 4. Defendants' Arguments Regarding Duplicative Recovery and the Complexity of Apportioning Damages Do Not Warrant Dismissal of State Law Indirect Purchaser Claims

Defendants' arguments regarding the last two *AGC* factors, the risk of duplicative recovery and the complexity of apportioning damages, are essentially a request that this Court overturn the repealer states' decision to allow indirect purchaser actions. Duplicative recovery concerns "generally [are] inapposite in the context of indirect purchaser state law antitrust claims." *Flash Memory*, 643 F. Supp. 2d at 1156. Even *DRAM*, upon which Defendants rely, recognizes this:

> States . . . which have repealed *Illinois Brick* and allowed indirect purchasers to sue for antitrust violations have necessarily made the policy decision that duplicative recovery may permissibly occur. Duplicative recovery is, in many if

---

[44] *E.g.* Electrograph Compl. ¶¶136, 224-225; CompuCom Compl. ¶¶136, 210-211; Costco Compl. ¶¶108,157-159, 183-84; Office Depot Compl. ¶¶125, 209-210; P.C. Richard Compl. ¶¶130, 214-215 ; Circuit City Compl. ¶¶128, 216-217; Polaroid Compl. ¶¶120; 184-184, 199.

[45] Electrograph Compl. ¶226; CompuCom Compl. ¶212; Costco Compl. ¶70; Office Depot Compl. ¶211; P.C. Richard Compl. ¶216; Circuit City Compl. ¶218; *see also* Polaroid Compl. ¶120 ("Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.").

1
2
not all cases alleging a nationwide conspiracy with both direct and indirect purchaser classes, a necessary consequence that flows from indirect purchaser recovery. Accordingly, it is no bar against standing, and this factor does not weigh against standing.

3
*DRAM I*, 516 F. Supp. 2d at 1093.

4
Likewise, Defendants' arguments that "proving pass-on from a component sale to a finished

5
product sale involves economic issues that are exceedingly complex" are inapplicable to indirect

6
state law claims. Mot. at 31 (quotations and citations omitted). The DAPs' allegations that CRTs

7
remain discrete and identifiable through the distribution chain and that overcharges have been

8
passed-on to them[46] are "sufficient for purposes of avoid[ing] dismissal." *Flash Memory*, 643 F.

9
Supp. 2d at 1155.

10
11
**V.     THE DAPS HAVE STATED CLAIMS UNDER THE MASSACHUSETTS AND WASHINGTON CONSUMER PROTECTION LAWS**

12
**A.  Massachusetts**

13
Defendants argue that certain DAPs' claims under the Massachusetts Consumer Protection

14
Act, Mass. Gen. Laws ch. 93A § 2, should be dismissed because the DAPs have not alleged that

15
they made a "written demand for relief" under Mass. Gen. Laws ch. 93A § 9(3) before filing their

16
complaints. Defendants' argument is moot, because the DAPs sent the required demand letters to

17
each Defendant[47] or were not required to do so under the statute. *See Burns v. Hale & Dorr LLP*,

18
445 F. Supp. 2d 94, 96-97 (D. Mass. 2006) (concluding that plaintiff's demand letter "was

19
adequate and satisfied the purpose of the demand requirement" where plaintiff "did not send a

20
letter to defendants prior to filing her initial complaint," but did "send a letter . . . which preceded

21
the filing of defendants' answer . . . as well as her amended complaint"); *Butler v. Deutsche Bank*

22
*Trust Co. Americas*, 2012 WL 3518560, at *12-*13 (D. Mass. August 14, 2012) (refusing to

23
dismiss claim "for failure to satisfy the demand letter requirement" because Defendant could not

24
show at the motion to dismiss stage that it held assets in the state); *see also McKensi v. Bank of*

25
*Am., N.A.,* No. 09-cv-11940, 2010 WL 3781841, at *3 (D. Mass. Sept. 22, 2010) ("While it would

26
27
28
---
[46] *E.g.* Electrograph Compl. ¶¶136, 224-226; CompuCom Compl. ¶¶136, 210-212; Costco Compl. ¶¶70, 108,157-159, 183-84; Office Depot Compl. ¶¶125, 209-211; P.C. Richard Compl. ¶¶130, 214-216 ; Circuit City Compl. ¶¶128, 216-218; Polaroid Compl. ¶¶120; 184-184, 199.
[47] *See* Declaration of Philip J. Iovieno in Support of Direct Action Plaintiffs Opposition to Defendants' Joint Motion to Dismiss and For Judgment on the Pleadings and exhibits thereto.

1    have been more appropriate to commence the action, wait the 30 days and then move to amend to

2    add the ch. 93A claim, [defendant] has cited no cases and none have been found where the

3    premature filing of a complaint constitutes a waiver of a plaintiff's right to assert a 93A action.

4    Since the demand letter was served, the Bank has had ample opportunity to assess the merits of the

5    plaintiff's claim and make a settlement offer if appropriate. The timing of the suit is not a basis to

6    dismiss the 93A claim."); *Powell v. Ocwen Loan Servicing, LLC*, 2012 WL 345665, at *4 (Mass.

7    Super. Ct. January 04, 2012) (denying motion to dismiss claim for failure to send a demand letter

8    when defendant failed to rebut contention that it did not maintain a place of business in

9    Massachusetts).  In other words, any supposed defect in the DAPs' pleadings caused by their

10   failure to reference the demand letters is not a sound basis for dismissing the DAPs' claims under

11   the Massachusetts Consumer Protection Act.

12       **B.  Washington**

13       Defendants allege that Costco's indirect purchaser claims under the Washington Consumer

14   Protection Act (WCPA) must be dismissed because "Washington courts have adopted the

15   straightforward rule of *Illinois Brick*."  Mot. at 33.  But this is an oversimplification.  Although

16   Washington law does not authorize private indirect purchasers to initiate suit, they are "not entirely

17   without a remedy" under Washington law because the Washington Attorney General may initiate

18   claims.  *Blewett v. Abbott Labs.*, 86 Wash. App. 782, 790, 938 P.2d 842, 847 (Wash. App. Div. 1

19   1997) (citing RCW 19.86.080).  And after *Blewett*, the Legislature provided that when the

20   Attorney General initiates a claim, "the court may . . . make such additional orders or judgments as

21   may be necessary to restore to any person in interest any moneys or property . . . which may have

22   been acquired, regardless of whether such person purchased or transacted for goods or services

23   directly with the defendant or indirectly through resellers." RCW 19.86.080(3) (emphasis added).

24   The Washington Attorney General long ago intervened in this case and announced that he was

25   "investigating whether certain of the defendants in this action have violated" the WCPA.  (Dkt.

26   912 at 2.)  And the Attorney General has since filed a complaint alleging that Defendants violated

27   the WCPA.  *State of Washington v. LG Electronics et al.*, No. 12-2-15842-8 (King County

28   Superior Ct.).  It would be improper to dismiss Costco's indirect purchaser claims under

1   Washington law in this action where Costco can recover based on the Washington Attorney

2   General's claim (which may be consolidated with or otherwise coordinated with Costco's claim

3   after Costco's case is remanded to the Western District of Washington, where it was originally

4   filed).

5        Moreover, nothing in Washington law suggests that Washington courts would apply a

6   narrower interpretation of *Illinois Brick* than has the Ninth Circuit.  Therefore, at the very least

7   Washington law allows indirect purchaser recovery by private plaintiffs where the direct purchaser

8   is owned or controlled by the conspirator, as Costco alleges was the case with many of its

9   purchases here.  Costco Compl. ¶ 16.

10  **VI.   THE POLAROID PLAINTIFFS HAVE SUFFICIENTLY IDENTIFIED THAT
         THEIR COMMON LAW CLAIM FOR UNJUST ENRICHMENT ARISES UNDER
11        MINNESOTA AND CALIFORNIA LAW**

12       Defendants move to dismiss the Polaroid Plaintiffs' common law unjust enrichment claim,

13  arguing the Polaroid Plaintiffs have not sufficiently identified the states' laws they rely upon in

14  bringing the claim.  Mot. at 33-34.  Contrary to Defendants' position, the Polaroid Plaintiffs'

15  Complaint specifically identifies the two states' laws from which their claims arise—Minnesota

16  and California.  *See* Polaroid Plaintiffs' Compl. ¶¶ 5, 8-9, 11 (alleging Defendants' purposefully

17  availed themselves of Minnesota and California state laws and caused injury in Minnesota and

18  California, and stating Plaintiffs' claims arise under Minnesota and California state laws); *see also*

19  *id.* ¶¶ 188-211 (stating claims under Minnesota and California state laws).  All of the allegations

20  set forth in the Complaint, including those cited above, are incorporated into the Polaroid

21  Plaintiffs' claim for unjust enrichment.  *See* Polaroid Plaintiffs' Compl. ¶ 212.  Accordingly, the

22  Polaroid Plaintiffs have sufficiently pled that their common law claim for unjust enrichment arises

23  under Minnesota and California state laws, and is not subject to dismissal for failure to identify a

24  particular state.[48]  *See* Fed. R. Civ. P. 8(a)(2) (notice pleading requires a "short and plain statement

25

26  ────────────────
    [48] To the extent the Court determines the Polaroid Plaintiffs' Complaint does not sufficiently
    identify Minnesota and California as the states from which their unjust enrichment claim arises, the
27  proper remedy would be to order the Polaroid Plaintiffs to make a more definite statement pursuant
    to Fed. R. Civ. P. 12(e), rather than dismissal pursuant to Rule 12(b).  Fed. R. Civ. P. 12(e) ("A
28  party may move for a more definite statement of a pleading . . . which is so vague or ambiguous
    that the party cannot reasonably prepare a response.")

of the claim").

## VII. THE DAPS HAVE STATED CLAIMS UNDER CALIFORNIA LAW

### A. Circuit City Has Stated Claims for Unjust Enrichment and Restitution

Defendants' argument that no stand-alone claim for restitution and unjust enrichment exists under California law should be rejected. *See* Mot. at 34-35. Judge Illston addressed the exact same arguments in *LCD*, denying the defendants' motion to dismiss Circuit City's unjust enrichment claims under California law and holding that Circuit City "invoked a valid theory of recovery." *TFT-LCD*, 2011 WL 4345435 at *3-4 (N.D. Cal., Sept. 15, 2011).

Defendants acknowledge that California appellate courts are split on the issue of whether California law supports a "stand-alone" claim for unjust enrichment or restitution. Judge Illston recognized the split but noted that "[m]any of the courts that have rejected "unjust enrichment" claims have nonetheless indicated that the claims could proceed under a different title."[49] *Id.* at *3. The California Supreme Court came down on Circuit City's side of the split in *Ghirardo v. Antonioli*. 14 Cal. 4th 39, 54 (Cal. 1996) (holding that the cross-claimant adequately pleaded a cause of action for unjust enrichment). In addition, the Ninth Circuit, California appellate courts, and federal district courts have recognized that unjust enrichment or restitution provides a valid claim for relief under California common law. *See, e.g.*, *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009) ("California's approach to unjust enrichment is consistent with this general understanding: . . . 'The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it.'" (quoting *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1663 (1992)); *In re Easysaver*

---

[49] *See also Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006) ("[F]or the most part, courts finding that California does not allow an 'unjust enrichment' cause of action have made essentially a semantic argument—focusing on the interrelationship between the legal doctrine of unjust enrichment and the legal remedy of restitution."). Many cases holding that unjust enrichment is not a stand-alone claim under California law still recognize that a plaintiff may plead a cause of action seeking restitution, which Circuit City does. *See, e.g.*, *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (Ct. App. 2011) (stating that "[c]ommon law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient"); *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (Ct. App. 2004) (construing the plaintiff's "purported cause of action for unjust enrichment as an attempt to plead a cause of action giving rise to a right to restitution," noting that "[t]here are several potential bases for a cause of action seeking restitution").

*Rewards Litig.*, 737 F. Supp. 2d 1159, 1180 (S.D. Cal. 2010) ("California courts permit a plaintiff

to invoke the doctrine of unjust enrichment" and allowing unjust enrichment claim in addition to

restitution claim); *Keilholtz v. Superior Fireplace Co.*, 2009 WL 839076, at *4–5 (N.D. Cal Mar.

30, 2009) ("Whether Plaintiffs' unjust enrichment cause of action is construed as a claim for

restitution as in the *McBride* case or is considered to be an independent cause of action as in the

*Lectrodryer* and *First Nationwide* cases, the allegations are sufficient to state a claim under

California law."); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (Ct. App. 2008) ("The

elements of an unjust enrichment claim are the receipt of a benefit and unjust retention of the

benefit at the expense of another."); *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (Ct. App.

2000) (affirming jury verdict on unjust enrichment claim).  Relying on this authority, Judge Illston

held that Circuit City's unjust enrichment claim "invoked a valid theory of recovery."  *LCD*, 2011

WL 4345435 at *4.  Accordingly, the Court should follow Judge Illston's holding in *LCD* and

uphold Circuit City's unjust enrichment/restitution claim under California law.[50]

### B. Circuit City, CompuCom, and the Polaroid Plaintiffs Have Stated Claims Under California's Unfair Competition Law

Defendants argue that the DAPs' claims under the California Unfair Competition Law

("UCL") should be dismissed because the DAPs have failed to state a claim for relief under federal

and state antitrust law.  Mot. at 36-37.  Defendants are wrong.  The DAPs have more than

sufficiently  alleged that Defendants' cartel violated the Sherman Act and several state laws,

including the California Cartwright Act.  *See supra* 6-34.  Accordingly, the DAPs have stated a

claim under the UCL based on these same allegations.  *See Cel-Tech Communications, Inc. v. Los

Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999) (to state claim under California Unfair

Competition Law, plaintiff may allege that defendant's conduct "threatens an incipient violation of

an antitrust law, or violates the policy or spirit of one of those laws because its effects are

comparable to or the same as a violation of the law, or otherwise significantly threatens or harms

---

[50] Defendants have also argued that unjust enrichment is unavailable as equitable relief because
Circuit City has pleaded adequate remedies at law.  This argument was rejected in *Keilholtz v.
Superior Fireplace Co.*, which held that "it is inappropriate at this early stage in the litigation to
determine whether other remedies available to Plaintiffs are adequate."  2009 WL 839076, at *5
(N.D. Cal March 30, 2009).

competition"). Moreover, there is no merit to Defendants' contention that the DAPs' fraud-based

allegations are insufficient to support a claim under the UCL. This Court has already upheld these

same allegations when it found that the DPP and IPP complaints adequately alleged fraudulent

concealment. *CRT*, 738 F. Supp. 2d at 1011-12. Accordingly, the Court should deny Defendants'

motion to dismiss the DAPs' claims under the UCL.

**VIII. THE DAPS HAVE STANDING TO BRING ANTITRUST CLAIMS BASED ON INDIRECT PURCHASES OF CRT PRODUCTS THAT OCCURRED PRIOR TO THE ENACTMENT OF *ILLINOIS BRICK* REPEALER STATUTES IN NEVADA AND NEBRASKA**[51]

**A. Plaintiffs Have Standing to Bring Claims Under Nevada Law for Indirect Purchases Made Prior to October 1, 1999**

In arguing that Plaintiffs are only permitted to bring indirect damages claims under

Nevada's Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010 *et seq.* ("UTPA"), for

purchases of CRT-containing products made after the statute's amendment on October 1, 1999,

Nev. Rev. Stat. § 598A.210 ("1999 Amendment"), Defendants ask this Court to ignore a clear

statement by a Nevada court to the contrary. As noted in Defendants' Motion, in *Pooler v. R.J.

Reynolds Tobacco Co.*, Case No. 00-cv-02674, 2001 WL 403167 (Nev. Dist. Ct. Apr. 4, 2001), a

Nevada district court concluded that the UTPA always was meant to permit "any person injured

by an alleged violation of the act" – including indirect purchasers – to bring suit, and that the

1999 Amendment simply clarified that original intent. *Id.* at *1. As a result, the court held that

indirect purchaser claims brought under the UTPA "may be pursued . . . whether the alleged

conduct . . . occurred before or after the 1999 amendment." *Id.*

Defendants attempt to undermine the *Pooler* decision by citing to a "litigation handbook"

and an earlier Nevada district court order that they claim ruled to the contrary.[52] *See* Mot. at 39.

Defendants' argument is unavailing. Indeed, Judge Wilken recently adopted the analysis set forth

in *Pooler* and agreed that indirect purchasers are permitted to sue under the UTPA for conduct

prior to the 1999 Amendment. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*,

Case No. 07-md-01819, 2010 WL 5094289, at *5 (N.D. Cal. Dec. 8, 2010) (denying a summary

---

[51] New York's Donnelly Act does not apply retroactively. *TFT-LCD*, 2011 WL 3738985, at *3 (N.D. Cal. Aug. 24, 2011) (citations omitted). Accordingly, the DAPs are not asserting any claims under that statute based on purchases made prior to December 23, 1998, the effective date that the statute was enacted.

[52] The Order in *Krotz v. Microsoft Corp.* cited by Defendants states that "plaintiffs' complaint fails to state a claim upon which relief can be granted," without any analysis or reasoning. No. A416361 (June 22, 2000).

1    judgment motion arguing that the defendants "are not liable [under Nevada law] for alleged price-

2    fixing that occurred before October 1, 1999").[53]

3         Given that the 1999 UTA amendment was only a clarification, and not a substantive

4    change to Nevada's antitrust law, this Court should reject Defendants' argument that Plaintiffs

5    lack standing under Nevada law to bring damages claims based on indirect purchases of CRT-

6    containing products made prior to October 1, 1999.

   ### B.  Plaintiffs Have Standing to Bring Claims Under Nebraska Law for Indirect Purchases Made Prior to July 20, 2002

7         Defendants' assertion that the 2002 amendment to Nebraska's Junkin Act, Neb. Rev. Stat.

8    § 59-821 ("2002 Amendment"), does not apply retroactively is misplaced.  Indeed, in *Arthur v.*

9    *Microsoft Corp.,* the Nebraska Supreme Court retroactively applied that same amendment as it

10   relates to a sister statute of the Junkin Act, Nebraska's Consumer Protection Act, Neb. Rev. Stat.

11   §§ 59-1601 *et seq.* ("CPA").  676 N.W.2d 29, 37-8 (Neb. 2004); *see also id.* at 41 (Stephan, J.,

12   dissenting) (criticizing majority's retroactive application of the statute).[54]  As the Nebraska

13   Supreme Court has made clear, given the similarities in the legislative intent behind and statutory

14   language of the Junkin Act and the CPA, "the standing requirements for an antitrust claim

15   [brought] under the [CPA] should be the same as for an antitrust claim under the Junkin Act."

16   *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 301 (Neb. 2006); *see also*, *TFT-LCD*, 2011 WL

17   3738985, at *3-4 (N.D. Cal. Aug. 24, 2011) (concluding that the Nebraska Supreme Court would

18   likely hold that the Junkin Act permitted indirect-purchaser suits even before the 2002

19   amendment).  As a result, this Court should reject Defendants' argument that Plaintiffs lack

20   standing to bring damages claims under Nebraska law based on indirect purchases of CRT-

21   containing products prior to July 20, 2002.

   ### CONCLUSION

23        For all the foregoing reasons, DAPs respectfully request that Defendants' motion be

24   denied.

---

[53] *Contra TFT-LCD*, 2011 WL 3738985, at *4 (N.D. Cal. Aug. 24, 2011) (abiding by the plain
language of UTPA absent a more definitive statement from Nevada's appellate courts); *In re
Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010).
[54] The same statute amending the Junkin Act to permit damages suits by plaintiffs who "dealt . . .
indirectly with the defendant" also amended the CPA at issue in *Arthur* to permit plaintiffs who
"dealt . . . indirectly with the defendant" to bring lawsuits under that act. *See* Neb. Rev. Stat. §59-
821 (Reissue 2004).

Respectfully submitted,

DATED:  September 28, 2012

/s/        Philip J. Iovieno
William A. Isaacson
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com
Email:  jmilici@bsfllp.com

Stuart Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone:  (954) 356-0011
Facsimile:   (954) 356-0022
Email:  ssinger@bsfllp.com

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:  piovieno@bsfllp.com
Email:  anardacci@bsfllp.com

*Liaison Counsel for Direct Action Plaintiffs and  Attorneys for Plaintiffs Electrograph Systems, Inc., Electrograph Technologies, Corp., Office Depot, Inc., Compucom Systems, Inc., Interbond Corporation of America, P.C. Richard & Son Long Island Corporation, Marta Cooperative of America, Inc., ABC Appliance, Inc., Schultze Agency Services LLC on Behalf of Tweeter Opco, LLC and Tweeter Newco, LLC*

/s/        Roman M. Silberfeld
Roman M. Silberfeld (SBN 62783)
David Martinez (SBN 193183)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone:  (310) 552-0130
Facsimile:   (310) 229-5800
Email:  RMSilberfeld@rkmc.com
Email:  DMartinez@rkmc.com

*Attorneys for Plaintiffs Best Buy Co., Inc, Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc.*

/s/         Kenneth S. Marks
H. Lee Godfrey
Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
David M. Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email:  lgodfrey@sumangodfrey.com
Email:  kmarks@susmangodfrey.com
Email:  jross@susmangodfrey.com
Email:  jcarter@susmangodfrey.com
Email:  dpeterson@susmangodfrey.com

Parker C. Folse III
Rachel S. Black
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
Email:  rblack@susmangodfrey.com
Email:  jconnors@susmangodfrey.com

*Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust*

/s/         David. J. Burman
David J. Burman
Cori G. Moore
Nicholas H. Hesterberg
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  (206) 359-8000
Facsimile:   (206) 359-9000
Email:  DBurman@perkinscoie.com
Email:  CGMoore@perkinscoie.com
Email:  NHesterberg@perkinscoie.com

Jordan S. Bass, Cal. Bar No. 208143
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone: (415) 344.7000
Facsimile:   (415) 344.7050
Email:  JBass@perkinscoie.com

*Attorneys for Plaintiff Costco Wholesale Corporation*

/s/        Jason C. Murray
Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone:  (213) 622-4750
Facsimile:   (213) 622-2690
Email:  jmurray@crowell.com

*Counsel for Plaintiffs Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.; RadioShack Corp.*

/s/        Kelly G. Laudon
Jessica L. Meyer (SBN: 249064)
James M. Lockhart (*pro hac vice*)
James P. McCarthy (*pro hac vice*)
Kelly G. Laudon (*pro hac vice*)
Lindquist & Vennum P.L.L.P.
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 371-3211
Facsimile:   (612) 371-3207
Email:  jmeyer@lindquist.com
Email:  jlockhart@lindquist.com
Email:  jmccarthy@lindquist.com
Email:  klaudon@lindquist.com

*Attorneys for Plaintiffs John R. Stoebner, as Chapter 7 Trustee for PBE Consumer Electronics, LLC and related entities; and Douglas A. Kelley, as Chapter 11 Trustee for Petters Company, Inc. and Related Entities, and as Receiver for Petters Company, LLC and related entities*