# DOCUMENT 7

1   Jon V. Swenson (SBN 233054)
2   BAKER BOTTS L.L.P.
    1001 Page Mill Road
3   Building One, Suite 200
    Palo Alto, CA 94304-1007
4   Telephone: (650) 739-7500
    Facsimile: (650) 739-7699
5   Email: jon.swenson@bakerbotts.com

6
    John M. Taladay (*pro hac vice*)
7   David T. Emanuelson (*pro hac vice*)
    BAKER BOTTS L.L.P.
8   1299 Pennsylvania Ave., N.W.
    Washington, DC 20004-2400
9   Telephone: (202) 639-7700
    Facsimile: (202) 639-7890
10  Email: john.taladay@bakerbotts.com
    Email: david.emanuelson@bakerbotts.com
11

12  *Attorneys for Defendants Koninklijke Philips*
    *Electronics N.V. and Philips Electronics North*
13  *America Corporation*

14  [Additional moving defendants and counsel listed in signature block]

15
                    **IN THE UNITED STATES DISTRICT COURT**
16
                     **NORTHERN DISTRICT OF CALIFORNIA**
17
                         **SAN FRANCISCO DIVISION**
18

19  IN RE: CATHODE RAY TUBE (CRT)          Case No. 3:07-cv-05944 SC
    ANTITRUST LITIGATION
                                           MDL No. 1917
20

21  This Document Relates To:              **DEFENDANTS' JOINT REPLY**
                                           **MEMORANDUM IN SUPPORT OF**
22  ALL DIRECT ACTION COMPLAINTS           **MOTION TO DISMISS AND FOR**
                                           **JUDGMENT ON THE PLEADINGS AS**
23                                         **TO CERTAIN DIRECT ACTION**
                                           **PLAINTIFFS' CLAIMS**
24
                                           Date:  TBD
25                                         Time:  TBD
                                           Place:  JAMS Resolution Center
26                                         Special Master:  Hon. Charles A. Legge
                                           (Ret.)
27

28

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     THE DECISION IN *ATM FEE* CONFIRMS THE LAW OF THIS MDL THAT DAPS'
CLAIMS ARE BARRED BY ILLINOIS BRICK ................................................................. 2

II.    DAPS' STATE LAW CLAIMS ARE TIME BARRED ......................................................... 5

     A.     DAPs Fail To Plead Fraudulent Concealment With Particularity ........................... 6

     B.     DAPs Were On At Least Constructive Notice As Of November 8, 2007 ............... 7

     C.     Cross-Jurisdictional Tolling Does Not Save DAPs' Untimely State Law Claims... 8

III.   DAPS' CLAIMS SHOULD BE DISMISSED TO THE EXTENT THAT THEY DO NOT
ALLEGE PURCHASES IN THE FORUM STATES ......................................................... 10

     A.     Judge Illston Correctly Decided That The Location Of A Purchase Is The
Dispositive Factor In Determining Whether Standing Exists ............................... 10

     B.     The Same Claims That Fail To Establish Contacts With Relevant States Should
Also Be Dismissed For Lack Of Prudential Standing ........................................... 13

IV.   DAPS HAVE NOT ESTABLISHED ANTITRUST STANDING FOR THEIR STATE
LAW CLAIMS UNDER ARIZONA, CALIFORNIA, ILLINOIS, MICHIGAN, AND
WASHINGTON STATE LAW ...................................................................................... 13

     A.     The *Associated General* Contractors Test Applies Under The State Laws Of
Arizona, California, Illinois, Michigan And Washington ..................................... 13

     B.     DAPs' Allegations Fail To Satisfy The *AGC* Test ............................................. 15

V.     DAPS' CLAIMS FAIL UNDER THE CONSUMER PROTECTION STATUTES OF
MASSACHUSETTS AND WASHINGTON .................................................................... 17

VI.   CERTAIN DAPS' UNJUST ENRICHMENT, RESTITUTION, AND CALIFORNIA
UNFAIR COMPETITION LAW CLAIMS ARE DEFICIENT ........................................... 18

     A.     The Polaroid Plaintiffs Fail To Identify Which State They Rely Upon For Their
Unjust Enrichment Claims ................................................................................... 18

     B.     Circuit City's Fourth Claim For Relief Should Be Dismissed Because California
Law Does Not Recognize A Cause Of Action For Restitution Or Unjust
Enrichment ......................................................................................................... 19

     C.     Circuit City, CompuCom, And The Polaroid Plaintiffs Have Not Stated A Claim
Under California's Unfair Competition Law ......................................................... 19

VII.   DAPS CANNOT SUE UNDER THE STATUTES OF NEBRASKA, NEVADA, OR
NEW YORK BASED ON PURCHASES PREDATING THOSE STATES' *ILLINOIS
BRICK* REPEALER AMENDMENTS ............................................................................ 20

1

CONCLUSION ..................................................................................................................... 20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS
AS TO CERTAIN DIRECT ACTION PLAINTIFFS' CLAIMS (3:07-CV-05944 SC, MDL NO. 1917)

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE(S)**

*Allstate Ins. Co. v. Hague*,
  449 U.S. 302 .................................................................................................. 11

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
  190 F.3d 1051 (9th Cir. 1999) ...................................................................... 15

*Arch Electronics, Inc. v. LG Electronics, Inc*,
  No. 07-10664 (S.D.N.Y. Nov. 29, 2007) ........................................................ 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 6

*Associated General Contractors v. California State Council of Carpenters*,
  459 U.S. 519 (1983) ("*AGC*") ......................................... 1, 13, 14, 15, 16, 17

*Baker v. Jewel Food Stores, Inc.*,
  823 N.E.2d 93 (Ill. App. 2005) ..................................................................... 14

*Bhan v. NME Hosp., Inc.*,
  772 F. 2d 1467 (9th Cir. 1999) ...................................................................... 15

*Blewett v. Abbott Labs.*,
  938 P.2d 842 (Wash. App. 1997) ................................................................... 16

*Burns v. Hale & Dorr LLP*,
  445 F. Supp. 2d 94 (D. Mass. 2006) .............................................................. 18

*Butler v. Deutsche Bank Trust Co. Americas*,
  No. 12-10337, 2012 WL 3518560 (D. Mass. Aug. 14, 2012) ........................ 18

*by Seaboard Corp. v. March Inc.*,
  284 P.3d 314 (Kan. 2012) .............................................................................. 10

*Champion v. Homa*,
  No. 03-275, 2008 WL 900967 (M.D. Ala. March 31, 2008) .......................... 10

*Charles Schwab & Co. v. Bank of Am.*,
  No. 10-4913, 2011 WL 1753805 (N.D. Cal. May 9, 2011) ............................ 19

*CompuCom Sys., Inc., v. Hitachi, Ltd.*,
  No. 11-03130 (N.D. Tex. Nov. 14, 2011) ...................................................... 12

*Conmar Corp. v. Mitsui & Co.*,
  858 F.2d 499 (9th Cir. 1988) .................................................................. 6, 7, 8

*County of Cook v. Philip Morris, Inc.*,
    817 N.E.2d 1039 (Ill. 2004) .................................................................. 16, 17

*Crago, Inc. v. Chungwa Picture Tubes, Ltd.*,
    No. 07-05944 (N.D. Cal. Nov. 26, 2007) ..................................................... 7

*Dean Foods Co. v. Brancel*,
    187 F.3d 609 (7th Cir. 1999) ...................................................................... 11

*E.W. French & Sons, Inc. v. General Portland Inc.*,
    885 F. 2d 1392 (9th Cir. 1989) ...................................................................... 7

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989) ...................................................................... 10

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ............................................................. 2, 3, 5

*In re ATM Fee Antitrust Litigation*,
    686 F.3d 741 (9th Cir. 2012) ("*ATM Fee*") ........................................ 1, 2, 3, 4, 5

*In re Cal. Title Ins. Antitrust Litig.*,
    No. 08-01341, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ................................. 20

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) .......................................... 6, 13, 14, 16, 20

*In re Copper Antitrust Litig.*,
    436 F.3d 782 (7th Cir. 2006) ...................................................................... 9

*In re DRAM Antitrust Litig.,*516
    F. Supp. 2d 1072 (N.D. Cal. 2007) ............................................................ 9, 14, 15

*In re DRAM Antitrust Litig.*,
    536 F. Supp. 2d 1129 (N.D. Cal. 2008) ("*DRAM II*") ....................................... 14, 15

*In re Estate of Thomas*,
    998 P.2d 560 (Nev. 2000) ........................................................................ 20

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ("*Flash*") ............................................ 14, 15

*In re GPU*
    527 F. Supp. 2d ............................................................................. 13, 14, 15

*In re GPU Antitrust Litig.*,
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ("*GPU II*") .......................................... 14, 15

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1101 (N.D. Cal. 2007) ("*GPU I*") ................................... 11, 13, 14, 15

*In re Linerboard Antitrust Litig*ation,
    223 F.R.D. 335 (E.D. Pa. 2004) .............................................................. 9

*In re Mattel, Inc*,
    588 F. Supp. 2d 1111 (C.D. Cal. 2008).................................................. 11

*In re Rezulin Products Liability Litig.*,
    No. 00-2843, 2006 WL 695253 (S.D.N.Y. Mar. 15, 2006) (stating Florida does not
    recognize cross-jurisdictional tolling)................................................. 10

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07- 01819, 2007 WL 4806325 (N.D. Cal. Aug. 30, 2007) ............................ 12

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ..................................... 11, 12, 18

*In re Sugar Indus. Antitrust Litig.*,
    579 F.2d 13 (3d Cir. 1978)............................................................... 3, 4, 5

*In re TFT-LCD (Flat Panel) Antitrust Litig. ("Interbond"),*
    No. 07-1827, at 3 (N.D. Cal. Jan. 18, 2012) (finding allegations of fraudulent
    concealment to provide tolling "until the DOJ announced its investigation on
    December 11, 2006.") ................................................................ 5, 8, 11, 12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 07-1827, 2010 WL 2609434 (N.D. Cal. June 28, 2010)................................... 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    No. 07-1827, 2012 WL 149632 (N.D. Cal. Jan. 18, 2012)........................ 10, 11, 12

*In re Urethane Antitrust Litig.*,
    663 F. Supp. 2d. 1067 (D. Kan. 2009) ...................................................... 9

*In re Vioxx Products Liability Litig.*,
    522 F. Supp. 2d 799 (E.D. La. 2007) ...................................................... 9

*In re Vitamins Antitrust Litig.*,
    183 Fed. App'x. 1 (D.C. Cir. 2006) (predicting Florida would not permit cross-
    jurisdictional tolling)............................................................... 10

*Jenson v. Allison-Williams Co.*,
    No. 98- 2229, 1999 WL 35133748 (S.D. Cal. Aug. 23, 1999) ............................ 10

*Kanamaru v. Holyoke Mut. Ins. Co.*,
    8 N.E. 2d 759 (Mass. 2008) ............................................................. 17

*Keilholtz v. Lennox Hearth Products, Inc.*,
    268 F.R.D. 330 (N.D. Cal. 2010) ...................................................... 11

*Kindt v. Matsushita Electric Industrial Co.*,
    No. 07-10322 (S.D.N.Y. Nov. 13, 2007) .................................................................................. 7

*Lorenzo v. Qualcomm, Inc.*,
    603 F. Supp. 2d 1291 (S.D. Cal. 2009) .................................................................................. 16

*McKensi v. Bank of Am., N.A.*,
    No. 09-11940, 2010 WL 3781841 (D. Mass. Sept. 22, 2010) ................................................ 18

*Meijer, Inc. v. LG Electronics, Inc.*,
    No. 07- 10674 (S.D.N.Y. Nov. 29, 2007) ............................................................................... 7

*Muchnick, Inc. v. Chungwa Picture Tubes, Ltd.*,
    No. 07- 05981 (N.D. Cal. Nov. 27, 2007) ............................................................................... 7

*Munoz v. MacMillan*,
    195 Cal. App. 4th 648 (2011) ................................................................................................. 19

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) .................................................................................................. 15

*Patterson v. Novartis, Inc.*,
    No. 11-402, at 10-11 (D.R.I. Aug. 28, 2012) ........................................................................ 10

*Pecover v. Electronic Arts, Inc.*,
    No. 08-2820, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .................................................. 11

*Powell v. Ocwen Loan Servicing, LLC*,
    No. 2010-2069, 2012 WL 345665 (Mass. Super. Ct. Jan. 4, 2012) ........................................ 18

*Princeton Display Technologies, Inc. v. Chungwa Picture Tubes, Ltd.*,
    No. 07- 05713 (S.D.N.J. Nov. 29, 2007) ................................................................................. 7

*R.C. Dick Geothermal Corp. v. Thermogenesis, Inc.*,
    890 F.2d 139 (9th Cir. 1989) .................................................................................................. 17

*Rhynes v. Stryker Corp.*,
    No. 10-5619, 2011 WL 2149095 (N.D. Cal. May 31, 2011) (Conti, J.) .................................. 19

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1980) ........................................................................................ 2, 3, 4, 5

*Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*,
    642 F.3d 560 (7th Cir. 2011) .................................................................................................... 9

*Senger Bros. Nursery, Inc. v. E.I. DuPont de Nemours & Co.*,
    184 F.R.D. 674 (M.D. Fla. 1999) ........................................................................................... 10

*Silva v. U.S. Bancorp*,
    5:10-cv-01854-JHN, 2011 WL 7096576 (C.D. Cal. Oct. 6, 2011) ........................................... 9

- vi -

*Sound Appraisal v. Wells Fargo Bank, N.A.*,
    717 F. Supp. 2d 940 (N.D. Cal. 2010), *aff'd* 451 Fed. App'x. 648 (9th Cir. 2011) ............... 11

*Soward v. Deutsch Bank AG*,
    814 F. Supp. 2d 272 (S.D.N.Y. 2011) ........................................................................ 9

*State of Washington v. LG Electronics*,
    No. 12-2-15842-8 (King County Superior Ct.) ......................................................... 18

*Sullivan v. Oracle Corp.*,
    662 F.3d 1265 (9th Cir. 2011) ................................................................................. 13

*Sutcliffe v. Wells Fargo Bank, N.A.*,
    No. 11-06595, 2012 WL 1622665 (N.D. Cal. May 9, 2012) ................................... 11

*Tatum v. Schwartz*,
    No. 06-01440, 2007 WL 419463 (E.D. Cal. Feb. 5, 2007) ..................................... 9

*Todd v. F. Hoffman-La Roche, Ltd.*,
    No. 98-4574, 2004 WL 5238952 (D. Kan. Aug. 20, 2004) ................................... 10

*Wang v. OCZ Technology Group, Inc.*,
    276 F.R.D. 618 (N.D. Cal. 2011) ............................................................................. 11

**STATUTES**

740 Ill. Comp. Stat. Ann. § 10/11 (West 2012) .......................................................... 14

C.P.L.R. § 214 ............................................................................................................. 6

Kan. Stat. Ann. § 60-512(2) ........................................................................................ 6

Miss. Code Ann. § 15-1-49 ......................................................................................... 6

State Laws ................................................................................................................... 13

WASHINGTON STATE LAW .................................................................................... 13

**OTHER AUTHORITIES**

Civil Rule 5-1(i) ......................................................................................................... 24

Fed. R. Civ. P. 9(b) ...................................................................................................... 6

Rule 11 ........................................................................................................................ 16

Thus, *Clemens* .......................................................................................................... 10

**INTRODUCTION**

The Direct Action Plaintiffs' ("DAPs") Opposition (the "Opposition" or "Opp.") is nothing but an attempt to obfuscate DAPs' fundamental pleading deficiencies and lack of standing to bring claims against the Defendants. To that end, DAPs repeatedly mischaracterize the relevant law and ignore the most basic deficiencies in their complaints. For example:

- Regarding federal antitrust standing, DAPs blatantly mischaracterize the effect of *In re ATM Fee* on the Report and Recommendation that is the law of this MDL, which establishes that purchasers of finished products incorporating CRTs do not have standing to assert federal claims. Contrary to DAPs' claims, *In re ATM Fee* supports the reasoning of the Report and Recommendation;

- Regarding the timeliness of their claims, DAPs (a) rely on conclusory allegations of fraudulent concealment that are irrelevant to the question of whether DAPs properly pled fraudulent concealment with particularity with respect to the more than four years between the European Commission's public announcement of its investigation into the alleged CRT conspiracy (November 8, 2007) and the date on which most DAPs filed their complaints (November 14, 2011); and (b) mischaracterize the Ninth Circuit's and various state courts' treatment of so-called "cross-jurisdictional" tolling in an effort to save their untimely claims;

- Regarding their pleading deficiencies in not alleging purchases in the states in which they assert state law claims, DAPs rely on inapposite cases while ignoring the clear and persuasive reasoning of Judge Illston in *In re TFT-LCD Antitrust Litigation*, which is directly on point;

- DAPs also mischaracterize the application of *Associated General Contractors* to Illinois, Michigan, and Arizona law, fail to support their Massachusetts and Washington consumer protection claims, fail to support their claims of unjust enrichment under California law; and fail to support their antitrust claims in Nebraska, Nevada, and New York for purchases predating those states' *Illinois Brick* repealer amendments.

Because of these deficiencies, all of the above claims must be dismissed as a matter of law.

DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS
AS TO CERTAIN DIRECT ACTION PLAINTIFFS' CLAIMS (3:07-CV-05944 SC, MDL NO. 1917)

**ARGUMENT**

## I. THE DECISION IN *ATM FEE* CONFIRMS THE LAW OF THIS MDL THAT DAPs' CLAIMS ARE BARRED BY *ILLINOIS BRICK*

There is very little that remains in dispute with respect to whether the DAP claims must be dismissed for lack of standing under *Illinois Brick*. It is undisputed that:

- As the law of the MDL, the Report and Recommendation Regarding Defendants' Joint Motion for Summary Judgment [Dkt. No. 1221] (May 31, 2012) ("May 31 Report") requires that DAPs' claims be dismissed. DAPs do not dispute that their claims are based on purchases of finished products (not tubes) and are no different from the claims that the Special Master recommended be dismissed in the May 31 Report.

- The only thing that has changed relative to DAPs' lack of standing since the May 31 Report is the Ninth Circuit's decision in *In re ATM Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012) ("*ATM Fee*").

- DAPs concede that *ATM Fee* confirms that they are not direct purchasers. Opp. at 7. As indirect purchasers, DAPs are barred from bringing federal damages claims unless they qualify for one of two narrow exceptions to *Illinois Brick* recognized by the Ninth Circuit.

- Under *ATM Fee*, it is undisputed that DAPs do not meet the co-conspirator exception, which would only apply if they purchased products from a co-conspirator at a price that was fixed by defendants. Opp. at 8 n.5.

- The only possible basis that remains for DAPs to assert federal antitrust standing, therefore, is to argue that they somehow qualify for the limited "owned or controlled" exception recognized by the Ninth Circuit in *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), and further explained in *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003).

- However, DAPs cannot dispute that Your Honor already held in the May 31 Report that *Royal Printing* does not apply in this MDL because unlike in *Royal Printing*, "the plaintiffs here never purchased the price-fixed product from anybody." *See* May 31 Report at 10.

In light of these undisputed points, the sole remaining issue is whether the May 31 Report should be altered based on DAPs' claim that *ATM Fee* expands *Royal Printing* to allow plaintiffs who did not purchase the price-fixed product from anyone to assert antitrust standing under the exception for purchases from owned or controlled affiliates. This argument has no merit as *ATM Fee* did nothing to change the Court's conclusion that plaintiffs who did not purchase the

allegedly price-fixed product from anyone (let alone directly from defendants) lack federal antitrust standing under the strict rules of *Illinois Brick*.  Indeed, *ATM Fee* made it even more difficult, not easier, for DAPs to claim antitrust standing.  *See* Defendants' Notice of Motion & Motion to Adopt Special Master's Report & Recommendation Regarding Defendants' Joint Motion for Summary Judgment & Memorandum of Law in Support Thereof [Dkt. No. 1274] (July 24, 2012) at 2.

DAPs effectively conceded this point in their Amici Curiae Brief in *ATM Fee,* where Best Buy, Circuit City, Target, Sears and others argued that *ATM Fee* should be reheard *en banc* because the decision limits (not expands) the reach of the exception to *Illinois Brick* for ownership/control.  *See* Brief for Interested Retailers & the American Antitrust Institute as Amici Curiae Supporting Appellant at 2, *Brennan v. Concord EFS, Inc.*, 686 F.3d 741 (9th Cir. 2012) (No. 10-17354) (attached hereto as Exhibit A) ("Amici Brief").

Remarkably, DAPs have now reversed course, claiming that *ATM Fee* expands the Ninth Circuit's application of *Illinois Brick* because it purportedly endorsed *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978), and extended *Royal Printing* by establishing a new rule that "the ownership or control exception applies regardless of whether a plaintiff has paid the price-fixed fee directly or the overcharge was passed on to them."  Opp. at 8.  Nothing could be further from the truth.  Instead, as DAPs acknowledged in their Amici Brief, the court in *ATM Fee* refused to extend *Royal Printing* and *Freeman* to situations where plaintiffs try, as DAPs do here, to establish standing by alleging a theory of pass-on.  Indeed, the court in *ATM Fee* made quite clear that it disapproved of pass-on cases such as *Sugar* because they "restrict *Illinois Brick's* influence by allowing an exception when the direct purchaser conspires with the seller, ***even though the price illegally set is an upstream cost that is passed-on to the plaintiffs***.  ***This contradicts*** the Supreme Court's admonition not to carve out exceptions to the [direct purchaser] rule for particular types of markets."  686 F.3d at 757 (emphasis added) (internal quotation marks omitted).

Thus, *ATM Fee* does not hold, as DAPs contend, that *Royal Printing* applies if ownership/control exists, but the plaintiff did not purchase the product alleged to be price-fixed.

-3-

Opp. at 7-8. Instead, the decision indicates that the Ninth Circuit is opposed to extending the ownership/control exception under those or any other circumstances, even if "meritorious." *ATM Fee*, 686 F.3d at 757. Indeed, as this Court has previously found, *Royal Printing* did not involve a fact situation in which the plaintiffs purchased a finished product containing the allegedly price-fixed product, and there is no indication in that decision, or in *ATM Fee*, that the Ninth Circuit would endorse such a new exception or find it to be consistent with the rigid rules of *Illinois Brick*. May 31 Report at 10-12.

Moreover, the exception articulated in *Royal Printing* has been construed narrowly by the Ninth Circuit, and applied only in the most extreme of circumstances where applying *Illinois Brick* would "***eliminate*** the threat of private enforcement," closing off "***every avenue*** for private enforcement of the antitrust laws." *ATM Fee*, 686 F.3d at 755 (quoting *Royal Printing*, 621 F.2d at 326 n.7, 327) (emphasis added). In *Royal Printing*, there was no other entity in a position to sue if *Royal Printing's* claims were dismissed on summary judgment. *Royal Printing*, 621 F.2d 327. *Royal Printing's* circumstances are simply not present here, because there is no danger that a faithful application of *Illinois Brick's* indirect purchaser bar will close off "every avenue for private enforcement of the antitrust laws."[1]

Citing to footnote 7 in *ATM Fee*, DAPs argue that they have standing because, purportedly, "*ATM Fee* agreed with the result in" *Sugar* that "[the owned or controlled exception] applies to the purchase of a finished product containing a price-fixed component." Opp. at 8 (citing *ATM Fee*, 686 F.3d at 755 n.7). This is again the opposite of what DAPs asserted before the Ninth Circuit in their Amici Brief, where they argued: "[i]n a footnote, the Panel stated its rejection of the Third and Seventh Circuits cases [including *Sugar*] whose holdings reject the Panel's understanding of the applicability of the direct purchaser rule." Amici Brief at 18. Indeed, footnote 7 in *ATM Fee* is a denunciation, not an endorsement, of Judge Illston's decision to apply *Sugar* to the facts in the *In re TFT-LCD Antitrust Litigation*. 686 F.3d at 755 n.7. And, it is therefore consistent with, not a negation of, the analysis of this Court in the May 31 Report,

---

[1] As Your Honor is aware, Defendants' separate motion for summary judgment is directed at only nine of the thirteen named Direct Purchaser Plaintiffs.

1  similarly rejecting the application of *Sugar* and *In re TFT-LCD*.[2]

2  The fact that *ATM Fee* recognized the continued existence of the ownership-control

3  exception is of no help to DAPs because that exception only applies, as this Court has found,

4  when the allegedly priced-fixed product—and not some other downstream product—is being

5  purchased from an affiliate that is owned or controlled by the defendants.  And rather than

6  expanding that exception any further, as explained above, the *ATM Fee* court made it clear that

7  the exception is to be narrowly construed.  686 F.3d at 757.

8  Finally, there is no merit to DAPs' claim that "*ATM Fee's* discussion of *Freeman*

9  confirms that whether a purchaser paid the price-fixed [sic] is irrelevant to application of the

10  ownership or control exception."  Opp. at 9.  *ATM Fee's* discussion of *Freeman* merely confirms

11  that "*Freeman* did not create a new variation of the *Royal Printing* exception" based solely on

12  deterrence.  *ATM Fee*, 686 F.3d at 756; *see also* Amici Brief at 17 (asserting that *ATM Fee*

13  truncates and restricts *Freeman,* not expands it).  This is consistent with the Special Master's

14  previous ruling that there is no additional exception to the *Illinois Brick* doctrine for deterrence.

15  May 31 Report at 11.

16  **II.    DAPS' STATE LAW CLAIMS ARE TIME BARRED**

17  Starting on November 8, 2007, there was widespread publicity surrounding coordinated

18  antitrust investigations in Europe, Japan, and around the world of an alleged conspiracy involving

19  CRT pricing.  Those investigations prompted various plaintiffs to file a slew of lawsuits within

20  weeks—including one brought just a few days later—making allegations, similar to those asserted

21  by DAPs here, that Defendants were engaged in a conspiracy to fix prices of CRTs.  Yet DAPs,

22  some of the largest and most sophisticated retailers in the United States, who were and are at the

23  same time pursuing claims that some of the same Defendants were engaged in a conspiracy to fix

24  prices of LCDs, inexplicably waited until November 14, 2011—**more than four years later**—to

25

26

27  [2] DAPs also claim that *ATM Fee* grants them standing because the decision "approvingly cited Areeda's endorsement of *Sugar's* application of the ownership or control exception."  Opp.

28  at 8.  The citation to Areeda in *ATM Fee*, however, was only to confirm that *Sugar* was decided under the owned/controlled, as opposed to the co-conspirator, exception.

1   file their respective lawsuits.[3]

2       DAPs seek to excuse their lack of timeliness by arguing that Defendants fraudulently

3   concealed the basis for their claims.  *See* Opp. at 10-18.  But to save their untimely claims, DAPs

4   would have to allege with particularity facts establishing that Defendants "fraudulently

5   concealed" the basis for DAPs' claims ***during the four year period[4] immediately prior to filing***

6   ***their lawsuits***.  Since DAPs allege no actions by Defendants during that period, their allegations

7   must fail as a matter of law.

8       Similarly misplaced is DAPs' argument that the so-called doctrine of cross-jurisdictional

9   tolling, based on the federal DPP action, applies to certain DAPs state-law claims.  *See* Opp. at

10  18-21.  As a result, nearly all of DAPs' state law claims are time barred and should be dismissed.[5]

11      **A.    DAPs Fail To Plead Fraudulent Concealment With Particularity**

12      A plaintiff "must plead ***with particularity*** the circumstances of the concealment and the

13  facts supporting its due diligence."  *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 502 (9th Cir.

14  1988) (emphasis added); *see also* Fed. R. Civ. P. 9(b).  Conclusory statements are insufficient to

15  satisfy that burden.  *Conmar*, 858 F.2d at 502; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678

16  (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements

17  of a cause of action will not do.'") (internal quotations omitted).

18      DAPs contend that they have sufficiently pleaded fraudulent concealment because their

19  allegations are analogous to those contained in the DPPs' and IPPs' class complaints.  Opp. at 11-

20  12 (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal.

21  2010)).  But whereas the initial DPP and IPP complaints were filed in November 2007, DAPs

22  inexplicably waited more than ***four years*** before bringing their claims.  DAPs allege no acts by

23  Defendants during the more than four-year period preceding the filing of their Complaints—the

---

24  [3] The two exceptions are Electrograph's complaint, which was filed on February 18, 2011, and
    Polaroid's complaint, which was filed on November 4, 2011.

25  [4] The claims asserted under the Kansas Restraint of Trade Act and the Mississippi Antitrust Act
    in Target's Amended Complaint, and under the New York Unfair Business Practices Act in

26  Electrograph's complaint, are subject to a three-year limitations period.  Kan. Stat. Ann. § 60-
    512(2); Miss. Code Ann. § 15-1-49; N.Y. C.P.L.R. § 214.

27  [5] *See* Appendix B to Defendants' Motion, which sets forth each of DAPs' state-law antitrust and
    consumer protection claims that are untimely.  Defendants also now accept that DAPs' New York

28  Donnelly Act claim is not time barred due to the pendency of the federal CRT investigation.

1 relevant period for a statute of limitations analysis—to fraudulently conceal facts from DAPs.

2 Rather, all the allegations of purported affirmative conduct by Defendants to "fraudulently

3 conceal" facts are part and parcel of their underlying conspiracy allegations and offer no

4 explanation as to why DAPs—unlike numerous plaintiffs—were unable to uncover their claims

5 against Defendants for another four years. *See, e.g.,* P.C. Richard Compl. ¶¶ 220-232.

6       DAPs likewise fail to allege any facts suggesting they exercised reasonable diligence (or,

7 in fact, did anything) in the period following the publicity surrounding the coordinated worldwide

8 CRT investigations in November 2007 to uncover the basis for their claims. *See, e.g.,* Target Am.

9 Compl. ¶¶ 233, 237.[6] Yet, numerous other plaintiffs were able to investigate, discover their

10 claims, and file lawsuits within weeks of the European Commission's public announcement on

11 November 8, 2007.[7] *See Conmar*, 858 F.2d at 504 ("Where a plaintiff's suspicions have been or

12 should have been excited, there can be no fraudulent concealment where he could have then

13 confirmed his earlier suspicion by diligent pursuit") (internal quotation marks omitted).

14 Specifically, the first IPP lawsuit was filed on November 13, 2007, and the first DPPs filed a

15 putative class action on November 26, 2007.[8] Yet DAPs claim, incredibly, that they failed to

16 uncover their claims for another **four years** before finally bringing suit on November 14, 2011.

17 The DAP claims simply cannot satisfy the due diligence test.

18       **B.**    **DAPs Were On At Least Constructive Notice As Of November 8, 2007**

19       A plaintiff who is aware or should have been aware of the operative facts that constitute

20 the basis of its cause of action is deemed to have knowledge, and thus cannot rely on the

21 fraudulent concealment doctrine to toll the statutes of limitations on their claims. *See E.W.*

---

22 [6] Target's allegations of due diligence consist solely of two conclusory statements. First, that
"Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for
23 relief despite due diligence in trying to discover the pertinent facts." Target Am. Compl. ¶ 233;.
Second, that "Plaintiffs could not have discovered the alleged contract, conspiracy or combination
24 at an earlier date by the exercise of reasonable diligence because of the deceptive practices and
techniques of secrecy employed by Defendants and their co-conspirators." *Id.* ¶ 237.
25 [7] *See e.g., Kindt v. Matsushita Electric Industrial Co.*, No. 07-10322 (S.D.N.Y. Nov. 13, 2007);
*Crago, Inc. v. Chungwa Picture Tubes, Ltd.*, No. 07-05944 (N.D. Cal. Nov. 26, 2007); *Muchnick,*
26 *Inc. v. Chungwa Picture Tubes, Ltd.*, No. 07- 05981 (N.D. Cal. Nov. 27, 2007); *Arch Electronics,*
*Inc. v. LG Electronics, Inc*, No. 07-10664 (S.D.N.Y. Nov. 29, 2007); *Meijer, Inc. v. LG*
27 *Electronics, Inc.*, No. 07- 10674 (S.D.N.Y. Nov. 29, 2007); *Princeton Display Technologies, Inc.*
*v. Chungwa Picture Tubes, Ltd.*, No. 07- 05713 (S.D.N.J. Nov. 29, 2007).
28 [8] *See Kindt*, No. 07-10322; *Crago*, No. 07-05944.

DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS
AS TO CERTAIN DIRECT ACTION PLAINTIFFS' CLAIMS (3:07-CV-05944 SC, MDL NO. 1917)

1   *French & Sons, Inc. v. General Portland Inc.*, 885 F. 2d 1392, 1399 (9th Cir. 1989); *see also*

2   *Conmar*, 858 F.2d at 502 ("Any fact that should excite [plaintiff's] suspicion is the same as actual

3   knowledge of his entire claim.") (internal quotation marks omitted).

4        The European Commission's November 8, 2007 announcement should have alerted DAPs

5   to the existence of their claims. Regardless of whether DAPs were on actual notice as of that

6   date, they were on constructive notice. Their claims to the contrary are belied by the many

7   plaintiffs who filed lawsuits in the weeks following the EC's announcement, some within just a

8   few days after that announcement was made.[9] DAPs either had actual notice of their claims or

9   failed to exercise reasonable diligence. As Judge Illston has repeatedly held in *LCD*, publicity

10  surrounding antitrust investigations by public enforcement authorities is sufficient to put plaintiffs

11  on at least constructive notice of their claims to start the running of the statute of limitations. *See,*

12  *e.g., In re TFT-LCD (Flat Panel) Antitrust Litig. ("Interbond"),* No. 07-1827, at 3 n.1 (N.D. Cal.

13  Jan. 18, 2012) (finding allegations of fraudulent concealment to provide tolling "until the DOJ

14  announced its investigation on December 11, 2006."). The same reasoning applies here, and any

15  tolling of DAPs' untimely state-law claims ended on November 8, 2007, when the

16  announcements were made about the CRT investigations. Because DAPs waited more than four

17  years after that date—until November 14, 2011—to file their lawsuits, those claims are time

18  barred.

### C.   Cross-Jurisdictional Tolling Does Not Save DAPs' Untimely State Law Claims

21        Failing to properly allege fraudulent concealment, DAPs resort to the specious argument

22  that some of their state law claims should be tolled based on the federal antitrust claim asserted by

23  the putative direct purchaser class through the purported doctrine of cross-jurisdictional tolling.

24  However, DAPs concede that cross-jurisdictional class action tolling does not rescue the majority

25  of their state-law claims. Although DAPs assert claims under the laws of 17 different states, they

28  ---
[9] *See supra* note 7.

1   argue that cross-jurisdictional tolling applies only to their claims under seven of them.[10]  They

2   make no attempt to argue that the doctrine can save their claims under Arizona, Illinois, Iowa,

3   Michigan, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, or Wisconsin law.  *See*

4   *Silva v. U.S. Bancorp*, 5:10-cv-01854-JHN, 2011 WL 7096576, at *3 (C.D. Cal. Oct. 6, 2011)

5   ("the Court finds that Plaintiff concedes his recordkeeping claim should be dismissed by failing to

6   address Defendants' arguments in his Opposition."); *Tatum v. Schwartz*, No. 06-01440, 2007 WL

7   419463, at *3 (E.D. Cal. Feb. 5, 2007) (dismissing complaint on basis that plaintiff "tacitly

8   concede[d] this claim by failing to address defendants' argument in her opposition.").

9          Despite DAPs' assertions, the remaining six state law claims are equally unsalvageable.

10  DAPs rely on *In re Linerboard Antitrust Litig*ation, 223 F.R.D. 335 (E.D. Pa. 2004), which they

11  fallaciously describe as the "leading decision" to address cross-jurisdictional tolling.[11]  Opp. at

12  18.  In so doing, DAPs ignore a growing list of federal courts that refuse to apply cross-

13  jurisdictional tolling,[12] guidance from this Court,[13] and, most importantly, controlling Ninth

14  Circuit precedent that would reject the use of cross-jurisdictional tolling for DAPs' six state law

15  claims.  In *Clemens v. DaimlerChrysler Corp.*, the Ninth Circuit held that "[t]he rule of *American*

---

[10] These are: California, Florida, Kansas, Massachusetts, Minnesota, New York, and Washington law.  Opp. at 19.  As noted *supra* in note 5, the New York cross-jurisdictional tolling argument is now moot.

[11] Contrary to DAPs' implication, there is nothing to suggest that *Linerboard*—a Pennsylvania district court decision—is a seminal cross-jurisdictional opinion that is controlling, or even persuasive, here.  *See, e.g., In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1081-82 (D. Kan. 2009) (rejecting *Linerboard* factors and holding that "state law alone must govern the application of a tolling principle to a state's statute of limitations.").  Moreover, even if those factors were to be applied here, DAPs' argument that Defendants were put on notice of their state law claims when the first federal law-based DPP complaint was filed is inapposite.  As Judge Easterbrook has written, "state and federal antitrust laws differ.  They create different legal claims.  That the period of limitations may be tolled for one claim (state antitrust law) does not imply that it is tolled for another (federal antitrust law)."  *Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*, 642 F.3d 560, 562 (7th Cir. 2011).

[12] *In re Copper Antitrust Litig.*, 436 F.3d 782, 793-97 (7th Cir. 2006) (holding that *American Pipe* tolling did not apply to save plaintiffs' federal antitrust claims based on a previously filed state class action); *Soward v. Deutsch Bank AG*, 814 F. Supp. 2d 272 (S.D.N.Y. 2011) (refusing  "to import the doctrine into New York's law" after noting that "[o]f the federal courts that have considered this issue, most have refused to extend the doctrine into a state that has yet to consider it"); *In re Vioxx Products Liability Litig.*, 522 F. Supp. 2d 799, 806-15 (E.D. La. 2007) (despite observing that Pennsylvania, Illinois and Puerto Rico all recognized class action tolling, refusing to expand this doctrine without each state "explicitly adopted cross-jurisdictional tolling").

[13] *In re DRAM Antitrust Litig.*, 516 F. Supp. 2d 1072, 1102-03 (N.D. Cal. 2007) (court found cross-jurisdictional tolling unavailable in antitrust actions brought under various state laws).

Pipe . . . does not mandate cross-jurisdictional tolling as a matter of state procedure" and would not "import [cross-jurisdictional] doctrine into state law where it did not previously exist." 534 F.3d 1017, 1025 (9th Cir. 2008). DAPs do not (and cannot) provide any authority that California,[14] Florida,[15] Kansas,[16] Massachusetts,[17] Minnesota,[18] or Washington[19] have expressly adopted cross-jurisdictional tolling. Thus, *Clemens* dictates that cross-jurisdictional tolling should not be imported into the limitations laws of these six states.

## III.   DAPS' CLAIMS SHOULD BE DISMISSED TO THE EXTENT THAT THEY DO NOT ALLEGE PURCHASES IN THE FORUM STATES

### A.   Judge Illston Correctly Decided That The Location Of A Purchase Is The Dispositive Factor In Determining Whether Standing Exists

In a series of five decisions beginning in June 2010, Judge Illston examined standing challenges to various complaints filed by direct-action plaintiffs in the LCD case and concluded

---

[14] Despite arguing that cross-jurisdictional tolling is applicable to a California claim, DAPs rely on *Hatfield v. Halifax PLC*, which itself acknowledges that *Clemens* "foreclose[s] application of *American Pipe*." 564 F.3d 1177, 1187-88 (9th Cir. 2009). But in an attempted slight of hand, DAPs' footnote citation to *Hatfield* purports to support equitable tolling instead of cross-jurisdictional tolling. Not only has the equitable tolling argument been rejected in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2012 WL 149632, at *3 (N.D. Cal. Jan. 18, 2012), but the Ninth Circuit rejected applying equitable tolling when a federal and state antitrust claim are at issue. *Eichman v. Fotomat Corp.*, 880 F.2d 149, 155-56 (9th Cir. 1989) (when a plaintiff chooses to file either a federal or state antitrust remedy first, a plaintiff "may not invoke the doctrine of equitable tolling.").

[15] *In re Vitamins Antitrust Litig.*, 183 Fed. App'x. 1 (D.C. Cir. 2006) (predicting Florida would not permit cross-jurisdictional tolling); *In re Rezulin Products Liability Litig.*, No. 00-2843, 2006 WL 695253 (S.D.N.Y. Mar. 15, 2006) (stating Florida does not recognize cross-jurisdictional tolling) (citing *Senger Bros. Nursery, Inc. v. E.I. DuPont de Nemours & Co.*, 184 F.R.D. 674, 680 (M.D. Fla. 1999)).

[16] *Todd v. F. Hoffman-La Roche, Ltd.*, No. 98-4574, 2004 WL 5238952 (D. Kan. Aug. 20, 2004) (since no Kansas case was on point, the court found "that because most of the states that have considered the issue have rejected cross-jurisdictional tolling and for very good reason, this court should follow their lead"); *abrogated on other grounds by Seaboard Corp. v. March Inc.*, 284 P.3d 314 (Kan. 2012).

[17] *Patterson v. Novartis, Inc.*, No. 11-402, at 10-11 (D.R.I. Aug. 28, 2012) (court declined to apply cross-jurisdictional tolling to a Massachusetts claim as Plaintiffs failed to show that Massachusetts had adopted cross-jurisdictional because "[i]t is not this Court's role sitting in diversity to create new state law in Massachusetts.")

[18] DAPs rely on *Jenson v. Allison-Williams Co*., No. 98- 2229, 1999 WL 35133748 (S.D. Cal. Aug. 23, 1999), which merely assumed Minnesota would apply cross-jurisdictional tolling. But as noted above, *Clemens* dictates that a court should not read tolling provisions into state law that do not exist.

[19] *Champion v. Homa*, No. 03-275, 2008 WL 900967, at *11 (M.D. Ala. March 31, 2008) (declared that cross-jurisdictional class action tolling under *American Pipe* was not available in actions brought under various state securities laws including Washington).

that the location of the purchase of a price-fixed good is the dispositive factor in determining

whether standing exists.[20]  This line of cases culminated in Judge Illston's decision of August 27,

2012, in which she stated that "[t]his Court has consistently held that, for purposes of state law

indirect purchaser claims, plaintiffs are deemed to be injured in the states where they *agreed to*

*pay* inflated prices for products, not the states where they merely received products."  *TFT-LCD*,

2012 WL 3727221, at *3 (N.D. Cal. Aug. 27, 2012) (emphasis added).  Even DAPs must concede

that "[i]n antitrust cases involving individuals purchasing consumer products, courts often focus

their analysis on where the purchase was made . . . ."  Opp. at 23; *accord In re Graphics*

*Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1101, 1028 (N.D. Cal. 2007) ("*GPU I*") (no

standing to bring indirect purchaser price-fixing action under California law where no allegations

of purchases in California).

      Rather than follow the standard applicable to price-fixing cases, DAPs rely upon a series

of non-price-fixing cases, all of which are irrelevant.  *See* Opp. at 22-23 (citing *Pecover v.*

*Electronic Arts, Inc.*, No. 08-2820, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) (case brought

under Section 2 of the Sherman Act and unrelated to price-fixing); and *Wang v. OCZ Technology*

*Group, Inc.*, 276 F.R.D. 618 (N.D. Cal. 2011) (deceptive advertising case where the court

expressly stated that the requisite jurisdictional nexus for price-fixing claims was not at issue)).[21]

Alternatively, DAPs cite *In re Static Random Access Memory (SRAM) Antitrust Litigation*, 580 F.

Supp. 2d 896, 905 (N.D. Cal. 2008), which actually confirms DAPs' obligation to allege

---

[20] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2010 WL 2609434 (N.D. Cal. June 28, 2010); *TFT-LCD*, 2011 WL 5922966 (N.D. Cal. Nov. 28, 2011); *TFT-LCD*, 2012 WL 149528 (N.D. Cal. Jan. 18, 2012); *TFT-LCD*, 2012 WL 149632 (N.D. Cal. Jan. 18, 2012); *TFT-LCD*, 2012 WL 3727221, at *3 (N.D. Cal. Aug. 27, 2012).

[21] *See also Sound Appraisal v. Wells Fargo Bank, N.A.*, 717 F. Supp. 2d 940 (N.D. Cal. 2010), *aff'd* 451 Fed. App'x. 648 (9th Cir. 2011) (alleging common law claims for interference with economic advantage and violations of the California UCL arising from an agreement to blacklist certain home appraisers); *Dean Foods Co. v. Brancel*, 187 F.3d 609 (7th Cir. 1999) (alleging that state agency improperly applied milk-pricing regulation to out-of-state transactions); *Keilholtz v. Lennox Hearth Products, Inc.*, 268 F.R.D. 330, 340 (N.D. Cal. 2010) (an unjust enrichment case applying California law where the alleged unlawful conduct occurred in California); *Sutcliffe v. Wells Fargo Bank, N.A.*, No. 11-06595, 2012 WL 1622665, at *16 (N.D. Cal. May 9, 2012) (alleging claims for, *inter alia*, violations of the California UCL for bank's fraudulent offer made in California); *In re Mattel, Inc*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) (a products liability case); *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 n.11, 315 n.19 (1981) (cited by DAPs for dicta in two footnotes discussing application of interest analysis and situs of injury in torts cases).

1   purchases in the relevant forum states.  In that case, Judge Wilken dismissed the plaintiffs' price-

2   fixing claims because, although the plaintiffs "argue[d] that all Plaintiffs' claims are based on

3   conduct that took place in California . . . Plaintiffs have not alleged *specific conduct* that occurred

4   in California." *Id.* (emphasis added).  The allegations in that case suffered from the same lack of

5   specificity as DAPs' allegations here.[22]

6       For example, in our initial brief, the Defendants explained (on a claim-by-claim basis) that

7   certain DAPs do not make any allegations of a purchase of CRTs or CRT finished products in the

8   relevant states.  Mot. at 17-18.  Costco, for example, brings claims under Arizona, Florida and

9   Illinois law, but merely alleges that it received products at its distribution centers located in those

10  states.  Costco Compl. ¶ 13.  It is not the receipt of products, however, that is the cause of

11  Costco's alleged injury.  As another example, Circuit City alleges that it made "purchases" in

12  Illinois, but the facts alleged by Circuit City have nothing to do with actual purchases.  The fact

13  that Circuit City may have received shipments, taken title, and maintained inventories in Illinois

14  (Circuit City Compl. ¶¶ 9, 22, 265) has nothing to do with the basic question of whether Circuit

15  City made purchases there.

16      Finally, DAPs urge the Court to adopt a "flexible" standard to determine whether standing

17  exists and claim that Judge Illston, for example, considered a multitude of factors when

18  determining whether standing can be achieved.  Opp. at 23-24.  As an initial matter, each of Judge

19  Illston's decisions was decided based on where the purchase took place and no other factor.[23]

20  *TFT-LCD*, 2012 WL 3727221, at *3 (stating that the place "where [plaintiffs] *agreed to pay*

21  inflated prices for products . . . ." is the applicable test).  Moreover, while it is true that the Due

---

[22] *Compare* First Consolidated Amended Complaint ¶¶ 159, 175, 183, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07- 01819, 2007 WL 4806325 (N.D. Cal. Aug. 30, 2007) (alleging that "Defendants' contract, combination, or conspiracy" and "business acts and practices" were "centered in, carried out, effectuated and perfected mainly in the State of California") *with, e.g.* CompuCom Compl. ¶¶ 173, 176, *CompuCom Sys., Inc., v. Hitachi, Ltd.*, No. 11-03130 (N.D. Tex. Nov. 14, 2011) [Dkt. No. 1] ("[t]he indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California").

[23] *See TFT-LCD*, 2012 WL 149632, at *4 (considering not just the location of Office Depot's headquarters, but also the fact that Office Depot's purchase order emanated from that location in concluding that Office Depot's "purchase of allegedly price-fixed goods" took place in Florida); *TFT-LCD*, 2011 WL 5922966, at *2 (concluding that "Costco's purchasing process was controlled from Washington"); *TFT-LCD*, 2012 WL 3727221, at *4 ("The undisputed evidence shows that AT&T Mobility agreed to pay allegedly inflated prices in Georgia, not Tennessee.").

-12-

Process Clause does not impose a single test to be applied in all cases, it certainly does not allow the imposition of multiple tests to be applied in either a single case or a single type of case. Such use of multiple tests would be inherently "arbitrary" and "fundamentally unfair," precisely the result that the Due Process Clause seeks to avoid. *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011). Based on this, even DAPs recognize that "courts often focus their analysis on where the purchase was made . . . ." Opp. at 23. When that standard is applied here, it is apparent that the claims identified in Appendix C to our motion should be dismissed.

### B. The Same Claims That Fail To Establish Contacts With Relevant States Should Also Be Dismissed For Lack Of Prudential Standing

We also demonstrated in our opening Memorandum ("Mem.") that the same state-law claims that fail to establish contacts with relevant states should also be dismissed for lack of prudential standing. Specifically, the DAP claims identified in Appendix C do not fall within the "zone of interests" identified in each state's statutes authorizing antitrust claims, each of which is designed to remedy conspiracies that affect commerce *within* each of the respective states. This prudential limitation on the scope of each state's antitrust law is reflected in the statutes listed in footnote 23 of our Memorandum. DAPs provide no meaningful response to this argument.

## IV. DAPS HAVE NOT ESTABLISHED ANTITRUST STANDING FOR THEIR STATE LAW CLAIMS UNDER ARIZONA, CALIFORNIA, ILLINOIS, MICHIGAN, AND WASHINGTON STATE LAW

### A. The *Associated General Contractors* Test Applies Under The State Laws Of Arizona, California, Illinois, Michigan And Washington

DAPs' claims must also be dismissed for lack of antitrust standing under the laws of five of the states at issue. DAPs' Opposition concedes that the antitrust standing principles articulated in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), apply under both California and Washington law. Opp. at 26 (citing *In re CRT Antitrust Litig.*, 738 F. Supp. 2d 1011, 1023). DAPs maintain, however, that *AGC* should not apply under Illinois, Michigan and Arizona law, purportedly because other courts in this district have stated that "it would be wrong for a district court judge, in *ipse dixit* style . . . to pronounce a blanket and nationwide revision of all state antitrust law." Opp. at 26 (citing *GPU I*, 527 F. Supp.

-13-

2d at 1026. Defendants, however, are not advocating any such "blanket" rule, and have rather

moved very narrowly as to those particular states that have either (i) expressly applied *AGC* in

determining antitrust standing under their state laws (*e.g.*, Michigan and Illinois), or (ii) enacted

harmonization provisions dictating that their states' antitrust statues be construed in accordance

with federal law (*e.g.*, Michigan, Illinois, and Arizona). *See* Mem. at 24-25 and n. 24-25. This

targeted approach obviates the need for the Court to "to undertake the back-breaking labor

involved in deciphering the state of antitrust standing" in a multitude of states. *See In re GPU

Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) ("*GPU II*").[24] Notably, DAPs have

failed to come forward with *any* contrary authority from any of the jurisdictions challenged by

Defendants with respect to antitrust standing.[25]

Instead, DAPs complain that there is "not a clear directive" from these states because not

all of the cited authority emanates from the states' *highest courts* or its legislatures. Opp. at 26-

27. This argument is unavailing. The Court in this case has already looked to intermediate

appellate authority from California in concluding that *AGC* applies under the Cartwright Act. *In

re CRT Antitrust Litig.*, 738 F. Supp. 2d at 1023. And, DAPs bury in a footnote this District's

well-reasoned, state-by-state application of *AGC* in *In re DRAM Antitrust Litig.*, 516 F. Supp. 2d

1072, 84-93 (N.D. Cal. 2007) ("*DRAM I*") and *In re DRAM Antitrust Litig.*, 536 F. Supp. 2d

1129, 1135 (N.D. Cal. 2008) ("*DRAM II*"). DAPs do not, and cannot, explain why state law

directly on point, or a state statutory provision that "harmonizes" a state statute with federal case

law, would not be sufficient.[26] Thus, Judge Hamilton's well-reasoned position in *DRAM*—

---

[24] DAPs neglect to mention that the *GPU I* court found a state's harmonization provision to be a sufficient basis upon which to apply *AGC* under that state's antitrust law (in that case, West Virginia). *In re GPU* 527 F. Supp. 2d at 1025.

[25] While DAPs acknowledge that Illinois has a harmonization provision, they maintain nonetheless that federal decisions need only be applied by Illinois courts if they are found "persuasive." Opp. at 27 (citing *Baker v. Jewel Food Stores, Inc.*, 823 N.E.2d 93, 101 (Ill. App. 2005). Defendants, however, have cited both Illinois law expressly applying *AGC*, *see* Mem. at 24 n. 24, as well as the harmonization provision itself, which states that Illinois' courts "*shall* use the construction of the federal law by the federal courts as a guide in construing" the Illinois Antitrust Act. *See* 740 Ill. Comp. Stat. Ann. § 10/11 (West 2012) (emphasis added).

[26] The cases cited by DAPs are themselves inconsistent as to what would constitute such "clearer directive." *Compare GPU II*, 540 F. Supp. 2d at 1097 (requiring express guidance from a state's *highest* court) *with In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151 (N.D. Cal. 2009) ("*Flash*") (finding a state's intermediate appellate courts to be binding, absent "*convincing evidence* that the state's supreme court likely would not follow it.") (emphasis added).

-14-

1    relying upon the courts and legislatures of the states themselves—is the proper approach to this

2    issue. *DRAM I*, 516 F. Supp. 2d at 1094-95. Indeed, Judge Hamilton specifically applied *AGC* to

3    claims under both Michigan and Arizona law (and DAPs mislead the Court by claiming that

4    Arizona was not among the states at issue in *DRAM*). *Compare* Opp. at 27 n. 30; *with DRAM I*,

5    516 F. Supp. 2d at 1095.[27]

6        **B.    DAPs' Allegations Fail To Satisfy The *AGC* Test**

7        As purchasers and resellers of finished products containing CRTs, and not CRTs

8    themselves, DAPs have failed to plead "antitrust injury" (the first and most critical of the *AGC*

9    factors). Decades of Ninth Circuit precedent, as well as *AGC* itself, clearly require that a plaintiff

10   be a participant *in the allegedly restrained market* in order to prove "antitrust injury." *See Bhan*

11   *v. NME Hosp., Inc.,* 772 F. 2d 1467, 1470 (9th Cir. 1999) ("the injured party [must] be a

12   participant in the *same* market as the alleged malefactors") (emphasis added); *Am. Ad Mgmt., Inc.*

13   *v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("[p]arties whose injuries . . . are

14   experienced in another market *do not suffer antitrust injury*") (emphasis added). The allegedly

15   restrained market in this case is the market for standalone CRT tubes, and DAPs do not and

16   cannot purport to be participants in that market. Nor have DAPs shown that their allegations

17   meet either of the categories for market participation enumerated by the Ninth Circuit (*i.e.*, that

18   the televisions and computer monitors bought and resold by the plaintiffs are "reasonably

19   interchangeable," or experience "cross-elasticity of demand," with CRTs). *See, e.g.*, *Bhan*, 772

20   F.2d at 1470-71; *DRAM II*, 536 F. Supp. 2d at 1139-41.

21       Ignoring this well-settled Ninth Circuit law, DAPs instead focus on Judge Conti's opinion

22   in an earlier stage of these proceedings with respect to the IPPs. Opp. at 27-28. DAPs' reliance

23   on this early decision from the MDL is misplaced for several reasons. *First*, Judge Conti's entire

24

_____

25   [27] Moreover, the few decisions in this District that have been "reticent" to apply the *AGC* test on a
     state-by-state basis did *not* pronounce a general rule that *AGC* does not apply under state law.
26   *See, e.g.*, *Flash*, 643 F. Supp. 2d at 1150-53. One of these courts simply chose to put off the
     issue, and later noted that "[i]t may yet prove correct to apply the [*AGC*] test." *See GPU I*, 527 F.
27   Supp. 2d at 1026; *GPU II*, 540 F. Supp. 2d at 1097. However, the proper approach is to decide
     *AGC* now, as standing is a threshold issue of antitrust pleading. *See AGC*, 459 U.S. at 521;
28   *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) ("antitrust standing is a threshold,
     pleading-stage inquiry").

1    decision was premised on the fiction perpetuated by the class plaintiffs at that time that there was

2    a nebulous, overarching "finished products conspiracy." *See In re CRT Antitrust Litig.*, 738 F.

3    Supp. 2d at 1017. Special Master Legge recommended that Defendants' Rule 11 motion on this

4    issue be granted, and the DPPs and IPPs have both withdrawn their "finished product conspiracy"

5    claims. DAPs here have similarly conceded that they do not and cannot allege any such

6    multifaceted conspiracy affecting multiple markets. *See* Iovieno Ltr. at 1-2 [Dkt. No. 1317-5]/

7          *Second*, two of the states at issue here, Illinois and Washington, are not even implicated in

8    the MDL. Because antitrust standing is predicated on the scope of the individual *Illinois Brick*

9    repealer states' laws, it is dispositive that both Illinois and Washington preclude a finding of

10   antitrust standing in these circumstances. *See County of Cook v. Philip Morris, Inc.*, 817 N.E.2d

11   1039, 1045 (Ill. 2004) (dismissing amended complaint upon finding that plaintiffs had not shown

12   antitrust injury, citing *AGC*); *Blewett v. Abbott Labs.*, 938 P.2d 842 (Wash. App. 1997) (denying

13   antitrust standing to indirect purchasers).

14         *Third*, DAPs cannot survive dismissal simply by pointing to allegations made by the IPPs,

15   who represent an entirely different, end-consumer market that is separate and distinct from the

16   retailer market in which Plaintiffs operate. Moreover, contrary to their claims (Opp. at 27), DAPs

17   here have not asserted the same allegations as those made by the IPPs in the MDL. For example,

18   they have not alleged that standalone CRT tubes account for a specific percentage of the cost of

19   manufacturing the finished product, or that the standalone CRT tubes are components that "can

20   easily be traced." *Compare* DAPs' Complaints; *with* IPP Compl. ¶ 228-30, 231. While DAPs

21   have alleged, in a feeble attempt to conjure up "antitrust injury," that the markets for standalone

22   CRTs and the markets for finished products containing CRTs are "inseparable" and/or

23   "inextricably intertwined," these conclusory assertions are not nearly enough to establish a

24   plausible antitrust injury. Indeed, the "simple invocation of the phrase 'inextricably intertwined'

25   will not allow a plaintiff to avoid the fundamental requirement" of antitrust injury. *Lorenzo v.

26   Qualcomm, Inc.*, 603 F. Supp. 2d 1291, 1301 (S.D. Cal. 2009).

27         DAPs have also failed to satisfy the remaining *AGC* factors. *See* Mem. at 29-32. DAPs

28   have not made any allegations to support a "causal connection" between their alleged injury and

-16-

1   the anticompetitive conduct that is alleged to have occurred in the separate market for CRT tubes.

2   *AGC*, 459 U.S. at 540; *see also R.C. Dick Geothermal Corp. v. Thermogenesis, Inc.*, 890 F.2d

3   139, 147 (9th Cir. 1989); *County of Cook v. Philip Morris, Inc.*, 817 N.E.2d at 1045. Moreover,

4   DAPs' claims are inherently speculative, their apportionment would be unreasonably complex,

5   and to allow them would run the risk of duplicative recovery. DAPs maintain that simply because

6   the states at issue repealed the *categorical* bar on recovery set forth in *Illinois Brick*, 431 U.S. at

7   720, these states are not concerned about the complexity of proving up damages. Opp. at 33-34.

8   A state law plaintiff, though, does not automatically obtain antitrust standing simply by being an

9   "indirect purchaser" in an "*Illinois Brick* repealer state." Indeed, DAPs' argument ignores that

10  courts in repealer states routinely apply *AGC in its totality* in finding that indirect purchaser suits

11  may only proceed where plaintiffs' claims are not inherently speculative and unreasonably

12  complex. *See* Mem. at 30-32. Here, DAPs' allegations only emphasize the complexity of

13  tracking any alleged overcharge through multiple manufacturing and distribution channels, and of

14  disaggregating any alleged overcharge from the myriad other components that make up a

15  television. In short, DAPs have not shown that their claims meet the "strong interest" in "keeping

16  the scope of complex antitrust trials within judicially manageable limits." 459 U.S. at 543-44.

17  
18  **V.  DAPS' CLAIMS FAIL UNDER THE CONSUMER PROTECTION STATUTES OF MASSACHUSETTS AND WASHINGTON**

19          This Court has twice before dismissed claims for failure to comply with the requirements

20  of the Massachusetts consumer protection statute, and should do so again here.[28] DAPs failed to

21  allege that they served a "written demand for relief" on Defendants as required under the statute.

22  *See* Mass. G.L. c. 93A, § 9(3). The prerequisites to suit set forth in the statute are unambiguous,

23  and DAPs' failure to comply with them mandates dismissal of their consumer protection claim.

24  *See, e.g.*, *Kanamaru v. Holyoke Mut. Ins. Co.*, 8 N.E. 2d 759, 768 (Mass. 2008) (a "plaintiff *must*

25  . . . plead that he has complied with this [demand letter] requirement as a prerequisite to suit.")

26  

---

[28] *See* Report, Recommendations and Tentative Rulings Regarding Defendants' Motions to
Dismiss [Dkt. No. 597] (Feb. 5, 2010) at 29-30; Report, Recommendations and Tentative Rulings
Regarding Defendants' Joint Motion to Dismiss the Second Consolidated Amended Complaint of
the Indirect Purchaser Plaintiffs [Dkt. No. 768] (Sept. 30, 2010) at 12-14.

-17-

1  (emphasis added).  DAPs attempt to skirt this bright-line rule by citing inapposite case law[29] and

2  declaring that they sent Defendants the required demand letters.  Here too, however, DAPs violate

3  the Massachusetts statute, sending the required letters on November 14, 2011, *the same day* they

4  served their Complaint, rather than the required 30 days before.

5        DAPs also attempt to obfuscate Washington courts' adherence to the straightforward rule

6  of *Illinois Brick*.  Indeed, DAPs themselves concede that "Washington law does not authorize

7  private indirect purchasers to initiate suit" under the Washington Consumer Protection Act.  Opp.

8  at 35.  What is more, DAPs cannot avoid this clear bar by attempting to bootstrap Costco's claim

9  to the Washington Attorney General's suit, a separate case naming different defendants.  *State of*

10  *Washington v. LG Electronics*, No. 12-2-15842-8 (King County Superior Ct.).  Finally, this Court

11  has already held that Costco's lack of standing is not cured by any of the recognized exceptions to

12  *Illinois Brick*.[30]

13  **VI.  CERTAIN DAPS' UNJUST ENRICHMENT, RESTITUTION, AND CALIFORNIA**
14  **UNFAIR COMPETITION LAW CLAIMS ARE DEFICIENT**

15      **A.  The Polaroid Plaintiffs Fail To Identify Which State They Rely Upon For**
            **Their Unjust Enrichment Claims**

16        Because the elements of unjust enrichment vary by state (and because unjust enrichment

17  does not even exist in certain states), courts regularly require plaintiffs to identify ***in their***

18  ***complaints*** the state or states they rely upon their unjust enrichment claims.  *See, e.g.*, *In re*

19  *Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d at 910 (granting

20  defendants' motion to dismiss unjust enrichment claims and stating that "until Plaintiffs indicate

21  which States' laws support their claim, the Court cannot assess whether the claim has been

22  adequately plead").  In their brief, the Polaroid Plaintiffs argue that their unjust enrichment claims

23

24  _____
   [29] None of the cases cited by DAPs squarely address the demand letter allegation requirement.
25  *See Burns v. Hale & Dorr LLP*, 445 F. Supp. 2d 94 (D. Mass. 2006) (discussing demand letter
   timing); *Butler v. Deutsche Bank Trust Co. Americas*, No. 12-10337, 2012 WL 3518560 (D.
26  Mass. Aug. 14, 2012) (analyzing whether defendant held asset in state); *McKensi v. Bank of Am.,*
   *N.A.*, No. 09-11940, 2010 WL 3781841 (D. Mass. Sept. 22, 2010) (discussing demand letter
27  timing); *Powell v. Ocwen Loan Servicing, LLC*, No. 2010-2069, 2012 WL 345665 (Mass. Super.
   Ct. Jan. 4, 2012) (analyzing whether defendant maintained place of business in state).
28  [30] *See* Report and Recommendation Regarding Defendants' Joint Motion For Summary Judgment
   [Dkt. No. 1221] (May 31, 2012) at 12.

1    arise under the laws of Minnesota and California. This argument finds no support in their actual

2    complaint and, as a result, must be rejected.[31]

3    **B.    Circuit City's Fourth Claim For Relief Should Be Dismissed Because**
        **California Law Does Not Recognize A Cause Of Action For Restitution Or**
4        **Unjust Enrichment**

5        Circuit City invites this Court to follow the minority view in holding that unjust

6    enrichment and restitution claims are valid theories of recovery under California law. This Court

7    should reject this invitation; instead, it should follow the majority rule and trend in California.

8    *See, e.g.*, *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011) ("There is no freestanding

9    cause of action for "restitution" in California"); *Charles Schwab & Co. v. Bank of Am.*, No. 10-

10   4913, 2011 WL 1753805, at *5 (N.D. Cal. May 9, 2011) (describing stand-alone unjust

11   enrichment claim under California law as "a minority view"). Circuit City is mistaken when it

12   argues that it is too early in this litigation to determine whether adequate legal remedies are

13   available to it. Opp. at 38 n. 50. As recognized by Judge Conti in 2011, "[w]here the claims

14   pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is

15   unavailable." *Rhynes v. Stryker Corp.*, No. 10-5619, 2011 WL 2149095, at *4 (N.D. Cal. May

16   31, 2011) (Conti, J.) (emphasis added). Circuit City seeks relief under the Cartwright Act, and

17   that statute provides an entirely adequate remedy at law.

18   **C.    Circuit City, CompuCom, And The Polaroid Plaintiffs Have Not Stated A**
        **Claim Under California's Unfair Competition Law**
19

20       Circuit City, CompuCom, and the Polaroid Plaintiffs do not dispute the fact that, if their

21   antitrust claims are dismissed from this action, then their claims under the California Unfair

22   Competition Law ("UCL") should also be dismissed. Opp. at 38. They simply assert that they

23   have adequately pleaded their antitrust claims. Circuit City, CompuCom, and the Polaroid

24   Plaintiffs also do not dispute the fact that their fraudulent concealment allegations are linked to

25   their antitrust allegations. Opp. at 39. To the extent that the Court dismisses these companies'

26   antitrust claims, their fraudulent concealment allegations are not enough to support a claim under

27

28   ---
[31] In any event, California law does not recognize a cause of action for unjust enrichment as
established *infra* in Section IV(B)

-19-

the UCL.  *See* Mem. at 37 (citing *In re Cal. Title Ins. Antitrust Litig.*, No. 08-01341, 2009 WL 1458025, at *8 (N.D. Cal. May 21, 2009) (dismissing both antitrust and "fraudulent" UCL claims because the UCL claims were based on the antitrust claims).

## VII. DAPS CANNOT SUE UNDER THE STATUTES OF NEBRASKA, NEVADA OR NEW YORK[32] BASED ON PURCHASES PREDATING THOSE STATES' *ILLINOIS BRICK* REPEALER AMENDMENTS

The Court has already held, in the context of the CRT class case, that indirect purchasers lack standing to bring claims under either Nebraska or Nevada law if the purchase predated those state's respective *Illinois Brick* repealer statute.  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d at 1025.  DAPs urge the Court to reverse its position, but they cite the same Nebraska and Nevada authorities that the Special Master and the Court considered in making that order.  Opp. at 40.  With respect to Nebraska, DAPs rely principally on *Arthur v. Microsoft Corp.*, an opinion that does not even mention the Junkin Act, the statute DAPs invoke here.  676 N.W.2d 29 (Neb. 2004).   Moreover, the majority opinion in *Arthur* does not discuss Nebraska's 2002 repealer amendment, let alone analyze whether the amendment applies retroactively.  DAPs also cite *Kanne v. Visa U.S.A., Inc.*, but ignore its numerous statements that indirect purchasers were barred from recovering under the Junkin Act until the Nebraska Legislature amended the statute in 2002.  723 N.W.2d 293, 300 (Neb. 2006).  Regarding Nevada, DAPs ignore controlling authority from the Nevada Supreme Court, holding that statutes apply prospectively only, absent "clear[], strong[], and imperative[]" language to the contrary.  *In re Estate of Thomas*, 998 P.2d 560, 562 (Nev. 2000).  DAPs cite to no such language, and provide no reason for the Court to diverge from its earlier holding that indirect purchasers lack standing to bring claims based on purchases predating the repealer.

## CONCLUSION

For the foregoing reasons, the aforementioned DAP claims should be dismissed with prejudice, or as applicable judgment entered in favor of Defendants on the pleadings.

---

[32] DAPs concede that they lack standing to assert claims under New York's Donnelly Act based on purchases made before December 23, 1998.  *See* Opp. at p. 39, n.51.  Accordingly, the Court should dismiss all such claims by Sears, Target, Electrograph, CompuCom and P.C. Richard.

-20-

| | |
|---|---|
| 1 | Dated:  October 26, 2012 |

Respectfully Submitted,

By: ___ /s/ Jon V. Swenson_____
Jon V. Swenson (SBN 233054)
**BAKER BOTTS L.L.P.**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304-1007
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
Email: jon.swenson@bakerbotts.com

John M. Taladay (*pro hac vice*)
David T. Emanuelson (*pro hac vice*)
**BAKER BOTTS L.L.P.**
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: david.emanuelson@bakerbotts.com

*Attorneys for Defendants Koninklijke Philips
Electronics N.V. and Philips Electronics North
America Corporation*

O'MELVENY & MYERS LLP

By: ___ /s/ Ian Simmons_____
IAN SIMMONS (*pro hac vice*)
Email: isimmons@omm.com
BENJAMIN G. BRADSHAW (SBN 189925)
Email: bbradshaw@omm.com
KEVIN D. FEDER (SBN 252347)
Email: kfeder@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Defendants Samsung Electronics
Co., Ltd. and Samsung Electronics America,
Inc.*

DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS
AS TO CERTAIN DIRECT ACTION PLAINTIFFS' CLAIMS (3:07-CV-05944 SC, MDL NO. 1917)

1

2

SHEPPARD MULLIN RICHTER & HAMPTON

3

By:____/s/ Gary L. Halling_____
GARY L. HALLING (SBN 66087)

4

E-mail: ghalling@sheppardmullin.com
JAMES L. MCGINNIS (SBN 95788)

5

E-mail: jmcginnis@sheppardmullin.com
MICHAEL W. SCARBOROUGH, (SBN 203524)

6

7

E-mail: mscarborough@sheppardmullin.com
**SHEPPARD MULLIN RICHTER & HAMPTON**

8

Four Embarcadero Center, 17th Floor

9

San Francisco, California 94111
Telephone: (415) 434-9100

10

Facsimile: (415) 434-3947

11

*Attorneys for Defendants Samsung SDI America, Inc.; Samsung SDI Co., Ltd.;*

12

*Samsung SDI (Malaysia) SDN. BHD.; Samsung SDI Mexico S.A. DE C.V.; Samsung SDI Brasil Ltda.; Shenzen Samsung SDI Co., Ltd. and Tianjin Samsung SDI Co., Ltd.*

13

14

15

MORGAN, LEWIS & BOCKIUS LLP

16

By:____/s/ Kent M. Roger_____
KENT M. ROGER (SBN 95987)
E-mail: kroger@morganlewis.com

17

MICHELLE PARK CHIU (SBN 248421)
E-mail: mchiu@morganlewis.com

18

**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower

19

San Francisco, California 94105-1126
Telephone: (415) 442-1000

20

Facsimile: (415) 442-1001

21

J. CLAYTON EVERETT, JR. (*pro hac vice*)

22

E-mail: jeverett@morganlewis.com
SCOTT A. STEMPEL (*pro hac vice*)

23

E-mail: sstempel@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**

24

111 Pennsylvania Avenue, NW
Washington, DC 20004

25

Telephone: (202) 739-3000
Facsimile: (202) 739-3001

26

*Attorneys for Defendants Hitachi, Ltd., Hitachi Displays, Ltd. (n/k/a Japan Display East, Inc.), Hitachi Asia, Ltd., Hitachi America, Ltd., and Hitachi Electronic Devices (USA), Inc.*

27

28

-22-

1                                                    WHITE & CASE LLP

2                                                    By:    /s/ Christopher M. Curran
                           CHRISTOPHER M. CURRAN (*pro hac vice*)
3                           E-mail: ccurran@whitecase.com
                           GEORGE L. PAUL (*pro hac vice*)
4                           E-mail: gpaul@whitecase.com
                           LUCIUS B. LAU (*pro hac vice*)
5                           E-mail: alau@whitecase.com
                           **WHITE & CASE LLP**
6                           701 Thirteenth Street, N.W.
                           Washington, DC 20005
7                           Telephone: (202) 626-3600
                           Facsimile: (202) 639-9355
8

9                           *Attorneys for Defendants Toshiba Corporation,*
                           *Toshiba America, Inc., Toshiba America*
10                         *Information Systems, Inc., Toshiba America*
                         *Consumer Products, L.L.C., and Toshiba*
11                         *America Electronic Components, Inc.*

12                           WINSTON & STRAWN LLP

13                           By:    /s/ Jeffrey L. Kessler
                           JEFFREY L. KESSLER (pro hac vice)
14                         E-mail: JKessler@winston.com
                         A. PAUL VICTOR (pro hac vice)
15                         E-mail: PVictor@winston.com
                         EVA COLE (pro hac vice)
16                         E-mail: EWCole@winston.com
                         MOLLY M. DONOVAN
17                         E-mail: MMDonovan@winston.com
                         **WINSTON & STRAWN LLP**
18                         200 Park Avenue
                         New York, NY 10166
19                         Telephone: (212) 294-6700

20                         STEVEN A. REISS (pro hac vice)
                         E-mail: steven.reiss@weil.com
21                         DAVID L. YOHAI (pro hac vice)
                         E-mail: david.yohai@weil.com
22                         ADAM C. HEMLOCK (pro hac vice)
                         E-mail: adam.hemlock@weil.com
23                         **WEIL, GOTSHAL & MANGES LLP**
                         767 Fifth Avenue
24                         New York, New York 10153-0119
                         Telephone: (212) 310-8000
25                         Facsimile: (212) 310-8007

26                         *Attorneys for Defendants Panasonic*
                         *Corporation (f/k/a Matsushita Electric*
27                         *Industrial Co., Ltd.), Panasonic Corporation of*
                         *North America, MT Picture Display Co., Ltd.*

28

1

2   ARNOLD & PORTER LLP

    By:      /s/ Sharon D. Mayo
3   SHARON D. MAYO (SBN 150469)
    sharon.mayo@aporter.com
    Three Embarcadero Center, 7th Floor
4   San Francisco, California  94111-4024
    Telephone:  (415) 471-3100
5   Facsimile:  (415) 471-3400

6   DOUGLAS L. WALD (*pro hac vice*)
    douglas.wald@aporter.com
7   WILSON D. MUDGE (*pro hac vice*)
    wilson.mudge@aporter.com
8   YONGSANG KIM (*pro hac vice*)
    yongsang.kim@aporter.com
9   **ARNOLD & PORTER LLP**
    555 Twelfth Street, NW
10  Washington, DC  20004
    Telephone:  (202) 942-5000
11  Facsimile:  (202) 942-5999

12  *Attorneys for Defendants LG Electronics, Inc.;*
    *and LG Electronics USA, Inc.*
13
    GIBSON, DUNN & CRUTCHER LLP
14
    By:      /s/ Rachel S. Brass
15  Joel S. Sanders (SBN 107234)
    Rachel S. Brass (SBN 219301)
16  Austin V. Schwing (SBN 211696)
    Joel Willard (SBN 247899)
17  **GIBSON, DUNN & CRUTCHER LLP**
    555 Mission Street, Suite 3000
18  San Francisco, California 94105
    Tel: (415) 393-8200
19  Fax: (415) 393-8306
    jsanders@gibsondunn.com
20  rbrass@gibsondunn.com

21  *Attorneys for Defendant Chunghwa Picture*
    *Tubes, Ltd. as to the Target Am. Compl., P.C.*
22  *Richard Compl., Tweeter Compl., CompuCom*
    *Compl., Interbond Compl., Costco Compl.,*
23  *Office Depo Compl. and Best Buy Compl. only*

24
        Pursuant to Local Civil Rule 5-1(i), the filer attests that concurrence in the filing of this
25
    document has been obtained from each of the above signatories.
26

27

28

                                                    -24-
    DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS
    AS TO CERTAIN DIRECT ACTION PLAINTIFFS' CLAIMS (3:07-CV-05944 SC, MDL NO. 1917)

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 26, 2012, I electronically filed Defendants' Joint Reply Memorandum in Support of Motion to Dismiss and For Judgment on the Pleadings as to Certain Direct Action Plaintiffs' Claims with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

<u>/s/ Jon V. Swenson</u>
Jon V. Swenson

# Exhibit A

Docket No. 10-17354

In the

# United States Court of Appeals

for the

## Ninth Circuit

PAMELA BRENNAN, TERRY CRAYTON, and DARLA MARTINEZ,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

CONCORD EFS, INC., FIRST DATA CORP., BANK OF AMERICA, N.A.,
JPMORGAN CHASE BANK, N.A., BANK ONE, N.A., CITIBANK, N.A.,
CITIBANK (WEST), FSB, SUNTRUST BANKS, INC., WACHOVIA
CORPORATION, WELLS FARGO BANK, N.A., SERVUS FINANCIAL CORP.

*Defendants-Appellees.*

Appeal from Final Judgment of the
United States District Court
For the Northern District of California
*In re ATM Fee Antitrust Litigation*, Case No. 3:04-cv-026776-CRB

**AMICI CURIAE BRIEF OF INTERESTED RETAILERS AND THE
AMERICAN ANTITRUST INSTITUTE IN SUPPORT OF APPELLANTS'
PETITION FOR REHEARING EN BANC**

Jonathan J. Ross
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
(713) 651-9366
*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENTS

1.     Pursuant to Fed. R. App. P. 26.1, Alfred H. Siegel, as Trustee of The Circuit City Stores, Inc. Liquidating Trust states as follows:  Alfred H. Siegel, as Trustee of The Circuit City Stores, Inc. Liquidating Trust does not have a parent corporation and no publicly held company owns 10% or more of the amicus' stock.

2.     Pursuant to Fed. R. App. P. 26.1, P.C. Richard & Son Long Island Corporation states as follows: P.C. Richard & Son Long Island Corporation does not have a parent corporation and no publicly held company owns 10% or more of the amicus' stock.

3.     Pursuant to Fed. R. App. P. 26.1, Electrograph Systems, Inc. states as follows:  Electrograph Systems, Inc. is a wholly-owned subsidiary of Electrograph Technologies Corp. and no publicly held company owns 10% or more of the amicus' stock.

4.     Pursuant to Fed. R. App. P. 26.1, the American Antitrust Institute states that it is a nonprofit corporation and, as such, no entity has any ownership interest in it.

5.     Pursuant to Federal Rule of Appellate Procedure 26.1, Interested Retailers, Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc. through their undersigned counsel, hereby certify as follows:  Best Buy Co.,

2359323v1/011997

Inc. does not have a parent corporation and no publicly held company owns 10% or more of its stock. Best Buy Enterprise Services, Inc., Best Buy Purchasing LLC, Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc. are wholly-owned by Best Buy Co., Inc.

6. Pursuant to Fed. R. App. P. 26.1, Target Corporation states as follows: Target Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

7. Pursuant to Fed. R. App. P. 26.1, Sears, Roebuck and Co. states as follows: Sears, Roebuck and Co.'s parent corporation is Sears Holdings Corporation. Sears Holdings Corporation is a publicly held corporation that owns 10 percent or more of Sears, Roebuck and Co.'s stock.

8. Pursuant to Fed. R. App. P. 26.1, Kmart Corporation states as follows: Kmart Corporation's indirect parent corporations are Sears Holdings Corporation and Kmart Holding Corporation, and its direct parent corporation is Kmart Management Corporation. Sears Holdings Corporation is a publicly held corporation that owns 10 percent or more of Kmart Corporation's stock.

9. Pursuant to Fed. R. App. P. 26.1, Old Comp Inc. states as follows: Old Comp Inc.'s parent corporation is Special Equity, LLC, and no publicly held corporation owns 10 percent or more of its stock.

2359323v1/011997

10.     Pursuant to Fed. R. App. P. 26.1, Good Guys, Inc. states as follows: Good Guys, Inc.'s parent corporation is Old Comp Inc., and no publicly held corporation owns 10 percent or more of its stock.

11.     Pursuant to Fed. R. App. P. 26.1, RadioShack Corporation states as follows: RadioShack Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

2359323v1/011997

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENTS ........................................i

TABLE OF CONTENTS ..........................................................iv

TABLE OF AUTHORITIES ......................................................v

INTRODUCTION AND STATEMENT OF INTEREST OF AMICI.....................1

ARGUMENT .....................................................................3

I.  Application of the Direct Purchaser Rule and Its Exceptions ........................3

    A.  *Illinois Brick*. ..........................................................3

    B.  Implementation of *Illinois Brick*'s Principles. .....................6

    C.  *Utilicorp* and *ARC America*. ........................................10

    D.  Appellate Practice After *Utilicorp*. .................................12

II. The Panel's Decision Is Contrary To Thirty-Five Years of Application of the Direct Purchaser Rule.............................16

    A.  Plaintiffs Are Not Indirect Purchasers. .............................17

    B.  The Co-Conspirator Exception Applies Regardless of Which Price is Fixed. ...................................................18

    C.  The Panel's Restriction of *Freeman* Is Unwarranted.........................20

CONCLUSION ..................................................................21

2359323v1/011997

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Shamrock Foods Co.*,
    729 F.2d 1208 (9th Cir. 1984) ............................................................ 9, 10, 18

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982)........................................................................7

*California v. ARC America Corp.*,
    490 U.S. 93 (1989)........................................................................10

*Campos v. Ticketmaster Corp.*,
    140 F.3d 1166 (8th Cir. 1998) ........................................................12

*Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*,
    523 F.3d 1116 (2008) ....................................................................15

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
    617 F.2d 478 (7th Cir. 1980) ............................................... 7, 8, 17, 18

*Free v. Abbott Laboratories, Inc.*,
    176 F.3d 298, 299 n.1 (1999) .........................................................12

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (2003) ............................................................ passim

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968)......................................................... 3, 5, 11, 14

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)............................................................ passim

*In re Beef Indus. Antitrust Lit.*,
    600 F.2d 1148 (5th Cir. 1979) .........................................................8

*In re Brand Name Prescription Drugs Antitrust Litigation*,
    123 F.3d 599, 604 (7th Cir. 1997) ...................................................14

2359323v1/011997

*In re Sugar Industry Antitrust Lit. v. Amstar Crop.*,
    579 F.2d 13 (3rd Cir. 1978) .................................................................. passim

*In Re: Linerboard Antitrust Litigation*,
    305 F.3d 145 (3rd Cir. 2002) ............................................................... passim

*Jewish Hospital Ass'n of Louisville, Kentucky,*
    *Inc. v. Stewart Mechanical Enterprises,*
    *Inc.*, 628 F.2d 971 (1980) ............................................................................8

*Kansas v. Utilicorp United, Inc.*,
    497 U.S. 199 (1990) ............................................................................ passim

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042, 1049-50 (9th Cir. 2008) ................................................ 15, 18

*Lowell v. American Cyanamid Co.*,
    177 F.3d 1228 (11th Cir. 1999) ..................................................................10

*Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*,
    281 F.3d 629 (7th Cir. 2002) ............................................................... passim

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (1980) ...................................................................... 8, 9, 14, 15

## **Statutes**

Fed. R. App. P 32(a)(7)(B)(iii) ..................................................................22

Fed. R. App. P. 29(d) ...............................................................................22

Fed. R. App. P. 32 (a)(6) ..........................................................................22

Fed. R. App. P. 32 (a)(7)(B) .....................................................................22

2359323v1/011997

## INTRODUCTION AND STATEMENT OF INTEREST OF AMICI

Amici Curiae are a group of retailers ("Retailers") who have been in the past and are currently involved in antitrust litigation in the United States.[1] Retailers have faced several large antitrust violations over the years from cartels and other conspiracies to fix the prices of either the goods Retailers sell or the key components of those goods. As the first purchaser of goods outside of these conspiracies, Retailers often serve as the "private attorneys general" contemplated by the antitrust laws of the United States.[2]

The American Antitrust Institute (AAI) also joins this brief as amicus curiae. The AAI is an independent, non-profit education, research, and advocacy organization whose mission is to sustain the vitality of the antitrust laws which would be undermined by the Panel's application of the direct purchaser rule.[3]

Amici file this brief in support of Appellant's Petition for Rehearing en Banc to assist the Court in determining whether the Panel erred in three of its conclusions: (1) that plaintiffs are not direct purchasers where they are the first

---

[1]  The specific retailers joining this brief are Sears, Roebuck and Co., Target Corp., K-Mart Corp., RadioShack Corporation, Old Comp Inc. (f/k/a CompUSA), Good Guys, Inc., Electrograph Systems, Inc., P.C. Richard & Son Long Island Corp., Best Buy Co., Inc., Best Buy Purchasing LLC., Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., Magnolia Hi-Fi, Inc., and Alfred H. Siegel, as Trustee of The Circuit City Stores Liquidating Trust.

[2]  Retailers are currently serving in that role in two cases pending in this Circuit, *In re TFT LCD (Flat Panel) Antitrust Litigation* and *In re Cathode Ray Tube (CRT) Antitrust Litigation.*

[3] The Board of Directors has approved this filing for AAI; views of individual members of AAI's Advisory Board may differ from AAI's positions. Certain members of AAI's Advisory Board are at law firms that are the co-lead counsel for plaintiffs in this matter, but those members played no role in the Directors' deliberations or the drafting of the brief. Pursuant to Fed. R. App. P. 29(c)(5), amici state that none of the parties to the *ATM Fee* case made any financial contribution to the drafting or filing of this brief. Nor did any of the lawyers employed by those parties contribute to any work on this brief.

1

purchaser outside of the conspiracy, (2) that the co-conspirator exception to the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), should be limited in its application only to circumstances when the conspirators conspire to fix the price paid by the antitrust plaintiff (as opposed to the upstream price one conspirator charges another), and (3) that the "no realistic possibility that direct purchasers will sue" doctrine enunciated by the Ninth Circuit in *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (2003), is limited solely to situations where a defendant in the conspiracy owns or controls (as narrowly defined by the Panel) the direct purchaser which sold the product to the antitrust plaintiff.

All three of these conclusions fail to recognize that the touchstone question is which entity is the first in the chain of distribution to have the ability and incentive to bring an antitrust action. Instead, the Panel focused on specifics like ownership and control, while ignoring the purpose behind the ownership and control exception: that the "direct" purchaser in cases where it is owned or controlled by the conspirator will obviously never sue. The Panel's focus on the tree of ownership and control ignores the forest of whether or not a party has the capacity and incentive to sue.

An examination of *Illinois Brick* and its appellate progeny demonstrate that the Panel's conclusions are not consistent with the Supreme Court's purpose in creating the direct purchaser rule, nor the case law implementing that purpose,

2

including that of this Circuit.  If the Panel's conclusions stand, they give a roadmap to antitrust conspirators on how to avoid the antitrust laws of the United States: two arms-length entities simply enter into a conspiracy to fix the price of a key component of a finished product that the downstream conspirator then sells to purchasers such as Retailers.  The Panel's decision creates a large and exploitable loophole in the direct purchaser rule, which should be corrected.

## ARGUMENT

### I.     Application of the Direct Purchaser Rule and Its Exceptions

To best understand the Panel's failure to abide by the principles enunciated above, it is useful to first examine the Supreme Court's decision in *Illinois Brick*, the implementation of the rule announced therein by the appellate courts, the two subsequent Supreme Court cases that commented on that implementation, and the subsequent appellate case law.

### A.     *Illinois Brick*.

The Supreme Court's decision in *Illinois Brick* answered a question that had been lingering since its decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968): if a defendant could not use as a defense to an antitrust claim the argument that the true antitrust injury was suffered by indirect (downstream) purchasers rather than the direct (midstream) purchaser plaintiff,

3

could an indirect purchaser use the argument offensively and assert claims against the antitrust conspirator?  The Supreme Court's answer was no.

The Court gave two reasons.  First, the Court indicated that it would not be fair to allow plaintiffs the same antitrust theory as a weapon that it had denied defendants as a defense.  *Illinois Brick*, 431 U.S. at 735.  The Court then turned to an examination of the economic challenges of determining which potential plaintiff downstream from the conspiring defendants was in the best position to recover damages.  The Court concluded that the first potential plaintiff in the distribution chain, the "direct purchaser," was the plaintiff best suited to sue for damages.  *Id.* at 737-38.  In doing so, the Court expressed concern that if all the potential purchasers in the distribution chain had a right to sue, actions would become unmanageable from both an economic (partitioning of damages) and legal (multiplicity of parties) standpoint.  *Id.* at 738-45.

The Court's concerns were in part based on the detrimental effect on antitrust litigation if causes of action were not limited to the direct purchaser.  "The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group….The combination of

increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement." *Id.* at 745.

The Court concluded its analysis with an elegant statement on the purpose of the direct purchaser rule:

> We think the longstanding policy of encouraging vigorous private enforcement of the antitrust laws supports our adherence to the *Hanover Shoe* rule, under which direct purchasers are not only spared the burden of litigating the intricacies of pass-on but are also permitted to recover the full amount of the overcharge. We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers. But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of "private attorneys general" to enforce the antitrust laws under § 4 is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

*Id.* at 745-46 (citations omitted). With that purpose in mind, the Court recognized that there would be exceptions to the rule it just announced. In fact, the Court indicated two potential exceptions: cases involving cost-plus contracts (because the pass-on concerns would not exist), and cases where the direct purchaser is owned or controlled by its customer. *Id.* at 736 & n.16. It did not preclude other exceptions, other than to comment that the direct purchaser rule was not a rule whose application should be determined on a market by market (or industry by industry) basis. *Id.* at 744.

5

### B.    Implementation of *Illinois Brick*'s Principles.

The Third Circuit was the first circuit court to implement the holding of *Illinois Brick*.  In *In re Sugar Industry Antitrust Lit. v. Amstar Crop.*, 579 F.2d 13 (3rd Cir. 1978), the Circuit was faced with a similar fact pattern to the one confronted by the Panel.  Manufacturers of sugar conspired to fix the price of sugar that was used in food products sold by themselves and others in the conspiracy. The manufacturers did not fix the price of the food products themselves, but rather just the price of the upstream ingredient: sugar.  *Id.* at 15-16.

The defendants argued that *Illinois Brick* deprived plaintiff of standing because it was an indirect purchaser of the sugar, which was purchased by members of the conspiracy for use in the finished food products.   The Court disagreed, finding that the plaintiff, as the first purchaser outside of the conspiracy, had standing as the direct purchaser.  *Id.* at 18.   It expressed concern that a refiner who illegally set the price of sugar could shield itself from the antitrust laws by putting the price-fixed product into the finished product.   "*Illinois Brick* did not purport to provide any such escape.  The opinion was at pains to point out that all of the overcharges could be collected by direct purchasers, the parties the Court believed most likely to take action against price-fixers."  *Id.*

The opinion further pointed out that there was no need to differentiate between sales by a division of one defendant and those by a subsidiary of another,

6

that either was controlled by the parent conspirator and thus could not be expected to sue its parent as the Supreme Court anticipated in *Illinois Brick*. *Id*. at 18-19. Thus for the Third Circuit, the principles enunciated in *Illinois Brick* were best followed by finding the direct purchaser to be the first purchaser in the distribution chain outside of the conspiracy (i.e., conspirators or entities controlled by a conspirator cannot be direct purchasers).

Other circuits followed this basic principle. In *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980), the plaintiff purchased aircraft from an entity separate from the defendant manufacturer, Cessna. Cessna asserted that *Illinois Brick* barred plaintiff from having standing to sue, and the district court agreed. *Id*. at 479.

The Seventh Circuit reversed. It pointed out that while the plaintiff had not sued the distributor, it alleged that the manufacturing defendant conspired with the distributor to monopolize the market in question. The Court noted that in effect, *Illinois Brick* did not apply to these circumstances as the both the manufacturer and the distributor were alleged to be co-conspirators in a common illegal scheme. *Id*. at 481. Thus in this circumstance, a court again looked to the first purchaser outside of the conspiracy to find standing to enforce the antitrust laws.[4]

---

[4] Two years later the Supreme Court itself noted that its holding in *Illinois Brick* was not meant to be applied blindly in all cases. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 474-75 (1982) (holding that *Illinois Brick*'s focus on the risk of duplicative recoveries engendered by allowing every person along a chain of distribution

7

The Sixth Circuit applied these principles in *Jewish Hospital Ass'n of Louisville, Kentucky, Inc. v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971 (1980).  The Court recognized both the control and cost-plus exceptions enunciated in *Illinois Brick*, as well as the concept enunciated in *Fontana Aviation* that, given a vertical conspiracy between the two defendants, *Illinois Brick* was not applicable.  It found, however, that the pleadings before it did not allege facts sufficient to sustain any of the exceptions.  It distinguished the facts alleged in the case before it from the facts alleged in *In re Sugar* while accepting the rationale of the Third Circuit.  *Id*. at 975.[5]

In the first decade after *Illinois Brick* this Circuit applied its principles in two cases heavily discussed in the Panel decision.  In *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (1980), plaintiffs alleged that defendant manufacturers of paper products sold their products through their wholesale divisions or wholly-owned subsidiaries, as well as through independent wholesalers[6].  The plaintiffs alleged purchases from different divisions or subsidiaries of the defendants,

---

to claim damages arising from a single transaction not applicable where the facts of the antitrust case before it "offers not the slightest possibility of a duplicative exaction").

[5]  In the immediate aftermath of *Illinois Brick* the Fifth Circuit also recognized the concept that in a vertical conspiracy what it called a "co-conspirator exception" to the *Illinois* Brick rule could be recognized (though it found it was not adequately pled in the case before it), though it expressed a belief, contrary to the Seventh Circuit's ruling in *Fontana Aviation*, that the middle-men who were alleged to be co-conspirators should be named as party defendants so as to avoid potential overlapping liability.  *See In re Beef Indus. Antitrust Lit.*, 600 F.2d 1148, 160-63 (5th Cir. 1979).  *See also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1171 & n.4 (8th Cir. 1998).

[6]  As to purchases plaintiffs made from the independent wholesalers, this Court found plaintiffs to be classic indirect purchasers and have no standing under *Illinois Brick*.  *Royal Printing*, 621 F.2d at 327-38.  That finding is entirely consistent with *Illinois Brick* and the view of Retailers in this brief.

8

including paper manufactured by one defendant and sold to the subsidiary of another defendant, before being re-sold to plaintiffs. *Id.* at 324.

This Court held that *Illinois Brick* does not deprive an indirect purchaser of standing where the direct purchaser is a division or subsidiary of a co-conspirator. *Id*. at 326. Given that there was "little reason for a price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator," the Court noted that allowing the plaintiff to sue would not "pose the same risk of multiple liability held objectionable in *Illinois Brick*." *Id.* The touchstone of this Court's analysis was consistent with the other cases cited above: the direct purchaser rule is designed to promote, not undermine, the effective enforcement of the antitrust laws.

This Court further addressed the issue in *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984). This Court held that consumers who purchased dairy products from grocery stores have standing to sue dairy product producers to the extent that the plaintiffs allege either (a) a horizontal conspiracy amongst the grocery stores to fix prices, or (b) a vertical conspiracy between the dairy product manufacturers and the retail grocery stores to fix the price paid by the consumers.

9

*Id.* at 1211-12.  Either way, the consumers would be the first party outside of the conspiracy able and willing to bring suit.[7]

### C.   *Utilicorp* **and** *ARC America*.

In 1989 and 1990 the Supreme Court had occasion to comment on and discuss its holding in *Illinois Brick*.  In *California v. ARC America Corp.*, 490 U.S. 93 (1989), the Court briefly commented on the concerns that motivated its adoption of the direct purchaser rule:

> In *Illinois Brick*, the Court was concerned not merely that direct purchasers have sufficient incentive to bring suit under the antitrust laws, as the Court of  Appeals asserted, but rather that at least some party have sufficient incentive to bring suit.  Indeed, we implicitly recognized as much in noting that indirect purchasers might be allowed to bring suit in cases in which it would be easy to prove the extent to which the overcharge was passed on to them.

*Id.* at 102 n.6.  Again, the Court reminded lower courts of the rationale behind the rule: to find the party in the best position to enforce the antitrust rules.

In *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990), the Court had occasion to reinforce both its rationale for the rule, and its previous instruction that the rule was not to be subject to an industry by industry review.  The Court began its review by reiterating its holding in *Illinois Brick* that it is the first purchaser

---

[7]  The Panel's decision argues that this Court restricted its holding with regard to vertical conspiracies only to those cases where the retail price (the price paid by the plaintiff) is the price specifically being fixed.  As discussed *infra*, that issue was not before this Court in *Shamrock Foods* and the Panel's attempt to use that case to support its new restriction on a long-held exception to application of *Illinois Brick*'s indirect purchaser rule is unavailing.  Other appellate decisions have cited *Shamrock Foods* for the proposition that *Illinois Brick* does not apply to a vertical conspiracy to fix the retail price paid by the plaintiff, but none have taken the step that the Panel took in declaring that *Illinois Brick* denies standing to a downstream plaintiff if the conspirators conspire to fix the input price in order to raise the output price.  *See, e.g., Lowell v. American Cyanamid Co.*, 177 F.3d 1228, 1229-32 (11th Cir. 1999).

outside of the conspiracy who is the direct purchaser by defining who is an indirect purchaser:  "In the distribution chain, they are not the immediate buyers from the alleged antitrust violators."  *Id.* at 207.

Because the consumers had no argument that they were the first buyer outside of the conspiracy, they asserted that the industry in question (regulated public utilities) was not suitable to the direct purchaser rule.  The idea that the rule should be subject to an industry-by-industry standard, however, had been rejected by the Supreme Court in *Illinois Brick* and that rejection was reiterated here: "Although the rationales of *Hanover Shoe* and *Illinois Brick* may not apply with equal force in all instances, we find it inconsistent with precedent and imprudent in any event to create an exception for regulated public utilities."  *Id.*

In its discussion the Court re-iterated that its interpretation of § 4 "must promote the vigorous enforcement of the antitrust laws," noting that if they were "convinced that indirect suits would secure this goal better in cases involving utilities, the argument to interpret § 4 to create the exception sought by the petitioners might be stronger."  *Id*. at 214.  But in the end, it determined that not to be the case: "Petitioners' argument does no persuade us that utilities will lack incentives to sue overcharging suppliers."  *Id.*  The Court concluded by reiterating that despite the fact that the economic rationales of its previous decisions might not apply with equal force in all cases, they were correct not to carve out exceptions

11

for "particular types of markets," quoting the phrase from *Illinois Brick*. *Id.* at 216. "[W]e remain unconvinced that the exception sought by the petitioners would promote antitrust enforcement better that the current *Illinois Brick* rule." *Id.*

Important to this discussion is what the Court did *not* do in *Utilicorp*. It did not reject any of the circuit court interpretations of *Illinois Brick* discussed above. It did not declare that any of the existing exceptions had gone too far or should be questioned. The only exception that it questioned was the one it originally posited and rejected in *Illinois Brick*: varying application of the direct purchaser rule by industry.

### D.    Appellate Practice After *Utilicorp*.

After *Utilicorp* appellate courts continued to recognize the first purchaser outside of the conspiracy concept laid out by the Supreme Court. The Fifth Circuit noted that indirect purchasers "'are not the immediate buyers from the alleged antitrust violators,' but are those who buy goods through an intermediary such as a retailer or wholesaler." *Free v. Abbott Laboratories, Inc.*, 176 F.3d 298, 299 n.1 (1999) (*quoting Utilicorp*, 497 U.S. at 207). *See also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (quoting same).

In *In Re: Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002), the Third Circuit returned to the issue. In *Linerboard*, the plaintiffs purchased corrugated sheets from defendants that contained a price-fixed component:

linerboard.  In the defendants' view, since the price that was fixed was upstream and not paid by the plaintiffs, *Illinois Brick* deprived plaintiffs of standing.  The Third Circuit disagreed.  As in *Sugar*, the Court found that the plaintiffs purchased from the conspirators themselves: thus *Illinois Brick* did not apply.  *Id.* at 159-60. Nothing in *Utilicorp* cast any doubt that *Sugar* continued to be good law.

The Seventh Circuit reinforced its previous understanding of the direct purchaser rule in *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629 (7th Cir. 2002), and in the process discussed the different labels that courts had applied to the same concept: the first purchaser outside of the conspiracy is the direct purchaser of *Illinois Brick*.  In that case, defendants conspired to fix the price of a specialty paper.  Plaintiffs purchased paper in several different ways: (1) directly from some of the defendant manufacturers, (2) from co-conspirators of the defendant manufacturers, and (3) from middlemen who were not alleged to be part of the conspiracy.  *Id.* at 631-32.

The Court applied *Illinois Brick* and *Utilicorp* and found standing for the plaintiffs in the first two examples, but not in the third, consistent with prior application of the direct purchaser rule.  As the court noted in discussing the purchases from the middlemen:

> The complaint alleges that Elof and the two Mitsubishi trading firms are members of the conspiracy, which makes plaintiffs the first purchasers from *outside* the conspiracy.  The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator

13

"exception" to *Illinois Brick* but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages.

*Id.* at 631-32 (emphasis in original). *See also In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 604 (7th Cir. 1997) (any indirect purchaser defense goes by the board where wholesalers participate in manufacturers' conspiracy since the wholesalers' customers are then direct purchasers from the conspirators). Tellingly, in neither case was the Seventh Circuit's understanding of the application of the direct purchaser rule based on which price was being fixed.

This Circuit has also reinforced post-*Utilicorp* its understanding that the first purchaser outside of the conspiracy has standing to sue. In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (2003), this Circuit reiterated its holding in *Royal Printing* that indirect purchasers can sue for damages "if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." *Id.* at 1145-46. In this case, this Circuit found a unity of interest because the defendants at the top of the distribution chain both owned the middleman and were accused of conspiring with it. *Id.* at 146. Unlike the Panel's decision, however, nowhere in *Freeman* does this Circuit suggest that *Royal Printing*'s "no realistic possibility" exception should be limited solely to ownership or control. To the contrary:

14

> The associations engaged in price fixing, and plaintiffs have standing
> to sue them. The associations purposely fixed the support fee they
> charged Sandicor at a supracompetitive level. Sandicor passed on
> some portion of the inflated support fee to agents, who paid higher
> prices for the MLS as a result. This is precisely the type of injury the
> antitrust laws are designed to prevent.

*Id.* at 1147. This Circuit's holding in *Freeman* is completely consistent with the
Third Circuit's holdings in *Sugar* and *Linerboard*: the first entity outside of the
conspiracy has direct standing to sue, regardless of the level at which the price was
fixed.

This Circuit also reaffirmed the principles of *Royal Printing* in *Delaware
Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (2008), noting
that *Royal Printing* allowed the suit to proceed against the wholesalers who were
subsidiaries of the defendants, but not against the independent wholesalers where
there was no allegation of control or participation in the conspiracy. *Id.* at 1121.

The *Delaware Valley* Court further noted that it had recently reaffirmed the
direct purchaser rule in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049-50 (9th
Cir. 2008), where it held that the banks were middlemen between the merchant
plaintiffs and the defendant credit card companies, and thus it was the banks who
had the right to sue as direct purchasers, not the merchant plaintiffs. Critical to this
Court's conclusion was the fact that in *Kendall*, the merchant plaintiffs "failed to
allege any facts showing that the banks were either controlled by or in a conspiracy
with the credit card companies." *Delaware Valley*, 523 F.3d at 1122. Again, this

15

Court, along with the other circuits, looked to find the first entity outside of the conspiracy to find *Illinois Brick*'s direct purchaser.

## II.     The Panel's Decision Is Contrary To Thirty-Five Years of Application of the Direct Purchaser Rule.

In *ATM Fee* the Panel ignores thirty-five years of jurisprudence in finding that the plaintiffs do not have standing to allege antitrust violations because they are indirect purchasers under *Illinois Brick*.  The panel makes this finding despite acknowledging that the plaintiffs are the first entity outside of the conspiracy to make any purchases.  In fact, the Panel is unequivocal in its assertion that it does not matter to its determination whether anyone would sue the defendants under its view of the law.  That antitrust violations would go unpunished is, to the Panel's view, irrelevant.

The Panel supports this position by arguing that (1) the plaintiffs are indirect purchasers because they did not pay the fee that was fixed, despite the fact that the fixed fee was incorporated into the product and plaintiffs are the first purchasers outside of the conspiracy, (2) the conspiracy fixed an up-stream price rather than the price paid by the plaintiffs, and thus the co-conspirator exception does not apply, and (3) *Freeman*'s "no realistic possibility of suit" doctrine must be limited to a situation where the middleman is owned or controlled by the upstream defendant.

16

All three of these propositions are wrong, and will be addressed in turn below.  But it is worth noting that all three collectively violate the Supreme Court's admonition in *Illinois Brick* that a purpose of the direct purchaser rule is to find a purchaser outside of the conspiracy to uphold the federal antitrust laws.  Instead, accepting the plaintiffs' allegations as correct, under the Panel's interpretation of the rule no entity will uphold the antitrust laws.  The Panel finds that a conspirator is the only entity that can sue as the direct purchaser.  The Panel's decision leaves a gaping hole in enforcement of the antitrust laws.

## A.    Plaintiffs Are Not Indirect Purchasers.

The Panel in short order determines that plaintiffs are indirect purchasers because they did not pay the illegally-fixed interchange fee, but rather paid the foreign ATM fee which contained the fixed fee.  In a footnote, the Panel stated its rejection of the Third and Seventh Circuits cases whose holdings reject the Panel's understanding of the applicability of the direct purchaser rule.

As we have seen, the Third Circuit found in *Sugar* and *Linerboard* that fixing the price of an item that was incorporated into the item purchased by the plaintiff made the plaintiff the direct purchaser of the product, thus *Illinois Brick* did not apply.  The Seventh Circuit, in *Fontana Aviation* and *Nippon Paper*, found that the first purchaser from outside the conspiracy could bring suit as the direct purchaser.

17

In its footnote, the Panel simply states that these holdings are in violation of the Supreme Court's admonition in *Utilicorp* not to carve out exceptions for particular types of markets. But that is not what *Sugar, Linerboard, Fontana Aviation,* or *Nippon Paper* do. They are not exceptions based on the economics of a particular industry, which the Supreme Court disapproved in both *Illinois Brick* and *Utilicorp*. Rather, these decisions simply support the proposition that the direct purchaser rule has no application until one is outside of the conspiracy. *Sugar* and *Fontana Aviation* were decided just a few years after *Illinois Brick*, and nothing in *Utilicorp* indicated disapproval with their reasoning as to why the direct purchaser rule did not apply. En banc review is necessary in this case in order to overrule the Panel's rejection of these longstanding principles.

### B. The Co-Conspirator Exception Applies Regardless of Which Price is Fixed.

The Panel's second mistake is its finding that the co-conspirator exception to the direct purchaser rule only applies when the price that is fixed is the price paid by the downstream plaintiff. The Panel finds irrelevant that the co-conspirators fixed the upstream price that was incorporated into the price paid by the plaintiffs.

The Panel relies on both *Shamrock Foods* and *Visa U.S.A.* for this proposition. While it is true that this Court in both those cases dealt with a fact pattern in which the fixed price was the price paid by the plaintiff, in neither case did this Court address, much less hold, that the fixing of an upstream price that was

18

included in the price paid by the downstream plaintiff was insufficient to confer standing under the co-conspirator exception.[8]

The Panel's decision, therefore, is the first circuit decision restricting the exception in this way.  It is a blueprint for the would-be antitrust violator.  If you want to avoid application of the antitrust laws, conspire with a middleman to fix the price of a component part of something the middleman sells.  Under the Panel's logic, so long as the middleman is a separate entity not owned or controlled by the first conspirator, both conspirators are immune from antitrust prosecution by the private attorneys general contemplated by § 4.

As both the Panel in its decision and the Seventh Circuit in *Nippon Paper* recognize, whether you call it a co-conspirator exception, or you find that the direct purchaser rule is not applicable in vertical conspiracies, you are really talking about the same thing.  The Panel does not dispute that under its holding there will be no one with any incentive to enforce the antitrust law with regard to the price fixing between the two conspirators.  When you deny standing to the true direct purchaser outside of the conspiracy, you effectively immunize the conspiracy from civil liability.  There is simply no question that such a result was not what the Supreme Court intended in either *Illinois Brick* or *Utilicorp*.

---

[8]  The Panel also cites to *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) for support.  That case stands for the proposition that the co-conspirator exception should be restricted to "a particular type of conspiracy – price-fixing conspiracies."  *Id.* at 215.  It did not address the question the Panel sets forth: whether the exception should be restricted solely to the fixing of the price paid by the plaintiff.

19

### C.   The Panel's Restriction of *Freeman* Is Unwarranted.

The Supreme Court in *Illinois Brick* was careful not to foreclose the possibility of exceptions to the direct purchaser rule over and above the cost-plus or owned or controlled exceptions it enunciated.  As we have discussed, the Supreme Court wanted a rule that would apply across the board (thus no industry by industry analysis) but one that also ensured enforcement by the first purchaser outside of the conspiracy.

This Circuit, in *Freeman*, was true to the Supreme Court's admonitions by enunciating the doctrine that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation."  *Freeman*, 322 F.3d at 1145-46.  The Panel stated that the doctrine is limited to the facts of *Freeman*, where one of the co-conspirators owned the other, and that it declined to extend the exception to situations where there is no ownership or control, narrowly defined.

This Circuit imposed no such limitation in *Freeman*.  The Panel's opinion is not a "de-inclination to extend *Freeman*" but rather an unwarranted restriction on this Circuit's previous decisions.  As with the Panel's other restrictions, it fundamentally misunderstands and misapplies the purpose of the direct purchaser rule.  *Freeman*'s recognition that indirect purchasers must be allowed to sue if there is no realistic possibility that the direct purchaser will sue is a direct

20

confirmation of *Illinois Brick*'s admonition that the first purchaser outside of the conspiracy has standing to bring suit. The Panel's truncating of this principal to narrowly defined ownership and control should be rejected.

## <u>CONCLUSION</u>

Retailers submit that the Panel's opinion is contrary to the settled law of the Supreme Court, this Circuit, and other circuits. En banc review should be granted so this Circuit can ensure that vigorous enforcement of the antitrust laws continues as the Supreme Court and Ninth Circuit decisions contemplate.

Dated: August 6, 2012

<div style="margin-left: 40%;">

By: */s/* Jonathan J. Ross

Jonathan J. Ross
H. Lee Godfrey
Kenneth S. Marks
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
Email:  jross@susmangodfrey.com
  lgodfrey@sumangodfrey.com
  kmarks@susmangodfrey.com

David Orozco (220732)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
Email:dorozco@susmangodfrey.com

</div>

21

Parker C. Folse III
Jordan Connors
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
     jconnors@susmangodfrey.com


William A. Isaacson
Melissa Felder
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:   wisaacson@bsfllp.com
         mfelder@bsfllp.com


Philip J. Iovieno
Anne M. Nardacci
Luke M. Nikas
Christopher V. Fenlon
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:   piovieno@bsfllp.com
         anardacci@bsfllp.com
         lnikas@bsfllp.com
         cfenlon@bsfllp.com

2359323v1/011997

Roman M. Silberfeld, Bar No. 62783
David Martinez. Bar No. 193183
Lauren E. Wood, Bar No. 280096
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
12049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone:  (310) 552-0130
Facsimile:  (310) 229-5800
Email: rmsilberfeld@rkmc.com
        dmartinez@rkmc.com.com
        lewood@rkmc.com.com


Elliot S. Kaplan
K. Craig Wildfang
ROBINS, KAPLAN, MILLER &
CIRESI L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN  55402
Telephone:  (612) 349-8500
Facsimile  (612) 339-4181
Email: eskaplan@rkmc.com
        kcwildfang@rkmc.com

*Attorneys for Retailer Amici Curiae*

23

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) as modified by Fed. R. App. P. 29(d) for amicus curiae submissions because it contains 5,463 words, as determined by Microsoft Word 2012, excluding the parts of the brief exempted by Fed. R. App. P 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2012 in 14-point Times New Roman.

SUSMAN GODFREY, LLP

By: */s/ Jonathan J. Ross*
          Jonathan J. Ross

*Attorneys for Retailer Amici Curiae*

9th Circuit Case Number(s) | 10-17354

NOTE: To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)

.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Aug 6, 2012 .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Daniel B. Allanoff
Meredith Cohen Greenfogel & Skirnick, P.C.
1521 Locust St.
Philadelphia, PA  19102

Signature (use "s/" format) | /s/ Jonathan J. Ross