# DOCUMENT 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

In Re: CATHODE RAY TUBE (CRT)          )
ANTITRUST LITIGATION,                   )
                                        )
                    Plaintiff,          )
------------------------------          )     Case No.
                                        )     07-5944 Sc
                                        )     MDL No. 1917
This Document Relates to:               )
                                        )
ALL ACTIONS,                            )
                                        )

---oOo---

<u>HEARING HELD BEFORE:</u>

<u>THE HONORABLE CHARLES A. LEGGE (RET.)</u>

---oOo---

FEBRUARY 14, 2013

BALINDA DUNLAP, CSR No. 10710

354251




BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco      (949) 955-0400 Irvine          (858) 455-5444 San Diego
(916) 922-5777 Sacramento       (408) 885-0550 San Jose           (760) 322-2240 Palm Springs     (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills   (212) 808-8500 New York City      (347) 821-4611 Brooklyn         (518) 490-1910 Albany
(516) 277-9494 Garden City      (914) 510-9110 White Plains       (312) 379-5566 Chicago          (702) 366-0500 Las Vegas
           +33 1 70 72 65 26 Paris        +971 4 8137744 Dubai         +852 3693 1522 Hong Kong

1

2                 UNITED STATES DISTRICT COURT

3               NORTHERN DISTRICT OF CALIFORNIA

4                   SAN FRANCISCO DIVISION

5                        ---o0o---

6

7

8
    In Re: CATHODE RAY TUBE (CRT)     )
9   ANTITRUST LITIGATION,             )
                                      )
10                      Plaintiff,    )
    ------------------------------    )   Case No.
11                                    )   07-5944 Sc
                                      )   MDL No. 1917
12  This Document Relates to:         )
                                      )
13  ALL ACTIONS,                      )
                                      )
14

15

16                       ---o0o---

17              HEARING HELD BEFORE:

18      THE HONORABLE CHARLES A. LEGGE (RET.)

19                       ---o0o---

20

21

22

23

24
    REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
25

                             2

BARKLEY
Court Reporters

```
1                     A P P E A R A N C E S

2                         ---o0o---

3    LIAISON COUNSEL FOR DIRECT ACTION PLAINTIFFS AND
     ATTORNEYS FOR PLAINTIFFS ELECTROGRAPH SYSTEMS,
4    INC., ELECTROGRAPH TECHNOLOGIES, CORP., OFFICE
     DEPOT, INC., COMPUCOM SYSTEMS, INC., INTERBOND
5    CORPORATION OF AMERICA, P.C. RICHARD & SON LONG
     ISLAND CORPORATION, MARTA COOPERATIVE OF AMERICA,
6    INC., ABC APPLIANCE, INC., SCHULTZE AGENCY SERVICES
     LLC ON BEHALF OF TWEETER OPCO, LLC AND TWEETER
7    NEWCO, LLC:

8          BOIES SCHILLER & FLEXNER LLP
           10 North Pearl Street, 4th Floor
9          Albany, New York  12207
           BY: LUKE NIKAS, ESQ.
10         (518) 694-4250
           lnikas@bsfllp.com
11

12   FOR THE PLAINTIFF COSTCO WHOLESALE CORP.:

13         PERKINS COIE LLP
           1201 Third Avenue, Suite 4900
14         Seattle, Washington 98101-3099
           BY: CORI GORDON MOORE, ESQ.
15         (206) 359-3849
           cgmoore@perkinscoie.com
16

17   FOR PLAINTIFFS AT&T MOBILITY, LLC; AT&T
     CORPORATION; AT&T SERVICES, INC.; BELLSOUTH
18   TELECOMMUNICATIONS, INC.; PACIFIC BELL TELEPHONE
     COMPANY; AT&T OPERATIONS, INC.; AT&T DATACOMM,
19   INC.; SOUTHWESTERN BELL TELEPHONE COMPANY; and
     MOTOROLA, INC.:
20
           CROWELL & MORING
21         515 South Flower Street, 40th Floor
           Los Angeles, California  90071
22         BY: MICHAEL KAO, ESQ.
           (213) 443-5557
23         mkao@crowell.com

24

25
```

3

BARKLEY
Court Reporters

1                    A P P E A R A N C E S
                        ---o0o---
2

3    FOR THE INDIRECT PURCHASER PLAINTIFFS:

4         TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
          2280 Union Street
5         San Francisco, California  94123
          BY: MARIO ALIOTO, ESQ.
6         (415) 563-7200
          malioto@tatp.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            4

BARKLEY
Court Reporters

<pre>
1                    A P P E A R A N C E S
                         ---o0o---
2
   FOR THE PLAINTIFFS BEST BUY CO., INC.; BEST BUY
3  PURCHASING LLC; BEST BUY ENTERPRISE SERVICES, INC.;
   BEST BUY STORES, L.P.; BESTBUY.COM, L.L.C.; and
4  MAGNOLIA HI-FI, INC.:

5       ROBINS, KAPLAN, MILLER & CIRESI LLP
        2049 Century Park East, Suite 3400
6       Los Angeles, California  90067-3208
        BY: DAVID MARTINEZ, ESQ.
7       (30) 552-0130
        dmartinez@rkmc.com
8

9  ATTORNEYS FOR PLAINTIFFS JOHN R. STOEBNER, AS
   CHAPTER 7 TRUSTEE FOR PBE CONSUMER ELECTRONICS, LLC
10 AND RELATED ENTITIES; AND DOUGLAS A. KELLEY, AS
   CHAPTER 11 TRUSTEE FOR PETTERS COMPANY, INC. AND
11 RELATED ENTITIES, AND AS RECEIVE FOR PETTERS
   COMPANY, LLC AND RELATED ENTITIES:
12
        LINDQUIST & VENNUM PLLP
13      4200 IDS Center
        80 South Eighth Street
14      Minneapolis, Minnesota  55402
        BY: JAMES M. LOCKHART, ESQ.
15      (612) 371-3953
        jlockhart@lindquist.com
16

17 FOR PLAINTIFF ALFRED H. SIEGEL, AS TRUSTEE OF THE
   CIRCUIT CITY STORES, INC. LIQUIDATING TRUST:
18
        SUSMAN GODFREY L.L.P.
19      1000 Louisiana Street, Suite 5100
        Houston, Texas  77002-5096
20      BY: DAVID M. PETERSON, ESQ.
        (713) 653-7873
21      dpeterson@susmangodfrey.com

22

23

24

25
</pre>

BARKLEY
Court Reporters

1                    A P P E A R A N C E S
                        ---o0o---
2
   FOR THE DEFENDANTS PANASONIC CORPORATION, PANASONIC
3  CORP OF NORTH AMERICA, AND MT PICTURE DISPLAY CO.,
   LTD.:
4
        WINSTON & STRAWN LLP
5       200 Park Avenue
        New York, New York  10166
6       BY: JEFFREY L. KESSLER, ESQ.
            MOLLY M. DONOVAN, ESQ.
7       (212) 294-4692
        jkessler@winston.com
8       mmdonovan@winston.com

9
   FOR THE DEFENDANTS KONINKLIJKE PHILIPS ELECTRONICS
10 N.V., PHILIPS ELECTRONICS NORTH AMERICA
   CORPORATION:
11
        BAKER BOTTS LLP
12      1299 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004-2400
13      BY: JOHN M. TALADAY, ESQ.
        (202) 639-7909
14      john.taladay@bakerbotts.com

15
   FOR THE DEFENDANTS SAMSUNG ELECTRONICS CO., LTD.,
16 AND SAMSUNG ELECTRONICS AMERICA, INC.:

17      O'MELVENY & MYERS LLP
        1625 Eye Street NW
18      Washington, D.C.  20004
        BY: BENJAMIN G. BRADSHAW, ESQ.
19          DAVID K. ROBERTS, ESQ.
        (202) 383-5300
20      bbradshaw@omm.com
        droberts@omm.com
21

22

23

24

25

                        6



1                    A P P E A R A N C E S
                           ---o0o---
2
    FOR THE DEFENDANTS TOSHIBA CORPORATION, TOSHIBA
3   AMERICA, INC., TOSHIBA AMERICA INFORMATION SYSTEMS,
    INC., TOSHIBA AMERICA CONSUMER PRODUCTS, L.L.C.,
4   AND TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.:

5        WHITE & CASE LLP
         701 Thirteenth Street, NW
6        Washington, D.C.  20005-3807
         BY: LUCIUS B. (ALBIE) LAU, ESQ.
7        (202) 626-3696
         alau@whitecase.com
8

9   FOR THE DEFENDANTS SAMSUNG SDI CO., LTD and SAMSUNG
    SDI AMERICA, INC.:
10
         SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
11       4 Embarcadero Center, 17th Floor
         San Francisco, California  94111
12       BY: JIM McGINNIS, ESQ.
             MICHAEL W. SCARBOROUGH, ESQ.
13       (415) 434-9100
         jmcginnis@sheppardmullin.com
14       mscarborough@sheppardmullin.com

15  FOR THE DEFENDANT CHUNGHWA PICTURE TUBES:

16       GIBSON, DUNN & CRUTCHER LLP
         555 Mission Street
17       San Francisco, California  94105-2933
         BY: JOEL S. SANDERS, ESQ.
18       (415) 393-8200
         jsanders@gibsondunn.com
19

20

21

22

23

24

25


                              7

BARKLEY
Court Reporters

1                    A P P E A R A N C E S
                          ---o0o---
2
   FOR THE DEFENDANTS LG.PHILIPS LCD AMERICA, INC.,
3  and LG.PHILIPS LCD CO., LTD.:

4        MUNGER, TOLLES & OLSON LLP
         560 Mission Street, 27th Floor
5        San Francisco, California  94105-2907
         BY: HOJOON HWANG, ESQ
6        (415) 512-4009
         hojoon.hwang@mto.com
7
         MUNGER, TOLLES & OLSON LLP
8        335 South Grand Avenue, Suite 3500
         Los Angeles, California  90071
9        BY: WILLIAM D. TEMKO, ESQ.
         (213) 683-9266
10       william.temko@mto.com

11
   FOR THE DEFENDANTS HITACHI ELECTRONIC DEVICES
12 (USA), LTD., HITACHI, LTD., and HITACHI DISPLAYS,
   LTD., and IPS ALPHA TECHNOLOGY, LTD.:
13
         MORGAN, LEWIS & BOCKIUS, LLP
14       1111 Pennsylvania Avenue, NW
         Washington, D.C.  20004
15       BY: J. CLAYTON EVERETT, JR., ESQ.
         (202) 739-5860
16       jeverett@morganlewis.com

17

18

19

20

21

22

23

24

25

                           8

BARKLEY
Court Reporters

1           SAN FRANCISCO, CALIFORNIA, FEBRUARY 14, 2013

2                          ---o0o---

3           JUDGE LEGGE:  All right.  Let's go on the

4    record, please.  We are here in the cathode ray

5    tube litigation concerning primarily the direct

6    action cases today, and the motions before me are

7    motions to dismiss the direct action complaints.

8           For those of you who may not have been

9    here in this room on this floor before, the

10   washrooms are out by the elevator.  You will need a

11   code to get into the washrooms.  The code is

12   plastered on the inside of the door of the

13   reception area as you go out, so I don't think you

14   will have any trouble remembering it.

15          We have refreshments here, coffee, tea.

16   Help yourself.  There's more upstairs on the 14th

17   Floor -- sorry, the 15th Floor, if you want to go

18   up there.

19          Now, before we note appearances, may I ask

20   who are going to be the principal speakers for the

21   plaintiffs?  I realize we have a lot of issues in

22   front of us and a lot of people may want to say

23   things, but who is going to be principally carrying

24   the oar for the plaintiffs' side of the case,

25   primarily, first of all, on the Federal actions?

                              9

BARKLEY
Court Reporters

1          MR. MARTINEZ:  I can speak to that, your

2    Honor.  I will argue the Federal action issues.

3    Mr. Peterson to my right will argue the

4    Samsung-specific motion to dismiss.  Mr. Lockhart

5    will argue some of the State issues --

6          JUDGE LEGGE:  And will you state your name

7    for the record, please.

8          MR. MARTINEZ:  David Martinez, Robins,

9    Kaplan, on behalf of Best Buy and direct action

10   plaintiffs.

11         JUDGE LEGGE:  Who is going to be primarily

12   speaking for the defendants?  And again, first of

13   all on the Federal causes of actions.

14         MR. KESSLER:  We are going to divide it up

15   by the points.  I, Jeffrey Kessler, will discuss

16   the Federal part of the case and also the AGC part

17   of the motion, and others can identify themselves

18   for the other points.

19         MR. LAU:  Your Honor, Albie Lau from White

20   & Case for Toshiba.  I will be arguing the due

21   process point of the brief as well as the unjust

22   enrichment and restitution part of the brief.

23         MR. EVERETT:  Clay Everett for the Hitachi

24   defendants, and I will be arguing the statute of

25   limitations issues as they apply to the State law

                          10

BARKLEY
Court Reporters

1    claims.

2            JUDGE LEGGE:  Thank you.  All right.  Now,

3    when you speak, would you please repeat your names.

4    The court reporter may not be that familiar with

5    you yet, and those of you who are in on the

6    telephone, if you speak over the phone, please

7    identify yourself.

8            Now, at the end of the hearing, if you

9    have not spoken, but still want your presence and

10   appearance being noted here, please be sure the

11   court reporter has your card.  I see she already

12   has quite a collection.  Your card or your name and

13   identifying information so that the record is

14   complete.

15           Now, I wanted to start out by asking

16   questions that I don't mean to be confrontational

17   and I do not mean to be provoking arguments from

18   any side here.  I just want to find out where we

19   are with respect to the direct action complaints.

20           So first of all, how many direct action

21   complaints do we have?

22           MR. MARTINEZ:  I know there are seven

23   firms, I believe, representing the various direct

24   action plaintiffs.  I think there are probably six

25   or seven direct action complaints, although there

11

BARKLEY
Court Reporters

1    may be more.

2              JUDGE LEGGE:  Well, I have a list here, I

3    think, in the moving brief -- I'm sorry, moving

4    motion.  Here it is here of the defendants, the

5    direct motion on Page 1 as listed in Footnote 1, if

6    you go down a quarter of a page, and there are sure

7    more than six or seven there.

8              MR. MARTINEZ:  Well, some of those

9    complaints include numerous plaintiffs.  So for

10   example, the Target complaint also includes Sears

11   and Kmart and others.  So there may be more than

12   seven complaints, but there are seven principal

13   ones.

14             JUDGE LEGGE:  What do you mean by

15   "principal"?

16             MR. MARTINEZ:  We can walk through them.

17   There's Best Buy.  There's Costco.  There's Circuit

18   City.

19             JUDGE LEGGE:  Why are you calling them

20   principal cases?

21             MR. MARTINEZ:  Simply because --

22             JUDGE LEGGE:  The size of the plaintiffs?

23             MR. MARTINEZ:  No, there are six, seven or

24   eight complaints.  "Principal" is not the most

25   appropriate word to use, but as I mentioned, some

12

BARKLEY
Court Reporters

1   of those complaints include numerous plaintiffs.

2           MR. HWANG:  This is Hojoon Hwang from

3   Munger, Tolles & Olson.  I happen to have a chart

4   here of the DAP complaints.

5           JUDGE LEGGE:  A chart?

6           MR. HWANG:  Yeah.  And there are 12 total

7   complaints, including the Tech Data one that was

8   recently filed, but it is not part of this hearing

9   today.

10           JUDGE LEGGE:  Is this listing in Footnote

11   1 of the defendants, is that accurate?

12           MR. BRADSHAW:  It is, your Honor, and to

13   save you the burden of having to count, there's 11

14   complaints there.

15           MR. KESSLER:  That's everything but the

16   Tech Data complaint, which was filed after the

17   motions were filed, and therefore, is not part of

18   the proceeding today.

19           MR. HWANG:  And those 11 complaints

20   encompass 19 different parties.

21           JUDGE LEGGE:  Okay.  So this listing in

22   Footnote 1, except for the recently filed Tech

23   Data, is an accurate listing of them?

24           MR. EVERETT:  Yes, your Honor.

25           MR. KESSLER:  To the defendants'

13

HEARING

1   knowledge, yes.  It is what we have been served

2   with, so that's what we know about.

3          JUDGE LEGGE:  Okay.  Now, are all of these

4   actions consolidated here in this district?

5          MR. EVERETT:  Yes, your Honor.

6          MR. MARTINEZ:  I believe they are all

7   pending here in the Northern District.

8          JUDGE LEGGE:  Okay.  Now, and do all of

9   these complaints allege a Federal cause of action?

10         MR. MARTINEZ:  Yes.

11         JUDGE LEGGE:  They do.  And do all of them

12  also allege a State cause of action?

13         MR. MARTINEZ:  I believe that's right.  I

14  don't think any of them do not.

15         MR. KESSLER:  They allege different State

16  causes of action.

17         JUDGE LEGGE:  I realize that.

18         MR. KESSLER:  But I think it's true that

19  each complaint alleges at least one State cause of

20  action, if not multiple.

21         JUDGE LEGGE:  Now, I am assuming, and I'd

22  appreciate you clarifying if I'm wrong, that all of

23  the plaintiffs are retailers?

24         MR. MARTINEZ:  That's not exactly right.

25         JUDGE LEGGE:  Okay.

14

BARKLEY
Court Reporters

1            MR. MARTINEZ:  Pardon me?

2            JUDGE LEGGE:  Then what's their status in

3    the chain of things?

4            MR. MARTINEZ:  Your Honor, I am not

5    familiar with the status of all 19 plaintiffs.  I

6    think most of them are retailers.  My client is a

7    retailer.  I think there's probably one or two

8    entities that are perhaps in the middle of the

9    distribution chain.

10           MR. HWANG:  Your Honor, I do happen to

11   have that on my chart as well.  There are two

12   system integrators, CompuCom and Electrograph.

13           JUDGE LEGGE:  Two what?

14           MR. HWANG:  System integrators that put

15   together IT systems for businesses.

16           JUDGE LEGGE:  I see what you're saying.

17           MR. HWANG:  There are two wholesalers.

18           JUDGE LEGGE:  Two wholesalers.

19           MR. HWANG:  Actually, Tech Data is a

20   wholesaler, but I guess we shouldn't count.  So

21   there's only one, MARTA, which is the wholesale

22   buying cooperative.  The rest of them are

23   retailers.

24           JUDGE LEGGE:  Is that a chart you can

25   share with me?

BARKLEY
Court Reporters

1           MR. HWANG:  No, unfortunately.

2           JUDGE LEGGE:  And share with the

3    plaintiffs?

4           MR. HWANG:  It has work product on it.

5           JUDGE LEGGE:  Okay.  Well, where do I go

6    to get a list of all the complaints?

7           MR. KESSLER:  Why don't we work with the

8    plaintiffs to agree on the status of each of the

9    plaintiffs and we'll submit something to you

10   jointly, your Honor, for your convenience.

11          JUDGE LEGGE:  Okay.  I would appreciate

12   that, because it seems to me obvious that, unlike

13   in the class actions that we already have, I am

14   going to have to give some attention to each of

15   these individual complaints and some of the motions

16   that you have made here.  I just want to be sure to

17   get my arm around it properly.

18          And I assume that all being filed in this

19   district, that when I want copies of the complaint,

20   I can get them from PACER; is that right, Sarah?

21          MR. KESSLER:  Yes.

22          JUDGE LEGGE:  All right.  Now, again, just

23   generally, most of them are retailers, and I assume

24   that the retailers sell multiple brands?

25          MR. MARTINEZ:  Correct.

16

BARKLEY
Court Reporters

1            JUDGE LEGGE:  Okay.  And I also assume

2    that they buy from more than one supplier?

3            MR. MARTINEZ:  I think that's accurate,

4    yes.

5            JUDGE LEGGE:  Okay.  And I am also

6    assuming that some bought from wholesalers rather

7    than from one of the defendants or defendants'

8    affiliates?

9            MR. MARTINEZ:  That's not the case for my

10   client, but I can't speak to others.

11           JUDGE LEGGE:  Okay.  That's an issue.

12           MR. MARTINEZ:  Pardon me?

13           JUDGE LEGGE:  That's an issue, then.

14           MR. MARTINEZ:  I am not sure I understand

15   what that means.

16           JUDGE LEGGE:  Well, you can see the

17   significance of the question:  Who do they buy

18   from?  And you don't know who they all buy from

19   even, you know, your clients, but not the rest of

20   the case.

21           MR. MARTINEZ:  Yes, sir.

22           JUDGE LEGGE:  Can I get any help from the

23   defendants?

24           MR. KESSLER:  I think, your Honor, each of

25   the plaintiffs here allege that they bought at

17

HEARING

BARKLEY
Court Reporters

1    least one CRT product directly from a defendant or

2    an alleged coconspirator.  So we are on the motion

3    to dismiss, so we have to assume their allegations

4    are true.

5            So we have proceeded on the basis that

6    they each have at least alleged to have at least

7    one such sale from either a defendant or an

8    affiliate of a defendant or an alleged

9    coconspirator with the defendant.  Each of the

10   complaints allege that.

11           They don't give us any information if they

12   bought a lot of products from wholesalers or not.

13   We just don't have any record at all on those

14   facts.

15           JUDGE LEGGE:  Okay.  I was just trying to

16   get -- fill it in from just what the chain of

17   distribution is generally, just get a feel for the

18   industry.

19           So I am going to sort of assume that

20   wholesalers of products of this type probably are

21   independent, maybe some of them are not, some of

22   them may be.  So we are just asking that as a

23   question mark as to the independence of the

24   wholesaler.

25           Okay.  Now, defendants argue, and so I

18

BARKLEY
Court Reporters

1   want to see if the plaintiffs agree with this, that

2   the alleged conspiracy is still a conspiracy to fix

3   the prices of the CRTs and not to fix the prices of

4   the finished products?

5           MR. MARTINEZ:  Correct.

6           JUDGE LEGGE:  That's correct, okay.

7           And I think -- is it clear that the direct

8   action plaintiffs purchased finished products and

9   did not purchase CRTs directly or is it possible

10  you bought some CRTs directly, maybe for repair

11  purposes or installation or something?

12          MR. MARTINEZ:  I know that my client, Best

13  Buy, did not.  Those are not at issue in this case.

14  But if anybody else around the table has claims

15  they purchased CRTs, I am sure they will share

16  that.

17          JUDGE LEGGE:  Okay.  Now, I gather you

18  agree that for definitional purposes, that then the

19  retailers at least are in the position of being an

20  indirect purchaser and not a direct purchaser?

21          MR. MARTINEZ:  Subject to the ownership

22  and control.

23          JUDGE LEGGE:  Yes, of course, I am not

24  trying to skirt that issue.  It has to be fixed

25  directly, but just for categorical purposes, that

19

BARKLEY
Court Reporters

1    you do believe that you are indirect purchasers but

2    still have the rights that primarily -- well, I

3    probably shouldn't give you.

4          All right.  Now, as a shortcut for me, how

5    do I get my arms around what the claims are in each

6    of the direct action complaints without having to

7    read each of the 12 or 13 complaints myself?

8          There are some charts in the documents you

9    have given to me.  The third one down here at the

10   end.  Are there any other charts, anything else you

11   have got that can assist me so instead of having to

12   have a pile of 12 or 13 complaints there and, each

13   time something comes up, reading each one, I can

14   look on some kind of a chart and, just using the

15   chart, know what's alleged and what's not?

16         MR. MARTINEZ:  We can certainly provide

17   that to your Honor on short notice.  We can get

18   that to you by the end of the day or tomorrow.  I

19   need some guidance on what you would like to see in

20   that chart.

21         JUDGE LEGGE:  Well, you know, the things

22   that are material to your cause of action.

23         MR. MARTINEZ:  So I envision we can lay it

24   out by the State law claims that each plaintiff is

25   asserting.

20

HEARING

1          JUDGE LEGGE:  Yeah, yeah.

2          MR. MARTINEZ:  But beyond that, the

3    complaints share a lot of similarities, more

4    similarities than differences.

5          JUDGE LEGGE:  Okay.  Well, that's fine.

6    That's what I wanted to know.

7          MR. MARTINEZ:  Yes, sir, we can put that

8    together.

9          JUDGE LEGGE:  On the Federal claim, for

10   example, do I have to read 12 or 13 complaints or

11   are your Federal claims so uniform that all I have

12   to do is read one?

13         MR. MARTINEZ:  I think the latter.

14         JUDGE LEGGE:  I think, too, but that's the

15   kind of thing I am looking for to save myself

16   having to go through every one of the complaints

17   with every one of the issues that has to be

18   decided.

19         You wanted to say something?

20         MR. BRADSHAW:  Ben Bradshaw from O'Melveny

21   & Myers.  With respect to the SEC, Samsung

22   Electronics' specific motion, there is a chart at

23   the end of the motion.

24         JUDGE LEGGE:  I saw some charts were

25   there.

21

BARKLEY
Court Reporters

1          MR. BRADSHAW:  That references specific

2    allegations and the complaint and then

3    cross-references the specific paragraph.

4          JUDGE LEGGE:  I saw you did that.

5          MR. BRADSHAW:  That might be helpful --

6          JUDGE LEGGE:  I didn't mean to ignore

7    those in there.

8          MR. BRADSHAW:  Just wanted to make sure

9    you knew about it.

10         JUDGE LEGGE:  I haven't had to drill down

11   to get to that point yet.

12         MR. BRADSHAW:  Sure.

13         JUDGE LEGGE:  So what am I getting?  Two

14   sets of charts, one specific and one jointly, or --

15         MR. KESSLER:  We will do a joint chart,

16   just put it in there, indicating whether they are

17   retailers, wholesalers or integrators.  Maybe one

18   chart would be easier for your Honor.  I don't

19   think there's going to be any dispute about --

20         JUDGE LEGGE:  I am not asking anybody to

21   give any contentions.

22         MR. KESSLER:  -- about these facts.  So I

23   think it should be easy to put that together for

24   you.

25         JUDGE LEGGE:  Now, have any of these

                          22

BARKLEY
Court Reporters

1   complaints been answered or are they all on the

2   status?

3          MR. KESSLER:  Only one.  It is noted in

4   Footnote 1 that the complaint in Electrograph

5   Systems was already answered.  So we filed our

6   motion there under as a judgment on the pleadings

7   motion as opposed to a motion to dismiss, but all

8   the others have not been answered.

9          JUDGE LEGGE:  Now, I believe that the

10  direct action cases are on the same schedule, same

11  track as the two class actions, are they not?  The

12  scheduling order which Conti signed in early '12

13  and the proposed one you have now submitted to me

14  and I submitted to him includes the direct action

15  cases as well as the two class actions.

16         MR. MARTINEZ:  I think that's right.

17         MR. KESSLER:  That's correct.  And even

18  the new case that's been filed that we have not yet

19  briefed, the stipulation we'd get into would be for

20  that company to join into the same track, even

21  though there will have to be a separate motion

22  addressed to that complaint to decide it later.

23         JUDGE LEGGE:  Now, and I assume that the

24  discovery that's been going on has included the

25  direct action plaintiffs as the two groups of

23

BARKLEY
Court Reporters

1  plaintiffs' parties?  You have been participating?

2          MR. MARTINEZ:  Yes, sir.

3          JUDGE LEGGE:  Do you think that you're --

4  the direct action plaintiffs are, what am I going

5  to say, fully advised about all of the discovery

6  that's occurred up to date and has access to the

7  discovery?

8          MR. MARTINEZ:  We certainly have tried to

9  be up-to-date, and I believe that we have access to

10  the discovery.

11          JUDGE LEGGE:  Okay.  All right.  Now I

12  want to talk about the Federal actions, and I want

13  to state what I believe the claim is that the

14  plaintiffs are making.  If it is not accurate, let

15  me know.

16          I believe you're contending that even

17  though you are an indirect purchaser, that you have

18  the right to sue under the Sherman Act for

19  overcharges, primarily based on the ownership and

20  control concept as expressed most recently by the

21  Royal Printing case?

22          MR. MARTINEZ:  Yes, sir.

23          JUDGE LEGGE:  Okay.  Are there any other

24  principal exceptions to the Illinois Brick case

25  that your complaints are relying on?

24

BARKLEY
Court Reporters

1          MR. MARTINEZ:  Not at this juncture.

2          JUDGE LEGGE:  All right.  Now, we do have

3    Judge Conti's decision of November the 29th of last

4    year, and the order that came out yesterday, I

5    assume you are all up to date with that, where

6    Judge Conti has denied the defendants' motion to

7    certify his decision for an interlocutory appeal.

8          Now -- as he's agreed with the plaintiffs

9    that they have a Federal cause of action under the

10   ownership and control exemption.

11         Now, all of your briefing was completed

12   before Judge Conti made his decision at the end of

13   November.  So do any of your briefs talk about what

14   or how does this apply to the direct action cases?

15         So I'd appreciate each side telling me how

16   you believe that Conti's decision applies to your

17   case, that is, the direct action cases.  I can

18   probably guess, but I'd like to hear it from you.

19         MR. KESSLER:  Maybe we should go first

20   since it is our motion and we can explain what our

21   view is.

22         JUDGE LEGGE:  Okay.

23         MR. KESSLER:  We obviously respectfully

24   disagreed with Judge Conti's decision.

25         JUDGE LEGGE:  That's the law in these

25

BARKLEY
Court Reporters

1    cases until it gets to the Ninth Circuit.

2           MR. KESSLER:  Correct.  Therefore, we

3    would be in a position to urge you to rule on our

4    motion.  We understand that you will be compelled

5    to follow Judge Conti's ruling, but we need a

6    ruling so that we preserve the issue for eventual

7    appeal to the Ninth Circuit.

8           In other words, we need an order in this

9    case, because while it may not be subject to

10   interlocutory review, we currently have no order on

11   that issue.  So to preserve that, we would urge all

12   the grounds that we made in our motion.

13          I don't think we have to argue them

14   because Judge Conti has determined them, but what

15   we think that means is that the motion should be

16   granted in part and denied in part, just the way

17   Judge Conti, in reviewing your decision, adopted it

18   in part and rejected it in part.

19          By that I mean the complaints are not

20   limited to purchases from owned and controlled

21   entities.  In other words, they were not drafted

22   that way.

23          So we believe what Judge Conti did accept

24   is that there's no coconspirator exception that

25   applies in this case, and he actually affirmed and

26

BARKLEY
Court Reporters

1    adopted your decision with respect to the

2    coconspirator exception, as under his understanding

3    of ATM, and I understand that the plaintiffs are

4    not pressing that exception anymore.

5            But because their complaints go beyond

6    just the owned and controlled customers, I believe

7    the appropriate thing for you to do is to enter an

8    order which would dismiss any claims with respect

9    to purposes for others, from third parties, from

10   wholesalers, from any others that might be

11   encompassed in the complaint, whether they are

12   conspirators or not, and to deny our motion under

13   Judge Conti's ruling with respect to purchases from

14   any entities that meet the standards of an owned

15   and controlled affiliate under the Royal Printing

16   test, and that way our position will be preserved

17   for appeal, but we also will do the housecleaning

18   that these cases are not proceeding with respect to

19   other purchases that were not under the owned and

20   controlled exception.

21           So that's what we would urge as a

22   resolution to the matter.

23           JUDGE LEGGE:  I am going to ask at the end

24   of my discussion on the Federal claim that you be

25   specific to me and submit it to me in writing what

27

BARKLEY
Court Reporters

1  you believe the form of order I should enter in at

2  least partially denying your motion.

3          MR. KESSLER:  We will be happy to do that,

4  and we can share that with plaintiffs, too, and

5  maybe we can come to an agreement and submit it to

6  your Honor.

7          JUDGE LEGGE:  What you're really saying to

8  me is that you recognize what Judge Conti has

9  decided with respect to this issue, that is,

10 standing of these plaintiffs.

11         You recognize that his decision is

12 applicable to the present direct action plaintiffs?

13         MR. KESSLER:  That's correct.  We view it

14 that it is the law of the MDL, subject to the Ninth

15 Circuit saying something differently.

16         JUDGE LEGGE:  Anything you want to add to

17 that, how you feel it's the relationship between

18 Judge Conti's decision and the direct action cases?

19         MR. MARTINEZ:  That intervening decision

20 is dispositive of the defendants' motion and the

21 motion should be denied in all respects.  I know

22 what Mr. Kessler argues for now is not in their

23 papers.

24         JUDGE LEGGE:  No, it is not, because, as I

25 said, it was written and filed with me before Conti

28

HEARING

BARKLEY
Court Reporters

1    decided.  That's what I am focusing on.  Now that

2    he's decided, where are we?

3         MR. MARTINEZ:  Their argument about the

4    coconspirator exception was something that was

5    available to them before but was not raised.

6         In any event, your Honor, I am happy to

7    look at whatever proposed order he wants to send

8    our way, but we think it is dispositive.

9         JUDGE LEGGE:  Okay.  So where I think I

10   am, just verbalizing here, without resolving

11   anything, is that Judge Conti's decision still

12   exists, is presently the law in Judge Conti's court

13   in these MDL cases and we are all going to comply

14   with, and it presently compels me to deny the

15   motion to dismiss to the extent that plaintiffs'

16   complaints are based upon the ownership and control

17   exception, primarily as articulated by the Royal

18   Printing case.

19        But I think that still leaves me with

20   matters to be resolved that have been raised in

21   these motions, and one is the statute of

22   limitations, and the second is the Associated

23   General Contractors case, which I would appreciate

24   counsel articulating that a little bit more later.

25        But even though you got a Federal cause of

HEARING

BARKLEY
Court Reporters

1  action, I still have to address those issues they

2  have raised, right?

3         MR. MARTINEZ:  Yes, sir.

4         JUDGE LEGGE:  Now, then I think I have to

5  do one other thing, too, that is, I think I have to

6  analyze the adequacy of the plaintiffs' allegations

7  under the ownership exceptions.

8         Can you tell me generally what you

9  alleged, is it just blanket allegations using the

10  words of "ownership" and "control" or is it alleged

11  specifically as to each supplier the plaintiff

12  bought from?

13         MR. MARTINEZ:  Yes, I can.

14         JUDGE LEGGE:  Please.

15         MR. MARTINEZ:  And I will start with the

16  premise that the ownership and control allegations

17  have not been challenged, even though they could

18  have been challenged, in the motion to dismiss.  So

19  that's not something that is properly before your

20  Honor.

21         But there are 22 paragraphs in the Best

22  Buy complaint, and I believe in the other

23  complaints, that go into detail about ownership and

24  control and the relationship between the various

25  defendant families.

HEARING

BARKLEY
Court Reporters

1              I actually brought --

2              JUDGE LEGGE:  Is this separate as to each

3    defendant group and family, similar to what's in

4    the class papers?

5              MR. MARTINEZ:  Correct.  So, your Honor,

6    anticipating that you might be curious about that

7    issue, I had someone go through the complaint and

8    highlight all the ownership and control allegations

9    and then had someone tag them.  I am happy to

10   provide that to you.

11             JUDGE LEGGE:  Which complaint have you

12   taken?

13             MR. MARTINEZ:  This is the Best Buy

14   complaint, but I think you'll find them -- let me

15   make sure I don't have any work product in here.

16             MR. LAU:  Are there copies of that

17   document for defense counsel?

18             MR. MARTINEZ:  No.  That's my copy.

19             JUDGE LEGGE:  Okay.  So you gave me a copy

20   of the Best Buy complaint.  I wanted to flip

21   through it here.  He's underlined where the words

22   "control" have been alleged.

23             MR. MARTINEZ:  Highlighted in yellow, yes.

24             JUDGE LEGGE:  So even though it would be

25   nice if you could give a copy to defense counsel, I

                        31

BARKLEY
Court Reporters

1    think they can safely assume for the record, after

2    their own actions, that you are relying upon the

3    allegations where the word "control" is used.

4            Well, there's a few other small things,

5    too, but most of this is a focus on the word -- the

6    allegation of control in the Best Buy complaint.

7    Thank you.

8            MR. KESSLER:  Could I address that, your

9    Honor?

10           JUDGE LEGGE:  Just one minute.  Go ahead.

11   I'm sorry.

12           MR. KESSLER:  Again, just to go to your

13   question, it is true that they indicate their

14   allegations about which entity they believe

15   controlled which entity in various paragraphs, and

16   I am sure that's what's been handed to you.

17           What they don't do is indicate which

18   entities they purchased CRT products from.  So

19   looking at the Best Buy complaints, for example,

20   Paragraph 9 of their complaint simply says:

21               "Plaintiffs purchased CRT products in

22               the United States and elsewhere,

23               directly and indirectly from

24               defendants and/or defendants'

25               subsidiaries and affiliates and/or any

32

HEARING

BARKLEY
Court Reporters

```
1                    agent defendants or defendants'
2                    subsidiaries and affiliates control."
3          But they don't indicate who they purchased
4   from, which products, which I would believe is
5   something that they should actually -- they have
6   that information very easily, and it would enable
7   the Court to better assess what sales are in and
8   out of this case.  If they were required to do
9   that, they ought to be pleading.
10          JUDGE LEGGE:  It is going to have to be
11  done at some point.
12          MR. KESSLER:  Yes.
13          JUDGE LEGGE:  The issue is:  Does it have
14  to be done at the pleading stage or is this a first
15  wave of written discovery subject matter?
16          MR. KESSLER:  Well, I guess, your Honor --
17  and again, in fairness, plaintiffs are correct, we
18  did not move on this ground because we were relying
19  on your Honor's decision that the whole exception
20  didn't apply.  So I am making an argument that's
21  not in my papers that I had in advance.
22          Had Judge Conti already ruled the way he
23  did, we probably would have moved under Twombly,
24  arguing that in order to give the specifics, it is
25  within their control, that they should be required
```

33

BARKLEY
*Court Reporters*

1    to state from whom they purchased.

2          Again, it may have to do with which

3    companies they have claims against and which they

4    don't or at least what the degree of their -- of

5    the liability is in the claims.

6          So I haven't made the argument.

7    Defendants haven't moved for it, but I think it is

8    something in due course we certainly should all

9    know, and I am sure they can state that.  I'll take

10   them at their word that each one that they said

11   will be able to identify what was one purchase, but

12   it would be good to know from who and how many.

13         JUDGE LEGGE:  Let me ask you this:  Do you

14   think that is a requirement of their pleading or

15   that that information can and will be supplied

16   through probably the first wave of discovery?

17         MR. KESSLER:  We have actually already --

18         MR. MARTINEZ:  May I respond?

19         MR. KESSLER:  -- I think, sent out

20   discovery, and I think some of them have responded

21   fully and some have not.  I guess part of the issue

22   here is getting all that information in sooner

23   rather than later, because it does shape the course

24   of this case very dramatically.

25         MR. BRADSHAW:  Your Honor --

34

BARKLEY
Court Reporters

1            JUDGE LEGGE:  Wait a minute.  I

2    interrupted counsel.

3            MR. MARTINEZ:  So I am not aware of any

4    decision that would require us to set forth that

5    much detail in our complaint, number one.

6            Number two, this same type of argument has

7    already been rejected in the District Court by

8    Judge Illston, specifically in the Best Buy case,

9    which she said, "You don't need to plead that level

10   of specificity.  That's properly the subject of

11   discovery."

12           And I can tell you that for purposes of my

13   client, we have already produced all our data,

14   millions of pages of data.  So they have all that

15   information.  So to say that we need to now go back

16   to the pleadings and start making hypertechnical

17   allegations is not practical and not required by

18   law.

19           MR. BRADSHAW:  Your Honor, I just want to

20   make one point, and I want to jump ahead to the

21   Samsung-specific motion.  I know we are talking

22   about the joint motion here, but SEC has

23   specifically challenged the adequacy under Twombly

24   and a whole line of cases of the adequacy of the

25   plaintiffs' allegations regarding control.

35

BARKLEY
Court Reporters

1              So we are directly challenging because

2     what you'll see in the complaints is that with

3     respect to SEC's alleged control of SDI -- and

4     again, I don't want to jump ahead, your Honor, but

5     I think it is an important point that SEC, as you

6     know, is only a purchaser of tubes.

7              Their complaint, as you have heard today,

8     does not allege a finished product conspiracy, and

9     all they have done is allege, using the word

10    "control" and nothing more, that SEC somehow

11    controls SDI.  We contest that that is sufficient

12    under Twombly and Iqbal.

13             They haven't indicated in any way, shape

14    or form other than use the word "control."  It is

15    one word that they have used to allege that SEC

16    controls SDI, and we are specifically challenging

17    the adequacy of that allegation specifically in the

18    context of a complaint, your Honor, that alleges a

19    conspiracy where the object of the conspiracy's a

20    product that SEC doesn't even make.

21             So, again, I don't want to jump ahead --

22             JUDGE LEGGE:  No, it is not jumping ahead

23    because it goes to the question what they are being

24    obliged to plead.  And you think in your situation

25    they are obliged to plead who they bought from?

36

BARKLEY
Court Reporters

1           MR. BRADSHAW:  Absolutely, your Honor.  In

2     the context of a complaint that is limited to a

3     conspiracy of tubes, the plaintiffs' failure to

4     differentiate any of the defendants with respect to

5     what they do, what products they make, who they

6     purchased from, is insufficient, in our view, under

7     the Twombly and Iqbal line of cases, particularly

8     given that they allege that SEC -- and it's

9     uncontested, SEC doesn't make tubes and has never

10    made tubes.

11          And in our case, SDI is a separate,

12    publicly-owned company.  They don't allege any,

13    any, zero, your Honor, zero facts of how SEC

14    allegedly controls SDI, a separate, publicly-traded

15    company.  There are no allegations, zero, none.

16          JUDGE LEGGE:  Okay.

17          MR. MARTINEZ:  If I may, just briefly,

18    Mr. Peterson will address that issue head-on.  I

19    just want to note for the record, counsel's not

20    talking about a motion to dismiss the complaint

21    that you have before you, because Samsung SDI has

22    not moved to dismiss the Best Buy complaint nor

23    could they, because they are not a defendant in our

24    case.  Mr. Peterson will address the balance of it.

25          MR. PETERSON:  Generally the objection to

                          37

BARKLEY
Court Reporters

1    the control allegation was not brought up in terms

2    of an ownership and control exception under

3    Illinois Brick.  It was brought up in the motion of

4    a potential vicarious liability which, in fact, the

5    plaintiffs are not pursuing.

6          So it's a very limited situation that SEC

7    brought specifically towards Samsung SDI to argue

8    that plaintiffs have not shown vicarious liability

9    for SEC based on SDI's actions.  That's, frankly,

10   not what we are discussing here at all.

11         Second, we have pled significantly more

12   detail about SEC's participation in this

13   conspiracy, which I have a feeling we'll be

14   discussing in greater detail later, but really that

15   is the gist of the objections that SEC raised, was

16   either through vicarious liability or through

17   insufficient pleading to show their own

18   participation in this case.

19         We have significant pleadings discussing

20   their own actions as coconspirators here to this

21   very conspiracy.

22         JUDGE LEGGE:  Okay.  Now, with respect to

23   the Federal claims, still -- I still want to have

24   the issues to cope with the statute of limitation

25   defense and the fraudulent assumption of that

38

BARKLEY
Court Reporters

1    defense and then what I call the Associated General

2    Contractor issues.

3           MR. KESSLER:  Those are actually, your

4    Honor, regarding the State claims.

5           JUDGE LEGGE:  I thought the statute of

6    limitations also went to the Federal?

7           MR. KESSLER:  No, we did not raise statute

8    of limitations for Federal, because for Federal

9    claims, they have a tolling argument based on the

10   fact that the direct class action covered them.

11          To the extent they have a Federal claim,

12   they would have been members of the direct

13   purchaser class and, therefore, we did not assert a

14   statute of limitations claim on the Federal Court.

15          JUDGE LEGGE:  What about AGC?

16          MR. KESSLER:  AGC would apply --

17          JUDGE LEGGE:  Associated General

18   Contractors.

19          MR. KESSLER:  Yes, Associated General

20   Contractors would apply to both Federal and State

21   claims.  However, again, I have to say we have only

22   moved on this motion, and I am sure they will point

23   this out, regarding the State claims on AGC because

24   the premise of our motion was that Illinois Brick

25   had ended the Federal claims.

                           39

BARKLEY
Court Reporters

1         Now that that is not the case, we

2   certainly have the ability and would assert AGC at

3   an appropriate time against the Federal claims.

4         JUDGE LEGGE:  Why do you keep saying ATC?

5   Am I missing something?

6         MR. KESSLER:  No, AGC.  It is just my New

7   York accent trying to articulate the exact words.

8   Associated General Contractors, to eliminate any

9   uncertainty.

10        While defendants certainly reserve the

11  right to make an AGC-based motion at some point, we

12  have to acknowledge the fact we did not argue that

13  applying to the Federal claims in this motion.  So

14  I cannot sua sponte, and I would not sua sponte

15  without briefing, ask that that be ruled on for the

16  Federal claims.

17        MR. MARTINEZ:  If I may respond, your

18  Honor, counsel's right they did not raise it, but

19  the standard is the same.  Whatever your Honor

20  decides as the two State laws that are at issue, it

21  is going to be dispositive of the argument on the

22  Federal side.

23        So we think that the answer to the

24  question today is easy based on what Judge Conti

25  and your Honor have already decided, and what I

40

BARKLEY
Court Reporters

1    don't want to do is have a Groundhog Day, where we

2    see these arguments raised again and again and

3    again.

4            MR. TALADAY:  Your Honor, with apologies

5    for complicating things a bit further, I know your

6    Honor is trying to scope out what claims he has to

7    address.

8            There is one exception to what Mr. Kessler

9    said with respect to motions to dismiss the Federal

10   claims on a statute of limitations grounds, and

11   that is that Philips filed a separate motion with

12   respect to dismiss on statute of limitations

13   grounds that does include the Federal claims, and

14   LG has filed a joinder to that motion.

15           JUDGE LEGGE:  Okay.

16           MR. KESSLER:  That's correct, and I

17   apologize.  I had forgotten that motion.  It is

18   based on specific facts relating to those

19   defendants, your Honor.

20           JUDGE LEGGE:  And that's of Philips only,

21   correct?

22           MR. TALADAY:  Philips, your Honor, but LG

23   also filed a joinder, so it would apply to them as

24   well.

25           MR. KESSLER:  Is that motion up today, is

                            41

BARKLEY
Court Reporters

1    that also part of the package?

2             JUDGE LEGGE:   Yes, it's there as well.

3             All right.   With respect to the Federal

4    allegations, what the plaintiffs want me to do is

5    just blanket denial; is that right?

6             MR. MARTINEZ:   Yes, sir.

7             JUDGE LEGGE:   Okay.   There's no concession

8    on any that some motion or one of these complaints,

9    the 12 complaints should be dismissed with leave to

10   amend?

11            MR. MARTINEZ:   No, your Honor, the

12   intervening decision by Judge Conti is dispositive

13   of the motion as they framed it.

14            JUDGE LEGGE:   Okay.

15            MR. KESSLER:   Your Honor, we do disagree

16   with that, and the reason is, just to highlight it,

17   looking at Paragraph 9 of the Best Buy complaint as

18   an example, this will be true of all the

19   complaints, what they allege is that they seek to

20   recover overcharges paid for the CRT products, all

21   of the CRT products containing price-fixed CRTs it

22   purchased during the relevant period, which would,

23   as framed in Paragraph 9, extend beyond controlled

24   companies, would extend beyond even the defendants

25   or their controlled companies, but would extend to

                            42

BARKLEY
Court Reporters

1    others who they identify as agents or

2    coconspirators, et cetera, which we believe, in

3    reviewing Judge Conti's decision, we believe he

4    affirmed your ruling that those claims were, in

5    fact, not viable because the coconspirator

6    exception cannot be invoked, and the only

7    exception, they are trying to invoke the Illinois

8    Brick because we now know there is the control

9    exception.

10            So that's why we think if you just deny

11   the motion outright, you'll be allowing those other

12   claims to go forward, and it's not correct we did

13   not raise it, because we argued extensively in our

14   motion to dismiss all of these claims, arguing that

15   the coconspirator exception did not apply and the

16   control exception didn't apply.  I think we are

17   correct --

18            JUDGE LEGGE:  So I don't have to take this

19   down, I'll have a transcript, what -- how you're

20   going to focus this procedure for me is by sending

21   a proposed formal order, of course you'll serve on

22   them, so I'll have before me what it is you want me

23   to do with the Federal side of this motion?

24            MR. KESSLER:  We will do that, your Honor.

25   Thank you.

43

BARKLEY
Court Reporters

1          JUDGE LEGGE:  Now, since we are going to

2    be arguing the Federal cause of action, what is the

3    position of the direct action plaintiffs about

4    proceeding with both a Federal cause of action and

5    the State cause of action?

6          Having your right to assert both claims,

7    you have a right to go to trial on both types of

8    claims, and if you're at trial, you do have a right

9    to get recoveries under the State statutes as well

10   as under Federal law.

11         MR. MARTINEZ:  We believe, your Honor,

12   that it's -- that we have viable State and Federal

13   claims.  Those claims are often asserted in the

14   same complaint together.  We believe that those

15   claims should be tried together, subject to

16   appropriate instructions to a jury, and we believe

17   we are entitled to recover damages under both the

18   Sherman Act and State law.

19         JUDGE LEGGE:  You would be recovering the

20   same damages, would you not, that's the amount of

21   the overcharges?

22         MR. MARTINEZ:  Not necessarily.

23         JUDGE LEGGE:  Not necessarily.

24         MR. MARTINEZ:  Nope.

25         JUDGE LEGGE:  Okay.  I just want to know

44

HEARING

BARKLEY
Court Reporters

1   all the contentions.  So you can go on both claims,

2   and you are entitled to remedies under both sets?

3           MR. MARTINEZ:  Yes.  To further

4   illustrate, in response to your question, so you

5   have Federal claims that are based on purchases

6   from the defendants or their owned and controlled

7   subsidiaries, and then you have the State law

8   claims which are based on indirect purchases from

9   non-defendant OEMs.  So different purchases and

10  different damages.

11          JUDGE LEGGE:  I haven't -- of course, as

12  you can tell from my questions, gotten to the point

13  of looking at each one of these State claims and

14  what it's based upon, but in the back of my head is

15  the idea that the State actions, any State actions

16  in these cases are based upon State statutes, which

17  were passed under the assumption that Illinois

18  Brick was the law and that unless a State remedy

19  was provided, Federal law had precluded any remedy

20  at all, which is now not the situation.

21          Now, are any of the State statutes so

22  specific that their foundation is expressly based

23  on the validity of Illinois Brick, or the

24  applicability, I guess I should say?

25          MR. MARTINEZ:  No, your Honor, and just by

45

HEARING

BARKLEY
Court Reporters

1  way of example, the statute in Minnesota, where

2  Best Buy's venued, provides that anybody that's

3  been directly or indirectly injured as a result of

4  anticompetitive conduct may sue.  So if you

5  think --

6          JUDGE LEGGE:  Directly?

7          MR. MARTINEZ:  Directly or indirectly.  So

8  there is standing to sue for direct or indirect

9  injuries.  So you think about it as two branches,

10  if you would, one is direct purchases by the direct

11  action plaintiffs from defendants and their

12  subsidiaries, Toshiba, for example, TVs that Best

13  Buy bought from Toshiba.

14          JUDGE LEGGE:  Which is remedial under the

15  Sherman Act.

16          MR. MARTINEZ:  Right.  Those are direct

17  purchases under the Sherman Act, but then Best Buy

18  also bought from Dell or from HP, non-defendant

19  OEMs, who in turn bought from the defendants.  So

20  to the extent that the overcharges passed on to

21  Dell and HP were then passed on to Best Buy and the

22  other direct action plaintiffs, that's a separate

23  injury.

24          JUDGE LEGGE:  So the fact that you have a

25  direct action doesn't preclude having the State

46

BARKLEY
Court Reporters

1    Court actions in the same complaint?

2              MR. MARTINEZ:  Yes, sir.

3              JUDGE LEGGE:  Okay.  Defendants differ

4    with that?

5              MR. KESSLER:  We don't differ that there

6    is a category of claims that cannot be pursued

7    under the Sherman Act, which is why we think some

8    of their claims should be dismissed, just as I

9    stated.

10             So for example, some claims alleged

11   coconspirators or -- from Dell or HP cannot be

12   pursued under the Sherman Act, and they are correct

13   that those claims, which don't come within Royal

14   Printing, theoretically could be pursued under a

15   State cause of action if the State statute applies

16   and it's there.

17             I don't know if we disagree about what

18   they were implying about double recovery.  There

19   can be no double recovery.  That I'm quite

20   confident of.  So that if it is a purchase from

21   Toshiba, for example, and if they were to prevail

22   under the Federal antitrust actions for a purchase

23   from Toshiba, they will not get a second recovery

24   on that purchase.

25             JUDGE LEGGE:  Even though the State

47

BARKLEY
Court Reporters

1    statutes' measure of damages could be different

2    than the Federal?

3         MR. KESSLER:  I believe one is going to be

4    deducted from the other if it is the same sale.  It

5    is a little bit, your Honor, like if you have a

6    claim for breach of contract and a claim for

7    negligence and it's the same injury, there may be

8    two theories to recovery, but if it is the exact

9    same injury, you're going to only get your actual

10   damages once, and I don't believe they would get

11   duplicative damages.

12        In fact, almost all the State statutes --

13   I can't give you every one, but almost all of them

14   talk about the Court shall avoid duplicative

15   damages, which is what your Honor is probably

16   remembering from the reconciliation to Illinois

17   Brick, so that they are not intended to give

18   duplicative damages.

19        But I don't disagree with plaintiffs that

20   there are damages here which they are seeking which

21   would not be duplicative because those branches of

22   their claims are precluded from the Sherman Act,

23   and they couldn't pursue them under the State law.

24   So those would not be duplicative.

25        JUDGE LEGGE:  Even if they are

48

BARKLEY
Court Reporters

1    duplicative, they are going to remain in the case?

2            MR. KESSLER:  I think they remain in the

3    case because conceivably we could defeat one

4    statute and not the other.  The point I am making

5    is they can't recover twice, and that I am

6    confident on, but that's an issue we can probably

7    address at a later stage in the proceeding, where

8    we see what claims ultimately remain if there's

9    going to be a trial.

10           JUDGE LEGGE:  All right.  Then that's all

11   I have that I want to talk about with respect to

12   the Federal claims.

13           Does any other party want to be heard on

14   the issue of the Federal claims, Federal cause of

15   action?

16           MR. TALADAY:  Your Honor, John Taladay,

17   Baker Botts, for the Philips defendants.  We will

18   address that, your Honor, but I assume your Honor

19   wants to hear the joint defense issues first, and

20   that's part and parcel of our statute of

21   limitations argument for Philips which involve both

22   State and Federal claims, which I suggest, your

23   Honor, we can address after the joint defense

24   motion is argued.

25           JUDGE LEGGE:  Does the joint -- who is

49

HEARING

BARKLEY
Court Reporters

1   presenting the joint defense motion, have anything

2   further to add?

3           MR. KESSLER:   Not on the Federal claims,

4   your Honor.

5           JUDGE LEGGE:   That's it.   John, what do

6   you want to add?

7           MR. TALADAY:   Well, your Honor, this gets

8   into the specifics of the allegations of the

9   plaintiffs as to Philips and LG.

10          Now, I'll remind your Honor that our

11  motion to dismiss seeks to dismiss both the State

12  and Federal claims of the direct action plaintiffs

13  filed on behalf of Philips, joined by LG as well,

14  and it's based, your Honor, on allegations that the

15  plaintiffs have made that are specific to Philips

16  and Philips' alleged involvement in the matter.

17          And there are four dispositive allegations

18  that we would point your Honor to, and I'll refer

19  to the Best Buy complaint, which seems to be the

20  model complaint people are referring to.

21          These are, your Honor, first, that in 2001

22  Royal Philips transferred its CRT business to a

23  50/50 joint venture with defendant LGE, forming

24  defendant LGPD or LPD.   That's Best Buy, Paragraph

25  46, 2001, transferred its CRT business.

HEARING

BARKLEY
Court Reporters

1            Following 2001, DAPs alleged Royal

2    Philips' only connection to the alleged cartel

3    were, quote, through LPD, and that's Best Buy

4    Paragraph 150.

5            Thirdly, your Honor, that in March of

6    2007, more than four years prior to the filing of

7    the DAP complaints, that "LPD became an independent

8    company."

9            And that's Best Buy Paragraph 40.

10           And finally, your Honor, that in March

11   2007 LPD announced that, and I am quoting:

12               "LPD announced that Royal Philips and

13               LGEI would cede control over the

14               company and the shares would be owned

15               by financial institutions and private

16               equity firms."

17           Now, with respect to the Federal claims,

18   your Honor, if your Honor looks at Paragraph 46,

19   which states that in 2001, more than ten years

20   before the filing of the DAP complaints, that Royal

21   Philips transferred its CRT business, that your

22   Honor would be far outside the Federal four-year

23   statute of limitations, and even if DAPs were to

24   receive the benefit of the class tolling, it would

25   be outside the extended statute of limitations

51

BARKLEY
Court Reporters

1   based on the class claims.

2           I have, your Honor, a chart that I can

3   share which illustrates this event.

4           If your Honor looks at the right side of

5   the chart of the graphic, you'll see that almost

6   all of the DAP complaints were filed on 11/14/2011,

7   and if you look at the very top, your Honor, where

8   the redlines are, you will see the implications of

9   the statute of limitations with respect to the

10  Federal claims.

11          The Federal claims' statute of limitations

12  will go back four years from 11/14/2011.  If they

13  were to receive the benefit of tolling based on the

14  filing of the class claims, your Honor, they would

15  get another four years from that time period, which

16  would take them back, your Honor, if you look at

17  the redline far to the left, the furthest back that

18  would take them is to 11/20/2003.  That's even with

19  the benefit of class tolling.

20          Your Honor, they allege in their complaint

21  that in 2001, Philips transferred its CRT business.

22  This is a clear break, your Honor, from Philips'

23  involvement in the cartel, and it falls far outside

24  the statute of limitations.

25          Now, your Honor, the plaintiffs argue in

HEARING

BARKLEY
Court Reporters

1  their briefing that this issue was previously

2  decided and that Judge Conti ruled on it.  I say,

3  well, but the allegations of the DAP plaintiffs are

4  different from and more extensive than the

5  allegations of the class complaints, and this

6  justifies a fresh look, your Honor, in part because

7  the DAP plaintiffs make no claims with respect to

8  finished products, and at the time your Honor and

9  Judge Conti decided on the motion to dismiss for

10  statute of limitations previously, finished product

11  claims were still in the case, and Philips

12  continued as a finished product manufacturer until

13  2007, your Honor.

14        A couple of other allegations that speak

15  to this, the DAPs know that in 2005, and I am

16  quoting:

17              "As a result of increased price

18              pressure and demand" --

19        Excuse me --

20              "Increased pressure on demand in

21              prices for CRTs, Philips wrote off the

22              remaining book value of 126 million

23              euros in its investment and said it

24              would not inject further capital into

25              the venture."

53

HEARING

BARKLEY
Court Reporters

1              They also say, your Honor, that they note

2    in their complaint that Philips was a finished

3    product manufacturer.  So while your Honor had

4    decided this previously based on the direct

5    purchaser complaint, this requires a fresh look at

6    the plausibility of Philips' participation based on

7    plaintiffs' allegations.

8              In a situation, your Honor, where there's

9    an absence of finished product conspiracy, where

10   Philips, by plaintiffs' allegations, had

11   transferred its interest in the CRT business, where

12   Philips, by plaintiffs allegations, has written off

13   any investments in that joint venture and where

14   Philips was operating, by plaintiffs' allegations,

15   as a CRT customer, the plausibility of Philips'

16   participation in the cartel is seriously called

17   into question.

18             And I would summarize, your Honor, by

19   suggesting that the foundations that your Honor

20   relied on based on the allegations of the direct

21   purchaser complaint have been altered.  The

22   allegations of the direct action plaintiffs are

23   different and more specific, and on that basis, I

24   think this justifies a fresh look, your Honor.

25             JUDGE LEGGE:  Okay.  Counsel?

54

BARKLEY
Court Reporters

1          MR. MARTINEZ:  Yes, let me see if I can

2  fill some of the gaps left by counsel's comments.

3          Just to frame the issue, Philips and LGE

4  are moving to dismiss the direct action plaintiffs'

5  claims based on the premise that its joint venture,

6  LPD, withdrew from the conspiracy.

7          JUDGE LEGGE:  Prior to the beginning of

8  the statute of limitations.

9          MR. MARTINEZ:  Well, that's a false

10  statement -- incorrect statement of the law.  There

11  is no law that says that if a plaintiff, a

12  defendant withdraws, the statute of limitations is

13  triggered.  It is certainly not the case in the

14  context of fraudulent concealment.

15          So to illustrate, you could conceive, and

16  that's precisely what is at issue here, five

17  defendants entering into a conspiracy in year one.

18  Five years later one of the defendants withdraws

19  and says nothing to the world about the conspiracy

20  and, in fact, has an interest in continuing to

21  conceal the conspiracy because otherwise it is

22  going to be on the hook for joint and several

23  liability for that five-year period.

24          Then the conspiracy is uncovered ten years

25  later, and the defendant that withdrew in the fifth

55

BARKLEY
Court Reporters

1    year, Philips -- excuse me, LPD then says, "Wait a

2    minute, the statute has lapsed because I withdrew

3    five years ago."  That's not the law.

4            If there are allegations of fraudulent

5    concealment, if the conspiracy was fraudulently

6    concealed, then the fact that a defendant withdraws

7    doesn't trigger the limitations period at all.

8    That's precisely what the Northern District of

9    California concluded in In Re: Rubber Chemicals

10   litigation, that was Judge Jenkins in 2007, and --

11           JUDGE LEGGE:  Is this case in your brief?

12           MR. MARTINEZ:  It should be, your Honor,

13   yes.

14           JUDGE LEGGE:  Okay.  What's the name of

15   it?

16           MR. MARTINEZ:  In Re: Rubber Chemicals

17   Litigation, 504 F. Supp F 790, the Court addresses

18   precisely these issues, the same argument that

19   Philips and LG are raising here, and says, "Wait a

20   minute.  If there's fraudulent concealment, you are

21   not off the hook simply because you withdrew.

22   Certainly you are not off the hook.  The policy of

23   fraudulent concealment is to allow plaintiffs to

24   sue many years after a defendant withdraws if the

25   conspiracy is concealed."

56

BARKLEY
Court Reporters

1    So that's what the Court says in that

2    case.  It cites to the Morton's Market versus

3    Gustafson's Dairy decision by the Eleventh Circuit.

4    That's the law that applies here.  And based on

5    that issue alone, the whole premise about whether

6    they withdrew falls apart.

7    Let me just go further, if the Court wants

8    me to.  I want to talk about their allegations in

9    their complaint that shows that there was an

10    effective withdrawal.

11    The creation of LPD by LGE and Philips in

12    2001 does not establish that they withdrew at all.

13    In fact, we allege in the complaint that they

14    created LPD for the purpose of controlling the

15    market and limiting supply.  We also allege that

16    the same bad actors that were involved at LGE and

17    Philips essentially badge-flipped.  They went to

18    work for the joint venture and they perpetrated the

19    conspiracy on behalf of LGE and Philips through the

20    joint venture.  Those are the allegations.

21    The fact that they continue to receive

22    income from this joint venture shows that they did

23    not withdraw, and that's precisely what your Honor

24    and Judge Conti concluded in the prior decision on

25    this issue.

57

BARKLEY
Court Reporters

1          Fast-forward to the allegation about LPD's

2    announcement in March of 2007, here's what the

3    complaint says, they say that the announcement was

4    that Royal Philips and LGD "would seek control over

5    the company."

6          That's a forward-looking statement.  You

7    read their brief.  They switched that around.  They

8    say that we alleged that they had relinquished

9    control, which is a backward-looking statement.  It

10   is a factual issue when, in fact, they ceded

11   control.  The complaint doesn't say when.

12         And as your Honor and Judge Conti

13   previously decided, the question of whether a

14   defendant has withdrawn is an intensely factual

15   question that cannot be decided on a motion to

16   dismiss at the motion to dismiss stage.

17         MR. TALADAY:  Your Honor, if I may

18   respond.

19         JUDGE LEGGE:  Just a minute.  I am not

20   sure he's finished.

21         MR. MARTINEZ:  So in their reply, your

22   Honor, they argue this case is different from what

23   happened in the class case because in the class

24   case at least you had a complaint filed in 2007.

25   Here the direct action plaintiffs did not file

HEARING

BARKLEY
Court Reporters

1    until 2011, and they don't allege that there was

2    fraudulent concealment during that four-year

3    period.

4            Well, that's also nonsense, your Honor.

5    What happened in the last four years, what happened

6    during the statutory period, what we knew or what

7    we did is completely irrelevant to the question.

8    The issue is what happened before that.

9            I don't have any further comments.

10           JUDGE LEGGE:  Okay.  Counsel?

11           MR. TALADAY:  Two points, your Honor.

12   First, with respect to withdrawal and particularly

13   with respect to 2007, your Honor says that the

14   point about ceding control is a forward-looking

15   statement.  Well, plaintiffs, DAPs, also say that

16   in March 2007, LPD became an independent company.

17   That's not forward-looking, your Honor.

18           And the fact that they were ceding control

19   at that time had to do with the bankruptcy

20   proceeding which we asked your Honor to take

21   judicial notice of, which was filed in 2006.  There

22   is no mystery about the relinquishment of any

23   rights, any relationship to LPD in March of 2007,

24   and that's quite clear, your Honor, from the DAPs'

25   complaint.  You don't need to look outside the four

HEARING

BARKLEY
Court Reporters

1  corners of that complaint.

2        With respect to withdrawal, your Honor,

3  Morton's Market, which the plaintiffs cite the

4  passage as controlling.  Here's what that passage

5  says, your Honor, it says:

6              "The law has given effect to a

7              conspirator's abandonment of the

8              conspiracy only where the conspirator

9              can demonstrate that he retired from

10             the business, severed all ties from

11             the business, and deprived the

12             remaining conspirator group of the

13             services which he provided to the

14             conspiracy."

15       Your Honor, you need only look at their

16  allegations to see every one of those criteria have

17  been met.  It is quite clear and, even though your

18  Honor has noted that those issues often are

19  fact-intensive, they are not always fact-intensive

20  when one need look no further than the four corners

21  of the complaint.

22       So even if your Honor were to believe it

23  would take an exceptional case to conclude on the

24  pleadings that withdrawal has occurred, this is

25  that case, your Honor.

HEARING

BARKLEY
Court Reporters

1           With respect to -- so where that would

2     leave us, your Honor, is that certainly virtually

3     all of the State claims would be outside the

4     statute of limitations, even if you look just at

5     the March 2007 date.

6           JUDGE LEGGE:  So this argument is going

7     not just to the Federal claim but to the State

8     claims, too.

9           MR. TALADAY:  Your Honor, I, in my initial

10    presentation limited my argument to the Federal

11    claims, but the arguments that were made by

12    plaintiffs' counsel lead to the State claims,

13    because March 2007 is related to the State claims,

14    whereas 2001 is related to the Federal claims.  I

15    am sorry to bleed over, your Honor.  I am just

16    responding.

17          With respect to fraudulent concealment,

18    your Honor, you'll recall that on the face of the

19    Florida State Attorney General complaint, their

20    complaint was untimely.  In that situation, your

21    Honor concluded that conclusionary allegations of

22    equitable stop on fraudulent concealment were

23    adequate to suspend the operation of the statute of

24    limitations where there's evidence on the face of

25    the complaint the complaints were untimely.

BARKLEY
Court Reporters

1          Here, your Honor, the allegations of

2     fraudulent concealment that they make are generic

3     allegations of fraudulent concealment.  We respect

4     your Honor's view that the "each defendant"

5     requirement with respect to fraudulent concealment

6     is difficult to implement and that it must be

7     viewed in light of the circumstances.  That's what

8     your Honor said twice in his prior decision.

9          But in light of these circumstances, your

10    Honor, where the plaintiffs have pled that LPD

11    became an independent company, that Philips ceded

12    control, it gave up its shareholding interest, it's

13    necessary, we believe, your Honor, for some

14    allegation individualized, particularized as to

15    Philips as to how it fraudulently concealed,

16    especially given that its only interest in LPD to

17    begin with was a passive shareholding interest.

18         So, your Honor, their rote allegations of

19    fraudulent concealment should not be permitted in

20    this circumstance to negate the allegations that

21    they made with respect to the withdrawal, to the

22    ceding of control of Philips.

23         JUDGE LEGGE:  Okay.  Now, the allegations

24    you want me to measure are those in the -- or maybe

25    in others, in the Best Buy case?

62

BARKLEY
Court Reporters

1          MR. TALADAY:  Yes, they are, your Honor.

2  They are in all of the complaints.  The paragraphs

3  I cited to you are in the Best Buy complaint.  I

4  can give those to your Honor again if you like.

5  46, 150 and 40, those are the three paragraphs on

6  which we principally relied.  I also mentioned

7  Paragraph 46.

8          JUDGE LEGGE:  Give me the numbers again.

9          MR. TALADAY:  40, 46 and 150, your Honor.

10          JUDGE LEGGE:  150?

11          MR. TALADAY:  150.

12          MR. MARTINEZ:  May I respond, your Honor?

13          JUDGE LEGGE:  Yeah, but do you need to?

14          MR. MARTINEZ:  It will be very brief.

15  Three points.

16          No. 1, we have already been through

17  whether the allegations of fraudulent concealment

18  are sufficient or not.  The allegations that we set

19  forth at Paragraphs 223 through 235 are identical

20  to those set forth by the class plaintiffs.  The

21  decision has already been made that's sufficient

22  and there's no reason to depart from that decision.

23          The argument, well, that was based on a

24  complaint that alleged a price-fixing conspiracy as

25  to the finished product and, therefore, you have a

BARKLEY
Court Reporters

1  different platform here and should reconsider.  The

2  decision by your Honor and Judge Conti was in no

3  way premised or related in any way on the existence

4  of a price-fixing conspiracy as to finished

5  products at all.  So, again, there's no reason to

6  depart from the prior ruling.

7          MR. HWANG:  Your Honor, since LG joined

8  the motion, I thought I might briefly speak on that

9  issue, if I may.  So LG filed a joinder in Philips'

10 briefs and the DAPs responded that, in fact, they

11 think the identical issues should be equitably

12 resolved on an identical basis.

13          To refer your Honor to the paragraphs that

14 Mr. Taladay cited that are now equivalent but are

15 applicable to LG would be 145, 37 and 40 of the

16 Best Buy complaint.

17          JUDGE LEGGE:  You are citing me to the

18 Best Buy complaint again?

19          MR. HWANG:  Yes.

20          JUDGE LEGGE:  Which paragraphs?

21          MR. HWANG:  145 and 36, I misspoke

22 earlier.

23          JUDGE LEGGE:  36?

24          MR. HWANG:  That's the one that alleges

25 that LPD became an independent company as of April

64

BARKLEY
Court Reporters

1   2007, and 40, of course, where they talk about the,

2   again, the ceding of control.

3        With respect -- if I may add one other

4   point on the substantive issues, with respect to

5   the fraudulent concealment allegations, I think we

6   have to look at it in light of the plausibility

7   requirement under Twombly and Iqbal.  If you look

8   at it in that context, in the absence of a finished

9   product conspiracy allegation, which is different

10  here than in the previous motions.

11       And in the presence of specific

12  allegations that LG and Philips divested themselves

13  of the CRT business ten years before these

14  complaints were filed, there has to be some

15  specific allegations about the -- each of the

16  defendants' participation in fraudulent concealment

17  because it is impossible that these defendants

18  would be involved in fraudulent concealment in

19  light of those facts.  I think those facts put the

20  burden on plaintiffs to be a little more specific

21  than the situation was back when the original

22  motions were decided.

23       JUDGE LEGGE:  Okay.  Thank you.  Does any

24  counsel present want to make any further argument

25  with respect to the Federal cause of action in the

BARKLEY
Court Reporters

1   direct action complaints?

2        MR. BRADSHAW:  Yes, your Honor.  Ben

3   Bradshaw.  I think the reason there's some

4   confusion is because there are defendant-specific

5   motions, but SEC and SEA have, in fact, filed a

6   motion that challenges all of the claims in the

7   complaints, including the Federal claims, including

8   the State claims.  So I do think this is the

9   appropriate time for me to speak about it.

10       Your Honor, the context of the SEC motion

11  is quite simple.  My clients, SEC and SEA,

12  purchased tubes.  We do not manufacture and we do

13  not sell tubes; we purchase tubes.

14       The complaint, the DAPs' complaint, is

15  limited to a conspiracy to fix the price of tubes.

16  Therefore, the question before your Honor is

17  whether or not there are facts in the complaint

18  that plausibly allege SEC's participation in a

19  conspiracy to fix the price of products it

20  purchases of which it's a customer.

21       Your Honor, that is a very distinct

22  question, which is categorically different than the

23  question that your Honor previously addressed in

24  your Honor's previous ruling.

25       And I want to address the comment by

66

HEARING

BARKLEY
Court Reporters

1    counsel that your Honor's previous ruling with

2    respect to the adequacy of pleadings, was not

3    premised on the conclusion that the conspiracy

4    allegations in the class complaints included a

5    conspiracy on both CRTs and CRT products.

6            In fact, your Honor's ruling was expressly

7    premised -- if I can just go to your Honor's

8    ruling.  I know you are well aware of your own

9    ruling, but this is what you said.

10           JUDGE LEGGE:  I am well aware of the

11   rulings, but when you get into the specific

12   language of my decision, I am not well aware of all

13   of those.

14           MR. BRADSHAW:  I am not aware of what I

15   did yesterday.  So here's what your Honor wrote,

16   and this addresses counsel's comment:

17               "Identifying which products are the

18               subject of the alleged conspiracy

19               underlies the analysis of many of the

20               grounds of defendants' motions, e.g.,

21               adequacy of pleading."

22           Your Honor then went on to say that:

23               "The distinction" --

24           This is the distinction between CRTs and

25   CRT finished products:

67

BARKLEY
Court Reporters

1              -- "underlies most of the defendants'

2              grounds for dismissal in these

3              motions."

4         So, your Honor, in the previous motions

5    your Honor had concluded that the conspiracy

6    allegations included both CRTs and CRT finished

7    products.

8         Now, the plausibility of that allegation

9    with respect to my clients, well, in that context,

10   my client SEC was a maker, was a manufacturer of

11   CRT finished products, i.e., the products that were

12   the object of the conspiracy.

13        Your Honor, that is categorically not the

14   case today.  This complaint, the object of the

15   conspiracy is CRTs.  My client, SEC, does not make

16   CRTs.  It purchases CRTs.  That's the context in

17   which your Honor has to view the plausibility of

18   the allegations.

19        Now, your Honor, let's look at the facts.

20   So putting aside the common sense aspect of it,

21   obviously as a customer, as a purchaser of CRTs,

22   SEC can be harmed by the conspiracy, but let's

23   analyze what plaintiffs specifically have alleged.

24        Plaintiffs specifically -- according to

25   the plaintiffs, they claim that they have alleged

68

HEARING

1    SEC's direct participation in the conspiracy, that

2    SEC participated through SDI and, finally, that SEC

3    controlled SDI.

4         Let's look specifically at what the

5    complaint says on those three grounds because, your

6    Honor, there are zero, no factual allegations in

7    the complaint against SEC that SEC directly

8    participated in the conspiracy, nor could they,

9    because SEC is a purchaser of tubes.

10        And with respect to the allegations of

11   control, we talked about this, your Honor, let's go

12   to the complaint.  I want your Honor to see what

13   they allege with respect to control.  And I am

14   looking at the Circuit City complaint here, which

15   is the complaint that is identified in the

16   briefing.  There is a single allegation with

17   respect --

18        JUDGE LEGGE:  Wait a minute.  I do not

19   have that in front of me.  So could you cite to me

20   the paragraphs you're reading from?

21        MR. BRADSHAW:  I am reading from Paragraph

22   51 of the Circuit City complaint.

23        JUDGE LEGGE:  Yes, okay.

24        MR. BRADSHAW:  This is what plaintiffs

25   say -- now, remember SEC purchases tubes and

69

BARKLEY
Court Reporters

1    manufactures finished products.

2                    "Defendant SEC dominated and

3                    controlled the finances, policies and

4                    affairs of Samsung SDI."

5            That's it.  There's nothing more.  There

6    is no allegation -- there are no factual

7    allegations of how this control allegedly took

8    place.

9            In fact, the allegations in the complaint

10   regarding control are exactly the opposite.  The

11   complaint alleges, as is, in fact, the case, that

12   SDI is a separately-owned company, which is

13   publicly traded.  SEC has a 20 percent passive

14   minority ownership interest in it, but it is a

15   separately public company that is separately

16   traded.

17           There are no other allegations, your

18   Honor, of control, none, nothing.  The plaintiffs'

19   entire allegations regarding control comes down to

20   one word in the English language, "control."

21           Now, your Honor, with respect to somehow

22   the notion that SEC, remember, separate company,

23   only purchases tubes, somehow, through SDI, we

24   weren't at any of the meetings, but the plaintiffs'

25   allegations that somehow we participated through

                            70

BARKLEY
Court Reporters

1    SDI, somehow through the participation of SDI we

2    participated in the meetings and somehow were party

3    to the alleged agreements.

4              Your Honor, the single allegation, and I

5    want to direct your attention to a specific

6    allegation in the complaint again, and it is

7    Paragraph 150, because it is very important that

8    your Honor see these allegations because this is

9    the sum total.  Paragraph 150 of the Circuit City

10   complaint.  This is what they allege against a

11   separate company:

12              "Between at least 1995 and 2007,

13              defendant Samsung" --

14              They are not talking about Samsung, it is

15   a family, which they claim is a family product,

16   there's no specific allegation as to which entity

17   they are talking about.

18              -- "through SEC Samsung SDI" --

19              Then they go on to list another.

20              -- "participated in at least 200 glass

21              meetings at all levels."

22              There is no factual allegation as to how

23   SEC somehow participated through SDI in any of

24   these meetings.  We weren't there.  Witness after

25   witness in the case has testified we are not there.

BARKLEY
Court Reporters

1         There are zero allegations, your Honor, to

2    suggest that somehow, if we are participating, if

3    SEC is participating in this conspiracy through

4    SDI, how are they doing it, who's authorizing it,

5    how does it take place.  There are zero factual

6    allegations in the complaint, your Honor, directed

7    at those issues.

8         And what I would submit to your Honor is

9    that, given the plausibility standards of Twombly,

10   where you have an allegation that SEC only

11   purchases, is a customer of tubes, do these

12   allegations, these factual allegations -- there are

13   no facts, they are conclusions, do they plausibly

14   state a claim against SEC that SEC participated in

15   a conspiracy to fix the price of products it

16   purchases?

17        In that context, your Honor, the answer

18   has got to be, and we believe strongly is, no.

19        Now, again, your Honor, given the previous

20   allegations in the previous -- in your Honor's

21   previous motion to dismiss ruling, plaintiffs

22   undifferentiated -- their failure to differentiate

23   between different defendants and families of

24   defendants is less significant when the conspiracy

25   at issue involves both CRTs and CRT finished

72

BARKLEY
Court Reporters

1  products, because the failure to differentiate, you

2  still have defendants that are participating in

3  those markets.

4          By contrast here, your Honor, SEC does not

5  manufacture the object of the conspiracy.  It does

6  not participate in that market.  That is a

7  categorical difference on which your Honor should

8  look in determining the plausibility of these

9  factual allegations.

10          Now, your Honor, what courts -- first of

11 all, we believe with respect to SEC that the claims

12 should be dismissed with prejudice, but at a

13 minimum, your Honor, the claims here, because of

14 the inadequacy of the pleadings, should be

15 dismissed without prejudice at a minimum, allow the

16 direct purchaser plaintiffs to continue to

17 participate in discovery, and if they uncover any

18 facts of which they haven't alleged which somehow

19 indicate that SEC participated in the conspiracy,

20 they are feel free -- or that SEC somehow

21 controlled SDI, they can feel free to amend their

22 complaint.

23          That is how courts deal with this issue.

24 The complaints should be dismissed without

25 prejudice, at a minimum, as to SEC and SEA, and

73

BARKLEY
Court Reporters

1   plaintiffs can be given the opportunity to replead.

2          Now, your Honor, with respect to if the

3   plaintiffs do replead, I am very skeptical that

4   they'll be able to e find any evidence.  And why am

5   I skeptical of that?  Because, your Honor, in this

6   case, witness after witness after witness has

7   testified thus far -- and I have a chart, your

8   Honor, and I am not asking your Honor to consider

9   this --

10          JUDGE LEGGE:  I took this chart.

11          MR. BRADSHAW:  That is a very different

12   chart.

13          JUDGE LEGGE:  If you are starting to give

14   me facts, I don't think I ought to have that here.

15          MR. BRADSHAW:  Your Honor, I am not asking

16   you to consider them.  What I am telling you is

17   that witness after witness after witness thus far

18   in this case has testified on the record SEC was

19   not present at any of the competitor meetings.  We

20   were not there.

21          The witnesses have also testified that SEC

22   is a customer.  We are a purchaser of tubes.  We

23   don't make tubes.

24          The witnesses have also testified, your

25   Honor, that SDI -- and this is in the plaintiffs'

74

BARKLEY
Court Reporters

1    complaint.  The plaintiffs' complaint alleges

2    SDI has as a fact -- it is a separate company.  It

3    is a separate, publicly-traded company, and the

4    only interest is the 20 percent ownership interest.

5           But, your Honor, under the Bestfoods case,

6    the Supreme Court has made clear that there's a

7    strong presumption of corporate separateness.  The

8    plaintiffs haven't alleged any facts, zero, none,

9    that would tie SEC to this conspiracy that would

10   somehow establish that SEC somehow controls SDI.

11          Your Honor, we would urge your Honor

12   strongly to dismiss SEC and SEA from these

13   complaints.  If -- at a minimum, without prejudice,

14   which is what courts do in these situations.  And

15   if the plaintiffs, if the direct action plaintiffs

16   find any evidence, uncover any evidence throughout

17   the discovery, they can amend.  That's what we

18   would ask.

19          JUDGE LEGGE:  Counsel?

20          MR. MARTINEZ:  Mr. Peterson is going to

21   respond.

22          MR. PETERSON:  Your Honor, first, it's our

23   position that this issue has already been decided

24   by both your Honor as well as Judge Conti.

25          Counsel for SEC is trying to differentiate

75

BARKLEY
Court Reporters

1    the March 30th, 2010, ruling with regards to the

2    direct and indirect classes that address this exact

3    issue by stating that the CRT finished product

4    conspiracy allegation was still in the case at that

5    time.

6            And while they do note that there is a

7    general statement to your Honor's recommendations

8    saying that some of defendants' arguments might be

9    affected whether there is a CRT-only conspiracy

10   versus a CRT product conspiracy, if you look at

11   both your Honor's ruling as well as Judge Conti's

12   ruling, it is not the case that the ruling as to

13   SEC and SEAI is affected in any way by this.

14           Most importantly, it's been framed as a

15   plausibility argument.  It is the law of the case

16   under the March 30th, 2010, ruling by Judge Conti:

17                "It is economically plausible that

18                affiliated companies would wish to see

19                any price increases in CRTs pass

20                through the purchasers of CRT

21                products."

22           That's the argument that we have made

23   that's been adopted by Judge Conti.  We see no

24   reason why that would be in any way affected by the

25   withdrawal of a conspiracy related to CRT finished

76

BARKLEY
Court Reporters

1    products.  That is not something that we had

2    alleged, and instead this is the exact allegation

3    that we make in our complaint as well.

4           With regard to SEC's direct participation

5    in the conspiracy, I would draw your Honor's

6    attention to Paragraph 150 of Circuit City's

7    complaint.  It actually does allege very

8    specifically:

9               "Between at least 1995 and 2007

10              defendant Samsung, through SEC" --

11          and it lists a number of other entities,

12              "-- participated in at least 200 glass

13              meetings at all levels."

14          What that means is there's an allegation

15    in this complaint that SEC participated in the

16    glass meetings.

17          If your Honor looks at Paragraph 151, what

18    you'll see here in the context is Circuit City

19    makes allegations as to, in Paragraph 150, the

20    Samsung entities which it alleges participated in

21    the meetings, and in Paragraph 151, the allegations

22    for the Samsung entities that did not

23    participate -- did not appear directly at those

24    meetings, but were instead represented at those

25    meetings by other parties within Samsung.

77

BARKLEY
Court Reporters

1          So the allegation within Paragraph 150 is,

2     in fact, that SEC was a direct participant at those

3     meetings.

4          Clearly any reference to the testimony at

5     depositions or any other facts that counsel has

6     asked you not to consider but still told you, it's

7     inappropriate at this point.  The allegations that

8     Circuit City have made for purposes of a motion to

9     dismiss are supposed to be taken as true.  That is

10    factually the allegation we have made here.

11         Another point that SEC briefed but

12    actually didn't raise here is important, and that

13    is we do make reference specifically to SEC and

14    SEAI in numerous places within the complaint, but

15    we also make references to Samsung as a whole.

16    What we do is we explain, first, detailed by

17    detailed paragraph, saying, "Here are each of the

18    Samsung entities, here's their relationship,

19    whether SEC controlled their finances, controlled

20    their actions with regard to this conspiracy and

21    with some of them, both SEC and SDI."

22         And then we say, "We will refer to all of

23    these collectively as 'Samsung'."

24         First off, that action has been approved

25    by Judge Illston in the LCD case when they raised

78

BARKLEY
Court Reporters

1   the same exact issue there, but we have gone a step

2   further here and actually explained why we would do

3   that with regard to each of these entities, and

4   that is in Paragraph 159.  We actually have a very

5   direct explanation that says:

6               "When Circuit City refers to a

7               corporate family or company or

8               companies by a single name in the

9               allegations, we are making an

10              allegation that one or more employees

11              or agents within that family acted on

12              behalf of everyone."

13      And part of the reason is because the

14   participants of these meetings didn't differentiate

15   whether you were Samsung SDI or SEC or Samsung

16   Shenzhen.  There are a number of different entities

17   that said you were there on behalf of Samsung, as

18   we allege here.

19      Secondly, the individual participants

20   entered into agreements on behalf of these

21   entities.  They reported the meetings back to all

22   the entities that they were representing.

23      So as a result, when we make allegations

24   as to Samsung, those are allegations on behalf of

25   Samsung SDI as well as SEC as well as SEAI.

HEARING

BARKLEY
Court Reporters

1          So SEC is on notice both as to the

2    specific allegations that we have made towards SEC

3    as well as the broader allegations that we have

4    made toward that entire company of families and how

5    they interact within this conspiracy.

6          Now, we have also heard a little bit about

7    the plausibility standard.  I would hold that it is

8    the law of the case at this point, that Judge Conti

9    has already recognized our exact standard as being

10   economically plausible.

11         But alongside that, it sounds like that's

12   really a factual issue for the most part here that

13   they would like to explore in terms of:  Why would

14   CRT purchasers who incorporate those into finished

15   products be willing to enter into such a

16   conspiracy?

17         We have provided a reason.  It's been

18   adopted by the Court.  If they would like to

19   challenge that either through evidence of some

20   other kind, I think that would be appropriate at a

21   later stage, but I am not aware of anything that

22   would hold that having identified already a

23   plausible explanation, that that can somehow be

24   trumped through further argument or further

25   information that they would like to introduce.

80

BARKLEY
Court Reporters

1            The other factor that they have raised

2    here as well is the notion of control and whether

3    we have sufficiently alleged control as to SEC and

4    Samsung SDI.

5            First, as I noted, we have alleged that

6    Samsung SEC was a direct conspirator in this

7    conspiracy.  They were a direct participant.

8    According to our allegations, they attended the

9    meetings.  Nonetheless, they do raise, in both

10   their motion and their response, control with

11   regards to vicarious liability and with regards to

12   veil piercing, neither of which we are alleging.

13           Under the Iqbal and Twombly standards, the

14   idea is that we need to nudge the facts along close

15   to plausibility and also provide them enough

16   information to know what allegations we are making.

17           The word "control," as we have alleged it,

18   very specifically between SDI and between SEC, puts

19   them on notice.  SEC dominated, controlled the

20   finances, policies and affairs of Samsung SDI

21   relating to the antitrust allegations alleged in

22   this complaint.

23           JUDGE LEGGE:  Where is that?

24           MR. PETERSON:  Paragraph 51.  If you look

25   at Paragraphs 49 through 58, they provide a very

HEARING

BARKLEY
Court Reporters

1   detailed explanation of the relationship of the

2   Samsung entities together.

3           And as your Honor held, in February 5th of

4   2010, on similar issues, the pleading purposes here

5   under Rule 8 are for each defendant to have notice

6   of the products, the time frames, the meeting, the

7   subject matters, the participants, locations and

8   the alleged conduct.

9           They have the information in front of

10  them.  They are able to question their personnel

11  about it.  They are able to search their records.

12  That's the noticed pleading that's required under

13  the rules.

14          And to the extent they later want to

15  challenge it, whether by this 20 percent notion,

16  based on the ownership of SDI, I would note that

17  SEC does own 20 percent of SDI, but it's also by

18  vast majority the largest single shareholder of

19  SDI.

20          Further, I am not sure that's necessarily

21  dispositive of this issue in any way.  That's an

22  argument to the legal sufficiency of whatever

23  factual evidence we can provide as to ownership and

24  control as opposed to having to explain in detail

25  how SEC controlled SDI.  There's no case that says

HEARING

BARKLEY
Court Reporters

1    that.

2            The Bestfoods case that they cited for the

3    strong presumption of corporate separateness,

4    that's obviously in relation to a veil-piercing

5    notion or an agency notion, and that's not what

6    we're seeking here.

7            We have instead alleged SEC, based on its

8    own actions in that case, is -- we are not trying

9    to disrupt the corporate separateness of SEC and

10   SDI.

11           MR. BRADSHAW:  Your Honor, I have a few

12   quick points.

13           JUDGE LEGGE:  Please make them quick.

14   Just listening to them, you have already spoken to

15   them.  I am not weighing to them.

16           MR. BRADSHAW:  I just want to make three

17   quick points, your Honor.  We categorically are not

18   on notice of what's being alleged.  We have no idea

19   how we allegedly controlled SDI.  They say we

20   controlled how, who, where, what, when.  Who am I

21   supposed to talk to?  I have no idea to whom am I

22   supposed to talk to.

23           JUDGE LEGGE:  Well, am I going to make

24   them do that in every one of their other complaints

25   as to every defendant, that they have to do more

HEARING

BARKLEY
Court Reporters

1    than say "ownership" and "control," they have got

2    to detail the facts of how to do it, is that the

3    standard?

4              MR. BRADSHAW:  Not necessarily.  Because

5    what are the allegations as to SEC?  That SEC only

6    makes tubes -- excuse me, only purchases tubes,

7    that SDI is a separate, publicly-owned company.  I

8    don't know what the allegations are with respect to

9    the relationship between other defendants and

10   affiliates.

11             I can tell you with SEC, the allegations

12   in the complaint are exactly the opposite of what

13   the plaintiffs contend.  And then in the face of

14   those allegations, the only thing they allege is,

15   quote, that we controlled.  We have no idea who we

16   are supposed to talk to.  We have no idea who

17   allegedly was authorizing this control.  It is

18   simply not there.

19             And, your Honor, I am stunned when I hear

20   that the plaintiffs allege, or claim to allege that

21   SEC through its own actions.  Where in this

22   complaint, in all of the complaints are there any,

23   any -- find me one that -- where SEC is alleged to

24   have taken its own action?

25             We have a very different view, your Honor,

84

BARKLEY
Court Reporters

1    and I'll just refer your Honor, you can look at it,

2    Paragraph 150.

3              JUDGE LEGGE:  150?

4              MR. BRADSHAW:  Yes.  The plaintiffs say

5    their direct allegations against SEC are that

6    Samsung, undefined, through SEC and then a whole

7    other list of entities, somehow participated.

8              Your Honor, please refer to the In Re:

9    potatoes case, the In Re: Cal Title Insurance case.

10   Courts routinely, when all the allegations come

11   down to using words like "through" or "participated

12   in," Courts have uniformly rejected those

13   allegations under Twombly and Iqbal as being

14   sufficient.

15             And, your Honor, I just want to end,

16   because I know your Honor's got a lot to get

17   through.  In Judge Conti's order, he specifically

18   quoted, your Honor, from Iqbal, which reads:

19                  "Determining whether a complaint

20                  states a plausible claim for relief

21                  will be a context-specific task that

22                  requires the reviewing court to draw

23                  on its judicial experience and common

24                  sense."

25             Your Honor, the context of this motion is

85

HEARING

BARKLEY
Court Reporters

1    a complaint which only alleges a conspiracy as to

2    tubes, products that my client does not make, nor

3    manufacture.

4         And you have to ask yourself:  Is it

5    plausible, is it economically plausible or

6    otherwise, as a matter of common sense, that SEC

7    would participate in a conspiracy to fix the price

8    of products that it is purchasing?

9         It would be injured.  It would suffer harm

10   if it were to agree to do that, and there's no

11   allegations that the downstream market, that the

12   price of finished products is somehow fixed.  In

13   fact, those have been expressly abandoned.  Those

14   prices are being set pursuant to market forces,

15   your Honor.

16        Judge Conti's statement about economic

17   plausibility makes sense only -- it can only make

18   sense in the context of a conspiracy to fix both

19   CRTs and CRT finished products.

20        And I'll leave it at that.

21        JUDGE LEGGE:  All right.  Anybody else

22   wish to speak to the portion of the Federal causes

23   of action?  All right.  We will take a recess at

24   this time.  Here's what I'd like to do:  We will

25   take a recess, 15, 20 minutes.  Our court reporter

HEARING

BARKLEY
Court Reporters

1    at least needs that; and I think we might all

2    benefit from it.

3         Then I want to come back to the State law

4    issues.

5         Now, I think the last couple of arguments

6    we have had here with respect to Philips and

7    Samsung kind of pointed at what may be occurring

8    here when you argue the State court issues.

9    Because in that context, that is, the State law

10   issues, we have a lot more individualized issues of

11   the particular States cause of actions, specific

12   defenses, things that are State-specific and

13   party-specific.

14        Now, I am not going to want to stop you

15   from arguing anything you think is significant, but

16   I think you have to appreciate the workability of

17   the oral versus the written argument in this kind

18   of context.  It is going to be very difficult for

19   me, even taking notes and even with a court

20   reporter, to keep track of individual things here

21   and individual things there.  You are going to have

22   to leave some of this to the written word you have

23   already put down.

24        So please do not just simply reargue

25   material that's in the brief.  Please, just for the

HEARING

BARKLEY
Court Reporters

1    benefit of all of us, focus on those things that

2    are a particular -- I guess the word is "focused."

3    You're going to argue the things you want to focus

4    on that you think are particularly important and

5    don't give us the whole thing, because you are

6    going to have to leave it to the briefs, for all

7    practical purposes, because the ear simply cannot

8    pick up as much and retain as the eye can do in

9    reading the same things.

10          MR. KESSLER:  Your Honor, I think you'll

11   find that's defendants' intention on the remaining

12   joint issues, which are not individual, are really

13   directed across the claims and across the parties

14   and will not be that individualized.

15          JUDGE LEGGE:  That's what I'm hoping for,

16   thank you.  You stated it better than I did.

17          Let's take a recess until 12:15, and then

18   we will come back to start with the State.

19              (Whereupon a recess was taken.)

20          JUDGE LEGGE:  Resuming the arguments in

21   defendants' motion to dismiss the direct action

22   plaintiffs' complaints, and we are going to focus

23   now on the State law causes of action, and I am

24   going to call on the defendants first to begin.  So

25   who is going to lead off?

88

BARKLEY
Court Reporters

1          MR. KESSLER:  I think we'll start first

2     with statute of limitations.

3          MR. EVERETT:  So, your Honor, we thought,

4     unless you have a different preference, that we

5     would just file briefs.  So we have statute of

6     limitations first and then due process and then AGC

7     and then individual states.

8          So on the statute of limitations, just to

9     set the field again, we have 11 direct action

10    complaints, nine of those were filed on November

11    14th, 2007, and two were filed a little bit earlier

12    than that.

13         They assert causes of action under 17

14    different State laws.  The statutes of limitation

15    for 13 of those -- sorry, 14 of those states is

16    four years.  Two have a three-year statute of

17    limitation that is -- it is actually very helpfully

18    referenced in Mr. Taladay's chart.

19         JUDGE LEGGE:  Which one is that?  Oh, yes,

20    yes.  The Philips chart.

21         MR. EVERETT:  That's right.  So you'll see

22    that Target asserts a claim under Kansas law.

23    Kansas has a three-year statute of limitation.

24    It's the gray line that goes from 11/14/08 through

25    11/14/11.

89

HEARING

BARKLEY
Court Reporters

1                    JUDGE LEGGE:  I see.

2                    MR. EVERETT:  Target asserts a claim under

3     Kansas law.  That has a three-year statute of

4     limitation.  RadioShack and Sears assert under

5     Mississippi.  That also has a three-year statute of

6     limitation.  And then the other claim with the

7     statute of limitation longer or different than four

8     years is Target's Wisconsin claim, which is six

9     years, and that, again, I guess, is a blue bar on

10    the chart.

11                   JUDGE LEGGE:  Yes, I see that.

12                   MR. EVERETT:  So everyone else is a

13    four-year statute of limitation, and given the

14    normal operation of statute of limitations in

15    antitrust cases claims accrue on injury, which

16    means there's a new claim every time there's a

17    purchase at an allegedly inflated price.

18                   And the statute of limitation reaches back

19    four years for most of these claims before the date

20    of filing, meaning absent some tolling doctrine

21    applying, the claims of the plaintiffs under these

22    various State laws would have expired as of

23    November 14th, 2007, for most of the claims.  And I

24    don't think there's any dispute about that.

25                   The dispute is about whether any tolling

90

BARKLEY
Court Reporters

1  doctrines apply after November 14th, 2007, that

2  would allow the plaintiffs to resuscitate their

3  claims.  The claims at issue in all the complaints

4  allege a conspiracy that runs, they allege, from

5  1995 to the end of November 2007.

6          So the practical effect of the statute of

7  limitations decision would be for those claims that

8  have a four-year statute of limitations, the claims

9  would be barred except for any claims that may have

10  arisen in the last couple of weeks of November

11  2007.  So that's the background.

12          There are two tolling doctrines that the

13  plaintiffs ask your Honor to consider and that they

14  contend that they have alleged.  The first of those

15  is fraudulent concealment.

16          The elements of a claim for fraudulent

17  concealment are, first, that the defendants have to

18  have engaged in some affirmative acts of

19  concealment; second, that within the statutory

20  limitations period the plaintiffs were not on

21  notice, either actual notice or inquiry notice of a

22  factual basis for their claims; and, third, that

23  they exercised due diligence in pursuing their

24  claims so that the lateness of their claims is not

25  a result of their own inaction.

91

BARKLEY
Court Reporters

1          So what I wanted to do is focus on the

2    latter of those -- the two latter of those three

3    elements, the inquiry notice element and the due

4    diligence element.

5          In terms of further factual background --

6    and this, again, is on the chart that Mr. Taladay

7    handed out, which is very helpful, thank you, on

8    November 8th, 2007, there were worldwide raids,

9    dawn raids and also search warrants executed around

10   the world.

11         We submitted in connection with our motion

12   a request for judicial notice.  Appendix A of that

13   is a press release that was issued by the European

14   Commission on November 8, 2007.  Following that

15   very quickly there were a number of complaints

16   filed.

17         The first of those was a complaint

18   entitled Kent versus Hitachi Ltd., and that is --

19   that complaint was filed on November 13th, 2007.

20   So that's not on the chart, but that would be

21   November 13, 2007.  And that complaint alleged

22   essentially the same conspiracy that the plaintiffs

23   allege here.

24         So in light of those facts, the question

25   for fraudulent concealment resolves to two separate

92

BARKLEY
Court Reporters

1    questions:  First, were the facts before November

2    14, 2007, all of the widespread publicity that

3    there was about these coordinated raids around the

4    world sufficient to excite a duty to inquire by the

5    plaintiffs?  If they were, then unless the

6    plaintiffs, through the exercise of due diligence,

7    would not have uncovered a basis for filing a

8    complaint consistent with Rule 11, then they cannot

9    rely on fraudulent concealment to toll their

10   claims, or save their claims, before November 2007.

11          I think the answer to both of those

12   questions, based on the facts that are before the

13   Court, very clearly has to be yes.  There was very

14   substantial publicity surrounding the worldwide

15   coordinated raids of the defendants' facilities in

16   relation to an investigation of price-fixing in the

17   cathode ray tubes on November 8, 2007.

18          That had to be sufficient to at least

19   provide a duty on behalf of the plaintiffs, some of

20   the largest and most sophisticated companies in the

21   United States, to inquire as to whether there was a

22   basis for bringing a claim.

23          And I think, you know, there are a number

24   of facts that show that this clearly was a

25   sufficient basis to excite a duty to inquiry.

93

BARKLEY
Court Reporters

1          The first is that literally five days

2     later the first complaint was filed in this case,

3     and that complaint, as I have mentioned before, the

4     Kent complaint, is attached as Appendix B to the

5     request for judicial notice that we submitted.  So

6     your Honor should have it.  And you'll look at

7     Paragraphs 29 through 32 of that complaint --

8               JUDGE LEGGE:  Which one?

9               MR. EVERETT:  The Kent complaint.

10              JUDGE LEGGE:  I don't have it.

11              MR. EVERETT:  It is Appendix B to our

12    request for judicial notice that was submitted in

13    connection with our motion to dismiss.

14          And that complaint references the basis

15    that they believe they had to file the complaint.

16    Paragraph 29 references the European Commission

17    dawn raids.

18          Paragraph 30, dawn raids by the JFTC on

19    the same day.

20          Paragraph 31, by the KFTC, the JFTC and

21    the United States Department of Justice.

22          Paragraph 32, again, the JFTC, KFTC and

23    European Commission.

24          Again, that evidences the very widespread

25    publicity there was about these coordinated raids,

                        94

BARKLEY
Court Reporters

1    and it also demonstrates that at least this

2    plaintiff thought that was sufficient to file a

3    complaint.  That complaint was not challenged on

4    Rule 11 grounds.

5          Within three weeks of that, five

6    additional complaints were filed and within one

7    year of that, an additional 30 complaints were

8    filed against the defendants.  All of those

9    complaints alleged essentially the same conspiracy

10   that plaintiffs allege here, and the facts did not

11   materially differ between them or between the

12   complaints that the direct action plaintiffs are

13   asserting here.

14         So we think very clearly that was

15   sufficient to excite a duty to inquire, and,

16   moreover, that the facts likewise demonstrate that

17   if the plaintiffs had acted with reasonable

18   diligence, they would have uncovered facts that

19   were sufficient to allow them to file a complaint

20   that was consistent with Rule 11.

21         Again, it is exactly the same facts that

22   demonstrate that, that within one year 36 different

23   complaints were filed that alleged essentially the

24   same cause of action.

25         It is not that the plaintiffs needed by

95

BARKLEY
Court Reporters

1    November 14th, 2007, to have had all of the facts

2    in front of them that would have allowed them to

3    file the complaint, although the Kent complaint

4    suggests that they could have, but rather simply

5    that with -- the facts that were available to them

6    before November 14th, 2007, were sufficient to put

7    them on notice so that they had to start to inquire

8    and that they would have, had they exercised

9    reasonable diligence, been able to discover

10   sufficient facts within the four-year statutory

11   period to allow them to make timely filing of the

12   claim.

13        We think those facts are very clear.  They

14   make fraudulent concealment inapposite here and

15   mandate dismissal of the direct action State law

16   claims that have a four-year statute of limitations

17   based on just the application of the statute of

18   limitations.

19        One other point I would just make in terms

20   of the adequacy of the notice and the duty to

21   inquire is that several of these plaintiffs in

22   particular -- let me see if I can find the exact

23   citations -- actually in their complaints allege

24   that it was the publicity surrounding the worldwide

25   raids of defendants' facilities along with the

96

HEARING

BARKLEY
Court Reporters

1    filing of various complaints that put them on

2    actual notice of their claim, so not just inquiry

3    notice, but actual notice of their claims, and that

4    they claim that the statute of limitations start

5    running then.

6          They peg the date for that as the end of

7    November 2007, which is very convenient, but the

8    facts clearly demonstrate that the publicity

9    surrounding the worldwide coordinated raids was

10   before November 14th, 2007, and, likewise, that a

11   complaint was filed before November 14th, 2007, as

12   well.

13         I am happy to address a particular issue

14   relating to the case law, but I think, if you look

15   closely at the case law that the plaintiffs cite in

16   their opposition on the points here, the facts are

17   differentiated because we have here objective facts

18   that they cannot deny that clearly demonstrate that

19   the exercise of reasonable diligence would have

20   allowed them to discover facts to bring a complaint

21   consistent with Rule 11, well within the statutory

22   limitations period.

23         So the second basis that --

24         MR. MARTINEZ:  Excuse me, Counsel, forgive

25   me for interrupting.  It may make sense to address

HEARING

BARKLEY
Court Reporters

1    these issues one at a time.

2              JUDGE LEGGE:  No, I think let's do it the

3    other way.

4              MR. MARTINEZ:  Okay.

5              JUDGE LEGGE:  I can help fill these out as

6    we go.

7              MR. EVERETT:  Sure.  So the second tolling

8    doctrine that plaintiffs rely on is a document

9    called the class action tolling.  And in

10   particular, these direct action plaintiffs, again,

11   you know, as we discussed earlier today, which are

12   largely very large retailers in the United States,

13   claim that they were, by virtue of their purchases

14   from defendants, members of the direct purchaser

15   class which asserted claims under Federal law only,

16   and they seek to use their membership in that

17   direct purchaser punitive class as a basis to toll

18   the statute of limitations for their various State

19   law claims.

20             So there is, as I know your Honor's aware,

21   we have argued this before in relation to Florida,

22   a doctrine that allows a tolling of statute of

23   limitations in cases where there is a -- an earlier

24   class action that includes the plaintiffs as its

25   members.

                              98

BARKLEY
Court Reporters

1              That tolling doctrine was initiated by the

2      Supreme Court in the American Pipe case, but,

3      importantly, it deals only with tolling of class

4      actions for claims that are -- if it's a Federal

5      class action for claims under Federal law.

6              Some states have adopted a class action

7      tolling for their State claims, but very few --

8      very few states have adopted the class action

9      tolling doctrine in a situation that's analogous to

10     here, where the earlier class action asserted

11     claims under the law of a different forum, here

12     Federal law claims, and that the later claims being

13     asserted were under the law of a different

14     sovereign, so here the various State law claims.

15             And there are various different policies

16     at issue that militate against the application of

17     the American Pipe tolling doctrine and

18     considerations like that.

19             As a result of that, the clear

20     overwhelming trend in the case law, particularly in

21     recent years, is not to import what's called

22     cross-jurisdictional class action tolling into

23     various State laws.

24             So let me address just briefly what those

25     different policy issues are.

HEARING

BARKLEY
Court Reporters

1          First, as a general matter, the policy

2     underlying American Pipe tolling is to prevent

3     duplicative suits, so it's not to encourage

4     companies to file protective individual suits, if

5     they can participate passively through a claim

6     that's being asserted on the basis of a class

7     action, but that doesn't apply when there's a

8     different law that would apply.

9          So if the plaintiffs here wanted to assert

10    claims under State law, I could not rely on their

11    participation in the direct purchaser class to

12    vindicate those claims.  And you heard here today

13    State law antitrust claims and Federal antitrust

14    claims are different.  State law antitrust claims

15    allow plaintiffs to pursue claims for indirect

16    purchases that they couldn't pursue under Federal

17    law and various differences between the Federal and

18    State claims.

19         So the policy interest that underlies

20    American Pipe tolling doesn't apply in the context

21    of claims that are brought later under different

22    speeches of law.

23         If your Honor wants to look at a case that

24    addresses and discusses that in great depth, the

25    Copper case that we cite in our brief, it's 436

BARKLEY
Court Reporters

1    F.3d 782, which is a Seventh Circuit decision from

2    2011, discusses that extensively.

3          So a second policy interest that states

4    take heck check into account and that militates

5    against application of cross-jurisdictional class

6    tolling is that essentially allowing

7    cross-jurisdictional class tolling makes the

8    statute of limitations of any particular state

9    dependent on the application of the law of a

10   different state.  So it is essentially -- it is

11   ceding sovereignty by state.  A lot of states don't

12   like that.

13         The Fourth Circuit took this specifically

14   into account in concluding that Virginia would not

15   adopt cross-jurisdictional class tolling, and that

16   case is Wade versus Danek, 182 F.3d 281.  That's

17   from 1999, Fourth Circuit.

18         The third policy interest that's

19   implicated and that would be undermined and that

20   would be of great concern to different states is

21   the possibility of forum shopping.  So if you

22   consider how cross-jurisdictional tolling would

23   work in practice, there might be a class action

24   filed in, say, Mississippi and after class

25   certification is denied in Mississippi, a new case

101

BARKLEY
Court Reporters

1    is brought in, say, Virginia, and if -- that would

2    only be allowed if jurisdictional tolling were

3    allowed across borders.

4            So if particular states adopted a standard

5    that would allow cross-jurisdictional class

6    tolling, it would essentially make that state the

7    forum for all disappointed potential class members.

8    And that's something that's of great concern to

9    states.

10           And a case that I would cite that

11   addresses that issue, which is, again, in our

12   brief, is the Soward versus Deutsche Bank case, 814

13   F.Supp.2d 272, which is from the Southern District

14   of New York in 2011.  I commend that case to your

15   Honor generally in the sense that it addresses and

16   discusses the cases that have addressed this issue

17   across the board.

18           So those are the policy interests that are

19   implicated and it suggests that

20   cross-jurisdictional tolling in particular is not

21   appropriate.

22           The Ninth Circuit has actually addressed

23   this issue particularly in the context of

24   California law and explicitly held that California

25   would not allow cross-jurisdictional class tolling.

102

BARKLEY
Court Reporters

1   So that case is Clemens versus DaimlerChrysler, 534

2   F.3d 1017.  It's from 2008, and it is --

3           JUDGE LEGGE:  What's the first name?

4           MR. EVERETT:  Clemens.

5           JUDGE LEGGE:  K or C?

6           MR. EVERETT:  C.  I think it is discussed

7   primarily in our reply brief.

8           JUDGE LEGGE:  I am not looking in the

9   right place.  Did you say a K or a C?

10          MR. EVERETT:  C, Clemens.

11          JUDGE LEGGE:  I don't see it here in your

12  reply brief.

13          MR. EVERETT:  Okay.  If you look on Page 9

14  of our reply brief, the last line of the text.

15          JUDGE LEGGE:  I don't think that got

16  picked up on the index.

17          MR. EVERETT:  I apologize for that.

18          JUDGE LEGGE:  Go ahead.

19          MR. EVERETT:  So that case addresses

20  California law specifically, but it follows what's

21  become the general rule in Federal courts.

22  First -- and there are two parts to that, first of

23  all, the Courts, I think uniformly at this point,

24  recognize that issues of the application of the

25  statute of limitations of any particular State law

103

BARKLEY
Court Reporters

1    is a matter of State law.  So there is no Federal

2    law that applies, per se, to all of the State laws

3    at issue in relation to cross-jurisdictional

4    tolling.

5           And the second point is that the Ninth

6    Circuit and, again, most of the Federal Court cases

7    that have considered the issue have come to the

8    conclusion that because of the policy interests

9    that make cross-jurisdictional tolling at least --

10   at the very least, very controversial, that Federal

11   Courts should not import into the State law a rule

12   of cross-jurisdictional tolling absent a very clear

13   statement from the State Courts at issue.

14          The plaintiffs here, remember, they

15   asserted claims or they assert claims under 17

16   different State laws.  In their opposition, they

17   point to cases that they claim allow

18   cross-jurisdictional tolling under the laws of only

19   seven of those states.  So those states are

20   identified, I think, at Page 19 of plaintiffs'

21   opposition, and then we discuss them at Pages 9 and

22   10 of our reply.

23          So there are ten different State laws that

24   even the plaintiffs don't make the contention would

25   allow cross-jurisdictional tolling, so they clearly

104

BARKLEY
Court Reporters

1   cannot rely on that doctrine to toll their claims

2   for those states.

3         Moreover, if you look at those particular

4   seven states -- and let me put New York to one

5   side, because there's a separate argument in

6   relation to New York.  So if you look at the cases

7   that they cite for those six different states,

8   they, quite frankly, simply don't support the

9   propositions that the plaintiffs contend that they

10  do.

11        The cases either deal with the application

12  of American Pipe tolling for different State law

13  claims, so not cross-jurisdictionally, or they

14  don't address the policy issues and there's a

15  Federal Court making an assumption that

16  cross-jurisdictional tolling would apply or they

17  address something completely different.

18        So just to give an example, the Seaboard

19  case that plaintiffs cite at Page 19, which is a

20  Kansas Supreme Court case, and the plaintiffs claim

21  that it allows cross-jurisdictional tolling, is

22  very explicit that Kansas law doesn't recognize

23  class action tolling at all.

24        So the case discusses American Pipe

25  tolling, but only to discuss the policy interests

HEARING

BARKLEY
Court Reporters

1    that are implicated by American Pipe in the context

2    of a saving statute in Kansas that would allow the

3    filing of new claims after there's been a dismissal

4    that's not on the merits.  There's no allegation,

5    and there can't be any claim here that the

6    plaintiffs in the Kansas case are relying on that

7    saving statute.

8            It just goes to point out that none of the

9    cases, and if you look at them, would allow,

10   clearly allow cross-jurisdictional tolling in this

11   context.  We cite cases from each of those states,

12   and this, again, is at Page 10 of our reply brief,

13   that explicitly hold that either the State issue

14   wouldn't allow class action tolling at all, and

15   that would be the case of Florida, or wouldn't

16   allow cross-jurisdictional tolling.

17           So the end result, your Honor, is that the

18   plaintiffs, we believe, cannot rely on either

19   fraudulent concealment or cross-jurisdictional

20   class tolling to save their claims.  They sat on

21   their rights.  They clearly were on at least

22   inquiry notice as of November 2007 at the very

23   latest, and yet they waited more than four years to

24   file their complaints.  And so we think their State

25   law claims should be dismissed.

106

BARKLEY
Court Reporters

```
 1              JUDGE LEGGE:  All right.  Counsel?
 2              MR. MARTINEZ:  Yes.  So start with the
 3   premise that fraudulent concealment tolls have the
 4   limitation period until the plaintiff either knows,
 5   has actual notice or has constructive notice of its
 6   claims.
 7              I think it is important to go back and
 8   review what the Ninth Circuit has said about
 9   constructive notice.  And the seminal case is the
10   Conmar case, which we cite in our brief.  That was
11   a 1988 case.  That was a summary judgment case.
12              JUDGE LEGGE:  What?
13              MR. MARTINEZ:  It's Conmar Corporation,
14   C-o-n-m-a-r.
15              JUDGE LEGGE:  Okay.
16              MR. MARTINEZ:  So that was a summary
17   judgment case, and here's what the Court said.  It
18   said that summary judgment on the question of
19   constructive notice is improper unless:
20                   "Uncontroverted evidence irrefutably
21                   demonstrates that a plaintiff
22                   discovered or should have discovered
23                   the cause of action but failed to file
24                   a timely complaint."
25              Pretty strong order, uncontroverted
```

107

BARKLEY
Court Reporters

1    evidence that irrefutably demonstrates, that's the

2    standard that the Ninth Circuit has articulated.

3    And that's a standard on summary judgment, let

4    alone a motion to dismiss.

5         Keeping that in mind, by the way, in

6    Conmar the Court denied summary judgment even

7    though there was the following evidence before it:

8    Evidence that an investigation had been disclosed

9    in major newspapers in the United States -- excuse

10   me, national newspapers and magazines, there was a

11   criminal investigation into defendants' conduct

12   that had been disclosed, there were publicly-filed

13   criminal court documents and guilty pleas by some

14   of the defendants and a prior related lawsuit.

15        The Ninth Circuit says that's not

16   sufficient to establish constructive notice as a

17   matter of law.

18        So compare that to this announcement by

19   the European Commission which the European

20   Commission called a, quote, preliminary step in a

21   foreign investigation into unspecified violations

22   of foreign law against unnamed companies and a

23   press release that stated that, quote, the

24   defendants should not be presumed to have engaged

25   in anticompetitive conduct.

                      108

BARKLEY
Court Reporters

1           So measured as against the standard that

2    the Ninth Circuit has articulated in Conmar,

3    there's no basis to -- on a motion to dismiss --

4    grant dismissal based on the question of

5    constructive notice, which is an intensely,

6    intensely factual question.

7           We cite to a number of cases that are all

8    dispositive.  The next case we cite to is the

9    Petroleum Products Antitrust Litigation case, where

10   the courts said a lawsuit alleging price-fixing in

11   the oil industry, which had been reported in

12   newspapers and trade journals, did not provide

13   constructive notice to plaintiffs who later filed

14   similar claims because the lawsuit, quote, did not

15   irrefutably demonstrate that the plaintiffs, quote,

16   discovered or should have discovered a cause of

17   action and failed to file a timely complaint.

18          And there are a number of cases that we

19   cite reaching the same conclusion.

20          Ultimately the question is:  What did we

21   know and what did we do before November 14, 2007?

22   And the suggestion that somehow we should have

23   learned of this EC announcement and filed suit

24   within that six-day period does not hold water.

25   Because what happened after November 14th, 2007,

BARKLEY
Court Reporters

1    through the date that we filed, November 14, 2011,

2    is irrelevant.  That's the statutory period in

3    which we had the right to bring a claim.

4           With respect to the question of

5    cross-jurisdictional tolling, the issue there is

6    whether the State court would recognize American

7    Pipe tolling in the cross-jurisdictional context,

8    meaning the effect that a Federal class action

9    would have on State law claims, and we cite to

10   various cases under State law where courts have

11   recognized cross-jurisdictional tolling because

12   they have applied it.  I don't think I need to get

13   into detail, but we submit that for that additional

14   reason, the claims were timely.

15          MR. EVERETT:  Sir, if I could just respond

16   very briefly.

17          JUDGE LEGGE:  He was brief; be brief.

18          MR. EVERETT:  I will take him as a model.

19   On the fraudulent concealment point he's, quite

20   frankly, just wrong in terms of -- when he says

21   that it is irrelevant what they did in the four

22   years following November 2007.

23          What fraudulent concealment clearly

24   requires is that the plaintiffs exercise due

25   diligence in seeking to uncover facts that would

110

BARKLEY
Court Reporters

1    allow them to bring a claim.

2              So once there is inquiry notice, once

3    there is some event that should cause them to

4    investigate, the clock starts to run, and the

5    defendants have -- and then they have to establish,

6    in order to rely on fraudulent concealment, that

7    after that date, had they exercised due diligence,

8    they would not have discovered facts that would

9    allow them to bring a complaint.

10             This case is differentiated from the cases

11   that he cited, the Conmar case and the Petroleum

12   Products case.  Because what those cases turned on,

13   if you look at them, is not whether there was some

14   event that should have imposed on the plaintiffs a

15   duty of inquiry, but rather that there was at the

16   summary judgment stage a failure -- there was a

17   fact issue presented as to whether the exercise of

18   due diligence in the period after the statutory

19   limitations period should have started to run would

20   have allowed the plaintiffs to find facts to allow

21   them to bring claims.

22             And that is very different from this case

23   because here we have 36 different complainants,

24   after finding exactly the same facts, were able to

25   investigate and within one year, well within the

                           111

BARKLEY
Court Reporters

1    four-year period, bring their own claims.

2           The second point in relation to that is

3    that some of these plaintiffs, as I mentioned

4    before, claim that these very facts, the media

5    publicity surrounding the coordinated raids and the

6    various filings of complaints in November 2007

7    created notice, and I actually found in my notes

8    the particular complaint citation, so I'd like to

9    give those to you.

10          The CompuCom complaint at Paragraph 216,

11   the Costco complaint at Paragraph 160 and the PC

12   Richard complaint at Paragraphs 220 through 232.

13          JUDGE LEGGE:  Okay.  I will pick them up

14   from the transcript.

15          MR. EVERETT:  Okay.  Again, we are not

16   saying that they had an obligation to file on

17   November 14, 2007.  We are not even saying they had

18   enough facts necessarily as of November 14, 2007,

19   to file, although, again, the Kent complaint

20   suggests that they should have, but rather that

21   before November 14, 2007, there were enough facts

22   available which they cite in some of their own

23   complaints that should have started the clock

24   running, and that, moreover, the undeniable facts

25   demonstrate that, had they exercised due diligence,

112

BARKLEY
Court Reporters

1  they should have been able to bring a complaint in

2  less than four years.

3          JUDGE LEGGE:  Okay.  All right.  What's

4  the next topic for discussion under the State law

5  claims?

6          MR. LAU:  Your Honor, it's going to be due

7  process and prudential standing.  These are related

8  topics.

9          In light of your Honor's earlier comments

10 about not repeating arguments that are simply in

11 the briefs, I think that the written argumentation

12 on prudential standing, which for us is found on

13 Pages 21 and 22 of our motion to dismiss, I think

14 the written submissions are sufficient here, your

15 Honor.

16         JUDGE LEGGE:  All right.  That's pages --

17 give them to me again.

18         MR. LAU:  21 and 22 of the motion to

19 dismiss.

20         JUDGE LEGGE:  Okay.  This is a joint

21 motion to dismiss?

22         MR. LAU:  Correct, your Honor.

23         I think a discussion, however, of due

24 process would be helpful to your Honor.  Let me

25 begin by saying in one sense the direct action

113

HEARING

1    plaintiffs and the defendants agree.  We both agree

2    that the Supreme Court's case in Allstate versus

3    Hague provides the general framework for examining

4    this due process question, and that is this:

5    According to the Allstate case, in order for due

6    process to be satisfied, there has to be

7    significant contacts with, A, the parties and, B,

8    the transaction or occurrence that gives rise to

9    the litigation.  We cite the Allstate case.  The

10   direct action plaintiffs cited the Allstate case.

11   We both agree that's the governing standard.

12        Where we disagree, your Honor, is what

13   does it mean when we identify the transaction or

14   occurrence?  We take the position, your Honor, that

15   you should follow Judge Illston in this regard, who

16   has considered this issue on five separate

17   occasions, most recently in her decision of August

18   2012.

19        And in that decision, your Honor, Judge

20   Illston stated that in order for due process to be

21   satisfied with respect to a specific State law

22   claim, due process is only satisfied in those

23   states where the parties agreed to pay price-fixed

24   goods, agree to pay, that's the standard.  Stated

25   otherwise, where was the merchandise purchased?  So

114

BARKLEY
Court Reporters

1    we think that's the -- those are the types of

2    factors you should apply here.

3         The direct action plaintiffs, your Honor,

4    they take a different view, and their different

5    view is this:  They say, well, due process doesn't

6    require any one set of standards to be governed in

7    every case, rather, it's a flexible standard.  So

8    they cite a number of different cases applying a

9    number of different criteria to determine whether

10   there are significant contacts.

11        However, your Honor, each and every one of

12   the cases relied upon by the direct action

13   plaintiffs in support of this flexible standard are

14   not price-fixing cases.  They are cases that are in

15   an entirely different context.

16        For example, they love the Pecover case,

17   P-e-c-o-v-e-r.  Yes, that arose under the Sherman

18   Act, but that arose under Section 2 of the Sherman

19   Act.

20        The allegation in that complaint was that

21   the defendant engaged in exclusive licensing

22   agreements that resulted in unfair competition.  So

23   in order to determine whether the requirements of

24   due process were met, the Court in that case did

25   not examine where the merchandise was ultimately

115

BARKLEY
Court Reporters

1    purchased, rather, the Court examined where did

2    this exclusive licensing agreement emanate from.

3    And it emanated from California.  So their due

4    process was satisfied with respect to California.

5           How about another case relied upon by the

6    plaintiffs, the Keilholtz case, K-e-i-l-h-o-l-t-z,

7    that's a product liability case, your Honor.  And

8    the Court, to examine whether due process was

9    satisfied, it did not examine where the fireplaces

10   were sold.  It is a product liability case.

11          What's significant, what's of

12   constitutional significance is where the fireplaces

13   were manufactured because it is a product liability

14   case, so where the fireplaces were manufactured,

15   that's the key.

16          And the same for every single case cited

17   by the plaintiffs, the Wang case, deceptive

18   advertising, did the Court care where the solid

19   state drives, where they were sold, no.  The Court

20   cared about where this advertising campaign

21   emanated from.  Again, it emanated from California,

22   so those are the factors the Court considered.

23          All of the cases, your Honor, that are

24   price-fixing cases, they follow the approach taken

25   by Judge Illston and they asked the very crucial

116

BARKLEY
Court Reporters

1    question:  Where did the parties agree to pay?

2    Because that's the injury --

3          JUDGE LEGGE:  Where did they what?

4          MR. LAU:  Where did the plaintiffs agree

5    to pay, in what state.  Because that's the injury

6    they suffer, that's the transaction or occurrence

7    that gives rise to the plaintiffs' litigation here.

8          So we would submit, your Honor, that Judge

9    Illston absolutely got it right on this.  Look to

10   where the plaintiffs agreed to pay, where they

11   purchased the allegedly price-fixed goods.

12         So that's one part of the discussion I

13   think we should have today.

14         Another part of the discussion -- well,

15   let me give you a little guide to help guide us.  I

16   know you indicated the desire to look at charts.  I

17   want to give you one that we included in our brief.

18   This is Appendix C to our motion to dismiss.

19         This will give -- so that you don't have

20   to read every single complaint, this gives you a

21   little guide as to what we are looking at.  You

22   want to take a look at Appendix C.

23         You also want to take a look at our brief,

24   your Honor, at Pages 17 through 20, and there what

25   we do is, for every plaintiff and every

117

BARKLEY
Court Reporters

1    jurisdiction listed on Appendix C, we discuss in a

2    summary format why we believe the allegations are

3    deficient.

4            If you look at Appendix C, the plaintiffs

5    fall into two categories.  The first category are

6    those plaintiffs that don't make any allegations of

7    a purchase whatsoever, and these are very easy to

8    exclude them.

9            So Magnolia Hi-Fi, with respect to

10   Minnesota, there's no allegation at all that

11   Magnolia made a purchase in Minnesota.

12           Costco, with respect to Arizona, Florida

13   and Illinois, there's no allegation that Costco

14   made a purchase in those three states.

15           And the same thing with respect to

16   Polaroid in California.  So these are easy claims

17   for the Court to resolve.

18           What may take a little more thinking, and

19   this is something I want to talk about today, are

20   the other claims raised by the other direct action

21   plaintiffs.

22           They will argue, they allege in their

23   complaints, your Honor, that they made purchases in

24   these specific jurisdictions.  However, the facts

25   that they allege in support of these purchases

118

BARKLEY
Court Reporters

1    simply don't add up to a purchase.

2              Again, this goes back to a theme we have

3    heard a few different times today, and that is the

4    continued importance of Bell Atlantic versus

5    Twombly.  Now, it is insufficient for plaintiffs to

6    make conclusionary allegations.  They must include

7    sufficient facts to make each and every one of

8    their claims plausible.

9              And for these plaintiffs, your Honor, that

10   are alleging a purchase, the facts in support of

11   that allegation are implausible, and I want to

12   explain why.

13             Let's take the first example of Circuit

14   City.  And if we look at Page 18 of the brief, we

15   summarize the Circuit City allegations in support

16   of why they believe that they made a purchase in

17   California.  Circuit City alleges that it received

18   shipments of and took title to products at

19   distribution centers in California.

20             Circuit City alleges that it sent purchase

21   orders and payments for products to California,

22   that their inventory's in California, that it sold

23   products to consumers in California and that it

24   maintained agents and representatives in

25   California.

                          119

BARKLEY
Court Reporters

1            Your Honor, these facts don't add up to a

2    purchase.  They simply don't.  What we need to find

3    out is where did the parties negotiate the

4    purchase.

5            Some of the factors that Judge Illston

6    said were dispositive in their totality would be

7    if -- where did the plaintiff receive invoices, in

8    what states did the plaintiff issue purchase orders

9    from, not where it sent to, where were the purchase

10   orders sent from?  In some instances she said, "All

11   right.  Combining those factors, where was the

12   plaintiffs' headquarters?  Take that into

13   consideration as well."

14           But these other factors, such as shipments

15   to jurisdictions, the fact that inventories were

16   held in certain jurisdictions, those are simply

17   insufficient from a due process perspective to

18   indicate that a purchase occurred in any of these

19   jurisdictions that we list.

20           I think that the plaintiffs -- and I give

21   them credit, they do recognize the existence of

22   Judge Illston's decisions in their brief.  They

23   recognize that Judge Illston has ruled against them

24   in terms of where parties have taken title, where

25   the defendants have had activities.

120

BARKLEY
Court Reporters

1          They even go so far on Page 23 of their

2     brief to include the following admission:

3               "In antitrust cases involving

4               individuals purchasing consumer

5               products, courts often focus their

6               analysis on where the purchase was

7               made."

8          So I give them credit for that.  I think

9     they understand that they really are swimming up

10    the stream on this issue.

11         And rather than go through complaint by

12    complaint, I think that hopefully this discussion

13    gives the Court enough guidance to look to the

14    briefs, particularly Pages 17 through 19 of our

15    brief, and the Court can see for itself how the

16    plaintiffs have failed to sufficiently allege a

17    purchase in these specific jurisdictions.

18              JUDGE LEGGE:  Thank you.

19              MR. LAU:  Thank you.

20              JUDGE LEGGE:  Counsel for plaintiffs?

21              MR. LOCKHART:  Yes, your Honor.  James

22    Lockhart speaking on behalf of the plaintiffs.

23         I think what your Honor will realize is

24    that the issues have clearly been joined.  Each of

25    the parties has adequately pled the State law that

121

BARKLEY
Court Reporters

1    they rely upon as a basis for their claims and

2    sufficient facts underlying those claims for

3    purposes of constitutional due process concerns,

4    which at this stage of the litigation is a pretty

5    minimal analysis.

6         The defendants know which state's law we

7    are relying upon, and it's really going to be a

8    discovery issue from here on out to ferret out

9    these additional facts that counsel for the

10   defendants is seeking.  These are not pleading

11   issues, per se.

12        We agree that the decision by the United

13   States Supreme Court in Allstate v. Hague lays out

14   what is constitutionally required, and that is as

15   stated, that the Court examines the context of the

16   state whose law is to be applied with the parties

17   involved in the case and with the transaction or

18   occurrence giving rise to the claim.

19        Well, in this case we have got both

20   transactions at issues, purchases of price-fixed

21   products, but we also have a conspiracy and acts in

22   furtherance of a conspiracy that are relevant to

23   this determination and which have been pled in the

24   complaint.

25        And that goes specifically -- I think

                         122

BARKLEY
Court Reporters

1    every party has alleged claims under California law

2    based upon the fact that there were acts in

3    furtherance of the conspiracy, which occurred here

4    in this state.

5         And so for purposes of all of -- each

6    party's allegations about California, yes, the

7    occurrence, which gives rise to the claims, the

8    antitrust conspiracy among the defendants is surely

9    a pertinent consideration.

10        I think that what the defendants -- and

11   perhaps the criticism we would have of Judge

12   Illston's decision is that she takes the focus and

13   really conflates the consideration of

14   constitutional due process issues with choice of

15   law issues, which the Court will have to decide

16   down the road.

17        As we argued in our brief, and I am not

18   going to repeat it in detail, under the

19   circumstances here, there may be multiple states'

20   laws that have application to the claims of

21   individual plaintiffs.

22        These are large companies that purchased

23   in various locations, and it's going to be

24   determined later which state's law is going to

25   apply to a particular claim or particular parts of

123

HEARING

BARKLEY
Court Reporters

1    the claim and that will likely come forward either

2    at the summary judgment stage or certainly at

3    trial, but it doesn't make the complaints that have

4    been well pled by the plaintiffs inappropriate or

5    insufficient in any respect.

6          And counsel for the defendants rested on

7    their brief with respect to prudential standing,

8    but that really is that same issue, fact-intensive

9    analysis that will come later as to which

10   individual state's law is going to apply to

11   individual purchasers or which parts of those

12   individual purchasers' claims.

13         Again, we pled enough certainly to be

14   constitutionally sufficient from a due process

15   perspective, and the balance will be decided down

16   the road based upon the discovery that the parties

17   take.

18         Thank you, your Honor.

19         JUDGE LEGGE:  Anything further?

20         MR. LAU:  Yes.  My colleague Mr. Lockhart

21   made two arguments I'd like to respond to.

22         Mr. Lockhart would like the Court to

23   believe this is a discovery issue that should be

24   punted down the road and resolved later.  I

25   disagree.

124

BARKLEY
Court Reporters

1      A due process challenge like this is

2  particularly well suited for a motion to dismiss.

3  Why?  Because all of the DAPs, they have all of the

4  facts in their possession to plead where they made

5  the purchase.  Circuit City knows where it

6  negotiated the purchase price for all of the sales

7  and so do the rest of the DAPs.

8      This is not a discovery issue, your Honor.

9  This is an issue where the plaintiffs have all the

10  necessary facts within their possession.  That's

11  point one.

12      Point two, Mr. Lockhart made mention of

13  the fact that the Court should consider acts in

14  furtherance of the conspiracy for purposes of

15  determining whether due process has been satisfied,

16  particularly with respect to California.

17      I disagree with that argument because

18  that's not the standard.  The DAPs cite no case

19  where Courts have utilized facts in furtherance of

20  the conspiracy in a due process context.  Certainly

21  we are not aware of any.

22      Again, go back to Judge Illston's reasoned

23  analysis, the transaction or occurrence that gives

24  rise to the plaintiffs' injury in this case is the

25  price they paid.  That's the transaction or

125

BARKLEY
Court Reporters

1    occurrence of constitutional moment, your Honor,

2    and that's what the Court should focus on.

3           Thank you.

4           JUDGE LEGGE:  Thank you.

5           MR. LOCKHART:  Can I briefly respond on

6    that last point?

7           JUDGE LEGGE:  Certainly.

8           MR. LOCKHART:  There have been multiple

9    cases that look at conduct of the defendants, both

10   in the context of antitrust cases and other cases.

11   The Pecover case, which counsel noted, is one of

12   those.  SRAM would be one of those.  Also Sullivan

13   v. Oracle, Sutcliffe v. Wells Fargo and the Wang

14   case, all of which are cited in our brief.

15          Not price-fixing, some of those are not

16   price-fixing cases, but they focus on the conduct

17   of the party that is at issue in the case.  And the

18   conduct of the defendants here in California in

19   furtherance of the conspiracy surely are at issue

20   and well pled in the complaint.

21          We will provide another chart, your Honor,

22   as we indicated we would, that will further detail

23   the factual allegations in the complaint and

24   present them to you in a fashion that's a little

25   more easily digested than the footnotes that we

126

BARKLEY
Court Reporters

1    cited to in our brief.

2              JUDGE LEGGE:  Okay.  Appreciate it.

3              MR. KAO:  Your Honor, if I may just raise

4    one point that I literally was just advised of, is

5    that the Ninth Circuit just issued an opinion today

6    reversing one of Judge Illston's orders dismissing

7    the California State law claims based on due

8    process grounds.  And I admit I haven't read the

9    whole opinion, but one piece of the opinion

10   states --

11             JUDGE LEGGE:  Wait a minute.  You sure it

12   is in the same case?

13             MR. KAO:  In the LCD case, yes.

14             JUDGE LEGGE:  Ninth Circuit has made a

15   ruling?

16             MR. KAO:  Yes, today.  And one piece of

17   it, the Ninth Circuit states:

18                  "To the extent a defendant's

19                  conspiratorial conduct is sufficiently

20                  connected to California and is not

21                  slight and casual, the application of

22                  California law to that conduct is

23                  neither arbitrary nor fundamentally

24                  unfair and the application of

25                  California law does not violate that

                           127

BARKLEY
Court Reporters

1            defendant's rights under the due

2            process clause."

3        I think that relates to that last issue.

4            MR. KESSLER:  I suggest, your Honor, that

5    none of us have seen that case.  If it is

6    appropriate, we will file a submission on that.  I

7    would note generally there are no such allegations

8    in any of these complaints that would meet Twombly

9    concerning California.

10           But having said that, I think it is an

11   issue that we should brief.  I don't know what

12   allegations there were in that other case, but

13   there are no such allegations here that would meet

14   Twombly.

15           JUDGE LEGGE:  Well, you should send me a

16   copy, and when you do, a two-page letter regarding

17   how that applies to this case -- these cases, I

18   should say, how that applies to these direct action

19   complaints.

20           All right.  What was the third subject

21   matter?

22           MR. KESSLER:  I think the next one, your

23   Honor, is mine, which is AGC, and I will try to be

24   brief and focused on this, given your Honor's

25   direction and the timing.

                        128

BARKLEY
Court Reporters

1           Your Honor, we have directed our AGC

2    arguments now to five states.  Those five states

3    are California and Washington, Illinois, Michigan

4    and Arizona.  So we have taken a targeted

5    approach --

6           JUDGE LEGGE:  California and Washington

7    and Illinois and?

8           MR. KESSLER:  And Arizona.  We have taken

9    a targeted approach, not a blunderbuss approach.

10   There's been some discussion in the case law not to

11   just argue across, but to focus on the specific

12   states.

13          California and Washington are conceded to

14   apply AGC.  So we have no dispute about its

15   application there.  Plaintiffs, in their brief, can

16   see that it applies.

17          With respect to Illinois, Michigan and

18   Arizona, we have cited either intermediate

19   appellate authority from those states or State

20   statutory enactments requiring harmonization

21   between State and Federal antitrust principles that

22   we believe establish that AGC would apply, a very

23   similar analysis to what Judge Hamilton did in the

24   DRAM case.

25          In fact, two of the states in which this

129

BARKLEY
Court Reporters

1   was applied in DRAM were Michigan and Arizona.

2   Illinois was not an issue with DRAM, and we believe

3   that the AGC factors do apply in those five states.

4          So I am going to move on now, assuming

5   that your Honor will conclude that AGC applies to

6   those five states and then the question becomes:

7   Have they satisfied the AGC standard?

8          And as a prerequisite, let me say it is

9   well-established in the case law that AGC is

10  independent of the issue of states allowing

11  indirect purchaser cases.  Plaintiffs tried to make

12  the argument, well, if the state is already allowed

13  for indirect purchaser cases, that must mean that

14  they have standing.  But that's not what it means.

15         It was the fact that, for example,

16  California specifically allows for AGC separately,

17  and Washington, and plaintiffs concede that shows

18  there's no necessary satisfaction of AGC by the

19  fact that indirect purchasers are allowed.

20         It is a separate prudential standing

21  doctrine developed by the Supreme Court and applied

22  by many states which has to do with the zone of

23  cases that should be allowed from a standing

24  matter.  So why does AGC -- why isn't that

25  satisfied here?

                           130

BARKLEY
Court Reporters

1        First, and most importantly, it's not

2    satisfied because of the most important AGC factor,

3    which is the requirement that you purchase the

4    product and suffer your antitrust injury in this

5    same relevant market, and that cannot be satisfied

6    here.

7        Why?  Because the products here are

8    completely different.  So this is not the usual AGC

9    argument, where it's the same product just being

10   sold at two different levels and you get into an

11   argument as to whether or not there's a sufficient

12   linkage between the two levels of the market,

13   wholesaler, retailer, manufacturer, et cetera.

14        These are two fundamentally different

15   products.  There's no disputes that televisions are

16   not interchangeable with CRTs, that computer

17   monitors are not interchangeable with CDTs.  They

18   are sold in different channels.  They have

19   completely different prices.

20        They have different market demands, and in

21   fact, they will vary depending on the market

22   factors as to what sizes are involved, many other

23   factors, because you could have some size

24   televisions competing with plasma televisions and

25   other sizes competing with LCD televisions, many

131

HEARING

BARKLEY
Court Reporters

1    other factors, so that what this does is we are in

2    the wrong antitrust market.

3            That same factor of difference creates

4    incredible complexity in trying to prove the injury

5    because it's a different product in a different

6    market.  It also fails the issue of how direct the

7    causation could be in these markets.

8            When you look at all these prudential AGC

9    factors, they all add up to a conclusion that when

10   you're dealing with a separate finished product in

11   which the component is only a small piece of the

12   demand of that product, it's only a contributing

13   piece.  Where AGC applies, that's going to be a

14   separate barrier to doing that, again, because the

15   injuries are too remote, they are too speculative,

16   they are too difficult to account for, and they

17   also have the potential for duplication.

18           We believe applying those factors in all

19   the cases, this would not be a case where AGC will

20   allow standing as a matter of prudence, and it's to

21   spare the parties and the Courts from the endless

22   debates that there were going to be trying to trace

23   this remote causation to different levels of the

24   distribution channel.

25           Remember, this is -- we are talking State

132

BARKLEY
Court Reporters

1   now, this is not products, as was discussed, that

2   are sold by related parties and control.  This is

3   not the Illinois Brick issue.

4           In the State actions, as you heard, they

5   are specifically seeking, for example, to claim

6   standing if they purchased a computer from

7   Hewlett-Packard or Dell, completely unrelated or a

8   television from Sharp, completely unrelated to any

9   of the defendants, they want to claim standing

10  under AGC to sue for a CRT conspiracy in which HP

11  and Dell and Sharp had no connection.  That's

12  exactly where the AGC factors mostly come in.  It's

13  too remote.  It's unrelated.

14          So, your Honor, I think this is all

15  spelled out very well in our briefs.  Unless you

16  have any further questions about it, I think I have

17  sufficiently focused our argument.

18          But the significance here is the different

19  products with unrelated parties that really we

20  believe dooms this standing under AGC.

21          JUDGE LEGGE:  Plaintiffs?

22          MR. MARTINEZ:  Yes, your Honor.  We

23  concede that the AGC applies to the California and

24  Washington claims.  We don't concede that it

25  applies to the Arizona, Michigan and Illinois

133

BARKLEY
Court Reporters

1    claims, your Honor, and Judge Conti has already

2    decided it doesn't apply to Arizona and Michigan.

3    The Court did not address Illinois previously, but

4    our position is that there is no clear directive

5    from Illinois such that AGC should apply.

6              As to the AGC factors themselves, again,

7    there's a binding decision by your Honor and by

8    Judge Conti.  It was in the indirect purchaser

9    plaintiff case.  The arguments that we heard from

10   Mr. Kessler were all set forth in the papers then,

11   and during argumentation then, and they were

12   rejected and should be rejected here.

13             Your Honor, in fact, we are one link up in

14   the distribution chain from the indirect purchaser

15   plaintiffs.  Those were the consumers.  So they are

16   more remotely situated than we are, and the Court

17   found that there was sufficient allegations to

18   establish standing.  Our allegations are negotiable

19   from those and, therefore, we have properly pled

20   facts establishing standing here.

21             Thank you.

22             MR. KESSLER:  Your Honor, just very

23   briefly in reply, I think the only thing I have to

24   reply to is in reference to your Honor's decision

25   and Judge Conti's adaptation of that.  The simple

BARKLEY
Court Reporters

1  answer is at the time of your Honor's decision,

2  there was a claim of a finished products

3  conspiracy.  Your Honor's very well aware of that.

4          That completely eliminated the argument

5  about it being in a different market because the

6  argument was it was in the same market and,

7  therefore, we did not have available to us the AGC

8  argument that I am making right now.

9          So I believe you have not looked at this

10 issue before, and Judge Conti has not looked at

11 this issue before in the context of what happens

12 when it is only a CRT conspiracy when we are

13 talking about unrelated purchases from unrelated

14 companies in a very different market, and that's

15 the issue we would like to focus on.

16         I think if you go back and look at your

17 previous ruling, and you will understand that this

18 was not an issue that was really before you because

19 they are very difficult allegations.

20         In fact, the reason we made the argument,

21 you recall, was it wasn't even clear during the

22 argument what they were alleging or not, and it had

23 only come up during the oral arguments that they

24 said, "Oh, no, we are alleging it for finished

25 products also," and that changed the whole nature

135

BARKLEY
Court Reporters

1    of what the Court was deciding then.  We are in a

2    very, very different posture today.

3           I would also suggest you have not

4    conclusively decided the issues with respect to

5    those states.  Again, I think we have now cited

6    authority which clearly would indicate that AGC

7    does apply in all five of these states.

8           So unless your Honor has questions, I

9    think that's all I have to say.

10          MR. MARTINEZ:  Just a brief response, if I

11   may.  I agree with Mr. Kessler that your Honor

12   should go back and review your opinion and Judge

13   Conti's opinion because we think you'll find that

14   it is dispositive.

15          The Court's analysis talks about CRT

16   panels, CRTs themselves.  In fact, here's what the

17   Court says furthermore -- this is Page 1022,

18   quote --

19          JUDGE LEGGE:  1022 of what?

20          MR. MARTINEZ:  1022 of the CRT decision by

21   Judge Conti dated March 30th, 2010.  It is 738

22   F.Supp.2d 1011 and 1022, where the Court talks

23   about CRTs and says:

24              "Furthermore, Courts have found

25               antitrust standing where plaintiffs

136

HEARING

1              purchase downstream goods from

2              manufacturers who made and allegedly

3              fixed the price of a component of

4              those goods."

5         So the focus of the Court's opinion was on

6    CRTs, not the product, and then the Court goes into

7    detail about CRT product and the CRT -- in the CRT

8    markets and talks about the allegations that those

9    two markets are inextricably intertwined and linked

10   and cannot be considered separately.

11        No mention here at all about the decision

12   being premised on an allegation of a price-fixing

13   conspiracy as to CRT products.

14        Thank you.

15        JUDGE LEGGE:  All right.  Anything else

16   anybody wants to present on the subject of the

17   State law claims?

18        MR. KESSLER:  I just, again, would urge

19   your Honor to read the portion of the opinion after

20   that and you will notice many allegations at the

21   time by the indirect purchasers that are not made

22   in any of the complaints here, so we do think it is

23   a fresh look, your Honor.

24        That's all I would say.

25        MR. TALADAY:  Your Honor, without making

                        137

BARKLEY
Court Reporters

1    any argumentation on the merits, I just wanted to

2    note with respect to the individual Philips motion

3    that LG has also joined, that if your Honor accepts

4    the withdrawal date of March 2007, as we mentioned,

5    virtually all of the DAP's State claims are

6    eliminated on a statute of limitations basis.

7    That's in our chart.

8            MR. MARTINEZ:  I'd like to respond to

9    that, if I may.

10           JUDGE LEGGE:  Just one second.  Did you

11   say it eliminates all or almost all?

12           MR. TALADAY:  It is all but two, your

13   Honor, all but the Electrograph claims and the

14   Target Wisconsin claim.  And that's evident in our

15   chart with the lines.

16           JUDGE LEGGE:  All right.  Yes, go ahead.

17           MR. MARTINEZ:  Simply to say that even if

18   your Honor accepts that there was a withdrawal by

19   Philips and LG in March of 2007, that's completely

20   irrelevant to the issue of whether the statute of

21   limitations began to run, given the allegations of

22   fraudulent concealment, that's the In Re: Rubber

23   Chemicals case that I referenced earlier, that says

24   precisely what I just said.

25           There's no triggering of the statute of

138

BARKLEY
Court Reporters

```
 1   limitations either on allegations of fraudulent

 2   concealment.  A defendant can withdraw on year one

 3   and still be liable for its participation in the

 4   conspiracy even if a claim is brought ten years

 5   later, so long as a conspiracy was concealed, which

 6   is precisely what we allege here.

 7            JUDGE LEGGE:  Anything else on State law

 8   claims?

 9            MR. BRADSHAW:  Your Honor, there are a

10   handful of State law-specific claims.  I would just

11   refer your Honor to the briefing with respect to

12   Massachusetts, your Honor, and your Honor's two

13   previous orders with respect to Massachusetts, but

14   that's laid out in our briefing.

15            That relates to the demand letter

16   requirement, which your Honor is quickly becoming

17   an expert in, having granted two orders on that

18   issue.

19            With respect to Nebraska and Nevada,

20   again, your Honor has already determined the

21   retroactivity, the retroactive application, and we

22   just refer your Honor to the briefing.

23            With respect to Washington, your Honor,

24   again, we just refer to the briefing with one

25   point, which is the plaintiffs, with respect to
```

BARKLEY
Court Reporters

1    Washington, concede that there is an Illinois Brick

2    bar, but they somehow argue that the presence of

3    the Attorney General action somehow enables them an

4    end-run around the Illinois Brick bar.

5            There's no case that they cite.  It's

6    never been determined.  Quite frankly, it is

7    nonsensical, and it's also the case that the

8    Washington State Attorney General action includes

9    different defendants.

10           My client, SEC, is not named as a

11   defendant in any of the -- with one exception, any

12   of the State AG actions, and that's because SEC is

13   only a purchaser of CRTs.

14           So we would just make those points, your

15   Honor, and refer your Honor to the briefing.

16           JUDGE LEGGE:  Okay.  Do you have any

17   verbal response?

18           MR. MURRAY:  Your Honor, if I may be heard

19   on the Nevada and the Nebraska claim.

20           JUDGE LEGGE:  Any reply?

21           MR. NIKAS:  I do, your Honor, I would like

22   to address the Massachusetts demand letter briefly.

23   It is set forth in plaintiffs' brief at Page 34 and

24   35.  I would like to very briefly respond to

25   defendants' point that this has been resolved.

BARKLEY
Court Reporters

1          If you go to Docket 597, Crego, go to

2    Docket 768, a later recommendation with respect to

3    the IPP actions, neither of those plaintiffs,

4    neither of those recommendations addressed the

5    decisions in the Burns case, 2006 District of

6    Massachusetts decision, nor the McKensi case, which

7    was also a District of Massachusetts decision,

8    which was decided in 2010, just before the second

9    recommendation was issued.

10          In both of those cases, the Courts held

11   that failure to wait 30 days before filing a

12   complaint is not a sufficient basis for dismissal

13   with prejudice, and in both instances allowed the

14   plaintiffs to cure any perceived defect with

15   respect to a failure to comply.

16          The second order, that's the 768 docket

17   number that your Honor issued, relied exclusively

18   on the Kamamara case, that's the case in which the

19   plaintiff made no claim to have sent a demand

20   letter, and in fact, had sent a letter to the

21   defendants expressly stating that he had no

22   intention of ever filing a 93A claim under

23   Massachusetts law.

24          And similarly, in the Crego decision, 597,

25   again, the plaintiff made no effort to demonstrate

141

BARKLEY
Court Reporters

1    that he sent a demand letter.

2          So we have submitted, attached to the

3    declaration of Philip Iovieno, all of the demand

4    letters served upon the defendants in November 2011

5    when the complaint was filed.  We submit that that

6    was sufficient to satisfy the demand letter

7    requirement, and to the extent your Honor says

8    otherwise, we request leave to plead to allege

9    having sent those demand letters.

10         MR. BRADSHAW:  Your Honor, I am compelled

11   to respond.  The demand letter was sent not 30 days

12   prior, but on the day that Tweeter filed a

13   complaint.

14         In your prior order with respect to the

15   indirect purchasers who filed their demand letter

16   three days before the complaint, your Honor held

17   that it's not up to the plaintiffs or your Honor to

18   decide what satisfies the statute.  The statute

19   requires that the demand letter be sent 30 days

20   before.

21         They sent the demand letter, only Tweeter,

22   excuse me, the other DAPs did not.  So we are only

23   talking about one demand letter, and it was sent on

24   the same day they filed the complaint.

25         Your Honor has already rejected that

                        142

HEARING

BARKLEY
Court Reporters

1    argument, and I would refer your Honor to your

2    September 30th, 2010, order.

3            Your Honor, with respect to the cases they

4    cite, they are all distinguishable.  The Burns

5    case, the plaintiffs filed an amended complaint.

6    That's the reason why.  That's the reason why the

7    Court permitted the claim to proceed, because they

8    filed an amended complaint.

9            In the McKensi case that counsel mentions,

10   the reason that the Court allowed that is because

11   the plaintiffs needed to file the complaint to

12   obtain a TRO.  There were extraordinary

13   circumstances.  They filed to get a TRO, and so

14   they couldn't wait the 30 days.

15           Those cases are distinguishable, your

16   Honor.  Your Honor has already held that it is not

17   up to the Court to modify the statute.  The statute

18   requires that a demand letter be sent 30 days

19   before the plaintiffs filed.  The plaintiffs -- and

20   only one of them even attempted to do it, but the

21   DAPs did not satisfy the statute.

22           JUDGE LEGGE:  All right.  Anything else

23   further on the State law claims?

24           MR. LAU:  Yes, your Honor.  We have in our

25   motion to dismiss a section of the brief discussing

BARKLEY
Court Reporters

1    unjust enrichment and restitution and California's

2    unfair competition law.  I think for the most part

3    we can rely upon the briefs.

4           There's one point I'd like to make, and

5    that's with respect to Circuit City.  Circuit City

6    attempts to assert causes of action for stand-alone

7    unjust enrichment and for restitution under

8    California law.

9           Quite simply, your Honor, there are two

10   lines of cases in California.  We believe the

11   majority rule is that there is no stand-alone cause

12   of action for either unjust enrichment or

13   restitution under California law.

14          Judge Illston disagrees with that and has

15   allowed stand-alone claims for unjust enrichment

16   restitution to proceed in the LCD case.

17          You don't have to decide what the majority

18   rule or minority rule is, your Honor.  Rather, we

19   would invite you to look at Judge Conti's decision

20   in the Rhynes case cited in our brief, R-h-y-n-e-s,

21   that's May 31st, 2001, and there Judge Conti

22   stated --

23          JUDGE LEGGE:  Sorry.  Slow down.  Give me

24   the case cite again.

25          MR. LAU:  The actual case cite is -- I

144

BARKLEY
Court Reporters

1   just have a Westlaw cite, 2011 Westlaw 214 --

2             JUDGE LEGGE:  Wait a minute.

3             MR. LAU:  2011 Westlaw 2149095, May 31st,

4   2011.

5             JUDGE LEGGE:  Okay.

6             MR. LAU:  And there Judge Conti refused to

7   allow equitable claims of relief to proceed,

8   holding that equitable relief is unavailable where

9   other claims may provide adequate legal remedy.

10  And so, your Honor, I think that's an accepted

11  principle.

12            Looking at other parts of Circuit City's

13  complaint, they do assert statutory claims that

14  would provide an adequate legal remedy.  So there

15  is no need for the Court to allow equitable claims

16  to proceed.

17            So we think that Judge Conti's decision in

18  the Rhynes case is a simple way to resolve that

19  issue.

20            And for the rest of the issues, we'll rest

21  on our briefs.

22            MS. MOORE:  Your Honor, I would like to be

23  heard on the -- one minor point of Washington.

24            MR. PETERSON:  I was going to respond to

25  that in California.

HEARING

BARKLEY
Court Reporters

1              MS. MOORE:  I was going to say we are the

2      only plaintiff to assert under Washington.

3              MR. PETERSON:  Just to respond very

4      briefly, for California, if you look at Judge

5      Illston's September 15, 2011, opinion in LCD, she

6      does a great job in analyzing and explaining that

7      it appears that there's a split of case law.  It is

8      merely a question of form over substance and how to

9      label this claim, which she analyzes and allows it

10     to go forward for Circuit City --

11             JUDGE LEGGE:  The cite?

12             MR. PETERSON:  2011 Westlaw 4345435.  This

13     is also on Pages 37 to 39 of our brief.

14             And to respond to his argument about

15     equity versus legal remedy, I would turn your

16     Honor's attention, rather than looking to a general

17     principle, Judge Wilken has already decided this in

18     the Keilholtz case.

19             A specific issue of whether a claim for

20     restitution or unjust enrichment should be allowed

21     to proceed at the same time is an unfair

22     competition law claim under California law at a

23     motion to dismiss stage, and she held that it is

24     inappropriate at the early stage to determine

25     whether any other remedies available are adequate.

146

BARKLEY
Court Reporters

1                 JUDGE LEGGE:  Yes, ma'am.

2                 MS. MOORE:  Washington.  Counsel is

3      correct, that as to private plaintiffs under

4      Washington law, Washington is not an Illinois Brick

5      repealer state.  However, Washington law does allow

6      the Attorney General to bring indirect claims, and

7      the Attorney General has, in fact, filed such a

8      claim in the state of Washington and counsel

9      acknowledged that.

10                Washington law also provides that in the

11     context of the AG case, the parens patriae case,

12     the Court may restore to any person an interest,

13     including those specifically who purchased goods

14     directly from the defendants or indirectly for

15     resellers to award damages.

16                And it's Costco's position as to its State

17     claim that it does have an ability to recover for

18     its indirect purchases as a resident of the state

19     of Washington, a person residing in the state of

20     Washington, through that case, and that any

21     decision your Honor would make should preserve

22     Costco's ability to do so.

23                JUDGE LEGGE:  Because you are a Washington

24     resident?

25                MS. MOORE:  We are.  That would be under

147

BARKLEY
Court Reporters

1    RCW 1986-080, Subsection 13 -- Subsection 3, excuse

2    me.

3           MR. MURRAY:  Your Honor, if I may be heard

4    on behalf of Sears and K-Mart plaintiffs, the

5    Nevada and Nebraska statute.

6           JUDGE LEGGE:  All right.

7           MR. MURRAY:  The argument that has been

8    made is essentially that these repealer statutes or

9    repealer amendments create a new but only

10   prospective right to indirect purchasers in those

11   states.

12          If you look at the case law in those

13   states, both courts in Nevada and Nebraska have

14   held that the repealer amendment did not change

15   substantive law but clarified existing law.  Cited

16   in the brief in the Nevada case, we asked your

17   Honor to look at the Pooler v. R.J. Reynolds

18   Tobacco case and with respect to Nebraska, the

19   Nebraska Supreme Court case of Arthur versus

20   Microsoft.

21          JUDGE LEGGE:  Who?

22          MR. MURRAY:  Arthur, A-r-t-h-u-r, they are

23   cited at Pages 39 and 40 of the opposing

24   memorandum.  But more importantly than both of

25   those State law cases, courts in the Northern

148

BARKLEY
Court Reporters

1    District of California have affirmed that principle

2    that these are clarifications, not changes in

3    substantive --

4              JUDGE LEGGE:  The statutes were

5    clarification?

6              MR. MURRAY:  Yes.  I'm sorry, the statutes

7    were clarification, and have permitted indirect

8    purchaser claims.  And both of those decisions, one

9    by Judge Wilken and the other by Judge Illston,

10   have been issued after Judge Conti's decision in

11   this case where he did limit the indirect purchaser

12   claims.

13             And for the decision with respect to

14   Nebraska, I would ask your Honor to look at Judge

15   Illston's decision in the LCD case that was issued

16   in August of 2011.  That's also cited in the brief.

17             With respect to the Nevada statute, I'd

18   ask your Honor to look at Judge Wilken's decision

19   in the Static Random Access Memory case that was

20   issued in December of 2010, both cited in the

21   brief, where they allowed indirect purchaser claims

22   prior to the enactment of the repealer offenders.

23             Just one more point, your Honor, to be

24   brief, both of these statutes, and I have copies

25   which I will provide to the Court, reflect the

149

BARKLEY
Court Reporters

1    amendments that contain the words "directly" or

2    "indirectly."  That's the only substantive change

3    in the statute.

4         This provision only makes sense if it's a

5    clarification and not a change in substantive law

6    because there would be no reason to put "directly"

7    into the statute.  That right always existed before

8    or after this repealer thing.

9         The only way that you can read this so

10   that all the words in the amendment make sense, and

11   it's consistent with the general rules of

12   construction that words be given their plain

13   meaning and that no terms should be meaningless, is

14   to view it as a clarification of existing law and

15   not the creation of a new and substantive right on

16   behalf of indirect purchasers.

17        And I'll pass out to your Honor the

18   amendments, and they are marked here where the

19   words "directly" and "indirectly" are inserted, and

20   I do have one copy for defendants which I will

21   share with them.

22        The point here is that you can only view

23   this as a clarification, which is consistent with

24   rulings by State courts in both of those states and

25   consistent with the opinions of Judge Wilken and

HEARING

BARKLEY
Court Reporters

1    Illston, who issued those opinions after Judge

2    Conti in this case.

3         I hope I haven't taken up too much time on

4    this point, but I thank you, your Honor, for your

5    patience.

6         MR. BRADSHAW:  Your Honor, we address

7    those cases in our briefing.  So again, I would

8    refer your Honor there.

9         Where we do agree is that Courts in this

10   district have addressed this issue, the Court being

11   your Honor.  You have already addressed these same

12   arguments, the exact same arguments were previously

13   raised and your Honor rejected them.  And I would

14   refer your Honor to the February 5th, 2010, order.

15   The arguments regarding --

16        JUDGE LEGGE:  Sorry.

17        MR. BRADSHAW:  Your order from February

18   5th, 2010, with respect to the retroactivity of

19   Nebraska and Nevada.  These exact same arguments

20   were presented to yourself and your Honor ruled on

21   them.

22        Thank you, your Honor.

23        JUDGE LEGGE:  All right.  Anything further

24   on State law?

25        All right.  Now, what do you expect from

BARKLEY
Court Reporters

1   me, what do we expect to do here?  I am

2   particularly concerned about time.  It doesn't

3   strike me that what I would do or not do here would

4   terribly interfere with any of the proceedings that

5   are still going on, that is, the discovery, the

6   deadlines you have got to meet.

7          I don't mean to imply that I am going to

8   drag my feet on this, but it is quite an

9   organizational problem for one person without law

10   clerks to pull these things together and go back

11   over what I had done before, not done before or

12   what Judge Conti's done and has not done and

13   address all the things that have been addressed.

14          I think what you would normally expect

15   from a Court would be a decision that addresses

16   both Federal and State.  And when it comes to the

17   State, we, of course, have to break it down into a

18   lot of different categories, and it means, I think,

19   a lot of new reading for me because I have not, as

20   I said, been confronted with the direct action

21   plaintiffs' complaints before, so this is going to

22   take a little time.

23          What about your schedule, is any of this

24   going to impact your schedule?  You are going to

25   want to know who is in or out and what cause of

152

BARKLEY
Court Reporters

1   action, I realize that.  But it seems to me the

2   next time that we would get to that, unless I just

3   give a complete dismissal to some defendants, or

4   recommend it, I should say, the next time you are

5   going to be concerned about this is probably the

6   motion for summary judgment stage.  Am I wrong?

7          MR. KESSLER:  Your Honor, I would say

8   because of the fact that on this motion there's no

9   longer a prospect of the Federal claims being

10  dismissed in their entirety, therefore, there's

11  nothing in this motion that has the potential by

12  itself to eliminate the entire complaint.

13         So therefore, since the conspiracy is the

14  same alleged no matter what claim is left, then I

15  don't think there's anything here that would impact

16  the schedule of going forward with the cases and

17  that you're right, it would have to be some

18  subsequent motion, I don't know if it is summary

19  judgment or some other type of motion on something

20  else, if there was going to be an elimination.

21         So I believe, at least from the

22  defendants' standpoint, we want you to take your

23  time to get this right, but we also want to keep on

24  schedule with everybody proceeding together,

25  because it becomes very costly and inefficient to

153

HEARING

BARKLEY
Court Reporters

 1  do anything else.

 2          We might have felt differently had Judge

 3  Conti come out differently on the Illinois Brick

 4  issue.  Absent that, this is the only --

 5          MR. BRADSHAW:  The only caveat, which I

 6  think you recognize, is that there are certain

 7  defendants that have filed their own separate

 8  motions.

 9          JUDGE LEGGE:  You want to know whether you

10  are in or out.

11          MR. BRADSHAW:  Whether we need to spend

12  resources to conduct specific discovery with the

13  DAPs.

14          MR. HWANG:  Your Honor, in addition to

15  echoing Mr. Bradshaw's comments, I guess my only

16  other concern is:  The contours of what claims are

17  left will actually have an impact on what discovery

18  we do as opposed to the DAPs, although I agree with

19  Mr. Kessler that the conspiracy discovery is

20  unaffected.

21          JUDGE LEGGE:  I don't want to be ominous

22  about this and have you think that it is going to

23  be on the shelf for three or four months.  It is

24  not going to be anything like that.

25          MR. McGINNIS:  I don't think I heard your

BARKLEY
Court Reporters

1   Honor tell us when you wanted the two-page letter
2   about the new case.
3          JUDGE LEGGE:  That's the Ninth Circuit
4   regarding one of Judge Illston's decisions.
5          MR. McGINNIS:  I am sure we can do it
6   whenever you want.
7          MR. LOCKHART:  Does a week make sense?
8          JUDGE LEGGE:  Yeah, that's fine.
9          MR. McGINNIS:  A week from tomorrow, how
10  about a Friday?
11         MR. LOCKHART:  That's fine.  And we'll get
12  you our -- these charts we have been talking about
13  at the same time.
14         JUDGE LEGGE:  Sure, whenever you can get
15  them.
16         MR. ALIOTO:  Your Honor, on any of these
17  further submissions, may we get served with those
18  on the indirect side?  Not all of this bears on our
19  case, but some of it does.  To the extent it is not
20  filed on ECF and it is just emailed to your Honor,
21  we would like to get served with any further
22  submissions.
23         JUDGE LEGGE:  All right.  You are making
24  your request in direction to them, and I'll leave
25  it there.  If you then feel that you are not

155

HEARING

BARKLEY
Court Reporters

1   getting what you should have gotten --

2           MR. ALIOTO:  No, no, we have gotten

3   everything.  I just wanted to make sure it

4   continues.

5                 (Whereupon the proceedings were

6                 concluded at 1:39 p.m.)

7                     ---o0o---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HEARING

BARKLEY
Court Reporters

```
 1              COURT REPORTERS CERTIFICATE

 2    STATE OF CALIFORNIA     )
                              )   ss.
 3    COUNTY OF SAN FRANCISCO )
                              )
 4    _____

 5

 6            I, BALINDA DUNLAP, hereby certify:

 7            I am a duly qualified Certified Shorthand

 8    Reporter, in the State of California, holder of

 9    Certificate Number CSR 10710 issued by the Court

10    Reporters Board of California and which is in full

11    force and effect.

12            I am not financially interested in this

13    action and am not a relative or employee of any

14    attorney of the parties, or of any of the parties.

15            I am the reporter that stenographically

16    recorded the testimony in the foregoing

17    proceeding and the foregoing transcript is a true

18    record of the testimony given.

19

20    Dated: February 21, 2013

21

22

23    _____

24

25
```

157

BARKLEY
Court Reporters

## 1

**1 (6)**
12:5,5;13:11,22;23:4;
63:16
**1:39 (1)**
156:6
**10 (2)**
104:22;106:12
**1011 (1)**
136:22
**1017 (1)**
103:2
**1022 (4)**
136:17,19,20,22
**11 (7)**
13:13,19;89:9;93:8;
95:4,20;97:21
**11/14/08 (1)**
89:24
**11/14/11 (1)**
89:25
**11/14/2011 (2)**
52:6,12
**11/20/2003 (1)**
52:18
**12 (6)**
13:6;20:7,12;21:10;
23:12;42:9
**12:15 (1)**
88:17
**126 (1)**
53:22
**13 (6)**
20:7,12;21:10;89:15;
92:21;148:1
**13th (1)**
92:19
**14 (8)**
9:1;89:15;93:2;
109:21;110:1;112:17,18,
21
**145 (2)**
64:15,21
**14th (9)**
9:16;89:11;90:23;
91:1;96:1,6;97:10,11;
109:25
**15 (2)**
86:25;146:5
**150 (12)**
51:4;63:5,9,10,11;
71:7,9;77:6,19;78:1;
85:2,3
**151 (2)**
77:17,21
**159 (1)**
79:4
**15th (1)**
9:17
**160 (1)**
112:11

**17 (4)**
89:13;104:15;117:24;
121:14
**18 (1)**
119:14
**182 (1)**
101:16
**19 (5)**
13:20;15:5;104:20;
105:19;121:14
**1986-080 (1)**
148:1
**1988 (1)**
107:11
**1995 (3)**
71:12;77:9;91:5
**1999 (1)**
101:17

## 2

**2 (1)**
115:18
**20 (6)**
70:13;75:4;82:15,17;
86:25;117:24
**200 (2)**
71:20;77:12
**2001 (8)**
50:21,25;51:1,19;
52:21;57:12;61:14;
144:21
**2005 (1)**
53:15
**2006 (2)**
59:21;141:5
**2007 (41)**
51:6,11;53:13;56:10;
58:2,24;59:13,16,23;
61:5,13;65:1;71:12;
77:9;89:11;90:23;91:1,
5,11;92:8,14,19,21;93:2,
10,17;96:1,6;97:7,10,11;
106:22;109:21,25;
110:22;112:6,17,18,21;
138:4,19
**2008 (1)**
103:2
**2010 (9)**
76:1,16;82:4;136:21;
141:8;143:2;149:20;
151:14,18
**2011 (11)**
59:1;101:2;102:14;
110:1;142:4;145:1,3,4;
146:5,12;149:16
**2012 (1)**
114:18
**2013 (1)**
9:1
**21 (2)**
113:13,18
**214 (1)**

145:1
**2149095 (1)**
145:3
**216 (1)**
112:10
**22 (3)**
30:21;113:13,18
**220 (1)**
112:12
**223 (1)**
63:19
**23 (1)**
121:1
**232 (1)**
112:12
**235 (1)**
63:19
**272 (1)**
102:13
**281 (1)**
101:16
**29 (2)**
94:7,16
**29th (1)**
25:3

## 3

**3 (1)**
148:1
**30 (7)**
94:18;95:7;141:11;
142:11,19;143:14,18
**30th (4)**
76:1,16;136:21;143:2
**31 (1)**
94:20
**31st (2)**
144:21;145:3
**32 (2)**
94:7,22
**34 (1)**
140:23
**35 (1)**
140:24
**36 (4)**
64:21,23;95:22;
111:23
**37 (2)**
64:15;146:13
**39 (2)**
146:13;148:23

## 4

**40 (6)**
51:9;63:5,9;64:15;
65:1;148:23
**4345435 (1)**
146:12
**436 (1)**
100:25
**46 (5)**

50:25;51:18;63:5,7,9
**49 (1)**
81:25

## 5

**50/50 (1)**
50:23
**504 (1)**
56:17
**51 (2)**
69:22;81:24
**534 (1)**
103:1
**58 (1)**
81:25
**597 (2)**
141:1,24
**5th (3)**
82:3;151:14,18

## 7

**738 (1)**
136:21
**768 (2)**
141:2,16
**782 (1)**
101:1
**790 (1)**
56:17

## 8

**8 (3)**
82:5;92:14;93:17
**814 (1)**
102:12
**8th (1)**
92:8

## 9

**9 (5)**
32:20;42:17,23;
103:13;104:21
**93A (1)**
141:22

## A

**abandoned (1)**
86:13
**abandonment (1)**
60:7
**ability (3)**
40:2;147:17,22
**able (7)**
34:11;74:4;82:10,11;
96:9;111:24;113:1
**absence (2)**
54:9;65:8
**absent (3)**

90:20;104:12;154:4
**Absolutely (2)**
37:1;117:9
**accent (1)**
40:7
**accept (1)**
26:23
**accepted (1)**
145:10
**accepts (2)**
138:3,18
**access (3)**
24:6,9;149:19
**according (3)**
68:24;81:8;114:5
**account (3)**
101:4,14;132:16
**accrue (1)**
90:15
**accurate (4)**
13:11,23;17:3;24:14
**acknowledge (1)**
40:12
**acknowledged (1)**
147:9
**across (5)**
88:13,13;102:3,17;
129:11
**Act (9)**
24:18;44:18;46:15,17;
47:7,12;48:22;115:18,19
**acted (2)**
79:11;95:17
**action (79)**
9:6,7;10:2,9;11:19,20,
24,25;14:9,12,16,20;
19:8;20:6,22;23:10,14,
25;24:4;25:9,14,17;
28:12,18;30:1;39:10;
44:2,3,4,5;46:11,22,25;
47:15;49:15;50:12;
54:22;55:4;58:25;65:25;
66:1;75:15;78:24;84:24;
86:23;88:21,23;89:9,13;
95:12,24;96:15;98:9,10,
24;99:5,6,8,10,22;100:7;
101:23;105:23;106:14;
107:23;109:17;110:8;
113:25;114:10;115:3,
12;118:20;128:18;
140:3,8;144:6,12;
152:20;153:1
**actions (22)**
9:25;10:13;14:4;
16:13;23:11,15;24:12;
32:2;38:9,20;45:15,15;
47:1,22;78:20;83:8;
84:21;87:11;99:4;133:4;
140:12;141:3
**activities (1)**
120:25
**actors (1)**
57:16

**acts (4)**
91:18;122:21;123:2;
125:13
**actual (6)**
48:9;91:21;97:2,3;
107:5;144:25
**Actually (15)**
15:19;26:25;31:1;
33:5;34:17;39:3;77:7;
78:12;79:2,4;89:17;
96:23;102:22;112:7;
154:17
**adaptation (1)**
134:25
**add (7)**
28:16;50:2,6;65:3;
119:1;120:1;132:9
**addition (1)**
154:14
**additional (4)**
95:6,7;110:13;122:9
**address (19)**
30:1;32:8;37:18,24;
41:7;49:7,18,23;66:25;
76:2;97:13,25;99:24;
105:14,17;134:3;
140:22;151:6;152:13
**addressed (8)**
23:22;66:23;102:16,
22;141:4;151:10,11;
152:13
**addresses (7)**
56:17;67:16;100:24;
102:11,15;103:19;
152:15
**adequacy (7)**
30:6;35:23,24;36:17;
67:2,21;96:20
**adequate (4)**
61:23;145:9,14;
146:25
**adequately (1)**
121:25
**admission (1)**
121:2
**admit (1)**
127:8
**adopt (1)**
101:15
**adopted (7)**
26:17;27:1;76:23;
80:18;99:6,8;102:4
**advance (1)**
33:21
**advertising (2)**
116:18,20
**advised (2)**
24:5;127:4
**affairs (2)**
70:4;81:20
**affected (3)**
76:9,13,24
**affiliate (2)**

**18:8;27:15**
**affiliated (1)**
76:18
**affiliates (4)**
17:8;32:25;33:2;84:10
**affirmative (1)**
91:18
**affirmed (3)**
26:25;43:4;149:1
**AG (2)**
140:12;147:11
**again (44)**
10:12;16:22;32:12;
33:17;34:2;36:4,21;
39:21;41:2,2,3;63:4,8;
64:5,18;65:2;71:6;
72:19;89:9;90:9;92:6;
94:22,24;95:21;98:10;
102:11;104:6;106:12;
112:15,19;113:17;
116:21;119:2;124:13;
125:22;132:14;134:6;
136:5;137:18;139:20,
24;141:25;144:24;151:7
**against (12)**
34:3;40:3;69:7;71:10;
72:14;85:5;95:8;99:16;
101:5;108:22;109:1;
120:23
**AGC (31)**
10:16;39:15,16,23;
40:2,6;89:6;128:23;
129:1,14,22;130:3,5,7,9,
16,18,24;131:2,8;132:8,
13,19;133:10,12,20,23;
134:5,6;135:7;136:6
**AGC-based (1)**
40:11
**agency (1)**
83:5
**agent (1)**
33:1
**agents (3)**
43:1;79:11;119:24
**ago (1)**
56:3
**agree (14)**
16:8;19:1,18;86:10;
114:1,1,11,24;117:1,4;
122:12;136:11;151:9;
154:18
**agreed (3)**
25:8;114:23;117:10
**agreement (2)**
28:5;116:2
**agreements (3)**
71:3;79:20;115:22
**ahead (7)**
32:10;35:20;36:4,21,
22;103:18;138:16
**Albie (1)**
10:19
**ALIOTO (2)**

**155:16;156:2**
**allegation (26)**
32:6;36:17;38:1;58:1;
62:14;65:9;68:8;69:16;
70:6;71:4,6,16,22;72:10;
76:4;77:2,14;78:1,10;
79:10;106:4;115:20;
118:10,13;119:11;
137:12
**allegations (91)**
18:3;22:2;30:6,9,16;
31:8;32:3,14;35:17,25;
37:15;42:4;50:8,14,17;
53:3,5,14;54:7,10,12,14,
20,22;56:4;57:8,20;
60:16;61:21;62:1,3,18,
20,23;63:17,18;65:5,12,
15;67:4;68:6,18;69:6,
10;70:7,9,17,19,25;71:8;
72:1,6,12,12,20;73:9;
77:19,21;78:7;79:9,23,
24;80:2,3;81:8,16,21;
84:5,8,11,14;85:5,10,13;
86:11;118:2,6;119:6,15;
123:6;126:23;128:7,12,
13;134:17,18;135:19;
137:8,20;138:21;139:1
**allege (33)**
14:9,12,15;17:25;
18:10;36:8,9,15;37:8,12;
42:19;52:20;57:13,15;
59:1;66:18;69:13;71:10;
77:7;79:18;84:14,20,20;
91:4,4;92:23;95:10;
96:23;118:22,25;
121:16;139:6;142:8
**alleged (36)**
18:2,6,8;19:2;20:15;
30:9,10;31:22;36:3;
47:10;50:16;51:1,2;
58:8;63:24;67:18;68:23,
25;71:3;73:18;75:8;
77:2;81:3,5,17,21;82:8;
83:7,18;84:23;91:14;
92:21;95:9,23;123:1;
153:14
**allegedly (7)**
37:14;70:7;83:19;
84:17;90:17;117:11;
137:2
**alleges (9)**
14:19;36:18;64:24;
70:11;75:1;77:20;86:1;
119:17,20
**alleging (5)**
81:12;109:10;119:10;
135:22,24
**allow (22)**
56:23;73:15;91:2;
95:19;96:11;100:15;
102:5,25;104:17,25;
106:2,9,10,14,16;111:1,
9,20;132:20;145:7,15;

**147:5**
**allowed (13)**
96:2;97:20;102:2,3;
111:20;130:12,19,23;
141:13;143:10;144:15;
146:20;149:21
**allowing (3)**
43:11;101:6;130:10
**allows (4)**
98:22;105:21;130:16;
146:9
**Allstate (5)**
114:2,5,9,10;122:13
**almost (4)**
48:12,13;52:5;138:11
**alone (2)**
57:5;108:4
**along (2)**
81:14;96:25
**alongside (1)**
80:11
**altered (1)**
54:21
**although (4)**
11:25;96:3;112:19;
154:18
**always (2)**
60:19;150:7
**amend (3)**
42:10;73:21;75:17
**amended (2)**
143:5,8
**amendment (2)**
148:14;150:10
**amendments (3)**
148:9;150:1,18
**American (8)**
99:2,17;100:2,20;
105:12,24;106:1;110:6
**among (1)**
123:8
**amount (1)**
44:20
**analogous (1)**
99:9
**analysis (7)**
67:19;121:6;122:5;
124:9;125:23;129:23;
136:15
**analyze (2)**
30:6;68:23
**analyzes (1)**
146:9
**analyzing (1)**
146:6
**and/or (2)**
32:24,25
**announced (2)**
51:11,12
**announcement (4)**
58:2,3;108:18;109:23
**answered (2)**
23:1,5,8

**147:5**
**anticipating (1)**
31:6
**anticompetitive (2)**
46:4;108:25
**antitrust (14)**
47:22;81:21;90:15;
100:13,13,14;109:9;
121:3;123:8;126:10;
129:21;131:4;132:2;
136:25
**anymore (1)**
27:4
**apart (1)**
57:6
**apologies (1)**
41:4
**apologize (2)**
41:17;103:17
**appeal (3)**
25:7;26:7;27:17
**appear (1)**
77:23
**appearance (1)**
11:10
**appearances (1)**
9:19
**appears (1)**
146:7
**appellate (1)**
129:19
**Appendix (7)**
92:12;94:4,11;117:18,
22;118:1,4
**applicability (1)**
45:24
**applicable (2)**
28:12;64:15
**application (11)**
96:17;99:16;101:5,9;
103:24;105:11;123:20;
127:21,24;129:15;
139:21
**applied (4)**
110:12;122:16;130:1,
21
**applies (12)**
25:16;26:25;47:15;
57:4;104:2;128:17,18;
129:16;130:5;132:13;
133:23,25
**apply (22)**
10:25;25:14;33:20;
39:16,20;41:23;43:15,
16;91:1;100:7,8,20;
105:16;115:2;123:25;
124:10;129:14,22;
130:3;134:2,5;136:7
**applying (4)**
40:13;90:21;115:8;
132:18
**appreciate (6)**
14:22;16:11;25:15;
29:23;87:16;127:2

**approach (4)**
116:24;129:5,9,9
**appropriate (8)**
12:25;27:7;40:3;
44:16;66:9;80:20;
102:21;128:6
**approved (1)**
78:24
**April (1)**
64:25
**arbitrary (1)**
127:23
**area (1)**
9:13
**argue (14)**
10:2,3,5;18:25;26:13;
38:7;40:12;52:25;58:22;
87:8;88:3;118:22;
129:11;140:2
**argued (4)**
43:13;49:24;98:21;
123:17
**argues (1)**
28:22
**arguing (6)**
10:20,24;33:24;43:14;
44:2;87:15
**argument (31)**
29:3;33:20;34:6;35:6;
39:9;40:21;49:21;56:18;
61:6,10;63:23;65:24;
76:15,22;80:24;82:22;
87:17;105:5;125:17;
130:12;131:9,11;
133:17;135:4,6,8,20,22;
143:1;146:14;148:7
**argumentation (3)**
113:11;134:11;138:1
**arguments (15)**
11:17;41:2;61:11;
76:8;87:5;88:20;113:10;
124:21;129:2;134:9;
135:23;151:12,15,19
**arisen (1)**
91:10
**Arizona (7)**
118:12;129:4,8,18;
130:1;133:25;134:2
**arm (1)**
16:17
**arms (1)**
20:5
**arose (2)**
115:17,18
**around (7)**
16:17;19:14;20:5;
58:7;92:9;93:3;140:4
**Arthur (2)**
148:19,22
**A-r-t-h-u-r (1)**
148:22
**articulate (1)**
40:7

**articulated (3)**
29:17;108:2;109:2
**articulating (1)**
29:24
**aside (1)**
68:20
**aspect (1)**
68:20
**assert (10)**
39:13;40:2;44:6;
89:13;90:4;100:9;
104:15;144:6;145:13;
146:2
**asserted (6)**
44:13;98:15;99:10,13;
100:6;104:15
**asserting (2)**
20:25;95:13
**asserts (2)**
89:22;90:2
**assess (1)**
33:7
**assist (1)**
20:11
**Associated (5)**
29:22;39:1,17,19;40:8
**assume (9)**
16:18,23;17:1;18:3,
19;23:23;25:5;32:1;
49:18
**assuming (3)**
14:21;17:6;130:4
**assumption (3)**
38:25;45:17;105:15
**ATC (1)**
40:4
**Atlantic (1)**
119:4
**ATM (1)**
27:3
**attached (2)**
94:4;142:2
**attempted (1)**
143:20
**attempts (1)**
144:6
**attended (1)**
81:8
**attention (4)**
16:14;71:5;77:6;
146:16
**Attorney (5)**
61:19;140:3,8;147:6,7
**August (2)**
114:17;149:16
**authority (2)**
129:19;136:6
**authorizing (2)**
72:4;84:17
**available (5)**
29:5;96:5;112:22;
135:7;146:25
**avoid (1)**

48:14
**award (1)**
147:15
**aware (9)**
35:3;67:8,10,12,14;
80:21;98:20;125:21;
135:3

**B**

**back (16)**
35:15;45:14;52:12,16,
17;65:21;79:21;87:3;
88:18;90:18;107:7;
119:2;125:22;135:16;
136:12;152:10
**background (2)**
91:11;92:5
**backward-looking (1)**
58:9
**bad (1)**
57:16
**badge-flipped (1)**
57:17
**Baker (1)**
49:17
**balance (2)**
37:24;124:15
**Bank (1)**
102:12
**bankruptcy (1)**
59:19
**bar (3)**
90:9;140:2,4
**barred (1)**
91:9
**barrier (1)**
132:14
**based (28)**
24:19;29:16;38:9;
39:9;40:24;41:18;45:5,
8,14,16,22;50:14;52:1,
13;54:4,6,20;55:5;57:4;
63:23;82:16;83:7;93:12;
96:17;109:4;123:2;
124:16;127:7
**basis (15)**
18:5;54:23;64:12;
91:22;93:7,22,25;94:14;
97:23;98:17;100:6;
109:3;122:1;138:6;
141:12
**bears (1)**
155:18
**became (4)**
51:7;59:16;62:11;
64:25
**become (1)**
103:21
**becomes (2)**
130:6;153:25
**becoming (1)**
139:16

**began (1)**
138:21
**begin (3)**
62:17;88:24;113:25
**beginning (1)**
55:7
**behalf (11)**
10:9;50:13;57:19;
79:12,17,20,24;93:19;
121:22;148:4;150:16
**Bell (1)**
119:4
**Ben (2)**
21:20;66:2
**benefit (5)**
51:24;52:13,19;87:2;
88:1
**Best (23)**
10:9;12:17;19:12;
30:21;31:13,20;32:6,19;
35:8;37:22;42:17;46:2,
12,17,21;50:19,24;51:3,
9;62:25;63:3;64:16,18
**Bestfoods (2)**
75:5;83:2
**better (2)**
33:7;88:16
**beyond (4)**
21:2;27:5;42:23,24
**binding (1)**
134:7
**bit (5)**
29:24;41:5;48:5;80:6;
89:11
**blanket (2)**
30:9;42:5
**bleed (1)**
61:15
**blue (1)**
90:9
**blunderbuss (1)**
129:9
**board (1)**
102:17
**book (1)**
53:22
**borders (1)**
102:3
**both (32)**
39:20;44:4,6,7,17;
45:1,2;49:21;50:11;
67:5;68:6;72:25;75:24;
76:11;78:21;80:1;81:9;
86:18;93:11;114:1,11;
122:19;126:9;141:10,
13;148:13,24;149:8,20,
24;150:24;152:16
**Botts (1)**
49:17
**bought (9)**
17:6,25;18:12;19:10;
30:12;36:25;46:13,18,19
**BRADSHAW (27)**

13:12;21:20,20,21,
5,8,12;34:25;35:19;
37:1;66:2,3;67:14;
69:21,24;74:11,15;
83:11,16;84:4;85:4;
139:9;142:10;151:6,17;
154:5,11
**Bradshaw's (1)**
154:15
**branches (2)**
46:9;48:21
**brands (1)**
16:24
**breach (1)**
48:6
**break (2)**
52:22;152:17
**Brick (12)**
24:24;38:3;39:24;
43:8;45:18,23;48:17;
133:3;140:1,4;147:4;
154:3
**brief (38)**
10:21,22;12:3;56:11;
58:7;63:14;87:25;
100:25;102:1;103:7,12,
14;106:12;107:10;
110:17,17;117:17,23;
119:14;120:22;121:2,
15;123:17;124:7;
126:14;127:1;128:11,
24;129:15;136:10;
140:23;143:25;144:20;
146:13;148:16;149:16,
21,24
**briefed (2)**
23:19;78:11
**briefing (10)**
25:11;40:15;53:1;
69:16;139:11,14,22,24;
140:15;151:7
**briefly (9)**
37:17;64:8;99:24;
110:16;126:5;134:23;
140:22,24;146:4
**briefs (9)**
25:13;64:10;88:6;
89:5;113:11;121:14;
133:15;144:3;145:21
**bring (8)**
97:20;110:3;111:1,9,
21;112:1;113:1;147:6
**bringing (1)**
93:22
**broader (1)**
80:3
**brought (7)**
31:1;38:1,3,7;100:21;
102:1;139:4
**burden (2)**
13:13;65:20
**Burns (2)**
141:5;143:4

**business (8)**
50:22,25;51:21;52:21;
54:11;60:10,11;65:13
**businesses (1)**
15:15
**Buy (25)**
10:9;12:17;17:2,17,
18;19:13;30:22;31:13,
20;32:6,19;35:8;37:22;
42:17;46:13,17,21;
50:19,24;51:3,9;62:25;
63:3;64:16,18
**buying (1)**
15:22
**Buy's (1)**
46:2

## C

**Cal (1)**
85:9
**CALIFORNIA (36)**
9:1;56:9;102:24,24;
103:20;116:3,4,21;
118:16;119:17,19,21,22,
23,25;123:1,6;125:16;
126:18;127:7,20,22,25;
128:9;129:3,6,13;
130:16;133:23;144:8,10,
13;145:25;146:4,22;
149:1
**California's (1)**
144:1
**call (2)**
39:1;88:24
**called (4)**
54:16;98:9;99:21;
108:20
**calling (1)**
12:19
**came (1)**
25:4
**campaign (1)**
116:20
**can (55)**
10:1,17;12:16;15:24;
16:20;17:16,22;20:11,
13,16,17,23;21:7;25:17,
20;28:4,5;30:8,13;32:1;
34:9,15;35:12;45:1,12;
47:19;49:6,23;52:2;
55:1;60:9;63:4;67:7;
68:22;73:21;74:1;75:17;
80:23;82:23;84:11;85:1;
86:17;88:8;96:22;98:5;
100:5;121:15;126:5;
129:15;139:2;144:3;
150:9,22;155:5,14
**capital (1)**
53:24
**card (2)**
11:11,12
**care (1)**

116:18
**cared (1)**
116:20
**carrying (1)**
9:23
**cartel (3)**
51:2;52:23;54:16
**case (139)**
9:24;10:16,20;17:9,
20;19:13;23:18;24:21,
24;25:17;26:9,25;29:18,
23;33:8;34:24;35:8;
37:11,24;38:18;40:1;
49:1,3;53:11;55:13;
56:11;57:2;58:22,23,24;
60:23,25;62:25;68:14;
70:11;71:25;74:6,18;
75:5;76:4,12,15;78:25;
80:8;82:25;83:2,8;85:9,
9;94:2;97:14,15;99:2,
20;100:23,25;101:16,25;
102:10,12,14;103:1,19;
105:19,20,24;106:6,15;
107:9,10,11,11,17;
109:8,9;111:10,11,12,
22;114:2,5,9,10;115:7,
16,24;116:5,6,7,10,14,
16,17;122:17,19;125:18,
24;126:11,14,17;127:12,
13;128:5,12,17;129:10,
24;130:9;132:19;134:9;
138:23;140:5,7;141:5,6,
18,18;143:5,9;144:16,
20,24,25;145:18;146:7,
18;147:11,11,20;148:12,
16,18,19;149:11,15,19;
151:2;155:2,19
**cases (50)**
9:6;12:20;23:10,15;
25:14,17;26:1;27:18;
28:18;29:13;35:24;37:7;
45:16;90:15;98:23;
102:16;104:6,17;105:6,
11;106:9,11;109:7,18;
110:10;111:10,12;115:8,
12,14,14;116:23,24;
121:3;126:9,10,10,16;
128:17;130:11,13,23;
132:19;141:10;143:3,
15;144:10;148:25;
151:7;153:16
**casual (1)**
127:21
**categorical (2)**
19:25;73:7
**categorically (3)**
66:22;68:13;83:17
**categories (2)**
118:5;152:18
**category (2)**
47:6;118:5
**cathode (2)**
9:4;93:17

**causation (2)**
132:7,23
**cause (19)**
14:9,12,19;20:22;
25:9;29:25;44:2,4,5;
47:15;49:14;65:25;
87:11;95:24;107:23;
109:16;111:3;144:11;
152:25
**causes (6)**
10:13;14:16;86:22;
88:23;89:13;144:6
**caveat (1)**
154:5
**CDTs (1)**
131:17
**cede (1)**
51:13
**ceded (2)**
58:10;62:11
**ceding (5)**
59:14,18;62:22;65:2;
101:11
**centers (1)**
119:19
**certain (2)**
120:16;154:6
**certainly (12)**
20:16;24:8;34:8;40:2,
10;55:13;56:22;61:2;
124:2,13;125:20;126:7
**certification (1)**
101:25
**certify (1)**
25:7
**cetera (2)**
43:2;131:13
**chain (4)**
15:3,9;18:16;134:14
**challenge (3)**
80:19;82:15;125:1
**challenged (4)**
30:17,18;35:23;95:3
**challenges (1)**
66:6
**challenging (2)**
36:1,16
**change (3)**
148:14;150:2,5
**changed (1)**
135:25
**changes (1)**
149:2
**channel (1)**
132:24
**channels (1)**
131:18
**chart (23)**
13:3,5;15:11,24;
20:14,15,20;21:22;
22:15,18;52:2,5;74:7,10,
12;89:18,20;90:10;92:6,
20;126:21;138:7,15

**charts (6)**
20:8,10;21:24;22:14;
117:16;155:12
**check (1)**
101:4
**Chemicals (3)**
56:9,16;138:23
**choice (1)**
123:14
**Circuit (34)**
12:17;26:1,7;28:15;
57:3;69:14,22;71:9;
77:6,18;78:8;79:6;
101:1,13,17;102:22;
104:6;107:8;108:2,15;
109:2;119:13,15,17,20;
125:5;127:5,14,17;
144:5,5;145:12;146:10;
155:3
**circumstance (1)**
62:20
**circumstances (4)**
62:7,9;123:19;143:13
**citation (1)**
112:8
**citations (1)**
96:23
**cite (23)**
60:3;69:19;97:15;
100:25;102:10;105:7,
19;106:11;107:10;
109:7,8,19;110:9;
112:22;114:9;115:8;
125:18;140:5;143:4;
144:24,25;145:1;146:11
**cited (15)**
63:3;64:14;83:2;
111:11;114:10;116:16;
126:14;127:1;129:18;
136:5;144:20;148:15,
23;149:16,20
**cites (1)**
57:2
**citing (1)**
64:17
**City (15)**
12:18;69:14,22;71:9;
77:18;78:8;79:6;119:14,
15,17,20;125:5;144:5,5;
146:10
**City's (2)**
77:6;145:12
**claim (50)**
21:9;24:13;27:24;
39:11,14;48:6,6;61:7;
68:25;71:15;72:14;
84:20;85:20;89:22;90:2,
6,8,16;91:16;93:22;
96:12;97:2,4;98:13;
100:5;104:17;105:20;
106:5;110:3;111:1;
112:4;114:22;122:18;
123:25;124:1;133:5,9;

135:2;138:14;139:4;
140:19;141:19,22;
143:7;146:9,19,22;
147:8,17;153:14
**claims (138)**
11:1;19:14;20:5,24;
21:11;27:8;34:3,5;
38:23;39:4,9,21,23,25;
40:3,13,16;41:6,10,13;
43:4,12,14;44:6,8,13,13,
15;45:1,5,8,13;47:6,8,
10,13;48:22;49:8,12,14,
22;50:3,12;51:17;52:1,
10,14;53:7,11;55:6;63:3,
8,11,12,13,14;66:6,7,8;
73:11,13;88:13;90:15,
19,21,23;91:3,3,7,8,9,22,
24,24;93:10,10;96:16;
97:3;98:15,19;99:4,5,7,
11,12,12,14;100:10,12,
13,14,14,15,18,21;
104:15,15;105:1,13;
106:3,20,25;107:6;
109:14;110:9,14;
111:21;112:1;113:5;
118:16,20;119:8;122:1,
2;123:1,7,20;124:12;
127:7;133:24;134:1;
137:17;138:5,13;139:8,
10;143:23;144:15;
145:7,9,13,15;147:6;
149:8,12,21;153:9;
154:16
**claims' (1)**
52:11
**clarification (5)**
149:5,7;150:5,14,23
**clarifications (1)**
149:2
**clarified (1)**
148:15
**clarifying (1)**
14:22
**class (39)**
16:13;23:11,15;31:4;
39:10,13;51:24;52:1,14,
19;53:5;58:23,23;63:20;
67:4;98:9,15,17,24;99:3,
5,6,8,10,22;100:6,11;
101:5,7,15,23,24;102:5,
7,25;105:23;106:14,20;
110:8
**classes (1)**
76:2
**clause (1)**
128:2
**Clay (1)**
10:23
**clear (10)**
19:7;52:22;59:24;
60:17;75:6;96:13;99:19;
104:12;134:4;135:21
**Clearly (12)**

78:4;93:13,24;95:14;
97:8,18;104:25;106:10,
21;110:23;121:24;136:6
**Clemens (3)**
103:1,4,10
**clerks (1)**
152:10
**client (8)**
15:6;17:10;19:12;
35:13;68:10,15;86:2;
140:10
**clients (3)**
17:19;66:11;68:9
**clock (2)**
111:4;112:23
**close (1)**
81:14
**closely (1)**
97:15
**coconspirator (7)**
18:2,9;26:24;27:2;
29:4;43:5,15
**coconspirators (3)**
38:20;43:2;47:11
**code (2)**
9:11,11
**coffee (1)**
9:15
**colleague (1)**
124:20
**collection (1)**
11:12
**collectively (1)**
78:23
**Combining (1)**
120:11
**commend (1)**
102:14
**comment (2)**
66:25;67:16
**comments (4)**
55:2;59:9;113:9;
154:15
**Commission (5)**
92:14;94:16,23;
108:19,20
**common (3)**
68:20;85:23;86:6
**companies (10)**
34:3;42:24,25;76:18;
79:8;93:20;100:4;
108:22;123:22;135:14
**company (18)**
23:20;37:12,15;51:8,
14;58:5;59:16;62:11;
64:25;70:12,15,22;
71:11;75:2,3;79:7;80:4;
84:7
**compare (1)**
108:18
**compelled (2)**
26:4;142:10
**compels (1)**

29:14
**competing (2)**
131:24,25
**competition (3)**
115:22;144:2;146:22
**competitor (1)**
74:19
**complainants (1)**
111:23
**complaint (116)**
12:10;13:16;14:19;
16:19;22:2;23:4,22;
27:11;30:22;31:7,11,14,
20;32:6,20;35:5;36:7,
18;37:2,20,22;42:17;
44:14;47:1;50:19,20;
52:20;54:2,5,21;57:9,13;
58:3,11,24;59:25;60:1,
21;61:19,20,25;63:3,24;
64:16,18;66:14,14,17;
68:14;69:5,7,12,14,15,
22;70:9,11;71:6,10;
72:6;73:22;75:1,1;77:3,
7,15;78:14;81:22;84:12,
22;85:19;86:1;92:17,19,
21;93:8;94:2,3,4,7,9,14,
15;95:3,3,19;96:3,3;
97:11,20;107:24;
109:17;111:9;112:8,10,
11,12,19;113:1;115:20;
117:20;121:11,12;
122:24;126:20,23;
141:12;142:5,13,16,24;
143:5,8,11;145:13;
153:12
**complaints (67)**
9:7;11:19,21,25;12:9,
12,24;13:1,4,7,14,19;
14:9;16:6,15;18:10;
20:6,7,12;21:3,10,16;
23:1;24:25;26:19;27:5;
29:16;30:23;32:19;36:2;
42:8,9,19;51:7,20;52:6;
53:5;61:25;63:2;65:14;
66:1,7;67:4;73:24;
75:13;83:24;84:22;
88:22;89:10;91:3;92:15;
95:6,7,9,12,23;96:23;
97:1;106:24;112:6,23;
118:23;124:3;128:8,19;
137:22;152:21
**complete (2)**
11:14;153:3
**completed (1)**
25:11
**completely (8)**
59:7;105:17;131:8,19;
133:7,8;135:4;138:19
**complexity (1)**
132:4
**complicating (1)**
41:5
**comply (2)**

29:13;141:15
**component (2)**
132:11;137:3
**CompuCom (2)**
15:12;112:10
**computer (2)**
131:16;133:6
**conceal (1)**
55:21
**concealed (4)**
56:6,25;62:15;139:5
**concealment (28)**
55:14;56:5,20,23;
59:2;61:17,22;62:2,3,5,
19;63:17;65:5,16,18;
91:15,17,19;92:25;93:9;
96:14;106:19;107:3;
110:19,23;111:6;
138:22;139:2
**concede (4)**
130:17;133:23,24;
140:1
**conceded (1)**
129:13
**conceivably (1)**
49:3
**conceive (1)**
55:15
**concept (1)**
24:20
**concern (3)**
101:20;102:8;154:16
**concerned (2)**
152:2;153:5
**concerning (2)**
9:5;128:9
**concerns (1)**
122:3
**concession (1)**
42:7
**conclude (2)**
60:23;130:5
**concluded (5)**
56:9;57:24;61:21;
68:5;156:6
**concluding (1)**
101:14
**conclusion (4)**
67:3;104:8;109:19;
132:9
**conclusionary (2)**
61:21;119:6
**conclusions (1)**
72:13
**conclusively (1)**
136:4
**conduct (10)**
46:4;82:8;108:11,25;
126:9,16,18;127:19,22;
154:12
**confident (2)**
47:20;49:6
**conflates (1)**

123:13
**confrontational (1)**
11:16
**confronted (1)**
152:20
**confusion (1)**
66:4
**Conmar (5)**
107:10,13;108:6;
109:2;111:11
**C-o-n-m-a-r (1)**
107:14
**connected (1)**
127:20
**connection (4)**
51:2;92:11;94:13;
133:11
**consider (5)**
74:8,16;78:6;91:13;
101:22;125:13
**consideration (3)**
120:13;123:9,13
**considerations (1)**
99:18
**considered (4)**
104:7;114:16;116:22;
137:10
**consistent (6)**
93:8;95:20;97:21;
150:11,23,25
**consolidated (1)**
14:4
**conspiracy (68)**
19:2,2;36:8,19;37:3;
38:13,21;54:9;55:6,17,
19,21,24;56:5,25;57:19;
60:8,14;63:24;64:4;
65:9;66:15,19;67:3,5,18;
68:5,12,15,22;69:1,8;
72:3,15,24;73:5,19;75:9;
76:4,9,10,25;77:5;78:20;
80:5,16;81:7;86:1,7,18;
91:4;92:22;95:9;122:21,
22;123:3,8;125:14,20;
126:19;133:10;135:3,
12;137:13;139:4,5;
153:13;154:19
**conspiracy's (1)**
36:19
**conspirator (3)**
60:8,12;81:6
**conspiratorial (1)**
127:19
**conspirators (1)**
27:12
**conspirator's (1)**
60:7
**constitutional (4)**
116:12;122:3;123:14;
126:1
**constitutionally (2)**
122:14;124:14
**construction (1)**

150:12
**constructive (6)**
107:5,9,19;108:16;
109:5,13
**consumer (1)**
121:4
**consumers (2)**
119:23;134:15
**contacts (2)**
114:7;115:10
**contain (1)**
150:1
**containing (1)**
42:21
**contend (3)**
84:13;91:14;105:9
**contending (1)**
24:16
**contention (1)**
104:24
**contentions (2)**
22:21;45:1
**contest (1)**
36:11
**context (24)**
36:18;37:2;55:14;
65:8;66:10;68:9,16;
72:17;77:18;85:25;
86:18;87:9,18;100:20;
102:23;106:1,11;110:7;
115:15;122:15;125:20;
126:10;135:11;147:11
**context-specific (1)**
85:21
**Conti (28)**
23:12;25:6,12;26:14,
17,23;28:8,25;33:22;
40:24;42:12;53:2,9;
57:24;58:12;64:2;75:24;
76:16,23;80:8;134:1,8;
135:10;136:21;144:21;
145:6;151:2;154:3
**continue (2)**
57:21;73:16
**continued (2)**
53:12;119:4
**continues (1)**
156:4
**continuing (1)**
55:20
**Conti's (18)**
25:3,16,24;26:5;
27:13;28:18;29:11,12;
43:3;76:11;85:17;86:16;
134:25;136:13;144:19;
145:17;149:10;152:12
**contours (1)**
154:16
**contract (1)**
48:6
**Contractor (1)**
39:2
**Contractors (4)**

29:23;39:18,20;40:8
**contrast (1)**
　73:4
**contributing (1)**
　132:12
**control (45)**
　19:22;24:20;25:10;
　29:16;30:10,16,24;31:8,
　22;32:3,6;33:2,25;
　35:25;36:3,10,14;38:1,2;
　43:8,16;51:13;58:4,9,11;
　59:14,18;62:12,22;65:2;
　69:11,13;70:7,10,18,19,
　20;81:2,3,10,17;82:24;
　84:1,17;133:2
**controlled (18)**
　26:20;27:6,15,20;
　32:15;42:23,25;45:6;
　69:3;70:3;73:21;78:19,
　19;81:19;82:25;83:19,
　20;84:15
**controlling (2)**
　57:14;60:4
**controls (4)**
　36:11,16;37:14;75:10
**controversial (1)**
　104:10
**convenience (1)**
　16:10
**convenient (1)**
　97:7
**cooperative (1)**
　15:22
**coordinated (5)**
　93:3,15;94:25;97:9;
　112:5
**cope (1)**
　38:24
**copies (3)**
　16:19;31:16;149:24
**Copper (1)**
　100:25
**copy (5)**
　31:18,19,25;128:16;
　150:20
**corners (2)**
　60:1,20
**corporate (4)**
　75:7;79:7;83:3,9
**Corporation (1)**
　107:13
**Costco (4)**
　12:17;112:11;118:12,
　13
**Costco's (2)**
　147:16,22
**costly (1)**
　153:25
**counsel (21)**
　29:24;31:17,25;35:2;
　54:25;59:10;61:12;
　65:24;67:1;75:19,25;
　78:5;97:24;107:1;

121:20;122:9;124:6;
126:11;143:9;147:2,8
**counsel's (4)**
　37:19;40:18;55:2;
　67:16
**count (2)**
　13:13;15:20
**couple (3)**
　53:14;87:5;91:10
**course (7)**
　19:23;34:8,23;43:21;
　45:11;65:1;152:17
**court (57)**
　11:4,11;29:12;33:7;
　35:7;39:14;47:1;48:14;
　56:17;57:1,7,5;
　80:18;85:22;86:25;87:8,
　19;93:13;99:2;104:6;
　105:15,20;107:17;108:6,
　13;110:6;115:24;116:1,
　8,18,19,22;118:17;
　121:13,15;122:13,15;
　123:15;124:22;125:13;
　126:2;130:21;134:3,16;
　136:1,17,22;137:6;
　143:7,10,17;145:15;
　147:12;148:19;149:25;
　151:10;152:15
**courts (20)**
　73:10,23;75:14;85:10,
　12;103:21,23;104:11,13;
　109:10;110:10;121:5;
　125:19;132:21;136:24;
　141:10;148:13,25;
　150:24;151:9
**Court's (3)**
　114:2;136:15;137:5
**covered (1)**
　39:10
**create (1)**
　148:9
**created (2)**
　57:14;112:7
**creates (1)**
　132:3
**creation (2)**
　57:11;150:15
**credit (2)**
　120:21;121:8
**Crego (2)**
　141:1,24
**criminal (2)**
　108:11,13
**criteria (2)**
　60:16;115:9
**criticism (1)**
　123:11
**cross-jurisdictional (21)**
　99:22;101:5,7,15,22;
　102:5,20,25;104:3,9,12,
　18,25;105:16,21;106:10,
　16,19;110:5,7,11
**cross-jurisdictionally (1)**

105:13
**cross-references (1)**
　22:3
**CRT (31)**
　18:1;32:18,21;42:20,
　21;50:22,25;51:21;
　52:21;54:11,15;65:13;
　67:5,25;68:6,11;72:25;
　76:3,10,20,25;80:14;
　86:19;133:10;135:12;
　136:15,20;137:7,7,7,13
**CRT-only (1)**
　76:9
**CRTs (21)**
　19:3,9,10,15;42:21;
　53:21;67:5,24;68:6,15,
　16,16,21;72:25;76:19;
　86:19;131:16;136:16,
　23;137:6;140:13
**crucial (1)**
　116:25
**cure (1)**
　141:14
**curious (1)**
　31:6
**currently (1)**
　26:10
**customer (5)**
　54:15;66:20;68:21;
　72:11;74:22
**customers (1)**
　27:6

## D

**DaimlerChrysler (1)**
　103:1
**Dairy (1)**
　57:3
**damages (10)**
　44:17,20;45:10;48:1,
　10,11,15,18,20;147:15
**Danek (1)**
　101:16
**DAP (6)**
　13:4;51:7,20;52:6;
　53:3,7
**DAPs (12)**
　51:1,23;53:15;59:15;
　64:10;125:3,7,18;
　142:22;143:21;154:13,
　18
**DAP's (1)**
　138:5
**DAPs' (2)**
　59:24;66:14
**Data (6)**
　13:7,16,23;15:19;
　35:13,14
**date (8)**
　24:6;25:5;61:5;90:19;
　97:6;110:1;111:7;138:4
**dated (1)**

136:21
**David (1)**
　10:8
**dawn (3)**
　92:9;94:17,18
**day (5)**
　20:18;41:1;94:19;
　142:12,24
**days (7)**
　94:1;141:11;142:11,
　16,19;143:14,18
**deadlines (1)**
　152:6
**deal (2)**
　73:23;105:11
**dealing (1)**
　132:10
**deals (1)**
　99:3
**debates (1)**
　132:22
**December (1)**
　149:20
**deceptive (1)**
　116:17
**decide (4)**
　23:22;123:15;142:18;
　144:17
**decided (17)**
　21:18;28:9;29:1,2;
　40:25;53:2,9;54:4;
　58:13,15;65:22;75:23;
　124:15;134:2;136:4;
　141:8;146:17
**decides (1)**
　40:20
**deciding (1)**
　136:1
**decision (44)**
　25:3,7,12,16,24;26:17;
　27:1;28:11,18,19;29:11;
　33:19;35:4;42:12;43:3;
　57:3,24;62:8;63:21,22;
　64:2;67:12;91:7;101:1;
　114:17,19;122:12;
　123:12;134:7,24;135:1;
　136:20;137:11;141:6,7,
　24;144:19;145:17;
　147:21;149:10,13,15,18;
　152:15
**decisions (4)**
　120:22;141:5;149:8;
　155:4
**declaration (1)**
　142:3
**deducted (1)**
　48:4
**defeat (1)**
　49:3
**defect (1)**
　141:14
**defendant (23)**
　18:1,7,8,9;30:25;31:3;

37:23;50:23,24;55:12,
25;56:6,24;58:14;62:4;
70:2;71:13;77:10;82:5;
83:25;115:21;139:2;
140:11
**defendants (50)**
　10:12,24;12:4;13:11;
　17:7,23;18:25;32:24;
　33:1;34:7;37:4;40:10;
　41:19;42:24;45:6;46:11,
　19;47:3;49:17;55:17,18;
　65:17;72:23,24;73:2;
　84:9;88:24;91:17;95:8;
　98:14;108:14,24;111:5;
　114:1;120:25;122:6,10;
　123:8,10;124:6;126:9,
　18;133:9;140:9;141:21;
　142:4;147:14;150:20;
　153:3;154:7
**defendant's (2)**
　127:18;128:1
**defendants' (17)**
　13:25;17:7;25:6;
　28:20;32:24;33:1;65:16;
　67:20;68:1;76:8;88:11,
　21;93:15;96:25;108:11;
　140:25;153:22
**defendant-specific (1)**
　66:4
**defense (7)**
　31:17,25;38:25;39:1;
　49:19,23;50:1
**defenses (1)**
　87:12
**deficient (1)**
　118:3
**definitional (1)**
　19:18
**degree (1)**
　34:4
**Dell (5)**
　46:18,21;47:11;133:7,
　11
**demand (16)**
　53:18,20;132:12;
　139:15;140:22;141:19;
　142:1,3,6,9,11,15,19,21,
　23;143:18
**demands (1)**
　131:20
**demonstrate (8)**
　60:9;95:16,22;97:8,
　18;109:15;112:25;
　141:25
**demonstrates (3)**
　95:1;107:21;108:1
**denial (1)**
　42:5
**denied (5)**
　25:6;26:16;28:21;
　101:25;108:6
**deny (4)**
　27:12;29:14;43:10;

Case 4:07-cv-05944-JST   Document 1707-14   Filed 05/31/13   Page 165 of 179
In Re: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

HEARING
February 14, 2013

97:18
**denying (1)**
  28:2
**depart (2)**
  63:22;64:6
**Department (1)**
  94:21
**dependent (1)**
  101:9
**depending (1)**
  131:21
**depositions (1)**
  78:5
**deprived (1)**
  60:11
**depth (1)**
  100:24
**desire (1)**
  117:16
**detail (10)**
  30:23;35:5;38:12,14;
  82:24;84:2;110:13;
  123:18;126:22;137:7
**detailed (3)**
  78:16,17;82:1
**determination (1)**
  122:23
**determine (3)**
  115:9,23;146:24
**determined (4)**
  26:14;123:24;139:20;
  140:6
**determining (3)**
  73:8;85:19;125:15
**Deutsche (1)**
  102:12
**developed (1)**
  130:21
**differ (3)**
  47:3,5;95:11
**difference (2)**
  73:7;132:3
**differences (2)**
  21:4;100:17
**different (56)**
  13:20;14:15;45:9,10;
  48:1;53:4;54:23;58:22;
  64:1;65:9;66:22;72:23;
  74:11;79:16;84:25;89:4,
  14;90:7;95:22;99:11,13,
  15,25;100:8,14,21;
  101:10,20;104:16,23;
  105:7,12,17;111:22,23;
  115:4,4,8,9,15;119:3;
  131:8,10,14,18,19,20;
  132:5,5,23;133:18;
  135:5,14;136:2;140:9;
  152:18
**differentiate (5)**
  37:4;72:22;73:1;
  75:25;79:14
**differentiated (2)**
  97:17;111:10

**differently (3)**
  28:15;154:2,3
**difficult (3)**
  62:6;87:18;132:16;
  135:19
**digested (1)**
  126:25
**diligence (10)**
  91:23;92:4;93:6;
  95:18;96:9;97:19;
  110:25;111:7,18;112:25
**direct (62)**
  9:5,7;10:9;11:19,20,
  23,25;12:5;19:7,20;
  20:6;23:10,14,25;24:4;
  25:14,17;28:12,18;
  39:10,12;44:3;46:8,10,
  10,16,22,25;50:12;54:4,
  20,22;55:4;58:25;66:1;
  69:1;71:5;73:16;75:15;
  76:2;77:4;78:2;79:5;
  81:6,7;85:5;88:21;89:9;
  95:12;96:15;98:10,14,
  17;100:11;113:25;
  114:10;115:3,12;
  118:20;128:18;132:6;
  152:20
**directed (3)**
  72:6;88:13;129:1
**direction (2)**
  128:25;155:24
**directive (1)**
  134:4
**directly (15)**
  18:1;19:9,10,25;
  32:23;36:1;46:3,6,7;
  69:7;77:23;147:14;
  150:1,6,19
**disagree (6)**
  42:15;47:17;48:19;
  114:12;124:25;125:17
**disagreed (1)**
  25:24
**disagrees (1)**
  144:14
**disappointed (1)**
  102:7
**disclosed (2)**
  108:8,12
**discover (2)**
  96:9;97:20
**discovered (5)**
  107:22,22;109:16,16;
  111:8
**discovery (18)**
  23:24;24:5,7,10;
  33:15;34:16,20;35:11;
  73:17;75:17;122:8;
  124:16,23;125:8;152:5;
  154:12,17,19
**discuss (4)**
  10:15;104:21;105:25;
  118:1

**discussed (3)**
  98:11;103:6;133:1
**discusses (4)**
  100:24;101:2;102:16;
  105:24
**discussing (4)**
  38:10,14,19;143:25
**discussion (7)**
  27:24;113:4,23;
  117:12,14;121:12;
  129:10
**dismiss (32)**
  9:7;10:4;18:3;23:7;
  27:8;29:15;30:18;37:20,
  22;41:9,12;43:14;50:11,
  11;53:9;55:4;58:16,16;
  72:21;75:12;78:9;88:21;
  94:13;108:4;109:3;
  113:13,19,21;117:18;
  125:2;143:25;146:23
**dismissal (6)**
  68:2;96:15;106:3;
  109:4;141:12;153:3
**dismissed (7)**
  42:9;47:8;73:12,15,
  24;106:25;153:10
**dismissing (1)**
  127:6
**dispositive (9)**
  28:20;29:8;40:21;
  42:12;50:17;82:21;
  109:8;120:6;136:14
**dispute (4)**
  22:19;90:24,25;
  129:14
**disputes (1)**
  131:15
**disrupt (1)**
  83:9
**distinct (1)**
  66:21
**distinction (2)**
  67:23,24
**distinguishable (2)**
  143:4,15
**distribution (5)**
  15:9;18:17;119:19;
  132:24;134:14
**district (10)**
  14:4,7;16:19;35:7;
  56:8;102:13;141:5,7;
  149:1;151:10
**divested (1)**
  65:12
**divide (1)**
  10:14
**Docket (3)**
  141:1,2,16
**doctrine (8)**
  90:20;98:8,22;99:1,9,
  17;105:1;130:21
**doctrines (2)**
  91:1,12

**document (2)**
  31:17;98:8
**documents (2)**
  20:8;108:13
**dominated (2)**
  70:2;81:19
**done (7)**
  33:11,14;36:9;152:11,
  11,12,12
**dooms (1)**
  133:20
**door (1)**
  9:12
**double (2)**
  47:18,19
**down (12)**
  12:6;20:9;22:10;
  43:19;70:19;85:11;
  87:23;123:16;124:15,
  24;144:23;152:17
**downstream (2)**
  86:11;137:1
**drafted (1)**
  26:21
**drag (1)**
  152:8
**DRAM (3)**
  129:24;130:1,2
**dramatically (1)**
  34:24
**draw (2)**
  77:5;85:22
**drill (1)**
  22:10
**drives (1)**
  116:19
**due (29)**
  10:20;34:8;89:6;
  91:23;92:3;93:6;110:24;
  111:7,18;112:25;113:6,
  23;114:4,5,20,22;115:5,
  24;116:3,8;120:17;
  122:3;123:14;124:14;
  125:1,15,20;127:7;128:1
**duplication (1)**
  132:17
**duplicative (7)**
  48:11,14,18,21,24;
  49:1;100:3
**during (6)**
  42:22;59:2,6;134:11;
  135:21,23
**duty (6)**
  93:4,19,25;95:15;
  96:20;111:15

---

**E**

**ear (1)**
  88:7
**earlier (7)**
  64:22;89:11;98:11,23;
  99:10;113:9;138:23

**early (2)**
  23:12;146:24
**easier (1)**
  22:18
**easily (2)**
  33:6;126:25
**easy (4)**
  22:23;40:24;118:7,16
**EC (1)**
  109:23
**ECF (1)**
  155:20
**echoing (1)**
  154:15
**economic (1)**
  86:16
**economically (3)**
  76:17;80:10;86:5
**effect (3)**
  60:6;91:6;110:8
**effective (1)**
  57:10
**effort (1)**
  141:25
**eg (1)**
  67:20
**eight (1)**
  12:24
**either (12)**
  18:7;38:16;80:19;
  91:21;105:11;106:13,
  18;107:4;124:1;129:18;
  139:1;144:12
**Electrograph (3)**
  15:12;23:4;138:13
**Electronics' (1)**
  21:22
**element (2)**
  92:3,4
**elements (2)**
  91:16;92:3
**elevator (1)**
  9:10
**Eleventh (1)**
  57:3
**eliminate (2)**
  40:8;153:12
**eliminated (2)**
  135:4;138:6
**eliminates (1)**
  138:11
**elimination (1)**
  153:20
**else (9)**
  19:14;20:10;86:21;
  90:12;137:15;139:7;
  143:22;153:20;154:1
**elsewhere (1)**
  32:22
**emailed (1)**
  155:20
**emanate (1)**
  116:2

**emanated (3)**
116:3,21,21
**employees (1)**
79:10
**enable (1)**
33:6
**enables (1)**
140:3
**enactment (1)**
149:22
**enactments (1)**
129:20
**encompass (1)**
13:20
**encompassed (1)**
27:11
**encourage (1)**
100:3
**end (10)**
11:8;20:10,18;21:23;
25:12;27:23;85:15;91:5;
97:6;106:17
**ended (1)**
39:25
**endless (1)**
132:21
**end-run (1)**
140:4
**engaged (3)**
91:18;108:24;115:21
**English (1)**
70:20
**enough (5)**
81:15;112:18,21;
121:13;124:13
**enrichment (6)**
10:22;144:1,7,12,15;
146:20
**enter (3)**
27:7;28:1;80:15
**entered (1)**
79:20
**entering (1)**
55:17
**entire (3)**
70:19;80:4;153:12
**entirely (1)**
115:15
**entirety (1)**
153:10
**entities (14)**
15:8;26:21;27:14;
32:18;77:11,20,22;
78:18;79:3,16,21,22;
82:2;85:7
**entitled (3)**
44:17;45:2;92:18
**entity (3)**
32:14,15;71:16
**envision (1)**
20:23
**equitable (4)**
61:22;145:7,8,15

**equitably (1)**
64:11
**equity (2)**
51:16;146:15
**equivalent (1)**
64:14
**especially (1)**
62:16
**essentially (8)**
57:17;92:22;95:9,23;
101:6,10;102:6;148:8
**establish (6)**
57:12;75:10;108:16;
111:5;129:22;134:18
**establishing (1)**
134:20
**et (2)**
43:2;131:13
**European (5)**
92:13;94:16,23;
108:19,19
**euros (1)**
53:23
**even (26)**
17:19;23:17,20;24:16;
29:25;30:17;31:24;
36:20;42:24;47:25;
48:25;51:23;52:18;
60:17,22;61:4;87:19,19;
104:24;108:6;112:17;
121:1;135:21;138:17;
139:4;143:20
**event (4)**
29:6;52:3;111:3,14
**eventual (1)**
26:6
**EVERETT (20)**
10:23,23;13:24;14:5;
89:3,21;90:2,12;94:9,11;
98:7;103:4,6,10,13,17,
19;110:15,18;112:15
**everybody (1)**
153:24
**everyone (2)**
79:12;90:12
**evidence (10)**
61:24;74:4;75:16,16;
80:19;82:23;107:20;
108:1,7,8
**evidences (1)**
94:24
**evident (1)**
138:14
**exact (9)**
40:7;48:8;76:2;77:2;
79:1;80:9;96:22;151:12,
19
**exactly (6)**
14:24;70:10;84:12;
95:21;111:24;133:12
**examine (3)**
115:25;116:8,9
**examined (1)**

**116:1**
**examines (1)**
122:15
**examining (1)**
114:3
**example (13)**
12:10;21:10;32:19;
42:18;46:1,12;47:10,21;
105:18;115:16;119:13;
130:15;133:5
**except (2)**
13:22;91:9
**exception (15)**
26:24;27:2,4,20;29:4,
17;33:19;38:2;41:8;
43:6,7,9,15,16;140:11
**exceptional (1)**
60:23
**exceptions (2)**
24:24;30:7
**excite (3)**
93:4,25;95:15
**exclude (1)**
118:8
**exclusive (2)**
115:21;116:2
**exclusively (1)**
141:17
**Excuse (7)**
53:19;56:1;84:6;
97:24;108:9;142:22;
148:1
**executed (1)**
92:9
**exemption (1)**
25:10
**exercise (4)**
93:6;97:19;110:24;
111:17
**exercised (4)**
91:23;96:8;111:7;
112:25
**existed (1)**
150:7
**existence (2)**
64:3;120:21
**existing (2)**
148:15;150:14
**exists (1)**
29:12
**expect (3)**
151:25;152:1,14
**experience (1)**
85:23
**expert (1)**
139:17
**expired (1)**
90:22
**explain (4)**
25:20;78:16;82:24;
119:12
**explained (1)**
79:2

**explaining (1)**
146:6
**explanation (3)**
79:5;80:23;82:1
**explicit (1)**
105:22
**explicitly (2)**
102:24;106:13
**explore (1)**
80:13
**expressed (1)**
24:20
**expressly (4)**
45:22;67:6;86:13;
141:21
**extend (3)**
42:23,24,25
**extended (1)**
51:25
**extensive (1)**
53:4
**extensively (2)**
43:13;101:2
**extent (7)**
29:15;39:11;46:20;
82:14;127:18;142:7;
155:19
**extraordinary (1)**
143:12
**eye (1)**
88:8

**F**

**F3d (3)**
101:1,16;103:2
**face (3)**
61:18,24;84:13
**facilities (2)**
93:15;96:25
**fact (34)**
38:4;39:10;40:12;
43:5;46:24;48:12;55:20;
56:6;57:13,21;58:10;
59:18;64:10;66:5;67:6;
70:9,11;75:2;78:2;
86:13;111:17;120:15;
123:2;125:13;129:25;
130:15,19;131:21;
134:13;135:20;136:16;
141:20;147:7;153:8
**fact-intensive (3)**
60:19,19;124:8
**factor (3)**
81:1;131:2;132:3
**factors (13)**
115:2;116:22;120:5,
11,14;130:3;131:22,23;
132:1,9,18;133:12;134:6
**facts (49)**
18:14;22:22;37:13;
41:18;65:19,19;66:17;
68:19;72:13;73:18;

74:14;75:8;78:5;81:14;
84:2;92:24;93:1,12,24;
95:10,16,18,21;96:1,5,
10,13;97:8,16,17,20;
110:25;111:8,20,24;
112:4,18,21,24;118:24;
119:7,10;120:1;122:2,9;
125:4,10,19;134:20
**factual (14)**
58:10,14;69:6;70:6;
71:22;72:5,12;73:9;
80:12;82:23;91:22;92:5;
109:6;126:23
**factually (1)**
78:10
**failed (1)**
107:23;109:17;121:16
**fails (1)**
132:6
**failure (6)**
37:3;72:22;73:1;
111:16;141:11,15
**fairness (1)**
33:17
**fall (1)**
118:5
**falls (2)**
52:23;57:6
**false (1)**
55:9
**familiar (2)**
11:4;15:5
**families (3)**
30:25;72:23;80:4
**family (5)**
31:3;71:15,15;79:7,11
**far (6)**
51:22;52:17,23;74:7,
17;121:1
**Fargo (1)**
126:13
**fashion (1)**
126:24
**Fast-forward (1)**
58:1
**FEBRUARY (4)**
9:1;82:3;151:14,17
**Federal (67)**
9:25;10:2,13,16;14:9;
21:9,11;24:12;25:9;
27:24;29:25;38:23;39:6,
8,8,11,14,20,25;40:3,13,
16,22;41:9,13;42:3;
43:23;44:2,4,10,12;45:5,
19;47:22;48:2;49:12,14,
14,22;50:3,12;51:17,22;
52:10,11;61:7,10,14;
65:25;66:7;86:22;98:15;
99:4,5,12;100:13,16,17;
103:21;104:1,6,10;
105:15;110:8;129:21;
152:16;153:9
**feel (5)**

18:17;28:17;73:20,21;
155:25
**feeling (1)**
38:13
**feet (1)**
152:8
**felt (1)**
154:2
**ferret (1)**
122:8
**few (5)**
32:4;83:11;99:7,8;
119:3
**field (1)**
89:9
**fifth (1)**
55:25
**file (14)**
58:25;89:5;94:15;
95:2,19;96:3;100:4;
106:24;107:23;109:17;
112:16,19;128:6;143:11
**filed (42)**
13:8,16,17,22;16:18;
23:5,18;28:25;41:11,14,
23;50:13;52:6;58:24;
59:21;64:9;65:14;66:5;
89:10,11;92:16,19;94:2;
95:6,8,23;97:11;101:24;
109:13,23;110:1;142:5,
12,15,24;143:5,8,13,19;
147:7;154:7;155:20
**filing (10)**
51:6,20;52:14;90:20;
93:7;96:11;97:1;106:3;
141:11,22
**filings (1)**
112:6
**fill (3)**
18:16;55:2;98:5
**finally (2)**
51:10;69:2
**finances (3)**
70:3;78:19;81:20
**financial (1)**
51:15
**find (10)**
11:18;31:14;74:4;
75:16;84:23;88:11;
96:22;111:20;120:2;
136:13
**finding (1)**
111:24
**fine (3)**
21:5;155:8,11
**finished (25)**
19:4,8;36:8;53:8,10,
12;54:2,9;58:20;63:25;
64:4;65:8;67:25;68:6,
11;70:1;72:25;76:3,25;
80:14;86:12,19;132:10;
135:2,24
**fireplaces (3)**

116:9,12,14
**firms (2)**
11:23;51:16
**first (30)**
9:25;10:12;11:20;
25:19;33:14;34:16;
49:19;50:21;59:12;
73:10;75:22;78:16,24;
81:5;88:24;89:1,6;
91:14,17;92:17;93:1;
94:1,2;100:1;103:3,22,
22;118:5;119:13;131:1
**five (11)**
55:16,18;56:3;94:1;
95:5;114:16;129:2,2;
130:3,6;136:7
**five-year (1)**
55:23
**fix (7)**
19:2,3;66:15,19;
72:15;86:7,18
**fixed (3)**
19:24;86:12;137:3
**flexible (2)**
115:7,13
**flip (1)**
31:20
**floor (3)**
9:9,17,17
**Florida (4)**
61:19;98:21;106:15;
118:12
**focus (13)**
32:5;43:20;88:1,3,22;
92:1;121:5;123:12;
126:2,16;129:11;
135:15;137:5
**focused (3)**
88:2;128:24;133:17
**focusing (1)**
29:1
**follow (3)**
26:5;114:15;116:24
**Following (5)**
51:1;92:14;108:7;
110:22;121:2
**follows (1)**
103:20
**Footnote (4)**
12:5;13:10,22;23:4
**footnotes (1)**
126:25
**forces (1)**
86:14
**foreign (2)**
108:21,22
**forgive (1)**
97:24
**forgotten (1)**
41:17
**form (3)**
28:1;36:14;146:8
**formal (1)**

43:21
**format (1)**
118:2
**forming (1)**
50:23
**forth (5)**
35:4;63:19,20;134:10;
140:23
**forum (3)**
99:11;101:21;102:7
**forward (4)**
43:12;124:1;146:10;
153:16
**forward-looking (3)**
58:6;59:14,17
**found (4)**
112:7;113:12;134:17;
136:24
**foundation (1)**
45:22
**foundations (1)**
54:19
**four (14)**
50:17;51:6;52:12,15;
59:5,25;60:20;89:16;
90:7,19;106:23;110:21;
113:2;154:23
**Fourth (2)**
101:3,17
**four-year (7)**
51:22;59:2;90:13;
91:8;96:10,16;112:1
**frame (1)**
55:3
**framed (3)**
42:13,23;76:14
**frames (1)**
82:6
**framework (1)**
114:3
**FRANCISCO (1)**
9:1
**frankly (4)**
38:9;105:8;110:20;
140:6
**fraudulent (28)**
38:25;55:14;56:4,20,
23;59:2;61:17,22;62:2,3,
5,19;63:17;65:5,16,18;
91:15,16;92:25;93:9;
96:14;106:19;107:3;
110:19,23;111:6;
138:22;139:1
**fraudulently (2)**
56:5;62:15
**free (2)**
73:20,21
**fresh (4)**
53:6;54:5,24;137:23
**Friday (1)**
155:10
**front (4)**
9:22;69:19;82:9;96:2

**FSupp2d (2)**
102:13;136:22
**fully (2)**
24:5;34:21
**fundamentally (2)**
127:23;131:14
**further (20)**
41:5;45:3;50:2;53:24;
57:7;59:9;60:20;65:24;
79:2;80:24,24;82:20;
92:5;124:19;126:22;
133:16;143:23;151:23;
155:17,21
**furtherance (5)**
122:22;123:3;125:14,
19;126:19
**furthermore (2)**
136:17,24
**furthest (1)**
52:17

---

## G

**gaps (1)**
55:2
**gather (1)**
19:17
**gave (2)**
31:19;62:12
**General (16)**
29:23;39:1,17,19;
40:8;61:19;76:7;100:1;
103:21;114:3;140:3,8;
146:16;147:6,7;150:11
**generally (6)**
16:23;18:17;30:8;
37:25;102:15;128:7
**generic (1)**
62:2
**gets (2)**
26:1;50:7
**gist (1)**
38:15
**given (11)**
20:9;37:8;60:6;62:16;
72:9,19;74:1;90:13;
128:24;138:21;150:12
**gives (6)**
114:8;117:7,20;
121:13;123:7;125:23
**giving (1)**
122:18
**glass (3)**
71:20;77:12,16
**goes (6)**
36:23;89:24;106:8;
119:2;122:25;137:6
**good (1)**
34:12
**goods (5)**
114:24;117:11;137:1,
4;147:13
**governed (1)**

115:6
**governing (1)**
114:11
**grant (1)**
109:4
**granted (2)**
26:16;139:17
**graphic (1)**
52:5
**gray (1)**
89:24
**great (4)**
100:24;101:20;102:8;
146:6
**greater (1)**
38:14
**ground (1)**
33:18
**Groundhog (1)**
41:1
**grounds (8)**
26:12;41:10,13;67:20;
68:2;69:5;95:4;127:8
**group (2)**
31:3;60:12
**groups (1)**
23:25
**guess (8)**
15:20;25:18;33:16;
34:21;45:24;88:2;90:9;
154:15
**guidance (2)**
20:19;121:13
**guide (3)**
117:15,15,21
**guilty (1)**
108:13
**Gustafson's (1)**
57:3

---

## H

**Hague (2)**
114:3;122:13
**Hamilton (1)**
129:23
**handed (2)**
32:16;92:7
**handful (1)**
139:10
**happen (2)**
13:3;15:10
**happened (5)**
58:23;59:5,5,8;109:25
**happens (1)**
135:11
**happy (4)**
28:3;29:6;31:9;97:13
**harm (1)**
86:9
**harmed (1)**
68:22
**harmonization (1)**

129:20
head (1)
  45:14
head-on (1)
  37:18
headquarters (1)
  120:12
hear (3)
  25:18;49:19;84:19
heard (11)
  36:7;49:13;80:6;
  100:12;119:3;133:4;
  134:9;140:18;145:23;
  148:3;154:25
hearing (2)
  11:8;13:8
heck (1)
  101:4
held (8)
  82:3;102:24;120:16;
  141:10;142:16;143:16;
  146:23;148:14
Help (4)
  9:16;17:22;98:5;
  117:15
helpful (3)
  22:5;92:7;113:24
helpfully (1)
  89:17
here's (7)
  58:2;60:4;67:15;
  78:18;86:24;107:17;
  136:16
Hewlett-Packard (1)
  133:7
Hi-Fi (1)
  118:9
highlight (2)
  31:8;42:16
Highlighted (1)
  31:23
Hitachi (2)
  10:23;92:18
Hojoon (1)
  13:2
hold (4)
  80:7,22;106:13;
  109:24
holding (1)
  145:8
Honor (249)
  10:2,19;13:12,24;
  14:5;15:4,10;16:10;
  17:24;20:17;22:18;28:6;
  29:6;30:20;31:5;32:9;
  33:16;34:25;35:19;36:4,
  18;37:1,13;39:4;40:18,
  19,25;41:4,6,19,22;
  42:11,15;43:24;44:11;
  45:25;48:5,15;49:16,18,
  18,23;50:4,7,10,14,18,
  21;51:5,10,18,18,22;
  52:2,4,7,14,16,20,22,25;

53:6,8,13;54:1,3,8,18,19,
  24;56:12;57:23;58:12,
  17,22;59:4,11,13,17,20,
  24;60:2,5,15,18,22,25;
  61:2,9,15,18,21;62:1,8,
  10,13,18;63:1,4,9,12;
  64:2,7,13;66:2,10,16,21,
  23;67:15,22;68:4,5,13,
  17,19;69:6,11,12;70:18,
  21;71:4,8;72:1,6,8,17,
  19;73:4,7,10,13;74:2,5,
  8,8,15,25;75:5,11,11,22,
  24;77:17;82:3;83:11,17;
  84:19,25;85:1,8,15,18,
  25;86:15;88:10;89:3;
  91:13;94:6;100:23;
  102:15;106:17;113:6,15,
  22,24;114:12,14,19;
  115:3,11;116:7,23;
  117:8,24;118:23;119:9;
  120:1;121:21,23;
  124:18;125:8;126:1,21;
  127:3;128:4,23;129:1;
  130:5;133:14,22;134:1,
  7,13,22;136:8,11;
  137:19,23,25;138:3,13,
  18;139:9,11,12,16,20,22,
  23;140:15,15,18,21;
  141:17;142:7,10,16,17;
  25;143:1,3,16,16,24;
  144:9,18;145:10,22;
  147:21;148:3,17;149:14,
  18,23;150:17;151:4,6,8,
  11,13,14,20,22;153:7;
  154:14;155:1,16,20
Honor's (19)
  33:19;62:4;66:24;
  67:1,6,7;72:20;76:7,11;
  77:5;85:16;98:20;113:9;
  128:24;134:24;135:1,3;
  139:12;146:16
hook (3)
  55:22;56:21,22
hope (1)
  151:3
hopefully (1)
  121:12
hoping (1)
  88:15
housecleaning (1)
  27:17
HP (4)
  46:18,21;47:11;
  133:10
Hwang (15)
  13:2,2,6,19;15:10,14,
  17,19;16:1,4;64:7,19,21,
  24;154:14
hypertechnical (1)
  35:16

I

idea (6)
  45:15;81:14;83:18,21;
  84:15,16
identical (3)
  63:19;64:11,12
identified (3)
  69:15;80:22;104:20
identify (5)
  10:17;11:7;34:11;
  43:1;114:13
identifying (2)
  11:13;67:17
ie (1)
  68:11
ignore (1)
  22:6
Illinois (20)
  24:24;38:3;39:24;
  43:7;45:17,23;48:16;
  118:13;129:3,7,17;
  130:2;133:3,25;134:3,5;
  140:1,4;147:4;154:3
Illston (11)
  35:8;78:25;114:15,20;
  116:25;117:9;120:5,23;
  144:14;149:9;151:1
Illston's (7)
  120:22;123:12;
  125:22;127:6;146:5;
  149:15;155:4
illustrate (2)
  45:4;55:15
illustrates (1)
  52:3
impact (3)
  152:24;153:15;154:17
implausible (1)
  119:11
implement (1)
  62:6
implicated (3)
  101:19;102:19;106:1
implications (1)
  52:8
imply (1)
  152:7
implying (1)
  47:18
import (2)
  99:21;104:11
importance (1)
  119:4
important (6)
  36:5;71:7;78:12;88:4;
  107:7;131:2
importantly (4)
  76:14;99:3;131:1;
  148:24
imposed (1)
  111:14
impossible (1)
  65:17
improper (1)

107:19
inaction (1)
  91:25
inadequacy (1)
  73:14
inapposite (1)
  96:14
inappropriate (3)
  78:7;124:4;146:24
include (5)
  12:9;13:1;41:13;
  119:6;121:2
included (4)
  23:24;67:4;68:6;
  117:17
includes (4)
  12:10;23:14;98:24;
  140:8
including (4)
  13:7;66:7,7;147:13
income (1)
  57:22
incorporate (1)
  80:14
incorrect (1)
  55:10
increased (2)
  53:17,20
increases (1)
  76:19
incredible (1)
  132:4
independence (1)
  18:23
independent (6)
  18:21;51:7;59:16;
  62:11;64:25;130:10
index (1)
  103:16
indicate (6)
  32:13,17;33:3;73:19;
  120:18;136:6
indicated (3)
  36:13;117:16;126:22
indicating (1)
  22:16
indirect (22)
  19:20;20:1;24:17;
  45:8;46:8;76:2;100:15;
  130:11,13,19;134:8,14;
  137:21;142:15;147:6,
  18;148:10;149:7,11,21;
  150:16;155:18
indirectly (6)
  32:23;46:3,7;147:14;
  150:2,19
individual (12)
  16:15;79:19;87:20,21;
  88:12;89:7;100:4;
  123:21;124:10,11,12;
  138:2
individualized (3)
  62:14;87:10;88:14

individuals (1)
  121:4
industry (2)
  18:18;109:11
inefficient (1)
  153:25
inextricably (1)
  137:9
inflated (1)
  90:17
information (9)
  11:13;18:11;33:6;
  34:15,22;35:15;80:25;
  81:16;82:9
initial (1)
  61:9
initiated (1)
  99:1
inject (1)
  53:24
injured (2)
  46:3;86:9
injuries (2)
  46:9;132:15
injury (9)
  46:23;48:7,9;90:15;
  117:2,5;125:24;131:4;
  132:4
inquire (5)
  93:4,21;95:15;96:7,21
inquiry (7)
  91:21;92:3;93:25;
  97:2;106:22;111:2,15
inserted (1)
  150:19
inside (1)
  9:12
installation (1)
  19:11
instances (2)
  120:10;141:13
instead (4)
  20:11;77:2,24;83:7
institutions (1)
  51:15
instructions (1)
  44:16
insufficient (5)
  37:6;38:17;119:5;
  120:17;124:5
Insurance (1)
  85:9
integrators (3)
  15:12,14;22:17
intended (1)
  48:17
intensely (3)
  58:14;109:5,6
intention (2)
  88:11;141:22
interact (1)
  80:5
interchangeable (2)

131:16,17
**interest (12)**
54:11;55:20;62:12,16,
17;70:14;75:4,4;100:19;
101:3,18;147:12
**interests (3)**
102:18;104:8;105:25
**interfere (1)**
152:4
**interlocutory (2)**
25:7;26:10
**intermediate (1)**
129:18
**interrupted (1)**
35:2
**interrupting (1)**
97:25
**intertwined (1)**
137:9
**intervening (2)**
28:19;42:12
**into (25)**
9:11;23:19,20;30:23;
50:8;53:24;54:17;55:17;
67:11;79:20;80:14,15;
99:22;101:4,14;104:11;
108:11,21;110:13;
118:5;120:12;131:10;
137:6;150:7;152:17
**introduce (1)**
80:25
**inventories (1)**
120:15
**inventory's (1)**
119:22
**investigate (2)**
111:4,25
**investigation (4)**
93:16;108:8,11,21
**investment (1)**
53:23
**investments (1)**
54:13
**invite (1)**
144:19
**invoices (1)**
120:7
**invoke (1)**
43:7
**invoked (1)**
43:6
**involve (1)**
49:21
**involved (4)**
57:16;65:18;122:17;
131:22
**involvement (2)**
50:16;52:23
**involves (1)**
72:25
**involving (1)**
121:3
**Iovieno (1)**

142:3
**IPP (1)**
141:3
**Iqbal (6)**
36:12;37:7;65:7;
81:13;85:13,18
**irrefutably (3)**
107:20;108:1;109:15
**irrelevant (4)**
59:7;110:2,21;138:20
**issue (67)**
17:11,13;19:13,24;
26:6,11;28:9;31:7;
33:13;34:21;37:18;
40:20;49:6,14;53:1;
55:3,16;57:5,25;58:10;
59:8;64:9;72:25;73:23;
75:23;76:3;79:1;80:12;
82:21;91:3;97:13;99:16;
102:11,16,23;104:3,7,
13;106:13;110:5;
111:17;114:16;120:8;
121:10;122:8;124:8,23;
125:8,9;126:17,19;
128:3,11;130:2,10;
132:6;133:3;135:10,11,
15,18;138:20;139:18;
145:19;146:19;151:10;
154:4
**issued (8)**
92:13;127:5;141:9,17;
149:10,15,20;151:1
**issues (31)**
9:21;10:2,5,25;21:17;
30:1;38:24;39:2;49:19;
56:18;60:18;64:11;65:4;
72:7;82:4;87:4,8,10,10;
88:12;98:1;99:25;
103:24;105:14;121:24;
122:11,20;123:14,15;
136:4;145:20

**J**

**James (1)**
121:21
**Jeffrey (1)**
10:15
**Jenkins (1)**
56:10
**JFTC (3)**
94:18,20,22
**job (1)**
146:6
**John (2)**
49:16;50:5
**join (1)**
23:20
**joinder (3)**
41:14,23;64:9
**joined (4)**
50:13;64:7;121:24;
138:3

**joint (15)**
22:15;35:22;49:19,23,
25;50:1,23;54:13;55:5,
22;57:18,20,22;88:12;
113:20
**jointly (2)**
16:10;22:14
**journals (1)**
109:12
**JUDGE (251)**
9:3;10:6,11;11:2;12:2,
14,19,22;13:5,10,21;
14:3,8,11,17,21,25;15:2,
13,16,18,24;16:2,5,11,
22;17:1,5,11,13,16,22;
18:15;19:6,17,23;20:21;
21:1,5,9,14,24;22:4,6,10,
13,20,25;23:9,23;24:3,
11,23;25:2,3,6,12,22,24,
25;26:5,14,17,23;27:13,
23;28:7,8,16,18,24;29:9,
11,12;30:4,14;31:2,11,
19,24;32:10,33:10,13,
22;34:13;35:1,8;36:22;
37:16;38:22;39:5,15,17;
40:4,24;41:15,20;42:2,7,
12,14;43:3,18;44:1,19,
23,25;45:11;46:6,14,24;
47:3,25;48:25;49:10,25;
50:5;53:2,9;54:25;55:7;
56:10,11,14;57:24;
58:12,19;59:10;61:6;
62:23;63:8,10,13;64:2,
17,20,23;65:23;67:10;
69:18,23;74:10,13;
75:19,24;76:11,16,23;
78:25;80:8;81:23;83:13,
23;85:3,17;86:16,21;
88:15,20;89:19;90:1,11;
94:8,10;98:2,5;103:3,5,
8,11,15,18;107:1,12,15;
110:17;112:13;113:3,16,
20;114:15,19;116:25;
117:3,8;120:5,22,23;
121:18,20;123:11;
124:19;125:22;126:4,7;
127:2,6,11,14;128:15;
129:6,23;133:21;134:1,
8,25;135:10;136:12,19,
21;137:15;138:10,16;
139:7;140:16,20;
143:22;144:14,19,21,23;
145:2,5,6,17;146:4,11,
17;147:1,23;148:6,21;
149:4,9,9,10,14,18;
150:25;151:1,16,23;
152:12;154:2,9,21;
155:3,4,8,14,23
**judgment (10)**
23:6;107:11,17,18;
108:3,6;111:16;124:2;
153:6,19
**judicial (5)**

59:21;85:23;92:12;
94:5,12
**jump (3)**
35:20;36:4,21
**jumping (1)**
36:22
**juncture (1)**
25:1
**jurisdiction (1)**
118:1
**jurisdictional (1)**
102:2
**jurisdictions (5)**
118:24;120:15,16,19;
121:17
**jury (1)**
44:16
**Justice (1)**
94:21
**justifies (2)**
53:6;54:24

**K**

**Kamamara (1)**
141:18
**Kansas (7)**
89:22,23;90:3;105:20,
22;106:2,6
**KAO (3)**
127:3,13,16
**Kaplan (1)**
10:9
**keep (3)**
40:4;87:20;153:23
**Keeping (1)**
108:5
**Keilholtz (2)**
116:6;146:18
**K-e-i-l-h-o-l-t-z (1)**
116:6
**Kent (5)**
92:18;94:4,9;96:3;
112:19
**KESSLER (50)**
10:14,15;13:15,25;
14:15,18;16:7,21;17:24;
22:15,22;23:3,17;25:19,
23;26:2;28:3,13,22;32:8,
12;33:12,16;34:17,19;
39:3,7,16,19;40:6;41:8,
16,25;42:15;43:24;47:5;
48:3;49:2;50:3;88:10;
89:1;128:4,22;129:8;
134:10,22;136:11;
137:18;153:7;154:19
**key (1)**
116:15
**KFTC (2)**
94:20,22
**kind (5)**
20:14;21:15;80:20;
87:7,17

**Kmart (1)**
12:11
**K-Mart (1)**
148:4
**knew (2)**
22:9;59:6
**knowledge (1)**
14:1
**knows (2)**
107:4;125:5

**L**

**label (1)**
146:9
**laid (1)**
139:14
**language (2)**
67:12;70:20
**lapsed (1)**
56:2
**large (2)**
98:12;123:22
**largely (1)**
98:12
**largest (2)**
82:18;93:20
**last (7)**
25:3;59:5;87:5;91:10;
103:14;126:6;128:3
**lateness (1)**
91:24
**later (18)**
23:22;29:24;34:23;
38:14;49:7;55:18,25;
80:21;82:14;94:2;99:12;
100:21;109:13;123:24;
124:9,24;139:5;141:2
**latest (1)**
106:23
**latter (3)**
21:13;92:2,2
**Lau (13)**
10:19,19;31:16;113:6,
18,22;117:4;121:19;
124:20;143:24;144:25;
145:3,6
**law (90)**
10:25;20:24;25:25;
28:14;29:12;35:18;
44:10,18;45:7,18,19;
48:23;55:10,11;56:3;
57:4;60:6;76:15;80:8;
87:3,9;88:23;89:22;
90:3;96:15;97:14,15;
98:15,19;99:5,11,12,13,
14,20;100:8,10,13,14,17,
22;101:9;102:24;
103:20,25;104:1,2,11;
105:12,22;106:25;
108:17,22;110:9,10;
113:4;114:21;121:25;
122:6,16;123:1,15,24;

Case 4:07-cv-05944-JST   Document 1707-14   Filed 05/31/13   Page 170 of 179
In Re: CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

HEARING
February 14, 2013

124:10;127:7,22,25;
129:10;130:9;137:17;
139:7;141:23;143:23;
144:2,8,13;146:7,22,22;
147:4,5,10;148:12,15,
15,25;150:5,14;151:24;
152:9
**laws (9)**
40:20;89:14;90:22;
99:23;104:2,16,18,23;
123:20
**law-specific (1)**
139:10
**lawsuit (3)**
108:14;109:10,14
**lay (1)**
20:23
**lays (1)**
122:13
**LCD (6)**
78:25;127:13;131:25;
144:16;146:5;149:15
**lead (2)**
61:12;88:25
**learned (1)**
109:23
**least (19)**
14:19;18:1,6,6;19:19;
28:2;34:4;58:24;71:12,
20;77:9,12;87:1;93:18;
95:1;104:9,10;106:21;
153:21
**leave (7)**
42:9;61:2;86:20;
87:22;88:6;142:8;
155:24
**leaves (1)**
29:19
**left (4)**
52:17;55:2;153:14;
154:17
**legal (4)**
82:22;145:9,14;
146:15
**LEGGE (185)**
9:3;10:6,11;11:2;12:2,
14,19,22;13:5,10,21;
14:3,8,11,17,21,25;15:2,
13,16,18,24;16:2,5,11,
22;17:1,5,11,13,16,22;
18:15;19:6,17,23;20:21;
21:1,5,9,14,24;22:4,6,10,
13,20,25;23:9,23;24:3,
11,23;25:2,22,25;27:23;
28:7,16,24;29:9;30:4,14;
31:2,11,19,24;32:10;
33:10,13;34:13;35:1;
36:22;37:16;38:22;39:5,
15,17;40:4;41:15,20;
42:2,7,14;43:18;44:1,19,
23,25;45:11;46:6,14,24;
47:3,25;48:25;49:10,25;
50:5;54:25;55:7;56:11,

14;58:19;59:10;61:6;
62:23;63:8,10,13;64:17,
20,23;65:23;67:10;
69:18,23;74:10,13;
75:19;81:23;83:13,23;
85:3;86:21;88:15,20;
89:19;90:1,11;94:8,10;
98:2,5;103:3,5,8,11,15,
18;107:1,12,15;110:17;
112:13;113:3,16,20;
117:3;121:18,20;
124:19;126:4,7;127:2,
11,14;128:15;129:6;
133:21;136:19;137:15;
138:10,16;139:7;140:16,
20;143:22;144:23;
145:2,5;146:11;147:1,
23;148:6,21;149:4;
151:16,23;154:9,21;
155:3,8,14,23
**less (2)**
72:24;113:2
**letter (14)**
128:16;139:15;
140:22;141:20,20;142:1,
6,11,15,19,21,23;
143:18;155:1
**letters (2)**
142:4,9
**level (1)**
35:9
**levels (5)**
71:21;77:13;131:10,
12;132:23
**LG (11)**
41:14,22;50:9,13;
56:19;64:7,9,15;65:12;
138:3,19
**LGD (1)**
58:4
**LGE (5)**
50:23;55:3;57:11,16,
19
**LGEI (1)**
51:13
**LGPD (1)**
50:24
**liability (9)**
34:5;38:4,8,16;55:23;
81:11;116:7,10,13
**liable (1)**
139:3
**licensing (2)**
115:21;116:2
**light (6)**
62:7,9;65:6,19;92:24;
113:9
**likely (1)**
124:1
**likewise (2)**
95:16;97:10
**limit (1)**
149:11

**limitation (10)**
38:24;89:14,17,23;
90:4,6,7,13,18;107:4
**limitations (38)**
10:25;29:22;39:6,8,
14;41:10,12;49:21;
51:23,25;52:9,11,24;
53:10;55:8,12;56:7;
61:4,24;89:2,6,8;90:14;
91:7,8,20;96:16,18;97:4,
22;98:18,23;101:8;
103:25;111:19;138:6,
21;139:1
**limited (5)**
26:20;37:2;38:6;
61:10;66:15
**limiting (1)**
57:15
**line (4)**
35:24;37:7;89:24;
103:14
**lines (2)**
138:15;144:10
**link (1)**
134:13
**linkage (1)**
131:12
**linked (1)**
137:9
**list (5)**
12:2;16:6;71:19;85:7;
120:19
**listed (2)**
12:5;118:1
**listening (1)**
83:14
**listing (3)**
13:10,21,23
**lists (1)**
77:11
**literally (2)**
94:1;127:4
**litigation (7)**
9:5;56:10,17;109:9;
114:9;117:7;122:4
**little (10)**
29:24;48:5;65:20;
80:6;89:11;117:15,21;
118:18;126:24;152:22
**locations (2)**
82:7;123:23
**Lockhart (10)**
10:4;121:21,22;
124:20,22;125:12;126:5,
8;155:7,11
**long (1)**
139:5
**longer (2)**
90:7;153:9
**look (44)**
20:14;29:7;52:7,16;
53:6;54:5,24;59:25;
60:15,20;61:4;65:6,7;

68:19;69:4;73:8;76:10;
81:24;85:1;94:6;97:14;
100:23;103:13;105:3,6;
106:9;111:13;117:9,16,
22,23;118:4;119:14;
121:13;126:9;132:8;
135:16;137:23;144:19;
146:4;148:12,17;149:14,
18
**looked (2)**
135:9,10
**looking (9)**
21:15;32:19;42:17;
45:13;69:14;103:8;
117:21;145:12;146:16
**looks (3)**
51:18;52:4;77:17
**lot (9)**
9:21,22;18:12;21:3;
85:16;87:10;101:11;
152:18,19
**love (1)**
115:16
**LPD (14)**
50:24;51:3,7,11,12;
55:6;56:1;57:11,14;
59:16,23;62:10,16;64:25
**LPD's (1)**
58:1
**Ltd (1)**
92:18

---

# M

**ma'am (1)**
147:1
**magazines (1)**
108:10
**Magnolia (2)**
118:9,11
**maintained (1)**
119:24
**major (1)**
108:9
**majority (3)**
82:18;144:11,17
**maker (1)**
68:10
**makes (5)**
77:19;84:6;86:17;
101:7;150:4
**making (10)**
24:14;33:20;35:16;
49:4;79:9;81:16;105:15;
135:8;137:25;155:23
**mandate (1)**
96:15
**manufacture (3)**
66:12;73:5;86:3
**manufactured (2)**
116:13,14
**manufacturer (4)**
53:12;54:3;68:10;

131:13
**manufacturers (1)**
137:2
**manufactures (1)**
70:1
**many (8)**
11:20;34:12;56:24;
67:19;130:22;131:22,
25;137:20
**March (12)**
51:5,10;58:2;59:16,
23;61:5,13;76:1,16;
136:21;138:4,19
**mark (1)**
18:23
**marked (1)**
150:18
**Market (15)**
57:2,15;60:3;73:6;
86:11,14;131:5,12,20,
21;132:2,6;135:5,6,14
**markets (4)**
73:3;132:7;137:8,9
**MARTA (1)**
15:21
**MARTINEZ (74)**
10:1,8,8;11:22;12:8,
16,21,23;14:6,10,13,24;
15:1,4;16:25;17:3,9,12,
14,21;19:5,12,21;20:16,
23;21:2,7,13;23:16;24:2,
8,22;25:1,28:19;29:3;
30:3,13,15;31:5,13,18,
23;34:18;35:3;37:17;
40:17;42:6,11;44:11,22,
24;45:3,25;46:7,16;
47:2;55:1,9;56:12,16;
58:21;63:12,14;75:20;
97:24;98:4;107:2,13,16;
133:22;136:10,20;138:8,
17
**Massachusetts (6)**
139:12,13;140:22;
141:6,7,23
**material (2)**
20:22;87:25
**materially (1)**
95:11
**matter (11)**
27:22;33:15;50:16;
86:6;100:1;104:1;
108:17;128:21;130:24;
132:20;153:14
**matters (2)**
29:20;82:7
**may (33)**
9:8,19,22;11:4;12:1,
11;18:22;26:9;34:2,18;
37:17;40:17;46:4;48:7;
58:17;63:12;64:9;65:3;
87:7;91:9;97:25;118:18;
123:19;127:3;136:11;
138:9;140:18;144:21;

145:3,9;147:12;148:3;
155:17
**maybe (6)**
18:21;19:10;22:17;
25:19;28:5;62:24
**McGINNIS (3)**
154:25;155:5,9
**McKensi (2)**
141:6;143:9
**MDL (2)**
28:14;29:13
**mean (8)**
11:16,17;12:14;22:6;
26:19;114:13;130:13;
152:7
**meaning (3)**
90:20;110:8;150:13
**meaningless (1)**
150:13
**means (6)**
17:15;26:15;77:14;
90:16;130:14;152:18
**measure (2)**
48:1;62:24
**measured (1)**
109:1
**media (1)**
112:4
**meet (4)**
27:14;128:8,13;152:6
**meeting (1)**
82:6
**meetings (14)**
70:24;71:2,21,24;
74:19;77:13,16,21,24,
25;78:3;79:14,21;81:9
**members (4)**
39:12;98:14,25;102:7
**membership (1)**
98:16
**memorandum (1)**
148:24
**Memory (1)**
149:19
**mention (2)**
125:12;137:11
**mentioned (5)**
12:25;63:6;94:3;
112:3;138:4
**mentions (1)**
143:9
**merchandise (2)**
114:25;115:25
**merely (1)**
146:8
**merits (2)**
106:4;138:1
**met (2)**
60:17;115:24
**Michigan (5)**
129:3,17;130:1;
133:25;134:2
**Microsoft (1)**

148:20
**middle (1)**
15:8
**might (8)**
22:5;27:10;31:6;64:8;
76:8;87:1;101:23;154:2
**militate (1)**
99:16
**militates (1)**
101:4
**million (1)**
53:22
**millions (1)**
35:14
**mind (1)**
108:5
**mine (1)**
128:23
**minimal (1)**
122:5
**minimum (4)**
73:13,15,25;75:13
**Minnesota (3)**
46:1;118:10,11
**minor (1)**
145:23
**minority (2)**
70:14;144:18
**minute (8)**
32:10;35:1;56:2,20;
58:19;69:18;127:11;
145:2
**minutes (1)**
86:25
**missing (1)**
40:5
**Mississippi (3)**
90:5;101:24,25
**misspoke (1)**
64:21
**model (2)**
50:20;110:18
**modify (1)**
143:17
**moment (1)**
126:1
**monitors (1)**
131:17
**months (1)**
154:23
**MOORE (4)**
145:22;146:1;147:2,
25
**more (24)**
9:16;12:1,7,11;17:2;
21:3;29:24;36:10;38:11;
51:6,19;53:4;54:23;
65:20;70:5;79:10;83:25;
87:10;106:23;118:18;
126:25;134:16;148:24;
149:23
**moreover (3)**
95:16;105:3;112:24

**Morton's (2)**
57:2;60:3
**most (16)**
12:24;15:6;16:23;
24:20;32:5;68:1;76:14;
80:12;90:19,23;93:20;
104:6;114:17;131:1,2;
144:2
**mostly (1)**
133:12
**motion (70)**
10:4,17;12:4,5;18:2;
21:22,23;23:6,7,7,21;
25:6,20;26:4,12,15;
27:12;28:2,20,21;29:15;
30:18;35:21,22;37:20;
38:3;39:22,24;40:11,13;
41:11,14,17,25;42:8,13;
43:11,14,23;44:24;50:1,
11;53:9;58:15,16;64:8;
66:6,10;72:21;78:8;
81:10;85:25;88:21;
92:11;94:13;108:4;
109:3;113:13,18,21;
117:18;125:2;138:2;
143:25;146:23;153:6,8,
11,18,19
**motions (13)**
9:6,7;13:17;16:15;
29:21;41:9;65:10,22;
66:5;67:20;68:3,4;154:8
**move (2)**
33:18;130:4
**moved (4)**
33:23;34:7;37:22;
39:22
**moving (3)**
12:3,3;55:4
**much (3)**
35:5;88:8;151:3
**multiple (4)**
14:20;16:24;123:19;
126:8
**Munger (1)**
13:3
**MURRAY (5)**
140:18;148:3,7,22;
149:6
**must (3)**
62:6;119:6;130:13
**Myers (1)**
21:21
**myself (2)**
20:7;21:15
**mystery (1)**
59:22

**N**

**name (5)**
10:6;11:12;56:14;
79:8;103:3
**named (1)**

140:10
**names (1)**
11:3
**national (1)**
108:10
**nature (1)**
135:25
**Nebraska (8)**
139:19;140:19;148:5,
13,18,19;149:14;151:19
**necessarily (5)**
44:22,23;82:20;84:4;
112:18
**necessary (3)**
62:13;125:10;130:18
**need (15)**
9:10;20:19;26:5,8;
35:9,15;59:25;60:15,20;
63:13;81:14;110:12;
120:2;145:15;154:11
**needed (2)**
95:25;143:11
**needs (1)**
87:1
**negate (1)**
62:20
**negligence (1)**
48:7
**negotiable (1)**
134:18
**negotiate (1)**
120:3
**negotiated (1)**
125:6
**neither (4)**
81:12;127:23;141:3,4
**Nevada (7)**
139:19;140:19;148:5,
13,16;149:17;151:19
**new (12)**
23:18;40:6;90:16;
101:25;102:14;105:4,6;
106:3;148:9;150:15;
152:19;155:2
**newspapers (3)**
108:9,10;109:12
**next (5)**
109:8;113:4;128:22;
153:2,4
**nice (1)**
31:25
**NIKAS (1)**
140:21
**nine (1)**
89:10
**Ninth (13)**
26:1,7;28:14;102:22;
104:5;107:8;108:2,15;
109:2;127:5,14,17;155:3
**non-defendant (2)**
45:9;46:18
**none (5)**
37:15;70:18;75:8;

106:8;128:5
**Nonetheless (1)**
81:9
**nonsense (1)**
59:4
**nonsensical (1)**
140:7
**Nope (1)**
44:24
**nor (5)**
37:22;69:8;86:2;
127:23;141:6
**normal (1)**
90:14
**normally (1)**
152:14
**Northern (3)**
14:7;56:8;148:25
**note (7)**
9:19;37:19;54:1;76:6;
82:16;128:7;138:2
**noted (5)**
11:10;23:3;60:18;
81:5;126:11
**notes (2)**
87:19;112:7
**notice (29)**
20:17;59:21;80:1;
81:19;82:5;83:18;91:21,
21,21;92:3,12;94:5,12;
96:7;20:97:2,3,3;106:22;
107:5,5,9,19;108:16;
109:5,13;111:2;112:7;
137:20
**noticed (1)**
82:12
**notion (5)**
70:22;81:2;82:15;
83:5,5
**November (29)**
25:3,13;89:10;90:23;
91:1,5,10;92:8,14,19,21;
93:1,10,17;96:1,6;97:7,
10,11;106:22;109:25;
110:1,22;112:6,17,18,
21;142:4
**nudge (1)**
81:14
**number (11)**
35:5,6;77:11;79:16;
92:15;93:23;109:7,18;
115:8,9;141:17
**numbers (1)**
63:8
**numerous (3)**
12:9;13:1;78:14

**O**

**o0o- (2)**
9:2;156:7
**oar (1)**
9:24

**object (4)**
36:19;68:12,14;73:5
**objection (1)**
37:25
**objections (1)**
38:15
**objective (1)**
97:17
**obligation (1)**
112:16
**obliged (2)**
36:24,25
**obtain (1)**
143:12
**obvious (1)**
16:12
**obviously (3)**
25:23;68:21;83:4
**occasions (1)**
114:17
**occurred (4)**
24:6;60:24;120:18;
123:3
**occurrence (7)**
114:8,14;117:6;
122:18;123:7;125:23;
126:1
**occurring (1)**
87:7
**OEMs (2)**
45:9;46:19
**off (6)**
53:21;54:12;56:21,22;
78:24;88:25
**offenders (1)**
149:22
**often (3)**
44:13;60:18;121:5
**oil (1)**
109:11
**Olson (1)**
13:3
**O'Melveny (1)**
21:20
**ominous (1)**
154:21
**once (3)**
48:10;111:2,2
**one (79)**
13:7;14:19;15:7,21;
17:2,7;18:1,7;20:9,13;
21:12,16,17;22:14,14,
17;23:3,13;29:21;30:5;
32:10;34:10,11;35:5,20;
36:15;41:8;42:8;45:13;
46:10;48:3,13;49:3;
55:17,18;60:16,20;
64:24;65:3;70:20;79:10;
83:24;84:23;89:19;94:8;
95:6,22;96:19;98:1;
105:4;111:25;113:25;
115:6,11;117:12,17;
119:7;125:11;126:11,

12;127:4,6,9,16;128:22;
134:13;138:10;139:2,
24;140:11;142:23;
143:20;144:4;145:23;
149:8,23;150:20;152:9;
155:4
**ones (1)**
12:13
**only (44)**
15:21;23:3;36:6;
39:21;41:20;43:6;48:9;
51:2;60:8,15;62:16;
70:23;72:10;75:4;84:5,
6,14;86:1,17,17;98:15;
99:3;102:2;104:18;
105:25;114:22;132:11,
12;134:23;135:12,23;
140:13;142:21,22;
143:20;146:2;148:9;
150:2,4,9,22;154:4,5,15
**operating (1)**
54:14
**operation (2)**
61:23;90:14
**opinion (8)**
127:5,9,9;136:12,13;
137:5,19;146:5
**opinions (2)**
150:25;151:1
**opportunity (1)**
74:1
**opposed (3)**
23:7;82:24;154:18
**opposing (1)**
148:23
**opposite (2)**
70:10;84:12
**opposition (3)**
97:16;104:16,21
**Oracle (1)**
126:13
**oral (2)**
87:17;135:23
**order (20)**
23:12;25:4;26:8,10;
27:8;28:1;29:7;33:24;
43:21;85:17;107:25;
111:6;114:5,20;115:23;
141:16;142:14;143:2;
151:14,17
**orders (6)**
119:21;120:8,10;
127:6;139:13,17
**organizational (1)**
152:9
**original (1)**
65:21
**others (8)**
10:17;12:11;17:10;
23:8;27:9,10;43:1;62:25
**otherwise (4)**
55:21;86:6;114:25;
142:8

**ought (2)**
33:9;74:14
**out (23)**
9:10,13;11:15,18;
20:24;25:4;33:8;34:19;
39:23;41:6;92:7;98:5;
106:8;120:3;122:8,8,13;
133:15;139:14;150:17;
152:25;154:3,10
**outright (1)**
43:11
**outside (5)**
51:22,25;52:23;59:25;
61:3
**over (6)**
11:6;51:13;58:4;
61:15;146:8;152:11
**overcharges (4)**
24:19;42:20;44:21;
46:20
**overwhelming (1)**
99:20
**own (12)**
32:2;38:17,20;67:8;
82:17;83:8;84:21,24;
91:25;112:1,22;154:7
**owned (6)**
26:20;27:6,14,19;
45:6;51:14
**ownership (15)**
19:21;24:19;25:10;
29:16;30:7,10,16,23;
31:8;38:2;70:14;75:4;
82:16,23;84:1

**P**

**PACER (1)**
16:20
**package (1)**
42:1
**Page (10)**
12:5,6;103:13;104:20;
105:19;106:12;119:14;
121:1;136:17;140:23
**pages (8)**
35:14;104:21;113:13,
16;117:24;121:14;
146:13;148:23
**paid (2)**
42:20;125:25
**panels (1)**
136:16
**papers (4)**
28:23;31:4;33:21;
134:10
**paragraph (27)**
22:3;32:20;42:17,23;
50:24;51:4,9,18;63:7;
69:21;71:7,9;77:6,17,19,
21;78:1,17;79:4;81:24;
85:2;94:16,18,20,22;
112:10,11

**paragraphs (11)**
30:21;32:15;63:2,5,
19;64:13,20;69:20;
81:25;94:7;112:12
**parcel (1)**
49:20
**Pardon (2)**
15:1;17:12
**parens (1)**
147:11
**part (18)**
10:16,16,22;13:8,17;
26:16,16,18,18;34:21;
42:1;49:20;53:6;79:13;
80:12;117:12,14;144:2
**partially (1)**
28:2
**participant (2)**
78:2;81:7
**participants (3)**
79:14,19;82:7
**participate (5)**
73:6,17;77:23;86:7;
100:5
**participated (13)**
69:2,8;70:25;71:2,20,
23;72:14;73:19;77:12,
15,20;85:7,11
**participating (4)**
24:1;72:2,3;73:2
**participation (11)**
38:12,18;54:6,16;
65:16;66:18;69:1;71:1;
77:4;100:11;139:3
**particular (13)**
87:11;88:2;96:22;
97:13;98:10;101:8;
102:4,20;103:25;105:3;
112:8;123:25,25
**particularized (1)**
62:14
**particularly (9)**
37:7;59:12;88:4;
99:20;102:23;121:14;
125:2,16;152:2
**parties (16)**
13:20;24:1;27:9;
77:25;88:13;114:7,23;
117:1;120:3,24;121:25;
122:16;124:16;132:21;
133:2,19
**parts (4)**
103:22;123:25;
124:11;145:12
**party (4)**
49:13;71:2;123:1;
126:17
**party's (1)**
123:6
**party-specific (1)**
87:13
**pass (2)**
76:19;150:17

**passage (2)**
60:4,4
**passed (3)**
45:17;46:20,21
**passive (2)**
62:17;70:13
**passively (1)**
100:5
**patience (1)**
151:5
**patriae (1)**
147:11
**pay (5)**
114:23,24;117:1,5,10
**payments (1)**
119:21
**PC (1)**
112:11
**Pecover (2)**
115:16;126:11
**P-e-c-o-v-e-r (1)**
115:17
**peg (1)**
97:6
**pending (1)**
14:7
**people (2)**
9:22;50:20
**per (2)**
104:2;122:11
**perceived (1)**
141:14
**percent (4)**
70:15;75:4;82:15,17
**perhaps (2)**
15:8;123:11
**period (15)**
42:22;52:15;55:23;
56:7;59:3,6;91:20;
96:11;97:22;107:4;
109:24;110:2;111:18,
19;112:1
**permitted (3)**
62:19;143:7;149:7
**perpetrated (1)**
57:18
**person (3)**
147:12,19;152:9
**personnel (1)**
82:10
**perspective (2)**
120:17;124:15
**pertinent (1)**
123:9
**Peterson (10)**
10:3;37:18,24,25;
75:20;82:21;84:24;145:24;
146:3,12
**Petroleum (2)**
109:9;111:11
**Philip (1)**
142:3
**Philips (33)**

41:11,20,22;49:17,21;
50:9,13,15,22;51:12,21;
52:21;53:11,21;54:2,10,
12,14;55:3;56:1,19;
57:11,17,19;58:4;62:11,
15,22;65:12;87:6;89:20;
138:2,19
**Philips' (6)**
50:16;51:2;52:22;
54:6,15;64:9
**phone (1)**
11:6
**pick (2)**
88:8;112:13
**picked (1)**
103:16
**piece (4)**
127:9,16;132:11,13
**piercing (1)**
81:12
**pile (1)**
20:12
**Pipe (8)**
99:2,17;100:2,20;
105:12,24;106:1;110:7
**place (3)**
70:8;72:5;103:9
**places (1)**
78:14
**plain (1)**
150:12
**plaintiff (13)**
20:24;30:11;55:11;
95:2;107:4,21;117:25;
120:7,8;134:9;141:19,
25;146:2
**plaintiffs (128)**
9:21;10:10;11:24;
12:9,22;13:1;14:23;
15:5;16:3,8,9;17:25;
19:1,8;23:25;24:4,14;
25:8;27:3;28:4,10,12;
32:21;33:17;38:5,8;
42:4;44:3;46:11,22;
48:19;50:9,12,15;52:25;
53:3,7;54:12,22;56:23;
58:25;59:15;60:3;62:10;
63:20;65:20;68:23,24,
25;69:24;72:21;73:16;
74:1,3;75:8,15,15;84:13,
20;85:4;90:21;91:2,13,
20;92:22;93:5,6,19;
95:10,12,17,25;96:21;
97:15;98:8,10,24;100:9,
15;104:14,24;105:9,19,
20;106:6,18;109:13,15;
110:24;111:14,20;
112:3;114:1,10;115:3,
13;116:6,17;117:4,10;
118:4,6,21;119:5,9;
120:20;121:16,20,22;
123:21;124:4;125:9;
129:15;130:11,17;

133:21;134:15;136:25;
139:25;141:3,14;
142:17;143:5,11,19,19;
147:3;148:4
**plaintiffs' (22)**
9:24;24:1;29:15;30:6;
35:25;37:3;54:7,10,14;
55:4;61:12;70:18,24;
74:25;75:1;88:22;
104:20;117:7;120:12;
125:24;140:23;152:21
**plasma (1)**
131:24
**plastered (1)**
9:12
**platform (1)**
64:1
**plausibility (11)**
54:6,15;65:6;68:8,17;
72:9;73:8;76:15;80:7;
81:15;86:17
**plausible (7)**
76:17;80:10,23;85:20;
86:5,5;119:8
**plausibly (2)**
66:18;72:13
**plead (5)**
35:9;36:24,25;125:4;
142:8
**pleading (8)**
33:9,14;34:14;38:17;
67:21;82:4,12;122:10
**pleadings (6)**
23:6;35:16;38:19;
60:24;67:2;73:14
**pleas (1)**
108:13
**please (10)**
9:4;10:7;11:3,6,10;
30:14;83:13;85:8;87:24,
25
**pled (8)**
38:11;62:10;121:25;
122:23;124:4,13;
126:20;134:19
**pm (1)**
156:6
**point (33)**
10:21;22:11;33:11;
35:20;36:5;39:22;40:11;
45:12;49:4;50:18;59:14;
65:4;78:7,11;80:8;
96:19;103:23;104:5,17;
106:8;110:19;112:2;
125:11,12;126:6;127:4;
139:25;140:25;144:4;
145:23;149:23;150:22;
151:4
**pointed (1)**
87:7
**points (8)**
10:15,18;59:11;63:15;
83:12,17;97:16;140:14

**Polaroid (1)**
118:16
**policies (3)**
70:3;81:20;99:15
**policy (10)**
56:22;99:25;100:1,19;
101:3,18;102:18;104:8;
105:14,25
**Pooler (1)**
148:17
**portion (2)**
86:22;137:19
**position (8)**
19:19;26:3;27:16;
44:3;75:23;114:14;
134:4;147:16
**possession (2)**
125:4,10
**possibility (1)**
101:21
**possible (1)**
19:9
**posture (1)**
136:2
**potatoes (1)**
85:9
**potential (4)**
38:4;102:7;132:17;
153:11
**practical (3)**
35:17;88:7;91:6
**practice (1)**
101:23
**precisely (6)**
55:16;56:8,18;57:23;
138:24;139:6
**preclude (1)**
46:25
**precluded (2)**
45:19;48:22
**preference (1)**
89:4
**prejudice (5)**
73:12,15,25;75:13;
141:13
**preliminary (1)**
108:20
**premise (5)**
30:16;39:24;55:5;
57:5;107:3
**premised (4)**
64:3;67:3,7;137:12
**prerequisite (1)**
130:8
**presence (3)**
11:9;65:11;140:2
**present (5)**
28:12;65:24;74:19;
126:24;137:16
**presentation (1)**
61:10
**presented (2)**
111:17;151:20

**presenting (1)**
50:1
**presently (2)**
29:12,14
**preserve (3)**
26:6,11;147:21
**preserved (1)**
27:16
**press (2)**
92:13;108:23
**pressing (1)**
27:4
**pressure (2)**
53:18,20
**presumed (1)**
108:24
**presumption (2)**
75:7;83:3
**Pretty (2)**
107:25;122:4
**prevail (1)**
47:21
**prevent (1)**
100:2
**previous (9)**
65:10;66:24;67:1;
68:4;72:19,20,21;
135:17;139:13
**previously (7)**
53:1,10;54:4;58:13;
66:23;134:3;151:12
**price (11)**
53:17;66:15,19;72:15;
76:19;86:7,12;90:17;
125:6,25;137:3
**price-fixed (4)**
42:21;114:23;117:11;
122:20
**price-fixing (9)**
63:24;64:4;93:16;
109:10;115:14;116:24;
126:15,16;137:12
**prices (5)**
19:3,3;53:21;86:14;
131:19
**primarily (7)**
9:5,25;10:11;20:2;
24:19;29:17;103:7
**principal (6)**
9:20;12:12,15,20,24;
24:24
**principally (2)**
9:23;63:6
**principle (3)**
145:11;146:17;149:1
**principles (1)**
129:21
**Printing (4)**
24:21;27:15;29:18;
47:14
**prior (9)**
51:6;55:7;57:24;62:8;
64:6;108:14;142:12,14;

149:22
**private (2)**
51:15;147:3
**probably (10)**
11:24;15:7;18:20;
20:3;25:18;33:23;34:16;
48:15;49:6;153:5
**problem (1)**
152:9
**procedure (1)**
43:20
**proceed (5)**
143:7;144:16;145:7,
16;146:21
**proceeded (1)**
18:5
**proceeding (6)**
13:18;27:18;44:4;
49:7;59:20;153:24
**proceedings (2)**
152:4;156:5
**process (21)**
10:21;89:6;113:7,24;
114:4,6,20,22;115:5,24;
116:4,8;120:17;122:3;
123:14;124:14;125:1,15,
20;127:8;128:2
**produced (1)**
35:13
**product (24)**
16:4;18:1;31:15;36:8,
20;53:10,12;54:3,9;
63:25;65:9;71:15;76:3,
10;116:7,10,13;131:4,9;
132:5,10,12;137:6,7
**products (44)**
18:12,20;19:4,8;
32:18,21;33:4;37:5;
42:20,21;53:8;64:5;
66:19;67:5,17,25;68:7,
11,11;70:1;72:15;73:1;
76:21;77:1;80:15;82:6;
86:2,8,12,19;109:9;
111:12;119:18,21,23;
121:5;122:21;131:7,15;
133:1,19;135:2,25;
137:13
**properly (4)**
16:17;30:19;35:10;
134:19
**proposed (3)**
23:13;29:7;43:21
**propositions (1)**
105:9
**prospect (1)**
153:9
**prospective (1)**
148:10
**protective (1)**
100:4
**prove (1)**
132:4
**provide (11)**

20:16;31:10;81:15,25;
82:23;93:19;109:12;
126:21;145:9,14;149:25
**provided (3)**
45:19;60:13;80:17
**provides (3)**
46:2;114:3;147:10
**provision (1)**
150:4
**provoking (1)**
11:17
**prudence (1)**
132:20
**prudential (5)**
113:7,12;124:7;
130:20;132:8
**public (1)**
70:15
**publicity (6)**
93:2,14;94:25;96:24;
97:8;112:5
**publicly (1)**
70:13
**publicly-filed (1)**
108:12
**publicly-owned (2)**
37:12;84:7
**publicly-traded (2)**
37:14;75:3
**pull (1)**
152:10
**punitive (1)**
98:17
**punted (1)**
124:24
**purchase (25)**
19:9;34:11;47:20,22,
24;66:13;90:17;118:7,
11,14;119:1,10,16,20;
120:2,4,8,9,18;121:6,17;
125:5,6;131:3;137:1
**purchased (15)**
19:8,15;32:18,21;
33:3;34:1;37:6;42:22;
66:12;114:25;116:1;
117:11;123:22;133:6;
147:13
**purchaser (22)**
19:20,20;24:17;36:6;
39:13;54:5,21;68:21;
69:9;73:16;74:22;98:14,
17;100:11;130:11,13;
134:8,14;140:13;149:8,
11,21
**purchasers (9)**
20:1;76:20;80:14;
124:11;130:19;137:21;
142:15;148:10;150:16
**purchasers' (1)**
124:12
**purchases (9)**
26:20;27:13,19;45:5,
8,9;46:10,17;66:20;

68:16;69:25;70:23;
72:11,16;84:6;98:13;
100:16;118:23,25;
122:20;135:13;147:18
**purchasing (2)**
86:8;121:4
**purpose (1)**
57:14
**purposes (11)**
19:11,18,25;27:9;
35:12;78:8;82:4;88:7;
122:3;123:5;125:14
**pursuant (1)**
86:14
**pursue (3)**
48:23;100:15,16
**pursued (3)**
47:6,12,14
**pursuing (2)**
38:5;91:23
**put (10)**
15:14;21:7;22:16,23;
65:19;87:23;96:6;97:1;
105:4;150:6
**puts (1)**
81:18
**putting (1)**
68:20

**Q**

**quarter (1)**
12:6
**quick (3)**
83:12,13,17
**quickly (2)**
92:15;139:16
**quite (10)**
11:12;47:19;59:24;
60:17;66:11;105:8;
110:19;140:6;144:9;
152:8
**quote (7)**
51:3;84:15;108:20,23;
109:14,15;136:18
**quoted (1)**
85:18
**quoting (2)**
51:11;53:16

**R**

**RadioShack (1)**
90:4
**raids (10)**
92:8,9;93:3,15;94:17,
18,25;96:25;97:9;112:5
**raise (6)**
39:7;40:18;43:13;
78:12;81:9;127:3
**raised (9)**
29:5,20;30:2;38:15;
41:2;78:25;81:1;118:20;

151:13
**raising (1)**
56:19
**Random (1)**
149:19
**rather (10)**
17:6;34:23;96:4;
111:15;112:20;115:7;
116:1;121:11;144:18;
146:16
**ray (2)**
9:4;93:17
**RCW (1)**
148:1
**Re (5)**
56:9,16;85:8,9;138:22
**reaches (1)**
90:18
**reaching (1)**
109:19
**read (8)**
20:7;21:10,12;58:7;
117:20;127:8;137:19;
150:9
**reading (5)**
20:13;69:20,21;88:9;
152:19
**reads (1)**
85:18
**realize (4)**
9:21;14:17;121:23;
153:1
**really (10)**
28:7;38:14;80:12;
88:12;121:9;122:7;
123:13;124:8;133:19;
135:18
**reargue (1)**
87:24
**reason (13)**
42:16;63:22;64:5;
66:3;76:24;79:13;80:17;
110:14;135:20;143:6,6,
10;150:6
**reasonable (3)**
95:17;96:9;97:19
**reasoned (1)**
125:22
**recall (2)**
61:18;135:21
**receive (4)**
51:24;52:13;57:21;
120:7
**received (1)**
119:17
**recent (1)**
99:21
**recently (4)**
13:8,22;24:20;114:17
**reception (1)**
9:13
**recess (4)**
86:23,25;88:17,19

**recognize (8)**
28:8,11;103:24;
105:22;110:6;120:21,
23;154:6
**recognized (2)**
80:9;110:11
**recommend (1)**
153:4
**recommendation (2)**
141:2,9
**recommendations (2)**
76:7;141:4
**reconciliation (1)**
48:16
**reconsider (1)**
64:1
**record (7)**
9:4;10:7;11:13;18:13;
32:1;37:19;74:18
**records (1)**
82:11
**recover (4)**
42:20;44:17;49:5;
147:17
**recoveries (1)**
44:9
**recovering (1)**
44:19
**recovery (4)**
47:18,19,23;48:8
**redline (1)**
52:17
**redlines (1)**
52:8
**refer (12)**
50:18;64:13;78:22;
85:1,8;139:11,22,24;
140:15;143:1;151:8,14
**reference (3)**
78:4,13;134:24
**referenced (2)**
89:18;138:23
**references (4)**
22:1;78:15;94:14,16
**referring (1)**
50:20
**refers (1)**
79:6
**reflect (1)**
149:25
**refreshments (1)**
9:15
**refused (1)**
145:6
**regard (4)**
77:4;78:20;79:3;
114:15
**regarding (8)**
35:25;39:4,23;70:10,
19;128:16;151:15;155:4
**regards (3)**
76:1;81:11,11
**rejected (7)**

26:18;35:7;85:12;
134:12,12;142:25;
151:13
**related (7)**
61:13,14;64:3;76:25;
108:14;113:7;133:2
**relates (2)**
128:3;139:15
**relating (3)**
41:18;81:21;97:14
**relation (6)**
83:4;93:16;98:21;
104:3;105:6;112:2
**relationship (6)**
28:17;30:24;59:23;
78:18;82:1;84:9
**release (2)**
92:13;108:23
**relevant (3)**
42:22;122:22;131:5
**relied (5)**
54:20;63:6;115:12;
116:5;141:17
**relief (3)**
85:20;145:7,8
**relinquished (1)**
58:8
**relinquishment (1)**
59:22
**rely (8)**
93:9;98:8;100:10;
105:1;106:18;111:6;
122:1;144:3
**relying (5)**
24:25;32:2;33:18;
106:6;122:7
**remain (3)**
49:1,2,8
**remaining (3)**
53:22;60:12;88:11
**remedial (1)**
46:14
**remedies (2)**
45:2;146:25
**remedy (5)**
45:18,19;145:9,14;
146:15
**remember (4)**
69:25;70:22;104:14;
132:25
**remembering (2)**
9:14;48:16
**remind (1)**
50:10
**remote (3)**
132:15,23;133:13
**remotely (1)**
134:16
**repair (1)**
19:10
**repealer (6)**
147:5;148:8,9,14;
149:22;150:8

**repeat (2)**
11:3;123:18
**repeating (1)**
113:10
**replead (2)**
74:1,3
**reply (9)**
58:21;103:7,12,14;
104:22;106:12;134:23,
24;140:20
**reported (2)**
79:21;109:11
**reporter (2)**
11:4,11;86:25;87:20
**representatives (1)**
119:24
**represented (1)**
77:24
**representing (2)**
11:23;79:22
**request (5)**
92:12;94:5,12;142:8;
155:24
**require (2)**
35:4;115:6
**required (5)**
33:8,25;35:17;82:12;
122:14
**requirement (6)**
34:14;62:5;65:7;
131:3;139:16;142:7
**requirements (1)**
115:23
**requires (5)**
54:5;85:22;110:24;
142:19;143:18
**requiring (1)**
129:20
**resellers (1)**
147:15
**reserve (1)**
40:10
**resident (2)**
147:18,24
**residing (1)**
147:19
**resolution (1)**
27:22
**resolve (2)**
118:17;145:18
**resolved (4)**
29:20;64:12;124:24;
140:25
**resolves (1)**
92:25
**resolving (1)**
29:10
**resources (1)**
154:12
**respect (64)**
11:19;21:21;27:1,8,
13,18;28:9;36:3;37:4;
38:22;41:9,12;42:3;

49:11;51:17;52:9;53:7;
59:12,13;60:2;61:1,17;
62:3,5,21;65:3,4,25;
67:2;68:9;69:10,13,17;
70:21;73:11;74:2;84:8;
87:6;110:4;114:21;
116:4;118:9,12,15;
124:5,7;125:16;129:17;
136:4;138:2;139:11,13,
19,23,25;141:2,15;
142:14;143:3;144:5;
148:18;149:13,17;
151:18
**respectfully (1)**
25:23
**respects (1)**
28:21
**respond (14)**
34:18;40:17;58:18;
63:12;75:21;110:15;
124:21;126:5;138:8;
140:24;142:11;145:24;
146:3,14
**responded (2)**
34:20;64:10
**responding (1)**
61:16
**response (4)**
45:4;81:10;136:10;
140:17
**rest (5)**
15:22;17:19;125:7;
145:20,20
**rested (1)**
124:6
**restitution (6)**
10:22;144:1,7,13,16;
146:20
**restore (1)**
147:12
**result (6)**
46:3;53:17;79:23;
91:25;99:19;106:17
**resulted (1)**
115:22
**Resuming (1)**
88:20
**resuscitate (1)**
91:2
**retailer (2)**
15:7;131:13
**retailers (8)**
14:23;15:6,23;16:23,
24;19:19;22:17;98:12
**retain (1)**
88:8
**retired (1)**
60:9
**retroactive (1)**
139:21
**retroactivity (2)**
139:21;151:18
**reversing (1)**

127:6
**review (3)**
26:10;107:8;136:12
**reviewing (3)**
26:17;43:3;85:22
**Reynolds (1)**
148:17
**Rhynes (2)**
144:20;145:18
**R-h-y-n-e-s (1)**
144:20
**Richard (1)**
112:12
**right (47)**
9:3;10:3;11:2;14:13,
24;16:20,22;20:4;23:16;
24:11,18;25:2;30:2;
40:11,18;42:3,5;44:6,7,
8;46:16;49:10;52:4;
86:21,23;89:21;103:9;
107:1;110:3;113:3,16;
117:9;120:11;128:20;
135:8;137:15;138:16;
143:22;148:6,10;150:7,
15;151:23,25;153:17,23;
155:23
**rights (4)**
20:2;59:23;106:21;
128:1
**rise (5)**
114:8;117:7;122:18;
123:7;125:24
**RJ (1)**
148:17
**road (3)**
123:16;124:16,24
**Robins (1)**
10:8
**room (1)**
9:9
**rote (1)**
62:18
**routinely (1)**
85:10
**Royal (9)**
24:21;27:15;29:17;
47:13;50:22;51:1,12,20;
58:4
**Rubber (3)**
56:9,16;138:22
**rule (11)**
26:3;82:5;93:8;95:4,
20;97:21;103:21;
104:11;144:11,18,18
**ruled (5)**
33:22;40:15;53:2;
120:23;151:20
**rules (2)**
82:13;150:11
**ruling (18)**
26:5,6,27:13;43:4;
64:6;66:24;67:1,6,8,9;
72:21;76:1,11,12,12,16;

127:15;135:17
**rulings (2)**
67:11;150:24
**run (3)**
111:4,19;138:21
**running (2)**
97:5;112:24
**runs (1)**
91:4

**S**

**safely (1)**
32:1
**sale (2)**
18:7;48:4
**sales (2)**
33:7;125:6
**same (37)**
23:10,10,20;35:6;
40:19;44:14,20;47:1;
48:4,7,9;56:18;57:16;
79:1;88:9;92:22;94:19;
95:9,21,24;109:19;
111:24;116:16;118:15;
124:8;127:12;131:5,9;
132:3;135:6;142:24;
146:21;151:11,12,19;
153:14;155:13
**Samsung (24)**
21:21;37:21;38:7;
70:4;71:13,14,18;77:10,
20,22,25;78:15,18;
79:15,15,17,24,25;81:4,
6,20;82:2;85:6;87:7
**Samsung' (1)**
78:23
**Samsung-specific (2)**
4:4;35:21
**SAN (1)**
9:1
**Sarah (1)**
16:20
**sat (1)**
106:20
**satisfaction (1)**
130:18
**satisfied (10)**
114:6,21,22;116:4,9;
125:15;130:7,25;131:2,5
**satisfies (1)**
142:18
**satisfy (2)**
142:6;143:21
**save (4)**
13:13;21:15;93:10;
106:20
**saving (2)**
106:2,7
**saw (2)**
21:24;22:4
**saying (9)**
15:16;28:7,15;40:4;

76:8;78:17;112:16,17;
113:25
**schedule (5)**
23:10;152:23,24;
153:16,24
**scheduling (1)**
23:12
**scope (1)**
41:6
**SDI (34)**
36:3,11,16;37:11,14,
21;38:7;69:2,3;70:4,12,
23;71:1,1,18,23;72:4;
73:21;74:25;75:2,10;
78:21;79:15,25;81:4,18,
20;82:16,17,19,25;
83:10,19;84:7
**SDI's (1)**
38:9
**se (2)**
104:2;122:11
**SEA (4)**
66:5,11;73:25;75:12
**Seaboard (1)**
105:18
**SEAI (3)**
76:13;78:14;79:25
**search (2)**
82:11;92:9
**Sears (3)**
12:10;90:4;148:4
**SEC (74)**
21:21;35:22;36:5,10,
15,20;37:8,9,13;38:6,9,
15;66:5,10,11;68:10,15,
22;69:2,2,7,7,9,25;70:2,
13,22;71:18,23;72:3,10,
14,14;73:4,11,19,20,25;
74:18,21;75:9,10,12,25;
76:13;77:10,15;78:2,11,
13,19,21;79:15,25;80:1,
2;81:3,6,18,19;82:17,25;
83:7,9;84:5,5,11,21,23;
85:5,6;86:6;140:10,12
**second (12)**
29:22;38:11;47:23;
91:19;97:23;98:7;101:3;
104:5;112:2;138:10;
141:8,16
**Secondly (1)**
79:19
**SEC's (5)**
36:3;38:12;66:18;
69:1;77:4
**Section (2)**
115:18;143:25
**seek (3)**
42:19;58:4;98:16
**seeking (5)**
48:20;83:6;110:25;
122:10;133:5
**seeks (1)**
50:11

**seems (3)**
16:12;50:19;153:1
**sell (2)**
16:24;66:13
**seminal (1)**
107:9
**send (2)**
29:7;128:15
**sending (1)**
43:20
**sense (11)**
68:20;85:24;86:6,17,
18;97:25;102:15;
113:25;150:4,10;155:7
**sent (13)**
34:19;119:20;120:9,
10;141:19,20;142:1,9,
11,19,21,23;143:18
**separate (18)**
23:21;31:2;37:11,14;
41:11;46:22;70:22;
71:11;75:2,3;84:7;
92:25;105:5;114:16;
130:20;132:10,14;154:7
**separately (4)**
70:15,15;130:16;
137:10
**separately-owned (1)**
70:12
**separateness (3)**
75:7;83:3,9
**September (2)**
143:2;146:5
**seriously (1)**
54:16
**serve (1)**
43:21
**served (4)**
14:1;142:4;155:17,21
**services (1)**
60:13
**set (8)**
35:4;63:18,20;86:14;
89:9;115:6;134:10;
140:23
**sets (2)**
22:14;45:2
**seven (8)**
11:22,25;12:7,12,12,
23;104:19;105:4
**Seventh (1)**
101:1
**several (2)**
55:22;96:21
**severed (1)**
60:10
**shall (1)**
48:14
**shape (2)**
34:23;36:13
**share (7)**
15:25;16:2;19:15;
21:3;28:4;52:3;150:21

**shareholder (1)**
82:18
**shareholding (2)**
62:12,17
**shares (1)**
51:14
**Sharp (2)**
133:8,11
**shelf (1)**
154:23
**Shenzhen (1)**
79:16
**Sherman (9)**
24:18;44:18;46:15,17;
47:7,12;48:22;115:17,18
**shipments (2)**
119:18;120:14
**shopping (1)**
101:21
**short (1)**
20:17
**shortcut (1)**
20:4
**show (2)**
38:17;93:24
**shown (1)**
38:8
**shows (3)**
57:9,22;130:17
**side (8)**
9:24;11:18;25:15;
40:22;43:23;52:4;105:5;
155:18
**signed (1)**
23:12
**significance (3)**
17:17;116:12;133:18
**significant (6)**
38:19;72:24;87:15;
114:7;115:10;116:11
**significantly (1)**
38:11
**similar (4)**
31:3;82:4;109:14;
129:23
**similarities (2)**
21:3,4
**similarly (1)**
141:24
**simple (3)**
66:11;134:25;145:18
**Simply (14)**
12:21;32:20;56:21;
84:18;87:24;88:7;96:4;
105:8;113:10;119:1;
120:2,16;138:17;144:9
**single (6)**
69:16;71:4;79:8;
82:18;116:16;117:20
**situated (1)**
134:16
**situation (7)**
36:24;38:6;45:20;

54:8;61:20;65:21;99:9
**situations (1)**
75:14
**six (5)**
11:24;12:7,23;90:8;
105:7
**six-day (1)**
109:24
**size (2)**
12:22;131:23
**sizes (2)**
131:22,25
**skeptical (2)**
74:3,5
**skirt (1)**
19:24
**slight (1)**
127:21
**Slow (1)**
144:23
**small (2)**
32:4;132:11
**sold (6)**
116:10,19;119:22;
131:10,18;133:2
**solid (1)**
116:18
**somehow (18)**
36:10;70:21,23,25;
71:1,2,23;72:2;73:18,20;
75:10,10;80:23;85:7;
86:12;109:22;140:2,3
**someone (2)**
31:7,9
**sooner (1)**
34:22
**sophisticated (1)**
93:20
**sorry (8)**
9:17;12:3;32:11;
61:15;89:15;144:23;
149:6;151:16
**sort (1)**
18:19
**sounds (1)**
80:11
**Southern (1)**
102:13
**sovereign (1)**
99:14
**sovereignty (1)**
101:11
**Soward (1)**
102:12
**spare (1)**
132:21
**speak (8)**
10:1;11:3,6;17:10;
53:14;64:8;66:9;86:22
**speakers (1)**
9:20
**speaking (2)**
10:12;121:22

**specific (23)**
21:22;22:1,3,14;
27:25;41:18;45:22;
50:15;54:23;65:11,15,
20;67:11;71:5,16;80:2;
87:11;114:21;118:24;
121:17;129:11;146:19;
154:12
**specifically (19)**
30:11;35:8,23;36:16,
17;38:7;68:23,24;69:4;
77:8;78:13;81:18;85:17;
101:13;103:20;122:25;
130:16;133:5;147:13
**specificity (1)**
35:10
**specifics (2)**
33:24;50:8
**speculative (1)**
132:15
**speeches (1)**
100:22
**spelled (1)**
133:15
**spend (2)**
154:11
**split (1)**
146:7
**spoken (2)**
11:9;83:14
**sponte (2)**
40:14,14
**SRAM (1)**
126:12
**stage (10)**
33:14;49:7;58:16;
80:21;111:16;122:4;
124:2;146:23,24;153:6
**stand-alone (3)**
144:6,11,15
**standard (14)**
40:19;80:7,9;84:3;
102:4;108:2,3;109:1;
114:11,24;115:7,13;
125:18;130:7
**standards (4)**
27:14;72:9;81:13;
115:6
**standing (15)**
28:10;46:8;113:7,12;
124:7;130:14,20,23;
132:20;133:6,9,20;
134:18,20;136:25
**standpoint (1)**
153:22
**start (8)**
11:15;30:15;35:16;
88:18;89:1;96:7;97:4;
107:2
**started (2)**
111:19;112:23
**starting (1)**
74:13

**starts (1)**
111:4
**State (103)**
10:5,6,25;14:12,15,19;
20:24;24:13;34:1,9;
39:4,20,23;40:20;44:5,9,
12,18;45:7,13,15,15,16,
18,21;46:25;47:15,15,
25;48:12,23;49:22;
50:11;61:3,7,12,13,19;
66:8;72:14;87:3,8,9;
88:18,23;89:14;90:22;
96:15;98:18;99:7,14,23;
100:10,13,14,18;101:8,
10,11;102:6;103:25;
104:1,2,11,13,16,23;
105:12;106:13,24;110:6,
9,10;113:4;114:21;
116:19;117:5;121:25;
122:16;123:4;127:7;
129:19,21;130:12;
132:25;133:4;137:17;
138:5;139:7,10;140:8,
12;143:23;147:5,8,16,
18,19;148:25;150:24;
151:24;152:16,17
**stated (7)**
47:9;88:16;108:23;
114:20,24;122:15;
144:22
**statement (8)**
55:10,10;58:6,9;
59:15;76:7;86:16;
104:13
**States (43)**
32:22;51:19;85:20;
87:11;89:7,15;93:21;
94:21;98:12;99:6,8;
101:3,11,20;102:4,9;
104:19,19;105:2,4,7;
106:11;108:9;114:23;
118:14;120:8;122:13;
127:10,17;129:2,2,12,
19,25;130:3,6,10,22;
136:5,7;148:11,13;
150:24
**state's (3)**
122:6;123:24;124:10
**states' (1)**
123:19
**State-specific (1)**
87:12
**Static (1)**
149:19
**stating (2)**
76:3;141:21
**status (4)**
15:2,5;16:8;23:2
**statute (57)**
10:24;29:21;38:24;
39:5,7,14;41:10,12;46:1;
47:15;49:4,20;51:23,25;
52:9,11,24;53:10;55:8,

12;56:2;61:4,23;89:2,5,
8,16,23;90:3,5,7,13,14,
18;91:6,8;96:16,17;
97:4;98:18,22;101:8;
103:25;106:2,7;138:6,
20,25;142:18,18;143:17,
17,21;148:5;149:17;
150:3,7

**statutes (9)**
44:9;45:16,21;48:12;
89:14;148:8;149:4,6,24

**statutes' (1)**
48:1

**statutory (8)**
59:6;91:19;96:10;
97:21;110:2;111:18;
129:20;145:13

**step (2)**
79:1;108:20

**still (14)**
11:9;19:2;20:2;29:11,
19;30:1;38:23,23;53:11;
73:2;76:4;78:6;139:3;
152:5

**stipulation (1)**
23:19

**stop (2)**
61:22;87:14

**stream (1)**
121:10

**strike (1)**
152:3

**strong (3)**
75:7;83:3;107:25

**strongly (2)**
72:18;75:12

**stunned (1)**
84:19

**sua (2)**
40:14,14

**Subject (10)**
19:21;26:9;28:14;
33:15;35:10;44:15;
67:18;82:7;128:20;
137:16

**submission (1)**
128:6

**submissions (3)**
113:14;155:17,22

**submit (7)**
16:9;27:25;28:5;72:8;
110:13;117:8;142:5

**submitted (6)**
23:13,14;92:11;94:5,
12;142:2

**Subsection (2)**
148:1,1

**subsequent (1)**
153:18

**subsidiaries (4)**
32:25;33:2;45:7;46:12

**substance (1)**
146:8

**substantial (1)**
93:14

**substantive (6)**
65:4;148:15;149:3;
150:2,5,15

**sue (5)**
24:18;46:4,8;56:24;
133:10

**suffer (3)**
86:9;117:6;131:4

**sufficiency (1)**
82:22

**sufficient (21)**
36:11;63:18,21;85:14;
93:4,18,25;95:2,15,19;
96:6,10;108:16;113:14;
119:7;122:2;124:14;
131:11;134:17;141:12;
142:6

**sufficiently (4)**
81:3;121:16;127:19;
133:17

**suggest (4)**
49:22;72:2;128:4;
136:3

**suggesting (1)**
54:19

**suggestion (1)**
109:22

**suggests (3)**
96:4;102:19;112:20

**suit (1)**
109:23

**suited (1)**
125:2

**suits (2)**
100:3,4

**Sullivan (1)**
126:12

**sum (1)**
71:9

**summarize (2)**
54:18;119:15

**summary (10)**
107:11,16,18;108:3,6;
111:16;118:2;124:2;
153:6,18

**Supp (1)**
56:17

**supplied (1)**
34:15

**supplier (2)**
17:2;30:11

**supply (1)**
57:15

**support (5)**
105:8;115:13;118:25;
119:10,15

**supposed (4)**
78:9;83:21,22;84:16

**Supreme (7)**
75:6;99:2;105:20;
114:2;122:13;130:21;

148:19

**sure (18)**
11:10;12:6;16:16;
17:14;19:15;22:8,12;
31:15;32:16;34:9;39:22;
58:20;82:20;98:7;
127:11;155:5,14;156:3

**surely (2)**
123:8;126:19

**surrounding (4)**
93:14;96:24;97:9;
112:5

**suspend (1)**
61:23

**Sutcliffe (1)**
126:13

**swimming (1)**
121:9

**switched (1)**
58:7

**system (2)**
15:12,14

**systems (2)**
15:15;23:5

## T

**table (1)**
19:14

**tag (1)**
31:9

**TALADAY (15)**
41:4,22;49:16,16;
50:7;58:17;59:11;61:9;
63:1,9,11;64:14;92:6;
137:25;138:12

**Taladay's (1)**
89:18

**talk (10)**
24:12;25:13;48:14;
49:11;57:8;65:1;83:21,
22;84:16;118:19

**talked (1)**
69:11

**talking (8)**
35:21;37:20;71:14,17;
132:25;135:13;142:23;
155:12

**talks (3)**
136:15,22;137:8

**Target (4)**
12:10;89:22;90:2;
138:14

**targeted (2)**
129:4,9

**Target's (1)**
90:8

**task (1)**
85:21

**tea (1)**
9:15

**Tech (4)**
13:7,16,22;15:19

**telephone (1)**
11:6

**television (1)**
133:8

**televisions (4)**
131:15,24,24,25

**telling (2)**
25:15;74:16

**ten (5)**
51:19;55:24;65:13;
104:23;139:4

**terms (7)**
38:1;80:13;92:5;
96:19;110:20;120:24;
150:13

**terribly (1)**
152:4

**test (1)**
27:16

**testified (5)**
71:25;74:7,18,21,24

**testimony (1)**
78:4

**theme (1)**
119:2

**theoretically (1)**
47:14

**theories (1)**
48:8

**therefore (9)**
13:17;26:2;39:13;
63:25;66:16;134:19;
135:7;153:10,13

**thinking (1)**
118:18

**third (5)**
20:9;27:9;91:22;
101:18;128:20

**Thirdly (1)**
51:5

**though (8)**
23:21;24:17;29:25;
30:17;31:24;47:25;
60:17;108:7

**thought (4)**
39:5;64:8;89:3;95:2

**three (9)**
63:5,15;69:5;83:16;
92:2;95:5;118:14;
142:16;154:23

**three-year (4)**
89:16,23;90:3,5

**throughout (1)**
75:16

**thus (2)**
74:7,17

**tie (1)**
75:9

**ties (1)**
60:10

**timely (2)**
96:11;107:24;109:17;
110:14

**times (1)**
119:3

**timing (1)**
128:25

**Title (3)**
85:9;119:18;120:24

**Tobacco (1)**
148:18

**today (15)**
9:6;13:9,18;36:7;
40:24;41:25;68:14;
98:11;100:12;117:13;
118:19;119:3;127:5,16;
136:2

**together (8)**
15:15;21:8;22:23;
44:14,15;82:2;152:10;
153:24

**told (1)**
78:6

**toll (3)**
93:9;98:17;105:1

**Tolles (1)**
13:3

**tolling (43)**
39:9;51:24;52:13,19;
90:20,25;91:12;98:7,9,
22;99:1,3,7,9,17,22;
100:2,20;101:6,7,15,22;
102:2,6,20,25;104:4,9,
12,18,25;105:12,16,21,
23,25;106:10,14,16,20;
110:5,7,11

**tolls (1)**
107:3

**tomorrow (2)**
20:18;155:9

**took (4)**
70:7;74:10;101:13;
119:18

**top (1)**
52:7

**topic (1)**
113:4

**topics (1)**
113:8

**Toshiba (5)**
10:20;46:12,13;47:21,
23

**total (2)**
13:6;71:9

**totality (1)**
120:6

**toward (1)**
80:4

**towards (2)**
38:7;80:2

**trace (1)**
132:22

**track (3)**
23:11,20;87:20

**trade (1)**
109:12

**traded (2)**
70:13,16
**transaction (6)**
114:8,13;117:6;
122:17;125:23,25
**transactions (1)**
122:20
**transcript (2)**
43:19;112:14
**transferred (5)**
50:22,25;51:21;52:21;
54:11
**trend (1)**
99:20
**trial (4)**
44:7,8;49:9;124:3
**tried (3)**
24:8;44:15;130:11
**trigger (1)**
56:7
**triggered (1)**
55:13
**triggering (1)**
138:25
**TRO (2)**
143:12,13
**trouble (1)**
9:14
**true (5)**
14:18;18:4;32:13;
42:18;78:9
**trumped (1)**
80:24
**try (1)**
128:23
**trying (9)**
18:15;19:24;40:7;
41:6;43:7;75:25;83:8;
132:4,22
**tube (1)**
9:5
**tubes (18)**
36:6;37:3,9,10;66:12,
13,13,15;69:9,25;70:23;
72:11;74:22,23;84:6,6;
86:2;93:17
**turn (2)**
46:19;146:15
**turned (1)**
111:12
**TVs (1)**
46:12
**Tweeter (2)**
142:12,21
**twice (2)**
49:5;62:8
**two (32)**
15:7,11,13,17,18;
22:13;23:11,15,25;35:6;
40:20;46:9;48:8;59:11;
89:11,16;91:12;92:2,25;
103:22;118:5;124:21;
125:12;129:25;131:10,

12,14;137:9;138:12;
139:12,17;144:9
**Twombly (11)**
33:23;35:23;36:12;
37:7;65:7;72:9;81:13;
85:13;119:5;128:8,14
**two-page (2)**
128:16;155:1
**type (3)**
18:20;35:6;153:19
**types (2)**
44:7;115:1

### U

**ultimately (3)**
49:8;109:20;115:25
**unaffected (1)**
154:20
**unavailable (1)**
145:8
**uncertainty (1)**
40:9
**uncontested (1)**
37:9
**Uncontroverted (2)**
107:20,25
**uncover (3)**
73:17;75:16;110:25
**uncovered (3)**
55:24;93:7;95:18
**undefined (1)**
85:6
**undeniable (1)**
112:24
**under (62)**
23:6;24:18;25:9;27:2,
12,15,19;30:7;33:23;
35:23;36:12;37:6;38:2;
44:9,10,17;45:2,17;
46:14,17;47:7,12,14,22;
48:23;65:7;75:5;76:16;
81:13;82:5,12;85:13;
89:13,22;90:2,4,21;
98:15;99:5,11,13;
100:10,16,21;104:15,18;
110:10;113:4;115:17,
18;123:1,18;128:1;
133:10,20;141:22;144:7,
13;146:2,22;147:3,25
**underlies (3)**
67:19;68:1;100:19
**underlined (1)**
31:21
**underlying (2)**
100:2;122:2
**undermined (1)**
101:19
**undifferentiated (1)**
72:22
**unfair (4)**
115:22;127:24;144:2;
146:21

**unfortunately (1)**
16:1
**uniform (1)**
21:11
**uniformly (2)**
85:12;103:23
**United (6)**
32:22;93:21;94:21;
98:12;108:9;122:12
**unjust (6)**
10:21;144:1,7,12,15;
146:20
**unless (7)**
45:18;89:4;93:5;
107:19;133:15;136:8;
153:2
**unlike (1)**
16:12
**unnamed (1)**
108:22
**unrelated (6)**
133:7,8,13,19;135:13,
13
**unspecified (1)**
108:21
**untimely (2)**
61:20,25
**up (21)**
9:18;10:14;20:13;
24:6;25:5;38:1,3;41:25;
62:12;88:8;103:16;
112:13;119:1;120:1;
121:9;132:9;134:13;
135:23;142:17;143:17;
151:3
**upon (12)**
29:16;32:2;45:14,16;
115:12;116:5;122:1,7;
123:2;124:16;142:4;
144:3
**upstairs (1)**
9:16
**up-to-date (1)**
24:9
**urge (5)**
26:3,11;27:21;75:11;
137:18
**use (3)**
12:25;36:14;98:16
**used (2)**
32:3;36:15
**using (4)**
20:14;30:9;36:9;85:11
**usual (1)**
131:8
**utilized (1)**
125:19

### V

**validity (1)**
45:23
**value (1)**

53:22
**various (13)**
11:23;30:24;32:15;
90:22;97:1;98:18;99:14,
15,23;100:17;110:10;
112:6;123:23
**vary (1)**
131:21
**vast (1)**
82:18
**veil (1)**
81:12
**veil-piercing (1)**
83:4
**venture (7)**
50:23;53:25;54:13;
55:5;57:18,20,22
**venued (1)**
46:2
**verbal (1)**
140:17
**verbalizing (1)**
29:10
**versus (11)**
57:2;76:10;87:17;
92:18;101:16;102:12;
103:1;114:2;119:4;
146:15;148:19
**viable (2)**
43:5;44:12
**vicarious (4)**
38:4,8,16;81:11
**view (10)**
25:21;28:13;37:6;
62:4;68:17;84:25;115:4,
5;150:14,22
**viewed (1)**
62:7
**vindicate (1)**
100:12
**violate (1)**
127:25
**violations (1)**
108:21
**Virginia (2)**
101:14;102:1
**virtually (2)**
61:2;138:5
**virtue (1)**
98:13

### W

**Wade (1)**
101:16
**Wait (8)**
35:1;56:1,19;69:18;
127:11;141:11;143:14;
145:2
**waited (1)**
106:23
**walk (1)**
12:16

**Wang (2)**
116:17;126:13
**wants (5)**
29:7;49:19;57:7;
100:23;137:16
**warrants (1)**
92:9
**Washington (19)**
129:3,6,13;130:17;
133:24;139:23;140:1,8;
145:23;146:2;147:2,4,4,
5,8,10,19,20,23
**washrooms (2)**
9:10,11
**water (1)**
109:24
**wave (2)**
33:15;34:16
**way (16)**
26:16,22;27:16;29:8;
33:22;36:13;46:1;64:3,
3;76:13,24;82:21;98:3;
108:5;145:18;150:9
**week (2)**
155:7,9
**weeks (2)**
91:10;95:5
**weighing (1)**
83:15
**well-established (1)**
130:9
**Wells (1)**
126:13
**weren't (2)**
70:24;71:24
**Westlaw (4)**
145:1,1,3;146:12
**what's (13)**
15:2;20:15,15;31:3;
32:16;56:14;83:18;
99:21;103:3,20;113:3;
116:11,11
**whatsoever (1)**
118:7
**whenever (2)**
155:6,14
**whereas (1)**
61:14
**Whereupon (2)**
88:19;156:5
**White (1)**
10:19
**whole (8)**
33:19;35:24;57:5;
78:15;85:6;88:5;127:9;
135:25
**wholesale (1)**
15:21
**wholesaler (3)**
15:20;18:24;131:13
**wholesalers (7)**
15:17,18;17:6;18:12,
20;22:17;27:10

**who's (1)**
  72:4
**whose (1)**
  122:16
**widespread (2)**
  93:2;94:24
**Wilken (3)**
  146:17;149:9;150:25
**Wilken's (1)**
  149:18
**willing (1)**
  80:15
**Wisconsin (2)**
  90:8;138:14
**wish (2)**
  76:18;86:22
**withdraw (2)**
  57:23;139:2
**withdrawal (8)**
  57:10;59:12;60:2,24;
  62:21;76:25;138:4,18
**withdrawn (1)**
  58:14
**withdraws (4)**
  55:12,18;56:6,24
**withdrew (6)**
  55:6,25;56:2,21;57:6,
  12
**within (17)**
  33:25;47:13;77:25;
  78:1,14;79:11;80:5;
  91:19;95:5,6,22;96:10;
  97:21;109:24;111:25,
  25;125:10
**without (8)**
  20:6;29:10;40:15;
  73:15,24;75:13;137:25;
  152:9
**Witness (8)**
  71:24,25;74:6,6,6,17,
  17
**witnesses (2)**
  74:21,24
**word (11)**
  12:25;32:3,5;34:10;
  36:9,14,15;70:20;81:17;
  87:22;88:2
**words (10)**
  26:8,21;30:10;31:21;
  40:7;85:11;150:1,10,12,
  19
**work (5)**
  16:4,7;31:15;57:18;
  101:23
**workability (1)**
  87:16
**world (3)**
  55:19;92:10;93:4
**worldwide (4)**
  92:8;93:14;96:24;97:9
**writing (1)**
  27:25
**written (7)**

  28:25;33:15;54:12;
  87:17,22;113:11,14
**wrong (4)**
  14:22;110:20;132:2;
  153:6
**wrote (2)**
  53:21;67:15

## Y

**year (7)**
  25:4;55:17;56:1;95:7,
  22;111:25;139:2
**years (19)**
  51:6,19;52:12,15;
  55:18,24;56:3,24;59:5;
  65:13;89:16;90:8,9,19;
  99:21;106:23;110:22;
  113:2;139:4
**yellow (1)**
  31:23
**yesterday (2)**
  25:4;67:15
**York (4)**
  40:7;102:14;105:4,6

## Z

**zero (7)**
  37:13,13,15;69:6;
  72:1,5;75:8
**zone (1)**
  130:22