# DOCUMENT 15

**WHITE & CASE**

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005

Tel   + 1 202 626 3600
Fax   + 1 202 639 9355
whitecase.com

Direct Dial + 202-626-3696      alau@whitecase.com

February 22, 2013

<u>VIA E-MAIL</u>

Honorable Charles A. Legge
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA  94111

Re:   *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-5944 SC,
      MDL No. 1917 (N.D. Cal.):   Defendants' Response To *AT&T Mobility
      LLC v. AU Optronics Corp.*, No. 11-16188, slip op. (9th Cir. Feb. 14,
      2013)

Your Honor:

        We write on behalf of defendants in this action to address *AT&T Mobility LLC v. AU
Optronics Corp.*, No. 11-16188, slip op. (9th Cir. Feb. 14, 2013) ("*AT&T*") (attached), in relation
to the due process arguments made in Defendants' Joint Motion to Dismiss and for Judgment on
the Pleadings as to Certain Direct Action Plaintiffs' Claims, filed on August 17, 2012 ("Joint
Motion").   As we will demonstrate, none of the direct action plaintiffs that are subject to the
Joint Motion's due process arguments meet the standards articulated by the *AT&T* Court.

        In *AT&T*, the Ninth Circuit examined whether California's Cartwright Act could apply to
AT&T's claims consistent with due process based on the allegations of AT&T's complaint.
Observing that the Cartwright Act makes unlawful both the sale of price-fixed goods in
California as well as the initial agreement to fix those prices (without reference to where those
goods will eventually be sold), the *AT&T* Court noted that the "transaction and occurrence" for
due process purposes "includes not only the sale of price-fixed goods, but Defendants' alleged
agreements and conspiracies to fix LCD prices." *AT&T*, slip op. at 13.   The Court found that the
AT&T complaint alleged sufficient connections between the claims and California because it
alleged that the defendants "entered into agreements to fix the prices of LCD panels in
California," "offered significant detail as to what conspiratorial conduct took place in
California," and identified "specific employees of particular Defendants, operating from offices
in California, [who] participated in illegally obtaining and sharing their co-conspirators' pricing
information." *AT&T*, slip op. at 7.

ABU DHABI  ALMATY  ANKARA  BEIJING  BERLIN  BRATISLAVA  BRUSSELS  BUCHAREST  BUDAPEST  DOHA  DÜSSELDORF  FRANKFURT  GENEVA
HAMBURG  HELSINKI  HONG KONG  ISTANBUL  JOHANNESBURG  LONDON  LOS ANGELES  MEXICO CITY  MIAMI  MILAN  MONTERREY  MOSCOW  MUNICH
NEW YORK  PARIS  PRAGUE  RIYADH  SÃO PAULO  SHANGHAI  SILICON VALLEY  SINGAPORE  STOCKHOLM  TOKYO  WARSAW  WASHINGTON, DC

Honorable Charles A. Legge

February 22, 2013

In this case, the allegations in the direct action plaintiffs' complaints fall far short of the allegations made by the plaintiffs in *AT&T*.  Importantly, none of them contain any specific allegation that defendants entered into any price-fixing agreement in California.  Most assert only that the alleged conspiracy affected California.  A handful of direct action plaintiffs further note that various criminal indictments "state[] that the combination and conspiracy [charged in the indictments] was carried out, in part, in California."[1]  Unlike the allegations at issue in *AT&T*, the direct action plaintiffs do not allege that any information was exchanged improperly in California or that any agreement on prices was reached in California.  *Compare AT&T*, slip op. at 7; *AT&T*, Second Am. Compl. ¶¶ 9, 105, 115, 238 (attached).  The bare and conclusory allegation that the conspiracy was "carried out, in part, in California" lacks any factual content to suggest plausibly that Defendants engaged in conspiratorial activity in California and thus falls far short of the standard articulated in *Bell Atlantic Corporation v. Twombly*.  550 U.S. 544, 556 (2007) ("[A] bare assertion of conspiracy will not suffice" and "a conclusory allegation of agreement . . . does not supply facts adequate to show illegality."); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("the complaint does not answer the basic questions:  who, did what, to whom (or with whom), where, and when?").

Another category of direct action plaintiffs in this case assert claims in states other than California and include ***no*** allegations of price-fixing conduct in those particular states.[2]  Thus, *AT&T* has no applicability to this category of claims.

A final category of state law claims are accompanied by allegations that "Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within" the states of Florida and Massachusetts.[3]  The statutes of Florida and Massachusetts, however, merely prohibit the sale of price-fixed goods and do not prohibit agreements and conspiracies involving price-fixed goods.[4]  As a result, *AT&T* does not apply to these claims.

Respectfully submitted,

*/s/ Lucius B. Lau*

Lucius B. Lau

---

[1] Circuit City Compl. ¶¶ 178-181, 183; Electrograph FAC ¶¶ 189-191, 252; Office Depo Compl. ¶¶ 172-175, 177; Polaroid Compl. ¶¶ 4, 166, 168; Target Am. Compl. ¶¶ 191-195, 255, 268 (Kmart, Old Comp, RadioShack, Sears, and Target).

[2] Circuit City (Illinois); CompuCom (New York); Costco (Arizona, Florida, Illinois); Electrograph (New York); Kmart: (Illinois, Minnesota, Nebraska, Nevada, North Carolina); Magnolia Hi-Fi (Minnesota); Old Comp (Illinois); Polaroid (Minnesota); RadioShack (Mississippi); Sears (Arizona, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin); and Target (Arizona, Illinois, Iowa, Kansas, Michigan, New York, North Carolina, Wisconsin).

[3] Kmart (Florida); RadioShack (Massachusetts), Sears (Florida and Massachusetts); and Target (Florida).

[4] *See* Fla. Stat. §§ 501.203, 501.204 ("Unfair methods of competition . . . in the conduct of any trade or commerce are hereby declared unlawful," and defining "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good . . . ."); Mass Gen. Laws ch. 93A §§ 1, 2 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful" and defining "trade" and "commerce" as "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property . . . .").

Honorable Charles A. Legge

WHITE & CASE

February 22, 2013

    cc:  David Martinez, Esq.
          David M. Peterson, Esq.
          Philip J. Iovieno, Esq.
          All Defense Counsel

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AT&T MOBILITY LLC; AT&T
CORP.; AT&T SERVICES, INC.;
BELLSOUTH TELECOMMUNICATIONS,
INC.; PACIFIC BELL TELEPHONE
COMPANY; AT&T OPERATIONS,
INC.; AT&T DATACOMM, INC.;
SOUTHWESTERN BELL TELEPHONE
COMPANY,

*Plaintiffs-Appellants*,

v.

AU OPTRONICS CORPORATION; AU
OPTRONICS CORPORATION AMERICA,
INC; CHI MEI CORPORATION; CHI
MEI OPTOELECTRONICS
CORPORATION; CHI MEI
OPTOELECTRONICS USA, INC.; CMO
JAPAN CO., LTD.; NEXGEN
MEDIATECH, INC.; NEXGEN
MEDIATECH USA, INC.; CHUNGHWA
PICTURE TUBES LTD.; TATUNG
COMPANY OF AMERICA, INC.; EPSON
IMAGING DEVICES CORPORATION;
EPSON ELECTRONICS AMERICA, INC.;
HANNSTAR DISPLAY CORPORATION;
LG DISPLAY CO., LTD.; LG DISPLAY
AMERICA, INC.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG

No. 11-16188

D.C. No.
3:09-cv-04997-SI

OPINION

2    AT&T MOBILITY LLC v. AU OPTRONICS CORP.

SEMICONDUCTOR, INC.; SAMSUNG
ELECTRONICS AMERICA, INC.; SHARP
CORPORATION; SHARP ELECTRONICS
CORPORATION; TOSHIBA
CORPORATION; TOSHIBA AMERICA
ELECTRONICS COMPONENTS, INC.;
TOSHIBA MOBILE DISPLAY
TECHNOLOGY CO., LTD.; TOSHIBA
AMERICA INFORMATION SYSTEMS,
INC.,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted
November 9, 2012—San Francisco, California

Filed February 14, 2013

Before: Ronald M. Gould and Milan D. Smith, Jr.,
Circuit Judges, and Kevin T. Duffy, District Judge.*

Opinion by Judge Milan D. Smith, Jr.

---

* The Honorable Kevin Thomas Duffy, District Judge for the U.S.
District Court for the Southern District of New York, sitting by
designation.

AT&T MOBILITY LLC v. AU OPTRONICS CORP.      3

## SUMMARY[**]

### Due Process / Application of State Law

The panel reversed the district court's partial dismissal of an antitrust action alleging a global conspiracy to fix the prices of LCD panels.

The panel held that with respect to state-law claims based on purchases that occurred outside California, the defendants' alleged underlying conduct involved not just the indirect purchase of price-fixed goods, but also the conspiratorial conduct that led to the sale of those goods. Accordingly, to the extent a defendant's conspiratorial conduct was sufficiently connected to California, and was not "slight and casual," the application of California antitrust law to that conduct would be neither arbitrary nor fundamentally unfair, and would not violate the Due Process Clause.

## COUNSEL

Ethan P. Schulman (argued), Crowell & Moring LLP, San Francisco, California, for Plaintiffs-Appellants.

Richard S. Taffet (argued), Bingham McCutchen LLP, New York, New York, for Defendants-Appellees.

Emilio E. Varanini (argued), for Amicus Curiae the State of California.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

M. SMITH, Circuit Judge:

The district court has certified to us pursuant to 28 U.S.C. § 1292(b) "the question whether the application of California antitrust law to claims against defendants based on purchases that occurred outside California would violate the Due Process Clause of the United States Constitution." Because the underlying conduct in this case involves not just the indirect purchase of price-fixed goods, but also the conspiratorial conduct that led to the sale of those goods, we answer in the negative. To the extent a defendant's conspiratorial conduct is sufficiently connected to California, and is not "slight and casual," the application of California law to that conduct is "neither arbitrary nor fundamentally unfair," and the application of California law does not violate that defendant's rights under the Due Process Clause. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981).

We therefore reverse the district court's order dismissing Plaintiffs' California law claims,[1] and remand for further proceedings consistent with this opinion.

---

[1] We focus on Plaintiffs' claims under the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700–16770 (Cartwright Act or Act), but the principles articulated herein apply equally to Plaintiffs' claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*. (UCL). The UCL provides a cause of action for harms caused by "any unlawful, unfair or fraudulent business act or practice." *Id*. It thereby "'borrows' violations from other laws by making them independently actionable as unfair competitive practices." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003). Because a violation of the Cartwright Act is, by definition, actionable under the UCL, we do not belabor our analysis in this case with respect to Plaintiffs' UCL claims.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs-Appellants AT&T Mobility LLC, AT&T Corporation, AT&T Services, Inc., BellSouth Telecommunications, Inc., Pacific Bell Telephone Company, AT&T Operations, Inc., AT&T Datacomm, Inc., and Southwestern Bell Telephone Company (collectively, Plaintiffs) are entities that provide voice and data communication services, and also sell mobile wireless handsets. Collectively, they do business in many parts of the world, including in California, though only one of them alleges that its principal place of business is located in California. Defendants-Appellees AU Optronics Corporation of America, Inc., Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen Mediatech, Inc., Nexgen Mediatech USA, Inc., Chunghwa Picture Tubes Ltd., Tatung Company of America, Inc., Epson Imaging Devices Corporation, Epson Electronics America, Inc., and Hannstar Display Corporation (collectively, Defendants)[2] are manufacturers and distributors of liquid crystal display (LCD) panels, whose respective headquarters and principal places of business are located in Asia and the United States, including California. Plaintiffs allege that between 1996 and 2006, they purchased billions of dollars worth of mobile handsets containing Defendants' LCD panels. They further allege that the prices they paid for those handsets were artificially inflated because Defendants had orchestrated a global conspiracy to fix the prices of LCD panels.

---

[2] Since oral argument in this case, the parties have stipulated to the dismissal of this appeal with respect to a number of the Defendants. Defendants Chunghwa Picture Tubes Ltd., Tatung Company of America, Inc., and Hannstar Display Corp. remain as Appellees.

Plaintiffs sued Defendants in the United States District Court for the Northern District of California under the Clayton Act,[3] the Sherman Act,[4] California's Cartwright Act,[5] California's UCL, and, in the alternative, the laws of a number of other states, seeking to recover damages caused by their direct and indirect purchases of LCD panels from Defendants. The Cartwright Act provides a private cause of action for indirect purchasers of price-fixed goods, whereas the antitrust laws of some other states do not. *See Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1082–83 (Cal. 2010) (discussing the effect of *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977), and California's legislative response). None of Plaintiffs' purchases at issue in this case was made in California.

After filing their initial complaint, Plaintiffs filed a first amended complaint (FAC). Defendants moved to dismiss Plaintiffs' California law claims in the FAC on the ground that the Due Process Clause of the Fourteenth Amendment forbids the application of California law to those claims. The district court granted Defendants' motion to dismiss, holding that the Due Process Clause requires that "in order to invoke the various state laws at issue, plaintiffs must be able to allege that 'the occurrence or transaction giving rise to the litigation'—plaintiffs' purchases of allegedly price-fixed goods—occurred in the various states."

---

[3] 15 U.S.C. §§ 12–27; 29 U.S.C. §§ 52–53.

[4] 15 U.S.C. §§ 1–7.

[5] Cal. Bus. & Prof. Code §§ 16700–16770.

The district court granted Plaintiffs leave to amend their complaint to specify each state in which the "purchases of price-fixed goods" were made. In this second amended complaint (SAC), Plaintiffs also included more detailed allegations regarding Defendants' California conduct that they claimed violated California law. They alleged that "defendants engaged in and implemented their conspiracy in the U.S. through the offices they maintained in California," and that Defendants entered into agreements to fix the prices of LCD panels in California. Plaintiffs offered significant detail as to what conspiratorial conduct took place in California. They alleged, for example, that specific employees of particular Defendants, operating from offices in California, participated in illegally obtaining and sharing their co-conspirators' pricing information.

Defendants moved to dismiss the SAC, in response to which Plaintiffs maintained that "they may pursue all of their claims under California law because defendants' price-fixing conduct in California creates the significant contacts between California and plaintiffs' claims required by Due Process." The district court disagreed, and dismissed Plaintiffs' California law claims that were not based on purchases that took place in California.

The district court granted Plaintiffs' motion to certify the dismissal order for immediate appeal under 28 U.S.C. § 1292(b), and we granted permission to appeal.

**STANDARD OF REVIEW**

We review de novo a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Frey v. California.*, 982 F.2d 399, 401 (9th Cir. 1993). We also

"review de novo questions of law, including due process claims." *Buckingham v. Sec'y of U.S. Dept. of Agr.*, 603 F.3d 1073, 1080 (9th Cir. 2010).

## DISCUSSION

Plaintiffs challenge the district court's conclusion that it violates Defendants' due process rights to apply California antitrust law to claims involving the purchase of price-fixed goods outside of California. They allege that the application of California law to all Defendants is constitutionally permissible because Defendants conspired, in California and in violation of California law, to fix the prices of goods that Plaintiffs eventually purchased elsewhere.

In its order dismissing Plaintiffs' FAC, the district court grounded its due process analysis on the view that "[i]n a price-fixing case, the relevant 'occurrence or transaction' is the plaintiff's purchase of an allegedly price-fixed good." Accordingly, the court concluded that the application of the antitrust laws of any state other than the state where the Plaintiffs purchased the allegedly price-fixed goods would violate Defendants' rights to due process. The court applied the same reasoning in its order dismissing Plaintiffs' SAC, which we review on interlocutory appeal.

The district court's conclusion ignores conduct that may give rise to a cause of action under the Cartwright Act. A modern "price-fixing case" is not a creature of common law, but instead arises under federal antitrust laws[6] or the antitrust

---

[6] *See, e.g.*, Sherman Antitrust Act, 15 U.S.C. §§ 1–7; Clayton Antitrust Act, 15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53.

laws of various states.[7]   The "relevant transaction or
occurrence" for purposes of a due process analysis is
therefore informed, at least in part, by the scope of conduct
that gives rise to liability under the relevant statutes.   A
reading of the plain text of the Cartwright Act reveals that the
district court's place-of-purchase focus severely truncates the
scope of anticompetitive conduct that the Act proscribes.

The Cartwright Act enumerates a relatively broad array of
anticompetitive and conspiratorial conduct that constitutes a
"trust."  Cal. Bus. & Prof. Code § 16720. The Act declares
that "every trust is unlawful, against public policy and void,"
*id*. § 16726, and provides a private right of action to "[a]ny
person who is injured in his or her business or property by
reason of anything forbidden or declared unlawful by this
chapter," *id*. § 16750.[8]  The unlawful activities described in
section 16720 include the sale of price-fixed goods in
California. *Id*. § 16720(d).  But that section includes other
conduct, such as the initial agreement to fix those
prices—without reference to where those goods will
eventually be sold. As the California Supreme Court has
explained:

> The Act also reaches deep in proscribing
> anticompetitive conduct: it prohibits two or
> more persons "[t]o make or enter into or

[7] "Today, every state (and the District of Columbia) has some kind of
antitrust law . . . ."  Stephen Calkins, *Perspectives on State and Federal
Antitrust Enforcement*, 53 Duke L.J. 673, 678 (2003).

[8] The question of whether the Cartwright Act provides a cause of action
based exclusively on out-of-state purchases is distinct from the inquiry of
whether such an application would violate the Due Process Clause, and is
not at issue in this case.

> execute or carry out any contracts, obligations
> or agreements of any kind or description, by
> which they . . . [a]gree to pool, combine or
> directly or indirectly unite any interests that
> they may have connected with the sale or
> transportation of any . . . article or
> commodity, that its price *might in any manner*
> be affected." (Bus. & Prof.Code, § 16720,
> subd. (e)(4), italics added.)  In so doing, the
> Act reaches beyond the Sherman Act to
> threats to competition in their incipiency . . . .

*Cianci v. Superior Court*, 710 P.2d 375, 383 (Cal. 1985)
(ellipses and alterations in original); *see also Knevelbaard
Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir.
2000) ("Under both California and federal law, agreements
fixing or tampering with prices are illegal per se." (quoting
*Oakland-Alameda Cnty. Builders' Exch. v. F. P. Lathrop
Constr. Co.*, 482 P.2d 226, 232 (Cal. 1971) (in bank))).
Rightly understood then, the "transaction or occurrence"
proscribed by the Cartwright Act includes not only the sale of
price-fixed goods, but the full extent of incipient
conspiratorial conduct described in section 16720 of the Act.

Defendants argue that the application of California law
would nonetheless violate their due process rights because
Plaintiffs' purchases of price-fixed goods all took place
*outside* of California.  However, the United States Supreme
Court held long ago that "[o]bjections which are founded
upon the Fourteenth Amendment must . . . be directed[] not
to the existence of the power to impose liability for an injury
outside state borders, but to the manner of its exercise as
being so arbitrary or unreasonable as to amount to a denial of
due process." *Alaska Packers Ass'n v. Indus. Accident*

*Comm'n*, 294 U.S. 532, 541–42 (1935) (applying California Workmen's Compensation Act to injuries sustained while employee was working in Alaska, where employment contract was executed in California).  Articulating what would amount to a denial of due process in that context, the Court later explained that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981).[9]  The Due Process Clause thus requires a court to invalidate the application of a state's law only where the state has "no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *See id*. at 308, 320.

In *Allstate*, the Court upheld the application of Minnesota insurance law to an insurance policy delivered in Wisconsin to a Wisconsin resident who subsequently died in an automobile accident that took place in Wisconsin and involved another Wisconsin resident. *Id*. at 320.  Following the accident, the decedent's wife moved to Minnesota and brought suit against the insurer in Minnesota court seeking a declaration that Minnesota law applied to her late husband's automobile insurance policy. *Id*. at 305–06.  The Minnesota Supreme Court upheld the application of Minnesota insurance law, and the United States Supreme Court affirmed. *Id*. at

---

[9] Though *Allstate* was a plurality opinion joined by four of the eight justices who heard the case, "[t]he dissenting Justices were in substantial agreement with this principle," and the Court later ratified it as controlling precedent. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818–19, 821–22 (1985).

12    AT&T MOBILITY LLC v. AU OPTRONICS CORP.

306–07, 320. The plurality cited three contacts Minnesota had with the case and the parties: (1) the plaintiff's husband's daily commute to Minnesota and his membership in that state's workforce prior to his death; (2) Allstate's general business presence in Minnesota; and (3) the plaintiff's Minnesota residency. *Id*. at 313–20.

As the somewhat tenuous nature of the Minnesota contacts illustrates, the Court's decision in *Allstate* places only "modest restrictions on the application of forum law," *Shutts*, 472 U.S. at 818, and most commentators have viewed *Allstate* as setting a highly permissive standard.[10] Neither the purchase and delivery of the relevant insurance policy nor the automobile accident that the plaintiff sought to recover on occurred in Minnesota. By comparison, Plaintiffs claim that some portion of Defendants' alleged illegal price-fixing conduct took place within California. Wherever the outer limit of due process constraints may lie, it is clear to us that Defendants' alleged illegal activity within California created more significant contacts with California than the contacts described in *Allstate* created with Minnesota.

In contrast to the broad scope of the *Allstate* plurality's search for contacts, the district court's guiding principle makes a single contact—the location of Plaintiffs' injury—dispositive. Put differently, the district court's place-

---

[10] *See, e.g.*, Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1240 (1992) ("*Hague* signalled judicial willingness to allow states extreme latitude in applying their own laws."); Russell J. Weintraub, *Who's Afraid of Constitutional Limitations on Choice of Law?*, 10 Hofstra L. Rev. 17, 17 (1981) ("*Allstate Insurance Co. v. Hague* confirms the view that the due process and full faith and credit clauses impose few limitations on choice of law . . . ." (footnotes omitted)).

of-purchase rule represents a return to the "wooden" and "now largely abandoned" *lex loci delicti* doctrine—an approach the plurality explicitly rejected in *Allstate*. *See Allstate*, 449 U.S. at 316 n.22. The *raison d'etre* of choice of law analysis, particularly in the context of tort-like suits,[11] is the common understanding that "a set of facts giving rise to a lawsuit, or a particular issue within a lawsuit, may justify, in constitutional terms, application of the law of more than one jurisdiction." *Allstate*, 449 U.S. at 307; *see also Shutts*, 472 U.S. at 823 ("[I]n many situations a state court may be free to apply one of several choices of law."). We see no reason why the due process constraints on the application of state antitrust law should, unlike any other area of law, follow the obsolete *lex loci delicti* rule.

Instead, the relevant "occurrence or transaction" in this case includes not only the sale of price-fixed goods, but Defendants' alleged agreements and conspiracies to fix LCD prices. Accordingly, the district court should have considered *all* of the Defendants' conduct within California leading to the sale of price-fixed goods outside the state when determining whether California law could be applied without offending Defendants' due process rights. *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012) ("California has a constitutionally sufficient aggregation of contacts to the claims of each putative class member in this [fraudulent misrepresentation] case because Honda's

---

[11] *See* Restatement (Second) of Conflict of Laws § 145 (1971) (when determining what state has the most significant relationship to the occurrence and the parties, contacts to consider include: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered).

corporate headquarters, the advertising agency that produced
the allegedly fraudulent misrepresentations, and one fifth of
the proposed class members are located in California.");
*Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1270–71 (9th Cir.
2011) (relying on both the location of defendant's
headquarters and the fact that "the decision to classify
Plaintiffs as teachers and to deny them overtime pay was
made in California," to conclude that the contacts were
"clearly sufficient" to apply California law to work performed
within California by nonresident employees). Thus, in-state
conduct that causes out-of-state injuries can be relevant to a
due process analysis, in the antitrust context and otherwise.

Finally, we conclude that the perpetration of
anticompetitive activities within California "creat[es] state
interests" in applying California law to that conduct. *See
Allstate*, 449 U.S. at 308, 320. While Defendants argue that
the purpose of antitrust laws is to compensate consumers, the
Supreme Court of California has found otherwise with respect
to the Cartwright Act:

> From its inception, the Cartwright Act has
> always been focused on the punishment of
> violators for the larger purpose of promoting
> free competition. It is, like antitrust laws
> generally, about the protection of *competition*,
> not *competitors*. Private damage awards are
> just a tool by which these procompetitive
> purposes are carried out . . . .

*Clayworth*, 233 P.3d at 1083 (internal quotations and citations
omitted). Applying California law to anticompetitive conduct
undertaken within California advances the Cartwright Act's
"overarching goals of maximizing effective deterrence of

antitrust violations, enforcing the state's antitrust laws against those violations that do occur, and ensuring disgorgement of any ill-gotten proceeds." *Id*. at 1070; *see also Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539, 557 (Cal. 1999) ("California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices.").

Nor would the application of California law impermissibly undermine the policies of other states, as Defendants contend. Because the Due Process Clause does nothing but circumscribe the universe of state laws that can be constitutionally applied to a given case, we "need not . . . balance the competing interests of California and [other states]." *United Farm Workers of Am., AFL-CIO v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1256 (9th Cir. 1982); *see also Allstate*, 449 U.S. at 308 n.10 ("[T]he Court has since abandoned the weighing-of-interests requirement."). Objections based on the interests of other states are more properly raised under a choice of law analysis,[12] or potentially under a challenge predicated on some other provision of the U.S. Constitution.[13]  Defendants raised no such arguments before the district court.

---

[12] "In this complex and murky area, it is indeed easy to lose one's bearings and to slip from a focus on the constitutional limitations on choice of law to the choice of law rules themselves." *Soo Line R.R. v. Overton*, 992 F.2d 640, 649 (7th Cir. 1993) (Ripple, J., dissenting).

[13] "Questions of legislative jurisdiction have not often played a significant role in state antitrust adjudication . . . . Where the issue has arisen, the courts have dealt with it as a question of state power under the commerce clause." Herbert Hovenkamp, *State Antitrust in the Federal Scheme*, 58 Ind. L.J. 375, 392 (1983).

16    AT&T MOBILITY LLC v. AU OPTRONICS CORP.

In light of the above, we conclude that anticompetitive conduct by a defendant within a state that is related to a plaintiff's alleged injuries and is not "slight and casual"[14] establishes a "significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate*, 449 U.S. at 112–13. Specifically, we hold in this case that the Cartwright Act can be lawfully applied without violating a defendant's due process rights when more than a *de minimis* amount of that defendant's alleged conspiratorial activity leading to the sale of price-fixed goods to plaintiffs took place in California. Such a defendant cannot reasonably complain that the application of California law is arbitrary or unfair when its alleged conspiracy took place, at least in part, in California.[15] *See Shutts*, 472 U.S. at 822 ("When considering fairness in this context, an important element is the expectation of the parties."); *Allstate*, 449 U.S. at 317–18 ("By virtue of its presence, Allstate can hardly claim unfamiliarity with the laws of the host jurisdiction and surprise that the state courts might apply forum law to litigation in which the company is involved.").

## CONCLUSION

"A state court is rarely forbidden by the Constitution to apply its own state's law," *Sullivan*, 662 F.3d at 1271, especially where, as here, the case is predicated upon

---

[14] *Allstate*, 449 U.S. at 333 (Powell, J., dissenting).

[15] As the district court has already noted, the requirements of the Due Process Clause must be satisfied individually with respect to each defendant in a case. *Cf. Shutts*, 472 U.S. at 821–22 (contacts must be related to each member of the plaintiff class).

AT&T MOBILITY LLC v. AU OPTRONICS CORP.     17

violations of a state's law that allegedly occurred within that state. The relevant transaction or occurrence in a price-fixing case involves both the conspiracy to illegally fix prices and the sale of price-fixed goods. The district court therefore erred in holding that the Due Process Clause will permit the application of California law in a price-fixing case *only* when a plaintiff purchased the price-fixed goods in California.

We reverse the district court's order dismissing Plaintiffs' claims under the Cartwright Act and the UCL. We remand to the district court for it to make an individual determination consistent with this opinion with respect to each Defendant as to whether Plaintiffs have alleged sufficient conspiratorial conduct within California, that is not "slight and casual," such that the application of California law to that Defendant is "neither arbitrary nor fundamentally unfair."

**REVERSED and REMANDED.**

| 1 | Jason C. Murray (CA Bar No. 169806) | Jeffrey H. Howard (*pro hac vice*) |
|---|---|---|
| 2 | CROWELL & MORING LLP<br>515 South Flower St., 40th Floor<br>Los Angeles, CA 90071 | Jerome A. Murphy (*pro hac vice*)<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue, N.W. |
| 3 | Telephone: 213-443-5582<br>Facsimile: 213-622-2690 | Washington, D.C. 20004<br>Telephone: 202-624-2500 |
| 4 | Email: jmurray@crowell.com | Facsimile: 202-628-5116<br>Email: jhoward@crowell.com |
| 5 | *Counsel for Plaintiffs* | jmurphy@crowell.com |
| 6 | [Additional counsel listed on signature page] | |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | | MASTER FILE No. 07-m-1827 SI<br>CASE No. 09-cv-4997 SI<br>MDL No. 1827 |
| This Document Relates to<br>Case No. 09-cv-4997-SI | | |
| _____ | | |
| AT&T MOBILITY LLC; AT&T CORP.; AT&T SERVICES, INC.; BELLSOUTH TELECOMMUNICATIONS, INC.; PACIFIC BELL TELEPHONE COMPANY; AT&T OPERATIONS, INC.; AT&T DATACOMM, INC.; SOUTHWESTERN BELL TELEPHONE COMPANY, | | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |
| Plaintiffs, | | |
| v. | | |
| AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA, INC; CHI MEI CORPORATION; CHI MEI OPTOELECTRONICS CORPORATION; CHI MEI OPTOELECTRONICS USA, INC.; CMO JAPAN CO. LTD.; NEXGEN MEDIATECH, INC.; NEXGEN MEDIATECH USA, INC.; CHUNGHWA PICTURE TUBES LTD.; TATUNG COMPANY OF AMERICA, INC.; EPSON IMAGING DEVICES CORPORATION; EPSON ELECTRONICS AMERICA, INC.; HANNSTAR DISPLAY CORPORATION; LG DISPLAY CO. LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA, INC.; SHARP CORPORATION; SHARP ELECTRONICS | | |

CORPORATION; TOSHIBA CORPORATION;
TOSHIBA AMERICA ELECTRONICS
COMPONENTS, INC.; TOSHIBA MOBILE
DISPLAY TECHNOLOGY CO., LTD.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.,

Defendants.

Plaintiffs AT&T Mobility LLC ("AT&T Mobility"), AT&T Corp., AT&T Services, Inc.,

Bellsouth Telecommunications, Inc., Pacific Bell Telephone Company, AT&T Operations, Inc.,

AT&T Datacomm, Inc., and Southwestern Bell Telephone Company (plaintiffs other than AT&T

Mobility are hereinafter referred to as "AT&T") for their Complaint against all defendants

named herein, hereby allege as follows:

## I.   **INTRODUCTION**

1.      AT&T Mobility sells mobile wireless handsets and wireless telecommunications

services to millions of customers throughout the United States.  From 1996 to 2006 ("the

Conspiracy Period"), AT&T Mobility purchased billions of dollars worth of mobile wireless

handsets in the United States for resale to its customers.  All of the mobile wireless handsets

AT&T purchased contained liquid crystal display panels ("LCD Panels").

2.      Since 2001, AT&T Mobility purchased mobile wireless handsets containing LCD

Panels in Memphis, Tennessee, where it maintained its central distribution center and received

mobile wireless handsets shipped to Tennessee by its vendors.  Before 2001, AT&T Mobility

purchased mobile wireless handsets containing LCD Panels at regional distribution centers

located in Illinois and New York, where it received mobile wireless handsets shipped to those

states by its vendors.

3.      From at least January 1, 1996 through at least December 11, 2006 ("the

Conspiracy Period"), through hundreds of in-person meetings, telephone calls, emails, and other

communications in the United States and abroad, defendants and their co-conspirators conspired

with the purpose and effect of fixing, raising, stabilizing, and maintaining prices for LCD Panels,

including LCD Panels included in mobile wireless handsets sold to AT&T Mobility.  Because

the U.S. market for LCD Panels and products containing those panels has always been one of the largest and most-profitable markets for defendants and their co-conspirators, defendants purposely fixed prices to unlawfully maintain and increase their profits from sales to customers in the U.S.

4.      During the Conspiracy Period, LCD Panels used in hand-held devices such as mobile wireless handsets included different technologies:  thin film transistor panels ("TFT-LCD Panels") and super-twist nematic panels ("STN-LCD Panels").  STN-LCD Panels included both color super-twist nematic ("CSTN-LCD Panels") panels, and monochrome super-twist nematic ("MSTN- LCD Panels") panels.  Defendants' conspiracy involved both TFT-LCD Panels and STN-LCD Panels.  Defendants engaged in meetings, discussions and exchanges of competitive price information regarding both TFT-LCD panels and STN-LCD Panels.  REDACT

REDACTED

5.      AT&T Mobility, as one of the largest wireless telecommunications providers in the U.S. and one of the most significant purchasers of mobile wireless handset, helped increase consumer demand in the U.S. for mobile wireless handsets during the Conspiracy Period and thus demand for LCD panels manufactured by defendants.  AT&T Mobility served as one of the principal distribution channels for mobile wireless handsets for the U.S. market.  Defendants knew that AT&T Mobility was among the most important purchasers of mobile wireless handsets containing the LCD Panels they manufactured, and that the LCD Panels they price fixed would end up in mobile wireless handsets purchased by AT&T Mobility in the U.S. Defendants analyzed the impact that increases in the number of AT&T Mobility subscribers would have on defendants' sales of LCD Panels for mobile wireless handsets that they knew would be purchased by AT&T Mobility in the United States.  Defendants were thus aware that AT&T Mobility would be affected by their conspiracy to fix the price of LCD Panels, and would suffer injury in the U.S. when it purchased handsets containing defendants' LCD Panels.

6.      Defendant Samsung Electronics Co. Ltd ("Samsung") sold both mobile wireless handsets and small LCD Panels used in mobile wireless handsets to customers in the United

States, including AT&T Mobility.  LG Electronics, Inc., one of the two founders and the largest owner of defendant LG Display, Inc., also sold mobile wireless handsets in the United States to AT&T Mobility.  Both Samsung and LG Electronics, Inc., through their corporate affiliates in the United States, negotiated supply agreements with AT&T Mobility and quoted prices to AT&T Mobility for mobile wireless handsets in the United States, with the knowledge that the price of those handsets were artificially inflated as a result of defendants' conspiracy to fix the price of LCD panels in those handsets.

7.  At least seven LCD Panel manufacturers have admitted in criminal proceedings to participating in this conspiracy and carrying out this conspiracy in the United States and California: defendants LG Display Co. Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.), Sharp Corporation, Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, Chi Mei Optoelectronics Corporation and HannStar Display Corporation. On or about November 12, 2008, LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels.  On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.  On or about December 9, 2009, Chi Mei Optoelectronics Corporation agreed to plead guilty and pay a $220 million criminal fine for its role in the conspiracy.  And on or about June 29, 2010, HannStar Display Corporation agreed to plead guilty and pay a $30 million criminal fine for its role in the conspiracy.

8.  Defendants engaged in conspiratorial conduct both within and outside the United States.  Defendants' conduct in the United States was centered in California.  Defendants LG Display Co. Ltd., LG Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging Devices Corporation all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California.  Each agreed that:  "Acts in furtherance of this conspiracy were carried out within the Northern District of California.  TFT-LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this

District." Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4; Case 3:09-cr-00854, Document 15-1 at 4. Defendant LG Display America, Inc., which admitted to participating in the conspiracy, maintains its principal place of business in San Jose, California. Similarly, defendants Chunghwa Picture Tubes, Ltd., Epson Imaging Devices Corporation, and Chi Mei Optoelectronics Corporation, which also admitted to participating in the conspiracy, used California corporations with principal places of business in Long Beach, California (defendants Tatung Company of America, Inc., Epson Electronics America, Inc., and Chi Mei Optoelectronics USA, Inc. respectively), as their sales agents in the United States for LCD Products containing LCD Panels which were affected by the conspiracy. Many of the other defendants also maintained offices and operations in California during the Conspiracy Period, including AU Optronics Corporation America, Inc., Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Information Systems, Inc.

9.     Defendants engaged in and implemented their conspiracy in the U.S. through the offices they maintained in California. Defendants' employees in their California offices engaged in communications and meetings with other defendants to exchange price and supply information and reach agreements regarding LCD Panel prices to be charged to their customers in the U.S. and elsewhere. Defendants' employees in California also received information from their counterparts elsewhere regarding the substance of defendants' agreements with respect to LCD Panel prices and supply, and were instructed to use this information in the course of price negotiations with customers in the United States. Defendants' California offices were thus the means through which they implemented their conspiracy in the United States. Defendants, including Samsung, used their employees in their California offices to implement their price fixing agreements with respect to small LCD Panels used in mobile wireless handsets, including mobile wireless handsets purchased by AT&T Mobility.

10.     As a result of defendants' conspiracy to fix the price of LCD Panels, the prices of these handsets containing LCD Panels also were artificially inflated. Defendants' conspiracy also artificially inflated the price of LCD Panels incorporated into the LCD Products AT&T

Mobility purchased for its own internal use during the Conspiracy Period, such as desktop computer monitors and notebook computers, and therefore artificially inflated the price of such LCD Products. AT&T Mobility thus suffered damages as a result of defendants' conspiracy, and brings this action to recover the overcharges paid for the mobile wireless handsets and other LCD Products it purchased during the Conspiracy Period.

11.     AT&T is a provider of voice and data communications services, including traditional local and long-distance voice services, internet access services, private enterprise network services, and other telecommunications services. One of the AT&T companies which was injured as a result of the conspiracy is Pacific Bell Telephone Company, a California corporation, which has provided voice and data telecommunications services to the vast majority of the people of California for nearly a century. During the Conspiracy Period, AT&T purchased LCD Products, such as desktop computer monitors and notebook computers, for its own internal use. Defendants' conspiracy raised the price of the LCD Panels incorporated into these LCD Products and therefore artificially inflated the price of the LCD Products. AT&T thus suffered damages as a result of defendants' conspiracy and brings this action to recover the overcharges paid for LCD Products during the Conspiracy Period.

12.     AT&T Mobility and AT&T bring this action seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages under Section 4 of the Clayton Act, California's Cartwright Act, and other state laws identified herein, as well as to recover the costs of suit, including reasonable attorneys fees, for the injuries that AT&T Mobility and AT&T suffered as a result of defendants' conspiracy to fix, raise, maintain and stabilize the prices of LCD Panels.

**II.     JURISDICTION AND VENUE**

13.     AT&T Mobility brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages for its direct purchases of LCD Panels from certain defendants. In addition, AT&T Mobility and AT&T bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all defendants.

14. AT&T Mobility and AT&T also bring this action pursuant to Section 47-25-101 *et seq.* of the Tennessee Code; Section 16750(a) of the California Business and Professions Code (the "Cartwright Act"); Section 44-1401 *et seq.* of the Arizona Revised Statutes; Section 28-4501 *et seq.* of the District of Columbia Code; the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*; Section 553.1 *et seq.* of the Iowa Code; Section 50-101 *et seq.* of the Kansas Statutes; Section 1101 *et seq.* of 10 Maine Rev. Stat.; Section 445.771 *et seq.* of the Michigan Compiled Laws; Section 325D.50 *et seq.* of the Minnesota Statutes; Section 75-21-1 *et seq.* of the Mississippi Code; Section 59-801 *et seq.* of the Nebraska Revised Statutes; Section 598A *et seq.* of the Nevada Revised Statutes; Section 57-1-1 *et seq.* of the New Mexico Statutes; Section 340 *et seq.* of the New York General Business Law; Section 75-1 *et seq.* of the North Carolina Gen. Stat.; Section 51-08.1-01 *et seq.* of the North Dakota Cent. Code; Section 37-1 *et seq.* of the South Dakota Codified Laws; Section 47-18-1 *et seq.* of the West Virginia Statutes; and Section 133.01 *et seq.* of the Wisconsin Statutes for injunctive relief and treble damages sustained by AT&T Mobility and AT&T as a result of their purchases of mobile wireless handsets, desktop monitors and notebook computers at artificially-inflated prices as a result of defendants' conspiracy to fix the price of LCD-Panels. AT&T Mobility's and AT&T's claims also bring claims pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "Unfair Competition Act").

15. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 over AT&T Mobility's and AT&T's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act. The Court has supplemental jurisdiction over AT&T Mobility's and AT&T's claims under the laws of Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin. AT&T Mobility's and AT&T's state law claims are so related to their claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

16.     The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin.  This effect gives rise to AT&T Mobility's and AT&T's antitrust claims.  During the Conspiracy Period, defendants' conspiracy affected the price of LCD Panels and LCD Products AT&T Mobility and AT&T purchased in the United States.  These LCD Products moved through, were sold in, or used in California and in each of the other states identified herein.

17.     This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each defendant conducts substantial business in the state of California, and a number of defendants maintain their headquarters in this District or elsewhere in California.  In addition, defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured LCD Panels and LCD Products for sale in the United States and California and several defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

18.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

19.     Because AT&T Mobility's and AT&T's action is related to the *In re TFT-LCD Antitrust Litigation* action, Case No. M:07-cv-1827 SI, the action will be assigned to the San Francisco division, Judge Susan Illston presiding.  This action concerns substantially the same parties, transactions and events as Case No. M:07-cv-1827 SI insofar as it involves a suit for damages and injunctive relief arising out of defendants' conspiracy to fix the price of liquid

crystal display ("LCD") panels in violation of the Sherman Act and the laws of California and other states. Pursuant to Pretrial Order #1 in M:07-cv-1827 SI, this case is automatically consolidated with M:07-cv-1827 SI for all pretrial proceedings without any further motion or order.

## III.    DEFINITIONS

20.    Liquid crystal display panels use glass plates and a liquid crystal compound to electronically display an image. The technology involves sandwiching a liquid crystal compound between two glass plates called "substrates." The resulting screen contains hundreds or thousands of electrically charged dots, or pixels, that form an image. As used herein, "LCD Panel" refers to both liquid crystal display panels and modules consisting of liquid crystal display panels combined with a backlight unit, a driver, and other equipment that allow the panel to operate and be integrated into a mobile wireless handset, television, computer monitor, or other product.

21.    During the Conspiracy Period, LCD Panels used in hand-held devices included three different technologies: thin film transistor panels ("TFT-LCD Panels"), color super-twist nematic (CSTN) panels, and monochrome super-twist nematic (MSTN) panels (collectively, "STN-LCD Panels"). The price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining and/or stabilizing the prices of LCD Panels using TFT, CSTN, and MSTN technology in LCD Products, including mobile wireless handsets and two-way radios.

22.    As used herein, the term "LCD Products" means any product containing an LCD Panel, including, without limitation, mobile wireless handsets (including voice, data, and combination voice and data devices), computer monitors, notebook and laptop computers, and televisions ("TVs").

23.    As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

24.    As used herein, the term "Conspiracy Period" refers to the time period beginning January 1, 1996 and continuing at least until December 11, 2006.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

## IV.     **THE PARTIES**

### A.     **Plaintiffs**

#### 1.     **AT&T Mobility**

25.     AT&T Mobility is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard in Atlanta, Georgia. AT&T Mobility is a wholly-owned subsidiary of AT&T Inc. AT&T Mobility is one of the largest national providers of mobile wireless telecommunications services in the United States, with over 78 million subscribers and a wireless network providing nationwide wireless coverage. Before 2007, AT&T Mobility was named Cingular Wireless LLC ("Cingular"). During the Conspiracy Period, AT&T Mobility purchased mobile wireless handsets and other LCD Products containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others. As a result of defendants' conspiracy, AT&T Mobility, has been injured in its business and property because the prices it paid for such LCD Products were artificially inflated by defendants' conspiracy.

26.     During and after the Conspiracy Period, AT&T Mobility acquired or received the stock of companies that also purchased mobile wireless handsets and other LCD Products containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others. As a result of defendants' conspiracy, these companies were injured in their business and property because the prices they paid for mobile wireless handsets and other LCD Products were artificially inflated by defendants' conspiracy. By acquiring or receiving a contribution of the stock of companies that purchased mobile wireless handsets and other LCD Products containing LCD Panels, AT&T Mobility obtained all claims and rights under federal and state laws to recover any overcharges suffered by those companies. As used herein, "AT&T Mobility" refers to AT&T Mobility LLC, f/k/a Cingular Wireless LLC, as well as any company that purchased mobile wireless handsets during the Conspiracy Period whose stock was later acquired or obtained by AT&T Mobility LLC.

#### 2.     **AT&T**

27.     AT&T Inc. is a holding company organized under the laws of Delaware and having its principal place of business in Dallas, Texas. AT&T Inc. is the parent corporation of

10

1    the following subsidiaries and affiliates: AT&T Corp., a corporation organized under the laws of

2    New York and having its principal place of business in Bedminster, New Jersey; AT&T

3    Services, Inc., f/k/a SBC Services, Inc., a corporation organized under the laws of Delaware and

4    having its principal place of business in Dallas, Texas; BellSouth Telecommunications, Inc., a

5    corporation organized under the laws of Georgia and having its principal place of business in

6    Atlanta, Georgia; Pacific Bell Telephone Company, a corporation organized under the laws of

7    California and having its principal place of business in San Francisco, California; AT&T

8    Operations, Inc., f/k/a SBC Operations, Inc., a corporation organized under the laws of Delaware

9    and having its principal place of business in San Antonio, Texas; AT&T DataComm, Inc. f/k/a

10    SBC DataComm, Inc., a corporation organized under the laws of Delaware and having its

11    principal place of business in Chicago, Illinois; and Southwestern Bell Telephone Company, a

12    corporation organized under the laws of Missouri and having its principal place of business in

13    Dallas, Texas. These entities are collectively referred to as "AT&T."

14        28.      During the Conspiracy Period, each of the entities described in the preceding

15    paragraph purchased LCD Products, including desktop computer monitors and notebook

16    computers, that contained LCD Panels affected by defendants' price fixing conspiracy.

17        29.      During the Conspiracy Period, BellSouth Affiliates Services Corp., a corporation

18    organized under the laws of Georgia, BellSouth Technology Group, Inc., a corporation organized

19    under the laws of Georgia, and BellSouth Technology Services, Inc., a corporation organized

20    under the laws of Georgia, purchased LCD Products that contained LCD Panels affected by

21    defendants' conspiracy. Since the end of the Conspiracy Period, plaintiff AT&T Services, Inc.

22    has acquired all rights of each of these entities, including all rights under federal and state

23    antitrust laws, to recover overcharges arising from purchases of LCD Products that contained

24    LCD Panels affected by defendants' conspiracy. Also during the Conspiracy Period,

25    Southwestern Bell Telephone L.P., a limited partnership organized under the laws of Texas,

26    purchased LCD Products that contained LCD Panels affected by defendants' conspiracy. Since

27    the end of the Conspiracy Period, plaintiff Southwestern Bell Telephone Company has acquired

28    all rights of Southwestern Bell Telephone L.P., including all rights under federal and state

1    antitrust laws to recover overcharges arising from the purchases of LCD Products that contained

2    LCD Panels affected by defendants' conspiracy.

3           30.      Throughout the Conspiracy Period, AT&T conducted a substantial amount of

4    business in California.  Plaintiff Pacific Bell Telephone Company provided local exchange

5    telecommunications services throughout California and maintained its headquarters in San

6    Francisco for nearly 100 years.  In addition, AT&T provided various wireline

7    telecommunications services to consumers, businesses and government customers in many of the

8    other states listed herein, where AT&T employees used notebook computers and desktop

9    monitors purchased by AT&T.

10       **B.**      **Defendants**

11           **1.**      **AU Optronics**

12           31.      Defendant AU Optronics Corporation is one of the world's largest manufacturers

13    of LCD Panels, with its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park,

14    Hsinchu 30078, Taiwan.  During the Conspiracy Period, said defendant manufactured, marketed,

15    sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

16           32.      Defendant AU Optronics Corporation America, Inc. is a wholly-owned and

17    controlled subsidiary of defendant AU Optronics Corporation, with its corporate headquarters at

18    9720 Cypresswood Drive, Suite 241, Houston, Texas and facilities located in San Diego and

19    Cupertino, California.  During the Conspiracy Period, said defendant manufactured, marketed,

20    sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

21           33.      Defendants AU Optronics Corporation and AU Optronics Corporation America,

22    Inc. are referred to collectively herein as "AU Optronics."  The AU Optronics companies were

23    members of the conspiracy that is the subject of this Complaint by virtue of their participation in

24    the conspiracy through the actions of their respective officers, employees, and representatives

25    acting with actual or apparent authority.  Alternatively, defendant AU Optronics Corporation

26    America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy

27    Period as the alter ego or agent of AU Optronics Corporation.  AU Optronics Corporation

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1   dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities

2   and used that domination or control to charge artificially high prices for LCD Panels.

3          **2.**   **Chi Mei**

4        34.   Defendant Chi Mei Corporation is another of the world's largest manufacturers of

5   LCD Panels, with its corporate headquarters at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te,

6   Tainan 717, Taiwan. During the Conspiracy Period, said defendant manufactured, marketed,

7   sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

8        35.   Defendant Chi Mei Optoelectronics Corporation is another of the largest

9   manufacturers of LCD Panels and a wholly-owned subsidiary of Chi Mei Corporation, with its

10   global headquarters at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park, Sinshih

11   Township, Tainan County, 74147 Taiwan. During the Conspiracy Period, said defendant

12   manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products

13   sold in the United States.

14        36.   Defendant Chi Mei Optoelectronics USA, Inc., f/k/a International Display

15   Technology USA, Inc. is a wholly-owned and controlled subsidiary of Chi Mei Corporation,

16   with its corporate headquarters at 101 Metro Drive Suite 510, San Jose, California. During the

17   Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels

18   incorporated into LCD Products sold in the United States.

19        37.   Defendant CMO Japan Co., Ltd., f/k/a International Display Technology, Ltd. is a

20   subsidiary of Chi Mei Corporation, with its principal place of business located at Nansei Yaesu

21   Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. During the Conspiracy Period, said

22   defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

23   Products sold in the United States.

24        38.   Defendant Nexgen Mediatech, Inc. ("Nexgen") is a wholly-owned and controlled

25   subsidiary of Chi Mei Corporation with its principal place of business at No. 11-2, Jen Te 4th St.,

26   Jen Te Village Jen Te, Tainan 717 Taiwan. During the Conspiracy Period, said defendant

27   marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics

28   Corporation in the United States.

39.     Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a wholly-owned and controlled subsidiary of Chi Mei Corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California.  During the Conspiracy Period, said defendant marketed, sold and/or distributed LCD Products manufactured by Chi Mei Optoelectronics Corporation in the United States.

40.     Defendants Chi Mei Corporation, Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA are referred to collectively herein as "Chi Mei."  The Chi Mei companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Chi Mei Corporation.  Chi Mei Corporation dominated or controlled Chi Mei Optoelectronics Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co., Ltd., Nexgen, and Nexgen USA regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 3.     **Epson**

41.     Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan.  The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.  Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. During the Conspiracy Period, Epson Japan manufactured, marketed, sold and/or distributed LCD Panels and/or LCD Products throughout the United States and elsewhere.

42.     Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson Corporation.  Its principal place of business is at 2580 Orchard Parkway, San Jose, California.  During the Conspiracy Period, Epson America sold and distributed LCD Products containing LCD Panels manufactured by Epson Japan to customers in the United States.

43.     Defendants Epson Japan and Epson America are referred to collectively herein as "Epson."  The Epson companies were members of the conspiracy that is the subject of this Complaint by virtue of their participation in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendant Epson America was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Epson Japan.  Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels and LCD Products.

**4.     Chunghwa**

44.     Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa") is a leading manufacturer of LCD Panels, with its global headquarters at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan.  Chunghwa is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan.  Chunghwa's Board of Directors includes representatives from Tatung Company.  The Chairman of Chunghwa, Weishan Lin, is also the Chairman and General Manager of the Tatung Company.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

45.     Defendant Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  During the Conspiracy Period,

1    Tatung America sold and distributed LCD Products manufactured by Chunghwa Picture Tubes,

2    Ltd. to customers throughout the United States.

3          46.     Defendants Chunghwa and Tatung America are referred to collectively herein as

4    "Chunghwa." During the Conspiracy Period, Chunghwa and Tatung were closely affiliated,

5    commonly owned, controlled and dominated by Tatung Corporation, and functioned as a single

6    enterprise and/or alter egos.

7              **4.**     **HannStar**

8          47.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company

9    with its headquarters at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.

10    During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed

11    LCD Panels incorporated into LCD Products sold in the United States.

12              **5.**     **LG Display**

13          48.     Defendant LG Display Co., Ltd., f/k/a LG Philips LCD Co., Ltd. is a leading

14    manufacturer of LCD Panels and is a joint venture created in 1999 by defendants Royal Philips

15    Electronics NV and LG Electronics, Inc.. LG Display Co., Ltd. maintains offices within this

16    District in San Jose, California and has its principal place of business located at 20 Yoido-dong,

17    Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. During the Conspiracy Period, said

18    defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

19    Products sold in the United States.

20          49.     Defendant LG Display America, Inc. f/k/a/ LG Philips LCD America, Inc. is

21    located at 150 East Brokaw Rd., San Jose, CA 95112. During the Conspiracy Period, said

22    defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD

23    Products sold in the United States.

24          50.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are referred to

25    collectively herein as "LG Display." Defendants LG Display Co., Ltd. and LG Display America,

26    Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions

27    of their respective officers, employees, and representatives acting with actual or apparent

28    authority. Alternatively, defendant LG Display America, Inc. was a member of the conspiracy

by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd. LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

### 6. **Samsung**

51. Defendant Samsung Electronics Co., Ltd. is located at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

52. Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

53. Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd., with its principal place of business at 3655 North First Street, San Jose, California 95134. During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels incorporated into LCD Products sold in the United States.

54. Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung." Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, defendants Samsung Electronics America, Inc. and Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc. and Samsung

1    Semiconductor, Inc. regarding conspiracy activities and used that domination or control to

2    charge artificially high prices for LCD Panels.

3          **7.    <u>Sharp</u>**

4          55.    Defendant Sharp Corporation, is located at 22-22 Nagaike-cho, Abeno-ku, Osaka

5    545-8522, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold

6    and/or distributed LCD Panels and LCD Products sold in the United States.

7          56.    Defendant Sharp Electronics Corporation is a wholly-owned and controlled

8    subsidiary of Sharp Corporation with its principal place of business at Sharp Plaza, Mahwah,

9    New Jersey, 07430.  During the Conspiracy Period, said defendant manufactured, marketed, sold

10   and/or distributed LCD Panels and LCD Products sold in the United States.

11         57.    Defendants Sharp Corporation and Sharp Electronics Corporation are referred to

12   collectively herein as "Sharp."  Defendants Sharp Corporation and Sharp Electronics

13   Corporation were members of the conspiracy that is the subject of this Complaint by virtue of the

14   actions of their respective officers, employees, and representatives acting with actual or apparent

15   authority.  Alternatively, defendant Sharp Electronics Corporation was a member of the

16   conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp

17   Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation

18   regarding conspiracy activities and used that domination or control to charge artificially high

19   prices for LCD Panels.

20         **8.    <u>Toshiba</u>**

21         58.    Defendant Toshiba Corporation is located at 1-1, Shibaura 1-chome, Minato-ku,

22   Tokyo, 105-8001, Japan.  During the Conspiracy Period, said defendant manufactured, marketed,

23   sold and/or distributed LCD Panels and LCD Products sold in the United States.

24         59.    Defendant Toshiba Mobile Display Co., Ltd., f/k/a Toshiba Matsushita Display

25   Technology Co., Ltd. is located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo,

26   108-0075, Japan.  During the Conspiracy Period, said defendant manufactured, marketed, sold

27   and/or distributed LCD Panels and LCD Products sold in the United States.

28

60.     Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of defendant Toshiba Corporation with its corporate headquarters at 19900 MacArthur Blvd., Ste. 400, Irvine, CA 92612.  During the Conspiracy Period, said defendant manufactured, marketed, sold and/or distributed LCD Panels and LCD Products sold in the United States.

61.     Defendant Toshiba America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc. with its principal place of business at 9470 Irvine Boulevard, Irvine, California.  During the Conspiracy Period, Toshiba America Information Systems, Inc. manufactured, marketed, sold and/or distributed LCD Products in the United States.

62.     Defendants Toshiba Corporation, Toshiba Mobile Display Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."  Defendants Toshiba Corporation, Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Alternatively, defendants Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba Corporation.  Toshiba Corporation dominated or controlled Toshiba Matsushita Display Technology Co., Ltd., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCD Panels.

**C.     Co-Conspirators**

63.     The actions in this Complaint were authorized, ordered, or done by defendants' respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

64. Each defendant acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein. Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels and/or LCD Products made by its parent company.

65. Various persons and entities participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These co-conspirators are believed to include, without limitation, LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., Ltd., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., Philips Electronics North America Corp., Ltd., IPS Alpha Technology, Ltd., Mitsui & Co., Ltd., Mitsubishi Electric Corporation, Panasonic Corporation, and Panasonic Corporation of North America.

66. The acts charged in this Complaint have been done by defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each defendant's business or affairs.

67. Each defendant named herein acted as the agent or joint venturer of or for the other defendants with respect to the acts, violations and common course of conduct alleged herein. Each defendant that is a subsidiary of a foreign parent acts as the United States agent for LCD Panels made by its parent company.

## V.    AT&T's PURCHASES OF LCD PANELS AND LCD PRODUCTS

68. During the Conspiracy Period, AT&T Mobility purchased billions of dollars of mobile wireless handsets that contained LCD panels manufactured by defendants. Defendants' conspiracy artificially inflated the prices of the LCD panels contained in these mobile wireless handsets. AT&T Mobility suffered injury caused by the conspiracy when it purchased mobile wireless handsets from defendants, their affiliates and other manufacturers of mobile wireless handsets.

69. Beginning in 2001, AT&T Mobility purchased mobile wireless handsets, which contained LCD Panels manufactured by defendants and sold at artificially-inflated prices

20

1  because of defendants' price fixing conspiracy, in Memphis, Tennessee, where it received

2  mobile wireless handsets shipped to its Memphis, Tennessee central distribution center by its

3  handset vendors.  Under AT&T Mobility's contracts with its handset vendors, AT&T Mobility

4  did not acquire title to the mobile wireless handsets ordered by AT&T Mobility until it received

5  and accepted shipments of those handsets at its Memphis, Tennessee central distribution center.

6  From this central distribution center, AT&T Mobility shipped mobile wireless handsets to its

7  company-owned retail stores, authorized sales agents, and national retail chains.  It also shipped

8  mobile wireless handsets direct to the consumer from its distribution center through online and

9  mail-order sales

10         70.     Before 2001, AT&T Mobility purchased mobile wireless handsets, which

11  contained LCD Panels manufactured by defendants and sold at artificially-inflated prices

12  because of defendants' price fixing conspiracy, at regional distribution centers in Illinois and

13  New York, where it received mobile wireless handsets shipped to those distribution centers by its

14  handset vendors.  AT&T Mobility shipped mobile wireless handsets from these regional

15  distribution centers to its company-owned retail stores, authorized sales agents, and national

16  retail chains, as well as directly to consumers.

17         71.     Throughout the Conspiracy Period, AT&T Mobility maintained in each of the

18  states where it operated company-owned retail stores and sold to authorized sales agents,

19  including in Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine,

20  Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina,

21  North Dakota, South Dakota, West Virginia, and Wisconsin inventories of mobile wireless

22  handsets that it purchased and received from the handset vendors at its distribution centers.

23  During the Conspiracy Period, AT&T Mobility's policy was to maintain mobile wireless

24  handsets amounting to at least 17 days worth of sales in each retail location.

25         72.     During the Conspiracy Period, AT&T Mobility also purchased LCD Products,

26  including notebook computers and desktop monitors containing LCD Panels manufactured by

27  defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

28  During the Conspiracy Period, AT&T Mobility purchased LCD Products at its offices and

1 facilities in Tennessee, California, Arizona, District of Columbia, Illinois, Iowa, Kansas, Maine,

2 Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina,

3 North Dakota, South Dakota, West Virginia, and Wisconsin, where it received LCD Products

4 shipped and/or delivered by its vendors.

5   73. During the Conspiracy Period, Plaintiff AT&T Corp. purchased LCD Products,

6 including notebook computers and desktop monitors containing LCD Panels manufactured by

7 defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

8 During the Conspiracy Period, AT&T Corp. purchased LCD Products at its offices and facilities

9 in Arizona, California, District of Columbia, Illinois, Kansas, New Mexico, New York, North

10 Carolina, and Tennessee, where it received LCD Products shipped and/or delivered by its

11 vendors.

12   74. During the Conspiracy Period, Plaintiff AT&T Services, Inc. purchased LCD

13 Products, including notebook computers and desktop monitors containing LCD Panels

14 manufactured by defendants and sold at artificially-inflated prices because of defendants' price

15 fixing conspiracy. During the Conspiracy Period, AT&T Services, Inc. purchased LCD Products

16 in California, Illinois, Kansas, Michigan, Nevada and Wisconsin, where AT&T Services, Inc.

17 and its affiliates received LCD Products shipped and/or delivered at their offices and facilities in

18 those states.

19   75. During the Conspiracy Period, Plaintiff BellSouth Telecommunications, Inc.

20 purchased LCD Products, including notebook computers and desktop containing LCD Panels

21 manufactured by defendants and sold at artificially-inflated prices because of defendants' price

22 fixing conspiracy. During the Conspiracy Period, BellSouth Telecommunications, Inc.

23 purchased LCD Products at its offices and facilities in Mississippi, North Carolina and

24 Tennessee, where it received LCD Products shipped and/or delivered by its vendors.

25   76. During the Conspiracy Period, Plaintiff Pacific Bell Telephone Company

26 purchased LCD Products, including notebook computers and desktop monitors containing LCD

27 Panels manufactured by defendants and sold at artificially-inflated prices because of defendants'

28 price fixing conspiracy. During the Conspiracy Period, Pacific Bell Telephone Company

purchased LCD Products at its offices and facilities in California and Nevada, where it received LCD Products shipped and/or delivered by its vendors.

77.     During the Conspiracy Period, Plaintiff AT&T Operations, Inc. purchased LCD Products, including notebook computers and desktop monitors containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  During the Conspiracy Period, AT&T Operations, Inc. purchased LCD Products in California, Illinois, Kansas, Michigan, Nevada and Wisconsin, where AT&T Operations, Inc. and its affiliates received LCD Products shipped and/or delivered by its vendors at their offices and facilities in those states.

78.     During the Conspiracy Period, Plaintiff AT&T DataComm, Inc. purchased LCD Products, including notebook computers and desktop monitors containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  During the Conspiracy Period, AT&T DataComm, Inc. purchased LCD Products in California, Illinois, Kansas, Michigan, Nevada and Wisconsin, where AT&T DataComm, Inc. received LCD Products shipped and/or delivered by its vendors at its offices and facilities in those states.

79.     During the Conspiracy Period, Plaintiff Southwestern Bell Telephone Company purchased LCD Products, including notebook computers and desktop monitors containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  During the Conspiracy Period, Southwestern Bell Telephone Company purchased LCD Products at its offices and facilities in Kansas, where it received LCD Products shipped and/or delivered by its vendors.

## VI.     THE MARKET FOR LCD PANELS AND LCD PRODUCTS

80.     During and after the Conspiracy Period, defendants, or one or more of their subsidiaries, sold LCD Panels in the United States through and into interstate and foreign commerce, including through California, Tennessee and other states.

81.     During the Conspiracy Period, defendants collectively controlled the market for LCD Panels, both globally and in the United States.

82.     Defendants' business activities substantially affected interstate trade and commerce in the United Stats and caused antitrust injury in the United States.  Defendants' business activities substantially affected trade and commerce within each of the 50 states, insofar as defendants' conspiracy artificially inflated the prices of LCD Products sold in all 50 states, and so caused antitrust injury in each of those states.

83.     LCD Panels are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products.  LCD Panels were the principal form of display screen used in desktop computer monitors, laptop computers and mobile wireless handsets during the Conspiracy Period.

84.     LCD Panels have no independent utility, and have value only as components of LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computer displays and TVs.  The demand for LCD Panels thus derives directly from the demand for LCD Products.

85.     The market for LCD Panels is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products.  For example, demand for mobile wireless handsets grew exponentially during the Conspiracy Period.  In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units.  This number ballooned to over one billion units by 2006.  This increased demand for mobile wireless handsets drove a similar increase in the demand for LCD Panels during the Conspiracy Period.  Shipments of LCD Panels for mobile wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

86.     The market for LCD Panels and LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook computers and televisions, are inextricably linked and intertwined because the LCD Panel market exists to serve the markets for LCD Products.  The market for LCD Panels and for LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

87.     AT&T Mobility participated in the market for LCD Panels during the Conspiracy Period through its purchases of mobile wireless handsets, notebook computers and desktop

24

computer monitors containing LCD Panels at artificially inflated prices caused by defendants' conspiracy.

88.    AT&T participated in the market for LCD Panels through its purchases of desktop computer monitors and notebook computers containing LCD Panels at artificially inflated prices caused by defendants' conspiracy.

**VII.    DEFENDANTS ENGAGED IN PRICE FIXING OF LCD PANELS IN THE UNITED STATES AND THEY PARTICIPATED IN PRICE FIXING MEETINGS OVERSEAS TO INCREASE THE PRICE OF LCD PANELS SOLD IN THE UNITED STATES**

89.    During the Conspiracy Period, the United States was the world's largest consumer of LCD Products and U.S. companies like Motorola, Dell, Apple and HP were among the largest purchasers of LCD Panels.  Defendants were aware that AT&T Mobility, as a wireless telecommunications provider, was one of the largest purchasers of mobile wireless handsets containing LCD Panels in the U.S.  When defendants conspired to fix in the U.S. the prices of LCD Panels sold to manufacturers of mobile wireless handsets, defendants knew that those panels would be incorporated into mobile wireless handsets that AT&T purchased in the United States.                                              REDACTED

90.    Defendants also analyzed how AT&T Mobility's and other wireless telecommunications providers' purchases of mobile wireless handsets would impact the demand for and supply of LCD panels.                                REDACTED

                                                                                              Defendants thus knew that their conspiracy to fix the price of LCD Panels would affect AT&T Mobility's purchases of mobile wireless handsets in the U.S.

91.     Samsung actively solicited AT&T Mobility's business in the United States and sold mobile wireless handsets to AT&T Mobility in the United States with the knowledge that the prices of mobile wireless handsets were artificially inflated by defendants' conspiracy to fix the price of LCD Panels.  Samsung established sales offices and sales agents in the United States for the purpose of negotiated supply agreements and marketing and selling mobile wireless handsets that contained LCD Panels manufactured by Samsung and its co-conspirators.  LG Electronics, one of the two founders and the largest owner of defendant LG Display, Inc., also solicited AT&T Mobility's business in the United States and sold mobile wireless handsets in the United States to AT&T Mobility.  Like Samsung, LG Electronics established sales offices and sales agents in the United States, including sales offices focused on LG Electronics' business with AT&T Mobility, for purposes of negotiated supply agreements and marketing and selling mobile wireless handsets that contained LCD Panels manufactured by LG Display, Samsung and their co-conspirators.  Both Samsung and LG Electronics, Inc., through their corporate affiliates in the United States, quoted prices to AT&T Mobility for mobile wireless handsets in the United States, with the knowledge that the price of those handsets were artificially inflated as a result of defendants' conspiracy to fix the price of LCD panels in those handsets.

A.     **Defendants Engaged in Bilateral and Multi-lateral Meetings and Communications With Competitors To Inflate Prices of LCD Panels and LCD Products**

92.     The defendants conspired to raise the prices of LCD Panels sold into the United States.  The LCD Panel conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, Taiwan and in California and elsewhere in the United States.  Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Defendants fostered a culture of corruption within their companies whereby employees at every level—from the very top executive all the way to lower-level sales representatives—engaged in frequent and continuous communications with the employees at every level of their competitors.  Defendants' senior executives at made it clear to their subordinates that they were required to engage in these illegal exchanges of supply, production, and pricing information as a part of their

26

employment.  The lower-level employees funneled the competitive information up to their superiors who utilized that information—along with the pricing information they, themselves, were able to collect through their own illegal competitor contacts—to set prices for LCD Panels at artificially-inflated levels.  The constant communications at all levels allowed defendants to conspire to set average prices across the entire industry, as well as conspire to fix the prices of the particular LCD Panels sold to specific U.S. customers, such as Motorola, Dell, Hewlett-Packard, Apple, and others.

        1.      **Defendants' engaged in illegal communications about pricing in the U.S.**

93.            REDACTED

94.            REDACTED

95.            REDACTED

<span style="color:red">REDACTED</span>

96.     For OEMs in the United States, such as Motorola, SonyEricsson, Palm and other manufacturers of mobile wireless handsets, defendants' U.S. affiliates led the LCD Panel price negotiations with those OEMs.  Pricing directions came from Asia, where the defendants were also engaging in conspiratorial acts to affect the price of LCD Panels and LCD Products.  Many of the defendants' conspiracy meetings and conspiracy communications took place in the U.S., involved the U.S. affiliates of the defendants, and directly targeted U.S. import commerce and U.S. OEMs.  Defendants' conspiratorial conduct also included discussions in Japan, South Korea, and Taiwan in which they agreed to illegally increase the prices of LCD Panels sold in the United States and around the world.  And, the Defendants' conspiracy included discussions regarding the retail prices for LCD Products sold by their own corporate subsidiaries and affiliates that manufactured LCD Products, such as mobile wireless handsets.   The Defendants conspiratorial acts in Asia were a necessary and integral part of the conspiracy to increase the price of LCD Panels and LCD Products in the U.S. market.

        **2.**        **Defendants engaged in illegal communications about pricing with respect to small panels**

97.     As part of the larger conspiracy to raise the price of LCD Panels, defendants engaged in bilateral communications specifically regarding prices for small LCD Panels used in mobile devices and two-way radios.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The

information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered to defendants' customers.

      98.     These bilateral communications between defendants routinely involved LCD Panels used in mobile wireless devices and other handheld products. Examples include:

- REDACTED

- REDACTED

- REDACTED

- REDACTED

29

REDACTED

• REDACTED

• REDACTED

• REDACTED

3. **Defendants engaged in illegal bilateral and multilateral communications about the pricing of TFT-LCD Panels and STN-LCD Panels**

99. In the early years of the conspiracy, beginning in at least 1996, representatives of the Japanese-based defendants, such as Sharp and Toshiba, met and agreed to fix the prices for LCD Panels generally, as well as to specific OEMs; they also agreed to limit the amount of LCD Panels each would produce.

100. In early 1998, high level representatives at various LCD manufacturers, including Sharp, Toshiba, Samsung, NEC, LG Electronics, and Mitsubishi, met to discuss projected sales volumes. The companies agreed that they needed additional meetings to head off the projected higher level of competition between the companies. The companies met again later in 1998 to again discuss their projected sales plans to limit competition between them.

101. Beginning in 1999, high level representatives of Samsung met with counterparts at LG and other companies to discuss pricing trends and other aspects of the LCD Panel market.

30

102.    By 2001, Sharp employees were engaging in bilateral discussions with competitors to share price information for both TFT-LCD Panels and STN-LCD Panels used for mobile wireless handset applications.    REDACTED

103.    Other defendants initiated similar discussions regarding the prices of STN-LCD Panel in furtherance of the conspiracy.    REDACTED

104.                            REDACTED

105.    From early 2001 through at least 2006, officials from defendants Samsung, AU Optronics, Chunghwa, Chi Mei, HannStar, LG Display, and Sharp met periodically in Taiwan to discuss and reach agreements on LCD Panel prices, price increases, production, and production capacity, and did in fact reach agreements increasing, maintaining, and/or fixing LCD Panel prices and limiting their production.  The group meetings these defendants participated in were called "Crystal Meetings."  Each defendant attended multiple meetings with one or more of the other defendants during this period.  The Crystal Meetings occurred in Taiwan; other similar meetings took place in South Korea, Japan, and in California and elsewhere in the United States on a regular basis throughout this period.

106.    The Crystal Meetings were highly organized and followed a set pattern.  Meetings among defendants' high-level executives were called "CEO" or "Top" meetings; while those among defendants' vice presidents and senior sales executives were called "Commercial" or

31

"Operational" meetings. As described below, the conspiracy also included "working level" meetings and communications.

107.    The "CEO" meetings occurred quarterly from approximately 2001 to 2006. The purpose and effect of these meetings was to stabilize or raise prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to show the participants figures relating to the supply, demand, production, and prices of LCD Panels for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply, until a consensus was reached concerning the participants' prices and production levels of LCD Panels in the coming months or quarter.

108.    The structure of "Commercial" meetings was largely the same as "CEO" meetings. These meetings took place more frequently than "CEO" meetings and occurred approximately monthly.

109.    During all of these meetings, defendants exchanged information about current and anticipated prices for their LCD Panels, and thereafter reached agreement concerning the specific prices to be charged in the coming weeks and months for LCD Panels. Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCD Panels.

110.    During these CEO and Commercial meetings, defendants also exchanged information about supply, demand, and their production of LCD Panels, and, thereafter, reached agreement concerning the amounts each would produce. Defendants limited the production of LCD Panels in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

111.    The structure of the so-called "Working Level" meetings was less formal than the CEO or Commercial meetings, and often occurred at restaurants over a meal. The purpose of the "Working Level" meetings was to exchange information on price, supply and demand, and production information which then would be transmitted up the corporate reporting chain to

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1    those individuals with pricing authority, which facilitated implementation of the conspiracy and

2    effectuated the agreements made at the CEO meetings and at the Commercial meetings.

3          112.    Defendants AU Optronics, Chi Mei, Chunghwa, HannStar, LG Display and

4    Samsung attended multiple CEO, Commercial and working-level meetings, as well as bilateral

5    discussions, during the Conspiracy Period and at least between 2001 and 2006.  Additionally,

6    Quanta Display and Unipac, which merged with AU Optronics, participated in working-level

7    meetings.  At the CEO and Commercial meetings, these defendants agreed on prices, price

8    increases, and production limits and quotas for LCD Panels.

9          113.    During the Crystal Meetings, defendants also agreed to engage in bilateral

10   communications with those defendants not attending these meetings.  Certain defendants were

11   "assigned" other defendants not in attendance and agreed to and did in fact communicate with

12   non-attending defendants to synchronize the price and production limitations agreed to at the

13   Crystal Meetings.  Participants at the Crystal meetings contacted Japanese defendants (such as

14   Sharp and Toshiba) to relay the agreed-upon pricing and production limitations.  Some of these

15   meetings and communications took place in the U.S. and specifically targeted U.S. commerce

16   and U.S. OEMs.

17         **B.**    **Defendants' Participation in the Conspiracy in California**

18         114.    Many defendants conducted operations in California throughout the Conspiracy

19   Period, including defendants Samsung, LG, Toshiba, Epson, AU Optronics, Chi Mei, Chunghwa,

20   Tatung, and NexGen Mediatech.  Through their California operations, defendants implemented

21   their price-fixing conspiracy in the United States.  In fact, defendants LG Display Co. Ltd., LG

22   Display America, Inc., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Epson Imaging

23   Devices Corporation specifically admitted during their plea hearings that acts in furtherance of

24   the conspiracy were carried out within California.  Defendants' employees based in California

25   engaged in bilateral and multilateral communications in furtherance of the conspiracy.

26         115.    Defendants also used their California operations to implement their price-fixing

27   agreements in the United States.  Through their activities in California, defendants' successfully

28   increased the price of LCD-Panels, including the price of LCD-Panels sold to customers in the

1    U.S. that manufactured mobile wireless handsets, which raised the price of mobile wireless

2    handsets purchased by AT&T Mobility.

3         116.                    REDACTED

4

5

6

7

8

9

10        117.                    REDACTED

11

12

13

14

15

16

17

18

19

20        118.                    REDACTED

21

22

23

24

25        119.                    REDACTED

26

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

REDACTED

120.     REDACTED

121.     REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

REDACTED

122.    REDACTED

123.    REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

C. **Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the U.S. and for Fixing the Price of LCD Panels and LCD Products Sold in the U.S.**

124.    In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers.  In a December 11, 2006, filing with the Securities and Exchange Commission, defendant LG Display disclosed for the first time that officials from the Korea Fair Trade Commission and Japan Fair Trade Commission visited the company's Seoul and Tokyo offices and that the United States Department of Justice ("DOJ") had issued a subpoena to its San Jose office.

125.    On December 12, 2006, news reports indicated that in addition to LG Display, defendants Samsung, Sharp and AU Optronics were also under investigation.

126.    At least one defendant has approached the DOJ to enter into a leniency agreement with respect to defendants' conspiracy to fix prices of LCD Panels.  In order to enter into a leniency agreement under the Corporate Leniency Policy of the Department of Justice, this defendant has reported defendants' price-fixing conspiracy to the DOJ and has confessed its own participation in defendants' price-fixing conspiracy.  The DOJ's investigation of the remaining defendants is ongoing and is expected to result in additional guilty pleas and criminal fines from the other defendants to this action.  However, a number of defendants and their executives have pleaded guilty to price fixing, as alleged more fully herein.

127.    Defendant Chi Mei Optoelectronics has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  In connection with its guilty plea, Chi Mei Optoelectronics has agreed to pay a criminal fine of $220 million.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

128.     Defendant LG Display has admitted and pleaded guilty to participating in the conspiracy from September 2001 through June 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  LG Display also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, reported at the time as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

129.     Chung Suk "C.S." Chung, an executive from LG Display also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Chung admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

130.     Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the conspiracy to fix the prices of LCD Panels sold worldwide, including the United States and California in particular, from September 2001 through June 2006.  Specifically, Mr. Kwon admitted that he participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements

reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.  In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

131.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide, including the United States and California in particular, from December 2001 through December 2005.  Specifically, Mr. Koo has been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan.  Mr. Koo has also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and his conspiratorial contacts.

132.    Chunghwa has admitted and pleaded guilty to participating in the conspiracy from September 2001 to December 2006 to fix the price of LCD Panels sold worldwide, including the United States and California in particular, and to participating in meetings, conversations and communications in Taiwan to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to agreed-upon prices.  Chunghwa also admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California.  In connection with its guilty plea, Chunghwa has agreed to pay a criminal fine of $65 million.

133.    In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin also pleaded guilty to participating in the conspiracy from September 2001 through December

2006. Specifically, Mr. Liu, Mr. Lee and Mr. Lin admitted that they participated in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreed to fix the prices of LCD Panels at certain predetermined levels, issued price quotations in accordance with the agreements reached, exchanged pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the participation of subordinate employees in the conspiracy. In connection with their guilty plea, Mr. Lin has agreed to serve a 9-month prison term and pay a criminal fine of $50,000; Mr. Liu has agreed to serve a 7-month prison term and pay a criminal fine of $30,000; and Mr. Lee has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

134. In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005. Specifically, Mr. Lin and Mr. Cheng have been charged with participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, including the Crystal Meetings that took place in Taiwan. Mr. Lin and Mr. Cheng have also been charged with agreeing to fix the prices of LCD Panels at certain predetermined levels, issuing price quotations in accordance with the agreements reached, exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy, accepting payment for the supply of LCD Panels sold at collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy and their conspiratorial contacts.

135. Defendant Sharp has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCD Panels sold to Dell from April 2001 to December 2006, to Apple Computer from September 2005 to December 2006, and to Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings, conversations and communications in Japan and in the United States with unnamed co-conspirators to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels,

agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. Sharp admitted that acts in furtherance of the conspiracy to fix the price of LCD Panels were carried out in California. Defendant Sharp participated in multiple Working Level meetings, as well as bilateral discussions with other defendants, during which it discussed and reached agreements with other defendants on prices for LCD Panels during the Conspiracy Period. AT&T Mobility purchased handsets from Motorola that contained LCD Panels for which Sharp admittedly fixed the prices.

136. Defendant Sharp also participated in multiple bilateral discussions with other defendants, including Toshiba and Epson, during the Conspiracy Period. Through these discussions, Sharp agreed on prices, price increases, production quotas and production limits for LCD Panels. Because Toshiba and Epson were Sharp's primary competitors in the sale of LCD Panels used in mobile wireless handsets, Sharp knew that it could not have fixed the prices of LCD Panels incorporated into such handsets – as Sharp admitted it did in its guilty plea – unless it reached agreements with Toshiba and Epson to do the same.

137. Defendant Epson Japan has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the price of LCD Panels sold to Motorola and agreed to pay a criminal fine of $26 million. Epson Japan has admitted to participating in the conspiracy from 2005 through 2006 to fix the prices of LCD Panels, and to participating in meetings, conversations and communications in Japan and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. During the Conspiracy Period, Motorola was one of AT&T Mobility's largest suppliers of mobile wireless handsets.

138. Defendant Epson America is a wholly-owned and controlled subsidiary of co-conspirator Epson Japan. At one of the bilateral meetings described above, Epson Japan was represented by co-conspirator Mitsui & Co., Ltd. ("Mitsui"). At that meeting, Mitsui served as an agent of, and under the direction of, both Epson Japan and Epson

41

America.  Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators.  In addition, to the extent Epson America sold or distributed LCD Products, it played a significant role in the conspiracy because defendants wished to ensure that the prices for such products did not undercut the pricing agreements reached at these various meetings.  Thus, Epson America was an active, knowing participant in the alleged conspiracy, and acted as Epson Japan's agent for selling LCD Products in the United States.

139.    Defendant Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCD Panels with one or more defendant that attended the Crystal Meetings.  The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCD Panels and fix prices of such panels at unreasonably high levels and to aid, abet, notify and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings.  During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers that allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein.  For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture.  In 2001, Toshiba and Matsushita formed a joint venture, Advanced Flat Panel Displays, which merged their LCD operations.  In April 2002, Toshiba and Matsushita formed a joint venture, Toshiba Mobile Display, f/k/a Toshiba Matsushita Display Technology Co. Ltd., which combined the two companies' LCD development, manufacturing, and sales operations.  In 2006, Toshiba purchased a 20% stake in LG Display's LCD Panel manufacturing facility in Poland.  The operation and management of these many different joint ventures afforded Toshiba and the other defendant joint-venture partners regular opportunities to communicate with each other to agree on prices, price increases and production limits and quotas for LCD Panels that each defendant manufactured and sold.

1          140.    Co-conspirator Hydis Technologies Co. Ltd., f/k/a BOE Hydis Technology Co.,

2   Ltd. ("Hydis"), participated in multiple lower level meetings between at least 2002 and 2005.  In

3   addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005.

4   Through these discussions, Hydis agreed on prices and supply levels for LCD Panels.

5          141.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") participated in

6   multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac

7   Electronics (later AU Optronics).  Through these meetings, Mitsubishi agreed on prices and

8   supply levels for LCD Panels.

9          142.    Co-conspirator Mitsui had at least one bilateral meeting, which included a

10  discussion about customers and future pricing, with a Taiwanese defendant in 2001.  Mitsui was

11  acting as an agent for co-conspirator Epson Japan in this discussion.  Mitsui and Epson Japan

12  agreed on prices and supply levels for LCD Panels.

13         143.    Co-conspirator NEC LCD Technologies, Ltd. ("NEC") participated in meetings

14  or discussions during the Class Period with at least one other defendant or co-conspirator, which

15  included discussions about prices for LCD Panels.

16         144.    Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a joint venture

17  among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic Corporation ("Panasonic"),

18  and one or more of the partners in this joint venture participated in the meetings described above.

19  As a result, IPS Alpha was represented at those meetings and was a party to the agreements

20  entered into by its joint venture partners at these meetings.  As explained above, the agreements

21  at these meetings included agreements on price ranges and output restrictions.  The joint venture

22  partners had substantial control over IPS Alpha's production levels and the prices of LCD Panels

23  the joint ventures sold both to the joint venture partners and other non-affiliated companies.

24  Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

25         145.    When AT&T Mobility and AT&T refer to a corporate family or companies by a

26  single name in their allegations of participation in the conspiracy, it is to be understood that they

27  are alleging that one or more employees or agents of entities within the corporate family engaged

28  in conspiratorial meetings on behalf of every company in that family.  In fact, the individual

participants in the conspiratorial meetings and discussions did not always know the corporate

affiliation of their counterparts, nor did they distinguish between the entities within a corporate

family. The individual participants entered into agreements on behalf of, and reported these

meetings and discussions to, their respective corporate families. As a result, the entire corporate

family was represented in meetings and discussions by their agents and were parties to the

agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate

families distributed LCD Panels or LCD Products to direct purchasers, these subsidiaries played

a significant role in the conspiracy because defendants wished to ensure that the prices for such

products paid by direct purchasers would not undercut the pricing agreements reached at these

various meetings. Thus, all entities within the corporate families were active, knowing

participants in the alleged conspiracy.

### D. Market Conditions Demonstrating the Conspiracy

146. Beyond the guilty pleas and the extensive evidence of the defendants'

wrongdoing produced by the defendants themselves, the market for LCD Panels provides further

evidence of defendants' collusive behavior.

#### 1. Structure of the LCD Panel Industry

147. The LCD Panel industry has several characteristics that facilitated a conspiracy to

fix prices, including high concentration, significant barriers to entry, homogeneity of products,

consolidation, multiple interrelated business relationships and ease of information sharing.

148. The LCD Panel industry is highly concentrated and thus conducive to collusion.

Throughout the Conspiracy Period, defendants collectively controlled a significant share of the

market for LCD Panels, both globally and in the United States.

149. The LCD industry is characterized by high barriers to entry. New fabrication

plants, or "fabs," can cost upwards of $2 to $3 billion, and rapidly evolving technology and

intellectual property requirements require constant research and development and investment.

Thus, firms cannot enter the market for the production and sale of LCD Panels without an

enormous capital investment.

150.     LCD Panels, whether incorporated into mobile wireless handsets or desktop monitors, notebook computers and TVs, are manufactured to a specific size, regardless of manufacturer.  The manufacture of standard panel sizes for products containing LCD Panels across the LCD Panel industry facilitates price transparency in the market for LCD Panels and enables LCD Panel manufacturers to monitor and analyze LCD Panel prices and thus enables them to enforce their conspiracy.

151.     The LCD Panel industry has experienced significant consolidation during the Conspiracy Period, as reflected by:

- the 2001 creation of AU Optronics itself through the merger of Acer Display and Unipac Electronics;

- the 2002 merger of the LCD operations of Toshiba and Matsushita into one entity, defendant Toshiba Mobile Display Co., Ltd., in 2002;

- the 2004 joint venture for the production of LCD Panels for televisions by Hitachi, Toshiba, and Matsushita;

- the 2005 transfer of Fujitsu Limited's LCD business to Sharp;

- the 2006 AU Optronics' acquisition of Quanta Display;

152.     Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD Panel industry.  Using the otherwise legitimate cover of joint ventures, cross licenses, and other cooperative arrangements, defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCD Panels with the numerous meetings described hereinafter.

153.     There were many opportunities for defendants to discuss and exchange competitively-sensitive information with their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication between the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss and

agree upon their pricing of LCD Panels and monitor each other's compliance with their agreement.

**2.     Pricing in the LCD Panel market indicates collusion by the defendants**

154.     Since at least 1996, the LCD Panel market has not behaved as would be expected of a competitive market free of collusion. Rather, the behavior of this market strongly evidences that defendants engaged in a significant price-fixing conspiracy that had the purpose and effect of stabilizing and raising prices for LCD Panels at supra-competitive levels.

155.     After initially being introduced into a market, consumer electronics products and their component parts typically are characterized by steady downward pricing trends. However, since at least 1996, the LCD Panel market has been characterized by price stability and certain periods of substantial upward pricing trends.

156.     Moreover, since at least 1996, the LCD Panel market has not followed the basic laws of supply and demand in a competitive market. In a competitive market, price increases normally occur during shortage periods. Since at least 1996, however, there have been significant price increases in the LCD Panel market during periods of both oversupply and shortage.

157.     The demand for consumer electronic products and their component parts generally increases over time. As would be expected, demand for LCD Panels and LCD Products were steadily and substantially increasing throughout the Conspiracy Period. For example, a November 2005 forecast indicated that shipments of LCD Panels for mobile wireless handsets would grow 66% from 2004 through 2005, due to increased demand for mobile wireless handsets.

158.     Rather than competing for this increased demand, however, since at least 1996, defendants worked together to stabilize prices by agreeing to fix prices at artificially high levels and to restrict the supply of LCD Panels through, among other things, decreasing their capacity utilization and refraining from expanding existing capacity. Those defendants not already

1  manufacturing LCD Panels in 1996 joined this conspiracy when they began manufacturing LCD
2  Panels.

3      159.    In 1996, the LCD Panel market was experiencing excess supply and drastic price
4  cuts. Prices had already fallen 40 to 50 percent in 1995, and were projected to continue dropping
5  due to lower manufacturing costs. However, LCD Panel prices began rising in 1996, allegedly
6  due to insufficient production capacity. In fact, defendants had begun stabilizing and raising the
7  prices.

8      160.    LCD Panel prices began to increase in early 1996. Defendants blamed the sudden
9  increase in prices on an alleged inability to supply enough LCD Panels to meet demand. By May
10  of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a
11  roller coaster of pricing in the display market, with no clear predictability anytime soon . . . .
12  Perplexed purchasers trying to keep up with the gyrating market can take solace that even
13  vendors are constantly being surprised by the sudden twists and turns."

14      161.    Soon thereafter, industry analysts began commenting on the unusual rise in LCD
15  Panel prices, noting that this rise in prices was "quite rare in the electronics industry."

16      162.    1996 also brought the advent of third generation fabs. Since 1996, additional
17  generations of fabs have been built, which has resulted in at least eight generations of LCD Panel
18  fabs. LG Electronics was scheduled to have its third generation fab online by 1997, and Hyundai
19  was scheduled to do so by early 1998. Each new LCD Panel generation was produced from ever
20  larger pieces of glass, so as to reduce the cost of the screens used in televisions, computer
21  monitors, and laptops. Ever-increasing production capacity threatened to outstrip demand for
22  LCD Panels, with the result that prices of LCD Panels should have decreased rapidly. Instead,
23  defendants falsely claimed to be operating at full capacity and unable to meet demand, despite
24  the millions of units of over-capacity that had supposedly existed months earlier, and prices
25  surged upwards. These price increases were also inconsistent with the fact that production had
26  become more efficient and cost effective.

27      163.    The supra-competitive level of LCD Panel prices during the Conspiracy Period is
28  demonstrated by, *inter alia*, the fact that costs were decreasing. One of the most significant costs

in producing an LCD Panel is the cost of its component parts.  Some of the major component parts for an LCD Panel include the backlight, color filter, PCB polarizer, and glass.  During the Conspiracy Period, the costs of these components collectively and individually had been generally declining, and in some periods at a substantial rate.  Thus, the margin between LCD Panel manufacturers' prices and their costs was unusually high during the Conspiracy Period.

164.    During the end of 2001 and 2002, LCD Panel prices increased substantially while the costs to produce these panels remained flat or decreased.  Similarly, during the end of 2003 to 2004, LCD Panel prices again increased by a substantial amount, while costs remained flat or decreased.  This economic aberration is the intended and necessary result of defendants' conspiracy to raise, fix, maintain, or stabilize the prices of LCD Panels.

165.    LCD Panel prices increased by more than 5% in October 2001.  These price increases continued until June of 2002.

166.    At the time, defendants blamed these price increases on supply shortages.  In fact, these price increases were a direct result of defendants' agreement to fix, maintain, and/or stabilize the prices of LCD Panels and defendants' false statements about supply shortages were designed to conceal their price-fixing agreement.  When asked why prices had increased, defendants repeatedly asserted that increases in LCD prices were due to increased demand and a "supply shortage."

167.    These price increases occurred as production costs declined due to lower prices for parts and components as well as improvements in manufacturing efficiency.  These decreasing costs should have led to lower prices and competition among defendants.  Instead, because defendants had entered into an agreement to fix, raise, and maintain the prices for LCD Panels at artificially high levels, it resulted in extremely high profits.  For example, defendants AU Optronics Inc., Chi Mei Optoelectronics Corp., Chunghwa Picture Tubes Ltd., and HannStar Display Inc. posted higher pretax profits than expected in the first quarter of 2002.  AU Optronics reported revenue of NT $19.7 billion in the first quarter, with pretax profit reaching about NT $2 billion.  Chi Mei Optoelectronics reported pretax earnings of NT $800 million on revenue of about NT $8.8 billion at the same period.

168.     This increase in prices and revenue was unprecedented.  During the first six months of 2002, revenue for Taiwan's five major LCD Panel manufacturers (defendants AU Optronics, Chi Mei, Chunghwa Picture Tubes Ltd., HannStar Display Inc., and Quanta Display Inc. (later purchased by AU Optronics) rose 184% from the same period in 2001.

**E.     The Conspiracy's Effect on Earlier LCD Technologies**

169.     During the Conspiracy Period, LCD Panels used in certain applications, including notebook PCs and mobile wireless handsets, included both TFT-LCD Panels and STN-LCD Panels.  STN-LCD Panels included CSTN-LCD Panels and MSTN-LCD Panels.  Certain defendants, their corporate affiliates, and other members of the conspiracy manufactured both TFT-LCD Panels and STN-LCD Panels, including defendants Samsung, Sharp and Epson.  The same individuals at the defendants who were engaged in bilateral communications and group meetings regarding TFT-LCD Panel prices also had pricing responsibilities for STN-LCD Panels.

**1.     Defendants' Bilateral Communications Regarding STN-LCD Panels**

170.     Defendants' conspiracy included agreements to raise fix, raise, maintain and/or stabilize the prices of both TFT-LCD Panels and STN-LCD Panels.  Specifically, defendants engaged in bilateral discussions in which they exchanged information about STN-LCD Panel pricing, shipments, and production.  These discussions usually took place between sales and marketing employees in the form of telephone calls, emails and instant messages.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered defendants' customers for STN-LCD Panels.

171.     REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1    172.    REDACTED

2

3

4

5

6

7    173.                      REDACTED

8

9

10

11

12

13    174.                      REDACTED

14

15

16

17

18    175.                   REDACTED

19

20

21

22

23

24    176.                      REDACTED

25

26

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1          REDACTED

2

3    177.          REDACTED

4

5    178.          REDACTED

6

7    179.          REDACTED

8

9

10

11

12

13

14

15   180.          REDACTED

16

17

18

19

20

21

22

23   181.          REDACTED

24

25

26

27   182.          REDACTED

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

REDACTED

183.                    REDACTED

**2.    The Structure of the LCD Panel Market Facilitated the Inflation of Prices of STN-LCD Panels As Well As TFT-LCD Panels**

184.    At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels and CSTN-LCD Panels were close substitutes for each other. For example, beginning in 2000, TFT-LCD Panels and CSTN-LCD Panels were both purchased in significant quantities for similar uses – i.e., display purposes – in mobile wireless handsets and other LCD Products that included small displays.  At other times during the Conspiracy Period, TFT-LCD Panels and CSTN panels were both purchased in significant quantities for use in notebook PCs.

185.    At certain points during the Conspiracy Period, for certain applications in LCD Panel Products, TFT-LCD Panels, CSTN-LCD Panels and MSTN-LCD Panels were substitutes for each other.  At these points during the Conspiracy period, all three panels were purchased for display applications in mobile wireless handsets and other LCD Products that included small displays.

186.    During the Conspiracy Period, purchasers of LCD Panels sometimes switched their purchases from TFT-LCD Panels to STN-LCD Panels in response to changes in the relative prices of TFT-LCD Panels and STN-LCD Panels.     REDACTED

<span style="color:red">REDACTED</span>

Because handset manufacturers could and sometimes did switch from TFT-LCD Panels to STN-LCD Panels in response to higher TFT-LCD Panel prices, defendants knew that in order to effectively fix, raise and maintain prices for TFT-LCD prices, as they have admitted, they would also need to fix, raise and maintain prices of STN-LCD panels as well. <span style="color:red">REDACTED</span>

.

187.    Because TFT-LCD Panels and STN-LCD Panels were close substitutes, and purchasers of LCD panels switched purchases between the two technologies, from at least 2001 through 2006, the price per square inch of TFT-LCD Panels and CSTN-LCD panels tracked very closely, as seen in the chart below:



188.    The defendants understood that they could profitably raise prices of STN-LCD Panels in response to increases in TFT-LCD Panel prices. <span style="color:red">REDACTED</span>

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

REDACTED

189.    Because TFT-LCD Panels and STN-LCD Panels, including both CSTN-LCD Panels and MSTN-LCD Panels were substitutes in certain LCD Products at certain points during the Conspiracy Period, and because defendants collectively controlled a significant share of the market for LCD panels, both globally and in the United States, defendants had the incentive and ability to inflate the prices of STN-LCD Panels as well as TFT-LCD Panels. The conspiracy's success in inflating TFT-LCD Panel prices also inflated STN-LCD prices, and *vice versa*.

## F.    Conspiracy's Effect on U.S. Commerce

190.    Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed LCD Panels to the facilities of foreign manufacturers, including manufacturers of mobile wireless handsets, knowing that they would subsequently be imported into the United States, one of their most important markets and a major source of their revenues. In this respect, defendants directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed LCD Panels to enter the United States market and inflating the prices of mobile wireless handsets and other LCD Products AT&T Mobility and AT&T purchased in the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices being paid for such products by U.S. companies like AT&T Mobility and AT&T.

191.    The U.S. LCD market is enormous and was a major focus of the conspiracy. Measured by value, defendants and others shipped during the Conspiracy Period more than 400 million LCD Panels, including those incorporated into LCD Products, into the United States for ultimate sale to U.S. consumers. During the Conspiracy Period, the value of these LCD Panels imported into the United States was in excess of $50 billion. Defendants shipped millions of LCD Products worth billions of dollars into the United States each year during the Conspiracy Period. As a result, a substantial portion of defendants' revenues was derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States. Most, if not all, defendants had marketing, sales, and account management teams

1   specifically designated to handle U.S. customer accounts and the U.S. market for LCD Panels

2   and LCD Products.

3        192.    During the Conspiracy Period, every defendant shipped LCD Panels directly into

4   the United States.

5        193.    Because of the importance of the U.S. market to defendants and their co-

6   conspirators, LCD Panels and LCD Products intended for importation into and ultimate

7   consumption in the United States were a focus of defendants' illegal conduct.  The defendants

8   knowingly and intentionally sent price-fixed LCD Panels and LCD Products into a stream of

9   commerce that lead directly into the United States.  Many LCD Panels were intended for

10  incorporation into finished products specifically destined for sale and use in the United States.

11  Furthermore, this conduct by defendants was meant to produce and did in fact produce a

12  substantial effect in the United States in the form of artificially-inflated prices for LCD Panels

13  and LCD Products.

14       194.    When high-level executives based at defendants' Asian headquarters agreed on

15  prices, they knew that their price-fixed LCD Panels would be incorporated into LCD Products

16  sold in the United States.  Moreover, because LCD Panels are – and were throughout the

17  Conspiracy Period – the most expensive and significant component of LCD Products, defendants

18  knew that price increases for LCD Panels would necessarily result in increased prices for LCD

19  Products sold in the United States.  Many defendants manufactured LCD Products and sold them

20  in the United States.  In fact, defendants routinely monitored the effect their price-fixing had on

21  the prices of such LCD Products sold in the United States.

22       195.    Defendants also monitored the prices for LCD Products sold in the United States,

23  which they often referred to as "street prices," because defendants were aware that the

24  conspiracy would elevate those prices in addition to the prices of LCD Panels.  In addition,

25  defendants used LCD Product pricing in the United States as a benchmark for establishing,

26  organizing, and tracking their price-fixing of LCD Panels.

27       196.    Defendants have acknowledged that their commercial activities involving

28  intentionally sending LCD Panels and LCD Products into the United States impacted American

import trade and import commerce.  In a series of complaints filed with the U.S. International Trade Commission over the past few years, defendants Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf).  *See In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-631, Complaint of Samsung Electronics Co., Ltd. (December 21, 2007) (Docket No. 2586*); In the Matter of Certain Liquid Crystal Display Modules, Products Containing Same, and Methods for Using the Same*, Investigation No. 337-TA-634, Complaint of Sharp Corporation (January 30, 2008) (Docket No. 2594); *In the Matter of Certain Liquid Crystal Display Devices and Products Containing the Same*, Investigation No. 337-TA-699, Complaint of Samsung Electronics Co., Ltd. (December 1, 2009) (Docket No. 2698).

197.    Defendants who have entered guilty pleas in connection with the LCD conspiracy have acknowledged that their illegal activities impacted imports into the United States and had a substantial effect on American import trade and import commerce.  Those defendants have expressly admitted that "[LCD Panels] affected by [their] conspiracy [were] sold by one or more of the conspirators to customers in [the Northern District of California]."

198.    For the reasons set forth above, defendants' illegal conduct involved import trade or import commerce into the United States.

199.    All of the above facts also demonstrate that defendants' illegal activities had a direct, substantial, and reasonably foreseeable effect on U.S. commerce.

## VIII.    PLAINTIFFS' INJURIES

200.    AT&T Mobility has suffered a direct, substantial, and reasonably foreseeable injury as both a purchaser of mobile wireless handsets containing LCD Panels and as a purchaser of other LCD Products as a result of defendants' conspiracy to raise, fix, stabilize, or maintain the price of LCD Panels at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of LCD Panels incorporated into such mobile wireless handsets, causing AT&T Mobility to pay higher prices than it would have in the absence of defendants' conspiracy.

201.     In some cases, AT&T Mobility purchased mobile wireless handsets directly from defendants.  For example, during the Conspiracy Period, AT&T Mobility purchased mobile wireless handsets directly from defendant Samsung and/or its wholly owned and controlled sales agents in the United States.  As a result of defendants' conspiracy to fix the price of LCD panels, AT&T Mobility purchased mobile "Samsung"-branded wireless handsets from Samsung at artificially-inflated prices and suffered injury in the United States as a direct purchaser from Samsung.

202.     During the Conspiracy Period, AT&T Mobility also purchased mobile wireless handsets directly from LG Electronics, Inc. and its subsidiaries, affiliates or sales agents in the United States (collectively, "LG Electronics").  LG Electronics owned a substantial interest in and exerted control over defendant LG Display, which has already pleaded guilty to having fixed the price of LCD Panels.  Defendants' conspiracy to fix the price of LCD Panels affected the LCD Panels contained in the mobile wireless handsets AT&T Mobility purchased from LG Electronics.  LG Electronics passed on the overcharge caused by defendants' conspiracy to AT&T Mobility, and as a result, AT&T Mobility suffered injury and paid supra-competitive prices for "LG"-branded mobile wireless handsets it purchased in the United States from LG Electronics.

203.     AT&T Mobility suffered injury in the United States as a direct purchaser as a result of its purchases of mobile wireless handsets from LG Electronics.  During the Conspiracy Period, LG Display was the manufacturing agent and alter ego of LG Electronics, and LG Electronics and LG Display constituted a single entity for purposes of AT&T Mobility's purchases from LG Electronics due to their close affiliation and unity of interest.  Beginning in July 1999, LG Electronics placed its LCD Panel manufacturing operations in LG Display, which LG Electronics organized as a joint venture and which also received a capital contribution from Royal Philips Electronics N.V.  In June 1999, LG Display began manufacturing LCD Panels at the same fabs in Gumi, South Korea previously owned and operated in the name of LG Electronics.  From 1999 through 2006 LG Electronics exerted control over all aspects of LG

1   Display's operations.  Boon Joon Koo, CEO of LG Display, was formerly vice president of LG

2   Electronics.  Hee Gook Lee, president of LG Electronics, served on the board of LG Display.

3           204.    In addition, due to its financial interest in and control over LG Display, LG

4   Electronics stood to reap substantial financial benefits from LG Display's participation in the

5   conspiracy to fix the price of LCD Panels.  Because LG Electronics profited from the artificially-

6   inflated prices for LCD Panels charged by LG Display, there is no realistic possibility that LG

7   Electronics will attempt to recover any overcharges for LCD Panels that LG Electronics

8   purchased from LG Display or any of LG Display's co-conspirators.

9           205.    AT&T Mobility also purchased mobile wireless handsets containing LCD Panels

10  from other handset OEMs, which in turn purchased LCD Panels from defendants and their co-

11  conspirators.  Defendants' conspiracy affected and artificially inflated the price of LCD Panels

12  purchased by these handset OEMs, which paid higher prices for LCD Panels than they would

13  have absent the conspiracy.  The conspiracy artificially inflated the prices of TFT-LCD Panels

14  included in mobile wireless handsets, as well the price of MSTN and CSTN LCD Panels

15  included in such handsets.

16          206.    The handset OEMs passed on to their customers, including AT&T Mobility, the

17  overcharges caused by defendants' conspiracy.  AT&T Mobility was not able to pass on to its

18  customers the overcharge caused by defendants' conspiracy.  Thus, AT&T Mobility suffered

19  injury when it purchased mobile wireless handsets containing LCD Panels from the handset

20  OEMs.

21          207.    In addition, AT&T Mobility and AT&T have suffered a direct, substantial, and

22  reasonably foreseeable injury as a result of defendants' conspiracy to raise, fix, stabilize or

23  maintain the price of LCD Panels at artificial levels as purchasers of LCD Products for their own

24  use.

25          208.    During the Conspiracy Period, a number of large computer OEMs, such as Dell,

26  IBM, and Hewlett-Packard, sold desktop computer monitors and laptop and notebook computers

27  to AT&T Mobility and AT&T.  In fact, the computer OEM with the largest share of desktop

28

1    computer monitor and laptop and notebook computer sales in the United States, Dell, sold

2    exclusively to end users, including AT&T Mobility and AT&T.

3        209.    Defendants' conspiracy artificially inflated the price of the LCD Panels purchased

4    by these computer OEMs for incorporation into the desktop computer monitors and laptop and

5    notebook computers sold to AT&T Mobility and AT&T.  The computer OEMs passed on these

6    artificially-inflated prices for LCD Panels to AT&T Mobility and AT&T, causing AT&T

7    Mobility and AT&T to pay higher prices for the desktop computer monitors and laptop and

8    notebook computers than they would have paid in the absence of the defendants' conspiracy.

9        210.    Once an LCD Panel leaves its place of manufacture, it remains essentially

10   unchanged as it moves through the distribution system.  LCD Panels are identifiable, discreet

11   physical objects that do not change form or become an indistinguishable part of an LCD Product.

12   Thus, LCD Panels follow a physical chain from defendants through manufacturers of LCD

13   Products sold to AT&T Mobility and to AT&T.

14       211.    The market for LCD Panels and the market for LCD Products are inextricably

15   linked and cannot be considered separately.  Defendants are well aware of this intimate

16   relationship.

17       212.    The LCD Product OEMs' demand for LCD Panels was relatively inelastic,

18   because there were no reasonable substitutes for LCD Panels to serve as the visual display for

19   products such as mobile wireless handsets, desktop computer monitors and laptop and notebook

20   computers.  The other principal flat panel display technology, plasma, is too big, consumes too

21   much power and is too fragile to be of any practical application in mobile wireless handsets or

22   laptop or notebook computers.  Other competing display technologies, such as OLED displays,

23   were not available during the Conspiracy Period and are only today becoming widely available.

24   In addition, throughout the Conspiracy Period, defendants controlled the market for LCD Panels.

25   Consequently, during the Conspiracy Period, the handset OEMs and computer OEMs had no

26   choice but to purchase LCD Panels from defendants and others at prices that were artificially

27   inflated, fixed, and stabilized by defendants' conspiracy.

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

213.     As a result, AT&T Mobility and AT&T were injured in connection with their purchases of LCD Products for internal use during the Conspiracy Period.

## IX.     DEFENDANTS' CONCEALED THEIR CONSPIRACY TO FIX THE PRICE OF LCD PANELS

214.     AT&T Mobility and AT&T did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December of 2006, when the existence of investigations by the DOJ and other antitrust regulators became public, because defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy.  Because defendants' agreement, understanding and conspiracy were kept secret, AT&T Mobility and AT&T were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LCD Products.

215.     The affirmative acts of defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

216.     The affirmative acts of defendants and their co-conspirators alleged herein, among others, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  The conspirators knew their activities were illegal.

REDACTED

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

217.     Therefore, the Defendants and their co-conspirators kept their conspiracy communications strictly confidential.     REDACTED

218.     By its very nature, defendants' price-fixing conspiracy was inherently self-concealing.  As alleged above, defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or even to other employees of defendants not involved in LCD Panel pricing or production.  In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.  Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, in approximately the summer of 2006, they discontinued the Working Level meetings in favor of one-on-one meetings to exchange pricing and supply information.  The meetings were coordinated so that on the same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until all competitors had met with each other.  These Round Robin meetings took place until at least November or December of 2006.  The information obtained at these meetings was transmitted up the corporate reporting chain to permit defendants to maintain their price-fixing and production-limitation agreement.

219.     In addition, defendants repeatedly gave pretextual justifications for the inflated prices of LCD Panels in furtherance of the conspiracy.

220.     There have been a variety of other purportedly market-based explanations for price increases.  The first was supply and demand.  In early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."  Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, also falsely reported in 1999 that price increases were due to "acute" shortages.

221.     Another false rationale provided by defendants was undercapitalization.  In 1999, Joel Pollack, a marketing manager for Sharp, stated:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry.

222.     A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung.  He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

223.     Increased demand was repeatedly cited by defendants throughout the Conspiracy Period.  On February 4, 2001, Bruce Berkoff, Executive Vice-President at LG Philips was quoted in News.com as saying that price increases were due to shortages.  He claimed, "demand grew so fast that the supply can't keep up."  Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15 percent due to increased demand for the holiday season. In 2005, Koo Duk-Mo of LG Philips stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so LCD TV supply is likely to remain tight throughout the year."

224.     Hsu Jen-Ting, a Vice-President at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001.  They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

225.    These explanations were all pretextual and each served to cover up the conspiracy.  As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to AT&T Mobility's and AT&T's claims.

**X.    VIOLATIONS ALLEGED**

**First Claim for Relief**
**(Violation of Sherman Act Against All Defendants)**

226.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

227.    Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least as early as January 1, 1996 and continuing through at least December 11, 2006, the exact dates being unknown to AT&T Mobility and AT&T, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCD Panels in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

228.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

a.    To fix, raise, maintain and stabilize the price of LCD Panels;

b.    To allocate markets for LCD Panels among themselves;

c.    To submit rigged bids for the award and performance of certain LCD Panels contracts; and

d.    To allocate among themselves the production of LCD Panels.

229.    The combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of LCD Panels has been restrained, suppressed, and/or eliminated in the United States;

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

b.     Prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

c.     Those who purchased LCD Panels produced by defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

230.     AT&T Mobility has been injured in its business and property by being forced to pay more for the mobile wireless handsets it purchased from defendants and their co-conspirators than it would have paid in the absence of defendants' conspiracy.

231.     Defendants' and their co-conspirators' conduct involved U.S. import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce that resulted in the injuries suffered by AT&T Mobility and gave rise to AT&T Mobility's antitrust claims.  As a result, AT&T Mobility suffered injury as a direct, proximate, and reasonably foreseeable result of defendants' conspiracy to fix the price of LCD Panels and are entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for their purchases of LCD Products containing LCD Panels sold by defendants, their coconspirators, and others.

232.     Because defendants all continue to manufacture LCD Panels, the market for production and sale of LCD Panels remains highly concentrated and susceptible to collusion, defendants continue to have the incentive to collude to increase LCD Panel prices or stabilize LCD Panel price declines, defendants' conspiracy to fix the price of LCD Panels could be easily repeated and concealed from AT&T Mobility and AT&T, AT&T Mobility and AT&T both face a serious risk of future injury, and are thus entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26 against all defendants, preventing and restraining the violations alleged herein.

**Second Claim for Relief**
**(Violation of State Antitrust and Unfair Competition Laws)**

233.    AT&T Mobility and AT&T incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

234.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the California Business and Professions Code § 16750(a), *et seq.* (the "Cartwright Act"):

235.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in California.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in California through its corporate-owned retail stores, through independent retailers located in California, and through its website on the Internet.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in California through both its own sales force and independent sales agents.  In addition, AT&T Mobility maintained in California inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and operating retail stores in California.

236.    AT&T, including Pacific Bell Telephone Company, provided a variety of wireline telecommunications services to residents, businesses and government customers in California. As a result of their presence in California and the substantial business they conduct in California, AT&T Mobility and AT&T are entitled to the protection of the laws of California.

237.    During the Conspiracy Period, AT&T Mobility purchased in California LCD Products, including desktop monitors and notebook computers, containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.  During the Conspiracy Period, Pacific Bell Telephone Company, AT&T Operations, Inc., AT&T Services, Inc., AT&T Datacomm, Inc., and AT&T Corp. purchased in California LCD Products, including desktop monitors and notebook computers, containing LCD

1    Panels manufactured by defendants and sold at artificially-inflated prices because of defendants'

2    price fixing conspiracy.

3          238.    Defendants engaged and participated in the conspiracy through their offices and

4    operations in California.  Defendants LG Display, Chunghwa and Sharp all admitted in their plea

5    agreements that acts in furtherance of their conspiracy to fix the price of LCD Panels were

6    carried out in California.  Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and

7    Toshiba all maintained offices in California during the Conspiracy Period.  Employees at

8    defendants' locations in California participated in meetings and engaged in bilateral

9    communications in California and intended and did carry out defendants' anticompetitive

10   agreement to fix the price of LCD Panels.  Defendants also participated in the conspiracy in the

11   U.S. through their California offices by providing information obtained through meetings with

12   other defendants to employees in their California offices for those California employees to use in

13   the course of fixing prices in negotiations with U.S. customers, including manufacturers of

14   mobile wireless handsets that were purchased by AT&T Mobility in the United States.

15   Defendants' conduct within California thus injured AT&T Mobility and AT&T both in

16   California and throughout the United States.

17         239.    Beginning at a time presently unknown to AT&T Mobility and AT&T, but at least

18   as early as January 1, 1996, and continuing thereafter at least up to and including at least

19   December 11, 2006, defendants and their co-conspirators entered into and engaged in a

20   continuing unlawful trust in restraint of the trade and commerce described above in violation of

21   the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have

22   each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and

23   allocate markets for, LCD Panels at supra-competitive levels.  Defendants' conduct substantially

24   affected California commerce.

25         240.    The aforesaid violations of Section 16720, California Business and Professions

26   Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

27   defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain

28   and stabilize the prices of, and to allocate markets for, LCD Panels.

241.    For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.      to fix, raise, maintain and stabilize the price of LCD Panels;

b.      to allocate markets for LCD Panels amongst themselves;

c.      to submit rigged bids for the award and performance of certain LCD Panels contracts; and

d.      to allocate among themselves the production of LCD Panels.

242.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.      price competition in the sale of LCD Panels has been restrained, suppressed and/or eliminated in the State of California;

b.      prices for LCD Panels sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.      those who purchased LCD Panels from defendants, their co-conspirators, and others and LCD Products containing LCD Panels from defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

243.    As a result of the alleged conduct of defendants, AT&T Mobility and AT&T paid supra-competitive, artificially inflated prices for the LCD Products they purchased during the Conspiracy Period.

244.    As a direct and proximate result of defendants' conduct, AT&T Mobility and AT&T have been injured in their business and property by paying more for LCD Products purchased in California from defendants, their coconspirators, and others than they would have paid in the absence of defendants' combination and conspiracy.  As a result of defendants' violation of Section 16720 of the California Business and Professions Code, AT&T Mobility,

and AT&T are entitled to treble damages and the costs of suit, including reasonable attorneys'
fees, pursuant to Section 16750(a) of the California Business and Professions Code.

245.     By reason of the foregoing, defendants have also engaged in unfair competition in
violation of California's Unfair Competition Law, California Business and Professional Code
§ 17200 et seq.

   a.   Defendants committed acts of unfair competition, as defined by Section
        17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of
        LCD Panels as described above;

   b.   The acts, omissions, misrepresentations, practices and non-disclosures of
        defendants, as described above, constitute a common and continuing
        course of conduct of unfair competition by means of unfair, unlawful
        and/or fraudulent business acts or practices with the meaning of Section
        17200, *et seq.*, including, but not limited to (1) violation of Section 1 of
        the Sherman Act; (2) violation of the Cartwright Act;

   c.   Defendants' acts, omissions, misrepresentations, practices and non-
        disclosures are unfair, unconscionable, unlawful and/or fraudulent
        independently of whether they constitute a violation of the Sherman Act or
        the Cartwright Act;

   d.   Defendants' acts or practices are fraudulent or deceptive within the
        meaning of Section 17200, *et seq.*;

   e.   Defendants' conduct was carried out, effectuated, and perfected within the
        state of California.  Defendants LG Display, Chunghwa and Sharp all
        admitted that acts in furtherance of the conspiracy to fix the price of LCD
        Panels were carried out in California.  Defendants also maintained offices
        in California where their employees engaged in communications, meetings
        and other activities in furtherance of defendants' conspiracy;

   f.   During the Conspiracy Period, AT&T Mobility and AT&T conducted a
        substantial volume of business in California.  AT&T Mobility provided

1    wireless communication services and sold mobile wireless handsets

2    containing LCD Panels to customers in California at its corporate-owned

3    retail stores and through its website on the Internet.  AT&T Mobility also

4    sold mobile wireless handsets to independent agents and retailers located

5    in California.  AT&T Mobility also provided wireless communication

6    services and sold mobile wireless handsets directly to business,

7    government and other customers in California.  In addition, AT&T

8    Mobility maintained in California inventories of mobile wireless handsets

9    containing LCD Panels manufactured and sold by defendants, their co-

10   conspirators, and others, and operated offices and retail stores in

11   California.  Pacific Bell Telephone Company provided various wireline

12   telecommunications services to residents, businesses and government

13   customers in California, where AT&T employees used notebook

14   computers and desktop monitors purchased by AT&T.  As a result of their

15   presence in California and the substantial business they conduct in

16   California, AT&T Mobility and AT&T are entitled to the protection of the

17   laws of California; and,

18        g.    By reason of the foregoing, AT&T Mobility and AT&T are entitled to full

19              restitution and/or disgorgement of all revenues, earnings, profits,

20              compensation, and benefits that may have been obtained by defendants as

21              result of such business acts and practices described above.

22   246.    By reason of the foregoing, defendants have entered into agreements in restraint

23   of trade in violation of Tennessee Code §§ 47-25-101 *et seq.*

24        a.    Defendants' conspiracy restrained, suppressed and/or eliminated

25              competition in the sale of LCD Panels in Tennessee and fixed, raised,

26              maintained and stabilized LCD Panel prices in Tennessee at artificially

27              high, non-competitive levels;

28

69

b.      As a result, defendants' conspiracy substantially affected Tennessee commerce;

c.      During the Conspiracy Period, beginning in 2001, AT&T Mobility purchased mobile wireless handsets containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy. AT&T Mobility purchased such handsets in Tennessee, where it received mobile wireless handsets shipped to Tennessee by AT&T Mobility's handset vendors. AT&T Mobility also purchased LCD products at its offices and facilities in Tennessee, including desktop monitors and notebook computers containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy. In addition, BellSouth Telecommunications, Inc. purchased at its offices and facilities in Tennessee LCD Products, including desktop monitors and notebook computers, containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.      AT&T Mobility and AT&T conducted a substantial volume of business in Tennessee. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Tennessee at its corporate-owned retail stores and through its website on the Internet. AT&T Mobility also sold mobile wireless handsets to independent agents and retailers in Tennessee. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Tennessee. AT&T Mobility also operated offices and retail stores in Tennessee. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses

70

1    and government customers in Tennessee, where employees used notebook
2    computers and desktop monitors purchased by BellSouth
3    Telecommunications, Inc..  As a result of their presence in Tennessee and
4    the substantial business they conduct in Tennessee, AT&T Mobility and
5    AT&T are entitled to the protection of the laws of Tennessee; and,

6    e.    As a direct and proximate result of defendants' conduct, AT&T Mobility
7          and BellSouth Telecommunications, Inc. have been injured in their
8          business and property by paying more for LCD Products purchased in
9          Tennessee from defendants, their coconspirators and others than they
10         would have paid in the absence of defendants' combination and
11         conspiracy, and are entitled to relief under Tennessee Code §§ 47-25-101
12         *et seq.*

13   247.  By reason of the foregoing, defendants have entered into agreements in restraint

14   of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*:

15   a.    Defendants' conspiracy restrained, suppressed and/or eliminated
16         competition in the sale of LCD Panels in Arizona and fixed, raised,
17         maintained and stabilized LCD Panel prices in Arizona at artificially high,
18         non-competitive levels;

19   b.    As a result, defendants' conspiracy substantially affected Arizona
20         commerce;

21   c.    During the Conspiracy Period, AT&T Mobility and AT&T Corp.
22         purchased at their offices and facilities in Arizona LCD Products
23         containing LCD Panels manufactured by defendants and sold at
24         artificially-inflated prices because of defendants' price fixing conspiracy.

25   d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a
26         substantial volume of business in Arizona.  AT&T Mobility provided
27         wireless communication services and sold mobile wireless handsets
28         containing LCD Panels to customers in Arizona at its corporate-owned

71

<table>
<tr><td>1</td><td>retail stores and through its website on the Internet.  AT&T Mobility also</td></tr>
<tr><td>2</td><td>sold mobile wireless handsets to independent agents and retailers in</td></tr>
<tr><td>3</td><td>Arizona.  AT&T Mobility also provided wireless communication services</td></tr>
<tr><td>4</td><td>and sold mobile wireless handsets directly to business, government and</td></tr>
<tr><td>5</td><td>other customers in Arizona.  In addition, AT&T Mobility maintained in</td></tr>
<tr><td>6</td><td>Arizona inventories of mobile wireless handsets containing LCD Panels</td></tr>
<tr><td>7</td><td>manufactured and sold by defendants, their co-conspirators, and others,</td></tr>
<tr><td>8</td><td>and operated offices and retail stores in Arizona.  During the Conspiracy</td></tr>
<tr><td>9</td><td>Period, AT&T provided various wireline telecommunications services to</td></tr>
<tr><td>10</td><td>businesses and government customers in Arizona, where employees used</td></tr>
<tr><td>11</td><td>notebook computers and desktop monitors purchased by AT&T Corp.  As</td></tr>
<tr><td>12</td><td>a result of their presence in Arizona and the substantial business they</td></tr>
<tr><td>13</td><td>conduct in Arizona, AT&T Mobility and AT&T are entitled to the</td></tr>
<tr><td>14</td><td>protection of the laws of Arizona; and,</td></tr>
</table>

15      e.    As a direct and proximate result of defendants' conduct, AT&T Mobility

16          and AT&T Corp. have been injured in their business and property by

17          paying more for LCD Products purchased in Arizona defendants, their co-

18          conspirators and others than they would have paid in the absence of

19          defendants' combination and conspiracy, and are entitled to relief under

20          Ariz. Rev. Stat. §§ 44-1401, *et seq.*

21    248.    By reason of the foregoing, defendants have entered into agreements in restraint

22 of trade in violation of District of Columbia Code Ann. §§28-4501 *et seq.*

23      a.    Defendants' conspiracy restrained, suppressed and/or eliminated

24          competition in the sale of LCD Panels in the District of Columbia and

25          fixed, raised, maintained and stabilized LCD Panel prices in the District of

26          Columbia at artificially high, non-competitive levels;

27      b.    As a result, defendants' conspiracy substantially affected District of

28          Columbia commerce;

1          c.       During the Conspiracy Period, AT&T Mobility and AT&T Corp.

2                 purchased at their offices and facilities in the District of Columbia LCD

3                 Products containing LCD Panels manufactured by defendants and sold at

4                 artificially-inflated prices because of defendants' price fixing conspiracy.

5          d.       During the Conspiracy Period, AT&T Mobility and AT&T conducted a

6                 substantial volume of business in the District of Columbia.  AT&T

7                 Mobility provided wireless communication services and sold mobile

8                 wireless handsets containing LCD Panels to customers in the District of

9                 Columbia at its corporate-owned retail stores and through its website on

10              the Internet.  AT&T Mobility also sold mobile wireless handsets to

11              independent agents and retailers in the District of Columbia.  AT&T

12              Mobility also provided wireless communication services and sold mobile

13              wireless handsets directly to business, government and other customers in

14              the District of Columbia.  In addition, AT&T Mobility maintained in the

15              District of Columbia inventories of mobile wireless handsets containing

16              LCD Panels manufactured and sold by defendants, their co-conspirators,

17              and others, and operated offices and retail stores in the District of

18              Columbia.  AT&T provided various wireline telecommunications services

19              to businesses and government customers in the District of Columbia,

20              where AT&T employees used notebook computers and desktop monitors

21              purchased by AT&T.  As a result of their presence in the District of

22              Columbia and the substantial business they conduct in the District of

23              Columbia, AT&T Mobility and AT&T are entitled to the protection of the

24              laws of the District of Columbia; and,

25          e.       As a direct and proximate result of defendants' conduct, AT&T Mobility

26              and AT&T Corp. have been injured in their business and property by

27              paying more for LCD Products purchased in the District of Columbia from

28              defendants, their coconspirators and others than they would have paid in

the absence of defendants' combination and conspiracy, and are entitled to
relief under District of Columbia Code Ann. §§ 28-4501, *et seq.*

249.    By reason of the foregoing, defendants have entered into agreements in restraint
of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

        a.     Defendants' conspiracy restrained, suppressed and/or eliminated
competition in the sale of LCD Panels in Illinois and fixed, raised,
maintained and stabilized LCD Panel prices in Illinois at artificially high,
non-competitive levels;

        b.     As a result, defendants' conspiracy substantially affected Illinois
commerce;

        c.     During the Conspiracy Period, AT&T Mobility purchased mobile wireless
handsets containing LCD Panels manufactured by defendants and sold at
artificially-inflated prices because of defendants' price fixing conspiracy.
AT&T Mobility purchased such handsets in Illinois, where it received
mobile wireless handsets shipped by AT&T Mobility's handset vendors.
AT&T Mobility, AT&T Services, Inc., AT&T Datacomm Inc., AT&T
Operations, Inc. and AT&T Corp. purchased at their offices and facilities
in Illinois LCD Products containing LCD Panels manufactured by
defendants and sold at artificially-inflated prices because of defendants'
price fixing conspiracy.

        d.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a
substantial volume of business in Illinois. AT&T Mobility provided
wireless communication services and sold mobile wireless handsets
containing LCD Panels to customers in Illinois at its corporate-owned
retail stores and through its website on the Internet. AT&T Mobility also
sold mobile wireless handsets to independent agents and retailers in
Illinois. AT&T Mobility also provided wireless communication services
and sold mobile wireless handsets directly to business, government and

1      other customers in Illinois.  In addition, AT&T Mobility maintained in

2      Illinois inventories of mobile wireless handsets containing LCD Panels

3      manufactured and sold by defendants, their co-conspirators, and others,

4      and operated offices and retail stores in Illinois.  During the Conspiracy

5      Period, AT&T provided various wireline telecommunications services to

6      residential customers as well as businesses and government customers in

7      Illinois, where AT&T employees used notebook computers and desktop

8      monitors purchased by AT&T.  As a result of their presence in Illinois and

9      the substantial business they conduct in Illinois, AT&T Mobility and

10     AT&T are entitled to the protection of the laws of Illinois; and,

11    e.  As a direct and proximate result of defendants' conduct, AT&T Mobility,

12      AT&T Services, Inc., AT&T Datacomm, Inc., AT&T Operations, Inc. and

13      AT&T Corp. have been injured in their business and property by paying

14      more for LCD Products purchased in Illinois from defendants, their co-

15      conspirators and others than they would have paid in the absence of

16      defendants' combination and conspiracy, and are entitled to relief under

17      the Illinois Antitrust Act.

18  250.  By reason of the foregoing, defendants have entered into agreements in restraint

19 of trade in violation of Iowa Code §§553.1 *et seq.*

20    a.  Defendants' conspiracy restrained, suppressed and/or eliminated

21      competition in the sale of LCD Panels in Iowa and fixed, raised,

22      maintained and stabilized LCD Panel prices in Iowa at artificially high,

23      non-competitive levels;

24    b.  As a result, defendants' conspiracy substantially affected Iowa commerce;

25    c.  AT&T Mobility purchased at its offices and facilities in Iowa LCD

26      Products containing LCD Panels manufactured by defendants and sold at

27      artificially-inflated prices because of defendants' price fixing conspiracy.

28

d.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

substantial volume of business in Iowa.  AT&T Mobility provided

wireless communication services and sold mobile wireless handsets

containing LCD Panels to customers in Iowa through its corporate-owned

retail stores, through independent retailers located in Iowa, and through its

website on the Internet.  AT&T Mobility also provided wireless

communication services and sold mobile wireless handsets directly to

business, government and other customers in Iowa through both its own

sales force and independent sales agents.  In addition, AT&T Mobility

maintained in Iowa inventories of mobile wireless handsets containing

LCD Panels manufactured and sold by defendants, their co-conspirators,

and others, and operated offices and retail stores in Iowa.  During the

Conspiracy Period, AT&T provided various wireline telecommunications

services to businesses and government customers in Iowa, where AT&T

employees used notebook computers and desktop monitors purchased by

AT&T.  As a result of their presence in Arizona and the substantial

business they conduct in Iowa, AT&T Mobility and AT&T are entitled to

the protection of the laws of Iowa;

e.     As a direct and proximate result of defendants' conduct, AT&T Mobility

has been injured in its business and property by paying more for LCD

Products purchased from defendants, their coconspirators and others than

it would have paid in the absence of defendants' combination and

conspiracy, and is entitled to relief under Iowa Code §§ 553.1 *et seq.*

251.     By reason of the foregoing, defendants have entered into agreements in restraint

of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

a.     Defendants' conspiracy restrained, suppressed and/or eliminated

competition in the sale of LCD Panels in Kansas and fixed, raised,

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

maintained and stabilized LCD Panel prices in Kansas at artificially high, non-competitive levels;

b.     As a result, defendants' conspiracy substantially affected Kansas commerce;

c.     During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc., AT&T Datacomm, Inc., AT&T Operations, Inc., AT&T Corp., and Southwestern Bell Telephone Company purchased at their offices and facilities in Kansas LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Kansas. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Kansas at its corporate-owned retail stores and through its website on the Internet. AT&T Mobility also sold mobile wireless handsets to independent agents and retailers in Kansas. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Kansas. In addition, AT&T Mobility maintained in Kansas inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Kansas. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers as well as businesses and government customers in Kansas, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Kansas and the substantial business they conduct in Kansas, AT&T Mobility and AT&T are entitled to the protection of the laws of Kansas; and,

77

e.   As a direct and proximate result of defendants' conduct, AT&T Mobility, AT&T Corp., AT&T Services, Inc., AT&T Operations, Inc., AT&T Datacomm, Inc., and Southwestern Bell Telephone Company have been injured in their business and property by paying more for LCD Products purchased in Kansas from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Kansas Stat. Ann. §§50-101 *et seq.*

252.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

a.   Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Maine and fixed, raised, maintained and stabilized LCD Panel prices in Maine at artificially high, non-competitive levels;

b.   As a result, defendants' conspiracy substantially affected Maine commerce;

c.   AT&T Mobility purchased at its offices and facilities in Maine LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.   During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Maine.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Maine through its corporate-owned retail stores, through independent retailers located in Maine, and through its website on the Internet.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Maine through both its own sales force and independent sales agents.  In addition, AT&T

78

1    Mobility maintained in Maine inventories of mobile wireless handsets

2    containing LCD Panels manufactured and sold by defendants, their co-

3    conspirators, and others, and operated offices and retail stores in Maine.

4    During the Conspiracy Period, AT&T provided various wireline

5    telecommunications services to businesses and government customers in

6    Maine, where AT&T employees used notebook computers and desktop

7    monitors purchased by AT&T.  As a result of their presence in Maine and

8    the substantial business they conduct in Maine, AT&T Mobility and

9    AT&T are entitled to the protection of the laws of Maine; and,

10        e.    As a direct and proximate result of defendants' conduct, AT&T Mobility

11    has been injured in its business and property by paying more for LCD

12    Products purchased from defendants, their coconspirators and others than

13    it would have paid in the absence of defendants' combination and

14    conspiracy, and is entitled to relief under Maine Rev. Stat. Ann. 10,

15    §§1101 *et seq.*

16    253.    By reason of the foregoing, defendants have entered into agreements in restraint

17    of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771 *et seq.*

18        a.    Defendants' conspiracy restrained, suppressed and/or eliminated

19    competition in the sale of LCD Panels in Michigan and fixed, raised,

20    maintained and stabilized LCD Panel prices in Michigan at artificially

21    high, non-competitive levels;

22        b.    As a result, defendants' conspiracy substantially affected Michigan

23    commerce;

24        c.    During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc.,

25    AT&T Operations, Inc., and AT&T Datacomm, Inc. purchased at their

26    offices and facilities in Michigan LCD Products containing LCD Panels

27    manufactured by defendants and sold at artificially-inflated prices because

28    of defendants' price fixing conspiracy.

79

d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Michigan. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Michigan at its corporate-owned retail stores and through its website on the Internet. AT&T Mobility also sold mobile wireless handsets to independent agents and retailers in Michigan. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Michigan. In addition, AT&T Mobility maintained in Michigan inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Michigan. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in Michigan, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Michigan and the substantial business they conduct in Michigan, AT&T Mobility and AT&T are entitled to the protection of the laws of Michigan; and,

e.    As a direct and proximate result of defendants' conduct, AT&T Mobility, AT&T Services, Inc., AT&T Operations, Inc., and AT&T Datacomm, Inc. have been injured in their business and property by paying more for LCD Products purchased in Michigan from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771 *et seq.*

254.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.*

a.      Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Minnesota and fixed, raised, maintained and stabilized LCD Panel prices in Minnesota at artificially high, non-competitive levels;

b.      As a result, defendants' conspiracy substantially affected Minnesota commerce;

c.      AT&T Mobility purchased at its offices and facilities in Minnesota LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Minnesota. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Minnesota through its corporate-owned retail stores, through independent retailers located in Minnesota, and through its website on the Internet. AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Minnesota through both its own sales force and independent sales agents. In addition, AT&T Mobility maintained in Minnesota inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Minnesota. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in Minnesota, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Minnesota and the substantial business they conduct in Minnesota, AT&T Mobility and AT&T are entitled to the protection of the laws of Minnesota; and,

e.      As a direct and proximate result of defendants' conduct, AT&T Mobility has been injured in its business and property by paying more for LCD Products purchased from defendants, their coconspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and is entitled to relief under Minnesota Stat. §§ 325D.50 *et seq.*

255.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

a.      Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Mississippi and fixed, raised, maintained and stabilized LCD Panel prices in Mississippi at artificially high, non-competitive levels;

b.      As a result, defendants' conspiracy substantially affected Mississippi commerce;

c.      During the Conspiracy Period, AT&T Mobility and BellSouth Telecommunications, Inc. purchased at their offices and facilities in Mississippi LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in Mississippi.  AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in Mississippi at its corporate-owned retail stores and through its website on the Internet.  AT&T Mobility also sold mobile wireless handsets to independent agents and retailers in Mississippi.  AT&T Mobility also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in Mississippi.  In addition, AT&T

82

Mobility maintained in Mississippi inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in Mississippi. During the Conspiracy Period, AT&T provided various wireline telecommunications services to residential customers, businesses and government customers in Mississippi, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. As a result of their presence in Mississippi and the substantial business they conduct in Mississippi, AT&T Mobility and AT&T are entitled to the protection of the laws of Mississippi; and,

  e. As a direct and proximate result of defendants' conduct, AT&T Mobility and BellSouth Telecommunications, Inc. have been injured in their business and property by paying more for LCD Products purchased in Mississippi from defendants, their coconspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under Mississippi Code Ann. §§ 75-21-1 *et seq.*

  256. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

  a. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of LCD Panels in Nebraska and fixed, raised, maintained and stabilized LCD Panel prices in Nebraska at artificially high, non-competitive levels;

  b. As a result, defendants' conspiracy substantially affected Nebraska commerce;

  c. AT&T Mobility purchased at its offices and facilities in Nebraska LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy.

83

1        d.     During the Conspiracy Period, AT&T Mobility and AT&T conducted a

2        substantial volume of business in Nebraska.  AT&T Mobility provided

3        wireless communication services and sold mobile wireless handsets

4        containing LCD Panels to customers in Nebraska through its corporate-

5        owned retail stores, through independent retailers located in Nebraska, and

6        through its website on the Internet.  AT&T Mobility also provided

7        wireless communication services and sold mobile wireless handsets

8        directly to business, government and other customers in Nebraska through

9        both its own sales force and independent sales agents.  In addition, AT&T

10        Mobility maintained in Nebraska inventories of mobile wireless handsets

11        containing LCD Panels manufactured and sold by defendants, their co-

12        conspirators, and others, and operated offices and retail stores in

13        Nebraska.  During the Conspiracy Period, AT&T provided various

14        wireline telecommunications services to businesses and government

15        customers in Nebraska, where AT&T employees used notebook

16        computers and desktop monitors purchased by AT&T.  As a result of their

17        presence in Nebraska and the substantial business they conduct in

18        Nebraska, AT&T Mobility and AT&T are entitled to the protection of the

19        laws of Nebraska; and,

20        e.     As a direct and proximate result of defendants' conduct, AT&T Mobility

21        has been injured in its business and property by paying more for LCD

22        Products purchased from defendants, their coconspirators and others than

23        it would have paid in the absence of defendants' combination and

24        conspiracy, and is entitled to relief under Nebraska Stat. §§ 59-801 *et seq.*

25    257.   By reason of the foregoing, defendants have entered into agreements in restraint

26 of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

27        a.     Defendants' conspiracy restrained, suppressed and/or eliminated

28        competition in the sale of LCD Panels in Nevada and fixed, raised,

84

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

1     maintained and stabilized LCD Panel prices in Nevada at artificially high,

2     non-competitive levels;

3         b.    As a result, defendants' conspiracy substantially affected Nevada

4     commerce;

5         c.    During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc.,

6     AT&T Operations, Inc., AT&T DataComm, Inc., and Pacific Bell

7     Telephone Company purchased at their offices and facilities in Nevada

8     LCD Products containing LCD Panels manufactured by defendants and

9     sold at artificially-inflated prices because of defendants' price fixing

10     conspiracy.

11         d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a

12     substantial volume of business in Nevada.  AT&T Mobility provided

13     wireless communication services and sold mobile wireless handsets

14     containing LCD Panels to customers in Nevada at its corporate-owned

15     retail stores and through its website on the Internet.  AT&T Mobility also

16     sold mobile wireless handsets to independent agents and retailers in

17     Nevada.  AT&T Mobility also provided wireless communication services

18     and sold mobile wireless handsets directly to business, government and

19     other customers in Nevada.  In addition, AT&T Mobility maintained in

20     Nevada inventories of mobile wireless handsets containing LCD Panels

21     manufactured and sold by defendants, their co-conspirators, and others,

22     and operated offices and retail stores in Nevada.  During the Conspiracy

23     Period, AT&T provided various wireline telecommunications services to

24     residential customers, businesses and government customers in Nevada,

25     where AT&T employees used notebook computers and desktop monitors

26     purchased by AT&T.  Nevada Bell, a wholly-owned subsidiary of the

27     AT&T companies, provided a variety of telecommunications services to a

28     substantial portion of the population of Nevada.  As a result of their

1                  presence in Nevada and the substantial business they conduct in Nevada,

2                  AT&T Mobility and AT&T are entitled to the protection of the laws of

3                  Nevada; and,

4        e.      As a direct and proximate result of defendants' conduct, AT&T Mobility,

5                  AT&T Services, Inc., AT&T Operations, Inc., AT&T DataComm, Inc.

6                  and Pacific Bell Telephone Company have been injured in their business

7                  and property by paying more for LCD Products purchased in Nevada from

8                  defendants, their coconspirators and others than they would have paid in

9                  the absence of defendants' combination and conspiracy, and are entitled to

10                  relief under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

11       258.      By reason of the foregoing, defendants have entered into agreements in restraint

12 of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

13        a.      Defendants' conspiracy restrained, suppressed and/or eliminated

14                  competition in the sale of LCD Panels in New Mexico and fixed, raised,

15                  maintained and stabilized LCD Panel prices in New Mexico at artificially

16                  high, non-competitive levels;

17        b.      As a result, defendants' conspiracy substantially affected New Mexico

18                  commerce;

19        c.      During the Conspiracy Period, AT&T Mobility and AT&T Corp.

20                  purchased at their offices and facilities in New Mexico LCD Products

21                  containing LCD Panels manufactured by defendants and sold at

22                  artificially-inflated prices because of defendants' price fixing conspiracy.

23        d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

24                  substantial volume of business in New Mexico. AT&T Mobility provided

25                  wireless communication services and sold mobile wireless handsets

26                  containing LCD Panels to customers in New Mexico at its corporate-

27                  owned retail stores and through its website on the Internet. AT&T

28                  Mobility also sold mobile wireless handsets to independent agents and

1 retailers in New Mexico.  AT&T Mobility also provided wireless

2 communication services and sold mobile wireless handsets directly to

3 business, government and other customers in New Mexico.  In addition,

4 AT&T Mobility maintained in New Mexico inventories of mobile wireless

5 handsets containing LCD Panels manufactured and sold by defendants,

6 their co-conspirators, and others, and operated offices and retail stores in

7 New Mexico.  During the Conspiracy Period, AT&T provided various

8 wireline telecommunications services to businesses and government

9 customers in New Mexico, where AT&T employees used notebook

10 computers and desktop monitors purchased by AT&T.  As a result of their

11 presence in New Mexico and the substantial business they conduct in New

12 Mexico, AT&T Mobility and AT&T are entitled to the protection of the

13 laws of New Mexico; and,

14     e.    As a direct and proximate result of defendants' conduct, AT&T Mobility

15 and AT&T Corp. have been injured in their business and property by

16 paying more for LCD Products purchased in Mew Mexico from

17 defendants, their coconspirators and others than they would have paid in

18 the absence of defendants' combination and conspiracy, and are entitled to

19 relief under New Mexico Stat. Ann. §§ 57-1-1 *et seq*.

20    259.   By reason of the foregoing, defendants have entered into agreements in restraint

21 of trade in violation of New York General Business Law §§ 340 *et seq*.

22     a.    Defendants' conspiracy restrained, suppressed and/or eliminated

23 competition in the sale of LCD Panels in New York and fixed, raised,

24 maintained and stabilized LCD Panel prices in New York at artificially

25 high, non-competitive levels;

26     b.    As a result, defendants' conspiracy substantially affected New York

27 commerce;

28

c.    During the Conspiracy Period, AT&T Mobility purchased mobile wireless handsets containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price fixing conspiracy. AT&T Mobility purchased such handsets in New York, where it received mobile wireless handsets shipped by AT&T Mobility's handset vendors. AT&T Mobility and AT&T Corp. purchased at their offices and facilities in New York LCD Products containing LCD Panels manufactured by defendants and sold at artificially-inflated prices because of defendants' price-fixing conspiracy.

d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a substantial volume of business in New York. AT&T Mobility provided wireless communication services and sold mobile wireless handsets containing LCD Panels to customers in New York at its corporate-owned retail stores and through its website on the Internet. AT&T Mobility also sold mobile wireless handsets to independent agents and retailers in New York. AT&T New York also provided wireless communication services and sold mobile wireless handsets directly to business, government and other customers in New York. In addition, AT&T Mobility maintained in New York inventories of mobile wireless handsets containing LCD Panels manufactured and sold by defendants, their co-conspirators, and others, and operated offices and retail stores in New York. During the Conspiracy Period, AT&T provided various wireline telecommunications services to businesses and government customers in New York, where AT&T employees used notebook computers and desktop monitors purchased by AT&T. AT As a result of their presence in New York and the substantial business they conduct in New York, AT&T Mobility and AT&T are entitled to the protection of the laws of New York; and,

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

| | | |
|---|---|---|
| 1 | e. | As a direct and proximate result of defendants' conduct, AT&T Mobility |
| 2 | | and AT&T Corp. have been injured in their business and property by |
| 3 | | paying more for LCD Products purchased in New York from defendants, |
| 4 | | their coconspirators and others than they would have paid in the absence |
| 5 | | of defendants' combination and conspiracy, and are entitled to relief under |
| 6 | | New York General Business Law §§ 340 *et seq.* |

7  260.  By reason of the foregoing, defendants have entered into agreements in restraint
8  of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

| | | |
|---|---|---|
| 9 | a. | Defendants' conspiracy restrained, suppressed and/or eliminated |
| 10 | | competition in the sale of LCD Panels in North Carolina and fixed, raised, |
| 11 | | maintained and stabilized LCD Panel prices in North Carolina at |
| 12 | | artificially high, non-competitive levels; |
| 13 | b. | As a result, defendants' conspiracy substantially affected North Carolina |
| 14 | | commerce; |
| 15 | c. | During the Conspiracy Period, AT&T Mobility, AT&T Corp. and |
| 16 | | BellSouth Telecommunications Inc. purchased at their offices and |
| 17 | | facilities in North Carolina LCD Products containing LCD Panels |
| 18 | | manufactured by defendants and sold at artificially-inflated prices because |
| 19 | | of defendants' price fixing conspiracy. |
| 20 | d. | During the Conspiracy Period, AT&T Mobility and AT&T conducted a |
| 21 | | substantial volume of business in North Carolina.  AT&T Mobility |
| 22 | | provided wireless communication services and sold mobile wireless |
| 23 | | handsets containing LCD Panels to customers in North Carolina at its |
| 24 | | corporate-owned retail stores and through its website on the Internet. |
| 25 | | AT&T Mobility also sold mobile wireless handsets to independent agents |
| 26 | | and retailers in North Carolina.  AT&T Mobility also provided wireless |
| 27 | | communication services and sold mobile wireless handsets directly to |
| 28 | | business, government and other customers in North Carolina.  In addition, |

89

1             AT&T Mobility maintained in North Carolina inventories of mobile

2             wireless handsets containing LCD Panels manufactured and sold by

3             defendants, their co-conspirators, and others, and operated offices and

4             retail stores in North Carolina.  During the Conspiracy Period, AT&T

5             provided various wireline telecommunications services to residential

6             customers, businesses and government customers in North Carolina,

7             where AT&T employees used notebook computers and desktop monitors

8             purchased by AT&T.  As a result of their presence in North Carolina and

9             the substantial business they conduct in North Carolina, AT&T Mobility

10            and AT&T are entitled to the protection of the laws of North Carolina;

11            and,

12      e.     As a direct and proximate result of defendants' conduct, AT&T Mobility,

13            AT&T Corp. and  BellSouth Communications, Inc. have been injured in

14            their business and property by paying more for LCD Products purchased

15            in North Carolina from defendants, their coconspirators and others than

16            they would have paid in the absence of defendants' combination and

17            conspiracy, and are entitled to relief under North Carolina Gen. Stat.

18            §§ 75-1 *et seq.*

19    261.    By reason of the foregoing, defendants have entered into agreements in restraint

20 of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

21      a.     Defendants' conspiracy restrained, suppressed and/or eliminated

22            competition in the sale of LCD Panels in North Dakota and fixed, raised,

23            maintained and stabilized LCD Panel prices in North Dakota at artificially

24            high, non-competitive levels;

25      b.     As a result, defendants' conspiracy substantially affected North Dakota

26            commerce;

27      c.     AT&T Mobility purchased at its offices and facilities in North Dakota

28            LCD Products containing LCD Panels manufactured by defendants and

1      sold at artificially-inflated prices because of defendants' price fixing

2      conspiracy.

3      d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

4              substantial volume of business in North Dakota.  AT&T Mobility

5              provided wireless communication services and sold mobile wireless

6              handsets containing LCD Panels to customers in North Dakota through its

7              corporate-owned retail stores, through independent retailers located in

8              North Dakota, and through its website on the Internet.  AT&T Mobility

9              also provided wireless communication services and sold mobile wireless

10             handsets directly to business, government and other customers in North

11             Dakota through both its own sales force and independent sales agents.  In

12             addition, AT&T Mobility maintained in North Dakota inventories of

13             mobile wireless handsets containing LCD Panels manufactured and sold

14             by defendants, their co-conspirators, and others, and operated offices and

15             retail stores in North Dakota.  During the Conspiracy Period, AT&T

16             provided various wireline telecommunications services to businesses and

17             government customers in North Dakota, where AT&T employees used

18             notebook computers and desktop monitors purchased by AT&T.  As a

19             result of their presence in North Dakota and the substantial business they

20             conduct in North Dakota, AT&T Mobility and AT&T are entitled to the

21             protection of the laws of North Dakota; and,

22     e.      As a direct and proximate result of defendants' conduct, AT&T Mobility

23             has been injured in its business and property by paying more for LCD

24             Products purchased from defendants, their coconspirators and others than

25             it would have paid in the absence of defendants' combination and

26             conspiracy, and is entitled to relief under North Dakota Cent. Code §§ 51-

27             08.1-01 *et seq.*

28

1    262.    By reason of the foregoing, defendants have entered into agreements in restraint
2  of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

3          a.    Defendants' conspiracy restrained, suppressed and/or eliminated
4                competition in the sale of LCD Panels in South Dakota and fixed, raised,
5                maintained and stabilized LCD Panel prices in South Dakota at artificially
6                high, non-competitive levels;

7          b.    As a result, defendants' conspiracy substantially affected South Dakota
8                commerce;

9          c.    AT&T Mobility purchased at its offices and facilities in South Dakota
10               LCD Products containing LCD Panels manufactured by defendants and
11               sold at artificially-inflated prices because of defendants' price fixing
12               conspiracy.

13         d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a
14               substantial volume of business in South Dakota.  AT&T Mobility
15               provided wireless communication services and sold mobile wireless
16               handsets containing LCD Panels to customers in South Dakota through its
17               corporate-owned retail stores, through independent retailers located in
18               South Dakota, and through its website on the Internet.  AT&T Mobility
19               also provided wireless communication services and sold mobile wireless
20               handsets directly to business, government and other customers in South
21               Dakota through both its own sales force and independent sales agents.  In
22               addition, AT&T Mobility maintained in South Dakota inventories of
23               mobile wireless handsets containing LCD Panels manufactured and sold
24               by defendants, their co-conspirators, and others, and operated offices and
25               retail stores in South Dakota.  During the Conspiracy Period, AT&T
26               provided various wireline telecommunications services to businesses and
27               government customers in South Dakota, where AT&T employees used
28               notebook computers and desktop monitors purchased by AT&T.  As a

92

result of their presence in South Dakota and the substantial business they
conduct in South Dakota, AT&T Mobility and AT&T are entitled to the
protection of the laws of South Dakota; and,

    e.    As a direct and proximate result of defendants' conduct, AT&T Mobility
has been injured in its business and property by paying more for LCD
Products purchased from defendants, their coconspirators and others than
they would have paid in the absence of defendants' combination and
conspiracy, and is entitled to relief under South Dakota Codified Laws
Ann. §§ 37-1 *et seq.*

263.    By reason of the foregoing, defendants have entered into agreements in restraint
of trade in violation of West Virginia §§ 47-18-1 *et seq.*

    a.    Defendants' conspiracy restrained, suppressed and/or eliminated
competition in the sale of LCD Panels in West Virginia and fixed, raised,
maintained and stabilized LCD Panel prices in West Virginia at artificially
high, non-competitive levels;

    b.    As a result, defendants' conspiracy substantially affected West Virginia
commerce;

    c.    AT&T Mobility purchased at its offices and facilities in West Virginia
LCD Products containing LCD Panels manufactured by defendants and
sold at artificially-inflated prices because of defendants' price fixing
conspiracy.

    d.    During the Conspiracy Period, AT&T Mobility and AT&T conducted a
substantial volume of business in West Virginia. AT&T Mobility
provided wireless communication services and sold mobile wireless
handsets containing LCD Panels to customers in West Virginia through its
corporate-owned retail stores, through independent retailers located in
West Virginia, and through its website on the Internet. AT&T Mobility
also provided wireless communication services and sold mobile wireless

93

1  handsets directly to business, government and other customers in West

2  Virginia through both its own sales force and independent sales agents.  In

3  addition, AT&T Mobility maintained in West Virginia inventories of

4  mobile wireless handsets containing LCD Panels manufactured and sold

5  by defendants, their co-conspirators, and others, and operated offices and

6  retail stores in West Virginia.  During the Conspiracy Period, AT&T

7  provided various wireline telecommunications services to residential

8  customers, businesses and government customers in West Virginia, where

9  AT&T employees used notebook computers and desktop monitors

10  purchased by AT&T.  As a result of their presence in West Virginia and

11  the substantial business they conduct in West Virginia, AT&T Mobility

12  and AT&T are entitled to the protection of the laws of West Virginia; and,

13  e.  As a direct and proximate result of defendants' conduct, AT&T Mobility

14  has been injured in its business and property by paying more for LCD

15  Products purchased from defendants, their coconspirators and others than

16  it would have paid in the absence of defendants' combination and

17  conspiracy, and is entitled to relief under West Virginia §§ 47-18-1 *et seq*.

18  264.  By reason of the foregoing, defendants have entered into agreements in restraint

19  of trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*

20  a.  Defendants' conspiracy restrained, suppressed and/or eliminated

21  competition in the sale of LCD Panels in Wisconsin and fixed, raised,

22  maintained and stabilized LCD Panel prices in Wisconsin at artificially

23  high, non-competitive levels;

24  b.  As a result, defendants' conspiracy substantially affected Wisconsin

25  commerce;

26  c.  During the Conspiracy Period, AT&T Mobility, AT&T Services, Inc.,

27  AT&T Operations, Inc., and AT&T Datacomm, Inc. purchased at their

28  offices and facilities in Wisconsin LCD Products containing LCD Panels

94

1      manufactured by defendants and sold at artificially-inflated prices because

2      of defendants' price fixing conspiracy.

3      d.      During the Conspiracy Period, AT&T Mobility and AT&T conducted a

4              substantial volume of business in Wisconsin. AT&T Mobility provided

5              wireless communication services and sold mobile wireless handsets

6              containing LCD Panels to customers in Wisconsin at its corporate-owned

7              retail stores and through its website on the Internet. AT&T Mobility also

8              sold mobile wireless handsets to independent agents and retailers in

9              Wisconsin. AT&T Mobility also provided wireless communication

10             services and sold mobile wireless handsets directly to business,

11             government and other customers in Wisconsin. In addition, AT&T

12             Mobility maintained in Wisconsin inventories of mobile wireless handsets

13             containing LCD Panels manufactured and sold by defendants, their co-

14             conspirators, and others, and operated offices and retail stores in

15             Wisconsin. During the Conspiracy Period, AT&T provided various

16             wireline telecommunications services to businesses and government

17             customers in Wisconsin, where AT&T employees used notebook

18             computers and desktop monitors purchased by AT&T. As a result of their

19             presence in Wisconsin and the substantial business they conduct in

20             Wisconsin, AT&T Mobility and AT&T are entitled to the protection of the

21             laws of Wisconsin; and,

22     e.      As a direct and proximate result of defendants' conduct, AT&T Mobility,

23             AT&T Services Inc., AT&T Operations, Inc., and AT&T Datacomm, Inc.

24             have been injured in their business and property by paying more for LCD

25             Products purchased in Wisconsin from defendants, their coconspirators

26             and others than they would have paid in the absence of defendants'

27             combination and conspiracy, and are entitled to relief under Wisconsin

28             Stat. §§ 133.01 *et seq.*

95

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, AT&T Mobility and AT&T request:

      A.    That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

          i.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

          ii.    An unreasonable restraint of trade or commerce in violation of the Cartwright Act, as alleged in the Second Claim for relief; and

          iii.    In the alternative, an unlawful combination, trust, agreement, understanding, concert of action and/or unfair, deceptive or fraudulent trade practice in violation of the state antitrust and unfair competition laws of Arizona, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Puerto Rico, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin, as well as the Unfair Competition Law of California, as alleged in the Third Claim for relief.

      B.    That AT&T Mobility and AT&T recover damages, as provided by federal and state antitrust laws, and that a judgment be entered in favor of AT&T Mobility and AT&T against defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

      C.    That AT&T Mobility and AT&T obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

      D.    That AT&T Mobility and AT&T recover damages and/or all other available monetary and equitable remedies under the state unfair competition laws identified above;

1          E.       That defendants, their affiliates, successors, transferees, assignees, and the

2   officers, directors, partners, agents, and employees thereof, and all other persons acting or

3   claiming to act on their behalf, be permanently enjoined and restrained from in any manner

4   continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged

5   herein, or from entering into any other conspiracy or combination having a similar purpose or

6   effect, and from adopting or following any practice, plan, program, or device having a similar

7   purpose or effect;

8          F.       That AT&T Mobility and AT&T be awarded pre- and post-judgment

9   interest, and that such interest be awarded at the highest legal rate from and after the date of

10  service of the initial Complaint in this action;

11         G.       That AT&T Mobility and AT&T recover their costs and disbursements of

12  this suit, including reasonable attorneys' fees as provided by law; and,

13         H.       That AT&T Mobility and AT&T be awarded such other, further, and

14  different relief as the case may require and the Court may deem just and proper under the

15  circumstances.

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
MASTER FILE NO. 07-m-1827 SI; CASE NO. 09-cv-4997 SI

## X.     **JURY TRIAL DEMAND**

Pursuant to Federal Rules of Civil Procedure Rule 38(b), AT&T Mobility and AT&T demand a trial by jury for all issues so triable.

Dated: July 23, 2010           Respectfully submitted,

          */s/ Jason C. Murray*

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213-443-5582
Facsimile: 213-622-2690
Email: jmurray@crowell.com

Jeffrey H. Howard (*pro hac vice*)
Jerome A. Murphy (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: 202-624-2500
Facsimile: 202-628-5116
Email: jhoward@crowell.com
     jmurphy@crowell.com

Kenneth L. Adams (*pro hac vice*)
R. Bruce Holcomb (*pro hac vice*)
Christopher T. Leonardo (*pro hac vice*)
Christopher H. Wood (*pro hac vice*)
ADAMS HOLCOMB LLP
1875 Eye Street NW
Washington, DC 20006
Telephone: 202-580-8822
Email: adams@adamsholcomb.com
     holcomb@adamsholcomb.com
     leonardo@adamsholcomb.com
     wood@adamsholcomb.com

*Counsel for AT&T Mobility, LLC, AT&T Corp., AT&T Services, Inc., BellSouth Telecommunications, Inc., Pacific Bell Telephone Company, AT&T Operations, Inc., AT&T DataComm, Inc., and Southwestern Bell Telephone Company*