1   Michael P. Kenny, Esq.
    mike.kenny@alston.com
2   Debra D. Bernstein, Esq.
    debra.bernstein@alston.com
3   Rodney J. Ganske, Esq.
    rod.ganske@alston.com
4   **ALSTON & BIRD LLP**
5   1201 West Peachtree Street
    Atlanta, Georgia  30309-3424
6   Tel: (404) 881-7000
7   Facsimile:  (404) 881-7777

8   James M. Wagstaffe, Esq. (SBN 95535)
    wagstaffe@kerrwagstaffe.com
9   **KERR & WAGSTAFFE LLP**
    100 Spear Street, 18th Floor
10  San Francisco, California 94105-1576
    Tel: (415) 371-8500
11  Facsimile: (415) 371-0500

12  *Attorneys for Plaintiffs Dell Inc. and Dell Products L.P.*

13  **[Additional Counsel Listed on Signature Page]**

14              **UNITED STATES DISTRICT COURT**

15             **NORTHERN DISTRICT OF CALIFORNIA**

16                **SAN FRANCISCO DIVISION**

17

18  DELL INC. and DELL PRODUCTS L.P.,

19              Plaintiffs,                    Master File No. 3:07-cv-05944-SC

            v.                                  MDL No. 1917

20  HITACHI, LTD.; HITACHI DISPLAYS, LTD.;      Individual Case No. 3:13-cv-02171-SC
    HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.;
21  HITACHI ELECTRONIC DEVICES (USA), INC.;     **FIRST AMENDED COMPLAINT**
    SHENZHEN SEG HITACHI COLOR DISPLAY
22  DEVICES, LTD.; IRICO GROUP CORPORATION;     **DEMAND FOR JURY TRIAL**
    IRICO GROUP ELECTRONICS CO., LTD.; IRICO
23  DISPLAY DEVICES CO., LTD.;  LG ELECTRONICS,
    INC.; LG ELECTRONICS USA, INC.; LG
24  ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP
    DISPLAYS INTERNATIONAL LTD.; MITSUBISHI
25  ELECTRIC CORPORATION; MITSUBISHI DIGITAL
    ELECTRONICS AMERICA, INC.; MITSUBISHI
26  ELECTRIC & ELECTRONICS, USA, INC.;
    KONINKLIJKE PHILIPS ELECTRONICS N.V.;
27  PHILIPS ELECTRONICS NORTH AMERICA
    CORPORATION; PHILIPS ELECTRONICS
28  INDUSTRIES (TAIWAN), LTD.; PHILIPS DA

AMAZONIA INDUSTRIA ELECTRONICA LTDA.;
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE
C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN.
BHD.; SAMTEL COLOR LTD.; THAI CRT CO.,
LTD.; TECHNICOLOR SA; THOMSON SA;
TECHNICOLOR USA, INC.; THOMSON
CONSUMER ELECTRONICS, INC.; TOSHIBA
CORPORATION; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.; TOSHIBA
AMERICA INFORMATION SYSTEMS, INC.

Defendants.

## FIRST AMENDED COMPLAINT

Plaintiffs Dell Inc. and Dell Products L.P. ("Dell") bring this First Amended Complaint for injury to its business and property as a direct result of the Defendants' and their co-conspirators' violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and allege as follows:

## I.      INTRODUCTION

1.      Defendants and their co-conspirators participated in a price-fixing conspiracy from as early as March 1, 1995, through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this anticompetitive conspiracy was to fix, raise, stabilize, and maintain prices for cathode ray tubes ("CRTs") and thereby artificially inflate the prices of products that contained CRTs. Dell was a substantial purchaser of CRT Products during the Relevant Period and suffered injury to its business or property as result of paying artificially inflated prices.

2.      Numerous other persons injured by the Defendants' and their co-conspirators' price-fixing conspiracy have filed Section 1 Sherman Act claims and those lawsuits have been joined for pretrial purposes in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917, in the Northern District of California.

3.      Defendants and their co-conspirators are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this

1 | Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT

2 | Products," and CDTs of all sizes and the products containing them shall be referred to as "CDT

3 | Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT

4 | Products."

5 |     4.    Defendants and their co-conspirators controlled the vast majority of the CRT market.

6 | During the Relevant Period, CRT Products were ubiquitous in the United States.

7 |     5.    The Defendants and their co-conspirators had a strong motive to fix prices. Since the

8 | mid-1990's, the CRT market faced significant financial pressures as customer preferences for other

9 | emerging technologies shrank profits and threatened the sustainability of the conspirators' CRT

10 | business. In order to maintain price stability, increase profitability, and decrease the erosion of pricing

11 | in the CRT market, Defendants and their co-conspirators unlawfully conspired to fix, raise, maintain,

12 | and stabilize CRT prices in the United States.

13 |     6.    With respect to CRTs, Defendants and their co-conspirators or their agents agreed to an

14 | integrated series of anticompetitive acts, including agreements to: (a) fix target prices and price

15 | guidelines; (b) exchange pertinent information on shipments, prices, production, and customer

16 | demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues

17 | created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their

18 | collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of

19 | accounts; (g) allocate market share of overall sales; (h) influence and, at times, coordinate pricing with

20 | producers in other geographic areas; (i) limit competition for certain key customers; (k) allocate

21 | customers; (k) allocate each producer's share of certain key customers' sales; and (l) restrict output.

22 |     7.    The CRT price-fixing conspiracy began with bilateral meetings in at least March of

23 | 1995 and continued throughout the Relevant Period. Also beginning in 1995, the conspirators began to

24 | engage in multi-lateral meetings. In furtherance of the price-fixing conspiracy, the Defendants and

25 | their co-conspirators conducted at least 500 meetings during the Relevant Period. These

26 | anticompetitive meetings occurred in multiple locales, including Taiwan, South Korea, Indonesia,

27 | Thailand, Singapore, Malaysia, China, the U.K., Europe, and the United States. These meetings

28 |

FIRST AMENDED COMPLAINT

1    included representatives from the highest levels of the conspirators' companies, as well as regional

2    managers and others.

3          8.      During the Relevant Period, the CRT price-fixing conspiracy affected billions of dollars

4    of commerce throughout the United States.

5          9.      The CRT price-fixing conspiracy is being investigated by the United States Department

6    of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted

7    by the DOJ was C.Y. Lin, the former Chairman and CEO of co-conspirator Chunghwa Picture Tubes,

8    Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on

9    February 10, 2009. Since then, federal indictments have been issued against five more individuals in

10   connection with Defendants' and their co-conspirators' CRT price-fixing conspiracy. In May 2011,

11   Samsung SDI Company Ltd. pleaded guilty to charges brought by the DOJ of participating in a

12   conspiracy among major CDT producers, the purpose of which was to fix prices, reduce output, and

13   allocate market shares of CDTs sold in the United States and elsewhere. Korea's Fair Trade

14   Commission has fined more than five CDT manufacturers more than $48 million. The European

15   Commission imposed the biggest antitrust penalty in its history, fining seven companies a combined

16   €1.47 billion ($1.97 billion) related to price fixing of CRTs.

17         10.     During the Relevant Period, Dell purchased CRT Products that incorporated price-fixed

18   CRTs at artificially inflated prices in the United States and elsewhere. Dell purchased these CRT

19   Products directly from Defendants and their co-conspirators, and/or Defendants' or their co-

20   conspirators' subsidiaries and affiliates, and/or through agents the Defendants and their co-conspirators

21   or Defendants' and their co-conspirators' subsidiaries and affiliates controlled. Dell suffered injury to

22   its business or property as a result of Defendants' and their co-conspirators' conspiracy, and brings this

23   action to recover the overcharges it paid for the CRT Products containing price-fixed CRTs that it

24   purchased during the Relevant Period.

25                              **II.      JURISDICTION AND VENUE**

26         11.     Dell brings this action to obtain injunctive relief under Section 16 of the Clayton Act,

27   and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and

28

FIRST AMENDED COMPLAINT                              MASTER FILE NO. 3:07-CV-05944-SC
                                                     MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

1  reasonable attorneys' fees arising from Defendants' and their co-conspirators' violations of Section 1

2  of the Sherman Act (15 U.S.C. § 1).

3      12.    The Court has subject matter jurisdiction over Dell's federal antitrust claims pursuant to

4  Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

5      13.    The activities of Defendants and their co-conspirators, as described herein, involved

6  U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct,

7  substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.

8  This effect gives rise to Dell's antitrust claims.  During the Relevant Period, Defendants' and their co-

9  conspirators' conspiracy affected the price of CRT Products purchased in the United States.  In

10 particular, Defendants' and their co-conspirators' conspiracy directly and adversely affected the price

11 of CRT Products purchased by Dell.

12     14.    This court has jurisdiction over each Defendant named in this action under Section 12

13 of the Clayton Act (15 U.S.C. § 22).  Defendants and their co-conspirators purposely availed

14 themselves of the laws of the United States as they manufactured CRT Products for sale in the United

15 States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators

16 knew would be sold to customers in the United States.  Defendants' and their co-conspirators'

17 conspiracy affected this commerce in CRT Products in the United States.

18     15.    Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15

19 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because each Defendant is either an alien

20 corporation, transacts business in this district, or is otherwise found within this district.  In addition,

21 venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving

22 rise to Dell's claims occurred in this district, and a substantial portion of the affected interstate trade

23 and commerce was carried out in this district.  Defendants and their co-conspirators knew that CRT

24 Products containing price-fixed CRTs would be sold and shipped into this District.

25                          III.    PARTIES

26     A.    Plaintiffs

27     16.    Dell Inc. is a corporation duly organized under the laws of the State of Delaware, with a

28 principal place of business in Round Rock, Texas.

17.     Dell Products, L.P. is a Texas limited partnership with its principal place of business in Round Rock, Texas.

18.     Dell Inc. and Dell Products, L.P. are sometimes referred to collectively herein as "Dell."

19.     Dell is a leading information technology company, offering a broad range of solutions, including services and products such as mobility products, desktop PCs, software and peripherals, including display devices, servers and networking services, and storage.

20.     During the Relevant Period, Dell purchased CRT Products that incorporated price-fixed CRTs directly from Defendants and co-conspirators, and/or Defendants' and co-conspirators' subsidiaries and affiliates, and/or any agents controlled by Defendants, Defendants' subsidiaries and affiliates, co-conspirators or co-conspirators' subsidiaries and affiliates.  Dell also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.  As such, Dell suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

21.     During the Relevant Period, Dell negotiated worldwide prices for the CRT Products it purchased from its corporate headquarters in Round Rock, Texas.  Dell frequently held in-person negotiations on the price and volume of CRT Products it purchased with Defendants and co-conspirators, and/or Defendants' and co-conspirators' subsidiaries, affiliates, and/or agents controlled by Defendants, Defendants' subsidiaries and affiliates, co-conspirators or co-conspirators' subsidiaries and affiliates.

22.     Dell Inc. is effectuating assignment of claims with its relevant subsidiaries and affiliates, whereby any of the antitrust claims described in this Complaint against the Defendants and their co-conspirators, which are held by Dell's subsidiaries and affiliates, have been or will be assigned to Dell Inc.

**B.      Defendants**

**1.      Hitachi Entities**

23.     Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs

1 was 20%. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed

2 CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

3      24. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its

4 principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-

5 0022, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara

6 City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing

7 and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate

8 company called Hitachi Displays. During the Relevant Period, Hitachi Displays sold and distributed

9 CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

10 Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to

11 the antitrust violations alleged in this Complaint.

12      25. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its

13 principal place of business at 2000 Sierra Point Parkway, Brisbane, California. Hitachi America is a

14 wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Relevant Period, Hitachi America

15 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

16 subsidiaries or affiliates, throughout the United States. Hitachi, Ltd. dominated and controlled the

17 finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this

18 Complaint.

19      26. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

20 principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318. Hitachi

21 Asia is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Relevant Period, Hitachi

22 Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

23 subsidiaries or affiliates, throughout the United States. Hitachi, Ltd. dominated and controlled the

24 finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this

25 Complaint.

26      27. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware

27 corporation with its principal place of business at 575 Mauldin Road Greenville, South Carolina

28 29607. HEDUS is a subsidiary of Hitachi, Ltd. and Hitachi Displays. During the Relevant Period,

1  HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

2  subsidiaries or affiliates, throughout the United States. Hitachi, Ltd. and Hitachi Displays dominated

3  and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in

4  this Complaint.

5        28.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") is

6  a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

7  District, Shenzhen 518035, China. Hitachi Displays owned at least a 25% interest in Hitachi Shenzhen

8  until November 8, 2007 (which was around the time that the government investigations into the CRT

9  industry began). Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last

10 two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured,

11 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12 throughout the United States. Hitachi, Ltd. and Hitachi Displays dominated and controlled the

13 finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

14       29.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi

15 Shenzhen and HEDUS are collectively referred to herein as "Hitachi."

16       **2.    Irico Entities**

17       30.    Defendant Irico Group Corporation ("IGC") is a Chinese company with its principal

18 place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the

19 parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and/or

20 sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or

21 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22 States.

23       31.    Defendant Irico Group Electronics Co., Ltd. ("IGE") is a Chinese company with its

24 principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is

25 owned by IGC and engages in the manufacture, marketing, distribution and/or sale of CRT Products.

26 According to its website, IGE was the first CRT manufacturer in China and one of the leading global

27 manufacturers of CRTs. During the Relevant Period, IGE manufactured, sold, and distributed CRT

28 Products, either directly or through its subsidiaries or affiliates, throughout the United States.

8

1    Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the

2    antitrust violations alleged in this Complaint.

3        32.    Defendant Irico Display Devices Co., Ltd. ("IDDC") is a Chinese company with its

4    principal place of business located at No. 16, Fenghui South Road West, District High-tech

5    Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of IGC.  In 2006,

6    IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, distributed, and

7    sold CRT Products either directly or through its subsidiaries or affiliates or through other Defendants

8    or co-conspirators in the United States.  Defendant IGC dominated and controlled the finances, policies

9    and affairs of IDDC Asia relating to the antitrust violations alleged in this Complaint.

10       33.    Defendants IGC, IGE, and IDDC are collectively referred to herein as "Irico."

11   **3.    LG Electronic Entities**

12       34.    Defendant LG Electronics, Inc. ("LGEI") is a South Korean entity headquartered at LG

13   Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721.  LGEI is a $48.5

14   billion global force in consumer electronics, home appliances and mobile communications, which

15   established its first overseas branch office in New York in 1968.  The company's name was changed

16   from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith Electronics

17   Corporation ("Zenith") in the United States.  In 2001, LGEI transferred its CRT business to a 50/50

18   joint venture with Royal Philips called LG.Philips Displays ("LGPD").  In 2002, LGEI had a 24.4%

19   worldwide CRT market share.  On April 1, 2007, LGPD became an independent company and changed

20   its name to LP Displays International, Ltd.  During the Relevant Period, LGEI manufactured,

21   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates

22   (such as Zenith), throughout the United States.

23       35.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

24   principal place of business at 1000 Sylvan Ave., Englewood Cliffs, N.J. 07632.  During the Relevant

25   Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or

26   through its subsidiaries or affiliates, throughout the United States.  LGEI dominated and controlled the

27   finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

28

FIRST AMENDED COMPLAINT

1    36.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

2    with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District, Taipei

3    City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of LG Electronics, Inc.  During the

4    Relevant Period, LGETT manufactured, sold, and distributed CRT Products, either directly or through

5    its subsidiaries or affiliates, throughout the United States.  LGEI dominated and controlled the

6    finances, policies and affairs of LGETT relating to the antitrust violations alleged in this Complaint.

7    37.    Defendants LGEI, LGEUSA, and LGETT are referred to collectively herein as "LG

8    Electronics."

9    **4.    Mitsubishi Entities**

10    38.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese

11    corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi

12    Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico

13    and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television

14    and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and

15    elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT

16    manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold

17    and distributed CRT Products in the United States.

18    39.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is

19    a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi

20    Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA

21    manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario,

22    Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing

23    division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's

24    television and monitor division also purchased CRTs from other CRT manufacturers.  During the

25    Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products

26    in the United States.

27    40.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

28    United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital

1   is a wholly-owned subsidiary of Mitsubishi Electric USA. During the Relevant Period, Mitsubishi

2   Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the

3   United States.

4        41.    Defendants Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

5   are collectively referred to herein as "Mitsubishi."

6       **5.**    **LP Displays**

7        42.    Defendant LP Displays International, Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong

8   company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.

9   LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture

10  between LG Electronics, Inc. ("LGEI") and Royal Philips. LP Displays announced in March 2007 that

11  Royal Philips and LGEI would cede control over the company and the shares would be owned by

12  financial institutions and private equity firms. LP Displays was a leading supplier of CRTs for use in

13  television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share

14  of 27%. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed

15  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

16      **6.**    **Philips Entities**

17       43.    Defendant Koninklijke Philips Electronics N.V. ("Royal Philips") is a Dutch entity with

18  its principal place of business at Brenner Center, Amstelplein 2, 1096 BC Amsterdam, The

19  Netherlands. In 2000, Royal Philips was the leading global supplier of CRTs. Royal Philips operated

20  in Asia directly through divisions (such as Philips Components Asia and Philips BGTV) and through

21  wholly-owned and separately incorporated subsidiaries. In 2001, Royal Philips transferred its CRT

22  business to a 50/50 joint venture with LGEI, forming LGPD (n/k/a LP Displays). LGPD operated in

23  Asia and in Europe through its division LGPD Europe Region. On April 1, 2007, LGPD became an

24  independent company and changed its name to LP Displays International, Ltd. During the Relevant

25  Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or

26  through its subsidiaries or affiliates, throughout the United States.

27       44.    Defendant Philips Electronics North America Corporation ("Philips America") is a

28  Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New York,

New York, 10020.  Philips America is a subsidiary of Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Koninklijke Philips Electronics N.V. ("Royal Philips") dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this Complaint.

45.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this Complaint.

46.     Defendant Philips da Amazonia Industria Electronica Ltda.  ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

47.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.     Samsung Entities**

48.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business at 15th — 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea.  Samsung SDI is a public company.  Samsung Electronics Co., Ltd. ("SEC") holds almost 20% of Samsung SDI's stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held

1   a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI

2   has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured,

3   marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

4   throughout the United States.  SEC dominated and controlled the finances, policies and affairs of

5   Samsung SDI relating to the antitrust violations alleged in this Complaint.

6          49.     Defendant Samsung SDI America, Inc. ("Samsung America") is a California

7   corporation with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California.

8   Samsung America is a wholly owned and controlled subsidiary of Samsung SDI.  During the Relevant

9   Period, Samsung America manufactured, marketed, sold and/or distributed CRT Products, either

10  directly or through its subsidiaries or affiliates, throughout the United States.  SEC and Samsung SDI

11  dominated and controlled the finances, policies and affairs of Samsung America relating to the

12  antitrust violations alleged in this Complaint.

13         50.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican

14  company with its principal place of business located at Blvd. Los Olivos, No.21014, Parque Industrial

15  El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary

16  of Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold

17  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

18  United States.  SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

19  Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

20         51.     Defendant Samsung SDI (Malaysia) Sdn Bhd. ("Samsung SDI Malaysia") is a

21  Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan Perindustrian,

22  Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI

23  Malaysia is a wholly-owned and controlled subsidiary of Samsung SDI.  During the Relevant Period,

24  Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly

25  or through its subsidiaries or affiliates, throughout the United States.  SEC and Samsung SDI

26  dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the

27  antitrust violations alleged in this Complaint.

28

1    52.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

2    with its principal place of business located at Av. Eixo Norte Sul, SIN, Distrito Industrial, 69088-480

3    Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

4    Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or

5    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

6    States.  SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung

7    SDI Brazil relating to the antitrust violations alleged in this Complaint.

8    53.    Defendant Shenzhen Samsung SDI Co. Ltd. ("Samsung SDI Shenzhen") is a Chinese

9    company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen,

10   China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Samsung SDI.  During

11   the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT

12   Products, either directly or through its subsidiaries or affiliates, throughout the United States.  SEC and

13   Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen

14   relating to the antitrust violations alleged in this Complaint.

15   54.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

16   company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing

17   County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of

18   Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or

19   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

20   States.  SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung

21   SDI Tianjin relating to the antitrust violations alleged in this Complaint.

22   55.    Defendants Samsung SDI, Samsung America, Samsung SDI Mexico, Samsung SDI

23   Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively

24   referred to herein as "Samsung."

25   **8.    Samtel**

26   56.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place

27   of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's

28   market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of

1   CRT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and

2   Great Britain for its CRT Products. During the Relevant Period, Samtel manufactured, marketed, sold

3   and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout

4   the United States.

5   **9.    Thai CRT**

6   57.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam

7   Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group,

8   and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During

9   the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either

10  directly or through its subsidiaries or affiliates, throughout the United States.

11  **10.    Thomson Entities**

12  58.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French

13  corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

14  Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer

15  Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants

16  located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to its

17  television-manufacturing division, which had plants in the United States and Mexico, and to other

18  television manufacturers in the United States and elsewhere. Thomson SA's television division also

19  purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the

20  United States to consumers under the RCA brand. In November 2003, Thomson SA sold its television

21  division to a joint venture it formed with Chinese company, TCL Corporation. The joint venture was

22  called TCL-Thomson Electronics Corporation ("TCL-Thomson"). As part of the joint venture

23  agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the

24  TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively. In

25  July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd. During the Relevant

26  Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or

27  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

28

FIRST AMENDED COMPLAINT                                    MASTER FILE NO. 3:07-CV-05944-SC
                                                          MDL NO. 1917 │ IND. CASE NO. 3:13-cv-02171-SC

59.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

60.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**11.     Toshiba Entities**

61.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10% worldwide market share for CRTs used in televisions and computer monitors.  In 2002, TC entered into a joint venture with MEI (now Panasonic Corporation) forming MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD"), in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62.     Defendant Toshiba America Consumer Products LLC ("TACP") is a limited liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of TC through Toshiba America, Inc.  During the Relevant Period, TACP manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its

1   subsidiaries or affiliates, throughout the United States. TC dominated and controlled the finances,

2   policies and affairs of TACP relating to the antitrust violations alleged in this Complaint.

3          63.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is headquartered at

4   9740 Irvine Blvd., Irvine, California 92718-1697. TAEC is a wholly-owned and controlled subsidiary

5   of TC through Toshiba America, Inc. During the Relevant Period, TAEC manufactured, marketed,

6   sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

7   throughout the United States. TC dominated and controlled the finances, policies and affairs of TAEC

8   relating to the antitrust violations alleged in this Complaint.

9          64.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is headquartered at

10  9740 Irvine Blvd., Irvine, California 92718-1697. TAIS is a wholly-owned and controlled subsidiary

11  of TC through Toshiba America, Inc.. During the Relevant Period, TAIS manufactured, marketed,

12  sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

13  throughout the United States. TC dominated and controlled the finances, policies and affairs of TAIS

14  relating to the antitrust violations alleged in this Complaint.

15         65.    Defendants TC, TACP, TAEC and TAIS are referred to collectively as "Toshiba."

16  **IV.     AGENTS AND CO-CONSPIRATORS**

17         66.    The acts alleged against the Defendants in this Complaint were authorized, ordered, or

18  done by their officers, agents, employees, or representatives, while actively engaged in the

19  management and operation of Defendants' businesses or affairs.

20         67.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or

21  for, other Defendants or co-conspirators with respect to the acts, violations, and common course of

22  conduct alleged by Dell. Each Defendant and co-conspirator that is a subsidiary of a foreign parent

23  acted as the United States agent for CRTs and/or CRT Products made by its parent company.

24         68.    Various persons and/or firms not named as Defendants in this Complaint participated as

25  co-conspirators in the violations alleged herein and may have performed acts and made statements in

26  furtherance thereof. These co-conspirators are believed to include, without limitation, Chunghwa

27  Picture Tubes, Ltd.; Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.; Orion Electronic Co.; Daewoo

28  Electronics Co., Ltd.; Daewoo-Orion Société Anonyme; P.T. Tosummit Electronic Devices

1  Indonesia; Tatung Company of America; Toshiba Display Devices (Thailand) Co., Ltd.; and

2  Videocon Industries, Ltd.

3      69.    Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its

4  principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established

5  in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received

6  certification by the United States, giving the company entry into that market. Throughout the Relevant

7  Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period,

8  Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its

9  subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

10     70.    Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian

11  company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000

12  Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of

13  Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of

14  the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia

15  manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates

16  throughout the United States. Chunghwa PT dominated and controlled the finances, policies and

17  affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint.

18     71.    Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

19  "Chunghwa."

20     72.    During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer

21  of CRT Products. Orion was a Korean corporation which filed for bankruptcy in 2004. In 1995,

22  approximately 85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved

23  in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world,

24  including South Africa, France, Indonesia, Mexico, and the United States. Dell is informed and

25  believes that Orion was wholly owned by the "Daewoo Group." The Daewoo Group included Daewoo

26  Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion

27  Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo

28  Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société

1   Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs

2   annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion,

3   Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT

4   Products, either directly or through their subsidiaries or affiliates, throughout the United States.

5       73.    Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

6       74.    P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

7   by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of

8   business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3

9   million CRTs by 1999.  In 2003, TEDI was transferred to MT Picture Display Co., Ltd., TC's joint

10  venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.

11  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products,

12  either directly or through its subsidiaries or affiliates, throughout the United States.  TC dominated and

13  controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

14  Complaint.

15      75.    Tatung Company of America, Inc. ("Tatung America") is a California corporation with

16  its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung

17  America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of

18  Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung

19  Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to her two

20  children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or

21  distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either

22  directly or through its subsidiaries or affiliates throughout the United States.

23      76.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with its

24  principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

25  Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of TC.  In 2003, TC

26  was transferred to MTPD.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated

27  as a wholly-owned and controlled subsidiary of MTPD until its closure in 2007.  During the Relevant

28  Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or

19

1   through its subsidiaries or affiliates, throughout the United States.  TC dominated and controlled the

2   finances, policies and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

3        77.      The acts alleged in this Complaint were done by Defendants and their co-conspirators,

4   or were authorized, ordered or done by their respective officers, agents, employees or representatives

5   while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.      TRADE AND COMMERCE

7        78.      During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

8   CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

9   commerce, including through and into this judicial district.

10        79.      During the Relevant Period, Defendants and their co-conspirators collectively

11   controlled a vast majority of the market for CRTs, both globally and in the United States.

12        80.      The business activities of Defendants and their co-conspirators substantially affected

13   interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VI.     FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY

### A.      CRT Technology and Products

16        81.      A CRT has three components: (a) one or more electron guns, each of which is a series

17   of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system

18   used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when

19   struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of

20   phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor

21   produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is

22   welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times,

23   leaving a surface of thousands of narrow lines of red, green, blue and black.

24        82.      CRT technology was first developed more than a century ago.  The first commercially

25   practical CRT television was made in 1931.  After RCA Corporation introduced the product at the

26   1939 World's Fair, it became widely available to consumers.  Since then, CRTs became critical

27   components of most display products, including televisions, computer monitors, oscilloscopes, air

28   traffic control monitors, and ATMs.  Even large public displays, including many scoreboards at sports

arenas, are comprised of thousands of single-color CRTs.

83.     The quality of a CRT determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

84.     Early CRT televisions displayed only black and white images. CRT technology was revolutionized in 1950 with the advent of the color CRTs. The CRT technology used today is similar to the one that RCA unveiled in 1950.

85.     CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

86.     CRTs have no independent utility, and have value only as components of other products, such as computer monitors and TVs. The demand for CRTs thus directly derives from the demand for such products.

87.     The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in that one would not exist without the other.

88.     Dell has participated in the market for CRTs as a buyer of CRT Products containing price-fixed CRTs from Defendants and co-conspirators, and/or Defendants' and co-conspirators' subsidiaries and affiliates, and/or through agents controlled by Defendants, Defendants' subsidiaries and affiliates, or co-conspirators or co-conspirators' subsidiaries and affiliates. Dell has also participated in the market for CRTs as a buyer of CRT Products containing price-fixed CRTs indirectly from non-Defendant OEMs and others. Defendants' unlawful conspiracy inflated the prices at which Dell bought CRT Products, and these supra-competitive prices directly injured Dell.

89.     Dell was directly injured in its business or property as a result of the supra-competitive prices it paid for CRT Products as a result of the price-fixing conspiracy alleged herein.

**B.     Structure of the CRT Industry**

90.     The CRT market has several structural characteristics that facilitated a successful price-fixing conspiracy, including market concentration, ease of information sharing, the consolidation of

1   manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened

2   price sensitivity to supply and demand forces, and homogeneity of products.

### 1.  Market Concentration

4   91.    During the Relevant Period, the CRT market was dominated by relatively few

5   companies. In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa, together

6   held a collective 78% share of the global CRT market. The high concentration of market share

7   facilitated price coordination because there were fewer participants among which to coordinate pricing

8   or allocate markets, thereby making it is easier to monitor the pricing and production of the

9   conspirators.

### 2.  Information Sharing

11  92.    Because of common membership in trade associations, interrelated business

12  arrangements such as joint ventures, allegiances between companies in certain countries and

13  relationships between the executives of certain companies, there were many opportunities for

14  Defendants and their co-conspirators to discuss and exchange competitive information. The ease of

15  communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.

16  Defendants and their co-conspirators took advantage of these opportunities to discuss, and agree upon,

17  their pricing for CRTs as alleged below.

18  93.    Hitachi, Samsung and Chunghwa are members of the Society for Information Display.

19  Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.

20  Similarly, Daewoo and LG Electronics, LP Displays, and Samsung are members of the Electronic

21  Display Industrial Research Association. Upon information and belief, Defendants and their co-

22  conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for

23  CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and

24  competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.  Consolidation

26  94.    The CRT market had significant consolidation during the Relevant Period, including but

27  not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG

28

FIRST AMENDED COMPLAINT

1  Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses

2  into MTPD.

3          **4.   Multiple Interrelated Business Relationships**

4      95.    The CRT market has a web of cross-licensing agreements, joint ventures, and other

5  cooperative arrangements that facilitated collusion.

6      96.    Examples of the high degree of cooperation among Defendants and their co-

7  conspirators in both the CRT market and other closely related markets include the following:

8          a.   The formation of the CRT joint venture LGPD in 2001 by LG Electronics and

9  Philips.

10          b.   LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display

11  Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

12          c.   The formation of the CRT joint venture MTPD in 2003 by Toshiba and Panasonic.

13          d.   In December 1995, Toshiba partnered with Orion and two other entities to form

14  TEDI, which manufactured CRTs in Indonesia.

15          e.   Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.

16  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-

17  LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its

18  network.

19          f.   Also in 1995, Toshiba entered into a technology transfer agreement with Chunghwa

20  for large CPTs.

21          g.   Chunghwa entered into a joint venture with Samsung for the production of CRTs.

22  Chunghwa also licenses technology from Philips, a recent development that helped resolve a patent

23  infringement suit filed in 2002.

24          h.   LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture,

25  sale and distribution of optical storage products such as DVD drives.

26          i.   Samtel participates in a joint venture, Samcor Glass Limited, with Samsung and

27  Corning Inc., USA for the production and supply of picture tube glass.

28

FIRST AMENDED COMPLAINT                        MASTER FILE NO. 3:07-CV-05944-SC
                                              MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

1          j.    Samtel claims to have supplied CRTs to, inter alia, LG Electronics, Samsung, and

2 Philips.

3          **5.   High Costs of Entry Into the Industry**

4        97.     There are significant manufacturing and technological barriers to entry into the CRT

5 market. It would require substantial time, resources and industry knowledge to overcome these

6 barriers to entry. During the Relevant Period, it was extremely unlikely that a new producer would

7 enter the market in light of the declining demand for CRTs.

8        98.     During the Relevant Period, the costs of the assembly components, both as a whole and

9 individually, were generally declining, and, in some periods, declining at a substantial rate. A

10 combination of price discussions and manipulation of the output of CRTs allowed Defendants and their

11 co-conspirators to keep prices above where they would have been but for the conspiracy.

12          **6.   The Maturity of the CRT Market**

13        99.      Newer markets typically are characterized by rapid growth, innovation and high

14 profits. During the Relevant Period, the CRT market was (and still is) a mature one, and like many

15 mature markets, was characterized by slim profit margins, creating a motivation to collude.

16        100.     Demand for CRTs was declining throughout the Relevant Period. Static declining

17 demand is another factor which makes the formation of a collusive arrangement more likely because it

18 provides a greater incentive to firms to avoid price competition.

19        101.     In addition, conventional CRT televisions and computer monitors were being rapidly

20 replaced by TFT-LCD and plasma displays. This was one of the factors which led Defendants and

21 their co-conspirators to engage in their price-fixing conspiracy to slow down declining CRT prices.

22 Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by

23 50.7%.

24        102.     Although demand was declining as a result of the popularity of flat-panel LCD and

25 plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display

26 technology during the Relevant Period, making Defendants' and their co-conspirators' price-fixing

27 conspiracy financially attractive. Due to the higher costs of LCD panels and plasma displays during

28

FIRST AMENDED COMPLAINT                  MASTER FILE NO. 3:07-CV-05944-SC

                                                MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

1    the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new

2    technologies.

3        **C.    Pre-Conspiracy Market**

4        103.    The genesis of the CRT price-fixing conspiracy was in the late 1980s as the CRTs

5    business became more international and Defendants and their co-conspirators began serving customers

6    that were also being served by other international companies. During this period, the employees of

7    Defendants and their co-conspirators would encounter employees from their competitors when visiting

8    their customers. A culture of cooperation developed over the years and these Defendant and co-

9    conspirator employees exchanged market information on production, capacity and customers.

10       104.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each

11   other's factories in S.E. Asia. During this period, these producers began to include discussions about

12   price in their meetings.

13       **D.    Defendants' and Co-Conspirators' Illegal Agreements**

14       105.    In order to control and maintain profitability during declining demand for CRTs,

15   Defendants and their co-conspirators engaged in a conspiracy, the purpose and effect of which was to

16   raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels

17   from at least March 1, 1995 through at least November 25, 2007.

18       106.    The CRT conspiracy was effectuated through a combination of group and bilateral

19   meetings. In the formative years of the conspiracy, bilateral discussions were the primary method of

20   communication and took place on an informal, ad hoc basis. During this period, representatives from

21   Daewoo, LG Electronics, and Samsung visited the other Defendant and co-conspirator manufacturers,

22   including Philips, Chunghwa, Hitachi, Thai CRT, and Toshiba, to discuss increasing prices for CRTs

23   in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand,

24   Japan, Malaysia, Indonesia and Singapore.

25       107.    Samsung, LG, Chunghwa, and Daewoo also attended several group meetings during

26   this period. The participants at these group meetings discussed increasing prices for CRTs.

27       108.    As more CRT manufacturers formally entered the conspiracy, the conspirators met in

28   groups more frequently. Beginning in 1997, the Defendants and co-conspirators put a formal system

FIRST AMENDED COMPLAINT

1 of multilateral and bilateral meetings in place. Defendants' and co-conspirators' representatives

2 attended hundreds of these meetings during the Relevant Period.

3       109.    The CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants

4 and their co-conspirators charged for CRTs.

5           **1.  "Glass Meetings"**

6       110.    The group meetings among the participants in the CRT price-fixing conspiracy were

7 referred to as "Glass Meetings" or "GSMs." Glass meetings were attended by employees at three

8 general levels of Defendants' and co-conspirators' corporations.

9       111.    The first level meetings were attended by high level company executives including

10 CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred

11 less frequently, typically quarterly, and were focused on longer term agreements and forcing

12 compliance with price fixing agreements.  Because attendees at top meetings had authority as well as

13 more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also

14 able to resolve disputes because they were decision makers who could make agreements.

15       112.    The second level meetings were attended by Defendants' and co-conspirators' high

16 level sales managers and were known as "management" meetings.  These meetings occurred more

17 frequently, typically monthly, and handled implementation of the agreements made at top meetings.

18       113.    Finally, the third level meetings were known as "working level" meetings and were

19 attended by lower level sales and marketing employees. These meetings generally occurred on a

20 weekly or monthly basis and were mostly limited to the exchange of information and discussing

21 pricing.  These lower level employees then transmitted the competitive information up the corporate

22 reporting chain.  The working level meetings also tended to be more regional and often took place near

23 Defendants' and co-conspirators' factories.

24       114.    The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis

25 following a top or management level meeting.  The Chinese Glass Meetings had the primary purpose

26 of reporting what had been decided at the most recent Glass Meetings to the Chinese manufacturers.

27 Participants at the Chinese Glass Meetings included the manufacturers located in China, such as

28

FIRST AMENDED COMPLAINT                           MASTER FILE NO. 3:07-CV-05944-SC
                                                MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

1   IRICO, as well as the China-based branches of the other Defendants and co-conspirators, including but

2   not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

3       115.   Glass meetings also occurred occasionally in various European countries.  Attendees at

4   these meetings included those Defendants and co-conspirators which had subsidiaries and/or

5   manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa,

6   Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.

7       116.   Representatives of Defendants' co-conspirators also attended what were known among

8   members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The

9   green meetings were generally attended by top and management level employees of Defendants and

10  their co-conspirators.

11      117.   During the Relevant Period, Glass Meetings took place in Taiwan, South Korea,

12  Europe, China, Singapore, Japan, Indonesia, Thailand and Malaysia.

13      118.   Participants often exchanged competitively sensitive information prior to a glass

14  meeting.  This included information on inventories, production, sales and exports.  For some such

15  meetings, where information could not be gathered in advance of the meeting, it was brought to the

16  meeting and shared.

17      119.   The Glass Meetings at all levels followed a fairly typical agenda.  First, the participants

18  exchanged competitive information such as proposed future CRT pricing, sales volume, inventory

19  levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for

20  coming months.  The participants also updated the information they had provided in the previous

21  meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a

22  white board.  The meeting participants then used this information to discuss and agree upon what price

23  each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed

24  upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also

25  discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target

26  prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the

27  participants also discussed and agreed upon production cutbacks.

28

FIRST AMENDED COMPLAINT                    MASTER FILE NO. 3:07-CV-05944-SC
                                           MDL NO. 1917 │ IND. CASE NO. 3:13-cv-02171-SC

120.     During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a bottom price.

121.     Defendants' and their co-conspirators' conspiracy included agreements on the prices at which certain Defendants and co-conspirators would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants and their co-conspirators realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants and their co-conspirators ensured that all OEMs paid supra-competitive prices for CRTs.

122.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins. Defendants and co-conspirators therefore concluded that in order to maintain their CRT price increases, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants and co-conspirators ensured that price increases for CRTs were passed on to purchasers of CRT Products.

123.     The agreements reached at the Glass Meetings included:

    a.     agreements on CRT prices, including establishing target prices, bottom prices, price ranges and price guidelines;

    b.     placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.     agreements on pricing for intra-company CRT sales to vertically integrated customers;

    d.     agreements as to what to tell customers about the reason for a price increase;

    e.     agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.     agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

h.    agreements to coordinate uniform public statements regarding available capacity and supply;

i.    agreements to allocate both overall market shares and share of a particular customer's purchases;

j.    agreements to allocate customers;

k.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.    agreements to keep their meetings secret.

124.    Efforts were made to monitor each of the Defendants' and co-conspirators' adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants and co-conspirators themselves. When cheating did occur, it was addressed in at least one of four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

125.    As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the Glass Meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT conspirators started holding fewer group meetings to avoid detection by government investigators and customers.

## 2.  Bilateral Discussions

126.    Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants and co-conspirators. The bilateral discussions occurred on a frequent basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

127.     During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

128.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe, and the United States.

129.     In order to ensure the efficacy of their global conspiracy, Defendants and co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States.  These CRT manufacturers were particularly important because they served the North American market for CRTs.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these manufacturers are all wholly owned and controlled subsidiaries of Defendants and co-conspirators, they adhered to the unlawful price-fixing agreements.  In this way, Defendants and co-conspirators ensured that prices of all CRTs imported into and sold in the United States were fixed, raised, maintained and/or stabilized at artificially inflated prices.

130.     Defendants and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

131.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Hitachi, Toshiba, and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant and co-conspirator manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had

regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the Glass Meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

132.    Between at least 1996 and 2001, Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several Glass Meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants and co-conspirators, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.

133.    Hitachi never effectively withdrew from this conspiracy. Instead, Hitachi continued to conceal the existence of the price-fixing conspiracy and abided by its agreement to keep the price fixing conspiracy a secret during the entire Relevant Period.

134.    Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRTs to purchasers, they played a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRTs paid by purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

135.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants and co-conspirators, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection

1   with CRTs was mandated by the Chinese government.  IRICO was acting to further its own

2   independent private interests in participating in the alleged conspiracy.

3        136.    Between at least 1995 and 2001, LG Electronics, through LGEI and LGETT,

4   participated in at least 100 Glass Meetings at all levels.  After 2001, LG Electronics participated in the

5   CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial

6   number of these meetings were attended by the highest ranking executives from LG Electronics.  LG

7   Electronics also engaged in bilateral discussions with the other Defendants and co-conspirators on a

8   regular basis.  Through these discussions, LG Electronics agreed on prices and supply levels for CRTs.

9        137.    LG Electronics never effectively withdrew from this conspiracy.  After 2001, when its

10  CRT business was transferred to LGPD, LG Electronics continued to enjoy the financial benefits of the

11  price-fixing conspiracy through its ownership of LGPD, which continued to participate in the

12  conspiracy.  The formation of LGPD further consolidated the industry, thus facilitating price-fixing

13  arrangements, and was consistent with the Defendants' and co-conspirators' desire to limit CRT

14  production.  During the Relevant Period, and even after the creation of LGPD, LG Electronics

15  continued to conceal the existence of the price-fixing conspiracy and abided by its agreement to keep

16  the price fixing conspiracy a secret.

17       138.    LGEUSA was represented at those meetings and was a party to the agreements entered

18  at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the

19  conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRTs

20  paid by purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus,

21  LGEUSA was an active, knowing participant in the alleged conspiracy.

22       139.    Between at least 2001 and 2006, LP Displays (f/k/a LGPD) participated in at least 100

23  Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest

24  ranking executives from LP Displays.  Certain of these high level executives from LP Displays had

25  previously attended meetings on behalf of LG Electronics and Philips.  LP Displays also engaged in

26  bilateral discussions with other Defendants and co-conspirators.  Through these discussions, LP

27  Displays agreed on prices and supply levels for CRTs.

28

140.     Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors. These meetings were attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

141.     Between at least 1996 and 2001, Philips, through Royal Philips and Philips Taiwan, participated in at least 100 Glass Meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants and co-conspirators. Through these discussions, Philips agreed on prices and supply levels for CRTs.

142.     Philips never effectively withdrew from this conspiracy. After 2001, when its CRT business was transferred to LGPD, Philips continued to enjoy the financial benefits of the conspiracy through its ownership of LGPD, which continued to participate in the conspiracy. The formation of LGPD further consolidated the industry, thus facilitating price-fixing arrangements, and was consistent with the Defendants' and co-conspirators' desire to limit CRT production. During the Relevant Period, and even after the creation of LGPD, Philips continued to conceal the existence of the price-fixing conspiracy and abided by its agreement to keep the price fixing conspiracy a secret.

143.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

144.     Between at least 1995 and 2007, Samsung, through Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking

1  executives from Samsung.  Samsung also engaged in bilateral discussions with the other Defendants

2  and co-conspirators on a regular basis.  Through these discussions, Samsung agreed on prices and

3  supply levels for CRTs.

4         145.    Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were

5  represented at those meetings and were a party to the agreements entered at them.  Thus, Samsung SDI

6  America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

7  alleged conspiracy.

8         146.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral

9  discussions with other Defendants and co-conspirators, particularly with Thai CRT.  These meetings

10  were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on

11  prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

12        147.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple Glass

13  Meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai

14  CRT also engaged in multiple bilateral discussions with other Defendants and co-conspirators,

15  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for

16  CRTs.  Thai CRT never effectively withdrew from this conspiracy.

17        148.    Between at least 1996 and 2005, Defendant Thomson participated in dozens meetings

18  with its competitors, including several Glass Meetings and multiple bilateral meetings.  These

19  meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson

20  discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated

21  sales, plant shutdowns, customer allocation, and new product development and agreed on prices and

22  supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its

23  CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the

24  European Commission that it played a role in the conspiracy.

25        149.    Between at least 1995 and 2003, Toshiba, through TC, TDDT and TEDI, participated in

26  several Glass Meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD.

27  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also

28

FIRST AMENDED COMPLAINT                              MASTER FILE NO. 3:07-CV-05944-SC
                                                     MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

1   engaged in multiple bilateral discussions with other Defendants and co-conspirators, particularly with

2   LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.

3          150.    Toshiba never effectively withdrew from this conspiracy.  After 2003, when its CRT

4   business was transferred to MTPD, Toshiba continued to enjoy the financial benefits of the price-

5   fixing conspiracy through its ownership of MTPD, which continued to participate in the conspiracy.

6   The formation of MTPD further consolidated the industry, thus facilitating price-fixing arrangements,

7   and was consistent with the Defendants' and co-conspirators' desire to limit CRT production.  During

8   the Relevant Period, and even after the creation of MTPD, Toshiba continued to conceal the existence

9   of the price-fixing conspiracy and abided by its agreement to keep the price fixing conspiracy a secret.

10         151.    TACP, TAEC and TAIS were represented at those meetings and were a party to the

11  agreements entered at them.  To the extent TACP, TAEC and TAIS sold and/or distributed CRT

12  Products to purchasers, they played a significant role in the conspiracy because Defendants and their

13  co-conspirators wished to ensure that the prices for CRT Products paid by purchasers would not

14  undercut the pricing agreements reached at the Glass Meetings.  Thus, Toshiba America, TACP,

15  TAEC and TAIS were active, knowing participants in the alleged conspiracy.

16         152.    Between at least 1995 and 2006, Chunghwa, through Chunghwa PT, Chunghwa

17  Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at

18  least 100 Glass Meetings at all levels.  A substantial number of these meetings were attended by the

19  highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa

20  PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with the other Defendants and co-

21  conspirators on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply

22  levels for CRTs.

23         153.    Tatung America was represented at those meetings and was a party to the agreements

24  entered at them.  To the extent Tatung America sold and/or distributed CRTs to purchasers, it played a

25  significant role in the conspiracy because Defendants and co-conspirators wished to ensure that the

26  prices for CRTs paid by purchasers would not undercut the CRT pricing agreements reached at the

27  Glass Meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

28

FIRST AMENDED COMPLAINT                                      MASTER FILE NO. 3:07-CV-05944-SC
                                                            MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

154. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants and co-conspirators on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

155. When Dell refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Dell is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

**E. The CRT Market During the Conspiracy**

156. Until recently, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

157. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion U.S. dollars) | Average Selling Price Per Unit |
|------|----------------------|-------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |

| 2000 | 119.0 | $28.0[1] | $235 |
|------|-------|----------|------|

158.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5%) were consumed in North America.  By 2002, North America still consumed around 35% of the world's CRT monitor supply. *See The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

159.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases occurred despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

160.    These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

## F.    International Government Antitrust Investigations

161.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

The Hungarian Competition Authority (Gazdasagi Versenyhivatal - GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co. Ltd, Samsung SDI Germany GmbH, Samsung SDI Magyarorszag Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

---

[1] Estimated market value of CRT units sold.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarorszag was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

162. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

163. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

164. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

165. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The

38

1    press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT)

2    manufacturing companies."

3        166.    On January 28, 2011, Korea's Fair Trade Commission announced that it fined five

4    manufacturers of CDTs more than 26 billion won ($23 million) for their roles in an alleged price-

5    fixing conspiracy. Since then, Korea has announced additional fines related to the Defendants' and

6    their co-conspirators' conspiracy.

7        167.    On March 18, 2011, the DOJ issued a press release announcing that Samsung SDI

8    Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the

9    output of, and allocate the market for CDTs. The United States and Samsung SDI entered into an

10   amended plea agreement on May 12, 2011, where Samsung SDI agreed to pay a $32 million criminal

11   fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as

12   January 1997, until at least as late as March 2006. The plea specified that, during this period, Samsung

13   SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the

14   primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in

15   the United States and elsewhere. In furtherance of the conspiracy, Samsung SDI, through its officers

16   and employees, engaged in discussions and attended meetings with representatives of other major CDT

17   producers. During these discussions and meetings, agreements were reached to fix prices, reduce

18   output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Acts in

19   furtherance of this conspiracy were carried out within the Northern District of California. The business

20   activities of SDI and its co-conspirators in connection with the production and sale of CDTs that were

21   the subjects of this conspiracy were within the flow of, and substantially affected, interstate and

22   foreign trade and commerce. The plea agreement also requires Samsung SDI's cooperation with the

23   DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or

24   sale of CDTs and CPTs.

25       168.    On December 5, 2012, the European Commission imposed the biggest antitrust penalty

26   in its history, fining seven companies, including Philips, LGE, Samsung and Toshiba, a combined

27   €1.47 billion ($1.97 billion) related to price fixing of CRTs.

28

FIRST AMENDED COMPLAINT                                    MASTER FILE NO. 3:07-CV-05944-SC
                                                           MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

169.     As outlined above, Defendants and their co-conspirators have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

170.     Several Defendants and co-conspirators also have a history of "cooperation" and anticompetitive conduct.  For example, Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

171.     Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

172.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.  On December 12, 2006, news reports indicated that Samsung and Chunghwa, as well as an LCD joint venture between Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

173.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

174.     On March 10, 2009, the DOJ announced that it had reached an agreement with Hitachi Displays, a subsidiary of Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.  In its plea agreement, Hitachi admitted to reaching agreements to fix the prices of LCD panels sold to Dell.

G.     The Role of Trade Associations and Trade Events During the Conspiracy

175.     Defendants' and their co-conspirators' collusive activities were furthered by trade associations and trade events that provided opportunities to conspire and share information.  One

1   example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of

2   2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a

3   national trade organization representing about 80 member companies in the Korean display industry,

4   including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by

5   EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated

6   goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996,

7   EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing

8   that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven

9   competitors should cooperate on common issues."

10      176.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and

11   participated extensively in the KDCs.

12      177.    The KDC took place in Seoul, Korea or other Korean venues on: December 4, 2002;

13   June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005;

14   July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT

15   operations participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung

16   Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.

17   Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

18      178.    Other opportunities to collude among Defendants and co-conspirators were provided by

19   events sponsored by the Society for Information Display, such as the annual Asian Symposiums on

20   Information Display, the annual International Display Manufacturing Conference and Exhibition (the

21   most recent one of which was held in Taipei, Taiwan), the annual International Meeting on

22   Information Displays (held each August in Daegu, Korea) and the annual International Display

23   Workshops (the most recent ones of which have been held in Japan).

24      179.    Through these trade association and trade events, and in meetings related to these trade

25   associations and trade events, on information and belief, Defendants and their co-conspirators shared

26   what would normally be considered proprietary and competitively sensitive information.  This

27   exchange of information was used to implement and monitor the conspiracy.

28

FIRST AMENDED COMPLAINT                              MASTER FILE NO. 3:07-CV-05944-SC
                                                     MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

**H.    Effects of Defendants' and Their Co-Conspirators' Antitrust Violations**

   **1.    Examples of Reductions in Manufacturing Capacity by Defendants and their Co-Conspirators**

180.    As explained above, during the Relevant Period, the Defendants and their co-conspirators conspired to limit production of CRTs by shutting down production lines for days at a time, closing or consolidating their manufacturing facilities in lower-cost venues such as China, and reducing manufacturing capacity to prop up prices.

181.    For example, Defendants' and co-conspirators' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Upon information and belief, these sudden, coordinated drops in factory utilization by Defendants and their co-conspirators were the result of Defendants' and co-conspirators' agreements to decrease output in order to stabilize the prices of CRTs.

182.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

183.    Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

184.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

185.    In July of 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana.

   **2.    Examples of Collusive Pricing and Production Restraints for CRT Products**

186.    Defendants' and their co-conspirators' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the

1    price of the average electronic display to about $50 in 1997." Despite such predictions, and the

2    existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

3        187.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable

4    USD50 and has been for some years . . . ." In reality, prices for CRTs never approached $50 in 1997,

5    and were consistently more than double this price.

6        188.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel

7    monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995

8    according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a

9    shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

10        189.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of

11    1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display

12    1998, an annual conference for the display industry, to state:

13            We believe that now is the time to revise our strategic plan in order to survive in this

14            tough environment and also to prepare for the coming years. This means that we have
        to deviate from the traditional approach of the simple scale up of production volume.

15

16        190.    A BNET Business Network news article from August 1998 reported that "key

17    components (cathode ray tubes) in computer monitors have risen in price. 'Although several

18    manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are

19    expected for the beginning of October . . . . While computer monitor price increases may be a

20    necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop

21    in demand if we have to raise our prices relative to CRT price increases.'"

22        191.    In early 1999, despite declining production costs and the rapid entry of flat panel

23    display products, the price of large sized color CRTs actually rose. The price increase was allegedly

24    based on increasing global demand. In fact, this price increase was a result of the collusive conduct as

25    herein alleged.

26        192.    After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the

27    average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly*

28

43

1    quoted an industry analyst as saying that this price increase was "unlike most other PC-related

2    products."

3        193.   On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT

4    monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to

5    manufacture CRTs.

6        194.   A 2004 article from Techtree.com reports that various computer monitor manufacturers,

7    including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to

8    increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.

9    Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will

10   be [a] 20% hike in the price of our CRT monitors."

11       195.   During the Relevant Period, the price of CRTs remained stable, and in some instances

12   went up in an unexplained manner, despite the natural trend in most technology products to go down

13   over time.  CRT technology was mature, and the costs of production were relatively low compared to

14   other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co.,

15   Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very

16   mature; prices and technology have become stable."

17       196.   CRT prices resisted downward price pressures and remained stable over a period of

18   many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian

19   currency crisis, the prices of CRT Products did not decline as much as they would have absent the

20   conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged

21   above.

22   **I.     Summary of Effects of Defendants' and Their Co-Conspirators' Antitrust
             Violations**

23

24       197.   The above combination and conspiracy had the following effects, among others:

25       a.   Price competition in the sale of CRTs by Defendants and their co-conspirators was

26   restrained, suppressed and eliminated throughout the United States;

27

28

b.   Prices for CRTs sold by Defendants and their co-conspirators were raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Purchasers of CRT Products from Defendants and their co-conspirators, including Dell, were deprived of the benefit of free and open competition in the purchase of CRT Products.

198.   As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, Dell was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

## VII.   FRAUDULENT CONCEALMENT

199.   Dell had neither actual nor constructive knowledge of the facts constituting its claim for relief before November 2007.  Dell did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 2007, when the government investigations described above became public.  Defendants and their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put Dell on inquiry notice that there was a conspiracy to fix prices for CRTs.

200.   Because the Defendants' and their co-conspirators' conspiracy was kept secret, Dell was unaware of Defendants' and their co-conspirators' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

201.   The affirmative acts of the Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded reasonable detection.

202.   As noted above, Defendants and their co-conspirators organized Glass Meetings to avoid detection, conducted bilateral meetings in secret and agreed at Glass Meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.

203.   Defendants and their co-conspirators coordinated and exchanged in advance the texts of the proposed communications with customers containing these pretextual statements and coordinated which co-conspirator would first communicate these pretextual statements to customers.

45

204.   By its very nature, Defendants' and their co-conspirators' price-fixing conspiracy was inherently self-concealing.

205.   The conspiracy as herein alleged was fraudulently concealed by Defendants and their co-conspirators by various means and methods, including, but not limited to, secret meetings, surreptitious communications among the Defendants and their co-conspirators by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws, and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

206.   As alleged above, in mid-2000, Defendants and their co-conspirators began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at Glass Meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy.  Defendants and their co-conspirators agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than one occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants and their co-conspirators not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

46



210. Defendants' and their co-conspirators' meeting minutes also reflect their affirmative

steps to conceal the conspiracy:

47

FIRST AMENDED COMPLAINT

MASTER FILE NO. 3:07-CV-05944-SC
MDL NO. 1917 | IND. CASE NO. 3:13-cv-02171-SC

211.     Defendants and their co-conspirators also agreed at Glass Meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

212.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants and their co-conspirators, which was undisclosed at the time.

213.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

214.     In addition, when several CRT manufacturers, including Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

215.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

216.     Dell is informed and believes, and thereon alleges, that Defendants' and their co-conspirators' purported reasons for the price increases of CRTs were materially false and misleading

48

1  and made for the purpose of concealing Defendants' and their co-conspirators' anti-competitive

2  scheme as alleged herein.

3       217.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their

4  conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Dell

5  has as a result of the anticompetitive conduct alleged in this Complaint.

6       218.    Dell's claims are also tolled by the filing of various class action lawsuits shortly after

7  the conspiracy was made public in November 2007, by ongoing government investigations, and by any

8  other tolling available by operation of law.

9               **VIII.   CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

10       219.    Dell incorporates by reference, as if fully set forth, the allegations in paragraphs 1

11  through 218 above.

12       220.    From March 1, 1995, the exact date being unknown to Dell and exclusively within the

13  knowledge of Defendants and their co-conspirators, Defendants and their co-conspirators entered into

14  a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in

15  violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating

16  competition in the United States.

17       221.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix,

18  maintain or stabilize the prices of CRTs sold in the United States.

19       222.    As part of and in furtherance of this conspiracy, Defendants and their co-conspirators or

20  their agents engaged in various collusive practices with respect to CRTs.

21       223.    With respect to CRTs, Defendants and their co-conspirators or their agents agreed, inter

22  alia, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, inter alia,

23  shipments, prices, production, and customer demand; (c) coordinate public statements regarding

24  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among

25  some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

26  agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h)

27  influence and, at times, coordinate pricing with producers in other geographic markets; (i) limit

28

1 | competition for certain key customers; (j) allocate customers; (k) allocate each producer's share of
2 | certain key customers' sales; and (l) restrict output.

3 |       224.   As a result of Defendants' and their co-conspirators' unlawful conduct, prices for CRTs
4 | were raised, fixed, maintained and stabilized in the United States.

5 |       225.   The contract, combination or conspiracy among Defendants and their co-conspirators
6 | consisted of continuing agreement, understanding and concerted action among Defendants and their
7 | co-conspirators.

8 |       226.   For purposes of formulating and effectuating their contract, combination or conspiracy,
9 | Defendants and their co-conspirators did those things they contracted, combined, or conspired to do,
10 | including:

11 |       a.   participating in meetings and conversations to discuss and agree upon the prices and
12 | supply of CRTs;

13 |       b.   communicating in writing and orally to fix target prices, floor prices and price
14 | ranges for CRTs;

15 |       c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a
16 | manner that deprived purchasers of free and open competition;

17 |       d.   issuing price announcements and price quotations in accordance with the
18 | agreements reached;

19 |       e.   selling CRTs to customers in the United States at non-competitive prices;

20 |       f.   exchanging competitively sensitive information in order to facilitate their
21 | conspiracy;

22 |       g.   agreeing to maintain or lower production capacity; and

23 |       h.   providing false statements to the public to explain increased prices for CRTs.

24 |       227.   As a result of Defendants' unlawful conduct, Dell was injured in its businesses and
25 | property in that it paid more for CRT Products than it otherwise would have paid in the absence of
26 | Defendants' unlawful conduct.

27

28

FIRST AMENDED COMPLAINT

## IX.    PRAYER FOR RELIEF

228.    WHEREFORE, Dell prays that the Court enter judgment on its behalf, adjudging and decreeing that:

a.    Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Dell was injured in its business and property as a result of Defendants' and their co-conspirators' violations;

b.    Dell shall recover damages it sustained, as provided by the federal antitrust laws, and a joint and several judgment in favor of Dell shall be entered against Defendants in an amount to be trebled in accordance with such laws;

c.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on Defendants' behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

d.    Dell shall be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

e.    Dell shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

f.    Dell shall receive such other or further relief as may be just and proper.

## X.    JURY TRIAL DEMANDED

229.    Pursuant to Federal Rule of Civil Procedure 38(b), Dell demands a trial by jury of all of the claims asserted in this Complaint so triable.

1    Date:  May 28, 2013

2                                            Respectfully submitted,

3                                      By:   /s/ Michael P. Kenny
                                             Michael P.  Kenny, Esq. (GA Bar No. 415064)
4                                            mike.kenny@alston.com
                                             Debra D.  Bernstein, Esq. (GA Bar No. 054998)
5                                            debra.bernstein@alston.com
                                             Rodney J.  Ganske, Esq. (GA Bar No. 283819)
6                                            rod.ganske@alston.com
                                             Matthew D.  Kent, Esq. (GA Bar No. 526272)
7                                            matthew.kent@alston.com
                                             Elizabeth Jordan, Esq. (GA Bar No. 415161)
8                                            elizabeth.jordan@alston.com
                                             Melissa Mahurin Whitehead, Esq. (GA Bar No. 667932)
9                                            melissa.whitehead@alston.com
                                             **ALSTON & BIRD LLP**
10                                           1201 West Peachtree Street
                                             Atlanta, Georgia  30309-3424
11                                           Tel: (404) 881-7000
                                             Facsimile:  (404) 881-7777
12
                                       By:   /s/ James M. Wagstaffe
13                                           James M. Wagstaffe, Esq. (SBN 95535)
                                             wagstaffe@kerrwagstaffe.com
14                                           **Kerr & Wagstaffe LLP**
                                             100 Spear Street, 18th Floor
15                                           San Francisco, California 94105-1576
                                             Tel: (415) 371-8500
16                                           Facsimile:  (415) 371-0500

17                                           *Attorneys for Plaintiffs  Dell Inc. and Dell Products L.P.*

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT                          MASTER FILE NO. 3:07-CV-05944-SC
                                                 MDL NO. 1917 │ IND. CASE NO. 3:13-cv-02171-SC