# EXHIBIT 13 (part 2)

1. The current condition of product delivery of several manufacturers Dec.
   a) SDI: Additionally, it is said that Mr. Yun said that some customer such as Sampo requested to decrease the price of 15"/17" $1 respectively recently, and **said that it is hoped that LG would not suggest a low price by approaching too hurriedly.**
   b) CPT: With relevance to the problem that some customers recently repeatedly hints to us that if the price in not good then we will not order henceforward, **we hope to maintain the price in a stable manner together with several manufacturers that provide product.**
2. Price problem
The result of several manufacturers: **The most important thing is to make sure the current price maintaining by several manufacturers.**
L/G: In this stage, there is no product to supply actually even though they suggest the low price of $88. Therefore there is no concern that this may affect to the product supply of CPT and SDI before February.
SDI: Mr. Yun answered that CPT could not meet the demand of Compal to 15" delivery, and Mr. Ha increased the delivery quantity to Compal by obtaining the consent of CPT. (Evidence Sogap Number 3-82)

(6) Meeting among competitors in 2000

<Table 22>         Outline of CDT cartel meeting in 2000[32]

| Serial No. | Date of opening | Agreement | Participated company | Evidence data |
|---|---|---|---|---|
| 1 | Jan. 24, 2000 | Price increase of 17"($90), plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips (top-level meeting) | p.1413, p. 1416, p.1417 of Evidence Sogap Number 3-83 Evidence Sogap Number 4-27 p.2875 of evaluation report |
| 2 | Feb. 24, 2000 | Sales price(15": $67/66, 17": $90/89), plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips (top-level meeting) | p.1432, p.1434, p.1436 of Evidence Sogap Number 3-85 Evidence Sogap Number 3-84 Evidence Sogap Number 3-86 Evidence Sogap Number 4-28 |
| 3 | Apr. 2000 | Control and inspection of production quantity | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | Evidence Sogap Number 3-87 p.1456 of Evidence Sogap Number 3-88 |
| 4 | May 26, 2000 | Sales price(15": $67, 17": $88, 19": the present price), plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips (top-level meeting) | p.1473, p.1475 of Evidence Sogap Number 3-89 Evidence Sogap Number 3-90 p.2888 of Evidence Sogap Number 4-29 |
| 5 | June 20, 2000 | Sales price(14": $54, increase of $2, 15": $67, increase of $2, 17": The present price), plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips (top-level meeting) | p.1503, p.1505, p.1507 of Evidence Sogap Number 3-92 p.2893 of Evidence Sogap Number 4-30 |
| 6 | June 28, 2000 | Confirm whether or not the performance of price increase | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p.1516 of Evidence Sogap Number 3-93 |
| 7 | July 13, 2000 | Price increase in Korea market, plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p.1537 of Evidence Sogap Number 3-95 Evidence Sogap Number 4-32~3 |

---

[32] In the CDT cartel meeting by month from 2000 to April 2001 hereinafter, the agreement is a thing by the meeting that only 5 companies of Chunghwa Picture Tubes, SDI, LG, Orion, Philips participated, and do not write it on the resolution on duplication because they are the same participated companies and participants.

| 8 | Sep. 21, 2000 | Estimating the size of CDT market with comparison to LCD, plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p.1553~4 of Evidence Sogap Number 3-96<br>Evidence Sogap Number 3-97<br>Evidence Sogap Number 4-34 |
| 9 | Sep. 27, 2000 | Plan of operation stop and inspection method | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p.1573 of Evidence Sogap Number 3-98 |
| 10 | Oct. 25, 2000 | Setting of the bottom price of sales(15": $66, 17":$85), plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips (Management level meeting) | p.1588, p.1592, p.1593 of Evidence Sogap Number 3-99<br>Evidence Sogap Number 3-100~2<br>p.2934 of Evidence Sogap Number 4-35<br>p.354 of Evidence Sogap Number 2-2 |

□ Multi-party meeting on Jan. 24, 2000

164    In the meeting, * Kim of Samsung SDI requested that all of the participants should abide by the agreement and suggested also to Matsushita, Hitachi to persuade the abidance of agreement, and the defendants collected the price increase requests that was received from the glass suppliers and then agreed to maintain the basic price of 17" CDT with $90 and agreed to maintain also the sales price targeting main customer with $90 from Mar.

> Mr. Inn Kim **requested to show the faith of the main 5 companies by abiding by the agreed price. Japanese manufacturers are to be cooperated to the price maintaining naturally through this.** Mr. Inn Kim requested that anyone who visits Malaysia <u>should seek the opportunity to have conversation with managers who are the staff in charge of sales of MEC Malaysia by obtaining a schedule.</u> He has a schedule to have additional conversation with MEC members on Mar. by opening a meeting again. Additionally, Me. Choi requested to chairperson to <u>get the meeting schedule with HTC top-level management.</u>                                                          (Evidence Sogap Number 3-83)

> Working employees suggested adjusting the <u>basic price of 17" tube</u> to $89 downward. But, they **consented to maintain the lowest price of $90** as the idea of president Lin after discussion among meeting participants. **It is scheduled that the price that is to be suggested to main customers is to be increased to $90** because of the increase of glass price from Mar.
>                                                          (Evidence Sogap Number 3-83)

165    Additionally, during Feb. 2000, with relevance to the production reduction days of 15", 17", it was agreed to stop production with 9 days of Chunghwa Picture Tubes, seven days of Samsung SDI, Orion, Philips. Finally, it was decided to hold the schedule of the next multi-party meeting at the office of Korea Orion on Feb. 24 at 2:00 p.m. the same year and decided to get golf meeting on Mar. 25.

> **All manufacturers agreed to reduce the production of 15"/17" continuously in February.**
> Chunghwa Picture Tubes decided to put nine days of production reduction period, and all of SDI/OEC/PH decided to plan production reduction period of at least seven days.
> Date of the next CDT CSM: Feb. 24 02:00 PM (Thursday), Place: OEC office, Seoul. Agreed temporarily to hold a green meeting in Seoul on Mar. 25.
>
> (Evidence Sogap Number 3-83)

> <Samsung SDI>
> LG: 4 days' closing (New Year) -> five days 17"/15"
> Orion: 4 days (New Year) -> seven days okay
> S/S: Seven days (5 days)
>
> (Evidence Sogap Number 4-27)

166 The meeting is a top-level meeting and * * Kim, * * Kim, * * Ha, * * Ha of Samsung SDI, * * Choi, * * Lee, * * Go, * * Lim of LG Electronics, * * Jo, * * Lee, * * Lee, * * Mun, * * O of Orion, Jim Smith, Jerry Lin, Limay Liu of Philips, Chieng-Yuan Lin, Chi-Chun Liu, Wen-Chun Cheng, Ching-Yuan Du of Chunghwa Picture Tubes participated. This is confirmed by the "visit report" of Chunghwa Picture Tubes and the business diary of * * Lee of Samsung SDI.

□ Multi-party meeting on Feb. 24, 2000

167    The defendants opened the information of first-quarter production quantity of 14", 15", 17", 19" CDT the same year and confirmed by making it with a table whether or not the adequate supply quantity is maintained. It is also a fact that Chunghwa Picture Tubes and Philips, among the defendants, raised discontent about the fact that they were being pressured into a price decrease by Taiwanese monitor companies based on the fact that Korean companies such as Samsung SDI, Orion, LG Electronics, etc., supplied CDT to Korean monitor manufacturers at a lower price than was agreed. It is possible to know from this that the transaction price in Korea, which would mutually affect other defendants as well as the sales quantity and sales price worldwide, including Korea, was the target of agreement of the same cartel. Additionally, it is possible to know that the meeting among Korean CDT manufacturers was continued in Korea, also agreed to deliver the meeting result that was held in Korea to the CDT working-level meeting of Taiwan for the effective agreement performance. Also, the defendants agreed to decide the price of Mar., 2000 with 66~67 dollars for 15", 89~90 dollars for 17" after the end of the discussion and, with relevance to the days of operation stop, agreed to do with 10 days for 15", five days for 17" in March 2000. Finally, agreed to hold the next meeting including golf meeting on Mar. 25 of the same year in Seoul with the hosting of Samsung SDI.

PH and CPT referred that Korean monitor manufacturers are in better condition than Taiwanese manufacturers, and **Taiwanese customers raised discontent that Korean companies had more competitiveness than Taiwanese manufacturers because they receive a special support from Korean CDT manufacturer.** Jerry insisted that PH had no sales in Korea. (The original production quantity was approximately 140k/m.)     (Evidence Sogap Number 3-85)

**Additionally, CSM of Korea side working employee is opening from time to time.** The employees of PH and CPT also can get invitation to participate regularly in the case of necessary. In order to report at the working employee level meeting that is held in Taiwan, the plan to have Korean manufacturers deliver the related market information to the employee who is in Taiwan was decided later.

(Evidence Sogap Number 3-85)

After the end of an extensive discussion among the meeting participants, **the price of March and message were decided to be done as follows: 15" 67/66 USD, 17" 90/89 USD** **Reduction of operation days**: On Mar., 2000, the meeting participants decided as follows: **17" five days, 15" 10 days** (Evidence Sogap Number 3-85)

Green meeting was decided to be held in Seoul on Mar. 25 (Saturday) by SDI. AM 8:30-11:30: High-level management meeting AM 12:00: Start of green meeting (Evidence Sogap Number 3-85)

168     The meeting is a top-level CDT multi-party meeting that was held in Korea, and * Kim, * * Kim, * * Lee of Samsung SDI, S. Y. Choi, S. K. Lee (* * Lee), K. Y. Go (* * Go), Mr. Lim (* * Lim) of LG Electronics, * * Jo, J. H. Mun (* * Mun), S. G. O (* * O), Jimmy Kim of Orion, Jim Smith, Jerry Lin, J. K. Park of Philips, Chi-Chun Liu, Ching-Yuan Du of Chunghwa Picture Tubes participated. This is confirmed by the "visit report" that was made by Ching-Yuan Du of Chunghwa Picture Tubes, meeting data that was distributed at the time of meeting, the 'application form of leaving a country' of participants of Chunghwa Picture Tubes, the information of business diary of * * Lee of Samsung SDI, etc.

☐ Control inspection of production quantity on April, 2000

169     It is a fact that Samsung SDI, LG Electronics, Orion, Philips and Chunghwa Picture Tubes shared the production control and inspection plan of 15" and 17" CDT at the each company's plant worldwide by making a table by date, and agreed to confirm the operation stop by having an employee of each company personally visit the other party's production facility. This is confirmed by the internal approval document and the table of control and inspection of Chunghwa Picture Tubes, which dispatched its employee to confirm the stop of the Samsung SDI production line in Shenzhen, China.

◆ Plan of 15" CMT production control & inspection –April, 2000 (X10)

| | CPT X 6 | | SDD X 5.5 | | LG X 4 | | ORION X 2.75 | | PHILIPS X 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Place | Inspection | Place | Inspection | Place | Inspection | Place | Inspection | Place | Inspection |
| Sat 4/1 | CPTI #1 #2 CPTY #3 CPTM #8 CPTM #2 | | Suwon #4 Pusan #3 #6 M'sia #6 | | Changwon #H3 #5 Wales #1 | | Kumi D9 BSA Mex #2 | | Chupel #3, 4, 5 (Relocated to China) | |
| Sun 4/2 | CPTI #1 #2 CPTY #3 CPTM #8 CPTF #2 | | Suwon #4 Pusan #3 #6 M'sia #6 | | Kumi #G1 Changwon #H3 #5 Wales #1 | | Kumi D9 BSA Mex #2 | | Chupel #3, 4, 5 (Relocated to China) | |
| Mon 4/3 | CPTI #1 #2 CPTY #3 CPTM #8 CPTF #2 | | Suwon #4 Pusan #3 #6 | | ChangwonH3 H3 0.5 days | | | | Chupel #3, 4, 5 (Relocated to China) | |
| Tue 4/4 | CPTI #1 #2 CPTY #3 CPTM #8 | | Pusan #3 #6 | | | | | | Chupel #3, 4, 5 (Relocated to China) | |
| Wed 4/5 | CPTI #2 CPTY #3 CPTM #8 | | Pusan #3 #6 | | | | | | Chupel #3, 4, 5 (Relocated to China) | |
| Thur 4/6 | CPTI #2 CPTY #3 CPTM #8 | | Pusan #3 #6 | | | | | | Chupel #3, 4, 5 (Relocated to China) | |
| Fri 4/7 | CPTI #2 CPTY #3 CPTM #8 | | | | | | | | Chupel #3, 4, 5 (Relocated to China) | |
| Sat 4/8 | CPTI #2 CPTY #3 CPTM #8 | | [illegible] #2 | PH | | | Kumi D9 BSA Mex #2 | | Chupel #3, 4, 5 (Relocated to China) | |
| Sun 4/9 | CPTI #2 CPTY #3 CPTM #8 | | Suwon #4 Pusan #3 #6 T [illegible] #2 | PH | Kumi #G1 #G2 Changwon #H3 #5 | | Kumi D9 Mex #2 | | Chupel #3, 4, 5 (Relocated to China) | |
| Mon 4/10 | CPTY #3 CPTM #8 | | Pusan #3 #6 T [illegible] #2 | PH | ChangwonH3 /H5 0.5 days | | | | Chupel #3, 4, 5 (Relocated to China) | |

□ Multi-party meeting on May 26, 2000

170 The defendants agreed to the sales price as the following and decided to notice the price increase to customers immediately, and the defendants agreed to stop the production line of 15" and 17" CDT at least over six days for the production quantity reduction and decided to submit the plan until May 30 the same year. The defendants decided to limit the number of participant to two or three people per each company for the way to maintain the confidential of the meeting, and agreed to hold the next meeting in Malaysia on June 20 the same year including golf meeting. This is confirmed by the "visit report" of Chunghwa Picture Tubes and the information that was written with hand on the hotel memo pad of Shanghai international convention center.

---

With relevance to the price problem, there was a review to the market condition and the price of Japanese manufacturer. The participants decided as the following after discussion.
Date of enforcement: July 1, 2000
Guideline of price: 15" MPRII: $67  (Core item:$66), 17" MPRII: $88  (Core item: $87)
There was a decision that the price of 19" is necessary to be maintained with the previous agreed price.
All manufacturers will deliver the agreed price to each customer immediately in order to gain time and to give lead time to customers for a smooth start after July 1.

(Evidence Sogap Number 3-89)

---

The participants decided to follow the suggestion of director Liu at the end of discussion.
-17" and 15": At least six days respectively; submittal of the plan by May 30

(Evidence Sogap Number 3-89)

---

> 1) Jerry requested to all participants <u>not to make a minutes but to keep only the related marketing investigation data</u> because the information of CSM meeting is frequently leaked to outside . . . . All the participating manufacturers **agreed to reduce the number of participant from four people to two or three people** after discussion.
> 2) Resolution that green meeting is to be held in Malaysia on June 20 (Tuesday) was passed. The meeting schedule is as the following.
> 07:30-12:00 Golf game  (Limited to four people per each manufacturer)
> 12:00-13:00 Lunch  (Brief lunch at Jin Ma Palace)
> 13:00-14:30 Report of SDI marketing investigation
> 14:30-17:30 All the participating president shall visit CPTM that president Lin hosts
>    CDT management meeting
> 17:30-18:00 Dinner (brief dinner at Jin Ma Palace)
> 18:00-21:00 CDT management meeting            (Evidence Sogap Number 3-89)

171    On the other hand, the defendants agreed to increase the price by two dollars for 14" CDT, 3 dollars for 15" CDT respectively and to do 87~88 dollars for the sales price for 17" CDT. Additionally, with relevance to the notice of price increase, agreed to increase to customers until the late May and to decide the production quantity reduction plan until the following week. This is confirmed by the business diary of * * Lee of Samsung SDI.

> <u>Notice of the price increase until the late May capacity control next week confirm</u>
> Price: +2$ 14", +3$ 15", 17": 88$~87$
> Day off: Philips seven days, LG 4 days, Orion & days, Chunghwa six days
>            (Evidence Sogap Number 4-29)

□ Multi-party meeting on June 20, 2000

172    The defendants checked mutually whether or not of the possibility of price increase through the sales quantity and increase or decrease rate by each company of 14", 15", 17", 19" CDT, and LG Electronics confirmed that it had noticed the price increase on May including the customers within the Group, and Philips confirmed that it had sent the price-increase letter to the customer. Additionally, Samsung SDI also revealed that the order condition became good because Samsung Electronics demanded a quick delivery because of the price increase and referred that the price increase will be successful in the case of not attempting to expand the market share among the participating company. Also, the defendants agreed to the guideline of CDT price by standard, and decided to submit the plan until June 28 the same year after deciding the days of production stop on July, 2000 at least six days in the case of 15", 17" CDT, and agreed to hold the next management level meeting on July 13 the same year by LG Electronics. This is confirmed by the "visit report" of Chunghwa Picture Tubes and the business diary of * * Lee of Samsung SDI.

> LG notified the price increase of May to customers (Customers local and within Group).
> PH sent a letter that informs the price increase to customers already. On the base of the negotiation condition of customers, there may be no problem to increase the price of 14". There is also no severe opposition to 15" . . . . In the case of 17", the situation is not as optimistic.
> SDI explained that the order of June is a little better than reservation because SEC requested a quick delivery last week because of the problem of price increase mainly. Customers (Including Korean companies) received notice already about price increase, and [SDI] believes that the price increase will be successful surely unless to attempt to touch other company's customers or to attempt to expand the market share, and when it is firm in regard to the price increase.
>
> (Evidence Sogap Number 3-92)

> The meeting participants decided as the following after considering the market condition and the current and actual enforcement price, the acceptability of customers with relevance to price adjustment, the original market share balance:
> (1)  Guideline of 14"/15" price:
> 14" MPRII: $54  (Core quantity:$53) and increase at least $20/pcs.
> 15" MPRII $67  (Core quantity:$66) and increase at least $20/pcs.
> Date of effect generation: July 1, 2000
> (2)  Price of 17" normal tube: Maintain the present price. The originally agreed price is delayed by one month and will be enforced from Aug. 1.
>
> (Evidence Sogap Number 3-92)

> Reduction of business day: July 2000
> All of LG, PH, CPT requested the production stop of 15"/17" during six days. SDI suggested five days. OEC hoped five days for 15", seven days for 17". The meeting participants decided as the following after discussion: At least six days for 17"/15" respectively, -submit the plan until June 28.
> Additionally, the manager-level meeting would in Seoul on July 13 (Tuesday), and it was decided that LG would prepare.
>
> (Evidence Sogap Number 3-92)

173    The meeting participants agreed to apply the price of 14", 15" CDT with the price that was agreed on July, 2007 and to delay the price of 17" one month by saying, "Let's abide by the agreement and delay the time of increase and do not trust the word of customer." This is confirmed by the business diary and statement of * * Lee of Samsung SDI.

> SDI: Keep agreement --> delay price increase→ do not trust
> 14"/15" July and agreed price, 17" delay of one month
>      →   Monitoring system: July/Aug.          (Evidence Sogap Number 4-30)

□ Multi-party meeting on June 28, 2000

174    The defendants checked mutually whether or not of customer notice of the agreed price increase and checked the response of customer with cross. It is possible to know from such fact that the purpose of the meeting was to draw the agreed price after checking whether or not of the price increase on the basis of the information on market demand and supply, which was not to be opened to the public, and to make the performance of agreement to be come true effectively by doing mutual confirmation of the competitor supply price that the customer suggests while also urgently requesting performance from the companies that were delaying the performance of the agreement.

This is confirmed by the "visit report" of Chunghwa Picture Tubes.

> According to Mr. Ha of SDI, ...all of Compal/Delta/KFC/ADI argued that the estimated value of LG is lower. Because of the high price of SDI the above customers canceled the order of SDI.
>
> Mr. Lim of LG made it clear that the total order quantity of LG on June is the same with the numerical value (15" – 682k, 17" – 711k, 19" - 175k) that was opened to the public in the meeting of last week. **LG has confidence that SDI was competing with a low price and so LG lost its order, and raised an objection . . . . LG did not win a contract clearly because of a low price.**
>
> According to the PH sales information of China, SDI Shenzhen was hesitating and did not show any movement of increasing domestic customer price. Mr. Ha was supported to do investigation and checking work, and was requested to press for the price increase.
>
> (Evidence Sogap Number 3-93)

□ Multi-party meeting on July 13, 2000

175   In the meeting, with relevance to the Korean market, the participant from Philips discussed with other participants the matters related to the price increase that was requested to Samsung Electronics and Daewoo Electronics, the possibility of price increase through a control of supply quantity, etc. This is confirmed by the "visit report" of Chunghwa Picture Tubes, "meeting preparation data on July 13" that was made just before the meeting opening in the business headquarters of Samsung SDI Digital Display, the meeting data that was distributed at the time of meeting.

> According to each resolution of the last meeting, PH and Hwafei will attempt to adjust the price with $53 (itc/cif) from Aug. 1. Mr. Park of PH said that he demanded the price increase to SEC and Daewoo respectively but had not yet received a definite answer.... The recent supply quantity to SEC/Daewoo is 20-25k/m respectively, and the total sum is about 50k/m. SDI and OEC answered that there may be no other supplier that can supply the above 50k to themselves. PH can ease suppression and can increase the price.
>
> (Evidence Sogap Number 3-95)

□ Multi-party meeting on Sept. 21, 2000

176      The defendants collected and shared the information that is related to the demand and supply condition of CDT (14", 15", 17", 19") by standard in the worldwide market and sales trend and discussed the sales quantity and setting plan of sales price henceforward. Additionally, one can conclude, according to the substitution of CDT monitor with TFT-LCD, that Samsung SDI explained that price plan of Samsung Electronics could be acceptable to the participants, and agreed to set the CDT price with the level that can have competitiveness according to the price change of TFT-LCD.

177    One can conclude from this that the purpose of each company was not to set the production and price by the independent judgment but to adjust the supply quantity jointly and artificially and to adjust also the sales price jointly according to the supply expansion condition of alternative product. The defendants decided to stop the production line of 15", 17" CDT during 14 days on Oct., 2000, and agreed to hold the next meeting in Seoul on the afternoon of Oct. 25 for the CDT meeting and on the morning of Oct. 26 for the green meeting, meaning a golf meeting. This is confirmed by the "visit report" of Chunghwa Picture Tubes as well as the meeting data and the business diary of * * Lee of Samsung SDI.

(C ) Rational price and TFT substitution trend of 17" flat tube:

The following is a prospect data that * * Kim of SDI has provided with relevance to the competitiveness of 17" flat monitor and the market price expected to 15" TFT LCD:

| 15" TFT monitor | | | 17" CDT flat monitor | | |
|---|---|---|---|---|---|
| Item | Present | Prospect | Item | Present | Prospect |
| Module cost | $450~480 | $300 | CDT cost | $110 | $90 |
| Other cost | $100 | $90 | Other cost | $80 | $75 |
| FOB price | $550~580 | $390 | FOB price | $190 | $165 |
| Whole price (FOB*1.2~1.3) | $660~725 | $470 | Whole price (FOB*1.3~1.4) | $247~260 | $214~231 |
| Retail price | $799 | $499 | Retail price | $249~279 | $216~250 |

Currently $799 is higher about 3.2 times than $249 with comparison to the retail price. If we use 2.5 as a factor instead of it, and **the price of 15" TFT monitor is $499, then the price of 17" CDT monitor should be $499/25 = $199.** Therefore, SEC judges that the price of 17" flat tube should be low than $80, and if not so nobody will purchase it . . . . **Therefore, SEC judges that $350 is the ultimate target price to the monitor . . . . However, if the price of TFT is to be decreased, then the price of CDT should also be decreased in order to maintain competitiveness.**          (Evidence Sogap Number 3-96)

Reduction of operation days: Qct [as the writing of the original] 2000
**Resolution: 14 days stop of 15"/17" production line**  (17" 8 days, 15" 6 days, 15"/17": seven days respectively)
Resolution: The next meeting shall be held in Seoul, Korea.
Oct. 25 PM Management level meeting  (AM CPT meeting), Oct. 26 AM Green meeting
(Evidence Sogap Number 3-96)

☐ Multi-party meeting on Sept. 27, 2000

178    In the meeting, the defendants agreed to make a stop plan of 15", 17" production line that is in the plant of the whole world during Oct. 2000, and to notice the inspection method to the other party two days prior to the inspection day. Additionally, decided to hold the next meeting at the Taiwanese Taoyuan office of Chunghwa Picture Tubes from 2:00 p.m. on Oct. 4 of the same year. This is confirmed by the "visit report" that was made by Pang-Yi Lin of Chunghwa Picture Tubes.

> Plan of line stop and inspection that each manufacturer reported is annexed. <u>Two days before the inspection day, it was agreed that the manufacturers must provide notice to the other party and to the one that would visit/sponsor.</u>
>
> Mr. Ha said that he hopes that top level management of each manufacturer can participate in the next meeting to discuss the price of Oct. <u>The date of the next meeting is 2:00 p.m., Oct. 4 (3) at the CPT Taoyuan plant.</u>
>
> <div align="right">(Evidence Sogap Number 3-98)</div>

☐ Multi-party meeting on Oct. 25, 2000

179     During the discussion of the agreement of the previous meeting by the defendants, the participant of Chunghwa Picture Tubes raised an objection at the point that the operation stop was not performed as the agreement that was agreed at the Wales plant, England, and Mr. Choi of LG Electronics answered that he would reply after confirmation, and the defendants agreed to control the supply and stabilize the price by cooperating to the price decrease request of customers. Additionally, the defendants, in order to prevent the nonperformance of the agreement, agreed to set the price guideline after submitting the minimum price, the average price that were applied to 15", 17" CDT product by each company and to produce a table for comparison. They agreed that there was a need to more strictly control the production quantity for the stabilization of price of Nov. 2000 and decided to stop the operation of production line over nine days. Additionally, agreed to hold the next meeting, CDT multi-party meeting at Chunghwa Picture Tubes Malaysia from 9:00 a.m. on Nov. 29 of the same year. This is confirmed by the visit report" and meeting data of Chunghwa Picture Tubes, the application form of leaving a country and a statement of accounts for business trip, a receipt for hotel accommodations at the time of business trip in Korea of the participant of Chunghwa Picture Tubes, the information that is written in the business diary and statement of * * Lee of Samsung SDI, etc.

> (A) Checking after the last meeting:
>
> Inspection control: **CPT looked back on the inspection to the condition of production stop at the LG Wales plant.** CPT employees found that LG had not performed the production stop according to the original plan. Mr. Choi of LG answered that he would answer after their inspection and LG had stopped the production over eight days due to the negative condition of obtaining orders in that month.
>
> <u>The five main companies must control the balance of demand and supply through close cooperation in order to maintain stable pricing.</u>
>
> <div align="right">(Evidence Sogap Number 3-99)</div>

(C) Price guideline:
All manufacturers anonymously provided the current prices of 15"/17" as follows:

|  | Lowest price | | Average price | | Price guideline | |
|---|---|---|---|---|---|---|
|  | 15" | 17" | 15" | 17" | 15" | 17" |
| 1 | $63 | $82 | $64 | $83 | $64 | $83 |
| 2 | $63 | $83 | $64 | $84 | $63 | $83 |
| 3 | $64 | $84 | $65 | $85 | $63-64 | $83-84 |
| 4 | $63 | $82 | $64 | $83 | $64 | $83 |
| 5 | $62 | $81 | $64 | $83 | $64 | $83 |
| Average | $63 | $82.5 | $64.2 | $83.6 | | |
| Lowest price | $62 | $81 | $64 | $83 | $63 | $83 |
| Japan | $58 | $76 | $60 | $81 | | |

After an extended discussion, **all the participants agreed that the price must not decreased more on the original price guideline in order to prevent a continuous price decrease: 15" - $66, 17" - $85.** Until now the price decrease of two dollars each could be permitted. [Written with memoirs] **To the main customer (key account), everybody agreed to the point that increasing the price discount was inappropriate.**

(Evidence Sogap Number 3-99)

Answer 49) It progressed with a similar method as that of the previous management-level meeting in the meeting too. Peculiarity was, at the time of setting price guideline, that **suggested to submit the current sales price by model with a secret ballot after writing it by one person among the participants who judged that the cheating of participants is to be a disturbance to the effective price agreement and its performance meanwhile and drew the "lowest price – average price – guideline" on the basis of the result. As a guideline by model, it was agreed at $66 for 15", $85 for 17".** Additionally, the number of operation stop days of Nov. 2000 was agreed at nine.

(Evidence Sogap Number 2-2)

Resolution: The market demand of Nov. is worse than that of Oct., and for the maintenance of price stability there is a need to control the production quantity more strictly. Therefore, **the days of production stop to the production line of 15"/17" must be increased to nine days from seven days on Oct.**
The next meeting is scheduled to be held at CPTM: 3:00 p.m. Nov. 28 – CPT management meeting, Nov. 29 a.m. ) (:00 CDT management meeting

(Evidence Sogap Number 3-99)

(7) Meeting among competitors on 2001

<Table 23>      Outline of CDT cartel meeting, 2001

| Serial No. | Date of opening | Agreement | Participated company | Evidence data |
|---|---|---|---|---|
| 1 | Feb. 23, 2001 | *Price guideline by each company (15": 59±2, 17": 76±2, Flat: 91±3, 19": 108±3),* plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p. 2940 of Evidence Sogap Number 4-36 |
| 2 | Mar. 19, 2001 | Price guideline by each company, plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p. 1643, p. 1645 of Evidence Sogap Number 3-103 Evidence Sogap Number 4-37 |
| 3 | Mar.28, 2001 | Confirmation of current price, exchange of information | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p. 1656 of Evidence Sogap Number 3-104 |
| 4 | Apr. 19, 2001 | Price guideline by model (14": 47±1, 15": 57±2, 17": 74±2, 19": 100±3), plan of operation stop | Chunghwa Picture Tubes, SDI, LG, Orion, Philips | p. 1666 of Evidence Sogap Number 3-105 Evidence Sogap Number 4-38 |
| 5 | June 27, 2001 | Refraining from selling with low price, price guideline by model, plan of operation stop | Chunghwa Picture Tubes, SDI, LPD, Orion (Management level meeting) | p. 1682, p. 1685 of Evidence Sogap Number 3-106 Evidence Sogap Number 3-107 Evidence Sogap Number 4-39 |

| 6 | July 24, 2001 | Price guideline by model, plan of operation stop | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1721 of Evidence Sogap Number 3-108<br>Evidence Sogap Number 4-40<br>Evidence Sogap Number 2-2 Answer 50) |
| 7 | Aug. 13, 2001 | Refraining from selling with low price | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1731 of Evidence Sogap Number 3-109 |
| 8 | Oct. 15, 2001 | Price guideline by model, plan of production line stop | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1731, p. 1739, p. 1741, p. 1744 of Evidence Sogap Number 4-41 |
| 9 | Oct. 23, 2001 | Price increase (Oct. 1: $10, Nov.:$15, Dec.: $5), refraining from selling with low price | Chunghwa Picture Tubes, SDI, LPD (Top level meeting) | p. 1731, p. 1739, p. 1741, p. 1744 of Evidence Sogap Number 3-110 |
| 10 | Dec. 17, 2001 | Price guideline by model (15": 44, 17": 58, 17" Flat: 67, 19": 85, 19" Flat: 100) | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1759 of Evidence Sogap Number 3-111<br>p. 2970 of Evidence Sogap Number 4-42 |
| 11 | Dec. 28, 2001 | Sales price by model, price difference by detailed specification | Chunghwa Picture Tubes, SDI, LPD | p. 1768~1770 of Evidence Sogap Number 3-112 |

☐ Multi-party meeting on Feb. 23, 2001

180    It is a fact that the defendants set the price guideline after comparing the application price of 15", 17", 19" CDT product by each company at the time, and agreed to stop the operation of production line during 12 days on Mar. the same year. This is confirmed by the business diary of * * Lee of Samsung SDI.

| Price Guide Line | | | | | |
|---|---|---|---|---|---|
| | Orion | SDI | LG | CPT | Philips |
| 15" | 60 | 59 | 57 | 57 | 57 | 59±2 |
| 17" | 76 | 75 | 75 | 74 | 75 | 76±2 |
| Flat | - | 15 | 10 (?) | 15 | 15 → 13 | 91±3 |
| 19" Con | - | *108 | 108 | 103 | (105±5) S/L | 108±3 |
| Capability control | | | | | |
| Chunghwa Picture Tubes: 15 days, LG: 14 days, Philips: 14 days, Orion: 6~7 days, SDI: 10 days | | | | | |
| 12 days (Circle) | | | (Evidence Sogap Number 4-36) | | |

181    The defendants exchanged the sales result of Feb. and the estimation of Mar.,2001, and exchanged the information of production change plan of each company. It is possible to know the relationship of Samsung SDI and Samsung Electronics from the statement of the participant of Samsung SDI. That is, it is grasped that Samsung Electronics was being provided 40% from CDT manufacturer besides Samsung SDI, and in the case of not keeping the agreement of CDT multi-party meeting, Samsung SDI may take away the quantity that is provided to Samsung Electronics.

In the meeting, the defendants drew the agreed price by putting together the opinion of each company to the price of 14", 15", 17", 19" CDT product on Apr. 2000, and agreed the days of operation stop of the production line during April 2001 with 14 days.

182     Additionally, the defendants decided to hold the next meeting in Shanghai, China on Apr. 19 the same year, and decided to hold green meeting, that is a meeting for golf, on Apr. 20. This is confirmed by the "visit report" of Chunghwa Picture Tubes and the information that is stated in the business diary of * * Lee of Samsung SDI.

> Currently, SDI is delivering 60% to SEC, and Taiwanese companies are occupying 20%, and the other Korean companies and the companies of Asia Pacific region are occupying 20%. **SDI referred that the internal transaction quantity became o actually because TSB sold 15" Minineck to SEC with a low price.**
>
> (Evidence Sogap Number 3-103)

**(B) New price guideline of Apr.**
Opinion and resolution of each manufacturer to the price decision for Apr. is as follows:

|         | CPT   | LG    | Orion | PH    | SDI   | Conclusion |
|---------|-------|-------|-------|-------|-------|------------|
| 14"     | 47±1  | --    | 47±1  | 47±1  | 48±1  | 47±1       |
| 15"     | 58±2  | 57±2  | 57±2  | 58±2  | 58±2  | 57±1       |
| 17"     | 75±2  | 75±2  | 75±2  | 75±2  | 75±2  | 75±2       |
| 17" RF  | 89±2  | 89±2  | 89±2  | --    | 89±2  | 89±2       |
| 19" 85khz | 101±3 | 100±3 | 101±3 | 103±3 | 101±3 | 100±3    |
| 19" 95khz | 106±3 | 105±3 | 106±3 | 108±3 | 106±3 | 105±3    |

**(E) Days of line stop of Apr.**
Each manufacturer reported to the planned days of operation stop: CPT – 14 days, Philips – 14 days, LG – 14 days, SDI – 12 days. It was finally decided to make the days of operation stop during one month of Apr. to be 14 days.

(Evidence Sogap Number 3-103)

□ Multi-party meeting on Mar. 28, 2001

183     The defendants exchanged the information that is related to the sales quantity of 14", 15", 17", 19" product and the customer response in market. Especially, there is a fact that other participants requested for the participants of Samsung SDI to report and correct to the thing that Samsung Electronics and Hansol Electronics, the customers of Korea suggested a low estimated value. This is confirmed in the "visit report" of Chunghwa Picture Tubes.

> SEC suggested a low price of $111 for 17" at the international information communication fair, and Hansol suggested an estimated value of $108 for 17" in order to obtain order. **With relevance to the irrational pricing** such as that SEC suggests $80 to 17" RF tube for the obtaining order, **all companies want that SDI Taipei should report to headquarters the above act that disturbs the market practices.**
>
> (Evidence Sogap Number 3-104)

□ Multi-party meeting on Apr. 19, 2001

184    The defendants exchanged the information that is related to the changes of sales quantity, the sales price by standard and the trend of customers, the present condition of production line change before the opening of meeting. Additionally, agreed to the new guideline of May 2001 as follows and decided the days of operation stop of production line during May for 14 days. And, they decided to hold the next meeting at Chunghwa Picture Tubes of Taoyuan of Taiwan from May 22 the same year AM 09. The above information is the same with the information that was stated in the business diary of * * Lee of Samsung SDI. This is confirmed by the 'interview report' that was made by Ling-Yun Cheng of Chunghwa Picture Tubes and the information of the business diary of * * Lee of Samsung SDI.

---

**(B) New price guideline:**

All manufacturers....were wanting to put every effort to maintain the price in order to avoid a condition of big scale adjustment that can disturb market. **Manufacturers decided to the price of May as follows.**

|  | Result |
|---|---|
| 14" | 47±1 |
| 15" | 57±2 |
| 17" | 74±2 |
| 17" RF | 87±2 |
| 19" 85khz | 100±3 |
| 19" 95khz | 105±3 |

**(E) Days of line closing on May**

Manufacturers **decided to the days of line closing on May with 14 days.**

(F) AOB:

It was decided to hold the next meeting at CPT of Taoyuan. (May 22 9:00 AM) CPT will preside the meeting.

(Evidence Sogap Number 3-105)

---

□ Multi-party meeting on June 27, 2001

185    The defendants exchanged information to the present condition of CDT sales before the opening of meeting. The participant of LG Electronics expressed complaint to the point that Orion intercepted the CDT order of its own company's inside with a low price, and Chi-Chun Liu (chairperson) of Chunghwa Picture Tubes requested to refrain from an aggressive act because such act only expands the loss of member companies.

186    Additionally, the defendants agreed with the sales price guideline of 14", 15", 17", 19" CDT and the days of production line stop (14 days) on July, 2001, and agreed to hold a meeting at Taiwan Samsung SDI on June 29 the same year for the inspection of production line stop, and agreed to hold the next meeting at Taiwan LPD on July 24 the same year.

Each company agreed with the regulation that the plan of stop by specific production plant, including Suwon, Pusan, Gumi of Korea, and inspection are to be implemented always before 3 days after notice. * * Kim, * * Park, * * Lee of Samsung SDI, * * Choi, * * Lee, * * Go of LPD[33], * * Jo, * * Gang of Orion, Chi-Chun Liu, Sheng-Jen Yang, Wen-Chun Cheng, Ling-Yun Cheng of Chunghwa Picture Tubes were participated in the meeting. This meeting is confirmed by the "visit report" of Chunghwa Picture Tubes, the meeting data that was distributed at the time of meeting, the 'business diary' of * * Lee of Samsung SDI.

> LG expressed a strong complaint to Orion to the point that Orion intercepted the order from LG monitor by using the low price of $58 in 17". Orion denied such suspicion and argued that Orion has concrete evidence that LG suggested estimated value to Taiwanese customers with $61. VP Liu, chairperson said that in the case that market is poor, to decrease the price to attract sales does not increase sales, and this only expands each company's loss. .. It is hopes that Orion should refrain from aggressive act of intercepting order from LG.                                      (Evidence Sogap Number 3-106)

(D) Price guideline
Several companies <u>agreed to adopt a numerical value that is close to the present condition as a guideline</u> to price estimate.

| 14" | $43 |
| 15" | $49 |
| 17" | $65 |
| 17" Flat | $78 |
| 19" 85khz | $90 |
| 19" 95khz | $95 |

(E) Days of Jul(Quoting the original word as it is) line stop
Several companies agreed to maintain 14 days of line stop on July, and several manufacturers will hold a meeting at SDI Taipei on June 29 PM 02:00 in order to confirm and investigate the implementation of plan.
(F) The next meeting will be held at LG Philips Taipei. (July 24, 13:30)
                                                            (Evidence Sogap Number 3-106)

□ Multi-party meeting on July 24, 2001

...

187     The defendants agreed to do the days of CDT production line stop during Aug. 2001 with 15 days and set the standard price of 14", 15", 17", 19" CDT. Additionally, agreed to hold the next meeting at the office of Korean Samsung SDI from Aug. 21 PM 01:00 the same year. * * Kim, * * Park, * * Lee of Samsung SDI, * * Choi, * * Lee, * * Go of LPD[34], * * Jo, * * Gang of Orion, Chi-Chun Liu, Sheng-Jen Yang, Wen-Chun Cheng, Ling-Yun Cheng were participated in the meeting, and held CDT multi-party meeting at the LPD office of Taipei, Taiwan according to the agreement of previous meeting. This is confirmed by the "visit report" that was made by Ling-Yun Cheng of Chunghwa Picture Tubes and the information of business diary and statement of * * Lee of Samsung SDI.

---

[33] LG Electronics and Philips combined the CRT business part of each company as of July 1, 2001 and established a joint venture of LG Philips Display(LPD), and after the time, the executives and staff in charge of CDT sales and business of LG Electronics and Philips were participated in the cartel meeting on behalf of LPD.
[34] LG Electronics and Philips Electronics established LPD (LG Philips Displays Korea Co., Ltd) on June 11, 2001 by the LPD Holdings that was established as a joint venture of CRT business part of each company, and acquired CRT business part from LG Electronics on June 30, 2001 and from Philips Electronics on July 1, 2001 by transfer. After this time, the executives and staff in charge of CRT sales and business of LG Electronics and Philips were participated in the cartel meeting on behalf of LPD.

**(C) Days of production stop during Aug.**
Several manufacturers decided to do the days of production stop during Aug. for the adjustment of production quantity instead of implementing plant closing.
**(D) Price guideline: Manufacturers agreed to do the standard price as follows.**

| | |
|---|---|
| 14″ | $42 |
| 15″ | $48 |
| 17″ | $64 |
| 17″ Flat | $76 |
| 19″ 85khz | $87 |
| 19″ 95khz | $92 |

(E) AOB. The next meeting is decided to be held at SDI, Korea. (Aug. 21 PM 01:00)

(Evidence Sogap Number 3-108)

□ Multi-party meeting on Aug. 13, 2001

188     Chunghwa Picture Tubes requested to Samsung SDI to stop to supply with a low price in the meeting, and about it Samsung SDI denied this fact. This is confirmed by the "visit report" of Chunghwa Picture Tubes.

CPT revealed that the current sales quantity increased and requested to SDI not to expand market share by suggesting a low price. If not so, all manufacturers will decrease the sales price henceforward in order to maintain market share and then such vicious circle will damage market severely. SDI argued and protected itself that it did not suggest a low price to new customers and now is transacting business with Philips/AOC of only 19″ flat and do not have relationship absolutely to the product of other size.
Two manufacturers(Samsung, LPD) were urged to lead to protect the price decrease and to adjust the price of each company.

(Evidence Sogap Number 3-109)

□ Multi-party meeting on Oct. 15, 2001

189     The defendants checked the plan of line operation stop of the production facility("shutdown plan") of each company in the whole world and agreed with the price guideline of 14″, 15″, 17″, 19″ CDT, after exchanging of information such as the increase or decrease of sales-production quantity. This is confirmed by the 'business diary' of * * Lee of Samsung SDI.

---

**Shutdown plan**
SDI – 2nd stage Suwon - #1 O.K. Malaysia - #4 not yet ~ 3rd stage: Pusan #5 scheduled
LPD – 3rd stage O.K. → Lebring & Hwafei – 1 line stop
Orion: Time is necessary for 3rd stage
CPT: FOLLOWED THE SKDL
Price guideline
14" $42 15" $43-45 17" $58 Flat $68 19" FST[35] $85            (Evidence Sogap Number 4-41)

---

□ Multi-party meeting on Oct. 23, 2001

190    According to the sales price increase of TFT-LCD that is the replacement product of CDT, the defendants judged it for the opportunity of price increase and agreed to increase the CDT price with 10 dollars for Oct., 15 dollars for Nov., 5 dollars for Dec. the same year respectively. Additionally, they raised objection to the thing that Samsung SDI expands market share and takes other participants' order quantity by leaving from the agreed price and supplying with a low price in the time of transaction with Samsung Electronics. About to this, Samsung SDI suggested a specific numerical value and denied the fact that secured the order with a low price.

191    Additionally, it is confirmed that the defendants decided the price that is supplied to main customer with a certain rate(2.5 ~ 4%) of low level than the agreed price, and it is possible to know that the price is to be changed connecting with the agreed price. This is confirmed by the "visit report" of Chunghwa Picture Tubes.

---

The part that was reached to a common agreement was to increase $10 on Oct. 1 and to increase $15 on Nov. and to increase $5 again on Dec.

(Evidence Sogap Number 3-110)

---

The information that CPT raised objection was that Samsung occupied a high market share in a downward market by doing a supportive internal transaction with a low price, and especially tries to secure the order of Taiwanese company with a low price. SDI refuted it strongly by saying that its own company is not securing the order with a low price but rather losing market share to Taiwanese company is a fact.
SDI revealed about the internal transaction of group that it was implemented at the level of 3% low than market price, and CPT also revealed that discount rate is 3%. LG discounted 4%, and PH expanded the discount rate from 1% to 2.5%.            (Evidence Sogap Number 3-110)

---

192    And, Samsung SDI informed the price of 17", 19" CDT that is to be applied henceforward to the participants and urged to refrain from the price decrease competition even though losing order, and about this, the participants decided to grope a method that can stop competition.

---

[35] FST is the abbreviation of Full Square Tube, and means a product that the corner part of Braun tube display is not round but square.

With relevance to the selecting standard of supply line of CDT customer, it is possible to know that the transaction relationship is maintained in the case that the price gap among suppliers is feeble but it can be changed anytime to the lowest supplier in the case that the price gap among suppliers is big. This is confirmed by the "visit report" of Chunghwa Picture Tubes.

---

He requested to all companies to devise a method to improve the current condition and to stop improper competition. LPD agreed and...
**SDI revealed to maintain market with the following price. 17": $55-57, RF: $66-68, 19": $85-88.** Additionally, SDI urged, in order to avoid a situation that is to be fighting each other by customers, to three manufacturers **to agree to a thing that instructs a prohibition of price decrease for obtaining order even though losing order**.

(Evidence Sogap Number 3-110)

---

Visited AOC after the meeting. The employee of AOC said with laugh that if the gap of price is small we can purchase CPT tube more but **if the gap of price is big we of course will purchase from the place that offers the lowest price**. Which executive in charge of purchase is not looking for the lowest price and is to waste money intentionally! Chen Wei of Compal, not giving any commitment, revealed that **every assignment should be done according to the price**.

(Evidence Sogap Number 3-110)

---

□ Multi-party meeting on Dec. 17, 2001

193    It is possible to know that the defendants sympathized on the thing that CDT market is to be deprived by LCD and agreed to increase the price with a joint action among CDT manufacturers, and the guideline of 15", 17", 19" CDT that are to be applied henceforward is listed in the business diary of * * Lee of Samsung SDI, and discussions ('internal price increase') to the price increase of internal transaction is also listed in it. This is confirmed by the "visit report" of Chunghwa Picture Tubes and the information of business diary of * * Lee of Samsung SDI.

---

The price increase of CDT will accelerate the CDT replacement by LCD, and it may be difficult to acquire it. CPT pointed out the fact that there will always be a lack of time without immediate action and said that the price of the LCD had increased 30 dollars and the CDT plants suffered loss with production.

(Evidence Sogap Number 3-111)

---

LPD
-Internal: Price increase of 60% for Philips, 95% LG monitor on Dec. 27
Response to price increase: The price increase depends on our response.

**Price guideline**

| | Market | New guideline |
|---|---|---|
| 15" | 41-42 | **44** |
| 17" | 56-57 | **58** |
| 17" Flat | 64-65 | **67** |
| 19" | 82-84 | **85** |
| 19" Flat | 98 | **100** |
| **Internal price increase** | | (Evidence Sogap Number 4-42) |

□ Multi-party meeting on Dec. 28, 2001

195   In the meeting, the defendants sympathized to the point that the price should be increased according to the price increase of LCD that is the substitutes of CDT, and discussed to the time of price increase. They discussed the price increase to the internal transaction line and agreed also to the level of price application. To put it concretely, LPD informed the fact that notified the price increase to Philips to other participants, and Samsung SDI revealed the plan to increase the supply price for Samsung Electronics in the case that other member companies agree to the price increase. Searching it concretely, the unit price of transaction within group was agreed to decide at the level that is discounted 2.5% than the agreed price, and agreed to the price difference of tube kinds and terms of payment in order to make the agreement of price increase to be performed effectively. This is confirmed by the "visit report" made by Ling-Yun Cheng of Chunghwa Picture Tubes.

The price of LCD increased with 3 times since Oct. and it is scheduled to be increased $10 additionally on the next month. There must be an opportunity to increase the price during the market condition of CDT is in the state of sustainability still. Besides, because newspapers in Taiwan had already reported to the schedule of price increase of CDT, if failed to increase the price this time, the weak point of CDT manufacturers is to be revealed, and finally the wind of sales price decrease is to blow once more.

(Evidence Sogap Number 3-112)

LPD said that **the price increase was a policy that was decided according to the instruction of CEO**, and LPD already **noticed to AOC/Philips that the price is to be increased.**

SDI implied that it is expected that difficulties may follow to the performance of actual increase plan because SEC and other customers do not want to accept the price increase of CDT. However, **if manufacturers are to agree to the price plan, then SDI will perform it at the same time.... All the manufacturers agreed to abide by the following principle of estimated value.**

(2) Principle of CDT estimated value:

(a) Date of effectuation: Feb. 1, 2002

(b) Unit price of CDT:  (Net-back price, excluding rebate)

| Kind of CDT | Unit price | Unit price of transaction within group (Discount of 2.5%) |
|---|---|---|
| 15" MPRII ITC | $44 | $42.9 |
| 17" FST MPRII ITC | $57 | $55.6 |
| 17" Flat TCO ITC | $67 | $65.3 |
| 19" FST TCO ITC | $82 | $80.0 |
| 19" Flat TCO ITC | $98 | $95.6 |

(Evidence Sogap Number 3-112)

**Price difference by tube kind**

| | Non ITC → ITC | MPR II → TCO |
|---|---|---|
| 15" | +1 | -- |
| 17" & 17 Flat | +1.5 | +1 |
| 19" | +2 | +2 |

Terms of payment: Local delivery OA 45 days (end of month), Export delivery: L/C or D/A 60 days
The next top management level meeting will be held at CPT Taoyuan on Jan. 24 12:00.

(Evidence Sogap Number 3-112)

(8) Meeting among competitors in 2002

<Table 24>        Outline of CDT cartel meeting in 2002

| Serial No. | Date of opening | Agreement | Participating company | Evidence data |
|---|---|---|---|---|
| 1 | Jan. 11, 2002 | Confirm whether or not performing the agreed price | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1778 of Evidence Sogap Number 3-113 |
| 2 | Jan. 18, 2002 | Confirm the performance of price increase again | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1788 of Evidence Sogap Number 3-114 |
| 3 | Jan. 23, 2002 | Confirm the performance of price increase, increase of sales price | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1795 of Evidence Sogap Number 3-115 |
| 4 | Jan. 30, 2002 | Agreement of price increase (Apr. $3) | Chunghwa Picture Tubes, LPD | p. 1798 of Evidence Sogap Number 3-116 |
| 5 | Feb. 22, 2002 | Increase of sales price | Chunghwa Picture Tubes, SDI, LPD, Orion | P.1804, p. 1806 of Evidence Sogap Number 3-116-1 p. 1822 of Evidence Sogap Number 3-117 |
| 6 | Mar. 20, 2002 | Increase of sales price targeting Korean customer | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 1826 of Evidence Sogap Number 3-118 |
| 7 | Apr. 22, 2002 | Maintaining the current sales price | Chunghwa Picture Tubes, SDI, LPD, Orion | p. 2971 of Evidence Sogap Number 4-43 |

| 8 | Nov. 28~29, 2002 | Maintaining the current sales price, assignment of market share by customer, penalties in the case of nonperformance | Chunghwa Picture Tubes, SDI, LPD | p. 2974 of Evidence Sogap Number 4-44 p. 314 of Evidence Sogap Number 2-1 |
| 9 | Dec, 2002 | Information exchange, maintaining the system of cooperation | Chunghwa Picture Tubes, SDI, LPD, Orion | Evidence Sogap Number 4-45 |

□ Multi-party meeting on Jan. 11, 2002

195    The defendants confirmed mutually whether or not of the performance of price increase that was agreed just before. In the case of Samsung SDI, informed to the participants to take a step to accept the price increase of Samsung Electronics with rapidity, and there is a fact that confirmed whether or not of performance to the participants of LPD who were succeeded to the price increase in the same condition of internal transaction. This is confirmed by the "visit report" of Chunghwa Picture Tubes.

> SEC cannot accept the increase of CDT price. Therefore, SEC is still facing a condition that the price increase is difficult. Additional discussion shall be held for a rapid acceptance of price increase. Additionally, SDI raised a question to LGE that had obtained the order of Gateway 17" F/19" F with a very low price. How is it possible for LPD to increase the price successfully to LGE.
>
> (Evidence Sogap Number 3-113)

□ Multi-party meeting on Jan. 18, 2002

196    The defendants exchanged the information of the present condition of production and sales and the response of customer, and then promised to perform the plan of price increase that was agreed, and decided to review the information of price increase again on Jan. 23 the same year. This is confirmed by the "visit report" of Chunghwa Picture Tubes.

> (B) Problem of CDT price increase: In spite of the continuous objection of customers to the price increase of CDT, **customers started to understand that such increase is inevitable. With the volition and trust of each CDT manufacturers that are participating in the meeting. The price increase of monitor plant should be progressed without problem this time.** Each manufacturer is to participate in the meeting that is scheduled to be held at SDI Taipei on Jan. 23 a.m. 09:30 and will update the information of price increase and review it.
>
> (Evidence Sogap Number 3-114)

□ Multi-party meeting on Jan. 23, 2002

197    The defendants checked mutually the condition of progress of price increase agreement on Feb., and especially, Samsung SDI made the other participants to confirm the condition of price increase progress for Samsung Electronics. Additionally, decided to increase the price of CDT 3 dollars on Apr. the same year because demand exceeds supply. This is confirmed by the 'report of meeting result' of Chunghwa Picture Tubes.

> (A) The price increase and the present condition of manufacturers on Feb. was reported as the following respectively.
> (a) SDI
> 1. SEC: **SDI revealed that it would follow the result of discussion that increases the price to SEC,** and said that it knows well that all manufacturers are worrying about this issue. Besides, the original estimated value is already higher 60% than the discussed price. (The price within group is discounted 2.5%); **There may be no problem to the price increase.**
> (B) Subject of 2<sup>nd</sup> price increase of CDT:
> **In order to shift the price increase of CDT for monitor plant to customer more efficiently in the situation that demand exceeds supply, it is said that CPT would increase the price one more time on Apr. The first stage is to decide with 3 dollars temporarily.**           (Evidence Sogap Number 3-115)

□ Two-party meeting on Jan. 30, 2002

198      The participants of the meeting discussed to perform the agreement of the previous meeting, and especially confirmed mutually again to the agreement of 'increase of 3 dollars on Apr.' This is confirmed by the "visit report" that was made by Ling-Yun Cheng of Chunghwa Picture Tubes.

> LPD will follow certainly the agreement to the overall price increase. Amid demand shows a strong shape, an opinion that the intention should be a thing that increases the price of the models of a variety of size with 3 dollars respectively on Apr. once more again in promoting the monitor manufacturers to shift the part of price increase of CDT to customers effectively was suggested in the meeting of last week (Jan. 23). LPD said that it agrees to the opinion basically.
>
>                                                        (Evidence Sogap Number 3-116)

□ Multi-party meeting on Feb. 22, 2002

199      It is confirmed that, in the meeting, Samsung SDI discussed with other defendants to the transaction of main customer, and then decided to adjust the sales price of 17" CDT for Samsung Electronics upward 2 dollars. Additionally, agreed to increase the sales price of a certain CDT size 3 dollars respectively on Apr. the same year and decided to do a final decision about whether or not of performance in the next top level meeting. And, decided to hold the next meeting at the office of Seoul LPD on Mar. 20 p.m. 01:30 the same year. And, as the following, the plan of operation stop of production line ("CDT Line Shutdown Plan") that was established to reduce the supply quantity of CDT jointly was suggested by region. With relevance to Korea market, it is confirmed that the plan of production line stop of the plant of Suwon, Pusan, Gumi of member company is reflected. This is confirmed by the "visit report" that was made by Ling-Yun Cheng of Chunghwa Picture Tubes and the data that was distributed at the time of meeting.

SDI shipped 2-3k of 17" high definition flat tube to SEC. Currently SDI has no other customers. **After discussion of manufacturers, SDI agreed to use the estimate value that is higher $2 than the original price of 17" flat tube.**

(Evidence Sogap Number 3-116-1)

CPT said that the price increase of $2 this time was a thing that the monitor manufacturers can shift the part of price increase of CDT to customers. CPT will increase the price of a certain size $3 respectively again on Apr. CPT hopes that manufacturers prepare a base of mutual understanding and to perform according to it. All of SDI/LPD did not object, but CPT hopes to progress through discussion and **can make a final decision at the CEO meeting that is to be held on the next month.**
The next meeting will be held at Seoul LPD on Mar. 20 p.m. 01:30.

(Evidence Sogap Number 3-116-1)

| CDT Line Shutdown Plan | | | | GSM/Feb. '02 | |
| Maker | Total line | Shutdown line | Original plan | Current situation | Remarks |
|---|---|---|---|---|---|
| SDI | 16.5 | 5 | Suwon #4, #5, Busan #6 Malaysia #4 (0.5 line), Suwon #1 (0.4 line) Busan #5 | Suwon #4, #5, Busan #6 Malaysia #4 (0.5 line, Suwon #1 (0.4 lines) Busan #5 | *Suwon #4 (17F) restart in SZ (02, 2Q) *M'sia #4 plan to shut down *Plan to shut down |
| LPD | 19 | 6 | Gumi (G1, G2), Dapon (4 lines) Dapon (1 line), Wales #2 (0.5 lines) Wales #2 (0.5 lines), Lebring 0.5 lines (1 line) | Gumi G1 Dapon 2.5 line (5 lines) Wales 0.5 lines Lebring 0.5 lines (1 line) Hwafei 0.5 lines (1 line) | *LPD T line plan to shut down

*Lebrig (?) *Hwafei plan to shut down |
| Orion | 5 | 1.5 | Mexico 1 line Kumi BSA | MXC 1 LINE Kumi 1 line | |
| CPT | 16 | 5 | CPTT #3, #4 CPTM #2 (0.5 LINES), #7 (0.5 LINES), CPTM #6 CPTM #7 (0.5 LINES), CPTY #1 (0.5 LINES) | CPTT #3/#4, CPTY #1/#2 CPTM #2 (0.5 LINES), #7 (0.5 LINES), #8 (1 LINE) | *CTTT #3/#4 will restart in the end of '02 |

☐ Multi-party meeting on Mar. 20, 2002

200    The defendants checked the present condition of production and sales by standard and the performance condition of price increase that was previously agreed. Samsung SDI imparted the information that 250,000 units among Toshiba's current sales quantity of 300,000 units are supplied to Samsung Electronics to other participants and Toshiba also informed the plan to increase the price 1 dollar for 17" CDT, 0.5 dollars for 15" CDT from Mar. 2002. This is confirmed by the "visit report" of Chunghwa Picture Tubes.

SDI says that the present sales quantity of TSB is 300K and 250K among it is a thing that was supplied to SEC. **TSB also will increase the price of CDT $1.0 for 17", $0.5 for 15" from Mar.**

(Evidence Sogap Number 3-118)

☐ Multi-party meeting on Apr. 22, 2002

201     The defendants agreed to maintain the previously agreed price to the price of 3/4 quarter 2002 after exchanging the information of market condition. Additionally, the fact that to induce Thai CRT to participate in the CRT multi-party meeting and discussed to establish a consultative group for the large CDT price discussion apart from the 3 CDT company of Korea is also confirmed. This is confirmed by the data that Seong Deok Park of Samsung SDI transmitted the meeting result through the office e-mail ("secret").

---

**3. Plan of 3Q price**
**-Each company agrees to the idea that should raise the price, but it seems difficult to increase the price actually. Therefore, the opinion is that maintaining the present price may be the best.**
4. A.O.B
-Controlling Thai-CRT: Induce to participate in the meeting continuously to Thai-CRT
-Request to establish a consultative group that includes Large/FLAT apart from domestic three companies of CRT

(Evidence Sogap Number 4-43)

---

(8) Multi-party meeting on Nov. 28~29, 2002

202     In the meeting, there is a fact that Chunghwa Picture Tubes urged to reduce the production quantity as the agreement because the market share of Samsung SDI 2002 increased, and Mr. Jo of LPD urged to maintain the present price ("Let's keep the price"). Additionally, agreed to set a targeting market share by main customers and to check performance every week or every month, and the staff in charge and manager shall be replaced in the case of not performing the agreed price and to put penalty of a content that other two companies attack the main customer of the member company that does not perform according to the suggestion of LPD. This is confirmed by the business diary and statement that recorded the information of the meeting by * * Song of Samsung SDI.

---

CPT: Only Samsung didn't reduce lines. Only Samsung saw an increase in M/S in '02 against '01.
LPD: Mr. Cho, **"Let's keep the price"**
LPD Proposal
-Negotiate on the target M/S and fix it for important customers
-Review every month or week
**-Penalty: If company cheat the agreed price**
**Person in charge and his/her manager will be dispelled.**
**Other two companies will attack trouble maker's major customers with a low price.**

(Evidence Sogap Number 4-44)

---

> Answer 28-1) "Only Samsung didn't reduce lines" is a thing that listed information that the representative of Chunghwa Picture Tubes referred, and it is a content of discontent that only Samsung SDI is not performing the previous agreement to reduce a production line. "Not fair to CPT" that was recorded in succession is a content that such act of Samsung SDI is not fair in the position of Chunghwa Picture Tubes (CPT) that performed the reduction agreement of production line.
> And, "CPT: Each company sets a reduced share target in troubled customers' is a content that Chunghwa Picture Tubes referred, and its meaning is to reduce sales quantity to customers that maximized negotiating power by comparing the price among CDT suppliers.  (Evidence Sogap Number 2-1)

□ Multi-party meeting on Dec. 26 or 29, 2002

203    The fact that the defendants shared the information of 17", 19" CDT sales quantity by each company from May, 2002 to Dec., 2002, and established the sales plan of 2003 jointly, and on the other hand decided to have more discussion at the meeting of Taiwan working level ("Need more discussion in Taiwan Working Level MTG") is confirmed in the meeting data.

(9) Meeting among competitors 2003

<Table 25>    Outline of CDT cartel meeting[36]

| Serial No. | Date of opening | Agreement | Participated company | Evidence data |
|---|---|---|---|---|
| 1 | Jan. 2, 2003 | Refraining from the price decrease, assignment of market share by each company (Chunghwa Picture Tubes: 25%, LPD: 305, SDI: 34%), prohibition of the option price | Chunghwa Picture Tubes, SDI, LPD (Working level meeting) | p.1839 of Evidence Sogap Number 3-119 |
| 2 | Feb. 2003 | Agreement of market share assignment and checking its performance | Chunghwa Picture Tubes, SDI, LPD | p.1848 of Evidence Sogap Number 3-120 p.2985 of Evidence Sogap Number 4-46 p.2993 of Evidence Sogap Number 4-47 |
| 3 | Mar. 21, 2003 | Agreement of market share assignment and checking its performance | Chunghwa Picture Tubes, SDI, LPD, Orion | p.1857 of Evidence Sogap Number 3-121 |
| 4 | Apr. 29, 2003 | Agreement of production quantity reduction, market share by customer | Chunghwa Picture Tubes, SDI, LPD | p.1863, p.1866 of Evidence Sogap Number 3-122 |
| 5 | May, 2003 | Refraining from the price decrease targeting Korean customer | Chunghwa Picture Tubes, SDI, LPD | p.1871 of Evidence Sogap Number 3-123 |
| 6 | May 20, 2003 | Agreement of market share assignment and checking its performance | Chunghwa Picture Tubes, SDI, LPD | p.3006 of Evidence Sogap Number 4-48 p.318 of Evidence Sogap Number 2-1 |
| 7 | May 30, 2003 | Agreement of market share assignment and checking its performance, surveillance plan of whether or not performing the agreement of production reduction | Chunghwa Picture Tubes, SDI, LPD | p.1884, p.1889, p.1893 of Evidence Sogap Number 3-124 |
| 8 | June 2003 | Agreement of the sales price by Korean customer of 17" CDT | Chunghwa Picture Tubes, SDI, LPD | p.1896 of Evidence Sogap Number 3-125 |
| 9 | June 12, 2003 | Refraining from the price decrease targeting Korean customer | Chunghwa Picture Tubes, SDI, LPD | p.3014, p.3016 of Evidence Sogap Number 4-49 |
| 10 | June 17, 2003 | Agreement of market share assignment and checking its performance, assignment of market share targeting Korean customer, maintaining the difference of sales price among customers of major and small scale | Chunghwa Picture Tubes, SDI, LPD (Top level meeting) | p.1912, p.1915, p.1919 of Evidence Sogap Number 3-126 |
| 11 | July 29, 2003 | Agreement of market share assignment and checking its performance, assignment of market share targeting Korean customer | Chunghwa Picture Tubes, SDI, LPD (Management level meeting) | p.1937, p.1939 of Evidence Sogap Number 3-127 Evidence Sogap Number 4-50 p.1951 of Evidence Sogap Number 3-128 |

---

[36] Hereinafter, in the cartel meeting by year and by month, do not list most of the participated companies and participants separately because only three companies of Chunghwa Picture Tubes, Samsung SDI, LPD, the defendants of this case participated in the meeting and agreed.

| 12 | Aug. 28, 2003 | Agreement of market share assignment, closing of production line | Chunghwa Picture Tubes, SDI, LPD | Evidence Sogap Number 3-129 p.1991, p.1974 of evaluation report p.1997 of Evidence Sogap Number 3-130 |
|---|---|---|---|---|
| 13 | Sep. 24, 2003 | Price difference by detailed specification, refraining from obtaining order with a low price | Chunghwa Picture Tubes, SDI, LPD | p.2036, p.2038 of Evidence Sogap Number 3-131 Evidence Sogap Number 3-132 |
| 14 | Oct., 2003 | Refraining from the price decrease targeting Korean customer, price difference by detailed specification | Chunghwa Picture Tubes, SDI, LPD | Evidence Sogap Number 3-133 p.2077, p.2079 of evaluation report |
| 15 | Oct. 28, 2003 | Agreement of market share assignment and checking its performance | Chunghwa Picture Tubes, SDI, LPD (Top level meeting) | p.356 of Evidence Sogap Number 2-2 Evidence Sogap Number 4-51~3 Evidence Sogap Number 3-134 |
| 16 | Nov. 12,, 2003 | Agreement of market share assignment and checking its performance, closing of production line | Chunghwa Picture Tubes, SDI, LPD | p.2100 of Evidence Sogap Number 3-135 |
| 17 | Nov. 26~27, 2003 | Sales price by major customer, including Korean customer | Chunghwa Picture Tubes, SDI, LPD | Evidence Sogap Number 3-136 p.2123 of Evidence Sogap Number 3-137 |
| 18 | Dec. 2, 2003 | The whole world market and market share by customer | Chunghwa Picture Tubes, SDI, LPD | p.2125, p.2127, p.2128 of Evidence Sogap Number 3-138 |

□ Multi-party meeting on Jan. 2, 2003

204   The defendants agreed to improve the rate of return by taking action jointly against the request of monitor companies' price decrease after exchanging the information of rate of return of each company. Additionally, assigned market share on the basis of the information of sales quantity of each company 2002, and decided the sales quantity by applying market share that was assigned to the total demand quantity of CDT in the whole world 2003 that was expected according to it.

205   And, the fact that the defendants agreed to the lowest price to the main customer unanimously, and that the defendants decided to maintain the agreed price to the request of customer's price decrease for the achievement of yearly profit target is confirmed. This is confirmed by the report of meeting result of Chunghwa Picture Tubes that has the title of "CDT market analysis."

With comparison to the situation that the monitor manufacturers of downward industry part are still getting a considerable profit in the production of CRT monitor (For example, the business profit of AOC is about USD 40M in 2002), the sales of CDT is facing loss. This is harmful to the business circles extremely. **Henceforward, can it be possible that how 3 manufacturers show their earnestness mutually, and remove the extreme price competition and resist jointly to the price decrease of PC brand manufacturers and monitor OEM manufacturers. Getting profit as a business target is the focal point of our cooperation henceforward.**          (Evidence Sogap Number 3-119)

The market share of 3 manufacturers is to be 28%, 32%, 24% respectively, in the case that the total quantity of CDT in the whole world this year is 82.5M, after classifying the data of real delivery of several manufacturers with 23.2M for LPD, 26.2M for SDI (Excluding 21"), in spite of the response by CPT in the meeting that there is a difference between the real result of the total sales quantity of each manufacturer 2002 and the numerical value that was reported at the CEO meeting on Nov. Additionally, **according to the resolution of CEO, sales is to be reduced 7% respectively in 2003**, and LPD is to be 21.5M, SDI is to be 24.4M, CPT is to be 18.2M, and among it, the total quantity of CPT in 2003 will be low 400K than the quantity that was decided by CEO. Therefore, it was suggested that the total system must be changed. However, LPD/SDI argued that it must follow the criteria that CEO had decided on Nov., and the result was not changed. **This means that market share of each manufacturer of the next year is to be 25% for CPT, 30% for LPD, 34% for SDI**.

(Evidence Sogap Number 3-119)

Each manufacturer, openly between each other, **came to an agreement unanimously about the level of lowest price to the main customer.**
Assuming that the goal of 3 manufacturers is getting profit, the attitude of them is firm very much to the customer's price decrease request. **All of them must keep their own price, and have the same interest that should not have an option price more to each customer.**
**3 manufacturers must keep the price together in order to achieve the yearly profit goal of each manufacturer.**

(Evidence Sogap Number 3-119)

□ Multi-party meeting during Feb. 2003

206    In the meeting, according to the following data of sales result of Samsung SDI, Samsung Electronics, LG Electronics, Hansol Electronics, Hyundai Electronics, Korean monitor manufacturer are included in the 12 big customers, it is possible to know that it is a main target of collusion through a cartel meeting from it.

3. Sales result by customer  (Suggestion)

(Unit: 1,000)

|  |  | 2002 | | | | | 2003 | |
|---|---|---|---|---|---|---|---|---|
|  |  | 1Q | 1Q | 3Q | 4Q | Total | Jan. | Feb. |
| 12 big customers | AOC | 186 | 188 | 203 | 230 | 307 | 65 | 45 |
|  | BenQ | 248 | 155 | 151 | 146 | 700 | 23 | 22 |
|  | Compal | 151 | 108 | 132 | 201 | 592 | 49 | 46 |
|  | Delta | 328 | 118 | 182 | 232 | 860 | 34 | 65 |
|  | Lite-On | 184 | 102 | 146 | 92 | 524 | 68 | 20 |
|  | Philips | 310 | 265 | 460 | 116 | 1,151 | 46 | 30 |
|  | Proview | 658 | 1,010 | 1,077 | 972 | 3,717 | 305 | 325 |
|  | Tatung | 33 | 14 | 28 | 22 | 97 | 10 | 6 |
|  | SEC | 3,373 | 3,269 | 3,343 | 3,816 | 13,801 | 1,107 | 1,080 |
|  | LGE | 28 | 31 | - | 15 | 72 | - | - |
|  | Hansol | 104 | 85 | 85 | 85 | 359 | 35 | 27 |
|  | Hyundai | 207 | 141 | 186 | 209 | 823 | 52 | 50 |
|  | Total | 5,808 | 5,406 | 5,993 | 5,216 | 23,503 | 1,794 | 1,716 |
| S customer | | 516 | 405 | 468 | 598 | 1,987 | 165 | 147 |
| Other companies | | 159 | 161 | 143 | 313 | 777 | 49 | 40 |
| G. total | | 6,483 | 6,052 | 6,604 | 7,128 | 26,257 | 2,008 | 1,905 |

Note) Detailed breakdown by customer/model is annexed

Moreover, we know the fact that the participants of Samsung SDI had decided to instruct to the internal employees not to sell at lower price to Korean customers.

We also know that since 2003, the defendants of this case had assigned the worldwide market share based upon the sales data, and during the year of 2003, they checked out each other if there were any occurrences of differences between the monthly sales and the agreed market shares by each company. This has been confirmed by "Meeting Preparation Data" of Samsung SDI and the result report of "CDT Market Review" by CPT (Chunghwa Picture Tubes Ltd).

Additionally, **Samsung had instructed to its internal employees arbitrarily not to sell bare tubes to the domestic customers or offer the estimate at lower prices.**     (Evidence *Sogap* number 3-230)

| | Agreed M/S | | | | | Actual | | | |
|---|---|---|---|---|---|---|---|---|---|
| | '02 | (M/S) | Real | '03 | (M/S) | '03.Jan | | Feb | |
| CPT | 19.2 | 28% | 19.5 | 17.8 | 28% | 1.4 | 26% | 1.0 | 22% |
| LPD | 23.3 | 34% | 23.2 | 21.7 | 34% | 1.9 | 36% | 1.7 | 37% |
| SDI | 26.3 | 38% | 26 | 24.4 | 38% | 2 | 38% | 1.9 | 41% |
| Total | 68.8 | 100% | 68.7 | 63.9 | 100% | 5.3 | 100% | 4.6 | 100% |

(Evidence *Sogap* 4-47)

Multi-party meeting on March 21, 2003

207     In this meeting, it is a fact that each company had coordinated the sales information on 14", 15", 17", and 19" CDTs, and they confirmed if the worldwide market share by each company had been enforced, which was agreed based upon the sales of the year of 2002. It is also true that they checked out each other if they enforced the agreed matters. This is confirmed by the meeting data, which were distributed to the participating companies before the meeting was held.

| | Agreed M/S | | | | | Actual | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | '02 | (M/S) | Real | '03 | (M/S) | '03.Jan | | '03.Feb | | '03.Mar | |
| CPT | 19.2 | 28% | 19.5 | 17.8 | 28% | 1.4 | 26% | 1.1 | 23% | 1.4 | 27% |
| LPD | 23.3 | 34% | 23.2 | 21.7 | 34% | 1.9 | 36% | 1.7 | 36% | 1.7 | 33% |
| SDI | 26.3 | 38% | 26 | 24.4 | 38% | 2 | 38% | 1.9 | 40% | 2.1 | 40% |
| Total | 68.8 | 100% | 68.7 | 63.9 | 100% | 5.3 | 100% | 4.7 | 100% | 5.2 | 100% |

(Evidence *Sogap* 3-121)

Multi-party meeting on April 29, 2003

208     After the defendants had made and exchanged the sales result table of each company, they had modified 72 million CDTs (Color Display Tubes) to 68 million CDTs, which were agreed upon by CEO's of each company in November 2002 regarding on the worldwide CDT demands. They also agreed to cut the production lines and the days operated in order to meet the supply. Moreover, they had checked whether they were abided by till the first quarter of 2003 before the meeting with the table of market share of each company (CPT 28%, LPD 34%, Samsung 38%), which was agreed to apply in 2003.

The included Korean customers among those major 12 companies are Samsung Electronics Co. Ltd. (SEC), LG Electronics Co. Ltd. (LGE), Hansol Electronics Inc, and Hyundai Electronics Industries Co. Ltd., and it has been confirmed that there was a formation of understanding that they do not violate each other with the major customers by each company in the checked-up contents on whether the share per each client company was enforced, which was agreed upon in the CEO meeting. This has been confirmed by the meeting data, which was recorded as the meeting held date ("04/29/2003") and "confidential" in CPT.

---

03 CMT demand lower than previous estimation: 72M (Nov. 2002 CED)→ 68M
Suggestion:
  ☐ Reduction of each maker's sales target to match the reality:
  ■ **Reduce 7% of CEO decision  (Reduce 7% of CEO decision)**
  ☐ 3 Makers Supply Control:  (Makers supply control)
  ■ **Shutdown 0.5 or 1 line in 2H 03  (Shutdown 0.5 or 1 line in 2H 03)**
  ■ **Decrease working day  (Decrease working day)**

(Evidence *Sogap* 3-122)

---

**M/S by CEO MTG Decision**  (NOTE: Edited Korean customers in the center)

|      | SEC | LGE | HANSOL | HYUNDAI |
|------|-----|-----|--------|---------|
| CPT  | 8%  | -   | -      | -       |
| LPD  | 5%  | 92% | 60%    | 20%     |
| SDI  | 80% | 4%  | 20%    | 30%     |

**20030I CDT M/S** (based on CDT shipment)

|      | SEC   | LGE   | HANSOL | HYUNDAI |
|------|-------|-------|--------|---------|
| CPT  | 0.7%  | 0%    | 0%     | 0%      |
| LPD  | 0%    | 96.7% | 49.4%  | 20.8%   |
| SDI  | 84.8% | 0.8%  | 19.7%  | 49.9%   |

Multi-party meeting during May

*209*  In this meeting they mutually exchanged information on the markdown requests of their customers, thus the fact has been confirmed that Samsung SDI had declined the request for lower price supply of SEC in order to avoid short revenues. This can be confirmed by the result report under the title "CDT market review" of CPT.

---

SDI mentioned that SEC had made inquiries on the willingness of acceptance for lower price orders. SDI had declined the SEC's request due to the fact that 17" FST had no comfortable production capability and Korea was not acquiring profits from the production of regular tubes. If SDI had accepted the lower price, for instance, $40 USD (at the current level, $46 ~ $47 USD were offered as estimates), SDI would have shut down earlier than that of the production lines as well as a lot more losses. (Evidence *Sogap* 3-123)

---

Multi-party meeting on May 20, 2003

*210*   The defendants had confirmed the assigned market share to each company in 2003, and they checked out if they were abided by the agreement based upon the sales result values of May of the same year. They held the next meeting on May 27 of the same year, and assured the restriction plan for production in the next meeting. They also decided to discuss on revealing the price and quantity information in a transparent fashion, and organizing to conduct surveillance on deviation of the agreement. This can be confirmed by business handbook and statement of Mr. ▽▽ Song of Samsung SDI.

| * Quantity of May | | | | | |
|---|---|---|---|---|---|
| | Quantity | M/S(%) | Agreed M/S (Agreed Market Share) | | |
| SDI | 1.68 | 38.6 | 38.2% | +0.4% | |
| LPD | 1.40 | 32.1 | 34% | -1.9% | |
| CPT | 1.27 | 29.1 | 27.9% | +1.2% | |
| | | | | | (Evidence *Sogap* 4-48) |

| * Tuesday of Next Week MTG    5/27 09:00 |
|---|
| 1) **June capacity reduction confirmation  (June capacity reduction confirmation)** |
| 2) Price/quantity record open under sun  (Price/quantity record open under sun) |
| 3) Committee |
| □Financial person check □retired people  □ Making a policing organization |
| (Evidence *Sogap* 4-48) |

| Answer 35) Next, CPT had informed in advance regarding on the meeting topic of next Tuesday 1) June capacity reduction confirmation" was the content for confirming whether the contents of production reduction agreement were executed; 2) "Price/quantity record open under sun" was the contents of revealing in a more transparent fashion than the revealing price/quantity by each participant in the same meeting. Finally, 3) □"Financial person check" was presenting the scheme to guide employees in financial affairs division to reveal more accurate information by making them to confirm mutually and "Making a policing organization" was the contents discussed as one of the schemes, which guarantee *reliably in terms of the enforcement of the agreed contents.* |
|---|
| (Evidence *Sogap* 2-1) |

□ Multi-party meeting on May 30, 2003

*211* This meeting was proceeded in the order of "sales updates of the three companies -> the market share by the group members between January and May in 2001 -> prediction on monitor demands ->discussion on the meeting results of working group from Taiwan -> suspension plan of production lines -> *other matters." While they were doing so, the defendants had compared the values of sales results* between January and May in order to confirm whether the market shares were abided by, which were agreed upon in 2003. Based upon those results, it was confirmed that CPT had decreased to 1.2%, in case of LPD, the decrease was 0.1%, and Samsung had 1.4% of increase. Moreover, the defendants had agreed upon to assign the market shares by the 12 major CDT customers including SEC, LGE, Hansol Electronics Inc, and Hyundai Electronics Industries Co. Ltd., and

Henceforth, the persons who were in charge of financial affairs of each company had proceeded the auditing, and consolidated the production regulation determining the price tags to assure. This can be confirmed by meeting data reported as held date ("05-30/2003") and "confidential" at that time of the meeting.

| | Agreed M/S | | | | | Actual | | |
|---|---|---|---|---|---|---|---|---|
| | '02 | (M/S) | Real | '03 | (M/S) | Jan~May | | M/S Diff. |
| CPT | 19.2 | 28% | 19.5 | 17.8 | 28% | 6.5 | 27% | -1.2% |
| LPD | 23.3 | 34% | 23.2 | 21.7 | 34% | 8.3 | 34% | -0.1% |
| SDI | 26.3 | 38% | 26 | 24.4 | 38% | 9.7 | 40% | 1.4% |
| Total | 68.8 | 100% | 68.7 | 63.9 | 100% | 24.5 | 100% | |

| |
|---|
| Further Discussion<br>- Policy to made:<br>a)  Audit (audit): suggested by Financial personnel in each company<br>b)  Capacity control (capacity control)<br>c)  Settle price matrix (settle price matrix)                                              (Evidence *Sogap* 3-124) |

212    The defendants as they had discussed in the previous meeting, had adjusted by decreasing the sales target in 2003, which was targeted at the outset, reflecting the reality. Hence, they agreed upon to shut down the production lines or cut down the days operated. According to the specific "shutdown plan," it has been confirmed that Samsung SDI had submitted the plan for shutting down 2 of Korean production lines during June in 2003. Finally, the next multi-party meeting by Top management will be held on June 17 in Malaysia, in this meeting, they decided to discuss matters such as the production suspension plan, audit method, and market share finalization.

| |
|---|
| SDI: Jun. 2003 Korea: 2-line<br>TOP Meeting (TOP Meeting) – 17th. June in Malaysia<br>Issues to decide:<br>  a. Shut-down Plan (Shut-down Plan)<br>  b. Audit Method (Audit Method) c. Market Share Finalize (Market Share Finalize)<br>                                                                                      (Evidence *Sogap* 3-124) |

☐ Multi-party meeting during June, 2003

213    The defendants had agreed to adjust the market share by each company in the CDT market, which was agreed upon at the early 2003, partly reflecting the reality. It has also been confirmed that they agreed upon reflecting the modified values with the shares of each of 12 customers agreeing to maintain the June price fundamentally relating to the July price of the same year, and targeting to maintain the existing market shares, they agreed the prices specifically on the major supply lines.

They also agreed upon to increase the price as much $0.5 USD on the secondary supply line. This can be confirmed by the "CDT market report" of Chunghwa PT.

○ The price was maintained as the June price fundamentally. **The prices on the major suppliers were assured, and to the secondary suppliers, it was maintained by adding $0.5 USD. This is for the purpose of strengthening the existing market shares.**

○ The negotiated prices of each manufacturer in July are as follows.[NOTE: Edited for Korean customers in the center]

- 17" FST

| Customer | Type | CPT | LPD | SDI |
|----------|------|-----|-----|-----|
| SEC | MPR, ITC | | | ? |
| | TCO, ITC | | | ? |
| LGE | MPR, ITC | | 47 | |

- 17" Flat

| Customer | Type | CPT | LPD | SDI |
|----------|------|-----|-----|-----|
| SEC | MPR, ITC | | | ? |
| | TCO, ITC | | | ? |
| | HBT, ITC | | | ? |
| LGE | TCO, ITC | 54.0 | 54.0 | |
| Hansol | 85K, TCO, ITC | | 53.5 | 55.0 |
| Hyundai | MPR, ITC | | 53.5 | 54.0 |

(Evidence *Sogap* 3-125)

☐ Multi-party meeting on June 12, 2003

*214*   The defendants had exchanged the related information on the sales and the prices, and the customers' responses by each customer, and in particular, Samsung SDI relating to the Korean demand vendor, SEC and the participants of CPT had discussed mutually and decided to propose the prices. Moreover, in case of LPD supplied by SEC, there was a danger of the agreed price for SEC being collapsed. Thus, they discussed to refrain from the supplying. Moreover, relating to the general prices, Tony Cheng of CPT had proposed his opinion that at the time of price increase, it should start from the customers with smaller market shares and on the other hand, at the time of price decrease, it should begin from the customers with larger market shares. The defendants proposed the opinion if the price difference was set as $0.2 USD between the major and small scale customers, it would be adequate. This can be confirmed in the recorded contents in the business handbook of Mr. ▽▽ Song of Samsung SDI.

○SEC
- CPT: First, we will go setting the price with SDI in SEC. – Do not come LPD. SEC is tricky. There is a danger of price collapse.

(Evidence *Sogap* 4-49)

* The price increase can start from smaller M/S, and the price decrease should be done in a bigger M/S, then M/S can be adjusted. (Tony Cheng's opinion)
O How are we going to do with the price differences?
- It is reasonable to set the price differences as <u>$0.20</u> between major and minor ones.

<div align="right">(Evidence <em>Sogap</em> 4-49)</div>

☐ Multi-party meeting on June 17

215  This meeting was the TOP management meeting, which was attended by the persons in charge of CDT sales, and the defendants had confirmed the market share differences reflected the actual sales between January and June during the same year with the assigned market share by each company in 2003. CPT had decided to shut down the production lines in Malaysia regarding on the shut-down of the each production line during the third quarter of the same year, and Samsung SDI decided to shut down the production line of Korean Plant. Consequentially, they had predicted that the excessive supply of CDT products in the second half of the year of 2003 would be reduced. Moreover, relating to the agreement on the market share by the 12 major customer companies, they agreed upon to follow the principle of the agreed results among the TOP management and they also made the market share possible by the supply company to adjust.

Capacity in 2nd half after line shutdown
- Total supply 34.3M > demand 32.5M
Principle: Obey the agreement of TOP management decision  (Principle: Obey the agreement of TOP management decision)
(1) Global M/S → CPT:LPD:SDI = 27.8%:34%:38.2%
(2) <u>M/S in individual customer is revisable.</u>

<div align="right">(Evidence <em>Sogap</em> 4-49)</div>

216   Moreover, the defendants had submitted the opinions of each company regarding on the assignment of the market shares by each customer company. We can see that this had made the suppliers simplified on one customer company ("simplify suppliers in one customer") to avoid from competition. After they did coordinate the opinions of each company, five customer companies including SEC and LGE, etc. with the occurrence of different views, they agreed upon the supply ratio by each company after they did tuning the opinions. According to the results, in case of SEC, Samsung SDI would supply 80%, and CPT would do that with 10%, 3% by LPD, in case of LGE, LPD was 96%, and Samsung SDI decided to supply 2%. The defendants empathized that it was necessary to have the differences of market shares between the main force company and small scale supplier for price stability; therefore, they decided to put differences of minimum $0.5 USD. This is confirmed in the meeting data of CPT.

| Y2003 (Kpc/m) | Original TTL Prod | M/S (%) CPT | LPD | SDI | Qty CPT | LPD | SDI | Revised TTL Prod |
|---|---|---|---|---|---|---|---|---|
| AOC | 11000 | 60% | 30% | 5% | 6600 | 3300 | 550 | 10300 |
| BenQ | 2200 | 66% | 17% | 17% | 1452 | 374 | 374 | 1625 |
| Compal | 2000 | 28% | 48% | 23% | 500 | 960 | 460 | 1500 |
| Delta | 1500 | 0% | 50% | 10% | 0 | 750 | 600 | 1300 |
| Lite-On | 2900 | 92.5% | 0% | 7.5% | 2683 | 0 | 218 | 3500 |
| Philips | 7700 | 18% | 74% | 0% | 1386 | 5698 | 0 | 6750 |
| Proview | 4500 | 0% | 0% | 95% | 0 | 0 | 4275 | 4100 |
| Tatung | 1700 | 95% | 0% | 5% | 1616 | 0 | 85 | 1100 |
| Samsung | 16000 | 8% | 5% | 80% | 1280 | 800 | 12800 | 16300 |
| LGE | 8300 | 0% | 92% | 4% | 0 | 7636 | 332 | 9000 |
| Hansol | 1000 | 0% | 60% | 20% | 0 | 600 | 200 | 700 |
| Hyundai | 1000 | 0% | 20% | 30% | 0 | 200 | 300 | 1000 |
| 12 Total | 59800 | | | | 15576 | 20318 | 20194 | 56175 |
| Others | 12200 | | | | | | | |
| Overall | 72000 | | | | 15576 | 20318 | 20194 | 56175 |
| M/S in 12 | | | | | 26.0% | 34.0% | 33.8% | |

Concept: (1) to simplify suppliers in one customer  (to simplify suppliers in one customer)
(2) Major with high portion (above 80%), minor with low portion (below 20%)
(3) less noise & price trouble  (less noise & price trouble)                    (Evidence *Sogap* 3-126)

-In order to have stable price it is necessary to have big difference of share and reasonable price gap between major and minor suppliers
-At least US$0.5 price gap between Major & minor supplier.  (At least US$0.5 price gap between Major & minor supplier)                                                    (Evidence *Sogap* 3-126)

☐ Multi-party meeting on June 29, 2003

*211*  The defendants had exchanged the related information to the sales status and operation status of production lines, and they discussed the necessity of consolidating the regulation of the market shares. In particular, in case of the defendants supplying at a lower price than an agreed price on one customer, we can see the structure, which can be influenced by the entire CDT market prices. That is, CPT said they would supply at a lower price to LGE and Phillips on the fact that LPD had supplied at a lower price on Compal. There is also the fact that SEC had cited the price for Compal, and they pressured on the price decrease of Samsung SDI.

UPD had insisted that the estimation offered to the HP project by Compal was $40.5 USD. If we all considered the price gap among ITC, Glare/Mpr2, and canceling coil, the above price is not at the level of massively low level than that of the current market prices. CPT insisted that glare (in terms of price cut) should be considered only as $2.0 USD. They criticized that canceling coil should not be used as the cause of price cut and that point was a debated matter at numerous times already. The calculated price by this method is at the comparable level to that of AOC at $44.0 USD. **If this is the market price, CPT will propose the above price as an estimate to LGE/PHS.** SDI also showed their quite discomfort on this, and it had been criticized for a long time for this in Korea. Perhaps, **it seems like SEC had used the Compal price to receive the equal treatment from SDI.** After all, LPD made clear that they would try to increase the price, and report it hereafter again.

(Evidence *Sogap* 3-127)

*218*  Moreover, relating to the sales for SEC, Samsung SDI let the participants of CPT know that Toshiba did appreciate for the smooth supply on SEC resulted from the price support by CPT.

Moreover, regarding on the 7% upward adjustment of sales market price for SEC by CPT, they agreed to achieve the 7% market share in the next meeting at the working level.

> TSB will continue to produce through September. For SEC supply, it will be continued during December. Hence, **we appreciate for having the smooth supply to SEC by the price support of CPT**. Relating to the market share request of 7% by CPT, in the next meeting at the working level; we will propose the plans to determine the assignment by plant and model to let CPT achieve the market share of 7%.
>
> (Evidence *Sogap* 3-127)

*219* Also, the defendants had agreed upon CPT to shut down one line of plant located in Malaysia, and Samsung SDI to do so with one production line of plant located in Korea till the third quarter of 2003. Moreover, it is a fact that they agreed upon the market shares by each major customer company at the second half of 2003.

2H '03 M/S Adjustment (finalized by TPE Working Level MTG)

| M/S% | CPT | LPD | SDI | Others | Total |
|---|---|---|---|---|---|
| SEC | 7% | 3% | 82% | 8% | 100% |
| LGE | - | 96% | 2% | 2% | 100% |
| Hyundai | - | 20% | 50% | 30% | 100% |
| Hansol | - | 40% | 20% | 40% | 100% |
| 2H  Total | 9.7M(28.7%) | 11.5M(34.1%) | 12.6M(37.3%) | 3.6M | 37.4M |

*220* This meeting was a CDT multi-party meeting at the management level, which was held in Samsung SDI office in Seoul, and attended by Chun Cheng Ye from CPT, and employees in charge of CDT sales-marketing of Mr. ▽▽ Lee from Samsung SDI. This can be confirmed by the "CDT market report" of CPT, and business handbook of Mr. ▽▽ Lee of Samsung SDI, and the distributed data at that time of the meeting.

☐ Multi-party meeting on August 28, 2003

*221* In this meeting, resulted from checking out if it was executed in terms of the market shares by each company agreed upon at the second half of 2003  (Samsung SDI 37.3%, LPD 34.1%, CPT 28.7%), the participants had agreed upon to add or subtract the market shares reflecting the amount of materials, which was not meet or exceeded portion, relating to the sales plan in 2004 on the facts that Samsung SDI had exceeded 0.5%, and LPD and CPT had the shortages of 0.1% and 0.4%, respectively. Moreover, the defendants had decided to assign the sales of each company to adapt the predicted 2004's demands based upon the market survey institutions and the market analysis data of each company, and

they agreed upon the shut-down schedule during the 3rd quarter of 2003. Relating to the same shut-down schedule of the production lines, we can see that Samsung SDI decided to continually apply pressure to decide upon the shut-down schedule of LPD production lines.

| M; % | Sales target | 2003 | | Sales plan for 2004 — sales target + 2003' gap failing to achieve the target |
|---|---|---|---|---|
| | | Achievable quantity | gap | |
| CPT (27.8%) | 16.8 | X | A=X-16.8 | 14.5 + A |
| LPD (34.0%) | 20.6 | Y | B=Y-20.6 | 17.7 + B |
| SDI (38.2%) | 23.1 | Z | C=Z-23.1 | 19.9 + C |
| Others | 6.5 | | | 2 |
| Total | | | | 54 |

(Evidence *Sogap* 3-129)

| Company | '02.End | '03.Mar | | '03.Jun | | 03.30 | | Capa: |
|---|---|---|---|---|---|---|---|---|
| | | Lines# | Shutdown Line | Lines# | Shutdown Line | Lines# | Shutdown Line | Per line |
| CPT | 11 | 10 | Taiwan: 1Line | 9 | Malaysia: 1Line | 8.0 | Malaysia: 1Line | 200K/m |
| LPD | 11.5 | 11.5 | | 10.5 | Huafei: 1Line Wales: 1Line Changsa:+1Line | 9.5 | ? | 200K/m |
| SDI | 11.5 | 11.5 | | 9.5 | Korea: 1Line | 8.5 | Korea: 1Line | 240K/m |
| Total | 34 | 33 | | 29 | | 26 | | |

It is difficult to deal with the line shut-down schedule of LPD in Hwafei due to the fact that there has been the exchange of opinions between internal divisions, although the LG group, PH group, and the venture partner in the actual place in Mainland China were all related. SDI will continually put pressure on them.                                                                (Evidence *Sogap* 3-130)

☐ Multi-party meeting on September 24, 2003

*222*    In this meeting, the participants from LPD had informed other participants that they would determine the sales price of 17" CDT in accordance with the agreed rules in the previous meeting, and they also agreed upon the price difference by detailed items of 17" CDT products. Furthermore, the defendants decided to share the information related to the precedent supply at the lower price breaking away from the agreed items of understanding, and refrain from the lower orders, which cause confusion of market price.

⊕ PD had explained that the 17″ regular tube had been developed, and the amount of cost reduction was approximately $3.00 USD (DY said that it was approximately $1.00 USD). They can enter into mass production in October. <u>The proposed price will follow the rules agreed on in the previous meeting</u>, and this is only $1.00 USD lower than the price of old model.

⊕ <u>The price difference between ITC and N-ITC[37]</u>: <u>LPD had proposed to decrease from at the outset of $1.50 USD to $0.50 USD in terms of the price gap between 17″ ITC and N-ITC.</u> However, the sudden decrease of the $1.00 USD gap could be the actual price increase to the customers; therefore, would there be any difficulty in implementation? **SDI did hint that this may be successful if we notify the customers regarding the US SI increase.** <u>It was decided to start the run.</u>

(Evidence *Sogap* 3-131)

---

Lastly, **the Chairman of the meeting pressed everyone <u>not to try to secure at the scene of the OEM orders, and they said that this kind of behavior would give rise to the confusion of the market prices.</u>**

(Evidence *Sogap* 3-131)

☐ Multi-party meetings around October, 2003

*223*    In this meeting, Samsung SDI had been concerned that the behavior of CPT supplying at lower prices to SEC could have effects on the pressure of price cuts in their company, and CPT had promised not to break away from the agreed on prices regarding this. Furthermore, they had judged that the price differences, which can occur following the detailed specification of CDP products, could obstruct the execution of the agreed prices; therefore, we can see the fact that they decided to allot the prices as a collaboration regarding the detailed price difference by agreeing to make a table of price differences by detailed specification. It was agreed that the next meeting would be the meeting of TOP management on November 26 under the supervision of LPD in Korea.

---

SDI is very concerned with the matter of agreed prices and the delivery of goods by SEC and CPT on the 17″ FS N-ITC. SDI and SEC have been in transactions of ITC tubes only; therefore, <u>if the ITC price becomes cut to $0.50 USD lower than that of the standard price on SEC by CPT, there is no doubt that this is another tactic for the price cut to SEC. As a result, because it could have an effect on the sales price of SDI by SEC,</u> CPT requests strongly not to adjust to $0.50 USD with the price difference to SEC or make the delivery of goods of N-ITC. Our reply was that we could follow the resolution of the meeting, and <u>we had already replied verbally that the $1.50 USD difference will be decreased to $0.50 USD. We also guaranteed that it would not break away from the agreed on price.</u>

(Evidence *Sogap* 3-133)

---

[37] ITC means that it is a product of complete adjustment in terms of its purity and convergence to make the quality of Braun Tube as in optimal condition, and in the case of N-ITC, it means that it has not been adjusted to the ITC condition.

| Item | | Current Price Standard | New Price Standard | Note |
|---|---|---|---|---|
| TCO -> MPR2 (TCO standard) | 15" | 0 | 0 | |
| | 17" | -1 | -0.5 | |
| | 17"F | -1 | -0.5 | |
| | 19" | -2 | -1 | |
| | 19"F | -2 | -1 | |
| MPR2 -> glazing/non-reflective (MPR2 standard) | 15" | -2 | -1/0.5 | |
| | 17" | -2 ~3 | -1/0.5 | |
| | 17"F | -2 ~3 | -1/0.5 | |
| ITC -> N-ITC (ITC standard) | 15" | -1 | -0.5 | |
| | 17"/F | -1.5 | -1 | Besides SEC – 0.5 |
| | 19"/F | -2 | -1.5 | |
| Frequency | 15" (48K -> 57K) | +1 | +1 | |
| | 19"/F (95K -> 85K) | -2 ~3 | -1.5 | |

III. TOP meeting
  - Time: The meeting will be held in the afternoon of November 26th, and golf will be played in the morning of November 27th.
- Location: Jeju Island, Korea
- LPD will host the meeting
Main agenda:
A. **To determine the worldwide market shares in 2004 regarding the 3 companies and manufacturers for individual major monitors. (SEC/LG)/ADC/PHS/EMC, etc.) percent.**
B. **The market demand situations and plans for enforcing the production line suspension.**

<div align="right">(Evidence <em>Sogap</em> 3-133)</div>

☐ Multi-party meeting on October 28, 2003

*224*      The defendants had checked out by making a table if the agreed market shares were well implemented, which were agreed upon by each company at the 2nd half of 2003, and they also agreed upon the option prices by detailed specifications. Relating to the worldwide market scale in 2004, they agreed upon 54 million, and they decided to discuss this by taking the submission of the market shares (proposals) by the customer until the next meeting regarding the 51 million besides the remaining 3 million of customers' demands, with the exception of the 12 major customers. They also decided to hold the next TOP multi-party meeting in Jeju Island on November 26 of the same year. This can be confirmed by the meeting materials of CPT and Samsung SDI, the business handbook and statement of Mr. ∇∇ Lee of Samsung SDI, and "The result report of the CDT Glass Meeting."

Reply 53) In the same meeting, they checked on how well they had been monitoring the market shares in 2003 (SDI: 24.4%, LPD: 21.7%, CPT: 17.8%) agreed upon by each company. Furthermore, in the same meeting, the participants discussed the option prices, and they then consulted to show the effects of the increased prices by decreasing the price gap according to coating, voting yes or no on DY attachment, and frequency, etc.

<div align="right">(Evidence <em>Sogap</em> 2-2)</div>

☐ Multi-party meeting on November 12, 2003

*225*   The defendants discussed 'the present sales conditions by each company in 2003 -> pre-estimate of worldwide CDT demands -> quota simulations of the market shares -> shut-down schedules for production lines,' and decided upon the market shares in 2004 as Samsung SDI 37.7%, LPD 34.0%, and CPT 28.3% after reflecting the actual sales as standards Samsung SDI 38.2%, LPD 34.0%, and CPT 27.8% relating to specifically the market share quota in 2004. They also agreed upon the line shut-down schedule for production lines in 2004 in order to dissolve the excessive demands fitting to the predicted demands of the markets. This can be confirmed by the distributed data at the time of the meeting.

|  | Sales | Original Target | M/S | Reflect of Reality | M/S | Plan | M/S |
|---|---|---|---|---|---|---|---|
| Mpcs;% | Y2002 | Y2003 |  | Y2003 |  | Y2004 |  |
| CPT | 19.2 | 17.8 | 27.8 | 16.5 | 27.1 | 15.0 | 28.3 |
| LPD | 23.3 | 21.7 | 34.0 | 20.6 | 33.8 | 18.0 | 34.0 |
| SDI | 26.3 | 24.4 | 38.2 | 23.8 | 39.1 | 20.0 | 37.7 |
| 3sub-ttl | 68.8 | 63.9 | 100 | 60.9 | 100 | 53.0 | 100 |
| Others | 15.0 | 8.0 |  | 5.7 |  | 3.0 |  |
| Grand-ttl | 82.0 | 72.0 |  | 66.6 |  | 56.0 |  |

(Evidence *Sogap* 3-135)

☐ Multi-party meeting between November 26th and 27th, 2003

*226*   In this meeting, they discussed the quota of market shares to the major customer companies (SEC, AOC, BenQ, and Compal, etc.), which could not be agreed upon in the minutes before the meeting on the date of 11.12.2003, and relating to the price of the 17" flat CDT, the member companies, which were agreed upon as the major supply line of large size customers including SEC, had agreed upon the prices, which would be proposed by each company by the customer companies to be enable to propose them *as cheaper prices than the supply price of other member companies. This fact can be confirmed by the* meeting hosting plan and the meeting data.

| Unit: US$ | CPT | LPD | SDI | Remark |
|---|---|---|---|---|
| ADC | 47 | 47 | 48 | Agreed $0.5 price gap advantage is gone |
| LiteOn | 47.5 | No offer | 48.5 | Price gap advantage is gone |
| Philips | 49.5 | 49 | 48.5 | Though SDI offer the lowest price among all, but no order. LPD price under suspicion. |
| Proview | 48→47 | 47 | 48 | |
| SEC | 53→50 | 51.5 | | |
| Compal | No offer | 49.5 | 49 | |

(Evidence *Sogap* 3-137)

☐ Multi-party meeting on December 2, 2003

*227*    After exchanging the information of the current sales situation at the time of the meeting, while the defendants were discussing the decrease of production lines, they reported that LPD decided to shut down 5 lines in Hwafei in Chia until the first half of 2004, and Samsung SDI also announced the facts that they would shut down 1 production line in Suwon and Busan at the beginning of 2003, and at the beginning of 2004 they would shut down 1 production line in Busan.

✦ PD explained that they decided to shut down at the 1st quarter of 2004, during **the beginning of** the same **year, 5 lines in Hwafei in China (approximately 80K/m of the production capability of each line)**
✦ DI already **shut down one production line in Suwon and another Busan** at the beginning of this year, and in the 3rd quarter they converted 1/2 lines in Shenzhen into 21″F CPT production according to the new TV tube demand. Currently, there are a total of 9 lines, and they have internal plans to decrease the production capability by converting 1 line in Busan for TV tube production at the beginning of the year.
(Evidence *Sogap* 3-138)

*228*    Furthermore, it has been confirmed that Samsung SDI had agreed on the market shares by each company by subtracting the exceeding market shares in 2004 regarding the exceeding fixed market shares in 2003, and they agreed as below in the market share quota by each customer. By the defendants agreeing upon the prices by option, it seems that they tried to prevent the effects of an actual price cut. This can be confirmed in the 'CDT market report" of CPT.

However, this year, the total performance record **exceeded 39.1%, which was a quota from SDI**. According to the previous proposal, **the quantity of SDI sales for next year should be restricted with this year's excess quantity**. Therefore, regarding the quantity as indicated clearly in the following table, it became CPT 15M (28.3%), LPD 18M (33.9%), and SDI 20M (37.8%).

(Evidence *Sogap* 3-138)

| M/S % | CPT | LPD | SDI | Others | Total |
|-------|-----|-----|-----|--------|-------|
| SEC | 7% | 4% | 82% | 7% | 14,500 |
| LGE | - | 98% | 1% | 1% | 10, 958 |
| Hyundai | - | 20% | 55% | 25% | 717 |
| Hansol | - | 40% | 10% | 50% | 461 |
| [Note: Edited Korean enterprise in the center] | | | | (Evidence *Sogap* 3-138) | |

The aim is maintaining the ITC conversion costs of the CDT manufacturers. In principle, LPD/SDI had agreed upon this aim. However, **the supply products of SDI -> SEC and LPD -> LGE are mainly ITC tubes. That kind of management would apply correspondingly to the price cuts on each customer within the group.** Even if in the case of CPT, which could not manage its internal production capability, the method *of sales as the form of B + D tubes is possible. Consequently, they emphasized that this would not have any effect on the prices, and they urged a review of the possibility of execution.*

(Evidence *Sogap* 3-138)

(10) Assembly between competitors in 2004

< Table 26 >        Summary of the CDT Cartel Meeting in 2004

| Series Number | Holding Date | Agreed Contents | Participating Companies | Evidence Data |
|---------------|--------------|-----------------|-------------------------|---------------|
| 1 | 01.27.2004 | Maintenance of the current sales price, agreement on the market shares by each company and check-up on the enforcement | CPT, SDI, LPD | Evidence *Sogap* 3-138 Page 2155<br>Evidence *Sogap* 3-140 Page 2181<br>Evidence *Sogap* 4-54~5 |
| 2 | 02.23.2004 | Agreement on the market shares by each company and check-up on the enforcement | CPT, SDI, LPD | Evidence *Sogap* 4-56 Page 3047<br>Evidence *Sogap* 4-57 |
| 3 | 03.02.2004 | Agreement on the market shares by each company and check-up on the enforcement, *production reduction ···* | CPT, SDI, LPD | Evidence *Sogap* 3-141<br>pages 2180, 2181, 2184<br>*Evidence Sogap* 4-58<br>Pages 3053, 3054, 3057 |
| 4 | 03.15.2004 | Increase in the sales price (5% increase after notifying 10% increase) | CPT, SDI, LPD | Evidence *Sogap* 4-61 Page 3074<br>Evidence *Sogap* 2-1 Page 324 |
| 5 | 03.25.2004 ~ 03.27.2004 | Increase in the sales price (every customer, every kind of machine: $2 ~ 3 USD), price differences by detailed specifications, schemes for specific price increase | CPT, SDI, LPD | Evidence *Sogap* 3-142<br>Pages 2186, 2192<br>Evidence *Sogap* 3-143<br>Pages 2197, 2200<br>Evidence *Sogap* 4-62 Page 3078 |
| 6 | 04.26.2004 ~ 04.27.2004 | Agreement on the market shares by each company and check-up on the enforcement, price increase by machine type (15", 17", 19" CDT) | CPT, SDI, LPD [TOP meeting] | Evidence *Sogap* 3-144<br>Pages 2229, 2234<br>Evidence *Sogap* 3-145 Page 2226<br>Evidence *Sogap* 4-63 |
| 7 | 05.06.2004 | Check-up on price the increase in April and increase plan in May (15", 17": $2, 19": $3), the price differences between 6 large and other transaction lines ($1.00 USD) | CPT, SDI, LPD | Evidence *Sogap* 4-64 Page 3085 |
| 8 | 05.24.2004 | 1st and 2nd price increases by machine type | CPT, SDI, LPD | Evidence *Sogap* 4-65 Page 3088<br>Evidence *Sogap* 4-66 ~7<br>Evidence *Sogap* 3-146 Page 2254 |

| 9 | 06.02.2004 | Transactions between affiliates and regular increase in the sales prices | CPT, SDI, LPD | Evidence *Sogap* 3-147 Page 2257 |
|---|---|---|---|---|
| 10 | 06.28.2004 ~ 06.29.2004 | 3rd price increase | CPT, SDI, LPD (TOP meeting) | Evidence *Sogap* 3-148 Page 2267 |
| 11 | 07.26.2004 ~ 07.27.2004 | Agreement on the market shares by each company and check-up on the enforcement, maintenance of the current sales price, and maintenance of confidentiality | CPT, SDI, LPD (Management meeting) | Evidence *Sogap* 3-149 ~ 50 Evidence *Sogap* 4-69 Page 3105 Evidence *Sogap* 4-68 |
| 12 | 08.17.2004 ~ 08.18.2004 | Maintenance of transaction prices among the affiliates, maintenance of the current sales price, and production reduction | CPT, SDI, LPD | Evidence *Sogap* 3-152 Page 2300 Evidence *Sogap* 3-151 Evidence *Sogap* 4-70 Page 3115 |
| 13 | 09.21.2004 | Agreement on the market shares by each company and check-up on the enforcement, production reduction | CPT, SDI, LPD (Management meeting) | Evidence *Sogap* 3-153 Page 2313 Evidence *Sogap* 3-154 ~ 6 |
| 14 | 10.26.2004 | Agreement on the market shares by each company and check-up on the enforcement, supply cut, maintenance of the current sales price | CPT, SDI, LPD (Management meeting) | Evidence *Sogap* 3-157 Evidence *Sogap* 4-71 Page 3120 |
| 15 | 11.2004 | Sales prices by each company with the Korean customers as subject | CPT, SDI, LPD | Evidence *Sogap* 3-158 Page 2356 |
| 16 | 11.15.2004 | Schemes for maintaining confidentiality, promoting the enforcement of previous agreed upon matters, agreement on the market shares by each company and check-up on the enforcement, and production reduction | CPT, SDI, LPD | Evidence *Sogap* 3-159 Evidence *Sogap* 3-160 Pages 2375, 2378, 2381 |
| 17 | 11.24.2004 | Prevention schemes for price cuts | CPT, SDI, LPD | Evidence *Sogap* 3-161 Evidence *Sogap* 3-162 Pages 2406, 2410 |
| 18 | 12.01.2004 | Agreement on the sales prices by each company and the quota of the market shares | CPT, SDI, LPD | Evidence *Sogap* 3-163 Pages 2435, 2430 |
| 19 | 12.29.2004 | Agreement on the sales prices by each company and shut-down scheme for production lines | CPT, SDI, LPD | Evidence *Sogap* 3-164 Pages 2452, 2455 Evidence *Sogap* 4-72 |

☐ Multi-party meeting on January 27, 2004

*229*    In this meeting, we can see that the defendants exchanged information on the current sales and the present operational conditions, and they had agreed to maintain the prices. This resulted from the confirmation of whether or not the market shares by each company in 2004 had been abided to by comparing with the actual sales, it had appeared that Samsung SDI and LPD had exceeded by 0.5% and 1.2%, respectively and that CPT could not achieve 1.7%. Furthermore, it has been confirmed that they had been operating the numbers of the worldwide production lines of each company at the time of the meeting, as Samsung SDI 9, LPD 11.5, and CPT 8 lines, and agreed to cut the lines by 7.5, 8.5, and 7 lines each relating to the agreement on the production cuts. They decided to hold the next meeting by the supervision of LPD in Taiwan on May 2 of the same year. This can be confirmed with the 'report for overseas business trips' of CPT, the business handbook of Mr. ▽▽ Lee of Samsung SDI, and the presentation data at the time of the meeting.

○ LPD mentioned that they have still been making a business loss, and hope to maintain the original conditions with all the prices. **SDI also insisted on the importance of the price maintenance**
○ Relations between the partners was very good. **Considering the price rise of the raw materials, the tube prices should be maintained for the time being.**          (Evidence *Sogap* 3-139)

| company | Line Control Plan & Status | | | | | | |
|---------|--------|--------|--------|-----------------|---------|--------|----------------|
|         | 02.End | 03.0`1 | 03.02  | 03.03 Target    | Current | Gap    | 04.01 Target   |
| CPT     | 11.0   | 10.0   | 9.0    | 8.0             | 8.0     | 0.0    | 7.0            |
| LPD     | 11.5   | 11.5   | 10.5   | 9.5             | 11.5    | 2.0    | 8.5            |
| SDI     | 11.5   | 11.5   | 9.5    | 8.5             | 9.0     | 0.5    | 7.5            |
| Total   | 34.0   | 33.0   | 29.0   | 26.0            | 28.5    |        | 23.0           |

☐ Multi-party meeting on December 23, 2004

*230*   In this meeting, with resulted from checking out the enforcement matters of the market shares by each company, which were agreed upon in the previous meeting, the defendants have no differences of opinion approaching closely to the agreed upon numerical values of the sales. They had agreed upon the adjustment after reconfirmation of the numerical values of the sales of the transactions lines, which were problematic until February 26th of the same year, and they held the next meeting in the LPD office between March 2 and March 3 of the same year. This can be confirmed by the data from "the DDM's practical business meeting result report' of Samsung SDI, and '3 company meeting at 14:00 on 02.23.2004 (LG)' recorded in the schedule of Mr. ▽▽ Song of Samsung SDI.

3. Meeting Contents
 - <u>Overall, the 3 companies were officially improving in terms of the results, and also in the case of M/A there was no big disorder by approaching closely to the agreed numerical values</u>
1) January results and forecast for February

|                 | CPT   | LPD   | SDI   | TOTAL | ... |
|-----------------|-------|-------|-------|-------|-----|
| January result  | 1,284 | 1,644 | 1,793 | 4,721 |     |
| M/S             | 27.2% | 34.8% | 38.0% |       |     |
| February result | 1,370 | 1,694 | 1,900 | 4,964 |     |
| M/S             | 27.6% | 34.1% | 38.3% |       |     |

=> They decided to adjust after confirming again in terms of the problematic transaction lines until 02/26 (AOC, EMC, SEC, COMPAL)

(Evidence *Sogap* 4-56)

③ Multi-party meeting on March 2 ~ 3 in 2004

*231*     The defendants checked out mutually how great the differences of sales results were between January and February of the same year, against the market shares of each company (Samsung SDI 37.7%, LPD 34.0%, CPT 28.3%), which were agreed upon in 2004.

As a consequence, it was confirmed that Samsung SDI and LPD exceeded 0.3%, and 0.4%, respectively, and CPT were unable to achieve 0.7%. In addition, relating to the agreement "04's Line Control Plan" for production lines, they agreed upon cutting the fixed numbers of lines additionally in order to maintain the optimal production lines by each company during the 1st quarter of 2004. After agreeing upon those market shares and the production cuts, the defendants had agreed upon the CDT prices from the 2nd quarter of 2004 in order to prevent the profit decreases. This can be confirmed by the presentation data from CPT and Samsung SDI, 'CDT Top Meeting (3/2)' prepared by Mr. ▽▽ Lee of Samsung SDI, and the business handbook of Mr. ▽▽ Lee of Samsung SDI.

| Mpcs;% | '04.Jan | | | '04.Feb | | | '04.Jan~Feb | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sales | M/S | M/S Gap | Sales | M/S | M/S Gap | Sales | M/S | M/S Gap |
| CPT | 1.3 | 27.2% | -1.1% | 1.4 | 27.9% | -0.4% | 2.7 | 27.5% | -0.7% |
| LPD | 1.6 | 34.8% | 0.8% | 1.7 | 34.0% | 0.0% | 3.4 | 34.4% | 0.4% |
| SDI | 1.8 | 38.0% | 0.3% | 1.9 | 38.2% | 0.4% | 3.7 | 38.1% | 0.3% |
| 3sub-ttl | 4.7 | 100% | 0.0% | 5.0 | 100% | 0.0% | 9.8 | 100% | 0.0% |
| Others | 0.2 | | | 0.2 | | | 0.4 | | |
| Grand-ttl | 4.9 | | | 5.2 | | | 10.2 | | |

(Evidence *Sogap* 3-141)

| Company | Additional Line Shutdown Plan (Additional Line Shutdown Plan) | | | |
|---|---|---|---|---|
| | Factory | Schedule | Line Reduction | After # of Line |
| CPT | Fuzhou 1L | Q1,'04(?) | 1L | 7.0L |
| LPD | Nanjing 2.5L Changwon 0.5L | Q1,'04 Q1,'04 | 3L | 8.5L |
| SDI | Busan 1L Another 0.5L | Q1,'04(?) ? | 1.5L | 7.5L |

(Evidence *Sogap* 3-141)

So, to prevent from profit loss, CDT price has to be increase[d] from Q2 '04.

☐ Multi-party meeting on March 15, 2004

*232* · We can see that the defendants had exchanged the sales information at the time of the meeting and agreed to increase the prices from the shipment of April 1st of the same year and notify the customers of the 10% increase in collaboration, pushing through to a 5% increase. This can be confirmed by the business handbook of Mr. ▽▽ Song of Samsung SDI.

- CPT's opinion □ Even if we lower the prices, we cannot prevent the CDT market decreases.
□ If we lose this opportunity, then it would be more difficult.
 - LPD's opinion □ Price increase
□ How are we going to corporate this if it decreases after the price increase?  -> It is necessary to prepare for the method of avoiding this
□ Timing wise: The only option is doing it as soon as possible (ASAP)
4. The method for price increase
- **Say we will increase by 10%, but can increase only by 5%** (LPD)
- **Everyone announces to our customer at the same time.**
- **April 1ˢᵗ Shipment increase price**

(Evidence *Sogap* 4-61)

---

Reply 43) We discussed the method of the price increase, and it was suggested "let's tell them we will increase by 10%, but actually do it by 5%" saying that we can notify the customers of a10% increase, but actually, we would increase by only 5%. 'Everyone announces to our customer at the same time' is the record of the agreed contents to set equally between the participating companies in terms of the notifying time for the price increase, which the customer companies try to avoid. As far as I remember, there was a forecast that in the wider markets at that period of 2004, the prices would go up. Therefore, the feeling was that increasing the prices altogether among the participating companies would not be that difficult. Relating to the time point of the price increase, "April 1ˢᵗ shipment increase price' was the record of the debate contents agreeing to increase the price from the shipment of April 1ˢᵗ.

(Evidence *Sogap* 2-1)

⑤ Multi-party meeting on March 25th ~ 27ᵗʰ, 2004

233     We can see that the defendants had discussed increasing the price of CDT to $2~3 USD with every type and size, and they had decided to proceed with the preparation work in collaboration in order to succeed with the price increase. The defendants had agreed upon the specific prices of 15", 17", and 19" of CDTs by 6 big customers and other customers, and it has been confirmed that they asked the enterprises, which were not the major suppliers regarding the 6 big customers, to offer the price of $0.50 USD higher than that of the major suppliers, and agreed upon the new optional prices.

Considering the price increase of the major materials and flexibility of the glass supply, **we have a plan to increase the prices of every type and size to $2-3 USD for all the customers.** Each applicable *account manager will submit the proposals for the price set-up for each customer. Furthermore, with* the responses from the customers, we should closely scrutinize the movements of the competing brands, and should determine if we are going to take the venture opportunity of the 2ⁿᵈ price increase. On the market situations, we recommend submitting the suitable news data.

(Evidence *Sogap* 3-142)

---

On April 1, the prices of the current new standards will be adjusted.

| Size | Tube Type | The customers of the world's 6 large CDT monitor | | | Other customers |
|------|-----------|--------------------------------------------------|----|----|-----------------|
| 15" | 48K | MPR2 | B÷D | 37 | 38 |
| 17"FS | | MPR2 | B÷D | 44 | 45 |
| 17"RF | | MPR2 | B÷D | 49 | 50 |
| 19"FS | 85K | MPR2 | B÷D | 65 | 66 |
| 19"RF | 95K | TCO | B÷D | 76 | 77 |

Those 6 large major customers are AOC, Philips, ECM, LightOn, SEC and LGE.

(Evidence *Sogap* 3-143, 4-62)

To the large customers, the 2nd-rank suppliers should propose higher prices of $0.50 USD. This is aimed at stabilizing the market shares, and this is to utilize the opportunities to emphasize the price differences between the large and small scale customers. Because the series of price increases can occur without any warning, the price will rise by only $2-3 USD at the 1st step. We also have to inform the customers on the Z steps of potential price increase. Thereupon, we must give DEM customers a certain amount of delivery time. In addition, the simultaneous optional prices will be enforced. The specific items will be as follows:

| Item | Size | Current Price | Adjusted Price | | |
|---|---|---|---|---|---|
| MPR2 → TCO | | 15" | | 0 | 0 |
| | | 17"/17"F | | +1 | +0.5 |
| | | 19"/19"F | | +2 | +1 |
| MPR2 → Glare/Anti-glare | | 15"/17"/17"F | | -2 | -1/0.5 |
| [prepared as a note: "B+D"] N-ITC → ITC | | 15" | | +1 | +0.5 |
| | | 17"/17"F | | +1.5 | +1 |
| | | 19"/19"F | | +2 | +1.5 |
| Frequency | | 15" (48K→57K) | | +1 | +1 |
| | | 19"/F (95K→85K) | | -2~3 | -1.5 |

234    Furthermore, according to the presentation data at that time of the meeting, they had also agreed upon the enforcement plan for the price increase by the specific time points. Specifically, on March 29, 2004, they had notified the customers about the official price increase, and they decided to distribute news materials of the price increase between March 30th and 31st of the same year. In addition, they decided to explain the background for the price increases and the reasons by having contact with the customers between April 1st and 10th, and after that time, to check out the enforcement situations in the meeting in Taiwan. The next TOP meeting was decided to be held on April 26, 2004 in Shanghai in China under the supervision of Samsung SDI. This can be confirmed in the "report for business trips' of CPT, the business handbook of Mr. ▽▽ Lee of Samsung SDI, and the presentation data, which was distributed during the meeting.

| ///. CDT Price Increase | | |
|---|---|---|
| Date | Acts | Note |
| March 26 | Meeting of the board of directors - discussion | |
| | - Price differences? | |
| | The price gap by size and type including the new optional prices | |
| | - When? | |
| | The starting point for applying the new prices | |
| | - Who will notify to whom? | |
| | The major and minor market sharers | |
| March 29 | Sending out the official letters to the customers | |
| March 30 ~ 31 | News materials | |
| | - CPT of Taiwan, LPD of Korea, SDI | |
| April 1 – 10 | Meeting with the customers | |
| | - The explanations on the backgrounds and the reasons for the price increase | |
| April - | Talk at the working level in Taipei - confirmed | |
| | - Feedback from the customers | Twice/Monday |
| | 5/10 | |

```
Top Meeting Schedule
- Date: Apr. 26(16:00~18:30) Top meeting
            Apr. 27(morning) Green meeting
- Place: Shanghai, China
- Host: SDI
                                          (Evidence Sogap 3-142)
```

⑥Multi-party meeting on April 26th ~ 27th, 2004

*235*     The defendants had checked out, based on the actual sale information, if the market shares of quota by each company in 2004 were abided by after sharing the information on the sales data and the current increase and decrease situations of each company at that time of the meeting. They agreed upon the guidelines for the price increases in April in 2004 with 15", 17", 19" CDTs allowing the supply to lower prices of the 1 US dollar difference to the main force supplier to the main customers ("1st Tier") including SEC and LGE. Furthermore, it has been confirmed that they decided in collaboration by making a table of the applicable prices to the new optional prices. This can be confirmed by the presentation data, which was distributed at the time of the meeting, '4/26 (Monday) CDT TOP MTG in Shanghai' among the business handbooks of Mr. ▽▽ Lee of Samsung SDI, and the emails exchanged among the participants before the meeting.

| Mpcs;% | '04.01 | | | '04. Apr | | |
|---|---|---|---|---|---|---|
| | Sales | M/S | M/S Gap | Sales | M/S | M/S Gap |
| CPT | 4.1 | 27.7% | -0.6% | 1.3 | 27.6% | -0.7% |
| LPD | 5.4 | 34.4% | 0.4% | 1.6 | 33.2% | -0.7% |
| SDI | 5.7 | 37.9% | 0.2% | 1.8 | 39.2% | 1.4% |
| 3sub-ttl | 14.9 | 100% | 0.0% | 4.7 | 100% | 0.0% |
| Others | 0.7 | | | 0.2 | | |
| Grand-ttl | 15.7 | | | 4.9 | | |

(Evidence Sogap 3-144)

| Size | Type | SPEC. | Suggested increase |
|---|---|---|---|
| 15" | CV | 48kHz, MPR, N-ITC | 38.0 |
| 17" | CV | MPR, N-ITC | 45.0 |
| 17" | SMF | MPR, N-ITC | 50.0 |
| 19" | CV | 85kHz, MPR, N-ITC | 66.0 |
| 19" | SMF | 95kHz[38], TCO, N-ITC | 77.0 |

※US1 Favor for 1st Tier is allowed only for 1 Major vendor
 * 1st Tier: SEC, AOC, LG, Philips, EMC, Lite-on

(Evidence Sogap 3-144)

---

[38] This means that the products with the horizontal frequencies are a maximum of 85khz and 95khz, respectively among the individual monitors of the 19" 85khz and 19" 95khz, and the horizontal frequencies are the numerical values showing how many times per 1 second it can display the horizontal lines. The higher the horizontal frequency support is, the higher the technology that has been applied to the product.

☐ Multi-party meeting on May 6, 2004

*236*    The defendants at the time of the check-up of whether there was any price increase in April *during the same year, LPD had confirmed whether or not Samsung SDI had enforced the price increase,* and after discussing the price increase in May after that time, the defendants had increased by 2 dollars with 17" CDT and 3 dollars with 19" CDT, and they had determined the quantity of the goods by company and agreed to maintain the 1 dollar price difference with 6 big transaction lines including SEC and LG, and other transaction lines. This can be confirmed by the report for the meeting results prepared by Mr. Hoon Choi of Samsung SDI.

---

Relating to the price increase in March, April, and May
 (1) The price increase review in April
 - LPD: They mentioned the prices one after another specifically saying that <u>SDI did not maintain the price</u>
increase in Delta, Compal, ADC, and SEC challenging these companies
 - **SDI:** In part of the transactions, (?) open L/C prices were not changed, and they had explained the price differences describing that <u>**the price was virtually increased**</u>
 (2) The price increase in May
 - LPD: <u>**At the time of the price increase in April, there was a part that SDL did not abide by. In the case of May, we will increase when we confirm whether or not SDI and CPT has increased.**</u>
 - CPT: The price increase of the 19" Flat is difficult. It can kill the 19" Flat market. In the case of the 19" FST, let's increase it by +$2 USD, and keep the Flat.                         (Evidence *Sogap* 4-64)

---

☐ Proceeding scheme for the price increase in May
 ☐ The price increase in May (15"/17" +$2 USD, 19" +$3.0)
 ☐ The quantity of the price increase
 - CPT: 6 big transaction lines + BenQ, the amount of materials in May 50%
 - LPD: 6 big transaction lines + Delta, the amount of materials in May 50%
 ☐ The price difference of 6 big transaction lines (9SEC, ADC, PHS, LGE, Proview, L/on) and other transaction lines: $1.00 USD

                                                               (Evidence *Sogap* 4-64)

---

☐ Multi-party meeting on May 24, 2004

*237*    In this meeting, they had debated that CPT would stop the shipment before the price increase for SEC of Samsung SDI, or the price increases of Phillips and LGE should be returned for protection of the affiliates. Hereof, Samsung SDI had promised to increase the price at the earliest stage possible, and at the time of the next price increase, they had agreed that they would increase the price for SEC going first and do that for the other customers. Furthermore, we know that they had checked out whether they had enforced this after the defendants had confirmed by making a table to see if the assigned market shares had been abided by at the time of the meeting by each company in 2004 and they had confirmed the prices of 15", 17", and 19" CDTs, which were agreed upon to increase in April and May in 2004, respectively.

This can be confirmed by the report for meeting results, which were reported to the Headquarters through SDI Mr. Hoon Choi's emails, the business handbook of Mr. ∇∇ Song of Samsung SDI, and the 'CDT Management Meeting (5/24)', which was prepared in order to help them to decide their stance before the meeting at the Sales Headquarters, and the presentation data distributed at the time of the meeting.

---

3. **Relating to the 2nd price increase by SEC**
 - CPT: The new P/O(6/11) price on 60K of non-shipped quantity among the total quantity of 90K in June
 did not reflect the 2nd increased prices -> The suspension of the shipment from 6/14
 **While they were requesting to SDI for the settlement at the early stage for the 2nd price increase, simultaneously, they had requested to LPD to suspend all the shipments with CPT**
 - LPD: According to the market survey of LGE, there was no increase of the set street price of SEC. In accordance with this, they are pressuring LPD. **If the price of SEC does not increase, PHS with 6/1 increase, LGE is scheduled to pay back at the level of captive customer protection with the 2nd price increase**
 - SDI: 6/15 coerced closing (15"/17"+ $2.0 USD). **They had explained that they are in the process of continually negotiating with SEC, and would settle at the earliest possible stage**
4. **Relating to the 3rd price increase**
 - They said that as long as the price increase of SEC has not been accomplished, the 3rd price increase would be difficult, and **they made it clear that from the 3rd price increase, after SEC's price increase first, they would push forward with the price increase with other transaction lines**
(Evidence *Sogap* 4-65)

---

I. 1st, 2nd Price-up

| Size | Type | SPEC. | Apr(A) | May(B) | Gap(B-A) |
|------|------|-------|--------|--------|----------|
| 15" | CV | 48kHz, MPR, N-ITC | 38.0 | 40.0 | 2.0 |
| 17" | CV | MPR, N-ITC | 45.0 | 47.0 | 2.0 |
| 17" | SMF | MPR, N-ITC | 50.0 | 52.0 | 2.0 |
| 19" | CV | 85kHz, MPR, N-ITC | 66.0 | 66.0 | - |
| 19" | SMF | 95kHz, TCO, N-ITC | 77.0 | 77.0 | - |

☐ Multi-party meeting on June 2, 2004

*238* In this meeting, the participants of the CPT side criticized that both Samsung SDI and LPD delayed the supplying price increase to the affiliates, saying that this is not keeping up with the agreement, and the defendants had agreed to increase by 1 dollar to the 6 top-tier companies, and 2 dollars each to other customers regarding on the product prices of 15" and 17" CDTs from July 1 of the same year. This can be confirmed by the 'CDT market report" prepared by Ibon Yun of CPT.

> 3. We have had **criticism pointing out in the meetings at numerous times that such delaying behaviors are unfair to our major customers of both SDI and LPD regarding delaying the price increase to the internal customers of the groups**.
>
> 4. When we analyze the supply and demand situations, it seems that the market will maintain fertile continually, and this is also another opportunity for the price increases. **The 3 companies had taken the shared stances with July 1 as the enforcement date. It is scheduled that the price increases for 15" and 17" regarding the 6 top-tier companies as $1.00 USD, and $2.00 USD on the other customers.** By doing this, the differences between the 1st and 2nd class customers will become bigger. (Evidence *Sogap* 3-147)

□ Multi-party meeting between June 28 ~ 29, 2004

239     We can see that the defendants had confirmed by making a table of the gap among the market shares in 2004 by coordinating the actual sales information, which was achieved in the first half of 2004. Furthermore, they had checked out if the agreements on the 1st price increase in April and the 2nd price increase in May of the same year had been enforced on the CDT products of 15", 17", and 19", and they agreed to increase the prices of 15" and 17" CDT products by 1 dollar from July 15 of the same year after executing the 2nd price increase regarding SEC by Samsung SDI. This can be confirmed by the presentation data at the time of the meeting.

> 3. 3rd Price-up (3rd Price-up)
> - **Conclusion: Only increase 15", 17"F**
> **(Effects from July 15th after succeeding from SDI to SEC 2nd time price-up)**
> - **Price Difference: 15" + USI, 17" + USI**
>
> (Evidence *Sogap* 3-148)

240     The defendants had agreed to hold the next CDT Management meeting on July 26~27 in Shanghai in China under the supervision of Samsung SDI, and the TOP meeting on August 19~20 in Gonmyung in China under the supervision of CPT.

□ Multi-party meeting between July 26~27, 2004

241     In this meeting, the employees in charge of CDT business-marketing for Samsung SDI, LPD, and CPT held the CDT multi-party meeting at the management level as they had agreed in the previous meeting. Furthermore, according to the 'Report for the CDT Meeting Results" of Samsung SDI, the defendants had agreed to maintain the CDT sales prices at the level at that time and the sales in August of 2004 at the level of June preparing for the LCD price falls, and they also discussed taking care not to get caught in the investigation regarding on the Anti-Trust Law.

This can be proved by the agreed fact in terms of the items mentioned in the "CDT market report" of CPT. This can be confirmed by the business handbook of Mr. ∇∇ Lee of Samsung SDI, 'CDT Meeting Result Report' reported to the Headquarters of Samsung SDI, 'CDT market report' of CPT, and the presentation data at that time of the meeting.

---

2) Agreed items
☐ Even if the LCD price has been falling sharply, the influential effect on the CDT demands with even the price cut will be small -> we can watch the LCD price situations, but need to **maintain the current price level for a while**
☐ **Maintain sales in August to the level of June**
☐ We should **make an effort not to conflict with the Anti-Trust Law (rumors of an LCD investigation)** with Glass MTG

(Evidence *Sogap* 4-69)

---

☐ Multi-party meeting between August 17~18, 2004

*242* It has been confirmed that the defendants had agreed to stabilize the CDT prices in collaboration due to the fact that CPT would become pressured for price cuts from the customers and they could influence the same effect on other defendants. This can be confirmed by the email that notifies the location change by ☐☐ Kim of LPD before the meeting, and the "returning report from overseas traveling" prepared by Cheng Chun of CPT, etc.

---

○ We could have made the market prices reasonably and uniformly by the price adjustment at the 2nd quarter. **However, SDI/LPD did not state the market prices to the internal customers for the groups (that is, SEC/LGE). When they compared the market prices, the current prices are $2.00~$3.00 USD lower per product.**
○ The CPT price is relatively higher than the price of SDI/LPD. When the market falls, the pressure from *the customers will be the greatest. To make a profit, CPT will endeavor to find a suitable method of* market price stability. **The first thing we have to do is request SDL/LPD to regulate their yield. Otherwise, after supply exceeds demand, it would be difficult to maintain the prices.**
○ **Due to the fact that SEC has been seeing the loss, if rumors circulate of the CDT price cut, then obviously, SDI will receive the request for big price cuts in that year and it will have more effect on SDI. Consequently, SDI agrees to make the price stability their priority.** (Evidence *Sogap* 3-152)

---

243 Furthermore, the defendants had decided to maintain the current prices in August in 2004 while they were debating the price adjustment scheme in the second half of the year in 2004 and 2005, and after September to adjust the price guidelines. In addition, it has been confirmed that they would take the method of the main force supplier leading and other defendants following for the price control during off-peak, and checking on the prices weekly; however, they decided to introduce a penalty system *for the time of defaults. The defendants had also recognized that it would be necessary to reduce* production, and as a short term measure they decided to reduce the manufacturing days, and for the long term to shut down the production lines. This can be confirmed in the presentation data of Samsung SDI.

---

✓ Aug. '04: Maintain the current price (maintain the current price)
✓ From Sep. '04: Adjustment of Price Guideline (From Sep. '04: Adjustment of Price Guideline)
✓ How to control in slow season

---

☐ Multi-party meeting on September 21, 2004

244   The dependents examined the differences in the market share of 2004 for each company individually by the third quarter of 2004, which was previously agreed upon, based on the sales reports made by them. Regarding the reduction of output, they agreed to reduce additionally one production line of each company, respectively in the fourth quarter of 2004 and the first quarter of 2005 on the basis of the production lines of each company agreed upon in June 2004. This resulted from their intentions to reduce the production lines artificially in order to minimize the excessive supplies of Color Display Tubes (CDTs), assuming that the demands of CDT worldwide in 2005 would be approximately 50 million. This can be verified through documents such as, 'Market Report on CDTs' made by Chunghwa Picture Tubes, Ltd., the hotel receipts for Chunghwa Picture Tubes, Ltd. (hereinafter referred to as CPT) and the documents on travel expenses to Korea.

'04 Capacity control guideline review

| company | Plan & Current Status | | | '04.04(C) | Gap(B-C) | '05.01(D) | Gap(B-D) |
|---|---|---|---|---|---|---|---|
| | '03 Top meeting(A) | Current(B) | Gap(B-A) | | | | |
| CPT | 8.0 | 8.0 | 0.0 | 7.0 | 1.0 | 6.0 | 2.0 |
| LPD | 9.5 | 9.5 | 0.0 | 8.5 | 1.0 | 7.5 | 2.0 |
| SDI | 8.5 | 9.5 | 1.0 | 8.5 | 1.0 | 7.5 | 2.0 |
| Total | 26.0 | 27.0 | 1.0 | 24.0 | 3.0 | 21.0 | 6.0 |

'05 Capacity control suggestion
- reduce the CDT capacity among 3 makers to 50M in '05

(Evidence *Sogap* number 3-153)

☐ Multi-party meeting on October 26, 2004

245   It is found that the defendants examined documents to see if the sales volume of each company matched up with the market share assigned for each company in October 2004, and they discussed the agreement on reduction of the market share and additional production line in the market of CDT for the future. In addition, they agreed to reduce the supplies from November 2004 and to maintain the sale prices until the end of the year. This can be verified through the presentations at meetings at that time and the 'Report on CDT MTG' by Samsung SDI.

2. Prospects and countermeasures for November
**- In November, they agreed to reduce the supplies for each company (100K/month individually in comparison with the previous month)**
☞ The supplies by the three companies were reduced to 5.5M in October, 5.2M in November, 4.8M in December and to 4.5M in January.
**3. Agenda on sale prices**
- They agreed to maintain the sale prices until the end of the year.      (Evidence *Sogap* number 4-71)

☐  CDT multi-party meeting held around November 2004

246     The defendants compared the sale prices of 17" CDTs for the main customers of each company at the meeting at that time, to ensure that there were the correct differences among the prices applied by each company to their main customers. In other words, when the sale prices that were applied were too low even to the main customers approved by the other companies, this could lead to pressure for price cutting. This can be understood by examining the report on the meetings by CPT.

| | SDI | LPD | CPT | |
|---|---|---|---|---|
| 1. SEC 17" RF | $48.90 | $50.50 | $50.50 | |
| 3. PHS & LGE 17" RF | LPD $50.00 | | | |

(Evidence *Sogap* number 3-158)

☐  Multi-party meeting on November 15, 2004

247     In this meeting, it is found that the defendants realized certain violations from the top at the first page of the document written by hand by examining it, and then that they even tried to hide the evidence. They exchanged information on the CDT market, or more specifically, the sales volume and price information for each customer, which is the main concern. Particularly, Samsung SDI had certain disputes with Proview, its primary customer, over LPD's sale expansion. However, you can see that there was an (implied) agreement that the defendants admitted their own primary suppliers among them for certain specific customers and that they had a principle of cartel (so called 'Matching Behavior'), meaning that if one of them expands its sales to its primary customer without prior consent among them, the others will retaliate it in the same way. They also agreed to check the market shares assigned to them in the CDT market and to execute the specific shutdown plan of production lines in January 2005. You verify this through the emails sent to the other participants of the meeting by Gyung Seop Han from LPD to confirm the meeting date and place and from the 'Business Report' by CPT.

...

Taking into account that it is against the free market system to hold a meeting with the partners in the industry, it is not appropriate to leave any documents as evidence.

(Evidence *Sogap* number 3-160)

**LPD gradually expanded its sales to Proview without giving any notice to SDI. This means that it violated the implied agreement on sales assignment.** SDI expressed its regret and strongly requested LPD to explain its follow-up and future plan for Proview. However, LPD argued that it merely maintained a relationship with Proview as the market demands were decreasing in 2005. They said that they had no choice regarding the company policy. **SDI was still uncomfortable with LPD and it continued requesting LPD to suggest reasonable explanations and follow-up to it. If it failed to do this, SDI said that it would make LPD's customers its own customers.**

(Evidence *Sogap* number 3-160)

☐  Multi-party meeting on December 1, 2004

248     The defendants assigned the specific market shares for each customer and check jointly to see if all of them followed this smoothly. Particularly, they found that the sale prices applied to six customers including SEC and LG Electronics were different from the previously agreed prices for each company. Therefore, they agreed to increase the sale prices based on the prices of Samsung SDI's products supplied to SEC. In addition, Sheng Boyang from CPT put in the report of evidences the strategies on how to get LPD to comply with the agreement by retaliating to LPD in the same way, which violated the agreed prices. This can be verified from the emails and the meeting report sent to the participants and from the 'CDT Market Report' made by Sheng Boyang from CPT.

As the results of the increase of the agreed prices in the past three executions, the standard prices from Taiwanese manufacturers were higher than those from Korean manufacturers. At the meeting, CPT suggested to the three manufacturers that the standard prices for the top six customers should be settled at the same level in order to secure the competitiveness of Taiwanese manufactures. The recommended approach is **to adjust the prices to Taiwanese manufacturers step by step until they come to the unified standard prices by making SDI's prices to SEC the lowest prices and, hereunder, lowering the prices to prevent a temporary drop in prices, which can lead to market collapse. SDI/LPD are not concerned about suggesting the same prices to the top six customers, and they have higher prices in mind.** The specific prices will be settled in the management meeting.

(Evidence *Sogap* number 3-162)

Regarding LPD's repetitive hindrances to the implied agreement by the three manufacturers on CDT M/S, CPT will respond to them by taking advantage of a small amount of low price strategies in dealing with LGE, and it will also make efforts to keep LPD from damaging the market prices at the same time as it uses this opportunity to discover the actual prices of LPD from the internal group.

(Evidence *Sogap* number 3-162)

☐  Multi-party meeting on December 1, 2004

249     The defendants found that during the processes for three increases in prices agreed upon in 2004, there was a gap in the prices applied among them, and they also found that in order to adjust the standard prices to the top six customers, the standard price of 17" CDT made by CPT was agreed to be set at $50. In addition, they agreed to the market share assigned for each customer, which was to be applied in 2005, based on the actual deliveries to the top six customers in 2004. Accordingly, SEC agreed to 85% with Samsung SDI, 12% with CPT and 4% with LPD, and LGE agreed to 96% with LPD and 2% with Samsung SDI and CPT respectively. This can be verified through the 'Report after Business Travel Overseas' by CPT.

With three increases in the prices irregularly, the standard prices from Taiwanese manufacturers became higher than those from Korean manufacturers. **To guarantee the competitiveness and fairness in the market for Taiwanese manufacturers, CPT suggested that they should make the standard prices at the same level for the top six customers.** At the present level, Samsung SDI has raised its standard price for SEC to $49 only once, but this is $2 lower than the $52 paid by Taiwanese manufacturers such as ADC/Lite-On. However, LPD/SDI think that December is not a good time for decreasing the price, and they want to maintain these prices by the end of the year. CPT agreed to decrease the price by $0.50 per month of the standard price up to $50 starting from January next year.

Official standard price

| 17" (MPR. B+D) | SEC | EMC | LGE | PHS | AOC | L-On |
|---|---|---|---|---|---|---|
| SDI | $48.9 | $51 | $51.5 | $51.5 | $52.5 | $51.5 |
| LPD | $49.5 | $51 | $50 | $50 | $51.5 | - |
| CPT | $49.5 | $50.5 | $51.5 | $51.5 | $51 | $51 |

(Evidence *Sogap* number 3-163)

| 제조사 | 2004 실제 인도분 | | | | 2005 가정 | | | |
| | CPT | LPD | SDI | Total | CPT | LPD | SDI | 증계 |
|---|---|---|---|---|---|---|---|---|
| SEC | 9.3% | 2.4% | 88.3% | | 12% | 4% | 84% | |
| | 1,407 | 383 | 13,461 | 15,251 | 1,572 | 524 | 11,006 | 13,102 |
| AOC | 61.6% | 28.3% | 10.1% | | 74% | 24% | 2% | |
| | 8,060 | 3,748 | 1,329 | 13,137 | 8,363 | 2,717 | 226 | 11,301 |
| LGE | 0.0% | 99.9% | 0.1% | | 2% | 96% | 2% | |
| | - | 9,784 | 7 | 8,794 | 169 | 8,110 | 169 | 8,448 |
| 프로뷰 | 8.8% | 0.3% | 90.8% | | 8% | 5% | 87% | |
| | 541 | 23 | 5,541 | 6,105 | 567 | 283 | 4,815 | 5,665 |
| 팔컵스 | 10.2% | 88.1% | 1.7% | | 14% | 84% | 2% | |
| | 500 | 4,252 | 55 | 4,807 | 574 | 8,442 | 82 | 4,098 |
| 라이트온 | 98.8% | 0.0 | 1.2% | | 99% | 0 | 1% | |
| | 2,620 | - | 30 | 2,650 | 1,683 | - | 17 | 1,700 |
| 기타 | 25.0% | 35.6% | 39.4% | | 20% | 32.3% | 47.7% | |
| | 1,350 | 2,193 | 3,232 | 6,775 | 678 | 1,094 | 1,616 | 3,388 |
| 시정 점유율 | 24.7% | 34.8% | 40.4% | | 28.5% | 33.9% | 37.6% | |
| & 총수량 | 14,478 | 20,382 | 23,654 | 58,514 | 13,605 | 16,166 | 17,931 | 47,702 |

Highlights in yellow show the items that the three manufacturers have disputes over.

☐ Multi-party meeting on December 29 2004

250     The defendants compared the tables with the present applied prices for the top six customers, and after discussing the possibility of changes of the applied prices, they agreed to maintain the prices that they agreed on in December 2004 even in January 2005. They also agreed with the plans for jointly monitoring the implementation of agreement on decreasing the production lines. Specifically, Jay Jeong and J. H. Choi were appointed as auditors by Samsung SDI, J. H. Oh and ○○ Kim by LPD, Bruce Lu and Eddie Mei by CPT, and they agreed to conduct audits by visiting each factory in several regions once a month. This can be verified from both CDT's market reports by CPT and the data on the sales volume and the plan for monitoring the shut-down of the production lines by each company, which were saved in the USB device of ○○ Lee of Samsung SDI and exchanged at the meeting.

|  | CPT | LPD | SDI |
|---|---|---|---|
| AOC | $50 | $51 | $51.5 |
| EMC | $50.5 | $51 | $50.5 |
| SEC | $49.5 | $49.5 | $49 |
| PCE | $51 | $50 | $51.5 |
| LGE | -- | $50 | -- |
| LON | $50.5 |  | $52.5 |

The above data is the 17" F standard prices of the top six customers. LPD suggested that the main suppliers could propose the adjustments of the standard prices for the customer concerned. In this case, LPD meant that the other two CDT manufacturers could adjust their prices in accordance with the new standard prices and that could make it possible to maintain the differences in the prices. CPT and SDI also agreed with this in principle, but this kind of agreement should be made on the assumption of the actual standard prices.

**The three manufacturers agreed to maintain the prices of December even in January effectively,** and they wanted to hold a supreme meeting as soon as possible to clarify the present confusing market trends.

(Evidence *Sogap* number 3-164)

---

1. Plan for closing the production lines

CPT representatives: Bruce Lu (Fuzhou), Eddie Mai (Fuzhou), LPD representative: J. H. Oh (Shenzhen), J. S. Kim (Seoul), SDI representatives: Jay Jeong (Tianjin), J. H. Choi (Seoul)

For the plan for closing the production lines, **each company assigned two auditors (1 main auditor and 1 assistant) to hold responsible for it, starting from January 1.**

**They would visit each of their factories irregularly to examine the situation of closed production lines.**
The preparation for audit is shown in the table as follows: O Main auditor, △ Assistant.

|  | Factories | CPT | LPD | SDI |
|---|---|---|---|---|
| CPT | Fuzhou |  | △ | O |
| LPD | Gumi | △ |  | O |
|  | Changsha | O |  | △ |
|  | Nanjing | △ |  | O |
| SDI | Korea | △ | O |  |
|  | Tianjin | △ ... | O |  |
|  | Shenzhen | O | △ |  |
|  | Malaysia | O | △ |  |
|  | Brazil | △ | O |  |

(Evidence *Sogap* number 3-164)

(11) Meetings among the competitors for 2005

<Table 27>          Overview of CDT Cartel Meeting for 2005

| No. | Dates | Descriptions of Agreements | Participants | Evidences |
|---|---|---|---|---|
| 1 | 1.19.2005 | Guidelines for Sales Prices for Models, Shut-down and Audit Plans of Production Lines | CPT, SDI, LPD | Evidence *Sogap* number 2-1, Page 326<br>Evidence *Sogap* number 3-165, Page 2467<br>Evidence *Sogap* number 4-73, Page 3129 |
| 2 | 2.24.2005 | Price reduction level (15": $1, 17/19": $2). Examination of assignment and implementation of the market share by each company. Reduction of production lines | CPT, SDI, LPD | Evidence *Sogap* number 3-166<br>Evidence *Sogap* number 3-167, Page 2541<br>Evidence *Sogap* number 3-168, Page 2522 and 2523<br>Evidence *Sogap* number 4-74, Page 3135 |

| 3 | 3.29.2005 -3.30 | Plans for maintaining the current sale prices, reducing the production lines and making audits. Sales prices for each small customer | CPT, SDI, LPD | Evidence *Sogap* number 3-169 - 70<br>Evidence *Sogap* number 3-171, Page 2456-7<br>Evidence *Sogap* number 4-75, Page 3145<br>Evidence *Sogap* number 4-76, Page 3448-9 |
| 4 | 4.13.2005 | Sales prices by customers and suppliers | CPT, SDI, LPD | Evidence *Sogap* number 3-172, Page 2548 |
| 5 | 4.26.2005 | Examination of the assignment and implementation of the market share by each company | CPT, SDI, LPD (Manager-level meeting) | Evidence *Sogap* number 3-173 - 4<br>Evidence *Sogap* number 3-176 - 7, Page - 2587<br>Evidence *Sogap* number 4-77, Page 3157 |
| 6 | 5.24.2005 | Plans for maintaining the current sale prices and reducing the production volume | CPT, SDI, LPD (Manager-level meeting) | Evidence *Sogap* number 2-1, Page 329<br>Evidence *Sogap* number 3-176 - 7<br>Evidence *Sogap* number 4-78 and 4 - 80<br>Evidence *Sogap* number 4-79, Page 3161 |
| 7 | 6.28.2005 | Plans for maintaining the current sale prices and reducing the production volume | CPT, SDI, LPD (Manager-level meeting) | Evidence *Sogap* number 3-178 - 180<br>Evidence *Sogap* number 4-81, Page 3172<br>Evidence *Sogap* number 4-82 |
| 8 | 7.20.2005 | Plans for information exchange and top-level management meeting | CPT, SDI, LPD | Evidence *Sogap* number 4-83<br>Evidence *Sogap* number 4-84, Page 3185<br>Evidence *Sogap* number 4-85 |
| 9 | 9.28.2005 | Examination of the assignment and implementation of the market share by each company. Methods on how to raise sales prices, reduction of the production volume | CPT, SDI, LPD (Top-level management meeting) | Evidence *Sogap* number 3-181, Page 2625<br>Evidence *Sogap* number 3-182<br>Evidence *Sogap* number 4-86 and 4 - 88<br>Evidence *Sogap* number 4-87, Page 3197 and 3199 |
| 10 | 11.2.2005 | Agreement on rise in the sales price ($1) and plan for its implementation | CPT, SDI, LPD | Evidence *Sogap* number 3-183, Page 2641 ... |
| 11 | 11.21.2005 | Examination of the agreement implementation of the previous increases in prices | CPT, SDI, LPD (Manager-level meeting) | Evidence *Sogap* number 2-1, Answer 59)<br>Evidence *Sogap* number 3-184, Page 2701<br>Evidence *Sogap* number 4-89 - 90 |
| 12 | 12.20– 12.21.2005 | Examination of the agreement implementation of the assignment on market share, and restraints of decreases in prices | CPT, SDI, LPD (Manager-level meeting) | Evidence *Sogap* number 1-1, Page 295<br>Evidence *Sogap* number 2-1, Page 332<br>Evidence *Sogap* number 3-185 and 187<br>Evidence *Sogap* number 3-186, Page 2709<br>Evidence *Sogap* number 4-91 - 92 |

☐ Multi-party meeting on January 19 2005

251   At this meeting held on December 15, 2004, ○○ Kim from LPD proposed to the other participants at the meeting to hold a Manager-level CDT meeting in Taiwan around January 12–18, 2005. In addition, ○○ Kong from LPD sent the participants an email on January 13, 2005 proposing that they would play golf from 7:30 AM to 12:00 PM on January 19 and then a manager-level meeting at Howard Plaza Hotel in Taiwan from 2:30 PM to 7:00 PM. According to the emails sent to the participants by ○○ Jeong from LPD, they limited the number of the participants for the golf match to two people per company and to three people per company for the manager-level meeting in order to keep this Cartel meeting secret.

As for the participants in the management meeting, I would like to explain what we previously agreed; we had better have **limited attendance considering securing the confidentiality** and **the value of the management meeting. (The number of participants is limited by taking into account the values of the manager-level meeting and confidentiality).**

Therefore, the following is each companies' mutual understanding so far

- Green meeting: 2 people per company

- Meeting attendants: 3 people per company

(Evidence *Sogap* number 3-165)

252    In addition, the defendants agreed to sell the products until February, 2005 in compliance with a new price guideline as specified below, and they also agreed to follow the plan for auditing the shut-down of production lines and checking whether the lines are closed or not. This can be verified by the 'Report on G/S MTG' by Samsung SDI and the statement made by △△ Song.

| Classification | Existing Guideline(A) | New Guideline (B) | (A) – (B) | IQ Management Sale Prices |
|---|---|---|---|---|
| 15" MPR2, SKD | $39 | $38 | $1 | $34.8 |
| 17" MPR2, SKD | $46 | $44 | $2 | $41.9 |
| 17 Flat TCD, SKD | $51 | $49 | $2 | $44.3 |
| 19 Flat TCD SKD | $72 | $70 | $2 | $63.7 |

5. Capability control

- Strengthening a line audit to make a follow-up of the Capability Control plan

☞ Two people per company **agreed to conduct audits by free pass without prior notice**

| | Number of Lines | Shut-Down Plan | |
|---|---|---|---|
| | End of 2004 → End of 2005 | - Beginning of 2005 | - June, 2005 |
| CPT | 8 → 6.5 | Bokju #1 or 2 (1.0) | Bokju #1 or 2 (0.5) |
| LPD | 9.5 → 7.5 | **Changwon #2 (1.0)** | Hwafei #1, #7 (1.0) |
| SDI | 9.5 → 7.5 | **Busan #1 (0.5), Shenzhen #1 (0.5)** | **Suwon (1.0)** |

(Evidence *Sogap* number 4-73)

Answer 40-1) In this meeting, they agreed to readjust the sales prices by December to January as every company reduced its own sales price due to sharp decreases in demand, and to accept the previously-reduced prices as their new guideline sales prices until February. Specifically, for 15" MPR2 and SKD sizes, they set the price at $38, which reflected a $1 reduction from the previously existing price of $39, and for 17" MPR2 and SKD sizes, they set the new guideline price at $41, which reflected a $2 reduction from $46. For 17" Flat, TCO and SKD sizes, they agreed to sell them at $49, which reflected a $2 reduction from $51, and for 19" Flat, TCO and SKD sizes, they agreed to sell them at $70, which reflected a $2 reduction from $72.

In addition, regarding the agreement on control of the production volume, we remember that we agreed to have an audit carried out without prior notice by two people from each company to check if the production lines were operated under Free Pass.

(Evidence *Sogap* number 2-1)

□  Multi-party meeting on February 24 2005

253    Regarding CDT sales prices, the defendants agreed to apply a $1 reduction to 15" and a $2 reduction to 17" and 19". The agreed upon CDT prices for each size are $38 for 15", $44 for 17" FST, $49 for 17", and $70 for 19", as shown below. The defendants also agreed to discuss the market prices among the affiliates to discover if they are too low and to discuss the plan for production line reduction and its execution. This can be verified through the emails sent by △△ Jeong from LPD on February 12 of the same year before the meeting and the 'Report on CDT Market' by CPT.

Due to decreases in the market demand, the manufacturers are cutting the prices to the other customers to secure their orders. Particularly, 17" Flats are the most controversial products. To guarantee fair competition among the key business operators in the market, **they decided on the price quotation again to the main six customers, which is to be issued in February. The prices after adjustment are $1 FOR 15" AND $2 FOR 17"/19".** As the market condition is still unclear, they agreed to maintain the current prices above all on the matter of decrease in prices in March and then keep in touch and decide on the prices when they receive orders from the customers or when they obtain the market share.

(Evidence *Sogap* number 3-168)

| USD | Specifications | Standard prices before 1 month | New standard prices after February updates | Differences |
|---|---|---|---|---|
| 15" | B+D, MPR2 | $39 | $38 | -$1 |
| 17" FST | B+D, MPR2 | $46 | $44 | -$2 |
| 17" | B+D, MPR2 | $51 | $49 | -$2 |
| 19" | B+D, TCO | $72 | $70 | -$2 |

(Evidence *Sogap* number 3-168)

- Each manufacturer superficially adjusts the prices for its customers based on the standard price. However, according to certain information from a SEC/Philips customer, the actual prices of the competitor were much lower than the other prices, due to internal trading within the group. <u>SDI/LPD suggests prices of the group's internal customers that are lower by at least $2-3 from the announced standard prices for 17". For 15", the differences in the prices can be up to $4-5.</u> Nonetheless, CPT cannot escape the reality of being the company ranking number 2. Tendency of decreasing orders might be accelerated.

- Plan and execution of shut-down: <u>**According to the resolution approved in the previous meeting, each manufacturer will close down 1 production line, starting from January.**</u> At present, customers are continuously asking for a decrease in the prices by being aware of serious oversupply of CDT. At the meeting, LPD suggested moving up the execution of shut-down of the 2nd production line to effectively control the gap between supply and demand. (At the meeting) <u>**it was decided to temporarily conduct the shut-down before June.**</u>

<div align="right">(Evidence <i>Sogap</i> number 3-168)</div>

254    According to the presentation evidence at the meeting, it was confirmed that they played golf in Palm Garden from 8:00 AM to 12:00 PM before the meeting and they then held a CDT multi-party meeting in Mariette Hotel in Taiwan from 2:00 PM to 5:00 PM. In addition, the participants examined the differences between the CDT market share worldwide, which they had agreed upon previously, and the actual sales volume from January to February 2005.

| 2005 | | 05.Jan | | | 05.Feb | | |
|---|---|---|---|---|---|---|---|
| Mpcs;% | Agreed M/S | Sales | M/S | M/S Gap | Sales | M/S | M/S Gap |
| CPT | 28.5% | 0.9 | 24.0% | -4.5% | 0.8 | 24.1% | -4.4% |
| LPD | 33.9% | 1.4 | 35.1% | 1.2% | 1.2 | 35.7% | 1.8% |
| SDI | 37.6% | 1.6 | 41.0% | 3.4% | 1.3 | 40.1% | 2.5% |
| 3sub-ttl | 100.0% | 3.9 | 100% | 0.0% | 3.2 | 100% | 0.0% |
| Others | | 0.1 | | | 0.1 | | |
| Grand-ttl | | 4.0 | | | 3.3 | | |

<div align="right">(Evidence <i>Sogap</i> number 3-167, 4-74 )</div>

(3) Multi-party meeting on March 29-30, 2005

255    You can see that the defendants exchanged the data on the sales and inventory reports by each company with each other. They agreed to maintain the sales prices in April 2005 after the predictions on the second quarter of 2005 and to strengthen the working-level meetings in which the sales prices are mostly discussed twice each month in the future. Furthermore, they agreed to tighten the audits to the production lines and to close down another single production line in addition to the two-level plan of the production line reduction, which was agreed upon previously. This can be verified from the 'Report on G/S MTG' by Samsung SDI.

**4. Agenda on sales prices**
**- Agreed to basically maintain the sales prices of April**
☞ For a solution, strengthen the working-level meeting, starting from April (discussions limited to sales prices twice/month)
**5. Capability Control**
**- Strengthening a line audit to make a follow-up of the Capability Control plan**
☞Conduct a line audit under Free Pass without any prior notice, starting from April
**- Agreed to examine the shut-down of an additional production line with the exception of the 2nd step shut-down, which was agreed previously.**

|  | Production Lines | Shut-Down Plan | |
|---|---|---|---|
|  | End of 2004 → End of 2005 | 1st Step (January) | 2nd Step (- June) |
| CPT | 8 → 6.5 | Completed by each company | An additional production line other than the line examined by each company |
| LPD | 9.5 → 7.5 | | |
| SDI | 9.5 → 7.5 | | |
| | | | (Evidence *Sogap* number 4-75) |

256    The defendants checked to see if each company complied with the market share assigned to it in 2005. After appointing an audit manager in each company for agreement on production control, they agreed to give a day's notice to the companies both in Korea and China and check with each other freely to see if the other companies' factories are operating. In addition, they agreed as below by breaking down the prices into the standard prices on 15", 17" and 19" CDT, the sales prices to the six customers by small vendors, and the sales prices to their own key customers out of the six customers. This can be verified through the notices on meeting schedules by CPT, 'CDT Report' by CPT, and the presentations at the meetings with CPT and Samsung SDI.

◆ Guideline on Production Capacity Control for 2005 (1 Unit: M)

| Manufac tures | By January 2005 (1st Step) | | | By June 2005 (2nd Step) | | |
|---|---|---|---|---|---|---|
| | Number of Lines | Line Reductio ns | Factories | Number of Lines | Line Reductions | Factories |
| CPT | 7.0 | -1 | - Fuzhou #1 or #2(?) | 6.5 | -0.5 | - Fuzhou # (?) |
| LPD | 8.5 | -1 | - C/W #2 0.7L #5 0.2L | 7.5 | -1 | 7 |
| SDI | 8.5 | -1 | - Busan #1 (0.5L) - S/Z #3 (0.5L) | 7.5 | -1 | - Suwon #1-2 #1-3 |
| Total | 28.0 | -3.0 | | 21.5 | -2.5 | |

- How was the internal decision for reaching the 2nd production capacity control made?
- It seems that the 2nd step started earlier than previously agreed.

◆ They need to operate an audit system to re-examine the 1st production capacity control

- Audit list (free admission)

**Korea   SDI ◄─► LPD**
**J.H. Choi    J.S. Kim**
**China   CPT ◄─► LPD**
**Bruce Lu    J.H. Oh**
**Eddie Mei**

**SDI**
**J Jeong**

- Mutual auditing is strongly recommended
- A day's notice of auditing can be made

(Evidence *Sogap* number 3-171, 4-76)

◆ Examination of the price guideline (based on February)

| Sizes | Specifications | Six customers excluded (Market prices) | Small companies → Six key companies | Key companies → Six key companies |
|---|---|---|---|---|
| 15" | 48kHz, N-ITC, MPR | U$39 | U$38.5 | U$38 |
| 17" FS | N-ITC, MPR | U$45 | U$44.5 | U$44 |
| 17"F | N-ITC, MPR | U$50 | U$49.5 | U$49 |
| 19"F | 96kHz, N-ITC, TCO | U$71 | U$70.5 | U$70 |

❖ Six key companies: SEC, AOC, LGE, Proview, Philips, Lite-On

(Evidence *Sogap* number 3-171, 4-76)

☐ Multi-party meeting on April 13 2005

At this meeting, the defendants disclosed the sales prices of 15" and 17" CDT for their key customers as shown below. This was carried out in order to adjust their own sales prices by taking into account the sales prices applied to the key customers of the other defendants. This can be verified through the meeting report written by Weilong Lu from CPT.



| 1. SDI→SEC | |
|---|---|
| 15" | $36.90 |
| 17" FS | $43.40 |
| 17" RF | $45.90 |

| 2. SDI→Proview | | |
|---|---|---|
| 15" | $35.50 | *Bare minus $5* |
| 17" FS | $43.50 | *Bare minus $6.5* |
| 17" RF | $46.50 | *Bare minus $6.5* |

| 3. LPD→LGE | |
|---|---|
| 15" | $36.50 |
| 17" FS | $41.60 |
| 17" RF | $46.50 |

| 4. LPD→Philips | |
|---|---|
| 15" | |
| 17" FS | $43.00 |
| 17" RF | $47.00 |

| 5. CPT→AOC | | |
|---|---|---|
| 15" | $36.50 | |
| 17" FS | $43.00 | *Bare minus $6.5* |
| 17" RF | $47.50 | *Bare minus $6.5* |

| 6. CPT→Liteon | |
|---|---|
| 15" | $37.00 |
| 17" FS | $43.00 |
| 17" RF | $48.00 |

(Evidence *Sogap* number 3-172)

☐ Multi-party meeting on April 26 2005

258 The defendants checked with each other to see if each company complied with the market shares agreed upon in 2005, and they also conducted an audit to check if they followed the agreement on reduction of the production volume. In addition, regarding the price of 17" CDI, they disclosed the prices applied to the six customers such as SEC and LG Electronics, etc. and they agreed to set a new price guideline for each customer at the next working-level meeting.

This can be verified through the emails notifying the meeting schedules before the meeting, the 'CDT Report' and the presentations that were made at the meetings.



(Evidence *Sogap* number 3-175, 4-77)

☐  Multi-party meeting on May 24 2005

259     Regarding the sales prices, the defendants agreed to comply with the previous agreements until July 2005. For production volume control, CPT agreed to keep 5 production lines, while LPD and Samsung SDI agreed to keep 6.5 production lines, respectively. According to the presentation data and the statements of the participants at the meeting, they checked the sales volume information of each company and the accomplishment of the market shares, which were agreed in 2005, as they did at the previous manager-level CDT multi-party meeting. In addition, they tried to maintain the proper differences in the prices of 17" CDT among the defendants and maintain the market share for each company by disclosing the sales prices of the primary suppliers for six customers. This can be verified from the statements and the diary of △△ Song from Samsung SDI, the "CDT G/S MTG Report," the "CDT Market Report" from CPT and the presentations from Samsung SDI and CPT.

**2. Agenda on sales prices**

- Agreed to basically maintain the sales prices until April

- 'Increases in sales prices' were proposed in June, although they received negative responses from the companies due to 'excessive capacity'.

☞ They will discuss the increase in sales prices for July at the end of June.

**3. Capability Control**

- They agreed to conduct the 3rd step by the 3rd quarter of the year

|  | Production Lines | Shut-Down Plan | | |
|---|---|---|---|---|
|  | End of 2004 | 1st Step | 2nd Step | 3rd Step |
|  |  | - 1Q | - 2Q | - 3Q |
| CPT | 8.0 (4,000 people) | 7.0 (3,100 people) | 6.0 (2,600 people) | 5.0 (2,200 people) |
| LPD | 9.5 | 8.5 (Changwon △) | 7.59 (Gumi △) | 6.5 (Hwafei △) |
| SDI | 9.5 | 8.5 (Busan/Shenzhen △.5 | 8.0 (Malian △5) | 6.5 (Suwon △5) |
| (Submitted) | 11.3 | respectively) |  |  |
| (Actual) |  | 10.3 (Busan △) |  |  |

(Evidence *Sogap* number 4-79)

Answer 54-1) In the order of 'I. CDT Sales Update' and 'II. Market Share Review,' we checked the data of the CDT sales volume of each company at the time of the meeting and discussed to what extend it failed to meet the market share that was agreed upon in 2005. If the agreed upon market share has a big difference in the sales volume, the companies concerned explained the reasons to the other companies. For the 'III. Market Information,' they made a table of the prices of 17" CRT/Flat monitors supplied by the primary suppliers to six customers such as SEC, LGE, ADC, Lite-On, Proview and Philips), and they discussed whether or not they would continue maintaining those prices in the future. Samsung SDI is mostly connected to SEC and Proview, LPD to LGE and Philips, and CPT to ADC and Lite-on. (Evidence *Sogap* number 2-1)

☐ Multi-party meeting on May 28 2005

260 The defendants were forced maintain the previously agreed upon prices by July 2005 after exchanging the sales information for each company and discussing the sales prices, and they agreed to control the production volume in accordance with the forecast for market demand in the second half of the same year. They also checked the supply of 15", 17" and 19" CDTs worldwide by exchanging the monthly information on sales, and they also checked to make sure that they exchanged the sale information for the key customers. Based on this information, they checked to see if they failed to meet the market share agreed upon for 2005, and they agreed with the implementation of decreasing the CDT production lines of each company and the plans for decreases of the production lines in future. This can be verified through the notes written in the calendar of Ling Yuenyun from CPT and the 'CDT G/S MTG Report,' the 'G/S MTG Report' from Samsung SDI and the presentations that were made at the meeting.

**2. Agenda on sales prices**

**- Agreed to basically maintain the sales prices by July**

- Increases in the sales prices was proposed, although they still had negative responses due to increases in 'LCD Capa' in the second half of the year.

**3. Capa Control**

**- They agreed to conduct the 3<sup>rd</sup> step by the 3<sup>rd</sup> quarter of the year**

| | Production Lines | Shut-Down Plan | | |
|---|---|---|---|---|
| | End of 2004 | 1st Step | 2nd Step | 3rd Step |
| | | - 1Q | - 2Q | - 3Q |
| CPT | 8.0 (4,000 people) | 7.0 (3,100 people) | 6.0 (2,600 people) | 5.0 (2,200 people) |
| LPD | 9.5 | 8.5 (Changwon △) | 7.59 (Gumi △) | 6.5 (Hwafei △) |
| SDI | 9.5 | 8.5 (Busan/Shenzhen | 8.0 (Malian/Suwon△5) | 6.5 (Suwon △5) |
| (Submitte | 11.3 | △.5 respectively) | | |
| d) | | 10.3 (Busan △) | | |
| (Actual) | | | | |

(Evidence *Sogap* number 4-81)

☐  Multi-party meeting on July 20 2005

261    The defendants agreed to hold a 'Top Meeting' in August of 2005 to reach an agreement on the necessity of production line adjustment in the second half of the same year after exchanging the information on the sales, inventory and production lines of each company. This can be verified from the schedules of △△ Song from Samsung SDI, the 'G/S MTG Report' and the presentations that were made at the meeting.

**5. Top Meeting**

- With unclear prospects for demand recovery in the second half of the year, the three companies **gradually came to the common understanding that they needed the reconstruction of the companies/production lines.**

**- They had a discussion to come to a common understanding about reconstruction through the Top Meeting at the end of August**

(Evidence *Sogap* number 4-84)

☐  Multi-party meeting on September 28 2005

262    It is shown that the defendants agreed to assign 38.1% to Samsung SDI, 34.4% to LPD and 25.8% to CPT for the market share of 2006. These are the numbers that reflect the differences between the market shares of each company agreed for 2005 and the actually accomplished numbers. They also agreed to reduce the number of the competitors for each customer by supplying only two companies for each customer to coexist with each other.

**2. M/S Allocation for 2006**

☐ Based on a total of 33.4M for three companies in 2006, they agreed to assign 38% to SDI, 35% to LPD, and 26% M/S to CPT

|  | M/S in 2005 | | | M/S in 2006 | |
|---|---|---|---|---|---|
|  | Original agreement | Actual | Differences | Agreement | Quantities |
| SDI | 37.7% | 41.0% | +3.3% | **38.1%** | 12.8M |
| LPD | 34.0% | 34.4% | +0.4% | **34.8%** | 11.6M |
| CPT | 28.3% | 24.6% | △7% | **25.8%** | 8.6M |

☞ **They agreed to introduce 2 vendors for each customer from 2006 to coexist with each other**

(Evidence *Sogap* number 4-87)

263    In addition, the defendants agreed to establish the price standards from CDT detailed sizes clearly for increases in sales prices, minimize the inventory, mutually persuade the customers to justify the causes of price increases and maintain the balance in the price differences for each customer. They also agreed to reduce 0.5 – 1 production line for each company by the first half of 2006 by adding the agreement on the reduction of the production volume to the existing agreement.

☐ **Three companies' discussions on how to increase the sales prices**

☐ Establish the processes for determining the prices

☞ Due to unclear price standards such as Bare/ITC, they can be put into an unfavorable situation when they have negotiations with monitor manufacturers

☐ Minimize the inventory for CDT manufacturers and supplies

☐ Make the monitor manufacturers form an understanding on the causes of price increases

☞ They will persuade the monitor manufacturers by saying that they may be on the road to ruin due to supply-chain collapses from price decreases.

☐ Maintain the price balances for each monitor manufacturer

☞ They will commence with this from ADC, which applies low prices, and gradually expand it

(Evidence *Sogap* number 4-87)

**4. Capa Control**

☐ Beside the plans discussed previously, they agreed to close down 0.5-1 production line additionally for the first step in 2005

☐ They strengthened the line audit for each company to follow-up the arranged plans for implementation

(Evidence *Sogap* number 4-87)

264    In addition, Samsung SDI and CPT had certain disputes over the sales volume to SEC. The message said that when CPT increased the sales volume to SEC without prior approval from Samsung SDI, Samsung SDI warned CPT that it would shrink the sales volume of CPT with price dumping to ADC and Lite-On, which are the primary customers of CPT if CPT did not stop doing this.

Samsung SDI strongly protested CPT's expansion of orders to SEC. It also warned that it would retaliate against CPT regarding its primary customers such as ADC/Lite-On if it did not receive a positive response from CPT. CPT clearly revealed that it would not compete in advance to increase the orders to SEC. It was SEC that assigned the orders in advance.

(Evidence *Sogap* number 3-181)

265    This meeting was a Top-level CDT multi-party meeting held in Taiwan.

The participants were ▢▢ Kim and ▢▢ Park from Samsung SDI, S. D. Han and ▢▢ Lee from LPD and Mr. Zhong and Jing-Song Lu from CPT. This can be verified from the schedules and the 'G/S MTG Report' of ▢▢ Song from Samsung SDI, the 'GSM Top-level Management Meeting' from CPT and the presentations that were made by Samsung SDI and CPT.

☐ Multi-party meeting on November 2 2005

266    At this meeting, the defendants agreed to increase the price by $1 from the current CDT prices, regardless of their customers, and facts were revealed that each member company notified its primary customers of the increases in prices and the other defendants agreed to follow. In addition, it is found that there were disputes over the attacks with price dumping to the primary customers of the other defendants. Through this, you can determine that there were both explicit and implied agreements that they should not attack the primary customers of the other defendants with price dumping among CDT cartel member companies. This can be verified through the 'Contact Report' from CPT.

---

◇ *Due to the causes stated above and the supply of masks, the expenses increased sharply.* Three parties **had common understanding on the current standard of prices** as follows: **The prices increased to USD.$1, regardless of the customers.**
   2. **This week, Samsung SDI will be responsible for official notification of the increases in prices on SEC/EMC, and LPD/CPT will follow.**
   3. **LPD also promised that it would notify LGE/PHS, which are its internal customers, of increases in prices this week.**
   4. With Samsung SDI harassing Lite-On over price dumping, CPT professed serious oppositions to this behavior and requested a return to its original prices. Otherwise, it would not cooperate with SEC.

(Evidence *Sogap* number 3-183)

---

☐ Multi-party meeting on November 21 2005

267    The defendants mutually confirmed with the other participants the implementation of a $1 increase in all the CDT prices agreed in the previous meeting, and from the defendants who were suspicious about the implementation, they obtained promises that they would follow the increases in prices in the future. This can be verified from the schedules and statements of ▢▢ Song from Samsung SDI, the presentations at the meeting and the Report on the Result with the title of 'GSM Meeting' from CPT.

1. Originally, **the three parties had common understanding on all of the customers. This means that they will increase their delivery prices of SL/PC from November, regardless of tube types.** However, only CPT and LPD increased the prices to ADC. Therefore, there were strong complaints on SDI, as it failed to follow the increases in prices.
2. SDI strenuously insisted that there were certain oppositions to increases in the sales prices to the primary customers (ADC/SEC and Proview) that were higher than those to CPT/LPD. **After active discussions, SDI agreed to follow the increases in prices to ADC. SEC/Proview will also make efforts to increase the prices starting from the delivery the following week. CPT and LPD will follow this adjustment after SDI sees that it is successful.**
3. In addition, **LPD argued that LGE had already accepted the request for increases in prices starting from November.**

<div align="right">(Evidence <em>Sogap</em> number 3-184)</div>

☐ Multi-party meeting on December 20-21 2005

268    It is seen that the defendants took an average of the market share by each company of the first and second half of 2005 and calculated the whole market share for 2005, and finally compared these figures mutually with the market share agreed upon previously. As the result of the comparison, the market shares for 2005 by each defendant worldwide were 25.5% by CPT, 335% by LPD and 41% by Samsung SDI. In addition, they agreed not to compete for CDT sales prices, as shown below. This can be verified from the schedules and statements from △△ Song from Samsung SDI, the emails on the meeting schedules sent to the other participants by ☐☐ Kim from LPD, the 'CDT GSM Meeting in December' from CPT, and the presentations that were made by Samsung SDI and CPT.

**I. Actual M/S results by each manufacturer in 2005**

|  | First half of 2005 | Second half of 2005 | Total |
|---|---|---|---|
| CPT | 23.9% | 27.4% | 25.5% |
| LPD | 35.5% | 31.1% | 33.5% |
| SDI | 40.5% | 41.5% | 41% |

**III. Price guarantees**
Continuously decreasing the quantities of CDT has already been irretrievable. The three manufacturers have a common understanding that the decreases in prices cannot create demand, but instead, it can lead the vicious circle of flame wars. **The above manufacturers hope that they will each control themselves and not enter into price competitions.**

<div align="right">(Evidence <em>Sogap</em> number 3-186)</div>

Answer 60-1) Similarly to the statements made at the meeting held just before this, the discussion went along in the order of 'CDT Sales Update' for checking the sales volume of each company, 'Market Share Review' for checking to see if the sales reports are consistent with the market share already agreed upon by each company, and 'Market Information' for discussing the necessity of predicting the future prices in accordance with market changes and to check the market prices.

<div align="right">(Evidence <em>Sogap</em> number 2-1)</div>

Answer 25-1) Above all, the participants checked to see if the market shares worldwide by each company are implemented as agreed. They calculated the market shares on the first half and the second half of 2005, respectively and the whole market share of 2005 from CPT, LPD, and Samsung SDI. As a result, the whole market share of 2005 was 41% by Samsung SDI, 33.5% by LPD, and 25.5% by CPT. However, we understated our sales to avoid criticism from the other participants. According to the meeting report, our market share in the second half of 2005 was actually closer to that of LPD. With the customers' demands dropping sharply, there were certain changes in the market share of 2005, but if the participants had not agreed to maintain the existing market share, we think that they would have seen the steeper changes in the market share. In addition, despite the situation that CDT market was shrinking at that time, the participants had a common understanding that they needed to avoid flame wars resulting from decreases in prices.

(Evidence *Sogap* number 1-1)

(12) Meetings among the competitors for 2006

I. Multi-party meeting on March 13-14 2006

269     It is seen that the defendants checked the monthly sales and market shares by each company and confirmed the differences with the assigned market shares previously agreed upon for 2006. In addition, they again confirmed the control agreement on the production volume by each company, which was agreed upon in Top-level CDT multi-party meeting held in September 2005. It is also found that the defendants adjusted the supply to SEC through agreement and checked to see if the previously agreed production line shut-down plan was implemented. In other words, the defendants had disputes *over AOC, a Taiwanese customer, for imbalance in supply, and they agreed that in return for CPT and LPD,* which reduce the supply to SEC, Samsung SDI would terminate business to AOC. They also confirmed that LPD would close down the Hwafei factory in China and Samsung SDI would close down the Suwon factory in Korea. This can be verified from the 'Visit Report (GSM Meeting)' and statements made by Jing-Song Lu from CPT and the result report under the title of 'Key items for discussion' by □□Ha from Samsung SDI.

---

1.   Competitors' sales and M/S           ...
2.   **Capa Control by each company**
□ **The discussion over Capa Control for three companies completed at the Top-level meeting in September 2005**
4.   About the meeting operations of three companies
□ Change of meeting chairman by three companies ☞ SDI in 2005 → CPT in 2006
□ How to operate the meetings ☞ 1 meeting a month at present followed by 1 meeting either quarterly or bimonthly
□ **Security enhancement and schedules for future meetings**
☞ **Discussion on meeting security reinforcement and future meeting schedules (places)**

(Evidence *Sogap* number 4-93, page 3223)

O SDI stated that it merely supplied the order for OPTVx20K by ADC, which is seeking Brazil's support. This is very unfair to SDI. **SDI proposed to completely terminate business dealings with ADC on the condition that LPD gives up the SEC order and CPTF drastically reduces M/S regarding SEC.** Both CPTF and LPD expressed their willingness to consider this proposal.

III. Hwafei Plant

O [LPD]'s Hwafei expected CDT production to completely cease in 5/E.

V. Miscellaneous

O SDI's Suwon plant will completely cease production of CRT in the near future.

(Evidence Sogap number 3-188, page 2722)

---

*Answer 26-1) This meeting was the last CDT multi party meeting with competitors that I attended.* **How much of the sales portion would be allocated to Samsung Electronics was discussed at this meeting among the participating companies.** *First, Samsung SDI criticized LPD and our company for supplying SDT to ADC at low prices. In addition, [they] stated that sales will stop for ADC on the condition that LPD gives up the order regarding Samsung Electronics and Chunghwa Picture Tubes reduces sales share regarding Samsung Electronics. I did state to the Samsung SDI participant that our company was willing to consider the proposal but the proposal was cordially rejected. Chunghwa Picture Tubes could not give up the CDT sales to Samsung Electronics... Additionally, the meeting participants reviewed the status of its plan to shut down the production line, in detail, the LPD representative stated that the company planned to shut down the Hwafei, China plant by end of May, 2006 and the Samsung SDI representative stated that SDI wanted to shut down the Suwon, Korea plant by the end of the year.*

(Evidence Sogap number 1-1, page 296)

---

4) Implementation facts

A) Implementation structure

270     The defendants of the common actions in this case agreed on the sales price, production volume reduction plan, allocation of the market share rate by market customer, etc. through CDT cartel meetings held regularly for over 10 years and did in fact implement these agreements in markets such as Korea, etc.

271     The items agreed on at the cartel meetings were implemented under the control of the main office of the participating groups. The CDT cartel meeting participants received orders to attend the meetings and the instructions regarding the meeting contents from the main office regardless of whether or not the employee was from the main office's sales, marketing department, or foreign branch office. In addition, the foreign branch office employee reported the agreed results either by email or in the form of a result report after the conclusion of the meeting. The detailed implementation structure according to the agreed measure is as follows:

272     Initially, the agreement regarding the fixed sales price used at the CDT cartel meetings was established among each company's main office or branch office employees, and

the main office or the branch office decided on the sales price to be used in the next negotiation cycle. The negotiation cycle with customers for CDT customarily took place to decide sales price and sales volume. The fixing of the sales price showed up in different forms, i) special price (scope) agreement by cycle, ii) agreement on the lowest price iii) agreement on the price difference by detailed specifications, iv) price agreement considering the quality difference by defendants, v) agreement on the price increase (decrease) range, vi) agreement on the price difference between major customers and small scale customers, vii) agreement on maintaining the previously agreed price etc. Additionally, defendants selected the company to notify customers in connection with the fixing sales price agreement and also agreed on the unit conditions such as the notification date and reason for the price increase etc.

Answer 10) Firstly, to discuss the price, agreements were made on the price increase and the lowest price (minimum, floor, bottom price). Also, a price agreement was made regarding separate customers, and there was an agreement on the detailed prices to be offered by major (primary) suppliers to 6 large customers. There also existed an agreement on the detailed prices to be offered by 2nd (secondary) suppliers to 6 large customers, as well as an agreement on the difference in price to be offered to 6 large customers and minor customers. The decision was jointly made regarding the selection of a company to notify customers, the timing of the price increase and the price increase background to be provided to the customers, and these were also made at the CDT cartel meetings.
(Evidence Sogap number 1-1)

273    The implementation of the agreement was assured by reviewing whether or not to implement the agreed sales price, since they were mostly reviewed at these meetings as noted above. The meeting participants that represented the defendants confirmed the status of implementation for the previous agreement turn by turn, and if a particular company's sale volume had increased based on the information obtained from customers or the market by each company, that company became the target of criticism. Each time, whether the volume increased or decreased was confirmed with a prepared table for items such as each company's production volume, sales volume and inventory volume, etc. and the increased sales volume for a particular customer was recognized as strong evidence of a sale at a low price.

274    Secondly, the defendants agreed on the need for artificial reduction for the overall production volume and also agreed on the detailed measures for the reduced production volume as well in the initial stages of common action of this case. Initially, defendants agreed on non-operation days by month, exchanged plans with each other and secured implementation of the agreement by visiting other party's production facilities and confirming whether or not operation had ceased. Monitoring methods also advanced to be more thorough by the parties agreeing to visit other companies unexpectedly without notice from time to time. In addition, defendants also agreed to shut down worldwide production lines according to the common plans possessed by each company, since operation termination can be faked and costs are involved in monitoring.

Yearly shut down plans were jointly established and the implementation of the agreement was reviewed monthly and quarterly.

Answer 10) There was an agreement on the production volume and worldwide CDT demand was estimated, and then each company's supply amount was designated accordingly in order to prevent a CDT price decrease. The cartel member companies submitted monthly operation termination plans to the head company before the meeting and the days of operation termination was set at the meeting. Also, an agreement was made to shut down the worldwide CDT plants' production lines themselves when the CDT market gradually contracted. The reason for agreeing to reduce production was with the agreement on price, it was not easy to monitor if there was deviation from the agreement due to products' different specifications and difference in quality. The participating companies even sent their employees to other companies to directly inspect whether or not operation ceased or lines were shut down.

(Evidence Sogap number 1-1)

275     Thirdly, the defendants also agreed on the allocation of the market share and sales volume share by customer in order to avoid mutual competition. The defendants do not have to compete in production technology and sales activities if shares are allocated by each company, and therefore they agreed to the allocation of market shares. The defendants agreed on market share rates based on previous sales volume materials for each company in order to allocate CDT market share rates and reviewed the implementation of the agreement based on the actual sales volume during each meeting. The agreement took place without many issues at most meetings, and they also adjusted the allocated share for the defendant that had more sales than the agreed share. They also compensated the member companies that had an actual sales figure of less than the allocate share and tried to implement the agreement depending on the market situation changes by readjusting the market share rates, etc.

Answer 10) Also, an agreement was made regarding the market share rate, and so there was an agreement on the sales share rate for each member company for the worldwide CDT market and for the sales share rate by customer, which  was reviewed to check whether there was compliance at each meeting.

(Evidence Sogap number 1-1)

276     In addition, these methods were also used for sales volume allocation for customers in a similar situation and members decided on the main suppliers and the 2nd suppliers by customers and mutually selected each sale's share rate. If sales did not take place according to the agreement, share rates were readjusted or encouraged implementation of the agreement through mutual discussions and further agreement and thus they were able to come to an agreement on the allocation of shares by customers. Each company enjoyed the benefit of not having to compete with other defendants for major customers with the allocation of the sales volume shares by customers. It was simple to monitor and check to see if other companies had supplied certain company's major customer with a low price, since its order would decrease and

the affected company would mention that it would use the same method to cause damage to the competitor at the cartel meeting and thus smooth implementation of the agreement on the mutual share rate could take place.

---

Answer 16) **The member company that had discovered non-compliance with the agreement would make threatening statements to the effect that it could also cause damage to the other company with similar methods .**

Answer 28) "Penalty: ⬚The other 2 companies will attack the trouble maker's major customers" is a suggested penalty for the participant that does not carry out the agreement ... ⬚'s meaning is "let the 2 companies supply the non-compliant company's major customers with low prices and take away the volume.

(Evidence Sogap number 2-1)

---

277    We know for a fact from these details that the defendants used various agreement methods and operated monitoring and control system to effectively implement the agreement made at the CDT cartel meetings.

B) Agreement's Implementation

278    Looking at the above 2. A), this case's common actions took place over a period of more than 10 years through cartel meetings that were held at least once every month. The items agreed on by the defendants from each meeting were reviewed at the next meeting to see if they were implemented and control rules were also established. The fact that this case's common action defendants disclosed the implemented items at each cartel meeting themselves and received confirmation from other defendants is confirmed based on statements made by the participants who attended each of these meetings as well as evidentiary materials.

B. Applicable Legal Provisions

Monopoly regulation and laws related to fair trade (prior to being amended as Act No. 7492 on April 1, 2006) Article 2-2 (applicable to acts in other countries) will apply even if the act occurred in a foreign country if the domestic market is affected. < This article was established in December 31, 2004>

Article 19 (Prohibition of Improper Common Actions) ⓐ A business person shall not improperly limit competition by entering into an agreement to carry out any 1 of the following items (herein below referred to as "Improper common actions") or cause other business persons to carry out such acts by the use of agreement, negotiation, decision or any other methods.
1.   Actions to set, maintain or change the price
2.   (Deleted)
3.   Actions to limit the product's production, release, transport or transactions or limit areas

C. Determination of Illegality

1)   Requirements to establish illegality

279     In order to establish improper common action under Act Article 19 Section 1, a business person enters into an agreement with another business person with agreement, negotiations or decisions and other methods regarding the acts specified in Act Article 19 Section 1 and such action does improperly limit competition. This Act applies even if these improper common actions took place in foreign countries if the actions affect the domestic market.

2)   Applicability of requirements for illegality

A)   Whether an agreement exists

(1)   Meaning of the agreement

280     There must be an agreement between the business persons through agreement, negotiations, decision or any other method to carry out common actions in order to establish improper common action. Agreement that establishes improper common action not only includes explicit agreements such as agreement and negotiations, etc. but also implicit agreements such as understanding between business persons. Agreement from the improper common action perspective means exchange of intent between the business persons and includes not only explicit agreement but also cases of implicit agreement or tacit understanding.[39]

281     Improper common action under Act Article 19 Section 1 means agreeing to carry out acts covered under any 1 item under the said section to actually limit competition for a particular transaction by a business person mutually with another business person and it does not require actually carrying out the act according to the agreement, and even if one business person did not intend to carry out the actions according to the agreement and agreed without any actual intention, this does not prevent the establishment of improper common action, since the other business person believes the unintended business person to act according to the agreement and the unintended business person also uses the fact that the other business person would act according to the agreement as established and thus this is equivalent to acts that limit competition. The above agreement need not take place among all the business persons participating in certain transactional area or a particular bidding and the act will be deemed an improper common action even if the act occurred only among some business persons if such an act is viewed as actions to limit competition.[40]

282     However, business persons continuously engage in common actions such as price decision, maintaining or changing prices, etc. in future with the purpose of limiting competition, designating certain standards such as principal agent for decision and decision method, etc. and further agree on the basic rules regarding the agreement such as to meet regularly in the future in order to implement these rules, and does meet multiple times during the implementation stage of the above agreement and carries out the agreement on detailed price decisions etc., This series of meetings may constitute improper common action overall, even if details of certain meetings or agreements change or there are changes to the membership composition. Additionally, in the case that agreements were made on pricing decisions and implementation actions based on such decisions, the expiration date of the improper common action is not the date of such agreement but rather the conclusion date of the actual

---

[39] Refer to Seoul High Court December 11, 2001 Announcement 2000Noo16830 decision
[40] Refer to Supreme Court February 23, 1999 Announcement 98Doo15849 decision

actions based on such agreement.[41]

283     Regarding "Whether it can be concluded that an agreement had been established regarding the basic rules and if price collusion had taken place", the following are important factors in making such determination: are there circumstances that show that price collusion was planned for a long term when the initial price collusion took place, if each price collusion took place regularly and at a certain interval, if the principal agent that determined the price increase at each price collusion was the same, if the effect from each price collusion continued to the next collusion and if a new collusion took place based on the agreed upon price from the previous collusion, etc. [42]

(2) Whether the action is subject to Act Article 19 Section 1 Clause 1

284     "Act that sets, maintains or changes the price" as specified by Article 19 Section 1 Clause 1 refers to the action taken by business person mutually with another business person to set, maintain or change the price of a product or service. The "price" referred to in this statement means the price *received by business person in return for providing a product or service, namely, it refers to all economic* benefits received by the business person from the other party to the transaction as a consideration and includes all products or service regardless of name if it is something that should be paid to the business person by the other party for the transaction in light of an applicable product, service characteristic, transaction details and method, etc. as compensation for a product or service.[43]

285     This price derived from "price determining action" does not only mean the final price itself that is related to the concluded transaction, but also includes the actions that determine the final transaction price, as well as actions that determine the factors necessary to determine the said final price such as the final price, average price, normal price, standard price, highest/lowest prices, etc.[44]

286     The case of two or more business people engaged in acts under Article 19 Section 1 refers not only to cases where business people determine the same final transaction prices for the same products, but also includes all acts that set the price's compositional factors' level or limit, such as acts in setting the basis for price determination such as the average price, normal price, standard price, highest or lowest price, etc. regarding the same or similar products, acts in setting the price increase or price decrease rate (range), profit rate or discount rate, etc. (Seoul High Court January 17, 2007 Announcement 2004Noo17060 decision)

---

[41] Refer to Supreme Court March 24, 2006 Announcement 2004Doo11275 decision
[42] Refer to Seoul High Court August 20, 2008 Announcement 2007Doo2939 decision
[43] Refer to Supreme Court May 8, 2001 Announcement 2000Doo10212 decision
[44] Refer to Supreme Court June 14, 2002 Announcement 2000Doo8905 decision, Seoul High Court October 10, 2000 Announcement 2000Noo1180 decision

In addition, mutual agreement as to the price guidelines is also deemed to be an improper common action designated by Article 19 Section 1 Clause 1.[45]

287      Accordingly, as seen in the actions of the above section 2.1., this case's defendants agreed on the lowest price, price guideline, sale price range, sale price increase and decrease range, price differentiation by detailed specification, etc. for CDT and also agreed on the price increase cause to be sent to the customer, notification person by customer, timing of the price increase notification and timing of the price, increase etc. and therefore, these actions are deemed to be an "Act that sets, maintains or changes the price" specified by Article 19 Section 1 Clause 1.

(3) Whether the action is subject to Article 19 Section 1 Clause 3

288      "Act that limits the product's production, release, transport or transaction or limits service" specified by Article 19 Section 1 Clause 3 refers to acts that bring about price maintenance or increase by each party business person limiting the production volume or sales volume to a certain level or reducing it to a certain share. In the case that the market share was set previously by agreement, the participating business persons must limit the product sales volume to maintain the agreed upon market share and thus this action constitutes acts that limit the product's production, release or transaction.[46]

289      Accordingly, as seen in the actions of the above section 2.1., this case's defendants attempted to prevent a price decrease by removing excess supply in response to the overall reduction of demand worldwide for CDT and thus they agreed to allocate the CDT market share by business or allocate the sales share by customer and implemented the agreement. In the case that the market share was set by previous agreement, the production volume must be limited to comply with the market share level in order to maintain the market share that was agreed to and ultimately, this leads to reduced competition regarding the market price, quality and service [47]and therefore such common acts

---

[45] Refer to Supreme Court July 12, 2002 Announcement 2000Doo10311 decision
[46] Refer to Supreme Court May 8, 2001 Announcement 2000Doo10212 decision, Seoul High Court November 16, 2000 Announcement 99Noo6226 decision
[47] Supreme Court May 8, 2001 Announcement 2000Doo10212 decision

regarding market share are deemed to be an "Act that limits the product's production, release, transport or transaction or limits service" specified by Article 19 Section 1 Clause 3. Additionally, the defendants agreed to days of non-operation of production lines and to shut down production lines in order to reduce the production volume and monitored whether or not operations ceased and mutually inspected the implementation of such acts in order to reduce the production volume, and thus these acts are applicable to Article 19 Section 1 Clause 3.

(4) Common action as one

290     Not only the case where defendants agree on the basic rules regarding improper common action and coming to an agreement on multiple occasions during the implementation stage, but also cases where multiple agreements were made over a long period of time without agreement on such basic rules and holding such meetings in series will be deemed to be an improper common action overall if those meetings continued without interruption based on the same intent and were carried out for the same purpose, even if there were some changes to each detailed content's agreement or membership composition, etc. without extenuating circumstances. [48]

291     As seen in the above 2. A) actions, this case's defendants conducted several cartel meetings and also agreed continuously on detailed sales price, the market share and production volume reduction, etc. during the common action period, thus this action is deemed to be one of common action considering the following:[49]

292     Firstly, defendants tried to bring about CDT's stable sales price (increase, maintain or prevent rapid decrease) during the common action period and participated in cartel meetings in order to carry out the same purpose with the same intent in order to maintain commercial viability and prevent mutual damage from price competition in the CDT market, and to adjust to the market demand situation with agreement on the allocation of the market share and production volume reduction, etc.

---

[48] Refer to Supreme Court September 25, 2008 Announcement 2007Doo3756 decision

[49] In this case, it could be determined that the basic agreement was established at the first multi-party meeting on November 23, 1996. That is, this meeting was attended by the CEO of the defendants and there were agreements on information exchange for production status and planning, sales price decrease control, as well as price agreement and reduction of the production volume, and these discussion details and agreement methods had a mutual relationship with later cartel meetings attended by staff members in that they became more detailed and continued during the common action period. In addition, this point is reinforced by the fact that they agreed to involve other competitors that had not attended the meeting and thereby displayed their intention of prolonging these cartel meetings over a long period of time.

293    Secondly, the defendants repeated the agreements and implementations without interruption during the common action period in order to achieve the cartel meeting's purpose. During this process, the defendants not only agreed on the sales price, but also consistently agreed and implemented the market shares by customers and production volume reduction, and also maintained the agreement method's same quality continuously by having the CEO to middle managers and staff members attend the meetings in a layered structure and by holding the meetings over a period of some 10 years in a regular cycle with more than 1 meeting per month, etc.

294    In particular, there was mutual connection of intention without interruption during the process of yearly repeated and routine agreements and implementation of this case's cartel meetings. That is, defendants discussed the implementation of previously discussed items and the feasibility of a price increase agreement, etc. after exchanging each company's production/sales status, future demand estimates and current prices, etc. at each cartel meeting.

295    In addition, each company readjusted in each quarter by incorporating the changed circumstances after agreeing on the yearly shares by each company based on the previous year's sales volume materials regarding the market shares. Additionally, the defendants continuously agreed on the production volume reduction at each meeting in order to prevent a price decrease in line with the defendants' estimated demand volume regarding the production volume reduction, and the implementation of such measures was confirmed by the defendants actually visiting each other companies to check on operation termination.

296    Thirdly, considering the fact that the participants in the meetings were composed mainly of the defendants and that this was maintained even though certain changes were made during common action period[50], this case's common action constitutes one common action.

---

[50] LPD, among the defendants, initially attended as LG Electronics and Phillips Electronics, but later attended as an LPD member when attending relevant meetings related to this case's common action meetings when LPD was established as a joint venture by merging the CRT business divisions of both companies and thus there is no difference in the consistency of the participants.

B) Determination on the limitation on competitiveness

297      The act of business people mutually deciding or changing the price leads to a situation where their intention affects the freely determined price or causes concern over such a situation by reducing the price determination within such a range and therefore this type of common action by business people is improper without any extenuating circumstances. [51]

298      Allocation of the sales volume or market share of the Asian market, etc. including the Korean market, and the price of the Korean market's product import/sales price formation and being maintained at a higher level than it would usually be under general factors by use of actual limitation of competition among business people as a result of an agreement on sales price maintenance and decision, etc. must be deemed to be a limitation of competition. [52]

299      In the case that the market share was set by previous agreement, the production volume must be limited to comply with the market share level in order to maintain the market share that was agreed to and ultimately, this leads to reduced competition regarding the market price, quality and service and therefore such common acts regarding the market share are limiting acts regarding the applicable product's production, release or transaction and thus this is deemed to be an improper common action under Article 19 Section 1 Clause 3, which controls the transactional market's competition.[53]

300      The actions reviewed in above 3. A., the common actions of the defendants in this case, constitute a common action that clearly causes only limitation on competition when considering the following: [54]

301      Firstly, this case's common actions are actions that resulted in agreements and implementations by agreeing on the market share allocation and production volume reduction, etc. through cartel meetings to artificially increase and maintain CDT's price that are sold in Korea and other markets and "price", "production volume" and "market allocation", etc. are inter-related and therefore these acts are deemed to be actions that are intended to limit competition and not for any other purposes.

...

[51] Refer to Supreme Court March 26, 2009 Announcement 2008Doo2058 decision

[52] Refer to Seoul High Court November 24, 2004 Announcement 2003Noo9000 decision

[53] Refer to Supreme Court May 8, 2001 Announcement 2000Doo10212 decision

[54] According to the Review Standard for common action (Amended August 12, 2009, Fair Trade Commission Established Rule No. 71, IV. Review of Illegality of Common Action), price, decision or limitation of production volume or allocation of the market or customer, etc. is considered to be clear cases with only limiting effects on competition.

302     Secondly, the defendants' agreement on the CDT price or production volume makes it clear that competition is completely excluded by monopolizing the market, since they exercised complete dominance due to their holding of almost 100% of the CDT market from around 2002. It also cannot be said that defendants intended to encourage competition when they selected the amount of the price decrease while the market size was shrinking and the price was decreasing due to the demand changing from CDT to flat displays. Price agreement is not limited to an agreement regarding price stabilization or price increase, but includes all common actions that impede promotion of non-price competition, such as quality or service, etc. and impede a faster price decrease while the market is experiencing a price decline trend without common and artificial price selection.

303     Thirdly, it is also clear that the defendants fundamentally participated in this case's common actions with intent to restrict competition. Firstly, the information exchanged by the defendants at the cartel meetings was generally information that is difficult to obtain from the market such as each company's production and sales volume, production line conversion plans, each company's orders and inventory status, each company's current prices and each company's future pricing plans, etc.[55] In addition, the defendants encouraged agreement by continuing with the argument that mutual competition can lead to mutual damage and thus it should be controlled at the actual cartel meetings. The defendants reviewed other companies' compliance with the agreed upon items and insisted on implementing the agreed upon items if any violations were discovered, such as excessive discounting, taking away another company's order, or not reducing the production volume or sales volume as agreed.

304     Fourthly, this case's common action does not have any relationship with the economic result that increases efficiency. The CDT cartel organized by the defendants is simply a communication system for adjusting and reaching an agreement on the sales price, allocation of the market share, reduction of the production volume and does not constitute an Economic Association that improves efficiency such as production, sale, purchase and research & development, etc.

---

[55] Actually, this fact is further supported by agreeing to not maintain evidence of meeting materials and limiting the number of people that may attend the meeting from each company to maintain the secrecy of the cartel meetings and the fact that meeting materials and the result reports are marked "secret" or "confidential", etc.

305    Accordingly, the defendants' decision on the sales price, production volume restriction and market allocation, etc. for the CDT market are clearly intended to limit competition, since these were actions that were taken mutually by agreement on CDT's sales price and limit on the production volume, etc. even though these decisions were to be made separately by the business people independently and these actions lead to reduced competition or cause competition to disappear among the business people in the CDT market and thus constitute actions that improperly restrict competition.

3) Conclusion

306    The defendants' CDT sales price setting actions violate Article 19 Section 1 Clause 1 and the actions to reduce the production volume and allocate market shares violate Article 19 Section 1 Clause 3.

4. Disposition

A.    Corrective measures and assessment of fines

307    As seen previously, the defendants have almost 100% market dominance in the domestic CDT sales market and the economic restrictive effect and the ripple effect severity is deemed to be substantial, and therefore a fine will be imposed pursuant to the Laws related to Monopoly Control and Fair Trade[56] Article 22 and Article 55-3, Enforcement Regulations of the said Act[57] Article 9 and Article 61 Section 1 [Asterisk2], Announcement on Imposition of Fine and Criteria[58] (herein below referred to as "Announcement of Imposition of Fine) 2. C. (1)[59].

...

---

[56] April 1, 2005 Enforcement Regulation (Provision No. 7315) supplemental Provision Article 8 (Interim Measure related to Fine for Improper Common Action) provides; "Those actions that took place prior to the effective date of this law and were concluded prior to the effect of this law or even after this provision goes into effect, the portion consisting of the continuous act  shall be subject to the previous regulation." In addition, April 1, 2005 Enforcement Regulation Enforcement Order (No. 18768) Supplemental Provision Article 4 (Interim Measure related to Fine for Improper Common Action) provides; "Those actions that took place prior to the effective date of this provision and concluded prior to the effect of this provision or even after this provision goes into effect, the portion consisting of the continuous act shall be subject to the previous regulation." However, the common action of this case consists of November 23, 1996-March 14, 2006 and thus the imposition of a fine pursuant to Article 22 refers to the fine that was in effect prior to the amendment by April 1, 2005 Enforcement Regulation No. 7315. Same as below.

[57] Refers to the fine prior to the amendment by April 1, 2005 Executive Order No. 18768. Same as below.

[58] Apply April 1, 2004 Fair Trade Commission Announcement No. 2004-7 pursuant to July 13, 2005 Fair Trade Commission Announcement No. 200-15 Supplemental Provision Article 2.

[59] Pursuant to Announcement of the fine 2. C. (1), the fine is imposed as a principle for improper common action.

However, corrective measures designed to prevent future illegal actions will not be imposed, since the defendants are not engaged in the CDT business due to the disappearance of the domestic CRT industry and there is no actual benefit of any corrective measures as of the date of the decision.

B. Calculation of the fine

1) Calculation of the basic fine

A) relevant sales amount

(1) Range of relevant products

308     A CDT for computer color monitors is the product that was affected directly or indirectly by the common action of this case. Products of 14", 15", 17" and 19" are decided as the related products for which agreement is to be sought.

(2) The dates the violation acts were initiated and terminated

309     For defendant Samsung SDI, defendant Chunghwa Picture Tubes, defendant Chunghwa Picture Tubes  Malaysia[60] and Chunghwa Picture Tubes Fuzhou [CPTF Optronics Co. Ltd.], the commencement of a common action is November 23, 1996. On the same date, Samsung SDI, defendant Samsung SDI, defendant Chunghwa Picture Tubes, defendant Chunghwa Picture Tubes Fuzhou and Orion held a highest level CDT cartel meeting, which was attended by each company's CEO, and exchanged information related to production status and future plans, which are essential for a CDT multi-party meeting, and agreed on production volume reduction, sales price decrease control and also agreed to each take on the roles of encouraging the participation of the other CRT business people. Thereafter, the CDT cartel continued for more than 10 years and thus November 23, 1996, the date on which defendant Samsung SDI, defendant Chunghwa Picture Tubes, defendant Chunghwa Picture Tubes Malaysia and Chunghwa Picture Tubes Fuzhou agreed on improper common action will be deemed to be the commencement date of the common action.

310     For defendant LPD, June 30, 2001 will be deemed to be the commencement date of the common action of this case.

---

[60] Refer to footnote 5) and footnote 14) as seen previously

As seen previously, LPD was established on June 11, 2001 by a holding company LPD by merging CRT business divisions of LG Electronics and Phillips Electronics, and the CRT business division was transferred to LPD by LG Electronics in the same year on June 30 and by Phillips Electronics in the same year on July 1. It participated for the first time at the cartel meeting on July 24, 2001 and received major sales materials/personnel information from the parent companies LG Electronics and Phillips Electronics. Considering that there was agreement with multi party meeting participants on the sales price by standard, production line termination, etc. on April 19, 2001 and June 27, 2001 when the parent company participated in the common action of this case as well as continuing with collusion regarding the foregoing on July 24, 2001 as a participant by the newly formed company on sales price guidelines establishment and maintaining termination of the production line, etc. with the same participants, thus there is a finding of restriction of competition and continuity of its effect, and therefore the date of the transfer of business of June 30, 2001 will be deemed to be the commencement date of the violation.

311    In addition, the date of conclusion of the common action refers to the date from which these agreements no longer took place and the fact that agreement no longer exists means engaging in actions that are clearly contrary to the agreed upon actions and thus it is difficult to determine if the agreement is being maintained. Examples of such actions are: if there were designated conditions or a deadline related to the agreement, these conditions were satisfied or the deadline had expired; or the applicable business person withdrew; there was an agreement to terminate the existing agreement or *return the increased price to its original position by agreement between business people, etc.*[61]

312    Accordingly, the termination date of this case's common actions is March 14, 2006. There is no evidence of any new meetings by the defendants after this date and it is unclear whether or not actual common action existed further. The fact is that the CEO of Chunghwa Picture Tubes testified that [it] was the last multi party meeting with the competitors. The fact is that the defendants discussed the plans to close Chinese, Korean and other plants and cease production lines at the last meeting on March 14, 2006 as well as the fact that it is difficult to acknowledge the common actions of this continuing under the condition of rapid contraction of the CDT market's demand and rapid conversion to the flat display market all lead to the conclusion that this case's common action's termination is March 14, 2006.

(3) Range of the relevant sales amount

---

[61] Refer to Seoul High Court November 24, 2004 Announcement 2003Noo9000 decision

The relevant sales amount refers to "The sales amount from the sale of products or service in a particular transaction area during the violation period by the violating business person or the same amount.[62] Accordingly, Samsung SDI and Chunghwa Picture Tubes' relevant sales amount is the amount that the defendants exported to Korea or sold domestically for all CDT products from November 23, 1006~March 14, 2006 and for LPD's relevant sales amount, the period is from June 30, 2001~March 14, 2006. However, 14" and 15" CDT products were included as the subject of agreement for the entire period of the common action, although17" CDT product was included as a collusion product starting from July 31, 1998 and 19" CDT product was included as a collusion product starting from January 18, 1999 and thus the relevant sales amount for those products will begin on the aforementioned dates and last until March 14, 2006.

B) Criteria for the imposition rate

314     Under the Announcement of Fine rule of 1. C. (1). (A)[63], the fine is to be set according to the violation act's severity, and thus the calculated point is 3.0[64] according to the Guidelines on Determination of Severity of Violations IV. 2. C. (1) relevant [Asterisk3], and a calculated point that is over 2.2 is deemed to be a very severe violation and therefore the imposition rate is 3.5%~5%. However, the 3.5% criteria imposition rate will be applied considering the fact that [acts] were carried out to ease and maintain the sales price's decrease amount during the collusion period of this case, the fact that most of the violations took place prior to the Announcement of Fine of April of 2004 and the fact that the acts were carried out to ease the deterioration of profit due to the CDT market's rapid changes and rapid demand reduction.

C) Basic fine amount

315     The basic fine total per defendant is as noted below pursuant to the criteria for the imposition rate <Table 28>.

...

---

[62] Enforcement Regulation Article 9 (Calculation method for fine) Section 1

[63] Announcement of Fine 1. C. (1) Improper common action

(A) The basic fine amount is calculated by multiplying the imposition criteria rate by the severity of the violation to the relevant sales amount.

| Degree of Severity | Imposition Criteria Rate |
| --- | --- |
| Very severe violation acts | 3.5%~5.0% |

[64] This case's violation details according to the Guidelines for determination of the severity of the violation act and calculation of the relevant sales amount when imposing fines: 0.5 (weight) x 3 points (Imposition level: High) = 1.5 points, market dominance rate among factors to consider for severity of violation act: 0.2 (weight) x 3 points (imposition level: High) =0.6 point. Ripple effect of violation acts: 0.3 (weight) x 3 points (Imposition level: High) = 0.9 point. The total of calculated points is 1.5 points + 0.6 points + 0.9 points = 3 points and is thus higher than 2.2 and therefore qualifies as a very serious violation act.

&lt;Table 28&gt;                           *Basic Fine Amount*

(Won)

| By Defendant | Relevant Sales Amount | Imposition Criteria Rate | Basic Imposition Amount |
|---|---|---|---|
| Samsung (SDI) | 2,079,129,417,703 | 3.5% | 72,769,529,619 |
| LPD (LPD) | 621,349,000,000 | 3.5% | 21,747,215,000 |
| Chunghwa Picture Tubes | TWD 6,039,799,493 (232,592,678,475) | 3.5% | TWD 211,392,982 (8,140,743,746) |
| Chunghwa Picture Tubes Malaysia | TWD 89,488,243 (3,446,192,237) | 3.5% | TWD 3,132,088 (120,616,728) |
| Chunghwa Picture Tubes Fuzhou | TWD 79,677,374 (3,068,375,672) | 3.5% | TWD 2,788,708 (107,393,148) |
| Total | 2,939,585,664,087 | - | 102,885,498,241 |

*3 companies of Chunghwa Picture Tube's Taiwan dollar (TWD) is derived as the commission decision date (January 26, 2011). Converted to won by applying the Korea Foreign Exchange Bank's initially announced sales basis rate (1 TWD – 38.51 won)

D) Calculation of the mandatory adjusted fine amount

316    The defendants do not have any basis for mandatory adjustments and therefore the basic fine amount is adopted as the adjusted fine amount.

E) Calculation of discretionary adjusted fine amount

317    (1) There was participation by high level executives who are directors or occupy a higher position who directly participated in the violation acts during the defendants' common actions of this case, and therefore 10% of the mandatory adjusted fine amount is added pursuant to the Announcement of Fine IV. 3. B.[65].

318    (2) Defendant Chunghwa Picture Tube, defendant Chunghwa Picture Tube Malaysia, and defendant Chunghwa Picture Tube Fuzhou had consecutive negative profits for years 2008 and 2009 and LPD[66] had negative profit for the years 2007 and 2008 and therefore,

---

[65] Announcement of Fine IV. 3. B. Grounds for additional amount and weight
  (5) In the case that the director or a higher position officer of the violating business has directly participated in the violation acts: less than 10 of 100
  (6) In case of causes that come under above miscellaneous items (1) to (5): Less than 10 of 100
[66] Determination was made with only 2007 and 2008 quarterly profit statements, since LPD had transferred the CRT business and assets in 2009 and it is currently not in operation and therefore there are no business reports for the year 2009.

20% of the mandatory adjusted fine amount is reduced pursuant to Announcement of Fine IV. 3. (C). (8). (B)[67].  The discretionary adjusted amount of the fine per defendant is as noted below <Table 29>.

<Table 29>                           Discretionary Adjusted Fine Amount

(Won)

| Defendant | Mandatory Adjusted Fine Amount | Additional/Reduction Rate | Amount of Adjustment | Discretionary Adjusted Fine Amount |
|---|---|---|---|---|
| Samsung (SDI) | 72,769,529,619 | 10% | 7.276,952,961 | 80,046,482,580 |
| LPD (LPD) | 21,747,215,000 | ⚠ | 2,174,721,500 | 19,572,493,500 |
| Chunghwa Picture Tubes | TWD 211,392,982 (8,140,743,746) | ⚠ | TWD 21,139,298 (814,074,374) | TWD 190,253,684 (7,326,669,372) |
| Chunghwa Picture Tubes Malaysia | TWD 3,132,088 (120,616,728) | ⚠ | TWD 313,208 2,061,672 | TWD 2,818,880 (108,555,056) |
| Chunghwa Picture Tubes Fuzhou | TWD 2,788,708 (107,393,148) | ⚠ | TWD 278,870 10,739,314 | TWD 2,509,838 (96,653,834) |
| Total | | - | | 107,150,854,342 |

F) Determination of the Imposed Fine Amount

319     (1) The defendant LPD[68] transferred the CRT business division to Meridian Solar & Display Co. Ltd. on June 8, 2009 and it is currently closed and its asset is only 15 million won with liabilities of over 30 billion won, and therefore it is objectively deemed to be unable to pay the fine and therefore the fine is waived for this entity.

320     (2) Considering the fact that defendant Samsung SDI, defendant Chunghwa Picture Tubes, defendant Chunghwa Picture Tubes  Malaysia, and Chunghwa Picture Tubes Fuzhou experienced deterioration of profitability due to industry re-structuring arising from the rapid price decrease and rapid decrease of demand for the applicable year in the CDT market, the fact is that the improper profit is small due to the actual loss of quarterly profits related to relevant products over the last 3~4 years, the fact is that there is no record of illegal activities over the past 3 years and [they] have introduced CP and are implementing them to prevent re-occurrence of violations, the fact is that there exists decisions by the Fair Trade Commission that had mitigated for management difficulties related to the market/industry for the applicable year,

---

[67] Announcement of Fine IV. 3. C. (8)
    (A) In the case that previous year's profit is negative: less than 10 of 100
    (B) In the case that recent quarterly profit is consecutively negative for more than 2 years: less than 20 of 100
[68] Parent company LPD Holdings (Netherlands company) is currently in bankruptcy and in the process of liquidation.

the fact is that the domestic and foreign market or the industry's objective circumstances or conditions' rapidly change and therefore the CDT market has disappeared, it is deemed that imposition of the discretionary adjusted fine amount is excessive and therefore 70% of the discretionary adjusted fine amount is reduced pursuant to Announcement of Fine 4. A. (2)'s regulation. However, any amount less than 1 million won is removed pursuant to Announcement of Fine 4. E.'s regulation. The imposed fine amount per defendant is as noted below in <Table 30>.

<Table 30>                     Imposed Fine Amount              (1000 Won, %)

| Defendant | Discretionary Adjusted Fine Amount | Reduction Rate | Imposed Fine Amount | Limits on Imposed Fine Amount | |
|---|---|---|---|---|---|
| | | | | 5% of 3 year average sales amount | 3 year average sales amount |
| Samsung (SDI) | 80,046,482 | 70 | 24,013,944 | 276,998,000 | 5,539,965,000 |
| LPD (LPD) | 19,572,493 | 100 | 0 | 42,371,000 | 847,437,000 |
| Chunghwa Picture Tubes | 7, 326, 669 (TWD 190, 253, 684) | 70 | 2,198,000 (TWD 57, 076, 105) | 110,111,000 | 2,202,227,000 |
| Chunghwa Picture Tubes Malaysia | 108,555 (RWD 2, 818, 880) | 70 | 32,566 (TWD 845, 664) | 19,981,000 | 399,636,000 |
| Chunghwa Picture Tubes Fuzhou | 96,653 (TWD 2, 509, 838) | 70 | 28,996 (TWD 752, 951) | 34,472,000 | 689,442,000 |

*Taiwan dollar (TWD) is converted at the amount of 1 TWD = 38.51 won

5. Conclusion

321     The defendants' actions of above 2. A. are in violation of Article 19 Section 1 Clause 1 and Clause 3, and therefore the decision is hereby rendered as contained in the main text by applying the regulations of Article 22 for the order to pay a fine.

**The Fair Trade Commission hereby renders its decision as noted above.**

March 11, 2011

**Chairperson** **Commission Chairman** Dong Soo Kim

**Chief Commissioner** **Hak Hyun Kim**

Commissioner Young Ho Ahn

Commissioner Myung Cho Yang

Commissioner Hong Kwon Lee

Commissioner Sung Hoon Chun

Commissioner Jong Won Choi