# EXHIBIT G

[UNREDACTED VERSION]

Case 4:07-cv-05944-JST   Document 1736-7   Filed 06/14/13   Page 2 of 6

In Re: Cathode Ray Tube (CRT) Antitrust Litigation
This Document Relates to: All Actions
GEOFFREY SHAVEY, 30(B)(6)
December 07, 2012

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5  IN RE: CATHODE RAY TUBE (CRT) )
    ANTITRUST LITIGATION          )
 6                                )
    _____ )
 7                                ) No. 07-5944 SC
                                  ) MDL No. 1917
 8  This Document Relates to:     )
                                  )
 9  ALL ACTIONS                   )
                                  )
10  _____ )
11     VIDEOTAPED 30(B)(6) DEPOSITION UPON ORAL EXAMINATION
12                          OF
13              COSTCO WHOLESALE CORPORATION
14                    GEOFFREY SHAVEY
15
16                      9:04 A.M.
17                   DECEMBER 7, 2012
18           1209 THIRD AVENUE, SUITE 4800
19                  SEATTLE, WASHINGTON
20
21
22
23
24  REPORTED BY: JULIE R. HEAD, CRR, RPR, CCR No. 3119
25
```

Page 3

```
 1                    A P P E A R A N C E S
 2
 3  FOR THE INDIRECT PURCHASER PLAINTIFFS:
 4       ROBERT J. GRALEWSKI, JR.
         Kirby McInerney LLP
 5       825 Third Avenue
         New York, New York 10022
 6       212.371.6600
         bgralewski@kmllp.com
 7
 8  FOR THE PANASONIC DEFENDANTS:
    (Present via teleconference call.)
 9
         SOFIA ARGUELLO
10       Winston & Strawn LLP
         200 Park Avenue
11       New York, New York 10166
         212.294.6700
12       sarguello@winston.com
13
14  FOR THE DEFENDANTS KONINKLIJKE PHILIPS ELECTRONICS NV
    AND PHILIPS ELECTRONICS NORTH AMERICA CORPORATION:
15
         DAVID T. EMANUELSON
16       Baker Botts LLP
         1299 Pennsylvania Avenue, NW
17       Washington, DC 20004
         202.639.7843
18       david.emanuelson@bakerbotts.com
19
20  FOR THE DEFENDANTS SAMSUNG ELECTRONICS CORPORATION, LTD,
    AND SAMSUNG ELECTRONICS AMERICA, INC.:
21
         DAVID K. ROBERTS
22       O'Melveny & Myers LLP
         1625 Eye Street, NW
23       Washington, DC 20006
         202.383.5300
24       droberts2@omm.com
25
```

Page 4

```
 1  FOR THE TOSHIBA DEFENDANTS:
    (Present via teleconference call.)
 2
         CHARISE NAIFEH
 3       White & Case LLP
         701 Thirteenth Street, NW
 4       Washington, DC 20005
         202.626.3600
 5       cnaifeh@whitecase.com
 6
 7  FOR COSTCO WHOLESALE CORPORATION AND THE WITNESS:
 8       ERIC J. WEISS
         NICK HESTERBERG
 9       Perkins Coie
         1201 Third Avenue, Suite 4800
10       Seattle, Washington 98101
         206.359.8000
11       eweiss@perkinscoie.com
         nhesterberg@perkinscoie.com
12
13  FOR THE STATE OF CALIFORNIA:
14       PAUL A. MOORE, III
         Office of the Attorney General
15       455 Golden Gate Avenue, Suite 11000
         San Francisco, California 94102
16       415.703.2372
         paul.moore@doj.ca.gov
17
18
19  ALSO PRESENT:
20       LORI TALBOTT, Videographer
21
22  ALSO PRESENT (Via Teleconference Call):
23       BRIAN ROSEWARNE, applEcon
24       MAYA MEIDAN, Compass Lexecon
25
```

Page 5

```
 1                      I N D E X
 2
 3  EXAMINATION BY:                                    PAGE
 4       MR. EMANUELSON                              7, 124
 5       MS. NAIFEH                                     117
 6       MR. GRALEWSKI                                  121
 7
 8  EXHIBITS FOR IDENTIFICATION                        PAGE
 9  608   Philips Electronics North America              9
10        Corporation's Notice of Deposition to Costco
11        Wholesale Corporation
12  609   Costco Wholesale Annual Report, Year Ended    21
13        August 28, 2011
14  610   8/7/06 The New York Times Article Entitled    96
15        Picture Tubes Are Fading Into the Past
16  611   Costco Wholesale Corporation v Hitachi, LTD, 110
17        Et Al., Complaint and Jury Demand
18
19
20
21
22
23
24
25
```

Case 4:07-cv-05944-JST   Document 1736-7   Filed 06/14/13   Page 3 of 6

In Re: Cathode Ray Tube (CRT) Antitrust Litigation
This Document Relates to: All Actions
GEOFFREY SHAVEY, 30(B)(6)
December 07, 2012

Page 38

1  there could be an opportunity buy or something that
2  comes available that we would take advantage of.
3     Q.  (BY MR. EMANUELSON:)  But there was no
4  particular policy or formula, the way you decided that?
5        MR. GRALEWSKI:  Same objections.
6        THE WITNESS:  No.  It just would depend on
7  what's available and if we thought something was a
8  compelling value to sell at our locations.
9     Q.  (BY MR. EMANUELSON:)  When did -- When did
10 Costco begin selling over the Internet; do you know?
11       MR. GRALEWSKI:  Object to the form.  Outside
12 the scope.
13       THE WITNESS:  '98, '99.
14    Q.  (BY MR. EMANUELSON:)  Has sales over the
15 Internet grown from '98 to '99 through 2007 and up to
16 the present day?
17       MR. GRALEWSKI:  Same objections.
18       THE WITNESS:  Yes.  Yes.
19    Q.  (BY MR. EMANUELSON:)  How -- How does that
20 affect -- How has the growth of Internet sales affected
21 Costco's product offerings in terms of -- Let me strike
22 that question.
23       Does the -- Did Costco's product line ever
24 vary by region -- by -- by -- by region or by store?
25       MR. GRALEWSKI:  Objection.

Page 39

1        MR. WEISS:  Objection.  Compound.
2        MR. GRALEWSKI:  Sorry.  I'll join.
3     Q.  (BY MR. EMANUELSON:)  Let's start by -- Let's
4  start by region.  Does Costco have regional designations
5  for -- for -- for its stores?
6     A.  Yes.
7        MR. GRALEWSKI:  Object to the form.  Outside
8  the scope.
9     Q.  (BY MR. EMANUELSON:)  Okay.  The product lineup
10 that Costco set, would it be consistent across the
11 United States or could it vary by the region?
12       MR. GRALEWSKI:  Same objection.
13       THE WITNESS:  Our -- Our intent, our own plan,
14 was to have it be consistent.
15    Q.  (BY MR. EMANUELSON:)  Did you give -- Let's
16 talk about local store managers.  Did local store
17 managers have autonomy to shift in and out products in
18 the lineup?
19       MR. GRALEWSKI:  Same objection.
20       THE WITNESS:  No.
21    Q.  (BY MR. EMANUELSON:)  No.  So -- Okay.
22       Did -- Did anyone at a regional level have
23 autonomy?
24    A.  No.
25       MR. GRALEWSKI:  Same objection.

Page 40

1     Q.  (BY MR. EMANUELSON:)  So, just want to talk a
2  little bit about the procurement process with suppliers.
3        For -- Starting with televisions, how -- how
4  does Costco -- what is the process that Costco comes to
5  an agreement on the price that it pays for televisions
6  with its suppliers?
7     **A.  Well, the suppliers furnish a cost and then we**
8  **make a decision on whether that's acceptable or not**
9  **or -- or if we're interested in that -- in that model.**
10    Q.  Does Costco -- Let me just say -- Period-wise,
11 is -- how -- how often do the offerings come in from
12 suppliers and Costco's decision to select them?
13    A.  Today?
14    Q.  Back -- In 1995 to 2007.
15    **A.  You know, we -- we would meet with the**
16 **suppliers continually, but, typically, you'd have a line**
17 **review in the fourth quarter and you'd have things**
18 **finalized by -- when we'd go to the Consumer Electronics**
19 **Show in January.**
20    Q.  And the -- the CES show, would that be for --
21 would you set the line for the entire year at that -- at
22 that show?  Is that the intention?
23       MR. GRALEWSKI:  Object to the form.  Outside
24 the scope, vague and ambiguous.
25       THE WITNESS:  On some SKUs, yes.  Again, it

Page 41

1  depended on when a product was available and when it
2  was -- when it was launching.
3     Q.  (BY MR. EMANUELSON:)  Did you have annual
4  contract -- Well, let's start with:  Did Costco have
5  master agreements with its suppliers?
6     **A.  It -- A vendor agreement.**
7     Q.  A vendor agreement.
8        And did it have -- Was that a form contract?
9  Did Costco have the same vendor agreement --
10    A.  Yes.
11    Q.  -- with every supplier?
12       MR. GRALEWSKI:  Object to the form.  Outside
13 the scope.
14    Q.  (BY MR. EMANUELSON:)  What was in the vendor
15 agreement?
16       MR. GRALEWSKI:  Same objection.
17       THE WITNESS:  Just standard terms and, you
18 know -- I mean, it just encompasses the entire agreement
19 with the supplier, as far as distribution and -- I mean,
20 I guess we could go through it if -- if we had it in
21 front of us.
22    Q.  (BY MR. EMANUELSON:)  I don't want to do that.
23    A.  Yeah.
24    Q.  Were there any negotiating points over the
25 vendor agreement?  Were there any, you know, certain

Page 42

1  points where a manufacturer would say, you know, we want
2  to have it this way or --
3      A.  There could be.
4          MR. GRALEWSKI: Object to the form.  Vague and
5  ambiguous, outside the scope.
6      Q.  (BY MR. EMANUELSON:)  Do you know -- Do you
7  know any -- Do you recall any that come to mind?
8          MR. GRALEWSKI: Same objections.  Vague and
9  ambiguous.
10         THE WITNESS: Nothing specific.  I'm sorry.
11         MR. GRALEWSKI: I -- I'm just -- I don't mean
12 to speak over you, and I'm just doing my job to protect
13 the -- the record.  So, I apologize.
14         THE WITNESS: I understand.  I'll pause.
15     Q.  (BY MR. EMANUELSON:)  So, price negotiations
16 were outside of the vendor agreement; is that right?
17     A.  **You had a vendor agreement of general business**
18 **terms and then you'd have an item agreement that was**
19 **specific to that item or SKU.**
20     Q.  Was the item agreement -- was there a standard
21 form for that or was it more informal, like over e-mail?
22         MR. GRALEWSKI: Object to the form.  Outside
23 the scope.
24         THE WITNESS: There was a form we used.
25     Q.  (BY MR. EMANUELSON:)  And what would -- What's

Page 43

1  the typ -- What's the term -- typical term of the item
2  agreement?
3      A.  **Back then, we had what we called an IPQ, or**
4  **item product agreement, and, again, it involved all the**
5  **technical specs, the shipping dimensions, the FOB point,**
6  **the cost, any, say, what we call performance discounts,**
7  **which would be early payment or distribution, if there**
8  **was any sort of additional dating for what we called our**
9  **water locations, our locations in Alaska, Hawaii, Puerto**
10 **Rico.  Those sorts of things.**
11         MR. GRALEWSKI: Object to the form of the
12 question.  Outside the scope, vague and ambiguous.
13     Q.  (BY MR. EMANUELSON:)  Within the -- Just so I'm
14 clear, within that IPQ, though, was the price of the
15 product that Costco would pay from the manufacturer; is
16 that right?
17     A.  Cost, yes.
18     Q.  Cost.  You say cost.  Over time, did that
19 change in terms of how -- Let me ask you, what was --
20 what was the term of the IPQ?  Was there a typical term?
21         MR. GRALEWSKI: Object to the form.  Vague and
22 ambiguous, outside the scope.
23         THE WITNESS: Really, as long as we were
24 actively ordering the item.
25     Q.  (BY MR. EMANUELSON:)  So, it would -- would it

Page 44

1  be essentially like a purchase order?
2          MR. GRALEWSKI: Same objection.
3          THE WITNESS: It's just the -- Any of the data
4  that we would input into our AS/400 system, so, it's not
5  a purchase order.  It's just all the -- the costs, and,
6  again, dimensions and specifications of that item.  So,
7  it's like an item info sheet with cost.
8      Q.  (BY MR. EMANUELSON:)  Did that process change
9  over time from 1997 to 199 -- to 2007 and how -- as to
10 how you would memorialize the price that you reached --
11 the cost that you reached with the manufacturer?
12     A.  Did the process change?
13     Q.  The process of how you would memorialize it,
14 the -- what -- what Costco was paying, the price that it
15 was paying for, let's say, televisions.
16         MR. WEISS: I'm going to object.  Vague,
17 compound.
18         MR. GRALEWSKI: Join.
19         THE WITNESS: Yeah, I guess I don't understand
20 the question.
21     Q.  (BY MR. EMANUELSON:)  You mentioned that the
22 way that pricing agreements are memorialized are through
23 this IPU -- PQ; is that right?
24     A.  Yes.
25     Q.  All right.  Were IPQs used from 1995 all the

Page 45

1  way through 2007?  That's a better way to ask it.
2      A.  **That makes sense.  We -- We use, now, what's**
3  **just called an item agreement, which is a bit more**
4  **detailed than the -- than the IPQ that we had in the --**
5  **the mid-'90s, but very similar as far as the information**
6  **that's contained on it.  It was -- It was a -- The item**
7  **agreement is a standardized form that's used throughout**
8  **the non-foods division, whereas the IPQ was -- was an**
9  **agreement that we had used in our department.**
10     Q.  So, if -- if a product is not -- We go back to
11 that original example, a product is not selling well and
12 Costco wants to go back and renegotiate a better price
13 from a supplier, do -- is a new IP -- new item agreement
14 or IPQ generated?  Is that how that works?
15     A.  **They typically would just update the cost and**
16 **initial the -- the IPQ and send it over.  This is back**
17 **in the days when we were using fax machines.  And then**
18 **we would just staple that on top so you'd have your most**
19 **recent cost up front.**
20     Q.  And am I right that the price to be
21 negotiate -- there wasn't any set time period that --
22 that the price could change?  It could be renegotiated
23 at any time within the time frame of the IPQ?
24     A.  **Yes, it was unique to each item.**
25     Q.  Where were they -- So, where -- where did the

Page 114

1  So, that would be -- I mean, it's not like we're making
2  20, 25 points.  I mean, it's a very competitive market
3  and we have to have value.  So, I'd have to look at a
4  specific example of what you're referring to on a cost
5  increase to give you a little more clarity on that.
6      Q.  (BY MR. EMANUELSON:)  Well, do you agree with
7  the general statement that Costco cannot pass on all of
8  its cost increases to customers?
9          MR. WEISS:  Objection.  Calls for a legal
10 conclusion.  It's vague.
11         THE WITNESS:  Do I agree --
12         MR. GRALEWSKI:  Join.  Asked and answered,
13 lacks foundation.
14         THE WITNESS:  Do I agree that we can't pass
15 on -- Can you say that again?
16     Q.  (BY MR. EMANUELSON:)  Do you agree that there
17 are instances where Costco cannot pass on cost increases
18 of the product that it purchases to customers?
19     A.  There are examples of that, yes.
20     Q.  Okay.  And what -- And we've discussed a few
21 of those, correct?  That it might be competition --
22     A.  Um-hum.
23     Q.  -- correct?
24         It might be demand consider -- I'm sorry.
25         MR. GRALEWSKI:  I'm sorry.  I just want to

Page 115

1  interpose my objections to the prior two questions which
2  are the same:  Calls for a legal conclusion, lacks
3  foundation.
4          MR. WEISS:  Join.
5          MR. GRALEWSKI:  Thank you, sir.
6      Q.  (BY MR. EMANUELSON:)  So, one factor that may
7  prohibit Costco from passing on cost increases may be
8  competition amongst other retailers, right?
9      A.  That's one factor, yes.
10     Q.  Another factor might be the demand of -- for
11 the products in the market, correct?
12     A.  Could be.
13     Q.  So, let me just give the LCD example that we
14 just talked about.  Could it be the case that another
15 product that is competing with CRTs -- in this case,
16 LCDs -- are entering the market so quickly that a cost
17 increase might not -- since that -- it affects demand
18 negatively for the CRT product?
19         MR. WEISS:  Objection.  Compound, vague,
20 confusing.
21         MR. GRALEWSKI:  Join.  Also lacks foundation.
22         THE WITNESS:  It could be a factor.
23     Q.  (BY MR. EMANUELSON:)  Right.  That was a
24 terrible question, I agree.
25         We discussed earlier that the LCD penetration

Page 116

1  into the market for televisions and monitors negatively
2  affected demand for CRT-based products; is that right?
3      A.  In general.
4          MR. GRALEWSKI:  Object to the form.  Misstates
5  testimony.
6          THE WITNESS:  You saying the demand for LCD
7  took away demand for CRT?
8      Q.  (BY MR. EMANUELSON:)  That's exactly what I'm
9  saying.
10     A.  I -- I'd say that's realistic.
11     Q.  So, what I'm asking is could that decrease in
12 demand for CRT-based products driven by the penetration
13 of a new technology affect Costco's ability to pass on
14 cost increases of the CRT product?
15         MR. WEISS:  Objection.
16         MR. GRALEWSKI:  Objection.
17         MR. WEISS:  Vague, outside the scope, calls
18 for a legal conclusion.
19         MR. GRALEWSKI:  Join.  Lacks foundation.
20         THE WITNESS:  And, again, it could be a
21 consideration because when you're looking at anything,
22 you're also looking at what that delta is between items,
23 and, at some point, it's going to get close enough where
24 one item becomes more desirable and one becomes less
25 desirable.  So, I mean, that could be a consideration.

Page 117

1          MR. EMANUELSON:  I think I'm done.
2          MR. GRALEWSKI:  Okay.  Why don't we see if any
3  other defense counsel here or on the phone have
4  questions.
5          MR. WEISS:  Anything here?
6          MR. ROBERTS:  Not here.
7          MS. NAIFEH:  Yes.
8          THE REPORTER:  Who said yes?
9          MS. NAIFEH:  Yes.  This is Charise Naifeh,
10 with White & Case.  I have a couple of questions.
11         MR. EMANUELSON:  Go ahead.
12              EXAMINATION
13 BY MS. NAIFEH:
14     Q.  Okay.  So, going back to the vendor agreement
15 and the standard terms that you were discussing earlier,
16 does Costco draft all of those vendor -- that vendor
17 agreement?
18         MR. GRALEWSKI:  Object to the form.  Outside
19 the scope.
20         MR. WEISS:  Join.
21         THE WITNESS:  Costco legal department did,
22 yes.
23     Q.  (BY MS. NAIFEH:)  Okay.  And what about the
24 standard terms?  Did -- Did Costco's legal department
25 draft those?

Page 118

1    MR. WEISS: Same objections.
2    MR. GRALEWSKI: Join.
3    THE WITNESS: Yes.
4  Q. (BY MS. NAIFEH:) Do you know how often the
5  vendor agreement was modified?
6    MR. WEISS: Same objections.
7    MR. GRALEWSKI: Join.
8    THE WITNESS: Not -- Not specifically.
9  Q. (BY MS. NAIFEH:) Do you have any recollection
10 of a date when -- specific date when the vendor
11 agreement was modified?
12   MR. WEISS: Same objections.
13   MR. GRALEWSKI: Join.
14   THE WITNESS: Not specifically.
15 Q. (BY MS. NAIFEH:) Okay. Same question with
16 regard to the standard terms.
17   MR. WEISS: Same objection.
18   MR. GRALEWSKI: Join.
19   THE WITNESS: Same response.
20 Q. (BY MS. NAIFEH:) Okay. And last question is:
21 When the vendor agreement is modified, is it changed for
22 all vendors at once or is it changed on a
23 vendor-by-vendor basis?
24   MR. WEISS: Same objection.
25   MR. GRALEWSKI: Join. So, lacks foundation,

Page 119

1  vague and ambiguous.
2    THE WITNESS: You know, I -- I believe that,
3  you know, the signed agreement that is in place just
4  remains and that a revised document would be used for
5  new vendor agreements or they may send out an addendum
6  that requires a -- a signature if there is a -- you
7  know, a material change, but I'm just speaking in
8  general terms.
9  Q. (BY MS. NAIFEH:) Okay. Is the same true for
10 the standard terms as opposed to the vendor agreement?
11 A. You know, I don't know.
12 Q. Okay. So, you -- you've never seen that --
13 that -- any documentation where the standard terms have
14 changed?
15   MR. WEISS: Objection. Misstates testimony.
16   MR. GRALEWSKI: Join. Outside the scope.
17   THE WITNESS: I know, over time and over this
18 time frame, the vendor agreement and the standard terms
19 have been revised, and I don't know if it's every couple
20 of years. I don't know what the specific years are, but
21 there have been updates.
22 Q. (BY MS. NAIFEH:) And do you know if those
23 updates were -- of the standard terms specifically are
24 for -- are all across the board for all vendors?
25   MR. WEISS: Objection. Lacks foundation,

Page 120

1  outside the scope.
2    MR. GRALEWSKI: Join. Compound, vague and
3  ambiguous.
4    THE WITNESS: I -- I would have to have
5  somebody from the Costco legal department answer as far
6  as how -- how that's communicated and how that's
7  handled.
8  Q. (BY MS. NAIFEH:) Okay. So, is -- are you
9  saying that you don't know whether it applies to all
10 vendors?
11   MR. WEISS: Same objections.
12   MR. GRALEWSKI: Join.
13   THE WITNESS: Yeah, that's what I'm saying. I
14 don't know the specific procedure as far as how those
15 changes are communicated and implemented.
16   MS. NAIFEH: Okay. Okay. No further
17 questions.
18   MR. WEISS: Anyone else on the phone?
19   MR. GRALEWSKI: I do have a few questions to
20 ask the witness. I'd like to take a short break and
21 then coordinate with my colleague -- colleagues and then
22 get back and ask an efficient set of questions, get you
23 out of here.
24   THE WITNESS: Okay.
25   MR. WEISS: Okay. Does that work for you?

Page 121

1    THE VIDEOGRAPHER: Off the record. The time
2  is 12:07 p.m.
3    (Off the record at 12:07 p.m.)
4    (Back on the record at 12:29 p.m.)
5    (Mr. Hesterberg is not present.)
6    THE VIDEOGRAPHER: Back on the record. The
7  time is 10:29 p.m.
8    THE REPORTER: You said ten.
9    THE VIDEOGRAPHER: 12:29 p.m. Thank you for
10 the correction.
11       EXAMINATION
12 BY MR. GRALEWSKI:
13 Q. Good afternoon, Mr. Shavey.
14 A. Good afternoon.
15 Q. Thank you for your time today.
16    As I mentioned on the record when we started
17 several hours ago, I represent a group of plaintiffs
18 that have sued the defendants. We were called indirect
19 purchaser plaintiffs. We're essentially Costco's
20 customers who buy your products.
21 A. Okay.
22 Q. Those are the folks I represent.
23    And I just have a couple questions -- I don't
24 know exactly if it will be two, but only five or ten
25 minutes' worth of questions, or -- maybe a little less.