# EXHIBIT A

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

Kenneth A. Gallo (*pro hac vice to be submitted*)
Joseph J. Simons (*pro hac vice to be submitted*)
Craig A. Benson (*pro hac vice to be submitted*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

*Attorneys for Plaintiffs Sharp Electronics Corporation* and
*Sharp Electronics Manufacturing Company of America, Inc.*

ORIGINAL
FILED

JUN 17 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MEJ

CV 13 2776

| | |
|---|---|
| SHARP ELECTRONICS CORPORATION; and SHARP ELECTRONICS MANUFACTURING COMPANY OF AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> KONINKLIJKE PHILIPS ELECTRONICS N.V., a/k/a ROYAL PHILIPS ELECTRONICS; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN) LTD.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS CONSUMER ELECTRONICS CO.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; and ORION ENGINEERING & SERVICE, INC., <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT AND JURY DEMAND

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................... 1

II.   JURISDICTION AND VENUE ....................................................................... 3

III.  MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT ..................... 5

IV.   PARTIES ............................................................................................................ 6

      A.    Plaintiffs ................................................................................................. 6

      B.    Defendants .............................................................................................. 7

V.    OTHER AGENTS AND CO-CONSPIRATORS .......................................... 10

VI.   TRADE AND COMMERCE .......................................................................... 29

VII.  FACTUAL ALLEGATIONS .......................................................................... 29

      A.    CRT Technology and Products ............................................................ 29

      B.    Structure of the CRT Industry ............................................................. 30

            1.    Market Concentration .............................................................. 31

            2.    Information Sharing .................................................................. 31

            3.    Consolidation ........................................................................... 31

            4.    High Costs of Entry into the Industry ..................................... 31

            5.    Homogeneity of CRTs .............................................................. 32

      C.    International Antitrust Investigations .................................................. 32

      D.    Pre-Conspiracy Market ........................................................................ 36

      E.    Defendants' and Co-conspirators' Illegal Agreements ....................... 36

            1.    "Glass Meetings" ..................................................................... 38

                  i.    Agreements on CRT prices, including establishing
                        target prices, "bottom" prices, price ranges, and
                        price guidelines; ........................................................... 42

            2.    Bilateral Discussions ............................................................... 42

            3.    Defendants' and Co-conspirators' Participation in Group
                  and Bilateral Discussions ......................................................... 44

      F.    The CRT Market During the Conspiracy .............................................. 51

- i -

G.     Effects of Defendants' and Co-Conspirators' Antitrust Violations ........................52

      1.     Examples of Collusive Pricing for CRTs .............................52

      2.     Examples of Reductions in Manufacturing Capacity by Defendants and Co-Conspirators .............................53

H.     Summary of Effects of the Conspiracy Involving CRTs ........................54

VIII.     PLAINTIFFS' INJURIES .............................................55

IX.     TOLLING .............................................................55

X.     FRAUDULENT CONCEALMENT .............................................56

XI.     CLAIM FOR VIOLATIONS .............................................59

FIRST CLAIM FOR RELIEF  (VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1) .............................................59

SECOND CLAIM FOR RELIEF (VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT) .............................................60

THIRD CLAIM FOR RELIEF (VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW) .............................................62

FOURTH CLAIM FOR RELIEF (VIOLATION OF THE NEW YORK DONNELLY ACT) .............................................63

FIFTH CLAIM FOR RELIEF (VIOLATION OF NEW YORK UNFAIR COMPETITION LAW) .............................................64

SIXTH CLAIM FOR RELIEF (NEW JERSEY ANTITRUST ACT, N.J. STAT. § 56:9-1 *ET SEQ.*) .............................................65

SEVENTH CLAIM FOR RELIEF (VIOLATION OF TENNESSEE CODE ANN. §§ 47-258-101 *ET SEQ.*) .............................................66

XII.     DAMAGES .............................................67

XIII.     PRAYER FOR RELIEF .............................................67

XIV.     JURY TRIAL DEMANDED .............................................69

COMPLAINT AND JURY DEMAND

1      Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing

2   Company of America, Inc., ("Sharp" or "Plaintiffs"), bring this action for damages and

3   injunctive relief under the antitrust laws of the United States and under the antitrust and fair

4   competition laws of California, New York, New Jersey, and Tennessee.  Sharp alleges the

5   following based on personal knowledge, investigation by counsel, and publicly available

6   materials, including publicly available materials from *In re Cathode Ray Tube (CRT) Antitrust*

7   *Litigation*, 3:07-cv-5944-SC (N.D. Cal.), MDL No. 1917, the U.S. Department of Justice

8   ("DOJ") website and other publicly available information regarding related criminal proceedings

9   by the DOJ, the findings of the Japanese Fair Trade Commission ("JFTC"), the Korean Fair

10  Trade Commission ("KFTC"), the European Commission ("EC"), and upon information and

11  belief.

12  **I.      INTRODUCTION**

13      1.      Sharp brings this action to recover damages on account of the antitrust injuries it

14  incurred as a result of a long-running conspiracy by suppliers of cathode ray tubes ("CRTs") to

15  coordinate and fix the prices of CRTs and exchange detailed competitive information.  The

16  resulting damages include, but are not limited to, overcharges which Sharp paid, directly or

17  indirectly, as a result of purchases in the United States.

18      2.      Defendants and their co-conspirators formed an international cartel that conducted

19  a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

20  December 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix,

21  raise, stabilize, and maintain prices for CRTs.

22      3.      Defendants and co-conspirators are or were among the leading manufacturers of:

23  (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color

24  display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and

25  (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer

26  monitors).  For purposes of this Complaint, CPTs and CDTs of all sizes will be referred to

27  collectively as "CRTs."  Also for purposes of this Complaint, CRTs and/or the products

28  containing CRTs shall be referred to collectively as "CRT Products."

4.       Defendants and co-conspirators control, or did control, the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

5.       In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants and co-conspirators conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRTs were sold in the United States.

6.       With respect to CRTs, Defendants and co-conspirators or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.  Defendants' and co-conspirators' conspiracy also included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured finished products containing CRTs, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their subsidiaries and affiliated original equipment manufacturers (OEMs) at a high enough level to support the CRT pricing in the market to other OEMs.

7.       The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 multilateral and bilateral meetings during the Relevant Period, including hundreds of multilateral meetings and hundreds of bilateral meetings.  These meetings occurred in various locales,

- 2 -

1   including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K.,

2   elsewhere in Europe, and the United States.  These meetings included representatives from the

3   highest levels of the respective companies, as well as regional managers and others.

4          8.       During the Relevant Period, the conspiracy affected billions of dollars of

5   commerce throughout the United States.

6          9.       This conspiracy is being investigated by the DOJ and has been investigated by

7   multiple foreign competition authorities, including the JFTC, KFTC, and EC.  The first

8   participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Chunghwa

9   Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury

10  in San Francisco on February 10, 2009.  Since then, five additional individuals have been

11  indicted in connection with Defendants' CRT price-fixing conspiracy.

12         10.      On March 18, 2011, the DOJ issued a press release announcing that it had reached

13  an agreement with Samsung SDI in which Samsung SDI would plead guilty and pay a $32

14  million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United

15  States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled

16  guilty to violating the Sherman Act, 15 U.S.C. § 1, from at least as early as January 1997, until at

17  least as late as March 2006.

18         11.      During the Relevant Period, Plaintiffs purchased CRT Products in the United

19  States and elsewhere directly and indirectly from Defendants and their co-conspirators, and/or

20  Defendants' and their co-conspirators' subsidiaries and affiliates, and/or any agents Defendants

21  or Defendants' subsidiaries and affiliates controlled, including but not limited to joint ventures.

22  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and brings this action to

23  recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

24  **II.     JURISDICTION AND VENUE**

25         12.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and

26  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to

27  recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising

28  from Defendants' and their co-conspirators' violations of the Sherman Act.  Jurisdiction also

- 3 -

1    exists under the Foreign Trade and Antitrust Improvement Act, 15 U.S.C. § 6a, because

2    Defendants' and their co-conspirators' conduct had a direct, substantial, and reasonably

3    foreseeable effect on United States domestic commerce, and such effect gave rise to Sharp's

4    claims alleged herein.

5        13.    Plaintiffs also bring this action pursuant to Section 16750(a) of the California

6    Business and Professions Code, for injunctive relief and treble damages that Plaintiffs sustained

7    due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California

8    Business and Professions Code (the "Cartwright Act").  Plaintiffs' claims are also brought

9    pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain

10    restitution from and an injunction against Defendants due to their violations of Section 17200 *et*

11    *seq.* of the California Business and Professions Code (the "California Unfair Competition Act").

12        14.    Plaintiffs also bring this action pursuant to Section 340 of the New York General

13    Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to

14    Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General

15    Business Law (the "Donnelly Act").  Plaintiffs' claims are also brought pursuant to Section 349

16    of the New York General Business Law, to obtain restitution from and an injunction against

17    Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law

18    (the "New York Unfair Competition Act").

19        15.    Plaintiffs also bring this action pursuant to N.J. Stat. § 56:9-1 *et seq.*, for

20    injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-

21    conspirators' violation of N.J. Stat. Section 56:9-1 *et seq.* ("New Jersey Antitrust Act").

22        16.    Plaintiffs also bring this action pursuant to Tenn. Code. Ann. §§ 47-258-101 *et*

23    *seq.*, for injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-

24    conspirators' violation of Tenn. Code. Ann. §§ 47-258-101 *et seq.*

25        17.    This Court has jurisdiction over Plaintiffs' claims arising under Section 1 of the

26    Sherman Act and Sections 4 and 16 of the Clayton Act pursuant to 28 U.S.C. §§ 1331, and

27    1337(a).  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs'

28

COMPLAINT AND JURY DEMAND

1    state antitrust and unfair competition claims because they are so related to Plaintiffs' Sherman

2    Act and Clayton Act claims that they form part of the same case and controversy.

3        18.    The activities of Defendants and their co-conspirators, as described herein,

4    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

5    did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

6    import trade or commerce. This effect gave rise to Plaintiffs' antitrust claims. During the

7    Relevant Period, Defendants' and their co-conspirators' conspiracy affected the prices of CRT

8    Products in the United States, and specifically the CRT Products Plaintiffs purchased in the

9    United States.

10       19.    This Court has jurisdiction over each Defendant named in this action under

11   Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10. Each Defendant

12   conducts substantial business in the state of California, and a number of Defendants and their co-

13   conspirators maintain their headquarters in this District or elsewhere in California. In addition,

14   Defendants all purposefully availed themselves of the laws of the United States and California

15   insofar as they manufactured, marketed, or distributed CRT Products in the United States and

16   California, and several co-conspirators have admitted that they engaged in conduct in furtherance

17   of the conspiracy in the Northern District of California.

18       20.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and

19   28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this

20   District, or is otherwise found within this District. In addition, venue is proper in this District

21   under 28 U.S.C. § 1391 because a substantial part of the events or admissions giving rise to this

22   claim occurred in this District. Defendants and their co-conspirators knew that affected CRT

23   Products would be sold and shipped into this District.

24   **III.    MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT**

25       21.    This action concerns substantially the same defendants, co-conspirators,

26   transactions and events that are involved in Case No. 3:07-cv-5944-SC (N.D. Cal.) before the

27   Honorable Samuel Conti in the San Francisco Division, insofar as it involves a suit for damages

28

- 5 -

1   and injunctive relief arising out of the conspiracy to fix the price of CRTs or restrain the output

2   of CRTs in violation of the Sherman Act and state law.

3   **IV.    PARTIES**

4   **A.    Plaintiffs**

5       22.    Plaintiff Sharp Electronics Corporation ("Sharp Electronics") is a New York

6   corporation, with its principal place of business in Mahwah, New Jersey.  Sharp Electronics is

7   the wholly owned U.S. sales and marketing subsidiary of Osaka-based Sharp Corporation.

8       23.    Sharp Manufacturing Company of America, Inc. ("SMCA") is a division of Sharp

9   Electronics, with its principal place of business in Memphis, Tennessee.

10      24.    Plaintiff Sharp Electronics Manufacturing Company of America, Inc. ("SEMA")

11  is a corporation organized and existing under the laws of California and has its principal place of

12  business in San Diego, California.  SEMA is a wholly owned subsidiary of Sharp Electronics.

13      25.    Sharp Electronica Mexico, S.A. de C.V. ("SEMEX") is a *maquiladora* company

14  (manufacturing facility).  SEMEX is 99% owned by SEMA, and 1% owned by Sharp

15  Electronics.

16      26.    Sharp Electronics and SEMA are sometimes referred to collectively herein as

17  "Sharp" or "Plaintiffs."

18      27.    During the Relevant Period, Sharp Electronics, directly and through its

19  subsidiaries, purchased substantial amounts of CRTs manufactured by Defendants and/or their

20  subsidiaries, their co-conspirators, and others, in the United States for incorporation into CRT

21  televisions ("CRT TVs").  As a result of Defendants' and their co-conspirators' conspiracy,

22  Sharp Electronics was injured in its business and property because the prices it paid for such

23  CRTs and CRT Products were artificially inflated by that conspiracy.

24      28.    During the Relevant Period, SMCA purchased substantial amounts of CRTs

25  manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the

26  United States, for incorporation into CRT TVs.  SMCA issued purchase orders from and

27  received invoices for its CRT Product purchases at its offices in Tennessee.  As a result of

28

COMPLAINT AND JURY DEMAND

1  Defendants' and their co-conspirators' conspiracy, SMCA was injured in its business and

2  property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

3        29.    During the Relevant Period, SEMA purchased and invoiced substantial amounts

4  of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others,

5  in the United States that were then sent to SEMEX for assembly into CRT TVs.  SEMA issued

6  purchase orders from and received invoices for its CRT Product purchases at its offices in

7  California.  After the manufacturing process was complete, all of the finished televisions were

8  shipped FOB back to SEMA in San Diego, California.  SEMA retained ownership of the CRTs

9  throughout the entire manufacturing process.  Additionally, SEMA recognized all of the revenue

10  from the sales of CRT TVs.  As a result of Defendants' and their co-conspirators' conspiracy,

11  SEMA was injured in its business and property because the prices it paid for such CRTs were

12  artificially inflated by that conspiracy.

13        30.    Plaintiffs also purchased, directly and/or through their subsidiaries, CRT

14  Products, including, but not limited to, from third party system integrators and OEMs, that

15  contained CRTs manufactured by Defendants and/or their subsidiaries, and/or their co-

16  conspirators, in the United States.

17        31.    During the Relevant Period, Sharp's negotiations for the purchase of CRTs took

18  place in the United States.  In addition, Sharp issued purchase orders for CRTs from the United

19  States and invoices for those CRT purchases were sent to Sharp in the United States.

20  **B.**    **Defendants**

21      **Philips Entities**

22        32.    Defendant Koninklijke Philips Electronics N.V., a/k/a Royal Philips Electronics

23  ("Royal Philips"), is a Dutch entity with its principal place of business at Amstelplein 2, 1070

24  MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest

25  electronics companies, with 121,000 employees located in over 100 countries.  In 2000, Royal

26  Philips was the leading global supplier of CRTs.  Royal Philips operated in Asia directly through

27  divisions (such as Philips Components Asia and Philips BGTV) and through wholly owned and

28  separately incorporated subsidiaries.  In 2001, Royal Philips entered into a joint venture with

- 7 -

LGEI forming LGPD, in which the entities combined their CRT businesses. LGPD operated in Asia and in Europe through its division LG.Philips Displays Europe Region. In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International, Ltd. During the Relevant Period, Royal Philips manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

33. Defendant Philips Electronics Industries (Taiwan) Ltd. ("PEIL") is a Taiwanese corporation with its principal place of business at 15F, 3-1 Yuan Chu St., Nangang District, Taipei 115, Taiwan. PEIL is a subsidiary of Royal Philips. During the Relevant Period, PEIL manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Royal Philips dominated and/or controlled the finances, policies, and/or affairs of PEIL relating to the antitrust violations alleged in this Complaint.

34. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New York, New York, 10020. Philips America is a wholly owned and controlled subsidiary of Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Royal Philips dominated and/or controlled the finances, policies, and/or affairs of Philips America relating to the antitrust violations alleged in this Complaint.

35. Defendant Philips Consumer Electronics Co. ("PCEC") has its principal place of business at 64 Perimeter Center E, Atlanta, Georgia 30346-2295. PCEC is a subsidiary of Royal Philips. During the Relevant Period, PCEC manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Royal Philips dominated and/or controlled the finances, policies, and/or affairs of PCEC relating to the antitrust violations alleged in this Complaint.

- 8 -

36.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly owned and controlled subsidiary of Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Royal Philips dominated and/or controlled the finances, policies, and/or affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

37.     Defendants Royal Philips, PEIL, PCEC, Philips America, and Philips Brazil are collectively referred to herein as "Philips."

**<u>Orion Engineering & Service, Inc. (and Co-Conspirators)</u>**

38.     Defendant Orion Engineering & Service, Inc., ("Orion Engineering") is a California corporation located at PO Box 2768, Calexico, California 92232, that sold CRT Products to customers in the United States.  During the Relevant Period, Orion Engineering manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

39.     Co-conspirator Orion Electric Company ("Orion"), a South Korean corporation that filed for bankruptcy in 2004, was a major manufacturer of CRT Products during the Relevant Period.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  In December 1995, Orion partnered with co-conspirator Toshiba Corporation and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  Orion dominated and/or controlled the policies and/or affairs of Orion Engineering relating to the antitrust violations alleged in this Complaint.

40.     Co-conspirator Display Orion Mexicana, S.A. de C.V. ("Domex") (formerly known as Daewoo Orion Mexicana) is a Mexican company located at KM. 10.5 Carretera A, San

- 9 -

1  Luis Rio Colorado, Corredor Industrial Palaco, Gonzalez Ortega, Mexicali, B.C. 21397, Mexico.

2  Domex was a subsidiary of Orion.  During the Relevant Period, Domex manufactured, marketed,

3  sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates

4  throughout the United States.  Orion dominated and/or controlled the policies and/or affairs of

5  co-conspirator Domex relating to the antitrust violations alleged in this Complaint.

6       41.     Orion, Orion Engineering and Domex are collectively referred to herein as

7  "Orion."

8  **V.    OTHER AGENTS AND CO-CONSPIRATORS**

9       42.     The acts alleged against Defendants in this Complaint were authorized, ordered,

10  or done by their officers, agents, employees, or representatives, while actively engaged in the

11  management and operation of Defendants' businesses or affairs.

12       43.     Each of the Defendants named herein acted as the principal, agent, or joint

13  venture of, or for, other Defendants with respect to the acts, violations, and common course of

14  conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the

15  United States agent for CRT Products made by its parent company.

16       44.     Whenever in this Complaint reference is made to any act, deed or transaction of

17  any corporation, the allegation means that the corporation engaged in the act, deed or transaction

18  by or through its officers, directors, agents, employees or representatives while they were

19  actively engaged in the management, direction, control or transaction of the corporation's

20  business or affairs.

21       45.     Defendants are also liable for acts done in furtherance of the alleged conspiracy

22  by companies they acquired through mergers and acquisitions.

23       46.     Various persons and/or firms not named as Defendants in this Complaint

24  participated as co-conspirators in the violations alleged herein and may have performed acts and

25  statements in furtherance thereof.  These co-conspirators who are not named as Defendants

26  include, but are not limited to, IRICO Group Corporation, IRICO Group Electronics Co., Ltd.,

27  IRICO Display Devices Co., Ltd., Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes

28  (Malaysia) Sdn. Bhd., Samtel Color, Ltd., Thai CRT, Hitachi Ltd., Hitachi Displays, Hitachi

- 10 -

America, Hitachi Asia, Hitachi Shenzhen, Hitachi Electronic Devices (USA), Inc., LG Electronics, Inc., LG Electronics USA, Inc., LG Electronics Taiwan Taipei Co., Ltd., LP Displays International, LG.Philips Displays Holding B.V., LG.Philips Displays International B.V., LG.Philips Displays USA Inc., LG.Philips Displays Korea Co. Ltd., LG.Philips Displays Mexico S.A. de C.V., LG.Philips Displays Brasil Ltda., Meridian Solar & Display Co., Ltd., Panasonic Corporation (f/k/a MEI), Matsushita Toshiba Picture Display Co., Ltd., Matsushita Malaysia, Panasonic Corporation of North America, Panasonic Consumer Electronics Co., PT.MT Picture Display, BMCC, MTPD New York, MTPD Ohio, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia, Samsung SDI HK, Toshiba Corporation, Toshiba America, Toshiba Display Devices (Thailand) Company, Ltd., Toshiba America Consumer Products LLC, Toshiba America Electronic Components, Inc., Toshiba America Information Systems, Inc., Thomson SA, Thomson Consumer Electronics, Videocon Industries, Ltd., Technologies Displays Americas, Technologies Displays Mexicana, Mitsubishi Electric Japan, Mitsubishi Electric USA, and Mitsubishi Digital.  Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

**Hitachi Entities**

47.    Co-conspirator Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

48.    Co-conspirator Hitachi Displays, Ltd. ("Hitachi Displays") (now known as Japan Display East, Inc.) is a Japanese company with its principal place of business located at AKS Building, 5F 6-2 Kanda Neribei-cho 3 Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing, and sales

concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd. dominated and/or controlled the finances, policies, and/or affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

49.     Co-conspirator Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 50 Prospect Avenue, Tarrytown, New York. Hitachi America is a wholly owned and controlled subsidiary of Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Hitachi, Ltd. dominated and/or controlled the finances, policies, and/or affairs of Hitachi America relating to the antitrust violations alleged in this Complaint.

50.     Co-conspirator Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 7 Tampines Grandes, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly owned and controlled subsidiary of Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd. dominated and/or controlled the finances, policies, and/or affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

51.     Co-conspirator Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendants Hitachi, Ltd. and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd. dominated and/or controlled the finances, policies, and/or affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

52.     Co-conspirator Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001

- 12 -

Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last few weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Hitachi, Ltd. and Hitachi Displays dominated and/or controlled the finances, policies, and/or affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

53.     Co-conspirators Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi Shenzhen, and HEDUS are collectively referred to herein as "Hitachi."

**LG Electronics Entities**

54.     Co-conspirator LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LG is a $48.97 billion global force in consumer electronics, home appliances, and mobile communications.  It established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995.  In 2001, LGEI entered into a 50/50 joint venture with Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"), in which the entities combined their CRT businesses.  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International, Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

55.     Co-conspirator LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Co-

COMPLAINT AND JURY DEMAND

conspirator LGEI dominated and/or controlled the finances, policies, and/or affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

56.     Co-conspirator LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Chi Hu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly owned and controlled subsidiary of LGEI.  During the Relevant Period, LGETT manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Co-conspirator LGEI dominated and/or controlled the finances, policies, and/or affairs of LGETT relating to the antitrust violations alleged in this Complaint.

57.     Co-conspirators LGEI, LGEUSA, and  LGETT are referred to collectively herein as "LG Electronics."

**LP Displays**

58.     Co-conspirator LP Displays International, Ltd. ("LP Displays International") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays International is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between LGEI and Royal Philips.  In March 2007, LP Displays International became an independent company.  LP Displays International is a leading supplier of CRTs for use in television sets and computer monitors.  LP Displays International announced in March 2007 that Royal Philips and LGEI would cede control over the company, and that the shares would be owned by financial institutions and private equity firms.  Prior to March 2007, LGEI and/or Royal Philips dominated and/or controlled the finances, policies, and/or affairs of LP Displays International relating to the antitrust violations alleged in this Complaint.  During the Relevant Period, LP Displays International manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

59.     Co-conspirator LG.Philips Displays Holding B.V. is a Dutch company located at Zwaanstraat 2A, Eindhoven, 5651 CA, the Netherlands.   Prior to undergoing bankruptcy proceedings, LGEI and Philips had consolidated their global CRT businesses in LG.Philips

- 14 -

1  Displays Holding, with LP Displays International managing the activities of the LPD Group

2  worldwide.

3        60.    Co-conspirator LG.Philips Displays International B.V. is a Dutch company

4  located at Postbus 3, 5600 AA Eindhoven, the Netherlands, registered with the Chamber of

5  Commerce under number 34154.55. During the LPD Group's bankruptcy proceedings, the

6  viable LPD businesses were transferred to LG.Philips Displays International B.V., including LP

7  Displays International, Ltd.

8        61.    Co-conspirator LG.Philips Displays USA Inc. ("LPD USA") was a U.S. company

9  with its primary office located at 9335 Airway Road, Suite 211, San Diego, California 92154.

10  During the Relevant Period, LGEI and/or Royal Philips dominated and/or controlled the

11  finances, policies, and/or affairs of LG.Philips Displays USA Inc. relating to the antitrust

12  violations alleged in this Complaint. During the Relevant Period, LG.Philips Displays USA Inc.

13  manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

14  subsidiaries or affiliates throughout the United States.

15        62.    Co-conspirator LG.Philips Displays Korea Co. Ltd. ("LPD Korea") was a Korean

16  company with its primary office at 184 Gongdan-Dong Gumi-Si, Gyeongsangbuk-do, South

17  Korea. During the Relevant Period, LGEI and/or Royal Philips dominated and/or controlled the

18  finances, policies, and/or affairs of LG.Philips Displays Korea Co. Ltd relating to the antitrust

19  violations alleged in this Complaint. During the Relevant Period, LG.Philips Displays Korea Co.

20  Ltd manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

21  subsidiaries or affiliates throughout the United States.

22        63.    Co-conspirator Meridian Solar & Display Co., Ltd. ("Meridian"), is a Korean

23  company located at 184 Gongdan-Dong Kumi Ksb, South Korea. As described in the JFTC's

24  October 2009 Announcement regarding the CRT cartel, LG.Philips Display Korea, Co. (LPD

25  Korea) transferred its business of manufacturing and selling cathode ray tubes for televisions to

26  Meridian Solar & Display Co., Ltd. on July 21, 2009.

27        64.    Co-conspirator LG.Philips Displays Mexico S.A. de C.V. ("LPD Mexico") was a

28  Mexican company with its primary office at Jabonoso El Tajito Km 1. 5, Gomez Palacio 35078,

- 15 -

1   Mexico.  During the Relevant Period, LGEI and/or Royal Philips dominated and/or controlled

2   the finances, policies, and/or affairs of LG.Philips Displays Mexico S.A. de C.V. relating to the

3   antitrust violations alleged in this Complaint.  During the Relevant Period, LG.Philips Displays

4   Mexico S.A. de C.V. manufactured, marketed, sold, and/or distributed CRT Products either

5   directly or through its subsidiaries or affiliates throughout the United States.

6        65.    Co-conspirator LG.Philips Displays Brasil Ltda. ("LPD Brazil") was a Brazilian

7   company with its primary office at Rod Pres Dutra Km 159, Sao Jose dos Campos, São Paulo

8   CEP 12240-420, Brazil.  During the Relevant Period, LGEI and/or Royal Philips dominated

9   and/or controlled the finances, policies, and/or affairs of LG.Philips Displays Brasil Ltda.

10  relating to the antitrust violations alleged in this Complaint.  During the Relevant Period,

11  LG.Philips Displays Brasil Ltda. manufactured, marketed, sold, and/or distributed CRT Products

12  either directly or through its subsidiaries or affiliates throughout the United States.

13       66.    LP Displays International, LG.Philips Displays Holding B.V., LG.Philips

14  Displays International B.V., LPD USA, LPD Korea, LPD Mexico, LPD Brazil, and Meridian are

15  referred to collectively herein as "LP Displays."

16  **Panasonic Entities**

17       67.    Co-conspirator Panasonic Corporation, which at all times during the Relevant

18  Period was known as Matsushita Electric Industrial Co., Ltd. (referred to hereafter as either

19  Panasonic or MEI) and only became Panasonic Corporation on October 1, 2008, is a Japanese

20  entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  The entity known as

21  MEI operated under that name until October 1, 2008 when it changed its name to Panasonic

22  Corporation.  During the Relevant Period, MEI manufactured, marketed, sold, and/or distributed

23  CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

24       68.    Co-conspirator Panasonic Corporation of North America ("PCNA") is a Delaware

25  corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey

26  07094.  PCNA is a wholly owned and controlled subsidiary of Panasonic Corporation.  During

27  the Relevant Period, PCNA manufactured, marketed, sold, and/or distributed CRT Products

28  either directly or through its subsidiaries or affiliates, throughout the United States.  Panasonic

- 16 -

Corporation dominated and/or controlled the finances, policies, and/or affairs of PCNA relating to the antitrust violations alleged in this Complaint.

69.   Co-conspirator Panasonic Consumer Electronics Co. ("PACEC") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey 07094. PACEC is a subsidiary of PCNA. During the Relevant Period, PACEC manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of PACEC relating to the antitrust violations alleged in this Complaint.

70.   Co-conspirator MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-Cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic entered into a joint venture with Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with a 64.5 percent interest. On April 3, 2007, MEI purchased the remaining 35.5 percent stake in the joint venture, making it a wholly owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of MTPD relating to the antitrust violations alleged in this Complaint.

71.   Co-conspirator MT Picture Display Corporation of America (New York) ("MTPD New York") was a corporation with its headquarters at 100 Westinghouse Circle, Horseheads, New York. MTPD New York was a wholly owned subsidiary of MTPD Co., Ltd. (through MT Picture Display Corporation of America, a holding company). Prior to the formation of MTPD, the facility was known as Toshiba Display Devices Inc. During the Relevant Period, MTPD New York manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

COMPLAINT AND JURY DEMAND

1    Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of

2    MTPD relating to the antitrust violations alleged in this Complaint.

3         72.    Co-conspirator MT Picture Display Corporation of America (Ohio) ("MTPD

4    Ohio") was a corporation located at 1554 Mckaig Ave Ste 1, Troy, Ohio.  MTPD Ohio was a

5    subsidiary of Panasonic.  Prior to the formation of MTPD, the facility was known as Matsushita

6    Display Devices Corporation of America.  During the Relevant Period, MTPD Ohio

7    manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its

8    subsidiaries or affiliates, throughout the United States.  Panasonic Corporation dominated and/or

9    controlled the finances, policies, and/or affairs of MTPD relating to the antitrust violations

10   alleged in this Complaint.

11        73.    Co-conspirator Matsushita Electronic Corporation (Malaysia) Sdn Bhd.

12   ("Matsushita Malaysia") was a Malaysian entity located at Lot 1, Persiaran Tengku Ampuan

13   Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a

14   wholly owned and controlled subsidiary of Panasonic Corporation, which then transferred it to

15   MT Picture Display Co. in 2003.  It was renamed MT Picture Display (Malaysia) Sdn. Bhd. and

16   operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant

17   Period, Matsushita Malaysia manufactured, marketed, sold, and/or distributed CRTs

18   manufactured by MEI either directly or through its subsidiaries or affiliates.  Panasonic

19   Corporation dominated and/or controlled the finances, policies, and/or affairs of Matsushita

20   Malaysia relating to the antitrust violations alleged in this Complaint.

21        74.    Co-conspirator Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese

22   company with its principal place of business located at No. 9 Jiuxianqioa N. Rd., Dashanzi

23   Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by

24   Defendant MTPD.  Formed in 1987, BMCC was Panasonic Corporation's first CRT

25   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

26   China.  During the Relevant Period, BMCC manufactured, marketed, sold, and/or distributed

27   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

28

1  States.  Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs

2  of BMCC relating to the antitrust violations alleged in this Complaint.

3      75.    PT.MT Picture Display Indonesia ("PT. MT Picture Display") is an Indonesian

4  company located at Kawasan EJIP Industrial Park Plot 3-G, Bekasi 17550, Desa Sukaresmi,

5  Kecamatan Cikarang Selatan, Kabupaten Bekasi, Republic of Indonesia.  In December 1995,

6  Toshiba Corporation partnered with Orion Electronic Co. and two other entities to form P.T.

7  Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an

8  annual production capacity of 2.3 million CRTs by 1999.  In 2002, Toshiba Corporation entered

9  into a joint venture with MEI (now Panasonic Corporation) called Matsushita Toshiba Picture

10 Display Co., Ltd., in which the entities consolidated their CRT businesses.  In 2003, TEDI was

11 transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name

12 was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, PT.MT Picture

13 Display manufactured, marketed, sold, and/or distributed CRT Products, either directly or

14 through its subsidiaries or affiliates, throughout the United States.  Toshiba Corporation (when it

15 was TEDI) and then Panasonic Corporation dominated and/or controlled the finances, policies,

16 and/or affairs of PT.MT Picture Display relating to the antitrust violations alleged in this

17 Complaint.

18     76.    Co-conspirators Panasonic Corporation (f/k/a MEI), MTPD, Matsushita Malaysia,

19 PCNA, PACEC, PT.MT Picture Display, BMCC, MTPD New York, and MTPD Ohio are

20 collectively referred to herein as "Panasonic."

21     **Samsung Entities**

22     77.    Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

23 ("Samsung SDI") is a South Korean company with its principal place of business at 428-5

24 Gongse-dong, Giheung-gu Yongin 446577, South Korea.  Samsung SDI is a public company.

25 Founded in 1970, Samsung SDI claims to be the world's leading company in the display and

26 energy business, with 12,000 employees and facilities in 16 countries.  Samsung SDI is one of

27 the largest CRT producers in the world.  Samsung SDI was the top manufacturer for CRTs in

28 2000, with a market share of approximately 20%.  In 2002, Samsung SDI held a 34.3%

worldwide market share in the market for CRTs, more than any other producer.  Samsung SDI

has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured,

marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

affiliates throughout the United States.

78.     Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a

California corporation with its principal place of business at 85 West Tasman Drive, San Jose,

California.  Samsung America is subsidiary of Samsung SDI.  During the Relevant Period,

Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products either

directly or through its subsidiaries or affiliates throughout the United States.   Samsung SDI

dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI America

relating to the antitrust violations alleged in this Complaint.

79.     Co-conspirator Samsung SDI (Malaysia) Sdn Bhd. ("Samsung SDI Malaysia") is

a Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan

Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

Samsung SDI Malaysia is a subsidiary of Samsung SDI.  During the Relevant Period, Samsung

SDI Malaysia manufactured, marketed, sold, and/or distributed CRT Products either directly or

through its subsidiaries or affiliates throughout the United States.  Samsung SDI dominated

and/or controlled the finances, policies, and/or affairs of Samsung SDI Malaysia relating to the

antitrust violations alleged in this Complaint.

80.     Co-conspirator Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

Mexican company with its principal place of business located at Boulevard Los Olivos, No.

21014, Parque Industrial El Florida, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a subsidiary

of Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates

throughout the United States.  Samsung SDI dominated and/or controlled the finances, policies,

and/or affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this

Complaint.

COMPLAINT AND JURY DEMAND

81.     Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, SIN, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a subsidiary of Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Samsung SDI dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

82.     Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at No. 5003 Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a subsidiary of Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Samsung SDI dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

83.     Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a subsidiary of Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Samsung SDI dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

84.     Co-conspirator Samsung SDI (Hong Kong), Ltd. ("Samsung SDI HK") is a Hong Kong corporation with its principal place of business at 8/F Central Plaza, 18 Harbour Road Wanchai, Hong Kong. During the Relevant Period, Samsung SDI HK manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Samsung SDI dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI HK relating to the antitrust violations alleged in this Complaint.

85.     Co-conspirators Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia, and Samsung SDI HK are collectively referred to herein as "Samsung."

**Toshiba Entities**

86.     Co-conspirator Toshiba Corporation ("TC") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, Toshiba held a five to ten percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into a joint venture with MEI (now Panasonic Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses.  In 2003, TEDI was transferred to MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TC manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

87.     Co-conspirator Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly owned and controlled subsidiary of TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii, Inc.) throughout the United States.  TC dominated and/or controlled the finances, policies, and/or affairs of Toshiba America relating to the antitrust violations alleged in this Complaint.

88.     Co-conspirator Toshiba America Consumer Products LLC ("TACP") is a limited liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly owned and controlled subsidiary of TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold, and/or distributed CRT Products either

- 22 -

directly or through its subsidiaries or affiliates throughout the United States.  TC dominated and/or controlled the finances, policies, and/or affairs of TACP relating to the antitrust violations alleged in this Complaint.

89.     Co-conspirator Toshiba America Electronic Components, Inc. ("TAEC") is headquartered at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly owned and controlled subsidiary of TC through Toshiba America.  TAEC is currently the North American sales and marketing representative for MTPD.  During the Relevant Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  TC dominated and/or controlled the finances, policies, and/or affairs of TAEC relating to the antitrust violations alleged in this Complaint.

90.     Co-conspirator Toshiba America Consumer Products, Inc. ("TACPI") was a company that is headquartered at 1420-B Toshiba Drive, Lebanon, Tennessee, 37087.  TACPI was a wholly-owned and controlled subsidiary of TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  TC dominated and/or controlled the finances, policies, and/or affairs of TACPI relating to the antitrust violations alleged in this Complaint.

91.     Co-conspirator Toshiba America Information Systems, Inc. ("TAIS") is headquartered at 9740 Irvine Blvd., Irvine, California 92618.  TAIS is a wholly owned and controlled subsidiary of TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  TC dominated and/or controlled the finances, policies, and/or affairs of TAIS relating to the antitrust violations alleged in this Complaint.

92.     Co-conspirator Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathurn Thani, Thailand 12000.  TDDT was a wholly owned

- 23 -

1  and controlled subsidiary of TC.  In 2003, TDDT was transferred to MTPD, TC's joint venture

2  with Panasonic Corporation. It was renamed as MT Picture Display (Thailand) Co., Ltd. and

3  operated as a wholly owned and controlled subsidiary of MTPD until its closure in 2007.  During

4  the Relevant Period, TDDT manufactured, marketed, sold, and/or distributed CRT Products

5  either directly or through its subsidiaries or affiliates throughout the United States.  TC

6  dominated and/or controlled the finances, policies, and/or affairs of TDDT relating to the

7  antitrust violations alleged in this Complaint.

8      93.    Co-conspirators TC, Toshiba America, TDDT, TACP, TACPI, TAEC, and TAIS

9  are referred to collectively as "Toshiba."

10     **Thomson Entities**

11     94.    Co-conspirator Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

12 corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-

13 Moulineaux, France.  Thomson SA, through its wholly owned subsidiary Thomson Consumer

14 Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

15 plants located in the United States, Mexico, China, and Europe.  Thomson SA sold its CRTs

16 internally to its television manufacturing division, which had plants in the United States and

17 Mexico, and to other television manufacturers in the United States and elsewhere.  In 2005,

18 Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period,

19 Thomson SA manufactured, marketed, sold, and/or distributed CRT Products either directly or

20 through its subsidiaries or affiliates throughout the United States.

21     95.    Co-conspirator Thomson Consumer Electronics, Inc. (n/k/a Technicolor USA,

22 Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

23 business located at 10330 N Meridian Street, Indianapolis, IN 46290-1024. Thomson Consumer

24 Electronics is a wholly owned subsidiary of Thomson SA.  Thomson Consumer Electronics was

25 a major manufacturer of CRTs for the United States market, with plants located in Scranton,

26 Pennsylvania, Marion, Indiana, and Mexicali, Mexico.  The United States-based plants were

27 closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television

28 manufacturing division, which had plants in the United States and Mexico, and to other

- 24 -

1  television manufacturers in the United States and elsewhere.  Thomson Consumer Electronics'

2  CRT business was eventually sold to Videocon Industries, Ltd. in 2005.  During the Relevant

3  Period, Thomson Consumer Electronics manufactured, marketed, sold, and/or distributed CRT

4  Products either directly or through its subsidiaries or affiliates throughout the United States.

5  Thomson SA dominated and/or controlled the finances, policies, and/or affairs of Thomson

6  Consumer Electronics relating to the antitrust violations alleged in this Complaint.

7      96.    Thomson SA and Thomson Consumer Electronics are collectively referred to

8  herein as "Thomson."

9      **Videocon**

10     97.    Co-conspirator Videocon Industries, Ltd. ("Videocon") is an Indian corporation

11  with its principal place of business located at Aurangabad Paithan Road 14, KM Stone,

12  Chitegaon, Aurangabad 431005, India.  In 2005, Videocon acquired Thomson's CRT businesses,

13  which included manufacturing facilities in Poland, Italy, Mexico and China.  Videocon acquired

14  the businesses, including Thomson Displays Americas LLC and Thomson Display Mexicana

15  S.A. de CV, through its wholly owned investment entity located in the Cayman Islands, Eagle

16  Corporation Limited.  Videocon manufactured CRTs for the United States market in Thomson's

17  former CRT plants in Mexicali, Mexico, and China.  During the Relevant Period, Videocon

18  manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly

19  through its subsidiaries or affiliates, to customers throughout the United States.

20     **Technologies Displays**

21     98.    Co-conspirator Technologies Displays Americas LLC (formerly Thomson

22  Displays Americas LLC) is a Delaware limited liability company with its principal place of

23  business located at 1778 Carr Road Suite 4B, Calexico, California 92231.  Technologies

24  Displays Americas is the parent corporation of Technologies Displays Mexicana, a Mexican

25  corporation which during the Relevant Period manufactured CRTs and sold the CRTs to

26  Technologies Displays Americas for sale and distribution.  During the Relevant Period,

27  Technologies Displays manufactured, marketed, sold, and/or distributed CRT Products, either

28  directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

- 25 -

States.  Thomson SA and then Videocon dominated and/or controlled the finances, policies, and/or affairs of Technologies Displays Americas  relating to the antitrust violations alleged in this Complaint.

99.     Co-conspirator Technologies Displays Mexicana, S.A. de C.V. (formerly Thomson Displays Mexicana) is a Mexican corporation with its principal place of business located at Calz. Robledo Industrial Colorad, Mexicali, B.C. 21384, Mexico.  Technologies Displays Mexicana is a wholly owned subsidiary of Technologies Displays Americas.  During the Relevant Period, Technologies Displays manufactured, marketed, sold, and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  Thomson SA and then Videocon dominated and/or controlled the finances, policies, and/or affairs of Technologies Displays Mexicana relating to the antitrust violations alleged in this Complaint.

100.     Technologies Displays Americas and Technologies Displays Mexicana are collectively referred to herein as "Technologies Displays."

**Chunghwa Entities**

101.     Co-conspirator Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Road, Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, co-conspirator Chunghwa PT manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

102.     Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.

1    During the Relevant Period, Chunghwa Malaysia manufactured, marketed, sold, and/or

2    distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

3    United States.  Co-conspirator Chunghwa PT dominated and/or controlled the finances, policies,

4    and/or affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this

5    Complaint.

6         103.    Co-conspirators Chunghwa PT and Chunghwa Malaysia are collectively referred

7    to herein as "Chunghwa."

8         **Irico Entities**

9         104.    Co-conspirator Irico Group Corporation ("IGC") is a Chinese entity with its

10   principal place of business at No.11 Xinxi Road, Shangdi, Haidian District.  Irico Group

11   Corporation is the parent company for multiple subsidiaries engaged in the manufacture,

12   distribution, and/or sale of CRT Products.  During the Relevant Period, Irico Group Corporation

13   manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

14   subsidiaries or affiliates throughout the United States.

15        105.    Co-conspirator Irico Group Electronics Co., Ltd. ("IGE") is a Chinese entity

16   located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  During the Relevant

17   Period, IGE manufactured, marketed, sold, and/or distributed CRT Products either directly or

18   through its subsidiaries or affiliates throughout the United States.  IGC dominated and/or

19   controlled the finances, policies, and/or affairs of IGE relating to the antitrust violations alleged

20   in this Complaint.

21        106.    Co-conspirator Irico Display Devices Co., Ltd. ("IDDC") is a Chinese entity

22   located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI

23   710075.  IDDC is a partially owned subsidiary of IGC.  In 2006, IDDC was China's top CRT

24   maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and/or sold

25   CRT Products either directly or through its subsidiaries or affiliates or through other Defendants

26   and co-conspirators in the United States.  IGC dominated and/or controlled the finances, policies,

27   and/or affairs of IDDC Asia relating to the antitrust violations alleged in this Complaint.

28        107.    IGC, IGE, and IDDC are collectively referred to herein as "Irico."

- 27 -

**Samtel**

108.    Co-conspirator Samtel Color, Ltd. ("Samtel") is an Indian company with its registered office at 6th Floor, 7 TDI Centre, Dist. Centre, Jasola, New Delhi-110025.  During the Relevant Period, Samtel manufactured, marketed, sold, and/or distributed CRT Products throughout the United States.

**Thai CRT**

109.    Co-conspirator Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group that was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**Mitsubishi Entities**

110.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico, and Canada for sale in the United States. These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold, and distributed CRT Products in the United States.

111.    Co-conspirator Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630. Mitsubishi Electric USA is a wholly owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico, and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

- 28 -

112.     Co-conspirator Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital is a wholly owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

113.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## VI.     TRADE AND COMMERCE

114.     During the Relevant Period, each Defendant and co-conspirator, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

115.     During the Relevant Period, Defendants and their co-conspirators collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

116.     The business activities of the Defendants and co-conspirators substantially affected interstate trade and commerce in the United States, caused antitrust injury in the United States, and restrained competition.  The business activities of Defendants and co-conspirators also substantially affected trade and commerce in California, New Jersey, Tennessee, and New York, and caused antitrust injuries in and restrained competition in California, New Jersey, Tennessee, and New York.

## VII.     FACTUAL ALLEGATIONS

### A.     CRT Technology and Products

117.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask–a thin screen of perforated metal–is welded to the faceplate panel and, to produce

- 29 -

1    a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines

2    of red, green, blue, and black.

3        118.    CRT technology was first developed more than a century ago.  The first

4    commercially practicable CRT television was made in 1931.  However, it was not until RCA

5    Corporation introduced the product at the 1939 World's Fair that it became widely available to

6    consumers.  After that, CRTs became the heart of most display products, including televisions,

7    computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

8        119.    The quality of a CRT itself determines the quality of the CRT display.  No

9    external control or feature can make up for a poor quality tube.

10        120.    Although there have been refinements and incremental advancements along the

11    way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT

12    technology used today is similar to that RCA unveiled in 1939.

13        121.    CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used

14    primarily in televisions and related devices and CDTs are primarily used in computer monitors

15    and similar devices.  The primary difference is that CDTs typically yield a higher resolution

16    image requiring more pixels than do CPTs.

17        122.    CRTs have no independent utility, and have value only as components of other

18    products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from

19    the demand of such products.  Accordingly, the market for CRTs and the market for the products

20    into which they are placed are inextricably linked and intertwined.

21        123.    Plaintiffs and/or their affiliates have purchased CRT Products from Defendants,

22    co-conspirators, and/or their subsidiaries and affiliates.    Defendants' and their co-conspirators'

23    unlawful conspiracy inflated the prices at which Plaintiffs purchased CRT Products to

24    supracompetitive levels, and Plaintiffs have thereby been injured.

25    **B.    Structure of the CRT Industry**

26        124.    The CRT industry has several characteristics that facilitated a conspiracy,

27    including market concentration, ease of information sharing, the consolidation of manufacturers,

28

- 30 -

1   multiple interrelated business relationships, significant barriers to entry, heightened price

2   sensitivity to supply and demand forces, and homogeneity of products.

3       **1.    Market Concentration**

4       125.    During the Relevant Period, the CRT industry was dominated by relatively few

5   companies.  In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together

6   held a collective 78% share of the global CRT market.  The high concentration of market share

7   facilitates coordination because there are fewer cartel members among which to coordinate

8   pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel

9   members.

10      **2.    Information Sharing**

11      126.    There were many opportunities for Defendants and their co-conspirators to

12  discuss and exchange competitive information.  The ease of communication was facilitated by

13  the use of meetings, telephone calls, e-mails, and instant messages.  Defendants and their co-

14  conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for

15  CRTs as alleged below.

16      **3.    Consolidation**

17      127.    The CRT industry also had significant consolidation during the Relevant Period,

18  including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

19  involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

20  and Panasonic's CRT businesses into MTPD.

21      **4.    High Costs of Entry into the Industry**

22      128.    There are significant manufacturing and technological barriers to entry into the

23  CRT industry.  It would require substantial time, resources and industry knowledge to overcome

24  these barriers to entry.  It is also extremely unlikely that a new producer would enter the market

25  in light of the declining demand for CRTs.

26      129.    During the Relevant Period, the costs of the assembly components, both as a

27  whole and individually, have been generally declining, and, in some periods, declining at a

28  substantial rate.  A combination of price discussions and manipulation of the output of CRTs

- 31 -

COMPLAINT AND JURY DEMAND

1    allowed Defendants and their co-conspirators to keep prices above where they would have been

2    but for the conspiracy.

3         **5.    Homogeneity of CRTs**

4         130.   CRTs are commodity-like products that are manufactured in standardized sizes.

5    One Defendant's or conspirator's CRT for a particular application, such as a particular size

6    television set or computer monitor, is substitutable for another's.  Defendants and their co-

7    conspirators sell and Plaintiffs purchase CRTs primarily on the basis of price.

8         131.   It is easier to form and sustain a cartel when the product in question is

9    commodity-like because it is easier to agree on prices to charge and to monitor those prices once

10   an agreement is formed.

11   **C.    International Antitrust Investigations**

12        132.   In November 2007, the DOJ and others commenced an investigation into price-

13   fixing in the CRT industry.  The United States investigation of the CRT conspiracy is being

14   conducted by the DOJ's Antitrust Division's office in the Northern District of California.

15        133.   On November 8, 2007, antitrust authorities in Europe, Japan, and South Korea

16   raided the offices of manufacturers of CRTs as part of an international investigation of alleged

17   price fixing.

18        134.   On November 8, 2007, it was reported that EC officials carried out unannounced

19   raids on manufacturers of CRTs based on suspected anticompetitive conduct.  That same day, the

20   EC issued a press release stating that "[t]he commission has reason to believe that the companies

21   concerned may have violated EU rules against price-fixing, sharing markets or exchanging

22   market information."

23        135.   On November 9, 2007, MEI (now known as Panasonic Corporation) and Samsung

24   SDI reported that they were cooperating with the JFTC, which raided the companies' CRT

25   production facilities on suspicion of anticompetitive conduct.

26        136.   On that same day, a Samsung spokesperson announced that its CRT subsidiary in

27   South Korea was being investigated by the KFTC as "part of an international probe into alleged

28   price-fixing."

- 32 -

137.    On November 12, 2007, Chunghwa announced that it had received a summons from the DOJ with respect to involvement in a CRT price-fixing cartel.

138.    On November 21, 2007, Philips acknowledged that it was being investigated as well. *The International Herald Tribune* reported that "competition authorities in several jurisdictions had started investigations," and that Philips "would assist regulators."

139.    In its 2008 Annual Report, Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to . . . cathode ray tubes (CRT) . . . ."

140.    On February 10, 2009, the DOJ issued a press release announcing that C.Y. Lin of Chunghwa was indicted for participating in a conspiracy to fix the prices of CRTs. The DOJ's announcement of the indictment explained it as follows:

> The indictment, filed today in U.S. District Court in San Francisco, charges Cheng Yuan Lin, aka C.Y. Lin, a resident of Taiwan, with conspiring with others to suppress and eliminate competition by fixing prices, reducing output and allocating market shares of color display tubes (CDTs) to be sold in the U.S. and elsewhere, beginning at least as early as Jan. 28, 1997, until at least as late as April 7, 2003. The indictment also charges C.Y. Lin with conspiring with others to suppress and eliminate competition by fixing prices for color picture tubes (CPTs) to be sold in the U.S. and elsewhere, beginning at least as early as March 12, 1997, until at least as late as April 7, 2003.
>
> CRTs consist of evacuated glass envelopes that contain an electron gun and a phosphorescent screen. When electrons strike the screen, light is emitted, creating an image on the screen. CDTs and CPTs are each types of CRTs. CDTs are used in computer monitors and other specialized applications, while CPTs are used in color televisions. The worldwide market for CRTs, including CPTs and CDTs, in 1997, at the start of the conspiracies has been estimated as approximately $26 billion.
>
> This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Antitrust Division. "The Antitrust Division will continue to prosecute individuals, wherever they are located and however high their position on the corporate ladder, who engage in price fixing aimed at U.S. businesses and consumers."
>
> According to the charges, C.Y. Lin and co-conspirators carried out the CDT conspiracy by, among other things:
>
> --Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China and elsewhere to discuss the prices, output and market shares of CDTs;
>
> --Agreeing during those meetings, conversations and communications to charge prices of CDTs at certain target levels or ranges;

- 33 -

--Agreeing during those meetings, conversations and communications to reduce output of CDTs by shutting down CDT production lines for certain periods of time;

--Agreeing during those meetings, conversations and communications to allocate target market shares for the CDT market overall and for certain CDT customers;

--Exchanging CDT sales, production, market share and pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices, output reduction and market share allocation;

-- Implementing an auditing system that permitted co-conspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations and reducing output in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

C.Y. Lin is charged with carrying out the CPT conspiracy with his co-conspirators by, among other things:

--Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia and elsewhere to discuss the prices of CPTs;

--Agreeing during those meetings, conversations and communications to charge prices of CPTs at certain target levels or ranges;

--Exchanging CPT pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.[1]

141.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng was a former assistant Vice President of Sales and

---

[1]    The significance of the April 7, 2003 ending date in this indictment is that it is when C.Y. Lin left the employ of Chunghwa PT.

COMPLAINT AND JURY DEMAND

Marketing at Chunghwa. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

142.   In November 2009, the EC confirmed that it had sent Statements of Objections to companies suspected of participation in two cartels in the CRT industry—one involving CPTs and one involving CDTs.

143.   On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Cheng Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identified Yeh as a "former director of sales" at "a large Taiwan-based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

144.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

145.   On March 18, 2011, the DOJ issued a press release announcing that Samsung SDI Company Ltd. had agreed to plead guilty and pay a $32 million criminal fine for its role in a global conspiracy to fix prices, reduce output, and allocate market shares of CDTs from at least as early as January 1997 until at least as late as March 2006.

146.   In June 2012, the EC sent a supplementary Statement of Objections to both Royal Philips Electronics N.V. and LG Electronics, Inc. to hold them responsible for the conduct of LPD.

147.   On December 5, 2012, the EC announced that it had fined seven international groups of companies a total of €1,470,515,000 for participating in cartels to fix prices of CPTs and/or CDTs. Fines were imposed on the following companies for price-fixing CPTs: Samsung

1   SDI, Philips, LG Electronics, Philips/LG Electronics, Thomson (now Technicolor), Panasonic,

2   and Panasonic/Toshiba/MTPD, and Panasonic/MTPD.  Fines were also imposed on the

3   following companies for price-fixing CDTs:  Samsung SDI, Philips, LG Electronics, and

4   Philips/LG Electronics.  The EC found that "between 1996 and 2006, these companies fixed

5   prices, shared markets, allocated customers between themselves and restricted their output," and

6   stated that "[t]he two CRT cartels are among the most organized cartels that the Commission has

7   investigated."  The EC further found that "the cartelists carried out the most harmful anti-

8   competitive practices including price fixing, market sharing, customer allocation, capacity and

9   output coordination and exchanges of commercial[ly] sensitive information" and that meetings

10  were held in various locations in Asia and Europe.

**D.    Pre-Conspiracy Market**

11

12          148.    The CRT conspiracy began in the late 1980s, as the CRT business became more

13  international and Defendants and co-conspirators began serving customers that were also being

14  served by other international companies.  During this period, the employees of Defendants and

15  co-conspirators would encounter employees from their competitors when visiting their

16  customers.  A culture of cooperation developed over the years and these Defendant and co-

17  conspirator employees would exchange market information on production, capacity, and

18  customers.

19          149.    In the early 1990s, representatives from Samsung, Chunghwa and others visited

20  each other's factories in Southeast Asia.  During this period, these producers began to include

21  discussions about price in their meetings.

**E.    Defendants' and Co-conspirators' Illegal Agreements**

22

23          150.    In order to control and maintain profitability for CRTs, Defendants and their co-

24  conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has

25  been to raise, fix, maintain, and/or stabilize the prices at which they sold CRTs to artificially

26  inflated levels from at least March 1, 1995 through at least December 2007.

27          151.    The CRT conspiracy was effectuated through a combination of group and

28  bilateral meetings.  Bilateral contacts and communications among Defendants commenced in the

COMPLAINT AND JURY DEMAND

late 1980s to early 1990s on an *ad hoc* basis.  Competitively sensitive information on pricing, production capacity, product mix, and customer information was exchanged.  In 1995, these bilateral meetings began to increase in frequency.  There were more than a dozen such meetings in 1995 and several dozen such meetings in 1996 alone.  In those formative years, bilateral discussions were the primary method of communication and took place on an *ad hoc* basis.  During the early to mid-1990s, representatives from LG Electronics and Samsung visited the other manufacturers, including Philips, Thai CRT, Hitachi, Toshiba, and Panasonic, to discuss increasing prices for CRTs in general and for specific customers.  These meetings took place in Taiwan, South Korean, Thailand, Japan, Malaysia, Indonesia, and Singapore.

152.    The meetings continued throughout the Relevant Period.  Bilateral contacts and communications were conducted in person, by telephone or e-mail.  As time went on, bilateral meetings encompassed specific intercompany agreements or followed up on agreements reached at group meetings.

153.    Samsung and LG Electronics, along with Chunghwa, also attended several *ad hoc* group meetings in the early to mid-1990s.  The participants at these group meetings also discussed increasing prices for CRTs.

154.    As more manufacturers entered the conspiracy, group meetings became more prevalent.

155.    With respect to CRTs, Defendants, co-conspirators, and/or their agents agreed to, *inter alia*: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

COMPLAINT AND JURY DEMAND

156.   The overall CRT conspiracy set and/or affected worldwide prices (including prices in the United States) that Defendants and co-conspirators charged for CRTs.

157.   Agreements as to CRTs were conducted through bilateral meetings as described above, through informal multilateral meetings as described above, and through more formal "Glass Meetings."

**1.   "Glass Meetings"**

158.   Beginning in 1997, CRT makers started to meet in a more organized, systematic fashion.  At some point, these meetings became known as "Glass Meetings" or "GSM."

159.   The Glass Meetings conducted with respect to CRTs fell into several categories:

a.   "Top Meetings" – these meetings were held by individuals at the highest level of the Defendant companies, including CEOs, Presidents, and Vice Presidents.  These happened less frequently, typically on a quarterly basis, and were focused on longer term agreements and dispute resolution.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.  Top Meetings occurred in South Korea, Taiwan, and China.

b.   "Management Meetings" – these meetings were held by high-level sales executives and/or managers.  These meetings occurred more frequently than "Top Meetings," typically on a monthly basis, and handled implementation of agreements made at "Top Meetings."  Management Meetings occurred in South Korea, Taiwan, China, Indonesia, Japan, and Thailand.

c.   "Working Level Meetings" – these meetings were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The Working Level Meetings also tended to be more regional and often took place near Defendants' and co-conspirators' factories.  In other words,

COMPLAINT AND JURY DEMAND

1  the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees

2  met in Korea, the Chinese in China, and so on.

3        d.    "Green Meetings" – these meetings occurred on golf courses.  These

4  meetings were generally attended by top and management level employees of Defendants and

5  co-conspirators.

6       160.    The Chinese Glass Meetings began in 1998 and generally occurred on a monthly

7  basis following a top or management level meeting.  The China Glass Meetings had the principal

8  purpose of reporting what had been decided at the most recent Glass Meetings to the Chinese

9  manufacturers.  Participants at the Chinese Glass Meetings included the manufacturers located in

10  China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants

11  and co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, and

12  Samsung SDI Tianjin.

13       161.    Glass Meetings also occurred occasionally in various European countries.

14  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries

15  and/or manufacturing facilities located in Europe, including Philips, LG Electronics, and LP

16  Displays.

17       162.    Participants would often exchange competitively sensitive information prior to a

18  Glass Meeting.  This included information on inventories, production, sales, and exports.  For

19  some such meetings, where information could not be gathered in advance of the meeting, it was

20  brought to the meeting and shared.

21       163.    The meetings at all levels followed a fairly typical pattern.  First, participants

22  exchanged competitive information such as proposed future CRT pricing, sales volume,

23  inventory levels, future production capacity, exports, customer orders, price trends, and forecasts

24  of sales volumes for coming months.  The participants also updated the information they had

25  provided in the previous meetings.  Each of the other participants then had the opportunity to

26  challenge the presenter on the information being presented, reflecting monitoring of the

27  conspiracy.

28

164.   Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  (However, with respect to meetings on CPT Products, one person typically served as chair after 2002.)  Then the meeting participants used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  Participants often computed overall production for each product and compared that to estimated demand.

165.   Based on this information, the meeting participants discussed and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

166.   During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

167.   The agreements encompassed prices in United States dollars to specific third party customers, and prices reflecting inclusion of specific features in a CRT (such as certain types of coating or the differing types of shadow mask).

168.   The agreements included not only prices charged to third party customers, but, in the case of vertically integrated manufacturers who produced both CRTs and CRT Products, also encompassed: (a) prices charged by the CRT manufacturing arm of each such integrated company to the corporate division or subsidiary that manufactured or sold computer monitors, televisions or other similar CRT Products and (b) price floors on quotations offered by the competitors of the integrated company to such a division or subsidiary.

169.   Defendants and co-conspirators also realized the importance of keeping the pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants and co-conspirators ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

- 40 -

170.   The Defendants and co-conspirators often also agreed and implemented coordinated output restrictions.  These output agreements began as agreements to shut down production lines for a certain number of days.  As time went on, they changed to agreements to shut down entire production lines.  To police this aspect of the conspiracy, there were in-person follow-up audits, in which a designated participant would visit the facilities of another participant in order to ensure that output restrictions were being implemented.  Sometimes, they also discussed plans related to future capacity expansion.  Defendants and co-conspirators based these determinations on what the market would look like, after jointly analyzing anticipated supply and demand.  The analysis often included consideration of downstream prices for televisions, computer monitors, or similar products and how they would affect the price ranges being collusively set.

171.   Defendants and co-conspirators would also agree on what to say about price changes or output restrictions to their customers in order to conceal their conspiracy.  Often, one participant was chosen to make the first price announcement, with the others following on an agreed-upon schedule.

172.   During the course of these meetings, attending Defendants and co-conspirators would be assigned the task of contacting non-attendees in order to secure their consent to the agreements reached.

173.   Finally, the attending Defendants and co-conspirators would organize the next upcoming meeting.

174.   Efforts were also made to monitor each Defendant's and co-conspirator's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants and their co-conspirators themselves.  When cheating did occur, it was addressed in at least four ways: (1) monitoring; (2) attendees at the meetings challenging other attendees if they did not live up to an agreement; (3) threats to undermine a competitor at one of its principal customers; and (4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

- 41 -

175.    From 2005 to 2007, the group Glass Meetings became less frequent, and bilateral meetings again became more prevalent.

176.    In summary, the types of agreements reached at the Glass Meetings included:

  i.      Agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

  ii.     Placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

  iii.    Agreements on pricing for intra-company CRT sales to vertically integrated customers;

  iv.     Agreements as to what to tell customers about the reason for a price increase;

  v.      Agreements to coordinate with CRT manufacturers and marketers that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

  vi.     Agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customers' demands;

  vii.    Agreements to coordinate uniform public statements regarding available capacity and supply;

  viii.   Agreements to allocate both overall market shares and share of a particular customer's purchases;

  ix.     Agreements to allocate customers;

  x.      Agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

  xi.     Agreements to keep their meetings secret.

**2.    Bilateral Discussions**

177.    Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, *ad hoc* basis, often between the group meetings.  These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts, and emails.

178.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico.

179.    The purpose of the bilateral discussions was to exchange information about past and future pricing, coordinate pricing with manufacturers, confirm production levels, share sales order information, and confirm pricing rumors.

180.    In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRTs. In this way, Defendants and their co-conspirators ensured that prices of all CRTs imported into the United States were fixed, raised, maintained, and/or stabilized at supracompetitive levels. North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Defendants and their co-conspirators also used bilateral discussions with each other during the price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

181.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that sometimes missed the group meetings, such as Toshiba, Panasonic, and Samtel. It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with the other Defendant or co-conspirator manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing and/or output agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing and/or output agreements to Toshiba. Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing and/or output agreements to Samtel. Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing and/or output agreements as

- 43 -

conveyed by Samsung, LG Electronics, and Thai CRT. Other times, Hitachi and Toshiba attended the Glass Meetings themselves. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-conspirators' Participation in Group and Bilateral Discussions

182. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them. For the various meeting participants identified below, in many instances, their high-ranking executives participated in a significant number of the meetings described.

183. Between at least 1996 and 2001, Hitachi, through Hitachi Ltd., Hitachi Shenzhen, Hitachi Displays, and Hitachi Asia, participated in and/or was party to over a dozen bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. These included more than ten bilateral meetings and more than five group meetings of the types described herein, which took place in Taiwan and China. Hitachi never effectively withdrew from this conspiracy.

184. Hitachi America and HEDUS were represented at those meetings and were parties to the agreements entered at them. Further, to the extent Hitachi America and HEDUS distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers

- 44 -

1 | would not undercut the pricing agreements reached at these various meetings. Thus, Hitachi

2 | America and HEDUS were active, knowing participants in this conspiracy.

3 |      185.    Between at least 1995 and 2001, LG Electronics participated in, through LGPD,

4 | LP Displays, LGEI, and LGETT, and/or was party to more than a dozen bilateral meetings and

5 | more than one hundred group meetings in which unlawful agreements as to, *inter alia*, price,

6 | output restrictions, and/or customer and market allocation of CRTs occurred. After 2001, LG

7 | participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

8 | Displays). A substantial number of these meetings were attended by the highest ranking

9 | executives from LG Electronics. LG Electronics never effectively withdrew from this

10 | conspiracy.

11 |      186.    LGEUSA was represented at these meetings and/or was a party to the agreements

12 | entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a

13 | significant role in the conspiracy because Defendants and co-conspirators wished to ensure that

14 | the prices for such products paid by direct purchasers would not undercut the pricing agreements

15 | reached at these various meetings. Thus, LGEUSA was an active, knowing participant in this

16 | conspiracy.

17 |      187.    Between at least 2001 and 2006, LP Displays (f/k/a LGPD) participated in and/or

18 | was party to at least one hundred Glass Meetings at all levels in which illegal agreements as to,

19 | *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. A

20 | substantial number of these meetings were attended by the highest ranking executives from LP

21 | Displays. Certain of these high level executives from LP Displays had previously attended

22 | meetings on behalf of LG Electronics and Philips. LP Displays also engaged in bilateral

23 | discussions with Defendants or other co-conspirators. Through these discussions, LP Displays

24 | agreed on prices and supply levels for CRTs. LP Displays never effectively withdrew from this

25 | conspiracy.

26 |      188.    LPD USA, LPD Brazil, LPD Korea, and LPD Mexico were represented at these

27 | meetings and/or were a party to the agreements entered at them. To the extent LPD USA, LPD

28 | Brazil, LPD Korea, and LPD Mexico sold and/or distributed CRT Products, they played a

1   significant role in the conspiracy because Defendants and co-conspirators wished to ensure that

2   the prices for such products paid by direct purchasers would not undercut the pricing agreements

3   reached at these various meetings.  Thus, LPD USA, LPD Brazil, LPD Korea, and LPD Mexico

4   were active, knowing participants in this conspiracy.

5        189.    Between at least 1996 and 2003, Panasonic, directly or through Panasonic

6   Corporation, Matsushita Malaysia, PT.MT Picture Display and MTPD, participated in and/or

7   was party to several dozen bilateral and group meetings in which unlawful agreements as to,

8   *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

9   These included bilateral meetings and group meetings of the types described herein.  These

10  meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic

11  never effectively withdrew from this conspiracy.

12       190.    PCNA and PACEC were represented at those meetings and/or were parties to the

13  agreements entered at them.  To the extent PCNA and PACEC distributed CRT Products to

14  direct purchasers, they played a significant role in the conspiracy because Defendants and co-

15  conspirators wished to ensure that the prices for such products paid by direct purchasers would

16  not undercut the pricing agreements reached at these various meetings.  Thus, PCNA and

17  PACEC were active, knowing participants in the alleged conspiracy.

18       191.    Between at least 2003 and 2006, MTPD participated in and/or was party to

19  multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions,

20  and/or customer and market allocation of CRTs occurred, and, in fact, MTPD led many of these

21  meetings during the latter years of the conspiracy.  These meetings were attended by high level

22  sales managers from MTPD.  MTPD also engaged in bilateral discussions with Defendants or

23  other co-conspirators.  Through these discussions, MTPD agreed on prices and supply levels for

24  CRTs.  MTPD never effectively withdrew from this conspiracy.

25       192.    MTPD New York and MTPD Ohio were represented at those meetings and/or

26  were parties to the agreements entered at them.  To the extent MTPD New York and MTPD

27  Ohio distributed CRT Products to direct purchasers, they played a significant role in the

28  conspiracy because Defendants and co-conspirators wished to ensure that the prices for such

- 46 -

1    products paid by direct purchasers would not undercut the pricing agreements reached at these

2    various meetings.  Thus, MTPD New York and MTPD Ohio were active, knowing participants

3    in the alleged conspiracy.

4          193.    Between at least 1998 and 2007, BMCC participated in and/or was party to

5    multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions,

6    and/or customer and market allocation of CRTs occurred.  These meetings were attended by high

7    level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with

8    Defendants or other co-conspirators, particularly the other Chinese CRT manufacturers.

9    Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of

10   BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese

11   government.  BMCC was acting to further its own independent private interests in participating

12   in the alleged conspiracy.  BMCC never effectively withdrew from this conspiracy.

13         194.    Between at least 1996 and 2007, Philips, through Royal Philips, PEIL, LGPD,

14   and/or LP Displays, participated in and/or was party to over one hundred bilateral and group

15   meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or

16   customer and market allocation of CRTs occurred.  A substantial number of these meetings were

17   attended by high level executives from Philips.  Philips participated through Royal Philips or its

18   subsidiaries into 2001 and participated thereafter through LGPD.  Philips never effectively

19   withdrew from this conspiracy.

20         195.    Philips America, Philips Brazil, and PCEC were represented at those meetings

21   and were parties to the agreements entered at them.  To the extent Philips America, Philips

22   Brazil, and PCEC distributed CRT Products to direct purchasers, they played a significant role in

23   the conspiracy because the conspirators wished to ensure that the prices for such products paid

24   by direct purchasers would not undercut the pricing agreements reached at these various

25   meetings.  Thus, Philips America, Philips Brazil, and PCEC were active, knowing participants in

26   this conspiracy.

27         196.    Between at least 1995 and 2007, Samsung, through Samsung SDI, Samsung SDI

28   Malaysia, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI HK participated in

- 47 -

1  and/or was party to hundreds of bilateral and group meetings in which unlawful agreements as

2  to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

3  These included dozens of bilateral meetings and several hundred group meetings of the types

4  described herein.  Samsung never effectively withdrew from this conspiracy.

5           197.    Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were

6  represented at those meetings and/or were parties to the agreements entered at them.  To the

7  extent Samsung America, Samsung SDI Brazil, and Samsung SDI Mexico distributed CRT

8  Products to direct purchasers, they played a significant role in the conspiracy because Defendants

9  and co-conspirators wished to ensure that the prices for such products paid by direct purchasers

10  would not undercut the pricing agreements reached at these various meetings.  Thus, Samsung

11  SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants

12  in this conspiracy.

13           198.    Between at least 1995 and 2003, Toshiba, through TC, MTPD, TDDT and TEDI,

14  participated in over 50 bilateral and group meetings in which unlawful agreements as to, *inter*

15  *alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.  These

16  meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba never

17  effectively withdrew from this conspiracy.

18           199.    Toshiba America, TAIS, TACP, TACPI, and TAEC were represented at those

19  meetings and/or were parties to the agreements entered at them.  To the extent Toshiba America,

20  TAIS, TACP, TACPI, and TAEC distributed CRT Products to direct purchasers, they played a

21  significant role in the conspiracy because Defendants and co-conspirators wished to ensure that

22  the prices for such products paid by direct purchasers would not undercut the pricing agreements

23  reached at these various meetings.  Thus, Toshiba America, TAIS, TACP, TACPI, and TAEC

24  were active, knowing participants in this conspiracy.

25           200.    Between at least 1996 and 2005, Thomson participated in and/or was a party to

26  bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output

27  restrictions, and/or customer and market allocation of CRTs occurred. These meetings were

28

COMPLAINT AND JURY DEMAND

1  attended by high level sales managers from Thomson. Thomson never effectively withdrew from

2  this conspiracy.

3      201.    Thomson Consumer Electronics, Technologies Displays Americas (then known as

4  Thomson Displays Americas), and Technologies Displays Mexicana (then known as Thomson

5  Displays Mexicana) were at those meetings and/or were parties to the agreements entered at

6  them.  To the extent Thomson Consumer Electronics, Technologies Displays Americas, and

7  Technologies Displays Mexicana distributed CRT Products to direct purchasers, they played a

8  significant role in the conspiracy because Defendants and co-conspirators wished to ensure that

9  the prices for such products paid by direct purchasers would not undercut the pricing agreements

10 reached at these various meetings.  Thus, Thomson Consumer Electronics, Technologies

11 Displays Americas, and Technologies Displays Mexicana were at those meetings and/or were

12 parties to the agreements and were active, knowing participants in this conspiracy.

13     202.    Upon information and belief, between 2005 and 2007, Videocon participated in

14 several Glass Meetings and multiple bilateral meetings with its competitors.  These meetings

15 were attended by high level sales managers from Videocon.  At these meetings, Videocon

16 discussed such things as CRT prices, production, revenues, volumes, demand, inventories,

17 estimated sales, plant shutdowns, customer allocation, and new product development, and agreed

18 on prices and supply levels for CRT Products.  Videocon never effectively withdrew from this

19 conspiracy.

20     203.    Technologies Displays Americas and Technologies Displays Mexicana were at

21 those meetings and/or were parties to the agreements entered at them.  To the extent

22 Technologies Displays Americas and Technologies Displays Mexicana distributed CRT Products

23 to direct purchasers, they played a significant role in the conspiracy because Defendants and co-

24 conspirators wished to ensure that the prices for such products paid by direct purchasers would

25 not undercut the pricing agreements reached at these various meetings.  Thus, Technologies

26 Displays Americas and Technologies Displays Mexicana were at those meetings and/or were

27 parties to the agreements and were active, knowing participants in this conspiracy.

28

- 49 -

204.    Between at least 1996 and 2004, Orion participated in and/or was party to multiple bilateral and at least several dozen group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. Orion never effectively withdrew from this conspiracy.

205.    TEDI, Domex, and Orion Engineering were represented at those meetings and/or were parties to the agreements entered at them. To the extent TEDI, Domex, and Orion Engineering distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants and co-conspirators wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, TEDI, Domex, and Orion Engineering were active, knowing participants in this conspiracy.

206.    Between at least 1995 and 2007, Chunghwa, through Chunghwa PT and Chunghwa Malaysia, participated in and/or were parties to hundreds of bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer and/or market allocation of CRTs occurred. These included hundreds of bilateral meetings and hundreds of group meetings of all the types described herein that took place in Southeast Asia, China, Europe, and Scotland. The representatives of Chunghwa who participated in some of these meetings included its highest executives, such as the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa never effectively withdrew from the conspiracy.

207.    Between at least 1998 and 2007, IRICO, through IGC, IGE, and IDDC, participated in and/or was party to multiple bilateral meetings and at least several dozen group meetings in which unlawful agreements as to *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. These meetings were attended by the highest ranking executives from IRICO. IRICO engaged in multiple bilateral discussions with Defendants or other co-conspirators, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

COMPLAINT AND JURY DEMAND

1  IRICO was acting to further its own independent private interests in participating in the alleged

2  conspiracy.  IRICO never effectively withdrew from this conspiracy.

3      208.    Between at least 1998 and 2006, Samtel participated in and/or was party to

4  multiple bilateral meetings in which unlawful agreements as to, *inter alia*, price, output

5  restrictions, and/or customer and market allocation of CRTs occurred.  These meetings occurred

6  in Malaysia.  Samtel never effectively withdrew from this conspiracy.

7      209.    Between at least 1998 and 2006, Thai CRT participated in and/or was party to

8  over 50 bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output

9  restrictions, and customer and/or market allocation of CRTs occurred.  Thai CRT never

10  effectively withdrew from this conspiracy.

11      210.    Between at least 1995 and 2005, Mitsubishi participated in multiple bilateral

12  meetings with its competitors.  These meetings were attended by high level sales managers from

13  Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production,

14  revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation,

15  and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi

16  never effectively withdrew from this conspiracy.

17  **F.**    **The CRT Market During the Conspiracy**

18      211.    Until the last few years, CRTs were the dominant technology used in displays,

19  including televisions and computer monitors.  During the Relevant Period, this translated into the

20  sale of millions of CRTs, generating billions of dollars in annual profits.

21      212.    The following data was reported by Stanford Resources, Inc., a market research

22  firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

COMPLAINT AND JURY DEMAND

213.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5%) were consumed in North America.  By 2002, North America still consumed around 35% of the world's CRT monitor supply.

## G.    Effects of Defendants' and Co-Conspirators' Antitrust Violations

214.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' and their co-conspirators' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

### 1.    Examples of Collusive Pricing for CRTs

215.    Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

216.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."  In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

217.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large color CRTs also rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

- 52 -

218.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

219.    A BNET Business Network news article from August 1998 reported that "the components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October  . . . .  While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

220.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."  In fact, this price increase was a result of the collusive conduct as herein alleged.

**2.      Examples of Reductions in Manufacturing Capacity by Defendants and Co-Conspirators**

221.    Defendants and their co-conspirators also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

222.    For example, Defendants' and their co-conspirators' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants and their co-conspirators were the result of their agreements to decrease output in order to stabilize the prices of CRTs.

COMPLAINT AND JURY DEMAND

223.    In December 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

224.    In July 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

225.    In December 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

226.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

227.    In July 2006, Orion America shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

**H.    Summary of Effects of the Conspiracy Involving CRTs**

228.    The above combination and conspiracy has had the following effects, among others:

a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

b.    Prices for CRTs sold by Defendants and their co-conspirators has been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.    Plaintiffs are deprived of the benefit of free and open competition in the purchase of CRTs.

d.    As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, Plaintiffs have been injured in their business and property in that they

- 54 -

1   paid more for CRTs than it otherwise would have paid in the absence of the unlawful conduct of

2   Defendants. Plaintiffs were also injured in that they paid more for CRT Products than they

3   otherwise would have paid in the absence of the unlawful conduct of Defendants and co-

4   conspirators.

5   **VIII. PLAINTIFFS' INJURIES**

6         229.    As direct purchasers of CRTs, Plaintiffs have suffered a direct, substantial, and

7   reasonably foreseeable injury as a result of Defendants' and their co-conspirators' conspiracy to

8   raise, fix, stabilize or maintain CRT prices at supracompetitive levels. Defendants' and their co-

9   conspirators' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher

10  prices than they would have in the absence of Defendants' and co-conspirators' conspiracy.

11        230.    Throughout the Relevant Period, Defendants and their co-conspirators controlled

12  the market for CRTs.

13        231.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as

14  it moves through the distribution system. CRTs are identifiable, discrete physical objects that do

15  not change from or become an indistinguishable part of a CRT Product. Thus, CRTs follow a

16  physical chain from Defendants and their co-conspirators through manufacturers of CRTs sold to

17  Plaintiffs.

18        232.    Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as

19  others, which in turn purchased CRTs from Defendants and/or their co-conspirators.

20  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

21  OEMs and others, which paid higher prices for CRTs than they would have absent the

22  conspiracy.

23        233.    Consequently, during the Relevant Period, the OEMs had no choice but to

24  purchase CRTs from Defendants and their co-conspirators and others at prices that were

25  artificially inflated, fixed, and stabilized by Defendants' conspiracy.

26  **IX. TOLLING**

27        234.    As discussed in paragraphs 9-10, and 132-47 above, the DOJ instituted criminal

28  proceedings and investigations against several Defendants and co-conspirators commencing on

- 55 -

1   at least November 2007 through the present.  Plaintiffs' claims have been tolling during these

2   criminal proceedings pursuant to 15 U.S.C. § 16.  Plaintiffs were also members of the putative

3   class actions asserted against Defendants and co-conspirators, including but not limited to the

4   following complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal., filed Nov. 26, 2007).

- *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Direct Purchaser Plaintiffs' Consolidated Amended Complaint, MDL No. 1917, Lead Case No. 3:07-cv-5944 (N.D. Cal., filed March 16, 2009).

235.    Plaintiffs' claims also have been tolled under the doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the putative class actions asserted against Defendants, which commenced as early as November 26, 2007.

## X.      FRAUDULENT CONCEALMENT

236.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief despite diligence in trying to discover the pertinent facts.  Defendants and their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

237.    The affirmative acts of the Defendants and co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants and co-conspirators organized Glass Meetings to avoid detection, conducted bilateral meetings in secret, and agreed to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

238.    By its very nature, Defendants' and co-conspirators' price-fixing conspiracy was inherently self-concealing.

- 56 -

239.   Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between the Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws, and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).  Glass Meeting participants knew that their actions were illegal pursuant to antitrust laws and that their meetings needed to be concealed.

240.   Companies attending Glass Meetings reduced the number of their respective attendees to maintain secrecy and staggered their arrivals and departures at meetings to avoid being seen in public with each other.  Meetings were frequently conducted at hotels rather than at the participants' businesses in order to maintain secrecy of the meetings.  Participants at Glass Meetings were told not to take minutes and not to disclose the fact of meetings to outsiders or to others within their respective companies.  When reporting on meetings within their respective companies, participants would often designate their reports as secret and confidential or instruct the recipients to destroy the report after reading.  The documents relating to the meetings kept by Defendants and their co-conspirators reflect their affirmative steps to conceal the conspiracy.  All of these actions were undertaken with the express purpose and effect of keeping the Glass Meetings and associated communications and information exchanges secret.

241.   Defendants and co-conspirators also agreed to give pretextual reasons for price increases and output reductions to their customers.

242.   As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price

- 57 -

1    rise was the result of collusive conduct among Defendants and co-conspirators, which was

2    undisclosed at the time.

3         243.    As alleged above, despite increased competition from flat panel monitors, prices

4    for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price

5    stabilization was purportedly due exclusively to a shortage of critical components such as glass.

6    This was a pretext used to cover up the conspiracy.

7         244.    In addition, when several CRT manufacturers, including Samsung, Philips, and

8    LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a

9    shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a

10   Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of

11   glass shells] is a global phenomena and every company has to increase the prices of CRT

12   monitors in due course of time."

13        245.    Manufacturers such as LG Electronics periodically issued press statements falsely

14   asserting that CRT prices were being driven lower by intense competition.

15        246.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported

16   reasons for the price increases of CRTs were materially false and misleading and made for the

17   purpose of concealing Defendants' anti-competitive scheme as alleged herein.

18        247.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

19   of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a

20   result of the anticompetitive conduct alleged in this Complaint.

21

22

23

24

25

26

27

28

COMPLAINT AND JURY DEMAND

# XI.   CLAIM FOR VIOLATIONS

**First Claim for Relief**
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

248.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

249.    From March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

250.    In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

251.    As a result of Defendants' and their co-conspirators' unlawful conduct, prices for CRTs were raised, fixed, maintained, and stabilized in the United States.

252.    The contract, combination or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

253.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      a.    Participating in meetings and conversations to discuss and agree upon the prices and supply of CRTs;

      b.    Communicating in writing and orally to fix prices, allocate customers, and restrict output;

      c.    Agreeing to manipulate prices and supply of CRTs sold in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

- 59 -

COMPLAINT AND JURY DEMAND

d.       Issuing price announcements and price quotations in accordance with the agreements reached;

e.       Selling CRTs to customers in the United States at non-competitive prices;

f.       Exchanging competitive sensitive information in order to facilitate their conspiracy;

g.       Agreeing to maintain or lower production capacity;  and

h.       Providing false statements to the public to explain increased prices for CRTs.

254.     As a result of Defendants' unlawful conduct, Plaintiffs have been injured in their businesses and property in that they have paid more for CRT Products than they otherwise would have paid in the absence of Defendants' and co-conspirators' unlawful conduct.

**Second Claim for Relief**
**(Violation of the California Cartwright Act)**

255.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

256.     During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California by issuing purchase orders from California and receiving invoices on those purchases there.  As a result of Plaintiffs' presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

257.     In addition, Defendants LP Display, Samsung, and Toshiba all maintained offices in California during the Relevant Period.   Employees at Defendants' and co-conspirators' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' and their co-conspirators' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' and their co-

COMPLAINT AND JURY DEMAND

1   conspirators' conduct within California thus injured Plaintiffs and their predecessor entities, both

2   in California and throughout the United States.

3          258.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March

4   1, 1995, and continuing thereafter at least up to and including at least December 2007,

5   Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in

6   restraint of the trade and commerce described above in violation of the Cartwright Act,

7   California Business and Professional Code Section 16720.

8          259.    Defendants have each acted in violation of Section 16720 to fix, raise, stabilize,

9   and maintain prices of, and allocate markets for, CRTs at supracompetitive levels. Defendants'

10  and their co-conspirators' conduct substantially affected California commerce.

11         260.    The aforesaid violations of Section 16720, California Business and Professional

12  Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

13  Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain,

14  and stabilize the prices of, and to allocate markets for, CRTs.

15         261.    For the purpose of forming and effectuating the unlawful trust, Defendants and

16  their co-conspirators have done those things which they combined and conspired to do, including

17  but in no way limited to the acts, practices and course of conduct set forth above and the

18  following:

19              a.   to fix, raise, maintain, and stabilize the price of CRTs;

20              b.   to allocate markets for CRTs amongst themselves; and

21              c.   to allocate among themselves the production of CRTs.

22         262.    The combination and conspiracy alleged herein has had, *inter alia*, the following

23  effects:

24              a.  price competition in the sale of CRTs has been restrained, suppressed, and/or

25          eliminated in the State of California;

26              b.  prices for CRTs sold by Defendants, their co-conspirators, and others have

27          been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels

28          in the State of California; and

- 61 -

c.  those who purchased CRTs from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

263.    As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supracompetitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

264.    As a direct and proximate result of Defendants' and co-conspirators' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**
**(Violation of California Unfair Competition Law)**

265.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

266.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California by issuing purchase orders from California and receiving invoices on those purchases there.  As a result of Plaintiffs' presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

267.    During the Relevant Period, Defendants and co-conspirators engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

268.    Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above.

- 62 -

269.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) a violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

270.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or Cartwright Act.

271.   Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*

272.   Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

273.   By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts and practices described above.

**Fourth Claim for Relief**
**(Violation of the New York Donnelly Act)**

274.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

275.   During the Relevant Period, Plaintiffs and their affiliated entities conducted a substantial volume of business in New York.  For example, Plaintiffs warehoused CRT Products in New York.  As a result of the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

276.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including December 2007,  Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

277.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained, and stabilized the price of CRTs in New York at artificially high, non-competitive levels.

278.    As a result, Defendants' conspiracy substantially affected New York commerce.

279.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq.*

280.    As a result of Defendants' violation of Section 340 *et seq.* of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

### Fifth Claim for Relief
### (Violation of New York Unfair Competition Law)

281.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

282.    Defendants and co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which CRTs were sold, distributed, or obtained in New York, and took efforts to conceal their agreements from Plaintiffs.

283.    The conduct of Defendants and co-conspirators described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. General Business Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

284.     Defendants' and co-conspirators' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New York; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supracompetitive, artificially inflated prices for CRT Products.

285.     During the Relevant Period, Defendants' and co-conspirators illegal conduct substantially affected New York commerce and consumers.

286.     During the Relevant Period, each of the Defendants named herein, directly, or indirectly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in New York.

287.     Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.

### Sixth Claim for Relief
### (New Jersey Antitrust Act, N.J. Stat. § 56:9-1 *et seq.*)

288.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

289.     During the Relevant Period, Sharp Electronics resided in New Jersey, and Plaintiffs and their affiliated entities conducted a substantial volume of business in New Jersey. Sharp Electronics oversaw SMCA's CRT procurement activities.  Once the CRTs were purchased, Sharp Electronics instructed SMCA and SEMA on the number of finished products that customers requested.  As a result of Plaintiffs' presence in New Jersey and the substantial business they conducted in New Jersey, Plaintiffs are entitled to the protection of the laws of New Jersey.

290.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including December 2007,  Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

- 65 -

1   trade and commerce described above in violation of the New Jersey Antitrust Act, N.J. Stat. §

2   56:9-1 *et seq.*

3       291.   Defendants' conspiracy restrained, suppressed, and/or eliminated competition in

4   the sale of CRTs in New Jersey and fixed, raised, maintained, and stabilized CRTs in New Jersey

5   at artificially high, non-competitive levels.

6       292.   As a result, Defendants' conspiracy substantially affected New Jersey commerce.

7       293.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been

8   injured in their business and property by paying more for CRT Products purchased from

9   Defendants, their co-conspirators and others than they would have paid in the absence of

10  Defendants' combination and conspiracy, and are entitled to relief under N.J. Stat. §§ 56:9-1 *et*

11  *seq.*

12      294.   By reason of the foregoing, Defendants have entered into agreements in restraint

13  of trade in violation of N.J. Stat. §§ 56:9-1 *et seq.*  Plaintiffs seek all forms of relief available

14  under N.J. Stat. §§ 56:9-1 *et seq.*

### Seventh Claim for Relief
### (Violation of Tennessee Code Ann. §§ 47-258-101 *et seq.*)

17      295.   Plaintiffs incorporate by reference all the above allegations as if fully set forth

18  herein.

19      296.   Defendants' and their co-conspirators' combinations or conspiracies had the

20  following effects: (1) CRT price competition was restrained, suppressed, and eliminated

21  throughout Tennessee; (2) CRT prices were raised, fixed, maintained, and stabilized at

22  artificially high levels throughout Tennessee; (3) Plaintiffs were deprived of free and open

23  competition in Tennessee; and (4) Plaintiffs paid supracompetitive and artificially inflated prices

24  for CRT Products in Tennessee.

25      297.   During the Relevant Period, Plaintiffs purchased CRT Products in Tennessee,

26  with purchase orders issuing from, and invoices being received, in Tennessee.

COMPLAINT AND JURY DEMAND

298.   During the Relevant Period, Defendants' and their co-conspirators' illegal conduct substantially affected Tennessee commerce.

299.   As a direct and proximate result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

300.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* Plaintiffs seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

## XII.   DAMAGES

301.   During the Relevant Period, Plaintiffs purchased CRT Products directly from Defendants, co-conspirators, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations.  During the Relevant Period, Plaintiffs also purchased CRT Products indirectly from Defendants, co-conspirators or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for such CRT Products than they would have paid in the absence of such antitrust violations.  As a result, Plaintiffs have sustained damages to their business and property in an amount to be determined at trial.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.   Defendants and co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the Unfair Competition Law of California, the New York Donnelly Act, New Jersey Antitrust Act, New York General Business Law § 349, and Tennessee Code Ann. §§ 47-25-101 *et seq.*, Plaintiffs were injured in their business and property as a result of Defendants' violations;

1    B.    Plaintiffs shall recover damages sustained, as provided by federal and state

2  antitrust laws, and that a joint and several judgment in favor of Plaintiffs be entered against the

3  Defendants in an amount to be trebled in accordance with such laws;

4    C.    Defendants, their subsidiaries, affiliates, joint ventures, successors, transferees,

5  assignees, and the respective officers, directors, partners, agents, and employees thereof and all

6  other persons acting or claiming to act on their behalf, be permanently enjoined and restrained

7  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

8    D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and that such

9  interest be awarded at the highest legal rate from and after the date of service of the initial

10  Complaint in this action;

11    E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

12  as provided by law; and

13    F.    Plaintiffs shall receive such other or further relief as may be just and proper.

COMPLAINT AND JURY DEMAND

## XIV.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

DATED:  June 17, 2013                    By: _____

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone:  (415) 788-8200
Facsimile:  (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

Kenneth A. Gallo (*pro hac vice to be submitted*)
Joseph J. Simons (*pro hac vice to be submitted*)
Craig A. Benson (*pro hac vice to be submitted*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC  20006
Telephone: 202.223.7300
Facsimile: 202.223.7420
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

*Attorneys for Plaintiffs*