Martin Quinn Esq.
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA94111
Telephone: (415) 774-2669
Fax: (415) 982-5287
Interim Special Master

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | **MDL No. 1917**<br>**JAMS Ref. No. 1100054618** |
| This Document Relates to:<br><br>ALL DIRECT ACTION CASES | **REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO STRIKE PROPOSED EXPERT TESTIMONY** |

To the Honorable Samuel Conti, United States District Judge:

On April 29, 2013, the Interim Special Master heard Defendants' Motion to Strike Proposed Expert Testimony of Dr. Janet S. Netz . Having considered the moving papers, evidence and the arguments of the parties, and good cause appearing, the Interim Special Master now makes the following Report and Recommendation. For the reasons set forth below, it is recommended that the Court DENY Defendants' motion.

## Introduction

This multi-district litigation involves allegations of a global price-fixing cartel among manufacturers of cathode ray tubes (CRTs). CRTs are a display technology used for the most part in televisions and computer monitors. See generally, Report and Recommendation re Motion for Class Certification (June 20, 2013) ("Class Certification Report"). CRTs are of two general types: color picture tubes ("CPTs") found in televisions sets, and color display tubes ("CDTs") used in computer monitors. Each type of CRT is manufactured in various sizes, shapes and with varying qualities. They are incorporated into CRT finished products which also vary by size, shape and quality. The CRTs have no independent utility. They are useful only for incorporation into finished televisions sets, computers and other products.[1]

Defendants are the major global manufacturers of CRTs, who allegedly controlled approximately 90% of the worldwide market for CRTs. Plaintiffs are individual consumers and entities who bought televisions and computer monitor products that contain defendants' CRTs. They contend that defendants conspired to increase prices of the CRTs between 1995 and 2007, and that this conspiracy resulted in artificially higher prices for the finished CRT products. Plaintiffs bought CRT finished products either from manufacturers of the products (e.g., Dell, Sharp or Hewlett-Packard) or from retailers (e.g., Best Buy or Wal-Mart). They seek restitution, disgorgement and damages under the antitrust, consumer protection and unfair competition laws of 21 states and the District of Columbia.

---

[1]  CRTs are now virtually obsolete, having been supplanted by LCD panels.

To prevail on the merits, plaintiffs must show that the alleged conspiracy increased the prices that they paid for the CRT finished products manufactured or sold by defendants.  Because the plaintiffs did not buy the products directly from defendant manufacturers, they will attempt to demonstrate this price increase by proving (1) that the cartel members were successful in increasing prices for their customers, in most cases the product manufacturers who bought the CRTs directly from defendants, and (2) that the direct purchasers and retailers "passed-on" the price increases down the distribution chain to the indirect purchaser consumers by including the price increases for the CRT in the prices at which they sold the finished products.  To prevail on class certification, plaintiffs must demonstrate that defendants' actions had a common impact on direct purchasers, that the pass-through of increased prices impacted consumers commonly, and that impact, damages and the quantification of damages can all be proved with common, classwide evidence.

<u>Parties' Contentions</u>

In order to establish this proof, plaintiffs have retained Dr. Janet S. Netz, a partner of ApplEcon, LLC, who has submitted a number of declarations in support of plaintiffs' Motion for Class Certification and in opposition to this motion.[2]  Broadly speaking, Dr. Netz has concluded that:

1. The cartel charged direct purchasers higher prices than the prices that would have existed but for the price-fixing.

2. The impact on direct purchasers was common in the form of higher prices.

3. Direct purchasers passed on the overcharges to retailers;

4. Retailers passed on the overcharges to indirect plaintiff consumers.

5. The amount of the overcharge to indirect purchasers can be calculated using a common method.

Defendants attack the reliability of these opinions on the following grounds:

//

---

[2] Defendants do not challenge Dr. Netz's qualifications to render opinions on these economic issues.

1        1. Dr. Netz relied in reaching her opinions on assumptions which have no support in the

2    record or evidence.  In particular, she assumed the cartel operated in the manner plaintiffs

3    alleged, she assumed that target prices fixed for overseas sales impacted U.S. sales, she assumed

4    that the cartel price increase was significant, and she assumed that retailed uniformly passed

5    through the price increases.

6        2. Dr. Netz used non-random samples and price data for direct purchasers and retailers

7    without any analysis to show that they were representative.

8        3. Dr. Netz used unreliable methodologies.  In particular, she averaged and aggregated

9    data in an improper and misleading way, she failed to perform a correlation study or refer to

10   peer-reviewed studies to demonstrate the existence of her assumed price structure, and she failed

11   to consider data regarding Sony and other market participants that would demonstrate her

12   opinions were faulty.

13                                    Legal Standard

14       Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific,

15   technical, or other specialized knowledge will assist the trier of fact to understand the evidence

16   or to determine a fact in issue."  Expert testimony must be both relevant to the issues in the case

17   and reliable.  Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786 (1993)

18   ["Daubert"].  A district court is to act as a "gatekeeper" to ensure through a rigorous analysis that

19   the proponent of the expert opinions has satisfied its burden, but the court has broad discretion to

20   apply the *Daubert* factors flexibly. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 and 150,

21   119 S.Ct. 1167 (1999).  The district court should focus not on the substance of the expert's

22   conclusions, but on the principles and methodology used to generate the conclusions. *Clarke v.*

23   *LR Sys.*, 219 F.Supp.2d 323, 332 (E.D.N.Y. 2002).  Despite the care with which the court must

24   scrutinize an expert's opinions, it should also adhere to the "liberal policy of admissibility" that

25   favors admission of any evidence that may assist the trier of fact. *In re Chocolate Confectionary*

26   *Antitrust Litigation*, No. 1:08-MDL-1935, 2012 WL 6655201 at *5 (M.D. Pa., December 7,

27   2012).

28

1    The Ninth Circuit concurs with these principles. "*Daubert* does not require a court to

2   admit or to exclude evidence based on its persuasiveness; rather it requires a court to admit or

3   exclude evidence based on its scientific reliability and relevance. [citation] Thus, an expert's

4   'inference or assertion must be derived by the scientific method' to be admissible. [citation] A

5   trial court has broad latitude not only in determining whether an expert's testimony is reliable,

6   but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale*

7   *Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

8    The Supreme Court in its very recent decision of *Comcast v. Behrend*, No. 110864, 569

9   U.S. ___, slip op. (2013) has stressed once again the need for the district court at the class

10   certification stage to conduct a "rigorous analysis" of the necessary elements for class

11   certification, including whether any expert opinions offered in support of certification are

12   relevant, i.e., consistent with the liability case, and demonstrate that damages are measurable on

13   a classwide basis. While damage calculations "need not be exact," the methodology proffered

14   must be "just and reasonable." *Id.,* slip op. at 7-8.

15    Applying these legal principles, the Interim Special Master first summarizes Dr. Netz's

16   analysis, methodology and findings, then addresses each of defendants' criticisms of her

17   approach, and finally considers the applicability of three Northern District antitrust cases which

18   have considered Dr. Netz's opinions.

19                                    Discussion

20    A.    Dr. Netz's Analysis

21          1.    The cartel was successful in raising prices for CRTs

22    Dr. Netz begins by describing the actions of the alleged cartel. In addition to fixing

23   prices directly, the cartel members are alleged to have restricted capacity, fixed market shares

24   among members, allocated customers to particular members, shared information about capacity

25   and output, and created social opportunities for competitors to build personal trust. [Netz

26   Declaration in Support of Motion for Class Certification, dated October 1, 2012 ("Netz Decl."),

27   p. 3] She documents her analysis with citations to meeting notes and other documents related to

28   100 "Glass Meetings" at which executives of the cartel members met weekly, monthly or less

1    frequently to discuss and agree on aspects of the CRT market, as well as to documents in which

2    cartel members commented on the success of the cartel's actions.

3          Dr. Netz then describes the workings of successful cartels generally, based on history and

4    economic theory. A cartel either fixes prices directly or restricts output, either of which has the

5    effect of increasing the actual price above the "but-for" or "competitive" price that would have

6    been charged in the absence of the cartel activity. She discusses how a successful cartel imposes

7    discipline by reining in firms that cheat on its agreements. And she explains how a cartel may

8    also benefit a vertically integrated firm, such as some of these defendants, which in this context

9    would manufacture both CRTs and CRT televisions or computer monitors. She supports all her

10   observations about cartels with detailed references to economic literature and studies. [Netz

11   Decl., pp. 6-15]

12         Dr. Netz then embarks on a detailed description of the CRT industry and market. She

13   reaches the following significant conclusions about the industry: (1) CPTs and CDTs are not

14   interchangeable; (2) CRTs are differentiated by application, size, shape, finish and mask type,

15   different resolutions and the use of various coatings. CRTs are generally designed for a

16   particular model being developed by a particular manufacturer, although they are not customized

17   in great detail. As a result, they cannot readily be substituted from one model or manufacturer to

18   another, and CRTs tend to be manufactured to customer order; (3) CRTs are produced in large,

19   expensive factories that produce at least 1 million tubes per year, cost $100-300 million or more,

20   and take at least 3 years to build and achieve full production. Production facilities make either

21   CDTs or CPTs, but rarely both.

22         As to the CRT market, she reaches the following conclusions. (1) The cartel members

23   controlled an exceptionally high percentage of the CRT market. From 1997 to 2005, cartel

24   members controlled between 90-100% of the CDT market, and between 87-92% of the CPT

25   market [Netz Decl., Exh. 4 & 5] Applying the Herfindahll-Hirschman Index (HHI) index, the

26   Justice Department considers a score of over 2,500 to be "highly concentrated." The CRT

27   market had an HHI score of 7,800 during the cartel period. [Netz Decl., pp. 27-28]; (2) The

28   CDT market was depressed by both the 2000-2001 dot-com crash and by the growing shift from

CRTs to LCD monitors. As a result most vendors reported 27% excess manufacturing capacity in 2000. A similar phenomenon occurred in the CPT market, with excess capacity reaching 19% in 2001. [Netz Decl., pp. 28-29] (3) The CRT distribution chain is quite varied. CRT manufacturers sell CRTs to product manufacturers (sometimes through a distributor), CRT product manufacturers sell to a retailer (sometimes through a distributor), and the retailer sells to the ultimate consumer. The direct purchaser may be an original equipment manufacturer (OEM), or a contract manufacturer of which there are various types. The indirect purchasers are big box retailers, electronic retailers, on-line retailers, and often a distributor is involved in the chain. Consumers normally buy from a retailer, but may also buy from a product manufacturer directly. In either case they are indirect purchasers of the CRT. [Netz Decl., pp. 29-33] Again, Dr. Netz supports every statement with a citation to documents and deposition testimony in this case, or to public reports.

Having laid this groundwork of the CRT industry and marketplace, Dr. Netz examines the evidence that the cartel succeeded in raising prices, and concludes for four reasons that it did. First, as noted above, the cartel had the ability to raise prices. It possessed a dominant market share of about 80-90% of the CRT market. Moreover, there were few alternatives to CRTs until the popularity of TFT-LCD panels grew later in the cartel period.[3] The CRT cartel's market power was not threatened by potential new entrants given the high barriers to entry (high cost of building manufacturing facilities, excess capacity).

Second, the CRT cartel engaged in the practices followed by other successful cartels. The CRT members developed an elaborate structure of Glass Meetings attended by a range of employees from top management to sales force members. These meetings not only resulted in agreements on price, supply and market shares, but were forums for exchanging competitive information and building trust among members. The meetings also provided a vehicle for monitoring compliance with cartel agreements, and enforcing them. They also imposed most-

---

[3]Dr. Netz notes that the TFT-LCD market was also impacted by a cartel whose members included many of the members of the alleged CRT cartel. [Netz Decl. pp. 36-37] The price increases generated by the LCD cartel dampened the intense price competition between the two products that might otherwise have existed. [Netz Decl., p. 42]

favored customer clauses, which have the effect of raising the cost of cheating.  Dr. Netz cites to well over 100 documents and deposition testimony to illustrate the validity of her conclusions. [Netz Decl., pp. 43-58]

Third, Dr. Netz examines both evidence concerning target prices, from Glass Meeting documents that actually state the target prices, and actual sales prices, from data for six defendants.  Although she examined approximately 1,800 target prices, she notes that the available data and evidence at this stage of the case is incomplete.  Discovery will develop more evidence concerning the setting of target prices, and more refined data on actual sales prices. But given the presently available data, Dr. Netz concludes that the cartel was "generally successful" in achieving actual sales prices close to their target prices.  [Netz Decl., p. 64] Overall, the cartel was able to charge prices at least 95% as high as the target price 63% of the time, and only 13% of the sales were more than 15% below the cartel's target price.  [Netz Decl., p. 63]  A variety of analyses by characteristic (size, finish and application) show roughly comparable results.  [Netz Decl., Exh. 14-17]

Fourth, in addition to an analysis of documented target and sales prices, Dr. Netz relies in two respects on common sense.  First, she notes that the cartel lasted some 12 years, despite the expense in both time and money and despite the participants' awareness that they were risking substantial files and jail terms.  Why would they continue to fix prices if their efforts were not bearing fruit?  [Netz Decl., pp. 58-61]  Second, documents produced disclose comments by defendants congratulating themselves with the success they were having.  [Netz Decl., pp. 64-65]

2.    The price increases impacted all direct purchasers in a common way.

It is not sufficient for Dr. Netz to show that some direct purchasers paid inflated cartel-fixed prices.  She must show that that it is more probable than not that the cartel's price increases impacted all, or nearly all, direct purchasers in a common way.  Her analysis in this respect is more controversial, and is the subject of defendants' criticisms as noted below.  Broadly speaking, she tries to show that both the target prices and the actual prices paid by direct purchasers operated in a predictable (and ultimately calculable) structure.

As to target prices, even though the cartel fixed target prices only for certain models (e.g., a flat 17" CPT), the market's price structure rippled that increase to all CRT models. To demonstrate this Dr. Netz relies on both economic theory and mathematical analysis.

The economic theory argument is as follows. As noted above the CRT market is highly differentiated: characteristics such as size, shape, finish and whether the customer is major or minor, impact prices. Other things being equal, a 17" CPT costs more than a 14" one. A cartel does not succeed unless it is able to raise prices on all models. If the cartel could increase the price only for 17" CPTs, customers would tend to migrate to the 15" or 19" models, thus blunting any impact of the price-fix. Dr. Netz cites documentary evidence that the CRT cartel acted in two ways to broaden the impact of its price fixing. First, it directly fixed prices on models with different characteristics (e.g., "bottom line pricing must be kept" for 15" at $44, 17" at $57, etc.) Second, the cartel fixed price differentials between models (e.g., the target price for a 15" CDT will be $15 above the price of a 14" CDT). [Netz Decl., pp. 66-68] But economic theory teaches that when customers move to alternative non-price-fixed models, the demand curve for such models increases, thus increasing the price for those models. Thus, raising the one target price causes prices of neighboring models that did not receive target prices to also increase. In support of this conclusion, Dr. Netz cites respected economic texts, treatises and articles.

Dr. Netz purports to verify the teaching of economic theory by performing a hedonic regression.[4] Using target prices from defendants' documents, Dr. Netz used a mathematical model that incorporated the principal model characteristics (size, shape, major or minor customer, and whether sold with add-ons or "bare"). The calculation showed that 98% of the variation in cartel target prices for CPTs is a function of these common characteristics, while 91% of the variation for CDTs is based on common characteristics. [Netz Decl., pp. 68-69] In other words, she concluded a very high percentage of the prices for 14" CPTs moved in tandem, as did the prices for 17' models, etc., and this was the case for all of the principal price-

---

[4] A hedonic regression is used by economists to correlate the price of goods with the features or qualities they possess. [Ness Decl., p. 68, fn. 219]

impacting characteristics – or in her words, that prices in the CRT market during the cartel period demonstrated a common price structure.

As to actual sales prices, Dr. Netz again relies on a series of hedonic regressions to demonstrate that a very high percentage of the changes in sales prices were determined by common variables (such as size, shape, major or non-major customer), and a very small percentage of price changes could be influenced by individual factors (e.g., individual customer negotiations). She used data from the six defendants that produced sales data[5], some providing it by transaction and others by month. Her calculations performed separately for different characteristics and combinations of characteristics showed that less than 10% of the price variance for CRTs could have been determined by non-common factors.[6] [Netz Decl., pp. 69-71 and Exh, 23 & 24]

Dr. Netz concludes from both theory and mathematical analysis that both target and actual sales prices for all CRT models moved in a highly predictable structure based on product characteristics that are common to the class, although the cartel set prices on only selected models. Accordingly, she concludes that proof of harm to all direct purchasers can be proved without any individual inquiry into any particular product or the conduct of any particular customer.

        3.   <u>The direct purchasers passed-on the price increases to indirect purchasers</u>

Dr. Netz relies on economic theory, evidence from defendants' documents and empirical pass-through studies to demonstrate that manufacturers of televisions and monitor products, and the downstream retailers, passed through the cartel price increases to ultimate consumers.

Economic theory teaches that firms will increase their prices to cover cost increases that are significant, non-transitory and industry-wide. It stands to reason that a firm might decide to absorb a price increase that was minimal, or temporary, or not aimed at all its competitors. But there is no rational reason for a firm to absorb a significant price increase that will continue

---

[5] Chunghwa, Hitachi, Panasonic, Phillips, Samsung and Toshiba
[6] Those percentages are actually for the logarithm of price, but Dr. Netz explains that the difference between the log and prices themselves is negligible.

1   indefinitely and that all one's competitors are encountering.  Dr. Netz argues that the cartel price

2   increases satisfied all three conditions, with multiple citations to economic literature.  [Netz

3   Decl., pp. 73-78]

4          Dr. Netz also points to numerous comments in defendants' documents that show that they

5   anticipated and observed that their price increases for CRTs were being incorporated into the

6   prices for CRT products.  [Netz Decl., pp. 78-79, Exh. 29-32]

7          Dr. Netz also uses regression analysis to perform 47 separate studies of prices and costs

8   in the distribution channel, using a wide variety of data, to calculate the pass through rate.  Her

9   pass-through studies regress the price against the cost, either for the entire distribution chain or

10  for only one level in the chain.  The results of those studies are discussed in Section A.4 below.

11         4.   The amount of overcharge paid by both direct and indirect purchasers can

12  be calculated using a common methodology

13  Direct Purchasers:  The amount of overcharge to direct purchasers is the difference

14  between the actual sales price and the "but-for" price that would have obtained had there been no

15  cartel.  Since the "but-for" price cannot by definition be observed, it is necessary to predict what

16  it would have been, using assumptions and inferences derived from and consistent with

17  economic theory and the evidence in the case.  [Netz Decl., pp. 83-84]  Dr. Netz offers four

18  formulaic methods to make an estimate of "but-for" prices:  (1) economic determinants method

19  (regression analysis to isolate the impact of the cartel from other price determinants such as

20  demand, cost and market structure, using data from within and outside the cartel period); (2)

21  benchmark comparisons method (using data for internal rates of return and price-cost margins

22  from industries similar to that for CRTs in which no cartel operated); (3) simulation method

23  (creating a model for the CRT industry using available data for demand, costs and competition

24  that will calculate marginal prices in the absence of a cartel); (4) market power method

25  (estimating the but-for elasticity of a firm's demand from produced sales and cost data, and

26  converting that through a mathematical formula into a "but-for" price).  Dr. Netz provides

27  supporting references from economic literature supporting the validity and relevance of all these

28  methods.  She concludes that sufficient data is, or is likely to be, available to use any of these

1    four methods – all of which rely on data common to the entire class and do not require input of
2    any individual evidence. [Netz Decl, pp. 83-97]

3         Indirect Purchasers:  Dr. Netz initially performed 40 separate regression analyses using
4    different data sets in order to determine the pass-through rate for CRT products.  The data sets
5    included large retailers like Best Buy, Kmart and Sears, product manufacturers and large
6    distributors; they included 17 years of transactions; in total her studies encompass over 131
7    million CRT tubes and products and all levels of the distribution channel.  [Netz Rebuttal, p. 74]
8    In response to defendants' odd criticism that this represented a "tiny sample," [Memorandum of
9    Law in support of Defendants' Motion to Strike the Proposed Expert Testimony of Dr. Janet S.
10   Netz ("Defs' Memo"], 21:9], Dr. Netz performed seven additional pass-through studies, using
11   data from K-Mart, Radio Shack, bestbuy.com and Sears.  The 47 studies found a pass-through
12   rate of 100% or greater in 36 of the studies, and a rate not statistically significantly less than
13   100% for the other 11 studies.[7]  Each analysis compared selling price with cost.  Her declaration
14   explains the data she used, both complete and incomplete, and the variables she used to conduct
15   her different studies.  For example, she performed three calculation of Wal-Mart's pass-through
16   rate using data for suggested retail prices, wholesale list prices and actual transaction data.  The
17   Wal-Mart data showed pass-through rates of 106%, 110% and 112% -- meaning that a product
18   manufacturer's price increase to Wal-Mart of $10 would be passed on to the customer as an
19   increase of $10.60, $11.00 or $11.20.

20        From these calculations, Dr. Netz concludes that it is possible to quantify the pass-
21   through rate by common evidence, and further concludes that virtually all class members
22   suffered common harm in an amount of at least 100% of the cartel overcharge.  [Netz Decl., pp.
23   97-104]

24   //

25

26

27   [7] To show antitrust impact it is not necessary that the pass-through rate be 100%.  For example a pass-through rate
     of 50% means that half the cartel price increase was passed-through, which still amounts to common harm to the
28   class.  A pass-through rate greater than 100% means that the manufacturer or retailer increased its prices by more
     than the cartel-generated increase.

5.     The amount of classwide damages can be calculated using a common formula

Dr. Netz states that the total damage to the class is the mathematical product of defendants' revenues from the products at issue, the overcharge rate to direct purchasers and the pass-through rate to indirect purchasers. She would obtain data for defendants' revenues from data that would allow her to isolate U.S. shipments of CRT tubes, then eliminate government purchases, and limit the results to the states that are part of the State Classes. This analysis, along with date concerning average weighted prices, would result in a calculation of revenues from class members for each product for each year. Dr. Netz would then multiply these yearly class revenue figures by the appropriate overcharge rate and pass-through rate – calculated by the methods outlined above — to obtain a damage figure for the entire class, for each product and for each year. [Netz Decl., pp. 105-107]

B.     Defendants' Criticisms

1.     Operation of the Cartel: Defendants attack Dr. Netz for assuming that the facts alleged in the complaint about how the cartel conducted itself are true. Specifically, they attack her for assuming that all participants adhered to every target price, and that target prices were global. First, she is entitled to assume that the allegations of the complaint about defendants' conduct will be proven. Her job is to opine as to the economic impact of that conduct on class members, if that conduct is proven. That is all that she purported to do. Moreover, her reports discuss in detail the evidence that the cartel was effective and that the increased prices it instituted were significant, long-lasting and industry-wide. The Interim Special Master rejects defendants' assertions that Dr. Netz made unwarranted or evidence-free assumptions about how the cartel worked. Rather, her description of the cartel's operations were closely tethered to documents and testimony in the case, as well as to plausible economic theory about how successful cartels in general operate. Although other evidence may exist to rebut her analysis, that will be the subject for cross-examination, and will bear on the weight not the methodological validity of her analysis.

//

2.    <u>Relevance of Target Prices to CRTs sold in the United States</u>:  Defendants

contend that Dr. Netz "assumed" that target prices for CRTs sold overseas applied to class

members who purchased CRT products in the United States.  Defendants' expert, Professor

Willig, noted that U.S. prices for CRT products tended to fluctuate during some period more than

worldwide prices because U.S. consumers took to LCD panels more quickly than consumers in

the rest of the world. [Expert Report of Robert D. Willig, 12/17/12, ¶18 and Exh. 4A, 4B, 5A

and 5B]  However, it appears to the Interim Special Master that Dr. Netz correctly relied on data

that shows that a very high percentage of CRT products, regardless of where they are assembled,

use CRTs made in Asia.  Although a small percentage of tubes are evidently made in the U.S.,

their impact on price, if any, will go to the weight of the analysis, not the methodology. [Netz

Rebuttal Decl., pp. 53-56]  Therefore, when the cartel fixed prices for sales of tubes to

manufacturers whose assembly plants were in Asia, or sold tubes to U.S.-based manufacturers, it

stands to reason that the increased prices of tubes would impact U.S. buyers of the resulting

products regardless of where they were assembled.  Moreover, in response to defendants'

criticism, Dr. Netz  analyzed data for both target and U.S. sales prices for CPTs, which showed a

<u>higher</u> correlation than for global sales of CPTs. [Netz Rebuttal Decl., p. 56]

The Interim Special Master concludes that defendants' assertion that Dr. Netz ignored

fluctuations in U.S prices for CRT products, to the extent it has any validity, is an attack on the

weight of her opinions not on the scientific reliability of her methodology.

3.    <u>Failure to show that Target Prices Covered the Class Period</u>:  Defendants criticize

Dr. Netz for using target prices for CDTs for only 7 months of the 12 year period in her

comparison of target prices and actual prices.  First, it is not clear that defendants are correct.

Dr. Netz appeared to compare target with sales prices from 1996-2006. [Netz Decl., Exh. 14].

But even if she did use target prices for a portion of the class period, defendants have not

provided any basis to question her expert judgment that her data is representative.

Defendants  also criticize her for relying on a hedonic regression analysis to verify the

existence of a price structure among different models of CRT products, and not performing a

price correlation analysis to confirm the purported structure.  Dr. Netz responds that the hedonic

1   regression is a more robust analysis than a correlation study, and the fact that analyses of

2   different data sets all confirmed the existence of a price structure verifies that her methodology

3   was appropriate.  The Interim Special Master concludes that defendants have not demonstrated

4   that the hedonic regression is an inappropriate methodology to use to determine whether CRT

5   prices operated pursuant to a structure.  It may be that a price correlation analysis would also

6   have done the job, or that it is even more suited to this situation.  But the issue on this motion is

7   not whether Dr. Netz's methodology is the best or the only correct one, but whether it is

8   basically sound and relevant to the issue being analyzed.  *In re Pressure Sensitive Labelstock*

9   *Antitrust Litigation*, No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa., November 19, 2007)

10  [price correlation analysis did not invalidate expert's conclusion that a price structure existed, *Id.*

11  at *19] Plaintiffs have demonstrated that her methodology for analyzing target prices was "just

12  and reasonable."

13          4.      Use of Average Price and Sales Data:  Defendants attack Dr. Netz's methodology

14  for making use in parts of her analysis of average or aggregated data.  Their contention is that the

15  use of averaging masks price differences that would be revealed by using only transaction-level

16  data.  Dr. Netz makes a number of responses.  First, she averaged some price data by month in

17  order to make it uniform across all the data sets she used.  Since some data was produced by

18  month, and other by transaction, in order to use all available data she was forced to make it

19  uniform.  [e.g. Netz  Decl., p. 70]  The alternative was to discard large amounts of data – for

20  which she would no doubt have been subject to different criticism.  Second, in her comparison of

21  target prices to actual sales prices, she aggregated sales price data into "groups" of CRTs that

22  shared similar common basic characteristics [size, finish, application (monitor or TV), and finish

23  (bare or with enhancements)].  She notes that she selected these groupings because they match

24  most closely the way the target and sales price data is organized, and concedes that are numerous

25  other variables (aspect ratio, dot pitch, frequency) that can have an impact on price.

26          Defendants repeatedly claimed that Dr. Netz admitted at her deposition that, if half the

27  sales prices were 25% above the target price, and another half were 25% below the target price,

28  her "average" would show that all sales were at 100% of the target price, and therefore that all

1   purchasers had been injured "when, under the hypothetical, at least half were not injured at all."

2   (Defs. Memo, p. 5)  Dr. Netz denies that she made any such admission – she admitted only that

3   the arithmetic of averages dictates that the average of 25% above and below a certain number –

4   this case the target price – will be that number.  Moreover, there is a basic flaw with defendants'

5   reasoning.  Impact or injury depends on whether a purchaser buys at a price artificially fixed

6   above the <u>competitive "but-for" price</u>, not on whether he buys above, at or below the <u>target</u> price.

7   Thus, all the hypothetical purchasers in defendants' example may well have been harmed

8   depending on how much the target price was set above the competitive price.  Defendants'

9   much-touted example does not, in the Interim Special Master's judgment, detract from Dr.

10   Netz's conclusion that the cartel price increases had classwide impact.

11          In summary, defendants are really saying that the only valid data is the most

12   disaggregated, granular data.  But disaggregating data to distinguish between every variation, no

13   matter how small, among CRTs can result in using data sets that are too small to be meaningful.

14   And requiring an expert to use only transaction data, when much of the data is in monthly form,

15   has its own downside of excluding a lot of relevant data.  Indeed, in much of her analysis Dr.

16   Netz did make use of transaction level data.[8]  And it is simply wrong to say that an expert's

17   analysis is inadmissible unless it analyzes every sale at the transaction level.  Since antitrust

18   defendants habitually attack plaintiffs' experts for averaging data, it is not surprising that several

19   courts have considered – and approved – the appropriate use of averages.  *See, e.g., In re TFT-*

20   *LCD (Flat Panel) Antitrust Litigation*, No. M 07-1827 SI, 2012 WL 555090 at *8 (N.D. Cal.,

21   February 21, 2012) ["LCD *Daubert*"];  *In re Aftermarket Automotive Lighting Products*

22   *Antitrust Litigation*, 276 F.R.D. 364, 372-374 (C.D. Cal. 2011) [method of averaging across

23   products not a basis to invalidate an expert's methodology].[9]  At bottom, there are plainly

24   situations in which averaging is appropriate and others when it would be unreliable.  But the

25   _____

26   [8] Dr. Netz points out that Dr. Willig also made use of averages even when transaction-level data was available.
Declaration of Janet S. Netz, PhD. In Support of Indirect-Purchaser Plaintiffs' Opposition to Defendants' Motion to
Strike the Proposed Expert Testimony of Dr. Janet S. Netz, p. 10].

27   [9] While courts have also criticized averaging, they did so on class certification motions, not as a ground on which to
declare an expert's analysis inadmissible, and there were unique characteristics of the marketplaces in those cases

28   that make them inapplicable to the present facts.  See discussion in Section C, below, of *GPU and Flash Memory*.

1  Interim Special Master concludes that Dr. Netz has provided rational justifications for her use of

2  averages when the form of the data made it reasonably necessary, and aggregated data in rational

3  groupings that matched the data she had.

4       5.     <u>Retailer Pass-Through</u>: Defendants assert that Dr. Netz made a "false

5  assumption" that retailers uniformly passed on price increases to consumers, without studying

6  actual pricing data. In fact, defendants themselves are guilty of a false assumption. Dr. Netz did

7  not reach her conclusion based on a naked assumption. She relied on sound economic theory

8  that pass-through occurs when price increases are significant, industry-wide and not transitory.

9  And she relied on defendants' own words in contemporaneous documents that record their

10  observations and conviction that pass-through was occurring. Defendants point to allegations in

11  pleadings and the testimony of Best Buy and Costco to show that retailers do not always pass on

12  price increases. Pleading allegations are a notably weak source of objective evidence. And even

13  isolated snippets of deposition testimony are not particularly persuasive, given that the witness's

14  response depends on the precise question asked and the context in which it was asked.

15       A more cogent criticism comes from analysis by defendants' expert, Dr. Robert Willig,

16  that identifies instances from the data in which retailers evidently did not pass-through every

17  single price increase. [Willig Decl. ¶135, Exh. 26] But Dr. Netz adequately responds to this

18  criticism by noting that she did not conclude that <u>every</u> price increase was passed on, but rather

19  that price increases comparable to those imposed by the cartel – significant, industry-wide and

20  long-lasting – were. [Netz Rebuttal, p.63-64]

21       Defendants also claim that Dr. Netz admitted in her deposition that she couldn't opine

22  that the cartel price increases were "significant" or "permanent," and that there is no basis to

23  conclude they were "industry-wide" since Sony, a large market player, was not part of the cartel.

24  [Defs. Reply, pp. 10-11] There is some justice in defendants' criticism of her failure to date to

25  provide more support for her conclusion that the cartel price increases were both "significant"

26  and "permanent." However, her conclusions are supported by both common sense (not

27  necessarily a bad thing) and statistical analysis. First, she sensibly notes that defendants were

28  unlikely to have continued the cartel for 12 years given the risks were they not obtaining

1   "significant" price rewards. Second, a retailer of ever-changing high-tech products will surely
2   view a price increase that persists for years as for all practical purposes "permanent." As to
3   Sony, Dr. Netz argued that, because Sony's market share did not increase, Sony had little, if any,
4   dampening effect on the cartel's ability to impose price increases on the entire CRT market.
5   Moreover, Dr. Netz buttresses her conclusions that the price increases had a common impact by
6   her 47 independent regression analyses discussed in Section A.3 and A.4 above.

7   As noted above defendants also accused Dr. Netz of a "false assumption" because she
8   used only a "tiny sample" of retailer data to demonstrate positive pass-through. It is simply
9   wrong to characterize 47 studies of tens of millions of transactions from 14 retailers over 17
10  years and relating to large entities at all stages of the distribution channel as "tiny."

11  As to all these criticism of her conclusions about retailer pass-through, the Interim
12  Special Master is not persuaded that her methodology was faulty, or that she made unwarranted
13  assumptions. Surely there will be challenges to the correctness of her data selection, and
14  defendants will offer competing methodologies. However, in ruling on admissibility a court
15  need not choose between competing experts provided that the opinions in question meet basic
16  criteria for scientific reliability – as Dr. Netz's opinions persuasively do. *See, Ellis,* 657 F.3d at
17  982.

18  6.      Manufacturer Pass-Through: Defendants' criticism again is not directed at Dr.
19  Netz's methodology, but rather attacks her selection of data and failure to conduct a statistical
20  analysis to prove that her data was representative. Dr. Netz responds that she used all data that
21  was in usable form and available to her, and that there is no magic statistical test to verify the
22  representativeness of data. When different analyses produce roughly comparable results, that in
23  itself confirms the representativeness of the data. Also, the selection of data is plainly a matter
24  within the judgment of an expert. While different experts might disagree on data selection, that
25  does not call into question the methodology being used.

26  7.      Improper Reliance on "Naked Economic Ipse Dixit": Defendants attack Dr. Netz
27  for relying on economic theory to fashion a common price structure, but ignored evidence that
28  actual prices varied widely based on individual customer negotiations and other individualized

1   features of the distribution channel. Defendants' criticism relies largely on deposition testimony

2   by employees of manufacturers and retailers. [Def. Memo, pp. 29-31]. Dr. Netz responds by

3   noting that the presence of individual price negotiations, clearance sales, volume purchases,

4   discounts for buying related products, and the like does not invalidate the notion that the cartel

5   had common impact. [Netz Rebuttal Decl., pp. 44-47] Her theory is that, because the cartel was

6   effective in increasing prices, all of those individualized discounts started from an artificially

7   increased platform. That is, but for the cartel, the customers who obtained various price

8   discounts would have paid <u>even lower</u> prices. The Interim Special Master concludes that Dr.

9   Netz's response is in accordance with sound economic logic. A reading of Dr. Netz's reports

10  shows that she did not in any way "ignore" data regarding individualized discounts; rather, she

11  demonstrated why they do not invalidate her theory.

12      C.      Other Decisions Considering Dr. Netz's Methodologies

13          The parties each place great weight on decisions from this Court in three cases that dealt

14  with Dr. Netz's opinions on antitrust impact. Plaintiffs point to Judge Illston's decisions that

15  uphold Dr. Netz's opinions in class certification and a *Daubert* challenge in the *In re TFT-LCD*

16  *(Flat Panel) Antitrust Litigation,* 267 F.R.D. 583 (N.D. Cal. 2010) [class certification] and *In re*

17  *TFT-LCD*, No. M 07-1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) [*Daubert*] cases.

18  Defendants rely on *In re Flash Memory Antitrust Litigation*, No. C-07 0086 SBA, 2010 WL

19  2332081 (N.D. Cal. June 9, 2010) ["*Flash Memory*"] and *In re Graphics Processing Units*

20  *Antitrust Litigation*, 253 F.R.D. 478 (N.D. Cal. 2008) ["*GPU*"].

21          TFT-LCD Case: *LCD* dealt with a product and distribution chain that was highly

22  comparable to that of the CRT industry. LCD flat panels succeeded CRTs in the marketplace;

23  neither product was sold stand-alone, both were imbedded in consumer products like televisions

24  and monitors; many of the same companies made both LCD panels and CRTs; many of the same

25  retailers sold them. Like CRTs, LCD panels were not highly customized for particular

26  customers. Both products exhibited a limited number of variations that impacted price, such as

27  size and finish. But they are not highly individualized as are, for example, the graphics cards

28  used in video games that were at issue in *GPU*.

Judge Illston dismissed challenges to Dr. Netz's opinions on a class certification motion, a motion to decertify, summary judgment motions, and a *Daubert* motion to strike her testimony. Two themes run through Judge Illston's opinions in *LCD*. First, plaintiffs need not prove the precise price increase that impacted every purchase by every class member of an LCD product. "[P]laintiffs need not be able to articulate the precise degree to which every individual class member was injured; it suffices to show that it was more likely than not that classwide impact had occurred." 2012 WL 555090 at *3. Second, most of defendants' attacks on Dr. Netz – her use of regression analysis, her use of averages, reliance on economic theory – are proper subjects for cross-examination, but "do not render her opinion so inherently suspect that it may not be admitted at trial." 2012 WL 555090 at *8.

A critical distinction between the present case and the *Flash Memory* and *GPU* cases discussed below is that the courts in *Flash Memory* and *GPU* were not ruling on Rule 702 *Daubert* motions to exclude evidence. The issue of the admissibility of the expert's opinions was not before those courts. Other courts have declined to apply to a *Daubert* issue case law that was rendered in other contexts such as class certification or summary judgment. *E.g.*, *In re Chocolate Confectionary Antitrust Litigation*, No. 1:08-MDL-1935, 2012 W.L. 6652501 at *6 (M.D. Pa., December 7, 2012)

GPU Case: *GPU* dealt with a conspiracy to fix prices of graphic processing units that were mounted on graphic chips and cards, which were in turn used in game consoles, laptops, mobile devices and other products. Graphic cards were sold directly to consumers, and incorporated into products; graphic chips were not sold individually. There were "hundreds" of types of graphic cards or chips. A very large percentage of graphic cards and chips were individually customized for a particular customer or application. The obvious example of customization would be for use in various typed of video games. The "overwhelming majority" of wholesale purchases of chips and cards were individually negotiated, the ultimate price depending on the volume, market power of the purchaser, degree of customization and many other factors. 253 F.R.D. at 480-481.

1    Dr. Netz's only contribution to *GPU* was to perform an analysis of pass-through to

2   indirect purchasers, which of course depended on plaintiffs' ability to demonstrate common

3   impact on direct purchasers. Judge Alsup found that a different expert had failed to demonstrate

4   classwide impact on direct purchasers, which was one ground on which he rejected Dr. Netz's

5   analysis. However, he went on to find her analysis inadequate to show classwide pass-through

6   because, due to the fragmentation of the distribution chain and the variability of the product, Dr.

7   Netz's regression analyses were unduly individualized (e.g., her eight regression analyses shared

8   only two common variables). Therefore, he concluded that the nature of the GPU market would

9   require her to construct separate equations with different variables for each reseller in each part

10   of the distribution channel in order to derive the pass-through rate applicable to each one. 253

11   F.R.D. at 503-504. The fragmentation and variability of the GPU market would render Dr.

12   Netz's analysis either "overly reliant on averages" or "unmanageably individualized." 253

13   F.R.D. at 504.

14    Thus, *GPU* is plainly distinguishable from the present case. First, Judge Alsup never

15   considered the admissibility of Dr. Netz's opinions, since he was ruling on class certification, not

16   on a *Daubert* motion. Second, his criticism of Dr. Netz was not that her methodology – her use

17   of averaging, regression analyses and economic theory – was unscientific, but rather that, given

18   the GPU product variability and diverse market place, she would be unable to demonstrate

19   impact, pass-through and damages on a common, classwide basis. The problem for class

20   certification was the GPU marketplace, not the viability of Dr. Netz's analysis. Therefore, *GPU*

21   is inapposite to the admissibility ruling that is before the Court in this case.

22    Flash Memory Case: This case dealt with a form of semiconductor memory embodied in

23   NAND flash memory chips, which are sold either as part of NAND flash memory cards or are

24   incorporated in electronic devices like USB flash drives, media players (e.g., iPods), laptop

25   computers, mobile phones, gaming devices, GPS devices and others. Defendants in the case

26   produced over 2,000 different types of NAND chips. Judge Armstrong found that over 82% of

27   purchases of NAND chips were made by three direct purchasers – all large companies with

28   substantial market power to obtain individually negotiated prices. 2010 WL 2332081 at *9.

1   Because of that particular market structure – utterly unlike that in the present case – the Court

2   found Dr. Netz's opinion regarding impact on direct purchasers to be unpersuasive. As for pass-

3   through to indirect purchasers, the Court noted that Dr. Netz had performed regression analyses

4   using data from five different retailers, which the Court found amounted to "a retailer-by-retailer,

5   manufacturer-by-manufacturer and product-by-product analysis," which failed to show that pass-

6   through could be proven with common, classwide evidence. 2010 WL 2332081 at *12.

7           Therefore, as in *GPU*, the Court was unpersuaded, given the particular characteristics of

8   the NAND market place (extreme concentration of direct purchasers, enormous variety in the

9   types and functions of chips, a more multi-layered distribution channel than that for CRTs), that

10   Dr. Netz would be able reliably to show common impact through classwide analyses. The Court

11   did not find that her methodologies were unsound in themselves, and as noted did not find that

12   her opinions were inadmissible. For these reasons, *Flash Memory* does not provide a rationale

13   for excluding Dr. Netz's opinions in this case.

14           In summary, the *LCD* case is closely parallel to CRT in so many respects: the structure

15   of the CRT and LCD markets, the nature of the distribution channels, the similar uses to which

16   tubes and panels are put, the presence of many of the same defendants in both cases, the robust

17   evidence of many years of high-level meetings and agreements among competitors (Crystal

18   Meetings in *LCD*, Glass Meetings in *CRT*), indictments in both cases of companies and

19   executives. Given those similarities, Judge Illston's finding that Dr. Netz's opinions are

20   admissible is entitled to great weight. In contrast, *GPU* and *Flash Memory* were not Rule 702

21   motions; the opinions reference no indictments; the products were not similar to CRT tubes and

22   exhibited far more variations in characteristics, which meant that the markets for graphic discs

23   and cards and for NAND memory chips were far more disintegrated than the CRT market;

24   individually negotiated prices predominated in both markets, whereas they were the exception

25   for CRTs. These distinctions vastly weaken the relevance of these two decisions to the issue of

26   admissibility of Dr. Netz's opinions in the present case.

27

28

1

## Conclusion

2          For the foregoing reasons and for good cause shown, the Interim Special Master

3     recommends that the Court DENY defendants' motion to exclude expert testimony of Dr. Netz.

4

5     Dated: June 20, 2013

          Martin Quinn
6          Interim Special Master

7

8     Approved/Disapproved/Modified

9

10    DATED: _____

          _____
11          Hon. Samuel Conti
          United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28