Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 204-7356
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

*Attorneys for Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc.*,

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>*Sharp Electronics Corp.*, et al. *v. Hitachi Ltd.*, et al., Case No. 13-cv-1173 SC | Case No. 07-cv-5944 SC<br><br>MDL No. 1917<br><br>**PLAINTIFFS' OPPOSITION TO THOMSON CONSUMER ELECTRONICS, INC.'S MOTION TO DISMISS**<br><br>Date: July 23, 2013<br>Time: 1:00 p.m.<br>Place: JAMS, Two Embarcadero Center, Suite 1500<br>Judge: Hon. Samuel Conti<br>Special Master: Hon. Charles A. Legge (Ret.) |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

ISSUES TO BE DECIDED ..................................................................................................1

PRELIMINARY STATEMENT...........................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT ........................................................................................................................4

I.    SHARP'S WELL PLEADED ALLEGATIONS DESCRIBE THOMSON CONSUMER'S PARTICIPATION IN THE CRT CARTEL ...........................................5

II.   SHARP'S CLAIMS ARE TIMELY BECAUSE THE LIMITATIONS PERIOD HAS TOLLED...................................................................................................7

    A.     Thomson Consumer Fraudulently Concealed the Conspiracy From Sharp ......................................................................................................................8

    B.     The Limitations Period Continued to Toll Even After the Conspiracy Became Public Because of Subsequent Related Proceedings ................................................................................................................11

III.   SHARP'S CLAIMS ARE APPROPRIATE UNDER THE SHERMAN ACT AND THE FTAIA...................................................................................................17

IV.   SHARP'S STATE LAW AND FINISHED PRODUCTS CLAIMS ARE PROPER...............................................................................................................................18

    A.     Sharp's Allegations for Purchases of Finished Products Meet the *Illinois Brick* Ownership-or-Control Exception..................................................19

    B.     Sharp's New York and New Jersey Antitrust and Unfair Competition Claims are Consistent with the Requirements of Due Process and Constitutional Standing....................................................................20

    C.     Sharp Has Antitrust Standing to Assert Federal, California, New York, and New Jersey Antitrust Claims For Finished Products .........................23

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allstate Ins. Co. v. Hague*,
449 U.S. 302 (1981)..........................................................................................20, 21

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999)....................................................................................23

*Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*,
640 F. Supp. 1411 (E.D.N.C. 1986)...........................................................................21

*American Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)....................................................................................................15

*Animal Science Prods., Inc. v. China Minmetals Corp.*,
654 F.3d 462 (3d Cir. 2011)........................................................................................17

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)..............................................................................................23, 24

*In re Antibiotic Antitrust Litig.*,
333 F. Supp. 317 (S.D.N.Y. 1971)..............................................................................14

*California v. ARC America Corp.*,
490 U.S. 93 (1989)......................................................................................................24

*In re Ariz. Dairy Prods. Litig.*,
No. 74-cv-594, 736, 1984 WL 21984 (D. Ariz. Nov. 5, 1984)....................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................5

*AT&T Mobility LLC v. AU Optronics Corp.*,
707 F.3d 1106 (9th Cir. 2013).............................................................................20, 21

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012)................................................................................19, 24

*Barker v. American Mobil Power Corp.*,
64 F.3d 1397 (9th Cir.1995)........................................................................................8

*Becks v. Emery-Richardson, Inc.*,
No. 86-cv-6866, 1990 WL 303548 (S.D. Fla. Dec. 21, 1990)...............................15, 16

*Becnel v. Deutsche Bank, AG*,
No. 11-4195, 2013 WL 135387 (2d Cir. Jan. 11, 2013) ..............................................17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2009)......................................................................................................5

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    123 F.3d 599 (7th Cir. 1997)............................................................................19, 25

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................................................................passim

*Chipanno v. Champion Int'l Corp.*,
    702 F.2d 827 (9th Cir. 1983).........................................................................12, 13, 14

*Conmar Corp. v. Mitsui & Co., Inc.*,
    858 F.2d 499 (9th Cir. 1988)...........................................................................................7

*Cox v. Microsoft Corp.*,
    8 A.D.3d 39 (N.Y. App. Div. 2004)...............................................................................7

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983)......................................................................................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    --- F. Supp. 2d ---, 2012 WL 5987861 (N.D. Cal. Nov. 29, 2012) ....................19, 20, 24

*In re Ditropan XP Antitrust Litig.*,
    529 F. Supp. 2d 1098 (N.D. Cal. 2007) .......................................................................20

*Dungan v. Morgan Drive-Away, Inc.*,
    570 F.2d 867 (9th Cir. 1978)........................................................................................12

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) .......................................................................24

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    546 F.3d 981 (9th Cir. 2008).........................................................................................17

*E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*,
    621 F. Supp. 310 (D. Del. 1985)...................................................................................16

*Erickson v. Pardus*,
    551 U.S. 89 (2007).........................................................................................................4

*In re Evanston Nw. Healthcare*,
    No. 07-cv-4446, 2008 WL 2229488 (N.D. Ill. May 29, 2008)......................................14

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)......................................................................................................18

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .......................................................................24

*In re Graphics Processing Units (GPU) Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................................22

*In re Graphics Processing Units (GPU) Antitrust Litig.*,
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) .......................................................................24

*Greyhound Corp. v. Mt. Hood Stages, Inc.*,
    555 F.2d 687 (9th Cir. 1977) ............................................................................................ 7

*Harris v. County of Orange*,
    682 F.3d 1126 (9th Cir. 2012) ........................................................................................ 16

*Hatfield v. Halifax PLC*,
    564 F.3d 1177 (9th Cir. 2009) ........................................................................................ 17

*Jewish Hosp. Ass'n v. Stewart Mech. Enters.*,
    628 F.2d 971 (6th Cir. 1980) ................................................................................... 20, 25

*Leh v. General Petroleum Corp.*,
    328 U.S. 54 (1965) .......................................................................................................... 12

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 335 (E.D. Pa. 2004) ..................................................................................... 16

*Minn-Chem, Inc. v. Agrium Inc.*,
    683 F.3d 845 (7th Cir. 2012) .................................................................................... 17, 18

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) .......................................................................................... 9

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
    211 F.3d 1224 (11th Cir. 2000) ...................................................................................... 10

*In re Optical Disk Drive Antitrust Litig.*,
    No. 3:10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ................................... 20

*Pecover v. Elec. Arts, Inc.*,
    633 F. Supp. 2d 976 (N.D. Cal. 2009) ............................................................................ 22

*United States v. Philip Morris Inc.*,
    116 F. Supp. 2d 131 (D.D.C. 2000) .................................................................................. 9

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1980) .......................................................................................... 19

*In re Rubber Chemicals Antitrust Litig.*,
    504 F. Supp. 2d 777 (N.D. Cal. 2007) ...................................................................... 10, 17

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011) .......................................................................... 19

*In re Static Random Memory (SRAM) Antitrust Litig.*,
    No. 07-1819, 2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) .......................................... 18

*Staub v. Eastman Kodak Co.*,
    726 A.2d 955 (N.J. App. Div. 1999) .............................................................................. 17

*Sullivan v. Oracle Corp.*,
    662 F.3d 1265 (9th Cir. 2011) ........................................................................................ 20

*Tech Data Corp. v. AU Optronics Corp.*,
    MDL. No. 1827 SI, 2012 WL 3236065 (N.D. Cal. Aug. 6, 2012) ................................. 16

*In re Terazosin Hydrochloride Antitrust Litig.*,
    160 F. Supp. 2d 1365 (S.D. Fla. 2001) ............................................................ 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    822 F. Supp. 2d 953 (N.D. Cal. 2011) ............................................................ 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    MDL. No. 1817, 2012 WL 506327 (N.D. Cal. Feb. 15, 2012)..................................... 18

*Two Queens, Inc. v. Scoza*,
    296 A.d.2d 302 (N.Y. App. Div. 2002) ............................................................ 22

*Urban League of Essex Cnty. v. Mahwah Twp.*,
    370 A.2d 521 (N.J. Super. Ct. 1977)............................................................... 22

*Watkins v. Resorts Int'l Hotel and Casino, Inc.*,
    591 A.2d 592 (N.J. 1991)........................................................................... 22

*Zenith Radio Corp. v. Hazeltine Research, Indus.*,
    401 U.S. 321 (1971)........................................................................... 11, 12

## STATUTES

15 U.S.C. § 16(i) ................................................................................. 7, 11, 12, 13

Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ............................................. 3, 17, 18

**ISSUES TO BE DECIDED**

1.  Whether Sharp's allegations state a claim for Thomson Consumer's involvement in a complex international price-fixing conspiracy.

2.  Whether Sharp's claims are timely because of fraudulent concealment and the prosecution of subsequent actions based in whole or in part on the same CRT conspiracy.

3.  Whether Sharp's claims, which relate to domestic and import commerce, are appropriate under the Sherman Act and the Foreign Trade Antitrust Improvements Act.

4.  Whether Sharp's finished product claims are sufficient under federal and state law.

**PRELIMINARY STATEMENT**

This case involves two United States companies – Sharp Electronics Corporation and Sharp Electronics Manufacturing Company of America, Inc. ("Sharp") – that purchased cathode ray tubes and products containing them valued at hundreds of millions of dollars.  Sharp alleges that between 1996 and 2007, it paid inflated prices for these CRTs and CRT products in the United States, because CRT manufacturers agreed to fix prices, exchange information, coordinate public statements, allocate market share, and restrict output as part of a massive international conspiracy.  Thomson Consumer Electronics Inc. ("Thomson Consumer"), a major U.S. CRT manufacturer during the relevant period and subsidiary of a company recently fined the equivalent of millions of dollars by competition authorities in Europe for its participation in the CRT conspiracy, urges this Court to dismiss Sharp's claims against it.  It argues generally that Sharp's allegations fail to state claims, are untimely, and that this Court lacks subject matter jurisdiction.  None of these arguments are new.  Under this Court's previous holdings – the law of the case – all of them fail.

Sharp's allegations are identical to others that this Court has already deemed <u>sufficient</u> to show participation by defendants like Thomson Consumer in this complex international price fixing conspiracy.  Sharp's complaint is timely, because Thomson Consumer fraudulently concealed the conspiracy and because, after the conspiracy was made public, the limitations period was tolled as government and private plaintiffs pursued legal actions based in

1   whole or in part on the very same conspiracy that Sharp alleges.  Thomson Consumer's

2   arguments regarding limitations would turn the policy supporting them on its head.  Limitations

3   periods are designed to ensure that defendants get fair notice of claims; Thomson Consumer itself

4   has put evidence into the record demonstrating that it was aware of legal actions relating to the

5   CRT conspiracy years ago.  Sharp's claims are <u>unaffected by the FTAIA</u> because its allegations

6   relate specifically to injuries in domestic and import commerce.  Sharp alleges injuries to United

7   States companies for purchases Sharp made in the United States.  Sharp's claims therefore are

8   proper under the Sherman Act and the Foreign Trade Antitrust Improvements Act, 15 U.S.C. §

9   6a.  And Sharp's <u>finished product claims</u> meet all statutory and due process requirements.

10        Thomson Consumer's motion should be dismissed in its entirety.

11                                **BACKGROUND**

12        **Sharp's allegations.**  U.S.-based Sharp Electronics Corporation and Sharp

13   Electronics Manufacturing Company of America (Sharp) manufactured cathode ray tube

14   televisions.  Compl. at ¶¶ 22-31.  In a 64-page complaint, comprising 287 paragraphs, Sharp

15   alleges in detail the "long-running conspiracy by suppliers of cathode ray tubes to coordinate and

16   fix the prices of CRTs and exchange detailed competitive information."  *Id.* at ¶ 1.

17        More specifically, Sharp explains the following in this complaint:

18        ***Sharp purchased CRTs in the U.S. from Thomson Consumer and other***

19   ***conspirators.***  Sharp "purchased substantial amounts of CRTs manufactured by [the defendants

20   and their co-conspirators] in the United States for incorporation into CRT televisions"  *Id.* at ¶ 27.

21   Thomson Consumer, a wholly-owned subsidiary of French company Thomson SA, "was a major

22   manufacturer of CRTs for the United States market, with plants located in Scranton,

23   Pennsylvania, Marion, Indiana, and Mexicali, Mexico."  *Id.* at ¶ 73.  "Thomson Consumer

24   Electronics sold its CRTs"  to "television manufacturers in the United States and elsewhere"

25   during the relevant period, until "Thomson Consumer Electronics' CRT business was eventually

26   sold to Videocon Industries, Ltd., in 2005."  *Id.*  North American manufacturers like Thomson

27   Consumer were "particularly important" because "North America was the largest market for CRT

28   televisions and computer monitors" during the conspiracy.  *Id.* at ¶ 169.

***Thomson Consumer participated in a CRT conspiracy.***  Sharp details in over 50 paragraphs how the "CRT conspiracy was effectuated through a combination of group and bilateral meetings." *Id.* at ¶ 140; ¶¶ 139-96.  Thomson Consumer's parent company "Thomson SA dominated and/or controlled the finances, policies, and/or affairs of Thomson Consumer Electronics relating to the antitrust violations" described in the Complaint.  *Id.* at ¶ 73.  "Between at least 1996 and 2005, Thomson [SA] participated in and/or was a party to bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred" *Id.* at ¶ 187.  "Thomson never effectively withdrew from this conspiracy." *Id.*  Thomson Consumer was also "at those meetings and/or [was a] part[y] to the agreements entered at them." *Id.* at ¶ 188.  To the extent that Thomson Consumer "distributed CRT Products to direct purchasers, [it] played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings." *Id.*  It was an "active, knowing participant[] in this conspiracy." *Id.*

***The conspiracy inflated prices.***  The "conspiracy was effective in moderating the normal downward pressure on prices for CRTs," *id.* at ¶ 200, and Sharp has "paid more for CRT Products" than it "otherwise would have in the absence of Defendants' unlawful conduct." *Id.* at ¶ 200.  In December 2012, the European Commission announced that it fined Thomson Consumer's parent millions for fixing prices, sharing markets, allocating customers and restricting output of color picture tubes, and observed that the cartel was "among the most organized cartels that the Commission has investigated." *Id.* at ¶ 136.

***Thomson Consumer and its conspirators concealed the conspiracy.***  Sharp alleges that the conspirators went to great lengths to keep their meetings and coordination hidden from the public and customers like Sharp. *Id.* at ¶¶ 222-33.  For example, meetings were held in secret, and defendants communicated over the phone in order to prevent the existence of written records. *Id.*  The conspirators also specifically discussed how to evade antitrust laws and how to conceal the conspiracy from customers like Sharp. *Id.* at ¶ 225.  Defendants would "coordinate and exchange in advance the texts of the proposed communications with customers" containing

"pretextual reasons for their pricing actions and output restrictions." *Id.* at ¶ 223.  Because of these efforts, Sharp "had neither actual nor constructive knowledge of the facts constituting [its] claim for relief despite diligence in trying to discovery the pertinent facts," *id.* at ¶ 222, until "the DOJ and others commenced an investigation into price-fixing in the CRT industry" in November 2007, which quickly became public.  *Id.* at ¶¶ 121-29.

**Procedural posture.**  Plaintiffs filed putative class action complaints on behalf of purchasers of CRTs shortly thereafter, including suits naming Thomson SA as a defendant in January of 2008.  The Court has not yet certified a class for either direct or indirect purchasers.[1]

On February 10, 2009, the Department of Justice indicted a Taiwanese CRT executive for his role in conspiracies to fix the prices of color display tubes and color picture tubes.  *Id.* at ¶ 129.  The Department stated that the conspiracy "harmed countless Americans." *Id.*  It subsequently indicted five more individuals for their role in the conspiracy and Samsung SDI entered a guilty plea for its involvement.  *Id.* at ¶¶ 130-34.  The indictments against the CRT executives remain open.

Sharp filed this lawsuit three months after the EC declared this one of the most organized cartels it had ever investigated.  *Id.* at ¶ 136.

**ARGUMENT**

Thomson Consumer's arguments fall primarily into three categories:  that (1) Sharp's complaint fails to state a claim; (2) Sharp's claims are untimely; and (3) this Court lacks subject matter jurisdiction over Sharp's claims.  Each is a recycled argument that this Court has already rejected.  The prior rulings in this case make plain that Sharp's complaint is more than sufficient to withstand Thomson Consumer's motion to dismiss for failure to state a claim. Thomson Consumer pays no heed to this Court's guidance that Sharp is not required at this stage to allege "specific facts;"  it is required only to give Thomson Consumer "fair notice of what . . . the claim is and the grounds upon which it rests."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1017 (N.D. Cal. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93

---

[1] On June 20, 2013, the Interim Special Master issued a Report and Recommendation recommending that the IPP class be certified.  Case No. 07-5944 (Dkt. 1742).

1   (2007)).  Sharp's allegations need only "raise a reasonable expectation that discovery will reveal

2   evidence of illegal agreement."  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556

3   (2009)).  Sharp does so and far more.  Accepting Sharp's allegations as true, one cannot escape

4   the conclusion that the complaint states "a claim to relief that is plausible on its face." *Ashcroft v.*

5   *Iqbal*, 556 U.S. 662, 678 (2009).  Moreover, now that Sharp has gained access to discovery, it has

6   direct evidence that Thomson SA and Thomson Consumer participated in bilateral and

7   multilateral meetings with CRT co-conspirators.

8           Thomson Consumer's arguments about tolling and limitations are lifted from

9   unsuccessful motions made by others in these litigations – down to references to specific cases

10  that this Court has already declared inapposite.  The arguments should be rejected now as they

11  were before; Sharp's claims are timely under appropriate tolling doctrines for fraudulent

12  concealment and government action.  Thomson Consumer's argument that this Court lacks

13  subject matter jurisdiction based on the FTAIA relies on a fundamental misunderstanding of

14  Sharp's clear allegations, which relate only to domestic and import purchases by United States

15  purchasers in the United States.  And Thomson Consumer's additional arguments relating to

16  Sharp's finished product claims rely on a misconstruction of both Sharp's claims and the law.

17          Thomson Consumer's motion to dismiss should be denied.

18  **I.    SHARP'S WELL PLEADED ALLEGATIONS DESCRIBE THOMSON
        CONSUMER'S PARTICIPATION IN THE CRT CARTEL**

19

20          To suggest that Sharp's allegations in this suit are insufficient to state a claim,

21  Thomson Consumer must ignore the pages this Court has already written on the subject.  This

22  Court has already determined that complaints virtually identical to Sharp's are more than

23  satisfactory to pass *Twombly* muster.  Thomson Consumer's argument relies instead on entirely

24  non-binding, inapposite and distinguishable cases.  *See* Mot. Dismiss at 17.  None compels any

25  conclusion other than that Sharp has pleaded "sufficient factual allegations to give rise to

26  plausible conspiracy claims" regarding CRTs.  *In re CRT*, 738 F. Supp. 2d at 1017.

27          For instance, Thomson Consumer shuns this Court's observation that "[c]ourts in

28  this district do not require plaintiffs in complex, multinational, antitrust cases to plead detailed,

1   defendant-by-defendant allegations; instead they require plaintiffs to make allegations that

2   plausibly suggest that each Defendant participated in the alleged conspiracy."  *Id.* at 1019

3   (citations omitted).  In its opinion ruling on motions to dismiss the class complaints, this Court

4   explained that "specific allegations" regarding defendants must be viewed "in the context of the

5   complaint taken as a whole." *Id.*

6          Thomson Consumer also ignores that the Court already recited, in its *CRT*

7   decision, the allegations that sufficed to state claims; *Sharp's complaint contains every single one*

8   *of them.*  For example, Sharp alleges:

9   •   That there were at least "500 multilateral and bilateral meetings" during the conspiracy

10      period.  Compl. at ¶ 7; *In re CRT*, 738 F. Supp. 2d at 1017-18 (same).

11  •   That the so-called Glass Meetings between defendants "followed a fairly typical pattern,"

12      some of which were attended by "individuals at the highest level of the Defendant

13      companies."  Compl. at ¶¶ 148, 152;  *In re CRT*, 738 F. Supp. 2d at 1017-18 (same).

14  •   That at the Glass Meetings the defendants reached "agreements on CRT prices,"

15      "exchanged competitively sensitive information," agreed to "coordinate uniform public

16      statements regarding capacity and supply," agreed to "allocate customers," and agreed "to

17      keep their meetings secret." Compl. at ¶¶ 151, 165; *In re CRT*, 738 F. Supp. 2d at 1017-18

18      (same).

19  •   That the acting Assistant Attorney General announced that the conspiracy "harmed

20      countless Americans."  Compl. at ¶ 129; *In re CRT*, 738 F. Supp. 2d at 1017 (same).

21         Equally unfounded is Thomson Consumer's argument that Sharp's allegations are

22  "insufficient as a matter of law to put Thomson Consumer on notice of the claims against it."

23  Mot. Dismiss at 16.  This Court has already ruled that allegations identical to Sharp's "plausibly

24  suggest that *each Defendant* participated in the alleged conspiracy."  *In re CRT*, 738 F. Supp. 2d

25  at 1019 (emphasis added).  As to American subsidiaries like Thomson Consumer, the Court found

26  sufficient allegations that they participated in the conspiracy because their foreign counterparts

27  "dominated and controlled the finances, policies and affairs" of the subsidiaries "relating to the

28  alleged antitrust violations."  *Id.* at 1020-22 (relating to Panasonic, Toshiba, LG Electronics,

1   Hitachi, and Philips entities). Sharp's allegations with respect to Thomson Consumer are

2   identical. *See* Compl. at ¶¶ 72-74; ¶¶ 187-88.

3          Accordingly, Sharp's allegations sufficiently state a claim against Thomson

4   Consumer.[2]

5   **II.    SHARP'S CLAIMS ARE TIMELY BECAUSE THE LIMITATIONS PERIOD HAS**

6          **TOLLED**

7          Thomson Consumer's arguments relating to the timeliness of Sharp's claims are

8   also unfounded. They disregard holdings of this Court and the law on relevant tolling doctrines.

9          Sharp alleges in its complaint that the defendants and their co-conspirators covered

10  up the existence of the conspiracy and their participation in it. Thomson Consumer's actions

11  fraudulently concealed the conspiracy from Sharp, which left Sharp with "neither actual nor

12  constructive knowledge of the facts giving rise to [its] claim," tolling the statute of limitations

13  until Sharp had reason to know of Thomson Consumer's participation in the conspiracy. *Conmar*

14  *Corp. v. Mitsui & Co., Inc.*, 858 F.2d 499, 502 (9th Cir. 1988). After the conspiracy became

15  public at the end of 2007, the limitations period tolled with respect to Thomson Consumer for

16  other reasons. Nearly immediately, numerous plaintiffs filed putative class action lawsuits

17  relating to the CRT conspiracy. Compl. at ¶ 220. Then, in February 2009, the Department of

18  Justice began indicting individuals for participating in the conspiracy. Compl. at ¶ 9.

19  Government actions relating to the CRT conspiracy remain ongoing, which has tolled the

20  limitations period on all of Sharp's claims. 15 U.S.C. § 16(i). That period remains tolled, and

21  Sharp's claims remain timely. *See Greyhound Corp. v. Mt. Hood Stages, Inc.*, 555 F.2d 687, 698

22  n.26 (9th Cir. 1977) (tolling doctrines may be "tacked" together), *vacated on other grounds*, 437

23  U.S. 322 (1978).

---

24  [2] In a footnote, Thomson Consumer also argues that Sharp fails to state a claim under New York

25  law, by not alleging any acts that were "misleading or deceptive," citing a federal case from
    Pennsylvania. Mot. Dismiss at 17 n.15. Thomson Consumer is wrong. Sharp alleges that

26  defendants and co-conspirators here agreed to charge illegally inflated prices and exchange
    competitive information, and to keep the fact of those agreements secret. This is "deceptive"

27  conduct under New York law. *See Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (N.Y. App. Div.
    2004) (finding allegations that included "entering into secret agreements" sufficient under the

28  statute).

**A.      Thomson Consumer Fraudulently Concealed the Conspiracy From Sharp**

Sharp describes how the defendants carried out the conspiracy through "secret meetings, surreptitious communications between the Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers)." Compl. at ¶ 225; *see also* ¶¶ 222-33. Defendants would "coordinate and exchange in advance the texts of the proposed communications with customers" containing "pretextual reasons for their pricing actions and output restrictions." *Id.* at ¶ 223. And Sharp alleges that, as a result, it had "neither actual nor constructive knowledge of the facts constituting [its] claim for relief despite diligence in trying to discovery the pertinent facts." Compl. at ¶ 222.

This Court has noted that "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *In re CRT*, 738 F. Supp. 2d at 1024 (quotations and citation omitted). It is noteworthy that, in arguing otherwise, Thomson Consumer points to *Barker v. American Mobil Power Corp.*, 64 F.3d 1397 (9th Cir.1995); this Court stated in its prior ruling that defendants' reliance on *Barker* at the dismissal stage was "misplaced," because *Barker* was a case involving summary judgment following extensive discovery, not a case ruling on a motion to dismiss. *In re CRT*, 738 F. Supp. 2d at 1024.

In any event, the Court has already looked at fraudulent concealment allegations that are just like those Sharp has made here with respect to Thomson Consumer, and concluded that they "are sufficient to deny" this type of motion. *Id.* at 1025. The Court pointed to the allegations that "Defendants gave pretextual reasons for price increases," "coordinated their misleading announcements," and "took steps to keep their meetings secret." *Id.* at 1024. Sharp alleges the same here. *See, e.g.*, Compl. at ¶ 223 (defendants would "coordinate and exchange in advance the texts of the proposed communications with customers" containing "pretextual reasons for their pricing actions and output restrictions"); ¶ 225 (defendants concealed the

1    conspiracy through "secret meetings" and "telephone or in-person meetings in order to prevent

2    the existence of written records").[3]  These allegations are more than sufficient in light of the early

3    stage of the case for Sharp, which has not until very recently had access to any discovery.

4           Thomson Consumer also argues that, because it sold its CRT business in 2005, it

5    "withdrew" from the alleged conspiracy and cannot be responsible for fraudulent concealment

6    thereafter.  Mot. Dismiss at 15.  It cites no law for this proposition.  This Court has already

7    rejected similar arguments, commenting that self-serving suggestions that defendants "withdrew

8    from the alleged conspiracy . . . raise[] questions issues inappropriate for resolution at the motion-

9    to-dismiss stage."  *In re CRT*, 738 F. Supp. 2d at 1025; *United States v. Philip Morris Inc.*, 116 F.

10   Supp. 2d 131, 154 (D.D.C. 2000) (noting that because withdrawal is an affirmative defense, the

11   defense must "clearly appear on the face of the complaint").  So too here.

12          First, Thomson Consumer is incorrect that the mere allegation that Thomson

13   Consumer's CRT business was sold to Videocon Industries in 2005 establishes, as a matter of

14   law, that Thomson Consumer withdrew from the conspiracy.  They cite no case reaching such a

15   conclusion on dismissal.  The only case they cite regarding the sale of a business – *Morton's*

16   *Market* – involved a determination at summary judgment.  The court there only concluded that

17   the defendant had withdrawn after determining, from the factual record, that it "certainly 'retired'

18   and totally severed its ties to the milk price-fixing conspiracy," and "did nothing more to assist or

19   participate in the price-fixing activities of the other dairies."  *Morton's Market, Inc. v.*

20   *Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999).  There is no basis for such a

21   conclusion here.

22          But even if Thomson Consumer had withdrawn from the conspiracy in 2005, its

23   argument that the limitations period somehow began to run then would still fail in light of the

24   continued concealment of the conspiracy.  In this regard, Sharp notes that Thomson Consumer, in

25

26   _____
     [3] Sharp takes issue with Thomson Consumer's suggestion that Sharp somehow had constructive
     notice of the conspiracy merely because the industry reflects characteristics that may be

27   conducive to cartelization.  Mot. Dismiss at 11 (citing cases).  Thomson Consumer, to be
     charitable, over reads the distinguishable cases on which it relies.  None present facts like here

28   and none of those is binding in any event.

1   its motion, cites only from the earlier version of *Morton's* , and not the later, corrected version

2   issued six months later.  The later, corrected version makes clear that withdrawal from a

3   conspiracy is not relevant, so long as fraudulent concealment of the conspiracy continues.  *See*

4   *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 211 F.3d 1224 (11th Cir. 2000) ("As to Pet, we

5   hold that it effectively withdrew from the conspiracy in 1985 and, as to it, these actions are not

6   timely-filed *unless the statute was equitably tolled by fraudulent concealment.  If so, Pet would be*

7   *liable for any price-fixing activity prior to its withdrawal.*").

8          A court in this district has, in fact, already ruled on this issue in a decision that

9   Thomson Consumer itself highlighted – for another point – in its briefing: *In re Rubber*

10   *Chemicals Antitrust Litigation*, 504 F. Supp. 2d 777 (N.D. Cal. 2007).  That case involved an

11   alleged international conspiracy among competitors to fix prices for rubber chemicals.  *Id.* at 779.

12   Plaintiffs alleged that the defendants fraudulently concealed the conspiracy by having "secret

13   meetings to set prices, agree[ing] not to publicly discuss the nature of the scheme, destr[oying]

14   documents that might evidence their actions, and [offering] pretextual justifications for the

15   inflated prices of rubber chemicals."  *Id.* at 788.  The court found the fraudulent concealment

16   allegations sufficient to toll the statute until October 2002, when public disclosures about an

17   investigation occurred.  *Id.* at 789.  One defendant argued that, because he had resigned from his

18   company in 2001, he had withdrawn from the conspiracy and therefore the complaint that

19   plaintiffs filed – in June of 2006 – was untimely as against him.  The court rejected this

20   reasoning, finding that plaintiffs' "allegations of fraudulent concealment would prevent the

21   statute of limitations as to [the allegedly withdrawing defendant's] conduct from beginning to run

22   until October 2002."  *Id.* at 790 (citing *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 211 F.3d

23   1224 (11th Cir. 2000)).  This same logic should apply to Thomson Consumer here.  Thomson

24   Consumer cannot escape liability for a conspiracy it participated in and fraudulently concealed

25   merely by withdrawing at some point before the conspiracy was made public.

26

27

28

### B.     The Limitations Period Continued to Toll Even After the Conspiracy Became Public Because of Subsequent Related Proceedings

The statute of limitations tolled even after the general announcement of the conspiracy in late 2007 for other reasons.

**Government action tolling.**  The limitations period for Sharp's claims against all defendants – including Thomson Consumer – tolled because of actions the Department of Justice brought relating to the CRT conspiracy.  By statute, "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws," the statute of limitations for private actions "based in whole or in part on any matter complained of" in the government's proceeding tolls during the pendency of the proceeding and one year thereafter.  15 U.S.C. § 16(i).  "Congress, believing that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws, enacted [the tolling provision] in order to assist private litigants in utilizing any benefits they might cull from government antitrust actions."  *Zenith Radio Corp. v. Hazeltine Research, Indus.*, 401 U.S. 321, 336 (1971) (citations omitted).

Because of the government's actions relating to the CRT conspiracy, Sharp's four-year limitations period against Thomson Consumer tolled again, at the latest, on February 10, 2009 – and remains tolled today.  On that date, the government indicted Cheng Yuan Lin of Taiwan for his involvement in conspiracies fixing the prices of CDTs and CPTs.  Compl. at ¶ 129.  The indictment, as described by the DOJ, charges that C.Y. Lin conspired with others "to suppress and eliminate competition by fixing prices . . . [for] color display tubes (CDTs) to be sold in the U.S." as well as "conspir[ed] with others to suppress and eliminate competition by fixing prices for color picture tubes (CPTs) to be sold in the U.S."  *Id.* at ¶ 129.  Conspirators attended meetings where they discussed setting prices at "target levels," then subsequently enforced those "agreed-upon prices" through meetings and information exchanges all while "taking steps to conceal the conspiracy."  *Id.*  The government thereafter indicted five other executives who participated in the conspiracy but only with respect to CDTs.  *Id.* at ¶¶ 130, 132,

133.[4]  Samsung SDI pleaded guilty to participating in a conspiracy with respect to CDTs on May 17, 2011.  Compl. at ¶ 134.  All the actions against the individuals remained pending according to their electronic dockets.

Government action tolling for claims against Thomson Consumer and others began when the first indictment issued.  *Dungan v. Morgan Drive-Away, Inc.*, 570 F.2d 867, 868 (9th Cir. 1978).  It is irrelevant whether Thomson Consumer was specifically named as a co-conspirator in the proceeding.  Proceedings "toll[] the statute of limitations against all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein."  *Zenith Radio Corp.*, 401 U.S. at 336.  This "materially furthers congressional policy by permitting private litigants to await the outcome of Government suits and use the benefits accruing therefrom."  *Id.*

Sharp's claims overlap directly with the subject matter of the government proceedings, more than fulfilling the statutory directive that private lawsuits only benefit from tolling if they are "based in in whole or in part on any matter complained of in said [government proceeding]."  15 U.S.C. § 16(i).  Other defendants in various related private litigations concede that these criminal proceedings instituted by the United States tolled the limitations period for opt-out plaintiffs' claims.[5]

Thomson Consumer's arguments that government tolling does not apply because there is insufficient overlap between Sharp's case and the government proceedings are baseless.  This Circuit has been clear that "section 16(i) [of the Clayton Act] must be broadly construed to accomplish its remedial purpose."  *Chipanno v. Champion Int'l Corp.*, 702 F.2d 827, 833 (9th Cir. 1983) (citing *Leh v. General Petroleum Corp.*, 328 U.S. 54, 59 (1965)).  "[C]onsideration of whether a later private suit is 'based in whole or in part on any matter complained of' in a prior

---

[4] *See United States v. Wen Jun Cheng*, No. 09-cr-00836 (N.D. Cal. Aug. 18, 2009); *United States v. Chung Cheng Yeh*, No. 10-cr-00231 (N.D. Cal. March 30, 2010); *United States v. Seung-Kyu Lee, Yeong-Ug Yang, and Jae-Sik Kim*, No. 10-cr-00817 (N.D. Cal. Nov. 9, 2010).

[5] Defendants' Joint Reply in Support of Motion to Dismiss as to Certain Direct Action Plaintiffs at 6 n.5 (conceding that New York Donnelly Act claims were not "time barred due to the pendency of the federal CRT investigation" because New York law adopted federal government action tolling), Case No. 07-cv-5944 (Dkt. 1422) (N.D. Cal. Oct. 26, 2012).  For this reason, Sharp's Donnelly Act claims have also been tolled.

1   government action, as required to suspend the running of limitations on the private claim during

2   the pendency of the government suit under section 16(i) in general . . . must be limited to a

3   comparison of the two complaints on their face." *Id.* at 832 (citations omitted). "If the necessary

4   overlap is present, the purpose of the statute is served though there are differences in the

5   allegations of the two complaints as to the means used, the defendants named, and the time period

6   and geographic area involved." *Id.* at 832-33 (citations omitted).

7       As in *Chipanno*, "[i]t is clear from the face of the [relevant] complaints that

8   plaintiffs' action is 'based . . . in part on any matter complained of' in the government's . . .

9   suit[s]." *Id.* at 832. Taking the indictment against Mr. Lin as the comparator, both Sharp's

10  complaint and the indictment describe a conspiracy for CRTs that includes both CDTs and CPTs.

11  *Compare* Compl. at ¶ 3 (noting that "CPTs and CDTs of all sizes will be referred to collectively

12  as 'CRTs'"), ¶¶ 121-36, 139-70, *with United States v. Cheng Yuan Lin*, No. 09-cr-00131, at 1, 4

13  (N.D. Cal. Feb. 10, 2009) (Dkt. 1) (indicting C.Y. Lin for conspiracies involving both CDTs and

14  CPTs). Both describe similar methods used in furtherance of the conspiracy. *Compare* Compl.

15  at ¶¶ 148, 165 (describing secret meetings in "South Korea, Taiwan, China, Indonesia, Japan and

16  Thailand" where agreements were made to set "target prices") *with United States v. Cheng Yuan*

17  *Lin*, No. 09-cr-00131, at 5 (N.D. Cal. Feb. 10, 2009) (meetings were held in "Taiwan, Korea,

18  Malaysia, China, Thailand, Indonesia, and elsewhere" where conspirators agreed to "charge

19  prices of CPTs at certain target levels"). Both allege that the conspiracy affected the prices of

20  CRTs sold in the United States. *Compare* Compl. at ¶ 214 (prices for CRTs were "fixed,

21  maintained and stabilized at artificially high and noncompetitive levels throughout the United

22  States") *with United States v. Cheng Yuan Lin*, No. 09-cr-00131, at 4 (N.D. Cal. Feb. 10, 2009)

23  (conspirators fixed "the prices of color picture tubes CPTs to be sold in the United States and

24  elsewhere").

25      None of Thomson Consumer's arguments to the contrary are persuasive; they rely

26  on either an incorrect recitation of the facts, or a misinterpretation of the law. Thomson

27  Consumer argues, for example, that the geographic scope of the indictments distinguishes them

28  from Sharp's complaint. Mot. Dismiss at 15. Even if the geographic scope of the complaint

differed from the government's action, the overlap between the two would still be sufficient for tolling to apply. *See Chipanno*, 702 F.2d at 829, 832-33 (tolling subsequent private claims which involved a timber market covering a broader geographic area than the government's case); *see also In re Antibiotic Antitrust Litig.*, 333 F. Supp. 317, 321 (S.D.N.Y. 1971) (government action about the domestic market tolled a private action even though the private action involved both domestic and foreign markets). But the Court need never even reach that question, because there *is* no gap in relevant geographies: as noted above, both the complaint and the indictments state that the global conspiracy, which included meetings in Asia and elsewhere, directly impacted the U.S. market. Compl. at ¶ 214.

Thomson Consumer also argues that the overlap is insufficient because no indictment covered CPTs. *See* Mot. Dismiss at 15. This argument is puzzling because Mr. Lin's indictment specifically covers CPTs, as Sharp explained in its complaint. Compl. at ¶ 129. But even the indictments alleging actions only with respect to CDTs provide the overlap necessary to toll the statute of limitations. There is no requirement that the markets at issue be "identical" for tolling to apply. For instance, in *In re Antibiotic Antitrust Litigation*, 333 F. Supp. 317 (S.D.N.Y. 1971), plaintiffs alleged a conspiracy affecting "both the farm and human markets" with "both domestic and international implications," as compared to the government's action in only the "domestic human consumption market." *Id.* at 321. The court concluded that "there is no logical reason why tolling should not also follow where the plaintiff incorporates the entire Government case and alleges more in addition. In both instances the overlap between the Government case and the private allegations suggests that valuable practical benefits may flow to the private plaintiff from tolling the statute." *Id.*; *see also In re Evanston Nw. Healthcare*, No. 07-cv-4446, 2008 WL 2229488, at *5-*6 (N.D. Ill. May 29, 2008) (tolling applied where the FTC's complaint was only for "acute inpatient hospital services sold to private payers," even though the private complaint alleged markets for "acute inpatient hospital services sold to direct purchasers as well as hospital-based outpatient services."); *In re Ariz. Dairy Prods. Litig.*, No. 74-cv-594, 736, 1984 WL 21984, at *2-*3 (D. Ariz. Nov. 5, 1984). Sharp's complaint is broader than the indictments

1   that focus only on CDTs, but its allegations, by definition, relate "in part" to those in the

2   government proceeding.

3   　　　　All of the government proceedings against the individuals remain open and

4   pending.  So long as they do, and for one year thereafter, Sharp's limitations period as to

5   Thomson Consumer (and all other defendants) remains tolled.

6   　　　　*American Pipe* **tolling.**  The claims against Thomson Consumer also tolled for

7   another independent reason from January 2008 through March 2009.  As this Court is aware,

8   shortly after the CRT conspiracy became public, multiple plaintiffs filed putative class action

9   lawsuits against a host of defendants relating to this conspiracy, purporting to cover classes of

10  direct and indirect purchasers.  *See* Compl. at ¶ 220.  Those lawsuits tolled the limitations period

11  for Sharp's claims under *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  *Id.* at

12  ¶ 221.  *American Pipe* tolling preserves claims against defendants who have notice "not only of

13  the substantive claims being brought against them, but also of the number and generic identities

14  of the potential plaintiffs who may participate in the judgment."  *Crown, Cork & Seal Co. v.*

15  *Parker*, 462 U.S. 345, 353 (1983) (citations omitted).

16  　　　　Thomson Consumer properly notes that no plaintiff named Thomson Consumer in

17  those suits, and cites some cases for the proposition that *American Pipe* tolling ordinarily does not

18  apply "against a party who is not named as a defendant in that class action."  Mot. Dismiss at 12.

19  "Such decisions are ordinarily premised on insufficient notice of the claim to additional parties

20  which were not defendants in the initial pleading since commencement of the suit against others

21  was insufficient to give a nondefendant notice of the assertion of the claims against him."  *Becks*

22  *v. Emery-Richardson, Inc.*, No. 86-cv-6866, 1990 WL 303548, at *12 (S.D. Fla. Dec. 21, 1990).

23  None of the cases Thomson Consumer cites, however, address the situation here, where there

24  appears to be little question that Thomson Consumer had notice of the legal actions and their risk

25  of exposure.  As Thomson Consumer pointed out to this Court separately, plaintiffs named its

26  parent corporation Thomson SA as a defendant in two direct purchaser class action lawsuits filed

27  on January 28, 2008.  *See Radio & TV Equip., Inc. v. Chunghwa Picture Tubes, Ltd.*, No. 08-

28  00542 (D.N.J. Jan. 28, 2008); *Sound Inv. Corp. v. Chunghwa Picture Tubes, Ltd.*, No. 08-00543

---

PLAINTIFFS' OPPOSITION TO THOMSON CONSUMER'S MOTION TO DISMISS
CASE NO. 13-1173-SC; MDL NO. 1917

1   (D.N.J. Jan. 28, 2008).[6]  The suits brought claims relating to purchases directly from defendants

2   and their "subsidiaries or affiliates in the United States." *Radio & TV Equip., Inc.*, No. 08-00542,

3   at ¶ 4 (D.N.J. Jan. 28, 2008) (Dkt. 1) .  These suits also arrived just months after Thomson

4   Consumer itself had received a subpoena from the DOJ "investigating alleged anticompetitive

5   conduct in the Cathode Ray Tubes ('CRT') industry."[7]  These facts would have provided notice

6   to Thomson Consumer to warrant tolling the statute of limitations on the facts here.  *See, e.g.*,

7   *Becks*, 1990 WL 303548, at *12 (applying the doctrine where parent corporation had

8   "constructive if not actual notice" of litigation, because its subsidiary was sued).[8]  (At the least,

9   when Thomson Consumer first had notice of the civil lawsuits could be easily learned through

10  discovery.)  *Cf. E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 621 F. Supp. 310, 313-

11  14 (D. Del. 1985) (relation back to party added through amendment under Rule 15(c) appropriate

12  because "the parent corporation had actual notice" and therefore "adding its wholly-owned

13  subsidiary as a party defendant does not prejudice the subsidiary").

14          This tolling would apply not only to Sharp's claims under federal law, but also

15  under state law where states have adopted the cross-jurisdictional tolling doctrine.  *See In re*

16  *Linerboard Antitrust Litig.*, 223 F.R.D. 335 (E.D. Pa. 2004).  There is an interest in cross-

17  jurisdictional tolling "[i]n the antitrust context, [because] declining to adopt cross-jurisdictional

18  class action tolling will invite the filing of numerous protective, duplicative and in many cases,

19  unnecessary, suits by class members that want to consider filing claims under state antitrust law

20  not included in a federal class action complaint."  *Id.* at 346.  Moreover, "independent of the

21

22

23  [6] Thomson SA was not named in the DPP's Consolidated Amended Complaint, filed on March
    16, 2009.  Case No. 07-5944 (Dkt. 436).

24  [7] *See* Thomson's Opposition to DAP's Motion for Leave to File Amended Complaints, Case No.
    07-cv-5944, at 10-11 (Dkt. 1629) (April 9, 2013) (citing and attaching as exhibits Thomson's

25  annual reports detailing antitrust the international antitrust investigations, including by the DOJ).
    Although normally limited to the face of the complaint when ruling on a motion to dismiss, the

26  court may take judicial notice of "undisputed matters of public record" and "documents on file in
    federal or state courts."  *Harris v. County of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012).

27
    [8] *But see Tech Data Corp. v. AU Optronics Corp.*, MDL No. 1827 SI, 2012 WL 3236065, at *5

28  (N.D. Cal. Aug. 6, 2012) (declining to toll the limitations period against unnamed NEC entities).

1  federal interest involved," California[9] and New Jersey[10] courts would apply cross-jurisdictional

2  tolling.[11]

3
4  **III.    SHARP'S CLAIMS ARE APPROPRIATE UNDER THE SHERMAN ACT AND THE FTAIA**

5          Sharp has alleged an international price fixing conspiracy that was aimed at, and

6  directly impacted, domestic commerce.  Sharp alleges injuries to United States companies for

7  purchases Sharp made in the United States.  Sharp's claims therefore are proper under the

8  Sherman Act and the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a – just as this

9  Court already concluded when denying motions to dismiss the class action complaints.  *In re*

10 *CRT*, 738 F. Supp. 2d at 1022-23.[12]  To the extent Thomson Consumer argues otherwise, it does

11 so only by misconstruing Sharp's complaint or the relevant case law (or both).

12         At the outset, it is not clear that the FTAIA need bear on this analysis at all.

13 Thomson Consumer calls up the FTAIA by focusing improperly on where meetings took place

14 and by arguing that the conspiracy also affected commerce in places other than the United States.

15 Mot. Dismiss at 23-24.  But courts have been clear that it is the affected trade or commerce that

16 matters for FTAIA purposes – not where meetings or conspiratorial activity took place.  *In re*

17 *Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d at 786.  And in any event there is nothing foreign

18 about the "trade or commerce" occurring between Sharp and Thomson Consumer.  Sharp has

19 alleged that Thomson Consumer, a U.S. company, participated in a conspiracy "aimed at U.S.

20 ────────────────
[9] *See Hatfield v. Halifax PLC*, 564 F.3d 1177, 1188-89 (9th Cir. 2009) (applying California
21 doctrine of equitable tolling based on class action filed in another jurisdiction).

   [10]  *See Staub v. Eastman Kodak Co.*, 726 A.2d 955, 967 (N.J. App. Div. 1999).
22
   [11] New York state courts have not definitively addressed the question. *See Becnel v. Deutsche*
23 *Bank, AG*, No. 11-4195, 2013 WL 135387, at *1 (2d Cir. Jan. 11, 2013).

   [12] Although Thomson Consumer states that the FTAIA presents a question of subject matter
24 jurisdiction, the Ninth Circuit has questioned whether it really is "an element of a claim" as
   opposed to a jurisdictional issue.  *In re Dynamic Random Access Memory (DRAM) Antitrust*
25 *Litig.*, 546 F.3d 981, 985 (9th Cir. 2008).  Since *DRAM*, the Third and Seventh Circuits have
   concluded that the FTAIA is properly viewed as an element of a claim and not jurisdictional.
26 *Animal Science Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-69 (3d Cir. 2011);
   *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 851-52 (7th Cir. 2012) (*en banc*).  Courts in this
27 district have since been divided in their approach.  *See In re TFT-LCD (Flat Panel) Antitrust*
   *Litig.*, 822 F. Supp. 2d 953, 958-59 (N.D. Cal. 2011).  Viewed in either light, Sharp's claims are
28 proper.

1   businesses and consumers" resulting in harm to "countless Americans."  Compl. at ¶ 129.  The

2   Sharp plaintiffs are U.S. entities and are suing based on their U.S. purchases.

3           Sharp has also alleged that the CRT conspiracy concerned U.S. import commerce.

4   Compl. at ¶ 18.  There is no question that claims relating to imports are proper under the Sherman

5   Act and fall outside the scope of the FTAIA.  *See Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845,

6   854 (7th Cir. 2012) (*en banc*) (noting that trade or commerce "are excluded at the outset from the

7   coverage of the FTAIA in the same way that domestic interstate commerce is excluded").

8           Even if the FTAIA applied, Sharp's allegations would satisfy that statute's

9   "domestic injury exception."  That exception brings injuries arising from "conduct involving

10  trade or commerce" with foreign nations under the Sherman Act's scope if (1) the underlying

11  conduct has caused a "direct, substantial, and reasonably foreseeable effect" on American

12  domestic, import, or (certain) export commerce," and (2) that effect gives rise to the injury.  *F.*

13  *Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (quoting 15 U.S.C. §

14  6a(1),(2)).

15          The CRT conspiracy had the direct, substantial and reasonably foreseeable effect

16  of "fix[ing], maintain[ing] and stabiliz[ing] [CRT prices] at artificially high and noncompetitive

17  levels throughout the United States."  Compl. at ¶ 214.  Sharp invoiced and purchased CRTs and

18  CRT products in the United States.  Compl. at ¶¶ 27-31.  The illegally inflated prices Sharp paid

19  in the United States for those CRTs "g[a]ve rise to" its antitrust injuries.   Compl. at ¶¶ 12, 27-31.

20  This meets the "domestic injury" exception.  *In re Static Random Memory (SRAM) Antitrust*

21  *Litig.*, No. 07-1819, 2010 WL 5477313, at *5-*6 (N.D. Cal. Dec. 31, 2010) (finding that the

22  "domestic injury exception" applied where the purchase was "billed to the United States"); *In re*

23  *TFT-LCD*, MDL. No. 1817, 2012 WL 506327, at *-*4 (N.D. Cal. Feb. 15, 2012) (same).

24  **IV.    SHARP'S STATE LAW AND FINISHED PRODUCTS CLAIMS ARE PROPER**

25          In addition to stating federal claims for the CRTs that Sharp purchased in the

26  United States to incorporate into CRT televisions, Sharp has also alleged claims under state and

27  federal law covering both these purchases and Sharp's purchases of finished CRT products.  For

28

1   the reasons explained below, Sharp's finished product and state law claims are proper and

2   Thomson Consumer's arguments to the contrary should be rejected.

3       A.    **Sharp's Allegations for Purchases of Finished Products Meet the *Illinois***
        ***Brick* Ownership-or-Control Exception**

4       Plaintiffs may assert federal antitrust claims for indirect purchasers in three

5   circumstances: when (1) there is a "preexisting cost-plus contract with the direct purchasers"; (2)

6   there is a "conspiracy between the manufacturer and the middleman"; or (3) "customers of the

7   direct purchaser own or control the direct purchaser" or "a conspiring seller owns or controls the

8   direct purchaser." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 749 (9th Cir. 2012) (citing

9   *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)); *In re Brand Name Prescription Drugs*

10  *Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (Posner, J.).

11      Once again, to argue that Sharp's allegations are insufficient, Thomson Consumer

12  must disregard previous rulings in this case.  This Court has already determined on summary

13  judgment that whether the ownership-or-control exception applies to claims for finished products

14  presents a question of fact for trial.  *In re CRT*, --- F. Supp. 2d ---, 2012 WL 5987861, at *7 (N.D.

15  Cal. Nov. 29, 2012).  The Court had thoroughly examined the controlling precedent and "[p]ut

16  simply," saw "no meaningful distinction between the facts of *Royal Printing* and the facts of this

17  case." *Id.* at *8; *see Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir.

18  1980) (permitting an indirect purchaser plaintiff to bring suit because it purchased from the

19  subsidiary of a conspirator and the division of another).

20      The ownership-or-control exception applies either "where the direct purchaser is

21  owned or controlled by its customer" or where "a conspiring seller owns or controls the direct

22  purchaser." *In re ATM Fee*, 686 F.3d at 749; *In re Brand Name Prescription Drugs*, 123 F.3d at

23  605.  To the extent Sharp purchased finished products from defendants or co-conspirators,

24  Sharp's allegations regarding ownership and control are identical to those already deemed

25  acceptable by this Court.  *In re CRT*, --- F. Supp. 2d ---, 2012 WL 5987861, at *7-*8.[13]   Sharp

26

27      [13] Although Thomson Consumer urges that these allegations are insufficient, the cases it cites do
not support that position.  *See Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d

28  1059, 1068 n.5 (E.D. Cal. 2011) (noting there were "[n]o allegations" that the direct purchaser

1   has alleged that the parent corporations "dominated and/or controlled" their subsidiary and

2   affiliated entities.  *See, e.g.*, Compl. at ¶¶ 32-102.  *Illinois Brick* permits purchasers of finished

3   products to bring suit where "a direct purchaser is a division or subsidiary of a co-conspirator,"

4   *In re CRT*, --- F. Supp. 2d ---, 2012 WL 5987861, at *7-*8, or where there is "functional

5   economic or other unity" between the direct purchaser and the indirect purchaser, *Jewish Hosp.*

6   *Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir. 1980).

7
8        **B.**     **Sharp's New York and New Jersey Antitrust and Unfair Competition Claims are Consistent with the Requirements of Due Process and Constitutional Standing**

9
10        Thomson Consumer also argues that because Sharp "does not allege that it

11   purchased CRTs or CRT Products in" New York or New Jersey, its claims must be dismissed for

12   lack of due process and constitutional standing.  Mot. Dismiss at 18.  The Ninth Circuit has

13   rejected this position.

14        **Due process.**  A state's substantive law may be applied consistent with the Due

15   Process Clause when that state has "a significant contact or significant aggregation of contacts,

16   creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."

17   *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981); *AT&T Mobility LLC v. AU Optronics*

18   *Corp.*, 707 F.3d 1106, 1111 (9th Cir. 2013); *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th

19   Cir. 2011).  Because both New Jersey and New York have a "significant aggregation of contacts"

20   with the claims asserted by Sharp here, application of those laws does not offend due process.

21        The Supreme Court's *Allstate* decision is instructive.  The Court upheld the

22   application of Minnesota law to an insurance claim brought by the decedent's wife, a Minnesota

23   resident, where the insurance policy was delivered to the late husband in Wisconsin and the

24   automobile accident at issue took place in Wisconsin.  449 U.S. at 305-06.  The Court found three

25   contacts with Minnesota significant: (1) the decedent's commute to Minnesota; (2) defendant

26   was "controlled by" defendants); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143, 2011 WL 3894376, at *6 (N.D. Cal. Aug. 3, 2011) (concluding that "putative class of direct

27   purchasers" had not alleged indirect purchaser claims); *In re Ditropan XP Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 n.2 (N.D. Cal. 2007) (noting in dicta that plaintiff was required to

28   demonstrate that both defendant-sellers were owned or controlled by the conspiring party).

1   Allstate's presence in Minnesota; and (3) the plaintiff's residence in Minnesota following the

2   accident but prior to bringing suit. *Id.* at 314-19. Even though the policy was not purchased in

3   Minnesota, Minnesota's "aggregation of contacts with the parties and the occurrence" was

4   therefore sufficient to apply its laws without offending due process. *Id.* at 320.

5          The Ninth Circuit recently addressed the specific question of what contacts are

6   appropriate to consider in determining which state laws should apply in antitrust cases. In *AT&T*,

7   it reversed the district court's ruling that claims relating to the LCD conspiracy could only be

8   brought under California law if the LCDs were purchased in California. The appeals court called

9   this a "wooden" approach to due process – focusing exclusively on purchases or the location of

10  the conspiratorial acts – and instead has emphasized "the broad scope of the *Allstate* plurality's

11  search for contacts" that give rise to a state's interest. *AT&T*, 707 F.3d at 1111-12. *AT&T* and

12  *Allstate* illustrate that the "broad scope" of the contacts relevant for due process go beyond

13  merely the locus of the injury or the location of conspiratorial acts. Other significant contacts

14  include the residence, place of incorporation, or place of business of the parties. *See Allstate*, 449

15  U.S. at 314-19 (considering the plaintiff's residence in Minnesota); *AT&T*, 707 F.3d at 1112, n.11

16  (comparing the factors considered to choice of law inquiries, which consider domicile, residence,

17  place of incorporation, and place of business).

18         Like in *Allstate*, Sharp's contacts with and presence in New York and New Jersey

19  weigh in favor of applying those states' laws here. Sharp Electronics Corporation is a New York

20  corporation with its principal place of business in New Jersey. Compl. at ¶ 22. Sharp conducted

21  business in both New Jersey and New York during the time periods relevant to this case,

22  including warehousing CRT Products in New York and overseeing SMCA's CRT procurement

23  activities in New Jersey during the time periods relevant to this case. *Id.* at ¶¶ 261, 275. Sharp

24  has alleged that as a result of the CRT conspiracy in which Thomson Consumer participated,

25  CRT prices were fixed and artificially raised in both New Jersey and New York. *Id.* at ¶¶ 263,

26  277. These contacts are sufficient to apply New Jersey and New York law to Thomson

27  Consumer's conduct. *See, e.g., Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F.

28  Supp. 1411, 1427 (E.D.N.C. 1986) (recognizing that North Carolina has "a proper interest in

1  protecting North Carolina based businesses from what it perceives to be unfair tactics of

2  competitors," in part because "such businesses are residents of the state").

3  **Constitutional standing.**  Because Sharp Electronics is a New York corporation

4  doing business there, with its principal place of business in New Jersey, it has standing to bring

5  claims under those state's laws.  *See In re Graphics Processing Units (GPU) Antitrust Litig.*, 527

6  F. Supp. 3d 1011, 1026-27 (N.D. Cal. 2007) ("Standing under each state's antitrust statute is a

7  matter of that state's law.").  Where, as here, the anticompetitive conduct's impact is felt by the

8  plaintiff in New York, the Donnelly Act applies.  *See Two Queens, Inc. v. Scoza*, 296 A.d.2d 302,

9  304 (N.Y. App. Div. 2002).  Similarly, because the effects of the anticompetitive conduct were

10  also felt by Sharp in New Jersey, Sharp's claim is proper under New Jersey law as well.  *See*

11  *Watkins v. Resorts Int'l Hotel and Casino, Inc.*, 591 A.2d 592, 604 (N.J. 1991) (holding that

12  "[o]ur definition of standing is more generous than the federal definition" and overruling prior

13  case finding lack of antitrust injury and standing under New Jersey law due to federal law);

14  *Urban League of Essex Cnty. v. Mahwah Twp.*, 370 A.2d 521, 523 (N.J. Super. Ct. 1977) ("New

15  Jersey has historically taken a liberal view on the issue of standing.").

16  Thomson Consumer cites three cases on prudential standing, none of which

17  advances its argument.  All three involved class representatives asserting claims on behalf of the

18  class in states in which the representatives neither purchased *nor resided*.  In two of these cases,

19  the courts expressly found standing lacking due to the absence of any representatives residing in

20  the states.  *See In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1370 (S.D.

21  Fla. 2001); *In re GPU*, 527 F. Supp. 2d at 1026-27.  In the third, the plaintiffs failed to brief the

22  standing question, and the court found that the plaintiffs alleged "no basis for standing to bring

23  claims under the laws of other states."  *Pecover v. Elec. Arts, Inc.*, 633 F. Supp. 2d 976, 984

24  (N.D. Cal. 2009).  Here, Sharp has alleged several such bases: its incorporation in New York; its

25  warehousing and operations in New York; and its substantial business and oversight of CRT

26  purchasing in New Jersey.  Compl. at ¶¶ 22, 275.  Not one Thomson Consumer's cases holds that

27  these contacts are insufficient to establish standing.

28

1          On these facts, both New Jersey and New York have an interest in the application

2   of their laws.

3      **C.      Sharp Has Antitrust Standing to Assert Federal, California, New York, and**
           **New Jersey Antitrust Claims For Finished Products**
4

5          Thomson Consumer does not contest that Sharp's injuries from its purchases of

6   CRTs are antitrust injuries.  It does argue, however, that "Sharp has not suffered injury 'of the

7   type the antitrust laws were intended to forestall' *to the extent it relies on its purchases of CRT*

8   *Products*."  *See* Mot. Dismiss at 20 (emphasis added).  This argument is without merit; Sharp's

9   finished product claims are proper as well.[14]

10         Sharp's purchases of CRT products are sufficient under the *Associated General*

11  *Contractors* factors this Court has recognized govern whether an antitrust injury exists:  "(1) the

12  nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were

13  intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4)

14  the risk of duplicative recovery; and (5) the complexity in apportioning damages."  *In re CRT*,

15  738 F. Supp. 2d at 1023 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of*

16  *Carpenters*, 459 U.S. 519, 535-44 (1983)).  Sharp prevails under each factor, as this Court already

17  determined when ruling on this question previously.  *See In re CRT*, 738 F. Supp. 2d at 1023.

18         Sharp's injuries with respect to finished products are direct and the type antitrust

19  laws are designed to protect.  Contrary to Thomson Consumer's assertion, there is no bright-line

20  requirement that only direct purchasers in the relevant market have antitrust standing.  *See Am. Ad*

21  *Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057-58 (9th Cir. 1999) (rejecting a

22  "consumer or competitor" test and noting that there are other situations in which a market

23  participant might suffer injury, including "indirect purchasers").  Sharp has alleged that the

24  finished products market here is "inextricably linked and intertwined," with the CRT market, such

25

26  [14] Sharp respectfully disagrees with the Special Master's analysis in the R&R to the contrary,
    which is currently under review.  *See* Report and Recommendation Regarding Defendants'
27  Motions to Dismiss Direct Action Complaints at 9, MDL. No. 1917 (Dkt. 1664).  Sharp's
    complaint, similar to the complaints addressed in the Report and Recommendation, allege the
28  connection between the CRT and CRT finished products markets.  *See, e.g.*, Compl. at ¶ 16.

1   that CRT panels have "no independent utility," deriving their demand from the finished products

2   market.  Comp. at ¶ 111.  Sharp has also alleged that CRTs are "identifiable, discrete physical

3   objects" even when incorporated into CRT products.  Compl. at ¶ 217.  These allegations mirror

4   the indirect purchaser claims in *In re Graphics Processing Units (GPU) Antitrust Litigation*, 540

5   F. Supp. 2d 1085 (N.D. Cal. 2007), where purchasers of consumer electronics alleged that GPU's

6   were "separate components of a computer" and that "costs attributable to them are traceable

7   through the chain of distribution." *Id.* at 1098.  Such allegations weighed in favor of standing and

8   do here as well.  *See also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1154 (N.D.

9   Cal. 2009).

10          For the same reason, Sharp's injuries with respect to finished products are not

11   speculative.  Allegations that a price-fixed product are "identifiable and traceable throughout the

12   chain of the distribution to the end user" are sufficient to demonstrate a chain of causation

13   between the anticompetitive conduct and the harm to the direct purchaser.  *In re Flash Memory*,

14   643 F. Supp. 2d at 1154-55.  Sharp's allegations that CRTs are "identifiable, discrete physical

15   objects" even when incorporated into CRT products supports finding standing here as well.

16   Compl. at ¶ 217.

17          Finally, Sharp's claims for purchases of finished products do not present a "risk of

18   duplicative recovery."  Duplicative recovery is not a concern where state law permits indirect

19   purchaser claims.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp.

20   2d 1072, 1093 (N.D. Cal. 2007) (noting that states such as California, which have repealed

21   *Illinois Brick*, "have necessarily made the policy decision that duplicative recovery may

22   permissibly occur"); *California v. ARC America Corp.*, 490 U.S. 93, 105 (1989) (noting that

23   "*Illinois Brick*, as well as *Associated General Contractors* and *Blue Shield*, all were cases

24   construing § 4 of the Clayton Act; in none of those cases did the Court identify a federal policy

25   against States imposing liability in addition to that imposed by federal law").  There is also no

26   risk of duplicative recovery for federal finished products claims when the "conspiring seller owns

27   or controls the direct purchaser" or "where the direct purchaser is owned or controlled by its

28   customer;" the "ownership or control" exception exists precisely because there is not a risk of

1   duplicative recovery where there is only one entity in the distribution chain that is bringing suit.

2   *See In re CRT*, --- F. Supp. 2d ---, 2012 WL 5987861, at *6-*7 (noting that there was no risk of

3   duplicative recovery from a subsidiary of a defendant bringing suit); *cf. In re ATM Fee*, 686 F.3d

4   at 749; *In re Brand Name Prescription Drugs*, 123 F.3d at 605; *Jewish Hosp. Ass'n*, 628 F.2d at

5   975.

6          Sharp therefore has standing to bring claims for finished products purchases.

7                                   **<u>CONCLUSION</u>**

8          For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny

9   Thomson Consumer's Motion to Dismiss in its entirety.

10

11  DATED:  June 21, 2013               By: /s/  *Craig A. Benson*

12                                      Kenneth A. Gallo (*pro hac vice*)
                                        Joseph J. Simons (*pro hac vice*)
13                                      Craig A. Benson (*pro hac vice*)
                                        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
14                                      2001 K Street, NW
                                        Washington, DC  20006
15                                      Telephone:  (202) 223-7300
                                        Facsimile:  (202) 204-7356
16                                      Email:  kgallo@paulweiss.com
                                        Email:  jsimons@paulweiss.com
17                                      Email:  cbenson@paulweiss.com

18
                                        Stephen E. Taylor (SBN 058452)
19                                      Jonathan A. Patchen (SBN 237346)
                                        TAYLOR & COMPANY LAW OFFICES, LLP
20                                      One Ferry Building, Suite 355
                                        San Francisco, California 94111
21                                      Telephone:  (415) 788-8200
                                        Facsimile:  (415) 788-8208
22                                      Email: staylor@tcolaw.com
                                        Email: jpatchen@tcolaw.com
23
                                        *Attorneys for Plaintiffs*
24

25

26

27

28