# EXHIBIT 1



# 2010 ANNUAL REPORT

# 2010 Annual Report



*Société anonyme* with a share capital of €174,846,625

Registered Office: 1-5, rue Jeanne d'Arc

92130 Issy-Les-Moulineaux

Nanterre Register of Commerce and Companies No. 333 773 174



This Registration document (*Document de Référence*) was filed with the *Autorité des Marchés Financiers* (AMF) on March 30, 2011, in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note (*note d'opération*) approved by the AMF . This document was prepared by the issuer and is the responsibility of the signatories thereof.

Copies of this registration document are available free of charge from Technicolor.

This registration document can also be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

of the Company's revenue. Pegasus has not yet definitively set forth in the litigation the per unit royalty figure or damages sum they seek in the case.

Pegasus also seeks an injunction to prohibit further sales of IRD's which allegedly infringe the patents in suit. If Pegasus were successful in the litigation and able to convince the Court to enter a permanent injunction, the Company's IRD sales could be disrupted. The Company notes, however, that all of the patents asserted against the Company have already expired, with the exception of one which is set to expire in August 2011. (In October, 2010, the Board of Patent Appeals reversed its initial decision ruling the patent in question unpatentable). The Company believes the court is unlikely to issue an injunction prior to the expiration of the last patent. Upon expiration of the last patent, the Company would be free to pursue IRD sales with no risk of an injunction; therefore the risk of this litigation relates primarily to the damages claimed by Pegasus, which amount, as indicated above, Pegasus has not yet claimed.

The stay of proceedings entered by the Delaware District Court in May 2003 remains in effect. The USPTO has now confirmed as patentable four claims of three patents asserted against the Company in the Delaware District Court litigation. However, a third request for re-examination of one of those patents has been tendered to the USPTO and Pegasus and PMC have appealed the rejection of certain asserted claims, all of which could affect the actual claims ultimately confirmed as patentable.

## IP Innovation and Technology Licensing Corp.

On June 20, 2003, Technology Licensing Corp. ("TLC") filed a lawsuit in the US District Court for the Eastern District of California alleging that certain Grass Valley Group products infringe four of TLC's US patents. Thereafter, TLC placed two of the patents into re-issue proceedings before the United States Patent and Trademark Office.

As a result, this lawsuit was stayed as to those patents pending reissue. Both patents have now reissued, and on October 2, 2009, the trial court formally lifted the stay of proceedings. A case management plan has been put in place with a projected September 2011 trial date. Because of the stay, the case is still in the early stages of development. The Company has received a favourable ruling in early claim construction proceedings. The purchaser of the Grass Valley Broadcast Business has contractually agreed to indemnify and hold the Company harmless in connection with this lawsuit, which is being vigorously defended.

In June and July 2005, the District Court granted summary judgment in favour of Technicolor on the remaining two patents. TLC appealed that ruling to the US Federal Circuit Court of Appeals.

In July 2006, the parties entered into a Settlement and License Agreement resolving all issues pertaining to the Appeal.

## Rembrandt Technologies v. Fox Entertainment and NBC

In December of 2006, Rembrandt Technologies filed separate lawsuits against Fox and NBC in the US District Court for the District of Delaware. Each suit alleges that defendants Fox and NBC infringe US Patent 5,243,627 entitled "Signal Point Interleaving Technique" (the "'627 patent") by transmission, or receipt and retransmission, over Fox and NBC television systems, of digital terrestrial broadcast signals that comply with the ATSC digital television standard. Both Fox and NBC have subsequently demanded that Technicolor defend and indemnify them in each case,

alleging that Rembrandt's infringement allegations are in essence based upon digital television transmission equipment sold to Fox and NBC by Thales Broadcast and Multimedia, which the Company acquired in December 2005.

While Technicolor has made no commitment with respect to Fox and NBC's demands for indemnity in the event of a settlement or judgment against them, Technicolor has agreed, subject to certain conditions and restrictions, to fund a portion of the defense costs in each case.

On November 8, 2008, the District Court issued an order construing the claims of the '627 patent. Rembrandt has conceded that it cannot prove infringement of the patent under the Court's claim construction, and in March of 2009 the parties reached an agreement in principle which has allowed for the early filing of a motion for summary judgment of non-infringement. Upon entry of a judgment in favour of defendants, Rembrandt has indicated its intention to appeal the judgment to the Federal Circuit Court of Appeals.

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC decision is expected sometime in 2011, but with no certainty.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability

Case 4:07-cv-05944-JST   Document 1744-3   Filed 06/21/13   Page 5 of 15
Case 3:07-cv-05944-SC   Document 1629-2   Filed 04/09/13   Page 32 of 36

| Financial statements
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

9

that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998. In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway. It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, in order to comply with the Environmental Protection Bureau's order, TCETVT has incurred approximately U.S.$7.2 million for the groundwater remediation. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$5.7 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate. In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.