Jon V. Swenson (SBN 233054)
BAKER BOTTS LLP
1001 Page Mill Road
Bld. One, Suite 200
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
Email: jon.swenson@bakerbotts.com

John M. Taladay (*pro hac vice*)
Joseph Ostoyich (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
BAKER BOTTS LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: joseph.ostoyich@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

*Attorneys for Defendants Koninklijke Philips Electronics
N.V. and Philips Electronics North America
Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

In re:  CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

_____

This Document Relates to:

*Electrograph Systems, Inc., et al. v. Hitachi, Ltd.,
et al.*, No. 11-cv-01656;

*Stoebner, et al. v. LG Electronics, et al.*, No. 11-
cv-05381;

*Siegel v. Hitachi, Ltd., et al.*, No. 11-cv-05502;

*Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.,*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 07-5944-SC

MDL No. 1917

**KONINKLIJKE PHILIPS ELECTRONICS
N.V. AND PHILIPS ELECTRONICS
NORTH AMERICA CORPORATION'S
MEMORANDUM IN RESPONSE TO
DIRECT ACTION PLAINTIFFS'
OBJECTIONS TO THE SPECIAL
MASTER'S REPORT AND
RECOMMENDATION REGARDING
PHILIPS' AND LG'S MOTION TO
DISMISS CERTAIN DIRECT ACTION
PLAINTIFFS' COMPLAINTS AND IN
SUPPORT OF ADOPTING THE SPECIAL
MASTER'S REPORT AND
RECOMMENDATION WITH RESPECT TO
KONINKLIJKE PHILIPS ELECTRONICS
N.V.'s AND PHILIPS ELECTRONICS
NORTH AMERICA CORPORATION'S**

No. 11-cv-05513;

*Target Corp, et al. v. Chunghwa Picture Tubes, Ltd.*, et al., No. 11-cv-05514;

*Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275;

*Office Depot, Inc. v. Hitachi Ltd., et al.*, No. 11-cv-06276;

*CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396;

*Costco Wholesale Corporation v. Hitachi, Ltd., et al.*, No. 11-cv-06397;

*P.C. Richard & Son Long Island Corporation, et al., v. Hitachi, Ltd., et al.*, No. 12-cv-02648;

*Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02649.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MOTION TO DISMISS**

Date:            August 23, 2013
Time:            10:00 a.m.
Place:           Hon. Samuel Conti
Special Master: Hon. Charles A. Legge,
                 U.S. District Judge (Ret.)

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................. 3

ARGUMENT ........................................................................................................... 7

I.   THE DAPS' FEDERAL LAW CLAIMS AGAINST THE
     PHILIPS DEFENDANTS ARE TIME BARRED ......................................... 7

     A.   The Philips Defendants Withdrew From The Alleged
          Conspiracy In June 2001 ................................................................... 7

          1.   The Philips' Defendants withdrawal in June 2001 is
               established by the DAPs' own allegations. ................................ 7

          2.   Any allegation that the Philips Defendants'
               participated in the alleged conspiracy after June
               2001 is implausible. ................................................................ 10

     B.   The DAPs' Arguments Against A Finding of Withdrawal
          Are Unavailing ................................................................................. 11

          1.   This Court's previous ruling, which relied on
               allegations of conspiracy in "CRT Finished
               Products" as well as CRTs, is not applicable to the
               DAPs' claims. ......................................................................... 11

          2.   The Philips Defendants' status as a mere
               shareholder of LPD after June 2001 cannot defeat
               withdrawal. ............................................................................. 13

          3.   The DAPs' remaining arguments that the Philips
               Defendants did not withdraw in 2001 are
               conclusory and insufficient as a matter of law. ..................... 16

     C.   The DAPs' Untimely Claims Against The Philips
          Defendants Cannot Be Saved By The Fraudulent
          Concealment Doctrine ...................................................................... 17

          1.   The DAPs have insufficiently alleged the Philips
               Defendants' involvement in any fraudulent
               concealment. ........................................................................... 18

          2.   Any alleged fraudulent concealment can only toll
               the statute of limitations until November 8, 2007,
               when the DAPs received constructive notice of their
               potential claims. ..................................................................... 21

     D.   *American Pipe* Tolling Is Inapplicable ........................................... 23

II.  THE DAPS' STATE LAW CLAIMS AGAINST THE PHILIPS
     DEFENDANTS ARE TIME BARRED ....................................................... 25

-i-

PHILIPS' MEMORANDUM IN RESPONSE TO DIRECT ACTION PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND
RECOMMENDATION REGARDING PHILIPS' AND LG'S MOTION TO DISMISS (3:07-CV-05944 SC, MDL NO. 1917)

1

A.    The Philips Defendants Clearly Withdrew From The
2          Alleged CRT Conspiracy Prior To The Applicable State
          Law Limitations Periods..........................................................................26

3          B.    Fraudulent Concealment Does Not Extend The Statute Of
                 Limitations.............................................................................................29
4
          C.    Cross-Jurisdictional Tolling Does Not Save DAPs'
5                Untimely State Law Claims....................................................................30

6    III.   THE DAPS' CLAIMS AGAINST THE PHILIPS DEFENDANTS
            SHOULD BE DISMISSED WITH PREJUDICE. .........................................33
7
     CONCLUSION ....................................................................................................................33

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*389 Orange St. Partners v. Arnold*,
    179 F.3d 656 (9th Cir. 1999) ........................................................................ 18

*Allen v. United Fin. Mortg. Corp.*,
    No. 09-2507, 2010 WL 1135787 (N.D. Cal. Mar. 22, 2010) ........................ 18

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) ......................................................... 2, 7, 23, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................... 14, 17, 29

*Beavers v. Metro. Life Ins. Co.*,
    566 F.3d 436 (5th Cir. 2009) ......................................................... 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................. 14, 17, 19, 29

*Bowoto v. Chevron Texaco Corp.*,
    312 F. Supp. 2d 1229 (N.D. Cal. 2004) ....................................................... 15

*Broam v. Bogan*,
    320 F.3d 1023 (9th Cir. 2003) ....................................................... 14

*Brunson Commc'ns, Inc. v. Arbitron*,
    239 F. Supp. 2d 550 (E.D. Pa. 2002) ....................................................... 10

*Car Carriers v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ....................................................... 10, 11

*Cervantes v. Countrywide Home Loans, Inc.*,
    656 F.3d 1034 (9th Cir. 2011) ....................................................... 18

*Champion v. Homa*,
    No. 3:03-cv-275, 2008 WL 900967 (M.D. Ala. Mar. 31, 2008) ............................ 33

*Chapel v. Lab. Corp. of America*,
    232 F. 3d 719 (9th Cir. 2000) ....................................................... 33

*Clemens v. DaimlerChrysler Corp.*
    530 F.3d 852 (9th Cir. 2008) ....................................................... 31

-i-

PHILIPS' MEMORANDUM IN RESPONSE TO DIRECT ACTION PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND
RECOMMENDATION REGARDING PHILIPS' AND LG'S MOTION TO DISMISS (3:07-CV-05944 SC, MDL NO. 1917)

*CompuCom Systems, Inc., v. Hitachi, Ltd., et al.*,
  Case No. 11-cv-06396 (N.D. Cal.) (Dkt. 1, Nov. 14, 2011)............................................22

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
  858 F.2d 499 (9th Cir. 1988) ......................................................................................22

*Costco Wholesale Corp. v. Hitachi, Ltd., et al.*,
  Case No. 11-cv-06397 (N.D. Cal.) (Dkt. No. 1, Nov. 14, 2011)....................................22

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ....................................................................................27

*Crown Cork & Seal Co., Inc. v. Parker*,
  462 U.S. 345 (1983) ..................................................................................................23

*DM Research, Inc. v. Coll. of Am. Pathologists*,
  170 F.3d 53 (1st Cir. 1999) ........................................................................................10

*E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*,
  No. 03-5412, 2008 WL 2220396 (E.D. Cal. May 27, 2008).................................... 15, 16

*Eichman v. Fotomat Corp.*,
  880 F.2d 149 (9th Cir. 1989) ......................................................................................32

*Glater v. Eli Lilly & Co.*,
  712 F.2d 735 (1st Cir. 1983) ......................................................................................24

*Global Servs. v. IKON Office Solutions*,
  No. C 10-05974, 2011 WL 6182425 (N.D. Cal. Dec. 13, 2011)....................................19

*GO Computer, Inc. v. Microsoft Corp.*,
  508 F.3d 170 (4th Cir. 2007) ................................................................................22, 23

*Guerrero v. Gates*,
  442 F.3d 697 (9th Cir. 2006) ......................................................................................19

*Haley v. City of Boston*,
  657 F.3d 39 (1st Cir. 2011) ........................................................................................27

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012) ..............................................................................22, 23

*In the Matter of O.P.M. Leasing Servs.*,
  13 B.R. 54 (Bankr. S.D.N.Y. 1981) ............................................................................27

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010)....................................... 11, 12, 21, 24, 28

*In re Copper Antitrust Litig.*,
  436 F.3d 782 (7th Cir. 2006) ......................................................................................31

*In re CRT Antitrust Litigation,*
  Case No. 07-5944, 2012 WL 5987861 (N.D. Cal. Nov. 29, 2012) .........................................24

*In re DRAM Antitrust Litig.,*
  516 F. Supp. 2d 1072 (N.D. Cal. 2007)...................................................................................31

*In re Fresh and Process Potatoes Antitrust Litig.,*
  834 F. Supp. 2d 1141 (D. Idaho 2011) ...................................................................................17

*In re Hanford Nuclear Reservation Litig.,*
  534 F.3d 986 (9th Cir. 2008)...................................................................................................24

*In re Linerboard Antitrust Litig.,*
  223 F.R.D. 335 (E.D. Pa. 2004) .............................................................................................31

*In re Rezulin Products Liability Litig.,*
  No. 00-Civ.-2843, 2006 WL 695253 (S.D.N.Y. Mar. 15, 2006) ...........................................32

*In re Rubber Chemicals Antitrust Litigation,*
  504 F. Supp. 2d 777 (N.D. Cal. 2007)....................................................................................21

*In re TFT-LCD Antitrust Litig.,*
  Nos. M 07-1827, 2012 WL 149632 (N.D. Cal. Jan. 18, 2012) .............................................32

*In re Urethane Antitrust Litig.,*
  663 F. Supp. 2d. 1067 (D. Kan. 2009) ...................................................................................31

*In re Vioxx Prods. Liab. Litig.,*
  522 F. Supp. 2d 799 (E.D. La. 2007) .....................................................................................31

*In re Vitamins Antitrust Litig.,*
  183 F. App'x 1 (D.C. Cir. May 15, 2006) ...............................................................................32

*Jenson v. Allison-Williams Co.,*
  No. 98-CV-2229, 1999 WL 35133748 (S.D. Cal. Aug. 23, 1999)........................................33

*Lee v. Grand Rapids Board of Education,*
  148 Mich. App. 364 (MI 1986) .........................................................................................32, 33

*Mair v. Consumers Power Co.,*
  419 Mich. 74, 348 N.W. 2d 256 (1984) .................................................................................32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ..........................................................................................................10, 11

*Metz v. Unizan Bank,*
  416 F. Supp. 2d 568 (N.D. Ohio 2006) ..................................................................................19

*Monzon v. S. Wine & Spirits of California,*
  834 F. Supp. 2d 934 (N.D. Cal. 2011)....................................................................................14

*Moreco Energy, Inc. v. Penberthy-Houdaille, Inc.*,
    No. 86 C 20153, 1988 WL 124928 (N.D. Ill. Oct. 21, 1988)...................................................20

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) ..................................................................................8, 9, 10, 28

*Neilson v. Union Bank of Cal.*, N.A.,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ..............................................................................14

*Newport v. Dell, Inc.*,
    No. CV-08-0096, 2008 WL 4347311 (D. Ariz. Aug. 21, 2008) ............................................31

*O'Brien v. National Property Analysts Partners*,
    719 F. Supp. 222 (S.D.N.Y. 1989) .......................................................................................19

*Orion Home Systems, LLC v. Chunghwa Picture Tubes, Ltd., et al.*,
    Case No. 3:08-cv-00178 (N.D. Cal.) (Dkt. No. 1, Jan. 1, 2008).........................................22

*Pace v. DiGuglielmo*,
    544 U.S. 408 (2006) ...............................................................................................................18

*Patterson v. Novartis, Inc.*,
    909 F. Supp. 2d 116 (D.R.I. 2012) ........................................................................................32

*Reisman v. United States*,
    409 F.2d 789 (9th Cir. 1969) .................................................................................................16

*Russell v. National Collegiate Athletic Ass'n*,
    No. C 11–4938, 2012 WL 1747496 (N.D. Cal. May 16, 2012) ...........................................27

*Rutledge v. Boston Woven Hose & Rubber Co.*,
    576 F.2d 248 (9th Cir. 1978) .................................................................................................21

*Seaboard Corp. v. March Inc.*,
    284 P.3d 314 (Kan. 2012).......................................................................................................32

*Senger Bros. Nursery, Inc. v. E.I. DuPont de Nemours & Co.*,
    184 F.R.D. 674 (M.D. Fla. 1999) ..........................................................................................32

*Session v. PLM Lender Servs., Inc.*,
    C 10-04942, 2011 WL 6748510 (N.D. Cal. Dec. 22, 2011) .................................................14

*Silva v. U.S. Bancorp*,
    5:10-cv-01854-JHN, 2011 WL 7096576 (C.D. Cal. Oct. 6, 2011) .......................................30

*Soward v. Deutsch Bank AG*,
    814 F. Supp. 2d 272 (S.D.N.Y. 2011) ...................................................................................31

*Tatum v. Schwartz*,
    No. Civ. S-06-01440, 2007 WL 419463  (E.D. Cal. Feb. 5, 2007) .......................................30

-iv-

PHILIPS' MEMORANDUM IN RESPONSE TO DIRECT ACTION PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND
RECOMMENDATION REGARDING PHILIPS' AND LG'S MOTION TO DISMISS (3:07-CV-05944 SC, MDL NO. 1917)

*Todd v. F. Hoffman-La Roche, Ltd.*,
   No. 98 C 4574, 2004 WL 5238952 (D. Kan. Aug. 20, 2004) .................................................. 32

*United States v. Antar*,
   53 F.3d 568 (3d Cir. 1995) ......................................................................................................... 8

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ............................................................................................................... 15, 16

*United States v. Lothian*,
   976 F.2d 1257 (1992) ......................................................................................... 7, 9, 10, 13, 16

*United States v. Lowell*,
   649 F.2d 950 (3d Cir. 1981) .................................................................................................. 8, 9

*United States v. Loya*,
   807 F.2d 1483 (9th Cir. 1987) .................................................................................................. 7

*United States v. Nippon Paper Indus. Co.*,
   62 F. Supp. 2d 173 (D. Mass. 1999) ..................................................................................... 8, 9

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ............................................................................................... 7, 8, 9, 10, 16

*Universal Grading Serv. v. eBay, Inc.*,
   No. C-09-2755, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ..................................................... 11

*Ventress v. Japan Airlines*,
   603 F.3d 676 (9th Cir. 2010) .................................................................................................. 33

*Vess v. Ciba-Geiby Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................................................................ 19

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) .................................................................................................. 18

*Williams v. Dow Chem. Co.*,
   No. 01-cv-4307, 2004 WL 1348932 (S.D.N.Y June 16, 2004) .............................................. 31

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,
   413 F.3d 553 (6th Cir. 2005) .................................................................................................. 24

**STATUTES**

740 Ill. Comp. Stat. §10/7(2) ...................................................................................................... 26

15 U.S.C. § 15b ............................................................................................................................... 7

Ariz. Rev. Stat. § 44-1410(B) ...................................................................................................... 25

Cal. Bus. & Prof. Code § 16750.1 .................................................................25

Cal. Bus. & Prof. Code § 17208 ....................................................................25

Fla. Stat. Ann. § 95.11(3)(f) ..........................................................................25

Fla. Stat. § 542.26(1) .....................................................................................25

Iowa Code Ann. § 553.16(1) ..........................................................................25

Kan. Stat. Ann. § 60-512(2) ...........................................................................26

Mass. Gen. Laws Ann. ch. 93 § 13 ................................................................26

Mich. Comp. Laws Ann. §445.781(1) ............................................................26

Minn. Stat. Ann. § 325D.64 .....................................................................25, 26

Miss. Code Ann. § 15-1-49 ............................................................................26

N.C. Gen. Stat. § 75-16.2 ..............................................................................26

N.M. Stat. Ann. § 57-1-12 .............................................................................26

N.Y. Gen. Bus. Law § 340(5) ...................................................................25, 26

Neb. Rev. Stat. § 59-1612 ..............................................................................26

Nev. Rev. Stat. § 598A.220(1) .......................................................................26

R.C.W. §19.86.120 .........................................................................................26

Wis. Stat. Ann. § 133.18(2) ...........................................................................25

**OTHER AUTHORITIES**

Fed. R. Evid. 201(f) ........................................................................................27

Fed. R. Civ. P.12(b)(6) .................................................................................2, 27

Fed. R. Civ. P. 9(b) ...............................................................2, 17, 18, 19, 20, 29

Fed. R. Civ. P. 11 .......................................................................................12, 24

Fed. R. Civ. P. 56 ...........................................................................................27

RESTATEMENT (THIRD) OF AGENCY § 1.01 (2012) ...............................16

1    Koninklijke Philips Electronics N.V. ("KPE") and Philips Electronics North America

2    Corporation ("PENAC") (collectively, "the Philips Defendants"), hereby file this memorandum in

3    response to the Direct Action Plaintiffs' Objections to the Special Master's Report and

4    Recommendation Regarding Philips' and LG's Motion to Dismiss Certain Direct Action Plaintiffs'

5    Complaints ("DAPs' Objections") and in support of adopting the Special Master's Report and

6    Recommendation with respect to the Philips Defendants' Motion to Dismiss.

7                                    **INTRODUCTION**

8          The Court should adopt Special Master Legge's Report and Recommendation (the "2013

9    R&R") recommending that all of the Direct Action Plaintiffs' ("DAPs") federal and state law claims

10   against KPE and PENAC, and LG Electronics, Inc. ("LGEI") and LG Electronics USA, Inc. ("LGE

11   USA") (collectively, "LG") be dismissed without leave to amend.  Special Master Legge correctly

12   found that all of these claims are barred by the applicable statutes of limitations.  Based on the DAPs'

13   specific and detailed factual allegations, these defendants exited the business of manufacturing

14   Cathode Ray Tubes ("CRTs") in June 2001—10 years prior to the filing of the DAPs' complaints—by

15   transferring their entire CRT business to an independent entity named L.G. Philips Displays Holding

16   B.V. ("LPD").  In light of these explicit factual allegations, the DAPs' claims are facially untimely and

17   cannot be saved by generic and conclusory assertions of tolling.  Therefore, Special Master Legge was

18   right to recommend the dismissal of the DAPs' claims against the Philips and LG Defendants with

19   prejudice as any amendment would be futile.

20         The allegations in the DAPs' complaints tell the story on which this Court will decide the

21   Philips Defendants' motion to dismiss.  According to those allegations, a conspiracy regarding CRTs

22   began in 1995.  The CRT business then owned by the Philips Defendants purportedly participated in

23   this conspiracy until 2001, when the Philips Defendants disposed of this CRT business entirely and

24   merely became a shareholder in LPD.  From 2001 forward, the separate *LPD entity* allegedly

25   continued to participate in the CRT conspiracy—but without any alleged involvement or knowledge by

26   the Philips Defendants who had sold off that business.  The DAPs further allege that after 2001, the

27   Philips Defendants were solely *purchasers* of CRTs and that the illegal pricing agreements were

28

concealed from all *customers*.  Based on the DAPs' own allegations, the Philips Defendants withdrew from the alleged conspiracy in June 2001.  The DAPs' claims against the Philips Defendants are untimely as they were not filed until ten years after this withdrawal, long after any applicable statute of limitations expired.

The DAPs seek to remedy the untimeliness of their claims by asserting that the applicable statutes of limitations were tolled due to the fraudulent concealment of their claims.  The Philips Defendants recognize that Your Honor previously held that fraudulent concealment claims often are not addressable at the motion to dismiss stage.  However, a different result is required here where the DAPs' own detailed allegations establish the Philips Defendants' withdrawal.  Moreover, the allegations of fraudulent concealment are not only conclusory, they bear no discernible relationship to the Philips Defendants.  Permitting such allegations of fraudulent conceal to toll the statute of limitations would allow plaintiffs to render their claims impervious to the relevant statute of limitations and Federal Rule of Civil Procedure 12(b)(6) merely by including the words "fraudulent concealment" in their complaint.  In this light, the DAPs fail to meet the stringent pleading requirements of Federal Rule of Civil Procedure 9(b), which mandate that the DAPs not just plead fraudulent concealment generally, but offer specific facts showing how—given the Philips Defendants' exit from the CRT business—an allegation of fraudulent concealment is plausible.  In short, the DAPs' own affirmative allegations establish that the Philips Defendants were not and could not have plausibly been involved in any alleged concealment after June 2001.  It make no sense for the Philips Defendants to continue in a conspiracy and the concealment of that conspiracy where they were the victim of allegedly inflated prices.

Nor can the DAPs' claims be salvaged by *American Pipe* or cross-jurisdictional tolling.  Even if these doctrines applied (they do not), they would only extend the statute of limitations back to November 2003—more than two years after the DAPs allege that the Philips Defendants exited the alleged conspiracy.  Moreover, *American Pipe* tolling is unavailable to the DAPs.  While the DAPs claim that the direct purchaser class claims tolled the statutes of limitations, the DAPs are admittedly not direct purchasers and therefore cannot claim tolling based on the filing of a direct purchaser class

1   complaint.  The Special Master was also correct in rejecting the DAPs' attempt to invoke cross-

2   jurisdictional tolling.  The DAPs do not even challenge that cross-jurisdictional tolling does not apply

3   to nine of their seventeen state law claims.  Courts, including the Ninth Circuit, have rejected the

4   application of cross-jurisdictional tolling to the DAPs' remaining state law claims.

5       The DAPs' state law claims fail for additional reasons.  The Special Master appropriately took

6   judicial notice of the fact that LPD declared bankruptcy in January 2006, after which time all aspects

7   of LPD were in the hands of the bankruptcy trustee.  Thus, even if the Court were to conclude that the

8   Philips Defendants were not extracted from the alleged conspiracy until January 2006—at which time

9   not even the independent LPD entity in which the Philips Defendants were a mere shareholder could

10  have conspired with respect to CRTs—all but one of the DAPs' state law claims would be untimely as

11  having been brought after the expiration of the applicable statutes of limitations.  The DAPs also allege

12  that the Philips Defendants took the additional step of "ceding control" of their passive shareholder

13  interests in LPD to financial institutions and private equity firms in March 2007.  Again, even

14  assuming that the Philips Defendants' detachment was not effective until March 2007, virtually all of

15  the DAPs' state law claims would still be untimely.

16  **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

17      The DAPs allege that the Philips Defendants participated in a conspiracy to fix the prices of

18  CRTs that were incorporated into Finished Products purchased by the DAPs.[1]  Most, if not all, of the

19  DAPs did not themselves purchase a CRT, but are instead asserting claims to recover for the

20  "overcharges paid for the CRT Products containing price-fixed CRTs."  *See, e.g.*, Best Buy Compl.

21  ¶ 9; 2013 R&R at 3–4.  As the Special Master found, and the DAPs concede, they are "indirect"

22  purchasers of CRTs.  *See* 2013 R&R at 4.

23

24

25

---

26  [1] While the Philips Defendants' motion to dismiss relates to eleven separate complaints filed by the
    DAPs, the facts alleged in those complaints are nearly identical.  In this brief, therefore, references will

27  often be made to the allegations in one complaint and corresponding allegations in the other DAPs'
    complaints can be found in the chart attached to this brief as Appendix A.

28

The DAPs brought suit against four separate Philips entities based on alleged violations of Section 1 of the Sherman Act and various state laws.[2]  The DAPs improperly characterize these four entities as a single defendant, "Philips," ignoring the companies' corporate structure and separateness. *See, e.g.*, Best Buy Compl. ¶ 50.[3]  It is undisputed that in June 2001, *all* Philips entities exited the CRT business when they divested their entire CRT operations to LPD, a 50/50 joint venture between KPE and LG Electronics.  *Id.* ¶ 46.  Indeed, the DAPs concede:

> In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD n/k/a LP Displays.

*Id.*; *see also id.* ¶ 40 ("LP Displays is the successor entity" of "LGPD" and "Royal Philips.").  LPD was an independently incorporated legal entity that was separate and distinct from the Philips Defendants.  *Id.* ¶ 40.  The DAPs' complaints contain no factual allegations that the Philips Defendants had any connection to the CRT industry after divesting their CRT business other than as a shareholder and customer of LPD.  Its shareholder status is evidenced by the DAPs' allegation that in 2005 the Philips Defendants "wrote off the remaining book value" of the investment in LPD.  *Id.* ¶ 46.

The DAPs' allegations concerning the Philips Defendants' involvement in the alleged price-fixing conspiracy change dramatically after the Philips Defendants divested the CRT business in June 2001.  Prior to the divestiture, the DAPs allege that the Philips Defendants directly participated in the CRT conspiracy from 1996 through 2001 by "participating in at least 100 glass meetings at all levels." *Id.* ¶ 150.  Following the divestiture however, the DAPs make no factual allegations (nor could they) that any Philips Defendant or employee was involved in any conspiratorial conduct, the operations of LPD, or the CRT industry generally.  Rather, the DAPs merely allege that *LPD employees*, who "had

---

[2] These entities are KPE, a holding company incorporated in the Netherlands; PENAC, an indirect U.S. subsidiary of KPE; Philips Electronics Industries, LTD ("PEIT"), a Taiwanese subsidiary of KPE; and Philips da Amazonia Industria Electronic Ltda ("PAIE"), an indirect Brazilian subsidiary of KPE.  *See, e.g.*, Best Buy Compl. ¶¶ 46–49.

[3] For example, KPE is a holding company with very few employees and has never been involved in the day-to-day operations of CRTs, Finished Products, or any other of its subsidiary businesses.  While the other three Philips entities have engaged in the CRT business at some point during the Relevant Period (March 1, 1995 through November 25, 2007), neither PEIT nor PAIE have a presence in the United States.

previously attended meetings on behalf of [the Philips Defendants]," engaged in conspiratorial

activities post-2001 and, therefore, the Philips Defendants somehow continued to participate in the

conspiracy "through its joint venture." *Id.* ¶ 145 (emphasis added), ¶150.  The DAPs allege no facts

that would purport to explain how the Philips Defendants may have continued to participate in a

conspiracy "through" LPD, a separate legal entity operating a business that the DAPs allege the Philips

Defendants had wholly divested.  Notably, while the DAPs allege that "Defendant Royal Philips

dominated and controlled the finances, policies and affairs" of the other Philips Defendants, they make

no such allegation as to Royal Philips' relationship with the ***LPD entity*** to which the CRT business

was transferred.  *Id.* ¶¶ 47–49.  LPD declared bankruptcy in January 2006, and in March 2007, LPD

announced that "Royal Philips" and LG Electronics would "cede control" of their passive shareholder

interest to "financial institutions and private equity firms."  2013 R&R at 15; Best Buy Compl. ¶ 40.

    The Philips Defendants moved to dismiss the DAPs' claims against them on statute of

limitations grounds.[4]  (Dkt. No. 1319, Aug. 17, 2012).  This motion was fully briefed (Dkt. Nos. 1383,

Sept. 28, 2012 [the DAPs' opposition brief] and 1419, October 26, 2012 [Philips Defendants' reply]),

and argued before Special Master Legge on February 14, 2013.  During the arguments, the parties and

the Special Master repeatedly referenced the timeline below, which illustrates the undisputed facts

alleged in the DAPs' complaints establishing the Philips Defendants' exit from the CRT industry in

June 2001 and the consequent untimeliness of the DAPs' claims.

---

[4] The Philips Defendants also joined in the Defendants' Joint Notice of Motion and Motion to Dismiss
and for Judgment on the Pleadings as to Certain Direct Action Plaintiffs' Claims and Memorandum of
Law in Support ("Joint Mot.").  *See* Dkt. No. 1317 (Aug. 17, 2012).

1

**FIGURE A**

2



3

In re CRT Antitrust Litigation
Philips' Motion to Dismiss DAP Complaints
Exhibit A

**Limitations Periods**

On May 2, 2013, Special Master Legge issued his Report and Recommendation.  (Dkt. No. 1664).  As it pertains to the Philips Defendants' individual motion to dismiss, Special Master Legge recommended dismissal of all of the DAPs' federal and state law claims without leave to amend because the claims are barred by the applicable statute of limitations.[5]  *See* 2013 R&R at 14–15.

_____

[5] LG filed a separate motion to dismiss the DAPs' state and federal causes of action incorporating the Philips Defendants' motion and supporting briefing.  Dkt. No. 1320 (Aug. 21, 2012).  Adoption of the Special Master's recommendation would result in the dismissal of all claims against the Philips and LG Defendants.

**ARGUMENT**

**I.    THE DAPS' FEDERAL LAW CLAIMS AGAINST THE PHILIPS DEFENDANTS ARE TIME BARRED**

The Court should adopt Special Master Legge's recommendation that the DAPs' federal claims be dismissed because they are barred by the applicable statute of limitations.

The DAPs' complaints were all filed between February 18, 2011, and November 14, 2011. *See* 2013 R&R at 14; *see also* Figure A, *supra* p. 6; Figure B *infra* p. 25. All of the DAPs' complaints include a claim under Section 1 of the Sherman Act, which has a four-year statute of limitations. *See* 15 U.S.C. § 15b. "That means that the statute of limitations should have *prima facie* run on [the Sherman Act claims] prior to November 14, 2007." 2013 R&R at 14. Thus, "[e]ven if plaintiffs are given the benefit of tolling based upon the filing of the first direct purchaser plaintiff class action on November 26, 2007, the statute has run on any conduct by [the Philips Defendants] prior to November 26, 2003." *Id.* The DAPs, however, cannot show that the Philips Defendants took any illegal act within this relevant time period because, based on the DAPs' own allegations, the Philips Defendants withdrew from the alleged CRT conspiracy in June 2001. Instead, the DAPs seek to remedy the untimeliness of their claims by asserting tolling based on fraudulent concealment and *American Pipe* class tolling. As explained below, however, these tolling doctrines are inapplicable and thus cannot save the DAPs' untimely claims.

**A.    The Philips Defendants Withdrew From The Alleged Conspiracy In June 2001**

**1.    The Philips' Defendants withdrawal in June 2001 is established by the DAPs' own allegations.**

Withdrawal from a conspiracy can be accomplished by a variety of means, including "disavow[al of] the unlawful goal of the conspiracy, affirmatively act[ing] to defeat the purpose of the conspiracy, or tak[ing] definite, decisive, and *positive steps to show* . . . *the defendant's disassociation from the conspiracy*." *United States v. Lothian*, 976 F.2d 1257, 1261 (1992) (quoting *United States v. Loya*, 807 F.2d 1483, 1493 (9th Cir. 1987) (internal quotation marks and brackets omitted, emphasis added)). The Supreme Court made clear in *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978), that these methods of establishing withdrawal can be satisfied through "[a]ffirmative acts inconsistent

with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *Id.* at 464–65.  Further, the communication of withdrawal to alleged co-conspirators need not be explicit; for example, the "'resumption of competitive behavior . . . [is] sufficient to communicate withdrawal or general abandonment of a price-fixing conspiracy.'"  *See United States v. Nippon Paper Indus. Co.*, 62 F. Supp. 2d 173, 190 (D. Mass. 1999) (quoting *Gypsum*, 438 U.S. at 464–65).  Once a defendant withdraws from an alleged conspiracy, the statute of limitations for any claim arising from that conspiracy begins to run.  *See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 837 (11th Cir. 1999) (citing *United States v. Antar*, 53 F.3d 568, 584 (3d Cir. 1995)).  Thus, accepting the allegations as true, the statute of limitations on the DAPs' Sherman Act claims began running in June 2001 and expired in June 2005, long before any of the DAPs filed their complaints in 2011.

The divestiture of a business also constitutes effective withdrawal from an alleged antitrust conspiracy.  *See, e.g., Morton's Mkt*, 198 F.3d at 839.  In *Morton's Market*, the court found that the defendant withdrew from an alleged milk price-fixing conspiracy by selling his dairy to a third-party. *Id.* at 837–39.  While the court recognized that the defendant's sale was "not a disavowal of the conspiracy so much as a business decision not to produce milk anymore[,]" *id.* at 838, it nonetheless found withdrawal because the defendant had "severed its ties" to the conspiracy and "did nothing more to assist or participate in the price-fixing activities of the other dairies."  *Id.* at 839.  Further, the court noted that the end of the defendant's involvement was "communicated to the other dairies by the media" and thus the withdrawal was effective because the former co-conspirators knew that the defendant "would not lend its services to the conspiracy" any more.  *Id.*; *see also United States v. Lowell*, 649 F.2d 950, 955 (3d Cir. 1981) ("'[A]ffirmative action' sufficient to show withdrawal as a matter of law from the conspiracy . . . may be demonstrated by the retirement of a coconspirator from the business, severance of all ties to the business, and consequent deprivation to the remaining conspirator group of the services that constituted the retiree's contribution to the fraud.").

Based on these standards, it is clear that the Philips Defendants' divestiture of their entire CRT business to LPD in June 2001 constitutes withdrawal as a matter of law.  As in *Morton's Market*, the

1   DAPs' allegations make clear that the Philips Defendants "severed their ties" from the alleged CRT

2   conspiracy by divesting the entirety of their CRT business.  Best Buy Compl. ¶ 46.  The DAPs further

3   concede that, following this divestiture, no representative of the Philips Defendants attended any of the

4   alleged cartel meetings or otherwise participated in the alleged CRT conspiracy and there is no

5   allegation of any knowledge by any of the Philips Defendants.  *Id.* ¶ 145.  Thus, like the defendant in

6   *Morton's Market*, the Philips Defendants "did nothing more to assist or participate" in the alleged CRT

7   conspiracy following the June 2001 divestiture, 198 F.3d at 839, and deprived the remaining alleged

8   conspirators of the "services that constituted the [Philips Defendants' alleged] contribution to the

9   [conspiracy]."  *Lowell*, 649 F.2d at 955.  Critically, after divesting its CRT business, the Philips

10  Defendants resumed "competitive behavior" by becoming *solely* a purchaser of the allegedly price-

11  fixed products.[6]  *See Nippon Paper*, 62 F. Supp. 2d at 190 ("'resumption of competitive behavior . . .

12  [is] sufficient to communicate withdrawal or general abandonment of a price-fixing conspiracy.'")

13  (internal citation omitted).  Indeed, the June 2001 divestment constituted a "disavow[al of] the

14  unlawful goal of the [alleged] conspiracy," as the Philips Defendants would have been harmed by any

15  alleged conspiracy to fix the price of CRTs as they would have been forced to purchase CRTs at

16  inflated prices.  *Lothian*, 976 F.2d at 1261.  Thus, the divestiture constituted an "affirmative act[]

17  inconsistent with the object of the conspiracy" by making the Philips Defendants solely victims of the

18  alleged conspiracy and giving them the incentive to obtain the lowest prices possible on the CRTs they

19  purchased for incorporation into Finished Products.  *Gypsum*, 438 U.S. at 464–65.

20          Further, it cannot be argued that the Philips Defendants' withdrawal was not "communicated in

21  a manner reasonably calculated to reach co-conspirators."  *Id.*  The creation of LPD in June 2001 was

22  open and notorious and, indeed, the DAPs allege that high ranking executives from only *LPD*—not

23  from any Philips entity—participated in at least 100 glass meetings from 2001 to 2006.  Best Buy

24

25  [6] The Philips Defendants' status as solely a customer after June 2001 is especially consequential given
    that the DAPs specifically allege that the conspirators made efforts to hide "the existence and nature of
26  their competitor pricing discussions from non-conspirators (including customers)."  Best Buy Compl.
    ¶ 227.  Thus, based on the DAPs' own allegations, the alleged conspiracy was hidden from the Philips
27  Defendants after June 2001.

28

1    Compl. ¶ 145.  Thus, the divestment of the CRT business effectively communicated to the alleged co-

2    conspirators that "Philips" would "not be lend[ing] its services to the [alleged] conspiracy" any longer.

3    *Morton's Mkt.*, 198 F.3d at 839.

4         Based on the DAPs' own allegations, the withdrawal in this case is even more pronounced than

5    the conduct found to constitute withdrawal in *Morton's Market* and *Lothian*.  In *Morton's Market*,

6    withdrawal was established by the mere sale of the allegedly conspiring dairy business.  198 F.3d at

7    839.  In *Lothian*, withdrawal was found where the defendant resigned from the defrauding business,

8    left the region, and ceased receiving a financial benefit from the fraud.  *See* 976 F.2d at 1263–64.

9    Here, not only did the Philips Defendants exit the CRT business allegedly involved in the conspiracy

10   (as in *Morton's Market* and *Lothian*), they became victims of the alleged conspiracy by becoming

11   solely purchasers of CRTs, an act clearly constituting the "resumption of competitive behavior."

12   *Gypsum*, 438 U.S. at 464.  The Supreme Court has found withdrawal as a matter of law on similar

13   facts.  *Id.* at 464-5.

14            **2.      Any allegation that the Philips Defendants participated in the alleged
                        conspiracy after June 2001 is implausible.**

15         A complaint fails to state plausible grounds for relief, and must be dismissed, where it alleges a

16   conspiracy that makes no economic sense.  The Supreme Court has held unequivocally that "if the

17   factual context renders [a plaintiff's] claim implausible—if the claim is one that simply makes no

18   economic sense—[the plaintiff] must come forward with more persuasive evidence to support their

19   claim than would otherwise be necessary."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

20   U.S. 574, 587 (1986); *see also Brunson Commc'ns, Inc. v. Arbitron*, 239 F. Supp. 2d 550, 563 (E.D.

21   Pa. 2002) (allegations in complaint must make "economic sense" to survive motion to dismiss); *DM

22   Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999) (affirming dismissal of

23   complaint where alleged antitrust conspiracy was "highly implausible"); *Car Carriers v. Ford Motor

24   Co.*, 745 F.2d 1101, 1109–10 (7th Cir. 1984) (affirming dismissal because alleged conspiracy was

25   "inherently implausible").  Similarly, this Court has explained that "[w]hile . . . conscious of its duty to

26   accept plaintiffs' allegations as true at the pleading stage, [the Court] remains convinced that the

27   [amended complaint], like the iterations that preceded it, fails to state a conspiracy claim under the

28

1    Sherman Act" because, among other things, "the scheme described by plaintiffs simply does not make

2    'economic sense.'"  *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755, 2012 WL 70644, at *5

3    (N.D. Cal. Jan. 9, 2012).

4         Here, the DAPs do not come close to meeting their pleading obligations.  The conspiracy

5    alleged by the DAPs sought to artificially inflate the price of CRTs.  As solely a purchaser of CRTs

6    after June 2001, such a conspiracy would increase the price that the Philips Defendants paid for CRTs,

7    thereby decreasing their profit margins on the sale of Finished CRT Products.  In other words, after

8    June 2001, the Philips Defendants were more directly injured by the alleged conspiracy than were the

9    retailer DAPs, as they directly purchased the CRTs—not just Finished CRT Products—and thus bore

10   the full cost of any inflation in the price of CRTs.  Indeed, the Court has already held with respect to a

11   purchaser of CRTs that such a defendant's participation in the alleged conspiracy is "counter-indicated,

12   since [the defendant] was a purchaser of tubes and could be adversely impacted by higher tube prices."

13   Order Adopting Special Master's Report & Recommendation re: Plaintiffs' Motion for Further

14   Discovery from Defendant Samsung Electronics Company (Dkt. No. 1410, Oct. 18, 2012) at 4.  The

15   Philips Defendants involvement in the alleged conspiracy after June 2001 therefore "simply makes no

16   economic sense."  *Matsushita*, 475 U.S. at 587.  The DAPs' allegations that the Philips Defendants

17   "conspired to injure [themselves]" are "inherently implausible" and must be dismissed.  *Car Carriers*,

18   745 F.2d at 1109.

19        **B.    The DAPs' Arguments Against A Finding of Withdrawal Are Unavailing**

20             **1.    This Court's previous ruling, which relied on allegations of conspiracy in
                   "CRT Finished Products" as well as CRTs, is not applicable to the DAPs'
21                 claims.**

22        The DAPs incorrectly assert in their objections that this Court has already determined that

23   whether the Philips Defendants withdrew from the alleged conspiracy in 2001 is an issue of fact that is

24   inappropriate to resolve at the motion to dismiss stage.  *See* DAPs' Objections at 8 (quoting *In re*

25   *Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010)).  The DAPs

26   fail to acknowledge however that the Direct and the Indirect purchaser plaintiffs' ("DPPs" and "IPPs,"

27   respectively) complaints, at the time of this Court's prior ruling, contained allegations of a cartel in

28

1   *CRT Finished Products* that were later withdrawn on Rule 11 grounds.  This case is now in a very

2   different posture that mandates a different outcome.  Indeed, as demonstrated throughout this brief,

3   courts find that withdrawal has occurred as a matter of law on less compelling facts than these.

4          In evaluating the Philips Defendants' motion to dismiss the DPPs' and IPPs' claims, Special

5   Master Legge determined that the Philips Defendants' alleged participation in the conspiracy to fix the

6   prices of ***Finished CRT Products*** after June 2001 foreclosed their withdrawal argument.  *See* Report,

7   Recommendations and Tentative Rulings Regarding Defendants' Motions to Dismiss ("2010 R&R") at

8   25 (Dkt. No. 597, Feb. 5, 2010) (rejecting Philips Defendants' withdrawal argument on basis that

9   "alleged conspiracy also pertains to CRT Products and not just tubes").  The Court agreed "with the

10  Special Master that this issue [of the Philips Defendants' withdrawal in 2001] raises factual questions

11  inappropriate for resolution at the motion-to-dismiss stage.  For example, how can the Court know at

12  this stage of the proceedings whether the withdrawing Defendants maintained financial interests in the

13  entities being sold or transferred."[7]  *In re CRT*, 738 F. Supp. 2d at 1025 (citing 2010 R&R at 25).  At

14  the time they were made, these decisions were supported by the fact that the Philips Defendants

15  remained manufacturers of Finished Products through November 2007—within the relevant statute of

16  limitations.  Thus, the Court and Special Master Legge did not have to reach the issue of whether the

17  June 2001 divestment sufficiently constituted withdrawal from the alleged CRT conspiracy because

18  there were issues of fact as to whether this act sufficiently constituted withdrawal from the alleged

19  *Finished Products* conspiracy.

20         Since the time of the Court's prior ruling, the DPPs and IPPs have all dropped any allegation

21  that Defendants engaged in a Finished Products conspiracy.  *See* Joint Mot. at 4 (citing July 17, 2012

22  Letter from Philip Iovieno to Eva W. Cole & Molly M. Donovan ("Iovieno Ltr.")).  And none of the

23  DAP complaints contain any allegation of a cartel relating to Finished Products.  Thus, the basis for

24  Special Master Legge's previous recommendation that factual issues foreclosed a determination that

25

26  [7] As described below, *see infra* Section I.B.2, the Philips Defendants' status as a passive shareholder of
    LPD after June 2001 should have no effect on their withdrawal from the alleged conspiracy as of June
27  2001.

28

1  the Philips Defendants withdrew from the conspiracy in June 2001 is no longer present.  Indeed,

2  Special Master Legge recognized the Court's prior ruling in his Report and Recommendation on the

3  current motion, but concluded that the Sherman Act claims against the Philips Defendants should be

4  dismissed because, "at the time of [the prior motion to dismiss], *finished products* were still a part of

5  the allegations, and Philips was a manufacturer of *finished products* until 2007."  2013 R&R at 15

6  (emphasis in original).  Given the removal of allegations based on Finished Products, there is no longer

7  a basis to find that the Philips Defendants' continued to be involved in the alleged CRT—as opposed

8  to Finished Products—conspiracy especially in light of the DAPs' own allegations that customers of

9  CRTs (including the Philips Defendants) did not know about the CRT conspiracy.  Best Buy Compl.

10  ¶ 227.

11     The Court should find that the Philips Defendants' withdrawal was effective in June 2001.

12  After June 2001, the DAPs' complaints fail to allege any involvement by the Philips Defendants in the

13  alleged conspiracy.  They do not allege the Philips Defendants' (a) attendance at any alleged CRT

14  conspiracy meeting; (b) knowledge of any alleged illegal activity being conducted after June of 2001;

15  (c) role in the CRT business generally, except as a customer; or (d) exercise of control over the

16  operations of LPD.  Thus, there is no basis to find that the Philips Defendants continued their

17  involvement in the alleged CRT conspiracy.

18        **2.  The Philips Defendants' status as a mere shareholder of LPD after June 2001 cannot defeat withdrawal.**

19

20     The DAPs nakedly assert in their objections to the Report and Recommendation that the

21  creation of LPD cannot constitute withdrawal because the Philips Defendants "continue[d] to benefit

22  financially from the conspiracy" after June 2001.  *See* DAPs' Objections at 9–10 (citing *Lothian*, 976

23  F.2d at 1264).  The DAPs fail to mention however that they *did not allege* any such financial benefit

24  accruing to the Philips Defendants in their complaints and, indeed, they could not accurately allege any

25

26

27

28

1   such benefit because none existed.[8]  The DAPs are precluded from manufacturing an alleged factual

2   dispute where the pleadings are devoid of any such allegations.  *See Session v. PLM Lender Servs.,*

3   *Inc.*, C 10-04942, 2011 WL 6748510, at *5 (N.D. Cal. Dec. 22, 2011) ("Plaintiff's attempt to

4   supplement the facts alleged in her complaint with her opposition brief is not allowed.  A plaintiff

5   cannot avoid dismissal of her complaint by alleging new facts in opposition to a motion to dismiss.");

6
7   *see also Monzon v. S. Wine & Spirits of California*, 834 F. Supp. 2d 934, 940–41 (N.D. Cal. 2011) ("A

8   court may not, however, look beyond the complaint and consider new facts alleged in a plaintiff's

9   opposition to a defendant's motion to dismiss.") (citing *Broam v. Bogan*, 320 F.3d 1023, 1026 (9th Cir.

10  2003))); *Neilson v. Union Bank of Cal.*, N.A., 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003) ("In order

11  to overcome the presumption of separateness afforded to related corporations, [a plaintiff] is required

12  to plead . . . specific facts supporting its claims, not mere conclusory allegations.").

13         Moreover, the DAPs' allegations establish that the Philips Defendants did not and could not

14  have received financial benefits from LPD:

15
16  • The Philips Defendants divested their entire CRT business to LPD in 2001; (Best Buy
       Compl. ¶ 46)

17  • LPD is the "successor entity" of LG's and "Royal Philips'" CRT businesses; (*Id.* ¶ 40)

18  • In 2005, "Royal Philips wrote off the remaining book value of 126 million Euros of its
       investment [in LPD] and said it would not inject further capital into the venture;" (*Id.* ¶ 46)

19
_____

20  [8] The handful of allegations that the DAPs cite to support the argument in their objections that "Philips
    . . . continued to enjoy the financial earnings gained by LPD's participation in the conspiracy" are
21  wholly unavailing.  DAPs' Objections at 9 (citing Best Buy Compl. ¶¶ 46, 98, 100, 141, 145, 150).
    Aside from alleging that LPD was formed as a joint venture with passive stock ownership (¶¶ 46, 100),
22  the remaining allegations relate generically to industry consolidation (¶ 98), wholly unrelated
    allegations regarding Hitachi (¶ 141), and conclusory allegations regarding "Philips'" purported
23  participation in alleged conspiracy meetings through LPD.  (¶¶ 145, 150).  These allegations are
    wholly conclusory and allege no *facts* supporting the allegation that the Philips Defendants "continued
24  to enjoy the financial earnings" of the conspiracy.  These allegations are exactly the type of conclusory
    allegations that are rejected as insufficient under *Twombly* and *Iqbal*.  *See Bell Atl. Corp. v. Twombly*,
25  550 U.S. 544, 555 (2007) (holding that plaintiff must allege "more than labels and conclusions" to
    state a claim—"a formulaic recitation of the elements of a cause of action will not do"); *Ashcroft v.
26  Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads *factual
    content* that allows the court to draw the reasonable inference that the defendant is liable for the
27  misconduct alleged.") (emphasis added).

28

1    • In January 2006, LPD went into bankruptcy and control of the estate was vested in the
2       hands of the trustee and creditors; (2013 R&R at 15)

3    • Publicly filed documents relating to the January 2006 LPD bankruptcy confirm that LPD
        *incurred losses in every year of its existence*, resulting in a "financial shortfall at the end of
4       the 2005 of approximately USD 1.3 billion;" (March 1, 2006 and August 26, 2006 reports
        from LPD bankruptcy trustee) (emphasis added)[9]

5    • LPD "announced in March 2007 that Royal Philips and LGEI would cede control" over
6       their passive shareholder interests and that those "shares would be owned by financial
        institutions and private equity firms." (Best Buy Compl. ¶ 40).

7    Thus, there are simply no allegations in the DAPs' complaints that the Philips Defendants benefitted

8    financially from LPD, let alone the conspiracy.  Moreover, the facts that are alleged and that can be

9    properly judicially noticed establish the absence of any such financial benefits.

10       The DAPs also fail to sustain the heavy burden required to overcome the presumption that each

11   of the Philips Defendants and LPD were all separate corporate entities.  In *United States v. Bestfoods*,

12   524 U.S. 51 (1998), the Supreme Court explained that even where a parent corporation owns 100

13   percent of a subsidiary, "[i]t is a general principle of corporate law deeply ingrained in our economic

14   and legal systems that a parent corporation (so-called *because of control through ownership of another*

15   *corporation's stock*) is not liable for the acts of its subsidiaries." *Id.* at 61 (internal quotation marks

16   omitted) (emphasis added); *see also E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, No. 03-5412,

17   2008 WL 2220396, at *5 (E.D. Cal. May 27, 2008) ("The independence of a subsidiary from the parent

18   corporation is to be presumed"); *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1234 (N.D.

19   Cal. 2004) ("The law allows corporations to organize for the purpose of isolating liability of related

20   corporate entities.").

21       Under the presumption of corporate separateness, a parent corporation is liable for the acts of

22   its affiliate only "where stock ownership has been resorted to, not for the purpose of participating in

23   the affairs of a corporation in the normal and usual manner, but for the purpose of controlling a

24   subsidiary company so that it may be used as a mere agency or instrumentality of the owning

25

26   _____

27   [9] As did the Special Master, the Court can take judicial notice of the facts relating to the LPD
     bankruptcy.  *See* 2013 R&R at 15; *see also supra* p. 27 n.25.

28

1   company." *Bestfoods*, 524 U.S. at 62–63.  The DAPs' allegations fail to overcome this presumption

2   because they allege *no facts* suggesting that LPD was an agent of any of the Philips Defendants.  To

3   establish vicarious liability through an agency theory, the DAPs would have to plead plausible

4   allegations fulfilling the elements of traditional federal common law agency, namely, (1) a

5   manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the

6   undertaking; and (3) that there is an understanding between the parties that the principal is to be in

7   control of the undertaking. *See E. & J. Gallo Winery*, 2008 WL 2220396, at *5; RESTATEMENT (THIRD)

8   OF AGENCY § 1.01 (2012).  The DAPs do not attempt to allege any such facts in their complaints.  It

9   would be a dangerous precedent to hold one corporation liable for the conspiratorial acts of a separate

10  corporate entity based solely on shareholder ownership.

11          Finally, the court in *Lothian*, made clear that there are multiple ways to establish withdrawal.

12  976 F. 2d at 1261.  A continuing ownership or financial interest may be relevant to the ultimate

13  question of whether the defendant took "definite, decisive and positive steps" to disassociate from the

14  conspiracy, but this factor does not preclude a conclusion that the defendant took affirmative action to

15  "disavow the unlawful goal of the conspiracy."  *Id.* at 1261, 1264 (citing *Reisman v. United States*, 409

16  F.2d 789, 793 (9th Cir. 1969)).  Here, the Philips Defendants did take affirmative action to "disavow

17  the unlawful goal of the [alleged] conspiracy," by completely exiting the business of manufacturing

18  and selling CRTs while it remained a purchaser of CRTs and thus a victim of any alleged price-fixing

19  conspiracy.  *Id.* at 1261.  Withdrawal has been determined as a matter of law where, as here, a

20  defendant takes "affirmative acts inconsistent with the object of the conspiracy"—i.e., becoming a

21  customer and therefore victim of the alleged conspiracy.  *See, e.g., Gypsum*, 438 U.S. at 464–65.

22              **3.      The DAPs' remaining arguments that the Philips Defendants did not
                          withdraw in 2001 are conclusory and insufficient as a matter of law.**

23

24          The DAPs assert that the Philips Defendants' divestment of their CRT business in June 2001

25  did not constitute withdrawal because "Philips and LG continued to have contact with the conspirators

26  through the new conspiring entity—LPD—which they themselves created."  DAPs' Objections at 10.

27  However, there are simply no *facts* supporting this assertion that would survive the scrutiny required

28

1   by *Twombly* and *Iqbal*.  *See Twombly*, 550 U.S. at 555 (plaintiff must allege "more than labels and

2   conclusions" to state a claim—"a formulaic recitation of the elements of a cause of action will not

3   do"); *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads *factual content*

4   that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

5   alleged.") (emphasis added).  The allegation that "[a]fter 2001, Philips participated in the CRT

6   conspiracy through [LPD]" is a vague, conclusory statement without factual support.  *See In re Fresh*

7   *and Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1165–66 (D. Idaho 2011) (rejecting

8   allegations that certain defendants participated in conspiracy "through" different defendant); *see also*

9   *Iqbal*, 556 U.S. at 681 (rejecting "bald allegations" that one defendant was "principal architect" of, and

10  another defendant "was 'instrumental to,'" challenged policy as "too chimerical to be maintained").

11      Similarly, the DAPs' argument that "the same employees that attended conspiracy meetings on

12  behalf of Philips and LG continued to attend the meetings on behalf of LPD" is insufficient.  DAPs'

13  Objections at 9 (citing Best Buy Compl. ¶¶ 145–150).  The DAPs do not (and could not) allege,

14  however, that any employee attending an alleged cartel meeting after 2001 was an employee of the

15  Philips Defendants after the Philips Defendants divested their entire CRT business to LPD.  Indeed, the

16  DAPs concede that post-2001, *LPD employees* alone participated in meetings with competitors and

17  merely assert that some of these individuals had *previously* worked for an unspecified Philips entity.

18  Best Buy Compl. ¶ 145.  This distinction is significant given that the Philips Defendants were solely

19  *purchasers* of CRTs after June 2001 and, thus, it was in the alleged conspirators' interests to prevent

20  the Philips Defendants from knowing about alleged agreements to artificially inflate the price the

21  Philips Defendants would have to pay for CRTs that they purchased.

22      **C.    The DAPs' Untimely Claims Against The Philips Defendants Cannot Be Saved By**
           **The Fraudulent Concealment Doctrine**

23

24      The DAPs seek to remedy the untimeliness of their claims by asserting that the doctrine of

25  fraudulent concealment should toll the running of the statute of limitations.  The DAPs' allegations of

26  fraudulent concealment, however, are insufficient to satisfy the requirements of Federal Rule of Civil

27  Procedure 9(b).  Further, any alleged concealment would only toll the statute of limitations until

28  November 8, 2007, when the DAPs were clearly placed on notice of their potential claims.  As this

1    date is more than four years prior to the filing of most of the DAP complaints on November 14, 2011,

2    the DAPs' claims are time-barred even if they had adequately alleged fraudulent concealment.

3              **1.    The DAPs have insufficiently alleged the Philips Defendants' involvement
                       in any fraudulent concealment.**

4            Fraudulent concealment must be sufficiently alleged in the DAPs' complaints in order to toll

5    the limitations period.  *See, e.g.*, *Allen v. United Fin. Mortg. Corp.*, No. 09-2507 SC, 2010 WL

6    1135787, at *1 (N.D. Cal. Mar. 22, 2010)  ("'[P]laintiffs seeking to toll the statute of limitations on

7    various grounds must have included the allegation in their pleadings.'" (quoting *Wasco Prods., Inc. v.*

8    *Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006), and citing *Pace v. DiGuglielmo*, 544 U.S.

9    408, 418–19 (2006)); *see also Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045–46

10   (9th Cir. 2011) (ruling that plaintiffs failed to demonstrate basis for equitable tolling or fraudulent

11   concealment).  Here, the issue is not only whether fraudulent concealment was adequately alleged

12   generally, but also whether the generalized allegations of fraudulent concealment made by the DAPs

13   are plausible *as to the Philips Defendants* in light of the DAPs' allegations that: (a) the Philips

14   Defendants withdrew from the alleged cartel in 2001; (b) the Philips Defendants were purchasers of

15   CRTs from 2001 through 2007; and (c) the conspirators "concealed the existence and nature of their

16   competitor pricing discussions from non-conspirators *including customers*."  Best Buy Compl. ¶ 227

17   (parenthesis omitted) (emphasis added).  Special Master Legge analyzed the DAPs' allegations of

18   fraudulent concealment and correctly determined that they were insufficient and implausible.  2013

19   R&R at 15.  The Court should adopt Special Master Legge's recommendation on this issue.

20           Fraudulent concealment is considered the same as any other fraud claim and is subject to the

21   heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  As such,

22   plaintiffs alleging fraudulent concealment of an antitrust conspiracy must plead facts with particularity,

23   going beyond the general "plausibility" standard associated with pleading in general.[10]  *Compare*

24

25   _____

26   [10] In the Ninth Circuit, the particularized pleading requirements of Rule 9(b) apply equally to federal
     and state law claims.  *See 389 Orange St. Partners v. Arnold*, 179 F.3d 656, 662–63 (9th Cir. 1999)

27   (applying Connecticut elements for fraudulent concealment where plaintiff sought to toll statute of
     limitations but requiring plaintiff to meet Rule 9(b) pleading standards); *Vess v. Ciba-Geiby Corp.*

28                                                                                      (Continued...)

1   *Twombly*, 550 U.S. at 560–61 (establishing "plausibility" standard); *with Guerrero v. Gates*, 442 F.3d

2   697, 706–07 (9th Cir. 2006) (to invoke fraudulent concealment, "[t]he plaintiff must . . . 'plead with

3   particularity the facts which give rise to the claim of fraudulent concealment'"); *and Global Servs. v.*

4   *IKON Office Solutions*, No. C 10-05974, 2011 WL 6182425, at **2–5 (N.D. Cal. Dec. 13, 2011)

5   (finding allegations, including allegations of "self-concealing" wrongful conduct, insufficient to toll

6   statute of limitations based on fraudulent concealment).

7       As explained more fully in the Defendants' Joint Motion and Reply and Defendants' Joint

8   Objections to the Report and Recommendations Regarding Defendants' Motions to Dismiss Direct

9   Action Complaints ("the Joint Objections") (Dkt. No. 1706, Aug. 17, 2012), the DAPs' generic

10   pleading of fraudulent concealment lacks sufficient particularity to satisfy the requirements under Rule

11   9(b) against *any* of the defendants.  Joint Mot. at 12–13; Defendants' Joint Reply Mem. in Supp. of

12   Mot. to Dismiss and for Judgment on the Pleadings as to Certain Direct Action Plaintiffs' Claims at 6–

13   7 (Dkt. No. 1422, Oct. 26, 2012); Joint Objections at 19–21.

14       Beyond these general deficiencies, the DAPs' allegations with respect to the Philips Defendants

15   are particularly lacking.  Courts consistently hold that the particularized pleading requirement of Rule

16   9(b) mandate that fraudulent concealment be pled not generally—but as to *each individual defendant*.

17   *See Metz v. Unizan Bank*, 416 F. Supp. 2d 568, 579 (N.D. Ohio 2006) ("The Plaintiff must

18   affirmatively plead facts supporting a claim for fraudulent concealment against *each specific*

19   *Defendant* who allegedly participated in the concealment in order to state a claim against that

20   Defendant which would survive an otherwise expired statute of limitations.") (emphasis added);

21   *O'Brien v. National Property Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989)

22   ("[a]llegations that *other* defendants acted to deceive plaintiffs from filing suit do not plead fraudulent

23

24   (...Continued)

25   *USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (holding that all allegations sounding in fraud must be pled
    with particularity and clarifying that "while a federal court will examine state law to determine

26   whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b)
    requirement that the circumstances of fraud must be stated with particularity is a federally imposed

27   rule") (internal citations omitted).  Thus, this analysis applies equally to the DAPs' state law claims.

28

1  concealment against *all* defendants.  The doctrine of fraudulent concealment tolls the statute of

2  limitations *only* as to those defendants who committed the concealment.") (internal quotations omitted)

3  (emphasis in original); *Moreco Energy, Inc. v. Penberthy-Houdaille, Inc.*, No. 86 C 20153, 1988 WL

4  124928, at *4 (N.D. Ill. Oct. 21, 1988) ("[W]hen a complaint contains allegations of fraudulent

5  concealment, it must reasonably notify each defendant of the part he plays in the fraudulent scheme.").

6       In addition to failing to meet Rule 9(b)'s particularity requirements, the DAPs' complaints

7  necessarily ***preclude*** the conclusion that the Philips Defendants fraudulently concealed any conspiracy

8  conduct after June 2001.  *See* Best Buy Compl. ¶ 46.  Following their June 2001 divestiture, the Philips

9  Defendants had neither the incentive nor the ability to conceal an alleged conspiracy in CRTs.  Indeed,

10  the DAPs make no allegations that any Philips entity or employee knew of or engaged in any illegal

11  conduct with respect to the alleged CRT conspiracy following that date, let alone committed

12  independent fraudulent acts of actual concealment.[11]  *See* DAPs' Objections at 4–5.  Instead, they

13  point to the actions of individuals at "glass meetings."  *See id.*  But after June 2001, the Philips

14  Defendants are not alleged to have attended these meetings and, as explained above, the allegation that

15  the Philips Defendants continued to participate in these meetings "through" LPD has no factual basis.

16  *See supra* pp. 16–17.

17       In their objections, the DAPs assert that the Court previously determined that the DPPs and

18  IPPs allegations of fraudulent concealment were sufficient to withstand a motion to dismiss and that

19

20  _____

21  [11] The only allegation related to the Philips Defendants after 2001 simply illustrates the deficiencies in
    the DAPs' pleadings.  The DAPs allege that: "[W]hen several CRT manufacturers, including

22  Defendant Philips . . . increased the price of CRTs in 2004, the price hike was blamed on a shortage of
    glass shells use [sic] for manufacturing CRT monitors."  Best Buy Compl. ¶ 232 (quoted at DAPs'
    Objections at 4 and cited at 13 and 14).  As discussed above, however, the Philips Defendants were no

23  longer manufacturing CRTs in 2004 and thus could not have increased their price.  The DAPs continue
    by alleging that: "In justifying this price increase, a Deputy General Manager for an LG Electronics

24  distributor in India stated, '[t]his shortage [of glass shells] is a global phenomena and every company
    has to increase the prices of CRT monitors in due course of time.'"  *Ibid* (emphasis added).  But this

25  statement—which was not made by any representative of the Philips Defendants (and indeed, on its
    face is a "distributor" for, and not an employee of even an LG Defendant)—relates to Finished

26  Products (CRT monitors), not CRTs themselves.  *Ibid.*  Given that the DAPs have dropped any
    allegation of a conspiracy in Finished Products, this allegation cannot support an allegation of

27  fraudulent concealment in *CRTs*.

28

1   this decision should equally apply to the DAPs' allegations.  *See* DAPs' Objections at 11–12 (quoting

2   and citing *In re CRT*, 738 F. Supp. 2d at 1024).  This argument, however, ignores the fact that—based

3   on the DAPs' allegations—it is now firmly established that the Philips Defendants withdrew from the

4   alleged conspiracy in 2001 and the DAPs fail to allege *the Philips Defendants'* continued involvement

5   in the conspiracy or any fraudulent concealment after that point.  While the DAPs assert that this

6   withdrawal is irrelevant for purposes of fraudulent concealment, their authorities are inapposite.

7   Unlike the withdrawing defendant in *In re Rubber Chemicals Antitrust Litigation*, 504 F. Supp. 2d 777

8   (N.D. Cal. 2007), the Philips Defendants here were directly harmed by any fraudulent concealment that

9   occurred after their divestiture of their CRT business in 2001.  And indeed, as alleged in the DAPs'

10  complaints, the alleged conspirators had every incentive to conceal their alleged price-fixing from CRT

11  customers like the Philips Defendants.  *See* Best Buy Compl. ¶ 227 ("... concealing the existence and

12  nature of the[] competitor pricing discussions from non-conspirator (including *customers*)"); *see also*

13  ¶ 225 ("... pretextual statements to *customers*"); ¶ 229 ("... pretextual reasons for price increases and

14  output reductions to their *customers*.") (emphases added).  In light of the DAPs' specific and detailed

15  allegations with regard to the Philips Defendants, it is implausible that the Philips Defendants could

16  have engaged in the type of generic acts of fraudulent concealment alleged to have occurred past the

17  June 2001 divestiture.

18              **2.      Any alleged fraudulent concealment can only toll the statute of limitations**
                **        until November 8, 2007, when the DAPs received constructive notice of**
19              **        their potential claims.**

20          In addition, the Court should reject the DAPs' assertion of fraudulent concealment because it is

21  uncontroverted that the DAPs were on inquiry notice of their potential claims no later than November

22  8, 2007, more than four years before the filing of most of their claims.

23          Fraudulent concealment only applies if a plaintiff establishes that a defendant "actively misled

24  him, [and] that [the plaintiff] had *neither actual nor constructive knowledge* of the facts constituting

25  his claim for relief despite his diligence in trying to discover the pertinent facts."  *Rutledge v. Boston*

26  *Woven Hose & Rubber Co.*, 576 F.2d 248, 249–50 (9th Cir. 1978) (emphasis added).  "It is enough that

27  the plaintiff 'should have been alerted to facts that, following duly diligent inquiry, could have advised

28

1    it of its claim.'"  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1062 (9th Cir. 2012) (quoting

2    *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988)).  Thus, fraudulent

3    tolling ceases, and the statute of limitations begins to run, when the DAPs "should have been alerted to

4    facts" that would cause a reasonable person to inquire, and if that inquiry would have "advised [them]

5    of [their] claim" within the limitations period.  *Id.*

6         The publicity surrounding the raids of certain Defendants on November 8, 2007, in connection

7    with a worldwide antitrust investigation of CRT pricing clearly imposed on the DAPs, at a bare

8    minimum, a duty to inquire.[12]  *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 172 (4th Cir.

9    2007) (A plaintiff is placed on inquiry notice of her claims "when enough red flags had flown that a

10   reasonably diligent person would have investigated and acted.").  Such an inquiry would have provided

11   them information to file their complaints within the relevant limitations period as more than thirty

12   complaints were filed within six months of November 8, 2007, including one within less than a week.

13   Many of these complaints specifically allege that these antitrust investigations triggered the plaintiffs'

14   notice of their potential claims.[13]  In fact, some ***DAPs*** even point to the November 2007 government

15   investigations as triggering their suspicions.[14]

16        Therefore, as a matter of law, even if the DAPs properly alleged fraudulent concealment, any

17   such concealment ceased to toll the statute of limitations by November 8, 2007, and the DAPs'

18   Sherman Act claims accrued no later than that date.  *See GO Computer*, 508 F.3d at 179 ("[I]t bears

19   emphasis that the date of inquiry notice is not a filing deadline.  It is only the date on which a cause of

20   action accrues and the four year period allotted [ . . . ] for a plaintiff to investigate begins."); *see also*

21   *Hexcel*, 681 F.3d at 1060 ("Full knowledge often awaits discovery, and the very notion of 'inquiry

22

23   _____

24   [12] The Court can take judicial notice of the publicity surrounding these raids.  *See* Request for Judicial
     Notice (Dkt. No. 1318, Aug. 17, 2012).

25   [13] *See, e.g.*, Complaint ¶ 94, *Orion Home Systems, LLC v. Chunghwa Picture Tubes, Ltd., et al.*,  Case
     No. 3:08-cv-00178-SC (N.D. Cal.) (Dkt. No. 1, Jan. 1, 2008).

26   [14] *See, e.g.*, Complaint ¶ 216, *CompuCom Systems, Inc., v. Hitachi, Ltd., et al.*, Case No. 11-cv-06396
27   (N.D. Cal.) (Dkt. No. 1, Nov. 14, 2011); Complaint ¶ 160, *Costco Wholesale Corp. v. Hitachi, Ltd., et
     al.*, Case No. 11-cv-06397 (N.D. Cal.) (Dkt. No. 1,  Nov. 14, 2011).

28

1   notice' implies something less than that" (quoting *GO Computer*, 508 F.3d at 178)).  Because the

2   undisputed fact that other plaintiffs were able to file suit establishes that "a reasonably diligent person

3   would have investigated and acted" beginning on November 8, 2007, the fraudulent concealment

4   doctrine cannot toll the DAPs' Sherman Act claims past that date.  *See GO Computer*, 508 F.3d at 172.

5   Almost all of the DAPs did not file their claims until November 14, 2011, four years and six days later

6   (the exception being Electrograph and Polaroid).  Their Sherman Act claims are therefore time barred.

7       **D.   *American Pipe* Tolling Is Inapplicable**

8       While the filing of a federal class action can, in certain circumstances, toll the federal statute of

9   limitations on the individual claims of putative class members pending a decision on class certification,

10  those circumstances are not present here.  *See Crown Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345,

11  353–54 (1983); *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974).  The DAPs assert that

12  "[t]here is no real dispute that *American Pipe* serves to toll [the DAPs'] federal claims as of November

13  26, 2007" and thus the DAPs' "federal claims extend to November 26, 2003—four years prior to the

14  date of the first direct purchaser plaintiff class complaint."  DAPs' Objections at 14.  What the DAPs

15  fail to recognize, however, is that *American Pipe* is wholly irrelevant to their federal claims.  Because

16  the Philips Defendants effectively withdrew from the alleged conspiracy in June 2001, as discussed

17  above, the DAPs' claims against the Philips Defendants accrued in June 2001 and became time-barred

18  in June 2005.  Whether *American Pipe* would apply to the DAPs' claims in theory, it clearly does not

19  apply here where the statute of limitations had already run more than two years before the filing of the

20  first class action complaint.  *American Pipe* tolling cannot serve to resurrect a claim after the statute of

21  limitations has expired.  *See Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 441 (5th Cir. 2009)

22  ("*American Pipe* does not resurrect expired claims and is inapplicable.").[15]

23

24

_____

25  [15] As explained in the following paragraph in the text, *American Pipe* does not apply to the DAPs
    because they were not direct purchasers of CRTs.  If the Court agrees with this argument then all of the
26  DAPs' federal claims (except those asserted by Electrograph) would also be untimely even if the Court
    found that the Philips Defendants withdrew from the alleged conspiracy in 2006 or 2007, as further
27  explained below.  *See infra* Section II.A.

28

1    Further, the DAPs are not entitled to tolling under *American Pipe*, which only tolls the statute

2    of limitations for "all asserted members of the class who would have been parties had the suit been

3    permitted to continue as a class action."  414 U.S. at 554.  The DAPs assert that *American Pipe* tolling

4    commenced with the filing of the "first direct purchaser plaintiff class complaint."[16]  DAPs'

5    Objections at 14.  As Special Master Legge found, however, most of the DAPs are retailers of products

6    incorporating CRTs.  2013 R&R at 3.  Thus, these DAPs "are 'indirect' purchasers of the CRTs, and

7    are not 'direct' purchasers for purposes of standing under the federal antitrust laws."[17]  *Id.* at 4.  The

8    DAPs therefore were not properly class members of a *direct* purchaser class of plaintiffs and *American*

9    *Pipe* cannot toll their claims during the pendency of a *direct* purchaser class action.[18]  *Am. Pipe*, 414

10   U.S. at 554.[19]

11

12

---

13   [16] The DAPs do not allege that the filing of the IPPs class action tolled the statute of limitations for
     their claims.  *See* DAPs' Objections at 14.  Indeed, the DAPs could not invoke *American Pipe* tolling

14   based on this filing because the DAPs are clearly not members of the putative class defined in the
     IPPs' complaints.  *See, e.g.*, Indirect Purchaser Plaintiffs' Consolidated Amended Complaint ¶ 240

15   (dkt. no. 437, Mar. 16, 2009) (limiting IPP class to persons or entities who purchased CRT Products
     "for their own use and not for resale.").  As Special Master Legge noted, most of the DAPs are retailers

16   and thus were clearly purchasing CRT Products for resale and are therefore excluded from the IPPs
     class.  *See* 2013 R&R at 3.

17   [17] The Court has similarly held that purchasers of Finished Products—like the DAPs here—were
     indirect purchasers of CRTs as opposed to direct purchasers.  *In re CRT*, 2012 WL 5987861, at *3

18   (N.D. Cal. Nov. 29, 2012).  The Court found that these indirect purchasers of CRTs had standing only
     if the owned or controlled exception to *Illinois Brick* applied to a particular purchase.  *See id.* at *8.

19   [18] The Philips Defendants recognize that the DAPs may have been considered members of the
     proposed class under the initial definition of the DPPs class.  *See* Class Action Complaint ¶¶ 37–38.

20   This class definition, however, was based on allegations of conspiracy "regarding both CRTs and CRT
     Products."  *In re CRT*, 738 F. Supp. 2d at 1016.  Since that time, the DPPs have withdrawn any

21   allegation of a "conspiracy encompassing Finished Products" (after Special Master Legge
     recommended that the Court grant the Defendants' Rule 11 motion) because of the lack of any

22   evidence of such a conspiracy.  *In re CRT*, 2012 WL 5987861, at *1.  Thus, there was not a good faith
     basis to ever assert a class based on the purchase of finished products that would have tolled the statute

23   of limitations as to the DAPs.

24   [19] The DAPs also should not be able to take advantage of *American Pipe* tolling because they filed
     individual lawsuits prior to the disposition of the certification of the DPPs class, thus defeating the

25   economy and efficiency intended by *American Pipe*.  *See Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,
     413 F.3d 553, 569 (6th Cir. 2005); *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 739 (1st Cir. 1983).  The

26   Philips Defendants, however, recognize that the Ninth Circuit has currently held to the contrary, *see In*
     *re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008), and thus only raise this

27   issue in order to preserve it.

28

## II.        THE DAPS' STATE LAW CLAIMS ARE ALSO TIME BARRED

The DAPs assert various state law claims under the antitrust and consumer protection statutes of seventeen different states that Special Master Legge correctly determined were also barred by the applicable statutes of limitations.  *See* 2013 R&R at 15.

The limitations periods for the DAPs' state law claims are either three or four years for all but one DAP claim.  That lone claim in the Target Complaint under the Wisconsin Antitrust Act carries a six year limitations period.  *See* Wis. Stat. Ann. § 133.18(2).  Below is a chart of the relevant cut-off dates for the DAPs' claims to be timely, based on the applicable limitations period and the filing date of each DAP complaint.  As only one DAP complaint was filed before November 2011, the vast majority of the DAPs' claims have a cut-off date that is no earlier than November 2007.

### FIGURE B

| Complaint | Filed | Applicable Statute of Limitations | Earliest Cut-Off Date |
|---|---|---|---|
| Target (Wisconsin Claim) | November 14, 2011 | 6 years – Wisconsin[20] | November 14, 2005 |
| Electrograph | February 18, 2011 | 4 years - California, New York[21] | February 18, 2007 |
| Polaroid | November 4, 2011 | 4 years - California, Minnesota[22] | November 4, 2007 |
| Best Buy, Circuit City, CompuCom, Costco, Interbond, Office Depot, P.C. Richard & Son, Target (excluding Wisconsin claim), and Tweeter | November 14, 2011 | 4 years - Arizona, California, Florida, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, and Washington[23]  3 years - Kansas and Mississippi[24] | November 14, 2007 |

[20] Wis. Stat. Ann. § 133.18(2).

[21] Cal. Bus. & Prof. Code § 16750.1; Cal. Bus. & Prof. Code § 17208; and N.Y. Gen. Bus. Law § 340(5).

[22] Cal. Bus. & Prof. Code § 16750.1; Cal. Bus. & Prof. Code § 17208; and Minn. Stat. Ann. § 325D.64.

[23] Ariz. Rev. Stat. § 44-1410(B); Cal. Bus. & Prof. Code § 16750.1; Cal. Bus. & Prof. Code § 17208; Fla. Stat. § 542.26(1); Fla. Stat. Ann. § 95.11(3)(f); 740 Ill. Comp. Stat. §10/7(2); Iowa Code Ann. § 553.16(1); Mass. Gen. Laws Ann. ch. 93 § 13; Mich. Comp. Laws Ann. §445.781(1); Minn. Stat. Ann. § 325D.64; Neb. Rev. Stat. § 59-1612; Nev. Rev. Stat. § 598A.220(1); N.M. Stat. Ann. § 57-1-12; N.Y. Gen. Bus. Law § 340(5); and N.C. Gen. Stat. § 75-16.2; R.C.W. §19.86.120.

[24] Kan. Stat. Ann. § 60-512(2); Miss. Code Ann. § 15-1-49.

All of these claims should be dismissed as untimely for the same reason as the DAPs' Sherman Act claims.  (In this regard, Figure A, *supra* is also instructive).  The Philips Defendants withdrew from the alleged conspiracy in 2001 and the DAPs' allegations of fraudulent concealment are insufficient to delay the accrual of their claims after this date.  As such, the statute of limitations on all of these claims expired, at the latest, in 2005 (and the Wisconsin claim in June 2007), long before any of the DAPs' complaints were filed in 2011.  Further, even if it had been sufficiently alleged, fraudulent concealment cannot save the DAPs' state law claims because the DAPs had constructive notice of their claims no later than November 8, 2007, more than four years before most of the DAPs filed their complaints.

In addition, even if the Court determined that the Philips Defendants did not withdraw in June 2001, the DAP complaints concede that the Philips Defendants withdrew from the alleged conspiracy no later than March 2007—more than four years prior to the filing of most of the DAPs' complaints.  Further, virtually every court to have considered the issue has held that cross-jurisdictional tolling would not apply to the state law claims alleged here.

### A.    The Philips Defendants Clearly Withdrew From The Alleged CRT Conspiracy Prior To The Applicable State Law Limitations Periods.

The DAPs' complaints make clear that the Philips Defendants withdrew from the alleged conspiracy in June 2001.  Even if the Court finds that it cannot determine as a matter of law that the Philips Defendants withdrew in 2001 with its exit from the CRT business, the DAPs' complaints and the public record make clear that the Philips Defendants withdrew in 2006 or, at latest, March 2007—well beyond the statutes of limitations for virtually all of the DAPs' state law claims.

Specifically, in January 2006, LPD declared bankruptcy.  LPD's bankruptcy filing is a matter of public record and thus the Philips Defendants request that the Court, like Special Master Legge, take judicial notice of this fact.  *See* Request for Judicial Notice (Dkt. No. 1421, Oct. 26, 2012).[25]  The

---

[25] The Court may consider materials that are public records or otherwise appropriate for taking judicial notice "at any time in the proceeding," without converting a Rule 12(b)(6) or 12(c) motion into a Rule 56 motion.  *See* Fed. R. Evid. 201(f); *see also Russell v. National Collegiate Athletic Ass'n*, No. C 11–4938, 2012 WL 1747496, at *4 n.1 (N.D. Cal. May 16, 2012) (granting request for judicial notice that

(Continued...)

1    public documents filed with this request—the March 1, 2006 and August 26, 2006 reports from LPD's

2    bankruptcy trustee—confirm that LPD declared bankruptcy in January 2006, after incurring losses in

3    every year of its existence that resulted in a "financial shortfall at the end of 2005 of approximately

4    USD 1.3 billion."  March 1, 2006 Report, at 5, 16, 22, 33; August 26, 2006 Report, at 6.  When the

5    bankruptcy filing occurred, any alleged remaining control over LPD became vested solely in the hands

6    of LPD's bankruptcy trustee and creditors.  August 26, 2006 Report, at 17 (LPD management

7    "report[ed] directly to the trustee and to the Steering Committee of the Bank Syndicate"); *see also In*

8    *the Matter of O.P.M. Leasing Servs.*, 13 B.R. 54, 58 (Bankr. S.D.N.Y. 1981) ("[A]s far as a

9    reorganizing corporate debtor is concerned, the trustee possesses and controls its assets, conducts its

10   affairs, and subordinate management, if any, serves at the trustee's pleasure.").  Based on this record,

11   Special Master Legge correctly found in his Report and Recommendation that "it is established by

12   judicial notice that LPD went publicly into bankruptcy in January 2006.  That effectively demonstrates

13   the absence of any participation [by the Philips Defendants] in any manufacturing enterprise or

14   conspiracy at least after that date."  2013 R&R at 15.

15          The DAPs allege further that LPD announced in March 2007 that the Philips and LG

16   defendants "ceded control" of their passive ownership of stock in LPD to "financial institutions and

17   private equity firms."  Best Buy Compl. ¶ 40.  Again, based on this allegation, there can be no doubt

18   that the Philips Defendants as of March 2007 could do "nothing more to assist or participate in" the

19   alleged CRT conspiracy.  *Morton's Market*, 198 F.3d at 839.  Indeed, in their objections, the DAPs

20   concede that the Philips Defendants' alleged relationship with the CRT conspiracy "continued at least

21   until January 2006 when LPD declared bankruptcy, and Plaintiffs allege it continued until March 2007

22   when LPD went into receivership."  DAPs' Objections at 10.

23   _____

24   (...Continued)

25   was asserted in reply to motion to dismiss).  Specifically, the Court can augment the facts and
     inferences from the body of the complaint with "data points gleaned from documents incorporated by
     reference into the complaint, matters of public record, and facts susceptible to judicial notice."  *Haley*

26   *v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011); *see also Coto Settlement v. Eisenberg*, 593 F.3d

27   1031, 1038 (9th Cir. 2010) (a court "may consider materials incorporated into the complaint or matters
     of public record" on a motion to dismiss).

28

As shown in Figures A & B, even using this later March 2007 withdrawal date results in the vast majority of the DAPs' state law claims being time barred.  As only the Electrograph Complaint and the Target Complaint's Wisconsin Antitrust Act claim involve a limitations period that runs prior to March 2007, the remaining DAP claims, which have November 2007 cut-off dates, are not timely.

Further, contrary to the DAPs' insinuation, *see* DAPs' Objections at 6, the Court's prior order denying the Philips Defendants' motion to dismiss the class actions based on withdrawal does not foreclose this conclusion.  *See In re CRT*, 738 F. Supp. 2d at 1025.  In the briefing on that motion— and because of the presence of Finished Product conspiracy allegations—the Philips Defendants did not submit the alternative argument that a March 2007 withdrawal date may be determined on the face of the pleadings.[26]  Thus, the Court never considered the issue of withdrawal in 2006 or 2007.  *Id.* Further, the Court's question as to how it could "know at this stage of the proceedings whether the withdrawing Defendants maintained financial interests in the entities being sold or transferred," in 2001, *id.*, is not an issue for these later withdrawal dates.  Instead, it is clear from the face of the DAPs' complaints and the public record that after January 2006 and, no later than March 2007, the Philips Defendants did not "maintain[] financial interests" in LPD because, as the DAPs concede, the Philips Defendants relinquished their passive shareholder interest to "financial institutions and private equity firms."  Best Buy Compl. ¶ 40.

Nor can the Philips Defendants' motion to dismiss the DAPs' state law claims be defeated by the DAPs' vague and conclusory allegations that "Philips and LG never effectively withdrew from the conspiracy."  DAPs' Objections at 10 (citing Best Buy Compl. ¶¶ 94, 96, 100, 113).  This is a legal conclusion without any supporting factual allegations of the exact type that *Twombly* and *Iqbal* reject. *See Twombly*, 550 U.S. at 555 ("a plaintiffs' obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the

---

[26] The March 2007 withdrawal date was not relevant to the Philips Defendants' motion to dismiss the IPPs and DPPs class complaints, since both classes had filed their complaints in November 2007.

1   allegations contained in a complaint is inapplicable to legal conclusions.").  There is no factual

2   allegation that the Philips Defendants had any—or even could have had any—involvement in the

3   alleged conspiracy after March 2007.  The DAPs' complaints establish that, after March 2007 (at the

4   latest), there are no allegations that the Philips Defendants had any control over, or other involvement

5   with, LPD.  Indeed, it is implausible that the Philips Defendants were involved after March 2007 when

6   the DAPs affirmatively allege that the Philips Defendants were not even shareholders of LPD and the

7   Philips Defendants' relationship with the conspiracy ended at that point.  *See* DAPs' Objections at 10

8   ("Plaintiffs allege [that Philips' relationship with the conspiracy] continued until March 2007 when

9   LPD went into receivership.").

10          **B.      Fraudulent Concealment Does Not Extend The Statute Of Limitations**

11          As with their Sherman Act claims, the DAPs seek to extend the statute of limitations for their

12   untimely state law claims based on the Philips Defendants' alleged fraudulent concealment.  *See*

13   DAPs' Objections at 11–14.  As with those claims, the Court should reject the DAPs' assertion of

14   fraudulent concealment because the DAPs' allegations are insufficient under Federal Rule of Civil

15   Procedure 9(b) and because the DAPs received constructive notice of their potential claims more than

16   four years prior to the filing of most of the DAP complaints.  Thus, most of the DAPs' claims (with the

17   exception of Electrograph and Polaroid's claims and Target's Wisconsin Antitrust Act claim) are

18   untimely even if fraudulent concealment applied.  *See supra* Section I.C.  In addition, even if the Court

19   determined that the statute of limitations did not commence in 2001, the DAPs' allegations

20   demonstrate that it would have started to run, at the latest, in January 2006 or March 2007.  It is

21   undisputed that LPD declared bankruptcy in January 2006, after which time *all aspects* of LPD were in

22   the hands of the bankruptcy trustee.  2013 R&R at 15.  And the DAPs allege that "LP Displays

23   announced in March 2007 that Royal Philips and LGEI would *cede control over the company* and the

24   shares would be owned by financial institutions and private equity firms."  Best Buy Compl. ¶ 40

25

26

27

28

1   (emphasis added).  Thus, at latest, the Philips Defendants withdrew from the alleged conspiracy—and

2   would have had no incentive or ability to conceal any purported unlawful conduct—as of January 2006

3   or March 2007.  As the DAPs filed their claims more than four years later, fraudulent concealment can

4   not save any claims that are subject to three or four year limitations periods.[27]

5           **C.      Cross-Jurisdictional Tolling Does Not Save DAPs' Untimely State Law Claims**

6           The DAPs' argument that their "state law claims were also tolled by the filing of the [DPPs]

7   class complaint, pursuant to cross-jurisdictional tolling," DAPs' Objections at 15, is wrong as a matter

8   of law.  The DAPs implicitly acknowledge that cross-jurisdictional tolling is not applicable to the

9   majority of their state law claims.  While generally asserting that cross-jurisdictional tolling applies to

10  all of their state law claims under the laws of seventeen different states, they then only argue that

11  cross-jurisdictional tolling applies to eight of their state law claims.[28]  DAPs' Objections at 15–16.

12  The DAPs make no attempt to argue that the doctrine can actually save their untimely claims under

13  Arizona, Illinois, Iowa, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, or Wisconsin

14  law, and thus these claims should be dismissed.  *See Silva v. U.S. Bancorp*, 5:10-cv-01854-JHN, 2011

15  WL 7096576, at *3 (C.D. Cal. Oct. 6, 2011) ("[T]he Court finds that Plaintiff concedes his

16  recordkeeping claim should be dismissed by failing to address Defendants' arguments in his

17  Opposition." (citing *Tatum v. Schwartz*, No. Civ. S-06-01440, 2007 WL 419463, at *3 (E.D. Cal. Feb.

18  5, 2007) (holding plaintiff "tacitly concede[d] this claim by failing to address defendants' argument in

19  her opposition.  Accordingly, defendants' motion to dismiss the fourth claim is GRANTED."))).[29]

20          In an effort to save the remaining eight state law claims, the DAPs rely on *In re Linerboard

21  Antitrust Litig.*, 223 F.R.D. 335 (E.D. Pa. 2004).  In so doing, the DAPs ignore a growing list of federal

22

23  _____

24  [27] The one exception would be the Electrograph Complaint, if the Court found that the Philips
    Defendants' withdrawal was not effective until March 2007.

25  [28] These are: California, Florida, Kansas, Massachusetts, Michigan, Minnesota, New York, and
    Washington law.  *See* DAPs' Objections at 16.

26  [29] DAPs also concede that the IPP complaint does not toll their state law claims.  *See* DAPs'
27  Objections at 17 (alleging that only the DPP complaint put Defendants on notice of the DAPs' much
    later-filed state law claims).

28

1  courts that refuse to apply cross-jurisdictional tolling,[30] guidance from this Court,[31] and controlling

2  Ninth Circuit precedent that would reject the use of cross-jurisdictional tolling for seven of these state

3  law claims.[32]  These authorities—as well as the authorities below—were all cited in the Defendants'

4  reply in support of their joint motion to dismiss.  *See* Dkt. No. 1422 at 16–18.  The DAPs fail to

5  address any of these cases.

6      In *Clemens v. DaimlerChrysler Corp.*, the Ninth Circuit held that "[t]he rule of *American Pipe*

7  . . . does not mandate cross-jurisdictional tolling as a matter of state procedure" and, thus, the Ninth

8  Circuit would not "import [cross-jurisdictional] doctrine into state law where it did not previously

9  exist."  530 F.3d 852, 860 (9th Cir. 2008).  The DAPs do not provide any authority that California,[33]

10

---

11  [30] *See, e.g.*, *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d. 1067, 1081–82 (D. Kan. 2009) (rejecting

12  *Linerboard* factors and holding that "state law alone must govern the application of a tolling principle to a state's statute of limitations"); *In re Copper Antitrust Litig.*, 436 F.3d 782, 793–97 (7th Cir. 2006)

13  (holding that *American Pipe* tolling did not apply to save plaintiffs' federal antitrust claims where plaintiff sought tolling during the pendency of their earlier-filed class action asserting only state antitrust claims); *Soward v. Deutsch Bank AG*, 814 F. Supp. 2d 272, 282 (S.D.N.Y. 2011) (refusing "to

14  import the doctrine into New York's law" after noting that "of the federal courts that have considered this issue, most have refused to extend the doctrine into a state that has yet to consider it"); *Newport v.*

15  *Dell, Inc.*, No. CV-08-0096, 2008 WL 4347311, at *5 (D. Ariz. Aug. 21, 2008) ("will not import the doctrine of cross-jurisdictional tolling into state [Arizona] law where the state has not expressly

16  adopted such cross-jurisdictional tolling"); *In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d 799, 806–15 (E.D. La. 2007) (recognizing that Pennsylvania, Illinois and Puerto Rico all recognized class action

17  tolling, but refusing to apply cross-jurisdictional tolling without each state "explicitly adopting cross-jurisdictional tolling").

18  [31] *See, e.g.*, *In re DRAM Antitrust Litig.*, 516 F. Supp. 2d 1072, 1102–03 (N.D. Cal. 2007) (court found

19  cross-jurisdictional tolling unavailable in antitrust actions brought under various state laws).

20  [32] While the DAPs' reliance on the statement that "New York would likely apply" cross-jurisdiction tolling from *Williams v. Dow Chem. Co.*, No. 01-cv-4307, 2004 WL 1348932, at *12 (S.D.N.Y June

21  16, 2004) is misplaced since *Clemens* requires a court not to read tolling provisions into state law that do not exist, the Philips and LG Defendants acknowledge that New York's Donnelly Act tolls actions

22  "during the pendency . . . and one year thereafter" any civil or criminal antitrust proceeding brought by the federal government.

23  [33] Despite arguing that cross-jurisdictional tolling is applicable to a California claim, the DAPs rely on

24  *Hatfield v. Halifax PLC*, which itself acknowledges that *Clemens* "foreclose[s] application of *American Pipe*." 564 F.3d 1177, 1187–88 (9th Cir. 2009).  But the DAPs' footnote citation to *Hatfield*

25  purports to support equitable tolling instead of cross-jurisdictional tolling.  Not only has the equitable tolling argument been rejected in *In re TFT-LCD Antitrust Litig.*, Nos. M 07-1827, 2012 WL 149632,

26  at *3 (N.D. Cal. Jan. 18, 2012), but the Ninth Circuit rejected applying equitable tolling when a federal and state antitrust claim are at issue.  *Eichman v. Fotomat Corp.*, 880 F.2d 149, 155–56 (9th Cir. 1989)

27  (when a plaintiff chooses to file either a federal or state antitrust remedy first, a plaintiff "may not invoke the doctrine of equitable tolling.").  Thus, in *Centaur Classic Convertible Arbitrage Fund Ltd.*

28  *v. Countrywide Financial Corporation*, the court considered *Hatfield* and *Clemens* and held that

(Continued...)

1  Florida,[34] Kansas,[35] Massachusetts,[36] Michigan,[37] Minnesota,[38] or Washington[39] have expressly

2  adopted cross-jurisdictional tolling.  Without express acceptance of cross-jurisdictional tolling from a

3  state's legislature or courts, *Clemens* mandates that cross-jurisdictional tolling not be imported into the

4

5  _____

   (...Continued)

6  "[b]ecause California does not recognize cross-jurisdictional tolling, this Court has no authority to
   apply *American Pipe* to toll the [California] state statute of limitations here."  878 F. Supp. 2d 1009,
7  1017 (C.D. Cal. 2011).

8  [34] *In re Vitamins Antitrust Litig.*, 183 F. App'x 1, 2 (D.C. Cir. May 15, 2006) (predicting Florida
   would not permit cross-jurisdictional tolling); *In re Rezulin Products Liability Litig.*, No. 00-Civ.-
9  2843, 2006 WL 695253, at *1 (S.D.N.Y. Mar. 15, 2006) (stating that Florida does not recognize cross-
   jurisdictional tolling (citing *Senger Bros. Nursery, Inc. v. E.I. DuPont de Nemours & Co.*, 184 F.R.D.
10 674, 680 (M.D. Fla. 1999))).

11 [35] *Todd v. F. Hoffman-La Roche, Ltd.*, No. 98 C 4574, 2004 WL 5238952, at *3 (D. Kan. Aug. 20,
   2004) (since no Kansas case was on point, the court found "that because most of the states that have
12 considered the issue have rejected cross-jurisdictional tolling and for very good reason, this court
   should follow their lead"), *abrogated on other grounds by Seaboard Corp. v. March Inc.*, 284 P.3d 314
13 (Kan. 2012).  Contrary to the DAPs' insinuation, the holding in *Seaboard* does not support cross-
   jurisdictional tolling in this case.  The *Seaboard* court's analysis was based exclusively on the specific
14 language of the Kansas savings statute and the court noted that it had "previously declined to adopt
   *American Pipe* tolling principles."  284 P.3d at 322–328; *see also id.* at 324 ("As Seaboard suggests,
15 the issue before us is not how we will apply the court-created *American Pipe* tolling principle.  Rather,
   the question we must determine is whether [the Kansas savings statute] allows an action to be
16 preserved by commencing a legal action in another jurisdiction.").

17 [36] *Patterson v. Novartis, Inc.*, 909 F. Supp. 2d 116, 123 (D.R.I. 2012) ("Without a "well-plotted" path
   showing an "avenue of relief" that the Massachusetts Supreme Judicial Court would take on cross
18 jurisdictional class-action tolling, and with no apparent consensus among the few states that have
   addressed the question, this Court declines Plaintiffs' invitation and refuses to embark into an
19 "unexplored frontier" and import cross jurisdictional class-action tolling into Massachusetts state
   law.").

20 [37] The DAPs rely on *Lee v. Grand Rapids Board of Education*, 148 Mich. App. 364, 370 (MI 1986)
   that tolled a state law claim based on a federal action that included state law claims.  But DAPs
21 concede that the federal class action that they rely upon, the Direct Purchaser Class Action, contains no
   state law allegations.  Therefore, the DAPs' state law claims are instead analogous to *Mair v.*
22 *Consumers Power Co.*, 419 Mich. 74, 77, 348 N.W. 2d 256 (1984) where the federal action had no
   concurrent state law claims, and the Michigan Supreme Court rejected the application of cross-
23 jurisdictional tolling.  Indeed, the Michigan Supreme Court in *Lee* distinguished *Lee* from *Mair*
   because the complaint in *Lee* included not only a federal claim but also state law claims, unlike the
24 DPPs class here that only asserted federal claims.

25 [38] The DAPs rely on *Jenson v. Allison-Williams Co.*, No. 98-CV-2229, 1999 WL 35133748 (S.D. Cal.
   Aug. 23, 1999) that assumed Minnesota would apply cross-jurisdictional tolling.  But as noted above,
   *Clemens* dictates that a court should not read tolling provisions into state law that do not exist.

26 [39] *Champion v. Homa*, No. 3:03-cv-275, 2008 WL 900967, at *11 (M.D. Ala. Mar. 31, 2008) (holding
   that cross-jurisdictional class action tolling under *American Pipe* was not available in actions brought
27 under various state securities laws including Washington).

28

1  limitations laws of any of these states and thus the DAPs' claims under these states' laws must be

2  dismissed as untimely.

3  **III.   THE DAPS' CLAIMS AGAINST THE PHILIPS DEFENDANTS SHOULD BE DISMISSED WITH PREJUDICE.**

4

5        The Special Master correctly recommended that the DAPs' claims against the Philips

   Defendants should be dismissed with prejudice. *See* 2013 R&R at 15. The Court should adopt this

6

   recommendation because the affirmative allegations in the DAPs' complaints establish that the Philips

7

   Defendants' exited the CRT business and, consequently, withdrew from the alleged CRT conspiracy.

8

   Thus, the face of the DAPs' complaints establish the untimeliness of their claims, a defect which

9

   cannot be remedied by amendment of the pleadings. *See Ventress v. Japan Airlines*, 603 F.3d 676, 680

10

   (9th Cir. 2010) (holding that a "district court acts within its discretion to deny leave to amend when

11

   amendment would be futile" (citing *Chapel v. Lab. Corp. of America*, 232 F. 3d 719, 725-26 (9th Cir.

12

   2000))).

13

                                      **CONCLUSION**

14

        For the foregoing reasons, the Court should enter an Order adopting Special Master Legge's

15

   recommendation to dismiss KPE and PENAC from the action with prejudice.

16

17  Dated: June 28, 2013                    By:  ___/s/ Jon V. Swenson_____
                                            Jon V. Swenson (SBN 233054)
18                                          BAKER BOTTS LLP
                                            620 Hansen Way
19                                          Palo Alto, CA 94304
                                            Telephone: (650) 739-7500
20                                          Facsimile: (650) 739-7699
                                            Email: jon.swenson@bakerbotts.com
21

22                                          John M. Taladay (*pro hac vice*)
                                            Joseph Ostoyich (*pro hac vice*)
23                                          Erik T. Koons (*pro hac vice*)
                                            Charles M. Malaise (*pro hac vice*)
24                                          BAKER BOTTS LLP
                                            1299 Pennsylvania Ave., N.W.
25                                          Washington, DC 20004-2400
                                            Telephone: (202) 639-7700
26                                          Facsimile: (202) 639-7890
                                            Email: john.taladay@bakerbotts.com
27

28

1

Email: joseph.ostoyich@bakerbotts.com
Email: erik.koons@bakerbotts.com

2

Email: charles.malaise@bakerbotts.com

3

4

*Attorneys for Defendant Philips Electronics North*
*America Corporation*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

  I hereby certify that on June 28, 2013, I electronically filed Koninklijke Philips Electronics

3

N.V. and Philips Electronics North America Corporation's Memorandum in Response to Direct

4

Action Plaintiffs' Objections to the Special Master's Report And Recommendation Regarding

5

Philips' and LG's Motion to Dismiss Certain Direct Action Plaintiffs' Complaints and in Support

6

of Adopting the Special Master's Report and Recommendation with Respect to Koninklijke

7

Philips Electronics N.V.'s and Philips Electronics North America Corporation's Motion to Dismiss

8

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the counsel of record in this matter who are registered on the CM/ECF system.

9

10

      By: /s/ Jon V. Swenson_____
        Jon V. Swenson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28