# **<u>EXHIBIT A</u>**

1  Martin Quinn Esq.
   JAMS
2  Two Embarcadero Center, Suite 1500
   San Francisco, CA 94111
3  Telephone: (415) 774-2669
   Fax: (415) 982-5287
4  Interim Special Master

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12

| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br>JAMS Ref. No. 1100054618 |
|---|---|
| This Document Relates to:<br><br>ALL DIRECT ACTION CASES | **REPORT AND RECOMMENDATION REGARDING DIRECT ACTION PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS** |

1    To the Honorable Samuel Conti, United States District Judge:

2         On May 8, 2013, the Interim Special Master heard Direct Action Plaintiffs' Motion for

3   Leave to File Amended Complaints[1]. Having considered the moving papers, evidence and the

4   arguments of the parties, and good cause appearing, the Interim Special Master now makes the

5   following Report and Recommendation. For the reasons set forth below, it is recommended that

6   the Court GRANT Direct Action Plaintiffs' motion.

7                          Basic Facts

8         This multi-district litigation involves allegations of a global price-fixing cartel among

9   manufacturers of cathode ray tubes (CRTs) during the period January 1, 1995-November 25,

10   2007. The class actions that are part of this MDL were filed in 2008. Direct Action Plaintiffs

11   ("DAPs") filed their opt-out actions in November 2011 and early 2012. Discovery commenced

12   in the class actions in March 2010 when the Court lifted the stay obtained by the DOJ.

13   Discovery closes in the DAP cases in March 2014, and trial is set for October 20, 2014.

14         The Direct Action Plaintiffs listed below seek leave to file amended complaints adding

15   Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson Consumer

16   Electronics, Inc.) (together, "Thomson"), and Mitsubishi Electric Corp., Mitsubishi Digital

17   Electronics America, Inc. and Mitsubishi Electric & Electronics, USA, Inc. (together

18   "Mitsubishi") as defendants, to add Videocon Industries, Ltd. as a non-party co-conspirator, and

19   to add charging allegations relating to tolling of the statute of limitations and make minor non-

20   substantive deletions. In addition, Costco seeks leave to add as defendants Samsung SDI Co.,

21   Ltd. and six related Samsung entities[2], and to add Panasonic Corp. and three related entities[3] as

22   non-party co-conspirators.

23   //

24

---

25   [1] The moving parties are: Electrograph, Siegal as trustee for Circuit City, Best Buy, Target, Interbond Corp. of Am., Office Depot, CompuCom Systems, Costco, P.C. Richard & Son Long Island Corp., and Schultze Agy. Serv.

26   [2] The seven Samsung entities are: Samsung SDI Co., Ltd., Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brazil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and

27   Samsung SDI (Malaysia) Sdn. Bhd.

28   [3] The four Panasonic entities are: Panasonic Corp., Panasonic Corp. of North America, MT Picture Display, Co., Ltd., Matsushita Electronic Corp. (Malaysia) Sdn. Bhd. and Panasonic Consumer Electronics Co..

In August 2012, the Indirect Purchaser Plaintiffs ("IPPs") sought leave to amend to add Thompson and Mitsubishi as defendants. Following argument, the parties stipulated to adding Thomson and Videocon as named co-conspirators. On November 19, 2012, Judge Legge issued a Report recommending that the amendment be allowed to add Mitsubishi as a defendant. [Dkt. 1453] The parties subsequently stipulated to instead add the Mitsubishi entities as named co-conspirators.

The DAPs filed this motion in March 2013.

<div align="center">Parties' Contentions</div>

The DAPs argue that Rule 15(a) and Ninth Circuit and other authority require that leave to amend be freely given. They contend that the amendments are timely because they filed this motion in response to the IPP motion to amend in August 2012, after which the DAPs conducted a focused document review to determine whether they had a basis to sue these additional parties. They contend that these new defendants will suffer no prejudice because there is adequate time to conduct discovery and prepare for trial. They note that all three potential defendants have long been on notice of, or participated in, these actions. Thomson was named as a defendant by the IPPs in 2007 and has recently been sued by Sharp in a DAP complaint filed March 15, 2013. Mitsubishi entered into a tolling agreement with the IPPs in 2011. Samsung and Panasonic have been named as defendants in multiple complaints. The proposed amendments do not add any new theories or alter the scope of discovery to conduct. The amendments are not futile as respects the statute of limitations because there is ample basis to apply Government Action tolling.

Thompson, Samsung and Mitsubishi contend that the DAPs unduly and unnecessarily delayed in seeking to name them as defendants. First, the DAPs have known of their alleged involvement in the CRT conspiracy at least since 2007-2008, and certainly since the DAPs filed their own actions in late 2011. Second, even assuming the DAPs did not reasonably appreciate the potential liability of these parties until the IPPs moved to amend in August 2012, the DAPs waited seven months to bring this motion. Moreover, they claim that adding them as defendants now will cause them prejudice because they have not participated in discovery to date, and/or

they will have a very compressed time within which to prepare for trial. Mitsubishi notes that it has never before been a defendant in any part of the CRT litigation, and that it has never been subpoenaed or investigated by any governmental body in connection with CRTs. Thomson also asserts that its French entity will file a motion to challenge personal jurisdiction, which will require delays in the pre-trial schedule.[4] Finally, Samsung argues that Costco's proposed amendment is futile because the state law claims are barred by the statute of limitations, and the federal Sherman Act claim will be defeated on various merits-based grounds.

## Legal Standard

Leave to amend shall be granted freely "when justice so requires." Fed. R. Civ. P. 15(a). This policy is applied "with extreme liberality" in the Ninth Circuit. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). The policy of liberality applies whether the amendment will "add new causes of actions or parties." *DCD Programs, ltd. v. Leighton*, 833 F.3d 183, 186 (9th Cir. 1987). Where the amendment seeks to add new parties, it must also satisfy the joinder requirements of Rule 20(a), but those also are to be applied liberally [*Matthews Metals Prods., Inc. v. RBM Precision Metal Prods., Inc.*, 186 F.R.D. 581, 583 (N.D. Cal. 1999)], and are easily satisfied here since the claims against the potential new parties are identical to those against other defendants.

Leave to amend shall be granted absent undue delay, bad faith or dilatory motive on the part of the moving party, prejudice to the nonmovant or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Of these "Foman factors" the most important is the presence or absence of prejudice. *Eminence Capital,* 316 F.3d at 1048.

The burden on showing prejudice from a proposed amendment rests on the non-moving party. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186-7 (9th Cir. 1987)

---

[4] Thomson filed a motion to dismiss on May 17, 2013 that asserted defenses based on the statute of limitations failure to state a claim and subject matter jurisdiction – but did not challenge personal jurisdiction. [Dkt. No. 1677]

Discussion

## A. Excessive Delay

The non-moving parties all charge DAPs with excessive delay in seeking to add them as defendants. Two periods of purported delay are in question. First, how do DAPs justify delaying from November 2011 when they generally filed the DAP actions until August 2012 when they assert that they were alerted to the potential involvement of Mitsubishi and Thomson by the IPPs' motion to amend? Second, how do DAPs justify delaying from August 2012 until March 2013 when they filed this motion?

The first question was largely answered as to Mitsubishi and Thompson by Judge Legge's Report in which he recommended that IPPs be permitted to add Mitsubishi as a defendant. He found that "[IPPs] have been diligent in seeking the amendment" because they only recently discovered "CRT production line reports" that "demonstrate Mitsubishi's participation [in the alleged cartel]." [Dkt. 1453, p.2] If it was reasonable for the IPPs to delay until August 2012 to appreciate Mitsubishi's involvement in the alleged conspiracy, no reason is suggested as to why it was not also reasonable for the DAPs to be unaware until then of Mitsubishi's involvement. The DAPs presented credible evidence that they were "prompted by" the IPPs' motion to amend, that they began "targeted review of … document productions for evidence of Thomson, Videocon and Mitsubishi participation in the conspiracy," that they discovered such evidence and also took account of the EU fine against Thomson [Weiss Decl., ¶¶2-5], and that they filed this motion within a month after reviewing relevant documents. [Weiss Reply Decl., ¶3] Costco explains its delay in seeking leave to file against Samsung by asserting that its counsel was attempting to clear a conflict of interest and that for efficiency it wanted to move jointly with all the other DAPs.[5] [Reply, p. 11]. No persuasive reason is presented for coming to a conclusion different as to Mitsubishi and Thomson than Judge Legge did as to Mitsubishi last year. Nor has Samsung satisfied its burden to show that Costco acted unreasonably in delaying to name it as a defendant.

---

[5] Costco offers no declararation regarding the alleged conflict of interest, but the Interim Special Master has no reason to doubt counsel's vercity.

As for the delay from August 2012 to March 2013, DAPs reasonably assert that they were performing due diligence by reviewing documents to assure themselves that there was an adequate basis to seek to add Mitsubishi (and Thomson) as defendants. The mere speculation that they might have completed that review and filed this motion 2-3 months sooner is not an adequate basis to demonstrate undue delay.[6]

B. Prejudice

1. Thomson

Thomson made and sold CRTs in the United States and other companies. It sold its CRTs both internally to its own television division, and to other television manufacturers. In November 2003 Thomson sold its television division to a joint venture with a Chinese company, TCL Corporation. In 2005 it sold its CRT business to Videocon Industries, Ltd. The DAPs allege that Thomson attended "dozens of meetings with its competitors," including Glass meetings, at which it agreed on prices and supply levels. [Motion, p. 5]

As noted above, Thomson was named in 2008 as a defendant in complaints filed by both the IPPs and the Direct Purchaser Plaintiffs ("DPPs"), but omitted as a defendant in the Consolidated Amended Complaints filed by the two classes in March 2009. Accordingly, Thomson did not participate actively in the cases until August 2012 when the IPPs sought again to add it as a defendant, except for entering into a tolling agreement with the IPPs in 2011. Ultimately, the parties stipulated that the Thomson entities would be added as non-party co-conspirators. However, Thomson's outsider status ended in March 2013 when Sharp named it in its DAP opt-out complaint. Therefore, regardless of whether this motion is granted, Thomson is a defendant in the DAP cases, and will face the same discovery obligations and the same trial date. As noted, Thomson's Rule 12 motion to dismiss is already on file.

Thomson has also been involved since 2008 in investigations relating to CRTs by the Department of Justice and the European Union, and in December 2012 was fined €38 million by the EU. [Weiss Decl., Exh. A]

---

[6] In the *LCD* case, Judge Illston denied a motion to add Mitsubishi as a defendant, but did so in part because the motion came after the classes had been certified, and adding Mitsubishi might require reopening that issue.

The naming of Thomson as a defendant in the Sharp action removed any credible argument that Thomson would be unduly prejudiced by being added as a defendant to these other DAP actions. Of course added burdens come with defending ten actions rather than one, but when all ten are part of a coordinated MDL proceeding the burden is greatly lessened. Moreover, Thomson has, of course, known of the CRT actions for almost five years since it was named as a defendant by both the IPPs and the DPPs, so it will have long ago preserved relevant documents. There is simply no persuasive basis on which to find that Thomson has satisfied its burden to show that it would be unduly prejudiced by allowing the requested amendments.

2. Mitsubishi

The question of prejudice is closer as to Mitsubishi since, unlike Thomson and Samsung, it has never been a party to these CRT cases or the target of any government investigations. While it signed a tolling agreement with the IPPs in 2011, and therefore, will have preserved its relevant documents, it has not previously participated in any discovery or motion practice. Nonetheless, Judge Legge fully considered the issue of prejudice in November 2012, and determined that Mitsubishi would not be unduly prejudiced by being added as a party.[7] Since the case management schedule has been adjusted since then to defer various deadlines, Mitsubishi is not in a materially different position now than it was when Judge Legge made his recommendation. For these reasons, Mitsubishi has not satisfied its burden to demonstrate undue prejudice.

3. Samsung

Samsung has been a defendant in multiple actions since the outset of the CRT litigation, both the class actions and individual opt-out actions. As such, it has been defending the cases actively for several years. Samsung's protestations that it did not participate in some depositions and motions are of little merit. First, it had the right as a party to participate in any deposition.

---

[7] "While the volume of information to be given to Mitsubishi [i.e., third-party discovery material] is undoubtedly substantial, it is not so much as to be prejudicial to Mitsubishi's right to defend itself in this litigation. In addition, numerous other defendants' counsel have been representing the defense interests throughout the course of this litigation. While Mitsubishi is not bound by that, it is some assurance that the case has been and is being defended up to this time." [Report, p. 3, Dkt. 1453]

Second, since it did not participate in the deposition of Costco's PMK in December 2012, that can be cured by permitting it to re-depose Costco now that Samsung is a party. Samsung has not advanced any persuasive reason why it would unduly prejudice it to be added to Costco's action as a defendant.

### C. Other Foman Factors

Thomson and Mitsubishi do not argue that any of the other *Foman* factors – bad faith, dilatory motive or futility – apply to them. Samsung, however, does argue that the proposed amendment would be futile because Costco's state antitrust claims will be barred by the statute of limitations. The issue is whether Governmental Action and cross-jurisdictional tolling will save Costco's claims. Each party cites a body of law that purportedly favors it. Since it cannot now be determined on the present record that Costco's claims will be barred, that issue is more appropriately determined on a motion to dismiss or for summary adjudication.

### D. Other Proposed Amendments

The DAPs also seek to add Videocon as a non-party co-conspirator, and Costco seeks to add the Panasonic entities as non-party co-conspirators. No opposition having been submitted to those requests, those amendments will be allowed.

The DAPs also seek to add charging allegations to specifically allege facts pertinent to the tolling issue, and to remove a few minor allegations. No opposition was presented as to those proposed amendments, so they also will be allowed.

### Conclusion

For the foregoing reasons and for good cause shown, the Interim Special Master recommends that the Court GRANT Direct Action Plaintiffs' motion for leave to file amended complaints as follows:

1. To add the following new defendants: Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.), Mitsubishi Electric Corp., Mitsubishi Digital Electronics America, Inc. and Mitsubishi Electric & Electronics, USA, Inc.

2. To add as a non-party co-conspirator Videocon Industries, Ltd.

3. In the case of Costco only to add the following new defendants: Samsung SDI Co., Ltd., Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brazil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and Samsung SDI (Malaysia) Sdn. Bhd.

4. In the case of Costco only to add as non-party co-conspirators Panasonic Corp., Panasonic Corp. of North America, MT Picture Display, Co., Ltd., Matsushita Electronic Corp. (Malaysia) Sdn. Bhd. and Panasonic Consumer Electronics Co.

5. To add additional allegations as reflected in the attached Amended Complaints relevant to *American Pipe*, cross-jurisdictional and Government Action tolling.

6. DAPs are directed to file their amended complaints, copies of which are attached to the Weiss Declaration as Exhibits C-K, within one week after the later of entry of this Report and Recommendation and Order thereon, or resolution of any objection thereto.

Dated: June 28, 2013

Martin Quinn
Interim Special Master

Approved/Disapproved/Modified

DATED: _____

Hon. Samuel Conti
United States District Judge

# **EXHIBIT B**

1   David J. Burman (admitted *pro hac vice*)
    Cori G. Moore (admitted *pro hac vice*)
2   Eric J. Weiss (admitted *pro hac vice*)
    Nicholas H. Hesterberg (admitted *pro hac vice*)
3   **PERKINS COIE** LLP
4   1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
5   Telephone:      206.359.8000
    Facsimile:      206.359.9000
6
    Joren Bass, Bar No. 208143
7   JBass@perkinscoie.com
    **PERKINS COIE** LLP
8   Four Embarcadero Center, Suite 2400
    San Francisco, CA  94111-4131
9   Telephone:      415.344.7120
    Facsimile:      415.344.7320
10
    Attorneys for Plaintiff Costco Wholesale Corporation
11  [Additional Counsel Listed on Signature Page]

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15  IN RE: CATHODE RAY TUBE (CRT)          Master File No. 3:07-cv-05944-SC
    ANTITRUST LITIGATION                   MDL No. 1917
16

17  This Document Relates to:             **DIRECT ACTION PLAINTIFFS'
                                          NOTICE OF MOTION AND MOTION
18  *Electrograph Systems, Inc., et al. v. Hitachi,*   **FOR LEAVE TO FILE AMENDED
    *Ltd., et al.,* No. 11-cv-01656;      COMPLAINTS; MEMORANDUM OF
19                                        POINTS AND AUTHORITIES IN
    *Alfred H. Siegel, as Trustee of the Circuit*   SUPPORT THEREOF**
20  *City Stores, Inc. Liquidating Trust v.*
    *Hitachi, Ltd., et al.,* No. 11-cv-05502;   Date:     May 1, 2013 (tentative)
21                                        Time:     9:30 a.m. (tentative)
    *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et*   Place:    JAMS Resolution Center, Two
22  *al.,* No. 11-cv-05513;                         Embarcadero Center, Suite 1500
                                          Judge:    Honorable Samuel Conti
23  *Target Corp, et al. v. Chunghwa Picture*   Special Master: Hon. Charles A. Legge (Ret.)
    *Tubes, Ltd., et al.,* No. 11-cv-05514;
24
    *Interbond Corporation of America v.*
25  *Hitachi, et al.,* No. 11-cv-06275;

26

27

1  *Office Depot, Inc. v. Hitachi Ltd., et al.*, No.
   11-cv-06276;

2  *CompuCom Systems, Inc. v. Hitachi, Ltd., et
   al.*, No. 11-cv-06396;

3

4  *Costco Wholesale Corporation v. Hitachi,
   Ltd., et al.*, No. 11-cv-06397;

5  *P.C. Richard & Son Long Island
   Corporation, et al., v. Hitachi, Ltd., et al.*,

6  No. 12-cv-02648;

7  *Schultze Agency Services, LLC, et al. v.
   Hitachi, Ltd., et al.*, No. 12-cv-02649.

8

9

10

11                     **NOTICE OF MOTION AND MOTION**

12         TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

13         PLEASE TAKE NOTICE that on May 1, 2013 at 9:30 a.m. or as soon thereafter as the

14  matter can be heard before the Honorable Charles A. Legge (Ret.) at the office of JAMS, Two

15  Embarcadero Center, Suite 1500, San Francisco, California, the moving plaintiffs listed on the

16  signature pages below (collectively, "Plaintiffs") will and hereby do move this Court, pursuant to

17  Federal Rules of Civil Procedure 15(a)(2) and 20(a)(2), for an Order granting Plaintiffs leave to

18  amend their complaints to add Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc.

19  (f/k/a Thomson Consumer Electronics, Inc.) (together, "Thomson") and Mitsubishi Electric

20  Corp.; Mitsubishi Digital Electronics America, Inc.; and Mitsubishi Electric & Electronics, USA,

21  Inc. (together, "Mitsubishi") as defendants; to add Videocon Industries, Ltd. ("Videocon") as a

22  non-party co-conspirator; and to assert additional allegations in support of *American Pipe*, Cross-

23  Jurisdictional, and Government Action tolling on the grounds that no undue prejudice will result

24  from the proposed amendments and Plaintiffs have exercised reasonable diligence in seeking the

25  amendments.[1]

    _____

26  [1] As explained below, plaintiff Costco Wholesale Corporation also seeks leave to amend its complaint to
    add as defendants certain Samsung SDI entities already named as defendants by other Plaintiffs

27

28  PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
    Case No. 3:07-05944-SC
    MDL No. 1917

1    This motion is based upon this Notice of Motion and Motion, the accompanying

2 Memorandum of Points and Authorities in support thereof, the Declaration of Eric J. Weiss in

3 Support of Plaintiffs' Motion for Leave to File Amended Complaints, any papers filed in reply,

4 the argument of counsel, and all papers and records on file in this matter.[2]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
_____
22 (specifically, Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Samsung SDI Mexico S.A. de C.V.;
Samsung SDI Brasil Ltda.; Shenzhen Samsung SDI Co., Ltd.; Tianjin Samsung SDI Co., Ltd.; and
23 Samsung SDI (Malaysia) Sdn. Bhd.) (together, "Samsung SDI") and to add as non-party co-conspirators
certain Panasonic entities already named as defendants by other Plaintiffs (specifically, Panasonic Corp.;
24 Panasonic Corp. of North America; MT Picture Display Co., Ltd.; Matsushita Electronic Corp. (Malaysia)
Sdn Bhd.; and Panasonic Consumer Electronics Co.) (together, "Panasonic").

25 [2] Pursuant to Local Rule 10-1, the Plaintiffs' proposed amended complaints are attached as Exhibits C–M
to the Declaration of Eric J. Weiss in Support of Direct Action Plaintiffs' Notice of Motion for Leave to
26 File Amended Complaints. All of the changes Plaintiffs propose to make by way of this motion are
reflected in redline in the attached proposed amended complaints.

27

28 PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

**TABLE OF CONTENTS**

**PAGE**

I.     BACKGROUND ........................................................................................ 1

II.    THE PROPOSED AMENDMENTS ........................................................ 4

    A.    Thomson and Videocon's Involvement in the CRT Conspiracy ............................ 4

    B.    Mitsubishi's Involvement in the CRT Conspiracy.................................................. 6

    C.    Samsung SDI and Panasonic's Involvement in the CRT Conspiracy .................... 6

    D.    *American Pipe*, Cross-Jurisdictional, and Government Action Tolling ................. 7

III.    LEAVE TO AMEND IS WARRANTED ............................................... 9

    A.    Rules 15 and 20 Establish a Liberal Standard for Granting Leave to Amend ........ 9

    B.    The Proposed Amendments Meet the Requirements of Rules 15 and 20.............. 11

        1.    The Proposed Amendments Would Not Cause Undue Prejudice............... 11

        2.    The Proposed Amendments Do Not Implicate the Other *Foman* Factors ......................................................................................................... 13

        3.    The Proposed Amendments Satisfy the Joinder Requirements of Rule 20 ............................................................................................................ 15

IV.    CONCLUSION........................................................................................ 15

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

# TABLE OF AUTHORITIES

PAGE

## CASES

*American Pipe & Construction. Co. v. Utah*,
    414 U.S. 538 (1974) ................................................................................................................ passim

*Bechtel v. Robinson*,
    886 F.2d 644 (3d Cir. 1989)................................................................................................ 11

*Burdick v. Union Sec. Ins. Co.*,
    2009 WL 4798873 (C.D. Cal. Dec. 9, 2009) .................................................................... 14

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983) ............................................................................................................ 14

*DCD Programs, Ltd. v. Leighton*,
    833 F.2d 183 (9th Cir. 1987)............................................................................ 9, 10, 11, 13

*Desert Empire Bank v. Ins. Co.*,
    623 F.2d 1371 (9th Cir. 1980)............................................................................................ 10

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003).......................................................................................... 9, 10

*Expoconsul Int'l, Inc. v. A/E Sys., Inc.*,
    145 F.R.D. 336 (S.D.N.Y. 1993) ...................................................................................... 13

*Foman v. Davis*,
    371 U.S. 178 (1962) ...................................................................................................... passim

*Hinson v. Norwest Fin. S.C., Inc.*,
    239 F.3d 611 (4th Cir. 2001) ............................................................................................ 10

*Howey v. United States*,
    481 F.2d 1187 (9th Cir. 1973)........................................................................................ 10, 13

*In re Linerboard Antitrust Litig.*,
    223 F.R.D. 335 (E.D. Pa. 2004) ........................................................................................ 8

*Issen v. GSC Enters., Inc.*,
    552 F. Supp. 390 (N.D. Ill. 1981) .................................................................................... 14

*League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*,
    558 F.2d 914 (9th Cir. 1977)............................................................................................ 11

*Matthews Metals Prods., Inc. v. RBM Precision Metal Prods., Inc.*,
    186 F.R.D. 581 (N.D. Cal. 1999) ...................................................................................... 10

*Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*,
   281 F.3d 629 (7th Cir. 2002) ............................................................................... 15

*Simons v. United States*,
   497 F.2d 1046 (9th Cir. 1974) ............................................................................. 10

*Smith v. Guaranty Servs. Corp.*,
   51 F.R.D. 289 (N.D. Cal. 1970) ................................................................... 11, 12

*Tosti v. Los Angeles*,
   754 F.2d 1485 (9th Cir. 1985) ............................................................................... 7

*United States v. Webb*,
   655 F.2d 977 (9th Cir. 1981) ................................................................................. 9

*Zenith Radio Corp. v. Hazeltine Research*,
   401 U.S. 321 (1971) ............................................................................................... 8

STATUTES

15 U.S.C. § 1 ............................................................................................................ 2

15 U.S.C. § 16 ................................................................................................... 8, 9

OTHER AUTHORITIES

Fed. R. Civ. P. 15 ........................................................................................... passim

Fed. R. Civ. P. 20 ........................................................................................... passim

Fed. R. Civ. P. 30(b)(6) .......................................................................................... 2

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

# MEMORANDUM OF POINTS AND AUTHORITIES

The undersigned Direct Action Plaintiffs[3] ("DAPs" or "Plaintiffs") hereby respectfully submit this Memorandum in support of their Motion for Leave to File Amended Complaints ("Motion"). As reflected in Plaintiffs' proposed amended complaints—attached as exhibits to the Declaration of Eric J. Weiss in Support of the Motion—all Plaintiffs seek to add Thomson and Mitsubishi as new defendants and to add Videocon as a non-party co-conspirator. Additionally, plaintiff Costco Wholesale Corporation seeks to add Samsung SDI entities as defendants and Panasonic entities as non-party co-conspirators. Plaintiffs also seek to assert additional, perfunctory allegations relevant to *American Pipe,* Cross-Jurisdictional, and Government Action Tolling; specifically, the limitations period for Plaintiffs' claims was tolled, as a matter of law, during the pendency of certain class action lawsuits and the U.S. Department of Justice's criminal proceedings against defendants. As set forth below, the Motion should be granted because it is being made in a timely manner, is supported by good cause, and will not prejudice any party.

## I.    BACKGROUND

Plaintiffs allege that they were injured by a price-fixing conspiracy among the major manufacturers of Cathode Ray Tubes ("CRTs") used in televisions, computer monitors, and other electronics products. The DAPs are companies—predominately large retailers—that purchased CRT products during the period January 1, 1995, through November 25, 2007 (the "Relevant Period") and that have decided to pursue their own antitrust claims in lieu of prosecution through the putative Direct-Purchaser Plaintiff ("DPP") and Indirect-Purchaser Plaintiff ("IPP") class actions. All of Plaintiffs' actions have been consolidated for MDL proceedings before this Court.

---

[3] The DAPs joining this motion are the following:  *Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656; *Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.*, No. 11-cv-05502; *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513; *Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514; *Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275; *Office Depot, Inc. v. Hitachi Ltd., et al.*, No. 11-cv-06276; *CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396; *Costco Wholesale Corporation v. Hitachi, Ltd., et al.*, No. 11-cv-06397; *P.C. Richard & Son Long Island Corporation, et al, v. Hitachi, Ltd., et al.*, No. 12-cv-02648; and *Schultze Agency Services, LLC, et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02649.

1

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1    Plaintiffs' operative complaints are identical in several key respects.  All allege that

2    Defendants—manufacturers of CRTs—engaged in an international price-fixing cartel to drive up

3    CRT prices to supracompetitive levels.  Specifically, they allege that throughout the Relevant

4    Period, Defendants participated in regular group and bilateral meetings during which they

5    exchanged pricing, production, and other confidential business information and entered into

6    anticompetitive agreements.  Plaintiffs claim that Defendants violated Section 1 of the Sherman

7    Act, 15 U.S.C. § 1, and a variety of state laws.

8    Full discovery commenced on March 8, 2010, when the stay of discovery obtained by the

9    Department of Justice expired.  The Defendants produced the majority of their documents in late

10   2011.  In November 2011, most of the DAPs opted to file their own complaints.

11   Discovery between Defendants and the DAPs began in 2012 but was delayed in light of

12   Defendants' motion for partial summary judgment against the DPPs, which the Court resolved in

13   late 2012.  *See* Order Granting In Part and Denying in Part Defendants' Joint Motion for

14   Summary Judgment, Dkt. 1470 (Nov. 29, 2012).  Most Plaintiffs are currently responding to

15   written discovery and document requests served by the Defendants.  Some Rule 30(b)(6)

16   depositions have been conducted, and merits depositions have recently begun.  The fact discovery

17   cutoff date is tentatively set for March 3, 2014 and trials are not scheduled to begin until October

18   20, 2014.  *See* Revised Scheduling Order, Dkt. No. 1595 (Mar. 13, 2013).

19   On August 22, 2012, the IPPs filed a motion for leave to amend their complaint.  *See*

20   IPPs' Motion for Leave to Amend Complaint, Dkt. 1325 (Aug. 22, 2012).  The IPPs claimed that

21   "conspiratorial evidence . . . revealed by recent discovery . . . convinced IP Plaintiffs that

22   Thomson, Mitsubishi, and Videocon should be added as Defendants."  *Id.* at 2.  Specifically,

23   based on information discovered during their preparation for Rule 30(b)(6) depositions, the IPPs

24   sought to add:

25   ▪ Thomson SA (n/k/a Technicolor SA) and Thomson Consumer Electronics, Inc.

26   (n/k/a Technicolor USA, Inc.) (together "Thomson").

27   2

28   PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

- ▪ Mitsubishi Electric Corp., Mitsubishi Digital Electronics America, Inc., and Mitsubishi Electric & Electronics, USA, Inc. (together "Mitsubishi").

- ▪ Videocon Industries, Ltd. ("Videocon").

The IPPs' motion was referred to Judge Legge, as Special Master, and was opposed by Mitsubishi Digital Electronics America, Inc.; Mitsubishi Electric & Electronics, USA, Inc., ("Mitsubishi Electric"); and Thomson. *See* Mitsubishi Electric Opposition, Dkt. 1348 (Sept. 14, 2012); Thomson Opposition, Dkt. 1352 (Sept. 14, 2012). Special Master Legge heard oral argument on the motion on September 27, 2012. Thereafter, the Special Master recommended that the Court grant a stipulated order permitting the IPPs to amend their complaint to add Thomson and Videocon as named co-conspirators. *See* Report and Recommendation on Stipulation and Proposed Order, Dkt. 1428 (Nov. 1, 2012).

On November 19, 2012, Special Master Legge recommended that the Court grant the IPPs' motion to add the Mitsubishi entities as named defendants. *See* Amended Report on IPP Motion to Amend Complaint, Dkt. 1453 (Nov. 19, 2012). The Special Master found that the addition of Mitsubishi "meets the requirements of Federal Rule of Civil Procedure 15(a) and the factors enumerated in *Foman v. Davis*, 371 U.S. 178 (1962)." *Id.* at 2. In particular, Special Master Legge found that the amendment would not add new issues to the case, was supported by evidence of Mitsubishi's involvement in the conspiracy, that the IPPs had been diligent in seeking the amendment, and that Mitsubishi would not be prejudiced by the amendment given the case schedule. *Id.* at 2-3. Thereafter, the IPPs reached a stipulation with Mitsubishi to add all of the Mitsubishi entities as co-conspirators. *See* Stipulation and Proposed Order Regarding Indirect Purchaser Plaintiffs' Fourth Consolidated Amended Complaint, Dkt. 1496 (Dec. 18, 2012). In late December 2012, the Court approved stipulations that permitted the IPPs to amend their complaint to add Mitsubishi, Thomson, and Videocon as co-conspirators. *See* Order Approving Stipulations Re: Leave to Amend Complaint to Add Certain Defendants, Dkt. 1505 (Dec. 27, 2012).

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1

**II. THE PROPOSED AMENDMENTS**

2      Like the IPPs, the DAPs seek leave to amend their complaints to name the Thomson and

3  Mitsubishi entities as Defendants. *See, e.g.*, Declaration of Eric J. Weiss in Support of Plaintiffs'

4  Motion for Leave to File Amended Complaints ("Weiss Decl."), Ex. C, Amended Complaint of

5  Costco Wholesale Corporation ("Costco Amended Complaint"), ¶¶ 60, 61 (adding Thomson SA

6  and Thomson Consumer Electronics, Inc. as Defendants); *id.* at ¶¶ 63-65 (adding Mitsubishi

7  Electric Corp.; Mitsubishi Digital Electronics America, Inc.; and Mitsubishi Electric &

8  Electronics, USA, Inc., as Defendants). Costco also seeks to add certain entities already named

9  as Defendants by other Plaintiffs. Specifically, Costco would name certain Samsung SDI entities

10 as Defendants,[4] and name certain Panasonic entities as co-conspirators.[5] These proposed

11 amendments are supported by the conspiratorial evidence described below.

12     Out of an abundance of caution, Plaintiffs also seek leave to add additional, perfunctory

13 allegations that the limitations period for Plaintiffs' claims was tolled, as a matter of law, during

14 the pendency of certain class action lawsuits and the U.S. Department of Justice's criminal

15 proceedings against defendants.[6]

16     **A.    Thomson and Videocon's Involvement in the CRT Conspiracy**

17     During the Relevant Period, Thomson manufactured, marketed, sold, and distributed

18 CRTs in the United States and elsewhere. Thomson manufactured CRTs for sale in the United

19 States in factories located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.

20     [4] The Samsung SDI entities are Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Samsung SDI
21 Mexico S.A. de C.V.; Samsung SDI Brasil Ltda.; Shenzhen Samsung SDI Co., Ltd.; Tianjin Samsung SDI
   Co., Ltd.; and Samsung SDI (Malaysia) Sdn. Bhd.) (collectively, "Samsung SDI"). *See* Costco Amended
22 Complaint, ¶¶ 41-41 (adding Samsung SDI entities as Defendants).

23     [5] The Panasonic entities are Panasonic Corp.; Panasonic Corp. of North America; MT Picture Display Co.,
   Ltd.; Matsushita Electronic Corp. (Malaysia) Sdn Bhd.; and Panasonic Consumer Electronics Co.)
24 (collectively, "Panasonic"). *See* Costco Amended Complaint ¶ 72 (adding Panasonic entities as non-party
   co-conspirators).

25     [6] The DAPs represented by Boies, Schiller & Flexner LLP also propose to delete one paragraph in each of
   their complaints. This paragraph, which was identical in each complaint, was superfluous to these
26 plaintiffs' claims. Furthermore, Target and RadioShack also propose to delete references to several
   entities that were inadvertently included their Amended Complaint.

27                                          4
   PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28 Case No. 3:07-05944-SC
   MDL No. 1917

1    Thomson also had CRT manufacturing plants in Europe and China. Thomson sold its CRTs

2    internally to its television-manufacturing division (which manufactured and sold CRT televisions

3    to consumers under the RCA brand) and to other television manufacturers in the United States

4    and elsewhere. Thomson's television division also purchased CRTs from other CRT

5    manufacturers. *See, e.g.*, Costco's Amended Complaint, ¶¶ 60-61.

6        In November 2003, Thomson sold its television division to a joint venture it formed with

7    Chinese company TCL Corporation. The joint venture was called TCL-Thomson Electronics

8    Corporation. As part of the joint-venture agreement, the parties agreed that the televisions made

9    by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

10   brands in Europe and North America, respectively. In July 2005, Thomson sold its CRT business

11   to Videocon Industries, Ltd. *Id.*

12       Prompted by the IPPs' motion for leave to amend, Plaintiffs began conducting targeted

13   reviews of the Defendants' voluminous document productions for evidence of Thomson and

14   Videocon's participation in the conspiracy. *See* Weiss Decl., ¶ 2. During that review, Plaintiffs

15   located evidence revealing that between at least 1996 and 2005, Thomson attended dozens of

16   meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.

17   *See id.* at ¶ 3; *see also* Costco's Amended Complaint, ¶ 147. These meetings were attended by

18   high-level sales managers from Thomson. At these meetings, Thomson discussed such things as

19   CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant

20   shutdowns, customer allocation, and new product development and agreed on prices and supply

21   levels for CRT Products. *See* Weiss Decl., ¶ 3; *see also* Costco's Amended Complaint, ¶ 147.

22       Further confirming Thomson's participation in the conspiracy is the December 5, 2012,

23   decision by the European Commission to levy a €38.6 fine against Thomson for its CRT price-

24   fixing. *See* Costco's Amended Complaint, ¶ 165; Weiss Decl. ¶ 5, Exh. A. Even before the

25   European Commission announced its fine, Technicolor SA (f/k/a Thomson SA) acknowledged in

26   its 2011 Annual Report that it had appeared before the European Commission regarding CRTs,

27

28

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1   and it admitted that "Thomson/Technicolor . . . played a minor role in the alleged anticompetitive

2   activity." Weiss Decl. ¶ 6, Exh. B. For all of these reasons, Plaintiffs seek to add Thomson as a

3   defendant to this litigation and to name its successor, Videocon, as a non-party co-conspirator.

### B.  Mitsubishi's Involvement in the CRT Conspiracy

5         Mitsubishi manufactured, marketed, sold, and distributed CRTs and CRT televisions in

6   the United States during the Relevant Period. Mitsubishi manufactured CRTs in factories located

7   in Japan, Taiwan, Mexico, and Canada for sale in the United States. These CRTs were sold

8   internally to Mitsubishi's television and monitor manufacturing division and to other television

9   and monitor manufacturers in the United States and elsewhere. Mitsubishi's television and

10  monitor division also purchased CRTs from other CRT manufacturers. *See, e.g.*, Costco's

11  Amended Complaint, ¶¶ 63-65.

12        As was the case with Thomson, the IPPs' motion led Plaintiffs to begin targeted

13  investigations for evidence of Mitsubishi's participation in the conspiracy. *See* Weiss Decl., ¶ 2.

14  And as with Thomson, Plaintiffs' review of Defendants' voluminous document productions

15  confirmed that Mitsubishi conspired with its competitors. Specifically, the evidence establishes

16  that between at least 1995 and 2005, Mitsubishi participated in multiple bilateral meetings with its

17  competitors. *See, e.g.*, Costco's Amended Complaint, ¶ 148; Weiss Decl., ¶ 4. These meetings

18  were attended by high-level sales managers from Mitsubishi. At these meetings, Mitsubishi

19  discussed such things as CRT prices, production, revenues, volumes, demand, inventories,

20  estimated sales, plant shutdowns, customer allocation, and new product development, and agreed

21  on prices and supply levels for CRT Products. *See* Weiss Decl., ¶ 4; *see also* Costco's Amended

22  Complaint, ¶ 148. Thus, Plaintiffs seek to add Mitsubishi as a defendant in this litigation.

### C.  Samsung SDI and Panasonic's Involvement in the CRT Conspiracy

24        Samsung SDI manufactured, marketed, sold, and distributed CRTs and CRT products in

25  the United States during the Relevant Period. Samsung SDI was one of the leading

26  manufacturers of CRTs, holding a 34.3 percent share of the worldwide market in 2002. Samsung

27   

6

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

28

1   SDI's global operations included the manufacture and sale of CRT products in the United States,

2   Mexico, Brazil, China, and Malaysia.  *See* Costco's Amended Complaint, ¶¶ 41-47.

3        Samsung SDI was an active member of the CRT price-fixing cartel.  It participated in a

4   substantial number of glass meetings and bilateral meetings, including many attended by its

5   highest-ranking executives.  *See id.*, ¶¶ 143-44.  Samsung SDI has admitted its participation in the

6   conspiracy to fix prices, reduce output, and allocate market shares of color display tubes sold in

7   the United States and elsewhere, agreeing to pay a $32 million fine to the United States

8   government.  *See id.*, ¶ 164.  The European Commission also recently fined Samsung SDI over

9   €150 million for its CRT price-fixing.  *See* Weiss Decl. ¶ 5, Exh. A.  In sum, Costco's request to

10  add the Samsung SDI entities as Defendants is supported by substantial evidence.

11       Ample evidence also supports Costco's request to name the Panasonic entities as co-

12  conspirators.  During the relevant period, Panasonic manufactured, marketed, sold, and

13  distributed CRT products throughout the United States.  Panasonic participated in several glass

14  meetings between 1996 and 2003, many of which were attended by high level sales managers.

15  After 2003, it participated in the CRT conspiracy through MTPD, which attended and in fact led

16  many of the conspiratorial meetings.  Panasonic also engaged in multiple bilateral discussions

17  with the Defendants.  *See* Costco's Amended Complaint, ¶¶ 137-39.  For these reasons, the

18  European Commission recently fined Panasonic over €150 million for its conspiratorial conduct,

19  levying additional fines totaling nearly €100 million against Panasonic, Defendant Toshiba, and

20  their former joint venture MTPD.  *See* Weiss Decl. ¶ 5, Exh. A.  For these reasons, Costco seeks

21  to name the Panasonic entities as co-conspirators.

22      **D.**    ***American Pipe*, Cross-Jurisdictional, and Government Action Tolling**

23       It is axiomatic that the statute of limitations was tolled during the pendency of the

24  DPP class actions until the DAPs opted out.  *See, e.g.*, *American Pipe & Construction. Co. v.*

25  *Utah*, 414 U.S. 538 (1974); *Tosti v. Los Angeles*, 754 F.2d 1485, 1488 (9th Cir. 1985) (tolling

26  continued through opt-out).  Plaintiffs' state-law claims are also tolled under *American Pipe* and

27         7

28  PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
    Case No. 3:07-05944-SC
    MDL No. 1917

1  cross-jurisdictional tolling, which toll the statute on state-law claims during the pendency of a

2  federal class action.  *See In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 346 (E.D. Pa. 2004)

3  ("In the antitrust context, declining to adopt cross-jurisdictional class action tolling will invite the

4  filing of numerous protective, duplicative and in many cases, unnecessary, suits by class members

5  that want to consider filing claims under state antitrust law not included in a federal class action

6  complaint.  These suits would undermine the efficiency of federal class actions." (citations

7  omitted)).

8         Moreover, the statute of limitations was tolled under the Government Action Theory.  *See*

9  15 U.S.C. § 16(i) ("Whenever any civil or criminal proceeding is instituted by the United States

10 to prevent, restrain or punish violations of any antitrust laws . . . the running of the statute of

11 limitations . . . shall be suspended during the pendency thereof and for one year thereafter.").

12 This tolling provision is broadly construed.  *See Zenith Radio Corp. v. Hazeltine Research*, 401

13 U.S. 321, 335 (1971) (naming different defendants does not defeat the tolling so long as the

14 private suit alleges "at least in part the same conspiracy").  Here, the U.S. Department of Justice

15 ("DOJ") filed its first indictment of Defendants on February 10, 2009, and criminal proceedings

16 are ongoing.

17        Plaintiffs' Complaints already discuss the DOJ's criminal proceedings against Defendants

18 and allege facts demonstrating that Plaintiffs were or remain members of the Direct and Indirect

19 Purchaser Classes.  *See* Costco's Original Complaint, ¶¶ 1, 10, 138-51.  Out of an abundance of

20 caution, however, Plaintiffs seek leave to add additional perfunctory allegations that the

21 limitations period for Plaintiffs' claims was tolled, as a matter of law, during the pendency of

22 certain class action lawsuits and the DOJ's criminal proceedings against defendants.  *See*

23 Costco's Amended Complaint ¶¶ 193-95.  Specifically, the United States Department of Justice

24 instituted criminal proceedings and investigations against several Defendants and co-conspirators

25 commencing on at least February 10, 2009.  Plaintiffs' claims were tolled during these criminal

26 proceedings pursuant to 15 U.S.C. § 16.

27
                                              8
PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28 Case No. 3:07-05944-SC
MDL No. 1917

1    Furthermore, as shown by Plaintiffs' allegations in their respective complaints, the DAPs

2    were members of Direct Purchaser Class Action asserted against Defendants, including, but not

3    limited to, the following Complaints:

4    • *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No.

5       1) (N.D. Cal. Nov. 26, 2007);

6    • Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC

7       (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009);

8    Thus, the DAPs' claims were tolled under *American Pipe* and related authorities

9    recognizing cross-jurisdictional tolling during the pendency of the DPP Class Actions asserted

10   against Defendants, which commenced no later than November 26, 2007.

11   **III.     LEAVE TO AMEND IS WARRANTED**

12      **A.     Rules 15 and 20 Establish a Liberal Standard for Granting Leave
                 to Amend**

13

14   Pursuant to Rule 15(a), leave to amend a pleading should be given freely "when justice so

15   requires." The liberal policy in favor of granting leave to amend is intended to "facilitate

16   decision[s] on the merits, rather than on the pleadings or technicalities." *United States v. Webb*,

17   655 F.2d 977, 979 (9th Cir. 1981). In the Ninth Circuit, the policy favoring leave to amend "is 'to

18   be applied with extreme liberality.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,

19   1051 (9th Cir. 2003) (citations omitted); *see also* Special Master's Amended Report on IPP

20   Motion to Amend Complaint, Dkt. 1453 (Nov. 19, 2012) (noting "extreme liberality" standard).

21   "This liberality in granting leave to amend is not dependent on whether the amendment will add

22   causes of actions or parties." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir.

23   1987). Rather, "If the underlying facts or circumstances relied upon by a plaintiff may be a

24   proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."

25   *Simons v. United States*, 497 F.2d 1046, 1049, n.2 (9th Cir. 1974).

26

27                                                    9

28

The Supreme Court has instructed that "the leave sought should, as the rule requires, be 'freely given'" unless the nonmovant establishes undue delay, bad faith or dilatory motive on part of the movant, prejudice to the nonmovant, or futility of amendment *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also DCD Programs,* 833 F.2d at 186 (assessing factors and reversing denial of leave to amend to add a new party in fourth amended complaint notwithstanding defendants' arguments of undue delay and futility). "These factors, however, are not of equal weight in that delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs*, 833 F.2d at 186. Instead, "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital*, 316 F.3d at 1048. "Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion." *Howey v. United States*, 481 F.2d 1187, 1190-91 (9th Cir. 1973). Without prejudice, or at least "a strong showing of any of the remaining . . . factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital*, 316 F.3d at 1052 (emphasis in original).

On a motion to amend to join additional parties, a court "must consider both the general principles of amendment provided by Rule 15(a) and also the more specific joinder provisions of Rule 20(a)." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 618 (4th Cir. 2001) (citing *Desert Empire Bank v. Ins. Co.*, 623 F.2d 1371, 1374 (9th Cir. 1980)). Rule 20 imposes two specific requirements for the permissive joinder of parties. It provides that "[p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20. The addition of a party pursuant to Rule 20(a) calls for an equally liberal analysis as that mandated by Rule 15(a). *Matthews Metals Prods., Inc. v. RBM Precision Metal Prods., Inc.*, 186 F.R.D. 581, 583 (N.D. Cal. 1999) ("[R]equirements of Rule 20(a) are construed liberally in order to promote the broadest scope of action consistent with

10

1   fairness to the parties.") (citing *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558

2   F.2d 914, 917 (9th Cir. 1977)).

3        In sum, Rules 15 and 20 establish a liberal standard that favors granting leave to amend.

4   That standard is easily satisfied here.

5               **B.      The Proposed Amendments Meet the Requirements of Rules 15 and 20**

6        Plaintiffs' proposed amendments to add as Defendants Thomson, Mitsubishi, and, in the

7   case of Costco, Samsung SDI, satisfy the requirements of Rules 15 and 20.  So too do Plaintiffs'

8   proposed tolling amendments and additions of non-party co-conspirators satisfy the rules to

9   amend.  Indeed, none of the factors that weigh against granting leave to amend a complaint are

10  present here.  Accordingly, Plaintiffs' motion for leave to amend should be granted.

11              **1.       The Proposed Amendments Would Not Cause Undue Prejudice**

12       The party opposing amendment has the burden of establishing undue prejudice.  *DCD*

13  *Programs*, 833 F.2d at 187.  Prejudice must be substantial to justify denial of leave to amend.

14  The nonmovant "must show that it was unfairly disadvantaged or deprived of the opportunity to

15  present facts or evidence which it would have offered had the amendments been timely." *Bechtel*

16  *v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (internal quotations omitted); *see also Smith v.*

17  *Guaranty Servs. Corp.*, 51 F.R.D. 289, 293 (N.D. Cal. 1970) (undue prejudice means undue

18  difficulty in defending a lawsuit due to a change in tactics or theories by the other party).

19       The proposed amendments would not cause undue prejudice to the parties that Plaintiffs

20  seek to add.  As noted by Special Master Legge in conjunction with the IPPs' motion, it is still

21  relatively early in this MDL proceeding (particularly in light of the recent revisions to the

22  Scheduling Order): merits depositions have only just begun, the discovery cutoff date is nearly a

23  year away, and trials are not scheduled to begin until October 2014.  *See* Amended Report on IPP

24  Motion to Amend Complaint, Dkt. 1453 at 2 (Nov. 19, 2012); Revised Scheduling Order, Dkt.

25  No. 1595 (Mar. 13, 2013).  Nor do the prior proceedings support a claim of prejudice:  "numerous

26  other defendants' counsel have been representing the defense interest throughout the course of

27                                                    11

28  PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
    Case No. 3:07-05944-SC
    MDL No. 1917

1    this litigation," there have been "no decisions by the court which would adversely impact

2    Mitsubishi [or Thomson]," and discovery considerations are "not so much as to be prejudicial to

3    Mitsubishi's [or Thomson's] right to defend itself in this litigation." *Id.* at 2-3. Furthermore,

4    Mitsubishi and Thomson have been on notice of the facts described in Plaintiffs' complaints since

5    2007, when the IPPs named Thomson as a defendant, or at least since 2011, when the IPPs

6    entered a tolling agreement with both Thomson and Mitsubishi. *See* IPPs' Motion for Leave to

7    Amend Complaint, Dkt. 1325 at 7 (Aug. 22, 2012).

8            Nor would Costco's proposed amendments prejudice existing Defendants Samsung SDI

9    and Panasonic. All of the Samsung SDI and Panasonic entities in question have been named as

10   Defendants in multiple Plaintiffs' operative complaints, both Defendant groups have appeared in

11   the action and are actively represented by counsel, and both will continue to defend themselves in

12   this litigation regardless of whether they are named in Costco's complaint. Through the joint

13   defense group, Samsung SDI and Panasonic have participated in the limited discovery

14   propounded on Costco to date and undoubtedly will participate in further discovery in the coming

15   months. Neither Samsung SDI nor Panasonic can establish that prejudice would result from

16   Costco's proposed amendment. And Costco's proposed amendment would not be futile because

17   there is ample evidence of both companies' participation in the conspiracy and because Costco's

18   claims are not barred by the statute of limitations.

19           Plaintiffs' proposed amendments would not alter the scope of discovery against the

20   existing Defendants or otherwise prejudice them. Plaintiffs' operative complaints put Defendants

21   on notice that Plaintiffs might pursue other co-conspirators based on what Plaintiffs learned

22   through discovery. *See, e.g.*, Costco's Original Complaint at ¶ 58. And the proposed amendment

23   will not make it any more difficult for the existing Defendants to defend this action. To the

24   contrary, joining Mitsubishi and Thomson to the existing actions would promote judicial

25   economy and should serve to reduce the costs of this litigation. As such, there is no risk of

26   prejudice from the proposed amendments.

27                                                      12

28   PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
     Case No. 3:07-05944-SC
     MDL No. 1917

Finally, Defendants cannot establish that they will suffer undue prejudice by Plaintiffs' proposed tolling amendments. As discussed, Plaintiffs' complaints already plead abundant facts in support of Government Action tolling and show that the DAPs were members of the putative DPP class sufficient to establish *American Pipe* and Cross-Jurisdictional tolling. These theories should therefore present no surprise to Defendants. And unlike fact-intensive fraudulent-concealment tolling, these legal-tolling theories do not require discovery.

### 2. The Proposed Amendments Do Not Implicate the Other *Foman* Factors

Just as the non-moving parties cannot meet their burden of establishing undue prejudice, so too are they unable to establish any of the other factors that counsel against amendment.

First, there is simply no basis to claim "bad faith or dilatory motive on part of the [Plaintiffs]," and the proposed amendments do not entail "undue delay." *See Foman*, 371 U.S. at 182. To the contrary, Plaintiffs have acted diligently by seeking amendment soon after unearthing evidence of Thomson's and Mitsubishi's participation in the conspiracy. Of course, there is no requirement that a plaintiff move to amend the moment it discovers such evidence. Indeed, "delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs*, 833 F.2d at 186; *see also Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973) ("While it is true that the motion was made five years after the third party complaint had been filed, we know of no case where delay alone was deemed sufficient grounds to deny a Rule 15(a) motion to amend . . . . There is no allegation that the government's motion was made in bad faith even though the government gave no reason for its lengthy delay."). Accordingly, courts liberally allow amendment to add new defendants after significant passage of time. *See, e.g., Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 145 F.R.D. 336, 338-39 (S.D.N.Y. 1993) (rejecting claims of undue delay and permitting plaintiffs to add new defendants approximately five years after commencement of case); *Issen v. GSC Enters., Inc.*, 552 F. Supp. 390, 394 (N.D. Ill. 1981)

13

1   (permitting amendment despite seven-year delay since amendment came before close of

2   discovery, before trial, and before rulings on summary judgment motions).

3           As to Plaintiffs' tolling amendments, and putting aside that Defendants are keenly aware

4   of the DOJ's criminal indictments, Plaintiffs have already asserted a wealth of allegations in their

5   complaints setting forth in great detail the factual basis for Government Action tolling.  And the

6   DAPs already allege facts showing that they were members of the DPP class.  *See Burdick v.*

7   *Union Sec. Ins. Co.,* No. 07-cv-4028 ABC (JCx), 2009 WL 4798873, at *10 n.17 (C.D. Cal. Dec.

8   9, 2009) (plaintiffs need not literally raise "equitable tolling" in the complaint for the doctrine to

9   apply; rather, "the sole issue is whether the complaint, liberally construed in light of our 'notice

10  pleading' system, adequately alleges facts showing the potential applicability of the equitable

11  tolling doctrine.").   And it is well settled that "[a] class complaint notifies the defendants not only

12  of the substantive claims being brought against them, but also of the number and generic

13  identities of the potential plaintiffs who may participate in the judgment." *Crown, Cork & Seal*

14  *Co. v. Parker*, 462 U.S. 345, 350-52 (1983) (citations omitted).  For these reasons, leave to amend

15  is proper.

16          Additionally, the proposed amendments do not alter the factual or legal questions

17  presented in the case.  The causes of action asserted against Thomson and Mitsubishi (and, in the

18  case of Costco, against Samsung SDI) are identical to those asserted against the existing

19  Defendants.  As the Special Master noted in connection with the IPPs' previous motion to amend,

20  "[i]t does not appear that any new issues would be added to the case." *See* Amended Report on

21  IPP Motion to Amend Complaint, Dkt. 1453 at 2 (Nov. 19, 2012).

22          Finally, the proposed amendments are not futile.  *See Foman*, 371 U.S. at 182.  To the

23  contrary, Plaintiffs have established that they have a reasonable basis to seek the addition of the

24  new Defendants.  Indeed, "[t]he reports demonstrate Mitsubishi's participation in the exchange of

25  production information with the other defendants, and show that Mitsubishi accounted for a

26  meaningful share of the United States market for CRTs during the alleged class period."

27
                                                    14
    PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28  Case No. 3:07-05944-SC
    MDL No. 1917

1   Amended Report on IPP Motion to Amend Complaint, Dkt. 1453 at 2 (Nov. 19, 2012).  The

2   evidence is at least as strong with respect to Thomson, Samsung SDI, and Panasonic.

3   Accordingly, "[t]he addition of Mitsubishi [and the other putative Defendants] meets the

4   requirements of Federal Rule of Civil Procedure 15(a) and the factors enumerated in *Foman v.*

5   *Davis*, 371 U.S. 178 (1962)." *Id.*  Similarly, Plaintiffs' proposed tolling amendments merely

6   reinforce what has already been pleaded:  that the limitations period was tolled as a matter of law

7   during the pendency of the DPP class action pursuant to *American Pipe* and Cross-Jurisdictional

8   tolling and during the pendency of the DOJ's criminal proceedings against Defendants pursuant

9   to Government Action tolling.

10              **3.    The Proposed Amendments Satisfy the Joinder Requirements
                        of Rule 20**
11

12          The addition of the new parties likewise comports with the liberal joinder requirements of

13  Rule 20.  Without question, the underlying factual basis for all claims arises out of the "same

14  transaction or occurrence," *i.e.*, a single overarching price-fixing conspiracy under which

15  Defendants are jointly and severally liable for their conduct.  *See* Fed. R. Civ. P. 20(a)(2)(A);

16  *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 633 (7th Cir. 2002) (holding

17  that every participant in an antitrust conspiracy is jointly and severally liable for overcharges by

18  other members of the cartel).  So too do the claims against the would-be Defendants involve

19  "question[s] of law or fact common to all defendants."  *See* Fed. R. Civ. P. 20(a)(2)(B).  As such,

20  addition of the new parties is proper.

21  **IV.    CONCLUSION**

22          For the foregoing reasons, Plaintiffs' Motion for Leave to File Amended Complaints

23  should be granted.

24

25

26

27                                              15
    PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28  Case No. 3:07-05944-SC
    MDL No. 1917

| | |
|---|---|
| 1 | DATED:  March 26, 2013 |

| | |
|---|---|

/s/  David. J. Burman
_____

David J. Burman (admitted *pro hac vice*)
Cori G. Moore (admitted *pro hac vice*)
Eric J. Weiss (admitted *pro hac vice*)
Nicholas H. Hesterberg (admitted *pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:      206.359.8000
Facsimile:      206.359.9000
Email:  DBurman@perkinscoie.com
Email:  CGMoore@perkiscoie.com
Email:  EWeiss@perkinscoie.com
Email:  NHesterberg@perkinscoie.com

Joren Bass, Bar No. 208143
JBass@perkinscoie.com
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:      415.344.7120
Facsimile:      415.344.7320

*Attorneys for Plaintiff Costco Wholesale*
*Corporation*


/s/  Philip J. Iovieno
_____

Philip J. Iovieno
Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email:  piovieno@bsfllp.com
Email:  anardacci@bsfllp.com

William A. Isaacson
Jennifer Milici
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com
Email:  jmilici@bsfllp.com

16

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

Stuart Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

*Liaison Counsel for Direct Action Plaintiffs and
Attorneys for Plaintiffs Electrograph Systems, Inc.,
Electrograph Technologies, Corp., Office Depot,
Inc., Compucom Systems, Inc., Interbond
Corporation of America, P.C. Richard & Son Long
Island Corporation, Marta Cooperative of America,
Inc., ABC Appliance, Inc., Schultze Agency Services
LLC on behalf of Tweeter Opco, LLC and Tweeter
Newco, LLC*

/s/ Roman M. Silberfeld
Roman M. Silberfeld, (SBN 62783)
David Martinez, (SBN 193183)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3400
Los Angeles, CA 90067-3208
Telephone: (310) 552-0130
Facsimile: (310) 229-5800
Email: RMSilberfeld@rkmc.com
Email: DMartinez@rkmc.com

*Attorneys For Plaintiffs Best Buy Co., Inc, Best Buy
Purchasing LLC, Best Buy Enterprise Services, Inc.,
Best Buy Stores, L.P., Bestbuy.com, L.L.C., and
Magnolia Hi-Fi, LLC*

/s/ Kenneth S. Marks
H. Lee Godfrey
Kenneth S. Marks
Jonathan J. Ross
Johnny W. Carter
David M. Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

17

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

1   Email: lgodfrey@sumangodfrey.com
    Email: kmarks@susmangodfrey.com
2   Email: jross@susmangodfrey.com
    Email: jcarter@susmangodfrey.com
3   Email: dpeterson@susmangodfrey.com

4
    Parker C. Folse III
5   Rachel S. Black
    Jordan Connors
6   SUSMAN GODFREY L.L.P.
    1201 Third Avenue, Suite 3800
7   Seattle, Washington 98101-3000
    Telephone: (206) 516-3880
8   Facsimile: (206) 516-3883
9   Email: pfolse@susmangodfrey.com
    Email: rblack@susmangodfrey.com
10  Email: jconnors@susmangodfrey.com

11  *Attorneys for Plaintiff Alfred H. Siegel, as Trustee*
12  *of the Circuit City Stores, Inc. Liquidating Trust*

13

14  /s/ Jason C. Murray
    Jason C. Murray (CA Bar No. 169806)
15  CROWELL & MORING LLP
    515 South Flower St., 40th Floor
16  Los Angeles, CA 90071
    Telephone: 213-443-5582
17  Facsimile: 213-622-2690
    Email:      jmurray@crowell.com
18
    Jerome A. Murphy (*pro hac vice*)
19  Astor H.L. Heaven (*pro hac vice*)
    CROWELL & MORING LLP
20  1001 Pennsylvania Avenue, N.W.
    Washington, D.C. 20004
21  Telephone: 202-624-2500
    Facsimile: 202-628-5116
22  E-mail: jmurphy@crowell.com
              aheaven@crowell.com
23
    *Counsel for Target Corp. and RadioShack Corp.*
24

25
    /s/ Richard Alan Arnold
26  Richard Alan Arnold

27                          18
    PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
28  Case No. 3:07-05944-SC
    MDL No. 1917

1
2
3
4
5
6
7
8
9

William J. Blechman
Kevin J. Murray
KENNY NACHWALTER, P.A.
201 S. Biscayne Blvd., Suite 1100
Miami, FL 33131
Tel: 305-373-1000
Fax: 305-372-1861
Email:   rarnold@knpa.com
Email:   wblechman@knpa.com
Email:   kmurray@knpa.com

*Counsel for Plaintiff Sears, Roebuck and Co. and Kmart Corp.;*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. 3:07-05944-SC
MDL No. 1917

# **EXHIBIT A**



**EUROPEAN COMMISSION**

**PRESS RELEASE**

Brussels, 5 December 2012

# Antitrust: Commission fines producers of TV and computer monitor tubes € 1.47 billion for two decade-long cartels

The European Commission has fined seven international groups of companies a total of € 1 470 515 000 for participating in either one or both of two distinct cartels in the sector of cathode ray tubes ("CRT"). For almost ten years, between 1996 and 2006, these companies fixed prices, shared markets, allocated customers between themselves and restricted their output. One cartel concerned colour picture tubes used for televisions and the other one colour display tubes used in computer monitors. The cartels operated worldwide. The infringements found by the Commission therefore cover the entire European Economic Area (EEA). Chunghwa, LG Electronics, Philips and Samsung SDI participated in both cartels, while Panasonic, Toshiba, MTPD (currently a Panasonic subsidiary) and Technicolor (formerly Thomson) participated only in the cartel for television tubes. Chunghwa received full immunity from fines under the Commission's 2006 Leniency Notice for the two cartels, as it was the first to reveal their existence to the Commission. Other companies received reductions of their fines for their cooperation in the investigation under the Commission's leniency programme.

Commission Vice President in charge of competition policy Joaquín Almunia said: *"These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behaviour that are strictly forbidden to companies doing business in Europe. Cathode ray tubes were a very important component in the making of television and computer screens. They accounted for 50 to 70% of the price of a screen. This gives an indication of the serious harm this illegal behaviour has caused both to television and computer screen producers in the EEA, and ultimately the harm it caused to the European consumers over the years".*

The two CRT cartels are among the most organised cartels that the Commission has investigated. For almost 10 years, the cartelists carried out the most harmful anti-competitive practices including price fixing, market sharing, customer allocation, capacity and output coordination and exchanges of commercial sensitive information. The cartelists also monitored the implementation, including auditing compliance with the capacity restrictions by plant visits in the case of the computer monitor tubes cartel.

**IP/12/1317**

Top management level meetings, dubbed "green(s) meetings" by the cartelists themselves because they were often followed by a golf game, designed the orientations for the two cartels. Preparation and implementation were carried out through lower level meetings, often referred to as "glass meetings", on a quarterly, monthly, sometimes even weekly basis. Meetings were held in various locations in Asia (Taiwan, Korea, Japan, Malaysia, Indonesia, Thailand, Hong Kong, etc.) and Europe (Amsterdam, Budapest, Glasgow, Paris, Rome). The cartels operated worldwide.

Multilateral meetings usually started with a review of demand, production, sales and capacity in the main sales areas, including Europe; then prices were discussed, including for individual customers, i.e. TV and computer manufacturers. They had therefore a direct impact on customers in the European Economic Area (EEA), ultimately harming final consumers. The cartelists were trying to address the decline of the CRT market in a collusive way, to the detriment of consumers. For example, one document recording the cartel discussions spells out clearly: *"producers need to avoid price competition through controlling their production capacity"*.

The investigation also revealed that the companies were well aware they were breaking the law. For instance, in a document found during the Commission's inspections, a warning goes as follows: *"Everybody is requested to keep it as secret as it would be serious damage if it is open to customers or European Commission"*. The participants were therefore taking precautions to avoid being in possession of anticompetitive documents. Some documents spelled out, for example: *"Please dispose the following document after reading it"*.

## Fines

The fines were set on the basis of the [Commission's 2006 Guidelines on fines](#) (see [IP/06/857](#) and [MEMO/06/256](#)).

In setting the level of fines, the Commission took into account the companies' sales of the products concerned in the EEA, the very serious nature of the infringement, its geographic scope, its implementation and its duration. If Chunghwa had not received full immunity, its fines would have been € 8 385 000 for the TV tubes cartel and € 8 594 000 for the computer monitor tubes cartel. Samsung SDI, Philips and Technicolor received reductions of fines ranging from 10 to 40% for their cooperation under the Commission's leniency programme. The reductions reflect the timing of their cooperation and the extent to which the evidence they provided helped the Commission to prove the respective cartels. One of the companies invoked its inability to pay the fine. The Commission assessed this claim under point 35 of the 2006 fines Guidelines and granted a reduction of the fine.

2

The fines imposed are as follows:

| Name of undertaking | Reduction under the Leniency Notice (%) | Fine for the TV tubes cartel[1] (€) | Fine for the computer monitor tubes cartel[1] (€) | Total fine[1] (€) |
|---|---|---|---|---|
| Chunghwa[2] | 100% | 0 | 0 | 0 |
| Samsung SDI | 40% | 81 424 000 | 69 418 000 | 150 842 000 |
| Philips | 30% | 240 171 000 | 73 185 000 | 313 356 000 |
| LG Electronics | 0% | 179 061 000 | 116 536 000 | 295 597 000 |
| Philips and LG Electronics[2] | 30% (reduction only for Philips) | 322 892 000 | 69 048 000 | 391 940 000 |
| Technicolor | 10% | 38 631 000 | | 38 631 000 |
| Panasonic | 0% | 157 478 000 | | 157 478 000 |
| Toshiba | 0% | 28 048 000 | | 28 048 000 |
| Panasonic, Toshiba and MTPD[2] | 0% | 86 738 000 | | 86 738 000 |
| Panasonic and MTPD[2] | 0% | 7 885 000 | | 7 885 000 |
| **TOTAL** | | 1 142 328 000 | 328 187 000 | **1 470 515 000** |

[1] *Legal entities within the undertaking may be held jointly and severally liable for the whole or part of the fine imposed.*

[2] *Jointly and severally liable for that whole fine imposed.*

## Background

A Cathode Ray Tube ("CRT") is an evacuated glass envelope containing an electron gun and a fluorescent screen. Two distinct types of CRTs are relevant for the cartels sanctioned in today's decisions: (i) colour display tubes (CDT) used in computer monitors and (ii) colour picture tubes (CPT) used for colour televisions. The CRT was gradually replaced by alternative techniques such as LCD and plasma displays.

The Commission's investigation started with unannounced inspections in November 2007 (see MEMO/07/453). A statement of objections was issued in November 2009 (see MEMO/09/525) on which the companies had the opportunity to comment and to be heard. A supplementary statement of objections concerning corporate liability was issued in June 2012 against two companies.

More information on this case will be available under the case number 39437 in the Commission's public case register on the competition website, once confidentiality issues have been dealt with. For more information on the Commission's action against cartels, see its cartels website.

## Action for damages

Any person or firm affected by anti-competitive behaviour as described in this case may bring the matter before the courts of the Member States and seek damages. The case law of the European Court of Justice (ECJ) and the Antitrust Regulation (Council Regulation 1/2003) both confirm that in cases before national courts, a Commission decision is binding proof that the behaviour took place and was illegal. Even though the Commission has fined the companies concerned, damages may be awarded without these being reduced on account of the Commission fine.

The Commission considers that meritorious claims for damages should be aimed at compensating, in a fair way, the victims of an infringement for the harm done. More information on antitrust damages actions, including the public consultation and a citizens' summary, is available at:

http://ec.europa.eu/comm/competition/antitrust/actionsdamages/documents.html

---

Contacts :

Antoine Colombani  (+32 2 297 45 13)

Marisa Gonzalez Iglesias  (+32 2 295 19 25)

---

# EXHIBIT B



ANNUAL REPORT **2011**
including the Annual Financial Report

**ANNUAL REPORT 2011** ............................................. 1

**1** **PRESENTATION OF THE GROUP AND ITS ACTIVITIES** ................................ 5
1.1   Selected Financial Data ............................................. 6
1.2   History and Strategy of the Company ................. 9
1.3   Business Overview ..................................................... 13

**2** **OPERATING AND FINANCIAL REVIEW AND PROSPECTS** ................................ 21
2.1   Overview ...................................................................... 22
2.2   Trends in the Media & Entertainment industry ...... 22
2.3   Summary of results .................................................. 23
2.4   Seasonality ................................................................. 24
2.5   Geographic breakdown of revenues & Effect of exchange rate fluctuations ........................ 24
2.6   Events subsequent to December 31, 2011 .......... 25
2.7   Notification of interests acquired in the share capital of French companies in 2011 ............. 26
2.8   Notification of interests acquired in the share capital of French companies in 2010 ............. 26
2.9   Results of operations for 2011 and 2010 ........... 26
2.10  Liquidity and capital resources ........................... 33
2.11  Priorities and objectives for 2012 ....................... 41

**3** **RISK FACTORS** ...................................................... 43
3.1   Risk related to the debt restructuring ............... 44
3.2   Market Risk ................................................................ 46
3.3   Risks related to the business ............................... 47
3.4   Other risks ................................................................. 53
3.5   Insurance .................................................................... 55

**4** **CORPORATE GOVERNANCE AND INTERNAL CONTROL PROCEDURES** ................. 57
4.1   Board of Directors .................................................... 58
4.2   Chairman's report on corporate governance, internal control and risk management ............ 64
4.3   Statutory Auditors' report on the Chairman's report on internal control procedures ........... 76
4.4   Compensation and benefits of Directors ........... 77
4.5   Executive Committee .............................................. 84

**5** **TECHNICOLOR AND ITS SHAREHOLDERS** ................. 87
5.1   Share capital .............................................................. 88
5.2   Listing information ................................................... 95

**6** **SOCIAL INFORMATION AND SUSTAINABILITY** ........... 97
6.1   Employees and workforce ....................................... 98
6.2   Environmental matters .......................................... 107
6.3   Technicolor Foundation for Cinema Heritage ...... 117

**7** **ADDITIONAL INFORMATION** ................................. 119
7.1   Property, Plant and Equipment .......................... 120
7.2   Memorandum and bylaws ..................................... 124
7.3   Material contracts .................................................. 125
7.4   Additional tax information ................................... 126
7.5   Organization of the Group .................................. 127
7.6   Documents on display ........................................... 130
7.7   Information on accounting services ................... 130
7.8   Accounting fees and services .............................. 131
7.9   Persons responsible for the Registration Document and the Annual Financial Report .......... 132

**8** **FINANCIAL STATEMENTS** .................................... 133
8.1   Technicolor 2011 consolidated financial statements ............. 134
8.2   Notes to the consolidated financial statements ............... 141
8.3   Statutory Auditors' report on the Consolidated Financial Statements ............. 231
8.4   Technicolor sa parent company financial statements ............. 233
8.5   Notes to the Parent Company Financial Statements .......... 236
8.6   Parent company financial data over the five last years (under article R.225-102 of the French Commercial code) ........... 257
8.7   Statutory auditors' report on the financial statements for the year ended December 31, 2011 .......... 258
8.8   Statutory Auditor's Special report on regulated agreements and commitments ........... 260

**9** **REGISTRATION DOCUMENT CROSS REFERENCE TABLE** ............................ 261



*Société anonyme* with a share capital of €223,759,083
Registered Office: 1-5, rue Jeanne d'Arc
92130 Issy-Les-Moulineaux
Nanterre Register of Commerce and companies No. 333 773 174

# ANNUAL REPORT **2011**



This Registration document *(Document de Référence)* was filed with the *Autorité des Marchés Financiers* (AMF) on March 27, 2012 in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note *(note d'opération)* approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

This registration document can be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA, Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson/Technicolor sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC should render its decision in 2012, but the Company considers that the timetable for the remainder of this proceeding cannot be accurately determined.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998.

In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway.

It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, TCETVT has incurred approximately U.S.$11 million in remediation costs. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$6.3 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate.

In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

# EXHIBIT C

1  David J. Burman (admitted *pro hac vice*)
   DBurman@perkinscoie.com
2  Cori G. Moore (admitted *pro hac vice*)
   CGMoore@perkinscoie.com
3  Eric J. Weiss (admitted *pro hac vice*)
   EWeiss@perkinscoie.com
4  Nicholas H. Hesterberg (admitted *pro hac vice*)
   NHesterberg@perkinscoie.com
5  **PERKINS COIE LLP**
   1201 Third Avenue, Suite 4900
6  Seattle, WA  98101-3099
   Telephone:  206.359.8000
7  Facsimile:  206.359.9000

8  Joren S. Bass, Bar No. 208143
   JBass@perkinscoie.com
9  **PERKINS COIE LLP**
   Four Embarcadero Center, Suite 2400
10 San Francisco, CA  94111-4131
   Telephone:  415.344.7120
11 Facsimilie:  415.344.7320

12 Attorneys for Plaintiff
   COSTCO WHOLESALE CORPORATION

13

14                 ~~UNITED STATES DISTRICT COURT~~

15               ~~WESTERN DISTRICT OF WASHINGTON~~

16       ~~AT SEATTLE~~ UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18

| | |
|---|---|
| 19  COSTCO WHOLESALE CORPORATION, | Master File No. 3:07-cv-05944-SC |
| 20           Plaintiff, | MDL No. 1917 |
| 21        v. | Individual Case No. 3:11-cv-06397 |
| 22  HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS | FIRST AMENDED COMPLAINT AND JURY DEMAND |

23
24
25
26
27
28

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO.,
LTD.; SAMSUNG ELECTRONICS AMERICA,
INC.; SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.;  SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG SDI
CO., LTD.; TIANJIN SAMSUNG SDI CO.,
LTD.; SAMSUNG SDI (MALAYSIA) SDN.
BHD.; SAMTEL COLOR LTD.; THAI CRT
CO., LTD.; TOSHIBA CORPORATION;
TOSHIBA AMERICA, INC.; TOSHIBA
AMERICA CONSUMER PRODUCTS, LLC;
TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.;
CHUNGHWA PICTURE TUBES, LTD.;
CHUNGHWA PICTURE TUBES
(MALAYSIA); TATUNG COMPANY OF
AMERICA, INC. TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

Defendants.

Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive

relief under the antitrust laws of the United States and of the states of California, Arizona,

Florida, Illinois, and Washington.  Costco alleges as follows based on information including the

pleas and prosecutions of certain Defendants and their executives as well as allegations in the

complaints of the direct and indirect purchaser classes and of other direct action plaintiffs,

allegations that were in some cases tested by motions to dismiss in MDL No. 1917.

**INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel that conducted a

conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the

"Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or

maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs").  The effects of the conspiracy on prices lasted into at least 2008.

2.     Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them are referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.     Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.  The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.     Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.     Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

3

6.      The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings and communications during the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from the highest levels of the companies, as well as regional managers and others.

7.      The conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      Throughout the Relevant Period, the conspiracy moderated the normal downward pressure on prices caused by periods of oversupply, process and other efficiency gains, and technological change.  The prices of producers who were not members of the conspiracy were also higher as a result of the conspiracy than they otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when prices declined, they declined from supra-competitive levels, rather than levels set by free and open competition, and prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any source than it would have paid in a competitive market.

10.     During the Relevant Period, Costco purchased CRT Products in the United States directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

4

**PARTIES**

**A.      Plaintiff**

11.      Plaintiff Costco Wholesale Corporation is now a Washington corporation with its principal place of business in Issaquah, Washington.  Costco operates throughout the United States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

12.      Costco Wholesale Corporation is the result of the combination of two companies: Costco and Price Club.  Price Club was founded in San Diego, California, in 1976, and grew to 76 United States stores by 1992, with over half in California.  Costco was founded in 1983 in Washington and by 1992 had over 90 stores nationwide, with nearly half in California.  In 1993, Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware.  As the new name suggested, the two companies were not fully integrated for many years, and the company had two principal executive offices, in San Diego, California, and Kirkland, Washington.  Many headquarters functions continued in California during the Relevant Period.  In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in Washington.

13.      During the Relevant Period, Costco purchased in the United States large numbers of CRT Products whose prices were inflated by the conspiracy.  Costco purchased and sold more such CRT Products in California than in any other state during the Relevant Period.  Costco's negotiations for the purchase of CRT Products took place primarily in the United States, and the basic choice of vendors was made from the company's headquarters.  Decisions among approved vendors and as to volumes to purchase were made in, and Costco purchase orders were created in and issued from, regional offices located in multiple states including California, Washington, Texas, Virginia, and Georgia.  Costco issued more purchase orders for CRT Products from California than from any other state.  The purchase orders reflected the volumes affected by and incorporated the supra-competitive prices resulting from the conspiracy.  Invoices were sent to Costco in Washington, with the invoices reflecting volumes and prices specified in purchase orders issued from the regional offices.

5

14.     Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida.  Costco received far more CRT Products in California than in any other state.

15.     Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16.     Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business.  There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations.  Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B.     Defendants**

      **1.     Hitachi Entities**

17.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi,

6

1  Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant
2  Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either
3  directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi,
4  Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to
5  the antitrust violations alleged in this complaint.

6      19.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company
7  with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.
8  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During
9  the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT
10  Products, either directly or through its subsidiaries or affiliates, throughout the United States.
11  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi
12  America relating to the antitrust violations alleged in this complaint.

13      20.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its
14  principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore
15  528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.
16  During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT
17  Products, either directly or through its subsidiaries or affiliates, throughout the United States.
18  Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi
19  Asia relating to the antitrust violations alleged in this complaint.

20      21.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware
21  corporation with its principal place of business located at 208 Fairforest Way, Greenville, South
22  Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During
23  the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either
24  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi,
25  Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS
26  relating to the antitrust violations alleged in this complaint.

27      22.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi
28  Shenzhen") was a Chinese company with its principal place of business located at 5001

7

1    Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at

2    least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the

3    time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen

4    was a member of the Hitachi corporate group for all but the last two weeks of the Relevant

5    Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and

6    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7    United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

8    finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in

9    this complaint.

10         23.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

11   HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

12         **2.    IRICO Entities**

13         24.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its

14   principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

15   IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

16   distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed,

17   sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates,

18   throughout the United States.

19         25.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

20   its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

21   712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT

22   manufacturer in China and one of the leading global manufacturers of CRTs. The website also

23   claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and

24   sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE

25   manufactured, marketed, sold, and distributed CRT Products, either directly or through its

26   subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled

27   the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this

28   complaint.

8

26.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.    Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.    LG Electronics Entities**

28.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

29.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

9

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

**4.     LP Displays**

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     BMCC**

33.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  BMCC is the second

10

largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

34.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Breitner Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips America relating to the antitrust violations alleged in this complaint.

36.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

11

1  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips

2  Taiwan relating to the antitrust violations alleged in this complaint.

3       37.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

4  Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

5  andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and

6  controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil

7  manufactured, marketed, sold, and distributed CRT Products, either directly or through its

8  subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

9  controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations

10  alleged in this complaint.

11       38.    Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are

12  collectively referred to as "Philips."

13       **7.    Samsung Entities**

14       39.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company

15  with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

16  dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.

17  During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products,

18  either directly or through subsidiaries or affiliates, throughout the United States.

19       40.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

20  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

21  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

22  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed

23  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

24  States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung

25  SEAI relating to the antitrust violations alleged in this complaint.

26       41.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

27  ("Samsung SDI") is a South Korean company with its principal place of business located at 575

28  Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a

12

major shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

42.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

43.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

44.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI

13

Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

45.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

46.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

47.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances,

policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

48.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia and their subsidiaries and affiliates are collectively referred to as "Samsung."

**8.    Samtel**

42.49.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.    Thai CRT**

43.50.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**10.    Toshiba Entities**

44.51.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC consolidated its CRT business into MTPD, a joint venture with co-conspirator

15

1    Panasonic Corporation.  During the Relevant Period, TC manufactured, marketed, sold, and

2    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

3    United States.

4        45.52.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

5    with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

6    York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of

7    Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and

8    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9    United States.  Defendant TC dominated and controlled the finances, policies, and affairs of

10   Toshiba America relating to the antitrust violations alleged in this complaint.

11       46.53.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

12   liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.

13   TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

14   During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products,

15   either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

16   TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust

17   violations alleged in this complaint.

18       47.54.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

19   California corporation with its principal place of business located at 19900 MacArthur Boulevard,

20   Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of

21   Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured,

22   marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

24   policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

25       48.55.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

26   corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California

27   92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through

28   Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and

16

1   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

2   United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAIS

3   relating to the antitrust violations alleged in this complaint.

4       49.56.  Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively

5   referred to as "Toshiba."

6       **11.    Chunghwa Entities**

7       50.57.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

8   company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

9   Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974,

10  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

11  that market.  Chunghwa PT's Board of Directors includes representatives from Tatung Company,

12  and its Chairman is also the Chairman and General Manager of Tatung Company.  Throughout

13  the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the

14  Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly

15  or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United

16  States.

17      51.58.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

18  Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

19  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

20  owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

21  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

22  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

23  Products either directly or through its subsidiaries or affiliates throughout the United States.

24  Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of

25  Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

26      52.59.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as

27  "Chunghwa."

28

12. Tatung Company of America, Inc.

53. Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold, and distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

**12.     Thomson Entities**

60.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

18

1    61.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

2    ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business

3    located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer

4    Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a

5    major manufacturer of CRTs for the United States market, with plants located in Scranton,

6    Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were

7    closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-

8    manufacturing division, which had plants in the United States and Mexico, and to other television

9    manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the

10   United States to United States consumers under the RCA brand.  Thomson Consumer

11   Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was

12   sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics

13   manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly

14   through its subsidiaries or affiliates, to customers throughout the United States.

15   62.    Thomson SA and Thomson Consumer Electronics are collectively referred to

16   herein as "Thomson."

17   **13.    Mitsubishi Entities**

18   63.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a

19   Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

20   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

21   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

22   internally to Mitsubishi's television and monitor manufacturing division and to other television

23   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

24   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

25   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

26   United States.

27   64.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric

28   USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.

19

1   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

2   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

3   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

4   and monitor manufacturing division and to other television and monitor manufacturers in the U.S.

5   and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other

6   CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

7   marketed, sold and distributed CRT Products in the United States.

8          65.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a

9   United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi

10  Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period,

11  Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and

12  monitors in the United States.

13         66.     Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

14  collectively referred to herein as "Mitsubishi."

15  **C.      Agents and Co-Conspirators**

16         54.67.  The acts alleged against Defendants in this Complaint were authorized, ordered, or

17  done by their officers, agents, employees, or representatives while actively engaged in the

18  management and operation of Defendants' businesses or affairs.

19         55.68.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other

20  Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

21         56.69.  When Plaintiff refers to a corporate family or companies by a single name in

22  allegations of participation in the conspiracy, it is to be understood that one or more employees or

23  agents of entities within the corporate family engaged in conspiratorial meetings on behalf of

24  every company in that family.  In fact, the individual participants in the conspiratorial meetings

25  and discussions did not always know the corporate affiliation of their counterparts, nor did they

26  distinguish between the entities within a corporate family.

27         57.70.  Individual participants entered into agreements on behalf of, and reported these

28  meetings and discussions to, their respective corporate families.  As a result, the entire corporate

20

families were represented in meetings and discussions by their agents and were parties to the agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate families distributed CRT Products, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products would not undercut the pricing agreements reached at these various meetings.  Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

58.71.  Various persons or firms not named as Defendants participated as co-conspirators in the alleged violations, performed acts, and made statements in furtherance of the conspiracy, and manufactured, sold, and distributed CRT Products to customers in the United States.  These co-conspirators include, but are not limited to: Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of North America ("PCNA"), MT Picture Display Co., Ltd. (f/k/a Matsushita Toshiba Picture Display Co., Ltd.) ("MTPD"), Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia"), Videocon Industries, Ltd., Mitsubishi Electric Corporation, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, PT.MT Picture Display Indonesia, P.T. Tosummit Electronic Devices Indonesia ("TEDI"), and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

**JURISDICTION AND VENUE**

59.72.  Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California, Washington, Arizona, Florida, and Illinois.

60.73.  This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331, which provides this Court with original jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against

21

restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C.

§ 1332 or, alternatively, 28 U.S.C. § 1367.

61.74.  Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28

U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in

this district and a substantial portion of affected interstate commerce was carried out in this

district.

62.75.  Defendants are subject to the jurisdiction of this Court by virtue of their

nationwide contacts and other activities, as well as their contacts with the State of Washington.

63.76.  Related cases are pending in MDL No. 1917 in the Northern District of California,

and this matter should be consolidated there for pretrial purposes but returned to this district for

trial.

## FACTS AND BACKGROUND

### A.    CRT Technology

64.77.  A CRT has three components: (a) one or more electron guns, each of which is a

series of metallic structures used to generate a beam of electrons; (b) a magnetic or other

deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that

phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow

mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color

image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red,

green, blue, and black.

65.78.  CRT technology was first developed more than a century ago.  The first

commercially practical CRT television was made in 1931.  However, it was not until RCA

Corporation introduced the product at the 1939 World's Fair that it became widely available to

consumers.  After that, CRTs became the heart of most display products, including televisions,

computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

22

AMENDED COMPLAINT AND JURY DEMAND
MASTER FILE NO. 3:07-CV-05944-SC | MDL No. 1917 | INDIVIDUAL CASE NO. 3:11-cv-06397

66.79.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

67.80.  Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

68.81.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

69.82.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.  The market for CRTs and the market for the products into which they are placed are inextricably intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are effectively inseparable.  Defendants are well aware of this intimate relationship.

70.83.  Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

71.84.  Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, non-defendant original equipment manufacturers ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' conspiracy.

23

**B.    Structure of the CRT Industry**

~~72.~~ 85.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.    Market Concentration**

~~73.~~ 86.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.    Information Sharing**

~~74.~~ 87.  Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~75.~~ 88.  Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

24

**3.** **Consolidation**

~~76.~~89.  The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

**4.** **Multiple Interrelated Business Relationships**

~~77.~~90.  The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

~~78.~~91.  Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003.

d.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

e.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

f.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

25

g.      Defendant Chunghwa has a joint venture with Defendant Samsung for the
production of LCD panels.  Chunghwa now licenses the technology from
Defendant Philips.

h.      Defendants LG Electronics and Hitachi entered into a joint venture in 2000
for the manufacture, sale, and distribution of optical storage products such
as DVD drives.

i.      Defendant Samtel participates in a joint venture, Samcor Glass Limited,
with Defendant Samsung and non-Defendant Corning Inc., USA for the
production and supply of picture tube glass.

j.      Defendant Samtel claims to have supplied CRTs to Defendants including
LG Electronics, Samsung, and Philips.

**5.      High Costs of Entry Into the Industry**

79.92.  There are significant manufacturing and technological barriers to entry into the
CRT industry.  It would require substantial time, resources, and industry knowledge to overcome
these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in
light of the declining demand for CRT Products.

80.93.  During the Relevant Period, the costs of the assembly components, both as a whole
and individually, have been generally declining, and, in some periods, declining at a substantial
rate.   A combination of price discussions and manipulation of the output of CRTs allowed
Defendants to keep prices above where they would have been but for the conspiracy.

**6.      Maturity of the CRT Product Market**

81.94.  Newer industries typically are characterized by rapid growth, innovation, and high
profits.  The CRT Product market is a mature one, and like many mature industries, is
characterized by slim profit margins, creating a motivation to collude.

82.95.  Demand for CRT Products was declining through most or all of the Relevant
Period.  Static declining demand is another factor which makes the formation of a collusive

26

arrangement more likely because it provides a greater incentive to firms to avoid price competition.

83.96.  In addition, conventional CRT televisions and computer monitors were being replaced by LCD and plasma displays.  This was one of the factors which led Defendants to engage in price-fixing to slow the decline of CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

84.97.  Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during most of the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

85.98.  In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

86.99.  As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.     Homogeneity of CRT Products**

87.100. CRT Products are commodity-like products manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

88.101. It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

27

1

### C.     Pre-Conspiracy Market

2      ~~89.~~102.The genesis of the CRT conspiracy was in the late 1980s as the CRT Products

3  business became more international and Defendants began serving customers that were also being

4  served by other international companies.  During this period, the employees of Defendants would

5  encounter employees from their competitors when visiting their customers.  A culture of

6  cooperation developed over the years, and these Defendant employees would exchange market

7  information on production, capacity, and customers.

8      ~~90.~~103.In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion

9  visited each other's factories in Southeast Asia.  During this period, these producers began to

10  include discussions about price in their meetings.

11

### D.     Defendants' and Co-Conspirators' Illegal Agreements

12      ~~91.~~104.To control and maintain profitability during declining demand for CRT Products,

13  Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been

14  to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least

15  March, 1995, through at least November 25, 2007.

16      ~~92.~~105.The CRT conspiracy was effectuated through a combination of group and bilateral

17  meetings and other communications and activities.  In the formative years of the conspiracy

18  (1995-1996), bilateral discussions were the primary method of communication and took place on

19  an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG

20  Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices

21  for CRTs in general and to specific customers.  These meetings took place in Taiwan, South

22  Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

23      ~~93.~~106.Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with Daewoo, also

24  attended several ad hoc group meetings during this period.  The participants at these group

25  meetings also discussed increasing prices for CRTs.

26      ~~94.~~107.As more manufacturers formally entered the conspiracy, group meetings became

27  more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic

28

<center>28</center>

1  fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants'
2  representatives attended hundreds of these meetings during the Relevant Period.

3  95.108. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that
4  Defendants charged for CRTs.

5  **1. "Glass Meetings"**

6  96.109. The group meetings among the participants in the CRT price-fixing conspiracy
7  were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at
8  three levels of Defendants' corporations.

9  97.110. The first level meetings were attended by high level company executives including
10 CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings
11 occurred less frequently, typically quarterly, and were focused on longer term agreements and
12 forcing compliance with price-fixing agreements. Because attendees at top meetings had
13 authority as well as more reliable information, these meetings resulted in agreements. Attendees
14 at top meetings were also able to resolve disputes because they were decision makers who could
15 make agreements.

16 98.111. The second level meetings were attended by Defendants' high level sales
17 managers and were known as "management" meetings. These meetings occurred more
18 frequently, typically monthly, and handled implementation of the agreements made at top
19 meetings.

20 99.112. Finally, the third level meetings were known as "working level" meetings and
21 were attended by lower level sales and marketing employees. These meetings generally occurred
22 on a weekly or monthly basis and were mostly limited to the exchange of information and
23 discussing pricing since the lower level employees did not have the authority to enter into
24 agreements. These lower level employees would then transmit the competitive information up
25 the corporate reporting chain to those individuals with pricing authority. The working level
26 meetings also tended to be more regional and often took place near Defendants' factories. In
27 other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers'
28 employees met in Korea, the Chinese in China, and so on.

29

100.113.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

101.114.     Glass meetings also occurred occasionally in European countries.  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson.  Chunghwa also attended these meetings.

102.115.     Representatives of Defendants also attended what were known in the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

103.116.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

104.117.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales, and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

105.118.     The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the

30

following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

106.119.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

107.120.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

108.121.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

109.122.    The agreements reached at the glass meetings included:

      a.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

      b.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

31

    c.      agreements on pricing for intra-company CRTs sales to vertically integrated customers;

    d.      agreements as to what to tell customers about the reason for a price increase;

    e.      agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.      agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

    g.      agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demands;

    h.      agreements to coordinate uniform public statements regarding available capacity and supply;

    i.      agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.      agreements to allocate customers;

    k.      agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.      agreements to keep their meetings secret.

110.123.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal

32

1    customers; and 4) a recognition of a mutual interest in living up to the target price and living up to

2    the agreements that had been made.

3    111.124.      As market conditions worsened in 2005-2007, and the rate of replacement

4    of CRT Products by LCDs increased, the group glass meetings became less frequent and bilateral

5    meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

6    subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns

7    about antitrust liability.

8         **2.    Bilateral Discussions**

9    112.125.      Throughout the Relevant Period, the glass meetings were supplemented by

10   bilateral discussions between various Defendants.  The bilateral discussions were more informal

11   than the group meetings and occurred on a frequent, ad hoc basis, often between the group

12   meetings. These discussions, usually between sales and marketing employees, took the form of

13   in-person meetings, telephone contacts and emails.

14   113.126.      During the Relevant Period, in-person bilateral meetings took place in

15   Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

16   Brazil, and Mexico, and the United States.

17   114.127.      The purpose of the bilateral discussions was to exchange information about

18   past and future pricing, confirm production levels, share sales order information, confirm pricing

19   rumors, and coordinate pricing with manufacturers in other geographic locations, including

20   Brazil, Mexico, and Europe, and the United States.

21   115.128.      To ensure the efficacy of their global conspiracy, Defendants also used

22   bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the

23   United States.  These Brazilian and Mexican CRT manufacturers were particularly important

24   because they served the North American market for CRT Products.  North America was the

25   largest market for CRT televisions and computer monitors during the Relevant Period.  Because

26   these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of

27   Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants

28

33

1   ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised,

2   maintained, and stabilized at supracompetitive levels.

3       ~~116.~~129.        Defendants also used bilateral discussions with each other during price

4   negotiations with customers to avoid being persuaded by customers to cut prices.  The

5   information gained in these communications was then shared with supervisors and taken into

6   account in determining the price to be offered.

7       ~~117.~~130.        Bilateral discussions were also used to coordinate prices with CRT

8   manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the

9   few days following a top or management meeting, the attendees at these group meetings would

10  meet bilaterally with the other Defendant manufacturers for the purpose of communicating

11  whatever CRT pricing and output agreements had been reached during the meeting.  For example,

12  Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing

13  agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for

14  communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral

15  communications with Thomson in Europe and the United States, and Samsung SDI had regular

16  communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was

17  responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel

18  implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.

19  Sometimes Hitachi and Toshiba also attended the glass meetings.

20          **3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral
                     Discussions**

21

22      ~~118.~~131.        Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd.,

23  Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings.

24  These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged

25  in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through

26  these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively

27  withdrew from this conspiracy.

28

34

119.132.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

120.133.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

121.134.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

122.135.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

123.136.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

35

1    were attended by the highest ranking executives from LP Displays.  Certain of these high level

2    executives from LP Displays had previously attended meetings on behalf of Defendants LG

3    Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

4    Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

5        137.    Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic

6    Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

7    Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

8    These meetings were attended by high level sales managers from Panasonic and MTPD.

9    Panasonic also engaged in multiple bilateral discussions with the Defendants.  Through these

10   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

11   withdrew from this conspiracy.

12       138.    PCNA was represented at those meetings and was a party to the agreements

13   entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers,

14   it played a significant role in the conspiracy because Defendants and their co-conspirators wished

15   to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

16   pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing

17   participant in the alleged conspiracy.

18       139.    Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

19   glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

20   These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

21   bilateral discussions with the Defendants.  Through these discussions, MTPD agreed on prices

22   and supply levels for CRTs.

23       ~~124.~~140.    Between at least 1998 and 2007, Defendant BMCC participated in multiple

24   glass meetings.  These meetings were attended by high level sales managers from BMCC.

25   BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other

26   Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

27   levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was

28

1    mandated by the Chinese government.  BMCC was acting to further its own independent private

2    interests in participating in the alleged conspiracy.

3        ~~125.~~141.        Between at least 1996 and 2001, Defendant Philips, through Royal Philips

4    and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips

5    participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a

6    LP Displays).  A substantial number of these meetings were attended by high level executives

7    from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.

8    Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never

9    effectively withdrew from this conspiracy.

10        ~~126.~~142.        Defendants Philips America and Philips Brazil were represented at those

11    meetings and were a party to the agreements entered at them.  To the extent Philips America and

12    Philips Brazil sold or distributed CRT Products to direct purchasers, they played a significant role

13    in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by

14    direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

15    Thus, Philips America and Philips Brazil were active, knowing participants in the alleged

16    conspiracy.

17        143.   Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

18    SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in

19    at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by

20    the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions

21    with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed

22    on prices and supply levels for CRTs.

23        ~~125.~~144.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and

24    Samsung SDI Mexico were~~as~~ represented at those meetings and were~~as~~ a party to the agreements

25    entered at them.  To the extent SEC and SEAI sold or distributed CRT Products, they played a

26    significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

27    Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

28

37

1   glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI

2   Mexico were active, knowing participants in the alleged conspiracy.

3       128.145.      Between at least 1998 and 2006, Defendant Samtel participated in multiple

4   bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were

5   attended by high level executives from Samtel.  Through these discussions, Samtel agreed on

6   prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

7       129.146.      Between at least 1997 and 2006, Defendant Thai CRT participated in

8   multiple glass meetings.  These meetings were attended by the highest ranking executives from

9   Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

10  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

11  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

12      147.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of

13  meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.

14  These meetings were attended by high level sales managers from Thomson.  At these meetings,

15  Thomson discussed such things as CRT prices, production, revenues, volumes, demand,

16  inventories, estimated sales, plant shutdowns, customer allocation, and new product development

17  and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this

18  conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July

19  2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

20      148.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

21  bilateral meetings with its competitors.  These meetings were attended by high level sales

22  managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices,

23  production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

24  allocation, and new product development, and agreed on prices and supply levels for CRTs.

25  Mitsubishi never effectively withdrew from this conspiracy.

26      130.149.      Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT,

27  and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT

28  conspiracy through MTPD.  These meetings were attended by high level sales managers from

38

Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and

supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

131.150.        Defendants Toshiba America, TACP, TAEC, and TAIS were represented

at those meetings and were a party to the agreements entered at them.  To the extent Toshiba

America, TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they

played a significant role in the conspiracy because Defendants wished to ensure that the prices for

CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

at the glass meetings.  Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing

participants in the alleged conspiracy.

132.151.        Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and

Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these

meetings were attended by the highest ranking executives from Chunghwa, including the former

Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions

with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa

agreed on prices and supply levels for CRTs.

133.Defendant Tatung America was represented at those meetings and was a party to the

agreements entered at them.  To the extent Tatung America sold or distributed CRT Products to

direct purchasers, it played a significant role in the conspiracy because Defendants wished to

ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing

participant in the alleged conspiracy.

134.152.        Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number

of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

engaged in bilateral discussions with other Defendants on a regular basis.  Through these

discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

39

1   Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

2   Daewoo never effectively withdrew from this conspiracy.

3   ~~135.~~153.      When Plaintiff refers to a corporate family or companies by a single name

4   in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

5   employees or agents of entities within the corporate family engaged in conspiratorial meetings on

6   behalf of every company in that family.  In fact, the individual participants in the conspiratorial

7   meetings and discussions did not always know the corporate affiliation of their counterparts, nor

8   did they distinguish between the entities within a corporate family.  The individual participants

9   entered into agreements on behalf of, and reported these meetings and discussions to, their

10  respective corporate families.  As a result, the entire corporate family was represented in meetings

11  and discussions by their agents and was a party to the agreements reached in them.

12  **E.      The CRT Market During the Conspiracy**

13  ~~136.~~154.      Until the last few years of the CRT conspiracy, CRTs were the dominant

14  technology used in displays, including televisions and computer monitors.  During the Relevant

15  Period, this translated into the sale of millions of CRT Products, generating billions of dollars in

16  annual profits.

17  ~~137.~~155.      During the Relevant Period, North America was the largest market for

18  CRT TVs and computer monitors.

19  **F.      International Government Antitrust Investigations**

20  ~~138.~~156.      Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of,

21  and restrict output for, CRTs sold in the United States during the Relevant Period, is

22  demonstrated by a multinational investigation commenced by the Antitrust Division of the United

23  States Department of Justice ("DOJ").

24  ~~139.~~157.      Separately, the European Commission and Japan and South Korea's Fair

25  Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being

26  sold in Europe and Asia.

27  ~~140.~~158.      In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is

28  also being investigated by the [European] Commission and/or the U.S. Department of Justice for

40

potential violations of competition laws with respect to semiconductors, LCD products, cathode

ray tubes (CRT) and heavy electrical equipment."

141.159.      On May 6, 2008, the Hungarian Competition Authority ("HCA")

announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The anti-competitive behaviour may have concerned the exchange
> of sensitive market information (about prices, volumes sold,
> demand and the extent to which capacities were exploited), price-
> fixing, the allocation of market shares, consumers and volumes to
> be sold, the limitation of output and coordination concerning the
> production. The undertakings evolved a structural system and
> functional mechanism of cooperation.

142.160.      On February 10, 2009, the DOJ issued a press release announcing that a

federal grand jury in San Francisco had that same day returned a two-count indictment against the

former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for

his participation in global conspiracies to fix the prices of two types of CRTs used in computer

monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the

Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release

further notes that Lin had previously been indicted for his participation in a conspiracy to fix the

prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the

prices of CRTs was carried out, in part, in California.

143.161.      On August 19, 2009, the DOJ issued a press release announcing that a

federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng

a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of

Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been

indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's

indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in

part, in California.

144.162.      On March 30, 2010, the DOJ issued a press release announcing that a

federal grand jury in San Francisco had that same day returned a one-count indictment against

Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of

41

CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

145.163.      On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

146.164.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.  The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

165.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release

42

1    accompanying the fines further notes that the CRT cartels were "among the most organised

2    cartels that the Commission has investigated."

3    ~~146.~~

4    ~~147.~~166.      Several Defendants also have a history of "cooperation" and

5    anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S.

6    Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

7    Dynamic Random Access Memory ("DRAM").

8    ~~148.~~167.      Defendants Samsung and Toshiba have acknowledged being contacted by

9    the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static

10   Random Access Memory ("SRAM") and NAND Flash Memory.

11   ~~149.~~168.      In December 2006, government authorities in Japan, Korea, the European

12   Union and the United States revealed a comprehensive investigation into anticompetitive conduct

13   in the closely-related TFT-LCD market.

14   ~~150.~~169.      On November 12, 2008, the DOJ announced that it had reached agreements

15   with three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display

16   America, Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of

17   the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in

18   a conspiracy to fix prices of TFT-LCD panels.

19   ~~151.~~170.      On March 10, 2009, the DOJ announced that it had reached an agreement

20   with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

21   violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role

22   in a conspiracy to fix the prices of LCD panels.

23   **~~151.~~**

24   **~~H.~~G.   The Role of Trade Associations During the Relevant Period**

25   ~~152.~~171.      Defendants' collusive activities have been furthered by trade associations

26   and trade events that provided opportunities to conspire and share information.  One example is

27   the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004,

28

43

by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

153.172.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

154.173.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

155.174.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

156.175.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

44

1    I.H.    **Effects of the Conspiracy**

2        157.176.    The conspiracy has had the following effects, among others:

3            a.    Price competition in the sale of CRTs by Defendants and their co-
                    conspirators has been restrained, suppressed, and eliminated throughout the
4                   United States;

5            b.    Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have
                    been raised, fixed, maintained, and stabilized at artificially high and
6                   noncompetitive levels throughout the United States; and

7            c.    Plaintiff has been deprived of the benefit of free and open competition in
                    the purchase of CRT Products.

8

9        158.177.    During the Relevant Period, while demand in the United States for CRT

10   Products continued to decline, Defendants' conspiracy was effective in moderating the normal

11   downward pressures on prices for CRT Products caused by the entry and popularity of the new

12   generation LCD panels and plasma display products.

13       159.178.    As a direct and proximate result of the unlawful conduct of Defendants,

14   Plaintiff has been injured in its business and property in that they paid more for CRT Products

15   than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

16                            **FRAUDULENT CONCEALMENT**

17       160.179.    Costco had neither actual nor constructive knowledge of the facts

18   supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Costco

19   did not discover, and could not have discovered through the exercise of reasonable diligence, the

20   existence of the conspiracy alleged herein until at least late November 2007, when investigations

21   by the United States and other antitrust authorities became widely reported.  Defendants' secret

22   conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a

23   conspiracy to fix the prices of CRT Products.

24       161.180.    Because Defendants' conspiracy was kept secret, Plaintiff was unaware of

25   Defendants' unlawful conduct and did not know that it was paying artificially high prices for

26   CRT Products.

27       162.181.    The affirmative acts of Defendants alleged herein, including acts in

28   furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

                                        45

precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

163.182.       Defendants' price-fixing conspiracy was inherently self-concealing.

164.183.       Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.  The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

165.184.       As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

166.185.       Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

167.186.   Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a CNET News.com article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

168.187.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

169.188.   As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

170.189.   In addition, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

171.190.   Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

172.191.   Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

173.192.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

*AMERICAN PIPE*, GOVERNMENT ACTION,
AND CROSS-JURISDICTIONAL TOLLING

193.    As discussed at length in Paragraphs 158-72 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Costco's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

194.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

195.    As shown by Costco's allegations in Paragraphs 1 and 10 and the following causes of action, Costco was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

~~173.~~

**FIRST CAUSE OF ACTION**
**(Violation of Section 1 of the Sherman Act)**

~~174.~~196.    Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

~~175.~~197.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~176.~~198.    In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

48

177.199.    As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

178.200.    The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

179.201.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

180.202.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

**SECOND CAUSE OF ACTION**
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

181.203.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

182.204.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

49

183.205.        As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

184.206.        Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### THIRD CAUSE OF ACTION
### (Violation of the Washington Consumer Protection Act, RCW 19.86.030)

185.207.        Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 184 above.

186.208.        Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

187.209.        As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

188.210.        Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

50

## FOURTH CAUSE OF ACTION
### (Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)

189.211.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

190.212.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

191.213.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

192.214.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## FIFTH CAUSE OF ACTION
### (Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*)

193.215.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

194.216.    Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

195.217.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

51

196.218.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently of whether they constitute a violation of the Sherman Act.

197.219.     Defendants' and their co-conspirators' acts are fraudulent or deceptive.

198.220.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

199.221.     Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy.  Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy.  Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

**SIXTH CAUSE OF ACTION**
**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

200.222.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 209 above.

201.223.     Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the the of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

202.224.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

203.225.     Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators'

52

conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D.      Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E.      Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

53

1    F.    Costco shall recover such other and further relief as the Court deems just.

2    DATED:                                    By: _____
                                              David J. Burman #10611(admitted *pro hac*
3                                             *vice*)
                                              Cori G. Moore (admitted *pro hac vice*)#28649
4                                             Noah G. Purcell #43492Eric J. Weiss (admitted
                                              *pro hac vice*)
5                                             Nicholas H. Hesterberg (admitted *pro hac*
                                              *vice*)#41970
6                                             **PERKINS COIE LLP**
                                              **Perkins Coie LLP**
7                                             1201 Third Avenue, Suite 4800
                                              Seattle, WA  98101-3099
8                                             Telephone:  206.359.8000
                                              Facsimile:  206.359.9000
9                                             Email:  DBurman@perkinscoie.com
                                                       CGMoore@perkinscoie.com
10                                                      NPurcellEWeiss@perkinscoie.com
                                                       NHesterberg@perkinscoie.com
11
                                              Joren S. Bass, Bar No. 208143
12                                            **PERKINS COIE LLP**
                                              Four Embarcadero Center, Suite 2400
13                                            San Francisco, CA  94111-4131
                                              Telephone:  415.344.7120
14                                            Facsimilie:  415.344.7320
                                              Email:  JBass@perkinscoie.com
15
                                              Attorneys for Plaintiff
16                                            COSTCO WHOLESALE CORPORATION

17

18

19   LEGAL25416835.5

20

21

22

23

24

25

26

27

28

54

# **EXHIBIT D**

1   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
    Roman M. Silberfeld, Bar No. 62783
2   RMSilberfeld@rkmc.com
    David Martinez, Bar No. 193183
3   DMartinez@rkmc.com
    2049 Century Park East, Suite 3400
4   Los Angeles, CA 90067-3208
    Telephone:   310-552-0130
5   Facsimile:   310-229-5800

6   Attorneys for Plaintiffs
    BEST BUY CO., INC.; BEST BUY PURCHASING
7   LLC; BEST BUY ENTERPRISE SERVICES, INC.;
    BEST BUY STORES, L.P.; BESTBUY.COM,
8   L.L.C.; and MAGNOLIA HI-FI, INC.

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13  BEST BUY CO., INC.; BEST BUY          Case No.  Master File No. 3:07-cv-05944-SC
    PURCHASING LLC; BEST BUY
14  ENTERPRISE SERVICES, INC.; BEST       MDL No. 1917
    BUY STORES, L.P.; BESTBUY.COM,
15  L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC,   Individual Case No. 3:11-cv-05513-SC

16            Plaintiffs,               **FIRST AMENDED COMPLAINT**

17       v.                             **JURY TRIAL DEMANDED**

18  HITACHI, LTD.; HITACHI DISPLAYS,
    LTD.; HITACHI AMERICA, LTD.;
19  HITACHI ASIA, LTD.; HITACHI
    ELECTRONIC DEVICES (USA), INC.;
20  SHENZHEN SEG HITACHI COLOR
    DISPLAY DEVICES, LTD.; IRICO
21  GROUP CORPORATION; IRICO
    GROUP ELECTRONICS CO., LTD.;
22  IRICO DISPLAY DEVICES CO., LTD.;
    LG ELECTRONICS, INC.; LG
23  ELECTRONICS USA, INC.; LG
    ELECTRONICS TAIWAN TAIPEI CO.,
24  LTD.; LP DISPLAYS INTERNATIONAL
    LTD.; PANASONIC CORPORATION;
25  PANASONIC CORPORATION OF
    NORTH AMERICA; MT PICTURE
26  DISPLAY CO., LTD.; BEIJING
    MATSUSHITA COLOR CRT CO., LTD.;
27  KONINKLIJKE PHILIPS
    ELECTRONICS N.V.; PHILIPS
28  ELECTRONICS NORTH AMERICA

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); ~~TATUNG COMPANY OF AMERICA, INC.;~~ THOMSON SA; TECHNICOLOR USA, INC.; MITSUBISHI ELECTRIC CORPORATION; MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC.; MITSUBISHI ELECTRIC & ELECTRONICS, USA, INC.~~,~~
Defendants.

Plaintiffs, Best Buy Co., Inc.; Best Buy Purchasing LLC; Best Buy Enterprise Services, Inc.; Best Buy Stores, L.P.; BestBuy.com, L.L.C.; and Magnolia Hi-Fi, ~~Inc.~~LLC (collectively "Plaintiffs" or "Best Buy"), for their Complaint against all Defendants named herein, hereby allege as follows:

## I. INTRODUCTION

1. Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2. Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products

1  containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be

2  referred to collectively herein as "CRT Products."

3      3.      Defendants control the majority of the CRT industry, a multibillion dollar market,

4  which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant

5  Period, virtually every household in the United States owned at least one CRT Product.

6      4.      Since the mid-1990s, the CRT industry faced significant economic pressures as

7  customer preferences for other emerging technologies shrank profits and threatened the

8  sustainability of the industry. In order to maintain price stability, increase profitability, and

9  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

10  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

11  States.

12      5.      With respect to CRTs, Defendants or their agents agreed, *inter alia*, to: (a) fix

13  target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments,

14  prices, production and customer demand; (c) coordinate public statements regarding available

15  capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some

16  of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the

17  agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales;

18  (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit

19  competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of

20  certain key customers' sales; and (k) restrict output.

21      6.      The conspiracy concerning CRTs commenced with bilateral meetings that began

22  in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995,

23  the co-conspirators began to engage in informal group meetings. By 1997, these group meetings

24  had become more formalized, as described in greater detail below. There were at least 500

25  conspiracy meetings during the Relevant Period, including hundreds of group meetings and

26  hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan,

27  South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These

28  meetings included representatives from the highest levels of the respective companies, as well as

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1 regional managers and others.

2        7.     During the Relevant Period, the conspiracy affected billions of dollars of

3 commerce throughout the United States.

4        8.     This conspiracy is being investigated by the United States Department of Justice

5 ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by

6 the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes,

7 Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco

8 on February 10, 2009. Since then, five more individuals have been indicted in connection with

9 Defendants' CRT price-fixing conspiracy.

10        9.     During the Relevant Period, Plaintiffs purchased CRT Products in the United

11 States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and

12 affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.

13 Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to

14 recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased

15 during the Relevant Period.

16 **II.**     **JURISDICTION AND VENUE**

17       10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of the

18 Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton

19 Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1

20 of the Sherman Act (15 U.S.C. § 1).

21       11.     Plaintiffs also bring this action pursuant to the Minnesota Antitrust Act of 1971

22 because Plaintiffs purchased in Minnesota CRT Products from both Defendants and non-

23 Defendant vendors containing price-fixed CRTs manufactured by Defendants.

24       12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the

25 Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has

26 supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367 because they

27 arise from the same nucleus of operative facts alleged in this Complaint. Plaintiffs' state law

28 claims are so related to their claims under Section 1 of the Sherman Act that they form part of the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

            FIRST AMENDED COMPLAINT

1    same case or controversy.

2          13.     The activities of Defendants and their co-conspirators, as described herein,

3    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did

4    have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import

5    trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the Relevant

6    Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

7    In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected

8    the price of CRT Products purchased by Plaintiffs.

9          14.     This court has jurisdiction over each Defendant named in this action.  Defendants

10   and their co-conspirators purposely availed themselves of the laws of the United States as they

11   manufactured CRT Products for sale in the United States, or CRTs which were incorporated into

12   CRT Products Defendants and their co-conspirators knew would be sold to customers in the

13   United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT

14   Products in the United States.

15         15.     Venue is proper in the Northern District of California under Section 12 of the

16   Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

17   corporation, transacts business in this District, or is otherwise found within this District.  In

18   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

19   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

20   conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into

21   this District.

22   **III.**    **PARTIES**

23        **A.**     **Plaintiffs**

24         16.     Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its headquarters and

25   principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated

26   retail stores throughout the United States and sold CRT Products in those stores.

27         17.     Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and

28   Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their headquarters and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   principal places of business in Richfield, Minnesota.

2      18.   Plaintiff Best Buy Stores, L.P. is a Virginia Limited Partnership with its

3   headquarters and principal place of business in Richfield, Minnesota.  Best Buy Stores, L.P.

4   operates retail stores throughout the United States and sells CRT Products in those stores.

5      19.   Plaintiff BestBuy.com, L.L.C. is a Virginia Limited Liability Company with its

6   headquarters and principal place of business in Richfield, Minnesota.  BestBuy.com, L.L.C. is a

7   wholly-owned subsidiary of Best Buy Stores, L.P. and operates Best Buy's retail online store.

8      20.   During the Relevant Period, Best Buy Purchasing LLC, Best Buy Enterprise

9   Services, Inc. and/or Best Buy Co., Inc. negotiated for the purchase of, purchased, and paid for

10  CRT Products for Plaintiff Best Buys Stores, L.P. and BestBuy.com, L.L.C.  These negotiations,

11  purchasing and payments took place out of Best Buy's principal place of business and

12  headquarters in Richfield, Minnesota.

13     21.   Plaintiff Magnolia Hi-Fi, ~~Inc.~~ LLC ("MHF") is a wholly-owned subsidiary of Best

14  Buy Co., Inc. with its headquarters in Kent, Washington, and has done business as Magnolia

15  Home Theater and Magnolia Audio Video.  MHF is a specialty consumer electronic retailer that

16  operates several Magnolia Audio Video standalone stores along the west coast and the greater

17  Chicago area, and several Magnolia Home Theater stores located within Best Buy stores.  During

18  the Relevant Time Period, MHF's purchasing of CRT Products took place in its headquarters in

19  Kent Washington.

20     22.   During the Relevant Period, Best Buy purchased CRT Products directly and

21  indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any

22  agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Best Buy

23  suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.

24     23.   Those products were kept as inventory and sold in Minnesota and every other state

25  where Best Buy retail stores were located, and over the internet throughout the United States.

26     24.   As a result of the Best Buy Plaintiffs' presence, purchases, and sales in Minnesota,

27  and the substantial business they conduct in and with entities in Minnesota, Plaintiffs are entitled

28  to the protection of the Sherman Act and the antitrust laws of Minnesota.

**B.** **Defendants**

    **1.** **Hitachi Entities**

25.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

26.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

27.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

28.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

29.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

30.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

31.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     IRICO Entities

32.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

1  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

2  distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed,

3  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

4  throughout the United States.

5        33.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with

6  its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

7  IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer

8  in China and one of the leading global manufacturers of CRTs. Their website also claims that in

9  2003, they were the largest CRT manufacturer in China in terms of production and sales volume,

10  sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured,

11  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

12  affiliates, throughout the United States. Defendant IGC dominated and controlled the finances,

13  policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

14        34.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with

15  its principal place of business located at No. 16, Fenghui South Road West, District High-tech

16  Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC.

17  In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured,

18  marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or

19  affiliates, throughout the United States. Defendant IGC dominated and controlled the finances,

20  policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

21        35.    Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

22        **3.    LG Electronics Entities**

23        36.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the

24  laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20

25  Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global

26  force in consumer electronics, home appliances and mobile communications, which established its

27  first overseas branch office in New York in 1968. The company's name was changed from Gold

28  Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United

1   States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant

2   Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007,

3   LGPD became an independent company and changed its name to LP Displays International Ltd.

4   During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products,

5   either directly or through its subsidiaries or affiliates, throughout the United States.

6          37.      Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with

7   its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey  07632.

8   LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant

9   Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly

10  or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated

11  and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations

12  alleged in this Complaint.

13         38.      Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

14  entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District,

15  Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG

16  Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or

17  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

18  United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of

19  LGETT relating to the antitrust violations alleged in this Complaint.

20         39.      Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as

21  "LG Electronics."

22                          **4.      LP Displays**

23         40.      Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong

24  Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux

25  Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was

26  created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March

27  2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs

28  for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5. **Panasonic Entities**

41. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this Complaint.

43. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

44. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it

FIRST AMENDED COMPLAINT

MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.     Philips Entities

46.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary

of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this Complaint.

48.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this Complaint.

49.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

50.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.    Samtel

51.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel

FIRST AMENDED COMPLAINT

manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

subsidiaries and affiliates, throughout the United States.

### 8. Thai CRT

52.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement

Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.

### 9. Toshiba Entities

53.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer

monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-

Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.

TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002,

TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the

entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States.

54.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New

York, New York  10020.  Toshiba America is a wholly-owned and controlled subsidiary of

Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

the United States.  Defendant TC dominated and controlled the finances, policies and affairs of

Toshiba America relating to the antitrust violations alleged in this Complaint.

55.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.
2  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.
3  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT
4  Products, either directly or through its subsidiaries or affiliates, throughout the United States.
5  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the
6  antitrust violations alleged in this Complaint.

7  56.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a
8  California corporation with its principal place of business located at 19900 MacArthur Boulevard,
9  Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of
10  Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured,
11  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or
12  affiliates, throughout the United States. Defendant TC dominated and controlled the finances,
13  policies and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

14  57.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California
15  corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California
16  92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through
17  Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or
18  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
19  United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS
20  relating to the antitrust violations alleged in this Complaint.

21  58.  Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively
22  referred to herein as "Toshiba."

23  **10.  Chunghwa Entities**
24  59.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese
25  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,
26  Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974,
27  Chunghwa PT's CRTs received certification by the United States, giving the company entry into
28  that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed

CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou

subsidiary) throughout the United States.

      60.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT

production, and it has established itself as one of the leading worldwide suppliers of CRTs.

During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

Products either directly or through its subsidiaries or affiliates throughout the United States.

Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa

Malaysia relating to the antitrust violations alleged in this Complaint.  Defendants Chunghwa PT

and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

### 11.    Tatung Company of America, Inc.

Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

### 12.    Thomson Entities

      61.    Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-

Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   internally to its television-manufacturing division, which had plants in the United States and

2   Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's

3   television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT

4   televisions were sold in the United States to consumers under the RCA brand. In November 2003,

5   Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL

6   Corporation. The joint venture was called TCL-Thomson Electronics Corporation ("TCL-

7   Thomson"). As part of the joint venture agreement, the parties agreed that televisions made by

8   TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA

9   brands in Europe and North America, respectively. In July 2005, Thomson SA sold its CRT

10  business to Videocon. During the Relevant Period, Thomson SA manufactured, marketed, sold

11  and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates,

12  to customers throughout the United States.

13         62.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)

14  ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business

15  located at 10330 N Meridian St., Indianapolis, IN 46290-1024. Thomson Consumer Electronics is

16  a wholly-owned subsidiary of Thomson SA. Thomson Consumer Electronics was a major

17  manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania,

18  Marion, Indiana and Mexicali, Mexico. The United States-based plants were closed in 2004.

19  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing

20  division, which had plants in the United States and Mexico, and to other television manufacturers

21  in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to

22  United States consumers under the RCA brand. Thomson Consumer Electronics' television

23  business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.

24  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or

25  distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

26  customers throughout the United States.

27         63.     Thomson SA and Thomson Consumer Electronics are collectively referred to

28  herein as "Thomson."

- 17 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**12.    Mitsubishi Entities**

64.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

65.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CAalifornia, 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

66.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

67.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

61.

**IV.    AGENTS AND CO-CONSPIRATORS**

62.68.   The acts alleged against Defendants in this Complaint were authorized, ordered, or

- 18 -

1  done by their officers, agents, employees, or representatives, while actively engaged in the

2  management and operation of Defendants' businesses or affairs.

3  ~~63.~~69.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of,

4  or for, other Defendants and co-conspirators with respect to the acts, violations, and common

5  course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of

6  a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent

7  company.

8  ~~64.~~70.  Various persons and/or firms not named as Defendants in this Complaint

9  participated as co-conspirators in the violations alleged herein and may have performed acts and

10 made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

11 include, but are not limited to, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

12 Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company, Samsung SDI America, Inc.,

13 Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd.,

14 Tianjin Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Orion Electronic Co.,

15 Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic

16 Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia, Videocon

17 Industries, Ltd., and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to

18 name some or all of these and other co-conspirators as Defendants at a later date.

19 ~~65.~~71.  Co-conspirator Samsung Electronics Co., Ltd. ("SEC") is a South Korean

20 company with its principal place of business located at Samsung Electronics Building, 1320-10,

21 Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

22 company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT

23 Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24 ~~66.~~72.  Co-conspirator Samsung Electronics America, Inc. ("SEAI") is a New York

25 corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

26 Ridgefield Park, New Jersey  07660.  SEAI is a wholly-owned and controlled subsidiary of

27 Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

28 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

- 19 -

United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this Complaint.

67. 73. Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this Complaint.

68. 74. Co-conspirator Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

69. 75. Co-conspirator Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI. During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating

FIRST AMENDED COMPLAINT

to the antitrust violations alleged in this Complaint.

70. 76.  Co-conspirator Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

71. 77.  Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

72. 78.  Co-conspirator Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

73. 79.  Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Co-Conspirator Samsung

2   SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

3   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

4   United States.  Co-Conspirators SEC and Samsung SDI dominated and controlled the finances,

5   policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this

6   Complaint.

7          74.80.  Co-conspirators SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

8   Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI

9   Malaysia are collectively referred to herein as "Samsung."

10         75.81.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

11  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

12  2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.

13  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries

14  all over the world, including South Africa, France, Indonesia, Mexico, and the United States.

15  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The

16  Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom

17  Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was

18  dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in

19  an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately

20  1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or

21  around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

22  marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their

23  subsidiaries or affiliates, throughout the United States.

24         76.82.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as

25  "Daewoo."

26         77.83.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia")

27  was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku

28  Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia

1  was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic

2  Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT

3  joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia)

4  Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During

5  the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT

6  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of

8  Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

9       78.84.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture

10  formed by TC, Orion and two other non-Defendant entities in December 1995. TEDI's principal

11  place of business was located in Indonesia. TEDI was projected to have an annual production

12  capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's

13  joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display

14  Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed

15  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

16  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the

17  antitrust violations alleged in this Complaint.

18       79.85.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT') was a Thai company with

19  its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road,

20  Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of

21  Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with

22  Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated

23  as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the

24  Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either

25  directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC

26  dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust

27  violations alleged in this Complaint.

28       80.86.  The acts charged in this Complaint have been done by Defendants and their Co-

conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendants' or Co-conspirators' business or affairs.

**V.    TRADE AND COMMERCE**

~~81.~~87.   During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

~~82.~~88.   During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

~~83.~~89.   The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Minnesota and caused antitrust injuries in Minnesota.

**VI.    FACTUAL ALLEGATIONS**

    **A.    CRT Technology**

~~84.~~90.   A CRT has three components:  (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

~~85.~~91.   CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

computer monitors, oscilloscopes, air traffic control monitors and ATMs.

86.92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

87.93.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

88.94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

89.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.97.  Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92.98.  Plaintiffs have participated in the market for products containing CRTs.  To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-

conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

~~93.~~ 99. Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.** **Structure of the CRT Industry**

~~94.~~ 100. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.** **Market Concentration**

~~95.~~ 101. During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Co-Conspirators Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.** **Information Sharing**

~~96.~~ 102. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~97.~~ 103. Defendants Hitachi, and Chunghwa and Co-conspirator Samsung are all members of the Society for Information Display. Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Co-conspirator Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their Co-

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.   Consolidation

98.104.          The CRT industry also had significant consolidation during the Relevant Period, including but not limited to:  (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.   Multiple Interrelated Business Relationships

99.105.          The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

100.106.          Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Co-conspirator Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Co-conspirator Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Philips, Panasonic, and Co-conspirator Samsung.

### 5. High Costs of Entry Into the Industry

101.107. There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

102.108. During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6. The Maturity of the CRT Product Market

103.109. Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

- 28 -

104.110.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

105.111.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

106.112.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

107.113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

108.114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.    Homogeneity of CRT Products**

109.115.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

110.116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once

an agreement is formed.

## C.    Pre-Conspiracy Market

~~111.~~117.        The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

~~112.~~118.        In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

## D.    Defendants' and Co-Conspirators' Illegal Agreements

~~113.~~119.        In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

~~114.~~120.        The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Co-conspirator Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

~~115.~~121.        Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

116.122.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

117.123.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.    "Glass Meetings"**

118.124.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' and Co-conspirator' corporations.

119.125.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

met in Korea, the Chinese in China, and so on.

~~122.~~128.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants and Co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

~~123.~~129.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and Co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) ~~and~~ IRICO, and Thomson. Chunghwa also attended these meetings.

~~124.~~130.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of Defendants.

~~125.~~131.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, ~~and~~ Malaysia, and the United States.

~~126.~~132.    Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

~~127.~~133.    The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who

1    would write the information on a white board. The meeting participants then used this

2    information to discuss and agree upon what price each would charge for CRTs to be sold in the

3    following month or quarter. They discussed and agreed upon target prices, price increases, so-

4    called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of

5    CRTs that were sold to specific customers, and agreed upon target prices to be used in

6    negotiations with large customers. Having analyzed the supply and demand, the participants

7    would also discuss and agree upon production cutbacks.

8    ~~128.~~134.    During periods of oversupply, the focus of the meeting participants turned

9    to making controlled and coordinated price reductions. This was referred to as setting a "bottom

10    price."

11    ~~129.~~135.    Defendants' conspiracy included agreements on the prices at which certain

12    Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured

13    CRT Products, such as televisions and computer monitors. Defendants realized the importance of

14    keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT

15    pricing in the market to other OEMs. In this way, Defendants ensured that all OEMs paid

16    supracompetitive prices for CRTs.

17    ~~130.~~136.    Each of the participants in these meetings knew, and in fact discussed, the

18    significant impact that the price of CRTs had on the cost of the finished products into which they

19    were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there

20    were slim profit margins. Defendants therefore concluded that in order to make their CRT price

21    increases stick, they needed to make the increase high enough that their direct customers (CRT TV

22    and monitor makers) would be able to justify a corresponding price increase to their customers. In

23    this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers

24    of CRT Products.

25    ~~131.~~137.    The agreements reached at the glass meetings included:

26         a.    agreements on CRT prices, including establishing target prices, "bottom" prices,

27               price ranges and price guidelines;

28         b.    placing agreed-upon price differentials on various attributes of CRTs, such as

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

quality or certain technical specifications;

c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.  agreements to coordinate uniform public statements regarding available capacity and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

132.138.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways:  1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

133.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral

- 34 -

1  meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas

2  to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about

3  antitrust issues.

4

5              **2.     Bilateral Discussions**

6      ~~134.~~139.          Throughout the Relevant Period, the glass meetings were supplemented by

7  bilateral discussions between various Defendants.  The bilateral discussions were more informal

8  than the group meetings and occurred on a frequent, ad hoc basis, often between the group

9  meetings. These discussions, usually between sales and marketing employees, took the form of in-

10 person meetings, telephone contacts and emails.

11      ~~135.~~140.          During the Relevant Period, in-person bilateral meetings took place in

12 Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand,

13 Brazil, ~~and~~ Mexico, and the United States.

14      ~~136.~~141.          The purpose of the bilateral discussions was to exchange information about

15 past and future pricing, confirm production levels, share sales order information, confirm pricing

16 rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil,

17 Mexico, ~~and~~ Europe, and the United States. .

18      ~~137.~~142.          In order to ensure the efficacy of their global conspiracy, Defendants also

19 used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, ~~and~~ Mexico, and

20 the United States, ~~such~~ as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These

21 ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the

22 North American market for CRT Products.  As further alleged herein, North America was the

23 largest market for CRT televisions and computer monitors during the Relevant Period.  Because

24 these ~~Brazilian and Mexican~~ manufacturers are all wholly-owned and controlled subsidiaries of

25 Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In

26 this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were

27 fixed, raised, maintained and/or stabilized at supracompetitive levels.

28      ~~138.~~143.          Defendants also used bilateral discussions with each other during price

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

- 35 -                FIRST AMENDED COMPLAINT

negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

~~139.~~ 144.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

~~140.~~ 145.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Co-conspirator Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

~~141.~~ 146.    Defendants Hitachi America and HEDUS were represented at those

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

142.147.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

143.148.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

144.149.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

145.150.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   executives from LP Displays had previously attended meetings on behalf of Defendants LG

2   Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.

3   Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

4        146.151.        Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

5   Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003,

6   Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

7   These meetings were attended by high level sales managers from Panasonic and MTPD.

8   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these

9   discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively

10   withdrew from this conspiracy.

11        147.152.        PCNA was represented at those meetings and was a party to the

12   agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct

13   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that

14   the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

15   agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the

16   alleged conspiracy.

17        148.153.        Between at least 2003 and 2006, Defendant MTPD participated in multiple

18   glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

19   These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

20   bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices

21   and supply levels for CRTs.

22        149.154.        Between at least 1998 and 2007, Defendant BMCC participated in multiple

23   glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC

24   also engaged in multiple bilateral discussions with other Defendants, particularly the other

25   Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

26   levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated

27   by the Chinese government.  BMCC was acting to further its own independent private interests in

28   participating in the alleged conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

150.155.	Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

151.156.	Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

152.157.	Between at least 1995 and 2007, Co-conspirator Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

153.158.	Co-conspirators SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

154.159.	Between at least 1998 and 2006, Defendant Samtel participated in multiple

- 39 -

bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

160.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

161.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

162.   Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

155.

156.163.   Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1 agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this

2 conspiracy.

3  157.164.  Defendants Toshiba America, TACP, TAEC and TAIS were represented at

4 those meetings and were a party to the agreements entered at them.  To the extent Toshiba

5 America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they

6 played a significant role in the conspiracy because Defendants wished to ensure that the prices for

7 CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached

8 at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing

9 participants in the alleged conspiracy.

10  158.165.  Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa

11 PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

12 participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

13 were attended by the highest ranking executives from Chunghwa, including the former Chairman

14 and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each

15 of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on

16 prices and supply levels for CRTs.

17  159.  Defendant Tatung America was represented at those meetings and was a party to

18 the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT

19 Products to direct purchasers, it played a significant role in the conspiracy because Defendants

20 wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut

21 the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active,

22 knowing participant in the alleged conspiracy.

23  160.166.  Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

24 Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of

25 these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also

26 engaged in bilateral discussions with other Defendants on a regular basis.  Through these

27 discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with

28 Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

Daewoo never effectively withdrew from this conspiracy.

161.167.    When Plaintiffs refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

162.168.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue(billion US dollars)[1] | Average Selling Price Per Unit |
|------|-----------------------|-------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

164.170.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials*, Fuji Chimera Research, 1997, p.12.

---

[1] Estimated market value of CRT units sold.

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

165.171.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

166.172.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

167.173.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

168.174.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

169.175.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

170.176.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

2   September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

3   ~~171.~~177.        Defendants also conspired to limit production of CRTs by shutting down

4   production lines for days at a time, and closing or consolidating their manufacturing facilities.

5   ~~172.~~178.        For example, Defendants' CRT factory utilization percentage fell from

6   90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

7   example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period

8   but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops

9   in factory utilization by Defendants were the result of Defendants' agreements to decrease output

10  in order to stabilize the prices of CRTs.

11  ~~173.~~179.        During the Relevant Period, while demand in the United States for CRT

12  Products continued to decline, Defendants' conspiracy was effective in moderating the normal

13  downward pressures on prices for CRT Products caused by the entry and popularity of the new

14  generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao

15  Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT

16  technology is very mature; prices and technology have become stable."

17  ~~174.~~180.        During the Relevant Period, there were not only periods of unnatural and

18  sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These

19  price increases were despite the declining demand due to the approaching obsolescence of CRT

20  Products caused by the emergence of a new, potentially superior and clearly more popular,

21  substitutable technology.

22  ~~175.~~181.        These price increases and price stability in the market for CRT Products

23  during the Relevant Period are inconsistent with a competitive market for a product facing rapidly

24  decreasing demand caused by a new, substitutable technology.

25      **F.    International Government Antitrust Investigations**

26  ~~176.~~182.        Defendants' conspiracy to fix, raise, maintain and stabilize the prices of,

27  and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated

28  by a multinational investigation commenced by the Antitrust Division of the United States

Department of Justice ("DOJ").

177.183.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

178.184.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

179.185.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.  The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007.  The coordination concerning the Hungarian market allegedly formed part of the European coordination.  Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

180.186.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.188.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.189.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the

- 46 -                    FIRST AMENDED COMPLAINT

combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

~~184.~~190.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Co-conspirator Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

~~185.~~191.     Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

192.     The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

193.     On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market. The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson). The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe." The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

~~186.~~

~~187.~~194.     As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    businesses in the electronics industry.

2    188.195.    Several Defendants also have a history of "cooperation" and

3    anticompetitive conduct.  For example, Co-conspirator Samsung was fined $300 million by the

4    U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

5    Dynamic Random Access Memory ("DRAM").

6    189.196.    Defendant Toshiba and Co-conspirator Samsung have acknowledged being

7    contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of

8    Static Random Access Memory ("SRAM") and NAND Flash Memory.

9    190.197.    In December 2006, government authorities in Japan, Korea, the European

10   Union and the United States revealed a comprehensive investigation into anticompetitive conduct

11   in the closely-related TFT-LCD market.

12   191.198.    On December 12, 2006, news reports indicated that Co-conspirator

13   Samsung and Defendant Chunghwa, as well as an LCD joint venture between Defendants Philips

14   and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-

15   LCDs.

16   192.199.    On November 12, 2008, the DOJ announced that it had reached agreements

17   with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display

18   America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of

19   the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in

20   a conspiracy to fix prices of TFT-LCD panels.

21   193.200.    On March 10, 2009, the DOJ announced that it had reached an agreement

22   with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to

23   violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in

24   a conspiracy to fix the prices of TFT-LCD panels.

25   194.201.    The plea agreements of LG Display Co., Ltd., Sharp Corporation,

26   Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

27   TFT-LCDs was carried out, in part, in California.

28

- 48 -                    FIRST AMENDED COMPLAINT

### G.   The Role of Trade Associations During the Relevant Period

~~195.~~202.   Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

~~196.~~203.   Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

~~197.~~204.   The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

~~198.~~205.   Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

~~199.~~206.   Through these trade association and trade events, and in meetings related to

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  these trade associations and trade events, on information and belief, Defendants shared what

2  would normally be considered proprietary and competitively sensitive information.  This exchange

3  of information was used to implement and monitor the conspiracy.

4    **H.**  **Effects of Defendants' Antitrust Violations**

5      **1.**  **Examples of Reductions in Manufacturing Capacity by Defendants**

6    ~~200.~~207.  As explained above, during the Relevant Period, Defendants consolidated

7  their manufacturing facilities in lower-cost venues such as China and reduced manufacturing

8  capacity to prop up prices.

9    ~~201.~~208.  In December of 2004, MTPD closed its American subsidiary's operations

10  in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing

11  was part of the company's "global restructuring initiatives in the CRT business."  The company

12  further stated that in the future, "CRTs for the North American market will be supplied by other

13  manufacturing locations in order to establish an optimum CRT manufacturing structure."

14    ~~202.~~209.  In July of 2005, LGPD ceased CRT production at its Durham, England

15  facility, citing a shift in demand from Europe to Asia.

16    ~~203.~~210.  In December of 2005, MTPD announced that it would close its American

17  subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG

18  Philips, the company explained that it was shifting its CRT operations to Asian and Chinese

19  markets.

20    ~~204.~~211.  In late 2005, Samsung SDI followed the lead of other manufacturers,

21  closing its CRT factory in Germany.

22    ~~205.~~212.  In July of 2006, Orion shut down a CRT manufacturing plant in Princeton,

23  Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia

24  and liquidating its joint venture with Toshiba.

25      **2.**  **Examples of Collusive Pricing for CRTs**

26    ~~206.~~213.  Defendants' collusion is evidenced by unusual price movements in the

27  CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for

28  CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent

- 50 -

Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

207.214.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

208.215.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

209.216.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

210.217.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

211.218.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

212.219.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

213.220.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    to manufacture CRTs.

2    214.221.    Over the course of the Relevant Period, the price of CRTs remained stable,

3    and in some instances went up in an unexplained manner, despite the natural trend in most

4    technology products to go down over time.  CRT technology was mature, and the costs of

5    production were relatively low compared to other emerging technologies.  As Finsen Yu,

6    President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as

7    saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have

8    become stable."

9    215.222.    CRT prices resisted downward price pressures and remained stable over a

10   period of many years.  Even in periods of decreasing prices caused by outside factors, such as the

11   Asian currency crisis, the prices of CRT Products did not decline as much as they would have

12   absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive

13   activities alleged above.

14       **I.    Summary Of Effects Of The Conspiracy Involving CRTs**

15   216.223.    The above combination and conspiracy has had the following effects,

16   among others:

17           a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has
                 been restrained, suppressed and eliminated throughout the United States;
18

19           b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been
                 raised, fixed, maintained and stabilized at artificially high and noncompetitive
20               levels throughout the United States; and

21           c.   Plaintiffs have been deprived of the benefit of free and open competition in the
                 purchase of CRT Products.
22

23           d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs
                 have been injured in their business and property in that they paid more for CRT
24               Products than it otherwise would have paid in the absence of the unlawful conduct
                 of Defendants.
25

     **VII.   PLAINTIFFS' INJURIES**
26
     217.224.    As a purchaser of computer monitors, TVs and other devices that contained
27
     CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of
28

---

- 52 -                              FIRST AMENDED COMPLAINT

Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

218.225.    Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their Co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

219.226.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

220.227.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

221.228.    Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

222.229.    As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

**VIII.  FRAUDULENT CONCEALMENT**

223.230.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a

FIRST AMENDED COMPLAINT

conspiracy to fix the prices of CRTs.

224.231.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

225.232.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

226.233.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

227.234.    Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

228.235.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

229.236.        Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

230.237.        As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

231.238.        As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

232.239.        In addition, when several CRT manufacturers, including Defendant Philips and LG Electronics and Co-Conspirator Samsung, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

233.240.        Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

234.241.        Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

- 55 -                          FIRST AMENDED COMPLAINT

242.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this Complaint.

## IX.   *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

243.   As discussed at length in Paragraphs 182-201 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present.  Best Buy's direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

244.   As shown by Best Buy's allegations in Paragraphs 20, 21 & 22 above and 252 and 259 below, Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes*, No. 3:07-cv-05944-SC  (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007)

- Direct Purchaser Plaintiffs' Consolidated Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

245.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Best Buy opted out on November 14, 2011. [2]

235.

## IX.X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

---

[2] *See, e.g., Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at 54 (C.D. Cal. May 5, 2011); *Jenson v. Allison-Williams Co.*, 1999 U.S. Dist. LEXIS 22170, at 18-19 (S.D.Cal. Aug. 23, 1999); *Cullen v. Margiotta*, 811 F.2d 698, 718-721 (2d Cir. 1987); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 341 (E.D. Pa. 2004); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528-29 (M.D. Fla. 1989); *Bartlett v. Miller and Schroder Municipals, Inc.*, 355 N.W.2d 435, 439 (Minn. Ct. App. 1984); *Carson v. Independent School Dist. No.* 623, 392 N.W.2d 216, 223 (Minn. 1986).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

**(Violation of Section 1 of the Sherman Act)**

~~236.~~246.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~237.~~247.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~238.~~248.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~239.~~249.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~240.~~250.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~241.~~251.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a. participating in meetings and conversations to discuss the prices and supply of CRTs;

    b. communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c. agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d. issuing price announcements and price quotations in accordance with the agreements reached;

    e. selling CRTs to customers in the United States at noncompetitive prices;

    f. exchanging competitively sensitive information in order to facilitate their

conspiracy;

    g.   agreeing to maintain or lower production capacity; and

    h.   providing false statements to the public to explain increased prices for CRTs.

~~242.~~252.      As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## **Second Claim for Relief**

**(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52, *et seq.*)**

~~243.~~253.      Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~244.~~254.      Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.* Defendants conspired to and did fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.

~~245.~~255.      The aforesaid violations of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

~~246.~~256.      For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        a.   to fix, raise, maintain and stabilize the price of CRTs;

        b.   to allocate markets for CRTs amongst themselves;

        c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

d.   to allocate among themselves the production of CRTs.

247.257.        The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.   price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

248.258.        As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

249.259.        As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees.

## X.XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq*., and that Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.      Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against

FIRST AMENDED COMPLAINT

the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.   Defendants engaged in a contract, combination, and conspiracy in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

D.   Plaintiffs shall recover damages sustained by them, as provided by Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, *et seq.*, and a joint and several judgment in favor of Plaintiffs shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.   Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

G.   Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.   Plaintiffs shall receive such other or further relief as may be just and proper.

## ~~XI.~~ XII.     JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

FIRST AMENDED COMPLAINT

DATED:                          **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _____
            Roman M. Silberfeld
            David Martinez

Attorneys for Plaintiffs
BEST BUY CO., INC.; BEST BUY PURCHASING
LLC; BEST BUY ENTERPRISE SERVICES, INC.;
BEST BUY STORES, L.P.; BESTBUY.COM,
L.L.C.; and MAGNOLIA HI-FI, ~~INC.~~LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

# **EXHIBIT E**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

1

2

INTERBOND CORPORATION OF AMERICA,
3
_____

4           Plaintiff,          | CASE NO. _____
_____

5                                           | **COMPLAINT**
v.

6   HITACHI, LTD.; HITACHI DISPLAYS, LTD.;  | **JURY TRIAL DEMANDED**
    HITACHI AMERICA, LTD.; HITACHI ASIA,
7   LTD.; HITACHI ELECTRONIC DEVICES (USA),
    INC.; SHENZHEN SEG HITACHI COLOR
8   DISPLAY DEVICES, LTD.; IRICO GROUP
    CORPORATION; IRICO GROUP ELECTRONICS
9   CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.;
    LG ELECTRONICS, INC.; LG ELECTRONICS
10  USA, INC.; LG ELECTRONICS TAIWAN TAIPEI
    CO., LTD.; LP DISPLAYS INTERNATIONAL
11  LTD.; PANASONIC CORPORATION;
    PANASONIC CORPORATION OF NORTH
12  AMERICA; MT PICTURE DISPLAY CO., LTD.;
    BEIJING MATSUSHITA COLOR CRT CO., LTD.;
13  KONINKLIJKE PHILIPS ELECTRONICS N.V.;
    PHILIPS ELECTRONICS NORTH AMERICA
14  CORPORATION; PHILIPS ELECTRONICS
    INDUSTRIES (TAIWAN), LTD.; PHILIPS DA
15  AMAZONIA INDUSTRIA ELECTRONICA
    LTDA.; SAMSUNG ELECTRONICS CO., LTD.;
16  SAMSUNG ELECTRONICS AMERICA, INC.;
    SAMSUNG SDI CO., LTD.; SAMSUNG SDI
17  AMERICA, INC.; SAMSUNG SDI MEXICO S.A.
    DE C.V.;  SAMSUNG SDI BRASIL LTDA.;
18  SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN
    SAMSUNG SDI CO., LTD.; SAMSUNG SDI
19  (MALAYSIA) SDN. BHD.; SAMTEL COLOR
    LTD.; THAI CRT CO., LTD.; TOSHIBA
20  CORPORATION; TOSHIBA AMERICA, INC.;
    TOSHIBA AMERICA CONSUMER PRODUCTS,
21  LLC; TOSHIBA AMERICA ELECTRONIC
    COMPONENTS, INC.; TOSHIBA AMERICA
22  INFORMATION SYSTEMS, INC.; CHUNGHWA
    PICTURE TUBES, LTD.; CHUNGHWA PICTURE
23  TUBES (MALAYSIA); TATUNG COMPANY OF
    AMERICA, INC.
    _____

24           Defendants._____

25

26  STUART H. SINGER (*Pro hac vice*)
    BOIES, SCHILLER, & FLEXNER LLP
27  401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, Florida 33301
28  Telephone: (954) 356-0011

1  Facsimile: (954) 356-0022
   Email: ssinger@bsfllp.com
2  _____
   WILLIAM A. ISAACSON (*Pro hac vice*)
3  BOIES, SCHILLER & FLEXNER LLP
   5301 Wisconsin Ave. NW, Suite 800
4  Washington, DC 20015
   Telephone: (202) 237-2727
5  Facsimile:  (202) 237-6131
   Email: wisaacson@bsfllp.com
6
7  PHILIP J. IOVIENO (*Pro hac vice*)
   ANNE M. NARDACCI (*Pro hac vice*)
8  LUKE NIKAS (*Pro hac vice*)
   CHRISTOPHER V. FENLON (*Pro hac vice*)
9  BOIES, SCHILLER & FLEXNER LLP
   10 North Pearl Street, 4th Floor
10 Albany, NY 12207
   Telephone: (518) 434-0600
11 Facsimile:  (518) 434-0665
   Email: piovieno@bsfllp.com
12
13 *Counsel for Plaintiff Interbond Corporation of America*
14
15                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
                       **SAN FRANCISCO DIVISION**
16
17 IN RE CATHODE RAY TUBE (CRT)        | Case No. 11-cv-06275
   ANTITRUST LITIGATION                |
18                                     | Master File No. 3:07-cv-05944-SC
   _____|
19 This Document Relates To Individual Case | MDL No. 1917
   No. 11-cv-06275
20                                     |
   INTERBOND CORPORATION OF            | **AMENDED COMPLAINT**
21 AMERICA., d/b/a BrandsMart USA      |
                                       | **JURY TRIAL DEMANDED**
22         Plaintiff,
23    vs.
24 HITACHI, LTD.; HITACHI DISPLAYS,
   LTD.; HITACHI AMERICA, LTD.;
25 HITACHI ASIA, LTD.; HITACHI
   ELECTRONIC DEVICES (USA), INC.;
26 SHENZHEN SEG HITACHI COLOR
   DISPLAY DEVICES, LTD.; IRICO GROUP
27 CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO
28 DISPLAY DEVICES CO., LTD.; LG
   ELECTRONICS, INC.; LG ELECTRONICS

BRANDSMART'S AMENDED COMPLAINT          61          Case No. 11-cv-06275
                                                    Master File No. 3:07-cv-05944-SC

USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.; SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff Interbond Corporation of America, d/b/a BrandsMart USA ("BrandsMart") for its Complaint against all Defendants named herein, hereby alleges as follows:

I. **INTRODUCTION**

1. Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this

1    conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2            2.    Defendants are or were among the leading manufacturers of: (a) color

3    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

4    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

5    devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

6    purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

7    to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

8    and the products containing them shall be referred to as "CDT Products."  CDT Products and

9    CPT Products shall be referred to collectively herein as "CRT Products."

10           3.    Defendants control the majority of the CRT industry, a multibillion dollar

11   market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

12   Relevant Period, virtually every household in the United States owned at least one CRT Product.

13           4.    Since the mid-1990s, the CRT industry faced significant economic

14   pressures as customer preferences for other emerging technologies shrank profits and threatened

15   the sustainability of the industry.  In order to maintain price stability, increase profitability, and

16   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

17   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

18   States.

19           5.    With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

20   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

21   shipments, prices, production and customer demand; (c) coordinate public statements regarding

22   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

23   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

24   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

25   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

26   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

27   producer's share of certain key customers' sales; and (k) restrict output.

28           6.    The conspiracy concerning CRTs commenced with bilateral meetings that

1   began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning

2   in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group

3   meetings had become more formalized, as described in greater detail below.  There were at least

4   500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and

5   hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

6   South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

7   meetings included representatives from the highest levels of the respective companies, as well as

8   regional managers and others.

9          7.      During the Relevant Period, the conspiracy affected billions of dollars of

10  commerce throughout the United States.

11         8.      This conspiracy is being investigated by the United States Department of

12  Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be

13  indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa

14  Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury

15  in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in

16  connection with defendants' CRT price-fixing conspiracy.

17         9.      During the Relevant Period, Plaintiff purchased CRT Products in the

18  United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

19  subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates

20  controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this

21  action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it

22  purchased during the Relevant Period.

23  **II.    JURISDICTION AND VENUE**

24         10.     Plaintiff brings this action to obtain injunctive relief under Section 16 of

25  the Clayton Act; and to recover damages, including treble damages under Section 4 of the

26  Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

27  Section 1 of the Sherman Act (15 U.S.C. § 1).

28         11.     Plaintiff also brings this action pursuant to Section 501.211 of the Florida

Statutes, for declaratory relief and damages that Plaintiff sustained due to Defendants' and their co-conspirators violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA").

12. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's FDUTPA claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiff's state law claims are so related to its claim under Section 1 of the Sherman Act that they form part of the same case or controversy.

13. The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiff's antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in Florida.

14. This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15. Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

into this District.

## III.    PARTIES

### A.    Plaintiff

16.    Plaintiff BrandsMart is a Florida corporation with its corporate headquarters in Hollywood, Florida.  BrandsMart was incorporated in 1977 with the opening of its first retail location in Miami, Florida.  Through the conclusion of Defendants' and the co-conspirators' conspiracy, BrandsMart was a supplier of consumer electronics products and services with 11 stores in Florida and Georgia.  In fiscal year 2010, BrandsMart sold $725 million of products and services.

17.    During the Relevant Period, BrandsMart purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, BrandsMart suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.  Throughout the Relevant Period, BrandsMart conducted a substantial amount of business in Florida.

18.    During the Relevant Period, BrandsMart's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in Florida.  In addition, BrandsMart's purchase orders for CRT Products were issued from Florida, all invoices for CRT Products were sent to BrandsMart in Florida, and all payments for CRT Products were made by BrandsMart from Florida.  BrandsMart employees based in Florida were also responsible for selecting vendors and product lines with respect to CRT Products.

### B.    Defendants

#### 1.    Hitachi Entities

19.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

1    subsidiaries or affiliates, throughout the United States.

2            20.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

3    company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

4    297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

5    in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

6    manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

7    create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

8    Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

9    through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

10   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

11   antitrust violations alleged in this complaint.

12           21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

13   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

14   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

15   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

16   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

17   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

18   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

19           22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

20   with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

21   Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

22   Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

23   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

24   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

25   affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

26           23.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

27   Delaware corporation with its principal place of business located at 208 Fairforest Way,

28   Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

24.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.    IRICO Entities**

26.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

27.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

1   CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website

2   also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

3   and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period,

4   IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

5   subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled

6   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

7   complaint.

8           28.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

9   company with its principal place of business located at No. 16, Fenghui South Road West,

10  District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned

11  subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant

12  Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

13  through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated

14  and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

15  alleged in this complaint.

16          29.     Defendants IGC, IGE and IDDC are collectively referred to herein as

17  "IRICO."

18          **3.      LG Electronics Entities**

19          30.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

20  the laws of the Republic of Korea with its principal place of business located at LG Twin

21  Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5

22  billion global force in consumer electronics, home appliances and mobile communications,

23  which established its first overseas branch office in New York in 1968. The company's name

24  was changed from Gold Star Communications to LGEI in 1995, the year in which it also

25  acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint

26  venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

27  ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to

28  LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

32.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

33.    Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.    LP Displays**

34.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

1   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2   affiliates, throughout the United States.

3           **5.       Panasonic Entities**

4           35.     Defendant Panasonic Corporation, which was at all times during the

5   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

6   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

7   Osaka 571-8501, Japan.   During the Relevant Period, Panasonic Corporation manufactured,

8   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9   affiliates, throughout the United States.

10          36.     Defendant Panasonic Corporation of North America ("PCNA") is a

11  Delaware corporation with its principal place of business located at One Panasonic Way,

12  Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

13  Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

14  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15  United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

16  and affairs of PCNA relating to the antitrust violations alleged in this complaint.

17          37.     Defendants Panasonic Corporation and PCNA are collectively referred to

18  herein as "Panasonic."

19          38.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

20  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

21  Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

22  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

23  manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.   On

24  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

25  venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

26  Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

27  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

28  subsidiaries or affiliates, throughout the United States.

39. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.    Philips Entities**

40. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

41. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

42.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

43.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

44.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.    <u>Samsung Entities</u>**

45.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

1    corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

2    Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

3    Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

4    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5    United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

6    Samsung SEAI relating to the antitrust violations alleged in this complaint.

7              47.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

8    Company ("Samsung SDI") is a South Korean company with its principal place of business

9    located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

10   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

11   Samsung SDI claims to be the world's leading company in the display and energy business, with

12   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

13   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

14   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

15   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

17   and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

18             48.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

19   California corporation with its principal place of business located at 3333 Michelson Drive, Suite

20   700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

21   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

22   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

24   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

25   violations alleged in this complaint.

26             49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

27   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

28   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

1   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

2   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

3   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

4   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

5   Mexico relating to the antitrust violations alleged in this complaint.

6        50.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

7   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

8   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

9   owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

10  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

11  directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

12  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

13  Brazil relating to the antitrust violations alleged in this complaint.

14       51.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

15  is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

16  Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

17  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

18  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

19  affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

20  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

21  violations alleged in this complaint.

22       52.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

23  Chinese company with its principal place of business located at Developing Zone of Yi-Xian

24  Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

25  subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

26  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

27  subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

28  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

1   the antitrust violations alleged in this complaint.

2          53.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

3   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

4   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

5   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

6   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

7   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

8   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

9   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

10  in this complaint.

11         54.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

12  SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

13  SDI Malaysia are collectively referred to herein as "Samsung."

14         **8.    Samtel**

15         55.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

16  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

17  110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

18  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

19  States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

20  Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

21  its subsidiaries and affiliates, throughout the United States.

22         **9.    Thai CRT**

23         56.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

24  1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

25  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

26  televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

27  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

28  United States.

1    **10.    Toshiba Entities**

2    57.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

3    principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

4    Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

5    and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

6    other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

7    Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

8    1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

9    in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12   58.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

13   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

14   4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled

15   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

16   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

17   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

18   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

19   complaint.

20   59.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a

21   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

22   3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

23   America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

24   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

25   States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP

26   relating to the antitrust violations alleged in this complaint.

27   60.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

28   California corporation with its principal place of business located at 19900 MacArthur

BRANDSMART'S AMENDED COMPLAINT            61            Case No. 11-cv-06275
                                                        Master File No. 3:07-cv-05944-SC

1    Boulevard, Suite 400, Irvine, California 92612.   TAEC is a wholly-owned and controlled

2    subsidiary of Defendant TC through Toshiba America.   During the Relevant Period, TAEC

3    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

4    subsidiaries or affiliates, throughout the United States.   Defendant TC dominated and controlled

5    the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

6    complaint.

7         61.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

8    California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

9    California 92618-1697.   TAIS is a wholly-owned and controlled subsidiary of Defendant TC

10   through Toshiba America.   During the Relevant Period, TAIS manufactured, marketed, sold

11   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

12   throughout the United States.   Defendant TC dominated and controlled the finances, policies and

13   affairs of TAIS relating to the antitrust violations alleged in this complaint.

14        62.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

15   collectively referred to herein as "Toshiba."

16        **11.    Chunghwa Entities**

17        63.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

18   Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

19   Taoyuan, Taiwan.   It was established in 1971 by Tatung Corporation to manufacture CRTs.   In

20   1974, Chunghwa PT's CRTs received certification by the United States, giving the company

21   entry into that market.   Throughout the Relevant Period, Chunghwa PT was one of the major

22   global CRT manufacturers.   During the Relevant Period, Chunghwa PT manufactured, sold, and

23   distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

24   Fuzhou subsidiary) throughout the United States.

25        64.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

26   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

27   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.   It is a wholly-

28   owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT

production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.    Tatung Company of America, Inc.**

Tatung Company of America, Inc. ("Tatung America**12.    Thomson Entities**

65.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a CaliforniaFrench corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America.  The other half usedThomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passedits television-manufacturing division, which had plants in the United States and Mexico, and to her two childrenother television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Tatung

1   ~~America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products

2   ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.~~, either directly or indirectly

3   through its subsidiaries or affiliates, to customers throughout the United States.

4          66.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

5   Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

6   business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

7   Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

8   Electronics was a major manufacturer of CRTs for the United States market, with plants located

9   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

10  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

11  television-manufacturing division, which had plants in the United States and Mexico, and to

12  other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

13  were sold in the United States to United States consumers under the RCA brand.  Thomson

14  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

15  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

16  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

17  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

18         67.    Thomson SA and Thomson Consumer Electronics are collectively referred

19  to herein as "Thomson."

20  **13.    Mitsubishi Entities**

21  ~~66.~~

22  ~~67.~~

23         68.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

24  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

25  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

26  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

27  internally to Mitsubishi's television and monitor manufacturing division and to other television

28  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

1    division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

2    Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

3    United States.

4           69.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

5    Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

6    Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

7    Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

8    Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

9    and monitor manufacturing division and to other television and monitor manufacturers in the

10   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

11   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

12   marketed, sold and distributed CRT Products in the United States.

13          70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

14   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

15   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

16   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

17   CRT televisions and monitors in the United States.

18          71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

19   are collectively referred to herein as "Mitsubishi."

20   **IV.    <u>AGENTS AND CO-CONSPIRATORS</u>**

21          68.72.  The acts alleged against Defendants in this Complaint were authorized,

22   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

23   in the management and operation of Defendants' businesses or affairs.

24          69.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint

25   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

26   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

27   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

28   made by its parent company.

1          70.74.  Various persons and/or firms not named as Defendants in this Complaint

2   participated as co-conspirators in the violations alleged herein and may have performed acts and

3   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

4   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

5   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

6   Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

7   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

8   conspirators as Defendants at a later date.

9          71.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

10  manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

11  2004.   In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

12  Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

13  subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

14  United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

15  Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

16  Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.   The

17  Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

18  joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

19  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

20  CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

21  DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

22  directly or through their subsidiaries or affiliates, throughout the United States.

23          72.76.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein

24  as "Daewoo."

25          73.77.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

26  Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

27  Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

28  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

74.78. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

75.79. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

76.80. The acts charged in this Complaint have been done by Defendants and

their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

**V.   TRADE AND COMMERCE**

~~77.~~81.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

~~78.~~82.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

~~79.~~83.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in Florida and caused antitrust injuries in Florida.

**VI.   FACTUAL ALLEGATIONS**

**A.   CRT Technology**

~~80.~~84.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

~~81.~~85.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions,

computer monitors, oscilloscopes, air traffic control monitors and ATMs.

82.86.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

83.87.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

84.88.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

85.89.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

86.90.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

87.91.  Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

88.92.  Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

89.93.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

**B.    Structure of the CRT Industry**

90.94.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.    Market Concentration**

91.95.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.    Information Sharing**

92.96.  Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

93.97.  Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

1    the meetings of these trade associations, Defendants exchanged proprietary and competitively

2    sensitive information which they used to implement and monitor the conspiracy.

3                    **3.**    **Consolidation**

4            ~~94.~~98.   The CRT industry also had significant consolidation during the Relevant

5    Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

6    involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

7    and Panasonic's CRT businesses into MTPD.

8                    **4.**    **Multiple Interrelated Business Relationships**

9            ~~95.~~99.  The industry is marked by a web of cross-licensing agreements, joint

10   ventures and other cooperative arrangements that can facilitate collusion.

11           ~~96.~~100.        Examples of the high degree of cooperation among Defendants in

12   both the CRT Product market and other closely related markets include the following:

13                    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

14                         LG Electronics and Philips.

15                    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

16                         Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

17                         purpose of manufacturing TFT-LCD panels.

18                    c.   The formation of the CRT joint venture MTPD in 2003 by Defendants

19                         Toshiba and Panasonic.

20                    d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita

21                         Display Technology Co., Ltd. as a joint venture for the purpose of

22                         manufacturing TFT-LCD panels.

23                    e.   In December 1995, Defendant Toshiba partnered with Orion and two

24                         other non-defendant entities to form TEDI, which manufactured CRTs

25                         in Indonesia.

26                    f.   Defendant Toshiba and Orion also signed a cooperative agreement

27                         relating to LCDs in 1995.  Pursuant to the agreement, Daewoo

28                         produced STN-LCDs, and Toshiba, which had substituted its STN-

LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

   g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

   h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

   i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

   j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

   k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.**     **High Costs of Entry Into the Industry**

    ~~97.~~101.    There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

    ~~98.~~102.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.**     **The Maturity of the CRT Product Market**

    ~~99.~~103.    Newer industries typically are characterized by rapid growth,

innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

100.104.      Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

101.105.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

102.106.      Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

103.107.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

104.108.      As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.      **Homogeneity of CRT Products**

105.109.      CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

106.110.        It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.        Pre-Conspiracy Market

107.111.        The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

108.112.        In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.        Defendants' and Co-Conspirators' Illegal Agreements

109.113.        In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

110.114.        The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

111.115.        Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with

1   ~~and~~ Daewoo, also attended several ad hoc group meetings during this period.  The participants at

2   these group meetings also discussed increasing prices for CRTs.

3         ~~112.~~116.     As more manufacturers formally entered the conspiracy, group

4   meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more

5   organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put

6   in place. Defendants' representatives attended hundreds of these meetings during the Relevant

7   Period.

8         ~~113.~~117.     The overall CRT conspiracy raised and stabilized worldwide and

9   U.S. prices that Defendants charged for CRTs.

10         **1.**      **"Glass Meetings"**

11         ~~114.~~118.     The group meetings among the participants in the CRT price-

12   fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended

13   by employees at three general levels of Defendants' corporations.

14         ~~115.~~119.     The first level meetings were attended by high level company

15   executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.

16   Top meetings occurred less frequently, typically quarterly, and were focused on longer term

17   agreements and forcing compliance with price-fixing agreements.  Because attendees at top

18   meetings had authority as well as more reliable information, these meetings resulted in

19   agreements.  Attendees at top meetings were also able to resolve disputes because they were

20   decision makers who could make agreements.

21         ~~116.~~120.     The second level meetings were attended by Defendants' high

22   level sales managers and were known as "management" meetings.  These meetings occurred

23   more frequently, typically monthly, and handled implementation of the agreements made at top

24   meetings.

25         ~~117.~~121.     Finally, the third level meetings were known as "working level"

26   meetings and were attended by lower level sales and marketing employees.  These meetings

27   generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

28   information and discussing pricing since the lower level employees did not have the authority to

1    enter into agreements.   These lower level employees would then transmit the competitive

2    information up the corporate reporting chain to those individuals with pricing authority.   The

3    working level meetings also tended to be more regional and often took place near Defendants'

4    factories.   In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

5    manufacturers' employees met in Korea, the Chinese in China, and so on.

6    ~~118.~~122.       The Chinese glass meetings began in 1998 and generally occurred

7    on a monthly basis following a top or management level meeting.   The China meetings had the

8    principal purpose of reporting what had been decided at the most recent glass meetings to the

9    Chinese manufacturers.   Participants at the Chinese meetings included the manufacturers located

10   in China, such as IRICO and BMCC, as well as the China-based branches of the other

11   Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

12   SDI Tianjin, and Chunghwa.

13   ~~119.~~123.       Glass meetings also occurred occasionally in various European

14   countries.   Attendees at these meetings included those Defendants and co-conspirators which had

15   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

16   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

17   of Daewoo~~)~~), IRICO, and ~~IRICO~~Thomson.   Chunghwa also attended these meetings.

18   ~~120.~~124.       Representatives of Defendants also attended what were known

19   amongst members of the conspiracy as "green meetings."   These were meetings held on golf

20   courses.   The green meetings were generally attended by top and management level employees

21   of Defendants.

22   ~~121.~~125.       During the Relevant Period, glass meetings took place in Taiwan,

23   South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and~~, Malaysia, and the

24   United States.

25   ~~122.~~126.       Participants would often exchange competitively sensitive

26   information prior to a glass meeting.   This included information on inventories, production, sales

27   and exports.   For some such meetings, where information could not be gathered in advance of the

28   meeting, it was brought to the meeting and shared.

123.127.　　The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

124.128.　　During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

125.129.　　Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid supracompetitive prices for CRTs.

126.　　Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

1    ~~indirect purchasers of CRT Products.~~

2        ~~127.~~130.    The agreements reached at the glass meetings included:

3            a.    agreements on CRT prices, including establishing target prices,

4                "bottom" prices, price ranges and price guidelines;

5            b.    placing agreed-upon price differentials on various attributes of CRTs,

6                such as quality or certain technical specifications;

7            c.    agreements on pricing for intra-company CRTs sales to vertically

8                integrated customers;

9            d.    agreements as to what to tell customers about the reason for a price

10               increase;

11           e.    agreements to coordinate with competitors that did not attend the

12               group meetings and agreements with them to abide by the agreed-

13               upon pricing;

14           f.    agreements to coordinate pricing with CRT manufacturers in other

15               geographic markets such as Brazil, Europe and India;

16           g.    agreements to exchange pertinent information regarding shipments,

17               capacity, production, prices and customer demands;

18           h.    agreements to coordinate uniform public statements regarding

19               available capacity and supply;

20           i.    agreements to allocate both overall market shares and share of a

21               particular customer's purchases;

22           j.    agreements to allocate customers;

23           k.    agreements regarding capacity, including agreements to restrict output

24               and to audit compliance with such agreements; and

25           l.    agreements to keep their meetings secret.

26       ~~128.~~131.    Efforts were made to monitor each Defendant's adherence to these

27  agreements in a number of ways, including seeking confirmation of pricing both from customers

28  and from employees of Defendants themselves.  When cheating did occur, it was addressed in at

BRANDSMART'S AMENDED COMPLAINT          61          Case No. 11-cv-06275
                                                    Master File No. 3:07-cv-05944-SC

least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

129.132.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    Bilateral Discussions

130.133.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

131.134.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

132.135.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and, Europe, and the United States.

133.136.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the United States.  These Brazilian and MexicanCRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the

Relevant Period. Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~134.~~137.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

~~135.~~138.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

~~136.~~139.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass

meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

137.140.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

138.141.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

139.142.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

140.143.    Defendant LGEUSA was represented at those meetings and was a

party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

141.144.	Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

142.145.	Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

143.146.	PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

144.147.	Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD

61

1    also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD

2    agreed on prices and supply levels for CRTs.

3        145.148.        Between at least 1998 and 2007, Defendant BMCC participated in

4    multiple glass meetings.  These meetings were attended by high level sales managers from

5    BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants,

6    particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on

7    prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with

8    CRTs was mandated by the Chinese government.  BMCC was acting to further its own

9    independent private interests in participating in the alleged conspiracy.

10       146.149.        Between at least 1996 and 2001, Defendant Philips, through Royal

11   Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

12   Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

13   (n/k/a LP Displays).  A substantial number of these meetings were attended by high level

14   executives from Philips.  Philips also engaged in numerous bilateral discussions with other

15   Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.

16   Philips never effectively withdrew from this conspiracy.

17       147.150.        Defendants Philips America and Philips Brazil were represented at

18   those meetings and were a party to the agreements entered at them.  To the extent Philips

19   America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

20   played a significant role in the conspiracy because Defendants wished to ensure that the prices

21   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

22   reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing

23   participants in the alleged conspiracy.

24       148.151.        Between at least 1995 and 2007, Defendant Samsung, through

25   SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

26   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

27   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

28   bilateral discussions with each of the other Defendants on a regular basis.  Through these

1    discussions, Samsung agreed on prices and supply levels for CRTs.

2         ~~149.~~152.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

3    and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

4    entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

5    a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

6    Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

7    the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

8    Mexico were active, knowing participants in the alleged conspiracy.

9         153.   Between at least 1998 and 2006, Defendant Samtel participated in

10   multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These

11   meetings were attended by high level executives from Samtel.   Through these discussions,

12   Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

13   this conspiracy.

14        154.   Between at least 1997 and 2006, Defendant Thai CRT participated in

15   multiple glass meetings.  These meetings were attended by the highest ranking executives from

16   Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

17   particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

18   levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

19        155.   Between at least 1996 and 2005, Defendant Thomson participated in

20   dozens of meetings with its competitors, including several glass meetings and multiple bilateral

21   meetings.  These meetings were attended by high level sales managers from Thomson.  At these

22   meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

23   demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

24   development and agreed on prices and supply levels for CRTs.  Thomson never effectively

25   withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon

26   Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played

27   a role in the conspiracy.

28        156.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

1    multiple bilateral meetings with its competitors.  These meetings were attended by high level

2    sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT

3    prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns,

4    customer allocation, and new product development, and agreed on prices and supply levels for

5    CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

6           ~~150.~~157.       Between at least 1995 and 2003, Defendant Toshiba, through TC,

7    TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the

8    CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended

9    by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple

10   bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

11   Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

12   this conspiracy.

13          ~~151.~~158.       Defendants Toshiba America, TACP, TAEC and TAIS were

14   represented at those meetings and were a party to the agreements entered at them.  To the extent

15   Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

16   purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

17   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

18   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

19   were active, knowing participants in the alleged conspiracy.

20          ~~152.~~159.       Between at least 1995 and 2006, Defendant Chunghwa, through

21   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

22   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

23   these meetings were attended by the highest ranking executives from Chunghwa, including the

24   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

25   discussions with each of the other Defendants on a regular basis.  Through these discussions,

26   Chunghwa agreed on prices and supply levels for CRTs.

27          ~~153.   Defendant Tatung America was represented at those meetings and was a~~

28   ~~party to the agreements entered at them.  To the extent Tatung America sold and/or distributed~~

BRANDSMART'S AMENDED COMPLAINT          61          Case No. 11-cv-06275
                                                     Master File No. 3:07-cv-05944-SC

1   ~~CRT Products to direct purchasers, it played a significant role in the conspiracy because~~

2   ~~Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would~~

3   ~~not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America~~

4   ~~was an active, knowing participant in the alleged conspiracy.~~

5   ~~154.~~160.     Between at least 1995 and 2004, Daewoo, through Daewoo

6   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.   A

7   substantial number of these meetings were attended by the highest ranking executives from

8   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

9   Through these discussions, Daewoo agreed on prices and supply levels for CRTs.   Bilateral

10  discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

11  bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

12  ~~155.~~161.     When Plaintiff refers to a corporate family or companies by a

13  single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or

14  more employees or agents of entities within the corporate family engaged in conspiratorial

15  meetings on behalf of every company in that family.  In fact, the individual participants in the

16  conspiratorial meetings and discussions did not always know the corporate affiliation of their

17  counterparts, nor did they distinguish between the entities within a corporate family.   The

18  individual participants entered into agreements on behalf of, and reported these meetings and

19  discussions to, their respective corporate families.  As a result, the entire corporate family was

20  represented in meetings and discussions by their agents and were parties to the agreements

21  reached in them.

22      **E.     The CRT Market During the Conspiracy**

23      ~~156.~~162.     Until the last few years of the CRT conspiracy, CRTs were the

24  dominant technology used in displays, including televisions and computer monitors.  During the

25  Relevant Period, this translated into the sale of millions of CRT Products, generating billions of

26  dollars in annual profits.

27      ~~157.~~163.     The following data was reported by Stanford Resources, Inc., a

28  market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

~~158.~~164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

~~159.~~165.    In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

~~160.~~166.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

~~161.~~167.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

~~162.~~168.    Defendants also conspired to limit production of CRTs by shutting

---
[1]    Estimated market value of CRT units sold.

down production lines for days at a time, and closing or consolidating their manufacturing facilities.

163.169.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

164.170.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

165.171.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

166.172.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

167.173.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

168.174.    Separately, the European Commission and Japan and South

Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

~~169.~~175.      In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

~~170.~~176.      On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

~~171.~~177.      On February 10, 2009, the DOJ issued a press release announcing

1   that a federal grand jury in San Francisco had that same day returned a two-count indictment

2   against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a

3   C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used

4   in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a

5   result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The

6   press release further notes that Lin had previously been indicted for his participation in a

7   conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and

8   conspiracy to fix the prices of CRTs was carried out, in part, in California.

9        ~~172.~~178.      On August 19, 2009, the DOJ issued a press release announcing

10   that a federal grand jury in San Francisco had the previous night returned a one-count indictment

11   against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the

12   prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an

13   assistant Vice President of Sales and Marketing at Chunghwa.   The press release notes that

14   Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-

15   LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of

16   CRTs was carried out, in part, in California.

17        ~~173.~~179.      On March 30, 2010, the DOJ issued a press release announcing

18   that a federal grand jury in San Francisco had that same day returned a one-count indictment

19   against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the

20   prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as

21   a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

22   The indictment states that the combination and conspiracy to fix the prices of CRTs was carried

23   out, in part, in California.

24        ~~174.~~180.      On November 9, 2010, the DOJ issued a press release announcing

25   that a federal grand jury in San Francisco had that same day returned a one-count indictment

26   against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim

27   a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of

28   CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former

1  executives from two color display tube (CDT) manufacturing companies." The indictment states

2  that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in

3  California.

4  ~~175.~~181.  On March 18, 2011, the DOJ issued a press release announcing

5  that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty

6  and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

7  ~~176.~~182.  Samsung SDI admitted that from at least as early as January 1997

8  until at least as late as March 2006, participated in a conspiracy among major CDT producers to

9  fix prices, reduce output, and allocate market shares of CDTs sold in the United States and

10  elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

11  and employees, engaged in discussions and attended meetings with representatives of other

12  major CDT producers. During these discussions and meetings, agreements were reached to fix

13  prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

14  elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

15  out in California.

16  ~~177.~~183.  The plea agreement of Samsung SDI requires that it cooperate with

17  the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

18  manufacture or sale of CDTs and CPTs.

19  184.  On December 5, 2012 the European Commission announced that it had

20  fined seven international corporate families a total of over €1.4 billion for their two-decade-long

21  effort to fix prices, share markets, restrict output, and allocate customers between themselves in

22  the CRT market. The companies fined by the European Commission included Chunghwa, LG

23  Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

24  Thomson). The Commission Vice President in charge of competition policy said, "These cartels

25  for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

26  behavior that are strictly forbidden to companies doing business in Europe." The press release

27  accompanying the fines further notes that the CRT cartels were "among the most organised

28  cartels that the Commission has investigated."

178.185.     As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

179.186.     Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

180.187.     Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

181.188.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

182.189.     On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

183.190.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

184.191.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

185.192.     The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.      The Role of Trade Associations During the Relevant Period**

186.193.      Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

187.194.      Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

188.195.      The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

189.196.      Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and

the annual International Display Workshops (the most recent ones of which have been held in Japan).

190.197.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

191.198.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

192.199.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

193.200.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

194.201.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

195.202.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

196.203.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.  Examples of Collusive Pricing for CRTs

197.204.        Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

198.205.        In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

199.206.        In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

200.207.        Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

201.208.        Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

202.209.        In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

203.210.        After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article

1  quoted an industry analyst as saying that this price increase was "unlike most other PC-related

2  products."

3  ~~204.~~211.     On June 1, 2004, LG Electronics raised the prices of its 15" and

4  17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of

5  glass needed to manufacture CRTs.

6  ~~205.~~212.     CRT prices resisted downward price pressures and remained stable

7  over a period of many years.  Even in periods of decreasing prices caused by outside factors,

8  such as the Asian currency crisis, the prices of CRT Products did not decline as much as they

9  would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the

10  collusive activities alleged above.

11  **3.     Summary Of Effects Of The Conspiracy Involving CRTs**

12  ~~206.~~213.     The above combination and conspiracy has had the following

13  effects, among others:

14      a.  Price competition in the sale of CRTs by Defendants and their co-

15          conspirators has been restrained, suppressed and eliminated

16          throughout the United States;

17      b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly

18          have been raised, fixed, maintained and stabilized at artificially high

19          and noncompetitive levels throughout the United States; and

20      c.  Plaintiff has been deprived of the benefit of free and open competition

21          in the purchase of CRT Products.

22      d.  As a direct and proximate result of the unlawful conduct of

23          Defendants, Plaintiff has been injured in its business and property in

24          that they paid more for CRT Products than it otherwise would have

25          paid in the absence of the unlawful conduct of Defendants.

26  **VII.   PLAINTIFF'S INJURIES**

27  ~~207.~~214.     As a purchaser of computer monitors, TVs and other devices that

28  contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a

result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

208.215.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

209.216.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

210.217.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

211.218.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

212.219.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

213.220.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.  FRAUDULENT CONCEALMENT

~~214.~~221.  Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

~~215.~~222.  Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

~~216.~~223.  The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

~~217.~~224.  By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

~~218.~~225.  Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and

concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

219.226.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

220.227.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

221.228.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

222.229.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

223.230.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

"[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

224.231. Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

225.232. Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

226.233. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

**IX.**

**IX.** *AMERICAN PIPE***, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

234. As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009. Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235. As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

236. Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

227.237.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

228.238.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

229.239.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

230.240.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

231.241.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

232.242.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

        b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

        c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

233.243.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

### (Violation of the Florida Deceptive and Unfair Trade Practices Act)

234.244.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235.245.    During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

236.246.    Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq.*

237.247.    During the Relevant Period, Plaintiff maintained its principal place of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in

Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities. As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

238.248.    In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff. These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

239.249.    The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." Fla. Stat. § 501.202(2). FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

240.250.    Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

241.251.    As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the FDUTPA, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.    Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*., and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.    Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.    Plaintiff shall receive such other or further relief as may be just and proper.

**XII.**          **JURY TRIAL DEMAND**

              Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

jury of all the claims asserted in this Complaint so triable.

Dated:                                        Respectfully Submitted,

                                   _____

                                   STUART H. SINGER (*Pro hac vice*)
                                   BOIES, SCHILLER, & FLEXNER LLP
                                   401 East Las Olas Boulevard, Suite 1200
                                   Fort Lauderdale, Florida 33301
                                   Telephone: (954) 356-0011
                                   Facsimile: (954) 356-0022
                                   Email: ssinger@bsfllp.com

                                   WILLIAM A. ISAACSON (*Pro hac vice to be filed*)
                                   BOIES, SCHILLER & FLEXNER LLP
                                   5301 Wisconsin Ave. NW, Suite 800
                                   Washington, DC 20015
                                   Telephone:  (202) 237-2727
                                   Facsimile:   (202) 237-6131
                                   Email:  wisaacson@bsfllp.com

                                   PHILIP J. IOVIENO (*Pro hac vice to be filed*)
                                   ANNE M. NARDACCI (*Pro hac vice to be filed*)
                                   LUKE NIKAS (*Pro hac vice to be filed*)
                                   CHRISTIOPHER CHRISTOPHER V. FENLON (*Pro hac vice to be filed*)

                                   BOIES, SCHILLER & FLEXNER LLP
                                   10 North Pearl Street, 4th Floor
                                   Albany, NY 12207
                                   Telephone:  (518) 434-0600
                                   Facsimile:   (518) 434-0665
                                   Email: piovieno@bsfllp.com

                                   *Counsel for Plaintiff*

*Interbond Corporation of America*

**EXHIBIT F**

1  ~~David H. Orozco (220732)~~
2  ~~SUSMAN GODFREY LLP~~
   ~~1901 Avenue of the Stars, Suite 950~~
3  ~~Los Angeles, California 90067-6029~~
   ~~Telephone:  (310) 789-3100~~
4  ~~Facsimile:   (310) 789-3150~~
   ~~dorozco@susmangodfrey.com~~
5
   Attorneys for Alfred H. Siegel, as Trustee of
6  the Circuit City Stores, Inc. Liquidating Trust
   [additional counsel listed on signature page]
7

H. Lee Godfrey (*pro hac vice ~~to be submitted~~*)
Kenneth S. Marks (*pro hac vice ~~to be submitted~~*)
Jonathan J. Ross (pro hac vice)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
lgodfrey@susmangodfrey.com
kmarks@susmangodfrey.com
jross@susmangodfrey.com

8
9
10 **UNITED STATES DISTRICT COURT**
11 **NORTHERN DISTRICT OF CALIFORNIA**
12
13 ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST,

Master File No. 3:07-cv-05944-SC

MDL No. 1917

14                          Plaintiff,
15 v.

Individual Case No. 11-cv-05502~~CASE NO.~~

16 HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA,
17 LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI

FIRST AMENDED COMPLAINT

18 COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP

JURY TRIAL DEMANDED

19 ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.;
20 LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP
21 DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC
22 CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING
23 MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.;
24 PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS
25 INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA
26 LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.;
27 SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A.
28 DE C.V.;  SAMSUNG SDI BRASIL LTDA.;

1

SHENZHEN SAMSUNG SDI CO., LTD.;
TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG
SDI (MALAYSIA) SDN. BHD.; SAMTEL
COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA); TATUNG
COMPANY OF AMERICA, INC., ;
TECHNICOLOR SA; TECHNICOLOR USA,
INC.; MITSUBISHI ELECTRIC
CORPORATION; MITSUBISHI DIGITAL
ELECTRONICS AMERICA, INC.; MITSUBISHI
ELECTRIC & ELECTRONICS, USA, INC.

                        Defendants.

Plaintiff, Alfred H. Siegel, as the duly appointed Trustee of the Circuit City Stores, Inc. Liquidating Trust (the "Circuit City Trust"), submits this Complaint against all Defendants named herein, and hereby alleges as follows:

I.  **INTRODUCTION**

1.      Plaintiff Circuit City Trust brings this action to recover those damages to Circuit City Stores, Inc., and its affiliated companies ("Circuit City") caused by a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period"), conducted by an international cartel formed by Defendants and their co-conspirators.  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products."  CDT Products and CPT

                            2

Products shall be referred to collectively herein as "CRT Products."

3. Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4. Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5. With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6. The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., ~~and~~ Europe, and the United States. These meetings included representatives from the highest levels of the respective

3

companies, as well as regional managers and others.

7. During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8. This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with defendants' CRT price-fixing conspiracy.

9. Circuit City was a leading national retailer of consumer electronics and operated over 700 electronics superstores in the United States. Throughout the period of the conspiracy alleged herein, Circuit City purchased CRT Products manufactured by defendants and their co-conspirators both directly from defendants and from other vendors. These purchases took place throughout the United States, including California and Illinois, where Circuit City's multiple regional distribution centers received CRT Products manufactured by defendants at prices that were artificially inflated based on defendants' conspiracy.

10. On November 10, 2008, Circuit City Stores, Inc. and affiliated domestic companies commenced cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code.[1] On September 10, 2010, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors (the "Plan Confirmation Order"), which provided for the establishment of the Circuit City Stores, Inc. Liquidating Trust and the appointment of Alfred H. Siegel as trustee of the Circuit City Trust. Pursuant to the Plan Confirmation Order, on the Effective Date of the Modified Second Amended Plan of Liquidation (the "Plan"), all property of the Circuit City bankruptcy estates, including all causes of action, were to be vested in and transferred to the

---

[1] *In re Circuit City Stores, Inc., et al.,* Case No. 08-35653 (KRH), in the United States Bankruptcy Court for the Eastern District of Virginia.

4

Circuit City Trust. The Plan became effective on November 1, 2010.

11.     During the Relevant Period, Circuit City purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Circuit City thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

12.     Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

13.     Plaintiff also brings this action pursuant to various state laws listed herein because Circuit City purchased CRT Products from both defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

14.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to their claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

15.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially

5

affected the price of CRT Products purchased by Circuit City in the states identified herein.

16.    This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

17.    Venue is proper in the Northern District of California under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.  Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

III.    **PARTIES**

A.    **Plaintiff**

18.    Circuit City Trust is a liquidating trust organized under the laws of the State of Virginia and established pursuant to the Plan Confirmation Order. Alfred H. Siegel, the Trustee of the Liquidating Trust, is a California citizen and resident.

19.    Circuit City was headquartered in Richmond, Virginia.   During the Relevant Period, Circuit City purchased in the United States CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Circuit City suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct.  Circuit City's negotiations for the purchase of CRT Products took place in the United States; purchase orders for CRT Products were issued from the United States; and invoices for CRT Products were

6

COMPLAINT

received by Circuit City in the United States.

20.     Upon information and belief, Circuit City purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California and Illinois

21.     Upon information and belief, during the Relevant Period, Circuit City received shipments of and took title to CRT Products at its distribution centers in Walnut, California; Livermore, California, and Long Beach, California, among other locations, and therefore purchased products in California for purposes of the California laws invoked in this Complaint.  Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution centers in California.  From its distribution centers in California and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution centers in California through online sales.

22.     During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at its distribution center in Marion, Illinois, among other locations, and therefore purchased products in Illinois for purposes of the Illinois law invoked in this Complaint. Under Circuit City's contracts with defendants and other CRT Product vendors, Circuit City did not take title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its distribution center in Illinois.  From its distribution center in Illinois and other states, Circuit City shipped CRT Products to its retail stores.  Circuit City also shipped CRT Products directly to consumers from its distribution center in Illinois through online sales.

**B.     Defendants**

**1.     Hitachi Entities**

23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

24.  Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

25.  Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.  Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

8

United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).    Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

**2.    IRICO Entities**

30.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**3.     LG Electronics Entities**

34.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion

2625971v1/012325

global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.      LP Displays**

38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

11

Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5. Panasonic Entities

39. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

41. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

42. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

43.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by Defendant MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

44.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and

13

prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

14

2625971v1/012325

48. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7. Samsung Entities**

49. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics company. During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

50. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of Defendant SEC. During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

51. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

15

COMPLAINT

2625971v1/012325

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

16

Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     <u>Samtel</u>**

59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

17

principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9. Thai CRT

60.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10. Toshiba Entities

61.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.   During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

62.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled

18

subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

63.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

64.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

65.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

2625971v1/012325

66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11.     Chunghwa Entities**

67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.     Tatung Company of America, Inc.**

69.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death,

20

her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

**13.     Thomson Entities**

70.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton,

21

Pennsylvania; Marion, Indiana; and Mexicali, Mexico. The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand. Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

72.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**14.     Mitsubishi Entities**

73.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States. These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

74.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers

in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

75.  Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

69.76.  Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.    AGENTS AND CO-CONSPIRATORS

70.77.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

71.78.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

72.79.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd. Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

73.80.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

74.81.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

75.82. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

24

this complaint.

~~76.~~83.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

84.    Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

~~77.~~85. Defendant Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.

~~78.~~86.  The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

25

79.87.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

80.88.  During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

81.89.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Illinois and caused antitrust injuries in California and Illinois.

## VII.    FACTUAL ALLEGATIONS

### A.    CRT Technology

82.90.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83.91.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84.92.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

the whole CRT product so that the product is often simply referred to as "the CRT."

85.93.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86.94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

88.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89.97.  Circuit City has participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-Defendant original equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices at which Circuit City bought CRT Products, and Circuit City has been injured thereby and paid supra-competitive prices for CRT Products.

90.98.  Circuit City has participated in the market for products containing CRTs. To the extent Circuit City indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.

91.99.  Circuit City has been injured by paying supra-competitive prices for CRT Products.

COMPLAINT

2625971v1/012325

### B. Structure of the CRT Industry

92.100. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

#### 1. Market Concentration

93.101. During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

#### 2. Information Sharing

94.102. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

95.103. Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

~~96.~~104.        The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

~~97.~~105.        The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

~~98.~~106.        Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.  Defendant Toshiba and Orion also signed a cooperative agreement

29

2625971v1/012325

relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5. High Costs of Entry Into the Industry

~~99.~~107.        There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~100.~~108.        During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

30

6.    **The Maturity of the CRT Product Market**

101.109.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

102.110.    Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

103.111.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

104.112.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

105.113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

106.114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

7.    **Homogeneity of CRT Products**

31

107.115.    CRT Products are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sold and Circuit City purchased CRT Products primarily on the basis of price.

108.116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.    Pre-Conspiracy Market**

109.117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

110.118.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

111.119.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

112.120.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc

32

basis. During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.121.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRTs.

114.122.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.123.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

1.    "Glass Meetings"

116.124.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.125.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

33

118.126.	The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

119.127.	Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

120.128.	The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

121.129.	Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO, and Thomson.  Chunghwa also attended these meetings.

122.130.	Representatives of Defendants also attended what were known

34

amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

123.131.      During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia, and the United States.

124.132.      Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

125.133.      The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

126.134.      During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

127.135.      Defendants' conspiracy included agreements on the prices at which

35

COMPLAINT

2625971v1/012325

certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

128.136.     Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins. Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

129.137.     The agreements reached at the glass meetings included:

a.  agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

b.  placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

c.  agreements on pricing for intra-company CRTs sales to vertically integrated customers;

d.  agreements as to what to tell customers about the reason for a price increase;

e.  agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

36

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

~~130.~~138.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~131.~~139.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.   Bilateral Discussions

~~132.~~140.   Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

37

took the form of in-person meetings, telephone contacts and emails.

133.141. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico, and the United States.

134.142. The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe, and the United States.

135.143. In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants ensured that prices of all CRTs sold imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

136.144. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

137.145. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output

38

agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.   LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Phillips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.   In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

138.146.         Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

139.147.         Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

140.148.         Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

39

with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

141. 149.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

142. 150.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

143. 151.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

144. 152.     Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After

40

2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

145.153.    PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

146.154.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

147.155.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

148.156.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level

executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

149.157.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

150.158.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

151.159.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

152.160.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

42

COMPLAINT

2625971v1/012325

161.   Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

162.   Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

153.163.     Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

154.164.     Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

155.165.     Defendants Toshiba America, TACP, TAEC and TAIS were

43

represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

156.166.        Between at least 1995 and 2006, defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other defendants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

157.167.        Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them. To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

158.168.        Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

159.169.        When Circuit City Trust refers to a corporate family or companies

44

by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E. The CRT Market During the Conspiracy

160. 170.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

161. 171.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

162. 172.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

163. 173.    Defendants' collusion is evidenced by unusual price movements in

---

[2]    Estimated market value of CRT units sold.

45

the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

164.174.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

165.175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

166.176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

167.177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

168.178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

46

used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

169.179.     Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

170.180.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

171.181.     During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

172.182.     During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products.  These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

173.183.     These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.     **International Government Antitrust Investigations**

174.184.     Defendants' conspiracy to fix, raise, maintain and stabilize the

47

prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

175.185.      Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

176.186.      In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

177.187.      On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

> According to the available evidences it is presumable that the

48

2625971v1/012325

coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

178.189.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.189.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.190.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large Taiwan-based color display tube (CDT) manufacturer." The

49

indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.191.     On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.193.     On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

183.194.     Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and

COMPLAINT

employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

184. 195.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

185. 196.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

186. 197.    Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

187. 198.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

188. 199.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

189. 200.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

190. 201.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

2625971v1/012325

Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

~~191.~~202.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

~~192.~~203.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

~~193.~~204.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."   Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

~~194.~~205.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

~~195.~~206.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

52

Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

~~196.~~207.        Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

~~197.~~208.        Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

### H.        Effects of Defendants' Antitrust Violations

#### 1.        Examples of Reductions in Manufacturing Capacity by Defendants

~~198.~~209.        As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

~~199.~~210.        In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

~~200.~~211.        In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

~~201.~~212.        In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like

53

LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

~~202.~~213.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

~~203.~~214.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.     Examples of Collusive Pricing for CRTs

~~204.~~215.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

~~205.~~216.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

~~206.~~217.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

~~207.~~218.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

~~208.~~219.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

54

We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

209.220.	In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

210.221.	After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

211.222.	On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

212.223.	Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

213.224.	CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

COMPLAINT

## H.    Summary Of Effects Of The Conspiracy Involving CRTs

214.225.    The above combination and conspiracy has had the following effects, among others:

    a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.  Prices for CRTs in CRT Products sold by Defendants to Circuit City directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.  Circuit City was deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.  As a direct and proximate result of the unlawful conduct of Defendants, Circuit City was injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VIII.   PLAINTIFF'S INJURIES

215.226.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Circuit City suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Circuit City to pay higher prices than they would have in the absence of Defendants' conspiracy.

216.227.    Circuit City also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.228.    The OEMs and others passed on to their customers, including Circuit City, the overcharges caused by Defendants' conspiracy.  Circuit City was not able to pass

on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Circuit City suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.229.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Circuit City.

219.230.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

220.231.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.232.    As a result, Circuit City was injured in connection with their purchases of CRT Products during the Relevant Period.

IX.    **FRAUDULENT CONCEALMENT**

222.233.    Neither Circuit City Trust nor Circuit City had actual or constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts.  Neither Circuit City Trust nor Circuit City discovered, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Circuit City Trust or Circuit City on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.234.    Because Defendants' agreement, understanding and conspiracy were kept secret, Circuit City Trust and Circuit City were unaware of Defendants' unlawful

COMPLAINT

conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.235.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.236.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.237.    Neither Circuit City nor Circuit City Trust could have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.238.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

COMPLAINT

these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.239.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.240.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.241.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

231.242.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.243.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.244.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and

COMPLAINT

2625971v1/012325

misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

245.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## X.    *American Pipe*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

246.    As discussed at length in Paragraphs 184-203 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Circuit City's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

247.    Costco's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

248.    As shown by Circuit City Trust's allegations in Paragraphs 1 and 10 and the following causes of action, Circuit City was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- 234. Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

## X.XI.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

235.249.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

60

~~236.~~250.    Beginning no later than March 1, 1995, the exact date being unknown to Circuit City and Circuit City Trust and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~237.~~251.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~238.~~252.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~239.~~253.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~240.~~254.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d.  issuing price announcements and price quotations in accordance with the agreements reached;

e.  selling CRTs to customers in the United States at noncompetitive prices;

f.  exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

241.255.    As a result of Defendants' unlawful conduct, Circuit City was injured in its businesses and property in that it paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

242.256.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243.257.    During the Relevant Period, Circuit City conducted a substantial volume of business in California.  In particular, Circuit City purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Circuit City also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Circuit City maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Circuit City also sold CRT Products to customers in California.  Finally, Circuit City maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Circuit City's business operations in California, it was registered to do business in the State and paid taxes to the State of California during the Relevant Period.   As a result of Circuit City's substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

244.258.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and

62

intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

245.259.        Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.    Defendants' conduct substantially affected California commerce.

246.260.        The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

247.261.        For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        a.   to fix, raise, maintain and stabilize the price of CRTs;

        b.   to allocate markets for CRTs amongst themselves;

        c.   to submit rigged bids for the award and performance of certain CRTs contracts; and

        d.   to allocate among themselves the production of CRTs.

248.262.        The combination and conspiracy alleged herein has had, inter alia, the following effects:

63

a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

249.263.    As a result of the alleged conduct of Defendants, Circuit City paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

250.264.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**<u>Third Claim for Relief</u>**

**<u>(Violation of California Unfair Competition Law)</u>**

251.265.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.266.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

253.267.    This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

64

254.268.    The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Circuit City and others to pay supra-competitive and artificially inflated prices for CRT Products.

      a.     <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

      b.     <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

      c.     <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Circuit City and Circuit City Trust were in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

255.269.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

65

~~256.~~270.　　Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

~~257.~~271.　　Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

~~258.~~272.　　By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### Fourth Claim for Relief

### (Restitution and Unjust Enrichment Under California Law)

~~259.~~273.　　Circuit City Trust incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~260.~~274.　　During the Relevant Period, and continuing thereafter at least up through the filing of this Complaint, defendants have received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a direct and proximate result of defendants' conspiracy. Defendants have unjustly retained these substantial benefits, at the expense of Circuit City, causing Circuit City damage.

### Fifth Claim for Relief

### (Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)

~~261.~~275.　　Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~262.~~276.　　During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Illinois.  Defendants' conspiracy constituted a conspiracy among competitors with the purpose and effect of restraining, suppressing and/or eliminating competition in the sale of CRT Products in Illinois and fixing, raising, maintaining and stabilizing CRT Product prices in Illinois at

66

COMPLAINT

2625971v1/012325

artificially high, noncompetitive levels.  Defendants' conduct and fraudulent concealment caused injury to Circuit City, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Circuit City as a purchaser.

263.277.    Defendants' conspiracy substantially affected Illinois commerce and unreasonably restrained trade in Illinois.

264.278.    During the Conspiracy Period, Circuit City received shipments of and took title to CRT Products at Circuit City's distribution center in Marion, Illinois and therefore purchased the products in Illinois at artificially-inflated prices because of defendants' price fixing conspiracy.  Under Circuit City's contracts with defendants and other vendors, Circuit City did not receive title to a substantial amount of the CRT Products ordered by Circuit City until it received and accepted shipments of those CRT Products at its Marion Illinois Distribution Center.

265.279.    During the Conspiracy Period, Circuit City conducted a substantial volume of business in Illinois.  Circuit City sold CRT Products and other products in retail stores in Illinois and on the Internet to Illinois customers.  In addition, Circuit City maintained in Illinois inventories of CRT Products manufactured and sold by defendants, their co-conspirators, and others.  As a result of Circuit City's presence in Illinois and the substantial business it conducted in Illinois, Circuit City Trust is entitled to the protection of the laws of Illinois; and

266.280.    As a direct and proximate result of defendants' conduct, Circuit City was injured by paying more for CRT Products purchased in Illinois from defendants, their co-conspirators and others than it would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under the Illinois Antitrust Act.

XI.XII.        PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California

67

Unfair Competition Law, and the Illinois Antitrust Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations, and that defendants unjustly retained substantial benefits received due to such conspiracy;

        B.     Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

        C.     Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

        D.     Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

        E.     Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

        F.     Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

        G.     Defendants engaged in a contract, combination, and conspiracy in violation of the Illinois Antitrust Act, and Plaintiff was injured in its business and property as a result of Defendants' violations;

        H.     Plaintiff shall recover damages sustained by it, as provided by the Illinois Antitrust Act, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

68

I.     Defendants received substantial benefits in the form of higher prices paid by Circuit City for CRT Products as a result of their conspiracy, and have unjustly retained these substantial benefits, at the expense of Circuit City;

J.     Defendants shall disgorge all ill-gotten gains and Plaintiff shall be entitled to restitution;

K.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

L.     Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

M.     Plaintiff shall receive such other or further relief as may be just and proper.

## ~~XII.~~XIII.     JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                          SUSMAN GODFREY L.L.P.

By: _____

~~David Orozco (220732)~~
~~SUSMAN GODFREY L.L.P.~~
~~1901 Avenue of the Stars, Suite 950~~
~~Los Angeles, California 90067-6029~~
~~Telephone: (310) 789-3100~~
~~Facsimile: (310) 789-3150~~
~~Email: dorozco@susmangodfrey.com~~

H. Lee Godfrey
(*pro hac vice* ~~*to be submitted*~~)
Kenneth S. Marks
(*pro hac vice* ~~*to be submitted*~~)
Jonathan J. Ross
(*pro hac vice)*
SUSMAN GODFREY L.L.P.

69

1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
Email: lgodfrey@sumangodfrey.com
        kmarks@susmangodfrey.com

Parker C. Folse III
(*pro hac vice to be submitted*)
Rachel S. Black
(*pro hac vice to be submitted*)
Jordan Connors
(*pro hac vice to be submitted*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883
Email:  pfolse@susmangodfrey.com
         rblack@susmangodfrey.com
         jconnors@susmangodfrey.com

Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust

70

COMPLAINT

2625971v1/012325

# EXHIBIT G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

1

2

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: wisaacson@bsfllp.com

3

4

5

6

7

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: piovieno@bsfllp.com

8

9

10

11

12

13

MIKE MCKOOL, JR. (*Pro hac vice*)
LEWIS T. LECLAIR (*Pro hac vice*)
SCOTT R. JACOBS (*Pro hac vice*)
MCKOOL SMITH, P.C
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
Email: mmckool@mckoolsmith.com

14

15

16

17

18

19

*Counsel for Plaintiff CompuCom Systems, Inc.*

20

21 COMPUCOM SYSTEMS, INC.,

22          Plaintiff,

23 v.

24 HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA,
LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR
25 DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS,
26 INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP
DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC
27 CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.;
28 PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS

1  INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA
   LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA,
2  INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI
   MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO.,
3  LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.;
   SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA
4  AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA
   AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION
5  SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES
   (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,

6            ~~Defendants.~~  **UNITED STATES DISTRICT COURT**
                            **NORTHERN DISTRICT OF CALIFORNIA**
7                            **SAN FRANCISCO DIVISION**

8  IN RE CATHODE RAY TUBE (CRT)          Case No. 11-cv-06396
   ANTITRUST LITIGATION
9                                         Master File No. 3:07-cv-05944-SC

10 This Document Relates To Individual Case   MDL No. 1917
   No. 11-cv-06396
11
                                          **AMENDED COMPLAINT**
12 COMPUCOM SYSTEMS, INC.,
                                          **JURY TRIAL DEMANDED**
13        Plaintiff,

14    vs.

15 HITACHI, LTD.; HITACHI DISPLAYS,
   LTD.; HITACHI AMERICA, LTD.;
16 HITACHI ASIA, LTD.; HITACHI
   ELECTRONIC DEVICES (USA), INC.;
17 SHENZHEN SEG HITACHI COLOR
   DISPLAY DEVICES, LTD.; IRICO GROUP
18 CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO
19 DISPLAY DEVICES CO., LTD.; LG
   ELECTRONICS, INC.; LG ELECTRONICS
20 USA, INC.; LG ELECTRONICS TAIWAN
   TAIPEI CO., LTD.; LP DISPLAYS
21 INTERNATIONAL LTD.; PANASONIC
   CORPORATION; PANASONIC
22 CORPORATION OF NORTH AMERICA;
   MT PICTURE DISPLAY CO., LTD.;
23 BEIJING MATSUSHITA COLOR CRT CO.,
   LTD.; KONINKLIJKE PHILIPS
24 ELECTRONICS N.V.; PHILIPS
   ELECTRONICS NORTH AMERICA
25 CORPORATION; PHILIPS ELECTRONICS
   INDUSTRIES (TAIWAN), LTD.; PHILIPS
26 DA AMAZONIA INDUSTRIA
   ELECTRONICA LTDA.; SAMSUNG
27 ELECTRONICS CO., LTD.; SAMSUNG
   ELECTRONICS AMERICA, INC.;
28 SAMSUNG SDI CO., LTD.; SAMSUNG
   SDI AMERICA, INC.; SAMSUNG SDI

1  MEXICO S.A. DE C.V.;  SAMSUNG SDI
2  BRASIL LTDA.; SHENZHEN SAMSUNG
   SDI CO., LTD.; TIANJIN SAMSUNG SDI
3  CO., LTD.; SAMSUNG SDI (MALAYSIA)
   SDN. BHD.; SAMTEL COLOR LTD.; THAI
4  CRT CO., LTD.; TOSHIBA
   CORPORATION; TOSHIBA AMERICA,
5  INC.; TOSHIBA AMERICA CONSUMER
   PRODUCTS, LLC; TOSHIBA AMERICA
6  ELECTRONIC COMPONENTS, INC.;
   TOSHIBA AMERICA INFORMATION
7  SYSTEMS, INC.; CHUNGHWA PICTURE
   TUBES, LTD.; CHUNGHWA PICTURE
8  TUBES (MALAYSIA).; TECHNICOLOR
   SA; TECHNICOLOR USA, INC.;
9  MITSUBISHI ELECTRIC CORPORATION;
   MITSUBISHI DIGITAL ELECTRONICS
10 AMERICA, INC.; MITSUBISHI ELECTRIC
   & ELECTRONICS, USA, INC.,

11            Defendants.

12        Plaintiff, CompuCom Systems, Inc. ("CompuCom") for its Complaint against all

13  Defendants named herein, hereby alleges as follows:

14  **I.     INTRODUCTION**

15        1.      Defendants and their co-conspirators formed an international cartel which

16  conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

17  through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

18  conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

19        2.      Defendants are or were among the leading manufacturers of: (a) color

20  picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

21  tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

22  devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

23  purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

24  to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

25  and the products containing them shall be referred to as "CDT Products."  CDT Products and

26  CPT Products shall be referred to collectively herein as "CRT Products."

27        3.      Defendants control the majority of the CRT industry, a multibillion dollar

28  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

1  Relevant Period, virtually every household in the United States owned at least one CRT Product.

2       4.    Since the mid-1990s, the CRT industry faced significant economic

3  pressures as customer preferences for other emerging technologies shrank profits and threatened

4  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

5  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

6  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

7  States.

8       5.    With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

9  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*

10  shipments, prices, production and customer demand; (c) coordinate public statements regarding

11  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

12  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

13  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

14  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

15  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

16  producer's share of certain key customers' sales; and (k) restrict output.

17       6.    The conspiracy concerning CRTs commenced with bilateral meetings that

18  began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning

19  in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group

20  meetings had become more formalized, as described in greater detail below.  There were at least

21  500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and

22  hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan,

23  South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These

24  meetings included representatives from the highest levels of the respective companies, as well as

25  regional managers and others.

26       7.    During the Relevant Period, the conspiracy affected billions of dollars of

27  commerce throughout the United States.

28       8.    This conspiracy is being investigated by the United States Department of

Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.   During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.   JURISDICTION AND VENUE

10.   Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.   Plaintiff also brings this action pursuant to various state laws listed herein, because Plaintiff purchased CRT Products from non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in New York and California.

12.   The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint. Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.   The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

1  import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the

2  Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

3  United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

4  substantially affected the price of CRT Products purchased by Plaintiff in the states identified

5  herein.

6        14.    This court has jurisdiction over each Defendant named in this action under

7  Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

8  availed themselves of the laws of the United States as they manufactured CRT Products for sale

9  in the United States, or CRTs which were incorporated into CRT Products Defendants and their

10  co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

11  conspirators' conspiracy affected this commerce in CRT Products in the United States.

12        15.    Venue is proper in the Northern District of Texas under Section 12 of the

13  Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

14  corporation, transacts business in this District, or is otherwise found within this District.  In

15  addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

16  events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

17  conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

18  into this District.

19  **III.**    **PARTIES**

20      **A.**    **Plaintiff**

21        16.    Plaintiff CompuCom is a Delaware corporation with its corporate

22  headquarters in Dallas, Texas.  Founded in 1987, CompuCom is a leading IT outsourcing

23  company providing infrastructure management services, application services, systems integration

24  and consulting services, as well as the procurement and management of hardware and software.

25  In 2010, CompuCom had $1.4 billion in revenue.  Through the conclusion of Defendants' and

26  the co-conspirators' conspiracy, CompuCom maintained operations in several states including

27  Texas, California, New York, and Massachusetts.

28        17.    During the Relevant Period, CompuCom purchased CRT Products directly

1  from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the

2  Defendants or Defendants' subsidiaries and affiliates controlled. CompuCom also purchased

3  CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers,

4  which contained CRTs that had been purchased from Defendants and their co-conspirators. As

5  such, CompuCom suffered injury as a result of Defendants' and their co-conspirators' unlawful

6  conduct.

7      18.  During the Relevant Period, CompuCom purchased CRT Products in,

8  *inter alia*, California and New York containing CRTs manufactured and sold by Defendants and

9  their co-conspirators. Plaintiff sent purchase orders to various CRT Product manufacturers in

10 each of these states and sent payment to these manufacturers in each of these states. In addition,

11 Plaintiff supplied its offices in California and New York with CRT Products and maintained

12 corporate offices and inventories in these states and provided information technology services to

13 its customers in these states.

14     B.   **Defendants**

15          1.   **Hitachi Entities**

16     19.  Defendant Hitachi, Ltd. is a Japanese company with its principal place of

17 business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the

18 parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide

19 market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd.

20 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

21 subsidiaries or affiliates, throughout the United States.

22     20.  Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

23 company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

24 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

25 in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design,

26 manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

27 create a separate company called Hitachi Displays. During the Relevant Period, Hitachi

28 Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

1   through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

2   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

3   antitrust violations alleged in this complaint.

4          21.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

5   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

6   York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

7   Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

8   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

9   United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

10  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

11         22.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

12  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

13  Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

14  Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

15  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16  United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

17  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

18         23.    Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

19  Delaware corporation with its principal place of business located at 208 Fairforest Way,

20  Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

21  Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

22  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

23  United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

24  finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

25  complaint.

26         24.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

27  Shenzhen") was a Chinese company with its principal place of business located at 5001

28  Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

25.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.     IRICO Entities

26.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

27.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

28.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

29. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3. LG Electronics Entities

30. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

to the antitrust violations alleged in this complaint.

32.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

33.    Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

**4.    LP Displays**

34.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.    Panasonic Entities**

35.    Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

1   affiliates, throughout the United States.

2           36.     Defendant Panasonic Corporation of North America ("PCNA") is a

3   Delaware corporation with its principal place of business located at One Panasonic Way,

4   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

5   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

6   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

7   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

8   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

9           37.     Defendants Panasonic Corporation and PCNA are collectively referred to

10  herein as "Panasonic."

11          38.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

12  Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

13  Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

14  Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

15  manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

16  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

17  venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

18  Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

19  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

20  subsidiaries or affiliates, throughout the United States.

21          39.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

22  Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

23  Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

24  is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

25  Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

26  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

27  China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

28  manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

COMPUCOM'S AMENDED COMPLAINT                    12                    Case No. 11-cv-06396
                                                                     Master File No. 3:07-cv-05944-SC

1  China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed
2  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United
3  States.

4              **6.      Philips Entities**

5              40.      Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips
6  Electronics ("Royal Philips") is a Dutch company with its principal place of business located at
7  Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one
8  of the world's largest electronics companies, with 160,900 employees located in over 60
9  countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal
10 Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming
11 Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on
12 demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126
13 million Euros of its investment and said it would not inject further capital into the venture.
14 During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT
15 Products, either directly or through its subsidiaries or affiliates, throughout the United States.

16             41.      Defendant Philips Electronics North America Corporation ("Philips
17 America") is a Delaware corporation with its principal place of business located at 1251 Avenue
18 of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and
19 controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America
20 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
21 subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and
22 controlled the finances, policies and affairs of Philips America relating to the antitrust violations
23 alleged in this complaint.

24             42.      Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips
25 Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu
26 Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal
27 Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or
28 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1  United States.  Defendant Royal Philips dominated and controlled the finances, policies and

2  affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

3          43.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

4  Brazil") is a Brazilian company with its principal place of business located at Av Torquato

5  Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

6  wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

7  Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

8  directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

9  Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

10  the antitrust violations alleged in this complaint.

11          44.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips

12  Brazil are collectively referred to herein as "Philips."

13          **7.     <u>Samsung Entities</u>**

14          45.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

15  company with its principal place of business located at Samsung Electronics Building, 1320-10,

16  Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

17  company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

18  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

19  States.

20          46.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

21  corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

22  Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

23  Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

24  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

25  United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

26  Samsung SEAI relating to the antitrust violations alleged in this complaint.

27          47.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

28  Company ("Samsung SDI") is a South Korean company with its principal place of business

located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public
company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,
Samsung SDI claims to be the world's leading company in the display and energy business, with
28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide
market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in
Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,
sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
throughout the United States.  Defendant SEC dominated and controlled the finances, policies
and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

48.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a
California corporation with its principal place of business located at 3333 Michelson Drive, Suite
700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of
Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,
marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or
affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and
controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust
violations alleged in this complaint.

49.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")
is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.
21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-
owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,
Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either
directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC
and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI
Mexico relating to the antitrust violations alleged in this complaint.

50.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a
Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,
Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

1  owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period,

2  Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

3  directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC

4  and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

5  Brazil relating to the antitrust violations alleged in this complaint.

6       51. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

7  is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

8  Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

9  Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured,

10 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

11 affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and

12 controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

13 violations alleged in this complaint.

14      52. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

15 Chinese company with its principal place of business located at Developing Zone of Yi-Xian

16 Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled

17 subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin

18 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

19 subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI

20 dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

21 the antitrust violations alleged in this complaint.

22      53. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

23 is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

24 Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

25 Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

26 Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

27 sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

28 throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the

finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

54.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

### 8.     Samtel

55.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.     Thai CRT

56.     Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.     Toshiba Entities

57.     Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

1    in which the entities consolidated their CRT businesses. During the Relevant Period, TC

2    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

3    subsidiaries or affiliates, throughout the United States.

4           58.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

5    corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

6    4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled

7    subsidiary of Defendant TC. During the Relevant Period, Toshiba America manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States. Defendant TC dominated and controlled the finances,

10   policies and affairs of Toshiba America relating to the antitrust violations alleged in this

11   complaint.

12          59.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a

13   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-

14   3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba

15   America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed

16   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

17   States. Defendant TC dominated and controlled the finances, policies and affairs of TACP

18   relating to the antitrust violations alleged in this complaint.

19          60.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a

20   California corporation with its principal place of business located at 19900 MacArthur

21   Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled

22   subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC

23   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

24   subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled

25   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this

26   complaint.

27          61.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a

28   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

62. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11. Chunghwa Entities

63. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

64. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

1            ~~12.    Tatung Company of America, Inc.~~

2         ~~Tatung Company of America, Inc. ("Tatung America~~**12.    Thomson Entities**

3           65.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a

4 ~~California~~French corporation with its principal place of business located at ~~2850 El Presidio~~

5 ~~Street, Long Beach, California.  Tatung America is a~~ 5 Rue Jeanne d'Arc 92130 Issy-les-

6 Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.~~

7 ~~Currently, Tatung Company owns approximately half of Tatung America.  The other half~~

8 ~~used~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the

9 United States market, with plants located in the United States, Mexico, China and Europe.

10 Thomson SA sold its CRTs internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung~~

11 ~~Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed~~its

12 television-manufacturing division, which had plants in the United States and Mexico, and to ~~her~~

13 ~~two children~~other television manufacturers in the United States and elsewhere.  Thomson SA's

14 television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT

15 televisions were sold in the United States to consumers under the RCA brand.  In November

16 2003, Thomson SA sold its television division to a joint venture it formed with Chinese

17 company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics

18 Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that

19 televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the

20 Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson

21 SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung~~

22 ~~America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products

23 ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~ either directly or indirectly

24 through its subsidiaries or affiliates, to customers throughout the United States.

25           66.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

26 Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

27 business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

28 Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

1   Electronics was a major manufacturer of CRTs for the United States market, with plants located

2   in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

3   plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

4   television-manufacturing division, which had plants in the United States and Mexico, and to

5   other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

6   were sold in the United States to United States consumers under the RCA brand.  Thomson

7   Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

8   business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

9   Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

10   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

11        67.    Thomson SA and Thomson Consumer Electronics are collectively referred

12   to herein as "Thomson."

13        **13.    Mitsubishi Entities**

14        68.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

15   is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

16   Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

17   Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

18   internally to Mitsubishi's television and monitor manufacturing division and to other television

19   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

20   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

21   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

22   United States.

23        69.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

24   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

25   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

26   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

27   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

28   and monitor manufacturing division and to other television and monitor manufacturers in the

1    U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

2    other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

3    marketed, sold and distributed CRT Products in the United States.

4            70.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

5    Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

6    Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.    During the

7    Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

8    CRT televisions and monitors in the United States.

9            71.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

10   are collectively referred to herein as "Mitsubishi."

11   **IV.    AGENTS AND CO-CONSPIRATORS**

12           66.72.  The acts alleged against Defendants in this Complaint were authorized,

13   ordered, or done by their officers, agents, employees, or representatives, while actively engaged

14   in the management and operation of Defendants' businesses or affairs.

15           67.73.  Each Defendant or co-conspirator acted as the principal, agent, or joint

16   venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

17   common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

18   subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

19   made by its parent company.

20           68.74.  Various persons and/or firms not named as Defendants in this Complaint

21   participated as co-conspirators in the violations alleged herein and may have performed acts and

22   made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

23   include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

24   Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

25   Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and

26   Videocon Industries, Ltd.  Plaintiff reserves the right to name some or all of these and other co-

27   conspirators as Defendants at a later date.

28           69.75.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

manufacturer of CRT Products. Orion was a Korean corporation which filed for bankruptcy in 2004. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States. Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

70.76. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

71.77. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

72.78. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

73.79. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

74.80. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

V. **TRADE AND COMMERCE**

75.81. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

76.82. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

77.83.  The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in New York and California and caused antitrust injuries in New York and California.

## VI.  **FACTUAL ALLEGATIONS**

### A.  **CRT Technology**

78.84.  A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

79.85.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

80.86.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

81.87.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

82.88.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer

monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

~~83.~~89.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

~~84.~~90.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

~~85.~~91.  Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

~~86.~~92.  Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

~~87.~~93.  Plaintiff has been injured by paying supra-competitive prices for CRT Products.

### B.    <u>Structure of the CRT Industry</u>

~~88.~~94.  The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

### 1.    <u>Market Concentration</u>

~~89.~~95.  During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and

Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2. Information Sharing

~~90.~~96. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

~~91.~~97. Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

~~92.~~98. The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

~~93.~~99. The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

94. 100.    Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

    a.  The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

    b.  Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

    d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

    e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

    f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

    g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

    h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

    i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage

products such as DVD drives.

      j.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

      k.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.**    **High Costs of Entry Into the Industry**

~~95.~~101.     There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~96.~~102.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.**    **The Maturity of the CRT Product Market**

~~97.~~103.     Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~98.~~104.     Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~99.~~105.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays. This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices. Between 2000 and 2006, revenues from the sale of CRT

1  televisions in the United States declined by 50.7 percent and were predicted to decline by an

2  additional 84.5 percent between 2006 and 2010.

3       ~~100.~~106.    Although demand was declining as a result of the popularity of

4  flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were

5  still the dominant display technology during the Relevant Period, making Defendants' collusion

6  and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels

7  and plasma displays during the Relevant Period, a substantial market for CRT Products existed

8  as a cheaper alternative to these new technologies.

9       ~~101.~~107.    In 1999, CRT monitors accounted for 94.5 percent of the retail

10  market for computer monitors in North America.  By 2002, that figure had dropped to 73

11  percent; still a substantial share of the market.

12      ~~102.~~108.    As for CRT televisions, they accounted for 73 percent of the North

13  American television market in 2004, and by the end of 2006, still held a 46 percent market share.

14          **7.    Homogeneity of CRT Products**

15      ~~103.~~109.    CRT    Products    are    commodity-like    products    which    are

16  manufactured in standardized sizes.  One Defendant's CRT Product for a particular application,

17  such as a particular size television set or computer monitor, is substitutable for another's.

18  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

19      ~~104.~~110.    It is easier to form and sustain a cartel when the product in

20  question is commodity-like because it is easier to agree on prices to charge and to monitor those

21  prices once an agreement is formed.

22      **C.    Pre-Conspiracy Market**

23      ~~105.~~111.    The genesis of the CRT conspiracy was in the late 1980s as the

24  CRT Products business became more international and Defendants began serving customers that

25  were also being served by other international companies.  During this period, the employees of

26  Defendants would encounter employees from their competitors when visiting their customers.  A

27  culture of cooperation developed over the years and these Defendant employees would exchange

28  market information on production, capacity and customers.

106.112.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

107.113.     In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

108.114.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

109.115.     Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

110.116.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

111.117.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1. "Glass Meetings"

~~112.~~118.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

~~113.~~119.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

~~114.~~120.     The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

~~115.~~121.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

~~116.~~122.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

117.123.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo)), IRICO, and IRICOThomson.  Chunghwa also attended these meetings.

118.124.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

119.125.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

120.126.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

121.127.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

1   of CRTs that were sold to specific customers, and agreed upon target prices to be used in

2   negotiations with large customers. Having analyzed the supply and demand, the participants

3   would also discuss and agree upon production cutbacks.

4   ~~122.~~128.      During periods of oversupply, the focus of the meeting participants

5   turned to making controlled and coordinated price reductions. This was referred to as setting a

6   "bottom price."

7   ~~123.~~129.      Defendants' conspiracy included agreements on the prices at which

8   certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

9   manufactured CRT Products, such as televisions and computer monitors. Defendants realized

10  the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

11  support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all

12  OEMs paid supracompetitive prices for CRTs.

13  ~~124.    Each of the participants in these meetings knew, and in fact discussed, the~~

14  ~~significant impact that the price of CRTs had on the cost of the finished products into which they~~

15  ~~were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there~~

16  ~~were slim profit margins. Defendants therefore concluded that in order to make their CRT price~~

17  ~~increases stick, they needed to make the increase high enough that their direct customers (CRT~~

18  ~~TV and monitor makers) would be able to justify a corresponding price increase to their~~

19  ~~customers. In this way, Defendants ensured that price increases for CRTs were passed on to~~

20  ~~indirect purchasers of CRT Products.~~

21  ~~125.~~130.      The agreements reached at the glass meetings included:

22          a.  agreements on CRT prices, including establishing target prices,

23              "bottom" prices, price ranges and price guidelines;

24          b.  placing agreed-upon price differentials on various attributes of CRTs,

25              such as quality or certain technical specifications;

26          c.  agreements on pricing for intra-company CRT sales to vertically

27              integrated customers;

28          d.  agreements as to what to tell customers about the reason for a price

increase;

e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

h.   agreements to coordinate uniform public statements regarding available capacity and supply;

i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

j.   agreements to allocate customers;

k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.   agreements to keep their meetings secret.

126.131.   Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

127.132.   As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2. Bilateral Discussions

~~128.~~133.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

~~129.~~134.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil ~~and~~, Mexico, and the United States.

~~130.~~135.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

~~131.~~136.    In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the United States.  These ~~Brazilian and Mexican~~CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

~~132.~~137.    Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

133.138.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

**3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

134.139.     Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

135.140.     Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

~~136.~~141.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

~~137.~~142.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

~~138.~~143.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

~~139.~~144.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of

1   Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with

2   other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for

3   CRTs.

4        140.145.    Between at least 1996 and 2003, Defendant Panasonic, through

5   Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After

6   2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with

7   Toshiba. These meetings were attended by high level sales managers from Panasonic and

8   MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants.

9   Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic

10  never effectively withdrew from this conspiracy.

11       141.146.    PCNA was represented at those meetings and was a party to the

12  agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct

13  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure

14  that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

15  agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in

16  the alleged conspiracy.

17       142.147.    Between at least 2003 and 2006, Defendant MTPD participated in

18  multiple glass meetings and in fact led many of these meetings during the latter years of the

19  conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD

20  also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD

21  agreed on prices and supply levels for CRTs.

22       143.148.    Between at least 1998 and 2007, Defendant BMCC participated in

23  multiple glass meetings. These meetings were attended by high level sales managers from

24  BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants,

25  particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on

26  prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with

27  CRTs was mandated by the Chinese government. BMCC was acting to further its own

28  independent private interests in participating in the alleged conspiracy.

144.149.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by high level executives from Philips.   Philips also engaged in numerous bilateral discussions with other Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

145.150.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.   To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

146.151.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.   Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis.   Through these discussions, Samsung agreed on prices and supply levels for CRTs.

147.152.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

153.    Between at least 1998 and 2006, Defendant Samtel participated in

multiple bilateral discussions with other Defendants, particularly with Thai CRT.    These meetings were attended by high level executives from Samtel.    Through these discussions, Samtel agreed on prices and supply levels for CRTs.    Samtel never effectively withdrew from this conspiracy.

148. 154.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.    These meetings were attended by the highest ranking executives from Thai CRT.    Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.    Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.    Thai CRT never effectively withdrew from this conspiracy.

155.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.    These meetings were attended by high level sales managers from Thomson.    At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.    Thomson never effectively withdrew from this conspiracy.    Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.    Thomson has admitted to the European Commission that it played a role in the conspiracy.

156.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.    These meetings were attended by high level sales managers from Mitsubishi.    At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.    Mitsubishi never effectively withdrew from this conspiracy.

149. 157.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.    After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.    These meetings were attended by high level sales managers from Toshiba and MTPD.    Toshiba also engaged in multiple

1   bilateral discussions with other Defendants, particularly with LG.  Through these discussions,

2   Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

3   this conspiracy.

4          ~~150.~~158.    Defendants Toshiba America, TACP, TAEC and TAIS were

5   represented at those meetings and were a party to the agreements entered at them.  To the extent

6   Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

7   purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

8   that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

9   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

10   were active, knowing participants in the alleged conspiracy.

11          ~~151.~~159.    Between at least 1995 and 2006, Defendant Chunghwa, through

12   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

13   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

14   these meetings were attended by the highest ranking executives from Chunghwa, including the

15   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

16   discussions with each of the other Defendants on a regular basis.  Through these discussions,

17   Chunghwa agreed on prices and supply levels for CRTs.

18          ~~152.   Defendant Tatung America was represented at those meetings and was a~~

19   ~~party to the agreements entered at them.  To the extent Tatung America sold and/or distributed~~

20   ~~CRT Products to direct purchasers, it played a significant role in the conspiracy because~~

21   ~~Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would~~

22   ~~not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America~~

23   ~~was an active, knowing participant in the alleged conspiracy.~~

24          ~~153.~~160.    Between at least 1995 and 2004, Daewoo, through Daewoo

25   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

26   substantial number of these meetings were attended by the highest ranking executives from

27   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

28   Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

154.161.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

155.162.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

156.163.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

157.164.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of

---

[1]    Estimated market value of CRT units sold.

1  which (48.5 percent) were consumed in North America.  By 2002, North America still consumed

2  around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and*

3  *Related Display Materials,* Fuji Chimera Research, 1997, p.12.

4       158.165.       In the 1990s, industry analysts repeatedly predicted declines in

5  consumer prices for CRT Products.  Despite such predictions, and the existence of economic

6  conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

7       159.166.       A BNET Business Network news article from August 1998

8  reported that "key components (cathode ray tubes) in computer monitors have risen in price.

9  'Although several manufacturers raised their CRT prices in the beginning of August, additional

10 CRT price increases are expected for the beginning of October . . . . While computer monitor

11 price increases may be a necessary course of action, we [CyberVision, a computer monitor

12 manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT

13 price increases.'"

14      160.167.       A 2004 article from Techtree.com reports that various computer

15 monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of

16 their monitors in response to increases in CRT prices caused by an alleged shortage of glass

17 shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the

18 end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

19      161.168.       Defendants also conspired to limit production of CRTs by shutting

20 down production lines for days at a time, and closing or consolidating their manufacturing

21 facilities.

22      162.169.       For example, Defendants' CRT factory utilization percentage fell

23 from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most

24 dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops

25 throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

26 these sudden, coordinated drops in factory utilization by Defendants were the result of

27 Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

28      163.170.       During the Relevant Period, while demand in the United States for

1    CRT Products continued to decline, Defendants' conspiracy was effective in moderating the

2    normal downward pressures on prices for CRT Products caused by the entry and popularity of

3    the new generation LCD panels and plasma display products.  As Finsen Yu, President of

4    Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of

5    2007: "[t]he CRT technology is very mature; prices and technology have become stable."

6          ~~164.~~171.        During the Relevant Period, there were not only periods of

7    unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT

8    Products.  These price increases were despite the declining demand due to the approaching

9    obsolescence of CRT Products caused by the emergence of a new, potentially superior and

10   clearly more popular, substitutable technology.

11         ~~165.~~172.        These price increases and price stability in the market for CRT

12   Products during the Relevant Period are inconsistent with a competitive market for a product

13   facing rapidly decreasing demand caused by a new, substitutable technology.

14        **F.    International Government Antitrust Investigations**

15         ~~166.~~173.        Defendants' conspiracy to fix, raise, maintain and stabilize the

16   prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is

17   demonstrated by a multinational investigation commenced by the Antitrust Division of the

18   United States Department of Justice in November 2007.

19         ~~167.~~174.        Separately, the European Commission and Japan and South

20   Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs

21   that were being sold in Europe and Asia.

22         ~~168.~~175.        In its 2008 Annual Report, Defendant Toshiba reported that "[t]he

23   Group is also being investigated by the [European] Commission and/or the U.S. Department of

24   Justice for potential violations of competition laws with respect to semiconductors, LCD

25   products, cathode ray tubes (CRT) and heavy electrical equipment."

26         ~~169.~~176.        On May 6, 2008, the Hungarian Competition Authority ("HCA")

27   announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

28                 The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH)

initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

170.177.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

171.178.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment

against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

172.179.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

173.180.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

174.181.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

175.182.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

1    and employees, engaged in discussions and attended meetings with representatives of other

2    major CDT producers.  During these discussions and meetings, agreements were reached to fix

3    prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

4    elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

5    in California.

6         176.183.      The plea agreement of Samsung SDI requires that it cooperate with

7    the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

8    manufacture or sale of CDTs and CPTs.

9         184.   On December 5, 2012, the European Commission announced that it had

10   fined seven international corporate families a total of over €1.4 billion for their two-decade-long

11   effort to fix prices, share markets, restrict output, and allocate customers between themselves in

12   the CRT market.  The companies fined by the European Commission included Chunghwa, LG

13   Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly

14   Thomson).  The Commission Vice President in charge of competition policy said, "These cartels

15   for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive

16   behavior that are strictly forbidden to companies doing business in Europe."  The press release

17   accompanying the fines further notes that the CRT cartels were "among the most organised

18   cartels that the Commission has investigated."

19        177.185.      As outlined above, Defendants have a history of competitor

20   contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances

21   in related businesses in the electronics industry.

22        178.186.      Several Defendants also have a history of "cooperation" and

23   anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S.

24   Department of Justice in October 2005 for participating in a conspiracy to fix the prices of

25   Dynamic Random Access Memory ("DRAM").

26        179.187.      Defendants Samsung and Toshiba have acknowledged being

27   contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices

28   of Static Random Access Memory ("SRAM") and NAND Flash Memory.

1    ~~180.~~188.    In December 2006, government authorities in Japan, Korea, the

2    European Union and the United States revealed a comprehensive investigation into

3    anticompetitive conduct in the closely-related TFT-LCD market.

4    ~~181.~~189.    On December 12, 2006, news reports indicated that Defendant

5    Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG

6    Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

7    ~~182.~~190.    On November 12, 2008, the DOJ announced that it had reached

8    agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary,

9    LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

10   Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

11   their roles in a conspiracy to fix prices of TFT-LCD panels.

12   ~~183.~~191.    On March 10, 2009, the DOJ announced that it had reached an

13   agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead

14   guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine

15   for its role in a conspiracy to fix the prices of TFT-LCD panels.

16   ~~184.~~192.    The plea agreements of LG Display Co., Ltd., Sharp Corporation,

17   Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

18   TFT-LCDs was carried out, in part, in California.

19       **G.    The Role of Trade Associations During the Relevant Period**

20   ~~185.~~193.    Defendants' collusive activities have been furthered by trade

21   associations and trade events that provided opportunities to conspire and share information.  One

22   example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the

23   summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.

24   KODEMIA is a national trade organization representing about 80 member companies in the

25   Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004,

26   the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association

27   of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations

28   related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

186.194.        Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

187.195.        The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

188.196.        Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

189.197.        Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

        **H.      Effects of Defendants' Antitrust Violations**

                **1.      Examples of Reductions in Manufacturing Capacity by Defendants**

190.198.        As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

1    191.199.    In December of 2004, MTPD closed its American subsidiary's

2    operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that

3    the closing was part of the company's "global restructuring initiatives in the CRT business."  The

4    company further stated that in the future, "CRTs for the North American market will be supplied

5    by other manufacturing locations in order to establish an optimum CRT manufacturing

6    structure."

7    192.200.    In July of 2005, LGPD ceased CRT production at its Durham,

8    England facility, citing a shift in demand from Europe to Asia.

9    193.201.    In December of 2005, MTPD announced that it would close its

10   American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.

11   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and

12   Chinese markets.

13   194.202.    In late 2005, Samsung SDI followed the lead of other

14   manufacturers, closing its CRT factory in Germany.

15   195.203.    In July of 2006, Orion shut down a CRT manufacturing plant in

16   Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory

17   in Malaysia and liquidating its joint venture with Toshiba.

18          **2.    Examples of Collusive Pricing for CRTs**

19   196.204.    Defendants' collusion is evidenced by unusual price movements in

20   the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation

21   predicted that "[e]conomies of scale, in conjunction with technological improvements and

22   advances in manufacturing techniques, will produce a drop in the price of the average electronic

23   display to about $50 in 1997."

24   197.205.    In 1996, another industry source noted that "the price of the 14"

25   tube is at a sustainable USD50 and has been for some years . . . ."

26   198.206.    In reality, prices for CRTs never approached $50 in 1997, and

27   were consistently more than double this price.

28

199.207.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

200.208.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

201.209.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

202.210.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

203.211.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

204.212.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

52

### 3.    Summary Of Effects Of The Conspiracy Involving CRTs

~~205.~~213.    The above combination and conspiracy has had the following effects, among others:

a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.    PLAINTIFF'S INJURIES

~~206.~~214.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

~~207.~~215.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

208.216.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

209.217.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

210.218.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

211.219.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

212.220.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

**VIII.    FRAUDULENT CONCEALMENT**

213.221.    Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

214.222.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

215.223.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

216.224.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

217.225.     Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

218.226.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending

55

1    these meetings were instructed on more than one occasion not to disclose the fact of these

2    meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

3    production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their

4    arrivals and departures at such meetings to avoid being seen in public with each other and with

5    the express purpose and effect of keeping them secret.

6        219.227.    Defendants also agreed at glass meetings and bilateral meetings to

7    give pretextual reasons for price increases and output reductions to their customers.

8        220.228.    As alleged above, in early 1999, despite declining production costs

9    and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

10   rose.  The price increase was allegedly based on increasing global demand for the products.  In

11   fact, this price rise was the result of collusive conduct amongst Defendants, which was

12   undisclosed at the time.

13       221.229.    As alleged above, despite increased competition from flat panel

14   monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

15   This price stabilization was purportedly due exclusively to a shortage of critical components

16   such as glass.  This was a pretext used to cover up the conspiracy.

17       222.230.    In  addition,  when  several  CRT  manufacturers,  including

18   Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price

19   hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying

20   this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

21   "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

22   prices of CRT monitors in due course of time."

23       223.231.    Manufacturers  such  as  LG  Electronics  periodically  issued  press

24   statements falsely asserting that CRT prices were being driven lower by intense competition.

25       224.232.    Plaintiff  is  informed  and  believes,  and  thereon  alleges,  that

26   Defendants' purported reasons for the price increases of CRTs were materially false and

27   misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

28   alleged herein.

225.233.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

IX.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

234.    As discussed at length in Paragraphs 173-192 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

235.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and
- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

226.236.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

227.237.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

228.238.       Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

229.239.       In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

230.240.       As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

231.241.       The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

232.242.       For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

   a.   participating in meetings and conversations to discuss the prices and supply of CRTs;

   b.   communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

   c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

   d.   issuing price announcements and price quotations in accordance with the agreements reached;

   e.   selling CRTs to customers in the United States at noncompetitive prices;

   f.   exchanging competitively sensitive information in order to facilitate their conspiracy;

g.  agreeing to maintain or lower production capacity; and

h.  providing false statements to the public to explain increased prices for CRTs.

233.243.       As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

234.244.       Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235.245.       During the Relevant Period, Plaintiff conducted a substantial volume of business in California.  In particular, Plaintiff purchased CRT Products, which contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California.  Plaintiff prepared and sent purchase orders for CRT Products to various manufacturers in California.  Plaintiff also sent payment for CRT Products to these manufacturers in California.  In addition, Plaintiff sold CRT Products in California containing CRTs manufactured and sold by Defendants and their co-conspirators; maintained offices and inventories in California of CRT Products containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California.

236.246.       In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

were carried out in California.  Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

237.247.      Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

238.248.      The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

239.249.      For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

        a.  to fix, raise, maintain and stabilize the price of CRTs;

        b.  to allocate markets for CRTs amongst themselves;

        c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

        d.  to allocate among themselves the production of CRTs.

240.250.      The combination and conspiracy alleged herein has had, inter alia, the following effects:

        a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

        b.  prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

        c.  those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

241.251.     As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

242.252.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Third Claim for Relief**

**(Violation of California Unfair Competition Law)**

243.253.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.254.     Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

245.255.     This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

246.256.     The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

     a.     <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

     b.     <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

     c.     <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

247.257.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

248.258.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

1   ~~249.~~ 259.       Defendants' acts or practices are fraudulent or deceptive within the

2   meaning of Section 17200 *et seq.*

3   ~~250.~~ 260.       By reason of the foregoing, Plaintiff is entitled to full restitution

4   and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have

5   been obtained by Defendants as result of such business acts and practices described above.

6   **Fourth Claim for Relief**

7   **(Violation of the New York Donnelly Act)**

8   ~~251.~~ 261.       Plaintiff incorporates and realleges, as though fully set forth

9   herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

10  ~~252.~~ 262.       During the Relevant Period, Plaintiff conducted a substantial

11  volume of business in New York. In particular, Plaintiff purchased CRT Products, which

12  contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially

13  inflated prices because of the price-fixing Conspiracy, in New York. Plaintiff prepared and sent

14  purchase orders for CRT Products to various manufacturers in New York. Plaintiff also sent

15  payment for CRT Products to these manufacturers in New York. In addition, Plaintiff sold CRT

16  Products in New York containing CRTs manufactured and sold by Defendants and their co-

17  conspirators; maintained offices, and inventories in New York of CRT Products containing

18  CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and

19  representatives in New York who sold CRT Products to consumers in New York. As a result of

20  its substantial contacts with New York, Plaintiff is entitled to the protection of the laws of New

21  York.

22  ~~253.~~ 263.       Beginning at a time presently unknown to Plaintiff, but at least as

23  early as December 23, 1998, and continuing thereafter at least up to and including November 25,

24  2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful

25  trust in restraint of the trade and commerce described above in violation of the Donnelly Act,

26  New York General Business Law §§ 340 *et seq.*

27

28

254.264.    Defendants' Conspiracy restrained, suppressed, and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained, and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

255.265.    As a result, Defendants' Conspiracy substantially affected New York commerce.

256.266.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy, and is therefore entitled to treble damages and the costs of suit, including attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the California Unfair Competition Law, and the New York Donnelly Act, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.    Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Plaintiff shall receive such other or further relief as may be just and proper.

## XII.        JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

1   Dated:                                   Respectfully Submitted,

2

3                                            _____

4                                            Mike McKool, Jr.
                                             State Bar No. 13732100
5                                            Email: mmckool@mckoolsmith.com
                                             Lewis T. LeClair
6                                            State Bar No. 12072500
                                             Email: lleclair@mckoolsmith.com
7                                            Scott R. Jacobs
                                             State Bar No. 10521550
8                                            Email: srjacobs@mckoolsmith.com
                                             MCKOOL SMITH, P.C.
9                                            300 Crescent Court, Suite 1500
                                             Dallas, TX 75201
10                                           Telephone: (214) 978-4000
                                             Facsimile: (214) 978-4044
11

12                                           *Counsel For Plaintiff Compucom Systems, Inc.*

13   OF COUNSEL:

14                                           William A. Isaacson *(Pro hac vice)*
15                                           BOIES, SCHILLER & FLEXNER LLP
                                             5301 Wisconsin Ave. NW, Suite 800
16                                           Washington, D.C.  20015
                                             Telephone:  (202) 237-2727
17                                           Facsimile:   (202) 237-6131
                                             Email:  wisaacson@bsfllp.com
18

19                                           Philip J. Iovieno *(Pro hac vice)*
                                             Anne M. Nardacci *(Pro hac vice)*
20                                           Luke Nikas *(Pro hac vice)*
                                             Christopher V. Fenlon *(Pro hac vice)*
21                                           BOIES, SCHILLER & FLEXNER LLP
                                             10 North Pearl Street, 4th Floor
22                                           Albany, NY  12207
                                             Telephone:  (518) 434-0600
23                                           Facsimile:   (518) 434-0665
                                             Email: piovieno@bsfllp.com
24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: anardacci@bsfllp.com
Email: lnikas@bsfllp.com
Email: cfenlon@bsfllp.com


Mike McKool, Jr. (*Pro hac vice*)
Email: mmckool@mckoolsmith.com
Lewis T. LeClair (*Pro hac vice*)
Email: lleclair@mckoolsmith.com
Scott R. Jacobs (*Pro hac vice*)
Email: srjacobs@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044


*Counsel For Plaintiff
Compucom Systems, Inc.*

# **EXHIBIT H**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems, Inc.
and Electrograph Technologies Corp.*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

IN RE CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION

This Document Relates To Individual Case
No. 11-cv-01656-SC

ELECTROGRAPH SYSTEMS, INC.;
ELECTROGRAPH TECHNOLOGIES
CORP.,

        Plaintiffs,

    vs.

HITACHI, LTD.; HITACHI DISPLAYS,
LTD.; HITACHI AMERICA, LTD.;
HITACHI ASIA, LTD.; HITACHI
ELECTRONIC DEVICES (USA), INC.;
SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP

Case No. 11-cv-01656-SC

Master File No. 3:07-cv-05944-SC

MDL No. 1917

~~FIRST~~SECOND AMENDED
COMPLAINT

JURY TRIAL DEMANDED

1  ELECTRONICS CO., LTD.; IRICO
   DISPLAY DEVICES CO., LTD.; LG
2  ELECTRONICS, INC.; LG ELECTRONICS
   USA, INC.; LG ELECTRONICS TAIWAN
3  TAIPEI CO., LTD.; LP DISPLAYS
   INTERNATIONAL LTD.; PANASONIC
4  CORPORATION; PANASONIC
   CORPORATION OF NORTH AMERICA;
5  MT PICTURE DISPLAY CO., LTD.;
   BEIJING MATSUSHITA COLOR CRT CO.,
6  LTD.; KONINKLIJKE PHILIPS
   ELECTRONICS N.V.; PHILIPS
7  ELECTRONICS NORTH AMERICA
   CORPORATION; PHILIPS ELECTRONICS
8  INDUSTRIES (TAIWAN), LTD.; PHILIPS
   DA AMAZONIA INDUSTRIA
9  ELECTRONICA LTDA.; SAMSUNG
   ELECTRONICS CO., LTD.; SAMSUNG
10 ELECTRONICS AMERICA, INC.;
   SAMSUNG SDI CO., LTD.; SAMSUNG
11 SDI AMERICA, INC.; SAMSUNG SDI
   MEXICO S.A. DE C.V.;  SAMSUNG SDI
12 BRASIL LTDA.; SHENZHEN SAMSUNG
   SDI CO., LTD.; TIANJIN SAMSUNG SDI
13 CO., LTD.; SAMSUNG SDI (MALAYSIA)
   SDN. BHD.; SAMTEL COLOR LTD.; THAI
14 CRT CO., LTD.; TOSHIBA
   CORPORATION; TOSHIBA AMERICA,
15 INC.; TOSHIBA AMERICA CONSUMER
   PRODUCTS, LLC; TOSHIBA AMERICA
16 ELECTRONIC COMPONENTS, INC.;
   TOSHIBA AMERICA INFORMATION
17 SYSTEMS, INC.; <span style="color:red">TECHNICOLOR SA;
   TECHNICOLOR USA, INC.; MITSUBISHI</span>
18 <span style="color:red">ELECTRIC CORPORATION; MITSUBISHI
   DIGITAL ELECTRONICS AMERICA,</span>
19 <span style="color:red">INC.; MITSUBISHI ELECTRIC &
   ELECTRONICS, USA, INC.,</span>
20      Defendants.

21

22      Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for
23 their Complaint against all Defendants named herein, hereby allege as follows:

24 **I.          INTRODUCTION**

25      1.      Defendants and their co-conspirators formed an international cartel which
26 conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,
27 through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

28

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs") and products containing CRTs.

2. Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3. Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4. Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRT Products were sold in the United States.

5. With respect to CRT Products, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

ELECTROGRAPH'S SECOND AMENDED COMPLAINT

3

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

6.      The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. Since February 10, 2009, federal indictments have been issued against six individuals in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiffs purchased CRT Products, both CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs

1   sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the

2   California Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also

3   brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code,

4   to obtain restitution from and an injunction against Defendants due to their violations of Section

5   17200 *et seq.* of the California Business and Professions Code (the "California Unfair

6   Competition Act").

7           12.     Plaintiffs also bring this action pursuant to Section 340 of the New York

8   General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to

9   Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General

10  Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349

11  of the New York General Business Law, to obtain restitution from and an injunction against

12  Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law

13  (the "New York Unfair Competition Act").

14          13.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

15  the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has

16  supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair

17  Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C.

18  § 1367. Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman

19  Act and they form part of the same case or controversy.

20          14.     The activities of Defendants and their co-conspirators, as described herein,

21  involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

22  did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

23  import trade or commerce. This effect gives rise to Plaintiffs' antitrust claims. During the

24  Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

25  United States.

26          15.     The activities of Defendants and their co-conspirators, as described herein,

27  were within the flow of, were intended to, and did have a direct and substantial effect on

28  commerce in California and New York. In particular Defendants' and their co-conspirators'

---

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

5

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

1    conspiracy directly and substantially affected the price of CRT Products purchased in these

2    states. These effects also give rise to Plaintiffs' antitrust claims. Plaintiffs maintained operations

3    in these states during the Relevant Period.

4           16.    This court has jurisdiction over each Defendant named in this action under

5    both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR.

6    Each Defendant conducts substantial business in New York as well as California. In addition,

7    Defendants and their co-conspirators purposely availed themselves of the laws of the United

8    States and the identified states insofar as they manufactured CRTs for sale in the United States,

9    including New York and California, or which were incorporated into CRT Products Defendants

10   and their co-conspirators knew would be sold to customers in the United States, including New

11   York and California. Defendants' and their co-conspirators' conspiracy affected this commerce

12   in CRT Products in the United States, including in New York and California.

13          17.    Venue is proper in the Eastern District of New York under Section 12 of

14   the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is

15   either an alien corporation, transacts business in this District, or is otherwise found within this

16   District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a

17   substantial part of the events or omissions giving rise to this claim occurred in this District.

18   Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed

19   CRTs would be sold and shipped into this District.

20   **III.    PARTIES**

21       **A.    Plaintiffs**

22          18.    Plaintiff Electrograph Systems, Inc. is a New York corporation with its

23   principal place of business in New York. Through May 2009, Electrograph Systems, Inc.

24   conducted business as a value-added wholesale distributor of display technology solutions,

25   including CRT displays and components, rear screen projection TVs, projectors, and digital

26   electronic products, primarily to resellers and system integrators. Electrograph Systems, Inc.

27   specialized in display, audio, connectivity, and other complementary technologies for sale to

28   commercial, retail and government customers.

19.     Plaintiff Electrograph Technologies Corp. is a New York corporation, with its principal place of business in New York.  Electrograph Technologies Corp. owns 100% of the outstanding capital stock of Electrograph Systems, Inc.   In addition to its ownership of Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph Technologies Corp. conducted business as an information technology solutions provider that specialized in hardware and software procurement, display technology, custom networking, security, IP telephony, remote management, application development/e-commerce, storage, and enterprise and Internet solutions.  Electrograph Technologies Corp. offered its customers single-source solutions customized to their information systems needs by integrating its analysis, design and implementation services with hardware, software, networking products and peripherals from leading vendors.

20.     During the Relevant Period, the Plaintiffs, and their predecessor entities described below, purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.   As such, the Plaintiffs suffered injury as a result of Defendants' unlawful conduct.  Throughout the Relevant Period, Plaintiffs, and their predecessor entities described below, conducted a substantial amount of business in New York and California.

### B.     Plaintiffs' Corporate History

21.     Electrograph Technologies Corp. was incorporated under the name Manchester Equipment Co., Inc. on August 21, 1973.  The company's name was changed to Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to Electrograph Technologies Corp. on August 1, 2005.  On August 1, 2005, upon consummation of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc., the merger sub was merged with and into Manchester Technologies, Inc., and Manchester Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and concurrently changed its name to Electrograph Technologies Corp.  During the Relevant Period, Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in

1    the United States and elsewhere directly and indirectly from Defendants, and/or Defendants'
2    subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and
3    affiliates controlled.  As such, Electrograph Technologies Corp. suffered injury as a result of
4    Defendants' unlawful conduct.

5           22.    Electrograph Systems, Inc. was incorporated under the name Electrograph
6    Acquisitions, Inc. on April 10, 1997.  On April 28, 1997, Manchester Equipment Co., Inc.—the
7    predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph
8    Acquisitions, Inc. from Bitwise Designs, Inc.  On April 29, 1997, Electrograph Acquisitions, Inc.
9    changed its name to Electrograph Systems, Inc.  During the Relevant Period, Electrograph
10   Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States
11   and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or
12   affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As
13   such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

14          23.    ActiveLight, Inc. was formed on April 16, 1998, as a Washington
15   company with its principal place of business in the State of Washington.  ActiveLight, Inc. was a
16   value-added wholesale distributor of display technology solutions and projectors to the
17   professional, commercial and high-end consumer markets.   During the Relevant Period,
18   ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or
19   Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants'
20   subsidiaries and affiliates controlled.  As such, ActiveLight, Inc. suffered injury as a result of
21   Defendants' unlawful conduct.

22          24.    On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired
23   100% of the outstanding stock of ActiveLight, Inc.  From the acquisition date through March 2,
24   2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc.
25   On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

26          25.    CineLight Corporation was formed on June 11, 2001, as a Washington
27   company with its principal place of business in the State of Washington.  CineLight Corporation
28   was a value-added wholesale distributor of advanced display technology products and

accessories to home theater designers and resellers.  During the Relevant Period, CineLight Corporation purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, CineLight Corporation suffered injury as a result of Defendants' unlawful conduct.

26.     On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of CineLight Corporation.  From the date of the acquisition until July 2006, CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  In July 2006, CineLight Corporation was merged into ActiveLight, Inc.

27.     International Computer Graphics, Inc. was formed on April 18, 1985, as a California company with its principal place of business in California.  International Computer Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and desktop displays, digital imaging peripherals and AV presentation products.  During the Relevant Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, International Computer Graphics, Inc. suffered injury as a result of Defendants' unlawful conduct.

28.     On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of International Computer Graphics, Inc.  From the date of the acquisition through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc.  On March 3, 2008, International Computer Graphics, Inc. was merged into Electrograph Systems, Inc.

29.     Champion Vision, Inc. was formed on June 19, 2003, as a New York company with its principal place of business in New York.  During the Relevant Period, Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Champion Vision, Inc. suffered injury as a result of Defendants' unlawful conduct.

30.     On September 15, 2008, Champion Vision, Inc. was merged into Electrograph Systems, Inc.

31.     Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland.  On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp.  Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area.  During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct. In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32.     In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

33.     During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary.  In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc.  As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities."  By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' conspiracy,

1  these predecessor entities were injured in their business and property because the prices they paid

2  for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any

3  reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any

4  of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems,

5  Inc. or Electrograph Technologies Corp.

6  **C.**  **Defendants**

7  **1.**  **Hitachi Entities**

8  34.  Defendant Hitachi, Ltd. is a Japanese company with its principal place of

9  business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

10  parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

11  market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

12  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

13  subsidiaries or affiliates, throughout the United States.

14  35.  Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

15  company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

16  297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

17  in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

18  manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

19  create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

20  Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

21  through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

22  dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

23  antitrust violations alleged in this complaint.

24  36.  Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

25  company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

26  York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

27  Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

28  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

37.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

38.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

39.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

40.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2.   **IRICO Entities**

41.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

42.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

43.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

44.     Defendants IGC, IGE and IDDC are collectively referred to herein as

"IRICO."

### 3. LG Electronics Entities

45. Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

46. Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI. During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

47. Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

48.     Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 4.     LP Displays

49.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 5.     Panasonic Entities

50.     Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.     Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

1    52.    Defendants Panasonic Corporation and PCNA are collectively referred to

2    herein as "Panasonic."

3    53.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

4    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

5    Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

6    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

7    manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On

8    March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

9    venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

10   Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

11   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12   subsidiaries or affiliates, throughout the United States.

13   54.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

14   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

15   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

16   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

17   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

18   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

19   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

20   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

21   China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

22   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

23   States.

24   **6.    Philips Entities**

25   55.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

26   Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

27   Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

28   of the world's largest electronics companies, with 160,900 employees located in over 60

1  countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal
2  Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming
3  Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on
4  demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126
5  million Euros of its investment and said it would not inject further capital into the venture.
6  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT
7  Products, either directly or through its subsidiaries or affiliates, throughout the United States.

8      56.    Defendant Philips Electronics North America Corporation ("Philips
9  America") is a Delaware corporation with its principal place of business located at 1251 Avenue
10 of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and
11 controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America
12 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
13 subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and
14 controlled the finances, policies and affairs of Philips America relating to the antitrust violations
15 alleged in this complaint.

16     57.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips
17 Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu
18 Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal
19 Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or
20 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
21 United States.  Defendant Royal Philips dominated and controlled the finances, policies and
22 affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

23     58.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips
24 Brazil") is a Brazilian company with its principal place of business located at Av Torquato
25 Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a
26 wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant
27 Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either
28 directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

1    Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

2    the antitrust violations alleged in this complaint.

3           59.    Defendants Royal Philips, Philips America, Philips Taiwan and Philips

4    Brazil are collectively referred to herein as "Philips."

5           **7.    Samsung Entities**

6           60.    Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

7    company with its principal place of business located at Samsung Electronics Building, 1320-10,

8    Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

9    company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

10   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

11   States.

12          61.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

13   corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

14   Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

15   Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

16   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

17   United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

18   Samsung SEAI relating to the antitrust violations alleged in this complaint.

19          62.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

20   Company ("Samsung SDI") is a South Korean company with its principal place of business

21   located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

22   company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

23   Samsung SDI claims to be the world's leading company in the display and energy business, with

24   28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

25   market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

26   Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

27   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

28   throughout the United States.  Defendant SEC dominated and controlled the finances, policies

1    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

2              63.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

3 California corporation with its principal place of business located at 3333 Michelson Drive, Suite

4 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of

5 Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured,

6 marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

7 affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

8 controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

9 violations alleged in this complaint.

10              64.    Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico")

11 is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

12 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-

13 owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

14 Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

15 directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

16 and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

17 Mexico relating to the antitrust violations alleged in this complaint.

18              65.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

19 Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

20 Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-

21 owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period,

22 Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

23 directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC

24 and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

25 Brazil relating to the antitrust violations alleged in this complaint.

26              66.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

27 is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

28 Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

1    Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

2    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

3    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

4    controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

5    violations alleged in this complaint.

6             67.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

7    Chinese company with its principal place of business located at Developing Zone of Yi-Xian

8    Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

9    subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

12   dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

13   the antitrust violations alleged in this complaint.

14            68.    Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

15   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

16   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

17   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

18   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

19   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

20   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

21   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

22   in this complaint.

23            69.    Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

24   SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

25   SDI Malaysia are collectively referred to herein as "Samsung."

26        **8.    Samtel**

27            70.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

28   principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.    Thai CRT

71.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.    Toshiba Entities

72.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

73.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

74. Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

75. Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

76. Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

77. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

**11. Thomson Entities**

78.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs  internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.   The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

79.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.   Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

23

business was sold to Videocon in 2005. During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

80. Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**12. Mitsubishi Entities**

81. Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States. These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the United States.

82. Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers. During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

83. Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618. Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA. During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

CRT televisions and monitors in the United States.

84.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.        AGENTS AND CO-CONSPIRATORS**

78.85.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

79.86.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRT Products made by its parent company.

80.87.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

81.88.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

1    joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

2    As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

3    CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

4    DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

5    directly or through their subsidiaries or affiliates, throughout the United States.

6            82.89.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein

7    as "Daewoo."

8            83.90.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

9    Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

10   Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

11   Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

12   Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

13   Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

14   Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

15   its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

16   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

17   throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

18   finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

19   this complaint.

20           84.91.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

21   venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's

22   principal place of business was located in Indonesia.  TEDI was projected to have an annual

23   production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

24   MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

25   Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

26   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27   throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

28   affairs of TEDI relating to the antitrust violations alleged in this complaint.

85.92. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

86.93. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V. TRADE AND COMMERCE

87.94. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

88.95. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

89.96. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in California and New York and caused antitrust injuries in California and New York.

## VI. FACTUAL ALLEGATIONS

### A. CRT Technology

90.97. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

91.98. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

92.99. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

93.100. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

94.101. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

95.102. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

96.103. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and

purposes, inseparable in that one would not exist without the other.

97. 104.　　Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and CRT Products and their purchases of CRT Products indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs and CRT Products.

98. 105.　　Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.　Plaintiffs were not able to pass the inflated prices on to their customers.

99. 106.　　Plaintiffs have been injured by paying supra-competitive prices for CRTs and CRT Products.

**B.　　Structure of the CRT Industry**

100. 107.　　The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.　　Market Concentration**

101. 108.　　During the Relevant Period, the CRT industry was dominated by relatively few companies.　In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78% share of the global CRT market.　The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2.　　Information Sharing**

102. 109.　　Because of common membership in trade associations, interrelated

business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products as alleged below.

103.110. Defendants Hitachi and Samsung, as well as Chunghwa, are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. **Consolidation**

104.111. The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. **Multiple Interrelated Business Relationships**

105.112. The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

106.113. Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

     a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

     b. Defendants LG Electronics and Philips also formed LG.Philips LCD

1     Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the
2     purpose of manufacturing TFT-LCD panels.

3   c.  The formation of the CRT joint venture MTPD in 2003 by Defendants
4     Toshiba and Panasonic.

5   d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita
6     Display Technology Co., Ltd. as a joint venture for the purpose of
7     manufacturing TFT-LCD panels.

8   e.  In December 1995, Defendant Toshiba partnered with Orion and two
9     other non-Defendant entities to form TEDI, which manufactured
10    CRTs in Indonesia.

11  f.  Defendant Toshiba and Orion also signed a cooperative agreement
12    relating to LCDs in 1995.  Pursuant to the agreement, Daewoo
13    produced STN-LCDs, and Toshiba, which had substituted its STN-
14    LCD production with TFT-LCD production, marketed Daewoo's
15    STN-LCDs globally through its network.

16  g.  Also in 1995, Defendant Toshiba entered into a technology transfer
17    agreement with Chunghwa for large CPTs.

18  h.  Chunghwa has a joint venture with Defendant Samsung for the
19    production of LCD panels.  Chunghwa now licenses the technology
20    from Defendant Philips, a recent development that helped resolve a
21    patent infringement suit filed in 2002.

22  i.  Defendants LG Electronics and Hitachi entered into a joint venture in
23    2000 for the manufacture, sale and distribution of optical storage
24    products such as DVD drives.

25  j.  Defendant Samtel participates in a joint venture, Samcor Glass
26    Limited, with Defendant Samsung and non-Defendant Corning Inc.,
27    USA for the production and supply of picture tube glass.

28  k.  Defendant Samtel claims to have supplied CRTs to Defendants LG

---

Electronics, Samsung, Philips, and Panasonic.

**5.      High Costs of Entry Into the Industry**

107.114.      There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

108.115.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRT Products allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.      The Maturity of the CRT Product Market**

109.116.      Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

110.117.      Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

111.118.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

112.119.      Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion

and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

113.120.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

114.121.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

115.122.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

116.123.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

117.124.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

118.125.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

119.126.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

120.127.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRT Products in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

121.128.    Defendants Samsung, LG, and LGMitsubishi, along with Chunghwa and Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRT Products.

122.129.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

123.130.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

1.    **"Glass Meetings"**

124.131.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

125.132.    The first level meetings were attended by high level company

executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

126.133.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

127.134.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

128.135.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

129.136.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants and co-conspirators which had

subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO, and Thomson.  Chunghwa also attended these meetings.

130.137.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

131.138.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the United States.

132.139.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133.140.    The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

134.141.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a

1    "bottom price."

2    ~~135.~~142.    Defendants' conspiracy included agreements on the prices at which

3    certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

4    manufactured end products, such as televisions and computer monitors.  Defendants realized the

5    importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

6    support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all

7    direct purchaser OEMs paid supracompetitive prices for CRTs.

8    ~~136.    Each of the participants in these meetings knew, and in fact discussed, the~~

9    ~~significant impact that the price of CRTs had on the cost of the finished products into which they~~

10    ~~were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there~~

11    ~~were slim profit margins.  Defendants therefore concluded that in order to make their CRT price~~

12    ~~increases stick, they needed to make the increase high enough that their direct customers (CRT~~

13    ~~TV and monitor makers) would be able to justify a corresponding price increase to their~~

14    ~~customers.  In this way, Defendants ensured that price increases for CRTs were passed on to~~

15    ~~indirect purchasers of CRT Products.~~

16    ~~137.~~143.    The agreements reached at the glass meetings included:

17        a.   agreements on CRT Product prices, including establishing target

18            prices, "bottom" prices, price ranges and price guidelines;

19        b.   placing agreed-upon price differentials on various attributes of CRT

20            Products, such as quality or certain technical specifications;

21        c.   agreements on pricing for intra-company CRT Product sales to

22            vertically integrated customers;

23        d.   agreements as to what to tell customers about the reason for a price

24            increase;

25        e.   agreements to coordinate with competitors that did not attend the

26            group meetings and agreements with them to abide by the agreed-

27            upon pricing;

28        f.   agreements to coordinate pricing with CRT manufacturers in other

geographic markets such as Brazil, Europe and India;

    g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    h.  agreements to coordinate uniform public statements regarding available capacity and supply;

    i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.  agreements to allocate customers;

    k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.  agreements to keep their meetings secret.

~~138.~~144.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~139.~~145.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2.    <u>Bilateral Discussions</u>

~~140.~~146.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees,

1     took the form of in-person meetings, telephone contacts and emails.

2            ~~141.~~147.    During the Relevant Period, in-person bilateral meetings took

3     place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

4     Thailand, Brazil ~~and~~, Mexico, and the United States.

5            ~~142.~~148.    The purpose of the bilateral discussions was to exchange

6     information about past and future pricing, confirm production levels, share sales order

7     information, confirm pricing rumors, and coordinate pricing with manufacturers in other

8     geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

9            ~~143.~~149.    In order to ensure the efficacy of their global conspiracy,

10    Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers

11    in Brazil ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI~~

12    ~~Mexico.~~and the United States.    These ~~Brazilian and Mexican~~CRT manufacturers were

13    particularly important because they served the North American market for CRT Products.  As

14    further alleged herein, North America was the largest market for CRT televisions and computer

15    monitors during the Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers

16    are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they

17    adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of

18    all ~~CRT Products imported into~~CRTs sold in the United States were fixed, raised, maintained

19    and/or stabilized at supracompetitive levels.

20           ~~144.~~150.    Defendants also used bilateral discussions with each other during

21    price negotiations with customers to avoid being persuaded by customers to cut prices.  The

22    information gained in these communications was then shared with supervisors and taken into

23    account in determining the price to be offered.

24           ~~145.~~151.    Bilateral discussions were also used to coordinate prices with CRT

25    Product manufacturers that did not ordinarily attend the group meetings, such as Defendants

26    Hitachi, Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a

27    top or management meeting, the attendees at these group meetings would meet bilaterally with

28    the other Defendant manufacturers for the purpose of communicating whatever CRT Product

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT
                                           39
                                                          Case No. 11-cv-01656-SC
                                                          Master File No. 3:07-cv-05944-SC

pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

146.152.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

147.153.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

148.154.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions

                                                40

with other Defendants, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRT Products. None of IRICO's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

149.155. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRT Products. LG Electronics never effectively withdrew from this conspiracy.

150.156. Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

151.157. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

152.158. Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After

1  2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with
2  Toshiba.   These meetings were attended by high level sales managers from Panasonic and
3  MTPD.   Panasonic also engaged in multiple bilateral discussions with other Defendants.
4  Through these discussions, Panasonic agreed on prices and supply levels for CRT Products.
5  Panasonic never effectively withdrew from this conspiracy.

6      153.159.      PCNA was represented at those meetings and was a party to the
7  agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct
8  purchasers, it played a significant role in the conspiracy because Defendants wished to ensure
9  that the prices for CRT Products paid by direct purchasers would not undercut the pricing
10 agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in
11 the alleged conspiracy.

12     154.160.      Between at least 2003 and 2006, Defendant MTPD participated in
13 multiple glass meetings and in fact led many of these meetings during the latter years of the
14 conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD
15 also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD
16 agreed on prices and supply levels for CRT Products.

17     155.161.      Between at least 1998 and 2007, Defendant BMCC participated in
18 multiple glass meetings.   These meetings were attended by high level sales managers from
19 BMCC.   BMCC also engaged in multiple bilateral discussions with other Defendants,
20 particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on
21 prices and supply levels for CRT Products.   None of BMCC's conspiratorial conduct in
22 connection with CRT Products was mandated by the Chinese government.  BMCC was acting to
23 further its own independent private interests in participating in the alleged conspiracy.

24     156.162.      Between at least 1996 and 2001, Defendant Philips, through Royal
25 Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,
26 Philips participated in the CRT Product conspiracy through its joint venture with LG Electronics,
27 LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level
28 executives from Philips.   Philips also engaged in numerous bilateral discussions with other

ELECTROGRAPH'S SECOND AMENDED COMPLAINT     42     Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

Defendants. Through these discussions, Philips agreed on prices and supply levels for CRT Products. Philips never effectively withdrew from this conspiracy.

157.163. Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

158.164. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

159.165. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

160.166. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRT Products. Samtel never effectively withdrew from this conspiracy.

161.167. Between at least 1997 and 2006, Defendant Thai CRT participated

in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products.  Thai CRT never effectively withdrew from this conspiracy.

168.  Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several glass meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

169.  Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and some multilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

~~162.~~170.  Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRT Products.  Toshiba never effectively withdrew from this conspiracy.

~~163.~~171.  Defendants Toshiba America, TACP, TAEC and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent

1   Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

2   purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

3   that the prices for CRT Products paid by direct purchasers would not undercut the pricing

4   agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

5   were active, knowing participants in the alleged conspiracy.

6   ~~164.~~172.    Between at least 1995 and 2004, Daewoo, through Daewoo

7   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

8   substantial number of these meetings were attended by the highest ranking executives from

9   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

10  Through these discussions, Daewoo agreed on prices and supply levels for CRT Products.

11  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary,

12  filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

13  ~~165.~~173.    When Plaintiffs refer to a corporate family or companies by a

14  single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one

15  or more employees or agents of entities within the corporate family engaged in conspiratorial

16  meetings on behalf of every company in that family.  In fact, the individual participants in the

17  conspiratorial meetings and discussions did not always know the corporate affiliation of their

18  counterparts, nor did they distinguish between the entities within a corporate family.  The

19  individual participants entered into agreements on behalf of, and reported these meetings and

20  discussions to, their respective corporate families.  As a result, the entire corporate family was

21  represented in meetings and discussions by their agents and were parties to the agreements

22  reached in them.

23      **E.    The CRT Market During the Conspiracy**

24  ~~166.~~174.    Until the last few years, CRTs were the dominant technology used

25  in displays, including televisions and computer monitors.  During the Relevant Period, this

26  translated into the sale of millions of CRT Products, generating billions of dollars in annual

27  profits.

28  ~~167.~~175.    The following data was reported by Stanford Resources, Inc., a

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT                                           45                    Case No. 11-cv-01656-SC
                                                                         Master File No. 3:07-cv-05944-SC

market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

168.176.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

169.177.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

170.178.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

171.179.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

---

[1]    Estimated market value of CRT units sold.

172.180.     After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

173.181.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

174.182.     A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

175.183.     Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

176.184.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

177.185.     During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

1    the new generation LCD panels and plasma display products.  As Finsen Yu, President of

2    Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of

3    2007: "[t]he CRT technology is very mature; prices and technology have become stable."

4    ~~178.~~186.    During the Relevant Period, there were not only periods of

5    unnatural and sustained price stability, but there were also increases in prices of CRT Products.

6    These price increases were despite the declining demand due to the approaching obsolescence of

7    CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

8    substitutable technology.

9    ~~179.~~187.    These price increases and price stability in the market for CRT

10   Products during the Relevant Period are inconsistent with a competitive market for a product

11   facing rapidly decreasing demand caused by a new, substitutable technology.

12        **F.    International Government Antitrust Investigations**

13   ~~180.~~188.    Defendants' conspiracy to fix, raise, maintain and stabilize the

14   prices of, and restrict output for, CRT Products sold in the United States during the Relevant

15   Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of

16   the United States Department of Justice ("DOJ") and others in November 2007.

17   ~~181.~~189.    On November 8, 2007, antitrust authorities in Europe, Japan and

18   South Korea raided the offices of manufacturers of CRTs as part of an international investigation

19   of alleged price fixing.

20   ~~182.~~190.    Defendant MTPD, now the CRT unit of Defendant Panasonic, has

21   confirmed that it was raided by Japan's Fair Trade Commission.

22   ~~183.~~191.    *Kyodo News* reported on November 8, 2007, upon information and

23   belief, that MTPD fixed prices for CRTs with manufacturers in three Asian countries, including

24   South Korea's Samsung SDI.  *Kyodo News* further reported that "[o]fficials of these three

25   companies are believed to have had at least 10 meetings since 2005 in major Asian cities to

26   coordinate target prices when delivering their products to TV manufacturers in Japan and South

27   Korea, the sources said."

28   ~~184.~~192.    Defendant Samsung SDI was raided by South Korea's Fair Trade

ELECTROGRAPH'S SECOND AMENDED
COMPLAINT

48

Case No. 11-cv-01656-SC
Master File No. 3:07-cv-05944-SC

Commission, which has started an investigation into Samsung's CRT business.

185.193.    The *Asian Shimbun* further reported on November 10, 2007, that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

186.194.    On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.   Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.   Royal Philips stated that it intended to assist the regulators.

187.195.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

188.196.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were

exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

189.197.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

190.198.     On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.199.     On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the

1  prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as

2  a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

3  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried

4  out, in part, in California.

5  192.200.      On November 9, 2010, the DOJ issued a press release announcing

6  that a federal grand jury in San Francisco had that same day returned a one-count indictment

7  against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim

8  a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of

9  CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former

10 executives from two color display tube (CDT) manufacturing companies."  The indictment states

11 that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in

12 California.

13 193.201.      On March 18, 2011, the DOJ issued a press release announcing

14 that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty

15 and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

16 194.202.      Samsung SDI admitted that from at least as early as January 1997

17 until at least as late as March 2006, participated in a conspiracy among major CDT producers to

18 fix prices, reduce output, and allocate market shares of CDTs sold in the United States and

19 elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

20 and employees, engaged in discussions and attended meetings with representatives of other

21 major CDT producers.  During these discussions and meetings, agreements were reached to fix

22 prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

23 elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

24 in California.

25 195.203.      The plea agreement of Samsung SDI requires that it cooperate with

26 the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

27 manufacture or sale of CDTs and CPTs.

28 204.      On December 5, 2012, the European Commission announced that it had

fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

~~196.~~205.	As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

~~197.~~206.	Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

~~198.~~207.	Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

~~199.~~208.	In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

~~200.~~209.	On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

~~201.~~210.	On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of

52

1  Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

2  their roles in a conspiracy to fix prices of TFT-LCD panels.

3  ~~202.~~211.   On March 10, 2009, the DOJ announced that it had reached an

4  agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead

5  guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine

6  for its role in a conspiracy to fix the prices of TFT-LCD panels.

7  ~~203.~~212.   The indictments of LG Display Co., Ltd., Sharp Corporation,

8  Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of

9  TFT-LCDs was carried out, in part, in California.

10  **G.    The Role of Trade Associations During the Relevant Period**

11  ~~204.~~213.   Defendants' collusive activities have been furthered by trade

12  associations and trade events that provided opportunities to conspire and share information.  One

13  example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the

14  summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.

15  KODEMIA is a national trade organization representing about 80 member companies in the

16  Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004,

17  the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association

18  of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations

19  related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United

20  States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

21  Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common

22  issues."

23  ~~205.~~214.   Samsung and LG Electronics were members of both KODEMIA

24  and EDIRAK, and have participated extensively in the KDCs.

25  ~~206.~~215.   The KDC has taken place in Seoul, Korea or other Korean venues

26  on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,

27  2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

28  and LG Electronics' CRT operations have participated at these events, including H.K. Chung,

Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

207.216.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

208.217.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

**H.    Effects of Defendants' Antitrust Violations**

**1.    Examples of Reductions in Manufacturing Capacity by Defendants**

209.218.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

210.219.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

211.220.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

212.221.      In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

213.222.      In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

214.223.      In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.      Examples of Collusive Pricing for CRT Products

215.224.      Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

216.225.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

217.226.      In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

218.227.      Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

219.228.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

220.229.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

221.230.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

222.231.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

223.232.     Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

224.233.     CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### H. Summary Of Effects Of The Conspiracy Involving CRT Products

225.234. The above combination and conspiracy has had the following effects, among others:

    a. Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b. Prices for CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c. Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII. PLAINTIFFS' INJURIES

226.235. As purchasers of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRT Products causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

227.236. Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have

1  absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT

2  Products.

3  ~~228.~~237.      The OEMs and others passed on to their customers, including

4  Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on

5  to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered

6  injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and

7  others.

8  ~~229.~~238.      Once a CRT leaves its place of manufacture, it remains essentially

9  unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical

10  objects that do not change form or become an indistinguishable part of a CRT Product.  Thus,

11  CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to

12  Plaintiffs.

13  ~~230.~~239.      The market for CRTs and the market for CRT Products are

14  inextricably linked and cannot be considered separately.  Defendants are well aware of this

15  intimate relationship.

16  ~~231.~~240.      Throughout the Relevant Period, Defendants controlled the market

17  for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

18  CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by

19  Defendants' conspiracy.

20  ~~232.~~241.      As a result, Plaintiffs were injured in connection with their

21  purchases of CRT Products during the Relevant Period.

22  **VIII.   FRAUDULENT CONCEALMENT**

23  ~~233.~~242.      Plaintiffs had neither actual nor constructive knowledge of the

24  facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.

25  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable

26  diligence, the existence of the conspiracy alleged herein until November 2007, when

27  investigations by the DOJ and other antitrust regulators became public.  Defendants engaged in a

28

1    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that

2    there was a conspiracy to fix the prices of CRT Products.

3         234.243.    Because Defendants' agreement, understanding and conspiracy

4    were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and

5    did not know that they were paying artificially high prices for CRT Products.

6         235.244.    The affirmative acts of Defendants alleged herein, including acts in

7    furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

8    precluded detection.  As noted above, Defendants organized glass meetings to avoid detection,

9    conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of

10   pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate

11   and exchange in advance the texts of the proposed communications with customers containing

12   these pretextual statements and would coordinate which co-conspirator would first communicate

13   these pretextual statements to customers.

14        236.245.    By its very nature, Defendants' price-fixing conspiracy was

15   inherently self-concealing.

16        237.246.    Plaintiffs could not have discovered the alleged contract,

17   conspiracy or combination at an earlier date by the exercise of reasonable diligence because of

18   the deceptive practices and techniques of secrecy employed by Defendants and their co-

19   conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or

20   combination.   The contract, conspiracy or combination as herein alleged was fraudulently

21   concealed by Defendants by various means and methods, including, but not limited to, secret

22   meetings, surreptitious communications between Defendants by the use of the telephone or in-

23   person meetings in order to prevent the existence of written records, discussion on how to evade

24   antitrust laws and concealing the existence and nature of their competitor pricing discussions

25   from non-conspirators (including customers).

26        238.247.    As alleged above, Defendants in mid-2000 began to hold CDT and

27   CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were

28

1    also told not to take minutes.  Attending companies also reduced the number of their respective

2    attendees to maintain secrecy.

3    ~~239.~~248.          Defendants also agreed at glass meetings and bilateral meetings to

4    give pretextual reasons for price increases and output reductions to their customers.

5    ~~240.~~249.          As alleged above, in early 1999, despite declining production costs

6    and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

7    rose.  The price increase was allegedly based on increasing global demand for the products.  In

8    fact, this price rise was the result of collusive conduct amongst Defendants, which was

9    undisclosed at the time.

10   ~~241.~~250.          As alleged above, despite increased competition from flat panel

11   monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

12   This price stabilization was purportedly due exclusively to a shortage of critical components

13   such as glass.  This was a pretext used to cover up the conspiracy.

14   ~~242.~~251.          In addition, when several CRT manufacturers, including

15   Defendants Samsung, Philips and LG Electronics, increased the price of CRT Products in 2004,

16   the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In

17   justifying this price increase, a Deputy General Manager for an LG Electronics distributor in

18   India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to

19   increase the prices of CRT monitors in due course of time."

20   ~~243.~~252.          Manufacturers such as LG Electronics periodically issued press

21   statements falsely asserting that CRT prices were being driven lower by intense competition.

22   ~~244.~~253.          Plaintiffs are informed and believe, and thereon allege, that

23   Defendants' purported reasons for the price increases of CRT Products were materially false and

24   misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

25   alleged herein.

26   ~~245.~~254.          As a result of Defendants' fraudulent concealment of their

27   conspiracy, the running of any statute of limitations has been tolled with respect to any claims

28   that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX.    *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

255.    As discussed at length in Paragraphs 188-212 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

256.    As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

257.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## ~~IX.~~X.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

~~246.~~258.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~247.~~259.    Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

248.260.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

249.261.    As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

250.262.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

251.263.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

  a. participating in meetings and conversations to discuss the prices and supply of CRT Products;

  b. communicating in writing and orally to fix target prices, floor prices and price ranges for CRT Products;

  c. agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

  d. issuing price announcements and price quotations in accordance with the agreements reached;

  e. selling CRT Products to customers in the United States at noncompetitive prices;

  f. exchanging competitively sensitive information in order to facilitate their conspiracy;

  g. agreeing to maintain or lower production capacity; and

  h. providing false statements to the public to explain increased prices for CRT Products.

252.264.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

## (Violation of the California Cartwright Act)

253.265.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

254.266.    During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

255.267.    In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT Products.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

256.268.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have

each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRT Products at supra-competitive levels. Defendants' conduct substantially affected California commerce.

257.269.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

258.270.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

a.   to fix, raise, maintain and stabilize the price of CRT Products;

b.   to allocate markets for CRT Products amongst themselves;

c.   to submit rigged bids for the award and performance of certain CRT Products contracts; and

d.   to allocate among themselves the production of CRT Products.

259.271.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

a.   price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California;

b.   prices for CRT Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

c.   those who purchased CRT Products from Defendants, their co-conspirators, and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

260.272.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

261.273.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of California Unfair Competition Law)

262.274.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

263.275.    During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

264.276.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*.

265.277.    Defendants committed acts of unfair competition, as defined by Section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of CRT Products as described above.

266.278.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

267.279.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

268.280.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

269.281.    Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

270.282.    By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### **Fourth Claim for Relief**

### **(Violation of the New York Donnelly Act)**

271.283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272.284.    Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere.  As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

273.285.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq*.

274.286.     Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

275.287.     As a result, Defendants' conspiracy substantially affected New York commerce

276.288.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq*.

277.289.     As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief**

**(Violation of New York Unfair Competition Law)**

278.290.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

279.291.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

280.292.     The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349,

which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

281.293.    Defendants' unlawful conduct had the following effects:  (1) CRT price competition was restrained, suppressed and eliminated throughout New York; (2) CRT Products prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products.

282.294.    During the Relevant Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

283.295.    During the Relevant Period, each of Defendants named herein, directly, or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

284.296.    Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

## X.XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the New York Donnelly Act and the unfair competition laws of California and New York and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.    Defendants shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

        C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

        D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

        E.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

Plaintiffs shall receive such other or further relief as may be just and proper.

## ~~XI.~~XII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                        Respectfully Submitted,

                              _____
                              Philip J. Iovieno
                              Anne M. Nardacci
                              ~~Benjamin D. Battles~~
                              BOIES, SCHILLER & FLEXNER LLP
                              10 North Pearl Street, 4th Floor
                              Albany, NY  12207
                              Telephone:  (518) 434-0600
                              Facsimile:  (518) 434-0665
                              Email: piovieno@bsfllp.com
                                    anardacci@bsfllp.com
                                  ~~bbattles@bsfllp.com~~

William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs Electrograph Systems,
Inc. and Electrograph Technologies Corp.*

# **EXHIBIT I**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

1

2

3   OFFICE DEPOT, INC.,

4          Plaintiff,

5   v.

6   HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
    HITACHI AMERICA, LTD.; HITACHI ASIA,
7   LTD.; HITACHI ELECTRONIC DEVICES (USA),
    INC.; SHENZHEN SEG HITACHI COLOR
8   DISPLAY DEVICES, LTD.; IRICO GROUP
    CORPORATION; IRICO GROUP ELECTRONICS
9   CO., LTD.; IRICO DISPLAY DEVICES CO.,
    LTD.; LG ELECTRONICS, INC.; LG
10  ELECTRONICS USA, INC.; LG ELECTRONICS
    TAIWAN TAIPEI CO., LTD.; LP DISPLAYS
11  INTERNATIONAL LTD.; PANASONIC
    CORPORATION; PANASONIC CORPORATION
12  OF NORTH AMERICA; MT PICTURE DISPLAY
    CO., LTD.; BEIJING MATSUSHITA COLOR
13  CRT CO., LTD.; KONINKLIJKE PHILIPS
    ELECTRONICS N.V.; PHILIPS ELECTRONICS
14  NORTH AMERICA CORPORATION; PHILIPS
    ELECTRONICS INDUSTRIES (TAIWAN), LTD.;
15  PHILIPS DA AMAZONIA INDUSTRIA
    ELECTRONICA LTDA.; SAMSUNG
16  ELECTRONICS CO., LTD.; SAMSUNG
    ELECTRONICS AMERICA, INC.; SAMSUNG
17  SDI CO., LTD.; SAMSUNG SDI AMERICA,
    INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
18  SAMSUNG SDI BRASIL LTDA.; SHENZHEN
    SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG
19  SDI CO., LTD.; SAMSUNG SDI (MALAYSIA)
    SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT
20  CO., LTD.; TOSHIBA CORPORATION;
    TOSHIBA AMERICA, INC.; TOSHIBA
21  AMERICA CONSUMER PRODUCTS, LLC;
    TOSHIBA AMERICA ELECTRONIC
22  COMPONENTS, INC.; TOSHIBA AMERICA
    INFORMATION SYSTEMS, INC.; CHUNGHWA
23  PICTURE TUBES, LTD.; CHUNGHWA
    PICTURE TUBES (MALAYSIA); TATUNG
24  COMPANY OF AMERICA, INC.,

25          Defendants.

CASE NO. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

26

27

28

1    STUART H. SINGER (*Pro hac vice*)
2    BOIES, SCHILLER, & FLEXNER LLP
     401 East Las Olas Boulevard, Suite 1200
3    Fort Lauderdale, Florida 33301
     Telephone: (954) 356-0011
4    Facsimile: (954) 356-0022
     Email: ssinger@bsfllp.com
5
6    WILLIAM A. ISAACSON (*Pro hac vice*)
     BOIES, SCHILLER & FLEXNER LLP
7    5301 Wisconsin Ave. NW, Suite 800
     Washington, DC 20015
8    Telephone:  (202) 237-2727
     Facsimile:   (202) 237-6131
9    Email:  wisaacson@bsfllp.com
10
     PHILIP J. IOVIENO (*Pro hac vice*)
11   ANNE M. NARDACCI (*Pro hac vice*)
     LUKE NIKAS (*Pro hac vice*)
12   CHRISTOPHER V. FENLON (*Pro hac vice*)
     BOIES, SCHILLER & FLEXNER LLP
13   10 North Pearl Street, 4th Floor
     Albany, NY 12207
14   Telephone:  (518) 434-0600
     Facsimile:   (518) 434-0665
15   Email: piovieno@bsfllp.com
16
17   *Counsel for Plaintiff Office Depot, Inc.*

18                    **UNITED STATES DISTRICT COURT**
                      **NORTHERN DISTRICT OF CALIFORNIA**
19                    **SAN FRANCISCO DIVISION**

20   IN RE CATHODE RAY TUBE (CRT)          Case No. 11-cv-06276-SC
     ANTITRUST LITIGATION
21                                          Master File No. 3:07-cv-05944-SC

22   This Document Relates To Individual Case   MDL No. 1917
     No. 11-cv-06276-SC
23
     OFFICE DEPOT, INC.,                    **AMENDED COMPLAINT**
24
            Plaintiff,                      **JURY TRIAL DEMANDED**
25
        vs.
26
     HITACHI, LTD.; HITACHI DISPLAYS,
27   LTD.; HITACHI AMERICA, LTD.;
     HITACHI ASIA, LTD.; HITACHI
28   ELECTRONIC DEVICES (USA), INC.;

SHENZHEN SEG HITACHI COLOR
DISPLAY DEVICES, LTD.; IRICO GROUP
CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO
DISPLAY DEVICES CO., LTD.; LG
ELECTRONICS, INC.; LG ELECTRONICS
USA, INC.; LG ELECTRONICS TAIWAN
TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL LTD.; PANASONIC
CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA;
MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT CO.,
LTD.; KONINKLIJKE PHILIPS
ELECTRONICS N.V.; PHILIPS
ELECTRONICS NORTH AMERICA
CORPORATION; PHILIPS ELECTRONICS
INDUSTRIES (TAIWAN), LTD.; PHILIPS
DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SDI CO., LTD.; SAMSUNG
SDI AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.; SAMSUNG SDI
BRASIL LTDA.; SHENZHEN SAMSUNG
SDI CO., LTD.; TIANJIN SAMSUNG SDI
CO., LTD.; SAMSUNG SDI (MALAYSIA)
SDN. BHD.; SAMTEL COLOR LTD.; THAI
CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff, Office Depot, Inc. ("Office Depot"), for its Complaint against all Defendants named herein, hereby alleges as follows:

## I.    **INTRODUCTION**

1.    Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,

1    through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this

2    conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

3        2.        Defendants are or were among the leading manufacturers of: (a) color

4    picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

5    tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

6    devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the

7    purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

8    to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes

9    and the products containing them shall be referred to as "CDT Products." CDT Products and

10   CPT Products shall be referred to collectively herein as "CRT Products."

11       3.        Defendants control the majority of the CRT industry, a multibillion dollar

12   market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the

13   Relevant Period, virtually every household in the United States owned at least one CRT Product.

14       4.        Since the mid-1990s, the CRT industry faced significant economic

15   pressures as customer preferences for other emerging technologies shrank profits and threatened

16   the sustainability of the industry. In order to maintain price stability, increase profitability, and

17   decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

18   contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

19   States.

20       5.        With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

21   fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,*

22   shipments, prices, production and customer demand; (c) coordinate public statements regarding

23   available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

24   among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

25   on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

26   overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

27   areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

28   producer's share of certain key customers' sales; and (k) restrict output.

OFFICE DEPOT'S AMENDED COMPLAINT          4          Case No. 11-cv-06276-SC
                                                     Master File No. 3:07-cv-05944-SC

6.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.      During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.      Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.     Plaintiff also brings this action pursuant to various state laws listed herein because Plaintiff purchased CRT Products from both Defendants and non-defendant vendors which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in those states.

12.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims listed herein under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's state law claims are so related to its claims under Section 1 of the Sherman Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased by Plaintiff in the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured CRT Products for sale in the United States, or CRTs which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States.

15.     Venue is proper in the Southern District of Florida under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

### III. PARTIES

#### A. Plaintiff

16. Plaintiff Office Depot is a Delaware corporation with its corporate headquarters in Delray Beach, Florida. Office Depot was incorporated in 1986 with the opening of its first retail location in Fort Lauderdale, Florida. Through the conclusion of Defendants' and the co-conspirators' conspiracy, Office Depot was a global supplier of office products and services. In fiscal year 2010, Office Depot sold $11.6 billion of products and services to consumers and businesses of all sizes. Upon information and belief, Office Depot owns all claims and rights under federal law and state law to recover any overcharges suffered by Office Depot and the following subsidiaries: (1) Viking Office Products, Inc.; (2) Solutions4sure.com, Inc., d/b/a Tech Depot; and (3) Computers4sure.com, Inc., (collectively, the "Office Depot Subsidiaries").

17. During the Relevant Period, Office Depot and the Office Depot Subsidiaries purchased CRT Products directly and indirectly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled. As such, Office Depot and the Office Depot Subsidiaries suffered injury as a result of Defendants' and their co-conspirators' unlawful conduct. Throughout the Relevant Period, Office Depot conducted a substantial amount of business in Florida and California.

18. Upon information and belief, during the Relevant Period, Office Depot and the Office Depot Subsidiaries purchased CRT Products in, *inter alia*, California and Florida containing CRTs manufactured and sold by Defendants and their co-conspirators. In addition, upon information and belief, Plaintiff supplied its offices in California and Florida with CRT Products and maintained corporate offices and inventories in these states.

19. Upon information and belief, Plaintiff purchased CRT Products, which

contained CRTs manufactured by Defendants and their co-conspirators and sold at artificially inflated prices because of the price-fixing conspiracy, in California and Florida.

**B.**     **Defendants**

**1.**     **Hitachi Entities**

20.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

21.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

22.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

23.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company

1    with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,

2    Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant

3    Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or

4    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

5    United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

6    affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

7              24.   Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a

8    Delaware corporation with its principal place of business located at 208 Fairforest Way,

9    Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and

10   Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or

11   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

12   United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the

13   finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this

14   complaint.

15             25.   Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi

16   Shenzhen") was a Chinese company with its principal place of business located at 5001

17   Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at

18   least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally

19   around the time that the government investigations into the CRT industry began).  Thus, Hitachi

20   Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the

21   Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold

22   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

23   throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and

24   controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

25   violations alleged in this complaint.

26             26.   Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

27   HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

28

## 2. **IRICO Entities**

27.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

28.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

29.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

30.     Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

**3.**     **LG Electronics Entities**

31.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

32.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

33.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

34.     Defendants LGEI, LGEUSA and LGETT are collectively referred to

1    herein as "LG Electronics."

2         **4.    LP Displays**

3         35.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5    Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7    In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8    of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9    billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10   and LGEI would cede control over the company and the shares would be owned by financial

11   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13   affiliates, throughout the United States.

14        **5.    Panasonic Entities**

15        36.    Defendant Panasonic Corporation, which was at all times during the

16   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18   Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

19   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20   affiliates, throughout the United States.

21        37.    Defendant Panasonic Corporation of North America ("PCNA") is a

22   Delaware corporation with its principal place of business located at One Panasonic Way,

23   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28        38.    Defendants Panasonic Corporation and PCNA are collectively referred to

---

OFFICE DEPOT'S AMENDED COMPLAINT                    12                    Case No. 11-cv-06276-SC
                                                                          Master File No. 3:07-cv-05944-SC

1    herein as "Panasonic."

2          39.     Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

4    Osaka, 571-8504, Japan.   In 2002, Panasonic Corporation entered into a joint venture with

5    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

6    manufacture CRTs.   Panasonic Corporation was the majority owner with 64.5 percent.   On

7    March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

8    venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

9    Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12          40.     Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

13   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

14   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

15   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

16   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

17   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

18   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

19   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

20   China.   During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

21   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22   States.

23          **6.     Philips Entities**

24          41.     Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

25   Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

26   Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

27   of the world's largest electronics companies, with 160,900 employees located in over 60

28   countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

1 Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming

2 Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on

3 demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126

4 million Euros of its investment and said it would not inject further capital into the venture.

5 During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT

6 Products, either directly or through its subsidiaries or affiliates, throughout the United States.

7       42.    Defendant Philips Electronics North America Corporation ("Philips

8 America") is a Delaware corporation with its principal place of business located at 1251 Avenue

9 of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and

10 controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America

11 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

12 subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and

13 controlled the finances, policies and affairs of Philips America relating to the antitrust violations

14 alleged in this complaint.

15       43.    Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips

16 Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu

17 Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal

18 Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or

19 distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

20 United States.  Defendant Royal Philips dominated and controlled the finances, policies and

21 affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

22       44.    Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips

23 Brazil") is a Brazilian company with its principal place of business located at Av Torquato

24 Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a

25 wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant

26 Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either

27 directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal

28 Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

1     the antitrust violations alleged in this complaint.

2          45.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips

3     Brazil are collectively referred to herein as "Philips."

4          **7.     Samsung Entities**

5          46.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

6     company with its principal place of business located at Samsung Electronics Building, 1320-10,

7     Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

8     company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

9     CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

10    States.

11         47.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

12    corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

13    Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

14    Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

15    distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16    United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

17    Samsung SEAI relating to the antitrust violations alleged in this complaint.

18         48.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

19    Company ("Samsung SDI") is a South Korean company with its principal place of business

20    located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

21    company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

22    Samsung SDI claims to be the world's leading company in the display and energy business, with

23    28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

24    market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

25    Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

26    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27    throughout the United States.  Defendant SEC dominated and controlled the finances, policies

28    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

1           49.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

2    California corporation with its principal place of business located at 3333 Michelson Drive, Suite

3    700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of

4    Defendant Samsung SDI. During the Relevant Period, Samsung SDI America manufactured,

5    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

6    affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and

7    controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

8    violations alleged in this complaint.

9           50.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico")

10   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

11   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-

12   owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period,

13   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

14   directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC

15   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

16   Mexico relating to the antitrust violations alleged in this complaint.

17          51.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

18   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

19   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-

20   owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period,

21   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

22   directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC

23   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

24   Brazil relating to the antitrust violations alleged in this complaint.

25          52.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

26   is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian

27   Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

28   Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured,

marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

53.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

55.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

**8.     Samtel**

56.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

### 9.  Thai CRT

57.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10.  Toshiba Entities

58.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.  During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

59.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

1    policies and affairs of Toshiba America relating to the antitrust violations alleged in this
2    complaint.

3            60.    Defendant Toshiba America Consumer Products, LLC ("TACP") is a
4    limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-
5    3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba
6    America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed
7    CRT Products, either directly or through its subsidiaries or affiliates, throughout the United
8    States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP
9    relating to the antitrust violations alleged in this complaint.

10           61.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a
11   California corporation with its principal place of business located at 19900 MacArthur
12   Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled
13   subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC
14   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
15   subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled
16   the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this
17   complaint.

18           62.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a
19   California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,
20   California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC
21   through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold
22   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
23   throughout the United States.  Defendant TC dominated and controlled the finances, policies and
24   affairs of TAIS relating to the antitrust violations alleged in this complaint.

25           63.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are
26   collectively referred to herein as "Toshiba."

27       **11.    Chunghwa Entities**

28           64.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

65.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.~~Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."~~

~~12.    Tatung Company of America, Inc.~~

66.    ~~Tatung Company of America, Inc. ("Tatung America") is a California~~Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12.    Thomson Entities**

67.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California.  Tatung America is a~~5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located

in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.    The ~~other half used to~~ joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be ~~owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to her two children~~ marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.    During the Relevant Period, ~~Tatung America~~ Thomson SA manufactured, marketed, sold and/or distributed CRT Products ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~ either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

68.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

1  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or
2  indirectly through its subsidiaries or affiliates, to customers throughout the United States.
3      69.    Thomson SA and Thomson Consumer Electronics are collectively referred
4  to herein as "Thomson."
5      **13.    Mitsubishi Entities**
6      70.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")
7  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,
8  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in
9  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold
10  internally to Mitsubishi's television and monitor manufacturing division and to other television
11  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor
12  division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,
13  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the
14  United States.
15      71.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi
16  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.
17  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi
18  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,
19  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television
20  and monitor manufacturing division and to other television and monitor manufacturers in the
21  U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from
22  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,
23  marketed, sold and distributed CRT Products in the United States.
24      72.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi
25  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.
26  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the
27  Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and
28  CRT televisions and monitors in the United States.

1                           73.      Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

2 are collectively referred to herein as "Mitsubishi."

3 **IV.**        **AGENTS AND CO-CONSPIRATORS**

4                  74.      The acts alleged against Defendants in this Complaint were authorized,

5 ordered, or done by their officers, agents, employees, or representatives, while actively engaged

6 in the management and operation of Defendants' businesses or affairs.

7                  75.      Each Defendant or co-conspirator acted as the principal, agent, or joint

8 venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

9 common course of conduct alleged by Plaintiff. Each Defendant and co-conspirator that is a

10 subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

11 made by its parent company.

12                  76.      Various persons and/or firms not named as Defendants in this Complaint

13 participated as co-conspirators in the violations alleged herein and may have performed acts and

14 made statements in furtherance thereof. These co-conspirators who are not named as Defendants

15 include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

16 Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

17 Tosummit Electronic Devices Indonesia ~~and~~, Toshiba Display Devices (Thailand) Co., Ltd., and

18 Videocon Industries, Ltd. Plaintiff reserves the right to name some or all of these and other co-

19 conspirators as Defendants at a later date.

20                  77.      During the Relevant Period, Orion Electronic Co. ("Orion") was a major

21 manufacturer of CRT Products. Orion was a Korean corporation which filed for bankruptcy in

22 2004. In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

23 Products. Orion was involved in CRT Products sales and manufacturing joint ventures and had

24 subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

25 United States. Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

26 Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

27 Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The

28 Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50

1   joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

2   As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's

3   CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and

4   DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either

5   directly or through their subsidiaries or affiliates, throughout the United States.

6          78.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein

7   as "Daewoo."

8          79.     Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita

9   Malaysia") was a Malaysian company with its principal place of business located at Lot 1,

10  Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.

11  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic

12  Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co.,

13  Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT

14  Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until

15  its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed,

16  sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

17  throughout the United States.  Defendant Panasonic Corporation dominated and controlled the

18  finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in

19  this complaint.

20         80.     P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint

21  venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's

22  principal place of business was located in Indonesia.  TEDI was projected to have an annual

23  production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant

24  MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT

25  Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold,

26  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27  throughout the United States.  Defendant TC dominated and controlled the finances, policies, and

28  affairs of TEDI relating to the antitrust violations alleged in this complaint.

81.     Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

82.     The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.     TRADE AND COMMERCE

83.     During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

84.     During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

85.     The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.  The business activities of Defendants also substantially affected trade and commerce in California and Florida and caused antitrust injuries in California and Florida.

## VI.     FACTUAL ALLEGATIONS

### A.     CRT Technology

86.     A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

87. CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

88. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

89. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

90. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

91. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

92. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes,

inseparable in that one would not exist without the other.

93.     Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant original equipment manufacturers ("OEMs") and others.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

94.     Plaintiff has participated in the market for products containing CRTs.  To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiff was not able to pass the inflated prices on to its customers.

95.     Plaintiff has been injured by paying supra-competitive prices for CRT Products.

### B.     Structure of the CRT Industry

96.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

#### 1.     Market Concentration

97.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.   The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

#### 2.     Information Sharing

98.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries

1    and relationships between the executives of certain companies, there were many opportunities

2    for Defendants to discuss and exchange competitive information.  The ease of communication

3    was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants

4    took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as

5    alleged below.

6              99.    Defendants Hitachi, Samsung and Chunghwa are all members of the

7    Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-

8    founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG

9    Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

10   Research Association.  Upon information and belief, Defendants and their co-conspirators used

11   these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At

12   the meetings of these trade associations, Defendants exchanged proprietary and competitively

13   sensitive information which they used to implement and monitor the conspiracy.

14             **3.    <u>Consolidation</u>**

15             100.    The CRT industry also had significant consolidation during the Relevant

16   Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture

17   involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's

18   and Panasonic's CRT businesses into MTPD.

19             **4.    <u>Multiple Interrelated Business Relationships</u>**

20             101.    The industry is marked by a web of cross-licensing agreements, joint

21   ventures and other cooperative arrangements that can facilitate collusion.

22             102.    Examples of the high degree of cooperation among Defendants in both the

23   CRT Product market and other closely related markets include the following:

24                    a.   The formation of the CRT joint venture LGPD in 2001 by Defendants

25                         LG Electronics and Philips.

26                    b.   Defendants LG Electronics and Philips also formed LG.Philips LCD

27                         Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the

28                         purpose of manufacturing TFT-LCD panels.

c.  The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d.  Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.  In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.  Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h.  Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

<div align="center">

**5.** **High Costs of Entry Into the Industry**

</div>

103.    There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

104.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

<div align="center">

**6.** **The Maturity of the CRT Product Market**

</div>

105.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

106.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

107.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

108.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

109.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

110.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.    Homogeneity of CRT Products**

111.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

112.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

**C.    Pre-Conspiracy Market**

113.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

114.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

115.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

1   November 25, 2007.

2          116.    The CRT conspiracy was effectuated through a combination of group and

3   bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

4   were the primary method of communication and took place on an informal, ad hoc basis.  During

5   this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited

6   the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba

7   and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These

8   meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and

9   Singapore.

10          117.    Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with and

11  Daewoo, also attended several ad hoc group meetings during this period.  The participants at

12  these group meetings also discussed increasing prices for CRTs.

13          118.    As more manufacturers formally entered the conspiracy, group meetings

14  became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized,

15  systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

16  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

17          119.    The overall CRT conspiracy raised and stabilized worldwide and U.S.

18  prices that Defendants charged for CRTs.

19          **1.      "Glass Meetings"**

20          120.    The group meetings among the participants in the CRT price-fixing

21  conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by

22  employees at three general levels of Defendants' corporations.

23          121.    The first level meetings were attended by high level company executives

24  including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top

25  meetings occurred less frequently, typically quarterly, and were focused on longer term

26  agreements and forcing compliance with price-fixing agreements.  Because attendees at top

27  meetings had authority as well as more reliable information, these meetings resulted in

28  agreements.  Attendees at top meetings were also able to resolve disputes because they were

1  decision makers who could make agreements.

2          122.    The second level meetings were attended by Defendants' high level sales

3  managers and were known as "management" meetings.    These meetings occurred more

4  frequently, typically monthly, and handled implementation of the agreements made at top

5  meetings.

6          123.    Finally, the third level meetings were known as "working level" meetings

7  and were attended by lower level sales and marketing employees.    These meetings generally

8  occurred on a weekly or monthly basis and were mostly limited to the exchange of information

9  and discussing pricing since the lower level employees did not have the authority to enter into

10  agreements.    These lower level employees would then transmit the competitive information up

11  the corporate reporting chain to those individuals with pricing authority.    The working level

12  meetings also tended to be more regional and often took place near Defendants' factories.    In

13  other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14  manufacturers' employees met in Korea, the Chinese in China, and so on.

15          124.    The Chinese glass meetings began in 1998 and generally occurred on a

16  monthly basis following a top or management level meeting.    The China meetings had the

17  principal purpose of reporting what had been decided at the most recent glass meetings to the

18  Chinese manufacturers.    Participants at the Chinese meetings included the manufacturers located

19  in China, such as IRICO and BMCC, as well as the China-based branches of the other

20  Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21  SDI Tianjin, and Chunghwa.

22          125.    Glass meetings also occurred occasionally in various European countries.

23  Attendees at these meetings included those Defendants and co-conspirators which had

24  subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25  LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26  of Daewoo)), IRICO, and IRICOThomson.    Chunghwa also attended these meetings.

27          126.    Representatives of Defendants also attended what were known amongst

28  members of the conspiracy as "green meetings." These were meetings held on golf courses.    The

green meetings were generally attended by top and management level employees of Defendants.

127.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and~~, Malaysia, and the United States.

128.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

129.    The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

130.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

131.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured CRT Products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all OEMs paid

1  supracompetitive prices for CRTs.

2  ~~132.    Each of the participants in these meetings knew, and in fact discussed, the~~
3  ~~significant impact that the price of CRTs had on the cost of the finished products into which they~~
4  ~~were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there~~
5  ~~were slim profit margins.  Defendants therefore concluded that in order to make their CRT price~~
6  ~~increases stick, they needed to make the increase high enough that their direct customers (CRT~~
7  ~~TV and monitor makers) would be able to justify a corresponding price increase to their~~
8  ~~customers.  In this way, Defendants ensured that price increases for CRTs were passed on to~~
9  ~~indirect purchasers of CRT Products.~~

10  ~~133.~~132.    The agreements reached at the glass meetings included:

11     l.  agreements on CRT prices, including establishing target prices,
12        "bottom" prices, price ranges and price guidelines;

13     m.  placing agreed-upon price differentials on various attributes of CRTs,
14        such as quality or certain technical specifications;

15     n.  agreements on pricing for intra-company CRT sales to vertically
16        integrated customers;

17     o.  agreements as to what to tell customers about the reason for a price
18        increase;

19     p.  agreements to coordinate with competitors that did not attend the
20        group meetings and agreements with them to abide by the agreed-
21        upon pricing;

22     q.  agreements to coordinate pricing with CRT manufacturers in other
23        geographic markets such as Brazil, Europe and India;

24     r.  agreements to exchange pertinent information regarding shipments,
25        capacity, production, prices and customer demands;

26     s.  agreements to coordinate uniform public statements regarding
27        available capacity and supply;

28     t.  agreements to allocate both overall market shares and share of a

particular customer's purchases;

u. agreements to allocate customers;

v. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

w. agreements to keep their meetings secret.

134.133.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

135.134.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.   Bilateral Discussions

136.135.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

137.136.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

138.137.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order

1    information, confirm pricing rumors, and coordinate pricing with manufacturers in other

2    geographic locations, including Brazil, Mexico and, Europe, and the United States.

3              139.138.      In order to ensure the efficacy of their global conspiracy,

4    Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

5    and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the

6    United States.   These Brazilian and MexicanCRT manufacturers were particularly important

7    because they served the North American market for CRT Products.  As further alleged herein,

8    North America was the largest market for CRT televisions and computer monitors during the

9    Relevant Period.  Because these Brazilian and MexicanCRT manufacturers are all wholly-owned

10   and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the

11   unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

12   imported intosold in the United States were fixed, raised, maintained and/or stabilized at

13   supracompetitive levels.

14             140.139.      Defendants also used bilateral discussions with each other during

15   price negotiations with customers to avoid being persuaded by customers to cut prices.  The

16   information gained in these communications was then shared with supervisors and taken into

17   account in determining the price to be offered.

18             141.140.      Bilateral discussions were also used to coordinate prices with CRT

19   manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

20   Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

21   management meeting, the attendees at these group meetings would meet bilaterally with the

22   other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

23   output agreements had been reached during the meeting.  For example, Samsung had a

24   relationship with Hitachi and was responsible for communicating CRT pricing agreements to

25   Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

26   CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

27   with Thomson in Europe and the United States, and Samsung SDI had regular communications

28   with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for

1   communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented

2   the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT. Sometimes

3   Hitachi and Toshiba also attended the glass meetings. In this way, Hitachi, Toshiba and Samtel

4   participated in the conspiracy to fix prices of CRTs.

5

6         **3.**     **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

7        ~~142.~~141.     Between at least 1996 and 2001, Defendant Hitachi, through

8   Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass

9   meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also

10   engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.

11   Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never

12   effectively withdrew from this conspiracy.

13        ~~143.~~142.     Defendants Hitachi America and HEDUS were represented at

14   those meetings and were a party to the agreements entered at them. To the extent Hitachi

15   America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a

16   significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

17   Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

18   the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the

19   alleged conspiracy.

20        ~~144.~~143.     Between at least 1998 and 2007, Defendant IRICO, through IGC,

21   IGE and IDDC, participated in multiple glass meetings. These meetings were attended by the

22   highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions

23   with other Defendants, particularly with other Chinese manufacturers. Through these

24   discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's

25   conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

26   IRICO was acting to further its own independent private interests in participating in the alleged

27   conspiracy.

28        ~~145.~~144.     Between at least 1995 and 2001, Defendant LG Electronics,

through LGEI and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG Electronics never effectively withdrew from this conspiracy.

146.145.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

147.146.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

148.147.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

149.148.    PCNA was represented at those meetings and was a party to the

agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

150.149.     Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

151.150.     Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

152.151.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

153.152.     Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices

1   for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

2   reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing

3   participants in the alleged conspiracy.

4        154.153.        Between at least 1995 and 2007, Defendant Samsung, through

5   SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

6   participated in at least 200 glass meetings at all levels.  A substantial number of these meetings

7   were attended by the highest ranking executives from Samsung.  Samsung also engaged in

8   bilateral discussions with each of the other Defendants on a regular basis.  Through these

9   discussions, Samsung agreed on prices and supply levels for CRTs.

10       155.154.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

11  and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

12  entered at them.  To the extent SEC and SEAI sold and/or distributed CRT Products, they played

13  a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

14  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

15  the glass meetings.  Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

16  Mexico were active, knowing participants in the alleged conspiracy.

17       156.155.        Between at least 1998 and 2006, Defendant Samtel participated in

18  multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These

19  meetings were attended by high level executives from Samtel.  Through these discussions,

20  Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from

21  this conspiracy.

22       157.156.        Between at least 1997 and 2006, Defendant Thai CRT participated

23  in multiple glass meetings.  These meetings were attended by the highest ranking executives

24  from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,

25  particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply

26  levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

27       157.    Between at least 1996 and 2005, Defendant Thomson participated in

28  dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral

OFFICE DEPOT'S AMENDED COMPLAINT                41                  Case No. 11-cv-06276-SC
                                                                    Master File No. 3:07-cv-05944-SC

1   meetings. These meetings were attended by high level sales managers from Thomson. At these

2   meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,

3   demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product

4   development and agreed on prices and supply levels for CRTs. Thomson never effectively

5   withdrew from this conspiracy. Thomson sold its CRT business to co-conspirator Videocon

6   Industries, Ltd., in July 2005. Thomson has admitted to the European Commission that it played

7   a role in the conspiracy.

8          158.   Between at least 1995 and 2005, Defendant Mitsubishi participated in

9   multiple bilateral and some multilateral meetings with its competitors. These meetings were

10  attended by high level sales managers from Mitsubishi. At these meetings, Mitsubishi discussed

11  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,

12  plant shutdowns, customer allocation, and new product development, and agreed on prices and

13  supply levels for CRTs. Mitsubishi never effectively withdrew from this conspiracy.

14          158.159.   Between at least 1995 and 2003, Defendant Toshiba, through TC,

15  TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the

16  CRT conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended

17  by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple

18  bilateral discussions with other Defendants, particularly with LG. Through these discussions,

19  Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from

20  this conspiracy.

21          159.160.   Defendants Toshiba America, TACP, TAEC and TAIS were

22  represented at those meetings and were a party to the agreements entered at them. To the extent

23  Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

24  purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

25  that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

26  agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and TAIS

27  were active, knowing participants in the alleged conspiracy.

28          160.161.   Between at least 1995 and 2006, Defendant Chunghwa, through

1    Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

2    and Scotland, participated in at least 100 glass meetings at all levels. A substantial number of

3    these meetings were attended by the highest ranking executives from Chunghwa, including the

4    former Chairman and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral

5    discussions with each of the other Defendants on a regular basis. Through these discussions,

6    Chunghwa agreed on prices and supply levels for CRTs.

7    ~~161.    Defendant Tatung America was represented at those meetings and was a~~

8    ~~party to the agreements entered at them. To the extent Tatung America sold and/or distributed~~

9    ~~CRT Products to direct purchasers, it played a significant role in the conspiracy because~~

10    ~~Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would~~

11    ~~not undercut the CRT pricing agreements reached at the glass meetings. Thus, Tatung America~~

12    ~~was an active, knowing participant in the alleged conspiracy.~~

13    162.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics,

14    Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number

15    of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also

16    engaged in bilateral discussions with other Defendants on a regular basis. Through these

17    discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with

18    Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.

19    Daewoo never effectively withdrew from this conspiracy.

20    163.    When Plaintiff refers to a corporate family or companies by a single name

21    in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more

22    employees or agents of entities within the corporate family engaged in conspiratorial meetings

23    on behalf of every company in that family. In fact, the individual participants in the

24    conspiratorial meetings and discussions did not always know the corporate affiliation of their

25    counterparts, nor did they distinguish between the entities within a corporate family. The

26    individual participants entered into agreements on behalf of, and reported these meetings and

27    discussions to, their respective corporate families. As a result, the entire corporate family was

28    represented in meetings and discussions by their agents and were parties to the agreements

reached in them.

E.     **The CRT Market During the Conspiracy**

164.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

165.     The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars)[1] | Average Selling Price Per Unit |
|------|----------------------|--------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

166.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

167.     In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

168.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price

---

[1] Estimated market value of CRT units sold.

1   increases are expected for the beginning of October . . . . While computer monitor price increases

2   may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not

3   foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

4          169.    A 2004 article from Techtree.com reports that various computer monitor

5   manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

6   monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

7   used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

8   September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

9          170.    Defendants also conspired to limit production of CRTs by shutting down

10  production lines for days at a time, and closing or consolidating their manufacturing facilities.

11         171.    For example, Defendants' CRT factory utilization percentage fell from

12  90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic

13  example of a drop in factory utilization in the CRT industry.   There were sudden drops

14  throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

15  these sudden, coordinated drops in factory utilization by Defendants were the result of

16  Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

17         172.    During the Relevant Period, while demand in the United States for CRT

18  Products continued to decline, Defendants' conspiracy was effective in moderating the normal

19  downward pressures on prices for CRT Products caused by the entry and popularity of the new

20  generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth

21  Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he

22  CRT technology is very mature; prices and technology have become stable."

23         173.    During the Relevant Period, there were not only periods of unnatural and

24  sustained price stability, but there were also increases in prices of CRTs and CRT Products.

25  These price increases were despite the declining demand due to the approaching obsolescence of

26  CRT Products caused by the emergence of a new, potentially superior and clearly more popular,

27  substitutable technology.

28         174.    These price increases and price stability in the market for CRT Products

during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

175.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice.

176.    Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

177.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tube (CRT) and heavy electrical equipment."

178.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

179.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

182.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183.    On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

184.    Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

185.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

186.    On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG

Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson). The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe." The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

186.187.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

187.188.    Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

188.189.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

189.190.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

190.191.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

191.192.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

192.193.    On March 10, 2009, the DOJ announced that it had reached an

agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

193.194.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

194.195.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

195.196.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

196.197.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

197.198.     Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

198.199.     Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

**H.     Effects of Defendants' Antitrust Violations**

**1.     Examples of Reductions in Manufacturing Capacity by Defendants**

199.200.     As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

200.201.     In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

201.202.     In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

202.203.     In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

203.204.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

204.205.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.    Examples of Collusive Pricing for CRTs

205.206.    Defendants' collusion is evidenced by unusual price movements in the CRT market. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

206.207.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

207.208.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

208.209.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

209.210.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

210.211.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price

1   increase was allegedly based on increasing global demand for the products.  In fact, this price

2   rise was the result of collusive conduct amongst Defendants.

3        ~~211.~~212.        After experiencing an oversupply of 17" CRTs in the second half

4   of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article

5   quoted an industry analyst as saying that this price increase was "unlike most other PC-related

6   products."

7        ~~212.~~213.        On June 1, 2004, LG Electronics raised the prices of its 15" and

8   17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of

9   glass needed to manufacture CRTs.

10        ~~213.~~214.        CRT prices resisted downward price pressures and remained stable

11   over a period of many years.  Even in periods of decreasing prices caused by outside factors,

12   such as the Asian currency crisis, the prices of CRT Products did not decline as much as they

13   would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the

14   collusive activities alleged above.

15        **3.**    **Summary Of Effects Of The Conspiracy Involving CRTs**

16        ~~214.~~215.        The above combination and conspiracy has had the following

17   effects, among others:

18              a.  Price competition in the sale of CRTs by Defendants and their co-

19                  conspirators has been restrained, suppressed and eliminated

20                  throughout the United States;

21              b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly

22                  have been raised, fixed, maintained and stabilized at artificially high

23                  and noncompetitive levels throughout the United States; and

24              c.  Plaintiff has been deprived of the benefit of free and open competition

25                  in the purchase of CRT Products.

26              d.  As a direct and proximate result of the unlawful conduct of

27                  Defendants, Plaintiff has been injured in its business and property in

28

that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.  PLAINTIFF'S INJURIES

215.216.    As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

216.217.    Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

217.218.    The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy.  Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

218.219.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

219.220.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

220.221.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase

CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

221.222.       As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

222.223.       Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

223.224.       Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

224.225.       The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

225.226.       By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

226.227.       Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract,

conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

227.228.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at glass meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement. During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

228.229.     Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

229.230.     As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

230.231.     As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

231.232.     In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

232.233.     Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

233.234.     Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

235.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.IX.

**IX.     *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

236.     As discussed at length in Paragraphs 175-194 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

237.     As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

238.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

234.239.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

235.240.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

236.241.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

237.242.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

238.243.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

239.244.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

b. communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c. agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d. issuing price announcements and price quotations in accordance with the agreements reached;

e. selling CRTs to customers in the United States at noncompetitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for CRTs.

~~240.~~245.     As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

~~241.~~246.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~242.~~247.     During the Relevant Period, each of the Defendants named herein, directly, and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold, and/or distributed CRT Products in commerce in the United States, including Florida.  Defendants' conduct and fraudulent concealment caused injury to Plaintiff, as both a direct and indirect purchaser, as Defendants' supra-competitive prices were passed on to Plaintiff as a purchaser.

243.248.   Based on the foregoing, Defendants engaged in unfair and deceptive acts in violation of Fla. Stat. §§ 501.201 *et seq*.

244.249.   During the Relevant Period, Plaintiff maintained its principal place of business in Florida.  Plaintiff also conducted purchasing negotiations in Florida for CRT Products; made purchasing decisions in Florida regarding CRT Products; sent purchase orders and payment for CRT Products from Florida; was invoiced for CRT Products it purchased in Florida; and resold CRT Products in Florida through its retail locations in Florida, among other Florida-based activities.  As a result of its presence in Florida, its purchases and sales in Florida, the substantial business it conducts in Florida, and the injury suffered in Florida, Plaintiff is entitled to the protection of the laws of Florida.

245.250.   In violation of Section 501.204, Defendants agreed to act, and did in fact act, in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida, and took efforts to conceal their agreements from Plaintiff.  These acts constitute a common and continuous course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices.

246.251.   The conduct of the Defendants described herein constitutes unfair and deceptive acts or practices within the meaning of FDUTPA, which is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce."  Fla. Stat. § 501.202(2).  FDUTPA is also intended to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."  Fla. Stat. § 501.202(3).

247.252.   Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for CRT Products that it purchased both directly and indirectly. During

the Relevant Period, Defendants' illegal conduct in violation of FDUTPA substantially affected Florida commerce, and injured Plaintiff in Florida, causing financial losses.

248.253.     As a result of Defendants' violation of the FDUTPA, Plaintiff is entitled to damages and the costs of suit, including attorneys' fees, pursuant to Fla. Stat. § 501.211.

**Third Claim for Relief**

**(Violation of the California Cartwright Act)**

249.254.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250.255.     During the Relevant Period, Plaintiff conducted a substantial volume of business in California.  In particular, upon information and belief, Plaintiff purchased CRT Products by sending purchase orders to California and sent payments to for CRT Products California.  Plaintiff also received shipments of CRT Products at its warehouses in California.  In addition, upon information and belief, Plaintiff maintained California inventories of CRT Products manufactured and sold by Defendants, their co-conspirators, and others, and operated warehouses in California.  Plaintiff also sold CRT Products to customers in California.  Finally, Plaintiff maintained offices and inventories in California of CRT Products and maintained agents and representatives in California who sold CRT Products to consumers in California.  As a result of Plaintiff's business operations in California, it was registered to do business in the State and, upon information and belief, paid taxes to the State of California during the Relevant Period.   As a result of its substantial contacts with California, Plaintiff is entitled to the protection of the laws of California**.**

251.256.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs. Defendant Samsung SDI admitted in its plea agreement that acts in furtherance of the conspiracy

were carried out in California. Defendants' conduct within California thus injured Plaintiff, both in California and throughout the United States.

252.257. Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' conduct substantially affected California commerce.

253.258. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

254.259. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.  to fix, raise, maintain and stabilize the price of CRTs;

    b.  to allocate markets for CRTs amongst themselves;

    c.  to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.  to allocate among themselves the production of CRTs.

255.260. The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.  price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

      b.   prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

      c.   those who purchased CRT Products containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

~~256.~~261.   As a result of the alleged conduct of Defendants, Plaintiff paid supra-competitive, artificially inflated prices for the CRT Products it purchased during the Relevant Period.

~~257.~~262.   As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in its business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiff is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**Fourth Claim for Relief**

**(Violation of California Unfair Competition Law)**

~~258.~~263.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~259.~~264.   Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

~~260.~~265.   This Complaint is filed, and these proceedings are pursuant to Sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from Defendant of all revenues, earnings, profits compensation, and benefits which they obtained as a result of their unlawful, unfair, and fraudulent conduct.

261.266.    The unlawful, unfair, and fraudulent business practices of Defendants, as alleged above, injured Plaintiff and members of the public in that Defendants' conduct restrained competition, causing Plaintiff and others to pay supra-competitive and artificially inflated prices for CRT Products.

a.    <u>Defendants' Unlawful Business Practices</u>: As alleged, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

b.    <u>Defendants' Unfair Business Practices</u>: As alleged above, Defendants violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce. Defendants illegally conspired, combined, and agreed to fix, raise, maintain, and/or stabilize prices, and to restrict the output of CRTs.

c.    <u>Defendants' Fraudulent Business Practices</u>: As alleged above, Defendants took affirmative actions to conceal their collusive activity by keeping meetings with coconspirators secret and making false public statements about the reasons for artificially inflated prices of CRTs. Members of the public were likely to be deceived, and Plaintiff was in fact deceived by Defendants' fraudulent actions. As a result of Defendants' unfair competition, Plaintiff suffered injury in fact and has lost money or property.

262.267.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of Section 17200 *et seq.*

263.268.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

264.269.      Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 *et seq.*

265.270.      By reason of the foregoing, Plaintiff is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the FDUTPA, the California Cartwright Act, and the California Unfair Competition Law, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.      Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Defendants engaged in a contract, combination, and conspiracy in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.      Plaintiff shall recover damages sustained by it, as provided by California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws;

E.      Defendants engaged in unlawful, unfair, and fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and Plaintiff was injured in its business as a result of Defendants' violations;

F.     Defendants shall be enjoined from engaging in further acts or practices in violation of and Plaintiff shall recover damages sustained by it as a result of Defendants' violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

G.     Defendants engaged in a contract, combination, and conspiracy in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

H.     Plaintiff shall recover damages sustained by it, as provided by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

I.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

J.     Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

K.     Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

L.     Plaintiff shall receive such other or further relief as may be just and proper.

## XII.     <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                              Respectfully Submitted,

_____

STUART H. SINGER
(Florida Bar No.: 377325 (*Pro Hac Vice*)
BOIES, SCHILLER, & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: ssinger@bsfllp.com

WILLIAM A. ISAACSON (*Pro Hac Vice to be filed*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO  (*Pro Hac Vice to be filed*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiff Office Depot, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT J**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

P.C. WILLIAM A. ISAACSON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

PHILIP J. IOVIENO (*Pro hac vice*)
ANNE M. NARDACCI (*Pro hac vice*)
LUKE NIKAS (*Pro hac vice*)
CHRISTOPHER V. FENLON (*Pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com

*Counsel for Plaintiffs P.C.* Richard & SON LONG ISLAND CORPORATION*Son Long Island Corporation*; MARTA COOPERATIVE*MARTA Cooperative* of AMERICA, INC*America, Inc*; and  ABC Appliance, Inc
ABC APPLIANCE, INC.,

        Plaintiffs,

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.,

1   ~~Defendants.~~

2   **UNITED STATES DISTRICT COURT**
    **NORTHERN DISTRICT OF CALIFORNIA**
3   **SAN FRANCISCO DIVISION**

4   IN RE CATHODE RAY TUBE (CRT)                    Case No. 12-cv-02648
    ANTITRUST LITIGATION
5                                                    Master File No. 3:07-cv-05944-SC

6                                                    MDL No. 1917

7   This Document Relates To Individual Case
    No. 12-cv-02648
8                                                    **AMENDED COMPLAINT**
    P.C. RICHARD & SON LONG ISLAND
9   CORPORATION; MARTA COOPERATIVE                  **JURY TRIAL DEMANDED**
    OF AMERICA, INC; and  ABC
    APPLIANCE, INC.,
10
            Plaintiffs,
11
        vs.
12
    HITACHI, LTD.; HITACHI DISPLAYS,
13  LTD.; HITACHI AMERICA, LTD.;
    HITACHI ASIA, LTD.; HITACHI
14  ELECTRONIC DEVICES (USA), INC.;
    SHENZHEN SEG HITACHI COLOR
15  DISPLAY DEVICES, LTD.; IRICO GROUP
    CORPORATION; IRICO GROUP
16  ELECTRONICS CO., LTD.; IRICO
    DISPLAY DEVICES CO., LTD.; LG
17  ELECTRONICS, INC.; LG ELECTRONICS
    USA, INC.; LG ELECTRONICS TAIWAN
18  TAIPEI CO., LTD.; LP DISPLAYS
    INTERNATIONAL LTD.; PANASONIC
19  CORPORATION; PANASONIC
    CORPORATION OF NORTH AMERICA;
20  MT PICTURE DISPLAY CO., LTD.;
    BEIJING MATSUSHITA COLOR CRT CO.,
21  LTD.; KONINKLIJKE PHILIPS
    ELECTRONICS N.V.; PHILIPS
22  ELECTRONICS NORTH AMERICA
    CORPORATION; PHILIPS ELECTRONICS
23  INDUSTRIES (TAIWAN), LTD.; PHILIPS
    DA AMAZONIA INDUSTRIA
24  ELECTRONICA LTDA.; SAMSUNG
    ELECTRONICS CO., LTD.; SAMSUNG
25  ELECTRONICS AMERICA, INC.;
    SAMSUNG SDI CO., LTD.; SAMSUNG
26  SDI AMERICA, INC.; SAMSUNG SDI
    MEXICO S.A. DE C.V.;  SAMSUNG SDI
27  BRASIL LTDA.; SHENZHEN SAMSUNG
    SDI CO., LTD.; TIANJIN SAMSUNG SDI
28  CO., LTD.; SAMSUNG SDI (MALAYSIA)

1  SDN. BHD.; SAMTEL COLOR LTD.; THAI
   CRT CO., LTD.; TOSHIBA
2  CORPORATION; TOSHIBA AMERICA,
   INC.; TOSHIBA AMERICA CONSUMER
3  PRODUCTS, LLC; TOSHIBA AMERICA
   ELECTRONIC COMPONENTS, INC.;
4  TOSHIBA AMERICA INFORMATION
   SYSTEMS, INC.; CHUNGHWA PICTURE
5  TUBES, LTD.; CHUNGHWA PICTURE
   TUBES (MALAYSIA); TECHNICOLOR
6  SA; TECHNICOLOR USA, INC.;
   MITSUBISHI ELECTRIC CORPORATION;
7  MITSUBISHI DIGITAL ELECTRONICS
   AMERICA, INC.; MITSUBISHI ELECTRIC
   & ELECTRONICS, USA, INC.,
8
9         Defendants.

21      Plaintiffs, P.C. Richard & Son Long Island Corporation ("P.C. Richard"), MARTA
22  Cooperative of America, Inc. ("MARTA"), and ABC Appliance, Inc. d/b/a ABC Warehouse
23  ("ABC Warehouse"), for their Complaint against all Defendants named herein, hereby allege as
24  follows:
25  **I.    INTRODUCTION**
26      1.    Defendants and their co-conspirators formed an international cartel which
27  conducted a long-running conspiracy extending at a minimum from at least March 1, 1995,
28  through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this

conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").

2.      Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.      The conspiracy concerning CRTs commenced with bilateral meetings that

1  began in at least March of 1995 and continued throughout the Relevant Period. Also beginning

2  in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group

3  meetings had become more formalized, as described in greater detail below. There were at least

4  500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and

5  hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan,

6  South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These

7  meetings included representatives from the highest levels of the respective companies, as well as

8  regional managers and others.

9         7.     During the Relevant Period, the conspiracy affected billions of dollars of

10  commerce throughout the United States.

11         8.     This conspiracy is being investigated by the United States Department of

12  Justice ("DOJ") and by multiple foreign competition authorities. The first participant to be

13  indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa

14  Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury

15  in San Francisco on February 10, 2009. Since then, five more individuals have been indicted in

16  connection with Defendants' CRT price-fixing conspiracy.

17         9.     During the Relevant Period, Plaintiffs purchased CRT Products in the

18  United States and elsewhere directly and indirectly from Defendants, and/or Defendants'

19  subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates

20  controlled. Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this

21  action to recover the overcharges paid for the CRT Products containing price-fixed CRTs they

22  purchased during the Relevant Period.

23  **II.    JURISDICTION AND VENUE**

24        10.     Plaintiffs bring this action to obtain injunctive relief under Section 16 of

25  the Clayton Act; and to recover damages, including treble damages under Section 4 of the

26  Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

27  Section 1 of the Sherman Act (15 U.S.C. § 1).

28        11.     Plaintiffs also bring this action pursuant to various state laws listed herein

1    because Plaintiffs purchased CRT Products from both Defendants and non-defendant vendors

2    which contained price-fixed CRTs manufactured by Defendants and their co-conspirators in

3    those states.

4            12.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

5    the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

6    supplemental jurisdiction over Plaintiffs' state law claims listed herein under 28 U.S.C. § 1367

7    because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiffs'

8    state law claims are so related to their claims under Section 1 of the Sherman Act that they form

9    part of the same case or controversy.

10           13.    The activities of Defendants and their co-conspirators, as described herein,

11   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

12   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

13   import trade or commerce.  This effect gives rise to Plaintiffs' antitrust claims.  During the

14   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

15   United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

16   substantially affected the price of CRT Products purchased by Plaintiffs in the states identified

17   herein.

18           14.    This court has jurisdiction over each Defendant named in this action under

19   Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

20   availed themselves of the laws of the United States as they manufactured CRT Products for sale

21   in the United States, or CRTs which were incorporated into CRT Products Defendants and their

22   co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

23   conspirators' conspiracy affected this commerce in CRT Products in the United States.

24           15.    Venue is proper in the Eastern District of New York under Section 12 of

25   the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

26   corporation, transacts business in this District, or is otherwise found within this District.  In

27   addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

28   events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped into this District.

### III.    PARTIES

#### A.    Plaintiff

##### 1.    P.C. Richard

16.    Plaintiff P.C. Richard is a New York corporation with its corporate headquarters in Farmingdale, New York.  P.C. Richard is the largest chain of private, family-owned electronics and appliances stores in the United States with 65 stores in Connecticut, New York, New Jersey, and Pennsylvania, as well as an online retail store.  Through the conclusion of Defendants' and the co-conspirators' conspiracy, P.C. Richard was a supplier of consumer electronics and appliances.

17.    During the Relevant Period, P.C. Richard purchased CRT Products directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled.  P.C. Richard also purchased CRT Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which contained CRTs that had been purchased from Defendants and their co-conspirators.  As such, P.C. Richard suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

18.    During the Relevant Period, P.C. Richard's negotiations for the purchase of CRT Products took place in the United States and were controlled by a department based at the company's headquarters in New York.  In addition, P.C. Richard's purchase orders for CRT Products were issued from New York, invoices for these CRT Products were sent to P.C. Richard in New York, and payments for these CRT Products were issued from New York.  P.C. Richard employees based in New York were also responsible for selecting vendors and product lines with respect to CRT Products.

##### 2.    MARTA

19.    Plaintiff MARTA is a Michigan corporation and has its corporate headquarters in Scottsdale, Arizona.   MARTA was initially formed in 1965 by twelve

1 independent appliance and electronics retailers as a member-owned, not-for-profit, buying

2 cooperative serving a select group of retailers in the appliance and electronics industry. Through

3 the conclusion of Defendants' and the co-conspirators' conspiracy, MARTA was a buying group

4 comprised of larger, independent retailers selling appliances, electronics and furniture.

5         20.     During the Relevant Period, MARTA purchased CRT Products directly

6 from the Conspirators, including Defendants, and/or the Defendants' subsidiaries and affiliates

7 and/or any agents the Defendants or Defendants' subsidiaries and affiliates controlled. MARTA

8 also purchased CRT Products from OEMs, as well as other suppliers, which contained CRTs that

9 had been purchased from Defendants and their co-conspirators. As such, MARTA suffered

10 injury as a result of Defendants' and co-conspirators' unlawful conduct.

11         21.     During the Relevant Period, MARTA's negotiations for the purchase of

12 CRT Products took place in the United States and were controlled by a department based at the

13 company's headquarters in Arizona. In addition, MARTA's purchase orders for CRT Products

14 were issued from Arizona, invoices for these CRT Products were sent to MARTA in Arizona,

15 and payments for these CRT Products were issued from Arizona and Illinois. From its

16 headquarters in Arizona, MARTA selected vendors and product lines with respect to CRT

17 Products.

18         **3.**     **ABC Warehouse**

19         22.     Plaintiff ABC Warehouse is a Michigan corporation with its corporate

20 headquarters in Pontiac, Michigan. ABC Warehouse was founded in 1963 as a family-owned

21 appliance and electronics retailer. Through the conclusion of Defendants' and the co-

22 conspirators' conspiracy, ABC Warehouse was a supplier of consumer electronics and

23 appliances with approximately 60 stores in Michigan, Ohio, and Indiana, as well as an online

24 retail store.

25         23.     During the Relevant Period, ABC Warehouse purchased CRT Products

26 directly from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents

27 the Defendants or Defendants' subsidiaries and affiliates controlled. As such, ABC Warehouse

28 suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

1    24.    During the Relevant Period, ABC Warehouse's negotiations for the

2    purchase of CRT Products took place in the United States and were controlled by a department

3    based at the company's headquarters in Michigan.  In addition, all ABC Warehouse purchase

4    orders for CRT Products were issued from Michigan, invoices for these products were sent to

5    ABC Warehouse in Michigan, and payments for these CRT Products were issued from ABC

6    Warehouse in Michigan.  ABC Warehouse employees based in Michigan were also responsible

7    for selecting vendors and product lines with respect to CRT Products.

8    **B.    Defendants**

9    **1.    Hitachi Entities**

10    25.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of

11    business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the

12    parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide

13    market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd.

14    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15    subsidiaries or affiliates, throughout the United States.

16    26.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

17    company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

18    297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

19    in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design,

20    manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

21    create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi

22    Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

23    through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd.

24    dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

25    antitrust violations alleged in this complaint.

26    27.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

27    company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

28    York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant

1  Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or
2  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
3  United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and
4  affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

5         28. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company
6  with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square,
7  Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant
8  Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or
9  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
10  United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and
11  affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

12         29. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a
13  Delaware corporation with its principal place of business located at 208 Fairforest Way,
14  Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and
15  Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold and/or
16  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
17  United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the
18  finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this
19  complaint.

20         30. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi
21  Shenzhen") was a Chinese company with its principal place of business located at 5001
22  Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at
23  least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally
24  around the time that the government investigations into the CRT industry began). Thus, Hitachi
25  Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the
26  Relevant Period. During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold
27  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
28  throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and

Case 4:07-cv-05944-JST   Document 1672-2   Filed 07/16/13   Page 518 of 852
Case 3:07-cv-05944-SC   Document 1676-1   Filed 03/26/13   Page 431 of 755

1    controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

2    violations alleged in this complaint.

3              31.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

4    HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

5              **2.    IRICO Entities**

6              32.    Defendant IRICO Group Corporation ("IGC") is a Chinese company with

7    its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

8    712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture,

9    marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12             33.    Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese

13   company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi

14   Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first

15   CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Their website

16   also claims that in 2003, they were the largest CRT manufacturer in China in terms of production

17   and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

18   IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

19   subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled

20   the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

21   complaint.

22             34.    Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese

23   company with its principal place of business located at No. 16, Fenghui South Road West,

24   District High-tech Development Zone, Xi'an, SXI 710075.   IDDC is a partially-owned

25   subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant

26   Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or

27   through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated

28   and controlled the finances, policies and affairs of IDDC relating to the antitrust violations

1    alleged in this complaint.

2         35.    Defendants IGC, IGE and IDDC are collectively referred to herein as

3    "IRICO."

4              **3.    LG Electronics Entities**

5         36.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under

6    the laws of the Republic of Korea with its principal place of business located at LG Twin

7    Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5

8    billion global force in consumer electronics, home appliances and mobile communications,

9    which established its first overseas branch office in New York in 1968.  The company's name

10   was changed from Gold Star Communications to LGEI in 1995, the year in which it also

11   acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint

12   venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays

13   ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to

14   LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold

15   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

16   throughout the United States.

17        37.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware

18   corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs,

19   New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.

20   During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT

21   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

22   Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating

23   to the antitrust violations alleged in this complaint.

24        38.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a

25   Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road,

26   NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of

27   Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed,

28   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

1    throughout the United States.  Defendant LGEI dominated and controlled the finances, policies

2    and affairs of LGETT relating to the antitrust violations alleged in this complaint.

3         39.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

4    herein as "LG Electronics."

5         **4.    LP Displays**

6         40.    Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

7    Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

8    Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

9    which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

10   In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

11   of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

12   billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

13   and LGEI would cede control over the company and the shares would be owned by financial

14   institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

15   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

16   affiliates, throughout the United States.

17        **5.    Panasonic Entities**

18        41.    Defendant Panasonic Corporation, which was at all times during the

19   Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

20   Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

21   Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

22   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

23   affiliates, throughout the United States.

24        42.    Defendant Panasonic Corporation of North America ("PCNA") is a

25   Delaware corporation with its principal place of business located at One Panasonic Way,

26   Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

27   Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

28   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

1   United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

2   and affairs of PCNA relating to the antitrust violations alleged in this complaint.

3        43.    Defendants Panasonic Corporation and PCNA are collectively referred to

4   herein as "Panasonic."

5        44.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

6   Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

7   Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

8   Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

9   manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

10  March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

11  venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

12  Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

13  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

14  subsidiaries or affiliates, throughout the United States.

15       45.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

16  Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

17  Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

18  is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

19  Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

20  enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

21  China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

22  manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

23  China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

24  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

25  States.

26  **6.    Philips Entities**

27       46.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

28  Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays). In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

47. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

48. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

49. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips. During the Relevant

Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

50. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

**7.** **Samsung Entities**

51. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. It is South Korea's top electronics company. During the Relevant Period, SEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

52. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of Defendant SEC. During the Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

53. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. SEC is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Relevant Period, Samsung SDI manufactured, marketed,

1    sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

2    throughout the United States. Defendant SEC dominated and controlled the finances, policies

3    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

4          54.    Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a

5    California corporation with its principal place of business located at 3333 Michelson Drive, Suite

6    700, Irvine, California 92612. Samsung America is a wholly-owned and controlled subsidiary of

7    Defendant Samsung SDI. During the Relevant Period, Samsung SDI America manufactured,

8    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

9    affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and

10   controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust

11   violations alleged in this complaint.

12         55.    Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico")

13   is a Mexican company with its principal place of business located at Blvd. Los Olivos, No.

14   21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-

15   owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period,

16   Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either

17   directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC

18   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

19   Mexico relating to the antitrust violations alleged in this complaint.

20         56.    Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a

21   Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N,

22   Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-

23   owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period,

24   Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either

25   directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC

26   and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

27   Brazil relating to the antitrust violations alleged in this complaint.

28         57.    Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen")

is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

58.  Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

59.  Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

60.  Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "Samsung."

1

**8.    Samtel**

2      61.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

3  principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

4  110065.   Samtel's market share for CRTs sold in India is approximately 40%, and it is that

5  country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

6  States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

7  Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

8  its subsidiaries and affiliates, throughout the United States.

9

**9.    Thai CRT**

10     62.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

11  1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

12  Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

13  televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

14  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

15  United States.

16

**10.    Toshiba Entities**

17     63.    Defendant Toshiba Corporation ("TC") is a Japanese company with its

18  principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

19  Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

20  and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

21  other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

22  Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

23  1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

24  in which the entities consolidated their CRT businesses.   During the Relevant Period, TC

25  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

26  subsidiaries or affiliates, throughout the United States.

27     64.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

28  corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

65.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

66.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

67.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

1    68.    Defendants TC, Toshiba America, TACP, TAEC and TAIS are

2    collectively referred to herein as "Toshiba."

3    **11.    <u>Chunghwa Entities</u>**

4    69.    Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

5    Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City,

6    Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In

7    1974, Chunghwa PT's CRTs received certification by the United States, giving the company

8    entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major

9    global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and

10   distributed CRT Products either directly or through its subsidiaries or affiliates (such as its

11   Fuzhou subsidiary) throughout the United States.

12   70.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

13   Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

14   Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-

15   owned and controlled subsidiary of Chunghwa.   Chunghwa Malaysia is focused on CRT

16   production, and it has established itself as one of the leading worldwide suppliers of CRTs.

17   During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT

18   Products either directly or through its subsidiaries or affiliates throughout the United States.

19   Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of

20   Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

21   Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as

22   "Chunghwa."

23   ~~**12.    Tatung Company of America, Inc.**~~

24   ~~**Tatung Company of America, Inc. ("Tatung America**~~**12.    Thomson**

25   **Entities**

26   71.    <u>Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA</u>") is a

27   ~~California~~French corporation with its principal place of business located at ~~2850 El Presidio~~

28   ~~**Street, Long Beach, California.  Tatung America is a**~~ 5 Rue Jeanne d'Arc 92130 Issy-les-

1    Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company.~~

2    ~~Currently, Tatung Company owns approximately half of Tatung America.  The other half~~

3    ~~used~~Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the

4    United States market, with plants located in the United States, Mexico, China and Europe.

5    Thomson SA sold its CRTs  internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung~~

6    ~~Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares~~

7    ~~passed~~its television-manufacturing division, which had plants in the United States and Mexico,

8    and to ~~her two children~~other television manufacturers in the United States and elsewhere.

9    Thomson SA's television division also purchased CRTs from other CRT manufacturers.

10    Thomson SA's CRT televisions were sold in the United States to consumers under the RCA

11    brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed

12    with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson

13    Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties

14    agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia

15    and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005,

16    Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period,

17    ~~Tatung America~~Thomson SA manufactured, marketed, sold and/or distributed CRT Products

18    ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~, either directly or indirectly

19    through its subsidiaries or affiliates, to customers throughout the United States.

20             72.  Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics,

21    Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of

22    business located at 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson

23    Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer

24    Electronics was a major manufacturer of CRTs for the United States market, with plants located

25    in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based

26    plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

27    television-manufacturing division, which had plants in the United States and Mexico, and to

28    other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

1  were sold in the United States to United States consumers under the RCA brand.  Thomson

2  Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT

3  business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer

4  Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

5  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

6       73.    Thomson SA and Thomson Consumer Electronics are collectively referred

7  to herein as "Thomson."

8       **13.    Mitsubishi Entities**

9       74.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

10  is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

11  Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

12  Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

13  internally to Mitsubishi's television and monitor manufacturing division and to other television

14  and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

15  division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

16  Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

17  United States.

18       75.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

19  Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

20  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

21  Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

22  Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

23  and monitor manufacturing division and to other television and monitor manufacturers in the

24  U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

25  other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

26  marketed, sold and distributed CRT Products in the United States.

27       76.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

28  Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

77.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.    AGENTS AND CO-CONSPIRATORS

72.78.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

73.79.  Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent company.

74.80.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

75.81.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo

Group." The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France. As of approximately 1996, DOSA produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004. During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

76.82. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

77.83. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

78.84. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the Relevant Period, TEDI manufactured, marketed, sold,

and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

79.85. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

80.86. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.   TRADE AND COMMERCE

81.87. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

82.88. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

83.89. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. Defendants' business activities substantially affected trade and commerce within each of the 50 states, as the conspiracy artificially inflated the prices of CRT Products sold in all 50 states, and therefore caused antitrust injury in every state including the states identified herein. Moreover, Plaintiffs

1  purchased price-fixed goods directly and indirectly from Defendants for sale across the United

2  States.

3  **VI.    FACTUAL ALLEGATIONS**

4       **A.    CRT Technology**

5       ~~84.~~90.  A CRT has three components: (a) one or more electron guns, each of

6  which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or

7  other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

8  that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A

9  faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate

10  coated with multiple colors of phosphor produces a polychromatic image.   An aperture or

11  shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to

12  produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

13  narrow lines of red, green, blue and black.

14       ~~85.~~91.  CRT technology was first developed more than a century ago.  The first

15  commercially practical CRT television was made in 1931.  However, it was not until RCA

16  Corporation introduced the product at the 1939 World's Fair that it became widely available to

17  consumers.  After that, CRTs became the heart of most display products, including televisions,

18  computer monitors, oscilloscopes, air traffic control monitors and ATMs.

19       ~~86.~~92.  The quality of a CRT itself determines the quality of the CRT display.  No

20  external control or feature can make up for a poor quality tube.  In this regard, the CRT defines

21  the whole CRT product so that the product is often simply referred to as "the CRT."

22       ~~87.~~93.  Although there have been refinements and incremental advancements

23  along the way since then, such as the development of thinner CRTs and CRTs with a flat screen,

24  the CRT technology used today is similar to that RCA unveiled in 1939.

25       ~~88.~~94.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are

26  used primarily in televisions and related devices and CDTs are primarily used in computer

27  monitors and similar devices.  The primary difference is that CDTs typically yield a higher

28  resolution image requiring more pixels than do CPTs.

89.95.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

90.96.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

91.97.  Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRT Products containing price-fixed CRTs and their purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRT Products.

92.98.  Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products.  Plaintiffs were not able to pass the inflated prices on to their customers.

93.99.  Plaintiffs have been injured by paying supra-competitive prices for CRT Products.

**B.**    **Structure of the CRT Industry**

94.100.        The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1.**    **Market Concentration**

95.101.        During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market.  The

high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.    Information Sharing

96. 102.        Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

97. 103.        Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3.    Consolidation

98. 104.        The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4.    Multiple Interrelated Business Relationships

99. 105.        The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

100. 106.        Examples of the high degree of cooperation among Defendants in

both the CRT Product market and other closely related markets include the following:

     a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

     b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

     c.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

     d.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

     e.   In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

     f.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

     g.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

     h.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

     i.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

       j.    Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

       k.    Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.**      **High Costs of Entry Into the Industry**

101.107.      There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

102.108.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

**6.**      **The Maturity of the CRT Product Market**

103.109.      Newer industries typically are characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

104.110.      Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

105.111.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays. This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an

additional 84.5 percent between 2006 and 2010.

106.112.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

107.113.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

108.114.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.  Homogeneity of CRT Products

109.115.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiffs purchased CRT Products primarily on the basis of price.

110.116.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.  Pre-Conspiracy Market

111.117.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

112.118.    In the early 1990s, representatives from Samsung, Daewoo,

Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.   Defendants' and Co-Conspirators' Illegal Agreements**

~~113.~~119.   In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

~~114.~~120.   The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

~~115.~~121.   Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with ~~and~~ Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

~~116.~~122.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

~~117.~~123.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

**1.   "Glass Meetings"**

~~118.~~124.   The group meetings among the participants in the CRT price-

fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

119.125.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

120.126.     The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

121.127.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

122.128.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

1   SDI Tianjin, and Chunghwa.

2   ~~123.~~129.        Glass meetings also occurred occasionally in various European

3   countries.  Attendees at these meetings included those Defendants and co-conspirators which had

4   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

5   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

6   of Daewoo~~)~~), IRICO, and ~~IRICO~~Thomson.  Chunghwa also attended these meetings.

7   ~~124.~~130.        Representatives of Defendants also attended what were known

8   amongst members of the conspiracy as "green meetings."  These were meetings held on golf

9   courses.  The green meetings were generally attended by top and management level employees

10  of Defendants.

11  ~~125.~~131.        During the Relevant Period, glass meetings took place in Taiwan,

12  South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and~~, Malaysia, and the

13  United States.

14  ~~126.~~132.        Participants    would    often    exchange    competitively    sensitive

15  information prior to a glass meeting.  This included information on inventories, production, sales

16  and exports.  For some such meetings, where information could not be gathered in advance of the

17  meeting, it was brought to the meeting and shared.

18  ~~127.~~133.        The glass meetings at all levels followed a fairly typical agenda.

19  First, the participants exchanged competitive information such as proposed future CRT pricing,

20  sales volume, inventory levels, production capacity, exports, customer orders, price trends and

21  forecasts of sales volumes for coming months.  The participants also updated the information

22  they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

23  who would write the information on a white board.  The meeting participants then used this

24  information to discuss and agree upon what price each would charge for CRTs to be sold in the

25  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

26  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

27  of CRTs that were sold to specific customers, and agreed upon target prices to be used in

28  negotiations with large customers.  Having analyzed the supply and demand, the participants

1    would also discuss and agree upon production cutbacks.

2        128.134.      During periods of oversupply, the focus of the meeting participants

3    turned to making controlled and coordinated price reductions.  This was referred to as setting a

4    "bottom price."

5        129.135.      Defendants' conspiracy included agreements on the prices at which

6    certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

7    manufactured CRT Products, such as televisions and computer monitors.  Defendants realized

8    the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

9    support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all

10   OEMs paid supracompetitive prices for CRTs.

11       130.   Each of the participants in these meetings knew, and in fact discussed, the

12   significant impact that the price of CRTs had on the cost of the finished products into which they

13   were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there

14   were slim profit margins.  Defendants therefore concluded that in order to make their CRT price

15   increases stick, they needed to make the increase high enough that their direct customers (CRT

16   TV and monitor makers) would be able to justify a corresponding price increase to their

17   customers.  In this way, Defendants ensured that price increases for CRTs were passed on to

18   indirect purchasers of CRT Products.

19       131.136.      The agreements reached at the glass meetings included:

20            a.  agreements on CRT prices, including establishing target prices,

21                "bottom" prices, price ranges and price guidelines;

22            b.  placing agreed-upon price differentials on various attributes of CRTs,

23                such as quality or certain technical specifications;

24            c.  agreements on pricing for intra-company CRT sales to vertically

25                integrated customers;

26            d.  agreements as to what to tell customers about the reason for a price

27                increase;

28            e.  agreements to coordinate with competitors that did not attend the

group meetings and agreements with them to abide by the agreed-upon pricing;

    f.  agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customer demands;

    h.  agreements to coordinate uniform public statements regarding available capacity and supply;

    i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.  agreements to allocate customers;

    k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.  agreements to keep their meetings secret.

~~132.~~137.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~133.~~138.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

    **2.**    **Bilateral Discussions**

~~134.~~139.    Throughout the Relevant Period, the glass meetings were

1   supplemented by bilateral discussions between various Defendants.  The bilateral discussions

2   were more informal than the group meetings and occurred on a frequent, ad hoc basis, often

3   between the group meetings. These discussions, usually between sales and marketing employees,

4   took the form of in-person meetings, telephone contacts and emails.

5        135.140.    During the Relevant Period, in-person bilateral meetings took

6   place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan,

7   Thailand, Brazil and, Mexico, and the United States.

8        136.141.    The purpose of the bilateral discussions was to exchange

9   information about past and future pricing, confirm production levels, share sales order

10   information, confirm pricing rumors, and coordinate pricing with manufacturers in other

11   geographic locations, including Brazil, Mexico and, Europe, and the United States.

12        137.142.    In order to ensure the efficacy of their global conspiracy,

13   Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

14   and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.and the

15   United States.  These Brazilian and MexicanCRT manufacturers were particularly important

16   because they served the North American market for CRT Products.  As further alleged herein,

17   North America was the largest market for CRT televisions and computer monitors during the

18   Relevant Period.  Because these Brazilian and MexicanCRT manufacturers are all wholly-owned

19   and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the

20   unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

21   imported intosold in the United States were fixed, raised, maintained and/or stabilized at

22   supracompetitive levels.

23        138.143.    Defendants also used bilateral discussions with each other during

24   price negotiations with customers to avoid being persuaded by customers to cut prices.  The

25   information gained in these communications was then shared with supervisors and taken into

26   account in determining the price to be offered.

27        139.144.    Bilateral discussions were also used to coordinate prices with CRT

28   manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

> **3.** **Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions**

140.145.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

141.146.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

142.147.     Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.   Through these discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

143.148.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

144.149.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

145.150.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for

CRTs.

146.151.     Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

147.152.     PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

148.153.     Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

149.154.     Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

150.155.     Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001,

1   Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD

2   (n/k/a LP Displays).   A substantial number of these meetings were attended by high level

3   executives from Philips.   Philips also engaged in numerous bilateral discussions with other

4   Defendants.   Through these discussions, Philips agreed on prices and supply levels for CRTs.

5   Philips never effectively withdrew from this conspiracy.

6          151.156.        Defendants Philips America and Philips Brazil were represented at

7   those meetings and were a party to the agreements entered at them.   To the extent Philips

8   America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

9   played a significant role in the conspiracy because Defendants wished to ensure that the prices

10  for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements

11  reached at the glass meetings.   Thus, Philips America and Philips Brazil were active, knowing

12  participants in the alleged conspiracy.

13         152.157.        Between at least 1995 and 2007, Defendant Samsung, through

14  SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin,

15  participated in at least 200 glass meetings at all levels.   A substantial number of these meetings

16  were attended by the highest ranking executives from Samsung.   Samsung also engaged in

17  bilateral discussions with each of the other Defendants on a regular basis.   Through these

18  discussions, Samsung agreed on prices and supply levels for CRTs.

19         153.158.        Defendants SEAI, Samsung SDI America, Samsung SDI Brazil

20  and Samsung SDI Mexico were represented at those meetings and were a party to the agreements

21  entered at them.   To the extent SEC and SEAI sold and/or distributed CRT Products, they played

22  a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT

23  Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

24  the glass meetings.   Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

25  Mexico were active, knowing participants in the alleged conspiracy.

26         154.159.        Between at least 1998 and 2006, Defendant Samtel participated in

27  multiple bilateral discussions with other Defendants, particularly with Thai CRT.   These

28  meetings were attended by high level executives from Samtel.   Through these discussions,

1    Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from
2    this conspiracy.

3         155.160.        Between at least 1997 and 2006, Defendant Thai CRT participated
4    in multiple glass meetings.  These meetings were attended by the highest ranking executives
5    from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants,
6    particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply
7    levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

8         161.    Between at least 1996 and 2005, Defendant Thomson participated in
9    dozens of meetings with its competitors, including several glass meetings and multiple bilateral
10   meetings.  These meetings were attended by high level sales managers from Thomson.  At these
11   meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,
12   demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product
13   development and agreed on prices and supply levels for CRTs.  Thomson never effectively
14   withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon
15   Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played
16   a role in the conspiracy.

17        162.    Between at least 1995 and 2005, Defendant Mitsubishi participated in
18   multiple bilateral and some multilateral meetings with its competitors.  These meetings were
19   attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed
20   such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,
21   plant shutdowns, customer allocation, and new product development, and agreed on prices and
22   supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

23        156.163.        Between at least 1995 and 2003, Defendant Toshiba, through TC,
24   TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the
25   CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended
26   by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple
27   bilateral discussions with other Defendants, particularly with LG.  Through these discussions,
28   Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from

1    this conspiracy.

2         157.164.    Defendants Toshiba America, TACP, TAEC and TAIS were

3    represented at those meetings and were a party to the agreements entered at them.  To the extent

4    Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct

5    purchasers, they played a significant role in the conspiracy because Defendants wished to ensure

6    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

7    agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS

8    were active, knowing participants in the alleged conspiracy.

9         158.165.    Between at least 1995 and 2006, Defendant Chunghwa, through

10   Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China)

11   and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of

12   these meetings were attended by the highest ranking executives from Chunghwa, including the

13   former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral

14   discussions with each of the other Defendants on a regular basis.  Through these discussions,

15   Chunghwa agreed on prices and supply levels for CRTs.

16        159.    Defendant Tatung America was represented at those meetings and was a

17   party to the agreements entered at them.  To the extent Tatung America sold and/or distributed

18   CRT Products to direct purchasers, it played a significant role in the conspiracy because

19   Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would

20   not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America

21   was an active, knowing participant in the alleged conspiracy.

22        160.166.    Between at least 1995 and 2004, Daewoo, through Daewoo

23   Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A

24   substantial number of these meetings were attended by the highest ranking executives from

25   Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.

26   Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral

27   discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for

28   bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

161.167.      When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.      The CRT Market During the Conspiracy**

162.168.      Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

163.169.      The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

164.170.      During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and*

---

[1]      Estimated market value of CRT units sold.

*Related Display Materials,* Fuji Chimera Research, 1997, p.12.

~~165.~~171.     In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

~~166.~~172.     A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

~~167.~~173.     A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

~~168.~~174.     Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

~~169.~~175.     For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops throughout the Relevant Period but to a lesser degree.  Plaintiffs were informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

~~170.~~176.     During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of

the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

~~171.~~177.     During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

~~172.~~178.     These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

### F.     International Government Antitrust Investigations

~~173.~~179.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

~~174.~~180.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

~~175.~~181.     In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

~~176.~~182.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips

Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

177.183.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

178.184.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an

assistant Vice President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

179.185. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

180.186. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

181.187. On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

182.188. Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix

prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

183. 189.      The plea agreement of Samsung SDI requires that it cooperate with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

190.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

184. 191.      As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

185. 192.      Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

186. 193.      Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

187. 194.      In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into

anticompetitive conduct in the closely-related TFT-LCD market.

188.195.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

189.196.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

190.197.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

191.198.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.    The Role of Trade Associations During the Relevant Period**

192.199.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the

Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

193.200.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

194.201.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

195.202.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

196.203.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

H.    **Effects of Defendants' Antitrust Violations**

1.    **Examples of Reductions in Manufacturing Capacity by Defendants**

197.204.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

1    198.205.    In December of 2004, MTPD closed its American subsidiary's

2    operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that

3    the closing was part of the company's "global restructuring initiatives in the CRT business."  The

4    company further stated that in the future, "CRTs for the North American market will be supplied

5    by other manufacturing locations in order to establish an optimum CRT manufacturing

6    structure."

7    199.206.    In July of 2005, LGPD ceased CRT production at its Durham,

8    England facility, citing a shift in demand from Europe to Asia.

9    200.207.    In December of 2005, MTPD announced that it would close its

10   American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.

11   Like LG Philips, the company explained that it was shifting its CRT operations to Asian and

12   Chinese markets.

13   201.208.    In late 2005, Samsung SDI followed the lead of other

14   manufacturers, closing its CRT factory in Germany.

15   202.209.    In July of 2006, Orion shut down a CRT manufacturing plant in

16   Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory

17   in Malaysia and liquidating its joint venture with Toshiba.

18            **2.    Examples of Collusive Pricing for CRTs**

19   203.210.    Defendants' collusion is evidenced by unusual price movements in

20   the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation

21   predicted that "[e]conomies of scale, in conjunction with technological improvements and

22   advances in manufacturing techniques, will produce a drop in the price of the average electronic

23   display to about $50 in 1997."

24   204.211.    In 1996, another industry source noted that "the price of the 14"

25   tube is at a sustainable USD50 and has been for some years . . . ."

26   205.212.    In reality, prices for CRTs never approached $50 in 1997, and

27   were consistently more than double this price.

28

206.213.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

207.214.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

208.215.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

209.216.    After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

210.217.    On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

211.218.    CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.       Summary Of Effects Of The Conspiracy Involving CRTs**

~~212.~~219.        The above combination and conspiracy has had the following effects, among others:

      a.   Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

      b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

      c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

      d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VII.    PLAINTIFF'S INJURIES**

~~213.~~220.        As purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

~~214.~~221.        Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have

absent the conspiracy.  The conspiracy artificially inflated the prices of CRTs included in CRT Products.

215.222.     The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

216.223.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

217.224.     The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate relationship.

218.225.     Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

219.226.     As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

**VIII.   FRAUDULENT CONCEALMENT**

220.227.     Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United

States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

221.228.     Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

222.229.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

223.230.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

224.231.     Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.   The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

225.232.     As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective

1     attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the

2     nature of their agreement. During these meetings, top executives and other officials attending

3     these meetings were instructed on more than once occasion not to disclose the fact of these

4     meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or

5     production. In fact, the top executives who attended conspiracy meetings agreed to stagger their

6     arrivals and departures at such meetings to avoid being seen in public with each other and with

7     the express purpose and effect of keeping them secret.

8             226.233.    Defendants also agreed at glass meetings and bilateral meetings to

9     give pretextual reasons for price increases and output reductions to their customers.

10             227.234.    As alleged above, in early 1999, despite declining production costs

11     and the rapid entry of flat panel display products, the price of large-sized color CRTs actually

12     rose. The price increase was allegedly based on increasing global demand for the products. In

13     fact, this price rise was the result of collusive conduct amongst Defendants, which was

14     undisclosed at the time.

15             228.235.    As alleged above, despite increased competition from flat panel

16     monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.

17     This price stabilization was purportedly due exclusively to a shortage of critical components

18     such as glass. This was a pretext used to cover up the conspiracy.

19             229.236.    In addition, when several CRT manufacturers, including

20     Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price

21     hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying

22     this price increase, a Deputy General Manager for an LG Electronics distributor in India stated,

23     "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the

24     prices of CRT monitors in due course of time."

25             230.237.    Manufacturers such as LG Electronics periodically issued press

26     statements falsely asserting that CRT prices were being driven lower by intense competition.

27             231.238.    Plaintiffs are informed and believe, and thereon allege, that

28     Defendants' purported reasons for the price increases of CRTs were materially false and

1    misleading and made for the purpose of concealing Defendants' anti-competitive scheme as

2    alleged herein.

3         239.   As a result of Defendants' fraudulent concealment of their conspiracy, the

4    running of any statute of limitations has been tolled with respect to any claims that Plaintiffs

5    have as a result of the anticompetitive conduct alleged in this complaint.IX.

6    **IX.   *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL**
          **TOLLING**
7

8         240.   As discussed at length in Paragraphs 179-198 above, the United States

9    Department of Justice instituted criminal proceedings and investigations against several

10   Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiffs' claims

11   were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

12        241.   As shown by Plaintiffs' allegations in Paragraphs 1 and 9 and the

13   following causes of action, Plaintiffs were members of  Direct Purchaser Class Actions asserted

14   against Defendants, including, but not limited to, the following Complaints:

15        • *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC
             (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and
16

17        • Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-
             05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).
18

19        242.   Plaintiffs' claims were tolled under *American Pipe & Construction Co. v.

20   Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during

21   the pendency of the Direct Purchaser Class actions asserted against Defendants, and

22   commencing on at least November 26, 2007.

23

24

25

26

27

28

## XI.    CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

~~232.~~243.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

~~233.~~244.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

~~234.~~245.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

~~235.~~246.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

~~236.~~247.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

~~237.~~248.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

  a.  participating in meetings and conversations to discuss the prices and supply of CRTs;

  b.  communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

  c.  agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d. issuing price announcements and price quotations in accordance with the agreements reached;

e. selling CRTs to customers in the United States at noncompetitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for CRTs.

238.249. As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of State Antitrust Laws)**

239.250. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.251. During the Relevant Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust laws referenced below. Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, subsidize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

241.252. The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

242.253. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired

1  to do, including, but in no way limited to, the actions, practices and course of conduct set forth
2  above and the following:

3          a.  to fix, raise, maintain and stabilize the price of CRTs;
4          b.  to allocate the market for CRTs amongst themselves;
5          c.  to submit rigged bids for the award and performance of certain CRT
6              contracts; and
7          d.  to allocate among themselves the production of CRTs.

8          243.254.    The combination and conspiracy alleged herein has had, inter alia,
9  the following effects:

10         a.  price competition in the sale of CRTs has been restrained, suppressed,
11             and/or eliminated in the states listed below;
12         b.  prices for CRTs sold by Defendants, their co-conspirators, and others
13             have been fixed, raised, maintained and stabilized at artificially high,
14             non-competitive levels in the states listed below; and
15         c.  those who purchased CRTs from Defendants, their co- conspirators
16             and others and CRT Products containing price-fixed CRTs from
17             Defendants, their co-conspirators and others have been deprived of the
18             benefits of free and open competition.

19         244.255.    As a result of the alleged conduct Defendants and their co-
20  conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products they
21  purchased during the Relevant Period.

22         245.256.    By reason of the foregoing, Defendants and their co-conspirators,
23  have entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et
24  seq.*:

25         a.  Defendants  and  their  co-conspirators'  conspiracy  restrained,
26             suppressed and/or eliminated competition in the sale of CRTs in
27             Arizona and fixed, raised, maintained and stabilized CRT prices in
28             Arizona at artificially high, non-competitive levels;

b. As a result, Defendants' and their co-conspirators' conspiracy substantially affected Arizona commerce;

c. During the Relevant Period, MARTA purchased CRT Products containing priced fixed CRTs in Arizona, and, as a result, MARTA is entitled to the protection of the laws of Arizona; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to damages and the costs of suit, including reasonable attorneys' fees, pursuant to Ariz. Rev. Stat §§ 44-1408(B).

246.257.    By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Code 10/1, *et seq.*:

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c. During the Relevant Period, MARTA purchased CRT Products containing price-fixed CRTs in Illinois, and, as a result, MARTA is entitled to the protection of the laws of Illinois; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, MARTA has been injured in its business and property by paying more for CRT Products containing CRTs

1 manufactured by Defendants, their co-conspirators, and others than it
2 would have paid in the absence of Defendants and their co-
3 conspirators' combination and conspiracy, and is therefore entitled to
4 treble damages and costs of suit, including reasonable attorneys' fees,
5 pursuant to the Illinois Antitrust Act, 740 Ill. Code 10/7(2).

6      247.258.      By reason of the foregoing, Defendants and their co-conspirators
7 also have entered into a restraint of trade in violation of Mich. Comp. Laws §§ 445.771, et seq.:

8          a. Defendants' and their co-conspirators' conspiracy restrained,
9             suppressed and/or eliminated competition in the sale of CRTs in
10            Michigan and fixed, raised, maintained, and stabilized CRT prices in
11            Michigan at artificially high, non-competitive levels;

12         b. As a result, Defendants' and their co-conspirators' conspiracy
13            substantially affected Michigan commerce;

14         c. During the Relevant Period, ABC Warehouse purchased CRT
15            Products containing price-fixed CRTs in Michigan, and, as a result,
16            ABC Warehouse is entitled to the protection of the laws of Michigan;
17            and

18         d. As a direct and proximate result of Defendants' and their co-
19            conspirators' conduct, ABC Warehouse has been injured in its
20            business and property by paying more for CRT Products containing
21            CRTs manufactured by Defendants, their co-conspirators, and others
22            than it would have paid in the absence of Defendants' and their co-
23            conspirators' conspiracy, and is therefore entitled to damages and the
24            costs of suit, including reasonable attorneys' fees, pursuant to Mich.
25            Comp. Laws § 445.778(2).

26      248.259.      By reason of the foregoing, Defendants and their co- conspirators
27 also have entered into an agreement in restraint of trade in violation of New York's Donnelly
28 Act, N.Y. Gen. Bus. Law §§ 340, et seq.:

a. Defendants' and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b. As a result, Defendants' and their co-conspirators' conspiracy substantially affected New York commerce;

c. Beginning on December 23, 1998, P.C. Richard purchased CRT Products containing price-fixed CRT panels in New York, and, as a result, P.C. Richard is entitled to the protection of the laws of New York; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, P.C. Richard has been injured in its business and property by paying more for CRT Products containing CRT panels manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy, and is therefore entitled to treble damages and costs of suit, including reasonable attorneys' fees, pursuant to N.Y. Gen. Bus. Law § 340(5).

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Ariz. Rev. Stat. §§ 44-1401, *et seq.*, and the Illinois Antitrust Act, and that Plaintiffs were injured in their businesses and property as a result of Defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be

1    entered against the Defendants in an amount to be trebled in accordance with such laws,

2    including Section 4 of the Clayton Act;

3            C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees,

4    and the respective officers, directors, partners, agents, and employees thereof, and all other

5    persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained

6    from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

7            D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and

8    such interest shall be awarded at the highest legal rate from and after the date of service of the

9    initial complaint in this action;

10           E.      Plaintiffs shall recover **its** costs of this suit, including reasonable

11   attorneys' fees as provided by law; and

12           F.      Plaintiffs shall receive such other or further relief as may be just and

13   proper.

14   **XII.**        **<u>JURY TRIAL DEMAND</u>**

15           Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by

16   jury of all the claims asserted in this Complaint so triable.

17

18

19

20

21

22

23

24

25

26

27

28

1   Dated:                                    Respectfully Submitted,

2

3                                   _____

4                                   PHILIP J. IOVIENO *(Pro Hac Vice)*
                                     ANNE M. NARDACCI *(Pro Hac Vice ~~to be filed~~)*
                                     LUKE NIKAS *(Pro Hac Vice ~~to be filed~~)*

5                                   CHRISTOPHER V. FENLON *(Pro Hac Vice ~~to be~~*

6   ~~*filed*~~*)*

                                   BOIES, SCHILLER & FLEXNER LLP

7                                   10 North Pearl Street, 4th Floor
                                   Albany, NY 12207

8                                   Telephone:  (518) 434-0600
                                   Facsimile:  (518) 434-0665

9                                   Email: piovieno@bsfllp.com
                                   Email: anardacci@bsfllp.com

10                                 Email: lnikas@bsfllp.com
                                   Email: cfenlon@bsfllp.com

11

12                                 WILLIAM A. ISAACSON *(Pro Hac Vice ~~to be filed~~)*
                                   BOIES, SCHILLER & FLEXNER LLP

13                                   5301 Wisconsin Ave. NW, Suite 800
                                   Washington, DC 20015

14                                   Telephone:  (202) 237-2727
                                   Facsimile:  (202) 237-6131

15                                   Email:  wisaacson@bsfllp.com

16

17                                   *Counsel for Plaintiffs P.C. Richard & Son Long Island Corporation, MARTA Cooperative of America, Inc., and ABC Appliance, Inc.*

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT K**

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
KENNY NACHWALTER, P.A.
201 S. Biscayne Boulevard, Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
Email: rarnold@knpa.com
          wblechman@knpa.com
          kmurray@knpa.com

*Counsel for Plaintiffs Sears Roebuck and Co. and Kmart Corp.*

Jason C. Murray (CA Bar No. 169806)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213-443-5582
Facsimile: 213-622-2690
Email: jmurray@crowell.com

*Counsel for Plaintiffs*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| TARGET CORP.; SEARS, ROEBUCK AND CO. and KMART CORP.; OLD COMP INC.; GOOD GUYS, INC.; RADIOSHACK CORP., <br><br> Plaintiffs <br><br> v. <br><br> CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA); TATUNG COMPANY OF AMERICA, INC.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; | **Master File No. 3:07-cv-05944-SC** <br><br> **MDL No. 1917** <br><br> Individual Case No. CASE NO. CV 11-5514 <br><br> **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

| | |
|---|---|
| 1 | HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC., TECHNICOLOR SA; TECHNICOLOR USA, INC.; MITSUBISHI ELECTRIC CORPORATION; MITSUBISHI DIGITAL ELECTRONICS AMERICA, INC.; and MITSUBISHI ELECTRIC & ELECTRONICS, USA, INC. |

Defendants

Plaintiffs Target Corp.; Sears, Roebuck and Co. ("Sears") and; Kmart Corp. ("Kmart"); Old Comp Inc.; Good Guys, Inc.; and RadioShack Corp. (hereafter "Plaintiffs") for their Second Amended Complaint for Damages and Injunctive Relief against all Defendants named herein, hereby allege as follows:

I.    **INTRODUCTION**

1.      Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

6.      During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.      This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.      On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.      During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

**II.    JURISDICTION AND VENUE**

10.    Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.    Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.    This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.    The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.    This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have admitted that they engaged in conduct in furtherance of the conspiracy in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

III.    **THE PARTIES**

A.    **Plaintiffs**

1.    **Target**

16.    Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com.  During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.    During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

2.   **Sears**

~~18.~~16.  Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for internal use during the Relevant Period.

~~19.~~17.  On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, both Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

~~20.~~18.  During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's negotiations for the purchase of CRTs took place in the United States and were controlled by merchandising departments based at the companies' respective headquarters in Illinois and Michigan.  In addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The merchandising departments in Illinois and Michigan were also responsible for selecting vendors and product lines with respect to CRTs.

~~21.~~19.  During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

1    CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,
2    Nebraska, Nevada, and North Carolina.
3                    3.       Old Comp
4            22.     Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas.
5    During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was
6    headquartered in Dallas, Texas.
7            23.     Old Comp owns all claims and rights under federal and state law to recover any
8    overcharges suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings
9    Company; (2) CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico
10   Inc.; (5) CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.;
11   and (9) BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA
12   Subsidiaries").
13           24.     During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries,
14   purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others
15   in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs
16   for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators'
17   conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property
18   because the prices they paid for such CRTs were artificially inflated by that conspiracy.
19           25.     During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs
20   took place in the United States and were controlled by the company's merchandising department at its
21   Texas headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and
22   received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was
23   also responsible for selecting vendors and product lines with respect to CRTs.
24           26.     During the Relevant Period, CompUSA also purchased CRTs at distribution centers
25   located in multiple states, including California and Illinois, where it received CRTs shipped to those
26   distribution centers.
27
28
                                        8
                    SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
                                        Case No. CV 11-5514

27. CompUSA no longer operates any stores. It sold its "CompUSA" brand names, service marks, and trademarks to an unrelated third party in 2008.

4. Good Guys

28. Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving, Texas. During the Relevant Period, The Good Guys maintained its headquarters in California and then in Texas.

29. The Good Guys owns all claims and rights under federal and state laws to recover any overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc. and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

30. During the Relevant Period, The Good Guys, by itself or through the Good Guys Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there. The Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant Period. As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good Guys Subsidiaries were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

31. During the Relevant Period, all of The Good Guys' negotiations for the purchase of CRTs took place in the United States and were controlled by the company's merchandising department at its California, and then Texas headquarters. In addition, The Good Guys issued all of its purchase orders for CRTs from California, and then Texas, and received invoices for those orders in California, and then Texas. The Good Guys' California and then Texas based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

32. During the Relevant Period, The Good Guys also purchased CRTs at a distribution center located in California, where it received CRTs shipped to that distribution center.

33. The Good Guys no longer operates any stores.

9
SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

5.    RadioShack

34.    Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com.  During the Relevant Period, RadioShack purchased and then resold from its facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  RadioShack also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

35.    During the Relevant Period, all of RadioShack's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters.  In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas.  RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

36.20.   During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

B.    **The Defendants**

1.    **IRICO Entities**

37.21.   Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs.  During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

38.22.   Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and

one of the leading global manufacturers of CRTs.  Their website also claims that in 2003, they were the

largest CRT manufacturer in China in terms of production and sales volume, sales revenue and

aggregated profit, and taxation.  During the Relevant Period, IGE manufactured, marketed, sold and/or

distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the

antitrust violations alleged in this complaint.

39.23.  Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its

principal place of business located at No. 16, Fenghui South Road West, District High-tech

Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In

2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed,

distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC

relating to the antitrust violations alleged in this complaint.

40.24.  Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

## 2. LG Electronics Entities

41.25.  Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the

Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong,

Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer

electronics, home appliances and mobile communications, which established its first overseas branch

office in New York in 1968.  The company's name was changed from Gold Star Communications to

LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred

its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called

LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and

changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured,

marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

throughout the United States.

1    42.26.  Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

2    principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

3    LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period,

4    LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

5    subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the

6    finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

7    43.27.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

8    with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

9    Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

10   During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

11   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

12   dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations

13   alleged in this complaint.

14   44.28.  Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG

15   Electronics."

16       **3.   LP Displays**

17   45.29.  Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong

18   company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central,

19   Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a

20   50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became

21   an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and

22   computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%.  LP

23   Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company

24   and the shares would be owned by financial institutions and private equity firms.  During the Relevant

25   Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its

26   subsidiaries or affiliates, throughout the United States.

27

28

### 4.    Hitachi Entities

46.30.  Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

47.31.  Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

48.32.  Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

49.33.  Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated

13

1   and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged

2   in this complaint.

3       50.34.  Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation

4   with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.

5   HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period,

6   HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its

7   subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

8   dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations

9   alleged in this complaint.

10      51.35.  Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was

11  a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian

12  District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

13  Shenzhen until November 8, 2007 (which was coincidentally around the time that the government

14  investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi

15  corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period,

16  Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its

17  subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays

18  dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust

19  violations alleged in this complaint.

20      52.36.  Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and

21  Hitachi Shenzhen are collectively referred to herein as "Hitachi."

22          5.      Panasonic Entities

23      53.37.  Defendant Panasonic Corporation, which was at all times during the Relevant Period

24  known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1,

25  2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During

26  the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs,

27  either directly or through its subsidiaries or affiliates, throughout the United States.

28

54.38.  Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

55.39.  Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

56.40.  Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

57.41.  Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured,

15

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 6.   Philips Entities

~~58.~~42.   Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

~~59.~~43.   Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

~~60.~~44.   Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

1     61. 45.  Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a

2     Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar

3     (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled

4     subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured,

5     marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

6     throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies

7     and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

8     62. 46.  Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are

9     collectively referred to herein as "Philips."

10          **7.      Samsung Entities**

11    63. 47.  Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its

12    principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-

13    gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant

14    Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through its

15    subsidiaries or affiliates, throughout the United States.

16    64. 48.  Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with

17    its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey

18    07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant

19    Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

20    subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

21    finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

22    complaint.

23    65. 49.  Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung

24    SDI") is a South Korean company with its principal place of business located at 575 Shin-dong,

25    Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major shareholder

26    holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the world's leading

27    company in the display and energy business, with 28,000 employees and facilities in 18 countries.  In

28

1    2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other

2    producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant Period, Samsung

3    SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or

4    affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies

5    and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

6        66.50.  Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

7    corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

8    California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

9    Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

10   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

11   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

12   Samsung SDI America relating to the antitrust violations alleged in this complaint.

13       67.51.  Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican

14   company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial

15   El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of

16   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed,

17   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

18   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

19   affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

20       68.52.  Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company

21   with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

22   Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of

23   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed,

24   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

25   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

26   affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

27

28

1    69.53.  Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese

2    company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.

3    Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.

4    During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed

5    CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants

6    SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI

7    Shenzhen relating to the antitrust violations alleged in this complaint.

8    70.54.  Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

9    company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing

10   County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of

11   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed,

12   sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

13   United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

14   affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

15   71.55.  Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

16   Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

17   Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.  Samsung

18   SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the

19   Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

20   directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and

21   Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

22   relating to the antitrust violations alleged in this complaint.

23   72.56.  Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

24   Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are

25   collectively referred to herein as "Samsung."

26

27

28

**8.    Samtel**

73.57.  Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of CRTs. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRTs.  During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.    Thai CRT**

74.58.  Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

**10.    Toshiba Entities**

75.59.  Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

76.60.  Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs, either directly

20

or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations

alleged in this complaint.

77.61.  Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability

company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-

owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant

Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the

finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

78.62.  Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California

corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400,

Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through

Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant

TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust

violations alleged in this complaint.

79.63.  Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California

corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-

1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.

During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly

or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this

complaint.

80.64.  Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to

herein as "Toshiba."

**11.     Chunghwa Entities**

~~81~~65.  Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

~~82~~66.  Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

~~83~~67.  Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

~~**12.     Tatung Company of America, Inc.**~~

~~Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold and/or distributed CRTs manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.~~

Formatted: Indent: Left:  0.5", No bullets or numbering

**12.     Thomson Entities**

68.     Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.   Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

69.     Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a United States corporation with its principal place of business located at 10330 N. Meridian Street, Indianapolis, Indiana 46290-1024.  Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in

1   2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson

2   Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

3   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

4       70.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as

5   "Thomson."

6   **13.     Mitsubishi Entities**

7       71.     Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese

8   corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi

9   Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and

10  Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and

11  monitor manufacturing division and to other television and monitor manufacturers in the United States

12  and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT

13  manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and

14  distributed CRT Products in the United States.

15      72.     Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a

16  United States corporation located at 5665 Plaza Drive, Cypress, California  90630.  Mitsubishi Electric

17  USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured

18  CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.

19  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division

20  and to other television and monitor manufacturers in the United States and elsewhere.  Mitsubishi's

21  television and monitor division also purchased CRTs from other CRT manufacturers.  During the

22  Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRT Products

23  in the United States.

24      73.     Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United

25  States corporation located at 9351 Jeronimo Road, Irvine, California  92618.  Mitsubishi Digital is a

26  wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital

27  manufactured, marketed, sold and distributed CRT Products in the United States.

28

<center>24</center>
<center>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514**</center>

74.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**IV.   AGENTS AND CO-CONSPIRATORS**

84. 75.  The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

85. 76.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

86. 77.  Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., Videocon Industries, Ltd., P.T. Tosummit Electronic Devices Indonesia and Toshiba Display Devices (Thailand) Co., Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

87. 78.  During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of

1    approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business

2    in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured,

3    marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates,

4    throughout the United States.

5        88. 79.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

6        89. 80.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a

7    Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan

8    Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-

9    owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation

10   transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with

11   Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated

12   as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period,

13   Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through

14   its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated

15   and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust

16   violations alleged in this complaint.

17       90. 81.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed

18   by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of

19   business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3

20   million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with

21   Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the

22   Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or

23   through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and

24   controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

25   complaint.

26       91. 82.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

27   principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

28

1  Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

2  2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

3  re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

4  subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured,

5  marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

6  throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs

7  of TDDT relating to the antitrust violations alleged in this complaint.

8     92.83.  The acts charged in this Complaint have been done by Defendants and their co-

9  conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

10  representatives while actively engaged in the management of each Defendant's or co-conspirator's

11  business or affairs.

12  **V.     TRADE AND COMMERCE**

13     93.84.  During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

14  CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

15  commerce, including through and into this judicial district.

16     94.85.  During the Relevant Period, Defendants collectively controlled a vast majority of the

17  market for CRTs, both globally and in the United States.

18     95.86.  The business activities of Defendants substantially affected interstate trade and commerce

19  in the United States and caused antitrust injury in the United States.  The business activities of

20  Defendants also substantially affected trade and commerce and caused antitrust injuries in California,

21  Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska,

22  Nevada, New Mexico, New York, North Carolina, and Wisconsin.

23  **VI.    FACTUAL ALLEGATIONS**

24     **A.     CRT Technology**

25     96.87.  A CRT has three components: (a) one or more electron guns, each of which is a series of

26  metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used

27  to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by

28

<div align="center">27

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514</div>

1    an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor

2    produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a

3    polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the

4    faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of

5    thousands of narrow lines of red, green, blue and black.

6        97.88.  CRT technology was first developed more than a century ago.  The first commercially

7    practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the

8    product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs

9    became the heart of most display products, including televisions, computer monitors, oscilloscopes, air

10   traffic control monitors and ATMs.

11       98.89.  The quality of a CRT itself determines the quality of the CRT display.  No external

12   control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT

13   product so that the product is often simply referred to as "the CRT."

14       99.90.  Although there have been refinements and incremental advancements along the way

15   since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology

16   used today is similar to that RCA unveiled in 1939.

17       100.91.        CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used

18   primarily in televisions and related devices and CDTs are primarily used in computer monitors and

19   similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring

20   more pixels than do CPTs.

21       101.92.        CRTs have no independent utility, and have value only as components of other

22   products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the

23   demand for such products.

24       102.93.        The market for CRTs and the market for the products into which they are placed

25   are inextricably linked and intertwined because the CRT market exists to serve the CRTs products

26   markets.  The markets for CRTs and products containing CRTs are, for all intents and purposes,

27   inseparable in that one would not exist without the other.

28

<center>28</center>
<center>SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</center>
<center>Case No. CV 11-5514</center>

1    ~~103.~~94.      Plaintiffs have participated in the market for CRTs through their direct purchases

2    from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original

3    equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices

4    at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-

5    competitive prices for CRTs.

6    ~~104.~~95.      Plaintiffs have participated in the market for products containing CRTs.  To the

7    extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-

8    conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these

9    products.  Plaintiffs were not able to pass the inflated prices on to their customers.

10   ~~105.~~96.      Plaintiffs have been injured by paying supra-competitive prices for CRTs.

11   **B.      Structure of the CRT Industry**

12   ~~106.~~97.      The CRT industry has several characteristics that facilitated a conspiracy,

13   including market concentration, ease of information sharing, the consolidation of manufacturers,

14   multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to

15   supply and demand forces and homogeneity of products.

16              **1.      Market Concentration**

17   ~~107.~~98.      During the Relevant Period, the CRT industry was dominated by relatively few

18   companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as

19   Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of

20   market share facilitates coordination because there are fewer cartel members among which to coordinate

21   pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel

22   members.

23              **2.      Information Sharing**

24   ~~108.~~99.      Because of common membership in trade associations, interrelated business

25   arrangements such as joint ventures, allegiances between companies in certain countries and

26   relationships between the executives of certain companies, there were many opportunities for

27   Defendants to discuss and exchange competitive information.  The ease of communication was

28

1   facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took

2   advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

3       109.100.     Defendants Hitachi, Samsung and Chunghwa are members of the Society for

4   Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea

5   Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and

6   Samsung are members of the Electronic Display Industrial Research Association.  Upon information and

7   belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and

8   agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants

9   exchanged proprietary and competitively sensitive information which they used to implement and

10   monitor the conspiracy.

11            **3.**      **Consolidation**

12       110.101.     The CRT industry also had significant consolidation during the Relevant Period,

13   including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving

14   Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's

15   CRT businesses into MTPD.

16            **4.**      **Multiple Interrelated Business Relationships**

17       111.102.     The industry is marked by a web of cross-licensing agreements, joint ventures and

18   other cooperative arrangements that can facilitate collusion.

19       112.103.     Examples of the high degree of cooperation among Defendants in both the CRT

20   market and other closely related markets include the following:

21           i.      The formation of the CRT joint venture LGPD in 2001 by Defendants LG

22                     Electronics and Philips.

23           ii.      Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd.

24                     n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of

25                     manufacturing TFT-LCDs.

26           iii.      The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba

27                     and Panasonic.

28

iv.     Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display
        Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-
        LCDs.

v.      In December 1995, Defendant Toshiba partnered with Orion and two other non-
        Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.     Defendant Toshiba and Orion also signed a cooperative agreement relating to
        LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and
        Toshiba, which had substituted its STN-LCD production with TFT-LCD
        production, marketed Daewoo's STN-LCDs globally through its network.

vii.    Also in 1995, Defendant Toshiba entered into a technology transfer agreement
        with Chunghwa for large CPTs.

viii.   Defendant Chunghwa has a joint venture with Defendant Samsung for the
        production of CRTs.  Chunghwa now licenses the technology from Defendant
        Philips, a recent development that helped resolve a patent infringement suit filed
        in 2002.

ix.     Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the
        manufacture, sale and distribution of optical storage products such as DVD
        drives.

x.      Defendant Samtel participates in a joint venture, Samcor Glass Limited, with
        Defendant Samsung and non-Defendant Corning Inc., USA for the production and
        supply of picture tube glass.

xi.     Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,
        Samsung, Philips, and Panasonic.

**5.     High Costs of Entry Into the Industry**

113.104.    There are significant manufacturing and technological barriers to entry into the
CRT industry.  It would require substantial time, resources and industry knowledge to overcome these

31

barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

114.105.    During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Market

115.106.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

116.107.    Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

117.108.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

118.109.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

119.110.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

120.111.    As for CRT televisions, they accounted for 73 percent of the North American
television market in 2004, and by the end of 2006, still held a 46 percent market share.

**7.    Homogeneity of CRTs**

121.112.    CRTs are commodity-like products which are manufactured in standardized sizes.
One Defendant's CRT for a particular application, such as a particular size television set or computer
monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRTs primarily on the
basis of price.

122.113.    It is easier to form and sustain a cartel when the product in question is
commodity-like because it is easier to agree on prices to charge and to monitor those prices once an
agreement is formed.

**C.    Pre-Conspiracy Market**

123.114.    The genesis of the CRT conspiracy was in the late 1980s as the CRTs business
became more international and Defendants began serving customers that were also being served by other
international companies.  During this period, the employees of Defendants would encounter employees
from their competitors when visiting their customers.  A culture of cooperation developed over the years
and these Defendant employees would exchange market information on production, capacity and
customers.

124.115.    In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa
visited each other's factories in S.E. Asia.  During this period, these producers began to include
discussions about price in their meetings.

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

125.116.    In order to control and maintain profitability during declining demand for CRTs,
Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the
effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to
artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

126.117.    The CRT conspiracy was effectuated through a combination of group and
bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the

33

1   primary method of communication and took place on an informal, ad hoc basis.  During this period,

2   representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

3   manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

4   increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

5   South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

6       ~~127.~~118.     Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also

7   attended several ad hoc group meetings during this period.  The participants at these group meetings also

8   discussed increasing prices for CRTs.

9       ~~128.~~119.     As more manufacturers formally entered the conspiracy, group meetings became

10  more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion,

11  and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

12  attended hundreds of these meetings during the Relevant Period.

13      ~~129.~~120.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

14  Defendants charged for CRTs.

15          1.   "Glass Meetings"

16      ~~130.~~121.     The group meetings among the participants in the CRT price-fixing conspiracy

17  were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three

18  general levels of Defendants' corporations.

19      ~~131.~~122.     The first level meetings were attended by high level company executives

20  including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings

21  occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing

22  compliance with price fixing agreements.  Because attendees at top meetings had authority as well as

23  more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also

24  able to resolve disputes because they were decision makers who could make agreements.

25      ~~132.~~123.     The second level meetings were attended by Defendants' high level sales

26  managers and were known as "management" meetings.  These meetings occurred more frequently,

27  typically monthly, and handled implementation of the agreements made at top meetings.

28

34

133.124.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

134.125.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

135.126.    Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO.

136.127.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

137.128.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia and the United States.

138.129.    Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such

meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

139.130.   The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

140.131.   During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

141.132.   Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

142.133.   Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers)

would be able to justify a corresponding price increase to their customers.  In this way, Defendants

ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

143.134.      The agreements reached at the glass meetings included:

     i.     agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

     ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

     iii.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

     iv.   agreements as to what to tell customers about the reason for a price increase;

     v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

     vi.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

     vii.  agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

     viii.  agreements to coordinate uniform public statements regarding available capacity and supply;

     ix.   agreements to allocate both overall market shares and share of a particular customer's purchases;

     x.    agreements to allocate customers;

     xi.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

     xii.  agreements to keep their meetings secret.

144.135.      Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1)

1   monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an

2   agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of

3   a mutual interest in living up to the target price and living up to the agreements that had been made.

4       145.136.      As market conditions worsened in 2005-2007, and the rate of replacement of

5   CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings

6   again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to

7   manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust

8   issues.

9       **2.**      **Bilateral Discussions**

10       146.137.      Throughout the Relevant Period, the glass meetings were supplemented by

11   bilateral discussions between various Defendants.  The bilateral discussions were more informal than the

12   group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These

13   discussions, usually between sales and marketing employees, took the form of in-person meetings,

14   telephone contacts and emails.

15       147.138.      During the Relevant Period, in-person bilateral meetings took place in Malaysia,

16   Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and

17   Mexico.

18       148.139.      The purpose of the bilateral discussions was to exchange information about past

19   and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and

20   coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and

21   Europe.

22       149.140.      In order to ensure the efficacy of their global conspiracy, Defendants also used

23   bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, and Mexico and the United

24   States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.  These CRT Brazilian and

25   Mexican manufacturers were particularly important because they served the North American market for

26   CRTs.  As further alleged herein, North America was the largest market for CRT televisions and

27   computer monitors during the Relevant Period.  Because the CRT se Brazilian and Mexican

28

1   manufacturers are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung~~

2   ~~SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices

3   of all CRTs imported into the United States were fixed, raised, maintained and/or stabilized at

4   supracompetitive levels.

5       ~~150.~~141.     Defendants also used bilateral discussions with each other during price

6   negotiations with customers to avoid being persuaded by customers to cut prices.  The information

7   gained in these communications was then shared with supervisors and taken into account in determining

8   the price to be offered.

9       ~~151.~~142.     Bilateral discussions were also used to coordinate prices with CRT manufacturers

10  that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic and

11  Samtel.  It was often the case that in the few days following a top or management meeting, the attendees

12  at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose

13  of communicating whatever CRT pricing and/or output agreements had been reached during the

14  meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating

15  CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was

16  responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular

17  bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular

18  communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible

19  for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the

20  agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and

21  Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the

22  conspiracy to fix prices of CRTs.

23        **3.**    **Defendants' and Co-Conspirators' Participation in Group and Bilateral**

24                    **Discussions**

25      ~~152.~~143.     Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi

26  Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings

27  were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral

28

1    discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi

2    agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

3    ~~153.~~144.    Defendants Hitachi America and HEDUS were represented at those meetings and

4    were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or

5    distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

6    Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the

7    pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active,

8    knowing participants in the alleged conspiracy.

9    ~~154.~~145.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC,

10   participated in multiple glass meetings.  These meetings were attended by the highest ranking executives

11   from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly

12   with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply

13   levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by

14   the Chinese government.  IRICO was acting to further its own independent private interests in

15   participating in the alleged conspiracy.

16   ~~155.~~146.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and

17   LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated

18   in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial

19   number of these meetings were attended by the highest ranking executives from LG Electronics.  LG

20   Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.

21   Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never

22   effectively withdrew from this conspiracy.

23   ~~156.~~147.    Defendant LGEUSA was represented at those meetings and was a party to the

24   agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a

25   significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

26   direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

27   LGEUSA was an active, knowing participant in the alleged conspiracy.

28

1    157.148.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD)

2    participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

3    attended by the highest ranking executives from LP Displays.  Certain of these high level executives

4    from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.

5    LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP

6    Displays agreed on prices and supply levels for CRTs.

7    158.149.    Between at least 1996 and 2003, Defendant Panasonic, through Panasonic

8    Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic

9    participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were

10   attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple

11   bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and

12   supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

13   159.150.    PCNA was represented at those meetings and was a party to the agreements

14   entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a

15   significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by

16   direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus,

17   PCNA was an active, knowing participant in the alleged conspiracy.

18   160.151.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass

19   meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

20   meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral

21   discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply

22   levels for CRTs.

23   161.152.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass

24   meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also

25   engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT

26   manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None

27   of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

28

1    BMCC was acting to further its own independent private interests in participating in the alleged

2    conspiracy.

3        162.153.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4    Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5    in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6    substantial number of these meetings were attended by high level executives from Philips.  Philips also

7    engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8    agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9        163.154.    Defendants Philips America and Philips Brazil were represented at those meetings

10   and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11   sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13   undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14   were active, knowing participants in the alleged conspiracy.

15       164.155.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung

16   SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least

17   200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18   ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19   Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20   for CRTs.

21       165.156.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22   Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23   extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25   undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26   America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27   alleged conspiracy.

28
                                      42

1    166.157.    Between at least 1998 and 2006, Defendant Samtel participated in multiple

2    bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended

3    by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply

4    levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

5        158.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass

6    meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT

7    also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through

8    these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively

9    withdrew from this conspiracy.

10        159.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings

11    with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings

12    were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such

13    things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant

14    shutdowns, customer allocation, and new product development and agreed on prices and supply levels

15    for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business

16    to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European

17    Commission that it played a role in the conspiracy.

18        167.160.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple

19    bilateral meetings with its competitors.  These meetings were attended by high level sales managers

20    from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production,

21    revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new

22    product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively

23    withdrew from this conspiracy.

24        168.161.    Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and

25    TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy

26    through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales

27    managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other

28

43

1    Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply

2    levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

3        ~~169.~~162.        Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4    meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5    TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6    conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7    would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8    TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9        ~~170.~~163.        Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12   attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13   Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14   Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15   for CRTs.

16       ~~171.   Defendant Tatung America was represented at those meetings and was a party to the~~

17   ~~agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct~~

18   ~~purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the~~

19   ~~prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at~~

20   ~~the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.~~

21       ~~172.~~164.        Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion

22   and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these

23   meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in

24   bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo

25   agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion,

26   its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew

27   from this conspiracy.

28

                                                    44

173.165.    When Plaintiffs refer to a corporate family or companies by a single name in their

allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or

agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every

company in that family.  In fact, the individual participants in the conspiratorial meetings and

discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish

between the entities within a corporate family.  The individual participants entered into agreements on

behalf of, and reported these meetings and discussions to, their respective corporate families.  As a

result, the entire corporate family was represented in meetings and discussions by their agents and were

parties to the agreements reached in them.

**E.    The CRT Market During the Conspiracy**

174.166.    Until the last few years, CRTs were the dominant technology used in displays,

including televisions and computer monitors.  During the Relevant Period, this translated into the sale of

millions of CRTs, generating billions of dollars in annual profits.

175.167.    The following data was reported by Stanford Resources, Inc., a market research

firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|--------------------------------|
| 1998 | 90.5                  | $18.9                        | $208                           |
| 1999 | 106.3                 | $19.2                        | $181                           |
| 2000 | 119.0                 | $28.0[1]                     | $235                           |

176.168.    During the Relevant Period, North America was the largest market for CRT TVs

and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide

market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in

North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor

---

[1]    Estimated market value of CRT units sold.

supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

~~177.~~169.      Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

~~178.~~170.      In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

~~179.~~171.      In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

~~180.~~172.      After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

~~181.~~173.      A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price.  'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

182.174.   A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

183.175.   Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

184.176.   For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

185.177.   During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products.  As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

186.178.   During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

187.179.   These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.**   <u>**International Government Antitrust Investigations**</u>

188. 180.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

189. 181.   On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.

48

Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried

out, in part, in California.

190.182.    On August 19, 2009, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen

Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type

of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and

Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his

participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the

combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

191.183.    On March 30, 2010, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng

Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of

CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a

large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination

and conspiracy to fix the prices of CRTs was carried out, in part, in California.

192.184.    On November 9, 2010, the DOJ issued a press release announcing that a federal

grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee

a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their

participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer

monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display

tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to

fix the prices of CRTs was carried out, in part, in California.

185.    On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung

SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce

the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an

amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine

and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January

1   1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI,

2   through its officers and employees, participated in a conspiracy among major CDT producers, the

3   primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in

4   the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers

5   and employees, engaged in discussions and attended meetings with representatives of other major CDT

6   producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

7   output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in

8   furtherance of this conspiracy were carried out within the Northern District of California.  The plea

9   agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal

10  antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

11  ~~193.~~186.        On December 5, 2012, the European Commission announced that it had fined

12  seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix

13  prices, share markets, restrict output, and allocate customers between themselves in the CRT market.

14  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips,

15  Samsung SDI, Panasonic, Toshiba, MTPD and Technicolor (formerly Thomson).  The Commission

16  Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook

17  cartels'; they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to

18  companies doing business in Europe."  The press release accompanying the fines further notes that the

19  CRT cartels were "among the most organized cartels that the Commission has investidated."

20  ~~194.~~187.        As outlined above, Defendants have a history of competitor contacts resulting

21  from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in

22  the electronics industry.

23  ~~195.~~188.        Several Defendants also have a history of "cooperation" and anticompetitive

24  conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in

25  October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory

26  ("DRAM").

27

28

196.189.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

197.190.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

198.191.    On December 12, 2006, news reports indicated that Defendants Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

199.192.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

200.193.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

201.194.    The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

G.    **The Role of Trade Associations During the Relevant Period**

202.195.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including

1    manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the

2    Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting

3    co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a

4    cooperation pact with the United States Display Consortium ("USDC").  In describing that pact,

5    Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should

6    cooperate on common issues."

7          203.196.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK,

8    and have participated extensively in the KDCs.

9          204.197.     The KDC has taken place in Seoul, Korea or other Korean venues on: December

10    4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4,

11    2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's and LG Electronics' CRT

12    operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han,

13    Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics.

14    Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

15          205.198.     Other opportunities to collude among Defendants were provided by events

16    sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information

17    Display, the annual International Display Manufacturing Conference and Exhibition (the most recent

18    one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays

19    (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent

20    ones of which have been held in Japan).

21          206.199.     Through these trade association and trade events, and in meetings related to these

22    trade associations and trade events, on information and belief, Defendants shared what would normally

23    be considered proprietary and competitively sensitive information.  This exchange of information was

24    used to implement and monitor the conspiracy.

25

26

27

28

**H.**   Effects of Defendants' Antitrust Violations

      **1.**   Examples of Reductions in Manufacturing Capacity by Defendants

~~207.~~200.   As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

~~208.~~201.   In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

~~209.~~202.   In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

~~210.~~203.   In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

~~211.~~204.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

~~212.~~205.   In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

      **2.**   Examples of Collusive Pricing for CRTs

~~213.~~206.   Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50

1    in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in

2    prices, CRT prices nonetheless remained stable.

3        214.207.     In 1996, another industry source noted that "the price of the 14" tube is at a

4    sustainable USD50 and has been for some years . . . ."

5        215.208.     In reality, consumer prices for CRTs never approached $50 in 1997, and were

6    consistently more than double this price.

7        216.209.     Despite the ever-increasing popularity of, and intensifying competition from, flat

8    panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995

9    according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a

10   shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

11       217.210.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis

12   of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display

13   1998, an annual conference for the display industry, to state:

14                   We believe that now is the time to revise our strategic plan in order to
                     survive in his tough environment and also to prepare for the coming years.
15                   This means that we have to deviate from the traditional approach of the
                     simple scale up of production volume.
16

17       218.211.     In early 1999, despite declining production costs and the rapid entry of flat panel

18   display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly

19   based on increasing global demand for the products.  In fact, this price rise was the result of collusive

20   conduct amongst Defendants.

21       219.212.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the

22   average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry

23   analyst as saying that this price increase was "unlike most other PC-related products."

24       220.213.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT

25   monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to

26   manufacture CRTs.

27

28
                                            54

1    ~~221.~~214.    Over the course of the Relevant Period, the price of CRTs remained stable, and in

2    some instances went up in an unexplained manner, despite the natural trend in most technology products

3    to go down over time.  CRT technology was mature, and the costs of production were relatively low

4    compared to other emerging technologies.  As Finsen Yu, President of Skyworth Macao Commercial

5    Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology

6    is very mature; prices and technology have become stable."

7    ~~222.~~215.    CRT prices resisted downward price pressures and remained stable over a period

8    of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian

9    currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy.

10   The stability of the price of CRTs was accomplished by the collusive activities alleged above.

11   **I.    Summary Of Effects Of The Conspiracy Involving CRTs**

12   ~~223.~~216.    The above combination and conspiracy has had the following effects, among

13   others:

14       a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has

15             been restrained, suppressed and eliminated throughout the United States;

16       b.    Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been

17             raised, fixed, maintained and stabilized at artificially high and noncompetitive

18             levels throughout the United States; and

19       c.    Plaintiffs have been deprived of the benefit of free and open competition in the

20             purchase of CRTs.

21       d.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs

22             have been injured in their business and property in that they paid more for CRTs

23             than they otherwise would have paid in the absence of the unlawful conduct of

24             Defendants.

25   **VII.   PLAINTIFFS' INJURIES**

26   ~~224.~~217.    As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and

27   reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain

28

1    CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs,

2    causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

3         225. 218.         Plaintiffs also purchased CRTs from OEMs as well as others, which in turn

4    purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and

5    artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for

6    CRTs than they would have absent the conspiracy.

7         226. 219.         The OEMs and others passed on to their customers, including Plaintiffs, the

8    overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the

9    overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased

10   CRTs containing such price-fixed CRTs from the OEMs and others.

11        227. 220.         Once a CRT leaves its place of manufacture, it remains essentially unchanged as

12   it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not

13   change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain

14   from Defendants through manufacturers of CRTs sold to Plaintiffs.

15        228. 221.         The market for CRTs and the market for products containing CRTs are

16   inextricably linked and cannot be considered separately.  Defendants are well aware of this intimate

17   relationship.

18        229. 222.         Throughout the Relevant Period, Defendants controlled the market for CRTs.

19   Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from

20   Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants'

21   conspiracy.

22        230. 223.         As a result, Plaintiffs were injured in connection with their purchases of CRTs

23   during the Relevant Period.

24   **VIII.   FRAUDULENT CONCEALMENT**

25        231. 224.         Plaintiffs had neither actual nor constructive knowledge of the facts supporting

26   their claims for relief despite diligence in trying to discover the pertinent facts.  Defendants engaged in a

27

28

1    secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was

2    a conspiracy to fix the prices of CRTs.

3         232.225.    Because Defendants' agreement, understanding and conspiracy were kept secret,

4    Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were

5    paying artificially high prices for CRTs.

6         233.226.    The affirmative acts of Defendants alleged herein, including acts in furtherance of

7    the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As

8    noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in

9    secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing

10   actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the

11   proposed communications with customers containing these pretextual statements and would coordinate

12   which co-conspirator would first communicate these pretextual statements to customers.

13        234.227.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

14   concealing.

15        235.228.    Plaintiffs could not have discovered the alleged contract, conspiracy or

16   combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices

17   and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and

18   fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or

19   combination as herein alleged was fraudulently concealed by Defendants by various means and

20   methods, including, but not limited to, secret meetings, surreptitious communications between

21   Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written

22   records, discussion on how to evade antitrust laws and concealing the existence and nature of their

23   competitor pricing discussions from non-conspirators (including customers).

24        236.229.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings

25   at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take

26   minutes.  Attending companies also reduced the number of their respective attendees to maintain

27   secrecy.

28
                                          57

237.230.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

238.231.    As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

239.232.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

240.233.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

241.234.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

242.235.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

236.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

58

**IX.** *AMERICAN PIPE,* **GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING**

237. As discussed at length in Paragraphs 183 through 187 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009. Plaintiffs' claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

238. Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

239. As shown by Plaintiffs' allegations in Paragraphs 1 through 9, and the following causes of action, Plaintiffs were members of Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 3:07-cv-05944 SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- 243. *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009)

**IX.X.** **CLAIM FOR VIOLATIONS**

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

244.240. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

245.241. Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

*Formatted:* Indent: Hanging: 0.5", Line spacing: single, Bulleted + Level: 1 + Aligned at: 0.75" + Indent at: 1"

1  246.242.  In particular, Defendants combined and conspired to raise, fix, maintain or

2  stabilize the prices of CRTs sold in the United States.

3  247.243.  As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed,

4  maintained and stabilized in the United States.

5  248.244.  The contract, combination or conspiracy among Defendants consisted of a

6  continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

7  249.245.  For purposes of formulating and effectuating their contract, combination or

8  conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

9  conspired to do, including:

10     a.   participating in meetings and conversations to discuss the prices and supply of

11         CRTs;

12     b.   communicating in writing and orally to fix target prices, floor prices and price

13         ranges for CRTs;

14     c.   agreeing to manipulate prices and supply of CRTs sold in the United States in a

15         manner that deprived direct purchasers of free and open competition;

16     d.   issuing price announcements and price quotations in accordance with the

17         agreements reached;

18     e.   selling CRTs to customers in the United States at noncompetitive prices;

19     f.   exchanging competitively sensitive information in order to facilitate their

20         conspiracy;

21     g.   agreeing to maintain or lower production capacity; and

22     h.   providing false statements to the public to explain increased prices for CRTs.

23 250.246.  As a result of Defendants' unlawful conduct, Plaintiffs were injured in their

24 businesses and property in that they paid more for CRTs than they otherwise would have paid in the

25 absence of Defendants' unlawful conduct.

26

27

28

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

251. 247.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252. 248.     During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

253. 249.     In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

254. 250.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

255. 251.     The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

1    256.252.    For the purpose of forming and effectuating the unlawful trust, Defendants and

2    their co-conspirators have done those things which they combined and conspired to do, including but in

3    no way limited to the acts, practices and course of conduct set forth above and the following:

4            a.    to fix, raise, maintain and stabilize the price of CRTs;

5            b.    to allocate markets for CRTs amongst themselves;

6            c.    to submit rigged bids for the award and performance of certain CRTs contracts;

7                  and

8            d.    to allocate among themselves the production of CRTs.

9    257.253.    The combination and conspiracy alleged herein has had, inter alia, the following

10   effects:

11           a.    price competition in the sale of CRTs has been restrained, suppressed and/or

12                 eliminated in the State of California;

13           b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been

14                 fixed, raised, maintained and stabilized at artificially high, non-competitive levels

15                 in the State of California; and

16           c.    those who purchased CRTs from Defendants, their co-conspirators, and others

17                 and CRTs containing price-fixed CRTs from Defendants, their co-conspirators,

18                 and others have been deprived of the benefit of free and open competition.

19   258.254.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-

20   competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

21   259.255.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been

22   injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by

23   Defendants, their co-conspirators and others than they would have paid in the absence of Defendants'

24   combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California

25   Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including

26   reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions

27   Code.

28

**Third Claim for Relief**

**(Violation of State Antitrust and Unfair Competition Laws)**

260.256.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

261.257.     Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

262.258.     The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

263.259.     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.     to fix, raise, maintain and stabilize the price of CRTs;

      b.     to allocate markets for CRTs amongst themselves;

      c.     to submit rigged bids for the award and performance of certain CRTs contracts; and

      d.     to allocate among themselves the production of CRTs.

264.260.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

      a.     price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b.     prices for CRTs sold by Defendants, their co-conspirators, and others have been

fixed, raised, maintained and stabilized at artificially high, non-competitive levels

in the states listed below; and

c.     those who purchased CRTs from Defendants, their co-conspirators, and others

have been deprived of the benefits of free and open competition.

~~265.~~261.     As a result of the alleged conduct of Defendants and their co-conspirators,

Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the

Relevant Period.

~~266.~~262.     By reason of the foregoing, Defendants and their co-conspirators also have

engaged in unfair competition in violation of California's Unfair Competition Law, California Business

and Professional Code § 17200, *et seq.*

a.     Defendants and their co-conspirators committed acts of unfair competition, as

defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize

the price of CRTs as described above;

b.     Defendants' and their co-conspirators' acts, omissions, misrepresentations,

practices and non-disclosures, as described above, constitute a common,

continuous and continuing course of conduct of unfair competition by means of

unfair, unlawful and/or fraudulent business acts or practices with the meaning of

Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of

the Sherman Act; and (2) violation of the Cartwright Act;

c.     Defendants' and their co-conspirators' acts, omissions, misrepresentations,

practices and non-disclosures are unfair, unconscionable, unlawful and/or

fraudulent independently of whether they constitute a violation of the Sherman

Act or the Cartwright Act;

d.     Defendants' and their co-conspirators' acts or practices are fraudulent or

deceptive within the meaning of Section 17200, *et seq.*;

e.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa, Sharp, Chi Mei, HannStar, and Epson all admitted that acts in furtherance of the conspiracy to fix the price of CRTs were carried out in California;

f.   During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in California~~: Target, Sears, Kmart, Old Comp, Good Guys, and RadioShack~~.  As a result, each is entitled to the protection of the laws of California; and

g.   By reason of the foregoing, each of those Plaintiffs is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants or their co-conspirators as result of such business acts and practices.

~~267.~~263.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Arizona and fixed, raised, maintained and stabilized CRT prices in Arizona at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Arizona commerce;

c.   During the Relevant Period, ~~the following~~ Sears ~~Plaintiffs~~ purchased CRTs in Arizona~~: Target and Sears~~.  As a result, Sears ~~each~~ is entitled to the protection of the laws of Arizona; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, Sears ~~each of those Plaintiffs~~ has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and

their co-conspirators' combination and conspiracy, and is therefore entitled to

relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

268.264.    By reason of the foregoing, Defendants and their co-conspirators also have

engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*

      a.    Defendants and their co-conspirators committed acts of unfair competition by

         engaging in a conspiracy to fix and stabilize the price of CRTs as described

         above;

      b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

         practices and non-disclosures, as described above, constitute a common,

         continuous and continuing course of conduct of unfair competition by means of

         unfair, unlawful and/or fraudulent business acts or practices, including, but not

         limited to violation of Section 1 of the Sherman Act;

      c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

         practices and non-disclosures are unfair, unconscionable, unlawful and/or

         fraudulent independently of whether they constitute a violation of the Sherman

         Act;

      d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

         deceptive;

      e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

         perfected within Florida; and

      f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Florida:

         Target, Sears and Kmart.  As a result, each is entitled to the protection of the laws

         of Florida.

269.265.    By reason of the foregoing, Defendants and their co-conspirators also have

entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code

10/1, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

c.   During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Illinois~~:~~ ~~Target, Sears, Kmart and Old Comp~~.  As a result, each is entitled to the protection of the laws of Illinois; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

~~270.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*~~

~~a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;~~

~~b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Iowa commerce;~~

~~c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa: Target.  As a result, each is entitled to the protection of the laws of Iowa; and~~

~~d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and~~

67

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1    others than it would have paid in the absence of Defendants and their co-
2    conspirators' combination and conspiracy, and is therefore entitled to relief under
3    Iowa Code §§ 553.1, *et seq.*
4    271.   By reason of the foregoing, Defendants and their co-conspirators also have entered into
5    an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*
6        a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
7        eliminated competition in the sale of CRTs in Kansas and fixed, raised,
8        maintained and stabilized CRT prices in Kansas at artificially high, non-
9        competitive levels;
10       b.   As a result, Defendants and their co-conspirators' conspiracy substantially
11       affected Kansas commerce;
12       c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:
13       Target.  As a result, each is entitled to the protection of the laws of Kansas; and
14       a.   As a direct and proximate result of Defendants' and their co-conspirators'
15       conduct, each of those Plaintiffs has been injured in its business and property by
16       paying more for CRTs manufactured by Defendants, their co-conspirators, and
17       others than it would have paid in the absence of Defendants and their co-
18       conspirators' combination and conspiracy, and is therefore entitled to relief under
19       Kansas Stat. Ann. §§ 50-101, *et seq.*
20   272.266.   By reason of the foregoing, Defendants and their co-conspirators also have
21   engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*
22       a.   Defendants and their co-conspirators committed acts of unfair competition by
23       engaging in a conspiracy to fix and stabilize the price of CRTs as described
24       above;
25       b.   Defendants' and their co-conspirators' acts, omissions, misrepresentations,
26       practices and non-disclosures, as described above, constitute a common,
27       continuous and continuing course of conduct of unfair competition by means of
28

68

1        unfair, unlawful and/or fraudulent business acts or practices, including, but not

2        limited to violation of Section 1 of the Sherman Act;

3    c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

4        practices and non-disclosures are unfair, unconscionable, unlawful and/or

5        fraudulent independently of whether they constitute a violation of the Sherman

6        Act;

7    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

8        deceptive;

9    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

10       perfected within Massachusetts; and

11    f.    During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in

12        Massachusetts~~: Sears and RadioShack~~.  As a result, Sears ~~each~~ is entitled to the

13        protection of the laws of Massachusetts.

14  ~~273.~~267.    By reason of the foregoing, Defendants and their co-conspirators also have

15  entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771,

16  *et seq.*

17    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

18        eliminated competition in the sale of CRTs in Michigan and fixed, raised,

19        maintained and stabilized CRT prices in Michigan at artificially high, non-

20        competitive levels;

21    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

22        affected Michigan commerce;

23    c.    During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in

24        Michigan~~: Target, Sears and Kmart~~.  As a result, each is entitled to the protection

25        of the laws of Michigan; and

26    d.    As a direct and proximate result of Defendants' and their co-conspirators'

27        conduct, each of those Plaintiffs has been injured in its business and property by

28

paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

274.268.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

    a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

    b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

    c.   During the Relevant Period, the following Plaintiffs purchased CRTs in Minnesota:  Target, Sears and Kmart.  As a result, each is entitled to the protection of the laws of Minnesota; and

    d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their coconspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Minnesota Stat. §§ 325D.50, *et seq.*

275.269.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

    a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Mississippi and fixed, raised, maintained and stabilized CRT prices in Mississippi at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

c.   During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in Mississippi~~: Sears and RadioShack~~.  As a result, Sears ~~each Plaintiff~~ is entitled to the protection of the laws of Mississippi; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

~~276.~~270.   By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*

a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nebraska and fixed, raised, maintained and stabilized CRT prices in Nebraska at artificially high, non-competitive levels;

b.   As a result, Defendants and their co-conspirators' conspiracy substantially affected Nebraska commerce;

c.   During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nebraska~~: Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of Nebraska; and

d.   As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-

71

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1    conspirators' combination and conspiracy, and is therefore entitled to relief under

2    Nebraska Stat. §§ 59-801, *et seq.*

3    ~~277.~~271.    By reason of the foregoing, Defendants and their co-conspirators also have

4    entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

5         a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

6               eliminated competition in the sale of CRTs in Nevada and fixed, raised,

7               maintained and stabilized CRT prices in Nevada at artificially high, non-

8               competitive levels;

9         b.    As a result, Defendants and their co-conspirators' conspiracy substantially

10              affected Nevada commerce;

11        c.    During the Relevant Period, ~~the following~~ Plaintiffs purchased CRTs in Nevada:

12              ~~Sears and Kmart~~.  As a result, each is entitled to the protection of the laws of

13              Nevada; and

14        d.    As a direct and proximate result of Defendants' and their co-conspirators'

15              conduct, each of those Plaintiffs has been injured in its business and property by

16              paying more for CRTs manufactured by Defendants, their co-conspirators, and

17              others than it would have paid in the absence of Defendants and their co-

18              conspirators' combination and conspiracy, and is therefore entitled to relief under

19              Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

20    ~~278.~~272.    By reason of the foregoing, Defendants and their co-conspirators also have

21    entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

22        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23              eliminated competition in the sale of CRTs in New Mexico and fixed, raised,

24              maintained and stabilized CRT prices in New Mexico at artificially high, non-

25              competitive levels;

26        b.    As a result, Defendants and their co-conspirators' conspiracy substantially

27              affected New Mexico commerce;

28

c. During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in New Mexico~~: Sears~~. As a result, Sears ~~each~~ is entitled to the protection of the laws of New Mexico; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

~~279.~~273. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in New York and fixed, raised, maintained and stabilized CRT prices in New York at artificially high, non-competitive levels;

b. As a result, Defendants and their co-conspirators' conspiracy substantially affected New York commerce;

c. During the Relevant Period, Sears ~~the following Plaintiffs~~ purchased CRTs in New York~~: Target and Sears~~. As a result, Sears ~~each~~ is entitled to the protection of the laws of New York; and

d. As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

280.274.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised, maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in North Carolina: Target, Sears and Kmart.  As a result, each is entitled to the protection of the laws of North Carolina; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

281.275.    By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

c.    During the Relevant Period, Sears the following Plaintiffs purchased CRTs in Wisconsin: Target and Sears.  As a result, Sears each is entitled to the protection of the laws of Wisconsin; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## X.XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of California, Arizona, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1     E.     Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

2  provided by law; and

3     F.     Plaintiffs shall receive such other or further relief as may be just and proper.

4  / / /

5  / / /

6  / / /

7  / / /

8  ~~/ / /~~

9  ~~/ / /~~

10  ~~XI.~~**XII.      JURY TRIAL DEMAND**

11     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

12  claims asserted in this Complaint so triable.

13  Dated:                    Respectfully submitted

14

15  ~~Jason C. Murray (CA Bar No. 169806)~~

16  ~~CROWELL & MORING LLP~~

17  ~~515 South Flower St., 40th Floor~~

18  ~~Los Angeles, CA 90071~~

19  ~~Telephone: 213-443-5582~~

20  ~~Facsimile: 213-622-2690~~

21  ~~Email:                    jmurray@crowell.com~~

22  ~~Jeffrey H. Howard (*pro hac vice*)~~

23  ~~Jerome A. Murphy (*pro hac vice*)~~

24  ~~CROWELL & MORING LLP~~

25  ~~1001 Pennsylvania Avenue, N.W.~~

26  ~~Washington, D.C. 20004~~

27  ~~Telephone: 202-624-2500~~

28  ~~Facsimile: 202-628-5116~~

~~E-mail: jhoward@crowell.com~~

~~jmurphy@crowell.com~~

1  *Counsel for Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;*
2  *RadioShack Corp.*
3  _____
4  Richard Alan Arnold, Esquire (pro hac vice)
5  William J. Blechman, Esquire (pro hac vice)
6  Kevin J. Murray, Esquire (pro hac vice)
   KENNY NACHWALTER, P.A.
7  201 S. Biscayne Boulevard, Suite 1100
   Miami, Florida 33131
8  Tel:    (305) 373-1000
   Fax:    (305) 372-1861
9  Email: rarnold@knpa.com
10          wblechman@knpa.com
            kmurray@knpa.com
11 *Counsel for Plaintiffs Sears Roebuck and Co. and*
   *Kmart Corp.*

(Field Code Changed) x3

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

1

2

3    ~~SCHULTZE AGENCY SERVICES~~WILLIAM A. ISAACSON (*Pro hac vice*)
     BOIES, SCHILLER & FLEXNER LLP
4    5301 Wisconsin Ave. NW, Suite 800
     Washington, DC 20015
5    Telephone:  (202) 237-2727
     Facsimile:   (202) 237-6131
6    Email:  wisaacson@bsfllp.com

7
     PHILIP J. IOVIENO (*Pro hac vice*)
8    ANNE M. NARDACCI (*Pro hac vice*)
     LUKE NIKAS (*Pro hac vice*)
9    CHRISTOPHER V. FENLON (*Pro hac vice*)
     BOIES, SCHILLER & FLEXNER LLP
10   10 North Pearl Street, 4th Floor
     Albany, NY 12207
11   Telephone:  (518) 434-0600
     Facsimile:   (518) 434-0665
12   Email: piovieno@bsfllp.com

13
     *Counsel for Plaintiff Schultze Agency Services, LLC*
14   *on behalf of* ~~TWEETER OPCO~~*Tweeter Opco, LLC and* ~~TWEETER NEWCO~~*Tweeter Newco,*
     *LLC*~~,~~
15   ~~_____~~

16   ~~_____ Plaintiff,_____~~
     ~~_____~~

17   ~~v.~~

18   ~~HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA,~~
     ~~LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR~~
19   ~~DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS~~
     ~~CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG~~
20   ~~ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS~~
     ~~INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF~~
21   ~~NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR~~
     ~~CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS~~
22   ~~NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN),~~
     ~~LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG~~
23   ~~ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI~~
     ~~CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;~~
24   ~~SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN~~
     ~~SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR~~
25   ~~LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.;~~
     ~~TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA ELECTRONIC~~
26   ~~COMPONENTS, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.;~~
     ~~CHUNGHWA PICTURE TUBES, LTD.; CHUNGHWA PICTURE TUBES (MALAYSIA);~~
27   ~~TATUNG COMPANY OF AMERICA, INC.,_____~~
     ~~Defendants.___~~

28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 12-cv-02649 |
| | Master File No. 3:07-cv-05944-SC |
| This Document Relates To Individual Case No. 12-cv-02649 | MDL No. 1917 |
| SCHULTZE AGENCY SERVICES, LLC on behalf of TWEETER OPCO, LLC and TWEETER NEWCO, LLC | **AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| vs. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; MT PICTURE DISPLAY CO., LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.; SAMSUNG SDI MEXICO S.A. DE C.V.; SAMSUNG SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMSUNG SDI (MALAYSIA) SDN. BHD.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA AMERICA CONSUMER PRODUCTS, LLC; TOSHIBA AMERICA | |

ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA PICTURE
TUBES, LTD.; CHUNGHWA PICTURE
TUBES (MALAYSIA); TECHNICOLOR
SA; TECHNICOLOR USA, INC.;
MITSUBISHI ELECTRIC CORPORATION;
MITSUBISHI DIGITAL ELECTRONICS
AMERICA, INC.; MITSUBISHI ELECTRIC
& ELECTRONICS, USA, INC.,

Defendants.

Plaintiff, Schultze Agency Services, LLC ("Schultze Agency Services") on behalf of Tweeter Opco, LLC ("Tweeter Opco") and Tweeter Newco, LLC ("Tweeter Newco") (collectively "Plaintiff"), for its Complaint against all Defendants named herein, hereby alleges as follows:

I.    **INTRODUCTION**

1.      Plaintiff brings this action to recover those damages to Tweeter Home Entertainment Group, Inc. and its affiliated companies ("Tweeter") caused by a long-running conspiracy among suppliers of cathode ray tubes ("CRTs") and related products. Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy

1   extending at a minimum from at least March 1, 1995, through at least November 25, 2007 (the

2   "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise, stabilize and

3   maintain prices for CRTs.

4            2.      Defendants are or were among the leading manufacturers of: (a) color

5   picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display

6   tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic

7   devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the

8   purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred

9   to collectively as "CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes

10  and the products containing them shall be referred to as "CDT Products."  CDT Products and

11  CPT Products shall be referred to collectively herein as "CRT Products."

12           3.      Defendants control the majority of the CRT industry, a multibillion dollar

13  market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the

14  Relevant Period, virtually every household in the United States owned at least one CRT Product.

15           4.      Since the mid-1990s, the CRT industry faced significant economic

16  pressures as customer preferences for other emerging technologies shrank profits and threatened

17  the sustainability of the industry.  In order to maintain price stability, increase profitability, and

18  decrease the erosion of pricing in the CRT market, Defendants conspired, combined and

19  contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United

20  States.

21           5.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a)

22  fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

23  shipments, prices, production and customer demand; (c) coordinate public statements regarding

24  available capacity and supply; (d) resolve issues created by asymmetrical vertical integration

25  among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating

26  on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of

27  overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

28  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

producer's share of certain key customers' sales; and (k) restrict output.

6.    The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.    During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.    This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.    During the Relevant Period, Plaintiff purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiff thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.    Plaintiff brings this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' violations of

1    Section 1 of the Sherman Act (15 U.S.C. § 1).

2              11.    Plaintiff also brings this action pursuant to Massachusetts General Laws,

3    chapter 93A. for injunctive relief and damages that Plaintiff sustained due to Defendants' and

4    their co-conspirators' violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq*., because Plaintiff

5    purchased CRT Products from non-defendant vendors which contained price-fixed CRTs

6    manufactured by Defendants and their co-conspirators in Massachusetts.

7              12.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of

8    the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.  The Court has

9    supplemental jurisdiction over Plaintiff's Massachusetts state law claims under 28 U.S.C. § 1367

10   because they arise from the same nucleus of operative facts alleged in this Complaint.  Plaintiff's

11   state law claims are so related to its claims under Section 1 of the Sherman Act that they form

12   part of the same case or controversy.

13             13.    The activities of Defendants and their co-conspirators, as described herein,

14   involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

15   did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and

16   import trade or commerce.  This effect gives rise to Plaintiff's antitrust claims.  During the

17   Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the

18   United States.  In particular, Defendants' and their co-conspirators' conspiracy directly and

19   substantially affected the price of CRT Products purchased by Plaintiff in Massachusetts.

20             14.    This court has jurisdiction over each Defendant named in this action under

21   Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely

22   availed themselves of the laws of the United States as they manufactured CRT Products for sale

23   in the United States, or CRTs which were incorporated into CRT Products Defendants and their

24   co-conspirators knew would be sold to customers in the United States.  Defendants' and their co-

25   conspirators' conspiracy affected this commerce in CRT Products in the United States.

26             15.    Venue is proper in the Eastern District of New York under Section 12 of

27   the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because each Defendant is either an alien

28   corporation, transacts business in this District, or is otherwise found within this District.  In

1    addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

2    events or omissions giving rise to this claim occurred in this District.  Defendants and their co-

3    conspirators knew that CRT Products containing price-fixed CRTs would be sold and shipped

4    into this District.

5    **III.**    **PARTIES**

6        **A.**    **Plaintiff**

7        16.    Through the conclusion of Defendants' and the co-conspirators'

8    conspiracy, Tweeter was headquartered in Massachusetts and operated as a regional retailer of

9    consumer electronics and operated dozens of stores in several states under the names Tweeter,

10   Sound Advice, HiFi Buys and Showcase Home Entertainment primarily in states along the east

11   coast and in Texas, Arizona, and Illinois.

12       17.    On June 11, 2007, Tweeter commenced cases in the United States

13   Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.  *In re*

14   *Tweeter Home Entertainment Group, Inc. et al.*, Case No. 07-10787 (PJW) (Jointly

15   Administered).   On July 13, 2007, the Court entered an Order (1) Approving Sale of

16   Substantially All of Debtors' Assets Free and Clear of All Liens, Claims, Interests and

17   Encumbrances; (2) Approving Assumption and Assignment of Certain Contracts and Leases; and

18   (3) Granting Related Relief (the "Sale Order"), which authorized the sale of substantially all the

19   assets of Tweeter, including the causes of action alleged herein, to Tweeter Newco and/or its

20   assignees (the "Sale").  The Sale was closed on or about July13, 2007.

21       18.    Tweeter Newco is the sole member and owner of Tweeter Opco.  Both

22   were formed by Schultze Asset Management in 2007 for the purpose of purchasing the assets of

23   Tweeter pursuant to the Sale Order and the Court approved Asset Purchase Agreement (the

24   "APA").  Pursuant to Section 2 of the APA, Tweeter Newco purchased "any rights, claims or

25   causes of action of Sellers against third parties relating to the Purchased Assets arising out of

26   events occurring prior to the Closing Date."

27       19.    On November 5, 2008, Tweeter Opco and Tweeter Newco commenced

28   cases in the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the

1    Bankruptcy Code.   *In re Tweeter Opco, LLC, et al.*, Case No. 08-12646 (MFW) (Jointly

2    Administered).   On December 5, 2008, the Court issued an Order Converting the Debtors'

3    Chapter 11 Bankruptcy Cases to Cases Under Chapter 7 of the Bankruptcy Code.

4            20.    Schultze Agency Services is the agent bank for certain lenders which

5    provided secured financing to Tweeter Opco and Tweeter Newco pursuant to a credit agreement

6    dated as of August 28, 2008 by and between Tweeter Newco and its affiliates as borrowers and

7    Schultze Agency Services as agent for the lenders.   On March 23, 2009, the Court in the Tweeter

8    Opco bankruptcy issued an order compelling the chapter 7 bankruptcy trustee to abandon certain

9    of the estates' assets to Schultze Agency Services, including the claims alleged in this complaint.

10   Accordingly, Schultze Agency Services is entitled to bring all claims and rights under federal

11   and state law to recover any overcharges suffered by Tweeter Home Entertainment Group, Inc.

12   and its subsidiaries, affiliates and predecessors, including, but not limited to:   NEA Delaware,

13   Inc.; New England Audio Co., Inc.; Bryn Mawr Radio and Television, Inc.; HiFi Buys

14   Incorporated; Home Entertainment of Texas, Inc.; DOW Stereo/Video, Inc.; United Audio

15   Centers, Inc.; Douglas T.V. & Appliance, Inc. and Douglas Audio Video Centers, Inc.; The

16   Video Scene, Inc. d/b/a Big Screen City; SMK Marketing, Inc. d/b/a Audio Video Systems;

17   Sound Advice, Inc. d/b/a Sound Advice and Showcase Home Entertainment; Hillcrest High

18   Fidelity, Inc.; and Sumarc Electronics Incorporated d/b/a NOW! Audio Video.

19           21.    During the Relevant Period, Tweeter purchased CRT Products directly

20   from the Defendants, and/or the Defendants' subsidiaries and affiliates and/or any agents the

21   Defendants or Defendants' subsidiaries and affiliates controlled.   Tweeter also purchased CRT

22   Products from original equipment manufacturers ("OEMs"), as well as other suppliers, which

23   contained CRT panels that had been purchased from Defendants and their co-conspirators.   As

24   such, Tweeter suffered injury as a result of Defendants' and co-conspirators' unlawful conduct.

25           22.    During the Relevant Period, Tweeter's negotiations for the purchase of

26   CRT Products took place in the United States and were controlled by a department based at the

27   company's headquarters in Massachusetts.   In addition, Tweeter's purchase orders for CRT

28   Products were issued from Massachusetts, invoices for these CRT Products were sent to Tweeter

1   in Massachusetts, and payments for these CRT Products were issued from Massachusetts.

2   Tweeter employees based in Massachusetts were also responsible for selecting vendors and

3   product lines with respect to CRT Products.

4       **B.**     **Defendants**

5           **1.**     **Hitachi Entities**

6         23.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of

7   business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the

8   parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide

9   market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd.

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12         24.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese

13   company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken,

14   297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd.

15   in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design,

16   manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to

17   create a separate company called Hitachi Displays. During the Relevant Period, Hitachi

18   Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or

19   through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd.

20   dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the

21   antitrust violations alleged in this complaint.

22         25.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York

23   company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New

24   York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant

25   Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold and/or

26   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

27   United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies and

28   affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

26.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

27.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

28.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

29.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

## 2. **IRICO Entities**

30. Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

31. Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

32. Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed, distributed and/or sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

33. Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

### 3.    **LG Electronics Entities**

34.    Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.    Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

36.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

37.    Defendants LGEI, LGEUSA and LGETT are collectively referred to

1  herein as "LG Electronics."

2          **4.**     **LP Displays**

3          38.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a

4  Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des

5  Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD,

6  which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.

7  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier

8  of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2

9  billion and a market share of 27%.  LP Displays announced in March 2007 that Royal Philips

10  and LGEI would cede control over the company and the shares would be owned by financial

11  institutions and private equity firms.  During the Relevant Period, LP Displays manufactured,

12  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13  affiliates, throughout the United States.

14          **5.**     **Panasonic Entities**

15          39.     Defendant Panasonic Corporation, which was at all times during the

16  Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic

17  Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi,

18  Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured,

19  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

20  affiliates, throughout the United States.

21          40.     Defendant Panasonic Corporation of North America ("PCNA") is a

22  Delaware corporation with its principal place of business located at One Panasonic Way,

23  Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant

24  Panasonic Corporation.  During the Relevant Period, PCNA manufactured, marketed, sold and/or

25  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

26  United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies

27  and affairs of PCNA relating to the antitrust violations alleged in this complaint.

28          41.     Defendants Panasonic Corporation and PCNA are collectively referred to

1    herein as "Panasonic."

2        42.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3    Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi,

4    Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with

5    Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to

6    manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On

7    March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint

8    venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic

9    Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD

10   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

11   subsidiaries or affiliates, throughout the United States.

12       43.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a

13   Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd.,

14   Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which

15   is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co.,

16   Ltd., China National Electronics Import & Export Beijing Company (a China state-owned

17   enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a

18   China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT

19   manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in

20   China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

21   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

22   States.

23       **6.    Philips Entities**

24       44.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips

25   Electronics ("Royal Philips") is a Dutch company with its principal place of business located at

26   Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one

27   of the world's largest electronics companies, with 160,900 employees located in over 60

28   countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal

Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45.     Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

46.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

47.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to

1       the antitrust violations alleged in this complaint.

2              48.     Defendants Royal Philips, Philips America, Philips Taiwan and Philips

3       Brazil are collectively referred to herein as "Philips."

4              **7.     Samsung Entities**

5              49.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

6       company with its principal place of business located at Samsung Electronics Building, 1320-10,

7       Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics

8       company.  During the Relevant Period, SEC manufactured, marketed, sold and/or distributed

9       CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

10      States.

11             50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a New York

12      corporation with its principal place of business located at 105 Challenger Road, 6th Floor,

13      Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of

14      Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold and/or

15      distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

16      United States.  Defendant SEC dominated and controlled the finances, policies and affairs of

17      Samsung SEAI relating to the antitrust violations alleged in this complaint.

18             51.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device

19      Company ("Samsung SDI") is a South Korean company with its principal place of business

20      located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public

21      company.  SEC is a major shareholder holding almost 20 percent of the stock.  Founded in 1970,

22      Samsung SDI claims to be the world's leading company in the display and energy business, with

23      28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a 34.3% worldwide

24      market share in the market for CRTs; more than any other producer.  Samsung SDI has offices in

25      Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured, marketed,

26      sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27      throughout the United States.  Defendant SEC dominated and controlled the finances, policies

28      and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

52.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

53.     Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

54.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

55.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured,

1    marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2    affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and

3    controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

4    violations alleged in this complaint.

5             56.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a

6    Chinese company with its principal place of business located at Developing Zone of Yi-Xian

7    Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled

8    subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin

9    manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

10   subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI

11   dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to

12   the antitrust violations alleged in this complaint.

13            57.     Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia")

14   is a Malaysian corporation with its principal place of business located at Lots 635 & 660,

15   Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus,

16   Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant

17   Samsung SDI.  During the Relevant Period, Samsung SDI Malaysia manufactured, marketed,

18   sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

19   throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the

20   finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged

21   in this complaint.

22            58.     Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung

23   SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung

24   SDI Malaysia are collectively referred to herein as "Samsung."

25            **8.     Samtel**

26            59.     Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its

27   principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-

28   110065.  Samtel's market share for CRTs sold in India is approximately 40%, and it is that

1    country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United

2    States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period,

3    Samtel manufactured, marketed, sold and/or distributed CRT Products, either directly or through

4    its subsidiaries and affiliates, throughout the United States.

5              **9.      Thai CRT**

6            60.      Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at

7    1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam

8    Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color

9    televisions.   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or

10   distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

11   United States.

12             **10.     Toshiba Entities**

13           61.      Defendant Toshiba Corporation ("TC") is a Japanese company with its

14   principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001,

15   Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions

16   and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two

17   other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in

18   Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by

19   1999.  In 2002, TC entered into MTPD, a joint venture with Defendant Panasonic Corporation,

20   in which the entities consolidated their CRT businesses.  During the Relevant Period, TC

21   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

22   subsidiaries or affiliates, throughout the United States.

23           62.      Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware

24   corporation with its principal place of business located at 1251 Avenue of the Americas, Suite

25   4110, New York, New York 10020.   Toshiba America is a wholly-owned and controlled

26   subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured,

27   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

28   affiliates, throughout the United States.  Defendant TC dominated and controlled the finances,

TWEETER'S AMENDED COMPLAINT                       19                    Case No. 12-cv-02649
                                                                       Master File No. 3:07-cv-05944-SC

1   policies and affairs of Toshiba America relating to the antitrust violations alleged in this
2   complaint.

3       63.     Defendant Toshiba America Consumer Products, LLC ("TACP") is a
4   limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-
5   3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba
6   America.  During the Relevant Period, TACP manufactured, marketed, sold and/or distributed
7   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United
8   States.  Defendant TC dominated and controlled the finances, policies and affairs of TACP
9   relating to the antitrust violations alleged in this complaint.

10      64.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a
11  California corporation with its principal place of business located at 19900 MacArthur
12  Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled
13  subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC
14  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its
15  subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled
16  the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this
17  complaint.

18      65.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a
19  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,
20  California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC
21  through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold
22  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,
23  throughout the United States.  Defendant TC dominated and controlled the finances, policies and
24  affairs of TAIS relating to the antitrust violations alleged in this complaint.

25      66.     Defendants TC, Toshiba America, TACP, TAEC and TAIS are
26  collectively referred to herein as "Toshiba."

27      **11.     Chunghwa Entities**

28      67.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a

TWEETER'S AMENDED COMPLAINT              20                Case No. 12-cv-02649
                                                          Master File No. 3:07-cv-05944-SC

Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers. During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

68. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein as "Chunghwa."

**12. Tatung Company of America, Inc.**

**Tatung Company of America, Inc. ("Tatung America** **12. Thomson Entities**

69. Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a ~~California~~French corporation with its principal place of business located at ~~2850 El Presidio Street, Long Beach, California. Tatung America is a~~ 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary ~~of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half used~~ Thomson Consumer Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.

Thomson SA sold its CRTs  internally to ~~be owned by Lun Kuan Lin, the daughter of Tatung~~ ~~Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed~~its television-manufacturing division, which had plants in the United States and Mexico, and to ~~her~~ ~~two children~~other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.  In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.    The  joint  venture  was  called  TCL-Thomson  Electronics Corporation ("TCL-Thomson").  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the Relevant Period, ~~Tatung~~ ~~America~~Thomson SA  manufactured,  marketed,  sold  and/or  distributed  CRT  Products ~~manufactured  by,  among  others,  Chunghwa  Picture  Tubes,  Ltd.,~~  either  directly  or  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

70.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business  located  at  10330  N  Meridian  St.,  Indianapolis,  Indiana,  46290-1024.    Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania; Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  Thomson Consumer Electronics' television business was sold to TCL-Thomson in 2003, and its CRT business was sold to Videocon in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products, either directly or

1    indirectly through its subsidiaries or affiliates, to customers throughout the United States.

2          71.    Thomson SA and Thomson Consumer Electronics are collectively referred

3    to herein as "Thomson."

4          **13.    Mitsubishi Entities**

5          72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan")

6    is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

7    Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in

8    Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold

9    internally to Mitsubishi's television and monitor manufacturing division and to other television

10   and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor

11   division also purchased CRTs from other CRT manufacturers.  During the Relevant Period,

12   Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT Products in the

13   United States.

14         73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi

15   Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.

16   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi

17   Electric USA manufactured CRTs for the United States market in plants located in Mexicali,

18   Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television

19   and monitor manufacturing division and to other television and monitor manufacturers in the

20   U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from

21   other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured,

22   marketed, sold and distributed CRT Products in the United States.

23         74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi

24   Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.

25   Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.   During the

26   Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and

27   CRT televisions and monitors in the United States.

28         75.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital

1 <u>are collectively referred to herein as "Mitsubishi."</u>

2 **IV.**     **AGENTS AND CO-CONSPIRATORS**

3       70.<u>76.</u>  The acts alleged against Defendants in this Complaint were authorized,

4 ordered, or done by their officers, agents, employees, or representatives, while actively engaged

5 in the management and operation of Defendants' businesses or affairs.

6       71.<u>77.</u>  Each Defendant or co-conspirator acted as the principal, agent, or joint

7 venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations, and

8 common course of conduct alleged by Plaintiff.  Each Defendant and co-conspirator that is a

9 subsidiary of a foreign parent acts as the United States agent for CRTs and/or CRT Products

10 made by its parent company.

11       72.<u>78.</u>  Various persons and/or firms not named as Defendants in this Complaint

12 participated as co-conspirators in the violations alleged herein and may have performed acts and

13 made statements in furtherance thereof.  These co-conspirators who are not named as Defendants

14 include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-

15 Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T.

16 Tosummit Electronic Devices Indonesia and<u>,</u> Toshiba Display Devices (Thailand) Co.,<u>, Ltd., and</u>

17 <u>Videocon Industries,</u> Ltd.  Plaintiff reserves the right to name some or all of these and other co-

18 conspirators as Defendants at a later date.

19       73.<u>79.</u>  During the Relevant Period, Orion Electronic Co. ("Orion") was a major

20 manufacturer of CRT Products.  Orion was a Korean corporation which filed for bankruptcy in

21 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT

22 Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had

23 subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the

24 United States.  Plaintiff is informed and believes that Orion was wholly owned by the "Daewoo

25 Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"),

26 Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components Co.  The

27 Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50

28 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries or affiliates, throughout the United States.

74.80.  Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

75.81.  Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

76.82.  P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this complaint.

77.83.  Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai

company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Defendant TC. In 2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD unit its closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust violations alleged in this complaint.

~~78.~~84. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.   TRADE AND COMMERCE

~~79.~~85. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

~~80.~~86. During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

~~81.~~87. The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in Massachusetts and caused antitrust injuries in Massachusetts.

## VI.   FACTUAL ALLEGATIONS

### A.   CRT Technology

~~82.~~88. A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate

that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

83.89.  CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

84.90.  The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

85.91.  Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

86.92.  CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

87.93.  CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.

88.94.  The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

89.95. Plaintiff has participated in the market for CRTs through its direct purchases from Defendants of CRT Products containing price-fixed CRTs and its purchases of CRT Products containing price-fixed CRTs indirectly from non-defendant OEMs and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has been injured thereby and paid supra-competitive prices for CRT Products.

90.96. Plaintiff has participated in the market for products containing CRTs. To the extent Plaintiff indirectly purchased CRTs as part of a CRT Product, Defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiff was not able to pass the inflated prices on to its customers.

91.97. Plaintiff has been injured by paying supra-competitive prices for CRT Products.

### B.   Structure of the CRT Industry

92.98. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

#### 1.   Market Concentration

93.99. During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

#### 2.   Information Sharing

94.100.       Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication

was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

95.101. Defendants Hitachi, Samsung and Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

96.102. The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

97.103. The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

98.104. Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

        a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

        b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

        c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Defendant Toshiba partnered with Orion and two other non-defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f. Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

g. Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

h. Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-defendant Corning Inc., USA for the production and supply of picture tube glass.

k. Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

**5.** **High Costs of Entry Into the Industry**

~~99.~~105. There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge

to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

~~100.~~106.      During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

## 6.      The Maturity of the CRT Product Market

~~101.~~107.      Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

~~102.~~108.      Demand for CRT Products was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

~~103.~~109.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price-fixing scheme in order to slow down declining CRT Product prices.   Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

~~104.~~110.      Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

~~105.~~111.      In 1999, CRT monitors accounted for 94.5 percent of the retail

market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

~~106.~~112.        As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.        Homogeneity of CRT Products

~~107.~~113.        CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

~~108.~~114.        It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.        Pre-Conspiracy Market

~~109.~~115.        The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

~~110.~~116.        In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.        Defendants' and Co-Conspirators' Illegal Agreements

~~111.~~117.        In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

112.118.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

113.119.     Defendants Samsung, LG, Mitsubishi, and Chunghwa, along with ~~and~~ Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

114.120.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

115.121.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

### 1.     "Glass Meetings"

116.122.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general levels of Defendants' corporations.

117.123.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were

1    decision makers who could make agreements.

2        ~~118.~~ 124.    The second level meetings were attended by Defendants' high

3    level sales managers and were known as "management" meetings.  These meetings occurred

4    more frequently, typically monthly, and handled implementation of the agreements made at top

5    meetings.

6        ~~119.~~ 125.    Finally, the third level meetings were known as "working level"

7    meetings and were attended by lower level sales and marketing employees.  These meetings

8    generally occurred on a weekly or monthly basis and were mostly limited to the exchange of

9    information and discussing pricing since the lower level employees did not have the authority to

10   enter into agreements.  These lower level employees would then transmit the competitive

11   information up the corporate reporting chain to those individuals with pricing authority.  The

12   working level meetings also tended to be more regional and often took place near Defendants'

13   factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean

14   manufacturers' employees met in Korea, the Chinese in China, and so on.

15       ~~120.~~ 126.    The Chinese glass meetings began in 1998 and generally occurred

16   on a monthly basis following a top or management level meeting.  The China meetings had the

17   principal purpose of reporting what had been decided at the most recent glass meetings to the

18   Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located

19   in China, such as IRICO and BMCC, as well as the China-based branches of the other

20   Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung

21   SDI Tianjin, and Chunghwa.

22       ~~121.~~ 127.    Glass meetings also occurred occasionally in various European

23   countries.  Attendees at these meetings included those Defendants and co-conspirators which had

24   subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics,

25   LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf

26   of Daewoo~~)~~), IRICO, and ~~IRICO~~Thomson.  Chunghwa also attended these meetings.

27       ~~122.~~ 128.    Representatives of Defendants also attended what were known

28   amongst members of the conspiracy as "green meetings."  These were meetings held on golf

1  courses.  The green meetings were generally attended by top and management level employees

2  of Defendants.

3        123.129.    During the Relevant Period, glass meetings took place in Taiwan,

4  South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand and, Malaysia, and the

5  United States.

6        124.130.    Participants would often exchange competitively sensitive

7  information prior to a glass meeting.  This included information on inventories, production, sales

8  and exports.  For some such meetings, where information could not be gathered in advance of the

9  meeting, it was brought to the meeting and shared.

10        125.131.    The glass meetings at all levels followed a fairly typical agenda.

11  First, the participants exchanged competitive information such as proposed future CRT pricing,

12  sales volume, inventory levels, production capacity, exports, customer orders, price trends and

13  forecasts of sales volumes for coming months.  The participants also updated the information

14  they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman"

15  who would write the information on a white board.  The meeting participants then used this

16  information to discuss and agree upon what price each would charge for CRTs to be sold in the

17  following month or quarter.  They discussed and agreed upon target prices, price increases, so-

18  called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

19  of CRTs that were sold to specific customers, and agreed upon target prices to be used in

20  negotiations with large customers.  Having analyzed the supply and demand, the participants

21  would also discuss and agree upon production cutbacks.

22        126.132.    During periods of oversupply, the focus of the meeting participants

23  turned to making controlled and coordinated price reductions.  This was referred to as setting a

24  "bottom price."

25        127.133.    Defendants' conspiracy included agreements on the prices at which

26  certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that

27  manufactured CRT Products, such as televisions and computer monitors.  Defendants realized

28  the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to

1    support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all

2    OEMs paid supracompetitive prices for CRTs.

3    ~~128.    Each of the participants in these meetings knew, and in fact discussed, the~~

4    ~~significant impact that the price of CRTs had on the cost of the finished products into which they~~

5    ~~were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there~~

6    ~~were slim profit margins.  Defendants therefore concluded that in order to make their CRT price~~

7    ~~increases stick, they needed to make the increase high enough that their direct customers (CRT~~

8    ~~TV and monitor makers) would be able to justify a corresponding price increase to their~~

9    ~~customers.  In this way, Defendants ensured that price increases for CRTs were passed on to~~

10   ~~indirect purchasers of CRT Products.~~

11   ~~129.~~134.    The agreements reached at the glass meetings included:

12              a.  agreements on CRT prices, including establishing target prices,

13                  "bottom" prices, price ranges and price guidelines;

14              b.  placing agreed-upon price differentials on various attributes of CRTs,

15                  such as quality or certain technical specifications;

16              c.  agreements on pricing for intra-company CRT sales to vertically

17                  integrated customers;

18              d.  agreements as to what to tell customers about the reason for a price

19                  increase;

20              e.  agreements to coordinate with competitors that did not attend the

21                  group meetings and agreements with them to abide by the agreed-

22                  upon pricing;

23              f.  agreements to coordinate pricing with CRT manufacturers in other

24                  geographic markets such as Brazil, Europe and India;

25              g.  agreements to exchange pertinent information regarding shipments,

26                  capacity, production, prices and customer demands;

27              h.  agreements to coordinate uniform public statements regarding

28                  available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

k. agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l. agreements to keep their meetings secret.

~~130.~~135.     Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

~~131.~~136.     As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**2.     Bilateral Discussions**

~~132.~~137.     Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

~~133.~~138.     During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil ~~and~~, Mexico, and the United States.

~~134.~~139.     The purpose of the bilateral discussions was to exchange

1  information about past and future pricing, confirm production levels, share sales order

2  information, confirm pricing rumors, and coordinate pricing with manufacturers in other

3  geographic locations, including Brazil, Mexico ~~and~~, Europe, and the United States.

4        ~~135.~~140.  In order to ensure the efficacy of their global conspiracy,

5  Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil

6  ~~and~~, Mexico, ~~such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico.~~and the

7  United States.  These ~~Brazilian and Mexican~~CRT manufacturers were particularly important

8  because they served the North American market for CRT Products.  As further alleged herein,

9  North America was the largest market for CRT televisions and computer monitors during the

10  Relevant Period.  Because these ~~Brazilian and Mexican~~CRT manufacturers are all wholly-owned

11  and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the

12  unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs

13  ~~imported into~~sold in the United States were fixed, raised, maintained and/or stabilized at

14  supracompetitive levels.

15        ~~136.~~141.  Defendants also used bilateral discussions with each other during

16  price negotiations with customers to avoid being persuaded by customers to cut prices.  The

17  information gained in these communications was then shared with supervisors and taken into

18  account in determining the price to be offered.

19        ~~137.~~142.  Bilateral discussions were also used to coordinate prices with CRT

20  manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi,

21  Toshiba, Panasonic and Samtel.  It was often the case that in the few days following a top or

22  management meeting, the attendees at these group meetings would meet bilaterally with the

23  other Defendant manufacturers for the purpose of communicating whatever CRT pricing and/or

24  output agreements had been reached during the meeting.  For example, Samsung had a

25  relationship with Hitachi and was responsible for communicating CRT pricing agreements to

26  Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating

27  CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications

28  with Thomson in Europe and the United States, and Samsung SDI had regular communications

with Mitsubishi.   And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.

### 3.     Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

138. 143.     Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

139. 144.     Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

140. 145.     Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.   Through these discussions, IRICO agreed on prices and supply levels for CRTs.   None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

141.146.     Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).   A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

142.147.     Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

143.148.     Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

144.149.     Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.   These meetings were attended by high level sales managers from Panasonic and MTPD.   Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

145.150.      PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

146.151.      Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

147.152.      Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

148.153.      Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

149.154.      Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they

played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

150.155.      Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

151.156.      Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

157.      Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

152.158.      Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

159.      Between at least 1996 and 2005, Defendant Thomson participated in

1  dozens of meetings with its competitors, including several glass meetings and multiple bilateral
2  meetings.  These meetings were attended by high level sales managers from Thomson.  At these
3  meetings, Thomson discussed such things as CRT prices, production, revenues, volumes,
4  demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product
5  development and agreed on prices and supply levels for CRTs.  Thomson never effectively
6  withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon
7  Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played
8  a role in the conspiracy.

9         160.   Between at least 1995 and 2005, Defendant Mitsubishi participated in
10  multiple bilateral and some multilateral meetings with its competitors.  These meetings were
11  attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed
12  such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales,
13  plant shutdowns, customer allocation, and new product development, and agreed on prices and
14  supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

15         153.161.    Between at least 1995 and 2003, Defendant Toshiba, through TC,
16  TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the
17  CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended
18  by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple
19  bilateral discussions with other Defendants, particularly with LG.  Through these discussions,
20  Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from
21  this conspiracy.

22         154.162.    Defendants Toshiba America, TACP, TAEC and TAIS were
23  represented at those meetings and were a party to the agreements entered at them.  To the extent
24  Toshiba America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct
25  purchasers, they played a significant role in the conspiracy because Defendants wished to ensure
26  that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing
27  agreements reached at the glass meetings.  Thus, Toshiba America, TACP, TAEC and TAIS
28  were active, knowing participants in the alleged conspiracy.

155.163.     Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

156.   Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

157.164.     Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this conspiracy.

158.165.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was

represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**E.**      **The CRT Market During the Conspiracy**

159.166.      Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

160.167.      The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|-----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

161.168.      During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

162.169.      In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

163.170.      A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor

---

[1]      Estimated market value of CRT units sold.

1 price increases may be a necessary course of action, we [CyberVision, a computer monitor

2 manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT

3 price increases.'"

4    164.171.    A 2004 article from Techtree.com reports that various computer

5 monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of

6 their monitors in response to increases in CRT prices caused by an alleged shortage of glass

7 shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the

8 end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

9    165.172.    Defendants also conspired to limit production of CRTs by shutting

10 down production lines for days at a time, and closing or consolidating their manufacturing

11 facilities.

12    166.173.    For example, Defendants' CRT factory utilization percentage fell

13 from 90% in the third quarter of 2000 to 62% in the first quarter of 2001.  This is the most

14 dramatic example of a drop in factory utilization in the CRT industry.  There were sudden drops

15 throughout the Relevant Period but to a lesser degree.  Plaintiff was informed and believes that

16 these sudden, coordinated drops in factory utilization by Defendants were the result of

17 Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

18    167.174.    During the Relevant Period, while demand in the United States for

19 CRT Products continued to decline, Defendants' conspiracy was effective in moderating the

20 normal downward pressures on prices for CRT Products caused by the entry and popularity of

21 the new generation LCD panels and plasma display products.  As Finsen Yu, President of

22 Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of

23 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

24    168.175.    During the Relevant Period, there were not only periods of

25 unnatural and sustained price stability, but there were also increases in prices of CRTs and CRT

26 Products.  These price increases were despite the declining demand due to the approaching

27 obsolescence of CRT Products caused by the emergence of a new, potentially superior and

28 clearly more popular, substitutable technology.

169.176.      These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.    **International Government Antitrust Investigations**

170.177.      Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice in November 2007.

171.178.      Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

172.179.      In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

173.180.      On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning

the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

174.181.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

175.182.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

176.183.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as

1   a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."

2   The indictment states that the combination and conspiracy to fix the prices of CRTs was carried

3   out, in part, in California.

4          177.184.      On November 9, 2010, the DOJ issued a press release announcing

5   that a federal grand jury in San Francisco had that same day returned a one-count indictment

6   against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim

7   a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of

8   CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former

9   executives from two color display tube (CDT) manufacturing companies."  The indictment states

10   that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in

11   California.

12          178.185.      On March 18, 2011, the DOJ issued a press release announcing

13   that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty

14   and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.

15          179.186.      Samsung SDI admitted that from at least as early as January 1997

16   until at least as late as March 2006, participated in a conspiracy among major CDT producers to

17   fix prices, reduce output, and allocate market shares of CDTs sold in the United States and

18   elsewhere.  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers

19   and employees, engaged in discussions and attended meetings with representatives of other

20   major CDT producers.  During these discussions and meetings, agreements were reached to fix

21   prices, reduce output, and allocate market shares of CDTs to be sold in the United States and

22   elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried

23   in California.

24          180.187.      The plea agreement of Samsung SDI requires that it cooperate with

25   the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the

26   manufacture or sale of CDTs and CPTs.

27          188.   On December 5, 2012, the European Commission announced that it had

28   fined seven international corporate families a total of over €1.4 billion for their two-decade-long

effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market. The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson). The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe." The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

181.189. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

182.190. Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

183.191. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

184.192. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

185.193. On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

186.194. On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for

their roles in a conspiracy to fix prices of TFT-LCD panels.

187.195.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

188.196.    The plea agreements of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

### G.    The Role of Trade Associations During the Relevant Period

189.197.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information. One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association. KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

190.198.    Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

191.199.    The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S.

Trinker and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

~~192.~~200.      Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

~~193.~~201.      Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

       **H.**      **Effects of Defendants' Antitrust Violations**

           **1.**      **Examples of Reductions in Manufacturing Capacity by Defendants**

~~194.~~202.      As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

~~195.~~203.      In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion.  Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business."  The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

~~196.~~204.      In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

~~197.~~205.      In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.

Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

198.206.     In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

199.207.     In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.     Examples of Collusive Pricing for CRTs

200.208.     Defendants' collusion is evidenced by unusual price movements in the CRT market.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."

201.209.     In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

202.210.     In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

203.211.     Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

204.212.     Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in this tough environment and also to prepare for the coming years.  This means that we have to deviate from the traditional approach of the simple scale up of production volume.

205.213.     In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

206.214.     After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

207.215.     On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India.  This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

208.216.     CRT prices resisted downward price pressures and remained stable over a period of many years.  Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have absent the conspiracy.  The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**3.     Summary Of Effects Of The Conspiracy Involving CRTs**

209.217.     The above combination and conspiracy has had the following effects, among others:

   a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

   b.  Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

   c.  Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

d. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII. PLAINTIFF'S INJURIES

210.218. As a purchaser of computer monitors, TVs and other devices that contained CRTs, Plaintiff has suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRTs at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRTs causing Plaintiff to pay higher prices than it would have in the absence of Defendants' conspiracy.

211.219. Plaintiff also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

212.220. The OEMs and others passed on to their customers, including Plaintiff, the overcharges caused by Defendants' conspiracy. Plaintiff was not able to pass on to its customers the overcharges caused by Defendants' conspiracy. Thus, Plaintiff suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

213.221. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

214.222. The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

215.223.    Throughout the Relevant Period, Defendants controlled the market for CRTs.  Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

216.224.    As a result, Plaintiff was injured in connection with its purchases of CRT Products during the Relevant Period.

## VIII.   FRAUDULENT CONCEALMENT

217.225.    Plaintiff had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein that affected it until November 2007, when the investigation by the DOJ became public and class action complaints in the United States were filed.  Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the prices of CRTs.

218.226.    Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

219.227.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

220.228.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

221.229.        Plaintiff could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

222.230.        As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

223.231.        Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

224.232.        As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

225.233.      As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to cover up the conspiracy.

226.234.      In addition, when several CRT manufacturers, including Defendants Samsung, Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

227.235.      Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

228.236.      Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.IX.

## IX.     *AMERICAN PIPE*, GOVERNMENT ACTION, AND CROSS-JURISDICTIONAL TOLLING

238.   As discussed at length in Paragraphs 177-196 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009.  Plaintiff's claims were tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239.   As shown by Plaintiff's allegations in Paragraphs 1 and 9 and the following causes of action, Plaintiff was a member of  Direct Purchaser Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago, Inc. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- Direct Purchaser Plaintiffs' Consolidated Amended Complaint, No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

240.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities recognizing cross-jurisdictional tolling during the pendency of the Direct Purchaser Class actions asserted against Defendants, and commencing on at least November 26, 2007.

# XI.    CLAIM FOR VIOLATIONS

## First Claim for Relief

## (Violation of Section 1 of the Sherman Act)

229.241.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

230.242.    Beginning no later than March 1, 1995, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

231.243.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of CRTs sold in the United States.

232.244.    As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

233.245.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

234.246.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a. participating in meetings and conversations to discuss the prices and supply of CRTs;

b. communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

c. agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

d. issuing price announcements and price quotations in accordance with the agreements reached;

e. selling CRTs to customers in the United States at noncompetitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for CRTs.

235.247.    As a result of Defendants' unlawful conduct, Plaintiff was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct.

**Second Claim for Relief**

**(Violation of Massachusetts General Laws Chapter 93A, §§ 2, *et seq.*)**

236.248.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

237.249.    Tweeter was a corporation organized and existing under the laws of the State of Massachusetts and during the Relevant Period, conducted a substantial volume of business in Massachusetts. In particular, Tweeter purchased CRT Products from Defendants and their co-conspirators in Massachusetts; maintained warehouses in Massachusetts containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and

representatives in Massachusetts who sold CRT Products to consumers in Massachusetts and elsewhere. As a result of its presence in Massachusetts and the substantial business it conducted in Massachusetts, Plaintiff is entitled to the protection of the laws of Massachusetts.

238.250.    Beginning at a time presently unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*

239.251.    The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the price of CRTs.

240.252.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but in no way limited to, the actions, practices and course of conduct set forth above and the following:

a. to fix, raise, maintain and stabilize the price of CRTs;

b. to allocate the market for CRTs amongst themselves;

c. to submit rigged bids for the award and performance of certain CRTs contracts; and

d. to allocate among themselves the production of CRTs.

241.253.    The combination and conspiracy alleged herein has had, *inter alia,* the following effects:

a. price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b. prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c.  those who purchased CRTs from Defendants, their co- conspirators and others and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators and others have been deprived of the benefits of free and open competition.

242.254.    As a result of the alleged conduct Defendants and their co-conspirators, Plaintiff paid supra-competitive, artificially inflated prices for CRT Products it purchased during the Relevant Period.

243.255.    By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*:

a.  Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.  Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.  Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

        f.    During the Relevant Period, Tweeter purchased CRT Products containing price-fixed CRTs in Massachusetts, and, as a result, Tweeter is entitled to the protection of the laws of Massachusetts.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and that Plaintiff was injured in its business and property as a result of Defendants' violations;

B.    Plaintiff shall recover damages sustained by it, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants engaged in a contract, combination, and conspiracy in violation of Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

D.    Plaintiff shall recover damages sustained by it, as provided by Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants;

E.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.    Plaintiff shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    Plaintiff shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

H.    Plaintiff shall receive such other or further relief as may be just and proper.

**XII.    <u>JURY TRIAL DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated:                                        Respectfully Submitted,

_____

PHILIP J. IOVIENO (*Pro Hac Vice*)
ANNE M. NARDACCI (*Pro Hac Vice to be filed*)
LUKE NIKAS (*Pro Hac Vice to be filed*)
CHRISTOPHER V. FENLON (*Pro Hac Vice to be filed*)

BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY 12207
Telephone:  (518) 434-0600
Facsimile:   (518) 434-0665
Email: piovieno@bsfllp.com
Email: anardacci@bsfllp.com
Email: lnikas@bsfllp.com
Email: cfenlon@bsfllp.com

WILLIAM A. ISAACSON (*Pro Hac Vice to be filed*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Schultze Agency Services, LLC*

# EXHIBIT M

1  Jason C. Murray (CA Bar No. 169806)
   CROWELL & MORING LLP
2  515 South Flower St., 40th Floor
   Los Angeles, CA 90071
3  Telephone:  213-443-5582
   Facsimile:  213-622-2690
4  Email: jmurray@crowell.com

5  Jerome A. Murphy (*pro hac vice*)
   Astor H.L. Heaven (*pro hac vice*)
6  CROWELL & MORING LLP
   1001 Pennsylvania Avenue, N.W.
7  Washington, D.C. 20004
   Telephone:  202-624-2500
8  Facsimile:  202-628-5116
   E-mail:  jmurphy@crowell.com
9          aheaven@crowell.com

10 *Counsel for Plaintiffs Target Corp. and RadioShack Corp*

11 [Additional counsel listed on signature page]

12            **UNITED STATES DISTRICT COURT**

13     **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

14

15 TARGET CORP.; SEARS, ROEBUCK AND          Master File No. 3:07-cv-05944-SC
   CO.; KMART CORP.; OLD COMP INC.;
16 GOOD GUYS, INC.; RADIOSHACK CORP.;        MDL No. 1917

17                      Plaintiffs               CASE NO Individual Case No. CV 3:11-5514 cv-
                                                05514
18                 v.

19 CHUNGHWA PICTURE TUBES, LTD.;
   CHUNGHWA PICTURE TUBES                     **SECOND AMENDED COMPLAINT FOR
20 (MALAYSIA); TATUNG COMPANY OF             DAMAGES AND INJUNCTIVE RELIEF**
   AMERICA, INC.; IRICO GROUP
21 CORPORATION; IRICO GROUP
   ELECTRONICS CO., LTD.; IRICO DISPLAY       **DEMAND FOR JURY TRIAL**
22 DEVICES CO., LTD.; LG ELECTRONICS,
   INC.; LG ELECTRONICS USA, INC.; LG
23 ELECTRONICS TAIWAN TAIPEI CO., LTD.;
   LP DISPLAYS INTERNATIONAL LTD.;
24 HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
   HITACHI AMERICA, LTD.; HITACHI ASIA,
25 LTD.; HITACHI ELECTRONIC DEVICES
   (USA), INC.; SHENZHEN SEG HITACHI
26 COLOR DISPLAY DEVICES, LTD.;

27

28
                               1

PANASONIC CORPORATION; PANASONIC
CORPORATION OF NORTH AMERICA; MT
PICTURE DISPLAY CO., LTD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
KONINKLIJKE PHILIPS ELECTRONICS
N.V.; PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN),
LTD.; PHILIPS DA AMAZONIA INDUSTRIA
ELECTRONICA LTDA.; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA,
INC.; SAMSUNG SDI MEXICO S.A. DE C.V.;
SAMSUNG SDI BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(MALAYSIA) SDN. BHD.; SAMTEL COLOR
LTD.; THAI CRT CO., LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER
PRODUCTS, LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TECHNICOLOR SA;
TECHNICOLOR USA, INC.; MITSUBISHI
ELECTRIC CORPORATION; MITSUBISHI
DIGITAL ELECTRONICS AMERICA, INC.;
MITSUBISHI ELECTRIC & ELECTRONICS,
USA, INC.

                                  Defendants

Plaintiffs Target Corp.; Sears, Roebuck and Co.; Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;

and RadioShack Corp. (hereafter "Plaintiffs") for their Complaint against all Defendants named herein,

hereby allege as follows:

**I.       INTRODUCTION**

1.       Defendants and their co-conspirators formed an international cartel which conducted a

long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

November 25, 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix, raise,

stabilize and maintain prices for cathode ray tubes ("CRTs").  Defendants are or were among the leading

manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions;

(b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of this Complaint, CPTs and CDTs of all sizes shall be referred to collectively as "CRTs."

2.      Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one product containing CRTs.

3.      Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry.  In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs were sold in the United States.

4.      With respect to CRTs, Defendants or their agents agreed, *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

5.      The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe.  These meetings included representatives from the

highest levels of the respective companies, as well as regional managers and others.

6.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

7.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

8.     On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with Defendant Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  On May 12, 2011, the United States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.

9.     During the Relevant Period, Plaintiffs purchased CRTs in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRTs they purchased during the Relevant Period.

## II.     JURISDICTION AND VENUE

10.    Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages for their direct purchases of CRTs from certain Defendants and for injunctive relief against all Defendants.

11.    Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code (the "Cartwright Act") and the various state antitrust and unfair competition laws listed herein.

12.    This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 over Plaintiffs' claims

arising under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  In addition, this Court has supplemental jurisdiction over Plaintiffs' claims arising under the state antitrust and unfair competition laws listed herein under 28 U.S.C. §1367.  Plaintiffs' state law claims are so related to their claims under the federal antitrust laws that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce, as well as on commerce in each of the states identified herein.  This effect gave rise to Plaintiffs' antitrust claims.  During the Relevant Period, Defendants and their co-conspirators' conspiracy affected the prices of the CRTs Plaintiffs purchased in the United States which moved through, were sold in, or used in each of the states identified herein.

14.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured CRTs and products containing CRTs for sale in the United States and California and several Defendants have. Samsung SDI has also admitted that they engaged in conduct in furtherance of the conspiracy occurred in the Northern District of California.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S. § 1391 because a substantial part of the events or admissions giving rise to this claim occurred in this district.

III.   **THE PARTIES**

    A.   **Plaintiffs**

        1.   **Target**

16.   Plaintiff Target Corporation is a Minnesota corporation with its headquarters in Minneapolis, Minnesota.  Target operates approximately 1,700 large-format general merchandise and food discount stores throughout the United States, as well as an online retail store, Target.com.  During the Relevant Period, Target purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  Target also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, Target was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

17.   During the Relevant Period, Target's negotiations for the purchase of CRTs took place in the United States and were controlled by a merchandising department based at the company's headquarters in Minnesota.  In addition, all Target purchase orders for CRTs were issued from Minnesota and all invoices were sent to Target in Minnesota.  Target's merchandising department in Minnesota was also responsible for selecting vendors and product lines with respect to CRTs.

18.   During the Relevant Period, Target also purchased CRTs at distribution centers located in multiple states, including Arizona, California, Florida, Illinois, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, and Wisconsin, where it received CRTs shipped to those distribution centers.

        2. Sears

19. Plaintiff Sears, Roebuck and Co. is a New York corporation with its headquarters in Hoffman Estates, Illinois.  Plaintiff Kmart Corporation is a Michigan corporation with its headquarters in Hoffman Estates, Illinois.  Sears, Roebuck and Co. and Kmart Corporation are two of the nation's largest broadline retailers, and together operate 3,500 full-line and specialty retail stores in the United States under the "Sears" and "Kmart" brands, as well as online retail stores, including Sears.com and Kmart.com.  During the Relevant Period, Sears, Roebuck and Co. and Kmart Corporation purchased

6

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1   substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the

2   United States for resale there.  Sears, Roebuck and Co. and Kmart Corporation also purchased CRTs for

3   internal use during the Relevant Period.

4        20. On March 24, 2005, Sears, Roebuck and Co. and Kmart Corporation became wholly owned

5   by a common corporate parent, Sears Holdings Corporation.  During and after the Relevant Period,

6   Sears, Roebuck and Co. and Kmart Corporation purchased CRTs manufactured and sold by Defendants,

7   their co-conspirators, and others.  As a result of Defendants' and their co-conspirators' conspiracy, both

8   Sears, Roebuck and Co. and Kmart Corporation were injured in their business and property because the

9   prices they paid for such CRTs were artificially inflated by that conspiracy.

10       21. During the Relevant Period, all of both Sears, Roebuck and Co.'s and Kmart Corporation's

11  negotiations for the purchase of CRTs took place in the United States and were controlled by

12  merchandising departments based at the companies' respective headquarters in Illinois and Michigan.  In

13  addition, all purchase orders for CRTs were issued by those companies from Illinois and Michigan

14  respectively and all invoices were sent to those companies in Illinois and Michigan respectively.  The

15  merchandising departments in Illinois and Michigan were also responsible for selecting vendors and

16  product lines with respect to CRTs.

17       22. During the Relevant Period, Sears, Roebuck and Co. also purchased CRTs at distribution

18  centers located in multiple states, including Arizona, California, Florida, Illinois, Massachusetts,

19  Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, and Wisconsin,

20  where it received CRTs shipped to those distribution centers.  Kmart Corporation likewise purchased

21  CRTs at distribution centers located in multiple states, including California, Florida, Illinois, Minnesota,

22  Nebraska, Nevada, and North Carolina.

23       **3. Old Comp**

24       23. Plaintiff Old Comp Inc. is a Delaware corporation with its headquarters in Irving, Texas.

25  During the Relevant Period, Old Comp was known as CompUSA Inc. ("CompUSA") and was

26  headquartered in Dallas, Texas.

27       24. Old Comp owns all claims and rights under federal and state law to recover any overcharges

28

1    suffered by CompUSA and the following subsidiaries:  (1) CompUSA GP Holdings Company; (2)

2    CompUSA Holdings Company; (3) CompUSA Stores L.P.; (4) CompUSA of Puerto Rico Inc.; (5)

3    CompUSA Management Company; (6) CompTeam Inc.; (7) cozone.com inc.; (8) BeOn Inc.; and (9)

4    BeOn Operating Company; and (10)  Computer City, Inc. (collectively, the "CompUSA Subsidiaries").

5         25. During the Relevant Period, CompUSA, by itself or through the CompUSA Subsidiaries,

6    purchased substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others

7    in the United States for resale there.  CompUSA and the CompUSA Subsidiaries also purchased CRTs

8    for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators'

9    conspiracy, CompUSA and the CompUSA Subsidiaries were injured in their business and property

10   because the prices they paid for such CRTs were artificially inflated by that conspiracy.

11        26. During the Relevant Period, all of CompUSA's negotiations for the purchase of CRTs took

12   place in the United States and were controlled by the company's merchandising department at its Texas

13   headquarters.  In addition, CompUSA issued all of its purchase orders for CRTs from Texas and

14   received invoices for those orders in Texas.  CompUSA's Texas-based merchandising department was

15   also responsible for selecting vendors and product lines with respect to CRTs.

16        27. During the Relevant Period, CompUSA also purchased CRTs at distribution centers located

17   in multiple states, including California and Illinois, where it received CRTs shipped to those distribution

18   centers.

19        28. CompUSA no longer operates any stores.  It sold its "CompUSA" brand names, service

20   marks, and trademarks to an unrelated third party in 2008.

21                    **4. Good Guys**

22        29. Plaintiff Good Guys, Inc. is a Delaware corporation with its headquarters in Irving, Texas.

23   During the Relevant Period, The Good Guys maintained its headquarters in California and then in

24   Texas.

25        30. The Good Guys owns all claims and rights under federal and state laws to recover any

26   overcharges suffered by The Good Guys and the following subsidiaries: (1) Good Guys California, Inc.

27   and (2) goodguys.com, inc. (collectively, the "Good Guys Subsidiaries").

28

31. During the Relevant Period, The Good Guys, by itself or through the Good Guys Subsidiaries, purchased and then resold from their respective facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  The Good Guys and the Good Guys Subsidiaries also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, The Good Guys and the Good Guys Subsidiaries were injured in their business and property because the prices they paid for such CRTs were artificially inflated by that conspiracy.

32. During the Relevant Period, all of The Good Guys' negotiations for the purchase of CRTs took place in the United States and were controlled by the company's merchandising department at its California, and then Texas headquarters.  In addition, The Good Guys issued all of its purchase orders for CRTs from California, and then Texas, and received invoices for those orders in California, and then Texas.  The Good Guys' California and then Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

33. During the Relevant Period, The Good Guys also purchased CRTs at a distribution center located in California, where it received CRTs shipped to that distribution center.

34. The Good Guys no longer operates any stores.

**2.**   ~~5.~~ **RadioShack**

19.   ~~35.~~ Plaintiff RadioShack Corporation is a Delaware corporation with its headquarters in Fort Worth, Texas.  RadioShack operates approximately 4,400 stores, 1,400 dealer outlets and nearly 700 wireless phone kiosks throughout the United States, as well as an online retail store, Radioshack.com.  During the Relevant Period, RadioShack purchased and then resold from its facilities substantial amounts of CRTs manufactured by Defendants, their co-conspirators, and others in the United States for resale there.  RadioShack also purchased CRTs for internal use during the Relevant Period.  As a result of Defendants' and their co-conspirators' conspiracy, RadioShack was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

20.   ~~36.~~ During the Relevant Period, all of RadioShack's negotiations for the purchase of

9

CRTs took place in the United States and were controlled by a merchandising department based at the company's Texas headquarters. In addition, all RadioShack purchase orders for CRTs were issued from Texas and all invoices were sent to RadioShack in Texas. RadioShack's Texas-based merchandising department was also responsible for selecting vendors and product lines with respect to CRTs.

21. ~~37.~~ During the Relevant Period, RadioShack also purchased CRTs at distribution centers located in multiple states, including California, Massachusetts, and Mississippi, where it received CRTs shipped to those distribution centers.

**B.     The Defendants**

**1.     IRICO Entities**

22. ~~38.~~ Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRTs. During the Relevant Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

23. ~~39.~~ Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs. Their website also claims that in 2003, they were the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation. During the Relevant Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

24. ~~40.~~ Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, marketed,

1    distributed and/or sold CRTs, either directly or through its subsidiaries or affiliates, throughout the

2    United States.  Defendant IGC dominated and controlled the finances, policies and affairs of IDDC

3    relating to the antitrust violations alleged in this complaint.

4          25.    41.  Defendants IGC, IGE and IDDC are collectively referred to herein as "IRICO."

5               2.    LG Electronics Entities

6          26.    42.  Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of

7    the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-

8    dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in

9    consumer electronics, home appliances and mobile communications, which established its first overseas

10   branch office in New York in 1968.  The company's name was changed from Gold Star

11   Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In

12   2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips

13   Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an

14   independent company and changed its name to LP Displays International Ltd.  During the Relevant

15   Period, LGEI manufactured, marketed, sold and/or distributed CRTs, either directly or through its

16   subsidiaries or affiliates, throughout the United States.

17         27.    43.  Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its

18   principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

19   LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period,

20   LGEUSA manufactured, marketed, sold and/or distributed CRTs, either directly or through its

21   subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the

22   finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

23         28.    44.  Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity

24   with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City,

25   Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.

26   During the Relevant Period, LGETT manufactured, marketed, sold and/or distributed CRTs, either

27   directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI

28

dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

29. 45. Defendants LGEI, LGEUSA and LGETT are collectively referred to herein as "LG Electronics."

### 3. LP Displays

30. 46. Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips. In March 2007, LP Displays became an independent company. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Relevant Period, LP Displays manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

### 4. Hitachi Entities

31. 47. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRTs. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

32. 48. Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRTs,

12

either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

33. 49. Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

34. 50. Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

35. 51. Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607.  HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays.  During the Relevant Period, HEDUS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

36. 52. Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interesting in Hitachi

Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

37.   53. Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS and Hitachi Shenzhen are collectively referred to herein as "Hitachi."

### 5.   Panasonic Entities

38.   54. Defendant Panasonic Corporation, which was at all times during the Relevant Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Relevant Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

39.   55. Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

40.   56. Defendants Panasonic Corporation and PCNA are collectively referred to herein as "Panasonic."

41.   57. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka, 571-8504, Japan.  In 2002, Panasonic Corporation entered into a joint venture with Defendant Toshiba Corporation

called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.  Panasonic Corporation was the majority owner with 64.5 percent.  On March 30, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it MT Picture Display Co., Ltd.  During the Relevant Period, MTPD manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

42. 58. Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50% of which is held by Defendant MTPD.  The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing facility in China.  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.      Philips Entities**

43. 59. Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture.  During the Relevant Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

44.  60. Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

45.  61. Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

46.  62. Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

47.  63. Defendants Royal Philips, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

### 7.  Samsung Entities

48.  64. Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514

1    Relevant Period, SEC manufactured, marketed, sold and/or distributed CRTs, either directly or through

2    its subsidiaries or affiliates, throughout the United States.

3         49.   65. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation

4    with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New

5    Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the

6    Relevant Period, SEAI manufactured, marketed, sold and/or distributed CRTs, either directly or through

7    its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

8    finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this

9    complaint.

10        50.   66. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

11   ("Samsung SDI") is a South Korean company with its principal place of business located at 575 Shin-

12   dong, Youngtong-gu, Suwon, South Korea.  Samsung SDI is a public company.  SEC is a major

13   shareholder holding almost 20 percent of the stock.  Founded in 1970, Samsung SDI claims to be the

14   world's leading company in the display and energy business, with 28,000 employees and facilities in 18

15   countries.  In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more

16   than any other producer.  Samsung SDI has offices in Chicago and San Diego.  During the Relevant

17   Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or through

18   its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the

19   finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this

20   complaint.

21        51.   67. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

22   corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine,

23   California 92612.  Samsung America is a wholly-owned and controlled subsidiary of Defendant

24   Samsung SDI.  During the Relevant Period, Samsung SDI America manufactured, marketed, sold and/or

25   distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.

26   Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of

27   Samsung SDI America relating to the antitrust violations alleged in this complaint.

28

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514 05514

52. 68. Defendant Samsung SDI Mexico S.A. de C.V.  ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

53. 69. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

54. 70. Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

55. 71. Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the

1    United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and

2    affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

3        56. 72. Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a

4    Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

5    Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung

6    SDI Malaysia is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the

7    Relevant Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either

8    directly or through its subsidiaries or affiliates, throughout the United States. Defendants SEC and

9    Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia

10   relating to the antitrust violations alleged in this complaint.

11       57. 73. Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI

12   Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI

13   Malaysia are collectively referred to herein as "Samsung."

14           **8.    Samtel**

15       58. 74. Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place

16   of business located at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's

17   market share for CRTs sold in India is approximately 40%, and it is that country's largest exporter of

18   CRTs. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain

19   for its CRTs. During the Relevant Period, Samtel manufactured, marketed, sold and/or distributed

20   CRTs, either directly or through its subsidiaries and affiliates, throughout the United States.

21           **9.    Thai CRT**

22       59. 75. Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26

23   Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement

24   Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.

25   During the Relevant Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either

26   directly or through its subsidiaries or affiliates, throughout the United States.

27

28

**10.     Toshiba Entities**

60.  ~~76.~~ Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC

held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.

In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to

form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have

an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC entered into MTPD, a joint

venture with Defendant Panasonic Corporation, in which the entities consolidated their CRT businesses.

During the Relevant Period, TC manufactured, marketed, sold and/or distributed CRTs, either directly or

through its subsidiaries or affiliates, throughout the United States.

61.  ~~77.~~ Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York,

New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.

During the Relevant Period, Toshiba America manufactured, marketed, sold and/or distributed CRTs,

either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC

dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust

violations alleged in this complaint.

62.  ~~78.~~ Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability

company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-

owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant

Period, TACP manufactured, marketed, sold and/or distributed CRTs, either directly or through its

subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the

finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

63.  ~~79.~~ Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California

corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400,

Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through

Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold and/or distributed

CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

64. 80. Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

65. 81. Defendants TC, Toshiba America, TACP, TAEC and TAIS are collectively referred to herein as "Toshiba."

### 11.    Chunghwa Entities

66. 82. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

67. 83. Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs.  During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRTs either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Chunghwa PT dominated and controlled the finances, policies

1    and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

2         68.    84. Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to herein

3    as "Chunghwa."

4              12. Tatung Company of America, Inc.

5              **12.    Thomson Entities**

6         69.    Defendant Technicolor SA (f/k/a Thomson SA) ("Thomson SA") is a French corporation

7    with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

8    Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics Corporation, was a

9    major manufacturer of CRTs for the United States market, with plants located in the United States,

10   Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing

11   division, which had plants in the United States and Mexico, and to other television manufacturers in the

12   United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT

13   manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the

14   RCA brand.  In July 2005, Thomson SA sold its CRT business to Videocon Industries, Ltd.  During the

15   Relevant Period, Thomson SA manufactured, marketed, sold and/or distributed CRTs, either directly or

16   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

17        70.    85. Tatung Company of America Defendant Technicolor USA, Inc. ("Tatung America")

18   is a California f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer Electronics") is a U.S.

19   corporation with its principal place of business located at 2850 El Presidio Street, Long Beach,

20   California.  Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns

21   approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter

22   of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her share passed to

23   her two children 10330 N Meridian St., Indianapolis, Indiana, 46290-1024.  Thomson Consumer

24   Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson Consumer Electronics was a major

25   manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania;

26   Marion, Indiana; and Mexicali, Mexico.  The United States-based plants were closed in 2004.  Thomson

27   Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had

28

                                             22
                         **SECOND** AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
                                             Case No. CV 11-5514 05514

plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.  During the Relevant Period, ~~Tatung America~~Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRTs ~~manufactured by, among others, Chunghwa Picture Tubes, Ltd.,~~ either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

71.    Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

### 13.    Mitsubishi Entities

72.    Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric Japan") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.  Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRTs in the United States.

73.    Defendant Mitsubishi Electric & Electronics USA, Inc. ("Mitsubishi Electric USA") is a United States corporation located at 5665 Plaza Drive, Cypress, California, 90630.  Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Relevant Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRTs in the United States.

74.    Defendant Mitsubishi Digital Electronics America, Inc. ("Mitsubishi Digital") is a United States corporation located at 9351 Jeronimo Road, Irvine, California, 92618.  Mitsubishi Digital is a

wholly-owned subsidiary of Mitsubishi Electric USA.  During the Relevant Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT televisions and monitors in the United States.

75.   Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

## IV.   AGENTS AND CO-CONSPIRATORS

76.   86. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

77.   87. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRTs made by its parent company.

78.   88. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, Matsushita Electronic Corporation (Malaysia) Sdn. Bhd., P.T. Tosummit Electronic Devices Indonesia and, Toshiba Display Devices (Thailand) Co., Ltd., and Videocon Industries, Ltd.  Plaintiffs reserve the right to name some or all of these and other co-conspirators as Defendants at a later date.

79.   89. During the Relevant Period, Orion Electronic Co. ("Orion") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRTs sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "Daewoo Group."  The Daewoo Group included Daewoo Electronics Co., Ltd. ("Daewoo Electronics"), Daewoo Telecom Co., Daewoo Corporation, and Orion Electronic Components

Co.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  During the Relevant Period, Orion, Daewoo Electronics and DOSA manufactured, marketed, sold and/or distributed CRTs, either directly or through their subsidiaries or affiliates, throughout the United States.

80. 90. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

81. 91. Matsushita Electronic Corporation (Malaysia) Sdn. Bhd. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to MT Picture Display Co., Ltd. ("MTPD"), its CRT joint venture with Toshiba Corporation, in 2003.  It was re-named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MTPD until its closure in 2006.  During the Relevant Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Panasonic Corporation dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

82. 92. P.T. Tosummit Electronic Devices Indonesia ("TEDI") was a CRT joint venture formed by TC, Orion and two other non-Defendant entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display Indonesia.  During the Relevant Period, TEDI manufactured, marketed, sold, and/or distributed CRTs, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this

1    complaint.

2        83.   93. Toshiba Display Devices (Thailand) Co., Ltd. ("TDDT") was a Thai company with its

3    principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum

4    Thani, Thailand 12000.  TDDT was a wholly-owned and controlled subsidiary of Defendant TC.  In

5    2003, TC was transferred to Defendant MTPD, TC's joint venture with Panasonic Corporation.  It was

6    re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned and controlled

7    subsidiary of MTPD unit its closure in 2007.  During the Relevant Period, TDDT manufactured,

8    marketed, sold and/or distributed CRTs, either directly or through its subsidiaries or affiliates,

9    throughout the United States.  Defendant TC dominated and controlled the finances, policies and affairs

10   of TDDT relating to the antitrust violations alleged in this complaint.

11       84.   94. The acts charged in this Complaint have been done by Defendants and their co-

12   conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

13   representatives while actively engaged in the management of each Defendant's or co-conspirator's

14   business or affairs.

15   **V.    TRADE AND COMMERCE**

16       85.   95. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold

17   CRTs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign

18   commerce, including through and into this judicial district.

19       86.   96. During the Relevant Period, Defendants collectively controlled a vast majority of the

20   market for CRTs, both globally and in the United States.

21       87.   97. The business activities of Defendants substantially affected interstate trade and

22   commerce in the United States and caused antitrust injury in the United States.  The business activities

23   of Defendants also substantially affected trade and commerce and caused antitrust injuries in California,

24   Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi,

25   Nebraska, Nevada, New Mexico, New York, North Carolina, and Wisconsin.

26

27

28

## VI.  FACTUAL ALLEGATIONS

### A.  CRT Technology

88.  ~~98.~~A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

89.  ~~99.~~CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

90.  ~~100.~~The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

91.  ~~101.~~Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

92.  ~~102.~~CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

93.  ~~103.~~CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the

1    demand for such products.

2        94.   104. The market for CRTs and the market for the products into which they are placed are

3    inextricably linked and intertwined because the CRT market exists to serve the CRTs products markets.

4    The markets for CRTs and products containing CRTs are, for all intents and purposes, inseparable in

5    that one would not exist without the other.

6        95.   105. Plaintiffs have participated in the market for CRTs through their direct purchases

7    from Defendants of CRTs and their purchases of CRTs indirectly from non-Defendant original

8    equipment manufacturers ("OEM") and others.  Defendants' unlawful conspiracy has inflated the prices

9    at which Plaintiffs have bought CRTs, and Plaintiffs have been injured thereby and paid supra-

10   competitive prices for CRTs.

11       96.   106. Plaintiffs have participated in the market for products containing CRTs.  To the

12   extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and their co-

13   conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these

14   products.  Plaintiffs were not able to pass the inflated prices on to their customers.

15       97.   107. Plaintiffs have been injured by paying supra-competitive prices for CRTs.

16       **B.    Structure of the CRT Industry**

17       98.   108. The CRT industry has several characteristics that facilitated a conspiracy, including

18   market concentration, ease of information sharing, the consolidation of manufacturers, multiple

19   interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply

20   and demand forces and homogeneity of products.

21              **1.    Market Concentration**

22       99.   109. During the Relevant Period, the CRT industry was dominated by relatively few

23   companies.  In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as

24   Chunghwa, together held a collective 78% share of the global CRT market.  The high concentration of

25   market share facilitates coordination because there are fewer cartel members among which to coordinate

26   pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel

27   members.

28

## 2.   Information Sharing

100. ~~110.~~ Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

101. ~~111.~~ Defendants Hitachi, Samsung and Chunghwa are members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

## 3.   Consolidation

102. ~~112.~~  The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and Panasonic's CRT businesses into MTPD.

## 4.   Multiple Interrelated Business Relationships

103. ~~113.~~ The industry is marked by a web of cross-licensing agreements, joint ventures and other cooperative arrangements that can facilitate collusion.

104. ~~114.~~ Examples of the high degree of cooperation among Defendants in both the CRT market and other closely related markets include the following:

      i.     The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

ii.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCDs.

iii.   The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

iv.   Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCDs.

v.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

vi.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

vii.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

viii.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of CRTs.  Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

ix.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

x.   Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

xi.   Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics,

Samsung, Philips, and Panasonic.

### 5.    High Costs of Entry Into the Industry

105.    ~~115.~~ There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs.

106.    ~~116.~~ During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.  A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Market

107.    ~~117.~~ Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT market is a mature one, ~~and like many mature industries, is characterized by slim profit margins, creating a~~ where there is greater motivation to collude.

108.    ~~118.~~ Demand for CRTs was declining throughout the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

109.    ~~119.~~ In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

110.    ~~120.~~ Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of CRTs and plasma displays during the Relevant Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

111. ~~121.~~ In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

112. ~~122.~~ As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7. Homogeneity of CRTs

113. ~~123.~~ CRTs are commodity-like products which are manufactured in standardized sizes. One Defendant's CRT for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiffs purchase CRTs primarily on the basis of price.

114. ~~124.~~ It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C. Pre-Conspiracy Market

115. ~~125.~~ The genesis of the CRT conspiracy was in the late 1980s as the CRTs business became more international and Defendants began serving customers that were also being served by other international companies. During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity and customers.

116. ~~126.~~ In the early 1990s, representatives from Samsung, Daewoo, and Chunghwa visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings.

### D. Defendants' and Co-Conspirators' Illegal Agreements

117. ~~127.~~ In order to control and maintain profitability during declining demand for CRTs, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to

1    artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

2    118.   128. The CRT conspiracy was effectuated through a combination of group and bilateral

3    meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary

4    method of communication and took place on an informal, ad hoc basis.  During this period,

5    representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant

6    manufacturers, including Philips, Chunghwa, Hitachi, Thai CRT, Toshiba and Panasonic, to discuss

7    increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan,

8    South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore.

9    119.   129. Defendants Samsung, LG, Mitsubishi and Chunghwa, along with Daewoo, also

10   attended several ad hoc group meetings during this period.  The participants at these group meetings also

11   discussed increasing prices for CRTs.

12   120.   130. As more manufacturers formally entered the conspiracy, group meetings became

13   more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion,

14   and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives

15   attended hundreds of these meetings during the Relevant Period.

16   121.   131. The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that

17   Defendants charged for CRTs.

18       1.    "Glass Meetings"

19   122.   132. The group meetings among the participants in the CRT price-fixing conspiracy were

20   referred to as "glass meetings" or "GSM."  Glass meetings were attended by employees at three general

21   levels of Defendants' corporations.

22   123.   133. The first level meetings were attended by high level company executives including

23   CEOs, Presidents, and Vice Presidents, and were known as "top" meetings.  Top meetings occurred less

24   frequently, typically quarterly, and were focused on longer term agreements and forcing compliance

25   with price fixing agreements.  Because attendees at top meetings had authority as well as more reliable

26   information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve

27   disputes because they were decision makers who could make agreements.

28

124. ~~134.~~ The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings.  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

125. ~~135.~~ Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

126. ~~136.~~ The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

127. ~~137.~~ Glass meetings also occurred occasionally in various European countries.  Attendees at these meetings included those Defendants and co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) ~~and~~ IRICO, and Thomson.

128. ~~138.~~ Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

129. ~~139.~~ During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand ~~and,~~ Malaysia, and the United States.

130. 140. Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

131. 141. The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

132. 142. During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

133. 143. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

134. 144. Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRTs was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they

needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRTs.

135. 145. The agreements reached at the glass meetings included:

    i.    agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges and price guidelines;

    ii.    placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    iii.    agreements on pricing for intra-company CRT sales to vertically integrated customers;

    iv.    agreements as to what to tell customers about the reason for a price increase;

    v.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    vi.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    vii.    agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

    viii.    agreements to coordinate uniform public statements regarding available capacity and supply;

    ix.    agreements to allocate both overall market shares and share of a particular customer's purchases;

    x.    agreements to allocate customers;

    xi.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    xii.    agreements to keep their meetings secret.

136. 146. Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
Case No. CV 11-5514 05514

Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

137. 147. As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

### 2. Bilateral Discussions

138. 148. Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

139. 149. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and, Mexico, and the United States.

140. 150. The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico and, Europe, and the United States.

141. 151. In order to To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and, Mexico, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican and the United States. These CRT manufacturers were particularly important because they served the North American market for CRTs. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period. Because these Brazilian and Mexican manufacturers

are all wholly-owned and controlled subsidiaries of Defendants ~~Philips and Samsung SDI~~, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs ~~imported into~~sold in the United States were fixed, raised, maintained, and ~~/or~~ stabilized at supracompetitive levels.

143.   ~~153.~~ Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

143.   ~~153.~~ Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings~~, such as Defendants Hitachi, Toshiba, Panasonic and Samtel~~.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and ~~/or~~ output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.  ~~In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRTs.~~

### 3.   Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

144.   ~~154.~~ Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral

discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

145. 155. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

146. 156. Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

147. 157. Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

148. 158. Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

149. ~~159.~~ Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

150. ~~160.~~ Between at least 1996 and 2003, Defendant Panasonic, through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings.  After 2003, Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.  These meetings were attended by high level sales managers from Panasonic and MTPD.  Panasonic also engaged in multiple bilateral discussions with other Defendants.  Through these discussions, Panasonic agreed on prices and supply levels for CRTs.  Panasonic never effectively withdrew from this conspiracy.

151. ~~161.~~ PCNA was represented at those meetings and was a party to the agreements entered at them.  To the extent PCNA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings.  Thus, PCNA was an active, knowing participant in the alleged conspiracy.

152. ~~162.~~ Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy.  These meetings were attended by high level sales managers from MTPD.  MTPD also engaged in bilateral discussions with other Defendants.  Through these discussions, MTPD agreed on prices and supply levels for CRTs.

153. ~~163.~~ Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

1    BMCC was acting to further its own independent private interests in participating in the alleged

2    conspiracy.

3        154. 164. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and

4    Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated

5    in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A

6    substantial number of these meetings were attended by high level executives from Philips.  Philips also

7    engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips

8    agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

9        155. 165. Defendants Philips America and Philips Brazil were represented at those meetings

10   and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil

11   sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy

12   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

13   undercut the pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil

14   were active, knowing participants in the alleged conspiracy.

15       156. 166. Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI,

16   Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at least 200

17   glass meetings at all levels.  A substantial number of these meetings were attended by the highest

18   ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of the other

19   Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels

20   for CRTs.

21       157. 167. Defendants SEAI, Samsung SDI America, Samsung SDI Brazil and Samsung SDI

22   Mexico were represented at those meetings and were a party to the agreements entered at them.  To the

23   extent SEC and SEAI sold and/or distributed CRTs, they played a significant role in the conspiracy

24   because Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not

25   undercut the CRT pricing agreements reached at the glass meetings.  Thus, SEAI, Samsung SDI

26   America, Samsung SDI Brazil and Samsung SDI Mexico were active, knowing participants in the

27   alleged conspiracy.

28

158.    168. Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

159.    169. Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

160.    Between at least 1996 and 2005, Defendant Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings.  These meetings were attended by high level sales managers from Thomson.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.  Thomson sold its CRT business to co-conspirator Videocon Industries, Ltd., in July 2005.  Thomson has admitted to the European Commission that it played a role in the conspiracy.

161.    Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral meetings with its competitors.  These meetings were attended by high level sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT prices, production, revenues, volumes, demand, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

162.    170. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD, its joint venture with Panasonic.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants,

1    particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.

2    Toshiba never effectively withdrew from this conspiracy.

3        163.  171. Defendants Toshiba America, TACP, TAEC and TAIS were represented at those

4    meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP,

5    TAEC and TAIS sold and/or distributed CRTs to direct purchasers, they played a significant role in the

6    conspiracy because Defendants wished to ensure that the prices for CRTs paid by direct purchasers

7    would not undercut the pricing agreements reached at the glass meetings.  Thus, Toshiba America,

8    TACP, TAEC and TAIS were active, knowing participants in the alleged conspiracy.

9        164.  172. Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT,

10   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,

11   participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were

12   attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of

13   Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other

14   Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels

15   for CRTs.

16       173. Defendant Tatung America was represented at those meetings and was a party to the

17   agreements entered at them.  To the extent Tatung America sold and/or distributed CRTs to direct

18   purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the

19   prices for CRTs paid by direct purchasers would not undercut the CRT pricing agreements reached at

20   the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

21       165.  174. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and

22   DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings

23   were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral

24   discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on

25   prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-

26   owned CRT subsidiary, filed for bankruptcy in 2004.  Daewoo never effectively withdrew from this

27   conspiracy.

28

166. 175. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

### E. The CRT Market During the Conspiracy

167. 176. Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRTs, generating billions of dollars in annual profits.

168. 177. The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|---|---|---|---|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

169. 178. During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

---

[1] Estimated market value of CRT units sold.

170. 179. Defendants' collusion is evidenced by unusual price movements in the CRT market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

171. 180. In 1996 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

172. 181. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged alleged.

173. 182. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

174. 183. A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

175. 184. A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004]

45

there will be [a] 20% hike in the price of our CRT monitors."

176. 185. Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

177. 186. For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRTs.

178. 187. During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

179. 188. During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs and CRTs. These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

180. 189. These price increases and price stability in the market for CRTs during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

F.      **International Government Antitrust Investigations**

181. 190. On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH,

46

Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o.., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.

Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

182. 191. On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

183. 192. On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice-President of Sales and

Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

184.  193. On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

185.  194. On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

186.  195. On March 18, 2011, the DOJ issued a press release announcing that Defendant Samsung SDI Company Ltd. had agreed to plead guilty to participating in a conspiracy to fix the prices of, reduce the output of, and allocate the market for CDTs.  The United States and Samsung SDI entered into an amended plea agreement on May 12, 2011, where Samsung SDI paid a 32 million dollar criminal fine and pled guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, from at least as early as January 1997, until at least as late as March 2006.  The plea specified that, during this period, Samsung SDI, through its officers and employees, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  In furtherance of the conspiracy, Samsung SDI, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers.  During these discussions and meetings, agreements were reached to fix prices, reduce

48

output, and allocate market shares of CDTs to be sold in the United States and elsewhere.  Acts in furtherance of this conspiracy were carried out within the Northern District of California.  The plea agreement also requires Samsung SDI's cooperation with the DOJ's ongoing investigation of federal antitrust and related criminal laws involving the manufacture or sale of CDTs and CPTs.

187.   On December 5, 2012, the European Commission announced that it had fined seven international corporate families a total of over €1.4 billion for their two-decade-long effort to fix prices, share markets, restrict output, and allocate customers between themselves in the CRT market.  The companies fined by the European Commission included Chunghwa, LG Electronics, Philips, Samsung SDI, Panasonic, Toshiba, MTPD, and Technicolor (formerly Thomson).  The Commission Vice President in charge of competition policy said, "These cartels for cathode ray tubes are 'textbook cartels': they feature all the worst kinds of anticompetitive behavior that are strictly forbidden to companies doing business in Europe."  The press release accompanying the fines further notes that the CRT cartels were "among the most organised cartels that the Commission has investigated."

188.   196. As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

189.   197. Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

190.   198. Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

191.   199. In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

192.   200. On December 12, 2006, news reports indicated that Defendants Samsung and

49

Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

193. ~~201.~~ On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD Products.

194. ~~202.~~ On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products.

195. ~~203.~~ The indictments of LG Display Co., Ltd., Sharp Corporation, and Chunghwa, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in California.

**G.      The Role of Trade Associations During the Relevant Period**

196. ~~204.~~ Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea.  EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

197. ~~205.~~ Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

198. 206. The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

199. 207. Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

200. 208. Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

## H. Effects of Defendants' Antitrust Violations

### 1. Examples of Reductions in Manufacturing Capacity by Defendants

201. 209. As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

202. 210. In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

203. 211. In July of 2005, LGPD ceased CRT production at its Durham, England facility,

1  citing a shift in demand from Europe to Asia.

2      204.  212. In December of 2005, MTPD announced that it would close its American

3  subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG Philips, the

4  company explained that it was shifting its CRT operations to Asian and Chinese markets.

5      205.  213. In late 2005, Samsung SDI followed the lead of other manufacturers, closing its

6  CRT factory in Germany.

7      206.  214. In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana.

8  The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and

9  liquidating its joint venture with Toshiba.

10           **2.**      **Examples of Collusive Pricing for CRTs**

11      207.  215. Defendants' collusion is evidenced by unusual price movements in the CRT market.

12  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not

13  fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation

14  predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in

15  manufacturing techniques, will produce a drop in the price of the average electronic display to about $50

16  in 1997."  Despite such predictions, and the existence of economic conditions warranting a drop in

17  prices, CRT prices nonetheless remained stable.

18      208.  216. In 1996, another industry source noted that "the price of the 14" tube is at a

19  sustainable USD50 and has been for some years . . . ."

20      209.  217. In reality, consumer prices for CRTs never approached $50 in 1997, and were

21  consistently more than double this price.

22      210.  218. Despite the ever-increasing popularity of, and intensifying competition from, flat

23  panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995

24  according to a *CNET News.com* article.  This price stabilization was purportedly due exclusively to a

25  shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

26      211.  219. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of

27  1998, which severely devalued Asian currencies.  This prompted the keynote speaker at Asia Display

28

1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to
> survive in his tough environment and also to prepare for the coming years.
> This means that we have to deviate from the traditional approach of the
> simple scale up of production volume.

212. 220. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

213. 221. After experiencing an oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

214. 222. On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

215. 223. Over the course of the Relevant Period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

216. 224. CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRTs did not decline as much as they would have absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

### I.  Summary Of Effects Of The Conspiracy Involving CRTs

217. 225. The above combination and conspiracy has had the following effects, among others:

    a.    Price competition in the sale of CRTs by Defendants and their co-conspirators has

been restrained, suppressed and eliminated throughout the United States;

b.   Prices for CRTs sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRTs.

d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRTs than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## VII.   PLAINTIFFS' INJURIES

218.   226. As purchasers of CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

219.   227. Plaintiffs also purchased CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators.  Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy.

220.   228. The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy.  Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy.  Thus, Plaintiffs suffered injury when they purchased CRTs containing such price-fixed CRTs from the OEMs and others.

221.   229. Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

222. 230. The market for CRTs and the market for products containing CRTs are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

223. 231. Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

224. 232. As a result, Plaintiffs were injured in connection with their purchases of CRTs during the Relevant Period.

## VIII.    FRAUDULENT CONCEALMENT

225. 233. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

226. 234. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRTs.

227. 235. The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

228. 236. By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

229. 237. Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and

1    techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and

2    fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or

3    combination as herein alleged was fraudulently concealed by Defendants by various means and

4    methods, including, but not limited to, secret meetings, surreptitious communications between

5    Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written

6    records, discussion on how to evade antitrust laws and concealing the existence and nature of their

7    competitor pricing discussions from non-conspirators (including customers).

8         230.  238. As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at

9    separate venues in order to avoid detection.  Participants at glass meetings were also told not to take

10   minutes.  Attending companies also reduced the number of their respective attendees to maintain

11   secrecy.

12        231.  239. Defendants also agreed at glass meetings and bilateral meetings to give pretextual

13   reasons for price increases and output reductions to their customers.

14        232.  240. As alleged above, in early 1999, despite declining production costs and the rapid

15   entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase

16   was allegedly based on increasing global demand for the products.  In fact, this price rise was the result

17   of collusive conduct amongst Defendants, which was undisclosed at the time.

18        233.  241. As alleged above, despite increased competition from flat panel monitors, prices for

19   CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was

20   purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used

21   to cover up the conspiracy.

22        234.  242. In addition, when several CRT manufacturers, including Defendants Samsung,

23   Philips and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a

24   shortage of glass shells use for manufacturing CRT monitors.  In justifying this price increase, a Deputy

25   General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a

26   global phenomena and every company has to increase the prices of CRT monitors in due course of

27   time."

28

235. 243. Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

236. 244. Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

237. 245. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

## IX. *AMERICAN PIPE*, GOVERNMENT ACTION AND CROSS-JURISDICTIONAL TOLLING

238. As discussed at length in paragraphs 181-195 above, the United States Department of Justice instituted criminal proceedings and investigations against several Defendants and co-conspirators commencing on at least February 10, 2009 through the present. Plaintiffs' direct claims for violation of the Sherman Act have been tolled during these criminal proceedings pursuant to 15 U.S.C. § 16.

239. Plaintiffs' claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-jurisdictional tolling during the pendency of these Direct Purchaser Class Actions asserted against Defendants, and commencing on at least November 26, 2007 until Plaintiffs opted out on November 14, 2011.

240. Plaintiffs were members of Class Actions asserted against Defendants, including, but not limited to, the following Complaints:

- *Crago Inc. v. Chunghwa Picture Tubes Ltd., et al.*, No. 3:07-cv-05944-SC (Dkt. No. 1) (N.D. Cal. Nov. 26, 2007); and

- *Direct Purchaser Plaintiffs' Consolidated Amended Complaint,* No. 3:07-cv-05944-SC (Dkt. No. 436) (N.D. Cal. Mar. 16, 2009).

57

**X.** ~~IX.~~ <u>CLAIM FOR VIOLATIONS</u>

**First Claim for Relief**

**(Violation of Section 1 of the Sherman Act)**

241. ~~246.~~ Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

242. ~~247.~~ Beginning no later than March 1, 1995, the exact date being unknown to ~~plaintiffs~~ Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

243. ~~248.~~ In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

244. ~~249.~~ As a result of Defendants' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States.

245. ~~250.~~ The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

246. ~~251.~~ For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of CRTs;

    b.    communicating in writing and orally to fix target prices, floor prices and price ranges for CRTs;

    c.    agreeing to manipulate prices and supply of CRTs sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    issuing price announcements and price quotations in accordance with the agreements reached;

    e.      selling CRTs to customers in the United States at noncompetitive prices;

    f.      exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.      agreeing to maintain or lower production capacity; and

    h.      providing false statements to the public to explain increased prices for CRTs.

247. ~~252.~~ As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRTs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Second Claim for Relief

## (Violation of the California Cartwright Act)

248. ~~253.~~ Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

249. ~~254.~~ During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRTs from Defendants and their co-conspirators in California; maintained warehouses in California containing CRTs manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRTs to customers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

250. ~~255.~~ In addition, Defendants ~~LG Display~~ Mitsubishi, Samsung and Toshiba all maintained offices in California during the Relevant Period.  Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRTs.  Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

251. ~~256.~~ Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and

their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720.  Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' conduct substantially affected California commerce.

252. 257. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

253. 258. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.    to fix, raise, maintain and stabilize the price of CRTs;

    b.    to allocate markets for CRTs amongst themselves;

    c.    to submit rigged bids for the award and performance of certain CRTs contracts; and

    d.    to allocate among themselves the production of CRTs.

254. 259. The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.    price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California;

    b.    prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.    those who purchased CRTs from Defendants, their co-conspirators, and others and CRTs containing price-fixed CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

255. 260. As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

256. 261. As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRTs containing price-fixed CRTs sold by Defendants, their co-conspirators and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief

### (Violation of State Antitrust and Unfair Competition Laws)

257. 262. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258. 263. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the state antitrust and unfair competition laws referenced below.  Defendants and their co-conspirators have each acted in violation of these state laws in their efforts to fix, raise, stabilize and maintain prices of, and allocate markets for, CRTs at supra-competitive levels.  Defendants' and their co-conspirators' conduct substantially affected commerce in these states.

259. 264. The aforesaid violations consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRTs.

260. 265. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

      a.      to fix, raise, maintain and stabilize the price of CRTs;

b. to allocate markets for CRTs amongst themselves;

c. to submit rigged bids for the award and performance of certain CRTs contracts; and

d. to allocate among themselves the production of CRTs.

261. 266. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a. price competition in the sale of CRTs has been restrained, suppressed, and/or eliminated in the states listed below;

b. prices for CRTs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the states listed below; and

c. those who purchased CRTs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

262. 267. As a result of the alleged conduct of Defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the CRTs they purchased during the Relevant Period.

263. 268. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200, *et seq.*

a. Defendants and their co-conspirators committed acts of unfair competition, as defined by Section 17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b. Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of

1    the Sherman Act; and (2) violation of the Cartwright Act;

2        c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations,

3            practices and non-disclosures are unfair, unconscionable, unlawful and/or

4            fraudulent independently of whether they constitute a violation of the Sherman

5            Act or the Cartwright Act;

6        d.    Defendants' and their co-conspirators' acts or practices are fraudulent or

7            deceptive within the meaning of Section 17200, *et seq*.;

8        e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and

9            perfected within the state of California.  ~~Defendants LG Display, Chunghwa,~~

10          ~~Sharp, Chi Mei, HannStar, and Epson all~~ Defendant Samsung SDI admitted that

11            acts in furtherance of the conspiracy to fix the price of CRTs were carried out in

12            California;

13        f.    During the Relevant Period, the following Plaintiffs purchased CRTs in

14            California:  Target~~, Sears, Kmart, Old Comp, Good Guys,~~ and RadioShack.  As a

15            result, each is entitled to the protection of the laws of California; and

16        g.    By reason of the foregoing, ~~each of those~~ Plaintiffs ~~is~~ are entitled to full restitution

17            and/or disgorgement of all revenues, earnings, profits, compensation, and benefits

18            that may have been obtained by Defendants or their co-conspirators as result of

19            such business acts and practices.

20        264.  ~~269.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

21  into an agreement in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401, *et. seq*:

22        a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

23            eliminated competition in the sale of CRTs in Arizona and fixed, raised,

24            maintained and stabilized CRT prices in Arizona at artificially high, non-

25            competitive levels;

26        b.    As a result, Defendants and their co-conspirators' conspiracy substantially

27            affected Arizona commerce;

28

c.     During the Relevant Period, the following Plaintiffs purchased CRTs in Arizona: Target and Sears.  As a result, eachTarget is entitled to the protection of the laws of Arizona; and

d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those PlaintiffsTarget has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

265.  270. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Florida Stat. §§ 501.201, *et seq.*

a.     Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

b.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

c.     Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

d.     Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

e.     Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Florida; and

     f.     During the Relevant Period, the following Plaintiffs purchased CRTs in Florida: Target, Sears and Kmart. As a result, eachTarget is entitled to the protection of the laws of Florida.

266. 271. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

     a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Illinois and fixed, raised, maintained and stabilized CRT prices in Illinois at artificially high, non-competitive levels;

     b.     As a result, Defendants and their co-conspirators' conspiracy substantially affected Illinois commerce;

     c.     During the Relevant Period, the following Plaintiffs purchased CRTs in Illinois: Target, Sears, Kmart and Old Comp. As a result, eachTarget is entitled to the protection of the laws of Illinois; and

     d.     As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those PlaintiffsTarget has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under the Illinois Antitrust Act, 740 Illinois Code 10/1, *et seq.*

267. 272. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*

     a.     Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Iowa and fixed, raised, maintained and stabilized CRT prices in Iowa at artificially high, non-competitive levels;

     b.     As a result, Defendants and their co-conspirators' conspiracy substantially

1    affected Iowa commerce;

2    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Iowa:

3    Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Iowa;

4    and

5    d.    As a direct and proximate result of Defendants' and their co-conspirators'

6    conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

7    property by paying more for CRTs manufactured by Defendants, their co-

8    conspirators, and others than it would have paid in the absence of Defendants and

9    their co-conspirators' combination and conspiracy, and is therefore entitled to

10    relief under Iowa Code §§ 553.1, *et seq.*

11    268. ~~273.~~ By reason of the foregoing, Defendants and their co-conspirators also have entered

12    into an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*

13    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

14    eliminated competition in the sale of CRTs in Kansas and fixed, raised,

15    maintained and stabilized CRT prices in Kansas at artificially high, non-

16    competitive levels;

17    b.    As a result, Defendants and their co-conspirators' conspiracy substantially

18    affected Kansas commerce;

19    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Kansas:

20    Target.  As a result, ~~each~~Target is entitled to the protection of the laws of Kansas;

21    and

22    d.    As a direct and proximate result of Defendants' and their co-conspirators'

23    conduct, ~~each of those Plaintiffs~~Target has been injured in its business and

24    property by paying more for CRTs manufactured by Defendants, their co-

25    conspirators, and others than it would have paid in the absence of Defendants and

26    their co-conspirators' combination and conspiracy, and is therefore entitled to

27    relief under Kansas Stat. Ann. §§ 50-101, *et seq.*

269. 274. By reason of the foregoing, Defendants and their co-conspirators also have engaged in unfair competition in violation of Massachusetts G.L. c. 93A, §§ 2, *et seq.*

    a.    Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRTs as described above;

    b.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, including, but not limited to violation of Section 1 of the Sherman Act;

    c.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act;

    d.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive;

    e.    Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within Massachusetts; and

    f.    During the Relevant Period, the following Plaintiffs purchased CRTs in Massachusetts: Sears and RadioShack.  As a result, each RadioShack is entitled to the protection of the laws of Massachusetts.

270. 275. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Michigan and fixed, raised, maintained and stabilized CRT prices in Michigan at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Michigan commerce;

c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Michigan: Target, Sears and Kmart. As a result, eachTarget is entitled to the protection of the laws of Michigan; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those PlaintiffsTarget has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Michigan Comp. Laws. Ann. §§ 445.771, *et seq.*

271. 276. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Minnesota Stat. §§ 325D.50, *et seq.*

a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Minnesota and fixed, raised, maintained and stabilized CRT prices in Minnesota at artificially high, non-competitive levels;

b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Minnesota commerce;

c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Minnesota: Target, Sears and Kmart. As a result, eachTarget is entitled to the protection of the laws of Minnesota; and

d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those PlaintiffsTarget has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to

68

relief under Minnesota Stat. §§ 325D.50, *et seq.*

272. 277. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Mississippi and fixed, raised, maintained and stabilized CRT prices in Mississippi at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Mississippi commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Mississippi: ~~Sears and~~ RadioShack. As a result, ~~each Plaintiff~~ RadioShack is entitled to the protection of the laws of Mississippi; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, ~~each of those Plaintiffs~~ RadioShack has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Mississippi Code Ann. §§ 75-21-1, *et seq.*

~~278. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801, *et seq.*~~

~~a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Nebraska and fixed, raised, maintained and stabilized CRT prices in Nebraska at artificially high, non-competitive levels;~~

~~b. As a result, Defendants and their co-conspirators' conspiracy substantially affected Nebraska commerce;~~

~~c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nebraska:~~

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
Case No. CV 11-~~5514~~05514

1      Sears and Kmart.  As a result, each is entitled to the protection of the laws of

2      Nebraska; and

3      d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

4      each of those Plaintiffs has been injured in its business and property by paying

5      more for CRTs manufactured by Defendants, their co-conspirators, and others

6      than it would have paid in the absence of Defendants and their co-conspirators'

7      combination and conspiracy, and is therefore entitled to relief under Nebraska

8      Stat. §§ 59-801, *et seq.*

9   279. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

10  agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

11      a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or

12      eliminated competition in the sale of CRTs in Nevada and fixed, raised,

13      maintained and stabilized CRT prices in Nevada at artificially high, non-

14      competitive levels;

15      b. As a result, Defendants and their co-conspirators' conspiracy substantially affected

16      Nevada commerce;

17      c. During the Relevant Period, the following Plaintiffs purchased CRTs in Nevada:  Sears

18      and Kmart.  As a result, each is entitled to the protection of the laws of Nevada;

19      and

20      d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,

21      each of those Plaintiffs has been injured in its business and property by paying

22      more for CRTs manufactured by Defendants, their co-conspirators, and others

23      than it would have paid in the absence of Defendants and their co-conspirators'

24      combination and conspiracy, and is therefore entitled to relief under Nevada Rev.

25      Stat. Ann. §§ 598A, *et seq.*

26  280. By reason of the foregoing, Defendants and their co-conspirators also have entered into an

27  agreement in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

28

70

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
**Case No. CV 11-5514 05514**

1   a. Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
2   eliminated competition in the sale of CRTs in New Mexico and fixed, raised,
3   maintained and stabilized CRT prices in New Mexico at artificially high, non-
4   competitive levels;
5   b. As a result, Defendants and their co-conspirators' conspiracy substantially affected
6   New Mexico commerce;
7   c. During the Relevant Period, the following Plaintiffs purchased CRTs in New Mexico:
8   Sears.  As a result, each is entitled to the protection of the laws of New Mexico;
9   and
10   d. As a direct and proximate result of Defendants' and their co-conspirators' conduct,
11   each of those Plaintiffs has been injured in its business and property by paying
12   more for CRTs manufactured by Defendants, their co-conspirators, and others
13   than it would have paid in the absence of Defendants and their co-conspirators'
14   combination and conspiracy, and is therefore entitled to relief under New Mexico
15   Stat. Ann. §§ 57-1-1, *et seq.*

16   273.   281.  By reason of the foregoing, Defendants and their co-conspirators also have entered

17   into an agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.*

18   a.   Defendants and their co-conspirators' conspiracy restrained, suppressed and/or
19   eliminated competition in the sale of CRTs in New York and fixed, raised,
20   maintained and stabilized CRT prices in New York at artificially high, non-
21   competitive levels;
22   b.   As a result, Defendants and their co-conspirators' conspiracy substantially
23   affected New York commerce;
24   c.   During the Relevant Period, the following Plaintiffs purchased CRTs in New
25   York:  Target and Sears.  As a result, eachTarget is entitled to the protection of
26   the laws of New York; and
27   d.   As a direct and proximate result of Defendants' and their co-conspirators'

28

71

conduct, each of those Plaintiffs Target has been injured in their business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under New York General Business Law §§ 340, *et seq.*

274. 282. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in North Carolina and fixed, raised, maintained and stabilized CRT prices in North Carolina at artificially high, non-competitive levels;

    b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected North Carolina commerce;

    c.    During the Relevant Period, the following Plaintiffs purchased CRTs in North Carolina:  Target, Sears and Kmart.  As a result, each Target is entitled to the protection of the laws of North Carolina; and

    d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, each of those Plaintiffs Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under North Carolina Gen. Stat. §§ 75-1, *et seq.*

275. 283. By reason of the foregoing, Defendants and their co-conspirators also have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

    a.    Defendants and their co-conspirators' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRTs in Wisconsin and fixed, raised, maintained and stabilized CRT prices in Wisconsin at artificially high, non-

competitive levels;

     b.    As a result, Defendants and their co-conspirators' conspiracy substantially affected Wisconsin commerce;

     c.    During the Relevant Period, the following Plaintiffs purchased CRTs in Wisconsin:  Target ~~and Sears~~.  As a result, ~~each~~Target is entitled to the protection of the laws of Wisconsin; and

     d.    As a direct and proximate result of Defendants' and their co-conspirators' conduct, ~~each of those Plaintiffs~~Target has been injured in its business and property by paying more for CRTs manufactured by Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants and their co-conspirators' combination and conspiracy, and is therefore entitled to relief under Wisconsin Stat. §§ 133.01, *et seq.*

## **XI.** ~~X.~~ **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act,  and the unfair competition laws of ~~California,~~ Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi ~~Nebraska, Nevada, New Mexico~~, New York, North Carolina, and Wisconsin, and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

1          D.      Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest

2 shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this

3 action;

4          E.      Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as

5 provided by law; and

6          F.      Plaintiffs shall receive such other or further relief as may be just and proper.

7 ///

8 ///

9 ///

10 ///

11 ///

12 ///

13 **XII.** ~~XI.~~ **JURY TRIAL DEMAND**

14        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the

15 claims asserted in this Complaint so triable.

16 Dated:                         Respectfully submitted

17                         _____

18                         Jason C. Murray (CA Bar No. 169806)
                         CROWELL & MORING LLP
                         515 South Flower St., 40th Floor

19                         Los Angeles, CA  90071
                         Telephone:  213-443-5582

20                         Facsimile:  213-622-2690
                         Email: jmurray@crowell.com

21                         ~~Jeffrey H. Howard~~ (*pro hac vice*)

22                         Jerome A. Murphy (*pro hac vice*)
                         Astor H.L. Heaven (*pro hac vice*)

23                         CROWELL & MORING LLP
                         1001 Pennsylvania Avenue, N.W.

24                         Washington, D.C. 20004
                         Telephone:  202-624-2500

25                         Facsimile:  202-628-5116
                         E-mail: ~~jhoward~~jmurphy@crowell.com

26                            ~~jmurphy~~ _aheaven@crowell.com

27                         *Counsel for Target Corp.~~; Sears, Roebuck  and Co.;~~*

28

1    *Kmart Corp.; Old Comp Inc.; Good Guys, Inc.;* and
     RadioShack Corp.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT C**

1  Robert A. Sacks (SBN 150146)
   sacksr@sullcrom.com
2  Rory P. Culver (SBN 271868)
   culverr@sullcrom.com
3  SULLIVAN & CROMWELL LLP
   1888 Century Park East, Suite 2100
4  Los Angeles, California 90067
   Tel.: (310) 712-6600
5  Fax: (310) 712-8800

6  Laura Kabler Oswell (SBN 241281)
   oswelll@sullcrom.com
7  SULLIVAN & CROMWELL LLP
   1870 Embarcadero Road
8  Palo Alto, California 94303
   Tel.: (650) 461-5600
9  Fax (650) 461-5700

10 Attorneys for Intervenor Thomson
   Consumer Electronics, Inc. and
11 Specially Appearing Thomson S.A.

12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

                 SAN FRANCISCO DIVISION
15

16 | IN RE:  CATHODE RAY TUBE (CRT) | ) | Master File No.  3:07-5944-SC |
   | ANTITRUST LITIGATION | ) | |
17 | | ) | MDL No. 1917 |
   | | ) | |
18 | ———————————————— | ) | **OPPOSITION OF INTERVENOR** |
   | | ) | **THOMSON CONSUMER** |
19 | This Document Relates to: | ) | **ELECTRONICS, INC. AND** |
   | | ) | **THOMSON S.A. (SPECIALLY** |
20 | *Electrograph Systems, Inc., et al.* v. *Hitachi,* | ) | **APPEARING) TO DIRECT ACTION** |
   | *Ltd., et al.,* No. 11-cv-01656; | ) | **PLAINTIFFS' MOTION FOR LEAVE** |
21 | | ) | **TO FILE AMENDED COMPLAINTS** |
   | *Alfred H. Siegel, as Trustee of the Circuit* | ) | |
22 | *City Stores, Inc. Liquidating Trust* v. *Hitachi,* | ) | Date:   May 1, 2013 |
   | *Ltd., et al.,* No. 11-cv-05502; | ) | Time:   9:30 a.m. |
23 | | ) | JAMS: Two Embarcadero Center, Suite 1500 |
   | *Best Buy Co., Inc., et al.* v. *Hitachi Ltd., et* | ) | Judge: Hon. Samuel Conti |
24 | *al.,* No. 11-cv-05513; | ) | Special Master: Hon. Charles A. Legge (Ret.) |
   | | ) | |
25 | *Target Corp., et al.* v. *Chunghwa Picture* | ) | [MOTION FOR LEAVE TO INTERVENE; |
   | *Tubes, Ltd., et al.,* No. 11-cv-05514; | ) | DECLARATION OF LAURA KABLER |
26 | | ) | OSWELL; AND [PROPOSED] ORDER |
   | *Interbond Corporation of America* v. *Hitachi,* | ) | FILED CONCURRENTLY HEREWITH] |
27 | *Ltd., et al.,* No. 11-cv-06275; | ) | |
   | | ) | |
28 | ———————————————— | ) | |

OPPOSITION TO MOTION FOR LEAVE TO FILE AMENDED COMPLAINTS
Case No. CV-07-5944-SC

1

2   *Office Depot, Inc.* v. *Hitachi, Ltd., et al.*, No.
     11-cv-06276;

3

4   *CompuCom Systems, Inc.* v. *Hitachi, Ltd., et al.,* No. 11-cv-06396;

5   *Costco Wholesale Corporation* v. *Hitachi, Ltd., et al.*, No. 11-cv-06397;

6

7   *P.C. Richard & Son Long Island Corporation, et al.* v. *Hitachi, Ltd., et al.,* No. 12-cv-02648; and

8

9   *Schultze Agency Services, LLC, et al.* v. *Hitachi, Ltd., et al.,* No. 12-cv-02649.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................2

ARGUMENT ...................................................................................................................................4

    I.     The DAPs' Motion Cannot Satisfy Even The Liberal Standard For Amendment
        Set Forth In Rule 15 .................................................................................................4

        A.     The Proposed Amendments Would Severely Prejudice Thomson and The
                Other Parties To This Litigation .............................................................5

        B.     The DAPs Have Provided Insufficient Justification For Naming Thomson
                as a Defendant at This Late Stage ..........................................................10

    II.     If Leave To Amend Is Granted, It Should Be Conditioned Upon a Four Month
        Stay of This Litigation and an Additional Eight Month Extension of All Deadlines ......12

CONCLUSION ..............................................................................................................................13

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

SULLIVAN
&
CROMWELL LLP

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*AmerisourceBergen Corp.* v. *Dialysist W., Inc.*
465 F.3d 946 (9th Cir. 2006) ...............................................8, 12

*Ascon Props., Inc.* v. *Mobil Oil Co.*
866 F.2d 1149 (9th Cir. 1989) ..............................................5

*Bechtel* v. *Robinson*
886 F.2d 644 (9th Cir. 1989) ...............................................10

*Chodos* v. *W. Publ'g Co.*
292 F.3d 992 (9th Cir. 2002) ...............................................4

*DCD Programs, Ltd.* v. *Leighton*
833 F.2d 183, 187 (9th Cir. 1987) ..........................................10

*Eminence Capital, LLC* v. *Aspeon, Inc.*
316 F.3d 1048 (9th Cir. 2003) ..............................................10

*Expoconsul Int'l, Inc.* v. *A/E Sys., Inc.*
145 F.R.D. 336 (S.D.N.Y. 1993) ...........................................10

*Foman* v. *Davis*
371 U.S. 178 (1962) .........................................................10

*Issen* v. *GSC Enters., Inc.*
522 F.Supp. 390 (N.D. Ill. 1981) ...........................................10

*Jackson* v. *Bank of Haw.*
902 F.2d 1385 (9th Cir. 1990) ............................................4, 5, 6, 10

*Lockheed Martin Corp.* v. *Network Solutions, Inc.*
194 F.3d 980 (9th Cir. 1999) .............................................7, 12

*Loehr* v. *Ventura Cnty. Cmty. Coll. Dist.*
743 F.2d 1310 (9th Cir. 1984) ..............................................8

*Morongo Band of Mission Indians* v. *Rose*
893 F.2d 1074 (9th Cir. 1990) ..............................................8

*Osakan* v. *Apple Am. Grp.*
No. 08-4722, 2010 WL 1838701 (N.D. Cal. May 5, 2010)....................7

*Roling* v. *E*Trade Sec., LLC*
279 F.R.D. 522 (N.D. Cal. 2012) ...........................................7

SULLIVAN
&
CROMWELL LLP

*Scognamillo* v. *Credit Suisse First Boston, LLC*
    587 F. Supp. 2d 1149 ...........................................................................................12

*Smith* v. *Guar. Serv. Corp.*
    51 F.R.D. 289 (N.D. Cal. 1970)........................................................................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
    No. 07-1827 (N.D. Cal. Apr. 12, 2011) ..............................................................5

*Union Pac. R. Co.* v. *Nev. Power Co.*
    950 F.2d 1429 (9th Cir. 1991) ..........................................................................10

*Wells Fargo Bank, N.A.* v. *Renz*
    No. 08-02561, 2010 WL 2867615 (N.D. Cal. July 20, 2010) ..............................6

*Wilkins-Jones* v. *Cnty. of Alameda*
    No. 08-1485, 2012 WL 3116025 (N.D. Cal. July 31, 2012) ................................8

**STATUTES AND RULES**

Fed. R. Civ. P. 15 ...............................................................................................................5

Fed. R. Civ. P. 16 ...............................................................................................................5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

1

## INTRODUCTION

2          On March 26, 2013, the Direct Action Plaintiffs ("DAPs") filed their Motion for Leave to

3   File Amended Complaints ("Motion"), seeking to name Thomson S.A.,[1] a French holding company that

4   does not regularly transact business in the United States, and Thomson Consumer Electronics, Inc.

5   (collectively, "Thomson") as defendants in a litigation that has a five year history, in which discovery is

6   well underway and in which dispositive motions have already been filed.  The Motion should be denied

7   because the proposed amendments are untimely and would be unduly prejudicial.  Alternatively, in the

8   event that the Court grants the DAPs' Motion, the Court should simultaneously amend the existing

9   scheduling order to provide a limited stay of proceedings in order to allow time for Thomson's motions

10  to dismiss (which will include jurisdictional, statute of limitations, and substantive grounds) to be

11  briefed and heard and, if necessary, for Thomson to catch up on the many years of complex litigation

12  that have taken place in its absence and without its involvement.

13          The DAPs have been on notice of Thomson's alleged involvement in the conduct

14  underlying their claims since at least 2008 and have been on notice of the specific facts allegedly

15  supporting their proposed amendments since August 2012, if not earlier.  Thomson S.A. was named as a

16  defendant in four of the original class action complaints filed in 2008, and both Thomson S.A. and

17  Thomson Consumer Electronics, Inc. were named as defendants in a proposed amendment to the

18  indirect purchaser plaintiffs' ("IPPs") complaint[2] in August 2012.  Nonetheless, no Thomson entity was

19  named by any of the DAPs when they filed their opt-out actions ("Direct Actions") in 2011 and 2012.

20          Now, five years after Thomson was first named as a defendant in the original class action

21  complaints, four years after it was dropped as a defendant by the Consolidated Amended Complaints,

22

---

23  [1]      As discussed in earlier briefing before this Court, Thomson S.A. objects to this Court exercising
         personal jurisdiction over it.  (*See* Dkt. No. 397.)  By specially appearing for purposes of
24       opposing the DAPs' Motion, Thomson S.A. does not waive, and expressly preserves, all rights,
         objections and defenses, including, without limitation, objections to jurisdiction, venue and
25       service.  In the event the Motion is granted, Thomson S.A. will move to dismiss the DAPs'
         amended complaints on these grounds.

26  [2]      Any terms undefined herein have the same meanings as used in the Direct Purchaser Plaintiffs'
         Consolidated Amended Complaint (Dkt. No. 436) and the Indirect Purchaser Plaintiffs'
27       Consolidated Amended Complaint (Dkt. No. 437) (collectively, the "Consolidated Amended
         Complaints").

28

and a year and a half after most of the DAPs filed the Direct Actions, the DAPs wish to once again re-introduce Thomson into this complex litigation at this exceedingly late stage in the game. The DAPs have failed to demonstrate that their proposed amendments are timely when the allegations could have been included years ago, particularly given the extreme prejudice and delay that will necessarily result in the event the Motion is granted. Adding Thomson as a defendant three years into discovery in these cases will force Thomson to play "catch up" in filing dispositive motions, conducting discovery and preparing its defense, causing delay and disruption at the expense of the other parties who have actively litigated this case for the past several years and will unduly result in extreme prejudice to Thomson. The Court should therefore deny the Motion.

## BACKGROUND

Thomson S.A. (but not Thomson Consumer Electronics, Inc.) was named as a defendant in two of the original direct purchaser plaintiffs' ("DPPs") complaints (*Radio & TV Equip., Inc.* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-00542 (D.N.J., filed Jan. 28, 2008) and *Sound Investments Corp.* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-00543 (D.N.J., filed Jan. 28, 2008)), as well as in two of the original IPPs' complaints (*Stack, et al.* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-01319 (N.D. Cal., filed March 7, 2008) and *Ganz* v. *Chunghwa Picture Tubes, Ltd., et al.*, No. 08-01721 (N.D. Cal., filed March 31, 2008)), all of which were later consolidated into the DPPs' and IPPs' Consolidated Amended Complaints (collectively, the "Class Actions"). Each of those original complaints alleged that Thomson S.A. manufactured, sold, and distributed CRTs and/or CRT Products throughout the United States and was involved in a global conspiracy with other named defendants. (*See Radio & TV Equip., Inc.* ¶¶ 27, 69-79; *Sound Investments Corp.*, ¶¶ 27, 69-79; *Ganz*, ¶¶ 22, 48-72; *Stack* ¶¶ 33, 62-86.)

Thomson has not, however, actively participated in the Class Actions because the DPPs and IPPs voluntarily decided not to pursue Thomson in March 2009. On September 12, 2008, the Court entered the Stipulation and Order for Limited Discovery Stay. (Dkt. No. 379.) Under the terms of the Stipulation and Order, the DPPs and IPPs were ordered to file consolidated complaints by March 16, 2009, rendering it unnecessary to respond to any of the originally filed complaints. (*Id.* ¶ 13.) In addition, discovery was generally suspended for six months, provided that the "plaintiffs shall be allowed to seek discovery relating to the issue of personal jurisdiction" as to "any defendant [that] takes

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

1    the position that . . . the Court lacks personal jurisdiction over that defendant." (*Id.* ¶ 4(g).)  On October

2    15, 2008, Thomson S.A. filed a Notice Pursuant to Paragraph 4(g) of Stipulation and Order, notifying

3    the DPPs and IPPs of Thomson S.A.'s intent to object to any discovery or other proceedings on the

4    ground that the Court lacks personal jurisdiction over Thomson S.A. (Dkt. No. 397).  Although the

5    DPPs and IPPs were then entitled to seek certain jurisdiction-related discovery from Thomson S.A., they

6    never did so.

7            Thomson's active participation in this case ended at that point, over four years ago.

8    Likely recognizing the minor role that Thomson played in any alleged conspiracy and the challenges

9    associated with this Court exercising personal jurisdiction over Thomson S.A., the DPPs and IPPs did

10   not include any allegations concerning Thomson nor name any Thomson entity as a defendant when

11   they filed their Consolidated Amended Complaints on March 16, 2009. (*See* Dkt. Nos. 436, 437.)  As

12   the DAPs point out in their Motion, the IPPs filed a motion on August 22, 2012 for leave to amend their

13   complaint to add Thomson and others as defendants. (Mot. at 2-3.)  However, Thomson was not

14   ultimately named as a defendant and instead was named as a non-party co-conspirator pursuant to a

15   Stipulation between Thomson and the IPPs after Thomson opposed that motion. (*See* Dkt. No 1505.)

16           In the four years since the Consolidated Amended Complaints were filed, both the Class

17   Actions and the Direct Actions have made substantial progress – all without Thomson's involvement.

18   Numerous dispositive motions have been filed addressing matters of significance to Thomson. (*See,*

19   *e.g.*, Dkt. No. 479 (joint motion to dismiss in DPPs' Class Action); Dkt. No. 485 (joint motion to

20   dismiss in IPPs' Class Action); Dkt. No. 1013 (joint motion for summary judgment in DPPs' Class

21   Action); Dkt. No. 1317 (joint motion to dismiss and for judgment on the pleadings in Direct Actions).)

22   Furthermore, discovery has been ongoing since March 8, 2010 in the Class Actions and since at least

23   2012 in the Direct Actions, which was likely only additive to the voluminous discovery previously

24   produced in the Class Action. (Mot. at 2.)   The DAPs have benefited from the existing discovery in the

25   Class Actions and they acknowledge in their Motion that "the Defendants produced the majority of their

26   documents in late 2011," "[s]ome Rule 30(b)(6) depositions have been conducted," and "merits

27

28

SULLIVAN
&
CROMWELL LLP

-3-

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

depositions have recently begun."[3]  (*Id*.)  Indeed, Thomson understands from other defendants that millions of pages of documents have been produced by parties and third parties in the Class Actions and Direct Actions and multiple depositions have already been taken, all of which Thomson will need to review before it will be able to meaningfully participate in this litigation.

On March 26, 2013, the DAPs filed their Motion seeking to name Thomson as a defendant in this action.  The DAPs assert that "[p]rompted by the IPPs' motion for leave to amend, [they] began conducting targeted reviews of the [d]efendants' voluminous document productions for evidence of Thomson and Videocon's participation in the conspiracy."  (Mot. at 5.)  Purportedly, "[d]uring that review, Plaintiffs located evidence" which warranted the proposed amendments.  (*Id*.) However, the new allegations in the proposed amended complaints are generic and are copied nearly verbatim from the allegations the IPPs sought leave to add to their complaint seven months ago, including that "Thomson participated in dozens of meetings with its competitors, including several Glass Meetings and multiple bilateral meetings."  (*See, e.g.*, Dkt. No. 1613, Ex. C, ¶ 147.)  Nothing in the DAPs' proposed amendments nor the Motion demonstrate how any alleged further review of discovery justifies the DAPs adding Thomson only now, or why it took the DAPs seven months after the IPPs' motion to amend to glean the evidence from their "targeted reviews" that led to the copying of these generic allegations against Thomson.

## **ARGUMENT**

## I.    **THE DAPS' MOTION CANNOT SATISFY EVEN THE LIBERAL STANDARD FOR AMENDMENT SET FORTH IN RULE 15.**

"When considering a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, will cause prejudice to the opposing party, or is a dilatory tactic."  *Chodos* v. *W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002); *see also Jackson* v. *Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990).  The decision to grant or deny

---

[3]    On March 3, 2013, the Court entered a Scheduling Order applicable to both the Class Actions and the Direct Actions.  (Dkt. No. 1594.)  According to this Order, the defendants' expert reports are due on November 22, 2013, fact and expert discovery are to be completed by March 3, 2014, less than 11 months from the date of this Opposition, and dispositive motions are to be filed shortly thereafter on April 15, 2014.

leave to amend is a matter for the Court's discretion, *Ascon Props., Inc.* v. *Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989), and "is not to be granted automatically." *Jackson*, 902 F.2d at 1387.

        In the LCD case, which involves many of the same parties as the present case, Judge Illston rejected an attempt by a class of indirect purchaser plaintiffs to add new defendants – including the Mitsubishi entities that the DAPs also now seek to add to this case – at a similarly late date. (Declaration of Laura K. Oswell ("Oswell Decl."), Ex. A, Order re: Indirect Purchaser Plaintiffs' Motion to File a Third Amended Complaint, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 (N.D. Cal. Apr. 12, 2011) (Dkt. No. 2641) ("LCD Order").)[4]  The Court stated that it was simply "too late" for the plaintiffs to add new defendants and acknowledged that "it's going to just take too much time and there's no good reason not to do this – not to have done it before." (Oswell Decl., Ex. B, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 (N.D. Cal.), Sept. 22, 2010 Hr'g Tr. ("LCD Transcript") at 22:3-5.)  On April 12, 2011, the Court issued a written order largely denying the motion to amend, except as to those new defendants necessary to clarify the liability of an existing defendant, those defendants that were formed by a merger of existing defendants, or those defendants necessary for purposes of facilitating a settlement, holding that, "adding [certain new] entities as defendants will cause delay due to service, new discovery, and motion practice."  (LCD Order at 1.)  This Court should reach the same conclusion as to Thomson in this case.

    **A.**    **The Proposed Amendments Would Severely Prejudice Thomson and The Other Parties To This Litigation.**

        Naming Thomson in the Direct Actions  after five years of complex procedural history and discovery in the Class Actions—to which the Direct Actions are inextricably linked—would severely prejudice Thomson.  Absent significant adjustments to the current Scheduling Order, the amendments would effectively deprive Thomson of the opportunity to adequately defend itself.  As Northern District courts have recognized, the "act of simply . . . [a]mending a complaint to add a party poses an especially acute threat of prejudice to the entering party…[a]voiding prejudice to the party to

---

[4]    Although defendants in that case opposed the motion to amend pursuant to Fed. R. Civ. P. 16 in addition to Fed. R. Civ. P. 15, whatever distinctions may exist between the two rules did not appear to factor into the Court's analysis.  (*See* LCD Order; LCD Transcript at 22:3-5.)

SULLIVAN
&
CROMWELL LLP

1   be added thus becomes [a] major objective." *Wells Fargo Bank, N.A.* v. *Renz*, No. 08-02561, 2010 WL

2   2867615, at *3 (N.D. Cal. July 20, 2010) (internal citations omitted). Indeed, avoiding prejudice to

3   Thomson is the most important factor in assessing the Motion under Rule 15. *See Jackson*, 902 F.2d at

4   1387 (affirming denial of leave to amend complaint).

5          If added as a defendant at this late date, Thomson S.A. would need to be served and it's

6   jurisdictional defense would then need to be litigated. During the pendency of that motion to dismiss, it

7   would be inequitable and prejudicial if Thomson S.A. were forced to simultaneously address the many

8   crucial events that are scheduled to occur in the meantime.[5] If the DAPs demand jurisdictional

9   discovery in response to Thomson S.A.'s motion to dismiss on jurisdictional grounds, it is reasonable to

10  assume that the discovery, briefing and decision on this issue alone would take an additional four or

11  more months after Thomson S.A. is properly served. In addition, Thomson intends to assert substantial

12  statute of limitations defenses that, along with other substantive challenges, would also need to be

13  resolved by way of motions to dismiss. Again, that process is likely to delay the current schedule by

14  several months.

15         In the event that Thomson is added as a defendant in this case and remains a defendant

16  after these threshold issues are decided, Thomson would be left to complete the following tasks while

17  simultaneously preparing to meet the various deadlines that are imposed by the Scheduling Order:

18      •   Collect, review, and produce documents responsive to discovery requests from the

19          DAPs—a process which is only further complicated by the fact that Thomson

20          S.A. is based in France and Thomson exited the CRT business entirely in 2005;

21      •   Obtain and search millions of pages of documents produced in the Class Actions

22          and Direct Actions for documents that relate to Thomson, and review, analyze,

23          and possibly translate those documents;

24      •   Serve additional discovery on the DAPs related to Thomson;

25

26  [5]   As noted above, the DAPs have been aware at least since October 2009, when Thomson S.A.
27        filed its notice of intent to object to the Court's jurisdiction (Dkt. No. 397), that the Court's
          jurisdiction as to Thomson S.A. would need to be resolved before this case could proceed as to
28        Thomson S.A.

SULLIVAN
&
CROMWELL LLP

- Meet and confer regarding the DAPs' discovery responses and file any necessary motions to compel;

- Engage experts and prepare expert reports;

- Identify, locate, contact and interview former Thomson personnel who may have knowledge concerning the DAPs' claims, a task which will again be complicated by the fact that Thomson S.A. is based in France and Thomson exited this business almost eight years ago; and

- Identify witnesses and notice depositions (which will likely including re-noticing depositions of witnesses already deposed but in whose depositions Thomson did not participate).

Given the magnitude of the tasks to be completed, in the absence of a stay or a substantial amendment to the current Scheduling Order, Thomson will be unfairly forced by the proposed amendments to litigate a complex international matter concerning a business it has not owned for eight years on an expedited and entirely impracticable basis.[6]

In circumstances like this, where the proposed amendments will necessitate additional discovery and thereby delay proceedings, leave to amend is frequently denied on the grounds that such additional delay and consequential expense to the parties is unduly prejudicial. *See, e.g.*, *Lockheed Martin Corp.* v. *Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) ("A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint."); *Osakan* v. *Apple Am. Grp.*, No. 08-4722, 2010 WL 1838701, at *5 (N.D. Cal. May 5, 2010) (denying motion for leave to amend the complaint because "[a]llowing Plaintiffs to add new plaintiffs at this juncture would require the Defendants to conduct new and/or additional discovery"); *Roling* v. *E*Trade Sec., LLC,* 279 F.R.D. 522, 525-26 (N.D. Cal. 2012) (denying motion for leave to amend the complaint where motions to dismiss and factual discovery would disrupt the case management schedule and thereby cause undue prejudice). Moreover, Thomson will suffer

---

[6] The substantial delay that will result from the need for Thomson to complete these enormous undertakings will almost certainly be exacerbated by presently unforeseeable disputes between the parties and other complications that will inevitably cause additional delay and expense to all parties.

-7-

even greater prejudice in completing these tasks because it will be very difficult for Thomson to locate key witnesses and evidence almost six years after the termination of the alleged conspiracy and almost eight years after Thomson exited the CRT business entirely.  *Wilkins-Jones* v. *Cnty. of Alameda*, No. 08-1485, 2012 WL 3116025, at *9 (N.D. Cal. July 31, 2012) ("Prejudice sufficient to warrant denying leave to amend can include, *e.g.*, the loss of evidence and witnesses due to the delay.")  Under these circumstances, in the absence of a stay or a substantial amendment to the Scheduling Order, the proposed amendments would cause undue prejudice to both Thomson and the existing defendants.[7]

In the LCD case, the Northern District recognized, as courts in the Ninth Circuit have consistently done, that this is precisely the type of prejudice that Rule 15 was intended to protect against.  *See* LCD Order at 1; *see also, e.g., AmerisourceBergen Corp.* v. *Dialysist W., Inc.*, 465 F.3d 946, 952-54 (9th Cir. 2006) (affirming denial of motion seeking leave to amend made five months before discovery deadline because it would prejudice defendant by forcing it to "scramble" to respond to "different legal theories and . . .  different facts"); *Morongo Band of Mission Indians* v. *Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) (affirming order denying plaintiff's request to file amended complaint); *Loehr* v. *Ventura Cnty. Cmty. Coll. Dist.*, 743 F.2d 1310, 1319-20 (9th Cir. 1984) (denying leave to amend to add new defendants  where plaintiff's "new pleadings involved many of the same occurrences as the original complaint, but also would have substantially complicated and delayed the case for new discovery, responsive pleadings, and considerations of state law"); *Wilkins-Jones*, 2012 WL 3116025, at *8 (denying leave to amend to add new defendant, noting "the possibility of prejudice from amendment is the most important factor in the Rule 15(a) analysis").

The DAPs claim that Thomson will not be prejudiced because Thomson has "been on notice of the facts described in Plaintiffs' complaints since 2007 [sic], when the IPPs named Thomson as a defendant, or at least since 2011, when the IPPs entered a tolling agreement with . . . Thomson."  (Mot.

---

[7]    Any delay resulting from the proposed addition of Thomson will also prejudice the other defendants in both the Direct Actions and the Class Action and disrupt the efficient proceeding of this case.  The DAPs argue that this is not the case because the proposed amendment "would not alter the scope of discovery against the existing Defendants or otherwise prejudice them." (Mot. at 12.)  The DAPs miss the point.  The addition of a new defendant (let alone the several defendants DAPs seek to add here) at this time will necessarily delay the proceedings significantly, at great cost to all parties.

SULLIVAN
&
CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

1   at 12.)  The DAPs thereby suggest that Thomson's *awareness* of this litigation is somehow equivalent to

2   Thomson's *participation* in this litigation.  (*See id*.)  This, of course, makes no sense and confounds the

3   question of Thomson's knowledge of the existence of the litigation with the significant work that will be

4   required and prejudice that will result if Thomson is brought into this litigation at this stage.

5             The DAPs cite to the Report and Recommendation of the Special Master (the "Mitsubishi

6   R&R") (Dkt. No. 1453) as if it condones their belated attempt to add Thomson to this litigation.  (Mot.

7   at 11-12.)  It does nothing of the sort.[8]  *First*, the R&R related exclusively to Mitsubishi and says

8   nothing about Thomson.  (*See* Dkt. No. 1453.)  Because the IPPs agreed not to add Thomson as a

9   defendant, and only as an alleged co-conspirator, the Special Master never had occasion to address the

10   issues unique to Thomson, including the fact that it sold its CRT business in 2005, claims against it are

11   likely time-barred, and that Thomson S.A. is a French company.  (*See id*.; *see also* Dkt. No. 1505.)

12   *Second*, the Mitsubishi R&R was issued four months ago, in response to a motion that was filed seven

13   months before the instant Motion was filed.  While the Special Master concluded that the amendments

14   were timely and that there was no prejudice, that conclusion was firmly rooted in the particular facts

15   before the Special Master at that time and heavily dependent upon the posture of the case. While at that

16   time, the Special Master noted that "[n]o purely merits depositions have as yet been taken, and most of

17   the depositions have focused on class certification issues" (Mitsubishi R&R at 2), now "[s]ome Rule

18   30(b)(6) depositions have been conducted, and merits depositions have recently begun." (Mot. at 2.)

19   There is ample reason to believe that if the IPPs had made their motion  today, the result would have

20   been different.[9]  *Finally*, although the Special Master noted that the "Plaintiffs had been diligent in

21   seeking the amendment," the DAPs have clearly not been, taking seven months to cut and paste

22   allegations that appeared in the IPPs' proposed amended complaint in August 2012.  (*See infra* at 11-

23   12.)

---

[8]    The Mitsubishi R&R was never adopted by this Court.  (*See* Dkt. No. 1505 (noting parties had agreed to stipulate to amendments to add Thomson and Mitsubishi as *non-party conspirators*, thereby mooting the motion for leave to amend).)

[9]    The fact that the IPPs ultimately agreed to resolve their motion to amend by agreement with both Thomson and Mitsubishi without naming either as a defendant suggests that the IPPs were cognizant of the substantial complications that would ensue and prejudice to all parties that would result if their proposed amendments were approved.

SULLIVAN & CROMWELL LLP

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

1    The remainder of the authority cited by the DAPs in support of the proposed amendments

2  is similarly inapposite.  Several of the cases cited address proposed amendments adding new claims or

3  clarifying existing ones, not adding new defendants,[10] and "[a]mendments seeking to add claims are to

4  be granted more freely than amendments adding parties."  *Union Pac. R. Co.* v. *Nev. Power Co.*, 950

5  F.2d 1429, 1432 (9th Cir. 1991).  Other cases cited by the DAPs seek to add as defendants entities that

6  are alter egos or agents of or are otherwise related to existing defendants (*see Expoconsul Int'l, Inc.* v.

7  *A/E Sys., Inc.*, 145 F.R.D. 336, 336 (S.D.N.Y. 1993), *Smith* v. *Guar. Serv. Corp.*, 51 F.R.D. 289, 296

8  (N.D. Cal. 1970)) or that were already defendants in parallel actions.  Still other cases cited by the DAPs

9  concern amendments in the "initial stages of discovery," *Bechtel* v. *Robinson*, 886 F.2d 644, 652 (9th

10 Cir. 1989), or in the case's "early stages" with no trial date pending, *DCD Programs, Ltd.* v. *Leighton*,

11 833 F.2d 183, 187 (9th Cir. 1987).  None of these cases support amendment in the circumstances

12 presented by the DAPs' Motion.  Finally, certain of the cases cited by the DAPs actually support the

13 denial of the Motion.  *See, e.g.*, *DCD Programs*, 833 F.2d at 187 ("Amending a complaint to add a party

14 poses an especially acute threat of prejudice to the entering party.").

15  **B.    The DAPs Have Provided Insufficient Justification For Naming Thomson as a Defendant at This Late Stage.**

16

17      Courts in the Ninth Circuit do not permit a plaintiff to amend its complaint where it has

18 unjustifiably and inexcusably delayed the proposed amendment.  *See Jackson*, 902 F.2d at 1388.  In

19 assessing delay, the court asks whether the moving party "knew or should have known the facts and

20 theories raised by the amendment in the original pleading."  *Id.*

21      The DAPs cannot credibly claim that they did not know or could not have known of their

22 alleged claims against Thomson prior to August 22, 2012.  As discussed *supra*, Thomson was named as

23 a defendant in four complaints filed in 2008.  Moreover, as the DAPs point out, Technicolor S.A. (f/k/a

24 Thomson S.A.) acknowledged in its 2011 Annual Report that it had appeared before the European

25 Commission regarding its involvement in this matter.  (Mot. at 5-6.)  That report was publicly released

26

27 [10]   *See, e.g.*, *Foman* v. *Davis*, 371 U.S. 178, 179 (1962); *Eminence Capital, LLC* v. *Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003); *Issen* v. *GSC Enters., Inc.*, 522 F.Supp. 390, 392 (N.D. Ill. 1981).

28

on March 27, 2012, nearly one year ago.[11]  (Oswell Decl., Ex. D, at 1).  In fact, Thomson S.A.'s public filings from as early as February 2008 disclosed the fact that the U.S. Department of Justice and European Union were investigating alleged antitrust violations in the CRT market by Thomson.  (*See e.g.*, Oswell Decl., Ex. E, at 84).

The DAPs also rely on allegedly incriminating documents and testimony indicating that Thomson participated in the so-called "glass meetings."  (*See* Mot. at 5.)  However, the DAPs admit that the "majority" of the defendants' documents—in which these supposedly incriminating documents would have been found—had been produced by late 2011.  (Mot. at 2.)  Surely, if the DAPs had made *any effort* to investigate their claims, they would have identified this "new evidence" long ago.

Regardless, *by their own admission*, the DAPs knew of the specific allegations they now make against Thomson no later than August 22, 2012 when the IPPs filed their motion for leave to amend.  (Dkt. No. 1325.)  The DAPs admit that their proposed amendments were "prompted by" that motion.  (Mot. at 5.)  While the DAPs argue that their "targeted reviews" of documents after the IPPs' filed their motion revealed evidence to support naming Thomson as a defendant in this matter, neither the Motion, the declaration in support thereof, nor the proposed amendments themselves (1) reveal the specific nature of that evidence beyond generalized allegations that Thomson participated in meetings with other defendants, (2) demonstrate that this evidence was somehow unavailable to the DAPs prior to the IPPs' motion for leave to amend or (3) suggest how this evidence differs from that purportedly identified by the IPPs.  Tellingly, the allegations in the proposed amended complaint  appear to have been copied nearly verbatim from the draft of the IPPs' Fourth Amended Complaint included with their August 22, 2012 motion.  (*Compare* Dkt. No. 1610-1, Ex. C., ¶ 161 ("Between at least 1996 and 2005, Defendant Thomson participated in *dozens of meetings* with its competitors . . . .") *with* Dkt. No. 1325-1, Ex. A, ¶ 186 ("Between at least 1996 and 2005, Defendant Thomson participated in *at least 61 meetings* with its competitors . . . ."); *compare also* Dkt. No. 1610-1, Ex. C, ¶¶ 61-63 *with* Dkt. No. 1325-1, Ex.

---

[11]     The DAPs also fail to disclose that the same information appears in Technicolor's *2010 Annual Report,* which was made publicly available on March 30, 2011.  (*See* Oswell Decl., Ex. C, at 1, 246.)

SULLIVAN
&
CROMWELL LLP

A, ¶¶ 102-04.)  Given the nature of their amendments, there is simply no reason the DAPs should have waited an additional seven months to file the instant Motion.

The DAPs have simply ignored their potential claims against Thomson since they brought their actions two years ago.  Thomson should not be punished, and this large, expensive case should not be derailed because of the DAPs' unexplained decision to delay taking action against Thomson.  Under these circumstances, the DAPs' substantial and unjustified delay in bringing the Motion is sufficient reason to deny it.  *See, e.g., Lockheed Martin Corp.,* 194 F.3d at 986 (affirming denial of leave to amend where plaintiff knew about facts underlying new proposed claim months before proposed amendment); *Scognamillo* v. *Credit Suisse First Boston, LLC*, 587 F. Supp. 2d 1149 at 1159 (denying plaintiffs' motion to amend complaint where plaintiffs "have long had access to the information on which they based their new theory of the case, and delayed in seeking leave to amend their complaint"); *see also AmerisourceBergen*, 465 F.3d at 953 ("We have held that an eight month delay between the time of obtaining a relevant fact and seeking a leave to amend is unreasonable.")

## II. IF LEAVE TO AMEND IS GRANTED, IT SHOULD BE CONDITIONED UPON A FOUR MONTH STAY OF THIS LITIGATION AND AN ADDITIONAL EIGHT MONTH EXTENSION OF ALL DEADLINES.

Although the DAPs' motion to amend should be denied for the foregoing reasons, in the event that it is not, the Court should stay this case for a minimum of four months to allow litigation of Thomson S.A.'s personal jurisdictional challenge.  While the DAPs state that "the discovery cutoff date is nearly a year away" (Mot. at 11) and thereby insinuate that the case has just begun, in reality there will likely be no more than eight to nine months in between the Court's ruling on the Motion and the close of discovery on March 3, 2014, during which Thomson would have to first brief and argue its motions to dismiss and then complete the mammoth task of catching up on fact and expert discovery in this matter.  Thomson S.A. should not be further prejudiced by being forced to incur costs to litigate other substantive issues in this case while simultaneously litigating jurisdictional issues and engaging in jurisdictional discovery before it has even been determined that this Court has jurisdiction over Thomson S.A.  In addition, Thomson will assert substantial statute of limitations and other challenges to

OPPOSITION TO MOTION FOR LEAVE TO AMEND
Case No. CV-07-5944-SC

SULLIVAN & CROMWELL LLP

the proposed claims that should be adjudicated before it is required to participate in ongoing, complex litigation. Four months is realistically the minimum period in which those matters can be determined.

Thereafter, the Court should extend the deadlines on the current Scheduling Order by an additional eight months (for a total of 12 months including the stay period) so that Thomson has sufficient time to get up to speed and can effectively prepare to participate in ongoing events, which will require extensive review of the facts, service of discovery, and the retention and preparation of experts in what will still be a very abbreviated time period, particularly in light of the fact that the DAPs and other parties to this litigation have been at it for several years already.

## CONCLUSION

The DAPs' proposed amendments would severely prejudice Thomson and should be denied. In the event that the Motion is not denied, it should be conditioned upon a four month stay of this case and an additional eight month (a total of 12 months) extension of all deadlines in the March 3, 2013 Scheduling Order.

Dated: April 9, 2013                    Respectfully submitted,


                                        /s/ Robert A. Sacks
                                        Robert A. Sacks (SBN 150146)
                                        Rory P. Culver (SBN 271868)
                                        SULLIVAN & CROMWELL LLP
                                        1888 Century Park East, Suite 2100
                                        Los Angeles, California 90067
                                        Tel.: (310) 712-6600
                                        Fax: (310) 712-8800

                                        Laura Kabler Oswell (SBN 241281)
                                        SULLIVAN & CROMWELL LLP
                                        1870 Embarcadero Road
                                        Palo Alto, California 94303
                                        Tel.: (650) 461-5600
                                        Fax: (650) 461-5700

                                        Attorneys for Intervenor Thomson
                                        Consumer Electronics, Inc. and
                                        Thomson S.A. (Specially Appearing)

SULLIVAN
&
CROMWELL LLP

-13-

1   Robert A. Sacks (SBN 150146)
    sacksr@sullcrom.com
2   Rory P. Culver (SBN 271868)
    culverr@sullcrom.com
3   SULLIVAN & CROMWELL LLP
    1888 Century Park East, Suite 2100
4   Los Angeles, California 90067
    Tel.:    (310) 712-6600
5   Fax:    (310) 712-8800

6   Laura Kabler Oswell (SBN 241281)
    oswelll@sullcrom.com
7   SULLIVAN & CROMWELL LLP
    1870 Embarcadero Road
8   Palo Alto, California 94303
    Tel: (650) 461-5600
9   Fax: (650) 461-5700

10  Attorneys for Intervenor Thomson
    Consumer Electronics, Inc. and
11  Thomson S.A. (Specially Appearing)

12

13                         **UNITED STATES DISTRICT COURT**

14                        **NORTHERN DISTRICT OF CALIFORNIA**

15                           **SAN FRANCISCO DIVISION**

16

17  IN RE:  CATHODE RAY TUBE (CRT)          )   Case No.  07-5944-SC
    ANTITRUST LITIGATION                    )
18                                          )   MDL No. 1917
                                            )
19  _____    )   **DECLARATION OF LAURA KABLER**
                                            )   **OSWELL IN SUPPORT OF OPPOSITION**
20  This Document Relates to:               )   **OF INTERVENOR THOMSON**
                                            )   **CONSUMER ELECTRONICS, INC. AND**
20  *Electrograph Systems, Inc., et al.* v. *Hitachi,* )   **THOMSON S.A. (SPECIALLY**
21  *Ltd., et al.,* No. 11-cv-01656;        )   **APPEARING) TO DIRECT ACTION**
                                            )   **PLAINTIFFS' MOTION FOR LEAVE**
22  *Alfred H. Siegel, as Trustee of the Circuit* )   **TO FILE AMENDED COMPLAINTS**
    *City Stores, Inc. Liquidating Trust* v. *Hitachi,* )   _____
23  *Ltd., et al.,* No. 11-cv-05502;        )
                                            )   Date:   May 1, 2013
24  *Best Buy Co., Inc., et al.* v. *Hitachi Ltd., et* )   Time:  9:30 a.m.
    *al.,* No. 11-cv-05513;                 )   JAMS: Two Embarcadero Center, Suite 1500
25                                          )   Judge: Hon. Samuel Conti
    *Target Corp., et al.* v. *Chunghwa Picture* )   Special Master: Hon. Charles A. Legge (Ret.)
26  *Tubes, Ltd., et al.,* No. 11-cv-05514; )
                                            )   [OPPOSITION TO MOTION TO AMEND
27  *Interbond Corporation of America* v. *Hitachi,* )   AND [PROPOSED] ORDER FILED
    *Ltd., et al.,* No. 11-cv-06275;        )   CONCURRENTLY HEREWITH]
28  _____    )

SULLIVAN
&
CROMWELL LLP

*Office Depot, Inc.* v. *Hitachi, Ltd., et al.*, No. 11-cv-06276; )
)
)
*CompuCom Systems, Inc.* v. *Hitachi, Ltd., et al.*, No. 11-cv-06396; )
)
)
*Costco Wholesale Corporation* v. *Hitachi, Ltd., et al.*, No. 11-cv-06397; )
)
)
*P.C. Richard & Son Long Island Corporation, et al.* v. *Hitachi, Ltd., et al.*, No. 12-cv-02648; and )
)
)
*Schultze Agency Services, LLC, et al.* v. *Hitachi, Ltd., et al.*, No. 12-cv-02649. )
)
)

OSWELL DECLARATION IN SUPPORT OF THOMSON'S OPPOSITION TO MOTION TO AMEND
Case No. CV-07-5944-SC

I, Laura Kabler Oswell declare under penalty of perjury as follows:

1.     I am a member of the Bar of the State of California, and associated with the firm of Sullivan & Cromwell LLP, counsel to Intervenor Thomson Consumer Electronics, Inc. and Thomson S.A., which is specially appearing in this action (collectively, "Thomson"). I submit this Declaration in support of Thomson's Opposition to Direct Action Plaintiffs' Motion for Leave to File Amended Complaints.

2.     Attached as Exhibit A hereto is a copy of the April 12, 2011 Order re: Indirect Purchaser Plaintiffs' Motion to File a Third Amended Consolidated Complaint in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 (N.D. Cal.) (Dkt. No. 2641).

3.     Attached as Exhibit B hereto is a copy of an excerpt from the transcript of the September 22, 2010 hearing in the case entitled *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. 07-1827 (N.D. Cal.).

4.     Attached as Exhibit C hereto is a true and correct copy of excerpts from Technicolor S.A.'s Annual Report for 2010, filed with the Autorité des Marchés Financiers on March 30, 2011 and publicly available at http://www.technicolor.com/uploads/investor_documents/interactive_annual_report_2010.pdf.

5.     Attached as Exhibit D hereto is a true and correct copy of excerpts from Technicolor S.A.'s Annual Report for 2011, filed with the Autorité des Marchés Financiers on March 27, 2012 and publicly available at http://www.technicolor.com/uploads/investor_documents/technicolor_2011_annual_report.pdf.

6.     Attached as Exhibit E hereto is a true and correct copy of excerpts from Technicolor S.A.'s Form 6-F, filed with the United States Securities Exchange Commission on February 15, 2008 and publicly available on EDGAR.

Executed this 9th day of April 2013, at Palo Alto, California

  /s/ Laura Kabler Oswell
      Laura Kabler Oswell

# EXHIBIT A

1

2

3

4

5    IN THE UNITED STATES DISTRICT COURT

6    FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    IN RE: TFT-LCD (FLAT PANEL) ANTITRUST          No. M 07-1827 SI
     LITIGATION
9    _____/              MDL. No. 1827

10   This Order Relates to:                         **ORDER RE: INDIRECT PURCHASER
                                                     PLAINTIFFS' MOTION TO FILE A
11   ALL CASES                                       THIRD AMENDED CONSOLIDATED
                                                     COMPLAINT**
12

13
     _____/
14

15        Now before the Court is the indirect purchaser plaintiffs' motion for leave to file a third amended

16   complaint. The indirect purchaser plaintiffs seek to amend the complaint to add new defendants and co-

17   conspirators, and to add additional state law claims.

18        With regard to the proposed new defendants and co-conspirators, the Court finds that as to

19   certain proposed new defendants, plaintiffs have demonstrated that leave to amend should be granted

20   and that there is no prejudice or delay caused by amendment. Specifically, plaintiffs may amend the

21   complaint to add (1) Unipac, Acer Display and Quanta Display as defendants in order to clarify the

22   liability of AU Optronics Corporation; (2) Chimei Innolux, which was formed by a three-way merger

23   by current defendants; and (3) Epson Imaging Devices Corporation.

24        However, the Court finds that the indirect purchaser plaintiffs have not shown that it is

25   appropriate to amend the complaint to name three additional proposed defendants, Hydis Technologies

26   Co., Mitsubishi Electric Corporation, and Mitsubishi Electric & Electronics USA, Inc. The Court finds

27   that adding these entities as defendants will cause delay due to service, new discovery, and motion

28   practice. In addition, adding these entities as defendants might require revisiting class certification to

1  address issues specific to these entities. The indirect purchaser plaintiffs may, however, amend the

2  complaint to name these entities as co-conspirators.

3        The Court GRANTS plaintiffs' motion to amend to add the following entities as named co-

4  conspirators: Fujitsu Display Technologies Corporation, NEC Corporation, NEC LCD Technologies

5  Ltd., NEC Electronics America, Inc., Panasonic Corporation, Panasonic Corporation of America, Sony

6  Corporation, and S-LCD Corporation.

7        The indirect purchaser plaintiffs also seek to add four new state law claims. The Court GRANTS

8  plaintiffs leave to amend to add claims under the New York antitrust statute and the Missouri

9  Merchandising Practices Act.[1] The Court DENIES plaintiffs' motion to the extent that plaintiffs seek

10  to add claims under Illinois and Oregon law. The States of Illinois and Oregon have opposed the

11  proposed amendments on numerous grounds.[2] The Court finds that the States' objections are well taken

12  in light of the issues raised in the pending proceedings related to the indirect purchaser plaintiffs' motion

13  for approval of the class settlements with certain defendants.[3]

14        The indirect purchaser plaintiffs' amended complaint must be filed by **April 29, 2011**. This

15  order resolves Docket Nos. 1948 and 2016.

16        **IT IS SO ORDERED.**

18  Dated: April 12, 2011

                                 _Susan Illston_

19                                   SUSAN ILLSTON
                                 United States District Judge

---

22       [1] In an order filed April 11, 2011, the Court granted in part and denied in part defendants' motion to dismiss Missouri's claim under the MMPA in Missouri's *parens patriae* complaint. Docket

23  No. 2632. When preparing the amended complaint, plaintiffs should review the Court's April 11, 2011 order for guidance regarding the MMPA claim.

24       [2] In contrast, the State of Missouri filed a statement in support of the indirect purchaser

25  plaintiffs' motion to amend the complaint to add the MMPA claim.

26       [3] Those proposed settlements include, *inter alia*, damages settlements for Oregon and Illinois classes, although the operative complaint does not allege claims under Oregon and Illinois law, and the

27  Court did not certify statewide classes under Oregon and Illinois law. Oregon and Illinois have intervened and filed objections to the proposed settlements. In December 2010, the Court appointed

28  retired Judge Weinstein to review the indirect purchaser plaintiffs' proposed settlements, and to make a recommendation to the Court regarding approval of those settlements.

2

# EXHIBIT B

Pages 1 - 62

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

IN RE:  TFT-LCD (FLAT PANEL)      )
ANTITRUST LITIGATION,             )
                                  )MDL 07-1827 SI
                                  )San Francisco, California
                                  )  September 22, 2010
_____  )  3:30 p.m.

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Direct Purchaser      LIEFF, CABRASER, HEIMANN
Plaintiffs:                   & BERNSTEIN
                          275 Battery Street, 30th Fl.
                          San Francisco, California  94111
                    BY:   RICHARD M. HEIMANN, ESQ.
                          JORDAN ELIAS, ESQ.
                          ERIC FASTIFF, ESQ.
                          BRENDAN GLACKIN, ESQ.


                          PEARSON, SIMON, WARSHAW & PENNY
                          44 Montgomery
                          Suite 2450
                          San Francisco, California 94104
                    BY:   BRUCE SIMON, ESQ.
                          JESSICA GRANT, ESQ.


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

Debra L. Pas, CSR, CRR, RMR, RPR
Official Reporter - U.S. District Court - San Francisco, California
(415) 431-1477

```
1   to you.
2          And then the other issues are wording and --
3          THE COURT:  And that I will deal with.  I've got an
4   order.  I just haven't done it yet.
5          All right.  Now, let's talk about the indirect
6   purchasers.  The motion to file the third amended complaint,
7   who wants to talk about that?
8          MR. CORBITT:  Good afternoon, your Honor.  Craig
9   Corbitt.
10         THE COURT:  Okay.  The indirect purchasers want to
11  file a third amended complaint to add new defendants,
12  Unipack -- I'll give you my view start to finish and then you
13  can tell me briefly what you want to argue about, okay?
14         I'm inclined to grant leave to amend to add Unipack,
15  Acer Display and Quanta Display.
16         I have a question for you about Chimei Innolux.  I'm
17  inclined to grant this.  Who is the defendant who is going to
18  be responding on these issues?
19         MR. CHERRY:  Well --
20         THE CLERK:  Is this Epson's?  No, this isn't Epson's
21  motion.
22         MR. CHERRY:  Yeah, this is the motion for leave to
23  amend.
24         THE CLERK:  Oh, wait, but that's what Mr. Johnson,
25  Brady Johnson was really, really wanting to --
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 5

 1          **MR. CHERRY:**  The state AG's are objecting.

 2          **THE CLERK:**  Right.  I have a phone number.  I can

 3  call him on the old-fashioned phone.  But he's really, like, in

 4  a panic that he's not able to -- and I don't know how important

 5  it is.

 6          **THE COURT:**  Why don't you phone him and see if you

 7  can get him?

 8          **THE CLERK:**  Okay.  Well, I just wanted to make sure

 9  it's okay that I do all that stuff.

10          (Brief pause.)

11          **MR. CHERRY:**  Your Honor, if you wanted to know who is

12  going to address it, I wasn't planning to address the motion in

13  particular, but you asked about the Chi Mei and the Innolux,

14  and I would like to speak to that when you are ready.

15          **THE COURT:**  And then you are going to do the --

16          **MR. LAZERWITZ:**  Mike Lazerwitz for LG Display.

17          We wrote the papers, but the -- our position is

18  straightforward and I don't think you need to hear more from

19  us.

20          Mitsubishi also filed its own papers and I thought

21  that the Mitsubishi lawyer was going to be here and raise that

22  with you.

23          **MR. TRUAX:**  Good morning, your Honor.  It's Terry

24  Truax, T-r-u-a-x, on behalf of Mitsubishi Electric Corporation.

25          **THE CLERK:**  Can you guys make sure you speak loud so

Exhibit B, Page 6

```
 1   that the person on the phone can -- Mr. Brady, if you could

 2   quickly state your appearance?

 3        MR. JOHNSON:  My name is Brady Johnson for the State

 4   of Washington.

 5        MR. HARROP:  This is Blake Harrop for the State of

 6   Illinois.

 7        THE COURT:  Are the two of you all that are on the

 8   phone now?

 9        THE CLERK:  I have other numbers.  I can --

10        THE COURT:  Welcome.  That's fine.

11        MR. JOHNSON:  We're not hearing you.

12        THE CLERK:  Okay.  Well, you're on our old phone

13   system, so this is all you get.  Hopefully, you can hear it.

14        MR. JOHNSON:  Okay.  There you go.

15        THE COURT:  All right.  The indirect purchasers want

16   to add Chimei Innolux as a defendant.  As I understand it, it

17   was formed in March of this year by a three-way merger of

18   current defendant Chi Mei Optoelectronics Corp. and two other

19   defendants.

20        I wanted to know what the real problem with this was.

21   It didn't sound like a big deal to me.

22        MR. CHERRY:  Well, two things.  I mean, we don't

23   believe there has been any showing of any involvement of

24   Innolux or Topoly.  I mean, they've never been mentioned.  They

25   just happened to enter into a three-way merger in March of this
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 7

1   year.

2          And the complaint just throws them in there with a

3   single sentence that says they should -- you know, they should

4   be defendants and they participated in the conspiracy.  One

5   sentence.  That's it.  And that can't be enough to bring them

6   into the case.  You know, they have to allege some facts to

7   show they should be in the case.

8          If it's just a name change, you know, for the -- to

9   say we're now the legal entity responsible for what CMO might

10  have done, that's one thing; but they're saying Innolux and

11  Topoly should be in the case and that they -- and in a single

12  sentence just saying they participated in the conspiracy.

13          **THE COURT:**  Mr. Corbitt?

14          **MR. CORBITT:**  I think that's kind of an over-reading

15  of the complaint, at least what we had in mind.

16          Chimei Innolux is, as we understand it, a new

17  entity -- and this is very similar to the AUO issue, is a new

18  entity that combined the former Chi Mei Corporation with

19  Innolux and TPO Display Corporation.  So it is appropriate for

20  us to substitute Chimei Innolux in place of the former Chi Mei.

21  I don't believe there is any dispute about that.

22          And we are -- to the extent that there is any

23  subsidiary liability from Innolux or TPO Display Corporation,

24  certainly Chimei Innolux would be liable for that we believe

25  under the law, and under Taiwanese law in particular, but we

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 8

```
 1  have not named them as additional defendants.  We are simply
 2  pointing out that Chi Mei and Innolux Display Corporation and
 3  TPO Display Corporation are the predecessor entities, along
 4  with Chi Mei, that now form the new defendant Chimei Innolux.
 5       MR. CHERRY:  Your Honor, I don't believe that's what
 6  the complaint says.
 7       THE COURT:  What paragraph is it?
 8       MR. CHERRY:  Do you have your complaint?
 9       MR. CORBITT:  Yes.  I think it's Paragraph 66.
10       MR. CHERRY:  Can I see?
11       (Brief pause.)
12       THE COURT:  He's right.  It says more than that.
13       MR. CHERRY:  I'm looking for the paragraph, but there
14  is -- I know there's a paragraph in here that says that they
15  participated -- here.  It's Paragraph 160.  It just says:
16            "The three predecessor companies of
17        Chimei Innolux -- Chi Mei Optoelectronics,
18        Innolux and TPO -- participated as
19        co-conspirators in the conspiracy."
20            There is no basis for that.
21       THE COURT:  I will give you leave to amend the
22  complaint to say -- if it's a new name because of the merger to
23  say what it is, but not to bring in the other two entities
24  unless there are specific factual allegations about them.
25       MR. CHERRY:  Okay.
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 9

```
1              MR. CORBITT:  Okay.

2              MR. BLUMENSTEIN:  Your Honor, Carl Blumenstein of

3    Nossaman for AU Optronics.

4              If we could go back to your Honor's first comment

5    regarding Quanta, Acer Display and Unipack, in their reply

6    papers what the plaintiff said, to make clear, was we just want

7    to add these allegations.  We are not naming them as party

8    defendants.

9              I think the complaint and the motion may have been a

10   little bit ambiguous with that, with regard to that

11   clarification, that the allegations will just come in.  We'll

12   deal with the allegations, but just to be clear, they are not

13   going to be named as party defendants, which I think we all

14   agree is --

15             THE COURT:  It's not possible.

16             MR. BLUMENSTEIN:  Right.

17             THE COURT:  I understood that.

18             MR. CORBITT:  That's correct, your Honor.  However,

19   in contrast to the issue we were just talking about with

20   Chi Mei, we think it's very clear that these predecessor

21   entities, while they were independent, were participants in the

22   conspiracy and that AUO is not liable for them.  We think

23   that's clearly alleged in here.

24             THE COURT:  But they are not named as defendants.

25             MR. CORBITT:  They can't be.  They don't exist any
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 10

```
 1   more.

 2           THE COURT:  Okay.  Hydis, I'm inclined to deny that.

 3   I just think it's too late to do that.  I think it's going to

 4   just take too much time and there's no good reason not to do

 5   this -- not to have done it before.

 6           I think it's -- I would give leave to name them as a

 7   co-conspirator, but not to bring them in as a defendant.

 8           The same thing about Mitsubishi, frankly.  I think

 9   it's too late to bring them in.

10           We can talk about Epson in a minute.  You want to add

11   co-conspirators.  You want to add Fujitsu, right, as a

12   co-conspirator?

13           MR. CORBITT:  Yes.

14           THE COURT:  Is it named as a co-conspirator in any of

15   the other complaints?

16           MR. CORBITT:  I don't know that it is, your Honor,

17   but we have alleged and we have evidence that they participated

18   in bilateral conspiracy meetings.  I'm not sure whether any

19   other plaintiff named them or not.

20           THE COURT:  What about Sony?

21           MR. CORBITT:  Sony has a joint venture with Samsung,

22   SCL -- SLCD, excuse me -- which is, we think, through that

23   joint venture, through Samsung's joint ownership and control of

24   that with Sony is a participant in the conspiracy and is a

25   co-conspirator.
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 11

```
 1        THE COURT:  Were they named as a co-conspirator in

 2   any of the other cases?

 3        MR. CORBITT:  Again, I don't know the answer.

 4        THE COURT:  Well, I am inclined at this time to grant

 5   that.

 6        With respect to the adding of any state claims, I

 7   will tell you that I'm inclined to deny your request to add

 8   Illinois.  I'm inclined to deny your request to add Oregon.

 9   I'm inclined to deny your request to add Missouri.

10        I wanted to ask you about New York.  You have already

11   got a claim, an indirect claim under New York state law.  And

12   you want to add the antitrust claim, the antitrust state law

13   claim, right?

14        MR. CORBITT:  Correct.

15        THE COURT:  The defendants suggest that that's going

16   to require a whole lot more briefing and decision making.  Do

17   you agree with that?

18        MR. CORBITT:  No, I don't, your Honor.  I think it's

19   a straightforward claim under state antitrust law, just like

20   the other states that you have that your Honor certified.  It's

21   the same class.  It's just a different relief that is now

22   available in light of the Supreme Court's *Shady Grove* decision.

23        Apparently, there are no new class reps there --

24        THE COURT:  Right because --

25        MR. CORBITT:  (Continuing) -- or anything like that.
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 12

 1          THE COURT:  Does anyone, any defendant want to talk

 2    about that?

 3          MR. LAZERWITZ:  Michael Lazerwitz for LG Display.

 4          Your Honor, all I would say is what we put on our

 5    papers, what -- our position is it's a little bit late in the

 6    day, but if your Honor is inclined to disagree with us, we will

 7    analyze the new claim and if we think we have a motion, we will

 8    file it.  If we don't, we won't.

 9          THE COURT:  I'm inclined to allow you to add the New

10    York antitrust claim on account of things you set out in your

11    papers, but, as I say, I'm inclined to deny Illinois, Missouri

12    and Oregon.

13          And then we get to the new class settlements.

14          MR. CORBITT:  I think Mr. Scarpulla may address the

15    settlements, so can I, if I may, your Honor, respond to your --

16          THE COURT:  You may briefly?

17          MR. CORBITT:  (Continuing) -- your inclination to

18    deny on the other points, which I -- I gather it all comes down

19    to the timeliness issue.

20          THE COURT:  I really does, yes.

21          MR. CORBITT:  And I guess --

22          THE COURT:  Timeliness and the timing.  We are now

23    however many months downstream from having certified your

24    class.  We are at least 12 months downstream from Mr. Scarpulla

25    having said, "We're ready to try this case next month," or

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 13

 1   Mr. Alioto or somebody.  Somebody said they were really ready,

 2   and now we are amending the complaint.  So now all those things

 3   go together to make me think it's not right.

 4          **MR. CORBITT:**  I guess I would say, your Honor, a lot

 5   has happened in the meantime, including a great deal of

 6   discovery that has been taken.  And this goes to the point of

 7   adding the new defendants, is that we, in fact, have testimony,

 8   have documents that there simply wasn't time to review a year

 9   ago when they were at the class cert stage that indicate the

10   involvement of these companies.

11          And we really didn't get underway with merits

12   depositions at all until, I think, right around the time the

13   class cert motions were argued, and there are now several dozen

14   of them.  There are several dozen more, I think, left to be

15   completed.

16          And many, many documents that -- out of millions that

17   were produced had not been finally reviewed at that stage,

18   which now have been.

19          So we now have evidence of participation by these

20   companies in the conspiracy.  We think that they are part of

21   it.

22          Moreover, we recognize that this case has been going

23   on for several years now, but by the same token, the discovery

24   cut-off that your Honor set is next May, which is eight months

25   from now.  And the trial date is nearly a year and a half from

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 14

1  now, in February 2012.  And we think in light of that, that

2  there is ample time to get whatever additional discovery may be

3  necessary from these companies.

4      There is no prejudice that we can see to the

5  defendants to the trial schedule.  We are obviously still

6  committed to that.  And, you know, we will do what it takes to

7  get the work done.

8      But you know, obviously, it's within your Honor's

9  discretion, but I think this is not the kind of situation, as

10  you've seen in some of the cases, where denial of leave to

11  amend was upheld by the Ninth Circuit, where there was just

12  extreme dilatoriness to the point of discovery would have to be

13  reopened or, you know, it was two weeks before trial or

14  anything like that.  We are not anywhere close to that.  We are

15  a long way away.

16      In terms of the states that we propose to add, in

17  particular Oregon and Illinois, that is a direct result of the

18  Supreme Court's decision last spring, I think in April -- I

19  don't remember the exact month -- in the *Shady Grove* case.

20      Prior to that, it was pretty clear under state law

21  that a class claim could only be brought by -- if it could be

22  brought, could only be brought by the Attorney Generals of

23  those states.  That was the precise issue that went up to the

24  Supreme Court in the context of New York law and the Supreme

25  Court said, no, that's wrong.  Rule 23 trumps the state laws,

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 15

1    or the state in that regard.  And as long as you can allege a

2    class under Rule 23 -- you can bring a case under Rule 23 even

3    if -- even despite the fact that if your case were in state

4    court, you could not do that.  Only the Attorney General could

5    do that.  So that is a clear change in the law, or at least an

6    explication of the law by the Supreme Court that is relatively

7    recent that simply did not exist at the time of the class cert.

8            And, again, we think that the burden to the

9    defendants would be minimal.  There are some new class reps,

10   but we would make them available right away.  We don't think

11   that the analysis of the issues in terms of the methodology for

12   class certification in terms of all the arguments the

13   defendants have made and presumably would make again about the

14   complexity of the distribution chain and all the difficulties

15   that pass through and so forth, these are the same issues that

16   your Honor has already ruled on and they are really no

17   different with respect to these new states.

18           So we think that that is a clear changed circumstance

19   and a recent changed circumstance that justifies adding those

20   states to the case, although they weren't in there previously.

21           Likewise, for Missouri.  Unfortunately, the Missouri

22   Attorney General, I think, was -- the woman from that office,

23   Ms. Schneider, was one of the people who intended to be on the

24   conference call, who is not present or tied in, but I would

25   respectfully request that since she supports the amendment and

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 16

```
 1   would like to see the Missouri state claim added to this case,
 2   that your Honor would allow her to participate or at least
 3   defer a ruling on that until she has an opportunity to address
 4   the Court.
 5            THE COURT:  Did she file something to that effect?
 6            MR. CORBITT:  I'm pretty sure she contacted --
 7            THE COURT:  No, no, no.  I mean, saying she supported
 8   your motion?  Did she file something?
 9            MR. CORBITT:  I don't recall that she filed it.  I
10   have had a number of conversations with her.
11            You know, frankly, since there was no opposition to
12   the concept of a Missouri claim per se, other than the general
13   points the defendants made in opposing the motion that
14   Mr. Lazerwitz had in his briefs and the other defendants and so
15   forth, she was prepared to come in and say something, but there
16   were no -- no questions raised about the substantive issues
17   under Missouri law or changes in the Missouri law that we
18   thought was necessary.
19            THE COURT:  Did she just file a lawsuit?
20            MR. CORBITT:  I'm sorry?
21            THE COURT:  Did she just file a lawsuit?
22            MR. CORBITT:  She filed a lawsuit, yes, I think about
23   a month ago, around the same time at the time rest of the
24   states filed a case.
25            THE COURT:  All right.  Well, she -- I'm sorry for
```

1    the telephone awkwardness.  If she wants to file something,

2    I'll be happy to take a look at it.

3            **MR. CORBITT:**  I appreciate that.

4            **THE COURT:**  I had not understood her to be supporting

5    your motion.

6            Okay.  What else?

7            **MR. CORBITT:**  There are only a couple of states that

8    don't like this, your Honor.  The rest of them are in favor

9    enough of it.

10           Well, I think those are the main points that I would

11   make, your Honor.  The rest of it is in our papers.

12           But, again, I would urge you that the timeliness

13   issue is -- I understand, obviously, your Honor's desire to get

14   this case moving, to not have a delay, to keep the discovery

15   cut-off, to keep the trial date.  We fully support that.  No

16   one wants that more in any case than plaintiffs do.  In

17   particularly, we do.  And we would not have tried to do this

18   had we not thought that there was really more than sufficient

19   time in order to get this done.

20           And, also, respectfully we think that the Supreme

21   Court's *Shady Grove* decision is ample grounds to permit an

22   amendment to add these additional states when we could have

23   done it before.

24           **THE COURT:**  All right.  Thank you.

25           **MR. HAGLUND:**  Mike Haglund representing the State of

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 18

```
 1   Oregon.

 2           One of the points we did not make in our papers is

 3   this, your Honor.  We filed our case in the District of Oregon

 4   on August 10th.  It's now been transferred and is in your

 5   court.

 6           The scope of the amendment that the plaintiffs -- the

 7   indirect plaintiffs seek in their amended complaint excludes

 8   governmental entities.  It's a much more practical approach to

 9   let the superior -- the lawyers with the superior ability to

10   represent Oregon governments and Oregon consumers, the Attorney

11   General, to proceed with Oregon's case.

12           If the amendment were granted, we have this situation

13   where the indirect purchaser plaintiffs here are representing

14   Oregon consumers, yet, we stay in the case as the Attorney

15   General representing State of Oregon interests on behalf of the

16   state government and all of the local governments, some 2,000

17   estimated total governmental entities in the state.

18           The other point I would like to make --

19           THE COURT:  You oppose his motion?

20           MR. HAGLUND:  Absolutely.

21           THE COURT:  That would be a bad thing, you think.

22           MR. HAGLUND:  It's a very, I think, awkward and

23   impractical approach to the State of Oregon's claims, which

24   have not heretofore been in the case because of the way the

25   class was defined.  To have, in effect, Oregon claimants
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 19

31

```
1  bifurcated, governments represented by the AG and consumers
2  represented by the independent -- or by the indirect purchaser
3  plaintiffs.
4         The other point I think that's worth making is that
5  their reading of Shady Grove is incorrect.  Justice Stevens was
6  quite clear in the opinion that his -- the applicable opinion
7  in that case; that even where a state procedural statute may
8  be, as he put it, procedural in the ordinary sense, it may be
9  so bound up with the substantive rights given -- applicable to
10 a particular claim that it still must give way or the federal
11 rule must still give way to that combination of procedure and
12 substance.  That's exactly what we have here.
13        Oregon adopted it's own repealer, Illinois Brick.
14 It's abundantly clear that the AG, both under that state
15 statute as well as under Section 16 of the Clayton Act, is the
16 right law firm to represent Oregon consumer as well as
17 governmental interests.  Their reading of Shady Grove, as if
18 Rule 23 simply trumps everything associated with these state
19 repealers is just an incorrect analysis of Shady Grove.
20        Thank you.
21        THE COURT:  All right.  Thank you.
22        MR. HARROP:  Your Honor, this is Blake Harrop on
23 behalf of the State of Illinois.
24        We are finding that as long as we stay on mute here,
25 we can hear you; but as soon as I take you off mute, I cannot
```

1   hear anybody in the courtroom.  So I'm going to sort of do this

2   like a walkie-talkie and try to be short with what I say.

3          I support everything that Mr. Haglund just said and

4   want to emphasize as well that the Illinois statute is clearly

5   a substantive statute that would under the readings of both the

6   assent and the current -- that is, five justices of the Supreme

7   Court -- be one that should be honored ahead of a private

8   action under class certification.

9          **THE COURT:**  Thank you.

10         **MR. CORBITT:**  May I respond briefly, your Honor?

11         **THE COURT:**  Briefly.

12         **MR. CORBITT:**  *Shady Grove*, we think, they are just

13  wrong, but your Honor can read the case and obviously decide

14  for yourself.

15         But the whole point of *Shady Grove* is that when you

16  are in Federal Court, Rule 23 applies.  If you meet the

17  requirements of Rule 23, you can have a class.

18         With respect to the comments by the gentleman from

19  Oregon, Oregon does not purport to represent businesses, only

20  natural persons as we understand it.  And so, therefore, the

21  same gap that he alleges would be present if we don't represent

22  governmental entities is present, I think, in his complaint.

23         Moreover, your Honor, we already represent consumers

24  and businesses in Oregon and Illinois and all the other states

25  to this extent.  Your Honor certified a nationwide injunctive

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 21

1    class, which is, obviously, everybody in the country.

2            You know, we've been doing this case for three years.

3    We've put a tremendous amount of effort into it, as your Honor

4    knows.  We've these classes certified.  We've taken dozens and

5    dozens of depositions and reviewed millions of documents.  And

6    so the notion that Attorney Generals, with all due respect,

7    three years later can come in and file a case and therefore it

8    should be presumed that what they do is superior to what we can

9    do, we think is just wrong and is also contrary to the

10   principle enunciated in the State of Hawaii case from many

11   years ago by the Supreme Court, which is that an antitrust case

12   as class actions are superior to parents claims.

13           **THE COURT:**  Now, I wanted to talk about the Epson and

14   Chung Hwa settlements.

15           **MR. SCARPULLA:**  Good afternoon, your Honor.  Francis

16   Scarpulla appearing on behalf of the indirect purchasers on

17   that issue, your Honor.

18           **THE COURT:**  Good afternoon.

19           I'm very concerned that because the -- well, we have

20   objections by Oregon, Washington and Illinois.  We have an

21   attorney for Oregon in the courtroom, right?

22           Do we have Illinois or Washington on the phone?

23           **UNIDENTIFIED VOICE:**  Yes, your Honor.  We are here.

24           **THE COURT:**  Okay.  My concern is that I now realize

25   because of the issues raised in Epson, and thinking back on

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

Exhibit B, Page 22

# EXHIBIT C



ANNUAL REPORT **2011**
including the Annual Financial Report

Exhibit C, Page 23



*Société anonyme* with a share capital of €223,759,083
Registered Office: 1-5, rue Jeanne d'Arc
92130 Issy-Les-Moulineaux
Nanterre Register of Commerce and companies No. 333 773 174

# ANNUAL REPORT **2011**



This Registration document *(Document de Référence)* was filed with the *Autorité des Marchés Financiers* (AMF) on March 27, 2012 in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note *(note d'opération)* approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

This registration document can be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

Exhibit C, Page 24

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA, Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson/Technicolor sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC should render its decision in 2012, but the Company considers that the timetable for the remainder of this proceeding cannot be accurately determined.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

## Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998.

In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway.

It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, TCETVT has incurred approximately U.S.$11 million in remediation costs. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$6.3 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate.

In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

Exhibit C, Page 25

# EXHIBIT D



**2010**
ANNUAL
REPORT

# 2010 Annual Report



*Société anonyme* with a share capital of €174,846,625

Registered Office: 1-5, rue Jeanne d'Arc

92130 Issy-Les-Moulineaux

Nanterre Register of Commerce and Companies No. 333 773 174



This Registration document (*Document de Référence*) was filed with the *Autorité des Marchés Financiers* (AMF) on March 30, 2011, in accordance with Article 212-13 of the AMF General Regulations. It may be used in connection with a financial transaction provided it is accompanied by a transaction note (*note d'opération*) approved by the AMF. This document was prepared by the issuer and is the responsibility of the signatories thereof.

Copies of this registration document are available free of charge from Technicolor.

This registration document can also be consulted on the website of the AMF (French version only) (www.amf-france.org) and on the website of Technicolor (www.technicolor.com).

Exhibit D, Page 27

of the Company's revenue. Pegasus has not yet definitively set forth in the litigation the per unit royalty figure or damages sum they seek in the case.

Pegasus also seeks an injunction to prohibit further sales of IRD's which allegedly infringe the patents in suit. If Pegasus were successful in the litigation and able to convince the Court to enter a permanent injunction, the Company's IRD sales could be disrupted. The Company notes, however, that all of the patents asserted against the Company have already expired, with the exception of one which is set to expire in August 2011. (In October, 2010, the Board of Patent Appeals reversed its initial decision ruling the patent in question unpatentable). The Company believes the court is unlikely to issue an injunction prior to the expiration of the last patent. Upon expiration of the last patent, the Company would be free to pursue IRD sales with no risk of an injunction; therefore the risk of this litigation relates primarily to the damages claimed by Pegasus, which amount, as indicated above, Pegasus has not yet claimed.

The stay of proceedings entered by the Delaware District Court in May 2003 remains in effect. The USPTO has now confirmed as patentable four claims of three patents asserted against the Company in the Delaware District Court litigation. However, a third request for re-examination of one of those patents has been tendered to the USPTO and Pegasus and PMC have appealed the rejection of certain asserted claims, all of which could affect the actual claims ultimately confirmed as patentable.

## IP Innovation and Technology Licensing Corp.

On June 20, 2003, Technology Licensing Corp. ("TLC") filed a lawsuit in the US District Court for the Eastern District of California alleging that certain Grass Valley Group products infringe four of TLC's US patents. Thereafter, TLC placed two of the patents into re-issue proceedings before the United States Patent and Trademark Office.

As a result, this lawsuit was stayed as to those patents pending reissue. Both patents have now reissued, and on October 2, 2009, the trial court formally lifted the stay of proceedings. A case management plan has been put in place with a projected September 2011 trial date. Because of the stay, the case is still in the early stages of development. The Company has received a favourable ruling in early claim construction proceedings. The purchaser of the Grass Valley Broadcast Business has contractually agreed to indemnify and hold the Company harmless in connection with this lawsuit, which is being vigorously defended.

In June and July 2005, the District Court granted summary judgment in favour of Technicolor on the remaining two patents. TLC appealed that ruling to the US Federal Circuit Court of Appeals.

In July 2006, the parties entered into a Settlement and License Agreement resolving all issues pertaining to the Appeal.

## Rembrandt Technologies v. Fox Entertainment and NBC

In December of 2006, Rembrandt Technologies filed separate lawsuits against Fox and NBC in the US District Court for the District of Delaware. Each suit alleges that defendants Fox and NBC infringe US Patent 5,243,627 entitled "Signal Point Interleaving Technique" (the "'627 patent") by transmission, or receipt and retransmission, over Fox and NBC television systems, of digital terrestrial broadcast signals that comply with the ATSC digital television standard. Both Fox and NBC have subsequently demanded that Technicolor defend and indemnify them in each case,

alleging that Rembrandt's infringement allegations are in essence based upon digital television transmission equipment sold to Fox and NBC by Thales Broadcast and Multimedia, which the Company acquired in December 2005.

While Technicolor has made no commitment with respect to Fox and NBC's demands for indemnity in the event of a settlement or judgment against them, Technicolor has agreed, subject to certain conditions and restrictions, to fund a portion of the defense costs in each case.

On November 8, 2008, the District Court issued an order construing the claims of the '627 patent. Rembrandt has conceded that it cannot prove infringement of the patent under the Court's claim construction, and in March of 2009 the parties reached an agreement in principle which has allowed for the early filing of a motion for summary judgment of non-infringement. Upon entry of a judgment in favour of defendants, Rembrandt has indicated its intention to appeal the judgment to the Federal Circuit Court of Appeals.

## Cathode Ray Tubes Investigations

On November 28, 2007, Technicolor USA Inc. (US) (formerly Thomson, Inc.) received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses.

In addition, class action law suits asserting private antitrust claims were filed in early 2008 in the United States that originally named Thomson and others as defendants, although Thomson/Technicolor was dropped as a named defendant when amended complaints were filed in the spring of 2009.

On January 9, 2008, Thomson received a request under art 18 (2) of Council Regulation n°1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively.

Thomson sold its CPT business in 2005 and never had activity in the CDT business. The Company has taken measures it considers appropriate to investigate the background to, and respond to, the subpoena and the EC requests.

On November 25, 2009, Thomson received a Statement of Objections ("SO") from the European Commission. The SO is an intermediate step in the EC's investigation and, therefore, is not in the nature of a final decision by the EC.

On March 3, 2010, Thomson/Technicolor filed its written response to the "SO". On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct. Thomson/Technicolor also informed the European Commission about its financial situation and continues to cooperate closely with the European Commission. The EC decision is expected sometime in 2011, but with no certainty.

On April 29, 2010 Technicolor's Brazilian affiliate received notice from the Brazilian Ministry of Justice indicating Brazilian authorities are initiating an investigation of possible cartel activity within the CRT industry in Brazil.

The Board of Directors has conducted a thorough examination of the risk associated with these proceedings and has determined that at this stage there are too many uncertainties to assess the extent of any liability

Case 4:07-cv-05944-JST Document 1732-2 Filed 07/02/13 Page 848 of 852
Case 3:07-cv-05944-SC Document 1629-2 Filed 04/02/13 Page 348 of 36

| Financial statements

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

9

that Technicolor may incur in consequence of these investigations. Given these conditions, the criteria for establishing a reserve are not satisfied.

# Environmental matters

A certain number of Technicolor's current and previously-owned manufacturing sites have an extended history of industrial use. Soil and groundwater contamination, which occurred at some sites, may occur or be discovered at other sites in the future. Industrial emissions at sites that Technicolor has built or acquired expose the Group to remediation costs. The Group has identified certain sites at which chemical contamination has required or will require remedial measures.

Soil and groundwater contamination was detected at a former production facility in Taoyuan, Taiwan acquired in the 1987 transaction with General Electric Company and Technicolor's affiliate in Taiwan owned the facility from approximately 1988 to 1992, when it was sold to an entity outside the Group. Soil remediation was completed in 1998. In 2002, the Taoyuan Environmental Protection Bureau ordered remediation of the groundwater underneath the former facility. The groundwater remediation process is underway. It is Technicolor's position that General Electric Company has a contractual obligation to indemnify Technicolor with respect to certain liabilities resulting from activities that occurred prior to the 1987 agreement with General Electric. General Electric denies the existence of any such obligations to Technicolor.

To date, in order to comply with the Environmental Protection Bureau's order, TCETVT has incurred approximately U.S.$7.2 million for the groundwater remediation. In the class action case referenced above under "Taoyuan County Former RCA Employees' Solicitude Association", TCETVT has incurred approximately U.S.$5.7 million to date to defend the action. It is TCETVT's position that General Electric is responsible for most if not all of the costs incurred by TCETVT for both matters, including all future costs and any judgment awarded.

In addition to soil and groundwater contamination, the Group sells or has sold in the past products which are subject to recycling requirements and is exposed to changes in environmental legislation affecting these requirements in various jurisdictions.

The Group believes that the amounts reserved and the contractual guaranties provided by its contracts for the acquisition of certain production assets will enable it to reasonably cover its safety, health and environmental obligations. However, potential problems cannot be predicted with certainty and it cannot be assumed that these reserve amounts will be precisely adequate. In addition, future developments such as changes in governments or in safety, health and environmental laws or the discovery of new risks could result in increased costs and liabilities that could have a material effect on the Group's financial condition or results of operations. Based on current information and the provisions established for the uncertainties described above, the Group does not believe it is exposed to any material adverse effects on its business, financial condition or result of operations arising from its environmental, health and safety obligations and related risks.

Exhibit D, Page 29

# EXHIBIT E

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 6–K

**Report of foreign Private Issuer**
**Pursuant to Rule 13a – 16 or 15d – 16 of**
**the Securities Exchange Act of 1934**

For the month of February, 2008

Commission File Number: 0–3003

# THOMSON

**46 quai A. Le Gallo**
**92648 Boulogne Cedex**

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20–F or Form 40–F.

Form 20–F ☒   Form 40–F ☐

Indicate by check mark if the registrant is submitting the Form 6–K in paper as permitted by Regulation S–T Rule 101 (b) (1): ☐

Note: Regulation S–T Rule 101 (b) (1) only permits the submission in paper of a Form 6–K if submitted solely to provide an attached annual report to security holders.

Indicate by check mark if the registrant is submitting the Form 6–K in paper as permitted by Regulation S–T Rule 101 (b) (7): ☐

Note: Regulation S–T Rule 101 (b) (7) only permits the submission in paper of a Form 6–K if submitted to furnish a report or other document that the registrant foreign private issuer must furnish and make public under the laws of the jurisdiction in which the registrant is incorporated, domiciled or legally organized (the registrant's "home country"), or under the rule of the home country exchange on which the registrant's securities are traded, as long as the report or other document is not a press release, is not required to be and has not been distributed to the registrant's security holders, and, if discussing a material event, has already been subject of a Form 6–K submission or other Commission filing on EDGAR.

Indicate by check mark whether the registrant by furnishing the information contained in this Form is also thereby furnishing the information to the Commission pursuant to Rule 12g3–2(b) under the Securities Exchange Act of 1934.

Yes ☐   No ☒

If "yes" is marked, indicate below the file number assigned to the registrant in connection with Rule 12g3–2(b) : 82– _____

– Thomson Group –
## NOTES TO THE UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS

**STV Asia, LTD v. Premier Retail Network**

On March 2, 2006 STV Asia, LTD ("STV") filed suit in the U.S. District Court for the Northern District of California against Premier Retail Networks ("PRN"), Thomson subsidiary since August 2005, alleging that PRN's "in store media network" infringes two U.S. patents allegedly owned by STV. On May 15, 2007, the parties, including the Securityholder Agent for the former PRN shareholders, entered into agreements fully resolving all claims which were the subject of the lawsuit without any material impact for the group.

**Rembrandt Technologies v. Fox Entertainment and NBC**

In December of 2006, Rembrandt Technologies filed separate lawsuits against Fox and NBC in the U.S. District Court for the District of Delaware. Each suit alleges that defendants Fox and NBC infringe U.S. Patent 5,243,627 entitled "Signal Point Interleaving Technique" (the "'627 patent") by its transmission, or receipt and retransmission, over Fox and NBC television systems, of digital terrestrial broadcast signals that comply with the ATSC digital television standard. Both Fox and NBC have subsequently demanded that Thomson defends and indemnifies them in each case, alleging that Rembrandt's infringement allegations are in essence based upon digital television transmission equipment sold to Fox and NBC by Thales Broadcast and Multimedia, a business which Thomson acquired in December 2005 from Thales (a French group, listed on the Euronext market). While Thomson has made no commitment with respect to Fox and NBC's demands for indemnity in the event of a settlement or judgment against them, Thomson has agreed, subject to certain conditions and restrictions, to fund a portion of the defense costs in each case. The cases are scheduled for trial in October 2009 and are being vigorously defended.

**Cathode Ray Tubes Investigations**

On November 28, 2007, Thomson Inc. received a subpoena issued on behalf of the Antitrust Division of the U.S. Department of Justice ("DOJ") investigating alleged anticompetitive conduct in the Cathode Ray Tubes ("CRT") industry, including Color Picture Tubes ("CPT") and Color Display Tubes ("CDT") businesses. On January 9, 2008 Thomson received a request under art 18(2) of Council Regulation n°1/2003 from the European Commission (the "EU") also relating to the CRT industry. In addition, class action law suits asserting private antitrust claims against Thomson (and other companies currently or formerly in the CRT industry) have been filed on January 28, 2008 in the United States in the District of New Jersey. Thomson sold its "CPT" business in 2005 and never had activity in the CDT business. It is Thomson's policy to conduct business in full compliance with all applicable competition laws. The Company is taking appropriate measures to respond to the subpoena and the EU request.

– 84 –

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 15, 2008

| | |
|---|---|
| By: | **/s/ Julian Waldron** |
| Name: | Julian Waldron |
| Title: | Senior Executive Vice President, Chief Financial Officer |